Aidan M. McCormack (AMM 3017)
R. Brian Seibert (RS 1978)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
(212) 335-4501 (fax)
aidan.mccormack@dlapiper.com
brian.seibert@dlapiper.com
*Attorneys for Plaintiff*
*Senior Health Insurance Company of Pennsylvania*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------- X

SENIOR HEALTH INSURANCE COMPANY :
OF PENNSYLVANIA,

             :

          Plaintiff,

             :

    v.

             :    Case No.

BEECHWOOD RE LTD., B ASSET
MANAGER, L.P., BEECHWOOD BERMUDA   **COMPLAINT AND**
INTERNATIONAL, LTD., BEECHWOOD RE :   **DEMAND FOR TRIAL BY JURY**
INVESTMENTS, LLC a/k/a BEECHWOOD
RE INVESTORS, LLC, ILLUMIN CAPITAL :
MANAGEMENT, LP, MOSHE M. FEUER
a/k/a MARK FEUER, SCOTT A. TAYLOR, :
DAVID I. LEVY, DHRUV NARAIN, and
JOHN DOES 1-10,             :

             :

          Defendants.

---------------------------------------- X

      Plaintiff Senior Health Insurance Company of Pennsylvania ("SHIP") brings this action

against defendants Beechwood Re Ltd. ("Beechwood Re"), B Asset Manager, L.P. ("BAM"),

Beechwood Bermuda International, Ltd. ("BBIL"), Beechwood Re Investments, LLC a/k/a

Beechwood Re Investors, LLC ("BRILLC"), and Illumin Capital Management, LP ("Illumin")

(collectively, the "Beechwood Advisors") and their current and former owners, officers, and

insiders, Moshe M. Feuer a/k/a Mark Feuer, Scott A. Taylor, David I. Levy, Dhruv Narain (collectively, the "Individual Defendants" and, with the Beechwood Advisors, "Beechwood" or "Defendants"), and John Does 1-10.

## NATURE OF THE ACTION

1.      This action arises from Beechwood's deceit, intentional misconduct, and extreme incompetence in the promotion and sale of investments to SHIP and in Beechwood's subsequent mismanagement and misuse of $320 million in policyholder reserves entrusted to it by SHIP through and related to three Investment Management Agreements (the "IMAs").

2.      The IMAs guaranteed SHIP an annual return of 5.85 percent, based on what Beechwood represented to be a conservative investment strategy that would be appropriate to SHIP's status as an insurer in run-off.  Beechwood failed to deliver on the guaranteed returns and also has failed to deliver all of SHIP's investment principal back to it.  Defendants failed to deliver because, once they secured control over SHIP's funds for investment, they jettisoned their promises to invest safely and in SHIP's best interest.  Beechwood instead used SHIP's funds to prop up and perpetuate highly speculative, distressed, and fraudulently valued investments that did not suit or benefit SHIP.

3.      Beechwood also favored its own interests and the interests of undisclosed but related third parties and affiliates who conspired with and effectively controlled Beechwood, all to SHIP's detriment.  These related parties were associated with Platinum Partners, described in more detail below.  Many of the individuals who were granted improper access to, and who benefited from the improper use of, SHIP's funds ultimately were indicted in federal court for

their misdeeds.  Defendant Levy and others are scheduled for criminal trial on January 7, 2019 for at least some of their Platinum-related actions.

4.      As Beechwood pursued this scheme over a period of multiple years, it consistently misled SHIP and presented financial reports that showed inflated and false valuations for SHIP's investments that concealed the misconduct and the portfolio's true value. Beechwood presented these inflated and false investment valuations in order to show inflated and false investment returns.  These false returns allowed Beechwood to claim and collect from SHIP substantial advisory performance fees that it had not actually earned and that were only recoverable under the IMAs after SHIP's actual investment performance exceeded the guaranteed 5.85 percent annual return.

5.      Beechwood's misconduct is particularly egregious in light of the fact that SHIP is the solvent run-off of a diminishing closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into, Conseco Senior Health Insurance Company (as SHIP was then known) between 1997 and 2000.  SHIP is owned by a trust formed with the assistance and approval of the Pennsylvania Department of Insurance to oversee the run-off.  Any excess trust assets that remain after the payment of all insurance liabilities ultimately inure to the benefit of a charity to be identified when SHIP's business is complete.  Hence, SHIP operates without a profit motive and solely for the benefit of its policyholders, who have purchased long-term care coverage to protect them when they are elderly, in failing health, and at their most vulnerable.

6.      Beechwood, primarily through statements by Feuer, Taylor, and Levy as well as through written materials, represented to SHIP and to others that the Beechwood Advisors were

part of a large, well-capitalized reinsurance group formed by Feuer and Taylor through the use of family money and other resources accumulated during successful careers as insurance and investment professionals.

7.     Initially formed in 2013, Beechwood Re was and is a reinsurer domiciled in Grand Cayman and regulated by the Cayman Islands Monetary Authority (the "CIMA").  On July 25, 2017, after this scheme ultimately was exposed, the CIMA placed Beechwood Re into Controllership.  BBIL, also formed in 2013, was licensed as an insurer located in Hamilton, Bermuda and regulated by the Bermuda Monetary Authority.  BAM was an investment entity created and controlled by Beechwood Re and BBIL.  BRILLC guaranteed the promised investment return under the BAM IMA.  These entities all shared common and inter-related ownership and control at all relevant times.

8.     The Beechwood Advisors, through the Individual Defendants, collectively touted themselves to reinsurers as the solution to shortages in reinsurance capacity for the life insurance markets and claimed a particular expertise in underwriting certain markets, such as long-term care, associated with specific asset risks and in providing flexibility for insurers seeking to manage their balance sheets and risk profiles.

9.     From their initial meetings and discussions onward, Beechwood consistently represented to SHIP and others that Beechwood clients were strongly protected by an asset management process that included compliance with pre-agreed investment guidelines, 24/7 client access to portfolio information and independent valuation by a national firm, independent rating by an SEC-approved and nationally recognized rating organization, and backing of investments

by hard assets and other tangible collateral.  Beechwood also promoted its ability to generate substantial and consistent returns based on the team's significant investing experience.

10.     Based on these oral and written representations and other available information, SHIP believed Beechwood to be a legitimate and trustworthy enterprise.  SHIP's confidence in Beechwood was bolstered by its knowledge that, in early 2014, Beechwood Re had entered into regulator-approved reinsurance transactions with Bankers Conseco Life Insurance Company ("BCLIC") and Washington National Insurance Company ("WNIC") (collectively, and as part of the CNO Financial Group, or "CNO").  These transactions involved $550 million of statutory reserves and approximately $40 million of other capital associated with closed blocks of long-term care insurance that were underwritten by BCLIC and WNIC.

11.     SHIP was aware of the BCLIC and WNIC reinsurance arrangements through SHIP's affiliate, Fuzion Analytics, LLC ("Fuzion"), which acts as a third-party policy and claims administrator for policies of long-term care business issued by various insurers, including SHIP. On February 1, 2014, Fuzion had entered into a Master Services Agreement with Beechwood Re pursuant to which Fuzion agreed to administer the WNIC and BCLIC long-term care insurance policies and certificates reinsured by Beechwood Re.

12.     Given the distressed nature of SHIP's book of business, Beechwood Re indicated that it was unwilling to enter into a similar reinsurance arrangement with SHIP pursuant to which Beechwood would, in essence, take SHIP's reserves and then assume the financial obligation to pay policy claims.  Beechwood nevertheless advised SHIP that it could gain access to the same kinds of allegedly high-quality, high-yield investments that supported the BCLIC and WNIC agreements by entering into investment management agreements with the Beechwood Advisors.

13.     Beechwood represented to SHIP, including in an April 10, 2014 email and attachment before any agreements were reached to invest, that Beechwood managed assets and investments conservatively, with a "credit-focused investment strategy which focuses on capital preservation," that it had a strong culture of risk management and transparency, and that it used best in class third party vendors.  These representations persuaded SHIP that Beechwood would be able to satisfy the performance guarantees that it was promising to SHIP.

14.     Nothing could have been further from the truth.

15.     In reality, the Beechwood Advisors and their related entities were formed as a mechanism to funnel money into Platinum Partners, L.P. ("Platinum" or "Platinum Partners"), a Manhattan-based hedge fund founded by Mark Nordlicht ("Nordlicht"), Murray Huberfeld ("Huberfeld"), and David Bodner ("Bodner") to prolong their existing Ponzi-like scheme.

16.     Although SHIP did not know Platinum or understand its secretive relationship with Beechwood, it appears that Platinum Partners falsely claimed that its funds averaged returns of 17% from 2003 to 2015 and guaranteed its investors liquidity on notice of 60 to 90 days.  That performance was grossly overstated, as set forth in criminal complaints and indictments brought against Huberfeld (*U.S. v. Seabrook  and Huberfeld*, 16-CR-467 (S.D.N.Y.)) and Nordlicht, Levy, and others (*U.S. v. Nordlicht, et al.*, 16-CR-640 (E.D.N.Y.)) in December 2016 (collectively, the "Criminal Indictments"), as well as in the United States Securities and Exchange Commission Complaint brought against certain Platinum entities, Levy, and others in December 2016 (*U.S. Sec. & Exch. Comm'n v. Platinum Management (NY) LLC, et al.*, 16-cv-6848-BMC (E.D.N.Y.)) (the "SEC Complaint").  Huberfeld already has pled guilty to certain

charges relating to Platinum activities, and many individuals remain under indictment and face the prospect of criminal trials.

17.     In truth, since at least 2012, Platinum Partners had been suffering severe liquidity problems and needed constant cash infusions to prop up its funds and support redemptions. Platinum Partners founders Nordlicht, Huberfeld, and Bodner could not attract investments directly from institutional investors because of their history of criminal convictions and civil liability.  To overcome this obstacle, Platinum surreptitiously partnered with Feuer, Taylor, and Levy (Huberfeld's nephew) to form the Beechwood Advisors and their related entities and devised a plan to secure access to the assets of insurers.  The Beechwood Advisors entered into investment management agreements and reinsurance treaties with insurance companies, took control of insurance company assets, and then secretly funneled those assets to Platinum Partners and related parties in the form of investments that were artificially and fraudulently valued.  By executing the IMAs, SHIP became one of the victims of this scheme.

18.     In addition to Beechwood's undisclosed role in propping up Platinum Partners, Feuer, Taylor, and Levy personally profited from the artificial and fraudulent valuation of Beechwood's asset holdings.  Beechwood's compensation under the IMAs derived from its right to retain annual investment returns that exceeded the 5.85% return guaranteed to SHIP.  Because Beechwood's investments of SHIP's funds were not in truth generating positive returns, no fees were earned.  Undaunted, Feuer, Taylor, and Levy, in concert with Platinum Partners and with the aid of Beechwood's paid advisors and consultants, submitted reports to SHIP, using the mails and wires of interstate commerce, that contained inflated and false valuations purporting to show that Beechwood's investments, particularly its Platinum-related investments, were performing

well and that SHIP's invested funds and guaranteed returns were secure.  These false reports provided the necessary cover that permitted the Beechwood Advisors to reward themselves fraudulently with commissions that had not in reality been earned.  At the same time, SHIP's invested principal secretly was shrinking in value and remained exposed to undisclosed but massive risk and uncertainty.

19.     During the course of the relationship between Beechwood and SHIP, Narain and a company he formed, Illumin, became involved in Beechwood's performance under the IMAs and in communicating directly with SHIP.  Narain became involved no later than January 2016, though it is possible he was involved earlier.  Illumin was formed by Narain and possibly others, as described in this Complaint.  Narain and Illumin made many false representations and helped advance the scheme and conspiracy to defraud SHIP.  Narain is included in this Complaint's definition of "Individual Defendants," Illumin is included in the definition of "Beechwood Advisors," and both are included in the definition of "Defendants."  These summary definitions, however, are only intended to include Narain and Illumin with reference to the time periods during which they were actually involved in Beechwood's dealings relevant to SHIP.

20.     SHIP was not told about Platinum's close connections to and control over Beechwood, and in any event Platinum's financial distress remained a secret until the summer of 2016.  Consistent with Beechwood's undisclosed fraudulent enterprise with Platinum Partners and its principals, and contrary to the representations made to SHIP as well as the obligations accepted by the Beechwood Advisors under the IMAs, Beechwood used the funds entrusted to it by SHIP to prop up and finance Platinum Partners' fraudulent investment schemes.  Beechwood caused SHIP to exchange unburdened cash for distressed debt and equity interests in entities

controlled by Platinum Partners that Beechwood understood, or was grossly negligent in failing to understand, were excessively risky and unsuitable for an insurer, particularly for an entity in run-off like SHIP.  Beechwood further acted in bad faith by favoring its own investment interests and those of its related parties and affiliates, all to the detriment of SHIP.

21.    The scheme to defraud SHIP eventually began to unravel.  On June 8, 2016, Huberfeld was arrested and charged with bribing a union official to make a $20 million investment in one of Platinum's funds.  Platinum's deep connections to Beechwood, however, remained undisclosed.  On July 25, 2016, Platinum's relationship with Beechwood was first reported in the press.  Over the course of the summer and fall of 2016, the *Wall Street Journal* ("*WSJ*") and other publications gradually exposed Beechwood's ties to Platinum Partners. Published sources uncovered and reported that Huberfeld and Nordlicht had used Beechwood to attract institutional investors.  According to a September 17, 2016 *WSJ* article, "[s]ince early 2014, Beechwood has put more than $200 million of client money in Platinum-linked investments, according to public filings and people familiar with the matter."

22.    Despite these unfolding revelations, Beechwood refused to accept responsibility and, just the opposite, continued to insist that it was performing in a manner consistent with its obligations under the IMAs.  For example, on the day after the July 25, 2016 *WSJ* article indicating a relationship between Beechwood and Platinum, Beechwood sent a letter to SHIP assuring it that SHIP's assets were secure and that Beechwood maintained strong safeguards to protect its client.  The Individual Defendants similarly gave oral reassurances to SHIP in this time period.  Feuer's July 26, 2016 letter falsely reassured SHIP that there was no reason to believe that SHIP's Platinum-related investments "suffered financial harm."  In July, August,

and September 2016, Feuer admitted in letters and published sources that Beechwood had not revealed to SHIP or other clients the nature and extent of the firm's investment ties to Platinum or that Platinum-related parties had owned a significant portion of Beechwood Re and related Beechwood entities.

23.     Despite the slow revelation in the second half of 2016 of these Platinum entanglements, Feuer and Beechwood continued to minimize and misstate the nature and extent of those ties, and Feuer and others continued to insist that Beechwood's investments – and SHIP's – were not materially harmed by Platinum's problems. Feuer also repeatedly claimed, orally and in writing, that Beechwood was severing ties with Platinum and that there was no known negative effect to SHIP.

24.     As a result of Defendants' mismanagement and misuse of the more than $270 million in funds that SHIP entrusted to Beechwood for investment under false pretenses through the IMAs, and another $50 million provided outside the IMAs, SHIP has sustained hundreds of millions of dollars in economic injury from Beechwood's Ponzi-like scheme. SHIP brings this action to recover the losses it has sustained as a result of Beechwood's misconduct, which includes breaches of contract and fiduciary duty, bad faith, gross negligence, fraudulent inducement and misrepresentations, and participation in a fraudulent scheme and racketeering activity that has resulted in multiple criminal indictments.

