UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
In re PLATINUM-BEECHWOOD LITIGATION :          18-cv-6658 (JSR)
------------------------------------ x
MARTIN TROTT and CHRISTOPER SMITH,  :
as Joint Official Liquidators and   :
Foreign Representatives of PLATINUM :
PARTNERS VALUE ARBITRAGE FUND L.P.  :           18-cv-10936 (JSR)
(in Official Liquidation), and      :
PLATINUM PARTNERS VALUE ARBITRAGE   :              OPINION
FUND L.P. (in Official              :
Liquidation),                       :
                                    :
        Plaintiffs,                 :
                                    :
          -v-                       :
                                    :
PLATINUM MANAGEMENT (NY) LLC, et    :
al.,                                :
                                    :
        Defendants.                 :
------------------------------------ x

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: |

JED S. RAKOFF, U.S.D.J.

On November 21, 2018, plaintiffs Martin Trott and

Christopher Smith, as Joint Official Liquidators and Foreign

Representatives of Platinum Partners Value Arbitrage Fund L.P.

(in Official Liquidation) ("PPVA"), and PPVA filed a multi-count

complaint against Platinum Management (NY) LLC ("Platinum

Management") and numerous other defendants. ECF No. 1. On

December 19, 2018, this Court held an initial conference at

which it invited defendants to file an initial round of motions

to dismiss. ECF No. 64, at 18:11-18. The Court stated that any

defendant was permitted to join or file a motion in the initial

round, but that no defendant who waited would be prejudiced from bringing a later motion as part of a second round. Id.

On January 25, 2019, plaintiffs filed their First Amended Complaint ("FAC"), ECF No. 159, and the following defendants filed motions to dismiss as part of the initial round: (1) Beechwood Capital Group LLC, B Asset Manager II LP, BBLN-PEDCO Corp., and BHLN-PEDCO Corp., ECF No. 199; (2) Beechwood Trust Nos. 7-14, ECF No. 187; (3) Bernard Fuchs, ECF No. 224; (4) David Bodner, ECF No. 182; (5) Daniel Saks, ECF No. 192; (6) The Estate of Jules Nordlicht, FCBA Trust, Morris Fuchs, Barbara Nordlicht, Aaron Parnes, Sarah Parnes, Shmuel Fuchs Foundation, and Solomon Werdiger, ECF No. 214; (7) The Estate of Uri Landesman, ECF No. 206; (8) GRD Estates Ltd., ECF No. 184; (9) Murray Huberfeld, ECF No. 172; (10) David Levy, ECF No. 217; (11) Meadows Capital LLC, ECF No. 253; (12) Leon Meyers, ECF No. 175; (13) Michael Nordlicht and Kevin Cassidy, ECF No. 194; (14) David Ottensoser, ECF No. 209; (15) Platinum FI Group, LLC, ECF No. 180; and (16) Rockwell Fulton Capital L.P. and Ditmas Park Capital L.P., ECF No. 208.[1] Plaintiffs opposed. ECF Nos. 223, 270.

---

[1] Defendants Twosons Corporation and Huberfeld Family Foundation also filed motions, ECF Nos. 201, 203, but these motions were subsequently withdrawn. Defendant David Steinberg filed a

2

After receiving full briefing from all parties, the Court
held oral argument on March 6 and 7, 2019. In a "bottom-line"
Order issued on March 15, 2019, ECF No. 276, the Court resolved
defendants' motions as follows:

- With respect to the motions of the Estate of Jules
  Nordlicht, FCBA Trust, Morris Fuchs, Barbara
  Nordlicht, Aaron Parnes, Sarah Parnes, Shmuel Fuchs
  Foundation, Solomon Werdiger, GRD Estates Ltd.,
  Meadows Capital LLC, Leon Meyers, Platinum FI Group,
  LLC, Rockwell Fulton Capital L.P., and Ditmas Park
  Capital L.P., the Ninth Count of the FAC (aiding and
  abetting breach of fiduciary duties) and the Tenth
  Count (aiding and abetting fraud) were dismissed.

- With respect to the motions of Beechwood Capital Group
  LLC, BBLN-PEDCO Corp., BHLN-PEDCO Corp., and Beechwood
  Trust Nos. 7-14, all claims were dismissed.

---

motion, ECF No. 196, but plaintiffs have since voluntarily
dismissed the action against Steinberg, ECF No. 274. In
addition, defendants Joseph SanFilippo and Abraham C. Grossman
belatedly joined the motions of other defendants, ECF Nos. 259,
261, and plaintiffs have not had an opportunity to respond.
Accordingly, the Court will wait to rule on SanFilippo's and
Grossman's motions until it rules on the second round of motions
to dismiss.

● With respect to the motions of David Bodner, Daniel

Saks, Murray Huberfeld, and David Ottensoser, only the

Fourteenth Count (unjust enrichment) was dismissed.

The Court denied these defendants' motions in all other

respects. In addition, the motions of those defendants not

mentioned above (B Asset Manager II LP, Bernard Fuchs, David

Levy,[2] Kevin Cassidy, Michael Nordlicht, and The Estate of Uri

Landesman) were denied in full.

This Opinion sets forth the reasons for the Court's

rulings.

## Background

The following allegations are taken from the FAC:

Martin Trott and Christopher Smith are the Court-
appointed Joint Official Liquidators and Foreign
Representatives (the "JOLs") of Platinum Partners Value
Arbitrage Fund L.P. (in Official Liquidation) ("PPVA"
and collectively with the JOLs, "Plaintiffs"), with
authority pursuant to Orders of the Grand Court of the
Cayman Islands and the United States Bankruptcy Court of
the Southern District of New York to liquidate the assets
of PPVA and bring litigation on its behalf[.]

The defendants in this case are an interrelated and
overlapping group of persons and entities, including the
Platinum Defendants (Mark Nordlicht, David Bodner,
Murray Huberfeld, Uri Landesman, David Levy, Bernard
Fuchs, Naftali Manela, David Ottensoser, Joseph
SanFilippo, . . . Daniel Small, Ezra Beren and Platinum

---

[2] As discussed below, the Court incorrectly stated that Levy's
motion was denied in its entirety. In fact, the Fourteenth Count
of the FAC was dismissed as to Levy, but Levy's motion was
otherwise denied.

4

Management (NY) LLC); the Beechwood Defendants (Mark
Nordlicht, David Bodner, Murray Huberfeld, David Levy,
Mark Feuer, Scott Taylor, Naftali Manela, David
Ottensoser, Daniel Saks, Ezra Beren, Dhruv Narain,
Illumin Capital Management LP, and the Beechwood
Entities (as defined below)[)], and certain other . . .
entities and individuals, including the BEOF Funds and
the Preferred Investors of the BEOF Funds (both as
defined below), Michael Joseph Nordlicht, Kevin Cassidy,
Seth Gerszberg, and Michael Katz . . . several of whom
have been indicted and/or sued for their role in
connection with certain of the acts discussed
below . . . .

FAC ¶¶ 2-3 (emphases omitted).

Platinum Management is a Delaware LLC that was founded in
2001 by defendants Mark Nordlicht, Murray Huberfeld, and David
Bodner. Id. ¶¶ 224, 226. Platinum Management was the General
Partner of PPVA, which was a multi-strategy hedge fund formed in
2003. Id. ¶¶ 213, 215. As General Partner, Platinum Management
was responsible for managing PPVA and calculating PPVA's net
asset value ("NAV"). Id. ¶¶ 230, 232. Platinum charged
management and incentive fees to PPVA based on PPVA's NAV, and
the Platinum Defendants collected nearly $100 million in
distributions and/or fees between January 2013 and August 2016.
Id. ¶ 237.

The misconduct alleged in the FAC began in late 2012, at
which time approximately 40% of PPVA's reported NAV consisted of
investments in two oil and gas companies, "Black Elk Energy
Offshore Operations, LLC ('Black Elk'), a Gulf of Mexico oil

5

platform operator, and Golden Gate Oil, LLC ('Golden Gate'), a California-based onshore oil operation." Id. ¶ 21 (emphases omitted). There was an explosion on one of Black Elk's platforms in November 2012, which resulted in multiple deaths and several investigations. Id. ¶ 23. Notwithstanding the serious financial problems that the explosion created for Black Elk, the Platinum Defendants increased their reported valuation of PPVA's investment in Black Elk. Id. ¶ 302. Similarly, over the course of the following year, the Platinum Defendants reported that PPVA's investment in Golden Gate had nearly quintupled in value, even though Golden Gate was having financial and operational trouble. Id. ¶¶ 312-21.

In order to support their inflated asset valuations and maintain the liquidity necessary to continue paying themselves fees and distributions, Nordlicht, Huberfeld, Bodner, Levy, Taylor, and Feuer "created Beechwood and, between March 2013 and late 2015, . . . used their positions of trust, authority and control over PPVA to cause PPVA and the Beechwood Entities to engage in the fraudulent, non-commercial transactions that comprise the First Scheme." Id. ¶ 28.

