UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- x
In re PLATINUM-BEECHWOOD LITIGATION :          18-cv-6658 (JSR)
-------------------------------- x
SENIOR HEALTH INSURANCE COMPANY OF :
PENNSYLVANIA,                                  18-cv-6658 (JSR)
                                   :
        Plaintiff,                 :
                                   :
        -v-                        :           
                                   :
BEECHWOOD RE LTD. et al.,          :
                                   :
        Defendants.                :
-------------------------------- x

JED S. RAKOFF, U.S.D.J.

        On July 24, 2018, plaintiff Senior Health Insurance Company

of Pennsylvania ("SHIP") brought a complaint against various

defendants - including Beechwood Re Ltd. ("BRE"), B Asset

Manager, L.P. ("BAM"), Beechwood Bermuda International Ltd.

("BBIL"), Beechwood Re Investments, LLC ("BRILLC"), Mark Feuer,

Scott Taylor, and Dhruv Narain (collectively, "Beechwood

Defendants") - after discovering that SHIP had invested $320

million with the affiliates of an allegedly Ponzi-esque scheme

that failed. ECF No. 1. On December 28, 2018, SHIP brought a

Second Amended Complaint ("SAC") against the same defendants.

ECF No. 84.

        On March 20, 2019, the Beechwood Defendants filed an Answer

to SHIP's SAC, in which they asserted a "Counterclaim"

containing five counts. ECF No. 190 ("Counterclaim"). On the

same day, the Beechwood Defendants moved for summary judgment on the first two counts of the Counterclaim related to advancement of expenses incurred in connection with Senior Health Insurance Company of Pennsylvania v. Beechwood Re Ltd. et al., 18-cv-6658-JSR (S.D.N.Y.) ("SHIP action"). ECF No. 191. In an Opinion and Order dated May 13, 2019, this Court denied the Beechwood Defendants' motion for summary judgment. In re Platinum-Beechwood Litig., 2019 WL 2093914, at *1 (S.D.N.Y. May 13, 2019) ("May 13 Opinion and Order"). On June 7, 2019, the Beechwood Defendants moved for reconsideration of this Court's May 13 Opinion and Order, ECF No. 429, and this Court denied the motion in a Memorandum Order dated July 8, 2019, ECF No. 534 ("July 8 Order").

Now before the Court is a motion by SHIP to dismiss all five counts of the Counterclaim. ECF No. 556. For the reasons discussed below, the Court resolves SHIP's motion as follows:

- Count 1 (declaratory judgment for advancement), Count 2 (breach of the "IMAs," as defined below), Count 3 (declaratory judgment for indemnification), Count 4 (rescission of the "Surplus Note," as defined below, for lack of consideration and fraudulent inducement), and the part of Count 5 alleging anticipatory breach of the Surplus Note are dismissed with prejudice; and

2

- The motion is denied with respect to the part of Count 5 asserting breach of good faith and fair dealing.

## Background

The overall background to this case has previously been set forth in various Opinions and Orders of this Court, familiarity with which is here assumed. See, in particular, Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd., 345 F. Supp. 3d 515, 520-23 (S.D.N.Y. 2018); Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd., 377 F. Supp. 3d 414, 418-19 (S.D.N.Y. 2019).

In evaluating SHIP's motion to dismiss the Counterclaim, the following allegations are taken as true:

On May 22, 2014, June 13, 2014, and January 15, 2015, SHIP entered into an Investment Management Agreement ("IMA") with each of BBIL, BRE, and BAM, respectively. Counterclaim ¶¶ 247-49. Paragraph 18(c) of each IMA states, in pertinent parts:

> To the maximum extent permitted by applicable law, each Indemnified Party [i.e., the Beechwood Defendants] shall be fully protected and indemnified by the Client [i.e., SHIP] . . . against all liabilities and losses . . . suffered by virtue of its or his serving as an Indemnified Party with respect to any action or omission suffered or taken that is not in material violation of this Agreement and does not constitute fraud, gross negligence or willful misconduct . . . . The Client shall . . . advance expenses, including legal fees, for which any Indemnified Party would be entitled by this Agreement to be indemnified upon receipt of an unsecured

3

> undertaking by such Indemnified Party to repay such
> advances if it is ultimately determined by a court of
> proper jurisdiction that indemnification for such
> expenses is not permitted by law or authorized by this
> Agreement . . . .

