UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
In re PLATINUM-BEECHWOOD LITIGATION :      18-cv-6658 (JSR)
------------------------------------- x
MELANIE L. CYGANOWSKI, as Equity    :
Receiver for PLATINUM PARTNERS      :
CREDIT OPPORTUNITIES MASTER FUND    :
LP, PLATINUM PARTNERS CREDIT        :
OPPORTUNITIES FUND (TE) LLC,        :
PLATINUM PARTNERS CREDIT            :
OPPORTUNITIES FUND LLC, PLATINUM    :
PARTNERS CREDIT OPPORTUNITIES FUND  :      18-cv-12018 (JSR)
INTERNATIONAL LTD., PLATINUM        :
PARTNERS CREDIT OPPORTUNITIES FUND  :      OPINION AND ORDER
INTERNATIONAL (A) LTD., and         :
PLATINUM PARTNERS CREDIT            :
OPPORTUNITIES FUND (BL) LLC,        :
                                    :
        Plaintiff,                  :
                                    :
        -v-                         :
                                    :
BEECHWOOD RE LTD. et al.,           :
                                    :
        Defendants.                 :
------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/7/19

JED S. RAKOFF, U.S.D.J.

On December 19, 2018, plaintiff Melanie L. Cyganowski filed

a multi-count Complaint against numerous defendants. ECF No. 1.

On March 27, 2019, defendants Washington National Insurance

Company ("WNIC") and Bankers Conseco Life Insurance Company

("BCLIC") filed an Answer, Cross-Claims, and Third-Party

Complaint ("WNIC TPC"). ECF No. 75. On March 29, 2019, plaintiff

filed a First Amended Complaint ("FAC"). ECF No. 81. And on May

15, 2019, defendant Senior Health Insurance Company of

Pennsylvania ("SHIP") and Fuzion Analytics, Inc. ("Fuzion")

filed an Answer, Cross-Claims, and Third-Party Complaint ("SHIP
TPC"). ECF No. 195.

With respect to the FAC, five motions to dismiss have been
filed. They are the motions of: (1) Beechwood Re Ltd.
("Beechwood Re"), Beechwood Re Investments, LLC ("BRILLC"), B
Asset Manager LP ("BAM I"), B Asset Manager II LP ("BAM II"),
Beechwood RE Holdings, Inc. ("Beechwood Holdings"), Beechwood
Bermuda International, Ltd. ("BBIL"), Beechwood Bermuda Ltd.
("BBL"), BAM Administrative Services LLC ("BAM Administrative"),
Mark Feuer, and Scott Taylor, ECF No. 183; (2) CNO Financial
Group, Inc. ("CNO") and 40|86 Advisors, Inc. ("40|86 Advisors"),
ECF No. 173; (3) PB Investment Holdings, Ltd. ("PBIHL"), ECF No.
205; (4) SHIP and Fuzion, ECF No. 156; and (5) WNIC and BCLIC,
ECF No. 168.

With respect to the WNIC TPC, ten motions to dismiss have
been filed. They are the motions of: (1) BAM Administrative, BAM
I, BBL, BBIL, Beechwood Capital Group LLC ("Beechwood Capital"),
Beechwood Holdings, Beechwood Re, Feuer Family Trust, Taylor-Lau
Family Trust, Feuer, Dhruv Narain, and Taylor, ECF No. 209; (2)
Beechwood Trust Nos. 7-14, ECF No. 189; (3) David Bodner, ECF
No. 186; (4) Murray Huberfeld, ECF No. 153; (5) Hokyong
(Stewart) Kim, ECF No. 191; (6) Lincoln International LLC
("Lincoln"), ECF No. 181; (7) David Ottensoser, ECF No. 193; (8)

2

PBIHL, ECF No. 200; (9) Daniel Saks, ECF No. 177; and (10) Will Slota, ECF No. 231. Beechwood Re has also moved to compel WNIC and BCLIC to arbitrate their claims against Beechwood Re. ECF No. 209.

With respect to the SHIP TPC, fourteen motions to dismiss were filed prior to the Court's issuing its "bottom-line" ruling on that date. They are the motions of: (1) BAM I, BAM II, BAM Administrative, Beechwood Re, Beechwood Holdings, BBL, BBIL, Feuer Family Trust, Taylor-Lau-Family Trust, B Asset Manager GP LLC ("BAM GP I"), B Asset Manager II GP LLC ("BAM GP II"), MSD Administrative Services LLC ("MSD Administrative"), N Management LLC ("N Management"), Beechwood Global Distribution Trust, Feuer Family 2016 Acq Trust, Taylor-Lau Family 2016 Acq Trust, and Beechwood Capital, ECF No. 284; (2) Beechwood Trust Nos. 7-14, Monsey Equities, LLC, and Beechwood Re Investments, LLC Series C ("BRILLC Series C"), ECF No. 280; (3) Bodner, ECF No. 278; (4) Kevin Cassidy and Michael Nordlicht, ECF No. 282; (5) Elliot Feit, ECF No. 344; (6) Bernard Fuchs, ECF No. 262; (7) Huberfeld, ECF No. 451 in 18-cv-6658; (8) Kim, ECF No. 291; (9) Lawrence Partners, LLC, ECF No. 356; (10) Ottensoser, ECF No. 276; (11) PBIHL, ECF No. 348; (12) Saks, ECF No. 271; (13) Slota, ECF No. 286; and (14) Whitestar LLC, Whitestar LLC II,

3

and Whitestar LLC III, ECF No. 350. (As noted below, a fifteenth motion has now been filed.)

After receiving full briefing from all relevant parties, the Court held oral argument on August 15, 2019. In a "bottom-line" Order issued on August 18, 2019, ECF No. 380, the Court granted the FAC defendants' motions in the following respects:

- BAM Administrative: Counts 1-3 (RICO and RICO conspiracy), Count 4 (Section 10(b) of the Exchange Act and Rule 10b-5), and Count 18 (Unjust Enrichment) were dismissed.

- BAM I, BAM II, Beechwood Holdings, BRILLC, CNO, 40|86 Advisors, Fuzion, Feuer, and Taylor: All claims were dismissed.

- Beechwood Re, BBIL, BBL, and PBIHL: Counts 1-3 (RICO and RICO conspiracy) and Count 4 (Section 10(b) of the Exchange Act and Rule 10b-5) were dismissed.

- SHIP, BCLIC, and WNIC: Counts 1-3 (RICO and RICO conspiracy), Count 4 (Section 10(b) of the Exchange Act and Rule 10b-5), Count 6 (aiding and abetting breach of fiduciary duty), and Count 7 (aiding and abetting fraud) were dismissed.

4

All of the above dismissals with respect to the FAC were with prejudice. In all other respects, the motions were denied.

In the same "bottom-line" Order, the Court granted WNIC TPC defendants' motions in the following respects:

- Bodner, Huberfeld, Kim, Ottensoser, Feuer Family Trust, Taylor-Lau Family Trust, Beechwood Holdings, BAM I, BAM Administrative, BBL, BBIL, and PBIHL: Counts 1 and 2 (RICO and RICO conspiracy), Count 18 (contribution and indemnity), and Count 19 (unjust enrichment) were dismissed.

- Feuer, Taylor, Beechwood Capital, and Beechwood Trust Nos. 7-14: All claims were dismissed.

- Lincoln: Counts 1 and 2 (RICO and RICO conspiracy), Count 6 (negligent misrepresentation), Count 18 (contribution and indemnity), and Count 19 (unjust enrichment) were dismissed.

- Narain: Counts 1 and 2 (RICO and RICO conspiracy), part of Count 3 (fraudulent inducement part only), Count 18 (contribution and indemnity), and Count 19 (unjust enrichment) were dismissed.

- Saks: Counts 1 and 2 (RICO and RICO conspiracy), part of Count 3 (fraudulent inducement part only), part of Count

5

7 (aiding and abetting fraudulent inducement part only),
Count 18 (contribution and indemnity), and Count 19
(unjust enrichment) were dismissed.

- Slota: Counts 1 and 2 (RICO and RICO conspiracy), Count 3
  (fraudulent inducement and fraud), Count 18 (contribution
  and indemnity), and Count 19 (unjust enrichment) were
  dismissed.

All of the above dismissals with respect to the WNIC TPC
were with prejudice. In all other respects, the motions were
denied, except that, with respect to Beechwood Re's motion to
dismiss and to compel arbitration, the Court, in light of the
Court's Memorandum Order dated July 10, 2019, stated it would
hold off decision of that motion until the arbitration panel
resolves the dispute as to whether WNIC and BCLIC are precluded
from bringing their motion to strike Beechwood Re's motion to
dismiss and to compel arbitration. ECF No. 333.

In the same "bottom-line" Order, the Court granted SHIP TPC
defendants' motions in the following respects:

- Beechwood Global Distribution Trust, Feuer Family 2016
  Acq Trust, and Taylor-Lau Family 2016 Acq Trust: Count 1
  (aiding and abetting fraud), Count 2 (aiding and abetting
  breach of fiduciary duty), Count 5 (civil conspiracy),
  and Count 7 (unjust enrichment) were dismissed.

6

- Bodner, Feit, Huberfeld, Kim, Saks, Slota, BAM II, Beechwood Trust Nos. 7-14, BRILLC Series C, Lawrence Partners, LLC, Monsey Equities, LLC, Whitestar LLC, Whitestar LLC II, and Whitestar LLC III: Count 5 (civil conspiracy) and Count 7 (unjust enrichment) were dismissed.

- Cassidy: Count 5 (civil conspiracy) was dismissed.

- Fuchs, Michael Nordlicht, Beechwood Holdings, BBL, PBIHL, BAM Administrative, Beechwood Capital, BAM GP I, BAM GP II, MSD Administrative, N Management, Feuer Family Trust, and Taylor-Lau Family Trust: All claims were dismissed.

- Ottensoser: Count 7 (unjust enrichment) was dismissed.

All of the above dismissals with respect to the SHIP TPC were with prejudice. In all other respects, the motions were denied.

In addition, after third-party defendant David Steinberg was belatedly served with the SHIP TPC, he was given permission to file his motion to dismiss after the Court issued the bottom-line Order on August 18, 2019. ECF No. 387. The Court hereby grants Steinberg's motion to dismiss Count 5 (civil conspiracy) and Count 7 (unjust enrichment) but denies his motion in all other respects.

7

This Opinion and Order sets forth the reasons for the Court's rulings in the "bottom-line" Order issued on August 18, 2019 and for the Court's rulings regarding Steinberg's motion to dismiss the SHIP TPC.

## Background

### I.  FAC

The following allegations are taken from the FAC and are assumed true for the purposes of assessing the motions to dismiss the FAC.

#### Parties

Melanie L. Cyganowski is the receiver ("Receiver") for the "PPCO Funds" consisting of the following plaintiff entities: (i) Platinum Partners Credit Opportunities Master Fund LP ("PPCO Master Fund"), (ii) Platinum Partners Credit Opportunities Fund (BL) LLC ("PPCO Blocker Fund"), and (iii) the PPCO Feeder Funds (consisting of Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund International Ltd., and Platinum Partners Credit Opportunities Fund International (A) Ltd.). FAC ¶¶ 25-31, 68-70, 76. Each PPCO Feeder Fund was, through PPCO Blocker Fund, a creditor of PPCO Master Fund. Id. ¶ 75.

Defendants in the FAC consist of the FAC Beechwood Defendants (as defined below), SHIP, Fuzion, BCLIC, WNIC, CNO, 40|86 Advisors, and John Does 1-100. Id. ¶¶ 46-55. Fuzion is affiliated with SHIP and was formed in 2012 to provide administrative and management services to long-term care insurance companies, including SHIP. Id. ¶ 121. CNO is a holding company that owns WNIC, BCLIC, and 40|86 Advisors. Id. ¶ 130-31. WNIC and BCLIC operate CNO's legacy long-term care business lines and are advised by 40|86 Advisors. Id. ¶ 127.

The FAC Beechwood Defendants include the FAC Beechwood Entities (as defined below), Feuer, and Taylor. Id. ¶ 47-49. The FAC Beechwood Entities include (i) Beechwood Re, (ii) BRILLC, (iii) BAM I, (iv) BAM II, (v) Beechwood Holdings, (vi) BBIL, (vii) BBIHL, (viii) BBL, (ix) BAM Administrative, and (x) the WNIC and BCLIC Reinsurance Trusts (consisting of BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub). Id. ¶ 46.

PPCO Master Fund, Platinum Partners Liquid Opportunity Master Fund, L.P. ("PPLO") and Platinum Partners Value Arbitrage Fund, LP ("PPVA") were New York City-based hedge funds founded between 2003 and 2005. Id. ¶ 65. The PPCO, PPLO, and PPVA family of funds are referred to as the "Platinum Funds." Id.

9

The following non-defendants are relevant to the FAC. Mark Nordlicht, the Platinum Funds' Chief Investment Officer, founded the Platinum Funds with Huberfeld and Bodner. Id. ¶¶ 57, 59-60. Levy was Beechwood's Chief Investment Officer in 2014, and in 2015, he rejoined the Platinum Funds as co-Chief Investment Officer with Nordlicht. Id. ¶ 58. The FAC alleges that both Nordlicht and Levy were jointly and solely responsible for the investment decisions of PPCO Master Fund. Id. ¶ 80. Platinum Credit Management LP ("PPCO Portfolio Manager") served as portfolio manager for PPCO Master Fund and the PPCO Feeder Funds. Id. ¶ 76. The FAC alleges that Nordlicht and the PPCO Portfolio Manager breached their fiduciary duty to PPCO Master Fund and the PPCO Feeder Funds. Id. ¶ 78.

Financial Conditions of PPVA and PPCO Through the End of 2013

In 2012, the PPVA Funds faced a severe liquidity crisis, because (1) investors were increasingly seeking redemption, (2) most of their investments (e.g., Black Elk, Golden Gate) were illiquid, high-risk, and overvalued, and (3) many of the PPVA Funds' portfolio companies needed capital. Id. ¶ 91.

Like the PPVA Funds, PPCO Master Fund also faced a liquidity crisis, because the PPCO Funds' assets were mostly illiquid, high-risk, and overvalued. Id. ¶¶ 101, 103. At the end

10

of 2013, PPCO Master Fund had just $5.7 million of cash on hand and was unable to meet the increased redemption requests or adequately fund its portfolio companies. Id. ¶¶ 101, 105.

## Creation of Beechwood Re

To solve the PPVA and PPCO Funds' liquidity crisis, Huberfeld and Nordlicht conspired with Feuer, Taylor, and Levy to form a reinsurance company, Beechwood Re. Id. ¶¶ 59, 108. The goal was to attract investment from insurance companies and to use the reinsurance trust assets to benefit Platinum, thereby enriching Platinum's and Beechwood's owners. Id. ¶ 108.

Nordlicht, Huberfeld, Bodner, and Levy owned and controlled Beechwood. Id. ¶ 110. Taylor and Feuer maintained ostensible and nominal management authority as, respectively, President and Chief Executive Officer of Beechwood. Id. Many members of Beechwood's management team were former Platinum Fund employees. Id. ¶ 111. Beechwood made no effort to hide from BCLIC, WNIC, and SHIP its deep ties to the Platinum Funds. Id. ¶ 112.

## BCLIC, WNIC, CNO, and SHIP

By 2012, long-term care carriers such as BCLIC, WNIC, and SHIP were facing increasing claims payments and increasing capital requirements. Id. ¶ 114. Beechwood targeted such long-term care insurers with troubled legacy portfolios. Id. ¶ 115.

11

Prior to 2008, SHIP had been owned by CNO, which supported SHIP's liquidity needs and "sought ways to reduce the strain of supporting SHIP's underwriting losses." Id. ¶ 117. CNO spun off SHIP in November 2008. Id. ¶ 118. Even after the spinoff, SHIP's ratio of claims to premiums steadily increased between 2009 and 2013, and it faced challenges to satisfying the regulatory surplus requirements under applicable Indiana insurance law. Id. ¶¶ 123-24. By 2013, SHIP had virtually no option for obtaining reinsurance or other arrangements to off-load its long-term care risk other than through Beechwood. Id. ¶ 126.

BCLIC and WNIC faced similar situations. Id. ¶ 127. Furthermore, CNO was "highly incentivized to, and did, direct the actions of [CNO's subsidiaries] WNIC and BCLIC because its financial health was dependent on BCLIC and WNIC." Id. ¶ 132. The Executive Vice President of BCLIC and WNIC was also the Chief Investment Officer and President of 40|86 Advisors. Id. ¶ 134. Consequently, all actions taken by WNIC and BCLIC in the FAC were done in concert with, or at the direction of, 40|86 Advisors. Id.

Beechwood's Relationship with BCLIC, WNIC, CNO, and SHIP

In October 2013, WNIC and BCLIC entered into Reinsurance Agreements with Beechwood by ceding a substantial portion of their legacy, runoff long-term care business to Beechwood Re.

12

Id. ¶ 141. Beechwood Re created the WNIC and BCLIC Reinsurance Trusts, because Beechwood Re was an unauthorized offshore reinsurer in New York and Indiana where BCLIC and WNIC were domiciled. Id. ¶ 145. The FAC alleges that CNO was incentivized to be an "active participant" in the parties' performance of the Reinsurance Agreements, because CNO would be responsible for any unsatisfied claims if Beechwood Re was unable to replenish the WNIC and BCLIC Reinsurance Trusts. Id. ¶ 151.

Between 2014 and 2016, CNO directed WNIC and BCLIC to transfer approximately $592 million to Beechwood pursuant to the Reinsurance Agreements. Id. ¶ 168. WNIC and BCLIC were "agreeable to the valuation of the assets ascribed to them by Beechwood because so long as the Reinsurance Trusts appeared to satisfy the amounts required by Indiana and New York state law, they could stay in compliance with their regulations." Id. ¶ 152.

Similarly, SHIP, acting by and through Fuzion,[1] entered into three Investment Management Agreements (collectively, "IMAs") with three Beechwood entities. Id. ¶ 162. All three IMAs guaranteed SHIP a 5.85% annual investment return on the net

_____

[1] Fuzion depended on the continued existence of SHIP for its financial survival, which is why Fuzion "was highly incentivized to, and did, direct the actions of SHIP in most, if not all, investment decisions." FAC ¶ 160.

13

asset value of the assets SHIP contributed; a shortfall would be made up by Beechwood, whereas the surplus would be taken by Beechwood as a "Performance Fee." Id. ¶ 163. Also, the IMAs provided that Beechwood must invest in a manner permitted by SHIP's corporate investment guidelines. Id. ¶ 167. Over time, SHIP invested approximately $270 million with Beechwood and its affiliates. Id. ¶ 166.

From WNIC, BCLIC, CNO, and SHIP's perspective, the above transactions saved them from their tough financial situations. By 2013, over "90% of all long-term care policy companies exited the industry" and "reinsurance was scarce under very onerous terms." Id. ¶ 221. Reinsurance was "virtually unavailable for books of legacy long-term care business, such as those of BCLIC and WNIC" except under very onerous terms. Id. ¶ 137. Beechwood was their "white knight." Id. ¶ 115. Furthermore, for WNIC and BCLIC, if the fiction of overvalued investments could be maintained by Beechwood, they could maintain a façade to their shareholders, investors and rating agencies that they had successfully wound down their legacy runoff business. Id. ¶ 221.

FAC Beechwood Defendants' Assistance to the Fraudulent Scheme

Upon receipt of the funds from BCLIC, WNIC, and SHIP, Beechwood, in early 2014, immediately began investing into the

14

Platinum Funds and their portfolio companies through loans and purchase of equity in non-arm's length transactions. Id. ¶ 169. The loans to the portfolio companies of the PPCO Funds allowed the PPCO Portfolio Manager to collect millions of dollars in unearned, excessive management and performance fees based on overvaluation of the PPCO Funds' assets. Id. ¶ 184. The PPCO Portfolio Manager in turn distributed these fees to various individual Beechwood defendants. Id.

The FAC alleges that neither Nordlicht nor Levy fulfilled his fiduciary duty to the PPCO Funds in any such non-arm's length transaction, despite their substantial managerial role in both Platinum and Beechwood. Id. ¶¶ 171-72. The FAC further alleges that Feuer and Taylor substantially assisted in each of these problematic transactions identified in the FAC. Id. ¶ 173.

WNIC and BCLIC's Knowledge of the Beechwood-Platinum Relationship

The FAC alleges that CNO, BCLIC, WNIC, and SHIP knew about Beechwood's investments into the Platinum Funds but chose to not lose "the white knight" with whom they had offloaded a substantial portion of their future claims risk. Id. ¶ 174-75. For example, Beechwood's quarterly reports to CNO, BCLIC, and WNIC – which were required under the Reinsurance Agreements – were full of references to Platinum Fund investments. Id. ¶ 196.

15

Other evidence of WNIC and BCLIC's knowledge of the Beechwood-Platinum relationship includes, among others, an email with Levy's biography which described Levy's position as Chief Investment Officer of PPVA and which was circulated among WNIC, BCLIC, CNO, and 40|86 Advisors. Id. ¶ 200. Also, as further evidence, 40|86 Advisors told CNO in February 2016 that 85% of Beechwood's private loan holdings were associated with the Platinum Funds. Id. ¶ 203.

The FAC notes that, despite this knowledge, WNIC and BCLIC chose not to immediately terminate the Reinsurance Agreements. Only in mid-2016 did WNIC, BCLIC, CNO, and 40|86 Advisors actively seek to separate their Beechwood investment from Platinum-related portfolio companies. Id. Furthermore, WNIC and BCLIC terminated the Agreements in September 29, 2016, only after the public indictment of Huberfeld caused the Platinum Funds to become a "public relations liability" for WNIC and BCLIC. Id. ¶ 205.

SHIP's Knowledge of the Beechwood-Platinum Relationship

SHIP also received monthly and quarterly reports from Beechwood that "made clear" that the assets bought by Beechwood had "significant connections to the Platinum Funds." Id. ¶ 208. In February 2015, SHIP entered into a non-arm's length transaction with Beechwood to satisfy its regulatory capital

16

requirements, which showed that SHIP was "not a passive investor being swindled by Beechwood. On the contrary, well aware of the Beechwood/Platinum relationship, SHIP was willing to, and did, join the scheme." Id. ¶ 211-19.

The December 2015 Fraudulent Conveyance that Harmed PPCO

Later when "Beechwood's investments into the Platinum Funds were floundering, [WNIC, BCLIC, CNO, 40|86 Advisors,] and SHIP directed Beechwood to consummate several fraudulent conveyance transactions with the PPCO Fund[s] between 2015 and 2016, which had but one goal: rid the insurers of bad assets by dumping them into the PPCO Funds and/or securitize the positions they were unable to dispose of by obtaining a lien in substantially all of the PPCO Funds' assets." Id. ¶ 176. In doing so, they also "aided and abetted the Platinum/Beechwood fraud and their respective breaches of fiduciary duty." Id. ¶ 222.

In December 2015, PPCO Master Fund issued a $15.5 million note to SHIP ("SHIP Note"). Id. ¶ 225. The SHIP Note was secured by almost all assets of PPCO Master Fund and certain of its direct and indirect subsidiaries (collectively, "MSA PPCO Subsidiaries"). Id. ¶ 226. The funds that PPCO Master Fund received by issuing the SHIP Note were siphoned from the PPCO Funds in the following ways:

• Disbursement by BAM Administrative (as agent for SHIP) to

17

Beechwood Bermuda and Beechwood Re for PPCO Master Fund
to purchase the Desert Hawk debt held in SHIP's account.
Id. ¶ 230. However, "at the time of the transaction, the
Desert Hawk debt was not worth the value it was ascribed
by Nordlicht and SHIP." Id. ¶ 232.

- Full repayment by BAM Administrative (as agent for SHIP)
of all indebtedness owed by LC Energy, a Platinum Fund
affiliate, to the WNIC and BCLIC Reinsurance Trusts. Id.
¶ 233. These debts were also worth well below the value
that WNIC, BCLIC, and Nordlicht ascribed to it. Id. ¶
234.

On January 20, 2016, SHIP loaned an additional $2 million
to PPCO Master Fund, which again was secured by the MSA PPCO
Subsidiaries. Id. ¶ 235. The outstanding amount loaned by SHIP
rose to $17.5 million (the "First Amended SHIP Note"). Id.

These transactions were "nothing more than a mechanism
through which to place the bad loans to Desert Hawk and LC
Energy onto the PPCO Funds' books for the benefit of SHIP and
BCLIC and WNIC" Id. ¶ 238. The FAC alleges that "the PPCO Funds
and its creditors, including the PPCO Feeder Funds, and the PPCO
Blocker Fund, were the victims of actual fraud which is subject
to avoidance under New York State law" and argues that "the

liens granted on the assets of PPCO Master Fund and the MSA PPCO Subsidiaries should be avoided." Id. ¶ 239.

### The March 2016 Fraudulent Conveyance that Harmed PPCO

On March 21, 2016, PPCO Master Fund, BAM Administrative, as agent, SHIP, and the WNIC and BCLIC Reinsurance Trusts entered into an approximately $69.1 million Note Purchase Agreement (the "March NPA"), which amended and restated the First Amended SHIP Note and authorized the sale of additional notes by PPCO Master Fund. Id. ¶ 240. These additional notes were secured by certain other PPCO Fund subsidiaries and affiliates ("NPA Guarantors"). An additional $52.5 million received (on top of $17.5 million already loaned under the First Amended SHIP Note) was channeled back to SHIP, WNIC, and BCLIC in exchange for SHIP and BRe WNIC 2013 LTC Primary (one of the WNIC and BCLIC Reinsurance Trusts) assigning debts they held in Northstar Offshore (the "Northstar Debt") to PPCO Master Fund, and in the form of a loan to PPVA, the proceeds of which, in turn, was used to purchase the remaining Northstar Debt from SHIP. Id. ¶¶ 246-48.

The purchase of the Northstar Debt amounted to a fraudulent conveyance, because the valuation of the Northstar Debt was "substantially overstated." Id. ¶ 250. Essentially, the above transactions were consummated to rid SHIP and BRe WNIC 2013 LTC Primary of the Northstar Debt that had "little to no chance of

19

performing." Id. ¶ 249. "In the end, the PPCO Funds and their portfolio companies were left with liens on substantially all of their assets while being saddled with an interest in a company — Northstar Offshore — on the verge of bankruptcy and a receivable from an equally financially precarious PPVA." Id.

The December 2015 and March 2016 transactions were allegedly "structured, negotiated and consummated with the substantial assistance" of Beechwood, WNIC, BCLIC, CNO, 40|86 Advisors, SHIP, and Fuzion. Id. ¶ 253.

## II.  **WNIC TPC**

The following allegations are taken from the WNIC TPC and are assumed true for the purposes of assessing the motions to dismiss the WNIC TPC.

### Parties

WNIC and BCLIC are insurance companies domiciled in New York and Indiana, respectively. WNIC TPC ¶¶ 478, 479. They are both subsidiaries of CNO. Id. ¶ 470. They allege that each of the cross-claim and third-party defendants intentionally took part in the conspiracy in which these defendants made misrepresentations to (1) induce WNIC and BCLIC to enter into the Reinsurance Agreements with Beechwood Re, through which WNIC and BCLIC invested $600 million in reinsurance trusts managed by Beechwood Re, and (2) prevent WNIC and BCLIC from terminating

20

the Reinsurance Agreements and withdrawing their investment, whereby such money was used as a "piggybank for Platinum." Id. ¶ 474. The "linchpin of the conspiracy" was to hide from WNIC and BCLIC that Beechwood Re and Beechwood entities were controlled and owned by Platinum and other Platinum-affiliated people such as Nordlicht, Huberfeld, and Bodner, because otherwise WNIC and BCLIC would not invest with Beechwood entities given Platinum individuals' checkered past. Id. ¶ 533. The injuries to WNIC and BCLIC as a result of this conspiracy are claimed to exceed $195 million. Id. ¶ 683.

