UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>PLATINUM-BEECHWOOD LITIGATION | Civil Action No. 18-cv-6658 (JSR) |
| MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation) and PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation),<br><br>Plaintiffs,<br><br>- against -<br><br>PLATINUM MANAGEMENT (NY) LLC, *et al.,*<br><br>Defendants. | Civil Action No. 18-cv-10936 (JSR) |

**JOLS' OMNIBUS MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

HOLLAND & KNIGHT LLP
Warren E. Gluck, Esq.
John L. Brownlee, Esq. (*pro hac vice*)
Richard A. Bixter Jr., Esq. (*pro hac vice*)
Megan Jeschke, Esq. (*pro hac vice forthcoming*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Facsimile:  212-385-9010

*Attorneys for Plaintiffs Martin Trott and Christopher
Smith, as Joint Official Liquidators and Foreign
Representatives of Platinum Partners Value Arbitrage
Fund L.P. (in Official Liquidation), and for Platinum
Partners Value Arbitrage Fund L.P. (in Official
Liquidation)*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................8

STANDARD OF REVIEW ......................................................................................................8

ARGUMENT ..........................................................................................................................9

I.      MATERIAL CONTESTED ISSUES OF FACT FORECLOSE SUMMARY
        JUDGMENT AGAINST THE JOLS' CLAIMS AGAINST THE MOVING
        DEFENDANTS ..............................................................................................................9

        A.      Applicable Standards..........................................................................................9

                1.      Fiduciary Status ......................................................................................9

                2.      Breach of Fiduciary Duty ......................................................................11

                3.      Fraud......................................................................................................11

                4.      Constructive Fraud ................................................................................12

                5.      Aiding and Abetting Liability ................................................................12

                6.      Unjust Enrichment................................................................................12

        B.      David Bodner ....................................................................................................13

                1.      There is a Genuine Dispute as to Whether Bodner Owed a Fiduciary
                        Duty to PPVA Because There is Material Evidence That Bodner
                        Exercised Control over PPVA in All Material Respects..............................13

                2.      There is a Genuine Dispute as to Whether Bodner Breached His
                        Fiduciary Duty to PPVA and Committed Fraud ...........................................16

        C.      BERNARD FUCHS ............................................................................................23

                1.      There is a Genuine Dispute as to Whether Fuchs Owed a Fiduciary Duty
                        to PPVA Because There is Credible Evidence That Fuchs Exercised
                        Control over PPVA In Material Respects. ...................................................23

                2.      There is a Genuine Dispute as to Whether Fuchs Breached His Fiduciary
                        Duty to PPVA and Committed Fraud ..........................................................24

        D.      HUBERFELD FAMILY FOUNDATION.................................................................26

        E.      SETH GERSZBERG............................................................................................29

F. EZRA BEREN ..................................................................................... 29

G. THE BEECHWOOD MOVANTS ........................................................... 34

  1. Summary Judgment Should Not Be Granted Against The Alter Ego Claims Asserted Against The Beechwood Entities ......................... 34

  2. Summary Judgment Should Not Be Granted on *In Pari Delicto* .................. 39

    a. The Corporate Insider Exception Applies To Permit Claims Against the Beechwood Movants. ...................................... 40

    b. The Adverse Interest Exception Applies to the Misconduct of Feuer, Taylor and Narain ................................................ 42

    c. Sole Actor Rule ................................................................ 49

    d. Innocent Insider Rule ....................................................... 50

  3. Summary Judgment On The Merits Of The Aiding And Abetting Claims Is Inappropriate ............................................................... 52

  4. Summary Judgment Should Not Be Granted Against The Declaratory Judgment Claims ...................................................... 58

II. LEGAL AND FACTUAL QUESTIONS REGARDING THE VALIDITY AND ENFORCEABILITY OF THE MARCH 2016 RELEASE PRECLUDE SUMMARY JUDGMENT. ............................................................................................. 62

A. The March 2016 Release Does Not Apply To Later-Accruing Claims ................... 63

B. The March 2016 Release Does Not Bar The JOL's Claims ..................... 63

C. There are disputed issues of material fact concerning whether the March 2016 Release is adequately supported by consideration. ................................. 69

D. Disputed issues of fact preclude a Finding that the Release Was Supported by Mutual Assent. ........................................................................ 71

E. The March 2016 Release is Void Under Applicable Cayman Liquidation Law ........ 72

CONCLUSION ..................................................................................................... 74

## T|ABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp.*,
  420 B.R. 178 (Bankr. S.D.N.Y. 2009)...........................................................................49, 50

*In re 455 CPW Assoc.*,
  No. 99-5068, 2000 WL 1340569 (2d Cir. Sept. 14, 2000) ......................................................41

*Allen v. Chanel, Inc.*,
  2015 WL 3938096 (S.D.N.Y. June 26, 2015) ........................................................................71

*Allied Chem. & Dye Corp. v. Steel & Tube Co.*,
  120 A. 486 (Del. Ch. 1923)....................................................................................................10

*Alpert v. 28 Williams Street Corp.*,
  473 N.E.2d at 27 ...............................................................................................................56, 58

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................................8

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
  915 N.Y.S.2d 7 (1st Dep't 2010), aff'd, 962 N.E.2d 765 (N.Y. 2011)..............................11, 66

*Aviles v. S&P Global, Inc.*,
  380 F. Supp. 3d 221 (S.D.N.Y. 2019)...............................................................................64, 65

*BAII Banking Corp. v. UPG, Inc.*,
  985 F.2d 685 (2d Cir. 1993)...................................................................................................68

*Bank Leumi USA v. Ehrlich*,
  98 F. Supp. 3d 637 (S.D.N.Y. 2015).......................................................................................40

*Bazak Intern. Corp. v. Tarrant Apparel Group*,
  378 F. Supp. 2d 377 (S.D.N.Y. 2005).....................................................................................71

*Benicorp Ins. Co. v. National Medical Health Card Systems, Inc.*,
  447 F. Supp. 2d 329 (S.D.N.Y. 2006).....................................................................................63

*In re Borders Grp.,Inc.*,
  453 B.R. 459 (Bankr. S.D.N.Y. 2011).....................................................................................41

*Breeden v. Kirkpatrick & Lockhart, LLP*,
  268 B.R. 704 (S.D.N.Y. 2001), *aff'd sub nom. In re Bennett Funding Group,*
  *Inc.*, 336 F.3d 94 (2d Cir. 2003) ............................................................................................49

*Briarpatch Ltd. v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004)...........................................................................................12

*Brown v. Lockwood*,
    432 N.Y.S.2d 186 (2d Dep't 1980)..................................................................................12

*Cahill v. Regan*,
    5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959) .........................................................................63

*Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc.*,
    758 F. Supp. 908 (S.D.N.Y. 1991)..................................................................................35

*In re CBI Holding Co., Inc.*,
    311 B.R. 350 (S.D.N.Y. 2004)...................................................................................49, 50

*In re CBI Holding Co, Inc.*,
    529 F.3d 432 (2d Cir. 2008) ............................................................................................49

*CBS Inc. v. Ahern*,
    108 F.R.D. 14 (S.D.N.Y. 1985) ........................................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................................8

*Center v. Hampton Affiliates*,
    488 N.E.2d 828 (N.Y. 1985).............................................................................................42

*Chambers v. TRM Copy Ctrs. Corp.*,
    43 F.3d 29 (2d Cir. 1994) ..................................................................................................9

*Cheese Shop Intern., Inc. v. Steele*,
    303 A.2d 689 (Del. Ch. 1973)..........................................................................................10

*Chia Huey Chou v. Remington Tai Che*,
    No. 09 CV 4121, 2010 WL 6546831 (E.D.N.Y. Aug. 24, 2010) ...........................................59

*CMF Investments, Inc. v. Palmer*,
    No. 13-CV-475 VEC, 2014 WL 6604499 (S.D.N.Y. Nov. 21, 2014)....................................59

*Cobalt Multifamily Investors I, LLC v. Shapiro*,
    2009 WL 2058530 (S.D.N.Y. July 15, 2009) .........................................................................49

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir.1994)..............................................................................................67

*Consorcio Prodipe, S.A. de. C.V. v. Vinci, S.A.*,
    544 F. Supp. 2d 178 (S.D.N.Y. 2008)...............................................................................66

*Contemporary Mission, Inc. v. Bonded Mailings, Inc.*,
   671 F.2d 81 (2d Cir. 1982) ........................................................................59

*Corsello v. Verizon New York, Inc.*,
   967 N.E.2d 1177 (N.Y. 2012) ...................................................................13

*Croton River Club v. Half Moon Bay Homeowners Ass'n (In re Croton River Club)*,
   52 F.3d 41 (2d Cir. 1995) .........................................................................53

*Dodge v. Richmond*,
   10 A.D.2d 4 (1st Dep't 1960), *aff'd*, 8 N.Y.2d 829 (1960) .....................59

*Dunning v. Leavitt*,
   85 N.Y. 30 (1881) ......................................................................................68

*EBC I, Inc. v. Goldman, Sachs & Co.*,
   5 N.Y.3d 11 (N.Y. 2005) ..........................................................................13

*Faulkner v. Arista Records LLC*,
   602 F. Supp. 2d 470 (S.D.N.Y. 2009) ........................................................9

*Fitzgerald v. Fahnestock & Co., Inc.*,
   48 A.D.3d 246, 850 N.Y.S.2d 452 (App. Div. 1st Dept. 2008) ................63

*Foresco Co., Ltd. v. Oh*,
   696 Fed. Appx. 550 (2d Cir. 2017) ...........................................................60

*Freeman v. Complex Computing Co.*,
   119 F.3d 1044 (2d Cir. 1997) ...................................................................35

*Gallo v. Prudential Residential Servs.*,
   LP, 22 F.3d 1219 (2d Cir. 1994) .................................................................9

*In re Glob. Aviation Holdings, Inc.*,
   478 B.R. 142 (Bankr. E.D.N.Y. 2012) ......................................................41

*Gorelik v. Lukov*,
   2011 WL 10702299 (N.Y. Sup. Ct. June 14, 2011) ..................................11

*Graubard Mollen Dannett & Horowitz v. Moskovitz*,
   86 N.Y.2d 112 (N.Y. 1995) ......................................................................11

*Hauswald v. Katz*,
   216 A.D. 92 (1st Dep't 1926) ....................................................................60

*Haynes v. Garez*,
   304 A.D. 2d 714 (N.Y. App. Div. 2003) ...................................................64

v

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
  116 F.3d 28 (2d Cir. 1997)..........................................................................71

*Hollander v. Lipman*
  885 N.Y.S.2d 354 (N.Y. App. Div. 2009) ...................................................69

*Indep. Asset Mgmt. LLC v. Zanger*,
  538 F. Supp. 2d 704 (S.D.N.Y. 2008).........................................................11

*Information Superhighway, Inc. v. Talk America, Inc.*,
  274 F. Supp. 2d 466 (S.D.N.Y. 2003).........................................................63

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
  407 F. Supp. 2d 483 (S.D.N.Y. 2005).........................................................53

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
  472 F. Supp. 2d 544 (S.D.N.Y. 2007)....................................................13, 53

*Joint Venture Asset Acquisition v. Zellner*,
  808 F. Supp. 289 (S.D.N.Y. 1992)..............................................................63

*JPMorgan Chase Bank v. Liberty Mutual Insurance Co.*,
  189 F. Supp. 2d 24 (S.D.N.Y. 2002)...........................................................64

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*,
  295 F. Supp. 2d 366 (S.D.N.Y. 2004).........................................................34

*Kalisch–Jarcho, Inc. v. City of New York*,
  448 N.E.2d 413 (N.Y. 1983)........................................................................64

*Kaufman v. Cohen*,
  760 N.Y.S.2d 157 (1st Dep't 2003) .............................................................11

*Kirschner v. KPMG LLP*,
  938 N.E.2d 941 (N.Y. 2010)...................................................................39, 42

*Korff v. Corbett*,
  155 A.D.3d 405 (1st Dep't 2017) ................................................................61

*Krys v. Butt*,
  486 F. App'x 153 (2d Cir. 2012) .................................................................12

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014).........................................................................12

*Lakhaney v. Anzelone*,
  788 F. Supp. 160 (S.D.N.Y. 1992)..............................................................60

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
   10 F. Supp. 3d 504 (S.D.N.Y. 2014)........................................................12

*In re Lehr Constr. Corp.*,
   528 B.R. 598 (Bankr. S.D.N.Y. 2015), *aff'd*, 551 B.R. 732 (S.D.N.Y. 2016),
   *aff'd*, 666 F. App'x 66 (2d Cir. 2016).....................................................49

*Liss v. Smith*,
   991 F. Supp. 278 (S.D.N.Y. 1998)..........................................................10

*Lowenbraun v. L.F. Rothschild, Unterberg, Towbin*,
   685 F. Supp. 336 (S.D.N.Y. 1988)..........................................................31

*Lumhoo v. Home Depot USA, Inc.*,
   229 F. Supp. 2d 121 (E.D.N.Y. 2002) .....................................................71

*Mandarin Trading Ltd. v. Wildenstein*,
   16 N.Y.3d 173 (N.Y. 2011) .....................................................................11

*Mangini v. McClurg*,
   249 N.E.2d 386 (N.Y. 1969)....................................................................64

*Marino v. Grupo Mundial Tenedora, S.A.*,
   810 F. Supp. 2d 601 (S.D.N.Y. 2011).....................................................10

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) .....................................................40

*McConnell v. Commonwealth Pictures Corp.*,
   7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960).....................59

*Meisel v. Grunberg*,
   651 F. Supp. 2d 98 (S.D.N.Y. 2009)........................................................11

*Matter of Morris*,
   623 N.E.2d 1157 (N.Y. 1993)..................................................................35

*Motorola Credit Corp. v. Uzan*,
   739 F. Supp. 2d 636 (S.D.N.Y. 2010)......................................................34

*Murray v. Northrop Grumman Info. Tech., Inc.*,
   444 F.3d 169 (2d Cir. 2006).....................................................................69

*Nobel Ins. Co. v. City of New York*,
   2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006).........................................40

*P.T. Bank Central Asia v ABN AMRO Bank N.V.*,
   301 A.D.2d 373, 754 N.Y.S.2d 245 (1st Dep't 2003) .............................11

*Penato v. George*,
  52 A.D.2d 939 (N.Y. App. Div. 1976) ............................................................10, 67

*In re PHS Grp.*,
  581 B.R. 16 (E.D.N.Y. 2018) ...................................................................14, 41, 67

*Prickett v. N.Y. Life Ins. Co.*,
  896 F. Supp. 2d 236 (S.D.N.Y. 2012).................................................................67

*Reddy v. Mihos*,
  160 A.D.3d 510 (1st Dep't 2018) ........................................................................61

*In re Refco Inc. Sec. Litig.*,
  826 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................................................10

*Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*,
  68 F.3d 1478 (2d Cir. 1995)................................................................................63

*Schmidt v. Bishop*,
  779 F. Supp. 321 (S.D.N.Y. 1991)......................................................................10

*Scott v. Harris*,
  550 U.S. 372 (2007)..............................................................................................9

*Shearson Lehman Hutton, Inc. v. Wagoner*,
  944 F.2d 114 (2d Cir. 1991)................................................................................39

*Simon Conway, et al. v. Marcum & Kliegman LLP*,
  176 A.D.3d 477 (N.Y. App. Div., 1st Dep't 2019)....................................42, 43, 44

*In re Stage Presence, Inc.*,
  592 B.R. 292 (Bankr. S.D.N.Y. 2018), *aff'd*, 2019 WL 2004030 (S.D.N.Y.
  May 7, 2019) ........................................................................................................35

*Suez Equity Investors, L.P. v. Toronto-Dominon Bank*,
  250 F.3d 87 (2d Cir. 2001)..................................................................................12

*Tatintsian v. Vorotyntsev*,
  2019 U.S. Dist. LEXIS 66379 (S.D.N.Y. Apr. 18, 2019)......................................10

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
  444 U.S. 11, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979).........................................31

*Trott v. Platinum Management (NY) LLC (In re Platinum-Beechwood Litigation)*,
  2019 WL 2569653 (S.D.N.Y. June 21, 2019) ......................................................40

*Tucker Anthony Realty Corp. v. Schlesinger*,
  888 F.2d 969 (2d Cir. 1989)................................................................................67

#73459034_v2

*TufAmerica, Inc. v. Codigo Music LLC*,
162 F. Supp. 3d 295 (S.D.N.Y. 2016)...................................................................71

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
241 F.3d 135 (2d Cir. 2001)..............................................................................71

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
216 F. Supp. 2d 198 (S.D.N.Y. 2002).................................................................10

*United States v. Bonanno Organized Crime Family of La Cosa Nostra*,
879 F.2d 20 (2d Cir. 1989).................................................................................59

*In re USACafes, L.P. Litigation*,
600 A.2d 43 (Del. Ch. 1991)..............................................................................10

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
901 A.2d 106 (Del. 2006)...................................................................................10

*Wallace v. Wood*,
752 A.2d 1175 (Del. Ch. 1999)....................................................................10, 13

*Weiner v. McGraw–Hill, Inc.*,
443 N.E.2d 441 (N.Y. 1982)..............................................................................69

*White Rose Food v. Saleh*,
99 N.Y.2d 589 (2003).........................................................................................60

## Statutes

Cayman Companies Law § 145 .....................................................................72, 73

## Other Authorities

Fed. R. Civ. P. 9(b) ..............................................................................................2

Fed. R. Civ. P. 56 .................................................................................................8

Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) (the "**Joint Official Liquidators**") and Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**" and collectively with the Joint Official Liquidators, the "**JOLs**") respectfully submit this omnibus memorandum of law in opposition to the motions for summary judgment filed by the following Defendants: (i) David Bodner ("**Bodner**"), (ii) Murray Huberfeld ("**Huberfeld**"), (iii) the Huberfeld Family Foundation, Inc. ("**Huberfeld Family Foundation**" or "**HFF**"), (iv) Bernard Fuchs ("**Fuchs**"), (v) Ezra Beren ("**Beren**"), (vi) Seth Gerszberg ("**Gerszberg**"), (vii) B Asset Manager LP ("**BAM**"), (viii) B Asset Manager II LP ("**BAM II**"), (ix) BAM Administrative Services, LLC ("**BAM Administrative**"), (x) Beechwood Re Investments LLC ("**BRILLC**"), (xi) Beechwood Re Holdings, Inc. ("**BRE Holdings**"), (xii) Beechwood Bermuda International Ltd. ("**BBIL**" and collectively with BAM, BAM II, BAM Administrative, BRILLC and BRE Holdings, the "**Beechwood Entities**"), (xiii) Mark Feuer ("**Feuer**"), (xiv) Scott Taylor ("**Taylor**"), and (xv) Dhruv Narain ("**Narain**" and collectively with Bodner, Huberfeld, the Huberfeld Family Foundation, Fuchs, Beren, Gerszberg, the Beechwood Entities, Feuer and Taylor, the "**Defendants**").

## PRELIMINARY STATEMENT

After nearly a year of discovery, and more than 50 depositions, it is clear that the JOLs' core allegations are correct.  Platinum Management, its owners, and leadership utilized their alter-ego and affiliate, Beechwood, to first inflate PPVA's net asset value ("NAV") so as to pay themselves at least $70.9 million to $102 million in wrongful fees and distributions between 2012 and 2016. Then, beginning with the Black Elk subordination and subsequent bond buyback from Beechwood, they engaged in a scheme to loot roughly $300 million of PPVA's assets. These acts constitute fraud – via the creation and submission of knowingly false and forged written materials and statements – and a clear and knowing breach of their fiduciary duties to PPVA.

