UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>PLATINUM-BEECHWOOD LITIGATION | Civil Action No. 18-cv-6658 (JSR) |
| MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation) and PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation),<br><br>Plaintiffs,<br><br>- against -<br><br>PLATINUM MANAGEMENT (NY) LLC, *et al.,*<br><br>Defendants. | Civil Action No. 18-cv-10936 (JSR) |

**PPVA PLAINTIFFS' STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) (the "**JOLs**") and Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**" and collectively with the JOLs, the "**PPVA Plaintiffs**") by and through their attorneys Holland & Knight LLP, submit this statement of material facts pursuant to Local Rule 56.1 opposition to Defendants' Motions for Summary Judgment.

## PPVA MASTER/FEEDER STRUCTURE AND PLATINUM MANAGEMENT AS GENERAL PARTNER AND INVESTMENT MANAGER OF PPVA

1. Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**") is a Cayman Exempted Limited Partnership.  (Declaration of Richard A. Bixter, Jr., dated March 6, 2020 ("**Bixter Decl.**") Ex. 1, Huberfeld Tr. Ex. 589 at 1).

2. David Bodner ("**Bodner**") and Murray Huberfeld ("**Huberfeld**") provided the initial seed capital to fund PPVA. (Bixter Decl. Ex. 2 ("**Bodner Tr.**") at 63:13-18; Bixter Decl. Ex. 3 ("**Huberfeld Tr.**") at 37:6-11).

3. On July 1, 2008, Platinum Management (NY) LLC (together with affiliated entities, "**Platinum Management**") executed that certain Second Amended and Restated Limited Partnership Agreement of Platinum Partners Value Arbitrage Fund L.P. (the "**PPVA Limited Partnership Agreement**").  (Ex. 1, Huberfeld Tr. Ex. 589 at 1).

4. The PPVA Limited Partnership Agreement names and defines Platinum Management as the "General Partner" of PPVA.  (*Id.*).

5. The PPVA Limited Partnership Agreement provides that "the management of the Partnership shall be vested exclusively in the General Partner."  (*Id.* at Section 2.02).

6. According to Section 1.06 of the PPVA Limited Partnership Agreement, the "Purposes of the Partnership" are "realizing capital appreciation by investing and trading in U.S.

2

and non-U.S. Securities . . . and to engage in all activities and transactions as the General Partner may deem necessary or advisable in connection therewith, including, without limitation:

> (i) to invest on margin, to engage in short sales and option writing, to enter into repurchase agreements and reverse repurchase agreements or to engage in such other investment techniques as the General Partner believes to be appropriate;

> (ii) to purchase, hold, sell, exchange, transfer and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities and other property, funds or rights held or owned by the Partnership including, without limitation, such property, funds or rights which constitute non-traditional investment instruments;

> (iii) to allocate and invest discrete segments of the Partnership's assets to entities managed by others ("Portfolio Entities") and, pursuant to agreements granting trading authority over the segments of the Partnership's assets, to investment managers selected by the General Partner ("Managed Accounts"); provided, that the General Partner shall be responsible for monitoring the trading activities of the Partnership, the Portfolio Entities and the Managed Accounts;

> (iv) to borrow or raise moneys, and to issue, accept, endorse and execute promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of such or other obligations of the Partnership by hypothecation or pledge of all or part of the property of the Partnership, whether at the time owned or thereafter acquired;

> (v) to engage personnel, including Affiliates (as defined in Section 2.05) of the General Partner, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership; and

> (vi) to engage attorneys, independent accountants, consultants, investment managers, investment advisors, traders or such other persons as the General Partner may deem necessary or advisable.

(*Id*. at Section 1.06).

7.    As General Partner, Platinum Management was responsible for calculating PPVA's net asset value and allocating net capital appreciation and net capital depreciation to the accounts of all partners.   (*Id.* at Sections 3.05, 3.06).   Additionally, as General Partner, Platinum Management was responsible for allocating Net Capital Appreciation and Net Capital Depreciation

3

to the accounts of all partners, and for calculating PPVA's NAV.  (*Id.* at Sections 3.05, 3.06.)

Although the PPVA Partnership Agreement made Platinum Management responsible for

calculating PPVA's NAV, it provided criteria as to how NAV must be calculated:

> (i) Listed Securities.  Freely marketable Securities listed or admitted to trading on any U.S. or non-U.S. stock exchange or the U.S. NASDAQ National Market System or comparable non-U.S. market system ("NMS") shall be valued (A) at the last reported sale price of the Security on the primary stock exchange or the NMS, as the case may be, on the date of determination, or in case there shall have been no sale of such security on such date, then (B) at the mean between representative "bid" and "asked" prices for such security on such exchange or the NMS at the close of business on the date of determination, or if no such "bid" and "asked" prices are reported on such date, then (C) at the last reported sale or mean between representative "bid and "asked" price within the five-day period preceding such date; or, if neither such last sale price nor "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

> (ii) Unlisted Securities. Freely marketable Securities traded over-the-counter or on another dealer market shall be valued (A) at the "last sale" price as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or other primary U.S. or non-U.S. quotation system as of the date of determination or, if no such price is reported for such date, then (B) at the mean between representative "bid" and "asked" prices at the close of business on the date of determination, as reported in NASDAQ or such other system (or, if not so reported, then as reported by a recognized quotation service); or, if no such price is reported on such date, then (C) at the "last sale" or mean between representative "bid" and "asked" prices so reported within the five-day period preceding such date; or, if neither such "last sale" price nor such "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

> (iii) Restricted Securities. All Securities which are not freely marketable by reason of legal restrictions ("Restricted Securities"), if readily and immediately convertible into or exercisable for freely marketable Securities, shall be valued on the basis applicable to such underlying Securities, reduced by the applicable conversion or exercise price, as the case may be, and all other Restricted Securities will be valued at their fair value, on the basis of the last representative sale price of similarly restricted Securities, or if no such sale price is available, then at such price as the General Partner deems to be fair value.

> (iv) Short Positions. Securities held short by the Partnership will be valued as respectively provided in (i), (ii) or (iii) hereof, as applicable. The value of Securities held short by the Partnership shall be treated as a liability of the Partnership and,

#73476550_v1

together with the amount of any margin or other loans on account thereof, shall be subtracted from the Partnership's assets in determining net assets of the Partnership.

(v) Options. Options for the purchase or sale of Securities will be valued as respectively provided in (i), (ii), (iii) or (iv) hereof, as applicable, except that options listed on an exchange will in any event be valued at the mean between the representative "bid" and "asked" prices at the close of business on the date of determination. Premiums from the sale of options written by the Partnership shall be included in the assets of the Partnership and the market value of such options shall be included as a liability of the Partnership.

(vi) Dividends. Dividends declared but not yet received, and rights in respect of Securities which are quoted ex-dividend or ex-rights, shall be included at the fair value thereof, less any applicable taxes thereon, as determined by the General Partner, which may, but need not, be the fair market value so determined on the day the particular Securities are first quoted ex-dividend or ex-rights.

(vii) Commodity Interests. Positions in commodities, commodity futures contracts, options on such futures contracts or other interests in commodities traded on an exchange, through a clearing firm or a bank or other financial institution shall be valued at their most recent settlement price, or closing market quotation, as appropriate, on the applicable exchange or with such firm or institution on the applicable determination date. If such contract cannot be liquidated, due to the operation of daily limits or otherwise, as of such determination date, the liquidating value on the first subsequent day on which the contract would be liquidated may be used or such other value as the General Partner may deem fair and reasonable.

(viii) Cash Items. Short-term money market instruments and bank deposits shall be valued at cost (together with accrued and unpaid interest) or market, depending on the type of investment, as the General Partner shall deem appropriate.

(ix) Assets Allocated to Portfolio Managers. All assets of the Partnership that are allocated to an independent portfolio manager (through a Portfolio Entity or Managed Account) for management shall be valued by the portfolio manager at their market value.

(x) Other Assets. The value of any other assets of the Partnership (or the value of the assets mentioned in this subsection (a) in situations not covered thereby, or in the event of any other happening determined by the General Partner in its discretion to make another method of valuation advisable) shall be their fair value, determined in such manner as may be selected from time to time by the General Partner in its discretion. All values assigned to assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

(*See id.* at Section 3.06.)

8.     The PPVA Limited Partnership agreement provides that "[t]he General Partner shall have the power by itself on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership set forth in Section 1.06, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a) open, maintain and close accounts with broker-dealers and other clearing organizations and issue all instructions and authorizations to broker-dealers and other clearing organizations regarding the Securities and/or money therein;

(b) open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(c) lend, with or without security, any of the Securities, funds or other properties of the Partnership, including by entering into reverse repurchase agreements and, from time to time without limit as to amount, borrow or raise funds, including by entering into repurchase agreements, and to secure the payment of obligations of the Partnership by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Partnership;

(d) commit segments of the Partnership's assets from time to time for investment in Portfolio Entities and Managed Accounts and to enter into discretionary investment management agreements with portfolio managers relating to the Partnership's investments;

(e) do any and all acts on behalf of the Partnership, and exercise all rights of the Partnership, with respect to its interest in any person, firm, corporation or other entity, including, without limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(f) organize one or more corporations, partnerships or other subsidiary entities formed to hold record title, as nominee for the Partnership, of Securities or funds of the Partnership; and

(g) authorize any employee or other agent of the Partnership to act for and on behalf of the Partnership in all matters incidental to the foregoing.

(*Id*. at Section 2.03).

9.     Effective as of December 1, 2010, Platinum Management, PPVA, Platinum Partners Value Arbitrage Fund (International) Limited (the "**International Fund**"), Platinum Partners Value Arbitrage Intermediate Fund Ltd. (the "**Intermediate Fund**" and together with the International Fund, the "Offshore Feeder Funds") and Platinum Partners Value Arbitrage Fund (USA) L.P., (the "**Onshore Feeder Fund**" and collectively with the Offshore Feeder Funds, the "**Feeder Funds**") entered into that certain Fourth Amended and Restated Investment Management Agreement (the "**Investment Management Agreement**").   (Bixter Decl. Ex. 4 at 1; CTRL2146217).

10.     By the Investment Management Agreement, PPVA and the Feeder Funds retained Platinum Management as investment manager "to provide invest advice  upon the terms and conditions" of the Investment Management Agreement.  (*Id*. at 1).

11.     As Investment Manager, Platinum Management was appointed as the "limited attorney-in-fact of each of the Funds to invest and reinvest the net assets."  (*Id*.)

12.     David Bree and Don Seymour (the "**DMS Directors**"), in their capacity as independent employees of DMS Offshore Investment Services ("**DMS**"), served as independent directors for the Offshore Feeder Funds, which funds in turn served staggered terms as Limited Partners of PPVA under the PPVA Limited Partnership Agreement. (Bixter Decl. Ex. 1 at 1).

13.     The DMS Directors served as directors of the Offshore Funds from February 22, 2006 until their resignation on June 15, 2016.  (Bixter Decl. Ex. 5 [CTRL8034792]).   Uri Landesman served as the third director for the Offshore Funds from 2010 until April 30, 2015, at which time he was replaced by Mark Nordlicht.   At all relevant times, the DMS Directors constituted a majority of the members of the Boards of Directors for the Offshore Funds.  (Bixter Decl. Ex. 6 [CTRL8431740]).

14.    The DMS Directors retained authority under the Investment Management Agreement to terminate the Investment Management Agreement and remove the Investment Manager with respect to the Offshore Funds.  (Bixter Decl. Ex. 4 [CTRL2146217]).

15.    The DMS Directors had the authority to remove Nordlicht as a Director of the Offshore Funds by co-signed notice, and to overrule Mark Nordlicht's decisions by simple majority vote.  (Bixter Decl. Ex. 7 [CTRL0700476]).

16.    The DMS Directors had discretion to resign as directors of the Offshore Funds. (*Id*.)

17.    The DMS Directors had significant oversight authority with respect to the Offshore Funds, and by extension, PPVA, which they exercised by, among other things, regularly holding board meetings.  (Bixter Decl. Ex. 8 [CTRL7985546] (March 24, 2016 minutes for the Board meeting of the Offshore Funds, attended by the DMS Directors and telephonically by Nordlicht in his capacity as director, and telephonically by Horowitz, SanFilippo, Duch, Kimelman and Ottensoser as representatives of Platinum Management, and SS&C Fund Services, discussing the investment manager's report on performance of the Platinum funds, updates on retained service providers, SEC audit, and status of pending audit of Platinum funds among other topics); Bixter Decl. Ex. 9 [CTRL7985547] (September 16, 2015 board minutes)).

18.    The DMS Directors would frequently engage in active discussions with Platinum Management representations concerning the financial condition of PPVA.  (Bixter Decl. Ex. 10 [CTRL7761519] (March 24, 2016 email from George Duch to Nordlicht, Levy, SanFilippo, Horowitz, Kaplan, and Ottensoser regarding preparation session for call with DMS to cover various topics including: "1. Timing of capital withdrawals payable as investors that issued complaints to SS&C, our administrators. 2. Increase in the loan payable on PPVA. 3. Health of the

fund today and what's happening for the rest of the year 2016. 4. Reasons for the cancellations of the previous 3 calls. 5. Legal status of the litigation matters." and providing supporting documents)).

19.     The DMS Directors requested and reviewed periodic updates on PPVA's financial performance, as communicated from Platinum Management.  (Bixter Decl. Ex.11 [CTRL7692861] (February 11, 2015 email from Platinum Management employee George Duch to Pierre Connolly of DMS, reflecting Connolly's request in connection with DMS' review of Platinum's financial statements for fiscal year 2013 and prior to the DMS Directors' approval of the same, that Platinum Management provide "confirmation . . . that they are not aware of any reason as to why the directors should not approve the audited financial statements and sign the audit representation letter" and Duch's subsequent transmission of the signed letter as requested)).

20.     The DMS Directors engaged in careful consideration of the information provided to them and thoughtful analysis before providing required consents to financial disclosures and other actions.  (Bixter Decl. Ex. 12  [CTRL7851562] (April 2016 email thread between Platinum Management and DMS reflecting Platinum Management's responses to DMS' inquiries regarding anticipated timing for completion of audit, substantive questions regarding compliance and the treatment of and reason for certain inter-Platinum funds loans and investment sales);  Bixter Decl. Ex. 13 [CTRL7641603] (January 30, 2015 email reflecting DMS' questions for SS&C regarding whether any investor complaints had been received, particularly with respect to the audited financials, and whether SS&C was aware of "any matters to report to those charged with governance")).

21.     In one such instance, the DMS Directors received a request to approve draft resolutions for the Offshore Funds that would have the effect of amending the Confidential Private

Offering Memorandum with respect to the creation of the new share class, appointing Mark Nordlicht as a director to replace Uri Landesman, and approving the replacement of BDO Tortuga by CohnReznick (Cayman) as auditors and the corresponding engagement letter. (Bixter Decl. Ex. 6 [CTRL8431740]).

22.     The DMS Directors undertook a careful review of the documentation and a DMS employee responded to counsel's request with an extensive list of questions, including why Landesman was resigning, the rationale for the change of auditor to CohnReznick (Cayman), why investor consent was not being sought in connection with the revision of the PPM, and indicating that the DMS Directors would not approve the requested consents until Platinum Management indicated that it was willing to distribute the updated PPM to all existing shareholders, not just potential investors. (*Id.*)

23.     In response, Cayman counsel indicated, among other statements, that it was "really up to the Board to make the call on this one." (*Id.*)

24.     On April 30, 2015, a Platinum Management executive emailed DMS and stated that after "further internal discussion at Platinum and as we discussed by telephone, I want to confirm that Platinum will distribute the updated PPM to all existing shareholders . . . ." (*Id.*)

25.     DMS liaised with the Cayman Islands Monetary Authority ("**CIMA**") and the Platinum funds' auditors to coordinate, file, and procure extensions required in light of the repeated and extensive delays surrounding the completion of the audit of the Platinum funds' 2013 financial statements. DMS also communicated regularly with the auditors and CIMA regarding the need for such extensions and reason for the delay. (Bixter Decl. Ex. 14 [CTRL4958329] (September 2014 email chain between Platinum and DMS indicating that further extension requests will be needed

and require a letter from BDO); Bixter Decl. Ex. 15 [CTRL4969650] (September 2014 email thread showing DMS coordination with BDO for further extension request)).

26.     On May 25, 2016, the DMS Directors gave initial notice by email of their intent to resign as directors of the Offshore Funds after being asked to approve "loans" from certain redeeming investors to to PPVA and the Offshore Funds.  (Bixter Decl. Ex. 16 [CTRL8871536]).

27.     On May 31, 2016, the DMS Directors submitted formal letters of resignation, effective as of June 30, 2016.  (Bixter Decl. Ex. 17 [CTRL7983314]).

28.     The DMS Directors initially were willing to assist Platinum Management in locating replacement directors and acknowledge the time sensitive nature of such task, stating that "[w]e are available to speak with prospective replacement directors and trust that this notice period provides sufficient time to identify replacement directors." (Bixter Decl. Ex. 16 [CTRL8871536]).

29.     The DMS Directors' willingness to assist Platinum Management in locating suitable replacement directors to ensure a smooth transition after their resignation changed when news reports about a fraud involving Platinum began appearing. On June 14, 2016, the DMS Directors contacted Suzanne Horowitz, general counsel of Platinum Management, to request a call to discuss the *Wall Street Journal* article published on the same date regarding Murray Huberfeld and the COBA Scheme (defined below) and the liquidation of PPVA, and it appears that a teleconference with Ms. Horowitz took place on June 15, 2016.   (Bixter Decl. Ex. 18 [CTRL8871697]) (June 14-15, 2016 email thread between James Kattan of DMS and Horowitz with Kattan making several requests to schedule a call with Horowitz and Bree to discuss *Wall Street Journal* article)).

30.     On June 15, 2016, the DMS Directors informed Horowitz that "given recent events" their resignation would be immediately effective, and submitted revised resignation letters. (Bixter Decl. Ex. 19 [CTRL8034594]; Bixter Decl. Ex. 5 [CTRL8034792]).

31.     No reference was made to Platinum's ability to secure replacement directors in the DMS Directors' revisedresignation letters.  (*Id.*)

## ORGANIZATIONAL STRUCTURE OF PLATINUM MANAGEMENT

32.     Platinum Management was formed on August 22, 2001 as a Delaware limited liability company.  (Bixter Decl. Ex. 20 [CTRL1968806]).

33.     The Second Amended and Restated Operating Agreement of Platinum Management, which was effective as of January 1, 2011 (the "**Platinum Management Operating Agreement**"), states that the members of Platinum Management are Mark Nordlicht ("**Nordlicht**"), the Mark Nordlicht Grantor Trust, and Uri Landesman ("**Landesman**").  *Id.*; (Bixter Decl. Ex. 21 ("**Bodner Admissions**") at #1-3, 6).

34.     The Platinum Management Operating Agreement states the membership and voting percentages of each member as follows:

| Name | Company Percentage / Voting Status |
|---|---|
| Mark Nordlicht | 10% |
| Uri Landesman | 25% |
| Mark Nordlicht Grantor Trust | 65% |

(Bixter Decl. Ex. 20 [CTRL1968806] at Sched. I).

35.     The Platinum Management Operating Agreement designates Landesman as the sole Manager (as defined therein) of Platinum Management.  (*Id.*)

36.     Nordlicht and the Mark Nordlicht Grantor Trust are listed as "Passive Members" of Platinum Management.  (*Id*.)

37.     The Platinum Management Operating Agreement requires unanimous consent of the members to admit additional members.  (*Id*. at Section 3.4.)

38.     In mid-2014, Bodner, Huberfeld and Nordlicht approved Bernard Fuchs ("**Fuchs**") to be a 10% partner in the management company (Platinum Management), in exchange for maintaining his investment. (Bixter Decl. Ex. 22 ("**Fuchs Tr.**") at 24:25 – 25:2-20, 26:3-8.)

39.     The Mark Nordlicht Grantor Trust, dated November 1, 2008, is between Nordlicht Management LLC and Mark Nordlicht.   (Bixter Decl. Ex. 23, Bodner Tr. Ex. 377.5 [CTRL0726431]).

40.     Nordlicht Management LLC is identified as the Settlor and Mark Nordlicht is identified as the Trustee of the Mark Nordlicht Grantor Trust.  (*Id*.)

41.     Through the Mark Nordlicht Grantor Trust, Mark Nordlicht granted the economic equivalent of a 24.99% membership interest in Platinum Management to Manor Lane Management LLC, whose affiliated member was identified as Murray Huberfeld. (*Id.*; Bodner Admissions at #9; Bixter Decl. Ex. 24 ("**Huberfeld Admissions**") at #6, 9).

42.     Manor Lane Management LLC was owned and controlled by Murray Huberfeld. (Bixter Decl. Ex. 25, Huberfeld Tr. Ex. 594 [CTRL0730025]; Huberfeld Tr. 15:15-19; 447:12-18.)

43.     Through the Mark Nordlicht Grantor Trust, Mark Nordlicht granted the economic equivalent of a 24.99% membership interest in Platinum Management to Grosser Lane Management LLC, whose affiliated member was identified as David Bodner.  (Bixter Decl. Ex. 8, Bodner Tr. Ex. 377.5 [CTRL0726431]; Bodner Admissions #8; Huberfeld Admissions #6, 8.)

#73476550_v1

44.     Grosser Lane Management LLC is owned and controlled by David Bodner.  (Bixter Decl. Ex. 26 [CTRL4938126]; Bodner Admissions #10; Bodner Tr. 31:24-25 – 32:1-4; Bixter Decl. Ex. 27 ("**Bodner, N. Tr.**") at 55:10-11, 56:8-10).

45.     The Mark Nordlicht Grantor Trust requires Mark Nordlicht, upon receipt of distributions from Platinum Management, to distribute the stated percentages of such distributions to Manor Lane, Grosser Lane and Nordlicht Management III LLC.  (Bixter Decl. Ex. 23, Bodner Tr. Ex. 377.5 [CTRL0726431]; Bixter Decl. Ex. 28 [CTRL5825428]).

46.     The Mark Nordlicht Grantor Trust requires advance written consent of Bodner and Huberfeld for any amendments thereto and precludes amendment of any beneficiary's interest in the Mark Nordlicht Grantor Trust.  (*Id*.)

47.     Under the terms of the Investment Management Agreement, Platinum Management, as PPVA's investment manager, was entitled to receive a 2% per annum Management Fee (as defined in the Investment Management Agreement), which was charged monthly, based on the net asset value determined and communicated by Platinum Management as General Partner. (Bixter Decl. Ex. 4 [CTRL2146217]; Bixter Decl. Ex. 29 [CTRL4596511]; Bixter Decl. Ex. 30 ("**SanFilippo Tr.**") at 59:13-25 60:2-13).

48.     Under the terms of the Investment Management Agreement, Platinum Management also was entitled to receive an incentive allocation equal to 20% of net capital appreciation or depreciation of PPVA's assets, after deducting all Partnership expenses, as calculated and communicated by Platinum Management as General Partner.   (Bixter Decl. Ex. 29 [CTRL4596511]).

49.     The partners in the management company [Platinum Management], *i.e*. the Mark Nordlicht Grantor Trust, Landesman and Nordlicht, received these fees.  (SanFilippo Tr. 67:2-13).

50.     Through its interest in the Mark Nordlicht Grantor Trust, Manor Lane Management, affiliated with Huberfeld, received a portion of the fees paid to Platinum Management.  (Huberfeld Tr. 73:3-8; SanFilippo Tr. 68:14-25 – 69:2-14; Huberfeld Admissions #12).

51.     Through its interest in the Mark Nordlicht Grantor Trust, Grosser Lane Management, which is affiliated with Bodner, received a portion of the fees paid to Platinum Management.  (Bodner Admissions #12; Bodner Tr. 113:10-25; SanFilippo Tr. 68:14-25 – 69:2-14).

52.     Collectively, the direct and beneficial members of Platinum Management, who were referred to as "partners", received more than $100 million in fees.  (Bixter Decl. Ex. 31, Fuchs Tr. Ex. 5 [CTRL8014947]).

53.     The partners of Platinum Management during the relevant time period were Nordlicht, Bodner, Huberfeld, Landesman, and starting in mid-2014, Fuchs.  (Fuchs Tr. 24:25 – 25:2-20, 26:3-8).

54.     Nordlicht, Bodner, Huberfeld, Landesman and Fuchs convened at partner meetings to discuss performance of the funds overseen by Platinum Management and its affiliated investment advisers, including PPVA.  (Bodner Admissions #45; Bixter Decl. Ex. 32 ( "**Katz Tr.**") at 260:4-18; Fuchs Tr. 44:20-45:6).

55.     Platinum Management did three primary things:  (i) operated PPVA, (ii) invested the assets of PPVA, and (iii) brought investors to PPVA.  (SanFilippo Tr. 124:20 to 125:9).  As set forth below, Huberfeld, Bodner and Fuchs played a central role in each of the foregoing.

56.     Nordlicht served as the Chairman and as Chief Investment Officer of Platinum Management.  (Bixter Decl. Ex. 29 [CTRL4596511]; SanFilippo Tr. 29:18-30:4, 104:14-17).

57.     David Levy ("**Levy**") served as Co-Chief Investment Officer of Platinum Management.  (*See* SanFilippo Tr. 108:16-108:24).    The partners in Platinum Management considered Levy a senior employee and he was consulted on important decisions.  (*Id.* at 108:25-109:3; Bixter Decl. Ex. 33 ( "**Properr Tr.**") at 124:2-9).

58.     Daniel Saks ("**Saks**") served as Co-Chief Investment Officer of Platinum Management during 2014.  (Bixter Decl. Ex. 34 ("**Saks Tr.**") at 39:18-21).

59.     Uri Landesman ("**Landesman**") served as the president of Platinum Management.  (*See* Bixter Decl. Ex. 29 [CTRL4596511]).

60.     Naftali Manela ("**Manela**") served as the Chief Operating Officer of Platinum Management.  (SanFilippo Tr. 334:4-6).

61.     Joseph SanFilippo ("**SanFilippo**") served as the Chief Financial Officer of Platinum Management.  (*Id.* at 51:15-17).

62.     During certain portions of the relevant time period, Daniel Mandelbaum ("**Mandelbaum**") also served as the Chief Financial Officer of Platinum Management.  (*Id.* at 386:23-387:2).

63.     David Ottensoser ("**Ottensoser**") served as in-house legal counsel and Chief Compliance Officer for Platinum Management.  (*Id.* at 176:6-10).

64.     Suzanne Horowitz served as Chief Legal Officer of Platinum Management.  (Bixter Decl. Ex. 35 ( "**Rogers Tr.**") at 145:17-22).

65.     David Steinberg ("**Steinberg**") served as Co-Chief Risk Officer.  (*See* Bixter Decl. Ex. 36 [CTRL6644829]).

#73476550_v1

66.     Ezra Beren ("**Beren**") served as a Vice President of and portfolio manager at Platinum Management. (*See* Bixter Decl. Ex. 37 ( "**Beren Tr.**") at 43:8-44:12, 44:23-45:4, 63:16-19).

67.     Andrew Kaplan ("**Kaplan**") served as the Director of Marketing and Chief Marketing Officer of Platinum Management.  (*Id.* at 232:5-7)

68.     Trey Rogers ("**Rogers**") served as Director of Financial Reporting for Platinum Management.  (Rogers Tr. 104:17-18)

69.     Eli Rakower ("**Rakower**") served as Director of Valuation at Platinum Management and also worked in that role for Beechwood (defined below).  (*Id.* at 104:14-15)

70.     Seth Gerszberg ("**Gerszberg**") had a role at Platinum Management that entailed putting "pressure" on Bodner and Huberfeld and that required him to "come[] through."  (*See* Bixter Decl. Ex. 38 [CTRL7733105])

## BACKGROUND ON BODNER, HUBERFELD, AND NORDLICHT

71.     Bodner and Huberfeld were friends and partners.  (*See* Bodner Tr. 25:7-12, 65:15-66:6).

72.     Huberfeld and Bodner did "[p]retty much all our business together, not exclusive, but a lot, very large part."  (*See* Huberfeld Tr. 31:10-20).

73.     Bodner and Huberfeld they were "equal partners" who co-invested, and shared profits and losses.  (Huberfeld Tr. 31:25-32:9, 32:20-21, 35:12-25); (Bodner Tr. 26:21-27:6, 43:3-5).

74.     As partners, Huberfeld involved Nordlicht and Bodner in "anything to do with Platinum or something related to that."  (Huberfeld Tr. 40:16-41:3).  Bodner agreed with respect to Huberfeld.  (*See* Bodner Tr. 67:2-7).

75.     Nordlicht is a cousin of David Bodner.  (*See id.* at 60:7-8).

76.     Nordlicht, Huberfeld, and Bodner started Platinum Management.  (*See id.* at 71:7-13).

77.     In or around 2003, Nordlicht started what became PPVA.  (Huberfeld Tr. 36:22-37:11).  Huberfeld and Bodner served as the seed investors of PPVA.  (*Id.* at 37:7-8, 56:19-23).

78.     Specifically, Bodner and Huberfeld were "looking to open up a hedge fund [a]nd Mark [Nordlicht] was known as a successful trader, and I think one of us or both of us approached him and asked him if he would join us."  (Bodner Tr. 61:12-21).

79.     Bodner, Huberfeld and Nordlicht together formed the inner circle of Platinum Management.  (Bixter Decl. Ex. 40, Bodner Tr. Ex. 377.34 [CTRL4919566])

80.     In his deposition as Platinum Management's Fed. R. Civ. P. 30(b)(6) witness, SanFilippo testified that he possessed no knowledge, either personally or on behalf of Platinum Management, with respect to, among other things, the following transactions, investigations and individuals that directly involved or implicated matters that would have been known to Bodner, Huberfeld and Nordlicht:

    i.      The consideration, or lack thereof, paid by Huberfeld, Bodner, and their affiliated entities in exchange for the March 2016 Release (defined below); (SanFilippo Tr. 77:16-78:16);

    ii.     The agreement of Bodner, Huberfeld, and their affiliated entities to forfeitfees generated by Platinum Management in return for an unsecured right to indemnification in the March 2016 Release (*id.* at 80:20-81:7);

    iii.    Angela Albanese ("**Albanese**") communicating electronically on Bodner's behalf and acting as the conduit for requests made to Bodner (*id.* at 87:25-88:15, 130:11-131:21);

    iv.     Huberfeld using a Gmail email account to conduct the business of Platinum Management (*id.* at 88:16-89:4);

    v.      Prior to June 8, 2016, any criminal investigation conducted by the United States Attorney's Office for the Southern District of New York involving Huberfeld

and/or Platinum Management, including any investigation relating to the COBA Scheme (defined below) (*id.* at 94:17-95:3, 98:18-99:13);

vi.   Fuchs accepting a loan from the HFF, Inc. ("**Huberfeld Family Foundation**") in lieu of a redemption from PPVA (*id.* at 151:20-152:10);

vii.  A "Chinese Wall" between Platinum Management and Beechwood (*id.* at 196:4-10, 198:12-20);

viii. Huberfeld paying a bribe to an official from the Correction Officers' Benevolent Association of New York ("**COBA**") in return for an investment in PPVA (*id.* at 224:12-226:14); and

ix.   Any discussions between Platinum Management and Beechwood on June 9, 2016 concerning the arrest of Huberfeld on June 8, 2016 (*id.* at 284:24-286:10).

## MURRAY HUBERFELD'S CONTROL OF PLATINUM MANAGEMENT AND PPVA'S ASSETS

### Beneficial Ownership

81.   Huberfeld, by and through Manor Lane Management LLC, received a share of the fees paid to Platinum Management.  (Bixter Decl. Ex. 39 [CTRL3500172]; Huberfeld Tr. 73:3-8).

82.   In March 2016, Huberfeld executed an agreement that purports to grant Huberfeld a release from any claims against him by PPVA and a right of indemnification from PPVA and by which he allegedly relinquished his beneficial ownership in Platinum Management a (the "**March 2016 Release**").  (Bixter Decl. Ex. 41, Bodner Tr. Ex. 377.57 [BODNER0000001]; Huberfeld Tr. 73:9-14).

83.   During the drafting process for the March 2016 Release, Nordlicht refused to provide a personal guarantee for the right of indemnification sought by Huberfeld, noting "I obviously can't be responsible personally for David and Murray's misconduct."  (Bixter Decl. Ex. 42, Bodner Tr. Ex. 377.59 [CTRL7749843]).

84.   HFF, an entity that  Huberfeld controlled and of which he was President, provided a "loan" to Fuchs for a redemption advance of funds Fuchs had invested in PPVA, in exchange for

Fuchs agreeing not to sue Bodner and Huberfeld.  (Bixter Decl. Ex. 43 ("**Fuchs Admissions**") at #8; Fuchs Tr. 60:10-62:8; Bixter Decl. Ex. 45 [HFF000417]; Bixter Decl. Ex. 46 [HFF000481]).

### Presence and Oversight

85.     Huberfeld maintained an office at Platinum Management and maintained an office at the New York offices of several entities that were affiliated with Beechwood enterprise, which consisted of a series of affiliated entities, investment management companies and reinsurance trusts (collectively, "**Beechwood**").  (Huberfeld Admissions #24, 25).

86.     Huberfeld was in the Platinum Management office "quite often, probably [two] or three days a week" between 2011 and 2014, at which time Platinum Management meved offices. (Huberfeld Tr. 126:20-24).

87.     Huberfeld was provided a secretary, who was an employee of Platinum Management and its affiliates, to answer phone calls and receive emails on his behalf.   (Huberfeld Tr. 90:8-11; Bixter Decl. Ex. 47 ("**Albanese Tr.**") at 22:24-29:22 (assistant while Huberfeld held office at Platinum Management); Bixter Decl. Ex. 48 ("**Northwood Tr.**") at 13:3 (assistant while Huberfeld held office at Beechwood)).

88.     Huberfeld participated in meetings of the partners at which the performance of the funds overseen by Platinum Management, including PPVA was discussed.  (Katz Tr. 260:4-18; Fuchs Tr. 44:20-45:6 (describing private monthly meetings with Bodner, Huberfeld and Nordlicht); Huberfeld Admissions #47; Huberfeld Tr. 130:2-23).

89.     Huberfeld was the intended audience of significant presentations regarding PPVA's financial status, "significant investments" and strategic goals. (Bixter Decl. Ex. 49, SanFilippo Tr. Ex. 1.130 [CTRL8008893]).

90.     On January 14, 2016, David Steinberg, Platinum Management's Chief Risk Officer, sent an email to Naftali Manela, Platinum Management's Chief Operating Officer, attaching four spreadsheets and stating as follows:

> Naftali, Each file is a simple spreadsheet showing different points. Taken all together, they show that with the inflows (including Apollo) and with some success with Agera, VSTA, ECHO, Desert Hawk we can still produce a decent return despite the interest expense of the addition debt (after the reduction of the rate to 7%).

> Without the extra money from Apollo or BAM, the fund will need to gate, Ari Glass and NM (and eventually Bam will have to join) put the fund into BK, we lose probably lose to $400mm of value due to unfunded positions, and a trustee is appointed to run the wind down with no *rachmanus* on BAM.

> <u>*This is the narrative for Murray and Beechwood*</u>.

(the "**Rachmanus Email**").  (Bixter, Decl. Ex. 50 [CTRL8011541] (emphasis added)).

91.     *Rachmanus* is a Yiddish word that means "mercy."  (Bixter Decl. Ex. 646 ("**Steinberg Tr.**") at 128:3-128:14).

92.     Steinberg's third chart, titled "PPVA Position Breakout," states that the total net value of PPVA's assets is **$333.2 million** – far less than the approximately **$752 million** NAV figure that Platinum Management reported to PPVA on December 31, 2015.  (Bixter, Decl. Ex. 50 [CTRL8011541]; Bixter Decl. Ex. 51 [CTRL8296283]).

93.     Notably, Steinberg lists the unencumbered value of PPVA's oil and gas positions, including Golden Gate Oil, LLC ("**Golden Gate Oil**") PEDEVCO Corp. ("**PEDEVCO**") and Northstar Offshore Group, LLC ("**Northstar**") as **$0**.  (*Id*.)

94.     In a January 2016 presentation to Feuer, Taylor, Bodner and Huberfeld prepared by Seth Gerszberg, Steinberg, Levy, Manela, and others, the following topics were discussed:

    a.  PPCO goal of raising $80M, moving $50M of equity from PPCO to PPVA and using $30M to fund ongoing operations;

b. Reviewing PPCO outflows (expenses, redemptions, investments), PPCO inflows and deficits, and strategies for raising $80M in PPCO, including $20M by "David and Murray's investor list" and "additional debt from Beechwood" of $50M;

c. PPVA Goals of raising $200M, converting $25-40M of 2015 redemptions to debt, renegotiate and refinance debt and sell Implant Sciences for $80-$100M;

d. Reviewing PPVA outflows of $205M (expenses, interest owed, margin calls, redemptions), PPVA potential inflows through creation of management share class, sale of Implant Sciences, noting that "if none of these happen, PPVA is facing a $150MM deficit" and "even after all these potential inflows, PPVA still faces a minimum deficit of 50M (assuming we can postpone the 2015 redemptions)";

e. Reviewing details of the "significant investments" including whether the positions were encumbered or unencumbered;

f. Reviewing existing debt and encumbrances, noting that "Due to BAM's security interests in PPVA's assets, namely Agera and Implant, **PPVA only has approx $40MM of assets which are unencumbered that can be borrowed against**. PPVA has no ability to borrow additional funds to cover its deficit.";

g. Reviewing a plan for "Beechwood-Financing the Deficit" and the use of the proceeds;

h. And a slide entitled "David and Murray" asking "What do we need from David and Murray? Help us figure out short-term liquidity issues, Help us close investment into PPCO and the management share class, [and] renegotiate the Beechwood note."

(Bixter Decl. Ex. 643 [CTRL8008894] (emphasis added)).

## Financials

95.     Platinum Management employees provided Huberfeld with information regarding the financial status of Platinum Management, PPVA, their affiliates, and their investments which were not provided to other investors. (Huberfeld Admissions # 64).  For example:

a. Until at least 2014, Huberfeld received "Daily Cash Sheets" telling him the "daily ins and outs" of the credit fund managed by Platinum Management's affiliated investment advisor.  (Huberfeld Tr. 91:18-24).

b. In February 2013, Platinum Management employee Joel Edelstein ("**Edelstein**") reported directly to Nordlicht and Huberfeld concerning investor commitments in Platinum Partners Black Elk Opportunities Fund LLC and Platinum Partners Black Elk Opportunities Fund International Ltd. (together, the "**BEOF Funds**"). (Bixter Decl. Ex. 53 [CTRL3691618]).

c. At Huberfeld's request, Landesman would regularly send Huberfeld a breakdown of assets under management according to each Platinum fund. (Bixter Decl. Ex. 54 [CTRL4418320]).

d. In August 2013, Nordlicht sent Huberfeld a list of PPVA assets under management and a subscription/redemption report, noting "please note subs vs reds. Need for new direction is clear." (Bixter Decl. Ex. 610 [CTRL4623441 – CTRL4623442]).

e. In March 2014, Edelstein reported to Huberfeld a per-investor breakdown of the "ppbe investors that agreed to roll" their investments in the BEOF Funds in connection with a March 2014 exchange offer. This list included HFF (Bixter Decl. Ex. 55, SanFilippo Tr. Ex. 1.110 [CTRL5221242]).

f. In July 2015, Daniel Mandelbaum, Chief Financial Officer of PPVA, shared initial performance estimates for PPVA and its affiliated fund, Platinum Partners Credit Opportunities Master Fund LP ("**PPCO**"). (Bixter Decl. Ex. 56 [CTRL7035649]).

96.     During a partner meeting in January 2015 attended by Huberfeld, Bodner expressed his opinion to the partners of Platinum Management that Platinum Management had overvalued certain of the assets of PPVA. (Fuchs Tr. 26:17-30:20; Fuchs Admissions #3, 44).

## **Management and Strategic Involvement**

97.     Even after his alleged step-back from management in 2011, Huberfeld continued to be involved in decision-making with Bodner and Nordlicht regarding the funds managed by Platinum Management and its affiliated investment advisers. (Fuchs Tr. 63:2-10; Katz Tr. 34:22-35:24 (describing Bodner and Huberfeld as "co-equal partners and Nordlicht was treated as a more junior partner")).

98.     Huberfeld was involved in and had input into investment positions, strategic decisions, redemptions, and other company matters, for example:

a. Platinum Management's response to an Audit Request by the U.S. Securities and Exchange Commission ("**SEC**") states that Huberfeld provided "input and opinions

regarding investments or other potential investments." (Bixter Decl. Ex. 57, SanFilippo Tr. Ex. 1.6 [CTRL6645956]).

b.  Nordlicht asking Huberfeld in August 2012 whether to take a position in Black Elk Energy Offshore Operations, LLC ("**Black Elk**"). (Bixter Decl. Ex. 58 [CTRL3525553]).

c.  Nordlicht discussing "decisions by committee" of "3 people" in reference to himself, Bodner and Huberfeld: "I have been pounding table that me and them shd [sic] have separate pl's in beechwood.  It's not fair to pm otherwise as with 3 people, there is always something that is going to bother someone, no matter how irrational (myself included). It's dysfunctional." (Bixter Decl. Ex. 40, Bodner Tr. Ex. 377.34 [CTRL4919566]) (emphasis added).

d.  Bodner and Huberfeld prevailing in their desires regarding PPVA's investment in China Horizon Investment Group ("**China Horizon**"). (Katz. Tr. 259:13-22).

e.  Nordlicht instructing Manela and Gilad Kalter, both Platinum Management executives, to "consult with Murray as to how to approach" the rollover of subscription agreements from the investors in the BEOF Funds to PPVA.  (Bixter Decl. Ex. 59 [CTRL6031208]).

f.  Nordlicht asking Huberfeld whether he has been "managing the lawyer to arrange payment over time on fine." (Bixter Decl. Ex. 60 [CTRL4731893]).

g.  Huberfeld telling Nordlicht regarding a transaction with Randy Katzenstein of OBEX: "The main thing is he should understand he owes us 8 percent on the capital paid monthly and then his 8 perecnt [sic] then his salary then 50/50 split. If he doesnot [sic] agree to this. [sic] We have no deal." (Bixter Decl. Ex. 61, Huberfeld Tr. Ex. 603 [CTRL6348309]).

h.  Regarding a May 2014 OBEX deal, Huberfeld instructing Nordlicht "if its no coupon it's a pass" and stating "I did agree that he has the right to call the money and we go [down] in pct if we don't fund I want 60 days between calls not 30 if it's a good deal we will fund and if its not we will do [down] in ownership."  (Bixter Decl. Exs. 61, Huberfeld Tr. Ex. 603 [CTRL6348309]); (Bixter Decl. Ex. 62, Huberfeld Tr. Ex. 604 [CTRL6331008]).

i.  Nordlicht informing Huberfeld that a December 2014 loan opportunity would "be better suited for beechwood. [Should] I vet first?" to which Huberfeld responds "I forwarded and reviewed with danny. Have Ira call him." (Bixter Decl. Ex. 63 [CTRL5966780]).

j.  ██████████████████████████████████████████████████████████

     ██████████████████████████████████████." (Bixter Decl. Ex. 64, Huberfeld Tr. Ex. 671 [BW-SHIP-00914974] (emphasis added)).

k.  Nordlicht setting up call to discuss "fund performance and marketing update" with, among others, Landesman, Fuchs, Kerry Propper, Levy, Bodner and Huberfeld. (Bixter Decl. Ex. 145 [CTRL7612213]).

l.  Nordlicht wanting to sell Crius [Energy] shares, and Huberfeld stating "needs discuuion [*sic*] as shares are in beechwood trust." (Bixter Decl. Ex. 65 [CTRL6677752]).

99.   In a January 8, 2016 email, Nordlicht routinely sent Huberfeld correspondence labeled "atty client privilege" regarding business strategy and liquidity issues. (Bixter Decl. Ex. 66, Huberfeld Tr. Ex. 692 [CTRL7725772]; Bixter Decl. Ex. 67 [CTRL8014832]; Bixter Decl. Ex. 68 [CTRL8310017]

100.   Nordlicht candidly described business and liquidity concerns to Huberfeld:

a.  "I think we need to revamp the strategy on PPVA and figure out what to do. It can't go on like this or practically we will need to wind down. This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude. I think we can overcome this but this is code red, we can't go on with status quo. We need to be very aggressive if we want to stay open. We can't pay out 25 million in reds per quarter and have 5 come in. It just becomes almost impossible to manage asset allocation among the different strategies..." (Bixter Decl. Ex. 69 [CTRL6309069]).

b.  "But the reality is Dec 1 is 2 weeks away and if I don't have 50 million inflow by Dec 1, platinum will have to be in wind down and probably Beechwood too if we are honest with eachother. [*sic*] It is time to pull out all the stops, I am willing to borrow the money against all my assets (real estate, lp interests in platinum, beechwood interest) , take all the risk on my shoulders, make any kind of deal as I think we get through this crunch, we will thrive. But I need help and frankly, I feel like Dovid is a little clueless as to what is about to happen. I can't imagine we let it all go down the tubes when 50 million pretty much saves us. It's not perfect and I really feel 125-150 is what fixes and relaunches us and maintains and builds on our 13 yr track record but at this point, with all the irons I have in the fire, I can get by with 50 and then lean on Kerry for more inflows going forward or just piece it together with all the marketing initiatives we have going. I know we want to solve one problem at a time but 50 million into platinum for dec 1 needs to be the number 1 priority because everything else is unsolvable otherwise." (Bixter Decl. Ex. 70 [CTRL7516525]).

c.  "Please read this to Dovid. It's 6 am here in israel, I have not gone to sleep because we are 12 hours away from both platinum and beechwood going down....but let's face it , we are not going to get out of this unless both of you go way out on a limb." (Bixter Decl. Ex. 71 [CTRL7736228]).

101.     Huberfeld participated in bringing Fuchs on as a partner in 2014.  (Fuchs Tr. 24:25-26:8; Bodner Admissions #5; Huberfeld Tr. 117:11-118:19).

102.     Huberfeld coordinated Platinum Management's search for new office space in 2014.  (*See* Bixter Decl. Ex. 647 [CTRL 715214] (Huberfeld discussing new lease terms on Carnegie Hall Tower property); Bixter Decl. Ex. 74 [CTRL4805870] (Huberfeld receiving lease information for 53rd floor); Bixter Decl. Ex. 75 [CTRL4831216] (Nordlicht responding to same: "I still think we might find awesome built out space elsewhere on one floor if we moved out with full park views but I defer to u.").

### Employee Matters

103.     Huberfeld was asked to conduct interviews and provided input into employment decisions at Platinum Management and Beechwood.  (Huberfeld Tr. 111:17-112:11; Bixter Decl. Ex. 76 [CTRL4303529] (Landesman requesting Huberfeld interview two potential candidates for employment at Platinum Management); Bixter Decl. Ex. 77 [BW-SHIP-01064379] (Huberfeld conducting interview of Beechwood employee candidate Jeremy Apfel in November 2014); Bixter Decl. Ex. 78 [BW-SHIP-00915006] (meeting Beechwood CIO candidate Dhruv Narain in May 2015)).

104.     Huberfeld's input was authoritative, including regarding senior executives at both Beechwood and Platinum Management; for example, regarding Nordlicht's need to "move [David Levy] over full time at some point" back to Platinum Management from Beechwood, Huberfeld told Nordlicht "It's a short-term issue. He can start moving right after[.]"  (Bixter Decl. Ex. 79, SanFilippo Tr. Ex. 1.10, [CTRL5712289]).

105.     Huberfeld participated in meetings to discuss employee downsizing at Platinum Management.  (Bixter Decl. Ex. 80, Testimony of Daniel Mandelbaum, *United States v. Nordlicht et al.*, 16-CR-640 (E.D.N.Y.) at 4321:6-21).

106.     Huberfeld "referred" personnel for employment at Platinum Management and Beechwood.  (Huberfeld Admissions #54, 55).

107.     Huberfeld's nephew, Levy served as Chief Investment Officer for Platinum Management and Beechwood.  (Huberfeld Tr. 252:10).

108.     Beren, Huberfeld's son-in-law,  was an employee of Platinum Management and Beechwood.  (Beren Tr. 131:21-132:4; Huberfeld Tr. 252:10).

### Soliciting Investors and Investor Relations

109.     Huberfeld solicited investors for PPVA on behalf of Platinum Management.  *See* (Bixter Decl. Ex. 648, SanFilippo Tr. Ex. 1.6 [CTRL6645955] (Platinum Management response to SEC auditors that Huberfeld "actively promotes the funds to his business and social contacts and other prospective investors, and has been responsible for introducing a number of investors to the funds"); Huberfeld Tr. 49:19-21, 54:6-8, 54:19-22).

110.     Huberfeld negotiated the terms of investment with prospective investors in funds managed by Platinum Management, including, for example, Huberfeld informing an investor that he would try to get him monthly interest payments.  (Bixter Decl. Ex. 81 [CTRL6098128]).

111.     Huberfeld discussed valuation of positions with potential investors.  (Bixter Decl. Ex. 82 [CTRL4388905] (Huberfeld describing the valuation methodology for Black Elk shares: "There are 120 million shares of black elk outstanding we are estimating a value of at least 3.5 a shares above the debt at today's out put [*sic*]. With the new drilling program that we are implementing the value could be $5-$6 a share. We feel $3.50 if on the conservative side").

112.    Huberfeld served as the point of contact for certain high-value investors.  One such investor was Marcos Katz, who invested nearly $50 million in PPVA.  (Huberfeld Tr. 152:8-11 (Huberfeld introduced Mr. Katz to the fund); Katz Tr. 36:4-8).

113.    Huberfeld continued to be the point of contact for Mr. Katz.  (Bixter Decl. Ex. 83 [CTRL8189631] (Katz instructing Huberfeld "Let us agree that our relationship will not depend on Mark's availability.")).

114.    Huberfeld met with Mr. Katz on more than one occasion in connection with Mr. Katz's investment in PPVA, including traveling to Mexico to see Mr. Katz regarding Mr. Katz' request to redeem his investment.  (Katz Tr. 43:8-44:23, 58:9-59:22, 65:3-70:15)

115.    Huberfeld pressed Mr. Katz not to ask for redemption of his investment in PPVA. (Katz Tr. 43:8-13)

116.    Huberfeld represented to Mr. Katz that "PPVA had sufficient assets to permit the Katzes to fully withdraw their investment."  (Katz Tr. 52:23-53:23, 36:16-25).

117.    Huberfeld negotiated with Mr. Katz regarding the timing of his redemption requests.  (Bixter Decl. Ex. 83 [CTRL8189631] (Katz informing Huberfeld re "Redemption: Mark had promised $10MM of redemption before January 1st, and in that occasion you said that it might be difficult to comply on that date, but by February 1st you could get me a check. I hope you will fulfill your commitment, you always told me that you would.").

118.    In April 2016, Katz wrote to Bodner, Huberfeld and Nordlicht after learning that Bodner and Huberfeld sought a release in connection with the March 2016 Release, stating "[w]hat the hell is going on? I left 50 million USD in the fond [sic] just because I trusted you."  (Bixter Decl. Ex. 84 [CTRL7814403]).

119.   Huberfeld was present during a meeting during which Nordlicht promised Marcos Katz that 40% of Katz's investment in PPVA would be repaid by December 2016.  (Katz Tr. 61:2-18, 275:21-276:23).

120.   Michael Katz, Marcos Katz's grandson, was granted access to Platinum Management's books and records in an effort to oversee his grandfather's significant investment; he met with Huberfeld as part of his review.  (Katz Tr. 19:16-21:2).

121.   Huberfeld also brought the Harari family (collectively, the "**Hararis**"), who held beneficial interests in Twosons Corporation, into PPVA (and the BEOF Funds).  (Huberfeld Tr. 155:14-17).

122.   Huberfeld did not just introduce the Hararis as a referral; Huberfeld actively negotiated terms with the Hararis regarding potential investments.  (Bixter Decl. Ex. 85 [CTRL4998473] (September 2014 potential investment of $15 million)).

123.   In January 2016,  Nordlicht implored Huberfeld to contact investors and connections to request investments into Platinum Management and PPVA, including from Marcos Katz.  (Bixter Decl. Ex. 86, Bodner Tr. Ex. 377.37 [CTRL7736607]; Bixter Decl. Ex. 71 [CTRL7736228]).

124.   Huberfeld offered to and did provide personal guarantees for certain high-value investors in PPVA.  (Fuchs Tr. 173:15-179:14, 303:8-305:17).

125.   Huberfeld also committed PPVA to provide guarantees for certain investors. (Bixter Decl. Ex. 87 [CTRL2186421] (Regarding a potential $25 million investment in which Huberfeld states to Landesman "Now u [sic] understand why I want to guarantee the deal. Its all about making these guys and others comfortable. The more deals they do with us that closes out perfectly (like we did on glacial) The more confidence these people will have"); Bixter Decl. Ex.

81 [CTRL6098128] (In which Huberfeld writes to a potential investor "For you and you only will get a Platinum guarantee.")).

126.   Huberfeld also solicited investors for the BEOF Funds and other "one-off" investments orchestrated by the employees of Platinum Management outside the structure of PPVA.  (*See* Huberfeld Admissions #101; Bixter Decl. Ex. 88 [CTRL4304818] (Huberfeld sending his investor script concerning an investment in the BEOF Funds to Landesman); Bixter Decl. Ex. 89 [CTRL4418359] (Huberfeld sending his investor script re an investment in the BEOF Funds to Nordlicht); Bixter Decl. Ex. 90 [CTRL3649570] (Huberfeld "working from hospital bed" to send aforementioned script to potential investor); Bixter Decl. Ex. 91 [CTRL3750098] (Huberfeld reporting $8.25 million in investor commitments to Landesman)).

## Ownership of Affiliated Companies

127.   PPBE Management LLC was the investment manager for the BEOF Funds. (Bixter Decl. Ex. 92, Bodner Tr. Ex. 377.62 [CTRL3679394]).

128.   Manor Lane Management LLC, an entity owned and controlled by Huberfeld, was a beneficial owner, via its interest in the David Levy Grantor Trust III,  of PPBE Management LLC and PPBE Holdings LLC and received payments from the David Levy Grantor Trust III. (Huberfeld Admissions #92, 94, 97, 98, 99; Bixter Decl. Ex. 93 [CTRL3710417] (Manela providing Huberfeld, at his request, "per partner" breakdown of quarter 2 fees investments in the BEOF Funds and Black Elk, including "72k" for Huberfeld); Bixter Decl. Ex. 94 [CTRL5221595] (in regards to "PPBE mgmt. fee wires" Huberfeld asking "why is there a diofrence [sic] between murray mark and david")).

## EZRA BEREN ACTING AS A CONDUIT FOR DAVID BODNER AND MURRAY HUBERFELD

129.    In addition to meetings with Bodner at Agera, over a period of years, Beren met with Bodner regularly.  (*See, e.g*., Bixter Decl. Ex. 583, Beren Tr. Ex. 1.1 [CTRL2346681]).

130.    This included meetings for "learning" (July 23, 2012) and a "New Deal" (October 23, 2013).  (*See* Bixter Decl. Ex. 584, Beren Tr. Ex. 1.2 [CTRL2347188]; Bixter Decl. Ex. 585, Beren Tr. Ex. 1.3 [CTRL4667405]).

131.    In May 2014, Steinberg attempted to schedule a meeting with Bodner, Beren, and Huberfeld wherein 2 hours needed to be "completely blocked off from David's schedule."  (*See* Bixter Decl. Ex. 586, Beren Tr. Ex. 1.4 [CTRL5096039]).  Steinberg designated the importance of the meeting as "High."  (*Id.*).

132.    On October 23, 2014, a potential counterparty, Benjamin Mayer ("**Mayer**") requested a status update, Beren replied "Hope to speak to David Bodner tomorrow."  (Bixter Decl. Ex. 587, Beren Tr. Ex. 1.7 [CTRL5734023]).   Beren encountered Mayer at the Platinum Management offices.  (Beren Tr. 84:9-12).

133.    The same day, Bodner scheduled a meeting with Beren and Mayer.  (*See* Bixter Decl. Ex. 588, Beren Tr. Ex. 1.8 [CTRL5736038]).

134.    Later on October 23, 2014, Beren recites to Steinberg Bodner's preferred structure of a potential Platinum deal:

> Spoke with David Bodner,
> He wants to offer a 3million credit facility with a 2yr term and a 10% coupon on all money outstanding along with the following:
>
> At closing, 1mm will be used strictly for the installation of the IBeacon technology in the Simon Malls-15% Equity kicker in stock on a fully diluted basis
>
> Additionally, 1 mm will only be available once specific benchmarks (tbd) are reached-Equity Kicker for the addtl 1 mm will be another 7.5% equity in the company

> The remaining 1mm will only be available once specific benchmarks (tbd) are reached- Equity Kicker for the addtl 1mm will be another 7.5% equity in the company
> He also mentioned that in case the stock soars at any point to throw in a convert feature conv at $1 or somewhere in that range

(Bixter Decl. Ex. 589, Beren Tr. Ex. 1.9 [CTRL5736309]).

135.    In November 2014, Beren assured Steinberg he would discuss with Huberfeld the "numbers" concerning a deal that could involve Beechwood.  (*See* Bixter Decl. Ex. 590, Beren Tr. Ex. 1.25 [CTRL5868388]).

136.    In 2015, Beren told Steinberg "[w]e need to have a talk with Murray at some point about economics on this deal.  Want to address today?"  (Bixter Decl. Ex. 591, Beren Tr. Ex. 1.27 [CTRL7061543]).  Steinberg responds "NO.  Lets see if we need to use beechwood altogether."  (*Id.*).

137.    On February 5, 2013, Beren asked Levy for materials to send to a potential investor in the BEOF Funds.  (Bixter Decl. Ex. 592, Beren Tr. Ex. 1.51 [CTRL4389904]).

138.    The next day, Beren, attaching BEOF Funds marketing materials, introduced a friend to Levy in part to "potentially help raise some money for the deal."  (Bixter Decl. Ex. 593, Beren Tr. Ex. 1.52 [CTRL4323469]).

### Role on Valuation Committee, PEDEVCO, and PPVA Energy Investments

139.    In 2013 and 2014, Beren participated in due diligence and strategy with respect to PEDEVCO, Black Elk, Golden Globe, and the broader "Platinum Oil and Gas assets strategy." (Bixter Decl. Ex. 642; [CTRL3695880]; Bixter Decl. Ex. 594, Beren Tr. Ex. 1.50 [CNOCSL_00988542]).  Nordlicht, Saks, Levy, Small and a Black Elk Executive, among others, participated in these calls.  (*Id.*).

32

140.     Beren participated in multiple PPVA valuation committee meetings.  (*See* Bixter Decl. Ex. 595, Beren Tr. Ex. 1.14 [CTRL4941592]; Bixter Decl. Ex. 596, Beren Tr. Ex. 1.15 [CTRL5762440]).

141.     Starting in 2014 at the latest, Beren participated in the valuation process for PEDEVCO and potentially other Platinum Management and/or Beechwood investments.  (*See* Bixter Decl. Ex. 597, Beren Tr. Ex. 1.55 [BW-SHIP-01027993]).

142.     On March 14, 2014, Eli Rakower, director of valuations for both Platinum Management and Beechwood, emailed Steinberg and Beren at their platinumlp.com email addresses that ███████████████████████████████████████████ ██████████████████████ (*Id.*).

**Knowledge and Perpetuation of Platinum Management/Beechwood Alter Ego Relationship**

143.     On November 12, 2014, Manela told Beren that "as of January 1 you'll be on draw from PPVA and get health insurance as well and well stop everything from beechwood."  (Bixter Decl. Ex. 598, Beren Tr. Ex. 1.19 [CTRL5813350]).  Beren responded: "Sounds good to me." (*Id.*).

144.     On April 28, 2015, from his platinumlp.com email address and after ████████ ████████████████████████████████████████████████████████████████████ ███████████████████████(Bixter Decl. Ex. 599, Beren Tr. Ex. 1.23; [BW-SHIP-01055439]).

145.     On August 27, 2015, in response to an inquiry as to whether Beechwood has any "marketing material or over some sort of overview information," Beren explained that:

> David Steinberg and Ezra Beren are portfolio managers for Platinum Management (NY), LLC …

Some of the principals of PMNY are also shareholder of a second investment company named B Asset Manager/Beechwood re, which provides asset management for insurance companies.

Often, investment opportunities brought by [portfolio managers] of PMNY may not fit the investment parameters of PPVA or PPCO, and PMNY may refer the opportunity to Beechwood. *The compensation terms for [portfolio managers] are the same for investments taken by PPVA, PPCO and Beechwood. So in essence Steinberg and Beren are PM's for PPVA, PPCO and Beechwood. Same principles, just different sources of capital.*

(Bixter Decl. Ex. 335, Beren Tr. Ex. 1.22 [CTRL8802198] (emphasis added)).

146.    In August 2016, Feuer described Beren as  (*See* Bixter Decl. Ex.576, Beren Tr. Ex. 1.28 [CNOCSL_00488362]).

147.    Beren formally joined BAM on January 1, 2016.  (*See* Beren Tr. 133:23-134:4; Bixter Decl. Ex. 602, Beren Tr. Ex. 1.17 [BODNER00000028]).

## **National Events**

148.    On October 22, 2014, Beren approached Huberfeld, HFF, and Beechwood about a transaction and requested Saks to review a " ▓▓▓▓▓▓▓▓▓▓ referenced National Events, Inc.  ("**National Events**").  (*See* Beren Tr. 186:3-12; Bixter Decl. Ex. 603, Beren Tr. Ex. 1.36 [BW-SHIP-00100435]).  Beren attached a National Events invoice.  (*Id.*).

149.    At the time, Beren knew Jason Nissen ("**Nissen**") served as an executive at National Events.  (*See* Beren Tr. 181:2-12).

150.    On October 23, 2014, Huberfeld asked Rechnitz to call him. (Bixter Decl. Ex. 604, Beren Tr. Ex. 1.38 [AN002438]).

151.    On October 28, 2014, Beren relayed Huberfeld's directive concerning the structure of any National Events deal to Saks – then BAM's CIO.  (Bixter Decl. Ex. 605, Beren Tr. Ex. 1.38

[BW-SHIP-01063351]). ███████████████████████████████████████████████

████████████████████████████████████████ . . . ." (*Id.*).

152.    On October 29, 2014, Thomas sent a revised term sheet relating to BAM's investment in World Event Group, LLC ("**WEG**") (the "**WEG Term Sheet**").  (Bixter Decl. Ex. 606, Beren Tr. Ex. 1.41 [BW-SHIP-01353175])  Thomas instructed Beren to arrange the execution of an NDA between BAM and WEG.  (*Id.*).

153.    On December 31, 2014, Beren asked Saks about the status of the WEG Term Sheet. (Bixter Decl. Ex. 607, Beren Tr. Ex. 1.43 [BW-SHIP-01301402]).

154.    On January 31, 2015, Saks sent Beren and Huberfeld an article concerning the "short selling" of Super Bowl tickets.  (*See* Bixter Decl. Ex. 608, Beren Tr. Ex. 1.44, [CNOCSL_01166449]).

155.    On April 23, 2015, Huberfeld directed a deal to Beechwood, along with Rechnitz and National Events, for 1.4 million for which "no paperwork was required."  (Bixter Decl. Ex. 329, Beren Tr. at Ex. 1.45 [CNOCSL_01581988]).

156.    On May 31, 2017, the United States Attorney's Office for the Southern District of New York indicted Nissen for running a Ponzi scheme involving "Premium Ticket Resale Business" that precipitated losses to investors of at least $70 million.  (*See* Bixter Decl. Ex. 600). On September 6, 2019, Nissen pled guilty to one count of wire fraud for his role in running the Ponzi Scheme.  (*See id.*).  On June 1, 2017, a civil complaint alleging many of the same allegations against Nissen and various National Events-affiliated entities was filed in the New York State Supreme Court, County of New York.  (*See* Bixter Decl. Ex. 609, *Taly USA Holdings, Inc., et ano. v. Nissen, et al.*, Index No. 652865/2017 (NYSCEF Doc. No. 1)).

157.    The complaint alleges that Beren, as well as Huberfeld, Huberfeld's wife, HFF, Jona Rechnitz, and many others, accepted or paid money from the defendants.  (*Id.* at 37).

158.    ████████████████████████████████████████████████████████

████████████████████████  (*See* Bixter Decl. Ex. 600).    In connection with the COBA scheme, Huberfeld did not reimburse the $60,000 out of his own pocket, rather he caused Platinum Management to make payments to Rechnitz's company under the guise of Platinum Management paying $60,000 for forged New York Knicks ticket invoices.  (Bixter Decl. Ex. 109 (*United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 1)

159.    Beren's *LinkedIn* page states he works at a "family office."  (Bixter Decl. Ex 583, Beren Tr. at Ex. 1.1 [CTRL2346681]).

## HUBERFELD FAMILY FOUNDATION

160.    On August 14, 1998, HFF was formed as a New York not-for-profit corporation. (*See* Bixter Decl. Ex. 96 [BW-SHIP-01513876]).  Huberfeld, Laura Huberfeld, and Rae Huberfeld served as the initial directors of HFF.  (*Id.*).

161.    On August 15, 1998, HFF elected Huberfeld as President, and Laura Huberfeld as Secretary and Treasurer.  (*Id.*).

162.    During the relevant time period, Huberfeld and his family held all directorships and office positions of HFF.   (*See* HFF Tr. at 38:5-39:4; Bixter Decl. Ex. 97, HFF Tr. Ex. 710.4 [HFF000006]; *see also, e.,g.,* Bixter Decl. Ex. 98, HFF Tr. Ex. 710.5 [HFF000089]; Bixter Decl. Ex. 99, HFF Tr. Ex. 710.6 [HFF000133]; Bixter Decl. Ex. 100, HFF Tr. Ex. 710.7 [HFF000133]; Bixter Decl. Ex. 101, HFF Tr. Ex. 710.8 [HFF000205]; Bixter Decl. Ex. 102, HFF Tr. Ex. 710.9 [HFF000223]; Bixter Decl. Ex. 103, HFF Tr. Ex. 710.9 [HFF000265]; Bixter Decl. Ex. 104, HFF Tr. Ex. 710.10 [HFF000316]; Bixter Decl. Ex. 104, HFF Tr. Ex. 710.11 [HFF000386]).

163.    According to its 2015 Form 990-PF, HFF paid Huberfeld's daughter Rachel $120,000 for roughly 20 hours of work per week.  (*See* Bixter Decl. Ex. 104, HFF Tr. Ex. 710.10 [HFF000311]).  Huberfeld chose this salary "arbitrarily."  (*See* HFF Tr. 60:18-24).

164.    Platinum Management facilitated the employee benefits to be provided by HFF.  (*See* Bixter Decl. Ex. 106 [CTRL015557]).

165.    Starting in 2013, Huberfeld Family Foundation, acting through its president, Murray Huberfeld, invested $1 million in the BEOF Funds, by which the Huberfeld Family Foundation obtained an interest in Black Elk preferred E equity.  (*See* Huberfeld Tr. 300:24-301:7, 302:7-15; Bixter Decl. Ex.107 [CTRL4689272]).

166.    On March 7, 2013, Huberfeld directed Joel Edelstein, a Platinum Management employee, to coordinate with Marcus Fox to arrange for a $1 million loan by HFF into the BEOF Funds.  (*See* Bixter Decl. Ex. 108 [CTRL3652166]).

167.    The same day, HFF subscribed to the BEOF Funds in the amount of $1 million.  (*See* Bixter Decl. Ex. 109 [CTRL4852499]).

168.    In March 2014, Huberfeld caused the Huberfeld Family Foundation, to roll over its existing investment in the BEOF Funds.  (*See* Bixter Decl. Ex. 95; SanFilippo Tr. Ex. 1-110; [CTRL5221242]).

169.    On September 11, 2014, the Huberfeld Family Foundation received an investor statement showing that its investment in the BEOF Funds had been fully redeemed in the amount of roughly $1.025 million.  The funds used to redeem the Huberfeld Family Foundation's investment in the BEOF Funds derived from the proceeds that Black Elk received from the Renaissance Sale (defined below) and the redemption payment was made possible as a result of the Black Elk Scheme (defined below). (*See* Bixter Decl. Ex. 110 [CTRL4997608]).

170.    Before the redemption payment noted in the September 11, 2014 statement, the Huberfeld Family Foundation previously had received distributions from the BEOF Funds.  (*See* HFF Tr. 325:20-24)

171.    Fuchs was unable to redeem any portion of his investment in PPVA in 2016 and, as a result, Fuchs could not fulfill a charitable pledge.  He sought payment from the Huberfeld Family Foundation of monies owed to him by the Platinum funds.  (Fuchs Tr. 60:12-17, 65:24-66-9).

172.    On or about March 31, 2016, the Huberfeld Family Foundation and a foundation affiliated with Bodner made a loan to the Fuchs' Family Foundation for roughly $325,000.  (*See* Fuchs Tr. 425:4-13, 427:25-428:4; HFF Tr. 83:21-84:2).

173.    Fuchs did not repay the loan made to the Fuchs Family Foundation by the Huberfeld Family Foundation and the outstanding balance is roughly $200,000.  (*See* Fuchs Tr. 436:23-25; HFF Tr. 100:1-15).

174.    In addition, between 2013 and 2017, the Huberfeld Family Foundation made, or participated in (along with Bodner), loans involving Huberfeld's friends and investors in PPVA, on wildly non-commercial terms, including:

    i.   Moshe Oratz and related entities (including SBO Trust), for a total of roughly $2 million, which included at least one loan for a non-charitable purpose designed for "making money."  (*See* HFF Tr. 154:11-155:12; Bixter Decl. Ex. 103, [HFF000299]; Bixter Decl. Ex. 104 [HFF000346]; Bixter Decl. Ex. 649 [HFF000410]; Bixter Decl. Ex. 650 [HFF000521]).

    ii.  Aaron Elbogen ("**Elbogen**"), for a total of roughly $6.5 million.  (*See* Bixter Decl. Ex. 111 ("**Elbogen Tr.**") at 83:14-21; Bixter Decl. Ex. 113 [CTRL4741771]; Bixter Decl. Ex. 112 [HFF000519]).

    iii. Hutton Ventures ("**Hutton**"), for a total of roughly $7 million.  (*See* HFF Tr. 181:17-21, 181:17-21).

    iv.  Huberfeld-Bodner Family Foundation, for a total of roughly $1.4 million. (*See* HFF Tr. 258:16-19).

175.     The HFF loans described in paragraph 143 above were made upon exorbitant, commercially-unreasonable terms.  (*See, e.g.,* Bixter Decl. Ex. 651 [CTRL4741822] ($2 million loan to Elbogen at 18 percent interest); Bixter Decl. Ex. 112 [HFF000519] ($1.5 million loan to Elbogen at 12 percent interest).

176.     The HFF loan to SBO Trust, guaranteed by Oratz, remains unpaid.  (*See* Bixter Decl. Ex. 112 [HFF0000522]).  A December 2016 loan by HFF to Hutton remains unpaid.  (*See* HFF Tr. 223:4-10)

177.     In 2016, Nordlicht claimed a tax break for "contributions" made by HFF to third party entities because the contributions were in fact repayments of loans that Nordlicht made to HFF.  (*See* Bixter Decl. Ex. 114 [CTRL7849580]).

## DAVID BODNER'S CONTROL OF PLATINUM MANAGEMENT AND PPVA'S ASSETS

### Beneficial Ownership

178.     Bodner received fees as a member of the management company, Platinum Management.  (Bodner Admissions #12; Bixter Decl. Ex. 115 [CTRL3491028]; *see also* e.g. Bixter Decl. Ex. 116 [BOD_ENT0000002 – BOD_ENT0000018]).

179.     David Bodner's charity, the Bodner Family Foundation, provided a "loan" to Bernard Fuchs to cover redemption payments owed to Fuchs in exchange for Fuchs' agreement not to sue David Bodner and Murray Huberfeld.  (Fuchs Admissions #8; Fuchs Tr. 60:10-62:8).

180.     In March 2016, Bodner purportedly relinquished his beneficial ownership in Platinum Management as part of the March 2016 Release.  (Bixter Decl. Ex. 41, Bodner Tr. Ex. 377.57 [BODNER0000001]; Bixter Decl. Ex. 117, Huberfeld Tr. Ex. 593 [BODNER0000011]).

181.     During the drafting process, Nordlicht refused to provide a personal guarantee for any right of indemnification granted to Bodner, noting "I obviously can't be responsible

39

personally for David and Murray's misconduct."  (Bixter Decl. Ex. 42, Bodner Tr. Ex. 377.59 [CTRL7749843]).

### Presence and Oversight

182.   Bodner maintained an office within the space at 250 W. 55th St. and 152 W. 57th St., 54th Floor, where Platinum Management and its affiliated entities were located.  (Bodner Tr. 78:2-4; Bodner Admissions #23).

183.   In May 2016, after execution of the March 2016 Release, Bodner maintained a corner office at Platinum Management.  (Bixter Decl. Ex. 118 [CTRL7886517]).

184.   Bodner was provided with IT infrastructure, IT support, and a registered Bloomberg terminal in his office at Platinum Management. (Bixter Decl. Ex. 652 [CTRL5810496]; Bixter Decl. Ex. 119 [CTRL3142444]; Bixter Decl. Ex. 120 [CTRL5717681]).

185.   Bodner was provided a secretary, was employed by Platinum Management, to answer phone calls and receive emails on Bodner's behalf. (Bodner Tr. 78:5-10; Bixter Decl. Ex. 121 [CTRL8505120 – CTRL8505121]; Bixter Decl. Ex. 122 [CTRL5164887] (Secretary informing contact about Bodner not having an email address: "His email is my email I print and fax or hand him every email that is for him"); Bixter Decl. Ex. 123 [ALB0000774]; Albanese Tr. 32:14-21 (Assistant at Centurion and then Platinum); Bixter Decl. Ex. 124 (**McGovern-Muller Tr.**") at 165:13-167:23 (assistant at Platinum Management)).

186.   Bodner regularly met with Platinum Managment executives and employees.  (*See, e.g.,* Bixter Decl. Ex. 125 [CTRL6385723] (Mark Nordlicht (requesting 4 "uninterrupted hours"); Bixter Decl. Ex. 126 [CTRL3497307]; Bixter Decl. Ex. 127 [CTRL4670006] (Landesman indicating it was Bodner who called for meeting); *see also* Katz Tr. 266:10-267:2 (Bodner "summoning" different people from management" into his office)).

187.   Bodner participated in the partner meetings convened to discuss performance of the funds overseen by Platinum Management and its affiliated investment advisers, including PPVA. (Bodner Admissions #45; Katz Tr. 260:4-18; Fuchs Tr. 44:20-45:6 (describing private monthly meetings with Bodner, Huberfeld and Nordlicht)).

188.   Bodner personally called for partner meetings at times. (Bixter Decl. Ex. 128 [CTRL3695379]; Bixter Decl. Ex. 129 [CTRL2106638]).

189.   Bodner requested position-level information regarding the funds be brought to partner meetings. (Bixter Decl. Ex. 130 [PPVA_RH_0249010]).

190.   On July 30, 2015, Bodner sent an email from his personal email account, that contained a link to the email address for Harvey Werblowsky, in-house counsel for PPVA and Platinum Management, and the following text:

> I'm really concerned that if Ed Bonach from CNO Financial Group
> Finds out we invested beechwoods money into platinum with its illiquid
> investments (since it didn't exactly fit their investment objective) he won't trust us
> and he will take all of the aprox 500 mil, he has invsted in beach wood -0
> That means beechwood would either implode or not be able to function fiancialy
> and may have to be dissolved;
> Even though we did a cancel and correct
> We weren't exactly honest with Ed about the original invstment or that
> beechwood and platinum really are integrated
> I'm concerned,
> What should we do ?
> I haven't called anybody back yet-I'm just trying todo som damage control right
> now.

(Bixter Decl. Ex. 131 [CTRL7128044]).

191.   Bodner was the intended audience of significant presentations regarding PPVA's financial status, "significant investments" and strategic goals. (Bixter Decl. Ex. 49, SanFilippo Tr. Ex. 1.130 [CTRL8008893 – CTRL8008894]).

192.    For example, in a January 2016 presentation to Feuer, Taylor, Bodner and Huberfeld prepared by Seth Gerszberg, Steinberg, Levy, Manela, and others, the following topics were discussed:

a.  PPCO goal of raising $80M, moving $50M of equity from PPCO to PPVA and using $30M to fund ongoing operations;

b.  Reviewing PPCO outflows (expenses, redemptions, investments), PPCO inflows and deficits, and strategies for raising $80M in PPCO, including $20M by "David and Murray's investor list" and "additional debt from Beechwood" of $50M;

c.  PPVA Goals of raising $200M, converting $25-40M of 2015 redemptions to debt, renegotiate and refinance debt and sell Implant Sciences for $80-$100M;

d.  Reviewing PPVA outflows of $205M (expenses, interest owed, margin calls, redemptions), PPVA potential inflows through creation of management share class, sale of Implant Sciences, noting that "if none of these happen, PPVA is facing a $150MM deficit" and "even after all these potential inflows, PPVA still faces a minimum deficit of 50M (assuming we can postpone the 2015 redemptions)";

e.  Reviewing details of the "significant investments" including whether the positions were encumbered or unencumbered;

f.  Reviewing existing debt and encumbrances, noting that "Due to BAM's security interests in PPVA's assets, namely Agera and Implant, **PPVA only has approx $40MM of assets which are unencumbered that can be borrowed against**. PPVA has no ability to borrow additional funds to cover its deficit.";

g.  Reviewing a plan for "Beechwood-Financing the Deficit" and the use of the proceeds;

h.  And a slide entitled "David and Murray" asking "What do we need from David and Murray? Help us figure out short-term liquidity issues, Help us close investment into PPCO and the management share class, [and] renegotiate the Beechwood note."

(Bixter Decl. Ex. 643 [CTRL8008894] (emphasis added)).

**Financials**

193.    Bodner received information regarding the financial status of Platinum Management, PPVA, investments, affiliates and/or its subsidiaries from Platinum Management employees on a regular basis, which information was not provided to passive investors. For example:

   a. From Uri Landesman on August 4, 2013, a detailed listing of the Assets Under Management for Platinum Management and each fund. (Bixter Decl. Ex. 132 [CTRL3690665]; Bodner Admissions #63).

   b. From David Steinberg, a January 9, 2014 report from The Seaport Group recommending sale of Black Elk 13.75% Senior Secured Notes because the bonds were "overvalued in the 80's" and states "However, we believe that the PDP PV-10 in the NSAI report significantly overstates asset value given the report's assumption of $2.87/Mcfe for cash operating expenses, compared to actual cash operating expenses of $6.22-$8.60/Mcfe over the past six quarters. We thus believe recovery could be significantly lower." (Bixter Decl. Ex. 133 [CTRL5081596, CTRL5081599]; Bodner Admissions #79).

   c. From Mark Nordlicht, February 6, 2014, regarding Beechwood's allocations, where they discussed how to distributed Beechwood's insurance money through PPVA. (Bixter Decl. Ex. 134 [CTRL5167622]).

   d. From Uri Landesman on April 13, 2015 regarding the amount of subscriptions received by PPVA in March 2015. (Bixter Decl. Ex. 135 [ALB0001068]).

   e. From Joan Janczewski regarding "how much more we have to pay to the Black Elk investors" with Bodner "anxious for data." (Bixter Decl. Ex. 136 [CTRL3312593]).

   f. Estimated fund performance for April 2012 from Uri Landesman (Bixter Decl. Ex. 137 [CTRL3571465]).

   g. Bodner admits to receiving monthly valuation figures for PPVA.  (Bodner. Tr. at 25:1-25).

194.    During a Platinum Management partner meeting in January 2015 ("**January 2015 Partner Meeting**"), Bodner stated to Bernard Fuchs, Nordlicht and Huberfeld that Platinum Management had overvalued certain of the assets of PPVA. (Fuchs Tr. 26:17-30:20; Fuchs Admissions #3).  In 2015, Bodner had a heated argument with Nordlicht "about the fund [PPVA], about the investments, [and] about the valuations." (Fuchs Tr. 26:17-30:20).  According to Fuchs, Bodner told Nordlicht, in front of Fuchs and Huberfeld, "that the valuations were not right, that

Mark Nordlicht wasn't properly marking the fund, and . . . he has to redo the fund because he . . . doesn't like the way the valuations were doing." (*Id*.)  And, it was Bodner who alone stated "no partner's taking any money out." (*Id*.)  Fuchs testified that the ultimate decision makers for Platinum Management with final authority were Bodner, Huberfeld, and Nordlicht. (Fuchs Tr. 49:22 to 50:8).

### Management Strategic Involvement

195.    Bodner was involved in decision-making with Huberfeld and Nordlicht regarding Platinum Management and its funds. (Fuchs Tr. 63:2-10; Katz Tr. 34:22-25:24 (describing Bodner and Huberfeld as "co-equal partners and Nordlicht was treated as a more junior partner")).

196.    For example, Bodner was involved in and had input into investment positions, strategic decisions, and redemption issues:

a.  Platinum Management response to SEC Audit request that Bodner provided "input and opinions regarding investments or other potential investments." (Bixter Decl. Ex. 57, SanFilippo Tr. Ex. 1.6 [CTRL6645956]).

b.  Bodner sourced investments for Platinum. (Saks Tr. 57:10-58:24).

c.  Nordlicht discussing "decisions by committee" of "3 people" in reference to himself, Bodner and Huberfeld.  (Bixter Decl. Ex. 40, Bodner Tr. Ex. 377.34 [CTRL4919566]).

d.  Bodner wanting to "know if Agera could borrow 30 million and dividend it out to us on short term basis to see us through next 2 months until management share class comes in." (Bixter Decl. Ex. 138 [CTRL7620246]).

e.  Bodner and Huberfeld prevailing in their desires regarding the China Horizon investment. (Katz. Tr. 259:13-22).

f.  Investor indicating to Bodner that the "timing [of redemption request] is in your hands" (Bixter Decl. Ex. 139 [CTRL5165396]).

g.  Nordlicht sending Bodner a letter from aggrieved investor threatening to report Platinum Management to the SEC. (Bixter Decl. Ex. 140 [BODNER0000016]).

h.  ████████████████████████████████████████ (Bixter Decl. Ex. 64, Huberfeld Tr. Ex. 671 [BW-SHIP-00914974]).

i.   Nordlicht inquiring of Levy as to status of "freeing up the 35 million in cash of black elk bonds that was supposed to come 'right out'" and whether he had "firm belief on money coming out. Before I go to David on bridge and restructuring plan on gom holdings, I need to know that money will be there and ideally, fast." (Bixter Decl. Ex. 141 [CTRL4976660]).

j.   Nordlicht discussing with Levy his "current thinking I to buy back some black elk debt with excess. I can sell that on Dovid easily if I ended up with nostar instead of beee…" (Bixter Decl. Ex. 142 [CTRL4997418]).

k.   Nordlicht discussing with Levy the need to "prep jeff we want to buy back roughly 30 million of bonds. We will go out to the market starting next week with 10 and do the other 20 as they come off. Please tell him today. I will talk to Dovid over the weekend but if he ask, u can tell him about position swap." (Bixter Decl. Ex. 143 [CTRL5006332]).

l.   Bodner participating in call regarding PEDEVCO following receipt of report showing decreased PV-10 due to reduction in boe recovery per PUD well and increased operating costs. (Bixter Decl. Ex. 144 [CTRL5097898]).

m.   Nordlicht setting up call to discuss "fund performance and marketing update" asking that "Uri, Bernie Fuchs, Kerry Proper, Antonio, David Levy, David Bodner, Murray, [and] Andrew Kaplan" be on. (Bixter Decl. Ex. 145 [CTRL7612213]).

197.   Bodner was a "leader of the [Platinum Management] organization" because in meetings with Platinum Management, "if there was any disagreement as to what had to be done, [Bodner] was consulted and he had the last word." (Katz Tr. 266:10-267:20).

198.   Bodner participated in bringing Fuchs on as a partner in 2014. (Fuchs Tr. 24:25-26:8; Bodner Admissions #5).

## Employee Matters

199.   Bodner participated in meetings to discuss employee downsizing at Platinum Management. (Bodner Tr. Ex. 377-28; Bixter Decl. Ex. 80, Testimony of Daniel Mandelbaum, *United States v. Nordlicht et al.*, 16-CR-640 (S.D.N.Y.) at 4321:6-21).

200.   Bodner informed his secretary that her role was going to be eliminated. (Albanese Tr. 50:8-24).

201.   ███████████████████████████████████ Platinum Management (and Beechwood). (Bixter Decl. Ex. 146 [AN000272] (Nordlicht complaining about Bodner

"shtupping" people in to Platinum Management); Bodner Tr. 171:24-172:7; Saks Tr. 55:17-56:8; Bixter Decl. Ex. 147 [CTRL5014747] (Landesman to Nordlicht about "disseminating news of the new roles for several key personnel" and "Duvid allegedly wants to sit down at some point this week to discuss…").

202.    Bodner interviewed candidates for jobs at Platinum Management and Beechwood. (Bixter Decl. Ex. 77 [BW-SHIP-01064379] (Bodner conducting interview of candidate Jeremy Apfel in November 2014)).

203.    Bodner's family members worked for Platinum Management, Beechwood, and/or Agera, including:

    a.    Yaakov "Itchy" Bodner (Bodner Tr. 355:6-8);

    b.    Samuel Adler (Bixter Decl. Ex. 148 ("**Adler Tr.**") at 43:5-11); and

    c.    Zevi Mayer (Bixter Decl. Ex. 149 [ALB0000982]).

### Soliciting Investors and Investor Relations

204.    Bodner provided input into investor relations. (Bixter Decl. Ex. 150 [CTRL5765730] (Landesman indicating he is not going to make further investor calls "unless Duvid asks me to")).

205.    Bodner solicited investors for funds managed by Platinum Management and its affiliated investment advisers.  (Bixter Decl. Ex. 57, SanFilippo Tr. Ex. 1.6 [CTRL6645956] (Platinum Management response to SEC Audit request describing Bodner as having "introduced investors to funds managed by the Advisers."); Saks Tr. 55:17-56:8; Fuchs Tr. 375:14-20).

206.    Bodner served as the point of contact for certain high-value investors. (Bixter Decl. Ex. 151 [CTRL5171525] (Landesman identifying investors for Bodner to call); Bixter Decl. Ex. 152 [CTRL3641764] (Huberfeld identifying contacts for Bodner "after funding of bayberry")).

207.    One such investor was Marcos Katz, who held nearly $50 million in the fund. (Bixter Decl. Ex. 153 [ALB0001631]; Bixter Decl. Ex. 154 [CTRL8253723]).

208.    Bodner met with Mr. Katz on more than one occasion, including traveling to Mexico to see Mr. Katz regarding Mr. Katz's request to redeem his investment in PPVA.  (Katz Tr.  43:14-24, 65:3-70:13; 111:15-112:12; Bixter Decl. Ex. 155 [CTRL7922210 – CTRL7922211] (May 2016 charter flight invoice for Bodner trip to Acapulco); Bixter Decl. Ex. 156 [CTRL7920886] (Katz requesting PPVA statements to "prepare" for meeting with Bodner)).

209.    Bodner pressed Mr. Katz not to ask for redemptions from the fund. (Katz Tr. 43:8-10).

210.    Bodner represented to Mr. Katz that "PPVA had sufficient assets to permit the Katzes to fully withdraw their investment." (Katz Tr. 52:23-53:20).

211.    Mr. Katz wrote to Bodner, Huberfeld and Nordlicht, in April 2016 after learning of Bodner's release "What the hell is going on? I left 50 million USD in the fond [sic] just because I trusted you." (Bixter Decl. Ex. 84 [CTRL7814403]).

212.    Huberfeld and Bodner were present during a meeting where Nordlicht promised that 40% of the Mr. Katz's investment in PPVA would be repaid by December 2016.  (Katz Tr. 61:2-18. 275:21-276:23).

213.    In or around December 2015, Michael Katz, Marcos Katz's grandson, was granted access to Platinum Management in an effort to oversee his grandfather's significant investment. (Katz Tr. 198:14-199:3, 205:9-17).  In so doing, Michael Katz met with Bodner. (*Id.* at 94:17-95:5).

214.     In January 2016, Nordlicht implored Bodner to contact investors and connections including Mr. Katz, Garfunkel, Elbogen, Schroen, to request investments.  (Bixter Decl. Ex.86, Bodner Tr. Ex. 377.37 [CTRL7736607]; Bixter Decl. Ex. 71 [CTRL7736228]).

215.     Bodner offered to and did provide personal guarantees for certain high-value investors. (Fuchs Tr. 173:15-179:14, 303:8-305:17).

### Ownership of Subsidiaries and Affiliates

216.     PPBE Management LLC was the investment manager for the BEOF Funds.  (Bixter Decl. Ex. 92, Bodner Tr. Ex. 377.62 [CTRL3679394]).

217.     Grosser Lane Management, through its interest in the David Levy Grantor Trust III, was a beneficial owner of PPBE Management LLC and PPBE Holdings LLC and received payments from the David Levy Grantor Trust III.  (Bodner Admissions #90, 92, 94, 96, 98; Bixter Decl. Ex. 93 [CTRL3710417] ("per partner" breakdown of quarter 2 fees from Black Elk, including "72k" for Bodner); Bixter Decl. Ex. 157 [CTRL3756202]; Bixter Decl. Ex. 94 [CTRL5221595]).

218.     Entities affiliated with the Bodner family provided the initial capital investment for Beechwood along with the Huberfeld and Nordlicht families. (Bodner Admissions #150).

### BERNARD FUCHS' CONTROL
### OF PLATINUM MANAGEMENT AND PPVA'S ASSETS

219.     In mid-2014, Bodner, Huberfeld and Nordlicht approved Fuchs to be a 10% partner in Platinum Management in exchange for maintaining his investment in PPVA.  (Fuchs Tr. 24:25 – 25:2-20, 26:3-8).

220.     Fuchs did not maintain a formal office at Platinum Management, but was present several times a week for several hours.  (Fuchs Tr. 104:3-106:4).

221. Fuchs was provided with the "bfuchs@platinumlp.com" email address prior to his admission as a Platinum Management partner and was sending emails from this email address and conducting business by at least 2011. (Bixter Decl. Ex. 158 [CTRL1801391]).

222. Fuchs routinely met with senior Platinum Management executives and employees to discuss strategic objectives. (Fuchs Tr. 100:25-102:12).

223. Fuchs participated in the partner meetings convened to discuss performance of the funds overseen by Platinum Management, including PPVA. (Fuchs Tr. 44:20-45:6 (describing private monthly meetings with Bodner, Huberfeld and Nordlicht)).

224. Fuchs received information from Platinum Management employees relating to the financial status of Platinum Management, PPVA and its investments, for example:

   a. Landesman asking Fuchs to push his people for "new money" and informing Fuchs that the books look "a little shvach" (*i.e.* underwhelming) this month. (Bixter Decl. Ex. 159 [CTRL3596900]).

   b. Landesman sending Fuchs preliminary estimated PPVA performance numbers. (Bixter Decl. Ex. 160 [CTRL4336049]).

   c. Landesman informing Fuchs of sale of shares in Implant Sciences Corporation including counts and pricing, as well as share prices in Navidea. (Bixter Decl. Ex. 161 [CTRL5842484]).

225. During a partner meeting in January 2015, Bodner told Bernard Fuchs that Platinum Management had overvalued certain of the assets of PPVA. (Fuchs Tr. 26:17-30:20; Fuchs Admissions #3). In 2015, Bodner had a heated argument with Nordlicht "about the fund [PPVA], about the investments, [and] about the valuations." (Fuchs Tr. 26:17-30:20) According to Fuchs, Bodner told Nordlicht, in front of Fuchs and Huberfeld, "that the valuations were not right, that Mark Nordlicht wasn't properly marking the fund, and . . . he has to redo the fund because he . . . doesn't like the way the valuations were doing." (*Id.*) And, it was Bodner who alone stated "no partner's taking any money out." (*Id.*) Fuchs testified that the ultimate decision makers for

Platinum Management with final authority were Bodner, Huberfeld, and Nordlicht. (Fuchs Tr. 49:22 to 50:8).

226.   Fuchs received a "loan" from Huberfeld, through the Huberfeld Family Foundation, and from Bodner through a charitable foundation associated with the Bodner family, in exchange for Fuchs signing the March 2016 Release.  (Fuchs Tr. 86:3-96:11).

### Management and Strategic Involvement

227.   Fuchs was involved in and had input into investment positions, strategic decisions, and redemption issues:

a.   Fuchs had a hands-on role with China Horizon.  (Steinberg Tr. 96:8-14).

b.   Fuchs was a member of the China Horizon board and participated in meetings regarding changes to the board membership.  (Bixter Decl. Ex. 162 [CTRL2194218]).

c.   Fuchs answered questions and participated in Platinum Management's response to the SEC investigation.  (Fuchs Tr. 110:2-112:22).

d.   Fuchs served as a primary point of contact at Platinum Management for the executives of China Horizon. (Bixter Decl. Ex. 163 [CTRL6570125] (Alan Clingman requesting to meet with Nordlicht and Fuchs in advance of the China Horizon Board call)).

e.   Fuchs was included in negotiations of pay outs from the Echo Therapeutics Stock Purchase Agreement.  (Bixter Decl. Ex. 164 [CTRL5986199]).

f.   Fuchs would sit in on meetings where investments were discussed and would ask Platinum Management employees about the investments they oversaw.  (Steinberg Tr. 95:6-23, 97:5-98:6).

228.   Fuchs was a primary participant in creating Platinum Management's Asia marketing team.  (Bixter Decl. Ex. 165 [CTRL4794300]).

229.   Fuchs offered to pay from his personal funds any excess salary expenditures for the Asia marketing team.  (Bixter Decl. Ex. 166 [CTRL4751844]).

230.    Fuchs negotiated the salary Landesman expected going forward as part of the March 2016 Release process.  (Bixter Decl. Ex. 167 [CTRL8339660]).

231.    Fuchs was informed as to Platinum Management employee benefits issues, for example, the cancelling of employee credit cards in January 2015. (Bixter Decl. Ex. 168 [CTRL6644823] (to which Fuchs responds "Keep up the pressure on everyone to get accustomed to the new rules")).

232.    Fuchs recommended the hiring of Alice Chen, a senior member of the Platinum Management Asia marketing team.  (Fuchs Admissions #4).

233.    Fuchs proposed terms for a transaction that would involve the sale of Beechwood. (*See* Fuchs Tr. 375:9-13; Bixter Decl. Ex. 169,  Fuchs Tr. Ex. 154 [BW-SHIP-00831514]). ████

████████████████████████████████████████████████████

████████████████████████

## Soliciting Investors and Investor Relations

234.    Fuchs solicited investors for PPVA and related transactions.  (Fuchs Admissions #7; Steinberg Tr. 96:15-18; Bixter Decl. Ex. 170 [CTRL2072960] (Landesman requesting Fuchs to "raise big money" for November 2011)).

235.    Fuchs served as the point of contact for certain high value PPVA and BEOF Funds' investors, including Thai Lee.  (Bixter Decl. Ex. 171 [CTRL4342424] (Fuchs pitching Black Elk to Thai Lee in February 2013)).

236.    Fuchs also met with significant investor Marcos Katz on more than one occasion, including traveling with Bodner to Mexico to see Mr. Katz regarding PPVA and Mr. Katz's request to redeem his investment.  (Katz Tr. 43:14-24, 65:3-70:13, 111:15-112:12; Bixter Decl. Ex. 155 [CTRL7922210 – CTRL7922211] (May 2016 charter flight invoice for Bodner trip to Acapulco); Bixter Decl. Ex. 172 [CTRL6922071] (June 2015 meeting).

237.     Fuchs offered to and did provide personal guarantees for certain high-value investors in PPVA.  (Bixter Decl. Ex. 173, Fuchs Tr. Ex. 150.31 [CTRL7126437] (Fuchs telling investor "If he puts in at least $10m we will give him prrsonal [sic] guarantees from Murray, David Bodner and myself, besides from Mark Nordlicht")).

238.     Fuchs provided personal funds to keep investors out of the side pocket for PPVA's illiquid investments.  (Bixter Decl. Ex. 174 [CTRL8239368] (noting that "Bernie is using $3mm of his own money to keep [Rivie Schwebel Retirement Plan] out of the SP")).

239.     Fuchs offered to and did provide guarantees on behalf of Platinum Management as well.  (Bixter Decl. Ex. 175 [CTRL4905644]).

240.     Fuchs tried to and did convince investors not to redeem their investment and assuaged investor concerns, for example:

   a.   Fuchs agreeing to contact an investor who was concerned that "Some friends have said that people are pulling money out of Platinum. They are afraid the fund has no future. What do you know about this? Is it just a false rumor? Is there some truth to it? I hope you will tell me if anything is wrong with it. This is what I am living on these days."  (Bixter Decl. Ex. 176 [CTRL6214094]).

   b.   Fuchs telling investor in November 2014 "I would not redeem anymore." (Bixter Decl. Ex. 177 [CTRL5809659]).

   c.   Fuchs indicating he had "time to have him recant" in response to investor request for redemption forms in April 2015.  (Bixter Decl. Ex. 178 [CTRL6718968]).

241.     Fuchs fielded calls from "unhappy" investors about the timing for receipt of their unpaid redemptions in May 2016.  (Bixter Decl. Ex. 179, Fuchs Tr. Ex. 150.59 [CTRL7891159] (Fuchs noting "I guess I need to hear more grief and complaints from unhappy investors who were promised and again broken promises")).

242.     Fuchs  made misleading statements to investors concerning PPVA.  (Bixter Decl. Ex. 180 [CTRL7884645] (Fuchs noting to Nordlicht "I will not answer anybody anymore. **I can't lie anymore** and i can't handle all the pressure anymore. Please call me!!!!!!!!") (emphasis added)).

## OVERVALUATION OF GOLDEN GATE OIL

243.    Golden Gate Oil, LLC ("**Golden Gate**") is a limited liability company organized under the laws of the State of Delaware on March 19, 2012.  The initial member of Golden Gate was Amrich Energy, Inc. ("**Amrich**"), with PPVA subsidiary Precious Capital LLC ("**Precious**") acquiring a membership interest shortly thereafter.  (Bixter Decl. Ex. 181 [CTRL8967297]).

244.    Golden Gate Oil was formed to for the purpose of leasing, developing and operating certain oil fields located in California.  At the time Golden Gate was formed in 2012, the oil fields it leased had been dormant since the 1980's.  (Bixter Decl. Ex. 182 [PPVA_RH_0648377 – PPVA_RH_0648378]).

245.    On or about April 10, 2012, Precious and Golden Gate Oil entered into that certain Note Purchase Agreement (the "**Precious NPA**"), by which Precious agreed to loan Golden Gate (the "**Golden Gate Loan**") up to $25 million to fund development of the oil fields leased by Golden Gate.  Interest on the Golden Gate Loan was to be charged at an aggregate rate of 24.999%, of which 15% was payable on a current basis and 9.999% was deferred until the maturity date, initially April 10, 2015.  The loan was secured by a security interest in and lien on all of the assets of Golden Gate Oil.  (*Id*.)

246.    Although it was not a party to the Precious NPA, PPVA funded the amounts loaned to Golden Gate by Precious, via transfers from PPVA to Precious to Golden Gate.  (*See, e.g.* Bixter Decl. Ex. 183 [CTRL6182011]; Bixter Decl. Ex. 184 [CTRL4587183]).

247.    Also on or about April 10, 2012, Precious was granted 48% of the membership interests in Golden Gate, pursuant to that certain Amended and Restated Operating Agreement dated April 10, 2012 (the "**Golden Gate April 2012 Operating Agreement**").  Precious did not make a separate capital contribution to Golden Gate in exchange for the membership interests it

received, but rather received those interests as additional consideration for providing the Golden Gate Loan.  (Bixter Decl. Ex. 182 [PPVA_RH_0648377 – PPVA_RH_0648378]).

248.    The Golden Gate Loan was to be disbursed in tranches, with an initial draw of $6.5 million at the closing to fund the initial costs of drilling four production wells and one water disposal well.  (*Id.*)

249.    The Precious NPA contained specific milestones and conditions precedent that Golden Gate was required to fulfill in order to obtain additional draws of up to an aggregate of $10 million (including the initial $6.5 million draw) as well as any further borrowings up to the total available amount of $25 million.  (*Id.*)

250.    In an email dated April 3, 2012 from Platinum Management portfolio manager Ari Hirt ("**Hirt**") to Nordlicht, with a copy to Jed Latkin ("**Latkin**"), Hirt described the investment rationale and parameters of the proposed Golden Gate financing.  Among other things, Hirt explained that (i) the PV10 value of the oil fields leased by Golden Gate was estimated to be $1 billion according to a reserve report prepared by Degolyer & MacNaughton ("**D&M**"), (ii) Golden Gate's net revenues from operations were projected to be well in excess of $1 million per month from and after September 2012, which would "put us in a good position to be completely repaid within two years on the principal [of the Golden Gate Loan]", (iii) draws in excess of the initial $6.5 million funding were contingent on meeting specific milestones.  (Bixter Decl. Ex. 185 [CTRL3347753]).

251.    On the same day, Nordlicht responded to Hirt's email as follows:

Obviously i am a sucker for upside but i do quibble with 2 items in your investment rationale.
1- i cringe at the 1 billion pv10 number as it doesnt mean anything. Our pv 10 in black elk of 1 billion is a number u can work off of but **when u have billion pv 10 on fields that are worth 15 in sale now, it doesnt really mean much**...but hopefully what we are saying is upside

exists.
2- i feel like team is supbar in that it's an experienced team at the top that has never been
successful to this magnitude, not even close. It doesnt mean we are not a do, i just want to
make sure we dont get high on our own supply as uri wd say!!!![1]

(*Id.* (emphasis added)).

252.   A month by month schedule summarizing Platinum Management's valuations of

the Golden Gate Loan and PPVA's indirect interest in the Golden Gate equity, prepared by Joseph

SanFillipo and sent to Nordlicht on or about November 7, 2014 (the "**GGO Valuation**

**Summary**"), shows that for the months May-August, 2012, the Golden Gate Loan was valued at

100% of the total principal owed plus the 15% accruing current interest, $0 value was ascribed to

the 9.999% deferred interest, and $0 value was ascribed to PPVA's indirect 48% equity interest in

Golden Gate Oil.  (Bixter Decl. Ex. 92, Bodner Tr. Ex. 377.62 [CTRL3679394]).

253.   The Third Quarter update document sent by Zachary Weiner of Platinum

Management to Marina Fedotova of Sterling Valuation Group ("**Sterling**"), Platinum

Management's third party valuation agent, in anticipation of a September 27, 2012 call, indicates

that until Golden Gate generated sufficient cash flow to pay the interest due on the Golden Gate

Loan, current interest would accrue but not be paid.  (Bixter Decl. Ex. 182 [PPVA_RH_0648377

– PPVA_RH_0648378]).

254.   For the month ended September 30, 2012, Platinum Management continued to

value the Golden Gate Loan at 100% of principal plus the 15% accruing interest, and still did not

ascribe any value to the 9.999% deferred interest.  However, the value ascribed to PPVA's indirect

48% equity interest in Golden Gate was $19.2 million.  Platinum Management prepared its Golden

Gate Oil related valuations for the period ended September 30, 2012 in November 2012.  (Bixter

Decl. Ex. 187 [CTRL5906056]).

---

[1] This entire email is [sic]

255.    The $19.2 million value that Platinum Management ascribed to PPVA's indirect 48% equity interest in Golden Gate for the period ending September 30, 2012 was premised upon a November 1, 2012 report (the "**Nov. 2012 Report**") prepared by consultant American Energy Advisers, Inc., which estimated that the market value of the fields that Golden Gate had begun to develop plus the market value of the field it had not yet drilled totaled approximately $50.7 million. Platinum Management calculated its valuation of the equity by subtracting the total principal plus 15% accrued interest under the Golden Gate Loan as of September 30, 2012 from $50.7 million, then multiplying the result by 48%.  (Bixter Decl. Ex. 188 [CTRL3439746 – CTRL3439748]).

256.    For the months ended October 31 and November 30, 2012, Platinum Management continued to ascribe a $19.2 million value to PPVA's indirect 48% equity interest in Golden Gate, and to value the debt at 100% of principal borrowed plus 15% accrued interest.  (Bixter Decl. Ex. 187 [CTRL5906056]).

257.    For the month ended December 31, 2012, Platinum Management increased its valuation of PPVA's indirect 48% equity interest in Golden Gate to $37.44 million.  (*Id*.)

258.    Golden Gate Oil's financial statements for the period ended December 31, 2012 show that it had a total of $1.08 million of operating revenue for the period from inception of the company through December 31, 2012.   (Bixter Decl. Ex. 189 [CTRL5029067]).

259.    Platinum Management increased its valuation of PPVA's indirect 48% equity interest in Golden Gate to $39.5 million for the month ended January 31, 2013, then retained that valuation for the months ended February 28, and March 31, 2013.  (Bixter Decl. Ex. 187 [CTRL5906056]).

260.    Platinum Management increased its valuation of PPVA's indirect 48% equity interest in Golden Gate to $47.44 million for the month ended April 30, 2013, and maintained the same valuation for the month ended May 31, 2013.  (*Id.*)

261.    Platinum Management increased its valuation of PPVA's indirect 48% equity interest in Golden Gate to $48 million for the month ended June 30, 2013, then held that same valuation for each month from June-November, 2013.  (*Id.*)

262.    Platinum Management increased its valuation of PPVA's indirect 48% equity interest in Golden Gate to **$176 million** for the month ending December 31, 2013.  (*Id.*)

263.    Golden Gate Oil's financial statements for the period ended December 31, 2013 show that it had a total of **$1.062 million of total operating revenue** for the period from inception of the company through December 31, 2013.   (Bixter Decl. Ex.189 [CTRL5029067]).

264.    The minutes of the January 24, 2013 Platinum Management Valuation Committee meeting contain an update by Hirt as to the status of Golden Gate Oil's operations.  Hirt reported that in November 2012, Golden Gate Oil drilled a total of seven wells.  However, as of January 24, 2013, Golden Gate Oil had not commenced production from those wells because issuance of the permits it required to operate them was delayed at least 6-8 weeks.  Hirt estimated that production would not begin until April 2013. (Bixter Decl. Ex. 190 [CTRL4493608]).

265.    On January 10, 2013, Nordlicht, Levy and Hirt exchanged emails concerning diligence materials about Golden Gate Oil to be provided to employees of Black Elk and a visit by the Black employees to Golden Gate Oil.  (Bixter Decl. Ex. 191 [CTRL3783598]).

266.    Thereafter, Black Elk employees, including Art Garza and John Hoffman, conducted diligence with respect to Golden Gate Oil.  On March 14, 2013, Steve Lieberman of American Energy Advisers, Inc., a consultant to Golden Gate Oil, emailed John Hoffman and Art

Garza of Black Elk, representatives of NSAI Petroleum, as well as Hirt, Levy and Nordlicht, concerning plans for an upcoming site visit to Golden Gate Oil.  In his email, Lieberman confirmed that the seven wells dug the prior year were still not operating as of that date but were expected to begin flush production by March 27, 2013.  (Bixter Decl. Ex. 192 [CTRL3851417]).

267.   On March 24-25, 2013, Nordlicht and Hirt exchanged emails concerning potential structures for a transaction by which Black Elk would purchase all or a portion of Golden Gate. The potential structures assumed a total purchase price for Golden Gate of $75 million or less.  At one point in the discussion, Nordlicht indicated that a deal was necessary "because let's face it, if we dont do some sort of deal with this company, it's going to go [from] potential shining light to headache very quickly and we have enough headaches."   [sic]   (Bixter Decl. Ex. 193 [CTRL3854871]).

268.   On April 5, 2013, Art Garza of Black Elk circulated to Nordlicht, Levy and John Hoffman of Black Elk a copy of the NSAI preliminary reserve report assessing the amount and potential value of the reserves contained in the oil fields leased by Golden Gate.  NSAI's report estimated the net amount of proven developed/undeveloped reserves as containing approximately 2.2 million barrels of oil, and estimated the proven and probable reserves as together containing approximately 4.4 million barrels of oil.  NSAI estimated the PV10 value of Golden Gate's total proven, probable and possible reserves as approximately **$160 million**, substantially lower than the greater than $1 billion PV10 value ascribed to the same reserves in the report prepared by Degolyer & McNaughton the prior year.  (Bixter Decl. Ex. 194 [CTRL4348853, CTRL4348855]).

269.   By July 2013, Black Elk employees had conducted due diligence with respect to a potential purchase of Golden Gate Oil.  In a July 15, 2013 post due diligence report emailed to John Hoffman, CEO of Black Elk and copied to other Black Elk executives and David Levy, Art

Garza indicated that buying Golden Gate Oil's assets would be "accretive" for Black Elk, but only at the correct price. He recommended that Black Elk negotiate a lower purchase price for Golden Gate Oil because, *inter alia*: (i) two wells were underperforming, (ii) one well was producing more barrels of water per day than barrels of oil, (iii) operation of the wells located on the Casmaila property was cash flow negative, with a total loss of $240 thousand since November 2012, and there was uncertainty as to whether continued production was necessary to maintain the lease; (iv) NSAI's estimate of the total Golden Gate reserves was 155-493 barrels of oil per day as compared to the Degolyer & Martin estimate of 296-1851 barrels of oil per day; and (v) further potential permitting issues. (Bixter Decl. Ex. 195 [CTRL4676873 – CTRL4676880]).

270.    Levy forwarded Art Garza's July 15, 2013 due diligence report concerning Golden Gate Oil to Nordlicht on July 19, 2013. In follow up emails, Nordlicht told both Levy and John Hoffman that Garza's email would have to be "managed." Hoffman replied that he would handle Garza, acknowledging that the decision (*i.e.* for Black Elk to purchase Golden Gate Oil) already had been made. (Bixter Decl. Ex. 196 [CTRL4704586])

271.    An August 7, 2013 email exchange between Nordlicht and Hirt confirms that as of that date, Golden Gate was in "limbo" as Platinum Management had called a halt to all drilling efforts and activities in anticipation of a possible sale to Black Elk. (Bixter Decl. Ex. 197 [CTRL4698873]).

272.    The members of Golden Gate entered into that certain First Amendment to Amended and Restated Operating Agreement of Golden Gate Oil on or about October 29, 2013 (the "**GGO First Amendment to Operating Agreement**"). It provides, *inter alia*, that Precious would have an option to purchase all of the other members' membership interests in Golden Gate for a stated purchase price, while the other members could put their membership interests to

59

Precious for the same price, but only if Golden Gate Oil met certain production milestones. The stated purchase price was $60 million plus any amounts advanced by Precious after October 29, 2013. The purchase price was payable in two installments, however. The first installment was to be calculated by multiplying the purchase price times 70%, then subtracting the full amount owed under the Golden Gate Note including all accrued interest and fees. The second installment was only payable in the event that Golden Gate achieved certain milestones. (Bixter Decl. Ex. 198 [CTRL5029068]).

273.    Beginning with the valuation for December 2013, Platinum Management calculated the value of PPVA's indirect equity interest in Golden Gate as if Precious had already executed the option to purchase and owned all of the equity in Golden Gate. (Bixter Decl. Ex. 208 [PPVA_RH_0672341 – PPVA_RH_0672349]).

274.    On October 8, 2013, Marina Fedotova of Sterling sent herself an email with bullet points regarding Golden Gate derived from a meeting with Platinum Managerment on that date. The bullet points stated:

- requested support for the 100mm equity value
- they have production forecasts (minimal)
- no production, no drilling; they were thinking of how much they can sell the asset for
- how much more cash needs to go in there; people who put in more will require return on the funds

(Bixter Decl. Ex. 201 [PPVA_RH_0663828]).

275.    On October 23, 2013, SanFilippo forwarded to Marina Fedotova documents relating to Platinum Management's valuation of Golden Gate Oil as of June 30, 2013, including a note describing the change in valuation methodology adopted by Platinum Management for this asset. For valuations relating to periods before June 2013, Platinum Management had utilized an "income approach" derived from a multiple of Golden Gate's projected EBITDA. Golden Gate

had not met its EBITDA projections however.  Accordingly, Platinum Management determined it also should combine the EBITDA multiple income approach with an asset approach that utilized a risked version of the project reserve values set out in the updated May 2013 report prepared by Degolyer & McNaughton.  (Bixter Decl. Ex. 202 [CTRL4831752 – CTRL4831754]).

276.    The May 2013 Degolyer & McNaughton report projected that the aggregate projected PV10 value of Golden Gate's proved and probable reserves exceeded $700 million. (Bixter Decl. Ex. 653 [PPVA_RH_0664769]).

277.    The Degolyer & McNaughton Report projected substantially higher PV10 values than the report prepared by NSAI.  *Compare* (Bixter Decl. Ex. 653 [PPVA_RH_0664769] *with* Bixter Decl. Ex. 194 [CTRL4348853]).

278.



(Bixter Decl. Ex. 203 [PPVA_RH_0665898]).

279.    In the subsequent events section of its 10Q for the period ended September 30, 2013, which was filed with the SEC on November 14, 2013, Black Elk reported that, "On November 14, 2013, we entered into a Purchase Option Agreement with the owners of Golden Gate Oil LLC pursuant to which we have the option to purchase 100% of the equity of Golden Gate for an aggregate purchase price equal to $60 million plus the amount of any advances made to Golden Gate by its members after October 29, 2013 plus the principal, interest and fees outstanding under certain debt of Golden Gate. Golden Gate and its principal owner are affiliated

with Platinum."  On April 29, 2014, Hirt forwarded to Levy and Daniel Small, with copies to

David Steinberg and Nordlicht a request for clarification as to the ownership of the option to

purchase Golden Gate arising out of the disclosure set forth in Black Elk's 10Q for the 3rd Q of

2013.  Hirt stated as follows:

> As you see from the below email and the attached Black Elk SEC disclosure, we really
> need to confirm and verify if the GGO Purchase Option assignment was indeed signed over
> to Black Elk. If it has been assigned to Black Elk, then we need to deal with issues such as
> the below email, and More Importantly need to deal with getting back this option with
> relation to what GGO is doing right now strategically. If it has not been signed over, then
> we need that confirmed and in turn Black Elk may have a disclosure issue to immediately
> deal with and fix.

(Bixter Decl. Ex. 204 [CTRL5212678 – CTRL5212679]).

280.    Neither Platinum Management nor Black Elk appear to have issued a corrective

disclosure concerning the option to purchase Golden Gate.  In a May 23, 2014 email to David

Steinberg, copying Nordlicht, Levy and Daniel Saks, Hirt recounted a conversation with a third

party investment bank in which the bank representative questioned him about Platinum

Management's valuation of Golden Gate in light of the Black Elk disclosure:

> Btw, one issue they brought up which must deal with is regarding the Black Elk SEC
> disclosure about the GGO Option -- the issue is that it publicly discloses the value of the
> option and therefore pegs GGO's value to $60M. This is ultimately a marketing issue that
> could be dealt with but something we should all be aware of that **Black Elk's public**
> **disclosure of the price of its option to purchase Golden Gate "pegs the value of Golden**
> **Gate at $60 million**.

(Bixter Decl. Ex. 205 [CTRL5213858] (emphasis added)).

281.    On February 26, 2014, Precious Capital as seller, and PPVA entered into that

certain Note Sale Agreement with BAM Administrative Services LLC and certain of its investment

advisory clients as buyers, by which Precious sold $21,805,500 in principal and $6,584,830 of

accrued interest due in connection with the Golden Gate Loan (the "**GGO Note Sale**

**Agreement**").  (Bixter Decl. Ex. 206 [CTRL5135687 – CTRL5135690]).

282.   The GGO Note Sale Agreement provides, *inter alia*, that the buyers could put the Golden Gate Oil Loan to PPVA, and that PPVA guaranteed all payments due to the buyer from Golden Gate.  (*Id.*)

283.   Precious and Golden Gate Oil previously had entered in an amendment to the Golden Gate Oil Loan in October 2013, which, *inter alia*, increased Golden Gate Oil's borrowing limit by $5.5 million.  In connection with the execution of the GGO Note Sale Agreement, the Golden Gate Oil Loan documents were further amended to again increase total availability under the loan, with all such additional amounts to be funded by Precious, *i.e.* PPVA.  (*Id.*)

284.   By early February 2014, Nordlicht was aware that Platinum Management would not combine Black Elk and Golden Gate Oil.  In an email dated February 3, 3014, Nordlicht instructed SanFilippo to adjust the year end 2013 valuation for Golden Gate Oil and Black Elk, to add $125 million to the valuation of PPVA's indirect equity interest in Golden Gate Oil and subtract a like amount from the value of PPVA's equity interest in Black Elk in light of the fact that the two companies would not be merging.  As a result, Platinum Management's valuation of Golden Gate was increased from **$48 million to $173 million.**  (Bixter Decl. Ex. 207 [CTRL6079964]).

285.   On April 15, 2014, SanFilippo sent to Marina Fedotova of Sterling information supporting the valuation of PPVA's indirect equity interest in Golden Gate as of year-end 2013. Included in those materials was a note explaining the reasoning behind the steep increase in the valuation:





(Bixter Decl. Ex. 208 [PPVA_RH_0672341 – PPVA_RH_0672349] (emphasis supplied)).

286.    The materials that SanFilippo sent to Sterling on April 15, 2014 include a worksheet detailing the comparable company analysis on which Platinum Management was relying for its updated valuation.   The worksheet contains information derived from a spreadsheet with comparable company metrics that Platinum Management employee Samuel Salfati sent to Nordlicht, with a copy to Zachary Weiner and Michael Nordlicht, on January 14, 2014.   (Bixter Decl. Ex. 209 [CTRL5998237 – CTRL59982338]; Bixter Decl. Ex. 208 [PPVA_RH_0672341 – PPVA_RH_0672349]).

287.    On January 14, 2014, Nordlicht forwarded Salfati's email and spreadsheet to Uri Landesman and Murray Huberfeld in two separate emails, each of which contained the same text:

> There is definitely room for Bracha to be Chal. 1.2 billion value based on comps for golden gate. I think they are all overvalued and it's somewhat capital intensive but if oil stays in upper 80's (something I personally don't think will happen) shd throw off hundreds of millions 2015-2018 and continue in the tens of millions for several years.

(Bixter Decl. Ex. 210 [CTRL5995037]).

288.    Nordlicht's January 14, 2014 emails to Landesman and Huberfeld admits that (i) he was aware that the companies to which Platinum Management was comparing Golden Gate for purposes of valuation were all "overvalued"; (ii) that the oil and gas business is "somewhat capital intensive";  (iii) that the valuations depended on whether the price of oil "stays in upper 80's"; and (iv) that the the price of oil staying in the upper 80's was something that he "personally don't think will happen."  (*Id.*)

289.    Separately, Nordlicht and others at Platinum Management were aware that the "general feeling that until Golden Gate showed signs it could produce efficiently, a cautious approach was warranted" remained a valid concern.  On February 3, 2014, the same day that Nordlicht told SanFilippo to raise the valuation of Golden Gate Oil by $125 million, Hirt and Nordlicht exchanged emails concerning Golden Gate CEO Dennis Corcoran's request for prompt transfer of $1.3 million to fund Golden Gate's operations:

> Please fund 100% of all funds that are requested as soon as they are requested. Platinum's piecemeal approach is not working. Please reference my previous email in which I recommended funding 100% of the Drill & Complete costs to the Control Account as soon as the AFE is approved and prior to spudding the well, and supplementing the Control Account as cost overruns are identified in advance of receiving the invoices. It is costing the company more and tying my hands in my attempts to conduct operations. I don't have time to "prioritize" bills that need to be paid because 100% of the bills need to be paid when requested. I will not go on this way any longer. And I'm concerned that Barry may also, "walk" if this policy continues. Feel free to forward this to Mark if you want to…I can't wait until Mark gets here to resolve this issue. In absence of "prepaying" the AFE

amount, we need all of the funds requested in the A/P summary now! And we will need 100% of all future funds requested as soon as they are requested."

(Bixter Decl. Ex. 211 [CTRL5125777]).

290.     Nordlicht responded by criticizing Corkran's performance and denying permission to fund the $1.3 million requested.  He said, "No, that's not going to happen. He is going to have to wait for me to get there. And I am very nervous as to the fact he keeps on giving us excuses on the drilling. Do we have replacement for him lined up?"  (*Id*.)

291.     After the transaction set forth in the GGO Note Sale Agreement was consummated, Platinum Management employees sent regular updates on the business and operations of GGO to a Beechwood email group set up under the address *ValuationGroup@beechwoodreinsurance.com*. Among other things, the updates describe the production problems associated with various wells, personnel changes – including the June 2014 termination of Dennis Corkran, Golden Gate's CEO, and the October 2014 termination of Barry Furlong, its CFO – and a further amendment to the Golden Gate Oil Loan to increase the availability under the loan to account for expected operating costs through March 2015 and interests payments due to Beechwood.  (*See, e.g.,* Bixter Decl. Ex. 212 [BW-SHIP-00957655]; Bixter Decl. Ex. 213 [CTRL6917554]).

292.     From and after the execution of the GGO Note Sale Agreement, PPVA funded all interest payments due to BAM Administrative Services LLC via advances by Precious to Golden Gate Oil under the Golden Gate Loan.  (*See, e.g.*, Bixter Decl. Ex. 214 [CTRL4926899 – CTRL4926900]; Bixter Decl. Ex. 215 [BW-SHIP-00728366]; Bixter Decl. Ex. 212 [BW-SHIP-00957655]).

293.     Golden Gate Oil did not meet the production targets set out in the October 2013 GGO First Amendment to Operating Agreement that would have enabled the other members to "put" their equity in Golden Gate Oil to Precious.  And, although it valued PPVA's indirect

ownership interest in the Golden Gate equity as if the purchase option contained in the GGO First Amendment to Operating Agreement had been exercised from and after year end 2013, Platinum Management did not cause PPVA's subsidiary, Precious, to exercise that option.  (Bixter Decl. Ex. 216 [CTRL5693125]; Bixter Decl. Ex. 217 [CTRL5985273]; Bixter Decl. Ex. 208 [PPVA_RH_0672341 – PPVA_RH_0672349]).

294.    In June 2014, Platinum Management renegotiated the price at which Precious could "call" or demand to purchase the remaining 52% of the equity in Golden Gate with the other equity holders.  (Bixter Decl. Ex. 218 [CTRL5986986 – CTRL5986988]).

295.    Precious entered into agreements by which it purchased the remaining equity in Golden Gate Oil on August 14, and September 2, 2014.  The aggregate purchase price was ***approximately $3 million***, with additional "production payments" to be made to the sellers if Golden Gate achieved certain production milestones, which were not achieved.  (*Id.*).

296.    In October 2014, in connection with its work to complete the 2013 YE audit, BDO asked questions concerning the option to purchase the remaining equity interests in Golden Gate and the timing of its execution.  Among other things, it wanted to know why there was a delay in executing on the purchase option contained in the GGO First Amendment to Operating Agreement if such option was "in the money," and also questioned the purchase price given the terms of such GGO First Amendment.  In a series of emails exchanged on October 8 and 13, 2014, Hirt, Nordlicht, Manela and George Duch discussed the response to provide to BDO.  Hirt's initial draft of a response is as follows:

> 1) without eliminating any other answers or possibilities as to why PPVA did not exercise the call option even though it was "in the money", is that a) there was no time expiration on the option so unless there was an I'm educate economic benefit to exercise the option, there was no impetus to exercise; b) ***while the enterprise value of the option was "in the money" the operational cash flow of the company was minimal to negative, therefore there was no incentive to exercise the option prior to either having more operational***

> ***momentum towards profitability or to having a more near term event to benefit from the enterprise value;*** and c) because of the above, PPVA had other capital priorities in managing its day to day activity
>
> 2) not sure what they are asking here. Clause 7.07d refers to a scenario whereby if PPVA had exercised its option (which it did not), this clause would have allowed the sellers to share in profits of value achieved by PPVA above a $60M valuation within 60 days of exercise....

(Bixter Decl. Ex. 216 [CTRL5693125] (emphasis added)).

297.    In response, Nordlicht directed that reference to Golden Gate having "minimal to negative operational cash flow" be dropped, as is reflected in the response that Duch sent to BDO. (Bixter Decl. Ex. 216 [CTRL5693125]; Bixter Decl. Ex. 219 [CTRL5693617 – CTRL5693618]).

298.    In response to December 2014 follow up question from BDO requesting further information about the price that eventually was paid for the remaining Golden Gate Oil equity, Hirt explained as follows:

> The Option Agreement at year-end 2013 gave Precious Capital a call option to purchase the 52% of Golden Gate Oil equity it did not already own at a total enterprise value of $60M. Alongside the call option, Amrich LLC had a put option to sell its 52% back to Precious Capital at the same $60M enterprise value if Golden Gate's drilling of its next wells met the Milestone requirements. One of the key milestones was that the wells should produce at least 250 bbls of oil per day for a thirty day period. When the wells were finished and tested in March 2014, the wells did not meet the milestone requirements. Given that Amrich could no longer "put" its shares to Precious Capital and that Golden Gate Oil was in default of its loan obligations, Precious had three choices --
>
> a) exercise the call option
>
> b) foreclose on the assets through the debt
>
> c) negotiate a lower price for the equity Given that Amrich did not want Precious to foreclose on the debt and receive nothing for its equity, Precious negotiated a sale price at a discount to the original $60M enterprise value, as evidenced by the "Purchase Agreement" dated August 14, 2014.

BDO in turn asked whether Platinum's expectations for the wells was different in 2014 than it had been previously, but Hirt does not appear to have responded.   (Bixter Decl. Ex. 217 [CTRL5985273]).

299.    Golden Gate's 1st Quarter 2014 financial statements show that it had a total of $228,000 in operational revenue for that quarter. (Bixter Decl. Ex. 220 [PPVA_RH_0676578]).

300.    By the 4th quarter of 2014, Platinum Management had tasked the Northstar management team with overseeing the operations of Golden Gate. (*See* Bixter Decl. Ex. 221 [PPVA_RH_0681131]; Bixter Decl. Ex. 222 [PPVA_RH_0135181]).

301.    Platinum Management valued PPVA's indirect equity interest in Golden Gate Oil to be worth $176 million as of the month ended January 31, 2014, and maintained that valuation through the month ended July 31, 2014. It valued PPVA's indirect equity interest in Golden Gate Oil with similar numbers in the ensuring months, with only slight reduction, and reported a value of approximately $152 million for the month ending June 30, 2015. (*See* Bixter Decl. Ex. 187 [CTRL5906056]; Bixter Decl. Ex. 223 [CTRL7129433]).

302.    Platinum Management represented to Sterling that the material drop in oil prices was the basis for the drop in its valuation of the Golden Gate equity at the end of 2014. (*See* Bixter Decl. Ex. 654 [PPVA_RH_0694447]).

303.    The updates provided to Beechwood and Platinum Management personnel by Hirt and Zachary Weiner of Platinum Management show that, irrespective of falling oil prices, Golden Gate Oil had significant operational set-backs during 2014 and in the first half of 2015. These set-backs included wells that didn't produce as expected, well that had to be shut in, mounting accounts payable and concerns that certain leases could be terminated for failure to operate. (*See, e.g.*, Bixter Decl. Ex. 225 [CTRL6447850]; Bixter Decl. Ex. 226 [CTRL6942537]; Bixter Decl. Ex. 213 [CTRL6917554]; Bixter Decl. Ex. 227 [CTRL6701937]; Bixter Decl. Ex. 228 [CTRL6702927]; Bixter Decl. Ex. 229 [CTRL6476456]).

304.    In early June 2015, Golden Gate's temporary operating permits expired.  As a result, Golden Gate was required to shut down operations until permitting issues were resolved. (Bixter Decl. Ex. 226 [CTRL6942537]; Bixter Decl. Ex. 230 [CTRL6936675]).

305.    In July 2015, Avery Alcorn of Northstar proposed a plan to transition Golden Gate into "stand by" mode by shutting down operations and terminating substantially all of Golden Gate's exiting employees while all permitting/operational issues were resolved.  (Bixter Decl. Ex. 231 [CTRL7042189]).

306.    As of September 1, 2015, permits still were not reissued, Golden Gate did not have any ongoing operations and had not paid any of its accounts payable for three months. (Bixter Decl. Ex. 232  [CTRL7255521]).

307.    An October 2, 2015 email from Mani Katari to Nordlicht and SanFilippo attaching the latest profit and loss report for PPVA indicates that "Golden Gate we are no longer accruing interest [on the Golden Gate loan] or adding on the interest paid to Beechwood as capital)".  (Bixter Decl. Ex. 233  [CTRL7353821 – CTRL7353822]).

308.    On December 7, 2015, Avery Alcorn of Northstar forwarded to Zach Weiner a December 4, 2015 email from Golden Gate Oil's auditor with attachments relating to the preparation of Golden Gate's 2014 financial statements.  Among other things, the auditor's email states that "There appears to be a risk for Going Concern due to the $31.5M owed to Precious capital, as well as due to the cumulative net losses of $22.5 million. Can you briefly explain managements [sic] plans to mitigate the risk of going concern? Such as sufficient production to offset operating costs or a guaranteed commitment of financing for at least a year past November 30, 2015."  Alcorn reiterated that Platinum Management would have to issue a letter indicating that it would not seek to collect on the $31 million outstanding on the Golden Gate Loan and

intended to continue financing Golden Gate Oil to avoid a going concern risk.  (Bixter Decl. Ex. 234 [CTRL7570924 – CTRL7570927]).

309.    By January 2016, Golden Gate continued to have significant outstanding accounts payable with no plan for restarting operations.  (Bixter Decl. Ex. 235 [CTRL7737168]).

310.    Throughout 2016, Golden Gate Oil was delinquent in paying its operating, payroll, lease, insurance and other expenses.  The leases eventually expired and operations were not restarted.  (*See, e.g*., Bixter Decl. Ex. 236 [CTRL8084644]; Bixter Decl. Ex. 237 [CTRL7936846]; Bixter Decl. Ex. 238 [CTRL8708309]).

311.    Platinum Management and its owners and executives continued to maintain similar values for PPVA's indirect equity interest in Golden Gate Oil, valuing such interest as approximately $142 million for the month ending December 31, 2015, and continued with similar valuations thereafter (Bixter Decl. Ex. 239 [CTRL8296297]).

## OVERVALUATION OF BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

312.    Black Elk Energy Offshore Operations, LLC was an oil and gas company formed under the laws of the state of Texas and headquartered in Houston, Texas.  Black Elk was formed in November 2007 to acquire, exploit and develop oil and natural gas properties.  As of the year ended December 31, 2012, substantially all of Black Elk's oil and gas producing assets were located offshore in U.S. federal and Louisiana and Texas state waters in the Gulf of Mexico. (Bixter Decl. Ex. 240 [CTRL4505667]).

313.    Black Elk's annual report on form 10K for the year ended December 31, 2012 reported that, as of December 31, 2012, Black Elk held leases encompassing approximately 542,500 gross (270,600 net) acres, 1,109 gross (569 net) wells and 233 production platforms. (*Id*.)

314. Also as of December 31, 2012, Black Elk reported that it (i) had estimated total proved oil, natural gas and NGL reserves of 40.3 MMBoe (48% oil) with a PV-10 value of $1,058 million based on the reserve report as of December 31, 2012 ("**NSAI Report**") of Netherland, Sewell & Associates, Inc., independent petroleum engineers ("**NSAI**"), using U.S. Securities and Exchange Commission ("**SEC**") pricing based on the average price as of the first day of each of the twelve months ended December 31, 2012; (ii) approximately 39% of its reserves were undeveloped; and (iii) for 2012, its net daily production averaged approximately 14,429 barrels of oil per day. (*Id.*)

315. On November 16, 2012, an explosion and fire occurred on Black Elk's West Delta 32-E platform, located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana (the "**Black Elk Explosion**"). At the time of the explosion, production on the platform had been shut in while crews of independent contractors performed maintenance and construction on the platform. Three workers died as a result of the explosion and subsequent fire, and others sustained varying degrees of personal injuries. (*Id.*)

316. Black Elk was named as a defendant in litigation and also was the object of various governmental/regulatory investigations arising out of and following the Black Elk Explosion. (*Id.*)

317. For the year ended December 31, 2012, Black Elk reported revenues of approximately $304 million, and EBITDA of approximately $79 million and a net loss of approximately $64 million, down from approximately $340 million in revenues, $110.68 million in EBITDA and a net profit of $15 million at year end 2011. (*Id.*)

318. At year-end 2012, there was $52 million outstanding on Black Elk's first priority senior secured revolving credit facility, approximately $150 million of 13.75% senior secured

bonds due 2015 ("**Black Elk Bonds**"), and approximately $108 million in unsecured accounts payable and accrued expenses.  (*Id*.)

319.    In September 2012, before the Black Elk Explosion, Standard & Poor's ratings services downgraded Black Elk's long term corporate credit rating from B- to CCC+. After the Black Elk Explosion, S&P placed Black Elk on Watch Negative reflecting the potential for further weakening of the Company's credit profile and liquidity based on its highly leveraged financial position and liquidity constraints.  (Bixter Decl. Ex. 241 [CTRL4373046 – CTRL4373049]).

320.    As of December 31, 2012, funds managed by Platinum Management or its affiliated investment advisers beneficially owned approximately 84% of Black Elk's outstanding voting membership interests and approximately 76% of its total outstanding membership interests.  As a result, Black Elk's public filings state that "for as long as Platinum holds a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions. As a controlling member, Platinum could make decisions that may conflict with noteholders' interests." (Bixter Decl. Ex. 240 [CTRL4505667]).

321.    As of December 31, 2012, PPVA beneficially owned Black Elk class A, B equity units and $30 million of class D preferred units.  As of YE 2012, Platinum Management valued the Black Elk class A and B equity held beneficially by PPVA at $215 million in the aggregate, and the Black Elk class D Units at 100% of par, or $30 million plus all accrued interest.  (Bixter Decl. Ex. 242 [CTRL4322987]).

322.    On or about January 25, 2013, Black Elk amended its operating agreement to provide for the issuance of $95 million of class E preferred equity (the "**Black Elk Preferred E Equity**") and to exchange $30 million of class D preferred units plus $13,028,000 of accrued interest for 43,028,000 of Class E Preferred.  (Bixter Decl. Ex. 240 [CTRL4505667]).

323.    Black Elk was obligated to pay 20% interest on the Black Elk Preferred E Equity, and to redeem the Black Elk Preferred E Equity by March 24, 2014.  If the Black Elk Preferred E Equity was not redeemed by March 24, 2014, then the interest rate increased to 36%.  (*Id*.)

324.    The BEOF Funds, two funds set up and managed by Platinum Management's principals, purchased an aggregate of $40 million of Black Elk Preferred E Equity from Black Elk.  The remaining Class E Preferred was purchased directly from Black Elk by investors including Twosons Corporation. (*Id*.)

325.    On March 26, 2013, Black Elk closed the sale of four fields to Renaissance Offshore LLC ("**Renaissance**") for a total purchase price of approximately $52.5 million (the "**2013 Renaissance Sale**").  Black Elk used the proceeds of the 2013 Renaissance Sale to reduce its outstanding borrowing under its senior credit facility and to fund corporate activities.  (*Id*.)

326.    For 2013, Black Elk projected that it would have approximately $337 million in revenues and approximately $120.8 million EBITDA.  (Bixter Decl. Ex. 241 [CTRL4373046 – CTRL4373049]).

327.    For the nine months ended September 30, 2013, Black Elk's revenues were only $190 million and its EBITDA was $25.7 million, as compared to $240 million in revenues and EBITDA of approximately $71 million for the nine months ended September 30, 2012. Black Elk's total revenues and EBITDA for the year ended December 31, 2013 totaled approximately $258 million and $45 million, respectively.  (Bixter Decl. Ex. 243, SAC Ex. 54).

328.    As of year-end 2013, Black Elk reported that it had $156 million of accounts payable outstanding.  (*Id.*)

329.    A memo prepared by Daniel Small ("**Small**"), a Platinum Management portfolio manager, provides the following explanation for Black Elk's substantially reduced 2013 financial performance:

> The company faced several headwinds related to the November 2012 West Delta 32 incident that negatively impacted performance for the first 9 months of 2013. The Company's platform which historically would be inspected by regulators on a quarterly or semi-annual basis experienced more frequent visits, sometimes weekly. The heightened regulatory scrutiny caused many of its platforms to be shut-in for extended periods of time which negatively impacted production. The increased visits also resulted in a greater number of cited infractions resulting in higher operating expenses due to elevated remediation work as well as incremental costs from the implementation of a comprehensive performance improvement plan that required the hiring of additional compliance personnel. General and Administrative costs were elevated due to increased legal and regulatory consulting fees. The company experienced delays in receiving hot work permits which hampered its ability to perform maintenance and workover projects necessary to optimize performance. Finally, the liquidity constraints caused by lower production and higher expenses disrupted the companies decommissioning program for non-economic fields representing a further drag on cash flow.

(Bixter Decl. Ex. 244 [CTRL5026390 – CTRL5026391]).

330.    Issues concerning Black Elk's financial performance and prospects are detailed in a due diligence report prepared for Asiasons Capital Ltd. ("**Asiasons**") and forwarded to Levy and an investment banker acting on behalf of Platinum Management on November 11, 2013.  (Bixter Decl. Ex. 245 [CTRL4653792 – CTRL4653795]).

331.    Among other things, the Asiasons report highlights the significant decrease in Black Elk's revenues since 2011, stagnant production, high operational and lease costs, a lack of financing to support the capital expenditures required for Black Elk to increase production, and a lack of capital with which to exercise the option to purchase Golden Gate Oil.  The report further states that "**Enterprise value is estimated in the range up to [$200 million] based on the**

**EBITDA/EBITDAX multiple. With debt and preferred shares of [$275 million],** *the value of equity to common shareholders is zero."* (*Id.* (emphasis added)).

332.    Black Elk's financial and operational problems, including, among other things, reduced profitability due to production decreases and lease operating expenses that were in excess of budget, also are detailed in a September 18, 2013 email from Small to Nordlicht and Levy and its related attachments.  Small's email was written after he visited Black Elk's offices in Houston and met with Black Elk personnel.  (Bixter Decl. Ex. 246 [CTRL4618006 – CTRL4618010]).

333.    Platinum Management initially had negotiated a proposed transaction with Asiasons in August-September 2013, under the terms of which 25% of the Black Elk class A and B equity beneficially held by PPVA would be exchanged for shares of Asiasons, and Asiasons also would purchase newly issued equity directly from Black Elk in exchange for Asiasons shares. Platinum Management increased its valuation of PPVA's beneficial interest in Black Elk's Class A and B equity units from approximately $226 million as of August 30, 2013 to $250 million as of September 30, 2013, based on the equity values implied by the terms of the proposed transaction with Asiasons.  (Bixter Decl. Ex. 247 [CTRL4602007]; Bixter Decl. Ex. 248 [CTRL4650848 – CTRL4650849; Bixter Decl. Ex. 249 [CTRL5906054 –CTRL5906055]).

334.    The proposed transaction with Asiasons was renegotiated after the value of Asiasons shares collapsed in mid October 2013.  (Bixter Decl. Ex. 251 [CTRL4788919]; Bixter Decl. Ex. 252 [CTRL6269148]; Bixter Decl. Ex. 248 [CTRL4650848 – CTRL4650849]).

335.    On December 6, 2013, Nordlicht emailed Sanfilippo with instructions to further increase the valuation of PPVA's beneficial interest in Black Elk class A and B equity by $28 million to $278 million, somehow based on the renegotiated deal with Asiasons.  (Bixter Decl. Ex. 252 [CTRL6269148]).

336.     On January 14, 2014, Black Elk filed with the SEC a statement on form 8K in which it announced that the proposed deal with Asiasons had been terminated upon the mutual agreement of the parties.  On February 3, 2014, Nordlicht sent an email to SanFilippo in which he stated that the year end 2013 valuation of PPVA's beneficial interest in Black Elk class A and B equity was premised upon the exercise by Black Elk of an option to purchase Golden Gate.  (Bixter Decl. Ex. 207 [CTRL6079964]).

337.     The option to purchase Golden Gate Oil referred to in Nordlicht's February 3, 2014 email was created upon the execution of that certain First Amendment to Amended and Restated Operating Agreement of Golden Gate Oil on or about October 29, 2013 (the "**GGO First Amendment to Operating Agreement**").  (Bixter Decl. Ex. 198 [CTRL5029068]).

338.     In the subsequent events section of its 10Q for the period ended September 30, 2013, which was filed with the SEC on November 14, 2013, Black Elk reported that, "On November 14, 2013, we entered into a Purchase Option Agreement with the owners of Golden Gate Oil LLC pursuant to which we have the option to purchase 100% of the equity of Golden Gate for an aggregate purchase price equal to $60 million plus the amount of any advances made to Golden Gate by its members after October 29, 2013 plus the principal, interest and fees outstanding under certain debt of Golden Gate. Golden Gate and its principal owner are affiliated with Platinum."  On April 29, 2014, Hirt forwarded to Levy and Daniel Small, with copies to David Steinberg and Nordlicht a request for clarification as to the ownership of the option to purchase Golden Gate arising out of the disclosure set forth in Black Elk's 10Q for the 3rd Q of 2013.  Hirt stated as follows:

> As you see from the below email and the attached Black Elk SEC disclosure, we really need to confirm and verify if the GGO Purchase Option assignment was indeed signed over to Black Elk. If it has been assigned to Black Elk, then we need to deal with issues such as the below email, and More Importantly need to deal with getting back this option with

relation to what GGO is doing right now strategically. If it has not been signed over, then we need that confirmed and in turn Black Elk may have a disclosure issue to immediately deal with and fix.

(Bixter Decl. Ex. 204 [CTRL5212678 – CTRL5212679]).

339.    As noted above, Platinum Management valued PPVA's beneficial interest in the Black Elk class A and B equity at $226 million as of the month ended August 30, 2013, $250 million as of the months ended September 30 and October 31, 2013, and increased the valuation to $278 million as of the month ended November 30, 2013. (Bixter Decl. Ex. 249 [CTRL5906054 – CTRL5906055]).

340.    Also as noted above, Nordlicht's December 6, 2013 email pegs the $28 million increase in the valuation of PPVA's beneficial interest in the Black Elk class A and B equity to the proposed transaction with Asiasons.  Prior increases in the valuation of the Black Elk class A and B equity occurred before the purchase option was created by the October 29, 2013 GGO First Amendment to Operating Agreement and before such option allegedly was assigned to Black Elk on November 14, 2013.  (Bixter Decl. Ex. 207 [CTRL6079964];  Bixter Decl. Ex. 249 [CTRL5906054 – CTRL5906055]).

341.    Nevertheless, Nordlicht's February 3, 2014 email states that "it does not look like we will be bringing in ggo into black elk. Black elks value as of yr end was based on the expectation we [would] be exercising the option on golden gate. Given our current thinking, please correct the yr end values and add 125 to golden gate and deduct 125 from black elk."  In other words, the value of PPVA's interest in Black Elk equity should be reduced by $125 million, but a corresponding $125 million increase should be made in the valuation of PPVA's beneficial interest in the Golden Gate equity.  (Bixter Decl. Ex. 198 [CTRL5029068]).

342.    The February 3, 2014 email does not provide any basis for the $125 million value swing as between the valuation of the Black Elk class A and B equity and the Golden Gate equity. (*Id.*)

343.    Nordlicht's February 19, 2015 draft response to SEC audit question 33-6, which sought information as to why there is no mention of Black Elk being assigned the option to purchase Golden Gate in Sterling's valuation report for the year ended December 2013, also comments on the shift in value between Black Elk and Golden Gate at year end 2013:

> Joe- 33-6. Does this work? I'm a little flying in blind because I don't have valuations in front of me but this is to best of my recollection.
>
> Black Elk option to buy Golden Gate does not appear in Sterling Reports because Sterling does quarterly reports and this was intra quarter phenomenon. There was a brief 1-2 month period towards the end of 2013 when the investment team set up transfer of option to Black Elk to acquire Golden Gate as at the time it was thought to be strategically accretive. Ultimately, the notion was quickly dismissed. While there is no formal documentation as to the option being accounted for in valuation, looking back at the values, it appears that in q4 2013 the option prevented Golden Gate from being marked up and correspondingly, Black Elk experiencing some operational issues at the time, saw its value remain constant. Once it was decided not to go ahead with the option, both valuations fell into place according to their respective fundamentals.

(Bixter Decl. Ex. 254 [CTRL6441625]).

344.    Platinum Management's adjusted year end 2013 valuation of PPVA's beneficial interest in Black Elk class A and B equity was revised downward to $150 million, while a corresponding increase was made to the value of PPVA's beneficial interest in Golden Gate. (Bixter Decl. Ex. 249 [CTRL5906054 –CTRL5906055]).

345.    Platinum Management valued PPVA's beneficial interest in the Black Elk class A and B equity at $150 million for the months ended January 31 and February 28, 2014.  Platinum Management valued PPVA's beneficial interest in the Black Elk class A and B equity at $145 million for the months ended March 31 and April 30, May 31, June 30, July 31 and August 31, 2014.  (*Id.*)

346.    On March 17, 2014, Black Elk announced the sale of one operated and 15 non-operated fields to Fieldwood Energy LLC for a purchase price of $50 million, subject to adjustments (the "**Fieldwood Sale**"), which was used to pay off Black Elk's senior credit facility, leaving the holders of the Black Elk Bonds as the senior secured creditors of Black Elk.   (Bixter Decl. Ex. 250 [CTRL5901148]).

347.    On August 15, 2014, Black Elk announced the sale of 7 operated fields and 1 non-operated field to Renaissance Offshore LLC (the "**Renaissance Sale**"), stating that the assets sold formed a significant portion of Black Elk's prior cash flow and proven reserves.  Black Elk used the proceeds of the sale to redeem $96 million of the Black Elk Preferred E Equity, which included those held by investors in the BEOF Funds such as HFF, as well as $11.33 million face amount of the Black Elk Bonds that were tendered for redemption in connection with the Consent Solicitation (defined below).  As of September 30, 2014, there remained outstanding approximately $138 million face amount of Black Elk Bonds due in December 2015, and Black Elk also had approximately $96 million of accounts payable.  Black Elk's EBITDA for the nine months ended September 30, 2014 was negative $11 million.  (*Id.*)

348.    Even after all but one of Black Elk's operating fields was sold to Renaissance, Platinum Management valued its common equity holdings in Black Elk at $145 million for the month ending August 31, 2014 and valued its holdings in the Black Elk Bonds at or near par (Bixter Decl. Ex. 257 [CTRL5673787]).

349.    The remaining assets of Black Elk were sold to Northstar in early 2015, with Northstar taking over operations in January 2015 due to Black Elk's inability to operate the offshore fields.  As of January 2015, only 1 of the 14 fields acquired by Northstar was operating and Black Elk was losing $2 million a month.  (Bixter Decl. 256 (December 2, 2016 Declaration

of Avery C. Alcorn, submitted in *In re Northstar Offshore Group LLC*, Case No. 16-34028, in the United States Bankruptcy Court for the Southern District of Texas, Dkt. No. 106)).

350.    In late 2015, employees for Golden Gate Oil and Northstar would lament the fact that, due to lack of funding, both companies could not pay trade creditors.  Levy and Nordlicht discussed firing these employees for speaking about the lack of funding through email. Bixter Decl. Ex. 258 [CTRL7262074]).

351.    An involuntary bankruptcy petition was filed against Black Elk in August 2015 in the United States Bankruptcy Court for the Southern District of Texas, which subsequently was converted to a voluntary chapter 11 case in September 2015 (the "**Black Elk Bankruptcy**").  (*See In re Black Elk Energy Offshore Operations, LLC*, Case No. 15-34287 (S.D. Tex.)).

352.    At the time of the Black Elk Bankruptcy, PPVA held approximately $26 Million of Black Elk Bonds, which at all relevant times remained unpaid and at all relevant times Platinum Management valued at or near par, despite the filing of the Black Elk Bankruptcy.   (Bixter Decl. Ex. 259 [CTRL7861220]).

## BEECHWOOD AS ALTER EGO OF PLATINUM MANAGEMENT

### Ownership of Beechwood by Bodner, Huberfeld and Nordlicht

353.    A noted above and as used herein, "Beechwood" refers to a group of affiliated reinsurance companies, , investment management and administrative companies, and reinsurance trusts.  (Bixter Decl. Ex. 260 [BW-SHIP-00000801]).

354.    Beechwood Re ("**Beechwood Re**"), a registered reinsurance company incorporated in the Cayman Islands, provided domestic reinsurance capacity to insurance entities.  (*See* Bixter Decl. Ex. 263 ("**Thomas Tr.**") at 22:25-23:11).   Taylor was the president of Beechwood Re. (Bixter Decl. Ex. 264 ("**Taylor Tr.**") at 623:20-22).

355.     Beechwood Re Holdings, Inc. ("**Beechwood Holdings**") was the holding company for the capital stock of Beechwood Re.  (Bixter Decl. Ex. 260 [BW-SHIP-00000801]).

356.     Beechwood Bermuda International Ltd. ("**BBIL**"), a registered reinsurance company, provided offshore reinsurance capacity to life insurance entities.  (Thomas Tr. 207:18-208:7).  Beechwood Bermuda Limited ("**BBL**"), was as the holding company for BBIL.  (*See* Taylor Tr. 307:19-23).

357.     Beechwood Re Investments LLC, a Delaware series limited liability company (together with the series LLCs, "**Beechwood Investments**"), was the holding company for the preferred stock issued by the reinsurance holding companies, Beechwood Holdings and Beechwood Bermuda Limited.  (Thomas Tr. 349:22-350:6, 455:24-457:3).

358.     B Asset Manager LP and B Asset Manager II LP (collectively, "**BAM**") served as the investment managers for the Beechwood reinsurance companies.  (Thomas Tr. 89:12-22).

359.     BAM Administrative Services LLC was an administrative and loan agent for Beechwood's investments and was a wholly-owned subsidiary of B Asset Manager LP.  (Bixter Decl. Ex. 260 [BW-SHIP-00000801]).   Beechwood, through its investment advisor entities including BAM  and BAM Administrative Services LLC, acted as agents for the Beechwood investment advisory clients such as BRE BCLIC Primary, BRE BCLIC SUB, BRE WNIC 2013 LTC Primary, BRE WNIC 2013 LTC SUB, BBIL ULICO 2014, etc. (collectively the "Beechwood Client Entities") and SHIP in connection with the transactions between and among the Beechwood Client Entities and SHIP on the one hand and PPVA and its subsidiaries on the other hand.  *See, e.g.,* SAC Exs. 46-47.

360.   During the relevant period, each of the affiliated Beechwood entities were beneficially owned, in whole or in part, by the same beneficial owners as Platinum Management, which as set forth above, were Nordlicht, Bodner and Huberfeld:

a. Beechwood Holdings: As of February 15, 2014, nineteen trusts established for the benefit of Nordlicht, Bodner, and Huberfeld family members collectively held an over 92% ownership interest in the non-voting common interests of Beechwood Holdings (collectively, the "**Beechwood Trusts**"). (Thomas Tr. 89:23-90:23; Bixter Decl. Ex. 265 [BW-SHIP-00252594] (Beechwood Holdings Written Consent issuing Beechwood Trust shares)):

   i. Bodner's children held interests in eight of the Beechwood Trusts. Naomi Bodner settled these trusts, and David Bodner was the protector. (Bixter Decl. Ex. 266 [BW-SHIP-001091103]).

   ii. Nordlicht's children held interests in six of the Beechwood Trusts. Dahlia Kalter settled these trusts and Mark Nordlicht was the protector. (*Id.*)

   iii. Huberfeld's children held five of the Beechwood Trusts. Laura Huberfeld settled these trusts and Seymour Huberfeld was the protector. (*Id.*) Seymour Huberfeld is Huberfeld's brother. (*See* Bixter Decl. Ex. 267 ("**Beren, J. Tr.**" at 76:7-10); *see also* Bixter Decl. Ex. 268 [CNOCSL_01558275] (identifying HFF as a contingent beneficiary of the trusts held for the benefit of the Huberfeld children)).

b. BBL: Through trusts established for the benefit of family members, Nordlicht, Bodner, and Huberfeld held roughly 72% of the voting interests of BBL and 40% of the common interests in BBL. (Bixter Decl. Ex. 260 [BW-SHIP-00000801]).

c. Beechwood Investments: Members of the Nordlicht, Bodner, and Huberfeld families, either directly or by and through companies which they owned or controlled, collectively held the majority of the Beechwood Investments' series and thus the majority of the non-voting preferred interests of Beechwood Re and BBIL.

(*See* Bixter Decl. Ex. 261, Adler Ex. 835 [BW-SHIP-00759842]); (*see also* Thomas Tr. 89:23-91:23).

    d.   <u>BAM</u>: Through family members, Nordlicht, Bodner, and Huberfeld held 62% of the Class A income-receiving interests in BAM and 45% of the Class B income-receiving interests in BAM. (*See* Thomas Tr. 81:13-16, 106:5-9; Bixter Decl. Ex. 260 [BW-SHIP-00000801]; Bixter Decl. Ex. 262, Bodner Tr. Ex. 377.88 [BW-SHIP-00835425]). BAM was the investment manager for Beechwood. (*See* Taylor Tr. 97:20-24).

361. The value of these investments was significant; in a June 2016 Ownership Schedule, Beechwood estimated the "family" investment in each of the above companies as follows:

|   | Family | B Asset Manager, LP | B Asset Manager, LP II | Beechwood Re Holdings, Inc. | Beechwood Bermuda Ltd. | Total |
|---|---|---|---|---|---|---|
| 1 | Scott Taylor | 4,072,581.45 | 1,486,663.40 | 10,725,118.95 | 16,500,047.12 | 32,784,410.92 |
| 2 | Mark Feuer | 8,144,918.55 | 2,973,237.60 | 21,449,948.00 | 33,000,094.24 | 65,568,198.40 |
| 3 | David I Levy | 1,221,750.00 | 445,990.10 | 3,217,506.50 | 4,950,014.14 | 9,835,260.74 |
| 4 | Nordlicht | 3,665,250.00 | 1,337,970.30 | 9,652,519.50 | 14,849,317.45 | 29,505,057.25 |
| 5 | Bodner | 3,665,250.00 | 1,337,970.30 | 9,652,520.80 | 14,847,142.58 | 29,502,883.68 |
| 6 | Huberfeld | 3,665,250.00 | 1,337,970.30 | 9,652,519.50 | 14,850,767.37 | 29,506,507.17 |
| 7 | Propper | - | - | 649,866.75 | 1,002,617.10 | 1,652,483.85 |
|   | Total | 24,435,000.00 | 8,919,802.00 | 65,000,000.00 | 100,000,000.00 | 198,354,802.00 |

(Bixter Decl. Ex. 262, Bodner Tr. Ex. 377.88 [BW-SHIP-00835425]).

**<u>Capitalization and Working Capital provided by Bodner, Huberfeld and Nordlicht</u>**

362. Beechwood Investments served as a repository for the series members – which were beneficially owned by Bodner, Huberfeld and Nordlicht – to deposit assets that could be drawn upon by Beechwood. (Thomas Tr. 349:22 – 350:13).

363. The Beechwood Investments series' assets initially consisted of certain of Nordlicht, Bodner, and Huberfeld's partnership interests in funds managed by Platinum Management and its affiliated investment advisers. On August 20, 2013, Beechwood Investments

issued a $100,000,000 Demand Note payable to Beechwood Re (the "**Beechwood Re Demand Note**").  (Bixter Decl. Ex. 269 [CNOCSL_01106560]).

364.    Nordlicht signed the Beechwood Re Demand Note in his capacity as the Manager of N Management LLC ("**N Management**"), which in turn was the Manager of each Beechwood Investments series.  (*Id.* at 3).

365.    On November 30, 2013, Beechwood Investments issued a $75,000,000 Demand Note payable to BBL (as amended, the "**BBL Demand Note**").  (Bixter Decl. Ex. 270 [BW-SHIP-00167404]).

366.    Nordlicht signed the BBL Demand Note in his capacity as Manager of N Management, the Manager of each of the Beechwood Investments series.  (*Id.* at 3).

367.    On April 8, 2014, in response to a request for a clarficiation from the Cayman Islands-based insurance manager for Beechwood Re on the capitalization of Beechwood Re and BBL, Taylor wrote to Feuer and Levy "████████████████████████ (*See* Taylor Tr. 137:18-24; Bixter Decl. Ex. 271 [BW-SHIP-00842927]).

368.    On May 16, 2014, Beechwood Investments amended the Beechwood Re Demand Note to reduce the principal amount to $25,000,000.  (Bixter Decl. Ex. 272 [CNOCSL_01715223]).

369.    Beechwood amended the Beechwood Re Demand Note in order to resolve a "mismatch" in the capitalization of Beechwood Re and BBL.  (*See* Taylor Tr. 139:8-15).

370.    

371.     Entities and individuals associated with Nordlicht, Bodner, and Huberfeld also funded the majority of the working capital for tBeechwood's initial operations, as shown in the April 2014 expense and profitability analysis forwarded by Feuer to Huberfeld:

| BEECHWOOD CASH FLOW ANALYSIS April 30, 2014 | |
| --- | --- |
| MONEY IN | |
| David Levy | 425,000 |
| Monsey Equities LLC | 1,150,000 |
| Lawrence Partners LLC | 1,150,000 |
| Dahlia Kalter + Jerome Management LLC | 1,150,000 |
| Kids Trust $ | 115,780 |
| *Money In as of April 30, 2014* | 3,990,780 |
| | |

(Bixter Decl. Ex. 274, Bodner Tr. Ex. 377.76 [BW-SHIP-00275588]).

### Regular Payments Out of Beechwood to Bodner, Huberfeld and Nordlicht

372.     MSD Administrative Services, LLC ("**MSD**") was a Beechwood related entity that purportedly provided administrative support to Beechwood.  (Taylor Tr. 307:5-15; Adler Tr. 72:13-73:22).

373.     The members of MSD were Feuer, Taylor and Levy. (Bixter Decl. Ex. 275 [CNOCSL_01303526]).

374.     In 2015, MSD and BAM, as "Management Companies", entered into a consulting agreement (the "LMM Consulting Agreement") with Lawrence-Monsey Management LLC ("**LMM**"), whereby LMM was retained as "Consultant":

> engaged to perform certain services for the benefit of [MSD and B Asset Manager] and each of their respective insurance company clients…including, without limitation, evaluating the capital

structure, growth plans new product lines of such Clients, as well as the capital structure and business of portfolio companies within all statutory trusts or otherwise managed by the Clients and/or the Management Companies (collectively, the "Portfolio Companies"), with respect to (a) provision of ongoing advice to each Management Company and the Clients relating to the development and implementation of new product lines, (b) ongoing assistance to each Management Company and the Clients to identify alternative credit sources, (c) ongoing guidance as to enhancements and improvements that may be made to Portfolio Companies, (d) ongoing guidance on optimization of credit based strategies relating to Portfolio Companies, (e) ongoing guidance to help identify potential realization and sale opportunities relating to Portfolio Companies, (f) ongoing monitoring of performance of the Portfolio Companies, and (g) such other services as may be reasonably agreed by the parties hereto.

(Bixter Decl. Ex. 276 [BW-SHIP-00655513]).

375. The LMM Consulting Agreement provided that LMM receive $335,000 in monthly compensation. (*Id.*).

376. In total, LMM received over $1.9 million from MSD and B Asset manager and distributed that money on a monthly basis to Lawrence Partners, Monsey Equities, and Dahlia Kalter. (Bixter Decl. Ex. 27 [LP000025]; Bodner Tr. 311:8-312:19).

377. Jessica Beren, Murray Huberfeld's daughter, and managing member of LMM signed the LMM Consulting Agreement on behalf of LMM. (Beren J. Tr. 114:2-7; *see also* Bixter Decl. Ex. 279 [BW-SHIP-00655513]).

378. LMM was a partnership between Lawrence Partners and Monsey Equities. (Beren, J. Tr. 113:2-4).

379. The members of Lawrence Partners were the Huberfeld children: Jessica Beren, who also served as Managing Member, and her siblings. (Bixter Decl. Ex. 278 [B000320288]; Beren, J. Tr. 16:16-17:8).

380.    The members of Monsey Equities were the eight Bodner children (ranging from 25 to 40 as of December 2019): Moshe Bodner, Aaron Bodner, Eliezer Bodner, Tzipporah Rottenberg, Rochel Fromotitz, Yissochar Bodner, Yaakov Bodner, Mordechai Bodner, with Naomi Bodner serving as a non-member manager.  (Bixter Decl. Ex. 279 [CTRL6400166]; *see also* Bodner Tr. 449-2:15; Bodner, N. Tr. 14:20-16:17).

381.    Bodner testified that he "got a check from Beechwood every month."  (Bodner Tr. 312:9-16.)  This payment amounted to roughly $100,000 a month.  (*Id.* at 312:17-19; 383:6-11; 446:18-447:9).  According to Bodner, "while Beechwood was alive, we were getting, I think, $100,000 a month, my family.  I don't know if it was every month, but that's what I received."  (*Id.* at 381:10-22).

### Early Concept for Reinsurance

382.    In July 2012, Nordlicht forwarded a Bloomberg article concerning a reinsurer to Huberfeld, Landesman and other employees of Platinum Management, including Ed Ho ("**Ho**"), asking "Shd we be looking at this?"  (*See* San Filippo Tr. 155:6-11).  Platinum Management began searching for a reinsurance partner.  (*See* SanFilippo Tr. 155:25-156:6).

383.    Kerry Propper formed and served as co-CEO of Chardan Capital Markets ("**Chardan**"). Jack Liu ("**Liu**") was an analyst at Chardan.  (Propper Tr. 19:16-20)).

384.    Propper introduced Platinum Management to the "concept of a reinsurance company." (*Id.* at 48:19-22)  Propper "came up with an idea to do a creative reinsurance company with Mark Nordlicht, period.  That's what I did." (*Id.* at 57:10-13).

385.    In late 2012, Huberfeld contacted Feuer to explain a transaction proposed by Alpha Re and to solicit Feuer's assistance in understanding the insurance industry.  (Bixter Decl. Ex. 280

("**Feuer Tr.**") at 27:18-25, 29:20-30:4; Taylor Tr. 226:6-10).  Nordlicht approached Feuer about a meeting with Alpha Re.  (*Id.*).

386.    Nordlicht brought his "pitch and risk guy" to the Alpha Re meeting to both "evaluate them" and "make [Alpha Re] more comfortable."  (Bixter Decl. Ex. 281 [CTRL3508484]).

387.    On December 2, 2012, Nordlicht requested Landesman for a "fund pitch PPVA, PPCO, and one off's.  This is to make reinsurer comfortable with our product.  Potentially we can get 5 bucks to manage for every 1 dollar in equity we put up.  We are talking 250 for 50 in equity. The equity we put up we will try and negotiate for its return to track our performance of where we invest the money."  (Bixter Decl. Ex. 282 [CTRL3508861]).

388.    ███████████████████████████████████████████████████████
████████████████████████████████████████   (Bixter Decl. Ex. 283, SanFilippo Tr. Ex. 1.27(A) [BW-SHIP-009019645]; Huberfeld Tr. 247:10-16).

389.    ██████████████████   (Bixter Decl. Ex. 283, SanFilippo Tr. Ex. 1.27(A) [BW-SHIP-009019645]).

390.    Between 2012 and 2013, Feuer, Taylor, and Nordlicht met with Alpha Re on at least one occasion.  (Feuer Tr. 28:2-18, 30:5-11, 31:4-7).

391.    During the late 2012- early 2013 time period, Nordlicht started consulting with Feuer about what became Beechwood.  (Feuer Tr. 43:13-16).  Feuer knew Nordlicht served as the Co-Chief Investment Officer of Platinum Management.  (*Id.* at 43:24-44:3).

392.    On December 12, 2012, Liu sent Nordlicht, Mark Graham ("**Graham**"), the principal of Blue Alternative Asset Management ("**Blue Alternative**"), Propper, and Levy a term

sheet for a "$25 million Alpha Re. note offering."  (Bixter Decl. Ex. 284, Propper Tr. Ex. 714 [CTRL3467125]).

393.  On December 18, 2012, Feuer, using the email address mfeuer@beechwoodcapitalgroup.com, emailed Nordlicht and Huberfeld:



(Bixter Decl. Ex. 285, Taylor Ex. 319 [CNOCSL_00472136]).

394.  On December 27, 2012, Chardan, Nordlicht, and Levy sent emails with the subject line "Alpha Re Terms" (the "**December 2012 Term Sheet**").  (Bixter. Decl. Ex. 286, SanFilippo Tr. Ex. 1.26(B) [CTRL3320780]).

395.  The December 2012 Term Sheet defined "Investors" as "Platinum Partners and Qualified Institutional Buyers/Accredited Investors" and provided, *inter alia*¸ that the "Capital Allocation" would involve (*id.* at 2):

> Platinum Partners and [Blue Alternative] will each independently manage the investment of the Reinsurance Proceeds in various Trust Accounts settled for benefit of the Reinsurance Contracts
>
> i)   Platinum Partners will manage the investment of 50% of the Reinsurance Proceeds plus the Proceeds from the Series B note (the "Platinum Portfolio")
>
> ii)  [Blue Alternative] will manage the investments of 50% of the Reinsurance Proceeds …."

396.  The December 2012 Term Sheet granted Platinum Management a 2 percent "Management Fee" and 20 percent "Incentive Fee."  (*Id.*)

397.    On January 25, 2013, Feuer reiterated to Nordlicht that ████████████ ██████████████████████████████████████████████████ Bixter Decl. Ex. 287, SanFilippo Tr. Ex. 1.27; [CNOCSL_01573925]).

398.    Nordlicht responded: ████████████████████████████ ██████████████████████████████████████ (*Id.*)

399.    On February 22, 2013, Liu sent Nordlicht, Levy, and Propper an "overview and draft transaction process for the AlphaRe Investment.  (Bixter Decl. Ex. 288, SanFilippo Tr. Ex. 1.26(D) [CTRL4425478]).  "As you have requested we are targeting a March 1 closing we have created an aggressive timeline."  (*Id.*)

400.    According to Liu, the "immediate action items" included "[e]ngage your insurance expert team for business diligence on Alpha Re."  (*Id.*)  Platinum Management <u>hired</u> Taylor and Feuer to conduct due diligence on the deal. (Bixter Decl. Ex. 224, CTRL4511292)

401.    Liu attached a presentation titled "Alpha Re. Platinum Investments Process Summary" (the "**Alpha Re Summary**").  (Bixter Decl. Ex. 228, CTRL4425479).

402.    The Alpha Re Summary assigns "Platinum Partners" the role of "Investors" and characterized its responsibilities as "Invests in AlphaRe and receive insurance proceeds."  (*Id.*). The Alpha Re Summary set forth a timeline wherein, on March 1, 2013, Alpha Re "receives $30 million investment capital and Platinum obtains the right to manage an initial $100 million capital simultaneously."  (*Id.*)

403.    Nordlicht forwarded the Alpha Re Summary to Huberfeld.  (Bixter Decl. Ex. 289, Huberfeld Tr. Ex. 649 [CTRL4555755]).

404.    According to Nordlicht,"[w]e will have feur and his partner doing separate insurance due diligence."  (*See* Bixter Decl. Ex. 290, SanFilippo Tr. Ex. 1.27(C); *see also* Propper Tr. 40:23-41:2).

405.    On February 25, 2013, Levy forwarded Feuer an "AlphaRe Platinum Termsheet" which described the ████████████ between Platinum Management and Blue Alternative as follows:



(Bixter Decl. Ex. 291, Feuer Tr. Ex. 537 [BW-SHIP-00919613]).

406.    The "████████████ granted Platinum Management a 2 percent "Management Fee" and 20 percent "Incentive Fee."  (*Id.*)

407.    On the next day, February 26, 2013, Alpha Re and Beechwood Capital executed an NDA.  (Bixter Decl. Ex. 292, Feuer Tr. Ex. 539 [BW-SHIP-00918340]).

408.    On March 4, 2013, Fred Marro ("**Marro**"), who consulted in the creation of Beechwood, forwarded Levy and Ottensoser, among others, a set of "Notes & Questions" concerning Alpha Re that described "Platinum Partners" as the "investor."  (Taylor Tr. 40:7-16;) Marro asked Levy to forward this information to Taylor.  (Bixter Decl. Ex. 293, SanFilippo Tr. 1.28(A) [CTRL44277832]).

409.    On March 5, 2013, Alpha Re provided due diligence information to Platinum Management.  (Bixter Decl. Ex. 294 [CTRL4366772]).

410.   On March 7, 2013, Taylor provided an analysis of multiple insurance transactions to Levy, Feuer, and Kalter.  (Bixter Decl. Ex. 295, Thomas Tr. Ex. 859 [CTRL4545157]).

411.   On March 10, 2013, Nordlicht described to Huberfeld an intended use of the liquidity expected from the reinsurance:

> I want to set an aggressive goal for April 1 of 50 million subs for fund.  **I believe I have 25 raised through alpha re**.  We need to raise another 25 in addition to 25 for Black elk drilling … Please, we need to push hard for this.  I need to this tie me over until Bear settlement and we have one month funding of up to 50 million for congestion trading in April.

(Bixter Decl. Ex. 296, Huberfeld Tr. Ex. 650 [CTRL4401044]).

### Formation of Beechwood

412.   The Alpha Re transaction ultimately faltered.  Discussions concerning what became Beechwood occurred simultaneous to the aborted Alpha Re Transaction and accelerated soon thereafter.  (Bixter Decl. Ex. 297 [CTRL4407018]; *see also* Propper Tr. 47:20-22).  When Kerry Propper complained that they had stolen his idea viz. Alpha Re, he was given an ownership interest in Beechwood (and Kerry Propper had only dealt with Platinum).  (Propper Tr. at 47:25 to 51:3)

413.   On March 20, 2013, Huberfeld proposed to Feuer, in an email entitled "Outline of terms,"  the structure for the reinsurance company they were to create. (Bixter Decl. Ex. 298, Taylor Ex. 277 [CNOCSL_00470701]).

414.   These"Outline of terms" proposed that:

> 1 - Nordlicht group to put any capital necessary to secure funds
> 2 - Capital to receive 8 percent preferred return
> 3 - Capital to be returned and preferred to be re paid before any profit split
> 4 -  Feuer group to receive 750k a year in draws(deducted from their profit split) after 100 million in funds deployed
> 5 -  Feuer group to run instance end
> 6 - Nordlicht group will run the investment allocation   side
> 7 - all profits split 50-50 to each group (After paying back the original capital )

> 8 - Nordlicht group to retain all fees generated by investments in Platinum funds

(*Id.*).

415.   The "Nordlicht group" mentioned in the "Outline of terms,"  referred in part to entities and individuals affiliated with Nordlicht, Bodner, and Huberfeld.  (Taylor Tr. 24:25-25:18).

416.   Bodner was sent the "Outline of terms."  (Bixter Decl. Ex.299, Huberfeld Ex. 653 [CTRL3748840]).

417.   Feuer responded to the "████████████████████████████ ████████████████████ (*Id.*). Feuer forwarded his email to Taylor.  (Bixter Decl. Ex. 300, Taylor Tr. Ex. 320 [CNOCSL_00474299]).

418.   On March 25, 2013, Feuer expressed gratitude to Huberfeld for the opportunity to work together.  (Bixter Decl. Ex. 301 [CNOCSL_01574200]).

419.   The formation of Beechwood also involved Bodner and Nordlicht.  (Propper Tr. 216:16-25; *see* Feuer Tr. 136:3-12).

420.   On April 8, 2013, Nordlicht asked Levy "So has feur started?"  (Bixter Decl. Ex. 302 [CTRL4537542]).  Levy responded "Yes.  I spoke to him last Friday they meet lawyers and brokers on Friday.  They want to have a call this week to get set up and decide on structures." (*Id.*) Nordlicht responded: "Ok we shldnt need to do all that fixed income, graham doesn't do it." (*Id.*)

421.   Levy responded:  "They said we can be up and running in 90 days." (*Id.*)

422.   On April 27, 2013, Taylor sent Levy an email, attaching a "Beechwood Re" overview presentation describing the proposed structure and investment objectives.  (Bixter Decl. Ex. 303, Taylor Tr. Ex. 278 [CTRL4437666]).

423.    On May 27, 2013, at Huberfeld's request, Crystal O'Sullivan, using a beechwoodcapitalgroup.com email address, scheduled a meeting at Huberfeld's home to be attended by Nordlicht, Levy, Feuer, and Taylor.  (Bixter Decl. Ex. 304 [CNOCSL_01574382]).

424.    On May 30, 2013, Levy emailed Nordlicht a proposed term sheet for "beechwood." (Bixter Decl. Ex. 305, Feuer Tr. Ex. 540 [CTRL4456678]).  This term sheet defined "Company" as "Beechwood Re" and "Investor" as "an entity controlled by David Levy."  (*Id.*) The "Company Structure" required Levy to "provide investment expertise" and granted him "the right to invest all proceeds of Reinsurance Transactions at his sole discretion."  (*Id.*)

425.    On June 10, 2013, Feuer sent a Beechwood Re Overview presentation to Huberfeld for his review.  (Bixter Decl. Ex. 306 [CNOCSL_01574521]).

426.    On July 4, 2013, after Feuer reported to Nordlicht on the status of obtaining a license for Beechwood Re in the Cayman Islands, Nordlicht told Feuer and Taylor that "I feel as if we just need to close one deal and floodgates can open."  (Bixter Decl. Ex. 307, Taylor Tr. Ex. 280 [CTRL4579275]; *see also* Taylor Tr. 51:16:52-5).

427.    On July 5, 2013, upon learning of the provisional approval of a license   for Beechwood Re, Feuer emailed Nordlicht with the text "Mazal tov!!" (Bixter Decl. Ex. 308, Feuer Ex. 519 [CTRL3711204]).  Nordlicht responded "we'll hold back the real mazel tov until we close the first deal," to which Feuer sent back "Agreed."  (*Id.*)

428.    During the formation of Beechwood, as well as between June 2013 and March 2014, Taylor and Feuer worked from the office of Platinum Management.  (Taylor Tr. 268:13-19, 275:9-14, 276:3-277:14).  Taylor estimated he spent between 25 and 50 work days at the offices of Platinum Management.  (*Id.* at 278:8-19).  To that end, on July 29, 2013, Levy requested

conference rooms for Taylor ███████████."  (Bixter Decl. Ex. 309, Taylor Ex. 322 [CNOCSL_00475255]).

429.     Between June 2013 and March 2014, Taylor "spent a considerable amount of … time on the formation of the Beechwood companies."  (Taylor Tr. 276:3-8]).  Beechwood's first client, CNO Financial Group, was brought to Platinum Management's offices for meetings, and the primary topic was "continuity" of investment strategy.     (Bixter Decl. Ex. 405 [CNOCSL_00480329]).

**Platinum's Use of Beechwood Funds**

430.     Prior to its creation, Platinum Management envisioned Beechwood as a potential source of liquidity for Platinum Management's investments.     (Bixter Decl. Ex. 310 [CTRL6520419]).

431.     As described by Nordlicht, Beechwood would be a cash cow for Platinum Management:

> We have mandate from a reinsurance company which we hope will be helpful to us going forward – certainly from a liquidity standpoint. They are 900 million – it is not part of aum because it isn't a traditional 2 and 20 type mandate. Mark is involved as an advisor in advising that money. Some of that money is invested in the fund.  Going forward there are opportunities if the fund has an opportunity and we want to lay off one of our lower yielding fund, based on their mandate that could be an opportunity for us to take advantage of this big pocket of money which Mark helps to advise and has a partial ownership. He expects them to grow as an investor in the fund. It helps us be more liquid throughout the portfolio if we ever want to sell a fund. Our edge is in structuring transactions. We feel the day we close on a transaction it is liquid we can sell to a competitor – the next day – at the price we paid for it. Now we have a ready made pocket of money where we can do that.

(*Id.*)

432.     As Levy explained to Nordlicht in a May 16, 2014 email entitled "████████



(Bixter Decl. Ex. 312 [BW-SHIP-00968908]).

433.     These investment requirements, which came from both regulation and client specific rules, were given to Bodner and Huberfeld as well.     (Bixter Decl. Ex. 313 [CTRL5178784]) (Bodner being provided blended "Beechwood position limits."); *see also* Bixter Decl. Ex. 314, Huberfeld Ex. 678 [BW-SHIP-00975449]).

434.     Taylor took "█████████████████████████████████ █████████████████████████████████ (Bixter Decl. Ex. 314, Huberfeld Ex. 678; [BW-SHIP-00975449]).

435.     The private deal summary was a Nordlicht requested tracking sheet of Platinum's "availability" in the "unrestricted" accounts.  (Bixter Decl. Ex. 315 [CTRL5051762]).

436.     Nordlicht requested that the tracking sheet allocate between investments he made versus investments made by "HB" using the unrestricted accounts:

> Can I get weekly report of all senior secured beechwood loans and remaining availability? I know it might be in one of larger reports but want to see it separately. Senior secured availability shall be defined by guidelines of the trust PLUS 50% of the unrestricted money. In addition, **please label on the bottom 2/3rds one third HB and MN. Right now this number will correspond exactly. However, based on new arrangement, I may be investing money that will only be credited for my account and vice versa. It would help then to see remaining availability broken out by HB and MN**. Should investments deviate, it will be necessary to track p and l on this basis as well.

(*Id.* (emphasis added)).

437.    This tracking sheet turned into a " ████████████████████████

provided to Nordlicht.   (Bixter Decl. Ex. 317 [BW-SHIP-00987438 – BW-SHIP-00987439];

Bixter Decl. Ex. 316 [CNOCSL_01031267 – CNOCSL_01031268]).

438.    Platinum Management also established a threshold investment requirement; as

described in a September 2014 agreement between Nordlicht and Levy:



Beechwood shall invest 5% of its capital into each PPVA and PPCO

(Bixter Decl. Ex. 318 Feuer Ex. 567 [CNOCSL_01191461]; *see also* Bixter Decl. Ex. 319 [BW-

SHIP-00262450]).

439.    This control was made possible by access to accounts containing Beechwood's

"unrestricted" funds:

> Need to talk today. All my liquidity is at Beechwood. I want to get
> started at Beechwood as the money is costing me so I really want to
> allocate. We are in the midst of setting up accounts at several prime
> brokers in accounts unrelated to trusts. We have unrestricted money
> that is closing by end of month I'm told. We can wait for that and
> we'll be at bnp, scotia or cs with full capabilities or we can get
> started at nomura now in trust accounts. I'm thinking 200x200 on
> Beechwood to start.

(Bixter Decl. Ex. 320 [CTRL6133591]; *see also* Bixter Decl. Ex. 321 [BW-SHIP-00729423]).

440.    Nordlicht pushed Levy, Taylor, and Feuer to get Platinum Management personnel set up with prime brokerage accounts for the "unrestricted" funds: "can we be all over this? Want to get started seamlessly when money comes in")  (*Id.*).

441.    On June 23, 2014, the same date that certain Black Elk Bonds (defined below) were sold from PPVA to Beechwood as part of the Black Elk Scheme (defined below), Nordlicht pressed again to get the prime brokerage accounts established: "████████████████████████ ███████████████████████████████████████ (Bixter Decl. Ex. 322 [BW-SHIP-00944081]) (access to account granted that day).

442.    Platinum Management's involvement in Beechwood's investment allocations was evident from the beginning. (Bixter Decl. Ex. 323, Taylor Ex. 282 [CTRL46333183] (Taylor thanking Nordlicht in August 2013 for his assistance with formulating Beechwood's investment guidelines)).

443.    Nordlicht and Levy participated heavily in the early discussions about the management, composition and proposed allocation for specific assets, including the assets provided by subsidiaries of CNO Financial Group, Inc. ("**CNO**"). (Bixter Decl. Ex. 324 [CTRL4826099]).

444.    In November 2013, Taylor solicited Nordlicht's input on whether they would be "giving the real estate and [CNO] buckets and allocation? How much?" and "Are we going to use a 3rd party for a little while, or expect Leff, David and Israel to manage $300 M for us?" to which Nordlicht declared that "our internal people [Leff, Levy, and Wallach] will manage the balance 40 percent." (*Id.*)

445.   Nordlicht reviewed Beechwood's proposed asset allocations with Huberfeld and Bodner, as seen, for example, in a February 2014 email from Nordlicht to Huberfeld and Bodner (through assistant).  (Bixter Decl. Ex. 325 [CTRL5167620]).

446.   Nordlicht sought advice from Huberfeld as to whether the particular investment should be allocated to Beechwood.  (*See, e.g.*, Bixter Decl. Ex. 63 [CTRL5966780]).

447.   The overlap between Platinum Management and Beechwood, as well as Bodner and Huberfeld's involvement in both, was evident in discussions with their investing and industry partners, for example in an email to Bodner (through his assistant), Huberfeld and Nordlicht, Mark Edelstein of Auramet proposed a "pipeline" of deals:



(Bixter Decl. Ex. 326 [BW-SHIP-00909732] (Huberfeld forwarded this email to Levy and Feuer with the annotation "Pipeline with reduced fees") (emphasis added); *see also* Bixter Decl. Ex. 327 [CTRL5185263] (OBEX proposal addressed to "David and Murray" regarding "manag[ing] funds for Beechwood in both the short dated monthly and quarterly reset Small Business Administration pools and whole loan paper.")).

448.   Huberfeld was significantly involved in Beechwood's investment development; as Saks testified:

> Murray Huberfeld introduced investment opportunities to Beechwood, numerous investment opportunities to Beechwood, and on occasion pushed for investments to be made.

(Saks Tr. 175:4-178:21).

449.     Beechwood abided by Huberfeld's investment directives, even when Saks, Taylor or Feuer disapproved. (*Id.*)

450.     For example, upon learning of Huberfeld's instruction to provide another $1 million to China Horizon, Taylor responded ███ yet nonetheless instructed Saks to comply with Huberfeld's request to fund the loan. (*Id.*; Bixter Decl. Ex. 328, Saks Ex. 49 [BW-SHIP-01094505]).

451.     Huberfeld-sourced loans were pushed through even without appropriate process, as was the case with a loan related to a short term investment involving Jona Rechnitz ("**Rechnitz**"). (Bixter Decl. Ex. 329, Thomas Tr. Ex. 884 [CNOCSL_01581988]).

452.     In April 2015, Huberfeld agreed to provide $1.1 million loan alongside a similar investment by Rechnitz to National Event promoter Jason Nissen for the Floyd Mayweather fight. (*Id.*).

453.     Huberfeld flipped the wire instructions to Feuer, who then directed Beechwood employee Samuel Adler (a relative of David Bodner) that they were ████████████ ████████████ (*Id.*).

454.     Adler was surprised by the direction noting "[████████████ ████████████ but after speaking to Feuer on the phone responded:

████████████████████████ ████████████████████████ ███ ███ ████████████████████████ of Beechwood managed assets, as described by Saks during his deposition.  (Saks Tr. 181:19-182:17).

456.     Examples of Bodner's involvement in sourcing and evaluating investments for Beechwood managed assets include, *inter alia*:

a.  Nordlicht directing a Platinum Management Portfolio Manger to "go see David Bodner directly to discuss seeding idea given that funding wd need to be Beechwood." (Bixter Decl. Ex. 330 [CTRL6070137]).

b.  Platinum Management employee seeking an appointment with Bodner because he had been "speaking with Mark about possibly getting an allocation from Beechwood and Mark suggest he meets with Mr. Bodner." (Bixter Decl. Ex. 331 [CTRL5883850])

c.  Richard Stadtmauer telling Beechwood counsel to ███████████████████ ████████████ (Bixter Decl. Ex. 332 ALB0000277]).

457.  Bodner was also involved in setting up meetings with potential investors in Beechwood, including a meeting with the Kushner Companies. (Bixter Decl. Ex. 333 [BW-SHIP-00917364]) (Beechwood vice president sending marketing materials to Charles Kushner with note ███████████████████████████████████████████████████ ████████████████████

## Investment Oversight and Control

458.  As explained by Nordlicht, even if the investment was sent to Beechwood in whole or in part, the transaction still was viewed as within the control of Platinum: "The issue is besides Platinum we have reinsurance mandate and I'd like to split it among entities, though all controlled by us." (Bixter Decl. Ex. 334 [CTRL6321906]).

459.  The control was made possible in part because of the overlap in portfolio managers; as Ezra Beren explained:

> David Steinberg and Ezra Beren are portfolio managers for Platinum Management (NY), LLC (PMNY). PMNY is the investment advisor for multiple funds including its two flagship funds Platinum Partners Value Arbitrage Fund, LP (PPVA) and Platinum Partners Credit Opportunities Fund, LP (PPCO).
>
> Some of the principals of PMNY are also shareholders of a second investment company named B Asset Manager/Beechwood Re, which provides asset management for insurance companies.

> Often, investement opportunities brought by PM's of PMNY may
> not fit the investement parameters of PPVA or PPCO, and PMNY
> may refer the opportunity to Beechwood. The compensation terms
> for PM's are the same for investements taken by PPVA, PPCO and
> Beechwood. So in essence Steinberg and Beren are PM's for PPVA,
> PPCO and Beechwood. Same principals, just different sources of
> capital.

(Bixter Decl. Ex. 335, Beren Tr. Ex. 1.22 [CTRL8802198]).

460.    Nordlicht echoed this, stating "The portfolio managers are the same!!! Hence the management is the same in my mind!!! Was this communicated to cs??  There is cross ownership in both entities. We are being treated from regulatory standpoint as affiliates, we might as well get credit for it administratively."  (Bixter Decl. Ex. 336, Thomas Tr. Ex. 872).

461.    The overlap of the portfolio managers was present from the beginning: on November 4, 2013, Nordlicht sent Feuer a list of six items for a "███████████  for a meeting with potential Beechwood investor, CNO.   (Bixter Decl. Ex. 337, Thomas Tr. Ex. 863 [CNOCSL_01576140]).

462.    Included in the proposed agenda was an introduction to David Leff, Israel Wallach, Stuart Kim, and David Ottensoser, all of whom were Platinum Management employees and who were to provide support to and manage the assets of Beechwood.  (Bixter Decl. Ex. 337, Thomas Tr. Ex. 863 [CNOCSL_01576140]; Bixter Decl. Ex. 324 [CTRL4826099]).

463.    In addition to portfolio managers, executives like Levy also wore two hats, one Platinum Management and one Beechwood.  (Bixter Decl. Ex. 338 [BW-SHIP-00454912] (Levy sending his list of things to do which included "████████████████████████████ tasks)).

464.    Levy's task list included a reminder for Levy to "███████████████████ [David Bodner]."  (*Id.*)

465.    Bodner, along with Huberfeld and Nordlicht, met regularly with other senior Beechwood executives, including Taylor and Feuer.  (Bixter Decl. Ex. 339 [BW-SHIP-00909041] (2014 "███████████████████ Bixter Decl. Ex. 340 [BW-SHIP-00909197]) (all-hands meeting immediately prior to decision on Black Elk Consent Solicitation)).

466.    In fact, Huberfeld had an office at Beechwood with a direct phone line and a secretary who managed his calendar, arranged meetings, and answered his calls.  (Northwood Tr. 12:4-13:3; Bixter Decl. Ex. 341 [CTRL5714383]; Bodner Tr. 152:17-153:9).

467.    Huberfeld was in his Beechwood office multiple times a week to discuss Beechwood's transactions and potential investments.  (Saks Tr. 111:24-112:7, 116:6-117:5; Bixter Decl. Ex. 342 [BW-SHIP-00909978]).

468.    Huberfeld met with Saks and received regular updates regarding Beechwood's operations; requesting and receiving regular in-depth reports as to the company's operations and investments from Saks.  (Bixter Decl. Ex. 343, Saks Ex. 446.27 [CNOCSL_01067250]; Saks Tr. 117:16-118:7, 183:15-184).

469.    Huberfeld received daily reports regarding Beechwood's P&L.  (Bixter Decl. Ex. 344 [BW-SHIP-01050099] (Huberfeld's assistant stating "███████████████████ ██████); Bixter Decl. Ex. 345 [AN016013] (example of P&L provided)).

470.    Huberfeld regularly was emailed a list of Beechwood's outstanding investment interest payment balances, which included interest funded or paid directly by PPVA.  (Bixter Decl. Ex. 346 (compilation of "outstanding balance" reports sent to Huberfeld)).

471.    Huberfeld was regularly solicited for advice or otherwise injected his position on ongoing investment decisions for Beechwood, for example:

  a.  Feuer soliciting advice from Huberfeld regarding PEDEVCO debt restructuring. Feuer Ex.  (Bixter Decl. Ex. 347 [BW-SHIP-00729216]).

    b.   Feuer seeking to discuss with Huberfeld significant litigation concerns at the China Horizon investment.  (Bixter Decl. Ex. 348, [BW-SHIP-00729221]).

    c.   Huberfeld shutting down a deal between Beechwood and OBEX, stating "Today is the last day for continued work on Randy's deal. Either he agrees to the terms or we are done, done, done today. That's it. No more discussions. Either we are done today or let's part with him as friends."  (Bixter Decl. Ex. 349, Saks Ex. 446.62 [CNOCSL_01532381]).

472.    Saks testified that Huberfeld "could push for things" and Saks could not recall an instance where one of Huberfeld's requests was denied.  (Saks Tr. 119:24-120:19).

473.    Bodner similarly was consulted regarding investment strategy for Beechwood, for example in an email addressed to "███████████████ Bodner was consulted about options for capital requirements of the San Gold investment.  (Bixter Decl. Ex. 350 [ALB0000231]).

474.    In another example, Bodner is seen dictating terms of various transactions for Beechwood.  (See Bixter Decl. Ex. 40, Bodner Tr. Ex. 377.34, CTRL4919566).

475.    In August 21, 2014, Brian Jedwab ("**Jedwab**") sent "deal summaries" to Nordlicht and Levy, which included a proposed investment by certain Beechwood Trusts via Amlaur Resources, LLC ("**Amlaur**") as agent (the "**Amlaur Proposal**").  (Bixter Decl. Ex. 351 [CTRL4918909]; Bixter Decl. Ex. 352 [CTRL4918911]).

476.    According to Jedwab, the Amlaur Proposal was "negotiated at length based on input from [David Bodner] and [Murray Huberfeld], and they approved [it]."  (See Bixter Decl. Ex 351 [CTRL4918909]).

477.    On September 8, 2014, certain Beechwood Trusts, as Lenders, and Amlaur, as Agent for the Lenders, entered into a Loan and Security Agreement that incorporated the relevant terms of the Amlaur Proposal.  (Bixter Decl. Ex. 353 [BW-SHIP-00273480]).

478.    For purposes of this transaction, "Amalur is on the Beechwood side, it is theirs and Amalur collects and distributes their cash."  (Bixter Decl. Ex. 354 [CNOCSL_00226596]).

479.     Nordlicht also had an office physical presence at Beechwood for a period of time, but his presence at Beechwood was not to be disclosed to outsiders.  (Bixter Decl. Ex. 355 [CTRL5104415] ("David Levy asked me to make sure that you all know not to tell people that Mark is at Beechwood unless you know them, or it is an internal call.  There is a Chinese wall between Beechwood and Platinum and for certain things it is crucial that the entities don't cross.")).

480.     In December 2015, Beechwood needed $11 million in connection with a transaction.  (Taylor Tr. 311:21-313:21)

481.     Lawrence Partners, Monsey Equities, and Dahlia Kalter provided funding for the December 2015 transaction. (*Id.*; *see also* Bixter Decl. Ex. 356 [LP000016]; *see also* Beren, J. Tr. 108:5-110:22).

482.     On January 5, 2016, Feuer approved wires fromMSD to repay the funding for the December 2015 transaction with $5,000,000 sent to Lawrence Partners, $5,000,000 sent to "Monsey Equities LLC/David Bodner" $1,000,000 sent to Dahlia Kalter. (Bodner Tr. 316:19-317:8).

### Hiring and Appointment of  Key Personnel, Managers, and Employees

483.     Nordlicht told Taylor and Feuer in early 2013 that he did not want a "stranger who I haven't worked with before on the [Beechwood] investment committee.  If the committee is to have real power, which based on our guidelines it does, I might need people I have worked with in the past."  (Bixter Decl. Ex. 357, Thomas Tr. Ex. 864 [CTRL4844810]).

484.     Nordlicht and Huberfeld discussed candidates for the position of Chief Operating Officer of BAM. (Bixter Decl. Ex. 358 [CTRL6093660] (Nordlicht informing Huberfeld "I'm thinking of offering randy katzenstin to be chief operating officer of b asset management… He is

pain in the ass but very mesudar, will be very strong with prime brokerages, setting up accounts, tracking all the different regulations to make sure we don't violate a particular state statute, and having everything ready reporting wise...is very commercial too. We need help, otherwise we will drown in paperwork."); *see also* Bixter Decl. Ex. 359 [CTRL6113982] (Nordlicht reporting back to Katzenstein "On positive front, I mentioned u coming over and Murray didn't bite my head off!!!")).

485.    On April 28, 2014, Nordlicht informed Feuer of the need for a transactional attorney at Beechwood.  (*See* Bixter Decl. Ex. 360, Taylor Ex. 310 [BW-SHIP-01003980]).  Feuer responded "[a]s we discussed, we will have some recommendations to you ASAP."  (*Id.*)

486.    Huberfeld participated in the recruitment of Dhruv Narain, who ultimately became the President of BAM.  (Bixter Decl. Ex. 361 [AN006435]).

487.    Bodner and Huberfeld family members also worked at Beechwood. (Bodner Tr. 23:11-22) (Bodner arranged for the hiring of his nephew, Samuel Adler, at Beechwood); Bixter Decl. Ex. 362 [AN000095] (Huberfeld's son was hired at Beechwood)).

## Compensation Decisions

488.    Huberfeld was responsible for negotiating draws for Taylor and Feuer, as evidenced by Feuer approaching Huberfeld in March 2014, in a lengthy email, seeking permission to adjust the salary draws for himself and Taylor, noting that "[█████████████████████████████ ███████████████████████████  (Bixter   Decl.   Ex.   363,   Huberfeld   Tr.   Ex.   673 [CNOCSL_01578961]).

489.    Beechwood portfolio Manager David Leff went to Huberfeld seeking to discuss Leff's evaluation and benchmark for his compensation contract, with a copy to Taylor and Feuer. (Bixter Decl. Ex. 364 [BW-SHIP-00910667]; *see also* Bixter Decl. Ex. 365 [CNOCSL_01120610]

(additional communications between Leff and Huberfeld, with a copy to Taylor and Feuer, in which Leff agrees with Huberfeld that the ████████████████████████████████ ████████████████████████████████).

490.    Nordlicht also was involved in managing personnel at Beechwood.  For example, he noted on a to-do list that he needed to ████████████████████████ and later negotiated those former Platinum Management employees' start date and set Kim's salary at Beechwood.  (*See* Bixter Decl. Ex. 366 [BW-SHIP-01012084]; Bixter Decl. Ex. 367 [BW-SHIP-00914729].

491.    Platinum Management also subsidized salaries of personnel primarily supporting Beechwood, as Rick Hogdon disclosed:

> (1)  I am currently on the Platinum payroll
> (2)  Spend 85% of my time at the Beechwood offices in NY and Bermuda/Cayman
> (3)  Services to Platinum/Beechwood see attached position description
> (4)  Providing services to Beechwood from Platinum is 90%

(Bixter Decl. Ex. 368 [CTRL6504609]).

## THE BLACK ELK SCHEME AND THE BOND SUBORDINATION

492.    PPBE Management LLC was the investment manager for the BEOF Funds.  David Levy was the Managing Member of PPBE Management LLC. (Bixter Decl. Ex. 92, Bodner Tr. Ex. 377.62, [CTRL3679394]).

493.    Manor Lane Management LLC, an entity owned and controlled by Huberfeld, through it interest in the David Levy Grantor Trust III, was a beneficial owner of and received payments from PPBE Management LLC and PPBE Holdings LLC. (Huberfeld Admissions #92, 94, 97, 98, 99; Bixter Decl. Ex. 93 [CTRL3710417] (Manela providing Huberfeld, at his request, "per partner" breakdown of quarter 2 fees investments in the BEOF Funds and Black Elk, including

"72k" for Huberfeld); Bixter Decl. Ex. 94 [CTRL5221595] (in regards to "PPBE mgmt. fee wires" Huberfeld asking "why is there a diofrence [sic] between murray mark and david").

494.    Grosser Lane Management, through its interest in the David Levy Grantor Trust III, was a beneficial owner of and received payments from PPBE Management LLC and PPBE Holdings LLC. (Bodner Admissions #90, 92, 94, 96, 98); (Bixter Decl. Ex. 93 [CTRL3710417] ("per partner" breakdown of quarter 2 fees from Black Elk, including "72k" for Bodner); Bixter Decl, Ex. 157 [CTRL3756202]); Bixter Decl. Ex. 94 [CTRL5221595]).

495.    Starting in January 2013, the BEOF Funds, two funds set up and managed by Platinum Management's principals, purchased an aggregate of $40 million of Black Elk Preferred E Equity from Black Elk.  Additional Black Elk Preferred E Equity was purchased directly from Black Elk by investors including Twosons Corporation.  (Bixter Decl. Ex. 240 [CTRL4505667]; Huberfeld Tr. 155:14-17).

496.    In March 2014, Edelstein reported to Huberfeld a per-investor breakdown of the "ppbe investors that agreed to roll" their investments in the BEOF Funds in connection with a March 2014 exchange offer.  This list included HFF and various entities associated with Bernard Fuchs. (Bixter Decl. Ex. 55, SanFilippo Tr. Ex. 1.110 [CTRL5221242]).

497.    In June 2014, Nordlicht implored Levy and Small to resist Black Elk officer's efforts to use the proceeds from the upcoming Renaissance Sale for anything other than Platinum Management's initiative:

> Use of proceeds from money coming in- there will be money grab and thy will want to pay payables, WE NEED TO RESIST THIS. get preferred paid off as quickly as possible. We want all cash reducing debt, cashflows in future will take care of payables. Let's get the mechanism done ASAP in terms of how we pay off bonds and get preferred paid. If we know we signing renaissance, lets have it mailed even before transaction closes. I need liquidity ASAP. Start laying people off now. Do not delay based on fear of employment

> law. Need to have all laid off by the time we close renaissance and
> replaced with new people…

(Bixter Decl. Ex. 370 [CTRL6335083]).

498.     That paying the holders of Preferred E Equity ahead of the Black Elk Bond holders

and trade creditors would lead to Black Elk's bankruptcy was known to Platinum Management;

and the interest of PPVA, which held the Black Elk Bonds, were incompatible with the interests

of PPBE, which held the equity.  Nordlicht discussed this inevitability when in June 2014 he

described the proposed strategy for Black Elk to Levy and other colleagues: "**we all need to come

to terms that black elk probably goes bk in this scenario**.") (Bixter Decl. Ex. 371

[CTRL6149182] (emphasis added)).

499.     Under the terms of Black Elk's then existing indenture ("**Black Elk Indenture**"),

the proceeds of any asset sale could only be used for certain purposes, including the purchase of

new revenue producing assets or to repay the Black Elk Bonds.  The Black Elk Bonds had to be

repaid in full before any such proceeds could be used to redeem Black Elk Preferred E Equity or

make a distribution to common equity holders.  *See* Bixter Decl. Exhibit 372, SAC Ex. 51

[CTRL3475690].

500.     In April 2014, Platinum Management tried first to amend the Black Elk Indenture

via aa private consent submitted by various PPVA affiliates holding Black Elk Bonds, which

SanFilippo signed. (Bixter Decl. Ex. 373 [CTRL6135940])

501.     In June 2014, Platinum Management learned that the trustee under the Black Elk

Indenture (the "Black Elk Indenture Trustee") would not agree to a short-form private consent, but

rather required a public consent solicitation of holders of Black Elk Bonds in order to amend the

Black Elk Indenture. (Bixter Decl. Ex. 374 [CTRL6348414]).

#73476550_v1

502.   Nordlicht resisted this procedure and wanted to proceed with the private consent without sign off from the Black Elk Indenture Trustee. (*Id.*; Bixter Decl. Ex. 375 [CTRL6348418]).

503.   Platinum Management coordinated the consent solicitation  process (the "**Consent Solicitation**"). (Bixter Decl. Ex. 376 [CTRL6188607]) (deciding among methods to effectuate consent solicitation).

504.   Under the terms of the Black Elk Indenture, PPVA, which held a majority of Black Elk's common equity, and its affiliates were deemed to be affiliates of Black Elk, so any votes they submitted in their capacities as bondholders had to be excluded from calculating whether a majority of the Black Elk Bonds consented to amendment of the Indenture.  (Bixter Decl. Ex. 377 [CTRL5996167]).

505.   This became clear to Platinum Management when counsel to Black Elk advised that "in determining whether the holders of the require principal amount of indenture securities have concurred in any such direction or consent, indenture securities owed by any obligor upon the indenture securities, or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such obligor, shall be disregarded…" (*Id.*).

506.   Black Elk CEO Jeffrey Shulse ("**Shulse**") forwarded the advice to Nordlicht, Small, Levy and others; Nordlicht responded: "Jeff – I see u accidentally forgot to include [Black Elk in house counsel] Marizza and label this attorney client privilege. I have corrected. …But when we say we have friendly holders we will be fully compliant with this provision. Thx" (*Id.*; *see also* Bixter Decl. Ex. 378 [CTRL6087541]).

507.   As of March 2014, funds managed by Platinum Management and its affiliated investment advisers held approximately $93 million face amount, and Beechwood held just over $5.36 million face amount of the $150 million face amount of Black Elk Bonds then outstanding:

| | |
|---|---|
| 22,870,000.00 | PPCO NMRA |
| 10,046,500.00 | PPCO NMRA |
| | |
| 24,987,000.00 | PPVA NMRA |
| 25,321,000.00 | PPVA CS |
| | |
| 10,146,000.00 | PPLO CS |
| | |
| 5,360,000.00 | BAM |
| | |
| 98,730,500.00 | |

(Bixter Decl. Ex. 379 [CTRL6244139 – CTRL6244140]; Bixter Decl. Ex. 380 [CTRL6311888]).

508.     On May 13, 2014, Nordlicht asked Israel Wallach of Beechwood "whats your capacity on black elk bonds?" to which Wallach responded $8.1M. (Bixter Decl. Ex. 381 [CTRL6146242]).

509.     Within the hour Nordlicht instructed Wallach: "Let's buy 8 million at 96. I can get funds to sell." (Bixter Decl. Ex. 382 [CTRL6319700]).

510.     Nordlicht informed Steinberg and Marzella that "Beechwood is buying 8 million black elk from PPVA. What is best way to cross? Can we do it today please?" (Bixter Decl. Ex. 383 [CTRL6326552]).

511.     Beechwood purchased the $8 million face amount of Black Elk Bonds from PPVA on May 13, 2014.  (Bixter Decl. Ex. 384 [BW-SHIP-00454694, BW-SHIP-00454699]).

512.    On June 18, 2014, Albanese, the assistant to Bodner and Huberfeld, scheduled a meeting with Bodner, Huberfeld, Nordlicht, Taylor and Feuer. The meeting was held on June 24, 2014 at Platinum. (Bixter Decl. Ex. 385 [BW-SHIP-00496586]).

513.    On June 23, 2014, Nordlicht again instructed Beechwood employees that "███

████████████████████████████████████████████████████████████

███████████ (Bixter Decl. Ex. 386 [BW-SHIP-00521241]).

514.    Feuer was aware that Beechwood was buying these additional Black Elk Bonds; Levy described Beechwood's purchase of $10 million face amount of Black Elk bonds in a June 30, 2014 email to Feuer.  (Bixter Decl. Ex. 385 [BW-SHIP-00496586]).

515.    On July 1, 2014, Nordlicht again arranged for Beechwood to purchase more Black Elk Bonds: ████████████████████████████████████████████

███████████ (Bixter Decl. Ex. 387 [BW-SHIP-00087082]).

516.    By early July, Platinum Management had reduced the amount of Black Elk Bonds held by PPVA and its affiliated funds to approximately $68 million face amount, and Beechwood's holdings had increased to approximately $30 million face amount.





(Bixter Decl. Ex. 388 [BW-SHIP-00456464]).

517.   Small asked Black Elk's counsel to confirm that Black Elk Bonds held by affiliates reduced the overall number of required consents to achieve a majority: "please confirm that under the TIA if $5MM of the bonds were owned by an affiliate then in order for the consent to be approved  a majority of $145MM (greater than $72.5MM) would need to consent rather than greater than $75MM."  (Bixter Decl. Ex. 389 [CTRL6159020]).

518.   Small forwarded to Nordlicht the attorney's response confirming Small's interpretation. (*Id.*)

519.   A few days later, Nordlicht directed Marzella to sell another "███████████████ ███████████████████████████████████████ (Bixter Decl. Ex. 390 [BW-SHIP-00521256]).

520.   On July 7. 2014, Small forwarded to Nordlicht and Levy the most recent draft of the Consent Solicitation, noting that the "company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. We also need to set a record date. Let's discuss asap in order to finalize and launch by Thursday." (Bixter Decl. Ex. 391 [CTRL6090998]).

521.   On July 9, 2014, Small informed the attorneys drafting the solicitation that "$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation." (Bixter Decl. Ex. 392 [CTRL4899874]).

522.   Just the day prior, Small had been copied on an email showing PPVA and its affiliates held approximately $62 million face amount of Black Elk Bonds as of July 8, 2014:

| | |
|---|---|
| 22,870,000.00 | PPCO NMRA |
| 6,712,000.00 | PPCO NMRA |
| | |
| - | PPVA NMRA |
| 18,321,000.00 | PPVA CS |
| | |
| 13,711,000.00 | PPLO CS |
| | |
| 13,360,000.00 | BAM |
| 23,657,000.00 | BBIL |
| | |
| 98,631,000.00 | Total |

(Bixter Decl. Ex. 393 [CTRL5153695]).

523.    Beechwood ended up holding approximately $37 million face amount of Black Elk bonds immediately before the Consent Solicitation commenced. (*Id.*); (see *also* Bixter Decl. Ex. 394 [BW-SHIP-00727882]) (schedule of Beechwood purchases of Black Elk bonds)).

524.    The purchase agreement for the Renaissance Sale was finalized July 10, 2014. When the transaction was consummated, Black Elk received $170 million in cash as well as the assumption of certain unsecured liabilities as proceeds of the Renaissance Sale. (Bixter Decl. Ex. 395 [BW-SHIP-00513482 – BW-SHIP-00513569]).

525.    Although the time period for the Consent Solicitation had not yet concluded and no formal board action had occurred regarding the use of the cash proceeds from the Renaissance Sale, Nordlicht informed his team on July 8, 2014 that "Black elk signing sale of properties tomorrow and planning on buying out ppbe by end of month." (Bixter Decl. Ex. 396 [CTRL5055373]).

526. On July 16, 2014, the Consent Solicitation was issued to holders of the Black Elk Bonds. (Bixter Decl. Ex. 397 [CTRL5067368]; *see also* Bixter Decl. Ex. 398 [CTRL5820219] (copy of notice to Joseph SanFilippo)).

527. The final form of Consent Solicitation required a majority of the voting bondholders to approve both the Renaissance Sale transaction and the proposed amendments to the Black Elk Indenture; holders were permitted to consent without tendering their Black Elk Bonds for repayment, but had to consent in order to tender their Black Elk Bonds. (*Id.*)

528. Samuel Adler, David Bodner's nephew, executed a consent on behalf of Beechwood on July 28, 2014 but did not tender the Beechwood's Black Elk Bonds, even though the amendment permitted Black Elk to redeem the Black Elk Preferred E Equity before the higher priority Black Elk Bonds. (Bixter Decl. Ex. 399 [BW-SHIP-00475467]).

529. Nordlicht, on behalf of PPVA, certified as part of the Consent Solicitation that "the Company and its Affiliates beneficially own approximately 85% of the outstanding voting membership interests of [Black Elk]. The Company and its Affiliates beneficially own exactly $18,321,000 in principal amount of Black Elk's 13.75% Senior Secured notes due 2015[.]" (Bixter Decl. Ex. 400 [CTRL6386533]).

530. Nordlicht's certification also disclosed the bonds held by PPCO and PPLO, noting that "43,293,000 Notes are beneficially owned by entities which may be deemed Affiliates of the Company which the Company disclaims beneficial ownership." (*Id.*)

531. Nordlicht's certification did not disclose Beechwood or the face amount of Black Elk Bonds held by Beechwood when disclosing the amount of bonds held by affiliates, notwithstanding that Beechwood, Platinum Management, PPVA and Black Elk were under the

direct or indirect control of the same people, including Nordlicht, Bodner, Huberfeld and Levy. (*Id.*)

532.    Nordlicht's officer certificate defined "Affiliates" to mean "any person or legal entity, any other person or legal entity directly or indirectly controlling or controlled by or under director or indirect common control with such specified person or legal entity."  (*Id.*)

533.    In support of the officer certificate executed by Nordlicht, Small provided an analysis of the consent and tender:

| Consent/Tender Analysis | | | |
|---|---|---|---|
| PPVA & Affiliates | 18,321,000 | | |
| Not Deemed Affiliates | 43,293,000 | | |
| Remaining Bondholders | 88,386,000 | | |
| Total Bonds Outstanding | 150,000,000 | | |
| | Total | PPVA & Affil | PPVA & Not Deemed Affil |
| Bonds Outstanding For Calculation of Vote | 150,000,000 | 131,679,000 | 88,386,000 |
| PPVA & Affiliates | 18,321,000 | 0 | 0 |
| Not Deemed Affiliates | 43,293,000 | 43,293,000 | 0 |
| Other | 37,618,000 | 37,618,000 | 37,618,000 |
| Total Consents | 99,232,000 | 80,911,000 | 37,618,000 |
| Total Tenders | 11,433,000 | 11,433,000 | 11,433,000 |
| Total Consents and Tenders | 110,665,000 | 92,344,000 | 49,051,000 |
| Percent | 74% | 70% | 55% |

(Bixter Decl. Ex. 401 [CTRL8660884]).

534.    The above analysis did not disclose or consider the impact of the $37,017,000 of face amount of Black Elk Bonds held by Beechwood. (*Id.*); (*see also* Bixter Decl. Ex. 402 [CTRL5544569 – CTRL5544570]).

117

535.    Excluding Beechwood, PPVA, PPLO and PPCO, holders of just $601,000 face amount of Black Elk bonds consented without tendering their Black Elk Bonds.  (*Id*.)

536.    On August 15, 2014, the Renaissance Sale closed. (Bixter Decl. Ex. 403 [CTRL6397754]).

537.    Assisting Platinum Management in "closing Renaissance and paying preferred" was Black Elk CEO Shulse, who disclosed his motivation as obtaining compensation for the services he had provided to Platinum Management. (Bixter Decl. Ex. 404 [CTRL6399139]).

538.    The proceeds of the Renaissance Sale were deposited into the Black Elk bank account on August 18, 2014. [confirm] (Bixter Decl. Ex. 403 [CTRL6397754]).

539.    Within days of the Renaissance Sale proceeds being deposited, Black Elk redeemed $105.9 million in Black Elk Preferred E Equity. (Bixter Decl. Ex. 406 [DOJ_CTRL_000423]).

540.    Disbursement occurred at the direction of Platinum Management, which controlled Black Elk.  For example, on August 18, 2014, Daniel Small of Platinum Management wrote to Jeffrey Shulse, directing him that  on behalf of the "majority of the board of managers you are hereby authorized to wire $70MM in partial payment of Preferred E units." (Bixter Decl. Ex. 407 [CTRL6400715]);

541.    HFF received over a $1 million payment as proeeds of the redemption of the Black Elk Preferred E Equity.  (Bixter Decl. Ex. 407, SAC Ex. 59 [CTRL6400715]; Bixter Decl. Ex. 409, SAC Ex. 60; Bixter Decl. Ex. 410, SAC Ex. 61).

542.    Huberfeld was involved in the above-stated process at all times:

- On June 24, 2014, Nordlicht forwarded information to Huberfeld regarding the potential close date for the Black Elk Renaissance deal.   (Bixter Decl. Ex. 477 [CTRL6240751])

- On July 21, 2014, after the Consent Solicitation was issued but before Beechwood consents seven days later, Levy forwarded to Huberfeld a spreadsheet entitled

WNIC BCLIC BBIL Holdings as of 7-18-14.xlsx" showing all positions, including the Black Elk bond holdings of approximately $37 million.  (Bixter Decl. Ex. 601 [CTRL5193708])

- CTRL5055373 Nordlicht to Manela, Huberfeld, Fuchs, On July 8, 2014, Nordlicht sent an email to Huberfeld stating: "Please distribute ppbe list. Black elk signing sale of properties tomorrow and planning on buying out ppbe by end of month. Lets try and see if any investors would like to transfer investments into one of our three funds. Thx"  (Bixter Decl. Ex. 396 [CTRL5055373])

543.    Black Elk's auditor , BDO Seidman LLP ("**BDO**"), had questions and concerns regarding the redemption of the Black Elk Preferred E Equity.   In July 2015, Platinum Management employee Jed Latkin, who was then acting as CEO of Black Elk, reported to David Levy that BDO was refusing to provide an unqualified opinion, wanting instead to note that the Renaissance "transaction violated the indenture and was a preferential payment" and that "there was control and manipulation by the parent ownership entity." (Bixter Decl. Ex. 411 [CTRL7098467]).

## BLACK ELK BOND BUYBACK

### Bond Price Manipulation

544.    In fall 2014, after the Renaissance Sale closed, the market price for Black Elk Bonds began to fall.  A substantial drop in the trading price for Black Elk Bonds could trigger margin calls to PPVA from its securities brokers.  (Bixter Decl. Ex. 412 [CTRL5772882]).

545.    By December 9, 2014, the trading price for Black Elk bonds fell as low as 22% of par which, as SanFilippo noted, caused Platinum Management to face a ███████████ (Bixter Decl. Ex. 413 [BW-SHIP-00479488]).

546.    Nordlicht directed Platinum Management employee David Steinberg to submit a bid for 90% of par in an effort to raise the trading price for Black Elk Bonds.  During that week, Steinberg also asked a friend at Seaport Global Holdings to submit similar bids, with the proviso

that Seaport Global Holdings would be repaid for its purchases. (Bixter Decl. Ex. 412 [CTRL5772882]; Bixter Decl. Ex. 655 [CTRL5926577]; Bixter Decl. Ex. 656 [CTRL5927987]; Bixter Decl. Ex. 657 [CTRL5931292]; Bixter Decl. Ex. 658 [CTRL5942089]).

547.   Seeing that Steinberg's efforts to bid 90% of par were ineffective, Nordlicht directed Steinberg to (1) bid a lower percentage and then slowly ratchet up the bids: "███████

████████████████████████████████████████████████

███████████████████ (Bixter Decl. Ex. 414 [BW-SHIP-00520855]).

548.   Also on December 9, 2014, Nordlicht asked his friend Randy Katzenstein of Interactive Brokers LLC/OBEX to start bidding on Black Elk Bonds, instructing Katzenstein to buy "$1mm of bonds to start. But also any odd lots. Even 10 bonds we'll buy. A lot of [loose] bonds are trading messy and we want to pick them up. Just get offers." (Bixter Decl. Ex. 415 [CTRL5937719]).

549.   When his purchases failed to register in the system, Platinum Management chided Katzenstein that it "Must be fixed. This is important." (Bixter Decl. Ex. 416 [CTRL5938757]).

550.   Throughout the process, Nordlicht remained involved. (Bixter Decl. Ex. 417 [CTRL5949621]).

551.   Between the efforts of Platinum Management, Seaport Global Holdings, and Katzenstein, the market price of Black Elk bonds slowly rose. (Bixter Decl. Ex. 418 [CTRL5942717 – CTRL5942718]) (showing bond pricing as of 12/10/14 between 62 and 70 percent of par)).

552.   On December 31, 2014, due to concerns with the continued lagging prince of the Black Elk Bonds, Nordlicht and Steinberg engaged Beechwood to cooperate with their market manipulation efforts. (Bixter Decl. Ex. 419 [CTRL6007239])

## Beechwood Puts the Black Elk Bonds to PPVA

553.   In November 2014, regarding the Black Elk situation, Scott Taylor told Saks that he raised the issue to the "powers that be."  (Bixter Decl. Ex. 199, Taylor Tr. Ex. 343 [BW-SHIP-1340284]).

554.   On January 30, 2015, less than eight months after Beechwood "purchased" the Black Elk Bonds from PPVA, Beechwood resold these same bonds as well as additional Black Elk Bonds that it had purchased on the open market to PPVA.  (Bixter Decl. Ex. 420 [CTRL7648017]).

555.   Prior to the sale, Beechwood was concerned about Black Elk's ability to pay the bonds and was dealing with client displeasure from CNO regarding the Black Elk Bond holdings. On the same day as the Black Elk Bond Buyback, Saks reported to Feuer and Taylor that CNO "███████████████████████████████████████████████ (Bixter Decl. Ex. 421 [BW-SHIP-00726472]).

556.   Beechwood agreed to defer the interest due to it in November 2014 for one month, but to secure payment of the deferred bond coupons, Beechwood required PPVA to escrow approximately $2.5 million in cash collateral to BAM, which represented half of one month's coupon.  (Bixter Decl. Ex. 422 [CTRL5886102]).

557.   On November 26, 2015, during the forbearance negotiations, Taylor wrote to Feuer ████████████████████████████████████████████████████████████ ████████████████ (Bixter Decl. Ex. 423[BW-SHIP-00274983]).

558.   Feuer responded: "████████████████████████████████████ (Bixter Decl. Ex. 424 [BW-SHIP-00274993]).

559.   Huberfeld was involved in this process as well.  In a November 26, 2014 email sent to Beechwood's in house counsel forwarding a copy of the collateral posting agreement, Taylor

noted "█████████████████████████████████████████ (Bixter Decl. Ex. 425 [BW-SHIP-01357978]).

560.     On January 20, 2015, a few weeks after Beechwood agreed to defer receipt of the interest due on its Black Elk Bonds, Beechwood sold the Black Elk bonds, which were near worthless and particularly worthless to PPVA given the consent soliciation, at a purchase price of $37,017,000, which represented 93.5% of par plus accrued interest that had been deferred in November. (Bixter Decl. Ex. 420 [CTRL7648017]).

561.     Prior to sale of the Black Elk Bonds, Huberfeld and Feuer exchanged emails regarding the bond pricing and schedule, and the variance between the sale price and the depressed market price. (Bixter Decl. Ex. 394 [BW-SHIP-00727882]).

562.     The bond pricing schedule confirms that the price to be paid to Beechwood was not keyed to then current market price of 76% of par, which would have yielded a total pyment of at $28,132,920, but rather was designed to make Beechwood whole by paying it an amount sufficient to repay what Beechwood paid for the bonds months before plus all accrued interest.   (*Id.*)

563.     Huberfeld also was copied on correspondence regarding the 93.9858% "████
█████████████████ (Bixter Decl. Ex. 426 [BW-SHIP-01231329 – BW-SHIP-01231330]).

564.     To fund PPVA's purchase of the Black Elk Bonds from BeechwoodPPVA's wholly owned subsidiary Montsant Partners LLC ("**Montsant**") entered into that certain Note Purchase Agreement dated January 30, 2015 with BAM Administrative as agent for Senior Health Insurance Company of Pennsylvania ("SHIP"), by which Montsant borrowed  $35 million from SHIP (the "**2015 Montsant Loan**").  (Bixter Decl. Ex. 186, SAC Ex. 64).

565.     The 2015 Montsant Loan initially was unsecured, but the terms of the Note Purchase Agreement required Montsant to provide collateral to secure its obligations thereunder.

Platinum Management and Beechwood caused PPVA to transfer ownership of the Implant Sciences 2008 Note (defined below) as well as other liquid securities to Montsant, and deposit those instruments and securities in an account pledged to BAM Administrative.  Scott Taylor was engaged in the process of choosing the collateral.  Beechwood's internal investment memo states that the purpose of the 2015 Montsant Loan was to ████████████████████████████ ████████ Bixter Decl. Ex. 428 [BW-SHIP-00801458]; Bixter Decl. Ex. 429 [BW-SHIP-00861698]).

566.    During a Platinum Management January 2015, shortly after the Black Elk Bond Buyback occurred, and PPVA marked those bonds at par, at a Partner Meeting, Bodner expressed his opinion to Bernard Fuchs, Nordlicht and Huberfeld that Platinum Management had overvalued the assets of PPVA. (Fuchs Tr. 26:17-30:20; Fuchs Admissions #3).

## COBA SCHEME

567.    On February 20, 2014, the Correction Officers Benevolent Association of New York ("**COBA**") subscribed (*i.e.* invested) $10 million into PPVA effective March 1, 2014. (Bixter Decl. Ex. 430 [CTRL8133336]).

568.    Huberfeld has admitted that he paid COBA official Norman Seabrook ("**Seabrook**"), a bribe of $60,000 through a conduit, in order to secure COBA's subscription (the "**COBA Scheme**")   (Bixter Decl. Ex. 431; *United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 201).

569.    On March 3, 2014, COBA's $10 million subscription was wired into PPVA's account.  (Bixter Decl. Ex. 432 [CTRL5062849]).

570.    Within minutes of the COBA wire arriving in PPVA's account, two separate Platinum Management employees, Landesman and Andrew Kaplan, notified Huberfeld of the

wire's arrival. (Bixter Decl. Ex. 433 [CTRL6069256]; Bixter Decl. Ex. 434, SanFilippo Tr. Ex. 1.50 [CTRL6013955]; Bixter Decl. Ex. 434, SanFilippo Tr. Ex. 1.51 [CTRL5179896]).

571.     Immediately upon the wires arriving, the Platinum Management employee responsible for coordinating company wires, Michael Kimelman ("**Kimelman**"), moved the funds to other accounts associated with PPVA.  (Bixter Decl. Ex. 436 [CTRL6046371]).  The movements were as follows:

> March 3, 2014
> 3.3.14, the Correction Officer's Benevolent Association (COBA) wired $10MM into the Platinum Partners Value Fund (PPVF ending in -0463)
>
> 3.3.14, PPVA-0463 transferred $10MM to PPVA-0500
> 3.4.14, PPVA-0500 transferred $10MM to PPVA-0148
> 3.4.14, PPVA-0148 transferred 2 $5MM sums to PPVA-0527

(Bixter Decl. Ex. 437 [CTRL8126284]).

572.     On March 4, 2014, Kimelman directed $3.6 million be wired out to the the account of the Mark Nordlicht Grantor Trust at Sterling National Bank and $850,000 to Landesman from PPVA's accounts.   (Bixter Decl. Ex. 438 [SSCLQ_00855181]; (Bixter Decl. Ex. 439 [CTRL8133356]; Bixter Decl. Ex. 437 [CTRL8126284]).

573.     Once the wire to the Mark Nordlicht Grantor Trust was received, Kimelman directed Sterling National Bank to wire $1.8 million to Grosser Lane Management, LLC and $1.8 million to Manor Lane Management, LLC from the account of the Mark Nordlicht Grant Trust. (Bixter Decl. Ex. 440 [CTRL6311389];  Bixter Decl. Ex. 437 [CTRL8126284]).

574.     Bodner admits to receiving the $1.8 million.  (Bodner Admissions #15).  Huberfeld has taken the 5th Amendment on the subject, but did (falsely) tell the Court overseeing his criminal trial that he did not receive COBA money.  (*See* Huberfeld December 20, 2018 Memo of Law, *U.S. v. Seabrook*, 16 cr. 467 (AKH) (dkt. #273 )). The percentage of the COBA money distributed

to Nordlicht, Bodner and Huberfeld differed from their ownership percentages and similar distributions of fees purportedly earned by Platinum Management.

575.    According to the criminal information filed by the U.S. Attorney's Office for the Southern District of New York, on December 11, 2014, Seabrook received $60,000 from Huberfeld in exchange for COBA investing in a fund managed by Platinum Management. Huberfeld paid the $60,000 through a conduit, Cooperating Witness-1, in the form of cash.  (Bixter Decl. Ex. 441, *United States v. Seabrook et al*., 1:16-cr-00467 (S.D.N.Y.) at ECF No. 1).

576.    The U.S. Attorney's Office for the Southern District of New York issued a superseding information that identified Jona Rechnitz ("**Rechnitz**") as the conduit.  (Bixter Decl. Ex. 99; *United States v. Seabrook et al*., 1:16-cr-00467 (S.D.N.Y.) at ECF No. 201).

577.    In December 2013, Huberfeld told Rechnitz and Seabrook that Platinum Management was willing to pay Seabrook between $100,000 and $150,000 per year if he was able to secure COBA's investment into PPVA.  The terms of the bribe were finalized at a meeting held at Platinum Management's offices.  (Bixter Decl. Ex. 109; *United States v. Seabrook et al*., 1:16-cr-00467 (S.D.N.Y.) at ECF No. 1).

578.    Huberfeld did not pay Rechnitz $60,000 of his own money, but rather caused PPVA to make payments to Rechnitz's company under the guise of  paying $60,000 worth of forged invoices for New York Knicks tickets.  (Bixter Decl. Ex. 109 (*United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 1).

579.    Huberfeld also arranged for payment to Rechnitz by causing PPVA to issue checks to charities associated with Rechnitz.  (*Id*.)

580.     Huberfeld actually caused payments in excess of $60,000 to be made to or for the benefit of Rechnitz/Seabrook.  On December 15, 2014, Platinum Management issued the following four checks:

      a.   Check number 3967 in the amount of $3,600 to Congregation Ahavath Chesed

      b.   Check number 2966 in the amount of $18,000 to Israel Cancer Research Fund

      c.   Check number 2965 in the amount of $18,000 to Yeshiva Ketana of Manhattan

      d.   Check number 2964 in the amount of $60,000 to JSR Capital Manhattan.

(Bixter Decl. Ex. 442 [CTRL8094557]; Bixter Decl. Ex. 443 [CTRL8094846]).

581.     Kimelman signed the checks.  (*Id.*)

582.     On December 15, 2015, the same day that $100,000 of checks were issued for the benefit of Rechnitz, Angela Albanese, on behalf of David Bodner, attempted to set up a telephone conversation between Bodner and Rechnitz.   (Bixter Decl. Ex. 444 [CTRL5960144]).

583.     During a meeting about staff reductions held in early 2015, Nordlicht informed Platinum Management executives that Kimelman could not be terminated: "if [there is] anyone we can't let go, it's Michael Kimelman because he knows stuff that we don't want anyone else to know."  (Bixter Decl. Ex. 80, Testimony of Daniel Mandelbaum, *United States v. Nordlicht et al.*, 16-CR-640 (S.D.N.Y.) at 4321:6-21).

## THE CATALYTIC INVESTIGATIONS

584.     In December 2014, in connection with an SEC audit of Platinum Management and its affiliatedinvestment advisers, the SEC issued Examination Request number 32.  Questions 15 and 16 of Request 32 asked for "a detailed description of Murray Huberfeld's and David Bodner's association with the Advisers" and information indicating "whether David Bodner and Murray Huberfeld were ever part of the investment decision making process for any of the Adviser's

investments and potential investments for the last four years." Email correspondence circulating a copy of Examination Request 32 within Platinum Management indicates that "we need to have a serious discussion" about that Request.   (Bixter Decl. Ex. 446 [CTRL6001943 – CTRL6001945]).

585.    On January 8, 2015, Platinum Management provided its responses to questions 15 and 16 of Request 32.  The response minimized the roles of Bodner and Huberfeld and did not disclose  their presence in the office or their input regarding investments:

Request List 32 –

15–Please provide a detailed description of Murray Huberfeld's and David Bodners [sic] association with the Advisers.

☐ Mr. Huberfeld and his family are beneficiaries of a trust that is a limited partner and non-managing member of certain of the Advisers, including Platinum Management (NY) LLC and Platinum Credit Management LP. He and his family also hold investments in funds managed by the Advisers. Mr. Huberfeld actively promotes the funds to his business and social contacts and other prospective investors, and has been responsible for introducing a number of investors to the funds. Further, as described in more detail in response to Item 16, Mr. Huberfeld was Chief Investment Officer of Platinum Credit Management LP (formerly Centurion Credit Group LP) prior to his resignation from that position on December 31, 2010. From time to time, members of the investment management team ask him for his views and opinions, particularly with regard to investments originated during his tenure as CIO. He is not presently employed by the Advisers, and does not hold any officer- or director-type positions with them.

☐ Mr. Bodner and his family are beneficiaries of a trust that is a limited partner and non-managing member in certain of the Advisers, including Platinum Management (NY) LLC and Platinum Credit Management LP. He and his family also hold investments in funds managed by the Advisers. He meets occasionally with his business partners to review the fund operation and has on several occasions introduced investors to funds managed by the Advisers. He is not employed by the Advisers, and does not hold any officer- or director-type positions with them.

16–Please indicate whether David Bodner and Murray Huberfeld were ever part of the investment decision making process for any of the Adviser's investments and potential investments for the last four years.

☐ Mr. Huberfeld was Chief Investment Officer of Platinum Credit Management LP (formerly Centurion Credit Group LP) until his resignation on December 31, 2010. On January 1, 2011, Mark Nordlicht assumed the role of Chief Investment Officer for Platinum Credit. Since that time, Mr. Huberfeld has been consulted by Mr. Nordlicht from time to time regarding the asset-backed loan portfolio managed by Platinum Credit, particularly

with regard to loans originated by Platinum Credit during Mr. Huberfeld's tenure as CIO. Mr. Nordlicht and certain portfolio managers of the Advisers have also sought Mr. Huberfeld's input and opinions regarding investments and prospective investments presented to the Advisers. Since January 1, 2011, Mr. Huberfeld has not had decision-making authority with respect to the Advisers' investments or potential investments.

☐ Mr. Bodner has never held any position with the Advisers, and has never held any decision-making authority with respect to the Advisers' investments or potential investments. He is, however, a passive business partner of Mr. Huberfeld and Mr. Nordlicht in the Advisers (as described in No. 15 above), and also a substantial stakeholder in the funds as an investor. As such, he keeps himself informed regarding the investments held by the fund, their performance, and issues related to those investments. From time to time, Mr. Huberfeld and Mr. Nordlicht seek Mr. Bodner's input and opinions regarding investments or potential investments.

(Bixter Decl. Ex. 57, SanFilippo Tr. Ex. 1.6 [CTRL6645956]).

586.     On January 12, 2015, the SEC issued Examination Request number 33 to Platinum Management in which it requested information regarding the potential investment deals that were introduced to Murray Huberfeld and a list of investors solicited by Murray Huberfeld. (Bixter Decl. Ex. 637 [CTRL8428751]).

587.     On February 4, 2015, the SEC issued Examination Request number 37 to Platinum Management, in which it requested that Platinum Management "re-survey all employees, associates, contractors and beneficiary owners including Murray Huberfeld" regarding use of private email accounts such as Gmail for business purposes. (Bixter Decl. Ex. 445 [CTRL8428755]).

588.     On February 10, 2015, the SEC issued Examination Request number 38 to Platinum Management, in which it requestedadditional information regarding the business conducted by the unaffiliated firms/businesses permitted to operate out of Platinum Management's offices and which were requested in Item 18 of Request 32.   (Bixter Decl. Ex. 445 [CTRL8428755 – CTRL8428756]).

589.     On May 12, 2015, *prior to the issuance* of any grand jury subpoenas were issued to Platinum Management, Nordlicht inquired to Platinum Management executives if "we have any payments made to jsr capital or Jonah Rechnitz from any of the management companies?" (Bixter Decl. Ex. 447 [CTRL6816409]).

590.     On May 21, 2015, the U.S. Attorney's Office for the Southern District of New York issued Grand Jury Subpoenas to "Platinum Partners" and "Centurion" requesting information and documentation related to "investments handled for, or monies received from or transferred for, [COBA] (the 'Union'), any Union funds, Norman Seabrook, or Michael Maielo, including any such transactions involving Centurion Credit Management [or Platinum Partners] or any related entities." (Bixter Decl. Ex. 448 [CTRL6855719]).

591.     On September 22, 2015, the SEC sent a letter to Platinum Management, outlining various deficiencies in its management and the operations, including with respect to PPVA, for which the SEC demanded immediate corrective action (The "**SEC Deficiency Letter**"). (Bixter Decl. Ex. 449 [CTRL7360002]).   The SEC Deficiency Letter listed signficant deficiencies, including but not limited to:

- Failure of Platinum Management to retain an active Chief Compliance Officer;
- Three straight years where PPVA's audited financial statements were released later than permitted under applicable laws;
- Failure of Platinum Management to engage in an annual compliance review;
- Failure to conduct Brokerage Committee  or Risk Committee meetings;
- Failure by Platinum Management to hold valuation committee meetings for PPVA, and as to the minutes of meetings that actually occurred, stating the following: "Furthermore, the format of the minutes that was provided to the Staff by the Advisers resembled more of an agenda than minutes. It is the Staffs opinion that the Advisers' Valuation Committee minutes/back up records fail to demonstrate whether any meaningful analysis and potential changes to investment values were contemplated or discussed at such meetings;"
- As to the valuation of PPVA's oil and gas investments: "The Staffs review of the Advisers' valuation policy revealed that it does not address the methodology of the fair

valuation of oil, gas, and mining investments, which comprised a significant amount of the Advisers' assets, and does not include information pertaining to inputs, assumptions, or haircuts. Since a significant portion of the funds' investments are valued utilizing the fair valuation approach, the Advisers' generic valuation policy should be revisited.  The Advisers should inform the Staff of any corrective action they intend on taking with respect to this matter;" and

- Failure to include Fuchs as an access person until he was made a partner in 2014, even though Fuchs was actively managing PPVA investments prior to that date.

(*Id*.)

592. ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████
████████████████████████████████████

593. ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████

594.    On April 13, 2016, Reuters published an article about Platinum Management titled "The top-performing hedge fund manager that's too hot for big money to handle." The article

provides details concerning the Black Elk Consent Solicitation, the COBA investigation, and other unfavorable issues.  (Bixter Decl. Ex. 450 [CTRL7829685]).

595.    On June 7, 2016, the U.S. Attorney's Office for the Eastern District of New York issued grand jury subpoenas to Bodner and Levy. (Bixter Decl. Ex. 451 [CTRL8846195]; Bixter Decl. Ex. 452 [CTRL8846196]).

596.    On June 8, 2016, the U.S. Attorney's Office for the Eastern District of New York issued a grand jury subpoena to Platinum Management, in which it sought a records related to Platinum Management, its funds, investor information, and records relating to audits and valuations of Black Elk, Golden Gate, and other companies. (*Id.*)

597.    The SEC's Division of Enforcement also issued a broad subpoena for information to Platinum Management on June 8, 2016, in which it requested information regarding the funds it managed as well as Beechwood.  (*Id.*).

598.    On June 8, 2016, U.S. Attorney's Office for the Southern District of New York issued subpoenas to Bodner and Levy, compelling their testimony before the grand jury convened in connection with the COBA investigation. (*Id.*)

599.    On June 8, 2016, the U.S. Attorney's Office for the Southern District of New York issued a grand jury subpoena to Platinum Management requesting testimony and production of materials related to the COBA investigation as well as "all documents…pertaining to incoming investments into, as well as redemption from, the PPVA or PPCO, from 2011 to the present" and all email communications of Mark Nordlicht, David Bodner, Uri Landesman, and others. (*Id.*)

600.    On June 8, 2016, Huberfeld was arrested in connection with the COBA investigation.  (Bixter Decl. Ex. 453; *United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 5).

601.    On June 8, 2016, the FBI searched Beechwood's offices, interviewed employees, and took Huberfeld's computer into evidence. (Bixter Dec. Ex. 454 [CTRL8056471]).

602.    On June 22, 2016, the FBI executed a search warrant at the Platinum Management offices related to the ongoing investigation being conducted by the U.S. Attorney's Office for the Eastern District of New York. (*Id.*)

603.    On May 25, 2018, Huberfeld pled guilty to conspiracy to commit honest services wire fraud. (*See* Bixter Decl. Exs. 455, 456, 457 [*United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF Nos. 194, 201 and 202]).

604.    As Huberfeld stated to the Court in connection with his allocution:

THE COURT: Could you please tell me, either by reading a statement that you prepared with your lawyers, or in your own words, what it is that you did that makes you guilty.

THE DEFENDANT: In December 2014, I was a limited partner through an interest in a trust of the management company of Platinum Partners. As a limited partner of the management company, I occasionally introduced potential investors to the Platinum Partners marketing staff.  In this capacity, Jona Rechnitz approached me to assist the fund in finding new investors for Platinum. In December 2014, Rechnitz asked me to submit a false invoice from his company, JSR Capital, to Platinum's management company in the amount of $60,000 for New York Knicks tickets.

I agreed to forward to Platinum's management company this invoice, knowing that no one at Platinum received the tickets. I knew the Knicks tickets invoice was false when I submitted it to Platinum's management company for payment. Instead, the money was requested by Rechnitz as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum Partners.

THE COURT: COBA being the Correction Officers Benevolent Association.

THE DEFENDANT: Yes, your Honor. Based on my misrepresentation, Platinum issued a check to Rechnitz's company in the amount of 60,000. At the time I submitted the invoice, Platinum's management company, its offices were located within the Southern District of New York.

#73476550_v1

(Bixter Decl. Ex. 458 [*United States v. Seabrook, et al.*, No. 1:16-cr-00467 (S.D.N.Y.) at ECF No. 203 at 27-28]).

605.    On February 14, 2019, Huberfeld was sentenced to 30 months in prison and ordered to pay $19 million in restitution, jointly with Seabrook and Rechnitz.  (Bixter Decl. Ex. 459 [*United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 296]).

606.    At his deposition in these actions, Huberfeld asserted his rights under the Fifth Amendment to the U.S. Constitution (the "**Fifth Amendment**") in refusing to respond to questions concerning Platinum Management's involvement with the COBA bribe and the transfer of COBA funds to the owners of Platinum Management.  (Huberfeld Tr. 375:16 to 377:2; 378:6-12; 378:15-20; 378:23 to 379:3; 379:6-11; 379:14-18; 380:3-10; 380:21 to 381:3; 383:9-17).

607.    Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to the question: "What is the relationship between COBA and Platinum?"  (*Id.*)

608.    Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to the question: "What was your role in bringing COBA to Platinum Partners?"  (*Id.*)

609.    Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to a question inquiring into where the COBA investment was transferred to Huberfeld, Nordlicht, Bodner and Gerszberg.  (*Id.*)

610.    Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to the question: "PPVA did not retain the benefit of the COBA investment, did it?  (*Id.*)

611.    Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to the question: "PPVA was a victim of money transferred out of it in relation to COBA, wasn't it?" (*Id.*)

612.     Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to the question: "As you sit here today, did PPVA or its investors receive any benefit as a result of the money invested in COBA?"  (*Id.*)

613.     Huberfeld asserted his rights under the Fifth Amendment in refusing to respond to questions as to the knowledge of Bodner and Huberfeld concerning the submission of false invoices to Platinum Management and the COBA investigation.  (*Id.*)

## THE DIVERSION OF ASSETS TO BEECHWOOD

614.     On January 8, 2016, Nordlicht sent an email to Huberfeld, copying Fuchs, David Levy and Seth Gerszberg, stating that "we are 12 hours away from both platinum and beechwood going down." (Bixter Decl. Ex. 71 [CTRL7736228]).

615.     Although internal documents circulated among Platinum Management personnel in early January 2016 acknowledge that PPVA owed $130 million to Beechwood due to guarantees and put agreements, Platinum Management   only reflected **$35.5 million** of debt owed to Beechwood in its contempraneous calculation of PPVA's NAV.   (Bixter Decl. Ex. 259 [CTRL7861220]).

616.     According to Feuer, Platinum Management's inability to cause PPVA to make interest payments to Beechwood on Beechwood's Golden Gate Oil investment caused ███████ ██████ (Bixter Decl. Ex. 470; Taylor Tr. Ex. 507; [BW-SHIP-00727696]).

617.     According to Feuer, Platinum Management's inability to cause PPVA to make interest payments to Beechwood on Beechwood's Northstar investment proved to CNO Financial Group, one of Beechwood's insurance clients, that its co-investment in Northstar was a ███ ████████████████ (Bixter Decl. Ex. 64, Huberfeld Tr. Ex. 671 [BW-SHIP-00914974]).   The

email further pleas that if something cannot be done immediately to get Murray and David on the phone.  (*Id.*)

618.     **As is evident from the documents cited herein**, *Huberfeld and Bodner were fully aware that Platinum was paying (or not paying) interest on these loans as they received cash sheets for Platinum and Beechwood.*

619.     On January 8, 2016, Mark Nordlicht asked David Steinberg and Seth Gerszberg to develop a presentation for Nordlicht, Huberfeld, Bodner and Beechwood on the state of PPVA. (Steinberg Tr. 109:6-110:7; Bixter Decl. Ex. 460 [CTRL8009309]).

620.     Seth Gerszberg was the owner and manager of a series of affiliated companies referred to as "The Collective," which included Over Everything LLC.  Platinum Management previously had caused PPVA to enter into agreements to loan funds and to or for the benefit of Over Everything LLC and its related entities.  As of December 31, 2015, Platinum Management reported the value of PPVA's debt and equity interests in Over Everything LLC as totalling approximately $22.4 million..   (Bixter Decl. Ex. 462 [CTRL6952352]; Bixter Decl. Ex. 51 [CTRL8296283]).

621.     The Collective discontinued operations during the fourth quarter of 2015, after which Nordlicht asked Gerszberg to join Platinum Management to assist with raising funds for PPVA, terminating Platinum Management employees, and addressing PPVA's liquidityand debt issues.  (Bixter Decl. Ex. 463 [CTRL7729509]; Bixter Decl. Ex. 464 [CTRL7725725]).  Even though the Collective had ceased operations, PPVA valued its investment at par (full value).

622.     As of December 31, 2015, Platinum Management reported the net asset value of PPVA as $752,920,596.71 (Bixter Decl. Ex. 51 [CTRL8296283])

623.    As of December 31, 2015, Platinum Management reported the value of PPVA's equity position in Golden Gate Oil as $141,999998.40 (Bixter Decl. Ex. 259 [CTRL7861220]).

624.    As of December 31, 2015, Platinum Management reported the value of PPVA's preferred and common equity positions in Northstar as $54,112,599.81 and $101,518,886.68, respectively.  (*Id.*)

625.    On January 12, 2016, Dan Grabon, an employee of The Collective, emailed various materials to Steinberg in connection with the upcoming presentation. (Bixter Decl. Ex. 465 [CTRL8007803-CTRL8007806]).

626.    One of these documents was a spreadsheet titled "Beechwood Asset Comparison" that listed the then current value of Beechwood's collateral position in certain Platinum/Beechwood co-investments.  (*Id.*)

627.    Notably, this spreadsheet lists the value of the collateral securing Beechwood's loan to Golden Gate Oil and $50 million face amount of Northstar notes, which consisted of security interests in and liens over all the assets of Golden Gate Oil and Northstar, respectively, as **$0**.  (*Id.*)

628.    On January 14, 2016, Steinberg sent an email to Naftali Manela, Chief Operating Officer of Platinum Management, attaching 4 spreadsheets and stating as follows:

> Naftali, Each file is a simple spreadsheet showing different points. Taken all together, they show that with the inflows (including Apollo) and with some success with Agera, VSTA, ECHO, Desert Hawk we can still produce a decent return despite the interest expense of the addition debt (after the reduction of the rate to 7%).

> Without the extra money from Apollo or BAM, the fund will need to gate, Ari Glass and NM (and eventually Bam will have to join) put the fund into BK, we lose probably lose to $400mm of value due to unfunded positions, and a trustee is appointed to run the wind down with no *rachmanus* on BAM.

> This is the narrative for Murray and Beechwood.

(the "**Rachmanus Email**").   (Bixter, Decl. Ex. 50, Steinberg Tr. Ex. 472 [CTRL8011541] (emphasis added)).

629.    The Joint Official Liquidators are analogous to a Trustee.  The above email shows that Steinberg and Platinum knew that a Trustee or Liquidator would not consider the purported debts to Beechwood to be valid.  *Rachmanus* is a Yiddish word that means "mercy." (Steinberg Tr. 128:3-128:14)

630.    Steinberg's third chart, titled "PPVA Position Breakout," lists the total net value of PPVA's assets as $333.2 million – far less than the $752 million NAV figure that Platinum Management reported to PPVA on December 31, 2015. (Bixter, Decl. Ex. 50, Steinberg Tr. Ex. 472 [CTRL8011541]).   Steinberg's fourth chart listed "potential winners, including: Agera, Vistagen, Echo, Desert Hawk, Urigen and "Asia Repo."  (*Id.*)  With the exception of Asia Repo which was mooted, Agera, Vistagen, Echo, Desert Hawk and Urigen – all the "potential winners" – were either outright transferred or liened for the benefit of Beechwood and PPCO, which Huberfeld, Bodner and Nordlicht control, over the next months leading up to the Agera transaction. (*See Bixter* Decl. Ex. 50)

631.    Most notable is that Steinberg lists the unencumbered value of PPVA's oil and gas positions, including its equity interests in Golden Gate Oil, PEDEVCO and Northstar, as **$0**, consistent with Dan Grabon's emails two days prior that Beechwood's secured debt interest in Golden Gate Oil and Northstar was worth nothing.  (*Id.*).

632.    The spreadsheets and materials prepared by Steinberg and Mr. Grabon were incorporated into Gerszberg's Powerpoint presentation for Bodner, Huberfeld, Nordlicht and Beechwood, which stated that PPVA had only $40 million in unencumbered assets to borrow against. (Bixter Decl. Ex. 642 [CTRL8008894]).

633.    Gerszberg knew that PPVA was valuing its investment in his own business at approximately $22 million, even though it was worthless and had stopped operating.  (*See Bixter Decl. Ex. 50*)

634.    In a January 2016 presentation to Feuer, Taylor, Bodner and Huberfeld prepared by Seth Gerszberg, Steinberg, Levy, Manela, and others ("**Gerszberg Presentation**"), the following topics were discussed:

   a.    PPCO goal of raising $80M, moving $50M of equity from PPCO to PPVA and using $30M to fund ongoing operations;

   b.    Reviewing PPCO outflows (expenses, redemptions, investments), PPCO inflows and deficits, and strategies for raising $80M in PPCO, including $20M by "David and Murray's investor list" and "additional debt from Beechwood" of $50M;

   c.    PPVA Goals of raising $200M, converting $25-40M of 2015 redemptions to debt, renegotiate and refinance debt and sell Implant Sciences for $80-$100M;

   d.    Reviewing PPVA outflows of $205M (expenses, interest owed, margin calls, redemptions), PPVA potential inflows through creation of management share class, sale of Implant Sciences, noting that "if none of these happen, PPVA is facing a $150MM deficit" and "even after all these potential inflows, PPVA still faces a minimum deficit of 50M (assuming we can postpone the 2015 redemptions)";

   e.    Reviewing details of the "significant investments" including whether the positions were encumbered or unencumbered;

   f.    Reviewing existing debt and encumbrances, noting that "Due to BAM's security interests in PPVA's assets, namely Agera and Implant, **PPVA only has approx $40MM of assets which are unencumbered that can be borrowed against**. PPVA has no ability to borrow additional funds to cover its deficit;"

   g.    Reviewing a plan for "Beechwood-Financing the Deficit" and the use of the proceeds;

   h.    And a slide entitled "David and Murray" asking "What do we need from David and Murray? Help us figure out short-term liquidity issues, Help us close investment into PPCO and the management share class, [and] renegotiate the Beechwood note."

138

(Bixter Decl. Ex. 28 [CTRL8008894] (emphasis added)).

635.    In the months following the *Rachmanus* Email, Platinum Management reported the

following net asset value of PPVA:

- As of January 31, 2016: $694,048458.43

- As of February 29, 2016: $702,399,799.68

- As of March 31, 2016: $709,672,851.54

- As of April 30, 2016: $720,648,387.82

(Bixter Decl. Ex. 466 [CTRL7803643]; Bixter Decl. Ex. 467 [CTRL7814081]; Bixter Decl. Ex.

468 [CTRL7882101]; Bixter Decl. Ex. 469 [CTRL8021630]).

**NORDLICHT SIDE LETTER AND MARCH 2016 RESTRUCTURING**

636.    At all relevant times, Implant Sciences Corporation ("**Implant Sciences**") was a

Massachusetts corporation engaged in the explosives trace detection ("ETD") market.  Its primary

business was to design, manufacture, and sell systems and sensors that detect trace amounts of

explosives and drugs for use in various security, safety, and defense industries.  See Bixter Decl.

Ex. 659 [CTRL7472644]).

637.    DMRJ Group LLC ("**DMRJ**") is a limited liability company organized under the

laws of Delaware and a subsidiary of PPVA. At all relevant times before the commencement of

the Cayman Liquidation, Platinum Management executives including David Levy, Mark

Nordlicht, Joe SanFilippo and Daniel Small served as officers of and managed and operated

DMRJ.  (*See* Bixter Decl. Ex. 498 [BW-SHIP-0137646]).

638.    Beginning in December 10, 2008, DMRJ made four separate term loans to Implant

Sciences pursuant to that certain Note and Warrant Purchase Agreement executed by the parties

on that date, which loans were memorialized in promissory notes issued by Implant Sciences to

DMRJ on December 10, 2008 (as amended, the "2008 Note"), September 1, 2009 (as amended, the "2009 Note"), September 5, 2012 (as amended, the "2012 Note") and February 28, 2013 (as amended, the "2013 Note" and collectively with the 2008, 2009 and 2012 Notes, the "Implant Term Notes"). (Bixter Dec. Ex. 660 [CTRL7834270, CTRL7834273]). On or about September 4, 2009, DMRJ and Implant Sciences entered into a credit agreement, promissory note and security agreement by which DMRJ agreed to provided Implant Sciences a revolving loan with an initial maximum borrowing limit of $3 million (the "Revolving Loan"). The borrowing limit on the Revolving Loan was increased to $23 million via a series of amendments entered into by DMRJ and Implant Sciences. (*Id.*).

639. Amounts owed by Implant Sciences to PPVA via DMRJ pursuant to the Implant Term Notes and the Revolving Loan were secured by perfected security interests and liens on all of Implant Sciences' assets. (*See id.*; Bixter Decl. Ex. 612 [BW-SHIP-01502116]). The 2008 Note, in the original principal amount of $5.6 million, was convertible into Implant Sciences common stock pursuant to a formula set out in the 2008 Note. Bixter Decl. Ex. 680( Platinum Management caused DMRJ to assign all of its rights, title and interest under the 2008 Note to Montsant in Spring 2015. Thereafter, the 2008 Note was included among the securities and instruments that served as collateral securing amounts owed to Beechwood under the Montsant Loan. Bixter Decl. Ex. 681 (BW-SHIP-01121295)

640. On or about March 19, 2014, BAM and Implant Sciences executed agreements by which BAM provided Implant Sciences with a term loan in the original principal amount of $20 million and Implant Sciences issued a promissory note to BAM in that amount (the "**BAM 2014 Note**"). Amounts owed to BAM under the BAM 2014 Note were secured by a security interest and lien on all of Implant Sciences' assets. In addition, Platinum Management caused

DMRJ to enter into an intercreditor agreement dated March 19, 2014 with BAM by which DMRJ agreed to subordinate its security interests and liens to BAM's security interests and liens.  (Bixter Decl. Ex. 660 [CTRL7834270]; Bixter Decl. Ex. 612 [BW-SHIP-01502116].

641.    Beginning in May 2015, Implant Sciences began to explore various strategic options, including a potential sale, by which it could maximize value to its shareholders and other stakeholders.  Implant Sciences engaged Chardan Capital Markets LLC ("**Chardan**") and Noble Financial Capital Markets ("**Noble**"), two financial advisors/investment banks, to advise it in connection with this effort.  [*See* Bixter Decl. Ex. 678 (CTRL7472642 – CTRL7272644]).

642.    Platinum Management and Beechwood were aware of and kept up-to date with respect to Implant Sciences' effort to explore strategic options, including a sale. *See (Bixter Decl. Ex. 175; CTRL7354069)*

643.    There is no evidence that Implant Sciences was not in default on its bond obligations to Beechwood on or around January 2016.  It also announced a new credit line with a third –party lender in December 2015.  *See* Implant Sciences 8K, January 4, 2016.

644.    On January 13, 2016, Nordlicht purportedly executed a one page letter, witnessed by Mark Feuer (the "**Nordlicht Side Letter**").  (Bixter Decl. Ex. 622 SAC at Ex. 75).  The Nordlicht Side Letter states that it is made on behalf of Nordlicht, PPVA, PPCO "and each of their affiliates", and provides:

> To the extent not otherwise in violation of applicable law, *upon the sale of the assets and/or equity (collectively, the "Sale") of Implant Sciences, Inc. and/or any of its subsidiaries (collectively, the "Company"), the proceeds of such Sale that inure, directly or indirectly, to the benefit of Platinum, shall immediately upon consummation of such Sale be applied and remitted to B Asset Manager, LP ("BAMLP"), in such amount necessary to purchase and/or repay in full all indebtedness owing by Golden Gate Oil Inc. to BAMLP and each of its investment advisory clients at such time (collectively, "BAM")*; provided, that, nothing herein shall modify the obligations of the Company herein to first repay all indebtedness owing by the Company to BAM with proceeds of a Sale ("Implant Repayment").

#73476550_v1

(*Id*. (emphasis added)).

645.    The Nordlicht Side Letter further states that Nordlicht agrees "to take or cause to be taken all additional actions deemed by BAM to be reasonably necessary in furtherance of the foregoing, as well as to create a perfected security interest in the obligations described above to the extent requested by BAM."  (*Id*.)

646.    Bids by potential purchasers of Implant Sciences were due on January 11, 2016, two days before the Nordlicht Side Letter was executed.  (Bixter Decl. Ex. 675, CTRL7728630; CTRL8178998). As of January 21, 2016, bids had been submitted and Implant Sciences' board of directors scheduled a meeting concerning the proposed sale transaction for February 2, 2016. (Bixter Decl. Ex. 617 [CTRL8178998]).  A few weeks later, in March 2016, Platinum Management and BAM orchestrated a series of transactions to "restructure" the transactions previously entered into among PPVA, PPCO and the Beechwood Entities and to attempt to memorialize the Nordlicht Side Letter ("**March 2016 Restructuring**").  (Bixter Decl. Ex. 623, SAC at Ex. 78).

647.    On March 21, 2016, Montsant, PPVA, Golden Gate Oil and BAM Administrative entered into the Master Guaranty ("**Master Guaranty**"), by which, *inter alia*, (i) Montsant agreed to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate Oil, to the extent of the assets contained in a collateral account of securities; (ii)  PPVA provided BAM Administrative, as agent for certain Beechwood Entities and SHIP, with a non-recourse guaranty of amounts owed by Golden Gate Oil and amounts owed by Montsant.  *Id*.   The guaranty was limited to certain amounts to be received by PPVA from the anticipated future sale of Implant Sciences. As stated in the Master Guaranty:

> Immediately following PPVA's receipt of any payments, proceeds, distributions and/or other amounts arising in any manner whatsoever from any right, title and/or interest, PPVA may have in and to Implant Sciences Corporation (the "Proceeds"), PPVA shall immediately following such receipt remit such Proceeds in immediately available funds as follows:

(a) First, PPVA shall make or cause to be made a payment to BAM [BAM Administrative] in an amount equal to Twenty-Million Dollars ($20,000,000.00) to prepay the principal amount owed by GGO to the Investors, as such term defined in that certain Note Purchase Agreement, (as same may be amended, restated, modified and or supplemented from time to time), dated as of April 10, 2012, by and between GGO and BAM (as successor agent to Precious); and

(b) Second, PPVA shall make or cause to be made a payment of any remaining Proceeds to pay in full all outstanding obligations and liabilities under that certain Note Purchase Agreement, dated as of March 19, 2014, by and between Implant Sciences Corporation, each of the investors party thereto, and the Agent [BAM Administrative].

(*Id*.)

648.    The Master Guaranty was further secured by collateral assignments from PPVA to Beechwood Entities of: (i) amounts owed under certain promissory notes issued by China Horizon to PPVA, in the original principal amount of $4,764,872; and (ii) carbon credits, emission reductions and related assets due and payable to PPVA under certain carbon credit portfolio agreements.  *Id*.

649.    In connection with the March 2016 Restructuring, on or about March 28, 2016, Platinum Management caused PPVA (via its subsidiary Montsant) to enter into an agreement to borrow funds with which to repurchase approximately @3.4 million shares of Navidea stock from a Beechwood client at a price per share of $1.95.

650.    The market price for Navidea shares on March 21, 2016 was approximately $1.00 per share.  (Bixter Decl. Ex. 629, SAC Ex. 77).

651.    The Navidea shares repurchased by PPVA on or about March 28, 2016 previously had been traded to Beechwood at the then market price of $1.95 per share in October 2015.  After the initial trade, however, the market price for Navidea stock had fallen, thereby impairing Beechwood's balance sheet.  (*See* Bixter Decl. Ex. 460 [CTRL8009309]).

**MARCH 2016 RELEASE**

652.    In late 2015 and early 2016, PPVA was straining under the pressure of overvaluation and the resultant illiquidity; Nordlicht called upon Bodner and Huberfeld to support the fund:

     a.    "But the reality is Dec 1 is 2 weeks away and if I don't have 50 million inflow by Dec 1, platinum will have to be in wind down and probably Beechwood too if we are honest with eachother. [sic] It is time to pull out all the stops, I am willing to borrow the money against all my assets (real estate, lp interests in platinum, beechwood interest) , take all the risk on my shoulders, make any kind of deal as I think we get through this crunch, we will thrive. But I need help and frankly, I feel like Dovid is a little clueless as to what is about to happen. I can't imagine we let it all go down the tubes when 50 million pretty much saves us. It's not perfect and I really feel 125-150 is what fixes and relaunches us and maintains and builds on our 13 yr track record but at this point, with all the irons I have in the fire, I can get by with 50 and then lean on Kerry for more inflows going forward or just piece it together with all the marketing initiatives we have going. I know we want to solve one problem at a time but 50 million into platinum for dec 1 needs to be the number 1 priority because everything else is unsolvable otherwise."  (Bixter Decl. Ex. 49 [CTRL7516525]).

     b.    "Please read this to Dovid. It's 6 am here in israel, I have not gone to sleep because we are 12 hours away from both platinum and beechwood going down….but let's face it , we are not going to get out of this unless both of you go way out on a limb." (Bixter Decl. Ex. 50 [CTRL7736228]).

653.    On December 13, 2016, Nordlicht wrote to Huberfeld and Fuchs "Am on my way to jfk with kids for their 6 pm flight to Israel. Dovid ducking my calls. Major shalom bayis situation. Dahlia is literally making me get on Israel flight if we don't connect and agree what we are doing." (Bixter Decl. Ex.471 [CTRL7591043]).[2]

654.    In March 2016, in light of the expaning government investigation into the COBA Scheme and the Platinum/Beechwood Relationship, as well as the January 2016 Gerszberg Presentation predicting the demise of PPVA, the partnership underwent a "divorce" whereby

---

[2] While it is true that Nordlicht had relocated to Israel at the start of the SEC investigation, after which he divided his time between Israel and New York, the statement that Nordlicht's wife would "make him get on a flight" is relevant.

Huberfeld and Bodner purportedly relinquished their beneficial ownership in Platinum Management as part of a release in which Huberfeld and Bodner sought <u>indemnity against suit</u> from Platinum Management and PPVA (the "**March 2016 Release**". (Huberfeld Tr. 73:9-14; Bixter Decl. Ex. 41, Bodner Tr. Ex. 377.57 [BODNER0000001]).

655.   Curtis Mallet-Prevost, Colt & Mosle LLP represented Bodner and Huberfeld, as well as Platinum Management during the "negotiation" phase of the March 2016 Release and prepared a memo address to Platinum Management's in-house counsel  justifying Platinum Management's release on behalf of the funds.  The memo was written "a███████████████ █████████  (Bixter Decl. Ex. 117, Huberfeld Tr. Ex. 593 [BODNER0000011]).

656.   The release was signed by Bodner, Huberfeld, Fuchs, Landesman and Nordlicht. (Bixter Decl. Ex. 41, Bodner Tr. Ex. 377.57 [BODNER0000001]).

657.   Fuchs testified that he agreed to sign the release in exchange for $500,000 in payments allegedly owed to him by PPVA, paid for by Bodner and Huberfeld as "loans", to enable Fuchs to meet certain charitable commitments. (Fuchs Tr. 60:8-61:5, 87:20-93:25).

658.   Fuchs further testified that Bodner and Huberfeld told him "if you don't sign this, you are not getting the money" and that Fuchs "didn't even read this agreement until [his] attorney brought it to my attention." (*Id.*)

659.   During the release drafting process, Nordlicht refused to provide a personal guarantee for the indemnity sought by Huberfeld and Bodner, noting "I obviously can't be responsible personally for David and Murray's misconduct."  (Bixter Decl. Ex. 42, Bodner Tr. Ex. 377.59 [CTRL7749843]).

660.   Nordlicht conveyed several times that there was no value to the management company at this time, and hence no value to the interests of Huberfeld and Bodner in the

Management company that they were "giving up" in exchange for the release. (Bixter Decl. Ex. 638 [CTRL8339805] (Nordlicht in response to concerns that the release was a gift for tax purposes: "That's the most moronic thing I have ever heard…even for them. There is no value right now to mgmt. co anyhow as evidenced by fact shares are being given away for just investment, no consideration."); *see also* Bixter Decl. Ex. 473 [CTRL8323807] (Nordlicht to Landesman: "In terms of 2016, going forward mgmt percentages are being determined by either people coming up with New cash or putting existing holdings at risk as first loss to bring in new capital. There is no value to management company otherwise and it is why david and Murray are gone. It's almost like a complete new startup.") (emphasis added)).

661.    Simultaneously with the Bodner and Huberfeld release negotiations, Platinum Management sought to secure a mutual release among Platinum Management, Huberfeld, Bodner and Marcos Katz. (Bixter Decl. Ex. 476 [CTRL7752714 and CTRL7752716]).

662.    The departure of Bodner and Huberfeld was apparently a surprise to Marcos Katz, who wrote to Huberfeld, Bodner and Nordlicht on April 11, 2016: "I am totally confused. Michael informed me that you left Platinum and gave back your shares. What the hell is going on? I left 50 million USD in the [fund] just because I trusted you."  (Bixter Decl. Ex. 84 [CTRL7814403]).

663.    The purported additional investment opportunity from Marcos Katz never materialized and Katz never counter-signed the Katz-Bodner-Huberfeld release. (Bixter Decl. Ex. 661 [CTRL8103947]).

664.    The estate of Marcos Katz filed a complaint against Nordlicht, Huberfeld, Bodner, Fuchs and G. Kalter seeking $39 million in compensatory damages for fraud and breach of fiduciary duty claiming that each "falsely and fraudulently induced the Katzes to invest and remain

invested in PPVA through false representations that PPVA was liquid and held sufficient assets to pay the Katzes' redemption requests."  (Bixter Decl. Ex. 478, Katz Tr. Ex. 2).

## AGERA ENERGY HISTORY AND AGERA TRANSACTIONS

### Formation of Principal Growth Strategies LLC and Agera Energy

665.   On December 4, 2013, PPVA and PPCO formed Principal Growth Strategies LLC ("**PGS**") as a Delaware limited liability company.  (Bixter Decl. at  Ex. 479 (hereinafter "**Trott Tr.**") at Ex. 23).

666.   Pursuant to the Operating Agreement of PGS (the "**PGS Operating Agreement**"), PPVA held 55% of the membership interests of PGS and PPCO held the other 45%.  (*Id.* at  15). Nordlicht served as the Managing Member of PGS.  (*Id.* at 13).

667.   Agera Energy LLC ("**Agera Energy**") was formed on March 5, 2014.  (Bixter Decl. Ex. 480 (hereinafter "**Narain Tr.**") at Ex. 204).

668.   During  the  five–year  term,  the  Cassidy  Employment  Agreement  escalates Cassidy's "gross salary" from $146,250.00 to $950,000.  (*Id.* at § 5(a)).

669.   In addition, the Cassidy Employment Agreement grants Cassidy a "bonus" of a total of seven percent of Agera Energy's gross revenues on a twice-yearly basis.  (*Id.* at § 5(b))

670.   Agera Holdings LLC ("**Agera Holdings**") was formed on July 3, 2014.  (Trott Tr. Ex. 18, p. 1.).  On the same day, Agera Energy became a wholly owned subsidiary of Agera Holdings.  (*Id.*)

671.   On June 11, 2014, Agera Energy issued an Amended and Restated Secured Convertible Promissory Note to PGS in the principal amount of $600,071.23 (as amended, the **"Agera Note"**).  (*See* Bixter Decl. Ex. 484, Trott Tr. Ex. 21)

672.     On July 3, 2014, PGS and Agera Energy amended the Agera Note to permit PGS to convert the Agera Note into 95% of the "outstanding capital securities" of Agera Holdings.  (*See* Bixter Decl. Ex. 485, Trott Tr. Ex. 22).

## Hiring of Kevin Cassidy

673.     In 2008, Optionable, Inc., a fund founded by Kevin Cassidy ("**Cassidy**") and Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives. Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months and was formally released from prison in December 2014.  (Bixter Decl. Ex. 486 [CTRL3742649]; Bixter Decl. Ex. 487 [CTRL3225678]).

674.     In April 2014, Nordlicht and Kevin Cassidy ("**Cassidy**") discussed compensation to Cassidy, via Starfish Holdings, Inc. ("**Starfish Holdings**"), of eight percent of PGS' profits in Agera Energy, in connection with Cassidy serving as an executive at Agera Energy.  (Bixter Decl. Ex. 663 [CTRL5360341])  Cassidy also suggests a "figurehead" in the management of Agera Energy.  (*Id.*)

675.     On June 17, 2014, Agera Energy and Kevin Cassidy ("**Cassidy**") executed an employment agreement (as amended, the "**Cassidy Employment Agreement**").  (Bixter Decl. Ex. 482, Trott Tr. Ex. 26)

676.     On December 29, 2014, the Securities and Exchange Commission ("**SEC**") sent Platinum Management Examination Request No. 32, which requested information concerning: (1) Cassidy's role at Agera; and (2) any payments to Cassidy by PPVA or any other Platinum Management-affiliated fund.  (Bixter Decl. Ex. 489 [CTRL6001949])

677.     On February 4, 2015, the SEC sent Platinum Management Examination Request No. 37, which requested information concerning: (1) any disclosures of Cassidy's "criminal and

civil fraud history and his employment with Agera" made by PPVA to investors; and (2) controls instituted by, among others, Platinum Management, Huberfeld, and Bodner, to monitor Cassidy's "activities regarding Agera." (*See* Bixter Decl. Ex. 490 [CTRL7665669])

678.    On February 6, 2015, Albanese scheduled a meeting at Agera Energy naming as attendees, among others, Bodner, Cassidy, Huberfeld, Nordlicht and Beren. (*See* Bixter Decl. Ex. 488 [AN013511]).

679.    On February 10, 2015, the SEC sent Platinum Management Examination Request No. 38, which requested information concerning:  (1) how Cassidy's hiring "benefits and is in the best interest of Agera"; and (2) the controls in place to "limit Cassidy's access to Agera's finances such as cash and credit accounts" (SEC Request Nos. 32, 37, and 38 are hereinafter known as the "**Cassidy SEC Requests**").  (Bixter Decl. Ex. 492 [CTRL8432472])

680.    On August 19, 2015, Nordlicht, in his purported capacity as the "Chief Investment Officer" of an unnamed entity, signed a one-sentence document purportedly to "certify" that "Kevin Cassidy in compensation for his work overseeing Agera Energy shall be entitled to 8 percent of all profits earned by Platinum Funds and any related entity"  (the "**Cassidy Side Letter**")  (Bixter Decl. Ex. 491, Trott Tr. Ex. 25)  Cassidy did not sign the Cassidy Side Letter. (*Id.*)

## Bodner's Involvement in Agera

681.    Bodner participated in Agera's business, including with respect to investments and transactions that made Nordlicht "uncomfortable."   (Bodner Tr. 363:2-364:10; *see* Bixter Decl. Ex. 493, Bodner Tr. Ex. 377.20 [CTRL5102673])

682.    On June 22, 2014, Nordlicht, copying Albanese, emailed Richard Stadtmauer ("**Stadtmauer**") and referenced Agera:  "Ritchie, I understand you came to an agreement with

David.  Even though I am not really happy with everything shook out … I will be glad to have it behind us … David asked me to email just to make sure there was no misunderstanding."  (*Id.*) Stadtmauer responded, copying "Dovid Bodner [AAlbanese@platinumlp.com]," "In fact, if I recall correctly, both you and Dovid said it would be worth about half of what they felt it was worth."  (*Id.*)

683.    Bodner went to Agera's office "every few weeks" and held meetings with, among others, Beren, Fuchs, Cassidy, and Huberfeld.  (Bodner Tr. 354:23-355:1; Bixter Decl. Ex. 495, Bodner Tr. Ex. 377.118 [ALB0000722]; Bixter Decl. Ex. 494, Bodner Tr. Ex. 377.119 [ALB0000742]).  Bodner's son Yaakov "Itchy" Bodner worked at Agera.  (Bodner Tr. 355:6-8)

684.    On March 17, 2015, Zevi Mayer, who appears to be Bodner's nephew, requested Bodner expedite his compensation.  (Bixter Decl. Ex. 663 [ALB0000982]).

685.    Bodner often worked at Agera's office and would give tours of Agera's offices to his partners and potential investors. (Fuchs Tr. 331:1-25)  Fuchs testified that during his tour of Agera, Bodner "wanted to show me how – this tremendous business that they have and how they're going to – how Platinum is going to benefit when they sell this business.  He wanted to show me around and – it was really impressive." *Id*.  Fuchs confirmed that Bodner was "trying to . . . encourage [Fuchs] to bring in more investors into Platinum, and [Agera] [was] one of the potential benefits of that."  (Fuchs Tr. 333:1-25)

686.    Bodner admitted that he was the point person on a proposed deal involving Agera because he "was in Agera.  Something like that might have happened because I was down there." (Bodner Tr. 365:9-15)

687.     On April 30, 2015, Bodner received an invite to a meeting at Platinum Management that would discuss "Agera Energy Buy out Major Energy / Strategic Partnership with LTC." (Bixter Decl. Ex. 496 [ALB0001140]).

688.     On May 6, 2015, Levy "cleared" a letter of acknowledgement with Bodner related to Agera.  (*See* Bixter Decl. Ex. 665 [CTRL6791407]).

689.     On December 25, 2015, Bodner inquired as to whether Agera Energy could incur debt.  (Bixter Decl. Ex. 497, Bodner Tr. Ex. 377.122 [CTRL7620254]).  Nordlicht told Levy that "David Bodner wants to know if Agera could borrow 30 million and dividend it out to us on [a] short term basis to see us through next 2 months until management share class comes in."  (*Id.*)

690.     On November 4, 2015, Bainbridge Energy Management LLC ("**Bainbridge Management**") was organized as a Delaware limited liability company.  (Bixter Decl. Ex. 666 [BW-SHIP-01073671]).  Aaron Schiff ("**Schiff**") and Yaakov Bodner jointly served as the managing members of Bainbridge Management.  (*Id.*)

691.     On November 5, 2015, Bainbridge Energy Holdings LLC ("**Bainbridge Holdings**") was organized as a Delaware limited liability company.  (*Id.*)  Schiff and Yaakov Bodner were the principals of Bainbridge Holdings.  (*Id.*)

692.     On November 4, 2015, Bainbridge Energy Finance Fund LLC ("**Bainbridge Fund**") was formed as a Delaware limited liability company.  (Bixter Decl. Ex. 667 [BW-SHIP-01073662]).  The Bainbridge Fund appointed Bainbridge Holdings as its managing member and Bainbridge Management as its investment manager.  (*Id.*)  On or around December 2015, Bainbridge Energy distributed a Private Placement Memorandum to potential investors.  (*Id.* at 1)

693.     The principals established Bainbridge to lend money to Agera against its receivables.  (Huberfeld Tr. 388:20-24)

151

694.    Bodner invested millions of dollars in Agera via Bainbridge.  (Bodner Tr. 368:22-369:4, 375:21-22, 430:10-12)  He received monthly interest payments.  (*Id.* at 433:20-434:14)

**Valuation of the Agera Note and Involvement of Beechwood**

695.    On January 25, 2016, for purposes of determining PPVA's net asset value, Nordlicht estimated the value of the Agera Note at $230 million.  (*See* Bixter Decl. Ex. 500, SanFilippo Tr.  265:8-266:17 [CTRL8159368] (PGS' interest in the Agera Note as between $205 and 210 million).  It does not appear that any party to the Trott Litigation has contested this valuation, and that it is not in material dispute.

696.    On February 2, 2016, Dhruv Narain ("**Narain**") joined B Asset Manager ("**BAM**") as President and Chief Investment Officer.  (*See* Bixter Decl. Ex. 501, Narain Tr. Ex. 821 at 1; Feuer Tr. 214:16-21)

697.    Platinum Management and BAM continued to obtain valuations of the Agera Note. For example, in valuing Agera Energy as of March 31, 2016, Alvarez & Marshal, LLC posited an aggregate equity value of between roughly $222 million and $270 million.  (*See* Bixter Decl. Ex. 503, SAC Ex. 71)

698.    Around that time, Platinum Management concluded that the combined interest of PPVA and PPCO in PGS maintained a value of more than $215 million.  (Bixter Decl. Ex. 504 [CTRL7908778]).

699.    On March 28, 2016, Narain emailed Taylor and Feuer with the subject line "Agera Valuation – Confidential."  (*See* Bixter Decl. Ex. 505, Taylor Tr. Ex. 349 [BW-SHIP-00722947]).

700.    According to Narain, Agera Energy's "███████████████████████ ████████████████████ in part because of the "███████████████████ ███████████████████ (Bixter Decl. Ex. 505, Taylor Tr. Ex. 349 [BW-SHIP-

00722947])   According to Narain, comparable companies "█████████████████████ (*Id.*);

(*see also* Narain Tr. 101:19-102:7).   Narain proposed that Beechwood pay for the Agera Note

with "█████████████████████████████████████████████



(*Id.*)

701.   Taylor responded "█████████████████████████ (Bixter Decl. Ex. 505,

Taylor Tr. Ex. 349 [BW-SHIP-00722947]).

702.   Narain told Feuer and Taylor that "████████████████████████

██████████   (Bixter Decl. Ex. 502, Narain Tr. Ex. 174 [BW-SHIP-01097754]).

703.   During this period, parties seeking to invest or otherwise transaction with Agera

Energy considered Beren a point of contact.   (Bixter Decl. Ex. 506, Beren Tr. Ex. 1.58

[CNOCSL_01144638]).   Beren made contemporaneous efforts to "reach[] out to a bunch of

business contacts to see if they'd be interested in investing in Agera." (*See* Beren Tr. 258:16-24).

704.   In March 2016, Nordlicht and Katz discussed the potential sale of the Agera Note

to an "insider." (Bixter Decl. Ex. 668, SAC Ex. 83).   Specifically, Nordlicht decided, in order to

sell the Agera Note, "we need an insider buying at an acceptable price."   (*Id.*)   According to

Nordlicht, around this time, "Dovid [Bodner] came back to [me] with some cockamany thing on

agera that beechwood wd buy it at one price as part of consortium."   (Bixter Decl. Ex. 507

CTRL8338388])

705.   Levy rejected this suggestion as "[r]iduculous" and instead offered to provide Katz

requested information because Katz "would def bid more at this point."   (*Id.*)   Levy also believed

that Beechwood offered to purchase the Agera Note at a "shitty value."  (Bixter Decl. Ex. 508 [CTRL8338396]).

706.    Steinberg and Narain continued discussing potential transactions related to the Agera Note.  (*See* Bixter Decl. Ex. 645 (hereinafter **"Steinberg Tr."**) at 149:7-11, 218:7-11; SanFilippo Tr. 270:21-24; 276:18-277:2.)

707.    Throughout this period, and up until the transactions on June 9, 2016 (collectively, the "**Agera Transactions**" or "**Agera Sale**"), Platinum Management did not hire outside counsel. (*See* Steinberg Tr. 186:19-22)  It was unusual for Platinum Management not to have outside counsel on a large transaction given the amount of the potential payment from the sale of the Agera Note.  (*See* SanFilippo Tr. 270:6-11; Steinberg Tr. 187:12-188:8).  The Agera transaction was the largest transaction Beechwood, Platinum or Beechwood's client SHIP had ever done. (SanFilippo Tr. 321:19-322:7; Robison Tr. 587:12)

708.    At this time, Steinberg assumed that the purchase price of a sale of the Agera Note would be calculated based on the enterprise value of Agera Energy as of the date of the transaction. (Steinberg Tr. 150:23-151:8).

709.    On April 1, 2016, after providing comments on the terms of a potential sale of the Agera Note, Steinberg told Narain ████████████████████████████████████ ████████████████████████████████████ *See* Bixter Decl. Ex. 509, Narain Tr. Ex. 808 [BW-SHIP-00878005]).  Steinberg adds ████████████████████ ████████████████████████████ (*Id.*)

710.    Steinberg comment regarding bad faith was directed at the alteration of the contents of the non-cash consideration paid to PGS as part of the sale of the Agera Note.  (*See* Steinberg Tr. 160:18-161:14; 177:24-178:5).

711.     This consideration included debt interests in PEDEVCO and China Horizon, which were later assigned by AGH Parent to PGS in conjunction with the Agera Transactions.  (*Id.* at 177:24-178:5).

712.     In so doing, Beechwood was "basically staying they're going to dictate in no uncertain terms" the non-cash consideration.  (*Id.* at 161:20-162:11; *see* SanFilippo Tr. 278:18-25 (Beechwood could "select anything they wanted whether or not it was fair value".))  The forensic examiner for Beechwood client CNO would later describe the transaction as one in which <u>they exchanged some "*bad debts*" held by Beechwood in return for new Agera notes.</u>

713.     Narain responds to this email "█████████████████████  (Bixter Decl. Ex. 509, Narain Tr. Ex. 808 [BW-SHIP-00878005]).

714.     In April 2016, Narain requested Beren's involvement in a potential transaction involving "███████████████████  (Beren Tr. 260:21-261:4; *see* Bixter Decl. Ex. 510 Beren Tr. Ex. 1.59 [CNOCSL_01147410]).

715.     From the perspective of Platinum Management, the urgency to sell the Agera Note increased in May 2016.  (*See* Steinberg Tr. 169:3-8)

716.     On May 4, 2016, Nordlicht asked Steinberg whether Platinum applied an EBITDA multiple to a potential sale of the Agera Note or if the potential price was a "set price."  (Bixter Decl. Ex. 511, Steinberg Tr. Ex. 474 [CTRL7889136]).  Steinberg responded "fixed price."  (*Id.*)

717.     On May 5, 2016, Narain discussed Agera Energy with a potential counterparty. (*See* Bixter Decl. Ex. 512, Narain Tr. Ex. 196).

718.     In distinguishing Agera Energy, Narain explained that Agera Energy ███████ ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████" (*Id.*)

719.   On May 10, 2016, Narain estimated the ████████████████████████

████████████████████████████████████   (*See* Bixter Decl. Ex. 513, Narain

Tr. Ex. 184 [BW-SHIP-00998096]).

720.   On May 12, 2016, Narain and Steinberg continued discussing a potential purchase

of the Agera Note.  (Bixter Decl. Ex. 514, Trott Tr. Ex. 28 [CTRL7916642]).  On this date, the

scheduled closing day for the sale of the Agera Note was August 2016.  (Steinberg Tr. 177:13-23).

721.   Narain confirmed to Steinberg that he informed BAM's transaction counsel of an

"emphatical[] need to execute and fund tomorrow."   (Bixter Decl. Ex. 514, Trott Tr. Ex. 28

[CTRL7916642]; *see* Steinberg Tr. 186:14-17).   This correspondence attached a spreadsheet

setting out "Agera Closing Numbers."  (Bixter Decl. Ex. 514, Trott Tr. Ex. 28 [CTRL7916642]).

The purchase price for PGS' interest in the Agera Note included what amounted to $90 million in

cash consideration at this time.  (*Id.* at 2).

722.   The next day, Narain reassured Steinberg that "[w]e are pushing very hard to close

by  end  of  May  as  you  guys  want."   (Bixter  Decl.  Ex.  515,  SanFilippo  Tr.  Ex.  1.84

[CTRL7919421]).

723.   On May 12, 2016, Steinberg, Levy, and Nordlicht discussed the "balance sheet" of

Agera Energy.  (Bixter Decl. Ex. 516, Bodner Tr. Ex. 377.128 [CTRL7917026]).  According to

Steinberg, "[t]here is a ton of confusion about the balance sheet […] that [Beechwood] is pissed

off about.  [Agera Energy] drew down $7mm from bainbridge which has a very costly prepayment

penalty[.]"  (*Id.*) Levy inquires:  "[w]hy would they draw … to pay off [B]eechwood?"  (*Id.*)

According to Steinberg, "[a]sk David Bodner I guess … [Beechwood] is freaking about it."  (*Id.*)

724.     The prepayment penalty in the loan from the Bainbridge Fund to Agera Energy meant that Agera Energy would incur a penalty if it prepaid because in so doing, it deprived the Bainbridge Fund of earning interest.  (*See* Steinberg Tr. 179:2-21)

725.     Also on May 12, 2016, Steinberg and Nordlicht discussed the rationale for the $170 million purchase for the Agera Note.  (Bixter Decl. Ex. 517 [CTRL7917187]).  Nordlicht told Steinberg "[j]ust leave it that numbers are the numbers."  (*Id.*)

726.     In addition, the $170 million purchase including "deducting" the $11 million owed to Bainbridge.  (*Id.*).

727.     On May 16, 2016, Nordlicht instructed Steinberg to close the Agera Transactions "as quickly as possible."  (Steinberg Tr. 188:25-189:23)  Steinberg communicated this to Narain.  (*Id.* at 189:24-190:4)

728.     On May 16, 2016, Steinberg reiterated that the $170 million "fixed" purchase price of the Agera Note was "no longer based on the previous Enterprise Value calculation[.]"  (Bixter Decl. Ex. 518, Steinberg Tr. Ex. 476 [CTRL7934363]).

729.     Around that time, Platinum Management "made concessions" to BAM "based on the understanding that [BAM] would be able to close [the Agera Transactions] by May 31."  (*Id.*)

### May 2016 Valuations of the Agera Note

730.     Between May 20 and 25, 2016, BAM, Agera Energy, and SHIP, an investment advisory client of BAM, held multiple meetings at the offices of Agera Energy and BAM that related to the sale of the Agera Note.  (*See* Narain Tr. 240:5-241:13, 242:6-13; Bixter Decl. Ex. 519, Narain Tr. Ex. 205; Bixter Dec. Ex. 520 ("**Wegner Tr.**") at 281:3-8).  At least one attendee believed the president of Agera Energy to be Cassidy.  (Wegner Tr. 326:2-10)

#73476550_v1

731.   In a meeting at the offices of Agera Energy, BAM presented an overview of the sale of the Agera Note (the "**Agera Presentation**"). (Bixter Decl. Ex.  521, Wegner Tr. Ex. 92, [BW-SHIP-00083309]).

732.   The Agera Presentation included an ███████████████," which in relevant part is as follows (*Id.* at 3):



733.   Wegner, then an executive at SHIP, understood the Agera Presentation to estimate the value of Agera Energy as between $227 million and $344 million.  (Wegner Tr. 323:19-324:10)

734.   At that time, SHIP understood the purchase price of the Agera Note to be $199 million.  (Wegner Tr. 324:11-15, 325:6-9).

---

[3] According to Narain, EV refers to "Enterprise Value." (*See* Narain Tr. 233:9-234:2)

735.    According to SHIP, BAM presented an investment in Agera Energy as a "good opportunity that was very likely to get increased in value very quickly." (Wegner Tr. 116:4-10, 323:22-325:19).

736.    On May 27, 2016, Duff & Phelps ("D&P") distributed to BAM a report entitled "Project Franklin: Draft Due Diligence Findings" (the "**Project Franklin Report**"). (Bixter Decl. Ex. 480, Narain Tr. Ex. 204 at 1).

737.    In the Project Franklin Report, D&P describes the transaction as "B Asset Manager ('BAM') intends to purchase a convertible note, from its holder, that is extended to Agera Holdings, LLC (the 'Company')." (*Id.* at 7) The Project Franklin Report summarizes the potential Agera Transactions as "based on an enterprise value of $208.4 [million] less [Agera Energy's] debt plus cash." (*Id.*)

738.    The Project Franklin Report posits that the total, due diligence adjusted EBITDA of Agera Energy in 2016 would be approximately $34.2 million. (*See id.* at 28) According to the Project Franklin Report, the fiscal year 2015 due diligence adjusted EBITDA of Agera Energy was approximately $25.6 million. (*See id.* at 13).

739.    The Project Franklin Report attributes the increase in EBITDA as "primarily due to acquisitions and increasing EBITDA margins resulting from cost management initiatives and the integration of the business into [Agera Energy's] pricing model and hedging strategy." (*Id.*)

740.    Days later, BAM contacted Egan Jones LLC ("**Egan Jones**") to provide "new ratings for Agera Energy." (Bixter Decl. Ex. 522, Narain Tr. Ex. 206 [CNOCSL_00273933]). Beechwood provided Egan Jones a document labeled "Agera Energy Transaction and Overview" which stated that Agera Energy had a 2016 EBITDA of $34 million. (*Id.* at 2).

741.     Meanwhile, Platinum Management discussed procuring a fairness opinion for the Agera Transactions.  (*See* Bixter Decl. Ex. 639 [CTRL7967279])  Platinum Management did not obtain a fairness opinion in conjunction with the Agera Transactions.  (Steinberg Tr. 198:10-24)

742.     On June 1, 2016, Narain stated that what would become the Agera Transactions involved a "motivated seller who very much needs the money."  (Bixter Decl. Ex. 523, Narain Tr. Ex. 189 [SHIP0087745]).   Around that time, Narain told Steinberg that the buyer of the Agera Note did not include entities owned by Nordlicht.  (Steinberg Tr. 237:24-239:10; Bixter Decl. Ex. 524, Steinberg Tr. Ex. 472).

743.     On June 2, 2016, Steinberg told outside counsel for an unrelated matter that he learned from Narain that neither Beechwood nor Nordlicht owned any of the entities acquiring the Agera Note.  (*See* Steinberg Tr. 238:20-239:10; Bixter Decl. Ex. 525, Steinberg Tr. Ex. 483).

744.     On June 7, 2016, Huberfeld forwarded Narain an email with an unaffiliated third party that references an exchange of equity for assets.  (*See* Bixter Decl. Ex. 526, Narain Tr. Ex. 801 [BW-SHIP-0100623]).  Narain responded less than 5 minutes later.  (*Id.*)  In addition, between January 2016 and June 2016, Narain met with Huberfeld on multiple occasions.  (*See* Narain Tr. 331:13-20).

745.     Also on June 7, 2016, Ottensoser, Steinberg, and SanFilippo discussed the response to questions concerning Cassidy that had issued by the SEC in conjunction with an audit of Platinum Management.  (*See* Bixter Decl. Ex. 527, Steinberg Tr. Ex. 481 [CTRL8021916]).

**Huberfeld Is Arrested and the FBI Raids the Office of BAM**

746.     On June 7, 2016, the United States Attorney's Office for the Eastern District of New York issued grand jury subpoenas to David Bodner and David Levy.  (Bixter Decl. Ex. 640 [CTRL 8562989 [CTRL8569290]).

747.    On June 8, 2016, the United States Attorney's Office for the Eastern District of New York issued a grand jury subpoena to Platinum Management.  (Bixter Decl. Ex. 528 [CTRL8049086]; *see also* SanFilippo Tr. 283:7-9).

748.    On June 8, 2016, the SEC issued a subpoena to Platinum Management.  (Bixter Decl. Ex. 529 [CTRL8024354]).

749.    On the morning of June 8, 2016, government officials spoke with multiple Platinum Management employees.  (*See* SanFilippo Tr. 96:21-97:14).

750.    Also on June 8, 2016, the United States Attorney's Office for the Southern District of New York unsealed an indictment of Huberfeld, which alleged conspiracy to commit wire fraud in connection with the COBA Scheme. (Bixter Decl. Ex. 115; *United States v. Seabrook et al.*, 1:16-cr-00467 (S.D.N.Y.) at ECF No. 5).

751.    Huberfeld was arrested that morning.  (SanFilippo Tr. 314:3-9).

752.    Multiple Beechwood employees, including Feuer and Taylor, knew about Huberfeld's arrest on the morning of June 8, 2016.  (*See* Bixter Decl. Ex. 530, Taylor Tr. Ex. 351, [BW-SHIP-01100273]; Feuer Tr. 653:21-25).

753.    On that day, Beechwood executive Rick Hodgdon emailed Taylor and another Beechwood employee with information concerning the arrest of Huberfeld.  (Bixter Decl. Ex. 530, Taylor Tr. Ex. 351, [BW-SHIP-01100273]).  The subject line is "Not good news."  (*Id.*).

754.    In addition, on June 8, 2016, the Federal Bureau of Investigation ("**FBI**") entered the offices of BAM.  (Narain Tr. 398:2-5; Feuer Tr. 652:22-653:5).

### Sale of the Agera Note

755.    On the morning of June 9, 2016, Narain sent multiple emails to finalize the Agera Transactions.  (*See* Bixter Decl. Ex. 531, Narain Tr. Ex. 210 [CNOCSL_01544978]).  For example,

at 6:13 AM, Narain emailed Beechwood transaction counsel with the subject line "

(*Id.*)

756.   At 6:27 AM, Narain referenced a ████████████████████ (Bixter Decl. Ex. 532 [CNOCSL_0154494].)

757.   At 6:40 AM, Narain emailed many of the same parties stating that ██████████ ████████████████████████████ (Bixter Decl. Ex. 533, Narain Tr. Ex. 191 [BW-SHIP-00165960]).

758.   At 10:56 AM, Narain set a noon deadline to exchange signed documents.  (Bixter Decl. Ex. 535 [CNOCSL_01545051]).

759.   On June 9, 20126, PGS amended the PGS Operating Agreement to grant Starfish Capital, Cassidy's entity, an eight percent membership interest in PGS.  (Bixter Decl. Ex. 536 [CTRL8126766]).

760.   On June 9, 2016, AGH Parent and "The Members Named Herein" executed an Amended and Restated Liability Company Agreement of AGH Parent (the "**AGH Parent Amended Operating Agreement**").  (Bixter Decl. Ex. 537, SAC Ex. 89 [CNOCSL00098633]).

761.   Steinberg signed as the "Authorized Signatory for PGS. (*Id.* at 68).  Narain signed as the "Authorized Signatory" for AGH Parent.  (*Id.* at 60, 62-66).  Cassidy signed as the "Authorized Signatory" for Starfish Holdings.  Cassidy also signed a Joinder Agreement to the AGH Parent Amended Operating Agreement, dated June 9, 2016, on behalf of Starfish Capital. (*Id.* at 69).

762.   The Members Schedule attached to the AGH Parent Amended Operating Agreement lists the following ownership interests in AGH Parent:

     a.   SHIP holds 350,000 Class A Preferred Units;

     b.   PGS holds 544,840 Class C Preferred Units;

     c.   BRe WNIC 2013 LTC holds 31,178.89 Class B-1 Preferred Units;

     d.   BBLN-Agera Corp. holds 50,600 Class B-1 Preferred Units;

     e.   BBIL ULICO 2014 holds 75,900 Class B-1 Preferred Units;

     f.   BHLN-Agera Corp. holds 50,600 Class B-1 Preferred Units;

     g.   BOLN-Agera Corp. holds 11,271.11 Class B-1 Preferred Units;

     h.   Beechwood Re Investments LLC holds 5,730 Common Units;

     i.   Starfish Capital holds 3,438 Class B-2 Preferred Units and 45,520 Class C Preferred Units; and

     j.   Starfish Holdings holds 12,062 Incentive Units.

(*Id.* at 70; *see also* Narain Tr. 191:4-23).

763.   In addition, $36,960,000 in purported assets were contributed to AGH Parent Beechwood in exchange for B-1 Debt.  (*See* Bixter Decl. Ex. 564, SAC Ex. 91 [CTRL8126765]) The B-1 Debt included debt interests in PPCO, China Horizon, and PEDEVCO.  (*Id.*)

764.   SHIP later considered conveyance of the Class B-1 Preferred Units as "█████████ ████████████████████████████████████████████  (*See* Bixter Decl. Ex. 538, Robison Tr. Ex. R.16 [SHIP0066968]).

765.   The AGH Parent Amended Operating Agreement permitted AGH Parent to redeem all or a portion of the Class C Preferred Units, provided that AGH Parent issued a redemption notice to PGS on or prior to October 31, 2016.  (*See* Bixter Decl. Ex. 537, SAC Ex. 89 at § 9.06 [CNOCSL00098633]).  In order to redeem the Class C Preferred Units, AGH Parent was required to pay PGS in "PGS Value" ("**PGS Value**").  (*Id.*)

766.    The AGH Parent Amended Operating Agreement defined PGS Value in relevant part as investments by AGH Parent in PPVA and PPCO with the "approximate aggregate value" of $35,400,000.00, and included "debt instruments" and "limited partnership interests." (*Id.*)

767.    On June 9, 2016, Agera Holdings further amended and restated the Agera Note. (Bixter Decl. Ex. 539, Trott Tr. Ex. 33 at §1(b)).  The Agera Note remained issued to PGS in the amount of $600,071.23 and convertible to 95% of the "outstanding capital securities" of Agera Holdings.  (*Id.*).

768.    On June 9, 2016, immediately prior to the Agera Transactions, Agera Energy, Agera Holdings, and Cassidy terminated the Cassidy Employment Agreement.  (Bixter Decl. Ex. 540, Trott Tr. Ex. 30).

769.    On June 9, 2016, PGS and Starfish Holdings executed a Profits Interest Award Agreement, Non-Solicitation and Non-Compete Agreement wherein PGS issued to Starfish Holdings the 12,062 Incentive Units in PGS.  (Bixter Decl. Ex. 541 [CTRL8126763]).

770.    On June 9, 2016, AGH Parent and PGS executed a Purchase Agreement (the "**Agera Purchase Agreement**") wherein PGS' sold its interest in the Agera Note to AGH Parent. (Bixter Decl. Ex. 543, SAC Ex. 90 [BW-SHIP-00000050]).

771.    Pursuant to the Agera Purchase Agreement, PGS received from AGH Parent a "Purchase Price" of $170,000,000.00.  (*Id.* at § 2.4).

772.    The Purchase Price consisted of

    a.  $65,293,450.00 in cash (with only $20 million paid out at closing);

    b.  Debt and equity instruments set forth in Schedule I thereto with a value of $43,666,460.00;

    c.  3,438 Class B-2 Units in AGH Parent with an "original value" of $2,000,000.00; and

    d.  590,400 Class C Units in AGH Parent with an "original value" of $59,040,000.00.

(*Id.*).

773.    Steinberg executed the agreement on behalf of PGS as its "Authorized Signatory." (*Id.* at 39).  Narain signed as the "Authorized Signatory" for AGH Parent.  (*Id.* at 38).

774.    On June 9, 2016, PGS and AGH executed an Assignment and Assumption Agreement ("the **2016 Agera Assignment**").  (Bixter Decl. Ex. 544, Narain Tr. Ex. 804 [CTRL8126760]).  Steinberg executed the agreement on behalf of PGS as its "Authorized Signatory."  (*Id.* at 2)  Narain signed as the "Authorized Signatory" for AGH Parent.  (*Id.*)

775.    Pursuant to Schedule A to the 2016 Agera Assignment, AGH Parent assigned to PGS debt interests held by AGH Parent in PPCO, China Horizon and PEDEVCO (the "**2016 Assigned Debt**").  (*Id.*)  AGH Parent received the Assigned Debt from Beechwood and SHIP. (*Id.*)

### The Bad Debt Assigned for the Good Agera Note

776.    The 2016 Agera Assignment set forth a fair market value of the Assigned Debt as $43,666,460.00, or par value.  (*Id.*)

777.    Starting in 2015 at the latest, Beechwood repeatedly expressed concerns about PPCO, China Horizon, and PEDEVCO, which investments were held by PPVA and PPCO.  (*See* Narain Tr. 544:23-545:5)  Beechwood determined the valuation of these assets.  (*See* Bixter Decl. Ex. 545 (hereinafter "**Robison Tr.**") at 612:13-19).

778.    Bodner, Huberfeld, Nordlicht, and multiple employees of Platinum Management also were aware of issues in connecting with the 2016 Assigned Debt, including related to valuation.  For instance, in January 2016, Narain admitted that there would be ███████ ████████████████████████████████████████████ (Bixter Decl. Ex. 546, Narain Tr. Ex. 814 [BW-SHIP-00766744]).

779.    Additional issues included:

a. PPCO:

   i. In July 2015, Feuer asked Nordlicht to ensure PPCO made payments "ASAP." (Bixter Decl. Ex. 547, Johnson Ex. 1.48 [BW-SHIP-00728221]).

   ii. In December 2015, Beechwood had difficulty in holding a certain class of PPCO-issued debt, in particular because, according to Feuer, CNO "won't touch it." (*See* Bixter Decl. Ex. 548, Johnson Tr. Ex. 1.49 [BW-SHIP-00832197]).

   iii. Huberfeld, one of the founders of PPCO, was arrested on June 8, 2016. (*See* Steinberg Tr. 245:7-246:11).

b. China Horizon:

   i. In December 2015, Huberfeld was involved with a $1 million loan by Beechwood to China Horizon. (*See* Bixter Decl. Ex. 549, Feuer Tr. Ex. 512 [CNOCSL_01212966). Taylor responded "Wtf?" (*Id.*)

   ii. On March 2, 2016, Alan Clingman ("**Clingman**"), an executive at China Horizon, told Samuel Adler of Beechwood that China Horizon awaited funding from a recent debt offering. (Bixter Decl. Ex. 550, Narain Tr. Ex. 807 [BW-SHIP-0092679]). Adler inquired as to the China Horizon payment to Beechwood, and Narain responded "Unclear." (*Id.*)

   iii. On March 13, 2016, Narain told Steinberg that he participated in ███ ██████ (Bixter Decl. Ex. 551, Narain Tr. Ex. 805 [BW-SHIP-00992636]).

   iv. On March 14, 2016, Clingman alluded to "complications around valuation" resulting from a potential "qualified ██████████ ████████ (*See* Bixter Decl. Ex. 552, Narain Tr. Ex. 806 [BW-SHIP-00992646]).

   v. On March 15, 2016, Beechwood did not include China Horizon debt as "██████████████████████ (Bixter Decl. Ex. 509, Narain Tr. Ex. 808; [BW-SHIP-00878004]).

   vi. On or about May 3, 2016, Beechwood's holdings in China Horizon debt had been declared in default for non-payment of interest. (*See* Bixter Decl. Ex. 553, Narain Tr. Ex. 810 [BW-SHIP-01129522]).

   vii. As of May 23, 2016, Steinberg did not need to provide Beechwood with any missing originals of China Horizon promissory notes because "███████████████████ (Bixter Decl. Ex. 554, Thomas Tr. Ex. 909 [BW-SHIP-00163116]).

   viii. As a result of litigation that had a "lot of value," the cash flow of China Horizon would not be "robust" in 2016. (*See* Narain Tr. 541:2-8; *see also* Johnson Tr. 133:8-12 (noting that the China Horizon litigation and the

166

failure to get government permits for business operations was public knowledge).

    ix. At the time of the Agera Transactions, Steinberg did not believe China Horizon would "generate cash." (*See* Steinberg Tr. 250:13-251:5).

c. PEDEVCO:

    i. Beren and Bodner were aware of a valuation report issued around February 2014 that raised concerns about PEDEVCO's operations and financial viability. (*See* Bixter Decl. Ex. 144, Beren Tr. Ex. 1.6 [CTRL5097898])

    ii. In November 2014, Beren discussed PEDEVCO's potential inability to main interest payments, depending in part whether PEDEVCO's "production kicks in" in the immediately following months. (*See* Bixter Decl. Ex. 555 [BW-SHIP-01063863])

    iii. In February 2015, Beren described Huberfeld and Saks as "adamant that BAM would not allow a "holiday on the cash flow sweep" and that "[t]hey did not care nor were sympathetic to lease expiring and legal fees etc." (*See* Bixter Decl. Ex. 557, Beren Tr. Ex. 1.26 [CTRL7652058])

    iv. In February 2015, Saks "brought in" Huberfeld and Bodner to participate in a dispute over PEDEVCO's repayment obligations. (Bixter Decl. Ex. 558, Beren Tr. Ex. 1.58 [CNOCSL_01144637]). Huberfeld told Beren "as long as you get me something back [from PEDEVCO] it will be ok" and so Beren "got them a cash payment." (*Id.*)

    v. In March 2015, Saks noted to Beren and Steinberg that PEDEVCO had a ████████████████████████████████████████ (Bixter Decl. Ex. 559, Beren Tr. Ex. 1.54 [BW-SHIP-00806909]).

    vi. In ████████████████████████████████████████████ ████████████████████████████ *ee* Bixter Decl. Ex. 560, Johnson Tr. Ex. 1.51 [CNO-SEC-0021850])

    vii. In January 2016, Feuer asked Huberfeld ███████████████ ████████████████████████. (Bixter Decl. Ex. 561, Huberfeld Tr. Ex. 679 [CNOCSL_01630873]).

    viii. In March 2016, Narain and Beren knew that a SEC filing detailed issues with PEDEVCO. (Bixter Decl. Ex. 668, Narain Tr. Ex. 813; [BW-SHIP-00079710]). Specifically, this filing reflected that ███████████ ████████████████████████████████████████████ ████████████████████████████ (Narain Tr. 447:10-17) (emphasis added).

    ix. In April 2016, BAM deferred principal and interest payments owed by PEDEVCO. (Bixter Decl. Ex. 562, Narain Tr. Ex. 816 [BW-SHIP-0025957]).

x.   In May 2016, Beren confirmed that the interest payments by PEDEVCO would be deferred so the person delivering the invoice shouldn't " ████████ ████████ (Bixter Decl. Ex. 563, Beren Tr. Ex. 1.62 [CNOCSL_01047674]).

xi.   Beechwood knew that Platinum Management objected to the inclusion of PEDEVCO debt in the noncash consideration.  (*See* Steinberg Tr. 253:9-254:3; 255:2-10).

780.   On June 9, 2016, PGS sent a Funding Direction Letter to AGH Parent.  (*See* Bixter Decl. Ex. 564, SAC Ex. 91 [CTRL8126765])  Steinberg signed as the "Authorized Signatory" for PGS.  (*Id.* at 2)

781.   Ultimately, Platinum Management did not obtain a fairness opinion in conjunction with the Agera Transactions.  (*See* Steinberg Tr. 198:10-24, 214:2-3)

782.   The Agera Transactions harmed PPVA (via PGS) in multiple ways.  For example, the Agera Note could have been sold for all cash, instead of the structure of the Agera Transactions.  (Steinberg Tr. 203:2-9)

783.   The "renegotiation" of the Agera Transactions pertaining to the composition and amount of noncash consideration was against the interests of PPVA because "it was a negotiation component to which [it] didn't really have any leverage to fight against."  (*Id.* at 209:15-210:8)

784.   Accordingly, Platinum Management "caved" to Beechwood on the issue of noncash consideration, which was considered a "key component."  (*Id.* at 251:9-20)

785.   On a June 14, 2016, on a call with investors, Nordlicht announced that PPVA would be entering liquidation and that Platinum Management would be winding down PPVA's operations.  (Bixter Decl. Ex. 565 [CTRL0001297]; Bixter Decl. Ex. 566 [CTRL8066190; Bixter Decl. Ex. 567 [CTRL8559389]).

786.   Of the $20 million in cash that PGS received from the Agera Sale, $15 million was immediately transferred to Seth Gerszberg and his entity, Spectrum30, LLC.  (Bixter Decl. Ex. 568, SAC Ex. 102 [CTRL8026092]) A significant portion of the Agera cash proceeds were paid

to insiders and Platinum Management as well.  (Bixter Decl. Ex. 641 [CTRL8400493-CTRL8400494])

787.    Fuchs described the Agera deal as follows:

[W]hen the [Agera] deal was made, we were being told the entire time that: "There's a big deal coming down. Agera's gonna be sold. Platinum is going to get a ton of money, and everything is going to be back to normal again.["] Like a normal business, you know, there's -- the business has ups and downs. You can sell this. You can sell that. And everyone was very excited about the Agera deal. All of a sudden, we find out that it was sold to Beechwood, and Beechwood got the assets for -- exactly -- I don't know exactly because I had nothing to do with Beechwood. I didn't know even know what was going on there.

(Fuchs Tr. 54:1-25)

788.    Fuchs indicated that PPVA lost "over 100 million" from the Agera Transactions.  (Fuchs Tr. 52:1-25)

## AFTERMATH OF THE AGERA TRANSACTIONS

789.    Subsequent to the Agera Transactions, Platinum Management discussed the value of Agera Energy.  In July 2016, Platinum Management valued Agera Energy at a $250 million "equity value."  (Bixter Decl. Ex.  570 [CTRL8121506]).

790.    Consequently, according to SanFilippo "[w]e took 86% of that [equity] value to account for minority ownership and incentives.  118.6M for PPVA and 97M for PPCO before any sale."  (Bixter Decl. Ex. 572 [CTRL8121513]).  Nordlicht responded: "Damn..thought that part of incentive wasn't in number listed … ok … we basically got 170 cash x.92 right now."  (*Id.*)

791.    Immediately following the Agera Transactions, on June 29, 2016, Beechwood instructed Beren to provide input on the conclusions of the valuation of PEDEVCO in a BAM valuation report.  (*See* Bixter Decl. Ex. 571, Beren Tr. Ex. 1.56 [BW-SHIP-00773899])

792.    On July 22, 2016, AGH Parent and BAM Management Services LLC ("**BAM Management**") executed an Agreement for Consulting Services, with an effective date of June 9, 2016.  (Bixter Decl. Ex. 573[BW-SHIP-00260352])  In return for an annual fee of $1,00,000, BAM

Management provided AGH Parent with "strategic planning and consulting services" for a ten year term.  (*Id.*)

793.     After the Agera Transactions closed, Narain d████████████████████████████████ (Bixter Decl. Ex. 574, Narain Tr. Ex. 803 [BW-SHIP-00774892])

794.     On July 22, 2016, Narain emailed Elliot Feit, an employee at Beechwood, with the subject line: "████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  (*Id.*) (emphasis added).

795.     On July 26, 2016, Wegner contacted Feuer and Taylor concerning the July 2016 article in the *Wall Street Journal* which described problems at Platinum Management.  (Bixter Decl. Ex. 575, Wegner Ex. 71 [SHIP0019119]; Wegner Tr. 127:15-17).  Wegner observed that: "█

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████"  (*Id.*).

796.     Beginning in or around August 2016, CNO hired Cornerstone Research Inc. ("**Cornerstone**") to audit its assets held by Beechwood.   (*See* Bixter Decl. Ex. 576, Narain Tr. Ex. 800 [CNOCSL_00488362]; *see also* Narain Tr. 556:4-10; Johnson Tr. 91:4-7).

797.     Cornerstone characterized the consideration paid by AGH Parent in conjunction with the Agera Transactions as including ████████████████████████ (Bixter Decl. Ex. 577, Narain Tr. Ex. 820 at ¶ 17).

798.     On October 3, 2016, Cornerstone informed CNO:

██████████████████████████████████

(Bixter Decl. Ex. 578, Johnson Tr. Ex. 1.80 [CNOCSL_00790922] (emphasis added)).

799.    On October 11, 2016, Narain distributed an "████████████████████

████████████████████████████████     (Bixter Decl. Ex. 579, Narain

Tr. Ex. 817 [CNOCSL_02078671]).

800.    On October 28, 2016, AGH Parent delivered the AGH Redemption Notice to PGS indicating its intent to exercise its redemption rights set forth in Section 9.6 of the AGH Parent Amended Operating Agreement "with respect to the portion of the Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."  (Bixter Decl. Ex. 580, SAC Ex. 93 [CTRL8592666]).

801.    On January 26, 2017, AGH Parent informed PGS that it intended to exercise the redemption rights set forth in Section 9.6 of the AGH Parent Amended Operating Agreement with respect to the Class C Preferred Units in AGH Parent held by PGS ("the "**2017 Agera Assignment**").  (Bixter Decl. Ex. 581, Narain Tr. Ex. 812 [SHIP0050492])  Narain, via BAM Management, signed as the "Authorized Signatory" for AGH Parent.  (*Id.*).

802.    Pursuant to Schedule A to the 2017 Agera Assignment, AGH Parent transferred to PGS uncollectable debt interests held by AGH Parent in Montsant, Golden Gate Oil, and PEDEVCO (the "**2017 Assigned Debt**").  (*Id.*).   The 2017 Assigned Debt purportedly had an aggregate value of $35,400,000, all valued at or near par, and thus equivalent to PGS Value.  AGH Parent received the 2017 Assigned Debt from certain Beechwood investor clients pursuant to assignments dated on or about January 26, 2017.  (*Id.*).

803.    As discussed in detail above, in 2014, Golden Gate Oil had operational problems and could not make interest payments to Beechwood under the Golden Gate Oil Loan, with PPVA making all interest payments to Beechwood.  (*See* Steinberg Tr. 76:3-19; 257:10-13).

804.    On October 21, 2014, Feuer asked for the payment of a Golden Gate Oil interest invoice because " ███████████████████████████████████████████ (*See* Bixter Decl. Ex. 470; Taylor Tr. Ex. 507; [BW-SHIP-00727696]).  According to Feuer, ████████ ████████████████████████████████████████████████ (Feuer Tr. 176:9-21).

805.    In addition, since 2016 at the latest, GGO had not produced any oil.  (*See* Steinberg Tr. at 257:14-20).

806.    Moreover, according to Steinberg:

> In March of 2016, the interest payments that Golden Gate had to make, I think were waived or deferred as part of what's become known in this consolidated litigation as the March 2016 restructuring.  So in March of 2016, there were no payments that had to be made to the Golden Gate loans.

(*Id.* at 258:5-9).

807.    Moreover, the value that Platinum Management ascribed to its interests in Golden Gate Oil "has to jibe with the price that it could be sold at that moment.  There was probably a discrepancy."  (*Id.* at 258:20-259:6)

808.    Montsant and GGO both defaulted on debt obligations owed to Beechwood.  (*See* Thomas Tr. 292:8-9)

809.    In December 2016, PEDEVCO faced a potential bankruptcy due to $7 million in PV-10 and $64 million in debt.  (Bixter Decl. Ex. 582, Johnson Ex. 1.61 [CTRL8679028]).

## SETH GERSZBERG

810.    Seth Gerszberg was the owner and manager of a series of affiliated companies referred to as "The Collective," which included Over Everything LLC, an investment position held

by PPVA through its subsidiary, Atlantic Growth Capital LLC ("**Atlantic Growth**").   (Bixter Decl. Ex. 462 [CTRL6952352]).

811.   The Collective was a struggling apparel distribution business that, upon its emergence from bankruptcy in 2014, was unable to continue profitable business operations in 2014.  (*Id*.)

812.   After emerging from bankruptcy, The Collective's primary wholesaler was his cousins, Steve and Alan Finkelman, through their companies West Loop South LLC ("**West Loop**") and Epocs Real Estate Partnership, Ltd. ("**Epocs**" and collectively, "**West Loop/Epocs**"). (*See* Bixter Decl. Ex. 50)

813.   By March 2015, Atlantic Growth had loaned The Collective more than $18 million, and The Collective was unable or unwilling to pay interest, negating the need for Atlantic Growth to provide further funding under any loan obligations.  (*Id*.)

814.    By the Summer of 2015, The Collective was in debt to West Loop for an amount of approximately $2.5 Million, and West Loop refused to ship additional apparel to The Collective unless Gerszberg found a way to pay West Loop for the outstanding debt.  (Bixter Decl. Ex. 631 [CTRL7181651])

815.   On August 10, 2015, Gerszberg wrote to Nordlicht asking for money.  In the email, Gerszberg states "When I told you we needed cash now to save holiday you said why didn't you tell me 2 weeks ago."  (*Id*.)

816.   Gerszberg expressly stated that he was not making an accusation of product flow interruption due to funding concerns.  (*Id*.)

817.   Gerszberg pegged his odds of success in the upcoming holiday season as 5-10%. (*Id*.)

818.     Nordlicht offered to provide Gerszberg's cousins with a $5 million secured loan from PPVA, to ultimately be used to fund The Collective, as well as a guaranty for $2.5 million West Loop/Epocs in additional funds to be provided to The Collective.  (*Id.*)

819.     These transactions were ultimately consummated, although the funds under the "loan" from West Loop/Epocs were ultimately transferred directly to The Collective.  (Bixter Decl. Ex. 632 [CTRL7219960]).

820.     The Collective discontinued operations at the end of 2015 and liquidated its business, after which Nordlicht brought Gerszberg onboard to Platinum Management to assist with raising funds for PPVA, terminating Platinum Management employees, and addressing PPVA's liquidity crisis. (Bixter Decl. Ex. 463 [CTRL7729509]; Bixter Decl. Ex. 464 [CTRL7725725]).

821.     Seth Gerszberg ("**Gerszberg**") had a role at Platinum Management that entailed putting "pressure" on Bodner and Huberfeld and that required him to "come[] through."  (*See* Bixter Decl. Ex. 38 [CTRL7733105]).

822.     On January 8, 2016, Nordlicht sent an email to Huberfeld, copying Fuchs, David Levy and Seth Gerszberg, stating that "we are 12 hours away from both platinum and beechwood going down." (Bixter Decl. Ex. 71 [CTRL7736228]).

823.     Against this backdrop, Mark Nordlicht tasked David Steinberg and Seth Gerszberg to develop a presentation for Nordlicht, Huberfeld, Bodner and Beechwood to address the problem. (Steinberg Tr. 109:6-110:7; Bixter Decl. Ex. 460 (CTRL8009309)]).

824.     On January 12, 2016, Dan Grabon, an employee of The Collective, emailed various materials to Steinberg in connection with the upcoming presentation. (Bixter Decl. Ex. 465 (CTRL8007803 – CTRL8007806]).

825.   One of these documents was titled "Beechwood Asset Comparison" and listed the current value of Beechwood's collateral position in certain Platinum/Beechwood co-investments. (*Id.*)

826.   Notably, this spreadsheet lists the value of Beechwood's senior security interest in and lien over all the assets of Golden Gate Oil and Northstar, as **$0**.  (*Id.*)

827.   The spreadsheets and materials prepared by Steinberg and Mr. Grabon were incorporated into Gerszberg's Powerpoint presentation for Bodner, Huberfeld, Nordlicht and Beechwood, which stated that PPVA had only <u>$40 million in unencumbered assets</u> to borrow against. (Bixter Decl. Ex. 643 (CTRL8008894)])

828.   In a January 2016, Gerszberg made a presentation to Feuer, Taylor, Bodner and Huberfeld prepared by Seth Gerszberg, Steinberg, Levy, Manela, and others.  The following topics were discussed:

    i.   PPCO goal of raising $80M, moving $50M of equity from PPCO to PPVA and using $30M to fund ongoing operations;

    j.   Reviewing PPCO outflows (expenses, redemptions, investments), PPCO inflows and deficits, and strategies for raising $80M in PPCO, including $20M by "David and Murray's investor list" and "additional debt from Beechwood" of $50M;

    k.   PPVA Goals of raising $200M, converting $25-40M of 2015 redemptions to debt, renegotiate and refinance debt and sell Implant Sciences for $80-$100M;

    l.   Reviewing PPVA outflows of $205M (expenses, interest owed, margin calls, redemptions), PPVA potential inflows through creation of management share class, sale of Implant Sciences, noting that "if none of these happen, PPVA is facing a $150MM deficit" and "even after all these potential inflows, PPVA still faces a minimum deficit of 50M (assuming we can postpone the 2015 redemptions)";

    m. Reviewing details of the "significant investments" including whether the positions were encumbered or unencumbered;

#73476550_v1

    n.   Reviewing existing debt and encumbrances, noting that "Due to BAM's security interests in PPVA's assets, namely Agera and Implant, **PPVA only has approx $40MM of assets which are unencumbered that can be borrowed against**. PPVA has no ability to borrow additional funds to cover its deficit;"

    o.   Reviewing a plan for "Beechwood-Financing the Deficit" and the use of the proceeds;

    p.   And a slide entitled "David and Murray" asking "What do we need from David and Murray? Help us figure out short-term liquidity issues, Help us close investment into PPCO and the management share class, [and] renegotiate the Beechwood note."

(Bixter Decl. Ex. 643 [CTRL8008894] (emphasis added)).

829.    Of the $20 million in cash that PGS received from the Agera Sale, $15 million was immediately transferred to Seth Gerszberg and his entity, Spectrum30, LLC.  Bixter Decl. Ex. 568 SAC Ex. 102 [CTRL8026092]).

830.    This amount was transferred to Gerszberg although Gerszberg had knowledge that PPVA would be liquidating and operating as a close-ended fund.  As but one example, on June 29, 2016 Gerszberg was consulting with Cayman attorneys to determine if a Cayman liquidation could "hold off" PPVA's creditors.  (Bixter Decl. Ex. 633 [CTRL8089651]).

831.    On July 4, 2016, Gerszberg learned from Nordlicht that he intended to file bankruptcy for PPVA.  (Bixter Decl. Ex. 634 [CTRL8096444]).

832.    Immediately thereafter, Gerszberg prepared a draft of a forbearance and security agreement, and sent it to his cousins, Steve and Alan Finkelman.  (Bixter Decl. Ex. 635 [PPVA_RH_0478501 – PPVA_RH_0478502]).

833.    On July 6, 2016, the agrrement was entered into among PPVA, DMRJ and West Loop/Epocs (the "**Forbearance and Security Agreement**"). (Bixter Decl. Ex. 636 [PPVA_RH_0478433]).

834.    The Forbearance and Security Agreement purports to provide West Loop/Epocs with a security interest in DMRJ's rights to certain proceeds from the sale of Implant Sciences. *Id.*

835.    According to the Forbearance and Security Agreement, the only consideration to DMRJ in connection with the Alleged Guaranty is a promise from West Loop and Epocs to "forbear from exercising rights or remedies with respect to the [Underlying Transactions] until October 31, 2016."  (*Id.*)

836.    Gerzberg has admitted that there was no forbearance provided in connection with the agreement.  *See* Bixter Decl. Ex. 675 (Gerszberg Tr. from DMRJ v. Westloop Ligation)


Dated: New York, New York
        March 6, 2020                                HOLLAND & KNIGHT LLP


                                        By:    s/ Warren E. Gluck
                                        _____


                                        Warren E. Gluck, Esq.
                                        John L. Brownlee, Esq. (*pro hac vice*)
                                        Richard A. Bixter Jr., Esq. (*pro hac vice*)
                                        HOLLAND & KNIGHT LLP
                                        31 West 52nd Street
                                        New York, New York 10019
                                        Telephone: 212-513-3200
                                        Facsimile:  212-385-9010
                                        Email: warren.gluck@hklaw.com
                                                john.brownlee@hklaw.com
                                                richard.bixter@hklaw.com


                                        *Attorneys for Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and for Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation)*

#73476550_v1