# EXHIBIT 2



EXHIBIT 7

# SECOND AMENDED AND RESTATED
# OPERATING AGREEMENT OF
# PLATINUM MANAGEMENT (NY) LLC

## Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I | Definitions | 1 |
| ARTICLE II | General Provisions | 6 |
| 2.1 | Formation and Foreign Qualification. | 6 |
| 2.2 | Name. | 7 |
| 2.3 | Purpose. | 7 |
| 2.4 | Principal Business Office. | 7 |
| 2.5 | Registered Office and Registered Agent. | 7 |
| 2.6 | Duration. | 7 |
| ARTICLE III | Members. | 7 |
| 3.1 | Members. | 7 |
| 3.2 | Passive Members. | 7 |
| 3.3 | Liability of Members. | 8 |
| 3.4 | Additional Members. | 8 |
| 3.5 | Meetings; Actions by Members. | 8 |
| ARTICLE IV | Management. | 9 |
| 4.1 | Managers. | 9 |
| 4.2 | Limitations on the Authority of the Managers. | 9 |
| 4.3 | Removal and Appointment of Managers. | 10 |
| ARTICLE V | Capital Contributions; Capital Accounts | 11 |
| 5.1 | Capital Contributions. | 11 |
| 5.2 | Capital Accounts. | 11 |
| 5.3 | Member Loans. | 12 |
| 5.4 | Drag Along Right. | 12 |
| ARTICLE VI | Allocations | 13 |
| 6.1 | Allocations of Net Profit and Net Loss. | 13 |
| 6.2 | Regulatory Allocations. | 13 |
| 6.3 | Tax Allocations. | 14 |
| ARTICLE VII | Distributions | 14 |
| 7.1 | Withdrawals and Distributions in General. | 14 |
| 7.2 | Member Draws. | 14 |
| 7.3 | Tax Distributions. | 15 |
| 7.4 | Ordinary Distributions. | 15 |
| 7.5 | Distributions Upon Sale, Merger or Dissolution. | 15 |
| 7.6 | Limitation on Distributions. | 16 |
| 7.7 | Distributions In-Kind. | 16 |
| 7.8 | Withholding. | 16 |
| 7.9 | Distribution of Reserves. | 16 |
| 7.10 | Expenses. | 17 |
| ARTICLE VIII | Withdrawal, Removal, Death and Disability | 17 |
| 8.1 | Removal. | 17 |
| 8.2 | Retirement, Permanent Disability or Death. | 17 |
| 8.3 | Retirement Interests. | 17 |
| 8.4 | Return of Confidential Information. | 18 |

i

| | | |
|---|---|---|
| 8.5 | Vesting. | 18 |
| 8.6 | Buy-out. | 18 |
| ARTICLE IX | Transfers of Interests. | 20 |
| 9.1 | Transfer Provisions. | 20 |
| 9.2 | Substituted Members. | 20 |
| ARTICLE X | Confidentiality, Non-Competition and Restrictive Covenants | 20 |
| 10.1 | Confidentiality. | 20 |
| 10.2 | Non-Competition and Non-Solicitation. | 21 |
| ARTICLE XI | Indemnification | 22 |
| 11.1 | Exculpation. | 22 |
| 11.2 | Indemnification. | 22 |
| ARTICLE XII | Records and Accounting, Fiscal Affairs | 23 |
| 12.1 | Records and Accounting. | 23 |
| 12.2 | Tax Status. | 23 |
| 12.3 | Tax Matters Partner. | 23 |
| 12.4 | Reports. | 24 |
| 12.5 | Member Representations and Warranties. | 24 |
| ARTICLE XIII | Company Property | 24 |
| 13.1 | Company Property. | 24 |
| 13.2 | Prohibition Against Partition. | 25 |
| ARTICLE XIV | Dissolution, Liquidation and Termination | 25 |
| 14.1 | Dissolution and Liquidation | 25 |
| 14.2 | Cancellation of Certificate of Formation. | 25 |
| ARTICLE XV | Miscellaneous | 26 |
| 15.1 | Governing Law. | 26 |
| 15.2 | Notice. | 26 |
| 15.3 | Severability. | 26 |
| 15.4 | Headings. | 26 |
| 15.5 | Interpretation. | 27 |
| 15.6 | Entire Agreement. | 27 |
| 15.7 | Termination, Revocation, Waiver, Modification or Amendment. | 27 |
| 15.8 | Binding Effect. | 27 |
| 15.9 | Further Assurances. | 27 |
| 15.10 | Waiver | 27 |
| 15.11 | Additional Remedies. | 28 |
| 15.12 | No Reliance by Third Parties. | 28 |
| 15.13 | Arbitration. | 28 |
| 15.14 | Counterparts. | 28 |

SECOND AMENDED AND RESTATED
OPERATING AGREEMENT OF
PLATINUM MANAGEMENT (NY) LLC

This Second Amended and Restated Operating Agreement (the "**Agreement**") of Platinum Management (NY) LLC (the "**Company**"), effective as of January 1, 2011, is entered into by and among URI LANDESMAN (the "**Manager**"), and MARK NORDLICHT and MARK NORDLICHT GRANTOR TRUST (each, a "**Passive Member**" and, collectively with Uri Landesman, in his individual capacity, the "**Members**").

**WHEREAS**, the Company was formed on August 22, 2001 as a limited liability company under the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "**Act**");

**WHEREAS**, the Company was governed by the terms of that certain Operating Agreement dated as of January 1, 2006, which was amended and restated as of November 1, 2008 (as amended, the "**Amended Agreement**");

**WHEREAS**, Ari Glass and A. Glass Management, LLC have withdrawn as Members and/or Managers of the Company, as applicable, and Uri Landesman has been admitted as a Member of the Company effective as of April 13, 2010 and has replaced Mark Nordlicht as the sole Manager of the Company effective as of January 1, 2011;

**WHEREAS**, the Members desire to further amend and restate the Amended Agreement to reflect such withdrawals, admission and change in Manager; and

**WHEREAS**, this Agreement completely restates, amends and supersedes the Amended Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows

## ARTICLE I
### Definitions

The capitalized terms used in this Agreement shall have the meanings specified in this Article I.

"**1/1/10 Company Value**" has the meaning set forth in Section 7.5.2.

"**Act**" has the meaning set forth in the preamble.

"**Adjusted Capital Account Deficit**" has the meaning set forth in Section 6.2.1.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, has control of, is controlled by, or is under common control with, such specified Person. For these purposes, "control" means the

1

possession, directly or indirectly, of the power to direct or cause the direction of the management of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocable Incentive Fee Share**" means, in respect of any Former Member to whom a Withdrawal Amount has been paid, an amount equal to what would have been the amount of such Former Member's share of the actual incentive fees received by the Company in respect of the year of the relevant Retirement Date or Removal Date, as the case may be, had such Former Member been a Member for the entire year; provided, however, that the Allocable Incentive Fee Share in respect of Uri Landesman shall be determined without giving effect to Section 8.5 hereof (i.e., with all Interests of such Members being deemed vested).

"**Allocation Formula**" has the meaning set forth in Section 6.1.1.

"**Beneficiary**" means each natural person beneficiary of the Trust and each natural person who is a managing member or general partner of a beneficiary of the Trust that is a limited liability company or limited partnership.

"**Beneficiary Percentage Interest**" means, with respect to a Beneficiary, such Beneficiary's then-current percentage entitlement to Distributions received by the Trust from the Company.

"**Authorized Representative**" has the meaning set forth in Section 10.1.

"**Business Day**" means a day other than a Saturday or Sunday on which banks are open for business in New York City.

