```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
In re PLATINUM-BEECHWOOD LITIGATION :      18-cv-6658 (JSR)
----------------------------------- x
MARTIN TROTT and CHRISTOPER SMITH,  :
as Joint Official Liquidators and   :
Foreign Representatives of PLATINUM :
PARTNERS VALUE ARBITRAGE FUND L.P.  :
(in Official Liquidation), and      :      18-cv-10936 (JSR)
PLATINUM PARTNERS VALUE ARBITRAGE   :
FUND L.P. (in Official              :
Liquidation),                       :
                                    :
         Plaintiffs,                :
                                    :      OPINION AND ORDER
              -v-                   :
                                    :
PLATINUM MANAGEMENT (NY) LLC, et    :
al.,                                :
                                    :
         Defendants.                :
----------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

On November 21, 2018, plaintiffs Martin Trott and
Christopher Smith, as Joint Official Liquidators and Foreign
Representatives of Platinum Partners Value Arbitrage Fund L.P.
(in Official Liquidation) ("PPVA"), and PPVA filed a multi-count
complaint against Platinum Management (NY) LLC ("Platinum
Management") and numerous other defendants. ECF No. 1. On
January 25, 2019, plaintiffs filed their First Amended Complaint
("FAC"), ECF No. 159, and the Court subsequently ruled on a
number of motions to dismiss the FAC, ECF Nos. 276, 290. On
March 29, 2019, plaintiffs filed their Second Amended Complaint

("SAC"), ECF No. 285, and the Court subsequently ruled on various motions to dismiss the SAC, ECF No. 408.

Now before the Court are four[1] motions for summary judgment by the following defendants: (1) David Bodner, ECF No. 523; (2) Bernard Fuchs, ECF No. 537; (3) Murray Huberfeld, ECF No. 584; and (4) Huberfeld Family Foundation, Inc. ("HFF"), ECF No. 522. Plaintiffs oppose all four motions. ECF No. 554. For the reasons set forth below, the Court grants summary judgment in favor of those moving defendants in the following respects:

- In favor of Bodner on (a) the Sixteenth Count (civil conspiracy) in its entirety and (b) parts of the First and Second Counts (breach of fiduciary duty), parts of the Fourth and Fifth Counts (fraud and constructive fraud), parts of the Third, Sixth, Seventh, and Eighth Counts (aiding and abetting breach of fiduciary duty and fraud), to the extent that these eight Counts are not premised on the overvaluation of PPVA's net asset value ("NAV");

---

[1] The motions of Seth Gerszberg and Joseph SanFilippo were withdrawn without prejudice after they had reached an agreement in principle with plaintiffs to settle all remaining claims against them. The motions of (1) B Asset Manager LP, B Asset Manager II LP, BAM Administrative Services, LLC, Beechwood Re Investments LLC, Beechwood Re Holdings, Inc., Beechwood Bermuda International Ltd., Mark Feuer, Scott Taylor, and Dhruv Narain, and (2) Beren are currently held in abeyance, given their representation to the Court that they have reached an agreement in principle with plaintiffs to settle all remaining claims against them.

- In favor of Fuchs on (a) the Sixteenth Count (civil conspiracy) and the Seventeenth Count (civil RICO) in their entirety and (b) parts of the First and Second Counts (breach of fiduciary duty), parts of the Fourth and Fifth Counts (fraud and constructive fraud), parts of the Third and Sixth Counts (aiding and abetting breach of fiduciary duty and fraud), to the extent that these six Counts are not premised on the NAV overvaluation; and

- In favor of HFF on all remaining claims.

In all other respects, the motions are denied.

### Background

Except where otherwise noted, the following facts, either undisputed or taken most favorably to the non-moving parties, are taken from the parties' Rule 56.1 statements:

In the early 2000s, defendants Mark Nordlicht, David Bodner, and Murray Huberfeld founded an affiliated group of hedge funds called "Platinum Partners." One of its flagship funds was Platinum Partners Value Arbitrage Fund L.P., a plaintiff in this action. See Plaintiffs 56.1 CS[2] ¶ 77; Huberfeld 56.1 ¶ 4; Bodner 56.1 ¶ 1.

---

[2]      In this Opinion and Order, the abbreviation "56.1" refers to a moving defendant's statement of material facts filed together with that defendant's moving brief: Bodner 56.1, Fuchs 56.1, Huberfeld 56.1, and HFF 56.1 can be found in, respectively, ECF Nos. 525, 537-6, 588, and 528. The abbreviation "Plaintiffs' Response to [Defendant A] 56.1" refers

As relevant here, the management of PPVA was exclusively vested in defendant Platinum Management, PPVA's general partner. See Second Amended and Restated Limited Partnership Agreement, dated July 1, 2008, ECF No. 585-6, § 2.02. In its capacity as the general partner, Platinum Management was responsible for calculating PPVA's NAV and allocating net capital appreciation and deprecation to the accounts of all partners. See id. §§ 3.05, 3.06. In addition, Platinum Management served as PPVA's investment manager. See Fourth Amended and Restated Investment Management Agreement, dated March 9, 2007, ECF No. 585-7 ("PPVA IMA"). Under the terms of the PPVA IMA, Platinum Management was entitled to receive a 2% per annum management fee based on PPVA's NAV. See id.; ECF No. 577, Ex. 29; SanFilippo Dep. 59:13-25, 60:2-13.[3] Platinum Management was also entitled to an

---

to plaintiffs' response to Defendant A's statement of material facts: Plaintiffs' Response to Bodner 56.1, Plaintiffs' Response to Fuchs 56.1, Plaintiffs' Response to Huberfeld 56.1, and Plaintiffs' Response to HFF 56.1 can be found in, respectively, ECF Nos. 571, 569, 572, and 570. The abbreviation "Plaintiffs 56.1 CS" refers to plaintiffs' counterstatement of material facts, which can be found in ECF No. 576.

[3]     The transcript of Angela Albanese Deposition, abbreviated "Albanese Dep.," can be found in ECF No. 530-4, Ex. A, ECF No. 577, Ex. 47. The transcript of Ezra Beren Deposition, abbreviated "Beren Dep.," can be found in ECF No. 577, Ex. 37. The transcript of David Bodner Deposition, abbreviated "Bodner Dep.," can be found in ECF No. 530-4, Ex. C, ECF No. 577, Ex. 42. The transcript of Mark Feuer Deposition, abbreviated "Feuer Dep.," can be found in ECF No. 530-4, Ex. E, ECF No. 577, Ex. 280. The transcript of Bernard Fuchs Deposition, abbreviated "Fuchs Dep.," can be found in ECF No. 530-4, Ex. G, ECF No. 577,

incentive allocation equal to 20% of net capital appreciation of PPVA's assets, after deducting all expenses, as calculated by Platinum Management in its capacity as PPVA's general partner. See PPVA IMA; ECF No. 577, Ex. 29.

The members of Platinum Management consisted of the Mark Nordlicht Grantor Trust (passive member) ("MNG Trust"), Nordlicht (passive member), and Uri Landesman (member & sole manager). See Second Amended and Restated Operating Agreement of Platinum Management (NY) LLC, ECF No. 585-2. The beneficiaries

---

Ex. 22. The transcript of Murray Huberfeld Deposition, abbreviated "Huberfeld Dep.," can be found in ECF No. 577, Ex. 3. The transcript of Huberfeld Family Foundations 30(b)(5) Witness Murray Huberfeld Deposition, abbreviated "HFF Dep.," can be found in ECF No. 577, Ex. 95. The transcript of Michael Katz Deposition, abbreviated "Katz Dep.," can be found in ECF No. 577, Ex. 32. The transcript of Stewart Kim Deposition, abbreviated "Kim Dep.," can be found in ECF No. 530-4, Ex. I. The transcript of Dhruv Narain Deposition, abbreviated "Narain Dep.," can be found in ECF No. 530-4, Ex. K, ECF No. 577, Ex. 480. The transcript of Mark Nordlicht Deposition, abbreviated "Nordlicht Dep.," can be found in ECF Nos. 607-2, 616-2. The transcript of Alexis Northwood Deposition, abbreviated "Northwood Dep.," can be found in ECF No. 530-4, Ex. L, ECF No. 577, Ex. 48. The transcript of David Ottensoser Deposition, abbreviated "Ottensoser Dep.," can be found in ECF No. 530-4, Ex. M, ECF No. 577, Ex. 421. The transcript of Kerry Propper Deposition, abbreviated "Propper Dep.," can be found in ECF No. 577, Ex. 33. The transcript of Daniel Saks Deposition, abbreviated "Saks Dep.," can be found in ECF No. 530-4, Ex. N, ECF No. 577, Ex. 64. The transcript of Joseph SanFilippo Deposition, abbreviated "SanFilippo Dep.," can be found in ECF No. 530-4, Ex. O, ECF No. 577, Ex. 30. The transcript of David Steinberg Deposition, abbreviated "Steinberg Dep.," can be found in ECF No. 530-4, Ex. P, ECF No. 577, Ex. 646. The transcript of Christian Thomas Deposition, abbreviated "Thomas Dep.," can be found in ECF No. 530-4, Ex. S, ECF No. 577, Ex. 263. This list is provided for citation purposes only, and is not exhaustive of the transcripts that the Court has reviewed.

