```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x
In re PLATINUM-BEECHWOOD LITIGATION :        18-cv-6658 (JSR)
----------------------------------- x
MARTIN TROTT and CHRISTOPER SMITH,  :
as Joint Official Liquidators and   :
Foreign Representatives of PLATINUM :
PARTNERS VALUE ARBITRAGE FUND L.P.  :
(in Official Liquidation), and      :        18-cv-10936 (JSR)
PLATINUM PARTNERS VALUE ARBITRAGE   :
FUND L.P. (in Official              :
Liquidation),                       :
                                    :
          Plaintiffs,               :
                                    :        OPINION AND ORDER
          -v-                       :
                                    :
PLATINUM MANAGEMENT (NY) LLC, et    :
al.,                                :
                                    :
          Defendants.               :
----------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Familiarity with the relevant background to this case is here assumed. Now before the Court are: (1) the motion of defendant Murray Huberfeld to exclude from trial Bill Post's expert testimony based on his report dated November 14, 2019, ECF No. 628-1 ("Post Report"), pursuant to Fed. R. Evid. 702 and 403 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993);[1] (2) the motion of defendant David Bodner to exclude from trial Ronald Quintero's expert testimony based his report dated November 14, 2019, ECF No. 634-1 ("Quintero

---

[1]    Huberfeld joins Bodner's motion to exclude the Quintero Report. See Huberfeld Mem. 1 n.2.

Report"), pursuant to Fed. R. Evid. 702 and 403 and Daubert;[2] and

(3) the motion of defendant Bernard Fuchs joining the motions of

Bodner and Huberfeld. See ECF Nos. 627, 630, 632; see also

Huberfeld Mem.; Bodner Mem.; Huberfeld Reply; Bodner Reply.[3]

Plaintiffs Martin Trott and Christopher Smith, as Joint Official

Liquidators and Foreign Representatives of Platinum Partners

Value Arbitrage Fund L.P. ("PPVA" or the "Master Fund"), and

PPVA oppose these motions. See Pls. Huberfeld Opp.; Pls. Bodner

Opp.

For the reasons set forth below, the Court grants in part

Huberfeld's motion, as joined by Fuchs and Bodner, by precluding

Post from (1) opining on defendants' mental state, and (2)

---

[2]     Bodner joins Huberfeld's motion to exclude the Post Report.
See Bodner Mem. 25 n.16.

[3]     In this Opinion and Order, the abbreviation "Huberfeld
Mem." refers to the Memorandum of Law of Defendant Murray
Huberfeld in Support of His Motion to Exclude the Expert Report
of Bill Post, ECF No. 629; the abbreviation "Bodner Mem." refers
to the Memorandum of Law of Defendant David Bodner in Support of
His Motion to Exclude the Expert Report of Ronald G. Quintero,
ECF No. 633; the abbreviation "Pls. Huberfeld Opp." refers to
the Memorandum of Law in Opposition to Defendants' Motion to
Exclude the Expert Report of Bill Post, ECF No. 637; the
abbreviation "Pls. Bodner Opp." refers to the plaintiffs'
Memorandum of Law in Opposition to Defendants' Motion to Exclude
the Expert Report of Ronald G. Quintero, ECF No. 640; the
abbreviation "Huberfeld Reply" refers to the Reply Memorandum of
Law of Defendant Murray Huberfeld in Further Support of His
Motion to Exclude the Expert Report of Bill Post, ECF No. 642;
and the abbreviation "Bodner Reply" refers to the Reply
Memorandum of Law of David Bodner in Support of His Motion to
Exclude the Expert Report of Ronald G. Quintero, ECF No. 643.

stating legal conclusions that Beechwood and Black Elk
Opportunity Fund ("BEOF") were alter egos of Platinum Management
(NY) LLC ("Platinum Management") and that Platinum Management
breached its fiduciary duty to PPVA. With respect to other
challenged aspects of the Post Report, Post may testify as to
(1) what a fiduciary or investment manager in a given context
would ordinarily do, (2) what the defendants here did instead,
and (3) why the latter had the effect of defrauding or harming
PPVA. Furthermore, Post may testify as to what the law is to the
extent that his statements are, in fact, what the law is as
determined by the Court; if the parties dispute what the
relevant law should be, this should be the subject of motions in
limine immediately prior to trial.

In addition, the Court grants in part Bodner's motion, as
joined by Huberfeld and Fuchs, by excluding Quintero's testimony
based on (1) his valuation opinion reflected in Exhibits 20 and
25 of Quintero's report, as well as other related parts of his
report, where he compares the values reported by Platinum
Management and the values assigned by third-party valuators to
imply that Platinum overvalued its assets, (2) his valuation
opinion regarding PPVA's investments in Over Everything, LLC
("Over Everything") and China Horizon Holdings Limited ("China
Horizon"), and (3) his quantification of hypothetical
redemptions by investors reflected in ¶ 72 and Ex. 39 of the

report. With respect to other challenged aspects of the Quintero Report, Quintero may, subject to the exclusions discussed in the previous sentence, provide his valuation opinions based on the so-called "straight-line" method, as long as he tells the jury that his method is unconventional and explains why he had to proceed in this alternative manner. Also, Quintero may testify that the amount of damages attributable to inflated incentive fees is $55.083 million, but may not testify that such amount is $88.9 million or "at least" $55.083 million.

In all other aspects, the motions are denied.[4]

## **Legal Standards**

Fed. R. Evid. 702, governing the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under this rule, the Court must ensure that "any and all scientific testimony or evidence admitted is not only relevant,

---

[4]   As stated during oral argument held telephonically on June 12, 2020, the Court will strictly enforce the rule that experts are not permitted to go outside the bounds of their reports when giving their testimony. See Transcript dated June 12, 2020.

but reliable." <u>Daubert</u>, 509 U.S. at 589.[5] Also, the Court should exclude the evidence only if "the flaw is large enough that the expert lacks good grounds for his or her conclusions." <u>Beastie Boys v. Monster Energy Co.</u>, 983 F. Supp. 2d 354, 363 (S.D.N.Y. 2014). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 595-96.

In addition to the requirements of Fed. R. Evid. 702, expert testimony is also subject to the relevancy requirement under Fed. R. Evid. 401. Lastly, under Fed. R. Evid. 403, the Court may still exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### Analysis – Huberfeld's Motion

By way of background, the remaining claims against Huberfeld[6] allege that Huberfeld and others fraudulently caused

---

[5]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

[6]    These consist of claims for breach of fiduciary duty, fraud, constructive fraud, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy.

PPVA to (1) falsely inflate the net asset values ("NAVs")
ascribed to PPVA's assets, thereby enabling Platinum principals,
including Huberfeld, to collect unearned management and
incentive fees, and (2) engage in non-commercial transactions
for the benefit of others at the expense of PPVA.

Post's qualification as an expert is not disputed. See Fed.
