Mbu2Pla1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION                18 Civ. 06658 (JSR)

----------------------------------x

MARTIN TROTT and CHRISTOPHER                 18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                    Plaintiffs,

              v.

PLATINUM MANAGEMENT (NY) LLC,
*et al.,*

                    Defendants.

----------------------------------x        Trial


                                            New York, N.Y.

                                            November 30, 2022
                                            9:50 a.m.

Before:

                    HON. JED S. RAKOFF,

                                            District Judge
                                              and a Jury

Mbu2Pla1

APPEARANCES

HOLLAND & KNIGHT, LLP
          Attorneys for Plaintiffs
BY:   WARREN E. GLUCK
          MARTIN L. SEIDEL
          RICHARD A. BIXTER JR.
          QIAN (SHEILA) SHEN
          NOAH W.S. PARSON
          ELLIOT A. MAGRUDER


CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Defendant Bodner
BY:   ELIOT LAUER
          GABRIEL HERTZBERG
          JULIA B. MOSSE
          NATHANIEL C. AMENT-STONE
          ALLESANDRA TYLER


Also Present:

Michael Robson, Technician
          Paradocs Motion Support

Esterah Brown, Paralegal
          Curtis Mallet-Prevost, Colt & Mosle LLP

Mbu2Pla1

```
 1              (In open court; jury not present)
 2              THE DEPUTY CLERK:  Will the parties please draw a
 3      microphone close to them and identify themselves for the
 4      record.
 5              MR. GLUCK:  Good morning, your Honor.  Warren Gluck of
 6      the law firm Holland & Knight, representing Platinum Partners
 7      Value Arbitrage Fund LLP——PPVA——as well as the Joint Official
 8      Liquidator Martin Trott, who sits next to me.  To his right is
 9      Richard Bixter, also a partner at Holland & Knight; Sheila
10      Shen, an associate at Holland & Knight; Noah Parson, an
11      associate at Holland & Knight; and Elliot Magruder, an
12      associate at Holland & Knight, all representing both
13      plaintiffs——PPVA and Martin Trott.
14              THE COURT:  Good morning.
15              MR. LAUER:  Good morning, your Honor.  Eliot Lauer, of
16      Curtis, Mallet-Prevost, Colt & Mosle, for the defendant, David
17      Bodner.
18              I would like to say that tomorrow I will be switching
19      firms and will be with the Katten firm, and we have taken care
20      of that in terms of all of the necessary filings.
21              With me is my partner Gabriel Hertzberg, who is also
22      going to Katten; Mr. David Bodner; my partner Julia Mosse, who
23      is also joining me at Katten.
24              THE COURT:  Is there going to be anyone left at Curtis
25      Mallet?
```

Mbu2Pla1

1          MR. LAUER:  And to her right is Mike Robson, who is a

2     technical person assisting us with graphics and the like; and

3     to his right is my colleague Nathaniel Ament-Stone, who is an

4     associate at Curtis Mallet; and to my rear is Alexandra Tyler

5     and Esterah Brown.

6          THE COURT:  Good morning.  All right.  So --

7          MR. GLUCK:  Your Honor, one moment.  I neglected to

8     mention Martin Seidel, a partner at Holland & Knight, was

9     stricken ill.  He is on the telephone.

10          THE COURT:  Yes, and I agreed to allow him to listen

11     in by telephone, but let me advise him that if at some point he

12     can't hear something, do not interrupt.  We will proceed

13     without any interruption.  All right?

14          So there are a number of motions *in limine*, and they

15     are adjudicated as follows:

16          First, there is defendant's motion to exclude proof of

17     pre-2013 incentive fee payments and preclude reference to

18     withdrawal of incentive fees after 2014.  The first portion of

19     that motion is denied; the second portion is granted.

20     Specifically, plaintiffs are permitted to present evidence

21     related to the $18.53 million in incentive fee payments that

22     were allegedly paid out to Platinum Management Partners in

23     2013.  However, plaintiffs cannot make any reference to cash

24     withdrawal of incentive fees by Mr. Bodner following September

25     2014, though this does not restrict plaintiffs from providing

Mbu2Pla1

1     evidence as to noncash interests Mr. Bodner allegedly redeemed

2     thereafter.

3            Defendant's second motion *in limine* is to consolidate

4     certain allegedly duplicative claims, and I think the jury will

5     be presented with just one claim for breach of fiduciary duty

6     and one claim for fraud, and I really don't see the aiding and

7     abetting claim on these facts remaining.

8            With respect to defendant's third motion *in limine*,

9     excluding references at trial to punitive damages and from the

10    jury instructions, I am not sure yet that this motion is ripe,

11    so I will preclude any mention of it on opening statements, but

12    I will resolve the question of whether there is an issue of

13    punitive damages to go to the jury at a later stage of this

14    trial.

15           MR. LAUER:  Your Honor --

16           THE COURT:  No.  I'm giving my rulings and I don't

17    want to be interrupted.

18           MR. LAUER:  Sorry.

19           THE COURT:  I was incredibly taken aback by some of

20    the last-minute applications in this case, particularly from

21    defense counsel, for example, an application to have service

22    electronically for two witnesses.  This trial has been set for

23    months.  If there was a problem with service, it should have

24    been resolved long ago.  That application is denied.

25           Now, to continue.

Mbu2Pla1

1          The defendant's fourth motion *in limine* is to preclude

2     argument or evidence in support of the plaintiffs' theories for

3     disgorgement and consequential damages.  I am leaning towards

4     granting that, but I will hear some argument on it later this

5     morning.

6          Then there is the defendant's fifth motion *in limine*

7     to exclude evidence relating to Mr. Bodner's criminal history

8     and dealings with the SEC and FTC and to exclude matters

9     already adjudicated on summary judgment.  The first part of

10    that motion is granted.  As to the second part, the evidence

11    concerning the creation and capitalization of Beechwood and the

12    BEOF funds and the Black Elk scheme and the Montsant

13    transactions and the Agera sale and the overvaluation of Over

14    Everything and China Horizon, that evidence may be presented so

15    long as it is limited to Mr. Bodner's role in the overvaluation

16    that's alleged to have resulted.

17         With respect to plaintiffs' first motion *in limine*,

18    which is to exclude evidence or argument relating to the March

19    2016 release agreement, that motion is denied.

20         With respect to plaintiffs' second motion *in limine*

21    seeking rulings that, first, the criminal convictions of PMNY

22    and PPVA executives—namely, Nordlicht, Levy, and Small—serve

23    as collateral estoppel and, second, that adverse inferences

24    should be made against Bodner as a result of Nordlicht's

25    invocation of the Fifth Amendment, that motion is denied.

Mbu2Pla1

1          With respect to plaintiffs' third motion *in limine*

2     seeking a ruling that all knowledge obtained by Curtis Mallet

3     in representation of PMNY and Bodner be imputed to Bodner, that

4     motion is denied with the qualification that any knowledge that

5     was obtained by Curtis Mallet during its representation of

6     Mr. Bodner personally in this proceeding may be imputed to the

7     defendant.

8          Now, there was something you, counsel, wanted to

9     raise.

10          MR. LAUER:  I apologize, your Honor.  I was not

11     calling to address the motions.  We had ordered -- I have a

12     hearing impairment.  We had ordered the Livenote and it didn't

13     work, and I was raising -- standing simply to ask if I could

14     put this near the Court so I can hear you until the Livenote

15     goes back on.

16          THE COURT:  Yes.  Now, my wife would argue that you

17     don't need to hear me and probably don't want to hear me, but

18     that's her view.  Yes, that's fine, and my apologies for being

19     a little grouchy, but it will only get worse as time goes by.

20          MR. LAUER:  Would it be okay if I put this up here?

21          THE COURT:  Yes.

22          MR. LAUER:  And I think once Livenote goes on, I won't

23     need it.

24          Thank you.

25          THE COURT:  Thanks a lot.

Mbu2Pla1

| | |
|---|---|
| 1 | Next, we will pick a jury of nine people.  Each side |
| 2 | will have -- |
| 3 | MR. HERTZBERG:  Your Honor, Gabriel Hertzberg.  I'm |
| 4 | sorry to interrupt. |
| 5 | In your remarks, when Mr. Lauer stood up about his |
| 6 | hearing problem, the Court denied the motions for alternative |
| 7 | service. |
| 8 | THE COURT:  Yes. |
| 9 | MR. HERTZBERG:  And I just wanted the Court to know |
| 10 | that we did e-mail the motion, as directed, into chambers a |
| 11 | month ago, on November 2, and there was some kind of a mixup |
| 12 | within chambers, and so the law clerk asked for them again this |
| 13 | morning. |
| 14 | THE COURT:  I see. |
| 15 | MR. HERTZBERG:  But if your Honor knows all of that, I |
| 16 | apologize.  I just wanted to make sure you were aware. |
| 17 | THE COURT:  No, I wasn't aware.  That's a relevant |
| 18 | point.  But I guess my question still is -- well, all right. |
| 19 | We will revisit that in a minute. |
| 20 | MR. HERTZBERG:  And then one more point of |
| 21 | clarification.  There is one motion for alternative service |
| 22 | from us and one for the plaintiffs. |
| 23 | THE COURT:  And when was the plaintiffs' motion made. |
| 24 | MR. GLUCK:  The plaintiffs' motion concerns Mr. Seth |
| 25 | Gerszberg. |

Mbu2Pla1

1          THE COURT:  No.  When was it made?

2          MR. GLUCK:  Oh, that motion was made a few weeks ago.

3     It was the same situation with e-mail to chambers.

4          THE COURT:  I apologize to counsel because I thought

5     it was just made.  I first learned about it this morning, and I

6     thought it was grossly untimely as a result, but now I

7     understand that it was only modestly untimely.  So we will hear

8     more about that later, then.

9          So each side will have three peremptory challenges.

10    We do this in rounds.  So my courtroom deputy, after we have

11    seated the nine jurors and I have questioned them for cause and

12    excuse any who need to be excused for cause and replace them,

13    will then hand a little board with cards to counsel, and you

14    will turn over the card that you want to exercise your

15    challenge for that round.  And it will be one for plaintiff,

16    one for defendant each round.  If you waive your challenge on a

17    given round, you still preserve your challenges for the

18    subsequent rounds unless both sides waive on a round, in which

19    case we have a jury.

20          How long does plaintiffs' counsel want for opening

21    statement?

22          MR. GLUCK:  We have about 90 minutes, your Honor.

23          THE COURT:  How much?

24          MR. GLUCK:  Nine zero, 90 minutes.

25          THE COURT:  No.  No.  I should have made this clear.

Mbu2Pla1

1    I never allow opening statements of more than 30 minutes, and

2    the reason for that is because this is the first time the jury

3    is hearing about the case, and they are not going to be able to

4    follow all of the nuances that you, as counsel, having embedded

5    yourself in this case for so long, take as obvious but will be

6    very strange to them.  So 30 minutes for each side.

7            Okay.  Let's see what else.

8            Oh, yes.  Plaintiffs' counsel indicated that they

9    thought the case would last about ten days or so, which seems

10   to me about right.  Defense counsel thought it might last as

11   much as 17 days, which I think is not going to happen.  And

12   then defense counsel, in an exercise of *chutzpah*, said they

13   wanted Fridays off.  I am going to grant you Fridays off for

14   religious reasons, but I am not going to grant you 17 days of

15   trial.  Forget about it.

16           So here is how that will operate.  Every time a

17   defense counsel is about to address a witness either on

18   cross-examination of the plaintiffs' witnesses or on direct

19   examination of their own witnesses, they will provide me at the

20   sidebar with a statement of how long they are going to be and I

21   will hold them to that.  If, as we move along, it seems to me

22   that those times are excessive, I will cut them down.  I don't

23   like to do that.  I have very rarely had to do that.  But when

24   I saw 17 days, it gave me a great deal of pause.  This is not

25   that complicated a case.

Mbu2Pla1

1          Let's see.  Linda, when is the jury panel available?

2          THE DEPUTY CLERK:  I should be able to call them now.

3          THE COURT:  Why don't you call?

4          THE DEPUTY CLERK:  I shall.

5          MR. LAUER:  Just a point of clarification, what we

6    asked on Friday was to end at 1:00.

7          THE COURT:  Yes, that's what I understood, and that's

8    granted.  And since I am feeling sure that you -- both sides

9    will only take about six days to try this case, that will be an

10   easy accommodation.

11         Okay.  Now, let me just hear, and then we will break

12   for a minute until the jury arrives -- and there is one person

13   who is seated in the back, when the jury rises you will need to

14   go to the back row because they need to occupy those seats.

15   Thank you.

16         So tell me the story——we will start with plaintiffs'

17   counsel and then defense counsel——on these people that you

18   haven't been able to serve that you want.

19         MR. GLUCK:  I am also developing a hearing problem

20   myself.

21         (Counsel confer)

22         MR. GLUCK:  There is one witness in this case --

23         THE COURT:  You don't have to stand, but bring the

24   microphone up to you so the court reporter can hear you.

25         MR. GLUCK:  There is one witness in this case Mr. Seth

Mbu2Pla1

Gerszberg.  Mr. Seth Gerszberg was the principal of Over

Everything.  We intend to provide evidence through him that

Over Everything was a defunct entity by the time of 2016.

Secondly, Mr. Gerszberg, along with others, delivered a

presentation to Mr. Bodner and Mr. --

            THE COURT:  Well, I'm not interested in -- I'm

assuming both sides have a good-faith reasoning for calling

these respective witnesses.  I just want to know why you

weren't able to serve them.

            MR. GLUCK:  We have had a process server outside his

house for a period of time, weeks.  At no point did he appear

to come home, and we believe that he has been avoiding service

of the trial subpoena in this case.  We have reached out to his

counsel.  We have sent e-mails to all of the e-mail address

that is we could find.  The Court will recall he was a

defendant in the case.

            THE COURT:  Who is his counsel.

            MR. GLUCK:  His counsel.

            MR. BIXTER:  Elliot Ostrove.  He was also the counsel

who negotiated this settlement.  Mr. Ostrove was requested to

accept service on behalf of his client.  He asked his client,

and evidently that request was not granted.  As a result, we

sent a process server to literally sit outside his house until

he could be served.

            THE COURT:  What is Mr. Ostrove's phone number?

Mbu2Pla1

1              MR. GLUCK:  Mr. Magruder will have that information.

2      Just hold on.

3              THE COURT:  I'm sorry?

4              MR. GLUCK:  Mr. Magruder will have the phone number.

5      I should probably, too.

6              I have a cell phone telephone number.  So this is his

7      e-mail address.  It is eostrove@EpsteinOstrove.com.  This is --

8              THE COURT:  No.  I want the cell phone number.

9              MR. GLUCK:  Cell phone number is 732-485-6241.  He's

10     got an office line as well, which is also 732 --

11             THE DEPUTY CLERK:  Stop.

12             THE COURT:  Just what's the name of the witness again?

13             MR. GLUCK:  The name of the witness is Seth Gerszberg.

14             THE COURT:  Oh, yes.

15             (Pause)

16             THE COURT:  What's the other number?

17             MR. GLUCK:  Office line is 732-820-7761.

18             (Phone call with Court and Mr. Ostrove)

19             THE COURT:  The jury panel is here.  We will deal with

20     the other witness in similar fashion in due course.

21             (Continued on next page)

22

23

24

25

1          THE COURT:  Ladies and gentlemen, we're about to hear

2     opening statements from counsel.  I want to advise you that of

3     course nothing that counsel says is evidence, the evidence will

4     come from the witnesses and the exhibits.  Because the evidence

5     will come in one little bit at a time, it may be very helpful

6     to you to hear what each side thinks the evidence will show or

7     fail to show as the case may be.

8          The plaintiff, who will give the opening statement

9     first, bears what we call the burden of proof.  That is to say

10    that they have to show that it's more likely than not that the

11    claims they have made are proven, and I'll tell you a lot more

12    about that with my jury instructions later on, but because they

13    have the burden of proof, they'll go first.

14         So we'll hear from plaintiffs' counsel.

15         MR. GLUCK:  Good morning, and thank you for serving.

16    My name is Warren Gluck and I'm an attorney at Holland &

17    Knight.  I represent Platinum Partners Value Arbitrage Fund.

18    It was a hedge fund.  This case is about hedge fund managers,

19    both the company that managed this hedge fund and individuals

20    sitting right there, a human hedge fund manager who was one of

21    the two senior partners at the management company that managed

22    the hedge fund, PPVA, called Platinum Partners Value Arbitrage

23    Funds, we're going to call it PPVA or "the fund" in this trial,

24    and we're going to show you how Platinum Management, the hedge

25    fund manager, and Mr. David Bodner, with his knowledge,

1    overvalued the assets of this hedge fund causing devastating

2    damage and real economic damage.  Why?  Because the higher the

3    value of the fund, the more fees the hedge fund managers would

4    get.  It's very simple.

5            Sitting at the table over there is Mr. David Bodner.

6    It's plaintiffs' contention, the fund's contention, and

7    Mr. Trott's contention that he was a fiduciary of the fund, he

8    was a senior partner in the Platinum Management company and he

9    personally received fees that were unearned.  It's that simple.

10   We want them back.

11           Hedge funds are set up in a very typical way.  In

12   fact, our first witness is going to be an expert witness on the

13   subject of hedge funds and how they're set up, both this fund

14   and in general, and what you will see on your screen is that

15   top level Platinum Management New York, that was Mr. Bodner's

16   company, that was the hedge fund manager here that was, guess

17   what, entitled to fees.

18           Investors put their money into the hedge fund just

19   like a bank, but instead of an account balance, you are

20   entitled to shares or limited partnership interests.  You get a

21   statement every month in the mail saying what your shares are

22   worth, and we're saying that from 2012, December 2012 all the

23   way to the very last statement the fund ever issued, those

24   numbers were wrong and they were wrong high.  Fees were taken

25   by the management company, Platinum Management and Mr. Bodner

MBUCpla2                          Opening – Mr. Gluck

1    personally, that they didn't earn and didn't deserve.

2            2 and 20.  Big fact for this case.  Many hedge funds

3    are set up in this way and this one was, too.  The 2 percent.

4    Platinum Management, the company at which Mr. Bodner maintained

5    an office that he went into every single day or almost every

6    day for a period of 15 years, was entitled to 2 percent of

7    what's called the net asset value of the fund.  That's just

8    adding up all the investments of the funds which could be oil

9    and gas, it could be pharmaceutical companies, they invested in

10   real companies.

11           This is a fraud, but not like a Madoff-style fraud,

12   which you'll hear about.  This was a fraud where there were

13   real investments and real assets that were just overvalued and

14   knowingly overvalued.  2 percent, the higher the value that's

15   being stated, the more that 2 percent was.  PPVA, the fund, the

16   fund that Mr. Trott has been assigned by the Cayman Court to

17   wind down and investigate the causes of its sheer collapse,

18   paid out of its bank account that 2 percent every month or

19   every other month, 2 percent for 10 years.  That number was

20   off.

21           The 20 percent.  Hopefully, when you invest, you make

22   money.  That's the whole point.  You find a good business to

23   invest in and you hope that the value of that business goes up.

