MC1CPLA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   In re:

 4   PLATINUM-BEECHWOOD LITIGATION          18 Civ. 06658 (JSR)

 5   ------------------------------------x

 6   MARTIN TROTT and CHRISTOPHER           18 Civ. 10936 (JSR)
     SMITH, as Joint Official
 7   Liquidators and Foreign
     Representatives of PLATINUM
 8   PARTNERS VALUE ARBITRAGE FUND LP
     (in Official Liquidation) and
 9   PLATINUM PARTNERS VALUE ARBITRAGE
     FUND LP (in Official Liquidation)
10
                   Plaintiffs,
11
              v.
12
     PLATINUM MANAGEMENT (NY) LLC,
13   et al.,

14                 Defendants.

15   ------------------------------------x     Trial

16

17                                       New York, N.Y.

18                                       December 1, 2022
                                         9:15 a.m.
19

20   Before:

21                    HON. JED S. RAKOFF,

22                                         District Judge
                                            and a Jury
23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MC1CPLA1

1                              APPEARANCES

2    HOLLAND & KNIGHT, LLP
          Attorneys for Plaintiffs
3    BY:  WARREN E. GLUCK
          MARTIN L. SEIDEL
4         RICHARD A. BIXTER JR.
          QIAN (SHEILA) SHEN
5         NOAH W.S. PARSON
          ELLIOT A. MAGRUDER
6

7    KATTEN MUCHIN ROSENMAN, LLP
          Attorneys for Defendant Bodner
8    BY:  ELIOT LAUER
          GABRIEL HERTZBERG
9         JULIA B. MOSSE

10

11   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Defendant Bodner
     BY:  NATHANIEL C. AMENT-STONE
12        ALLESANDRA TYLER

13

14

15   Also Present:

16   Michael Robson, Paradocs Motion Support

17   Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25

MC1CPLA1

1          (In open court; jury not present)

2          THE COURT:  So, first, we will be sitting today only

3    until 3:45 because of other matters I have.

4          Secondly, how long does defense counsel want on cross

5    examination of the witness currently on the stand?

6          MR. LAUER:  Thank you, your Honor.  Good morning.  On

7    the assumption that Mr. Gluck has only 10 to 15 minutes more.

8          THE COURT:  He only asked for 10 and he only gets 10.

9          MR. LAUER:  It will be 2 hours and 25 minutes maximum.

10   I hope I can do it in less than two hours.

11         THE COURT:  That seems reasonable.

12         I received, in response to my draft preliminary

13   instruction, some proposed changes, mostly from defense

14   counsel.

15         The first was with respect to the second paragraph and

16   the second sentence, which in my draft reads, in 2016, PPVA

17   wound up its operations after its investments lost much of

18   their monetary worth.  Defense counsel would strike that and

19   substitute, "Platinum Management New York, LLC (Platinum

20   Management).  General partner investment manager PPVA filed a

21   petition and it came in court to commence an orderly wind-down

22   of PPVA under the Court's supervision."  I think that's

23   considerably more than I wanted to have in a preliminary

24   instruction.

25         How about, "In August 2016, Platinum Management New

MC1CPLA1

1    York, LLC, the general partner investment manager, PPVA,

2    commenced a wind-down of PPVA under court supervision."  It's

3    not that different.  Let me hear from plaintiffs' counsel.

4    I'll repeat that my suggestion, "in August 2016, Platinum

5    Management New York, LLC," I don't think we need that.  "A

6    general partner of an investment manager of PPVA commenced a

7    wind-down," I think probably should be hyphenated, "of PPVA

8    under court — lower case — supervision."

9             Any problems with that from plaintiffs' counsel?

10            MR. GLUCK:  No objection.

11            THE COURT:  Next, in the third paragraph where the

12   draft had "Plaintiffs' claim is that the defendant in this

13   case, David Bodner, had material control of PPVA."  And the

14   next words in the original were "and its related entities."

15   And defense counsel would strike "and its related entities" and

16   would substitute "through his control of Platinum Management."

17            And the very bottom of that same paragraph in the last

18   sentence where there was some reference to "unearned incentive

19   and management fees from PPVA to its owners and managers," and

20   defense counsel would change that to "the owners and managers

21   of Platinum Management."

22            Any objection from plaintiffs' counsel to any of those

23   changes?

24            MR. BIXTER:  Your Honor, for the first line item, we

25   think "related entity" is more appropriate, given Beechwood and

MC1CPLA1

1    the BUF funds, we think the original language was more

2    appropriate.

3              For the second one, we're fine with the change.

4              MR. HERTZBERG:  Your Honor, the language that we've

5    proposed tracks your Honor's summary judgment opinion at

6    ECF 624, page 24 almost verbatim.  What this case is about is

7    not control of PPVA through a control of Beechwood, the case is

8    about control of PPVA through the control of Platinum

9    Management, the investment management company.

10             MR. BIXTER:  Your Honor, our contention has always

11   been that Mr. Bodner's role at both Platinum Management and

12   Beechwood, his ownership of BUF is at the heart of this case

13   and these are a summary of the plaintiffs' allegations.

14             MR. HERTZBERG:  Your Honor, if I may, they may

15   summarize the plaintiffs' allegations, but those allegations

16   did not survive summary judgment.  What did survive was the

17   control of PPVA through the control of Platinum Management.

18             THE COURT:  I don't have my summary judgment opinion

19   in front of me, so I'll take a look at that.  Depending on how

20   that reads, I'll either go with the changes or not.  So I'll

21   see what the summary judgment said.

22             There is a similar change to the next paragraph.

23   There are two changes to the next paragraph.  They all are on

24   the same point.  So I'll ask my law clerk to get me my summary

25   judgment opinion, I'll take a look at it and resolve it one way

MC1CPLA1

1   or the other.

2          I think the time to give this instruction to the jury

3   is after the completion of the current witness.  So probably

4   sounds like late this morning, early this afternoon.

5          Is there anything else?

6          MR. LAUER:  Just one housekeeping matter.  Mr. and

7   Mrs. Bodner have a family celebration, their grandson is being

8   bat mitzvah'd this weekend, it's in Chicago.  So Mr. Bodner --

9   Cleveland.  Sorry.  Cleveland.  He will not be here tomorrow

10  and, if appropriate, I just ask the Court to explain that he

11  has a family matter.

12         THE COURT:  I'm not going to go into that it's a

13  bat mitzvah, and whether it's in Cleveland or Chicago is a

14  matter of debate, but I will make some appropriate --

15         MR. LAUER:  Thank you, your Honor.

16         MR. GLUCK:  One similar housekeeping matter.  We were

17  alerted by the court transcriber that exhibits PX 376, 377, and

18  479, which were sought to be introduced into the record

19  yesterday and the subject of either objections or not

20  objections, but intended to be introduced and admitted did not

21  make the index of the transcript because the court reporter was

22  waiting on an affirmative statement from the Court saying

23  "admitted" and either she didn't hear it or --

24         THE COURT:  I think the affirmative statement from the

25  Court is that they are received and I will now break down and

MC1CPLA1

1    make that affirmative statement so they are all received.

2            MR. GLUCK:  Great, 376, 377, 479.

3            THE COURT:  Very good.

4            (Plaintiffs' Exhibits 376, 377, 479 received in

5    evidence)

6            The jury is ready.  Let's get the witness back on the

7    stand in the meantime.

8            THE DEPUTY CLERK:  Juror No. 3 called me at 9:28

9    saying he was pulling into the parking lot he uses down here.

10   So I imagine he'll be here a quarter of.  They do have a little

11   plaque to get him in as fast as possible.  Let's say 9:40.

12           THE COURT:  I'm sorry about that.  Sounds like there

13   is nothing we can do about it.

14           THE DEPUTY CLERK:  Nine minutes.

15           THE COURT:  It will give me a chance to look at my

16   summary judgment.  So we'll take a 10-minute break.

17           (Recess)

18           (Continued on next page)

19

20

21

22

23

24

25

MC1Cpla1                         Post - Direct

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  I

3      know one of you had a slight driving problem, those things

4      happen, but we are ready to proceed.

5              MR. GLUCK:  Mr. Parson, would you recall Plaintiffs'

6      Exhibit 590, which is where we left off.  I'll ask you begin

7      with the cover page of the Power Point.  Thank you.

8       WILLIAM POST, resumed.

9      DIRECT EXAMINATION CONTINUED

10     BY MR. GLUCK:

11     Q.  Mr. Post, is this Power Point one of the documents that you

12     reviewed in concluding that the net asset value of PPVA had

13     been catastrophically overvalued?

14     A.  Yes, it is.

15     Q.  What is your understanding of what this document is?

16     A.  My understanding is this was prepared by an outside

17     consultant who was intimately involved in the operations of

18     Platinum and their portfolio companies, and that this was

19     prepared for the management team and senior leadership team at

20     Platinum to describe the state of affairs at Platinum on or

21     about the first quarter of 2016.

22     Q.  Seth Gerszberg and David Steinberg?

23     A.  Yes, that's correct.

24             MR. GLUCK:  Would you please turn to page 11,

25     Mr. Parson.

MC1Cpla1                          Post - Direct

1    Q.  Mr. Post, have you reviewed slide 11, page 11?

2    A.  Yes, I have.

3    Q.  And what does that tell you?

4    A.  It tells me that there is a considerable amount of debt and

5    encumbrances that are devaluing the assets of Platinum.

6    Q.  Are all of these debts encumbrances listed within the

7    liability section of the 2016 NAV sheet?

8    A.  No, they are not.

9         MR. GLUCK:  Mr. Parson, could you please go to the

10   next slide or page.

11   Q.  Have you reviewed this slide in connection with your

12   testimony here today?

13   A.  Yes, I have.

14   Q.  Does this slide provide a basis for your conclusion that

15   Platinum Management's valuations of PPVA's assets were

16   materially misstated?

17   A.  Yes, that demonstrates part of the record that I believe

18   led me to the conclusion that the assets were grossly

19   overstated, the value.

20   Q.  Do you see the first bullet, total unencumbered assets?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  That refers to assets that do not have -- they are not

24   collateralized or being used to securitize loans.

25   Q.  Assuming that that bullet point is accurate, what would

MC1Cpla1                        Post - Direct

1    that indicate the NAV of the fund to be?

2    A.  Well, in the 2016 balance sheet, I believe that they showed

3    a hundred and -- they showed a total asset value of

4    $900 million, and if the unencumbered assets were only valued

5    at $312 million, that is a $600 million overstatement of value.

6           MR. GLUCK:  Could you highlight, please, Mr. Parson,

7    the next bullet point.

8    Q.  If PPVA had a net asset value of approximately

9    700 million-plus as it was represented in 2016, what would you

10   expect, based on your 25 years overseeing hedge funds, the

11   amount of assets which could be unencumbered and borrowed

12   against?

13          MR. LAUER:  Objection.

14          THE COURT:  As phrased, sustained.

15          MR. GLUCK:  I'll rephrase.

16   Q.  Mr. Post, in your years supervising hedge funds, were there

17   occasions when hedge funds would seek to borrow against the

18   assets that they held?

19   A.  Yes, I've seen that on many occasions.

20   Q.  Here, does it appear that this presentation is saying that

21   PPVA only has $40 million of assets that are unencumbered to

22   borrow against?

23   A.  Yes, after reviewing this document, they are -- this

24   document purports to say that despite the balance sheet

25   indicating that the net asset value was $700 million-plus,

MC1Cpla1                       Post - Direct

1   according to this document, there's only $40 million that is

2   unencumbered.  So that means that, substantially, all of the

3   assets are encumbered and therefore could not be borrowed

4   against.

5   Q.  I'll just note for the record, in that answer, you used the

6   correct $700 million net asset value.  I think you used the

7   $900 million in a prior answer, but I think that was a slipup.

8           MR. GLUCK:  The last bullet point, please, Mr. Parson.

9   Q.  What does it mean, from the perspective of one overseeing a

10  hedge fund, that PPVA has no additional funds -- excuse me.  I

11  misspoke.  PPVA has no ability to borrow additional funds to

12  cover its debts?

13  A.  This means that, for all intents and purposes, PPVA was

14  insolvent.

15  Q.  How does that track with a purported NAV of more than

16  $700 million?

17          MR. LAUER:  Objection.  Outside the scope of the

18  report.

19          MR. GLUCK:  The report contains liability --

20          THE COURT:  No.  Overruled.

21          MR. GLUCK:  Mr. Parson, will you please bring up

22  Defendant's Exhibit 144.

23          Excuse me.  I didn't get the question.

24  Q.  How does that track with the contention, in the April 2016

25  NAV statements, that there was a $700 million-plus NAV?

MC1Cpla1                    Post - Direct

1   A.  It indicates to me that there was a substantial material

2   overstatement of the value of Platinum.

3          MR. GLUCK:  Thank you.  Now, this is a defense exhibit

4   to which we have no objection.

5          So I would move Defendant's Exhibit 144 into evidence.

6          THE COURT:  Received.

7          (Defendant's Exhibit 144 received in evidence)

8   Q.  Mr. Post, in your review of documents concerning the human

9   beings who were actually running Platinum Management, did you

10  have an understanding of who Seth Gerszberg was?

11  A.  Yes.

12  Q.  What was he doing?

13  A.  Outside consultant that was retained to assist in trying to

14  correct the problems at Platinum.

15  Q.  Is it your understanding, based on your holistic review of

16  the documents, that Seth Gerszberg delivered the Power Point

17  that we just looked at to Mr. David Bodner?

18  A.  Yes.  My understanding is that he prepared those documents

19  and that Power Point.

20         MR. GLUCK:  Mr. Parson, will you please call up

21  Plaintiffs' Exhibit 225.

22         I would ask that Exhibit 225, Plaintiffs' Exhibit 225

23  be moved into evidence.

24         THE COURT:  Any objection?

25         MR. LAUER:  No.

MC1Cpla1                         Post - Direct

```
 1   Q.  Can you identify what Exhibit 225 is for us, Mr. Post?

 2               THE COURT:  I'm sorry.  You would have to wait for me

 3   to say the magic word, received.

 4               MR. GLUCK:  I'm sorry.  That was my fault.

 5               (Plaintiffs' Exhibit 225 received in evidence)

 6               THE COURT:  Go ahead.

 7   A.  This is a side letter from Mr. Nordlicht which indicates

 8   that he is offering additional collateral or security to, in

 9   essence, the Beechwood management company to securitize

10   obligations.

11   Q.  Obligations of Golden Gate Oil?

12   A.  Yes.

13   Q.  So wait.  Beechwood was holding that Golden Gate Oil debt;

14   right?

15   A.  Yes.

16   Q.  About 38, $40 million worth?

17   A.  That's correct.

18   Q.  And on January 13th, Mark Nordlicht is agreeing to have

19   PPVA repay all of that debt?

20   A.  That's correct.

21   Q.  Was that liability included in the NAV sheets that you

22   reviewed in 2016?

23   A.  No, it was not included.

24   Q.  And what is the effect of not including a liability such as

25   this --
```

MC1Cpla1                         Post - Cross

1          MR. LAUER:  Objection.

2     Q.  -- on the NAV?

3          MR. LAUER:  Objection.

4          THE COURT:  Overruled.

5     A.  Well, it's very unusual.  This company that they reference

6     in this document, Implant Sciences, was a portfolio company

7     owned by Platinum.  So this is one of the, quote, assets of the

8     fund, and they are, in essence, promising proceeds and the

9     value of that asset to securitize the obligations of Platinum.

10    That's a very unusual circumstance for a hedge fund to use

11    portfolio companies to collateralize debt because it diminishes

12    the value of the fund.  And this also was not listed as a

13    liability in their calculation that we just spoke about, that

14    showed the 700-plus-million dollars of value.

15         MR. GLUCK:  Thank you, Mr. Post, for your time.  I

16    have no more questions.

17         THE COURT:  Cross examination.

18    CROSS-EXAMINATION

19    BY MR. LAUER:

20    Q.  Good morning, Mr. Post.  Prior to yesterday, we had never

21    met; right?

22    A.  That's correct.

23         MR. LAUER:  Can you put back up PX 225 for a minute.

24    Q.  So you said that the matter that is reflected in 225, in

25    your opinion, should have been reflected as a liability on the

MC1Cpla1                          Post - Cross

1    balance sheet.  Did I understand your testimony correctly?

2    A.   That was my testimony.

3    Q.   How exactly would this be reflected as a liability on the

4    balance sheet?

5    A.   Well, it's an encumbrance, so whether it's contingent or

6    actual is a determination that would have to be analyzed.  But,

7    in my opinion, based on my professional experience in analyzing

8    balance statements and the operations of hedge funds, this

9    should have been listed as an encumbrance.  That's my

10   professional opinion.

11   Q.   You said on direct examination this should have been listed

12   on the balance sheet as a liability, did you not?

13   A.   I think that that is not exactly what I said.  It should

14   have been included as an encumbrance.  Whether it was actually

15   listed is a matter more for the way an accountant might prepare

16   a balance sheet.

17   Q.   Did I misunderstand, did you or did you not say, in

18   response to Mr. Gluck's statement, that this item should have

19   been listed as a liability on the balance sheet?  You can

20   change your testimony if you want, but did you not testify to

21   that?

22   A.   It should have been listed.

23   Q.   As a liability?

24   A.   Yes.

25   Q.   In what dollar amount?

MC1Cpla1                        Post - Cross

1   A.  Well, I don't have a document in front of me that could

2   make that calculation.  The debt, I think, was approximately

3   $40 million.

4   Q.  Now, you know, right, as you sit here, that what you really

5   meant to say was you thought this should be disclosed, not that

6   it should have been listed as a liability.  Isn't that what

7   you're trying to say now?

8   A.  No, sir, that's not.

9   Q.  What?

10  A.  No, sir, that is not.

11  Q.  So tell me the dollar amount that should be listed as a

12  liability.

13  A.  Well, not only -- actually, it possibly could have been an

14  additional amount because there is the debt of $40 million and

15  then the encumbrance has some value.  So the value should have

16  been determined and it should have been included.

17  Q.  How much, what is the dollar amount of the liability?

18  A.  I don't have the calculations in front of me.  I'm just

19  talking from a conceptual perspective and from an ethical

20  perspective, this is what should have been done.

21  Q.  In all of your review, did you see anything that connected

22  Mr. Bodner to this letter?

23  A.  Indirectly, yes.

24  Q.  Did you see any document that connected Mr. Bodner to this

25  letter?

MC1Cpla1                        Post - Cross

1    A.  Sir, I have reviewed, comprehensibly, the record.  And I

2    think my previous testimony is that Mr. Bodner was a managing

3    member of the management team at Platinum Management, and this

4    document was prepared by Mark Nordlicht, who was also part of

5    the leadership.  So, in my opinion, based on my review of the

6    record, it's clear that Mr. Bodner had direct knowledge or the

7    management team had knowledge of this and it should have been

8    included as an encumbrance in some manner, shape, or form and

9    calculated as part of the net asset value, which was not done.

10   Q.  Did anyone tell you that Mr. Bodner saw this letter or was

11   informed of this letter or its contents before it was sent?

12   A.  No.

13   Q.  Did you see in anyone's deposition that Mr. Bodner was

14   informed of this letter or knew of this letter?

15   A.  Based on my review of the record, it's clear that he was

16   involved in significant matters relating to the fund and

17   therefore I would say yes, he was aware of this based on his

18   role at Platinum Management.  He was there every day of the

19   week for 13, 14, 15 years, and this is a significant issue.

20   And I also reviewed in the record the many times that

21   Mr. Nordlicht met with Mr. Huberfeld and Mr. Bodner, and it

22   would seem to me this is a significant matter that

23   Mr. Nordlicht, based on the way he operated, would have

24   disclosed this to Mr. Bodner.

25   Q.  Okay.  But now can you answer my question.  Did you see

MC1Cpla1                        Post - Cross

1  anything in any deposition or any document that connected

2  Mr. Bodner to this particular matter?

3  A.  Nothing other than my conclusions about how the business

4  operated.

5  Q.  So you saw nothing, except you're making a conclusion;

6  right?

7  A.  No, that's not what I said.

8  Q.  Okay.  Then tell me what you saw or what someone told you

9  that connected Mr. Bodner to this particular letter or the

10 matter that's in this letter.

11 A.  Reiterating what I said, Mr. Bodner was part of the senior

12 management team and Mr. Nordlicht signed this letter.

13 Q.  Is that it?

14 A.  I think that's a comprehensive description of my answer.

15 Q.  You also said Mr. Bodner came to the office for 15 years

16 five days a week.  Did I hear you correctly?

17 A.  I believe that's what the record indicated.

18 Q.  What record?

19 A.  Testimony, deposition testimony, records, emails.

20 Q.  Tell me one person's deposition who said that for 15 years,

21 Mr. Bodner came to the office every day of the week.

22 A.  Actually, I believe that's what you said in your opening

23 statement.

24 Q.  My opening statement is not evidence.

25      Tell me one person who either told you live or a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MC1Cpla1                              Post - Cross

1   deposition that you read or a document that you saw that

2   Mr. Bodner came to the office every day of the week, five days

3   a week.

4   A.   Well, in addition to what you said in your opening

5   statement that he was at the office doing charitable work, you

6   also said that he had an office --

7           THE COURT:   Excuse me.   What counsel said in his

8   opening statement is not evidence and you should not refer to

9   it in your answer.

10          Please answer the question that was put.

11          THE WITNESS:   Thank you, your Honor.

12  A.   Would you restate the question.

13          MR. LAUER:   Would the court reporter read the question

14  back.

15          THE COURT:   Question was, tell me one person who

16  either told you live or a deposition that you read or a

17  document that you saw that Mr. Bodner came to the office every

18  day of the week, five days a week.

19  A.   Well, we've reviewed in the evidence and the exhibits that

20  I talked about, many emails just in my testimony yesterday that

21  indicated meetings that took place between staff members with

22  Mr. Bodner, and I made a comprehensive review of emails and

23  other records and it was my conclusion, based on those, that

24  Mr. Bodner was at the offices on a regular basis.

25  Q.   Well, a regular basis is not five days a week.   So is it

MC1Cpla1                       Post - Cross

1  fair to say that you have no basis to say that Mr. Bodner came

2  to the office for 15 years, five days a week?  Would you agree

3  with that?

