MC22PLA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION                18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER                 18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                Plaintiffs,

           v.

PLATINUM MANAGEMENT (NY) LLC,
*et al.,*

                Defendants.

------------------------------------x      Trial


                                           New York, N.Y.

                                           December 2, 2022
                                           9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                           District Judge
                                             and a Jury

MC22PLA1

1                              APPEARANCES

2   HOLLAND & KNIGHT, LLP
            Attorneys for Plaintiffs
3   BY:  WARREN E. GLUCK
         MARTIN L. SEIDEL
4        RICHARD A. BIXTER JR.
         QIAN (SHEILA) SHEN
5        NOAH W.S. PARSON
         ELLIOT A. MAGRUDER
6

7   KATTEN MUCHIN ROSENMAN, LLP
            Attorneys for Defendant Bodner
8   BY:  ELIOT LAUER
         GABRIEL HERTZBERG
9        JULIA B. MOSSE

10

11  CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
            Attorneys for Defendant Bodner
    BY:  NATHANIEL C. AMENT-STONE
12       ALLESANDRA TYLER

13

14

15  Also Present:

16  Michael Robson, Paradocs Motion Support

17  Esterah Brown, Paralegal, Curtis Mallet

18  Robert C. Folland, Esq., Barnes & Thornburg, LLP

19

20

21

22

23

24

25

MC22PLA1

1        (Trial resumed; jury not present)

2        THE COURT:  So my law clerk did not hear back from

3   Mr. Harrison yesterday with regard to Mr. Grenville.  He did,

4   however, earlier provide the name and contact number for

5   Mr. Grenville's office manager, whose name is Shannon

6   S-H-A-N-N-O-N, Cervone C-E-R-V-O-N-E.  Her phone number is

7   212-207-6827 -- I'm sorry, 6877, and her e-mail is

8   scervone@sterlingvaluationgroup.com.

9        Defense counsel wanted substitute service.  How were

10  you planning to make that substitute service?

11        MR. AMENT-STONE:  Your Honor, I believe we had

12  proposed e-mail to Mr. Grenville and his counsel who at the

13  time we thought was Mr. Harrison.

14        THE COURT:  So that motion is granted, and you may do

15  that today.

16        THE DEPUTY CLERK:  All jurors present.

17        THE COURT:  In addition, I left with Ms. Cervone a

18  voice mail a few minutes ago saying that the Court was very

19  anxious to make contact with Mr. Grenville and that it was

20  important that he contact the Court today, and I gave the phone

21  number and name of my law clerk.

22        If we have not heard from him -- I also mentioned in

23  my voice mail that he could have counsel call on his behalf.

24  If we have not heard from him or his counsel by Monday morning,

25  I will issue a bench warrant for his arrest and have that bench

MC22PLA1

1   warrant lodged with the Immigration authorities, Customs

2   authorities, so that if he returns to the United States, he can

3   be arrested.

4           So is Mr. Fuchs here?

5           MR. GLUCK:  No.  Mr. Fuchs is ill.  As a result we

6   intend to call Jed Latkin as our first witness.

7           MR. HERTZBERG:  Before the jury comes in, your Honor,

8   could we have some attention to our realtime?  I see that

9   theirs is live.

10          (Pause)

11          THE COURT:  First, we will continue whether your

12  Livenote is working or not.  As Mr. Lauer undoubtedly recalls,

13  this didn't even exist and somehow trials were conducted

14  without it in the bad old days.

15          Second, there is some lawyer here for someone?

16          MR. GLUCK:  Jed Latkin is in the security line.

17          THE COURT:  Pardon?

18          MR. GLUCK:  Jed Latkin, our witness, is apparently in

19  the middle of a security line that has been moving slowly for

20  20 minutes.

21          THE COURT:  When did he arrive?

22          MR. FOLLAND:  Good morning, your Honor.  My name is

23  Robert Folland.  I am Mr. Latkin's attorney.  He arrived

24  approximately 20 minutes ago.

25          THE COURT:  All right.  Linda, why don't you go with

MC22PLA1

1    this gentleman downstairs and get this guy through security.

2         And why don't you tell the jury, Linda, that because

3    the witness is ill we are bringing in another witness and it

4    will be a few minutes.

5         There were some other things that counsel wanted to

6    raise.  Yes.

7         MR. LAUER:  We have two matters, your Honor.

8         The first is we thought we had -- or the Court had

9    disposed of the issue of Mr. Nordlicht being called to testify

10   so he could assert his Fifth Amendment rights.  The Court has

11   said that there will be no adverse inference.  And we

12   understand that Mr. Gluck intends still to call Mr. Nordlicht

13   so he can assert his Fifth Amendment rights.  I understand he

14   he's got new reasons for doing this, but we have basically

15   argued the *LiButti* matter twice—once several years ago and

16   once more recently—and the Court ruled that there was no

17   adverse inference.  And frankly, any -- the prejudice from

18   Mr. Nordlicht standing in front of the jury taking his Fifth

19   Amendment rights --

20        THE COURT:  I think the latter is the issue.  The law

21   is clear that a finder of fact in a civil case can, if they

22   wish, draw a negative inference from someone's invocation of

23   the Fifth Amendment, but that doesn't override this Court's

24   application of Rule 403.  So the question is whether the

25   prejudice from that procedure outweighs any probative value.

1          So I will hear from plaintiffs' counsel.

2          MR. GLUCK:  Sure.  Let's start with what I hope is the

3     easiest issue.  I don't think these are new.

4          Firstly, there are a set of questions where

5     Mr. Nordlicht should not be able to invoke his Fifth Amendment

6     right.  In particular, the defense intends to seek an

7     apportionment of Mr. -- any liability to Mr. Bodner to a

8     general named Ezra Beren.  He was one of the former defendants

9     in this case.

10          You may recall that, in relation to Ezra Beren,

11     Mr. Nordlicht submitted an affidavit/declaration concerning

12     Mr. Beren's noninvolvement in Platinum and sat for a deposition

13     also concerning Mr. Beren's noninvolvement in Platinum.  That

14     is the first topic that we seek to address.  And what I don't

15     believe is new but --

16          THE COURT:  Before you get to the second topic, let me

17     hear from --

18          MR. LAUER:  I think that matter can be resolved.  We

19     will agree -- I mean, I'm not familiar with all of the

20     background, but Ezra Beren, his name has not really been

21     raised, so we are comfortable essentially saying that we will

22     not assert that Mr. Beren's involvement affects the

23     proportionality under the GOL.

24          THE COURT:  All right.  So that resolves that.

25          MR. GLUCK:  That's resolved.

MC22PLA1

1          The second matter concerns the release itself.  That

2    release is one of the joint exhibits because obviously we see

3    no need to call Mr. Fuchs or Mr. Bodner to say their signature

4    is there.  They have already testified to that.

5          Mr. Nordlicht's signature, on the other hand, there is

6    no evidence in the record that he signed it.  In fact, when one

7    compares the side letter——that Nordlicht side letter that is in

8    the record——and his signature there to the signature on the

9    release, they are totally different, totally.  They look

10   nothing alike.

11         Now, there is record evidence from the Feuer

12   deposition that Mark Nordlicht signed that side letter in front

13   of Feuer directly, wouldn't leave the room until it was done.

14         There is also an understanding on our side that on

15   some occasion Mr. David Steinberg was orally authorized to sign

16   things for Mr. Nordlicht.

17         From our perspective, we don't care which it is, but

18   we intend to introduce testimony, if possible, as to whether or

19   not Mr. Nordlicht even signed this document.

20         THE COURT:  On the basis that, if he didn't sign it,

21   it's not a valid release.

22         MR. GLUCK:  And if someone was to testify, for

23   example, Mr. Steinberg——and, again, this is unknown to us——that

24   this sort of signature had been delegated with authority, we

25   would want to know how an important document like that could be

MC22PLA1

1    assigned to a lower level person.

2             THE COURT:  Well, I think the latter is a legal

3    question unless you are disputing the facts.  And if you are

4    disputing the facts, then Mr. Steinberg is your person you

5    would need to call, not Mr. Nordlicht.

6             MR. GLUCK:  Well, Mr. Steinberg may or may not say

7    that he was delegated the authority.  We don't know.  I have no

8    idea.

9             THE COURT:  Let me hear from the defense.

10            MR. LAUER:  This is the first I have heard of this.

11    We have been litigating this case for four years.  There are

12    multiple e-mails going back and forth indicating multiple

13    copies.  We are calling Isaac Neuberger, who will testify that

14    he did this, to Suzanne Horowitz the general counsel.

15    Mr. Bodner relied on this.

16             I mean, we can spend the day, if you will, arguing

17    apparent authority that -- if the issue is, you know, does this

18    document bind Mr. Nordlicht's company and the entities, of

19    course; and in any normative situation, this document and Mark

20    Nordlicht's multiple signatures on the document, you know, with

21    multiple in-house lawyers dealing with it and --

22             THE COURT:  Does someone have a copy of this release?

23             MR. LAUER:  I'm sorry?

24             THE COURT:  Does someone have a copy of it?

25             MR. LAUER:  Sure.

MC22PLA1

1              THE COURT:  Let me see a hard copy.

2              MR. GLUCK:  If you wouldn't mind, we would also like

3    to show his real signature.  It may be authority but --

4              THE COURT:  No, no.  I just want to take a look.

5              The witness is here, so we will continue this

6    discussion at the break.

7              Let's bring in the jury.  Let's get the witness on the

8    stand.

9              (Continued on next page)

Mc22Pla1                         Latkin - Direct

 1              (Jury present)

 2              THE COURT:  Let's get the witness on the stand,

 3     please.

 4              Good morning, ladies and gentlemen.  Thank you for

 5     your promptness.

 6              Mr. Fuchs was already feeling a bit ill yesterday and,

 7     after meeting with his doctor, he, with the Court's permission,

 8     will postpone the rest of his testimony to next week when he is

 9     feeling better.

10              We were fortunate we were able to get the next witness

11     after that, but that was the cause of the delay this morning.

12     So thank you for your patience and we are ready to proceed.

13              So please call your next witness.

14              MR. GLUCK:  Plaintiff calls Mr. Jed Latkin.

15      JED LATKIN,

16          called as a witness by the plaintiffs

17          having been duly sworn, testified as follows:

18              THE WITNESS:  I do.  Jed Latkin J-E-D, L-A-T-K-I-N.

19              THE COURT:  J-E-D, that's an unusual name.

20              MR. GLUCK:  Excellent first name.

21              THE COURT:  Go ahead, counsel.

22     DIRECT EXAMINATION

23     BY MR. GLUCK:

24     Q.  Mr. Latkin, can you please state your highest level of

25     education?

1  A.  I have an MBA from Columbia University.

2  Q.  Mr. Latkin, did there come a time when you were employed by

3  Platinum Management?

4  A.  Yes.

5  Q.  And could you please explain to the jury when that was and

6  how it came about?

7  A.  It came about in -- I think I officially became --

8  technically it was a consultant, but under working there every

9  day, in April of 2011 is when I became pretty much full-time.

10 I had joined the group in December of 2010, after working for

11 approximately five years for ING, my former boss at ING, a man

12 named Uri Landesman, brought me over to Platinum to introduce

13 me to Mark Nordlicht and helped me help work on some projects

14 for the firm.

15 Q.  Mr. Parson, I will ask you to bring up the demonstrative

16 just so that we can associate some faces with the names we will

17 be talking about on Mr. Latkin's testimony today.

18         Mr. Latkin, you stated that you had previously worked

19 for Uri Landesman?

20 A.  Yes, I did.

21 Q.  And what was -- what became -- and that was at ING then?

22 A.  Yes.

23 Q.  What was Mr. Landesman's role at Platinum when you joined?

24 A.  When I joined, he was president and a partner of the

25 management company, I believe.

Mc22Pla1                    Latkin - Direct

1   Q.  Did you have occasion to interact with others at Platinum

2   Management during your time there?

3   A.  I interacted with virtually everybody at Platinum since I

4   was responsible for helping out with a lot of the different

5   projects the different portfolio managers were working on.

6   Q.  Would you regularly go into the office?

7   A.  Every day that I wasn't on the road working on a project

8   for Platinum, I was in the office, yes.

9   Q.  When you were on the road, if you wouldn't mind explaining

10  for the jury, were you working for Platinum while you were on

11  the road?

12  A.  Yes, I would be going around to various companies to help

13  talk to management, to go through the issues, talk about the

14  operations at the different companies.

15  Q.  Did you have occasion to interact with Mr. Mark Nordlicht

16  during your time at Platinum?

17  A.  I interacted with him regularly, probably every day.

18  Q.  Did you have occasion to interact with Mr. David Levy

19  during your time at Platinum?

20  A.  I interacted with him quite a bit, yes.

21  Q.  Did you have occasion to interact with Mr. Murray Huberfeld

22  during your time at Platinum?

23  A.  I did.

24  Q.  Did you have occasion to interact with Mr. David Bodner

25  during your time at Platinum?

Mc22Pla1                          Latkin - Direct

```
1    A.  I interacted with him in connection with if I ever
2    interacted with Murray because the two of them were always
3    together.
4    Q.  Understood.
5            When you would go into Platinum's offices, when you
6    weren't on the road, would you observe Mr. Huberfeld at those
7    offices?
8    A.  I did, yes.
9    Q.  When you were -- same question, when you were at Platinum's
10   offices when you weren't on the road, did you have occasion to
11   observe Mr. David Bodner at those offices?
12   A.  Yes.  They shared an office on the 54th floor, I believe.
13   Q.  Setting aside any time you spent as CEO of Black Elk, which
14   we will come to later, would you mind estimating for us the
15   amount of time you would spend in the office versus on the
16   road?
17   A.  I would say it was about 50/50.
18   Q.  Over what period of years?
19   A.  From -- I first started going to the office in December of
20   2010, and I believe my final days going into the office were
21   March of '16, I believe.
22   Q.  Who did you principally report to at Platinum?
23   A.  Mark Nordlicht.
24   Q.  Would you have input into Platinum's valuations of its
25   assets?
```

Mc22Pla1                        Latkin - Direct

1    A.  No.

2    Q.  And why is that?

3    A.  I was told that my input, when I would meet with the

4    valuation people, the Sterling people, was only to comment on

5    the overall operations, the potential of the business, what we

6    saw as potential revenue opportunities, growth opportunities,

7    but not on the valuation.

8              MR. HERTZBERG:  Your Honor, excuse me.  Objection.

9    Hearsay.

10             THE COURT:  No.  I will allow it.  Overruled.

11   BY MR. GLUCK:

12   Q.  Just to clarify, were you directly told as to what you

13   could and could not say to Sterling Valuations?

14   A.  Yes.

15             THE COURT:  Who told you?

16             THE WITNESS:  Depending on where the asset was, it was

17   either Naftali Manela or -- and now I'm trying to -- it was

18   mostly Naftali Manela who would tell me what I should talk

19   about.  Also Joseph SanFilippo that I remember.

20   BY MR. GLUCK:

21   Q.  Did you have occasion to discuss the roles of Murray

22   Huberfeld and David Bodner with Mark Nordlicht during your time

23   in which you reported to Mark Nordlicht?

24   A.  Yes, I did.

25   Q.  Did you have occasion to discuss the roles of David Bodner

1  and Murray Huberfeld with Uri Landesman on the basis of your

2  relationship with Uri Landesman?

3  A.  Yes.

4  Q.  What is your understanding as to the roles of David Bodner

5  and Murray Huberfeld at Platinum?

6  A.  My understanding was they were two of the founding three

7  partners of the organization.

8  Q.  What powers did they have?

9  A.  As -- they were absolutely -- they were the final

10 decision-makers.

11 Q.  And who told you that?

12 A.  Both Mark and Uri.

13 Q.  Did you have occasion to observe Murray Huberfeld and David

14 Bodner performing their duties while in the office?

15 A.  I did.

16 Q.  Did you -- would Murray Huberfeld, would you hear him

17 speak?

18 A.  I did, yes.

19 Q.  And how about David Bodner?

20 A.  Not really, no.

21 Q.  Why is that?

22 A.  He was more of the silent type.  Murray was the -- Murray

23 did most of the talking.

24 Q.  But Mr. Bodner was present while Murray was doing the

25 talking?

1   A.  Yes.  They had an office with two desks next to each other.

2   Q.  Do you recall any occasions when you had sitdown

3   conversations with Mark Nordlicht concerning his relationship

4   with Murray Huberfeld and David Bodner?

5   A.  I do, yes.

6   Q.  Could you please tell the jury your recollections of those

7   occasions.

8   A.  When I first started, we discussed how the partnership was

9   set up, everybody's role, how capital would be allocated.  That

10  was at the beginning, when I officially became a member of the

11  team in approximately April of 2011.

12          Then a few years later, and I'm trying to remember the

13  exact date, it was either late 2013 or early 2014, I was

14  brought out to Houston to do a meeting at Black Elk's office as

15  a restructuring individual.  My career started out at Citibank

16  doing restructuring of companies that were in trouble, and Mark

17  wanted my opinion on the -- on Black Elk.  So we went out to

18  the office, sat in the office, and I met some of the people and

19  discussed.

20          And then later on that evening, we went out for drinks

21  at the hotel in Houston, and when we were sitting there -- Mark

22  and I had become quite friendly, and he just looked really

23  tired and we were talking about work.  And I said:  Is

24  everything okay?  And Mark said to me:  No.

