MC5Cpla1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION            18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER              18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                 Plaintiffs,

            v.

PLATINUM MANAGEMENT (NY) LLC,
et al.,

                 Defendants.

------------------------------------x     Trial


                                          New York, N.Y.

                                          December 5, 2022
                                          10:00 a.m.

Before:

                 HON. JED S. RAKOFF,

                                          District Judge
                                            and a Jury

MC5Cpla1

1                                    APPEARANCES

2   HOLLAND & KNIGHT, LLP
            Attorneys for Plaintiffs
3   BY:  WARREN E. GLUCK
         MARTIN L. SEIDEL
4        RICHARD A. BIXTER JR.
         QIAN (SHEILA) SHEN
5        NOAH W.S. PARSON
         ELLIOT A. MAGRUDER

6

7   KATTEN MUCHIN ROSENMAN, LLP
            Attorneys for Defendant Bodner
8   BY:  ELIOT LAUER
         GABRIEL HERTZBERG
9        JULIA B. MOSSE

10

11  CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
            Attorneys for Defendant Bodner
    BY:  NATHANIEL C. AMENT-STONE
12       ALLESANDRA TYLER

13

14

15  Also Present:

16  Michael Robson, Paradocs Motion Support

17  Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25

 1              (In open court; jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.  I

 3     hope you had a great weekend.  I took my grandson to the Giants

 4     game, so the reason I'm wearing black is because they win.

 5              MR. SEIDEL:  It was a tie, your Honor.

 6              THE COURT:  Yes, indeed.

 7              So, Mr. Fuchs, you were sworn in previously.  Let me

 8     remind you that you're still under oath.

 9              THE WITNESS:  Okay.

10              THE COURT:  Very good.  Go ahead.

11      BERNARD FUCHS, resumed.

12     DIRECT EXAMINATION CONTINUED

13     BY MR. GLUCK:

14     Q.  Good morning, Mr. Fuchs.  Are you feeling better today?

15     A.  Thank God, better.  Thank you.

16              MR. GLUCK:  Mr. Parson, we had Plaintiffs' Exhibit 585

17     up on the screen when we took a break.  Would you mind

18     recalling that.

19     Q.  To provide the jury a reminder, Mr. Fuchs, were you one of

20     the larger investors in PPVA?

21     A.  Yes.

22     Q.  And were you granted a partnership interest in the middle

23     of 2014?

24     A.  Yes.

25     Q.  When we broke, we were speaking about the China Horizon

MC5Cpla1                              B. Fuchs - Direct

1   investment.  Do you recall that?

2   A.  Yes.

3   Q.  In 2015, did there come a time when China Horizon began

4   having problems?

5   A.  Yes.

6   Q.  Could you please tell the jury about that.

7   A.  The problems they were having was that the Chinese

8   government, who had a deal with China Horizon that were going

9   to support them, all of a sudden they decided that they don't

10  need China Horizon to do the work, they can do it themselves.

11  Q.  Based on your experience in China, were you a person at

12  Platinum who was overseeing this investment?

13  A.  Yes, I was helping Platinum run this investment, correct.

14  Q.  Did you have discussions with Mr. Bodner regarding this

15  investment?

16  A.  I had discussions with Mr. Bodner, Mr. Huberfeld,

17  Mr. Nordlicht all about this investment, yes.

18  Q.  Let me rephrase.  Did you have any discussions with

19  Mr. Bodner and Mr. Huberfeld regarding this problem that you

20  just described, the Chinese government?

21  A.  Yes.

22          MR. GLUCK:  Mr. Parson, will you please call up

23  PX 470.

24          We move to admit it into evidence.

25          MR. HERTZBERG:  No objection.

MC5Cpla1                         B. Fuchs - Direct

1          THE COURT:  Received.

2          (Plaintiffs' Exhibit 470 received in evidence)

3    Q.  Mr. Fuchs, do you recall discussing in your testimony

4    Thursday the concept that when China Horizon had a problem

5    previously, you had gone to Mr. Bodner regarding a bridge loan?

6    A.  Allen Clingman went to Mr. Bodner, correct.

7    Q.  And you had been looped into that conversation?

8    A.  I was in that office when they had the conversation,

9    correct.

10   Q.  Is this an example of an email where you received a

11   correspondence from Mr. Allen Clingman?

12   A.  Yes.

13   Q.  Why did you then forward this correspondence to Ms. Angela

14   Albanese?

15   A.  For the purpose of forwarding this to Mr. Bodner.

16   Q.  The subject, bridge, would you mind explaining that, what

17   does it mean?

18   A.  It was a bridge loan until the monies came in to cover

19   the -- whatever they needed the monies, this was like a bridge

20   to cover the interim period until the monies that was supposed

21   to come from UBS.

22   Q.  Can you tell the jury, with as much specificity as you can,

23   exactly what you learned the problems were with China Horizon

24   and the Chinese government about a year later from this email?

25   A.  Please ask again.

MC5Cpla1                          B. Fuchs - Direct

1    Q.  Would you mind telling the jury exactly what you understood

2    the problems of China Horizon to be with the government about a

3    year later.

4    A.  Yes.  Originally, the Chinese government was supporting

5    this concept of China Horizon, opening up these stores in the

6    rural areas to supply the local Chinese that were not living in

7    the main cities, to be able to buy products that are real

8    products, not copies or imitations, for example, or like

9    Coca-Cola or something that China was famous for making copies

10   of the real thing.  So the Chinese government was originally

11   very much supporting China Horizon to open up these stores with

12   their support.  When they saw that it was going well and that

13   they were opening so many more stores, the Chinese government

14   felt that they don't need China Horizon to be running it, they

15   can run it themselves and cut out China Horizon.

16   Q.  Did you have an understanding of what the impact would be

17   on China Horizon's business from this?

18   A.  Of course.

19   Q.  What was that?

20   A.  It was that this was going to be a big setback for the

21   investment that China Horizon was bringing to Platinum.

22   Q.  And did you keep Mr. Bodner and Mr. Huberfeld and

23   Mr. Nordlicht apprized of these developments in real time?

24   A.  Yes.

25   Q.  How did you do so?

MC5Cpla1                          B. Fuchs - Direct

1    A.  We spoke about it in the office, that there is a problem

2    with this investment now.

3    Q.  I would like to switch now into your presence in the office

4    after you were made a partner in 2014.

5             How often would you go into the office?

6    A.  A couple of times a week.

7    Q.  Would you speak with people in the office at that time?

8    A.  Usually I would.

9    Q.  Did there come a time when you personally became aware that

10   PPVA was having liquidity problems?

11   A.  Yes.

12   Q.  Could you please describe those.

13   A.  When people make redemption requests and they were promised

14   that they were going to receive the monies at a certain date

15   and these dates were not met, so I would go and ask

16   Mr. Nordlicht what is going on, why aren't they getting the

17   monies when they were promised.  And they were said -- and I

18   was told that they had some issues, that they were selling some

19   of -- their portfolios were being sold and until they get sold,

20   they'll roll the tight money.  Once they get sold, they'll have

21   the monies available to give their redemptions.

22   Q.  Did you have a personal understanding as to whether PPVA

23   had the actual capability to meet these redemptions at that

24   time?

25   A.  I felt that they did.

MC5Cpla1                          B. Fuchs - Direct

1            MR. GLUCK:  Mr. Parson, would you please call up

2      Plaintiffs' Exhibit 408.

3            I would ask that this be admitted into evidence.

4            MR. HERTZBERG:  No objection.

5            THE COURT:  Received.

6            (Plaintiffs' Exhibit 408 received in evidence)

7      Q.  Mr. Fuchs, who is Alain Kuppermann?

8      A.  Alain Kuppermann was the secretary for Mr. Rechnitz, Shlomo

9      Rechnitz.

10     Q.  And what are you suggesting by this email that you wrote to

11     him that's highlighted and zoomed?

12     A.  I'm suggesting that if this gentleman, Kenny Lehman,

13     invests $10 million as a loan, that he will have personal

14     guarantees from those people mentioned.

15     Q.  Why would it be necessary to issue or offer a personal

16     guarantee in connection with an investment of this fund?

17     A.  Because this person would not get this loan unless he had

18     the guarantees, besides from the fund, he wanted personal

19     guarantees from the people that were mentioned here.

20     Q.  Did he have concerns about the ability to repay the loan by

21     PPVA?

22     A.  I'm not certain if that was his reason, but that's what he

23     requested.

24     Q.  Mr. Fuchs, are you familiar with a gentleman named Marcos

25     Katz?

MC5Cpla1                          B. Fuchs - Direct

1   A.  Yes.

2   Q.  Who is he?

3   A.  He was a large investor in the fund.

4   Q.  Larger than you?

5   A.  Yes.

6   Q.  And do you know anything about him or his background?

7   A.  He was a very wealthy man.  He has passed away since then.

8   Q.  Had you met him before?

9   A.  Several times I met him.

10  Q.  Have you met his grandson, Michael Katz?

11  A.  Yes, I have.

12  Q.  In what context did you meet Michael Katz?

13  A.  I met him a few times, first at Mr. Katz's home.  He had a

14  home in the city, an apartment.  And also then he had an office

15  at Platinum.

16  Q.  Were you present at any meetings where yourself,

17  Mr. Bodner, or Mr. Huberfeld and either Marcos Katz or Michael

18  Katz were present?

19  A.  Yes.

20  Q.  Can you please describe those meetings.

21  A.  It was a meeting in Mr. Katz's home in Mexico.  We all flew

22  down together to Mexico to meet with Mr. Katz.

23  Q.  What was discussed at that meeting?

24  A.  It was discussed that the fund is healthy, that he should

25  not be concerned about his investment, and that he should be

MC5Cpla1                          B. Fuchs - Direct

1    patient and that everything will be okay.

2    Q.  Do you remember when that meeting occurred?

3    A.  I think it was sometime in 2015 or maybe early 2016.  I

4    don't remember exactly.

5    Q.  Was Mr. Bodner present for that meeting?

6    A.  Yes.

7    Q.  He flew down?

8    A.  Yes.

9    Q.  With you?

10   A.  Yes.

11   Q.  Were you present for any meetings with Mr. Katz at which

12   the subject of Agera was discussed?

13   A.  No.

14   Q.  Had you had any personal meetings with Mr. Bodner regarding

15   the subject of Agera?

16   A.  Yes.

17   Q.  Could you please describe for the jury what Agera was?

18   A.  Agera was a company that when you have your electric bills,

19   every person has electric bills every month, so Agera was a

20   company that you paid them and they would get discounts for you

21   because they would buy bulk electricity and they were able to

22   give customers discounts on their electric bills.  By the way,

23   that was my understanding of Agera.

24              (Continued on next page)

25

Mc52Pla2                        Fuchs - Direct

1   Q.   Did you understand that PPVA had an investment in Agera?

2   A.   Yes.

3   Q.   Did you have any discussions with Mr. Bodner regarding

4   PPVA's investment?

5   A.   Not really discussions, but he wanted somebody to come up

6   and visit at the place up in Westchester County, the Agera

7   facility, where they were headquartered, to show me the

8   facility and to make me feel comfortable knowing that this is

9   going to be a tremendous investment for PPVA.

10  Q.   To break that down, when you said "their facilities," did

11  you mean Agera's facilities?

12  A.   Yes, Agera's facility.

13  Q.   Mr. Bodner invited you to Agera's facilities?

14  A.   Correct.

15  Q.   And Mr. Bodner expressed a view that Agera was a positive

16  investment?

17  A.   Yes.

18  Q.   Did Mr. Bodner have an office at Agera?

19  A.   I'm not sure.

20  Q.   In addition to the problems you were personally aware of

21  with respect to China Horizon, did there come a time when you

22  observed personally, based on your personal interactions, that

23  PPVA or Platinum Management began to have problems in late

24  2015?

25  A.   The only thing that I realized was that there was a

1    liquidity issue that they weren't able to make redemptions on

2    time.

3    Q.  They weren't able to.

4    A.  Correct.

5            MR. GLUCK:  Mr. Parson, would you please call up

6    PX 587.  Is there a second page?  Okay.  Go back to the first

7    page please.

8            We move 587 into evidence.

9            MR. HERTZBERG:  No objection, subject to connection.

10           THE COURT:  Received subject to connection.

11           (Plaintiff's Exhibit 587 received in evidence)

12   BY MR. GLUCK:

13   Q.  Mr. Fuchs, can you please review this e-mail?

14   A.  I am looking at it right now, yes.

15   Q.  Do you recall sending the e-mail to Mark Nordlicht and

16   Murray Huberfeld at the top of the page?

17   A.  Yes.

18   Q.  Does this e-mail refresh your recollection as to whether

19   there were any issues or problems at Platinum around the end of

20   2015?

21   A.  Yes.

22   Q.  Did there come a time when you learned that Mark Nordlicht

23   intended to go to Mr. Bodner and Mr. Huberfeld for help?

24   A.  Yes.

25   Q.  How did you learn that?

1    A.  I saw the e-mail before that, that he mentioned that he is

2    trying to reach Mr. Bodner and Mr. Huberfeld.

3    Q.  What did you understand the problem or request to be?

4    A.  To lend the fund short-term loans so they that they

5    continue staying up -- as an active fund.

6    Q.  Who is -- had you ever come across a gentleman named Seth

7    Gerszberg?

8    A.  I think I met him once or twice at the office.

9    Q.  He was at Platinum's offices?

10   A.  I met him there.

11   Q.  Do you have an understanding of what Mr. Seth Gerszberg's

12   role was in conveying any information or requests to Mr. Bodner

13   and Mr. Huberfeld?

14   A.  Not really.

15   Q.  Okay.  We look to your statement.  You say "this way we

16   stay alive."  I'm asking you about this one first.  What did

17   you mean when you say "this way we stay alive"?

18   A.  Because Mark had mentioned in the e-mail below that he

19   needs these funds, short-term funds, in order to keep the fund

20   working, otherwise the fund would have to shut down.

21   Q.  What did you mean by raising money for a new fund?

22   A.  Because he had taken -- he had opened up -- I think the

23   fund at that time had like $700 million in assets, and he put a

24   large amount of the money into—what's it called, I forgot what

25   it's called—inactive, where people can't take money out of

Mc52Pla2                          Fuchs - Direct

```
1    that fund and the rest of the money was in a fund which was

2    liquid.

3    Q.  Turning to the next to last clause which has "all good

4    positions, no skeletons," Mr. Parson -- my question, Mr. Fuchs,

5    is did you have an understanding that PPVA had either bad

6    positions or skeletons?

7    A.  Sorry?

8    Q.  Mr. Fuchs, did you have an understanding that PPVA had

9    either bad positions or skeletons?

10   A.  When you say "bad positions," you mean positions that were

11   not liquid at the time, which if people wanted to have

12   liquidated their position, to sell it, they couldn't sell it,

13   correct?

14   Q.  I'm asking you.  What did you mean by "good positions" and

15   what did you mean by --

16   A.  That's what I think it was.  It was positions that, if

17   people wanted to get their money out, they couldn't sell these

18   positions so quickly.  They were illiquid.

19            MR. GLUCK:  Mr. Parson, would you please call up

20   Plaintiffs' Exhibit 588, and I ask that this be moved into

21   evidence.

22            MR. HERTZBERG:  No objection.

23            THE COURT:  Received.

24            (Plaintiff's Exhibit 588 received in evidence)

25   BY MR. GLUCK:
```

Mc52Pla2                           Fuchs - Direct

```
1    Q.  Mr. Fuchs --
2              THE COURT:  Actually, for the record, the connection
3    on the previous exhibit was satisfied.
4    Q.  Mr. Fuchs, do you see the e-mail address Seth@thecollective
5    copied on this e-mail?
6    A.  Yes.
7    Q.  Do you have a recollection of whether that is Seth
8    Gerszberg?
9    A.  I don't.
10   Q.  Okay.  Do you have a personal understanding of what it
11   means when Mr. Nordlicht says, "Please read this to Dovid.  It
12   is 6 a.m. here in Israel.  I have not gone to sleep because we
13   are twelve hours away from both Platinum and Beechwood going
14   down."
15   A.  What's the question?
16   Q.  Do you know what that meant?
17   A.  Yes.
18   Q.  Could you please tell the jury your understanding of this
19   e-mail that you received.
20   A.  That if he doesn't get financing quickly, both firms are
21   going down.
22   Q.  What sort of issues could cause both firms—Beechwood and
23   Platinum—to go down in 12 hours?
24             MR. HERTZBERG:  Objection.
25   A.  I'm not sure.
```

1         MR. GLUCK:  Mr. Parson, would you please call up

2    Plaintiffs' Exhibit 424.

3         And we would move also 424 into evidence.

4         MR. HERTZBERG:  No objection, subject to connection.

5    Q.  My apologies in the last e-mail.

6         THE COURT:  Whoa, whoa.  Excuse me.

7         MR. GLUCK:  Sorry.

8         THE COURT:  So it's received.  I don't think there is

9    any further connection that needs to be shown.  On its face it

10   shows connection.  So it is received.

11        (Plaintiff's Exhibit 424 received in evidence)

12        MR. GLUCK:  I will attempt to form the connection.

13   BY MR. GLUCK:

14   Q.  Mr. Fuchs, in the last e-mail it said -- there is a

15   statement that said please read this to Dovid.  Do you have an

16   understanding about who Dovid was in this e-mail?

17   A.  Yes.

18   Q.  Who is that?

19   A.  David Bodner.

20   Q.  In this e-mail, if you look to your statement, excuse me,

21   Mr. Nordlicht's statement.  Do you see the statement of

22   Mr. Nordlicht that said, "If anyone destroyed your *simcha*, it's

23   the other two partners"?

24   A.  Yes.

25   Q.  Do you have an understanding about what Mr. Nordlicht was

Mc52Pla2                         Fuchs - Direct

1    talking about there?

2    A.  Yes

3    Q.  What was that understanding?

4    A.  D&B and Murray Huberfeld.

5    Q.  And how did they destroy your *simcha*?

6    A.  Because they were not willing to put any money into the

7    fund to save it.

8    Q.  Did you feel frustration regarding that?

9    A.  Yes.

10   Q.  Do you have a personal view as to who was to blame for the

11   collapse of PPVA?

12           MR. HERTZBERG:  Objection.

13           THE COURT:  Sustained.

14   BY MR. GLUCK:

15   Q.  Mr. Parson, will you . . .

16           Mr. Fuchs, did there come a time when you were asked

17   to sign a release of Mr. Bodner and Mr. Huberfeld?

18   A.  Yes.

19   Q.  What do you recall about that?

20   A.  I recall that I needed some money for a charity that I

21   promised them for the holidays, monies I gave every year.

22   Unfortunately, since partners were not able to take any money

23   out of the fund, all the money that I had earned all my life

24   was in the fund, I literally had no cash available at all, so I

25   asked them to help me, Mr. Huberfeld and Mr. Bodner, that I

1    should be able to make this commitment to the school for my

2    *alma mater* for the holidays.  So they offered to give me this

3    money, and they wanted me to sign some kind of a release.

4    Q.  Is there some dispute between yourself and Messrs. Bodner

5    and Huberfeld about whether this was a loan or a gift?

6    A.  I don't think there is a dispute.

7    Q.  Okay. do you know where that money came from, the 250,000?

8    A.  I think it came from Mr. Huberfeld and Mr. Bodner.

9    Q.  Do you know why Mr. Huberfeld and Mr. Bodner wanted you to

10   sign this release?

11   A.  I had no idea.

12   Q.  They didn't tell you anything?

13   A.  No.  I needed the money and they gave me to sign it, I

14   signed it.  I was in a desperate situation at that time.

15   Q.  Did you understand at the time that the document you were

16   signing was purporting to give a release of the fund PPVA to

17   Mr. Bodner?

18   A.  I did not.

19   Q.  Did anyone explain that to you?

20   A.  Not really.

21   Q.  Did you have any understanding of whether Platinum

22   Management or PPVA had any claims against Mr. Bodner or

23   Mr. Huberfeld at that time?

24   A.  I did not.

25   Q.  This $250,000, did you in fact make the charitable payment

1   to the school that you mentioned?

2   A.  Yes.

3   Q.  Did any portion of that money go to PPVA?

4   A.  Sorry?

5   Q.  Did any portion of that 250,000 go to PPVA?

6   A.  No.

7   Q.  To the very best of your knowledge, did PPVA benefit in any

8   way proximate to that payment of $250,000?

9   A.  No.

10  Q.  Mr. Fuchs, do you know the name Martin Trott?

11  A.  Yes.

12  Q.  Who is it?

13  A.  Liquidator.

14  Q.  Liquidator of PPVA?

15  A.  Of PPVA.

16  Q.  Is he sitting right there?

17  A.  I never met him.

18  Q.  Fair enough.

19          Did Mr. Trott and PPVA bring a lawsuit against you?

20  A.  Yes.

21  Q.  Do you know why?

22  A.  Because I was part of Platinum Management for a short time.

23  Q.  Did you resolve that?

24  A.  Yes.

25  Q.  Did you pay an amount of money that you were capable of

Mc52Pla2                        Fuchs - Direct

1   paying to PPVA in order to resolve that?

2   A.  Yes.

3           MR. HERTZBERG:  Objection.

4           THE COURT:  Well, as worded, sustained.  But if you

5   want to ask him did he pay an amount of money to resolve that

6   lawsuit, I will allow that question.

7   Q.  Did you pay an amount of money to resolve that litigation?

8   A.  Yes.

9   Q.  Within the -- before you resolved the litigation, had you

10  provided what's called a deposition in this matter?

11  A.  Yes.

12  Q.  You recall providing depositions?

13  A.  Yes.

14  Q.  Did you describe the heated dinner at which Mr. Bodner

15  stated that the marks were overvalued and partners could not

16  withdraw funds in those --

17          MR. HERTZBERG:  Leading.

18          MR. GLUCK:  I will withdraw.  Let me see if I can

19  rephrase that.

20  Q.  Do you recall testifying here about a heated dinner in this

21  court?

22  A.  Yes.

23  Q.  And at that dinner, was there a directive issued by

24  Mr. Bodner?

25          MR. HERTZBERG:  Leading, prior consistent.

Mc52Pla2                          Fuchs - Direct

1              THE COURT:  Overruled.  You may answer.

2    A.  Yes.

3    Q.  Did you describe that same dinner in your deposition

4    testimony in this case prior to your entering this settlement?

5    A.  Yes.

6    Q.  In -- after a complaint was brought against you, did you

7    yourself bring a lawsuit against Mr. Bodner and Mr. Huberfeld?

8    A.  No.

9    Q.  Did you bring a claim against Mr. Bodner and Mr. Huberfeld?

10   Do you recall that?

11   A.  No.

12   Q.  Okay.  Had you testified regarding Mr. Bodner's role at

13   PPVA within your deposition?

14   A.  Yes.

15   Q.  Did you testify about the circumstances of your signing the

16   release and the $250,000 at your deposition?

17              MR. HERTZBERG:  Objection.

18              THE COURT:  Well, I think it's all right, but I can't

19   really tell without a sidebar.  I'm sorry.  We need a sidebar.

20              (Continued on next page)

21

22

23

24

25

Mc52Pla2                              Fuchs - Direct

1                   (At the sidebar)

2                   THE COURT:  Is this a prior inconsistent statement?

3                   MR. GLUCK:  There is an affidavit that Mr. Fuchs

4      signed in connection with his settlement agreement, and I'm

5      suggesting that while that affidavit was signed, that all of

6      the content of that affidavit had been previously testified to

7      well before the settlement.

8                   THE COURT:  I don't see how that comes up on direct.

9      I'm sorry.

10                  MR. GLUCK:  Perhaps on cross.

11                  THE COURT:  If cross, and then redirect.

12                  Sustained.

13                  (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. GLUCK:  This will be the last question.

3      Mr. Parson, would you bring up Mr. Fuchs's cross-claim for the

4      purposes of refreshing Mr. Fuchs' recollection on the screen,

5      and I will ask that it be admitted into evidence.

6           MR. HERTZBERG:  Objection.  I think Mr. Gluck brings

7      up for the witness and not the jury, right?

8           MR. GLUCK:  Yes.

9           It will new Plaintiff's Exhibit No. --

10          MS. SHEN:  We will mark it for identification as 928.

11          MR. GLUCK:  928.

12          THE COURT:  It's not up yet for anyone.

13          I will ask, as I have previously, does someone have a

14     paper copy?

15          MR. GLUCK:  There may be a paper copy.  I'm sure there

16     is a paper copy.

17          THE COURT:  Well, just to move things along, if it's

18     what I think it is, the witness did not indicate the need for

19     any refreshment.  His answers were absolute.  So it wouldn't

20     properly be shown to him to refresh his recollection.  So this

21     is -- I'm guessing what it is.  Under those circumstances, it

22     can't be shown to him anyway, so the -- although now we will

23     see what it is.

24          It is what I thought it was.  He didn't indicate any

25     memory failure.

Mc52Pla2                          Fuchs - Cross

1              MR. GLUCK:  He did not remember --

2              THE COURT:  He said he -- his testimony to your

3      questions was unequivocally "no."  He just said the word "no."