## PARTIES

25.     Plaintiff Senior Health Insurance Company of Pennsylvania is an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

26.     Defendant Beechwood Re Ltd. is a reinsurance company domiciled in the Cayman Islands, which had offices in New York, New York at all relevant times.

27.     Defendant B Asset Manager LP is a limited partnership domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

28.     Defendant Beechwood Bermuda International, Ltd. is a reinsurance company domiciled in Bermuda, which had offices in New York, New York at all relevant times.

29.     Defendant Beechwood Re Investments, LLC is a limited liability company domiciled in Delaware, which had its principal place of business in New York, New York at all relevant times.

30.     Defendant Illumin Capital Management, LP is a limited partnership formed in Delaware, which had its principal place of business in New York, New York at all relevant times.

31.     Defendant Moshe M. Feuer a/k/a Mark Feuer is a resident of Lawrence, New York.

32.     Defendant Scott A. Taylor is a resident of New York, New York.

33.     Defendant David I. Levy is a resident of New York, New York.

34.     Defendant Dhruv Narain is a resident of Purchase, New York.

35.     Upon information and belief, defendants John Does 1-10 are unnamed and unknown individuals or entities who directly or indirectly acted in furtherance of and benefited from Beechwood's scheme of self-dealing, deceit, intentional misconduct, and extreme mismanagement of SHIP's funds and investments, all to SHIP's detriment and harm.  Any references in this Complaint to the terms defined in the introductory paragraph or elsewhere,

including "Beechwood" or "Defendants," do not refer specifically to the Doe defendants unless expressly noted otherwise. As set forth in this Complaint, the scheme and conspiracy at issue necessarily involved additional individuals and entities. Their particular identities and roles cannot currently be identified by SHIP, but are known to the Defendants identified in this Complaint. These necessary additional actors facilitated the scheme and conspiracy and enjoyed the benefits of favoring their interests over SHIP's best interests.

## JURISDICTION AND VENUE

36. This Court has jurisdiction over this matter under 28 U.S.C. § 1331, 28 U.S.C. § 1332(a), and 18 U.S.C. § 1964. The Beechwood Advisors likewise have consented to jurisdiction in this district pursuant to Section 21 of the IMAs.

37. This Court likewise has supplemental jurisdiction over SHIP's state law claims under 28 U.S.C. § 1367, as the claims against Beechwood are related to claims upon which original subject matter jurisdiction is based.

38. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this district.

39. Venue is also proper in this Court pursuant to 28 U.S.C. §1391(c) because the Beechwood Advisors have consented to venue in this district pursuant to Section 21 of the IMAs.

## FACTUAL BACKGROUND

### A.    SHIP

40. After sustaining significant and ongoing underwriting losses, SHIP stopped writing new business in 2003 and began to work with the Pennsylvania Insurance Department to

develop a run-off strategy.   In 2008, the ownership of SHIP was transferred from a wholly owned subsidiary of Conseco, Inc. to the Senior Healthcare Trust, which was then merged into the Senior Healthcare Oversight Trust (the "Oversight Trust"), and the company's name was changed to the "Senior Health Insurance Company of Pennsylvania."   The Trustees of the Oversight Trust serve as SHIP's Directors and are primarily former insurance regulators.

41.     SHIP is responsible for funding the covered long-term care expenses of its elderly policyholders.   When all of SHIP's policies and other obligations have been satisfied, proceeds from the liquidation of SHIP, if any, will be disbursed by the Oversight Trust to a common law trust, which at that time will select an ultimate beneficiary. This ultimate beneficiary must be one or more charities that are focused on senior health issues.

42.     Hence, although SHIP is organized as a "for profit" corporation, it is managed solely for the benefit of its policyholders and without a profit motive.   As SHIP is no longer managed to earn a return on equity, SHIP's policyholders are the primary beneficiaries of SHIP's statutory surplus (which equals the amount by which its assets exceed its obligations).

43.     SHIP was introduced to Beechwood Re in late 2013.   On February 1, 2014, SHIP's affiliate, Fuzion, entered into a Master Services Agreement with Beechwood Re pursuant to which Fuzion agreed to administer the long-term care insurance policies that had been reinsured with Beechwood Re by WNIC and BCLIC with the approval of their respective regulators.   Fuzion and SHIP share the same employees.   Both WNIC and BCLIC had been affiliates of SHIP prior to the transfer of SHIP's ownership to the Oversight Trust.

44.     Because SHIP is a solvent run-off that no longer writes new business, SHIP's access to capital and sources of income are limited to policyholder premiums and investment

income.  SHIP's ability to preserve its asset base thus is essential.  Further, while SHIP has at all times been solvent and in possession of sufficient assets and reserves to run-off its business, SHIP has continued to experience adverse loss experience, which has negatively affected its surplus.  If a U.S. domiciled insurance company's surplus falls below a certain amount in relation to its risk, its domestic regulators may exercise enforcement powers, including placing the company into receivership and ordering liquidation.

45.     In 2014 and 2015, Brian Wegner, SHIP's then-President and CEO, Paul Lorentz, SHIP's then-CFO, and others met with and otherwise communicated with Feuer, Taylor, and Levy electronically, by telephone, and in person to discuss SHIP's unique status as a run-off insurer and the particular challenges it faced with respect to its surplus.  Feuer, Taylor, and Levy advised SHIP that Beechwood Re was unable to enter into a reinsurance agreement with SHIP. They proposed, however, to assist SHIP in improving its capital and surplus status by offering SHIP the opportunity to participate in the same investments in which Beechwood Re invested the reserves associated with the WNIC and BCLIC policies and certificates that were reinsured by Beechwood Re.

46.     Unbeknownst to SHIP and undisclosed by Defendants, these investments were primarily investments in or involving Platinum Partners, an entity that at the time remained unfamiliar to SHIP.  These investments also would favor the interests of Beechwood and Platinum and their related parties to SHIP's detriment, though SHIP could not have known this at the time.

### B.    Beechwood and Platinum Partners

47.    The vast majority of the assets Platinum Partners managed was invested through Platinum Partners Value Arbitrage Fund, L.P. ("PPVA") and Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), each of which itself was comprised of several feeder funds (collectively, the "Platinum Entities").

48.    In 2013, co-conspirators Nordlicht, Huberfeld, Bodner, Levy, Feuer, and Taylor formulated a scheme to create a new entity that would present the false appearance of being unrelated to Nordlicht, Huberfeld, or Bodner in order the attract institutional investors that Platinum itself could not attract directly.

49.    The scheme resulted in the creation in 2013 of a new reinsurance company, Beechwood Re, to lure institutional investors, such as insurers, into entrusting their funds to a seemingly legitimate, independent insurance company.  Once invested, however, those funds were used to enrich the co-conspirators and aid in their fraudulent scheme.  The co-conspirators over time created several additional Beechwood-related entities to further their schemes.

50.    Beechwood Re and related entities served as an artifice and vehicle for perpetrating the co-conspirators' racketeering activity and granted the co-conspirators control, even though that control typically was heavily camouflaged.  Nordlicht, Bodner, and Huberfeld held significant ownership interests in Beechwood Re and related entities, along with Feuer, Taylor, and Levy.  Nordlicht, Bodner, Huberfeld, and Levy, and perhaps others, acquired much of their ownership interests through nineteen family trusts that were given nondescript names to disguise their identities and ownership interests.  The trusts bore the generic names "Beechwood Trust No. 1" through "Beechwood Trust No. 19."  The beneficiaries of the trusts were, in the

case of Nordlicht, Bodner, and Huberfeld, their respective children, and in the case of Levy, himself.

51.    Nordlicht, Huberfeld, and Bodner also acquired Beechwood Re's preferred shares using a company called Beechwood Re Investments, LLC ("Beechwood Investments").  The managing member of Beechwood Investments was an entity controlled by Nordlicht called N Management LLC, and its nine members were denominated as "Beechwood Re Investments, LLC Series A" through "Beechwood Re Investments, LLC Series I" (each a "Beechwood Series").  Each Beechwood Series, in turn, was beneficially owned by Nordlicht, Huberfeld, Bodner, Levy, and their families.  These complex and generically identified ownership structures were designed to hide the Platinum connections and to support the story Beechwood's principals were telling.

52.    Beechwood Re appears to have been capitalized in large part by an undisclosed $100 million note from Beechwood Investments, an entity that had unknown financial strength to support a note of that size.  It is unclear whether the note was backed by any hard assets or reliable collateral.

53.    At the time of Beechwood Re's formation, Feuer was its Chief Executive Officer ("CEO") , Taylor was its President, and Levy was its Chief Investment Officer ("CIO").

54.    BBIL appears to have had a similar ownership and control structure to Beechwood Re, with Feuer as CEO and Taylor as President.

55.    BAM served as the investment arm for Beechwood Re and BBIL.  In 2014, Levy served as BAM's Chief Financial Officer and CIO.  Until approximately June 2016, Nordlicht, Levy, and two other Platinum-related associates apparently owned a majority interest in BAM.

BRILLC, which guaranteed the investment return under the BAM IMA, likewise was controlled by the Platinum-related parties.

56.     Narain became part of the Beechwood management no later than January 2016. Any ownership interests or control of Narain or the company he later formed, Illumin, with regard to the Beechwood entities was not disclosed and is presently unknown to SHIP.

### C.     Defendants' Misrepresentations to Induce SHIP to Enter Into the IMAs

57.     On April 10, 2014, Taylor, on behalf of Beechwood and through the mails and wires of interstate commerce, sent SHIP's CEO Wegner an email, with copies to Levy and Feuer.   The email attached documents that provided information concerning Beechwood's purported "asset management capabilities, strategies, and platform" and advised that Beechwood's "focus for SHIP will be in the Asset Backed Senior Secured Credit class of investments."   Taylor noted in his April 10, 2014 email that those classes of investments were "where we [Beechwood] are particularly strong, and can provide you [SHIP] some superior yield on a risk adjusted basis."

58.     The April 10, 2014 email included a "Discussion Document" that summarized Beechwood's purported investment strategy and guidelines.   The Discussion Document indicates that, in investing assets, Beechwood:   (a) employs a "[c]redit-focused investment strategy which focuses on capital preservation"; (b) seeks "[s]uperior adjusted returns"; (c) has a "[s]trong culture of risk management and transparency"; and (d) uses "[b]est in class third party vendors."

59.     The Discussion Document represents that "Capital Preservation is [Beechwood's] highest priority," that "[r]isk management and capital preservation are central tenets of strategy," and that Beechwood pursues "strategies that focus on niche opportunities that provide low-

volatility returns irrespective of the direction of broader markets." The document states that the "Basis of Beechwood's Investment Strategy is Superior Risk Management Capabilities," which includes "[d]etailed analysis of underlying forms of collateral," a "[f]ocus on appropriate deal controls," "active monitoring and due diligence," and "third party controls, independent valuation, compliance program."

60.     The Discussion Document indicates that Beechwood uses "[b]est in class third party administration, audit, and valuation services." It represents that Beechwood's portfolio is audited annually "by a top tier accounting firm with significant industry experience" and that "Lincoln Valuation Group evaluates all valuations on a quarterly basis."

61.     The Discussion Document touts its management team as "[s]table and experienced," with a "[p]roven record of outperformance in various market environments." The document lists and provides biographies for four key members of the Beechwood team, including Feuer, Taylor, and Levy. The biographies of Feuer and Taylor set forth their prior experience with Marsh & McLennan and their respective prior experience with Merrill Lynch and McKinsey & Company.

62.     Feuer and Taylor also made other oral and written representations to SHIP that promoted their experience with Marsh & McLennan and their respective prior experience with Merrill Lynch and McKinsey & Company.

63.     The entire sales pitch was a ruse. Beechwood's various oral and written representations were untrue and misleading because they did not reflect Beechwood's true investment approach and scheme and did not account for the fact that Beechwood intended to and would use SHIP's assets to favor Beechwood, Platinum, and their related parties and

affiliates.  Defendants repeatedly misrepresented to SHIP that Beechwood was owned by Feuer and Taylor, who portrayed themselves as upstanding professionals who capitalized Beechwood with family money and the fortunes earned during their professional careers, along with funds from a third principal, Levy.

64.    During a series of meetings and communications in 2014, when SHIP was evaluating Beechwood as a potential investment manager, Beechwood – primarily through Feuer, Taylor, and Levy – consistently misrepresented Platinum employees as being senior officers of Beechwood, without revealing that Platinum would control investment of SHIP's assets contributed under the IMAs or that Platinum and Beechwood related parties would enjoy preferential treatment over SHIP's interests.

65.    Feuer attended a SHIP Board meeting on May 13, 2014 and presented information on Beechwood, its experience in managing insurance business, and its plans for reinsuring blocks of long-term care business.  Again, he did not discuss Platinum's significant involvement in or control over Beechwood's investing strategies.  The presentation discussed Beechwood's strategy as an investment manager, but did not review any specific investments or assets under management by Beechwood.

66.    Levy led an oral and written presentation to SHIP officials, including Wegner and Lorentz, at Beechwood's New York office in the months prior to the IMAs being executed. Levy reiterated Beechwood's consistent themes of strong security and collateralization, conservative approach, and a guaranteed return for SHIP.

67.    Prior to entering into the IMAs or placing any assets with Beechwood for investment management, SHIP was provided available Beechwood financial statements and

other financial reporting that were purportedly provided by Beechwood's independent auditor, KPMG.   This information from Beechwood indicated that it possessed a strong balance sheet, providing increased comfort to SHIP while considering Beechwood's business proposals.

68.   SHIP's senior management also understood that CNO had vetted Beechwood in connection with the 2013 reinsurance transactions between CNO and Beechwood and that both the Indiana and New York Departments of Insurance had reviewed and approved the CNO-Beechwood reinsurance transaction.   CNO and the regulators apparently were not told about Platinum's involvement either, and CNO has sued Beechwood as well.

69.   Over the course of several meetings and communications, Beechwood consistently described to SHIP how Beechwood could provide attractive rates of return on equity investments and loans and emphasized the security underlying its portfolio loans.

70.   In its presentations to SHIP, Beechwood recommended a strategy of investing in assets that were highly collateralized and well protected.   Beechwood represented to SHIP that the investments were over-secured by collateral that Beechwood could seize in the event that a loan or other investment was not repaid, which would enable Beechwood to recover the value of any investment.

71.   Beechwood's April 2014 Discussion Document also emphasized its relationships with well-known third-party valuation firms, including Egan Jones, Lincoln Valuation Group, and Duff & Phelps, and claimed to have "formal policies outlining all fair valuation practices and methods."

72.   Unbeknownst to SHIP, Defendants' representations were false, misleading, and material, and Defendants knew, or they were at least grossly negligent in not knowing, that they

were false, misleading, and material when they made them to SHIP in order to induce SHIP to enter the IMAs and to turn over, in time, more than $270 million for investment.

73.     Defendants concealed from SHIP in a fraudulent or at least grossly negligent manner that they intended to place SHIP's assets into investments that were highly speculative, opaque, and not adequately secured.  They also hid the reality that Beechwood intended, in essence, to convert SHIP's assets to the uses of Platinum and the individuals controlling Beechwood and Platinum in a manner fundamentally inconsistent with the safe and conservative portfolio they promised would result in a guaranteed return.