Beechwood is defined in the FAC as "a business comprised of reinsurance companies, investment management entities, investment trusts and related entities." Id. ¶ 8. There is not a

6

clear distinction in the FAC between the defined term "Beechwood" and the defined term "Beechwood Entities," but the latter group includes the following defendants:

- Beechwood Re Ltd. ("Beechwood Cayman") and Beechwood Bermuda International Ltd. ("Beechwood Bermuda"), which are reinsurance companies (collectively, the "Beechwood Reinsurance Companies") that received significant funds for investment from insurance investors. Id. ¶¶ 199, 200, 359.

- Beechwood Re Holdings, Inc. ("Beechwood Holdings"), which is a corporation that holds all the common stock of Beechwood Cayman. Id. ¶ 198.

- Beechwood Trust Nos. 1 through 20 (each a "Beechwood Trust"), which were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families, and through which they owned nearly 70% of the common stock in the Beechwood Reinsurance Companies. Id. ¶¶ 204, 362-63.

- Defendant Beechwood Re Investments, LLC ("Beechwood Investments"), which was used as a vehicle by Nordlicht, Bodner and Huberfeld to purchase all the preferred shares in the Beechwood Reinsurance

Companies. Id. ¶ 197.

- Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I (each a "Beechwood Series"), which were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families, and which owned all of the membership interests in Beechwood Investments. Id. ¶¶ 206-07.

- Beechwood Capital Group, LLC ("Beechwood Capital"), which is a New York LLC that shares an address with Feuer's principal residence. Id. ¶ 194.

- B Asset Manager LP ("BAM I") and B Asset Manager II LP ("BAM II" and, collectively with BAM I, "BAM"), which served as investment advisors for Beechwood and its investments and were 70% owned by Nordlicht, Bodner, Huberfeld and Levy. Id. ¶¶ 195-96.

- BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, and BBIL ULICO 2014 Trust (collectively, the "Beechwood Insurance Trusts"), which are insurance trusts. Id. ¶ 203.

- BAM Administrative Services LLC ("BAM Administrative"), which served as an agent for the Beechwood Insurance Trusts and acted as an agent and

8

signatory on behalf of the Beechwood Reinsurance
Companies in connection with certain transactions
within the First and Second Schemes. Id. ¶ 201.

- BBLN-PEDCO Corp. and BHLN-PEDCO Corp. (collectively,
  the "Beechwood SPVs"), which are special purpose
  vehicles that were managed by BAM Administrative. Id.
  ¶ 202.

The FAC alleges that the Platinum Defendants and the
individual Beechwood Defendants used the Beechwood Entities to
engage in the "First Scheme," whereby they "caused PPVA to enter
into numerous non-commercial transactions with the Beechwood
Entities and, in some cases, to co-invest with the Beechwood
Entities in third-party companies." Id. ¶ 387. These
transactions were used "to justify ever-increasing valuations of
the underlying assets as reported by Platinum Management," "to
mask the performance failures at the underlying operating
companies," and "to pay the Platinum Defendants unearned
partnership shares and/or fees." Id. ¶¶ 392-94.

For example, the FAC alleges, in February 2014, the
Platinum and Beechwood Defendants caused BAM Administrative to
buy a loan that one of PPVA's subsidiaries, Precious Capital,

9

had extended to Golden Gate. Id. ¶ 403.[3] Even though the
defendants knew that Golden Gate faced operational and financial
difficulties, BAM Administrative bought the loan at par in order
to "provide[] the Platinum Defendants with a basis upon which to
justify their valuation of that investment as reported to PPVA."
Id. ¶ 406. Included in the note purchase agreement was a put
option pursuant to which PPVA agreed to repurchase the loan from
BAM Administrative and guarantee payment of the debt in full.
Id. ¶ 408.

As another example of a First Scheme transaction, in 2014
the Platinum and "Beechwood Defendants caused a subsidiary of
PPVA . . . as well as certain Beechwood Entities to purchase
certain senior secured notes . . . issued by PEDEVCO Corp.
('PEDEVCO'), a publicly traded oil and gas company based in
Texas." Id. ¶ 415. Only PPVA's subsidiary was required to make
continuing loans to PEDEVCO, and PPVA's subsidiary's interests
were also subordinated to the interests of the Beechwood
Entities. Id. ¶¶ 416-18. Furthermore, in 2016, the Beechwood
Entities made another investment in PEDEVCO that further

---

[3] Although plaintiffs refer to both BAM I and BAM Administrative
as the purchasing agent, see FAC ¶¶ 403, 405, the Note Sale
Agreement lists BAM Administrative as the purchasing agent, ECF
No. 159, Ex. 46.

10

subordinated PPVA's interest, and PEDEVCO began experiencing revenue shortfalls because of falling oil prices and other operational issues. Id. ¶¶ 419-20. Although the Platinum Defendants knew that PEDEVCO could not meet its obligations to PPVA's subsidiary, they claimed that the NAV of PPVA's interest was $28 million. Id. ¶ 421.[4]

Finally, the most significant First Scheme transaction described in the FAC is the Black Elk Scheme. As noted above, PPVA had a substantial equity stake in Black Elk, and, as of August 2011, PPVA also owned a significant portion of the senior secured notes that Black Elk had issued. Id. ¶¶ 429-30. The senior secured notes were governed by an indenture that prohibited Black Elk from using proceeds from asset sales to make payments to its preferred equity investors. Id. ¶¶ 432.

After the Black Elk explosion described above, the Platinum Defendants set up Platinum Partners Black Elk Opportunities Fund LLC ("BEOF I") and Platinum Partners Black Elk Opportunities Fund International Ltd. ("BEOF II" and together with BEOF I, the

---

[4] The FAC also describes a similar First Scheme transaction in 2014 in which the Platinum and Beechwood Defendants caused BAM Administrative to refinance a $20 million loan that the PPVA subsidiary DMRJ had made to Implant Sciences Corporation ("IMSC"). FAC ¶ 423. As with the PEDEVCO notes, defendants caused DMRJ to subordinate its interests to BAM Administrative. Id. ¶ 426.

11

"BEOF Funds"). FAC ¶¶ 143-44, 438. According to the FAC, "the
BEOF Funds were a standalone mechanism by which Platinum
Management personnel, their family and friends, and certain
preferred investors were offered the opportunity to invest in
Black Elk outside of the regular funds." Id. ¶ 439 (internal
quotations omitted). Through BEOF, these "Preferred Investors"[5]
purchased millions of dollars of preferred equity in Black Elk.
Id. ¶ 442.

Over the course of 2013, Black Elk's financial condition
deteriorated, and this deterioration was reported in Black Elk's
public filings. Id. ¶ 448. In addition, Moody's downgraded Black
Elk's debt because of its condition. Id. ¶ 449. Black Elk's
public filings also showed that Platinum Management was a
majority owner and had effective control of Black Elk. Id.
¶¶ 451-52. In 2014, Black Elk entered into negotiations to sell

---

[5] "The Preferred Investors of the BEOF Funds include the following
persons and entities: (i) Morris Fuchs; (ii) Leon Meyers; (iii)
Small; (iv) Levy; (v) MN Consulting NY LLC; (vi) Estate of Jules
Nordlicht; (vii) Barbara Nordlicht; (viii) Estate of Solomon
Englander; (ix) Estate of Gertrude Englander; (x) Rockwell Fulton
Capital; (xı) Ditmas Park Capital, LP; (xii) Platinum FI Group
LLC; (xiii) FCBA Trust; (xiv) Aaron Parnes; (xv) Sarah Parnes;
(xvi) Shmuel Fuchs Foundation; (xvii) Solomon Werdiger; (xviii)
Olive Tree Holdings LLC; (xix) Huang Lai Tsu Hsia; (xx) Huberfeld
Family Foundation; (xxi) Mind, Body & Soul Co., Limited; (xxii)
Twosons Corporation; (xxiii) GRD Estates Ltd.; (xxiv) Meadows
Capital LLC; (xxv) Abraham C. Grossman; (xxvi) David Gichtin;
(xxvii) Ora Gichtin; (xxviii) Golda Wilk; (xxix) Estate of Marcos
Katz; (xxx) Adela Katz; and (xxxi) John Does 1-100." Id. ¶ 146.

a significant portion of its assets to Renaissance Offshore, LLC. Id. ¶ 455. As discussed above, the indenture governing the senior secured notes would have required the proceeds of such a sale to go to holders of the senior secured notes, a significant portion of which were held by PPVA, rather than to the preferred equity, a significant portion of which was held by the Preferred Investors. In order to allow the proceeds of the sale to go to the preferred equity, the Platinum Defendants had to amend the indenture. Id. ¶ 463.

Amendment of the indenture required a majority vote of senior secured note holders that were not affiliated with Black Elk. Id. ¶ 465. To create the appearance of independence, the Platinum Defendants transferred senior secured notes from PPVA to the BEOF Funds and to other Beechwood Entities. Id. ¶¶ 467, 473. These transferees then supported the amendment to the indenture, and Black Elk wired roughly $100 million from the Renaissance sale to holders of its preferred equity. Id. ¶¶ 487, 490. $47 million of that went to PPVA, but $36 million of that $47 million was then transferred to the BEOF Funds. Id. ¶¶ 491-92. PPVA was left with $22 million of unpaid senior secured notes at the time of Black Elk's bankruptcy. Id. ¶ 495.