Counterclaim ¶¶ 250-52.

The Counterclaim alleges that SHIP's SAC "seeks to hold [the Beechwood Defendants] liable for acts or omissions they have taken in connection with their duties, or exercise of their powers under, the IMAs," where, according to the Counterclaim, none of the actions that the Beechwood Defendants took or failed to take were "in material violation of the IMAs or that constitute[] fraud, gross negligence, or willful misconduct." Id. ¶ 257. Therefore, according to the Counterclaim, the SHIP action has triggered the indemnification and advancement provisions of the IMAs. On this basis, the Counterclaim propounds its first three counts, to wit:

(1) declaratory judgment that SHIP must immediately advance certain amounts to BAM, BBIL, BRE, Feuer, Taylor, and Narain for expenses that they had already incurred in connection with their defense of the SHIP action ("Count 1"), id. ¶¶ 266-69;

(2) breach of contract by SHIP under Paragraph 18(c) of the IMAs to advance to the Beechwood Defendants their

4

expenses incurred as a result of the SHIP action

("Count 2"), id. ¶¶ 270-74; and

(3) a declaratory judgment that SHIP must indemnify the
Beechwood Defendants against all liabilities and
losses suffered by virtue of the Beechwood Defendants
being Indemnified Parties under the IMAs ("Count 3"),
id. ¶¶ 275-78.

The Counterclaim then alleges the following additional
facts:

SHIP "is regulated by the Pennsylvania Insurance Department
[("PID")] and subject to various rules and regulations designed
to protect its policy-holders," one of which is the requirement
for SHIP "to maintain a risk-based capital ("RBC") ratio above
certain levels." Id. ¶¶ 279-80. In the fall of 2014, SHIP was
concerned about its RBC falling below a "substandard level," and
it "devised a plan to increase SHIP's surplus at zero cost to
SHIP by having SHIP contribute additional funds under the IMAs
with certain Beechwood entities, which would then be lent back
to SHIP in the form of a surplus note." Id. ¶¶ 282-83. The
Beechwood Defendants were unaware of "these internal
machinations." Id. ¶ 284.

To that end, in February 2015, the following allegedly
circular transactions occurred: (1) SHIP contributed $60 million

5

to BBIL for investment under the IMA; (2) BBIL loaned BRILLC $50 million and BRILLC pledged assets in support of that loan, pursuant to a secured promissory note and a pledge agreement; and (3) BRILLC purchased $50 million of SHIP's surplus note ("Surplus Note"). Id. ¶ 289. The Surplus Note matures on April 1, 2020 and accrues interest at the rate of 6% per year. Id. ¶ 290.

On December 30, 2014, SHIP's then-CFO sent an internal email stating: "[I]f you diagram this, you will see a[] circular funding arrangement of $50M from SHIP to BRe and BBIL to BBL and back to SHIP." Id. ¶¶ 287-88. Nonetheless, "SHIP assured the Beechwood Defendants that, because BRILLC had access to additional capital, the transaction was not in fact circular and would comply with Pennsylvania law." Id. ¶ 288. Furthermore, SHIP's then-CFO represented to the Beechwood Defendants that SHIP would make sure the transaction complied with Pennsylvania law, as evidenced by the August 21, 2015 email: "My position is that SHIP is and will remain responsible for compliance with Pennsylvania law." Id. ¶ 286. SHIP knew that "there would be information asymmetry in this transaction," that the Beechwood Defendants "did not have visibility into SHIP's capital strategy," and that the Beechwood Defendants "were not ensconced in the particulars" of the above transactions. Id. ¶ 285.

6

The terms of the Surplus Note dictate that SHIP "pay
interest to BRILLC beginning on April 1, 2016, and thereafter on
April 1 of each year until the Surplus Note has been paid in
full." Id. ¶ 298. The Surplus Note requires that SHIP seek prior
approval of the Pennsylvania Insurance Commissioner
("Commissioner") for interest payments and that SHIP "provide
the Commissioner with written notice at least thirty days prior
to the intended date of the payment of principal or interest on
the Surplus Note." Id. ¶ 299-300. SHIP "did not submit any
payment notices to the Commissioner, and, in hindsight, clearly
never intended to do so." Id. ¶ 301. Since the execution of the
Surplus Note, "SHIP has not paid any interest, though interest
has been due to BRILLC since April 1, 2016." Id. ¶ 302.