Cross-claim/third-party defendants in the WNIC TPC are:

- Nordlicht, Huberfeld, and Bodner, co-Founders of Platinum. Id. ¶¶ 480-82. Nordlicht ultimately controlled the assets WNIC and BCLIC entrusted; Huberfeld and Bodner conducted the conspiracy's day-to-day business through a secretary. Id.

- Feuer and Taylor, former Chief Executive Officer and President, respectively, of Beechwood Re. Id. ¶¶ 483, 485. They also were founders of Beechwood Re and the principals of most Beechwood entities. Id.

- Feuer Family Trust and Taylor-Lau Family Trust, trusts with Feuer's and Taylor's families as beneficiaries,

respectively. Id. ¶¶ 484, 488. These trusts were asset
protection vehicles for siphoning off gains from the
fraudulent schemes. Id.

- Levy, Senior Manager of Platinum and Beechwood, as well
  as former Chief Investment Officer of Beechwood Re and
  BAM I. Id. ¶ 489. He directed the investment of WNIC and
  BCLIC's reinsurance trust assets. Id.

- Hodgdon, Slota, Leff, Manela, Saks, Kim, and Poteat, all
  senior managers of Platinum. Id. ¶¶ 489, 493, 498, 500,
  504, 505, 506. They misrepresented themselves (and others
  misrepresented them) to WNIC and BCLIC as, respectively,
  Managing Director/Chief Underwriting Officer, Chief
  Operating Officer, Portfolio Manager, Portfolio Manager,
  Chief Investment Officer, Chief Risk Officer, and Chief
  Technology Officer of Beechwood Re and BAM I. Id.

- Small, Managing Director of Platinum. Id. ¶ 496. He
  misrepresented himself (and others misrepresented him) to
  WNIC and BCLIC as a Portfolio Manager of Beechwood Re and
  BAM I. Id.

- Ottensoser, General Counsel of Platinum, Beechwood Re,
  BAM I, and BAM Administrative. Id. ¶ 502.

- Narain, Chief Investment Officer of Beechwood Re and BAM

I starting in January 2016. Id. ¶ 508. He directed the investment of WNIC's and BCLIC's reinsurance trust assets in Platinum-controlled funds and entities. Id.

- Beechwood Re, a Cayman Islands insurer that entered into the Reinsurance Agreements with WNIC and BCLIC. Id. ¶ 509.

- Beechwood Holdings, a Delaware corporation and the parent of Beechwood Re. Id. ¶ 511.

- Beechwood Capital, a Delaware limited partnership and agent for Beechwood Re. Id. ¶ 512.

- BAM I, a Delaware limited partnership and agent and investment manager for Beechwood Re. Id. ¶ 513.

- BAM Administrative, a Delaware limited liability company and agent for Beechwood Re and BAM I in administrating all aspects of the Reinsurance Agreements, along with Beechwood Re and BAM I. Id. ¶ 514.

- BBL, BBIL and BBIHL (predecessor-in-interest to PBIHL), Bermuda entities and the transferees of certain "capital" of Beechwood Re as discussed below. Id. ¶ 515-17.

- Beechwood Trusts No.1-20, trusts established and controlled by Nordlicht, Huberfeld, Bodner or Levy. Id. ¶ 518.

23

- Beechwood Series A through I, vehicles established and controlled by Nordlicht, Huberfeld or Bodner for funding and controlling Beechwood. Id. ¶ 520. Also, they were asset protection vehicle for siphoning off gains from the fraudulent schemes. Id.

- Lincoln, a valuation vendor that Platinum and Beechwood retained from early 2014 to early 2015.

Creation of Beechwood Re

By 2013, when Platinum's "key investment and properties, including Black Elk and Golden Gate, were hemorrhaging red ink," Platinum started "relying almost exclusively on new investments and inter-fund loans to fund investor redemptions." Id. ¶ 523. Specifically, Nordlicht, Huberfeld, and Bodner wanted outside funding from institutional investors such as WNIC and BCLIC. Id. ¶ 524. However, they knew institutional investors would not invest in Platinum because of their high-risk investment strategy and their "checkered past" of making speculative investments with unsavory companies, getting involved in scandals, and having criminal records. Id. ¶ 525.

To attract capital from WNIC and BCLIC, Platinum - through Nordlicht, Huberfeld, Bodner, and Levy - entered into a conspiracy with Beechwood Capital - through Feuer and Taylor - whereby they agreed to establish and use a reinsurance company,

24

Beechwood Re, to induce WNIC and BCLIC to "hand over funds to Beechwood, via reinsurance agreements or otherwise, so that Beechwood could use those funds to keep Platinum afloat." Id. ¶ 532.

Misrepresentations Prior to the Entry into the Reinsurance Agreements

To induce WNIC and BCLIC to enter into the Reinsurance Agreements with Beechwood Re, Nordlicht, Huberfeld, Bodner, Feuer, Taylor, Levy, Hodgdon, Slota, Small, Leff, Manela, Ottensoser, Kim, Saks, Poteat, and Lincoln ("co-conspirators") made representations regarding: "(a) who owned Beechwood Re and other Beechwood entities, (b) Beechwood Re's capital, (c) how Beechwood Re would invest the assets that WNIC and BCLIC would transfer to Beechwood Re under reinsurance agreements, and (d) who would control and operate Beechwood Re and other Beechwood entities." Id. ¶ 537.

First, from the earliest contacts with WNIC and BCLIC in 2013 through the signing of the Reinsurance Agreements in February 2014, Beechwood Capital and Beechwood Re repeatedly misrepresented the ownership structure of Beechwood by stating that Feuer, Taylor, and Levy owned and controlled Beechwood Re, Beechwood Holdings, and BAM I. Id. ¶¶ 538-41. In fact, Beechwood's internal documents reveal that Nordlicht, Huberfeld,

25

and Bodner controlled and owned a substantial stake in these entities. Id. ¶ 542.

Second, starting in the summer of 2013, Beechwood Capital and Beechwood Re repeatedly misrepresented that Beechwood had over $100 million in capital when in fact Beechwood Re and Beechwood Holdings had less than $300,000 in capital. Id. ¶ 543. Specifically, Nordlicht, Huberfeld, and Bodner caused BRILLC to issue a demand note in the amount of $100 million (the "Demand Note") to Beechwood Re. Id. ¶ 545. Based on this, Beechwood continued to represent to WNIC and BCLIC that Beechwood had over $100 million in capital, while hiding the true nature of the Demand Note from WNIC and BCLIC. Id. ¶¶ 545-46. The collateral that backed the Demand Note "took the form of Platinum-controlled funds and entities, which . . . were fraudulently overvalued." Id. ¶ 548.

Third, Beechwood entities and the co-conspirators misrepresented Beechwood Re's intentions and abilities as to how it would invest $600 million funds that WNIC and BCLIC placed in their reinsurance trust accounts, who would serve on the Beechwood investment committee, and so forth. Id. ¶¶ 550-51, 563-64, 566-71. In addition, Beechwood Re represented that it would grant only WNIC and BCLIC a first priority security interest in those reinsurance trust accounts (as required by

26

insurance laws and regulations), but it simultaneously granted a first priority security interest in those accounts to Nomura Securities in order to get this prime broker to extend credit to Beechwood Re and BAM I to make further investments in Platinum-controlled funds and entities. Id. ¶¶ 556-57. Neither WNIC and BCLIC nor Nomura knew of this simultaneous grant of a first priority security interest. Id.

Fourth, starting in July 2013, Feuer, Taylor, and Levy represented other employees of Beechwood as Beechwood employees to WNIC and BCLIC, when in fact they were Platinum employees receiving paychecks from Platinum. Id. ¶¶ 572-73. The co-conspirators made conscious efforts throughout many years to maintain this optic of separation between Platinum and Beechwood in the eyes of BCLIC, WNIC, and federal and state regulators. Id. ¶¶ 574-91.

Misrepresentations After the Entry into the Reinsurance Agreements

Relying on the above four kinds of misrepresentations, WNIC and BCLIC entered into the Reinsurance Agreements on February 10, 2014. Until the termination of the Reinsurance Agreements in September 29, 2016, Nordlicht, Huberfeld, Bodner, Levy, Feuer, and Taylor directed other cross-claim and third-party defendants and used the reinsurance trust assets to enrich themselves and

27

Platinum entities. Id. ¶ 606. In addition, the above four types of misrepresentations continued in the following manner, for the purpose of preventing WNIC and BCLIC from terminating the Reinsurance Agreements.

First, in 2014 and 2015, when WNIC and BCLIC pressed Feuer, Taylor and/or Levy about the relationship between Platinum and Beechwood — prompted by over $100 million of trust assets invested in Platinum-controlled funds such as PPCO, Black Elk Energy Offshore Operations LLC ("Black Elk"), Golden Gate Oil LLC ("Golden Gate"), and ALS Capital Ventures LLC ("ALS") — Feuer, Taylor and/or Levy repeatedly denied the existence of any relationship between Beechwood and Platinum. Id. ¶ 611. The co-conspirators' justification for putting money in the Platinum entities was because "Levy was familiar with them and believed they were valuable investments based on his former employment with Platinum." Id. ¶ 612.

Second, with respect to Beechwood Re's capital, on or about May 16, 2014, the co-conspirators amended and restated the Demand Note downward from $100 million to $25 million without communicating this to WNIC and BCLIC. Id. ¶ 617. $75 million in "capital" was diverted to Beechwood Bermuda entities to (a) satisfy applicable Bermuda insurance law requirements that these Bermuda entities be adequately capitalized and (b) purchase

28

certain assets. Id. ¶¶ 618, 625. Meanwhile, from December 2014 to January 2015, Feuer and Taylor repeatedly told WNIC and BCLIC that Beechwood Re had over $100 million in "capital." Id. ¶ 621. In January 2015, Taylor was forced to tell the truth to WNIC and BCLIC, upon which Taylor also falsely claimed that the "Beechwood Companies [had] an irrevocable right to the assets within a Delaware Series LLC" and that Beechwood "considers the entirety of Beechwood's capital as available to support any liabilities within our companies . . . first and foremost being the WNIC and BCLIC blocks." Id. ¶ 623. The transfer of $75 million in the Demand Note from Beechwood Re to the Beechwood Bermuda entities left Beechwood Re grossly undercapitalized. Id. ¶ 626.

Third, the Beechwood management team wore both Beechwood and Platinum hats but tried concealing this by, for instance, only using their Beechwood email addresses when communicating with WNIC and BCLIC. Id. ¶ 629. By the end of 2014, Feuer and Taylor finally admitted that Levy had been using his investment discretion inappropriately, promising to WNIC and BCLIC that Levy would be separated from Beechwood and that Beechwood Re and its agents would "divest the trust assets of Platinum-controlled funds and entities." Id. ¶ 631. Levy was formally replaced with Saks, but, behind the scene, Levy continued directing Beechwood

29

Re's investments of trust assets with direction from Nordlicht. Id. ¶¶ 632-34. In addition, during 2015 and 2016, Beechwood Re and its agents divested only some of Platinum-controlled investments and also added additional Platinum-controlled investments to the WNIC and BCLIC trusts' portfolios, not fulfilling the promise. Id. ¶ 633.

Fourth, misrepresentations continued as to how trust assets would be invested. In 2014 and 2015, the Co-Conspirators sought to establish additional prime brokerage arrangements, in addition to the arrangement with Nomura discussed above, by granting them a first priority security interest. Id. ¶¶ 639-40. Furthermore, Feuer, Taylor, Levy, Kim, Saks, and Levy repeatedly assured WNIC and BCLIC of the "prudency of their investments" whenever WNIC and BCLIC confronted them about putting trust assets into illiquid and speculative Level 3 assets and ventures, including JF Aircorp, Trilliant, LLC, Kennedy RH Holdings LLC, and Platinum-controlled funds and entities such as Agera, LC Energy, PPCO and Golden Gate Oil. Id. ¶¶ 642, 644. Also, they represented that these transactions were at "arm's-length." Id. ¶ 644.

Breach of the Reinsurance Agreements by Beechwood Re

Beechwood Re also allegedly breached the following provisions of the Reinsurance Agreements:

30

- In "each of the primary trust accounts for WNIC and BCLIC, Beechwood Re was required to deposit and maintain assets that had an aggregate fair market value of 102% of the expected future liabilities for the policies that WNIC or BCLIC (as applicable) ceded." Id. ¶ 658. This was meant to serve as collateral for Beechwood Re's obligation to pay future claims on the ceded policies. Id. This requirement was not satisfied, in part because Beechwood relied on inflated valuations of asset and the fair market values impermissibly included investments in Platinum-controlled funds. Id. ¶ 659-60, 662.

- If the fair market value of the assets in the trusts fell below the aforementioned contractual thresholds, Beechwood Re was required to top up. Beechwood Re did not top up, as it relied on the inflated valuations. Id. ¶ 661.

- If the fair market value of the assets in the trusts were above the contractual thresholds, Beechwood Re could withdraw "surplus" from the funds and distribute as it saw fit. Based on the inflated valuations, Beechwood Re repeatedly withdrew these unearned "surplus." Id. ¶ 662.

- Beechwood Re "breached its obligations to divest the

31

trust accounts of investments that did not comply with the investment guidelines." Id. ¶ 664.

- Upon termination of the Reinsurance Agreements on September 29, 2016, Beechwood Re was required to pay WNIC and BCLIC (1) "cash or admitted invested assets having a fair market value equal to the statutory reserves attributable to the liability [WNIC and BCLIC] recaptured" and (2) "a proportionate amount of the Negative Ceding Commission". Id. ¶ 668-69. According to these provisions, WNIC and BCLIC were owed over \$150 million, which has not been paid. Id.

## Exposure of the Fraud

On June 8, 2016, Huberfeld was arrested, and news broke out that Huberfeld and Nordlicht had been using Beechwood Re to attract institutional investors for the Platinum-controlled funds and entities. Id. ¶ 677. In reaction, WNIC and BCLIC began reviewing and auditing the trusts' investments, discovering many issues. Id. Finally, WNIC and BCLIC terminated the Reinsurance Agreements on September 29, 2016. Id. ¶ 681.

## Lincoln's Participation in the Fraud

The remainder of the allegations focus on Lincoln's participation in the scheme. As the Reinsurance Agreements were getting finalized, Beechwood Re needed "a valuation firm to

issue quarterly reports that would show WNIC and BCLIC the reinsurance trust assets were being safely and prudently invested," which would require "mak[ing] self-dealing look legitimate." Id. ¶ 691. Lincoln, eager to get new and more businesses from Platinum, filled in this role. Id. ¶ 692, 700-02. Before the engagement, Lincoln "understood that Platinum had established Beechwood Re as an affiliated reinsurer that it controlled for the specific purpose of providing Platinum with 'permanent capital,' including by 'leverag[ing] reinsurance premiums as a source of capital.'" Id. ¶ 699.

Lincoln knowingly issued valuation reports based on incomplete, false, and misleading information. Id. ¶ 707. For instance:

- Lincoln accepted without verification the inflated, self-reported and unsupported net asset value figures in valuating the Platinum fund investments. Id. ¶ 711.
- When Lincoln requested investment committee memoranda, financial statements, and offering memoranda of Golden Gate, PPCO, and Black Elk on February 27, 2014, Lincoln received only financial statements of these entities (and for Black Elk, the statements were for 2012), and it did not press further for necessary supporting documentation. Id. ¶ 712.

- Lincoln wrote negative assurance letters stating there was "nothing that came to our attention that would lead us to believe that management's fair values estimates as shown are unreasonable," based on questionable financial information supplied without any supporting documentation. Id. ¶ 714.

- As for positive assurance valuations, Beechwood Re often dictated which methodology Lincoln needed to use – or Lincoln changed its methodology on its own – to make sure that the desired valuation falls within the ranges produced by a chosen methodology. Id. ¶¶ 726, 745-47.

- Lincoln knew that Beechwood Re and Platinum entities were related and that, therefore, the transactions involving Beechwood Re, BAM I, and BAM Administrative's investments into Platinum-related entities and funds could not have been at arm's length. Id. ¶¶ 718, 733. Nonetheless, Lincoln continued to assign a fair value of 100% as if these transactions were at arm's length. Id. ¶ 733.

- Lincoln did not maintain independence, because it "capitulated to Beechwood Re, [BAM I] and BAM Administrative's requests to change loan descriptions and to remove ratings, references to Platinum, and any

34

discussion of 'speculative assets' from its valuation reports." Id. ¶ 737-42.

Lincoln's reports, including the negative assurance letters and positive assurance valuations, justified Beechwood Re's withdrawal of "surplus" from the trusts while avoiding its obligation to top up. Id. ¶ 721. And WNIC and BCLIC relied on these documents — of which reliance Lincoln was aware of — to assume their reinsurance trust assets were "safe, reliable and valuable." Id. ¶¶ 728, 752-53.

By December 2014, it became "more difficult for Lincoln to simply ignore the issues with Beechwood Re, [BAM I], and BAM Administrative's investment values, insufficient collateral, and countless self-dealing investments in Platinum and Platinum-related entities." Id. ¶ 760. For the first time, in its 2014 Q4 valuations, Lincoln dropped the positive assurance valuations from previous 100% fair value to roughly 70-90% range for various Platinum-related investments. Id. ¶ 768. On February 5, 2015, a Lincoln employee directed other employees to "go back and cleanse your files on the Beechwood valuations in accordance with our record retention policy. Please delete any draft models or reports and just hang onto the final models and analyses." Id. ¶ 774. On February 19, 2015, Lincoln sent a notice of termination to Beechwood. Id. ¶ 780.

## III.  SHIP TPC

The following allegations are taken from the SHIP TPC and are assumed true for the purposes of assessing the motions to dismiss the SHIP TPC.

Parties

Cross-claim and third-party defendants include:

- Beechwood Capital, a New York limited liability company. SHIP TPC ¶ 9.

- Beechwood Re, a Cayman Island reinsurance company and party to an IMA, dated June 13, 2014, with SHIP. Id. ¶ 11.

- Beechwood Holdings, a Cayman Islands entity and the parent of Beechwood Re. Id. ¶ 12.

- BBIL, a Bermuda reinsurance company and party to another IMA, dated May 22, 2014, with SHIP. Id. ¶ 13.

- BBL and BBIHL (predecessor-in-interest to PBIHL), Bermuda reinsurance entities. Id. ¶¶ 14-15.

- BAM I, a Delaware limited partnership and party to the third IMA, dated January 15, 2015, with SHIP. Id. ¶ 16.

- BAM II, a Delaware limited partnership and investment advisor for other Beechwood entities. Id. ¶ 17.

- Beechwood Asset Management Trust I and Beechwood Asset

36

Management Trust II, entities through which Nordlicht,
Huberfeld, Bodner, Levy, Feuer, and Taylor owned BAM I.
Id. ¶ 18.

- BAM GP I and BAM GP II, Delaware limited liability
companies. Id. ¶ 19.

- BAM Administrative and MSD Administrative, Delaware
limited liability companies. Id. ¶ 20.

- Nordlicht, Huberfeld, and Bodner, Co-Founders of
Platinum. Id. ¶¶ 21-24. They exerted significant control
over the entire Platinum-Beechwood enterprise's affairs
and orchestrated investment decisions. Id.

- Platinum Management (NY) LLC ("Platinum Management"), a
Delaware limited liability company and the general
partner of PPVA. Id. ¶ 25. Its investment, risk, and
valuation committees set valuations of PPVA's
investments, which permitted them to overcharge
performance fees. Id.

- Beechwood Trusts Nos. 1-20, trusts established and
controlled by Nordlicht, Huberfeld, Bodner or Levy. Id.
¶ 518. Each held ownership interests in Beechwood
Holdings and BBL. Id. ¶ 26.

- Feuer Family Trust and Taylor-Lau Family Trust, trusts

37

organized for Feuer's and Taylor's families as beneficiaries, respectively. Id. ¶¶ 27, 28.

- BRILLC Series A through I, vehicles established and indirectly controlled by Nordlicht, Huberfeld and/or Bodner. Id. ¶ 30.

- Dahlia Kalter, the wife of Nordlicht and an absolute guarantor, along with Nordlicht, of the Montsant Note Purchase Agreement dated January 30, 2015, on behalf of Montsant Partners LLC in favor of SHIP. Id. ¶ 32.

- N Management LLC ("N Management"), a Delaware limited liability company and agent to the BRILLC Series A-I. Id. ¶ 33.

- Beechwood Global Distribution Trust, Feuer Family 2016 ACQ Trust, and Taylor-Lau Family 2016 ACQ Trust, trusts created by Feuer, Taylor, Levy, Nordlicht, Huberfeld, and Bodner for the August 5, 2016 transactions to conceal Nordlicht, Huberfeld, and Bodner's economic interest in Beechwood entities. Id. ¶ 34.

- Feit, Chief Financial Officer of BAM I, responsible for calculating any performance fees that the Beechwood parties to the IMAs took. Id. ¶ 35.

- Saks, a portfolio manager at Platinum Management until

38

2014 and Chief Investment Officer of BAM I starting at
the end of 2014. Id. ¶ 37.

- Estate of Uri Landesman, representing the interests of
the late Uri Landesman, who passed away on September 14,
2018 and who was former President and managing partner of
Platinum Management. Id. ¶ 38.

- Small, managing director of Platinum Management. Id.
¶ 39.

- Ottensoser, General Counsel of Platinum Management, PPVA,
and, during early stages, certain Beechwood entities. Id.
¶ 41.

- Naftali Manela, Chief Operating Officer of PPVA, employee
of certain Beechwood entities, and member of the Platinum
Management valuation committee. Id. ¶ 43.

- Kim, a senior manager of Platinum Management and Chief
Risk Officer of Beechwood Re and BAM I. Id. ¶ 44.

- Slota, a senior manager of Platinum and Chief Operating
Officer of Beechwood Re and BAM I. Id. ¶ 45.

- Fuchs, an individual with no official title but had "day-
to-day involvement in the management and operations of
Platinum Management and PPVA." Id. ¶ 46.

- Michael Nordlicht, a nephew of Nordlicht who participated

39

in the Agera transactions. Id. ¶ 48.

- Cassidy. Soon after finishing his sentence for securities
  frauds, he was appointed as managing director of Agera
  Energy by Nordlicht in 2014. Id. ¶ 58.

The Development of the Platinum-Beechwood Scheme

By 2012, several of Platinum's flagship investments were
not performing well — and "it was imperative that Nordlicht,
Huberfeld, and Bodner find fresh sources of investment dollars.
Their options were limited, however, by their own checkered
reputations [involving their prior criminal history and SEC
investigations]." Id. ¶ 55. For this reason, "in early 2013,
Nordlicht, Huberfeld, Bodner, and Levy . . . entered into a
conspiracy with Feuer, Taylor, and Beechwood Capital . . . to
establish a reinsurance company, Beechwood Re, and to use it as
a vehicle to fraudulently induce insurers to entrust funds to
Beechwood through reinsurance agreements or other contractual
arrangements." Id. ¶ 63.

Beechwood and Platinum had shared management and control,
and were in fact integrated: Beechwood initially operated out of
Platinum's offices, various individuals maintained email
accounts with both Beechwood and Platinum Partners, Platinum
employees with no actual role at Beechwood participated in
Beechwood transactions, and many Beechwood employees were former

40

or concurrent employees of, or deeply connected to, Platinum (e.g., Nordlicht, Levy, Slota, Ottensoser, Small, Manela, Saks, Beren, and Kim). Id. ¶¶ 103-09, 120-24. All of this occurred while Nordlicht, Huberfeld, and Bodner maintained control over Beechwood investments regardless of their titles. Id. ¶¶ 110-17.

Such tie between Platinum and Beechwood "was not disclosed to SHIP or other insurers." Id. ¶ 75. This scheme was furthered through "Beechwood's intentionally complex structure to avoid revealing" Nordlicht, Bodner, and Huberfeld's control over the investments to SHIP and other clients. Id. ¶ 79. For instance, ownership of common shares in Beechwood Holdings and BBL was split among 22 trusts — most of which had nondescript names such as Beechwood Trust Nos. 1-20 — and one individual, in order to "deceive investors" and claim that Beechwood "was a new and independent venture owned by Feuer, Taylor and Levy." Id. ¶ 85-86. Also, the Platinum-Beechwood co-conspirator's "constantly and consistently lied about and hid the Platinum-Beechwood connection, including to the SEC, state regulatory bodies, clients, potential clients, and business partners." Id. ¶ 100.

Beechwood's Misrepresentations to Induce SHIP to Enter into the IMAs

Starting with an email on April 10, 2014, SHIP started receiving "sales pitch" from Taylor, Feuer, and other Beechwood

41

individuals in oral and written forms. Id. ¶ 137-46. The April

10, 2014 document included statements such as "Basis of

Beechwood's Investment Strategy is Superior Risk Management

Capabilities," which includes "[d]etailed analysis of underlying

forms of collateral," a "[f]ocus on appropriate deal controls,"

"active monitoring and due diligence," and "third party

controls, independent valuation, compliance program." Id. ¶ 139.

Furthermore, in various presentations, Levy "reiterated

Beechwood's consistent themes of strong security and

collateralization, conservative approach, and a guaranteed

return for SHIP," and Beechwood "represented to SHIP that the

investments were over-secured by collateral that Beechwood could

seize in the event that a loan or other investment was not

repaid, which would enable Beechwood to recover the value of any

investment." Id. ¶¶ 147, 151. During the course of these sales

pitches, Platinum's controlling role was concealed. Id. ¶¶ 144-

49.

## The Investment Management Agreements

On May 22, 2014, June 13, 2014, and January 15, 2015, SHIP

entered into three IMAs with BBIL, Bermuda Re, and BAM I, all of

which contained a similar set of provisions. Id. ¶ 162. Each IMA

contractually guaranteed to SHIP an annual investment return of

5.85% of the net asset value of the assets in the relevant

42

account, and in the event that there was a shortfall, the Beechwood counterparty was required to make up the difference (with a slight modification for the IMA with BAM I). Id. ¶¶ 168-69; 188-89; 207-08. On the other hand, the Beechwood counterparty could retain investment returns above the 5.85% return as a performance fee. Id. ¶¶ 170, 181, 207-08. The IMAs obligated the Beechwood counterparties to comply with (1) SHIP's Investment Policies and (2) (except for the IMA with BAM I) the Beechwood counterparties' investment guidelines, all of which had certain collateralization and risk profile requirements for investments using SHIP's funds. Id. ¶¶ 176-77, 196-97, 214.

The Beechwood counterparties failed to comply with their own investment guidelines and SHIP's Investment Policies. Id. ¶ 178, 198, 215. For instance, prior to June 2014, Platinum caused BBIL to acquire the Black Elk notes at their face value, even though they were only worth a fraction of that amount. Id. ¶ 180. Beechwood never "disclosed to SHIP the Platinum connection to other assets in which SHIP was invested, that Platinum was directing SHIP's investments, that Platinum and Beechwood insiders were personally benefiting from fees and charges related to those investments, or the related-party nature of such transactions and the inherent conflicts of interest that such ties reflect." Id. ¶ 181.

43

Furthermore, to the extent the Receiver is seeking to hold SHIP liable for acts or omission taken in connection with SHIP's status as a "Client Indemnified Party" as defined in the IMAs, SHIP is entitled to indemnification under Paragraph 18 of the IMAs. Id. ¶ 217-31.