1

Discovery, including memoranda and emails sent to PPVA, has further revealed the catalyst for the urgent and bold dissipation that began with the Nordlicht Side Letter and culminated in the Agera Transactions:   the expanding and inevitably catastrophic COBA bribery investigation. Defendants received formal notice of the COBA criminal investigation via a grand jury subpoena in the summer of 2015 and received notice and advice regarding the expanding criminal investigation, to include the Platinum-Beechwood relationship, in March 2016. This was followed by a breakdown of defense-government communications, and climaxed with Huberfeld's arrest on June 8, 2016.  As the government's investigation closed in, Platinum and Beechwood's principals furiously worked to transfer PPVA's last remaining asset, Agera, to the business they owned, controlled and hoped would survive – Beechwood.

Each of the motions for summary judgment filed by Defendants should be denied because there are disputed material facts that go to the core of each and every conclusion Defendants urge this Court to reach.  And "disputed material facts" is a cosmic understatement: the evidence in this case of fraud and breach of fiduciary duty is overwhelming.

Bodner, Huberfeld, and HFF all seek to enforce a purported release that these fraudsters gifted to themselves in March 2016 – after receiving grand jury subpoenas and while the federal criminal investigation of their conduct expanded.  But the law is clear that they cannot release themselves from intentional or grossly negligent conduct, and all of the counts against them allege fraud, breach of duty, or aiding and abetting the same – specifically, intentional conduct.[1]   Moreover, the evidence is clear that the releases were not supported by adequate consideration and, in any event, are void as a fraudulent transfer to insiders on the eve of insolvency.

Documentary evidence and testimony establishes that Nordlicht, Bodner and Huberfeld owned ___**and controlled**___ PPVA and Beechwood.  They were the "powers that be" – a triumvirate and

---

[1] Defendants argued that all counts must satisfy Rule 9(b), which only applies to conduct that is intentional.

committee that made major (and even minor) investment and operational decisions for PPVA and Beechwood.  Bodner and Huberfeld were senior partners, and Nordlicht was the junior partner.  They were the Platinum Partners that operated Platinum Management, PPVA's general partner and investment manager, which unquestionably owed fiduciary duties to PPVA.  Bodner's self-serving contention that he did not have fiduciary duties because he structured his ownership interest via an indirect trust[2] to PPVA is disputed on the facts and the law.   In any event, he was clearly aware of Platinum Management's duty and actively aided and abetted the numerous breaches.

Bodner knew there was an overvaluation of PPVA's assets.  Bodner knew the negative impact that the Black Elk subordination had on PPVA's Black Elk Bond holdings.  Bodner knew the Black Elk Bonds were worthless but supported the corrupt Black Elk bond buyback.  Bodner, with Huberfeld and Landesman, directly pocketed more than $4.5 million of the $10 million COBA investment via a "special distribution" in March 2014, and there is no doubt that Bodner was aware, at least by June 2016, that the COBA funds that he and the others received were the fruit of Huberfeld's criminal conduct.[3]  Bodner and Huberfeld were given a presentation by the remnants of Platinum Management that demonstrated that PPVA, which Platinum Management had reported to have a net asset value of $750 million, was missing half of its value and owed the remainder to purported creditors.  The same presentation provided a list of "potential winners" which if handled properly, could produce a "decent return" for PPVA.

What was Bodner and Huberfeld's reaction to receiving this information?  They continued to allow PPVA to put out monthly NAV sheets listing a net asset value in the range of $700 million, and conspired to move all of the "potential winners" (including Agera) to other companies they controlled

---

[2] To hide his involvement in the fund due to his checkered past.

[3] It is remarkable that Bodner, after Huberfeld and Norman Seabrook were convicted of a bribery scheme to funnel the COBA funds to PPVA, continues to claim that the $1.8 million he received in March 2014 from the COBA investment was legitimate.  There is no doubt that the COBA investment was obtained through bribery, and yet, neither Bodner nor Huberfeld have taken any steps to return those funds to PPVA, who Huberfeld admits was his victim.

– Beechwood and PPCO.  Moreover, in the face of the criminal investigation into their COBA misconduct and the PPVA meltdown, they attempted to leverage their worthless interests in Platinum Management for both a *release* from their wrongful conduct and an *indemnity* from the partnership they were supposed to support because it was clear both criminal and civil litigation – *i.e.* this action – was coming, and they intended for PPVA to pay for it.  In particular, Bodner maintained an office at Agera (Platinum's most valuable asset), controlled a side fund that was a major creditor of Agera, and hence his approval was a requisite for the corrupt Agera transaction to be consummated.  In short, Bodner's recitation of the facts is materially disputed with admissible evidence.

HFF makes various arguments, including that the release applies to it – each should be rejected because those arguments rely on fundamentally disputed facts.  HFF is not just a charity.  It is another pool of capital that Huberfeld controlled and utilized to operate his investment businesses, and, in that way, is no different than Beechwood or Platinum.  If Huberfeld wanted to do a deal, he would examine whether there was sufficient cash at Platinum, Beechwood or HFF and utilize the vehicle that was most convenient.  In particular, Huberfeld used HFF (which necessarily is imputed with Huberfeld's knowledge), to mask Platinum's crisis, make payouts and advances on (impossible) PPVA redemptions or disguised loans to disgruntled investors, and keep his scheme afloat.  Huberfeld also used HFF to seed and invest in the corrupt BEOF Funds, receiving a payout ahead of PPVA, and at the expense of PPVA.  In sum, HFF is liable for aiding and abetting fraud, aiding and abetting breach of duty, and unjust enrichment.  All of HFF's arguments to the contrary are based on disputed facts, and its summary judgment motion should be denied.

Bernard Fuchs was a partner of Platinum Management.  He was told there was an investigation and has admitted lying about the same.  He was part of the inner circle, positing ideas about how the other Defendants could unwind and pull money out of Beechwood – the "Bernie Fuchs round trip" idea.  He attended the major dinners and meetings where important matters comprising the

overvaluation, Black Elk, and the dissipation were decided and discussed.  Bodner specifically told Fuchs that PPVA was overvalued in January 2015.  And, when Bodner prevented any partner from taking money out of PPVA, Fuchs demanded, and received, his money from HFF.  Fuchs, as a direct partner of Platinum Management claims he is not a fiduciary.  The facts giving rise to this implausible defense are disputed.  In any event, he knowingly aided and abetted the Platinum fraud and breaches of duty, writing in response to new redemption demands:  <u>"I will not answer anybody anymore.  I can't lie anymore and I can't handle all the pressure anymore."</u> There are factual disputes that go to the heart of the Fuchs' claims and defenses, and his motion for summary judgment should be denied.

Beechwood was Platinum's reinsurance arm.  Platinum's CFO testified that Beechwood was an affiliate of Platinum.  Mark Nordlicht stated that the two were affiliates and should receive "credit" for being so.  Defendant Ezra Beren described the Platinum-Beechwood relationship as one where there were simply two pools of capital but the same management.

The idea for pumping reinsurance to prop up and overvalue Platinum holdings was presented to Platinum Management by Kerry Propper, who later became a Platinum Management employee.  Propper's idea was for Platinum to seed "Alpha Re," and Alpha Re would give half the resultant reinsurance proceeds to Platinum to invest.  Platinum then ***hired*** Mark Feuer and Scott Taylor to conduct diligence on the deal.  Mark Feuer and Scott Taylor were then, and always were, Platinum insiders.  After a term sheet was signed, and on the eve of closing, Platinum (including Feuer and Taylor) decided to steal the idea, breach its NDA and term sheet, and form the reinsurer themselves.  Feuer already had an investment company called Beechwood so they named the Platinum reinsurance arm Beechwood.  A deal was similarly struck that all Beechwood reinsurance money would be put in Platinum.  When Kerry Propper complained that they had stolen his idea, Alpha Re, he was given an ownership interest in Beechwood (and Kerry Propper had only dealt with Platinum).

Beechwood was started and operated in Platinum's offices, where both Taylor and Feuer reported to work.   Beechwood's first client, CNO Financial Group, was brought to Platinum Management's offices for meetings, and the primary topic was "continuity" of investment strategy – *i.e.,* Platinum's investment strategy. Beechwood then acquired the loan-portions of Platinum investments – particularly in oil and gas – for the corrupt and wrongful purpose of justifying the inflated equity valuations of those same investments.   Beechwood eventually obtained its own offices, but was always staffed by a revolving door of Platinum employees.   Mark Nordlicht, David Levy, David Bodner and Murray Huberfeld made the majority, if not all, of Beechwood's investment decisions.

Platinum Management and the Beechwood Entities are alter egos – they were chronically undercapitalized relative to their operations, made informal and intercompany loans, shared the same beneficial ownership and office space (for a time), made informal intercompany loans, invested in the same assets, commingled assets, and most importantly, engaged in corrupt and wrongful aims.   It is hard to imagine a more clear-cut case for alter ego, let alone the aiding and abetting breach of duty claims.

*In pari delicto* is not a defense to the alter ego counts, and Beechwood, Feuer, Taylor and Narain's motion for summary judgment on this ground should be denied.   With respect to Beechwood, it is an alter ego of Platinum Management and cannot avail itself to the defense.   With respect to Feuer and Taylor, the situation is different than it was at the motion to dismiss stage.   Plaintiffs took discovery regarding Feuer and Taylor's defense of *in pari delicto*, and it was illuminating.   As set forth above, and contrary to this Court's prior assumption, Feuer and Taylor **were hired by Platinum** – and the concept for Beechwood was a Platinum idea.   The JOLs respectfully submit that Feuer and Taylor are insiders, for whom the *in pari delicto* defense is not available, or at the very least, there

are material questions of fact as to whether they are insiders, rendering summary judgment that *in pari delicto* applies inappropriate.

Next, summary judgment is not appropriate on the *in pari delicto* defense because the "adverse interest" exception applies.  Namely, each of the defendants engaged in a series of acts designed to loot PPVA of its assets.  This looting began with the Black Elk subordination and BEOF payout, continued through the PPVA-Beechwood Black Elk bond buyback, and culminated with the Nordlicht Side Letter, Master Guaranty and the Agera transaction.  The Agera transaction was Dhruv Narain's brainchild.  He knew that Agera was Platinum's most valuable asset and knew that ***approximately $120 million* of the $170 million** purchase price had little or no value.  ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████  After learning about Huberfeld's arrest and the fact that the FBI raided Beechwood's offices on June 8, 2016, Narain frantically urged all parties to close the Agera transaction "as soon as humanly possible."  As a holder of PPVA limited partner interests, Narain, and the other Beechwood defendants, knew that PPVA was going into liquidation within days, as announced during an investor call.  The Agera transaction was simply the transfer of PPVA's most valuable asset to Beechwood to PPVA's detriment. At a minimum, there are core factual disputes that go to the heart of each of their defenses and summary judgment should be denied as to Beechwood, Feuer, Taylor, Narain,

Finally, this Court should deny Beren's motion for summary judgment.  Beren has stated a *prima facie* defense, but it is hardly appropriate for summary judgment – it is barely plausible.  Beren's entire defense is that the documents in this case should be disregarded, because they were intentionally false:  he was not on the valuation committee even though the documents say he was; he was not a real vice president and portfolio manager even though he had the official title; he did not understand the Platinum-Beechwood relationship even though he wrote emails perfectly describing

the same; he did not act as Huberfeld's (his father-in-law) and Bodner's proxy concerning investments even though there are numerous emails to the contrary. He contends that he did not have the investment acumen to engage in what was alleged, that he has not spent the past three years managing the Huberfeld empire (contrary to his LinkedIn page which says he managed a "family office"). He claims he did not successfully close any deals, but the records show that he brought a sports ticket "investment" opportunity to Huberfeld, who then directed the investments be made via Beechwood and HFF, in a $1.4 million transaction for which "no paperwork was required." A plea to ignore the documents is simply not grounds for summary judgment.

## STATEMENT OF FACTS

Citations to significant facts material to the arguments are included throughout the brief, but, in the interest of brevity, are not reproduced in full in this filing. The JOLs' respectfully direct the Court to the JOLs Statement of Facts filed pursuant to Local Rule 56.1 ("**R. 56.1**") for a full review of facts relevant to this filing.[4]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 prohibits entry of summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To satisfy this heavy burden, the moving party bears the burden of showing that "under the governing law, there can be but one reasonable conclusion as to the verdict" and providing "affirmative evidence" from which a factfinder could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 257 (1986).

When considering a motion for summary judgment the trial court's task "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its

---

[4] All capitalized terms not defined herein shall have the meaning prescribed to them in the JOLs' R. 56.1.

duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs.*, LP, 22 F.3d 1219, 1224 (2d Cir. 1994). The Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment should not be entered if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party . . . ." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## ARGUMENT

### I.   MATERIAL CONTESTED ISSUES OF FACT FORECLOSE SUMMARY JUDGMENT AGAINST THE JOLS' CLAIMS AGAINST THE MOVING DEFENDANTS

Defendants Bodner, Fuchs, HFF, Beren, Gerszberg, and the Beechwood Movants argue that they are entitled to judgment as a matter of law on claims related to breach of fiduciary duty and/or aiding & abetting. As set forth in the JOLs' Rule 56.1 Statement and below, these Defendants are incorrect. The facts in evidence are more than sufficient to require a trial by jury on each of their contributions to overvaluation of PPVA's net asset value and payment of fees to Platinum Management and its owners, as well as the subsequent diversion of PPVA's remaining valuable assets to Beechwood and other insiders. The summary judgment motions of these Defendants should be denied in their entirety.

### A.   Applicable Standards

#### 1.   Fiduciary Status

This Court has made clear that "[t]he existence of a fiduciary relationship is often a 'fact-intensive' inquiry appropriate for a jury." *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (citing *CBS Inc. v. Ahern*, 108 F.R.D. 14, 26 & n. 21 (S.D.N.Y. 1985)). As this Court has explained, "the question of fiduciary status based on the extent of an individual's involvement in particular transactions is particularly fact-intensive and thus not appropriate for summary judgment."

*Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002)); *Schmidt v. Bishop*, 779 F. Supp. 321, 325 (S.D.N.Y. 1991)).

Both New York and Delaware law[5] assert that "a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D.2d 939, 942 (N.Y. App. Div. 1976); *see also Cheese Shop Intern., Inc. v. Steele*, 303 A.2d 689, 690 (Del. Ch. 1973) ("A fiduciary relationship is a situation where one person reposes special trust in reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another. The relationship connotes a dependence"). Applying this principal to the control over assets, "one who controls property of another may not, without express or implied agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owners." *In re USACafes, L.P. Litigation*, 600 A.2d 43, 48 (Del. Ch. 1991). Accordingly, "[w]hen control over corporate property was recognized to be in the hands of shareholders who controlled the enterprise, the fiduciary obligation was found to extend to such persons as well." *Id.* (citing *Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 120 A. 486, 491 (Del. Ch. 1923)); *Wallace v. Wood*, 752 A.2d 1175, 1178 (Del. Ch. 1999) ("[o]fficers, affiliates and parents of a general partner, may owe fiduciary duties to limited partners if those entities control the partnership's property.")

Under New York law, "[i]t has been well established that 'business [and] professional partners, are bound by a fiduciary duty requiring 'the punctilio of an honor the most sensitive''"

---

[5] As this Court has noted, regardless of the choice of law applied to claims alleging breach of fiduciary duty, "the outcome is the same under the law of either [Delaware or New York]." *Tatintsian v. Vorotyntsev*, 2019 U.S. Dist. LEXIS 66379, at \*20 (S.D.N.Y. Apr. 18, 2019) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006); *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 503 (S.D.N.Y. 2011); *see also Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 610 (S.D.N.Y. 2011) ("because the application of New York or Delaware law leads to the same result here, the Court need not choose which state's law to apply").

*Gorelik v. Lukov*, 2011 WL 10702299 (N.Y. Sup. Ct. June 14, 2011) (alterations in original) (quoting *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 118 (N.Y. 1995)).

### 2.    Breach of Fiduciary Duty

Under applicable New York law, the elements of a breach of fiduciary duty claim are: "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed trust or confidence in another and whether the second person accepts the trust and confidence and thereby gains a resulting superiority or influence over the first." *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008). In particular, where a "defendant ha[s] discretionary authority to manage [a plaintiff's] investment accounts, it owe[s] [the plaintiff] a fiduciary duty of the highest good faith and fair dealing." *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 7, 16 (1st Dep't 2010), aff'd, 962 N.E.2d 765 (N.Y. 2011).

### 3.    Fraud

"To state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (1st Dep't 2003).

A material omission can form the basis for fraud liability where a special relationship exists between plaintiff and defendant requiring the defendant to disclose information – such as where the defendant owes fiduciary duties to the plaintiff or under the "special facts" doctrine where defendant has superior knowledge to the plaintiff. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (N.Y. 2011); *P.T. Bank Central Asia v ABN AMRO Bank N.V.*, 301 A.D.2d 373, 754 N.Y.S.2d 245 (1st Dep't 2003) (defendant had information not readily available to plaintiff that demonstrated

that value was overstated when it solicited plaintiffs continued relationship with defendant); *Suez Equity Investors, L.P. v. Toronto-Dominon Bank*, 250 F.3d 87 (2d Cir. 2001) (finding that "a determination of whether a special relationship exists is essentially a factual inquiry").

### 4. Constructive Fraud

Under New York law, a "constructive fraud claim modifies the claim for actual fraud by replacing the scienter requirement with the requirement that Defendants maintained either a fiduciary or confidential relationship with Plaintiff." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC,* 10 F. Supp. 3d 504, 524 (S.D.N.Y. 2014); *see Brown v. Lockwood*, 432 N.Y.S.2d 186, 193-94 (2d Dep't 1980)

### 5. Aiding and Abetting Liability

"A claim for aiding and abetting a breach of fiduciary duty requires, *inter alia*, that the defendant knowingly induced or participated in the breach." *Krys v. Butt*, 486 F. App'x 153, 157 (2d Cir. 2012). "Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." *Id.*

"To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014).

### 6. Unjust Enrichment

To prevail on a claim for unjust enrichment under New York law, a plaintiff must show that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Relief for unjust enrichment is "available only in

unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

## B.   David Bodner

The JOLs assert claims against Bodner for Breach of Fiduciary Duty (Counts I and II), Fraud and Constructive Fraud (Counts IV and V), Aiding and Abetting Breach of Fiduciary Duty (Counts III and VII), and Aiding and Abetting Fraud (Counts VI and VIII). Bodner advances two primary defenses. First, Bodner claims that there are no genuine disputes as to any material facts regarding whether he breached his fiduciary duty to PPVA, committed fraud, or aided and abetted those claims. And, second, Bodner alleges that he should be immune from all liability because he exchanged general releases with PPVA in 2016. The JOLs will address Bodner's general release arguments below. See *infra* section xxxx. As to his other defenses, the JOLs respectfully assert that there is overwhelming evidence that Bodner owed a fiduciary duty to PPVA, breached that duty and committed fraud, and that, at a minimum, aided and abetted those claims as well. Thus, his motions should be denied.

### 1.   There is a Genuine Dispute as to Whether Bodner Owed a Fiduciary Duty to PPVA Because There is Material Evidence That Bodner Exercised Control over PPVA in All Material Respects.