"**Buy-Out Amount**" has the meaning set forth in Section 8.6.3.

"**Capital Account**" has the meaning set forth in Section 5.2.1.

"**Capital Contribution**" means any contribution to the Company of property or services made by or on behalf of a Member.

"**Cause**" means, with respect to Uri Landesman, his:

(i)   conviction of a felony or a plea of guilty or nolo contendere to a charge of commission of a felony, in each case, that involves theft or embezzlement by him;

(ii)   willful malfeasance in the performance of his duties to the Company; or

(iii)   commission of any act or acts that results in a restriction on or the suspension of his activities by a governmental or regulatory authority or that results in a governmental or regulatory authority imposing other sanctions on him that involves a fine of at least $50,000, unless any other Member commits the same act.

EWAGNE\127314.8 - 3/30/11

"Certificate of Formation" means the Company's Certificate of Formation as filed with the Delaware Secretary of State, as it may be amended, supplemented or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of any succeeding law.

"Company" has the meaning set forth in the preamble.

"Company Percentage" means, at any time and with respect to any Member, including any Retired Member, such Member's interest in the Net Profit and Net Loss of the Company, as listed on the books and records of the Company at such time. The aggregate amount of all Company Percentages (including both Voting Company Percentages and Non-Voting Company Percentages) shall always be equal (as nearly as possible) to 100%.

"Confidential Information" has the meaning set forth in Section 10.1.

"Deferred Fees" means any performance-based and/or asset-based fees earned by the Company the receipt of which has been deferred by the Company to a period beyond the year in which such fees were earned, as adjusted for any appreciation or depreciation at the conclusion of the applicable deferral period on account of any hypothetical investment of the deferred fees.

"Family Interest" has the meaning set forth in Section 9.1.

"Family Member" has the meaning set forth in Section 9.1.

"Fiscal Period" means a period commencing on the day immediately following the last day of the immediately preceding Fiscal Period and ending on the earliest of (a) December 31, (b) the date immediately preceding the date on which any Member's Company Percentage is adjusted pursuant to this Agreement, (c) the date immediately preceding the effective date of any distribution to any Member, (d) the date on which the Company is liquidated and wound-up, and (e) such other date as the Managers may determine.

"Fiscal Quarter" of the Company means the calendar quarter.

"Fiscal Year" means the period ending December 31 of each calendar year; provided, however, that the Company's final Fiscal Year shall end on the date on which the Company is liquidated and wound-up.

"Former Member" means any Retired Member and Uri Landesman if removed for Cause pursuant to Section 8.1.

"Initial Members" means, collectively, Mark Nordlicht, Uri Landesman and the Trust.

"Interest" means the rights in the Company afforded under this Agreement and the Act, whether of an economic or voting character or a combination thereof.

"Losses" has the meaning set forth in Section 11.2.

3

"**Manager**" means, at any time, any Person listed on the books and records of the Company as a manager at such time.

"**Member**" means a Passive Member or a Manager where no distinction is required and shall include a Retired Member unless otherwise provided or the context otherwise requires.

"**Member Deferred Fee Election**" means, with respect to each Member for any Fiscal Year, the deferral elections, if any, such Member has made pursuant to the Company's Deferred Income Allocation Plan (or similar plan), as the same may be amended from time to time, with respect to its prospective allocable share of Deferred Fees.  For the avoidance of doubt, (a) a Member Deferred Fee Election shall include any election made by a Member (at the same time as Member Deferred Fee Elections are made by other Members) not to defer payment of its allocable share of any Deferred Fees, (b) 40% of any Deferred Fees earned in respect of any Fiscal Year ending prior to January 1, 2010 shall be deemed to be the Member Deferred Fee Election of Mark Nordlicht or, upon his death, his heirs, and (c) 60% of any Deferred Fees earned in respect of any Fiscal Year ending prior to January 1, 2010 shall be deemed to be the Member Deferred Fee Election of the Trust, solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary.

"**Member Specific Deferred Fee Income**" means, with respect to each Member and for any Fiscal Period, that portion of the income recognized by the Company, if any, that is attributable to Deferred Fees and is covered by a Member Deferred Fee Election made by such Member.

"**Net Distributable Cash**" means all cash receipts of the Company, less the portion thereof used to pay or establish reserves for all Company expenses and contingencies, all as reasonably determined by the Managers in accordance with industry standard practices and to the extent applicable, consistent with prior Fiscal Periods.  Net Distributable Cash shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions in reserves previously established.

"**Net Profit**" and "**Net Loss**" mean, with respect to each Fiscal Period, an amount equal to the Company's Taxable Income or Tax Loss, as the case may be, for such Fiscal Period, together with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such Taxable Income or Tax Loss (but in no event shall any amount be included on account of Deferred Fees until such Deferred Fees are recognized by the Company as income for federal income tax purposes);

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations §1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be subtracted from such Taxable Income or Tax Loss;

(c)     upon a distribution of property (other than cash) to a Member, Net Profit or Net Loss for the Fiscal Period in which the distribution occurs shall be determined as if such property

4

were sold for its then fair market value, and the income, gain or loss from such deemed sale shall be allocated as provided in Section 6.1; and

(d)     where the book value of an asset is different than its tax basis, Net Profit or Net Loss will be determined based on the asset's book value. Similarly, depreciation or amortization for this purpose shall be based on the asset's book value.

"**Net Residual Income or Loss**" means, for any fiscal period, the Company's Net Profit or Net Loss excluding all Member Specific Deferred Fee Income.

"**Non-Voting Company Percentage**" means the Company Percentage attributable to a Retirement Interest.

"**Paid Incentive Fee Share**" means, in respect of any Former Member to whom a Withdrawal Amount has been paid, an amount equal to that portion of the Withdrawal Amount paid to such Former Member that is attributable to any accrued incentive fees.

"**Passive Member**" means, at any time, any Person listed on the books and records of the Company as a passive member at such time.

"**Permanent Disability**" means, in respect of any Manager or Member, physical or mental illness or disease or impairment which renders such Manager or Member unable to perform the essential functions of his job with the Company for 180 consecutive days.

"**Person**" means any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust or entity.

"**Regulations**" means the Treasury Regulations promulgated under the Code.

"**Removal Date**" has the meaning set forth in Section 8.1.

"**Retired Member**" means any retired, removed or Permanently Disabled Member, or the estate of any deceased Member, whose Interest has not been purchased by the Company pursuant to Section 8.6.

"**Retirement Date**" has the meaning set forth in Section 8.2.

"**Retirement Interest**" means the Interest held by a Retired Member, which Interest shall have no right to vote on any matter.

"**Tax Matters Partner**" has the meaning set forth in Section 12.3.

"**Taxable Income**" or "**Tax Loss**" means, with respect to each Fiscal Period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in such taxable income or loss).

5

"**Transfer**" means any sale, transfer, gift, assignment or pledge of, or grant of a security interest in an Interest, by operation of law or otherwise, excluding, however any grant of such a security interest in favor of the Company.

"**Transferring Member**" means a Member that makes a Transfer of all or any portion of its Interest to a Family Member pursuant to Section 9.1.

"**Trust**" means the Mark Nordlicht Grantor Trust.

"**Trust Agreement**" means the trust agreement of the Trust dated November 1, 2008.

"**Trustee**" means Mark Nordlicht solely in his capacity as trustee of the Trust and any successor trustee of the Trust.

"**Vested Interest**" has the meaning set forth in Section 8.5.

"**Voting Company Percentages**" means the aggregate of the Company Percentages of all Members other than Retired Members.