of MNG Trust were Nordlicht Management III LLC, Grosser Lane
Management LLC ("Grosser Lane"), and Manor Lane Management LLC
("Manor Lane"). See Trust Agreement of Mark Nordlicht Grantor
Trust, ECF No. 585-3 ("MNG Trust Agreement"). Nordlicht served
as the trustee of MNG Trust. See id.

Moving defendant David Bodner and his wife were the members
of Grosser Lane, which held a 24.99% Economically Equivalent
Membership Interest (as defined in the MNG Trust Agreement) in
MNG Trust. See Bodner 56.1 ¶ 4; MNG Trust Agreement. Through MNG
Trust and Grosser Lane, Bodner was entitled to a portion of the
profits generated through the funds managed by Platinum
Management, including PPVA. See Bodner 56.1 ¶ 8. Also, in late
2013, the Bodner family made an investment in Beechwood. See id.
¶ 35.

Moving defendant Murray Huberfeld was the only member of
Manor Lane, which held a 24.99% Economically Equivalent
Membership Interest in MNG Trust. See Huberfeld 56.1 ¶¶ 5-6; MNG
Trust Agreement. Huberfeld, individually or through family
members and controlled entities, was indirectly a beneficial
owner of limited partnership interests in PPVA. See Huberfeld
56.1 ¶ 17.

Moving defendant Huberfeld Family Foundation, Inc. is a New
York State not-for-profit corporation established in August
1998. See HFF 56.1 ¶ 30. It has made millions of dollars in

charitable donations to a variety of charitable, religious, and education organizations. See id. ¶ 31. Huberfeld was a director and president of HFF throughout 2013 and 2014. See id. ¶ 38. HFF made investments in, inter alia, PPVA. See id. ¶ 35.

Moving defendant Bernard Fuchs was a partner with 10% interest in Platinum Management since 2014. See Fuchs 56.1 ¶ 1. He was never a member of Platinum Management's valuation or risk committee. See id. ¶¶ 2, 3. As of October 31, 2015, he and his affiliate entities had invested about $22 million in PPVA and about $7.8 million in Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), another Platinum flagship fund. See id. ¶ 6. His role at Platinum consisted of, inter alia, bringing in additional investors and convincing existing investors not to seek redemptions when PPVA faced liquidity issues. See ECF No. 577, Exs. 170, 171, 173-79; Fuchs Dep. 24:25-25:20, 26:3-8.

Non-moving defendant Mark Nordlicht, at all relevant times, served as the Chief Investment Officer of Platinum Management. See Bodner 56.1 ¶ 13. Non-moving defendant Uri Landesman was the Managing Member of Platinum Management. See id. Non-moving defendant David Levy was the Co-Chief Investor Officer of Platinum Management prior to the launch of Beechwood, and later became the Chief Investment Officer of Beechwood. See Plaintiffs 56.1 CS ¶¶ 57, 107.

-7-

In 2013, certain Platinum individuals, along with Mark Feuer and Scott Taylor, established a collection of corporate entities doing reinsurance business under the trade name "Beechwood," for the purpose of gaining access to hundreds of millions of dollars in insurance assets to which Platinum would not otherwise have access. See Plaintiffs 56.1 CS ¶¶ 412-19, 427, 430-36. Before the Beechwood enterprise officially launched, it had its roots in Platinum: for instance, an email from Huberfeld on March 20, 2013 sets forth an outline of terms for the Beechwood enterprise and assigned roles between Platinum and Beechwood individuals for its launch. See ECF No. 577, Ex. 277. Also, early on, Beechwood held meetings with its potential clients, such as CNO Financial Group, Inc., at Platinum's office. See ECF No. 577, Ex. 405. At all relevant times, Feuer and Taylor were, respectively, the Chief Executive Officer and the President of the Beechwood enterprise. See Feuer Dep. 267:25-268:3; Taylor Dep. 123:9-10.

From 2014 to 2017, Platinum and Beechwood engaged in a series of related-party transactions that were, according to plaintiffs, fraudulent and harmful to PPVA. Three sets of those transactions are relevant for the purpose of evaluating the instant motions:

Black Elk scheme

-8-

As of December 31, 2014, PPVA beneficially owned senior secured notes, Series E preferred equity, and a majority of common equity in Black Elk Energy Offshore Operations, LLC ("Black Elk"), a Houston-based company engaged in the exploration, development, and production of oil and natural gas properties. See ECF Nos. 536-36, 536-38. On July 10, 2014, Black Elk agreed to sell certain oil and gas fields to Renaissance Offshore LLC ("Renaissance sale"). See Purchase and Sale Agreement, ECF No. 577, Ex. 395. When the transaction closed on August 15, 2014, Black Elk received $170 million in cash, and Renaissance also assumed certain unsecured liabilities of Black Elk. See id.; ECF No. 577, Ex. 403.

The Indenture governing the Black Elk senior secured notes dictated that the proceeds from the Renaissance sale be applied to repay the outstanding Black Elk notes in full, before they could be applied to redeem Black Elk Series E preferred equity. See Indenture, ECF No. 577, Ex. 372 ("Black Elk Indenture"), § 4.10(b). To bypass this requirement, prior to the closing of the Renaissance sale, Black Elk and Black Elk Energy Finance Corp., on July 16, 2014, circulated a consent solicitation to the holders of the Black Elk notes to amend the Indenture so that Black Elk could use the proceeds of the asset sale (1) to purchase at par any notes that noteholders would elect to tender, and (2) to use any remaining proceeds to redeem Series E

preferred equity before repaying the Black Elk notes.[4] See Offer to Purchase and Consent Solicitation Statement, ECF No. 526-29 ("Black Elk Consent Solicitation"), at 18; see also Form 8-K of Black Elk Energy Offshore Operations, LLC, dated August 15, 2014, ECF No. 526-30.

However, additional preparatory steps were necessary to ensure that a requisite vote for an amendment would be obtained. Section 9.02(a) of the Indenture permitted an amendment to the Indenture "with the consent of the Holders of a majority in aggregate principal amount of the Notes affected thereby then outstanding . . . ." Black Elk Indenture § 9.02(a). PPVA and its affiliates, which together held a majority of common equity in Black Elk, were deemed to be affiliates of Black Elk, and so their votes would be excluded from determining whether holders of a majority of the Black Elk notes consented. See id. § 2.09. Accordingly, PPVA engaged in a series of transactions transferring its Black Elk notes to Beechwood, whose votes did count. Compare ECF No. 577, Exs. 393, 394 with ECF No. 577, Ex. 379, 380; see also ECF No. 577, Ex. 381-83, 386-87, 390. These transfers were meant to ensure that the notes would be in

---

[4]    Noteholders were permitted to consent without tendering their Black Elk notes for repayments, but they had to consent in order to tender their Black Elk notes. See Plaintiffs 56.1 CS ¶ 527.

amendment-friendly hands so that the requisite consent would be obtained.

As a result, the requisite consent was obtained, the Indenture was amended as desired, and Black Elk applied the proceeds from the Renaissance sale to, inter alia, redeem about $100 million of Series E preferred equity rather than paying off the Black Elk notes, a significant portion of which were held by PPVA and its subsidiaries. See Form 8-K of Black Elk Energy Offshore Operations, LLC, dated August 21, 2014, ECF No. 526-30; ECF No. 577, Ex. 406.