R. Evid. 702; Huberfeld Reply 3.[7] Post claims that the scope of
his expert assignment consists of explaining "how investment
fund managers implement practices, processes, and controls in
order to comply with their fiduciary duties," evaluating "how
Platinum Management (NY) LLC and individual defendants named
later in this report managed [PPVA] in the 2012 to 2016
timeframe," and opining, "from an investment management industry
perspective, as to whether such management was consistent with
their fiduciary duties." Post Report ¶ 9.

I.  **Testimony on defendants' mental state**

"Inferences about the intent or motive of parties or others
lie outside the bounds of expert testimony." In re Rezulin
Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004);

---

[7]    Post is a Senior Managing Director at FTI Consulting's
Forensic and Litigation Consulting practice. See Post Report ¶
1. Post has over 29 years of experience as an investment
management professional, including as chief executive officer,
chief investment officer, portfolio manager, and chief
compliance officer at various investment management and advisory
companies. See id. He also has expertise in analyzing and
monitoring the performance of other fund managers. See id.

see also Marvel Worldwide, Inc. v. Kirby, 777 F. Supp. 2d 720,

729-30 (S.D.N.Y. 2011), aff'd in part and vacated in part, 726

F.3d 119 (2d Cir. 2013).

Accordingly, Post may not testify about the knowledge or

intent of the defendants with respect to the alleged fraudulent

schemes at issue. See, e.g., Post Report ¶ 13 (stating that

Platinum Management and its principals "[i]ntentionally engaged

in sham transactions . . . ."); id. ¶ 23 ("Bodner, Huberfeld,

and Fuchs all had knowledge of and/or controlled [Platinum

Management] and its engagement in fraudulent activities.").

## II.   Testimony on legal conclusions

"It is a well-established rule in this Circuit that experts

are not permitted to present testimony in the form of legal

conclusions." United States v. Articles of Banned Hazardous

Substances, 34 F.3d 91, 96 (2d Cir. 1994). To allow such

opinions would "trespass[] on the province of the jury and the

trial court" by imposing the expert's view on the parameters of

the law and whether or not it has been violated. Fiataruolo v.

United States, 8 F.3d 930, 941 (2d Cir. 1993).

In Sections III, VI, and VII, Post offers a legal

conclusion that Beechwood and BEOF were alter egos of Platinum

Management. See, e.g., Post Report ¶¶ 13, 51, 54. Since "alter

ego" is a legal term of art, this is in effect a legal

conclusion, at least in part, and consequently Post may not

testify as such at trial. However, Post is permitted to testify, based on his industry experience, as to whether Platinum Management, Beechwood and BEOF had the indicia of an alter ego relationship. See id. ¶¶ 55-66.

Similarly, in Sections VIII and IX, Post offers a legal conclusion that Platinum Management failed to meet its fiduciary duty to PPVA in various ways. See, e.g., id. ¶¶ 69, 84, 95, 111. Again, Post may not testify as such at trial. However, Post may testify as to (1) what a fiduciary or investment manager in a given context would ordinarily do according to relevant industry standards, (2) what the defendants here did instead, and (3) why the latter had the effect of defrauding or harming PPVA.[8] When offering the third type of testimony, Post may not use the adjective "fraudulent" to directly describe the transactions at issue (e.g., "engaged in fraudulent transactions"), see, e.g., id. ¶¶ 13, 22, 23, 27, 30-32, 48, 50, 52, 54, 69, 84, 95, 110-11, as such characterization amounts to providing legal conclusions with respect to fraud claims. See United States v.

---

[8]   As the Court stated during oral argument, by way of analogy, this is akin to the third prong of Rule 10b-5 of the Securities Exchange Act of 1934. See 17 C.F.R. § 240.10-5(c) ("To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person") (emphasis added).

Scop, 846 F.2d 135, 139-43 (2d Cir. 1988); see also Fed. R. Evid. 703.[9]

Applying this framework, the Court holds that Post may testify, subject to all exclusions and conditions stated elsewhere in this Opinion and Order, on the topics of, inter alia:

- How investment managers must perform their duties in accordance with relevant industry standards, see, e.g., Post Report ¶¶ 42-47;

- How "Platinum Management and its principals, . . . [a]s an SEC Registered Investment Advisor, had a fiduciary duty to put [PPVA's] . . . interests above the interests of Platinum Management and its principals," id. ¶ 13;[10]

- How Platinum Management "put its own interests . . . above those of [PPVA]" and such conduct had the effect of defrauding PPVA, id. ¶ 69;

---

[9]   To be clear, Post may testify to the so-called badges of fraud, subject to all exclusions and conditions mentioned elsewhere in this Opinion and Order. See Grayiel v. AIO Holdings, LLC, No. 3:15-cv-821(CHB)(LLK), 2019 WL 2372901, at *3 (W.D. Ky. Mar. 15, 2019).

[10]   The Court's understanding of this portion of the report is that Post did not intend to opine that specific individuals such as Huberfeld owed a fiduciary duty; rather, the report implies that, if Huberfeld, as a factual matter, is found by fact-finders to be a Platinum principal as such, then he would owe a fiduciary duty. See also Transcript dated June 12, 2020. Therefore, Post may testify based on this excerpted portion of the report.

- How Platinum Management and its executives "overvalue[d] PPVA's interests," id. ¶ 25; see also, e.g., id. ¶¶ 102-110;

- How the overvaluation had the effect of harming PPVA, see, e.g., id. ¶ 13;

- How Platinum and its executives "engaged in [] transactions involving self-dealing, conveyance, subordination, and encumbrance of fund assets, and [] misrepresentation of asset values – all of which financially damaged the Master Fund for the [personal] benefit of [Platinum Management's] owners," id. ¶ 48; see also, e.g., id. ¶¶ 49-52;

- Lack of independent safeguards (to be framed as deviation from relevant industry standards) in connection with related-party transactions involving Black Elk, Agera, and the Nordlicht Side Letter, as well as the manner and extent to which defendants' conduct had the effect of harming PPVA,[11] see, e.g., id. ¶¶ 67-101; and

---

[11]    Specifically, Post may testify regarding the transactions involving Black Elk Energy Offshore Operations LLC ("Black Elk"), see Post Report ¶¶ 70-84, Agera Energy LLC, see id. ¶¶ 85-95, the Nordlicht Side Letter, see id. ¶¶ 96-101, and the alleged overvaluation schemes, see id. ¶¶ 102-111, which were complex and allegedly designed to obfuscate the ultimate goal of dissipating PPVA's assets for the benefit of Platinum Management and its affiliates and owners. See SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 270 (D. Conn. 2017) ("[I]n a complex action regarding corporate or securities law, expert testimony may help a jury understand unfamiliar terms and concepts" and expert

- Importance of NAVs to a hedge fund and that certain
  transactions effectuated by Platinum Management were
  carried out in order to justify inflated valuations and
  strip its assets of values, see, e.g., id. ¶¶ 102-11.