24   Now, real deal of Platinum Management was, pursuant to a

25   contract, investment management agreement and a general

1   partnership agreement, was that Platinum Management was to get

2   20 percent of the upside, of the increase in value.

3        Now let's be clear, if the fund value stayed the same,

4   that number should be a zero.  If it went down, that number

5   should be a zero.  We will demonstrate that from December 2012

6   through to 2015, they took incentive fees on fictitious upside.

7   It didn't happen.  The fund's assets did not go up.  If you

8   find that the fund's assets didn't go up, then every dollar of

9   incentive fees taken by Platinum Management and Mr. Bodner

10  should not have been taken.  It's that the simple.

11       What's a hedge fund do?  Well, it's kind of what you

12  would think.  They bring in investors, people who are looking,

13  who have excess cash, they want to make a little bit of money,

14  and so they put their money into the fund.  Then there's a

15  whole company structure — office managers, secretaries,

16  whatever you have to operate the actual logistics of running an

17  investment company.

18       They would identify potential companies to invest in,

19  oil and gas.  You're going to hear a lot about that,

20  pharmaceuticals, technology.  They would either invest in that

21  company's shares or loan the company money under loan

22  agreements so that they could run and operate.  Also, they

23  would -- and this is critical, Platinum Management was

24  delegated the sole responsibility to calculate the value of

25  those assets and the net asset position, and they did so

1    falsely, wrongly, and knowingly, and that is the testimony you

2    will hear over the next couple of weeks.

3           Overvaluation, that is what this case is about.  We

4    will demonstrate that the core assets, the core companies that

5    Platinum Management caused PPVA to invest in were stated to

6    have a value way beyond what was the actual truth.  For

7    example, there was an investment in an oil company in the gulf

8    of Texas.  It was the biggest investment of the fund, it was

9    called Black Elk.  You're going to hear a lot about Black Elk.

10   But in November of 2012, there was a devastating explosion.

11   It's about a third of the whole assets.  That year, Platinum

12   Management, with David Bodner's knowledge, said its assets went

13   up and they took a cut of the fictitious upside.  They

14   shouldn't have.  It was wrong.

15          The plaintiff in this case, his name is Martin Trott,

16   and he has a partner named Chris Smith.  They are the joint

17   official liquidators of Platinum Partners Value Arbitrage Fund,

18   the fund.  Like many funds, it was set up as a Cayman company.

19   Many, many are, there's nothing unusual about it, but when

20   things like this happen, when the fund blows up and goes into

21   bankruptcy, the Cayman Grand Court appoints a fiduciary, a

22   trained accountant and a forensic to pike through what

23   happened, make reports to the court, pay back creditors and

24   investors best they can, marshal assets and, yes, determine if

25   there's an appropriate litigation to bring against those who

MBUCpla2                         Opening - Mr. Gluck

1    were responsible for the fund's demise.  What you will hear is

2    that David Bodner is not really one of those persons, he's one

3    of those persons most responsible, and those are the

4    testimonies that you will hear from the expert witnesses and

5    the fact witnesses that we call.

6          How was it set up?  This is a very rough chart.  It's

7    designed to give you some familiarity with the structure.  The

8    first thing that Mr. Bodner's counsel will tell you is that

9    Mr. Bodner is not on any of the documents.  How is that

10   possible?  Well, you see at the top where it says Platinum

11   Management New York, that's the hedge fund management company.

12   Mr. Bodner hid his ownership interests through two layers of

13   trusts and subcompanies.

14         I'll ask you to look at the one that says Mr. Uri,

15   Landesman.  He's deceased.  He was the former president of

16   Platinum Management.  He owned his interests directly.  He was

17   on the papers.  Mr. Bodner did not.  Mr. Bodner held his

18   interests through something called the Mark Nordlicht Transfer

19   Trust.  It's hard to decipher, and there's a reason for it.

20   Mark Nordlicht was the manager of the fund, he was the

21   investment manager.  The witnesses will testify that Mr. Bodner

22   and his partner, Murray Huberfeld, held themselves out as

23   principals of this fund and took said that they had assigned

24   Mark Nordlicht to run the day-to-day operations, and he did.

25   Mark Nordlicht is going to be a name you hear in this trial

1    over and over again.  And it was ultimately Mark Nordlicht, at

2    a day-to-day level, that set these fund values.  What you will

3    also hear that Mr. Bodner knew what those values were and he

4    knew they were wrong.  That is what the evidence is going to

5    show.

6            These are the persons who were involved in this

7    fiasco.  At the top, David Bodner and his partner of 30 years,

8    Mr. Murray Huberfeld.  You will hear that they actually

9    operated an unincorporated partnership.  They shared profits,

10   they shared losses, they shared revenues.  If there was a

11   company that required funding, they would take it from one of

12   their joint developments and move it into the other.

13           Uri Landsman, he was the man I just mentioned, he died

14   a few years ago.

15           Mark Nordlicht, he will be called to the stand.  He

16   was the investment manager, day-to-day operations person.

17   You'll see a lot of emails in this case with his name on it.

18   In fact, you will see a lot of emails where he is decrying and

19   upset about the very developments that Platinum Management was

20   saying were going nothing but up.  They were not.

21           David Levy was a portfolio manager at the fund and the

22   nephew of Murray Huberfeld.  You're going to hear his name a

23   lot, too.  He's on some of the documents.

24           And lastly, Bernard Fuchs, he became a minority

25   partner, senior partner, minority partner, Bernie Fuchs, in

1    2014.  Why?  He was a big investor in this fund.  He was one of

2    their original investors, one of their big investors over a

3    long time, and in 2014 in exchange for not pulling his money

4    out, they gave him a 10-percent slice of that management

5    company.  You're going to hear from him and he's going to be a

6    witness in this case.  You are going to hear from him what

7    Mr. Bodner told him about Mr. Bodner's role at this fund and

8    why he invested.

9           What you're seeing on your screen right now is an

10   excerpt of a document that we have agreed is going to come into

11   this case.  It is that monthly NAV statement, it's what's on

12   your screen right now.  Now, here's the thing, you see where it

13   says net assets, $720 million, that was in April of 2016, and

14   this was the last NAV statement the fund ever produced before

15   there were arrests and bankruptcies.  This is the last

16   statement, and this statement is glaringly wrong.  What we are

17   about here today is just the overvaluation.  You will hear

18   things concerning other problems at this fund, but Mr. Bodner

19   is only on trial today for the overvaluation because that

20   $720 million number was dead wrong.

21          Part of it, $135 million of it, real money, was

22   purportedly the value of shares that the fund held in a

23   California-based oil drilling company called Golden Gate.

24   Here's the problem, by April of 2016, it wasn't drilling any

25   oil, it was just water, it was a failure.  Platinum Management

1    knew that and David Bodner knew that.  That value should have

2    been a zero.  Golden Gate had $40 million of creditors it

3    couldn't pay, let alone the shares for the investors being

4    worth $135 million.  We will ask you to find that Platinum

5    Management breached its fiduciary duties and committed fraud on

6    April 2016 when they knowingly put this out and that David

7    Bodner knew the numbers were wrong.

8            Another one.  Company called Over Everything.  They

9    make T-shirts and funny slogans.  It was a real company at one

10   time.  You will hear from the principal of this company,

11   Mr. Seth Gerszberg, that it effectively shuttered by the

12   beginning of 2016, yet this is being valued at more than

13   $22 million, the shares of it.  You will hear that Mr. Bodner

14   was aware that the company was effectively shuttered because

15   the very same Mr. Gerszberg made a desperate presentation along

16   with some other stuff at Platinum to Mr. Bodner saying the

17   numbers are all off, the values are close to zero, especially

18   on the oil and gas, and we need more money.  That was in

19   January of 2016, this is April, $22 million.

20           Next one, China Horizon.  Great idea in principal.  In

21   ruler China, there weren't the sort of 7-Eleven's we have here

22   where people can buy conveniences, Diet Cokes, whatever.  PPVA

23   invested in a company that was going to spread out small

24   convenient stores over China.  Another problem, though.  You

25   will hear from Mr. Bernard Fuchs, that 10-percent share owner

who specialized in China that by the time of April 2016, the

Chinese government also thought this was a pretty good idea,

pulled the license, and set up a competing venture.  The value

is listed at $60 million.  You'll hear that's impossible.  It

was knowingly overvalued and Mr. Fuchs specifically told

Mr. Bodner about these problems.

        Black Elk Energy, this is a big one, and this is the

one that caused a lot of the other issues in this case,

including those arrests.  In 2012, Black Elk was the single

largest investment held by Platinum.  Couple hundred million of

actual value.  But in November of 2012, there was an explosion

on one of the main rigs off the southern coast of Texas.  It

was a real operating company.  You will hear our experts and

fact witnesses on the ground, including the later CEO of

Black Elk say there was no way that that asset increased in

value after the explosion.  In fact, they were faced with

criminal regulatory problems.  People died.  It didn't go up.

That's what you need to know.

        Now, in the wake of this explosion, you will hear that

it was an all-hands-on-deck situation.  Obviously, at Platinum

Investment, their biggest investment had literally just

exploded.  They do two things, and I'm going to do this solely

in the context as it relates to overvaluation and not whether

it's a fraud or any of the other things that happened with this

particular fund.

1              The first thing that was done was that a side fund,

2     not PPVA, we're going to call it the Black Elk Opportunity

3     Fund, a one-off thing was set up and just like Platinum

4     Management, Mr. Bodner held an ownership interest in that

5     company through a grantor trust.  Mr. Bodner went out and

6     sought investors for this new one-off venture.  Mr. Bodner

7     directed others, including Mr. Fuchs, to find investors for

8     this one-off venture and they were successful.  They raised

9     $95 million and put that $95 million, not through PPVA, not

10    through the fund, but through this side pocket -- excuse me.

11    Sidearm into Black Elk to try to support it.  Okay, nothing

12    wrong with that, but we're going to hear from our experts and

13    the former CEO of Black Elk is something called dilution.  When

14    someone else puts in money, they're at the debt or in shares,

15    the value is diluted.

16             By 2014, Black Elk oil prices were very high, sold

17    almost all of its assets and operations and rigs and oil

18    fields, that were actually pretty valuable, for $110 million.

19    You're going to hear about this, it's called the Renaissance

20    Sale, and this is where things get very whacky.

21             After that sale, there's just 10 percent, at most,

22    remaining, and some will say it's a lot less than 10 percent.

23    The worst assets, the worst pieces of oil field, the stuff that

24    no buyer wanted was remaining at Black Elk, and you're going to

25    hear testimony from the CEO of Black Elk, who's a former

1   Platinum guy during that period.  Those assets were transferred

2   to yet another company that they created called Northstar, and

3   that April 2016 NAV statement, the two entries associated with

4   Northstar that you see on your screen right there,

5   $114 million, $76 million, that was what they were valuing the

6   scraps at.  The main piece had just been sold for $110 million

7   when oil prices were at their peak.  Two years later when oil

8   prices went down, they're valuing the scraps, and not even the

9   scraps, the shares of the company that own the scraps at

10  $180 million, you will hear it's impossible.  You'll hear it's

11  impossible from the expert witnesses and you'll hear it's

12  impossible from the guy who sold the scraps.

13        How could this happen?  How could this happen?  It's

14  an SEC regulated fund.  It's an audited fund.  In fact, you're

15  going to hear one of the defenses that Mr. Bodner is going to

16  give is that he relied on the audited financials.  I assumed

17  everything was okay.

18        The first way they hid it was with this Black Elk

19  Opportunities fund.  It changed the subject.  It created the

20  illusion that these bonds held by Black Elk could still be paid

21  and the illusion that these equity valuations would be valid.

22        Second way was by a company that Mr. Bodner founded

23  and capitalized called Beechwood, and you're going to hear a

24  lot about Beechwood in this case.  It was just another

25  investment company, and this one was called Reinsurance.  Turns

1   out that when insurance companies, they collect their premiums,

2   they hold reserves, they need to pay it out.  They actually

3   give that money, those reserves they hold, to someone to

4   invest.  That someone turned out to be the same team at

5   Platinum Management plus two insurance specialists, Scott

6   Taylor and Mark Feuer.

7        In 2014, they set up this Beechwood company, take in

8   600 to $800 million, but then of that, slice it, $60 million,

9   $80 million.  They pump back into Platinum.  Remember I told

10  you that they didn't just invest in companies, they loaned

11  companies money, companies like Northstar, that one that was

12  just set up, technology companies — those are hard loans, that

13  money needs to be paid back.

14       The move here, the way they evaded detection by

15  everyone, except for those in the know, was that they sold the

16  loans from these companies that were bad paper, Golden Gate

17  couldn't pay its bills, it was pumping water.  It couldn't pay

18  back 30, $40 million in loans.  They sold them at full value to

19  Beechwood, which these gentlemen controlled and then they just

20  sat on it.  Occasionally, they would have the fund, PPVA making

21  interest service payments, and when those stopped, it was

22  actually a crisis that you'll hear about, but at no point were

23  these operating companies actually even paying their own

24  interest bills.  But to the outside world, oh, their debt is in

25  good standing.  Maybe if you weren't on the ground watching the

 1   water pull up instead of oil, these stock valuations, they're

 2   called level 3 assets, they're hard to say, maybe it's

 3   plausible, and that is how, for years, this escaped detection.

 4   And David Bodner used the very incentive fees, the LP interest

 5   he was being granted wrongly in Platinum to capitalize

 6   Beechwood, and also capitalized it with cash, and this we will

 7   prove, too.

 8          Point being, he helped, actively helped, particular by

 9   founding and capitalizing Beechwood.  At all times he knew he

10   was on both sides of this thing.  He was watching interest

11   payments go out from PPVA and into Beechwood.  He knew because

12   he was getting reports from Mark Nordlicht and his other

13   portfolio managers at regular partner meetings.

14          Here's the timeline.  This is what we're going to show

15   you over the next two weeks and this is the timeline of

16   Mr. Bodner's knowledge.  He's involved in every single one of

17   these issues and events.  We have emails to show it.  We have

18   calendar invites for the dinner meetings and the partner

19   meetings.

20          Here's the kicker.  I showed you April 2016 NAV

21   statements with just those four assets.  The ones that I

22   mentioned that were actually zeros by that time, that's nearly

23   $300 million that they're saying existed that actually didn't.

24   That one circle in January of 2015, Mr. Bodner was given a

25   presentation by a portfolio manager, who you're probably going

1    to hear from, his name was David Steinberg, and another

2    gentleman who owned that T-shirt business who you definitely

3    are going to hear from, his name was Seth Gerszberg.   In that

4    presentation, it literally says that these oil and gas assets,

5    the Over Everything company and others are zeros.   He was told

6    this in a desperate attempt to raise more money.   They were

7    asking for his help and he refused.

8            Now, refusing is not why he's on trial.   He's on trial

9    because he had special knowledge and a duty to speak up to stop

10   this thing.   He was even a fiduciary.   You'll be instructed

11   about what a fiduciary is, someone who is a senior person in an

12   organization that commands respect, whose investors believe he

13   has oversight power.   By not disclosing the truth at that time

14   and every other time before it, way back to that Black Elk

15   explosion in 2012, which he definitely knew about, he breached

16   his duties and committed what the law considers fraud, because

17   when you know something is going on and you don't speak up and

18   you know something's going on and you don't stop it, that's

19   fraud.

20           In fact, even before that presentation, next circle,

21   Mr. Bodner and his partners held one of their regular dinners.

22   That's how they would hold their partnership meetings, they

23   would go to out to dinner and they would talk about the

24   business of the fund.

25           You are going to hear testimony about a very heated

dinner where Mr. Bodner and Mr. Fuchs were yelling at each

other.  Mr. Bodner was saying the assets were off.  Mark

Nordlicht was mismarking the funds, high, not low, and as a

result — and this shows you his power — Mr. Bodner issued a

decree that no partners, himself, Murray Huberfeld, Mark

Nordlicht, Mr. Fuchs, and the deceased, Uri Landesman could

take any money out of the fund from that point forward and his

directive was followed.  He was in charge, but that act wasn't

enough.  He could have stopped this thing in its tracks.  The

stated reason you will hear from Mr. Fuchs was optics.  It

would look bad if partners were taking their money out of the

fund.  He could have said we need to wind this thing down and

appoint someone like Mr. Trott.  We need to tell investors the

truth, that a lot of their money had been lost, not all, but a

lot.  He didn't, and that was a breach of duty and that was a

fraud.

          THE COURT:  You have basically reached the end of your

time, but I'll give you a minute or two to finish up.

          MR. GLUCK:  Thank you.

          As I've said, there was some background issues.

You'll hear some stuff about some SEC investigations.  They

were looking at the same thing, which he knew about, and there

were criminal investigations.  They were looking at a number of

things that he knew about, too, none of which is great for a

fund.

MBUCpla2                        Opening - Mr. Gluck

1              With my last couple of minutes, we're going to be
2      seeking monetary damages for the fees that they got but they
3      shouldn't have got, the fees that he personally got but he
4      shouldn't have got, the fees that the management company
5      received and they shouldn't have received.  Remember, he had
6      that office in the management company, he was using their
7      resources.  He could have stopped this, but he didn't, and
8      there's real damage as a result.
9              The last thing I'm going to mention is something
10     called the release.  This is the big defense in this case.
11     Just before that April statement when the walls are crashing
12     in, when there's criminal investigations and SEC
13     investigations, there is another desperate plea to bring in
14     someone to help this management company, not PPVA, Platinum
15     Management New York.  And the proposal, as you can see on your
16     screen, was to remove David Bodner and Murray Huberfeld from
17     three layers down of having a beneficial interest in the Mark
18     Nordlicht trust, and replace them with this guy named Marcos
19     Katz, who was also a big investor in the fund and was
20     considering taking over those interests.  That's all.  None of
21     that would have helped or affected PPVA the fund.  They were
22     just getting ready for a deal to swap out these beneficial
23     interests in the management company and they didn't.  This deal
24     never went through.  David Bodner, Murray Huberfeld demanded a
25     complete release for everything they had done wrong, and that

1   release was signed by none other than Mark Nordlicht, who at

2   the time was the head of this Platinum Management company and

3   yes, he could bind PPVA, but he's one of the coconspirators.

4   He's the one who approved all these valuations, he's the one

5   who committed the fraud and the tort in addition to

6   Mr. Huberfeld and Mr. Bodner.

7          What we will ask you to find is not only was this of

8   zero value to PPVA, but it is fundamentally against public

9   policy for this release to be upheld and to have validity,

10  otherwise fraudsters could just release each other at any time

11  and never pay the consequences.  This cannot be upheld.

12         We will prove all of these things to you over the next

13  two weeks through witnesses with firsthand knowledge who are on

14  the ground when the water was being pumped, CEO of Black Elk,

15  Mr. Fuchs, two experts, one specializing in hedge funds, the

16  other specializing on the numbers side, the valuation side, and

17  we will convince you that, a, we have met our burden, that

18  there was a fraudulent overvaluation, Mr. Bodner knew about it

19  and did nothing and, in fact, helped it when he had this

20  Beechwood entity, and they will have failed to demonstrate to

21  you that this release should be upheld.