4  A.   I have a basis upon which he was -- my review of the record

5  was that he was at the offices on a regular basis for an

6  extended period of time from the beginning of the fund

7  establishment in 2003 until 2015, 2016, and I think the record

8  reflects that and I relied on those records in arriving to that

9  conclusion.

10 Q.   So you have no basis to say, as you did several times in

11 your testimony, that for 15 years, Mr. Bodner came to the

12 office five days a week; correct?

13 A.   I reviewed the record and I believe the record supports my

14 conclusion.

15 Q.   Can you cite one document, one item of testimony --

16             THE COURT:  Asked and answered.  Go along to something

17 else.

18 Q.   By the way, you were tasked by Holland & Knight,

19 Mr. Trott's counsel, to form an opinion back in 2019 on whether

20 Mr. Bodner controlled Platinum Management and PPVA; correct?

21 A.   That's not precisely what my assignment was.  I think

22 that's a slight mischaracterization.

23 Q.   Was that included in your assignment, that you were tasked

24 with forming an opinion on whether Mr. Bodner had

25 decision-making authority and control of Platinum Management

MC1Cpla1                          Post - Cross

1   and PPVA?

2   A.  Yes, that was part of my opinion.

3   Q.  And at the time that you delivered your report, Mr. Bodner

4   had already given his deposition in this case; right?

5   A.  I don't recall the precise time.

6   Q.  And you did not read Mr. Bodner's deposition before

7   delivering your report, did you?

8   A.  I did not.

9   Q.  I'm going to show you Exhibit JX 72, which is the SEC

10  deficiency letter that you were shown yesterday.

11          Now, you testified about this letter yesterday;

12  correct?

13  A.  Yes, I did.

14  Q.  And the SEC staff was at Platinum's office for over a year.

15  Do you remember that?

16  A.  The document says what it says.

17  Q.  Did you look at the work papers that went with this?

18  A.  I've looked at the work papers that were prepared by

19  accountants.

20  Q.  Did you look at the communications from Platinum to the SEC

21  that are in the Platinum server to see all the communication

22  back and forth over the period of one year when the SEC staff

23  was at Platinum's office?

24  A.  I've been working on this case for over three years, and so

25  we reviewed these documents, yes.

MC1Cpla1                        Post - Cross

1   Q.  And when the staff was there, they were able to see who was

2   coming into the office and who was not; right?

3   A.  I can't answer that question.

4   Q.  The SEC could see whether Mr. Bodner was there; right?

5   A.  I can't answer that question.

6            THE COURT:  Sustained.

7            MR. LAUER:  Thank you.

8   Q.  Now, in this letter, the SEC noted a number of deficiencies

9   in the way Platinum Management ran its office; right?

10  A.  Yes.

11  Q.  But there's nothing in this letter that suggests from the

12  SEC's point of view that they found fraud in the valuations, is

13  there?

14  A.  I'm not sure that was their task.

15  Q.  There's nothing in this letter which suggests fraud in the

16  valuations; correct?

17  A.  Well, I would disagree with that.  They had a very

18  significant set of comments and observations with the valuation

19  process and the lack of the retention of documents.  If those

20  documents had been maintained and if records of the valuation

21  committee had been available for review, it's likely or

22  possible they could have discovered some aspect of this

23  valuation scheme.

24  Q.  Is there anything in this letter in which the SEC, after

25  spending a year at Platinum, says that they find that the

MC1Cpla1                        Post - Cross

1    valuations were fraudulent?

2    A.   In my professional opinion, doing this for many years and

3    reviewing hedge funds' activities, if an actor or an investment

4    management company has the intent to deceive, it is not often

5    easy for anyone to conclude that or to discover that.  So I

6    believe, as I said previously, that the fact that they didn't

7    keep records made it very difficult for the SEC or for anyone

8    else analyzing their activities to actually understand what was

9    going on inside the business.

10   Q.   Okay.  But in this SEC deficiency letter, they do not say

11   that they found fraud in the valuations; correct?

12   A.   I think they go into this believing companies are honestly

13   conducting business.

14   Q.   Is there anything in the letter in which the SEC says that

15   they are concerned that the valuations are inflated?

16   A.   Yes, they do.  I think indirectly, you could interpret the

17   way that their valuation methodology was not adhered to, the

18   compliance functions were not adhered to, the supervisorial

19   functions that they mentioned, and the fact that there were no

20   minutes of the meetings.  Those are all significant issues

21   relating to this topic.

22   Q.   Do they ever say in this letter that they are concerned

23   that, as a result of these bookkeeping errors or deficiencies,

24   that they are concerned that the assets are inflated?

25   A.   As I said, I believe that there is an indirect link to

MC1Cpla1                          Post - Cross

1    that -- to your question in what they pointed out were

2    deficiencies.

3    Q.  Is there any suggestion in this letter that Mr. Bodner was

4    a control person or a manager, and that is another deficiency,

5    it should have been disclosed in the ADV forms that were filed

6    with the SEC?

7    A.  I'm not sure they are aware of that issue.

8    Q.  I'm not asking you what they were aware of, I'm asking you

9    what's in the letter.

10   A.  Well, I don't have the entire letter in front of me.  If

11   you would like me to take a look at that, I could do that.

12   Q.  Please, go ahead.

13            MR. LAUER:  May I hand it to the clerk to hand it to

14   the witness, your Honor?

15            THE COURT:  Yes.

16            MR. LAUER:  I'm handing up Exhibit 72.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1    A.   Is there a question?

2    Q.   Yes.

3    A.   Could you please repeat your question?

4    Q.   Is there any suggestion in this letter that Mr. Bodner was

5    a control person or a manager and that is another deficiency

6    and it should have been disclosed in the ADV forms that were

7    filed with the SEC?

8    A.   Well, as I explained in my background, I do work for the

9    enforcement division of the SEC.  I have read many deficiency

10   letters.  In the first page of this letter they, in essence,

11   say that this is a preliminary finding.  So notwithstanding the

12   fact that it may not have been specifically mentioned, this

13   letter points out an initial investigation of Platinum's

14   investment activities.  And even in the last paragraph of this

15   letter, they talk about the level of serious concerns they have

16   about the failure to maintain e-mails.  So they were looking

17   for a response, and I merely pointed out the fact that this is

18   the first stage of the investigation, and the follow-on

19   activities of the SEC would be based on the responses that they

20   received from Platinum.  And shortly thereafter, Platinum went

21   out of business.

22   Q.   Can you answer my question, sir?  Is there anything in the

23   letter that says the ADV forms should have listed Bodner as a

24   control person?

25   A.   No.

Mc12Pla2                          Post - Cross

1    Q.  Thank you.

2            Now, the SEC staff interviewed every single person who

3    worked at Platinum, right?

4    A.  I do not know that.

5    Q.  Do you know that they interviewed a number of people?

6    A.  I'm not familiar with what they did.

7    Q.  Do you know that they posed numerous questions to the

8    compliance officer and the chief legal officer during the

9    course of the year that they were there?

10   A.  I don't know specifically what they did in their

11   investigation.

12   Q.  Okay.  I'm going to show you marked for

13   identification—it's not in—DX 188.  Take a look at it.  It is

14   a cover e-mail and three pages.  Do you see that it is from

15   Harvey Werblowsky, Joshua Kramer to Syed Husain at the SEC?

16   A.  Yes, I see that.

17   Q.  And it is January 8, 2015?

18   A.  Yes.

19   Q.  And the deficiency letter was September 22, 2015, nine

20   months later?

21   A.  Yes.

22   Q.  Okay.  Turn to the second page of the attachment.  Do you

23   see the request list --

24           THE COURT:  Excuse me.  This is not in evidence.

25           MR. LAUER:  We move it.  We move DX 188.

Mc12Pla2                          Post - Cross

1                THE COURT:  Any objection?

2                (Counsel confer)

3                MR. GLUCK:  No objection.

4                THE COURT:  So is there an objection?

5                MR. GLUCK:  No.

6                THE COURT:  Received.

7                (Defendant's Exhibit 188 received in evidence)

8     BY MR. LAUER:

9     Q.  So if everyone can now see DX 188, this is a cover e-mail

10    to the SEC, right?

11    A.  Appears to be.

12    Q.  And it attaches a number of responses to SEC requests that

13    were numbered.  Do you see that?

14    A.  No.  I'm not following you.

15    Q.  The first page of the attachment, Platinum Partners, do you

16    see that?

17    A.  The first page, yes.

18    Q.  And this is a response to a request made by the SEC,

19    correct?

20    A.  It appears that that is the case.  I will accept your

21    representation of that.

22    Q.  Okay.  So now turn to the next page, request list 32.  Do

23    you see that?

24    A.  I do see that.

25    Q.  And number 15, they asked for a detailed description of

1   Murray Huberfeld's and David Bodner's association with the

2   advisors.  Do you see that?

3   A.  I do.

4   Q.  And this is back in January, nine months before the

5   deficiency letter.  Right?

6   A.  Yes.

7   Q.  In the second paragraph, in response to list 32, the SEC is

8   advised that Mr. Bodner is a beneficiary of a trust and a

9   limited partner and a non-managing member in certain of the

10  advisors, including Platinum Management.  Do you see that?

11  A.  Yes, I do.

12  Q.  And then no. 16 says, "Please indicate whether David Bodner

13  and Murray Huberfeld were ever part of the investment

14  decision-making process for any of the advisor's investments

15  and potential investments for the last four years."

16          Have I read that correctly?

17  A.  Yes, you have.

18  Q.  And the first response says that Mr. Huberfeld was the

19  chief investment officer for Centurion for a period of time,

20  correct?

21  A.  Yes.

22  Q.  And then the next paragraph, if you turn to the following

23  page, and let's read that, the SEC was told, "Mr. Bodner has

24  never held any position with the advisors, and has never held

25  any decision-making authority with respect to the advisors'

Mc12Pla2                          Post - Cross

1    investments or potential investments.  He is, however, a

2    passive business partner of Mr. Huberfeld and Mr. Nordlicht in

3    the advisors, as described in no. 15 above, and also a

4    substantial stakeholder in the funds as an investor.  As such,

5    he keeps himself informed regarding the investments held by the

6    fund, their performance, and issues related to those

7    investments.  From time to time, Mr. Huberfeld and

8    Mr. Nordlicht seek Mr. Bodner's input and opinions regarding

9    investments or potential investments."

10            Have I read that correctly?

11   A.  Yes.

12   Q.  And the SEC had nine months to follow up and to see whether

13   the people at Platinum agreed with that, right?

14            THE COURT:  Sustained.

15   A.  I can't answer that.

16            THE COURT:  Sustained.  This witness has already

17   indicated he has no knowledge of what the SEC did or did not

18   do.  So any questions along those lines are out.

19            Counsel, come to the sidebar.

20            (Continued on next page)

21

22

23

24

25

Mc12Pla2                            Post - Cross

1              (At the sidebar)

2              THE COURT:  So I am, in an adversary system, very

3      reluctant to intervene.  In my opinion, plaintiffs' counsel

4      might have interposed objections to numerous of the questions

5      put by defense counsel but chose not to do so.  I intervened

6      once or twice simply because we need to move this matter along.

7      Nevertheless, let me advise plaintiffs' counsel that if you

8      want to sit there like a potted plant, that is your choice, and

9      the Court is only going to intervene in the most extreme

10     circumstances to move things along or for clarification.  So

11     whatever bed you choose to lie in will be the bed you will lie

12     in.

13             MR. GLUCK:  Understood.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. LAUER:

3    Q.  Now, with respect to the matters that the SEC did address,

4    did you see anything in Platinum's records that reflected that

5    Mr. Bodner had any responsibility for record retention?

6              MR. GLUCK:  Objection to this entire line of

7    questioning on the grounds that it misstates facts known to the

8    public and the Court; to wit, while --

9              THE COURT:  Wait.  Excuse me.  The Court's rules are

10   you can state up to three words on an objection.  You are

11   already up to about ten.  What is the ground of your objection

12   either under -- you can cite a rule if you would like or you

13   can use one or two words, but not a whole speech.

14             MR. GLUCK:  Misstates record.  SEC filed a complaint

15   on valuation against Platinum Management.

16             THE COURT:  Overruled.

17             As I understand this line of questioning, it is

18   counsel wants to see what, if anything, was said about

19   Mr. Bodner in any of the documents that the witness says he

20   relied on in forming his opinions, and that is perfectly

21   appropriate cross-examination.  What would not be appropriate

22   cross-examination would be to ask the witness to speculate as

23   to what the SEC saw, heard, did, or things of that sort.  He

24   wasn't there and there is nothing in the record regarding it.

25             Go ahead.

Mc12Pla2                        Post - Cross

1    BY MR. LAUER:

2    Q.  Did you see anything in the -- in your review of documents

3    in preparing your report that Mr. Bodner had a specific role in

4    producing the NAV statements?

5    A.  In my review of the record, he didn't actually do maybe the

6    administrative work; but the overarching issues, yes, the

7    record supports the fact that he was aware of the issues.

8    Q.  So --

9    A.  That's a different set of responsibilities.  The actual

10   preparation sounds ministerial or administrative.  And so you

11   start with the conceptual issues that we discussed about how

12   you value your company and your assets and your debts and

13   liabilities, and then you work down through an administrative

14   process to actually prepare a document which sets forth the

15   NAV.  So that's -- there is nothing inconsistent there --

16          THE COURT:  Excuse me.  I have already had occasion to

17   point out to counsel the rules of the game, but let me point it

18   out to you as well.  Just answer the question.

19          The question was:  Did you see anything in your review

20   of documents in preparation for your report that Mr. Bodner had

21   a specific role in producing the NAV statements?  I think

22   that's a yes-or-no question.  What's the answer?

23          THE WITNESS:  Yes.

24          THE COURT:  What did you see?

25          THE WITNESS:  Mr. Bodner was involved in the

Mc12Pla2                    Post - Cross

1    significant discussions about the values of the portfolio

2    companies and their encumbrances.

3           THE COURT:  All right.

4    BY MR. LAUER:

5    Q.  Do you have any document that you refer in your report

6    where Mr. Bodner participated in valuation committee meetings?

7    A.  My conclusions were based on my entire -- the review of the

8    entire record.

9    Q.  But you cite no document in your report that reflected

10   Mr. Bodner participating in valuation committee meetings,

11   right?

12   A.  I don't believe I specifically addressed that in my report.

13   Q.  And when you talk about him discussing valuations, you are

14   really referring to the briefing that Mark Nordlicht would give

15   every couple of months to the partners, right?

16   A.  That was one element.

17   Q.  Do you have any other evidence in your opinion that

18   Mr. Bodner discussed the valuations of these particular assets

19   with someone else at Platinum?

20   A.  My conclusions were based on a very comprehensive review of

21   the record.

22   Q.  Can you identify any individual other than Mr. Nordlicht,

23   who, according to you, discussed the valuations of the assets

24   with Mr. Bodner?

25   A.  Well, even reading this letter, the response we are looking

Mc12Pla2                    Post - Cross

1    at, and it's in the screen in front of me, it says, "As such,

2    he keeps himself informed regarding the investments held by the

3    fund, their performance, and issues related to those

4    investments."  And I would interpret that as encumbrances and

5    valuations of portfolio companies.  So this is a document we

6    reviewed and we relied on this.

7    Q.  I asked you can you identify any individual other than

8    Mr. Nordlicht with whom Mr. Bodner would have discussed

9    valuations of the assets.

10   A.  My testimony was that the management team, including chief

11   risk officers, CFOs, David Levy, portfolio managers, there were

12   a variety of people that were in senior positions in running

13   the fund that, based on my review of the records, I reached a

14   conclusion that Mr. Bodner had discussions with all of those

15   folks about these issues.

16   Q.  Do you cite to any specific, tangible evidence that in fact

17   shows what you just said, that those individuals spoke about

18   valuations of the assets with Mr. Bodner?

19          MR. GLUCK:  Objection.  The witness is being asked to

20   recall a 100-paragraph report he wrote with all of its

21   footnotes.  Can the witness please see his report so that he

22   can identify the answers to Mr. Lauer's questions?

23          THE COURT:  So putting aside the fact the objection

24   part of what you just said was either 13 or 14 words, depending

25   on whether "100 paragraph" is hyphenated or not, I think what

Mc12Pla2                          Post - Cross

1   you intended to say was "show him the report."

2            MR. GLUCK:  "Show him the report."

3            THE COURT:  That is granted.

4            MR. LAUER:  I am happy to do that.  May I hand it to

5   the -- I am handing my copy of the report.

6   A.  May I have a moment to review this?

7   Q.  Sure.

8            THE WITNESS:  Maybe to save time I can go through my

9   report, your Honor, and I can answer his question by doing

10  that?

11           THE COURT:  Sure.

12  A.  On page 11, footnote 25, I reference e-mails that support

13  the position that Mr. Bodner, Mr. Huberfeld were members of the

14  management team and reported on a routine -- or were informed

15  on a routine basis by Mr. Landesman, Mr. Levy, Mr. Nordlicht

16  about business operations.

17           Footnote no. 26 also.

18  Q.  No. 26, reciting an e-mail exchange between Mr. Jedwab and

19  Mr. Nordlicht?  That's what you are referring to?

20  A.  Yes.

21  Q.  And --

22  A.  And that's contained in paragraph 24 of my report, of my

23  opinion, which references directly my opinion that Mr. Bodner

24  and Mr. Huberfeld were senior members of the management team,

25  not passive investors.

Mc12Pla2                          Post - Cross

Q.  The question, and the reason you were given the report was
can you identify an individual other than Mr. Nordlicht who
discussed the valuation of the assets with Mr. Bodner?  That's
what --

             THE COURT:  No.  That was an earlier question.  I
don't think that was the specific question that you put right
before his counsel asked for the report.  So just put a
separate -- put a new question, whatever question you --

             MR. LAUER:  May I have the report back?

             THE COURT:  Sure.  If you are going to ask him does
the report say X, then he has to read it.

             Maybe I can move this along first of all.

             Ladies and gentlemen, just for your information,
before an expert gets to testify, they have to submit a written
report, and their testimony is limited essentially to the
opinions stated in their report.

             As you know, there are a couple of questions in this
case.  One is whether the fund overvalued its assets.  But a
more central question, I suggest, is what did Mr. Bodner know
and what duty, if any, did he have with respect to any
overvaluation?  And so the witness has offered an opinion,
based on his experience and review, and then counsel has a
right to say what was the basis for that?  Because if in fact
the basis is lacking, then that's one thing, or if it's
present, that's something else.  You will make your evaluation.

1            But to put it in broader terms, a central issue in

2     this case is whether Mr. Bodner was largely a passive investor

3     with little knowledge of what was going on or whether he had

4     more significant knowledge of what was going on and, if so,

5     whether he had a duty to do something about it.  So that's the

6     background to these questions.  Go ahead, counsel.

7            MR. LAUER:  Thank you, your Honor.

8     BY MR. LAUER:

9     Q.  Moving on, you testified yesterday that in 2016,

10    Golden Gate had substantial issues, and you questioned its

11    value in 2016, right?

12    A.  Yes.

13    Q.  Did you review some of the earlier documents going back to

14    2012 when the Golden Gate investment was acquired?

15    A.  Yes, I did.

16    Q.  And did you see in 2012 there was great expectation that,

17    with the 18 million barrels of reserves, provided enough money

18    could be raised, this could be a very substantial, profitable

19    business?  Do you recall that?

20    A.  Do I -- I'm not sure I understand the question.

21    Q.  Well, the question is, back in 2012, when Platinum went out

22    of its way to spend money to acquire an interest in

23    Golden Gate, it had great expectations that, if it was able to

24    put enough money in to develop the oilfields, it would make a

25    nice profit, right?

Mc12Pla2                              Post - Cross

1    A.  I think that was their hope.

2    Q.  Right.  And it didn't work out, right?

3    A.  It not only didn't work out, but if there was an

4    opportunity there, they would have been able to find lenders or

5    investors that would have joined with them and that in fact did

6    not happen.

7    Q.  So between 2012, when they had high expectations and 2016,

8    reality set in that this was more difficult than anyone had

9    imagined, right?

10   A.  That's your opinion.

11   Q.  You testified that 95 percent of Black Elk was sold and 5

12   percent was left and bought by Northstar, right?

13   A.  That was my testimony.

14   Q.  Where did you get the 95 percent/5 percent from?

15   A.  That was generally the conclusion we reached in the review

16   of the documents in the record.

17   Q.  Who is we?

18   A.  Myself.

19   Q.  Okay. and you said that you questioned Northstar's 2016

20   valuation of 76 million.  Did you see that Northstar had other

21   assets in addition to the assets that it acquired from

22   Black Elk?

23   A.  What I testified to is that Renaissance didn't buy those

24   assets because they didn't value them.

25   Q.  I am talking about Northstar.  Did you see in the records

Mc12Pla2                          Post - Cross

1     that Northstar, in addition to acquiring the assets from

2     Black Elk, that Northstar had other oil and gas assets?

3     A.  Yes.  I think they believed they had other assets.

4     Q.  In fact, in September of 2014, PPVA bought the Northstar

5     assets from NGP.  This had nothing to do with Black Elk, right?

6     A.  If that -- I don't know.  I wasn't involved in the

7     transaction.

8     Q.  Okay.  So it is possible that the 76 million valuation of

9     Northstar included other assets beyond the miscellaneous assets

10    that were picked up from Black Elk, right?

11    A.  My opinion was based on, in essence, what actually

12    happened, which was that those assets were virtually worthless

13    regardless of what transactions preceded their actual demise.

14    Q.  Did you study the non-Black Elk assets owned by Northstar?

15              MR. GLUCK:  Objection.  Asked and answered.  He

16    said --

17              THE COURT:  Sustained.

18    BY MR. LAUER:

19    Q.  China Horizon, you say that in 2016 the business basically

20    was not very viable in light of the fact that the Chinese

21    government had revoked the license, right?