25          And I said:  Mark, you know, you have had me really

Mc22Pla1                          Latkin - Direct

 1  busy, running around, trying to fix all these issues, all these

 2  different deals that I have been working on that have problems.

 3  Why don't you just walk away and start over?  And he said to

 4  me:  11 or 12 years ago, I made a deal with the devil, and I'm

 5  still paying for it to this day.

 6              MR. AMENT-STONE:  Objection.

 7              THE COURT:  Sustained.

 8  BY MR. GLUCK:

 9  Q.  Did you understand that Mark Nordlicht had referred to a

10  deal with Murray Huberfeld and David Bodner?

11              MR. AMENT-STONE:  Objection.

12              MR. GLUCK:  The word was removed.  I will rephrase.

13  Q.  Did you understand that Mark Nordlicht felt he could not

14  walk away because --

15              MR. AMENT-STONE:  Objection.

16  Q.  -- because he had made a deal with David Bodner and Murray

17  Huberfeld?

18              MR. AMENT-STONE:  Objection.

19  Q.  Did he --

20              THE COURT:  Excuse me.  So the original testimony was

21  objected to, in the Court's view, on the grounds of 403,

22  namely, the terminology used and I sustained the objection on

23  that ground.

24              If in this conversation the specifics of a particular

25  deal were described, that can be elicited.  If, however, all

Mc22Pla1                    Latkin - Direct

 1   you are asking for is this witness's interpretation of what the

 2   deal was or any aspect of it, including whether or not anyone

 3   could cancel it, that is, I think, not sufficiently within his

 4   power to testify to.

 5          So I will put the next question.

 6          In this conversation, did he describe with any

 7   specificity the alleged deal he had made with Mr. Bodner and/or

 8   Mr. Huberfeld?

 9          THE WITNESS:  He did because I --

10          THE COURT:  No, no, just answer my question.

11          What did he say in that regard?

12          THE WITNESS:  He discussed the idea of a sunset

13   provision where, when he originally set up the partnership, he

14   had no ability to buy out or extricate himself from the other

15   two individuals.

16          THE COURT:  All right.  That will be received.  Go

17   ahead, counsel.

18   BY MR. GLUCK:

19   Q.  What was the relationship between the sunset issue and

20   Black Elk within the confines of that particular conversation?

21   A.  Well, we were discussing how there was such an issue with

22   the company.  There were a lot of problems post the explosion,

23   and I said:  Let's just walk away and remove yourself.  And he

24   said:  I can't.  I cannot break the partnership.

25   Q.  Due to the sunset issue?

Mc22Pla1                          Latkin - Direct

1   A.  Due to the sunset provision, correct.

2            THE COURT:  Do you want to tell the jury what a sunset

3   provision is.

4   BY MR. GLUCK:

5   Q.  Please.  Sorry.  Please describe for the jury what a sunset

6   provision is in a contract?

7   A.  Well, he had no ability to buy out the partnership.  If the

8   partnership was very successful -- and I should preface this by

9   we were having a conversation around that time about giving Uri

10  Landsman and myself our own fund to run, and one of the clauses

11  that we were specifically discussing was if we were successful,

12  would we be able to buy out the original investors and sunset

13  them off.  And that's why it became such a big topic, because

14  we didn't necessarily want to be beholden to original investors

15  from the beginning.  You didn't want to have to dissolve the

16  partnership and then move on to another partnership.  Because

17  if you have already established a fund, you want to be able to

18  keep the name going but not necessarily all the investors that

19  you are working with.  Mark had explained in his agreement he

20  didn't have that ability.

21  Q.  Was the issue of debt raised?

22            MR. AMENT-STONE:  Objection.  Leading.

23            MR. GLUCK:  I can ask a different question.

24  BY MR. GLUCK:

25  Q.  Were there any other issues that Mark Nordlicht raised that

1    he was concerned about or tired from?

2    A.   Yes.   He said that he had owed them money.

3    Q.   To who?

4    A.   Both Murray and David.

5    Q.   I would like to switch topics now.

6           During your work at Platinum, did you become familiar

7    with a company called Golden Gate Oil?

8    A.   Yes, I did.

9    Q.   Was that one of your jobs, to oversee Golden Gate Oil?

10   A.   Yes, it was.

11   Q.   Were you the senior person overseeing Golden Gate Oil?

12   A.   I worked with another individual named Ari Hirt.

13   Q.   What was Golden Gate Oil?

14   A.   Golden Gate Oil was an oil company in the Santa Maria

15   Valley, which is in between Bakersfield and Los Angeles.   It

16   was a pretty significant amount of acreage that was in several

17   different areas but within that same region that had been

18   drilled by Unical in the 1980s and then abandoned when oil

19   prices were reduced, went down.

20          We had -- Ari Hirt and myself had the opportunity to

21   partner with a group called AmRich Energy, which was Amiel

22   David and Richard -- I never remember his last name, and it was

23   to drill those fields to sort of revitalize them and drill oil

24   in that area.

25   Q.   Did Platinum -- PPVA own shares in the company Golden Gate

1    Oil?

2    A.   When the deal was struck, it was a $25 million line and as

3    part of the inducement to do the deal, PPVA received 48 percent

4    of the entity.

5    Q.   Just to make sure that the jury can follow that, PPVA was

6    awarded 48 percent of the shares of Golden Gate Oil, is that

7    correct?

8    A.   That is correct.

9    Q.   Also, the line that you referenced, was that a loan?

10   A.   It was a line of credit, and what I said was they -- a lot

11   of the deals that I worked on were very credit-unworthy

12   companies, and so a typical bank would not lend.  And the way

13   the deals were structured, you would do the loan, we would do

14   the loan, but it would also have a very high interest rate and

15   then what was referred to as an inducement, and I'm using air

16   quotes for the -- an inducement to encourage us to do the loan,

17   PPVA to do the loan, typically there would be shares.  This was

18   viewed as a very risky offering, so we received 48 percent of

19   the shares in the company as well as the interest rate.

20   Q.   When we would look to PPVA statements about the value of

21   its holdings in Golden Gate and from a shares perspective, we

22   would be looking to the 48 percent shares that you just

23   referenced, is that right?

24   A.   Correct.

25   Q.   Mr. Parson, would you please call up Plaintiffs' Exhibit

1    240 which we would seek to admit into evidence.

2              MR. AMENT-STONE:  No objection.

3              THE COURT:  No objection?

4              MR. AMENT-STONE:  No objection.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 240 received in evidence)

7    BY MR. GLUCK:

8    Q.  Mr. Latkin, can you please describe this document in

9    general terms for the jury?

10   A.  So this is the note agreement.  You could think of it as

11   similar to a mortgage because it was senior secured, which

12   meant, similar to a mortgage, it had a security interest in all

13   the assets.  So if the company didn't pay, they would forfeit

14   the assets.  And this just describes the terms of how we would

15   lend the money, draws on it.  This wasn't a typical mortgage

16   for -- or a loan that you are used to.  It was a line, and

17   every time they wanted to draw on it, they had to ask for the

18   money, and depending on whether or not they met certain

19   criteria, the money was either advanced or not in each

20   instance.

21   Q.  Thank you.

22             I note that it says -- I note that the lender is a

23   company calls Precious Capital, LLC.  Was that like a special

24   purpose vehicle with PPVA?

25             MR. AMENT-STONE:  Objection.  Leading.

Mc22Pla1                         Latkin - Direct

1  Q.  Could you describe what PPVA -- what Precious Capital, LLC,

2  is in relation to PPVA.

3  A.  Precious Capital was an LLC.  It was an entity that was

4  created as essentially a subsidiary of PPVA to do certain

5  deals.  And the reason why you do that is to separate deals

6  from the parent company so they have their each individual

7  allocation.

8  Q.  Thank you.

9      For practical purposes, would it be fair to say that

10 this was a PPVA investment?

11 A.  PPVA, I believe, owned 99.9 percent of it.

12 Q.  Thank you.

13     Now, did you come to learn that this note, this loan

14 was sold at a later date to a third party?

15 A.  I did.

16 Q.  Mr. Parson, would you please call up Plaintiffs' Exhibit

17 239.

18         MR. AMENT-STONE:  No objection.

19         THE COURT:  Received.

20         (Plaintiff's Exhibit 239 received in evidence)

21         THE COURT:  By the way, ladies and gentlemen, when the

22 case is given to you for your deliberations at the close of all

23 of the evidence, all of the exhibits will be provided and an

24 index of them, so you can find the ones you want to look at and

25 don't have to look at the ones you don't want to look at.

Mc22Pla1                    Latkin - Direct

1   BY MR. GLUCK:

2   Q.   Did Platinum -- PPVA sell the Golden Gate loan to

3   Beechwood?

4   A.   They did.

5   Q.   What was your understanding of what Beechwood was?

6   A.   My understanding was Beechwood was a reinsurer that

7   Platinum had an interest in and owned, and this note was sold

8   to create liquidity at PPVA.  So this is one of the assets that

9   I worked on that created liquidity.  So the value of the note

10  was sold and it became held by Beechwood and in return,

11  Beechwood gave cash to PPVA to create liquidity at Platinum

12  Partners Value Arbitrage.

13  Q.   In 2014, when around this note was sold to Beechwood, were

14  you still working on Golden Gate for Platinum at that time?

15  A.   I was.  I was overseeing it.  There had been -- Ari was the

16  primary on this, and there had been quite a few issues with it,

17  and so Mark turned to me quite a few times to step in, oversee,

18  make sure that meetings were happening and management was being

19  spoken to, and that it was getting back up to speed since it

20  had had significant issues.

21  Q.   I will ask you about those significant issues in a moment,

22  but as the supervisory person for this Golden Gate investment

23  in 2014, do you have a view on what the value of this debt was?

24          MR. AMENT-STONE:  Objection.  Foundation.  Not an

25  expert.

1          THE COURT:  Certainly the objection needs to be

2    sustained on the grounds of foundation.  Maybe you can lay a

3    foundation.

4          MR. GLUCK:  Let me lay some foundation.

5    BY MR. GLUCK:

6    Q.  Mr. Latkin, are you a financial professional?

7    A.  I am.

8    Q.  Is it your job at -- excuse me.  Was it your job at

9    Platinum to value and oversee investments?

10   A.  It was my job to oversee the investments and opine on my

11   opinion.  They didn't ask me what I thought of the valuation.

12   I would discuss what I liked and disliked about the companies

13   that I worked with.  I would talk about what I thought they

14   were worth.  But my value to them was for the fact that I could

15   manage companies and really know what was going on, get to the

16   bottom of what was going on.

17   Q.  Would you be consulted on the acquisition price for

18   companies, whether they be shares or debt?

19   A.  Oh, 100 percent, yes.

20         MR. GLUCK:  I hope that's sufficient foundation.

21   Q.  Did you form a view as to what the acquisition price of

22   this Golden debt -- Golden Gate debt was in 2014?

23   A.  Could you rephrase?  Do you mean --

24   Q.  Sure.

25   A.  -- in terms of the selling of it to Beechwood or --

Mc22Pla1                    Latkin - Direct

 1  Q.  To the market.

 2            MR. AMENT-STONE:  Objection.

 3            THE COURT:  What took you so long?  Sustained.

 4            MR. GLUCK:  Let's go through the problems.

 5            THE COURT:  Just to move things along, counsel, number

 6  one, he testified that doing these valuations was not part of

 7  what his job was and certainly not part of what he

 8  communicated.  Second, there is no indication he communicated

 9  that valuation at the time.  So then he would be giving his

10  view now as to what he thought the valuation was, which is

11  limited only to expert testimony.  So you better go on to

12  something else.

13            MR. GLUCK:  I understand.

14  BY MR. GLUCK:

15  Q.  Did you communicate your views regarding Golden Gate's

16  valuation at the time to anyone at Platinum?

17  A.  I spoke to Mark about it quite frequently, yes.

18  Q.  Did you also speak to anyone else at Platinum regarding

19  your views as to the valuations of Golden Gate at the time?

20  A.  I believe I had conversations with David Levy, Dan Small,

21  Zach Weiner, Naftali Manela, and several -- and Ari Hirt, and

22  several other people with regards to our thinking about the

23  value of the company at that stage.

24  Q.  And what was the content of your communications?

25  A.  That the company -- the wells that had been drilled so far

Mc22Pla1                          Latkin - Direct

were not producing what we thought they would.  The original

estimate for the first four wells drilled was going to be

approximately 150 barrels per day, and unfortunately we were

getting mostly water.  And what oil we were getting we couldn't

sell, because we didn't have the infrastructure.  We also

didn't have the infrastructure to cart away the water.  So the

assumption was that unless significant money was spent, there

was very limited value to the entity.

Q.  Are you familiar with a D&M report regarding PV10 that was

commissioned in or around April of 2012 for Golden Gate?

A.  I believe the report was earlier than 2012, but it became

the basis for why the investment was made.  DeGolyer -- I can

never say it correctly.  DeGolyer & McNaughton——

D-E-G-U-L-Y-E-R; McNaughton, M-C-N-A-U-G-H-T-O-N——was one of

the world's leading valuation company for oil.  Another one out

there is Netherland & Sewell, which we used later.  But that

report became the basis of making the investment report, had

estimated that the fields, the area known as the fairway, Santa

Maria Valley and Casmalia, which was I forget how we described

it, but sort of off to the side would have a value of close to

a billion dollars.

             (Continued on next page)

MC2Cpla2                         Latkin - Direct

1    BY MR. GLUCK:

2    Q.  What was your view of the value of those two fields,

3    Casmalia and --

4              MR. AMENT-STONE:  Objection.  Foundation.

5    Q.  What was your view in your role as operational supervisor

6    and investment manager regarding this report?

7              MR. AMENT-STONE:  Same objection.

8              THE COURT:  Sustained.

9    Q.  Did you communicate any views regarding this report and its

10   validity to Platinum Management?

11   A.  Well, I remember thinking that I was very excited about the

12   opportunity.  However, within the report, there is the caveat

13   that to achieve the close to a billion dollar valuation value

14   of oil, one would have to spend approximately 200 to

15   $250 million in capital expenditures.  In discussing the deal,

16   we only were going to allocate a $25 million line to,

17   quote-unquote, prove out a basis for the valuation and then

18   hopefully be able to sell it on later.  My concern was would

19   the $25 million be enough when the report specifically pointed

20   to a 200 to $250 million need of capital expenditures to get

21   that oil out of the ground.

22   Q.  Do you recall who you specifically reported those concerns

23   to?

24   A.  Most of my conversations on this were with Mark Nordlicht

25   and Uri and Ari Hirt, my partner.

MC2Cpla2                         Latkin - Direct

1   Q.  Did you have any specific conversations with Mark Nordlicht

2   or Uri Landesman as to who they, in turn, discussed these

3   concerns with?

4   A.  Yes.  When we first bought the deal, Mark had expressed in

5   an email to me that he was very excited about the prospects,

6   but before everything was approved, they would have to discuss

7   it in the partner meeting with Murray and David.

8           Then, in followup conversations with Uri, who I spoke

9   to many times a day, he was a very close friend of mine, he

10  said, also, how excited they were about it, but that they would

11  need to get the approval in the partner meeting because of

12  the -- I'll use bifurcation of valuation.  So the idea was

13  could we create value with only spending approximately

14  $25 million to get anywhere close to that 1 billion.

15          And that's a good question, because if you drill a few

16  wells, as we were originally proposing, four wells initially

17  and they're not good, you could really ruin the value of the

18  asset.  So that was something that had to be really considered

19  when there were so many other potential investment

20  opportunities.  So that was a decision that had to be made by

21  the entire group.

22  Q.  In point of fact, a few wells were drilled; is that right?

23  A.  Four wells were drilled in Casmalia.

24  Q.  And you were present in California at least some times

25  during that operation?

MC2Cpla2                         Latkin - Direct

1    A.  I was, yes.

2    Q.  And what happened with those four wells?

3    A.  They were not very well -- they were not successful.  When

4    we brought in the drilling company, we went with a lesser

5    drilling company in order to save money.  One of the wells

6    missed its mark, its payload entirely, and the other wells were

7    pretty much not producing.  It was mostly water cut.  So when

8    you look at a well, when they drill, they flood the fields and

9    that forces the oil.  Similar to when have you an oil spill,

10   the oil is on top, you put the water in, it forces the oil out.

11           Also in this case, it's heavier oil, so you would need

12   to heat, as well, but that was not something that was going to

13   be done until later.  But because these had all been previously

14   drilled, when you were bringing up the oil, you were also

15   bringing up water, and it's referred to as the water cut, and

16   our water cut was very high.  We were getting very little oil

17   for what was coming up.

18           When you're drilling in California, which is why so

19   many people -- which is why I personally was a little bit

20   worried about doing California because of the environmental

21   regulations.  For instance, we had a delay drilling because

22   there was a newt that -- these were all under strawberry fields

23   and there was a newt that came to the strawberry fields only

24   once a year to procreate, so you couldn't disturb the newt

25   until later.  And then you also had to worry about moving the

1  water.  It was -- there was so many moving pieces.  It was

2  really -- it was a mess.

3  Q.  Did there come a time when you began to have concerns that

4  the original PV10 report was mistaking one liquid for another,

5  water for oil?

6       MR. AMENT-STONE:  Objection.

7       MR. GLUCK:  Let me rephrase.

8  Q.  Did there come a time when you began to have concerns

9  regarding the accuracy of the original PV10 report?