4      He didn't say "I don't remember."

5              That's the end of the direct examination.

6      Cross-examination.

7      CROSS-EXAMINATION

8      BY MR. HERTZBERG:

9      Q.  Good morning, Mr. Fuchs.

10     A.  Good morning.

11     Q.  Mr. Fuchs, you and I have met before, correct?

12     A.  Yes.

13     Q.  I am Dave Hertzberg, I represent David Bodner.  You know

14     that.

15     A.  Yes.

16     Q.  Last time we saw each other, other than in the hallway

17     here, was at your deposition in this case.  Do you recall that?

18     A.  Yes.

19     Q.  And that was in December of 2019, right?

20     A.  Yes.

21     Q.  You sat for two depositions.  Do you recall that?

22     A.  No.  Oh, yeah, I do.  I remember now, yes.

23     Q.  And the first one was a couple of months before the second

24     one?

25     A.  Yes.

Mc52Pla2                          Fuchs - Cross

1   Q.  The first one was in October 2019.  Right?

2   A.  Yes.

3   Q.  You had a lawyer there representing you both times.

4   A.  Yes.

5   Q.  And you worked with your lawyer to prepare both times,

6   right?

7   A.  Yes.

8   Q.  Your lawyer showed you documents to prepare you each time?

9   A.  Yes.

10  Q.  And back then you were a defendant in this case.

11  A.  Yes.

12  Q.  Plaintiffs sued you for a lot of money.

13  A.  Yes.

14  Q.  Their allegations were serious.

15  A.  Yes.

16  Q.  You recall what the plaintiffs alleged about you.

17  A.  Slightly, I remember a little bit.

18  Q.  Have you read the complaint?

19  A.  At that time?

20  Q.  Yeah.

21  A.  Yes, I must have read it, of course.

22  Q.  And you filed an answer that went through the complaint and

23  admitted and denied each of the paragraphs of the complaint one

24  by one?

25  A.  Yes.

Mc52Pla2                          Fuchs - Cross

1   Q.  And you reviewed that answer before it was filed --

2   A.  Yes.

3   Q.  -- correct?

4           Do you recall that plaintiffs alleged in their

5   complaint that even though you didn't have an official title at

6   Platinum Management, you had day-to-day involvement in the

7   management and operations of Platinum Management and PPVA?  Do

8   you recall that?

9   A.  No.

10          MR. HERTZBERG:  Mr. Robson, can we show just the

11  witness the second amended complaint, paragraph 105.

12          MR. GLUCK:  Objection.

13          THE COURT:  No, that's I think -- there might have

14  been an objection which wasn't made—and it's much too late

15  now—to the previous questions, but now that those questions

16  were put without objection and the foundation has been laid for

17  showing this to the witness.  It can be shown to the witness,

18  and to the witness only.

19  BY MR. HERTZBERG:

20  Q.  Do you recognize the first page as the second amended

21  complaint filed by the plaintiffs?

22  A.  I don't see anything on the first page, just complaint

23  against Platinum Management, Nordlicht.

24  Q.  Right.  Mr. Fuchs, I'm asking you whether this looks to you

25  like the document that you said you had read previously, just

Mc52Pla2                              Fuchs – Cross

1    looking at the cover page.

2    A.  Yes, it looks like it, yes.

3    Q.  And if Mr. Robson could take us to paragraph 105?

4              THE COURT:  I'm sorry, wait a minute.  Go back to the

5    previous page.

6              Counsel, come to the sidebar.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla2                          Fuchs - Cross

1            (At the sidebar)

2            THE COURT:  Maybe I misunderstood.  I thought that

3      counsel was saying that this was the complaint previously

4      brought against him.

5            MR. HERTZBERG:  Against Mr. Bodner.

6            THE COURT:  No.

7            MR. HERTZBERG:  Yes.  This is the complaint that was

8      brought against Mr. Fuchs.

9            THE COURT:  Well, it doesn't say so on the page we

10     just looked at.

11           MR. HERTZBERG:  I'm going to go to the next page.

12           THE COURT:  Then let me see the next page.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla2                        Fuchs - Cross

1                (In open court)

2                THE COURT:  Let me see the next page, page 2, if you

3        can count that far.

4                MR. HERTZBERG:  It would be the next slide, paragraph

5        105.

6                THE COURT:  No, that's not what I want.  I want page 2

7        of this exhibit.  And if you don't have page 2 of this

8        document, then the Court objects and we will take a break.

9                Ladies and gentlemen, I am very disconcerted by the

10       poor management of both sides.  I don't know what they did with

11       their weekend.  Maybe they were upset with the Giants.

12               But we are going to take a 15-minute break and get

13       this figured out.  You may step down.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla2                        Fuchs - Cross

1            (Jury and witness not present)

2            THE COURT:  There is a background here which I am

3     going to get to in one minute; but, first, on the immediate

4     pending matter, what was just shown to the witness as the first

5     page of a complaint against him was a page that showed only

6     other people being named as the defendants.  That's why I

7     stopped the music.  But apparently it is not possible for

8     someone to find the second page of that complaint.  But let's

9     now get to something more material.

10           On Friday I had mentioned that the parties' deposition

11    submissions in this case that I had received were hopelessly

12    inadequate, confusing, and wrong.

13           At the close of business Friday, my law clerk was

14    handed a new set, which supposedly corrected the problems, and

15    the result was I came in to chambers on Saturday intending to

16    rule on the objections.  And what I got was something that, in

17    all but one respect, cured none of the problems I had mentioned

18    previously, not to mention innumerable further problems.

19           So let's just review it one more time.

20           MR. HERTZBERG:  Your Honor?

21           THE COURT:  No.  I spent a long time Saturday trying

22    to work this out without success because it was so rotten, and

23    I will put on the record why I consider it to be

24    unprofessional, inadequate, and a great waste of the Court's

25    time.

1          So the first problem I have pointed out was that the

2     Michael Katz deposition, the portions that the parties intended

3     to be read to the jury started out with page 18/line 2.

4     "Q  And you said you were not employed at Platinum."  No

5     background about Mr. Katz or what even led up to that question.

6          Then on page 19, it was still included, although I

7     asked to have it excised, line 19, Mr. Gluck:  "Object to the

8     form.  You can answer the question.  You can answer the

9     question."

10         Then on -- I attempted nevertheless to rule on the

11    objections.  They were at least now placed in the right column.

12         But then after we get to page 28 and what plaintiff

13    had marked as what they wanted shown or read to the jury or

14    shown to the jury—that's videoed—begins with the word, I will

15    give you a direct quote, "Was his relationship to Platinum, if

16    you know," even though, as I pointed out to them, they had to

17    include the prior sentence, which is.

18    "Q  And what about David Bodner, what," and then it follows.

19         But since it was Saturday and my time is your time, I

20    went a little bit further.

21         So on page 33, plaintiffs ask the following be shown

22    to the jury, line 10:

23    "Q  Looking at paragraph 3, 'Each of the defendants made false

24    representations to the Katzes to induce them to invest and

25    maintain and increase their investment in PPA,' does this

Mc52Pla2                        Fuchs - Cross

1    include David Bodner?"  There were objections.  How can I

2    possibly read all of those objections?  How can the jury

3    possibly understand it if they hadn't been told what document

4    this is in reference to?  It's paragraph 3 out of the thin,

5    blue air.

6           So in the hopes that my time will not be totally

7    wasted, I turned to the shorter depositions, beginning with the

8    deposition of Maggie McGovern-Muller, and I got as far as the

9    first few pages that were submitted and, the first thing that

10   plaintiffs asked, after a few background questions on

11   Ms. Muller, this was on page 59, beginning at line 24:

12   "Q  Okay.  Now at some point you moved, and is it fair to say

13   those offices were consolidated into one?"

14          There has been no previous testimony offered——I'm sure

15   there was in the deposition, but not in what was handed to

16   me——as to the fact that there were two offices, which is the

17   predicate for that question.  The question was objected to.

18   How could I answer it without knowing the predicate?

19          So then I turned to the final deposition that was

20   offered, which was the deposition of Randall Katzenstein, and

21   the very first, literally the first thing offered here, which

22   was offered by the defendant, so this would be the first thing

23   the jury would hear, and there was no objection to this, is

24   page 30/line 10:

25   "Q  And those senior management people who were both at

1    Platinum and Beechwood included Mark Nordlicht?

2    "A  Correct."

3            Once again, that question on its face assumes that the

4    jury has already heard prior deposition inclusions that explain

5    what led up to that question.  It makes no sense.  It is

6    totally confusing to a jury to start it right there.

7            So at that point I had two questions in my own mind.

8    One was whether to just strike all the deposition submissions

9    from both sides on the ground that, despite every effort by

10   this Court, the parties couldn't get their act together.  I

11   resolved that question as being too harsh.

12           Then the next question was, well, how long would it

13   take the parties to put together a proper submission for the

14   Court to rule on?  And that's the question I am putting to you

15   now because no deposition is going to be read in this case

16   until I have had a right and an opportunity to rule, and what

17   has been presented to me -- I could give you, if you are really

18   dying to hear it, I could give you about 50 more similar

19   examples.

20           So let me hear first from plaintiffs' counsel.  When

21   can you get me a proper --

22           MR. GLUCK:  Your Honor, what -- I will give this to

23   Sheila.  She has direct knowledge.  But I think there may have

24   been a miscommunication with the Court's clerk.  There was a

25   revised --

Mc52Pla2                         Fuchs - Cross

1           THE COURT:  I just want a date.

2           MS. SHEN:  Your Honor, we could have them prepared

3    today.  I understand that there were revised at least PDFs

4    delivered to the Court on Sunday and that there were hard

5    copies either brought to Court today or were also to be

6    delivered.

7           THE COURT:  I'm sorry.  There were PDFs, quote,

8    delivered to the Court on Sunday now.  They could not have been

9    physically delivered or if they were, of course the Court is

10   closed on Sunday.  And in a moment of weakness I didn't come in

11   Sunday.  I went to the Giants game.  And now you are saying

12   there are hard copies.  How were those copies sent on Sunday?

13          MS. SHEN:  Sorry, your Honor.  To clarify, I said I

14   believed there were hard copies delivered to the Court on

15   Sunday or they might have been brought today.

16          Just a little background, the parties did discuss the

17   Court's analysis of the deposition designations on Friday.  We

18   had agreed that we would jointly address those concerns over

19   the weekend, and I thought we had relayed to the Court that we

20   were going to prepare revised submissions over the weekend.

21          THE COURT:  No one conveyed that to me.

22          MS. SHEN:  I apologize for that, your Honor, but the

23   parties did prepare revised submissions that I think

24   substantially address the Court's concerns.  Those --

25          THE COURT:  Do you have them now?

Mc52Pla2                          Fuchs – Cross

1             MS. SHEN:  Yes.  Defense counsel have them.

2             THE COURT:  Let me see.

3             All right.  So let me hand back, through my law clerk,

4    to the parties all that was given to me on Friday afternoon.

5             So I will take a look at these new ones, which at

6    least on very quick review seem to be considerably improved,

7    and I will get you my rulings in due course.

8             All right.  Let's get the jury back.  Let's get the

9    witness back.

10            Does someone actually have a copy of the complaint in

11   its entirety that shows, as alleged, that the witness was named

12   in it?

13            MR. HERTZBERG:  Yes, Judge.  Ms. Tyler will pass that

14   up.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Mc52Pla2                          Fuchs - Cross

1              (Jury and witness present)

2              THE COURT:  Ladies and gentlemen, I think we are in

3    much better shape now.

4              So go ahead, counsel.

5              MR. HERTZBERG:  Thank you.

6    BY MR. HERTZBERG:

7    Q.  Before the break, Mr. Robson had page 1 of the second

8    amended complaint up for the witness only, and we were going to

9    turn to page 2 of the second amended complaint.

10             Do you see your name at the top of that page,

11   Mr. Fuchs?

12   A.  Yes.

13   Q.  Does that refresh your recollection that this is the second

14   amended complaint that was filed by the plaintiffs against you

15   and others?

16   A.  Yes.

17   Q.  Mr. Robson, if you could go to paragraph 105.

18             Does that refresh your recollection that the

19   plaintiffs alleged that, even though you did not have an

20   official title at Platinum Management, you had day-to-day

21   involvement in the management and operations of Platinum

22   Management and PPVA?

23   A.  Yes.

24   Q.  And do you recall that plaintiffs included you in a group

25   defined in the complaint as "the Platinum defendants"?

Mc52Pla2                           Fuchs - Cross

```
 1   A.  Yes.

 2   Q.  And did they allege that you and the other so-called

 3   Platinum defendants engaged in a systematic misrepresentation

 4   and overvaluation of PPVA's NAV?  Do you recall that?

 5   A.  Yes.

 6   Q.  Those allegations about you were false, weren't they?

 7   A.  Yes.

 8   Q.  You denied them.

 9   A.  Yes.

10   Q.  They said you were a manager, but you weren't.

11   A.  Correct.

12   Q.  You fought for years to defeat those claims.

13   A.  Yes.

14   Q.  You filed motions asking this Court to dismiss you.

15           THE COURT:  Sustained.

16   Q.  Until just a few weeks ago, you were still a defendant in

17   this case.

18           THE COURT:  Sustained.

19           MR. GLUCK:  Objection.

20   BY MR. HERTZBERG:

21   Q.  Mr. Fuchs, you reached a settlement agreement with the

22   plaintiffs, correct?

23   A.  Yes.

24   Q.  And the date of that agreement is November 16, 2022?

25   A.  Yes.
```

Mc52Pla2                         Fuchs - Cross

1    Q.  And you paid money to settle their claims.

2    A.  Yes.

3    Q.  And they gave you a release as a part of that transaction.

4    A.  Yes.

5           MR. HERTZBERG:  Marking for identification, please,

6    DX 716.

7           MR. GLUCK:  No objection.

8    Q.  Mr. Fuchs, do you recognize this as the settlement

9    agreement you entered into with the plaintiffs?

10   A.  Yes.

11          MR. HERTZBERG:  Offer it.

12          MR. GLUCK:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 716 received in evidence)

15   BY MR. HERTZBERG:

16   Q.  Mr. Fuchs, you -- excuse me.  Mr. Robson, could you please

17   turn to page 2, paragraph 3.

18          Is that the release by the plaintiffs of you?

19   A.  Yes.

20   Q.  You demanded that release as a condition of this

21   transaction.

22   A.  Yes.

23   Q.  You understand what that release means, sir?

24   A.  Yes.

25   Q.  It means that plaintiffs can't sue you again for anything

Mc52Pla2                          Fuchs - Cross

1    that predates the release, right?

2    A.  Yes.

3    Q.  Mr. Robson, if you can turn to paragraph 4.

4              You gave a release to the plaintiffs, isn't that

5    right?

6              THE COURT:  Do you understand the question?

7              THE WITNESS:  No.

8              THE COURT:  So in addition to their releasing you from

9    any claims that they might have against you, did you release

10   them from any claims you might have against them?

11             THE WITNESS:  Yes.

12   BY MR. HERTZBERG:

13   Q.  And that means that you can't sue them for anything that

14   predates the release.

15   A.  Yes.

16   Q.  And you didn't believe you had a claim against them, did

17   you?

18   A.  No.

19   Q.  But they asked for the release of you because you were

20   getting one from them.  Isn't that right?

21   A.  Yes.

22   Q.  Another aspect of this settlement agreement required you to

23   cooperate with the plaintiffs.

24   A.  Yes.

25   Q.  Mr. Robson, could you please pull up paragraph 7.

Mc52Pla2                          Fuchs - Cross

1              Paragraph 7 states, "Cooperation.  Fuchs shall consult

2     and assist the PPVA parties in connection with their

3     prosecution of claims against David Bodner in the Trott

4     action."  Did I read that correctly?

5     A.  Yes.

6     Q.  Was this the Trott action?

7     A.  Yes.

8     Q.  You cooperated with them in this action?

9     A.  Yes.

10    Q.  As a condition of avoiding this trial?

11    A.  Yes.

12    Q.  Does this paragraph require that you make yourself

13    available for preparation for 20 hours with them?

14    A.  Yes.

15    Q.  Did you do that?

16    A.  No.

17    Q.  How many hours did you spend preparing with them?

18    A.  A few.

19    Q.  A few hours?

20    A.  Yes.

21    Q.  You rehearsed your testimony?

22    A.  Yes.

23    Q.  And that was just in the last few weeks?

24    A.  Yes.

25              THE COURT:  Ladies and gentlemen, I should point out

Mc52Pla2                           Fuchs - Cross

1   to you that it is perfectly lawful and indeed conventional for

2   lawyers who call a witness to be with the witness in advance

3   and go over his or her proposed testimony, and my expectation

4   is that will be true of every single witness in this case.

5   BY MR. HERTZBERG:

6   Q.  Mr. Robson, thank you.  You can take this down.

7           Mr. Fuchs, on your direct with Mr. Gluck covered a lot

8   of years, so I'm going to try to establish a timeline for us.

9           In late 2005/early 2006, you said you met with

10  Mr. Huberfeld and Mr. Bodner about investing in a fund,

11  correct?

12  A.  Yes.

13  Q.  And at that time Mr. Huberfeld was the chief investment

14  officer of a fund called Centurion, correct?

15  A.  Yes.

16  Q.  And Centurion was headquartered on the 54th floor of the

17  Carnegie Tower on 57th Street.

18  A.  Yes.

19  Q.  And that's where you met with Mr. Huberfeld?

20  A.  Yes.

21  Q.  And Mr. Bodner shared an office with Mr. Huberfeld at that

22  time, right?

23  A.  Yes.

24  Q.  And when you came in for that meeting, you had known

25  Mr. Huberfeld for many years.

Mc52Pla2                          Fuchs - Cross

1   A.  Yes.

2   Q.  You did not know Mr. Bodner.

3   A.  I only had met him once before.

4   Q.  And Mr. Huberfeld pitched to you on investing in Centurion.

5   A.  Yes.

6   Q.  Centurion was a lending fund, right?

7   A.  Yes.

8   Q.  Basically extended loans to nontraditional borrowers?

9   A.  Yes.

10  Q.  That was the business of Centurion?

11  A.  Yes.

12  Q.  Mr. Nordlicht was not in your first meeting.

13  A.  Yes.

14  Q.  Is it correct that Mr. Nordlicht was not in your first

15  meeting?

16  A.  Yes.

17  Q.  Mr. Huberfeld and Mr. Bodner told you about Mr. Nordlicht

18  at that meeting?

19  A.  Yes.

20  Q.  And they said that Mr. Nordlicht ran the Platinum Partners

21  Value Arbitrage fund, right?

22  A.  Yes.

23  Q.  And that was a different fund than Centurion.

24  A.  Yes.

25  Q.  They had different investment mandates?

Mc52Pla2                          Fuchs - Cross

```
 1    A.  Yes.

 2    Q.  Nordlicht's fund was more stocks, commodities, options,

 3    complex hedges, that sort of thing?

 4    A.  Yes.

 5    Q.  Mr. Nordlicht was something of a quantitative genius.

 6              MR. GLUCK:  Objection.

 7              THE COURT:  Sustained.

 8    Q.  Mr. Nordlicht's strength was more quantitative products

 9    than Mr. Huberfeld's.

10              MR. GLUCK:  Objection.

11              MR. HERTZBERG:  Withdrawn.

12    Q.  Did Mr. Nordlicht have a different skill set than

13    Mr. Huberfeld?

14    A.  I have no idea.

15    Q.  Mr. Huberfeld's fund, Centurion, was a lending fund, right?

16    A.  Yes.

17    Q.  And they suggested that you go meet Mark and hear about

18    PPVA.

19    A.  Yes.

20    Q.  And after meeting Mark and after meeting Murray and hearing

21    about Centurion, you agreed to invest 1 million in Centurion

22    and 1 million in PPVA?

23    A.  Yes.

24    Q.  In 2008-2009, you were semiretired, right?

25    A.  Yes.
```

Mc52Pla2                         Fuchs - Cross

1    Q.  You and your brother had gotten out of the electronics
2    business.
3    A.  Yes.
4    Q.  You were looking for something to do.
5    A.  Yes.
6    Q.  You started coming in to the Centurion office a couple of
7    times a work.
8    A.  Yes.
9    Q.  And that office was the 54th floor of that building on 57th
10   Street.
11   A.  Yes.
12   Q.  And PPVA had a different office on -- in the same building
13   but on a different floor, right?
14            MR. GLUCK:  Objection.
15   A.  Yes.
16            THE COURT:  Overruled.  The answer was "yes."
17   Q.  And you were given use of an office at Centurion in that
18   2008-2009 time period.
19   A.  Yes.
20   Q.  You shared an office with Harvey Werblowsky?
21   A.  Yes.
22   Q.  And Harvey was an in-house lawyer at Centurion.
23   A.  Yes.
24   Q.  And when you were here last Thursday and you told Mr. Gluck
25   that before you became a partner you were given an office at

Mc52Pla2                          Fuchs – Cross

1    Platinum Management, that was incorrect.  Your office was at

2    Centurion.

3    A.  Yes.

4    Q.  In 2009-2010, do you recall that Mr. Huberfeld started

5    something that he called a credit committee or an investment

6    committee for Centurion?

7    A.  I don't recall.

8    Q.  Let me see if I can refresh your memory.

9              Mr. Robson, for the witness only, please, DX 728.

10             Mr. Fuchs, the document that's on your screen, is that

11   a document that you recognize?

12             MR. GLUCK:  Objection.  Relevance.

13   A.  No.

14             THE COURT:  Whoa, whoa, whoa.

15             MR. HERTZBERG:  I will get there in three questions,

16   Judge.

17             THE COURT:  I think the witness said it didn't refresh

18   his recollection.

19             (Continued on next page)

20

21

22

23

24

25

MC5Cpla3                          Fuchs - Cross

1    BY MR. HERTZBERG:

2    Q.  Mr. Fuchs, do you recall that you were invited to attend

3    meetings at Centurion that Mr. Huberfeld organized, which he

4    called a credit committee or an investment committee?

5    A.  Yes, I was invited, yes.

6    Q.  Do you remember that there were a number of individuals who

7    were on that committee, including Naftali Manela?

8    A.  Yes.

9    Q.  He was the CFO of Centurion?

10   A.  Yes.

11   Q.  At that time, you were just a limited partner in Centurion;

12   correct?

13   A.  I was an investor in Centurion, yes.

14   Q.  You know the investors of the hedge fund are limited

15   partners in the fund?

16   A.  Yes.

17   Q.  And I understand that we've been talking about partners in

18   management, partners in the fund.  So that's something I want

19   to make clear.

20         In 2008, 2009, you were a partner in Centurion, but

21   not a partner in the management company?

22   A.  Yes.

23   Q.  That's true of PPVA, as well, right, you were a limited

24   partner in the fund, but you were not a partner in the

25   management company?

MC5Cpla3                          Fuchs - Cross

1    A.  Yes.

2    Q.  So as a limited partner in the fund and someone who is not

3    a partner in the management company, you were invited to attend

4    those credit committee meetings organized by Mr. Huberfeld?

5    A.  Yes.

6    Q.  Did Brian Jedwab attend those meetings?

7    A.  Yes.

8    Q.  Brian was a portfolio manager at Centurion?

9    A.  Yes.

10   Q.  And he was a managing director at Centurion?

11   A.  I'm not sure.

12   Q.  Did Irv Gross attend those meetings?

13   A.  I don't recall that name.

14   Q.  You don't recall the name?  Okay.

15          Do you recall that at those meetings, there were

16   people from both inside and outside the fund that Mr. Huberfeld

17   brought together for these credit committee meetings?

18   A.  I don't recall outsiders.

19   Q.  Well, you were an outsider; right?

20   A.  Yes.

21   Q.  And Mr. Bodner attended those meetings; right?

22   A.  Yes.

23   Q.  And Mr. Huberfeld would take opinions from the people

24   around the table as to whether Centurion should make a loan,

25   not make a loan, that sort of thing?

MC5Cpla3                              Fuchs – Cross

1    A.  Yes.

2    Q.  And you would evaluate the creditworthiness of the

3    borrower?

4    A.  Yes.

5    Q.  Maybe talk about the quality of the collateral?

6    A.  Yes.

7    Q.  The Centurion loans were often or always asset-backed;

8    right?

9    A.  Yes.

10   Q.  And that was sort of Mr. Huberfeld's specialty?

11   A.  Yes.

12            MR. GLUCK:  Objection.

13   Q.  Do you believe you went to about six of those credit

14   committee meetings?

15   A.  Approximately.

16   Q.  And when Mr. Gluck asked you last week about investment

17   process meetings where you said, quote, they would go around

18   the table and get everyone's opinion, you were referring to

19   those Centurion credit meetings, weren't you?

20   A.  Yes.

21            MR. GLUCK:  Objection.

22   Q.  When were you sitting at those meetings and hearing

23   opinions, and perhaps even giving your own opinion; right?

24   A.  I did not give my opinion.  I was just an onlooker.

25   Q.  When you were sitting at those meetings and hearing

MC5Cpla3                         Fuchs - Cross

1   opinions from people around the table, did you consider

2   yourself a fiduciary to the Centurion investors?

3   A.  No.

4   Q.  Last week, you referred to, in addition to what Mr. Gluck

5   called process meetings, you referred to separate meetings

6   where you would go and sit with Murray and David in their

7   office.  Do you recall that?

8   A.  Yes.

9   Q.  And those meetings were general discussions?

10  A.  Yes.

11  Q.  You didn't discuss the underlying positions or the

12  companies?