74.     Defendants concealed from SHIP in a fraudulent or at least grossly negligent manner that they intended to place SHIP's assets in related-party transactions involving one or more of the principals of the Beechwood Advisors or the Platinum entities and their associates.

75.     Defendants concealed from SHIP in a fraudulent or at least grossly negligent manner that they intended to place SHIP's funds into high-risk investments without sufficient collateralization, which enabled the Beechwood Advisors, in concert with the Individual Defendants, to divert SHIP's funds to Platinum-related entities without providing adequate protections to enable SHIP to recover its invested funds and in violation of SHIP's known investment guidelines and restrictions.

76.     Defendants concealed from SHIP in a fraudulent or at least grossly negligent manner that Beechwood was materially owned and influenced by Nordlicht, Huberfeld, and Bodner and that Beechwood had substantial and direct ties to Platinum and was effectively controlled by it.

77.     Defendants concealed from SHIP in a fraudulent or at least grossly negligent manner that, with only one apparent exception other than Feuer and Taylor, every purported senior officer of Beechwood was actually an employee of Platinum.

78.     As each of the three IMAs was successively executed, Defendants further concealed their actions by, as set forth in this Complaint, providing false and misleading information to SHIP regarding the nature of the investment strategy and the individual investments, including fraudulent valuations.  Beechwood thus created a false impression that the investments made on SHIP's behalf were performing well, which encouraged SHIP to invest additional funds and discouraged SHIP from taking earlier actions to protect its funds that were being manipulated and diminished in value by Beechwood's schemes.

79.     Based upon and in reliance on Defendants' false and misleading representations and the fraudulent or grossly negligent omission or concealment of material information, SHIP entered into the IMAs to its detriment.

80.     If SHIP had known that Beechwood's representations were false and misleading and that Defendants had omitted and concealed material facts about Defendants' investment opportunities and structure in a fraudulent or at least grossly negligent manner, SHIP never would have entered into the IMAs.

**E.     The Investment Management Agreements**

81.     SHIP entered into three Investment Management Agreements with the Beechwood Advisors.  All three IMAs contain the same basic structure, with a few minor exceptions that do not materially change the nature of Beechwood's breaches or misrepresentations.  The substance of the IMAs is incorporated into this Complaint by reference.

The IMAs all were controlled by the Individual Defendants and their related parties in essentially the same manner, even though the individual agreements had different contractual counterparties. A primary reason for using different counterparties, ironically in retrospect, was that this diversification should further protect SHIP's invested funds. SHIP also was subject to investment guidelines limiting investment concentration. SHIP further understood from Beechwood prior to executing the IMAs that Beechwood was managing assets that were achieving returns well in excess of the IMA guaranteed returns, which guarantees were considered additional protection for SHIP. Each of the IMAs granted Beechwood discretion over the specific investments made.

### i.    The BBIL IMA

82.    The first IMA between SHIP and BBIL for the provision of investment management and advisory services was executed as of May 22, 2014 (the "BBIL IMA").

83.    The BBIL IMA is governed by New York law. BBIL IMA, ¶ 20.

84.    Pursuant to the BBIL IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

85.    The BBIL IMA appointed BBIL as SHIP's investment adviser and manager to invest and manage the funds on behalf of SHIP and "subject at all times to the fiduciary duties imposed upon it by reason of its appointment to invest and manage the Assets." BBIL IMA, ¶ 1.

86.    BBIL contractually guaranteed an annual investment return to SHIP equal to 5.85% (non-compounded) of the net asset value of the assets contributed to the account. This guaranteed payment would then be automatically reinvested in the custody account to be

managed by BBIL, BBIL IMA, Exhibit B at ¶ 3, which effectively makes the guaranteed annual return "compounded."

87.     In the event that SHIP's investments under the BBIL IMA did not achieve an annual Investment Return of 5.85%, BBIL was obligated to "(i) pay the Client [SHIP] any Investment Return shortfall from its own account and (ii) as necessary, contribute assets to the Account from its own account such that the net asset value of the Account equals the Initial NAV."  BBIL IMA, Exhibit B at ¶ 3.  This "True-Up Payment" provision effectively required BBIL to pay the guaranteed investment return and maintain the asset base, whether the investments performed as BBIL represented they would or not.

88.     The BBIL IMA permitted BBIL to retain investment returns above the 5.85% guaranteed Investment Return as a Performance Fee.  BBIL IMA, Exhibit B at ¶ 1.

89.     From September 2015 to July 2016, BBIL withdrew from the Wilmington Trust account at least $12,343,891 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher.  Because these performance fees had not in fact been earned, Defendants paid themselves out of SHIP's invested principal and not out of excess earnings.

90.     Pursuant to the terms of the BBIL IMA, BBIL was required to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers" under the agreement.  BBIL IMA, ¶ 1.

91.     Pursuant to the terms of the BBIL IMA, BBIL promised to make all investment decisions and to manage SHIP's invested funds "consistent with the general investment policy, guidelines and restrictions" of BBIL for Senior Secured Credit Opportunities and to invest in

classes of admitted assets subject to SHIP's corporate investment guidelines.  BBIL IMA, ¶ 3(b) and Exhibit A.

92.     The referenced Exhibit A to the BBIL IMA contains BBIL's "Adviser Investment Policy, Guidelines and Restrictions" and "Guidelines for Senior Secured Credit Opportunities." BBIL's investment document specifies that it must invest in a manner permitted by "SHIP's corporate investment guidelines 'Senior Health Insurance Company of Pennsylvania: Investment Objectives, Policies and Guidelines, Version 1.6'" ("SHIP's Investment Policies").

93.     SHIP's Investment Policies begin by emphasizing that "[c]ognizant of the fiduciary character of the insurance business, [SHIP] seeks to achieve investment returns commensurate with the protection of invested capital while minimizing the risk of impairment of investment assets to provide financial stability for its policy holders."  SHIP's "general investment objective" was specified to be "to seek current income consistent with the preservation of capital and prudent investment risk.  Long-term growth is an important secondary consideration."

94.     As Beechwood fully understood, SHIP's Investment Policies at the time required, among other things, that "[a]ssets invested to support run-off long term care obligations will have liquidity, risk and maturity characteristics appropriate to such policies and will be invested in such a manner as to meet policyholder obligations while providing a reasonable return."

95.     BBIL's own investment guidelines likewise required, among other things, that BBIL would "engage in transactions in which there is a ***well-known*** and ***understood*** counterparty risk, and liquid/valuable collateral to secure any such loan.  ***Controls are always in***

***place to secure the movements of cash and proceeds such that Beechwood always has a first right to monies.***" BBIL IMA, Exhibit A (emphasis added).

96.     BBIL failed to comply with both its own investment guidelines and SHIP's Investment Policies.  Rather, BBIL, together with the Individual Defendants, utilized the BBIL IMA to take control over SHIP's assets and to deploy those assets to benefit Platinum, thereby enriching the Individual Defendants as well as Platinum's and Beechwood's owners and related parties, at the expense of SHIP.  Beechwood did so without SHIP's knowledge of or consent to the risky and hopelessly conflicted relationship with Platinum that led to inappropriate investments.

97.     During performance under the IMA, BBIL compounded the damage to SHIP by falsely overstating the value of the assets under management in the BBIL IMA account to justify its retention of Performance Fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

### ii.     *The Beechwood Re IMA*

98.     The second IMA for the provision of investment management and advisory services was between SHIP and Beechwood Re and was executed as of June 13, 2014 (the "BRe IMA").

99.     The BRe IMA is governed by New York law.  BRe IMA, ¶ 20.

100.    In connection with the BRe IMA, SHIP ultimately deposited a total of $80 million into a custody account at Wilmington Trust for investment by Beechwood Re on SHIP's behalf. This amount was in addition to the previously described $80 million invested pursuant to the BBIL IMA.

101.    Similar to the BBIL IMA, the BRe IMA appointed Beechwood Re as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties.  Beechwood Re agreed to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers under this Agreement."  BRe IMA, ¶ 1.

102.    Beechwood Re contractually guaranteed an annual investment return to SHIP equal to 5.85% (non-compounded) of the net asset value of the assets contributed to the account. This guaranteed payment would then be automatically reinvested in the custody account to be managed by Beechwood Re on SHIP's behalf, which again effectively makes the guaranteed annual return "compounded."  BRe IMA, ¶ 1(b) and Exhibit B at ¶ 3.

103.    In the event that SHIP's investments under the BRe IMA did not achieve an annual Investment Return of 5.85%, Beechwood Re was obligated to "(i) pay the Client [SHIP] any Investment Return shortfall from its own account and (ii) as necessary, contribute assets to the Account from its own account such that the net asset value of the Account equals the Initial NAV."  BRe IMA, Exhibit B at ¶ 3.  This "True-Up Payment" provision effectively required BBIL to pay the guaranteed investment return and maintain the asset base, whether the investments performed as BBIL represented they would or not.

104.    The BRe IMA permitted Beechwood Re to retain investment returns above the 5.85% guaranteed Investment Return as a Performance Fee.  BRe IMA, Exhibit B at ¶ 1.

105.    From September 2014 to April 2016, Beechwood Re withdrew from the Wilmington Trust account at least $10,275,000 of SHIP's funds in performance fees, according to the records available to SHIP, and the actual amount could be higher.  Because these

performance fees had not in fact been earned, Defendants paid themselves out of SHIP's invested principal and not out of excess earnings.

106.    Pursuant to the terms of the BRe IMA, Beechwood Re was required to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers" under the agreement.  BRe IMA, ¶ 1.

107.    Pursuant to the terms of the BRe IMA, Beechwood Re promised to make all investment decisions and to manage SHIP's invested funds "consistent with the general investment policy, guidelines and restrictions" of BBIL for Senior Secured Credit Opportunities and to invest in classes of admitted assets subject to SHIP's corporate investment guidelines. BRe IMA, ¶ 3(b) and Exhibit A.

108.    The referenced Exhibit A to the BRe IMA contains Beechwood Re's "Adviser Investment Policy, Guidelines and Restrictions" and "Guidelines for Senior Secured Credit Opportunities."  Beechwood Re's investment document specifies that it must invest in a manner permitted by "SHIP's corporate investment guidelines 'Senior Health Insurance Company of Pennsylvania: Investment Objectives, Policies and Guidelines, Version 1.6'" ("SHIP's Investment Policies").

109.    SHIP's Investment Policies begin by emphasizing that "[c]ognizant of the fiduciary character of the insurance business, [SHIP] seeks to achieve investment returns commensurate with the protection of invested capital while minimizing the risk of impairment of investment assets to provide financial stability for its policy holders."  SHIP's "general investment objective" was specified to be "to seek current income consistent with the

preservation of capital and prudent investment risk.  Long-term growth is an important secondary consideration."

110.    As Beechwood fully understood, SHIP's Investment Policies at the time required, among other things, that "[a]ssets invested to support run-off long term care obligations will have liquidity, risk and maturity characteristics appropriate to such policies and will be invested in such a manner as to meet policyholder obligations while providing a reasonable return."

111.    Beechwood Re's own investment guidelines likewise required, among other things, that Beechwood Re would "engage in transactions in which there is a ***well-known*** and ***understood*** counterparty risk, and liquid/valuable collateral to secure any such loan.  ***Controls are always in place to secure the movements of cash and proceeds such that Beechwood always has a first right to monies.***"  BRe IMA, Exhibit A (emphasis added).

112.    Beechwood Re failed to comply with both its own investment guidelines and SHIP's Investment Policies.  Rather, Beechwood Re, together with the Individual Defendants, utilized the BRe IMA to take control over SHIP's assets and to deploy those assets to benefit Platinum, thereby enriching the Individual Defendants as well as Platinum's and Beechwood's owners and related parties, at the expense of SHIP.  Beechwood did so without SHIP's knowledge of or consent to the risky and hopelessly conflicted relationship with Platinum that led to inappropriate investments.

113.    During performance under the IMA, Beechwood Re compounded the damage to SHIP by falsely overstating the value of the assets under management in the BRe IMA account to justify its retention of Performance Fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

### iii.   *The BAM IMA and Side Letter*

114.   The third IMA for the provision of investment management and advisory services was between SHIP and BAM and was executed as of January 15, 2015 (the "BAM IMA").

115.   The BAM IMA is governed by New York law.  BAM IMA, ¶ 20.

116.   Contemporaneous with execution of the BAM IMA, in January 2015, SHIP deposited an initial $50 million into a custody account at Wilmington Trust to be invested and managed by BAM, subject to investment guidelines prescribed by the IMAs and the insurance laws of Pennsylvania.  Subsequently, in March 2015, SHIP deposited an additional $60 million into the same account and subject to the same investment guidelines and legal limitations, for a total investment of $110 million to be managed by BAM under the BAM IMA.  This $110 million was in addition to the $160 million invested with Beechwood pursuant to the other two IMAs.

117.   Similar to the other two IMAs, the BAM IMA appointed BAM as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties.  BAM agreed to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers under this Agreement." BAM IMA, ¶ 1.

118.    The language of the BAM IMA itself differed from the BBIL IMA and BRe IMA in that it did not expressly guarantee a specific investment return.  SHIP, however, entered into a side letter with BRILLC, which was commonly controlled along with the other Beechwood Advisors, and in the side letter BRILLC guaranteed an annual investment return of 5.85% (non-compounded) of the net asset value of the assets contributed by SHIP under the BAM IMA (the

30

"Side Letter").   The purpose of the Side Letter was to "provide to Client [SHIP] certain assurances as relates to the performance of the investments managed under the IMA." Beechwood explained to SHIP that BRILLC's involvement provided additional capital support to BAM.   The guaranteed payment would be automatically reinvested in the custody account to be managed by BAM on SHIP's behalf, which effectively makes the guaranteed annual return "compounded."   Side Letter at 1.

119.   The method of calculating BAM's Performance Fee was slightly different under the BAM IMA as compared with the other two IMAs.   Pursuant to Exhibit B to the BAM IMA, BAM's Performance Fee was to be the greater of the following:

> (1) 1% of the net asset value of the Assets in the Account as of the last day of each measuring Year, or (2) 100% of the cash value reflected in the Net Profit Yield (as defined below).   For purposes hereof, (a) "Net Profit Yield" shall be defined as the Total Portfolio Yield (as defined below) minus 5.85% and (b) "Total Portfolio Yield" shall be defined as the investment return (based on both realized and unrealized trading profit) on the Account for each respective measuring Year….")

BAM IMA, Exhibit B at ¶ 1.

120.   The BAM IMA still anticipated an annual 5.85% guaranteed return to SHIP, through the Side Letter, and the excess over that amount would go to BAM.   If a return of less than 5.85% was achieved, however, BAM would receive 1% of the net asset value, a feature not included in the other two IMAs.   The Side Letter likewise promised a "True-Up Payment" in the event of any shortfall in the annual return, and this mechanism was designed to work in a manner similar to the provision in the other IMAs.