After the proceeds of the Renaissance sale were distributed to the Preferred Investors, the Beechwood Entities still held a

13

significant portion of Black Elk's senior secured notes. Id.
¶ 504. As these notes had dropped in value and were unlikely to
be repaid, the Platinum and Beechwood Defendants caused a
subsidiary of PPVA, Montsant, to purchase all the Beechwood
Entities' senior secured notes at 93.5% of par. Id. ¶ 509. These
defendants also caused Montsant to pay interest on the loan to
Golden Gate that BAM Administrative had purchased from Precious
Capital. Id. The Platinum and Beechwood defendants financed the
loan by causing Montsant to borrow $35.5 million from Senior
Health Insurance Company of Pennsylvania ("SHIP") - a Beechwood
client - and Platinum Management subsequently collateralized
this loan with assets belonging to PPVA and another PPVA
subsidiary. Id. ¶¶ 510, 513.

Despite the above-described actions, PPVA still had roughly
$300 million worth of assets by mid-2015. Id. ¶ 538. Later that
year, "the Defendants conspired to commence the Second Scheme,
engaging in an intentional scheme to transfer or encumber nearly
all of the Remaining PPVA Assets to or for the benefit of the
Platinum Defendants, the Beechwood Defendants," Platinum
Partners Credit Opportunities Master Fund L.P. ("PPCO"), another
Platinum Management-operated fund, "and select insiders of the
Platinum Defendants, and to the detriment of PPVA." Id. ¶ 539.
During the Second Scheme, "the Platinum Defendants deliberately

14

granted the Beechwood Entities, PPCO and other insiders/friends/preferred investors liens on PPVA's investments at the subsidiary level, and the Platinum Defendants would consistently report PPVA's NAV without taking into account the encumbrances provided to these insider parties, thereby inflating the total amount of fees and other compensation due to them." Id. ¶ 540.

For example, as discussed above, the Platinum and Beechwood Defendants directed Montsant to grant liens to the Beechwood Entities on the remaining PPVA assets that held actual value. Id. ¶¶ 544-48. Notwithstanding these encumbrances, the assets were still included in PPVA's NAV calculations as if they held their full value. Id. ¶ 549.

Another example of a Second Scheme transaction is a side letter that Mark Nordlicht executed in order to divert funds from PPVA to the Beechwood Entities. As noted above, BAM Administrative purchased the Golden Gate loan from Precious Capital, and the Platinum and Beechwood defendants caused Montsant to pay the interest on that loan when Montsant bought the Beechwood Entities' senior secured notes in Black Elk. By January 2016, Montsant was no longer able to pay interest, but Implant Sciences Corporation ("IMSC") — in which PPVA held a substantial interest — was being marketed for sale. Id. ¶¶ 558,

15

565. Without any consideration to PPVA or its subsidiaries, Nordlicht signed a letter that obligated PPVA to apply any proceeds from the IMSC sale toward the satisfaction of Golden Gate's debt to BAM. Id. ¶¶ 561, 564.

Next, the FAC describes a "restructuring" that took place in March 2016, pursuant to which the Platinum and "Beechwood Defendants orchestrated a series of transactions in connection with . . . all of the transactions previously entered into between and among PPVA, PPCO and the Beechwood Entities, whereby all the benefits flowed directly to certain Beechwood Entities and PPCO, and thus to the individual Platinum and Beechwood Defendants who owned and managed those entities and were entitled to charge them for partnership shares and fees, to the detriment of PPVA." Id. ¶ 572.

The FAC alleges that the "culmination" of the Second Scheme was a series of transactions involving Agera Energy, "a leading energy reseller to the consumer and business markets." Id. ¶¶ 599, 660. Although Agera Energy is a wholly owned subsidiary of Agera Holdings, PPVA and PPCO owned a controlling interest in Agera Energy through their jointly owned subsidiary PGS. Id. ¶¶ 602, 608. Specifically, PGS held a note that was convertible into 95% of the equity in Agera Energy. Id. ¶ 603. Meanwhile,

16

Agera Holdings was 95.01% owned by defendant Michael Nordlicht, who is Mark Nordlicht's nephew. Id. ¶¶ 610-11.

Michael did not pay anything for his equity interest in Agera Holdings. Id. ¶ 614. Furthermore, despite having graduated from law school only one year prior — and despite having no experience in private practice or the energy sector — Michael was installed by his uncle as general counsel of Agera in late 2013. Id. ¶ 613. The FAC alleges that Mark Nordlicht also caused defendant Kevin Cassidy to be hired as a senior executive at Agera Energy despite having served two stints in prison and having been arrested a third time for a securities-related fraud. Id. ¶¶ 604-05.

On June 9, 2016, the Platinum and Beechwood Defendants caused PGS to transfer its convertible note interest to AGH Parent, an entity that was controlled by the defendants but was not affiliated with PPVA. Id. ¶ 631. Although the Platinum and Beechwood Defendants believed that the value of the note was between $225 million and $285 million, they caused it to be sold for only $170 million. Id. ¶ 637. Furthermore, two-thirds of the purchase price of the note "was paid in the form of uncollectable, valueless debt instruments that were transferred at par value, as well as membership interests in AGH Parent that were subject to redemption at the sole discretion of the

Beechwood Defendants and Beechwood Entities in exchange for worthless debt and equity interests." Id. ¶ 639.

In connection with the sale of the note, Michael Nordlicht transferred his equity and voting interests in Agera Holdings to AGH Parent, and Cassidy received 8% of the gross proceeds of the sale. Id. ¶¶ 643-44. The FAC alleges that, in order to make the payment to Cassidy, "Steinberg, Cassidy and his counsel prepared an amendment to the PGS operating agreement that granted Starfish [Capital, Inc.], Cassidy's alter ego, 8% of the membership interests in PGS on the day before the Agera Sale closed." Id. ¶ 645. The FAC also alleges that this "grant was made for no consideration." Id.

In addition, approximately $60 million of the purchase price to PGS was paid in the form of Class C Units in AGH Parent. Id. ¶ 649. Roughly $35 million of these Units were subject to redemption in exchange for $35 million in assets held by Beechwood-related Entities. Id. ¶ 650. The Beechwood Entities exercised this redemption right in January 2017 and transferred to PGS distressed debt obligations that had a face value of $35 million in exchange for Class C Units held by PGS. Id. ¶¶ 651-56. The Beechwood Entities subsequently sold these interests in AGH Parent to a third party, and PGS was left with the distressed debt obligations. Id. ¶¶ 657-59. As a result of these

18

Agera transactions, the FAC alleges that PPVA lost as much as $150 million to the Beechwood Entities. Id. ¶ 660.[6]

On November 21, 2018, plaintiffs commenced this action, and on January 25, 2019, they filed the FAC. The FAC contains twenty-one counts, including, as relevant here:

- Claims against the Platinum Defendants for breach of fiduciary duty (First and Second Counts), aiding and abetting breach of fiduciary duties (Third Count), fraud (Fourth Count), constructive fraud (Fifth Count), aiding and abetting fraud (Sixth Count), civil conspiracy (Sixteenth Count), and civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Seventeenth Count);

- Claims against the Beechwood Defendants for aiding and abetting breach of fiduciary duties (Seventh Count), aiding and abetting fraud (Eighth Count), unjust

[6] The final aspect of the Second Scheme – referred to as the "Security Lockup" – is not essential to the instant motions. The FAC describes the Security Lockup as a "series of transactions, documents and promissory notes that the Platinum Defendants, together with Defendant Seth Gerszberg, caused PPVA to enter into with select redeeming investors and certain creditors of PPVA, by which those investors and creditors preferentially were granted security interests and liens on all assets of PPVA (and in some cases subsidiary assets) to collateralize tens of millions of dollars of equity redemption claims or otherwise unsecured debt for no additional consideration." Id. ¶ 11(iv).

19

enrichment (Fourteenth Count), civil conspiracy
(Sixteenth Count), and civil RICO (Seventeenth Count);

- Claims against the BEOF Funds and Preferred Investors
  for aiding and abetting breach of fiduciary duties
  (Ninth Count), aiding and abetting fraud (Tenth
  Count), and unjust enrichment (Fifteenth Count);

- Claims against Kevin Cassidy for aiding and abetting
  breach of fiduciary duties (Twelfth Count) and unjust
  enrichment (Fourteenth Count); and

- A claim against Michael Nordlicht for aiding and
  abetting breach of fiduciary duties (Twelfth Count).

At an initial conference held on December 19, 2018, Bodner
requested permission to file a motion to dismiss on group
pleading grounds. The Court granted his request and informed the
other defendants that they could join Bodner's motion or file
their own motions. The Court also informed the defendants that
they would not be prejudiced from bringing further motions to
dismiss on more particularized grounds if they chose not to join
or file a motion in the first round.

Sixteen motions to dismiss are now before the Court. Some
of these motions argue only that the moving defendants were
impermissibly group pled and therefore must be dismissed. Others

20

argue specifically that each count against the moving defendants fails to state a claim. As noted above, this Court issued a "bottom-line" Order on March 15, 2019, in which it granted defendants' motions in some respects and denied the motions in other respects. This Opinion sets forth the reasons for the Court's rulings.