Based on this account, defendant BRILLC propounds the
following two additional counterclaims:

(4)  rescission of the Surplus Note for lack of
     consideration and fraudulent inducement ("Count 4"),
     id. ¶¶ 304-10; and

(5)  (i) anticipatory repudiation of SHIP's obligations to
     repay the full amount of principal and interest due
     and (ii) breach of SHIP's duty of good faith and fair
     dealing ("Count 5"), id. ¶¶ 311-13.

## Analysis

7

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[1] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

**I.  Counts 1-3**

In the May 13 Opinion and Order, this Court denied the Beechwood Defendants' motion for summary judgment as to Counts 1 and 2, holding that "Paragraph 18 [of the IMAs] does not indemnify expenses incurred in litigation with SHIP." May 13 Opinion and Order, at *5. In the July 9 Memorandum Order, the Court reaffirmed this conclusion by denying the Beechwood Defendants' motion for reconsideration, noting that the Beechwood Defendants were not "entitled to advancement of expenses incurred in the SHIP Action." July 9 Order 4. As the

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

Court explained, "New York law . . . imposes a strong presumption against reading indemnification provisions to cover expenses incurred in litigation between the parties." May 13 Opinion and Order, at *3 (referencing Hooper Associates v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989).; PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co., 2006 WL 3370698, at *1 (2d Cir. Nov. 20, 2007)). The Court further held that the Beechwood Defendants failed to demonstrate that Paragraph 18 of the IMAs – under which they sought indemnification and advancement – rebutted that presumption. Id. at *4 (referencing In re Refco Sec. Litig., 890 F. Supp. 2d 332, 343-44 (S.D.N.Y. 2012); Bridgestone/Firestone, Inc. v. Recovery Credit Servcs., 98 F.3d 13, 21 (2d Cir. 1996)).

In reaching that conclusion, the Court found relevant that "Paragraph 18(c) contain[s] only broad language that does not unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves." Id. "More importantly," the Court continued, "it is clear from the terms of Paragraph 18 that future third-party claims were possible at the time of the contract." Id. The Court also noted that other aspects of Paragraph 18's structure cut against interparty indemnification, rejecting an alternative reading of Paragraph

9

18 that the Beechwood Defendants put forth in their motion for reconsideration. Id. at *4-5; July 8 Order 10-11.

It follows that for the reasons stated in the May 13 Opinion and Order and the July 8 Memorandum Order, as summarized above, Counts 1-3 of the Counterclaim must be dismissed with prejudice.

## II. Counts 4 and 5: Primary Jurisdiction Doctrine and Burford Doctrine

SHIP argues that this Court should dismiss — or at least stay — Counts 4 and 5 of the Counterclaim under (1) the primary jurisdiction doctrine because "the claim requires the resolution of issues that, under a regulatory scheme, have been entrusted to the expertise of an administrative agency" or (2) the "Burford abstention doctrine," see Burford v. Sun Oil Co., 319 U.S. 315 (1943), because "the adjudication of [the] particular claim in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial state concern." ECF No. 557 ("SHIP Memo."), at 9.

The party requesting abstention pursuant to both the primary jurisdiction doctrine and the Burford abstention doctrine "bears the heavy burden of showing that abstention is warranted." DMJ Assocs., L.L.C. v. Capasso, 228 F. Supp. 2d 223, 227 (E.D.N.Y. 2002).

## A. Primary Jurisdiction Doctrine

The primary jurisdiction doctrine is concerned with "promoting power relationships between the courts and administrative agencies charged with particular regulatory duties." United States v. W. Pac. R.R. Co., 352 U.S. 59, 63 (1956). When deciding whether to defer to an administrative agency, the Court looks at the following factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy consideration within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." Ellis v. Tribune Television Co., 443 F.3d 71, 82-83 (2d Cir. 2006).