## Numerous Related-Party Transactions

Between May 2014 and June 2016, SHIP entrusted \$270 million in total to Beechwood pursuant to the IMAs, and another \$50 million outside of the IMAs. Id. ¶ 138. These funds were placed into "investments that were highly speculative, not adequately secured, opaque, and not appropriately disclosed to SHIP" and/or investments tied to Platinum that were "high-risk, complex, inadequately collateralized, and often distressed." Id. ¶¶ 233, 237. Also, the investments in the Platinum funds and entities were not made at arm's length, involved "intentionally inflated and unsupportable valuations," and were not in the interests of SHIP. Id. ¶ 234. The examples include: (1) Golden Gate Oil, LLC., id. ¶ 240; (2) Milberg Hamilton Capital Credit Facility, id.; (3) Lumens Energy Group LLC, id.; (4) China Horizon Investment Group, id.; (5) Kennedy Sobli Consultants, id.; (6) Montsant Partners, LLC, id. ¶¶ 240, 249-256; (7) PEDEVCO Corp., id. ¶¶ 257-67; (8) Agera Energy, id. ¶¶ 268-320. Many loans made to these entities using SHIP's funds "carried artificially high

44

interest rates and were subject to fees and upfront payments that were not reasonably supported by the financial condition or outlook of the obligors." Id. ¶ 244.

The SHIP TPC further describes the last three transactions above, as follows:

*Montsant Partners, LLC*. Two weeks after the IMA was signed, BAM I purchased, on SHIP's behalf, an unsecured term note issued by Montsant — a wholly-owned subsidiary of PPVA — in the principal amount of $35,500,000, pursuant to a Note Purchase Agreement ("Montsant NPA") dated January 30, 2015. Id. ¶¶ 249-50. The Montsant NPA, which was not provided to SHIP, specifies that Montsant "shall use the proceeds of the sale of the Notes to disburse to its parent company, PPVA." Id. The note was never properly secured; after nine amendments to the post-closing collateralization deadline, it was collateralized by assets that also served as collateral for debt to be collected under two other defaulted investments in which Beechwood had invested SHIP's policy reserves. Id. ¶¶ 252-53. SHIP has "not been paid back its principal and has not received any payment of interest on this note." Id. ¶ 255. Furthermore, in conjunction with the Montsant NPA, Nordlicht and Kalter "jointly and severally guarantee[d] that the Obligations [of the Montsant NPA] will be

paid strictly in accordance with the terms of the Documents,"
none of which was paid. Id. ¶ 256.

   *PEDEVCO Corp.* Funds deposited in the BAM I IMA account were
used to acquire, on SHIP's behalf, debt interests in PEDEVCO, a
highly speculative oil business, from other Beechwood entities.
Id. ¶¶ 257-58. Not only was an investment of this type "entirely
unsuitable" for SHIP given the speculative nature, but also this
investment occurred after the prices of oil and natural gas had
declined by 50% between March 2014 and April 2015, which meant
PEDEVCO was financially struggling. Id. ¶¶ 258-61. In 2016,
through a series of transactions, the PEDEVCO debt interests
were restructured to subordinate SHIP's rights for repayment
under Beechwood's rights for repayment. Id. ¶¶ 262-64.
Eventually, PEDEVCO acknowledged its inability to repay, and
SHIP collected only pennies on the dollar because of the
subordination of their rights for repayment. Id. ¶¶ 266-67.

   *Agera Energy, LLC.* In May and June 2014, Agera Energy
issued a secured convertible note to Principal Growth Strategies
LLC ("PSG"), an entity owned 55% by PPVA and 45% by PPCO. Id. ¶¶
270-71. This note was shortly after amended to become
convertible to 95.01% of the equity interests in Agera Energy
("Convertible Note"). Id. ¶ 271. In June 18, 2014, Beechwood
entities, including Beechwood Re, acquired $51.9 million of

46

senior secured debt issued by Agera Energy, where $30 million came from SHIP's accounts. Id. ¶ 274. Agera Energy used these proceeds to purchase the assets of Glacial Energy Holdings Inc., an electricity and natural gas retailer. Id. Even though SHIP's money was used to finance this purchase and the transaction report on SHIP's account stated that SHIP's loan would receive 14% interest, SHIP was not paid any interest on it. Id. ¶¶ 274-75. In April 2015, Beechwood and Platinum engineered a few similar asset acquisitions by Agera Energy, using $14 million from SHIP's account without any interest payment to SHIP. Id. ¶ 277.

In 2016 and 2017, "Platinum, Narain and Beechwood orchestrated the sale and resale of [PGS's] Convertible Note to investors, including SHIP, in a series of transactions that ultimately resulted in the transfer of $65 million in cash and $105 million in other assets to PGS in order to prop up PPCO and PPVA." Id. ¶ 280. This was accomplished through a series of complex transactions, one of which was Beechwood's "formation of AGH Parent to acquire the Convertible Note from PGS for $170 million" in June 2016. Id. ¶¶ 281-301. The $170 million that AGH Parent paid came from Beechwood investors, including SHIP who invested $50 million outside of the IMAs into AGH Parent. Id. This $170 million valuation of the Convertible Note — a result

47

of negotiation between Narain and another Platinum entity — was grossly overvalued, because this Convertible Note had been valued at \$15 million two months prior. Id. ¶ 284. These transactions were motivated by Platinum's need for cash to "satisfy demands for investor withdrawals, to support distressed investments, and to provide the appearance of valuable assets in Platinum funds." Id.

Finally, around June 2017, Beechwood sold its interests in various Beechwood assets for over \$1 billion to affiliates of Eli Global. Id. ¶ 318. Beechwood's interests in AGH Parent were included in the sale, but SHIP's were not, "thereby allowing Beechwood, its insiders, and certain Platinum insiders to cash out interests in the Agera enterprise for which they had invested no funds and had taken no risk, while leaving SHIP with nearly \$70 million of funds tied up in illiquid interests of questionable worth in an entity now controlled by Eli Global." Id.

Excessive Performance Fees Based on Overvaluation

The co-conspirators also "grossly overvalued the investments in SHIP's portfolio, and intentionally fed the independent valuation firms misleading information, tailored to achieve the desired result: inflated values." Id. ¶ 321. The goal was to create an overall annual return over the 5.85%

48

threshold to take performance fees. Id. ¶ 322. Over time, tens of millions in performance fees were collected based on its consistently false representations to SHIP, and Beechwood never made any true-up payments to SHIP's account. Id. ¶¶ 341-44.

Beechwood often delegated valuation to Platinum's valuations, as the Golden Gate overvaluation example shows. Id. ¶¶ 333-35. Both the Platinum valuation committee, in charge of "reviewing the values of all of PPVA's significant investments," and the Platinum risk committee, in charge of "setting investment strategy for Platinum Management and analyzing new investment opportunities," had a significant impact on the net asset values reported by PPVA. Id. ¶ 326.

Continued Concealment

Beechwood also prevented SHIP and other investors from finding out about Beechwood's scheme and from extricating their funds from the "irresponsible and conflicted investments" at an earlier time. Id. ¶ 367. For instance, during the SEC investigation that started on July 10, 2014, Nordlicht "lied and told his attorneys that the companies had different General Counsels," which was false as Ottensoser was the General Counsel to both Platinum and Beechwood. Id. ¶ 368. Furthermore, numerous asset-protection schemes, including the use of trusts, were

49

employed to "put their pilfered profits beyond the reach of creditors like SHIP and enrich themselves." Id. ¶ 379-83.

When CNO started confronting Beechwood about the relationship between Beechwood and Platinum and asked to divest CNO's investments from "Platinum-controlled funds and entities," Beechwood feared that "CNO would catch onto the Platinum-Beechwood Scheme." Id. ¶¶ 373-77. Then, Beechwood "diverted most if not all of those investments into SHIP's account, saddling SHIP with all of the inappropriate Platinum-related investments," as evidenced by an email sent on July 23, 2015. Id. ¶ 376.

After Huberfeld was arrested in June 2016 and the media started exposing the Beechwood-Platinum connection, Beechwood sent an email letter to SHIP on July 26, 2016, falsely representing that, inter alia, (1) it was in the process of severing all ties with Platinum; (2) "Beechwood is currently owned 99% through family trusts of Messrs. Feuer and Taylor; and (3) "no fund or institution of any kind has ever had any ownership of Beechwood." Id. ¶¶ 386-87. Ten days after, Feuer and Taylor, through Feuer Family 2016 ACQ Trust and Taylor-Lau Family 2016 ACQ Trust, acquired the equity ownership interests of Nordlicht, Huberfeld, Bodner, and Levy in Beechwood entities in exchange for secured promissory notes totaling more than $200

50

million (the "August 5, 2016 Transactions"), which kept the economic interests of Nordlicht, Huberfeld, Bodner, and Levy intact. Id. ¶ 389. Afterwards, Beechwood sold a portion of its assets to an affiliate of Eli Global, which triggered a change of control provision under the promissory notes agreement that made a material portion of the proceeds of the sale of those assets to "flow[] directly into the hands of Nordlicht, Huberfeld, Bodner, and Levy." Id. ¶ 396.

Into the fall of 2016, SHIP continued to receive assurances that its investments were "sound, secured by appropriate collateral, and appropriately valued." Id. ¶ 399. By the time SHIP discovered the scheme and took mitigating measures in November 2016, "much of the damage already was done." Id. ¶ 405-07.

## IV. Overview of the Counts

The FAC contains 19 counts, including, as relevant here:

• Claims against Beechwood Re, BRILLC, BAM I, BAM II, Beechwood Holdings, BBIL, PBIHL, Beechwood Bermuda, Fuzion, CNO, 40|86 Advisors and John Does 1-100 for RICO and RICO conspiracy (Counts 1-3), Section 10(b) of the Exchange Act and Rule 10b-5 (Count 4), aiding and abetting breach of fiduciary duty (Count 6), and aiding and abetting fraud (Count 7);

51

- Claims against Feuer and Taylor for RICO and RICO
  conspiracy (Counts 1-3), Section 10(b) of the Exchange
  Act and Rule 10b-5 (Count 4), Section 20 of the Exchange
  Act (Count 5), aiding and abetting breach of fiduciary
  duty (Count 6), and aiding and abetting fraud (Count 7);

- Claims against BAM Administrative and SHIP for RICO and
  RICO conspiracy (Counts 1-3), Section 10(b) of the
  Exchange Act and Rule 10b-5 (Count 4), aiding and
  abetting breach of fiduciary duty (Count 6), aiding and
  abetting fraud (Count 7), fraudulent conveyance (Counts
  8-17), unjust enrichment (Count 18), and declaratory
  relief (Count 19); and

- Claims against BCLIC and WNIC for RICO and RICO
  conspiracy (Counts 1-3), Section 10(b) of the Exchange
  Act and Rule 10b-5 (Count 4), aiding and abetting breach
  of fiduciary duty (Count 6), aiding and abetting fraud
  (Count 7), fraudulent conveyance (Counts 13-17), unjust
  enrichment (Count 18), and declaratory relief (Count 19).

The WNIC TPC contains 19 counts, including, as relevant
here:

- Claims against Huberfeld, Bodner, Feuer Family Trust,
  Taylor-Lau Family Trust, Beechwood Holdings, and

52

Beechwood Trust Nos. 1-20 for RICO and RICO conspiracy
(Counts 1 and 2), aiding and abetting fraud (Count 7),
aiding and abetting breach of fiduciary duty (Count 12),
contribution and indemnity (Count 18), and unjust
enrichment (Count 19);

- Claims against Slota and Ottensoser for RICO and RICO
  conspiracy (Counts 1 and 2), fraudulent inducement and
  fraud (Count 3), aiding and abetting fraud (Count 7),
  aiding and abetting breach of fiduciary duty (Count 12),
  contribution and indemnity (Count 18), and unjust
  enrichment (Count 19);

- Claims against Kim, Saks, Narain, BAM I, and BAM
  Administrative for RICO and RICO conspiracy (Counts 1 and
  2), fraudulent inducement and fraud (Count 3), aiding and
  abetting fraud (Count 7), breach of fiduciary duty (Count
  11), aiding and abetting breach of fiduciary duty (Count
  12), contribution and indemnity (Count 18), and unjust
  enrichment (Count 19);

- Claims against BBL, BBIL, and PBIHL for RICO and RICO
  conspiracy (Counts 1 and 2), fraudulent inducement and
  fraud (Count 4), aiding and abetting fraud (Count 7),
  aiding and abetting breach of fiduciary duty (Count 12),

fraudulent conveyance (Counts 14-17), contribution and
indemnity (Count 18), and unjust enrichment (Count 19);

- Claims against Lincoln for RICO and RICO conspiracy
  (Counts 1 and 2), fraudulent misrepresentation (Count 5),
  negligent misrepresentation (Count 6), aiding and
  abetting fraud (Count 8), conspiracy to commit fraud
  (Count 9), aiding and abetting breach of fiduciary duty
  (Count 13), contribution and indemnity (Count 18), and
  unjust enrichment (Count 19);

- Claims against Beechwood Re for breach of contract (Count
  10) and contribution and indemnity (Count 18); and

- A claim against Feuer, Taylor, and Beechwood Capital for
  contribution and indemnity (Count 18)

The SHIP TPC contains 8 counts, including, as relevant

here:

- Claims against BAM II, Beechwood Holdings, BBL, PBIHL,
  BAM Administrative, Beechwood Capital, BAM GP I, BAM GP
  II, MSD Administrative, N Management, Bodner, Cassidy,
  Feit, Fuchs, Huberfeld, Kim, Michael Nordlicht,
  Ottensoser, Saks, Slota, and Steinberg for aiding and
  abetting fraud (Count 1), aiding and abetting breach of
  fiduciary duty (Count 2), civil conspiracy (Count 5), and

54

unjust enrichment (Count 7);

- Claims against Feuer Family Trust, Taylor-Lau Family
  Trust, Beechwood Trust Nos. 1-20, BRILLC Series A-I,
  Lawrence Partners, LLC, Monsey Equities, LLC, Whitestar
  LLC, Whitestar LLC II, and Whitestar LLC III for aiding
  and abetting fraud (Count 3), aiding and abetting breach
  of fiduciary duty (Count 4), civil conspiracy (Count 5),
  and unjust enrichment (Count 7);

- Claims against Beechwood Global Distribution Trust, Feuer
  Family 2016 ACQ Trust, and Taylor-Lau Family 2016 ACQ
  Trust for aiding and abetting fraud (Counts 1 and 3),
  aiding and abetting breach of fiduciary duty (Counts 2
  and 4), civil conspiracy (Count 5), and unjust enrichment
  (Count 7); and

- A claim against Beechwood Re, BAM I, and BBIL for
  declaratory judgment for contract indemnification (Count
  8).

## Legal Standards

### I. Standard of Review

In order to survive a motion to dismiss, plaintiff must
"state a claim to relief that is plausible on its face."

55

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When adjudicating a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

"Although Fed.R.Civ.P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order). Where a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct, [it] fail[s] to satisfy this minimum standard." Id.

However, "[t]he group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." Elliott Assocs., L.P.

---

[2] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

56

v. Hayes, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000). "The group pleading doctrine allows particular statements or omissions to be attributed to individual defendants even when the exact source of those statements is unknown." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010). "Group pleading allows plaintiffs only to connect defendants to statements — it does not also transitively convey scienter." Id. at 406.

"In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement." In re Alstom SA, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005); cf. Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986) ("[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question.").

Furthermore, "[w]hile it is settled that the group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint, this does not imply that the group pleading doctrine applies only to fraud claims; rather, it applies whenever Rule

57

9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature." Schwartzco Enterprises LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014). For example, "[t]he group pleading doctrine applies to breach of fiduciary duty claims that are rooted in fraud." Id. at 352-53.

## II. Claim-Specific Legal Standards

### A. Civil RICO Under 18 U.S.C. § 1962(c)

Section 1962(c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To plead any RICO violation, moreover, a plaintiff must allege that defendant engaged in at least two predicate acts of "racketeering activity," where "racketeering activity" is defined to include a host of state and federal offenses. See 18 U.S.C. §§ 1961(1), (5). In the present case, the FAC and the WNIC TPC allege that relevant defendants engaged in the predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341, 1343.

In addition to alleging two predicate acts, a RICO
plaintiff must plead continuity and relationship to establish
that the racketeering activity constitutes a "pattern."
Continuity, in turn, "is both a closed- and open-ended concept,
referring either to a closed period of repeated conduct, or to
past conduct that by its nature projects into the future with a
threat of repetition." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S.
229, 241 (1989). Where, as here, the pattern is closed-ended,
the Second Circuit has held that "predicate acts occurring over
less than a two-year period may not be deemed a pattern." First
Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 168
(2d Cir. 2004).

**B. Civil RICO Under 18 U.S.C. § 1962(a)**

The RICO provision under 18 U.S.C. § 1962(a) makes it
"unlawful for any person who has received any income derived,
directly or indirectly, from a pattern of racketeering activity
. . . to use or invest, directly or indirectly, any part of such
income, or the proceeds of such income, in acquisition of any
interest in, or the establishment or operation of, any
enterprise which is engaged in, or the activities of which
affect, interstate or foreign commerce."

**C. Civil RICO Conspiracy Under 18 U.S.C. § 1962(d)**

59

The RICO conspiracy provision under 18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of [18 U.S.C. § 1962(a)-(c)]." In order to state a Section 1962(d) claim, "a plaintiff must plead as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of [that] co-conspirator in furtherance of the conspiracy; (3) that the co-conspirator knowingly participated in the same." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 303 (S.D.N.Y. 2000) (summarizing Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990)). "[M]ere knowledge of a scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy." Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001).

**D. Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78a et seq., makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

60

necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. Implementing this statutory provision, Rule 10b-5 states that "it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 U.S.C. § 240.10b-5.

To state a private civil claim under Section 10(b) of the Exchange Act or Rule 10b-5, "plaintiff must prove (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrong state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

61

In addition to the Rule 9(b) requirement applicable to all claims sounding in fraud, the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") require that plaintiff (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). Absent a fiduciary duty to speak, silence cannot support a claim of fraud. Rather, for liability to attach, there must be "an actual statement, one that is either untrue outright or misleading by virtue of what it omits to state." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016).

## E. Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities Exchange Act states that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or

indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.

To state a claim under Section 20(a) of the Exchange Act, plaintiff must show (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

## F. Common Law Fraud

Under here applicable New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." Kaufman v. Cohen, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). Under Rule 9(b), furthermore, plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). "In cases where the alleged fraud consists of an omission and the plaintiff is unable to specify the time and place because no

63

act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000).

In addition, pure omissions (as opposed to misleading statements) are actionable when defendant had an affirmative duty to disclose that information to plaintiff, such as when defendant owes fiduciary duty to plaintiff. SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S. 2d 62, 66 (1st Dep't 2004). And even in the absence of fiduciary duty, a duty to disclose arises if "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F. 3d 566, 582 (2d Cir. 2005).

**G. Fraudulent Inducement**

To state a claim for fraudulent inducement, a plaintiff "must allege a misrepresentation or material omission on which [it] relied that induced [it] to enter into an agreement." Barron Partners, LP v. LAB123, Inc., 593 F. Supp. 2d 667, 670 (S.D.N.Y. 2009). A fraudulent inducement claim is also subject to the heightened pleading standard of Rule 9(b).

64

## H. Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014). "Actual knowledge is required to impose liability on an aider and abettor under New York law," although "a complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads not constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances." Id.

## I. Breach of Fiduciary Duty

Under here applicable New York law, the elements of a breach of fiduciary duty claim are "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed 'trust or confidence in another' and whether the second person accepts the trust and confidence and 'thereby gains a resulting superiority or influence over the first.'" Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704,

709 (S.D.N.Y. 2008). In particular, where "defendant had discretionary authority to manage [plaintiff's] investment accounts, it owed [plaintiff] a fiduciary duty of the highest good faith and fair dealing." <u>Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.</u>, 915 N.Y.S.2d 7, 16 (1st Dep't 2010), <u>aff'd</u>, 962 N.E.2d 765 (N.Y. 2011).

## J. Aiding and Abetting Breach of Fiduciary Duty

"A claim for aiding and abetting a breach of fiduciary duty requires, inter alia, that the defendant knowingly induced or participated in the breach." <u>Krys v. Butt</u>, 486 F. App'x 153, 157 (2d Cir. 2012) (summary order). "Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." <u>Id.</u>

Generally "the same activity is alleged to constitute the primary violation underlying both claims" (<u>i.e.</u>, claims of fraud and claims of aiding and abetting breach). <u>Id.</u>; <u>see also</u> <u>Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC</u>, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007). For this reason, unless otherwise stated, these two claims are analyzed together in this Opinion and Order for efficiency's sake.

## K. Fraudulent Misrepresentation

66

To succeed on a theory of fraudulent misrepresentation
under New York law, plaintiff must show that "(1) the defendant
made a material false representation, (2) the defendant intended
to defraud the plaintiff thereby, (3) the plaintiff reasonably
relied upon the representation, and (4) the plaintiff
suffered damage as a result of such reliance."
Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,
98 F.3d 13, 19 (2d Cir. 1996).

## L. Negligent Misrepresentation

Under New York law, "the elements of negligent
misrepresentation are: (1) carelessness in imparting words; (2)
upon which others were expected to rely; (3) and upon which they
did act or failed to act; (4) to their damage. Most relevant,
the action requires that (5) the declarant must express the
words directly, with knowledge or notice that they will be acted
upon, to one to whom the declarant is bound by some relation or
duty of care." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d
775, 788 (2d Cir. 2003).

## M. Civil Conspiracy

Under New York law, civil conspiracy is not an independent
tort. Instead, "[a]ll that an allegation of conspiracy can
accomplish is to connect nonactors, who otherwise might escape
liability, with the acts of their co-conspirators." Burns

67

Jackson Miller Summit & Spitzer v. Lindner, 452 N.Y.S.2d 80, 93–94 (2nd Dep't 1982), aff'd, 451 N.E.2d 459 (N.Y. 1983). "Where there is an underlying tort, the elements of civil conspiracy are: (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." Pope v. Rice, 04-cv-4171 (DLC), 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005). Where a claim of civil conspiracy "involves a conspiracy to breach a fiduciary duty, all members of the alleged conspiracy must independently owe a fiduciary duty to the plaintiff." Id.

## N. Actual Fraudulent Conveyance in Violation of New York Debtor and Creditor Law § 275 or 276

Actual or constructive fraudulent conveyance claims must satisfy Rule 9(b).

Section 275 of the New York Debtor and Creditor Law ("NYDCL"), titled "Conveyances by a person about to incur debts," states: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NYDCL § 275.

Section 276 of the NYDCL, titled "Conveyance made with intent to defraud," states: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NYDCL § 276. The party asserting an intentional fraudulent transfer must "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid." United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002).

Section 278 of the NYDCL, entitled "Rights of creditors whose claims have matured," states:

> 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
>
>> a. have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>>
>> b. disregard the conveyance and attach or levy execution upon the property conveyed.
>
> 2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

69

NYDCL § 278.

## O. **Constructive Fraudulent Conveyance in Violation of New York Debtor and Creditor Law § 273, 274, or 277**

Under New York law, certain transactions are deemed to operate as if they were fraudulent conveyances. In such circumstances, there is no requirement to show an intent to defraud. Englander Capital Corp v. Zises, 2013 N.Y. Misc. LEXIS 5282, *8 (1st Dep't 2013).

Thus, Section 273 of the NYDCL, titled "Conveyances by insolvent," states: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.

Similarly, Section 274 of the NYDCL, titled "Conveyances by persons in business," states: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NYDCL § 274.

70

Finally, Section 277 of the NYDCL, titled "Conveyance of partnership property," states: "Every conveyance of partnership property and every partnership obligation incurred when the partnership is or will be thereby rendered insolvent, is fraudulent as to partnership creditors, if the conveyance is made or obligation is incurred, . . . b. To a person not a partner without fair consideration to the partnership as distinguished from consideration to the individual partners." NYDCL § 277.

**P. Contribution and Indemnify**

"As a matter of law, there is no right to contribution under RICO." Dep't of Econ. Dev. v. Arthur Andersen & Co., 747 F. Supp. 922, 932 (S.D.N.Y. 1990); see also Friedman v. Hartmann, 787 F. Supp. 411, 415, 417 (S.D.N.Y. 1992).

In the Second Circuit, indemnification is not ordinarily available in a case where "the party seeking indemnification has knowingly and willfully violated the federal securities laws." In re Residential Capital, LLC, 524 B.R 563, 594 (Bankr. S.D.N.Y. 2015). However, contribution for violations of federal securities law is allowed among joint tortfeasors. Stratton Group, Ltd. v. Sprayregen, 466 F. Supp. 1180, 1185 (S.D.N.Y. 1979).

71

Under New York law, a party cannot "indemnify itself against its own intentional torts," which includes intentional acts of fraud claims. Barbagallo v. Marcum, 11-cv-1358 (JBW), 2012 WL 1664238, at \*4 (E.D.N.Y. May 11, 2012); Austro v. Niagara Mohawk Power Corp., 487 NE. 2d 267, 267 (N.Y. 1985). However, a claim for contribution allows a tort defendant to seek apportionment of liability among joint tortfeasors equal to the relative fault of each tortfeasor. D'Ambrosio v. City of New York, 435 N.E.2d 366, 369 (N.Y. 1982); see also Dole v. Dow Chemical Company, 30 N.Y.2d 143, 143 (1972) (recognizing common law contribution among all joint tortfeasors in New York).

Under Article 10 of the New York Debtor and Creditor Law, "there is neither an express nor implied right of indemnification or contribution." Edward M. Fox & James Gadsden, Rights of Indemnification and Contribution Among Persons Liable for Fraudulent Conveyances, 23 Seton Hall L. Rev. 1600, 1605 (1993).

### Q. Unjust Enrichment

To state a claim for unjust enrichment under New York law, plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373

72

F.3d 296, 306 (2d Cir. 2004). Relief for unjust enrichment is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). Accordingly, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.

## R. The Wagoner Rule and the Doctrine of In Pari Delicto

The Wagoner rule stands for the "well-settled proposition that a bankrupt corporation, and by extension, an entity that stands in the corporation's shoes, lacks standing to assert claims against third parties for defrauding the corporation where the third parties assisted corporate managers in committing the alleged fraud." Cobalt Multifamily Inv'rs I, LLC v. Shapiro, 857 F. Supp. 2d 419, 425 (S.D.N.Y. 2012). The Wagoner rule applies not only to bankruptcy trustees, but also to liquidators and court-appointed receivers. See Bullmore v. Ernst & Young Cayman Islands, 861 N.Y.S.2d 578, 586-87 (N.Y. Sup. Ct. 2008); Cobalt, 857 F. Supp. 2d at 425.

The doctrine of in pari delicto is similar to the Wagoner rule. Instead of functioning as a prudential rule of standing, however, the doctrine of in pari delicto is an affirmative

defense under New York law that "generally precludes a wrongdoer . . . from recovering from another wrongdoer." Picard v. HSBC Bank PLC, 454 B.R. 25, 29 (S.D.N.Y. 2011), amended sub nom. In re Bernard L. Madoff Inv. Sec. LLC, 11 Civ. 763 (JSR), 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54 (2d Cir. 2013), and aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54 (2d Cir. 2013); see Kirschner v. KPMG LLP, 938 N.E.2d 941, 950 (N.Y. 2010) ("The doctrine of in pari delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers.").[3]

## S. Alter Ego

---

[3] During the oral argument held on August 15, 2019 regarding the instant motions to dismiss, the Receiver submitted for the Court's consideration the decision in In re E.S. Bankest, L.C., 04-17602, 2010 WL 2926023, at *3 (Bankr. S.D. Fla. July 23, 2010), which held that "[t]here is substantial law that imputation and in pari delicto do not apply to a Court-appointed receiver." The Court declines to follow that holding for two reasons. First, a holding by a bankruptcy court for the Southern District of Florida applying Florida law has no precedential value for this Court in the present case. Second, that holding is inconsistent with the case law in this Circuit. See, e.g., Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991) (holding that the doctrine of in pari delicto applies to court-appointed bankruptcy trustees, noting that "a bankruptcy trustee . . . may only assert claims held by the bankrupt corporation itself."); Cobalt Multifamily Inv'rs I, LLC v. Arden, 857 F. Supp. 2d 349, 362 (S.D.N.Y. 2011) ("[T]he Wagoner rule applies to [an SEC] receiver because he fulfills a role sufficiently analogous to that of a bankruptcy trustee.").