"It is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and beneficiary but results from the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20 (N.Y. 2005). Rather, the actual relationship between the parties determines the existence of a fiduciary duty. *Id.*; see also *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 472 F. Supp. 2d 544, 550 (S.D.N.Y. 2007) (explaining that limited partners who assume managerial control over a limited partnership will have fiduciary obligations); *Wallace v. Wood*, 752 A.2d 1175, 1178 (Del. Ch. 1999) ("[o]fficers, affiliates and parents of a general partner,

may owe fiduciary duties to limited partners if those entities control the partnership's property.") This is particularly true given that "[j]ust as an individual's formal title and position in a company should not determine their insider status, so too, a person's deliberate divesting of any formal title and position in a company should not, ***without closer inspection***, dictate that he be deemed a third party, non-insider." *In re PHS Grp.*, 581 B.R. at 32 (emphasis added). This "closer inspection" should be performed by the jury in their exclusive role as the finder of fact and should not, as Bodner contends, be resolved as a matter   on summary judgment. Bodner's concealed ownership of Platinum Management and control over PPVA's assets is a matter for the jury, which is entitled to hear the overwhelming evidence set forth in the JOLs' Rule 56.1 Statement.

Bodner, an owner and partner of Platinum Management, PPVA's general partner and investment manager, made key decisions for Platinum Management, controlled its largest fund, PPVA, and, along with Huberfeld and Nordlicht, was an ultimate decision maker with final authority for Platinum Management.  JOLs' Rule 56.1 Statement of Material Facts ("SOMF") ¶¶ 178-218.  One of Bodner's partners at Platinum Management, Fuchs, was an eyewitness to much of Bodner's activities at Platinum Management.  It was Bodner, along with Nordlicht and Huberfeld, who invited Fuchs to be Platinum partner in 2014. *Id.* at ¶ 219.  It was Bodner who, in 2015, had a heated argument with Nordlicht "about the fund [PPVA], about the investments, [and] about the valuations." *Id.* at ¶ 194.  According to Fuchs, Bodner told Nordlicht, in front of Fuchs and Huberfeld, "that the valuations were not right, that Mark Nordlicht wasn't properly marking the fund, and . . . he has to redo the fund because he . . . doesn't like the way the valuations were doing." *Id.*  And, it was Bodner who alone decided that "no partner's taking any money out." *Id.*

This exchange between the partners must be viewed in the context of the Black Elk Bond Buyback – which occurred shortly thereafter in January 2015.  This evidence, standing alone, creates

a genuine dispute as to whether Bodner was in sufficient control of PPVA that he owed a fiduciary duty to PPVA.

Bodner, along with Huberfeld and Nordlicht, were the founders of PPVA, with Huberfeld and Bodner providing the initial seed money for the hedge fund.  SOMF ¶ 2.  Bodner maintained a corner office at Platinum Management, *id.* at ¶ 183, and was provided a secretary who was employed by Platinum Management, *id.* at ¶ 185. Michael Katz, an advisor to Platinum Management, described Bodner and Huberfeld as the senior partners of Platinum and Nordlicht as more of a junior partner. *Id.* at ¶ 195.

Fuchs testified that the ultimate decision makers for Platinum Management with final authority were Bodner, Huberfeld, and Nordlicht.  SOMF ¶ 194.  Nordlicht emphasized this point when he complained about "decisions by committee" of "3 people", referring to himself, Huberfeld and Bodner.  *Id.* at ¶ 196(c).  In connection with PPVA's investment in China Horizon, Bodner and Huberfeld were able to overrule Nordlicht as to investment strategy. *Id.* at ¶ 196(e).  Nordlicht regularly consulted with Bodner on strategic decisions and deferred to Bodner's judgment and authority, *see id.* at ¶ 197, including the formulation of a strategy, in January 2016, to address the Platinum/Beechwood financial crisis, *id.* at ¶ 634.  The settled-upon strategy was the transfer of assets out of PPVA to Beechwood, which culminated with the Agera Sale.  *See generally*, *id.* at ¶¶ 776-778.

Bodner was heavily involved in the creation of Beechwood, including the development of a strategy for Platinum/Beechwood co-investments in the face of reinsurance regulations and investment limits.  *See* SOMF ¶¶ 416, 419.  Bodner also had an increasing presence at Agera Energy, one of PPVA's most valuable assets, holding regular meetings with Agera executives, including Kevin Cassidy.  *Id.* at ¶¶ 681-694.

Bodner also was involved in the hiring and firing of personnel at Platinum Management and Beechwood, regularly conducting interviews and providing input for hiring decisions, taking part in

meetings concerning downsizing of Platinum Management's work force, and referring personnel for employment at Platinum Management and Beechwood. *See* SOMF ¶ 199-203. As but one example, Samuel Adler, Bodner's nephew and Beechwood's Rule 30(b)(6) witness in this case, was the Beechwood employee who voted in favor of the Consent Solicitation in connection with the Black Elk Scheme. SOMF ¶¶ 487, 528. These facts clearly establish, at a minimum, that there is a material dispute as to whether Bodner owed a fiduciary duty to Platinum Management's largest fund, PPVA.

### 2. There is a Genuine Dispute as to Whether Bodner Breached His Fiduciary Duty to PPVA and Committed Fraud.

In addition to asserting that he owed no fiduciary duty to PPVA, Bodner claims that, even if he did, there are no disputed facts that could constitute a breach of his purported fiduciary duty. Not surprisingly, the JOLs disagree.

The JOLs have alleged, and discovered significant evidence in support, that Bodner breached his duty to PPVA in several ways. First, as noted above, there is overwhelming evidence that Bodner knew PPVA was overvalued, raised his concerns about the overvalued fund to his Platinum Management partners, and then took steps to hide the overvaluation, all while accepting millions of dollars in fees and distributions based on the overvalued fund. Bodner has admitted that beginning in 2012 he received "the marks" every month about PPVA and information about how PPVA was performing. SOMF ¶ 193. In January 2014, Bodner received a "High-Yield Stressed Credit Review" prepared by The Seaport Group, from David Steinberg, PPVA's portfolio manager. *Id.* at ¶ 193(b). The Review recommends against buying Black Elk bonds and expressly stated that the PV-10 valuation is overvalued. *Id.* Despite knowing that PPVA was overvalued, Bodner, and his partners, continued to accept millions in fees and distributions. The Platinum Management partners taking over $100 million in fees and distributions from PPVA. *Id.* at ¶ 52.

Next, there is credible evidence that Bodner, along with Nordlicht and Huberfeld, helped establish and manage Beechwood, an affiliate company of Platinum. *See generally,* SOMF ¶¶ 353-

429.  Bodner has admitted that he was a Beechwood investor and substantial partner at Beechwood.  *Id.* at ¶¶ 371, 381.  There is evidence that Bodner and his partners met with potential investors for Beechwood and actively worked together on how to invest Beechwood funds.  *Id.* at ¶ 456-457.  Moreover, Bodner and Huberfeld actively participated with Nordlicht on how Beechwood should distribute CNO's insurance funds through Platinum that were initially invested in Beechwood in 2014.  *See id.* at ¶¶ 193(c), 433-434.  Bodner also participated in initial meetings to discuss reinsurance thresholds, directed Platinum Management employees, including Platinum Management chief investing officer Daniel Saks, to begin work at Beechwood, sourced deal opportunities for Beechwood, and held meetings at Beechwood.  *See generally*, *id.* at ¶¶ 430-434, 455.

In defense, Bodner relies on his alleged "passive" ownership interests in both Platinum and Beechwood.  However, the record is replete with instances of Bodner meeting with portfolio managers and Platinum/Beechwood executives to discuss various transactions, with Bodner actually modifying term sheets himself in certain instances.  *See* SOMF ¶¶ 186-198.  Bodner was a regular attendee at monthly Platinum Management partner meetings, where PPVA's performance and strategic decisions were discussed.  *Id.* at ¶¶ 186-188.  At one of these meetings in January 2015, as noted above, Bodner expressed his opinion to the other partners (Nordlicht, Huberfeld and Fuchs) that PPVA's assets had been overvalued.  *Id.* at ¶ 225.  Michael Katz testified that Bodner and Huberfeld – who both have admitted to having a partnership with each other and a unity of business interests – were the senior partners of Platinum Management, with Nordlicht serving as a more junior partner.  *Id.* at ¶ 97.  Despite claims to the contrary, emails from Ezra Beren show that Bodner actively took part in meetings with Platinum Management's third party valuation firms.  Michael Katz also claimed that Bodner was considered the "leader of the [Platinum Management] organization" because in meetings with Platinum management, "if there was any disagreement as to what had to be done, [Bodner] was consulted and he had the last word."  *Id.* at ¶ 197.  Although it is highly unlikely that

any juror would believe Bodner's claim that he did not participate in the management of Platinum and Beechwood, it is, at a minimum, a genuine dispute for which the jury will need to decide.

In January 2016, Bodner was the recipient of a presentation from other Platinum Management executives which sets forth overvaluation of PPVA's net asset value by more than $400 million and admits that PPVA's unencumbered assets only amounted to $40 million. SOMF ¶ 634. Despite this, PPVA's net asset value remained largely unchanged in the following months. *Id.* at ¶ 635.

In addition to his management activities, Bodner was an immediate beneficiary of $1.8 million in funds fraudulently acquired through the COBA scheme. SOMF ¶ 574. Bodner has admitted accepting the $1.8 million but claims it was a legitimate payment for prior earned fees. *Id.* Huberfeld, through his guilty plea, admitted his role in defrauding PPVA and paying Jona Rechnitz $60,000 to obtain the COBA investment but claimed in his sentencing papers that he had left Platinum in January 2011 (not true) and "none of the loss to COBA was 'reasonably foreseeable' to him in 2014." *See id.* at ¶ 603. Also not true. Also, when questioned about the $3.6 million COBA payments to himself and Bodner, Huberfeld invoked his right to remain silent claiming that answering the questions truthfully would incriminate him. *See id.* at ¶ 606-613. Although Bodner may deny knowledge and participation in the COBA Scheme, a jury should be allowed to weigh the evidence given his close partnership with Huberfeld and Landesman, Nordlicht's own description of Huberfeld and Bodner's "misconduct," Bodner's immediate receipt of the $1.8 million and a telephone call Bodner made to Jona Rechnitz on December 15, 2014, the same day that the COBA bribe was effectuated. *Id.* at ¶ 582.

There are clearly material facts in dispute, including facts related to Bodner's knowledge of the Platinum/Beechwood relationship and his efforts to conceal fraud. Exhibit 33 to the JOLs' Second Amended Complaint is a perfect example. Although Bodner identified this exhibit as the "Albanese email," it is, in fact, an email that was sent from "a business person" to Bodner. Bodner then

forwarded the email, from his rarely used email account, to one of Platinum Management's counsel.

Bodner's email included the following:

> I'm really concerned that if Ed Bonach from CNO Financial Group
> Finds out we invested beechwoods money into platinum with its illiquid investments (since it
> didn't exactly fit their investment objective) he won't trust us and he will take all of the aprox
> 500 mil, he has invsted in beach wood -0
> That means beechwood would either implode or not be able to function fiancialy and may
> have to be dissolved;
> Even though we did a cancel and correct
> We weren't exactly honest with Ed about the original invstment or that beechwood and
> platinum really are integrated
> I'm concerned,
> What should we do ?
> I haven't called anybody back yet-I'm just trying todo som damage control right now.

SOMF ¶ 190.[6]

As the Court recalls, this email was referenced in Bodner's written motion to dismiss (Dkt #183) and argued during both hearings on March 7, 2019 and June 4, 2019.  At that time, Bodner's counsel, Mr. Lauer, admitted that "a business person has given this information to the secretary Bodner/ANG Huberfeld and writes, 'I'm really concerned that if Ed Bonach' -- and he's obviously got to explain who Ed Bonach is, 'from CNO financial group', etc. 'What should we do?.'"   Mr. Lauer explained to the Court:  "So what you have here is not something written by Bodner concerning something that Bodner knows, but someone in this organization is concerned.  . . . . [S]omeone is reaching out to Bodner, basically telling Bodner, you don't know about this, but there's an issue here, what should we do . . . ."  (Dkt. No. 293 at 9).   Significantly, Mr. Lauer never alleged that this email was actually drafted by Bodner's secretary.  The Court denied Bodner's motions to dismiss.  On September 19, Bodner's secretary, Angela Albanese, with counsel provided to her by Bodner, signed an affidavit claiming, in direct conflict with Mr. Lauer's assertions in court, that she was the sole

---

[6] The entire email is [sic].

author of the email and that she sent it to Bodner in an effort to pressure him to improve her severance pay.  According to Ms. Albanese, the email was her invention alone.  (Bodner Mem. at p. 10)

As the Court noted at the hearing on March 7, 2019, "[t[here's no way that this was drafted by a secretary.  It may have been sent by a secretary, but I think it is ridiculous to assume that a secretary would write, 'I'm really concerned," etc., etc."  *Id.* at 8.  We agree.  Bodner's effort to explain away this devastating email, which, by the way, is corroborated by other evidence, with Ms. Albanese's newly created and patently false story is ridiculous.  However, the email alone, and Ms. Albanese's story about who wrote it, creates a genuine dispute of material facts, including the JOLs' allegations of breach of fiduciary duty and fraud, and ends any basis for Bodner's summary judgment motion.

Another transaction in which the JOLs allege that Bodner breached his fiduciary duty to PPVA and committed fraud was the below-value sale of Agera to Beechwood on June 9, 2016 – the day after his partner Huberfeld was arrested.  Bodner admits to incidental connections to Agera, but denies any involvement in the sale of PPVA's interest in Agera to Beechwood.  The facts, of course, tell a different story.  *See generally* SOMF ¶¶ 681-694.

Agera was a significant asset of PPVA, a fund in which Bodner, Huberfeld and Nordlicht controlled and managed.  Bodner, as discussed above, also was a controlling partner, with Nordlicht and Huberfeld, of Beechwood, an affiliate entity of PPVA.  *See also* SOMF ¶ 145.  Bodner was a significant investor in Agera.  *Id.* at ¶ 694.  He, and his son, Yakoff Bodner, loaned Agera approximately $18 million through their fund, Bainbridge Partners ("**Bainbridge**").  This high interest rate loan had a "very costly prepayment penalty".  *Id.* at ¶¶ 690-694.  Bodner often worked at Agera's office and would give tours of Agera's offices to his partners and potential investors.  *Id.* at ¶ 685.  Fuchs testified that during his tour of Agera, Bodner "wanted to show me how – this tremendous business that they have and how they're going to – how Platinum is going to benefit when

20

they sell this business.  He wanted to show me around and – it was really impressive."  *Id.*  Fuchs confirmed that Bodner was "trying to . . . encourage [Fuchs] to bring in more investors into Platinum, and [Agera] [was] one of the potential benefits of that."  *Id.*  Bodner also discussed with David Levy, and perhaps Mark Nordlicht and Kevin Cassidy, about having Agera borrow $30 million for a cash infusion into Platinum.  *Id.* at ¶ 689.  Bodner admitted that he was the point person on this proposed deal because he "was in Agera.  Something like that might have happened because I was down there."  *Id.*at ¶ 686.

With regard to the fraudulent dissipation of Agera to Beechwood on June 9, Fuchs, a partner of Bodner's at Platinum, was clear that Bodner, Nordlicht and Huberfeld were to blame.  Fuchs described the Agera deal as follows:

> [W]hen the [Agera] deal was made, we were being told the entire time that: "There's a big deal coming down. Agera's gonna be sold. Platinum is going to get a ton of money, and everything is going to be back to normal again. ["] Like a normal business, you know, there's -- the business has ups and downs. You can sell this. You can sell that. And everyone was very excited about the Agera deal. All of a sudden, we find out that it was sold to Beechwood, and Beechwood got the assets for -- exactly -- I don't know exactly because I had nothing to do with Beechwood. I didn't know even know what was going on there.

SOMF ¶ 787.  Fuchs indicated that PPVA lost "over 100 million" from the fraudulent transfer.  *Id.* at ¶ 788.

On May 12, 2016, less than a month before Agera was transferred to Beechwood, David Steinberg wrote an email to Mark Nordlicht and David Levy indicating that the Agera deal was in trouble.  *See* SOMF ¶¶ 723-726.  Steinberg wrote that Beechwood was upset because Agera borrowed $7 million from Bodner's Bainbridge, with its high interest rate and costly pre-payment penalty, raising Beechwood's debt to $45 million.  *Id.*  Levy questioned Agera's borrowing, and, in response, Steinberg wrote that he should "[a]sk David Bodner".  *Id.* Given the complex debt structure, Bainbridge and David Bodner's approval, and consent to restructuring, was necessary to transfer Agera to Beechwood.

Bodner's final gambit is to attempt to hide behind Platinum Management's stated valuation process. What Bodner does not mention is that whether the valuation of PPVA's assets was accomplished as set forth in top-line documents is disputed. Even the SEC took issue with Platinum Management's valuation process, particularly with the valuation procedures for PPVA's oil and gas investments such as Golden Gate Oil and Black Elk. *See* SOMF ¶ 343. In September 2015, the SEC criticized Platinum Management's valuation committee meetings, stating that it was unclear whether any valuation determinations had even been made at these meetings. *See id.* at ¶ 591.

Further, not only did Bodner admit to the overvaluation of PPVA's assets, he was regularly called on to address PPVA's inability to pay interest to Beechwood on loans guaranteed by PPVA in the failed co-investments. In one such instance where PPVA could not make payment to Beechwood on Northstar's debt obligations ███████████████████████████████████████

███████████████████████████████████████████

The JOLs allege that PPVA's net asset value was set by Platinum Managements' partners, including Bodner (who told Fuchs that the fund was overvalued at Fuchs' first appearance at a partner meeting), and that Platinum Management's employees were tasked with justifying the numbers.

As a fiduciary with control over PPVA's assets and Platinum Management's operations as PPVA's general partner and investment manager, Bodner breached his duties by failing to disclose the overvaluation of PPVA's assets, creating the corrupt Platinum/Beechwood enterprise, and diverting assets to Beechwood at a time when the government was investigating Huberfeld, his partner, and he was seeking to exit Platinum Management due to criminal investigations into Platinum Management.

The JOLs also have an actionable claim against Bodner for fraud and breach of fiduciary duty in connection with the overvaluation of PPVA's NAV, which Bodner acknowledged, and Bodner's failure to disclose the same, despite his clear "special relationship" to Platinum Management and the

overvaluation scheme. There is also contested evidence in the record that supports Bodner's involvement in the fraudulent looting of PPVA's assets.

In the event that this Court somehow finds that Bodner is not a fiduciary to PPVA as a matter of law, the JOLs assert that the facts set forth herein and in the JOLs' Rule 56.1 statement create contested issues of fact as to Bodner's aiding and abetting fraud, and aiding and abetting breach of fiduciary duty due to his actual knowledge and substantial assistance with various transactions at issue.

Accordingly, Bodner's motion for summary judgment should be denied in its entirety.

## C.      BERNARD FUCHS

The JOLs have brought claims against Fuchs for Breach of Fiduciary Duty (Counts I and II), Fraud and Constructive Fraud (Counts IV and V), Aiding and Abetting Breach of Fiduciary Duty (Count III) and Aiding and Abetting Fraud (Counts VI).

> **1.      There is a Genuine Dispute as to Whether Fuchs Owed a Fiduciary Duty to PPVA Because There is Credible Evidence That Fuchs Exercised Control over PPVA In Material Respects.**

Like Bodner, Fuchs argues that he owed no fiduciary duty to PPVA as a matter of law. This argument fails for the same reasons that Bodner's argument fails.