"**Withdrawal Amount**" means, in respect of any retired, removed, disabled or deceased Member (or, with respect to the Trust, the death or Permanent Disability of a Beneficiary), the book value of such Member's Capital Account (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's Capital Account equal to such Beneficiary's Beneficiary Percentage Interest) as of the Retirement Date or the Removal Date, as the case may be, increased by the aggregate of such Member's portion of management fee and incentive fee income which has accrued to such date but not yet been allocated to such Member, if any (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's portion of such management and incentive fee income equal to such Beneficiary's Beneficiary Percentage Interest), and, solely with respect to the removal of Uri Landesman for Cause pursuant to Section 8.1, reduced by any amounts reasonably reserved by the Company to defend any lawsuits reasonably relating to any acts or omissions of Uri Landesman that gave rise to such Cause. Any unused amounts so reserved shall be paid out to Uri Landesman upon the Company's reasonable determination that such reserve is no longer needed.

## ARTICLE II
### General Provisions

2.1    Formation and Foreign Qualification.

2.1.1    The Members (i) unanimously ratify, confirm and approve the continuance of a limited liability company pursuant to the provisions of the Act and this Agreement and (ii) acknowledge and agree that the Certificate of Formation for the Company, dated August 22, 2001, has heretofore been filed with the Delaware Secretary of State and that, effective as of the date hereof, this Agreement constitutes the Operating Agreement of the Company.

2.1.2    The Managers shall cause the Company to comply with any requirements necessary to qualify the Company as a foreign limited liability company in any

6

jurisdiction in which the Company shall be conducting business so as to require such compliance.

2.2    Name.

The name of the Company is "Platinum Management (NY) LLC." The business of the Company may be conducted under any other name deemed necessary or desirable by the Managers.

2.3    Purpose.

The Company is formed for the purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in (i) any lawful act or activity for which a limited liability company may be formed under the Act and (ii) any and all activities necessary or incidental to the foregoing, including, without limitation, investment management activities.

2.4    Principal Business Office.

The location of the principal office of the Company shall be 152 West 57th Street, 4th Floor, New York, New York or such other location as the Managers may from time to time designate.

2.5    Registered Office and Registered Agent.

The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The Corporation Trust Company shall act as the Company's registered agent for the purpose of accepting service of process within the State of Delaware.

2.6    Duration.

The term of the Company commenced on the date that the Certificate of Formation was filed with the Delaware Secretary of State and shall continue in full force and effect until terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## Members

3.1    Members.

The names, addresses, status as Manager, Passive Member or Retired Member, Capital Contributions and Company Percentage of the Members shall be maintained by the Managers with the records of the Company.

3.2    Passive Members.

No Passive Member shall have the right, authority or power to act for or on behalf of the Company or to take any action or do any thing that would be binding on the Company, or to

7

make any expenditures or incur any indebtedness in the name or on behalf of the Company solely by reason of being a Passive Member. The Passive Members shall have only such voting rights and other rights of consent or approval as expressly set forth in this Agreement or in the Act.

### 3.3   Liability of Members.

All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability solely by reason of being a Member, except to the extent provided by the Act.

### 3.4   Additional Members.

3.4.1   The admission of a new Member to the Company requires the consent of 100% of the Voting Company Percentages. Each new Member, as a condition precedent to admission to the Company as a Member, shall execute and acknowledge such instruments, in form and substance reasonable satisfactory to the Managers, as the Managers may deem necessary or desirable to effectuate such admission and to confirm that the Person to be admitted as a Member has agreed to be bound by the terms of this Agreement.

3.4.2   Unless otherwise consented to by 100% of the Company Percentages, the admission of a new Member to the Company shall reduce the Company Percentages of all Members, including Retired Members, on a pro rata basis.

### 3.5   Meetings; Actions by Members.

3.5.1   Meetings of Members (a) may be called by the Managers at any time and for any purpose(s), and (b) shall be called by the Managers upon the direction of 50% or more of the Voting Company Percentages. Notice of any meeting shall be sent to all Members (other than Retired Members) at least three days prior to such meeting and shall specify the time, date, place and purpose(s) of such meeting.

3.5.2   Meetings of Members may take place in person or by telephone. Any Member not present at a meeting in person by telephone or by proxy will be promptly informed by the Managers of any action(s) taken at such meeting.

3.5.3   Any action requiring the consent of 75% or 100%, as the case may be, of the Voting Company Percentages, may be taken either at a meeting where the holders of 75% or 100%, as applicable, of the Voting Company Percentages are present, or by the written consent of the holders of 75% or 100%, as applicable, of the Voting Company Percentages.

EWAGNE\1273J4.8 - 3/30/11

## ARTICLE IV
### Management

4.1     Managers.

4.1.1   Except to the extent expressly limited by this Agreement or by the Act, the business and affairs of the Company shall be managed by the Managers who shall have the exclusive right and power to manage the business of the Company. The Managers shall be authorized to do on behalf of the Company all things that are necessary or appropriate to carry out the Company's purposes and shall be responsible for policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company. Effective as of January 1, 2011, Mark Nordlicht voluntarily resigned as a Manager and Uri Landesman became the Company's sole Manager.

4.1.2   The Managers each shall have an equal say in all matters relating to the management of the Company and no Manager shall have the authority to bind the Company unless authorized by a vote of all Managers with each Manager having one vote; provided, however, that in the event of a deadlock with respect to any vote of the Managers, the right to break the tie vote shall alternate between the Managers with the first Manager to break a tie vote being decided by a coin toss. Except to the extent expressly limited by this Agreement, all instruments, contracts, agreements and documents providing for the acquisition, mortgage or disposition of the property of the Company shall be valid and binding on the Company if properly authorized by a vote of the Managers and executed by any one of the Managers.

4.1.3   Each of the Managers shall devote such time, resources and attention in order to carry out his duties hereunder as he shall determine to be necessary or appropriate.

4.1.4   The Managers shall owe to the Company and the Members duties of care and loyalty equivalent to those owed by the officer of a Delaware corporation to such corporation and its stockholders.

4.1.5   The Managers may appoint officers of the Company and may delegate any or all of their duties to one or more such officers and may revoke any such delegation at any time. Mark Nordlicht is hereby appointed as the Company's Chief Investment Officer effective as of January 1, 2011, and he shall have such responsibilities as are customarily assigned to such office.

4.2     Limitations on the Authority of the Managers.

4.2.1   Notwithstanding anything to the contrary herein, the following actions shall require the consent of not less than 75% of the Voting Company Percentages:

(a)     the removal or replacement of a Manager. Upon removal as Manager of a Manager who is also a Member, such Manager shall become a Passive Member;

9

(b)     the sale or merger of the Company;

(c)     the dissolution of the Company;

(d)     a voluntary bankruptcy filing with respect to the Company; and

(e)     issuing preferred Interests in the Company.

4.2.2   Notwithstanding anything to the contrary herein, the following actions shall require the consent of not less than 100% of the Voting Company Percentages:

(a)     admission of a new Member;

(b)     a non-pro-rata dilution of Members' Interests in connection with the admission of a Member;

(c)     transfer of all or any portion of any Member's Interest to any Person other than a Family Member;

(d)     incurrence of indebtedness for which the Company is liable in excess of 1% of the 1/1/10 Company Value;

(e)     guaranteeing the debt of a third party;

(f)     loaning money in excess of 1% of the 1/1/10 Company Value;

(g)     amending this Agreement or the Company's Certificate of Formation; and

(h)     any transaction between the Company and any Affiliate of the Company, any Manager or any Member that is not expressly contemplated by this Agreement.