Lastly, as relevant for HFF's motion only, HFF, on February 8, 2013, invested approximately $1 million in Black Elk Opportunities Fund International, Ltd. ("BEOF Fund"), through which HFF obtained an interest in Black Elk Series E preferred equity. See HFF 56.1 ¶ 40; ECF No. 577, Ex. 107. On August 21, 2014, HFF received $1,026,677 from BEOF Fund as proceeds of the redemption of Black Elk Series E preferred equity as part of the Black Elk scheme. See HFF 56.1 ¶ 41; ECF No. 577, Exs. 407, 409, 410. HFF was not a Black Elk noteholder. See HFF 56.1 ¶ 51.

Montsant transactions

On January 20, 2015, a few weeks after agreeing to defer receipt of the interest due on Black Elk notes, Beechwood sold their Black Elk notes back to PPVA at a price of 93.5% of par plus accrued interests deferred in November 2014 ("Black Elk

notes buyback"). See ECF No. 577, Ex. 420. Plaintiffs here argue
that PPVA was forced to overpay for those Black Elk notes, as
then-current market price was significantly lower.[5] See
Plaintiffs 56.1 CS ¶¶ 561-62. To fund this purchase, on January
30, 2015, Montsant Partners, LLC, a wholly-owned subsidiary of
PPVA, borrowed $35.5 million from Senior Health Insurance
Company of Pennsylvania ("SHIP"), a Beechwood client, and
deposited certain liquid securities in an account pledged to
Beechwood as a collateral ("Montsant loan," and, together with
the Black Elk notes buyback, "Montsant transactions"). See
Unsecured Term Note, ECF No. 577, Ex. 186; ECF No. 577, Exs.
428-29, 614.

Agera sale

On June 9, 2016, Principal Growth Strategies LLC ("PGS"), a
PPVA subsidiary, sold the notes issued by Agera Energy LLC to
AGH Parent LLC ("AGH Parent") for a purchase price of $170
million, consisting of $65.29 million in cash and the balance in
the form of various equity and debt interests valued at par
("Agera sale"). See Purchase Agreement, ECF No. 577, Ex. 543, §

---

[5]   In the fall of 2014, after the Renaissance sale closed, the
market price for Black Elk notes began to fall; by December 9,
2014, a brokerage firm believed that the trading price for these
notes were as low as 22% of par. See ECF No. 577, Ex. 413.
Emails and other documentary evidence support a reasonable
inference that, to prop up the market price of these notes,
Nordlicht, Steinberg, and Steinberg's contacts made efforts to
submit artificial bids and make artificial purchases. See ECF
No. 577, Exs. 412, 414-19, 655-58.

2.4. For the non-cash portion, AGH Parent and PGS executed an Assignment and Assumption Agreement, pursuant to which AGH Parent assigned to PGS, <u>inter alia</u>, certain debt interests in China Horizon. <u>See</u> ECF No. 577, Ex. 544, 564. Plaintiffs here argue that the overall consideration and the non-cash portion of the consideration were each inadequate. <u>See</u> Plaintiffs Opp. 47, 56.

Furthermore, on January 26, 2017, AGH Parent exercised its right to redeem certain securities that it had sold to PGS as part of the Agera sale, and, as consideration for such redemption, it transferred to PGS additional debt interests, which were valued at near par but were allegedly worthless. <u>See</u> ECF No. 577, Ex. 581; <u>see also</u> Amended and Restated Limited Liability Company Agreement among AGH Parent LLC and the Members Named Herein, ECF No. 577, Ex. 537 § 9.06.

<u>Overvaluation of PPVA's NAVs</u>

In addition to the aforementioned related-party transactions, the parties dispute whether Platinum Management overvalued the NAVs of some of the PPVA investments and funds, where such alleged overvaluations allowed Platinum Management and its beneficial owners to pocket excess, unearned management fees from PPVA, as discussed in more detail below.

<u>Expanding Government Investigations</u>

Starting in December 2014, the Securities and Exchange Commission ("SEC") issued various examination requests regarding, <u>inter alia</u>, Bodner's and Huberfeld's roles at Platinum. <u>See</u> ECF No. 577, Ex. 445-46, 457, 637.

On May 21, 2015, the U.S. Attorney's Office ("USAO") issued grand jury subpoenas to Platinum Partners requesting information and documents, as part of their investigation into Huberfeld's bribery payment to Norman Seabrook, then-President of Correction Officers' Benevolent Association, to have Seabrook invest the union fund with Platinum Partners ("COBA bribery scheme"). <u>See</u> ECF No. 577, Ex. 448. By March 2, 2016, the USAO expanded the investigation into Platinum Partners, requesting information on the transactions between Platinum and Beechwood since 2014. <u>See</u> ECF No. 577, Ex. 273.

<u>March 20, 2016 Release Agreement</u>

On March 20, 2016, Bodner and Huberfeld, among others, entered into a Release Agreement with Platinum Management, under which they gave up their economic rights in Platinum and provided Platinum entities with a general release from liability, in exchange for those Platinum entities, including PPVA, providing a similar unconditional general release of Bodner and Huberfeld. <u>See</u> Release Agreement, ECF No. 585-9 ("Release Agreement") ¶ 3(b), Recital A (defining "Platinum" to include PPVA); <u>see also</u> <u>id.</u> ¶¶ 3(a), 3(c), 4(b), 4(c). The

Release Agreement also released "any entity controlled by" Huberfeld, which includes HFF, from general liability. Id. ¶ 3(a). The Release Agreement is governed by the laws of the State of New York. See id. ¶ 5(e).

Aftermath

On June 8, 2016, federal authorities arrested Huberfeld for conspiracy to commit wire fraud in connection with the COBA bribery scheme. See United States v. Seabrook et al., No. 16-cr-0467 (AKH) (S.D.N.Y.), ECF No. 5. Shortly thereafter, the USAO and the SEC brought, respectively, a criminal action and a civil action against Platinum individuals and entities for engaging in a multi-pronged fraudulent scheme. See United States v. Nordlicht et al., No. 16-cr-00640 (BMC) (E.D.N.Y.); SEC v. Platinum Management (NY) LLC et al., No. 16-cv-06848 (BMC) (E.D.N.Y.). Additional civil actions against Platinum and Beechwood entities and individuals, including the instant action, followed. See, e.g., In re Platinum-Beechwood Litig., Nos. 18-cv-6658, 18-cv-10936, 18-cv-12018 (JSR) (S.D.N.Y.).[6]

---

[6]    During his deposition, Nordlicht invoked his right against self-incrimination under the Fifth Amendment to almost all questions asked. See generally Nordlicht Dep. Unlike in a criminal case, the finder of fact in a civil case may, in certain circumstances, draw an adverse inference against the alleged co-conspirators from a co-conspirator's assertion of the Fifth Amendment. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). Whether to draw an adverse inference turns on "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."

LiButti v. United States, 107 F.3d 110, 121 (2d Cir. 1997). The
Second Circuit has set forth four non-exclusive factors in
making such determination: (1) the nature of the relationship
between the defendant and the witness, (2) the degree of control
over the witness by the defendant, (3) the alignment of
interests between the witness and the defendant, and (4) the
role of the witness in the litigation. Id. at 123.

On the one hand, the four LiButti factors favor drawing an
adverse inference from Nordlicht's invocation. Nordlicht's
loyalty to some of the moving defendants is quite clear, claims
against him substantially overlap with claims against some of
these moving defendants, and Nordlicht occupies the most central
role in this litigation. see, e.g., Plaintiffs 56.1 CS ¶¶ 56,
77, 382-411; ECF No. 577-4; ECF No. 577, Exs. 336, 355; ECF No.
607-1, Ex. 8.

On the other hand, drawing adverse inferences relying on
the non-exclusive LiButti factors alone, without considering the
overall context of this deposition, not only has minimal
probative value but does not advance the ultimate goal of "the
search for truth." LiButti, 107 F.3d at 121. Because Nordlicht
remains under a serious threat of criminal prosecution, the most
reasonable inference from his silence is that he did so because
of the prosecution. See In re Platinum-Beechwood Litig., 367 F.