These statements are not, contrary to Huberfeld's assertions,
legal conclusions. See Pretter v. Metro-North Commuter R. Co.,
No. 00-cv-4366 (JSR), 2002 WL 31163876, at *1 (S.D.N.Y. Sept.
30, 2002) ("[E]xpert testimony is not objectionable because it
embraces an ultimate issue to be decided by the trier of
fact."). Instead, they seek to contextualize the evidence so
that the jury may understand the standards under which Platinum
Management and its managers were operating with respect to
management of PPVA's assets, as well as standard industry
practices by investment managers to meet such standards. See
United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991).

## III.  Testimony on what the relevant law is

Section V of the Post Report opines on the existence and
contours of the fiduciary duties of care and loyalty owed by
defendants to PPVA, see Post Report ¶¶ 34-37, and discusses the
legal prohibitions against "fraud and deceit and making untrue

---

testimony that embraces an ultimate issue to be decided by the
jury is permitted, as long as those opinions do not "merely tell
the jury what result to reach.").

statements" under the Investment Advisors Act of 1940, see Post
Report ¶¶ 38-41.[12]

The Court finds that Post may provide testimony based on
these portions of the report, so long as his statements are, in
fact, what the law is as previously determined by the Court.
Indeed, if Post simply recites what the law truly is, Post's
testimony can be hardly said to "usurp the role of the trial
judge in instructing the jury as to the applicable law," which
is the main concern behind the prohibition against a witness'
instruction of applicable principles of law to the jury. United
States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999).[13]

---

[12]    In addition, as referenced above, the Post Report
frequently makes use of the legal terms "alter ego,"
"fraudulent," "statutorily required," and the like. See, e.g.,
id. ¶ 13.

[13]    As the Court stated at oral argument, the Court's practice
is not to grant limiting instructions to the jury after letting
experts opine on whatever they think the law is. See Transcript
dated June 12, 2020. Instead, the Court's Individual Rules of
Practice direct the parties, before the start of the trial, to
submit their proposed charges to the jury so that the Court can
determine what the law is at the onset of trial. Furthermore, it
is the Court's practice, on one of the first days of the trial,
to give the jury a high-level overview of the relevant law as
determined by the Court. The Court expects that this practice
will moot many concerns raised with respect to whether experts
may opine on what the law is.

Conversely, if the parties dispute what the relevant law provides,[14] the expert may not state what the law is unless and until the Court makes a determination. Accordingly, if there is any dispute as such, parties should file appropriate motions in limine prior to trial, following the procedure laid out in the Court's Individual Rules of Practice.

## IV.   Testimony based on background information in Section IV

Huberfeld argues that Post may not testify on matters such as the relevant companies, their structures, and the rights and obligations related to those companies, see Post Report ¶¶ 14-21, because they are testimony on "lay matters" that are "neither scientific nor in any way beyond the jury's ken." Andrews v. Metro North Commuter R. Co., 882 F.2d 705, 708 (2d Cir. 1989).[15]

Not so. This case is far from those involving uncomplicated facts that the jury is capable of understanding on their own.

---

[14]   For instance, during oral argument, counsel for Bodner raised a concern that ¶ 41 of the Post Report based on the Investment Advisor Act may not be entirely accurate on the ground that there might have been other disclosure obligations at play arising from investment management agreements and other relevant contracts. See Transcript dated June 12, 2020.

[15]   In his reply brief, Huberfeld argues for the first time that Section IV is an end-run around evidentiary rules, as this Section is based on allegedly inadmissible hearsay or objectionable evidence. See Huberfeld Reply 2, 4-5, 4 n.4. However, the Court "will not consider an argument raised for the first time in a reply brief." United States v. Yousef, 327 F.3d 56, 115 (2d Cir. 2003).

See In re Longtop Fin. Techs. Ltd. Sec. Litig., 32 F. Supp. 3d
453, 462 (S.D.N.Y. 2014). For instance, Post's explanation of
Platinum Management's role in the managing of PPVA and fund
structures, see Post Report ¶¶ 14-21; see also id. ¶¶ 25-32,
will synthesize and summarize evidence in a manner that
"streamline[s] the presentation of [evidence] to the jury,
saving the jury time and avoiding unnecessary confusion." Louis
Vuitton Malletier S.A. v. Sunny Merch. Corp., 97 F. Supp. 3d
485, 504 (S.D.N.Y. 2015).

Huberfeld further argues that many parts of Section IV are
presented "solely for the purpose of constructing a factual
narrative based upon record evidence" under the guise of
"background." Highland Capital Mgmt., L.P. v. Schneider, 379 F.
Supp. 2d 461, 469 (S.D.N.Y. 2005). For instance, Huberfeld
points to ¶ 24, which states:

> These owners and executives of [Platinum Management]
> regularly met for partner dinners and at their shared
> offices at [Platinum Management] and Beechwood to discuss
> and direct investment and asset allocation strategy for
> the Master Fund and the other funds under their control.
> . . . [I]t is clear from the evidence with regard to the
> investment management functions at [Platinum Management],
> ultimate authority and control resided with . . .
> Huberfeld.

Post Report ¶ 24.

However, an expert may lay a factual foundation for his or
her opinion. See Amorgianos v. Nat'l R.R. Passenger Corp., 303
F.3d 256, 266-67 (2d Cir. 2002). Therefore, Post may testify on

14

these background facts discussed in Section IV, subject to the exclusions and conditions stated elsewhere in this Opinion and Order, so long as they are relevant to laying a foundation for his expert testimony such as in the case of ¶ 24. <u>See also</u> <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding that, in order to assist the trier of fact in understanding the evidence, "an expert may opine on an issue of fact within the jury's province" so long as they do not "give testimony stating ultimate legal conclusions based on those facts").

## V.   Testimony using emotionally charged rhetoric

The Court will not permit any testimony based on emotionally charged rhetoric. <u>See, e.g.</u>, Post Report ¶ 95 ("The foregoing set of transactions demonstrate how [Platinum Management] <u>flagrantly</u> disregarded its fiduciary duty") (emphasis added). In this example, Post may use a different adverb, such as "materially," in his testimony.

### Analysis – Bodner's Motion

The remaining claims against Bodner[16] generally allege that Bodner participated in a fraudulent scheme to overvalue the NAVs

---

[16]   These consist of claims for breach of fiduciary duty, fraud, constructive fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting fraud, to the extent that they are premised on the overvaluation of NAVs of PPVA's assets.

of PPVA's assets, thereby enabling Platinum individuals,
including Bodner, to siphon off unearned management and
incentive fees from PPVA. Plaintiffs offer the Quintero Report
to support the above claims and to quantify the resulting
damages in the form of inflated management and incentive fees
during the period from December 2012 to March 2016 ("Damages
Period"). See Quintero Report ¶ 1(a).[17]

While Quintero's qualification as an expert is undisputed,[18]
Bodner brings (unlike Huberfeld's challenges against the Post
Report) pure Daubert-like and Rule 702 challenges against the
Quintero Report, questioning the reliability of Quintero's
methodology and the application of the methodology to the data.