22         Thank you.

23         THE COURT:  Thank you very much.  We'll hear now from

24  defense.

25         MR. LAUER:  Thank you, your Honor.

MBUCpla2                       Opening - Mr. Lauer

1          Good afternoon.  As Judge Rakoff has introduced us,

2     I'm Eliot Lauer, I represent David Bodner, and together with my

3     colleague, Dave Hertzberg, Julia Mosse and Nathaniel

4     Ament-Stone from whom you'll be hearing a bit during the trial,

5     we're here for Mr. Bodner.  We do not represent Platinum

6     Management, we do not represent Mark Nordlicht, we do not

7     represent the managers of the fund.  I don't have a lot of time

8     in the opening to respond to each and every comment, but I have

9     confidence in you that you await to see that if those comments

10    can actually be supported with evidence.

11         You may be familiar with the famous children's story,

12    the Emperor's New Clothes.  This is a story about two swindlers

13    who come to town.  They convince a gullible king that they have

14    magical fabric from which they can make a magnificent robe for

15    the emperor.  The fabric is so special that only wise men can

16    see the fabric.  The emperor is so excited, he can't see the

17    fabric, he certainly won't admit it.  All his ministers come,

18    they look at the fabric and pretend to see it.  The swindlers

19    pretend to cut the cloth, measure the emperor, put on this

20    magical robe.  Finally, the day comes, they put the robe on the

21    emperor, he opens the door to the square to greet his people.

22    None of the adults in the crowd will acknowledge what they know

23    to be true, they don't see the clothes, but they won't admit

24    it.  Finally, a young child, who has not been briefed on the

25    magical qualities of the cloth, sees the emperor and excitedly

MBUCpla2                        Opening - Mr. Lauer

1    shouts, the emperor has no clothes.  This was a classic tale of

2    spin over substance.

3          You may find the liquidator's case against David

4    Bodner, who's the only defendant in this case, is likewise a

5    case of spin, but not substance.  It has no clothes.  They

6    claim that David Bodner is the invisible man behind the

7    invisible curtain, that he had decision-making authority at

8    Platinum and that he controlled the affairs of PPVA.  As you

9    observe the testimony, as you observe the documents, ask

10   yourself whether you see the clothes.

11         We submit there will be no evidence that Bodner

12   controlled PPVA, there will be no evidence that he somehow

13   controlled Mark Nordlicht, who legally and contractually and

14   actually ran PPVA.  There will be no evidence that he had

15   decision-making authority.  There will be no evidence he had

16   anything to do with valuations.

17         Plaintiffs' case is about three things.  They claim,

18   A, that Bodner was in control; B, that even though he had

19   nothing to do with creating valuations, somehow he came to know

20   that six of these assets were fraudulently inflated, supposedly

21   to steal incentive fees and management fees from PPVA; and C,

22   that David Bodner did nothing to stop this supposed stealing

23   when they had the authority to shut it down.

24         You may find that there is no evidence in this case

25   that David Bodner ever came to know that the assets were

1    fraudulently inflated.  Indeed, when plaintiffs suggest or say

2    that Bodner knew, ask yourselves if they actually show you

3    evidence during this trial of exactly what it is that he knew

4    and exactly how it is they say he came to know it.

5            You may find also that plaintiffs like to focus on

6    this early 2015 meeting.  What they like to ignore is that long

7    before this 2015 meeting that my colleague mentioned, Platinum

8    Management had suspended taking incentive fees.  So PPVA was no

9    longer being forced to pay these fees because there was no

10   money.  They weren't selling assets to pay the fees.

11           This case, as my colleague mentioned, is about a

12   fourth thing, and this is important.  It's a signed agreement

13   in which Platinum, PPVA, Bodner, Huberfeld, Fuchs, Landesman,

14   and others released each other from any claims.  The plaintiffs

15   in this case claim that you should ignore the release because

16   it was a fraud on PPVA.  You may find, when we show you the

17   evidence, the exact opposite, that the release transaction was

18   designed to allow Bodner and Huberfeld to basically retire from

19   having any ownership in Platinum and allow Mark Nordlicht to

20   bring in some billionaires, Marcos Katz, Victor Hannah, who

21   Mark was trying to get $100 million to put into Platinum and

22   the funds so these oil and gas assets could be funded, he could

23   pay for the drilling, he could pay to get the reserves out of

24   the ground.  One thing you're not going to hear is any dispute

25   as to the millions and millions and millions of barrels of oil

that was in the ground.  The problem was you need money to get

it out.

David Bodner and Murray Huberfeld started Platinum

Partners Value Arbitrage Fund in 2003.  To run the fund, they

brought in Mark Nordlicht, who was an experienced commodity

trader.  Murray Huberfeld was going to run, during a period of

time, the lending side of the business, but the deal was David

Bodner made it very clear, I'm going to put many millions of

dollars in to seed the fund, I'll be an investor, I'll put

money in the fund, as well, but I have no interest in running a

hedge fund, I don't want to be part of management, I don't want

anyone reporting to me, and I don't want to supervise anyone.

That's how it went for the duration of the fund.

The case centers on 2013, 2014, 2015, and the first

three months of 2016.  PPVA was managed by Platinum Management,

and you'll see documents in this case where we show you that

the way it was structured, Mark Nordlicht controlled 75 percent

of the shares of Platinum Management and therefore, he didn't

need to talk to anyone or get anyone's approval or agreement in

running Platinum Management or in running the fund.  He was the

boss.  Everyone else were limited partners.  They had an

interest, they had money up, they're entitled to get briefings,

but they're not inside.  There's a very big difference you may

find between having an interest, being an owner, and being on

the inside.

MBUCpla2                       Opening – Mr. Lauer

1          I'm going to show you a composite chart which shows
2     you all of the managers, accountants, executives, lawyers,
3     compliance people at Platinum Management during the period
4     January 1, 2013 through March 31, 2016.  Not everyone was there
5     throughout the period, but you see all those individuals.  The
6     point of this is, one, there's no mention of David Bodner.  But
7     significantly, you will not hear testimony or evidence that any
8     one of those individuals reported to David Bodner or was
9     supervised by David Bodner or shared weekly, monthly, or annual
10    reports with David Bodner.  They were running the fund, they
11    were managing PPVA, and David Bodner was an outside owner and
12    they did not work for him or report to him.
13          You'll hear about something called ADV forms, which
14    are filed with the Securities and Exchange Commission listing
15    anyone who's considered a control person.  These forms, which
16    we'll show you the one filed in 2014, which was signed by
17    Oliver Jimenez, who was the compliance officer, the one filed
18    in 2015, which is signed by David Ottensoser, who at one time
19    was general counsel and compliance officer, and these forms
20    list all of the people.
21          In fact, we'll show you a page, 16, 17, and 18 from
22    DX 181, this is the one signed by Oliver Jimenez, and you will
23    see beginning at the bottom, that's the beginning of the chart
24    going onto the next page.  I'm running through this quickly,
25    but during the course of the trial, you'll get to see this

1    close up.  Those are the listings of people in different

2    positions at Platinum, and some of them are listed twice who

3    were deemed control persons, and it's up to the compliance

4    people and the lawyers to decide who to put on.  Obviously

5    David Bodner is not listed.

6              PPVA had a valuation committee designed to decide what

7    were the values each month of these various assets.  That's a

8    composite of the members of the valuation committee.  Again,

9    during this three and a quarter period of time.  A lot of

10   people, lot of people dealing with valuations.  You can imagine

11   trying to figure out what's the value of an oil and gas

12   development property when one month, oil can be $60, the next

13   month, it is $40, and the next month, oil is $100.  And

14   basically the way you value these companies is to guesstimate

15   how much oil will come out of the ground over the next number

16   of years and, if so, what's the price of oil going to be when

17   the oil comes out.  So there's a lot of conjecture.

18             You'll find that the way they do their valuations is

19   they come up with wide ranges.  You can have a valuation of an

20   oil and gas field that could run anywhere from $250 million to

21   $350 million, and anywhere in that range, the accountants and

22   the value waiters will tell you is reasonable because there are

23   so many variables.  Who knows exactly what oil will be selling

24   for or exactly how much oil you will actually get out of the

25   ground during some period of time.  No one on the valuation

MBUCpla2                        Opening – Mr. Lauer

1    committee submitted reports to Bodner, communicated with Bodner

2    about any of the valuation issues.

3          PPVA also had auditors on an annual basis.  They would

4    come in and submit, under law, audited financial reports with

5    their auditor's opinion.  For example, we will show you the BDO

6    independent auditor's report on their audit of PPVA for 2013,

7    this included Black Elk.  This is a year after the explosion.

8          By the way, the explosion obviously had an impact on

9    the business, but during the course of the trial and when

10   you're asked to review this case, you have to connect the

11   rhetoric and the event with the dollars.  In other words, no

12   one will dispute that having an explosion on an oil and gas

13   well is something that you don't want to have, but does it have

14   a $50 million impact, a $100 million impact, is it covered by

15   insurance?  All those things need to be considered.  And what

16   you'll see, according to the audited financials that BDO signed

17   off on, which is DX 569, they said in their opinion, as of

18   December 31, 2013, this is a year and a quarter after the

19   explosion, PPVA's numbers were set forth in accordance with

20   generally accepted accounting standards.

21         At that time, Black Elk was listed as having a value

22   of $148 million, and that was confirmed by the auditors.

23   Golden Gate, an oil and gas development property in California,

24   was confirmed at a value of $173 million.  For 2014, Cohn

25   Reznick's independent auditors report gave PPVA and the

MBUCpla2                        Opening - Mr. Lauer

valuations a clean opinion, and there the principal assets were

Golden Gate, now valued at only $140 million because of the

drop in oil prices.  And Northstar, the one that was mentioned

and included the Black Elk assets, but also new assets that

were put in, $138 million.

        The auditors communicated with key people at Platinum,

and you'll see various forms from their work papers of who the

principle members of management were.  You will see their fraud

risk inquiry form listing the management personnel that they

interviewed.  They talked to Manela, Nordlicht, Mandelbaum,

Ottensoser, Sasha.  You'll see a separate list from the work

papers of key employees they interviewed.  SanFillipo, Duch,

Friedman, Rakower, none of them communicated with Bodner and

apparently no one ever told any of the auditors that Bodner was

the man in control or someone that they should speak to.

        You would think if Bodner had decision-making

authority and had knowledge of, if you will, how the sausage

was being made, you would see communications and they would

show you communications on a regular basis from the managers,

such as, Mr. Bodner, or David, here's our proposed valuation

for this month, what do you think.  Here's our financial

statements, here's a script Mark Nordlicht is going to use this

month when he does the call with investors.  Here are the

weekly reports from each of the portfolio managers on each of

the businesses so you have detailed knowledge of what's going

MBUCpla2                          Opening - Mr. Lauer

1    on.  In short, the kind of regular detailed information you

2    would expect a boss to receive if he or she were actually

3    managing the company.

4           Instead, you're going to find miscellaneous emails

5    here and there which prove just the opposite.  Indeed, if

6    Bodner had decision-making authority, you would think he at

7    least could write a check at Platinum Management.  Another

8    document that you'll see from the audit work papers is a signed

9    written consent form given to the auditors by Platinum

10   Management, that's the one that was given to Cohn Reznick, and

11   it lists all the individuals who can sign checks, who have

12   authorization with respect to any of the bank accounts under

13   the control of Platinum Management.  Bodner cannot even write a

14   check for Platinum Management without asking someone's

15   approval.  He had no check writing authority.  Indeed, he was

16   so not in management that when Mr. Trott took over beginning in

17   the summer of 2016, and he was there for a number of months,

18   apparently no one told Trott that Bodner was such an important

19   person that Trott should speak with him.  Trott did not reach

20   out to Bodner, didn't even know Bodner had a role.  That's how

21   uninvolved Bodner was in actually running the business.

22          Now, you've heard about the management fee and the

23   incentive fees.  In addition to receiving a portion of the

24   incentive fees, because he was an owner and a founder, Bodner's

25   family had over $40 million invested in the funds.  Some of it

MBUCpla2                        Opening – Mr. Lauer

 1    was in the PPVA fund and some of it was in the sister fund,

 2    PPCO.  The other managers, Huberfeld and Nordlicht, also had

 3    significant family money.  This was his major investment and as

 4    you can imagine, it was all lost.  This isn't a case of Bodner

 5    leaving other people holding the bag, he lost his entire

 6    investment.

 7            Now, as a founder and as an investor, he was given an

 8    office, a shared office, a shared secretary at Platinum, and he

 9    would come in several times a week to work on his own

10    investments, to occasionally meet with Nordlicht and others

11    because they had a number of charity activities that they did

12    together, and they had private developments outside of

13    Platinum, and from time to time someone would consult him on a

14    Platinum Investment, but he's not on the inside.

15            Now, you may find that giving someone an office or a

16    shared secretary doesn't make them in control.  For example,

17    Michael Katz, one of the JOL's listed witnesses in this trial,

18    was given an office because his family had a large investment

19    and he needed a place to work.  He was even given a Platinum

20    email address.

21            Similarly, Bernie Fuchs, who you will hear from,

22    another listed witness, before he became a partner for a number

23    of years had an office there because he also was an important

24    investor.

25            Testimony and documents will show you how out of touch

1   with the details Bodner was.  And I'm going to show you an

2   email that was exchanged between Mr. Nordlicht and his

3   executive colleague, David Levy.  If you look at the bottom of

4   that email, it starts at the very bottom, mark Nordlicht says,

5   stop talking to Bodner, please.  How many times do you have to

6   do that.  And Levy says, about what?  What happened now?  And

7   then Nordlicht says, he is a busy body.  Just control the

8   information flow to him, please.  Better yet, don't talk to

9   him.  And then Levy says, okay, I don't think I said anything

10  bad to him, I will tell him I don't know when he asks.

11          You may find from your own experience a busy body is

12  not the boss, nor does it seem the managers, Nordlicht, Levy,

13  the others are sharing critical information with him.

14          You've heard a little bit about these level 3 assets,

15  which are basically hard to value assets because they're not

16  traded on an exchange and they're unique.  How do you value

17  three thousand acres in California that has oil in the ground

18  and you need to figure out where to put the drills and how to

19  do the drilling?  Do you go straight down?  Do you do it

20  diagonally and so forth?

21          One thing is clear, Golden Gate, the oil property in

22  California, had 18,700,000 barrels of proven reserves.  If you

23  think about it, at just $60 a barrel, that's close to a billion

24  dollars if you get it out of the ground, minus your expenses.

25  That's how they were doing these valuations.  You look at the

MBUCpla2                      Opening - Mr. Lauer

1    engineering reports demonstrating what's in the ground and you

2    estimate how much will it cost you to get it out of the ground

3    over what period of time and what is the prediction for oil

4    prices during the period of time that you get it out.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MbuwPla3                    Opening – Mr. Lauer

1              MR. LAUER:  Just one other word on Black Elk because

2    an explosion resonates, and my colleague spent a lot of time on

3    that.  The explosion was in November of 2012.  Their expert,

4    Mr. Quintero, who came in and expressed his opinion on when the

5    assets in PPVA were inflated, has expressed an opinion that as

6    of December 31, 2012, there was no inflation.  His report

7    starts January 1, 2013.  So after the explosion, he does not

8    express an opinion that the Black Elk asset was actually

9    inflated.  So what that means is they adjusted whatever the

10   values would have been to include any accommodation that

11   insurance did not cover, if it didn't cover it fully.

12              Now, Quintero is going to come in and he is going to

13   say he didn't do valuations the way the valuing people did,

14   Alvarez & Marcel and Sterling; he didn't do valuations the way

15   the auditors did, which is look at the reserves and try to

16   estimate what the value will be when the oil comes out of the

17   ground.  He didn't do any of that.

18              What he did is he looked at what happened after the

19   meltdown at Platinum and he said, well, if that's all you have

20   got after the meltdown, well, I'll work backwards and use that

21   as the basis for my calculations.

22              And you may find his work is like taking a price in

23   early in 2020, during the COVID -- let's say March or April of

24   2020, when things went way down because of the lockdown, and

25   using those numbers to value something six months earlier in

1    2019 when the economy was robust.  Think of that when you hear

2    Quintero and wait for us to examine.

3          Because investors come and go with a hedge fund, if a

4    hundred million dollars goes out and 50 million dollars comes

5    in, there is going to be a deficiency of 50 million, and that's

6    what happened to platinum in 2014 and 2015.  People took money

7    off the table because Platinum had been doing well and there

8    was a significant imbalance.  It's what we call a liquidity

9    problem.  They didn't have money and they had to use as much

10   money as they had to pay investors who were pulling money out

11   of the fund and that meant that they couldn't put money into

12   the oil and gas wells.  So if they put money in the oil and gas

13   wells, they had to delay the withdrawals by the investors.  It

14   created a lot of stress.

15         You will see that beginning in the early part of 2014,

16   the early part of 2014, this is before Bernie Fuchs became a

17   partner, they stopped charging the dollars for the incentive

18   fees.  By 2015, Mark Nordlicht was keeping the money in the

19   fund to run these assets.  They stopped taking some of the

20   management fees.  In fact, Nordlicht mortgaged an apartment to

21   get $7 1/2 million to put into the fund in order to pay

22   salaries and keep the fund going so as not to hurt the oil and

23   gas assets.

24         At this meeting that he talked about, you are going to

25   see that David Bodner expressed a view that Mark was

MbuwPla3                           Opening – Mr. Lauer

1   essentially encouraging people to take money out and Mark

2   Nordlicht told David Bodner:  You have no idea what you are

3   talking about.  You don't know how to run a fund.  Go back to

4   Monsey where you live and that was the end of it.

5        Bernie Fuchs didn't cut and run.  Nobody cut and run.

6   They continued to believe in Mark, they continued to believe in

7   that fund, and for a year a half they worked diligently to try

8   to save the fund.

9        So I am going to talk a little bit about this release.

10  2016, Mark Nordlicht is desperate to get money into the fund.

11  He says to Huberfeld and Bodner:  You guys have been partners

12  for a long time, you have been clipping coupons, you have been

13  taking the money from the fees, and you are not putting

14  anything back.  Will you put new money in so we can have some

15  liquidity?

16       And Bodner and Huberfeld said:  No.  We don't want to

17  put any more money in.

18       And Nordlicht said:  So will you withdraw or retire

19  from the fund so I can offer your shares to someone else?  I

20  have got Marcus Katz who is a Mexican billionaire.  He is

21  already an investor in the fund.  He will come in.