22    A.  That was my testimony.

23    Q.  But back in 2013, this business and the business idea of

24    creating these 7-Elevens in rural China seemed to be a very

25    promising business, right?

1    A.  I have no opinion on that.

2    Q.  So what happened in 2016 is not an indication of the

3    potential for this business in 2013, right?

4    A.  Yeah, I agree with that.

5    Q.  You were asked a number of questions about Black Elk

6    Opportunity Fund, right, and you mentioned that Mr. Bodner was

7    part of the owner group, right?

8    A.  Yes, he was.

9    Q.  And Black Elk Opportunity Fund raised $100 million or

10   almost $100 million from investors, right?

11   A.  That's correct.

12   Q.  And that was real money that was put in by investors in

13   order to help support the Black Elk business, right?

14   A.  I'm not sure what you mean by real investors.

15   Q.  Investors.  People who are not members of Platinum

16   Management.

17   A.  Well, they were related investors so they had -- they

18   were -- as I -- my testimony was that this was a straw man that

19   was created to support the debt stability plan.  So -- and they

20   had very attractive terms, but they were many of the same

21   investors my -- as there were in Platinum.

22   Q.  Yes, but they weren't part of Platinum Management.  They

23   were limited partners in Platinum's fund, right?

24   A.  Well, yes, the investors were.

25   Q.  Right.  And these investors put in $100 million of their

1    own money to help fund the Black Elk operation, right?

2    A.  I can't speak to what the intentions of the management team

3    was other than what I testified to, which was that this was a

4    scheme to prevent foreclosure on debt.

5    Q.  Well, it was as -- you call it a scheme, but they raised

6    $100 million so the company -- as preferred, so the company

7    could run its business, right?

8    A.  Well, it was an opportunity for people who were going to

9    lose their money in Platinum to recover some part of it in

10   another venture that was related, same management team.  So

11   it's -- as I testified, it was not an independent fund that was

12   created of outside investors that had made a thorough due

13   diligence review of activities.  And in addition, these

14   preferred terms that they received are highly unusual in my

15   experience as an analyst and expert on fundraising for hedge

16   funds.

17   Q.  What was unusual about it?  The interest rate?

18   A.  Yes.  That's one of the things.

19   Q.  So let me ask you this:  At the time that these investors

20   were asked to put money in, did you consider Black Elk a good

21   credit or a risky credit?

22   A.  Well, there was also --

23             MR. GLUCK:  Outside the scope of the witness's expert

24   report.  He was not asked to opine on whether Black Elk was a

25   good credit or a bad credit in relation -- oh, sorry.

Mc12Pla2                              Post - Cross

1          THE COURT:  So the objection is sustained, but if you

2      persist in making speaking objections, I will, as a punishment,

3      overrule each and every objection.  Understood?

4          MR. GLUCK:  Understood.

5          THE COURT:  Very good.

6      BY MR. LAUER:

7      Q.  You said Beechwood was created to -- let me rephrase that.

8      Beechwood had over a billion dollars from these insurance

9      companies to invest, right?

10     A.  It's not really part of my report.

11     Q.  You talked about Beechwood, didn't you?

12     A.  I did.

13     Q.  You said Beechwood was used to prop up artificial values,

14     right?

15     A.  With regard to the amount of money they raised, I think my

16     testimony was that -- approximately 800 million, not a billion.

17     Q.  Okay, and --

18     A.  And I testified that a portion of that was available to be

19     put into risky investments, and I think I used a number of

20     about 80 million --

21     Q.  Let's talk about -- sorry.  Go ahead.

22     A.  -- or 10 percent.

23     Q.  The business model of Beechwood, are you familiar with it?

24     A.  Generally.

25     Q.  Okay.  And the idea was these insurance companies had a

Mc12Pla2                    Post - Cross

1   relatively low hurdle, meaning the deal with Beechwood was we
2   will give you $800 million, plus or minus, and if you can get
3   us a 6 percent return, you get to keep anything above that,
4   right?
5   A.  Yes.
6   Q.  So from the perspective of the Platinum and the Beechwood
7   managers, that was an attractive business model.  Take the 800
8   million, Feuer and Taylor would manage the insurance aspects of
9   it and if you do better than 5 or 6 percent, you get to keep
10  the money, right?
11  A.  It's not part of my opinion about the quality of the offer
12  to the investors
13  Q.  Okay.  But the long and the short of it Beechwood was set
14  up and it had the promise of being a very real and potentially
15  very profitable business.
16          MR. GLUCK:  Objection.
17  A.  It's not part of my report.
18  Q.  Okay.  After Beechwood got set up, it had its own office,
19  right?
20  A.  No.
21  Q.  Are you suggesting that Beechwood did not have a separate
22  office at a different street in Manhattan than Platinum?
23  A.  Eventually it did, but when it was originated and founded,
24  it was founded out of the Platinum offices before they moved to
25  a separate location.

1  Q.  That was my question.  After they got set up and they got

2  organized, they moved to a separate building in a separate part

3  of Manhattan, right?

4  A.  I was not -- I'm not sure I understood what you meant by

5  saying "after it was set up," the timing of that.  My

6  understanding is that they set the business up while they were

7  at Platinum.  They actually operated for some period of time at

8  Platinum, and then they moved it to a separate office.

9  Q.  Page 102 of yesterday you testified that this -- what you

10  called the debt stability scheme, that's your phrase, right?

11  A.  That is my phrase.

12  Q.  You say, "This was a way of hiding the distressed nature of

13  the debt from the auditors."  Right?

14  A.  Yes.

15  Q.  You also said, "If Platinum had guaranteed interest

16  payments that were owed by their portfolio company, that's a

17  liability on the fund and it should have been reflected" right?

18  A.  Yes.  Generally that's my conclusion.

19  Q.  And am I correct that this was disclosed to the auditors?

20  A.  I can't -- I have no response to that.  I don't have any

21  actual knowledge of what -- of your representation.  I'm not

22  sure what you mean by that or --

23  Q.  Well, your suggestion yesterday was this was something that

24  should have been disclosed to the auditors.  Are you clarifying

25  for us today you didn't mean to suggest that in your opinion it

1    wasn't disclosed to the auditors?

2    A.  My testimony yesterday was that these guarantees that were

3    made by Platinum should have been included in arriving at the

4    NAV, and they were not.

5    Q.  No.  You testified yesterday it should have been disclosed

6    to the auditors, did you not?

7         MR. GLUCK:  Objection.  Mischaracterizes.

8    Q.  Did you testify at page 102, at line 22, the following

9    question by Mr. Gluck:

10   "Q  Is the debt stability scheme one of your answers as to how

11   this could have happened?

12   "A," line 24, "Yes, this was a way of hiding the distressed

13   nature of the debt from the auditors."

14         Did you give that testimony in response to Mr. Gluck's

15   question?

16   A.  I did, and I stand by that.

17   Q.  And did you say today that you reviewed the work papers?

18   A.  I did review the report papers.

19   Q.  And am I -- and did you see that in the work papers these

20   debts were disclosed to the auditors?

21         MR. GLUCK:  Objection: mischaracterizes.

22         THE COURT:  Overruled.

23   A.  I don't agree with your representation.

24   Q.  Okay.  Let's take a look at Exhibit DX 625.  Is that in

25   evidence?  Okay.  We would move DX 625 and DX 569.  DX 625 is

Mc12Pla2                          Post - Cross

1    the audit report and financial statements for PPVA --

2                  THE COURT:  You don't need to identify what they are.

3    Counsel has copies of them.

4                  So let me find out if there is any objection.

5                  MR. GLUCK:  No objection.

6                  THE COURT:  Received.

7                  (Defendant's Exhibits 569, 625 received in evidence)

8    BY MR. LAUER:

9    Q.  Let's take a look at Exhibit 625, page 55, could be 56 of

10   the PDF, it's the part that says "Master Fund Guarantees."

11                 Do you have that?

12   A.  I am looking at that on the screen.

13   Q.  Okay.  So this is what they call the disclosure portion of

14   the financial statements.  Footnote disclosure?

15   A.  Yes.

16   Q.  And the first one talks about the master fund guaranteed

17   the obligations of the portfolio companies.  Do you see that?

18   A.  Yes.

19   Q.  So that's basically saying PPVA guarantees debt of some of

20   these assets, right?

21   A.  Yes.

22   Q.  The next one, during 2014, in order to induce lenders to

23   extend credit to certain portfolio companies, the master fund

24   entered into various put option agreements, right?  So that's

25   something else that was disclosed to the auditors, right?

Mc12Pla2                          Post - Cross

1              MR. GLUCK:  Objection.  Outside the scope.  Put

2       option.  Objection.  Put option.  Outside scope.

3              THE COURT:  No, I will allow it.  You may answer.

4       A.  I didn't -- in my report, I didn't go through any detailed

5       analysis of what was provided to auditors and what is not, and

6       my testimony yesterday was about the balance sheet in 2016, not

7       2014.

8       Q.  The -- let's turn to the 2013 report, which is 569, and it

9       is page 28 or 29 of the PDF I'm sure, it should be page 60 of

10      the document.  This lists related-party transactions.  Do you

11      see that?

12      A.  Yes.

13      Q.  It talks about an exchange agreement with PPBE -- that's

14      Black Elk?

15      A.  Yes.

16      Q.  And there are a number of disclosures involving related

17      party loans and obligations, right?

18      A.  Yes.

19      Q.  And if you turn to page 41 of the document, which is page

20      42 of the PDF, this is in the Golden Gate section.  You see

21      there is disclosure of the Beechwood as a related party of

22      Platinum Management purchasing $28 million Golden Gate debt.

23      Do you see that?

24      A.  I do.

25      Q.  So that was also disclosed to the auditors.

Mc12Pla2                          Post - Cross

1    A.  Yes.

2    Q.  And not only was it disclosed to the auditors, this is

3    disclosed to all of the investors.

4    A.  If they received this, and I can't comment on that.

5    Q.  Okay.

6           THE COURT:  Counsel, find an appropriate spot to pause

7    so we can give the jury their mid-morning break.

8           MR. LAUER:  Now is as good as any, your Honor.

9           THE COURT:  Okay.  So we will take a 15-minute break.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc12Pla2                          Post - Cross

1                    (Jury not present)

2                    THE COURT:  A couple of items.

3                    First, I neglected to mention that Mr. Harrison, the

4       attorney who was being asked to contact Mr. Grenville, called

5       at 9:00 this morning, as he had been asked to do, and said that

6       he had reached Mr. Grenville's office manager and had made

7       clear to her that he needed to convey my messages to

8       Mr. Grenville, but by the time that all got done coupled with

9       the fact that Mr. Grenville is in Hong Kong, he didn't have

10      anything more specific to report back to me yet.  So I told him

11      to report back at 5:00 today, but I also obtained from him both

12      the phone number and the e-mail for the office manager.

13                   So we will see what happens at 5:00.  But, if

14      necessary, either counsel or perhaps the Court will call the

15      office manager so that we can move this along.

16                   Second, here is the final preliminary instruction—let

17      me give a copy to each side—adopting some, but not all, of the

18      suggestions from defense counsel.  Defense counsel made a

19      representation about something in the Court's summary judgment

20      determination opinion.  I didn't see any such thing, but maybe

21      you can point me to it.

22                   MR. HERTZBERG:  Your Honor, let me pull up my copy, if

23      I may.  I believe what I had cited to the Court was the passage

24      at page 24.

25                   THE COURT:  Hold on.  Let me look at page 24.

Mc12Pla2                         Post - Cross

1              What passage are you referring to?

2              MR. HERTZBERG:  At the end of the first full

3    paragraph, your Honor the Court wrote, "The following evidence

4    shows that Bodner exerted significant influence over the

5    affairs of Platinum," and Platinum is defined earlier as

6    Platinum Management.

7              THE COURT:  Where do you see anywhere that Platinum is

8    defined in this opinion as Platinum Management?

9              MR. HERTZBERG:  Your Honor, you write on the first

10   page, "Platinum Management is defined as Platinum Management.

11   Platinum is an undefined term."

12             THE COURT:  Yes.  And so I reread the entire opinion,

13   boring though it may have been, and Platinum, it's very clear,

14   was used as a collective term to refer to all the entities that

15   are wound up in this case and not just Platinum Management, and

16   therefore I rejected your suggestion.

17             MR. HERTZBERG:  Thank you, Judge.

18             THE COURT:  All right.  We will see you in 12 minutes.

19             (Recess)

20

21

22

23

24

25

MC1Cpla3                              Post - Cross

1              (Jury present)

2              THE COURT:  The jury would ask counsel at the front

3    table to use the microphone and enunciate so that they can hear

4    everything you say.  I don't care what you say, but they care.

5    Anyway, in all seriousness, please do so.  It will help our

6    court reporter, too.

7              Please be seated.

8              MR. LAUER:  May I proceed?

9              THE COURT:  Yes.

10   BY MR. LAUER:

11   Q.  Yesterday, you were shown Plaintiffs' Exhibit 592.

12             MR. LAUER:  I would ask that that be put on the

13   screen.

14   Q.  This is from David Steinberg to Naftali Manela, January 14,

15   2016.  Do you have that?

16   A.  I do.

17   Q.  They're going over a narrative for Murray and Beechwood.

18   Do you see that?

19   A.  Yes.

20   Q.  He's referring to a spreadsheet and then he says, taken

21   altogether, they show the inflows, including Apollo.  Then he

22   goes on to say they could have a decent return.

23             Do you know, what is Apollo?

24   A.  Global private equity company.

25   Q.  At the time, this was run by Leon Black?

1    A.   Yes.

2    Q.   And they were a very large private equity firm?

3    A.   They were.

4    Q.   The document is talking about trying to get a large influx

5    of cash from Apollo to help support the businesses of the fund

6    that needed cash; right?

7    A.   I'll accept your representation.  I have no opinion on

8    that.

9    Q.   You testified about this document yesterday; right?

10            MR. GLUCK:  Objection.  Mischaracterization.

11            THE COURT:  I take it the objection is not in this

12   respect.  So sustained.

13   Q.   Do you accept my suggestion that a fair reading of this

14   email is that they're trying to get money from Apollo?

15            MR. GLUCK:  Objection.  Mischaracterization.

16            THE COURT:  Sustained.

17   Q.   Then they say without the extra money from Apollo or BAM,

18   the fund will need to gate.  Do you see that?

19   A.   Yes.

20   Q.   Are you familiar with a gating concept?

21   A.   Yes.

22   Q.   So in a hedge fund, what does it mean when you gate

23   something?

24   A.   You basically cease operations.

25   Q.   So according to this email, they were saying if we don't

MC1Cpla3                        Post - Cross

1   get this money from Apollo and BAM, we might need to cease

2   operation; right?

3   A.  Yes.

4   Q.  And on the more positive side, they're saying if we do get

5   this money and these investments, Agera, VSTA, ECHO, Desert

6   Hawk work out, they can still produce a decent return; right?

7             MR. GLUCK:  Objection.  Mischaracterization.

8             THE COURT:  It was a question.  Overruled.

9   A.  I'm reading on its face, there are a lot of if's there, is

10  all I can say.

11  Q.  Basically, they're saying we're at a crossroads.  If we can

12  get this big money in, we might have a chance of producing

13  decent returns, and if we can't get the big money in, we might

14  have to gate; right?

15  A.  Correct, and they didn't get the money.

16  Q.  I'm not asking you what happened, I'm asking you what they

17  are contemplating.  They're contemplating trying to get the

18  money so they can keep operating; right?

19  A.  I think that's fair.

20  Q.  And do you know that contemporaneous with this January 14

21  email where they're trying to get money from Apollo, that Mark

22  Nordlicht was beginning to have discussions with some of the

23  private individuals, like Marcos Katz and Victor Hannah to put

24  big money in?  Do you know of that?

25  A.  I'm aware of that, yes.

MC1Cpla3                              Post - Cross

1    Q.  Now, is there a difference between a liability and saying
2    that an asset is encumbered?
3    A.  Those are synonymous.
4    Q.  If I owe $100 million, I have a $100 million liability;
5    right?
6    A.  Correct.
7    Q.  So if I have an asset that's worth $200 and I owe $100, I
8    have equity of $100; right?
9    A.  That sounds reasonable.
10   Q.  Well, $200 minus the liability of $100 leaves me equity of
11   $100?
12   A.  I'll agree with that, yes.
13   Q.  Now, if I have a $200 asset and I get a $200 million loan
14   from a bank, I'd get a $100 loan from a bank, but they want me
15   to encumber or put up as collateral $200, my liability is $100;
16   right?
17   A.  I'm a little lost there on your math.  Sorry.
18   Q.  If I have a $200 asset and the bank will lend me $100 if I
19   put the $200 asset up as collateral, I still have only a $100
20   liability; right?  I borrowed $100 from the bank, I put up my
21   $200 asset, so my liability is $100; right?
22   A.  It's not quite that simple because once you put the asset
23   up for collateral, then there becomes another issue you would
24   have to consider.  So it's not just the actual encumbrance,
25   it's whether the business -- that whether that collateral is at

MC1Cpla3                    Post - Cross

1    risk, and that is a function of the debt that's placed.

2              So, in other words, if the lender thought that you

3    were going to not be able to satisfy your obligations for,

4    under your example, the $100, that would call into question

5    whether the collateral was protected.  So it's not just black

6    or white, there's two elements to the analysis of what is the

7    actual encumbrance or debt.

8    Q.  I want to try to clarify for everyone the distinction

9    between a liability and an encumbrance.  Let me try again.

10             If I borrow $100 from the bank and the bank says put

11   up this $200 asset as collateral, what is the amount of my

12   liability?

13   A.  Well, I would say it would be $300, possibly, because if

14   you were unable to service your debt and they foreclosed, you

15   would get the collateral, plus you would still owe the

16   $100 million.  That's the way collateral works to securitize a

17   debt.

18   Q.  If I borrow $100 from the bank and I put up a $200 asset,

19   on the day that I borrow the $100, is it not a fact that the

20   amount of my liability is only $100?

21   A.  No.

22   Q.  No?  I have equity of $100 and I have liability --

23             THE COURT:  I think you need to move on.

24             MR. LAUER:  Thank you, your Honor.

25   Q.  You expressed the view that when a partner, whether it was

MC1Cpla3                          Post - Cross

Huberfeld or Bodner would get an email from the CFO with the

monthly increase or decrease in an NAV, that that was somehow

unusual.  Did I understand your testimony correctly?

A.  I'm not sure that that was specifically what we discussed,

but I'm listening.

Q.  I appreciate that.

        Did you know that the Platinum investors were largely

friends, family, social acquaintances of the owners of

Platinum?

A.  I think generally that's a true statement.

Q.  Did you know that the practice at Platinum, which might not

have been the case at a more public institutionalized fund, was

that any one of the investors could call Mark Nordlicht and he

would tell them about the assets?

A.  That could be true.

Q.  Do you know, for example, that Marcos Katz came to the

office once a month to get a personal report on the assets?

        MR. GLUCK:  Objection.

A.  I was --

        MR. GLUCK:  Objection.  Outside the scope.

        THE COURT:  Sustained.

Q.  You were shown an email yesterday where, I think it's

Plaintiffs' Exhibit 415.

        MR. LAUER:  If that's in evidence, let's put it up.

Q.  Do you recall being shown this yesterday?

MC1Cpla3                        Post - Cross

1   A.  Yes.

2   Q.  And you had some comments about four uninterrupted hours

3   with Mark?

4   A.  Yes.

5   Q.  Do you have any idea what they talked about?

6   A.  No.

7   Q.  And by the way, the secretary says to Mark's secretary that

8   David would like four hours; right?

9   A.  That's what the email says.

10  Q.  And Mark's secretary writes back, ha, he was, like,

11  uninterrupted, quote, no calls, lol.  Do you see "lol"?

12  A.  Yes.

13  Q.  What does "lol" mean to you?

14  A.  Laugh out loud.

15  Q.  So Mark's secretary is saying that's a joke that Mark's

16  going to give him four uninterrupted hours; right?

17          MR. GLUCK:  Objection.

18  A.  I can't read their minds.  I don't know what they intended.

19          MR. LAUER:  Let's turn to PX 590.

20  Q.  You were shown this today; right?

21  A.  Yes.

22  Q.  This is right around the same time as the January 14 email,

23  this is January 12, latest presentation; right?

24  A.  Correct.

25  Q.  You go to the second page of the attachment, PPCO, goal,

MC1Cpla3                              Post - Cross

1    raise $80 million, right, they're trying to raise money?

2               MR. GLUCK:  Objection.  Outside the scope.  PPCO, not

3    PPVA.

4               MR. LAUER:  I'll move on, your Honor.

5               Go to page 607 of the PDF, PPVA, goal, raise

6    $200 million.  Do you see that?

7    A.  Yes.

8    Q.  So they needed money desperately; right?

9    A.  It appears so.

10   Q.  And then on page 8 of the document or 9 of the PDF, they

11   talk about management share class, 50 to $100 million.  Do you

12   see that?

13   A.  Yes.

14   Q.  So they're talking about getting people to put in 50 to 100

15   and become members of the management group; right?

16   A.  It's outside the scope.  I don't really have an opinion on

17   that specific line.

18   Q.  And then the very last page of the document, what do we

19   need from David and Murray; right?

20   A.  I'm at that page.

21   Q.  So part of this presentation is how do we get a lot of new

22   money, and one of the ways was to try to enlist help from David

23   and Murray; right?

24   A.  Yes, it appears that they're looking for help from the two

25   of them.

1    Q.  Help us close investment into PPCO and the management share

2    class.  Again, do you have any idea what management share class

3    is referring to?

4    A.  Generally speaking.

5    Q.  What's your understanding as it relates to Platinum

6    Management?

7    A.  Well, the way I incorporated this into my opinion is that

8    these are things that are beyond typically what an investor

9    would be involved in.  That's exactly the point of my research

10   and conclusions, is that, typically, investors, no matter how

11   large they are, are not involved in these types of decisions

12   and these types of presentations unless they presented it to

13   all the investors, which I do not believe they did based on my

14   read of the record.  So this is highly unusual involvement of

15   two supposed passive investors.  That was my conclusion.