10  A.  Yes, there were.

11  Q.  Did you commission a second report?

12  A.  Yes, at the request of Mark and others, another report was

13  commissioned with Netherland Sewell, which is the entity that I

14  mentioned earlier.

15       MR. GLUCK:  Mr. Parson, will you please bring up

16  Plaintiffs' Exhibit 538, which I believe has already been

17  admitted into evidence.

18  Q.  Who is NSAI?

19  A.  Netherland Sewell Associates international.  I believe the

20  AI stands for associates international, but the NS is

21  Netherland Sewell.

22  Q.  Did they perform a PV10 report for Golden Gate?

23  A.  They did.

24  Q.  What was the outcome of that report?

25  A.  It was significantly lower.  It was approximately

MC2Cpla2                        Latkin - Direct

1    $160 million.

2    Q.  As opposed to?

3    A.  $927 million, I believe was the original one,

4    approximately.

5    Q.  Your math, it's about 10 to 15 percent of what you thought

6    you had?

7    A.  Yes.

8    Q.  What was your reaction to this report?

9    A.  I was very disappointed and I didn't -- I actually -- I

10   doubted -- what I would say is I was disappointed, but I think

11   that my reaction was there's got to be a middle ground between

12   the D&M and the NS reports because there's a lot of -- I would

13   say there is a lot of flexibility -- when you're doing reports

14   like these, they're not doing 3D seismic, they're doing just

15   basic valuations, looking at historical, and Netherland Sewell

16   had the benefit of being able to then see what we were raising

17   from the wells that we drilled.  D&M did it based on historical

18   maps, topography of the area, and the production, the

19   production data from before, but they did not do detailed 3D

20   seismic, which is when you actually go in and take 3D images

21   and you can see everything.  It's really quite cool.

22          Netherland Sewell took it another step from D&M.  They

23   didn't do 3D seismic because that would be very expensive, but

24   they said, okay, we have the historic and what we have been

25   producing so far, and what we had been producing so far was

MC2Cpla2                    Latkin - Direct

1   mostly water.  While you need water, unfortunately this is

2   water you can't really do anything with, that that is where

3   their new estimate came from.

4   Q.  Did there come a time when Golden Gate Oil actually stopped

5   its production efforts altogether?

6   A.  Yes.

7   Q.  When was that?

8   A.  It was around the end of 2014, 2015.

9   Q.  What revenue was Golden Gate Oil producing when it was

10  producing?

11  A.  It wasn't much, maybe 100,000 at most, but it was -- Mark

12  and I had a conversation about how only -- only us could figure

13  out a way, in a market where everybody wants oil, managed to

14  not find a buyer because the market in California is very

15  controlled.  Valero is the only game in town.  So whatever oil

16  we were raising, we couldn't even sell it.  And we received a

17  huge discount to what market prices were.

18  Q.  Was Golden Gate, based on its revenues, able to service the

19  loans that we described?

20  A.  No, it was -- for all intents and purposes, it was

21  completely insolvent.

22  Q.  As a restructuring professional and as the person

23  overseeing Platinum's investment in Golden Gate, what does that

24  mean for that equity incentive that you described earlier?

25  A.  Well, similar to -- as I described earlier, a mortgage on a

MC2Cpla2                        Latkin - Direct

1     house, if you have financial issues and you're forced to sell

2     your house, the bank gets to keep whatever the mortgage amount

3     is and then you get anything above that.

4             In this situation, because we had shown that we

5     weren't able to get oil out of the ground, and then once we got

6     oil out of the ground, we couldn't even sell it for market

7     prices, there would be no residual value other than the debt.

8     So even though we'd only lent them, I think at the end it was a

9     total of maybe 10 to $13 million, the assets were worth

10    probably less than that, which means that in a bankruptcy

11    liquidation, any equity holders would get nothing.

12            MR. GLUCK:  Mr. Parson, I think I actually called up

13    the wrong exhibit earlier.  My apologies to everyone.  Could

14    you pull up PX 255.

15    Q.  This is what I intended to show you, but --

16            MR. GLUCK:  I move PX 255 into evidence.

17            MR. AMENT-STONE:  No objection.

18            THE COURT:  Received.

19            (Plaintiff's Exhibit 255 received in evidence)

20    Q.  Is this the agreement by which PPVA sold the debt we were

21    just describing to Beechwood?

22    A.  Yes, it is.

23    Q.  In 2014?

24    A.  In 2014, yes.

25    Q.  And 2014 production had already ceased?

MC2Cpla2                    Latkin - Direct

1   A.   Yes.

2            MR. GLUCK:   Mr. Parson, will you please call up

3   PX 547.

4            We would seek to move PX 547 and its Platinum produced

5   attachments into evidence.

6            MR. AMENT-STONE:   No objection.

7            THE COURT:   Received.

8            (Plaintiff's Exhibit 547 received in evidence)

9   Q.   Mr. Latkin, would you have played a role in preparing the

10  GGO-level financials?

11  A.   Yes.

12  Q.   So you're familiar with them?

13  A.   Yes.

14            MR. GLUCK:   If you please turn to page 3, Mr. Parson.

15            GGO is Golden Gate Oil.

16            I'm sorry.  Page 2.  Go forward to the revenue page.

17  Thank you.

18  Q.   Do you recognize this as the revenue sheet for Golden Gate

19  Oil?

20  A.   I do, yes.

21  Q.   And what does this sheet show about Golden Gate's oil

22  revenues in January through March of 2014?

23  A.   It shows we had -- that Golden Gate had sold about 100,000

24  in January, declining to 86 in February, and 42.4 in March.

25  Q.   Thank you.  Did Golden Gate's revenues ever increase?

1    A.  No, they didn't.

2    Q.  And how much money was Golden Gate losing at this time?

3    A.  So if you go to the bottom, you could see that our net

4    income --

5            MR. GLUCK:  Mr. Parson, if you wouldn't mind zooming

6    in on that, the net income.

7            I'm sorry.  Continue your answer.

8    A.  We were losing -- we lost about $3.7 million in January,

9    $2.6 million in February, and that number of the $5.2 million

10   in income is an accounting figure.  So, in reality, you have to

11   deduct -- if you want to know the real number, you would have

12   to take off the -- if you look up, there's something called

13   drilling and completion.  So that $5.7 million was an add-back

14   in March of 2014.  That's merely an accounting --

15   Q.  It's not real revenue?

16   A.  It's a trick.  It's not a trick, it's within the accounting

17   rules, but it's kind of adding back the completion because then

18   that becomes -- that moves off the balance sheet to

19   amortization, but in reality, the money spent was $5.7 million.

20   That's just an accounting trick.  That money then moves to cash

21   flows --

22           MR. AMENT-STONE:  Objection.  403.

23           THE COURT:  Sustained.

24   Q.  Let's look at the $1 million loss number then.  What is the

25   relationship, as an investment professional overseeing this

MC2Cpla2                    Latkin - Direct

1   investment, between the losses and the value of the investment?

2   A.  That's not a simple question.

3        If the revenues were going up and we were spending

4   more and we were seeing a commensurate increase in revenues,

5   then that's okay because you would think that the future is

6   bright, similar to how Amazon, even though they would lose a

7   lot of money every quarter, they were building towards the

8   future.

9        In this scenario, we were spending a lot of money,

10  although we had cut back a lot, but revenues were declining.

11  That sort of spiral downward would lead one to believe that --

12  a professional as myself, would lead me to believe that things

13  were not looking promising for the future.

14  Q.  In fact, operations were going to be imminently ceasing

15  based on this timeframe?

16  A.  Yes.

17  Q.  If there is no operations, there is no future revenue;

18  right?

19  A.  No.

20  Q.  Did you discuss this balance sheet that you prepared or

21  assisted in preparing with anyone at Platinum Management?

22  A.  Yes.

23  Q.  Who did you discuss it with?

24  A.  With Mark Nordlicht and Uri Landesman, and some of the

25  others in management.

MC2Cpla2                          Latkin - Direct

1    Q.  What was the content of those discussions?

2    A.  That we had some significant production issues, that we

3    were not getting the value we thought we would have gotten out

4    of it, and that we would have to rethink how we approached the

5    investment.

6    Q.  Did you have any specific conversations with either

7    Mr. Landesman or Mr. Nordlicht as to whether those views were,

8    in turn, passed on to the Platinum Partners such as Murray

9    Huberfeld, David Bodner, Bernie Fuchs?

10             MR. AMENT-STONE:  Objection.  Compound.

11             MR. GLUCK:  I'll go one by one.

12   Q.  Did you have any specific conversations with Mark Nordlicht

13   and Uri Landesman as to whether these views were passed on to

14   David Bodner?

15   A.  Yes.

16   Q.  And were they?

17   A.  It was my understanding that they were discussed, yes.

18   Q.  Is that because you were told that?

19   A.  Yes.

20   Q.  Same question, Murray Huberfeld.

21   A.  Yes.

22             MR. AMENT-STONE:  Objection.  This is all hearsay.

23             MR. GLUCK:  Coconspirator.

24             THE COURT:  I don't think that fits within the

25   coconspirator exception.  Sustained.

MC2Cpla2                          Latkin - Direct

1   Q.  Did you have any specific conversations regarding these

2   balance sheets with PPVA's valuators, such as Sterling?

3   A.  That, I don't recall if I had a specific conversation on

4   the balance sheet.

5   Q.  Did there come a time when you were asked to participate in

6   Sterling valuation meetings regarding Golden Gate?

7   A.  Yes.

8   Q.  How would you have been asked to do that?

9   A.  I would get an invitation from either -- depending on the

10  fund, either PPVA or PPCO, I would get an invitation to a

11  meeting from either Joseph SanFillipo or Naftali Manela.

12  Q.  Did you receive any instructions from Joe SanFillipo or

13  Naftali Manela as to what you could or could not say to

14  Sterling?

15  A.  Yes.

16  Q.  What were those instructions?

17  A.  Just about --

18          MR. AMENT-STONE:  Objection.  Hearsay.

19          THE COURT:  No, that's not hearsay.  That falls within

20  the exception.  Overruled.

21  Q.  To be clear, did you personally receive instructions as to

22  what you could say or not say to Sterling?

23  A.  Yes.

24  Q.  And what were those instructions?

25  A.  I was told to just discuss the revenues and the potential

MC2Cpla2                              Latkin - Direct

1    of the asset.

2    Q.  Were there any prohibitions on what you could discuss?

3    A.  I was not to discuss my thoughts on valuation.

4    Q.  Were you permitted to discuss your thoughts regarding

5    operating costs?

6    A.  No.

7    Q.  Were you explicitly told not to state them?

8    A.  My discussions, when I went to the valuation meetings, I

9    was told to just talk about the upside and the potential of the

10   businesses.

11   Q.  If the matters you were told not to discuss were not

12   revealed, what would be the impact --

13            MR. AMENT-STONE:  Objection.  Hypothetical.

14            MR. GLUCK:  Rephrase.

15   Q.  Why is it important to consider something like operating

16   costs when evaluating an investment?

17   A.  I guess the old joke is, you say we lose money on every

18   widget we sell, but we'll make it up on volume.  If your

19   revenues, if you're making $1 million, but your costs are

20   $3 million, you're not a viable entity.  You're upside down, as

21   they would say.  It was always going through -- there was

22   always potential, but you have to discuss how much it will cost

23   to get to that potential.  And to just look at an asset in a

24   vacuum and the potential without considering whether or not you

25   have the ability to finance it is why most businesses fail

MC2Cpla2                           Latkin - Direct

1    because they get enamored with potential, but they don't focus

2    on what it's going to cost to get to that potential.

3    Q.  When you had your meetings with Sterling, was Golden Gate's

4    revenue unprofitable?

5    A.  Yes.

6    Q.  Was there ever a time when you believed --

7         MR. GLUCK:  Strike that.

8    Q.  How much money would it have taken, if any, to make Golden

9    Gate's revenues profitable?

10   A.  It would have taken millions of dollars.

11        If you look back at the statements, on revenues,

12   there's three categories, there's oil sales, gas sales, and

13   then LCOUs sold.  I'm not going to focus on that.  I would

14   focus on the middle line, gas sales.  So we were raising -- a

15   lot of gas was coming up and there's specific limitations in

16   California -- once again, California environmental regulations

17   of what you could do with it.

18        When we were developing the project, we could have

19   spent a relatively trivial amount, a few million dollars to

20   attach to a gas pipeline to sell the gas so that way that gas

21   sales, instead of being a zero each quarter, each month, could

22   have been probably as much as or more than oil because you're

23   raising a lot of gas in these wells, but they didn't have the

24   money to spend it, so we didn't spend it.  So that would have

25   been a few million to spend.  We could have done that, but

didn't.  We could have sold off some of the other leases, but
then you'd actually crystalize the value, so we didn't.  We
just focused on trying to get as much oil out of the ground as
possible.

But therein also was a difficulty, there was no piping
for the water, so we had to pay for trucks.  So the more we
forced the wells, the more money we lost because there was no
piping to get the water away.  So every time we drilled and it
was a 95- to 99-percent water cut, you were taking a little bit
of oil and putting it over here and a whole line of trucks were
coming in and trucking off the water.  So, in fact, we had this
reverse problem of the more we drilled, the more we spent
because of the disposal.

Q.  There was one item that I think I would ask you to clarify
for the jury.  You used the term "crystalize the value."  What
do you mean when you say if you sell off a lease, you
crystalize the value?

A.  So when people are looking at valuations, they always look
at what they call comparables, other transactions.  So when you
sell a lease that attaches a value to -- similar, if you live
in a house and your neighbor has a similar house to you and
they sell that house for $1 million, and say you paid half a
million dollars for your house or similar, you say oh, wow, my
house is worth $1 million because that's what my neighbor got.
When you sell a lease, you create a value for the rest of the

MC2Cpla2                      Latkin - Direct

1  leases.  So if it's in the same area and you sell one lease for

2  a million and you have 20 thousand other leases, wow, you have

3  a great asset there, and that's why everybody's so -- that's

4  why people in the neighborhoods always want to know how much

5  did the apartment next to me sell for, how much did the house

6  next to me sell for because that gives you a basis for your

7  valuation.  If we had sold the lease, given the results, the

8  price would have been less than what we had paid for the leases

9  and that would have attached a lower value to the overall

10 entity.

11 Q.  These meetings with Sterling, where would they occur?

12 A.  They occurred in the conference room on the 54th floor

13 at -- when we were still at 157 and then eventually we moved

14 to, I think it was Eighth Avenue was the second office.  But

15 when it was on -- when we were on One 57th Street, which is

16 next to Carnegie Hall, they were on the 54th floor conference

17 room.

18 Q.  Setting aside any prohibitions on what you were directed to

19 say, what did Sterling ask you?

20 A.  They asked me very basic questions, really.  And I had

21 conversations after those meetings with Naftali and Ari why the

22 questions were so basic in terms of what the companies did,

23 what the potential was.  The questions were just what does the

24 company do, what do you think the company could do in terms of

25 raising oil.  They never asked me any of the probing questions

MC2Cpla2                        Latkin - Direct

1   that, having been a portfolio manager for ING, running a

2   $2 billion -- co-running a $2 billion fund, when I would meet

3   with companies, you always ask what's your cost of revenue,

4   what's your potential, how much do you have to spend to get to

5   that potential.  None of those questions that I used to ask

6   companies to come up with my own valuation model were ever

7   asked to me.

8   Q.  Thank you.  Switching subjects now.

9          Were you also tasked with overseeing Platinum's

10  investment in a company called Black Elk?

11  A.  I was brought in to run Black Elk in April of 2015.

12  Q.  And what was your role?

13  A.  I was CEO.

14  Q.  CEO of Black Elk?

15  A.  Correct.

16  Q.  Now, as CEO of Black Elk, did you have complete access to

17  Black Elk's books and records?

18  A.  Only after I took over as CEO, not before.

19  Q.  Excuse me.  Let me rephrase.

20          Once you were CEO of Black Elk, did you have complete

21  access to Black Elk's books and records?

22  A.  Yes.

23  Q.  Did you have access to emails?

24  A.  Yes.

25  Q.  Briefly describe your duties as CEO of Black Elk.

A.   I was brought into Black Elk after a series of events had

occurred, the most recent one being the sale of a majority of

the producing assets of the entity.  My job was -- I was

brought in essentially to clean up because when I came in, we

were facing multiple lawsuits.  We had over $90 million in

outstanding liabilities, multiple other issues going on.  There

was cleanup that needed to be done in the Gulf because there's

specific rules when you drill in the Gulf.  You set up a

platform and when you leave that platform, you have to plug it

and clean it up.  So there's significant cost to that.  My role

was to manage the remaining assets and figure out how to sort

of extricate myself out of all the -- Black Elk out of all the

problems it was facing.

Q.   Let's try to start at the beginning.

        Were you aware of what form PPVA's investment in

Black Elk took?  And by that I mean bonds or common equity, et

cetera.

A.   I was aware when I got in.  It wasn't my -- prior to my

becoming CEO, Mark approached me to ask my opinion on the oil

assets because I had actually spent a significant amount of

time in oil.  I lived in Russia for a year working on oil

projects.  When I was at Citibank, we were some of the original

financiers of Lukoil.  When they were coming out of communism,

we really helped them finance their oil industry.  So I had

quite a bit of experience on the finance side.  So when I came

MC2Cpla2                          Latkin - Direct

1   in there, I got to really get a sense to look at everything and

2   comment on what I thought the potential would be.