13  A.  No.

14  Q.  You've talked in general about how the fund is performing,

15  good month, bad month, that sort of thing?

16  A.  Yes.

17  Q.  In January 2011, Mr. Huberfeld stepped down from his

18  position at Centurion; correct?

19  A.  Yes.

20  Q.  And Mark Nordlicht took over Centurion?

21  A.  Yes.

22  Q.  He renamed it, Platinum Partners Credit Opportunities Fund?

23  A.  Yes.

24  Q.  But it was the same fund as Centurion?

25  A.  Yes.

MC5Cpla3                        Fuchs – Cross

1    Q.  Same investors?

2    A.  Yes.

3    Q.  Same assets?

4    A.  Yes.

5    Q.  Same terms?

6    A.  Yes.

7    Q.  Meaning same redemption terms, that sort of thing?

8    A.  Yes.

9    Q.  It was a re-brand; right?

10   A.  Yes.

11   Q.  And Mr. Nordlicht became chief investment officer of what

12   was formerly Centurion?

13   A.  Yes.

14   Q.  And Mr. Huberfeld took a back seat?

15   A.  Yes.

16   Q.  At that point, Mr. Huberfeld wasn't managing Centurion/PPCO

17   anymore?

18   A.  Yes.

19   Q.  Correct?

20   A.  Yes.

21   Q.  And then in late 2014, the two funds or the two fund

22   management companies were consolidated into a single office on

23   55th Street; right?

24   A.  Yes.

25   Q.  And you were given an office there?

MC5Cpla3                        Fuchs - Cross

1    A.  Yes.

2    Q.  And Mr. Bodner was given an office there?

3    A.  Yes.

4    Q.  And Mr. Huberfeld did not have an office there?

5    A.  Yes.

6    Q.  And the fact that you had an office at that new space on

7    55th Street, that didn't put you in control of Platinum

8    Management; correct?

9    A.  Correct.

10   Q.  And it didn't put you in control of Mark Nordlicht?

11   A.  Correct.

12   Q.  It didn't give you the power to direct Mark Nordlicht?

13   A.  Yes.

14   Q.  PPVA was his fund; right?

15   A.  Yes.

16   Q.  The fund that he ran?

17   A.  Yes.

18   Q.  That he was in control of?

19   A.  Yes.

20   Q.  We established that you were a limited partner in PPVA

21   going back all the way to 2005 or 2006; right?

22   A.  Yes.

23   Q.  And many members of your family also are limited partners

24   of PPVA?

25   A.  Yes.

MC5Cpla3                        Fuchs - Cross

1  Q.  And many of your friends and community members and contacts

2  are limited partners of PPVA?

3  A.  Yes.

4  Q.  Have you seen PPVA's offering memorandum?

5  A.  I don't recall.

6          MR. HERTZBERG:  Mr. Robson, could you pull up DX 729

7  for identification.

8          THE COURT:  By the way, counsel, because we started

9  late and had that interruption, the jury hasn't yet had their

10  midmorning break.  I think we should probably give them that

11  break in the next 5 to 10 minutes.

12          MR. HERTZBERG:  Very good, Judge.  Thank you.

13          We would offer DX 729.

14          MR. GLUCK:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 729 received in evidence)

17  BY MR. HERTZBERG:

18  Q.  Mr. Fuchs, is this what every limited partner in PPVA

19  receives when they make the decision to subscribe to the fund?

20  A.  Yes.

21          MR. HERTZBERG:  If you turn to page 8 of the PDF,

22  Mr. Robson.  This is page 8 of the document, Mr. Robson, I'm

23  looking for page 8 of the PDF.  If you could highlight the

24  investment manager in that paragraph in the lower-right corner.

25  Q.  It says here, Mr. Fuchs, the investment manager of the

MC5Cpla3                          Fuchs - Cross

1   partnership, Platinum International and the master fund, is

2   Platinum Management NY LLC.  That's what we've been calling

3   Platinum Management; right?

4   A.  Yes.

5   Q.  And that's defined as the investment manager; right?

6   A.  Yes.

7   Q.  And it says --

8            MR. HERTZBERG:  Mr. Robson could highlight this.

9   Q.  -- the controlling principal of the investment manager is

10  Mark Nordlicht; is that right?

11  A.  Yes.

12  Q.  So every investor that subscribes to PPVA receives an

13  offering memo that tells them that the controlling principal of

14  the investment manager is Mark Nordlicht; is that right?

15  A.  Yes.

16           MR. HERTZBERG:  If you could go to page 28,

17  Mr. Robson, again of the PDF.

18           Mr. Robson, if you could pull out the first paragraph,

19  investment manager, and highlight the second sentence where

20  I'll read.

21  Q.  The investment manager has full discretionary authority and

22  responsibility to invest and reinvest the assets of the

23  partnership and the master fund.

24           Do you see that, Mr. Fuchs?

25  A.  Yes.

MC5Cpla3                          Fuchs - Cross

1    Q.  Did I read that correctly?

2    A.  Yes.

3    Q.  And that's saying that Mr. Nordlicht has full discretionary

4    authority over PPVA?

5              MR. GLUCK:  Objection.

6    A.  Yes.

7              MR. HERTZBERG:  Mr. Robson, if you could go to the

8    next page, 29, of the PDF.

9    Q.  Here, the prospective investor is introduced to the team,

10   right, do you see that on the top?

11   A.  Yes.

12   Q.  And the team is Mark Nordlicht, chairman and chief

13   investment officer and Uri Landesman, president.  Do you see

14   that?

15   A.  Yes.

16   Q.  And then below that, the team also consists of the

17   portfolio managers.  Do you see that?

18   A.  Yes.

19             MR. HERTZBERG:  Mr. Robson, if you go to page 33.  The

20   top full paragraph, if you could pull that out, starting with

21   certain, the first sentence.  If you highlight as I read.

22   Q.  Certain private investments made by the master fund will

23   share many of the same risk characteristics as venture capital

24   investing, offering the opportunity for significant gains, but

25   also involving a high degree of risk, including complete loss

MC5Cpla3                        Fuchs - Cross

1    of capital.

2              Did I read that correctly?

3    A.   Yes.

4    Q.   And then the last sentence of that paragraph, starting

5    with -- the second to last sentence of that paragraph, starting

6    with portfolio companies.  It says portfolio companies may be

7    thinly traded and undercapitalized and therefore may be more

8    sensitive to adverse business for financial developments.  In

9    the event that a portfolio company is unable to generate

10   sufficient cash flow or raise additional equity capital to meet

11   its projected cash needs, the value of the master fund's

12   investment in such portfolio company could be significantly

13   reduced or lost entirely.

14             MR. GLUCK:  Objection.

15   Q.   Did I read that correctly?

16             MR. GLUCK:  Relevance.

17             THE COURT:  No, I'll allow it.  Overruled.

18             MR. HERTZBERG:  Your Honor, I want to be mindful of

19   the jury, so if this is a good place for us to break or I can

20   go another couple of minutes.

21             THE COURT:  That's fine.  We'll take 15 minutes.

22             (Continued on next page)

23

24

25

MC5Cpla3                         Fuchs - Cross

1                (Jury not present)

2                THE COURT:  Please be seated.

3                So, I've now had a chance to review the latest

4     submission on the deposition of Michael Katz.  It is definitely

5     much improved.  There are still things one might quibble about,

6     for example, on page 9, lines 3 and 4, defendants offer the

7     answer, but don't offer the question.  So it's just a free

8     floating answer, but that's what you asked for, that's what

9     you'll get.

10               I was a little taken aback by some of the things that

11    plaintiffs offered that were quite properly objected to by

12    defense counsel.  For example, at page 265, line 10, this was

13    offered by the plaintiff.

14    "Q. Well, it says here that Katz has considered Bodner a

15    leader, so...

16    "A. Okay.  So yes, they would agree with that statement, my

17    grandmother would agree with that statement.

18    "Q. Have you heard your grandmother say that?

19    "A. That Bodner was leader.

20    "Q. Of the Platinum Management organization?

21    "A. In so many words, yes.

22    "Q. What were the words that she used?

23    "A. I mean, who is calling the shots in the firm."

24               THE COURT:  The defendant objected to that colloquy on

25    hearsay grounds, personal knowledge grounds, various other

MC5Cpla3                              Fuchs – Cross

1    grounds, and I admire defendants restraint in not saying

2    something like, you got to be kidding.  But I was a little

3    taken aback that plaintiffs' counsel would offer this.

4            Anyway, I ruled on the Katz deposition.  My ruling are

5    recorded and I will ask my law clerk to hand this initially to

6    plaintiffs' counsel, you can make a copy for defense counsel so

7    both sides know my rulings on Mr. Katz.

8            Okay.  We'll see you all in 10.

9            (Recess)

10           THE COURT:  Defense counsel passed me a note saying

11   they want 60 more minutes for completion of cross, and that's

12   fine, but not 61.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated.

3           MR. HERTZBERG:  Mr. Robson, if you could please turn

4    to page 43 of the PDF of DX 729 we were just looking at.  And

5    you can put that up for the jury.  Thank you.

6    BY MR. HERTZBERG:

7    Q.  Mr. Fuchs, calling your attention to the paragraph that

8    begins no participation in management.  Do you see that?

9    A.  Yes.

10   Q.  And the first sentence there states to prospective

11   investors that limited partners have no right or power to take

12   part in the management or control of the business of the

13   partnership, the intermediate fund, or the master fund.

14          Did I read that correctly?

15   A.  Yes.

16   Q.  And the master fund is PPVA; right?

17   A.  Yes.

18   Q.  And then not the next sentence, but the one that begins

19   with limited partners.  It says limited partners must rely

20   solely on the judgment of the investment manager in selecting

21   investments and trades and should not invest in the partnership

22   unless they are willing to entrust all aspects of the portfolio

23   management to the investment manager.

24          Did I read that correctly?

25   A.  Yes.

MC5Cpla3                         Fuchs - Cross

1    Q.  And the investment manager is Mark Nordlicht; right?

2    A.  Yes.

3    Q.  And the next paragraph --

4         MR. HERTZBERG:  You can zoom out of that, Mr. Robson.

5    Q.  -- starting with dependence upon investment manager.  The

6    first line there says investment and trading decisions made by

7    the investment manager ultimately are based on the judgment of

8    Mark Nordlicht.

9         Did I read that correctly?

10   A.  Yes.

11        MR. HERTZBERG:  If we can go to page 48.

12   Q.  Do you see there is a heading there, conflicts of interest

13   at the top of that page?

14   A.  Yes.

15   Q.  Prospective investors are being told that these are

16   potential conflicts of interest that may arise in their

17   investment in the fund?

18        MR. GLUCK:  Objection.  Relevance.

19        MR. HERTZBERG:  Relevance is in the bottom paragraph.

20        THE COURT:  Well, we'll see.  In any event, for now,

21   I'll allow it.  The question was:  "Prospective investors are

22   being told that these are potential conflicts of interest that

23   may arise in their investment in the fund?"

24        Now, the objection was relevance.  The objection could

25   have been on the grounds that the document speaks for itself

MC5Cpla3                        Fuchs - Cross

1    and I would have had no choice but to sustain that objection,

2    but that wasn't the objection made.  So the objection is

3    overruled.

4            MR. HERTZBERG:  Mr. Robson, if you could highlight the

5    bottom paragraph, other business relationships of the

6    investment manager.

7    Q.  The second sentence reads, the investment manager and its

8    affiliates are not restricted from entering into other business

9    advisory relationships or engaging in other business

10   activities, even though such activities may be in competition

11   with the master fund.

12           Did I read that correctly?

13   A.  Yes.

14           MR. HERTZBERG:  If you go to page 51, please,

15   Mr. Robson.

16   Q.  The paragraph that begins asset valuation, it says in the

17   first line, the investment manager — that's Mr. Nordlicht;

18   right?

19   A.  Yes.

20   Q.  — Has substantial discretion in determining the value of

21   certain of the master fund's assets.

22           Did I read that correctly?

23   A.  Yes.

24   Q.  And a few lines down on the right-hand side, there's a

25   sentence that starts with "in addition."

1            In addition, a significant portion of the master

2       fund's assets may be invested in restricted securities.  To the

3       extent that the master fund makes such investments, the value

4       of those investments will be determined in the investment

5       manager's sole discretion.  The investment manager will face a

6       conflict of interest in making any of these valuation

7       decisions.

8            Did I read that correctly?

9       A.  Yes.

10      Q.  So any investor who decides to invest in PPVA is told that

11      limited partners have no participation in management; correct?

12      A.  Yes.

13      Q.  They are told investment decisions are based solely on the

14      decision of Mark Nordlicht; correct?

15      A.  Yes.

16      Q.  They are told that Mark Nordlicht has sole discretion to

17      determine value; correct?

18      A.  Yes.

19      Q.  And that the investment manager, Platinum Management and

20      its affiliates, can engage in other business activities, even

21      when those are in conflict with PPVA?

22      A.  Yes.

23      Q.  That's what it says?

24      A.  Yes.

25            MR. HERTZBERG:  You can take that down, Mr. Robson.

MC5Cpla3                              Fuchs – Cross

1    Thank you.

2    Q.   Do you know what a subscription agreement is?

3    A.   No.

4    Q.   Can we pull up for identification DX 727.

5            We offer it.

6            MR. GLUCK:  No objection.

7            THE COURT:  Since there's no objection, interestingly

8    enough, it will be received.

9            (Defendant's Exhibit 727 received in evidence)

10   Q.   Mr. Fuchs, do you recognize this document?

11   A.   Yes.

12   Q.   Is this the subscription agreement for the Bernard Fuchs

13   2007 grandchildren trust No. 2?

14   A.   Yes.

15   Q.   If you turn to page 22 of the PDF, do you see that this is

16   dated January 1, 2012?

17           MR. HERTZBERG:  That's in the top-left corner,

18   Mr. Robson.

19   A.   Yes.

20   Q.   And the subscriber is that trust that I identified a few

21   seconds ago; right?

22   A.   Yes.

23   Q.   And the trustees of that trust are your son and his wife?

24   A.   No, my son and my daughter.

25   Q.   And a couple of lines down where there's a telephone number

MC5Cpla3                        Fuchs - Cross

1   and an email address, that's your cellphone number, isn't it?

2   A.  My old cellphone number, correct.

3   Q.  And that's your old email address?

4   A.  Yes.

5   Q.  So do you recognize this document now?

6   A.  Yes.

7   Q.  Can you explain to the jury what it is?

8   A.  When you put more money into the fund, you have to sign --

9   you have to fill out a subscription document that you are

10  putting additional monies or -- initial money or additional

11  monies into the fund.

12  Q.  And it's a contract; right?

13  A.  Correct.

14  Q.  And if you turn to page 4 of the PDF, anyone who subscribes

15  to the fund acknowledges — and this is in paragraph 3 — as part

16  of this contract that they have, quote, received, read, and

17  understood the provisions of the fund's confidential private

18  offering memorandum.

19          Do you see that?

20          MR. GLUCK:  Objection.  Document speaks for itself.

21          THE COURT:  Sustained.

22  Q.  Did you acknowledge in this agreement that the subscriber

23  received, read, and understood the provisions of the fund's

24  confidential private offering memorandum?

25  A.  Yes.

1   Q.  And that was the offering memo that we just looked at, the

2   document prior to this one?

3   A.  Yes.

4   Q.  Do you have knowledge of whether every investor in PPVA

5   signs a document like this one?

6   A.  Yes.

7             MR. GLUCK:  Objection.

8             THE COURT:  Sustained.

9   Q.  You talked last week with Mr. Gluck about an explosion at

10  the Black Elk drilling site in the Gulf in November of 2012.

11  Do you recall that?

12  A.  Yes.

13  Q.  And you said it was on the cover of the New York Times?

14  A.  Yes.

15  Q.  And in early 2013, you personally invested in what you

16  called I think a one-off fund that was making an additional

17  investment into Black Elk?

18  A.  Yes.

19  Q.  And you called that the BEOF fund?

20  A.  Yes.

21            MR. HERTZBERG:  Mr. Robson, can we pull up DX 726.

22            We offer it.

23            MR. GLUCK:  No objection.

24            THE COURT:  Received.

25            (Defendant's Exhibit 726 received in evidence)

MC5Cpla3                           Fuchs - Cross

1   Q.  Mr. Fuchs, is this the offering memorandum for the Platinum

2   Partners Black Elk Opportunities Fund?

3   A.  Yes.

4   Q.  And on the lower right, do you see that it's for your

5   exclusive use?

6   A.  Yes.

7   Q.  That means this is the offering memo that was provided to

8   you; right?

9   A.  Yes.

10  Q.  And the cover page, first couple of words of the cover page

11  make very clear that this is a Platinum Partners sponsored

12  fund; right?

13  A.  Yes.

14  Q.  It was no secret to anyone receiving this offering memo

15  that the BEOF fund was being sponsored by Platinum Partners;

16  correct?

17  A.  Correct.

18  Q.  And if you go to page 15 of the PDF, does it identify at

19  the top of page 15 who the managing member of this fund is?

20            MR. GLUCK:  Objection.  Document speaks for itself.

21            THE COURT:  Well, yes, I think that objection is

22  legit, but just to move things along, I'll allow him to

23  identify that.  You may answer the question.

24  A.  Yes.

25            THE COURT:  The question was -- oh, you answered it

MC5Cpla3                          Fuchs - Cross

1   correctly.  Does it identify at the top of page 15 who the

2   managing partner is, and you answered "yes."  Go ahead.

3   Q.  Is the managing member of the BEOF fund PPBE Holdings, LLC?

4   A.  Yes.

5   Q.  Is the principal of the managing member identified in that

6   paragraph as David Levy?

7   A.  Yes.

8   Q.  Under management company, if we zoom out and go down, the

9   paragraph that begins the management company is deemed.  It

10  says, the management company is deemed to be a registered

11  investment advisor with the SEC — and I'll elide some text — on

12  the registration statement, form ADV of Platinum Management

13  NY LLC, one of its affiliates.

14         Did I read that correctly?

15  A.  Yes.

16  Q.  So, again, it's no secret to anyone that this is a fund

17  sponsored by Platinum Management?

18  A.  Yes.

19  Q.  And then there is a little section there that says key

20  personnel with the management company and David Levy was

21  described there in the second sentence.  It says that from 2006

22  to the present, Mr. Levy has served as a portfolio manager,

23  initially serving as an underwriting analyst at PPVA.

24         So, again, the connection to PPVA is very much

25  disclosed here; right?

MC5Cpla3                          Fuchs - Cross

1   A.  Yes.

2   Q.  And over the next couple of pages --

3        MR. HERTZBERG:  Mr. Robson, you can zoom out of that

4   and just tick through who the key personnel of the management

5   company are, and it identifies Mark Nordlicht; right?

6   A.  Yes.

7   Q.  Gilad Kalter.

8   A.  Yes.

9   Q.  And Naftali Manela; right?

10  A.  Yes.

11  Q.  Next page.  Dan Small?

12  A.  Yes.

13  Q.  And Joel Edelstein.

14  A.  Yes.

15  Q.  You knew at the time that you made an investment in this

16  BEOF fund that PPVA already had a substantial position in the

17  company, in Black Elk?

18  A.  Yes.

19  Q.  In fact, you knew that PPVA owned a majority of the stock

20  of Black Elk?

21  A.  I did not know that.

22  Q.  Did you have an understanding as to what percentage of the

23  stock of Black Elk was owned by PPVA at that time?

24  A.  I had no idea.

25  Q.  You knew that PPVA was Long Black Elk, as they say?

MC5Cpla3                          Fuchs - Cross

1    A.  Yes.

2    Q.  And by investing alongside PPVA by injecting fresh money

3    into Black Elk through your investment in this fund, your

4    intention was to help PPVA, not hurt it; correct?

5              MR. GLUCK:  Objection.

6              THE COURT:  Overruled.

7    A.  Yes.

8    Q.  Can you fathom, Mr. Fuchs, how an injection of liquidity

9    into an operating business can hurt the existing shareholders

10   at that business?

11   A.  No.

12   Q.  That doesn't make any sense, does it?

13   A.  No.

14   Q.  Let's change gears, Mr. Fuchs.  I want to talk about the

15   2015 dinner that you described with Mr. Gluck.

16             Now, you said last week at trial that it was December

17   2014 or January 2015.  Do you recall that?

18   A.  Yes.

19   Q.  Don't you know that it was in the beginning of 2015?

20   A.  I wasn't sure exactly if it was the end of 2014 or

21   beginning of 2015.  I knew it was approximately that time.

22   Q.  Well, at your deposition, sir —

23             MR. HERTZBERG:  And I'll ask Mr. Robson to play the

24   clip.

25   Q.  — You were asked this question and gave this answer.

MC5Cpla3                          Fuchs - Cross

1              (Video played)

2              THE COURT:  Wait a minute.  Wait a minute.  Wait a

3    minute.  Counsel, come to the sidebar.

4              (Continued on next page)

MC5Cpla3                          Fuchs - Cross

1                (At the sidebar)

2                THE COURT:  So I should have made this clear earlier,

3      and I apologize for not having done it.  My practice with

4      respect to depositions being offered for impeachment is that

5      the party who's offering it first states the page and lines

6      that he proposes to play and gives two or three seconds to his

7      adversary to say whether he objects or not.  The objection,

8      typically the only objection that could be made, but not always

9      is it's not inconsistent.  But you have to give him that

10     opportunity.

11               MR. HERTZBERG:  Very good, Judge.

12               THE COURT:  So when you get back to counsel table,

13     tell him what pages and lines and then we'll proceed.

14               MR. HERTZBERG:  Sure.  Thank you, Judge.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MC5Cpla3                          Fuchs - Cross

1                  (In open court)

2                  MR. HERTZBERG:  Your Honor, I've communicated to

3     Mr. Gluck the page and line.

4                  THE COURT:  Okay.  Any objection?

5                  MR. GLUCK:  No.  The last line is the only thing --

6                  THE COURT:  You may play it.  Go ahead.

7                  MR. HERTZBERG:  Thank you.  Mr. Robson, could you play

8     clip 3, please.

9                  (Video played)

10    BY MR. HERTZBERG:

11    Q.  Mr. Fuchs, you became a partner in Platinum Management in

12    June of 2014; right?

13    A.  Yes.

14    Q.  And this meeting that occurred in the first quarter of

15    2015, that was the first meeting among your new partners in

16    Platinum Management that you had attended?

17    A.  Yes.

18    Q.  And the others that were at that meeting were

19    Mr. Nordlicht, Mr. Landesman, Mr. Bodner, and I think you said

20    Mr. Huberfeld was in and out; right?

21    A.  Yes.

22    Q.  Are you certain that Mr. Landesman was there?

23    A.  Quite certain, yes.

24    Q.  Do you recall at your deposition, this is at page 26, line

25    21 to 23.

1          MR. GLUCK:  We object to the improper --

2          THE COURT:  Let me see the transcript, please.

3          The objection is overruled.

4    Q.  You were asked this question, you gave this answer:

5    "Q. Who was there?

6    "A. Mark Nordlicht, Murray Huberfeld, David Bodner, and

7    myself."

8    Q.  You didn't testify at your deposition, in October 2019,

9    that Mr. Landesman was there, did you?

10   A.  If that's what it says, that's what it says.

11   Q.  So sitting here today, you have a recollection of whether

12   Mr. Landesman was there or not?

13   A.  I can't remember.

14   Q.  The dinner was at a restaurant in Manhattan; right?

15   A.  Yes.

16          THE COURT:  A minute ago, you said that you were quite

17   certain he was there.  Do you remember saying that a minute

18   ago?

19          THE WITNESS:  Yes.

20          THE COURT:  And now you're saying you don't remember

21   one way or the other?

22          THE WITNESS:  Because if I wrote in that original one

23   that only I didn't mention him and now I'm saying I think he

24   was there, I'm not certain if he was there or not.

25          THE COURT:  All right.  Go ahead.

MC5Cpla3                           Fuchs - Cross

1    BY MR. HERTZBERG:

2    Q.  At that dinner, Mr. Nordlicht made some kind of a

3    presentation about the positions?

4    A.  I don't remember if that's how it started or if Mr. Bodner

5    started with Mr. Nordlicht about the evaluation.  I don't

6    remember if Mr. Nordlicht made a presentation or Mr. Bodner

7    just began with his remarks to him.

8                    (Continued on next page)

Mc52Pla4                          Fuchs - Cross

1    BY MR. HERTZBERG:

2    Q.  Mr. Bodner didn't just take his coat off, sit down, and

3    then start yelling at Mr. Nordlicht, right?

4    A.  It took a few minutes before he started, correct.

5    Q.  And it was because of something that -- a discussion that

6    was happening at the table, right?

7    A.  I don't recall if it was a discussion prior to that.  All I

8    remember is the yelling and screaming, the shouting.

9    Q.  And Mr. Bodner took issue with the way that Mr. Nordlicht

10   was -- that he was valuing PPVA or was it PPCO or was it both?

11   A.  It was PPVA.

12   Q.  And why are you certain of that?

13   A.  Because he was saying that the fund is overvalued.  He has

14   to reduce the valuation of the fund.

15   Q.  But there were two funds that he was --

16   A.  He was talking about PPVA.

17   Q.  How do you know that?

18   A.  I remember clearly that's what he was talking about.  That

19   was the fund that was involved with oil.  He said oil prices

20   came down dramatically, the fund should be revalued.