121.   From March 2015 to June 2016, BAM withdrew from the Wilmington Trust account at least $10,950,000 from SHIP in performance fees, according to the records available

to SHIP, and the actual amount could be higher.  Because these performance fees had not in fact been earned, Defendants paid themselves out of SHIP's invested principal and not out of excess earnings.

122.    Pursuant to the terms of the BAM IMA, BAM was required to "use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers under this Agreement."  BAM IMA, ¶ 1.

123.    Pursuant to the terms of the BAM IMA, BAM promised to make all investment decisions and to manage SHIP's assets "consistent and compliant with . . . the general investment policy, guidelines and restrictions as described  on Exhibit A."  BAM IMA, ¶ 3(b).

124.    The referenced Exhibit A to the BAM IMA contains BAM's "Adviser Investment Policy, Guidelines and Restrictions."  BAM's investment document specifies that it must invest in a manner permitted by "SHIP's corporate investment guidelines 'Senior Health Insurance Company of Pennsylvania: Investment Objectives, Policies and Guidelines, Version 1.7'" ("SHIP's Investment Policies, Version 1.7"), which document was materially consistent with the earlier version.

125.    SHIP's Investment Policies, Version 1.7 begins by emphasizing that "[c]ognizant of the fiduciary character of the insurance business, [SHIP] seeks to achieve investment returns commensurate with the protection of invested capital while minimizing the risk of impairment of investment assets to provide financial stability for its policy holders."  SHIP's "general investment objective" was specified to be "to seek current income consistent with the preservation of capital and prudent investment risk.  Long-term growth is an important secondary consideration."

126.    As Beechwood fully understood, SHIP's Investment Policies, Version 1.7 in place at the time required, among other things, that "[a]ssets invested to support run-off long term care obligations will have liquidity, risk and maturity characteristics appropriate to such policies and will be invested in such a manner as to meet policyholder obligations while providing a reasonable return."

127.    BAM and BRILLC failed to comply with SHIP's investment policy.  Rather, BAM and BRILLC, together with the Individual Defendants, utilized the BAM IMA and BRILLC Side Letter to take control over SHIP's assets and to deploy those assets to benefit Platinum, thereby enriching the Individual Defendants as well as Platinum's and Beechwood's owners and related parties, at the expense of SHIP.  Beechwood did so without SHIP's knowledge of or consent to the risky and hopelessly conflicted relationship with Platinum that led to inappropriate investments.

128.    During performance under the IMA, BAM and BRILLC compounded the damage to SHIP by falsely overstating the value of the assets under management in the BAM IMA account to justify its retention of Performance Fees to which it would not otherwise be entitled as well as to extend the duration of the scheme and magnify the losses.

**F.    Beechwood's Failed and Fraudulent Performance**

129.    SHIP entrusted $270 million to the Beechwood Advisors to invest prudently, conservatively, and in accordance with the terms of the three IMAs and another $50 million was entrusted outside the IMAs.  SHIP relied on the material misrepresentations and omissions by the Beechwood Advisors and the Individual Defendants who controlled the Beechwood Advisors' activities in deciding to entrust Beechwood with the investment of funds that SHIP held as

reserves to pay policyholder claims.  Notwithstanding the representations made about their investment protocols, disciplines, and security, not to mention guaranteed returns, to induce SHIP to enter into the IMAs and to invest both the IMA funds and additional funds through them, and contrary to the promises made in the IMAs and in violation of the fiduciary duties owed to SHIP, the Beechwood Advisors placed SHIP's money into investments that were highly speculative, not adequately secured, opaque, and not appropriately disclosed to SHIP.  Many of the Beechwood investments are invested in related-party transactions involving one or more of the principals of the Beechwood Advisors or the Platinum entities.

130.    Rather than adhering to their representations and promises made in the IMAs and otherwise, the Beechwood Advisors, in concert with the Individual Defendants, used most of the SHIP funds entrusted to them to acquire high-risk, complex, inadequately collateralized, and often distressed investments tied to Platinum that were purposely structured by Beechwood, the Individual Defendants, and the co-conspirators to enrich themselves and their related parties at the expense of investors like SHIP.

131.    For example, Beechwood invested SHIP's money in direct and indirect interests in numerous loans that had been made by Platinum-related entities, including PPCO and PPVA.  Far removed from the safe, well-vetted, well-collateralized middle market credit transactions that SHIP expected, based on Beechwood's representations, the Platinum-related loans were high-risk investments that had been made to entities pursuing highly speculative ventures.  The loans carried artificially high interest rates and were subject to fees and upfront payments that were not reasonably supported by the financial condition or outlook of the obligors.  Beechwood, the Individual Defendants, and the co-conspirators knew, or were grossly negligent in not knowing,

when they structured these loan investments that a high probability existed that the obligors would default and would fail to repay the principal. When they purchased these investments on SHIP's behalf, typically from PPCO, PPVA, or an entity managed by or related to Beechwood, the Individual Defendants knew, or were grossly negligent in not knowing, that the investments were severely distressed, defaulting, or about to default. Indeed, Platinum was able to perpetuate these investments and prolong its scheme only so long as Beechwood attracted new investors or diverted funds from existing investors to structure and restructure the investments and thereby continued to use them to funnel cash, fees, and payments to Beechwood, the Individual Defendants, Platinum, and the related parties and co-conspirators.

132.    To avoid detection of these practices and to justify their claims to Performance Fees under the IMAs, which only were recoverable if the annual return exceeded the 5.85% guaranteed to SHIP, Defendants, other purported employees of Beechwood, and Beechwood's paid advisors and consultants submitted reports that contained inflated, and in some cases entirely falsified, valuations that purported to show that the Platinum-related investments were performing well and that SHIP's investments were sound.

133.    Beechwood provided reports to SHIP on a quarterly basis that included an overview of the investments that Beechwood managed on SHIP's behalf. These reports did not accurately or adequately disclose the profound involvement and conflicted entanglements of Platinum Partners or other Platinum-affiliated entities in the investments or that many of the investments were severely distressed, defaulting, or nearly defaulting at the time of the reports and were likely to default prior to repayment of principal. SHIP relied on Beechwood as its

investment manager and fiduciary to provide accurate information regarding the assets under management and to disclose fully any potential conflicts of interest or related-party transactions.

134.    Beechwood also provided monthly valuation reports to SHIP that purported to show the value of the assets under management.  The monthly reports included Beechwood's valuations of the investments under management, but did not include detailed information regarding the full nature of and parties involved in the Beechwood investments.

135.    Although SHIP did not know it at the time, the values in these monthly reports also were largely inflated or falsified and did not reflect accurate representations regarding SHIP's assets under Defendants' control.  SHIP relied on Beechwood as its investment manager to provide the company with accurate information.

136.    By way of example, on April 20, 2015, Elliot Feit of Beechwood, through the mails and wires of interstate commerce, sent Paul Lorentz, SHIP's then-Chief Financial Officer, an April 9, 2015 Duff & Phelps Report, which SHIP later learned significantly overvalued at least two assets in which Beechwood invested SHIP funds:  Montsant Partners LLC and MYSYRL Capital LLC.

137.    Although Beechwood claimed to use "independent valuation" based on "fair valuation practices and methods," SHIP later learned that no such independent valuation was ever conducted, as Beechwood controlled all information provided to its third-party valuation consultants, and the valuation consultants provided disclaimers and did not attempt to verify the accuracy or completeness of any information provided regarding the value of investments managed by Beechwood.  This enabled Beechwood to provide an air of legitimacy to its inflated valuations by essentially laundering them through a third party.

138.    Beechwood used these inflated valuation reports to support the various and multiple withdrawals over time of "Performance Fees" under the IMAs, even though such fees had not truly been earned.

139.    Beechwood also entered into transactions that placed its interests and those of Platinum or Platinum-related individuals ahead of SHIP's, in breach of the IMAs, the fiduciary duties, and the representations Beechwood had made in seeking to induce SHIP's investments. For example, in addition to using SHIP funds to acquire high-risk and over-valued investments that had been owned or structured by Platinum, Beechwood caused SHIP to invest nearly $40 million directly in certain Platinum funds, including PPCO and PPVA.  This was particularly harmful to SHIP, because the same high-risk investments, with their false and inflated values, in which SHIP became invested directly, also represented a significant percentage of the PPCO and PPVA portfolios.  SHIP thus was victimized through double exposure to Platinum's problems.

*i.*    ***Montsant Partners LLC***

140.    BAM's investment in Montsant Partners, LLC ("Montsant") illustrates the Beechwood Advisors' misuse of SHIP's assets to enrich Platinum-controlled entities to SHIP's detriment.  Montsant is a Delaware limited liability company that is wholly owned by PPVA. Michael Nordlicht, Montsant's managing member, is the nephew of Mark Nordlicht, one of the founders of the Platinum fund complex.

141.    On January 30, 2015, at BAM's sole direction and just two weeks after the BAM IMA was executed, funds deposited in the BAM IMA account were used to acquire, on SHIP's behalf, an unsecured term note issued by Montsant in the principal amount of $35,500,000.

142.    Daniel Saks of BAM signed the January 30, 2015 Montsant Note Purchase Agreement (the "Montsant NPA") on behalf of SHIP as its investment manager.  Saks also signed the Montsant NPA on behalf of BAM Administrative Services, LLC.

143.    The Montsant NPA, which was not provided to SHIP before BAM made the investment on SHIP's behalf, specifies that Montsant "shall use the proceeds of the sale of the Notes to disburse to its parent company, PPVA."  In other words, BAM took $35,500,000 of SHIP's funds and handed these funds directly into Platinum's control by way of the Montsant NPA.

144.    The Montsant NPA also contained a post-closing collateralization requirement. Between January 30, 2015 and April 16, 2015, the NPA was amended nine times to extend the date for the required collateralization.  Ultimately, Montsant purported to pledge a small amount of collateral that appears to have lacked any monetary value even remotely commensurate with Montsant's debt obligation.  Further, in a complex and arcane structure typical of those used by Beechwood, this collateral simultaneously served as collateral for the debt to be collected under two other defaulted investments in which Beechwood had invested SHIP policy reserves.

145.    BAM's use of SHIP's assets to enrich Platinum through the Montsant investment constitutes a breach of the BAM IMA, including the implied covenant of good faith and fair dealing, and of the fiduciary duties owed by each of the Defendants to SHIP, and evidences Beechwood's concerted efforts to defraud SHIP by using SHIP's assets to enrich and benefit themselves and Platinum to SHIP's deliberate detriment, all in furtherance of the common scheme.

ii.     **PEDEVCO Corp.**

146.    In addition to direct investments in Platinum or Platinum-related investments, SHIP's funds were used to salvage and perpetuate highly speculative, poorly performing investments structured by Beechwood, the Individual Defendants, and the co-conspirators.  For example, at BAM's sole direction, funds deposited in the BAM IMA account were used to acquire, on SHIP's behalf, debt interests in an entity known as PEDEVCO Corp. ("PEDEVCO"), as described below.  BAM used SHIP's funds to purchase, at par value, highly risky distressed debt that PEDEVCO originally had issued to Beechwood-related entities, and then attempted to alter and subordinate SHIP's interests so that the Beechwood-related entities would be preferred over SHIP in the likely event that PEDEVCO defaulted on its obligations.

147.    PEDEVCO's primary business activity was the acquisition, exploration, development, and production of oil and natural gas shale in the United States, with a secondary focus on conventional oil and gas investments.  As such, PEDEVCO was a highly speculative business carrying a high degree of risk, because the success of its business depended not only on its ability to find and extract these natural resources but also on whatever the prevailing prices of oil and natural gas were at the time of extraction.  Under the best of circumstances, PEDEVCO would be an entirely unsuitable investment for SHIP, even without the favoritism shown to other interests over SHIP's, because an investment of this type typically lacks early positive cash flow and liquidity.  At the time that BAM forced SHIP into PEDEVCO, however, circumstances were particularly grim for the oil and gas industry, as oil and natural gas prices were rapidly declining. Notwithstanding the price decline and its negative effect on PEDEVCO's value and

creditworthiness, BAM exercised its complete discretion under the IMA and used BAM IMA funds contributed by SHIP to purchase a portion of the Beechwood investment at full par value.

148.     Specifically, on or about March 7, 2014, PEDEVCO had entered into a senior debt facility with five Beechwood investors, including BRE BCLIC Primary Trust ("BCLIC Primary"), an entity that had loaned PEDEVCO $11,800,000.  The loan from BCLIC Primary was evidenced by a Senior Secured Promissory Notice issued by PEDEVCO on March 7, 2014 (the "2014 Pedevco Note").

149.     On or about October 7, 2014, BCLIC Primary entered into a Participation Agreement with BBIL pursuant to which BBIL acquired a $2,433,383.06 participation interest in the 2014 Pedevco Note (the "BBIL Participation Interest"), reducing BCLIC Primary's investment by that amount.

150.     The prices of oil and natural gas declined by 50% between March 2014 and April 2015.  As a result, PEDEVCO's financial condition had deteriorated and the likelihood of repayment of the 2014 PEDEVCO Note was low.  Despite this perilous condition, in April 2015 BAM purchased, on SHIP's behalf, the 2014 PEDEVCO Note (which was subject to the BBIL Participation Interest) from BCLIC Primary.   SHIP's purchase was made pursuant to an Assignment Agreement, dated April 16, 2015, between BCLIC Primary and SHIP.

151.     After using SHIP's funds to rescue BCLIC Primary from this poor investment and dumping it on SHIP, BAM doubled down on the harm to SHIP by restructuring PEDEVCO's debt (including the 2014 PEDEVCO Note) in 2016 to assure that Beechwood entities would be repaid in full with interest, charges, and fees, ahead of and to the detriment of other investors, including SHIP.

152.    The price of oil and the price of natural gas continued to decline, and by the beginning of May 2016 PEDEVCO needed more financing.  In May 2016, Beechwood arranged to have two of its related entities, BBLN-PEDCO Corp., a Delaware corporation ("BBLN") and BHLN-PEDCO Corp., a Delaware corporation ("BHLN"), provide additional financing to PEDEVCO pursuant to the terms of an Amended and Restated Note Purchase Agreement dated as of May 12, 2016, by and among PEDEVCO, BBLN, BHLN, and others, including SHIP (the "2016 NPA").  The 2016 NPA was negotiated by Dhruv Narain, BAM's then-Chief Investment Officer, who also executed the 2016 NPA on behalf of SHIP in his capacity as authorized signatory for BAM.

153.    Pursuant to the 2016 NPA, the existing investors, including SHIP, had their existing Senior Secured Promissory Notes replaced with Amended and Restated Secured Promissory Notes ("Tranche B Notes") that were subordinated to Senior Secured Promissory Notes ("Tranche A Notes") that PEDEVCO issued to BBLN and BHLN.  The 2016 NPA also increased the size of SHIP's loan to PEDEVCO from $11,800,000 to $12,585,118.75 (the "SHIP PEDEVCO Note") by adding accrued and unpaid interest to the principal.  That is, Beechwood decreased the relative priority of SHIP's investment position at the same time that it increased the size of SHIP's financial commitment in a failing venture.