## Analysis

### I. Standard of Review

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Although Rule 8 of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or

---

[7] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

21

exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001). Where a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct, [it] fail[s] to satisfy this minimum standard." Id.

However, while "lumping all the defendants together," is generally impermissible, there is a doctrine - referred to as the "group pleading doctrine" - that serves as "an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." Elliott Assocs., L.P. v. Hayes, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000). "The group pleading doctrine allows particular statements or omissions to be attributed to individual defendants even when the exact source of those statements is unknown." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010). "In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement." In re Alstom SA, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005).

"Group pleading allows plaintiffs only to connect defendants to statements — it does not also transitively convey scienter." Anwar, 728 F. Supp. 2d at 406. Furthermore, "[w]hile it is settled that the group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint, this does not imply that the group pleading doctrine applies only to fraud claims; rather, it applies whenever Rule 9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature." Schwartzco Enterprises LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014). For example, "[t]he group pleading doctrine applies to breach of fiduciary duty claims that are rooted in fraud." Id. at 352-53.

## II.  Legal Standards

### A. Breach of Fiduciary Duty

Under here applicable New York law, the elements of a breach of fiduciary duty claim are: "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed trust or confidence in another and whether the second person accepts the trust and confidence

23

and thereby gains a resulting superiority or influence over the first." Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008). In particular, where a "defendant ha[s] discretionary authority to manage [a plaintiff's] investment accounts, it owe[s] [the plaintiff] a fiduciary duty of the highest good faith and fair dealing." Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc., 915 N.Y.S.2d 7, 16 (1st Dep't 2010), aff'd, 962 N.E.2d 765 (N.Y. 2011).

## B. Aiding and Abetting Breach of Fiduciary Duty

"A claim for aiding and abetting a breach of fiduciary duty requires, inter alia, that the defendant knowingly induced or participated in the breach." Krys v. Butt, 486 F. App'x 153, 157 (2d Cir. 2012). "Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." Id.

## C. Fraud

"To state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." Kaufman v. Cohen, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). Under Rule 9(b), a plaintiff must:

24

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). "In cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000).

### D. Constructive Fraud

Under New York law, a "constructive fraud claim modifies the claim for actual fraud by replacing the scienter requirement with the requirement that Defendants maintained either a fiduciary or confidential relationship with Plaintiff." LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 524 (S.D.N.Y. 2014); see Brown v. Lockwood, 432 N.Y.S.2d 186, 193-94 (2d Dep't 1980) ("The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of

25

scienter upon the part of the defendant, his knowledge of the
falsity of his representation, is dropped and is replaced by a
requirement that the plaintiff prove the existence of a
fiduciary or confidential relationship . . . .").

## E. Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud under
New York law, the plaintiffs must show (1) the existence of a
fraud; (2) the defendant's knowledge of the fraud; and (3) that
the defendant provided substantial assistance to advance the
fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir.
2014). "Actual knowledge is required to impose liability on an
aider and abettor under New York law," and "a complaint
adequately alleges the knowledge element of an aiding and
abetting claim when it pleads not constructive knowledge, but
actual knowledge of the fraud as discerned from the surrounding
circumstances." Id. "There must also be a nexus between the
primary fraud, the alleged aider and abettor's knowledge of the
fraud, and what the alleged aider and abettor did with the
intention of advancing the fraud's commission." Id.

## F. Unjust Enrichment

To state a claim for unjust enrichment under New York law,
a plaintiff must allege that: "(1) defendant was enriched, (2)
at plaintiff's expense, and (3) equity and good conscience

26

militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). Relief for unjust enrichment is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). Accordingly, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.

## G. Civil Conspiracy

Under New York law, civil conspiracy is not an independent tort. Instead, "[a]ll that an allegation of conspiracy can accomplish is to connect nonactors, who otherwise might escape liability, with the acts of their co-conspirators." Burns Jackson Miller Summit & Spitzer v. Lindner, 452 N.Y.S.2d 80, 93–94 (2d Dep't 1982), aff'd, 451 N.E.2d 459 (N.Y. 1983). "Where there is an underlying tort, the elements of civil conspiracy are: (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."

Pope v. Rice, No. 04 Civ. 4171 (DLC), 2005 WL 613085, at *13
(S.D.N.Y. Mar. 14, 2005).

**H. Civil RICO**

Plaintiffs allege RICO violations under 18 U.S.C.
§ 1962(c), which makes it "unlawful for any person employed by
or associated with any enterprise engaged in, or the activities
of which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering
activity." To plead a RICO violation, a plaintiff must allege
that the defendant engaged in at least two predicate acts of
"racketeering activity," where "racketeering activity" is
defined to include a host of state and federal offenses. 18
U.S.C. §§ 1961(1), (5). In the instant action, plaintiffs allege
that defendants engaged in the predicate acts of mail and wire
fraud under sections 1341 and 1343 of title 18. FAC ¶ 961.

In addition to alleging two predicate acts, a RICO
plaintiff must plead, among other things, continuity to
establish that the racketeering activity constitutes a
"pattern." Continuity, in turn, "is both a closed- and open-
ended concept, referring either to a closed period of repeated
conduct, or to past conduct that by its nature projects into the
future with a threat of repetition." H.J. Inc. v. Nw. Bell Tel.

Co., 492 U.S. 229, 241 (1989). Where, as here, the pattern is closed-ended, the Second Circuit has held that "predicate acts occurring over less than a two-year period may not be deemed a pattern." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 168 (2d Cir. 2004).

## III. Moving Defendants

### A. The Preferred Investors

The Estate of Jules Nordlicht, FCBA Trust, Morris Fuchs, Barbara Nordlicht, Aaron Parnes, Sarah Parnes, Shmuel Fuchs Foundation, Solomon Werdiger, GRD Estates Ltd., Meadows Capital LLC, Leon Meyers, Platinum FI Group, LLC, Rockwell Fulton Capital L.P., and Ditmas Park Capital L.P. are all members of the group referred to in the FAC as the "Preferred Investors of the BEOF Funds." FAC ¶ 146. The FAC brings claims against the Preferred Investors for aiding and abetting breach of fiduciary duties (Ninth Count), aiding and abetting fraud (Tenth Count), and unjust enrichment (Fifteenth Count).

As explained in more detail above, the relevant allegations against the Preferred Investors concern their involvement in the Black Elk Scheme. Specifically, the FAC alleges that the Preferred Investors were close affiliates of the Platinum Defendants who purchased preferred equity in Black Elk through the BEOF Funds. Id. ¶¶ 439, 442. Over the course of 2013, Black

29

Elk's financial condition deteriorated, and "at least certain of the investors in the BEOF Funds raised concerns as to the status of their investment by the beginning of 2014." Id. ¶¶ 447, 460.

To protect the Preferred Investors, the Platinum Defendants developed a plan to divert proceeds to preferred equity holders from the sale of a substantial portion of Black Elk's assets to Renaissance Offshore, LLC. Id. ¶¶ 461-62. As discussed above, PPVA owned a significant percentage of the senior secured notes that Black Elk had issued, and the indenture governing those notes prohibited Black Elk from using asset sales to make payments to its preferred equity investors. Id. ¶¶ 431-32. To circumvent this prohibition, the Platinum Defendants deceptively caused holders of the senior secured notes to vote to amend the indenture. Id. ¶¶ 487-88. The Platinum Defendants then caused Black Elk to wire roughly $100 million from the Renaissance sale to holders of its preferred equity, including $36 million that was initially wired to PPVA but was then transferred to the BEOF Funds and distributed to the Preferred Investors. Id. ¶¶ 490-93.

Plaintiffs argue that the Preferred Investors' participation in the Black Elk Scheme establishes that the Preferred Investors aided and abetted the Platinum Defendants in their fraud and breach of fiduciary duties. Plaintiffs contend that the Preferred Investors "were offered an interest in an

30

'unaffiliated' fund labeled Black Elk Opportunities by Platinum Management, which they knew had fiduciary duties to PPVA, and knowingly participated and executed the wrongful 'opportunity' — a scheme to recoup their failed investment at the expense of PPVA." Plaintiffs' Opposition to Moving Defendants' Motions to Dismiss 18 ("Opp."), ECF No. 223. Moreover, plaintiffs argue, the Preferred Investors must have known about the Platinum Defendants' tortious conduct "given that many were family or longtime associates of Platinum Management executives and willfully invested and then rolled over their investment in the BEOF Funds at a time when Black Elk was publicly reporting significant financial difficulties." Id. at 19.

The Court, however, finds that the allegations in the FAC establish no more than guilt by association with respect to the Preferred Investors. As noted above, to state a claim for aiding and abetting, a plaintiff must plausibly allege that the defendant had actual knowledge of the underlying tort. Krys, 486 F. App'x at 157; Krys, 749 F.3d at 127. Plaintiffs fail to meet that requirement. To illustrate:

- Jules and Barbara Nordlicht are alleged only to be the parents of Mark Nordlicht. FAC ¶ 148.
- Morris Fuchs is alleged only to be the brother of Bernard Fuchs, and the Shmuel Fuchs Foundation is

31

alleged only to be set up for Morris and Bernard's family. Id. ¶¶ 151, 152.