SHIP argues that all four factors support dismissal of Counts 4 and 5, because: (1) the Surplus Note fits "squarely within the technical expertise of the Commissioner, who is expressly charged with the review, approval, enforcement and oversight of surplus notes," SHIP Memo. 11 (referencing 40 Pa Stat. § 4452); (2) Pennsylvania law has vested the Commissioner with "exclusive authority over approval and regulation of surplus notes and has not created a private right of action to

11

challenge such approvals or regulation," id. at 12; (3)
"attempting to resolve these counterclaims, including payment on
the surplus note, which is preconditioned on approval from PID,
would require this Court to wade into the regulatory regime
created under the Pennsylvania Insurance Code," creating "a
significant risk of inconsistent rulings and potential
disruption of PID's authority over the Surplus Note," id. at 13-
14; and (4) "the question of whether the Surplus Note was
supported by consideration and constitutes a valid instrument
was necessarily decided by the Commissioner in approving its
issuance," so BRILLC must raise the issues of circularity or
intention of nonpayment with the Commissioner, id. at 12.

The Court disagrees with SHIP's characterization of the
instant issues. With respect to the first and second factors,
the issues in front of the Court are matters of contract breach,
good faith and fair dealing, lack of consideration, and
fraudulent inducement, all of which are clearly "within the
conventional experience of judges." Ellis, 443 F.3d at 82. It is
true that the contractual provisions at issue are rooted in the
statutory language of the Pennsylvania Insurance Code, but even
then the present case "does not involve technical or policy
considerations within the agency's particular field of expertise
but instead simply requires us to engage in an activity –

12

statutory interpretation – that is the daily fare of federal

judges." Schiller v. Tower Semiconductor Ltd., 449 F.3d 286, 295

(2d Cir. 2006). As BRILLC points out, this Court "is not being

asked to address . . . whether the form of the Surplus Note

meets statutory and regulatory guidelines before it is issued."

ECF No. 575 ("Beechwood Memo."), at 10. Nor is the present case

about BRILLC challenging administrative decisions or regulations

by the Commissioner, which makes SHIP's assertion that there is

no "private right of action to challenge [the Commissioner's]

approvals or regulation" largely irrelevant. SHIP Memo. 12.

     The fourth factor also cuts against SHIP, because the fact

that no prior application was made to the agency "would normally

weigh against primary jurisdiction." Schiller, 449 F.3d at 295.

It is also likely that the Commissioner, whose role concerns

approving and regulating surplus notes, would not be expected to

decide, or be interested in deciding, the instant dispute

surrounding fraudulent inducement or good faith and fair dealing

claims.[2]

     While the Court is somewhat more sympathetic to SHIP's take

on the third factor, ultimately this factor does not strongly

---

[2] This is even more likely to be the case if BRILLC's
representation that "there is no apparent mechanism for [BRILLC
to make an application to the Commissioner] under the
Pennsylvania Insurance Code" is true. Beechwood Memo. 11.

13

favor SHIP's argument. If the Court grants the remedies sought by BRILLC, it is possible there might be "a substantial danger of inconsistent rulings" where SHIP might be torn between this Court's order and the Commissioner's position (which, given the Platinum-Beechwood scandal, may be against making such payments). However, this concern is alleviated by the fact that this Court ultimately dismissed Count 4 on the independent grounds set forth below, and so the only remedy at issue is the damages sought under Count 5. These damages, if awarded, would not be in contravention of the Commissioner's authority as discussed in more detail below. For these reasons, this risk embodied in the third prong is largely alleviated.

Putting these four factors together, the Court determines that invoking the preliminary jurisdiction doctrine is not warranted in the present case.

### B. **Burford Abstention Doctrine**

Alternatively, SHIP argues that Burford abstention is warranted. The Burford doctrine requires that, "[w]here timely and adequate state-court review is available," federal courts must "decline to interfere with the proceedings or orders of state administrative agency . . . where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with

14

respect to a matter of substantial public concern." New Orleans
Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S.
350, 361 (1989). In determining whether such abstention is
appropriate, the Second Circuit articulated the following three
factors for courts to consider: "(1) the degree of specificity
of the state regulatory scheme; (2) the need to give one or
another debatable construction to a state statute; and (3)
whether the subject matter of the litigation is traditionally
one of state concern." Hachamovitch v. DeBuono, 159 F.3d 687,
697 (2d Cir. 1998).