Under New York law, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. New York State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993). "While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." Id. at 1161. "Typically, piercing analysis is used to hold individuals liable for the actions of a corporation they control. However, New York law recognizes 'reverse' piercing, which . . . seeks to hold a corporation accountable for actions of its shareholders." Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).

## Legal Analysis - FAC

## I. Common Argument – Whether the Receiver's Claims Are Barred by the **Wagoner** Rule and the Doctrine of **In Pari Delicto**

Various FAC defendants argue that the Wagoner rule and the doctrine of in pari delicto bar the Receiver's claims generally,

75

because the PPCO entities were involved in much of the
misconduct of which the FAC accuses these defendants. See ECF
No. 184, at 9; ECF No. 157, at 9-11; ECF No. 169, at 18; ECF No.
207, at 10.

According to the FAC, there are two types of events that
affected the PPCO entities: (1) the ones that both harmed and
benefited the PPCO entities, such as the overvaluation of PPCO
assets starting from before 2013, which helped the PPCO entities
sustain their business but also harmed the PPCO entities by
causing excessive management fees, FAC ¶¶ 101-06, 186-87; and
(2) the ones that harmed but did not benefit PPCO, such as the
2015 and 2016 fraudulent conveyance transactions or the Black
Elk transaction that was for the "sole benefit of the PPVA
Funds," id. ¶¶ 180, 225-58, 324(iii), 335(iii).

As to the latter type of events, there is no wrongdoing on
the PPCO entities' part, so the Wagoner rule and the doctrine of
in pari delicto are not applicable.[4] Each and every one of the
Receiver's claims against the FAC defendants has some basis in
the 2015 and 2016 fraudulent conveyance transactions, so none of

---

[4] If, for some reason, the allegedly fraudulent conduct by the
officers and controllers of the PPCO entities are imputed to the
PPCO entities, the adverse interest exception would apply. See
Kirschner v. KPMG LLP, 938 N.E.2d 941, 952 (N.Y. 2010).

76

these claims should be categorically barred by the Wagoner rule
and the doctrine of in pari delicto.

As to the former type of event, the Wagoner rule and the
doctrine of in pari delicto may be applicable, so the Court
looks to see if any exceptions apply. Under the adverse interest
exception, the Wagoner rule and in pari delicto doctrine will
not apply where a corporate officer "totally abandoned the
corporation's interests and [is] acting entirely for his own or
another's purposes." Kirschner v. KPMG LLP, 938 N.E.2d 941, 947
(N.Y. 2010). The adverse interest exception "cannot be invoked
merely because [the officer] has a conflict of interest or
because he is not acting primarily for his principal." Center v.
Hampton Affiliates, Inc., 488 N.E.2d 828, 830 (N.Y. 1985).
Indeed, New York law "reserves this most narrow of exceptions
for those cases – outright theft or looting or embezzlement –
where the insider's misconduct benefits only himself or a third
party; i.e., where the fraud is committed against a corporation
rather than on its behalf." Kirschner, 938 N.E.2d, at 952. The
PPCO Funds benefited somewhat from the alleged overvaluations,
which helped maintain the façade of financial viability in the
eyes of their creditors and investors and thereby attracted
additional capital from investors such as WNIC, BCLIC, and SHIP
to solve the liquidity crisis the PPCO Funds faced at or before

the end of 2013. See, e.g., FAC ¶¶ 100-07. Therefore, the
adverse interest exception does not apply with respect to the
former type of events.

Nor does the insider exception apply with respect to the
former type of events. Under the insider exception, "in pari
delicto/Wagoner does not apply to the actions of fiduciaries who
are insiders in the sense that they either are on the board or
in management, or in some other way control the corporation." In
re Refco Inc. Sec. Litig., 07-md-1902 (JSR), 08-cv-3065 (JSR),
08-cv-3086 (JSR), 08-cv-7416 (JSR), 08-cv-8267 (JSR), 2010 WL
6549830, at *16 (S.D.N.Y. Dec. 6, 2010), report and
recommendation adopted in part, rejected in part on other
grounds sub nom. In re Refco Sec. Litig., 779 F. Supp. 2d 372
(S.D.N.Y. 2011), aff'd sub nom. Krys v. Butt, 486 F. App'x 153
(2d Cir. 2012); see also Glob. Crossing Estate Representative v.
Winnick, 04-cv-2558 (GEL), 2006 WL 2212776, at *15 (S.D.N.Y.
Aug. 3, 2006) ("Courts have held that the Wagoner and 'in pari
delicto' rules do not apply to claims against corporate insiders
for breach of their fiduciary duties."). Nordlicht, Levy, and
the PPCO Portfolio Manager – who allegedly controlled, or owed
fiduciary duties to, the PPCO entities– would qualify as
"insiders," but they are not defendants in the present FAC
action. None of the FAC Beechwood Defendants – even Taylor and

78

Feuer - are alleged to control or owe fiduciary duties to the PPCO entities, and do not fit within the definition of "insiders" for the purpose of the insider exception. See In re Madoff Sec., 987 F. Supp. 2d 311, 321 (S.D.N.Y. 2013) (holding that insider exception is used "narrowly to allow only for suit [] against a fiduciary of the []corporation, not against third parties who are alleged to have aided and abetted the [] fraud, short of control by the third party" over the corporation).

In sum, to the extent that a portion of a given claim is premised on the overvaluation of the PPCO assets, the Wagoner rule and the doctrine of in pari delicto preclude such portion of the claim. However, no FAC claim is completely barred by the Wagoner rule or the doctrine of in pari delicto.[5]

## II. Common Argument - Whether Receiver's RICO Claims Are Barred by the PSLRA

Section 107 of the PSLRA - also referred to as the "RICO Amendment" - provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The Receiver claims that her RICO claims may

---

[5] In addition, "in pari delicto is not a defense to a fraudulent conveyance suit." FIA Leveraged Fund Ltd. v. Grant Thornton LLP, 150 A.D.3d 492, 497 (N.Y. App. Div. 2017) (citing In re Verestar, Inc., 343 B.R. 444, 480 n. 19 (Bankr. S.D.N.Y. 2006)).

not be dismissed because of the PSLRA "[u]nless and until this

Court rules that the Receiver has alleged an actionable

securities fraud claim against at least one defendant in

connection with her RICO claim," ECF No. 256, at 17; but this

argument is incorrect as a matter of law. In fact, the RICO

Amendment "bars any claim that is actionable as fraud in the

purchase or sale of securities, even in situations where a

plaintiff lacks standing or is otherwise precluded from

asserting a valid claim under the securities laws." Zohar CDO

2003-1, Ltd. v. Patriarch Partners, LLC, 286 F. Supp. 3d 634,

643 (S.D.N.Y. 2017) (emphasis in original); see also MLSMK Inv.

Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011).

Further, the Receiver claims that the predicate offenses of

her RICO claims are not securities frauds, but rather (1)

"actions constituting aiding and abetting [Nordlicht and

others'] breach of fiduciary duty and fraud" and (2)

"participating in the structuring and consummating of the

fraudulent [December 2015 and March 2016 transactions]." Id. at

18. The Court disagrees with this characterization. As the FAC

Beechwood Defendants note, ECF No. 184, at 15, the FAC itself

alleges the following as predicate acts for the Receiver's RICO

claims:

> transmit communications and documents which assisted

80

> Nordlicht and his cohorts in their breach of fiduciary
> duty to the Platinum Fund investors and creditors . .
> . [and] in perpetuating a fraud on the investors and
> creditors of the Platinum Funds; [and]

> actively participate in the structuring and
> consummation of [and transmit communications and
> documents that facilitated] the fraudulent conveyance
> transactions in or about December 2015 and March 2016
> which saddled the PPCO Fund with liens on
> substantially all of its assets, and that of its
> subsidiaries, without receiving fair consideration in
> return

FAC ¶ 283. The latter category consists entirely of securities
transactions: (1) the December 2015 transactions consisted of
"PPCO Master Fund issu[ing] a $15.5 million note," secured by
substantially all of the assets of the MSA PPCO Subsidiaries, to
SHIP, where the money received from the note issuance was used
to purchase Desert Hawk debt, id. ¶¶ 221-35; and (2) the March
2016 transactions consisted of a sale of "additional notes" by
PPCO Master Fund in the amount of $52.5 million, where the money
received was either exchanged with Northstar debts or loaned out
to PPVA which then purchased additional Northstar debt from
SHIP, id. ¶¶ 240-48. In addition, a large portion of the former
category of predicate acts is based on the December 2015 and
March 2016 transactions, as well as other securities
transactions involving the Black Elk interest.

Once those securities transactions are excluded, the only
remaining candidate for predicate acts for the RICO claims is

the "misrepresentation and overvaluation of the PPCO Funds' net asset value," which allowed Nordlicht and the PPCO Portfolio Manager to charge "millions of dollars of excessive management and incentive fees" and left the PPCO Funds "cash poor." Id. ¶¶ 191, 324(i), 335(i). These actions also fail to qualify as predicate acts for the same reasons discussed in Trott. In an almost identical scenario in Trott, this Court concluded that misstatements concerning the funds' net asset value, which led to "the attendant withdrawal of unearned fees," may be "less obviously integral to the purchase and sale of securities," but when they were made "in substantial part to sustain defendants' Ponzi scheme," they are not "merely incidental or tangentially related to the sale of securities." Trott et al. v. Platinum Management (NY) LLC et al., 18-cv-10936 (JSR), 2019 WL 2569653, at *5 (S.D.N.Y. June 21, 2019); see also Picard v. Koh, 907 F. Supp. 2d 392, 398 (S.D.N.Y. 2012). And, as the Second Circuit explained, "conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 n.1 (2d Cir. 2011).[6]

---

[6] Alternatively, if and to the extent that the RICO claims are based on such predicate acts, they would be barred by the

In sum, all predicate acts of the Receiver's RICO claims are related to the purchase or sale of securities, and so the PSLRA bars the Receiver's RICO claims. Therefore, the Court, in its "bottom-line" Order, dismissed all of the Receiver's RICO claims.[7]

## III. Common Argument – Whether the Receiver's Securities Fraud Claims Should Be Dismissed

---

Wagoner rule and the doctrine of in pari delicto, as discussed above.

[7] When the Court dismissed a claim in the FAC, the WNIC TPC, or the SHIP TPC in its "bottom-line" Order issued August 18, 2019, such dismissal was with prejudice, for the following reasons. First, the parties had been on notice for many months – since the Court's Opinion and Order issued on December 6, 2018 disposing of the motion to dismiss the complaint in the SHIP action – as to how this Court analyzed these motions. Indeed, on and after December 6, 2018, the Court had issued no less than four Opinions and Orders disposing close to 30 motions to dismiss in the SHIP and Trott actions. SHIP, obviously, was a party to that process in the SHIP action; and most of the claims in the FAC, the WNIC TPC, and the SHIP TPC are similar to those claims in the relevant complaints in the SHIP and Trott actions. Second, the Receiver, WNIC, and SHIP have been in possession of relevant underlying documents for a substantial period of time. The fact that they cannot put forth particularized, specific allegations against respective defendants makes it highly doubtful that granting them leave to replead would result in new versions of complaints that would cure the pleading failures discussed in this Opinion and Order. Third, because on March 8, 2019 WNIC, BCLIC, CNO, and 40|86 Advisors had filed the motions to dismiss the Receiver's original complaint, the Receiver had been on notice before filing the FAC on April 1, 2019 as to what kind of arguments the defendants would raise in attempting to dismiss the FAC. ECF Nos. 58, 63.

83

Various defendants moved to dismiss the Receiver's Rule

10b-5 and Section 20(a) claims. See, e.g., ECF No. 184, at 17-

19; ECF No. 157, at 14-19; ECF No. 207, at 17-18; ECF No. 169,

at 13-14. In its "bottom-line" Order, the Court granted those

motions, as the FAC fails to adequately plead the

misrepresentation element in compliance with the Rule 9(b) and

PSLRA heightened pleading standards. See also ECF No. 184, at

17-19.[8] Basically, the FAC describes the relevant

misrepresentations in the following words:

- In fact, it was clear at the time of the transaction that the Desert Hawk debt was not worth the value it was ascribed by Nordlicht and SHIP. Whether the parties used a discounted cash flow approach, a comparable companies analysis or a precedent transactions analysis, they knew the Desert Hawk debt had an estimated fair market value that was well below the value misrepresented by them in the SHIP Note transaction. [FAC ¶ 232]

- The June 3, 2014 Secured Term Note was also known to be worth well below the value ascribed to it by CNO Defendants and Nordlicht. Using a discounted cash flow approach with proper adjustments made to LC Energy's financial projections to reflect more reasonable operating assumptions and a discount rate (cost of capital) more reflective of a development stage mining company, the LC Energy loan was not worth even close to par. . . . Thus, at the execution of these

---

[8] Movants put forth other, independent grounds to dismiss the securities fraud claims in the FAC. See, e.g., ECF No. 157, at 18-20; ECF No. 184, at 17-19; ECF No. 157, at 16-17; ECF No. 301, at 2. The Receiver argues against each of these points. ECF No. 256, at 25-35; ECF No. 310. The Court does not reach these issues, because it is sufficient to ground the dismissal on the FAC's failure to adequately plead the misrepresentation element.

84

securities purchases, BCLIC and WNIC misrepresented
that the purchase price was fair. [Id. ¶ 234]

- The remaining $21.35 million received under the March
NPA Notes was "loaned" by PPCO Master Fund to PPVA to
allow it to purchase the remaining Northstar Indenture
Debt from SHIP. However, no cash changed hands as the
cash "loaned" to PPVA was directed to SHIP. As before,
at the execution of these securities purchases, SHIP
and CNO Defendants misrepresented that the purchase
price was fair. [Id. ¶ 238]

- [T]he Beechwood, CNO and SHIP Defendants were able to,
and in fact, did engage in and employ a plan, scheme
and conspiracy to defraud PPCO Funds in connection
with the purchase and sale of the Purchased
Securities, and did materially misrepresent to the
PPCO Funds that the true value of the Purchased
Securities was their par value as set forth in the
transaction documents for the PPCO Loan Transactions
and Securities Purchases, and knowingly omitted or
concealed that the true value of the Purchased
Securities was only a fraction of par value. [Id. ¶
311]

Generally, to meet the Rule 9(b) and PSLRA pleading

standards, more specificity is required than the broad and

group-pled allegations quoted above.[9] Other than the fourth

---

[9] In addition, the first excerpted paragraph suffers from the
fact that it is unclear who "them" is. One possible reading is
that "them" refer to Nordlicht and SHIP. Another possible
reading is that "them" is referring to the parties to the Desk
Hawk debt purchase. A third reading is that "them" refers to
those present at the earlier note issuance. The fact that the
Court has to speculate on what "them" refers to underscore a
problem with this type of broad and group-pled allegations.
    The second excerpted paragraph also suffers from ambiguity
and raises a plausibility issue. The paragraph starts with the
discussion of the knowledge of "CNO Defendants and Nordlicht"
but at the end concludes, "Thus, . . . BCLIC and WNIC

85

excerpt above (which is a conclusory statement relying on impermissible group pleading), the FAC needs to make clear if each of the above misrepresentations is an affirmative, explicit statement or a silent omission. If the former, each of the above excerpts fails to "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). If the latter, the FAC fails to explain why there was a duty to disclose held by most of the defendants, who were not even parties to the transactions. Also, if grounded on omission, the above allegations fail to plead with particularity, for instance, "the [entity] responsible for the failure to disclose" and "the context of the omissions and the manner in which they misled the plaintiffs" Adler v. Berg Harmon

---

misrepresented that the purchase price was fair." FAC ¶ 234. Putting aside the fact that the usage of "CNO Defendants" relies on impermissible group pleading, the paragraph raises some plausibility issue as to why the knowledge of CNO Defendants and Nordlicht is suddenly attributed to BCLIC and WNIC without any additional explanation. Furthermore, there is a gap in the allegations as to how WNIC and BCLIC misrepresent the price at the "execution of these securities purchases," when they were not even parties to the transaction.

The third excerpted paragraph relies on impermissible group pleading, lumping together six entities and failing the particularity requirement.

86

Assocs., 816 F. Supp. 919, 924 (S.D.N.Y. 1993).

To avoid dismissal for failing to plead the misrepresentation element, the Receiver argues in her opposition brief that the Second Circuit has found "deceptive conduct in connection with the sale of securities to be implied misrepresentations under Section 10(b) and Rule 10b-5 without the uttering of words." ECF No. 256, at 26. The Receiver is referring to securities fraud claims based on subsections (a) and (c) of Rule 10b-5, but to rely on those subsections rather than subsection (b) of Rule 10b-5, plaintiff must prove that defendant committed an inherently deceptive or manipulative act that is independent from any alleged misstatement or omission. See, e.g., Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005) (rejecting liability based on subsections (a) and (c) of Rule 10b-5, where the only basis for such claims is alleged misrepresentations or omissions); see also In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005) ("Subsections (a) and (c) are not a backdoor into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5."). For this reason, the Receiver cannot rely on subsections (a) and (c) of Rule 10b-5, when the gravamen of her securities claims are misstatements and omissions regarding the true price of the assets PPCO Master

Fund received, rather than any deceptive or manipulative act committed by the relevant defendants.

In its "bottom-line" Order, the Court also granted the motion to dismiss the Section 20(a) claims against Feuer and Taylor, because no "primary violation by the controlled person" under Section 10(b) was found for the reasons stated above. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).[10]

## IV. Common Argument – Whether the Receiver's Unjust Enrichment Claim Should Be Dismissed

Under New York law, unjust enrichment claims are "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the

---

[10] The Section 20(a) claims against Feuer and Taylor fail for an independent reason that the FAC does not make any particularized allegation tying them to the December 2015 and March 2016 transactions or any other allegedly fraudulent securities transactions. See, e.g., FAC ¶ 318 ("Beechwood, through Levy, with the substantial assistance of Feuer and Taylor, ably assisted the Platinum Funds in perpetrating the fraud that the Platinum Funds' assets were worth significantly more than in reality by entering into the transactions described above.").

As to the Section 20(a) claim against CNO, which is not in the FAC, the Receiver argues in her opposition brief that the claim was omitted from the FAC because of a "scrivener's error." ECF No. 256, at 35 n.11. However, an opposition brief to a motion to dismiss cannot cure the defect in the FAC itself. But even if the Court had granted leave to replead and the Section 20(a) claim against CNO was properly stated in the FAC, it would have been dismissed for the same reason that the Section 20(a) claims against Feuer and Taylor were dismissed.

88

defendant to the plaintiff." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.

In the present case, unjust enrichment claims are not completely duplicative of the contracts and torts claims, as they are framed as an alternative to the fraudulent conveyance claims. See FAC ¶ 418 ("If this Court determines that [certain parts of the December 2015 and March 2016 transactions] are not voidable under New York law," the Receiver requests the Court to hold for the Receiver on the unjust enrichment claim.); ECF No. 169, at 25 n.23. Although not binding on this Court, various bankruptcy courts have refused to dismiss unjust enrichment claims on the basis that they were duplicative of fraudulent transfer claims, noting that "it is conceivable that the plaintiff could recover under one theory but not the other." In re Operations N.Y. LLC, 490 B.R. 84, 100 (Bankr. S.D.N.Y. 2013); see also Silverman v. H.I.L. Assocs. Ltd., 387 B.R. 365, 412 (Bankr. E.D.N.Y. 2008) ("While there can be no doubt that the Trustee would not be entitled to duplicative relief, there similarly is no doubt that at the pleadings stage, a plaintiff is not required to elect a single theory upon which to

89

proceed."). The Court chooses to follow this principle articulated by bankruptcy courts.

However, while the FAC adequately pleads how BCLIC, WNIC, and SHIP may have been enriched through the December 2015 and March 2016 conveyance transactions, the FAC fails to adequately allege facts as to how BAM Administrative benefited from the allegedly fraudulent transactions at issue. Therefore, the Court dismisses the unjust enrichment claim against BAM Administrative only.

## V. FAC Beechwood Defendants

Certain FAC Beechwood Defendants – Beechwood Re, BRILLC, BAM I, BAM II, Beechwood Holdings, BBIL, BBL, Bam Administrative, Feuer, and Taylor – moved to dismiss all claims against them, except the fraudulent conveyance and declaration relief claims. See ECF No. 184, at 3. With respect to the claim for aiding and abetting breach of fiduciary duty, these moving defendants argue that the FAC fails to plead the elements of the claim with "sufficient particularity under Rule 9(b)," by failing to allege, for example, that "Feuer or Taylor had knowledge concerning PPCO's net asset value, the [December 2015 and March 2016 transactions], or the Black Elk transaction." Id. at 23.

90

The Receiver responds that the claims for aiding and abetting breach of fiduciary duty are subject to the Rule 8(a) pleading standard, not Rule 9(b), because those claims allege that Nordlicht and the PPCO Portfolio Manager breached their duties of loyalty and good faith to the PPCO Funds by causing the PPCO Funds to enter into transactions that were detrimental to the PPCO Funds, which is not dependent on "any party having committed fraud" or on "allegations of misrepresentations or omissions." ECF No. 256, at 37.

The Receiver's argument to recharacterize the claims as not rooted in any fraudulent conduct by Nordlicht and the PPCO Portfolio Manager is misplaced. The primary breach by Nordlicht and the PPCO Portfolio Manager on which the aiding and abetting claims are premised, according to the FAC, are:

> (i) Systematically misrepresenting and overvaluing the PPCO Funds' net asset value for the purpose of, inter alia, paying certain select insiders of the PPCO Funds unearned fees, resulting in the payment of, among other amounts, unearned management and professional fees believed to be tens, if not hundreds, of millions of unnecessary investments by the PPCO Funds in underwater investments;
>
> (ii) Causing PPCO Master Fund's entry into [the December 2015 and March 2016 fraudulent conveyance transactions]; and
>
> (iii) Causing PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the sole benefit of the PPVA Funds, which subsequently resulted in a $24 million damages settlement against the

91

> Receivership Estate by the bankruptcy trustee of Black
> Elk.

FAC ¶ 324. It is impossible not to read these allegations as
grounded in fraud. In fact, the Receiver's attempt at such
recharacterization is, frankly, disingenuous, in that the FAC
almost verbatim restates these three allegations as the primary
fraud upon which the claim for aiding and abetting fraud rests.
Id. ¶ 335.

Under Rule 9(b), the aiding and abetting claims must be
pled with particularity for each of the FAC Beechwood
Defendants. Lumping them together as "Beechwood Defendants,"
which involves 13 different Beechwood entities, would generally
be considered insufficient to meet this standard. See id. ¶¶ 41,
46, 49. Further, the claims against Beechwood Holdings and BAM
II must be dismissed for the independent reason that there is
not a single, particularized allegation against each of them.
Similarly, the claims against BAM I and BRILLC must be dismissed
as well, because the former is mentioned only in one instance as
a party to the IMA with SHIP, see id. ¶ 165, and the latter is
mentioned only in one instance as part of certain transactions
in February 2015, see id. ¶¶ 212-13. Neither allegation is
related to the primary fraud and breach of fiduciary duty by
Nordlicht and the PPCO Portfolio Manager excerpted above.

In contrast, the FAC adequately alleges that BAM
Administrative, Beechwood Re, BBIL, BBIHL, and BBL were involved
in the December 2015 and March 2016 transactions, which are
closely related to the primary fraud and breach of fiduciary
duty by Nordlicht and the PPCO Portfolio Manager. See, e.g., id.
¶¶ 230, 246. These entities were an integral part of those
allegedly fraudulent transactions, and thus substantial
assistance is adequately pled.

Although less clear cut, the Court also finds that the
knowledge element of the aiding and abetting claims is
sufficiently pled. Knowledge is attributed to BAM
Administrative, Beechwood Re, BBIL, BBIHL, and BBL in the FAC in
the following allegations:

> Knowing full well that a fraud was afoot, and that
> Nordlicht and Levy were breaching their fiduciary
> duties, the Beechwood Defendants structured,
> negotiated and implemented several transactions to
> facilitate the fraud. . . .
>
> The Beechwood Defendants, the SHIP Defendants and each
> of the CNO Defendants . . . had actual knowledge . . .
> that Nordlicht and the PPCO Portfolio Manager owed and
> breached their fiduciary duties to the PPCO Funds
> [and] breached those duties and . . . conduct by
> Nordlicht and the PPCO Portfolio Manager was
> fraudulent . . . because (i) Nordlicht was hopelessly
> conflicted in each and every transaction he negotiated
> and consummated with them (through Beechwood) because
> he was both the Chief Investment Officer of the
> Platinum Funds while one of the majority stakeholders
> and decision-makers in Beechwood and (ii) the PPCO
> Portfolio Manager was directing the PPCO Funds to

93

> enter into the PPCO Loan Transactions and Securities
> Purchases, which were not intended to be in their best
> interests, but rather were structured solely to
> benefit the Defendants.

Id. ¶¶ 179, 328, 337. Although the excerpts above rely on group

pleading, the fact that these entities actively participated in

the allegedly fraudulent transactions that are described in

detail, combined with the latter excerpts above, "give[s] rise

to an inference of knowledge" of the primary fraud and breach of

fiduciary duty. Krys v. Pigott, 749 F.3d 117, 129 (2d Cir.

2014). Thus, the Court, in its "bottom-line" Order, granted the

motion to dismiss the aiding and abetting claims against

Beechwood Holdings, BAM I, BAM II, and BRILLC and denied the

motion to dismiss the aiding and abetting claims against BAM

Administrative, Beechwood Re, BBIL, BBIHL, and BBL.

Lastly, the aiding and abetting claims against Feuer and

Taylor are not adequately pled, because the FAC does not make a

single particularized allegation against Feuer or Taylor in

connection with any of these problematic transactions. For this

reason, the aiding and abetting claims against Feuer and Taylor

are dismissed.

## VI.    SHIP and Fuzion

In its "bottom-line" Order, the Court granted the motion to

dismiss the aiding and abetting claims against SHIP and Fuzion

94

for failing to satisfy Rule 9(b). First, the allegations purporting to plead substantial assistance and knowledge rely exclusively on impermissible group pleading. In the context of the December 2015 and March 2016 transactions, for instance, it is alleged that "[t]he CNO and SHIP Defendants" — which include CNO, 40|86 Advisors, Fuzion, BCLIC, WNIC, and SHIP — actively negotiated and consummated the relevant transactions, such as negotiating "the aggregate amounts to be loaned by them under the March NPA," "each of the March NPA Notes," "the terms and conditions of Amended Security Agreement," and so forth. These allegations rely on impermissible group pleading that does not satisfy Rule 9(b). FAC ¶ 254.

Second, the only time knowledge is attributed to SHIP and Fuzion is – as SHIP and Fuzion correctly point out, ECF No. 157, at 20-23 – when they are lumped together with most of the other defendants to have "had actual knowledge that the conduct by Nordlicht and the PPCO Portfolio Manager was fraudulent . . . [or] that Nordlicht and the PPCO Portfolio Manager owed and breached their fiduciary duties to the PPCO Funds and breached those duties." Id. ¶¶ 328, 337. Given that SHIP and Fuzion were not parties to the December 2015 and March 2016 transactions and that there are no non-conclusory allegations showing their

involvement in these transactions,[11] one cannot conclude that the allegations "give rise to an inference of knowledge" of the primary fraud and breach of fiduciary duty. Krys v. Pigott, 749 F.3d 117, 129 (2d Cir. 2014).