Fuchs was a longtime investor in PPVA who, in 2014, was granted a ten percent partnership interest in Platinum Management by Bodner, Huberfeld, and Nordlicht due to his efforts in sourcing and managing investors. SOMF ¶ 219.  In exchange, Fuchs was required to stop seeking redemptions and continue to bring investors to the fund.  *See id.*  As a partner, he attended monthly partner meetings, had access to insider information, including Bodner's 2015 conclusion that PPVA's assets were overvalued, and participated in some of the decisions for Platinum Management.  *See id.* at ¶¶ 222-225.  Fuchs also helped market PPVA to investors and attempted to convince current investors

not to seek redemptions, particularly after Platinum Management could no longer hide PPVA's liquidity problems.  *See generally id.* at ¶¶ 234-242.

In addition, Fuchs was involved in managing certain investments, including PPVA's investment in China Horizon, for which Fuchs served on the board of directors as a Platinum representative.  SOMF ¶ 227.  Fuchs led the effort for Platinum Management to market PPVA to investors in Asia and was primarily responsible for investor relations.  *Id.* at ¶ 227-228.  Fuchs came up with ideas as to how to further hide the Platinum-Beechwood relationship (Bernie Fuchs' round trip idea), *id.* at ¶ 223, and he regularly told investors not to be concerned about PPVA's liquidity issues.  *See id.* at ¶¶ 240-241.  In May 2016, Yan Tai, the marketing director for Platinum's Asia Division, wrote an email to Nordlicht, Levy and Fuchs informing them that two Platinum investors sought redemptions, totaling $1.8 million.  *See* Bixter Decl. Ex. 180.  Two days later, after receiving no response, Tai wrote Fuchs and Nordlicht again asking for help in getting the redemptions paid.  Fuchs then wrote privately to Nordlicht and told him, "<u>I will not answer anybody anymore.  **I can't lie anymore** and I can't handle all the pressure anymore.  Please call me!!!!!!!</u>" *See id.*; SOMF ¶ 242 (emphasis added).  Fuchs clearly understood that as a partner of Platinum Management he had a fiduciary duty to PPVA and yet, despite that duty, was dishonest in his management of the fund.

The fact-intensive inquiry into Fuchs' fiduciary status should be determined by the jury in their exclusive role as the finder of fact and should not, as Fuchs contends, be resolved on summary judgment.

> **2.    There is a Genuine Dispute as to Whether Fuchs Breached His Fiduciary Duty to PPVA and Committed Fraud.**

Fuchs asserts that he was not involved in fraudulent schemes orchestrated by Platinum Management. This argument is contradicted by the documents and Fuchs' deposition testimony.

Fuchs' claims he was only a passive investor until his sudden elevation to partnership in 2014. That is not true. As early as 2011, Fuchs was working alongside Platinum Management employees

and using a Platinum Management email address.  SOMF ¶ 221.  At his first partner meeting with Bodner, Nordlicht and Huberfeld, he was witness to Bodner's comments about the overvaluation of PPVA.  *Id.* at ¶ 225.

Fuchs' had intimate knowledge of PPVA's worsening financial condition and constant liquidity crisis, often receiving desperate pleas from Platinum Management president Uri Landesman to raise more money.  SOMF ¶ 224.  This also involved raising funds in connection with the BEOF Funds, for which Fuchs and his relatives were investors.  *See id.* at ¶ 235-237.

Fuchs had knowledge that Platinum Management would regularly engage in overvaluation of PPVA's assets.  Once PPVA's true financial condition became too hard to ignore, Fuchs sent Nordlicht emails telling Nordlicht that he was not willing to lie anymore to investors.  *See* SOMF ¶ 242.  Yet, Fuchs continued to lie.  In the lead up to the Agera sale, Fuchs promised investors that the Agera sale would solve PPVA's financial issues.  *See id.* at ¶ 787.  Fuchs now claims that he had no knowledge of the harm the Agera sale caused PPVA, even though he was the party overseeing the China Horizon investment for Platinum Management when it collapsed after a foreign government's failure to authorize China Horizon's business operations. *See id.* ¶ 227.  Debt held by Beechwood was transferred as portion of the non-cash consideration for the Agera Note.  *See id.* at ¶¶ 775, 798.

As a fiduciary with control over PPVA's assets and Platinum Management's operations as PPVA's general partner and investment manager, Fuchs breached his duties by failing to disclose the overvaluation of PPVA's assets, the extent of the liquidity issues within PPVA that made it impossible to fund PPVA's illiquid investments, and his participation in the Black Elk scheme.

The JOLs also have an actionable claim against Fuchs for fraud, in connection with the overvaluation of PPVA's NAV and Fuchs' failure to disclose that overvaluation, despite his admitted knowledge of the overvaluation after becoming a partner, and even though he had an obvious "special relationship" to Platinum Management and the overvaluation scheme.

In the event that this Court somehow finds that Fuchs is not a fiduciary to PPVA as a matter of law, the JOLs assert that the facts set forth herein and in JOL's Rule 56.1 statement create contested issues of fact as to Fuchs' aiding and abetting liability, due to his actual knowledge and substantial assistance with various transactions and conduct at issue. Accordingly, Fuchs' motion for summary judgment should be denied in its entirety.

### D.   HUBERFELD FAMILY FOUNDATION

The JOLs filed claims against the Huberfeld Family Foundation ("HFF") for Aiding and Abetting Breach of Fiduciary Duty (Count IX), Aiding and Abetting Fraud (Count X) and Unjust Enrichment (Count XV). At its core, HFF was used by its president, Murray Huberfeld, a convicted felon who has admitted to defrauding PPVA, and the other owners of Platinum Management, to disguise payments, either through loans or investments, to individuals and entities on behalf of Platinum Management. These deceptive practices of HFF's president were critical to creating, and maintaining, the illusion that Platinum was a viable and profitable company.

Defendant Bernie Fuchs explained how HFF played a prominent role in these deceptions. In 2016, when Fuchs was a partner at Platinum, he requested approximately $325,000 in redemptions from Platinum in order to pay various philanthropic obligations. SOMF ¶ 171. Platinum was short on cash at the time, and, thus, had HFF, as well as a similar Bodner Foundation, "loan" Fuchs the $325,000 in lieu of redemption. *See id.* at ¶ 172. Fuchs paid a portion of the funds back but acknowledged that he refused to repay most of the "loan" because the $325,000 was his money. *Id.* at ¶ 173. The evidence is clear that Huberfeld, and the other partners, treated HFF as just another Platinum capital pool and used HFF's funds, when necessary, to fund BEOF or disguise Platinum's payments and obligations.

HFF responds that the aiding and abetting claims are deficient because the JOLs failed to establish that HFF provided substantial assistance to the perpetrators, which proximately damaged

PPVA. This is nonsense. Mr. Fuch's testimony alone creates a material issue of fact for the jury on all three claims, but, as is typical in this case, there is so much more.

First, HFF's assertion that it was just "a mere passive investor in the BEOF Fund . . . [with] no management authority or ownership stake in the BEOF Fund . . . and . . . no authority or discretion to control the BEOF Fund's actions" is directly contradicted by the evidence.

HFF's owner and president, Murray Huberfeld, had complete control of the BEOF Funds marketing and knowledge of the plan to subordinate PPVA's interests in the Black Elk Bonds to the equity interests of their friends and family. Huberfeld decided how the BEOF Funds were invested and, importantly, which investors were paid and in what order. *See* SOMF ¶¶ 324, 495. There also is significant evidence that Huberfeld, in his role as owner of HFF, was involved in the Black Elk Consent Solicitation scheme. *See id.* at ¶¶ 465, 542. On June 24, 2014, Nordlicht forwarded an email to Huberfeld regarding the potential close date for the Black Elk Renaissance deal. *Id.* at ¶ 542. Three weeks later, on July 8, Nordlicht sent another email to Huberfeld asking him to distribute the "ppbe list" and informing him that "Black elk signing sale of properties tomorrow and planning on buying out ppbe by end of month. Lets try and see if any investors would like to transfer investments into one of our three funds." *Id.* On July 21, 2014, after the consent solicitation was issued, but before Beechwood consents on July 28, Levy sent Huberfeld a spreadsheet, entitled "WNIC BCLIC BBIL Holdings as of 7-28-14xlsx" showing all positions, including the Black Elk bond holdings of $37 million. *Id.*

HFF also falsely claims that "HFF's February 8, 2013 investment in the BEOF Fund was made prior to the time that Black Elk had allegedly suffered any financial or economic difficulties." (HFF Mem. at p. 13) Again, this is simply not true. The explosion of one of Black Elk's oil production platforms occurred in November 2012, which led to significant well closures, government

investigations, and litigation. SOMF ¶¶ 315-316. There is also substantial evidence that Black Elk was near insolvent prior to the explosion. *See id.* at ¶¶ 317-319.

In January 2013, Huberfeld created the BEOF Funds. Huberfeld was responsible for marketing the "one off investment" that was specifically created "outside of the [PPVA] funds." *See* SOMF ¶ 126. Similar to Platinum Management, Huberfeld had a stake in the entity that managed the BEOF Funds, and Nordlicht directed that Huberfeld be compensated by <u>PPVA</u> for his efforts in connection with the BEOF Funds. *See id.* at ¶¶ 127-128. Huberfeld knowingly invested HFF Funds in this fraudulent scheme to benefit HFF. *See id.* at ¶¶ 165-170, 541.

Second, HFF's motion ignores two important facts. First, HFF rolled over its investment in the BEOF Funds through a new March 2014 offering. SOMF ¶ 168. Despite its contentions, Black Elk's financial condition, by this time, had significantly worsened, rendering it impossible for Black Elk to pay its bondholders, equity holders and its trade creditors, hence the subordination concept. *See id.* at ¶¶ 326-328. Finally, HFF and Huberfeld accepted the fraudulently gained proceeds of the Renaissance Sale *at PPVA's expense*, ***knowing*** that PPVA's Black Elk Bond position had been subordinated to effectuate the equity payment to BEOF Funds - Platinum Management's friends and family. *See generally id.* at ¶¶ 492-543.

HFF's substantial assistance is not limited to the Black Elk Scheme. Huberfeld, and other Platinum Management partners, used HFF as a source of funds to maintain the fraudulent illusion that PPVA was a financially sound hedge fund, rather than an enterprise teetering on the brink of collapse. This gave Huberfeld, Bodner and Nordlicht the required time to divert PPVA's assets to Beechwood, and other insiders, before the government investigations into COBA and the Platinum/Beechwood relationship came to fruition.

During the period 2012-2017, HFF made "loans" totaling $10,019,730 to the following persons or entities: $6.5 million to the Aaron Elbogen Irrevocable Trust; $1,825,000 to Moshe Oratz;

$1,369,730 to the Huberfeld Bodner Family Foundation; and $325,000 to the Fuchs Family Foundation. SOMF ¶ 174. The JOLs contend that these "loans" were made to PPVA investors and insiders in order to keep their money in PPVA and avoid mass redemptions, or to otherwise maintain the illusion of PPVA's viability. As noted above, Fuchs testified that HFF was used to pay him an investor redemption in 2016 that PPVA would be unable to afford. In April 2016, Nordlicht claimed a tax break based on "contributions" made by HFF because the contributions were in fact repayment of loans. *Id.* at ¶ 177.

For these same reasons, there is sufficient evidence in the record to support the JOLs' claim for unjust enrichment. HFF knowingly entered into transactions outside the structure of PPVA in order to subordinate PPVA and unjustly enrich itself by way of the Renaissance Sale. Accordingly, there is substantial evidence HFF aided and abetted the breach of duty and fraud, and was unjustly enriched by its efforts, and, thus, HFF's motion for summary judgment should be denied.

### E.   SETH GERSZBERG

The JOLs have brought claims against Gerszberg for Aiding and Abetting Breach of Fiduciary Duty (Count XIII) and Unjust Enrichment (Count XIV).

Gerszberg's allegation that he had no knowledge of the extent of PPVA's financial crisis is false. Beginning in December 2015, Gerszberg served as a key advisor to Platinum Management in connection with various PPVA investment positions and negotiations with PPVA's creditors. SOMF ¶¶ 821-823. In fact, Gerszberg and his team at The Collective helped to author a January 2016 presentation to Bodner, Huberfeld and Beechwood concerning the crisis within PPVA. *Id.* at ¶ 823-827. This presentation, aided with contributions from David Steinberg (PPVA's Chief Risk Officer) and Naftali Manela (PPVA's Chief Operating Officer), painted a detailed picture of PPVA's financial troubles, including an overstatement of PPVA's net asset value by more than $400 million dollars

and a shocking admission that PPVA, a supposedly billion dollar hedge fund, had unencumbered assets of only $40 million.  *Id.* at ¶ 827.

From January 2016 until the commencement of PPVA's Cayman liquidation, Gerszberg was in the Platinum Management "inner circle" with detailed knowledge of PPVA's financial troubles. *See e.g.,* SOMF ¶ 827-828.  He had knowledge of Huberfeld's arrest and Nordlicht's announcement of PPVA's liquidation shortly thereafter.  *See id.* at ¶¶ 829-30.

When Gerszberg learned that Nordlicht planned to file bankruptcy for PPVA, he took immediate action to benefit his cousins and himself to the detriment of PPVA. Gerszberg's actions with respect to the West Loop/Epocs Forbearance and Security Agreement, which he drafted, demonstrates that Gerszberg affirmatively assisted Platinum Management's breaches of fiduciary duty.  *See* SOMF ¶¶ 831-832.

Armed with the knowledge that PPVA's managers had settled on formal liquidation and as a means to resolve creditor claims, Gerszberg prepared and arranged for the execution of the Forbearance and Security Agreement dated July 5, 2016, under which DMRJ Group LLC, a subsidiary of PPVA that held the valuable Implant Sciences asset, provided West Loop/Epocs a limited, non-recourse guaranty of amounts of more than $7.5 million allegedly owed by PPVA. SOMF ¶ 831-834.  Gerszberg's intention was clear: to provide his family with a subsidiary level (higher priority) encumbrance of PPVA's assets to improve their position in light of PPVA's upcoming liquidation – he even arranged for his cousins to take physical possesion of the Implant Sciences promissory note.

for the case that Gerszberg aided and abetted the breach of fiduciary owed to PPVA by Platinum Management and Nordlicht is clear. Gerszberg had detailed, insider knowledge of PPVA's financial distress, and plans for liquidation. He wielded that knowledge to his own benefit and to the detriment of PPVA. He willfully accepted $15 million of the remaining $20 million held by PPVA at

the same time Nordlicht announced to PPVA's investors that PPVA would be liquidating and operating as a _close-ended fund_.  *See* SOMF ¶¶ 829-831.  Against this backdrop, Gerszberg, one of the few with detailed knowledge of PPVA's financial situation, found the last asset of any value at PPVA – its debt interests in Implant Sciences – and effectively gifted them to entities controlled by his cousins pursuant to a falsely titled "forebearance agreement" to relieve himself personally of liability and to improve his relatives' position.

As Gerszberg admited in his deposition testimony in the DMRJ litigation that forebearance was not the purpose of the forebearance agreement. Indeed there was nothing to forbear.  , He further admitted in his summary judgment motion that the Forbearance  and Security Agreement benefitted him, as it relieved him of the debt burden to West Loop/Epocs..

These facts clearly are sufficient to support an aiding and abetting breach of fiduciary duty claim and an unjust enrichment claim against Gerszberg. Accordingly, Gerszberg's motion for summary judgment should be denied in its entirety.

### F.    EZRA BEREN

The JOLs have brought claims against Beren for Breach of Fiduciary Duty (Counts I and II), Fraud and Constructive Fraud (Counts IV and V), Aiding and Abetting Breach of Fiduciary Duty (Counts III and VII) and Aiding and Abetting Fraud (Counts VI and VIII).

As a portfolio manager entrusted with PPVA's assets, Ezra Beren owed a fiduciary duty to PPVA. Investment advisors who manage funds belonging to others are a classic example of fiduciaries who owe the highest duty of loyalty to those on whose behalf they act; both New York law and the federal law recognize this status and obligation. *See Lowenbraun v. L.F. Rothschild, Unterberg, Towbin,* 685 F. Supp. 336, 343 (S.D.N.Y. 1988) (New York law); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979) (federal law).

31

Through his role managing and evaluating the PEDEVCO investment, Beren knew that the PEDEVCO debt assigned from Beechwood to PGS as part of the Agera Sale was nearly worthless. No later than February 2014, Beren and Steinberg discussed issues with PEDEVCO as disclosed in a third-party valuation report. *See* SOMF ¶ 779(c)(i).  The report concluded, *inter alia¸* that PEDEVCO had "drastically" reduced its recovery and raised its operating costs by a <u>factor of four</u>.  *Id.* By February 2015, Beren had to serve as an intermediary between PEDEVCO and Beechwood when PEDEVCO was unable to make debt payments on its obligations to Beechwood.  *See id.* at ¶ 779(c)(ii)-(iv).  In May 2016, Beren counseled other Beechwood employees that interest on the PEDEVCO debt would likely be deferred – a tacit acknowledgement that the PEDEVCO debt would be transferred to PGS and that there was no hope that the debt was collectable. *Id.* at ¶ 779(c)(x).

Beren participated in valuation committee meetings and had knowledge at all relevant times of the overvaluation of PPVA's assets, particularly its interest in PEDEVCO. SOMF ¶¶ 139-142. The correspondence makes clear that he relayed terms from his father-in-law to senior members of Platinum Management such as David Steinberg, who served as Platinum Management's chief risk officer. *See, e.g., id.* at ¶ 779(c).

Starting in 2015, Beren attended multiple meetings at Agera Energy with, among others, Bodner, Huberfeld, and Saks.  *See* SOMF ¶ 678, 683.  Beren's involvement with Agera Energy continued into spring 2016, including in the critical months leading up to the Agera Sale. At this time, Beren's role *vis a vis* Agera Energy appears to have increased, as he was considered a point of contact by third-parties seeking to invest or otherwise transact with Agera Energy.  *Id.* at ¶ 703.

Beren was also one of the Platinum personnel who cross pollinated between Platinum Management and Beechwood. He received benefits from PPVA while technically working for BAM, and sourced and negotiated deals involving Beechwood using his Platinum email address. *See* SOMF ¶¶ 143-146.

This interconnectedness enabled Beren to act as proxy and conduit for both David Bodner and Murray Huberfeld at both Platinum Management and Beechwood. Beren is the son-in-law of Murray Huberfeld, *see* SOMF ¶ 108, and as set forth below carried out both Huberfeld and Bodner's instructions on various matters concerning Platinum Management and Beechwood. For instance, in the context of a February 2015 discussion over whether Platinum Management would cause PPVA to make interest payments to Beechwood on behalf of PEDEVCO, Beren tells Nordlicht that Huberfeld and Bodner were discussing the issue at Beechwood's offices. SOMF ¶ 779(c)(iii). Beren frequently held meetings, often for several hours, with Bodner and Huberfeld. *See, e.g., id.* at ¶¶ 129-138. Bodner and Huberfeld used Beren to relay their directives concerning Platinum/Beechwood's operations:

- An October 28, 2014 email to Danny Saks, who at that time worked at Beechwood, outlined the structure of a potential Beechwood loan, relaying Huberfeld's demands concerning the minutiae of the transactions, *see id.* ¶ 151.