4.3     <u>Removal and Appointment of Managers.</u>

4.3.1   Each Manager shall serve as Manager for so long as he is a Member or is a beneficiary of any trust that is a Member, unless removed as Manager as provided herein. With the exception of Uri Landesman, who may be removed as a Manager and as a Member, as applicable, pursuant to Section 8.1 below, a Manager may be removed as a Manager, but not as a Member, only with the consent of 75% of the Voting Company Percentages.  Upon such a removal, the removed Manager shall become a Passive Member.

4.3.2   If at any time, a Manager retires from the Company, is removed as Manager, dies or suffers a Permanent Disability and there is no other Manager, a new Manager shall promptly be selected by a vote of 75% of the Voting Company Percentages. Notwithstanding the foregoing, in the event that Mark Nordlicht dies or suffers a Permanent Disability while he is a Manager, the Members agree to appoint and

EWAGNE\127314.8 - 3/30/11

select such individual, if any, who has been previously designated by Mark Nordlicht in writing to all of the Members to serve as a Manager in replacement of Mark Nordlicht; **provided** that such individual is reasonably acceptable to all of the other Managers. In the event that no such individual has been so designated or such individual is not reasonably acceptable to all of the other Managers, a replacement Manager shall promptly be selected by a vote of 75% of the Voting Company Percentages.

4.3.3   The Managers, without the consent of the Passive Members, may appoint any Member or non-Member to serve as an additional Manager.

### ARTICLE V
### Capital Contributions; Capital Accounts

5.1    Capital Contributions.

5.1.1   Prior to or concurrently with the execution of this Agreement, each Member has made, or is making, a Capital Contribution as set forth on Schedule 1 attached hereto.  Any additional Capital Contributions by a Member from time to time shall be reflected on Schedule 1.

5.1.2   To the extent approved by the Managers from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire.  If the Managers determine that additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, including, without limitation, the expansion or diversification of such business, the Members (other than Retired Members) shall be obligated to contribute such additional Capital Contributions on a pro rata basis; provided, however, that no Member shall be required to make Capital Contributions in excess of an aggregate of $25,000 during any rolling twelve-month period.

5.1.3   No Member shall be paid interest on any Capital Contribution.

5.2    Capital Accounts.

5.2.1   An individual capital account (a "**Capital Account**") shall be established on the books of the Company and maintained for each Member in compliance with this Agreement and in accordance with Regulation § 1.704-1(b)(2)(iv).

5.2.2   Each Member's Capital Account shall be increased by:

(a)     The amount of such Member's Capital Contributions to the Company;

(b)     The amount of Net Profit allocated to such Member pursuant to Article VI hereof; and

(c)     Any other increases required by Regulation § 1.704-1(b)(2)(iv).

5.2.3   Each Member's Capital Account shall be decreased by:

11

(a)     The amount of Net Loss allocated to such Member pursuant to Article VI hereof;

(b)     All amounts paid or distributed to the Member by the Company (other than any distribution in respect of repayment of principal or interest on any loan made by such Member to the Company pursuant to Section 5.3); and

(c)     Any other decreases required by Regulation § 1.704-1(b)(2)(iv).

5.2.4    The Members' Capital Accounts may (but are not required to) be adjusted in accordance with, and upon the occurrence of any event described in, Regulation § 1.704-1(b)(2)(iv)(f) and at such other times as may be determined by the Managers to reflect a revaluation of the Company's assets and liabilities and the Company's books.

5.2.5    All provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and shall be interpreted in a manner consistent with such Regulations. The Company shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations under Section 704(b) of the Code.

5.3     Member Loans.

Subject to Section 4.2.2 hereof, any capital that the Managers determine is required in connection with the operation of the Company may, at the election of the Managers, in whole or in part, be borrowed by the Company from third parties and/or one or more Members or any Affiliate of a Member; provided, however, that (i) any such loan(s) made to the Company by a Member and/or an Affiliate of a Member shall be on such terms as are agreed by the Managers and the Members and/or Affiliates making such loan(s); (ii) any such loan(s) must be evidenced in writing by a promissory note of the Company; and (iii) the Managers shall offer all Members the same opportunity to make any such loan(s) to the Company on a pro rata basis based on their respective Company Percentages. No Member shall be required to loan money to the Company.

5.4     Drag Along Right.

If Members holding at least 75% of the Voting Company Percentages decide to sell all or substantially all of the Interests of the Company to a bona fide third party buyer in an arm's length transaction, each Member (including a Retired Member) agrees that he will sell a pro rata portion of his Interest in the Company to such buyer at the same time and on the same terms as the other Members; **provided**, that such Member receives his pro rata share of the entire purchase price.

EWAGNE\127314.8 - 3/30/11

## ARTICLE VI
### Allocations

6.1    Allocations of Net Profit and Net Loss.

6.1.1    Except as otherwise provided herein, Net Profit and Net Loss for each Fiscal Period, shall be allocated among the Members in the following manner (the "Allocation Formula"):

(a)    each Member's Member Specific Deferred Fee Income, if any, shall be allocated to such Member; and

(b)    Net Residual Income or Loss shall be allocated among the Members in accordance with their respective Company Percentages.

6.2    Regulatory Allocations.

6.2.1    Notwithstanding any other provision of this Agreement, Net Loss (or items of deduction as computed for book purposes) shall not be allocated to a Member to the extent that the Member has or would have, as a result of such allocation, an Adjusted Capital Account Deficit.  As used herein, a Member's "**Adjusted Capital Account Deficit**" means such Member's Capital Account has a deficit, after the Capital Account has been:  increased by any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations § 1.704-2(g)(1) and § 1.704-2(i)(5); and reduced by any adjustments, allocations or distributions described in Regulations § 1.704-1(b)(2)(ii)(d)(4), (5) or (6).  Any Net Loss (or items of deduction as computed for book purposes) which otherwise would be allocated to a Member, but which cannot be allocated to such Member because of the application of the immediately preceding sentence, shall instead be allocated to the other Members, in accordance with their respective Company Percentages, subject to the limitation imposed by the immediately preceding sentence.

6.2.2    In order to comply with the "qualified income offset" requirement of the Regulations under Code Section 704(b), and notwithstanding any other provision of this Agreement to the contrary, if a Member for any reason (whether or not expected) has an Adjusted Capital Account Deficit, items of Net Profit (consisting of a pro-rata portion of the items thereof) shall be allocated to such Member in an amount and manner sufficient to eliminate as quickly as possible the Adjusted Capital Account Deficit.

6.2.3    If as a result of Section 6.2.1 or 6.2.2, any Member has been allocated at any time cumulative allocations of Net Profit or Net Loss in excess of the allocations such Member would have received but for such Sections, the Managers shall make offsetting allocations of the Net Profit and Net Loss to the Members to the extent allowable under the Code and the Regulations so that after giving effect to such offsetting allocations (or expected future allocations) each Member has been finally allocated amounts of Net Profit and Net Loss that such Member would have been allocated without Sections 6.2.1 and 6.2.2.

13

6.2.4   If the respective Company Percentages of the existing Members in the Company change or if an Interest is transferred to any other Person, all income, gains, losses, deductions, tax credits and other tax incidents resulting from the operations of the Company for the Fiscal Year of transfer shall be allocated, as between transferor and transferee, by taking into account their varying Company Percentages and by utilizing an interim closing of the Company's books in accordance with Section 706 of the Code and the Regulations thereunder. A transferee of an Interest shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Interest.