Supp. 3d 318, 328 (S.D.N.Y. 2019). Although Nordlicht's retrial
would focus on the Black Elk scheme, the prosecution's case puts
Nordlicht in criminal jeopardy with respect to many other
aspects of the Platinum business. See United States v.
Nordlicht, No. 16-cr-640 (BCM), 2019 U.S. Dist. LEXIS 167084, at
*58 (E.D.N.Y. Sept. 27, 2019); Transcript 6/24/2019 in United
States v. Nordlicht, No. 16-cr-640 (BCM) (E.D.N.Y.), available
at ECF No. 618-1, at 6611; see also Transcript 5/3/2019, ECF No.
616-1, at 42:23-43:4 ("[I]t would be virtual malpractice for a
lawyer not to advise his or her client, when there's a criminal
case pending, to take the Fifth everywhere," and "the reason for
doing it would be to preserve one of the few advantages that a
defendant has in a criminal case, which is the right to
silence").

Lastly, even if the Court were to draw adverse interests,
the Court finds that, based on its review of the transcript of
Nordlicht deposition, the analysis and conclusion set forth in
this Opinion and Order would not be affected: adverse inference
is "not a substitute for relevant evidence," and it cannot by

**Analysis – Motions of David Bodner and Murray Huberfeld**

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[7]

Bodner and Huberfeld move for summary judgment on all remaining claims against them, which consist of: (1) claims for breach of fiduciary duty (First and Second Counts); (2) claims for fraud and constructive fraud (Fourth and Fifth Counts); (3) claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraud (Third, Sixth, Seventh, and Eighth Counts); and (4) claims for civil conspiracy (Sixteenth Count).

---

itself raise an issue of fact to defeat summary judgment. United States v. Rylander, 460 U.S. 752, 758, 761 (1983).

[7]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

ECF No. 523; Bodner Mem. 1[8]; ECF No. 584; Huberfeld Mem. 2. For
the reasons set forth below, the Court grants summary judgment
in favor of Bodner on (1) the claim for civil conspiracy in its
entirety and (2) parts of the claims for breach of fiduciary
duty, fraud, constructive fraud, aiding and abetting fraud, and
aiding and abetting breach of fiduciary duty, to the extent that
these claims are not premised on the NAV overvaluations. In all
other respects, Bodner's motion is denied, and Huberfeld's
motion is denied in its entirety.

## I.   Whether PPVA released all claims against Bodner and Huberfeld in the Release Agreement

On March 20, 2016, Bodner and Huberfeld, among others,
entered into a Release Agreement with Platinum Management. See
Release Agreement. In exchange for Bodner and Huberfeld (1)
giving up their interests in Platinum Management, (2) subjecting
their and their affiliates' limited partnership interests in the
Platinum feeder funds to a two-year lockup period, and (3)
providing Platinum Management and other Platinum funds with a

---

[8]    In this Opinion and Order, the abbreviation "Mem." refers
to a moving defendant's memorandum of law in support of his or
its motion for summary judgment: Bodner Mem., Fuchs Mem.,
Huberfeld Mem., and HFF Mem. can be found in, respectively, ECF
Nos. 524, 537-7, 587, and 527. The abbreviation "Plaintiffs
Opp." refers to plaintiffs' omnibus opposition memorandum of law
against defendants' motions, and it can be found in ECF No. 573.
The abbreviation "Reply" refers to a moving defendant's reply
memorandum of law in further support of his or its motion for
summary judgment: Bodner Reply, Fuchs Reply, Huberfeld Reply,
and HFF Reply can be found in, respectively, ECF Nos. 599, 593,
590, and 595.

broad unconditional general release from liability, Platinum

Management, on behalf of PPVA among other Platinum entities,[9]

released Bodner and Huberfeld from:

> any and all manner of actions, causes of actions, suits,
> . . . judgments, executions, claims and demands
> whatsoever, whether in law or in equity, whether known,
> unknown, or hereafter becoming known, foreseen or
> unforeseen, suspected or unsuspected . . . existing or
> hereafter arising, in law or in equity or otherwise that
> have been or could have been or in the future could be or
> might be asserted . . . that are based in whole or in
> part on any act or omissions, transaction, or event in
> connection in any manner whatsoever with Platinum, from
> the beginning of the world to the Effective Date.

Release Agreement ¶ 3(b), Recital (defining "Platinum" to

include PPVA); see also id. ¶¶ 3(a), 3(c), 4(b), 4(c).

Bodner and Huberfeld argue that, because the Joint Official

Liquidators, standing in PPVA's shoes, are bound by the release,

Bodner and Huberfeld are entitled to summary judgment on all

remaining claims based on this affirmative defense. See Bodner

Mem. 17; Huberfeld Mem. 8-12; Answer by David Bodner, ECF No.

431; Answer by Murray Huberfeld, ECF No. 432; see also United

States SBA v. Coqui Capital Mgmt., LLC, No. 08-cv-0978 (LTS),

2008 U.S. Dist. LEXIS 86772, at *8 (S.D.N.Y. Oct. 27, 2008).

However, there is a genuine issue of whether the agreement

was entered into for a fraudulent purpose. "Under New York law,

---

[9]   Platinum Management, as the general partner of PPVA, was
authorized to provide the release on PPVA's behalf. See
Locafrance U.S. Corp. v. Intermodal Sys. Leasing, 558 F.2d 1113,
115 (2d Cir. 1977).

a release or waiver clause may be attacked and set aside . . .

for substantive flaws in its execution, such as fraud in the

inducement, illegality, duress, or mutual mistake." <u>Joint</u>

<u>Venture Asset Acquisition v. Zellner</u>, 808 F. Supp. 289, 302

(S.D.N.Y. 1992).[10] The Release Agreement was entered into after

Platinum received grand jury subpoenas for records related to

the COBA bribery scheme, less than three weeks after learning

that federal prosecutors had expanded their criminal

investigation to Platinum-Beechwood transactions, and just

before Platinum sunk. Also, as discussed in more detail below,

evidence demonstrates that Bodner and Huberfeld were likely

aware of various troubles PPVA faced, such as overvaluations of

PPVA's assets. <u>See, e.g.,</u> Fuchs Dep. 26:17-30:20 (testifying

that, at a January 2015 meeting among him, Nordlicht, Huberfeld,

and Bodner, Bodner criticized Nordlicht that "the valuations

were not right" and "Nordlicht wasn't properly marking the

fund").[11] Lastly, although Bodner argues that the release had a

---

[10]    "The requirement of an 'agreement fairly and knowingly
made' has been extended, however, to cover other situations
where . . . because of the existence of overreaching or unfair
circumstances, it was deemed inequitable to allow the release to
serve as a bar to the claim of the injured party." <u>Mangini v.</u>
<u>McClurg</u>, 249 N.E. 2d 386, 392 (N.Y. 1969). Likewise, agreements
are unenforceable under New York law when "prompted by the
sinister intention of one acting in bad faith." <u>Kalisch-Jarcho,</u>
<u>Inc. v. City of New York</u>, 448 N.E.2d 413, 413 (N.Y. 1983).

[11]    Huberfeld argues that a broad release given by a
sophisticated principal to its fiduciary is valid, even in the

legitimate business purpose of making room for Marcos Katz, a prominent investor, to make a substantial new investment in PPVA, see Bodner 56.1 ¶ 51, the fact that Katz never did and was rather shocked to find out that Bodner and Huberfeld were seeking to sever themselves from Platinum undermines the authenticity of the said business purpose. See Email from Katz to Huberfeld, Nordlicht, and Bodner, dated April 11, 2016, ECF No. 577, Ex. 84.[12]

All of these facts raise an issue of whether the Release Agreement was entered into for a fraudulent purpose of permitting one co-conspirator, Platinum Management, to release its other co-conspirators, Bodner and Huberfeld, from liability. Therefore, the motions of Bodner and Huberfeld for summary

---

face of allegations that the fiduciary committed fraud and intentional wrongdoing against the principal, "so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into." See Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V., 17 N.Y.3d 269, 278 (2011). However, the instant case is distinguishable from Centro in that, here, the releasing party was allegedly controlled by the same set of individuals that were being released from liability.