## VI. Whether Quintero's valuation opinions fail to satisfy Daubert and Rule 702

While it is true that any one "minor flaw in an expert's
reasoning or a slight modification of an otherwise reliable
method will not render an expert's opinion per se inadmissible,"

---

[17]   Also, plaintiffs note that Quintero will provide testimony
on damages incurred by PPVA because of various allegedly
fraudulent transactions, including the transactions in
connection with PPVA's interests in Black Elk and Agera. This
part of the Quintero Report was not challenged by the instant
motions. See Pls. Bodner Opp. 1-2.

[18]   In brief, he has had "forty years of experience as a
financial professional, with specific expertise in mergers &
acquisitions ("M&A"), valuations of businesses and securities,
financial restructuring, bankruptcy & insolvency, and forensic
accounting." Quintero Report ¶ 3.

multiple "indicia of unreliability" will. Amorgianos v. Amtrak, 303 F.3d 256, 265, 267 (2d Cir. 2002). Such indicia of unreliability may include, among others, an expert's "inability to explain a number of variables and assumptions used in his analysis," failure to independently verify information provided to him by counsel, or glaring or admitted errors in his analysis. Lippe v. Bairnco Corp., 99 F. App'x, 274, 279 (2d Cir. 2004) (summary order). Ultimately, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Amorgianos, 303 F.3d at 267.

### A.  Quintero's valuation methodology, generally

In his report, Quintero provides valuation opinions on eight illiquid positions in the PPVA portfolio. See Quintero Report 17 tbl.1, Exs. 23-30. Generally, in estimating "true" value of each asset, he draws a straight line from a higher estimated value (a) as of December 2012 (the beginning of the Damages Period) or (b) at a later point in time that he accepts as fairly stated (e.g., an acquisition price) to a lower estimated value (x) as of March 2016 (the end of the Damages Period) or (y) at an earlier point in time when a given asset was sold. See generally Quintero Report Exs. 23-30.

Bodner argues that Post's testimony on valuations should all be excluded because his methodology is unsound. In Bodner's

view, Quintero should have attempted to ascertain fair values as of particular measurement dates, rather than using the "straight-line" method.[19] That is, in Bodner's view, Quintero should have instead engaged in a full-blown appraisal of each asset -- based on traditional valuation methods of a cost approach, a market comparison approach, and/or an income approach -- to opine on the "price the holder would [have received] from selling the asset in an orderly transaction <u>at the measurement date</u>." <u>Federal Housing Financial Agency v. Nomura Holding Am. Inc.</u>, No. 11-cv-6201 (DLC), 2015 WL 629336, at *3 (S.D.N.Y. Feb. 13, 2015) (citing Statement of Financial Accounting Standards 157) (emphasis added).[20]

---

[19]   By way of demonstration, Bodner asserts that, instead of engaging in a linear extrapolation between the estimated December 2012 value and the estimated March 2016 value to estimate the "true" value as of January 2015, Quintero should have carried out an actual valuation as of January 2015.

[20]   Furthermore, Bodner argues that Quintero's assumption that the decline in value would occur in a straight line is illogical. <u>See</u> Bodner Mem. 8. In Bodner's view, asset values may decline slowly for the most part and fall precipitously in a short period of time immediately preceding the collapse of a business. However, although that may be so, it is just as possible that asset values would substantially decline right after the analytical start date and decline slowly afterwards, depending on what happened to the business at issue. If that is the case, Quintero's method of using a straight line, despite reasonable indications that the decline in value of many assets was front-loaded, may actually be conservative in favor of Bodner.

Although Quintero's methodology is indeed unconventional, that appears to be a function of the fact that standard valuation methods may well be unavailable and inadequate with respect to the investments at issue. A cost approach may not have been viable, because Platinum was allegedly stating valuations many multiples in excess of its acquisition costs; market value comparisons may have been inadequate given lack of comparability in reference to assets in Platinum's highly idiosyncratic investments; and an income approach, which requires reliable financial data from which a discounted cash flow can be determined, may have been rendered challenging by Platinum's allegedly discredited financial data. See also Deposition of Ronald G. Quintero, ECF Nos. 635-4, 639-1 Ex. 3 ("Quintero Dep."), at 217:8-221:18.[21] Further complicating the use of traditional methods was that assets at issue were all "Level 3" assets -- essentially highly illiquid investments in early-stage or speculative companies -- reflecting an absence of observable and verifiable market and financial inputs and

---

[21]    In his reply brief, Bodner responds that these assertions ring hollow given the contemporaneous work done by the first-class valuators and auditors that validated Platinum's own valuations. See Bodner Reply 8 n.5. However, a key part of plaintiffs' claims in this action is that these valuators and auditors were also duped by defendants. Therefore, it is more proper for the jury to determine which expert's opinion is more credible, rather than for the Court to outright exclude this portion of the Quintero Report.

entailing the highest degree of subjectivity and difficulty in valuations, all of which arguably allowed a lot of room for defendants to engage in manipulation of values. See Quintero Report 9, 11. Further still, Bodner's assertion is tantamount to asking plaintiffs to present an analysis of damages that derives from the very same financial data devised by defendants in a sophisticated manner to allegedly defraud and conceal their schemes, which would be illogical and inequitable.

After all, "[g]eneral acceptance" of the unconventional straight-line method "is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence" Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). And, in his report, Quintero did not stop at drawing a straight line – he provided reasons validating his proposition with reference to contemporaneous value indicators ascertainable.

For these reasons, the Court will generally permit Quintero's testimony on his valuation opinions, subject to a few exceptions as discussed below, so long as he states clearly to the jury that his methodology is non-traditional and explains why he had to proceed in this manner.

**B.   Application of Quintero's methodology to specific assets**

The Court finds that, generally, the application of Quintero's valuation methodology to each of the illiquid assets at issue is reliable, save for three exceptions. Specifically, Quintero may not testify regarding (1) his valuation opinion reflected in Exhibits 20 and 25 of his report, as well as other related parts of the report, where he compares the values reported by Platinum Management and the values assigned by third-party valuators to imply that Platinum Management overvalued these assets, (2) his valuation opinion on PPVA's investment in Over Everything, and (3) his valuation opinion on PPVA's investment in China Horizon.

## 1. Golden Gate Oil LLC

PPVA held membership and debt interests in Golden Gate Oil LLC ("Golden Gate") throughout the Damages Period. Quintero assigns $37.4 million for PPVA's 48% membership interests in Golden Gate as of December 2012, adopting Platinum's reported valuation. He then reduces that amount on a straight-line basis to about $2.7 million as of November 2014, which is when PPVA bought out 50% membership interests in Golden Gate from another equity holder for $2.7 million.[22] Based on this equity analysis

---

[22] Bodner argues that Quintero does not explain his approach with respect to what happens after November 2014, while continuing to charge defendants damages for that period. See Bodner Mem. 11. In the Court's review, it appears that Quintero simply decreased this amount on a linear basis to $0 as of March

as well as a separate debt analysis (which is not disputed by the parties), Quintero concludes that PPVA's interests in Golden Gate were overstated by over $139 million during the Damages Period. See Quintero Report 17, Ex. 24. The Court finds this application of the methodology generally reliable.