22       They agreed to step out and, as part of that release

23  transaction, we are going to show -- we will show you during

24  the course of the trial—because I am running out of time—we

25  will show you the signed release agreement in which Murray

MbuwPla3                    Opening - Mr. Lauer

1    Huberfeld and David Bodner agreed to give up their interest and

2    Mark then offered that interest to Marcus Katz.

3           Marcus Katz got to the point of signing a series of

4    complex business agreements with Platinum.  But the day after

5    the signed agreements were submitted, in June of 2016, Murray

6    Huberfeld was arrested on an unrelated matter that had nothing

7    to do with David Bodner, and basically one thing led to the

8    other and the fund collapsed.  But you will see in the evidence

9    that this agreement was not one fraudster, if you will, helping

10   another fraudster but, rather, one very desperate but sincere

11   manager trying to get money into a fund.  He was going to get

12   at least $10 million from Marcus Katz to start and he was

13   looking to get $50 million from a guy named Victor Hanna who

14   was going to put money in and that money will enable the fund

15   to survive, and that's what this is going to be about.

16           I want to say one last thing.  Bodner and Huberfeld

17   left the fund.  They performed their part of the agreement.

18   Bernie Fuchs signed that release agreement releasing them, and

19   he was so annoyed when the JOL sued him in this case, along

20   with David Bodner, later he settled with the JOLs, he filed a

21   cross-claim against David Bodner saying:  I'm blaming you.

22           We sent his lawyer the release agreement.  We said:

23   This is a valid release agreement.

24           The lawyer said:  Well, Bernie didn't tell me.  I

25   didn't know about this.  You are absolutely right, this release

MbuwPla3                       Opening - Mr. Lauer

1   agreement is a valid, binding, enforceable agreement, and they

2   dropped the claim.

3           So I will have the opportunity at the end of this case

4   to sum up this evidence.  Our argument, as the Court has

5   instructed you and will instruct you, is just argument, but I

6   will have the opportunity in a more organized fashion to show

7   you (a) that they will not offer you evidence, proof that

8   Bodner directed anything at Platinum Management.  He clearly

9   had an interest, but he was on the outside.  He was a busy

10  body.  They weren't sharing detailed information with him.  He

11  never had any detailed information that could challenge the

12  valuations that Mark Nordlicht was using.

13          Two, we are going to show you that he never came to

14  know that these assets were fraudulently inflated.

15          And (c) and you can end it right there, you are going

16  to see that the purpose of this release was total good faith,

17  totally -- total good faith of guys who basically said, okay,

18  we have made enough, we are retiring, we see that the fund is

19  teeter-tottering, and if new money doesn't come in, this fund

20  may not survive.  Take the money from Katz.  Take the money

21  from Hanna.  We are walking out.  We didn't run the fund.

22  Bodner didn't run the fund.  Traditionally, when you exit a

23  business, you get a release.

24          And by the way, one last thing.  This release was

25  approved by Marcus Katz's lawyer.  And you are going to hear

MbuwPla3

from Marcus Katz's lawyer, Isaac Neuberger.  He is a senior

partner in a prestigious Baltimore law firm.  He is going to

come here and he is going to tell you that this was a real

deal, Marcus Katz was going to put money in.  He is going to

tell you who Marcus Katz was and what he would have represented

to this fund if he was in this fund.  And you are going to see

that with that money and with the 50 million they were trying

to get from Victor Hanna, they could have saved this fund.  It

didn't happen, but that doesn't change the release, which was

not dependent on Katz or Hanna.

          I appreciate your attentiveness, and I look forward to

addressing you again in a more coherent fashion at the end of

the evidence to show you, and I hope you will find, then, that

David Bodner did not control, did not know.  And frankly you

will not see, I think, that the emperor has clothes.  Thank you

very much.

          THE COURT:  Thank you very much.

          So ladies and gentlemen, don't worry about the fact

that you have now heard about lots of names and lots of events.

All of this will be made very clear to you as we move forward.

It always is hard just at the beginning to follow absolutely

everything, but that's why we have two weeks to do it and not

just one hour.

          Normally we take our lunch at 1:00, but I think maybe,

given where we are at, it makes more sense to take our lunch

MbuwPla3

now.  And even better, normally I would give you an hour, but

I'm going to give you an hour and a quarter because I have to

take up some matters with counsel.  So -- and I want to give

them a lunch break, too.  So we will break for lunch now and we

will resume at 1:50.  Have a very good lunch.  We will see you

then.

                    (Continued on next page)

MbuwPla3

1                    (Jury not present)

2              THE COURT:  Okay.  So Mr. Ostrove called back and he

3    has now been authorized to arrange Mr. Gerszberg's appearance

4    here in court.  I, of course, am very disappointed that I

5    didn't have to send out the marshals, but I will survive

6    somehow.

7              Mr. Ostrove says the best way to reach him is at his

8    cell number, which you already have, but just again for the

9    record it is 732-489-6241.  However, while you should only talk

10   to Mr. Gerszberg after you receive permission to do so from

11   Mr. Ostrove, Mr. Ostrove thinks at the end it may be simplest

12   just to talk directly to Mr. Gerszberg, and he did tell my law

13   clerk that we could give you Mr. Gerszberg's number, which is

14   848-330-0880.  Let's start with Mr. Ostrove.

15             Now, let me find out what was the problem with the

16   witness that the defense had a problem serving?

17             MR. AMENT-STONE:  Thank you so much, your Honor.  I'll

18   try to be brief on this.

19             This motion was to Mr. Murray Grenville, who is the

20   founder and CEO of Sterling Valuation Group, which performed

21   valuations of PPVA assets for most of the relevant period

22   through, I think, the second quarter of 2015, so his testimony

23   is important for that reason.

24             We first began trying to serve him in February and

25   March of this year.  We were in discussions with Todd Harrison

MbuwPla3

         1    of McDermott Will & Emery, who we understood to be his counsel

         2    because he is his counsel in a Platinum-related litigation

         3    actually, which is -- which was brought against Sterling, to

         4    represent Sterling in that matter, and he spoke with us about

         5    the subpoena.  We had back and forth——even, I would say,

         6    negotiations——over the course of several months.  we attempted

         7    to serve Mr. Grenville at Sterling's offices in Manhattan,

         8    where access was denied.  We attempted to serve at his home in

         9    Jersey City and found out that he was in Hong Kong and expects

        10    to be in Hong Kong for an indeterminate time.

        11            We spoke with Mr. Harrison, who proposed that a

        12    pretrial deposition be taken, and I believe plaintiffs did not

        13    want to proceed in that manner.  And we understood Mr. Harrison

        14    to be working with us on behalf of Mr. Grenville.  He then

        15    later said to this Court that he doesn't represent

        16    Mr. Grenville in this matter.

        17            So in sum, we have tried I think eight formal service

        18    attempts in addition to a lot of e-mail correspondence and

        19    phone calls with Mr. Harrison between February and November of

        20    this year.

        21            THE COURT:  Let me start with Mr. Harrison.  What's

        22    his phone number?

        23            MR. AMENT-STONE:  So I only have his office number

        24    which is 212-547-5727.

        25            THE COURT:  Okay.  And do you have any phone number or

MbuwPla3

1    e-mail for Mr. Grenville?

2              MR. AMENT-STONE:  Well, there would be his Sterling

3    e-mail address.  I don't think we have a phone number for him.

4              THE COURT:  This is the company that he is the head

5    of?

6              MR. AMENT-STONE:  Yes.  He is the CEO of Sterling.

7              THE COURT:  The company's principal place of business

8    is in Manhattan?

9              MR. AMENT-STONE:  Madison Avenue, yes.  And we did

10   attempt formal service at that office, but access was denied to

11   the process server.

12             THE COURT:  All right.  Let's first start with

13   Mr. Harrison and see what we can do.

14             (Pause)

15             THE COURT:  So there is no answer at the number you

16   gave me for Mr. Harrison and no voice mail.  Is he with a law

17   firm?

18             MR. AMENT-STONE:  He is with McDermott Will & Emery.

19             THE COURT:  What's their main number?

20             MR. AMENT-STONE:  Let's see here.  We also do have an

21   office phone for Mr. Grenville.  However, we do understand he

22   is in Hong Kong, so I'm not sure if the number is forwarding.

23             THE COURT:  Well, let's start with McDermott.

24             MR. AMENT-STONE:  McDermott, 212-547-5400.

25             THE COURT:  What's Mr. Harrison's first name?

MbuwPla3

1          MR. AMENT-STONE:  Todd.

2          THE COURT:  Excuse me?

3          MR. AMENT-STONE:  Todd, T-O-D-D.

4          (Telephone conversation between the Court and Todd

5   Harrison)

6          THE COURT:  So you heard all that, but just for the

7   record, I had a delightful conversation with Mr. Harrison and

8   he reiterated that he doesn't represent Mr. Grenville for these

9   purposes.  He said that Mr. Grenville felt he had been dragged

10  through the mud, was his term, for something that he shouldn't

11  have been involved in at all.  And I said, you know, that may

12  or may not be, but that doesn't justify evading service.

13         So he is going to reach out to Mr. Grenville and

14  report back to my law clerk at 9 a.m. tomorrow, and I am quite

15  confident that we will, as we did in the case of the other

16  witness, get a prompt resolution that will be satisfactory.

17         All right.  I suppose you actually want to have lunch.

18  Well, all right.  So we will see you in an hour.

19         COUNSEL:  Thank you.

20         (Luncheon recess)

21

22

23

24

25

Mbu2Pla3

1                    A F T E R N O O N    S E S S I O N

2                              2:05 p.m.

3           (Jury not present)

4           THE DEPUTY CLERK:  May I bring in the jury?

5           THE COURT:  Yes.  Let's get the witness on the stand.

6           MR. GLUCK:  Plaintiff calls William Post.

7           (Continuend on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mbu2Pla3                    Post - Direct

1          (Jury present)

2          THE COURT:  The jurors can always be seated right away

3    when you come to your seats.  We are standing in honor of you.

4    You are the boss, but you get to sit down.

5          Now everyone else can sit down as well.

6          So let's swear in the witness.

7          THE DEPUTY CLERK:  Do you want to call your witness?

8          MR. GLUCK:  Yes.  The plaintiff calls Mr. William

9    Post.

10    WILLIAM POST,

11        called as a witness by the plaintiffs

12        having been duly sworn, testified as follows:

13          THE DEPUTY CLERK:  Please state and spell your full

14    name for the record.

15          THE WITNESS:  My name is William Post, or Bill Post as

16    I am known professionally.  My first name is W-I-L-L-I-A-M,

17    last name Post, like post office.  And my first name I use

18    professionally is Bill.

19          THE COURT:  Counsel.

20    DIRECT EXAMINATION

21    BY MR. GLUCK:

22    Q.  Mr. Post, thank you for being here today.

23          Have you been engaged by Mr. Martin Trott,

24    Mr. Christopher Smith, and Platinum Partners Value Arbitrage

25    Fund, which I will refer to as PPVA or "the fund," to act as an

Mbu2Pla3                         Post - Direct

1   expert witness in this matter?

2   A.  Yes, I have.

3   Q.  Would you please provide a brief synopsis of your

4   experience in the hedge fund industry for the jury.

5   A.  Yes, I will.  Can I start with my academic background?

6   Q.  Of course.

7   A.  I am 68 years old.

8           THE COURT:  Is that part of your academic background?

9   A.  I attended the University of Virginia and received a

10  degree.  I am a Viet Nam era veteran.  When I graduated from

11  University of Virginia, I became a naval officer, and in the

12  Navy I was a finance and logistics officer.  After graduating

13  from the University of Virginia, I attended the Navy

14  postgraduate school and finished a program in finance, and then

15  for the remainder of my naval career I was the chief financial

16  officer at two naval air stations on the west coast.

17          I then attended law school, graduated, and practiced

18  law as a securities attorney, where I represented hedge funds

19  and investment organizations.

20          After approximately eight years as being a lawyer, I

21  became a stockbroker and became an investment professional for

22  another almost 30 years.

23          My other academic qualifications is that I am a member

24  of the CFA organization, which is the professional organization

25  for investment managers.  I have also completed a program at

Mbu2Pla3                          Post - Direct

Harvard Business School in investment management.  I have also

completed the financial analyst program at Northwestern

University.  And I am also a lecturer at the University of

California Berkeley campus in the Haas Business School, and I

teach stock market dynamics.

        My career as an investment professional started out,

as I mentioned, as a stockbroker and I eventually became a

portfolio manager.  I have been the chief investment officer of

many organizations.  I have been the CEO and also the chief

compliance officer of an SEC-registered RIA, which is very

similar to Platinum or if not identical, which is one -- the

entity that we are going to be talking about today.

        I was also the president of the alternative asset

business at Franklin Templeton, a company you may know.  While

I was there, I ran a hedge fund of funds, and what that was, it

was two different investment strategies where we employed --

        (Court reporter confers)

A.   Fifteen hedge funds.  We had two funds with 15 managers in

each fund, and to select those 30 managers for those two

different funds, I have probably interviewed close to a hundred

hedge funds and examined their management, their investment

activities.

        For the last eight years I have been an expert witness

in investment fraud and investment schemes.  I have been an

expert witness in over 25 matters.  I am currently working for

Mbu2Pla3                         Post - Direct

the Securities and Exchange Commission in their enforcement

division.   I worked on one of the largest -- second largest

hedge fund Ponzi scheme, which was the Allen Stanford Ponzi

scheme, where there was $10 billion stolen from investors.   I

have worked on several other Ponzi schemes.   I have worked on

many investment matters related to hedge funds and investment

organizations.

         I am an expert in investing money and I am an expert

in how investment organizations, including hedge funds, are

managed and operated.   I understand the ownership structure of

these types of organizations.   I understand how fundraising is

conducted.   I understand the relationships between limited

partners and passive investors in the management team, and I

have testified and been hired as an expert many times on

various schemes where investment management companies hide

their activities or try to deceive their investors and/or

government and regulatory agencies.

Q.   Thank you.

         In connection with your role overseeing those roughly

40 investment managers, your fund-of-funds oversight, what was

your job in respect of supervision in terms of how those hedge

fund managers were performing their roles?

A.   Well, those two funds had an investment strategy.   And so

we originally -- our first step is to figure out whether we can

find the hedge fund that is doing the type of investing that

Mbu2Pla3                          Post - Direct

1    matches our investment goal.  But the real devil is in the

2    details.  It is not just that they say they can do something

3    like these hedge funds, it's actually whether they are

4    competent investment professionals.  So do they do a good job

5    of investing your money?

6            But then there is also a question about whether or not

7    they also have the capability.  Just because you are a good

8    investor doesn't mean that you are a good manager of the

9    business.  So we looked very carefully at the management of

10   those hedge funds, which is just the day-to-day operations, as

11   well as looking at their investment management operations.

12           And so and then we also -- once we hired them, we were

13   very concerned about monitoring their activities and making

14   sure that they didn't deviate from their investment strategies.

15   But also if they had changes in personnel or in their ownership

16   structure or management team, that we identified those and

17   continued to monitor them.  So we would go back to those funds

18   on a very regular basis, at least twice a year, go to their

19   offices.  We would talk to the people who were running the

20   business we would talk to their employees.  We would make sure

21   that they were in compliance with the Securities and Exchange

22   Commission rules and regulations.

23           So it's very important in the investment business that

24   you follow these guidelines because you are there obviously to

25   make money for the investors, but you have to protect the

Mbu2Pla3                          Post - Direct

investors and you also have to make sure that you are in

compliance with a variety of things that allow, for example,

the SEC to come in and examine your books and records and the

way you operate.  They want to know that you are doing things

according to Hoyle.  So it's really crucial when you are

looking at these businesses that you look into all those

details, make sure that they are presenting reports and doing

things correctly.

          So I learned a lot in interviewing a hundred different

hedge funds and their management teams about how hedge funds

operate, how they are managed, how they make investment

decisions, how their valuation committees work, how they

produce reports, how they raise money, how they administer

their funds when people are investing new monies into a fund or

withdrawing money, etc.

Q.  Thank you.

          In connection with this case, Mr. Post, were you asked

to analyze the structure of Platinum -- PPVA's hedge fund

manager, Platinum Management?

A.  Yes, I was.

Q.  Were you asked to analyze the methodology by which Platinum

Management valued the fund's investments?

A.  Yes, I was.

Q.  Were you asked to analyze the actual control and management

exerted by the various human beings within that Platinum

Mbu2Pla3                         Post - Direct

1    Management office?

2    A.   Yes, I was.

3    Q.   Were you asked to analyze the relationship between Platinum

4    and a reinsurance company called Beechwood?

5    A.   Yes.

6    Q.   Were you asked to analyze the relationship between Platinum

7    and another fund called the Black Elk Opportunities Fund?

8    A.   Yes, I did.

9    Q.   Have you formed views as to all of these matters?

10   A.   I have formed views as to all of these matters that I was

11   asked to look at.

12   Q.   What records or documentations do experts in your position,

13   tasked with the exercises I have just referenced, look at in

14   order to form the views that you formed?

15   A.   Well, it's pretty straightforward.  First off, we look at

16   the organizational documents.  Some of those were referenced

17   earlier today, like the filings that are required with the SEC.

18   But there are documents which are used which are the fund

19   company, and then the fund company is the entity that collects

20   the money.  And then there is a management company that manages

21   those monies and makes the investments.  So we look at what we

22   call the formation documents that basically describe what they

23   are going to do, how the companies are organized and structured

24   from a management perspective, how they are organized from an

25   investment perspective.

Mbu2Pla3                          Post - Direct

1           Then in this case I have also looked at many, many

2    e-mails and records that were produced by Platinum and

3    Beechwood and Northstar and Black Elk Opportunities Fund.  I

4    have also reviewed testimony.  So a lot of the people who are

5    going to be talking today to you folks gave depositions, and

6    they talked in the first person about what they saw, so I

7    reviewed those deposition transcripts.

8           THE COURT:  Let me just interrupt to tell the jury

9    what a deposition is.

10           In any civil case, before the case goes to trial, both

11    sides can take the testimony of witnesses for the other side or

12    of third-party witnesses and that is called a deposition.  And

13    some of that may come into evidence later, we will see, and I

14    will give you further instructions if it does.  But right now

15    it is just of relevance because the expert said he had reviewed

16    them.

17           So go ahead.

18    A.  And then in this matter there was also I think a

19    significant document which was a deficiency letter which was

20    issued by the Securities and Exchange Commission.  So one of

21    the things I referenced earlier is that the Securities and

22    Exchange Commission most likely on an annual basis comes into

23    an investment business and actually does an audit.  They go

24    through the books and records and the processes of the company,

25    and so there was I think a very important piece of evidence in

Mbu2Pla3                          Post - Direct

this case which was the results of the Securities and Exchange

audit, and it's called a deficiency letter which they issued,

which is rather comprehensive about a description of things

that Platinum did -- didn't do properly.

Q.   Thank you.

          Let's start at the beginning.  We will call up that

letter in a few moments, but for a jury who -- some of whom may

be hearing about a hedge fund for the very first time today,

let's start with a very basic question.  What's a hedge fund?