16   Q.  Can you answer my question.

17   A.  I think I just did.

18   Q.  I asked you what was meant by management share class.

19   A.  It's part of a possible solution on how to fix the problems

20   that were facing the company.

21   Q.  Right.  Is it fair to say what they were referring to is

22   getting risk people to put money in and take a position in the

23   management?

24   A.  Well, doesn't that suggest that they're replacing

25   management by inserting new management?  So they're replacing

1    Mr. Bodner and Mr. Huberfeld with new managers.  That's the way
2    I interpret that.
3    Q.  The next highlighted, they'll only do these things if they
4    see a possibility of extricating themselves in the long run.
5    That's referring to Bodner and Huberfeld?
6    A.  It appears to be that's who they're referring to.
7    Q.  Right.  And basically that they're looking to retire from
8    Platinum Management; right?
9    A.  Yes, they were looking to retire from their management
10   positions at Platinum Management.
11   Q.  Now, in your report, you had a chart in which you
12   identified a number of emails that were the basis for your
13   conclusion that Mr. Bodner had a control position, that he was
14   in control of Platinum Management, right, do you remember that?
15   A.  Well, I don't have my report in front of me, but generally,
16   my opinion was that Mr. Bodner was in a control position.
17          MR. LAUER:  With the Court's permission, I would hand
18   the report to the clerk.
19          THE COURT:  Yes.
20   Q.  So take a look at paragraph 57.  Does that refresh your
21   recollection that you had a chart in which you gave the backup
22   to your conclusion that Mr. Bodner was one of the control
23   people.
24   A.  Yes, I see that.
25   Q.  And I'd like to show you some of these documents so we can

MC1Cpla3                        Post - Cross

1   get an understanding of what you were relying on.

2           So you say that evidence to you that Mr. Bodner

3   overrules Mark Nordlicht for financing options is reflected in

4   the document in your report for control 6351132, and that's

5   been marked for identification as Defendant's Exhibit 710.

6           MR. LAUER:  Which I would offer into evidence.

7           THE COURT:  Any objection?

8           MR. GLUCK:  We haven't seen it yet.

9           No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 710 received in evidence)

12  Q.  So let's take a look at this.  You say that this document

13  shows Mr. Bodner overruling Mark Nordlicht for a financing

14  option; right?

15  A.  Correct.

16  Q.  So let's start at the bottom.  It says Ezra, are you

17  available 12:30 Monday to meet with my partner, David Bodner,

18  to talk about the merchant cash events line.

19          Do you see that?

20  A.  Yes.

21  Q.  So this is Mark Nordlicht talking to Ezra Tuchman about a

22  potential investment involving a cash advance line.  That's a

23  loan; right?

24  A.  It appears to be a loan.

25  Q.  PPVA or some fund managed by Mark Nordlicht is looking into

MC1Cpla3                    Post - Cross

1   making loans to whomever it is that Mr. Tuchman is dealing

2   with; right?

3   A.   That's your representation.  I used this document as part

4   of my basis of my report, and I can tell you why I used this

5   document, but I can't tell you what the parties were thinking.

6   Q.   Okay.  So above that, he says okay, there's a chance I

7   might be in London, but David will be there regardless.  I

8   would like to hear more, but I'm already sold on the borrower.

9   That's Mark Nordlicht telling Ezra Tuchman he is sold on the

10  borrower; right?

11  A.   Yes.

12  Q.   And he's also sold on your monitoring capabilities, meaning

13  Mark Nordlicht is comfortable that Ezra can help monitor the

14  lending that Mark would provide to the borrower; right?

15  A.   I think he was talking about monitoring the borrower.

16  Q.   Right.  And that's something that Mark was comfortable

17  with, that Mark would lend money to the borrower and Ezra would

18  help monitor; right?

19  A.   I'm not sure I understand that arrangement by looking at

20  this email.

21  Q.   You say in your report one of the things that allowed you

22  to conclude that David Bodner had control is that he overruled

23  Mark Nordlicht on a financing option; right?

24  A.   If you let me point out in this email how I came to that

25  conclusion, what part I relied on, I'm more than happy to do

MC1Cpla3                        Post - Cross

1   that.

2   Q.  We're going to get there.

3   A.  Okay.

4   Q.  But first, you rely on this email for your conclusion that

5   Bodner overruled Nordlicht for a financing option; right?

6   A.  That's correct.

7   Q.  So now let's go.  So Mark says he's sold on the borrower;

8   right?

9   A.  Yes.

10  Q.  Now move up.  Then Ezra writes back, Mayor, that's Mark,

11  good morning, I just received an email from David that he has

12  decided to move forward with another lender.  Do you see that?

13  A.  I do.

14  Q.  Now this David, it's not referring to David Bodner, is it,

15  it's referring to the borrower, is it not?

16          MR. GLUCK:  Objection.

17  A.  That was not my interpretation --

18          THE COURT:  I'm sorry.  Was there an option?

19          MR. GLUCK:  Objection.  Mischaracterizes.

20          THE COURT:  Go ahead.  You may continue.

21  A.  My interpretation was that this was David Bodner.

22  Q.  Now that you've had the opportunity to read this more

23  clearly, am I not correct that your interpretation is simply

24  wrong?  David is referring to the borrower and Mr. Nordlicht is

25  the lender; right?

1   A.  Is there -- no.  I believe that this represents that

2   Mr. Bodner was overruling the lending and borrowing situation,

3   which is not necessarily, in my experience, something that an

4   investor would be involved in.

5   Q.  Ezra Tuchman, who's in Israel with his Genesis group, is

6   telling Mark Nordlicht, who just told Ezra he's sold on the

7   borrower.  Ezra Tuchman says, I just received an email from

8   David that he has decided to move forward with another lender,

9   meaning he's not borrowing from Mark; right?

10              THE COURT:  I suppose somewhere in the last two

11  minutes there is a question lurking, but I couldn't really

12  defect it.  Put a question, counsel.

13  Q.  Is there anything in this email that suggests David is

14  anyone other than the borrower who decided to move forward with

15  a different lender and not Mark Nordlicht's company?

16              MR. GLUCK:  Objection.  Asked and answered.

17              THE COURT:  Overruled.  You may answer.

18  A.  I believe this refers to Mr. Bodner.

19  Q.  Because you thought David Bodner was borrowing money from

20  Mark?

21  A.  No, I believe Mr. Bodner was overruling Mr. Nordlicht.

22  Q.  And instead of telling Mark, he told Ezra Tuchman in

23  Israel?

24  A.  I can't answer that.

25  Q.  Another one of your emails that you relied on, you say

MC1Cpla3                        Post - Cross

1    received concealed MF data from PM CFO, and you cite an email,

2    counsel stem 7035649.

3              Do you see that?

4    A.  Yes.

5              MR. GLUCK:  It's not on the screen.

6              MR. LAUER:  I would mark Defendant's Exhibit 211, and

7    we would offer DX 711.

8              THE COURT:  Any objection?

9              (Pause)

10             Received.

11             (Defendant's Exhibit 711 received in evidence)

12   Q.  What is MF data?

13   A.  It relates to valuations that are preliminary.

14   Q.  What does it stand for?

15   A.  It relates to pre -- these initial estimates.

16   Q.  Is MF initials for something?

17   A.  It's a financial term that describes preliminary value

18   determinations as referenced in this email.

19   Q.  But what is the term, what is the term, MF?

20   A.  I'm not sure I know what the -- how it's -- I just know

21   that the combination of these three words relates to

22   preliminary data.

23   Q.  So you don't know what MF data is?

24   A.  No.

25   Q.  You used it in your chart; right?

1    A.  I used the phrase, "MF data."

2    Q.  And you don't know what MF is?

3    A.  It's a phrase that relates to preliminary value.

4    Q.  So take a look at DX 711.  This is to Mr. Huberfeld, not to

5    Mr. Bodner; right?

6    A.  Yes.

7    Q.  And what is concealed about this?

8    A.  Well, it's just -- this information is something you

9    typically would not share with anyone other than part of the

10   management team.

11   Q.  But what is concealed?  Concealed means there is something

12   sneaky going on.  What is concealed?

13          MR. GLUCK:  Objection.  Asked and answered.

14          THE COURT:  Sustained.  You can rephrase it.

15   Q.  VA1.1/1.5.  That's referring to PPVA; right?

16   A.  Yes.

17   Q.  And CO is referring to PPCO; right?

18   A.  Correct.

19   Q.  You also have in your chart pitches PM to investors?

20   A.  Yes.

21   Q.  By the way, on DX, that was only to Huberfeld, you didn't

22   have one to Bodner, did you?

23   A.  My conclusion was based on the fact that there was evidence

24   in the record that Mr. Huberfeld and Mr. Bodner were partners

25   and that they shared information.  So I arrived at my

MC1Cpla3                        Post - Cross

1   conclusion that if you send something to Mr. Huberfeld, it was

2   also communicated to Mr. Bodner.

3   Q.  But you don't have any -- you haven't seen any emails to

4   Mr. Bodner like that, have you?

5   A.  Like what?  I'm not sure I understand what you're referring

6   to.

7   Q.  I'm referring to DX 11, the concealed data to

8   Mr. Huberfeld.  You did not see any emails to Mr. Bodner or

9   Mr. Bodner's secretary similar to the one that you identified

10  in your chart?

11            MR. GLUCK:  Objection.  Mischaracterizes.

12            THE COURT:  Overruled.

13  A.  I don't see Mr. Bodner's name listed here, but I base my

14  opinion on, as I said, the way they conducted business, their

15  custom and practice.

16  Q.  In your report, paragraph 12, you say you understood

17  discovery is still occurring with numerous depositions yet to

18  occur.  I reserve all rights to amend the report.

19            In the period between November 19 when you put in your

20  report and the submission of the exhibits for trial, three

21  years, did you provide a supplement to your report?

22  A.  I did not.

23  Q.  Now, you cite document 3692863, you say that Mr. Bodner

24  pitches Platinum Management to investors, and that's another

25  one of the things you rely on that he's in control.  Do you see

1    that?

2    A.  Yes.

3    Q.  So I'm going to show you PX 434.  If you start at the

4    bottom, which is the second page of the document --

5              MR. GLUCK:  Just a moment.  It's not on the screen.

6              MR. LAUER:  It's not in evidence?  We move PX 434.

7              MR. GLUCK:  No objection.

8              THE COURT:  Received.

9              (Plaintiffs' Exhibit 434 received in evidence)

10   Q.  Do you have it in front of you?

11   A.  I do.

12   Q.  So start at the bottom.  This is a document that you

13   specifically referenced as evidence that Mr. Bodner was in

14   control; right?

15   A.  It was one of the supporting documents, yes.

16   Q.  And this one supposedly says that Bodner pitches investors;

17   right?

18   A.  Yes.

19   Q.  Now, if you go to the very bottom, there's a short

20   communication from Murray Huberfeld to SY, that's Shlomo Yehuda

21   Rahatz, the gentleman that is the potential investor?

22   A.  I'm not sure where I see that on this document.

23   Q.  On the second page --

24   A.  I only have the first page that I can see.

25   Q.  Well, then you need to see the second page.

MC1Cpla3                    Post - Cross

A.  I do.  Thank you.

Q.  At the bottom of the second page, do you see, SY, we are

confirmed for 12:00 noon at your house on Thursday.  I was able

to move things around and both Bernie and Mark Nordlicht and I

will be there.  See you then.  Murray.

        Do you see that?

A.  Yes.

Q.  That's Murray Huberfeld telling Rahatz that he, Bernie

Fuchs, and Mark Nordlicht will be at husband house; right?

A.  Correct.

        (Continued on next page)

Mc12Pla4                    Post - Cross

1   Q.  And then that was on August 20.  Then above, on August 29,

2   Rechnitz writes back to Huberfeld, Fuchs, Nordlicht, and

3   someone named Steven Stroll, "Dear guys," and he gives a number

4   of reasons why he is not interested in investing in the fund,

5   right?

6   A.  Yes.

7   Q.  And then if you turn to the first page, Mark says to Bernie

8   Fuchs, with a copy to Murray Huberfeld, basically see if you

9   can put together a response.  Right?

10  A.  Yes.

11  Q.  And then at the very top, Angela Albanese, Mr. Bodner's

12  secretary, says, "David, got it.  He is going to speak to Mark

13  first and get back to you."  Right?

14  A.  Yes.

15  Q.  So you don't know what, if anything, Bodner said to Mark

16  Nordlicht about this, right?

17  A.  This represents, in my opinion, the way that they conducted

18  business, and if you would like me to tell you why I used this

19  to rely on, I'm more than happy to share that with you.

20  Q.  First I want to you just answer the question.  You don't

21  know what Bodner said to Mark Nordlicht about this, do you?

22  A.  I don't specifically know that, and that wasn't what I was

23  using the document for.

24  Q.  Your counsel will have time to do a redirect.

25          THE COURT:  No, counsel.  Just put another question.

1    BY MR. LAUER:

2    Q.  Am I correct there is nothing in this document that

3    reflects Mr. Bodner pitching Rechnitz or any other investor?

4    A.  I think it is evidence of the way that they pitched their

5    investors.

6    Q.  By the way, in paragraph 24 of your report, you say the

7    ultimate authority resided, though, with Bodner, right, and you

8    cite an e-mail between Jedwab and Nordlicht August 21, 2014,

9    right?

10   A.  Are you referring to paragraph 24 of my report?

11   Q.  I am.

12   A.  Footnote 26?

13   Q.  Yes.  You referred to an e-mail in there between

14   Mr. Nordlicht and Mr. Jedwab, right?

15   A.  Yes, I did.

16   Q.  Did you come to learn that Mr. Jedwab did not work at PPVA?

17   A.  I'm not aware of that.

18   Q.  Did you read his deposition after your report was filed?

19   A.  Yes, I did.

20   Q.  Okay.  And did you see that he worked for Bayberry?

21   A.  I don't recall that.

22          MR. GLUCK:  Objection: mischaracterizes.

23   Q.  Let's take a look --

24          THE COURT:  The objection is sustained and the jury

25   will disregard the last question and answer.  It's really a

Mc12Pla4                        Post - Cross

1    form of counsel testifying.

2              MR. LAUER:  I would mark for identification and offer

3    Plaintiffs' Exhibit 373, which is this exhibit, which is this

4    e-mail.  Can we show counsel 373?

5              We offer it.

6              THE COURT:  Any objection.

7              MR. GLUCK:  To this exhibit?  No.

8              THE COURT:  Received.

9              (Defendant's Exhibit 373 received in evidence)

10   BY MR. LAUER:

11   Q.  Do you see at the very bottom, toward the bottom, Nordlicht

12   says, on August 21, 2014, "We should talk.  I have been

13   pounding the table that me and them should have separate P & Ls

14   in Beechwood."  Do you see that?

15   A.  Yes, I do.

16   Q.  Does that indicate that this e-mail was about Beechwood and

17   Mr. Jedwab and not PPVA?

18             MR. GLUCK:  Objection:  Mischaracterizes.

19             MR. LAUER:  What?

20             THE COURT:  Overruled.

21   A.  I used this e-mail to support my opinion and it was another

22   section of this that I relied on, not this quote.

23   Q.  I show you Plaintiffs' Exhibit 488.  Is that in evidence?

24   If it's not in evidence, we move it.

25             THE COURT:  Any objection?

Mc12Pla4                        Post - Cross

1            MR. GLUCK:  It is not on the screen.

2            THE COURT:  Received.

3            It is your exhibit, so you presumably know what it

4     says.

5            MR. GLUCK:  Now it is.

6            THE COURT:  And since it's your exhibit it is

7     received.

8            MR. LAUER:  Thank you.

9            (Plaintiff's Exhibit 488 received in evidence)

10    BY MR. LAUER:

11    Q.  So this is the famous busybody e-mail.  You are familiar

12    with it?

13    A.  Yes, I am.

14    Q.  And you see that Mark Nordlicht tells Levy stop talking to

15    Bodner.  Do you see that at the very bottom?

16    A.  Yes, I do.

17    Q.  And you were aware of this e-mail at the time that you

18    wrote your report?

19    A.  Yes, I was.

20    Q.  Did you speak to any of the managers, lawyers, or employees

21    of Beechwood?

22    A.  No.

23    Q.  Did you read any of their depositions before you put in

24    your report?

25    A.  My report specifically cites the documents and the record

Mc12Pla4                         Post - Cross

1     that I relied on.

2     Q.  Let's talk about hedge fund valuations.  At paragraph 103

3     of your report, you make a comment that the least reliable

4     valuations are level 3.  Can you explain to the jury what is a

5     level 3 valuation and what is meant by "least reliable"?

6     A.  What paragraph are you referring to?

7     Q.  Paragraph 103.

8     A.  Oh, 103.

9            Well, as paragraph 103 states, there are different

10    types of assets that are valued in different manners, and even

11    though a level 3 asset is difficult to value, there is a little

12    bit more to that in this matter because if you don't -- it's

13    one thing to value the asset, and follow these standards, but

14    it's another to ignore material information about that asset.

15    For example --

16    Q.  Excuse me.  Could you answer my question?  Could you

17    explain what is a level 3 asset?

18    A.  I was trying to do that.  I apologize for not -- a level 3

19    asset is a category of assets that you might own as a hedge

20    fund and it needs to be valued, and you are obligated to

21    evaluate it and value it correctly.

22    Q.  Can you explain what is difficult or one of the issues of

23    valuing a level 3 asset that might not be present, with, say a

24    level 1 asset?

25    A.  Other assets might be traded on the New York Stock Exchange

or have some value that's established in some sort of market

dynamic, like a bond or a company that is being traded.

Privately held assets that are part of a portfolio company, you

have to take a variety of pieces of information and arrive at a

value.  But my point was there are a variety of aspects of that

valuation process.  So it's not just the oil in the ground, but

it's whether the company has the resources to extract the oil,

for example.  So those all have to be considered to arrive at a

level 3 valuation that attempts to be accurate.

Q.  And there is nothing wrong in owning a level 3 asset, is

there?

A.  There is nothing *per se* wrong with owning a level 3 asset

but there is something called diversification.  So one of the

duties of an investor is to avoid concentrated positions in a

portfolio.  So one of the standards that you might look at if

you were analyzing a hedge fund are what kinds of assets do

they own, and if they are concentrated in level 3 assets, that

would mean that the portfolio is generally risky and there is a

lot of wiggle room or room for monkey business in the way you

evaluate or value level 3 assets.

Q.  Okay.  Can you just answer my question?  There is nothing

wrong in a hedge fund owning a level 3 asset, is there?

          MR. GLUCK:  Objection.

A.  There is --

          THE COURT:  Whoa.  Objection.

Mc12Pla4                          Post - Cross

1              MR. GLUCK:  Objection.  Asked and answered.

2              THE COURT:  Sustained.

3    BY MR. LAUER:

4    Q.  Is there anything *per se* wrong in a hedge fund owning a

5    level 3 asset?

6              THE COURT:  Asked and answered.

7              MR. LAUER:  Thank you.

8    BY MR. LAUER:

9    Q.  The concentration in level 3 assets was disclosed, was it

10   not, in the financial statements?

11   A.  Yes, I would say that's an accurate statement.

12   Q.  And did you listen to or read the transcripts of Mark

13   Nordlicht's monthly calls with investors?

14   A.  If that was part of the record, I reviewed that.

15   Q.  I don't know what you reviewed, so I'm asking if you

16   remember reading the transcripts or listening to his calls.

17   A.  I generally recall that I did review those documents and

18   transcripts.

19   Q.  And did you see that Mark often talked about the fact that

20   a lot of assets were level 3 assets?

21   A.  Yes, I know he said that.

22   Q.  Now, we have seen in a number of these valuation reports

23   that evaluators use ranges in expressing the value of a level 3

24   asset.  Are you familiar with that?

25   A.  Yes.

1    Q.  Why do valuators -- let me rephrase that.  In the case of a

2    level 1 asset, Apple stock, if you wanted to know what the

3    value was, you would give one number.  You would look at the

4    stock price, right?

5    A.  Yes, that's correct.

6    Q.  In the case of a level 3 asset, what we see are these wide

7    ranges.  Why are values presented in ranges?

8    A.  Because it relates to the circumstances and the factual

9    issues that you would incorporate into arriving at a value.  So

10   it's --

11   Q.  Why are they presented as ranges?  Let's say 100 low, 120

12   mid, 140 high.  What does that mean?

13   A.  Well, it means that there is no market dynamic to actually

14   establish a precise value.  But it's important that those

15   ranges are relative narrow.  There is not broad -- there is not

16   broad authority or it's not okay—let's use that word—to have

17   wide ranges so they have to be -- the range that you are using

18   has to be reasonable based on the particular asset.  So, yes,

19   there is a range, but it has to be reasonable.

20   Q.  Within the range, whether the range is very broad or only

21   moderately broad or less broad, when a hedge fund manager is

22   presented with a range of values for a level 3 asset, but he

23   has to put down for net asset value purposes a single number,

24   how does that work?  You get a range—low, mid, high—but for

25   net asset value purposes to tell the investors each month you

1    have to choose one number, right?

2    A.  Right, but let me give you an example --

3    Q.  You have to choose one number, right?

4    A.  You do, but let me give you an example.

5         If you had oil reserves that were valued at a billion

6    dollars, for example, and you didn't have the resources to

7    extract --

8         THE COURT:  So the question did not ask for an example

9    and therefore none should be given.

10        THE WITNESS:  Okay.  Sorry.

11   BY MR. LAUER:

12   Q.  Are you familiar with Alvarez & Marcal?

13   A.  Yes.  I used to work there.

14   Q.  Are they a reputable firm?

15   A.  I would have difficulty answering that based on my

16   experience there.

17   Q.  You were the national director for four years.

18   A.  That's correct.

19   Q.  So during the four years that you were the national

20   director, was Alvarez & Marcal a reputable firm?