3   Q.   Did PPVA hold common equity in Black Elk?

4   A.   They did, yes.

5   Q.   Did PPVA also hold debt in Black Elk?

6   A.   Their main financing vehicle was debt.  As I commented

7   earlier on Golden Gate, the equity was granted typically as an

8   inducement to lend more money.  There has to be a sweetener, as

9   you would call it, to encourage to give more money, you would

10  take more equity.

11  Q.   Did you have an understanding of what Platinum Management

12  was valuing its equity in Black Elk at?

13          MR. AMENT-STONE:   Objection.  At what time?

14  Q.   Let's start 2012.

15  A.   No, I did not.

16  Q.   Did you have an understanding of what PPVA was valuing its

17  equity in Golden Gate at, let's say 2013?

18  A.   No, I did not.

19  Q.   Did there ever come a time when you learned what PPVA was

20  valuing its equity interests in Black Elk and Golden Gate at?

21  A.   Yes.

22  Q.   How did that happen?

23  A.   I'm trying to remember.  In Golden Gate, I remember seeing

24  an email or a printout that showed some equity value and I had

25  a conversation over email with Ari Hirt about what it was

MC2Cpla2                          Latkin - Direct

worth, and I said wow, it's worth so much, we should be getting

a bonus.  And Black Elk, I'm trying to remember exactly when I

learned about the equity valuation.  It was after -- pretty

much after the fact, I think after I had already gotten into

running Black Elk.  He really was not aware until then what the

equity value was.

Q.  Are you now aware that PPVA was valuing its equity in

Golden Gate Oil in 2016 at $120 million?

          MR. AMENT-STONE:  Objection.  Testifying.

          MR. GLUCK:  Mr. Parson, will you please pull up the

April 2016 NAV statement.

Q.  Are you familiar with the company SS&C?

A.  Yes.

Q.  They're an administrator?

A.  Yes.

Q.  These are PPVA's financials?

A.  Yes.

Q.  Dated April 30, 2016.

          MR. GLUCK:  We're going to use Golden Gate first,

Mr. Parson.

Q.  Was Golden Gate defunct by 2016?

A.  Yes.

          MR. AMENT-STONE:  Objection.  Relevance.

          THE COURT:  Overruled.

Q.  Do you see what the shares, the 48 percent interests of

MC2Cpla2                        Latkin - Direct

1    Golden Gate is being valued at on this document?

2    A.  It says $122 million.

3    Q.  Is that possible?

4    A.  No, it is not.

5            MR. AMENT-STONE:  Objection.

6            MR. GLUCK:  Thank you.  You can call off the screen,

7    Mr. Parson.

8            THE COURT:  I'm sorry.  There was an objection.

9            MR. GLUCK:  I'm sorry.

10           THE COURT:  The objection is overruled.  The answer

11   will stand.

12   Q.  Did you ever come to have an understanding of what PPVA was

13   valuing its Black Elk common equity at in 2014?

14   A.  Yes.  Later on in 2014, I had conversations with

15   Mr. Landesman, and he said to me it was a significant part of

16   the fund, but there were no dollars put behind that, I didn't

17   know what the number was.  But later on, I saw valuation

18   reports, probably in the '16 timeframe, '15, '16 timeframe.

19   Q.  About $200 million?

20   A.  About that, yeah.

21   Q.  Let's start with your understanding of Black Elk's

22   operational timeline.

23           Where was Black Elk located?

24   A.  Black Elk was a Gulf of Mexico oil drilling company.  It

25   was run out of Houston, Texas.

MC2Cpla2                        Latkin - Direct

```
 1   Q.  Would you travel to Houston, Texas in connection with your
 2   responsibilities?
 3   A.  What timeframe?
 4   Q.  When you were CEO.
 5   A.  Every day, yes.  I lived down there five days a week.
 6   Q.  Do you have an understanding that there was an explosion in
 7   late 2012 on one of the Black Elk rigs?
 8   A.  Yes, there was an explosion that, unfortunately, three
 9   Filipino workers perished in.
10   Q.  Can you briefly describe what happened and any
11   investigations or litigations that followed.
12   A.  And I should have answered previously when you asked me
13   what my role was.  Part of my role when I was brought into
14   Black Elk was to meet with a bunch of government entities to
15   negotiate a resolution over the outstanding explosion from
16   2012.
17          To put it very succinctly, Black Elk was doing what is
18   called hot work.  On the platform, they were doing drilling and
19   other work, and similar to what happened with GGO and the
20   drilling, they were using a firm that was not licensed and were
21   using undocumented, unlicensed workers on the platform.  When
22   they were doing the hot work, they did not shut off --
23          MR. AMENT-STONE:  Objection.  Relevance.  403.
24          MR. GLUCK:  Valuation.
25          THE COURT:  Sustained.
```

MC2Cpla2                    Latkin - Direct

1   Q.  As an investment professional overseeing PPVA's investment

2   in Black Elk, what, if any, issues in terms of performance of

3   Black Elk or valuation of Black Elk are connected to lawsuits

4   or government --

5                MR. AMENT-STONE:  Objection.  Form.

6                THE COURT:  It's a little hazy, but I'll allow it.

7   Overruled.

8   A.  I do have to correct the form of your question that when I

9   was at Black Elk as CEO, I was representing all the creditors.

10  I was not -- I need to be clear.  I was not their representing

11  PPVA, which actually led to much consternation, as there are

12  emails between Mark and myself.  So I was representing all

13  creditors.  But my job was to go through and figure out where

14  the liabilities lay, who was responsible.  And when you're

15  dealing with the government, especially when it comes to the

16  Gulf of Mexico, which is so important, you have to make sure

17  that you have all the facts straight.  When meeting with these

18  committees, it's often quite daunting because you sit there and

19  there are lots of people all sort of glaring at you and asking

20  very specific questions.  But, my job was to get to the bottom

21  of what actually happened and come up with a solution.

22                MR. AMENT-STONE:  Objection.  403 again.

23                THE COURT:  So I will allow all that, but I think the

24  question is, at least the question I'll put is what was the

25  impact of this from a financial standpoint on either Black Elk

MC2Cpla2                          Latkin - Direct

1    or PPVA?

2                  THE WITNESS:  The explosion?

3                  THE COURT:  Yes.

4                  THE WITNESS:  The explosion fundamentally changed the

5    business because once that happened, they were subject to

6    increased oversight, there were discussions of manslaughter

7    charges, Oxley violations, which are the environmental code --

8                  MR. AMENT-STONE:  Objection.  403.

9                  THE COURT:  I'll let those all stand, but I'm trying

10   to get more a question of financial impact.

11                 THE WITNESS:  It made the business much more expensive

12   to run.

13                 MR. GLUCK:  Thank you.

14   BY MR. GLUCK:

15   Q.  Now, for the jury, what is the relationship between a

16   business being much more expensive to run and investor value?

17   A.  Well, it reduces the value of the business because -- it

18   did two things.  One, we had to have increased oversight, which

19   every barrel we produced now had more costs associated with it

20   because of the increased oversight; and two, it limited the

21   ability for Black Elk to go out and get new assets because they

22   had a strike against it due to the explosion.  So the ultimate

23   potential of the business was severely hampered.

24   Q.  Did there come a time when a decision was made at Black Elk

25   to sell a very large proportion of its assets and operations to

1    a third party?

2    A.   Yes.

3    Q.   Who was that third party?

4    A.   An oil company called Renaissance.

5    Q.   Now, you had full access to the documentations and emails

6    concerning that Renaissance deal; is that right?

7    A.   After the transaction was done.

8    Q.   Can you please describe the transaction to the jury.

9    A.   Essentially, all of the prime operating assets of Black Elk

10   were sold to Renaissance Petroleum for -- it was about

11   $104 million, maybe a little bit more, plus the resolution of

12   some outstanding liabilities.  And when I say liabilities, I

13   don't mean explosion liabilities, I mean outstanding debts that

14   were some bills paid to vendors and whatnot.

15   Q.   When did that sale occur?

16   A.   I believe that was the end of '14, approximately, within

17   2014 was when they --

18   Q.   Would it refresh your recollection, summer of '14, does

19   that sound right?

20   A.   Yes, it was August of '14, I believe.

21   Q.   When you arrived at Black Elk, it was 2015?

22   A.   My first day was right after passover, April 2015.

23   Q.   What assets remained at Black Elk after the Renaissance

24   sale?

25   A.   It was a motley mix of some assets that were no longer

1    producing, some that were producing very sporadically, and then

2    a couple of partnership interests with some other producers

3    where we were receiving just royalties.

4           MR. GLUCK:  Mr. Parson, will you please bring up

5    Plaintiffs' Exhibit 112.

6           THE COURT:  Counsel, just keep in mind, somewhere in

7    the next five minutes, we want to give the jury their

8    midmorning break.

9           MR. GLUCK:  Which we seek to move into evidence.

10          MR. AMENT-STONE:  No objection.

11          THE COURT:  Received.

12          (Plaintiff's Exhibit 112 received in evidence)

13   Q.  Is this a copy of at least the first page of the purchase

14   and sale agreement on the Renaissance transaction?

15   A.  Yes, it is.

16   Q.  So after this Renaissance transaction, what was the

17   day-to-day operations of Black Elk that you were overseeing as

18   CEO?

19   A.  The company still had a lot of metal in the Gulf, so there

20   was still a lot of oversight, and with that comes a lot of

21   regulation and requirements.  There wasn't much in the way of

22   production, revenues were very limited.  I was responsible --

23   one of the things I was about to undertake was doing something

24   called a jibs audit, which was to try to determine correct

25   accounting on royalties and revenues received to see if we were

1    underpaid by our partners so I could generate some extra

2    revenue that way.  I was coming up with proposals to clean up

3    the nonproducing assets because once you did that, if you did

4    it for less, then what was bonded — so what was reserved — you

5    can free up some cash that way.  But, essentially, my job was

6    to clean up because there wasn't much in the way of day-to-day

7    production.  It was really managing the oversight of the

8    remaining assets and making sure that we didn't have anymore

9    environmental issues pop up.

10   Q.  Was Black Elk heading into bankruptcy?

11   A.  Yes.

12   Q.  Did you have discussions regarding what remained of

13   Black Elk and its dissent into bankruptcy with anyone at

14   Platinum Management during this period?

15   A.  I did.

16   Q.  Who was that?

17   A.  My discussions were with Mark Nordlicht, David Levy, and

18   then an individual named Zach Weiner.

19   Q.  Did you have any specific discussions with Mark Nordlicht

20   as to whether the content of your reports were being passed on

21   to the platinum partners?

22            MR. AMENT-STONE:  Objection.  Hearsay.

23            THE COURT:  No, I think that would be within the

24   exception.  Overruled.

25   A.  Well, so two specific things stand out.  One, Mark asking

MC2Cpla2                    Latkin - Direct

1    me what is your assessment after the first two weeks there, he

2    asked me what is your assessment of the viability here.  And

3    then in a conversation I had around that time with Uri, he said

4    can I get a preview of what's going to be discussed at the

5    partner meeting as to how bad it is.

6    Q.  At the partner meeting?

7    A.  Yes.

8    Q.  Do you have an understanding about what those partner

9    meetings were?

10   A.  My understanding is that they were offsite meetings amongst

11   the partners, which at one point in time were Uri, Mark, David,

12   and Murray, and then also later on included Bernie Fuchs.

13   Q.  Did there come a time while you were CEO of Black Elk when

14   Black Elk transferred its remaining scraps, remaining asset

15   scraps to another company?

16           MR. AMENT-STONE:  Objection as to scraps.

17           THE COURT:  Ground.

18           MR. AMENT-STONE:  403.

19           THE COURT:  Well, scraps is perhaps a little too

20   colloquially.  Reminds me what I left on the breakfast table

21   this morning.

22           MR. GLUCK:  Withdrawn.

23           THE COURT:  No.  I think it's a good time to take our

24   midmorning break and we'll take a 15-minute break.

25           (Continued on next page)

1           (Jury not present)

2           THE COURT:  Please be seated.

3           Couple of things we needed to take up.

4           First, under my rules, counsel were supposed to

5    provide the Court three days in advance of trial with proposed

6    deposition testimony that they wished to introduce together

7    with any objections, and this was to be done on copies of the

8    transcript of the deposition with proponent indicating the

9    lines that they wanted to introduce and then proponent

10   indicating the margin objections to any particular lines.

11          Now, I don't know that anything of that sort was

12   produced three days before trial, but, in any event, I was

13   furnished with, this morning by my law clerk, the marked up

14   deposition of Michael Katz.  That not only does not comply with

15   my rules, but more importantly, it makes no sense.

16          So, I'm looking at what was given to me with respect

17   to the deposition of Michael Katz.  The first line being

18   offered is page 18, line 2 of the deposition.

19   "Q.  And you said were you not employed at Platinum?

20   "A.  That's correct."

21          It's a somewhat bizarre first line to introduce to the

22   jury.  I got to believe that somewhere in those preceding

23   17 pages, there was some description of who Mr. Katz was that

24   might be helpful to the jury.

25          In any event, there's then marked up, on page 18 and

1   19, a whole bunch of lines, none of which are objected to on

2   the face of those two pages.

3          On page 20, opposite what I believe is something

4   that's not being offered, namely testimony beginning at

5   page 20, line 7, there is a box that says defendant's

6   objections, 401, 802.  I have no idea why they're being offered

7   as to something that's not -- why those objections are being

8   made as to something that's not being offered, but this same

9   approach continues in much of the two volumes that follow.

10          Just to give another slightly different example, on

11  page 28, line 15, there is offered the second part of a

12  question, reading, "Was his relationship to Platinum, if you

13  know?"  That, of course, makes no sense.  But there was not

14  highlighted for offering the first part of that question, which

15  was, "And what about David Bodner, what... " and there follows

16  the line, "what was his relationship to Platinum, if you know?"

17  So that's meaningless.  There, the objection is placed as to

18  the lines that are being offered.  The objection is 401, and

19  PK, which I assume is personal knowledge.  Those objections I

20  at least can understand.

21          By the way, in what is being offered at various

22  places, there is included, without objection, the statement of

23  the opponent at the time, objecting to form.  Now those would

24  be preserved if there had been an objection raised in the

25  margin, but there was not.  So, for example, on page 19, what

1    is being offered is, beginning at line 16:

2    "Q.  You said you monitored your -- you had to monitor your

3    grandfather's investments; is that right?

4              "MR. GLUCK:  Object to the form.  You can answer the

5    question.  You can answer the question."

6              I see no reason why those lines, 19 through 21, should

7    be offered, but that's what you gave me.

8              In short, gentlemen and ladies, this is a mess and I'm

9    not going to spend my time trying to figure out what you

10   intended until you give me something that's proper.  I'll hand

11   this back to my law clerk, and no depositions, therefore, will

12   be played today.

13             Now, you started to raise, although it doesn't relate

14   to anything I think that's going to happen today, the question

15   of the signatures on the release and whether you had to call

16   Mr. Nordlicht -- oh, yes.  Do we have a copy of the release?

17   You want to hand that up, Mr. Lauer.

18             MR. LAUER:  Yes.  May I explain what I'm handing up?

19             THE COURT:  Sure.

20             MR. LAUER:  I am handing up a cover letter from

21   Suzanne Horowitz, who was general counsel of Platinum to

22   Michael Katz, the grandson of Marcos Katz, and enclosing swap

23   agreement and word version of the Katz agreement.  Annexed to

24   it are maybe some duplicates.

25             Exhibit 74, which is one of these agreements, that

```
 1   happens to be the release that is at issue in our case, along

 2   with the other releases that were signed by Mr. Nordlicht and

 3   it could be, and I'm not testifying, but it could be that the

 4   Nordlicht signature is some type of mechanical signature

 5   because, to me, they all look identical and that's why we're

 6   handing the cover letter from Suzanne Horowitz, who is on our

 7   witness list.

 8            THE COURT:  Was this release agreement or anything

 9   about it referenced in any of the Rule 56.1 statements of

10   undisputed facts that were propounded in connection with

11   summary judgment?

12            MR. LAUER:  I believe it was.  Mr. Hertzberg can

13   supplement that.

14            THE COURT:  Was there an objection?

15            MR. HERTZBERG:  Your Honor, the plaintiffs raised a

16   number of issues with the release that were specifically

17   litigated at summary judgment.  One of those was --

18            THE COURT:  That's very helpful.  What I want to know,

19   did they raise the question they're raising today about whether

20   Nordlicht saw it?

21            MR. HERTZBERG:  Absolutely not.

22            THE COURT:  So let me go back to plaintiffs' counsel.

23   Why isn't that --

24            MR. GLUCK:  The context of the summary judgment motion

25   was by them.  They were seeking summary judgment dismissing the
```

MC2Cpla2                      Latkin - Direct

1   case on the basis of the release.  We opposed on a variety of

2   grounds.

3            THE COURT:  One of the grounds was that they had been

4   released.

5            MR. GLUCK:  Precisely.

6            THE COURT:  You opposed, successfully opposed on a

7   number of legal grounds, which I agreed with.  The question is,

8   did you also at that time raise that this release is no good

9   because the Nordlicht signature either isn't there or is a

10  phoney or something like that, and it sounds like you did not.