21   Q.  Did somebody say something about oil prices at that

22   meeting?

23   A.  Well, PPVA was involved in oil.  That was their main

24   investment.

25   Q.  That's not my question.  My question is whether the oil

Mc52Pla4                        Fuchs - Cross

1   prices were discussed at that meeting.

2   A.  Yes.  Mr. Bodner brought that up.  That's why the price --

3   the valuation should be down because of the price of oil has

4   dramatically fallen.

5   Q.  Ah.  Is there some reason why you didn't recall that

6   component of the conversation when Mr. Gluck was asking you

7   questions?

8            THE COURT:  Sustained.

9            MR. GLUCK:  Objection.

10            (Audio feedback)

11            THE COURT:  That sound you just heard meant you can

12   put another question.

13   BY MR. HERTZBERG:

14   Q.  What Mr. Bodner said to Mr. Nordlicht was that he wasn't

15   valuing the fund properly, isn't that right?

16   A.  Yes.

17   Q.  And you didn't know what he meant by that.

18   A.  I knew what he meant.  He meant that Mr. Nordlicht should

19   bring down the valuation of the fund.

20   Q.  At your deposition, page 28, line 21, . . .

21            (Counsel confer)

22            MR. HERTZBERG:  Your Honor, my friend wants to show

23   you another one.

24            THE COURT:  Let's have a sidebar.

25            (Continued on next page)

Mc52Pla4                         Fuchs – Cross

1                (At the sidebar)

2                MR. HERTZBERG:  Judge, I just asked the witness:  Do

3       you know what he meant by that?  He said:  Yes.  He said no at

4       his deposition, flat no.

5                THE COURT:  Let me see what you want to address.

6                MR. HERTZBERG:  I want to introduce:  "Do you know

7       what he meant by that?"

8                (Court reporter confers).

9                THE COURT:  This is page 29/line 5.  I'm sorry.

10      Before that, there was an answer on line 3.

11               "He said it wasn't valued properly."

12               Then it continues with line 5.

13      "Q  Do you know what he meant by that?

14      "A  No.

15      "Q  Well, did you ask?

16      "A  I didn't have to ask.  I understood what it meant."

17               So I think the objection is sustained.

18               (Continued on next page)

19

20

21

22

23

24

25

Mc52Pla4                          Fuchs - Cross

1              (In open court)

2              THE COURT:  Ladies and gentlemen, let me explain a

3     little bit about what is going on right now.  As you heard from

4     me previously, before a case goes to trial, a civil case goes

5     to trial, both sides get to take the testimony of witnesses for

6     the other side and other relevant people under oath but without

7     a judge being there to rule on any objections.  That's called a

8     deposition.

9              If someone on the stand says something that is

10    arguably inconsistent with what they said at their deposition,

11    then counsel is allowed to read or play the arguably

12    inconsistent portion.

13             You may decide, number one, it's not really

14    inconsistent.  Or you may decide it is inconsistent, and I

15    think that he was more accurate in what he is saying today.  Or

16    you may decide it is inconsistent, but I think he was more

17    accurate in what he was saying at the time of the deposition.

18    Or you may decide that it just generally bears on his

19    credibility one way or the other.  So all of that is in your

20    domain.  I just want to explain the procedure that's going on.

21             So the objection, though, for the last proposed

22    reading was sustained, so go on to something else.

23    BY MR. HERTZBERG:

24    Q.  Mr. Fuchs, fair to say that Mr. Nordlicht was bullish by

25    nature?

Mc52Pla4                           Fuchs - Cross

1    A.  Yes.

2    Q.  You understand what that term means, "bullish"?

3    A.  Yes.

4    Q.  It means he was an optimist?

5    A.  Yes.

6    Q.  He was an optimist with respect to the assets that he was

7    managing for PPVA.

8    A.  Yes.

9    Q.  And he was an optimist in his valuations.

10   A.  Yes.

11   Q.  He saw upside and potential where perhaps others didn't.

12   A.  Yes.

13   Q.  That was his -- that was his unique quality, would you say

14   that?

15              MR. GLUCK:  Objection.

16              THE COURT:  Sustained.

17   BY MR. HERTZBERG:

18   Q.  Were there situations where Mr. Nordlicht saw upside where

19   others didn't and he was right?

20   A.  I'm not sure.

21   Q.  Well, you had confidence in Mr. Nordlicht, right?

22   A.  Yes.

23   Q.  You saw him make some good bets over the years.

24   A.  Yes.

25   Q.  Is it possible that Mr. Nordlicht -- what Mr. Bodner was

1    voicing to Mr. Nordlicht during that dinner was perhaps he

2    should be a bit more conservative?

3    A.  Yes.

4             MR. GLUCK:  Objection.

5             THE COURT:  Sustained.

6             When there is an objection, you have to wait.

7             THE WITNESS:  I'm sorry.

8             THE COURT:  The objection is sustained.  The last

9    answer will be stricken.

10   BY MR. HERTZBERG:

11   Q.  Mr. Fuchs, Mr. Nordlicht believed in his valuations, didn't

12   he?

13            MR. GLUCK:  Objection.

14            THE COURT:  Sustained.  Counsel, by now you should

15   know you can't ask that kind of question.

16   Q.  Mr. Fuchs, at the time of that dinner, you had quite a bit

17   of personal and family money in the funds, right?

18   A.  Yes.

19   Q.  And in PPVA in particular.

20   A.  Yes.

21   Q.  And you know that when a fund like PPVA shows strong

22   returns, it creates an incentive for investors to make

23   withdrawls.

24            MR. GLUCK:  Objection.

25            THE COURT:  Sustained.

Mc52Pla4                         Fuchs - Cross

1    Q.  As an investor in the funds, Mr. Fuchs, were you

2    incentivized to take profits when the fund was marked up?

3    A.  I took profits every year.  Whatever profits were for the

4    year, I took out the profits so I could pay my taxes and use

5    the money for everyday living.

6    Q.  Do you have personal knowledge that other investors took

7    profits when the fund was marked up?

8              THE COURT:  Sustained.

9    Q.  Fair to say that Mr. Nordlicht didn't appreciate

10   Mr. Bodner's opinion at that dinner?

11             MR. GLUCK:  Objection.

12             THE COURT:  Sustained.  What is in the mind of someone

13   else cannot be the subject of testimony by a witness.  They

14   don't live in the mind of someone else.  You can ask a witness

15   what he heard.  You can argue to the jury on summation what

16   they should infer about what's going on in someone's mind.  But

17   a witness is limited to what he saw, heard, and the like.

18   Q.  Mr. Fuchs did you hear Mr. Nordlicht get angry in response

19   to Mr. Bodner's opinion at that dinner?

20   A.  Yes.

21   Q.  Was it clear to you from your observation of Mr. Nordlicht,

22   that he was angry?

23   A.  Yes.

24   Q.  Did he tell Mr. Bodner to go back to Monsey?

25   A.  Something like that.

Mc52Pla4                          Fuchs - Cross

1    Q.  Did he tell him to go back to Yeshiva?

2    A.  Yes.

3    Q.  Did he tell Mr. Bodner that Mr. Bodner does not understand

4    his business?

5    A.  Yes, he did.

6    Q.  Did he say to Mr. Bodner:  You don't even come into the

7    office?

8              MR. GLUCK:  Objection.  Well, withdrawn.

9              THE COURT:  I think the objection was waived because

10   there was no objection to the last three questions, so

11   overruled.

12             You may answer.

13             THE WITNESS:  What's the question again?

14             THE COURT:  The question was:  "Did he say to

15   Mr. Bodner:  You don't even come into the office?"

16             THE WITNESS:  I don't remember if he said those words.

17             THE COURT:  That's all the question asks.

18   BY MR. HERTZBERG:

19   Q.  Trial transcript 280:17-21.

20             Just last week Mr. Fuchs you were asked this question

21   you gave this answer.

22   "Q  What did Mark Nordlicht say in response?

23   "A  They had a heated argument.  Mark Nordlicht said:  You

24   don't know what you are talking about.  You don't come into the

25   office.  You don't run the fund every single day.  I know

1   better than you.  It's marked properly."

2          Was that your testimony last week?

3   A.  Yes.

4   Q.  And that was true that Mr. Bodner didn't come into the

5   office, isn't it?

6   A.  Regularly, correct.

7   Q.  Mr. Nordlicht later said to you that you shouldn't listen

8   to Mr. Bodner.

9   A.  Yes.

10          MR. GLUCK:  Objection.

11          THE COURT:  Overruled.  The answer was yes, and that

12   will stand.

13          MR. HERTZBERG:  Thank you, Judge.

14   BY MR. HERTZBERG:

15   Q.  He said that Mr. Bodner was irrational, isn't that what he

16   told you?

17   A.  Yes.

18   Q.  He said you should trust him, Mr. Nordlicht, because he

19   knows what's going on.

20   A.  Yes.

21   Q.  He knows the positions and Mr. Bodner doesn't.  Isn't that

22   what he said?

23          MR. GLUCK:  Objection -- oh, withdrawn.

24   Q.  You can answer.

25   A.  Yes.

Mc52Pla4                          Fuchs - Cross

1   Q.  He implored you to have faith in him, didn't he?

2   A.  Yes.

3   Q.  Coming out of that meeting, you believed that

4   Mr. Nordlicht's valuations were correct and that Mr. Bodner's

5   view was just wrong.

6   A.  Yes.

7   Q.  That's because Mr. Nordlicht had his hands on the reins,

8   isn't that right?

9           MR. GLUCK:  Objection.  Objection.

10          THE COURT:  Yes, I think even if that terminology was

11  used in prior testimony, which it may have been, it's too vague

12  to be of much use, especially to an urban jury.

13  BY MR. HERTZBERG:

14  Q.  Did you say the equivalent of Mr. Nordlicht was driving the

15  subway and Mr. Bodner was not?

16  A.  Yes.

17  Q.  And Mr. Nordlicht was the one who was running the place

18  every single day.

19  A.  Yes.

20  Q.  And Mr. Bodner was not involved day to day.  Isn't that

21  right?

22  A.  Yes.

23  Q.  So you concluded that Nordlicht knew better than Bodner.

24  A.  Yes.

25  Q.  You concluded that Bodner was speaking irrationally.

Mc52Pla4                         Fuchs - Cross

1    A.  Yes.

2    Q.  You concluded that Mark's positions were fine after that

3    dinner?

4    A.  Yes.

5    Q.  That's because you heard nothing at that dinner from

6    Mr. Bodner or anyone else that led you to believe that

7    Mr. Nordlicht was intentionally overvaluing the positions of

8    PPVA.

9               MR. GLUCK:  Objection.

10              THE COURT:  No, I will allow it.  You may answer.

11   A.  Yes.

12   Q.  There was nothing factual about what Mr. Bodner said that

13   undermined your confidence in Mr. Nordlicht's numbers.

14   A.  Yes.

15   Q.  Mr. Bodner never said that Mr. Nordlicht's numbers were

16   fraudulent, did he?

17   A.  No.

18   Q.  He presented you with no facts at that dinner or any time

19   since that undermined your confidence in Mr. Nordlicht's

20   numbers.

21   A.  Yes.

22   Q.  After that dinner you continued to invest in the fund

23   yourself.

24   A.  Yes.

25   Q.  You invested for your wife.

Mc52Pla4                      Fuchs - Cross

1    A.  Yes.

2    Q.  You invested for your grandchildren.

3    A.  Yes.

4    Q.  After that dinner, you continued to solicit your friends,

5    your contact, members of your community to invest in PPVA.

6    A.  Yes.

7    Q.  You discouraged your friends withdrawing their funds from

8    PPVA after that dinner.

9    A.  Yes.

10   Q.  Which you never would have done had you seen anything there

11   or after that suggested to you that some kind of fraud was

12   going on.

13   A.  Correct.

14   Q.  Mr. Fuchs, you believed in Mr. Nordlicht, didn't you?

15   A.  Yes.

16   Q.  You believed in his ability to turn the fund around.

17   A.  Yes.

18   Q.  You believed in his valuations.

19   A.  Yes.

20   Q.  You believed -- withdrawn.

21         We are here seven years later and we are sitting in

22   this courtroom.  You have lost tens of millions of dollars in

23   PPVA, right?

24   A.  Yes.

25   Q.  And you still believe that Mark believed in his numbers.

Mc52Pla4                           Fuchs - Cross

1   A.  Yes.

2   Q.  Mark may have been wrong, but he didn't lie.  Isn't that

3   the bottom line, Mr. Fuchs?

4           THE COURT:  Sustained.  That's a question for the

5   jury.

6   Q.  You believe that Mark acted in good faith.

7           THE COURT:  Asked and answered.  Sustained.

8   BY MR. HERTZBERG:

9   Q.  Let me change gears.

10          Mr. Fuchs, you testified that the 2015 dinner ended on

11  a sour note because Mr. Bodner said that, quote, no partner is

12  taking money out at this time.  Do you recall that?

13  A.  Yes.

14  Q.  And you said that that was until they get more liquidity.

15  Do you recall that?

16  A.  Yes.

17  Q.  Mr. Bodner didn't say that investors couldn't take out

18  money, did he?

19  A.  No.

20  Q.  So what Mr. Bodner was effectively saying was that outside

21  investors should come before the people who were sitting at

22  that table.

23  A.  Yes.

24  Q.  That was his decree, as Mr. Gluck put it?

25  A.  Yes.

Mc52Pla4                         Fuchs - Cross

1    Q.  Liquidity was tight at that time.

2    A.  Yes.

3    Q.  Mr. Bodner was saying that for the little bit of liquidity

4    that we have available, until we fix it, let's just put the

5    four of us at the back of the line and put the investors first.

6             MR. GLUCK:  Objection.

7    Q.  That's what he was saying.

8             THE COURT:  Sustained.

9    Q.  Mr. Gluck asked you why Mr. Bodner had the power to issue a

10   decree like that.  Do you recall that question?

11   A.  Yes.

12   Q.  Isn't the answer that Mr. Bodner suggested something that

13   was so obviously the correct and ethical thing to do that

14   Mr. Nordlicht simply agreed with him?

15            MR. GLUCK:  Objection.

16            THE COURT:  Sustained.

17   Q.  You said that you think -- you thought Mr. Bodner could

18   make that quote/unquote decree because he was a partner.

19   A.  Yes.

20   Q.  Mr. Gluck pointed out that you, too, were a partner, didn't

21   he?

22   A.  Yes.

23   Q.  And you said that your partnership status was lower.

24   A.  Yes.

25   Q.  Mr. Bodner -- you were a 10 percent partner, right?

Mc52Pla4                          Fuchs - Cross

1    A.  Yes.

2    Q.  You were a minority partner.

3    A.  Yes.

4    Q.  And Mr. Bodner, through his family, was a 25 percent

5    partner, right?

6            MR. GLUCK:  Objection.

7            THE COURT:  Well, I will allow that if you know.

8    A.  I don't know how much he had.

9    Q.  Do you have any knowledge of what percentage of Platinum

10   Management was held by Mr. Bodner and his family?

11   A.  I'm not sure.

12   Q.  Was it less than 50?

13   A.  Yeah, again, I'm not sure exactly what percentage each one

14   of the partners had originally.

15   Q.  You knew you had ten, right?

16   A.  That's all I knew.

17   Q.  And you knew that Mr. Nordlicht was a majority.

18           MR. GLUCK:  Objection.

19           THE COURT:  Sustained.

20   Q.  Did you have any knowledge as to whether Mr. Nordlicht was

21   the majority owner of Platinum Management?

22           THE COURT:  It's clear now that this witness doesn't

23   have sufficient knowledge to give any precise answers and the

24   rest would be speculative.  Sustained.

25   BY MR. HERTZBERG:

Mc52Pla4                         Fuchs - Cross

1    Q.  You said that at that dinner Mr. Bodner told Mr. Nordlicht

2    to redo the positions, right?

3    A.  Yes.

4    Q.  But Mr. Nordlicht did not redo the positions.  Right?

5    A.  Yes.

6    Q.  So he didn't listen to Mr. Bodner.

7    A.  Correct.

8    Q.  He heard Mr. Bodner's view and he rejected it.

9    A.  Yes.

10   Q.  Isn't that because Mr. Nordlicht didn't have to listen to

11   Mr. Bodner?

12          MR. GLUCK:  Objection.  Knowledge.

13          THE COURT:  Sustained.

14   Q.  One of the reasons that you came out of that dinner and

15   still had confidence in the valuation and the positions was

16   that you knew that the fund had accounting firms that were

17   working on the financial statements of the fund.  Isn't that

18   right?

19   A.  Yes.

20   Q.  They were auditing the financial statements of the fund.

21   A.  Yes.

22   Q.  And you knew that there were valuation firms that were

23   working on the valuations that Mark set for the fund.

24   A.  Yes.

25   Q.  And that gave you comfort because they were experts and you

Mc52Pla4                          Fuchs - Cross

 1    were not.

 2              MR. GLUCK:  Objection.

 3    Q.  Is that right?

 4              THE COURT:  No, I will allow that.

 5    A.  Yes.

 6    Q.  And they were experts and Mr. Bodner was not.

 7              MR. GLUCK:  Objection.

 8              THE COURT:  Sustained.

 9    Q.  Mr. Fuchs, you have known Mr. Bodner for how many years?

10    A.  15, 16 years.

11    Q.  He is a pretty bright guy?

12    A.  Yes.

13    Q.  Does he have any expertise in the oil and gas area?

14              MR. GLUCK:  Objection.

15              THE COURT:  Sustained.

16              Counsel, you have got five more minutes before you

17    have to relinquish the reins.

18              MR. HERTZBERG:  Okay.

19    BY MR. HERTZBERG:

20    Q.  Mr. Fuchs, we talked about the release agreement for March

21    2016.  Do you recall that testimony?

22    A.  Yes.

23    Q.  Could Mr. Robson please put up JX 74 and if we go quickly

24    to PDF page 8.

25              Is that your signature, sir?

Mc52Pla4                          Fuchs – Cross

1    A.   Yes.

2    Q.   And that's Mr. Nordlicht's signature for the various

3    Platinum entities?

4    A.   Yes.

5    Q.   Calling your attention to section 3, mutual releases and

6    identification, that's at page 2 of the PDF.

7              MR. GLUCK:   Objection.   Document speaks for itself.

8              THE COURT:   Yes, he can put the question.

9    Q.   You are aware of the contents of this, Mr. Fuchs?

10   A.   Yes.

11   Q.   Is this the agreement by which Mr. Bodner and Mr. Huberfeld

12   gave up their interests in Platinum Management so that

13   Mr. Nordlicht could market those interests to attract liquidity

14   to the fund?

15             MR. GLUCK:   Objection.   Foundation.

16             THE COURT:   Yes.   I think you need to lay a

17   foundation.

18   BY MR. HERTZBERG:

19   Q.   You said you were aware of the account contents of the

20   agreement, correct?

21   A.   Yes.

22             MR. GLUCK:   Objection.   The witness said he didn't

23   read it.

24             MR. HERTZBERG:   I'm sorry.   Is there an objection?

25             MR. GLUCK:   Objection.   The witness said he didn't

Mc52Pla4                        Fuchs - Cross

1    read it.

2                THE COURT:  I'm sorry.  The question was:  You said

3    you were aware of the contents of the agreement, correct?  The

4    answer:  Yes.  So the objection is overruled.

5    BY MR. HERTZBERG:

6    Q.  Mr. Fuchs, what was the purpose of this agreement?

7    A.  I really don't remember.

8                THE COURT:  If you know.

9    A.  I really don't remember.

10   Q.  In paragraph 1, which is at page 2 of the PDF, it says

11   "relinquishment of beneficiary interest in the trusts."  In

12   that paragraph, is that reflecting that Mr. Bodner and

13   Mr. Huberfeld are giving up their interest in Platinum

14   Management they held through a trust?

15   A.  I never read this agreement.  All I know is they told me

16   that they are giving up their shares in the company to Mark

17   Nordlicht so he can attract more investors.  I never read this

18   agreement.

19   Q.  Did you understand that a Marcos Katz was going to be

20   making an investment into PPVA in exchange for some of the

21   shares given up by Mr. Huberfeld and Mr. Bodner?

22   A.  I was not aware of that.

23   Q.  Didn't you in fact have direct discussions with Mr. Katz

24   about that issue?

25   A.  I don't recall.

Mc52Pla4                         Fuchs - Cross

1    Q.  Can we pull up DX 709, please.  You will see that this --

2    do you recognize this e-mail, Mr. Fuchs?

3              MR. GLUCK:  No objection, pending relevance.

4              THE COURT:  All right.  So it's received.  Put any

5    questions you want.

6              (Defendant's Exhibit 709 received in evidence)

7    BY MR. HERTZBERG:

8    Q.  You write May 23, 2016, three days after this lease

9    agreement was signed, that you just spoke to Mr. Katz and he

10   was very happy.  Do you recall that?

11   A.  I really don't.

12   Q.  Do you have any reason to doubt that that's what occurred?

13   A.  No.

14   Q.  At your deposition, at page 294, lines 13-23 --

15             MR. HERTZBERG:  Mr. Gluck?

16             MR. GLUCK:  (Indicating).

17   Q.  You were asked this question and you gave this answer:

18   "Q  Do you have any -- what did you -- what information did you

19   pass on to him in March of 2016 that would have made Marcos

20   Katz happy?  Do you recall?

21   "A  Yes.  That they were going to make him a partner for 10

22   percent of the fund.

23   "Q  Okay.

24   "A  Because they had the shares from Huberfeld and Bodner, so

25   they were going to give him 10 percent."

Mc52Pla4                          Fuchs – Cross

1              And that's why you wrote here that Mr. Katz was happy.

2     Isn't that right?

3     A.   Yes, I remember now, yes.

4     Q.   Okay.

5              THE COURT:  Counsel, although you have reached the end

6     of your allotted time, I will give you a few more minutes but

7     only after lunch, so we are going to give the jury their lunch

8     and we will see you at 2:00.

9              You can step down.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla4                         Fuchs – Cross

1              (Jury and witness not present)

2              THE COURT:  Now I will ask you for a binding

3    representation of how much longer you want.

4              MR. HERTZBERG:  If I may just take a quick look at my

5    notes, Judge.  Eight minutes, please.

6              THE COURT:  Okay.  And this is not binding, but can

7    plaintiffs' counsel give me an approximation of how much you

8    think there will be on redirect.

9              MR. GLUCK:  A 55 minutes.

10             THE COURT:  Okay.  So it sounds like we will, without

11   question, reach another witness today.  Who is the next witness

12   by the way.

13             MS. SHEN:  Angela Albanese.

14             THE COURT:  Okay.  I have looked over the depositions

15   that in the latest form that were handed up regarding Randall

16   Katzenstein and Mandy McGovern Muller.  I was extremely

17   disappointed to see that no objections were made to either of

18   the sides' proposals, thus depriving me of the opportunity to

19   make a snide remark or two, but I will bear up somehow.

20             I will see you all in an hour.

21             MR. HERTZBERG:  Your Honor, very quickly, Mr. Bodner

22   will go to pray from 1:10 to 2:10, so he may come back ten

23   minutes after the jury is here.

24             THE COURT:  That's fine, but we are starting at 2:00.

25             MR. HERTZBERG:  Very good.

Mc52Pla4                           Fuchs - Cross

1              MR. LAUER:  We understand.

2              THE COURT:  Very good.

3              (Luncheon recess)

Mc52Pla4                         Fuchs - Cross

1            A F T E R N O O N     S E S S I O N

2                          2:10 p.m.

3             (Jury not present)

4             THE DEPUTY CLERK:  May I get the jury?

5             THE COURT:  Please.  And let's get the witness back on

6    the stand.

7             (Jury present)

8             THE COURT:  All right.

9    BY MR. HERTZBERG:

10   Q.  Mr. Fuchs, before the lunch break, I was asking you

11   questions about Marcos Katz.  Do you recall that?

12   A.  Yes.

13   Q.  And we showed you an e-mail that was DX 709.  You will

14   recall that, after seeing the e-mail, that Mr. Katz was very

15   happy about receiving the shares that Bodner and Huberfeld were

16   giving up.  Do you recall that?

17   A.  Yes.

18   Q.  And they were giving those shares up pursuant to that

19   release agreement dated March 20, 2016, which was three days

20   before the conversation that you had with Mr. Katz on March 23.

21   Do you recall that?

22   A.  Yes.

23   Q.  Mr. Katz was not the only investor or potential investor

24   who was being worked with to come in and provide liquidity to

25   the fund in exchange for the shares given up by David and

Mc52Pla4                        Fuchs - Cross

1    Murray.

2               MR. GLUCK:  Objection.  Foundation.

3               THE COURT:  Do you have any personal knowledge about

4    that?

5               THE WITNESS:  I know that they told me they are giving

6    up their shares to --

7               THE COURT:  No, no.  I don't mean what someone told

8    you.  Were you present in any meeting where this was discussed?

9               THE WITNESS:  No.

10              THE COURT:  Okay.  Sustained.

11   BY MR. HERTZBERG:

12   Q.  Mr. Fuchs, have you ever heard the name Victor Hanna?

13   A.  It sounds familiar.  Could you refresh my memory?

14   Q.  Well, do you have personal knowledge that someone by that

15   name was looking at taking the shares that had been given up by

16   Bodner and Huberfeld?

17              MR. GLUCK:  Same objection.

18              THE COURT:  Well, first, answer that question yes or

19   no.