154.    At the time of the 2016 NPA, PEDEVCO lacked the capital to extract oil and natural gas from its properties and thus had no viable means of generating enough funds to repay both the Tranche A and the Tranche B debt.   Because the self-dealing terms of the 2016 NPA provided for BBLN and BHLN to be repaid in full (including interest) before SHIP would receive even one cent in repayment of the SHIP PEDEVCO Note, SHIP was set up from the

outset to lose its entire investment.  Worse, having staked out a priority position, BBLN and

BHLN made SHIP's recovery even less likely in that they failed to fund their commitments fully,

providing only $6.4 million of the $12.5 million promised to PEDEVCO to fund its operations.

155.    PEDEVCO ultimately acknowledged its inability to repay the Tranche B Notes,

which included the SHIP PEDEVCO Note.  SHIP has been forced to take pennies on the dollar

for its interests in the PEDEVCO Note, all because of the actions of Beechwood and the

Individual Defendants, including the subordination of the PEDEVCO Note to the Tranche A

Notes.  Beechwood, by contrast, abused its investment management authority and maneuvered to

its favor and SHIP's detriment such that both BBLN-Pedco and BHLN-Pedco have largely

recovered their principal investments in the Tranche A Notes.

156.    These PEDEVCO-related transactions, including most egregiously the 2016 NPA

and the purported subordination of the PEDEVCO Note to the Tranche A Notes, constitute a

breach of the IMAs, including the implied covenant of good faith and fair dealing, and of the

fiduciary duties owed by each of the Defendants to SHIP, and evidence Beechwood's concerted

efforts to defraud SHIP by using SHIP's assets to enrich and benefit themselves without regard

for and to the deliberate detriment of SHIP.

### iii.    BRILLC-BBIL Note

157.    The PEDEVCO investment was not an isolated experience.  In February 2015,

BRILLC issued a $50 million note to its closely related party, BBIL (the "BRILLC Note").

BBIL wired $50 million of SHIP's funds from the BBIL IMA custodial account to BRILLC's

account at Capital One Bank on February 19, 2015 to fund the BRILLC Note.

158.    As BBIL has acknowledged, BBIL holds the BRILLC Note as SHIP's nominee. BBIL identified the note as an asset of SHIP on the Wilmington Trust custodial account statements, beginning in or around February 2015, and BBIL agreed, as discussed below, to transfer the BRILLC Note formally into SHIP's name in 2017.

159.    The BRILLC Note was secured by BRILLC's assets.   Pursuant to a Pledge Agreement dated February 19, 2015, BRILLC pledged its equity interests in several funds, including PPVA and PPCO and other Platinum-related investments, as collateral for the BRILLC Note.

160.    The BRILLC Note specified that interest accrued on the outstanding principal of the note at an annual rate of six percent (6%).

161.    Interest on the BRILLC Note was payable in cash annually in arrears; payment was due on April 30 each year, beginning with April 30, 2016.

162.    To date, BRILLC has not made payment of any principal or interest on the BRILLC Note.   BRILLC thus is in default under the terms of the BRILLC Note and owes the amounts due to SHIP.

163.    The terms of the BRILLC Note provide that, upon occurrence of an Event of Default, the BRILLC Note "shall immediately become due and payable, without notice, together with reasonable attorneys' fees."   Despite this requirement, BRILLC has not satisfied its obligations under the Note and has not repaid SHIP the $50 Million transferred from SHIP to fund the principal or any accrued interest.   BBIL similarly has not taken any action to collect on the BRILLC Note or any of the assets pledged by BRILLC.

164.     In 2017, BBIL acknowledged that it held the BRILLC Note for SHIP and thus agreed to transfer the BRILLC Note to SHIP.  BBIL refused, however, to complete the transfer unless SHIP executed an assignment agreement in a form that was unacceptable to SHIP. Further, at the time that the draft assignment agreement was proposed by BBIL, SHIP learned that BBIL had, unilaterally and without SHIP's knowledge or consent, allowed BRILLC to alter in a substantial manner the collateral securing the BRILLC Note and had executed an Amended and Restated Pledge Agreement as of March 31, 2017.

165.     These self-dealing actions constitute a breach of the IMAs, including the implied covenant of good faith and fair dealing, and of the fiduciary duties owed by each of the Defendants to SHIP, and evidence Beechwood's concerted efforts to defraud SHIP by using SHIP's assets to enrich and benefit themselves without regard for and to the deliberate detriment of SHIP.

### iv.     *Agera Energy*

166.     Among the most egregious abuses of Beechwood's access to SHIP's funds involves AGH Parent, LLC ("AGH Parent"), a vehicle through which tens of millions of dollars of SHIP's funds were funneled to PPCO and PPVA, while structuring the ownership of the investment in a highly complex and opaque manner that positioned Defendants and their related parties to exit their positions in AGH Parent successfully and at a large profit, while leaving SHIP with illiquid investments of uncertain value.

167.     An entity known as Agera Energy, LLC ("Agera Energy") was formed in March 2014 to enable Platinum Partners to acquire surreptitiously the assets of electricity and natural gas retailer Glacial Energy Holdings Inc. ("Glacial"), which was then the subject of Chapter 11

bankruptcy proceedings.  Platinum Partners was Glacial's lender and had taken an ownership stake in the entity when it was unable to repay its debt.

168.    Shortly after Agera Energy's formation, Platinum Partners purported to make a loan to Agera Energy secured by a note that could, at the holder's option, be converted into ownership of nearly all of the company's equity interests.  This convertible note, and the equity rights it represented, would ultimately become the vehicle through which Platinum Partners, aided by Beechwood, would use investor money – including funds from SHIP – to realize in excess of $100 million in profits and fees without investing or risking any appreciable amount of its own funds.

169.    Specifically, in May 2014, Agera Energy issued a Secured Convertible Promissory Note (the "Original Note") to Principal Growth Strategies LLC ("PGS").  On June 11, 2014, the Original Note was amended and restated into a $600,071.23 Secured Convertible Promissory Note (the "Convertible Note"), which granted PGS the unconditional option to exchange the Convertible Note for 95.01% of the equity interests in Agera Energy.  PGS is owned 55% by PPVA and 45% by PPCO.  It is unknown whether, as with many Platinum Partners-related company loans, these transactions existed only on paper or whether funds actually were transferred.

170.    On June 17, 2014, Michael Nordlicht acquired 100% of the equity in Agera Energy.  At the time of the sale, Michael Nordlicht was a recent law school graduate who previously had worked as an analyst at Platinum Management for his uncle, Mark Nordlicht.  It is unclear what, if anything, he paid for his interest in Agera Energy.

171.    The next day, on June 18, 2014, Michael Nordlicht sold a 4.99% interest in Agera Energy to Beechwood Re.  It is unclear what, if anything, Beechwood Re paid for that interest.

172.    Also on June 18, 2014, Beechwood-related entities, including Beechwood Re, acquired $51.9 million of senior secured debt issued by Agera Energy.  SHIP provided $30 million of the $51.9 million loaned.  Agera Energy used the loan proceeds to fund its purchase of Glacial assets for $53 million.  Treating the SHIP IMA accounts like Beechwood's personal stash of cash, BBIL transferred $30 million from SHIP's BBIL IMA account to Beechwood Re, which is identified as the owner of the senior secured debt attributable to SHIP's payment, falsely creating the impression that Beechwood Re was the source of the funds that Agera Energy used to buy Glacial and falsely inflating Beechwood Re's balance sheet.

173.    The transaction was reported on SHIP's IMA account statements as a $30 million secured term note issued by Agera Energy at 14% interest.  SHIP's principal was repaid by December 2014, apparently without any accrued interest being paid.

174.    As a result of this transaction, Platinum Partners and Beechwood essentially owned Agera Energy, which in turn owned the Glacial assets, without any evidence of having expended any funds of their own.  Instead, they used Beechwood's access to SHIP's assets within the IMA accounts and other investor money to fund the acquisition, but did not provide any equity stake to SHIP and did not even pay SHIP interest for the use of its funds.

175.    In April 2015, Platinum and Beechwood needed more capital to buy two smaller energy retailers and to otherwise fund activities.  Once again, Beechwood reached into SHIP's pockets, and BAM caused SHIP to loan $14 million to Agera Energy to fund its purchase of

Energy.me LLC and Lumens Energy Group, LLC.  As before, the acquisition loans were repaid without interest.

176.    By April 2016, circumstances had become dire for the cash-strapped Platinum funds.  Narain, who had taken the helm as Chief Investment Officer at BAM, began to seek a buyer for Agera Energy in order to exit the investment.  In order to assure that Agera Energy would be sold at a massive profit that would primarily benefit Beechwood, Platinum, and other related parties, Narain and the co-conspirators embarked upon a scheme designed to drive up the value of Agera Energy artificially while funneling tens of millions of investor dollars to the Platinum funds.

177.    Working in concert with Platinum, Narain and Beechwood orchestrated the sale and resale of the Convertible Note to investors, including SHIP, in a series of transactions that ultimately resulted in the transfer of $65 million in cash and $105 million in other assets to PGS in order to prop up PPCO and PPVA.  Narain, acting for Beechwood, maneuvered the transactions as described below so that Beechwood and Platinum entities and insiders received unearned equity interests in the Agera enterprise, Beechwood retained complete control over Agera Energy, and the Beechwood, Platinum, and other related parties would essentially siphon off any profit.

178.    Specifically, on April 1, 2016, pursuant to an Assignment of Note and Liens (the "First Repo Agreement"), PGS assigned the Convertible Note to BBIL ULICO 2014 ("BBIL ULICO"), Beechwood Bermuda Investment Holdings Ltd. ("BBIH"), and BBIL (together, the "First Repo Assignees") in exchange for $15 million in cash, of which $2.5 million (representing 16.7%) was funded from SHIP's BBIL IMA funds.  The First Repo Agreement gave PGS the

unconditional right to repurchase the Convertible Note by repaying the $15 million purchase price, plus a fee, by June 15, 2016.  The $15 million price did not reflect the value of the Convertible Note and appears to represent the amount of money that Platinum needed at that moment to survive, pending a sale of the Agera Energy enterprise.

179.   PGS did not exercise its repurchase right by the repurchase date or ever repay the $15 million purchase price. Nonetheless, on May 12, 2016, BAM caused the First Repo Assignees and a newly formed Beechwood entity, BBLN-Agera Corp. ("BBLN-Agera"), to enter into an Amended and Restated Assignment of Note and Liens (the "Second Repo Agreement"), which effectively resold the Convertible Note at a new purchase price of $25 million.  This price included the $15 million previously paid by the First Repo Assignees.  The remaining $10 million was paid to PGS by BBLN-Agera.  Of that $10 million, $5 million was funded from SHIP's BBIL IMA account. These transactions funneled $25 million in new investor money (including a total of $7.5 million from SHIP) to PGS, and thus to PPVA and PPCO, at a time when both entities were in the midst of a liquidity crisis and required immediate capital infusions.  Nothing changed with respect to Agera Energy between April and May 2016 that could justify a $10 million increase in the value of the Convertible Note.  The sole driver of the increase in the purchase price was Platinum's need for immediate cash.

180.   The Repo Note transactions were short-term fixes designed to keep funds flowing to Platinum pending the exit event that Narain was orchestrating.  In order to assure large payoffs to Platinum, Beechwood, and their related parties, on May 31, 2016, Beechwood caused the formation of AGH Parent to acquire the Convertible Note from PGS for $170 million in new

cash and investment assets, including substantial equity in AGH Parent while, at the same time, giving Beechwood control over the operation of AGH Parent and, thus, Agera Energy.

181.    The $170 million purchase price for the Convertible Note was not supported by any third-party valuation of the Agera enterprise.  In addition, it is unfathomable that the true value of the Convertible Note could have increased from $15 million in April 2016, to $25 million in May 2016, and then to $170 million in June 2016.  Rather, the $170 million purchase price was negotiated between Narain on Beechwood's behalf and related party Platinum based on the needs of Platinum for cash to satisfy demands for investor withdrawals, to support distressed investments, and to provide the appearance of valuable assets in Platinum funds in order to stave off the impending insolvencies of these funds.  Further, PGS had invested no money, beyond the initial (at least on paper) $600,071.23 note value in the enterprise.  Every penny of the acquisition of the Agera assets had been funded by Beechwood investors, primarily SHIP, on terms that were unfair to those investors, who had taken all of the risk.  Had the Beechwood Advisors acted prudently and in SHIP's best interests, SHIP would have held the majority of the equity in Agera Energy directly or through the option represented in the Convertible Note.  Instead, having caused SHIP to fund most of the acquisition costs for the underlying energy assets, as well as two purchases of the Convertible Note, the Beechwood Advisors, led by Narain, allowed PGS to reclaim "ownership" of the Convertible Note, all in order to funnel more cash to PGS.

182.    In an effort to generate new investment dollars for PGS, in May 2016, Beechwood approached SHIP about investing funds in AGH Parent outside of the IMA agreements.  Beechwood made representations to SHIP regarding the soundness of the proposed

additional investment, assuring SHIP that Beechwood was acting in SHIP's best interests with respect to investments in AGH Parent regardless of whether SHIP's investments were made through the IMA funds or through new funds from SHIP invested at Beechwood's direction and with Beechwood's advice.

183.   On June 8 and 9, 2016, Beechwood caused and induced SHIP to enter into a series of unconventional and complex transactions (the "June 2016 Transactions") that were designed to avoid detection of the scheme that appears to have been orchestrated primarily by Narain on behalf of Beechwood.

a.   Certain Platinum-related distressed assets in accounts under management at Beechwood (including SHIP's accounts) were assigned to AGH Parent pursuant to an Assignment Agreement dated June 8, 2016 (the "Assignment Agreement");

b.   PGS re-acquired the Convertible Note from BBLN-Agera and the First Repo Assignees under the Assignment of Secured Convertible Promissory Note dated June 9, 2016 (the "Repurchase Assignment");

c.   The Convertible Note was amended and restated, then sold by PGS to AGH Parent for $170,000,000 in cash and non-cash consideration to PGS under a Purchase Agreement dated June 9, 2016 (the "PGS Note Purchase Agreement");

d.   Beechwood caused its investor clients (including SHIP) to contribute cash and non-cash interests (primarily in additional distressed Platinum assets) in exchange for B-1 Units in AGH Parent valued at $100 per unit pursuant to a Contribution Agreement dated June 9, 2016 among AGH Parent and various transferors (the "Contribution Agreement");

e.   AGH Parent was recapitalized under an Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") that gave Beechwood full management control of AGH Parent;

f.   AGH Parent issued $51,960,000 of secured notes to various investors (including SHIP) pursuant to a Note Purchase Agreement and related documents, in exchange for a mix of cash and asset contributions;  and

g.   Beechwood entered into a Purchase Option Agreement on behalf of certain Beechwood investors (including SHIP) that provided those investors (including

SHIP) with a collective option to purchase a 4.99% equity interest in Agera Holdings.

184.    At the closing that occurred on June 9, 2016, AGH Parent paid PGS $65,293,540 in cash; $43,666,460 in scheduled debt and equity instruments, including various debt instruments then held by SHIP; 3,438 newly issued Class B-2 Units in AGH Parent with an original value of $2,000,000; and 590,400 Class C Units in AGH Parent with an original value of $59,040,000.   PGS also repaid the $25 million it received under the Repo Note transactions as the consideration for reacquiring the Convertible Note under the Repurchase Agreement.