- FCBA Trust is alleged only to be a trust set up by friends of Bodner, Huberfeld, and Manela. Id. ¶ 159.

- Aaron and Sarah Parnes are alleged only to be clients of Huberfeld's. Id. ¶ 170.

- Solomon Werdiger is alleged only to be a friend of Huberfeld's, a contributor to Huberfeld's charities, and a long-term investor in Platinum funds. Id. ¶ 156.

- GRD Estates Ltd. is alleged only to be a client of Huberfeld's, with a principal who is a friend of Huberfeld's. Id. ¶ 163.

- Meadows Capital LLC is alleged only to be an investment firm managed by an acquaintance of Huberfeld's. Id. ¶ 164.

- Leon Meyers is alleged only to be a long-term Platinum investor and a friend of Nordlicht's and Levy's. Id. ¶ 153.

- Platinum FI Group, LLC is alleged only to be a longtime client of Huberfeld's, with a principal who is a close friend of Huberfeld's. Id. ¶ 162.

32

- Rockwell Fulton Capital L.P. and Ditmas Park Capital
  L.P. are alleged only to be clients of Nordlicht's.
  Id. ¶ 171.

The plaintiffs' allegations are insufficient to impute
actual knowledge to any of these defendants, and the FAC thus
fails to state claims for aiding and abetting.

The FAC does, however, state a claim for unjust enrichment
against each of the defendants above. As explained, the elements
of unjust enrichment are that "(1) defendant was enriched, (2)
at plaintiff's expense, and (3) equity and good conscience
militate against permitting defendant to retain what plaintiff
is seeking to recover." Briarpatch Ltd., 373 F.3d at 306. Here,
plaintiffs have plausibly alleged that millions of dollars were
transferred to the Preferred Investors at the expense of PPVA,
both because the proceeds of the Renaissance Sale should have
gone to senior secured note holders instead of preferred equity,
and because $36 million was transferred directly from PPVA to
the BEOF Funds. Moreover, the Preferred Investors cannot raise a
group pleading defense because the FAC contains a table
detailing the specific distributions that each of the Preferred
Investors received from the BEOF Funds. FAC ¶ 493.

For these reasons, the Court granted the Preferred
Investors motions to dismiss the Ninth Count of the FAC (aiding

and abetting breach of fiduciary duties) and the Tenth Count
(aiding and abetting fraud), but it denied their motions to
dismiss the Fifteenth Count (unjust enrichment).[8]

## B. The Beechwood Entities

Beechwood Capital Group LLC ("Beechwood Capital"), B Asset
Manager II LP ("BAM II"), BBLN-PEDCO Corp., BHLN-PEDCO Corp.,
and Beechwood Trust Nos. 7-14 are all members of the group
referred to in the FAC as the "Beechwood Entities." FAC ¶ 206.
The FAC brings one alter ego claim against the Beechwood
Entities (Eighteenth Count). In essence, the FAC alleges that
the Beechwood Entities were "a collection of entities
established in part to implement the First and Second Schemes
and loot PPVA of its assets." Opp. 32.

Each of the moving Beechwood Entities argues that
plaintiffs' claim against them relies on impermissible group
pleading. ECF Nos. 189, 200. And, for the most part, each of the
Beechwood Entities is correct. For example, the FAC makes no
specific allegations about Beechwood Trust Nos. 7-14, and the
only specific allegation that it makes about BBLN-PEDCO Corp.
and BHLN-PEDCO Corp. is that they "are special purpose

_____

[8] For the same reasons, the Fifteenth Count also states a claim
against Levy, who - in addition to being a Platinum Defendant
and a Beechwood Defendant - is a Preferred Investor. FAC ¶ 146.

34

vehicles . . . and Beechwood Entities that, at all relevant times, were managed by BAM Administrative and administered in New York, New York." FAC ¶ 202. Together, the two PEDCOs are referred to as the "Beechwood SPVs," id., but the only allegation that the FAC makes about this collective entity is that it was a Beechwood Entity, id. ¶ 206.

Similarly, regarding Beechwood Capital, the FAC alleges only that: (1) It is "a New York limited liability company with its principal place of business in Lawrence, New York, at the same address as Feuer's principal residence," id. ¶ 194; (2) "By February 28, 2013, Levy and Nordlicht were advising Beechwood Capital and designating Taylor as Beechwood Capital's manager," id. ¶ 344; (3) "On February 26-28, 2013, writing from 'beechwoodcapitalgroup.com' email domains, Taylor and Feuer, copying Levy at his Platinum Management email address, discussed the execution of an NDA between Beechwood Capital and Alpha Re Limited, another reinsurance company," id. ¶ 345; and (4) "On March 28, 2013, Steinberg sent an email to Huberfeld forwarding a list of wire transfers. Included among them is a transfer by Platinum Management of $1,749,666.51 to Beechwood Capital, evidencing Platinum Management's initial investment in Beechwood and corresponding control thereof," id. ¶ 346 (citing ECF No. 159, Ex. 33).

These allegations have no bearing on liability. The second allegation says only that Beechwood Capital was advised by Levy and Nordlicht and managed by Taylor, and the third allegation mentions a reinsurance company, Alpha Re Limited, that appears nowhere else in the FAC. Furthermore, regarding the fourth allegation, the exhibit cited does not provide any evidence that Platinum Management transferred money to Beechwood Capital, let alone for nefarious purposes. See ECF No. 200, at 4 (explaining that the exhibit shows a transfer from Beechwood Capital to another company). Accordingly, the FAC fails to attribute any specific wrongdoing to Beechwood Capital.

With respect to BAM II, however, the group pleading defense fails. Although BAM II is referenced individually only once in the FAC, it is also referenced collectively with B Asset Manager LP ("BAM I") as "BAM." FAC ¶ 196. BAM, in turn, is referenced multiple times in the FAC and is alleged to have played a central role in defendants' misconduct. See, e.g., id. ¶ 364 ("The Platinum Defendants and Beechwood Defendants also created BAM to manage and invest the assets obtained through reinsurance agreements with the Beechwood Reinsurance Companies."); id. ¶ 391 ("The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would

36

be repaid, but rather to further the goal to enrich the Platinum Defendants and Beechwood by increasing the fees payable to Platinum Management and BAM."). While it is true that BAM I and BAM II are "lumped" together as a single BAM entity, it cannot seriously be argued that the FAC fails as a result to give BAM II "fair notice of what the plaintiff's claim is and the ground upon which it rests." Atuahene, 10 F. App'x at 34.

For these reasons, the Court denied BAM II's motion to dismiss, but it granted the motions of Beechwood Capital, BBLN-PEDCO Corp., BHLN-PEDCO Corp., and Beechwood Trust Nos. 7-14 to dismiss the FAC as to them on group pleading grounds.

## C. The Platinum and Beechwood Defendants

David Bodner, Murray Huberfeld, David Ottensoser, and David Levy are each members of the groups referred to in the FAC as the Platinum Defendants and the Beechwood Defendants. Uri Landesman is a Platinum Defendant but not a Beechwood Defendant. Daniel Saks is Beechwood Defendant but not a Platinum Defendant. The FAC alleges that the Platinum and Beechwood Defendants worked closely to orchestrate both the First and Second Schemes. It brings claims against the Platinum Defendants for breach of fiduciary duty (First and Second Counts), aiding and abetting breach of fiduciary duties (Third Count), fraud (Fourth Count), constructive fraud (Fifth Count), aiding and abetting fraud

37

(Sixth Count), civil conspiracy (Sixteenth Count), and civil RICO (Seventeenth Count). It brings claims against the Beechwood Defendants for aiding and abetting breach of fiduciary duties (Seventh Count), aiding and abetting fraud (Eighth Count), unjust enrichment (Fourteenth Count), civil conspiracy (Sixteenth Count), and civil RICO (Seventeenth Count).

The following excerpts from the FAC highlight some of the relevant allegations against each of the moving Platinum and Beechwood Defendants:

[Landesman] held the title President of Platinum Management. Together with [Mark] Nordlicht, he served as co-chief investment officer of PPVA, responsible for all trading, asset allocation and risk management on behalf of PPVA, and was a member of both the valuation and risk committees. Landesman was a member of Platinum Management . . . [and] remained involved in developing strategy for managing PPVA's liquidity issues and seeking out new investors even after his resignation in 2015.

[Huberfeld,] together with [Mark] Nordlicht and David Bodner, founded and is an owner of Platinum Management. Huberfeld also is a founder and was at all relevant times an owner of the Beechwood Entities. Among other things, Huberfeld was involved with sourcing investment opportunities, meeting with and marketing to important investors and developing business and investment strategy for PPVA. He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investment partners.

[Bodner] is another founder and owner of Platinum Management. Bodner also is a founder and was at all relevant times an owner of the Beechwood Entities. Like Huberfeld, Bodner was involved with sourcing investment

38

opportunities, meeting with and marketing to important investors and developing investment strategies for PPVA and its investments . . . . He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investment partners.