   SHIP argues that all three factors support dismissal,
because: (1) "[t]he Pennsylvania Insurance Code establishes a
complex and reticulated oversight scheme, including statutory
requirements specific to the issuance and repayment of Surplus
Notes," SHIP Memo. 15; (2) this Court's interpretation of the
Surplus Note could create a risk that the Surplus Note may be
"subject to an interpretation that is inconsistent with PID's
interpretation and regulation of other surplus notes issued by
other insurance companies," id. at 16; and (3) the states have
"exclusive jurisdiction over insurance administration and
regulation, thereby creating an important state interest," id.
(citing Capital Indem. Corp. v. Curiale, 871 F. Supp. 205, 208
(S.D.N.Y. 1994)).

15

For substantially similar reasons as those already discussed with respect to the primary jurisdiction, the Court thinks SHIP mischaracterizes the counterclaims at issue. To repeat, the counterclaims mainly concern matters of contract breach, breach of good faith and fair dealing, lack of consideration, and fraudulent inducement, rather than wading into the "complex and reticulated oversight scheme." Id. at 15. This case is therefore meaningfully distinguishable from the case relied on by SHIP, Mathias v. Lennon, 474 F. Supp. 949, 955 (S.D.N.Y. 1979), where the Illinois Director of Insurance brought an action against a New York insurance company and its rehabilitator for their discrimination in favor of New York policyholders at the expense of its Illinois insureds. There, the key issue was the manner in which a state regulator was conducting the "rehabilitation of an insolvent insurance company"; here, the key issues concern matters of contract dispute that only tangentially touch upon insurance regulatory mechanisms, if at all. Id.

It is true that, as also stated above, the remedies sought, if granted, might conceivably create conflict with the Commissioner's stance; but "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction." Colorado River Water

Conservation Dist. v. United States, 424 U.S. 800, 816 (1976).

"The potential conflict here . . . would not be such as to impair impermissibly the State's effort to effect its policy respecting" the insurance regulation. Id. The essence of SHIP's view – that because the Surplus Note implicates some state regulatory issues, these issues categorically cannot be adjudicated by federal courts as per the Burford doctrine – is overreaching and quite contrary to the principle that abstention from the exercise of federal jurisdiction is "an extraordinary and narrow exception." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89 (1959).

For the foregoing reasons, SHIP fails to meet "the heavy burden of showing that abstention is warranted," DMJ Assocs., L.L.C. v. Capasso, 228 F. Supp. 2d 223, 227 (E.D.N.Y. 2002), and consequently, the Court declines to invoke the primary jurisdiction or Burford abstention doctrine with respect to Counts 4 and 5 of the Counterclaim.

**C. Count 4**

Now the Court turns to whether there are independent grounds to dismiss Count 4 of the Counterclaim. Count 4 seeks rescission of the Surplus Note, an equitable remedy. Clark v. Allstate Ins. Co., 2010 WL 1904013, at *2 (W.D. Pa. May 7, 2010). Under here applicable Pennsylvania law, "the only grounds

17

upon which equity will permit rescission of an executed contract are fraud, mistake, failure of consideration, and quia timet." Umbelina v. Adams, 34 A.3d 151, 158-59 (Pa. Super. 2011).

## 1. Rescission Based on Fraudulent Inducement

Under Pennsylvania law, the elements of fraudulent inducement are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. 2005). Fed. R. Civ. Pro. 9(b) requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud."

The Counterclaim alleges that SHIP "fraudulently induced BRILLC to enter into the Surplus Note by assuring Defendants during the negotiations that led to the execution of the Surplus Note that the transaction was legitimate and compliant with Pennsylvania law, and, at the same time, failing to disclose that SHIP never intended to ask the Commissioner for permission to make any payments under the Surplus Note." Id. ¶ 306.