Lastly, the case for dismissing the aiding and abetting claims against Fuzion is even stronger. Throughout the FAC - as SHIP and Fuzion correctly point out, ECF No. 157, at 14 - Fuzion is lumped together with SHIP as the "SHIP Defendants," and Fuzion is broadly mentioned as having "advised" SHIP. FAC ¶¶ 7, 10, 11. The allegations lack particularity as to what and how Fuzion specifically advised SHIP. Essentially, the FAC treats Fuzion and SHIP as interchangeable and identical, when they are separate legal entities with different business functions.

For these reasons, the aiding and abetting claims against SHIP and Fuzion are dismissed.

## VII. WNIC and BCLIC

WNIC and BCLIC moved to dismiss the aiding and abetting claims, the fraudulent conveyance claims, and the declaratory

---

[11] In light of these two points, the Court is not persuaded that circumstantial evidence shows SHIP's and Fuzion's actual knowledge that, for instance, "Nordlicht both owned interests in Platinum and Beechwood while serving in a management capacity at various Platinum entities yet consummated a series of fraudulent transactions with PPCO Master Fund by which Nordlicht openly failed to fulfill his fiduciary duties to PPCO Master Fund." ECF No. 256, at 42-43.

96

relief claim against them. The motion is granted only with
respect to the aiding and abetting claims, for the following
reasons.

**A. Aiding and Abetting Claims**

The Court dismisses the aiding and abetting claims against
WNIC and BCLIC for substantially the same reasons that it
dismissed those claims against SHIP and Fuzion.

**B. Fraudulent Conveyance Claims**

### 1. Whether the Receiver Has Standing to Bring Fraudulent Conveyance Claims on Behalf of the NPA Guarantors and the MSA PPCO Subsidiaries

WNIC and BCLIC divide the fraudulent conveyance claims into
two kinds of claims: (1) the claims based on the transfers made
by PPCO Master Fund, and (2) the claims based on the liens and
obligations granted by the NPA Guarantors and the MSA PPCO
Subsidiaries (collectively, the "PPCO Subsidiaries") as security
for PPCO Master Fund's issuance of notes in December 2015 and
March 2016. ECF No. 169, at 24-25; see also FAC ¶¶ 373, 381,
388, 397, 405, 411, 415. Then, WNIC and BCLIC argue that the
Receiver lacks standing to bring the fraudulent conveyance
claims under New York law to avoid the latter type of interests,

because she is not a receiver for a "creditor" of the PPCO
Subsidiaries. ECF No. 169, at 24-25.[12]

There are two problems with WNIC and BCLIC's argument.
First, the Receiver brings the fraudulent conveyance claims to
avoid the liens on the PPCO Subsidiaries on behalf of the
receivership entities, not the PPCO Subsidiaries.[13] The
fraudulent conveyance claims are brought pursuant to the
Receivership Order, which granted the Receiver the right to sue
for and collect all "Receivership Property," including any
security interests conveyed by the PPCO Subsidiaries, even
though the Receiver is not a receiver of the PPCO Subsidiaries.
ECF No. 256, at 57.[14] Pursuant to the Receivership Order, the

---

[12] The parties do not dispute that the Receiver has standing to
bring the fraudulent conveyance claims with respect to the
former type of interests, as those claims are brought on behalf
of the PPCO Feeder Funds and PPCO Blocker Fund – creditors to
the transferor PPCO Master Fund. FAC §§ 66-75; ECF No. 169, at
24-25; ECF No. 299, at 13-14; ECF No. 256, at 54-55.

[13] Therefore, WNIC and BCLIC's argument that the fraudulent
conveyance claims are brought on behalf of entities outside the
scope of the Receivership entities is incorrect. ECF No. 299, at
14.

[14] Standing is "a limitation on the authority of a federal court
to exercise jurisdiction," it is properly addressed within the
context of a Rule 12(b)(1) motion. Alliance for Envt'l Renewal,
Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 89 n.6 (2d Cir.
2006). And "[i]n resolving a motion to dismiss for lack of
subject matter jurisdiction under Rule 12(b)(1), a district
court . . . may refer to evidence outside the pleadings."

98

Receiver has the "right to sue for and collect . . . from third parties all Receivership Property," which includes the guarantee interests granted by the PPCO Subsidiaries. ECF No. 256, at 57. This is because "[e]ach of the [PPCO Subsidiaries] is majority owned by PPCO Master Fund, with ultimate corporate authority belonging to PPCO Master Fund," and the "Receivership Property" is defined as "all property interests of the Receivership Entities, including, but not limited to, monies . . . claims, rights and other assets, together with all . . . other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly." Id.

Second, WNIC and BCLIC correctly state that only a creditor of the PPCO Subsidiaries can bring these fraudulent conveyance claims under New York law, yet incorrectly take a rigid and literal approach to the word "creditor," contrary to the established case law. ECF No. 169, at 24-25; ECF No. 299, at 14. In Eberhard v. Marcu, the case on which WNIC and BCLIC rely, the Second Circuit addressed the effect of a receivership's scope on a receiver's standing to bring a fraudulent conveyance claim

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Therefore, even though this piece of information was presented outside the FAC, the Court considers this piece of information in order to make a standing determination.

99

under NYDCL, starting with the following basic premise: "It is well settled that in order to set aside a fraudulent conveyance, one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it." 530 F.3d 122, 129 (2d Cir. 2008). Therefore, it held, "a receiver's standing to bring a fraudulent conveyance claim will turn on whether he represents the transferor only or also represents a creditor of the transferor." Id. at 133.[15]

As to what the Eberhard court meant by "a creditor of the transferor," "[m]any courts have reasoned that, when a receiver sues to recover funds improperly diverted from the corporation during a Ponzi scheme, the corporation is itself acting as a creditor," Cobalt Multifamily Inv'rs I, LLC v. Arden, 46 F. Supp. 3d 357, 362 (S.D.N.Y. 2014). Indeed, Eberhard itself notes that, in Scholes - a Seventh Circuit case that Eberhard endorses and that involved a Ponzi scheme - the receiver could bring fraudulent transfer claims on behalf of certain corporations

---

[15] In Eberhard, the "transferor" was a Nordlicht-equivalent figure who allegedly committed fraud and directed the entities he controlled in furtherance of the fraud scheme, and, unlike here and other cases that found a receiver's standing, a receiver was appointed with authority over the assets of that individual transferor only, and not the entities allegedly used by the transferor to commit his fraud. 530 F.3d, at 133-35. Therefore, the Second Circuit found that the receiver lacked standing to bring fraudulent conveyance claims on behalf of the individual transferor only. Id.

that were technically transferors of the fraudulent conveyance
at issue, because they were "zombies" controlled "completely" by
the wrongdoer at issue, rendering such transfers "in essence,
coerced." Eberhard, 530 F.3d at 132 (analyzing Scholes v.
Lehmann, 56 F.3d 750, 752-55 (7th Cir.1995)).

## 2. Whether NYDCL § 278(1) or Sharp Immunizes BCLIC and WNIC from Liability

WNIC and BCLIC claim that they were "merely subsequent
transferees, with the [WNIC and BCLIC Reinsurance Trusts] as the
transferors" and that recapture was "clearly for fair
consideration" as they were exercising their secured creditor
rights to recapture not just the trust assets but also all of
the policyholder liabilities. ECF No. 169, at 20. Because a
"fair consideration" was given for this subsequent transfer
where WNIC and BCLIC were the transferees, WNIC and BCLIC argue
that they cannot be liable as per NYDCL § 278(1). However, WNIC
and BCLIC cannot raise the NYDCL § 278(1) defense because they
must show, as a matter of law, that the transaction was "for
fair consideration without knowledge of the fraud at the time of
the purchase." NYDCL § 278(1).

Alternatively, BCLIC and WNIC argue that, even with WNIC
and BCLIC's knowledge of the underlying fraud, the holding from
Sharp immunizes them from fraudulent conveyance liability. ECF

101

No. 169, at 20-22. By way of background, in Sharp, the bankruptcy trustee sued State Street Bank and Trust Company ("State Street") – which was a secured creditor of Sharp International Corporation's ("Sharp") – alleging that State Street was aware of Sharp's involvement in corporate fraud but nonetheless caused Sharp to borrow money from other unsuspecting creditors so that State Street would be repaid on its secured loan. In re Sharp Int'l. Corp., 403 F.3d. 43, 46-49, 53 (2d Cir. 2005).

Referencing Sharp, BCLIC and WNIC claim that under the Reinsurance Agreements, they were granted a "first priority security interest" on the BCLIC and WNIC Reinsurance Trust assets. ECF No. 169, at 20-21. They claim that it is "settled law that, in these very circumstances, a secured party foreclosing on its security interest cannot be held liable under fraudulent transfer law, even if it is aware of its debtor's fraud and the fact that the foreclosure may harm the debtor's other creditors." Id. at 21-22 (emphasis in original) (referencing Sharp, 403 F.3d. at 54-55 (holding that "the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance" even if the subsequent transferee knew that the funds to repay it were "fraudulently obtained")).

The Court holds that the instant case is distinguishable from Sharp. First, in Sharp, the defendant-creditor was merely aware of the fraud but was not active participant in the fraud itself; in contrast, in the present case, WNIC and BCLIC are alleged to have actively participated in the initial conveyance transactions by directing and influencing the parties to engage in the initial conveyance which allegedly did not involve fair value consideration. Second, Sharp notes that "[t]he decisive principle in this case is that a mere preference between creditors does not constitute bad faith." Id. at 54. Here, the allegations in the FAC do not paint a picture that the December 2015 and March 2016 transactions involved mere preference issue among creditor; rather, the allegations paint a picture of "bad faith" on part of WNIC and BCLIC. Indeed, Sharp held that "bad faith" is not "knowledge on the part of the transferee that the transferor is preferring him to other creditors" and that it "does not ordinarily refer to the transferee's knowledge of the [fraudulent] source of the debtor's monies which the debtor obtained at the expense of other creditors." Id. at 54-55. WNIC and BCLIC's alleged conduct goes far beyond what the Second Circuit describes as not constituting bad faith.

Given that the present case is clearly distinguishable from In re Sharp, the Court views the alleged second-step transfer of

103

assets from the BCLIC and WNIC Reinsurance Trusts to BCLIC and WNIC as part of one integrated transaction in which fraudulent transfers were made from PPCO Master Fund to, and for the benefit of, BCLIC and WNIC. See Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) ("We will not turn a blind eye to the reality that [two conveyances] constituted a single integrated transaction."). This collapsing of the transactions is further supported by the fact that the Reinsurance Trusts existed for the sole benefit of BCLIC and WNIC. See, e.g., Cadle Co. v. Newhouse, 74 Fed. App'x. 152, 153 (2d Cir. 2003) ("Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance.") (emphasis added).

For these reasons, the Court holds that neither NYDCL § 278(1) nor Sharp immunizes BCLIC and WNIC from the fraudulent conveyance claims. Thus, the motion to dismiss the fraudulent conveyance claims against WNIC and BCLIC based on NYDCL §§ 273, 274, 275, and 277[16] is denied.

---

[16] WNIC and BCLIC argue that the fraudulent conveyance claim based on NYDCL § 277(a) is not applicable to the present case, because this provision applies only to the conveyance of "partnership property" to a "partner" and because the FAC makes no allegation that BCLIC and WNIC were partners of PPCO Master

### 3. **Whether the Intent Element in NYDCL § 276 Is Adequately Pled**

The fraudulent conveyance claim based on NYDCL § 276 requires an additional analysis, because, unlike the claims based on NYDCL §§ 273, 274, 275, and 277, it requires actual intent. See NYDCL § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."). Because proving "[a]ctual intent [under NYDCL § 276] is difficult to establish through direct evidence," the intent may be "inferred from the facts and circumstances surrounding the transfer." S.E.C. v. Smith, 646 Fed. App'x. 42, 45 (2d Cir. 2016) (summary order). These so-called "badges of fraud" are facts and circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Sharp, 403 F.3d. at 56 (referencing Wall St. Assocs. v. Brodsky, 257 A.D.2d 526 (1st Dep't 1999)). Such badges include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the

---

Fund. ECF No. 169, at 25. This argument is irrelevant, because the Receiver's claim is based on NYDCL § 277(b), not NYDCL § 277(a).

105

> financial condition of the party sought to be charged
> both before and after the transaction in question; (5)
> the existence or cumulative effect of a pattern or series
> of transactions or course of conduct after the incurring
> of debt, onset of financial difficulties, or pendency or
> threat of suits by creditors; and (6) the general
> chronology of the events and transactions under inquiry.

Ford Motor Credit Co. LLC v. Orton-Bruce, 14-cv-5382 (KMK), 2017 WL 1093906, at *9 (S.D.N.Y. Mar. 22, 2017). The FAC puts forth factual allegations that indicate most of these badges of fraud, see FAC §§ 225-53, and thus the Court finds that actual intent is adequately pled.

## C. Declaratory Relief Claim

By way of background, the following allegations from the FAC form the basis for the declaratory relief claim. In December 23, 2015, PPCO Master Fund issued the SHIP Note to SHIP pursuant to a December 2015 Master Security Agreement, where PPCO Master Fund and the PPCO Subsidiaries gave security interest in substantially all of their assets to BAM Administrative. FAC ¶¶ 225-26.

In January 20, 2016, SHIP loaned additional $2 million to PPCO Master Fund pursuant to the First Amended SHIP Note. Id. ¶ 236. In conjunction, PPCO Master Fund and the PPCO Subsidiaries entered into a Ratification Agreement, which ratified the December 2015 Master Security Agreement and reaffirmed the

106

guarantee obligations of PPCO Master Fund and the PPCO Subsidiaries. Id.

In connection with the March 2016 transaction, PPCO Master Fund, BAM Administrative, as agent, and various purchasers including SHIP, the Beechwood Reinsurance Trusts, entered into a note purchase agreement ("March NPA") that amended and restated the First Amended SHIP Note. Id. ¶ 240. In connection with the March NPA, PPCO Master Fund entered into the Amended Security Agreement, pursuant to which it granted its security interests to BAM Administrative, as agent, in substantially all of its assets. Id. ¶ 241. However, "no subsidiaries of PPCO Master Fund executed the Amended Security Agreement," and "the Amended Security Agreement expressly provides that it did not amend or restate the December 2015 Security Agreement." Id. ¶ 242.

Despite the foregoing, "BAM Administrative, as agent, asserts liens against all of the assets of PPCO Master Fund and the MSA PPCO Subsidiaries." Id. ¶ 424. Therefore, the FAC asks for this Court's declaratory judgment that those asserted liens "do not attach to the assets of the MSA PPCO Subsidiaries," because "no MSA PPCO Subsidiaries executed the Amended Security Agreement." Id. ¶ 426.

WNIC and BCLIC were the only parties moving to dismiss this claim. The only support they provide for the motion is that the

107

declaratory relief claim seeks "the exact same relief as [the Receiver's] fraudulent conveyance claims." ECF No. 169, at 25 n.23. The Court does not find the declaratory relief claim to be duplicative of the fraudulent conveyance claims, because the former stems from the argument that the MSA PPCO Subsidiaries never executed the Amended Security Agreement, whereas the latter concerns whether certain transactions that MSA PPCO Subsidiaries entered into - pursuant to the December 2015 Security Agreement, the Ratification Agreement, and, if executed, the Amended Security Agreement - were fraudulent. Therefore, the Court denies the motion to dismiss the declaratory relief claim.

## VIII. CNO Financial Group, Inc. and 40|86 Advisors, Inc.

In its "bottom-line" Order, the Court dismissed the aiding and abetting claims against CNO and 40|86 Advisors for substantially similar reasons that it dismissed the aiding and abetting claims against SHIP and Fuzion.[17] Indeed, the case for dismissing those claims against CNO and 40|86 Advisors is stronger than the case for dismissing those claims against SHIP,

---

[17] In addition, CNO and 40|86 Advisors incorporate by reference the arguments by BCLIC and WNIC, so the Court's ruling regarding BCLIC and WNIC largely applies to CNO and 40|86 Advisors to the extent relevant. ECF No. 174, at 3.

WNIC, or BCLIC, because CNO's and 40|86 Advisors' role –

captured only in conclusory allegations such as that they

"directed Beechwood" to enter into the allegedly fraudulent

conveyance transactions – is even further removed from the

allegedly fraudulent transactions at issue. See FAC ¶¶ 11, 248,

311.[18]

---

[18] CNO and 40|86 Advisors argue that they are not subject to personal jurisdiction of this Court, ECF No. 174, at 3-4, but the Court holds that personal jurisdiction exists.

To establish specific personal jurisdiction over defendant, plaintiff must show that (1) jurisdiction is warranted under the state's long-arm statue and (2) exercising jurisdiction comports with the Fourteenth Amendment's Due Process Clause. See, Sonera Holding B.V. v. Cukurova Holding AS., 750 F.3d 221, 224 (2d Cir. 2014).

The Court finds that New York's long-arm statute applies here, because, among other reasons, NYCPLR § 302(a)(2) allows jurisdiction over any non-domiciliary "who in person or through an agent . . . commits a tortious act within the state," where the term "agent" is rather interpreted broadly. See Topps Co., Inc. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 91 (S.D.N.Y. 1997). The FAC sufficiently shows that CNO's agents – WNIC and BCLIC – "acted in New York for the benefit of, with the consent of, and under some control by the non-resident principal." ECF No. 256, at 60 (referencing Emerald Asset Advisors, LLC v. Schaffer, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012)).

Indeed, CNO's conduct is often inseparable from its subsidiaries', given their intertwined structure. See, e.g., FAC ¶¶ 128, 129, 130. The allegations concerning CNO go beyond "bare allegation" that the parent "controlled or otherwise directed or materially participated in the operations" of its subsidiary, which was deemed by the Second Circuit to be not enough to invoke personal jurisdiction over a parent entity. Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 86 (2d Cir. 2018).

Meanwhile, 40|86 Advisors worked closely with BCLIC and WNIC. See, e.g., FAC ¶¶ 144, 203. Furthermore, although

109

## IX. PB Investment Holdings, Ltd.

As a preliminary matter, PBIHL, the successor-in-interest to BBIHL, argues that the Court lacks personal jurisdiction over it. ECF No. 207, at 5-9. However, the Court holds that specific personal jurisdiction exists over PBIHL based on (1) the payoff letters accompanying the March 2016 Note Purchase Agreement and (2) the reasons stated in the contexts of the WNIC TPC and the SHIP TPC discussed below.[19]

---

allegations against 40|86 Advisors rely on a group-pleading term such as "CNO Defendants," 40|86 Advisors were part of all transactions and conduct that BCLIC and WNIC were involved in, so the Court finds that specific jurisdiction exists over 40|86 Advisors.

The due process prong focuses on the contact between defendant and the forum state, inquiring whether the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). The Court finds that this prong is met, as the "conduct by CNO and 40|86 Advisors, in negotiating, structuring and consummating allegedly fraudulent transactions governed by New York law and providing for New York court jurisdiction over disputes" is evidence of purposeful availing of the privilege of conducting activates in New York. Id. at 63. Indeed, CNO and 40|86 Advisors are alleged to have been closely involved in transactions that involved New York forum and New York law.

[19] "Where, as here, a district court rules on a motion under Rule 12(b)(2) on the basis of the complaint, the motion papers, and the supporting memoranda, without conducting an evidentiary hearing or deferring its ruling until the receipt of evidence at trial, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Jones v. Boto Co., 498 F. Supp. 2d

110

According to the Receiver, pursuant to these payoff letters, PBIHL received "millions of dollars in proceeds of each of the note purchases through its related entity and agent BAM Administrative Service (having its primary place of business in New York)." ECF No. 256, at 64 (referencing FAC ¶¶ 246-47). Because the forum for disputes arising from and the governing law of the March 2016 Note Purchase Agreement is New York, PBIHL is bound by the New York forum selection clause under the closely related doctrine, which provides that "a non-party to a contract may be subject to its forum selection clause if the non-party is so closely related to either the parties to the contract or the contract dispute itself that enforcement of the clause against the non-party is foreseeable." Diamond v. Calaway, 18-cv-3238 (KPF), 2018 WL 4906256, at *4 (S.D.N.Y. Oct. 9, 2018). In addition, the exercise of personal jurisdiction over PBIHL comports with the due process requirement because it purposefully availed itself of the privilege of conducting

---

822, 823 (E.D. Va. 2007) (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). "Eventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial. But where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993).

activities in New York through BAM I, its related entity and agent, thus invoking the benefits and protections of New York law.

Finally, the Court denies the motion to dismiss the aiding and abetting claims against PBIHL for substantially the same reasons that it denied the motion to dismiss the aiding and abetting claims against those FAC Beechwood Defendants involved in the December 2015 and March 2016 transactions.

## Legal Analysis – WNIC TPC

## I. Common Argument – Whether the RICO Claims Are Barred by the PSLRA

Various movants argue that the RICO claims against them in the WNIC TPC should be dismissed because of the RICO Amendment. ECF No. 188, at 3; ECF No. 154, at 6; ECF No. 194, at 1-2; ECF No. 210, at 8; ECF No. 179, at 8-9; ECF No. 192, at 7; ECF No. 232, at 10-11. The Court agrees with these movants for substantially the same reasons discussed above in the context of the FAC and in Senior Health Insurance Company of Pennsylvania v. Beechwood Re Ltd. et al., 18-cv-6658 (JSR) (the "SHIP action"). See In re Platinum-Beechwood Litig., 377 F. Supp. 3d 414, 424-26 (S.D.N.Y. 2019).

In brief, Beechwood's inducement of WNIC and BCLIC into the Reinsurance Agreements is a kind of securities fraud – just as

112

Beechwood's inducement of SHIP into the IMAs was considered a kind of securities fraud in the SHIP action - based on SEC v. Zandford, 535 U.S. 813 (2002). In Zandford, the U.S. Supreme Court held that the respondent engaged in securities fraud "by selling his customer's securities and using the proceeds for his own benefit without the customer's knowledge," because the securities sales and respondent's fraudulent practices were not independent events but rather coincided. Id. at 815. Here, WNIC and BCLIC's funds were alleged to be obtained by Beechwood for Platinum to inject capital into Platinum's investments and acquire securities, and such "conduct undertaken to keep a securities fraud Ponzi scheme alive" are covered under the PSLRA. MLSMK Inv. Co v. JP Morgan Chase & Co., 651 F.3d 268, 277 n.11 (2d Cir. 2011); see also Picard v. Kohn, 907 F. Supp. 2d 392, 396 (S.D.N.Y. 2012).[20] For this reason, the Court dismisses the RICO claims against all moving defendants.

---

[20] Trying to distinguish the present case from Zandford and the SHIP action, WNIC and BCLIC argue that their entry into the Reinsurance Agreements is not a securities transaction, but a purely contractual transaction, whereby they "ceded liabilities to Beechwood and gave Beechwood $42 million in cash as a fee (referred to as a negative ceding commission) to take on those risks, plus approximately $550 million in assets — almost all cash — to satisfy statutory reserve requirements for the risks transferred." ECF No. 256, at 9. WNIC and BCLIC argue that this first transaction should be distinguished from Beechwood and Platinum's subsequent usage of "the reinsurance trust funds to

113

## II. Common Argument – Whether WNIC and BCLIC's Claims Are Barred by the Doctrine of In Pari Delicto

Huberfeld, Kim, and PBIHL argue that WNIC and BCLIC's claims are barred by the in pari delicto doctrine, because WNIC and BCLIC are "alleged to have been knowing accomplices [in the FAC] in the same fraudulent conspiracy for which they now assert claims against [the cross-claim and third-party defendants]." ECF No. 154, at 9; see also ECF No. 192, at 12; ECF No. 202, at 11.

At this motion-to-dismiss stage, the Court takes WNIC and BCLIC's allegations in the WNIC TPC to be true in assessing whether the claims in the WNIC TPC can withstand the motions to dismiss. But the allegations in the FAC are irrelevant See, e.g., Gary/Chi. Int'l Airport Auth. v. Zaleski, 144 F. Supp. 3d 1019, 1022 (N.D. Ind. 2015) (rejecting the view that "any defendant who files a third-party complaint would necessarily be deemed to admit all the allegations of the original complaint"). And the WNIC TPC does not make any admission that WNIC and BCLIC were accomplices in the FAC in the same fraudulent conspiracy.

---

engaged in securities fraud." Id. at 10-11. But, similar to the fact pattern in Zandford, "[t]his is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so. . . . Rather, respondent's fraud coincided with the sales themselves." Zandford, 535 U.S. at 815.

114

Therefore, none of the claims in the WNIC TPC should be
dismissed because of the doctrine of in pari delicto.

## III.    Common Argument - Whether WNIC and BCLIC's Contribution and Indemnity Claims Should Be Dismissed

The WNIC TPC asks that, if WNIC and BCLIC are ultimately
found liable to the Receiver, all cross-claim and third-party
defendants must indemnify or contribute to WNIC and BCLIC. WNIC
TPC ¶¶ 919-22. Bodner moved to dismiss this claim against him,
and Huberfeld, Saks, Ottensoser, PBIHL, Slota, and the WNIC TPC
Beechwood Parties either incorporated Bodner's argument or made
similar argument. ECF No. 188, at 13; ECF No. 154, at 7-8; ECF
No. 179, at 21; ECF No. 194, at 2; ECF No. 202, at 23; ECF No.
232, at 23, ECF No. 210, at 10.

Given that the Court already dismissed certain claims
against WNIC and BCLIC in the FAC, the only relevant claims
against WNIC and BCLIC for the purpose of these contribution and
indemnity claims are the fraudulent conveyance, unjust
enrichment, and declaratory relief claims.

First, the Court dismisses WNIC and BCLIC's contribution
and indemnity claims to the extent they are based on the
Receiver's fraudulent conveyance claims against them, because,
under Article 10 of the New York Debtor and Creditor Law, "there
is neither an express nor implied right of indemnification or

115

contribution." Edward M. Fox & James Gadsden, Rights of Indemnification and Contribution Among Persons Liable for Fraudulent Conveyances, 23 Seton Hall L. Rev. 1600, 1605 (1993) (referencing NYDCL § 270).

Second, WNIC and BCLIC's contribution and indemnity claims to the extent they are based on the Receiver's unjust enrichment claims against them are dismissed, because the WNIC TPC does not make any reference to the December 2015 and March 2016 transactions, let alone allege that any of the cross-claim and third-party defendants in the WNIC TPC may be jointly liable to the Receiver for liabilities arising out of such transactions.

Third, for substantially similar reasons, the Court dismisses WNIC and BCLIC's contribution and indemnity claims to the extent they are based on the declaratory relief claim against WNIC and BCLIC.

Putting these together, the Court grants the movants' motions – other than Beechwood Re's motion for the reasons stated below – to dismiss WNIC and BCLIC's contribution and indemnity claims.

## IV. Common Argument – Whether WNIC and BCLIC's Unjust Enrichment Claims Should Be Dismissed

Under New York law, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a

116

conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). Accordingly, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987). And although "courts in this Circuit routinely allow plaintiffs to plead such claims in the alternative," this is so "when the validity or scope of the contract is difficult to determine." Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance Co., Inc., 239 F. Supp. 3d 761, 795 (S.D.N.Y. 2017).

Here, there does not appear to be a dispute about the validity or scope of the Reinsurance Agreements. Unlike in the SHIP action - where $50 million was invested in Agera Energy outside of the IMAs, which was the basis for finding that some portion of the unjust enrichment claim in the SHIP action was not dismissed - all of BCLIC and WNIC's funds at issue in the WNIC TPC were invested through the Reinsurance Agreements with Beechwood Re. Also, WNIC and BCLIC make numerous torts claims against various defendants, which also subsume a large part of WNIC and BCLIC's unjust enrichment claims. For these reasons, all unjust enrichment claims in the WNIC TPC are dismissed.