  ████ In connection with PPVA assuming PEDEVCO's debt obligations to Beechwood due to PEDEVCO's financial collapse ████
  
  ████████████████████████████████████████████

  In November 2014, Beren told Steinberg he would consult with Huberfeld to further discuss Huberfeld's wishes in connection with the PEDEVCO investment, *id.* at ¶ 135;

- A July 13, 2015 email from Beren to Steinberg, told Steinberg that "[w]e need to have a talk with Murray at some point about economics on this deal. Want to address today?" *Id.* at ¶ 136

- On October 23, 2014, after a meeting at Bodner's behest, Beren recited Bodner's detailed formulation of the strictures of a Platinum deal to Steinberg:

  > Spoke with David Bodner,
  > He wants to offer a 3million credit facility with a 2yr term and a 10% coupon on all money outstanding along with the following:
  > At closing, 1mm will be used strictly for the installation of the IBeacon technology in the Simon Malls-15% Equity kicker in stock on a fully diluted basis
  > Additionally, 1 mm will only be available once specific benchmarks (tbd) are reached-Equity Kicker for the addtl 1 mm will be another 7.5% equity in the company
  > The remaining 1mm will only be available once specific benchmarks (tbd) are reached- Equity Kicker for the addtl 1mm will be another 7.5% equity in the company

> He also mentioned that in case the stock soars at any point to throw in a convert feature conv at $1 or somewhere in that range[7]

*Id.* ¶ 134.

- On February 11, 2014, in the wake of a valuation report casting serious doubt on the prospects of PEDEVCO, Beren is copied on an email from Steinberg to Nordlicht asking whether Nordlicht wants to join a call with the valuation company, as "<u>David Bodner will be on it</u>." SOMF at ¶ 779(c)(i).

- 

It is clear that Beren owed—and breached—a fiduciary duty to PPVA. But even if he did not, the facts above would still support the JOLs' aiding and abetting claims against Beren, as he had actual knowledge of the fraud and breach of fiduciary duty committed by Platinum Management and its owners and substantially assisted those Defendants at all relevant times.[8]  Accordingly, Beren's motion for summary judgment should be denied in its entirety.

### G.     THE BEECHWOOD MOVANTS

The JOLs assert claims for alter ego liability (Count XVIII) against BAM, BAM II, BAM Admin, BRILLC, BRE Holdings, and BBIL (the "**Beechwood Entities**"). The JOLs have brought claims against Feuer, Taylor, Narain, BAM, BAM II, and BAM Administrative for Aiding and Abetting Breach of Fiduciary Duty (Count VII) and Aiding and Abetting Fraud (Counts VIII). And the JOLs seek a declaratory judgment invalidating the Nordlicht Side Letter and the Master Guaranty on the ground that they are void as against public policy (Count XX and XXI). The Beechwood Movants seek summary judgment on all of these claims, but, for the reasons detailed below, their motion should be denied in its entirety.

### 1.     Summary Judgment Should Not Be Granted Against The Alter Ego Claims Asserted Against The Beechwood Entities.

---

[7] All quotations are [sic].

[8] Beren contends that he was not one of the controlling persons and was not a proxy for Huberfeld and Bodner at Platinum and Beechwood.  This is *his defense.*  A jury should decide if it is mere coincidence that Huberfeld submitted *forged sports tickets invoices* to Platinum in connection with COBA, while his son-in-law, Beren successfully brought the "investment" in sports tickets to HFF, Beechwood and Platinum.  That enterprise, National Events, was criminal and its *motis operandai* was to *forging sports ticket invoices in order to accomplish the scheme*.  Beren has denied all involvement in COBA and in relation to the forged invoices at issue in COBA.  However it is uncontested that Beren formed the National Events relationship, HFF made the investment in National Events. ▮

The Beechwood Entities seek summary judgment as to Count XVIII of the SAC, asserting that "the record cannot support the Liquidators' alter ego allegations against the Beechwood Entities." (Beechwood Mem. at p. 28).  For the reasons stated below, their motion should be denied.

The elements of an alter ego claim are not in dispute: to sustain their alter ego claim, the JOLs must show that "the owner exercised domination over the corporation and that the domination was used to commit a fraud or wrong." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 295 F. Supp. 2d 366, 379 (S.D.N.Y. 2004); *Motorola Credit Corp. v. Uzan*, 739 F. Supp. 2d 636, 640 (S.D.N.Y. 2010)( "[t]he party seeking to pierce the corporate veil must further establish that the controlling corporation abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.")(internal citations omitted.)

New York courts consider multiple factors in determining whether domination and control of the corporation existed, including: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

"[T]he decision whether to pierce the corporate veil must be based on the 'attendant facts and equities' of each separate case, and cannot be reduced to a set of formulas and factors with pre-determined weights." *In re Stage Presence, Inc.*, 592 B.R. 292, 303 (Bankr. S.D.N.Y. 2018), aff'd, 2019 WL 2004030 (S.D.N.Y. May 7, 2019) (citing Matter of Morris, 623 N.E.2d 1157 1160-61 (N.Y.

35

1993)); *Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 914 (S.D.N.Y. 1991) ("piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury.")

The record shows a different story, and domination and control by Platinum are sufficiently established to defeat the Beechwood Entity's motion. While brevity demands that not all of these facts be listed here, it is clear that, at the very least, these facts, and others in the Rule 56.1 Statement, demonstrate a legitimate factual dispute as to the alter ego relationship:

Beechwood was created by the partners at Platinum Management (Bodner, Huberfeld, and Nordlicht), and, as is evident from a March 20, 2013 email from Huberfeld to Feuer, had the purpose of intermingling assets with Platinum:



SOMF ¶ 413.  In September 2014, Levy, while wearing his hat as CIO of Beechwood, submitted a "one pager" to Nordlicht, where he agreed that 5% of all Beechwood assets would be invested in PPVA or PPCO assets.  *Id.* at ¶ 438.

Bodner, Huberfeld and Nordlicht beneficially owned each Beechwood enterprise. SOMF ¶ 360. The working capital and emergency funding was also provided by Bodner, Huberfeld and Nordlicht, as was the regulatory-required $100 million capitalization, albeit through a demand note supported, not by cash, but by a collection of inflated PPVA limited partnership interests. *See id.* at ¶ 363.  Bodner, Huberfeld and Nordlicht actively dictated investments and were involved in

employment and strategic decisions on behalf of the Beechwood Entities, sometimes with little to no involvement from Feuer or Taylor.  *See generally, id*. at ¶ 458-481.

Nordlicht expressly acknowledged the lack of corporate formalities.  In an email concerning consolidation of trader fees among Beechwood and Platinum Management, Nordlicht stated: "[t]he portfolio managers are the same!!! Hence the management is the same in my mind!!! Was this communicated to cs??  There is cross ownership in both entities. We are being treated from regulatory standpoint as affiliates, we might as well get credit for it [*sic*] administratively."  SOMF ¶ 460.  According to Feuer, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  *Id.* at ¶ 617.  Regarding the deteriorating Black Elk situation in November 2014, Feuer told Daniel Saks that ███████████████████████ ████████████████  In August 2015, Beren was writing third parties that: "The compensation terms for [portfolio managers] are the same for investments taken by PPVA, PPCO and Beechwood. So in essence Steinberg and Beren are PM's for PPVA, PPCO and Beechwood.  Same principles, just different sources of capital."  *Id.* at 145.

None of the Beechwood-Platinum Management transactions were at arms-length and in certain egregious circumstances, like the Nordlicht Side Letter and Agera Note Sale, were completely unsupported by typical legal, valuation, or other external process or opinions. *See, e.g.*, SOMF ¶ 505, 707.  A revolving door of Platinum Management executives and employees, including, but not limited to, David Levy, Ezra Beren, Danny Saks, Eli Rakower, Stewart Kim, Naftali Manela, David Leff, and David Ottensoser, simultaneously pursued Platinum Management and Beechwood investments and were compensated by both entities.  *See id.* at ¶¶ 57, 104 (Levy); *id.* at ¶¶ 143-147 (Beren); *id.* at ¶¶ 58, 151 (Saks); *id.* at ¶ 142 (Rakower); *id.* at ¶ 462 (Kim, Leff, Ottensoser);  *id.* at ¶ 628 (Manela).Beechwood executives operated out of Platinum Management offices and vice versa.

Huberfeld and Nordlicht held personal offices at Beechwood, hidden behind personal assistants who were instructed not to mention their presence at Beechwood unless the call was from a trusted person.

There also is ample record evidence showing that Platinum Management used the Beechwood Entities to commit fraud.  Platinum Management used the Beechwood Entities to engage in the various non-commercial, insider transactions by which Platinum Management was able to artificially inflate PPVA's net asset value and eventually transfer or encumber PPVA's assets for the benefit of the Beechwood Entities and their owners, to the detriment of PPVA. These transactions included, without limitation:

- The GGO Note Purchase Agreement, whereby Platinum Management caused PPVA to sell its interest in uncollectable Golden Gate Oil debt to the Beechwood Entities, with the hidden failsafe of the GGO Put Option and Guaranty, permitting Beechwood to put the debt back to PPVA at any time. Golden Gate Oil never made payments on this debt, with all interest payments made by PPVA.  SOMF ¶¶ 245-246.

- The Black Elk Scheme, whereby Beechwood was used as a fraudulent tool to enable Platinum Management insiders, friends and designated investors/creditors to take the proceeds from the sale of the assets of PPVA's largest investment, Black Elk, in contravention of the prior rights of PPVA and Black Elk's other creditors, while leaving the Black Elk investment worthless to PPVA. *See id.* at ¶ 511, 513-515, 523.

- The Black Elk Bond Buyback, whereby Platinum Management caused PPVA to purchase Beechwood's entire holdings of Black Elk Bonds at near par value, even though those bonds were trading at 22% of par the month before. *See generally id.* at ¶¶ 544-566.

- The Nordlicht Side Letter, a one page document dated January 13, 2016, signed by Mark Nordlicht, and witnessed by Mark Feuer, which requires PPVA, and any of its subsidiaries and affiliates holding the valuable proceeds from the sale of Implant Sciences, to use such proceeds to pay approximately $37 million of uncollectable debt owed to Beechwood by Golden Gate Oil, for no benefit to PPVA. *See generally id.* at ¶¶ 642-646.

- The March 2016 "Restructuring" and the Master Guaranty between and among PPVA, certain of its subsidiaries, and Beechwood, among others, by which Beechwood was granted liens on available PPVA assets to further collateralize uncollectable Golden Gate Oil debt and the Beechwood Entities sold Navidea stock to PPVA for twice its then market price. *See id.* at ¶ 646-651.

- The Agera Transactions, the June 9, 2016 transfer of one of PPVA's last valuable assets, a majority interest in Agera Energy, worth an undisputed amount of <u>at least</u>

$205 million, to Beechwood and its insurance clients, for under value consideration. *See id.* at ¶¶ 695-729.

In summary, there is overwhelming evidence that the Beechwood Entities are the alter ego of Platinum Management, at all times treated as the reinsurance arm of Platinum Management by Nordlicht, Huberfeld and Bodner, their common owners. In addition, the record shows that Platinum Management and the Beechwood Entities' common owners used the Beechwood Entities as a tool to enrich themselves to the detriment of PPVA. At a minimum, a genuine dispute of material fact sufficient to require a jury to determine whether the Beechwood Entities were the alter ego of Platinum Management.

### 1.    Summary Judgment Should Not Be Granted on *In Pari Delicto*

The Beechwood Movants assert that the prudential rule established by the Second Circuit in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) deprives the JOLs of standing to pursue the aiding and abetting claims at issue here and/or that such claims are barred by the common law affirmative defense of *in pari delicto. Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010). As such, these defendants argue that they are entitled to summary judgment as a matter of law.

The Beechwood Defendants are wrong. First, *in pari delicto/Wagoner* does not apply to corporate insiders/alter egos of Platinum Management such as the Beechwood Entities, and evidence produced through discovery has revealed that, as asserted in the JOLs' Second Amended Complaint, Feuer and Taylor were indeed corporate insiders of PPVA as well.

In the event that this Court concludes that Feuer and Taylor are not corporate insiders, it is clear that the actions taken or overseen by them in conjunction with the Black Elk Scheme, the Black Elk Bond Buyback, the Nordlicht Side Letter and the Agera Sale (as to Narain as well) were undertaken for the benefit of other parties and to the detriment of PPVA. Under these circumstances, the adverse interest exception applies.

Finally, the Beechwood Movants' motion wrongly describes Mark Nordlicht as the sole actor, disregarding that PPVA also consisted of numerous other parties, including limited partners/innocent investors managed by independent Cayman directors that could have taken steps to halt the fraudulent conduct orchestrated by the Defendants with the aid and assistance of Feuer, Taylor and Narain and others had they been alerted to the same. Indeed, the Platinum enterprise was a large organization with substantial constituencies, most of whom have testified that they did not know about the fraud.

### a. The Corporate Insider Exception Applies To Permit Claims Against the Beechwood Movants.

First, as this Court previously held, neither the *Wagoner* prudential standing rule nor New York's *in pari delicto* doctrine applies to claims asserted against alter egos of corporate insiders. *Trott v. Platinum Management (NY) LLC (In re Platinum-Beechwood Litigation)*, 2019 WL 2569653, * 5-6 (S.D.N.Y. June 21, 2019) ("**June 21ˢᵗ Order**"). As set forth in Section I.G. above, material facts are contested as to whether the Beechwood Entities are alter egos of Platinum Management, the general partner and investment manager of PPVA, due to common ownership and control in furtherance of a fraud. The Court need not look any further for a basis to deny them the *in pari delicto* defense.

Further, the JOLs respectfully request that due to the availability of new evidence obtained through discovery, this Court should revisit its previous holding that Feuer and Taylor are not corporate insiders of PPVA.[9]

---

[9] *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("The law of the case doctrine, however, does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss."); *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015) (explaining that renewed examination of arguments first raised in a motion to dismiss is warranted on summary judgment because the court's inquiry at summary judgment is different from the inquiry on a motion to dismiss); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 141–42 (E.D.N.Y. 2009) ("[B]ecause of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment.")

What has been learned through discovery is that, despite Feuer and Taylor's contentions, Beechwood was not a separate company and the concept was not theirs. Beechwood was presented to Platinum by Kerry Propper, and the original plan was for Platinum to receive 50% of the reinsurance proceeds obtained by a joint venture between Platinum and another entity, Alpha Re. SOMF ¶ 395.

When presented with this idea, Platinum *hired* Feuer and Taylor to act as consultants and work on the Platinum re-insurance deal. SOMF ¶ 400. After a term sheet was signed, the parties had exchanged information and were about to close, Platinum decided to steal the idea, breach the term sheet and their NDA. *See id.* at ¶ 412. In short, the foundation for the Court's prior ruling, that Feuer and Taylor did not work for Platinum, is untrue.

Beechwood just happened to be the name of one of Feuer's prior investment vehicles that had a separate insurance business, and they decided to use it for Platinum's re-insurance arm. Beechwood was born in Platinum's offices. SOMF ¶ 428. Feuer, and particularly Taylor, reported to work at Platinum once Beechwood was launched. *Id.* at ¶ 429. When Beechwood obtained their first "client" – CNO – CNO went to Platinum's offices for initial meetings and the focus was on "continuity" of Platinum's investment strategy. *Id.*

When it became clear that Beechwood could not invest ***all*** of the re-insurance proceeds at Platinum, it was agreed between Platinum and Beechwood that Beechwood would purchase various Platinum debt. However, Beechwood ensured and pressured Platinum to pay interest on this debt at all relevant times.

An employee's title alone will not dictate his/her status as an insider for *in pari delicto/Wagoner* purposes. *See In re Glob. Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012). "Just as an individual's formal title and position in a company should not determine their insider status, so too, a person's deliberate divesting of any formal title and position in a company

41

should not, without closer inspection, dictate that he be deemed a third party, non-insider." *In re PHS Group*, 581 B.R. at 32. An insider's status, *i.e.*, <u>control</u>, should be determined "based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *In re Borders Grp.,Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011). A third party may be deemed an insider when he executes "actual management of the Debtor's affairs" to afford him "***an opportunity to self-deal.***" *In re 455 CPW Assoc.,* No. 99-5068, 2000 WL 1340569, at *5 (2d Cir. Sept. 14, 2000) Of course – self-dealing as between Platinum and Beechwood is precisely what occurred.

Here, there is sufficient evidence in the record to afford the jury the right to determine whether Feuer and Taylor were corporate insiders of PPVA and thus not afforded availability to the *in pari delicto*/*Wagoner* defense.

> **b.    The Adverse Interest Exception Applies to the Misconduct of Feuer, Taylor and Narain.**

It is well settled that the *in pari delicto* defense fails, and the conduct of an entity's agent will not be imputed to the entity, when the agent at issue is acting in his or her own interests and adversely to the interests of the entity. *See, e.g., Center v. Hampton Affiliates*, 488 N.E.2d 828, 829-830 (N.Y. 1985) (stating rule); *Kirschner*, 938 N.E.2d at 951. The exception exists "where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (*i.e.*, 'adverse') to the corporation's own interests." *Kirschner*, 938 N.E.2d at 952. The adverse interest exception applies to cases involving looting and embezzlement, "where the insider's misconduct benefits only himself or a third party; *i.e.*, where the fraud is committed against a corporation rather than on its behalf." *Id.* at 952.

Under this exception, a manager's misconduct will not be imputed to a corporation when the manager is defrauding the corporation in concert with a third party – there can be no presumption that the manager has disclosed all material facts to the corporation, as disclosure would defeat the fraud. *Hampton Affiliates*, 488 N.E.2d at 829-830.

The determinative factor is whether the agent's actions provided a benefit to the corporation. It has recently been clarified that "the mere continuation of a corporate entity does not *per se* constitute a benefit that precludes application of the adverse interest exception." *Simon Conway, et al. v. Marcum & Kliegman LLP*, 176 A.D.3d 477, 477-78 (N.Y. App. Div., 1st Dep't 2019) (rejecting prior, unreasonably narrow interpretations of the adverse interest exception).

In *Simon Conway*, the 1st Department rejected defendants' argument that the hedge funds' continued survival for another two years after the defendants had completed their audits constituted a sufficient "benefit" to defeat the adverse interest exception – i.e., to contravene the allegation that the manager's conduct was entirely for its own or a third party's purposes. Id. at 478. As the court explained,

> [R]eliance on speculation about the benefits to be derived from the continued existence of an entity is inconsistent with the analysis of the adverse interest exception in *Kirschner*. It may be possible in every case to construct a hypothetical scenario where the company teetering on the brink of insolvency because of its agent's fraud meets with an opportune circumstance that allows it to resume legitimate business operations. Permitting such speculation would render the adverse interest exception meaningless. Further, an ongoing fraud and a continued corporate existence may harm a corporate entity: The agent may prolong the company's legal existence so that he can continue to loot from it, as appears to have been the case here.

*Id.* at 478.

"[T]he applicability of the adverse interest exception must be evaluated with respect to specific instances of alleged misconduct. June 21 Order at * 6. Here, there are contested issues of fact as to the purported benefit PPVA received from several of the transactions outlined in the JOLs' Second Amended Complaint that bar summary judgment.

Black Elk Bond Subordination. This Court already held that the allegations set forth in the JOLs' Second Amended Complaint are sufficient to trigger the adverse interest exception in connection with the Black Elk Scheme, where Platinum/Beechwood executives engaged in various

maneuvers to create a fraudulent consent solicitation to subordinate PPVA's bond holdings to the equity interests of Platinum Management's friends and family. June 21 Order at *6. The Beechwood Movants can point to nothing revealed through discovery that refutes these facts. Instead, they argue that PPVA somehow benefitted from the Black Elk Scheme and the subordination of its bonds, because of put options granted by PPVA in 2013 in connection with PPVA's sale of Preferred E Equity shares, granting Preferred E equity holders the right to sell its shares back to PPVA.