6.3     Tax Allocations.

6.3.1   Unless otherwise required by Section 704(c) of the Code and the Regulations thereunder, items of income, gain, loss and deduction of the Company for U.S. federal income tax purposes shall be allocated among the Company in the same manner as the related item was allocated under Section 6.1 hereof. The required allocations of Section 704(c) of the Code or similar allocations under the Regulations are hereby incorporated.

6.3.2   Allocations pursuant to this Section 6.3 are made solely for income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit or Net Loss or distributions pursuant to any provision of this Agreement.

## ARTICLE VII
### Distributions

7.1     Withdrawals and Distributions in General.

No Member shall have any right to withdraw or demand distribution of any amount in its Capital Account except as expressly provided in this Article VII and Article VIII.

7.2     Member Draws.

In respect of any Fiscal Year, the Company, in the sole discretion of the Managers, may pay each Member who also provides services to the Company or any of its Affiliates an advance against its allocable share of the Net Profit for such Fiscal Year to the extent of available cash (the "Draw"). Each Member's annual Draw shall be payable in equal monthly installments on the first Business Day of each month. The Managers shall determine each Member's Draw in respect of each Fiscal Year; **provided**, that Draws shall be made on a pro rata basis among eligible Members based on their respective Company Percentages, unless a Member consents in writing to receive less than his pro rata share. Any draw payments made to the Trust pursuant to this Section 7.2 shall be solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary. All payments made pursuant to this Section 7.2 shall be treated as "guaranteed payments" within the meaning of Section 707(c) of the Code.

14

7.3     Tax Distributions.

In the sole discretion of the Managers, no less frequently than quarterly and consistent with the Members' obligations to make quarterly estimated income tax payments, the Company may distribute to each Member a minimum cash distribution in an amount reasonably determined by the Managers to be necessary for such Member to pay any applicable taxes or estimated taxes attributable to allocations of Net Profit to such Member for the related Fiscal Period. The amounts to be distributed pursuant to this Section 7.3 shall be calculated by the Managers in their reasonable discretion taking into account the maximum combined United States federal, State of New York and City of New York tax rates applicable to individuals (or, if any Member is subject to higher combined United States federal, state and local tax rates and such Member so requests, such higher combined tax rates) on ordinary income and net short-term and long-term capital gain (as applicable), and otherwise based on such reasonable assumptions as the Managers determine in good faith to be appropriate. The highest distribution percentage applicable to any Member shall be applied equally to each Member regardless of its actual tax liability with respect to income of the Company.

7.4     Ordinary Distributions.

Subject to Section 7.5, as soon as practicable after the Net Profit for each Fiscal Year has been determined, the Company shall make distributions to the Members in an aggregate amount equal to the Company's Net Distributable Cash in respect of such Fiscal Year in excess of distributions made pursuant to Sections 7.2 and 7.3 during such Fiscal Year. In the sole discretion of the Managers, distributions may also be made during any Fiscal Year from the Company's Net Distributable Cash in respect of such Fiscal Year in excess of distributions made pursuant to Sections 7.2 and 7.3 during such Fiscal Year, at such times and in such amounts as may be determined by the Managers from time to time. All amounts distributed to the Members pursuant to this Section 7.4 shall be made in the same proportion as the related Net Profit was allocated under Section 6.1. Distributions with respect to realized Member Specific Deferred Fees shall be made to the applicable Members under Sections 7.3 and 7.4.

7.5     Distributions Upon Sale, Merger or Dissolution.

7.5.1   Notwithstanding anything else to the contrary in this Agreement, in the event of the sale, merger or dissolution of the Company, the Company shall make distributions in the following order and priority:

(a)     first, to the payment and discharge of all of the claims of all creditors of the Company that are not Members or Affiliates of any Member;

(b)     second, to the setting up of any reserves that the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; provided that any reserves not necessary to satisfy such liabilities or obligations are distributed in accordance with this Section 7.5.1 as soon as practicable;

(c)     third, to the payment and discharge of all of the claims of all creditors of the Company that are Members or Affiliates of any Member;

15

(d)     fourth, pro rata to (i) Mark Nordlicht or, upon his death, his heirs until Mark Nordlicht or his heirs, as applicable, have received an amount equal to 40% of the 1/1/10 Company Value, and (ii) the Trust, solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary, until the Trust has received an amount equal to 60% of the 1/1/10 Company Value; and

(e)     fifth, to each of the Members (including, for the avoidance of doubt, the Trust and any Retired Members) in proportion to their Company Percentages. Any Member Specific Deferred Fees shall be allocated and distributed to such Members, as applicable.

7.5.2   The Managers expressly agree to retain, at the expense of the Company, an independent third party appraiser to determine the fair value of the Company as of the opening of business on January 1, 2010, excluding any Member Specific Deferred Fees (the "**1/1/10 Company Value**").

7.6     Limitation on Distributions.

The right of any Member or the legal representatives of such Member to receive any distribution in respect of its Capital Account pursuant to this Article VII is subject to the provision by the Managers for all Company liabilities in accordance with Section 18-607(a) of the Act. Furthermore, no distribution shall be made (a) if such distribution would violate any contract or agreement to which the Company is then a party, or any law, rule, regulation, order or directive of any governmental authority then applicable to the Company, (b) to the extent that the Managers, in their reasonable discretion, determine that any amount otherwise distributable should be retained by the Company to pay, or to establish reasonable reserves for the payment of, any liability or obligation of the Company, whether liquidated, fixed, contingent or otherwise, or (c) to the extent that the Managers, in their reasonable discretion, determine that cash available to the Company in insufficient to permit such distribution.

7.7     Distributions In-Kind.

The Managers may direct that any asset of the Company be distributed, pro rata, in-kind in accordance with the provisions of this Article VII.

7.8     **Withholding.**

The Managers may withhold from any amount allocable or payable to any Member any taxes required to be paid or withheld by the Company on behalf of or for the account of such Member. Any such taxes shall be deemed to be a distribution or payment to such Member, reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the Capital Account of such Member.

7.9     Distribution of Reserves.

Subject to Sections 7.5 and 7.6, the Managers, in their reasonable discretion, may determine that all or part of any amount previously retained by the Company to establish or fund a reserve should no longer be retained by the Company may distribute any such amounts to the

EWAGNE\127314.8 - 3/30/11

Members pro rata in proportion to their respective Capital Account balances as of the date any such determination is made.

 7.10 Expenses.

 Except as otherwise provided in this Agreement or in any agreement to which the Company is a party, the Company will be responsible for all expenses incurred by the Company.

## ARTICLE VIII
### Withdrawal, Removal, Death and Disability

 8.1 Removal.

 Uri Landesman may be removed by Mark Nordlicht as a Manager and as a Member at any time either (a) for Cause on not less than 10 days' prior written notice, or (b) without Cause on not less than 30 days prior written notice, in each case effective as of a date (the "**Removal Date**") specified in such notice, provided that Uri Landesman shall have 10 days from the date of his receipt of any notice purporting to remove him for Cause to cure the circumstances resulting in such Cause (if such circumstances are capable of being cured within such 10 days).

 8.2 Retirement, Permanent Disability or Death.

  8.2.1 Any Member may retire from the Company at any time on not less than 30 days' prior written notice to the Managers and the Members, as of a date (the "**Retirement Date**") specified in such notice. In the event that Mark Nordlicht retires from the Company at a time when he is the trustee of the Trust, the Trust shall be deemed to have retired from the Company as of the same time. From the day immediately following the Retirement Date, the retiring Member shall (i) have no further power or authority to perform any services for or on behalf of the Company, (ii) cease all activities on behalf of the Company, (iii) have no authority to act or on behalf of the Company, and (iv) cease to be a Manager (if applicable).