[12]    In support of their argument that the Release Agreement was legitimate, Bodner and Huberfeld refer to a contemporaneous legal memorandum prepared by then-counsel for Bodner and Huberfeld memorializing the background, purpose, and justification for the Release Agreement. See Memorandum dated March 20, 2016, ECF No. 586-1; see also Huberfeld 56.1 ¶ 23. Although this may add to the legitimacy of the Release Agreement, there is a genuine issue of whether the memorandum was drafted for self-serving purposes, given their knowledge of then-ongoing government investigations.

judgment on the issue of whether the Release Agreement released them from all claims in this action are denied. Because this is the only ground upon which Huberfeld moved for summary judgment, Huberfeld's motion for summary judgment is therefore denied in its entirety. The Court now proceeds to consider the remainder of Bodner's motion on the merits of each remaining claim.

## II.   Breach of fiduciary duty (First and Second Counts)

Under here applicable New York law, the elements of a breach of fiduciary duty claim are: "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." Meisel v. Grunberg, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed trust or confidence in another and whether the second person accepts the trust and confidence and thereby gains a resulting superiority or influence over the first." Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008).

### A. Whether a fiduciary duty existed

Bodner argues that he owed no fiduciary duty to PPVA. See Bodner Mem. 19-20.[13] It is undisputed that Bodner was not a managing member, officer, or employee of Platinum Management,

---

[13]    It is undisputed that Platinum Management owed fiduciary duties to PPVA. See Bodner Mem. 4; Huberfeld Mem. 2-3; Plaintiffs Opp. 66.

and various individuals testified that he had no role at
Platinum Management or PPVA other than as an investor. See,
e.g., SanFilippo Dep. 73:5-22, 129:12-15, 417:7-20, 418:18-
419:9; Saks Dep. 350:6-10; Beren Dep. at 80:4-6, 171:25-172:6;
Steinberg Dep. 371:2-6.[14] Bodner further adds that he, through
Grosser Lane, did not have any voting, appointment, and other
power over internal affairs of Platinum Management; instead,
Grosser Lane only held a passive 24.99% interest in the profits
of Platinum Management. See Operating Agreement of Grosser Lane
Management LLC, ECF No. 530-1, Ex. 1, Sch. A; MNG Trust
Agreement 1; Second Amended and Restated Operating Agreement of
Platinum Management (NY) LLC, ECF No. 530-1, Ex. 3, § 3.2;
Defendant David Bodner's Responses to Plaintiffs' First Request
for Admission, ECF No. 530-3, Ex. 10, No. 12. Finally, Bodner
argues that even if the layers of separation between Bodner and
Platinum Management were to be disregarded (rendering Bodner a
non-managing member of Platinum Management), New York law
dictates that non-managing members are comparable to
shareholders of a corporation, who do not owe fiduciary duties

---

[14]   In addition, various individuals testified that Bodner had
no involvement, authority, physical presence, or role at
Beechwood. See, e.g., Feuer Dep., ECF No. 530-4, Ex. E, at
22:16-18, 550:11-16, 804:7-805:20; Thomas Dep. 104:13-17, 106:5-
16, 200:4-11, 458:15-24; Kim Dep. 232:4-233:11; Steinberg Dep.
71:25-72:14; Narain Dep. 578:9-580:2; Saks Dep. 350:9-22.

to the entity. See Keith v. Black Diamond Advisors, Inc., 48 F.
Supp. 2d 326, 333 n.3 (S.D.N.Y. 1999).

However, although Bodner did not have a title at Platinum
or contractually-defined control over Platinum, other evidence
creates a genuine dispute over whether Bodner owed a fiduciary
duty to PPVA. "It is fundamental that fiduciary liability is not
dependent solely upon an agreement or contractual relation
between the fiduciary and beneficiary but results from the
relation." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 20
(N.Y. 2005). "The existence of a fiduciary relationship is often
a fact intensive inquiry appropriate for a jury." Faulkner v.
Arista Records LLC, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009).
The following evidence shows that Bodner exerted significant
influence over the affairs of Platinum, based upon which the
jury may find that he owed a fiduciary duty to PPVA, Platinum's
biggest fund.

First, in a chain of emails, Nordlicht notes that Platinum
is being run by "decisions by committee" of "3 people,"
referring to himself, Huberfeld, and Bodner. ECF No. 577, Ex.
40. On January 11, 2016, Platinum Management employees made a
presentation discussing various ways to address financial and
liquidity issues that Platinum faced; the last slide, entitled
"David and Murray" (referring to Bodner and Huberfeld), asked
"What do we need from David and Murray? Help us figure out

short-term liquidity issues, Help us close investment into PPCO and the management share class, [and] renegotiate the Beechwood note." ECF No. 577, Ex. 49.

Second, Michael Katz, an advisor to Platinum Management, testified in his deposition that Bodner and Huberfeld operated as the senior partners of Platinum, and Nordlicht as more of a junior partner. See Katz Dep. 34:22-35:24; see also Fuchs Dep. 63:2-10. Katz also testified that Bodner was considered the "leader of the [Platinum Management] organization" because, during Platinum Management meetings, "if there was any disagreement as to what had to be done, [Bodner] was consulted and he had the last word." Katz Dep. 266:10-267:20.

Third, according to Fuchs' deposition testimony, at a dinner meeting in January 2015 Bodner told Nordlicht "that the valuations were not right, that Mark Nordlicht wasn't properly marking the fund, and [that] he has to redo the fund because he . . . doesn't like the way the valuations were doing." Fuchs Dep. 28:8-13. Indeed, at the same meeting, Bodner demanded that "[u]ntil we straighten out this fund properly, no partner's taking any money out." Fuchs Dep. 27:8-10.[15]

In sum, evidence strongly supports that Bodner exercised significant "superiority or influence over" PPVA's affairs.

---

[15]   Neither Katz nor Fuchs offered any testimony that Bodner made any specific decision regarding any of the transactions at issue in this case.

Zanger, 538 F. Supp. 2d at 709. Accordingly, the Court concludes that there is a genuine dispute of a material fact regarding whether Bodner owed a fiduciary duty to PPVA.

**B. Whether the fiduciary duty, if any, was breached**

Assuming Bodner owed a fiduciary duty to PPVA, the Court finds that there is a genuine dispute of whether Bodner breached that fiduciary duty by failing to disclose the overvaluations of PPVA's NAVs when he admittedly had knowledge of the overvaluations. In addition to raising his concerns about the overvaluations[16] to other Platinum partners as discussed above, Bodner also admitted that, during the relevant time, he received reports involving PPVA's NAVs. See Plaintiffs 56.1 CS ¶ 193.[17]

---

[16]  Although Bodner argues that Platinum Management implemented a robust set of procedures for valuations, see Bodner Mem. 11; Bodner 56.1 ¶¶ 63-79, it is disputed whether the process was robust enough and whether Platinum Management complied with its process. To name one among several examples, on September 22, 2015, the SEC sent a letter to Platinum Management outlining various deficiencies in its management and operations, for which the SEC demanded immediate corrective action; for instance, the SEC opined that the valuation committee minutes/back up records "fail to demonstrate whether any meaningful analysis and potential changes to investment values were contemplated or discussed at such meetings." ECF No. 577, Ex. 449.

[17]  Bodner disputes the significance of this evidence, noting that every investor in PPVA, not just Bodner, received monthly NAV reports. See, e.g., ECF No. 529-1, Ex. 50. Bodner also argues that there is no evidence that Bodner had access to some separate information containing different numbers, but this assertion is contradicted by some evidence showing that Bodner received at least some financial information regarding Platinum that might not have been provided to other passive investors. See, e.g., Plaintiffs 56.1 CS ¶ 193. In any event, any such

And, despite such knowledge, he allegedly took unearned fees and
distributions – amounting to $100 million between him and
Huberfeld according to Nordlicht's email to Fuchs dated January
15, 2016 – based on such overvaluations. See ECF No. 577, Ex.