Bodner raises two objections. First, with respect to Quintero's statement that "[t]he large disparities of almost $200MM between the values reported by Platinum and cost (Exs. 24.2 and 24.3) are not credible considering Golden Gate never achieved a meaningful level of production," Bodner argues that this is nothing more than speaking with the benefit of hindsight, because, although the oil field lacked production and active wells at the moment, it had proven reserves according to an independent oil and gas valuation firm, DeGolyer & MacNaughton ("D&M"). See Bodner Mem. 10.

However, other evidence reasonably supports Quintero's statement at issue, creating a material dispute over facts. Although D&M indicated so, Golden Gate's oil production was significantly below estimates, according to records from California oil regulators and internal emails circulated among Platinum and Beechwood executives, and none of Golden Gate's several approaches to extracting oil worked. See Quintero Report

_____

2016, which appears reasonable given the precarious financial and business prospects that Golden Gate faced.

Ex. 17; see also Pls. Bodner Opp. 14. Also, some of the key factors Quintero relied upon were Platinum's own acknowledgement of overreliance on PV10,[23] Platinum's knowledge of Golden Gate's operational failures, and Platinum's inability to finance these operations. See, e.g., ECF No. 639-1, Ex. 6 (Mark Nordlicht writing to a Golden Gate portfolio manager, "I cringe at the 1billion pv10 number as it doesn't mean anything. Our pv 10 in black elk of 1 billion is a number u can work off of but when u have billion pv 10 on fields that are worth 15 in sale now, it doesnt really mean much . . . ."). Moreover, other evidence shows continued operational challenges, including well closures and wells pumping primarily water. See ECF No. 639-1, Exs. 9, 10.[24] All of this reasonably supports Quintero's challenged statement at issue, and therefore the Court rejects Bodner's motion to exclude this portion of Quintero's testimony.

---

[23]   PV10 is the present value of estimated future oil and gas revenues, net of estimated direct expenses and discounted at an annual rate of 10%.

[24]   Furthermore, for instance, on April 5, 2013, a Black Elk employee circulated to Nordlicht and David Levy a copy of a Netherland Sewell & Associate ("NSAI") preliminary reserve report assessing Golden Gate's proven, probable, and possible reserves at about $160 million, substantially below the $1 billion PV10 ascribed to the same reserves in the year before by D&M. Nordlicht responds, "How can there be such a big discrepancy between d and m and nsai, I just don't understand it?" ECF No. 639-1, Ex. 7.

Second, with respect to Quintero's statement that "Golden Gate was in a shutdown mode by 2016; the Liquidator has not realized any proceeds from Golden Gate debt or equity investments as of the date of this report [(i.e., November 14, 2019)]," see Quintero Report Ex. 24, Bodner argues that the market for oil reserves in November 2019 says nothing about the price that an orderly transaction would have produced in, say, January 2015. See Bodner Mem. 11. However, again, the Court finds Quintero's approach in this respect reasonable: in November 2014, PPVA bought out a third-party's 50% equity interest in Golden Gate for less than $3 million in a market transaction, and the business prospects of Golden Gate did not improve since. See Quintero Report Ex. 24 ("It is not credible that a 50% membership interest would be sold at an implied 100% equity value of $5.4 MM if the equity was worth $181 MM during the 4th quarter of 2014, as indicated in Platinum's valuation."); see also Quintero Dep. 236:19-237:7.

Essentially, Bodner is asking the Court to find the valuation work of Platinum's auditors and valuation agents authoritative and to reject Quintero's approach simply because he placed greater weight on contemporaneous evidence of Platinum's failed attempts to revive Golden Gate's oil and gas wells than on PV10 estimates. This is an improper basis for excluding expert testimony. See Scott v. Chipotle Mexican Grill,

Inc., 315 F.R.D. 33, 43 (S.D.N.Y. 2016) ("The duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court.").

### 2. Northstar Offshore Group, LLC

In Exhibit 25, Quintero estimates the value of PPVA's interests in Northstar Offshore Group, LLC ("Northstar"), an oil and gas exploration company, by drawing a decreasing line from $136.6 million as of September 2014 (which Quintero accepted from Platinum's valuation and which is close to the price at which Northstar assets were acquired a few months prior) to $182,000 as of March 2016, in light of the fact that Northstar went bankrupt later in 2016. See Quintero Report Ex. 25.

Bodner argues that it was improper of Quintero to rely on the bankruptcy sale of Northstar's assets after the Damages Period to conclude that PPVA's investment in Northstar near the end of the Damages Period was worth almost nothing, which would imply that Platinum overvalued the Northstar assets by $192.7 million in March 2016. See Bodner Mem. 7-8.

Nevertheless, not only is the low bankruptcy sale price of Northstar's assets reasonable evidence of Platinum's overvaluation at the end of the Damages Period, but also Quintero relies on other contemporaneous evidence hinting at Northstar's precarious financial conditions: December 2014 and

April 2015 financial statements, see Quintero Report Ex. 25; ECF No. 392-2, Ex. 11, a declaration submitted by the Chief Financial Officer of Northstar as part of the bankruptcy proceedings, stating that "the lack of capital and high repair costs on the properties have handicapped [Northstar's] ability to significantly enhance the production and cash flow of the Black Elk assets," see Quintero Report Ex. 25, at 2; an August 12, 2015 email from a Northstar employee to Platinum executives pleading for a couple of millions of dollars for funding, see ECF No. 392-2, Ex.13; and a December 28, 2015 email from Nordlicht to a Platinum employee stating that Northstar at that time was insolvent, see ECF No. 392-2, Ex. 14. For these reasons, Quintero's approach here is reasonably supported, and thus the Court denies Bodner's motion to exclude Quintero's testimony on Northstar valuation.

### 3. Black Elk Energy Offshore Operations LLC

Over the course of the Damages Period, PPVA held a number of debt and equity interests in Black Elk, an oil and gas exploration company. See Quintero Report Ex. 23. The main thrust of Quintero's opinion relating to Black Elk is that, from the time of the explosion on Black Elk's West Delta 32 platform in November 2012 until the sale of substantially all of Black Elk's assets to Renaissance Offshore LLC in August 2014 ("Renaissance Sale"), Black Elk suffered a steady deterioration in its

financial condition that rendered Black Elk unable to pay its creditors, while Platinum valued the common equity positions held by PPVA as high as $191 million during the Damages Period. See id.