A.   Well, a hedge fund is an investment business.  It's an

investment company.  And we use the word hedge fund, it's kind

of a misnomer.  It's not really an accurate word.  But it

primarily refers to two things—the management fee that a hedge

fund is entitled to charge the investors, which is typically 2

percent annually; and then, what we call 2 and 20, a 20 percent

incentive fee which the investment management company or the

hedge fund is entitled to take of the gain in value.  So if the

fund gains $100 in one year, they not only get their 2 percent

management fee on the $100, but they get -- or the total value,

they also get 20 percent of that $100 that they earned, so they

get $20.  So we call it 2 and 20.  But that general structure

of 2 percent management fee and a 20 percent incentive fee is

usually the way we describe how hedge funds are compensated for

their work.

Q.   Was PPVA, the fund in this case, a hedge fund like you just

Mbu2Pla3                         Post - Direct

described?

A.   Yes, PPVA was a hedge fund where they were entitled to
receive 2 percent of the assets they managed, and if they had
positive gains, they were entitled to 20 percent of the upside
annually.

Q.   Now, I think you have just referenced a hedge fund manager.
What is a hedge fund manager and who was PPVA's hedge fund
manager here?

A.   So I mentioned earlier that the company that actually
receives the investments is PPVA.  So all the money that was
raised from all of the investors all over, onshore and
offshore, all of that money flowed into PPVA.  But there has to
be somebody to manage that money, and that's Platinum
Management.  So that's the management company.  And those are
the investment professionals and the administrative folks that
are managing the funds.  So Platinum Management was the manager
of PPVA, of Platinum Partners.

Q.   Was Platinum Management regulated by the SEC?

A.   Yes.  It's an investment organization, and they are
required to operate in a manner that is consistent with the
Security and Exchange rules and regulations.  They have to
adhere to their fiduciary duty.  The fiduciary duty is owed to
the investors, and they have to be in compliance.  So, yes,
Platinum Management, the management company, is regulated by
the Securities and Exchange Commission and the rules and

Mbu2Pla3                          Post - Direct

1    regulations are the responsibility to be adhered to by the

2    people that work there.

3    Q.  You mentioned this 2 and 20 structure.  In this case, did

4    the documents governing PPVA and Platinum Management provide

5    for this 2 percent fee and 20 percent upside structure you

6    described?

7    A.  Yes, they did.

8    Q.  Can you please explain what the phrase "net asset value"

9    means within the hedge fund context and specifically as that

10   word is used within the relationship between Platinum

11   Management and PPVA, the fund?

12   A.  That's a very important term, net asset value.  It's

13   important for a couple of reasons.

14        Number one, if you are an investor, the net asset

15   value is what the pool of money is worth at any one time,

16   right?  It's like you put in $200 million and your investment

17   goes up to 300 million, you can make a calculation and what net

18   asset value means is that you take the assets that are owned by

19   the fund and you subtract the liabilities.  So that's why we

20   call it net asset value, NAV.

21        That NAV number not only tells the investor what the

22   total investment is, so you can do the math, if I own 10

23   percent of that, I know what my investment is now or at any

24   given time.  But then most importantly for Platinum Management

25   and for the fund, the net asset value is how you calculate your

2 percent management fee and whether you are entitled to an

incentive fee.  If the fund's value goes down, the net asset

value decreases, you are obviously not entitled to any

incentive fee.  Likewise, if the fund value declines, your 2

percent is a smaller number.  So you would get less management

fees if the fund was losing value.

Q.  Thank you.

        In relation to the calculation of net asset value,

what is the relationship between loans or debt on an asset and

the value of the asset?  And I will give you an example that

perhaps some of the folks can understand.

        If the fund had bought a home for a million dollars

but also had a loan, a mortgage, on that home for 500,000,

could you please explain for the jury how the net asset value

of that home would be calculated from the fund's perspective.

A.  Well, the way -- the analogy I have used is—you probably

all know this—if you own a house and you have a mortgage, if

your house is worth $2 million and you have a million dollar

mortgage, what's the value -- what's the net asset value of

your house?  It's the $2 million value, the market value, minus

the mortgage of a million dollars, so you have a million

dollars in equity.  So that's what your net asset value of your

home was.

        Now one other concept here—you are going to hear me

talk about this and other folks—is a bond.  What's a bond?  A

Mbu2Pla3                        Post - Direct

1    bond is just like a mortgage.  So a bond is something that

2    could be issued——you probably know this——by municipality or the

3    U.S. government or a state, but companies also issue bonds in

4    exchange for loans.  So a bond is in essence just like a

5    mortgage.  The company needs money, so they issue a bond, and

6    the bond is an obligation of the company to pay a certain

7    return on the money that they have borrowed.

8    Q.   In addition to debt or bonds that may exist within the

9    companies in which a fund like PPVA invested, could PPVA itself

10   borrow money or issue the security of the type you just

11   described with respect to bonds?

12   A.   No, they couldn't.  I'm not sure that I answered your

13   question because I think what I left out was that if there is a

14   loan and you are talking about net asset value, the fact that

15   you owe money reduces the net asset value.  It's a liability.

16   So it's just like a mortgage but I want to be clear about that.

17        Would you please repeat the question again?

18   Q.   Sure.

19        And in addition to, for example, bonds that -- debt

20   that may have been issued by companies like Black Elk in which

21   PPVA was invested, were you asked to analyze borrowings debt of

22   PPVA, the fund, itself?

23   A.   Yes.  So the way a hedge fund operates is that they invest

24   in companies.  Sometimes it's a public company that you could

25   buy the stock on the stock exchange, but in this case it was

Mbu2Pla3                          Post - Direct

almost exclusively private companies.  Each one of those

companies we call a portfolio company.  So the portfolio

companies make up the assets or those are what you are

investing in as the fund here, Platinum, was investing in

companies, private companies.  Those companies can issue debt

or bonds, but Platinum would not issue debt because the debt

has to be securitized.  There has to be something to secure it.

So when a company issues a bond, what is the security that is

protecting that loan that you are making?  The investors are

buying the bond.  And what is the guarantee that they are going

to get paid?  It's the assets of the underlying company.  It's

those assets which are protecting the bond's interest.  So the

company goes out of business, you sell the company, and you pay

the bondholders back what they are owed.

                    (Continued on next page)

MBUCpla4                    Post - direct

1   BY MR. GLUCK:

2   Q.  You stated that you formed or you analyzed and then formed

3   views on the way in which Platinum Management, the hedge fund

4   manager's PPVA valued PPVA's assets; is that fair?

5   A.  Yes.

6          MR. GLUCK:  Mr. Parson, would you please call up Joint

7   Exhibit 72.

8   Q.  Mr. Post, is Joint Exhibit 72 the deficiency letter you

9   referenced earlier in your remarks?

10  A.  Yes, it is.

11  Q.  And what did you learn or comprehend from this letter?

12         THE COURT:  Are you offering this?

13         MR. GLUCK:  It's a stipulated exhibit, your Honor.

14         THE COURT:  You still have to offer it.

15         MR. GLUCK:  We would offer it into evidence, your

16  Honor.

17         MR. LAUER:  No objection.

18         THE COURT:  Received.

19         (Joint Trial Exhibit 72 received in evidence)

20  A.  This represents an audit that was by the Securities and

21  Exchange Commission.  As I mentioned, they did something very

22  similar to what I did when I was running a hedge fund to funds

23  and I was looking at my managers to make sure they were doing

24  things correctly.  This memorializes the results of their

25  investigation.

1              And there are some interesting, I think, significant

2      issues that are pointed out by the Securities and Exchange

3      Commission in this deficiency letter.  Among the things that

4      this letter states is that they didn't think Platinum did a

5      very good job of keeping correspondence.  This is important

6      because if you can't find the correspondence that basically

7      tracks what's going on on a day-to-day basis, you really don't

8      know what a company is doing.  There is a requirement, it's

9      called a records retention requirement, that the Securities and

10     Exchange Commission makes all companies comply with, which

11     means they have to communicate through authorized communication

12     devices so that there's records, emails have to be retained.

13     All of the important communications internally and externally

14     have to be maintained.  This deficiency letter says that

15     Platinum didn't do a good job about that.

16             Another thing that this letter points out is that they

17     require that statements, which show NAV, are produced on a

18     consistent and regular basis, quarterly, and that they are

19     distributed to all the investors.  They basically found fault

20     with Platinum for not adhering to those rules.  They were late

21     and they often didn't send them out to their investors.

22             MR. GLUCK:  Mr. Parson, if you go to the next page as

23     Mr. Post is talking so the jury can see it.

24             THE WITNESS:  I think that's the last page.  There was

25     21 pages in this letter, so it's rather voluminous.

MBUCpla4                        Post - direct

1   Q.  If you would, Mr. Post, continue your summary of the

2   deficiency findings.

3   A.  I think another very significant finding was that -- this

4   has been talked about.  This is, I think, about how you value

5   the assets of Platinum.  What they said in this deficiency

6   letter is that there really wasn't a process that they could

7   discern where there was records that were kept about how they

8   actually did their valuations.  They typically would have like

9   an agenda of what might be talked about, but they didn't

10  maintain records about the actual discussions and the issues

11  that you would typically see a valuation committee struggling

12  with.  So they had no real basis upon which to understand how

13  that valuation process was conducted.

14          And they also felt, I think -- I'm generalizing here.

15  But they also felt from a compliance perspective there was a

16  broad ignoring of the rules that they were supposed to follow.

17  They ignored many, many other areas where they were required to

18  be in compliance, and this letter pointed those issues out and,

19  by the way, demanded that they be corrected.

20  Q.  These deficiencies, what problems could they cause in lay

21  terms for a fund like PPVA with respect to the management?

22  A.  Well, I mentioned the records retention.  If you don't have

23  the records, you don't know what actually was going on.  So was

24  that intentionally hiding something or does that make the

25  investigation more difficult, there is a record retention.

1          I think the biggest issue here is valuation.  So, the

2     valuation establishes the net asset value.  One of the things

3     that the Securities and Exchange Commission is very concerned

4     about is, is a fund entitled to the fees they're taking out of

5     the investors' money.  So if the valuation process is flawed,

6     the manager is getting more money than they'd earned and

7     they're taking an incentive fee, which they're not entitled to.

8     So this is a very important point.

9          And I think one of the most significant things about

10    the deficiency and their failure to adhere to these proper

11    valuation methodologies is that they -- this leads to them

12    possibly taking money in the management fees that they're not

13    entitled to and it possibly allows them to take incentive fees

14    that they're not entitled to take.

15    Q.  Placing yourself in your position of 25 years overseeing

16    hedge funds and hedge fund managers like this, what would your

17    reaction be if one of the funds that you were overseeing

18    received a letter like this?

19          MR. LAUER:  Objection.

20          THE COURT:  Sustained.

21          MR. GLUCK:  Mr. Parson, please call up

22    Plaintiff's Exhibit 760, which we will seek to move into

23    evidence.  It is not an objected exhibit.

24          THE COURT:  Any objection?

25          MR. LAUER:  Yes.  It's after the relevant period.

MBUCpla4                    Post - direct

1    It's April, not March.

2            THE COURT:  That's relevant for cross examination, but

3    I think it has potential probative value.

4            MR. GLUCK:  For the record, we do not agree that the

5    relevant period as defined by defense counsel is the relevant

6    period.  Rather, it is December of 2012 through their final

7    statement.

8            THE COURT:  You're saying the date is the date it was

9    compiled.

10           (Plaintiff's Exhibit 760 received in evidence)

11   BY MR. GLUCK:

12   Q.  Mr. Post, do you understand what role SS&C played in this

13   case?

14   A.  Yes, SS&C is a hedge fund administrator and they're set up

15   to receive investor funds and distributions.  They're an

16   administrative organization and they basically provide their

17   third party that helps the hedge fund that doesn't have these

18   administrative capabilities internally to do their job.

19   Q.  Were you asked to review, from a birdseye perspective, the

20   financials being prepared by Platinum Management, such as this

21   in this case?

22   A.  Yes, I did.  I was.

23   Q.  What does this document tell you about the value of the

24   assets Platinum Management represented that they were holding?

25   A.  Well, this shows their positive assets.  We're talking

MBUCpla4                          Post - direct

about the $979 million minus their liabilities equals their net

asset value.  So the net asset value with this statement shows

is $720,648,387.  So that $720 million is the basis upon which

they would earn their 2 percent management fee, and if that

number had increased or had increased, then they would be

entitled to an incentive fee based on the increase between the

last balance statement.

Q.  Have you formed a view as to whether the gross number,

$979 million in this case represented on this sheet was

accurate?

           MR. LAUER:  Objection.  It's outside the report.

           MR. GLUCK:  Your Honor, it was well within the report.

           THE COURT:  Well, I'm afraid we'll need to have a

brief sidebar.

           (Continued on next page)