21   A.  I don't know what you mean by your definition of reputable.

22   They are an operating business in the consulting area.  I was

23   running an investment management business there.  I was not

24   involved in their consulting business.

25   Q.  Did you have some dispute with them that you -- you are not

Mc12Pla4                        Post - Cross

1    comfortable saying they are a reputable --

2              THE COURT:  Sustained, irrelevant.

3              MR. LAUER:  Sorry.

4    Q.  So Alvarez & Marcal performed valuation services, right?

5    A.  Correct.

6    Q.  And when you listed them on your CV as part of your

7    expertise, you pointed out that Alvarez & Marcal performed work

8    for 90 percent of the Fortune 1000 companies, right?

9    A.  That's correct.

10   Q.  So you were projecting that the Court should consider, in

11   considering your credentials, that you worked for this serious

12   firm, Alvarez & Marcal, right?

13             MR. GLUCK:  Objection.

14             THE COURT:  Sustained.

15   BY MR. LAUER:

16   Q.  Now, Alvarez & Mars do valuation work for PPVA.

17   A.  That's my understanding.

18   Q.  And did you look at their valuations?

19   A.  Yes, I did.

20   Q.  You discuss in your report something called PV10, right?

21   A.  Right.

22   Q.  And that appears in the Alvarez & Marcal valuation reports?

23   A.  Yes.

24   Q.  Could you explain, as simply as possible, what is PV10?

25   A.  It's a methodology used in valuations.

Mc12Pla4                         Post - Cross

1   Q.   Okay, but what is the methodology or what relevance does it

2   have in determining how you value an oil and gas development

3   property?

4   A.   It's a calculation that's used to arrive at a value.

5   Q.   Can you explain how that would work?  If I have -- let's

6   say I have 18 million barrels of oil in the ground and I

7   have -- and I -- and based on reliable information I believe

8   oil will be 60 or $70 a barrel over the next couple of years.

9   How do these valuators go about estimating the range of values

10  for that property?

11  A.   They use a formula to come up with a determination.

12  Q.   I would like to show you -- and does that include, among

13  other considerations, PV10?

14  A.   Yes.

15  Q.   Take a look at -- I would like to mark for identification

16  Defendant's Exhibit 649, and I will also show you Defendant's

17  Exhibit 649, and we offer it.

18          MR. GLUCK:  Your Honor, we do have a limited objection

19  here.  We have an objection to these reports --

20          THE COURT:  Well, briefly what is your objection.

21          MR. GLUCK:  That these reports should not come in for

22  their truth.

23          THE COURT:  So hearsay.

24          What about that?

25          MR. LAUER:  It's being offered to what was presented.

Mc12Pla4                        Post - Cross

1   We are not really dealing in exactly.

2            THE COURT:  I'm sorry.  Maybe I was unclear.  Let me

3   ask the witness.

4            Is this a document cited in your report?

5            THE WITNESS:  I don't specifically believe so, no.

6            THE COURT:  Okay.  Is it a document you reviewed?

7            THE WITNESS:  Yes.

8            THE COURT:  All right.  You are going to have to lay a

9   greater foundation before I can receive it.  I understand it's

10  not being offered for its truth, but that is always a difficult

11  concept for a jury to handle, so I need something more

12  specific.

13  BY MR. LAUER:

14  Q.  Well, in your report you criticized or you made an

15  observation that you thought Platinum relied on PV10, right?

16  A.  Yes.

17  Q.  And you thought that that was -- you were critical of their

18  use of PV10 to do valuations, right?

19            MR. GLUCK:  Objection: mischaracterizes.

20            THE COURT:  No, I will allow it.

21  A.  My criticism was that it's incomplete.  It's not an

22  appropriate, comprehensive way to arrive at the value of a

23  level 3 asset.  That was my criticism.

24  Q.  But you criticized them for relying on PV10, right?

25  A.  What I was critical of was that there were more factors and

conditions that you need to take into account to arrive at a

value that you place as part of your calculation of NAV.  This

is part of the process of arriving at an accurate NAV number.

Q.  Okay.  And I was showing you the Alvarez report to show you

that they also use PV10, right?

A.  Correct.

Q.  And the Alvarez report, which is for June 30, 2015,

provides a range of values of the Northstar and Golden Gate oil

group, right?

A.  Yes, but that wasn't how I arrived at my opinion that there

was a valuation problem.

Q.  And the purpose of the Alvarez & Marcal report was to

provide Alvarez & Marcal's confirmation, was it not, to

Platinum of the values that Platinum was using, right?

A.  I think that's the intent of why you hire an outside

auditor.

Q.  They are not auditors; they are valuators, right?

A.  Valuators.

Q.  And you understood that the Alvarez & Marcal report was

provided to Platinum, right?

A.  That's true.

Q.  And Platinum's valuation of the Northstar and Golden Gate

oil property, as of June 30, 2015, was consistent with the

Alvarez & Marcal valuation, right?

A.  I would have to review that.  I don't have an opinion about

Mc12Pla4                       Post - Cross

1    that.

2              THE COURT:  That certainly is objectionable, that

3    question, on several grounds.  It refers to a matter not in

4    evidence, it's a portion of a document not in evidence, it's

5    arguably hearsay, and so the objection, so cleverly made by

6    plaintiffs' counsel to that question, is sustained.

7              Now, there is a question that defense counsel should

8    be putting to me at this point, and the question that defense

9    counsel should be putting to me is:  How much time does he have

10   left on his allotted time of two hours and 20 minutes of cross?

11   And the answer is four minutes.

12             MR. LAUER:  I appreciate the information.

13   Q.  I want to talk about ranges again.  So Alvarez -- do you

14   recall that Alvarez used very broad ranges in their valuations?

15   A.  That's your description of ranges.

16   Q.  For example, would a range of 280 million to 350 million,

17   is that broad, medium, narrow?  How do you describe that?

18   A.  I would say that's broad.

19   Q.  And does that ring a bell that that's a range that Alvarez

20   used for these oil and gas constants?

21   A.  Yes.

22             MR. LAUER:  I don't know if your Honor has ruled on

23   it—if you have, I apologize—but we do offer 649 not for its

24   truth but for the fact it was communicated and used for

25   confirmation.

Mc12Pla4                      Post - Cross

1          THE COURT:  And as I indicated when you first made it,

2    I thought you needed to specify with more particularity and lay

3    a foundation.  It seems to me you have laid a foundation for

4    its admissibility of certain pages, but not for the

5    admissibility of the entire document because what you are

6    saying is that, whether it is accurate or inaccurate, it shows

7    that another firm that he was associated with used a similar

8    methodology.  I take it that's what you are getting at.

9          MR. LAUER:  Correct, and --

10         THE COURT:  So I will at the next break ask you to

11   specify which pages will be admitted for that limited purpose.

12         MR. LAUER:  Thank you.

13         So within the document, not necessarily the PDF, it is

14   document 3, and the cover page, and page -- schedule 1,

15   which -- schedule 2, schedule 3, 4, 5, 6, 7, for these assets.

16         THE COURT:  We will take up, as I say, at the next

17   break what portions of this document can be received.  But if

18   you have any further -- you are really running very close to

19   the end of your time.  Maybe you want to --

20         MR. LAUER:  I am going to finish up.  This is the last

21   line of questioning.

22   BY MR. LAUER:

23   Q.  You read Mr. Quintero's report?

24   A.  Yes, I did.

25   Q.  And you understood that instead of doing a traditional

appraisal, let's say, of the value in the assets as of end of

2014 or 2015, he looked to what these assets were worth or sold

for after the meltdown and then did this straight line

computation, right?

        MR. GLUCK:  Objection:  Mischaracterizes.  Outside the

scope.

Q.  You understood his methodology?

        MR. LAUER:  I will rephrase it, your Honor.

Q.  Very simply, because I have -- I am on borrowed time, could

you explain the nature of what -- of Quintero's analysis in

terms of not doing a contemporaneous appraisal, but looking at

2016-2017 values.

A.  Well, I think his methodology is accurate and reliable and

commonly used, but I would say he focused on more of the actual

issues that were associated with their failed enterprises, and

he looked at the result of their business activities, and I

think he factored that in to eliminate this range you are

talking about or the guesstimate part of what the evaluators

arrived at.  So he added in more factual information about how

these business entities actually were performing, the kind of

cash flow issues that they were confronted with, and those all

factored into his overall conclusions.

Q.  Are you aware of any specific hedge fund that you can cite

to us that did it, so net asset values either on a year end or

on a monthly basis that used that type of methodology as

Mc12Pla4                          Post - Cross

1    opposed to contemporaneous valuations?

2              MR. GLUCK:  Objection.

3              THE COURT:  Overruled.

4    A.  I have seen many hedge funds that have gone through the

5    valuation process that have used a fundamentally different way

6    than Platinum to arrive at their values.

7              MR. LAUER:  Just last point, we would offer select

8    pages from Defendant's Exhibit 416, which is the December 31,

9    2015 Alvarez report.

10             THE COURT:  All right.  We will take that up at the

11   break.

12             MR. GLUCK:  Same objection.

13             MR. LAUER:  Thank you, your Honor.

14             THE COURT:  Okay.  So ladies and gentlemen, we are

15   going to give you your lunch break.  I should let you know that

16   today we are only going until 3:45 because of another matter

17   that I have to handle, so we probably won't take a break in the

18   afternoon.  So we will give you -- now it's ten minutes before

19   one.  We will give you all the way until 2:00, but then we will

20   go without a break to 3:45.  So just keep that in mind and have

21   a good lunch, and we will see you at 2:00.

22             (Continued on next page)

23

24

25

Mc12Pla4                      Post - Cross

1           (Jury not present)

2           THE COURT:  You can step down.  We will see you at

3    2:00.

4           (Witness not present)

5           THE COURT:  So over the lunch break, counsel for both

6    sides should consult as to which pages of Defense Exhibit 649

7    and Defense Exhibit 416 should be received.  The only ground on

8    which I am receiving any of these pages is that essentially the

9    same methodology was used by Alvarez as was used by Platinum on

10   other occasions or things to that effect.

11          If you can't agree on those pages, I will take that

12   up.  So let's reconvene at 1:50 in case there are any

13   controversies.  At that time I will also ask plaintiffs'

14   counsel to tell me again, in binding fashion, how long he wants

15   on redirect.

16          Okay.  We will see you at 1:50.

17          (Luncheon recess)

18

19

20

21

22

23

24

25

MC1Cpla5

                              AFTERNOON SESSION

                                (1:56 p.m.)

1        THE COURT:  Have you reached agreement on the pages

2   yet or not?

3        MS. SHEN:  We have not reached agreement, your Honor.

4        THE COURT:  Starting with Exhibit 649, what pages does

5   defense counsel want to put in?

6        MR. LAUER:  Your Honor, I'm deferring to Ms. Mosse,

7   who is much more familiar with the details.

8        MS. MOSSE:  Your Honor, we would move pages 1 through

9   4, and then schedules 1 through 15, which are all the

10  supporting schedules of the PPVA investment.

11       THE COURT:  Is plaintiffs' counsel objecting to all of

12  that or just a portion?

13       MS. SHEN:  The majority of it, your Honor.  The only

14  portion that we agree to move in is the valuation methodology

15  section, which is a small box in, I think it's the lower

16  left-hand corner of schedule 1 in that report.

17       THE COURT:  So I will allow in all of schedule 1, but

18  none of the other schedules.  I will allow in -- before we get

19  to the schedules, pages 1 through 4, not for their truth, none

20  of this comes in for its truth, but you really can't understand

21  what's going on in schedule 1 if you don't have pages 1

22  through 4.

23       So let's turn to 416.  What does defense counsel want

MC1Cpla5

1    in?

2              MS. MOSSE:  For exhibit 416, your Honor, we would move

3    to admit again pages 1 through 4, and then schedules 1

4    through 8.

5              THE COURT:  1 through 8.  And how about plaintiffs'

6    counsel?

7              MS. SHEN:  We would have the same objection and would

8    consent to only moving in the valuation methodology.

9              THE COURT:  So again, all I'll admit from 416, pages 1

10   through 4, and schedule 1.

11             How long does plaintiffs' counsel want for redirect?

12             MR. GLUCK:  35 minutes.

13             THE COURT:  35.  All right.

14             (Continued on next page)

1          (Jury present)

2          THE COURT:  Redirect.

3    REDIRECT EXAMINATION

4    BY MR. GLUCK:

5    Q.  Good afternoon, Mr. Post.  For the jury, I'm going to ask a

6    number of redirect questions within the scope of the cross

7    examination by Mr. Lauer.

8          MR. GLUCK:  Mr. Parson, will you please call up

9    Defendant's Exhibit 188.

10   Q.  As that is being called up, Mr. Post, do you recall earlier

11   today you were queried about the stated role of Mr. Bodner in

12   Defendant's Exhibit 188?

13   A.  Yes, I do.

14   Q.  Did you have an opportunity to review that role both in

15   your testimony and during the intermission?

16   A.  Yes, I did.

17   Q.  What is your view as to the accuracy of the stated role of

18   Mr. Bodner in this document?

19         MR. LAUER:  Objection.

20         THE COURT:  I'm not quite sure what that means, but if

21   the witness understands it, he can answer, but maybe you want

22   to rephrase.

23         MR. GLUCK:  I'll rephrase.

24   Q.  The document states Mr. Bodner and his families are

25   beneficiaries of the trust, that is a limited partner and

MC1Cpla5                        Post - Redirect

1    non-managing member in certain of the advisors, including

2    Platinum Management, LLC, Platinum Credit Management, LP --

3           THE COURT:  Counsel, I think, once again, you need to

4    get closer.  When you're reading, the jury can't hear you, the

5    reporter can't hear.

6           MR. GLUCK:  Sorry.

7    Q.  He meets occasionally with his business partners to review

8    the fund operations and has on several occasions introduced

9    investors to funds managed by the advisors.  He's not employed

10   by them and does not hold any officer or director-type

11   positions with them.

12          I will ask you, Mr. Post, to comment based on your

13   review of the emails, documents, and testimony in this matter

14   that went into your report as to whether that statement is

15   accurate.

16          MR. LAUER:  Objection.

17          THE COURT:  I think that was opened up by the cross.

18   Overruled.

19   A.  I believe this statement is untrue and a material

20   misstatement of Mr. Bodner's role in the company.

21   Q.  What is the basis of your contention, bearing in mind we

22   have done a direct examination.

23          MR. LAUER:  Objection.

24   A.  Well, I reviewed the books and records and emails, the

25   entire set of email and communications, deposition testimony,

1   which much of it hasn't covered today, and based on that very

2   comprehensive review, this statement, in my opinion, is not

3   accurate and is a misrepresentation of Mr. Bodner's role as a

4   principle at Platinum.  It just doesn't fit the facts.

5            MR. GLUCK:  Mr. Parson, will you please call up JX 72.

6   Q.  Mr. Post, JX 72, which has already been admitted into

7   evidence, is the letter to which you had testified about

8   yesterday and you were asked a number of questions by Mr. Lauer

9   about this letter today.  Do you recall that?

10  A.  I do.

11  Q.  Do you recall questions to the effect that this letter or

12  asking you to identify where this letter challenged the

13  valuations being put forward by Platinum Management?

14  A.  Yes, I do.

15  Q.  And did you provide various answers as to how this letter

16  indirectly challenged the valuations provided by Platinum

17  Management?

18           MR. LAUER:  Objection.

19           THE COURT:  Overruled.

20  A.  Yes, I did.

21  Q.  When were you retained by PPVA to serve as its hedge fund

22  expert?

23  A.  Over three years ago.

24  Q.  When you were retained, were you provided a copy of the

25  Securities and Exchange Commission complaint alleging that

MC1Cpla5                         Post - Redirect

1   Platinum Management engaged in fraud --

2            THE COURT:  The question was stopped back where, were

3   you provided with the SEC complaint, period.

4            MR. GLUCK:  Yes.

5   Q.  Were you provided a copy of a complaint filed in court by

6   the SEC against Platinum Management, Mark Nordlicht, and

7   others?

8   A.  Yes, I was, and I did review that.

9   Q.  Did that complaint allege that there had been an

10  overvaluation of Platinum's management?

11           MR. LAUER:  Objection.

12           MR. GLUCK:  I did not say that word.

13           MR. LAUER:  Objection.

14           THE COURT:  Do you have a copy of the complaint?

15           MR. GLUCK:  We do.

16           Mr. Parson, will you please bring up a copy of the

17  complaint.

18           THE COURT:  I think defense counsel completely opened

19  the door to this in his cross examination.  So because the

20  cross examination was about what the SEC had said in an earlier

21  writing in a different way and now the door is opened as to

22  what they said in this writing.

23           The jury should understand that, of course, a

24  complaint is not itself evidence, it's just an accusation.  So

25  the fact that the SEC says that the moon is made of green

cheese, to take an example, would not make the moon, in fact,

made of green cheese, everyone knows it's really made of bleu

cheese.

        The point is, the witness was asked about, well, did

you consider what the SEC said or failed to show in another

document, now it's fair to bring out what they said in their

complaint filed in court.

        So, are you offering the complaint?

        MR. GLUCK:  We are offering the complaint as an

exhibit, newly marked Exhibit 905 on the basis of the door

being --

        THE COURT:  And the objection is noted.  It is

received, not for its truth, but rather for response to the

cross examination about what the witness believed the SEC had

asserted or failed to assert.

        MR. LAUER:  We take exception, your Honor.

        THE COURT:  Yes.

        (Plaintiffs' Exhibit 905 received in evidence)

BY MR. GLUCK:

Q.  The question was, does this complaint, without going into

detail, does this complaint allege that Platinum Management

overvalued its assets?

A.  Yes, it does.

Q.  Do you recall a line of questioning earlier today regarding

your assessment of the Northstar asset?

MC1Cpla5                        Post - Redirect

1    A.  Yes.

2    Q.  Do you recall being questioned as to whether you were aware

3    that Northstar comprised not merely that 5, 10 percent of

4    Black Elk, but that there was some additional assets added in?

5    A.  Yes, I do remember that.

6    Q.  Were you aware that there were some additional assets added

7    into Northstar in preparing your report?

8    A.  Yes, I was aware of that.

9    Q.  Do you have your report in front of you?

10   A.  Yes, I do.

11   Q.  And to be clear, this is not a memory test and neither was

12   today supposed to be.

13          Would you please turn to page 28 of your report.

14   A.  Yes, I'm there.

15   Q.  Can you please describe what page 28 of your report sets

16   forth as to the bankruptcy of Northstar that occurred in

17   June 2016, two months after that NAV statement?

18          MR. LAUER:  Objection.

19   A.  Is this page 28 or --

20   Q.  Paragraph 28.

21          THE COURT:  Hang on.  The objection is overruled.

22   A.  Yes, I'm looking at paragraph 28.

23   Q.  Would you please describe for the jury your assessment of

24   the value of Northstar's assets, the bankruptcy two months

25   after this April 2016 NAV.

MC1Cpla5                    Post - Redirect

1     A.   I referenced there was only remaining 5 percent in value.

2     That additional transaction that I think defense counsel

3     mentioned was a million-dollar transaction.  But, ultimately,

4     they filed bankruptcy and their assets were worth $13 million,

5     plus a line of credit was provided.  That's a substantially

6     lower number than the number that was used to calculate the

7     NAV, substantially lower.

8     Q.   Setting aside the line of credit, the operational line of

9     credit, that $13 million, was that even enough to clear the

10    indebtedness of Northstar?

11    A.   No, it was not enough to even eliminate the debt that the

12    company owned.

13    Q.   If it was not enough to clear the indebtedness of

14    Northstar, what were the shares of Northstar worth?

15    A.   Less than zero.

16    Q.   Do you recall a set of questions regarding your assessment

17    of Mr. Bodner's presence in the Platinum offices?

18    A.   Yes, I do.

19    Q.   Was it your intention to state that Mr. Bodner was in the

20    office each and every day for five years?

21            MR. LAUER:  Objection.

22    Q.   Excuse me.  15 years.

23            THE COURT:  Sustained.

24    Q.   Please characterize your understanding of Mr. Bodner's

25    presence in the Platinum Partners office between the years --

1   since the founding of the fund and 2016.

2   A.   Again, I reviewed many emails, deposition transcripts and

3   documents which indicated that he was in the offices on a

4   regular basis consistently over that timeframe.  I believe

5   specifically Mr. Fuchs' deposition testimony references the

6   amount of time he was there and the fact that he attended

7   partners meetings, not investors meetings, but partners

8   meetings on a regular basis.  Those facts were the foundation

9   of my opinion about the extent of time that Mr. Bodner spent at

10  the Platinum offices.  Also, I referenced that his office was

11  on the same floor as the management team of Platinum and the

12  other administrators or many of the other folks at Platinum

13  were a floor below.  So there was a special management floor

14  where his office was.

15  Q.   You were shown a number of emails and documents today.  Did

16  any of those impact your conclusion that Mr. Bodner had the

17  capability to dictate certain policies?

18  A.   Yes, they did.

19  Q.   Explain how.

20  A.   Well, there were numerous examples, they weren't all

21  discussed today or yesterday that I reviewed that were part of

22  the record, that indicated that -- and key decisions, for

23  example, no more distributions.  I think, again, Mr. Fuchs'

24  deposition testimony that I read stated that that was what

25  Mr. Bodner pronounced at a partners meeting.  That is not the

MC1Cpla5                        Post - Redirect

1   type of pronouncement that there will be no further

2   distributions that an investor would have the authority to

3   make.  Only a person who is part of the management team would

4   be able to tell the entire company no more distributions.

5   Q.  Have you further reviewed emails in preparation for your

6   report, not after, but in preparation for your report that

7   indicate that Mr. Bodner had control over what investments

8   would be made and what investments would not be made?

9   A.  Yes, I reviewed emails that confirm that.

10  Q.  Have you reviewed emails or other documents which indicate

11  that Mr. Bodner had special access to information specifically

12  as to the nonperformance of the Platinum assets and the payment

13  of interest by Platinum PPVA to Beechwood?