11           MR. GLUCK:  That's where we disagree.  We had a

12  Nordlicht deposition, if the Court would recall, and the

13  question was put -- the release was -- the very first time the

14  release was I think brought in any deposition.  It was not

15  something that, frankly, PPVA really knew about before that

16  motion, and the question was put to Mr. Nordlicht, did you sign

17  this release.  He took the Fifth Amendment.  We had always

18  believed --

19           THE COURT:  And he said yes.

20           MR. GLUCK:  He didn't say yes.

21           THE COURT:  He said he did not sign it.

22           MR. GLUCK:  Did not say yes.  He took the Fifth

23  Amendment.

24           THE COURT:  He took the Fifth on that.

25           MR. GLUCK:  He took the Fifth.  So when preparing

MC2Cpla2                    Latkin - Direct

1    for -- this was now two years ago, but preparing for this trial

2    today, we took a look at the basic rules, there's a burden

3    shifting.  The first burden is on a proponent of a release to

4    demonstrate its validity.  That is theirs.  They have to show

5    that it was a real document, it was actually signed, and it

6    says what it says.  And then that's their burden and we are

7    simply calling a witness to see if they can meet their first

8    burden.

9              Then, apparently, based on the cases that are in the

10   jury instructions that have been submitted, there is a question

11   then as to whether the release is void or voidable, and this

12   was the primary issue in summary judgment.  Voidable, if there

13   is lack of consideration, a whole bunch of other stuff.  Void

14   if it violates public policy, violates a penal statute, a few

15   others.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1           THE COURT:  By the way, with respect to the latter,

2      which you mentioned in your opening statement, I am not sure --

3      we don't have to decide this right now, but I'm not sure that

4      is a jury question.  I think it's a judge question.  But we

5      can --

6           MR. GLUCK:  I honestly don't know the answer.  I know

7      when we were preparing the jury instructions we were analyzing

8      this case law.

9           THE COURT:  Holding something is void as against

10     public policy is, I am almost certain, an equitable remedy

11     going back to the Courts of Chancery in the 17th and 18th

12     century.  Perhaps you remember that.  But we don't need to get

13     into that.  I just flag that for your consideration.

14          MR. GLUCK:  There is a New York Court of Appeals case

15     that begins with a K that we have cited in our jury

16     instructions, and I'm sure someone can pull that up.  And in

17     fact, this Court yourself has once interpreted on the voidable

18     side, but it cited this New York case, and I think that's the

19     highest authority is from the '40s or '50s in New York on this

20     issue.  And our view is that that when the issue of public

21     policy is raised, the burden then shifts back to the proponent

22     to show that it was not in violation of public policy.

23          THE COURT:  That may be.  But my only point is a

24     different one, which is, on certain issues, like whether there

25     was consideration, is a jury issue, classic jury issue.  That's

1    a fact issue.

2              MR. GLUCK:  It's a fact.

3              THE COURT:  Whether assuming it is otherwise a valid

4    release is nevertheless void as against public policy is, I

5    suspect, an issue for the Court.  But really because we are

6    running out of time -- and, by the way, at 1:00 I must leave

7    promptly at 1:00 because I'm giving a talk at Columbia Law

8    School at 2:15, so there won't be time for any further

9    discussion then, but this is not imminent.  So, all right.  I

10   will take a look at the release --

11             MR. GLUCK:  Just so the Court understands, before you

12   get to that voidable/void issue, it is our express

13   understanding that it is the burden of the proponent of the

14   release to show every element of its initial validity.

15             THE COURT:  Okay.

16             MR. GLUCK:  So it's a very simple thing that we don't

17   think --

18             THE COURT:  That may well be.  And I will take that

19   into consideration and I will look at any -- here is what I

20   would like.  Someone should send to my law clerk sometime this

21   afternoon where the release is referenced in the 56.1

22   statements and what was said or not said in response.

23             Okay.  Anything else we need to take up?

24             MR. LAUER:  Your Honor, may I add to this?  On the

25   very limited issue, putting this public policy argument aside,

Mc22Pla3                        Latkin – Direct

1   as we were dealing with, let's say, a simple commercial

2   release, on that very issue, I would just like to say there are

3   multiple additional e-mails from Horowitz and other people at

4   Platinum, for example, to counsel for Bodner and Huberfeld

5   enclosing the release.  There clearly is at the very least

6   apparent authority.  There clearly is --

7            THE COURT:  All right but the more important thing,

8   remember, this all came up only on the question of whether --

9   the immediate question was whether or not the plaintiff could

10  call Mr. Nordlicht.

11           MR. LAUER:  Yes.

12           THE COURT:  And the question was whether the jury

13  could draw an adverse inference from his taking the fifth on

14  whether or not he signed the release.  And I am inclined to

15  think that, given the fact that he took the Fifth as to

16  virtually everything, as I understand it, that would be too

17  speculative on the jury's part, but I will think about that

18  some more.

19           How much longer does plaintiff have on the direct of

20  this witness?

21           MR. GLUCK:  I think it's 15 to 20 minutes.

22           THE COURT:  Okay.  And defense counsel, how long do

23  you have on cross.

24           MR. LAUER:  Mr. Ament-Stone is doing the --

25           THE COURT:  Yes.  I know that from his vigorous and

Mc22Pla3                          Latkin - Direct

 1  often successful objections.

 2              MR. AMENT-STONE:  Thank you, your Honor.

 3              If I understand correctly, the direct will have been

 4  about an hour or actually more like an hour forty, right?

 5              THE COURT:  Well, it doesn't matter.  They want

 6  another 20 minutes.  I'm going to give them another 20 minutes.

 7              MR. AMENT-STONE:  All right.  Thank you, your Honor.

 8  Let's say an hour and a half.

 9              THE COURT:  Pardon?

10              MR. AMENT-STONE:  Hour and a half.

11              THE COURT:  Hour and a half?  Okay, you want an hour

12  and a half, you will get an hour and a half.  And I'm sure the

13  jury will follow every moment carefully.

14              MR. AMENT-STONE:  I will try to end early.

15              THE COURT:  All right.

16              MR. LAUER:  Your Honor, one other housekeeping matter,

17  if your Honor is okay with it, just to let the jury know that

18  Mr. Bodner had --

19              THE COURT:  Thank you.  I will do that as soon as we

20  are going to bring them in.  We are going to bring them in

21  about three minutes.  If you want a break, this is your chance.

22              (Recess)

23              THE DEPUTY CLERK:  All rise.

24              May I bring in the jury?

25              THE COURT:  Please.  Let's get the witness back on the
    stand.

1        (Jury present)

2             THE COURT:   Counsel.

3    BY MR. GLUCK:

4    Q.  Mr. Latkin, did there come a time when you personally

5    oversaw the transfer of the remnants of Black Elk's assets to

6    another company?

7    A.  Yes.

8    Q.  And what other company was that?

9    A.  A company called Northstar.

10   Q.  What is your understanding of Northstar?

11   A.  Northstar was another oil company also in the Gulf of

12   Mexico, in Houston, that Platinum had an interest in, and

13   Black Elk made a sale of assets to them to try to free up some

14   bonding so that we can pay off some creditors.

15   Q.  Do you know whether Platinum held shares, common equity, in

16   Northstar?

17   A.  I know now that they did.  Back then I wasn't sure what the

18   arrangement was, but I know now that they had equity in

19   Northstar, yes.

20   Q.  Same question, preferred equity.  Would it be the same

21   answer?

22   A.  Yes.

23   Q.  Do you know whether Beechwood held any debt in Northstar?

24   A.  I believe they did, yes.

25   Q.  What was the sale price of these remnants of assets to

Mc22Pla3                           Latkin - Direct

Northstar?

A.   I remember it wasn't much.   It was -- in reality, there are

two sales prices.   There is what it was sold for, which was

nothing, really, but it was the transfer of the assets leaving

the bonding behind.   And so I think a little bit of background

needs to be explained.

         All these assets, each asset has bonds behind it to

guarantee a cleanup.   And by transferring the assets to

Northstar, Northstar would assume the liability and put bonding

in place, thereby leaving the existing bonds outstanding, and

they could get freed up because it is collateral to make sure

that there is money left behind, even in a bankruptcy, to clean

up the remnants of what was left.

Q.   So Northstar was actually getting a bunch of liabilities?

A.   Northstar was taking on liabilities because the assets did

have potential, but money would have needed to be spent.   So in

a similar situation to GGO, the assets that they took on needed

cap ex, needed capital expenditure.

Q.   Mr. Parson, would you please call back up Plaintiffs'

Exhibit 761.

         I will represent that the preferred and common shares

of Northstar were held by PPVA and enumerated in this document

is Lafitte and Northstar GOM.

         Mr. Parson, would you please highlight those two

lines?

Mc22Pla3                         Latkin - Direct

```
 1            What was the value of the assets transferred to
 2   Northstar?
 3   A.  On this document or --
 4   Q.  No, no, at the time when you handled it.
 5   A.  I mean --
 6            THE COURT:  I'm sorry.  Before you answer the
 7   question, ladies and gentlemen, I should have really mentioned
 8   this at the beginning today, but just I don't know if you
 9   noticed, Mr. Bodner is not here today.  That's because of a
10   family obligation that, with the Court's permission, he had to
11   attend to.  So he will be back on Monday, and he was excused
12   for today.
13            Sorry.  Go ahead, counsel.
14   BY MR. GLUCK:
15   Q.  What was the value of the assets transferred?
16            MR. AMENT-STONE:  Objection.
17            THE COURT:  No, I think that's different from the
18   earlier situation.  Overruled.
19            You may answer.
20   Q.  What was the value of the assets transferred to Northstar
21   that you oversaw?
22   A.  So I would say the value was zero, but in reality it was
23   more negative because to get any value from them, significant
24   money would have had to have been spent on capital
25   expenditures.
```

1    Q.  You returned to Platinum after your tenure as CEO of

2    Black Elk, right?

3    A.  Correct.  I left Black Elk in October of 2015, after the

4    bankruptcy proceedings started.

5    Q.  Did you continue your duties overseeing various assets,

6    including the oil and gas ones?

7    A.  Yes.

8    Q.  At the time did you know what Platinum was valuing its

9    shares in Northstar at?

10   A.  I did not, no.

11   Q.  Sitting here today, is a valuation of 180 million plus for

12   the shares of Northstar possible?

13            MR. AMENT-STONE:  Objection.

14            THE COURT:  Sustained.

15   BY MR. GLUCK:

16   Q.  Do you have any views sitting here today regarding the

17   valuation of the shares of Northstar 180 million?

18            THE COURT:  Sustained.

19            MR. AMENT-STONE:  Objection.

20            THE COURT:  Sustained, sustained.

21   Q.  How would one calculate the value of Northstar's shares?

22            MR. AMENT-STONE:  Objection.

23            THE COURT:  Sustained.

24   BY MR. GLUCK:

25   Q.  Are you aware of whether Northstar had any debt on it?

1    A.  I believe they did, yes.

2    Q.  Are you aware whether Northstar went into bankruptcy?

3    A.  I believe they did, yes.

4    Q.  Are you aware of whether the creditors in the Northstar

5    bankruptcy were repaid?

6    A.  I don't believe so.

7    Q.  Were you given any instructions in your capacity as CEO of

8    Black Elk regarding how long that company should remain in

9    business?

10   A.  Yes.

11   Q.  Who gave you those instructions?

12   A.  It's important to say that when I started, the idea was to

13   try to keep it in business as long as possible, and I accepted

14   the role as CEO with the understanding that I would do my best

15   to try to save it, to try to get the creditors repaid, and to

16   try to see if anything could be salvaged out of it.

17   Q.  Was there a reason provided to you as to why Platinum

18   wanted Black Elk to stay in business as long as possible?

19            MR. AMENT-STONE:  Objection.  Hearsay.

20   Q.  Directly provided.

21            MR. AMENT-STONE:  Objection.

22            THE COURT:  Well, no.  First of all, just answer the

23   immediate question yes or no.  The question is:  Was there a

24   reason provided to you as to why Platinum wanted Black Elk to

25   stay in business as long as possible?

1          THE WITNESS:  Yes.

2          THE COURT:  Who provided you with that reason?

3          THE WITNESS:  Mark Nordlicht.

4          THE COURT:  And what did he say?

5          THE WITNESS:  They needed it to stay around long

6    enough so that assets can be transferred to the other entities

7    and to prevent against claims arising from the previous

8    Renaissance transaction.

9          THE COURT:  What do you mean by they needed it to stay

10   around long enough so that the assets could be transferred to

11   the other entities?  Pause there for a minute.  What do you

12   mean by that?

13         THE WITNESS:  If Black Elk went into bankruptcy within

14   only a few months of the transaction having been closed, there

15   could have been the potential of claims against the individuals

16   that received the payout from the closing of the deal because

17   when the deal was done, there was a bondholder vote to not

18   repay the bonds and to allow money to flow directly to an

19   entity that Platinum controlled, leaving the bonds outstanding.

20         THE COURT:  So in other words, what you are saying is

21   if the company went into bankruptcy too soon, then under

22   bankruptcy law and other assertions, claims might have been

23   made.

24         THE WITNESS:  Correct.

25         THE COURT:  As to assets that were transferred in the

1    interim period.

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.

4              And then you also said there was a second reason

5    that's no longer on my screen, you said, as to why you were

6    told the company needed to stay in business for a while.

7              THE WITNESS:  They also wanted to be able to transfer

8    other assets to Northstar to be able to then free those of any

9    possible claims that Black Elk had.

10             THE COURT:  All right.

11             THE WITNESS:  So any of the remaining potentially

12   viable assets would be transferred to Northstar and money would

13   be spent to put in the cap ex, which was my understanding.

14             It's important to note that when I accepted this

15   position it was the idea to make sure that everybody and the

16   creditors and everybody got their money back, which in

17   Black Elk's case they did.  I managed to put together --

18             THE COURT:  Well, that's all interesting, but there

19   was no pending question.

20             Why don't you put a pending question?

21   BY MR. GLUCK:

22   Q.  Yes.  Thank you.  I would like to close the line of

23   questioning.

24             Are you familiar with a gentleman named Daniel Small?

25   A.  Yes, I am.

Mc22Pla3                          Latkin - Cross

1   Q.  Who is he?

2   A.  He was a portfolio manager for Platinum Partners.

3   Q.  Was he connected to the Black Elk investment?

4   A.  He and David Levy were the primary portfolio managers on

5   Black Elk.

6   Q.  Did there come a time when you became aware that Daniel

7   Small sued PPVA or some of its subsidiaries for a bonus in

8   connection with Black Elk?

9   A.  Yes.

10  Q.  Did the joint liquidators and PPVA hire you as a consultant

11  in that litigation to walk them through what happened with

12  Black Elk and whether Daniel Small may be entitled to a bonus

13  or not?

14  A.  Yes.

15  Q.  Is there an agreement where PPVA agreed to pay you for your

16  time in exchange for walking PPVA through these issues?

17  A.  Yes.

18  Q.  Have you testified truthfully here today?

19  A.  I have, yes.

20  Q.  Are you being remunerated for your time?

21  A.  I am.

22          MR. GLUCK:  Thank you.

23          THE COURT:  Cross-examination.

24  CROSS-EXAMINATION

25  BY MR. AMENT-STONE:

1    Q.  Good morning, Mr. Latkin.  It's still morning for about 15

2    minutes.

3           Counsel was just asking you a bit about your

4    cooperation agreement with the plaintiffs, and can we pull

5    up -- can we pull up that exhibit, the consulting agreement.  I

6    don't have the number written down here.  It's like 718 or 719.

7           (Counsel confer)

8           MR. AMENT-STONE:  I would offer this into evidence as

9    DX 717.

10          MR. GLUCK:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 717 received in evidence)

13   BY MR. AMENT-STONE:

14   Q.  So this cooperation agreement required you to testify in

15   this trial, right?

16   A.  Correct.

17   Q.  And under this cooperation agreement, you have to not only

18   testify in this trial, but also provide plaintiffs with

19   testimony and assistance in three other legal proceedings, is

20   that right?

21   A.  I don't know if it was three, but it was in other legal

22   proceedings.  I don't remember the exact number.

23   Q.  Well, why don't we go to page 2, which list the

24   proceedings.  So you will see there is A, B, C, and D and A is

25   Trott v. Platinum Management.  That's this case?

Mc22Pla3                        Latkin - Cross

1    A.  Yes.

2    Q.  Okay.  And you see the three other matters listed there.

3    A.  Correct.

4    Q.  And in the second item, Daniel Small v. DMRJ, did you

5    provide a sworn affidavit in that litigation?

6    A.  I did, yes.

7    Q.  And we can close that out.

8              In this cooperation agreement, you were required to

9    meet and prepare with plaintiffs' counsel in all of these

10   proceedings, right?

11   A.  Correct.

12   Q.  And if we go to page 3, it estimates here that the time of

13   your testimony, not including travel, will be ten hours, right?

14   A.  Correct.

15   Q.  And it estimates preparation time, not including travel, of

16   20 hours?

17   A.  Correct.

18   Q.  Is that how much time you spent preparing for this

19   proceeding, about 20 hours?

20   A.  I'm trying to -- I have been following my hours.  It's -- I

21   believe it's been less than that.  For this particular trial?

22   Q.  Yes.

23   A.  It's been a little bit less than 20 hours.

24   Q.  What about for the other proceedings?

25   A.  I was not paid for the other proceedings and I didn't bill

1   any hours for anything else.