20              THE WITNESS:  I know that they were negotiating --

21              THE COURT:  No, that's not a yes or no.

22              THE WITNESS:  I'm sorry.  So what's the question

23   again?

24              THE COURT:  So I take it the answer is you have some

25   knowledge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc52Pla4                         Fuchs - Cross

1           THE WITNESS:  Yes.

2           THE COURT:  And what is the source of that knowledge?

3           THE WITNESS:  I was told by Mark Nordlicht that he was

4    looking to bring in a --

5           THE COURT:  That's enough.  The objection is

6    sustained.

7    BY MR. HERTZBERG:

8    Q.  Mr. Fuchs, the March 20, 2016 release agreement, you

9    testified earlier that you signed that because of -- because

10   you needed some kind of a loan?

11   A.  Yes.

12   Q.  Are you certain that you have that timing right, Mr. Fuchs?

13   A.  I'm not certain because there were two different times of

14   loans, so I'm not sure which one took place when and which one

15   the agreement was for.  So I'm a little bit confused, but I

16   know there were two different times of financial help.

17   Q.  Isn't it true that the release agreement that you signed on

18   March 20, 2016 had nothing at all to do with a loan to you?

19   A.  So what was it for?

20   Q.  Well, I haven't been sworn in, Mr. Fuchs.

21   A.  I don't remember.  I don't remember what it was for.

22          MR. HERTZBERG:  Mr. Robson, counsel, page 465/line 11

23   to 467/17.  The witness had a distinct recollection.

24          MR. GLUCK:  Sorry.  What was the page?

25          MR. HERTZBERG:  465/11 to 467/17.

Mc52Pla4                         Fuchs - Cross

1          Judge it's the World Cup now, so I hope I get stoppage

2     time while Mr. Gluck is looking this up.

3          THE COURT:  Hope springs eternal.

4          (Pause)

5          MR. HERTZBERG:  Mr. Robson, clip no. 4.

6          (Video played)

7     BY MR. HERTZBERG:

8     Q.  Mr. Fuchs, does that refresh your memory that there was no

9     connection between any loan and your execution of the March 20

10    release?

11    A.  Yes.

12    Q.  And there was no such connection, right?

13    A.  Correct.

14    Q.  Mr. Gluck asked you about a claim that you had asserted

15    against Mr. Bodner and you couldn't recall that, right?

16    A.  Correct.

17    Q.  Mr. Robson, for the witness only, could you pull up DX 736,

18    and if you could turn to the next page, please.

19          Mr. Fuchs, take a look at that and let me know if you

20    recognize it.

21    A.  I don't.

22    Q.  Okay.  Mr. Fuchs, coming back to the January 2015 or early

23    2015 dinner, did -- after Mr. Bodner expressed his views, did

24    Mark Nordlicht say anything like:  David, we have discussed

25    this before; or David, we have been through this before; or

Mc52Pla4                    Fuchs - Redirect

1   anything like that?

2   A.  I don't remember exactly the words that he used.

3   Q.  But did he say anything of that kind?

4   A.  Could be.

5   Q.  Did you come away from that meeting with any kind of

6   impression that that conversation had occurred before?

7   A.  No, I didn't.

8            THE COURT:  That's it, counsel.

9            MR. HERTZBERG:  Thank you, Judge.  Meaning my time is

10  up?

11           THE COURT:  That's what I meant.

12  REDIRECT EXAMINATION

13  BY MR. GLUCK:

14  Q.  Mr. Fuchs, it's tough being on the witness stand here or in

15  a deposition, isn't it?

16  A.  Yes, very.

17  Q.  I would like to start going through some of the topics that

18  counsel went through today if you don't mind.

19           Mr. Parson, would you please call up the first amended

20  answer of defendant Bernard Fuchs, and I'm going to ask that it

21  be moved into evidence based on opening the door and based on

22  other reasons.

23           MR. HERTZBERG:  Objection to opening the door, Judge.

24           MR. GLUCK:  The Court will allow me to explain why.

25  In particular, I'm going to ask the witness to refer to his

Mc52Pla4                         Fuchs - Redirect

1   counterclaim regarding PPVA.  There were questions regarding

2   any claims he made.

3           THE COURT:  Well, all right.  Let me show you this

4   hard copy for a minute.  Do we have a number on this?

5           MR. GLUCK:  We do.  This will be --

6           THE COURT:  Look at the first page.  Look at the

7   right-hand column.

8           Is it your testimony you have not seen this before?

9           THE WITNESS:  I don't remember.

10          THE COURT:  So let me ask you a different question.

11  You were represented in connection with all these matters by a

12  law firm, yes.

13          THE WITNESS:  Novak, Mr. Novak.

14          THE COURT:  And when he prepared something to be filed

15  on your behalf, was it his practice to have you review it?

16          THE WITNESS:  I must have, yes.

17          THE COURT:  So is it your testimony that although you

18  don't specifically remember this particular document, you are

19  confident that you did review it before it was filed.

20          THE WITNESS:  Yes.  But I just don't remember it.

21          THE COURT:  I understand.  I understand.  Are you

22  offering this?

23          MR. GLUCK:  I am.

24          THE COURT:  Any objection?

25          MR. HERTZBERG:  No objection.

Mc52Pla4                    Fuchs - Redirect

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 927 received in evidence)

3    BY MR. GLUCK:

4    Q.  Let me try to build some foundation as well.

5          Mr. Fuchs, do you recall when Mr. Hertzberg was

6    examining you he asked you whether you had reviewed the denials

7    in relation to PPVA, the JOL suit against you?

8    A.  Correct.

9    Q.  Okay. is this your denials?

10   A.  This document?

11   Q.  This document.

12   A.  Yes.

13   Q.  I am going to ask you to turn on this issue first of

14   release to page 10, paragraph 54.

15         Please highlight the heading as well.  Thank you.

16         You were asked by Mr. Hertzberg in connection with why

17   there was mutual release in your settlement agreement with

18   Mr. Trott whether you had asserted any claims against PPVA.  Do

19   you remember that from today?

20   A.  Yes.

21   Q.  In response you suggested that the answer was no.  Do you

22   remember that?

23   A.  Yes.

24   Q.  Looking at this now, does this refresh your recollection

25   that in this lawsuit you asserted a counterclaim against PPVA

Mc52Pla4                          Fuchs - Redirect

1  and the joint liquidators?

2  A.  Yes.

3  Q.  Did you believe that you were entitled to indemnity as a

4  manager under the PPVA management agreement?

5  A.  Yes.

6  Q.  Is that why, among other reasons, the release to PPVA was

7  granted by you in connection with the settlement?

8  A.  Yes.

9  Q.  Did you also submit or do you recall submitting any proofs

10  of debt in the Cayman Islands liquidation proceeding?

11  A.  I'm sorry?

12  Q.  Do you also recall submitting any proofs of debt in the

13  Cayman Island liquidation proceeding?

14  A.  Yes.

15  Q.  Is that perhaps another reason why you released PPVA in

16  connection with the settlement agreement?

17  A.  Yes.

18  Q.  Mr. Fuchs, when you came to invest with Platinum, there

19  were two funds being operated, is that right?

20  A.  Yes.

21  Q.  Was one of those funds PPVA?

22  A.  Yes.

23  Q.  And another one came to be known as PPCO?

24  A.  Yes.

25  Q.  You -- is it true that you invested in both?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc52Pla4                           Fuchs – Redirect

A.   Yes.

              (Continued on next page)

MC5Cpla5                         B. Fuchs - Redirect

1   BY MR. GLUCK:

2   Q.  What floor would you go to of the office building when you

3   would go to visit Platinum?

4   A.  The 54th --

5            MR. HERTZBERG:  Objection.  Form.

6   Q.  Did you go to visit Platinum subsequent to your investment?

7            MR. HERTZBERG:  Objection.  Form.

8            THE COURT:  No.  Overruled.

9   Q.  Did you?

10  A.  Sorry?

11  Q.  Would you go to visit Platinum after you made your

12  investment?

13  A.  Yes.

14  Q.  What floor would you go to?

15  A.  54th floor.

16  Q.  Do you have a recollection of whether any persons of PPVA

17  also sat on the 54th floor?

18  A.  Yes, sometimes.

19  Q.  Like who?

20  A.  Like Mark Nordlicht.

21  Q.  What about Angela Albanese?

22  A.  Angela was always on the 54th floor at that time.

23  Q.  What about Jed Latkin, do you remember anything, where he

24  sat?

25  A.  I don't think he sat on the 54th floor.  I think he was on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MC5Cpla5                        B. Fuchs - Redirect

1   the 4th floor if I remember.

2   Q.   What about Mr. Landesman?

3   A.   On the 4th floor.

4   Q.   Was there a time when you came into contact with Mr. Ari

5   Glass?

6   A.   Yes.

7   Q.   Where would he sit?

8   A.   I think he also was on the 4th floor.

9   Q.   Do you know whether PPVA paid for the facilities and the

10  use of that 54th floor?

11  A.   I have no idea.

12  Q.   Did there come a time when you became interested in PPVA's

13  expenses?

14  A.   No.

15  Q.   Do you know who paid Ms. Angela Albanese's salary?

16  A.   No.

17  Q.   Did you provide an affidavit in this matter two weeks ago

18  or roughly a week ago?  Do you recall that?

19  A.   I don't.

20  Q.   You don't recall that?

21  A.   Please remind me.

22          MR. GLUCK:  We would seek to bring into evidence the

23  affidavit signed by Mr. Bernard Fuchs.

24          MR. HERTZBERG:  Objection.

25          THE COURT:  Sustained.

MC5Cpla5                          B. Fuchs - Redirect

1    Q.  Mr. Hertzberg asked you this morning if you recall entering

2    into a settlement agreement with PPVA.  Do you remember that?

3    A.  Yes.

4    Q.  Mr. Hertzberg asked you a number of questions regarding

5    your testimony in connection with that settlement agreement.

6    Do you remember that?

7    A.  Yes.

8    Q.  Mr. Hertzberg asked you a number of questions regarding

9    preparation for your testimony.  Do you remember that?

10   A.  Yes.

11   Q.  Mr. Hertzberg asked you whether you had prepared an

12   affidavit in connection with your testimony.  Do you remember

13   that?

14   A.  No.

15            MR. HERTZBERG:  I don't believe I asked that question.

16            THE COURT:  Well, the answer was no.

17   Q.  Do you recall during questioning this morning whether the

18   process of investment meetings that you attended were PPCO

19   meetings or PPVA meetings?

20            MR. HERTZBERG:  Objection to form.

21            THE COURT:  Overruled.

22   A.  They were primarily PPCO meetings.

23   Q.  That's your testimony now?

24   A.  And there might have been one or two PPVA, also.  It's hard

25   to quantify which were which -- how many were PPCO and how

1    many -- there were a couple of each, probably.  I just don't

2    remember exactly how many of each.

3    Q.  Do you have memory problems, Mr. Fuchs?

4    A.  I'm older, so I could have some memory problems.  I'm going

5    to be 77.

6    Q.  Was it often the case that matters concerning PPVA and PPCO

7    would be discussed together?

8    A.  Yes.

9           MR. GLUCK:  Mr. Parson, please call up

10   Plaintiffs' Exhibit 588.  I'll ask you to highlight the first

11   through fourth lines.

12   Q.  Is this an email about both PPVA and PPCO?

13   A.  Yes.

14   Q.  You said it would be often the case that matters concerning

15   PPVA and PPCO were discussed together.

16          Do you have an understanding about any differences in

17   management between PPVA and PPCO?

18   A.  As far as I knew, Mark Nordlicht was in charge of both

19   funds.

20          MR. GLUCK:  I'd like to introduce paragraph 20 of the

21   affidavit as a prior inconsistent statement.

22   Q.  Mr. Fuchs, do you recall, I asked you whether you knew who

23   Angela Albanese was employed by?

24   A.  Yes.

25   Q.  And what was your answer just now?

1    A.  Yes, she was employed by Mr. Huberfeld and Mr. Bodner.

2    Q.  Do you know whether she was employed by Platinum Inc.?

3    A.  I don't know what it was called, but the manager of PPCO or

4    PPVA, but she was there as the personal executive secretary.

5              MR. GLUCK:  Now I'd like to introduce a prior

6    inconsistent statement, paragraph 20 of your affidavit.

7              THE COURT:  I'm sorry.  You're introducing this as an

8    inconsistent?

9              MR. GLUCK:  Yes, that he knew that Albanese was

10   employed by Platinum.

11             THE COURT:  The objection is sustained.

12   Q.  Did you ever become a partner in the management company of

13   PPCO?

14   A.  As far as I knew, I became a partner in Platinum

15   Management.

16   Q.  Was that the management company for PPVA?

17   A.  As far as I knew, it was both Platinum for PPVA and PPCO.

18   That's what I was told.

19   Q.  Did you ever receive any fees based on the net asset value

20   of PPCO?

21   A.  I never received anything.

22   Q.  As far as you know -- let me ask the question simply.

23             Were you only a partner of Platinum Management PPVA's

24   manager or did you also become a partner of PPCO?

25   A.  As far as I was told, I became a partner of Platinum

MC5Cpla5                    B. Fuchs - Redirect

1    Management of both funds.  That's as far as my recollection is.

2    Q.  And you don't know whether PPVA paid for salaries or rents

3    on the 54th floor?

4         MR. HERTZBERG:  Asked and answered.

5    Q.  Having refreshed your recollection?

6         THE COURT:  I'll allow it.

7    A.  I have no idea.

8    Q.  The meetings, the process meetings that you attended --

9         MR. GLUCK:  Mr. Parson, will you please pull up

10   Plaintiffs' Exhibit 929, the demonstrative of the meetings.

11        MS. SHEN:  It's 930.

12        MR. GLUCK:  930.

13        MS. SHEN:  Sorry.  928.

14        MR. GLUCK:  My apologies.  928, please.

15   Q.  Mr. Fuchs, I'm going to represent to you that this is a

16   compilation --

17        MR. HERTZBERG:  Hold on a second.  Your Honor, we have

18   objections to this document.  Before Mr. Gluck starts

19   describing it, I want to flag it.

20        THE COURT:  Sustained.  You can't testify to this.

21        MR. GLUCK:  I'm sorry?

22        THE COURT:  You cannot testify.  You can't represent

23   who it's for.  You can't even represent that that depends it's

24   phase A, phase 10 or whatever.

25        MR. GLUCK:  Fair enough.  Nevertheless, we would like

MC5Cpla5                          B. Fuchs - Redirect

1    to show the witness --

2              THE COURT:  You can show the witness anything.

3    Q.  Mr. Fuchs, would it be fair to say that when there were

4    meetings, you would receive calendar invitations?

5    A.  I don't recall seeing these calendars, but -- I don't know.

6    Q.  Let's go through these meetings.

7              Mr. Joe Mann, do you recall where he worked?

8    A.  Yes.

9    Q.  Where did he work?

10   A.  At PPVA.

11   Q.  Two lines down in yellow, further than that, Mr. Uri

12   Landesman, where did he work?

13   A.  PPVA.

14   Q.  Two lines after that, same answer?

15   A.  Same answer, yes.

16   Q.  Both November and December of 2013, you worked at PPVA?

17   A.  Yes.

18   Q.  Would you attend meetings with Mr. Uri Landesman,

19   Mr. Murray Huberfeld, Mr. David Bodner and others.

20   A.  Yes.

21   Q.  Let's keep going down the list.

22              Is this another meeting you attended?

23   A.  Yes.

24   Q.  Let's do an example --

25              MR. HERTZBERG:  Your Honor, the refreshing or the

MC5Cpla5                         B. Fuchs – Redirect

1    purported refreshening is not appropriate.

2                MR. GLUCK:  Let's pull up control 4726315 when we get

3    an opportunity so that we can see the format.

4                THE COURT:  So, the objection would have been

5    sustained had it been made in timely fashion, but you just let

6    it go on, so the objection is waived.  But that all goes to the

7    previous answers, not going forward.  In other words, I think

8    you really ought to go to another subject.

9                Let me ask you a question, you were asked on your

10   cross examination about Marcos Katz.  Do you remember that?

11               THE WITNESS:  Yes.

12               THE COURT:  I was unclear.  Did you meet with Marcos

13   Katz?

14               THE WITNESS:  Yes, several times.

15               THE COURT:  And that was for what purpose?

16               THE WITNESS:  I was asked to go meet with him to tell

17   him how I am invested in the fund and how comfortable I am in

18   the fund and to give him a comfort level of someone of my age

19   that was closer to his age who was also heavily invested in the

20   fund.

21               THE COURT:  Was Mr. Bodner with you on some or all of

22   those meetings?

23               THE WITNESS:  At some of those meetings, yes.

24               THE COURT:  What, if anything, did he say?

25               THE WITNESS:  He said that here is Bernie Fuchs, he's

MC5Cpla5                          B. Fuchs - Redirect

1    an investor in the fund, I'm an investor in the fund.  We're

2    all here and everything is going to be fine, just don't be

3    nervous about it, the fund.

4                THE COURT:  Was there any discussion of whether or not

5    Mr. Katz should seek redemption?

6                THE WITNESS:  That's why we had the meeting, because

7    he was concerned --

8                THE COURT:  The point was to convince him not to seek

9    redemption?

10               THE WITNESS:  Correct.

11               THE COURT:  And that was a point made to him by both

12   you and Mr. Bodner, among others?

13               THE WITNESS:  And Mr. Huberfeld and Mr. Nordlicht,

14   correct.

15               THE COURT:  This was in the spring of 2015, yes?

16               THE WITNESS:  Yes.

17               THE COURT:  Was there any representation made that

18   PPVA had sufficient assets to fully redeem his investment?

19               THE WITNESS:  Yes, it was made very clear to him that

20   the fund was healthy.

21               THE COURT:  And did that include a representation by

22   Mr. Bodner?

23               THE WITNESS:  It included representation of

24   Mr. Bodner, Mr. Huberfeld, and Mr. Nordlicht.

25               THE COURT:  And how about yourself?

MC5Cpla5                          B. Fuchs - Redirect

1              THE WITNESS:  I was only there as a participant

2    because my money was there on the table, also.  So I told him

3    I'm also comfortable.

4              THE COURT:  Okay.  Go ahead.

5              MR. GLUCK:  Mr. Parson, will you please recall

6    Exhibit 927, in particular paragraph 72, which is admitted in

7    evidence.

8    BY MR. GLUCK:

9    Q.  Do you recall when Mr. Hertzberg asked you whether you

10   considered yourself a manager at Platinum Management?  Do you

11   recall that from this morning?

12   A.  No.

13   Q.  Did you consider yourself a manager of Platinum Management

14   after you were made a partner?

15   A.  Of course not.

16   Q.  If you look at your screen and you look at paragraph 72,

17   does that refresh your recollection in any way?

18   A.  Yes.

19   Q.  And how does it refresh your recollection?

20   A.  I remember I felt lousy.

21   Q.  Did you believe you had been the victim of a rope the dope?

22   A.  Yes.

23   Q.  Why is that?

24   A.  Because they made me a partner and a few months later, the

25   announcement was made that no partner is taking any money out.

1  Q.  You invested in these hedge funds beginning in what, 2005,

2  2006?

3  A.  2006, yes.

4  Q.  And you visited these hedge funds on a regular basis after

5  that?

6  A.  Yeah, pretty often.

7  Q.  And then you became a partner of Platinum Management

8  beginning in 2014; is that right?

9  A.  Middle of 2014, correct.

10  Q.  Do you have an understanding of what a hedge fund manager

11  does?

12  A.  Yes.

13  Q.  What do they do?

14  A.  They decide to make investments in different companies and

15  try to make a profit so they can give investors a share of the

16  profits.

17  Q.  Did they try to bring in investors?

18  A.  That's also part of it, yes.

19  Q.  Do they try to run the operations of the hedge fund?

20  A.  Yes, they do, that's part of it.

21  Q.  With respect to Mr. Bodner, did Mr. Bodner bring in

22  investors?

23  A.  I'm not sure if he did or if he didn't.

24  Q.  Did you bring in investors?

25  A.  Yes, I did.

MC5Cpla5                          B. Fuchs - Redirect

Q.  Did Mr. Bodner instruct you to bring in investors?

A.  Yes.

Q.  Do you know whether Mr. Bodner played a role in the
management of investments or deciding what to invest in?

A.  He was involved in a couple of investments that I know that
he was involved in it, yes.

Q.  Do you know whether Mr. Bodner was involved in the
operations?

A.  I think the operations were run by Mark Nordlicht.

Q.  Do you know whether Mr. Bodner was involved in any employee
decisions?

A.  I'm not sure.

Q.  Were you?

A.  I was involved in some Chinese employees that came to work,
yes.

Q.  What about with respect to Mr. Edelman, your son-in-law?

A.  Edelstein.  Yes, I asked Mr. Huberfeld to give him a job,
yes.

Q.  So you were a partner in 2014, you helped to bring in
investors.  Did you have a role in the management of the
investments?

A.  None.

Q.  What about China Horizon?

A.  They made the investment, then they asked me to look after
it, but I was not involved in the decision of bringing the

MC5Cpla5                          B. Fuchs - Redirect

1    investment in.  They didn't ask me beforehand.  After they made

2    the investment, they asked me if I could just look into it to

3    see if it's going to be a good -- if it's going to be okay.

4    Q.  I'll refer you to paragraph 74 of the same document.  My

5    question is who are the other Platinum defendants?

6              MR. HERTZBERG:  Objection.  Is the witness being

7    refreshed?  I don't understand why he's --

8              MR. GLUCK:  Let me rephrase.

9    Q.  Was Mr. Bodner the first member of Platinum Management?

10   A.  Yes.

11   Q.  Do you believe that Mr. Bodner owed you a fiduciary duty?

12             MR. HERTZBERG:  Objection.

13             THE COURT:  Sustained.

14   Q.  Did you trust Mr. Bodner to oversee your investments?

15             MR. HERTZBERG:  Objection.

16             THE COURT:  Overruled.

17   A.  Yes.

18   Q.  Did he tell you that he was overseeing your investments?

19   A.  When I invested into the fund initially, the reason I

20   invested because I trusted Mr. Huberfeld, and Mr. Huberfeld

21   told me that him and Mr. Bodner were partners for the last 30

22   years, so I trusted Mr. Huberfeld and because of that, I

23   trusted Mr. Bodner equally.

24   Q.  Did Mr. Bodner represent himself to the investors that you

25   brought in as the principal of PPVA?

MC5Cpla5                         B. Fuchs - Redirect

1   A.  Yes.

2                 MR. HERTZBERG:  Objection.

3                 THE COURT:  Did you witness him doing that?

4                 THE WITNESS:  Yes.

5                 THE COURT:  The objection is overruled.

6   Q.  Did you believe that Mr. Bodner maintained negative veto

7   control over matters concerning Platinum Management?

8                 MR. HERTZBERG:  Objection form.

9                 THE COURT:  Sustained.

10  Q.  Did you believe that Mr. Bodner --

11                THE COURT:  Almost every question that begins with the

12  words "did you believe" is going to be subject of an objection,

13  sustained.  His beliefs are not what he's here to testify

14  about.  He is here to testify as to what he saw, heard, and

15  observed.

16  Q.  Did you observe that Mr. Bodner maintained control of

17  Platinum Inc.?

18                MR. HERTZBERG:  Objection.

19                THE COURT:  Sustained because that's really just --

20  well, let me put a question to move this along.

21                Did you see or hear Mr. Bodner giving orders with

22  respect to any aspect of Platinum?

23                THE WITNESS:  I only saw one order, the order that he

24  said that partners are not taking any money out.  And that

25  order was --

MC5Cpla5                          B. Fuchs - Redirect

1              THE COURT:  So that's the order that you observed;

2      correct?

3              THE WITNESS:  Correct.

4              THE COURT:  Go ahead.

5              MR. GLUCK:  Now I would like to introduce --

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  The record should reflect that we're

3  looking at the declaration of Mr. Fuchs.  Plaintiffs' counsel

4  is now seeking, as he has earned the right to do, to impeach

5  his own witness.  The affidavit, to a remarkable extent, deals

6  with things other than facts, but beliefs and understandings.

7  Understanding is admissible when we're talking about something

8  fairly narrow.  For example, I think there was a question put

9  by one counsel or the other earlier during that famous meeting

10  where there was yelling, did you understand that Mr. Bodner was

11  angry.  That's a permissible inference, that falls within the

12  lay opinion exception to a percipient witness being limited to

13  what he heard and observed.

14          Here, the paragraph that I think plaintiff wants to

15  introduce is paragraph 21.  Quote, for as long as I was an

16  investor in Platinum funds, Bodner held himself as the

17  principal of PMNY with authority to make decisions about the

18  management and the funds, solicit investors, evaluate the

19  performance of the funds, and assess investment strategy.

20          Now, that may or may not be admissible.  I don't think

21  it has yet been asked, maybe I missed it, whether Mr. Bodner

22  said he was a principal, said he had authority to make

23  decisions, said there was discussion about soliciting investors

24  that's already been pursued.