185.    Significantly, AGH Parent reserved a right to redeem a portion of the Class C Units from PGS in exchange for certain Platinum-related assets that were scheduled and given an agreed value as part of the transactions.   Given the distress of the Platinum fund complex, this redemption right was included in order to give Beechwood and Platinum insiders a mechanism to attempt to transfer equity in AGH Parent to themselves in the event that PGS or its owners were placed into insolvency or receivership proceedings.

186.    The cash and securities paid to PGS exceeded $55 million, including $50 million that came from SHIP and was not invested directly through one of the existing IMA accounts.

187.    In exchange for its direct investment of $50 million in AGH Parent, SHIP received 350,000 Class A Preferred Units, a B-1 Senior Secured Note issued by AGH Parent in the principal amount of $15 million, and 5,730 Common Units in AGH Parent as an "equity kicker."   SHIP also received a $940,000 B-1 Senior Secured Note issued by AGH Parent and a $5,000,000 interest in BBLN-Agera's $9,060,000 B-1 Senior Secured Note issued by AGH Parent from cash and assets contributed through the IMA Accounts.

188.    BAM Management Services LLC ("BAM Management"), which is wholly owned and controlled by Beechwood, was appointed as the Manager of AGH Parent. As such, BAM Management essentially had complete discretion to manage AGH Parent in exchange for a fee of $1 million per year.   Another Beechwood entity, BAM Administrative Services, LLC ("BAM Administrative"), which served as the administrative agent for all Beechwood-related debt investments that Beechwood acquired for the account of SHIP, was appointed as the administrative agent on the AGH Parent debt.   Thus, between BAM Management and BAM Administrative, Beechwood possessed complete control over all of SHIP's interests in AGH Parent, Agera Energy, and any related entities.

189.    After giving effect to the June 2016 transactions, SHIP's total investment in AGH Parent, Agera Holdings, Agera Energy, and any related entity was approximately $60 million.

190.    In late July 2016, the relationship between Beechwood and Platinum was first reported in the press, resulting in pressure on Beechwood Re in particular both to justify its investment of reserve funds under its various reinsurance agreements with other insurers in Platinum-related entities and to liquidate investments to demonstrate returns.   To that end, on July 26, 2016, Beechwood caused SHIP to purchase 18,593.80 B-1 Units in AGH Parent from BBIL-ULICO, an entity that appears to have been set up by Beechwood to invest reserves ceded to Beechwood Re under a reinsurance agreement between Beechwood Re and one or more long-term care insurers associated with ULICO Casualty Company.   Although these units had been issued to BBIL-ULICO on June 9, 2016 at a valuation of $100 per unit, Beechwood caused SHIP to pay $11,323,000 for them, which represents a purported six-fold value increase in just over one month.

191.    Beechwood sought to avoid detection of this elaborate scheme by brokering a sale of AGH Parent, which would result in the unwinding of the structure and the repayment of SHIP's debt and equity interests, without any significant return for SHIP, but at a substantial profit to Beechwood, its principals, and its investors. As part of this scheme, AGH Parent exercised its redemption option with PGS, notifying PGS of its intent to redeem 336,928.93 Class C Units.

192.    Pursuant to a Purchase Agreement dated November 18, 2016, AGH Parent agreed to sell the Convertible Note and the 49.9 common units of Agera Holdings for a purchase price of $315,000,000.   The agreement was negotiated by Narain and was executed by Narain on behalf of AGH Parent and Feuer as Manager of AGH Supplemental.   The buyer under this agreement was a third-party, unrelated acquisition vehicle set up by Bamara LLC.   Once Bamara and its lenders completed diligence on the transaction, however, they declined to close.

193.    In January 2017, AGH Parent redeemed the Class C Units from PGS. Immediately thereafter, and in violation of the LLC Agreement, BAM Management caused AGH Parent to reissue those Class C Units to Beechwood-related entities and various insiders without adequate consideration, thus seeking to assure that, in the event of a sale of the Convertible Note, those sums that (following the redemption) would have flowed to SHIP and others would actually flow to Beechwood-related entities and insiders.

194.    In or around January 2017, Narain formed Illumin and moved the remaining Beechwood investment management, operations, and administrative team to Illumin.   From that date, Illumin effectively served as an alter ego to Beechwood, performing the operations and

agency functions formerly performed by BAM Administrative and the investment management functions formerly provided by BAM, BBIL, and Beechwood Re.

195.    In or about June 2017, Beechwood entered into one or more transactions with affiliates of Eli Global/Global Bankers Insurance Group through which it sold its interests in various Beechwood entities for, upon information and belief, in excess of $1 billion.  Those assets included interests held by Beechwood in AGH Parent for its own account, as well as for the account of certain other investors, not including SHIP, thereby allowing Beechwood, its insiders, and certain Platinum insiders to cash out interests in the Agera enterprise for which they had invested no funds and had taken no risk, while leaving SHIP with nearly $70 million of funds tied up in illiquid interests of questionable worth in an entity now controlled by Eli Global.

196.    These examples illustrate Beechwood's distorted priorities and misguided loyalties and show the complex schemes devised and employed to keep SHIP and others in the dark while SHIP's assets were being depleted, misused, and converted to Defendants' benefit and to SHIP's detriment.  Defendants used SHIP's funds for their own purposes and without regard to the purported purposes of the written agreements and without regard for differences among the various entities and agreements.  SHIP's funds were just new fuel to keep the broad scheme burning longer.  Defendants' actions prevented SHIP, among other things, from discovering the true nature and value of investments made with its assets, denied SHIP the ability to protect its assets from speculative investments, depletion, and misuse by Defendants. Defendants further denied SHIP access to full and accurate information about the nature and performance of the investments, thus preventing SHIP from taking earlier actions to protect itself and limit the damage being done to it.  Defendants caused SHIP to expend significant amounts in

order to uncover over time the true nature and value of investments made with its assets as well as additional amounts in an effort to alter or exit investments and otherwise to realize any value from such investments in mitigation of Defendants' unlawful acts.  The full extent of the harm caused by Beechwood's manipulations still is not fully known.

### G.  Revelation of Beechwood's Misconduct

197.  SHIP was unaware of and had no reason to suspect Beechwood's deep ties to Platinum or the pervasive nature of Defendants' fraudulent conduct or their failure to perform in accordance with the IMAs and their fiduciary duties.  The truth was not revealed until after news reports in the summer and fall of 2016 gradually began to expose the nature and extent of Beechwood's involvement with and control by Platinum.  Murray Huberfeld of Platinum was arrested on June 8, 2016, and news articles followed, but they did not reveal Platinum's complex connections to Beechwood.  The first article to reveal connections between Platinum and Beechwood was published by the *Wall Street Journal* on July 25, 2016.

198.  After its connections to Platinum were identified, Beechwood continued its pattern of deceiving SHIP.  A July 26, 2016 Beechwood letter to Wegner, SHIP's CEO, represented that Beechwood had reviewed investments that Beechwood made involving Platinum Partners and reassured SHIP that Beechwood has "no reason to believe that either Beechwood or any of your related portfolios suffered financial harm."  Beechwood also continued to tout its "appropriate risk management" and "strong safeguards" for SHIP's investments.  Beechwood likewise represented to SHIP that it was in the process of, and was capable of, severing all ties with Platinum.  Into the fall of 2016, SHIP continued to be assured that its investments were secured by appropriate collateral, and Beechwood offered no indication

that it had favored its own interests and those of its affiliates, including Platinum-related interests, over SHIP's.

199.    In connection with its representation to SHIP that Beechwood was not exposed to Platinum's troubles and that SHIP's investments were not at risk, Beechwood continued to claim performance fees under the IMAs at least through the fall of 2016.  For example, BBIL withdrew performance fees of $11,291,401 on August 1, 2016 under the BBIL IMA and BAM claimed $2,755,544.56 in performance fees for the period ending September 30, 2016.  While the IMAs permitted Beechwood to receive quarterly payments based on estimated performance fees, Beechwood was only entitled to receive performance fees if the investment return on the IMAs exceeded the 5.85% guaranteed return.  With the Platinum funds collapsing, Beechwood knew, or was grossly negligent in not knowing, that the actual value of the assets in the respective IMAs was far below the point at which Beechwood was entitled to retain the performance fees it has taken, much less take additional fees.

200.    In addition to reassuring SHIP that its investments were secure throughout the summer and fall of 2016, Beechwood also represented to the Pennsylvania Insurance Department on August 17, 2016 that SHIP's portfolio was strongly protected and highly collateralized, Beechwood was taking "aggressive action" to reduce its exposure to Platinum investments and to unwind and sever "our limited ties with Platinum," and the guaranteed returns in SHIP's IMA accounts remained secure.  This letter reassured SHIP as to the extent of capital and surplus available for the Beechwood Advisors to "backstop these respective guarantees" to SHIP on its investments.

201.    In or about November 2016, as Beechwood purported to be attempting to assist SHIP, Beechwood's in-house counsel proposed to SHIP that the IMAs be terminated, an action clearly designed to protect the Beechwood Advisors at SHIP's expense.

202.    SHIP refused to act on Beechwood's request, but directed Beechwood to transfer all cash and short-term investments out of the IMA accounts managed by Beechwood and to move those assets into SHIP's custodial accounts at Bank of New York Mellon.  SHIP also instructed Beechwood to transfer all limited partnership and other equity interests in each of the IMA accounts that were not registered solely in SHIP's name into SHIP's exclusive name and advised Beechwood that it was no longer authorized to act with respect to any asset in which SHIP possessed a direct or indirect interest, without express direction from SHIP.

203.    Despite SHIP's efforts to limit its harm, by November 2016 much of the damage already was done. Over the course of the next several months, SHIP gradually began to uncover misrepresentations and omissions by Beechwood and the pervasive cover-up of Beechwood's disastrously harmful and unsuitable investment of SHIP assets and its favoring of its own interests and those of its affiliates over the interests of its client, SHIP.  Beechwood's cooperation and release of information to assist SHIP's damage-control efforts has been, and remains, intermittent and incomplete.  Beechwood continues to advance its interests over SHIP's in the resolution and disposition of mutual investments or investments in the same entities.  What SHIP has learned, though still incomplete, demonstrates forcefully Beechwood's breaches of each of the IMAs, its bad faith, its breaches of fiduciary and other legal duties owed to SHIP, its gross negligence, and its intentional misconduct, conspiring, and racketeering with others.

E.     **The RICO Enterprises**

204.   Beechwood Re, BBIL, BAM, BRILLC, and Illumin are enterprises within the meaning of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"). Moreover, Beechwood – the association-in-fact of Beechwood Re, BBIL, BAM, BRILLC, Illumin, Beechwood Holdings, Beechwood Investments, and the Beechwood trusts – constitutes a second RICO enterprise.  And the association-in-fact of these entities and their co-conspirators, including, but not limited to, Feuer, Taylor, Levy, Narain, Nordlicht, Bodner, and others at or associated with Platinum, constitutes a third RICO enterprise.  As set forth in this Complaint, as well as in the Criminal Indictments and SEC Complaint, Defendants and their co-conspirators functioned as a unit and conducted the affairs of each of these three RICO enterprises through a pattern of racketeering activity.

205.   These RICO enterprises shared common purposes and a structure.  The primary purpose was to use the vehicles of Beechwood Re, BBIL, BAM, BRILLC, and Illumin to obtain funds from institutional investors, particularly insurance companies, and to use them to enrich the co-conspirators while furthering their ongoing Ponzi-like scheme, all to SHIP's detriment.

206.   Defendants' and their co-conspirators' use of the mails and wires of interstate commerce was integral to their perpetration of their common purposes and fraudulent schemes. Each of the co-conspirators agreed and committed to participate in these RICO enterprises and their common purposes and fraudulent schemes through two or more predicate acts of racketeering activity.

207.   These RICO enterprises had an ascertainable structure and organization that existed apart from the predicate acts of racketeering activity, as is demonstrated by: (a) the

58

ownership and management structure of Beechwood Re, BBIL, BAM, BRILLC, Beechwood Holdings, Beechwood Investments, and Illumin; (b) the roles the co-conspirators played in the establishment of, acquisition of interests in, and operation and management of Beechwood Re, BBIL, BAM, BRILLC, Beechwood Holdings, Beechwood Investments, and Illumin; and (c) many of the co-conspirators' often overlapping roles and positions at Beechwood Re, BBIL, BAM, BRILLC, Beechwood Holdings, Beechwood Investments, Illumin and the various Platinum entities.  As is demonstrated not only by each of the Defendants' roles and positions, but also by the facts set forth in this Complaint, the Criminal Indictments of Levy, Nordlicht, Huberfeld, and others, and the SEC Complaint, the co-conspirators functioned as a unit, with each of the Defendants participating in the operation or management of the RICO enterprises and playing vital roles in directing the enterprises' affairs through a pattern of racketeering activity.

208.    On May 25, 2018, a Department of Justice press release announced that Huberfeld pled guilty to conspiracy to commit wire fraud in connection with at least one aspect of his Platinum-related activities.

209.    The co-conspirators' pattern of racketeering activity has been continuous and ongoing.  The Criminal Indictments and the SEC Complaint confirm the pattern of racketeering, as it relates to SHIP and other insurers, that commenced at least by 2013 and remains ongoing and open-ended.  For example, Beechwood Re's and BBIL's reinsurance relationships with other insurers appear to be continuing at present, and Beechwood Re still maintains control of reinsurance trust assets.  The predicate acts of racketeering activity are all related, as all are tied to the enterprises' central purposes, as identified in this Complaint, and all have had the same or similar results (e.g., inducing institutional investors such as insurers to entrust assets to

Beechwood), participants (e.g., the co-conspirators, including those identified as Defendants in this action), victims (e.g., SHIP and other insurers), methods of commissions (e.g., deceptive schemes and promises, misrepresentations, fraudulent concealment of material facts, and over-valuation of assets), personally profiting Defendants and Platinum-related participants (e.g., Nordlicht, Huberfeld, Bodner, Levy, Feuer, and Taylor), and other distinguishing characteristics such as using Platinum's designees to serve as Beechwood managers.   The predicate acts of racketeering activity have been an integral part of the enterprises' regular way of doing business.

## COUNT ONE

### Breach of Contract
### (Against BBIL)

210.   SHIP incorporates each and every allegation above as if set forth fully in this count.

211.   SHIP executed three contractually binding IMAs with the Beechwood Advisors. The BBIL IMA was executed by SHIP and BBIL on May 22, 2014.

212.   The BBIL IMA guaranteed SHIP an annual investment return equal to 5.85% of the net asset value of the funds invested by SHIP.

213.   BBIL breached the BBIL IMA by failing to deliver the promised, guaranteed investment returns.   BBIL further breached the BBIL IMA by failing to protect and return SHIP's invested funds or equivalent assets, upon SHIP's demand.

214.   Under the BBIL IMA, BBIL was also required to manage SHIP's assets in a manner "consistent with the general investment policy, guidelines and restrictions" of BBIL and SHIP and its other contractual duties.

215.    BBIL breached the BBIL IMA by not complying with those investment policies, guidelines, and restrictions, by placing SHIP funds into investments and related-party transactions that were highly speculative, not adequately secured, opaque, and  not appropriately disclosed to SHIP, and by failing to have sufficient controls in place to secure SHIP's interests. BBIL further favored its own financial interests and those of its affiliates, to SHIP's financial detriment, in the manner in which BBIL managed the investment of SHIP's funds.