[Levy] was a portfolio manager and beginning in 2015, co-chief investment officer of PPVA. He had direct responsibility for overseeing and managing many of PPVA's most significant investments . . . . He was a member of the risk and valuation committees responsible for valuing PPVA's assets and assessing risk related thereto, and was appointed as an operating officer/manager of certain subsidiaries through which PPVA's investments were held . . . . During 2013-2014, he also was employed as the Chief Investment Officer of BAM . . . , even when BAM ostensibly was on the opposite side of a transaction from PPVA.

[Ottensoser was] general counsel, chief compliance officer and a member of the risk committee [of Platinum Management and PPVA]. Ottensoser participated in drafting, reviewing and/or commenting on the contracts and other documents that bound PPVA to the improper transactions comprising the First and Second Schemes and without which the First and Second Scheme could not have occurred. As a member of the risk committee, he was responsible for assessing the risk associated with PPVA's investments, a significant issue in determining value. At the same time, Ottensoser provided legal services to BAM/the Beechwood Entities, even when those parties ostensibly were on opposite sides of a transaction from PPVA.

[Saks] was, until about 2014, a portfolio/investment manager with oversight and control over numerous PPVA investments. In particular, by the end of 2013, Saks became responsible for overseeing and managing PPVA's bio/pharma investments . . . and previously was involved with overseeing the investment in Golden Gate Oil. During 2014, Saks began working for the Beechwood Entities, eventually serving as Chief Investment Officer

39

and then President of B Asset Manager LP during and after 2015.

FAC ¶¶ 12(ii)-(vi), (ix), (xi).

Bodner filed the primary motion to dismiss on behalf of the Platinum and Beechwood Defendants, and the other moving defendants have either joined Bodner's motion or incorporated Bodner's arguments by reference in their own motions.[9] All defendants argue, as a threshold matter, that the FAC impermissibly lumps them together and fails to meet even Rule 8's notice pleading requirements, let alone the heightened Rule 9(b) standard that applies to the FAC's fraud-based claims. See Memorandum of Law of Defendant David Bodner in Support of His Motion to Dismiss the First Amended Complaint 4-11 ("Bodner MTD"), ECF No. 183; Defendant Murray Huberfeld's Memorandum of Law in Support of His Motion to Dismiss the Amended Complaint 2 ("Huberfeld MTD"), ECF No. 173; Memorandum of Law in Support of David Ottensoser's Motion to Dismiss the First Amended Complaint 8-9 ("Ottensoser MTD"), ECF No. 210; Defendant David Levy's Joinder in Motions to Dismiss and Memoranda of Law 1 ("Levy MTD"), ECF No. 217; Defendant Daniel Saks' Memorandum of Law in

---

[9] Bernard Fuchs has incorporated only Section I of Bodner's memorandum, which addresses the issue of group pleading. The other moving Platinum and Beechwood Defendants appear to incorporate Bodner's particularized arguments for dismissing each cause of action.

40

Support of Motion to Dismiss 2-5 ("Saks MTD"), ECF No. 193;
Memorandum of Law of Defendant Estate of Uri Landesman 1
("Landesman MTD"), ECF No. 207. With respect to the specific
causes of action in the FAC, the defendants rely on the
arguments made in Bodner's memorandum.

Starting with breach of fiduciary duty, Bodner argues that
the FAC fails to "set forth any facts establishing a fiduciary
duty owed by Bodner to PPVA, and . . . does not allege a single
act, statement, or omission by Bodner that could constitute a
breach of any such duty." Bodner MTD 12. Regarding fraud and
constructive fraud, he contends that the FAC "does not identify
any specific conduct attributable to Bodner" and "describes no
fraudulent statements or omissions made by Bodner to anyone."
Id. Moving to RICO, Bodner argues that the FAC "fails to allege
with requisite particularity that Bodner engaged in predicate
acts of mail fraud and wire fraud sufficient to constitute a
pattern of racketeering activity." Id. at 13. And as for unjust
enrichment — alleged against Bodner in connection with the
Second Scheme transactions — Bodner argues that "[t]he FAC does
not allege a single action or statement by Bodner that was part
of or in furtherance of any of the Second Scheme transactions,
and certainly does not describe any wrongful conduct by Bodner
with the specificity required by Rule 9(b)." Id.

41

Bodner also argues that the FAC fails to plead secondary actor liability for aiding and abetting and civil conspiracy. With respect to aiding and abetting, Bodner contends that the FAC "does not identify any conduct by Bodner that could plausibly be described as providing substantial assistance in the commission of a fraud." Id. at 14. And regarding conspiracy, Bodner argues that "there is no factual allegation of an overt act by Bodner in furtherance of any agreement with others to harm PPVA." Id. Bodner also argues that "the FAC's allegations of actual knowledge on Bodner's part are limited to the conclusory claim that 'the Beechwood Defendants had actual knowledge that the Platinum Defendants were defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the First and Second Schemes.'" Id. at 15 (quoting FAC ¶ 853).

Beginning with the moving defendants' threshold contention that the FAC should be dismissed on group pleading grounds, there is no question that plaintiffs have cleared the "low bar" imposed by Rule 8. Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14-cv-10104 (VEC), 2015 WL 5710645, at *4 (S.D.N.Y. Sept. 29, 2015). The purpose of Rule 8 is to "give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Ferro v. Ry. Exp. Agency, Inc., 296 F.2d 847,

42

851 (2d Cir. 1961). Plaintiffs have fulfilled this purpose by describing in exhaustive detail the nature of the First and Second Schemes and by identifying the Platinum and Beechwood Defendants as the individuals responsible for those schemes.

As defendants note, however, plaintiffs' claims are grounded in fraud and must therefore surmount not only the less onerous obstacles presented by Rule 8, but also the more significant barriers imposed by Rule 9(b). As a general matter, where a plaintiff brings claims sounding in fraud, she must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner, 459 F.3d at 290. This is true regardless of whether a plaintiff's claim is for actual fraud, constructive fraud, or breach of fiduciary duty. See Krys, 749 F.3d at 129 ("In asserting claims of fraud — including claims for aiding and abetting fraud or a breach of fiduciary duty that involves fraud — a complaint is required to plead the circumstances that allegedly constitute fraud 'with particularity.'" (quoting Fed. R. Civ. P. 9(b))); Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd., 345 F. Supp. 3d 515, 530 (S.D.N.Y. 2018) ("[A]t a minimum . . . misstatements

43

and omissions in a constructive fraud claim must be pled with the same specificity as those in an actual fraud claim.").

Notwithstanding Rule 9(b)'s particularity requirement, a plaintiff is not always obligated to identify the misstatements or omissions made by each defendant. Instead, under the group pleading doctrine, "where the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a published company document, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery." Elliott Assocs., 141 F. Supp. 2d at 354; cf. Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986) ("[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."). "In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement." In re Alstom SA, 406 F. Supp. 2d at 449.

Here, the relevant published statements for purposes of the FAC's fraud-based claims are the Platinum Defendants'

44

persistently inflated reports of PPVA's NAV. After the Black Elk explosion, for example, the Platinum Defendants reported an increased valuation in PPVA's investment in Black Elk, notwithstanding the company's obvious problems. FAC ¶ 302. And during the following year, the Platinum Defendants reported that PPVA's investment in Golden Gate had nearly quintupled in value, even though Golden Gate was having financial and operational difficulties. Id. ¶¶ 312-21. Throughout the First Scheme, moreover, the Platinum Defendants – in concert with the Beechwood Defendants - "caused PPVA to enter into numerous non-commercial transactions with the Beechwood Entities" in order "to justify ever-increasing valuations of the underlying assets as reported by Platinum Management." Id. ¶¶ 387, 392. And during the Second Scheme, the Platinum Defendants transferred or encumbered PPVA's remaining assets but nevertheless "would consistently report PPVA's NAV without taking into account the encumbrances . . . , thereby inflating the total amount of fees and other compensation due to them." Id. ¶ 540.

Each of the Platinum Defendants, moreover, is alleged to have been a high-level corporate insider, and it is therefore appropriate to charge them with the misstatements of PPVA's NAV. They are not a random assortment of low-level functionaries. Instead, they are precisely the kind of "narrowly defined group

45

of highly ranked officers or directors" that the group pleading doctrine contemplates. Elliott Assocs., 141 F. Supp. 2d at 354.

To illustrate, the FAC makes the following allegations about Bodner and Huberfeld: (1) they were founders and owners of Platinum Management and the Beechwood Entities, FAC ¶ 12(iii)-(iv); (2) they were "involved with sourcing investment opportunities, meeting with and marketing to important investors, dealing with issues concerning liquidity and redemptions, and developing business and investment strategy for PPVA," id. ¶ 83; (3) they were "involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investors," id. ¶ 84; (4) their "approval was required for all significant business, investment and personnel decisions" regarding PPVA, Platinum, and the Beechwood Entities, id. ¶¶ 84-85; and (5) they "participated in improperly inflating the values of PPVA's assets in order to improperly increase PPVA's NAV," id. ¶ 86.