18

With respect to the allegation that SHIP never intended to perform its obligations to pay interest, SHIP argues that the Counterclaim offers only conclusory statements in this respect. SHIP Memo. 18. Also, in SHIP's view, the allegation that BRILLC relied on SHIP's assurance regarding the legitimacy and legality of the transaction is refuted by the facts that: (1) "BRILLC was a party to the $50 million IMA transaction . . . [so] BRILLC was in possession of all of the facts that would give rise to the possibility of circularity," id. at 19 (referencing Counterclaim ¶ 289); and (2) "the Surplus Note was found by the Commissioner to be legitimate and in compliance with Pennsylvania law," id.

BRILLC responds that the allegation that SHIP never intended to honor the terms of the Surplus Note is supported by the factual allegations that "SHIP secretly questioned the legitimacy of the transaction and the fact that SHIP has failed to request permission to fund a single interest payment over the last three and a half years." Beechwood Memo. 15 (referencing Counterclaim ¶¶ 287-88, 301). Furthermore, BRILLC notes that its reliance on SHIP's representations regarding the issues of circularity and the legitimacy of the transaction was justified, because SHIP repeatedly assured as such and "SHIP had superior knowledge of Pennsylvania insurance law." Id. at 14, 16. Lastly, BRILLC argues that the Commissioner's approval is irrelevant,

19

because "it does nothing to legitimize the circular transaction, or that SHIP kept its concerns hidden from the Beechwood Parties." Id. at 16.

This Court agrees with SHIP in that the Counterclaim fails to allege facts giving rise to an inference of SHIP's "preconceived and undisclosed intention of not performing" its obligations under the Surplus Note, other than conclusory statements that fail to satisfy the Rule 9(b) standard. Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd. et al., 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018) (citing Spinelli v. Nat'l Football League, 903 F.3d 185, 210 (2d Cir. 2018)). While BRILLC gives some specificity to its claim that SHIP made no request to the Commissioner after the execution of the Surplus Note, this does not support the view that even before the execution SHIP intended not to perform. Also, SHIP's alleged questioning of the legitimacy of the transaction has nothing to do with SHIP's alleged intention not to request.

Furthermore, BRILLC fails to adequately allege fraudulent inducement based on SHIP's representation that the transaction complied with the Pennsylvania law and was not circular. It is not clear from the face of the Counterclaim as to why the transaction was indeed not "legitimate and compliant with Pennsylvania law." Counterclaim ¶ 306. Indeed, there is nothing

20

in the Counterclaim that suggests that the Commissioner, who could independently assess the transaction, found the transaction not in compliance with Pennsylvania law.

The representation regarding circularity also suffers from a related issue: without any allegation as to why circularity may render the transaction non-compliant with Pennsylvania law, it is not plausibly pled as to (1) why this representation is "material to the transaction at hand" and (2) why BRILLC would have not entered into the transaction had it known it was circular (other than one conclusory statement stating so), Counterclaim ¶ 308. Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. 2005).

On top of all these, no allegation in the Counterclaim pleads that there was a proximate causation – in addition to a but-for causation – between the alleged misrepresentation regarding circularity and the injury to BRILLC. See Eigen, 874 A.2d at 1190 ("A party claiming fraud in the inducement must demonstrate that the fraud proximately caused economic harm."). Rather, BRILLC's injury allegedly comes from SHIP's nonpayment of interest starting in 2016, which is unrelated to the circularity structure.

**2. Rescission Based on Lack of Consideration**

21

Count 4 of the Counterclaim also alleges that the Surplus Note is "void for lack of consideration because . . . this transaction was a circular transaction with no benefit to the Beechwood contracting entities, just financial engineering on the part of SHIP." Counterclaim ¶ 305. SHIP argues that this allegation is "wholly conclusory" and "not based on any factual predicate." SHIP Memo. 20. BRILLC responds that its Counterclaim lays out in detail how the Surplus Note transaction occurred and how SHIP's former CFO described the transaction as a circular funding arrangement. Beechwood Memo. 16 (referencing Counterclaim ¶¶ 282, 289).