## V. Beechwood Trust Nos. 7-14

Excluding the allegations impermissibly grouping Beechwood Trust Nos. 7-14 with dozens of other defendants, the WNIC TPC makes only the following relatively particularized allegation against Beechwood Trust Nos. 7-14: "The Platinum co-founders and Levy created each of the Beechwood Trusts as an asset protection vehicle for use in siphoning off and secreting the ill-gotten gains from the Co-conspirators racketeering activities and placing them beyond the reach of their creditors." WNIC TPC ¶ 518. However, this allegation is too broad to satisfy Rule 9(b), and so the Court dismisses the aiding and abetting claims against Beechwood Trust Nos. 7-14.

## VI. David Bodner

The WNIC TPC makes the following allegations, among others, against Bodner: (1) he "conducted the conspiracy's day-to-day business via a secretary who relayed his directives to other Co-conspirators," id. ¶ 482; (2) he was a party to a July 30, 2015 email where Huberfeld and Bodner expressed their concern about the Chief Executive Officer of CNO finding out that their trust assets were invested in Platinum ("July 30, 2015 email"), id. ¶

118

472;[21] (3) he, along with Nordlicht and Huberfeld, issued the

"$100 million Demand Note" which was used to allegedly deceive

WNIC and BCLIC into thinking that Beechwood Re was adequately

capitalized, id. ¶ 548; and (4) "[t]he leaders of the

---

[21] In their briefs and during the oral argument held on August 15, 2019, the parties vigorously debated as to how this email chain should be interpreted. In that email chain, on July 29, 2015, an account with the name "BodnerAngHuberfeld" with the email address "bodnerang@gmail.com" sent an email to David Bodner, stating "I'm really concerned that if Ed Bonach from CNO Financial Group Finds out we invested beechwoods [sic] money into platinum with its illiquid investments (since it didn't exactly fit their investment objective) he won't trust us and he will take all of the aprox [sic] 50 mil, he has invsted [sic] in beachwood [sic]. . . That means beechwood would either implode or not be able to function financialy [sic] and may have to be dissolved; Even though we did a cancel and correct We weren't exactly honest with Ed about the original investment or that beechwood and platinum really are integrated . . . I'm concerned, What should we do ? [sic] I haven't dalled anybody back yet-I'm just trying to do som [sic] damage control right now. Kind Regards, Platinum Partners . . . ." 18-cv-10936, ECF No. 285-3, Ex. 33. Then, on July 30, 2015, David Bodner responds to the sender of the July 29, 2015 email, writing only "hwerblowsky@platinumlp.com." Id.

Bodner argues that the sender of July 29, 2015 was Bodner's secretary Angela Albanese and that "hwerblowsky@platinumlp.com" is the email address of Platinum's in-house lawyer Harvey Werblowsky. ECF No. 311, at 4-5, 6 n.2. In contrast, WNIC and BCLIC construe this email as a communication between Bodner and Huberfeld confessing to the alleged fraudulent scheme. In light of this factual dispute, the Court interprets this piece of evidence in favor of WNIC and BCLIC at this motion to dismiss stage, because it is not entirely clear who sent the July 29, 2015 email. On the one hand, it may be the secretary based on the email address itself. On the other hand, this email was signed on behalf of Platinum Partners and involves discussions of matters that one would not necessarily expect a secretary to participate in.

conspiracy[, including Bodner,] met periodically to steer the Co-conspirators after they agreed upon the terms of the conspiracy in March 2013" at least on the fifteen specific dates, id. ¶ 605.

At least the third allegation, and possibly with the fourth allegation, adequately plead the substantial assistance element of the aiding and abetting claims. Even when lumped with Nordlicht and Huberfeld, it cannot seriously be argued that the third allegation fails as a result to give Bodner "fair notice of what the plaintiff's claim is and the ground upon which it rests." Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001). As to the knowledge element of the aiding and abetting claims, the above allegations as a whole - especially the July 30, 2015 email - are sufficient to give plausible inference that Bodner had knowledge of the primary fraud and breach of fiduciary duty. With respect to the July 30, 2015 email, as this Court noted during the oral argument for Trott et al. v. Platinum Management (NY) LLC et al., 18-cv-10936 (JSR) (the "Trott action") on March 7, 2019, this email "presupposes that the recipient knew about that [they] invested Beechwood's money into Platinum with its illiquid investment . . . the language could fairly be read by any reasonable fact finder as conveying to Mr. Bodner what we already knew and a concern that

120

they now have if someone outside finds out." Transcript of Oral

Argument dated March 7, 2019 starting at 10:30 a.m., Trott et

al. v. Platinum Management (NY) LLC et al., 18-cv-10936

(S.D.N.Y. Mar. 7, 2019), at 10.

For these reasons, the motion to dismiss the aiding and

abetting claims against Bodner is denied.

## VII.   **Murray Huberfeld**

Because the WNIC and BCLIC's allegations against Bodner and

those against Huberfeld are substantially similar and because

Huberfeld incorporates by reference Bodner's arguments to

support his motion to dismiss, see ECF No. 154, at 1, the Court

similarly denies the motion to dismiss the aiding and abetting

claims against Huberfeld.

## VIII.   **Daniel Saks**

### A. **Fraudulent Inducement and Aiding and Abetting Fraudulent Inducement Claims**

Saks points out that the Reinsurance Agreements were signed

in February 2014, whereas, according to the WNIC TPC, Saks began

working at Beechwood in "late 2014." ECF No. 179, at 3, 14, 17

(referencing WNIC TPC ¶ 504). For this reason, the Court grants

the motion to dismiss the fraudulent inducement claim and the

claim for aiding and abetting fraudulent inducement against

Saks.

## B. Breach of Fiduciary Duty Claim

Saks argues that WNIC and BCLIC fail to show that Saks owed a fiduciary duty to WNIC and BCLIC, because the allegations do not provide a single fact that shows that a "personal relationship of trust and confidence" existed between Saks and WNIC and BCLIC. ECF No. 179, at 12. However, the Court finds that a reasonable factfinder could readily conclude that Saks owed fiduciary duty to WNIC and BCLIC. As the Chief Investment Officer of Beechwood Re and BAM I from late 2014, he had discretionary investment authority over the asset that WNIC and BCLIC entrusted to Beechwood. When WNIC and BCLIC transferred $600 million to Beechwood Re, it is plausible to infer that WNIC and BCLIC were reposing "trust or confidence" in Beechwood Re and its officers including Saks, with whom WNIC and BCLIC were interacting regularly. WNIC TPC ¶ 644; see also Indep. Asset Mgmt. LLC v Zanger, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008). Where "defendant had discretionary authority to manage [plaintiff's] investment accounts, it owe[s] [plaintiff] a fiduciary duty of the highest good faith and fair dealing." Assured Guar. (UK) Ltd., v. J.P. Morgan Inv. Mgmt. Inc., 915 N.Y.S.2d 7, 16 (1st Dep't 2010), aff'd, 962 N.E. 2d 765 (N.Y. 2011). The WNIC TPC is replete with examples of Saks' personal communications with WNIC and BCLIC, asking them to trust his

122

expertise and prudence. See, e.g., WNIC TPC ¶ 644. There is no doubt that, according to the allegations, his role as a corporate official, combined with this conduct, "created a personal relationship of trust and confidence." Krys v. Butt, 486 F. App'x 153, 156 (2d Cir. 2012) (summary order).

Furthermore, the breach element is sufficiently pled through the allegations that Saks engaged in a series of non-arm's-length transaction and concealed these transactions from WNIC and BCLIC. For instance, the WNIC TPC details Saks' involvement in investing WNIC and BCLIC's assets: "[I]n February 2015, Levy, Saks, Manela and others collaborated on the investment of trust assets in China Horizon, a Platinum-controlled entity. In May 2015, Levy, Saks and Nordlicht, among others, collaborated in the execution of a waiver to Agera Energy, another Platinum-controlled entity into which the Co-conspirators invested trust assets. Starting in December 2015 and extending into 2016, Levy collaborated with Saks, Manela and Nordlicht, among others, to make further investments of trust assets in ALS, another Platinum-controlled entity." WNIC TPC ¶ 634. Similarly, in his communications with WNIC and BCLIC, he is alleged to have concealed from WNIC and BCLIC material information regarding the Platinum-Beechwood connection. Id. ¶ 644.

123

For these reasons, the Court denies the motion to dismiss the breach of fiduciary duty claim against Saks.

### C. Fraud Claim

As Saks argues, ECF No. 179, at 14, a fraud claim based on omission must generally be accompanied by "the existence of a fiduciary relationship requiring disclosure of the unknown facts." Connaughton v. Chipotle Mexican Grill, Inc., 23 N.Y.S.2d 216, 220 (1st Dep't 2016). The Court determined above that Saks owed a fiduciary duty to SHIP. Furthermore, the existence of such a fiduciary relationship requiring disclosure is further supported by the special facts doctrine, because Saks "possess[ed] superior knowledge, not readily available to [SHIP], and knows that [SHIP] is acting on the basis of mistaken knowledge." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005).

With respect to pleading Saks' omissions, allegations – especially the ones in WNIC TPC ¶ 644 – satisfy Rule 9(b), because they (1) identify what the omissions were, (2) identify Saks as the person who failed to disclose, (3) reveal the context of the omissions, (4) explain why the statements were fraudulent, and (5) show what Saks obtained through the fraud. Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000). As to the last factor,

124

Saks seems to hold a view that the pleading must show that Saks personally obtained some pecuniary benefits from the fraudulent scheme to satisfy Rule 9(b);[22] but the Court disagrees. According to the WNIC TPC, what Saks obtained through the fraud was the preventing of WNIC and BCLIC from terminating their Reinsurance Agreements. WNIC TPC ¶¶ 636, 652, 804.

In addition, the Court finds that the intent to mislead is adequately pled, considering the following particularized allegations in the WNIC TPC:

> On January 26, 2015, when WNIC and BCLIC questioned the prudency of the investment of trust assets in JF Aircorp and Trilliant, LLC, among other investments, Saks asked WNIC's and BCLIC's Eric Johnson to repose trust in Saks' wisdom in making those investments, but concealed from Johnson (a) that Murray Huberfeld, who do-founded Platinum and owned and controlled Beechwood, had dictated that Beechwood Re, BAM and BAM Administrative invest trust assets in JF Aircorp, and (b) that the Trilliant investment was a shameless bribe directed to the principal of SHIP and his family, which was designed to induce SHIP to invest with Beechwood; . . .

---

[22] Saks claims that the WNIC TPC fails to allege "what [Saks] obtained through the fraud," because "[t]he motive to maintain the appearance of corporate profitability, or the success of an investments, will naturally involve benefit to a corporation, but does not 'entail concrete benefits,'" and "[a]n increase to individual employment compensation is also insufficient to satisfy the requirement that a concrete benefit be alleged." ECF No. 179, at 15 (citing Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996); Acito v. IMCERA Grp, Inc., 47 F. 3d 47, 54 (2d Cir. 1995)). Also, Saks argues that "[t]he only compensation [Saks] received was employment compensation," which was "not alleged to have been increased as to him by virtue of the alleged fraud." Id. at 16.

125

> On February 16, 2015, when WNIC and BCLIC questioned a
> loan to Kennedy RH Holdings LLC, Saks and Kim again asked
> WNIC and BCLIC to rely on their expertise, touting the
> safety of the loan because it was being made to an
> individual, Bernard Fuchs, who had a net worth in excess
> of $30 million. Saks and Kim concealed from WNIC and
> BCLIC that Fuchs, a defendant in the PPVA Action, was a
> crony of the three Platinum co-founders and was hip-deep
> in the Platinum Ponzi-esque scheme.

Id. ¶ 644 (emphasis added). The fact that Saks' alleged
omissions occurred when WNIC and BCLIC asked questions about the
questionable investments adds more weight to the inference that
Saks had fraudulent intent in making those omissions.

Lastly, the reliance and injury prong is adequately pled
through the allegation that "WNIC and BCLIC reasonably relied on
the representations to their detriment, including by not
terminating the Reinsurance Agreements or taking other actions
that could have ameliorated the damages WNIC and BCLIC incurred
as a result of these misrepresentations." Id. ¶¶ 636, 652, 804.

## D. Aiding and Abetting Claims

There is no doubt that the allegations regarding Saks'
conduct and omissions discussed above – especially his active
concealing of the Platinum-Beechwood connection and the
allegedly problematic nature of those transactions – adequately
plead substantial assistance. See, e.g., WNIC TPC ¶¶ 504, 579,
634, 644. In addition, Saks' knowledge of the primary fraud and
breach of fiduciary duty is strongly inferable from the alleged

126

conduct and omissions, aided by the allegation that he was both
a senior manager of Platinum and Chief Investment Officer of
Beechwood Re's and BAM I. Id. ¶ 504.

## IX. Hokyong (Stewart) Kim

Because Saks and Kim are similarly situated, according to
the WNIC TPC, see, e.g., id. ¶ 644, the Court, for substantially .
the same reasons that the Court denied Saks' motion, denies the
motion to dismiss the breach of fiduciary duty claim, the fraud
claim, and the aiding and abetting claims against Kim.

## X. Lincoln International LLC

Generally, the allegations against Lincoln are well-
particularized and specific, see WNIC TPC ¶¶ 691-783, yet a few
issues merit more attention.

First, as to the reliance element of the misrepresentation
claims, Lincoln argues that the disclaimer language in relevant
valuation reports – such as that (1) the reports were for
Beechwood only and should not be relied by any third party, (2)
"Lincoln has not made any independent valuation or appraisal of
the assets," and (3) Lincoln had "relied upon and assumed the
accuracy and completeness of the financial information supplied
to [Lincoln] and considered in [Lincoln's] analysis" of fair
value, WNIC TPC ¶¶ 716, 716 n.35; Beechwood Engagement Letter,
ECF No. 187-2, Ex. B, at 2 – make WNIC and BCLIC's reliance on

127

those reports unjustified. ECF No. 182, at 18-19. The Court disagrees. Under New York law, "it is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 785 (2d Cir. 2003).

According to the WNIC TPC, the disclaimer language has been rendered boilerplate-like by Lincoln's alleged conduct. For instance, the disclaimer that Lincoln has "relied upon and assumed the accuracy and completeness of the financial information supplied to [Lincoln] and considered in [Lincoln's] analysis" is an empty statement, when Lincoln allegedly knew that the information it received might not have been complete or accurate. E.g., WNIC TPC ¶¶ 720, 722, 728, 730-35; Disclaimer and Confidentiality Statement, ECF No. 187, Ex. C; see also P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 301 Ad. 2d 373, 378 (N.Y. App. Div. 2003) (Disclaimer "does not preclude plaintiff's claim based upon representations that [defendant] made to plaintiff that [defendant] allegedly knew were false."). In addition, the disclaimer language that no parties other than Beechwood should rely is also meaningless, because Lincoln was allegedly aware of WNIC and BCLIC receiving and relying on Lincoln's valuations. WNIC TPC ¶¶ 752-59. For these reasons, Lincoln's disclaimer

128

reads like boilerplate, and thus the disclaimer defense against justifiable reliance cannot stand.[23]

Second, the causation element of the misrepresentation claims is adequately pled through the allegations that WNIC and BCLIC did not terminate its relationship with Beechwood when Lincoln did because of misrepresentations and omissions in Lincoln's reports. See id. ¶¶ 768, 782, 832. Indeed, even in the final report – issued after Lincoln had learned more about possible issues with working with Beechwood – Lincoln does not identify the Platinum-Beechwood tie and other problems Lincoln allegedly knew as the reasons for their downgrade of various valuations. Id. ¶¶ 768, 783.

Third, as to the intent element of the fraudulent misrepresentation claim, the Court finds that the WNIC TPC has sufficiently "alleg[ed] facts to show that [Lincoln] had both motive and opportunity to commit fraud." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d

---

[23] In addition, Lincoln argues that reliance was unjustified because Section 597 of the Reinsurance Agreements gave WNIC and BCLIC opportunity "to verify that the assets were properly valued." ECF No. 182, at 18. However, as WNIC and BCLIC correctly point out, precisely because Lincoln allegedly represented that it was independent, reviewed substantial data, and never disclosed that these were non-arm's length transactions, WNIC and BCLIC did not exercise its opportunity to object to the valuation reports. ECF No. 256, at 11.

Cir. 2004). The WNIC TPC makes plausible allegations that Lincoln had incentives to (1) "replace [Platinum's previous valuation firm] for all of the Platinum funds," (2) "serve as a referral source for opportunities with other hedge fund managers and / or reinsurance firms," and (3) bolster . . . "credentials in the hedge fund and reinsurance communities." WNIC TPC ¶ 700. Also, the WNIC TPC alleges "facts that constitute strong circumstantial evidence of conscious . . . recklessness" by Lincoln in disregarding whether the information it received was true. Morgan Guar. Tr. Co. of N.Y., 375 F.3d at 187; see also, e.g., WNIC TPC ¶¶ 723-25, 727. For these reasons, the Court denies the motion to dismiss the fraudulent misrepresentation claim.

Fourth, however, because the special relationship element of the negligent misrepresentation claim is not adequately pled, the Court dismisses the negligent misrepresentation claim against Lincoln. WNIC and BCLIC contend that a special relationship existed between Lincoln, on the one hand, and BCLIC and WNIC, on the other, because Lincoln had "actual and specific knowledge that [WNIC and BCLIC were] receiving and relying on its reports." ECF No. 256, at 18-19 (referencing WNIC TPC ¶¶ 752-58). However, "New York strictly limits negligent misrepresentation claims to situations involving actual privity

130

of contract between the parties or a relationship so close as to approach that of privity." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 271 (2d Cir. 1993). In fact, plaintiff must show that the benefit to the non-party was the "end and aim of the transaction." Bayerische Landesbank v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 60 (2d Cir. 2012). Even though Lincoln allegedly knew that WNIC and BCLIC relied upon Lincoln's reports, Lincoln was engaged by the Beechwood entities pursuant to engagement letters, where the end and aim of the engagement was to benefit Beechwood, not WNIC and BCLIC per se. Furthermore, the WNIC TPC does not allege that there was a direct contact between Lincoln and WNIC and BCLIC. Indeed, the absence of "direct contact" is an important factor in finding that no special relationship exists. See Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 115 (2d Cir. 2012).

In addition, with respect to the aiding and abetting claims against Lincoln, the parties dispute what type of knowledge is relevant for the purpose of pleading the knowledge element: WNIC and BCLIC argue that it is the knowledge of the overvaluation, ECF No. 255, at 20, and Lincoln argues that it is the knowledge of the alleged Ponzi scheme, ECF No. 182, 22, or of Platinum's secret control of Beechwood, ECF No. 320, at 13. The language of Count Eight and Count Thirteen in the WNIC TPC indicates that

the aiding and abetting claims against Lincoln are premised on, inter alia, the knowledge of overvaluation, the knowledge of non-arm's length nature of the transactions, and the knowledge of Platinum's control over Beechwood investments. WNIC TPC ¶¶ 845, 884. Given that the WNIC TPC sufficiently alleges facts that establish the aiding and abetting claims based on the knowledge of overvaluation and the knowledge of non-arm's length nature of the transactions,[24] the Court denies the motion to dismiss the aiding and abetting claims against Lincoln.

Lastly, the Court denies the motion to dismiss the claim for civil conspiracy to commit fraud, because all elements of the claim - (1) the "agreement" in the form of engagement letters with Beechwood Re and BAM I, along with an "informal" arrangement with Platinum, (2) an "overt act" in the form of Lincoln's issuance of allegedly defective valuation reports with fraudulent valuations, (3) Lincoln's allegedly intentional participation in the furtherance of a plan or purpose, and (4) the "resulting damage" by WNIC and BCLIC in the form of not terminating the Reinsurance Agreements or taking other

---

[24] There is no doubt that the WNIC TPC adequately pleads substantial assistance, because Lincoln's alleged overvaluation of dozens of investments allowed Beechwood to fraudulently withdraw millions in surplus while avoiding its obligations to top-up the relevant trusts. See WNIC TPC ¶ 782.

132

ameliorative steps earlier, see generally WNIC TPC ¶¶ 691-783 –
are adequately pled. See Pope v. Rice, 04-cv-4171 (DLC), 2005 WL
613085, at *13 (S.D.N.Y. Mar. 14, 2005).

## XI. David Ottensoser

Other than moving to dismiss the claims under RICO, RICO
conspiracy, contribution and indemnity, and unjust enrichment –
all of which the Court has dismissed as discussed above –
Ottensoser did not move to dismiss the fraud claim and the
aiding and abetting claims against him, so these claims remain.
ECF No. 194, at 1-2.

## XII. PB Investment Holdings, Ltd.

As a threshold matter, PBIHL argues that the Court does not
have personal jurisdiction over it. In addition to the reasons
discussed above in the context of the FAC and below in the
context of the SHIP TPC, the Court finds that specific personal
jurisdiction over PBIHL is established through the alter ego
theory. "Under New York law, if a court has personal jurisdiction
over a defendant, it may also exercise personal jurisdiction over
an alter ego defendant." Micro Fines Recycling Owego, LLC v.
Ferrex Eng'g, Ltd., 17-cv-1315 (LEK/DEP), 2019 WL 1762889, at *5
(N.D.N.Y. Apr. 22, 2019); see also S. New England Tel. Co. v.
Glob. NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010). Personal
jurisdiction over an alter ego defendant can be exercised where

133

the "allegedly controlled entity was a shell for the allegedly controlling party; it is not necessary to show also that the shell was used to commit a fraud." Int'l Equity Invs. v. Opportunity Equity Partners, Ltd., 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007); see also Marine Midland Bank N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)). The factors to consider in a jurisdictional alter-ego analysis include "whether there was a failure to observe corporate formalities, evidence of undercapitalization, intermingling of personal and corporate funds, shared office space and phone numbers, any overlap in ownership and directors and whether the corporation was used to perpetrate a wrongful act against the plaintiffs." Cardell Fin. Corp v. Suchodolski Assocs., 09-cv-6148 (VM) (MHD), 2012 U.S. Dist. LEXIS 188295, at *94-95 (S.D.N.Y. July 17, 2012).

Based on these factors, the Court finds that the WNIC TPC adequately alleges that PBIHL is an alter ego for the relevant Platinum and Beechwood entities over which the Court has personal jurisdiction. For instance, the WNIC TPC alleges overlap in management and ownership: "Platinum owned and controlled Beechwood . . . . Platinum and Beechwood were integrated, with their senior managers shuttling back and forth between Platinum and Beechwood," WNIC TPC ¶ 586; Taylor and Feuer were "[President and Chief Executive Officer,

134

respectively,] of Beechwood Re as well as the principal[s] of most Beechwood entities, and Taylor was also the President of Beechwood Bermuda, including the predecessor-in-interest of PBIHL," id. ¶¶ 483, 485, 623. The WNIC TPC alleges intermingling of corporate funds: Taylor made false representations as to how the "entirety of Beechwood's capital" is available to WNIC and BCLIC, id. ¶ 623; Platinum and Beechwood entities intermingled funds with PBIHL, when Platinum funded Beechwood Bermuda (including PBIHL) with "$75 million of the borrowing capacity under the $100 million Demand Note from Beechwood Re . . . to satisfy Bermuda insurance regulators," id. ¶ 623.

Having determined that it has personal jurisdiction over PBIHL, the Court denies the motion to dismiss the fraudulent conveyance claims against PBIHL, because the WNIC TPC plausibly and with particularity alleges facts establishing each element of the fraudulent conveyance claims under the NYDCL. WNIC and BCLIC allege that the "Demand Note Transfer occurred on or about May 16, 2014" and that the transfer was in the amount of $75 million. Id. ¶ 619. The WNIC TPC alleges that three defendants, including PBIHL, were recipients of the Demand Note transfer, id. ¶ 618, but this grouping appears inevitable as WNIC and BCLIC would need to conduct discovery to see how the funds were apportioned among PBIHL and the two other Beechwood Bermuda

135

defendants. The transfer was designed for the purpose of, and
succeeded in, rendering Beechwood Re insolvent and placing
Beechwood Re's "capital" beyond the reach of WNIC and BCLIC, and
there was no consideration for Beechwood Re's transfer of the
$75 million at issue. Id. ¶ 620. These alleged facts satisfy the
elements of the § 275 claim (actual conveyance made with the
intent or belief of going insolvent), the § 273 claim
(constructive conveyance by becoming insolvent, in the absence
of fair consideration), and the § 274 claim (constructive
conveyance by becoming undercapitalized, in the absence of fair
consideration).

      With respect to the § 276 claim (actual conveyance made
with intent to defraud), it is the transferor's intent to
defraud – rather than the transferee's intent, as PBIHL argues –
that matters, and the transferor Beechwood Re's intent is
adequately pled as well. See In re Sharp Int'l. Corp., 403 F.3d
43, 56 (2d Cir. 2005) (holding that a creditor must show "intent
to defraud on the part of the transferor to prevail on a Section
276 claim") (emphasis added).[25]

_____

[25] In addition, PBIHL argues that the WNIC TPC fails to plead
that WNIC and BCLIC each is a "creditor" with standing to sue
under New York's statute, ECF No. 202, at 21, but the WNIC TPC
is clear that WNIC and BCLIC are creditors of Beechwood Re under
the Reinsurance Agreements to avoid the Demand Note transfer,
see WNIC TPC §§ 890-92.

Lastly, the allegations regarding the Demand Note transfer discussed above and Taylor's January 14, 2015 email state the fraud claim and the aiding and abetting claims. In an email dated January 14, 2015, Taylor, on behalf of all Beechwood entities including the predecessor-in-interest to PBIHL, wrote that he and Feuer "consider the entirety of Beechwood's capital as available to support any liabilities within [their] companies. . . . It has always been our intent to utilize all of [our] capital availability to support the liabilities of our businesses, first and foremost being the [WNIC and BCLIC] block." WNIC TPC ¶ 623. This statement by Taylor is attributable to PBIHL, as Taylor was alleged to be the President of PBIHL's predecessor-in-interest and that such email was "on behalf of all Beechwood companies." Id. (emphasis added). And there is no allegation suggesting that Taylor was acting outside the scope of his responsibility as President in making this statement. Once this statement is attributable to PBIHL, combined with the Demand Note transfer, scienter is adequately pled. Lastly, for substantially similar reasons as discussed above – i.e., based on the Demand Note transfer discussed above and Taylor's January 14, 2015 email - the Court denies the motion to dismiss the aiding and abetting claims against PBIHL.

**XIII.  Will Slota**

137

The fraud claim and the aiding and abetting claims against Slota are premised on the following three allegations: (1) his search for a valuation firm, (2) Slota's signing of brokerage agreements with Nomura and his efforts to look for additional prime brokers, and (3) the following email that he sent to Hodgdon in November 2013, in response to Hodgdon sending an email to Slota's Platinum email address regarding a Beechwood matter:

> Please DO NOT email me at [Slota's Platinum address] regarding Beechwood business. We've set up separate email addresses for all staff involved in Beechwood. Mine is [Slota's Beechwood email address].
>
> I believe I've repeatedly made myself clear on this point. This is the third time I will have been reminding you.

WNIC TPC ¶¶ 494-95, 638.

With respect to the first allegation, Slota is alleged to be "the point person responsible for finding and hiring a valuation firm that would make Beechwood's investments in Platinum and Platinum-related entities appear legitimate to the outside world." Id. ¶ 495. Other than conclusory statements such as "Slota and the Co-conspirators enticed Lincoln to participate in this fraud," there is no specific allegation imputing fraudulent intent on Slota's part. Id. Other than Slota signing the NDAs with Lincoln, id. ¶ 696, and passing on the first

138

Negative Assurance Letter issued by Lincoln to Wilmington Trust on March 7, 2014, id. ¶ 759, which in and of themselves are not wrongful actions, there is no particularized allegation that Slota pressured Lincoln to produce overvalue assets or that he was aware of the alleged overvaluations.