The Beechwood Movants are not telling the full story. In the ensuing months, the majority of these put options were rendered moot as a matter of law, whether due to redemption of preferred E Equity by Black Elk or through a rollover of the BEOF Funds through a March 2014 exchange offer. *See, e.g.,* SOMF ¶¶ 168, 347. By the time of the Consent Solicitation, the put obligations had been reduced to $20 million, which was roughly the same as PPVA's Black Elk Bond holdings (approximately $18 million) and significantly less to the amount of bonds sent to Beechwood. *See* SOMF ¶¶ 347, 560. More importantly, the remaining put option owed at the time of the Consent Solicitation was never exercised and was at all times a contingent obligation of PPVA, with the direct obligor being Black Elk, the issuer of the shares. This type of "speculative benefit" is the type that does not cut against the adverse interest exception. *Simon Conway*, 176 A.D.3d at 478.

The Black Elk Bond Buyback. The Beechwood Movants also argue that the adverse interest exception does not apply to the January 30, 2015 Montsant Transactions and the January 30, 2015 repurchase of more than $35 million in Black Elk Bonds held by the Beechwood Entities ("**Black Elk Bond Buyback**"). The Beechwood Movants are wrong.

First, the Beechwood Movants conveniently ignore the evidence of Black Elk's financial situation in the wake of Renaissance Sale, whereby Black Elk sold its remaining prime assets and substantially all of Black Elk's employees were fired at the direction of Platinum Management. By January 2015, Black Elk had one remaining offshore well in operation and was losing $2 million a

month.  SOMF ¶ 349.  Indeed, as early as June 2014, Nordlicht commented that the Renaissance Sale would result in a Black Elk bankruptcy, which was indeed filed in August 2015.  *See id.* at ¶ 351.

The market took notice. On December 9, 2014, Platinum Management's broker dropped the price of Black Elk Bonds to 22% of par, reflecting the market's view of Black Elk's ability to pay amounts due for the bonds.  SOMF ¶ 545.  Thereafter, Platinum and Beechwood employees manipulated the market by asking connections to post offers for, and purchase the bonds at, substantially inflated prices without disclosing that the offers were being orchestrated and paid for by Platinum Management in order to boost the market price for the Black Elk Bonds.  *See id.* at ¶ 545-552.  Also around this time, Feuer, Taylor and Platinum Management negotiated a deferred interest agreement, obligating PPVA to pay interest on the Black Elk Bonds held by Beechwood and post over $2 million of collateral to ensure payment. *See id.* at ¶ 560.

Second, the Beechwood Movants' characterization of the Black Elk Bond Buyback as an arms-length transaction where Nordlicht needed Black Elk Bonds for the creation of Northstar does not comport with reality. PPVA could have purchased any additional bonds they required on the open market for a substantially lower price, raising a disputed issue of fact as to whether the repurchase of Black Elk Bonds from Beechwood was truly necessary to effectuate the Northstar transaction. This is further called to question by the Montsant Transactions, under which PPVA was forced to borrow funds in order to buy the bonds. Finally, there is also evidence that Beechwood, and its investor clients, desperately wanted to get rid of its Black Elk position in the wake of the Renaissance Sale. *See* SOMF ¶ 539.  These facts call to question the propriety of the transactions and dispel the notion that PPVA received any benefit at all for the Black Elk Bond Buyback.

The Nordlicht Side Letter. – Based on nothing but Mark Feuer's testimony, the Beechwood Movants argue that the January 2016 Nordlicht Side Letter, a three paragraph document purporting to encumber approximately $35 million due to DMRJ, PPVA's subsidiary, from the expected sale of

Implant Sciences, somehow benefitted PPVA. This argument is not credible and certainly is in dispute.

The Beechwood Movant's assertions that Nordlicht executed the Nordlicht Side Letter "to avoid BAM Admin from placing Implant into default" is incredible on its face. This purported "bargain" is belied by the Nordlicht Side Letter itself, as BAM's purported agreement to "forbear" defaulting Implant Sciences is nowhere stated in that document. *See* Bixter Decl. Ex. 622 SAC at Ex. 75. Indeed, the Nordlicht Side Letter does not obligate BAM to do or not do, to give or not give, anything, as consideration for allegedly obligating PPVA and its affiliates (including DMRJ) to guaranty payment of the Golden Gate Oil debt.

Further, Feuer's contention that he was threatening to default Implant Sciences is not supported by any documentary evidence in this case. Beechwood was well aware that Implant Sciences was engaged in a marketed sale process, and that it was accepting bids from potential buyers two days before the Nordlicht Side Letter was allegedly executed. SOMF ¶ 646. A notice of default would have done nothing but decreased the sale price and Beechwood's chance of recovery. On its face, the Nordlicht Side Letter is the type of "embezzlement and looting" to which the adverse interest exception applies.

The Agera Sale – As this Court stated in the June 21 Order:

> The fact that PGS received $45 million in cash from the Agera Sale does not prove that PPVA (through PGS) received a benefit from the sale. To the contrary, it is reasonable to infer based on the pleadings that PGS could have received significantly more cash if the convertible note had been sold at a market price. To hold that any amount of cash received is a benefit, even if that cash pales in comparison to the value of the assets for which it was exchanged, would render the term "benefit" meaningless. That said, defendants may well be able to show after discovery that PPVA received necessary liquidity from the Agera Sale. If this liquidity enabled PPVA to sustain its operations, then it may qualify as a benefit, even if the convertible note was sold below market price. And if the Agera Sale benefitted PPVA, then the adverse interest exception does not apply[.]

(June 21 Order at * 13)

46

Latching onto the opening, Beechwood Movants contend that the Agera Sale was done for liquidity purposes based on: (i) the self-serving testimony of various Defendants in this case; (ii) discussions between Nordlicht and Michael Katz, during a time when Nordlicht was attempting to persuade Marcos Katz, Michael Katz's father, to invest additional funds in PPVA; and (iii) PGS's receipt of only $20 million from the closing of the Agera Sale. (Beechwood Mem. at p. 25-28).

However, the Agera Sale on June 9, 2016 was not for liquidity purposes.  CNO's forensic examiner, who met with Beechwood and Narain in particular during the course of their investigation, summarized the Agera transaction as follows: "bad debt [held by Beechwood] was exchanged for new [good] debt."   SOMF ¶ 712.

To be clear, there does not appear to be any dispute in the record that Agera was worth more than $200 million.  It was sold for $170 million, but $120 million of the "purchase price" actually consisted of "bad debt" that Beechwood ***knew*** to be worthless.  That is not a transaction for liquidity, but rather is a classic dissipation.

The Beechwood Movants also fail to mention that at the same time Platinum Management began the process of selling the Agera Note, the government had an ongoing criminal investigation into the COBA Scheme and had expanded its investigation into the Platinum/Beechwood relationship, and this was the true catalyst for the accelerated sale.  *See generally*, SOMF ¶¶ 584-601.

Once the expanded investigation came to light, the transfer of the Agera Note to Beechwood was immediately accelerated on instructions from Mark Nordlicht to David Steinberg, who "led" negotiations on behalf of PPVA and stated in writing that the terms of the Agera Sale were fundamentally against the business interests of PPVA.  *See* SOMF ¶ 709; *see also id.* at ¶¶ 706-713. The writing on the wall was clear as is the true motive of the Agera Sale: to offload one of PPVA's remaining assets of value under the guise of "debt forgiveness" before the arrests began.

47

Despite attempts by Platinum and Beechwood executives to fast track the sale, they did not get it done fast enough. On June 8, 2016, Huberfeld, the founder of PPVA and an owner of Beechwood, was arrested in connection with the COBA Scheme. SOMF ¶ 600. The FBI also executed a search warrant at Beechwood's offices that morning. Feuer, Taylor and Narain decided to close the deal anyway, following a 6:40 a.m. directive from Narain to "move aggressively to close and fund as soon as humanly possible." Six days later, Nordlicht announced to investors (including Beechwood) and the public that PPVA would be entering liquidation. *Id.* at ¶ 785.

It cannot be credibly argued that the Agera Sale, which Beechwood admits only provided PGS with $20 million on June 9, 2016, was for the purposes of liquidity. Records produced in this case demonstrate that a substantial majority of the funds received by PGS in connection with the Agera Sale were diverted to Seth Gerszberg, a Platinum insider, or to Platinum Management. SOMF ¶ 786. Given Nordlicht's announcement of PPVA's liquidation, the funds paid to Platinum Management at that time were in satisfaction ***of a creditor claim*** and not for PPVA's liquidity issues or the survival of PPVA. The Agera sale provided almost no liquidity to PPVA and, instead, left PPVA without its most valuable asset, leaving the Cayman liquidation without a means of funding itself.

Perhaps most importantly, the non-cash consideration portion of the Note Purchase Price did not provide any liquidity to PPVA or any benefit to PPVA. The non-cash consideration consisted of the assignment of debts owed by PEDEVCO, China Horizon and PPCO. SOMF ¶¶ 710-711. The record is replete with evidence that PEDEVCO and China Horizon were struggling and unable to pay debts. *See, e.g., id.* at ¶¶ 777-779. Narain admitted that these companies would be unable to satisfy their debt obligations, and due to the liquidity crisis within Platinum, it is evident that PPCO would not be able to cover for PGS on the assigned debt either. *See id.*

The remainder of the non-cash consideration was paid in the form of subordinated equity interests in AGH Parent, the holding company for the Agera Note, under circumstances where that

48

same entity was loaded with debt for Beechwood's benefit. The majority of these subordinated equity interests were redeemable for "PGS value," Platinum-affiliated debt chosen by Beechwood at its sole discretion.  SOMF ¶¶ 797-798.  Beechwood and particularly Narain chose to "redeem" this interest with more bad debt – including in the long-shuttered Golden Gate Oil – debt that he *knew* had no value.  The Agera Sale is the exact type of "looting and embezzlement" that the adverse interest exception is meant to address.  At the very least, this is a question for the jury to answer.

a.    Sole Actor Rule

The sole actor rule bars application of the adverse interest exception to imputation when the defrauded corporation was so completely controlled and dominated by its bad actor agents that the court determines the corporation to be a mere alter ego of its agents without any distinct identity, as "it would be nonsensical to refrain from imputing the agent's acts of fraud to the corporation . . . because the agent is identical to the corporation." *In re Lehr Constr. Corp.*, 528 B.R. 598, 610 (Bankr. S.D.N.Y. 2015), aff'd, 551 B.R. 732 (S.D.N.Y. 2016), aff'd, 666 F. App'x 66 (2d Cir. 2016) (quoting *In re CBI Holding Co., Inc.*, 311 B.R. at 373). The sole actor rule will apply where "the corporate principal and its agent are indistinguishable, such as where the agent is a corporation's sole shareholder. . . or where the corporation bestows upon its agent unfettered control and allows the agent to operate without meaningful supervision with respect to a particular type of transaction." *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 710 (S.D.N.Y. 2001), *aff'd sub nom. In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003).

This case bears no resemblance to the types of cases where the sole actor rule applies. *Compare In re 1031 Tax Grp.*, 420 B.R. at 205 (sole actor rule applied where wrongdoer was the sole shareholder of the company) with *In re CBI Holding Co, Inc.*, 529 F.3d 432, 453 n.9 (2d Cir. 2008) (finding sole actor rule did not apply where bad actor corporate managers were not sole shareholders, there was no finding that shareholders were complicit in the fraud, and bankruptcy court found that

48% shareholder was innocent of the fraud); and *Cobalt*, 2009 WL 2058530, at *8, n.12 (explaining that the sole actor rule was not applicable where innocent shareholders had rights under the corporation's bylaws to call meetings, vote on certain matters, and, most importantly, to remove managers for willful or grossly negligent violations of the corporation's governing documents). PPVA is not a closely held corporation with unity between a small group of managers and owners. PPVA was a hedge fund consisting of investors represented through the Feeder Fund limited partners, as well as a general partner that contained dozens of employees at a time. The Beechwood Movants' argument that Mark Nordlicht is the sole actor on behalf of all of PPVA is belied by common sense and the substantial evidence that Platinum had numerous parties and actors.

### 1.   Innocent Insider Rule

The "innocent insider" rule is a counter to the sole actor rule which applies where there is evidence that an innocent insider existed who could have and would have stopped the fraud if he/she had been made aware of it. *See In re 1031 Tax Grp.*, 420 B.R. at 202–03 ("If an innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply."). The rationale for the innocent insider rule is that "where only some members of management are guilty of the misconduct, and the innocent members could and would have prevented the misconduct had they known of it, the culpability of the malefactors should not be imputed to the company because that imputation would punish innocent insiders (*e.g.*, non-culpable shareholders) unfairly." *In re CBI Holding Co.*, 311 B.R. at 372; *See In re 1031 Tax Grp.*, 420 B.R. at 204 (affording greater weight to innocent shareholders rather than innocent control persons).

To invoke the innocent insider rule, the plaintiff must show that the individual was not involved in or aware of the wrongdoing, had the ability to intervene to stop the fraudulent activity if

he had been aware of it, and actually would have done so if he had been informed of the fraud. *See In re 1031 Tax Grp.,* 420 B.R. at 205.

Here, it must be noted that PPVA is not a corporation with a shareholder class consisting entirely of bad actors. Rather, PPVA consisted of Platinum Management, its general partner, and its feeder funds, which held limited partnership interests in PPVA.  SOMF ¶¶ 1, 9.  The Feeder Funds held the interests of investors in PPVA, including third-party investors with no connection to Platinum Management or its executives, and who were damaged by the fraudulent conduct of Beechwood.

These investors were provided with representatives that could take action on their behalf to stop fraudulent conduct from occurring: David Bree and Don Seymour (the "**DMS Directors**")[10], in their capacity as independent employees of DMS Offshore Investment Services ("**DMS**"), who served as directors for the Offshore Feeder Funds until their public resignation following the arrest of Murray Huberfeld.  SOMF ¶ 13.  Platinum Management president Uri Landesman served as the other board member of the Feeder Funds until April 2015, at which point he was replaced with Nordlicht.  *Id.*

The DMS Directors had oversight authority with respect to the Offshore Funds, and by extension, PPVA, which they frequently exercised by regularly holding board meetings, engaging in active discussion of the financial condition of PPVA, requesting and reviewing periodic updates on PPVA's financial performance and pending audits, and liaising with Cayman Islands Monetary Authority ("**CIMA**") on PPVA's behalf regarding outstanding audits.  SOMF ¶ 25.

The DMS Directors retained authority to terminate Platinum Management as investment manager for the Offshore Feeder Funds and to terminate Mark Nordlicht as a director.  SOMF ¶ 14.

---

[10] While PPVA intends to call the DMS Directors as witnesses in any trial, they are by no means the only innocent actors and the focus on DMS herein should not be construed as anything other than an indication of PPVA's present intent to call DMS.  There are other potential innocent actors, including shareholders, creditors and other management.  It defies credulity to suggest that Mark Nordlicht was the sole wrongdoer at Platinum.

The timing and events surrounding the DMS Directors' resignation make clear that the DMS Directors were exercising their authority to resign in light of the newly revealed information regarding Huberfeld's arrest, Nordlicht's announcement of PPVA's liquidation, and the full extent of PPVA's liquidity crisis. The DMS Directors gave initial notice by email dated May 25, 2016 of their intent to resign from the Offshore Feeder Funds, and shortly thereafter submitted formal letters of resignation dated May 31, 2016 and effective as of June 30, 2016.  SOMF ¶¶ 26-27.

The DMS Directors initially were willing to assist Platinum Management in locating replacement directors and acknowledging the time sensitive nature of such task.  SOMF ¶ 28.  The willingness to assist Platinum Management in locating suitable replacement directors to ensure a smooth transition after their resignation, however, appears to have changed immediately when news reports became public about Huberfeld's arrest and the fraudulent conduct associated with the COBA Scheme. On June 14, 2016, the DMS Directors contacted Platinum Management to discuss the *Wall Street Journal* article published on the same date regarding the COBA Scheme and unwinding of PPVA. *Id.* at ¶ 29.  On June 15, 2016 the DMS Directors informed Platinum Management that "given recent events" their resignations would be immediately effective, and revised resignation letters were submitted. No reference was made to Platinum's ability to secure replacement directors in the revised notice.  *Id.* at ¶ 30.

Given that the DMS Directors originally were cognizant of the need for suitable replacements to be located prior to the effective date of their resignation, but upon learning of the fraudulent activity at Platinum resigned effective immediately, it can be argued that not only did the DMS Directors have the corporate authority to take steps to stop the fraud perpetrated by the Defendants, but also that they certainly would have done so earlier if fully informed, as evidenced by their resignation within 24 hours of reading press reports concerning the COBA Scheme.

Accordingly, the DMS Directors served as innocent actors with sufficient corporate authority in order to negate the Beechwood Movants' reliance on the sole actor exception. At the very least, there are contested issues of fact concerning the existence of innocent actors and summary judgment is not appropriate.

        **ii.**        **Summary Judgment On The Merits Of The Aiding And Abetting Claims Is Inappropriate.**

In attacking the substantive merits of the aiding and abetting claims asserted against them, the Beechwood Movants largely rely on the same argument raised in connection with their *in pari delicto* defense discussed above: that the transactions between PPVA and Beechwood benefitted PPVA by providing PPVA with "liquidity" or funded companies in which PPVA held investment positions. In support of this argument, the Beechwood Movants concoct an alternate version of reality, relying on self-serving testimony of Beechwood executives and other Defendants. Crediting this argument would require the true reality of what occurred.[11]

If a company's controlling shareholders stand on both sides of a transaction, Courts will apply a fairness standard to the transaction to determine whether a breach of fiduciary duty occurred. *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 501-502 (S.D.N.Y. 2005); see also *Croton River Club v. Half Moon Bay Homeowners Ass'n (In re Croton River Club)*, 52 F.3d 41, 44 (2d Cir. 1995) (in commercial matters, if the business judgment rule does not protect a fiduciary's decision, then the burden falls upon the fiduciary to demonstrate that its actions were reasonable and/or fair). As stated by this Court in *Int'l Equity*:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The latter aspect of fairness relates to the economic and

---

[11] For reasons stated in the "adverse interest" section above, the JOLs' vigorously dispute that PPVA received sufficient benefits from Beechwood in connection with the Black Elk Scheme, the Black Elk Bond Buyback, the Nordlicht Side Letter or the Agera Sale.

> financial considerations of the proposed merger, including all relevant
> factors . . . . However, the test for fairness is not a bifurcated one as
> between fair dealing and fair price. All aspects of the issue must be
> examined as a whole since the question is one of entire fairness.

*Id.* (holding that the fairness standard is substantially similar under New York and Delaware law).

Here, there can be no dispute that the fairness standard applies to all dealings between Platinum Management and the Beechwood Movants. It is undisputed that Platinum Management's majority owners – Huberfeld, Bodner and Nordlicht – established Beechwood and held equity interests in the Beechwood enterprise for which they each received compensation. *See* SOMF ¶¶ 360-361, 372-381. Platinum Management are on both sides of all transactions at issue.[12] Beechwood cannot credibly argue against this.