  8.2.2 In the event of the death or Permanent Disability of a Manager, Passive Member or Beneficiary, the date of death or Permanent Disability shall be the Retirement Date.

 8.3 Retirement Interests.

  8.3.1 Subject to Sections 8.5 and 8.6, as of any Retirement Date (or Removal Date, as the case may be), a removed, retired, Permanently Disabled or deceased Member's Interest (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's Membership Interest) equal to such Beneficiary's Beneficiary Percentage Interest) shall be exchanged for a Retirement Interest, which Retirement Interest shall grant to the Retired Member a Non-Voting Company Percentage in an amount equal to the retired, removed, Permanently Disabled or deceased Member's Company Percentage (or, in the case of the Trust, the applicable portion of the Trust's Company Percentage) as of the Retirement Date (or Removal Date, as the case may be).

EWAGNE\127314.8 - 3/30/11

8.3.2   Subject to Sections 8.5 and 8.6, upon the retirement, removal, Permanent Disability or death of any Member, and upon the death or Permanent Disability of a Beneficiary, the Company shall pay to the Retired Member (or the Trust in the case of the death or Permanent Disability of a Beneficiary), the Withdrawal Amount; provided, however, that such Retired Member shall remain liable to the Company for the amount by which its Paid Incentive Fee Share exceeds its Allocable Incentive Fee Share.  Except in extraordinary circumstances, 90% of the Withdrawal Amount (less such Retired Member's portion of any management fee and incentive fee income which has accrued to such date but not yet been allocated to him) shall be paid to such Retired Member within 60 days of the Retirement Date (or Removal Date, as the case may be), and the balance shall be paid within 30 days of the completion of the audits of the private investment funds managed by the Company for the Fiscal Year in which the Retirement Date (or Removal Date, as the case may be) occurs; provided, that to the extent Section 409A requires an earlier payout date, then such amount shall be paid by no later than such earlier date.

8.4   Return of Confidential Information.

Upon the removal, retirement, Permanent Disability or death of any Member, such Member, or the heirs of such Member, as the case may be, shall return, or cause to be returned, to the Company all Confidential Information (as defined in Section 10.1 hereof) that is or was in such Member's possession or control, and such Confidential Information shall remain in the possession and control of the Company.

8.5   Vesting.

Upon the retirement, removal for Cause or death of Uri Landesman, in each case, prior to January 1, 2015, Uri Landesman's Non-Voting Company Percentage shall be reduced by an amount, in respect of each Fiscal Quarter (or portion thereof) remaining between the applicable Retirement Date or Removal Date, as the case may be, and January 1, 2015, equal to 5% of Uri Landesman's Voting Company Percentage as of the applicable Retirement Date or Removal Date, as the case may be (each such resulting Non-Voting Company Percentage, a "**Vested Interest**"); provided, however, that each such Vested Interest shall not be less than 20% of Uri Landesman's Voting Company Percentage as of the applicable Retirement Date or Removal Date, as the case may be.  Upon the removal of Uri Landesman without Cause or the Permanent Disability of Uri Landesman, in each case prior to January 1, 2015, Uri Landesman's Vested Interest shall equal 100% of his Voting Company Percentage as of the applicable Removal Date or Retirement Date, as the case may be.

8.6   Buy-out.

8.6.1   No Member shall have the right to acquire any other Member's Interest.

8.6.2   In the event that Uri Landesman is removed for Cause pursuant to Section 8.1 prior to January 1, 2015, the Company shall have the right, in the sole discretion of Mark Nordlicht, to purchase all of Uri Landesman's Interest (including, for the avoidance of doubt, his Vested Interest) for the Withdrawal Amount in respect of such Interest;

18

provided, however, that Uri Landesman shall remain liable to the Company for the amount by which his Paid Incentive Fee Share exceeds his Allocable Incentive Fee Share.

Upon such a repurchase by the Company of Uri Landesman's Interest in the Company:

    (a)    beginning on the day immediately following the Removal Date, Uri Landesman shall no longer be a Member of the Company and the other Members of the Company shall participate in Uri Landesman's Company Percentage on a pro rata basis; and

    (b)    90% of the Withdrawal Amount (less such former Member's portion of any management fee and incentive fee income which has accrued to such date but not yet been allocated to him) in respect of Uri Landesman shall be paid to him within 60 days of the Removal Date, and the balance shall be paid within 30 days of the completion of the audits of the private investment funds managed by the Company for the Fiscal Year in which the Removal Date occurs; **provided**, that to the extent Section 409A requires an earlier payout date, then such amount shall be paid by no later than such earlier date.

8.6.3   In the event that Uri Landesman retires from the Company pursuant to Section 8.2 hereof prior to January 1, 2015, the Company shall have the right, in the sole discretion of Mark Nordlicht, to purchase all of Uri Landesman's Interest (including, for the avoidance of doubt, his Vested Interest) at the fair market value of such Vested Interest as of the Retirement Date (as determined by an independent valuation firm having a national reputation and having experience in valuing interests in entities like the Company, jointly selected by Mark Nordlicht and Uri Landesman, each acting reasonably. In the event such individuals cannot agree upon such a valuation firm within 90 days of the Retirement Date, each individual shall choose a valuation firm meeting the above criteria, and such valuation firms shall jointly select a third valuation firm meeting the above criteria, and such third valuation firm shall determine such fair market value (the "**Buy-Out Amount**").

Upon such a repurchase by the Company of Uri Landesman's Interest in the Company:

    (a)    beginning on the day immediately following the applicable Retirement Date, Uri Landesman shall no longer be a Member of the Company in any capacity and the other Members of the Company shall participate in his Company Percentage on a pro rata basis; and

    (b)    the Buy-out Amount shall be paid to Uri Landesman by means of a three-year promissory note having, as principal terms, equal quarterly payments of principal and interest with interest calculated monthly at a rate equal to the one-month LIBOR rate as of the last day of the immediately preceding month plus 2%, compounded monthly.

19

## ARTICLE IX
### Transfers of Interests

9.1     Transfer Provisions.

No Member shall have the right to Transfer all or any portion of its Interest to any Person without the prior written consent of all of the Members (but not any Retired Member); provided, however, that a Member may Transfer all or a portion of its Interest in the Company (the "**Family Interest**") to his spouse, children, grandchildren or siblings, to a trust for the benefit of the Member or such family members and/or to an entity solely owned by such Member, such family members or such a trust and, in the case of the Trust, to another trust for the benefit of the same beneficiaries (collectively, "**Family Members**"), if such transferee complies with Section 9.2 below, in which case, (i) the Transferring Member shall be deemed to have voting control over all decisions to be made with respect to the Family Interest, (ii) the Transferring Member shall execute or shall cause to be executed all documents or instruments required to be executed by the Company evidencing such voting control, and (iii) the Family Interest shall be deemed to be owned by the Transferring Member for the purposes of Article VIII and this Article IX and shall be included in any permitted Transfer by such Transferring Member pursuant to this Article IX (other than to a Family Member). Any Transfer made in violation of the provisions of this Article IX shall be null and void and shall not bind the Company or any Member.

9.2     Substituted Members.

The transferee of an Interest shall have the right to become a substituted Member of the Company only if (i) the consent referred to in Section 9.1 has been obtained, and (ii) the transferee executes and acknowledges such instruments, in form and substance reasonably satisfactory to the Managers, as the Managers may deem necessary or desirable to effectuate such Transfer and to confirm that the transferee has agreed to be bound by the terms of this Agreement.