31.[18] All this evidence supports that Bodner had the knowledge of
the overvaluation but may have withdrawn fees in breach of his
duty, sufficient to deny Bodner's motion for summary judgment on
the claim for breach of fiduciary duty with respect to the
overvaluations of PPVA's NAVs.

In contrast, however, no evidence connects Bodner to any of
the more specific self-dealing transactions at issue in this
action as set forth above. With respect to the Agera sale,
plaintiffs argue that, according to Fuchs' testimony, Bodner
worked at Agera's office and would give tours of Agera's offices
to his partners and potential investors. See Fuchs Dep. 333:1-
25; see also Bodner Dep. 365:9-15. Fuchs further testified that,
during a tour of Agera, Bodner was "trying to . . . encourage
[Fuchs] to bring in more investors into Platinum and [Agera]
[was] one of the potential benefits of that." Fuchs Dep. 333:1-

---

dispute is resolved in favor of the non-moving parties at this
summary judgment stage.

[18]    Bodner states that he received no distributions of fees
after March 2014. Bodner 56.1 ¶ 9. However, in light of the
Nordlicht email dated January 15, 2016, the Court finds there is
a genuine dispute and makes reasonable inferences in favor of
the non-moving parties.

25. Also, plaintiffs note that, in December 2015, Bodner inquired about having Agera borrow $30 million for a cash infusion into Platinum. See ECF No. 577, Ex. 497; Bodner Dep. 365:9-15.[19] However, all of this at most suggests Bodner's connection to the general affairs of Agera Energy LLC, rather than any specific connection specifically to the fraudulent Agera sale itself. Indeed, as Steinberg and Narain (who negotiated the sale on Platinum's and Beechwood's sides, respectively) testified, they did not take directions from Bodner in negotiating and executing the Agera sale, and plaintiffs have put forth no evidence to the contrary. See Steinberg Dep. 185:7-12, 381:14-24; Narain Dep. 104:7-11, 579:16-580:2.

With respect to the Black Elk scheme, no evidence connects Bodner specifically to the amendment of the Black Elk Indenture, the Consent Solicitation, or any other aspect of the Black Elk scheme as described in ¶¶ 440-515 of the SAC.

With respect to the Montsant transactions, plaintiffs point to an email dated November 26, 2015, where, during the

---

[19]    In addition, plaintiffs focus on the fact that Bodner and his son, through certain Bainbridge entities, had invested in Agera by making a loan. See Bodner Dep. 368:22-369:4, 375:21-22, 430:10-12; see also Plaintiffs 56.1 CS ¶¶ 723-26. However, this loan transaction does not implicate Bodner with structuring the Agera sale for less than the allegedly true value of Agera notes, thereby looting PPVA of its assets. Cf. ECF No. 577, Ex. 517.

forbearance negotiations immediately prior to the Black Elk notes buyback, Taylor wrote to Feuer, "Call me on this./ I had a thought late last night that gets what Bodner wants and I want simultaneously." ECF No. 577, Ex. 42. Even assuming this email overcomes a hearsay objection, the email is too vague and unspecific to show how Bodner may have been involved in the Montsant transactions, if at all; and, even if it were not deemed too vague, the email ties Bodner only to the interest forbearance portion of the Montsant transactions, not the Black Elk notes buyback and the Montsant loan that injured PPVA.[20]

In sum, the Court grants summary judgment in favor of Bodner on those portions of the claim for fiduciary duty that are not premised on the overvaluations of PPVA's NAVs (i.e., portions of the claim premised on the specific transactions at issue), but denies the motion in all other respects.

## III.  Fraud and constructive fraud (Fourth and Fifth Counts)

Under here applicable New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made,

---

[20]    For the first time in this protracted case, plaintiffs advanced at the summary judgment stage new claims against Bodner based on his alleged receipt of proceeds from the COBA bribery scheme. However, this allegation was not in the SAC, and, "plaintiffs are barred from relying on conduct that should have been alleged in the SAC." June 21, 2019 Opinion, at *11 n.11.

justifiable reliance by the plaintiff and resulting injury."
Kaufman v. Cohen, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). In
addition, pure omissions are actionable when defendant had an
affirmative duty to disclose that information to plaintiff, such
as when defendant owes a fiduciary duty to plaintiff or under
the "special facts" doctrine where defendant has superior
knowledge to plaintiff. SNS Bank, N.V. v. Citibank, N.A., 777
N.Y.S. 2d 62, 66 (1st Dep't 2004); Aetna Cas. & Sur. Co. v.
Aniero Concrete Co., 404 F. 3d 566, 582 (2d Cir. 2005) (per
curiam). And, a "constructive fraud claim modifies the claim for
actual fraud by replacing the scienter requirement with the
requirement that Defendants maintained either a fiduciary or
confidential relationship with Plaintiff." LBBW Luxemburg S.A.
v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 524 (S.D.N.Y.
2014).

On the one hand, no evidence here shows that Bodner himself
authored the misrepresentations regarding PPVA's NAVs, or that
he was on the valuation committee, or that he interacted with
outside auditors or valuation service providers for PPVA. See,
e.g., SanFilippo Dep. 417:25-419:17. On the other hand, however,
pure omission may here be actionable, because Bodner might have
had the obligation, as a fiduciary, to disclose the fraudulent
nature of such valuations to PPVA, from which he was receiving
excessive management fees and distributions. See SNS Bank, N.V.

v. Citibank, N.A., 777 N.Y.S. 2d 62, 66 (1st Dep't 2004). At the
same time, as discussed above, no evidence ties him to any
specific transaction at issue. Therefore, for substantially the
same reason as in the context of the claim for breach of
fiduciary duty, the Court grants summary judgment in favor of
Bodner on portions of the claims for fraud and constructive
fraud that are not premised on the overvaluations of PPVA's
NAVs, but denies the motion in all other respects.

IV.  **Aiding and abetting breach of fiduciary duty and aiding and
     abetting fraud (Third, Sixth Seventh, and Eighth Counts)**

The Sixth and Third Counts allege that Bodner, in his
capacity as a Platinum defendant, aided and abetted Platinum
Management's fraud and breach of its fiduciary duties to PPVA,
while the Eighth and Seventh Counts allege that Bodner, in his
capacity as a Beechwood defendant, aided and abetted individual
Platinum defendants and Platinum Management in their fraud and
breach of fiduciary duties to PPVA. See SAC ¶¶ 784-85, 847, 849.

"To establish liability for aiding and abetting fraud under
New York law, the plaintiffs must show (1) the existence of a
fraud; (2) the defendant's knowledge of the fraud; and (3) that
the defendant provided substantial assistance to advance the
fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir.
2014). "A claim for aiding and abetting a breach of fiduciary
duty requires, inter alia, that the defendant knowingly induced

-31-

or participated in the breach." Krys v. Butt, 486 F. App'x 153, 157 (2d Cir. 2012) (summary order).

Because "the same activity is alleged to constitute the primary violation underlying both claims," the claim for aiding and abetting fraud here overlaps substantially with the claim for aiding and abetting breach of fiduciary duty. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007). For this reason, except where otherwise stated, these two claims are analyzed together.

The analysis here also largely follows from the above analysis of Bodner's motion on the claims for breach of fiduciary duty, fraud, and constructive fraud. With respect to the NAV overvaluations, there is evidence of Bodner's actual knowledge that Platinum Management and other Platinum defendants were committing the alleged fraud and breach. "[S]ubstantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." In re Sharp Int'l Corp., 403 F.3d 43, 50 (2d Cir. 2005). And, the inaction of an aider and abettor is actionable when the aider and abettor has an affirmative duty to act or has a fiduciary duty to plaintiff, as possibly applicable here. See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 203 (S.D.N.Y. 2006). Meanwhile, as

discussed above, there is no evidence tying Bodner to any specific transactions at issue, whether in terms of actual knowledge or substantial assistance. Therefore, the Court grants summary judgment in favor of Bodner on portions of the aiding and abetting claims that are not premised on the overvaluations of PPVA's NAVs, but denies the motion in all other respects.