It is true that Quintero's opinion that Platinum overvalued Black Elk assets is in part based on his observation that the "reported fair value" by Platinum was higher than the values assigned by third party valuators. See Quintero Report Ex. 23.5. As Bodner points out, this is highly misleading given that valuators were tasked to value only Level 3 assets (i.e., the non-publicly traded portion of PPVA's Black Elk securities), but not Black Elk senior notes for which there was a readily available market price. Therefore, the Court excludes any testimony based on Exhibit 23.5 or any other parts of the report, such as Exhibit 20, stating that Platinum overvalued its assets on the basis of comparison with the ranges of values assigned by independent valuators. See Lippe, 288 B.R. at 686; see also Quintero Dep. 152:5-155:23 (Quintero conceding that his Exhibit 20 does not account for Level 1 and 2 positions that the valuators were not tasked to review).

However, the Court rejects Bodner's request that Quintero's testimony on valuation of Black Elk notes and other investments be excluded. Exhibit 23.5 was not the only basis for Quintero's valuation opinion on Black Elk notes; elsewhere, Quintero

engaged in a careful analysis to justify his valuation, writing,
for instance: "13.75% corporate bonds, which were publicly
traded, eroded to 2% of par value by 3/16 (Exhibit 23.2, p. 2),
whereas Platinum reported them at more than 80% of par value at
3/16 (Exhibit 23.2, p. 1); after the bankruptcy filing, the
bonds fell in price that were generally below 25% of par value,
and as low as 1% of par value; Platinum did not begin to take
significant markdowns until May 2015 (Exhibit 23.2)." Quintero
Report ¶ 23.

With respect to equity interests in Black Elk generally,
Quintero reduces their value from December 2012 on a straight-
line basis to August 2014, when the Renaissance Sale occurred.
At this endpoint, Quintero assigns zero value to equity
interests in Black Elk, writing: "since [fair value] is a
function of production capability, oil prices, and cost
structure rather than changes in equity investment, reported
[fair value] at 12/12 was reduced on a straight-line basis to $0
upon the Renaissance Sale, which deprived the Company of any
remaining potential to meet its financial obligations." Quintero
Report Ex. 23.

Bodner attacks Quintero's assignment of zero value to Black
Elk equity securities after the Renaissance Sale, noting that
Black Elk senior notes traded publicly at around 90 percent of
par in September and October of 2014, a few months after the

Renaissance Sale. See Quintero Dep. 140:14-141:22. However, Quintero's assumption of zero value after the Renaissance Sale is reasonably supported by his observation that the sale "deprived the Company of any remaining potential to meet its financial obligations and obtain a positive equity value." Quintero Report Ex. 23. If Bodner wishes to contest this portion of the opinion, the proper avenue is cross-examination, not exclusion of Quintero's opinion. Moreover, Quintero's opinion regarding the steady and significant decline of Black Elk's equity value is reasonably based on Black Elk's quarterly and annual filings with the U.S. Securities and Exchange Commission at the time, see Quintero Report Ex. 23.4, and his review of contemporaneous emails by Platinum Management representatives, see Quintero Dep. 190:22-192:4.

To sum up, the Court grants Bodner's motion to exclude testimony based on Exhibits 23.5 and 20, but denies his motion to preclude Quintero from testifying on valuation of Black Elk investments.

### 4. PEDEVCO Corp.

In valuing PPVA's equity and debt investments in PEDEVCO Corp. ("PEDEVCO"), Quintero draws a straight line from $36.5 million of the NAV estimated as of May 2015 to $5.66 million of the NAV estimated as of March 2016, where the $5.66 million figure comes from the Liquidators' estimates of anticipated

realization from a potential sale of PEDEVCO. <u>See</u> Quintero
Report Ex. 27.

While Bodner criticizes this approach for drawing a
straight line and using an estimated "fire sale" price as the
end price, <u>see</u> Bodner Mem. 14, the Court finds Quintero's
approach reliable. The basis for such a decline was adequate
based on Quintero's stated observations, informed by publicly
disclosed financials, that: "During the 4 quarters ending 6/16,
PEDEVCO had: (1) minimal and declining revenues; (2) consistent
deficits in cash flow from operating activities, discretionary,
and EBITDA; (3) declining cash, net working capital, and
stockholders' equity; and (4) its debt balance grew. Also,
during this time period its market capitalization declined from
$19.89MM to $8.69MM." Quintero Ex. 27. Therefore, the Court
denies Bodner's motion to exclude Quintero's testimony on
PEDEVCO valuation.

### 5. Desert Hawk Gold Corp.

Quintero offers that the reported values of PPVA's
interests in Desert Hawk Gold Corp. ("Desert Hawk"), a mineral
exploration firm, from December 2012 through March 2016
"exceeded [his estimated] fair values by as much as $23.63 MM."
Quintero Report Ex. 28. In reaching that conclusion, Quintero
makes estimates of "true" values by drawing a straight line from

Platinum's own valuation as of March 2013 to the sale price as of 2016 when the Liquidators sold the asset. See id.

The Court again finds this approach reasonable. Quintero took into account, in addition to the sale price, internal Platinum emails discussing operational difficulties during the Damages Period as well as the possibility that Platinum would cause PPVA to foreclose on its equity interest, which would have had the effect of reducing the value of PPVA's equity interest to zero. See Quintero Report Ex. 28. Accordingly, Bodner's motion to exclude Quintero's testimony on Desert Hawk valuation is denied.

### 6. Over Everything LLC

Quintero opines, without any explanation, that the NAV of the investment in Over Everything in September 2014 was $4.74 million. Quintero then states that, as of March 2016, the investment was worth $0, because, inter alia: Over Everything's May 2015 balance sheet indicated that it was insolvent; its weekly cash burn rate was $263,000 in September 2015; upon the sale of Over Everything's assets, there would be no funds remaining for PPVA's equity position because of certain senior debt. See Quintero Report Ex. 29; see also ECF No. 639-2, Exs. 15, 16. As before, Quintero draws a straight line from the estimated value as of September 2014 down to the estimated value as of March 2016. See Quintero Report Ex. 29.

31

Although the Court finds it reasonable to assign $0 value
to the investment as of May 2015, it is unclear to the Court how
Quintero came up the $4.74 million starting figure. Accordingly,
the Court grants Bodner's motion to exclude Quintero's testimony
on Over Everything valuation.

### 7. Michael Goldberg Receivable

The Quintero Report describes how Michael Goldberg, a
former employee of Platinum, allegedly owed certain notes to
Platinum, secured by a portfolio of securities transferred from
Platinum to him in connection with his separation agreement. See
Quintero Report Ex. 30. However, the existence of such notes is
evidenced only by signed term sheets, and, therefore, Quintero
opines that these notes were effectively worthless, contrary to
Platinum's positive valuation of this receivable at face value.
See id.

Bodner, assuming that such notes exist, argues that a
reasonable liquidator should have inquired about the status of
the receivable, attempted to obtain payment of the notes or
return of the portfolio, or taken discovery from Goldberg to see
if he had a copy of the notes, instead of concluding they do not
exist and assigning them zero value. See Bodner Mem. 15-16.