MBUCpla4                        Post - direct

```
 1                (At the sidebar)

 2                THE COURT:  Where is it in the report?

 3                MR. GLUCK:  I have to find the section.  Right here.

 4                THE COURT:  Let me see.

 5                MR. GLUCK:  We have a set of excerpts, your Honor.

 6                THE COURT:  Why isn't that within the scope?  Why is

 7      it not within the scope of what the report says?

 8                MR. LAUER:  Okay.  Thank you.

 9                THE COURT:  Objection is overruled.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MBUCpla4                          Post - direct

1          (In open court)

2    BY MR. GLUCK:

3    Q.  Mr. Post, have you formed a view regarding the accuracy and

4    validity of that gross number, $979 million, which was

5    represented to be the assets of this fund?

6    A.  Yes, I have.

7    Q.  What is that view?

8    A.  That this is a catastrophic overvaluation of the assets of

9    the Platinum arbitrage fund.  This represents that.

10   Q.  I'll go through your reasoning in just a moment.

11          Have you also formed a view regarding the liability

12   side listed in the prior page of $258 million?

13   A.  Yes, I have.

14   Q.  And what is that view?

15   A.  That this also drastically understates liabilities of the

16   company.

17   Q.  And we'll go through your reasons for that in a moment.

18          Now, one thing at a time.

19          What is the effect of overstating the gross value of

20   the assets on a hedge fund's NAV?

21   A.  The impact is that their Platinum Partners, the fund and

22   the management company, are receiving fees that they're not

23   entitled to.  That simple.

24   Q.  Similarly, what is the effect of understating the

25   liabilities of a fund like PPVA?

MBUCpla4                      Post - direct

1    A.  Understating the liabilities overstates the value and also

2    results in a company, in this case Platinum, not being entitled

3    to the management fees that they received.

4           MR. GLUCK:  Mr. Parson, would you please call up

5    Plaintiff's Exhibit 761.

6           This is another exhibit to which I understand there is

7    no objection, which we would seek to admit into evidence.

8           THE COURT:  Any objection?

9           MR. LAUER:  No, your Honor.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 761 received in evidence)

12   Q.  Mr. Post, were you asked to prepare an overview analysis of

13   the large position assets and liabilities of PPVA?

14   A.  Yes, I reviewed these positions.

15   Q.  I'll refer you first to the entity Golden Gate Oil, LLC.

16   Do you see that?

17   A.  I do.

18   Q.  Can you please tell us what Golden Gate Oil was and how

19   these numbers relate to the value?

20   A.  Well, Golden Gate Oil was one of the portfolio companies

21   that I mentioned that Platinum owned and operated.  So they

22   didn't actually operate the oil company, but they managed and

23   supervised the operation of that oil company in California

24   related to possible oil drilling activities in the State of

25   California.

Q.   Is it your understanding that at this time in 2016, PPVA

held the shares of Golden Gate Oil?

A.   Yes.  So that means that they owned Golden Gate Oil,

Platinum.  The fund owned Golden Gate Oil.

Q.   What value is Platinum Management putting on its shares of

Golden Gate Oil?

A.   The market value that they show in this statement is

$122 million and change.

Q.   Have you reviewed documents that the portfolio company,

Golden Gate Oil and Platinum Management concerning Golden Gate

Oil's performance from 2012 through 2016?

A.   I have.

Q.   And what did you learn from those documents?

A.   That in April of 2016, this company was basically

worthless.  They had no operations, they had lost their leases,

they had no material business operations.  So this number is

closer to zero than it is to $122 million.

Q.   How did you know that the operations had seized, the leases

had been lost, the wells were pumping water, how did you

determine that?

A.   I reviewed correspondence from folks that worked at Golden

Gate that were telling Platinum that this was the case, the

company had vendor bills that they couldn't pay, they couldn't

pay their debt, they couldn't continue to do drilling, the

drilling activities had failed, there was no oil.  The company

1   was virtually out of business.

2   Q.  At this time in 2016, did you review any documents which

3   would indicate that Golden Gate Oil owed money or had --

4   A.  Yes, in addition to not having any material business

5   operations, they owed a substantial amount of money to bond

6   owners, people that had, in one way or another, lent them money

7   so they could continue their operations.

8   Q.  Was there an ability of Golden Gate Oil to even repay those

9   debts based on your understanding of its operations?

10   A.  No, there wasn't.  So if their business operations were

11   worth zero and had outstanding debt, their actual value was a

12   negative number in the 20 to $30 million range, I believe.

13   Q.  Had you reviewed any documents on the issue of who owned

14   that debt of Golden Gate Oil in 2016?

15   A.  I have.

16   Q.  What did those documents say?

17   A.  Well, there was -- we've talked about this, we can talk

18   about it in some greater detail, but between the Black Elk

19   Opportunities Fund and Beechwood, which were two funds which

20   were set up, which were side funds, during this timeframe,

21   those two entities, in essence, purchased the debt from PPVA.

22   Q.  We'll talk about Beechwood in a moment.

23        MR. GLUCK:  Mr. Parson, if you wouldn't mind

24   highlighting the Black Elk Energy tab, about five lines down.

25   Q.  Mr. Post, do you see the highlighted section, which says

1  Black Elk Energy Offshore?

2  A.  Yes.

3  Q.  You were asked to evaluate PPVA's investment in Black Elk

4  Energy from 2012 to 2016?

5  A.  Yes.

6  Q.  Can you describe for us first what Black Elk Energy was?

7  A.  Well, by 2016 -- I think you have to start back in 2012.

8  Black Elk was an oil drilling business, primarily in the Gulf

9  of Mexico.  In 2012, they had an explosion on one of their oil

10  rigs.  Sometime after this and before this date, substantially

11  all of the assets of Black Elk were sold in this Renaissance

12  transaction for about $115 million.  This purports to be what's

13  left over as value from that transaction.

14  Q.  Are you aware or were you asked to analyze the value of the

15  company, which I'll remind you is Northstar, into which the

16  leftovers of Black Elk Energy were transferred?

17  A.  Yes, I did.

18          MR. GLUCK:  Mr. Parson, would you please highlight the

19  Lafitte and Northstar lines of this document.

20  Q.  Mr. Post, is it your understanding that the Lafitte line

21  item and the Northstar line item refer to PPVA shareholdings in

22  this Northstar company?

23  A.  Yes, I understand that.

24  Q.  What was Platinum Management valuing PPVA's shares in

25  Northstar at as of 2016 in April?

1    A.   They were valuing it at approximately $190 million.

2    Q.   Now, I thought that Black Elk had sold the vast majority of

3    its assets in 2014 for $110 million?

4    A.   That's correct.  They sold 95 percent of their assets for

5    approximately $115 million.

6    Q.   Are you aware of whether Northstar had any debt on it?

7    A.   In addition, they had a substantial amount of debt.

8    Q.   So how could it be the case that the shares of Northstar,

9    which owned about 5 percent or 10 percent of the remnants of

10   Black Elk, could be worth $180 million?

11   A.   Well, that's very difficult to come up with this number.

12   Let's just go through that.  If they sold Black Elk to

13   Renaissance for -- they sold 95 percent of the assets of

14   Black Elk, the oil company in the Gulf for $115 million, that

15   means that 5 percent was probably only worth another

16   $10 million.  And those are also assets that Renaissance didn't

17   want to buy.  So there is an issue about what that 5 percent

18   was actually worth, but it probably couldn't have been worth

19   more than another 10 or $15 million.  So the fact that two

20   years later when they have no assets and virtually no business

21   operations, this 5 percent is now being valued at $190 million,

22   is rather extraordinary.

23         MR. GLUCK:  Mr. Parson, would you please highlight the

24   line which says China Horizon Ordinary Shares, and you can

25   remove the other highlights.

MBUCpla4                         Post - direct

1    Q.  Mr. Post, were you asked to analyze, on a high level, the

2    valuation of PPVA's development in a company called China

3    Horizon?

4    A.  Yes, I was.

5    Q.  What does this statement provide regarding China Horizon's

6    value?

7    A.  It says that this company that they --

8            MR. LAUER:  Excuse me, Mr. Post.

9            Can we fix the date when he was asked to do these

10   things, because I'm not seeing all these details in his report.

11           MR. GLUCK:  Sure.

12   Q.  Were you asked at the inception of your work to analyze all

13   of the value of the assets which we're going over now?

14   A.  Yes, I was.

15   Q.  What does this document tell you that Platinum Management

16   was valuing China Horizon shares at?

17   A.  This statement says that those shares were worth

18   $48 million, almost $49 million.

19   Q.  Have you, in the course of your preparation and research,

20   reviewed emails and correspondence concerning the business

21   status of China Horizon in April of 2016?

22   A.  Yes, I did.

23   Q.  What did that review reveal?

24   A.  Well, it's referenced, China Horizon was attempting to

25   operate these 7-Elevens in China and they needed a license from

1   the Chinese government to do so and that license was revoked.

2   So there were no business operations in China.

3           So my conclusion is that it's impossible that that

4   company could have been worth $48 million if they had no

5   business operations in China because they lack the appropriate

6   licenses to operate there.

7   Q.  Now, we've just gone over a number of investments and the

8   total listed is around $300 million.  Would you agree with

9   that?

10  A.  Yes, I would agree, that's about $300 million.

11  Q.  Where you've concluded that those valuations were

12  materially inaccurate?

13  A.  Yes, that was my conclusion.

14  Q.  And materially inaccurate upwards, not downwards; is that

15  accurate?

16  A.  Yes, that's correct.

17  Q.  Now, I think you stated that PPVA and Platinum Management,

18  they were regulated by the SEC; is that right?

19  A.  Yes, they were.

20  Q.  Did they also have audit companies auditing their books?

21  A.  Yes, they did.

22  Q.  Were you asked, as part of your expert work, to try and

23  figure out how an overvaluation like this could be missed for

24  so long by the auditors and the SEC?

25  A.  It's something that came to my attention in my review.

1    Q.  And did the entities, Black Elk Opportunities Fund and

2    Beechwood, form part of your analysis?

3    A.  They did.

4    Q.  Let's take them one by one.

5           Would you please explain to the jury what the

6    Black Elk Opportunities Fund was and what documents you

7    reviewed concerning it.

8    A.  Well, Black Elk Opportunities Fund was a new investment

9    vehicle that the Mark Nordlicht group, which included

10   Mr. Huberfeld and Mr. Bodner, established to raise capital,

11   supposedly to inject money into these businesses to help

12   correct their problems.

13   Q.  Based on your review, who owned Black Elk Opportunities

14   Funds management?

15   A.  In essence, it was the same ownership as Platinum

16   Management and the Platinum Fund.

17   Q.  Was Black Elk Opportunity Fund part of PPVA?

18   A.  No, they weren't part of PPVA, but they had the same

19   management team, they operated out of the same offices.  So

20   they were similar in almost every respect.

21   Q.  Did you form a view on the role that this Black Elk

22   Opportunity Fund played in camouflaging this overvaluation?

23   A.  Yeah, this is what I'd call a debt stabilization plan.  So

24   my conclusion is that they established the Black Elk

25   Opportunity Fund and Beechwood to artificially prop up the

MBUCpla4                          Post - direct

value of the debt that these portfolio companies carried.

          And what does that mean?  If you lent money and you
were a lender and you realized that people you lent the money
to couldn't make the payments, what would you do, you'd
foreclose.  You can't make your mortgage payments on your
house, the bank forecloses.  So if the owners of this debt had
been real lenders instead of Black Elk Opportunity Fund, they
would have foreclosed on this debt because the service couldn't
be made either by Platinum or by the actual companies.  So
Black Elk provided a way to kind of, in essence, authenticate
the debt as real and the values by creating this entity that
was a related entity.

          Now, how would I contrast that to what a typical hedge
fund might do?  If you were a typical hedge fund running a
legitimate business operation, you would have gone to third
parties who had the money and the desire to invest in your
business.  You wouldn't set up your own little new fund to kind
of obscure the reality and the truth, you would go to third
parties.  There is many, many companies out there that do
distress lending.  So would you find an independent company, it
would come in and value the assets and review the business
operations, and if they like what they saw and they felt there
was potential there, they would be willing to give them that
money.

          But I don't believe, based on my analysis, that these

MBUCpla4                          Post - direct

1   assets -- that any third party, a legitimate investment

2   business would have been interested in them.  They certainly

3   wouldn't have been interested in paying the type of money,

4   paying face value for the debt.  So Black Elk Opportunity Fund

5   was set up as a strawman to basically validate fictitious

6   values, and it was controlled by the same folks that ran

7   Platinum.

8   Q.  Let's talk about Beechwood.

9          Did you have occasion to review what Beechwood was in

10  the course of your work?

11  A.  Beechwood is a similar internally created vehicle that

12  propped up artificial values.  In this case, we've heard that

13  it was a reinsurance company.  What does that mean?  I think

14  you all know a little bit about insurance, but when you pay

15  premiums into an insurance company, they invest the money you

16  give them and they try to make more money so they can pay their

17  obligations based on insurance.  So, in essence, Beechwood was

18  an offshore reinsurance company and they collected, oh,

19  somewhere around $800 million in new investments.

20         They hired a couple of folks, Scott Taylor and Mark

21  Feuer, who were investment professionals.  It was owned by the

22  same management team, the Nordlicht group, which was

23  Mark Nordlicht, Mr. Huberfeld, and Mr. Bodner, and of that

24  $800 million, they were able to take approximately $80 million

25  and also apply debt, which was virtually worthless, but that

MBUCpla4                          Post - direct

prevented a foreclosure because now there is a new entity on it
and they're all happy with what they think is the ability to
get paid.

          And something else also very curious here is the only
reason I think Black Elk Opportunity Fund and Beechwood
investors were willing to do this is because there was some
guarantees that Platinum made, which said if these underlying
entities, the portfolio companies can't make this debt service,
Platinum will make those payments.  That's also highly unusual.

Q.  Did Mr. Bodner have a beneficial interest in the Black Elk
Opportunity Fund management?

A.  In other words, was he an owner?

Q.  Yes.

A.  Yes, he was.

Q.  Same question for Beechwood.

A.  Yes, he was also an owner of Beechwood.

Q.  In your description of the role that the BEOF fund played,
did you summarize certain parts so as to avoid issues regarding
the criminal bond subordination that is not part of this trial?

A.  Yes, I did.

Q.  Is it a fairly complex story?

A.  Very complex.

Q.  Who were the human beings that capitalized the Beechwood
Reinsurance Company?

A.  The Nordlicht group, primarily.

MBUCpla4                          Post - direct

1    Q.  And you're using the phrase "Nordlicht group."  Have you

2    reviewed documents that define this Nordlicht group?

3    A.  I have.

4    Q.  What is your understanding of who that Nordlicht group was?

5    A.  Mark Nordlicht, Mr. Huberfeld, and Mr. Bodner.

6            MR. GLUCK:  Mr. Parson, would you please pull up

7    Plaintiff's Exhibit 382.

8            I will note that we are not offering this into

9    evidence, rather this is being displayed so that the fact

10   finder, the jury can see the documents and the information that

11   you were relying on in order to form your opinions.

12           I'll represent to the Court we're certainly going to

13   attempt to admit it, but not in this context.

14           MR. LAUER:  I'm not sure I understand it.  If he's

15   offering it, we have no objection.  If he's not offering it, I

16   don't know what he intends to do with it.

17           THE COURT:  I agree.  Are you offering it or not?

18           MR. GLUCK:  I'm not offering it into evidence.

19           THE COURT:  Then I don't think you get to show it to

20   the jury.

21           MR. GLUCK:  Then we'll offer it into evidence.

22           THE COURT:  It's received.

23           (Plaintiff's Exhibit 382 received in evidence)

24           By the way, in about five minutes, we're going to give

25   the jury their midafternoon break, so find an appropriate spot

MBUCpla4                              Post - direct

1     to pause.

2                    MR. GLUCK:  Yes.

3     BY MR. GLUCK:

4     Q.  Mr. Post, in the course of your review of this matter, did

5     you understand who a gentleman named Murray Huberfeld was?

6     A.  Yes, Mr. Huberfeld was Mr. Bodner's partner.

7     Q.  During the course of your review, did you have an

8     understanding about the manner in which Mr. Bodner sent and

9     received emails during his time at Platinum?

10    A.  Yes, I came to a conclusion about that.

11                   MR. GLUCK:  Mr. Parson, would you please highlight the

12    "to" line which says Angela Albanese?

13    Q.  What is your understanding regarding the role of Ms. Angela

14    Albanese in relation to correspondence of David Bodner?

15    A.  Well, I'm not sure this email says this, but I know there's

16    an email that exists where someone asks what's Mr. Bodner's

17    email address.

18                   MR. LAUER:  Your Honor, can we have an answer to the

19    question.

20                   THE COURT:  I think that's fair.

21    A.  My understanding is that Ms. Albanese received -- that she

22    was Mr. Bodner's email address.  So in other words, anything

23    that was sent to Mr. Bodner was sent to her.

24                   MR. GLUCK:  Mr. Parson, you can reduce the zoom.

25    Q.  If you look down on the page where it says outline of

1    terms.  Do you see that?

2    A.  Yes, I see that.

3    Q.  Is this the basis of your understanding or your testimony

4    just now that the Nordlicht group, as you called it, formed and

5    capitalized Beechwood?

6    A.  Yes, this is how Beechwood was capitalized by Mr. Bodner,

7    Mr. Huberfeld, and Mr. Nordlicht.

8    Q.  Excuse me, I misspoke.  Is this one of the documents, not

9    the document?

10   A.  Yes.

11   Q.  Would you mind running through at least what your

12   understanding of these terms is.

13   A.  At the bottom of this email?

14   Q.  Yes, the highlighted portion, highlighted terms 1

15   through 8.

16   A.  Well, from my review of the documents, the Nordlicht group

17   put in the capital to secure the funds, meaning they had to

18   make an investment, and I believe they used their limited

19   partnership interest to fund this new business.  And this talks

20   about what they were entitled to receive.

21        A preferred return is something that a preferred

22   shareholder would get.  If you're a common shareholder, you

23   might not get anything unless you sold your shares, but if

24   you're a preferred shareholder, you're entitled to either

25   sometimes the gain in the value or actually like an 8 percent

MBUCpla4                          Post - direct

1    or some number, a return on your investment that you get

2    automatically.  So it's a combination between being an owner

3    and also being a lender, but you're getting a guaranteed

4    preferred return in front of everybody else.  So preferred

5    returns have to be paid before other investors get paid.  So

6    they put themselves into a preferred position.

7              The next line, they were paid before there was any

8    profit split.  The Feuer group were Mark Feuer and Scott Taylor

9    who were the two investment professionals who were involved in

10   the Beechwood investment.  Mark Feuer was an investment

11   professional, so he would run the insurance side of it and

12   Mr. Nordlicht would run the investment side of it.

13   Q.  Is it your understanding that Mr. Bodner was a member of

14   the Nordlicht group?

15   A.  Yes, Mr. Bodner was a member of the Nordlicht group.

16   Q.  And have you reviewed documents indicating that Mr. Bodner,

17   through various entities and trusts, owned the Beechwood

18   entities?

19   A.  Yes.

20             MR. GLUCK:  Mr. Parson, would you please call up

21   Plaintiff's Exhibit 384.  We'll seek to bring into evidence.

22   Q.  Mr. Post, in the beginning of Beechwood's formation, you

23   aware are of whether they had their own offices?

24   A.  I am aware of the office situation when they formed the

25   company.

MBUCpla4                      Post - direct

1   Q.  And what was that situation?

2   A.  Beechwood was formed out of the Platinum offices, Platinum

3   Management and the hedge fund.  They used the same offices.

4   Q.  Did you form a view in your reports and your testimony here

5   today as to Mr. Bodner's role in directing Beechwood's

6   investments into the PPVA debt?

7   A.  Yes.

8   Q.  What was that view?

9   A.  Well, broadly speaking, Mr. Bodner came to the offices four

10  to five times a week from 2003 all the way through this

11  timeframe.  So he was at the office every day.  There were two

12  floors in the Platinum Management complex, one was more

13  administrative, but the top floor were the professionals, the

14  managers, the investment managers and the people who ran the

15  business.  Mr. Bodner had an office there for that entire

16  timeframe when all these business activities were going on,

17  including the formation of Beechwood and the formation of

18  Black Elk Opportunity Fund.  They were all done on that same

19  floor in the same office.

20  Q.  Beechwood was a reinsurance company; is that right?

21  A.  Correct.

22  Q.  It would have clients that were insurance companies that

23  would hand over their money for investments in appropriate

24  ways?

25  A.  Yes.

MBUCpla4                    Post - direct

1   Q.  Do you see where on the first line it says CNO?

2   A.  Yes.

3   Q.  What do you understand CNO to be?

4   A.  An insurance organization.

5   Q.  What do you understand the whole phrase, he's here now,

6   Scott taking Murray and Mr. Bodner through the CNO limits now

7   in Feuer's office?

8   A.  Well, as I mentioned, they raised approximately

9   $800 million, but they were having a discussion about what

10  percentage of the $800 million could be invested in something