14  A.  Yes, I reviewed documents which indicate that he had

15  knowledge of that fact.

16          MR. GLUCK:  Mr. Parson, will you please call up

17  PX 419.

18          We move to have this brought into evidence.

19          MR. LAUER:  No objection.

20          THE COURT:  Received.

21          (Plaintiffs' Exhibit 419 received in evidence)

22  Q.  Mr. Post, does this appear to be an email originating from

23  Ms. Angela Albanese?

24  A.  Yes.

25  Q.  Mr. Bodner's secretary?

MC1Cpla5                          Post - Redirect

1   A.  Yes.

2   Q.  Does it also appear to be going to Mr. David Bodner's

3   personal email address?

4   A.  Yes, it does.

5   Q.  Have you seen any other documents in this case that

6   actually include Mr. Bodner's personal email address?

7   A.  Yes, that's my recollection, there were other documents.

8   Q.  If you go to the text of the document, it appears to be a

9   forward from -- excuse me.  If you go to the text of the

10  document, you'll see it was originally sent from Mr. Mark

11  Nordlicht to both Mr. Huberfeld and Ms. Albanese, Mr. Bodner's

12  secretary.  Do you see that?

13  A.  Yes, I do.

14  Q.  And she determined to forward it along to Mr. Bodner's

15  personal email address.  Do you see that?

16  A.  Yes.

17  Q.  Looking to the phrase that says Beechwood allocations and

18  then potentials.  Do you see those?

19  A.  Yes, I do.

20  Q.  Are these the Beechwood money that had been raised that

21  would in turn be invested in PPVA or PPCO?

22  A.  Yes, they are.

23  Q.  It says specifically PPVA 29.5.  Do you see that?

24  A.  Yes, I do.

25  Q.  Have you formed a view as to whether Mr. Bodner was aware

1  that the Beechwood money was being allocated to PPVA in this

2  manner?

3  A.  Yes, I have.

4  Q.  And what is that opinion?

5  A.  Well, because Mr. Bodner was involved in a management role

6  in both Beechwood and in Platinum, he was getting information

7  about both those entities.  This, again, is not the type of

8  information that an investor would receive.  This is, in my

9  experience in reviewing this type of information, this is the

10 type of information that management would receive.

11            MR. GLUCK:  Just to refresh your recollection on the

12 interest point, Mr. Parson, will you please recall up

13 Plaintiffs' Exhibit 562, which has already been admitted into

14 evidence.

15 Q.  You were asked this morning whether the documents you were

16 being shown, in effect, undercut your view that Mr. Bodner was

17 aware that PPVA was making interest payments on behalf of these

18 bad assets like Northstar.  Do you recall that?

19            MR. LAUER:  Objection to the question.

20            MR. GLUCK:  I'll rephrase it.

21 Q.  You were asked this afternoon a series of questions and

22 shown some documents that had the purpose of trying to cast

23 doubt on your conclusion that Mr. Bodner had special knowledge.

24 Do you recall that?

25            THE COURT:  Sustained.

1   Q.  Is this email an example that you relied on in concluding

2   that when there was a problem with PPVA making interest

3   payments for these bad assets, Mr. Bodner and Mr. Huberfeld

4   were the persons to call and sort it out?

5   A.  Yes, I think a clear reading of this says you need to get

6   in touch with Murray and David on the phone to figure out what

7   we're going to do.  That sounds like a question for management.

8   Q.  Senior management?

9   A.  Or senior management.

10          MR. GLUCK:  Mr. Parson, will you please call up

11   exhibit 459.

12   Q.  Earlier today, I think you were asked some questions as to

13   whether a footnote in your report actually represented an email

14   to Mr. Huberfeld or an email to Mr. Bodner.  My question here

15   is, did you rely on exhibit 459 for your view that Mr. Bodner

16   was specifically aware of the interest payments and amounts

17   going from PPVA to Beechwood?

18          MR. LAUER:  Objection.

19          THE COURT:  Ground.

20          MR. LAUER:  It's not responsive to the cross.

21          THE COURT:  I think it's in the ballpark.  Overruled.

22   A.  Yes, I did rely on this email to support my conclusions.

23   Q.  And does this email reference a number of PPVA and appears

24   PPCO interest payments being made for debt being held by

25   Beechwood?

1    A.  Yes, it does.

2    Q.  And does this, a piece of evidence that goes to your theory

3    that the manner in which this overvaluation was disguised was

4    by Beechwood sitting on debt that had gone back?

5              MR. LAUER:  Objection.

6              THE COURT:  So I've tried to keep count of the

7    percentage of the questions put by plaintiffs' counsel that

8    were leading questions.  I think it's 99 percent, but it may be

9    just 98.  The objection is sustained.

10             MR. GLUCK:  Withdrawn.

11   Q.  Can you please describe for us how this document relates to

12   your thesis regarding — your words — the debt stability scheme?

13   A.  Yes.  So Beechwood held the debt, so the interest payments

14   were payable to Beechwood.  In what I would call more of a

15   typical business scenario, the debt holder would be very

16   concerned that the companies that they had the debt in would be

17   paying the debt service, not the fund.  So, this would normally

18   create an issue, which I referred to, which is that if those

19   payments were in jeopardy because these portfolio companies

20   didn't have the money to pay the interest, a creditor, which

21   would be Beechwood, would foreclose.  They would say we are not

22   confident that the portfolio companies that owe us the money

23   can pay it because these interest payments are coming from

24   Platinum.  That's a very unusual circumstance.  In fact, in all

25   my years of reviewing hedge funds and the way that they manage

1   their portfolios, I have not seen a parent, such as Platinum,

2   that paid interest payments for this number of portfolio

3   companies, which means that every one of these portfolio

4   companies was not capable of paying their debt service, which

5   leads me further to the conclusion that there is no value

6   there.  These companies were on the verge of failure or they

7   were virtually out of business.  Those out-of-business

8   portfolio companies --

9           THE COURT:  I think you've answered the question.

10          MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 479,

11  please.

12  Q.  Is this one of the documents that you relied upon regarding

13  the conclusion of Mr. Bodner dictating certain policies at

14  Platinum Management?

15          MR. LAUER:  Objection.  Outside the scope.

16          THE COURT:  No, I think it's at least arguably within

17  the scope, but of course I will give you recross if you wish to

18  explore it further.  Overruled.

19          MR. LAUER:  Thank you.

20          MR. GLUCK:  Very quickly, Mr. Parson,

21  Plaintiffs' Exhibit 376.  I will note that 479 was already

22  moved into evidence.  376, please.

23  Q.  Do you recall the questions today about whether these

24  preliminary estimates were sent to just Huberfeld or Mr. Bodner

25  also?

MC1Cpla5                          Post - Redirect

1    A.  Yes, I do.

2    Q.  Does this document refresh your recollection as to whether

3    you had seen documents showing the preliminary estimates also

4    going to Mr. Bodner?

5    A.  Yes, it does.

6             MR. GLUCK:  Thank you.  I would move to admit

7    Plaintiffs' Exhibit 376 into evidence.

8             It's already in.  My apologies.

9             MR. LAUER:  We have no objection except that he

10   misspoke, it's to Bernie Fuchs.

11            THE COURT:  That's what it looks like.

12   Q.  Do you see the copy line?

13   A.  I do.

14   Q.  Who is that?

15   A.  It's to Angela Albanese.

16   Q.  Mr. Bodner's secretary?

17   A.  Yes.

18            THE COURT:  So the CC is.  In any event, the document

19   speaks for itself.

20   Q.  We're going to switch topics now.

21            Do you recall a series of questions today regarding

22   the concept of PV10, oil in the ground and how you value it?

23   A.  Yes, I do.

24   Q.  And do you understand that Alvarez was provided some PV10

25   numbers?

MC1Cpla5                          Post - Redirect

1    A.  I understand they were provided PV10 numbers by Platinum.

2    Q.  We have limited time, so I'm just going to show you a

3    couple of examples.

4              MR. GLUCK:  Mr. Parson, will you please call up

5    Plaintiffs' Exhibit 534.

6              We would ask to move this into evidence.

7              MR. LAUER:  I have to read it.

8              No connection to Mr. Bodner.

9              THE COURT:  I don't know what it's being offered for,

10   but I will receive it subject to connection and we'll see what

11   the followup questions are.

12             MR. GLUCK:  Solely on the issue of overvaluation.

13             THE COURT:  Okay.  Received.

14             (Plaintiffs' Exhibit 534 received in evidence)

15   Q.  The email indicates an Amrich PV10 value showing a nearly

16   $1 billion number.  Do you see that.

17   A.  Yes, I do.

18   Q.  It's a 2012 email; right?

19   A.  Correct.

20   Q.  Are you aware of a subsequent PV10 analysis that was done

21   on the same oil fields of Golden Gate?

22   A.  Yes, I am.

23             MR. GLUCK:  Mr. Parson, will you please call up

24   Plaintiffs' Exhibit 538.

25             We ask this be brought into evidence.  Same purpose,

1    valuation.

2              MR. LAUER:  We object.  This is not Alvarez.

3              THE COURT:  Overruled.  Received.

4              (Plaintiffs' Exhibit 538 received in evidence)

5    Q.  Based on your review of the records in this case, was the

6    valuation showing a mere $160 million as opposed to a billion

7    of oil in the ground shared with the auditors or Alvarez?

8    A.  Based on my review of the record, this PV10 analysis was

9    not given to Alvarez for their evaluation.

10   Q.  So Platinum Management figured out just a year later that

11   there was less than a tenth of what they thought, or

12   approximately?

13   A.  That's correct.

14   Q.  Let's speak about the Black Elk Opportunities funds for a

15   moment.  You were asked a number of questions about those funds

16   today.  Do you recall that?

17   A.  I do.

18   Q.  In particular, you were asked a question regarding whether

19   the fund raised real money.  Do you remember that?

20   A.  I do.

21   Q.  Black Elk Opportunity Fund, was that a part of PPVA?

22   A.  It was purported not to be, but it actually had the same

23   management team.

24   Q.  From the strict perspective of PPVA's value and PPVA's

25   holdings, what happens when another company invests

MC1Cpla5                         Post - Redirect

1   $100 million into a structure which PPVA invested?

2   A.  This results in what we call dilution.  It's a $100

3   company, that's the total value, and the shareholders own $100.

4   If $20 of new money comes in, that means that those folks that

5   had $100 worth of value now only have $80.  That's dilution.

6   That's because the new investment produces the value of their

7   shares.

8   Q.  Based purely now on -- ignore the bond holdings.  Based

9   upon PPVA's common equity investment in Black Elk, what was the

10  effect of this BEOF $100 million going in?

11  A.  It decreases the value of Platinum's ownership in the fund.

12          MR. GLUCK:  Mr. Parson, will you please bring up

13  Defendant's Exhibits 569 and 625.

14  Q.  Do you recognize this as the BDO audited financial

15  statements you reviewed this morning?

16  A.  Yes, I do.

17          MR. GLUCK:  Mr. Parson, we're trying to do this

18  quickly, can you also bring up 625.

19  Q.  My questions for both of these documents are, you were

20  asked whether there are liabilities disclosed on these two

21  documents.  Do you recall that?

22  A.  I do.

23  Q.  You were asked questions regarding whether a put had been

24  disclosed.  Do you recall that?

25  A.  I do.

1    Q.  What's a put?

2    A.  Gives somebody who owns the put the right to force someone

3    to buy back what you hold.

4    Q.  Has it ever been your contention that all liabilities of

5    PPVA were not disclosed?

6              MR. LAUER:  Objection.

7              THE COURT:  Overruled.

8    A.  No.  In fact, I mentioned a --

9              THE COURT:  No, the question was answered.

10   Q.  Is it your contention that some liabilities of PPVA were

11   not disclosed?

12             MR. LAUER:  Objection.

13             THE COURT:  Overruled.

14   A.  Yes.

15   Q.  On the 2016 NAV sheet that we looked at, in fact, there

16   were around $200 million of liabilities, weren't there?

17   A.  Yes, there were.

18   Q.  I would like to point you to a particular example.  Do you

19   recall reviewing the Nordlicht side letter?

20   A.  Yes, I do.

21   Q.  Do you recall that it purported to guarantee the

22   outstanding indebtedness of Golden Gate Oil?

23             MR. GLUCK:  And it's not a leading because I'm going

24   to ask the view question in a second.

25   Q.  Do you have a view based upon your analysis of that

1    document as to whether at the time, in 2016, that was a

2    contingent liability or a --

3    A.   I have an opinion on that.

4    Q.   And what is that opinion?

5    A.   By 2016, this had evolved from being a contingent liability

6    to an actual liability.

7    Q.   And why is that?

8    A.   Because the business operations were, in essence, defunct.

9    Q.   Was there a reasonable prospect of Golden Gate being able

10   to repay the roughly $40 million that it owed to Beechwood?

11   A.   There was -- in my review of the record, there was no

12   likelihood that they could make that payment.

13   Q.   Therefore, would it be fair to state that PPVA had that

14   liability by that time?

15   A.   Yes, if the underlying company couldn't make the payment,

16   then PPVA would be obligated to make that.

17   Q.   Is that an example of the sort of liabilities you are

18   saying were undisclosed?

19   A.   Yes, that was an undisclosed liability at that point, the

20   underlying Golden Gate could not.

21   Q.   And to be clear, you --

22           MR. GLUCK:  Withdrawn.

23           THE COURT:  Good that you withdraw that question

24   because you have exactly 90 seconds left on your allotted time.

25           MR. GLUCK:  I hope I can do it.

1            Mr. Parson, could you please quickly bring up

2    exhibit 373.

3    Q.  You were asked some questions today about whether Brian

4    Jedwab was a Platinum person or a Bayberry person.  Do you

5    recall that?

6    A.  I do.

7    Q.  Have you reviewed documents that indicate that Mr. Jedwab

8    played a significant role at Platinum?

9    A.  I did.  I believe he was an employee of Platinum.

10   Q.  Is this one of those documents?

11   A.  Yes, it is.

12           MR. GLUCK:  I move 373 into evidence, please.

13           MR. LAUER:  We don't have an objection.

14           THE COURT:  Received.

15           (Plaintiffs' Exhibit 373 received in evidence)

16   Q.  Mr. Post, last question.  You submitted your report in

17   November of 2019; is that right?

18   A.  That's correct.

19   Q.  Now, I'm not asking you this question as to whether any of

20   this was a basis for your report, but since that time, have you

21   seen anything from testimony or evidence or arguments of

22   counsel or documents counsel have showed you that undermine

23   your conclusions or strengthen your conclusions in any way that

24   PPVA's assets were overvalued or that Mr. Bodner played a

25   senior management role at --

1          MR. LAUER:  Can I have an objection?

2          THE COURT:  You can have one, you can have two, you

3    can have probably seven for that particular question.

4    Sustained.

5          Recross.

6          MR. LAUER:  Thank you.

7    RECROSS EXAMINATION

8    BY MR. LAUER:

9    Q.  You were asked about the Nordlicht letter that you said had

10   become a liability.  Do you recall that just a minute ago?

11   A.  Yes, I do.

12   Q.  That letter was in 2016?

13   A.  Yes.

14   Q.  And you were shown financial statements, exhibits DX 569

15   and DX 625?

16   A.  I'll trust your representation.

17         THE COURT:  Those were the two exhibits.

18   Q.  And the question was, essentially, shouldn't the Nordlicht

19   side letter, which you said had become a liability, shouldn't

20   that have been disclosed in the financial statements?

21         MR. GLUCK:  Objection.  Not the question.

22         THE COURT:  It's close enough.  Overruled.

23   A.  I didn't say it shouldn't be disclosed or that it wasn't

24   disclosed.  I was characterizing whether it was a liability or

25   a contingent liability.  My conclusion was it was no longer

MC1Cpla5                              Post - Recross

contingent liability, it had become an actual liability because

of the failure of the underlying businesses.  That is a

separate issue than what they should or should not have given

to the evaluators.

Q.  You're not suggesting that the 2016 liability or contingent

liability should have been disclosed in the 2013 or 2014

financial statements, are you?

A.  We haven't really talked about that.

Q.  Now, you were shown by me the Alvarez & Marsal reports for

June 30 and December 31, 2015.  Do you recall that?

A.  I do.

Q.  And they were based on a PV10 that had been done by a

company called DeGolyer?

A.  That's correct.

Q.  And Mr. Gluck showed you an email that referred to a

different company's PV10 for the Golden Gate Oil and gas field;

right?

A.  That's correct.

Q.  And he asked you whether that different company's PV10

analysis was disclosed to Alvarez; right?

A.  That's correct.

Q.  And you said it wasn't; am I correct?

A.  Yes.

Q.  And you know, while you were being asked those questions,

that the other PV10 analysis was done in 2013?

MC1Cpla5                    Post - Recross

1    A.   Yes.

2    Q.   And Alvarez was not hired to do valuation work until two

3    years later, 2015, you know that; right?

4    A.   I know that.

5    Q.   Now, you keep talking about investors and managers.

6    Platinum Management had owners; right?

7    A.   Yes, there was an ownership structure.

8    Q.   So will you agree with me, the world is not broken up into

9    investors and managers, but you have outside investors,

10   managers, and you can have owners that are not managers.  I'm

11   not asking about our case, just in general so we understand the

12   methodology and the terminology, you could have people who own

13   a management company who are not in management, is that not a

14   possibility?

15   A.   Theoretically, yes.

16   Q.   Right.  And you could be a passive owner of a management

17   company and not be a manager; right?

18   A.   That's correct, but highly unusual.

19   Q.   It is correct, right, you could be an owner of a management

20   company and not manage; right?

21   A.   Theoretically.

22   Q.   You could be the one who provided the capital that allowed

23   someone else to run a management company; right?

24   A.   That's possible.

25   Q.   Now, you said something about $100 million that was raised

1    in the form of preferred, in other words, these investors

2    putting in new fresh money into this Black Elk fund, that

3    somehow that diluted or that diminished the value of PPVA's

4    interest.  Can you explain how adding $100 million to a company

5    makes someone's investment in that company less valuable?

6          MR. GLUCK:  Objection.  Solely diminished as opposed

7    to diluted.

8          THE COURT:  With that amendment, I'll allow the

9    question.

10          MR. LAUER:  May I rephrase it, your Honor.

11   Q.  There's a difference between dilution and reduce; right?

12   A.  Yes, I'd agree with that.

13   Q.  The fact that your percentage ownership of something is

14   made smaller does not necessarily mean that the value of your

15   interest is smaller; right?

16   A.  I'm not sure I understand.

17   Q.  If you own a company that's worth $100 and someone puts in

18   $100, you might have a smaller percentage of that new company;

19   right?

20   A.  The issue is whether the infusion of capital that you just

21   referenced increases the value of the company.

22   Q.  Right --

23   A.  And in this case, my review was that the additional money

24   that was put in by Beechwood did not necessarily increase the

25   value of the company.

MC1Cpla5                         Post - Recross

1    Q.  So it's your testimony that you can put $100 million of

2    fresh money into a company and it doesn't add to the value of

3    the company?  I just want to understand your testimony.

4    A.  That's exactly my testimony.

5    Q.  A couple of times when you were asked about how you formed

6    your view as to where Mr. Bodner was and what he was doing or

7    what he said, you relied on Mr. Fuchs; right?

8    A.  He was one of the sources of information and facts that I

9    relied on.

10   Q.  And that was the only deposition that you read before doing

11   your report; right?

12   A.  Correct.

13   Q.  And if it turned out that Mr. Fuchs was wrong, then that

14   might undermine some of the decisions in your report; right?

15   A.  How could he be wrong about something that he witnessed.

16   Q.  If he's lying; right?

17        THE COURT:  Excuse me.  That was not responsive to the

18   question.

19   Q.  To the extent that you're relying on Mr. Fuchs to form your

20   opinion and it turns out Mr. Fuchs was wrong either because he

21   acknowledges that he was wrong or he's deemed to have spoken

22   untruthfully, would that reduce or diminish the strength of

23   your opinion as it relates to the matters on which you are

24   relying on Mr. Fuchs?

25        MR. GLUCK:  Objection.  Foundation.  Speculation.

1          THE COURT:  No.  First of all, let me ask defense

2     counsel, because we didn't set a time for your recross, how

3     much longer do you have?

4          MR. LAUER:  Five minutes or less.

5          THE COURT:  All right.  So this is really a question

6     for the jury, not for the witness, but just while we're on the

7     subject.

8          I will give you detailed instructions at the end of

9     the case about how you evaluate an expert's testimony, but one

10     of the things that this and every single expert relies on is

11     either the testimony of other people or the documents prepared

12     by other people or other things that were prepared by other

13     people.  Because he wasn't there, he's relying on his review of

14     the records.  So, if the records are accurate, then that tends

15     to support the expert's testimony, and if the records are

16     inaccurate, that tends to less support or undercut the

17     witness's testimony.  That's sort of like common sense.

18          So I think that's really what that question was

19     directing at.  So let's move on.

20          MR. LAUER:  Thank you, your Honor.

21     BY MR. LAUER:

22     Q.  A number of times you said that if you saw an email that

23     went to Angela Albanese, you concluded that it also necessarily

24     went to Mr. Bodner; right?

25     A.  Yes, that was my conclusion.

1    Q.  Have you read Angela Albanese's deposition since delivering

2    your report?

3    A.  Yes, I have.

4    Q.  Did you see that she said that sometimes she would deliver

5    something to Mr. Bodner and sometimes, in fact more often, the

6    communications were from Mr. Huberfeld?  Did you read that in

7    her deposition?

8             MR. GLUCK:  Objection.  Mischaracterization.

9             THE COURT:  Sustained on other grounds.

10            MR. GLUCK:  -- be called as a witness.

11   Q.  You were shown the SEC complaint.  When was that filed?

12   A.  In 2016.

13   Q.  You filed in December 2016?

14   A.  That's correct.

15   Q.  Could you read who the defendants were in that SEC case?

16            MR. LAUER:  It's PX 905.  Can we have that.

17            MR. GLUCK:  I doubt they do.  Mr. Parson, please feel

18   free to call it up on the screens.