2   Q.   So what did you get out of this cooperation agreement?

3   A.   What do you mean by that, sir?

4   Q.   Well, aren't they paying you a consulting fee?

5   A.   For this testimony I will be submitting a bill for my

6   hours, correct.

7   Q.   In fact, we see at the bottom of page 3 here, Latkin's

8   compensation, $200 an hour for your time?

9   A.   Correct.

10  Q.   Is that right?  Okay.

11          And you are also having your hotel accommodations

12  reimbursed?

13  A.   Correct.

14  Q.   Are you staying at the Millennium Hilton?

15  A.   I am, yes.

16  Q.   And how many times have you traveled to New York in

17  preparation for your testimony in this case?

18  A.   Just today.

19  Q.   Welcome to New York.

20          And is this the only legal proceeding in which you

21  have traveled pursuant to this consulting agreement?

22  A.   Yes.

23  Q.   And they also cover your airfare, right?

24  A.   Correct.

25  Q.   And your transportation, your travel expenses, your meals,

1    right?

2    A.  Correct.

3    Q.  And that's not your only compensation in this agreement, is

4    it?

5    A.  I don't think there is any other -- not that I know of,

6    there isn't any other compensation.

7    Q.  Are they paying your legal bills in connection with this

8    proceeding?

9    A.  I have an attorney representing me, yes.

10   Q.  That wasn't what I asked.  I asked are plaintiffs paying

11   that attorney?

12   A.  Yes.

13   Q.  All right.  And is that lawyer Mr. Folland?

14   A.  Yes.

15   Q.  And he charges six eighty an hour, right?

16   A.  I believe so, yes.

17   Q.  And for the record, that's $680, not $6.80.  Maybe it's

18   obvious.

19           Beyond that, if you look to paragraph 5, which is on

20   pages 4 to 5, I noticed here there is a paragraph called

21   "release of Latkin," and then another paragraph called "release

22   of the PPVA parties."  Right?

23   A.  Correct.

24   Q.  So you and plaintiffs have agreed to release one another

25   from any claims relating to your consulting agreement, right?

Mc22Pla3                          Latkin - Cross

1   A.   Yes.

2   Q.   Okay.  So as a condition of your consulting agreement, you

3   demanded that they release you.  Right?

4   A.   I wouldn't say I demanded they release me, just I was

5   advised by counsel that that's standard, that there is a

6   two-way release when you do something like this.

7   Q.   Got it.  Thank you.

8           Now, before you and plaintiff signed this cooperation

9   agreement in which they agreed to pay your expenses, your legal

10   bills, your fee of 200 an hour, and in which you agreed to

11   these mutual releases, you must have discussed your testimony

12   that you anticipated you would provide, right?

13   A.   I -- actually, no, we did not.

14   Q.   But didn't you give a sworn affidavit in another litigation

15   that was listed?  We just looked at that, right?

16   A.   In the Dan Small case.  I didn't know if you meant for this

17   case or for other cases, I had given an affidavit for Dan

18   Small, correct.

19   Q.   So let's just, for a clear record, with the affidavit in

20   the Dan Small case and your testimony in this case, is there

21   any other testimony you have provided in written or oral form

22   pursuant to this agreement?

23   A.   No.

24   Q.   But plaintiffs had to be comfortable with your testimony

25   before they agreed to release you, right?

Mc22Pla3                        Latkin - Cross

1              MR. GLUCK:  Objection.

2              THE COURT:  Sustained.

3              MR. GLUCK:  Mischaracterizes.  Second agreement or

4     amendment or (inaudible).

5              (Court reporter confers)

6              THE COURT:  I sustained the objection.

7     BY MR. AMENT-STONE:

8     Q.  The affidavit you filed in the Dan Small proceeding, did

9     plaintiff's counsel draft that for you?

10    A.  I don't remember if they drafted it or I worked on it with

11    my lawyer.  I don't remember who drafted it.  I think they

12    might have had a copy and then we amended it.

13    Q.  Now, I noticed you spoke a lot about your business

14    discussions with Mark Nordlicht, right?

15    A.  Correct.

16    Q.  And you testified that Mark Nordlicht and Murray Huberfeld

17    and David Bodner were final decision-makers regarding PPVA, is

18    that right?

19    A.  Correct.

20    Q.  Were they the only final decision-makers?

21    A.  To my knowledge, yes.

22    Q.  Okay.  You are familiar with the affidavit that you

23    submitted in the Dan Small case, right?

24    A.  If there is going to be a specific question, I wouldn't

25    mind seeing it, so that way I could refresh my memory.  It's

Mc22Pla3                          Latkin - Cross

1   been a while.

2             MR. AMENT-STONE:  May I approach to refresh his

3   memory?

4             THE COURT:  Yes.

5   Q.  My question is really on paragraph 6, which is on the

6   second page of this testimony.  Does that refresh your

7   recollection as to your prior testimony of who were the

8   ultimate decision-makers?

9   A.  Yes, it does.

10  Q.  Do you wish to amend your testimony here today that the

11  only three final decision-makers were Huberfeld, Bodner and

12  Nordlicht?

13  A.  I mean, I guess if you say that, there were five partners.

14  My understanding was always that Murray, David, and Mark were

15  the final decision-makers.

16  Q.  But that wasn't your prior testimony, right?

17            MR. GLUCK:  Objection.

18            THE COURT:  Can I see the affidavit?

19            MR. GLUCK:  Improper impeachment.

20            MR. AMENT-STONE:  Your Honor, shall I read it into the

21  record?

22            THE COURT:  No.

23            So did I understand from testimony that you gave

24  earlier today that Mr. Fuchs was not originally one of the

25  partners; he was added later?

1    THE WITNESS:  Mr. Fuchs, to my knowledge, became a

2 partner at the very end pretty much, like the last . . .

3    THE COURT:  All right.  And with respect to

4 Mr. Landesman, was he a partner at all times?

5    THE WITNESS:  Yes, he was.

6    THE COURT:  All right.  So why did you exclude him, if

7 you did, from your belief that the ultimate decision-makers

8 were Nordlicht, Huberfeld and Bodner?

9    THE WITNESS:  He was never -- to my understanding, in

10 my discussions with Uri, he was never a final decision-maker.

11 In the end, because the capital had been provided, my

12 understanding from Uri is that because it was mostly their

13 capital to begin with that the final decision-makers were

14 Murray, David, and Mark.

15    THE COURT:  All right.

16 BY MR. AMENT-STONE:

17 Q.  Uri Landesman was president of Platinum Management, wasn't

18 he?

19 A.  Yes, he was.

20 Q.  And as we have established, you previously testified that

21 he was one of the final decision-makers at Platinum Management.

22 A.  What I testified was that he was one of the partners, but

23 when I would discuss with him what we were working on, my

24 understanding was that he was not a final decision-maker, but

25 one of the partners, but ultimately the final decisions were

1   made by Murray, Mark, and David.

2   Q.  So when you characterized him in a sworn affidavit in the

3   New York Supreme Court as one of the five ultimate

4   decision-makers, that was incorrect, that was false?

5   A.  It was not false, but he was one of five and I'm sure he

6   had some impact on the decision, but he was not -- he wasn't

7   the final arbiter.

8   Q.  Some impact or an ultimate decision-maker?

9   A.  I think we are discussing semantics, but he was one of five

10  partners at the end, but the ultimate decision rested with the

11  three main partners.  They would -- my understanding from Uri

12  is they would take a vote, but the decision rested with the

13  three main partners.

14  Q.  Now, in the five years that I think you testified you were

15  on the road 50/50, half the time on the road/half the time in

16  the office, with companies in which PPVA was invested, did you

17  call -- you didn't call David Bodner about this business, did

18  you?

19  A.  No.

20  Q.  You -- and I apologize if I'm going to be skipping around

21  here a little bit.

22          You mentioned Murray Huberfeld and David Bodner in the

23  same breath, and I think you talked about some conversations

24  where it wasn't clear which of the two you were talking about,

25  but did I understand your testimony correctly that

1    Mr. Huberfeld spoke much more with you than David Bodner?

2    A.  Yes.

3    Q.  You didn't really have business dealings with Mr. Bodner,

4    did you?

5    A.  I did not, no.

6    Q.  You also gave some testimony about a sunset provision and

7    Mr. Nordlicht's attitude about the sunset provision.  Am I

8    right that Mr. Nordlicht didn't like the impression, he felt

9    that he was the one doing work, but Mr. Huberfeld and

10   Mr. Bodner were still getting paid and they were not producing

11   the same way he was?

12   A.  I'm not sure I understand the question.  I didn't --

13            MR. GLUCK:  Objection.  Mischaracterizes.

14            THE COURT:  Yes, I think, although the objection is

15   rather late, that you need to rephrase that question.

16   BY MR. AMENT-STONE:

17   Q.  Have you ever seen such a sunset provision, the sunset

18   provision that Mr. Nordlicht was concerned about?

19            MR. GLUCK:  Objection.  Mischaracterizes.

20            THE COURT:  Overruled.

21   BY MR. AMENT-STONE:

22   Q.  You testified that there was a sunset provision in the

23   agreements and that you spoke with Mr. Nordlicht about it,

24   right?

25            MR. GLUCK:  Objection.  Mischaracterizes.

Mc22Pla3                    Latkin - Cross

1            THE COURT:  Overruled.

2    A.  He said that there was not a sunset provision.

3    Q.  I'm sorry.  Yes.

4            And are you aware that Mr. Nordlicht wanted to buy out

5    Messrs. Huberfeld and Bodner, buy out their shares?

6    A.  I am not aware.  I just know that he, in my conversation

7    with him, he said he would have liked to have that option.

8    Q.  And he couldn't, right?

9    A.  As far as I know, no.

10   Q.  So he wanted to have Mr. Huberfeld and Mr. Bodner out.

11   A.  That was my understanding from that conversation.

12   Q.  And if Mr. Bodner and Mr. Huberfeld were out of Platinum

13   Management, he could bring in other partners.

14   A.  I suppose, yes.

15   Q.  Let's talk a little bit about Golden Gate.  You mentioned

16   the example of Amazon, which lost money every quarter year

17   after year for many years, until it built to a profitable

18   future, right?

19   A.  Yes.

20   Q.  And we only know that Amazon was a success story in

21   hindsight, right?

22   A.  Correct.

23   Q.  So in 1998 or 2002, or I think several years after that, we

24   didn't have the foresight to know if and when Amazon would ever

25   become a profitable business.

Mc22Pla3                          Latkin - Cross

1              MR. GLUCK:  Objection.

2              THE COURT:  Sustained.

3    Q.  Isn't Uber a similar story?  Uber was losing money for many

4    years until -- actually, I'm not even sure if it is profitable

5    yet but --

6              THE COURT:  None of this -- this is a fact witness.

7    He is not offering an opinion, and therefore hypotheticals or

8    discussion of other companies or anything like that is

9    improper.  Sustained.

10             MR. AMENT-STONE:  Understood, your Honor.

11   BY MR. AMENT-STONE:

12   Q.  Let's pull up PX 547, which was previously shown to you.

13   These are the Golden Gate financial statements that you

14   testified about earlier, right?

15   A.  Correct.

16   Q.  And you see this was sent from Joseph SanFilippo to Marina

17   Fedotova?

18   A.  Correct.

19   Q.  Can you remind the jury what Joseph SanFilippo's position

20   was?

21   A.  He was CFO of PPVA.

22   Q.  And do you know who Marina Fedotova was, is?

23   A.  I believe she was one of the people who worked for Sterling

24   on the valuation committee.

25   Q.  So these financial statements that you testified about

Mc22Pla3                              Latkin - Cross

1   earlier were shared with Sterling.

2   A.  Correct.

3   Q.  And you were also shown the 2014 note-sale agreement.  We

4   don't necessarily have to pull that up, but that was also

5   disclosed to PPVA's independent valuators, right?

6   A.  I don't have firsthand knowledge of whether it was or was

7   not.

8   Q.  Do you know if it was disclosed to third-party auditors?

9   A.  I don't have firsthand knowledge of that, no.

10  Q.  Now, you testified that you were told not to discuss your

11  thoughts on valuation, and you testified you were told this by

12  Mr. SanFilippo and Naftali Manela, is that right?

13  A.  Correct.

14  Q.  And they never told you that that was coming from a

15  particular person, did they?

16  A.  No.

17  Q.  You testified that valuation was not really a part of your

18  job.  Is that fair?

19  A.  Valuation as in terms of what they reported to investors,

20  no.

21  Q.  Well, you said you were instructed not to discuss your

22  thoughts on valuation, right?

23  A.  With Sterling, correct.

24  Q.  You attended valuation committee meetings, right?

25  A.  Correct.

Mc22Pla3                         Latkin - Cross

1   Q.   But you attended them as a portfolio manager, not as a

2   member of the committee.

3   A.   As a member of which committee?

4   Q.   The valuation committee.

5   A.   The -- the -- I attended them from Platinum's side.

6   Q.   Right.

7   A.   You mean from Sterling's side?

8   Q.   No, no, no.  I'm sorry.  Let me be clear.

9        You attended valuation committee meetings at Platinum,

10  but you did so in your capacity as a portfolio manager, right?

11  A.   Yes.

12  Q.   By the way, Mr. Bodner was never at any of those meetings,

13  was he?

14  A.   As I recall, none of the partners were at those meetings.

15       MR. AMENT-STONE:  Let's pull up DX 96, which I will

16  offer once it is up.  Offering this into evidence.

17       (Pause)

18       MR. AMENT-STONE:  Was there an objection?

19       MR. GLUCK:  No objection.

20       THE COURT:  Received.

21       (Defendant's Exhibit 96 received in evidence)

22  BY MR. AMENT-STONE:

23  Q.   I think you just said you didn't think there were any

24  partners at these meetings, right?

25  A.   The ones I attended, Mark and Uri were actually not in the

Mc22Pla3                        Latkin - Cross

1    room with me, to my recollection.  They were not there.

2    Q.  Do you see that your name is listed here as attending

3    meetings in Q4 2013, Q1 2014, and Q2 2014?

4    A.  Yes.

5    Q.  Do you see that Mark Nordlicht also attended all three of

6    those meetings?

7    A.  I see him on the list, but he was not in the room when I

8    was there.

9    Q.  Okay.  And Mr. Landesman is also listed on one of those as

10   well, right?

11   A.  He was also not in the room when I was there.

12   Q.  Okay.  And a number of other people including the CFO,

13   right?

14   A.  They were in attendance, correct, but, for instance, in Q4

15   2013, when I was in the room, it was Joseph SanFilippo, and

16   myself, and Ari Hirt.  Michael Goldberg was not there and Dan

17   Small was not there and Mark Nordlicht nor Uri were there while

18   I was there.  They might have been there another time, but

19   while I was in the room, they were not there.

20   Q.  Okay.  Now, you don't claim to be more informed about

21   valuation than Sterling was, right?

22            MR. GLUCK:  Objection.

23            THE COURT:  Sustained.

24   Q.  You were not hired as a valuator at Platinum Management?

25            MR. GLUCK:  Objection.

1          THE COURT:  No, I will allow that.

2   A.  Part and parcel of my job was to either help out with

3   existing positions or come up with new positions to invest in,

4   and a key part of that is to project what an assumed valuation

5   would be as part of the rationale for making an investment.

6   You can't invest in something in a vacuum.  You want to try to

7   understand what the upside is, and the upside is key to coming

8   up with valuation.

9   Q.  Okay, but that wasn't my question.  My question was you

10  weren't the valuation person, right?

11         MR. GLUCK:  Objection.  Mischaracterizes --

12         THE COURT:  That wasn't your question, but I will

13  allow that question.  The new question is:  You weren't the

14  valuation person.  The objection, which could have been on the

15  grounds of vagueness and would have been sustained, was

16  unfortunately on the grounds of mischaracterization, and that

17  is overruled.

18         MR. AMENT-STONE:  Your Honor, can I rephrase the

19  question anyway?

20         THE COURT:  That's a good idea.

21         MR. AMENT-STONE:  Thank you.

22  BY MR. AMENT-STONE:

23  Q.  You are not a valuation professional.

24  A.  Yes, I am.

25  Q.  Okay.  You -- what do you mean by that?  I'm sorry.  What

Mc22Pla3                          Latkin - Cross

1   do you mean you are a valuation professional?

2   A.  I mean fundamental to what I do as a -- for my career is

3   provide input on valuation for businesses and what something is

4   worth.  That's part and parcel of what I do.  When I am brought

5   in to a restructuring situation, part of the due diligence that

6   I am expected to do is to tell them whether or not there is

7   value in the company.  Is it worth saving?  Is it worth

8   spending money?  How you can get some value for creditors?  How

9   you can look at different aspects of the business and decide

10  maybe there is an area that's worth investing in and saving, or

11  maybe it's just better off left for dead?  But that's very much

12  a fundamental.

13          I worked as a portfolio manager for ING for five

14  years --

15          THE COURT:  No, no.  You have answered the question.

16          THE WITNESS:  Apologize.

17  Q.  Let's be more specific.  When you were brought on to

18  Golden Gate, that was not a restructuring situation, right, in

19  2012?

20          MR. GLUCK:  Objection.  Time frame.

21  BY MR. AMENT-STONE:

22  Q.  When you started working on the Golden Gate portfolio,

23  Platinum was looking to acquire Golden Gate, is that right?

24  A.  Ari sourced the deal, and then I was brought on to work

25  with him, yes.