25          The paragraph goes on.  It is my understanding that

MC5Cpla5                         B. Fuchs - Redirect

1    Huberfeld, Nordlicht, and Landesman all consulted with Bodner
2    with respect to investment strategy, valuation of the Platinum
3    funds assets, office operations, and targeting investors.  That
4    is not admissible.
5          Next sentence is, likewise, for all employees,
6    managers of PM and I took direction from Bodner; based on his
7    role, I would assume that Bodner asked for the Platinum funds
8    positions and cash flows regularly: and then he was kept
9    apprized of the performance of Platinum funds' assets.  Some of
10   that may be arguments that counsel can make on summation, but
11   there's nothing here that's a prior inconsistent statement of
12   knowledge that he has.
13         So my ruling is that plaintiffs' counsel can question
14   Mr. Fuchs now about whether Mr. Bodner said something to the
15   effect that he was a principal of PMNY, whether he said
16   something to the effect that he had authority to make decisions
17   about the management of the funds, whether he said he had the
18   authority so solicit investors, whether he had said something
19   to the effect that he had the authority to assess investment
20   strategy, et cetera, in other words, things covered by the
21   first sentence.  If the answer is inconsistent with the first
22   sentence, the first sentence can be received, but none of the
23   rest.
24         (Continued on next page)
25

MC5Cpla5                         B. Fuchs - Redirect

1                   (In open court)

2    BY MR. GLUCK:

3    Q.  Mr. Fuchs, did Mr. Bodner state to you or to anyone else

4    within your presence that he was a principal of Platinum Inc.?

5    A.  Nobody went around saying I'm the partner, I'm the partner.

6    If they were the partner, then I came and that's how I was

7    introduced, that Murray Huberfeld, David Bodner, they were

8    partners in the company, we started the fund, it's our fund.

9    that's it.

10                  THE COURT:  As a partner yourself, as you have

11   educated me, did you not know, from the partners meetings, who

12   the other partners were?

13                  THE WITNESS:  Of course.

14                  THE COURT:  Was Mr. Bodner at those meetings?

15                  THE WITNESS:  Yes.

16                  THE COURT:  Go ahead.

17   BY MR. GLUCK:

18   Q.  Mr. Fuchs, did Mr. Bodner state to you or to anyone else

19   within your presence that he had authority to make decisions

20   about the management, the funds, PPVA?

21   A.  I'm sorry.  What's the question?

22                  THE COURT:  Did he say something or one or more things

23   to the effect that he had authority to make decisions about the

24   management of the funds?

25                  THE WITNESS:  The only thing that he said that I

MC5Cpla5                         B. Fuchs - Redirect

 1   recall was what he said, that no partner would be taking any
 2   money out of the fund.
 3          THE COURT:  That was, to your understanding, a
 4   statement that that was an order, as far as you were concerned?
 5          THE WITNESS:  Yes.
 6          THE COURT:  And he gave it as an order?
 7          THE WITNESS:  Yes.
 8          THE COURT:  Now you said before that you didn't see
 9   him solicit investors, but you understand he had the power to
10   solicit investors?
11          THE WITNESS:  Yes.
12          THE COURT:  Did he say something or hold himself out
13   in some way as someone who had the authority to assess the
14   investment strategy?
15          THE WITNESS:  No.
16          THE COURT:  And finally, did he hold himself out as
17   someone who had the authority to evaluate the performance of
18   the funds?
19          THE WITNESS:  No.
20          THE COURT:  So, counsel, although some of it is
21   arguably consistent, some of it is arguably inconsistent.  If
22   you want to read that first sentence, I will allow it.
23          MR. GLUCK:  Thank you.  Mr. Parson, will you pull up
24   only the first sentence of paragraph 21 of Mr. Fuchs'
25   affidavit, only the first sentence.

MC5Cpla5                          B. Fuchs - Redirect

1            THE COURT:  Just to set the stage and then I'll turn

2      it back to counsel.

3            We're looking at a declaration that you made back on

4      November 21st of this year.  Do you remember that?

5            THE WITNESS:  Yes.

6            THE COURT:  And you made the declaration under

7      penalties of perjury; right?

8            THE WITNESS:  Yes.

9            THE COURT:  So you understood it had to be truthful?

10           THE WITNESS:  Yes.

11           THE COURT:  Go ahead.

12           MR. GLUCK:  Mr. Parson, will you please zoom in and

13     highlight only the first sentence of paragraph 21 of Mr. Fuchs'

14     affidavit.

15     Q.  It states, Mr. Fuchs, did you previously testify that for

16     as long as you were an investor in the Platinum funds, Bodner

17     held himself out as a principal of PMNY with the authority to

18     make decisions about the management of the funds, solicit

19     investors, evaluate the performance of the funds, and assess

20     investment strategy?

21     A.  Yes.

22     Q.  Is that your testimony today?

23     A.  Yes.

24     Q.  Do you have a tendency to get sometimes confused?

25     A.  Not often.

MC5Cpla5                        B. Fuchs - Redirect

1   Q.  The dinner that occurred, that was your very first --

2            THE COURT:  Counsel, I'm going to give you a little

3   more time than you asked for because it was only a ballpark

4   estimate and because we had a sidebar, I think you've got about

5   five more minutes.

6   Q.  The dinner meeting that you testified to, that was your

7   first partners meeting; is that right?

8   A.  Yes.

9   Q.  At that dinner meeting, did you have a detailed

10  understanding of Beechwood?

11  A.  No.

12  Q.  At that dinner meeting, did you know about the Renaissance

13  sale of Black Elk and the subordination of the bonds that

14  occurred after?

15  A.  No.

16  Q.  At that dinner meeting, did you know that Beechwood had

17  acquired the debt of Platinum operating companies like Golden

18  Gate, Northstar, and Black Elk?

19            MR. HERTZBERG:  Objection.

20            THE COURT:  Overruled.

21  A.  I really did not know anything about what Beechwood had

22  done with Platinum.  I had no knowledge of what was going on

23  between these two companies.

24  Q.  Did you know that Golden Gate was pumping water only and

25  had recently become defunct?

MC5Cpla5                        B. Fuchs - Redirect

1    A.  No.

2              MR. HERTZBERG:  Objection.

3    Q.  Was that discussed at the meeting?

4              THE COURT:  I take it you changed the question to was

5    the allegation that Golden Gate was pumping water and had only

6    recently become defunct, whether that allegation was discussed

7    in the meeting?

8              MR. GLUCK:  Yes.

9              THE COURT:  Was that discussed?

10             THE WITNESS:  No.

11   Q.  Did you know that to be the case prior to the meeting?

12   A.  No.

13   Q.  Were you aware of whether Mr. Bodner knew about these facts

14   prior to the meeting?

15   A.  No.

16   Q.  Were you aware whether Mr. Huberfeld knew about these facts

17   prior to the meeting?

18   A.  No.

19   Q.  Were you aware that Platinum PPVA had just bought another

20   $30 million of Black Elk bonds from Beechwood prior to the

21   meeting?

22   A.  No.

23   Q.  Are you aware whether Mr. Huberfeld knew that?

24   A.  Sorry?

25   Q.  Were you aware of whether Mr. Huberfeld knew that?

MC5Cpla5                    B. Fuchs - Redirect

1    A.  I have no idea.

2    Q.  Are you aware of whether Mr. Bodner knew that?

3    A.  No, I have no idea.

4            MR. GLUCK:  Very quickly, Noah, will you please call

5    up Plaintiffs' Exhibit 566.

6            I would seek to admit this into evidence.

7            MR. HERTZBERG:  Outside the scope.

8            THE COURT:  In the form that is presently on the

9    screen, although my ophthalmologist assures me that I have

10   20/20 vision, I can't read it, if you would be kind enough to

11   blow it up.

12           MR. GLUCK:  Sorry.  If you would go to the next page.

13           THE COURT:  What's the ground of the objection?

14           MR. HERTZBERG:  Outside the scope, Judge.

15           THE COURT:  Thank you.  Overruled.

16           MR. GLUCK:  Mr. Parson, will you very quickly please

17   call up Plaintiffs' Exhibit 396.

18           Seek to admit this into evidence.

19           MR. HERTZBERG:  Objection.  Subject to connection.

20   And outside the scope.

21           THE COURT:  Overruled.  Received.  And the previous

22   one is received.

23           (Plaintiffs' Exhibits 566, 396 received in evidence)

24   BY MR. GLUCK:

25   Q.  Did you know that PPVA, after the Renaissance sale, after

MC5Cpla5                    B. Fuchs - Redirect

1   the assets of Black Elk had been sold, agreed to buy Black Elk

2   bonds from Beechwood?

3   A.  No.

4   Q.  Did you have an understanding of what Northstar was at that

5   time?

6   A.  I had some idea.

7   Q.  Did you know that Northstar was formed with the remnants of

8   Black Elk's assets?

9   A.  I think I knew that.  I remember something about that.

10  Q.  Did you have an understanding about what those assets were

11  being valued at at that time?

12  A.  No.

13  Q.  I think you testified earlier that Mr. Nordlicht said

14  something to the effect that Mr. Bodner wasn't coming into the

15  office at the dinner.  Do you recall that?

16  A.  Right.

17  Q.  Based on your personal knowledge and experience, did you

18  see the SEC in Platinum's offices from mid 2014 through 2015?

19  A.  Yes.

20  Q.  Do you have any understanding as to why Mr. Bodner was not

21  coming into the office during that period?

22  A.  He did come in, he just didn't -- maybe didn't come in

23  every day, but he did come in, I'd seen him often.

24  Q.  Were you aware that Mr. Bodner instructed his secretary to

25  set up a Bodner Gmail account so that emails could be sent by

MC5Cpla5                      B. Fuchs - Redirect

1   her and to her for Mr. Bodner off the Platinum server during

2   this period?

3          MR. HERTZBERG:  Objection.

4   Q.  Did you know that at the dinner?

5          THE COURT:  Sustained.

6   Q.  Have you heard of the Corrections Officer and Benevolent

7   Association Pension Fund?  Have you heard of it?

8   A.  Yes.

9   Q.  Are you aware they were an investor in PPVA?

10  A.  Yes.

11  Q.  By that dinner, were you aware of the circumstances by

12  which COBA, the corrections officers fund, became an investor

13  in PPVA?

14  A.  They just invested, so I knew they invested.

15  Q.  Is that all you know today?

16  A.  Of course now I know different.

17  Q.  What do you know differently?

18  A.  Well, they arrested Mr. Huberfeld for bribing somebody.

19  Q.  At the dinner, you didn't know that, did you?

20  A.  No.

21  Q.  Do you know whether Mr. Huberfeld was aware of that?

22  A.  No.

23  Q.  Do you know whether Mr. Bodner was aware of it?

24  A.  No.

25  Q.  After that dinner, did you take any action whatsoever to

MC5Cpla5                          B. Fuchs - Redirect

1    determine whether Mr. Bodner's contentions that the funds being

2    overvalued were true?

3    A.  No.

4    Q.  Is that why you were sued by PPVA and Mr. Martin Trott?

5    A.  Yes.

6    Q.  Sitting here today, are you aware that the SEC filed a

7    complaint against Platinum Management for overvaluation?

8    A.  I have no aware of this.

9    Q.  You sued Platinum Management, David Bodner, Mark Nordlicht,

10   and others for breach of their fiduciary duties to PPVA, didn't

11   you?

12   A.  That was originally when the lawsuit came, we countersued.

13   Q.  Do you recall when Mr. Hertzberg showed you paragraphs from

14   documents showing that Mark Nordlicht had extraordinary

15   discretion as to how to value the assets?

16   A.  Yes.

17   Q.  Do you believe he had the right to lie?

18   A.  No right to lie.

19   Q.  Do you understand whether, notwithstanding discretion,

20   there are limits as to how assets can be valued?

21   A.  Yes.

22   Q.  Do you have an understanding of whether the SEC sued

23   Platinum Management --

24           THE COURT:  Sustained.  Counsel, you've completed your

25   examination since you interpreted my five minutes to mean ten.

1           Any recross?

2           MR. HERTZBERG:  Very brief.

3    RECROSS EXAMINATION

4    BY MR. HERTZBERG:

5    Q.  Mr. Fuchs, you said Mr. Bodner instructed you to do various

6    things.  What does that mean?  How can Mr. Bodner instruct you

7    to do anything?

8    A.  Well, when he called me into the office with Mr. Huberfeld

9    together after making me a partner, he instructed me that this

10   doesn't mean you can sit on your laurels and do nothing.  I

11   still want you to go out and bring investors into the fund.

12   Q.  And you testified about a meeting in the spring of 2015

13   under the Judge's examination of you.  You went to see

14   Mr. Katz.  Do you recall that?

15   A.  Yes.

16   Q.  And following that meeting, did Marcos Katz send his

17   grandson, Michael, to monitor at Platinum Management?

18   A.  Yes.

19   Q.  And Michael Katz was present for several months in the

20   offices at Platinum Management?

21   A.  Yes.

22   Q.  And he worked closely with Mark Nordlicht?

23   A.  I'm not sure.  I think so.

24   Q.  And that was before March 20, 2016, when there was the

25   transaction where Mr. Bodner and Mr. Huberfeld were going out

MC5Cpla5                          B. Fuchs - Recross

1    and Mr. Katz was coming in?

2    A.  Yes.

3    Q.  You testified about some problems at China Horizon.  When

4    did those problems arise?

5    A.  The series problems were 2015.

6    Q.  Early in the year, late in the year?

7    A.  I can't remember exactly.

8    Q.  Could it have been around October, November of 2015?

9    A.  Could have been around then.

10   Q.  Mr. Bodner had a personal investment in China Horizon;

11   isn't that right?

12   A.  I'm not sure if he did.

13   Q.  You were on the board of China Horizon?

14   A.  Yes.

15   Q.  And you continued to believe in China Horizon and the

16   potential of China Horizon even after those issues arose?

17   A.  Yes.

18   Q.  Mr. Gluck showed you a document, it was PX 408.

19           MR. HERTZBERG:  I'll ask my friends at the front table

20   if they can please pull that up.

21   Q.  Do you recall this, Mr. Fuchs?

22   A.  Yes.

23   Q.  Did you even speak to Mr. Bodner before writing to

24   Mr. Kuppermann that he would join a guarantee?

25   A.  No.

1           MR. HERTZBERG:  You can take this down.  Thank you.

2           Mr. Robson, can you pull up PX 587, please.  Thank

3    you.

4    Q.  And this is where you wrote just right at the top there --

5           MR. HERTZBERG:  Mr. Robson, if you can zoom in.

6    Q.  -- you talked about the new fund which has all good

7    positions, no skeletons.  Do you see that?

8    A.  Yes.

9    Q.  By skeletons, you meant positions that needed liquidity;

10   right?

11   A.  Yes.

12   Q.  You were not referring to positions for which -- you

13   weren't saying that those positions were overvalued?

14   A.  No.

15          MR. HERTZBERG:  That's it.  Thank you, Judge.  Thank

16   you, Mr. Fuchs.

17          THE COURT:  Anything else?

18          MR. HERTZBERG:  One more question, your Honor.

19          THE COURT:  Silly me, here I thought we were going to

20   give the jury a midafternoon break, but I don't want to stop

21   you, counsel.

22   Q.  Joel Edelstein, how is he related to you?

23   A.  My son-in-law.

24   Q.  And he had a position within Platinum Management?

25   A.  Yeah, he worked at the fund, yes.

MC5Cpla5                          B. Fuchs - Redirect

1   Q.  He was at Centurion?

2   A.  Yes.

3   Q.  And he was the chief operating officer of Centurion?

4   A.  I'm not sure if that was his title.

5   Q.  After the consolidation with Mark Nordlicht, he stayed on?

6   A.  Yes, for a short while, yes.

7   Q.  And he was working there until when?

8   A.  I think till 2014.

9           MR. HERTZBERG:  Nothing further.  Thank you.

10          THE COURT:  Okay.

11          MR. GLUCK:  One last question.

12          THE COURT:  Last time either counsel tell me one last

13  question.  You asked four or five, but alright.

14  REDIRECT EXAMINATION

15  BY MR. GLUCK:

16  Q.  Did you go over every line and word of your affidavit

17  submitted two weeks ago or a week ago with Mr. Joel Edelstein?

18  A.  Yes.

19          MR. GLUCK:  Thank you.

20          THE COURT:  Thank you very much.  You may step down.

21  You can leave all those papers there.

22          (Witness excused)

23          Ladies and gentlemen, I'll give you your midafternoon

24  break of 15 minutes.

25          (Continued on next page)

1          (Jury not present)

2          THE COURT:  So I think there are two outstanding

3    matters.  One is I had reserved judgment on defendant's fourth

4    motion *in limine* to preclude an argument of evidence in support

5    of the plaintiffs' theories for disgorgement and consequential

6    damages.  And I understand the witness is coming up later today

7    or tomorrow, whether he be permitted to address at least some

8    of that, so we need to rule on that before then.

9          So I've reviewed the parties' submissions.  Let me

10   make sure I understand the facts and arguments and then I'll

11   hear from each side.

12         So consequential damages are mentioned only once in

13   the operative complaint, and that's in connection with the sale

14   of Agera to Beechwood at paragraph 671 of the plaintiffs' short

15   and concise state ment of its claims.  "The loss of PPVA's

16   interest in Agera has caused substantial consequential damages

17   in an amount to be determined at trial."

18         I don't think disgorgement is mentioned anywhere in

19   the pleadings.  However, the plaintiff argues that, even that

20   one sentence about consequential damages alerted defense

21   counsel that that was something that was going to be sought at

22   trial, that there is no, they say, prejudice to defendant from

23   including that, and it's something that I don't think either

24   side mentioned.  My recollection that the Federal Rules of

25   Civil Procedure say that a party is awarded judgment on

1    liability is entitled to all appropriate remedies or words to

2    that effect.

3            So, let me hear first from defense counsel, then from

4    plaintiffs' counsel.

5            MR. LAUER:  Thank you, your Honor.  I'd like to

6    address two aspects to the motion.  One is the one that your

7    Honor started on, which is not only a failure to ask for

8    consequential damages with respect to the first scheme, but the

9    entirely misleading nature, I'm not saying it was intentional,

10   but in terms of the outcome, the surprise and the luring in, if

11   you will, of the case until the motion *in limine* process in

12   which consequential damages is only referenced in that second

13   scheme, and the Court granted, and the 26 disclosure never

14   mentions consequential damages.

15           Their expert, they had an expert on damages.  He makes

16   the statement, among other statements, I was asked to render my

17   expert opinion about damages sustained by the plaintiffs as a

18   consequence of actions by the defendants during the period

19   beginning December 2012 through March 31, 2016, including but

20   not limited to.  There's no mention of consequential damages.

21           The Agera transaction, along with several other

22   discrete transactions, is identified as a discrete looting of

23   an asset in the second scheme, but nowhere does the expert or

24   counsel in any way purport to connect the valuation issue as

25   a -- that someone who did not disclose the valuation issue at

MC5Cpla5                          B. Fuchs - Redirect

1    some earlier point in time would foresee all these

2    consequences.

3              So, basically, we enter this case and we argue summary

4    judgment, and the summary judgment was from the decision

5    perspective.  There is no evidence connecting Mr. Bodner, even

6    assuming for summary judgment purposes he could be responsible

7    for failure to disclose at some point in time that there was a

8    valuation, that the assets were overvalued.  There is no

9    connection between Mr. Bodner's conduct and any of these

10   individual transactions, not limited to Agera, because these

11   individual transactions occurred throughout the second scheme,

12   they're not limited to 2016 or 2015.  And the Court granted

13   summary judgment, Agera was out of the case.

14             Now, what does connection mean?  So putting aside the

15   fact that we were never on notice that we have to deal with the

16   entirety of the second scheme, in other words, today, right

17   now, they're choosing to simply deal with Agera, a $70 million

18   claim, but conceptually, if they're right, summary judgment,

19   that valuation is there, but the discrete transactions are not

20   is an illusion because every one of the second schemes, the

21   second scheme transactions could be said to have followed in

22   time some earlier point of disclosure.

23             I need to take some moments on this, because this is

24   an enormous dollar amount and it's a multiple of the actual

25   dollars of incentive fees that are claimed in the case.  So if

MC5Cpla5                      B. Fuchs - Redirect

1    you think about it, while much of the focus in this case has

2    been on what was going on when oil dropped and put a lot of

3    pressure on the fund and they had this dinner meeting in early

4    2015, and Agera coincidently happens to be a specific

5    transaction after that dinner, but conceptually, they want to

6    argue at some point, whether it's a strong point or not, going

7    back to who knows when, 2010, 2011, Mr. Bodner can be tapped

8    with knowledge of overvaluation.

9            Therefore, in effect, what they are saying is we

10   argued summary judgment, we won summary judgment, the second

11   scheme transactions are all out, but in reality, they're saying

12   guess what, Judge, you said there's no evidence connecting, we

13   believe there is a causal connection.  The irony is not lost

14   that there's a causal connection between the failure to

15   disclose at earlier points in time and every one of these

16   second scheme transactions.

17           So, we believe that when the Court ruled, there was no

18   Agera claim because there was no evidence connecting

19   Mr. Bodner.  At that point in time, if they had evidence that

20   connected Mr. Bodner to the Agera claim, it was incumbent upon

21   them to say, your Honor, we have another rationale for why

22   Agera or some of these other second scheme transactions are

23   still in the case, even if the Court wants to limit it to

24   valuation, because at some earlier point, the jury could find

25   nondisclosure and all of these things could be foreseeable.

1          Now, I'll say one other thing, and that is with

2     respect to Agera.  The allegation with Agera is that,

3     essentially, there was a criminal act in which whoever it was

4     was doing the transaction, took an asset that they believe was

5     worth more than it was sold for.  They have a separate lawsuit

6     in chancery court in Delaware where they're suing the insurance

7     companies that have invested in Beechwood basically for

8     participating in a fraudulent transaction in which they helped

9     loot Agera from the fund.  So, basically, they are saying while

10    some of the oil assets were hopelessly overvalued, Agera, if

11    anything, was undervalued and whatever it was worth, it was

12    stolen.  So their consequential damage argument is that they

13    can establish, quote-unquote, a nondisclosure at some earlier

14    point in time that created the liability and that a reasonable

15    person or Mr. Bodner reasonably could foresee that somehow,

16    down the line, any one of these transactions, and particularly

17    Agera, could be the subject of this separate crime.  You have

18    an intervening criminal act, you have the Court finding

19    there's no connection, you have counsel failing to argue at

20    summary judgment there is a connection, it's a causal one.

21         So, with that, we believe the consequential damages is

22    out of the case.  It would be grossly unfair to allow it in the

23    case, to have evidence on this $70 million transaction.  I have

24    no idea, Judge, whether it was a good deal, a bad deal.  We've

25    never focused on that, period.

MC5Cpla5                          B. Fuchs - Redirect

1              I'd like to just more briefly address the

2     disgorgement, the unjust enrichment.  Never raised, they put in

3     Quintero.  Quintero has this massive report detailing his whole

4     methodology, and we went through all of that.  Your Honor may

5     recall, and I know it was COVID time and I was on the phone,

6     but your Honor may recall there was vociferous argument on

7     whether or not Quintero should be able to testify because it

8     was not clear that he was able to show that the inflated

9     incentive fees were actually paid.  The entire discussion at

10    that *Daubert* was proof, can they prove that the fees were

11    actually paid and plaintiff said he can do it, he will be able

12    to pinpoint every one of the payments, no problem.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla6

1          MR. LAUER:  Nothing was ever said, prior to the motion

2     *in limine* advice by the other side, that in addition to

3     claiming for fees that were paid, for fees that were ultimately

4     redeemed and paid in cash, we have a disgorgement argument that

5     feeder fund interests that were based on inflated incentive

6     fees should be disgorged at whatever the then fair market value

7     was.  Obviously today it has virtually no value.

8          So their argument is a somewhat original one, although

9     not totally original, that worthless now, you should be forced

10    to disgorge what the fair market value was then.  Their expert

11    never addressed this.  No one ever addressed it.  We certainly

12    were not on any notice that we needed an expert to address

13    this, and they have no expert evidence valuing the fair market

14    value of these illiquid feeder fund interests which they say

15    was worth some X percentage of their notional value because of

16    the fraud.

17          THE COURT:  I need you to --

18          MR. LAUER:  Yes.  I'm sorry.

19          THE COURT:  Before the end of the break, I want to

20    hear from your adversary.

21          MR. LAUER:  Sure.  May I just address the other aspect

22    of this unjust enrichment, faithless servant.

23          Mr. Bodner was not a servant.  The 2012 fees are not

24    compensation.  They are ownership distributions.  They have

25    nothing to do with compensation.  All of the faithless servant

Mc52Pla6

1    cases deal with consultants, attorneys, anyone else that's

2    providing a service.

3           Second, the distributions for 2012 are entirely

4    severable from 2013 and we believe, based on the way this case

5    has conducted itself, never was there any suggestion that the

6    noninflated fees were in this case until the motion *in limine*

7    period.  They never asked for disgorgement or unjust enrichment

8    with respect to the first scheme.

9           THE COURT:  Thank you very much.  Let me hear from

10   plaintiffs' counsel.

11          MR. GLUCK:  I will take the points in the same order,

12   your Honor, consequential in Agera followed by the LP

13   interests.