216.    BBIL's breaches, individually and together, have had the effect of denying SHIP the guaranteed fruits of the BBIL IMA.

217.    BBIL's breaches of the BBIL IMA, individually and together, were intentional and deliberate, were aimed at the public generally, and evince a high degree of moral turpitude, demonstrating BBIL's wanton dishonesty or reckless disregard as to its obligations under the BBIL IMA.

218.    BBIL's actions, omissions, or concealments taken in connection with its duties under the BBIL IMA were not in good faith, were in violation of the BBIL IMA, and constituted fraud, willful misconduct, or at the very least gross negligence on the part of BBIL.

219.    BBIL's conduct in its failed performance of the BBIL IMA further constitutes a breach of the implied covenant of good faith and fair dealing that exists in every contract.

220.    As a result of such breach, SHIP has suffered damages in excess of $75,000.

221.    Because of the intentional, deliberate, and malicious nature of BBIL's acts in breach of the BBIL IMA, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT TWO

### Breach of Contract
### (Against Beechwood Re)

222.    SHIP incorporates each and every allegation above as if set forth fully in this count.

223.    SHIP executed three contractually binding IMAs with the Beechwood Advisors. The BRe IMA was executed by SHIP and Beechwood Re on June 13, 2014.

224.    The BRe IMA guaranteed SHIP an annual investment return equal to 5.85% of the net asset value of the funds invested by SHIP.

225.    Beechwood Re breached the BRe IMA by failing to deliver the promised, guaranteed investment returns.  Beechwood further breached the BRe IMA  by failing to protect and return SHIP's invested funds or equivalent assets, upon SHIP's demand.

226.    Under the BRe IMA, Beechwood was also required to manage SHIP's assets in a manner "consistent with  the general investment policy, guidelines  and  restrictions" of Beechwood Re and SHIP and its other contractual duties.

227.    Beechwood Re breached the BRe IMA by not complying with those investment policies, guidelines, and restrictions, by placing SHIP funds into investments and related-party transactions that were highly speculative, not adequately secured, opaque, and  not appropriately disclosed to SHIP, and by failing to have sufficient controls in place to secure SHIP's interests. Beechwood Re further favored its own financial interests and those of its affiliates, to SHIP's financial detriment, in the manner in which Beechwood Re managed the investment of SHIP's funds.

228.    Beechwood Re's breaches, individually and together, have had the effect of denying SHIP the guaranteed fruits of the BRe IMA.

229.    Beechwood Re's breaches of the BRe IMA, individually and together, were intentional and deliberate, were aimed at the public generally, and evince a high degree of moral turpitude, demonstrating Beechwood Re's wanton dishonesty or reckless disregard as to its obligations under the BRe IMA.

230.    Beechwood Re's actions, omissions, or concealments taken in connection with its duties under the BRe IMA were not in good faith, were in violation of the BRe IMA, and constituted fraud, willful misconduct, or at the very least gross negligence on the part of Beechwood.

231.    Beechwood Re's conduct in its failed performance of the BRe IMA further constitutes a breach of the implied covenant of good faith and fair dealing that exists in every contract.

232.    As a result of such breach, SHIP has suffered damages in excess of $75,000.

233.    Because of the intentional, deliberate, and malicious nature of Beechwood Re's acts in breach of the BRe IMA, as set forth in this Complaint, SHIP is entitled to punitive damages.

**COUNT THREE**

**Breach of Contract**
**(Against BAM and BRILLC)**

234.    SHIP incorporates each and every allegation above as if set forth fully in this count.

63

235.   SHIP executed three contractually binding IMAs with the Beechwood Advisors. The BAM IMA was executed by SHIP and BAM on January 15, 2015.

236.   The BAM IMA, subject to a Side Letter with BRILLC, guaranteed SHIP an annual investment return equal to 5.85% of the net asset value of the funds invested by SHIP.

237.   BAM and BRILLC breached the BAM IMA and Side Letter by failing to deliver the promised, guaranteed investment returns.   BAM and BRILLC further breached the BAM IMA and Side Letter by failing to protect and return SHIP's invested funds or equivalent assets, upon SHIP's demand.

238.   Under the BAM IMA, BAM was required to manage SHIP's assets in a manner "consistent with the general investment policy, guidelines and restrictions" of BAM and SHIP and its other contractual duties.

239.   BAM breached the BAM IMA by not complying with those investment policies, guidelines, and restrictions, by placing SHIP assets into investments and related-party transactions that were highly speculative, not adequately secured, opaque, and  not appropriately disclosed to SHIP, and by failing to have sufficient controls in place to secure SHIP's interests. BAM further favored its own financial interests and those of its affiliates, to SHIP's financial detriment, in the manner in which BAM managed the investment of SHIP's funds.

240.   The breaches by BAM and BRILLC, individually and together, have had the effect of denying SHIP the guaranteed fruits of the BAM IMA and Side Letter.

241.   The breaches by BAM and BRILLC of the BAM IMA and Side Letter, individually and together, were intentional and deliberate, were aimed at the public generally,

and evince a high degree of moral turpitude, demonstrating the wanton dishonesty or reckless disregard by BAM and BRILLC as to their obligations under the BAM IMA and Side Letter.

242.    The actions, omissions, or concealments taken by BAM and BRILLC in connection with their duties under the BAM IMA and Side Letter were not in good faith, were in violation of the BAM IMA and Side Letter, and constituted fraud, willful misconduct, or at the very least gross negligence on the part of BAM and BRILLC.

243.    The conduct of BAM and BRILLC in its failed performance of the BAM IMA and Side Letter further constitutes a breach of the implied covenant of good faith and fair dealing that exists in every contract.

244.    As a result of such breach, SHIP has suffered damages in excess of $75,000.

245.    Because of the intentional, deliberate, and malicious nature of the acts of BAM and BRILLC in breach of the BAM IMA and Side Letter, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT FOUR

### Breach of Fiduciary Duty
### (Against All Known Defendants)

246.    SHIP incorporates each and every allegation above as if set forth fully in this count.  The term "Known Defendants" in this Complaint is intended to refer to all identified Defendants, but not John Does 1-10.

247.    The Beechwood Advisors, as SHIP's investment advisors, owed fiduciary duties to SHIP pursuant to the terms of the IMAs and by the nature of the overall relationship of trust that existed.

248.    The Individual Defendants, as the most senior officers of Beechwood responsible for performance of the IMAs and given the nature of the overall relationship of trust, owed SHIP fiduciary duties as well.

249.    Based on Defendants' assurances that Beechwood would invest SHIP's assets prudently, in accordance with all relevant investment guidelines, and consistently with Defendants' other representations, and would be able to perform on Beechwood's guaranteed contractual returns, SHIP reposed trust and confidence in Defendants.

250.    Defendants owed SHIP duties of candor, loyalty, and care.

251.    Defendants breached these fiduciary duties by the acts set forth in this Complaint, and thus denied SHIP the use and benefit of its invested funds and denied it the guaranteed contractual returns on those funds or the promised returns on certain specific investments. Defendants further denied SHIP access to full and accurate information about the nature and performance of the investments, thus preventing SHIP from taking earlier actions to protect itself and limit the damage being done to it.

252.    Defendants' breaches of their fiduciary duties were intentional and deliberate, and evince a high degree of moral turpitude, demonstrating Beechwood's wanton dishonesty or reckless disregard as to its obligations under the IMAs and Side Letter.  At the very least, Defendants' actions constitute gross negligence.

253.    As a direct result of Defendants' misconduct, SHIP has suffered damages in excess of $75,000.

254.   Because of the intentional, deliberate, and malicious nature of Beechwood's acts in breach of its fiduciary duties, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT FIVE

### Fraud in the Inducement
### (Against All Known Defendants)

255.   SHIP incorporates each and every allegation above as if set forth fully in this count.

256.   Prior to execution of each of the IMAs and any investments, Defendants knowingly made numerous false representations of material fact to SHIP, knowing such statements were false when making them, as detailed in this Complaint, with the intent of inducing SHIP to enter into the IMAs or any investments.

257.   Defendants also knowingly omitted and concealed from SHIP material information, even though Defendants knew such information was material, as detailed in this Complaint, and they did so with the intent of inducing SHIP to enter into the IMAs or any investments.

258.   SHIP was induced to believe that its contributed assets would be invested conservatively and in investments suitable to an insurer in run-off.  SHIP further was induced to believe that its assets would be invested consistent with SHIP's best interests and that Beechwood would not favor its own interests and the interests of its affiliates to SHIP's detriment.  Beechwood induced SHIP to believe that it would receive guaranteed annual returns and that Beechwood was capable of producing, and intended to produce, those guaranteed annual returns.

259.    SHIP justifiably relied upon such misrepresentations and omissions or concealments to its detriment in entering into the IMAs or any investments.

260.    SHIP has been injured as a proximate result of Defendants' fraudulent misrepresentations, omissions, and concealments.  Defendants denied SHIP the use and benefit of the funds it invested through and with Defendants, denied it the ability to invest those funds consistent with SHIP's investment policies and guidelines, and denied it the ability to obtain a reasonable investment return on its invested funds.

261.    Defendants' misrepresentations and omissions or concealments in inducing SHIP to enter into the IMAs and otherwise to invest through and with Defendants were intentional and deliberate, evince a high degree of moral turpitude, and demonstrate Defendants' wanton dishonesty or reckless disregard for the rights of SHIP.

262.    As a result of Defendants' conduct, SHIP has suffered damages in excess of $75,000.

263.    Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT SIX

### Fraud
### (Against All Known Defendants)

264.    SHIP incorporates each and every allegation above as if set forth fully in this count.

265.    During as well as before performance under the IMAs or in connection with any investment, Defendants knowingly made numerous false representations of material fact to

SHIP, as detailed in this Complaint, with the intent of causing SHIP not to terminate the IMAs or any investments after they were executed or otherwise interfere with Defendants' scheme.

266.    During as well as before performance under the IMAs or in connection with any investment, Defendants also knowingly omitted and concealed material information from SHIP, even though they knew such information was material, as detailed in this Complaint, and Defendants did so with the intent of causing SHIP to continue to invest and not to terminate the IMAs or any investments or otherwise interfere with Defendants' scheme.

267.    SHIP justifiably relied upon such misrepresentations and omissions or concealments to its detriment by investing, by continuing to invest, and by not terminating the IMAs or any investments after they were executed, and by not attempting to interfere with or influence Defendants' actions.

268.    SHIP has been injured as a proximate result of each of the Defendants' fraudulent misrepresentations and concealments, as set forth in this Complaint.

269.    Defendants' misrepresentations and omissions or concealments made with the intent of causing SHIP to enter into and remain in the IMAs or any investments were intentional and deliberate, evince a high degree of moral turpitude, and demonstrate Defendants' wanton dishonesty or reckless disregard for the rights of SHIP.

270.    As a result of Defendants' conduct, SHIP has suffered damages in excess of $75,000.

271.    Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT SEVEN

### Constructive Fraud
### (Against All Known Defendants)

272.    SHIP incorporates each and every allegation above as if set forth fully in this count.

273.    During as well as before performance under the IMAs, Defendants made numerous false representations of material fact to SHIP, as detailed in this Complaint, with the intent of causing SHIP not to terminate the IMAs or any investments after they were executed and to continue investing through Beechwood.

274.    During as well as before performance under the IMAs or in connection with any investment, Defendants also omitted and concealed material information from SHIP, as detailed in this Complaint, and Defendants did so with the intent of causing SHIP to continue to invest and not to terminate the IMAs or any investments.

275.    A fiduciary relationship existed between SHIP and the Beechwood Advisors.  As described above, the Beechwood Advisors, as SHIP's investment advisors, owed fiduciary duties to SHIP pursuant to the terms of the IMAs and by the nature of the relationship of trust that existed.

276.    A fiduciary relationship also existed between SHIP and the Individual Defendants who acted on behalf of Beechwood, including the most senior officers of Beechwood responsible for performance of the IMAs and Narain, who assumed certain responsibilities after the IMAs had been executed.

277.    SHIP reposed trust and confidence in Defendants, based on Defendants' assurances that Beechwood would invest SHIP's assets prudently, in accordance with all relevant

investment guidelines, consistently with Defendants' other representations, and in SHIP's best interests.  Defendants also assured SHIP that they would be able to perform on Beechwood's guaranteed contractual returns and all other promises.

278.    Because of the nature of the fiduciary relationships, SHIP justifiably relied upon Defendants' misrepresentations and omissions or concealments to its detriment by investing, by continuing to invest, and by not terminating the IMAs or any investments after they were executed.

279.    SHIP has been injured as a proximate result of each of the Defendants' fraudulent misrepresentations and concealments, as set forth in this Complaint.

280.    Defendants' misrepresentations and omissions or concealments made with the intent of causing SHIP to enter into the IMAs or any investments were intentional and deliberate, evince a high degree of moral turpitude, and demonstrate Defendants' wanton dishonesty or reckless disregard for the rights of SHIP.

281.    As a result of Defendants' conduct, SHIP has suffered damages in excess of $75,000.

282.    Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT EIGHT

### Violation of RICO – 18 U.S.C. § 1962(c)
### (Against All Known Defendants)

283.    SHIP incorporates each and every allegation above as if set forth fully in this count.

284.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

285.    Plaintiff SHIP is a "person" as defined in 18 U.S.C. § 1961(3).

286.    Each of the Defendants is a "person" as that term is defined in 18 U.S.C. § 1961(3).

287.    Each of the Defendants was employed by, an owner of, or associated with certain enterprises: (a) Beechwood Re, BBIL, BAM, BRILLC, or Illumin; (b) Beechwood – the association-in-fact of Beechwood Re, BBIL, BAM, BRILLC, Beechwood Holdings, Beechwood Investments, and Illumin; and (c) the association-in-fact of Defendants and their co-conspirators, including, but not limited to, Nordlicht, Huberfeld, Bodner, and the other Platinum-related persons.

288.    Each of these entities or associations-in-fact constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  Each of these RICO enterprises had an ascertainable structure, organization, and common purposes and existed apart from the predicate acts perpetrated by these Defendants.  At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce.  Each of the Defendants participated directly or indirectly in the management, direction, or operation of each enterprise.