Moving to Ottensoser, the FAC alleges that: (1) he was "general counsel and Chief Compliance Officer for Platinum Management and PPVA," id. ¶ 105; (2) he was "one of the in house counsel responsible for documenting the transactions that comprised the First and Second Schemes and was actively involved

46

in closing those transactions," id. ¶ 106; (3) he was "a member of the risk committee, [and] was responsible for assessing the risk associate[d] with PPVA's assets and investments, a significant issue in determining the value thereof," id. ¶ 109; and (4) he "us[ed] his position as a member of the risk committee to participate in the false inflation of the value of PPVA's assets . . . in order to report information that resulted in PPVA's NAV being inflated and overstated," id. ¶ 110.

Next, as to Levy, the FAC alleges that: (1) he was co-CIO of PPVA, id. ¶ 50; (2) he "was a portfolio manager with responsibility for overseeing and managing several of PPVA's most significant investments," id.; (3) he was a member of the valuation committee and "was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated," id. ¶ 52; and (4) he "us[ed] his position as a member of the valuation committee to falsely inflate the value of PPVA's assets . . . in order to report information that resulted in PPVA's NAV being inflated and overstated," id. ¶ 54.

Finally, with respect to Landesman, the FAC alleges that: (1) he was President of Platinum Management and co-CIO of PPVA, id. ¶ 56; (2) he "shared responsibility with [Mark] Nordlicht

47

for all trading, asset allocation and risk management on behalf
of PPVA," id. ¶ 57; (3) he "was a member of the risk committee,
and in that capacity was responsible for assessing the risks
associated with PPVA's investments, which was a significant
factor in determining value," id. ¶ 58; (4) he was also a member
of the valuation committee and "was responsible for assessing
the actual value of PPVA's investments and reporting such values
so that PPVA's NAV could be accurately determined and any fees
and other charges accurately calculated," id. ¶ 59; (5) he "was
involved with sourcing investment opportunities, meeting with
and marketing to important investors and developing investment
and business strategy for PPVA and its investments," id. ¶ 60;
and (6) he "was responsible for marketing PPVA on behalf of
Platinum Management, and making representations concerning
PPVA's NAV and the status of its various investments," id. ¶ 63.

The Court concludes based on the foregoing that the FAC
"allege[s] facts indicating that [each] defendant was a
corporate insider, with direct involvement in day-to-day
affairs, at" Platinum Management. In re Alstom SA, 406 F. Supp.
2d at 449. Even Bodner's memorandum - which the other moving
defendants join or incorporate - explicitly concedes that
Landesman, Levy, and Ottensoser had day-to-day roles at Platinum
Management. Bodner MTD 8. And Bodner and Huberfeld cannot

48

distinguish themselves from their fellow Platinum Defendants simply because the FAC fails to "identify any title or position" that they held. Id. To the contrary, plaintiffs concede that Bodner and Huberfeld did not have official titles at PPVA, but they contend that the Platinum co-founders "covertly conducted Platinum's day-to-day business by way of a 'secretary' who would relay their directives to the other Defendants," and they argue that Bodner and Huberfeld were "among the primary decision makers overseeing PPVA." Opp. 10. At least at the pleading stage, this is enough to charge Bodner and Huberfeld with Platinum Management's misstatements.

Having determined that the FAC ties each of the moving Platinum Defendants to Platinum Management's misstatements, the Court next turns to the issue of scienter. Under Rule 9(b), fraudulent intent may be alleged generally, and although "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations," a plaintiff adequately pleads scienter where she "allege[s] facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). A strong inference of fraudulent intent, in turn, "may be established either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id.

Here, plaintiffs have alleged myriad facts that give rise to a strong inference of fraudulent intent for each of the moving Platinum Defendants. Bodner and Huberfeld, for example, are alleged to be founders and owners of Platinum Management who stood to benefit from the inflation of PPVA's NAV. They are also alleged to be founders and owners of the Beechwood Entities, which were created for the express purpose of "provid[ing] Platinum Management with transaction partners that could be used to justify . . . PPVA's inflated NAV." FAC ¶ 337. Levy is likewise alleged to have received a percentage of Platinum Management's profits and to have been "instrumental in the creation of Beechwood." Id. ¶ 53.

Landesman is alleged to have been an owner of Platinum Management, co-CIO of PPVA, a member of the risk and valuation committees, and one of the people responsible "for all trading, asset allocation and risk management on behalf of PPVA." Id. ¶¶ 56-61. And Ottensoser - while not alleged to be an owner of Platinum Management - is alleged to have received a compensation package through which he benefitted from PPVA's inflated NAV. Id. ¶ 12(ix). He is also alleged to have been general counsel,

chief compliance officer, and a member of the risk committee, as well as one of the people "involved in creating Beechwood" and one of the people "responsible for documenting the transactions that comprised the First and Second Schemes." Id. ¶¶ 105-09.

These facts are only a portion of those alleged in the FAC, but they are sufficient by themselves to "give rise to a strong inference of fraudulent intent." Shields, 25 F.3d at 1128. Moreover, since there is no dispute that PPVA justifiably relied on Platinum Management's misstatements of its NAV, or that PPVA was damaged by the payment of inflated performance fees, plaintiffs have stated a claim for fraud against the Platinum Defendants. For these reasons, the Court denied the Platinum Defendants' motions to dismiss the Fourth Count of the FAC.

Furthermore, because the moving defendants' arguments for dismissing plaintiffs' RICO claim essentially mirror their arguments for dismissing plaintiffs' fraud claim, see Bodner MTD 13, the Court denied the Platinum Defendants' motions to dismiss the Seventeenth Count as well. The Court also denied the Platinum Defendants' motions to dismiss the Sixth and Sixteenth Counts for aiding and abetting fraud and civil conspiracy, respectively, as it follows from plaintiffs' plausible allegations of primary actor liability in connection with the

51

fraudulent inflation of PPVA's NAV that plaintiffs have plausibly alleged secondary actor liability as well.[10]

In addition to the claims just discussed, which sound in fraud, the FAC also brings claims – for breach of fiduciary duty, aiding and abetting breach of fiduciary duties, and constructive fraud – that require plaintiffs to allege that each of the Platinum Defendants owed PPVA a fiduciary duty. "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed trust or confidence in another and whether the second person accepts the trust and confidence and thereby gains a resulting superiority or influence over the first." Indep. Asset Mgmt. LLC, 538 F. Supp. 2d at 709. Accordingly, a plaintiff cannot allege that a corporate official owed a fiduciary duty without "indicat[ing] that there was anything about [the defendant's] role as a corporate official that created a personal relationship of trust and confidence." Krys, 486 F. App'x at 156.

Here, plaintiffs have plausibly alleged that each of the moving Platinum Defendants created such a relationship. Bodner and Huberfeld are alleged to be founders of PPVA, and to have

---

[10] For those Platinum Defendants who are also Beechwood Defendants, the Court likewise denied their motions to dismiss the Eighth Count, as this count alleges aiding and abetting fraud as well.

52

been "involved in the management and operation of PPVA" to such an extent that their "approval was required for all significant business, investment and personnel decisions." FAC ¶¶ 41, 84; see United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991) ("At the heart of the fiduciary relationship lies reliance, and de facto control and dominance."). Landesman and Levy are each alleged to have been co-CIOs of PPVA; Landesman is also alleged to have been "responsible for all trading, asset allocation and risk management on behalf of PPVA," FAC ¶ 12(ii), while Levy is alleged to have "had direct responsibility for overseeing and managing many of PPVA's most significant investments," id. ¶ 12(vi); see Assured Guar. (UK) Ltd., 915 N.Y.S.2d at 16 (where a "defendant ha[s] discretionary authority to manage [a plaintiff's] investment accounts, it owe[s] [the plaintiff] a fiduciary duty of the highest good faith and fair dealing"). And Ottensoser is alleged to have been PPVA's general counsel and chief compliance officer, as well as a member of its risk committee. FAC ¶ 12(ix); see Limmer v. Medallion Grp., 428 N.Y.S.2d 961, 963 (1st Dep't 1980) ("[O]fficers are bound by their duty of undivided and unqualified loyalty . . . .").

Because plaintiffs have plausibly alleged that the moving Platinum Defendants owed PPVA a fiduciary duty, they have also stated a claim for constructive fraud. See Brown, 432 N.Y.S.2d

53

at 193-94 ("The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of scienter upon the part of the defendant . . . is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship . . . ."). Moreover, because the FAC alleges that the Platinum Defendants breached their fiduciary duties in large part by defrauding PPVA - and because, as discussed above, the FAC states a claim for fraud against the Platinum Defendants - the FAC also states a claim for breach of fiduciary duty. Finally, as with plaintiffs' fraud claim, the FAC plausibly alleges aiding and abetting breach of fiduciary duties because the Platinum Defendants' secondary actor liability follows from their primary actor liability. Accordingly, the Court denied the Platinum Defendants' motions to dismiss the First, Second, Third, and Fifth Counts.[11]

In sum, for the moving defendant who is only a Platinum Defendant - here, Landesman - the Court did not dismiss any of the claims in the FAC. The Court did, however, dismiss the

---

[11] For those Platinum Defendants who are also Beechwood Defendants, the Court likewise denied their motions to dismiss the Seventh Count, as this count alleges aiding and abetting breach of fiduciary duties as well.

54

Fourteenth Count for unjust enrichment brought against those moving defendants who are Beechwood Defendants - here, Bodner, Huberfeld, Ottensoser, Levy,[12] and Saks.