The Counterclaim does allege the details regarding the Surplus Note transaction, but these allegations do not plausibly plead the claim for lack of consideration. In exchange for lending $50 million, BRILLC received the rights to interest and principal payments from SHIP (although allegedly SHIP has not performed its obligation). The fact that BRILLC entered into a different transaction with BBIL – where, as a result, BRILLC's economic position was hedged in net – does not mean that the consideration was lacking in BRILLC's transaction with SHIP. Furthermore, the form of separate transactions and of separate corporate existence of BRILLC, BBIL, and BRE should be respected, unless there is a particular reason for this Court to

22

collapse those transactions. No such reason is alleged nor necessary in this Court's view based on the Complaint.

For all of the reasons stated above, Count 4 of the Counterclaim is dismissed with prejudice.

### D. **Count 5**

Count 5 is based on (1) SHIP's alleged anticipatory repudiation of "its obligation to repay the full amount of principal and interest due under the Surplus Note" and (2) SHIP's alleged breach of its duty of good faith and fair dealing under the Surplus Note by "failing to ask the Commissioner for permission to make interest payments due." Counterclaim ¶ 312.

#### 1. **Anticipatory Breach**

Under Pennsylvania Law, a claim for anticipatory breach must be premised on a defendant's "absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." 2401 Pennsylvania Ave. Corp. v. Fed'n of Jewish Agencies of Greater Philadelphia, 489 A.2d 733, 736 (1985). BRILLC argues that SHIP has anticipatorily breached the contract by "absolutely and unequivocally" refusing to perform, as evidenced by never seeking the Commissioner's approval of payment. Id. at 20.

The Court dismisses this portion of Count 5 for the following reasons. As a threshold matter, this portion of Count

23

5 of the Counterclaim is based on SHIP's alleged repudiation of "its obligation to repay the full amount of principal and interest due under the Surplus Note," rather than its repudiation of its obligation to seek the Commissioner's approval. Counterclaim ¶ 312. According to Section 2 of the Surplus Note, unless and until the Commissioner approves, SHIP does not have any such obligation to repay the principal and interest. ECF No. 558-1, Ex.1 ("Surplus Note"), at 1.

But even if Count 5 of the Complaint were worded differently to focus on SHIP's obligation to seek the Commissioner's permission, SHIP's past refusal to seek such permission does not necessarily establish that SHIP would continue to refuse making a request. In fact, SHIP may arguably comply with the contract by making such a request prior to April 1, 2020, a possibility not ruled out by the allegations in the Counterclaim.

For these reasons, this portion of Count 5 based on a claim for anticipatory breach is dismissed with prejudice.

### 2. Breach of the Duty of Good Faith and Fair Dealing

Count 5 also asserts a claim for breach of the duty of good faith and fair dealing. Under Pennsylvania law, "[w]hether express or implied, the covenant of good faith and fair dealing acts as a term of the contract, and that covenant arises from

24

the contract itself." <u>Zaloga v. Provident Life & Acc. Ins. Co.</u>
<u>of Am.</u>, 671 F. Supp. 2d 623, 630 (M.D. Pa. 2009). As the
Pennsylvania courts have noted:

> Section 205 of the Restatement (Second) of Contracts
> suggests that "[e]very contract imposes upon each
> party a duty of good faith and fair dealing in its
> performance and its enforcement." A similar
> requirement has been imposed upon contracts within the
> Uniform Commercial Code by 13 Pa.C.S. § 1203. The duty
> of "good faith" has been defined as "[h]onesty in fact
> in the conduct or transaction concerned."

<u>Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank and Trust</u>,
560 A.2d 151, 153 (Pa. Super. 1989).

Put another way, a breach of the duty of good faith and
fair dealing occurs when, even though there has been no breach
of the express terms of the contract, compliance with its terms
has been effectively undercut by a party proceeding in a manner
inconsistent with good faith and fair dealing.

So far as this part of Count 5 is concerned, the focus is
on the alleged prior failure by SHIP to approach the
Commissioner for permission to pay money to BRILLC, which was a
condition precedent to such payment. In other words, if SHIP
devised an artifice to excuse its having to pay BRILLC its
yearly payments by the simple expedient of secretly not pursuing
the Commissioner's approval that was a precondition to such

payments, SHIP acted in breach of the duty of good faith and
fair dealing.