With respect to the second allegation, it is alleged that "the efforts to establish additional prime brokerage arrangements were led by Slota, Levy and Taylor initially" and that Levy and Slota "signed a series of eight agreements with Nomura, all dated January 31, 2014." Id. ¶¶ 638, 640. Not only do these allegations successfully plead the substantial assistance element of the aiding and abetting claims against Slota, but also they, together with the fact that Slota was the Chief Operating Officer, provide a reasonable inference of Slota's knowledge of the primary fraud and breach of fiduciary duty - that Beechwood was promising incompatible interests in the trust assets to two different parties.

However, while the aiding and abetting claims are sufficiently pled, the fraud claim cannot be based on this allegation, because there is no allegation as to what Slota represented to WNIC and BCLIC regarding the incompatible interests. Also, the allegations do not support the contention that Slota had an affirmative duty to disclose the truth

regarding incompatible security interests to WNIC and BCLIC, so
the fraud claim cannot be based on this omission, either.

As to the third allegation, in light of the surrounding
circumstances, a reasonable factfinder may infer from the
November 2013 email that Slota had the requisite knowledge of
the primary fraud and breach of fiduciary duty, especially given
his role as "the enforcer within the integrated Platinum-
Beechwood conspiracy for maintaining the deception that
Beechwood had no connection with Platinum." Id. ¶ 494. The
aiding and abetting claims should move forward for this reason.

However, the third allegation does not state a fraud claim.
Aside from the email he sent to Hodgdon, at a November 8, 2014
meeting, Slota is alleged to have misrepresented himself as the
Chief Operating Officer of Beechwood. Id. ¶ 577. However,
compared to Kim and Saks who were allegedly in close contact
with WNIC and BCLIC, see id. ¶ 644, the above allegation is the
only pled interaction that Slota had with WNIC and BCLIC. Also,
Kim and Saks repeatedly made misrepresentations to WNIC and
BCLIC to be proximate cause of their harm, id., but Slota's
email itself and his representation at the November 8 meeting do
not sufficiently plead the justifiable reliance and resulting
injury element of a fraud claim.

140

For these reasons, the motion to dismiss the fraud claim against Slota is granted,[26] but the motion to dismiss the aiding and abetting claims against Slota is denied.

## XIV. WNIC TPC Beechwood Parties

The WNIC TPC Beechwood Parties consist of: Feuer, the Feuer Family Trust, Taylor, the Taylor-Lau Family Trust, Beechwood Holdings, BAM I, BAM Administrative, BBL, BBIL, Beechwood Re, Narain, and Beechwood Capital. Not all of these individuals and entities moved to dismiss the claims against them. ECF No. 210.

### A. Fraudulent Inducement Claim Against Dhruv Narain

Narain notes that he did not arrive at Beechwood until January 2016, WNIC TPC ¶ 508, which was after the Reinsurance Agreements had been executed. ECF No. 210, at 14. For this reason, the fraudulent inducement claim against Narain is dismissed.

### B. Fraud Claim Against Dhruv Narain

The WNIC TPC makes the following particularized allegation against Narain:

---

[26] The fraudulent inducement claim against Slota is also dismissed because, as Slota correctly points out, there is "no action by Slota described in the [WNIC] TPC that could have caused [WNIC and BCLIC] to enter into the Reinsurance Agreements or refrain from terminating them." ECF No. 232, at 19. Simply put, "[t]here is no explanation of how the minimal alleged communications by Slota . . . induced [WNIC and BCLIC] to enter into the Reinsurance Agreements." ECF No. 313, at 7.

141

> On June 23, 2016, WNIC and BCLIC questioned the
> investment of trust assets Quest Livery and Atlantic
> Coast Life Insurance, wondering if there was any
> aspect to the transactions that were not at arm's-
> length. Narain and Kim rushed to assure WNIC and BCLIC
> to rely on their expertise that the transactions were
> prudent and asked WNIC and BCLIC to consent to the
> transactions. Of course, Narain knew first hand that
> the Quest Livery transaction was not at arm's-length,
> as it was a sweetheart deal for one of Huberfeld's
> cronies. Narain did not disclose that fact. Nor did
> Narain or Kim reveal that the Atlantic Coast Life
> Insurance deal was another bribe aimed at inducing the
> insurer directed to invest its funds with Beechwood.
> The bribe succeeded in accomplishing exactly that.

WNIC TPC ¶ 644. Narain argues that the above investment actually
occurred on February 9, 2016, and so there was "no nexus between
alleged representation . . . and [WNIC and BCLIC's] conduct."
ECF No. 210, at 15. To support this claim, Narain attaches as an
exhibit to his motion papers the email exchanges between Eric
Johnson of WNIC and BCLIC and Kim (but not Narain) on June 23,
2016, which discuss the "sale of Quest Livery from WNIC Sub,"
not investment into Quest Livery. ECF No. 314-1, at 1 (emphasis
added). Narain argues that "this document is clearly
incorporated into the [WNIC TPC] by reference because it
provides the basis for WNIC and BCLIC's fraud claim." ECF No.
312, at 9.[27]

---

[27] Generally, "when a defendant attempts to counter a plaintiff's
Complaint with its own factual allegations and exhibits, such
allegations and exhibits are inappropriate for consideration by

However, although it is possible that this document was the only basis upon which WNIC and BCLIC drafted the above allegations in WNIC TPC ¶ 644, it is also possible that WNIC and BCLIC relied on additional documents to draft this paragraph, as evidenced by the fact that (1) the emails in the exhibit do not involve Narain, while WNIC TPC ¶ 644 identifies Narain as a speaker, and (2) the emails in the exhibit mainly discuss Quest Livery, whereas WNIC TPC ¶ 644 also discusses investment in Atlantic Coast Life Insurance. The Court cannot conclude with certainty as to whether the above allegations against Narain relied exclusively on the emails in the exhibit. Therefore, the Court leaves this question, as well as the question as to the veracity of the last paragraph in WNIC TPC ¶ 644, to a later stage in the litigation.

---

the Court at the motion to dismiss stage." Reyes v. Cty. of Suffolk, 995 F. Supp. 2d 215, 220 (E.D.N.Y. 2014). According to the Second Circuit, "the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Accordingly, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." Cortec Industries, Inc. et al. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991). Therefore, the Court considers this exhibit at this motion to dismiss stage.

143

Because the elements for the fraud claim against Narain are adequately pled (1) for substantially similar reasons as the ones discussed in the context of the fraud claims against Saks and Kim and (2) based on his February 2016 email where he stated, "we all agree Platinum related stuff is egregious," the Court denies the motion to dismiss the fraud claim against Narain. See WNIC TPC ¶¶ 472, 548, 564, 643.

## C. Breach of Fiduciary Duty Claim Against Dhruv Narain

Narain argues that the WNIC TPC rests simply on "Narain's corporate position" and does not allege facts giving rise to the inference that Narain "had a fiduciary relationship with Narain personally." ECF No. 210, at 18. This is not accurate. First, according to the WNIC TPC, he was not just a regular officer but a Chief Investment Officer who "had discretionary authority" to manage WNIC and BCLIC's investment accounts, thereby owing "a fiduciary duty of the highest good faith and fair dealing." Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc., 915 N.Y.S.2d 7, 16 (1st Dep't 2010), aff'd, 962 N.E.2d 765 (N.Y. 2011). Second, when his investor had a specific question about one of the investments in June 23, 2016, he was alleged to have "rushed to assure [WNIC and BCLIC] to rely on their expertise," which a reasonable fact finder could infer as asking for the

144

investor's trust and confidence in his investment discretion and decision. WNIC TPC ¶ 644.

Therefore, for substantially similar reasons as the ones discussed in the context of the fraud claim against Narain and the breach of fiduciary duty claims against Saks and Kim above, the Court denies the motion to dismiss the breach of fiduciary duty claim against Narain.

## D. Motion to Dismiss or Compel WNIC and BCLIC to Arbitrate Their Breach of Contract Claim and Contribution and Indemnity Claims Against Beechwood Re

Beechwood Re moved to dismiss, or compel arbitration on, the breach of contract claim and the contribution and indemnity claim against it. ECF No. 209. In its motion to compel arbitration under Section 4 of the Federal Arbitration Act, Beechwood Re argues that the WNIC TPC "raise[s] disputes arising under the broad scope of the arbitration provisions contained in the Reinsurance Agreements." ECF No. 210, at 18.[28] On June 11,

_____

[28] Beechwood Re argues that the current allegations against Beechwood Re in the WNIC TPC are virtually identical to the allegations against Feuer and Taylor in a previous case in front of the Court, where the Court granted a motion to compel arbitration. See Bankers Conseco Life Ins. Co. v. Feuer, 16-cv-7646 (ER), 2018 WL 1353279, at *1 (S.D.N.Y. Mar 15, 2018). Furthermore, Beechwood Re argues that WNIC and BCLIC, on the one hand, and Beechwood Re, on the other, entered into valid agreements with broad arbitration provisions requiring the parties to arbitrate "all disputes or differences between the Parties arising under or relating to" the Reinsurance

145

2019, WNIC and BCLIC made a motion to quash such motion by Beechwood Re, arguing that Beechwood Re cannot make such motion until posting additional security pursuant to the applicable New York and Indiana security statutes. ECF No. 244. In a Memorandum Order dated July 10, 2019, this Court denied this motion by WNIC and BCLIC, on grounds that the arbitration panel should first decide whether WNIC and BCLIC were precluded from bringing their motion, given that the arbitration panel had previously awarded them some interim security which subsequently had been confirmed by this Court. ECF No. 333, at 12-13. Therefore, the Court has not and will not rule on Beechwood Re's instant motion until the arbitration panel decides whether WNIC and BCLIC are precluded from bringing their motion to enforce the applicable New York and Indiana security statutes in quashing Beechwood Re's motion to dismiss or to compel arbitration.

## Legal Analysis – SHIP TPC

### I. Common Argument – Whether SHIP's Unjust Enrichment Claims Should Be Dismissed

---

Agreements. ECF No. 211-2, Ind. Re. Ins. § 10.1(a); ECF No. 211-3, NY Re. Ins. § 10.1(a). Beechwood Re further adds that, in fact, WNIC and BCLIC are arbitrating the exact same claims and issues with Beechwood Re in an ongoing arbitration before the American Arbitration Association, Bankers Conseco Life Ins. Co. et al. v. Beechwood Re Ltd. et al., AAA Case No. 01-16-0004-2510, and so this Court lacks jurisdiction over this matter for now. ECF No. 210, at 3, 21.

Various movants argue that SHIP's unjust enrichment claims
against them are subsumed by SHIP's breach of contract claims
against the Beechwood counterparties to the IMAs in the SHIP
action and by other tort claims against them in the present
action. ECF No. 279, at 13; ECF No. 262-2, at 6-7; ECF No. 284,
at 17; ECF No. 351, at 9-10; ECF No. 357, at 13. The Court
agrees.

The core of SHIP's unjust enrichment claims is that these
defendants enriched themselves using the proceeds from unearned
performance fees and other monies earned from transactions that
favored Platinum or Beechwood over SHIP, most of which are
governed by, or pursuant to, the terms of the IMAs. Because
"[t]he existence of a valid and enforceable written contract
governing a particular subject matter ordinarily precludes
recovery in quasi contract for events arising out of the same
subject matter," these claims are precluded. Clark-Fitzpatrick,
Inc. v. Long Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).[29]

_____

[29] Alternatively, various moving cross-claim and third-party
defendants correctly point out that the SHIP TPC generally fails
to allege with Rule 9(b) specificity that they were enriched at
SHIP's expense. ECF No. 279, at 13; 18-cv-6658, ECF No. 452, at
10; ECF No.262-2, at 6-7; ECF No. 287, at 21; ECF No. 284, at
17; ECF No. 346, at 12-14; ECF No. 347, at 11-12; ECF No. 351,
at 9; ECF No. 357, at 13. For instance, Ottensoser notes that he
"was not an owner of any of the various Beechwood Entities, just
as he was not an owner of Platinum Management (NY) LLC, and the

147

A small portion of the unjust enrichment claims that appears not to be governed by any valid and enforceable written contract concerns SHIP's $50 million investment in the June 2016 Agera transaction outside of the IMAs. SHIP TPC ¶ 232. However, the unjust enrichment claims based on the June 2016 Agera transaction are not pled adequately with respect to who were unjustly enriched, except in the case of Cassidy: "Cassidy was slotted to receive, and did receive, interests in AGH Parent worth in excess of $13 million through Starfish Capital, an entity dominated and controlled by Cassidy, for no apparent consideration." Id. ¶ 308. In the SHIP action, after the second of motions to dismiss, this Court has held that the unjust enrichment claim can proceed only against Feuer and Taylor for their "significant ownership positions in" Agera, but dismissed the claim based on the $50 million investment in Agera as to all other defendants therein for failing to specify who was enriched. See In re Platinum-Beechwood Litig., 377 F. Supp. 3d 414, 427 (S.D.N.Y. 2019). For the same reason, the Court in its "bottom-line" Order dismissed the unjust enrichment claims against all moving defendants other than Cassidy in this action

---

SHIP TPC does not allege otherwise." ECF No. 277, at 1. Michael Nordlicht argues that him holding a 95.01% equity interest in Agera Holdings does not prove that he received anything of value belonging to SHIP. ECF No. 283, at 3, 17.

148

and also hereby dismisses the unjust enrichment claim against
Steinberg.

## II. Common Argument – Whether SHIP's Civil Conspiracy Claims Should Be Dismissed

The civil conspiracy claims, just like the aiding and
abetting claims, seek to hold the co-conspirator defendants
secondarily liable for the primary torts committed by Beechwood
and Platinum/Beechwood insiders. In the SHIP TPC, the civil
conspiracy claims are largely duplicative of the aiding and
abetting claims. See SHIP TPC ¶¶ 445-53. Therefore, if the
aiding and abetting claims are not dismissed for a given
defendant, the civil conspiracy claim against that defendant
should be dismissed. See Loreley Fin. (Jersey) No 3 Ltd. v.
Wells Fargo Sec., LLC, 12-cv-3723 (RJS), 2016 WL 5719749, at *8
(S.D.N.Y. Sept. 29, 2016) ("In cases in which Plaintiffs' aiding
and abetting claims overlap with their conspiracy claims, New
York courts have allowed the aiding and abetting claims to
proceed, but have dismissed as duplicative the conspiracy
claims.").

Even for those defendants against whom the aiding and
abetting claims are otherwise dismissed, the Court still
dismisses the conspiracy claims for two independent reasons.

149

First, the SHIP TPC does not adequately plead the element of existence of an agreement. As Saks notes, the SHIP TPC could have provided, for instance, "times, facts, and circumstances regarding how the conspiracy began or, to the extent Saks was brought into the conspiracy later, the agreement by which Saks allegedly jointed the conspiracy." ECF No. 272, at 11. For Michael Nordlicht, it is not clearly pled as to whether there was an "agreement" that Michael Nordlicht joined to further the goals of conspiracy. And the Court would not find a conspiracy agreement based solely on defendants' common employment. See Schwartz v. Soc'y of N.Y. Hosp., 605 N.Y.S.2d 72, 73 (1st Dep't 1993); Brownstone Inv. Grp. v. Levey, 486 F. Supp. 2d 654, 661 (E.D. Ky. 2007).

Second, for certain individuals, civil conspiracy claims are dismissed for similar reasons that aiding and abetting claims were dismissed. For example, for the same reasons the substantial assistance or knowledge element is not adequately pled against a particular defendant, the "intentional participation in furtherance of a plan" element would also often fail. Pope v. Rice, 04-cv-4171 (DLC), 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005).

For these reasons, the Court in its "bottom-line" Order dismissed the civil conspiracy claims against all moving

defendants[30] and hereby dismisses the civil conspiracy claim against Steinberg.

## III. BAM I et al.

The group "BAM I et al." includes: BAM I, BAM II, BAM Administrative, Beechwood Re, Beechwood Holdings, BBL, BBIL, the Feuer Family Trust, the Taylor-Lau Family Trust, BAM GP II, BAM GP II, MSD Administrative, N Management, Beechwood Global Distribution Trust, Feuer Family 2016 Acq Trust, Taylor-Lau Family 2016 Acq Trust, and Beechwood Capital. They move to dismiss all claims against them, and they incorporate by reference the arguments in the memoranda supporting the motions to dismiss filed by Bodner, Beechwood Trust Nos. 7-14, Monsey Equities, LLC, and BRILLC LLC Series C. ECF No. 281, 1 n.2.

### A. Aiding and Abetting Claims

In its "bottom-line" Order, the Court granted the motion to dismiss the aiding and abetting claims against BAM Administrative, Beechwood Holdings, BBL, MSD Administrative, Beechwood Capital, N Management, BAM GP I, BAM GP II, the Feuer Family Trust, and the Taylor-Lau Family Trust, and denied the motion to dismiss the aiding and abetting claims against other

---

[30] This excludes Ottensoser, who did not move to dismiss the civil conspiracy claim against him. ECF No. 277, at 1.

BAM I et al. defendants, based on the following particularized

allegations, among others.

With respect to BAM II:

> BAM II, in conjunction with BAM I, served as an
> investment advisor for the other Beechwood Entities,
> and enacted Investment Management Agreements with both
> BBIL and Beechwood Re. In their capacity as investment
> managers, BAM signed on behalf of SHIP, and was the
> signatory for most, if not all, of the deals Beechwood
> caused SHIP to enter. For deals in which SHIP was
> transacting with a Beechwood Entity directly, BAM II
> served as the investment advisor to the Beechwood
> Entity and BAM I served as investment advisor to SHIP.
> . . .
>
> BAM's[31] subsequent requests for withdrawal of
> Performance Fees totaling $7,850,000 similarly were
> based on fraudulent valuations of SHIP's investments.
> On each of those five occasions between July 2015 and
> July 2016, BAM used the falsely inflated asset
> valuations set forth in the valuation reports that BAM
> sent to SHIP - which valuations remained essentially
> unchanged over that entire period, save for minor
> fluctuations - as the basis for its Performance Fee
> calculations, intending and knowing that SHIP would
> rely on those false valuations to its detriment in
> approving the Performance Fees.

Id. ¶¶ 17, 351. BAM II was heavily involved in many of these

allegedly problematic transactions. It is hard to argue that,

based on these allegations, BAM II did not substantially assist

or did not have the requisite knowledge.

With respect to BAM Administrative (a/k/a/ BAMAS):

---

[31] BAM I and BAM II are grouped together in the SHIP TPC as
"BAM." BAM's involvement in the Montsant, PEDEVCO, and Agera
transactions is described in detail in the SHIP TPC. See
generally SHIP TPC ¶¶ 249-320.

152

BAMAS served as agent for the Beechwood Trusts and as
agent and signatory on behalf of Beechwood Re and BBIL
in connection with certain transactions described more
fully below. For example, BAMAS was a signatory to a
May 22, 2015 participation agreement in a July 14,
2010 Desert Hawk Gold Corp. note as agent for
Beechwood Re, BBIL, SHIP, BCLIC, WNIC and ULICO,
counter to DMRJ Group I, LLC — a subsidiary of PPVA. .
. .

Saks also signed the Montsant NPA on behalf of BAMAS,
which served as SHIP's agent for the transaction. . .
.

BAMAS, Michael Nordlicht, and Kevin Cassidy were
knowing and willing participants in the conspiracy to
commit fraud and breach of fiduciary duty by virtue of
their involvement in the June 2016 AGH Transactions.

SHIP TPC ¶¶ 20, 251, 449. The motion to dismiss the aiding and

abetting claims against BAM Administrative is granted, because

(1) the first and last excerpted allegations fail to plead such

claims, because the SHIP TPC does not discuss the Desert Hawk

transaction elsewhere and does not mention BAM Administrative in

the context of the June 2016 AGH Transactions at all, (2) the

second allegation is too vague and broad to infer knowledge or

establish substantial assistance, and (3) the last allegation is

conclusory.

With respect to MSD Administrative:

According to an organizational chart attached to a
March 17, 2014 email from Feuer to Samuel Adler, MSD
Administrative was an '[a]dministrative company for
mercurial tasks. For its limited services with these
"mercurial tasks," MSD Administrative was paid

> significant service fees by the Beechwood Entities.
> These service fees were used to funnel money out of
> the Beechwood Entities in order to shield assets from
> creditors.

Id. ¶ 21. As BAM I et al. correctly point out, the "mercurial

tasks" description fails to state the aiding and abetting claims

without any explanation as to what these tasks entailed and why

these "mercurial tasks" tied to the primary fraud or breach of

fiduciary duty at issue. ECF No. 285, at 10. Furthermore, the

allegations regarding service fees are too vague and conclusory

to meet the Rule 9(b) standard. Therefore, the Court dismisses

the aiding and abetting claims against MSD Administrative.

With respect to Beechwood Holdings and BBL:

> The Beechwood Holdings Subsidiaries were paid
> significant management fees and were provided
> significant assets for no consideration. . . .

> The BBL Subsidiaries were paid significant management
> fees and were provided significant assets for no
> consideration.

Id. ¶¶ 91, 93. These allegations fail to plead the aiding and

abetting claims, because they are targeted at the subsidiaries

of Beechwood Holdings and BBL and there is no support as to why

the Court should pierce the corporate veil to hold the relevant

parent entities liable for their subsidiaries' conduct.

With respect to Beechwood Capital:

> Beechwood Capital served as a "trade reference" for
> other of the Beechwood Entities in order to access

154

> vendors and banks and prime brokers. In communications
> with targets of the scheme, including SHIP, Feuer and
> Taylor characterized Beechwood Capital as a New York
> private investment fund that was developing a new
> entrant into the life and health reinsurance market,
> without revealing that Beechwood Capital in fact was a
> mere instrumentality to be employed in furtherance of
> the Platinum-Beechwood Scheme. . . .
>
> On or about March 28, 2013, Steinberg emailed
> Huberfeld a list of wire transfers, one of which was a
> transfer by Platinum of approximately $50,000.00 to
> Beechwood Capital. This transfer appears to represent
> Platinum's initial investment in, and funding of,
> Beechwood.

Id. ¶¶ 9, 66.[32] These allegations fail to state the aiding and
abetting claims. In the first excerpted paragraph, Feuer and
Taylor, not Beechwood Capital itself, made the alleged
misrepresentation. As to the second excerpted paragraph, as this
Court has previously found, the initial funding of Beechwood
does not in and of itself show any fraudulent intent or
knowledge of the primary fraud or breach of fiduciary duty. See
In re Platinum-Beechwood Litig., 18-cv-6658 (JSR), 2019 WL
1570808, at *12 (S.D.N.Y. Apr. 11, 2019).

With respect to N Management:

> N Management, controlled by Nordlicht, signed the

---

[32] In addition, Beechwood Capital is alleged to be part of the
Feuer Group, which in turn is alleged to be a recipient of the
March 20, 2013 email outlining the terms of the Platinum-
Beechwood Scheme, and by February 2013, the group was "already
in discussion with potential targets." SHIP TPC ¶¶ 64-65. These
allegations are too broad and rely on impermissible group
pleading.

> demand notes upon which Beechwood Re claimed to be
> capitalized with $100 million and BBIL claimed to be
> capitalized with $75 million. N Management also caused
> BRILLC to issue a secured promissory note to BBIL so
> that BBIL could purchase a surplus note from SHIP in
> the amount of $50 million. . . . In 2017, under the
> control of Feuer, N Management released all of the
> initial collateral upon which the $100 million demand
> notes were based, and replaced that collateral with
> certain interests in the Surplus Note, AGH Parent LLC,
> Beechwood Holdings, and BBL.

Id. ¶ 33. The two transactions were executed as part of initial
capitalization of Beechwood entities, and they do not by
themselves support anything remotely close to N Management's
knowledge of the primary fraud or breach of fiduciary duty. The
SHIP TPC does not contain any detail regarding the 2017
transaction, let alone any support as to why N Management's role
in this transaction satisfies the substantial assistance or
knowledge element. For these reasons, the aiding and abetting
claims against N Management are dismissed.

With respect to the Feuer Family Trust and the Taylor-Lau
Family Trust:

> The Feuer Family Trust was created to hold Mark
> Feuer's ownership interest in Beechwood Holdings and
> BBL. . . .

> The Taylor-Lau Family Trust was created to hold Scott
> Taylor's ownership interest in Beechwood.

156

Id. ¶¶ 27, 28. These allegations regarding ownership do not show any wrongdoing or knowledge of the primary fraud or breach of fiduciary duty.

With respect to the Beechwood Global Distribution Trust, the Feuer Family 2016 ACQ Trust, and the Taylor-Lau Family 2016 ACQ Trust (collectively, the "2016 Acquisition Trusts"):

> [They] were trusts created and used for the purpose of furthering the fraudulent schemes of Feuer, Taylor, Levy, Nordlicht, Huberfeld, and Bodner. On August 5, 2016, each of the 2016 Acquisition Trusts was used to execute the transfer of equity in Beechwood Holdings and BBL from the Nordlicht Group to Feuer and Taylor in exchange for debt in the form of secured promissory notes amounting to approximately $100 million. . . . [As part of the August 5, 2016 Transactions,] the Beechwood Trusts purported to transfer their nearly 70% interest in Beechwood Holdings to the Taylor-Lau Family 2016 ACQ Trust and the Feuer Family 2016 ACQ Trust in exchange for a promissory note in the principal amount of $36,550,000. The BRILLC Series Entities, with the BRILLC Series Members acting on their behalf, also purported to transfer their approximately 70% aggregate interest in BBL to the Taylor-Lau Family 2016 ACQ Trust and the Feuer Family 2016 ACQ Trust in exchange for a promissory note in the principal amount of $51,439,756.10.

Id. ¶¶ 34, 433.[33] These allegations plead the substantial assistance and knowledge elements of the aiding and abetting claims. These three trusts were instrumental in carrying out the August 5, 2016 Transactions, which further concealed Nordlicht,

---

[33] The SHIP TPC contains additional specific allegations against each of the 2016 Acquisition Trusts regarding their role in the August 5, 2016 Transactions. See, e.g., SHIP TPC ¶¶ 389, 431-34.

Huberfeld, and Bodner's economic interest in Beechwood Holdings and BBL by changing the companies' ownership structure, while maintaining the intended economic beneficiaries. See id. Furthermore, the detailed descriptions of their involvement give "rise to an inference of [their] knowledge" of the primary fraud by misrepresentation and breach of fiduciary duty by harming SHIP. Krys v. Pigott, 749 F.3d 117, 129 (2d Cir. 2014).

Lastly, there are no particularized allegation satisfying the Rule 9(b) standard against BAM GP I and BAM GP II, and so the Court grants the motion to dismiss the claims against BAM GP I and BAM GP II.

## B. Claim for Declaratory Judgment for Contractual Indemnification

BAM I et al. moved to dismiss the claim for declaratory judgment for contractual indemnification, but they did not provide any reason. Therefore, the motion is denied.