Nor can they credibly argue that the myriad of transactions Platinum Management caused PPVA to enter into with Beechwood were accomplished at a fair dealing or at a fair price. As but one example set forth in JOLs' Rule 56.1 Statement, consider the Agera Sale. The Beechwood Movants' argument that non-cash debt instruments transferred to PPVA as part of the Agera Sale were of significant value is incredible on its face. By January 2016, Platinum Management and Beechwood executives were privately aware of $130 million in debt that Defendants had caused PPVA to owe to the Beechwood Entities. SOMF ¶ 615. On January 14, 2016, Steinberg sent an email to Naftali Manela, attaching four spreadsheets and stating as follows:

> Naftali, Each file is a simple spreadsheet showing different points.
> Taken all together, they show that with the inflows (including Apollo)
> and with some success with Agera, VSTA, ECHO, Desert Hawk we
> can still produce a decent return despite the interest expense of the
> addition debt (after the reduction of the rate to 7%).
> Without the extra money from Apollo or BAM, the fund will need to
> gate, Ari Glass and NM (and eventually Bam will have to join) put the
> fund into BK, we lose probably [c]lose to $400mm of value due to

---

[12] Take the Agera Sale for example: common equity in AGH Parent was provided to Beechwood Re Investments LLC, the entity through which Nordlicht, Bodner, Huberfeld and their respective wives and children, beneficially held their interests in Beechwood.

> unfunded positions, and a trustee is appointed to run the wind down
> with no *rachmanus* on BAM.
> *This is the narrative for Murray and Beechwood.*

*Id.* at ¶ 628 (emphasis added).

Steinberg's third chart, titled "PPVA Position Breakout," lists the total net value of PPVA's assets as $333.2 million – far less than the $752 million NAV figure that Platinum Management reported to PPVA and ordinary investors on December 31, 2015. SOMF ¶ 630.  Notably, Steinberg lists the unencumbered value of PPVA's oil and gas positions, including Golden Gate Oil, PEDEVCO, and Northstar, as $0. *Id.* This information was incorporated into a presentation for Bodner, Huberfeld, Feuer and Taylor that was created by Platinum Management executives and Platinum Management advisor Seth Gerszberg. *Id.* at 632.

It was clear that a decision needed to be made concerning which part of the Platinum/Beechwood enterprise would survive. The investigation into the COBA Scheme and Platinum Management provided the answer: Beechwood would survive and would be granted Platinum Management's valuable assets and relieved of Platinum Management's bad debts.



SOMF ¶ 798 (emphasis added).

Enabled by the interconnectedness of Platinum Management and Beechwood, the Agera transaction was bereft of fair dealing or fair value.

**First**, the contemporaneous valuations of the Agera Note by Platinum Management, Beechwood, valuation firms retained by Platinum Management and Beechwood, as well as Agera executives were consistently more than $205 million and were increasing in the lead up to the Agera

Sale. *See* SOMF ¶¶ 697, 700. Joseph SanFilippo admitted at the Rule 30(b)(6) deposition of Platinum Management that the Agera Note was worth between $205-$210 million. *See id.* at ¶ 695. As such, even if the purchase price for the Agera Note had been $170 million payable in cash that figure would be tens of millions less than the Agera Note was worth.

Second, Platinum Management made no effort to ensure a fair sale process of the Agera Note, nor did it guard against the conflicts of interest of its majority owners. Platinum Management did not obtain a fairness opinion for the Agera Sale. SOMF ¶ 741. Indeed, Platinum Management did not even retain outside counsel for the complex set of transactions comprising the Agera Sale, the largest transaction that Beechwood and Platinum had ever done. SOMF ¶ 707. Platinum Management did not take the steps necessary to ensure fairness and protect against the obvious conflict of interest at the heart of the Agera Sale. *See Alpert v. 28 Williams Street Corp.*, 473 N.E.2d at 27 (conflicted fiduciaries must show effort to simulate an arm's length transaction, through appointment of independent negotiator or independent board).

Third, Platinum Management caused the Agera Note to be sold on terms that benefitted Platinum Management's insiders, its affiliated business – Beechwood – and friends such as Kevin Cassidy, a convicted felon inserted into Agera by Platinum. *See* SOMF ¶¶ 759, 762-764. For example, Beechwood was permitted to pay approximately $43 million of the total sale price by assigning to PGS debt owed to Beechwood by PPCO – even though its founder Murray Huberfeld had been arrested the day prior – and debts owed by China Horizon and PEDEVCO, which were both Platinum/Beechwood co-investments of little to no value. *See, e.g., id.* at ¶¶ 777, 779.

Moreover, not all of the consideration was payable upon closing of the Agera Sale. Instead, Platinum Management agreed that approximately $59 million of the total purchase price could be paid with subordinated class C membership units in AGH Parent, $35.4 million of which could be redeemed by AGH Parent in exchange for Platinum related debt or investments chosen by Beechwood

in its <u>sole discretion</u> and valued at par. *See* SOMF ¶ 772. The remaining approximately $19 million worth of class C membership units could only be redeemed for cash, but there was no mechanism by which PGS or PPVA could require that the redemption occur. *See* Bixter Decl. Ex. 543, SAC Ex. 90 [BW-SHIP-00000050].

Fourth, Platinum Management agreed to close the Agera Sale on June 9, 2016, even though Huberfeld, one of its founders and owners, had been arrested the day before in connection with the COBA Scheme. Any argument that the Agera Sale, where it is admitted that the Agera Note was sold at a discount of at least $35 million, was necessary to assist the ongoing operations of PPVA, is disputed given that Nordlicht announced the liquidation of PPVA five days after the Agera Sale closed. SOMF ¶ 785. The cash proceeds from the Agera Sale cannot be said to have benefitted PPVA by helping to sustain its operations, as those operations effectively were terminated a few days later.

It was not just the Agera Sale; each transaction between Platinum Management and Beechwood is an insider transaction "negotiated" by a revolving door of Platinum/Beechwood employees and their common owners. At every turn, PPVA was handed the short end of the stick in these transactions – whether through non-disclosed guarantees/put options, subordination of interests, or secret obligations to pay interest – that at all times benefitted Beechwood to the detriment of PPVA.

The sale of the Golden Gate Oil Loan to Beechwood in February 2014, which included a guaranty by and put option to PPVA, is another example of feigned liquidity. The sale was nothing more than a loan to PPVA that notably went undisclosed on Platinum Management's report of PPVA's net asset value. *See* SOMF ¶¶ 284-285. Golden Gate Oil never made a payment of interest on the debt originated by PPVA, and the parties knew that Golden Gate Oil would never be able to do so. *See generally id.* at ¶¶ 288-292. By this time, both Platinum Management and Beechwood were aware that Golden Gate Oil's wells were pumping water and Nordlicht was questioning internally the ludicrous manner of calculating Golden Gate Oil's value based on PV-10 estimations

given the facts on the ground. *See id.* Around the same time, Platinum Management increased the value of its equity holdings in Golden Gate Oil by more than $80 million by purchasing the remaining 48% of Golden Gate Oil's equity <u>for less than $3 million</u>. *Id.* at ¶ 295. PPVA immediately began covering interest payments to Beechwood by way of a new line of credit, which, again, all parties knew Golden Gate Oil would be unable to pay. *See id.* Similar arrangements were made with debt purchases by Beechwood for Implant Sciences, PEDEVCO, Northstar and Montsant. *See id.* at ¶ 616-617, 803, 98(j).

It is therefore clear that, in agreeing to engage in the Agera Sale, and other transactions set forth herein and the JOLs' Rule 56.1 Statement, the Beechwood Movants aided and abetted the breach of fiduciary duty that Platinum Management and others owed to PPVA at all times, as these transactions consistently benefitted Beechwood to the overall detriment of PPVA. So too are the Beechwood Movants liable for aiding and abetting fraud. The Beechwood Movants regularly entered into transactions with PPVA, orchestrated by Platinum Management/Beechwood employees, with actual knowledge that such transactions would permit Platinum Management and its owners to perpetuate its overvaluation scheme and later divert PPVA's remaining valuable assets to Beechwood as the criminal investigations threatened to take down the Platinum enterprise. Accordingly, the Beechwood Movants' motion for summary judgment against the aiding and abetting claims should be denied.

### 1. Summary Judgment Should Not Be Granted Against The Declaratory Judgment Claims

Counts 20 and 21 of the JOLs' Second Amended Complaint seek to invalidate the Nordlicht Side Letter and the Master Guaranty on the ground that they are void as against public policy. In its June 21 Opinion, this Court denied Beechwood's motion to dismiss those claims because it found that the SAC alleges sufficient facts to show that "the Nordlicht Side Letter and Master Guaranty were structured for the corrupt purpose of stripping value from PPVA." *Id.* at 31.

The Beechwood Movants now argue that summary judgment should be entered dismissing Counts 20 and 21 because it provided PPVA with consideration and thus the Nordlicht Side Letter and Master Guaranty cannot be deemed to be void as against public policy. (Beechwood. Mem. at p. 30-31)  Beechwood is wrong as a matter of law and, in any case, there exists a genuine dispute of fact as to the underlying purpose of those agreements as well as to whether consideration was granted.

New York law is clear that a contract "made 'with corruption and fraud contemplated as its purpose" is contrary to public policy and unenforceable. *CMF Investments, Inc. v. Palmer*, No. 13-CV-475 VEC, 2014 WL 6604499, at *2 (S.D.N.Y. Nov. 21, 2014) (*quoting Dodge v. Richmond*, 10 A.D.2d 4, 16 (1st Dep't 1960), aff'd, 8 N.Y.2d 829 (1960)). "[E]ven where a contract is not itself unlawful, the bargain may still be illegal [and unenforceable] under New York law if it is closely connected with an unlawful act." *CMF Investments*, 2014 WL 6604499, at *2 (*quoting United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir. 1989).

As such, New York courts have held that even when all the elements of a contract, including consideration, may exist, a contract still will be deemed void and unenforceable as a matter of public policy when its performance would practice fraud or deception on a third party. *Chia Huey Chou v. Remington Tai Che*, No. 09 CV 4121, 2010 WL 6546831, *3-4 (E.D.N.Y. Aug. 24, 2010), citing *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 86 (2d Cir. 1982) (Oakes, C.J. concurring and dissenting) ("As a matter of public policy, fraud and deception practiced on a third party ... will invalidate a New York contract, at least where there is a 'direct connection between the illegal transaction ... and the obligation sued upon.' "); *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 471, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960) (same).

The same rule applies here. As discussed above, the JOLs argue that the evidence shows that the series of transactions that Platinum/Beechwood's common owners caused PPVA to engage in between February 2014 and June 2016 were designed to benefit the interests of Beechwood and its

owners and executives, Nordlicht, Bodner, Huberfeld, Levy, Feuer and Taylor, who were paid millions of fees in connection with Beechwood's operations, to the detriment of PPVA.

For example, Platinum Management and its executives had not sought to collect interest on loans or preferred stock owed to PPVA by the companies in which it caused PPVA to invest, such as Golden Gate Oil.   SOMF ¶ 803.   Yet, once that loan was held by Beechwood, Platinum Management/Beechwood worked together to ensure that Beechwood would receive all payments due, initially by arranging for those payments to be funded by PPVA, and then by purporting to grant Beechwood a direct and preferential right of payment from PPVA's remaining valuable assets, such as the expected recovery from Implant Sciences (the Nordlicht Side Letter, Master Guaranty), and the Montsant collateral account and Carbon Credits portfolio (Master Guaranty).  These actions preserved Beechwood's business in the face of questions and complaints from its clients, such as CNO, thereby ensuring the continued flow of fees to Beechwood's owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer.  Thus, even assuming, *arguendo*, that Beechwood provided consideration, the Nordlicht Side Letter and Master Guaranty should be deemed to be void and unenforceable as contrary to public policy, because there is evidence that their underlying purpose was fraudulent. At a minimum, a dispute of facts exists as to the underlying purpose of the Nordlicht Side Letter and Master Guaranty. For this reason, Beechwood's motion for summary judgment as to Counts 20 and 21 should be denied.

In addition, Beechwood's motion for summary judgment as to Counts 20 and 21 should be denied because there exists a dispute as to whether PPVA actually received consideration for the Nordlicht Side Letter and Master Guaranty as Beechwood claims. "A guaranty must be supported by consideration in order to be valid under New York law." *Foresco Co., Ltd. v. Oh,* 696 Fed. Appx. 550, 551 (2d Cir. 2017). "Consideration for a guaranty must be expressly or impliedly stated in the instrument, and the instrument must be delivered to and accepted by the guarantor." *Lakhaney v.*

*Anzelone*, 788 F. Supp. 160, 163 (S.D.N.Y. 1992).  The party seeking to enforce an alleged guaranty has the burden of proving that consideration exists for the guaranty. *Hauswald v. Katz*, 216 A.D. 92, 94 (1st Dep't 1926).  Moreover, "a guaranty is to be interpreted in the strictest manner."  *White Rose Food v. Saleh*, 99 N.Y.2d 589, 591 (2003).

If enforced, the Nordlicht Side Letter – a  three-paragraph one page document – would have the effect of granting Beechwood a priority interest in the proceeds received from Implant Sciences in preference to all of PPVA's other creditors and stakeholders to be used to pay what was then an approximately $35 million obligation owed by Golden Gate Oil to Beechwood.  *See* Bixter Decl. Ex. 622 SAC at Ex. 75.  Yet, on its face that document does not recite or indicate that Beechwood would do *anything* in exchange for receiving that preference, much less a specific agreement to forbear from defaulting either Golden Gate Oil or Implant Sciences, as Beechwood claims was its purpose. There also is no contemporaneous documentary evidence to support Beechwood's claim that the Nordlicht Side Letter was executed to induce Beechwood to forbear from defaulting Implant Sciences. *See Korff v. Corbett*, 155 A.D.3d 405, 411 (1st Dep't 2017) ("Here, similarly, there is nothing in the agreement that suggests that plaintiff was forbearing pursuing a claim, nor does anything in the record otherwise indicate that plaintiff had agreed not to assert his rights against defendants."). *See* also *Reddy v. Mihos*, 160 A.D.3d 510, 514 (1st Dep't 2018).

There also is a dispute of fact as to the existence of any purported concern that Beechwood would default Implant Sciences in January 2016. By the end of 2015, Implant Sciences had engaged an investment banker to market the company for a potential sale of its business to a third party buyer, and had ample borrowing limits to make payment to Beechwood. SOMF ¶ 641.  The lenders to Implant Sciences, including Beechwood, were involved in this sale process and aware of the timeline for a sale of the company, which was expected to result in proceeds sufficient to pay off all amounts due to Beechwood as well as all amounts due to PPVA's subordinated lender subsidiaries. *Id.* at ¶

61

642.  In January 2016, when the Nordlicht Side Letter was purportedly signed, Implant Sciences was in the process of accepting bids from third party buyers. *Id.* at 646.  Given that a default would have significantly depressed Implant's market value and possibly chilled the bidding, Beechwood's after the fact claim that the Nordlicht Side Letter was signed to induce it to forebear from defaulting Implant Sciences simply is disingenuous and without any factual support.

There also is a dispute as to what consideration Beechwood provided PPVA in exchange for the Master Guaranty. In its brief, Beechwood recites a series of "tangible" benefits from the Master Guaranty. A closer examination of each of these so called benefits indicates that they were anything but.  For example, Beechwood did not "return" PPVA's Navidea shares, but rather sold them to PPVA for <u>twice</u> the then market price. SOMF ¶¶ 650-651.  So too, by March 2016, Golden Gate Oil had not been operating for months, was effectively insolvent, and the Golden Gate Loan was uncollectible. *See id.* at ¶ 310.  Yet Platinum Management and Beechwood caused PPVA to grant Beechwood additional collateral to secure the loan, when otherwise it would have had, at best, an unsecured claim against PPVA related thereto. While it is true that Beechwood did release its lien on the Agera Note in connection with the exchange of Northstar notes for PPCO debt, the lien release was not part of the Master Guaranty, but rather a transaction between Beechwood and PPCO. In any case, the release of Beechwood's existing lien on the Agera Note enabled Platinum management and Beechwood to arrange the outright sale of the Agera Note to Beechwood, the "negotiations" of which would begin a few days later. Under the circumstances, it cannot be deemed as "consideration" to PPVA.

For all of these reasons, Beechwood's motion for summary judgment as to Counts 20 and 21 of the SAC should be denied.

## II.   LEGAL AND FACTUAL QUESTIONS REGARDING THE VALIDITY AND ENFORCEABILITY OF THE MARCH 2016 RELEASE PRECLUDE SUMMARY JUDGMENT.

Bodner, Huberfeld and HFF ask this Court to do the unthinkable. They each request that the Court essentially immunize them from liability in this case based on a release agreement, negotiated

by, and among, Bodner, Huberfeld and other Defendants, including Nordlicht and Fuchs, and signed after Platinum received a grand jury subpoena for records related to the COBA bribery scheme and just weeks after learning that federal prosecutors for the Southern District of New York had expanded their criminal investigation to Beechwood. (the "March 2016 Release") The effect of such an order would permit one co-conspirator, Platinum Management, to release its other co-conspirators from liability just moments before Platinum sunk below the surface and left fund, PPVA, to a certain death at the bottom of the financial sea. This Court has made clear that fraudsters cannot release themselves on behalf of victims. Thus, the March 2016 Release should be declared void as against public policy and summary judgment should be denied.

### A.    The March 2016 Release Does Not Bar the JOL's Claims

"Under New York law, a release or waiver clause may be attacked and set aside . . . for substantive flaws in its execution, such as fraud in the inducement, illegality, duress, or mutual mistake." *Joint Venture Asset Acquisition v. Zellner*, 808 F.Supp. 289, 302 (S.D.N.Y. 1992) (collecting authority); *see also, e.g., Aviles v. S&P Global, Inc.*, 380 F. Supp. 3d 221, 301-02 (S.D.N.Y. 2019) (release arising from alleged breach of fiduciary duty invalid to bar claims).

Courts applying New York law have found "there is a requirement that a release covering both known and unknown injuries be 'fairly and knowingly made.'" *Haynes v. Garez*, 304 A.D. 2d 714, 715 (N.Y. App. Div. 2003) (quoting *Mangini v. McClurg*, 249 N.E. 2d 386, 392 (N.Y. 1969). As explained by the Court of Appeals:

> Fraud, however, had long been a ground for setting aside a release. The requirement of an 'agreement fairly and knowingly made;' has been extended, however, to cover other situations where because the releasor has had little time for investigation or deliberation, ***or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party***.

*Mangini*, 249 N.E.2d at 392 (collecting cases) (emphasis added).

Likewise, agreements are unenforceable under New York law when "prompted by the sinister intention of one acting in bad faith." *Kalisch–Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 413 (N.Y. 1983).   This is, as this court has noted, because there is a "familiar equitable principle that a wrongdoer, whether willful or negligent, should not benefit from his own wrongdoing." *JPMorgan Chase Bank v. Liberty Mutual Insurance Co.*, 189 F.Supp.2d 24, 28 (S.D.N.Y. 2002) (Rakoff, J.)

Judge Oetken's recent *Aviles* case, addressing closely analogous facts, is particularly instructive here. There, the court declined to apply a purported release to bar claims against non-officer defendants for aiding and abetting breaches of fiduciary duty, in circumstances where there was a plausible basis to conclude that those issuing the purported release were themselves breaching fiduciary duties to the company. The court articulated its rationale—equally applicable here—as follows:

> The Court has determined that Plaintiffs have plausibly alleged that [officer defendants'] conduct around the Settlement Agreement [containing the release] constituted a fiduciary breach. . . . And [the non-officer defendants invoking the release] are plausibly alleged to have aided and abetted that breach. So, the question remains: May a corporation's release of claims against a third party be rescinded, in the absence of fraud, where the release arises out of a fiduciary breach that was committed by the corporate officers and knowingly facilitated by the third party?