## ARTICLE X
### Confidentiality, Non-Competition and Restrictive Covenants

10.1     Confidentiality.

Each Member acknowledges that he or it will from time to time have access to information of a confidential or proprietary nature, as commonly and generally understood, including, without limitation, confidential or proprietary investment methodologies, trade secrets, proprietary or confidential plans, client identities and information, client lists, business operations or techniques, records and data that are not matters of public record (other than through a breach by such Member of this Agreement or any confidentiality agreement with the Company or an Affiliate of the Company) (collectively, the "**Confidential Information**") owned or used in the Company and its Affiliates. Each Member agrees to keep confidential and not ever disclose, publish, divulge, furnish, use or make accessible, nor permit any of representative or other Person acting on behalf of such Member (an "**Authorized Representative**") to disclose, publish, divulge, furnish, use or make accessible, to anyone any Confidential Information; provided, however, that a Member (or an Authorized Representative of a Member) may disclose

20

any such Confidential Information (a) that has become a matter of public record (other than through a breach by such Member of this Agreement or any confidentiality agreement with the Company or an Affiliate of the Company), (b) as may be required or appropriate in any report, statement or testimony submitted to any governmental authority having or claiming to have jurisdiction over such Member (or any Authorized Representative of such Member), but only that portion of the Confidential Information which, in the written opinion of counsel for the Member (or any Authorized Representative of such Member), is required or would be required to be furnished to avoid liability for contempt or the imposition of any other material judicial or governmental penalty or censure, (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, or (d) as to which the Managers have unanimously consented in writing.   Each Member hereby further agrees that, upon the termination of such Member as a Manager or Passive Member, all data, memoranda, client lists, notes, programs and other papers, items and tangible media, and reproductions thereof, relating to the foregoing matter in such Member's possession or control shall be returned to the Company and remain in the possession of the Company. This Section 10.1 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

    10.2   Non-Competition and Non-Solicitation.

        10.2.1   During the term of the Company, except with the prior written consent of the Initial Members, no Member (including, for the avoidance of doubt, any Retired Member) or any Affiliate of any of the foregoing shall:

           (a)   engage in, or become a passive investor in, any investment manager to a hedge fund, private equity fund or other privately offered pooled investment vehicle, unless such Member or principal of any Member shares all his profits from such business with the other Members of the Company (including Retired Members) on a pro rata basis in accordance with their respective Company Percentages; or

           (b)   solicit any employee of the Company or its Affiliates (other than any employees who at the time of such solicitation are also employees of any investment management company owned in full or in part by such soliciting Member in accordance with the terms of clause (a) above).

    Notwithstanding the foregoing, if Uri Landesman is removed without Cause, the provisions in clauses (a) and (b) above shall not apply to him or his Affiliates.

        10.2.2   Each Member agrees that the provisions of Section 10.2.1 are reasonable and necessary for the protection of the Company and its Affiliates, and that each provision, and the period or periods of time, geographic areas and types and scope of restrictions on the activities specified therein are, and are intended to be, divisible. Each Member further acknowledges that the goodwill, good name, and good standing of the Company in the investment industry are essential for the Company's day-to-day operation and existence. In the event that any provision of Section 10.2.1, including any one sentence, clause or part thereof, shall be deemed contrary to law or invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining

provisions shall not be affected, but shall, to the full extent permitted by law, remain in full force and effect and any invalid and unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same valid and enforceable, but in no event shall such provisions be modified, amended or limited to be more restrictive than the provisions contained herein.

10.2.3 This Section 10.2 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

ARTICLE XI
Indemnification

11.1    <u>Exculpation</u>.

Notwithstanding any other provision of this Agreement, whether express or implied, or obligation or duty at law or in equity, no Member (including, with limitation, the Managers) shall be liable to the Company for any act or omission in relation to the Company, this Agreement, any related document or any transaction or investment contemplated hereby or thereby taken or omitted by a Member in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Member; provided that such act or omission does not constitute gross negligence, willful misconduct, bad faith or fraud.

11.2    <u>Indemnification</u>.

The Company shall indemnify and hold harmless each Member (including, without limitation, the Managers) and his or its Affiliates from and against any and all losses, claims, damages, liabilities, expenses (including, without limitation, legal fees and expenses), judgments, fines, settlements and other amounts relating to any and all acts, omissions, claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, which relate to the Member's relationship to, or status or activities with, the Company or which otherwise relate to or arise in connection with the property, business or affairs of the Company ("Losses"). The Member's expenses paid or incurred in defending itself against any Losses shall be reimbursed as paid or incurred. The indemnification provided pursuant to this Section 11.2 shall not apply with respect to a Member for that portion of any Losses determined by the final decision (from which an appeal cannot be taken or is not timely taken) of a court of competent jurisdiction to have been caused by such Member's gross negligence, willful misconduct, bad faith or fraud. Any payments made to or on behalf of a Member who is later determined not to be entitled to such payments shall be refunded to the Company promptly following such determination. This indemnity shall be provided out of Company assets only, and no Member shall have any personal liability with respect to this indemnity. The provisions of this Section 11.2 shall survive the termination of this Agreement with respect to all actions of a Member which occurred prior to such termination.

22

ARTICLE XII
Records and Accounting, Fiscal Affairs

12.1    <u>Records and Accounting</u>.

12.1.1 The Company shall maintain books and records which shall reflect all Company transactions and which shall be appropriate and adequate for the Company's business. The Members shall have the right during normal business hours to request access to and copy such books and records, upon at least 1 Business Day's prior written notice to the Managers, in person or by their authorized attorney or agent, but only if (i) the request to access and/or copy: (i) is for a purpose reasonably related to the Company's business and the Member's Interest in the Company, is not for any commercial purpose, is not detrimental to the best interest of the Company, is not damaging to the Company or its business and the Company is not required by law or by agreement with third parties to keep such books and records confidential (as reasonably determined by the Managers in good faith); (ii) the Member agrees (in form and substance satisfactory to the Manager) to use such information only for Company purposes and to maintain such information in strict confidence; and (iii) reasonable reproduction and distribution costs are paid by the Member.

12.1.2 The books and records of the Company shall be kept on the accrual basis in accordance with generally accepted accounting principles (except for revenues, which shall be accounted for on a cash basis).

12.2    <u>Tax Status</u>.

The Members intend that the Company will be treated as a partnership for U.S. federal, state and local income tax purposes and will be subject to all provisions of Subchapter K of the Code.

12.3    <u>Tax Matters Partner</u>.

Pursuant to Section 6231(a)(7)(A) of the Code, Mark Nordlicht is hereby designated as the "**Tax Matters Partner**" of the Company for all purposes of the Code and for the corresponding provision of any U.S. state or local statute. All of the Members hereby consent to such designation and agree to take any such further action as may be required by the Regulations or otherwise to effectuate and maintain such designation. In his capacity as the Tax Matters Partner, Mark Nordlicht shall have the exclusive right and authority to determine the accounting methods and conventions to be used in the preparation of the Company's tax returns and make such elections under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Company, or any other method or procedure related to the preparation of such returns; provided, that no such election under any such tax law shall be made which would have a negative impact on any Member not shared by the other Members in proportion to their respective interests hereunder. Promptly after any filing is made by the Tax Matters Partner with the Internal Revenue Service or with any other taxing authority, the Tax Matters Partner will provide a copy of same to each of the other Members.

23

12.4    Reports.

The Company shall furnish to each Member detailed financial statements and information and documents (including Form K-1 or comparable information) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

12.5    Member Representations and Warranties.

12.5.1  Each Member represents and warrants that such Member has been advised to consult, and has consulted, independent counsel and tax counsel concerning the consequences of receiving such Member's Interest in the Company and becoming a Member, and such Member has neither received nor relied upon any investment, financial or tax advice from the Managers or counsel for the Company.