## V.   Civil conspiracy (Sixteenth Count)

Under applicable New York law, civil conspiracy is not an independent tort. See Kovkov v. Law Firm of Dayrel Sewell, PLLC, et al., No. 11329, 2020 WL 1574978, at *1 (N.Y. App. Div. Apr. 2, 2020). Instead, "[a]ll that an allegation of conspiracy can accomplish is to connect nonactors, who otherwise might escape liability, with the acts of their co-conspirators." Burns Jackson Miller Summit & Spitzer v. Lindner, 452 N.Y.S.2d 80, 93-94 (2nd Dep't 1982), aff'd, 451 N.E.2d 459 (N.Y. 1983). Here, the civil conspiracy claim, just like the aiding and abetting claims, seeks to hold Bodner secondarily liable for the underlying tort – primary fraud and breach of fiduciary duty – committed by other primary actors such as Platinum Management and Platinum defendants, and the allegations of the Sixteenth Count are essentially identical to those set forth in the aiding and abetting claims. That is, plaintiffs' conspiracy claim is, on any scenario, entirely duplicative of their aiding and abetting claims, and thus the Court grants summary judgment in

favor of Bodner on the conspiracy claim for administrative purposes. See SAC ¶¶ 960-67; see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, No. 12-cv-3723 (RJS), 2016 WL 5719749, at *8 (S.D.N.Y. Sept. 29, 2016).

**Analysis – Motion of Huberfeld Family Foundation, Inc.**

HFF here moves for summary judgment on all remaining claims against it: (1) claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraud (Ninth and Tenth Counts), and (2) claim for unjust enrichment (Fifteenth Count). ECF No. 522; HFF Mem. 1, 11. The Court grants HFF's motion in it entirety and dismisses the SAC as against HFF with prejudice for the following reason.

I.  **Aiding and abetting breach of fiduciary duty and aiding and abetting fraud (Seventh and Eighth Counts)**[21]

As a threshold matter, the parties argue over the scope of the aiding and abetting claims. HFF argues that the remaining claims against HFF are limited to their alleged participation in the Black Elk scheme through its investment in BEOF Fund. See SAC ¶¶ 475, 440-515; In re Platinum-Beechwood Litig., No. 18-cv-

---

[21]  HFF also argues that the SAC should be dismissed against HFF on the ground that PPVA released all claims against HFF, an alleged third-party beneficiary, in the March 20, 2016 Release Agreement. For the reasons discussed above, the Court rejects this argument as a basis for granting the motion of HFF for summary judgment. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 697 (2d Cir. 1993) ("[A] third-party beneficiary . . . possess[es] no greater right to enforce a contract than the actual parties to the contract.").

10936 (JSR), 2019 WL 2569653, at *17 (S.D.N.Y. June 21, 2019)

("June 21, 2019 Order"). Plaintiffs respond that, in addition to

its involvement in the Black Elk scheme, HFF made loans totaling

about $10 million to the Aaron Elbogen Irrevocable Trust, Moshe

Oratz, the Huberfeld Bodner Family Foundation, and the Fuchs

Family Foundation from 2012 to 2017. See Plaintiffs 56.1 CS ¶

174. Plaintiffs broadly allege that these loans were means to

appease investors to keep their money in PPVA and avoid mass

redemptions.[22] However, these loans are not related to any of the

transactions at issue in this action, nor is it clear how these

loans furthered the fraudulent schemes that allegedly injured

PPVA. See also June 21, 2019 Opinion, at *16. Therefore, the

Court rules in favor of HFF on the scope issue.

　　　With respect to the substantial assistance element, HFF was

not a noteholder and thus could not, and did not, participate in

the Consent Solicitation. See Black Elk Consent Solicitation;

see also ECF Nos. 526-13 through 21. Instead, the undisputed

evidence shows that the only conduct that ties HFF to the Black

---

[22]　　Plaintiffs argue that Fuchs' testimony shows that HFF
effectively paid a redemption payment to Fuchs, see Plaintiffs
Opp. 26, 29, but this is a mischaracterization of his testimony.
Fuchs in fact testified that he had borrowed money in 2015 from
HFF because he could not redeem his investment from PPVA given
his partnership status (rather than because PPVA was facing
financial troubles), and Fuchs made clear that he had been
planning on, and he had indeed been, paying back this loan, but
at some point chose not to continue paying back because he was
"angry" at Huberfeld for losing his money in Platinum. See Fuchs
Dep. 60:12-62:14; see also HFF Dep. 83:21-84:2, 100:1-15.

Elk scheme was (1) making a $1 million investment in BEOF Fund on February 8, 2013, (2) rolling over its investment in BEOF Fund through a new March 2014 offering, and (3) receiving $1,026,677 in distribution from the same investment on August 21, 2014 after the Renaissance sale closed. See Individual Account Statement for the Month Ended March 31, 2013, ECF No. 526-23; Individual Account Statement for the Month Ended August 31, 2014, ECF No. 526-24; ECF No. 577, Ex. 55.

None of this constitutes substantial assistance. HFF's February 8, 2013 investment was made 17 months before the Consent Solicitation was distributed to the Black Elk noteholders, and the rollover also occurred prior to the conception of the Black Elk scheme. Therefore, with respect to these two actions, there was no "nexus between the primary fraud, the alleged aider and abettor's knowledge of the fraud, and what the alleged aider and abettor did with the intention of advancing the fraud's commission." In re Platinum-Beechwood Litig., No. 18-cv-6658 (JSR), 2019 WL 1570808, at *9 (S.D.N.Y. Apr. 11, 2019). The third and last action also does not constitute substantial assistance, because HFF's receipt of distribution from BEOF Fund did not "proximately cause[] the harm upon which the primary liability is predicated." JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005). Here, PPVA's injury from the Black Elk scheme was "a direct or

reasonably foreseeable result of" the Consent Solicitation
and/or the redemption of Series E preferred equity, not HFF's
receipt of distribution from BEOF Fund, which occurred after the
PPVA's redemption of preferred equity was completed. Filler v.
Hanvit Bank, Nos. 01-cv-9510, 02-cv-8251 (MGC), 2003 WL
22110773, at *2 (S.D.N.Y. Sept. 12, 2003). Therefore, the Court
grants summary judgment in favor of HFF on the claims for aiding
and abetting fraud and breach of fiduciary duty.[23]

## II.   Unjust enrichment (Fifteenth Count)

To state a claim for unjust enrichment under New York law,
plaintiff must allege that "(1) defendant was enriched, (2) at
plaintiff's expense, and (3) equity and good conscience militate
against permitting defendant to retain what plaintiff is seeking
to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373
F.3d 296, 306 (2d Cir. 2004).

By way of background, in August 2015, a bankruptcy action
involving Black Elk commenced in the U.S. Bankruptcy Court for
the Southern District of Texas. See In re Black Elk Energy

---

[23]    In their opposition brief and during oral argument,
plaintiffs relied heavily on Huberfeld's conduct to attempt to
find HFF liable. See Plaintiffs Opp. 26-29; Transcript 4/7/2020.
However, this is not an alter ego claim – which the Court
explicitly dismissed at the motion to dismiss stage – and thus
plaintiffs' reliance as such is an impermissible end-run around
the Court's prior ruling that piercing the corporate veil based
on the fact that Huberfeld was HFF's president, director, and
official signatory would leave very little of the rule that
courts must "disregard corporate form" only "reluctantly."
Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979).

Offshore Operations, LLC, No. 15-34287 (Bankr. S.D. Tex.) (the "Black Elk action"). As part of the Black Elk action, the post-confirmation litigation trustee for Black Elk commenced an action against PPVA seeking, inter alia, to avoid and recover transfers of proceeds from Black Elk to PPVA in connection with the Renaissance sale. See ECF No. 526-31, at 8-9. Black Elk and PPVA subsequently settled the action, wherein PPVA agreed not to oppose Black Elk's motion for default judgment. See id. at 2, 7-15. In HFF's view, PPVA's settlement and its agreement not to oppose the motion show PPVA's acknowledgement that funds originating from the Renaissance sale were to be due to Black Elk rather than PPVA. HFF Mem. 16-17.