However, because the existence of meaningful documentation of

the notes appears to be disputed,[25] the Court finds that it is
acceptable for Quintero to value the alleged receivable as
worthless. In any event, Bodner is entitled to cross-examine
Quintero at trial and let the jury resolve this factual dispute.
Accordingly, Bodner's motion to exclude Quintero's testimony on
valuation of Goldberg receivable is denied.

### 8. China Horizon

Quintero also offers his opinion regarding PPVA's
investment in China Horizon Holdings Limited ("China Horizon"),
a party to a joint venture with China Post, the postal service
of the People's Republic of China. See Quintero Report Ex. 26.
Quintero opines that the alleged overvaluation cost PPVA $5.5
million in fees, relying on (1) the event in December 2015,
three months before the end of the Damages Period, where the
Chinese government pulled out of the venture to the detriment of
China Horizon, and (2) "[v]alue estimated using the China
Horizon bridge loan as a proxy for the Company's tangible
assets," where this bridge loan was made in mid to late 2016
after the collapse of the joint venture. Id.

---

[25]    The lack of this documentation is an issue in a pending
litigation. See Platinum Partners Value Arbitrate Fund L.P. v.
Goldberg, No. 18-01650 (SCC) (Bankr. S.D.N.Y.).

Quintero's report and plaintiffs' opposition brief[26] provide
some explanation for why Platinum might have overvalued its
investments in China Horizon in or after December 2015 after the
Chinese government exited the joint venture, but they fail to
provide any explanation fully accounting for why Quintero's
estimation of the NAV of the investments in China Horizon was
also significantly lower compared to Platinum's reported value
before December 2015. Accordingly, given this unreliability, the
Court precludes Quintero from testifying on China Horizon
valuation.

## VII. Whether Quintero's damages opinion regarding excessive incentive fees is inadmissible under Daubert

Based on the above valuation opinions, Quintero concludes
that the damages resulting from inflated management fees and
inflated incentive fees are at least, respectively, $15.844
million and $55.083 million. See Quintero Report ¶¶ 11(a), 23,
33(a)-(b).[27] With respect to the incentive fees, Bodner

---

[26]   Plaintiffs emphasize that Quintero reviewed contemporaneous
documents regarding the detrimental effect that China Post's
withdrawal from the joint venture had on the ability of China
Horizon to continue as a going concern. See ECF No. 639-2, Exs.
17-19.

[27]   The heading of Exhibit 21 states: "Fees Charged to [PPVA]
Based on AUM Reported by the Platinum, January 2012 Through
March 2016." Quintero Report Ex. 21. Because the Damages Period
starts from December 2012, Bodner contends that Exhibit 21
purports to impermissibly include into damages incentive fees
from January 2012 through December 2012. However, contextually

challenges the $55.083 million figure on two grounds, both of which the Court rejects.[28]

### A. Whether Quintero had no reliable support for the assertion that PPVA actually paid $55.083 million in excessive incentive fees

Bodner first argues that Quintero has no evidence to support his assertion that PPVA actually paid, rather than that PPVA was simply charged, $55.083 million in incentive fees. See Bodner Mem. 17. According to the relevant partnership agreements, outside investors (i.e., limited partners of the two "Feeder Funds,"[29] which, in turn, were limited partners of PPVA), not PPVA, had a contractual obligation to allocate 20% incentive

---

it is obvious that "2012" in the heading of Exhibit 21 is a typo, where Quintero meant to say 2013. See id. Ex. 21; see also id. ¶ 24.

[28]   There is less of a dispute with respect to management fees. Damages arising from excessive management fee are calculated by multiplying the amount of purported overvaluation by the annualized rate of 2% on a monthly basis and summing them up for the Damages Period. Bodner does not challenge the opinion that damages attributable to excessive management fees amount to at least $15.844 million. Quintero may therefore testify so at trial, with proper reductions to account for the Court's exclusion of valuation opinions on Over Everything and China Horizon investments.

[29]   These Feeder Funds were Platinum Partners Value Arbitrage (USA) L.P., a Delaware limited partnership and on-shore fund for U.S. taxpayers and Platinum Partners Value Arbitrage (Intermediate) Ltd., a Cayman Islands exempted limited partnership and off-shore fund for tax-exempt persons and entities.

fees to those Feeder Funds' general partner.[30] Likewise, the financial statements for the Feeder Funds explicitly identify each year's incentive allocation as a line item in the "change in partners' capital," showing a reduction in capital to the Feeder Funds' limited partners and an increase in capital to the Feeder Funds' general partner. See ECF No. 634-10. The bottom line, Bodner argues, is that the incentive allocation is a book entry at the Feeder Fund level that has no impact on PPVA and on assets under management by PPVA; therefore, no such payment by PPVA ever occurred. See also ECF Nos. 634-7, 8, 9. Indeed, Bodner argues, plaintiffs are unable to point to any evidence showing any payment of incentive fees during the Damages Period.[31]

However, it is common sense that no one invests in a hedge fund so that the money can sit in a feeder fund bank account; rather, all funds invested at the feeder fund level are expected to be transferred to the master fund for investments, where cash would be transferred from the master fund to the feeder funds to

---

[30]   This general partner was Platinum Partners Value Arbitrage LP, a Delaware limited partnership.

[31]   As to why incentive fees may have accrued but never actually paid, Bodner, without providing any evidence, speculates that the general partner of the Feeder Funds was "reluctant to make actual cash redemptions within the Damages Period" because of "liquidity constraints at PPVA." Bodner Reply 4.

discharge the feeder funds' obligation. Indeed, the Quintero

Report states: "The Feeder Funds did not have access to free

cash flow other than via the Master Fund [(i.e., PPVA)]. We are

aware that the Feeder Funds looked to recharge fees and expenses

to the Master Fund which in turn transferred cash to the Feeder

Funds to discharge operational expenses. Redemptions were

similarly back to back transferred from the Master Fund to the

Feeder Funds." Quintero Report App'x A.

As to Bodner's claim that no evidence of payment exists,

this appears to be a heavily disputed factual issue. For

example, in February 2014, the Feeder Funds made cash payments

to the general partner account in the amount of $13.4 million,

and these payments were funded by cash transfers from PPVA. See

ECF No. 639-2, Exs. 20-23.[32] Bodner argues that these payments

had no relation to incentive fees, whereas plaintiffs vehemently

argue to the contrary.[33] Given that plaintiffs and Quintero have

---

[32]   Relatedly, although not in the context of incentive fees,
evidence shows that management fees charged at the feeder fund
level were actually paid by PPVA. See, e.g., ECF No. 639-2, Ex.