11  that was risky.

12          MR. LAUER:  Excuse me.  Your Honor, we object to this.

13  He wasn't there.

14          MR. GLUCK:  Your Honor, may I answer the objection?

15          THE COURT:  Well, I think this is probably a good

16  place to give the jury their midafternoon break and I'll hear

17  further argument on it outside their presence.

18          So I'll give you a 15-minute break at this time.

19          (Continued on next page)

20

21

22

23

24

25

MBUCpla4                          Post - direct

1              (Jury not present)

2              THE COURT:  So the objection was, in effect, hearsay.

3    The so the question was what do you understand the whole

4    phrase, he's here now, Scott taking Murray and Mr. Bodner

5    through the limits now in Feuer's office.  He just asked for

6    the private deal summary, as well.  And the question was what

7    do you understand that to mean.  The objection was that the

8    witness wasn't there.  But that doesn't mean that he doesn't

9    have an understanding based on his review of the documents.

10   What I'm wondering is how this fits within his expertise.  I'm

11   asking plaintiffs' counsel.

12             MR. GLUCK:  Setting aside the specific wording of the

13   question, the reason I believe it falls within his expertise is

14   that Mr. Post was asked as an expert in how hedge funds and

15   businesses like Beechwood are running actuality, not just on

16   the documents, but how they're running actuality.

17             Therefore, in this context of Beechwood acquiring the

18   debt of the Platinum portfolio operating companies, this is a

19   piece of evidence that he's reviewed that goes to this issue of

20   a plan to acquire the debt and otherwise use the Beechwood

21   money to invest in Platinum.  It was not, by the way, and to

22   the extent this is relevant, intended for the truth that David

23   Bodner was there.  It is rather about this investment concept.

24             THE COURT:  Yes.

25             MR. LAUER:  Your Honor, two of the individuals are on

1    their witness list.  If the Court is interested in having the

2    jury or they're interested in having the jury understand what

3    took place at this meeting, they can ask Mr. Taylor, they can

4    ask Mr. Huberfeld.

5          You may remember that when we made the *Daubert*, we

6    basically said that, with all due respect to Mr. Post, he's

7    really being asked to testify as a spokesman for Mr. Gluck.

8    He's not offering any real expertise, he's simply interpreting

9    documents the way a lawyer would interpret documents.

10         We thought, if you look at his report when there were

11   more defendants in this case, he was focused on systems,

12   controls, and criticizing those aspects.  Right now, we're

13   dealing with a very narrow valuation case and a claim that

14   Bodner knew the valuations were off.  I mean, there was a lot

15   of leeway granted here --

16         THE COURT:  Well, I'm glad to hear from you that we're

17   now dealing with a very narrow case because now I know that

18   your case will be even shorter than I was worried about this

19   morning.  Nevertheless, your objection is sustained.

20         MR. GLUCK:  Your Honor, thank you.  May I respond just

21   very briefly?

22         THE COURT:  You can respond, but I've ruled and my

23   practice is not to have endless discussions after I've ruled.

24   I'll give you one exception in this case, this will be an

25   exception.

1           MR. GLUCK:  To the extent there are similar topics as

2     part of this presentation, it is my understanding that

3     Mr. Bodner's defense here is that because the auditors of the

4     SEC didn't pick this up, how could he have?  Our response is

5     that this is how this, the transfer of assets and debt to

6     Beechwood is how it would be conceived and therefore falls

7     directly within Mr. Post's job and to explain, all right, was

8     there an overvaluation, okay, but how did it happen, and that

9     is the intent of this line of testimony.  This is just one

10    document we were trying to use to make --

11          THE COURT:  I'm not ruling on anything else.  I'm

12    ruling on the specific question, which is this is from Mr. Fife

13    to Naftali, Mr. Bodner is nowhere copied here.  And it is in

14    response to the Naftali, Manela's question, let's see when he's

15    coming over, I'll look to 2:30 today, when is Puerto Rico

16    closing.  The response was he's here now.

17          I'll stop there.  That has zero evidence of relevance.

18          Scott taking Murray -- "taking," by the way, is

19    capitalized improperly, but that was Mr. Fife's problem.  Scott

20    taking Murray and Mr. Bodner for the CNO limits now in Feuer's

21    office.  That clearly is at least single hearsay and probably

22    double hearsay, and the fact that an expert can look at hearsay

23    doesn't mean that he's just free to opine on someone else's,

24    oh, I saw Jones murder Smith and the expert says that shows

25    that he had criminal intent.  That would never be admissible.

MBUCpla4                          Post - direct

1           Scott taking Murray and Bodner through the CNO limits

2     now in Feuer's office.  He just asked for the private deal

3     summary, as well.  This all sounds to me like probably double

4     hearsay, but at least single hearsay of the description of some

5     physical activity or verbal activity that's not specified of

6     very general terms, as to which as I understand from defense

7     counsel, you will be calling two people with actual knowledge.

8           MR. GLUCK:  Yes.

9           THE COURT:  The objection is sustained.  We'll see you

10    in 10 minutes.

11          I'm sorry.  Let me hand out to both counsel my craft

12    of the preliminary instructions to give to the jury tomorrow.

13    As mentioned earlier, tonight you'll send my law clerk any

14    suggestions or additions or objections.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Mbu2Pla5

1                    (Jury not present)

2                    THE DEPUTY CLERK:  May I bring in the jury?

3                    THE COURT:  Please, and let's get the witness back on

4      the stand.

5                    Please be seated.

6                    Just while we are waiting for the jury, tomorrow we

7      will start with the jury at 9:30, but we will start with you

8      guys at 9:15 to take any comments you have on the preliminary

9      instructions.

10                    (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mbu2Pla5                         Post - Direct

1            (Jury present)

2            THE COURT:  All right, counsel.

3    BY MR. GLUCK:

4    Q.  Mr. Post, welcome back.

5            Were you asked to analyze the issue of common control

6    between Platinum Management and Beechwood?

7    A.  Yes, I was.

8    Q.  Did you form any views on whether there was in fact some

9    common control between Platinum and Beechwood?

10   A.  Yes, I did.

11   Q.  How did you form that view?

12   A.  Well, I analyzed documents and records and deposition

13   testimony which provided a basis upon which I made my --

14   reached my conclusions.

15   Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

16   388, please.

17           MR. HERTZBERG:  Your Honor, I'm told that that TV

18   shows what the jury is seeing.  This is not a document that's

19   been offered or admitted.

20           THE COURT:  I'm sorry.  There shouldn't be anything on

21   the screen right now.

22           MR. HERTZBERG:  That's right.  Thank you, Judge.

23           THE COURT:  Are you offering 388?

24           MR. GLUCK:  Yes, I am offering it into evidence and

25   will be asking whether it was one of --

1          THE COURT:  Any objection?

2          MR. LAUER:  We are not on it.  Hearsay.

3          MR. GLUCK:  Your Honor, a response to the hearsay

4   objection would be coconspirator, and this is in furtherance.

5          THE COURT:  Hold on.  Let me just read this.  Sorry.

6          Overruled.  Received.

7          (Plaintiffs' Exhibit 388 received in evidence)

8   BY MR. GLUCK:

9   Q.  Mr. Post, the document in front of you, Exhibit 388, is

10  this one of the documents you looked at in forming your view as

11  to commonality of control and management between Platinum and

12  Beechwood?

13  A.  Yes, it is.

14  Q.  Are there other documents that you reviewed that also

15  form -- led you to this conclusion?

16  A.  Yes.

17  Q.  I would like you to, for a moment——because it's a difficult

18  concept——describe once again your views regarding what you

19  called the debt stability scheme.  Would you mind repeating

20  that for us?

21  A.  The debt stability scheme is that if the owners of the

22  debt -- an owner of the debt was a legitimate creditor, if you

23  weren't getting your payments on time or you were worried that

24  they weren't going to be made, then your option would be to

25  foreclose.  That's what a lender does.  But if you transfer

Mbu2Pla5                        Post - Direct

1    that debt to a friendly party, which we have talked about

2    Black Elk Opportunity Fund and Beechwood, those parties are not

3    going to react in a normal way.  They are not going to insist

4    on foreclosure because they are all part of the same group.  So

5    it was an artificial way to prevent foreclosure when you have

6    nonperforming assets.

7          Under a normal situation, a lender would look at the

8    fact that Black Elk -- the oil business was not operating

9    anywhere near, had debt.  Same with Golden Gate.  So those

10   loans would have been in jeopardy, they would have been

11   distressed, and a legitimate third-party lender would have

12   foreclosed.  But when you created Beechwood and Black Elk

13   Opportunity Fund, you have a created, in essence, a straw man

14   that basically protected those misvaluations.

15   Q.  Thank you.

16          Do you recall at the beginning of this testimony we

17   went through that 2016 NAV statement where it appeared there

18   was about 300 million overvalued and I asked you whether you

19   were tasked with figuring out how something this big could have

20   been missed.  Do you recall that?

21   A.  I do.

22   Q.  Is the debt stability scheme one of your answers as to how

23   this could have happened?

24   A.  Yes.  This was a way of hiding the distressed nature of the

25   debt from the auditors.

1    Q.  Are you aware of any specific evidence to suggest that

2    these portfolio companies——Golden Gate or Northstar——were

3    unable to service this debt that Beechwood was holding?

4    A.  Yes.  There were -- I have read correspondence, e-mail

5    correspondence, that indicated that was in fact the case they

6    could make debt service but the unusual requirement was that

7    Platinum, the fund, guaranteed these payments, which in essence

8    is a liability.  It was not also recorded.  If Platinum, the

9    fund, guaranteed interest payments that were owed by their

10   portfolio company, that's a liability on the fund and it should

11   have been reflected.

12   Q.  Mr. Parson, could you please call up Plaintiffs' Exhibit

13   459, please.

14           And I will ask you, Mr. Post, whether this is the sort

15   of evidence that you would look at to determine whether it was

16   Platinum actually making these interest payments on the debt

17   stability scheme.

18   A.  Yes, and I note that this is from Mr. Huberfeld to Angela,

19   so this is in essence an e-mail from Mr. Huberfeld to

20   Mr. Bodner, and this is something I relied on that indicated

21   that these interest payments were being made not by the

22   portfolio companies or not able to be made by the portfolio

23   companies.

24           MR. LAUER:  Your Honor, we -- we will deal with this

25   after.  It's all right.

Mbu2Pla5                              Post - Direct

1            THE COURT:  All right.

2   Q.  Thank you.

3            Did there come a time when even Platinum, PPVA, the

4   fund, had trouble making these interest payments?

5   A.  Yes.

6   Q.  Mr. Parson, would you please call up Exhibit 562.

7            And my question for you, Mr. Post, will be whether

8   this is one of the exhibits -- I'm sorry.  I forgot to move 459

9   into evidence.

10           MR. LAUER:  We object to it.  It never went to

11  Mr. Bodner.

12           MR. GLUCK:  Coconspirator, furtherance of the

13  conspiracy, specifically the debt stability scheme.

14           MR. LAUER:  I'm not going to argue in front of the

15  Court.

16           THE COURT:  If you want a sidebar, I will hear you,

17  but otherwise I overrule the objection.

18           Do you want a sidebar.

19           MR. LAUER:  Do you want us to come up?

20           THE COURT:  Yes, come up.

21           Ladies and gentlemen, I should explain to you why we

22  have sidebars and we will try to keep it to a minimum.  It is

23  so that I can hear about stuff that you haven't heard yet which

24  may be admissible or may be not admissible.  And if it turns

25  out not to be admissible, then you shouldn't be hearing it.  So

Mbu2Pla5                          Post - Direct

1    I hear at the sidebar what some future testimony is going to be

2    in this case, and then I decide whether it is admissible or

3    not.  So the great advantage of the sidebar is you can sit

4    there and twiddle your thumbs.  But, in any event, we will try

5    to keep them to a minimum.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mbu2Pla5                        Post - Direct

1                (At the sidebar)

2                MR. LAUER:  Your Honor, Angela Albanese testified that

3    she does not give everything she gets to Mr. Bodner.  She

4    mostly gives --

5                THE COURT:  No, no, but that doesn't matter.  This is

6    not being offered for Mr. Bodner's knowledge *per se*.  This is

7    being offered to establish the conspiracy, and this is a

8    statement of a coconspirator in furtherance of the conspiracy.

9    And the law of conspiracy is that a coconspirator doesn't have

10   to know everything that was said by every other coconspirator

11   in furtherance of the conspiracy.  So in order to establish a

12   conspiracy, they have to establish both the fact of the

13   conspiracy and then also ultimately Mr. Bodner's membership in

14   that conspiracy, but this is offered on the first prong.  It's

15   overruled.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Plaintiffs' Exhibit 459 received in evidence)

3    BY MR. GLUCK:

4    Q.  So we moved to put Exhibit 459 into evidence, and

5    Mr. Parson -- I'm sorry.  Let me restart.

6          Mr. Post, did there come a time when you reviewed

7    documents, correspondence indicating that even Platinum began

8    having trouble making the interest payments that were owed by

9    these portfolio companies?

10   A.  Yes.

11   Q.  Mr. Parson, can you please call up Plaintiffs' Exhibit 562,

12   which is offered into evidence under the same basis.

13         Now first, Mr. Post, could you please remind the jury

14   who CNO is in relation to Beechwood.

15   A.  CNO was an investor, but they happened to be an insurance

16   company.

17   Q.  Is this one of the documents that you reviewed to form the

18   conclusion that Platinum began having trouble making the

19   interest payments on behalf of entities like Northstar pursuant

20   to your debt stability scheme hypothesis?

21   A.  Yes.

22   Q.  In relation to your task of evaluating who was actually in

23   charge at Platinum Management, what documents -- what sorts of

24   documents would you review and would similar experts review?

25   A.  Well, this is what I have done professionally as an expert

Mbu2Pla5                          Post - Direct

witness.  I look at how a business operates and I basically

can -- on my experience and my expertise, I can, in essence,

reach a conclusion about whether someone is a passive investor

or an active investor or not involved in management or involved

in management.

        So, many of the things that I reviewed in this case,

for example, this e-mail, helped me to figure out whether an

investor is passive or active.  If the investor is active, then

they look more like a member of the management team.  And if

they are a part of the management team, then that triggers

their fiduciary duties to the investors.  So I look at a

multitude of facts and circumstances.  I have talked about a

few of them, like the fact that Mr. Bodner was in the office,

the fact that they are going to Mr. Bodner, Mr. Huberfeld, held

on operational and financial issues related to the business.

That sounds more like an active manager than a passive

investor, and I can talk more about passive investors and what

they might look like.

Q.  Let's stick with this issue that on the one hand these

companies that are being valued at hundreds of millions of

dollars like Golden Gate and Northstar can't even make their

own interest payments.  Did you review specific documents that,

by 2016, when you saw that NAV statement, these sorts of

entities, Northstar, Golden Gate, were defunct or on their way

to becoming defunct?

Mbu2Pla5                          Post - Direct

1   A.  Yes, I did.

2   Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

3   563.

4              (Court and court reporter confer)

5              THE COURT:  562 is received.

6              (Plaintiffs' Exhibit 562 received in evidence)

7              MR. GLUCK:  Move to admit 563 into evidence on the

8   same grounds as before, in furtherance of the conspiracy, debt

9   stability scheme.

10             MR. LAUER:  Objection.

11             THE COURT:  So I'm going to receive it, but I thought

12  the overall basis for offering this was, in addition to their

13  independent admissibility in furtherance of the conspiracy,

14  that this was stuff that he relied on in reaching a conclusion.

15  I don't think that opens the door to going through thousands of

16  documents.

17             MR. GLUCK:  Understood.

18             THE COURT:  Maybe this will be the last.

19             MR. GLUCK:  Very tight.

20             (Plaintiffs' Exhibit 563 received in evidence)

21  BY MR. GLUCK:

22  Q.  Is this the sort of document that you would look to and

23  rely on regarding the actual operations of companies like

24  Golden Gate and Northstar?

25  A.  Yes.  This is a document which discusses financial issues

Mbu2Pla5                      Post - Direct

1    at Golden Gate and at Beechwood.  And so in reviewing this

2    document, I concluded that this demonstrates that there were --

3              MR. LAUER:  We are objecting to the document.

4              THE COURT:  No, no.  I overruled the objection.

5              MR. LAUER:  Sorry.

6    A.  To me this demonstrates that there were cash problems,

7    operational funding problems, by both of these portfolio

8    companies, where they couldn't pay vendors and didn't have the

9    sufficient funds to pay interest payments and operate their

10   businesses.

11             THE COURT:  Just so the record is clear for our

12   reporter the document was received.

13             MR. GLUCK:  This will be the last one in this vein.

14   Q.  And did you in fact review any documents where Mr. Mark

15   Nordlicht directed the shutdown of the unprofitable fields at

16   Golden Gate and Northstar?

17   A.  Yes.  I found the document in the record that was a

18   specific instruction by Mr. Nordlicht to shut down the

19   Golden Gate Oil nonperforming wells.

20             MR. GLUCK:  As I said, this is the last one in this

21   vein.

22             Mr. Parson, could you please pull up Plaintiffs'

23   Exhibit 564.  We seek to admit 564 on the same basis, and in

24   particular in relation to the testimony of Mr. Post that

25   Platinum knew in 2015 that these entities were defunct, they

1  were valuing them as though they were not in April of 2016.

2  A.  Is that a question?

3  Q.  No.  That's my basis for offering it into evidence.  I will

4  ask you a question about it in a second.

5          THE COURT:  Any objection?

6          MR. LAUER:  We object.

7          THE COURT:  The same objection previously made and the

8  same ruling.  The objection is overruled.  Received.

9          (Plaintiffs' Exhibit 564 received in evidence)

10 BY MR. GLUCK:

11 Q.  In your role overseeing hedge fund managers, what do you

12 infer from this document regarding the viability of Golden Gate

13 and Northstar and the valuation being placed on shares of

14 Golden Gate and Northstar by Platinum?

15 A.  Well, if I'm trying to determine whether values are

16 overstated on the balance sheet, which was April of 2016, this

17 would be very informative.  This would show me that there were

18 significant and serious operational issues that if I was

19 valuing an asset, I would want to take into consideration in

20 making that valuation, and my conclusions in reviewing the

21 facts and the record are that this document is indicia or an

22 indication that Golden Gate Oil was an unprofitable business,

23 not operating, couldn't pay its debts, and therefore the

24 valuation that was reflected on the balance sheet cannot be

25 accurate and is most likely false.

1    Q.  Mr. Post, in the course of your review -- and that's your

2    view of this particular e-mail.  In the course of your review,

3    did you come across any documents or correspondence which

4    showed that Platinum Management itself knew that these assets

5    had a zero or near zero value prior to issuing that NAV

6    statement?

7    A.  Yes.

8    Q.  Mr. Parson, could you please call up Plaintiffs' Exhibit

9    592.  Is this one of --

10             MR. GLUCK:  I move 592 into evidence, please.

11             MR. LAUER:  Same objection.

12             THE COURT:  Same ruling.  Received.

13             (Plaintiffs' Exhibit 592 received in evidence)

14   BY MR. GLUCK:

15   Q.  First of all, do you have an understanding of who Mr. David

16   Steinberg is?

17   A.  Yes, I do.

18   Q.  Who?

19   A.  He is the chief risk officer.

20   Q.  And who is Naftali Manela?

21   A.  Portfolio manager at Platinum.

22   Q.  Is it possible he was the CFO?

23   A.  Yes, excuse me.

24   Q.  Do you see what the subject line is?

25   A.  Yes.

1    Q.  Attached to this document are three Excel spreadsheets,

2    right?

3    A.  Yes.

4    Q.  And Mr. Steinberg is saying:  Look at these Excel

5    spreadsheets in order.  They tell a story.  Do you see that?

6    A.  Yes.

7    Q.  Have you reviewed these three spreadsheets?

8    A.  I have.

9    Q.  What story are they telling?

10   A.  They are telling that there is a massive problem with many

11   of the portfolio companies of Platinum, that they are not

12   operating profitably, they are losing money, and that they are

13   on the verge of complete collapse.

14   Q.  I will ask you to highlight the bottom portion first, if

15   you wouldn't mind, instead of the top.

16         Mr. Post, do you recall when I asked you about what

17   the effect of undisclosed liabilities would be on PPVA's net

18   asset value?

19   A.  Yes.

20   Q.  Have you reviewed PPVA's liabilities as set forth in that

21   2016 NAV statement?

22   A.  I did.

23   Q.  Are Northstar debts listed in that statement?

24   A.  No.

25   Q.  How about Golden Gate debt?  Is that listed in the

Mbu2Pla5                          Post - Direct

1   statement?

2   A.  No.

3   Q.  Thank you, Mr. Parson.  If you wouldn't mind shutting that

4   window.

5           Can you please go to the next Excel spreadsheet?  If

6   you wouldn't mind flipping it.

7           Mr. Post, would you please take us through what this

8   Excel sheet is stating.

9   A.  This is a list of the portfolio companies, and it shows the

10  amount of encumbrances, or debt, and values.