19            THE COURT:  I'm old enough to remember when exhibits

20   were solely written documents and the theory was if I instead

21   having them available on the screen, we would move things along

22   more quickly and efficiently.

23   Q.  Could you read the defendants.

24   A.  Platinum Management, Platinum Credit Management, Mark

25   Nordlicht, David Levy, Daniel Small, Uri Landesman, Joseph

MC1Cpla5

1    Mann, Joseph SanFillipo, and Jeffrey Shulse.

2    Q.  No David Bodner; right?

3    A.  If David Bodner was part of Platinum Management.

4              MR. LAUER:  Oh, please.  Thank you.  We're finished.

5              THE COURT:  Anything else?

6              MR. LAUER:  No, your Honor.

7              THE COURT:  Thank you very much.  You may step down.

8              (Witness excused)

9              Ladies and gentlemen, before we turn to the next

10   witness, couple things.

11             First, just in case you're curious about people pass

12   objections and I rule on them and all like that, you don't

13   really have to worry about it, but I'll tell you why that

14   happens.

15             There are a bunch of rules that actually come down

16   from about 500 years ago in England, but were very slow to

17   change things in the legal system, and they determine what

18   evidence you are allowed to hear and what evidence you are not

19   allowed to hear.  For example, an obvious example would be

20   multiple hearsay.  If a witness said in a murder case against

21   John Jones, I heard Mrs. Smith tell Mr. Smith who said he had

22   heard it from Mr. Albanese, who heard it from Mr. Baruch that

23   John Jones committed that murder, that would never be allowed

24   into evidence because there's no way to know whether all that

25   gossip was accurate or inaccurate.  It's not the testimony of

MC1Cpla5

someone who actually witnessed the murder, it's the testimony

of someone who said, well, I heard so-and-so say to so-and-so,

who said to so-and-so, who said to so-and-so, who said to

so-and-so that John Jones committed the murder.  So the courts

of England, and then the United States, decided about 500 years

ago that would not be presented to you, and that's called the

hearsay rule.

So there are a lot of the other technical rules and

the whole point of those rules is to make sure that you don't

get evidence that you can't reasonably evaluate because it's so

out of evidentiary quality.

So counsel have the right and duty to object and I

have to decide whether those objections are good or bad.

That's what that's all about.  I just wanted you to know, and

then you can congratulate yourself for never going to law

school.

Now I'm going to ask my law clerk to hand out to you

what I'm going to call a preliminary instruction.  We're going

to read this together now, but you can take it into the jury

room and keep it.  These are not my final instructions, I'll

give you the final instructions at the end of all the evidence,

but this is sort of a heads up on what some of the issues in

this case are going to be.

Let's read this together.

To the jury:  Before we go forward with more of the

MC1Cpla5

evidence, I want to give you a brief overview of the claims in this case.  Let me emphasize that this is just a brief overview.  After you have heard all the evidence and the parties have made their closing arguments, I will give you detailed instructions of law that will displace this preliminary instruction and will govern your deliberations.

This is a civil lawsuit arising out of events concerning an investment fund, Platinum Partners Value Arbitrage Fund, LP, known as PPVA, which primarily invested in assets such as oil and gas.  In August 2016, Platinum Management New York, LLC, known as Platinum Management, the general partner and investment manager of PPVA, commenced a wind-down of PPVA under court supervision.

Plaintiffs Martin Trott and Christopher Smith are court-appointed liquidators who have the legal authority to sue on behalf of investors and creditors to recover assets of the fund that are unlawfully held by others.  Plaintiffs claim that the defendant in this case, David Bodner, had material control of PPVA and its related entities and failed to disclose to shareholders his knowledge that the fund's assets were overvalued, even though he allegedly had a duty to do so.  They also claim that Mr. Bodner's decision to withhold this knowledge resulted in the unlawful payment of millions of dollars in unearned incentive and management fees from PPVA to the owners and managers of Platinum Management — including

MC1Cpla5

1    Mr. Bodner and his family.

2          Mr. Bodner disputes that he had any material control

3    over PPVA and its related entities, including its valuation and

4    investment decisions.  He denies that he had access to detailed

5    or confidential information regarding the fund's alleged

6    overvaluation of its assets.  He further asserts that even if

7    he had such information, he was not under any duty to disclose

8    this knowledge.  He also maintains that he was released from

9    any liability in this case by a written release agreement,

10   dated March 16, and signed by previous managers of PPVA.

11         Please remember that this preliminary instruction is

12   simply a very brief overview of the claims in this case.  I

13   will give you more detailed, final instructions that will

14   replace this overview and will govern your deliberations.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Mc12Pla6

1          THE COURT:  So as I say, you can hold on to that and

2    when you leave tonight, leave it in the jury room and pick it

3    up tomorrow at any time you want.

4          Okay.  Please call your next witness.

5          MR. GLUCK:  Plaintiff calls Mr. Bernard Fuchs.

6          MR. HEFTER:  I'm not Mr. Fuchs.

7          THE COURT:  No.  You come up here.

8          MR. HEFTER:  No, I'm not the witness, your Honor.

9          THE COURT:  Oh, I'm sorry.

10         MR. HEFTER:  I'm the attorney.  Can I have just a

11   moment with counsel.

12         THE COURT:  Who are you?

13         MR. HEFTER:  I am Michael Hefter, of Hogan Lovells,

14   and I represent Mr. Fuchs.

15         MR. GLUCK:  Your Honor --

16         THE COURT:  Go ahead.

17         MR. GLUCK:  Mr. Fuchs is not feeling well and he's got

18   a cough, so I'm going to try to keep it as short as possible.

19         THE DEPUTY CLERK:  Does he have a mask on?  Would he

20   like one?

21         MR. GLUCK:  If he has a mask it's going to be problem

22   for me.  I actually have a serious hearing problem.

23    BERNARD FUCHS,

24        called as a witness by the plaintiffs

25        having been duly sworn, testified as follows:

Mc12Pla6                        Fuchs - Direct

1              THE COURT:  Counsel.

2    DIRECT EXAMINATION

3    BY MR. GLUCK:

4    Q.  Mr. Fuchs, I understand that you are not feeling well

5    today, but are you able to hear me and understand my questions?

6    A.  Yes, I am.

7    Q.  Okay. did there come a time when you were introduced to the

8    Platinum Partners funds?

9    A.  Yes.

10   Q.  Could you please tell the jury when that happened.

11   A.  At the end of 2005 or the beginning of 2006.

12   Q.  Had you accumulated some wealth by that time?

13   A.  Yes.

14   Q.  In what business were you operating prior to your

15   investment?

16   A.  The electronics business, importing from China.

17   Q.  Did you determine to make an investment in PPVA?

18   A.  Yes.

19   Q.  Who did you meet with in connection with your potential

20   investment in PPVA?

21   A.  With Mr. Huberfeld and Mr. Bodner.

22   Q.  Approximately when was that meeting?

23   A.  At end of 2005 or beginning of 2006.

24   Q.  What did Mr. Huberfeld and Mr. Bodner tell you about what

25   PPVA was?

Mc12Pla6                        Fuchs - Direct

A.   That it was a hedge fund that invested in various different
businesses and that there was a little bit of a risk, but it
was very highly profitable, had a very good track record.

Q.   Did you HAVE any relationship with Mr. Huberfeld and
Mr. Bodner prior to that?

A.   I knew Mr. Huberfeld from previously, but Mr. Bodner I only
had met once before.

Q.   What, if anything, did Mr. Huberfeld and Mr. Bodner tell
you about their roles at the fund?

A.   As far as I understood they were partners.

Q.   Partners of Platinum?

A.   Correct.

Q.   Did they tell you they were also partners with each other?

A.   I don't remember if they said that or not.  I don't
remember.

Q.   What, if anything, did they describe to you regarding what
they did at Platinum Management?

A.   Well, they oversaw the investments and made sure that the
investments are running properly.

Q.   Did you ultimately determine to make an investment in PPVA?

A.   Yes.

Q.   How much?

A.   I started off with a million dollars.

Q.   Over time did that amount increase?

A.   Yes.

Mc12Pla6                          Fuchs - Direct

1    Q.  What was the largest amount that you believe you had

2    invested in PPVA?

3    A.  Approximately $30 million.

4    Q.  Did Mr. -- did you have more than one meeting with

5    Mr. Bodner and Mr. Huberfeld?

6    A.  I used to meet them often.  Whenever I went up to the

7    office, I used to meet them, say hello.

8    Q.  Did you become familiar with a gentleman named Mark

9    Nordlicht?

10   A.  Yes.

11   Q.  Was Mark Nordlicht in your first meetings?

12   A.  No.

13   Q.  How is it that you became introduced to Mark Nordlicht?

14   A.  Subsequently, after I met Mr. Huberfeld and Mr. Bodner,

15   they introduced me at a later time to Mark Nordlicht as one of

16   their partners that runs one of the divisions.

17   Q.  What did they describe Mark Nordlicht's role at the fund to

18   be?

19   A.  He ran the Platinum Partners Value Arbitrage Fund.  It was

20   two different funds.  He ran one of the funds.

21   Q.  What did they describe their, Murray and Huberfeld's [sic]

22   role in relation to Mark Nordlicht?

23   A.  That they were partners in both funds.

24   Q.  Did they tell you that they would be overseeing

25   Mr. Nordlicht?

Mc12Pla6                          Fuchs - Direct

1    A.  They said that Mark Nordlicht is going to run the fund but

2    they will make sure that everything is running properly.

3    Q.  Did you place your trust in Mr. Huberfeld and David Bodner?

4    A.  Yes.

5    Q.  Is the reason you invested in the fund because of this

6    oversight of David Bodner and Murray Huberfeld?

7    A.  Yes.

8    Q.  Eventually there came a time when you yourself were granted

9    an interest in the management company, is that fair?

10   A.  Yes.

11   Q.  Before that, do you recall being invited to meetings at

12   which the way Platinum would select or not reject investments

13   was presented to you?

14   A.  Yes.

15   Q.  Was the purpose of those meetings to give you comfort as to

16   the process by which Platinum would accept an investment or not

17   accept an investment?

18   A.  Yes.

19   Q.  When did those meetings take place?

20   A.  2009, 2010, several meetings that I attended as an

21   observer.

22   Q.  Who attended those meetings?

23   A.  A bunch of people——Murray Huberfeld, David Bodner, Mark

24   Nordlicht, Eli Colter, Uri Landesman, Naftali Manela, people

25   that were involved in running the fund.

Mc12Pla6                              Fuchs - Direct

1   Q.  Did Murray Huberfeld and David Bodner play an active role

2   in those meetings?

3   A.  Yes.

4   Q.  Can you describe for me, if you will, what was presented to

5   you as the process by which Platinum would either decide to

6   make an investment or say this one's not for us?

7   A.  They would review the potential of the risk/reward ratio to

8   see if it pays to invest in this business or not.  They would

9   go around the table, they would get everyone's opinion that was

10  in the fund, and they made their decisions afterwards.

11  Q.  Did Murray Huberfeld actively participate in these

12  meetings?

13  A.  Yes.

14  Q.  Did David Bodner actively participate in these meetings?

15  A.  Yes.

16  Q.  Do you have a view on whether -- or the reason you were

17  invited to observe this decisional process?

18  A.  I'm sorry?

19  Q.  It was a bad question.

20          Why do you understand that you as an investor were

21  invited to view this process of decision-making?

22  A.  Because I was investing, kept on increasing my investments

23  in the funds, so they wanted me to see how they choose

24  businesses to go into, investments.

25  Q.  And what did you take away from the process?

Mc12Pla6                          Fuchs - Direct

1    A.  I felt very comfortable.

2    Q.  Was part of that comfort based upon the role of Murray

3    Huberfeld and David Bodner and the investment selection or

4    rejection process?

5    A.  I was comfortable with the entire process.

6    Q.  Let me -- just repeat that.

7    A.  I was comfortable with the entire process, everybody that

8    was there.  I was comfortable.

9    Q.  And so part of that comfort stemmed from the fact that

10   Murray Huberfeld and David Bodner were a part of that process.

11   A.  Yes.

12   Q.  Did you have an understanding about the reputations of

13   Mr. Bodner and Mr. Huberfeld as investors?

14   A.  I'm sorry?

15   Q.  Did you have an understanding about the reputation of

16   Mr. Huberfeld and Mr. Bodner as good investors?

17           MR. HERTZBERG:  Objection, your Honor.  Hearsay and

18   foundation.

19           THE COURT:  Sustained.

20   BY MR. GLUCK:

21   Q.  At any time prior to your becoming a partner at Platinum

22   Management, did you hear anyone dispute or disagree that

23   Mr. Huberfeld and Mr. Bodner were senior partners with

24   authority to decide or participate in the selection or

25   rejection of investments?

Mc12Pla6                        Fuchs - Direct

1                MR. HERTZBERG:  Objection:  Hearsay and leading.

2                MR. GLUCK:  I will rephrase.

3     BY MR. GLUCK:

4     Q.  When you first invested at PPVA, were there times when you

5     would visit PPVA's offices?

6     A.  Yes.

7     Q.  Before you became a partner, were you actually granted a

8     shared office?

9     A.  No.  I'm sorry.  Say it again?  I'm sorry.

10    Q.  Before you were made a partner, were you granted a place

11    within Platinum Management to sit when you would come to visit?

12    A.  Yes.

13    Q.  How many -- how often would you come to visit?

14    A.  A few times a week.

15    Q.  And where would you sit?

16    A.  In one of the offices that I shared with Harvey Werblowsky.

17    Q.  Who is Harvey Werblowsky?

18    A.  One of the in-house intern for Centurion who was PPCO at

19    that time.

20    Q.  What would you do when you came to the office?

21    A.  I would just talk with the portfolio manager, see how they

22    are doing, what they are investing in, how everything is doing,

23    just to make myself -- keep myself busy——I was like

24    semiretired——and to be comfortable with what they are doing.

25    Q.  During these visits and while you were present at the

Mc12Pla6                          Fuchs - Direct

1   office, was this understanding that you had that Mr. Bodner and

2   Mr. Huberfeld participated in the investment process or

3   rejection process, was that confirmed or did you hear anything

4   that would undermine it?

5           MR. HERTZBERG:  Hearsay, compound, form.

6   Q.  Was that confirmed?

7           THE COURT:  No.  Excuse me.

8           MR. GLUCK:  Sorry.

9           THE COURT:  No, I don't think it's hearsay because

10  it's seeking, I am almost sure, a negative.  A negative can

11  never be hearsay.  Overruled.

12  A.  That was my understanding that they were partners in

13  everything that was going on there.

14  Q.  Would you speak with Mr. Bodner and Mr. Huberfeld during

15  your periodic visits?

16  A.  Of course, yes, I did.

17  Q.  Did you observe whether Mr. Huberfeld or Mr. Bodner had an

18  office within Platinum Management?

19  A.  Yes.

20  Q.  They did.

21  A.  They did.

22  Q.  Would -- when you would go for your visits, were Mr. Bodner

23  and Mr. Huberfeld typically in the office?

24  A.  Usually, yes.

25  Q.  What would you speak with Mr. Huberfeld and Mr. Bodner

Mc12Pla6                         Fuchs - Direct

1    about?

2              MR. HERTZBERG:  Your Honor, objection.  Unfortunately

3    I think we need a sidebar because I won't be able to do it in

4    three words.

5              THE COURT:  I don't think we need a sidebar, but I

6    don't think you can ask that question.  You have to break it

7    down to Mr. Bodner and Mr. Huberfeld.

8              MR. HERTZBERG:  Thank you, Judge.

9              MR. GLUCK:  I think I understand.

10   BY MR. GLUCK:

11   Q.  Did Mr. Huberfeld and Mr. Huberfeld share an office?

12   A.  Yes.

13   Q.  When you would go to speak to them, would you speak to them

14   together?

15   A.  Yes.

16   Q.  What -- when you would speak to Mr. Bodner and

17   Mr. Huberfeld together, what would you talk about?

18   A.  Just in general how the business is doing, how the fund is

19   doing.

20   Q.  Did Mr. Bodner speak during these meetings?

21   A.  Yes.

22   Q.  Did Mr. Huberfeld speak during these meetings?

23   A.  Yes.

24   Q.  Did they have knowledge regarding the investment activities

25   of PPVA?

1   A.   It seems so according to my opinion.

2   Q.   Would you talk about how various assets or companies were

3   doing with them?

4   A.   Not particularly.

5   Q.   What would you talk about?

6   A.   We talked in general how the fund is performing, if the

7   fund will have a good month, will have a bad month, how the

8   fund is doing for the year.

9   Q.   How many times would you estimate you were invited to one

10  of these process meetings where the mechanisms by which PPVA

11  would either invest or reject an investment --

12          THE COURT:  Gee.  Is that leading or not?  Oh, it's

13  leading.  Sustained.

14  BY MR. GLUCK:

15  Q.   How many investment process meetings do you recall

16  attending?

17          MR. HERTZBERG:  Your Honor, it's process meetings --

18          THE COURT:  I think that's unclear what is meant by

19  that.

20  BY MR. GLUCK:

21  Q.   Do you recall earlier in your testimony describing being

22  invited to meetings at which the process by which Platinum

23  would either select or reject investments would be displayed?

24  A.   Yes.

25          MR. HERTZBERG:  Mischaracterizes.

1          THE COURT:  I agree.  I think that was not his

2     testimony.  He was -- but let's just ask so we all will be on

3     the same page.

4          When you were periodically invited to these meetings

5     with Mr. Bodner and Mr. Huberfeld, I thought you told us that

6     you mostly talked about how the fund was doing.

7          THE WITNESS:  No.  I was invited to several meetings

8     where they sat around the table discussing new potential

9     investments.

10         THE COURT:  Ah.  Okay.  So we will distinguish those

11    meetings.  Okay.

12         And so let's deal with those meetings and now you

13    can --

14         MR. GLUCK:  Allow me to clarify the record.

15    BY MR. GLUCK:

16    Q.  On the one hand, you would come by the office from time to

17    time and at those times you might drop by Mr. Huberfeld and

18    Mr. Bodner's shared office, is that right?

19    A.  Yes.

20    Q.  Separate and distinct from that, we discussed earlier a set

21    of investment process meetings at which much more than

22    Mr. Huberfeld and Mr. Bodner would attend, but others as well?

23    A.  Yes.

24         THE COURT:  So this meeting is not just the two of

25    them; it's a whole bunch of people.  Yes?

Mc12Pla6                          Fuchs - Direct

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  Thank you.

3     BY MR. GLUCK:

4     Q.  My question was not the drop-by meetings where you would

5     stop by the office.  How many of the investment process

6     meetings did you attend?

7          MR. HERTZBERG:  Your Honor, the witness has never said

8     process.  Mr. Gluck has said process.

9          THE COURT:  But I think it's now clear to the jury in

10    these meetings where there are a bunch of people, how many of

11    those did you attend?

12         THE WITNESS:  Maybe a half a dozen.

13    BY MR. GLUCK:

14    Q.  And in all of these meetings, were Mr. Huberfeld and

15    Mr. Bodner present?

16    A.  Yes.

17    Q.  Did they both speak?

18    A.  Yes.

19    Q.  Was the subject of whether or not to invest in a particular

20    opportunity the primary purpose of those meetings?

21    A.  Yes.

22    Q.  Thank you.

23         Did there come a time when you yourself began to

24    engage in a role more than a mere investor?

25    A.  Yes.

Mc12Pla6                        Fuchs - Direct

1    Q.  Did there come a time in particular when you began

2    soliciting other investors to invest in Platinum?

3    A.  Yes.

4    Q.  Who authorized you to do so?

5    A.  Mr. Huberfeld and Mr. Bodner.

6    Q.  How did you go about finding additional investors for

7    Platinum?

8    A.  Well, I went to people that were my friends, and being that

9    I had retired from my business, they would ask me what I was

10   doing and I was telling them that I am investing at these hedge

11   funds, at Platinum, and I'm very happy with the returns, and I

12   am able to make the profit every year, that they are earning.

13   And they said, Can we also invest?  And I said, Sure, come down

14   to the office, meet the principals, and you will see if you

15   feel comfortable.

16   Q.  Would you attend those meetings, the meetings where you had

17   identified some prospective investor and then the investor went

18   to go meet Platinum?

19   A.  Yes.

20   Q.  Who would attend, from the Platinum side, those meetings?

21   A.  Usually Mr. Huberfeld.

22   Q.  Anyone else?

23   A.  Sometimes Mr. Nordlicht, sometimes Mr. Bodner, but usually

24   Mr. Huberfeld.

25   Q.  Do you recall that in late 2012 there was an explosion on

1   the Black Elk –– one of the Black Elk oil rigs?

2   A.   Yes.

3   Q.   How did you come to learn about that?

4   A.   It was on the front cover of the *New York Times*.

5   Q.   Was it discussed in the Platinum offices?

6   A.   Yes.

7   Q.   While you were there?

8   A.   Yes.

9   Q.   Who did you discuss it with?

10  A.   The entire office.

11  Q.   Did you discuss it with Mr. Bodner?

12  A.   Everyone discussed it.

13  Q.   Let me just ask that specific question.  Did you discuss it

14  with Mr. Bodner?

15  A.   I don't remember if I discussed with him alone, but it was

16  discussed with everybody.

17  Q.   Okay.  And what was the subject of the discussion?

18  A.   That it was a sad situation, that one of the investments

19  that Platinum had exploded, and some people died.

20  Q.   Have you used the phrase "all hands on deck situation"?

21  A.   Yes.

22  Q.   Was the explosion on the Black Elk oil rig an all hands on

23  deck situation ––

24  A.   Yes.

25  Q.   –– at Platinum?

Mc12Pla6                          Fuchs - Direct

1    A.  Yes.

2    Q.  Did you come to learn about what you may have been told was

3    a one-off project, which we in this case are calling Black Elk

4    Opportunities Fund?

5    A.  Yes.

6    Q.  Did you become an investor in the Black Elk Opportunities

7    Fund?

8    A.  Yes.

9    Q.  What was it to your understanding?

10   A.  To my understanding it was a short-term loan to Black Elk

11   so they could continue operations.