1    Q.  So you were not brought on in a restructuring context.

2    A.  Not at the beginning, no.

3    Q.  And you were not asked to provide a valuation opinion on

4    Golden Gate.

5    A.  When we initially invested in it, Ari was the primary, but

6    Mark did ask me what I thought it was worth.

7    Q.  And Platinum Management had third-party evaluators.  That

8    was Sterling.  Right?

9    A.  Now I thought -- my understanding of Sterling was to verify

10   the valuations that they were given, to either agree or

11   disagree.  That was my understanding that the portfolio

12   managers would discuss the companies, then there was a

13   valuation committee that they would work with, and then they

14   would come up with whether they agreed or disagreed with the

15   valuations.

16   Q.  So what did you tell Mr. Nordlicht you thought Golden Gate

17   was valued at in 2012?

18   A.  What I thought it was valued at or what I thought it would

19   have been worth?

20   Q.  Let's say worth.  What did you think it was worth?

21   A.  I don't remember the exact number that I told him, but I

22   said that it could have significant value in the hundreds of

23   millions.

24   Q.  And I guess that ties into your earlier testimony about the

25   need to put in capital to realize that value?

1   A.   Correct.

2   Q.   And the $25 million initial capital was proof of concept,

3   right?

4   A.   I wouldn't say proof of concept as so much as to try to --

5   I guess it's a tough term to say proof of concept, but it's

6   basically to try to flesh out whether or not the wells were

7   what they said they were.  So it was already an established

8   concept because these were fields that had been drilled.  The

9   idea was to figure out if you could really get what we thought

10  was in there.  It was -- the idea was to see -- the report

11  said:  This is what we think the oil is.  For Casmalia, we

12  chose the areas that we thought were best to drill, because

13  that would sort of prove out what that report was and, as we

14  unfortunately saw, that was not the case.

15  Q.   But the $25 million investment, no one expected that to

16  realize the full potential revenue from the oil, did they?

17  A.   No.

18  Q.   You gave some testimony about the report by DeGolyer &

19  McNaughton?

20  A.   That's why I always say D&M.

21  Q.   It's a tough one, the D&M report.  Was there a subsequent

22  D&M report?

23  A.   I don't remember off the top of my head if there was or was

24  not.  In my preparation for this, I viewed the D&M initial

25  report and then a Netherland Sewell report.  I don't remember

Mc22Pla3                        Latkin - Cross

1    if there was a follow-on D&M report.

2              (Continued on next page)

MC2Cpla4                          Latkin - Cross

1    BY MR. AMENT-STONE:

2    Q.  And you were one of the portfolio managers for Golden Gate

3    until 2015; right?

4    A.  Correct.

5    Q.  But you don't know if there was a second D&M report?

6    A.  I don't remember if there was.  It was a while ago.  And

7    for the purposes of this, the materials that I reviewed were

8    the initial D&M report and the Netherland Sewell report.

9    Q.  Do you know if either D&M report was shared with the

10   valuators?

11   A.  I'm fairly certain the first one was, but I couldn't say

12   100 percent.

13   Q.  You also mentioned the Netherland Sewell or NSAI report; is

14   that right?

15   A.  Correct.

16   Q.  Was that commission indeed the context of Black Elk looking

17   to potentially buy Golden Gate?

18   A.  I believe that was part of the rationale.

19   Q.  If I understand your testimony correctly, you're not aware

20   of a second D&M report; right?

21   A.  I don't recall.

22   Q.  You never attended a partner meeting, right, at Platinum

23   Management?

24   A.  I did not, no.

25   Q.  So you wouldn't know what was discussed?

MC2Cpla4                    Latkin - Cross

1    A.   I only received information on what was discussed at the

2    partner meetings secondhand from Mr. Landesman in discussions,

3    but not officially, no.

4    Q.   When exactly were the four wells at Golden Gate that you

5    testified about, when were they being drilled?

6    A.   My recollection, it was either the end of '12, beginning of

7    '13.  I know that, like I said, we had that delay because of

8    the spawning newts, but I don't remember the exact timing, but

9    it was in that timeframe.

10   Q.   Now — I warned you I'd be jumping around — with respect to

11   your earlier testimony that you were told not to discuss

12   certain things with auditors or with valuators, you worked at

13   this company for years; right?

14            MR. GLUCK:  Objection.  Vague.

15            THE COURT:  It's a little vague, but I'll allow it.

16   A.   Which company?

17   Q.   Platinum Management.

18   A.   Well, I was a portfolio manager for the entities.  There

19   were so many entities.  I think that's -- if you want me to

20   answer as like a blanket, I did work with Platinum for many

21   years, correct.

22   Q.   Were they your employer?

23   A.   No, I was actually a consultant.

24   Q.   When was that conversation with Mr. SanFillipo and

25   Mr. Manela in which you were told not to discuss certain

MC2Cpla4                          Latkin - Cross

1   things?

2   A.   Before every valuation meeting.

3   Q.   They told you this every time there was a valuation

4   meeting?

5   A.   Yes, they did.

6   Q.   Did they think you wouldn't remember?

7           MR. GLUCK:   Objection.   403.

8           MR. AMENT-STONE:   Fair.

9   Q.   I guess you don't know what they thought?

10          THE COURT:   Sustained.   It's not 403, but it's

11   sustained.

12   Q.   But you continued to work as a portfolio manager with

13   Platinum until the Black Elk position; right?

14   A.   Yes.

15   Q.   So you kept working at this position after being told at

16   every single valuation meeting not to discuss certain things.

17   Why didn't you quit?

18          MR. GLUCK:   Objection.

19          THE COURT:   Overruled.

20   A.   My job was to try to create value at the companies as the

21   individual who was structuring or structuring person, I very

22   much like to try to fix companies and fix problems.   The

23   valuation committees were not my purview.   My purview was to

24   try to create as much value at the companies that I was working

25   with.

MC2Cpla4                          Latkin - Cross

1   Q.  So you weren't concerned by being told that you couldn't

2   share certain information or discuss certain information?

3   A.  I wouldn't say concerned.  They just said limit your

4   discussions for time purposes or whatever.  They said limit

5   your discussions to just talking about the revenues and the

6   valuation committee would discuss the valuation.  That's what

7   they told me.

8   Q.  Because this wasn't your purview, you don't know all the

9   information that was shared with the valuators?

10  A.  I just know what I shared with them.  I don't know what was

11  shared after me, no.

12  Q.  As an example, we saw with PX 247, that Mr. SanFillipo

13  shared financials with Sterling?

14  A.  Yes.

15  Q.  And you weren't copied on that email?

16  A.  No, I was not.

17  Q.  Do you know offhand how oil prices in early 2016 compared

18  to those in let's say 2012, 2013?

19          MR. GLUCK:  Limited objection.  Just scope.

20          THE COURT:  Overruled.

21  A.  Oil prices, by my recollection, oil prices were lower, as I

22  recall, in '16 than in 2012.  I remember them being lower, that

23  there was a declining price trend from '12, '13, '14, and '16,

24  I recall they were lower.  That was one of the things I

25  remember.  I would need to see -- I don't -- I kind of remember

MC2Cpla4                       Latkin - Cross

1   that the prices in '12 and '13 were higher than in '16.

2   Q.  This is not a memory test.

3          MR. AMENT-STONE:  Can we pull up DX 719.

4          I would offer this into evidence.

5          MR. GLUCK:  Just a query on foundation.  Is this from

6   one of the reports?

7          MR. AMENT-STONE:  Yes.

8          MR. GLUCK:  Objection based on lack of witness's

9   knowledge or familiarity with this chart.  What could the

10  witness be testifying to?

11         THE COURT:  Sustained.

12  Q.  Does it refresh your recollection, sir, if I were to say to

13  you that oil prices were -- and I'm speaking specifically

14  about --

15         THE COURT:  Sustained.  That's you testifying.  That's

16  not permitted.

17  Q.  As you've testified, oil prices fell between 2012 and 2016;

18  right?

19         MR. GLUCK:  Objection.  Mischaracterizes.

20         THE COURT:  Overruled.  I hate to interrupt, but just

21  since we've had this so often from both sides.  The objection

22  on grounds of mischaracterization is almost never proper for

23  the following reason.  If the witness is simply asked, now you

24  testified so and so, right — it's up to him to say right or

25  wrong.  It may be a mischaracterization, but by saying

1  mischaracterization, counsel unintentionally is conveying a

2  message to the witness and that's why it's improper.  If, on

3  the other hand, the question is, now you testified to such and

4  such and isn't it a fact that — that question is improper on

5  the grounds of compound, on the grounds of the questioner

6  testifying and, therefore, you don't need to object to the

7  grounds of mischaracterization because it's doubly improper on

8  other grounds.  So I think we need to leave alone, except in

9  very rare circumstances, the objection of mischaracterization.

10         This is the kind of thing we normally discuss at the

11 sidebar, but I knew you'd love to hear all this.

12 BY MR. AMENT-STONE:

13 Q.  Mr. Latkin, in 2013 through 2015, 2016, would you have been

14 monitoring oil prices?

15 A.  Yes.

16         MR. AMENT-STONE:  Can I show the witness a chart to

17 refresh his recollection?  That would be this same document.

18         THE COURT:  You can show him anything you want as long

19 as you don't identify it.

20 Q.  Does this refresh your recollection as to the change in oil

21 prices over the 2013 to 2016 period?

22 A.  Yes, this is what --

23         THE COURT:  The question is do you now have an

24 independent recollection.  This document could be right, could

25 be wrong, could be someone's laundry list, could be whatever,

MC2Cpla4                          Latkin - Cross

1    and it's not before the jury.

2              So now, having looked at it, the question is, do you

3    have an independent recollection that oil prices were lower,

4    going down during that period.

5    A.  Yes, this was my recollection.

6    Q.  Do you remember that they fell about two-thirds over that

7    period?

8    A.  Yes, I do.

9    Q.  How would you expect a two-thirds decrease in oil prices to

10   affect the viability of an oil business?

11   A.  It depends on where the oil business is because of the

12   lifting costs.  If the question -- is the question the U.S. oil

13   businesses or just oil businesses in general?

14   Q.  Let's focus on the U.S.

15   A.  It would have a negative effect.

16   Q.  Still on the subject of oil, there was some testimony about

17   Northstar and you said you valued the Northstar, the bonding at

18   zero; is that right?

19   A.  No, that is incorrect.

20   Q.  Let me clarify.

21             The Black Elk assets that Northstar acquired, you said

22   you valued them at zero; right?

23   A.  I said that their value was approximately zero because of

24   the cap that's necessary.

25   Q.  But there was cash consideration paid for those assets;

MC2Cpla4                    Latkin – Cross

```
 1   right?
 2   A.  Off the top of my head, I recall it being the freeing of
 3   the bonds, which was significant, but I don't remember the
 4   exact amount of what was paid for the assets.
 5   Q.  You don't remember the amount of the bonding?
 6   A.  I don't off the top of my head, no.  If you can -- there
 7   were documents that had the breakdown of the bonds.  If you
 8   could show me those, I could review, but I don't remember
 9   specific amounts, no.
10   Q.  Do you still have the chart that I handed to you a moment
11   ago?
12   A.  I do.
13   Q.  Can you identify the timeframe when the price began to
14   collapse?
15            MR. GLUCK:  Objection.  Is he asking --
16            THE COURT:  Let me have the chart.
17            Do you have an independent, in-your-head recollection
18   of when the price began to collapse?
19            THE WITNESS:  Very much so, yes.
20            THE COURT:  All right.  When?
21            THE WITNESS:  August of '14.
22            THE COURT:  Okay.
23   Q.  And after August of '14, do you remember if they continued
24   to fall for some time?
25   A.  Yes.
```

MC2Cpla4                    Latkin – Cross

1   Q.  Do you remember when oil prices bottomed out?

2   A.  I think it was about end of 2015, they bottomed out close

3   to $10 or $11 a barrel.

4   Q.  Let's talk a little bit about Black Elk.

5          You gave some testimony about the West Delta 32

6   explosion in 2012; right?

7   A.  I forgot that was West Delta 32, but yes, I did.

8   Q.  And you're aware that Black Elk had publicly traded bonds,

9   didn't it?

10  A.  They had high yield bonds, correct.

11  Q.  What kind of bonds?

12  A.  A high yield, they're called, because they paid a very high

13  interest rate.

14  Q.  And those bonds were registered with the SEC?

15  A.  Yes.  I believe so, yes.

16  Q.  And so Black Elk was required to file quarterly and annual

17  reports with the SEC?

18  A.  They were, yes.

19  Q.  Those reports were publicly available; right?

20  A.  Yes.

21  Q.  I could Google them right now and pull them up?

22          MR. GLUCK:  Objection.

23          THE COURT:  I am sure you could.  The question is can

24  you be permitted to do so and the answer is no.

25          MR. AMENT-STONE:  Your Honor, to be clear, I'm not

MC2Cpla4                          Latkin - Cross

 1   actually asking to do that.  I just meant were they publicly

 2   available.

 3   Q.   Investors or perspective investors could access those SEC

 4   reports for free, couldn't they?

 5   A.   They could, yes.

 6              MR. AMENT-STONE:  Let's pull up DX 3, which I will

 7   offer into evidence.

 8              MR. GLUCK:  No objection.

 9              THE COURT:  Received.

10              (Defendant's Exhibit 3 received in evidence)

11   Q.   This is Black Elk's 10-K for calendar year 2012; right?

12   A.   Yes, it is.

13   Q.   Is a 10-K one of the public annual filings that I was

14   referring to?

15   A.   The 10-K is an annual filing, yes.

16   Q.   And if you go to page 40 of this PDF, which I think is

17   numbered as 35 in the filing, you see that at the top?

18              MR. AMENT-STONE:  Can you highlight risks related to.

19   Q.   There was a heading, risks related to our relationship with

20   Platinum; right?

21   A.   Correct.

22   Q.   And so here, Black Elk disclosed that Platinum beneficially

23   owned 84 percent of their voting interests; right?

24   A.   Yes.

25              THE COURT:  Ladies and gentlemen, although I have a

1    feeling you probably won't spend much time on the cover page of
2    this document, but just for clarity, although this says at the
3    very top United States Securities and Exchange Commission, this
4    is not a document prepared by the SEC, it's a document prepared
5    by the company and then given to the SEC.  A 10-K is an annual
6    report and any company that engages in the sale of securities
7    to the public has to file with the Securities and Exchange
8    Commission every year and also every quarter, but a 10-K is
9    every year, an annual report in which the company states what
10   its financial situation is.
11              So, if you do look at this when you're in the jury
12   room, this is not a document authored by the SEC, it's a
13   document given to the SEC, but authored by Black Elk.
14              Go ahead, counsel.
15              MR. AMENT-STONE:  If we move further down the page,
16   can we pull up the West Delta 32 block platform incident and
17   highlight that part.  Actually, highlight all the way down the
18   rest of the page if you could.  Thank you, sir.
19   BY MR. AMENT-STONE:
20   Q.  This is where, on the 10-K, Black Elk disclosed the fact of
21   the explosion, didn't it?
22   A.  Correct.
23   Q.  And they disclosed the degree of tragic loss?
24   A.  Correct.
25   Q.  And they disclosed regulatory investigation and an audit

MC2Cpla4                          Latkin - Cross

1   and civil litigation; right?

2   A.   Correct.

3            MR. GLUCK:   Objection.   Relevance.

4            THE COURT:   Overruled.

5   Q.   So there was nothing secret about the explosion?

6   A.   I'm unsure I understand you.   There was nothing secret in

7   terms that the explosion occurred or why the explosion

8   occurred.   This just says that the explosion occurred and three

9   workers were killed.   They didn't disclose the details of why

10  it happened, you know, the nature of who was working at the

11  time it happened, whether or not there was culpability or --

12           MR. AMENT-STONE:   Objection.   403.   Relevance.

13  Q.   This wasn't Black Elk's --

14           MR. GLUCK:   There was an objection to the objection.

15  The witness was answering the question.

16           THE COURT:   Marginal, but I'll allow it.

17  Q.   This wasn't Black Elk's only filing to address the

18  explosion, was it?

19           MR. GLUCK:   The witness should finish his answer to

20  the question asked.

21           THE COURT:   No, I think he finished it.   You may

22  answer the question.

23  A.   I would need to see the other filings to see if it was

24  repeatedly disclosed in other Ks and Qs before I would comment.

25  I would need to see the other filings.

1    Q.  No problem.  We're not going to go through all of them,

2    that would be tedious.

3           MR. AMENT-STONE:  But let's bring up DX 8.  And I

4    would offer this into evidence, as well.

5           MR. GLUCK:  No objection.

6           THE COURT:  Received.

7           (Defendant's Exhibit 8 received in evidence)

8    Q.  So this is a form 10-Q, filed in the third quarter of 2013

9    or for the third quarter of 2013.  Is that a quarterly filing

10   that Black Elk made to the SEC?

11   A.  Yes, a 10-Q is a quarterly filing.  Yes.

12          MR. AMENT-STONE:  Can we go to page 5 of the PDF.

13   Q.  Again, you see quite a few paragraphs here about the

14   explosion.

15          MR. AMENT-STONE:  Can we highlight the paragraph

16   beginning as of November 12th, 2013.

17   Q.  You see here, they're talking about several civil lawsuits

18   that were filed relating to the explosion; right?