14          On Agera, I agree with almost everything that

15   Mr. Lauer said except we chose Agera for a reason.  What this

16   Court ruled on summary judgment was that Mr. Bodner -- there

17   was insufficient evidence tying Mr. Bodner to the act of the

18   Agera transaction.  He was not liable for it.  We did not

19   interpret that opinion as a bar, an implicit bar to any and all

20   consequential damages for that which we are present on trial

21   for, overvaluation, failure to disclose.

22          Now, if it was, we are wrong and I sit down.  But if

23   it wasn't, the fair question is:  Are there a set of damages

24   that are reasonably foreseeable from an overvaluation and a

25   failure to disclose?  Where I categorically object is this is

Mc52Pla6

1    bringable to any alternate transactions that occurred before

2    the knowledge, after the knowledge, later in time, etc.  It is

3    this transaction, and I will tell you why.  And this is in

4    Mr. Quintero's report.  I respectfully disagree on that fact.

5            Since the beginning, the thesis of the plaintiffs was

6    this debt stability scheme, that the debt of Golden Gate,

7    Northstar, what have you, was sent over to Beechwood, which

8    Mr. Bodner also has knowledge of—not liable for but knowledge

9    of—and then held and they didn't sit on their rights.  They

10   didn't enforce them.  Right?  Even 2015 Golden Gate shut down.

11   Nobody is foreclosing.  That is the essence of the

12   overvaluation scheme.

13           And let me tell you why, I don't know if it's

14   criminal, but why the Agera transaction is the subject of this

15   Delaware transaction and we believe this case.  The purchase

16   price, $170 million, Mr. Quintero might say that's in the

17   ballpark.  He might say it was worth 50, 40 million more, but

18   in the ballpark.  The reason why Agera, and only Agera, is in

19   this case and directly foreseeable is because of the noncash

20   consideration paid.  It was $50 million and then the very

21   garbage debt that was the hidden concealment of the

22   overvaluation.  Your Golden Gate notes, your Northstar notes,

23   etc., etc.  $120 million of that $170 million purchase

24   price—and I'm approximating—was that very debt.  And that is

25   why we are only stating that that is the foreseeable instead

Mc52Pla6

1  of, you know, investments in rocket ships and all of the other

2  stuff that is in that second amended complaint.  Because all of

3  that stuff——the Court ruled how it ruled——Mr. Bodner is not

4  liable for.  But the notion that this would come back, that the

5  holding of the Beechwood debt would need to be recompensed in

6  some way, that is what we are saying was foreseeable.  And we

7  did say there were consequential damages in our complaint, and

8  that is why we believe, notwithstanding Mr. Lauer's arguments

9  and the Court's summary judgment ruling, that the summary

10  judgment ruling did not impact consequential damages.

11        The question now is what is foreseeable and, frankly,

12  plaintiffs have voluntarily narrowed that which is foreseeable

13  out of all of the other things——and there is maybe some other

14  stuff could have been——to this noncash consideration for Agera,

15  the very debt of the debt stability scheme.  So that's why we

16  say there is consequentials in the case.

17        I will also add that after discovery, recently——I can

18  tell you it's been prefaced to defense counsel——Mr. Trott

19  engaged lawyers in connection with two arbitrations, the audit

20  firms, and it suggested that the case law is very clear that in

21  an overvaluation fraud attorney's fees for third parties——not

22  for this case but for third parties——are collectible.  So

23  that's consequential damages.

24        On the issue of clawback, firstly, it is either a 4.9

25  or a 5.9 million issue.  As I sit here today, I don't know

Mc52Pla6

1    which one, but it is one of those two.  And there, we

2    believe -- I have to disagree with Mr. Lauer's time frame and

3    narrative.  We, PPVA, since the beginning of this case, said we

4    believe that every incentive fee paid out, you know, December

5    2012 onward shouldn't be paid.  It didn't go up to zero.  It

6    has always been the position.

7          It was only at the *Daubert* hearing, which preceded

8    these motions *in limine* by maybe a month, that it was suggested

9    that in fact -- first of all, none of the fees are damage to

10   PPVA, which was rejected, and then the conclusion was that to

11   the extent PPVA master fund actually paid management fees or

12   actually paid incentive fees or paid for the redemption of

13   those incentive fees, they are in the case and that's where we

14   stand now.

15         Drawing on that distinction for the very first time,

16   it was defendants that decided to draw a distinction, I

17   understand why, between cash incentive fees and noncash

18   incentive fees.  It was the very first time we heard was in

19   their motions *in limine*.  We had never drawn that distinction

20   prior.  I understand why they did, based upon the Court's

21   summary judgment ruling, but I'm just saying we hadn't.  We

22   were not distinguishing between cash or not cash.

23         And we agree with one thing; that, in the traditional

24   sense, adding more LP interest to the feeder fund are not

25   damages to the master fund.  So we let that drop and we

Mc52Pla6

1    continue to let it drop.

2         But then in analyzing our pleadings in the course of

3    the case so far, as well as the relevant case law cited in our

4    papers, we see that breach of fiduciary duty -- by the way,

5    which is synonymous with faithful servant.  There is no lower

6    standard.  If he is a fiduciary, he is a fiduciary.  And

7    disgorgement is a remedy.  There is a lot of New York cases on

8    this.  And it's not just a remedy for the SEC, as I think

9    defense is suggesting.  It's a remedy for all the private

10   parties.  And we are saying that these fees were directly --

11   the shares were directly paid on account of the overvaluation.

12        That's all we are looking at, the $4.9-5.9 million,

13   and we are saying at the time that they had value.  It's one of

14   the reasons there is a straight line.  We acknowledge these

15   shares were not valueless in 2013.  I don't think there was

16   much debt on the fund in '13.  Even if the NAV was overstated,

17   if the fund was worth whatever, 300 million, the shares were

18   worth a fraction of that.  It wasn't insolvent until later,

19   2016.

20        THE COURT:  All right.  I know there are other things

21   you need to address, but I am also mindful that we want to not

22   keep the jury.

23        The next witness is not Mr. Quintero, right?

24        MR. GLUCK:  No.  It is Ms. Albanese.

25        THE COURT:  How long is that?

Mc52Pla6

1            MS. SHEN:  No more than an hour on direct.

2            THE COURT:  I would hope so.  I would hope it would be

3    a lot less than that.  All right.  At 4:30, when we excuse the

4    jury, I will hear what plaintiffs' counsel wants to further and

5    I will give each side a short rebuttal as well, and I will make

6    a decision by sometime this evening, so you will have it before

7    Mr. Quintero gets on the stand.

8            But now we bring in the next witness and get the jury.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2               THE COURT:  Please call your next witness.

3               MS. SHEN:  Plaintiffs call Angela Albanese.

4    ANGELA ALBANESE,

5          called as a witness by the plaintiffs

6          having been duly sworn, testified as follows:

7               THE COURT:  Counsel.

8    DIRECT EXAMINATION

9    BY MS. SHEN:

10   Q.  Good afternoon, Ms. Albanese.

11            Are you familiar with an entity called Platinum

12   Management?

13   A.  Yes.

14   Q.  Are you familiar also with AN entity called Centurion?

15   A.  Yes, ma'am.

16   Q.  How are you familiar with Platinum Management?

17   A.  I used to be employed there.

18   Q.  And did you also for a time work for Centurion?

19   A.  Yes, I worked for Centurion.

20   Q.  When did you first start working for Platinum Management?

21   A.  Actually I don't think I worked under Platinum.  I think I

22   only worked under Centurion.

23   Q.  When did you start working for Centurion?

24   A.  2008.

25   Q.  And when you were hired, when you were first hired, what

1   were your duties?

2   A.  I was an executive assistant.

3   Q.  To whom?

4   A.  To Murray Huberfeld.

5   Q.  Did there come a time when you also became an executive

6   assistant to David Bodner?

7   A.  Yes.

8   Q.  And when approximately was that?

9   A.  A few -- I guess within a year or two after.  I don't know

10  to exact dates.

11  Q.  When did you stop working at Centurion or Platinum?

12  A.  Somewhere around 2015 or the beginning -- I think it was

13  the beginning of 2016 or the end of 2015.  I don't know the

14  exact dates.

15  Q.  And from the time that you -- well, let me ask it this way.

16  Were you still working for David Bodner at the time that you

17  left Platinum or Centurion?

18  A.  I'm sorry.  I don't understand the question.

19  Q.  Sure.  Did you have responsibilities as David Bodner's

20  executive assistant for the duration of your time at Centurion

21  or Platinum?

22  A.  At Centurion, yes.

23  Q.  Do you recall that at some point in time Centurion became

24  PPCO?

25  A.  No, I do not.

Mc52Pla6                          Albanese - Direct

1    Q.  Do you recall at some time -- point in time that Centurion

2    and Platinum Management merged into one entity?

3    A.  I think when I got there they were not merging.  Like when

4    I first started, they might have been Platinum, and then when I

5    first started they were Centurion.

6    Q.  After you started, though, at some point they became

7    Platinum, correct?

8    A.  I think they became Centurion.

9    Q.  Do you recall which company signed your paychecks?

10   A.  Pretty sure it was Centurion.  I never looked at it because

11   it was direct deposit.

12   Q.  You sat for a deposition in this case, correct?

13   A.  Correct.

14   Q.  And you had an attorney present at that deposition?

15   A.  That was -- yes, that was like three years ago.  Yes.

16   Correct.

17   Q.  Mr. Bodner paid your attorney's fees for that appearance,

18   correct?

19   A.  I believe Centurion and Mr. Bodner did.

20   Q.  You were issued a subpoena to appear today at trial?

21   A.  That is correct.

22   Q.  And you authorized Mr. Hertzberg, who is Mr. Bodner's

23   attorney, to accept service of that subpoena, correct?

24   A.  That is correct.

25           MS. SHEN:  Your Honor permission to treat the witness

Mc52Pla6                          Albanese - Direct

1   as hostile under Rule 611(c).

2                THE COURT:  Yes.  The jury should understand it's not

3   a question of hostility in the ordinary English language.  It

4   just means that the interests of the witness may be arguably

5   adverse to the interests of the plaintiff, and the result of

6   this is that the plaintiff can put a leading questions, where

7   otherwise they couldn't on direct examination.

8                So with that understanding, you can proceed.

9                MS. SHEN:  I'm sorry, your Honor.  I didn't catch the

10  end of your sentence.

11               THE COURT:  The answer to your inquiry is yes.

12  BY MS. SHEN:

13  Q.  Ms. Albanese, when you were working at Platinum or

14  Centurion, you went to the office every day, correct?

15  A.  Yes.

16  Q.  And you sat on the 54th floor?

17  A.  In the beginning years, yes, and then we moved.

18  Q.  Before the move, Centurion Platinum had two floors——one on

19  54 and one on 4 in that building?

20  A.  That's correct.

21  Q.  Mr. Bodner sat on the 54th floor?

22  A.  Yes.

23  Q.  Mr. Huberfeld did as well?

24  A.  Yes.

25  Q.  Mr. Nordlicht?

1    A.  I think he was on the fourth floor.

2    Q.  Mr. Landesman, did he sit on 54 or 4?

3    A.  I don't know.  Sorry.

4    Q.  What about Mr. Eli Colter?

5    A.  He was -- I don't remember right now.  I'm sorry.

6    Q.  Naftali Manela?

7    A.  He was the one -- I believe 54.

8    Q.  Joseph SanFilippo?

9    A.  I think he was on 4.  I don't remember because the

10   building -- because we moved, so I don't really remember.

11   Q.  Sure.  Ari Glass?

12   A.  I don't remember.  I'm sorry.

13   Q.  What about Harvey Werblowsky?

14   A.  I don't think Harvey had an office there.  I don't

15   remember.

16   Q.  Do you recall that Mr. Landesman had an office next to

17   Mr. Bodner?

18   A.  What's his first name.

19   Q.  Uri?

20   A.  Yes.

21   Q.  So that would have been on 54, correct?

22   A.  I think that was in the new building.

23   Q.  Okay.  When the offices moved buildings, everybody

24   consolidated on to one floor, correct?

25   A.  That's correct.

1   Q.  Around what time is that?

2   A.  The year?

3   Q.  Correct.

4   A.  I don't remember.  It was like maybe 2014, 2015.

5   Q.  So you -- I asked you a couple of questions earlier about

6   your paychecks.  You were never paid by Mr. Bodner personally,

7   correct?

8   A.  That's correct.

9   Q.  You were never paid by Mr. Huberfeld personally?

10  A.  That's correct.

11  Q.  Let's talk a little bit about the work that you did for

12  Mr. Bodner.

13          You were in charge of scheduling his meetings?

14  A.  Yes.

15  Q.  You were in charge of answering his phone?

16  A.  Yes.

17  Q.  You were in charge of maintaining his calendar?

18  A.  Yes.

19  Q.  You were in charge of relaying messages to him.

20  A.  Yes.

21  Q.  You were in charge of receiving e-mails on his behalf.

22  A.  Yes.

23  Q.  You printed e-mails for him?

24  A.  Yes.

25  Q.  You were in charge of sometimes writing his e-mails.

Mc52Pla6                          Albanese – Direct

 1    A.  Yes.

 2            MS. SHEN:  Can we please pull up PX 394.  We move 394

 3    into evidence.

 4            MR. HERTZBERG:  No objection.

 5            THE COURT:  Received.

 6            (Plaintiff's Exhibit 394 received in evidence)

 7    BY MS. SHEN:

 8    Q.  Ms. Albanese, we gave you a hard copy, but it is also up on

 9    your screen, so feel free to look at whatever you are

10    comfortable with.

11            I'm going to direct your attention to the second

12    e-mail on the first page that says it is from Cristean Cruz to

13    Angela Albanese, dated January 16, 2014.  Do you see where I am

14    at?

15    A.  Does it begin with "Robert"?

16    Q.  Yes, exactly.

17    A.  Okay.

18    Q.  Now, the Albanese in the to lines the Ang@platinumlp.com,

19    that was your Platinum e-mail address, correct?

20    A.  Yes.

21    Q.  In this e-mail, an individual named Mr. Cristean Cruz is

22    asking you:  "Did Mr. Bodner change his e-mail address?"  Do

23    you see that?

24    A.  Yes.

25    Q.  Mr. Parson, can you pull up to the e-mail on top.

Mc52Pla6                        Albanese - Direct

1              In response, you say to Mr. Cruz:  "That is strange.

2     No.  That is not his e-mail.  His e-mail is my e-mail.  I print

3     and fax or hand him every e-mail that is for him."  Do you see

4     that?

5     A.  Yes.

6     Q.  That's in reference to Mr. David Bodner, correct?

7     A.  Is it?  Okay.  Is it?  I mean, I can't see the beginning

8     part again.

9     Q.  Sure.  Can you please pull up that first e-mail from

10    Mr. Cruz.  He is asking specifically about Mr. Bodner.  Do you

11    see that?

12    A.  Okay.  Okay.

13    Q.  So that representation to Mr. Cruz that Mr. Bodner's e-mail

14    is your e-mail and that you print and fax or hand him every

15    e-mail that is for him, that's a fair and accurate

16    representation, correct?

17    A.  Sure.

18    Q.  That's in fact what you did every time somebody would send

19    an e-mail to Mr. Bodner.  They would actually send it to you

20    and you would print or fax a copy to him, correct?

21    A.  That sounds about right.

22    Q.  And that's because Mr. Bodner himself didn't use e-mails,

23    right?

24    A.  That is correct.

25    Q.  Noah, you can take down this exhibit.  Thank you.

```
1          And also part of the protocol was that sometimes you
2    would -- Mr. Bodner would dictate e-mail responses to you and
3    you would write them up and send them out, correct?
4    A.  Sometimes, yeah.
5          MS. SHEN:  Mr. Parson, can we please pull up PX 390.
6    We move 390 into evidence.
7          MR. HERTZBERG:  No objection.
8          THE COURT:  Received.
9          (Plaintiff's Exhibit 390 received in evidence)
10   BY MS. SHEN:
11   Q.  Mr. Parson, if you could focus in on the top e-mail.
12         Ms. Albanese, this e-mail is from Bodner Ang
13   Huberfeld.  That's the sort of shorthand and the e-mail itself
14   is BodnerAng@gmail.com.  Do you where I am at?
15   A.  Yes.
16   Q.  That was your e-mail address, correct?
17   A.  Yes.
18   Q.  That was an e-mail that you used specifically for
19   Platinum-related correspondence, correct?
20   A.  I think specifically for Bodner or Huberfeld.  Not
21   Platinum.
22   Q.  Okay.  Understood.
23         And in this -- this is an e-mail from you, and you are
24   writing to somebody named Sol Lax.  Do you see that?
25   A.  I do.
```

Mc52Pla6                     Albanese - Direct

1   Q.  I want to direct your attention to the signature line there

2   where it says "Sincerely, Dovid Bodner."  Do you see that?

3   A.  Yes.

4   Q.  If Mr. Bodner dictated an e-mail to you sometimes he would

5   sign it on his behalf, is that fair?

6   A.  Yes.

7           MS. SHEN:  Mr. Parson, can you please pull up PX 554.

8   Can we move 554 into evidence?

9           MR. HERTZBERG:  No objection.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 554 received in evidence)

12   BY MS. SHEN:

13   Q.  Ms. Albanese, I'm going to direct your attention to the top

14   e-mail on this first page, as well.  Do you see that it's from

15   David Steinberg to you?

16   A.  Um-hmm, yes.

17   Q.  David Steinberg was an employee of Platinum, correct?

18   A.  Yes.

19   Q.  I believe he was the chief risk officer, correct?

20   A.  I don't know.

21   Q.  And the subject line says "forward Black Elk report."  Do

22   you see that?

23   A.  I do.

24   Q.  Black Elk was an asset that Platinum invested in, correct?

25   A.  I don't know.

Mc52Pla6                    Albanese - Direct

1    Q.  Well, Mr. Steinberg sent you this -- Mr. Steinberg sent you

2    this to forward to Mr. Bodner, correct?

3    A.  It appears that way.

4    Q.  And pursuant to your typical protocol, you would have made

5    sure that Mr. Bodner got a copy of this, correct?

6    A.  Yes.

7    Q.  Mr. Parson, you can take down 554.

8              Please pull up PX 442.  We move PX 442 into evidence.

9              MR. HERTZBERG:  No objection.

10             THE COURT:  Received.

11             (Plaintiff's Exhibit 442 received in evidence)

12   BY MS. SHEN:

13   Q.  Ms. Albanese, again I want you to take a look at the

14   topmost e-mail.  It is from you to somebody named Leea Haddad.

15   Do you see that?

16   A.  Yes.

17   Q.  And in the copy line, you have copied Isaac Barber and

18   David Levy.  Do you see that?

19   A.  Yes.

20   Q.  Isaac Barber was a Platinum portfolio manager?

21   A.  I know he was employed there.  I don't know his job title.

22   Q.  He worked specifically on PPVA assets though, correct?

23   A.  I don't know his specific job title.  I do know he worked

24   there.

25   Q.  David Levy was also employed at Platinum, correct?

Mc52Pla6                        Albanese - Direct

1    A.  Yes.

2    Q.  And he also worked specifically on PPVA assets.

3    A.  I don't know his job title.  I know he did work there.

4    Q.  In this e-mail, you are telling Lee, "David B. wanted me to

5    let you know that Isaac and David L. are looking at this."  Do

6    you see where I am at?

7    A.  Yes.

8    Q.  That would have been a -- Mr. Bodner would have relayed

9    that to you and asked you specifically to pass this on to Leea

10   Haddad, correct?

11   A.  Sure, yes.

12   Q.  You would not have, for example, sent this particular

13   e-mail without Mr. Bodner's instruction, correct?

14   A.  Yes.

15   Q.  Mr. Parson, you can take this exhibit down.

16           So Ms. Albanese, we have looked at a number of e-mails

17   where the domain of the e-mail address was the gmail.com

18   address.  That was because you were specifically told to use a

19   personal e-mail for all communications on behalf of Mr. Bodner,

20   correct?

21   A.  Yes.

22   Q.  You were instructed specifically not to use a Platinum

23   e-mail address for communications concerning Mr. Bodner,

24   correct?

25   A.  Yes.

Mc52Pla6                        Albanese - Direct

1    Q.  Okay.  I want to jump forward in time a little bit to

2    around the time when you left Platinum.  You said that you

3    stopped working for Platinum around maybe late 2015, early

4    2016?

5    A.  I think it was Centurion.  You keep saying Platinum, but if

6    I remember, I was always under Centurion.

7    Q.  Okay.

8    A.  Unless I'm mistaken.

9    Q.  Yes, I'm going to come back to this, and maybe I can give

10   you something that will refresh your recollection, but in the

11   interest of moving this along, let's talk about the

12   circumstances of your leaving Platinum or Centurion.

13   A.  Okay.

14   Q.  So even though you didn't leave until maybe early 2016, you

15   were aware about a year ahead of that that your position was

16   being terminated?

17            THE COURT:  Excuse me for interrupting.  Can we go

18   back to Exhibit 442 in evidence.  Someone put the first page of

19   that exhibit on the screen.

20            So looking at the very top of that, this is a message

21   from you dated October 22, 2012, yes?

22            THE WITNESS:  Yes.

23            THE COURT:  And you are listed there as under your

24   name is "Platinum Credit Management" correct.

25            THE WITNESS:  Yes.  I think I am reversing Centurion

Mc52Pla6                         Albanese - Direct

1    and Platinum.

2              THE COURT:  Just answer my question.  Are you listed

3    there as Platinum Credit Management?

4              THE WITNESS:  Yes.

5              THE COURT:  And so you were holding yourself out as

6    part of Platinum Credit Management, yes?

7              THE WITNESS:  Yes.

8              THE COURT:  And your -- you had two e-mails at the

9    bottom of that first entry.  One is ang@platinumlp.com and the

10   other is aalbanese@platinumlp.com.  Yes?

11             THE WITNESS:  Yes.

12             THE COURT:  So again, you were holding yourself out as

13   part of Platinum LP and earlier Platinum Credit Management,

14   yes?

15             THE WITNESS:  Yes.

16             THE COURT:  So I'm not understanding your testimony

17   about Centurion.  Isn't it a fact that you were holding

18   yourself out at all times as representative of Platinum?

19             THE WITNESS:  I just realized, you know, I was

20   originally Centurion, and then I became Platinum.  But since it

21   was like ten -- over ten years ago, I got confused.

22             THE COURT:  Okay.

23             THE WITNESS:  So at one point I was Centurion, and

24   then I became Platinum.

25             THE COURT:  Okay.  And that was from at least 2012

Mc52Pla6                        Albanese – Direct

1    onward.

2            THE WITNESS:  It appears that way.  In '08, when I did

3    originally start, it was Centurion.

4            THE COURT:  So you started at Centurion.  At some

5    point, though, you shifted it under the heading of Platinum,

6    yes?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.  Very good.

9            Go ahead.

10           MS. SHEN:  Thank you, your Honor.

11   BY MS. SHEN:

12   Q.  So we were talking about the circumstances around your

13   termination.  You knew about a year before the end of your

14   tenure at Platinum that your position was going to be

15   eliminated, correct?

16   A.  Yes.

17   Q.  That would have been around January of 2015, correct?

18   A.  When I knew?

19   Q.  Yes.

20   A.  Or when you I left?

21   Q.  When you knew.

22   A.  Okay.  That sounds about right.

23   Q.  And between January 2015 and the time that you actually

24   left, you spent some time negotiating a severance package with

25   Platinum, correct?

Mc52Pla6                          Albanese - Direct

1    A.  Yes.

2    Q.  David Bodner was involved in those negotiations?

3    A.  I think so, yes.

4    Q.  At first the offer that was made to you was a severance of

5    around $30,000, is that correct?

6    A.  That is correct.

7    Q.  Mr. Parson, can we please pull up PX 380.

8            Actually, just before we get to this, the severance

9    package that you ultimately received when you were terminated

10   was closer to $100,000, is that correct?

11   A.  That is correct.

12           MS. SHEN:  We move PX 380 into evidence.

13           MR. HERTZBERG:  Objection.  401 and 403.

14           MS. SHEN:  Goes to motive, your Honor.

15           THE COURT:  Overruled.  Received.

16           (Plaintiff's Exhibit 380 received in evidence)

17   BY MS. SHEN:

18   Q.  Mr. Parson, can you Zoom in on the substance of the e-mail,

19   please.

20           Now -- I'm sorry would you mind just including the

21   date, as well.

22           Ms. Albanese, this is an e-mail dated July 29, 2015,

23   from your Platinum Bodner e-mail address, correct?

24   A.  Yes.

25   Q.  And you sent this during the time when you were negotiating

Mc52Pla6                        Albanese - Direct

1    your severance package with Platinum, correct?

2    A.  Yes.

3    Q.  Now, in this e-mail, you say, "We weren't exactly honest

4    with Ed about the original investment or that Beechwood and

5    Platinum really are integrated."  Do you see where I am at?

6    A.  Yes.

7    Q.  You knew that when you wrote this e-mail that this

8    statement wasn't true, correct?

9    A.  Yes.

10   Q.  You knew that CNO in fact did know that Platinum and

11   Beechwood were integrated, correct?

12   A.  I knew that what?

13   Q.  You knew -- sorry, it was a little complicated.

14           You knew that CNO was aware that Platinum and

15   Beechwood were integrated.

16   A.  I did not.  I didn't know that was the case.

17   Q.  You knew, though, that there were concerns about the

18   relationship between Platinum and Beechwood, correct?