289.    As set forth in detail in this Complaint, each Defendant conducted or participated in the conduct of affairs of each of these three RICO enterprises through a pattern of racketeering activity, as set forth in 18 U.S.C. § 1961(5).  That is, each Defendant knowingly perpetrated and

agreed to perpetrate numerous predicate acts of racketeering activity identified under 18 U.S.C. § 1961(1), specifically mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Each Defendant knowingly perpetrated and agree to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud SHIP and other institutional investors to enter into investment management agreements or reinsurance agreements and to obtain money and property by means of false pretenses, representations and promises.   Predicate acts of racketeering include, but are not limited to, using the mails and wires of interstate commerce to:

> a) make representations to SHIP, including, but not limited to, the April 10, 2014 Discussion Document, the BBIL IMA, the Beechwood Re IMA, the BAM IMA, and the BRILLC Side Letter, that Defendants would provide secure, highly collateralized, and well-protected investments when instead Defendants intended to use investment assets to perpetuate a scheme that involved enriching Platinum Partners or committing SHIP's entrusted assets in risky, speculative transactions and subordinating SHIP's interests to those of Beechwood-related entities;

> b) transmit communications, including, but not limited to, the April 9, 2015 Duff & Phelps Report and the April 20, 2015 email to Paul Lorentz of SHIP, that contained inflated, and in some cases fraudulent, valuations of Beechwood's Platinum Partners-related investments to SHIP and others, and these communications in turn were used by Defendants to collect unearned performance fees;

c) transmit communications, primarily statements by Feuer and Taylor, mispresenting that Beechwood was well capitalized and would prudently invest SHIP's assets, while concealing and affirmatively misrepresenting Beechwood's true ownership structure and purpose;

d) transmit communications, including the April 10, 2014 Discussion Document, that misrepresented the true nature of Beechwood's management team, while concealing its ties to and control by Platinum Partners, Nordlicht, Huberfeld, Bodner, and other Platinum-related persons;

e) orchestrate the use of funds invested by SHIP to acquire highly risky debt assets, including, but not limited to, the PEDEVCO Note and 2016 NPA, the 2015 Montsant NPA and subsequent amendments, and the Agera Energy transactions extending through at least 2017, and then subordinate SHIP's interests to those of Beechwood-related entities, thereby enriching Defendants; and

f) commit similar and related acts of fraud against BCLIC and WNLIC, which date back to at latest 2013.

290.   These predicate acts of racketeering activity are all related, as Defendants have perpetrated the predicate acts from the common purpose of furthering their fraudulent schemes, as identified and discussed in detail in this Complaint.  Their predicate acts of racketeering activity have all had common (a) results (furthering their fraudulent schemes to induce institutional investors such as insurers to entrust assets to Beechwood), (b) participants (Defendants and their co-conspirators), (c) victims (insurers such as SHIP), (d) methods of commission (the use of fraudulent and deceptive devices to induce insurers into entrusting their

assets to Beechwood, the false and fraudulent over-valuation of assets) and (e) other distinguishing characteristics (such as using Platinum-associated individuals as purported Beechwood managers).

291.    The predicate acts of racketeering have also been continuous.  Defendants began perpetrating predicate acts of racketeering in furtherance of their fraudulent schemes by 2013 at the latest, when they fraudulently executed reinsurance agreements with BLCLIC and WNIC, and they have perpetrated them continuously for several years.  Defendants began their racketeering with direct regard to SHIP no later than 2014, when they caused SHIP to execute the first IMA.  Their predicate acts of racketeering remain ongoing and open-ended, as Defendants retain millions in funds or assets from and owing to SHIP and other investors, which Defendants misappropriated and misused over a period of serval years.  The predicate acts of racketeering activity have been an integral part of the enterprises' regular way of doing business.  Defendants thus have engaged in a "pattern" of racketeering activity, as that phrase is defined in 18 U.S.C. § 1961(5).

292.    Each Defendant has violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

293.    SHIP has been injured in its business and property by reason and a proximate result of each of Defendant's violations of 18 U.S.C. § 1962(c), in at least the following ways: (a) by being fraudulently induced to enter into IMAs or other investments with Beechwood and by paying unearned performance fees to Beechwood; (b) by reducing the value of SHIP's assets through investments that are speculative, risky, or simply sham transactions, all of which were made to benefit Platinum; (c) by the need to hire consultants and legal counsel to unwind

Beechwood's improper investments of SHIP assets; and (d) by the need to hire legal counsel and advisors to pursue SHIP's claim.

294.    By virtue of Defendants' violations of 18 U.S.C. §1962(c), SHIP is entitled to recover from them three times the damages sustained by reason of the Defendants' actions, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT NINE

**Violation of RICO – 18 U.S.C. § 1962(a)**
**(Against All Known Defendants)**

295.    SHIP incorporates each and every allegation above as if set forth fully in this count.

296.    Under 18 U.S.C. § 1962(a), it is "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

297.    Each Defendant has received income derived, directly or indirectly, from the pattern of racketeering set forth above, including, but not limited to: (a) the assets that SHIP and other similarly situated victims entrusted to Defendants, which assets were used to enrich the Defendants and closely related Platinum Partners entities and affiliates; and (b) the unearned performance fees that Defendants collected as a result of the fraudulent valuations provided to SHIP and other similarly situated victims.

298.    Although Defendants represented to SHIP that they would invest SHIP's assets conservatively, Defendants instead used SHIP funds to buy Beechwood-related entities out of distressed and highly risky investments, including but not limited to the PEDEVCO note.   To make things worse, Defendants subordinated SHIP's interests beneath their own.  This enriched Defendants and allowed them to perpetuate their Ponzi-esque scheme, which in turn further injured SHIP and similarly-situated victims of the scheme.

299.    Defendants used the above-mentioned racketeering income in furtherance of their RICO enterprises: (a) Beechwood Re, BBIL, BAM, BRILLC, or Illumin; (b) Beechwood – the association-in-fact of Beechwood Re, BBIL, BAM, BRILLC, Beechwood Holdings, Beechwood Investments, and Illumin; and (c) the association-in-fact of Defendants and their co-conspirators, including, but not limited to, Nordlicht, Huberfeld, Bodner, and the other Platinum-related persons.  Each enterprise was engaged in and affected interstate and foreign commerce.   The racketeering income was reinvested in these enterprises as part of a scheme by Defendants to perpetuate more injurious and illegal acts.

300.    Each Defendant's violation of 18 U.S.C. §1962(a) has directly and proximately injured SHIP in its business and property in at least the following ways: (a) by being fraudulently induced to enter into IMAs or other investments with Beechwood and paying unearned performance fees to Beechwood; (b) by reducing the value of the SHIP's assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit Defendants and Platinum; (c) by the need to hire consultants and legal counsel to unwind Beechwood's improper investments of SHIP assets; and (d) by the need to hire legal counsel to pursue SHIP's claim.

301.    By virtue of Defendants' violations of 18 U.S.C. §1962(a), SHIP is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT TEN

### Violation of RICO – 18 U.S.C. § 1962(d)
### (Against All Known Defendants)

302.    SHIP incorporates each and every allegation above as if set forth fully in this count.

303.    Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [§ 1962(a), (b), or (c)]."

304.    As described in detail in this Complaint, Defendants and their co-conspirators agreed and conspired with each other to violate 18 U.S.C. §§ 1962(a) and (c).

305.    The purposes of the conspiracy included obtaining funds from institutional investors, particularly insurers such as SHIP, via investment management agreements and reinsurance agreements, taking control of such funds, and using them to further and perpetuate the co-conspirators' ongoing Ponzi-esque scheme to enrich Defendants and their co-conspirators to the detriment of their purported investors.

306.    Defendants, as co-conspirators, perpetrated and agreed to perpetrate numerous predicate acts of racketeering activity identified under 18 U.S.C. § 1961(1), specifically mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Each Defendant perpetrated and agreed to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud SHIP and other institutional investors to

enter into investment management agreements or reinsurance agreements and to obtain money and property by means of false pretenses, representations and promises.   Predicate acts of racketeering include, but are not limited to, using the mails and wires of interstate commerce to:

a) make representations to SHIP, including but not limited to the April 10, 2014 Discussion Document, the BBIL IMA, the Beechwood Re IMA, the BAM IMA, and the BRILLC Side Letter, that Defendants would provide secure, highly collateralized and well-protected investments, when instead Defendants intended to use investment assets to perpetuate a scheme that involved enriching Platinum Partners and/or committing SHIP's entrusted assets in risky, speculative transactions, and subordinating SHIP's interests to those of Beechwood-related entities;

b) transmit communications, including but not limited to the April 9, 2015 Duff & Phelps Report and the April 20, 2015 email to Paul Lorentz of SHIP, that contained inflated, and in some cases fraudulent, valuations of Beechwood's Platinum Partners-related investments to SHIP and others, which in turn were used by Defendants to collect unearned performance fees;

c) transmit communications, primarily statements by Feuer and Taylor, misrepresenting that Beechwood was well capitalized and would prudently invest SHIP's assets, while concealing and affirmatively misrepresenting Beechwood Re's true ownership structure and purpose;

d) transmit communications, including the April 10, 2014 Discussion Document, that misrepresented Beechwood's management team, while concealing its ties to

and control by Platinum Partners, Nordlicht, Huberfeld, Bodner, and other Platinum-related persons;

e) orchestrate the use of funds invested by SHIP to acquire highly risky debt assets, including but not limited to the PEDEVCO Note and the Agera Energy transactions, then subordinate SHIP's interests to those of Beechwood-related entities, thereby enriching Defendants; and

f) commit similar and related acts of fraud against BCLIC and WNLIC, which date back to at latest 2013.

307.   Each Defendant's agreement can reasonably be inferred from the close ties to the other co-conspirators and their mutually dependent, coordinated efforts to achieve the common purposes of the co-conspirators and each enterprise.  Specifically, the Individual Defendants, as the primary executives and Chief Investment Officer of Defendants Beechwood Re, BBIL, BAM, and Illumin, acted in concert with executives of Platinum Partners to create a fraudulent scheme to attract new, unsuspecting institutional investors, including SHIP, without revealing that such investors were being committed to investment through Platinum Partners.

308.   SHIP has been injured in its business and property by reason of the aforementioned conspiracy, and a proximate result of each of Defendant's violations of 18 U.S.C. §§ 1962(a) and (c), in at least the following ways: (a) by being fraudulently induced to enter into IMAs or other investments with Beechwood and paying unearned performance fees to Beechwood; (b) by reducing the value of the SHIP's assets through investments that are speculative, risky, or simply sham transactions, all of which were made to benefit Platinum; (c)

by the need to hire consultants and legal counsel to unwind Beechwood's improper investments of SHIP assets; and (d) by the need to hire legal counsel to pursue SHIP's claim.

309.    By virtue of the Defendants' violations of 18 U.S.C. §1962(d), SHIP is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT ELEVEN

### Civil Conspiracy
### (Against All Defendants, Including John Does 1-10)

310.    SHIP incorporates each and every allegation above as if set forth fully in this count.

311.    Defendants, acting in concert and as a conspiracy, committed fraud in the inducement against SHIP by fraudulently inducing SHIP to enter each of the three IMAs and in turn invest SHIP's funds pursuant to those IMAs, as well as by causing or inducing SHIP to entire into other investments.

312.    Defendants, including John Does 1-10, further conspired to commit fraud in the performance against SHIP by misrepresenting the nature and performance of SHIP's investments, thereby causing SHIP to remain in unsuitable investments that favored the interests of the co-conspirators and their related parties over SHIP's best interests and to pay performance fees as well as continue to invest and not terminate the fraudulently induced IMAs or other investments.

313.    At all relevant times, each Defendant was a knowing and intentional participant in the conspiracy and agreed to pursue its aims.  Defendants were closely related entities or

individuals, with close corporate relationships and common control between the Beechwood Advisors and the individuals who are Defendants.

314.    Each Defendant committed one or more overt acts in furtherance of the conspiracy, including, but not limited to, making fraudulent representations to SHIP concerning its investment strategy, fraudulently concealing material information from SHIP concerning the performance of its assets, egregiously and maliciously mishandling the assets that SHIP entrusted to Defendants, or accepting ill-gotten benefits of the scheme.

315.    SHIP has been injured as a proximate result of the wrongful acts committed by Defendants in furtherance of the conspiracy, as set forth in this Complaint.

316.    As a result of Defendants' conduct, SHIP has suffered damages in excess of $75,000.

317.    Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT TWELVE

### In the Alternative, Gross Negligence
### (Against All Known Defendants)

318.    SHIP incorporates each and every allegation above as if set forth fully in this count.

319.    SHIP incorporates each and every allegation above as if set forth fully in this count.

320.    As set forth in this Complaint, SHIP alleges that Defendants conspired with Platinum and its principals, as well as others, to defraud and harm Plaintiffs, by knowingly and intentionally participating in a fraudulent scheme to induce SHIP to turn over approximately

$320 million to be managed by Beechwood for the benefit of Platinum and its principals, and to bolster and further Platinum's fraud scheme, which was known to Defendants.

321.    In the event it is determined that Defendants were unaware that the scheme was fraudulent and did not conspire intentionally with others to defraud SHIP in the manner set forth, SHIP asserts this claim for relief for gross negligence.

322.    Defendants owed SHIP a duty to act with reasonable care in connection with managing SHIP's assets.

323.    Defendants breached that duty of care by, among other things, making imprudent investments to benefit Platinum, failing to advise SHIP of the reasons for such investments, and improperly valuing such assets.  Defendants' conduct, as set forth in this Complaint, evinces a reckless disregard for and indifference to the rights of SHIP and smacks of intentional wrongdoing.

324.    As a result of Defendants' gross negligence, SHIP has sustained substantial losses in connection with the investments made under the IMAs and through other investments.

325.    Such gross negligence has actually and proximately caused damages to SHIP, in an amount in excess of $75,000.

326.    Because of the reckless or wanton nature of Beechwood's acts, as set forth in this Complaint, SHIP is entitled to punitive damages.

## COUNT THIRTEEN

### In the Alternative, Unjust Enrichment
### (Against All Defendants, Including John Does 1-10)

327.    SHIP incorporates each and every allegation above as if set forth fully in this count.

83

328.   As set forth in this Complaint, SHIP alleges that Defendants breached the IMAs and Side Letter and otherwise received money from SHIP for investment.

329.   In the event it is determined that the IMAs or Side Letter or other investment agreements are not enforceable for any reason, or that they do not apply to any Defendant's actions, SHIP asserts this equitable claim for relief.

330.   Defendants, including John Does 1-10, were unjustly enriched, at SHIP's expense, when Defendants received and enjoyed the use of SHIP's invested assets as well as when they collected Performance Fees in connection with investments that did not comply with SHIP's investment guidelines and had not in truth earned the requisite return to merit Performance Fees.   But for Defendants' improper conduct, those amounts never would have been paid to Beechwood and Defendants, and equity and good conscience militate against permitting any of the Defendants to retain those amounts, and other amounts they have personally received as a result of the IMAs or other investments.

331.   SHIP is entitled to restitution or other recoverable damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, SHIP respectfully demands judgment in the amount of actual damages proven at trial, including all direct or consequential damages, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under state law, damages for diminution of value, and restitution, plus all applicable interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  New York, New York
        July 24, 2018

Respectfully submitted,

By:

    Aidan M. McCormack (AMM 3017)
    R. Brian Seibert (RS 1978)
    DLA Piper LLP (US)
    1251 Avenue of the Americas
    New York, New York 10020
    T: (212) 335-4500
    F: (212) 335-4501
    E: aidan.mccormack@dlapiper.com
    E: brian.seibert@dlapiper.com

    James D. Mathias (*pro hac* forthcoming)
    Kathleen A. Birrane (*pro hac* forthcoming)
    DLA Piper LLP (US)
    The Marbury Building
    6225 Smith Avenue
    Baltimore, Maryland 21209-3600
    T: (410) 580-3000
    F: (410) 580-3001
    E: james.mathias@dlapiper.com
    E: kathleen.birrane@dlapiper.com

    *Attorneys for Plaintiff*
    *Senior Health Insurance Company of*
    *Pennsylvania*