As discussed above, Bodner argued in his memorandum that the FAC failed to state a claim for unjust enrichment because it did not "plead[] facts that demonstrate that Bodner participated in some wrongful conduct such that any benefit he received was detrimental to PPVA." Bodner MTD 13. Plaintiffs' opposition, however, did not address Bodner's argument, despite addressing arguments made by the Preferred Investors and Kevin Cassidy that the FAC failed to state a claim for unjust enrichment against them. See Opp. 20-23. Accordingly, the Court has treated the claim as abandoned. See Lipton v. Cty. of Orange, NY, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

As a final point, the Court must explain its decision to deny Saks's motion to dismiss except with respect to the Fourteenth Count just discussed. Saks, as noted, is named only

---

[12] In its "bottom-line" Order, the Court incorrectly stated that Levy's motion to dismiss was denied in its entirety. ECF No. 276, at 4. In fact, the Fourteenth Count of the FAC was dismissed as to Levy.

55

as a Beechwood Defendant. Accordingly, in addition to unjust enrichment, the FAC brings claims against him for aiding and abetting, conspiracy, and civil RICO. As relevant here, the FAC alleges that: (1) "Saks worked as a portfolio manager at Platinum Management" until 2014, FAC ¶ 173; (2) in 2014, Saks began working at BAM and became CIO and later President, id. ¶¶ 174-75; (3) "Saks routinely received and was involved in commenting on the third party valuation reports sent to BAM that included inflated valuations of the Beechwood transactions with PPVA," id. ¶ 176; (4) "Saks was involved in orchestrating the January 2015 Montsant transaction" - in which Montsant bought the Beechwood Entities' senior secured notes in Black Elk at 93.5% of par - and he "executed the transaction documents on behalf of BAM," id. ¶ 177; and (5) "Saks similarly was involved in negotiating amendments to the Golden Gate Oil transaction documents," id.

In his short motion to dismiss, Saks incorporates the arguments made in Bodner's memorandum, and he argues, in essence, that the FAC fails to attribute to him "even one instance of specific wrongful conduct or specific knowledge of wrongful conduct by others." Saks MTD 4. Based on the foregoing allegations, however, the Court can reasonably infer that Saks knowingly participated in the Platinum Defendants' tortious

56

conduct. Not only does the FAC allege that Saks moved from a
portfolio management position at Platinum Management to become
CIO and President of BAM – which, as noted, is alleged to have
played a central role in defendants' misconduct, see, e.g., FAC
¶¶ 364, 391 – but it also alleges that he helped orchestrate the
transaction in which Montsant paid millions of dollars for Black
Elk senior secured notes of dubious value, id. ¶ 177.
Specifically, Saks executed the agreement under which Montsant
pledged collateral to secure the loan from SHIP that it used to
purchase the notes. ECF No. 159, Ex. 64. And, as discussed
above, the encumbrance of Montsant's assets was one of the key
mechanisms through which defendants benefitted the Beechwood
Entities while overstating PPVA's NAV. See FAC ¶¶ 543-49.
Accordingly, while Saks is not prejudiced from hereafter moving
to dismiss the remaining claims in the FAC on more
particularized grounds, the Court rejects his broad-brush
argument that no wrongdoing or knowledge of wrongdoing has been
attributed to him.

## D. Michael Nordlicht and Kevin Cassidy

Michael Nordlicht and Kevin Cassidy are not members of a
defined group in the FAC, but the FAC alleges that they aided
and abetted the Platinum Defendants' breach of fiduciary duties
(Twelfth Count) through their role in the Agera transactions. In

57

addition, the FAC alleges that Cassidy was unjustly enriched (Fourteenth Count) by his receipt of 8% of the gross proceeds of the sale of the convertible note from PGS to AGH Parent.

Nordlicht and Cassidy move to dismiss on group pleading grounds, and they also argue that the FAC fails to state claims for aiding and abetting or unjust enrichment. Memorandum of Law of Defendants Michael Nordlicht and Kevin Cassidy in Support of Their Motion to Dismiss the First Amended Complaint for Failure to State a Claim 1 ("Nordlicht-Cassidy MTD"), ECF No. 195. With respect to aiding and abetting, defendants argue that the FAC "does not plead any specific facts showing that either Michael Nordlicht or Kevin Cassidy had actual knowledge of any primary breach of fiduciary duty owed by the 'Platinum Defendants' to PPVA in connection with the Agera Transaction, specific intent to participate in such breach, or took action to further such breach proximately resulting in damage to PPVA." Id. at 2. Additionally, regarding unjust enrichment, Cassidy argues that "[t]here are no facts upon which the Court could infer that [he] was wrongfully enriched by receiving something of value that belonged to PPVA or at PPVA's expense." Id. at 3.

Plaintiffs respond that Nordlicht and Cassidy "were actively involved in effectuating the Agera Transactions" and "cannot claim merely to have been 'inactive' bystanders to those

58

transactions." Opp. 22 (emphasis omitted). For example, plaintiffs argue, Nordlicht was installed by his uncle as general counsel of Agera Energy despite having no relevant experience, and he was given a 95.01% equity interest in Agera for no consideration. Id. at 22. Plaintiffs argue that these actions "make[] little sense unless [Nordlicht] was aware of and sought to assist the successful completion of the underlying deal." Id.

Furthermore, plaintiffs argue, "Nordlicht provided substantial assistance to the closing of the Agera Transactions, working with Steinberg, Ottensoser, Narain and Cassidy to prepare the documents and schedules by which the various parts of the Agera Transactions were accomplished." Id. Nordlicht "also executed the documents by which the equity he owned was transferred to a nominee of the Beechwood Entities," an action without which the transaction could not have closed. Id. Similarly with Cassidy, plaintiffs argue that the FAC alleges that he "was involved in the preparation of the documents related to the Agera Transactions," and that he "worked directly with Steinberg to create the mechanism by which 8% of the Agera purchase price was paid to an entity set up by Cassidy to avoid having any taxes withheld from such payment." Id. at 23.

Finally, with respect to the unjust enrichment claim, plaintiffs argue that "Cassidy was not employed as a portfolio manager at Platinum Management" and "did not have a written contract with Platinum Management, PPVA or PGS that would entitle him to any payment in connection with the sale of the Agera Note." Id. However, "Starfish, an entity created and controlled by Cassidy, was made a party to the Agera Transactions as a means of paying Cassidy 8% of the total proceeds of the sale, which amounted to millions of dollars." Id. at 24. Plaintiffs contend that "Starfish was granted an ownership interest in PGS the day prior to the Agera Sale in order to 'take care of Kevin' due to his efforts in effectuating the Agera Transactions." Id.

Based on the foregoing, the Court concludes that the FAC plausibly alleges that Nordlicht and Cassidy knew the Platinum Defendants were breaching their fiduciary duties to PPVA. As noted, an inference of scienter can be established "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," Shields, 25 F.3d at 1128, and plaintiffs have satisfied this burden for the reasons discussed in their opposition. With the element of scienter satisfied, there is little question that plaintiffs have also plausibly alleged that Nordlicht and Cassidy participated in the

breach. As such, the Court denied Nordlicht and Cassidy's motion to dismiss the Twelfth Count of the FAC.

The Court also concludes that the FAC plausibly alleges that Cassidy was unjustly enriched. Plaintiffs allege that Cassidy created and controlled Starfish, FAC ¶ 140, and that Starfish was granted 8% of the membership interests in PGS the day before the sale of the convertible note closed, id. ¶ 645. This grant was allegedly made without consideration, id., and notwithstanding the fact that Cassidy had no contractual entitlement to payment, id. ¶ 621. Concurrent with the sale of the convertible note, moreover, PGS "repurchased" its membership interests from Starfish for $7 million in cash and $6.5 million in other consideration. Id. ¶ 646. These allegations make it plausible that Cassidy was unjustly enriched at the expense of PPVA (through PGS), and the Court accordingly denied Cassidy's motion to dismiss the Fourteenth Count of the FAC.

## E. Bernard Fuchs

Fuchs is a Platinum Defendant. He filed a one-page memorandum of law urging the Court to dismiss the claims against him on group pleading grounds. ECF No. 224. Because the FAC clearly makes individualized allegations with respect to Fuchs, see, e.g., FAC ¶¶ 12(v), 111-19; ECF No. 159, Ex. 2, the Court denied Fuchs's motion to dismiss. However, Fuchs will not be

prejudiced from bringing a second motion to dismiss on more particularized grounds.

## **Conclusion**

This Opinion has set forth the reasons for the Court's "bottom-line" Order issued on March 15, 2019. As noted at the outset, the motions disposed of herein were filed as part of an initial round, and no defendant will be prevented from bringing a motion as part of the second round, which has now been scheduled. ECF No. 283. Pursuant to that schedule, the deadline to answer or move to dismiss the FAC is April 22, 2019, opposition papers must be filed by May 13, 2019, and reply papers must be filed by May 23, 2019. The Court will then hold oral argument on June 4, 2019 at 10:00 AM.

Dated:   New York, NY

      April 11 , 2019       JED S. RAKOFF, U.S.D.J.