Section 2 of the Surplus Note, in part based on Section
445.2 of the Pennsylvania Insurance Code, states:

> (b) The annual interest rate on this Surplus Note
> shall be equal to six percent (6.00%) per annum.
> Subject to the provisions contained in this Section 2,
> unpaid interest shall be due and payable on April 1,
> 2016, and thereafter on April 1 of each year until
> this Surplus Note has been paid in full. . . .
>
> (d) Principal or interest on this Surplus Note shall
> not be a liability nor an expense except to the extent
> that the payment has been approved by the Insurance
> Commissioner of the Commonwealth of Pennsylvania (the
> "Commissioner"). Unapproved interest shall not be
> represented as an addition to the principal or
> notional amount and shall not accrue further interest.
> The Surplus Note shall accrue interest only on the
> outstanding principal balance and not on accrued but
> unpaid interest.
>
> (e) Any interest payment or principal repayment on
> this Surplus Note requires prior approval of the
> Commissioner. The Company shall provide the
> Commissioner with written notice at least thirty days
> prior to the intended date of the payment of principal
> or interest on the Surplus Note.

Surplus Note 1.³ The last sentence leaves open the possibility

that SHIP could delay indefinitely providing notice to the

---

³ Although the Surplus Note was not submitted as an exhibit to
the Counterclaim, but submitted as an exhibit to SHIP's
memorandum in support of its motion to dismiss, this Court may
consider it without converting SHIP's motion to dismiss into a
motion for summary judgment, because the Beechwood Defendants'
allegations regarding Count 4 and 5 of the Counterclaim are

26

Commissioner as long as it did not intend to make the payment. But this would be commercially unreasonable and a clear breach of the duty of good faith and fair dealing.

Based on the above and the factual allegation that SHIP never sought the Commissioner's approval for interest payments, the Counterclaim sufficiently pleads a claim for breach of duty of good faith and fair dealing.[4]

### 3. Remedy

Under Count 5, BRILLC seeks damages "in an amount to be determined at trial, but in an amount at least equal to $50 million, plus interest." Counterclaim ¶ 313. SHIP argues that the damages BRILLC is seeking are not permitted under the terms of the Surplus Note, because the Surplus Note is "expressly subordinated to all of SHIP's obligations and liabilities and the authority to permit payment under the Surplus Note is vested solely in the Commissioner," as required by the Pennsylvania Insurance Code. SHIP Memo. 24 (referencing Surplus Note 1 and 40 Pa. Stat. § 445.2(d)).

_____

heavily based on the Surplus Note. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Cortec Industries, Inc. et al. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991).
[4] Although SHIP argues that the Commissioner would never in fact have approved the payment, this is a factual dispute that cannot be resolved on a motion to dismiss.

It is the Court's view that SHIP conflates the nature of the remedy sought under Count 5. If BRILLC ultimately prevails on Count 5, the Court would not be issuing an injunction to force SHIP to make interest payments under the Surplus Note. Rather, SHIP would be required to pay for its breach of the terms of the Surplus Note. Furthermore, if such relief is granted, it is likely that the amount of damages will be determined pursuant to the expectation damages – a "preferred basis of contract damages" under the Pennsylvania law "designed to place the aggrieved in as good a position as would have occurred had the contract been performed." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669 (3d Cir. 1998). In the present case, this would be the amount that SHIP would have had to pay if SHIP had sought the Commission's approval starting in 2016. This amount would be what the Commissioner would have approved anyway, if any, in the counterfactual, further mitigating the concern that the relief sought would interfere with the Commissioner's statutory authority or with the Surplus Note's subordinated status vis-à-vis SHIP's other obligations and liabilities.

For all of the reasons stated here, the motion to dismiss Count 5 of the Counterclaim is granted in part (anticipatory

28

breach of the Surplus Note) and denied in part (breach of the
duty of good faith and fair dealing).

## Conclusion

In sum, Counts 1-4 and part of Count 5 of the Counterclaim
are dismissed with prejudice, and the motion is denied in all
other respects.

The Clerk is directed to close the entries at docket number
556 in 18-cv-6658.

SO ORDERED.

Dated:    New York, NY

September 2, 2019                    JED S. RAKOFF, U.S.D.J.

29