## IV. Beechwood Trust Nos. 7-14, Monsey Equities, LLC, Beechwood Re Investments, LLC Series C, Lawrence Partners LLC, Whitestar LLC, Whitestar LLC II, and Whitestar LLC III

Other than the allegations regarding ownership structures of these entities, the SHIP TPC makes more or less the same allegations against these entities as it does for the Beechwood Global Distribution Trust, the Feuer Family 2016 ACQ Trust, and the Taylor-Lau Family 2016 ACQ Trust discussed above. See id. ¶

433. Here, the Court finds that the grouping of entities – by relying on terms such as "Beechwood Trusts," "BRILLC Series Entities," and "BRILLC Series Members" - is not fatal to satisfying the pleading standards in this particular circumstance, because the SHIP TPC alerts these defendants that identical claims are asserted against each, which are combined for efficiency's sake; it would amount to an unreasonable burden for SHIP to, at the pre-discovery stage, distinguish among these entities, for instance, as to what percentage of the 70% aggregate interest in BBL each of the BRILLC Series Members transferred. For substantially the same reasons as discussed in the context of the Beechwood Global Distribution Trust, the Feuer Family 2016 ACQ Trust, and the Taylor-Lau Family 2016 ACQ Trust, the motion to dismiss the aiding and abetting claims against Beechwood Trust Nos. 7-14, Monsey Equities, LLC, Beechwood Re Investments, LLC Series C, Lawrence Partners LLC, Whitestar LLC, Whitestar LLC II, and Whitestar LLC III is therefore denied.[34]

---

[34] Some of these moving defendants contend that nothing about the August 5, 2016 Transactions is "alleged to have caused any damage to SHIP," ECF No. 337, at 3, but the Court does not find this argument persuasive. The SHIP TPC states that the continued concealment made SHIP "not to terminate the IMAs sooner or to take other actions that might mitigate the damages that SHIP suffered while the IMAs remained in effect." SHIP TPC ¶¶ 437-38, 443-44.

## V. David Bodner

As a threshold matter, Bodner argues that the SHIP TPC fails to adequately allege facts establishing primary fraud as part of the claim for aiding and abetting fraud. ECF No. 279, at 5-8. Contrary to Bodner's view, the SHIP TPC contains allegations that Taylor, Feuer, Levy, and others committed fraud, for instance, by making affirmative misrepresentation to SHIP or that they breached their fiduciary duty to SHIP. See, e.g., id. ¶¶ 67, 71, 128, 132, 142, 268, 411, 420, 446. Furthermore, this Court has held previously that SHIP has adequately pled actionable fraud and fiduciary duty claims against those individuals in the SHIP action based on similar allegations. See In re Platinum-Beechwood Litig., 377 F. Supp. 3d 414, 419-20 (S.D.N.Y. 2019); In re Platinum-Beechwood Litig., 345 F. Supp. 3d 515, 523-27 (S.D.N.Y. 2019).

As discussed above in the context of the FAC, the July 29, 2015 email sufficiently establishes Bodner's knowledge. See SHIP TPC ¶ 114. With respect to the substantial assistance element, various statements and emails sent on behalf of Platinum – such as alleged overvaluation of the Platinum portfolios, see id. ¶¶ 321-66 – can be attributable to Bodner given his insider status as one of the founders of Platinum and as an alleged mastermind of the alleged scheme. Further supporting this, he did have

160

input into Platinum's and PPVA's investment valuations or

assessments of associated risks. See id. ¶¶ 327–28. For all of

these reasons, the motion to dismiss the aiding and abetting

claims against Bodner is denied.

## VI. Elliott Feit

The SHIP TPC makes the following particularized allegations

against Feit:

> Feit was responsible for calculating any performance
> fees to which any of the Beechwood Advisors were
> allegedly entitled, for submitting the performance fee
> requests to SHIP, and for responding to requests from
> SHIP for information about those requests. As
> discussed below, all of the performance fee requests
> submitted by Feit or others were false, in that each
> request was based on inflated valuations of the
> investment assets within the SHIP IMA Accounts that
> the Beechwood Advisors managed. . . . Because of
> Feit's position as an officer within Beechwood and his
> day-to-day involvement in the operations and finances
> at the Beechwood Advisors, he understood that the
> investment valuations reported to SHIP and others were
> materially inflated. Feit was on the Finance Committee
> and made monthly presentations to the board on the
> financial performance of the Beechwood, Advisors
> including the assets under the IMAs. Feit also worked
> with the valuation firms to get confirmation of
> Beechwood's inflated valuations. [SHIP TPC ¶ 35]
>
> For example, on April 2, 2015, Elliot Feit, Finance
> Director of Beechwood, acting for and at the direction
> of Beechwood and through the mails and wires of
> interstate commerce, requested authorization from
> Lorentz to withdraw $3,500,000 as a Performance Fee
> from the BAM IMA account. In support of this request,
> Feit represented in writing to Lorentz that the assets
> contained in the BAM IMA account at that time
> possessed a market value of $115,143,472.39 'and a
> principal plus interest owed to SHIP of

161

$110,780,801.37.' In light of the asserted 'excess' of $4,362,671.02, Feit requested approval of a withdrawal of $3,500,00 in Performance Fees, and submitted a 'Withdrawal Notice' for that amount signed by Saks for countersignature by Lorentz. Feit further supported this request by attaching the Wilmington Trust statements for this account for the period ending on March 31, 2015, to illustrate the purported investment activity and interest accrued on the account. [Id. ¶ 347]

This plan to transfer bad investments from CNO's account to SHIP's is revealed in a series of emails between several of the Co-Conspirators on July 23, 2015. Stewart Kim forwards Elliot Feit a conversation with Eric Johnson and Timothy Bischof of CNO, requesting 'a table specifying the loans/amounts potentially to be transferred into the [WNIC] Trust' and asks him to provide the materials. Feit forwards the exchange to Moti Edelstein and asks for a 'listing of the bclic privates' to which Edelstein asks if he 'want[s] the list of loans transferred from BCLIC Primary to SHIP-BAM showing their current values[.]' Feit agrees that is how he understood the request. Edelstein proceeds to send Feit a list that Feit in turn forwards to Kim. The list includes loans to: . . . . Each and every one of these investments is related to Platinum. Each and every one of these loans was purchased at or around par, despite Beechwood's knowledge that they were not worth their purported value. [Id. ¶ 377]

See also id. ¶¶ 354, 360. These allegations – contrary to Feit's characterization as "nothing more than carry out his ministerial and administrative duties as a finance director at Beechwood," ECF No. 346, at 1, 5, 9 – sufficiently plead substantial assistance. In addition, these allegations, together with his alleged role as a member of the Finance Committee of Platinum

162

and the Chief Financial Officer of BAM I,[35] lead to a reasonable

inference of his knowledge of the primary fraud and breach of

fiduciary duty. See also JP Morgan Chase Bank v. Winnick, 406 F.

Supp. 2d 247, 252 (S.D.N.Y. 2005) (holding that defendant's

knowledge can be pled generally under Rule 9(b), "provided a

factual basis is pled which gives rise to a strong inference of

fraudulent intent").

## VII. Bernard Fuchs

The SHIP TPC makes the following particularized allegations

regarding Fuchs:

> Fuchs did not have an official title, but nevertheless
> had day-to-day involvement in the management and
> operations of Platinum Management and PPVA. . . . He
> also was aware of and participated in the planning,
> marketing, and execution of various aspects of those
> transactions, such as assisting in the planning of the
> Agera Transactions. . . . During late 2015 and the
> first quarter of 2016, Fuchs engaged in numerous
> discussions with investors seeking information
> concerning the status of PPVA, their investments, and
> requests for redemption, often exchanging emails with
> Nordlicht, Bodner, Huberfeld, Levy, and Landesman
> concerning the best response to those investor
> inquiries or forwarding on such inquiries. . . . Fuchs

---

[35] Feit refutes the factual allegations that he had a dual role
in Platinum and Beechwood and that he was "BAM I's CFO,"
submitting an affidavit attesting that he was employed by MSD
Administrative and never employed by any Platinum-related
entity. ECF No. 346, at 4 (referencing Feit Affidavit, ECF No.
345, Ex. A ¶¶ 3-8). The Court does not consider this affidavit
at this motion to dismiss stage, because the affidavit is
submitted to dispute a factual allegation made in the SHIP TPC.
See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d
150, 156 (2d Cir. 2006).

163

> was also heavily involved in the China Horizon investments, and served on the China Horizon board of directors. [SHIP TPC ¶ 46]

> The Platinum and Beechwood Insiders caused SHIP to invest in two promissory notes with China Horizon Investment Group . . . . The related-party nature of the transactions was never revealed to SHIP. . . . In November 2015, the Platinum and Beechwood Insiders caused Beechwood to buy a promissory note from Kennedy Sobli Consultants, a company owned by Bernard Fuchs—a partner at Platinum Partners—and his family. [Id. ¶ 240(e)-(f)]

The above allegations adequately plead substantial assistance. However, the knowledge element is not sufficiently pled. In contrast to Bodner, Huberfeld, or Nordlicht, Fuchs does not occupy as central of a role as an insider of the Beechwood-Platinum scheme. The China Horizon deal and the Kennedy Sobli Consultants deal are alleged to be non-arm's length deals, but these deals, in and of themselves, do not necessarily add to the inference that Fuchs had the knowledge that relevant Beechwood entities and individuals were committing fraud against or breaching their fiduciary duty to SHIP. Lastly, the SHIP TPC describes the Agera transaction in detail but never mentions Fuchs other than that he "assist[ed] in the planning of the Agera Transaction," which lacks particularity. Id. ¶ 46. For

these reasons, the motion to dismiss the aiding and abetting claims against Fuchs is granted.[36]

## VIII.    Murray Huberfeld

Huberfeld incorporates by reference Bodner's and other moving defendants' applicable arguments. 18-cv-6658, ECF No. 452, at 1. Contrary to Huberfeld's claim that the only affirmative act that SHIP connects to Huberfeld in the SHIP TPC is the March 20, 2013 email discussed below, id. at 8, the SHIP TPC makes the following particularized allegations against Huberfeld: (1) he participated in initial funding of Beechwood Re, SHIP TPC ¶¶ 23, 66, 72; (2) he maintained an office, phone line, and computer at Beechwood's offices and was provided a full-time secretary, id. ¶¶ 23, 111-12; (3) on March 9, 2015, Huberfeld "gave the go ahead to David Steinberg - using a Platinum email address - to sell $10 million worth of PEDEVCO from CNO's WNIC 2013 LTC Primary trust to a third-party bank," id. ¶ 113; and (4) he sent the March 20, 2013 email setting

---

[36] In addition to the knowledge and substantial assistance elements, Fuchs also focuses on the proximate causation element. ECF No. 262-2, at 5. However, the concept of proximate cause is already "embedded into the substantial assistance element," and it is established "where a plaintiff's injury was a direct or reasonably foreseeable result of the defendant's conduct." Silvercreek Management, Inc. v. Citigroup, Inc. et al., 346 F. Supp. 3d 473, 488 (S.D.N.Y. 2018).

165

forth a detailed "outline of terms" between Platinum and Beechwood, id. ¶ 64.

Without even relying on the group pleading doctrine — which is permitted here given Huberfeld's insider status, see id. ¶¶ 327-28 — these allegations sufficiently plead the substantial assistance element of the aiding and abetting claims. For substantially similar reasons as discussed above in the case of Feit, the above alleged facts - along with Huberfeld's insider status and the July 29, 2015 email discussed above - "give rise to an inference of knowledge" of the underlying fraud and breach of fiduciary duty. Krys v. Pigott, 749 F.3d 117, 129 (2d Cir. 2014). In fact, whether SHIP sufficiently pleads the knowledge element is not disputed by Huberfeld. But in any case, the knowledge element is adequately pled for substantially the same reasons that it is adequately pled for the aiding and abetting claims against Bodner, as discussed above). See ECF No. 322, at 35; 18-cv-6658, ECF No. 452.

## IX. Hokyong (Stewart) Kim

The SHIP TPC makes the following particularized allegations against Kim:

> Kim was a senior manager of Platinum Management. Starting in November 2013, Kim misrepresented himself and other Platinum Management employees to WNIC and BCLIC as the Chief Risk Officer for Beechwood Re and BAM. . . . At the time, Beechwood Re and BAM did not

166

> have a Chief Risk Officer, despite marketing materials
> claiming otherwise. [SHIP TPC ¶ 44]
>
> This plan to transfer bad investments from CNO's
> account to SHIP's is revealed in a series of emails
> between several of the Co-Conspirators on July 23,
> 2015. Stewart Kim forwards Elliot Feit a conversation
> with Eric Johnson and Timothy Bischof of CNO,
> requesting "a table specifying the loans/amounts
> potentially to be transferred into the [WNIC] Trust"
> and asks him to provide the materials. Feit forwards
> the exchange to Moti Edelstein and asks for a "listing
> of the bclic privates" to which Edelstein asks if he
> "want[s] the list of loans transferred from BCLIC
> Primary to SHIP-BAM showing their current values[.]"
> Feit agrees that is how he understood the request.
> Edelstein proceeds to send Feit a list that Feit in
> turn forwards to Kim. The list includes loans to
> [various entities . . . where each] every one of these
> investments is related to Platinum. Each and every one
> of these loans was purchased at or around par, despite
> Beechwood's knowledge that they were not worth their
> purported value. [Id. ¶ 377]

These allegations sufficiently plead the substantial assistance element. Furthermore, given Kim's role as the Chief Risk Officer of Beechwood Re and BAM I, the above conduct — especially his affirmative misrepresentation as the Chief Risk Officer of Beechwood Re and BAM I and his deep involvement the transactions transferring bad investments from WNIC and BCLIC's account to SHIP's — give rise to an inference of Kim's knowledge of the underlying fraud by misrepresentation and breach of fiduciary duty by harming SHIP.

**X.  Michael Nordlicht and Kevin Cassidy**

167

The SHIP TPC makes the following particularized allegations

against Michael Nordlicht:

> Michael Nordlicht participated in meetings with SHIP to
> discuss the Agera Transactions. He participated directly
> in the closing of those transactions to the detriment of
> SHIP. [Id. ¶ 48]
>
> On June 17, 2014, Michael Nordlicht acquired 100% of the
> equity in Agera Energy. At the time of the sale, Michael
> Nordlicht was a recent law school graduate who previously
> had worked as an analyst at Platinum Management for his
> uncle, Mark Nordlicht. It is unclear what, if anything,
> he paid for his interest in Agera Energy. [Id. ¶ 272]
>
> The next day, on June 18, 2014, Michael Nordlicht sold a
> 4.99% interest in Agera Energy to Beechwood Re. It is
> unclear what, if anything, Beechwood Re paid for that
> interest. [Id. ¶ 273]
>
> Steinberg and Ottensoser – working with others, including
> Michael Nordlicht, Narain, and Kevin Cassidy – were
> responsible for preparation of the documents by which
> various portions of the [June 2016 AGH Transactions] were
> consummated. [Id. ¶ 304]

Although the above allegations may plead the substantial

assistance element, for similar reasons as the ones discussed

above for dismissing the aiding and abetting claims against

Fuchs, the knowledge element here is not adequately pled. In

contrast to Bodner, Huberfeld, or Nordlicht, Michael Nordlicht

does not occupy as central of a role as an insider of the

Beechwood-Platinum scheme. Although the Agera transactions are

alleged to be non-arm's length deals, these deals in and of

themselves do not add to the inference that Michael Nordlicht

had the knowledge of the primary fraud or breach of fiduciary duty.

In addition to the last excerpted allegation above, Cassidy faces the following particularized allegations:

> When Cassidy was released from prison in 2014, Nordlicht, Bodner, and Huberfeld installed him as the managing director of Agera Energy. Cassidy was intimately involved in all aspects of the Agera Transactions and participated in meetings with SHIP related to the transactions. . . . In 2016, when the Beechwood Advisors were soliciting SHIP to participate as an unwitting victim in the June 2016 Agera Transactions where SHIP's fresh cash of $50 million or more was needed to advance the scheme, Cassidy met with Wegner and Lorentz of SHIP when they visited New York before the deal, and Cassidy joined in the effort to solicit SHIP on the false premise that the proposed deal was a legitimate transaction when in fact SHIP was duped, as he fully understood. [Id. ¶ 49]
>
> Cassidy and others from Agera Energy provided information to SHIP regarding corporation operations and assisted Beechwood and Platinum in soliciting SHIP's investment outside the IMAs. [Id. ¶ 288]

These allegations sufficiently plead facts establishing substantial assistance. Furthermore, his role as a director of Agera and the above alleged conduct – especially his soliciting of SHIP's funds, which are more closely tied to the primary fraud and breach of fiduciary duty against SHIP compared to Michael Nordlicht's alleged roles – give rise to an inference of Cassidy's knowledge of the underlying fraud and breach of fiduciary duty.

## XI. David Ottensoser

169

Ottensoser moved to dismiss only the unjust enrichment

claim against him, which was dismissed as discussed above. ECF

No. 277, at 1.

## XII. PB Investment Holdings Ltd.[37]

The SHIP TPC makes the following particularized allegation

regarding BBIHL, PBIHL's predecessor-in-interest:[38]

> Specifically, on April 1, 2016, pursuant to an
> Assignment of Note and Liens (the "First Repo
> Agreement"), PGS assigned the Convertible Note to BBIL
> ULICO 2014 . . . , [BBIHL] . . . , and BBIL (together,
> the "First Repo Assignees") in exchange for $15
> million in cash, of which $2.5 million (representing
> 16.7%) was funded from SHIP's BBIL IMA funds. [SHIP
> TPC ¶ 281]

In its "bottom-line" Order, the Court granted the motion to

dismiss the aiding and abetting claims against PBIHL, because

---

[37] PBIHL incorporates by reference the personal jurisdiction
argument it made in its memoranda in support of its motions to
dismiss the claims against PBIHL in the FAC and the WNIC TPC.
ECF No. 347, at 13. For the reasons discussed above in the
context of the FAC and the WNIC TPC, the Court has specific
personal jurisdiction over PBIHL in the context of the SHIP TPC
as well. In addition, PBIHL's predecessor-in-interest was a
party to the First Repo Agreement, dated April 1, 2016, where
SHIP claims that this was negotiated and consummated in New
York. ECF No. 361, at 28.

[38] As PBIHL correctly points out, PBIHL was not included in the
SHIP TPC's definition of "Platinum Entities," "Beechwood
Entities," or "Co-Conspirators," so, strictly speaking, none of
Counts 1, 2, and 7 were ever alleged against PBIHL. ECF No. 361,
at 1 (referencing SHIP TPC ¶ 1 nn. 1-3). The Court's analysis
here assumes this error did not exist, although this error alone
is fatal to SHIP's claims against PBIHL.

this allegation alone fails to plead knowledge of the primary

fraud and breach of fiduciary duty. It would be speculative to

infer BBIHL's knowledge of the primary fraud or breach of

fiduciary duty from this minor role alone as part of a

complicated series of Agera transactions. This minor role is in

stark contrast to, for instance, BAM I's extensive involvement

in the Montsant, PEDEVCO, and Agera transactions. Indeed, SHIP's

aiding and abetting claims against PBIHL "appear to be an

attempt to create liability by association." ECF No. 347, at 9.

## XIII. Daniel Saks

The SHIP TPC makes the following particularized

allegations, among others, against Saks: (1) Saks received and

was involved in commenting on the third-party valuation reports

sent to BAM I, which included inflated valuations of the

Beechwood transactions with PPVA, SHIP TPC ¶¶ 37, 339; (2) Saks

signed a Note Purchase Agreement on SHIP's behalf to acquire a

note from Montsant Partners, LLC, a wholly owned portfolio

company of Platinum Partners Value Arbitrage Fund, LP, id. ¶¶

249-51;[39] (3) despite the prices of oil and natural gas rapidly

---

[39] Saks disputes the allegation that the loan made to Montsant
using SHIP's money, pursuant to the Note Purchase Agreement that
Saks signed, was effectively undercollateralized, because it was
guaranteed by Nordlicht and Kalter. ECF No. 272, at 3-4.
However, at this motion to dismiss stage, the Court takes the

171

declining and PEDEVCO's financial condition worsening, in April 2015, BAM I purchased, on SHIP's behalf, the PEDEVCO notes, which were then assigned to SHIP pursuant to a document Saks executed on SHIP's behalf, id. ¶ 261;[40] (4) Saks "was involved in negotiating amendments to the Golden Gate Oil transaction documents," id. ¶ 37; and (5) Saks signed a withdrawal notice document in the amount of $3,500,000 in performance fee from SHIP's account, id. ¶ 347. These allegations sufficiently plead substantial assistance. Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) ("[S]ubstantial assistance can take many forms, such as executing transactions or helping a firm to present an enhanced financial picture to others."). For similar reasons as discussed above in the context of Feit, Huberfeld, and Kim, Saks' role as the Chief Investment

---

allegations that this loan was effectively undercollateralized – more so given that the post-closing collateralization requirement was not subsequently satisfied – at their face value. SHIP TPC ¶¶ 253-55. Furthermore, these guarantee obligations had not been performed by Nordlicht and Kalter as of the date of filing of the SHIP TPC. Id. ¶ 256.

[40] Saks argues that he resigned from BAM I on December 31, 2015, and so he cannot be held liable for the 2016 transactions that restructured the PEDEVCO debt to subordinate SHIP's priority for repayment under Beechwood's rights for repayment. ECF No. 272, at 2, 4 (referencing SHIP TPC ¶¶ 258-67). But he allegedly executed an Assignment Agreement dated April 16, 2015 through which SHIP acquired a secured note issued by PEDEVCO in April 2015, which was allegedly problematic. SHIP TPC ¶ 261.

172

Officer of Beechwood Re and BAM I and his intimate and extensive

involvement in the allegedly problematic transactions described

here[41] give rise to a strong inference of Saks' knowledge of the

primary fraud and breach of fiduciary duty.

## XIV. Will Slota

The SHIP TPC makes the following allegations against Slota:

[Slota] was a senior manager of Platinum Management who, starting in November 2013, misrepresented himself to WNIC and BCLIC as the Chief Operating Officer of Beechwood Re and BAM. . . . Slota and the Co-Conspirators lived this lie for several years, starting in November 2013, when Slota's paychecks were coming from Platinum Management. . . . Slota served as the enforcer within the integrated Platinum-Beechwood conspiracy for maintaining the deception that the Beechwood Entities had no connection with Platinum, ensuring that the Co-Conspirators who were misrepresenting themselves as certain of the Beechwood Entities' officers and managers did NOT use their "@platinumlp" domain (or otherwise convey evidence of their Platinum affiliation) when communicating with those outside of the conspiracy. . . . Slota was also the point person responsible for finding and hiring a valuation firm that would make the Beechwood Advisors' investments in Platinum Funds and Platinum-related entities appear legitimate to the outside world. [SHIP TPC ¶ 45]

[I]n a series of emails from March 11, 2014 among Nordlicht, Slota, Kim, and Levy, after congratulating Slota for making eight fraudulent agreements with a prime broker in order to open the CNO trust accounts, Nordlicht made this plan clear: "let's all please focus on our respective jobs. Stew [Kim] needs to look at risk, u

---

[41] In this respect, Saks is incorrect in arguing that SHIP's aiding and abetting claim against him depends solely on Saks' position as Chief Investment Officer to supervise SHIP's investments in 2015 and his prior employment at Platinum which allegedly allowed him to be aware of "all aspects of the Platinum-Beechwood scheme." ECF No. 272, at 7 (emphasis).

> [Slota] need to do blocking and tackling on [prime
> brokerage] account openings. [Id. ¶ 116]

> Beechwood always intended to defer to Platinum's
> valuations. For example, in a series of emails from March
> 19, 2014, Will Slota, Naftali Manela, Elliot Feit, and
> David Levy discuss putting together BAM's valuation
> policy. [Id. ¶ 335]

For substantially similar reasons as discussed above in the
context of Feit, Huberfeld, Kim, and Saks, these allegations
state aiding and abetting claims against Slota. In particular,
his role as the Chief Operating Officer of Beechwood Re and BAM
I and the above allegations – especially that Slota was in
charge of opening allegedly fraudulent prime brokerage account –
give rise to an inference of Slota's knowledge of the primary
fraud and breach of fiduciary duty.

## XV. David Steinberg[42]

---

[42] Steinberg argues that all the claims against him are barred by
Rule 14 of the Federal Rules of Civil Procedure, allegedly
because "Rule 14(a) does not allow a third-party complaint to be
founded on a defendant's independent cause of action against a
third-party defendant, even though arising out of the same
occurrence underlying plaintiff's claim, because a third-party
complaint must be founded on a third party's actual or potential
liability to the defendant of all or part of the plaintiff's
claim against the defendant." ECF No. 388, at 9. As SHIP
correctly points out, the SHIP TPC did not rely on Rule 14 to
join Steinberg; instead, SHIP made valid crossclaims against
other co-defendants pursuant to Rule 13(g) and then joined
Steinberg to those crossclaims pursuant to Rules 18 and 20. See
Fed. R. Civ. P. 18(a) ("A party asserting a claim, counterclaim,
crossclaim, or third-party claim may join, as independent or
alternative claims, as many claims as it has against an opposing

The SHIP TPC makes the following allegations against

Steinberg:

> [Steinberg was] a portfolio manager, investment
> advisor, and co-chief risk advisor for PPVA, and was
> at all relevant times a member of the valuation
> committee that had overall responsibility for valuing
> PPVA's assets. Steinberg was integrally involved in
> nearly all aspects of the Platinum-Beechwood Scheme.
> He began working as a co-investment advisor to BAM in
> 2014, for which he was paid significant performance
> fees. Steinberg participated in the Platinum
> Management valuation committee meetings and help set
> the inflated PPVA valuations, which caused the
> inflated valuations represented by the Beechwood
> Advisors. [SHIP TPC § 47]

> Huberfeld also maintained active control over
> Beechwood investments. On March 9, 2015, he gave the
> "[g]o ahead" to David Steinberg — using a Platinum
> email address — to sell $10 million worth of Pedevco
> from CNO's WNIC 2013 LTC Primary trust to a third-
> party bank. [Id. § 113]

> [In the context of the Montsant transaction,]
> Nordlicht and David Steinberg, both Platinum
> executives, executed the Note Purchase Agreement on
> behalf of Montsant. [Id. § 240b; see also § 251]

> David Steinberg, a senior vice president and portfolio
> manager for Platinum, joined the board of PEDEVCO by
> July 2015. [Id. § 257]

> Further, on May 23, 2014, Ari Hirt, a Platinum
> Management portfolio manager for Golden Gate told
> Nordlicht, Levy, Saks, and Steinberg that a potential

---

party."); Fed. R. Civ. P. 20(a)(2) ("Persons . . . may be joined
in one action as defendants if: (A) any right to relief is
asserted against them jointly, severally, or in the alternative
with respect to or arising out of the same transaction,
occurrence, or series of transactions or occurrences; and (B)
any question of law or fact common to all defendants will arise
in the action.").

> third party lender had brought up Black Elk's SEC
> filing, writing "the issue is that it publicly
> discloses the value of the option and therefore pegs
> [Golden Gate's] value at $60M. This is ultimately a
> marketing issue that could be dealt with but something
> we should all be aware of. [Id. § 333]

For substantially similar reasons as discussed above for other moving defendants, these allegations adequately plead substantial assistance, especially his signing of relevant transactional documents. Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) ("[S]ubstantial assistance can take many forms, such as executing transactions or helping a firm to present an enhanced financial picture to others."). Indeed, the above allegations as a whole – especially combined with the allegation that he was a portfolio manager, investment advisor, and co-chief risk advisor for PPVA, a board member of PEDEVCO, and a member of the valuation committee – "give rise to an inference of [Steinberg's] knowledge" of the overvaluation of Golden Gate Oil and the non-arm's length nature of the PEDEVCO and Agera transactions, as well as the primary breach of fiduciary duty associated with those alleged frauds. Krys v. Pigott, 749 F.3d 117, 129 (2d Cir. 2014).

## Conclusion

In sum, this Opinion and Order set forth the reasons for the Court's "bottom-line" Order issued on August 18, 2019, which

176

is hereby reaffirmed. In addition, it grants Steinberg's motion to dismiss the unjust enrichment claim and the civil conspiracy claim in the SHIP TPC against him, while denying Steinberg's motion in all other respects.

The Clerk is directed to close the entry with the docket number 387 on the Cyganowski docket, 18-cv-12018.

SO ORDERED.

Dated:    New York, NY
          October 7, 2019

JED S. RAKOFF, U.S.D.J.