> The parties have cited no New York law on this question, and the Court has found no authority that directly controls. But the Court takes the view that New York courts would likely answer in the affirmative. After all, where a fiduciary relationship exists between" parties to a contract, there must be clear proof of the integrity and fairness of a transaction between them, or any instrument thus obtained will be set aside or held as invalid, even in the face of a release of claims. . . . New York courts will sometimes set aside a third-party transaction executed by a fiduciary in breach of its obligations. *And considerations of equity militate against allowing an unscrupulous fiduciary to double down on a breach by taking the additional step of validly insulating its third-party co-conspirator from any liability for the breach.*

> The Court concludes that the Settlement Agreement's release of claims does not bar Plaintiffs' derivative common-law claims against the [defendants invoking the release] to the extent that the release arose from a fiduciary breach that [such defendants] knowingly abetted.

380 F. Supp. 3d at 301-02 (emphasis added; quotations and citations omitted).  Hence, *Aviles* stands for the essential (though unremarkable) proposition that co-conspirators cannot release themselves from liability.

Bodner and Huberfeld suggest that the purpose of the March 2016 Release was to free up liquidity for PPVA and entice Marcos Katz to join Platinum Management as a partner. (Bodner Mem. at p. 17; Huberfeld Mem. at p. 5).[13] But the record evidence on this point is hardly undisputed for purposes of defendants' summary judgment motion. While Katz was indeed simultaneously discussing an entry into Platinum Management, it is clear that Huberfeld's and Bodner's departure was a shock to Katz. Upon learning of their exit, he stated: "I am totally confused. [My grandson] informed me that you left Platinum and gave back your shares. What the hell is going on? I left 50 million USD in the f[u]nd just because I trusted you." SOMF ¶ 211.

The evidence in the record more accurately indicates that the true purpose of the March 2016 Release Agreement—an improper purpose shared by both the releasees and Platinum Management as releasor—was to allow Bodner and Huberfeld to run away from Platinum Management due to the looming government investigation into the COBA Scheme they perpetrated, the expansion of that investigation into Platinum Management, and the questionable Platinum/Beechwood relationship they controlled.  This evidence is more than sufficient to show that, just as in *Aviles*, the March 2016

---

[13] In so arguing, defendants primarily rely on a legal memorandum prepared by counsel for Bodner and Huberfeld, which self-servingly characterizes the March 2016 Release as Bodner's and Huberfeld's to attract new investors to the Platinum Funds. That document is a memo from Curtis Mallet to Platinum's in-house counsel.  At this point, Curtis is representing Platinum Management, PPVA, Bodner and Huberfeld in connection with the COBA investigation and the SEC investigation.  Curtis is also simultaneously representing Bodner and Huberfeld in connection with their attempted separation from Platinum Management and negotiating with Platinum and PPVA on behalf of Bodner and Huberfeld. However, in this memo, Curtis purports to be outside counsel to Platinum, in the same separation negotiation, and gives advice to Platinum Management concerning the appropriateness of granting a release and indemnity to Bodner and Huberfeld on behalf of PPVA, which release and indemnity includes the very conduct they are defending.  It also bears mention that the memo seems to refer to Huberfeld and Bodner as fiduciaries and describes this as a "fiduciary situation."

Release was an improper attempt by Platinum Management to "insulat[e] its third-party co-conspirator[s] from any liability," and, as such, it should provide the defendants with no cover here.

Bodner and Huberfeld argue that "a general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud," citing *Consorcio Prodipe, S.A. de. C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 190 (S.D.N.Y. 2008). But *Consorico* and similar cases cited to by Bodner and Huberfeld in support of this proposition are inapposite here, because: (1) the parties entering into broad and general release agreements in those cases were separate and distinct entities with no fiduciary relationship; and (2) the parties were actively engaged in disputes which they sought to resolve through executing a mutual release. The latter is absent in this case, as there was no active or potential litigation among Platinum Management, Bodner, and Huberfeld. On the former, Judge Castel's *Consorcio* decision highlighted the difference between determining whether to enforce a release in the context of a fiduciary relationship, which often compels a different result, and a case like *Consorcio*, where no special relationship existed between the parties. *Id.* at 192.

Indeed, on this point, the circumstances here are even more egregious than those in *Aviles*, because—unlike in *Aviles*, where the defendants invoking the release were, at most, aiders and abettors of breaches of fiduciary duties by others—the record evidence here strongly suggests that Bodner and Huberfeld themselves owed fiduciary duties to PPVA, duties which they breached by attempting to absolve themselves of liability for their myriad breaches of duty to PPVA.

Bodner and Huberfeld acknowledge that Platinum Management was both the General Partner and Investment Manager of PPVA, and thus Platinum Management owed fiduciary duties to PPVA. (Bodner Mem. at p. 4; Huberfeld Mem. at p. 2-3); *See, e.g.*, *Assured Guar. (UK) Ltd.*, 915 N.Y.S.2d at 16; *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989)[14].

---

[14] Although the special relationship between PPVA and Platinum Management is undisputed, there are genuine issues of material fact concerning which <u>individuals</u> exercised control over PPVA and its assets and over Platinum Management itself, as well as those individuals' participation in, and knowledge of, the torts at issue here. The inquiry is relevant

Here, the JOLs have set forth more than mere "conclusory assertions" that a special relationship existed between PPVA and the individuals who owned and controlled Platinum Management, including Huberfeld and Bodner.  *See generally* SOMF ¶¶ 178-218 (Bodner); *id.* at ¶¶ 81-177 (Huberfeld).  Bodner and Huberfeld were the founders of PPVA, and there is evidence in the record that they were the "senior partners" in Platinum Management (with Nordlicht acting as junior partner). *Id.* They were heavily involved in bringing investors to the Platinum Funds and managing its investments. They had operational oversight and were well aware of the overvaluation of PPVA's assets and the liquidity problems that plagued PPVA. *Id.* While Bodner and Huberfeld may dispute their level of control, there are more than sufficient facts in the record to show Bodner and Huberfeld exercised control over Platinum Management such that fiduciary duties should be deemed to have been owed by them to PPVA. And, accordingly, there are more than sufficient facts to show that the attempt of Bodner and Huberfeld to evade their duties to PPVA by improperly leveraging their control over Platinum Management to secure a purported release of PPVA's claims against them was, itself, a breach of their fiduciary duty to PPVA, foreclosing enforcement of their purported release.[15]

---

because fiduciary status does not depend on a contract or agreement, but rather "a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another" particularly when one person controls the assets of the other. *Penato v. George*, 52 A.D.2d 939, 942 (N.Y. App. Div. 1976). *See also Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 250 (S.D.N.Y. 2012). Determining which individuals exercised "control" over an entity is a fact-driven inquiry, asking "particularly whether or not the facts indicate an opportunity to self-deal or exert more control over the Debtor's affairs than is available to other creditors." *In re PHS Grp., Inc.*, 581 B.R. 16, 32 (E.D.N.Y. 2018). New York courts do not hesitate to conclude  that a controlling person of a fiduciary, such as Platinum Management, may himself be personally liable for a breach of fiduciary duty or another tort committed by that fiduciary, when the controlling person participates in the fraud or has actual knowledge of it. *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994) (corporate officers may be held liable for fraud if they participate in it or have actual knowledge of it).

[15] HFF's reliance on the March 2016 release is similarly ineffectual. HFF was not a party to the March 2016 Release, and provided no consideration to PPVA in exchange for said release. At best, HFF is a third-party beneficiary of the agreement. However, a contract that is void under the law is not only unenforceable as between the parties to that contract, but also void and unenforceable as to any third party beneficiaries. It is well settled under New York law that "a third-party beneficiary . . . possesse[s] no greater right to enforce a contract that the actual parties to the contract." *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697 (2d Cir. 1993) (citing *Dunning v. Leavitt*, 85 N.Y. 30, 35 (1881) ("it would be contrary to justice or good sense to hold that [a third-party beneficiary] should acquire a better right against the promisor than the promisee himself had")). Accordingly, just as the March 2016 Release is invalid to bar the JOL's claims against Huberfeld and Bodner for the reasons detailed above, it is likewise invalid as to HFF as purported third-party beneficiary.

The claims asserted against Bodner, Huberfeld, and the Huberfeld Family Foundation are premised upon intentional and fraudulent conduct. The evidence obtained in discovery, detailed at length above, demonstrates that Huberfeld and Bodner were aware of PPVA's liquidity problems and the overvaluation of PPVA's net asset value that threatened to destroy the entire fund. As but one example, a presentation was prepared for Bodner, Huberfeld and Beechwood in January 2016 by Platinum Management executives indicating that the net asset value of PPVA was inflated by more than $400 million and PPVA only had $40 million in unencumbered assets. SOMF ¶ 94.  By at least January 2015 Bodner was declaring that PPVA's assets were overvalued.  *Id.* at ¶ 95.  Beyond this, there is ample evidence of willful misconduct, including their siphoning off the COBA investment and the dissipation of assets to Beechwood and other insiders.  And this misconduct was even recognized by Mark Nordlicht at the time of the March 2016 Release was executed: in refusing to provide a personal guarantee for the indemnity sought by Huberfeld and Bodner, Nordlicht told Huberfeld and Bodner's attorney that "I obviously can't be responsible personally for David and Murray's misconduct." *Id.* at 181.  This Court should find that the March 2016 Release is invalid and void as a matter of law.  At the very least, a reasonable jury could, and should be allowed to, find that Bodner and Huberfeld each were aware of and participated in willful or grossly negligent acts as co-conspirators in concert with Platinum Management, and similarly find the March 2016 Release void and invalid.

### B.   There are disputed issues of material fact concerning whether the March 2016 Release is adequately supported by consideration.

Both Bodner and Huberfeld ignore disputed facts surrounding the alleged consideration they provided to PPVA in exchange for the March 2016 Release. Under New York law, to be valid, a contract must be supported by consideration. *See, e.g.*, *Murray v. Northrop Grumman Info. Tech.,*

_____

*Inc.*, 444 F.3d 169, 178 (2d Cir. 2006). Consideration to support an agreement exists where there is "either a benefit to the promisor or a detriment to the promisee." *Hollander v. Lipman* 885 N.Y.S.2d 354 (N.Y. App. Div. 2009) (quoting *Weiner v. McGraw–Hill, Inc.*, 443 N.E.2d 441, 445 (N.Y. 1982)). Bodner contends that the value provided in exchange for their release was as follows:

> The Release Agreement caused Bodner, and also Huberfeld, to forfeit their interests in the [Mark Nordlicht Grantor] Trust and to subject their families' limited partnership interest in the Platinum feeder fund to a two-year lockup period, as opposed to the 90-day redemption terms provided in the funds' subscription agreement. (56.1 ¶ 52). At the time, the Bodner and Huberfeld families held approximately $80 million in limited partnership interest in the funds. (56.1 ¶ 53). Bodner and Huberfeld also gave general releases to the Platinum entities (56.1 ¶ 54); and waived certain rights with respect to distribution of 2015 accrued management fees (56.1 ¶ 55).

(Bodner Mem. at p. 9). Huberfeld alleges that he provided similar consideration under the March 2016 Release on behalf of himself and his "affiliated entities." (Huberfeld R. 56.1 Statement at ¶ 20).

Bodner and Huberfeld's waiver of rights to management fees is not consideration for PPVA under any circumstances because that claim belongs to Platinum Management, not to them directly.[16] Similarly, an agreement to forbear from redeeming limited partnership interests in the Platinum Feeder Funds potentially could be consideration to the feeder funds, but not to PPVA, because neither Bodner nor Huberfeld (or any of their family members or affiliates) were limited partners *in PPVA*.

In any case, the January 2016 presentation made to Bodner and Huberfeld put them on notice that PPVA itself had, at most, $40 million in unencumbered assets, more than that in debt, and their interests in Platinum Management and the PPVA feeder fund were worth nothing.  *See* SOMF ¶ 94. By March 2016, it was clear that both PPVA and Platinum Management were in even worse financial condition.  As Mark Nordlicht himself explained in an email to Uri Landesman on March 10, 2016:

> Uri –

---

[16] By the same token, an agreement to forbear from receiving compensation from the Mark Nordlicht Grantor Trust provides no consideration to PPVA.

> I know you are frustrated by needing to have things simple for the divorce. Unfortunately, we are anything but simple now. *we are in the midst of a complete relaunch of our business*. In terms of 2015, all fees are being used to take care of issues ( PPlo unwind, side pocket coverage, various investor accommodation). If things turn around significantly, I guess there cd be some value there but realistically, I wdnt count on it. *In terms of 2016, going forward mgmt percentages are being determined by either people coming up with New cash or putting existing holdings at risk as first loss to bring in new capital. There is no value to management company otherwise and it is why david and Murray are gone. It's almost like a complete new startup.*

Bixter Decl. Ex. 473 [CTRL8323807] (emphasis added). Thereafter, on March 17, 2016, just three days prior to execution, Mark Nordlicht explained to David Levy, Huberfeld's nephew, there is nothing of value and "no consideration" for the March 2016 Release: "*There is no value right now to mgmt. co anyhow as evidenced by fact shares are being given away for just investment, no consideration*." Bixter Decl. Ex. 638 [CTRL8339805] (emphasis added).

These admissions as to complete lack of value, at the very least, creates disputed issues of material fact regarding whether an agreement to forbear from redeeming limited partnership interests in the PPVA feeder funds and from collecting management fees had any value at all, much less could be consideration for the "broad, unconditional general release" provided to Bodner, Huberfeld and their affiliates, including HFF, in the March 2016 Release.

### C.   Disputed Issues of Fact Preclude a Finding that the Release Was Supported by Mutual Assent.

The enforceability of an agreement under New York law also requires the presence of mutual assent or a "meeting of the minds." As this Court has noted, "[m]utual assent is a question of fact to be found by the jury." *Bazak Intern. Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 145 (2d Cir. 2001)). To determine the presence of mutual assent, "[t]he totality of the parties' acts, phrases and expressions must be considered, along with 'the attendant circumstances, the situation of

the parties, and the objectives they were striving to attain.'" *Id.* (quoting *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 161 (E.D.N.Y. 2002)).

Here, the attendant circumstances, the situation of the parties, and the objectives they were striving to attain are key factual considerations because "'[f]raud in the execution prevents the parties from achieving mutual assent and, thus, prevents the parties from forming a valid contract.'" *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 324 (S.D.N.Y. 2016) (quoting *Allen v. Chanel, Inc.*, 2015 WL 3938096, at *7 (S.D.N.Y. June 26, 2015)); *see also Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir. 1997) ("Fraud in the execution occurs where there is a '*misrepresentation as to the character*' or essential terms of a proposed contract").

PPVA was the victim of Platinum Management's, Bodner's and Huberfeld's fraud, but was being told at the time that its net value (although negative at the time) was worth more than $700 million. Under these circumstances, there was fraud in the inducement because Platinum Management lied to PPVA in connection with the released conduct.

The JOLs have presented evidence of overreaching and unfair circumstances with respect to the creation of the March 2016 Release that would render its enforcement inequitable under the circumstances, namely, the intent by Bodner and Huberfeld to disengage from Platinum Management before the government investigations – and the exposure of their concealed control over Platinum Management – came to fruition. Nordlicht, at the same time, all but abdicated his advocacy on behalf of the funds, as evidenced by his email to Huberfeld and Bodner just three days before execution of the March 2016 Release, telling them "I don't care what's in it, I trust you and will sign whatever is needed."

## D.     The March 2016 Release Does Not Apply To Later-Accruing Claims

71

As an initial matter, while Bodner, Huberfeld and HFF assume that the March 2016 Release—assuming its application is proper here, which it is not (*see infra*)—encompasses all of the JOL's claims within its purported scope. As a factual matter, that is not so.

"[A] release may not be read to cover matters which the parties did not desire or intend to dispose of." *Fitzgerald v. Fahnestock & Co., Inc.*, 48 A.D.3d 246, 850 N.Y.S.2d 452 (App. Div. 1st Dept. 2008) (*citing Cahill v. Regan*, 5 N.Y.2d 292, 299, 184 N.Y.S.2d 348 (1959)). Further to this principle, a release is generally construed to release only claims in existence as of the time the release becomes effective, and will not release claims arising from conduct subsequent to the release. *See generally, e.g., Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1485 (2d Cir. 1995) ("Although the releases shield the [defendants] from any liability for any conduct through their effective dates, they do not protect the [defendants] from liability arising from any subsequent conduct."); *Benicorp Ins. Co. v. National Medical Health Card Systems, Inc.,* 447 F. Supp. 2d 329, 338 (S.D.N.Y. 2006) ( "[C]ourts have ordinarily held a party's release to be 'inapplicable to conduct subsequent to the execution of the release'" (citations omitted)); *Information Superhighway, Inc. v. Talk America, Inc.,* 274 F. Supp. 2d 466, 417 (S.D.N.Y. 2003) (same).

The March 2016 Release, on which the moving defendants base their argument, was stated to be effective as of March 20, 2016, and by its terms purports to release claims existing as of that date. Accordingly, whatever its effect on then-existing claims, it can have no effect on claims arising from facts occurring after March 20, 2016, including their involvement in the Agera Transactions, discussed above.

### E.  The March 2016 Release is Void under Applicable Cayman Liquidation Law

On August 23, 2016, in the wake of Huberfeld's arrest in connection with the COBA Scheme and the sale of the Agera Note, Platinum Management caused PPVA to commence provisional liquidation proceedings in the Grand Court of the Cayman Islands. The March 2016 Release, which

was entered into within six months before the commencement of the Cayman Liquidation, thus is void as a matter of Cayman law, because it was a transfer of an interest in PPVA's property to related parties – Bodner, Huberfeld, and HFF.

Section 145 of the Cayman Companies Law states:

> (1) Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

> (2) A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

> (3) For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

Cayman Companies Law at Sec. 145 (emphasis added). (Kish Decl.)

The release provided to Bodner, Huberfeld and HFF was a transfer of PPVA's property interests, namely the ability of PPVA to bring a claim against those Defendants and seek damages, as the JOLs are doing through this case. The indemnification provided to Bodner, Huberfeld and HFF in connection with the March 2016 Release likewise is a "payment obligation" incurred by PPVA.

For the same reasons as the JOLs argue that Bodner and Huberfeld are fiduciaries to PPVA, they are related parties under the Cayman Companies Law Sec. 145, as they have the ability to "control the company or exercise significant influence over the company in making financial and operating decisions. *Id*. As such, the March 2016 Release is deemed to be a void preferential transfer by PPVA in preference to PPVA's other creditors. Accordingly, the March 2016 Release is invalid under applicable Cayman law.

73

## CONCLUSION

For the foregoing reasons, the JOLs respectfully request the Court: (i) deny the Defendants' motions for summary judgment in their entirety; and (ii) grant any additional relief that this Court deems just and proper.

Dated: New York, New York
March 6, 2020

HOLLAND & KNIGHT LLP

By:    /s Warren E. Gluck

Warren E. Gluck, Esq.
John L. Brownlee, Esq. (*pro hac vice*)
Richard A. Bixter Jr., Esq. (*pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Facsimile: 212-385-9010
Email: warren.gluck@hklaw.com
john.brownlee@hklaw.com
richard.bixter@hklaw.com

*Attorneys for Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and for Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation)*