12.5.2  Each Member agrees, with respect to each Company income tax return that is prepared and filed in compliance with the provisions of this Agreement, that such Member shall not (a) treat, on such Member's income tax returns, any item of income, gain, loss, deduction or credit relating to such Member's interest in the Company in a manner inconsistent with the treatment of such item by the Company as reflected on Form K-1 or any other information statement furnished by the Company to such Member for use in preparing such Member's income tax returns, or (b) file any claim for refund relating to any such item based on, or which would result in, such inconsistent treatment.

12.5.3  In the event of a breach by any Member of the provisions of this Section 12.5, such Member shall be liable to the Company and the other Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

12.5.4  This Section 12.5 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

## ARTICLE XIII
### Company Property

13.1    Company Property.

All property now or hereafter owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property. Title to the assets and properties, real and personal, now or hereafter owned by or leased to the Company, shall be held in the name of the Company; provided, however, that if the Managers determine that title shall be held other than in the name of the Company, the Person or Persons who hold title shall certify by instrument duly executed and acknowledged, in form for recording or filing, that title is held as nominee and/or trustee for the sole benefit of the Company pursuant to the terms of this Agreement, and an executed copy of such instrument shall be delivered to each Member.

24

13.2   Prohibition Against Partition.

Each Member hereby permanently waives and relinquishes any and all rights it may have to cause all or any part of the property of the Company to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any one of them.

## ARTICLE XIV
### Dissolution, Liquidation and Termination

14.1   Dissolution and Liquidation.

14.1.1  The Company shall dissolve upon, but not before, the first to occur of the following:

(a)   the holders of 75% of the Voting Company Percentages consent in writing to the dissolution of the Company;

(b)   the retirement, removal, death or Permanent Disability of the last remaining Manager unless the Members select a replacement Manager pursuant to Section 4.3.2 within 90 days of the relevant Retirement Date or Removal Date, as the case may be;

(c)   the bankruptcy or insolvency of the Company; or

(d)   operation of law.

14.1.2  Upon dissolution of the Company, but prior to the cancellation of the Certificate of Formation, the Company shall immediately commence to wind up its affairs, and the Managers shall proceed with reasonable promptness to liquidate the business of the Company.

14.1.3  During the period of the winding up of the affairs of the Company, the rights and obligations of the Members shall continue as provided herein.

14.1.4  The Company shall terminate after its affairs have been wound up and its assets fully distributed in accordance with Section 7.5.1.

14.1.5  No Member shall be obligated to repay any deficit in such Member's Capital Account to the Company or any other Member or have any right to demand property other than cash upon dissolution and termination of the Company.

14.2   Cancellation of Certificate of Formation.

Upon the completion of the liquidation of the Company's property, the Managers shall cause the cancellation of the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in all foreign jurisdictions.

ARTICLE XV
Miscellaneous

15.1    Governing Law.

This Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Delaware without regard to its conflicts of laws rules.

15.2    Notice.

15.2.1  All communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered personally with receipt acknowledged; (ii) sent by registered or certified mail, return receipt requested; (iii) transmitted by facsimile (receipt of which shall be confirmed by telephone and by a writing sent by registered or certified mail on the Business Day that such facsimile is sent); or (iv) sent by recognized overnight courier for next Business Day delivery; to, in the case of notice to a Member, the address or facsimile number, as the case may be, set forth with respect to such Member in the books and records of the Company (or at such other address or facsimile number for a Member as such Member shall specify by notice to the Company, or, in the case of notice to the Company, to the attention of the Managers at the Company's principal business office.

15.2.2  Notice of change of address shall be deemed given when actually received or upon refusal to accept delivery thereof; all other communications shall be deemed to have been given, received and dated on the earliest of:  (i) when actually received or upon refusal to accept delivery thereof, (ii) the date when delivered personally, (iii) one Business Day after being sent by facsimile or overnight courier and (iv) four Business Days after registered or certified mailing.

15.3    Severability.

In case any one or more of the provisions contained in this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute for such invalid and unenforceable provision in light of the tenor of this Agreement and, upon so agreeing, shall incorporate such substitute provision in this Agreement.

15.4    Headings.

The headings in this Agreement have been inserted solely as a matter of convenience and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

EWAGNE\127314.8 - 3/30/11

15.5    Interpretation.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the Person or Persons referred to may require

15.6    Entire Agreement.

This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior agreements or understandings among the parties relating to the subject matter hereof, oral or written, all of which are hereby merged into this Agreement.  There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement.

15.7    Termination. Revocation, Waiver, Modification or Amendment.

No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing by the Members holding at least 75% of the Voting Company Percentages.  Without the written consent of each Member (including a Retired Member) adversely affected thereby, no amendment of this Agreement shall be made that (i) increases the obligations of any Member to make Capital Contributions, (ii) alters the allocation for tax purposes of any items of income, gain, loss, deduction or credit, (iii) alters the manner of computing the distributions of any Member, or (iv) allows the obligation of a Member to make a Capital Contribution to the Company to be compromised by the consent of less than all the Members.

15.8    Binding Effect.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

15.9    Further Assurances.

Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and to take all such further actions as may be required by law or deemed by the Managers to be necessary or useful in furtherance of the Company's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

15.10   Waiver

No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by any other Member of its obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligation of such Member hereunder.  Failure on the part of a Member to declare such other Member in default, irrespective

27

of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

### 15.11 Additional Remedies.

The rights and remedies of any Member hereunder shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

### 15.12 No Reliance by Third Parties.

Except as expressly provided herein, the provisions of this Agreement are not for the benefit of any creditor or other Person (including, without limitation, a Beneficiary) other than a Member, and no creditor or other Person shall obtain any rights under this Agreement or by reason of this Agreement. Beneficiaries shall in no event be considered Members of the Company, and the Managers, in their capacity as such, shall not have any fiduciary duties to the Beneficiaries.

### 15.13 Arbitration.

Any dispute arising out of, or relating to, this Agreement or the breach thereof (other than Article 10 hereof), or regarding the interpretation thereof, shall be finally settled by arbitration conducted in New York City in accordance with the rules of JAMS then in effect before a single arbitrator appointed in accordance with such rules. Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction. The arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance. For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration and for purposes of Article 8 hereof, the parties hereby submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County, or the United States District Court for the Southern District of New York, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon it if sent by registered mail addressed to it at the address referred to in Section 15.2 above. The parties agree that money damages would be an inadequate remedy for any breach of any provisions of Article X and in the event of a breach or threatened breach of such provisions, the Managers or their successors or assigns may, in addition to other rights and remedies existing in their favor, apply for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, such provisions, without posting a bond or other security.

### 15.14 Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any party

28

to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.

[Remainder of page intentionally left blank.]

EWAGNE\127314.8 - 3/30/11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

Manager:

_____
URI LANDESMAN

Passive Members:

_____
MARK NORDLICHT

MARK NORDLICHT GRANTOR TRUST

By:_____
Mark Nordlicht,
solely in his capacity as Trustee

30

Schedule I

### Schedule of Members

| Name | Address | Member Status | Company Percentage /Voting Status |
|------|---------|---------------|-----------------------------------|
| Mark Nordlicht | | Passive Member; Chief Investment Officer | 10% Voting Company Percentage |
| Uri Landesman | | Manager; Member | 25% Voting Company Percentage |
| Mark Nordlicht Grantor Trust | | Passive Member | 65% Voting Company Percentage |