In addition, separately, the Black Elk trustee commenced an adversary proceeding against HFF (the "HFF action"), seeking repayment of $1,026,677 that had been transferred from Black Elk to BEOF Fund, which in turn had been transferred to HFF. See ECF No. 526-32. On January 31, 2019, after the parties reached a settlement, the trustee dismissed with prejudice all of its claims against HFF, and, on February 6, 2019, the Court entered a formal order of dismissal with prejudice. See ECF No. 526-33. In HFF's view, the HFF action shows that HFF's receipt of its principal investment in BEOF Fund was not at PPVA's expense, but rather at Black Elk's expense, and the settlement of the HFF

action shows that the remaining issues involving HFF's receipt of proceeds from the Renaissance sale are resolved.

While the Court is cautious not to read too much into what these settlements imply, plaintiffs do not respond to any of these points raised by HFF, understandably because arguing otherwise would be seeking double recovery against HFF. Therefore, on the ground that plaintiffs abandoned their claim, the Court grants summary judgment in favor of HFF on the unjust enrichment claim. See Lipton v. Cty. Of Orange, NY, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed" at the summary judgment stage.).

### Analysis – Motion of Bernard Fuchs

Fuchs moves for summary judgment on all remaining claims against him, which consist of: (1) claims for breach of fiduciary duty (First and Second Counts); (2) claims for fraud and constructive fraud (Fourth and Fifth Counts); (3) claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraud (Third and Sixth Counts);[24] (4) claim for civil conspiracy (Sixteenth Count); and (5) claim for civil RICO

---

[24]   Fuchs mistakenly assumes that the Seventh Count – claim for aiding and abetting breach of fiduciary duty against Beechwood defendants, of which Fuchs is not a part – is alleged against him. Fuchs Mem. 4.

violation (Seventeenth Count). ECF No. 537; Fuchs Mem. 4. For the reasons set forth below, the Court grants summary judgment in favor of Fuchs on (1) the claims for civil conspiracy and civil RICO violation in their entirety and (2) parts of the claims for breach of fiduciary duty, fraud, constructive fraud, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty that are not premised on the NAV overvaluations. In all other respects, Fuchs' motion is denied.

## I.  Breach of fiduciary duty (First and Second Counts)

To begin with, Fuchs argues that he did not owe any fiduciary duty to PPVA. See Fuchs Mem. 4-5, 6-7. Undisputedly, he was not a member of the risk or valuation committee of Platinum Management, and he did not have an office at Platinum Management. See Fuchs 56.1 ¶¶ 2-3, 10, 22. Rather, Fuchs contends, his job was limited to passing on any information and reports he received from Platinum principals to actual and potential investors. See id. ¶ 23. Also, he argues that there is no evidence that he had any role in overseeing PPVA's assets. See Fuchs Mem. 4; see also Fuchs 56.1 ¶¶ 4-5.

However, other evidence creates a genuine dispute of whether Fuchs owed a fiduciary duty to PPVA, just as it was the case for Bodner. For instance, Fuchs was a Platinum partner with a 10% membership interest, which is quite a significant position to occupy within the enterprise. See Fuchs Dep. 24:25-25:20,

26:3-8. According to Steinberg's testimony, while Fuchs "didn't have any role at Platinum in terms of making investment decisions or having to consent on investments" generally, Fuchs did have a "hands-on" role with PPVA's investment in China Horizon, where he served as a board member. Steinberg Dep. 95:6-96:14. Most importantly, he was in charge of Platinum's investor relations, including in Asia. See ECF No. 577, Exs. 165, 166; Defendant Fuchs' Responses to Plaintiff's Request for Admission, ECF No. 477, Ex. 43, at #4. All of these lead to a reasonable inference that PPVA might have reposed "trust or confidence" in Fuchs. Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008). Therefore, there is a genuine dispute concerning whether Fuchs owed a fiduciary duty to PPVA.

Furthermore, the Court finds that there is a genuine dispute of whether such duty, if any, was breached with respect to the NAV overvaluations. Evidence shows that Fuchs was aware of the overvaluations – at the very least, according to Fuchs' own testimony, Fuchs first-hand witnessed Bodner getting upset about how PPVA's NAVs were overvalued, during the aforementioned January 2015 meeting. See Fuchs Dep. 26:17-30:20.[25] Fuchs'

---

[25]   As evidence of Fuchs' alleged misconduct, plaintiffs repeatedly emphasize that, when the marketing director for Platinum's Asia division repeatedly wrote emails to Fuchs in May 2016 informing that two Platinum investors sought redemptions totaling $1.8 million, Fuchs wrote privately to Nordlicht, "I will not answer anybody anymore. I can't lie anymore and i [sic]

failure to act for more than a year despite this knowledge may constitute a breach of his fiduciary duty to PPVA, assuming that the jury finds that he owed one.

In contrast, there is no evidence that Fuchs played any role in any of the specific transactions at issue in this action (e.g., the Black Elk scheme or the Agera sale) or generally that he had anything to do with transfers of PPVA's assets for the benefit of Beechwood, PPCO, or other insiders. See Fuchs Mem. 4-5; see also Fuchs 56.1 ¶¶ 19, 21, 25-28. The fact that Fuchs had a role in PPVA's investments in China Horizon in and of itself has no bearing on whether he was involved in the Agera sale itself. Cf. Plaintiffs Opp. 25.

For these reasons, as it was the case for Bodner, the Court grants summary judgment in favor of Fuchs on the claims for breach of fiduciary duty to the extent they are not predicated on the NAV overvaluations. In all other respects, Fuchs' motion for summary judgment on the claims for breach of fiduciary duty is denied.

## II.  Fraud, constructive fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting fraud (Fourth, Fifth, Third, and Sixth Counts)

---

can't handle all the pressure anymore. Please call me !!!!!!!!" ECF No. 577, Ex. 180. However, this email does not materially help plaintiffs' case here, because the claims at issue are not predicted on harms suffered by these investors in Asia, and this lie has no connection to any of the specific transactions or the NAV overvaluations.

As discussed above, evidence shows that Fuchs had knowledge of the overvaluation of PPVA's NAVs. Also, for substantially the same reason as discussed in the context of Bodner, his inaction may be actionable under the claims for fraud, constructive fraud, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty, if he is found to have owed a fiduciary duty to PPVA. See SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S. 2d 62, 66 (1st Dep't 2004); Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F. 3d 566, 582 (2d Cir. 2005) (per curiam); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 203 (S.D.N.Y. 2006). Therefore, the Court grants summary judgment in favor of Fuchs on these claims to the extent they are not predicated on the NAV overvaluations.[26] In all other respects, the motion for summary judgment on these claims is denied.

## III.  Civil conspiracy and civil RICO (Sixteenth and Seventeenth Counts)

---

[26]   Plaintiffs also argue that the breach, fraudulent action, and substantial assistance elements are established by the fact that Fuchs helped market PPVA to potential investors and attempted to convince then-current investors not to seek redemptions when PPVA faced liquidity issues. See ECF No. 577, Exs. 170, 171, 173-79; Fuchs Admission #7; Steinberg Dep. 96:15-18; Katz Dep. 43:14-24, 65:3-70:13, 111:15-112:12. However, plaintiffs here are PPVA and Joint Official Liquidators, not those investors, and there is no nexus between the alleged misconduct at issue here and the harm suffered by PPVA. If anything, PPVA benefited from Fuchs' conduct as such.

For substantially the same reason as discussed above in the context of Bodner's motion, the Court grants summary judgment in favor of Fuchs on the claim for civil conspiracy for being duplicative of the aiding and abetting claims.

Finally, as the Court discussed at the motion to dismiss stage, Section 107 of the Private Securities Litigation Reform Act generally bars plaintiffs' claims for RICO violation in this action, and thus the Court grants summary judgment in favor of Fuchs on the claim for RICO violation. See June 21, 2019 Order, at *5; 18 U.S.C. § 1964(c).

### Conclusion

This Opinion and Order disposes of the motions of Bodner, Fuchs, Huberfeld, and HFF for summary judgment on all remaining claims against them. The Clerk is directed to close the following entries on the Trott docket (18-cv-10936): 523, 537, 584, and 522. The Clerk is also directly to close the following entries on the master docket (18-cv-6658): 745, 732, 821, and 743.

SO ORDERED.

Dated:   New York, NY
         April 21, 2020

_____
JED S. RAKOFF, U.S.D.J.