24 (evidencing the use of PPVA's funds to pay more than $40
million in management fees to Platinum Management during the
Damages Period). By way of another example, plaintiffs assert
that PPVA made a payment of management fees related to what is
termed the Correctional Officers Benevolent Association bribery
scheme. See Pls. Bodner Opp. 4 n.4.

[33]   At oral argument, counsel for plaintiffs stated that
$55.083 million of payments relating to excessive incentive fees
can be precisely constructed by adding up (1) direct payments by

put forth some evidence from which it is not completely
unreasonable to infer that PPVA did make incentive fee payments
to the general partner of the Feeder Funds, the Court permits
Quintero to testify on this topic, after which the jury will
resolve this disputed factual issue.

### B. Whether Quintero's calculation of the amount of damages attributable to excessive incentive fees lacks reliable methodology

Quintero calculates the damages attributable to excessive
incentive fees by multiplying the monthly changes in purported
overstatement by 20% and summing them up for the Damages Period.
See Quintero Report Exs. 23.1, 24.1, 25.1, 26.1, 27.1, 28.1,
29.1, 30.1. This is based on his assumption that incentive fees
are charged as 20% of net realized and unrealized monthly gains

---

PPVA to the general partner of the Feeder Funds and (2)
"surreptitious" payments that were made through issuing shares
in PPVA to the general partner account where the general partner
subsequently redeemed them for their full value in exchange for
cash, where all these payments are verifiable based on a close
review of Appendix A -- 410 pages in length, most of which are
spreadsheets -- of the Quintero Report. See Transcript dated
June 12, 2020. This argument was not raised in plaintiffs'
brief, but regardless the Court does not exclude Quintero's
testimony on damages opinion on this ground and leaves it up to
the jury to determine whether the testimony regarding payments
of $55.083 million is credible. In addition, to the extent that
it is disputed if Appendix A is part of the Quintero Report, the
Court rules that it is so and therefore Quintero may testify
based on the spreadsheets at issue. However, Quintero is not
permitted to go outside the bounds of what is already in his
report (including the spreadsheets) in discussing the mechanism
through which PPVA allegedly made incentive fee payments,
directly or indirectly, to Platinum Management.

on assets under management, as well as other income on net
assets under management, subject to certain adjustments. See id.
¶ 23. Such calculation leads to $88.9 million, which is
ironically higher than the $55.083 million that Quintero himself
gathers as the total amount of incentive fees actually charged
(or paid, as plaintiffs contend) during the Damages Period. See
Quintero Report ¶ 21. In an attempt to resolve this inconvenient
discrepancy, Quintero phrases that the damages amount is "at
least" $50.083 million. See Quintero Report ¶ 33.

The Court finds it problematic that Quintero's calculated
damages figure exceeds what Quintero himself calculates as the
actual amount charged on (or paid by) PPVA, when the former
should be capped by the latter. This internal inconsistency[34] is
sufficient to preclude Quintero from testifying that damages
attributable to excessive incentive fees were $88.9 million or
"at least" $50.083 million.

---

[34]   Quintero tries to explain away this discrepancy by stating:
"This can occur, since realized and unrealized losses may be
offset against realized and unrealized gains for purposes of
calculating Incentive Fees. However, losses are absolute
reductions in Incentive Fees. If measured as of the end of the
Damages Period, since they can only be offset by subsequent
realized and unrealized gains, which is not likely for a fund
that is in liquidation." Quintero Report ¶ 32. Putting aside the
fact that the last sentence makes no grammatical sense, it is
unclear how this explanation addresses a substantial discrepancy
in the amount of $38.817 million.

Nevertheless, Quintero may testify that damages attributable to excessive incentive fees amount to $55.083 million. Bodner here argues that such damages figure must be lower than $55.083 million, because some portion of that must have been based on legitimate gains. However, Quintero's assumption here is, indeed, that <u>all</u> of $55.083 million was illegitimately gained, given that Quintero's estimated "true" value for each and every asset at issue decreased over time during the Damages Period; therefore, according to Quintero, no incentive fees should have been paid, cumulatively, during the Damages Period at all. <u>See</u> Quintero Report Exs. 23.1, 24.1, 25.1, 26.1, 27.1, 28.1, 29.1, 30.1.

In sum, Quintero may testify that the amount damages attributable to excessive management fees is $55.083 million, but not that such amount is "at least" $55.083 million or $88.9 million.

## VIII.   Whether Quintero's theories regarding possible earlier redemptions should be excluded

"Expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." <u>Lippe v. Bairnco Corp.</u>, 288 B.R. 678, 686 (S.D.N.Y. 2003), <u>aff'd</u> 99 F. App'x. 274 (2d Cir. 2004).

In ¶¶ 68-70 and Exhibit 39 of his report, Quintero writes that, had Platinum Management made a "full and fair disclosure" of assets under management and associated problems affecting them, PPVA investors would have sought redemption of their investments, possibly leading to the termination of the fund and the cessation of management and incentive fees. Quintero discusses five hypothetical scenarios of investor withdrawal at different pace over time, and concludes that the amount of damages in the form of such avoidable fees ranges from $65 million to $80 million. See Quintero Report ¶¶ 65-73, Ex. 39.

The Court precludes Quintero from testifying on these five scenarios and resulting conjecture that damages range from $65 million to $80 million. See Quintero Report ¶ 72, Ex. 39. The $65 million figure is based on a scenario where 60%, 75%, 75%, and 75% of investments had hypothetically been withdrawn (cumulatively) as of 2013, 2014, 2015, and the first quarter of 2016, and the $80 million figure is based on another scenario where 65%, 90%, 100%, and 100% of investments had hypothetically been withdrawn (cumulatively) as of 2013, 2014, 2015, and the first quarter of 2016. The assumptions behind each scenario are entirely speculative and backed by no empirical support.

However, Quintero may testify that full and truthful disclosures would have caused more investor redemptions (without any quantification), because such hypothetical outcome would

41

have been very likely. See Quintero Report ¶¶ 65-71. Indeed, any reasonable investor who discovers that his or her investments were fraudulently valued would lose faith in their fund managers and demand their money back.

Accordingly, the Court grants Bodner's motion to exclude Quintero's testimony based on the five scenarios (i.e., quantification of the impact of hypothetical redemptions), while denying Bodner's motion to exclude Quintero's testimony that more redemption would have occurred had full disclosures been made (i.e., the occurrence of hypothetical redemptions).

### Analysis – Fuchs' Motion

Because Fuchs joins the motions of Bodner and Huberfeld without adding anything new, see ECF No. 630, Fuchs' motion is granted in part and denied in part consistent with the Court's rulings above on the motions of Huberfeld and Bodner.

### Conclusion

In sum, the Court grants in part and denies in part the motions of Huberfeld, Bodner, and Fuchs. The Clerk of the Court is directed to close the entries bearing docket numbers 627, 632, and 630 in 18-cv-10936 and 868 and 871 in 18-cv-6658.

SO ORDERED.

Dated:   New York, NY
         June 29, 2020                    JED S. RAKOFF, U.S.D.J.