11  Q.  That number on the right "unencumbered," what is

12  "unencumbered"?

13  A.  That there is no associated debt.

14  Q.  So, Mr. Steinberg -- well, let me ask this:  What is

15  Mr. Steinberg saying about what the real value of these assets

16  were?

17  A.  I think he referred to it as it was almost certainly going

18  to end up in a bankruptcy.

19  Q.  The NAV was listed at nearly 900 million in April.  Excuse

20  me.  The gross asset value was listed at nearly 900 million in

21  April here, 1048, but the unencumbered value is listing at only

22  333 million.  Do you see that?

23  A.  I do.

24  Q.  What proportion of the value of PPVA is missing?

25  A.  That's -- it's almost $400 million.

1    Q.  And this is an e-mail from the chief risk officer of

2    Platinum Management to the CFO of Platinum Management in

3    January?

4    A.  Correct.

5    Q.  But in April they are still listing a NAV of more than 700

6    million.

7    A.  That's correct.

8    Q.  What is your conclusion as to whether, irrespective of

9    whether your interpretation of those e-mails about problems at

10   the operating company is right, whether Platinum Management

11   knew the value of the company?

12              MR. LAUER:  Objection.  State of mind.  It's excluded

13   in the *Daubert*.

14              MR. GLUCK:  The witness is an expert.

15              THE COURT:  No, no.  Well, lucky me, I'm going to have

16   another sidebar.

17              (Continued on next page)

18

19

20

21

22

23

24

25

Mbu2Pla5                        Post - Direct

1              (At the sidebar)

2              THE COURT:  So I did not understand plaintiffs'

3     counsel's response to defense counsel's objection.  Defense

4     counsel's objection was that this was not within what the Court

5     permitted after its *Daubert* hearing and plaintiffs' counsel

6     said he is an expert.  That's a *non sequitur*.

7              MR. GLUCK:  He made an objection on state of mind.  My

8     response is that he is not testifying as to an individual's

9     state of mind, but rather the organization Platinum

10    Management's knowledge.

11             THE COURT:  And since when does an organization have a

12    state of mind.

13             MR. GLUCK:  They have knowledge.

14             THE COURT:  That's -- I don't think that's within what

15    I permitted, and I don't think it is what the rules of evidence

16    permit either, so the objection is sustained.

17             MR. LAUER:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

Mbu2Pla5                    Post - Direct

1                (In open court)

2                MR. GLUCK:  The question is withdrawn.

3                THE COURT:  But only after I overruled counsel asking

4     the question.  Go ahead.

5     BY MR. GLUCK:

6     Q.  Mr. Post, was this one of the documents you relied upon to

7     form your conclusion that there was a catastrophic

8     overvaluation of PPVA?

9     A.  Yes I relied on this document to reach my conclusion.

10    Q.  Mr. Post, were you also asked to evaluate the internal

11    management structure of Platinum Management?

12    A.  Yes, I was.

13    Q.  Mr. Bodner does not appear on Platinum Management SEC

14    registration documents.  Is that right?

15    A.  That's correct.

16    Q.  He does not appear on the fund's prospectus, is that right?

17    A.  That's correct.

18    Q.  On what basis do you state or what is the basis for your

19    conclusion that Mr. Bodner was in fact a senior partner, an

20    involved senior partner at Platinum Management?

21    A.  Well, I mentioned this previously, but I would look at how

22    they actually operated the business and what was Mr. Bodner's

23    involvement in this.  And so we heard and I have heard today

24    that this was a major investment for him; that he went into the

25    offices almost every day of the week for 15 years.

Mbu2Pla5                          Post - Direct

1          But it's highly unusual that one investor would have

2     access to this inside information.  Once you enter that tent,

3     so to speak, of knowledge you are no longer just an investor.

4     You are part of the management team.

5          And even if you are not running the day-to-day

6     operations, I have read and reviewed e-mails which said that --

7     from people that work there, that they referred to

8     Mr. Huberfeld and Mr. Bodner as the senior partners, as the

9     ones that made the ultimate decisions on major issues.  That's

10    fairly typical of the way investment organization works.  You

11    have got people that run the business and then you have people

12    that have the authority to actually make major decisions.  And

13    my review of the documents are that Mr. Bodner and

14    Mr. Huberfeld were the senior partners, made the major

15    decisions.

16         Mr. Nordlicht ran the business on a day-to-day basis.

17    But once you are at the company's offices, once you get an

18    e-mail account, you then cross that line.  The fact that,

19    again, in my review is that Angela was Mr. Bodner's assistant,

20    and if an e-mail was sent to her, then my conclusion is that it

21    is -- that's part of a methodology of conducting business.  And

22    so that changes someone's status from just being an investor to

23    actually being part of the management team.

24         And you don't have to have many points, or what we

25    call indicia, that point to whether a person is a manager or

not.  If you only had one of those that you could make major

decisions, stock, for example, distributions, that one decision

puts you into management because no other investors had that

power or authority.  No other investors who weren't part of

management were in their offices on a daily basis participating

in partnership meetings, participating in a whole variety of

other activities.

So it's not volume, it is the quality and the types of

decisions that Mr. Bodner and Mr. Huberfeld had the authority

to make, and my review of the documents are that they were

involved in the activities, making significant decisions for

the organization, and they did that for quite a continuous

period of time.

MR. LAUER:  Your Honor, we would ask that that be

stricken.  He was asked the question what facts and what we had

was a generalized answer.

THE COURT:  So I was waiting for you to make a similar

objection, but you allowed him to go on at great length before

you objected, and I consider that a waiver.

Overruled.

BY MR. GLUCK:

Q.  Let me ask specifically, you mentioned partner meetings

because I do want to get to the facts.  Did you review

documents which indicate that Mr. Bodner participated in

Platinum Management partner meetings with Mr. Huberfeld,

Mbu2Pla5                        Post - Direct

1    Mr. Nordlicht, and Mr. Fuchs?

2    A.  Yes, I did.

3    Q.  Were those documents in the form of calendar invites?

4    A.  Yes, they were.

5    Q.  Were these meetings described in deposition transcripts?

6         MR. LAUER:  I object.  His report says he read only

7    one deposition, and he has not filed a supplemental report.  I

8    think at this point forward we are entitled to facts.

9         MR. GLUCK:  Your Honor, he filed this report in --

10        THE COURT:  Excuse me.  The objection is sustained,

11   but I think counsel for both sides need to have less in the way

12   of speaking objections.  So from now on I will ask counsel to

13   say at most, when making objection, three words: "objection"

14   and then either you can state one word like "hearsay" or

15   "foundation" or "nonresponsive," or you can cite a rule, like

16   "Rule 403," and then plaintiffs' counsel in response can say

17   something like "coconspirator" or some other word or two, but

18   that's all.

19        Also, I'm going to ask the witness to confine yourself

20   to answering just the question asked.

21        Go ahead, counsel.

22   BY MR. GLUCK:

23   Q.  It was a compound question, so let me ask it one at a time.

24        Mr. Post, did you review documents in the form of

25   calendar invites indicating that Mr. Bodner attended

1    partnership meetings with Mr. Nordlicht, Mr. Huberfeld, and at

2    times Mr. Fuchs?

3    A.  Yes, I did.

4    Q.  And how often would those partnership meetings occur

5    according to the calendar invites?

6          MR. LAUER:  Hearsay.  No basis.  He doesn't know.

7          THE COURT:  Overruled.

8    A.  On a regular basis; quarterly, if not more frequently.

9    Q.  Mr. Post, did you review any deposition testimony?

10   A.  Yes.

11         THE COURT:  How many depositions did you review?

12         THE WITNESS:  I don't recall.

13         THE COURT:  Well, there was an assertion made a minute

14   ago that it was perhaps just one.  Is that right?

15         THE WITNESS:  That could be correct, your Honor.

16         THE COURT:  All right.

17   BY MR. GLUCK:

18   Q.  Mr. Post, are you distinguishing between deposition

19   testimony that you read in advance of submitting your report in

20   2019 as opposed to depositions that you may have read in

21   general and after that date?

22         THE COURT:  No, he can't rely on depositions he has

23   read thereafter.

24   BY MR. GLUCK:

25   Q.  But were you making that distinction?

Mbu2Pla5                          Post - Direct

1    A.  Yes.

2            THE COURT:  In any event, put another question,

3    counsel.

4    BY MR. GLUCK:

5    Q.  Did you review the deposition testimony of Mr. Michael

6    Katz?

7    A.  Yes.

8            THE COURT:  The question is was that before or after

9    you issued your report?

10           THE WITNESS:  I don't have the time frame in my mind.

11           MR. LAUER:  May I approach the bench?

12           THE COURT:  Yes.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. LAUER:  I am handing the Court his report and he

3    lists only one deposition.

4           THE COURT:  Which is?

5           MR. LAUER:  Bernard Fuchs, who will be testifying.

6           THE COURT:  That's neither here nor there.

7           MR. LAUER:  He only reviewed one deposition.

8           THE COURT:  He admitted a minute ago that it could be

9    only one, and now if you want to both stipulate that it's just

10   one and it's Mr. Fuchs, I will be happy to let you so

11   stipulate.  Do you so stipulate?

12          MR. GLUCK:  I stipulate that he reviewed Mr. Fuchs

13   prior to the submission of the report.

14          THE COURT:  All right.  Very good.  I will inform the

15   jury.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

Mbu2Pla5                         Post - Direct

1              (In open court)

2              THE COURT:  So ladies and gentlemen, there are three

3    types of evidence.  There is testimony, there are exhibits, and

4    there is something called a stipulation, where the parties

5    agree on something, and you can consider a stipulation as a

6    fact that both parties agree on, and therefore you can take it

7    into account.  So the parties at the sidebar have just

8    stipulated that this witness only reviewed one deposition

9    before he issued his report and that was the deposition of

10   Mr. Fuchs.

11             Go ahead.

12             MR. GLUCK:  I misspoke.

13             THE COURT:  That's all right.

14   BY MR. GLUCK:

15   Q.  Mr. Post, did you review the deposition of Mr. Fuchs prior

16   to the submission of your --

17   A.  Yes, I did.

18   Q.  -- report?

19             In that deposition did Mr. Fuchs describe Mr. Bodner's

20   role?

21   A.  He did.

22   Q.  Did he describe Mr. Bodner's participation in partner

23   meetings in which Mr. Fuchs attended?

24   A.  Yes, he did.

25   Q.  Did Mr. Fuchs describe an episode at one of these partner

Mbu2Pla5                          Post - Direct

1   meetings --

2           THE COURT:  No, no.  As I understand it, Mr. Fuchs is

3   going to testify?

4           MR. GLUCK:  Let me rephrase the question.  Mr. Fuchs

5   is being called.

6   BY MR. GLUCK:

7   Q.  Was part of your assessment that Mr. Bodner was an active

8   member of Platinum Management based upon his ability or lack

9   thereof to issue directives or orders?

10  A.  Yes.

11  Q.  Did you review deposition testimony of Mr. Fuchs indicating

12  that Mr. Bodner directed that no partner distributions will be

13  taken after that dinner meeting?

14  A.  Yes, I recall that.

15  Q.  Is it typical or atypical for a passive investor, as

16  Mr. Bodner claims to be, to be able to issue a directive of

17  that nature?

18  A.  I have never seen a passive investor issue that type of

19  directive.

20  Q.  What would be the effect?  Assuming that Mr. Bodner

21  directed that the partners at Platinum Management were no

22  longer allowed to withdraw money, what does that mean in

23  layman's terms?

24  A.  That means that he was concerned not only about depleting

25  operating funds, but it also meant that he was concerned about

1    valuations and whether the management fees were justified based

2    on valuations that he had seen.

3    Q.  Did you also review documents indicating that Mr. Bodner

4    had a role in telling Platinum Management personnel what they

5    could do or could not do?

6    A.  Yes.

7    Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

8    479, which is sought to be admitted.

9            Mr. Post, is this one of the documents that you relied

10   upon to form your conclusion that Mr. Bodner would direct what

11   a Platinum Management employee could do or not do, in this case

12   evidently providing some sort of Black Elk company?

13   A.  Yes.

14   Q.  And is it typical for a passive investor to have authority

15   over what other investors could know or not know concerning the

16   investments of a fund?

17           MR. LAUER:  Objection.

18   Q.  Based on your experience supervising hedge funds for 25

19   years.

20   A.  I've never seen a passive --

21           THE COURT:  Hold on a minute.  There is an objection.

22   That means you don't answer until I rule on the objection.

23           Overruled.  You may answer.

24   A.  In my experience, reviewing differential authority between

25   a passive investor and an active investor, a part of

1   management, I have never seen a passive investor who had the

2   ability or the authority to provide this type of instruction.

3   Q.  Thank you.  We ask to move 479 into evidence.

4           Mr. Parson, will you please call up Exhibit --

5   Plaintiffs' Exhibit 377.  And as you do that, Mr. Post, did you

6   review any documents that describe what actually went on at

7   these partner meetings that were the subject of the calendar

8   invites you testified to?

9   A.  No.

10  Q.  Mr. Post -- firstly I would like to seek to admit

11  Plaintiffs' Exhibit 377, into evidence which is an e-mail from

12  Mr. Bodner's secretary Angela Albanese to Mark Nordlicht and

13  others.

14          THE COURT:  Any objection?

15          MR. LAUER:  No.

16          THE COURT:  Thank you.  Received.

17          (Plaintiffs' Exhibit 377 received in evidence)

18  BY MR. GLUCK:

19  Q.  Mr. Post, is it typical for a passive investor to receive

20  information on positions of a fund outside a normal reporting?

21  A.  No, that would be, in essence, privileged and confidential

22  information.  If it was distributed to one investor, it should

23  have been distributed to all the investors.

24  Q.  Have you formed a view on whether Mr. David Bodner was

25  granted access to special knowledge by virtue of his attendance

1    at these partner meetings?

2    A.   Yes.

3    Q.   And what is that view?

4    A.   That he was treated not like an investor, but he was

5    treated as part of the management team because he received

6    information that other investors never received.

7    Q.   Thank you.

8              I think that we have admitted this.

9              Mr. Parson, will you please call up Plaintiffs'

10   Exhibit 376.

11             Move to admit 376 into evidence.

12             THE COURT:   Received.

13             MR. LAUER:   We object to 376.

14             THE COURT:   Well, you've got to be a little faster on

15   the draw, but what's the nature of your objection?

16             MR. LAUER:   It's not sent to Mr. Bodner or from

17   Mr. Bodner.

18             THE COURT:   No, no.  We have been over that.

19   Overruled.

20             (Plaintiffs' Exhibit 376 received in evidence)

21   BY MR. GLUCK:

22   Q.   Same question, Mr. Post.  Is it typical for a passive

23   investor to receive preliminary estimates regarding fund

24   performance?

25   A.   No, that's very unusual.

Mbu2Pla5                        Post - Direct

1    Q.  What does that indicate?

2    A.  Say that again please.

3    Q.  What does the receipt of preliminary estimates on fund

4    performance indicate?

5    A.  That's typically internal information, that's before

6    reports are submitted to the regulatory authorities and to the

7    investors.  So this is internal confidential information that a

8    passive investor would not be even entitled to receive.

9    Q.  Mr. Parson, will you please call up Exhibit 415, please.

10             I will seek to admit Plaintiffs' Exhibit 415.

11             THE COURT:  Received.

12             (Plaintiffs' Exhibit 415 received in evidence)

13   BY MR. GLUCK:

14   Q.  Mr. Post, was Abby Baez another secretary at Platinum?

15   A.  Yes.

16   Q.  Is this one of the documents that you relied upon to form

17   your conclusion that Mr. Bodner had access to special

18   knowledge?

19   A.  Yes, it is.

20   Q.  Is this one of the documents that you relied upon to form

21   your conclusion that he was not a passive investor in Platinum

22   Management?

23   A.  Yes, it is.

24   Q.  Do you recall testifying earlier regarding the sale of

25   nearly all of Black Elk's assets?

Mbu2Pla5                          Post - Direct

1   A.  Yes.

2   Q.  Do you recall when that occurred?

3   A.  Yes, I do.

4   Q.  And when was that?

5   A.  2014.

6   Q.  In the summer of 2014?

7   A.  Yes.

8   Q.  Without describing any detail, what surrounds the consent

9   solicitation which surrounded the Renaissance sale, can you

10  describe for me when a consent solicitation in relation to

11  Black Elk occurred?

12          MR. LAUER:  Objection.

13  A.  I don't have the --

14          THE COURT:  No.  You have to wait until I rule.

15          THE WITNESS:  Sorry.

16          THE COURT:  Overruled.  You may answer.

17  A.  Generally at the time frame of the date of this e-mail,

18  August of 2014.

19  Q.  In your experience overseeing hedge funds, would it be

20  typical for a passive investor to be granted meetings,

21  four-hour, uninterrupted meetings, with the chief investment

22  officer like Mark Nordlicht?

23          MR. LAUER:  I object.

24          THE COURT:  Sustained.

25  Q.  Final exhibit.  Mr. Parson, would you please call up

1   Plaintiffs' Exhibit 590.  Mr. Parson if you wouldn't mind going

2   to the Power Point slide, the next page, please.

3           Mr. Post, earlier in your testimony, you opined that

4   the April 2016 NAV statement contained a catastrophic

5   overvaluation.  Do you recall that?

6   A.  I do.

7   Q.  Have you reviewed the PowerPoint which is Exhibit 590?

8   A.  I have.

9   Q.  Is that one of the documents that led you to conclude that

10  Platinum Management overstated the net asset value of PPVA.

11  A.  Yes.  This is one of the documents I reviewed and based my

12  opinion on or conclusions.

13  Q.  What is your understanding based on your review of the

14  documents of what this presentation was about?

15  A.  Well, it's --

16          MR. LAUER:  Hearsay.

17          MR. GLUCK:  Conspiracy.

18          THE COURT:  No.  Not yet, anyway.

19          MR. GLUCK:  Withdrawn.  May I rephrase the question?

20          THE COURT:  Yes.

21  BY MR. GLUCK:

22  Q.  Does this presentation contain information about the

23  financials of PPVA?

24  A.  Yes, it does.

25          (Continued on next page)

MBUCpla6                        Post - direct

1           MR. GLUCK:  Mr. Parson, will you please go to the next

2      slide.

3           THE COURT:  So, what is this document?

4           THE WITNESS:  It was a review of the financial

5      condition of the portfolio companies of Platinum.

6           THE COURT:  Prepared by who?

7           THE WITNESS:  It was prepared by staff, I think given

8      to the CFO.

9           THE COURT:  Prepared by persons within Platinum?

10          THE WITNESS:  Yes.

11          THE COURT:  Are you offering 590?

12          MR. GLUCK:  We are.

13          THE COURT:  Any objection?

14          MR. LAUER:  It was never communicated to our client.

15     He's got a witness --

16          THE COURT:  That is not only an objection I've dealt

17     with before, but I think does not fit within my rule that I

18     just propounded earlier today.  The objection should be limited

19     to three words.  An objection which could have been stated as

20     irrelevant, that's what you're claiming, that's overruled.  Or

21     it could have been hearsay, that's also overruled.  So the

22     document is received.

23          (Plaintiff's Exhibit 590 received in evidence)

24          However, we are now at 4:30.  Ladies and gentlemen,

25     it's really lousy outside and I know you wanted to stay until

MBUCpla6                          Post - direct

1    midnight tonight when the rain would clear away, but,

2    unfortunately, I'm just going to have to let you go.

3           Tomorrow, we will start promptly at 9:30.  It's very

4    important to meet our timeframe that you all be here.  We can't

5    start unless all of you are here.  So, my suggestion is you

6    plan to be in the jury room about 9:20 or so and we'll start

7    promptly then.  See you tomorrow.  Have a good evening.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MBUCpla6                    Post - direct

1                (Jury not present)

2                THE COURT:  You may step down.  See you tomorrow.

3                So how much longer does plaintiff have on direct?

4                MR. GLUCK:  10 minutes with Mr. Post.

5                THE COURT:  And Mr. Lauer, I'll ask you to give me,

6      tomorrow morning, your indication of how long you'll be on

7      cross.

8                I should have mentioned this earlier, but I'm sure it

9      was already known to all counsel.  First, any witness, except

10     for Mr. Bodner, is excluded from this courtroom at all times,

11     both before and after he or she testifies.

12               Second, when a witness is on cross, the witness can

13     have no substantive communication with counsel.

14               All right.  We'll see you tomorrow.

15                                  * * *

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     WILLIAM POST

 4    Direct By Mr. Gluck  . . . . . . . . . . . . .56

 5

 6                          PLAINTIFF EXHIBITS

 7    Exhibit No.                              Received

 8     760  . . . . . . . . . . . . . . . . . . .74

 9     761  . . . . . . . . . . . . . . . . . . .78

10     382  . . . . . . . . . . . . . . . . . . .89

11     388  . . . . . . . . . . . . . . . . . . 101

12     459  . . . . . . . . . . . . . . . . . . 107

13     562  . . . . . . . . . . . . . . . . . . 109

14     563  . . . . . . . . . . . . . . . . . . 109

15     564  . . . . . . . . . . . . . . . . . . 111

16     592  . . . . . . . . . . . . . . . . . . 112

17     377  . . . . . . . . . . . . . . . . . . 127

18     376  . . . . . . . . . . . . . . . . . . 128

19     415  . . . . . . . . . . . . . . . . . . 129

20     590  . . . . . . . . . . . . . . . . . . 132

21

22                            JOINT EXHIBITS

23    Exhibit No.                              Received

24     72                                        70

25
```