12   Q.  And was it your understanding that BEOF——Black Elk

13   Opportunities Fund——was separate from PPVA?

14   A.  Yes, it was a one-off.

15   Q.  Were you asked to solicit investors for Black Elk

16   Opportunities Fund?  And I am distinguishing that from any work

17   you did soliciting investors for PPVA.

18   A.  Yes.

19   Q.  Who asked you to solicit investors for Black Elk

20   Opportunities Fund?

21   A.  Mr. Nordlicht, Mr. Huberfeld, and Mr. Bodner.

22   Q.  Were you successful in soliciting investors for Black Elk

23   Opportunities Fund?

24   A.  Yes.

25   Q.  Did there also come a time when your advice or expertise

1   was sought in relation to particular Platinum investments?

2   A.  Yes.

3   Q.  Does the name China Horizon, is that a familiar name to

4   you?

5   A.  Yes.

6   Q.  Were you asked to advise on Platinum's potential investment

7   in China Horizon?

8   A.  Yes.

9   Q.  Who asked to you advise?

10  A.  Mark Nordlicht, Murray Huberfeld, David Bodner.

11  Q.  Why do you think they asked your advice on this particular

12  investment?

13  A.  Because being that I traveled for 31 years in China and did

14  business there, they felt that I would have knowledge and that

15  might be that would mean something in this investment.

16  Q.  Did Platinum ultimately decide to make an investment in

17  China Horizon?

18  A.  If I remember correctly, they invested first and then they

19  asked me my opinion.

20  Q.  And what was your opinion?

21  A.  That it's a good investment.

22  Q.  Did you follow China Horizon's progress once the investment

23  had been made?

24  A.  Yes.

25  Q.  And that was part of your -- I won't say duties, but that

Mc12Pla6                        Fuchs - Direct

1    was one of the things you would do when you went into

2    Platinum's offices?

3    A.  Yes.  I was asked to be -- to look into this to make sure

4    that it's a good investment and that they are doing okay.

5    Q.  Did there come a time when there was a problem with that

6    investment?

7    A.  There was a -- yes.

8    Q.  Describe that problem.

9    A.  I think there was a liquidity issue.  They needed more

10   money to be able to build this business up.

11   Q.  They needed more money.

12   A.  Correct.  China Horizon needed more money.

13   Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

14   464.  And I would have -- move to have 464 brought into

15   evidence.

16           MR. HERTZBERG:  Objection your Honor, just the time.

17           THE COURT:  I'm sorry?

18           MR. HERTZBERG:  It's the time period.  It's a 2010

19   e-mail.

20           THE COURT:  Yes, but I think this is foundational.

21   Overruled.  Received.

22           (Plaintiff's Exhibit 464 received in evidence)

23   BY MR. GLUCK:

24   Q.  Mr. Fuchs for the avoidance of any doubt, I'm asking you

25   simply about your role in China Horizon at any particular time.

1    It's not a valuation issue at this time.

2             Now, Mr. Fuchs, is it fair to say that by 2010

3    Platinum had already invested in China Horizon?

4    A.  Yes.

5    Q.  And that this liquidity issue you described had arisen?

6    A.  Yes.

7    Q.  They needed money.

8    A.  Yes.

9    Q.  Okay.  Bottom portion of the e-mail, who is Mr. Alan

10   Clingman?

11   A.  He is the one who brought this investment to Platinum.

12   Q.  Did he play an ownership or management role at China

13   Horizon?

14   A.  Yes.

15   Q.  What was that?

16   A.  He was the manager of China Horizon.

17   Q.  Would you interface with Mr. Clingman?

18   A.  Yes.

19   Q.  The e-mail we are looking at is you, Bernie Fuchs, sending

20   an e-mail, is that right?

21   A.  Yes.

22   Q.  And one of your e-mail addresses is lxBernie@aol.com?

23   A.  Yes.

24   Q.  And you are sending it to Ms. Angela Albanese.

25   A.  Yes.

Mc12Pla6                        Fuchs - Direct

1   Q.  Who is Angela Albanese?

2   A.  She is the personal secretary to Mr. Huberfeld and

3   Mr. Bodner.

4   Q.  And she's actually got two e-mail addresses on this

5   particular e-mail, doesn't she?

6   A.  Yes.

7   Q.  One at Centurion and one at Platinum, is that right?

8   A.  Yes.

9   Q.  Is Centurion the fund that Huberfeld ran?

10  A.  Yes.

11  Q.  And is Platinum PPVA the -- what we are talking about in

12  this case?

13  A.  Yes.

14  Q.  Why did you send this e-mail to Angela Albanese?

15  A.  So that she should forward this to Mr. Bodner.

16  Q.  You would minimize, Noah, the . . .

17          And what is -- very, very briefly what is the content

18  of this update?

19  A.  That they needed money to continue this business.

20  Q.  Did you then have any discussions with Mr. Bodner about

21  where this money would come from?

22  A.  No.

23  Q.  Did China Horizon seek a bridge loan from UBS?

24  A.  I remember something about that, yes.

25  Q.  Okay.  Now that your recollection is refreshed, do you

Mc12Pla6                        Fuchs - Direct

1  recall whether Mr. Bodner was involved in China Horizon

2  obtaining a bridge loan from UBS?

3  A.  Yes.

4  Q.  And what was the nature of that involvement?

5  A.  I'm not certain, but Mr. Clingman was involved with

6  Mr. Bodner to arrange the financing, extra financing.

7  Q.  In your role monitoring this asset for Platinum, you

8  brought this liquidity issue to the attention of Mr. Bodner, is

9  that correct?

10 A.  Correct.

11 Q.  And then he then acted in some way to try to solve that

12 liquidity issue.

13 A.  Yes.

14 Q.  Thank you.

15        Did there come a time when, in addition to finding

16 some investors and looking after this particular Chinese asset,

17 that you actually were given a partnership in Platinum

18 Management?

19 A.  Yes.

20 Q.  Could you please explain to us when and how that happened.

21 A.  It was sometime in the middle of 2014.  I was called into

22 the offices of Mr. Huberfeld and Mr. Bodner, that they are

23 making me a 10 percent partner in Platinum Management.

24 Q.  So Mr. Huberfeld and Mr. Bodner had the power to grant a

25 new partnership interest?

Mc12Pla6                        Fuchs - Direct

1    A.   Yes.

2    Q.   Were you pleased with this investment?

3    A.   I was very pleased.

4    Q.   What did you understand that you had done to merit your

5    partnership?

6    A.   Well, I had a large amount of money invested in the fund

7    already and they explained to me that -- I asked them, Do I

8    have to pay any money to get this partnership, this 10 percent?

9    And they replied, You are not necessary to pay any money.  All

10   that you have to do is keep the money that you have in the

11   fund; keep it in the fund and also continue soliciting

12   investors.

13   Q.   When did this occur?

14   A.   Sometime in the middle of 2014.

15   Q.   Middle of 2014?

16   A.   Yes, approximately.

17   Q.   At that time, to your knowledge, who were the other

18   partners of Platinum Management besides yourself?

19   A.   As far as I knew it was Mr. Huberfeld, Mr. Bodner,

20   Mr. Nordlicht, and possibly Mr. Uri Landesman.

21   Q.   Mr. Uri Landesman that would make sense.  Okay.

22        Had -- prior to you becoming partner, had you been

23   made aware, based on your presence in the office, that there

24   were partnership meeting -- partner meetings that would occur

25   with some regularity to discuss the fund?

Mc12Pla6                              Fuchs - Direct

1    A.  Yes.

2    Q.  Before you were a partner, you were named a partner, did

3    you ever attend one of those meetings?

4    A.  No.

5    Q.  Once you became a partner, did you become invited to those

6    meetings?

7    A.  Yes, one meeting.

8    Q.  One meeting.

9    A.  Yes.

10   Q.  When was that meeting?

11   A.  End -- late 2014 or early 2015.

12   Q.  Somewhere.

13           Would it be fair to say December '15 or January --

14   excuse me, December '14 or January '15?

15   A.  Yes.

16   Q.  Where did that meeting take place?

17   A.  In a restaurant in Manhattan, on the West Side.

18   Q.  Do you remember the name of the restaurant?

19   A.  Maybe Prime Grill or something.  Prime.  Something Prime

20   Grill.  On 85th Street and Broadway.

21   Q.  A Kosher restaurant?

22   A.  Kosher restaurant, yes.

23   Q.  Okay.  What happened at that meeting?

24   A.  There was an argument that broke out between Mr. Bodner and

25   Mr. Nordlicht.

1    Q.  What were they arguing -- you were present at the table?

2    A.  Yes.

3    Q.  Who else was present at the table?

4    A.  Uri Landesman was present and Murray Huberfeld was in and

5    out also at that meeting.  He lived a block away, so he would

6    pop in, go out for a while, come back.

7    Q.  He had a seat at the table, but maybe he was in and out?

8    A.  Correct, yes.

9    Q.  Okay.  What was the dispute about?

10   A.  Mr. Bodner said to Mr. Nordlicht that he wants him to

11   reduce the amount of money in the fund, that the positions were

12   not valued properly.  He should redo the positions.

13   Q.  Did he --

14   A.  Lower them.

15   Q.  Did he say they were too high or too low?

16   A.  He said it was too high.

17   Q.  What did Mark Nordlicht say in response?

18   A.  They had a heated argument.  Mark Nordlicht said:  You

19   don't know what you are talking about.  You don't come into the

20   office.  You don't run the fund every single day.  I know

21   better than you.  It's marked properly.

22   Q.  Did they, what, go back and forth?

23   A.  Yes.

24   Q.  How long?

25   A.  Ten to 15 minutes back and forth.

Mc12Pla6                         Fuchs - Direct

1    Q.  Were their voices raised?

2    A.  A little bit.

3    Q.  You were a partner after that date, correct?

4    A.  Yes.

5    Q.  Are you personally aware of any steps taken by Mr. Bodner

6    or anyone to confirm or deny Mr. Bodner's assertions that the

7    value of the fund's assets were too high?

8    A.  No.

9    Q.  Are you personally aware of any disclosures made to anyone

10   other than at that dinner that the value of the fund was too

11   high?

12   A.  No.

13   Q.  How did the dispute resolve?  What happened?  How did it

14   end?

15   A.  It ended on a sour note, as far as I was concerned, with

16   Mr. Bodner said no partner is taking out any money at this

17   time.  We are not letting any partners take out any money.

18   Q.  Two questions.  To you, what did that mean, no partner

19   allowed to take out any money?

20   A.  That means that since I'm a partner now -- usually I would

21   take out money every year, the profits of the fund.  I would

22   get the returns end of the year from the accountants, and I

23   would take out my profits.  This meant now that I cannot take

24   out any money from the fund because -- until they get more

25   liquidity.

Mc12Pla6                        Fuchs - Direct

1    Q.  How did you feel about that decree?

2    A.  Lousy.

3    Q.  Lousy.

4    A.  Lousy.

5    Q.  Why did you think that Mr. Bodner had the power to issue a

6    decree like that?

7    A.  He was a partner.

8    Q.  You were a partner.

9    A.  Very small partner.

10   Q.  Mr. Nordlicht was a partner.

11   A.  He was.

12   Q.  So whose will survived that particular day?

13   A.  Mr. Bodner's.

14   Q.  If it had been up to you, would you have continued to take

15   out money?

16   A.  Yes.

17   Q.  Was your partnership status lower than that of

18   Mr. Bodner's?

19   A.  Yes.

20   Q.  I would like to go through some details now.

21          Mr. Parson, would you please call up Plaintiffs'

22   Exhibit 527.

23          THE COURT:  Counsel, don't forget we are ending at

24   quarter of.

25          MR. GLUCK:  Okay.  I think I can probably get two or

Mc12Pla6                        Fuchs - Direct

1    three exhibits done and then take a break.

2              THE COURT:  You have ten minutes.  I just want you to

3    be clear, because of another matter I have, we have to stop

4    promptly at 3:45.

5              MR. GLUCK:  Okay.  Understood.

6              I would ask that Plaintiff Exhibit 527 be moved into

7    evidence.

8              MR. HERTZBERG:  No objection.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 527 received in evidence)

11   BY MR. GLUCK:

12   Q.  Mr. Fuchs, is this an example of an e-mail where the

13   Black Elk Opportunity Fund was described to you?

14   A.  Yes.

15   Q.  And this is the fund where you went out and personally

16   solicited investors?

17   A.  Yes.

18   Q.  And you personally invested the fund yourself?

19   A.  Yes.

20   Q.  And this e-mail comes from Mr. Huberfeld, right?

21   A.  Yes.

22   Q.  But did you speak with Mr. Bodner about your authorization

23   to solicit investors for the Black Elk Opportunity Fund?

24   A.  I spoke to both of them about it.

25   Q.  Thank you.

Mc12Pla6                          Fuchs – Direct

1              Mr. Parson, would you please call up Plaintiffs'

2        Exhibit 528.

3              MR. HERTZBERG:  No objection.

4              THE COURT:  I'm sorry.  You are offering this?

5              MR. GLUCK:  Offering it into evidence.

6              THE COURT:  And there was no objection.  Received.

7              (Plaintiff's Exhibit 528 received in evidence)

8    BY MR. GLUCK:

9    Q.  My first question will be, Mr. Fuchs, do you have any idea

10   why this e-mail was marked attorney-client privilege?

11   A.  No.

12   Q.  Thank you.

13              Who is Thai?

14   A.  She was an investor in the fund in PPVA.

15   Q.  One of your contacts?

16   A.  Yes.

17   Q.  Is this an example of you soliciting an investor for this

18   BEOF project?

19   A.  Yes.

20   Q.  Thank you.

21              Platinum Management was aware that you were doing so?

22   A.  Yes.

23   Q.  Did -- is her last name Lee?

24   A.  Yes, Thai Lee.

25   Q.  Did Thai Lee actually make an investment in the BEOF fund.

Mc12Pla6                      Fuchs - Direct

1    A.  No.

2    Q.  Why not?

3    A.  She didn't want to invest in something that caused some

4    people to die.

5    Q.  Thank you.

6              Plaintiffs' Exhibit 434, please.  I think this may

7    have been previously marked into evidence during the expert

8    session, but -- yup.  Okay.

9              Mr. Fuchs, is this another example of your attempts to

10   solicit investors on behalf of the Black Elk Opportunity Fund?

11   A.  Yes.

12   Q.  And Mark Nordlicht is telling "you bring this one home."

13             MR. HERTZBERG:  Objection.

14   A.  Yes.

15             MR. HERTZBERG:  Where is that?

16             MR. GLUCK:  First line.

17             THE COURT:  It says "bring this home" is the first

18   three --

19             MR. GLUCK:  "Bring this home."  Excuse me.

20   BY MR. GLUCK:

21   Q.  Why did you forward the description from the terms to the

22   contents to Ms. Angela Albanese?

23   A.  So that she should show this e-mail to David Bodner.

24   Q.  Why did you want to show -- why did you want this e-mail to

25   be reviewed by David Bodner?

Mc12Pla6                       Fuchs - Direct

1  A.  He did not have his own e-mail account, so it had to be

2  going through Angela.

3  Q.  I understand that, but why did you want him to see these?

4  A.  Because he wanted to see if he could get this investment

5  from this person.

6  Q.  Was he supervising you in your role in bringing these

7  investments -- investors in?

8  A.  He just wanted to know if I needed help to get this thing

9  done.

10  Q.  And there is a reply from Ms. Albanese at the top.  Do you

11  see that?

12  A.  Yes.

13  Q.  It says "David got it/read it."  Do you see that?

14  A.  Yes.

15  Q.  Do you know whether Mr. Bodner spoke to Mark about this

16  e-mail?

17  A.  No.

18  Q.  Did Mr. Bodner get back to you about this particular

19  investment?

20  A.  I don't remember.

21  Q.  Are you familiar with a company called Beechwood?

22  A.  Yes.

23  Q.  What was Beechwood?

24  A.  It was a company that they started——Mr. Huberfeld,

25  Mr. Bodner, Mr. Nordlicht——some time in 2014, I think.

Mc12Pla6                          Fuchs - Direct

1    Q.  Do you know what its business was?

2    A.  Not really.  I think reinsurance, something like that.

3    Q.  Were you invited to participate in that business?

4    A.  I was told specifically you are not going to be a partner

5    in Beechwood, and I said okay.

6    Q.  Fast forwarding a little bit, there was this dinner

7    December '14/January '15.  You were -- is it fair to say that

8    in 2015 you were still performing a role with respect to China

9    Horizon?

10   A.  Yes.

11   Q.  Now, we talked about this liquidity issue they had in 2010,

12   but was there a more serious issue that developed in 2015?

13   A.  Yes.

14   Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

15   585.  I will ask that this be moved into evidence.

16            MR. HERTZBERG:  No objection.

17            THE COURT:  Received.

18            (Plaintiff's Exhibit 585 received in evidence)

19   BY MR. GLUCK:

20   Q.  It appears that at the bottom portion of the e-mail

21   Mr. Clingman, who was China Horizon's manager, is sending an

22   e-mail to yourself and Mark Nordlicht, right?

23   A.  Yes.

24   Q.  He says, "Danny is making us go through hoops to get the

25   funding."  Do you know who Danny is?

Mc12Pla6                        Fuchs - Direct

1   A.  Yes.

2   Q.  Who is that?

3   A.  Danny Saks.

4   Q.  Who is Danny Saks?

5   A.  He was at that time, if I remember correctly, at Beechwood.

6   Q.  Was he previously at Platinum?

7   A.  Yes.

8   Q.  So you knew who he was?

9   A.  Yes.

10  Q.  Were they asking Platinum for more money or Beechwood for

11  more money?

12  A.  It seemed so.

13  Q.  From your perspective, was -- who were they asking money

14  from, Beechwood or Platinum?

15  A.  It seems from Beechwood.

16  Q.  If you go up the -- you can zoom out.

17          In the top e-mail --

18          THE COURT:  No.  I think, counsel, now we need to end

19  for this afternoon.

20          So ladies and gentlemen, tomorrow, as you may recall,

21  we only sit until 1:00, so we need to start right at 9:30, and

22  have a very good evening.  We will see you tomorrow.

23          (Continued on next page)

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Mc12Pla6                        Fuchs - Direct

1            (Jury not present)

2            THE COURT:  Okay.  How much longer does plaintiff have

3       on the direct of Mr. Fuchs?

4            MR. GLUCK:  Under 45 minutes.

5            THE COURT:  Okay.  Mr. Fuchs, this is totally up to

6       you.  If, tomorrow morning, you are still feeling under the

7       weather and don't feel you can come down, we will take another

8       witness and we will take up your testimony sometime next week.

9       If, on the other hand, you can make it down, as you did

10      today—and it is much appreciated—we will just go forward, and

11      I guarantee you that your testimony will be over in the morning

12      and there will be no problem, no religious problem regarding

13      the afternoon.  So you just let your counsel know sometime

14      tomorrow morning before 9:30, and counsel then just let us

15      know.

16           MR. HEFTER:  Yes, your Honor.

17           THE WITNESS:  I'm going to the doctor tonight.

18           THE COURT:  There is a lot of this -- one of my

19      grandsons has strep throat.  There are a lot of things going

20      on.

21           THE WITNESS:  I don't have COVID.  I checked that.

22           THE COURT:  Believe me, we would have taken

23      precautions.  It could be --

24           THE WITNESS:  Streptococcus it could be.

25           THE COURT:  It could be some other kind of flu.  It

Mc12Pla6                    Fuchs - Direct

1    could be too much Kosher food, whatever.  But, anyway, we will

2    see you tomorrow morning.

3              THE WITNESS:  Hopefully.  Thank you.

4              THE COURT:  Okay.  I will ask counsel to be here at

5    9:15 just in case there is anything we need to take up.  Right

6    now it doesn't sound like it, but you never know.  So I will

7    see you at 9:15 tomorrow.

8              (Adjourned to Friday, December 2, 2022, at 9:15 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    WILLIAM POST

 4   Direct By Mr. Gluck  . . . . . . . . . . . . 143

 5   Cross By Mr. Lauer . . . . . . . . . . . . . 149

 6   Redirect By Mr. Gluck  . . . . . . . . . . . 225

 7   Recross By Mr. Lauer . . . . . . . . . . . . 246

 8

 9    BERNARD FUCHS

10   Direct By Mr. Gluck  . . . . . . . . . . . . 258

11

12

13                       PLAINTIFF EXHIBITS

14   Exhibit No.                             Received

15    376, 377, 479  . . . . . . . . . . . . . . 142

16    225  . . . . . . . . . . . . . . . . . . . 148

17    434  . . . . . . . . . . . . . . . . . . . 203

18    488  . . . . . . . . . . . . . . . . . . . 208

19    905  . . . . . . . . . . . . . . . . . . . 229

20    419  . . . . . . . . . . . . . . . . . . . 233

21    534  . . . . . . . . . . . . . . . . . . . 240

22    538  . . . . . . . . . . . . . . . . . . . 241

23    373  . . . . . . . . . . . . . . . . . . . 245

24    464  . . . . . . . . . . . . . . . . . . . 274

25    527  . . . . . . . . . . . . . . . . . . . 283
```

```
1                          PLAINTIFF EXHIBITS

2     Exhibit No.                                    Received

3      528   . . . . . . . . . . . . . . . . . . . 284

4      585   . . . . . . . . . . . . . . . . . . . 287

5

6

7                          DEFENDANT EXHIBITS

8     Exhibit No.                                    Received

9      144   . . . . . . . . . . . . . . . . . . . 147

10     188   . . . . . . . . . . . . . . . . . . . 162

11     569, 625  . . . . . . . . . . . . . . . . . 181

12     710   . . . . . . . . . . . . . . . . . . . 196

13     711   . . . . . . . . . . . . . . . . . . . 200

14     373   . . . . . . . . . . . . . . . . . . . 207

15

16

17

18

19

20

21

22

23

24

25
```