19   A.  Correct.

20   Q.  And it says all civil cases filed both in Texas and

21   Louisiana as a result of the West Delta 32 incident are being

22   defended by insurance defense counsel; right?

23   A.  Correct.

24   Q.  That means that Black Elk's insurance was covering those

25   claims?

MC2Cpla4                    Latkin - Cross

1           MR. GLUCK:  Objection.  Scope.  Personal knowledge.

2           THE COURT:  Sustained.

3           MR. AMENT-STONE:  I'll rephrase the question.

4    Q.  That means that in this filing, Black Elk was representing

5    to the public that insurance was covering these claims?

6    A.  That's a mischaracterization of what it says.  The

7    insurance was defending the claims, but then there would be a

8    determination of liability depending on the outcome.  Insurance

9    would only -- they defend it to start, but based on what the

10   outcomes were, that's when insurance decides whether or not to

11   pay.

12          MR. AMENT-STONE:  We can take this exhibit down.

13   Q.  You don't know if and how the third party valuators like

14   Sterling took into account the explosion at West Delta 32?

15   A.  I do not, no.

16   Q.  Or the independent auditors that audited Platinum's

17   financial statements?

18   A.  I do not, no.

19   Q.  Now, you became CEO of Black Elk after it had sold the

20   assets in the Renaissance sale; right?

21   A.  Correct.

22   Q.  I think you testified April 2015 is when you started?

23   A.  Correct.

24   Q.  And you didn't have involvement in the Black Elk portfolio

25   when you were working on Golden Gate; right?

MC2Cpla4                          Latkin - Redirect

1   A.  Correct.

2   Q.  Four months after you took over as CEO, Black Elk was

3   forced into bankruptcy by its creditors; right?

4   A.  Correct.

5   Q.  And two months after that, you were fired as CEO?

6   A.  I was removed during the bankruptcy proceeding, yes.

7   Q.  So you were at Black Elk maybe five, six months in total?

8   A.  Six, seven months, yes.

9   Q.  You started in April, you left in October; right?

10  A.  Correct.

11  Q.  So that's, at most, six months?

12  A.  Seven, approximately seven months.

13  Q.  And you didn't discuss Black Elk with David Bodner?

14  A.  I did not, no.

15  Q.  And you didn't discuss Golden Gate with David Bodner?

16  A.  I did not, no.

17          MR. AMENT-STONE:  That's all.  Thank you.

18          THE COURT:  Any redirect.

19  REDIRECT EXAMINATION

20  BY MR. GLUCK:

21  Q.  Has anyone at PPVA, since August of 2016 when the

22  liquidators were appointed, ever brought a claim against you?

23  A.  No.

24  Q.  Had they suggested that there was a claim?

25  A.  No.

MC2Cpla4                            Latkin - Redirect

1    Q.  Was there any disputes between yourself and PPVA?

2    A.  No.

3    Q.  You were asked a question in connection with the cross

4    about the releases that were in the cooperation agreement.  Do

5    you recall that?

6    A.  I do.

7    Q.  Was it ever suggested that you were a joint tort teaser

8    with the PPVA?

9             MR. AMENT-STONE:  Objection.  Legal.

10   Q.  For the liquidators.

11            MR. GLUCK:  I just hadn't finished.

12            MR. AMENT-STONE:  Same objection.

13   A.  No.

14            THE COURT:  There was an objection, but I overrule the

15   objection.

16   A.  No.

17   Q.  The affidavit that was referenced, either submitted or sent

18   to counsel on the Daniel Small matter, do you recall preparing

19   that?

20   A.  I recall.

21   Q.  Do you recall there was a late-night session?

22   A.  I do, yes.

23   Q.  Do you recall that there was an open Zoom window in which

24   parties were typing information?

25   A.  I do, yes.

MC2Cpla4                         Latkin - Redirect

1    Q.  It wasn't prepared for you, was it?

2    A.  No.

3    Q.  Was everything you said today truthful and accurate to the

4    best of your knowledge?

5    A.  Yes.

6    Q.  $200 an hour, is that what you are being compensated?

7    A.  Correct.

8    Q.  How does that compare to the sort of money you make in your

9    outside life?

10              THE COURT:  I'm sorry.  I didn't quite understand the

11   previous -- you were being questioned a few minutes ago about

12   the preparation of the affidavit and the question was put, it

13   wasn't prepared for you, was it, and you said no.  I thought it

14   was --

15              THE WITNESS:  No, we prepared it together.  That

16   was --

17              THE COURT:  But you were the one who said what was in

18   it was truthful; right?

19              THE WITNESS:  Yes.

20              THE COURT:  All right.

21   Q.  In the cooperation agreement, there's a compensation for

22   $200 an hour.  Do you recall that?

23   A.  I do.

24   Q.  How does that compare to the sort of money you make in your

25   general professional activities?

1    A.  It's significantly lower than what I charge per hour.

2    Q.  Why did you want a lawyer to help you in connection with

3    any testimony like this?

4    A.  Well, as I'm involved in some public companies, it's always

5    advised to have counsel just in case there's a question or

6    anything, it's advisable to have counsel representing you, with

7    you to make sure you can seek advice if there is a question you

8    feel uncomfortable with or you don't know the answer to, it's

9    good to have counsel there.

10   Q.  Is your lawyer sitting in the courtroom today?

11   A.  He is, yes.

12   Q.  In your capacity outside this case, do you routinely hire

13   lawyers?

14   A.  Unfortunately, yes.

15   Q.  I can appreciate that.

16            In terms of this counsel's billable rate, how does it

17   compare to other lawyers you hire and your business dealings?

18   A.  He's actually quite a bit less than -- once again, I say

19   unfortunately, he's quite a bit less than the other ones I'm

20   dealing with, even currently.

21   Q.  Where did you fly from --

22            THE COURT:  What a bargain.

23   Q.  Where did you fly from in order to appear for your

24   testimony today?

25   A.  Columbus.

MC2Cpla4                          Latkin - Redirect

1   Q.  How much was that plane ticket?

2   A.  I don't -- actually, I do recall.  It was actually

3   expensive, this one.  Normally, they're really cheap, but this

4   one was $900 round trip.

5   Q.  $900?

6   A.  For a coach, yeah.

7   Q.  The sunset provision conversation that you recall having

8   with Mr. Mark Nordlicht, was he trying to advise you regarding

9   the creation of your new fund?

10  A.  He was, yes.

11  Q.  Was he trying to -- was there a suggestion that you perhaps

12  should include one of these?

13  A.  Yes, there was.

14  Q.  And that was the context of the discussion; correct?

15  A.  Yes, it was.

16          MR. GLUCK:  Mr. Parson, could you please bring up

17  JX 71.

18          I would ask that this be moved into evidence as a

19  joint exhibit.

20          MR. AMENT-STONE:  No objection.

21          THE COURT:  Received.

22          (Joint Trial Exhibit 71received in evidence)

23  Q.  Was there a period when Black Elk was considering buying

24  Golden Gate?

25  A.  Yes, there was.

MC2Cpla4                          Latkin - Redirect

1    Q.  And was one of the reasons that NSAI report was prepared

2    was in connection with that potential transaction?

3    A.  Yes.

4    Q.  Now, it never happened; right?

5    A.  It did not, no.

6    Q.  Do you know why?

7    A.  I mean, I think it was just the valuation just wasn't there

8    and Black Elk didn't want to do it.

9    Q.  Did Black Elk form a view as to what the value of Golden

10   Gate was?

11              MR. AMENT-STONE:  Objection.

12              THE COURT:  Sustained.

13   Q.  Do you have any direct knowledge in your capacity as a

14   portfolio manager of Platinum as to overseeing the Black Elk

15   and Golden Gate assets as to what the management of Black Elk

16   at that time were prepared to pay for Golden Gate?

17              MR. AMENT-STONE:  Same objection.

18              THE COURT:  It's not the same in my view, but it's

19   still a good one.  Sustained.

20              MR. GLUCK:  Can you bring this off the screen.

21   Q.  When you testified concerning the relay of information from

22   yourself to Platinum Management, was it your suggestion or did

23   you intend to suggest that you had directly spoken with

24   Mr. Bodner?

25   A.  No.

1    Q.  Were you specifically told that your views or reports or

2    updates were presented either by Mark Nordlicht or

3    Mr. Landesman to Mr. Bodner and the partners?

4              MR. AMENT-STONE:  Hearsay.

5              THE COURT:  Well, I think it's responsive to an area

6    that was opened up on cross, so you may answer.

7    A.  Yes, I was.

8              THE COURT:  Who told you that?

9              THE WITNESS:  Both Uri and Mark Nordlicht told me.

10   Q.  Do you recall a very specific conversation where you were

11   asked to prepare materials so that they could be presented to

12   the partners at one of these partner dinners?

13   A.  I don't recall the exact date, but yes, we were -- I was

14   asked to prepare materials on this and other -- and actually on

15   other investments, but yes, I was asked to prepare materials to

16   present.

17   Q.  You worked at Platinum for approximately five years?

18   A.  Approximately, yes.

19   Q.  During your time at Platinum, would you speak with

20   ownership consultants or portfolio managers at Platinum?

21   A.  Yes.

22   Q.  Did you form an understanding regarding the roles of the

23   Platinum Partners from those persons?

24             THE COURT:  Sustained.  Counsel, of course you're free

25   to take as long as you like, but we are about seven minutes

MC2Cpla4                          Latkin - Redirect

1    before 1 o'clock.

2    Q.   You worked at Black Elk for approximately six months?

3    A.   About six and a half, but yes.

4    Q.   Were you busy during that period?

5    A.   Inordinately busy.  It was exceedingly busy, yes.

6    Q.   How long were your days?

7    A.   I mean, I lived in the office.  I basically lived in the

8    office.  Where I was living was across the street so I can just

9    spend virtually 24 hours a day in the office.  It was very,

10   very long days.

11   Q.   For your preparation for today's testimony, it was under

12   20 hours of preparation?

13   A.   Correct.

14   Q.   How many hours did you spend working at Black Elk?

15            MR. AMENT-STONE:  Relevance.

16            MR. GLUCK:  Relevance is insinuation that a mere

17   six months would not be enough to gain an expertise or

18   understanding.

19            THE COURT:  I'll allow it.

20   A.   I mean, I was working 20 hours a day.  I mean, there were

21   times when I actually slept in the office.  I mean, there was a

22   dual reason for that, I was working very hard, but it was also

23   a very bad area where the offices were.  So after 10,

24   11 o'clock, you really didn't want to go out.  But there was a

25   lot of work to be done and I really had to get up to speed.  So

1    it was a very long six and a half months.

2    Q.  You were asked whether you spoke directly with Mr. Bodner

3    in the cross.  Do you recall that?

4    A.  I do.

5    Q.  When you would speak with Mr. Huberfeld, was Mr. Bodner

6    present?

7    A.  Yes, he was.

8    Q.  Did you ever witness Mr. Bodner engaged in discussions with

9    other Platinum Partners?

10   A.  I saw them speaking, but I didn't hear what Mr. Bodner

11   says.  I mean, I couldn't even tell you what he sounds like,

12   but I've saw them conversing, yes.

13   Q.  Did you ever witness any closed-door meetings?

14   A.  I saw the door being closed with them in it, but I didn't

15   witness it since the door was closed, but I did see them all

16   enter and close the door.

17   Q.  Did you ever witness any circumstance in which people were

18   required to leave their cellphones outside the door?

19   A.  On one or two occasions, yes.

20   Q.  Why would they have to do that?

21            MR. AMENT-STONE:  Objection.  Speculation.

22            THE COURT:  Sustained.

23   Q.  Did you have any conversations with anyone at Platinum

24   regarding why persons were being required to leave their

25   cellphones outside the door?

1             MR. AMENT-STONE:  Hearsay.

2             THE COURT:  Well, answer the question yes or no and

3    we'll see where it goes.  The question was, did you have any

4    conversations with anyone at Platinum regarding why persons

5    were being required to leave their cellphones outside the door.

6             THE WITNESS:  Yes.

7             THE COURT:  With whom did you discuss that?

8             THE WITNESS:  That particular conversation was with

9    Paul Poteet, who was an IT guy at the -- who ran IT for

10   Platinum Partners.

11            THE COURT:  The objection is sustained.

12            MR. GLUCK:  No further questions.

13            THE COURT:  Anything else?

14            MR. AMENT-STONE:  Yes, your Honor, very briefly.

15            THE COURT:  Well, take all the time you want.  You've

16   got two and a half minutes.

17   RECROSS EXAMINATION

18   BY MR. AMENT-STONE:

19   Q.  Mr. Latkin, you testified about a report that you prepared.

20   What report did you give, what specific report were you asked

21   to prepare?

22   A.  Summary of the positions and what was going on at the

23   companies.

24   Q.  When was this?

25   A.  I mean, I was asked a few times to do that.  I don't recall

1  the exact dates.  Mark asked me and Uri asked me to prepare

2  summaries of what was going on with the various positions that

3  I was involved in.

4  Q.  Was this when you were at Golden Gate?

5  A.  I was managing three positions, so there was -- yes.

6  Q.  Do you know if it was 2011, 2012, 2013?

7  A.  I think that I gave summaries as early as the end of 2012,

8  but it would be 2012, 2013, 2014.

9  Q.  Was that any different than a VC meeting presentation, VC

10  being venture capital -- valuation committee.  Mistaken note.

11         Was that any different than what you would prepare for

12  a valuation committee presentation?

13  A.  It was more depth, I would think.  Just more -- I would say

14  it was more raw, I would say.  In other words, more, you know,

15  more raw, you know, not as official, you know, any spreadsheets

16  or anything like that.  It was just more what's going on, here

17  are my thoughts.

18  Q.  So by more raw, do you mean more narrative, fewer numbers?

19  A.  More narrative, yes, fewer numbers.

20  Q.  Now, regarding the mutual releases in your cooperation

21  agreement, I think you testified that plaintiffs didn't say you

22  had done anything wrong; right?

23  A.  Correct.

24  Q.  And you didn't say they had done anything wrong?

25  A.  That's incorrect.

MC2Cpla4                         Latkin - Redirect

1   Q.   Really?  What had they done wrong?

2   A.   Well, I've already moved on in my life, but I mean I was

3   owed a lot of money by the estate because I did not receive --

4   I wouldn't say -- I did not receive commensurate compensation

5   for the five years I spent there, but I've moved on and it is

6   what it is, but I was more releasing them than they were

7   releasing me for full disclosure.

8            MR. AMENT-STONE:  Nothing further.

9            THE COURT:  Anything else?

10           MR. GLUCK:  Just on that last point.

11           THE COURT:  All right.  Very quickly, you've got about

12   30 seconds.

13   REDIRECT EXAMINATION

14   BY MR. GLUCK:

15   Q.   The plaintiffs in this case are PPVA in liquidation and the

16   liquidators.  You weren't suggesting the liquidators or the

17   bankrupt company owed you money, it was the former management;

18   correct?

19   A.   Yes.

20           MR. GLUCK:  Thank you.

21           THE COURT:  Thank you very much.  You may step down.

22           (Witness excused)

23           Ladies and gentlemen, we're off to a good start.  We

24   will reconvene on Monday at 9:30.  Have a very good weekend.

25   Don't even think about this case.  We will proceed accordingly

MC2Cpla4                          Latkin – Redirect

1    on Monday.  So you're excused at this time.

2              (Continued on next page)

1          (Jury not present)

2          THE COURT:  If anyone has anything regarding this case

3   that they need to raise, you can raise it through a joint

4   telephone call with my law clerk who will be here the rest of

5   today.  After I finish my speech, I will being coming back

6   here, so I'll be here sometime around 5:30 and 6:00 so I can

7   get you a response to any matters you want to raise.  Of

8   course, if you choose not to raise matters, I will forgive you

9   for doing that.  We'll see you all on Monday.  Thanks a lot.

10          MR. LAUER:  Your Honor, may I hand the clerk -- I'm

11   sorry.  Just wanted to hand the clerk the additional cover

12   letter on the release to our firm --

13          THE COURT:  I looked at the release and it does seem

14   to me much more likely than not that Mr. Nordlicht's signature

15   is an electronic signature, that doesn't end the issue, but it

16   does appear to be that's the case.

17          (Adjourned to December 5, 2022 at 9:30 a.m.)

18                            * * *

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JED LATKIN

Direct By Mr. Gluck . . . . . . . . . . . . . 302

Cross By Mr. Ament-Stone . . . . . . . . . . 365

Redirect By Mr. Gluck . . . . . . . . . . . 400

Recross By Mr. Ament-Stone . . . . . . . . . 409

Redirect By Mr. Gluck . . . . . . . . . . . 411

                    PLAINTIFF EXHIBITS

Exhibit No.                                  Received

 240  . . . . . . . . . . . . . . . . . . . 314

 239  . . . . . . . . . . . . . . . . . . . 315

 255  . . . . . . . . . . . . . . . . . . . 326

 547  . . . . . . . . . . . . . . . . . . . 327

 112  . . . . . . . . . . . . . . . . . . . 345

                    DEFENDANT EXHIBITS

Exhibit No.                                  Received

 717  . . . . . . . . . . . . . . . . . . . 366

 96   . . . . . . . . . . . . . . . . . . . 379

 3    . . . . . . . . . . . . . . . . . . . 395

 8    . . . . . . . . . . . . . . . . . . . 398

                      JOINT EXHIBITS

Exhibit No.                                  Received

 71                                          404