19   A.  Regarding?  I'm sorry.  By who?

20   Q.  That generally there were concerns -- or that Mr. Bodner,

21   excuse me, specifically, had concerns about CNO finding out

22   about the relationship between Platinum and Beechwood?

23   A.  No.

24   Q.  Around this time of July 2015, you were still going into

25   the office, correct?

Mc52Pla6                    Albanese - Direct

1   A.  Yes.

2   Q.  And when you were in the office, you spoke to other people

3   who worked there?

4   A.  Yes.

5   Q.  And you were aware that there were concerns about the

6   stability of the Platinum funds, correct?

7   A.  Yes.

8   Q.  There were also concerns expressed around the office about

9   investors trying to pull out of the Platinum funds, correct?

10  A.  Yes.

11  Q.  And by this time in July 2015, the SEC had already started

12  its investigation into Platinum, correct?

13  A.  I don't remember the dates.

14  Q.  Okay.  Sure.

15  A.  Honestly.

16  Q.  In 2014-2015, you saw SEC investigators in the Platinum

17  office, correct?

18  A.  I did, but I don't remember the date, the time frame

19  honestly.

20  Q.  Okay.  Fair enough.

21       You knew that Mr. Bodner was concerned about all of

22  the things that we just talked about, correct?

23  A.  No, I didn't know.  I didn't discuss that with him, so I

24  don't know his level of concern.

25  Q.  You purported to send this e-mail on behalf of Mr. Bodner,

1    correct?

2    A.  No.  You said I sent it on behalf of him?

3    Q.  Yes.

4    A.  I did not send this e-mail on behalf of him.

5    Q.  Well, sure.  Sorry.  Let me make my question a little more

6    clear.

7             When you wrote this e-mail at the time, you intended

8    it to look like it was coming from Mr. Bodner, correct?

9    A.  No.  I sent this to Mr. Bodner.  I believe that I sent this

10   to Mr. Bodner.

11   Q.  And you knew that it would scare him, correct?

12   A.  That was my intention.

13   Q.  Yeah, it was your intention to scare him into -- to scare

14   him into giving you a better severance deal, correct?

15   A.  That's exactly correct.

16   Q.  And you knew specifically that issues around the

17   Platinum-Beechwood affiliation would be something that would

18   scare him, correct?

19   A.  Yes.

20   Q.  Mr. Parson, you can take this exhibit down.

21            Let's shift gears a little bit.  I want to talk

22   about -- so you mentioned earlier about another one of your

23   responsibilities was maintaining Mr. Bodner's calendar,

24   correct?

25   A.  He mostly maintained it, but he told me what to put on it.

Mc52Pla6                     Albanese - Direct

1    Q.   Okay.  And he also -- that included telling you what
2    meetings to schedule on his behalf, correct?
3    A.   Yes.
4    Q.   And sometimes he would track his day-to-day meetings in
5    e-mails, correct?
6    A.   Yeah, I would ask him if it was -- if he wants to do that
7    meeting, and then he would let me know.
8              MS. SHEN:  Mr. Parson, can you please pull up PX 467.
9    We move PX 467 into evidence.
10             MR. HERTZBERG:  No objection.
11             THE COURT:  Received.
12             (Plaintiff's Exhibit 467 received in evidence)
13   BY MS. SHEN:
14   Q.   Mr. Parson, can you zoom in on this a bit.
15             So this is an e-mail from you to Mr. Huberfeld dated
16   August 21, 2013.  Do you see that?
17   A.   Yes.
18   Q.   And you had sent Mr. Huberfeld these e-mails pretty
19   regularly showing his and Mr. Bodner's meetings for the day,
20   correct?
21   A.   Yes.
22   Q.   And I want to direct your attention to the second portion
23   of this e-mail that says "FYI on David's calendar."  Do you see
24   that?
25   A.   Yes.

Mc52Pla6                    Albanese - Direct

1   Q.  All these meetings you had confirmed with Mr. Bodner before

2   putting it on his calendar, right?

3   A.  Most likely.

4   Q.  And here it shows that Mr. Bodner was first meeting with

5   Mr. Nordlicht and Alan Clingman.

6   A.  Okay.

7   Q.  Mark Nordlicht was the chief investment officer of PPVA and

8   Platinum Management, correct?

9   A.  I think so.

10  Q.  And Alan Clingman was from China Horizon, correct?

11  A.  I don't recall.

12  Q.  There is then a 2:30 meeting with Isaac Barber, Murray

13  Huberfeld, and David Bodner.  Do you see that?

14  A.  Yes.

15  Q.  Isaac Barber was also an employee of Platinum Management?

16  A.  Yes.

17  Q.  He was a portfolio manager?

18  A.  I don't know his title, but I do know he worked there.

19  Q.  Fair to say you got into the practice of sending e-mails

20  like this to Mr. -- to Murray Huberfeld tracking Mr. Bodner's

21  calendar?

22  A.  I don't know if I always added David's stuff to his.  I

23  don't recall what I did, but I do know this e-mail I did send.

24  Q.  And sometimes, though, you did add Mr. Bodner's

25  information, right?  His meetings?

Mc52Pla6                        Albanese – Direct

1    A.  I sometimes, yes.

2              MS. SHEN:  Mr. Parson, can you please pull up PX 932.

3    We move this into evidence.

4              MR. HERTZBERG:  Same objection as the last witness.

5              MS. SHEN:  Perhaps we can sidebar, your Honor.

6              THE COURT:  I'm sorry.  I need to see -- all right.

7    Let's have a sidebar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc52Pla6                        Albanese – Direct

1                  (At the sidebar)

2                  THE COURT:  Does someone have a copy of this?

3                  MS. SHEN:  Yes.  It's an Excel spreadsheet.  It's a

4       little bulky to print, but it is a summary of all of the

5       e-mail -- all of the e-mails similar to the one that we just

6       went over with the witness.  Defense counsel has copies of all

7       of the underlying e-mails.  We provided it to them in summary

8       form.  They raise objections to certain columns in our summary

9       chart, like which is this one that we have excised from the

10      copy to show to the witness.

11                 THE COURT:  I still need to see it, a hard copy.

12                 Now it is 10 minutes before we break.  Do you want to

13      go on to something else and I will take this up at the break?

14                 MS. SHEN:  Okay.  Thank you.

15                 (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Mc52Pla6                          Albanese - Direct

1                    (In open court)

2                    MS. SHEN:  Mr. Parson, could you please pull up

3      PX 414.

4                    We move 414 into evidence.

5                    MR. HERTZBERG:  No objection.

6                    THE COURT:  Received.

7                    (Plaintiff's Exhibit 414 received in evidence)

8      BY MS. SHEN:

9      Q.  Ms. Albanese, this is a May 2, 2014 e-mail from David

10     Steinberg to you.  Do you see that?

11     A.  Yes.

12     Q.  David Steinberg was the chief risk officer for Platinum?

13     A.  I don't recall his role.

14     Q.  But he was employed by Platinum, correct?

15     A.  Yes.

16     Q.  Same with Ezra Beren, who is on the cc line?

17     A.  Yes.

18     Q.  And in this -- Mr. Steinberg is asking that you schedule a

19     meeting for him, Mr. Beren, Mr. Huberfeld, and David Bodner for

20     two hours.  Do you see that?

21     A.  Yes.

22     Q.  And he wants you to block the time off on Mr. Bodner's

23     calendar, correct?

24     A.  Correct.

25     Q.  It happened pretty regularly that Platinum employees asked

Mc52Pla6                      Albanese - Direct

```
 1    for long meetings with Mr. Bodner, correct?
 2    A.  No.
 3    Q.  It happened pretty frequently that Platinum employees asked
 4    for meetings with Mr. Bodner, correct?
 5    A.  Yes.
 6    Q.  And you were never invited to sit in on those meetings,
 7    correct?
 8    A.  Correct.
 9    Q.  It was always only -- let me rephrase.
10            No assistants were ever invited to sit in on those
11    meetings, correct?
12    A.  That is correct.
13    Q.  Those meetings were always closed door?
14    A.  Correct.
15    Q.  And sometimes the people attending those meetings were
16    asked to leave their cell phone outside the room, correct?
17            MR. HERTZBERG:  Objection.  403.
18    A.  I don't know that.
19            THE COURT:  When there is an objection, you need to
20    wait until I rule.
21            Well, given the answer, I will let it stand.
22            MS. SHEN:  Mr. Parson, could we please pull up PX 430.
23    We move 430 into evidence.
24            MR. HERTZBERG:  401, says David Bodner will not be
25    there.
```

Mc52Pla6                        Albanese - Direct

1                THE COURT:  Overruled.

2                (Plaintiff's Exhibit 430 received in evidence)

3      BY MS. SHEN:

4      Q.  Mr. Parson, can you please start by pulling up the second

5      e-mail from the top from Daniel Small.

6                Ms. Albanese, this is an e-mail from Daniel Small to

7      you and David Levy dated September 24, 22 -- excuse me 2012,

8      correct?

9      A.  It looks that way, yes.

10     Q.  Daniel Small was also a Platinum employee?

11     A.  I believe so, yes.

12     Q.  And at this time you would have still been in the old

13     offices with the two floors, correct?

14     A.  Yes.

15     Q.  And Daniel Small sat on the fourth floor?

16     A.  I think so, yes.

17     Q.  And it happened fairly frequently that Platinum employees

18     would go between the floors for meetings, correct?

19     A.  Yes.

20     Q.  They would almost -- if they had a meeting with Mr. Bodner,

21     they would always come up to 54, right?  He never went down to

22     the fourth floor?

23     A.  I don't know if he ever went down there to have a meeting.

24     Q.  Okay.  But employees from the fourth floor would come up to

25     54 pretty regularly to meet with Mr. Bodner?

Mc52Pla6                        Albanese - Direct

1   A.  Yes.

2   Q.  And then, Mr. Parson, if you would pull up the first e-mail

3   at the top.

4          Okay.  And here you are telling Mr. Levy to schedule a

5   meeting with David Bodner, correct?

6   A.  Can you ask me that question again?  I'm sorry.

7   Q.  Sure.  Yeah, let me maybe just step back a little bit

8   because I think this e-mail is a little confusing.

9          Mr. Parson, can you please actually go to the second

10  page.

11         Let's start there so you can see the entire chain,

12  Ms. Albanese.

13         So this is the first e-mail in the chain, and Mr. Levy

14  is saying to you "Dovid and I have a meeting at 1 tomorrow with

15  Shlomo Kalish.  Can we please have a conference room?"  Do you

16  see that?

17  A.  Yes.

18  Q.  And the Dovid he is referring to would have been David

19  Bodner, correct?

20  A.  Yes.

21  Q.  Going up to the next e-mail before that chronologically,

22  you say on September 24, 2012, you ask, it looks like to David

23  Levy, "Hi.  Do you still want to have a meeting on our floor?"

24  Do you see that?

25  A.  Yes.

1   Q.  David Levy, in response to that, "Yes.  Please call Dan

2   Small as he is the one taking the meeting."  Correct?

3   A.  It reads that way, yes.

4   Q.  And then if you read sort of the e-mails that we have

5   already gone over on top of that, fair to say that the top

6   e-mail looks like they are actually talking about two different

7   meetings——one with David Levy and one between Dan Small and

8   Mr. Kalish?

9   A.  It is confusing, yes.

10  Q.  And but so just to clarify, in the top e-mail there is one

11  meeting for David Bodner and David Levy, correct?

12  A.  There is -- are you asking me if there is two meetings

13  there?

14  Q.  Yes.  You are talking about two different meetings there.

15  A.  I don't know.  Am I?  It's a little confusing.

16  Q.  That's okay.  We can move on.

17  A.  Thank you.

18  Q.  You were aware that Mr. Bodner was an investor of the

19  Platinum fund, correct?

20  A.  Yes.

21  Q.  But around the office they referred to him as a partner,

22  correct?

23  A.  I -- around the office they would refer to him as a

24  partner?  I don't recall that.  I recall them refer to Murray

25  as a partner.

Mc52Pla6

1   Q.  Did they also refer to Mr. Nordlicht as partner?

2   A.  Yes.

3   Q.  What about Mr. Landesman?

4   A.  I don't recall.

5   Q.  Mr. Landesman had an assistant, correct?

6   A.  Yes.

7   Q.  Mr. Huberfeld had an assistant?

8   A.  Yes.

9   Q.  Did Mr. Nordlicht have an assistant?

10  A.  Yes.

11  Q.  Were you aware of any just mere investors of Platinum that

12  had an assistant employed by Platinum?

13  A.  No.

14          THE COURT:  Counsel, find a spot in the next two or

15  three minutes to break since we need to excuse the jury for

16  today.

17          MS. SHEN:  This is a good time to break, your Honor.

18          THE COURT:  So ladies and gentlemen, we will restart

19  tomorrow at 9:30.  Another full day, but we are moving right

20  along.  So have a very good evening and we will see you

21  tomorrow at 9:30.

22          (Continued on next page)

23

24

25

Mc52Pla6

1          (Jury not present)

2          THE COURT:  Please be seated.  Before the witness

3     leaves, there was an issue that came up at the sidebar.  Do you

4     have a copy of that exhibit?

5          MS. SHEN:  We will have a printed copy for the Court

6     in the morning.

7          THE COURT:  We will take it up in the morning.  You

8     are excused.  We will see you at 9:30 tomorrow morning.

9          THE WITNESS:  Okay.  Thank you.  Bye.

10          THE COURT:  Ms. Albanese, is there something you need?

11          THE WITNESS:  Yes, I need my bag.

12          (Witness not present)

13          THE COURT:  Plaintiffs' counsel was giving his remarks

14     on the question of damages.

15          MR. GLUCK:  So as we have stated, the issue of

16     distinction between the cash fee and the non-cash fees came up

17     around the *Daubert* motion in response to that first raised by

18     defense counsel.  We responded very simply that disgorgement

19     was a remedy being sought in this case, that there are a number

20     of cases which considered disgorgement to be compensatory in

21     nature, including, but not limited to, the cases involving the

22     faithless servant.  There is no distinction for this purpose as

23     to equity award or salary.  The point is the return of

24     ill-gotten gains.

25              Separately and on top of that, these particular

Mc52Pla6

1     Platinum LP interests in general were used to capitalize

2     Beechwood, which was the mechanism of the overvaluation.

3                (Continued on next page)

1          MR. GLUCK:  And for those reasons, we submit that this

2     was always known.  There should never have been a doubt that

3     all fees were being sought by us.  Effectively, the Court made

4     a particular ruling that if PPVA actually paid the fees, it's

5     clearly damages, but it wasn't like we weren't like this

6     before, it was just a consequence of the ruling.

7          I would simply refer the Court to a number of cases

8     that we cited in our briefs, which was that preclusion is a

9     very harsh remedy that should only be imposed in rare

10    situations.  I'm citing *Update Art, Inc. v. Modlin Pub* (2d Cir.

11    1988).  They have to satisfy a very high burden that we have

12    utterly failed to show that this was at issue and that they are

13    materially prejudiced.

14         THE COURT:  I thank you very much.  I'll hear briefly

15    from defense counsel and rebuttal.

16         MR. LAUER:  Very briefly.  This obsession with

17    Beechwood is a completely disingenuous concept.  The issue in

18    the case is valuation.  For example, Golden Gate.  This is

19    purely for purposes of this point.  If Golden Gate lost most of

20    its money, it didn't lose most of its money because there was

21    an alleged hidden loan, it lost its value because it wasn't

22    producing oil.  This Beechwood business is complete nonsense.

23         Let me address very quickly these points.  They never

24    raised the issue of alter ego.  What they're trying to do on

25    disgorgement is to get money on Grosser Lane.  The Court may

1    have even addressed something like this in Madoff.  If they

2    want to sue Grosser, if they want a claim from Grosser, they

3    had to sue Grosser.  They can't prove alter ego without

4    alleging alter ego.  We had no discovery on that.

5         Next, we had no notice on fee to fund issues, Quintero

6    never provided any evidence, and we're completely blindsided by

7    that.  The Agera thing is clearly subsumed in the summary

8    judgment.  The $4 million in fees, to this day, I have no idea

9    what they're talking about.  They never produced the documents.

10   We literally have no idea where this is coming from other than

11   throw some damages in.

12        Rule 37 basically says if you don't disclose your

13   damages theories in your Rule 26, unless you've got a really

14   good reason for not doing it, you're going to be precluded.

15   Most respectfully, Judge, they should be precluded.  We were

16   completely blindsided.  This case has been going on -- it went

17   on, there are multiple depositions.  None of these issues were

18   raised until after the summary judgment and the *Daubert*.  So we

19   would ask you to bring this case back to where it was, which is

20   fees and management fees that were paid, either directly or

21   paid in redemptions so the lawyers in this case and the parties

22   in this case have a more rounded view of where these issues

23   are.

24             THE COURT:  All right.  Anything else from plaintiffs?

25             MR. GLUCK:  With respect, Beechwood and this mechanism

1   of holding the debt in the case from day one is absolutely

2   material.  The disclosure failures would not have been relevant

3   if the fact of the underlying business failures had been known.

4   This was the mechanism for fraud and Mr. Bodner was on both

5   sides of it.  He owned Beechwood, he owned Platinum.  That is

6   rejected.

7            On this issue of the alter ego, we do not seek alter

8   ego, we haven't alleged alter ego.  With respect, there has

9   been substantial discovery on the roles of Mr. Bodner's and

10  Mr. Huberfeld's family members in this operation, and that they

11  did not have a role in this set of entities.  Ms. Naomi Bodner

12  was deposed, Ms. Laura Huberfeld was deposed.  One or more of

13  both of their children were deposed.  This issue has been on

14  notice since November of 2018, and they were deposed almost

15  entirely on this issue of whether these entities were a

16  strawman and whether Mr. Bodner was, in fact, controlling the

17  money.

18           I'll refer the Court to the very recent July 29, 2022

19  decision of the Second Circuit, *Gasson v. Premiere Capital,*

20  *LLC*, expressly stating that judgments could be enforced

21  directly against such family-based straw entities without

22  piercing the corporate veil in any way, and that's the relevant

23  individuals' bankruptcy in that case did not preclude such

24  enforcement.  It lists factors that are to be considered, and

25  they're not piercing the corporate veil or corporate ego

MCM5pla7

1    factors.  These are independent enforceability factors just

2    like in this case, and the Court can read it for itself.  We

3    have every one of those factors --

4             THE COURT:  I will read it before making a decision.

5    Thank you very much.

6             MR. GLUCK:  Thank you.

7             THE COURT:  I will get you a decision tonight as at

8    least a bottom line.  I may not be able to write an opinion for

9    a while, but I will do that, as well.

10            With respect to punitive damages, I never decide

11   whether they go to the jury until the close of all the evidence

12   in the case.

13            With respect to the issue that's been sort of ongoing,

14   whether the release is invalid because the signature of

15   Mr. Nordlicht was allegedly not his or something to that

16   effect, Mr. Fuchs testified today that it was Mr. Nordlicht's

17   signature.  And as far as I know, the only evidence that it was

18   not his or at least not something he offered was his taking the

19   Fifth in his deposition, and for reasons that were already

20   indicated, I don't draw any reasonable inference from that

21   since he took the Fifth across the board.

22            So, I will wait until tomorrow, but at least at the

23   moment, I think there is no meaningful objection to the jury

24   being told, in fact, this is a release that was entered into by

25   this signatory party.  That, of course, is totally without

MCM5pla7

prejudice to your arguments that it's not a valid release for
legal reasons or factual reasons, whatever other factual
reasons.

I will ask plaintiffs' counsel to let me know first
thing tomorrow a binding commitment on how much longer you have
on this witness, and we'll take up the one exhibit that you're
going to get me a hard copy of, and I'll ask defense counsel to
make a binding representation of how long they're going to be
on cross.

Now, who do we have after this witness?

MS. SHEN:  We have Mr. Quintero teed up tomorrow and
then Mr. Nordlicht and Mr. Huberfeld.

THE COURT:  A little concern that we're moving with
less alacrity than is appropriate.  And I always worry about
that because a jury that is bored is a jury that loses focus.
Now, this has been a terrific jury so far, so I'm not ready to
pull a trigger — that's another one of those rural analogies.
In any event, I just flag that for everyone and we'll discuss
it further if necessary.

So, I have a matter in my chambers at 9:00, but it
shouldn't take more than 20 minutes, so we'll see you at 20
after 9:00.

MR. LAUER:  Your Honor, I hate to add to the Court's
burden, but there is this issue that I raised with the clerk
about disqualification.

MCM5pla7

1          THE COURT:  So what is this, someone wants to call

2     Mr. Lauer?

3          MR. SEIDEL:  Yes, your Honor, we are calling Mr. Lauer

4     as a fact witness.

5          THE COURT:  I doubt very much I'm going to allow that.

6     Tell me what your basis is for saying this.

7          MR. SEIDEL:  So Mr. Lauer was the lead partner in

8     negotiating the release that they relied so heavily on for

9     defense.  His testimony -- in fact, they have a defense

10    exhibit, Exhibit 366, authored by Mr. Lauer to the Platinum

11    fund and Platinum Management explaining to them why, on behalf

12    of Mr. Bodner, they could, in fact, enter into a release

13    waiving his fiduciary obligations and his fraud liability.

14         THE COURT:  So what's the relevance?

15         MR. SEIDEL:  The relevance is, your Honor, he's the

16    one who negotiated --

17         THE COURT:  That's a memo they're offering?

18         MR. SEIDEL:  They're offering, yes.

19         THE COURT:  Are you objecting to it as irrelevant?

20         MR. SEIDEL:  We were not.  I was actually going to

21    examine Mr. Lauer about this memo, among other things.

22         THE COURT:  It's hard for me to see what the relevance

23    is.

24         When did you first find out that Mr. Lauer was someone

25    you might want to call as a fact witness?

MCM5pla7

1          MR. SEIDEL:  We would have found out when that

2   memorandum was produced, which would have been prior to summary

3   judgment.  I think this particular memorandum --

4          THE COURT:  So months ago.

5          MR. GLUCK:  Months ago, and we listed him months ago

6   and we alerted --

7          THE COURT:  Did you move for his disqualification?

8          MR. GLUCK:  Absolutely not.

9          THE COURT:  So your position is that you are happy for

10  him to still be counsel, but you think he also ought to be a

11  fact witness?

12         MR. SEIDEL:  Yes, Judge.

13         THE COURT:  Last time I looked at the law, that was

14  not permitted.  But if you can show me some authority

15  permitting that, usually your remedy, if, in fact, he is a fact

16  witness, I doubt that he is, but is to seek his

17  disqualification because the jury cannot meaningfully

18  distinguish between his role as a fact witness when his

19  credibility is an issue and his role as an advocate when his

20  credibility is not an issue.  Therefore, your remedy should

21  have been to seek his disqualification, which, clearly, you

22  haven't done.

23         MR. GLUCK:  There's a wrinkle on that one and there's

24  a reason.  We did seek his disqualification.

25         THE COURT:  I'm old enough to appreciate wrinkles.

MCM5pla7

1              MR. GLUCK:  The fact is that when this case first

2      started, what we knew was that Curtis had been a very

3      substantial counsel for PPVA, and we moved for Curtis to be

4      disqualified, perhaps the first motion in the case.  We had no

5      idea that this release was even in existence or that this

6      memorandum was in existence at the time.

7              Now, that motion was briefed and decided, and that is

8      why we have not moved since, because there has been a ruling.

9              THE COURT:  I have someone waiting in my chambers, but

10     I will think about all that and we can discuss this more

11     tomorrow.  So we'll see you tomorrow at 20 after.

12             (Adjourned to December 6, 2022 at 9:20 a.m.)

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

 BERNARD FUCHS

Direct By Mr. Gluck  . . . . . . . . . . . . 417

Cross By Mr. Hertzberg . . . . . . . . . . . 438

Redirect By Mr. Gluck  . . . . . . . . . . . 515

Recross By Mr. Hertzberg . . . . . . . . . . 546

Redirect By Mr. Gluck  . . . . . . . . . . . 549


 ANGELA ALBANESE

Direct By Ms. Shen . . . . . . . . . . . . . 563




PLAINTIFF EXHIBITS

Exhibit No.                              Received

 470   . . . . . . . . . . . . . . . . . . 419

 408   . . . . . . . . . . . . . . . . . . 422

 587   . . . . . . . . . . . . . . . . . . 426

 588   . . . . . . . . . . . . . . . . . . 428

 424   . . . . . . . . . . . . . . . . . . 430

 927   . . . . . . . . . . . . . . . . . . 517

 566, 396 . . . . . . . . . . . . . . . . . 542

 394   . . . . . . . . . . . . . . . . . . 569

 390   . . . . . . . . . . . . . . . . . . 571

 554   . . . . . . . . . . . . . . . . . . 572

```
1                         PLAINTIFF EXHIBITS
2    Exhibit No.                                     Received
3     442    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 573
4     380    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 578
5     467    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 582
6     414    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 586
7     430    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 588
8
9
10                        DEFENDANT EXHIBITS
11   Exhibit No.                                     Received
12    716    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 452
13    729    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 466
14    727    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 476
15    726    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 478
16    709    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 507
17
18
19
20
21
22
23
24
25
```