MC62PLA1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION              18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER               18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

               Plaintiffs,

          v.

PLATINUM MANAGEMENT (NY) LLC,
et al.,

               Defendants.

------------------------------------x      Trial


                                           New York, N.Y.

                                           December 6, 2022
                                           9:20 a.m.

Before:

               HON. JED S. RAKOFF,

                                           District Judge
                                             and a Jury
```

MC62PLA1

APPEARANCES

HOLLAND & KNIGHT, LLP
        Attorneys for Plaintiffs
BY:   WARREN E. GLUCK
        MARTIN L. SEIDEL
        RICHARD A. BIXTER JR.
        QIAN (SHEILA) SHEN
        NOAH W.S. PARSON
        ELLIOT A. MAGRUDER


KATTEN MUCHIN ROSENMAN, LLP
        Attorneys for Defendant Bodner
BY:   ELIOT LAUER
        GABRIEL HERTZBERG
        JULIA B. MOSSE


CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
        Attorneys for Defendant Bodner
BY:   NATHANIEL C. AMENT-STONE
        ALLESANDRA TYLER




Also Present:

Michael Robson, Paradocs Motion Support

Esterah Brown, Paralegal, Curtis Mallet

MC62PLA1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  First order of business is to hear from
 3    plaintiffs' counsel as to how much longer you might have on
 4    your direct.
 5              MS. SHEN:  I expect another 20 minutes on
 6    Ms. Albanese, but we do have an issue with Ms. Albanese.  We
 7    got an e-mail from her this morning saying that she --
 8              THE COURT:  I haven't seen any e-mail, so let me hear
 9    what's the issue.
10              MS. SHEN:  Sorry.  She e-mailed us this morning.
11              THE COURT:  I'm sorry.  She e-mailed you to say what?
12              MS. SHEN:  She said that she was unwell and not
13    planning to appear.  We offered to send a car for her.  She
14    said she was concerned about that the commute took a lot out of
15    her yesterday.  We have been following up with her all morning
16    and we have received no responses.
17              THE COURT:  All right.  Why don't you send her an
18    e-mail saying we are sorry to hear she is not feeling well, and
19    we will excuse her until 9:15 tomorrow morning.  If she still
20    feels unwell during the day, we will need to see a doctor's
21    letter.
22              MS. SHEN:  Okay.  We will send that.
23              THE COURT:  Who is your next witness?
24              MS. SHEN:  We will start with deposition designations
25    this morning and then our first live witness will be Seth
```

MC62PLA1

1 Gerszberg.

2    THE COURT:  I'm having a little trouble hearing you.

3 You can be seated if you would like, but just speak into the

4 microphone.

5    So how long do you think you will be on direct with

6 that witness?

7    MS. SHEN:  With the designations, I think it might

8 take about 45 minutes to read them all in.

9    THE COURT:  And who do we have after that?

10    MS. SHEN:  Seth Gerszberg.

11    THE COURT:  Were there some other issues that anyone

12 wanted to raise?  I want to get to the release in a minute, but

13 anything else?

14    MS. SHEN:  Your Honor, I actually have one question

15 about the designations.  There was one objection that has

16 designations that your Honor didn't rule on in the copy that

17 you gave us, and I wanted to just clarify that before we move

18 forward.

19    THE COURT:  What was the exhibit?

20    MS. SHEN:  It's in the Katz deposition.  I have the

21 original.  There was just one of defendant's objections your

22 Honor didn't mark --

23    THE COURT:  I'm sorry.  In the depositions.  I'm

24 sorry.  I missed one.  I see.  Hand it up.

25    (Pause)

MC62PLA1

1           THE COURT:  I'm sorry.  I see.  You should know from

2      my rulings on the three succeeding objections that this

3      objection is also sustained.  So let me hand this back to

4      plaintiffs' counsel.

5           Anything else.

6           MR. GLUCK:  Two other items.

7           One is, we took to heart your comment about alacrity

8      and moving trial along.  The idea from plaintiffs is that we

9      move the remainder of the unobjected-to plaintiffs' exhibits

10     into evidence, that is, streamline matters, opposed by defense

11     counsel.

12          THE COURT:  Let me hear what defense counsel said.

13          MR. LAUER:  I didn't hear it exactly, but if this is

14     the application to just mass introduce documents, I have always

15     believed that the Court's rule, which is the one that I have

16     mostly experienced, is if an exhibit is important enough, it

17     gets introduced at trial, otherwise we have trial by ambush.

18     And there are a lot of documents in this case, a lot of

19     documents were in, issues are no longer in, so --

20          THE COURT:  Well, I agree with you, although not

21     totally for your rhetorical reasons about ambush.

22          "Unobjected to" means unobjected to on any ground but

23     relevance.  You always preserve an objection for relevance

24     until the exhibit is offered, and how do you know, if you are

25     defense counsel, whether an exhibit is relevant or not until

MC62PLA1

1    the moment it is introduced?

2              MR. GLUCK:  I can provide an example.  There are sets,

3    dozens of exhibits that, for example, are simply the SSNC NAV

4    statements of PPVA, one after another after another.

5              THE COURT:  Well, I will tell you what.  If you --

6    with respect to specific exhibits, if you can work out an

7    agreement with counsel, of course that's fine with the Court,

8    but I'm not going to make a blanket acceptance.  What I will

9    say is that when an exhibit is offered, since these are all

10   exhibits that both sides have seen in advance, I am not going

11   to allow any objection other than relevance to any exhibit that

12   was previously not objected to and I am going to expect counsel

13   to determine whether they want to object on grounds of

14   relevance very quickly after the offers.

15             MR. GLUCK:  Thank you.  We will try to do that.

16             The second item is that there appears to be, on the

17   part of Mr. Nordlicht's counsel, some confusion over whether he

18   is permitted to be called as a trial witness, and he has

19   suggested that he is available by telephone.

20             THE COURT:  First we have got to reach the question of

21   whether there is a basis for calling him and then we will worry

22   about the logistics, but I still haven't heard any convincing

23   ground for calling Mr. Nordlicht.

24             Who wants to call Mr. Nordlicht?  Plaintiffs' counsel

25   I think the only thing you mentioned was to have him repeat

MC62PLA1

1    taking the Fifth on the release; and, for reasons I have

2    already indicated, I didn't think that was admissible.

3         So is anyone else planning to call Mr. Nordlicht for

4    any reason?

5         MR. GLUCK:  I'm not sure if anyone else is planning to

6    call Mr. Nordlicht.  There was a two-page e-mail sent to your

7    law clerk, Mr. Bardia, on --

8         THE COURT:  Who is in—an experience I know you will

9    be very surprised to hear this—a subway delay.  That might

10   happen in a Paris subway and the Moscow subway.  I can't

11   believe it would happen in the New York subway.

12        MR. GLUCK:  I can call it up now and give the Court a

13   gist.  That e-mail set forth in detail the reasons and bases

14   and topic matters for the plaintiffs' intent to call

15   Mr. Nordlicht on the issue of release other than -- other than

16   on particular --

17        THE COURT:  I see.  So rather than discuss it now, let

18   me take a look at that.  Just if you would send it to my

19   courtroom deputy, who will give you her e-mail, so she is one

20   step ahead and I will take a look at that and we will discuss

21   it at the next break.

22        By the way, the schedule today is I have a zoom

23   conference in my chambers at 12:30 on another matter, so we

24   will go from 9:30 to 12:25 with our usual mid-morning break,

25   but we will take lunch early from 12:25 to 1:25, and then we

MC62PLA1

| | |
|---|---|
| 1 | will continue, and then I have another matter at 4:00. |
| 2 | All right.  Anything else? |
| 3 | MS. SHEN:  Sorry, your Honor.  I have one, just one |
| 4 | matter of housekeeping, as well.  This is really for the |
| 5 | record.  There was a little confusion yesterday with some of |
| 6 | the exhibits that were -- we were trying to get. |
| 7 | (Court reporter confers) |
| 8 | There were some issues with the exhibit markings that |
| 9 | we had identify on Mr. Fuchs' redirect, and I just want to |
| 10 | clarify for the record the correct exhibit numbers. |
| 11 | THE COURT:  Okay. |
| 12 | MS. SHEN:  So the Fuchs first amended answer and |
| 13 | crossclaims was marked as PX 928 for identification, but it |
| 14 | actually was remarked as PX 927 and it came into evidence as |
| 15 | PX 927.  And then PX 928 was remarked as a summary chart that |
| 16 | was marked for identification, but it did not come into |
| 17 | evidence. |
| 18 | THE COURT:  All right.  So in terms of the exhibit |
| 19 | that was received, what is the number that, when it is sent to |
| 20 | the jury it will bear. |
| 21 | MS. SHEN:  It will be PX 927. |
| 22 | THE COURT:  All right.  Very good. |
| 23 | (Plaintiff's Exhibit 927 received in evidence) |
| 24 | THE COURT:  Let's get the witness on the stand, the |
| 25 | next witness.  I will explain to the jury the other witness is |

MC62PLA1

1    postponed.  And let's bring in the jury.

2              (Pause)

3              THE DEPUTY CLERK:  The final juror has entered the

4    courthouse and is making their way up.  A couple of the jurors

5    have asked me if I know when testimony will end.

6              THE COURT:  Sure.  At the end.  But what you can tell

7    them -- I will tell them when they come in that as far as I can

8    tell we are still on schedule, but I can't predict for sure

9    exactly when testimony will end, but I will determine, as I

10   told them when we selected them, that this case will go to them

11   sometime early next week.  And if anyone has any problem with

12   that, you better raise it now.

13             MR. LAUER:  Your Honor, most respectfully, I think the

14   discussions that we have had, at least with the other side, was

15   sort of even steven, and we have been anticipating ending our

16   evidence sometime on next Wednesday, given the progress to

17   date, the number of days that they will have taken for their

18   case and our need to address things.

19             THE COURT:  When does plaintiffs' counsel expect to

20   conclude.

21             MR. GLUCK:  We think that, with this Albanese issue

22   and potentially the Nordlicht issue, we are three-quarters of

23   the day before.  We hope to be finished Wednesday evening or

24   Thursday morning instead of Wednesday afternoon.

25             THE COURT:  So let's assume Wednesday -- end of court

MC62PLA1

1    Wednesday for completion of plaintiffs' case, and I think I may

2    have to start putting in time limits on both direct and cross,

3    which I am very reluctant to do, but we do need to move this

4    along.

5            So defense starts Thursday morning.  Who is it you are

6    calling?

7            MR. HERTZBERG:  Your Honor, we would call Joseph

8    SanFilippo, CFO of PPVA is our first witness.

9            THE COURT:  Who else?  Who else are you planning for

10   sure to call?

11           MR. HERTZBERG:  David Steinberg, the chief risk

12   officer and portfolio manager we have heard from.  Obviously

13   Mr. Bodner.  We are planning on calling witnesses from

14   Alvarez & Marcal evaluator.  Sterling, the gentleman your Honor

15   called back from Hong Kong.  Cohn Reznick, the auditor.  BDO

16   auditor.

17           THE COURT:  That sounds cumulative and excessive to

18   me, but I will think about it.

19           Let's get the next witness on the stand now.

20           MR. GLUCK:  We are reading.

21           THE DEPUTY CLERK:  Jury entering the courtroom.

22           (Continued on next page)

23

24

25

MC62PLA1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  It is

3     really going to be a nasty day outside, so it's the perfect day

4     for sitting as a jury, right?

5          I heard you were inquiring as to when the evidence in

6     this case will conclude.  It's going to be, as I think I

7     indicated when you were sworn in, we are allotting two weeks.

8     That will go into early next week.  The one thing I can't

9     predict is how long your deliberations will take.  So that will

10    be up to you, not to me.  But in terms of the evidence, I'm

11    optimistic that we will complete all the evidence by next

12    Tuesday.

13         So we are now going to hear excerpts from certain

14    depositions.  I told you yesterday what a deposition is.  It's

15    sworn testimony that is taken by the parties in advance of

16    trial.  Sometimes a witness is not available either because

17    they live too far away or for whatever reason, and then in that

18    case excerpts from their testimony can be read into evidence.

19    These are some of these excerpts were proposed by the

20    plaintiff, some by the defendant, but that doesn't matter.

21    What's important for you to understand is it is just the same

22    as if the person was here testifying except you won't see the

23    live person, but you will be able to hear what that person had

24    to say.  One counsel will read the questions as if he were the

25    person propounding the questions and one counsel will read the

Mc62Pla1                    "Muller –

1   answers.

2           But let's first identify who the witness is whose

3   deposition you are offering.@@

4           MR. GLUCK:  Margaret Muller, M-U-L-L-E-R.

5           THE COURT:  All right, counsel.  Go ahead.

6   BY MR. MAGRUDER:

7   "Q   All right.  Would you please state your full name and

8   spell your first and last name for the court reporter.

9   A.   Maggie Muller, M-A-G-G-I-E M-U-L-L-E-R.

10  "Q   Okay.  Where do you work now?

11  "A   I work from home.

12  "Q   Okay.  Before that, where did you work?

13  "A   I worked at -- I worked at Platinum on 55th Street.

14  "Q   And did Mr. Mark Nordlicht have an office there?

15  "A   Yes.

16  "Q   Okay.  Did Mr. Huberfeld have an office there?

17  "A   No.

18  "Q   Okay.  Did Mr. Landesman have an office there?

19  "A   Yes.

20  "Q   Did Mr. Bodner have an office there?

21  "A   No.

22  "Q   Mr. Bodner did not have an office at Platinum?

23  "A   No.

24  "Q   Okay.  Now, at some point you moved, and is it fair to say

25  that those offices were consolidated into one?

Mc62Pla1                    "Muller –

```
 1   "A    Yes.

 2   "Q    All right.  Do you remember when the move was?

 3   "A    2014.

 4   "Q    Okay.

 5   "A    I believe.

 6   "Q    And at that time, do you remember what -- what is the

 7   address for the new -- the new space?  Do you remember?

 8   "A    I don't remember.

 9   "Q    But you went to work there every day, correct?

10   "A    It was on 55th and Eighth.  Maybe it was 250 West 55th.  I

11   don't remember.

12   "Q    Okay.  All right.  And how -- so if they moved there in

13   2014, you would have worked there a little over two years, is

14   that correct, before you were let go?

15   "A    Yes.

16   "Q    Now, so who had offices in that building, the new space

17   for Platinum?

18   "A    The 4th floor and the 54th floor moved to the 55th Street

19   address.

20   "Q    Right.  Okay.

21         "And was Mr. Bodner -- did he have an office in this

22   new space?

23   "A    Yes.

24   "Q    Okay.  And Mr. Landesman?

25   "A    Yes.
```

Mc62Pla1                       "Muller –

1   "Q    Mr. Huberfeld?

2   "A    Maybe he shared an office with David.  No, I don't

3   remember.  No.

4   "Q    So you don't remember?

5   "A    No.

6   "Q    Okay.  How about Mr. Fuchs?

7   "A    Yes.

8   "Q    Okay.  So he had an office in the new space.

9   "A    Yes.

10  "Q    Okay.  How about Mr. Saks?  Did he have an office in the

11  new space?

12  "A    I think I am confusing Mr. Saks with someone else, to be

13  honest.

14  "Q    Okay.

15  "A    So I don't remember.

16  "Q    Okay.  You were pretty clear that Mr. Mark Nordlicht had

17  an office in the new space, correct?

18  "A    Yes.

19  "Q    And Mr. Landesman had an office in the new space.

20  "A    Yes.

21  "Q    And Mr. Bodner had an office in the new space.

22  "A    Yes.

23  "Q    Okay.  Let's talk about the offices.  Who else, other than

24  Mr. Nordlicht, Mr. Landesman, Mr. Bodner, Mr. Fuchs, had

25  offices, if you can remember?

Mc62Pla1                          "Muller —

```
 1    "A    So the offices are reserved for upper management.  So our
 2    CFO had an office.
 3    "Q    Who was that?
 4    "A    Mandelbaum.
 5    "Q    Okay.  Anybody else?
 6    "A    The COO had an office.
 7    "Q    Who was that?
 8    A.    Will Slota.
 9    "Q    Okay.  And anyone else?
10    "A    I don't remember.  I don't know.
11    "Q    Okay.  Now, when you first started, you stated that you
12    were assistant to Mr. Landesman.  Is that correct?
13    "A    Yes.
14    "Q    Were you assistant to anyone else when you first started?
15    "A    No.
16    "Q    Did there come a time when you became an assistant to
17    someone else?
18    "A    In 2016, 2015, the end of 2015, I became assistant to
19    Mr. Bodner.
20    "Q    Okay.  Why did that happen?
21    "A    Because his old assistant left.
22    "Q    Okay.  And had you done any work for him before?
23    "A    No.
24    "Q    Okay.  And so when Angela Albanese left, did Mr. Bodner
25    come to you and ask if you would be his assistant, too?
```

Mc62Pla1                    "Muller –

1   "A    No.

2   "Q    How did you get that position?

3   A.    So Angela left, and I think he was using Mimi; and then

4   Mimi went on vacation, and so then Nicole was filling in; and

5   then Nicole's dad died.

6   "Q    What's Nicole's last name?

7   "A    I don't remember.

8   "Q    Okay.  What is Mimi's last name?

9   "A    Morales.

10  "Q    Okay.

11  "A    So her dad died, so she was out.  So then I took over not

12  to take over, but was just filling in for a while.  I thought

13  she was going to be out.  And I guess I was a better assistant

14  or something, so he decided to stay with me.

15  "Q    And you just kept -- and so at that point you were both

16  the assistant for Mr. Landesman and Mr. Bodner?

17  "A    Yes.

18  "Q    Is one of your duties was to set up meetings between I

19  will call them the principals——Mr. Nordlicht, Mr. Bodner,

20  Mr. Landesman, Mr. Huberfeld——was that one of your duties was

21  to help set up and schedule meetings?

22  "A    Yes.

23  "Q    And did these meetings typically happen at the Platinum

24  offices?

25  "A    Yes.

Mc62Pla1                    "Muller –

1   "Q    Okay.  And would you ever attend any of these meetings?

2   "A    No.

3   "Q    Okay.  So they had -- they never had you come in and take

4   notes or anything like that during a meeting.

5   "A    No.

6   "Q    Did anyone -- any other assistant play that role, go to

7   the meetings and take notes or anything like that?

8   "A    No.

9   "Q    So when the principals had a meeting, it was just them.

10  "A    Yes.

11  "Q    Did they ever hold their meetings, again, these

12  principals, at restaurants?

13  "A    I don't know.  As an assistant, my job was to also make

14  dinner reservations.  I don't know if" . . .

15          (Pause)

16  "A    I don't know.  As an assistant, my job was to make -- also

17  make dinner reservations.  I don't know if it was for a meeting

18  or if they were just having dinner.

19  "Q    I see.  Okay.  And for these -- for these dinner meetings,

20  did you ever attend any of those?

21  "A    No.

22  "Q    After these meetings, do you recall any incident in which

23  either Mr. Landesman or Mr. Bodner would come back to you and

24  ask you to memorialize what happened or take notes or anything

25  like that?

Mc62Pla1                        "Muller –

```
 1    "A   No.

 2    "Q   Any memory of any contentious meetings that one of the

 3    principals——either Mr. Bodner, Mr. Landesman——told you that

 4    there was a meeting and that -- with the other principals, and

 5    it went poorly or there was fighting or anything like that?

 6    "A   No.

 7    "Q   No memory of anything like that.

 8    "A   No.

 9    "Q   So this is control number 4670006 and this is tab 1.

10    Exhibit No. 220, tab 1, instant message, top message dated

11    11/25/13 from Uri Landesman to Uri Landesman, subject

12    conversation, Bates number CTRL467006, description is marked by

13    the reporter for identification.

14         So what is -- what is this, this being tab 1?

15    "A   I am looking to see what it is.  I will tell you.

16    "Q   Okay.  Good.  Thank you.

17    "A   This is an instant message between me and my boss, Mr. Uri

18    Landesman.

19    "Q   Okay.  So this is dated November 25, 2013.  It's around --

20    it's in the afternoon, I guess, and this -- was this an IM

21    service that you had with internal to the office that you could

22    instant message him as opposed to e-mail?

23    "A   Yes.

24    "Q   Okay.  And so you said:  Uri, you need a full hour with

25    Duvid or will half an hour do?  He responds:  He called the
```

Mc62Pla1                        "Muller –

1    meeting.  You responded:  Okay.

2            "So is this an instance where you are helping set up a

3    meeting between Mr. Landesman and Mr. Bodner?

4    "A   I don't know.  Since there is no last name after Duvid, I

5    don't know, and there were several men in the office named

6    David.

7    "Q   Does anyone else go by D-U-V-I-D other than Mr. Bodner?

8    "A   Yes.

9    "Q   Who?

10   "A   It could have been –– I don't remember their last names.

11   It could have been –– I don't know to be honest.  There were a

12   lot of Davids.

13   "Q   Okay.  Any other Davids ask you to set up meetings with

14   Mr. Landesman, do you recall?

15   "A   I don't remember.

16   "Q   Well, actually, Uri is saying he called the meeting,

17   correct?

18   "A   I can't remember.

19   "Q   Well, that's what it says, right?

20   "A   That is what it says, but you are asking me which Duvid it

21   was and ––

22   "Q   I'm asking you.

23   "A   To be honest, I don't remember.

24   "Q   Mr. Landesman is saying he called the meeting, 'he' being

25   Duvid, whoever Duvid is, correct?

Mc62Pla1                          "Muller –

1    "A    Yes.

2    "Q    Okay.  And so and you are helping set up this meeting?

3    "A    Uh-huh.

4    "Q    Correct.  Okay.  Well, other than Mr. Bodner, did you work

5    for any other Duvids that you helped set up meetings for?

6    "A    I didn't work for Bodner, Mr. Bodner, at this time.

7    "Q    Okay.  All right.  I had asked you a little bit earlier

8    about communications with investors, and if you could take a

9    look at tab 3.  Okay.  And you say -- and he says --

10   Mr. Landesman says, as I just indicated, no, unless Duvid asks

11   me to.  So is that referencing Mr. Bodner who is asking him to

12   make these investor calls?

13   "A    I don't know.

14   "Q    Okay.  Is there any other Duvid who was asking

15   Mr. Landesman to make investor calls?

16   "A    I'm not on these e-mails.  I don't know.

17   "Q    I understand.  I am just asking you are there any other

18   Duvids?

19   "A    I answered.  I said no.  I don't know.

20   "Q    You don't know.  So did Mr. -- are you aware that

21   Mr. Bodner asked him to make --

22   "A    I'm not aware.

23   "Q    -- investor calls?

24   "A    No.

25   "Q    Was Mr. Bodner a partner?

Mc62Pla1                    "Muller –

1    "A    Yes.

2    "Q    Now, with regard to setting up these e-mails with

3    investors, this was one instance where the meeting was set up

4    between the investor and Mr. Landesman, Mr. Kimmelman and

5    Mr. Mann, correct?

6    "A    On this same phone call?

7    "Q    Yes.

8    "A    No, that's --

9    "Q    That's what you were being asked to do, correct?

10   "A    No.  I'm asked to set up a phone call with Uri and Amir.

11   "Q    Did you ever -- and Amir is an investor?

12   "A    Yes.

13   "Q    Okay.  And we -- and Mr. Landesman is a partner?

14   "A    Yes.

15   "Q    Did you ever set up similar calls between other investors

16   and Mr. Bodner, do you remember?

17   "A    Between investors and Mr. Bodner?

18   "Q    Um-hmm.

19   "A    Uh-huh."

20          MR. AMENT-STONE:  Objection.

21          THE COURT:  Excuse me?

22          MR. AMENT-STONE:  That wasn't the testimony.

23          MR. GLUCK:  "Um-hmm."

24          MR. MAGRUDER:  I think I'm supposed to say "um-hmm."

25          MR. AMENT-STONE:  He says.

Mc62Pla1                          "Muller –

1              MR. GLUCK:  Oh.

2     BY MR. MAGRUDER:

3     "Q    Um-hmm.

4     "A    When?

5     "Q    At any time.

6     "A    No, not that I recall.

7     "Q    Not that you recall?

8     "A    Correct.

9     "Q    This is an IM instant message between you and

10    Mr. Landesman in November of 2013, control number 4655, excuse

11    me, 4658573, and you write to him:  'I only got PPLO margin for

12    the day.  I will bring it in with your lunch when Perl leaves.'

13             "Okay.  What is the PPLO margin for the day?  Do you

14    remember that?

15    "A    It was the margin report.

16    "Q    Okay.  And who would have given that to you?

17    "A    I think at this point, I don't know, I could just log in,

18    pull it, and print it.  I don't think I physically took it from

19    anyone.  I think it was on the computer.

20    "Q    Okay.  And is this something -- the document that you

21    would routinely give to Mr. Landesman?

22    "A    Yes.

23    "Q    And who is Perl, P-E-R-L?

24    "A    Whoever he was meeting with.  Perl must have been the

25    person who came to his office.

Mc62Pla1                    "Muller –

1    "Q    But do you know who that person is?

2    "A    I can't remember who they were.  Yeah.  No.  I don't -- I

3    don't remember.

4    "Q    Okay.  And then he responds 'after Duvid.'  Is that

5    Mr. Bodner?

6    "A    I don't know.

7    "Q    You don't know.  Do you suspect that it's Mr. Bodner?

8    "A    No, I don't suspect it.

9    "Q    Do you know who else he would be meeting with named Duvid?

10   "A    Could have been there speaking to any number of guys in

11   the office.  There were a few Davids and Duvids.

12   "Q    He spells it D-U-V-I-D.  Anybody else that spells it that

13   way?

14   "A    That's how you spell it in like Jewish people.  They put

15   the U in there.

16   "Q    Right.

17   "A    And say Duvid, so any one of them.

18   "Q    So anyone else?

19   "A    Yes.

20   "Q    Did you see that often?

21   "A    Yes, very often.

22   "Q    To who?

23   "A    For everyone named David would be referred to as Duvid.

24   "Q    Well, I thought when Angela left in late July 2015, you

25   started to help Mr. Bodner.  Is that not accurate?

Mc62Pla1                    "Muller –

1   "A    Two other girls before me helped him, then this landed in

2   my lap.

3   "Q    Okay.  I see.  But you -- when she left, you moved to her

4   desk.

5   "A    I don't know when that happened.

6   "Q    Why?

7   "A    I probably moved to her desk right before I started

8   working for David because she was right outside of my boss's

9   office, so it made sense for me to move there.  I couldn't stay

10  where I was originally.

11  "Q    All right.  Let's take a look at 22, control number

12  7736607.  It's an e-mail between you and Mr. Nordlicht, January

13  8, 2016.  At this time you were Mr. Bodner's assistant, is that

14  correct, January of 2016?

15  "A    Yes.

16  "Q    You were also Mr. Landesman's assistant, correct?

17  "A    Yes.

18  "Q    All right.  And he writes, 'Bottom line is, let's divide

19  up and schedule when and where we are going after prospects.

20  Next week is judgment week.  I really think even if we have to

21  ask favor for investment in PPCO, we should do it and do

22  crossover or try to get a hybrid half and half.  PPCO should

23  double over three years, so even if PPVA crashed, you get

24  principal back and own small management share in great credit

25  fund.  Maggie, please E print out and send to David,' and is

Mc62Pla1                          "Muller –

1   that refer to David Bodner?

2   "A    Yes.

3   "Q    Is that a mistype what is E print versus just print?

4   "A    That's a typo.

5   "Q    Okay.  So at this point in time, is Mr. Bodner not taking

6   e-mail so you would have to print it out and put it on his

7   desk?  Is that what you would do?

8   "A    Yes.

9   "Q    So he didn't just -- whatever, the communication would go

10  to him, just not from e-mail, is that correct?

11  "A    This communication?

12  "Q    Correct.

13  "A    Yes.

14  "Q    And so your -- your duty was to print it and make sure he

15  got it, so he got the communication, just not through e-mail,

16  correct?

17  "A    Yes.

18  "Q    Okay.  And you did this, correct?  You say 'okay.'

19  "A    Yes."

20          MR. MAGRUDER:  That's all for Ms. McGovern Muller.

21          THE COURT:  Okay.  So a couple of things first.  I am

22  sure that from now on when you read the Bible you will keep in

23  mind the battle between Goliath and Duvid.

24          You heard reference in that to the witness who was on

25  the stand late yesterday, Ms. Albanese.  I neglected to mention

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc62Pla1                     "Katzenstein –

1   to you that she is a little under the weather today.  She will

2   probably be here tomorrow.  So we had to interrupt her

3   testimony, but she will continue before the end.

4           What's next?

5           MR. MAGRUDER:  This is the deposition of Randall

6   Katzenstein, R-A-N-D-A-L-L K-A-T-Z-E-N-S-T-E-I-N.

7           THE COURT:  Go ahead.

8   BY MR. MAGRUDER:

9   "Q   Let me -- you don't have to write a book for me in

10  response to this question, but if you could just trace for us

11  your work history after you graduated from Syracuse University,

12  that would be helpful.

13  "A   Well, the first three years I was an accountant—two years

14  public, one year internal audit.  Part of the public was at

15  Pricewaterhouse, and I did some tax work for about six months.

16  And Continental Grain is the internal -- this firm I worked

17  for.  It's the second largest private company in the world at

18  the time.  I worked there for about a year.  I traveled about

19  95 percent of the time.

20          "And then I got recruited to Merrill Lynch

21  Commodities.  I worked at a bunch of brokerage firms.  Merrill

22  was fine, but I couldn't really get into the institutional

23  space there without being in their head office, and I was

24  working in Morristown.

25          "Anyway, so I worked at a few firms in the beginning,

Mc62Pla1                    "Katzenstein –

1   kind of nothing too long, and then worked at finally a place

2   where I could co-head the bond desk, cash bond desk at Revco.

3   Revco is not around anymore, but it became the largest futures

4   company in the world.  It was the largest futures company and

5   commodity firm in the world.  I worked there for 16 years.  I

6   left --

7   "Q    Approximately what period of time was that?

8   "A    Well, I left in '01, so minus 16.

9   "Q    Got it.

10  "A    I think I got there around '87, early '87, late '86,

11  something like that, '87, and the bond desk part was like five

12  years.  And then I left Revco in May of '01, relatively good

13  timing, and I started OBEX.  And we became -- I think we became

14  an NFA member very quickly, National Futures Association.  And

15  we applied for our FINRA license, SEC, well, to be regulated by

16  the SEC.  And that went relatively quickly, too.  I remember

17  even getting interviewed by -- in Boston by the -- I don't know

18  if it was FINRA, probably it was FINRA, and so this was May I

19  started.  But within a year, I had my SEC registration.  Since

20  '01 I have had OBEX, so it's been a while.

21  "Q    Did there come a time when you had any business dealings

22  with Mark Nordlicht?

23  "A    Well, when I was at Revco we did business, I believe.

24        MR. MAGRUDER:  This is Mr. Katz Stein's attorney:

25        "The question to you was did there come a time when

1   you did business with Mr. Nordlicht?

2   "A   Well, not with him directly ever, I mean with companies

3   where he would -- you mean him with personally or with his

4   company?

5   "Q   Could be either, but I gather from what you have said so

6   far it sounds like you had dealings with companies he worked

7   for, is that fair to say?

8   "A    Yeah, yeah.

9   "Q   Please tell us about that then.

10  "A   I'm trying to remember if I ever did business with him

11  before he had Platinum and where we actually did business.  I

12  know we went -- I know we started to start a company in Taiwan

13  trading S Rands, D Rands and things like that, brokering

14  computer chips.  That's the right place to go, Taiwan.  He sent

15  a representative there with me to look at it.  It never

16  happened.  And at the end of the day, I mean, I enjoyed it, I

17  enjoyed traveling, but we ended up not doing it.  So, but I

18  spend a couple of weeks in Taipei.  I don't know if I ever did

19  business with him before Platinum offhand.

20  "Q   So I gather there was a time when you began working with

21  him at Platinum?

22  "A    Yeah.

23  "Q   And how did that develop?  When did -- how did it start?

24  Let's put it that way.

25  "A   Well, we had an office in Carnegie Tower next to Carnegie

Mc62Pla1                    "Katzenstein –

1   Hall, and I don't remember the first time I may have gone
2   there.  And he was living in New York.  I was still living -- I
3   still live in Westchester.  And I don't remember how that
4   occurred.  I believe I may have contacted him.  It's possible.
5   I had, over my career at OBEX, I hired traders to work for me
6   from time to time.  So I hired -- we just had a few
7   relationship -- I know I introduced him to Barclays Bank, and
8   they were doing a fair business -- a fair amount of business
9   with Barclays for Platinum.  I just don't remember when that
10   occurred.  I don't remember.  We were managing some money for
11   Platinum at one point in a separately managed account that
12   Platinum set up.  I had two British traders——one in New York,
13   one in London——very experienced people, you know, 30, 40, 30
14   years of experience.
15          "Well, let's assume -- I'm not sure, but let's assume
16   we were starting a futures relationship, where we were clearing
17   some of the futures.  I think it might have been when he was
18   doing a lot -- no, no, before -- it was before.  I introduced
19   him to Triland, too.  Triland is part of Mitsubishi Corp.  It's
20   not around anymore.  They closed their U.S. office.  But
21   Mitsubishi I believe still owns Triland in the U.K., and I
22   think Triland was after Barclays.  But I think we only
23   introduced him to Barclays for the management we were doing,
24   not for the regular business.  I think Triland was the regular
25   business which was mainly options.  They were doing arbitrage,

1   something between European and American options, and we were

2   introduced to Thailand -- Triland.  It was an important

3   account, and it grew and it grew really well.  There weren't

4   really any issues of substance.  I mean, you always have a

5   little issues with clients, but nothing of major consequence.

6   And then, you know, I would periodically invest -- visit -- I

7   would visit periodically their office at Carnegie Tower.

"Q   When you say their offices, you are referring to Platinum?

"A   Right.

10          MR. MAGRUDER:  This is Mr. Katzenstein's attorney:

11          "Mr. Katzenstein, the question pending is what does

12   OBEX -- just briefly describe OBEX.

"A   So OBEX introduces business and it brings business to, you

14   know -- well, we have contracts with Mitsubishi, Triland,

15   Mitzui, Mizuho Bank, currently with Macquarie, Cantor

16   Fitzgerald, different, different quality firms.  We only let

17   ourselves do business with quality firms because our clients,

18   first of all, demanded quality firms.  So we couldn't really

19   bring an account to a middle sized firm too often.  They needed

20   big balance sheets, generally speaking.  So we introduce and

21   then we oversee the clerical side.  Generally on the statement

22   it says introduced by OBEX Securities, so the clients get to

23   see that.  I like that, too.  It's sort of like a form of

24   advertising.  And but we have no say.  I mean, we don't really

25   take orders."

MC6Cpla2                      "Katzenstein –

1   "Q.   And in addition to Mark Nordlicht, did Murray Huberfeld --

2   are there other individuals at Platinum with whom you dealt

3   over the years?

4   "A.   Many.

5   "Q.   And if you could just name the ones you've dealt with most

6   frequently, that would be helpful.

7   "A.   Well, I have a staff.  I have an operations staff.  So

8   they would tend to deal with them more than I would deal with

9   them.  Generally, it's the client's operations staff.  It's

10  more my role to bring in the clients and get it set up.  And

11  then I'm big on delegating.  I'm pretty good at it.

12          So it would be my staff that would deal with the

13  day-to-day, and I would notice if there was, like, a repetitive

14  email or something's not getting done because I'm usually cc'd

15  on things or we have, like, a group email.  But, you know, at

16  Platinum, I met David Bodner.  I didn't have any dealings with

17  him, but I met him.  I knew Uri -- you know his last name.

18  "Q.   Landesman, by any chance, L-a-n-d-e-s-m-a-n?

19  "A.   Landesman, yeah.

20  "Q.   Okay.  Did there come a time when you became familiar with

21  an outfit called Beechwood?

22  "A.   Yes.

23  "Q.   And when was that, approximately?

24  "A.   You know, whatever the emails show.  I mean, five years

25  ago, maybe.

MC6Cpla2                    "Katzenstein –

1   "Q.  Was it your understanding that Beechwood was an entity set

2   up by Platinum?

3   "A.  I don't know.  I mean, at a later point, possibly after

4   this email or before, I went up to, you know -- I saw similar

5   people at Platinum Management, senior management sitting at

6   Beechwood.  One would assume there's a relationship.

7   "Q.  And those senior management people who were both at

8   Platinum and Beechwood included Mark Nordlicht?

9   "A.  Correct.

10  "Q.  And Murray Huberfeld?

11  "A.  Correct.

12  "Q.  And David Bodner?

13  "A.  I don't believe I ever saw him there.

14  "Q.  David Levy?

15  "A.  I think the first time I met him was there at Beechwood.

16  "Q.  What was the basis of your understanding when

17  Mr. Nordlicht -- you're having a discussion with Mr. Nordlicht

18  about coming to work at Platinum and Beechwood, why is

19  Mr. Nordlicht the person to be talking to in connection with

20  that conversation?

21  "A.  There was no one ever else to talk to there about any

22  decision.

23  "Q.  At Beechwood?

24  "A.  Well, at Platinum, for sure.  And Beechwood, I hardly knew

25  anyone there.  I didn't know anybody, and Murray I didn't like

MC6Cpla2                     "Katzenstein –

1    to talk to, so kind of left it to Mark.

2    "Q.  Let's go to that.  Is Murray Huberfeld another person who

3    you recall being part of Beechwood?

4    "A.  I saw him there, yeah.

5    "Q.  And part of Platinum?

6    "A.  Murray -- I saw him in the -- like I said, they shared

7    that floor at one point in the Carnegie Tower.  And then I

8    think they moved -- I don't know where Murray was.  Platinum --

9    oh, yeah, Murray had a higher floor in the building, but in the

10   old floor, they shared space.  And you would, once in a while,

11   I guess you would see Murray, but I really had no interactions

12   with him to speak of.

13   "Q.  Did you have an understanding as to whether Mr. David

14   Bodner was in charge or managing Platinum or Beechwood?

15   "A.  I knew there was a relationship.  Your question that -- I

16   didn't know anything per se.  I felt -- I believed there was a

17   relationship, somewhat of a partnership between Bodner and

18   Murray, but Murray was more the active and Bodner was more the

19   passive person.

20   "Q.  Had you met Mr. Bodner, let's say, when you were

21   considering the position at Platinum around 2013, 2014?

22   "A.  No.

23   "Q.  Had you ever met him?

24   "A.  Had I ever?  I think, yeah, I met him one -- a couple of

25   times.  I kind of liked him.

MC6Cpla2                    "Katzenstein –

1    "Q.  Did you discuss a potential position at Platinum or

2    Beechwood with Mr. Bodner?

3    "A.  Unlikely.

4    "Q.  And why is that?

5    "A.  Just, just don't see why I would do that, and I hardly had

6    a relationship with him to discuss it.  I don't believe so.

7    "Q.  Was there a time when either Platinum or Beechwood

8    considered investing in OBEX?

9    "A.  Beechwood -- well, there was a discussion with me and Mark

10   investing in OBEX, yeah.

11   "Q.  You and Mark who?

12   "A.  Nordlicht.

13   "Q.  You and Mark Nordlicht?

14   "A.  Yes.

15   "Q.  Investing in OBEX?

16   "A.  There was a discussion about it, yes.

17   "Q.  Let me understand, OBEX is your company?

18   "A.  Yes.

19   "Q.  So the discussion was about you taking personal money and

20   Mark Nordlicht taking personal money and investing in OBEX?

21   "A.  Oh, I didn't care how --

22        MR. MAGRUDER:  Katzenstein's attorney:  "Objection to

23   form."

24   "A.  We wanted more capital.  We were talking --

25   "Q.  "We," OBEX?

MC6Cpla2                          "Katzenstein –

"A.   OBEX -- going, self-clearing, becoming a bigger firm.  As
I said earlier, we only introduced business.  So having real
capital, like 20 million, 30 million, 30, 40, 50 million --
because I went to Mr. Aerni, did I ever introduce?  I must have
went to 20, 30 firms to talk about raising capital for OBEX,
private equity shops.

"Q.   So would it be fair to say that you recall discussing
Platinum and Beechwood making an investment into OBEX, that was
a potential conversation?

"A.   Yes.

"Q.   How far did it get?

"A.   Well, with Platinum, nowhere.  With Beechwood, it got to a
serious discussion and -- between me and their attorney.  I
think Chris was his name.

"Q.   Thomas?

"A.   Yeah, I believe so.  Christian Thomas, maybe.  But there
were -- they were looking.  There was one consideration that
they were going to invest some serious capital into OBEX and I
decided not to go forward.

"Q.   I'm going to show you an email, which I'm going to mark as
RK5, and I'd like you to just take a quick look at it and see
if you can tell me if you recall this correspondence.

          Katzenstein 5, excuse me, instead of RK5.

          CTRL6331008 was marked as Katzenstein 5 for
identification as of this date.

MC6Cpla2                    "Katzenstein –

1              What I would like you to do, once you've glanced at

2      it, take a look at the page that's marked.  Well, they're all

3      the same control number.  This is CTRL633108, and there is an

4      email on the third page which I gave you, that's right at the

5      bottom of the page.

6      "A.  You mean 26?

7      "Q.  May 25th, Sunday, May 25, 5:33 p.m.  It's right at the

8      bottom of the page, and it begins "Dear David, Murray, and

9      Mark."

10             MR. MAGRUDER:  There's an objection from

11     Mr. Katzenstein's attorney:  "Murray, David, and Mark."

12             There is a comment from plaintiff's counsel, "Yes,

13     Murray, David, and Mark."

14     "A.  May 25?

15     "Q.  Right at the bottom.

16     "A.  Okay.  "Dear Murray, David, and Mark."  Okay.  Thank you.

17     "Q.  Would you mind taking a look at that sentence and then the

18     following page and tell me if you broadly recognize the email.

19     "A.  I mean, I wrote it.  So, yeah.  This is when we were

20     discussing them investing into OBEX.

21     "Q.  Okay.  And "them," who do you understand "them" to be

22     here?

23     "A.  "Them" meaning Beechwood.  In this email, it's Beechwood.

24     Like I said, I don't care, per se, as long as I felt it was a

25     solid amount of money that would be good for our firm.  So, in

MC6Cpla2                    "Katzenstein –

1   this case, it's Beechwood.

2   "Q.  Okay.  My question is similar to the one I asked you when

3   you were having a discussion with Mr. Nordlicht regarding a

4   position at Platinum and Beechwood.

5          Specifically why, if you can recall, when you were

6   writing to Beechwood in connection with a potential investment

7   by Beechwood into OBEX, were you writing to Murray –– like I

8   said, Murray Huberfeld, David, and Mark, why were they the

9   persons to write to for a Beechwood investment?

10  "A.  I felt they were the guys in charge, I guess.

11  "Q.  How do you think you would have come to that

12  understanding?

13  "A.  They were the only guys I was talking to.

14  "Q.  Did they represent that they had authority to make

15  decisions on Beechwood investments?

16  "A.  It's unlikely they said those words.

17  "Q.  Did they imply they had authority to make decisions on

18  Beechwood investments?

19  "A.  I don't know.  I don't know.

20  "Q.  Would you have written this email to them otherwise?

21  "A.  Unlikely.

22  "Q.  If you look back at Exhibit 5, right on that page where

23  the email gets cut off, but it says "Dear Murray, David, and

24  Mark."

25  "A.  Right.

MC6Cpla2                    "Katzenstein –

1   "Q.   I just want to point you to the "to" field where it says

2   Murray Huberfeld, and then bodnerang@gmail.com, and Mark

3   Nordlicht.  Just tell me if you see that.

4   "A.   Yeah.  I don't know why I have Bodner on here.

5   "Q.   Did you understand that that was David Bodner's email

6   address?

7   "A.   Yeah, I just -- as I was just saying, I don't know.  I

8   mean, all the thousands of emails, this might have been one of

9   the only ones where I've included him.  And it might be because

10  I saw it and maybe there's an email before this that they wrote

11  to me with his name there because he would not be the one I

12  would ever really include.

13  "Q.   If you flip to the very front page now, the very --

14  "A.   And I -- yeah.  So this says David.  Yeah.  I'm sorry.

15  When I was thinking David Levy before, I thought we were

16  talking "David."

17  "Q.   David Bodner is who you're referring to; right?

18  "A.   Apparently, but that might have been a courtesy.

19  "Q.   I want to show you an email, which we'll mark as

20  Katzenstein Exhibit 6.

21  "A.   I think I recall why --

22          MR. MAGRUDER:  Comment from Mr. Katzenstein's counsel:

23  "There's no question pending about this document.

24  "Q.   Do you wish to modify --

25          MR. MAGRUDER:  Another question from Mr. Katzenstein's

MC6Cpla2                      "Katzenstein -

counsel:  "Is it part of your answers?"

"A.  Well, that David Bodner, because the first time I met

Murray, David was --

            MR. MAGRUDER:  Comment from Mr. Katzenstein's counsel:

 "Do you want to clarify a prior answer you gave?"

"A.  Well, no, it's just the David there.  I know why I added

David now.

"Q.  Why is that?

"A.  Because I think he was -- he was in the first meeting that

I had with Murray.

"Q.  Concerning Beechwood?

"A.  No, concerning the investment into OBEX.

"Q.  The investment by Beechwood into OBEX, excuse me.

"A.  Like I said, whoever it was coming from, it was just the

first meeting, and I remember the first meeting, it was with

Murray and David.

"Q.  And that email chain, though, concerns a potential

transaction between -- excuse me.  A potential transaction

whereby Beechwood was going to make an investment into OBEX?

"A.  Again, you're asking me — I didn't care.  I'd started with

Platinum and I think it ended with Beechwood.

"Q.  That's fine.

            I marked exhibit Katzenstein 8.  It is an email --

            MR. MAGRUDER:  Mr. Katzenstein's counsel:  "What

number are we on?"

MC6Cpla2                         "Katzenstein –

1          Excuse me.  Katzenstein 6.  Katzenstein 6.

2    "Q.  Just take a look at this email and then you can let me

3    know if you recognize it.

4    "A.  There is no email.  It's just the subject heading, you

5    mean?

6    "Q.  Just the subject heading.

7    "A.  Right.

8    "Q.  Any reason to believe you didn't send this email?

9    "A.  No, but I don't recognize it.

10   "Q.  So it's from you to Mr. Nordlicht around May 2014.  It

11   says the -- what does the subject say?

12        MR. MAGRUDER:  Mr. Katzenstein's counsel:  He's just

13   asking to you read the subject.

14   "A.  "Mark, I am just going to send it out to Murray, David,

15   and you, unless you see a reason to hold off.  Murray wants

16   it."

17   "Q.  So who do you understand "Murray" to be in that?

18   "A.  That's Murray Huberfeld.

19   "Q.  And David?

20   "A.  Well, normally I would have said it's David Levy, but

21   given what we just looked at, it's probably David Bodner.

22   "Q.  Do you recall ever speaking with Murray Huberfeld or David

23   Bodner about the Black Elk bond?

24   "A.  Never.

25   "Q.  Establishing the account?

1     "A.  I don't believe I ever did.

2              MR. MAGRUDER:  Your Honor, that's the end of

3     Mr. Katzenstein.  I understand our witness is here if you would

4     like to proceed.

5              THE COURT:  Very good.  Call your next witness.

6              MS. SHEN:  Plaintiffs call Seth Gerszberg.

7              THE DEPUTY CLERK:  Please take the witness stand.

8      SETH GERSZBERG,

9          called as a witness by the Plaintiffs,

10         having been duly sworn, testified as follows:

11             THE DEPUTY CLERK:  State your name and spell it slowly

12    for the record.

13             THE WITNESS:  Seth Gerszberg, S-e-t-h

14    G-e-r-s-z-b-e-r-g.

15             THE COURT:  Counsel.

16    DIRECT EXAMINATION

17    BY MR. GLUCK:

18    Q.  Good morning, Mr. Gerszberg.

19    A.  Good morning.

20    Q.  Did there come a time when you became introduced to

21    Platinum Partners?

22    A.  Yes.

23    Q.  Can you please tell the jury about that.

24    A.  Maybe in 2013, a mutual friend introduced me to Platinum.

25             MR. GLUCK:  Would you mind speaking up.

MC6Cpla2                        Gerszberg - Direct

1           THE WITNESS:  I'm sorry.  How's that?

2           MR. GLUCK:  Good.

3    A.  2013, I believe, I was introduced to Platinum through

4    mutual friends.

5    Q.  And what was the context?

6    A.  Potentially investing in my business.

7    Q.  What was your business?

8    A.  A clothing company.  Originally, it was called Ecko Unltd.

9    Clothing.  It was then we sold the brand and converted it into

10   a group of smaller brands and it was a platform that had retail

11   and wholesale.

12   Q.  Was it called The Collective?

13   A.  Eventually, the name migrated to The Collective.

14   Q.  Did Platinum make an investment in The Collective?

15   A.  Yes.

16   Q.  Can you please describe it for the jury, very broadly.

17   A.  It was supposed to fund -- it's been a long time, but it

18   was supposed to fund $40 million of capital.  We ended up

19   getting, over prolonged stages and timing, about $15 million

20   ultimately.  We ended up short on capital.

21   Q.  Are you familiar with the name Over Everything?

22   A.  Yes.

23   Q.  Could you explain what that is and what the relationship is

24   to your business.

25   A.  Over Everything was -- I don't remember the lot of company

1   names and I can't tell you how they were organized or

2   structured.  There was probably 30 different corporate names,

3   so I can't tell you about the structure.  Over Everything

4   happened to be a term utilized by Big Sean, the rapper, but I

5   don't recall specifically how that company was utilized or

6   involved.

7   Q.  Within your clothing business?

8   A.  Right.

9   Q.  Okay.  So just for a moment, could you just describe how

10  you founded your clothing business and then how it ended up?

11  A.  Yes.  I had started in 1993 with my partner, Marc Ecko, and

12  we ran the business unsuccessfully probably for about six years

13  and accumulated a lot of debt.  Then, over time, we learned

14  enough about the mechanics of the business to pay back all the

15  debt that we owed and to go on to run a successful clothing

16  business that had multiple brands and retail locations and

17  wholesale.

18  Q.  And you said they were unsuccessful, what happened?

19  A.  The first six years, we lost $6 million not knowing how to

20  run the apparel business and made lots of mistakes and

21  accumulated friends and family debt that we ultimately were,

22  you know, thankfully able to pay back.

23  Q.  Did your clothing companies end up in bankruptcy?

24  A.  Eventually did end up in bankruptcy.

25  Q.  When did that occur?

1    A.  Maybe in 2014.

2    Q.  Were you aware of how or in what amount Platinum was

3    valuing its investment in your clothing company?

4    A.  No, I don't recall.

5    Q.  Did there come a time when you began to have a relationship

6    with Platinum, beyond that of a recipient of money?

7            MR. LAUER:  Objection.  Leading.

8            THE COURT:  Overruled.

9    A.  It was a time after we closed our business at the end of

10   2015 that I became more interested in how Platinum was able to

11   pay back investors because some of the money that was lent to

12   our company in 2015 was guaranteed by Platinum, but I was

13   ultimately responsible.

14   Q.  Did you start coming into the office of Platinum?

15   A.  Yes.

16   Q.  When was that?

17   A.  Around the beginning of 2016, I believe.

18   Q.  And who asked you to come to the office?

19   A.  Nobody.

20   Q.  You just started coming in?

21   A.  Yeah.

22   Q.  And what would you do there?

23   A.  Tried to understand the nature of the liquidity crisis in

24   2000 -- well, I won't say crisis.  In 2008, I had $200 million

25   of debt and the capital market had problems and I had to deal

MC6Cpla2                    Gerszberg - Direct

1   with trying to get through my -- the hurdles I had with debt.

2   So I thought I understood how to operate companies that were

3   financially challenged.  And so, I understood that there was

4   some -- there were liquidity challenges at Platinum as being

5   able to fund businesses such as mine.  So I just wanted to see

6   if I could help provide some support to the investments that

7   they had that might materialize and have better yields which

8   would ultimately lead to repayment of the debt that I was

9   ultimately guaranteeing.

10  Q.  You were trying to help them out based on some of the rough

11  experiences that you had?

12  A.  Sure.

13  Q.  Did Platinum Management know that your clothing business

14  had gone into bankruptcy?

15  A.  Yes.

16          MR. LAUER:  Could we have individuals, your Honor.

17          THE COURT:  Well, when you say that Platinum knew your

18  clothing business went into bankruptcy, how do you know that

19  they did?

20          THE WITNESS:  I told them.

21          THE COURT:  You told hem.  Who did you tell?

22          THE WITNESS:  Mark Nordlicht primarily, and some of

23  the investment managers.  I also remember meeting Murray

24  Huberfeld.  I don't know if the bankruptcy came up at that time

25  because I might have met them previously or -- but I think they

MC6Cpla2                          Gerszberg - Direct

1   both knew.  I'm sure Mark knew.

2   BY MR. GLUCK:

3   Q.  When you began going into Platinum's office to provide

4   guidance, did you assume a role where you began preparing a

5   presentation of PPVA's investment, investment positions and

6   financials?

7             MR. LAUER:  Objection.

8             THE COURT:  Well, as phrased, sustained.

9   Q.  When you came into Platinum, did you play a role in

10  preparation of financials positions?

11            MR. LAUER:  Objection.

12            THE COURT:  Overruled.

13  A.  As far as the financials, no.

14            THE COURT:  So what did you do, other than sit there,

15  when you began coming to the offices?

16            THE WITNESS:  So we took the financials, specifically

17  financials for each company, like profit and loss statements or

18  bank statements or balance sheets.  I never looked at any of

19  those things.  I was just trying to understand how much

20  leverage different positions had on them and how much potential

21  liquidity or value we created from those positions to

22  understand either by specific individual investments or by

23  group, whether or not there was suppressed value or the

24  opportunity to create further monetization for certain

25  positions.

MC6Cpla2                        Gerszberg - Direct

Q.   So you were looking at Platinum -- when you say Platinum

positions, you mean Platinum investments?

A.   Places -- again, at first, I really wasn't looking at

specifically what part of Platinum, but just the idea of

investments that Platinum made and to companies that seemed to

have, you know, a -- that I could understand fast enough to put

into some kind of assessment or group or understand enough to

see whether or not there was more liquidity that could be

created for supporting those positions.

Q.   And when you refer to the word "leverage," is that a word

that relates to debt somehow?  What is leverage?

A.   Again, I'm not -- I'm not trying to posit that I'm a

financial guru or anything, I'm just a regular person assessing

business and saying does this business look like it is right

for an investment or for debt, which would create some

opportunity for the business beyond where it is today.

Q.   Let me rephrase.

          What did you mean when you used the word "leverage" in

your answer?

A.   Same thing, that you could either create an opportunity to

borrow more money against it or create the opportunity to sell

pieces of it.  Just finding value.

          MR. GLUCK:  Mr. Parson, will you please call up

Plaintiffs' Exhibit 907.

          We would seek to move this into evidence.

MC6Cpla2                        Gerszberg - Direct

1           MR. LAUER:  No objection.

2           THE COURT:  Received.

3           (Plaintiffs' Exhibit 907 received in evidence)

4           MR. GLUCK:  If you highlight, Mr. Parson, where it

5    says "from," and then Mr. Gerszberg's email address.  I just

6    want to build that foundation.

7    Q.  Mr. Gerszberg, can you see on the screen in front of you

8    this email?

9    A.  Yes.

10   Q.  Do you see where it says seth@thecollective.com?

11   A.  Yes.

12   Q.  Is that your email address?

13   A.  It is.

14   Q.  And you're corresponding with Mark Nordlicht?

15   A.  That's what it says.

16          MR. GLUCK:  Drop that down now.

17   Q.  In the meeting below, do you recall meeting with Murray

18   Huberfeld and David Bodner around this time, January 2016?

19   A.  Can I read the email to orient what you're asking about?

20   Q.  Sure.

21   A.  Because I don't remember.

22          MR. GLUCK:  Mr. Parson, you can flip to the end of the

23   chain if that's available.

24          THE WITNESS:  Just a moment.  I'm just reading.

25          MR. GLUCK:  Let us know when you're finished reading.

MC6Cpla2                          Gerszberg - Direct

1          THE WITNESS:  Yes.

2          MR. GLUCK:  This is the second page.

3          Let's start here, and when you've reviewed this

4     paragraph, let us know.

5          THE WITNESS:  Can you go back to let me see the --

6     Q.  Ready?

7     A.  Yeah.

8     Q.  So let's begin.  Who is Mr. David Levy?

9     A.  Another manager at Platinum.

10    Q.  And who is Mr. Andrew Kaplan?

11    A.  He was involved in investments or investors.

12    Q.  Platinum guys?

13    A.  Platinum.

14    Q.  And so you're being copied on this email.  What do you

15    understand Mr. Nordlicht to be telling you here?

16    A.  I don't really recall.  It seems like at the time, I --

17    this is early on when I first got to spending time at

18    Platinum's office and I think I was trying to understand the

19    historical returns for Platinum and for the two different, I

20    guess, funds at Platinum.

21    Q.  You see where it says the clause, and also update for

22    presentations.

23          MR. GLUCK:  Mr. Parson, can you highlight that.

24    A.  Yes.

25    Q.  Do you recall preparing a presentation during your time at

1    Platinum during this period?

2    A.  I doubt this was the reference for that presentation.

3         MR. GLUCK:  Let's go to the next page.

4    Q.  When you say that presentation, do you have a particular

5    presentation you're thinking about?

6    A.  Yeah, I remember preparing a presentation like the

7    following month, I believe, that grouped together some of

8    Platinum's investments, but I wouldn't have -- I don't believe

9    I would have -- I would have thought to have done this this

10   quickly.  This is probably related to the investor

11   presentation.

12        MR. GLUCK:  Mr. Parson, if you go to the January 6th

13   line on the email from Mr. Gerszberg, saying meeting Murray and

14   David on the 10th floor of your building.

15   Q.  Do you see that?

16        Were you meeting Mr. -- well, who is Murray and David?

17   A.  It was Murray Huberfeld and David Bodner.

18   Q.  Why were you meeting them?

19   A.  I think -- it's hard to remember.  It was a number of years

20   ago.  I think the cadence was that Mark wanted -- Mark

21   Nordlicht, I think, wanted David and Murray to -- or maybe I

22   suggested meeting with them.  I'm not quite sure what, you

23   know, whether it was my request or Mark's, but I think that --

24   I think that Mark wanted more support from David and Murray.

25   Q.  What did you understand Mr. Huberfeld and Mr. Bodner's role

MC6Cpla2                          Gerszberg – Direct

1   at Platinum to be?

2             MR. LAUER:  Objection.

3             THE COURT:  Overruled.

4   A.  That they had historically been more involved, that they

5   were not really as involved, that they had historically had

6   management shares in some of these vehicles and that they were

7   clearly less involved at that time.  And over the course of

8   time, merging timelines, this is five years ago, but they were

9   trying to -- or they were planning giving back their -- or they

10  had pledged to give back their ownership of Platinum.

11  Q.  Speak into the microphone.

12  A.  I'm sorry.  My understanding was that whether it was at

13  this time or months later, this is fairly early on, so I was

14  still trying to understand what was going on, but it was clear

15  that they weren't as involved in the business that, you know,

16  that Mark wasn't getting as much participation or support as he

17  may have years earlier and I think that Mark indicated at some

18  point they were selling their shares or they were giving back

19  their shares and somebody else was going to buy into the

20  management.

21            MR. GLUCK:  Mr. Parson, could you bring up DX 144.

22            I'm not sure this is in evidence yet, but we would

23  move it into evidence.

24            THE COURT:  Received.

25            (Defendant's Exhibit 144 received in evidence)

Q.  You're not on this email, but I'm going to ask you about it

because it talks about you.  Do you understand that?

A.  Uh-huh.

Q.  Do you know who a guy named Kerry Propper was?

A.  I think he was the -- he was like a -- Mark was living in

Israel and he was the lead -- he was like the lead -- he was

acting president or CEO, some lead leadership role in Platinum

when I got there.

Q.  He was like an interim manager while Mark Nordlicht was in

Israel?

A.  You know, I don't know technically, but that, practically,

that's what it was, that was what was going on.

Q.  Did you step into that role following Mr. Kerry Propper?

A.  I wasn't trying to step into a role or take a title, I was

trying to move things along and understand the business.  So it

didn't look -- Kerry wasn't very actively involved in the

position, so I mostly was focused on, you know, trying to

understand the positions and how to deal with the needs of the

businesses that were in the portfolio.

Q.  Are you familiar with the fact that there were actually two

funds, PPVA and PPCO?

A.  Yes.

Q.  They're both referenced in this email; right?

A.  I didn't write the email, but I'm reading it for the first

time.

MC6Cpla2                         Gerszberg - Direct

1    Q.  I'm just asking, do you see where it says between PPCO

2    transfer and PPVA, we should be okay?

3    A.  Again, you're asking me to comment on an email I still

4    haven't even gotten to the point where you're asking the

5    question.  I mean, if it says it, then it's there.

6    Q.  Do you see it?

7    A.  No.  Why don't you highlight it.

8           MR. GLUCK:  Mr. Parson, can you highlight it.  Okay.

9    Q.  Here's my question:  In your role, would you deal with both

10   PPCO investments and PPVA investments in the issues you were

11   dealing with?

12   A.   Initially -- at some point, it was more material in terms

13   of how funds could be generated for positions, but initially I

14   didn't really -- I wasn't really that focused on the

15   distinction, I was just focused on positions that were -- that

16   had value and positions that didn't.  This is pretty early on.

17   I wasn't as -- I was starting to understand the nuances between

18   the two funds, but my primary objective at the time was just to

19   find opportunities to be helpful.  So it wasn't specific to

20   PPCO or PPVA.  I don't know that I even knew which fund

21   invested in my business until sometime later on.

22          MR. GLUCK:  Okay.  Unhighlight it, Mr. Parson.

23   Q.  Mark Nordlicht, on January 6th, 2016, after saying scared

24   out of my mind, says he sat with Murray and David today to try

25   and pressure them to help to no real avail.  Got one million

MC6Cpla2                     Gerszberg - Direct

1    guaranteed from them, each of them.  No cash that -- and a

2    token gets me on the subway.

3          Here's my question:  Did you meet with Mr. Huberfeld

4    and Mr. Bodner on January 6th?

5    A.  It's clear this says that I did, so I must have.  I

6    wouldn't remember the date or --

7    Q.  What would you have talked about?

8    A.  That Mark felt pressure about liquidity.

9    Q.  Anything else?

10   A.  At this time -- again, this is very -- I can't parse out

11   the sequence of this timeline of when I had a conversation with

12   Murray and David about what I could tell you.  You're reminding

13   me by this email that on the 6th specifically, I met with them

14   and talked about -- and I do now recall specifically indicating

15   that Mark -- there were financial calls or something that were

16   of concern to Mark at that time.  And the nature of that

17   business was that they were -- a lot of the positions required

18   additional funds to -- for them to stay healthy.

19   Q.  And this is not a memory test, by the way.  I'm going to

20   take you through documents.

21         MR. GLUCK:  Mr. Parson, please call up PX 908.

22   Q.  So this is following in the day and Mark's asking you what

23   happened?

24   A.  Yeah.

25         MR. GLUCK:  And now please call up PX 909.

MC6Cpla2                        Gerszberg - Direct

1              I move to admit 908.

2              MR. LAUER:  No objection.

3              THE COURT:  Received.

4              (Plaintiffs' Exhibit 908 received in evidence)

5              MR. GLUCK:  Now please call up 909.

6   Q.  Take a moment to read this email, please.  Let us know when

7   you're done.

8              MR. GLUCK:  While you're reading it, we'll seek to

9   move this email into evidence.

10             MR. LAUER:  No objection.

11             THE COURT:  Received.

12             (Plaintiffs' Exhibit 909 received in evidence)

13  A.  Okay.

14  Q.  So you're writing this email and then the "to," it says Jay

15  SanFillipo.  Do you see that?

16  A.  Yup.

17  Q.  Who's that?

18  A.  I believe he was somebody in finance -- somebody in

19  finances at Platinum.  He's like a lead finance guy.

20  Q.  And then it's copied N. Manela.  Do you remember who that

21  was?

22  A.  I think other finance guy, Mark Manela or something like

23  that.  I don't know.

24  Q.  We know who Mark Nordlicht.

25             Who's Dan Grabon?

MC6Cpla2                        Gerszberg - Direct

1   A.  It's got a Collective address, I should remember him.

2   Sorry.

3   Q.  Someone on your side?

4   A.  Yeah.  Maybe somebody doing data collection or something

5   for me.  I'm not sure.

6   Q.  Now, just to set your head, we just looked at a set of

7   emails where you had had a meeting with Mr. Bodner and

8   Mr. Huberfeld on January 6th.

9           Do you see here, this is a January 8 email, it says

10  you're preparing for a meeting with Murray and David.  Do you

11  see that?

12  A.  Yes.

13  Q.  Mark is Mark Nordlicht?

14  A.  Sure.

15  Q.  Murray is Murray Huberfeld?

16  A.  Yup.

17  Q.  David is David Bodner?

18  A.  Right.

19  Q.  So you're going to have another meeting with them?

20  A.  I mean, that -- again, that was my decision.  I don't know

21  if anybody was expected, you know, they weren't calling me to

22  have a meeting with them.  At that time, I think it was

23  probably my election to have meetings with them.  This would be

24  if I had more gravitas to get financial information by saying

25  I'm meeting with the principals.

1   Q.  Because David Bodner was a principal; right?

2   A.  Again, I wasn't privy to specific documents or how the

3   business was run.  What I did know was that there historically

4   was a number of people that were involved in the business.  It

5   seemed like it was Mark and Murray and David that were involved

6   for a long time.  At some point, the office moved to a

7   different location, you know, it was clear Mark was running the

8   show.  There were other people also, Landesman and Bernie that

9   were around, also, but they seemed to be the people that had

10  the most, you know, historical experience, exposure to the

11  business, and that was probably keeping -- I certainly believed

12  at the time that the historical retained earnings that I had

13  seen were most heavily invested with the members that were

14  originally part of what that management team was.  I don't know

15  the management team -- or ownership, I should say, is a more

16  fair way of saying --

17  Q.  You're asking Joe and Naftali to back off as accounting

18  types for a bunch of employee financial information for 2013 to

19  2016?

20  A.  Yup.

21  Q.  Because you wanted to incorporate that into your

22  presentation somehow?

23  A.  Again, I'm not sure the specific motivation of this

24  particular document in the context of what I was trying to put

25  together.  Eventually, there was a document that was put

MC6Cpla2                        Gerszberg - Direct

1   together.  I don't believe that compensation was really part of

2   what I ultimately put together.  I'm assuming that this was

3   important to me at the time.

4   Q.  At the time you were evaluating this issue?

5   A.  Definitely, it seems clear.

6   Q.  Now, do you recall, not SanFillipo or -- do you recall a

7   gentleman named David Steinberg?

8   A.  Yes.

9   Q.  Do you recall working on a presentation with David

10  Steinberg?

11  A.  Yes.  Again, I don't know that this was specifically part

12  of it or not.

13  Q.  Understood.

14  A.  I don't remember, I should say.  I'm sorry.

15          MR. GLUCK:  Mr. Parson, will you please call up

16  PX 588.

17          MR. LAUER:  586 or 588?

18          MR. GLUCK:  588, which has previously been admitted

19  into evidence.

20  Q.  After you've reviewed the email, just let us know.

21          MR. GLUCK:  This is also January.  It's already in

22  evidence.

23  Q.  Ready?

24  A.  No.  I'm sorry.  I'm a slow reader.

25          Okay.

1   Q.  My first question is, do you know why Mark Nordlicht copied

2   you on this email?

3   A.  What I noticed happening at Platinum was that it seemed

4   like Mark was an alarmist at times.  So it seemed like, oh, the

5   sky is falling, and it was because maybe there was a capital

6   call by a trading call.  So the trading bank would ask for more

7   coverage, so they'd have to put in like an extra million

8   dollars or something or $2 million because something was now

9   out of the effective leverage.  And because there was so much

10  money in the trading positions, a failure to perform at the

11  million or $2 million level, it wasn't a million or $2 million

12  concern, it would be whether or not the bank would continue to

13  provide leverage for other positions that were -- that would

14  impact things more significantly.

15          So it sounds crazy for a fund that's that big to be

16  impacted by a million or $2 million, but what was constantly

17  happening is money was coming in from odd places or sometimes

18  personal money was put in.  So I know that at some point, Mark

19  mortgaged his own properties to put money into the company, it

20  would seem like a fair validation that he had a high level of

21  belief that there was value that he was going to bring out, but

22  regardless, there was definitely times where it felt like a

23  million or two, the sky was going to fall.

24          With that said, that was a position that lasted, while

25  I was there, for probably six months.  So, for six months, it

1    was maybe $1 million mattered that much, but it was about to be

2    terrible, but at the same time, the business was able to

3    ultimately still continue operating and funding different

4    positions poorly for much more time.  So it wasn't like, you

5    know -- and what I started to see was that there was a lot of

6    trapped value potentially in positions.

7           So it makes an understanding, personally, you know,

8    from my experience where you have to make deposits for future

9    things or you're payables are not lined up with your time and

10   your receivables.  I understood that, a lot of times, Mark

11   would say things we each get money today, and he did, but it

12   sounded like, you know, it sounded like there was only

13   $1 million worth of value there at the time, which wasn't a

14   fair reflection.

15          And I definitely know throughout the time that he did

16   not feel that --

17          THE COURT:  I think you've answered the question.

18          THE WITNESS:  All right.

19          THE COURT:  I think you have answered the question,

20   sir.  That means you don't speak further.  Got it?  Do you

21   understand me?  Do you speak English?  Do you understand what I

22   just said?  Yes or no?

23          THE WITNESS:  What was the question?

24          THE COURT:  Ladies and gentlemen, we're going to give

25   you your midmorning break at this time.  15 minutes.

MC6Cpla2                        Gerszberg – Direct

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           (Jury not present)

2           THE COURT:  So, you will forgive me, but my job is to

3    make sure that the rules of evidence are being followed and

4    when, inadvertently, someone does not follow the rules of

5    evidence, I have to cut them off.  So I interrupted you because

6    you had long answered the question that was put and you were

7    giving interesting information that may have been interesting

8    to you or to counsel, but was not part of what was admissible

9    to the jury.  My job is to protect the jury from this evidence.

10   My point is when I say to you that's the end, you need to end

11   your answer.  Do you understand?

12           THE WITNESS:  Yes, I understand.  What I don't

13   understand is whether or not I answered the question because I

14   don't remember the question, and I definitely now understand

15   that I need to make sure that I answer the question.

16           THE COURT:  So if you don't understand the question,

17   if counsel puts a question to you --

18           THE WITNESS:  I understood it, I just don't remember

19   it.  I was talking for so long.

20           THE COURT:  I'm sorry?  You have to speak into the

21   microphone.

22           THE WITNESS:  I was talking for so long, clearly I

23   didn't remember the question.  So I just wanted to know if I,

24   in fact, answered it.

25           THE COURT:  I appreciate it.  And I'm not trying to be

1    critical.  I just want to make sure that you understand that my

2    job is to make sure that the jury does not hear stuff that is

3    not admissible under the rules of evidence.  Since you're not a

4    lawyer, you don't know what the rules of evidence do;

5    unfortunately, I do.

6             THE WITNESS:  And if you would have told me --

7             THE COURT:  So, if I have occasion to say that's the

8    end of your answer, that means, I'm saying in a polite way,

9    it's time to end your answer.

10            THE WITNESS:  If it was polite, I would have

11   understood.  I don't understand mitigating me and telling me,

12   asking if I speak English in front of the jury.

13            THE COURT:  Well, because you were glaring at me and

14   giving me a very hard time on something that I think you should

15   have understood, but now we're on the same wave, yes.

16            THE WITNESS:  In whatever mitigated fashion I'm

17   sitting here, yeah.

18            THE COURT:  Good.  We'll see you all in ten minutes.

19            How much longer do you have on direct?

20            MR. GLUCK:  25 minutes.

21            THE COURT:  Okay.

22            (Recess)

23            (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  Okay, counsel.

3    BY MR. GLUCK:

4    Q.  Mr. Gerszberg, if PPVA or PPCO, I suppose, but let's focus

5    on PPVA, if they needed $1 million and they were $900 million

6    in asset funds, didn't they have any liquid assets?

7          MR. LAUER:  Objection.  Leading.

8          MR. GLUCK:  The witness has proved himself to be

9    worthy of, I think, leading questions.

10         THE COURT:  I'll allow it.

11   A.  I can't speak to money they had in the bank or didn't or

12   money that was coming in or wasn't.  It was constantly money

13   coming in and money that needed to be paid, more money that

14   needed to be paid than not.  I can tell you only from personal

15   experience that I had a company that people valued at

16   $600 million and sometimes I was a million short.

17   Q.  Here's the thing, that wasn't my question.  Are you

18   familiar with what's called a level 1 asset?

19   A.  No.

20   Q.  Stocks that trade on the exchange, there's a price for

21   them; right?

22   A.  Uh-huh.

23   Q.  Do you know whether PPVA had any stocks?

24   A.  I wasn't looking at current --

25   Q.  You didn't look at them?

MC6Cpla2                        Gerszberg - Direct

1   A.  At PPVA's stock position, no.  I might have asked somebody

2   about it, but I haven't traded stocks.  I think I bought one

3   stock -- you're looking funny at me, so I'm kind of curious to

4   see what you got because I don't know stocks.

5   Q.  You didn't know that all of PPVA stockholdings were locked

6   up in a collateral account with Beechwood?

7           MR. LAUER:  Objection.

8           THE COURT:  Sustained.

9           MR. GLUCK:  We would move this email and its

10  associated attachment into evidence.

11          MR. LAUER:  It's in evidence.

12          THE COURT:  It's in.  All right.  What's the number,

13  does anyone know?

14          MS. SHEN:  590.

15          MR. GLUCK:  590.

16  Q.  Mr. Dan Grabon, he was somebody that worked with you at The

17  Collective?

18  A.  I don't remember.  It says The Collective, probably did.

19  Q.  And he's sending this email to Mr. Naftali Manela?

20  A.  Again, it's what it says.

21  Q.  Do you remember if he was the CFO of Platinum, something

22  like that?

23  A.  I thought he was an operations guy, like a COO-type guy.

24  Q.  Mr. David Steinberg, do you remember him?

25  A.  Yep, absolutely.

MC6Cpla2                          Gerszberg - Direct

1    Q.  And then you?

2    A.  Yep.

3    Q.  Did you all work on this presentation together?

4    A.  I was asking for data from a lot of people.

5    Q.  Do you recall you saw you had meetings with Mr. Bodner,

6    Mr. Huberfeld on the 6th and you're preparing for another

7    meeting in the emails we saw on the 8th.  Did you then have

8    another meeting with Mr. Bodner and Mr. Huberfeld?

9    A.  You tell me.

10   Q.  Let's look at the presentation.

11            Do you recall preparing these slides?

12   A.  I definitely was involved in preparing them.  I definitely

13   was leading the narrative of the story.  May have been somebody

14   else that was actually preparing the specific slide.  I

15   definitely was directing it with data I was collecting, working

16   with the people on the list.

17   Q.  Why would you be counting $20 million from David and

18   Murray's investor list?

19   A.  Can you go back to the preceding slide?

20   Q.  Sure.

21   A.  I'm trying to get orientated.

22            Can I ask you --

23   Q.  I think that's a PPCO slide --

24   A.  Is this a midterm document --

25            THE COURT:  I'm sorry.  He's not allowed to answer

MC6Cpla2                           Gerszberg - Direct

 1    that.

 2              MR. GLUCK:  That's correct.

 3    Q.  We've gone back to the preceding slide, which I believe was

 4    a PPCO slide and this is a PPVA case.

 5    A.  Can you just go back a little bit to the beginning.

 6              MR. LAUER:  Your Honor, I have a hard copy, if that

 7    would help.

 8              THE COURT:  Yes.

 9              THE WITNESS:  Thank you.

10              MR. LAUER:  May I hand it directly?

11              THE COURT:  Yes.

12              THE WITNESS:  Thank you.  I'm sorry.  It's been five

13    years.  I'm trying to -- okay.  So what was the question?

14    Q.  The question is, why do you recall, if anything, as to why

15    you were putting $20 million next to David and Murray's

16    investor list on this particular slide that's in front of you

17    on your screen?

18              THE WITNESS:  May I give context?

19              THE COURT:  Maybe I can help you out, but you have to

20    speak into the microphone.

21              THE WITNESS:  May I give context?

22              THE COURT:  Yes.  So you prepared this conversation?

23              THE WITNESS:  Yes.

24              THE COURT:  And what was the purpose of the

25    presentation?

MC6Cpla2                         Gerszberg - Direct

1         THE WITNESS:  This is only 12 days after I started

2    hanging out at the Platinum office.  It was really quick.

3         THE COURT:  Right.  But what were you trying to

4    accomplish?

5         THE WITNESS:  I was trying to figure out the value of

6    various different key positions and the liquidity requirements

7    to fund them.  So I was trying to figure out where money would

8    come from and what money was needed.

9         THE COURT:  So when you say in this slide, "How do we

10   raise $80 million in PPCO ($50 million for PPVA and $30 million

11   to stay in fund)," how did you arrive at those figures?

12        THE WITNESS:  So the first thing is that any of this

13   information was cobbled together from various different people

14   in a very short period of time without understanding more

15   context than was provided to me.  So I was trying to utilize

16   the data that I was collecting and figure out if there was a

17   clean path forward.  So when I looked at --

18        THE COURT:  I'm sorry.  When you say a clean path

19   forward, meaning there were problems to be overcome, yes?

20        THE WITNESS:  I mean, it was obvious that there was --

21   that organizationally looking at certain ways to -- yes, the

22   answer is that there were challenges needed to be overcome --

23        THE COURT:  The answer is yes.

24        THE WITNESS:  Yes.  Yes.

25        THE COURT:  Okay.  So you came up with this proposal

MC6Cpla2                    Gerszberg - Direct

1  to raise $80 million, yes?

2        THE WITNESS:  It was just an idea, yes.  Approach,

3  yes.  Yes.

4        THE COURT:  And you were presenting it to a number of

5  the people in charge?

6        THE WITNESS:  Yes.

7        THE COURT:  Including Mr. Bodner, among others?

8        THE WITNESS:  Mr. Bodner was -- the primary reason for

9  trying to put this together --

10        THE COURT:  Who was present at this meeting when you

11  gave this presentation?

12        THE WITNESS:  Originally, Mark Nordlicht.

13        THE COURT:  No one else was there?

14        THE WITNESS:  Maybe Naftali and David, if they were

15  there, I wouldn't remember.  They were inconsequential.  If

16  there was more people -- but it was Mark.

17        THE COURT:  And the first item in your suggestion of

18  how the company could raise $80 million is David and Murray's

19  investment list.

20        THE WITNESS:  Yes.

21        THE COURT:  And David is Mr. Bodner?

22        THE WITNESS:  Yes.

23        THE COURT:  And the question counsel was putting was

24  how did you come up with that suggestion?

25        THE WITNESS:  I simply looked at the money that was

1    invested in these funds and whose name was next to them.

2              THE COURT:  But I guess the question is --

3              THE WITNESS:  Actually, I have to ask who brought

4    these people into the fund over the course of time.

5              THE COURT:  But you felt, based with all the

6    reservations and qualifications you have mentioned, this was

7    very new and all preliminary, but you were of the view that you

8    could bring in other investors, yes?  You didn't say

9    $100 million, you didn't say $2 million, you came up with this

10   $20 million from some basis, yes?

11             THE WITNESS:  Yes, a placeholder there.  I was also

12   the only person that believed that.

13             THE COURT:  And when you say down at the very bottom,

14   additional debt from Beechwood, $50 million, what did you mean?

15             THE WITNESS:  I thought that Beechwood was

16   over-collateralized with some of their other positions.

17             THE COURT:  And explain to the jury, who is not

18   familiar with these terms, what do you mean by

19   over-collateralized?

20             THE WITNESS:  I felt that they took security positions

21   for money that they lent to Platinum that were more secure than

22   they needed to be and that a conventional lending opportunity

23   might provide more.  Again, it was my -- that was a guess, that

24   they were -- that they didn't need that much security against

25   the positions that they had.

1          THE COURT:  Okay.  Go ahead.

2          MR. GLUCK:  And the Court anticipated the next item.

3    BY MR. GLUCK:

4    Q.  In connection with that Beechwood security, do you recall

5    that Platinum's liquid assets, its stockholdings were trapped

6    in a third-party collateral account?

7    A.  I was more focused on other positions than the one --

8    you're asking me about the stock, you're saying the stock

9    position, but I didn't really understand the stock trading

10   model or the benefits of it or how collateralized it was as

11   much as the other operating positions.

12   Q.  But in your previous answer to the Court's question, you

13   suggested that Beechwood was over collateralized; right?

14   A.  Yes.

15   Q.  And wasn't the nature of that collateral that the stocks,

16   the liquid stocks --

17   A.  I wasn't focused on liquid stocks, there were other

18   positions.  So I'm not a stock guy, I'm an operating guy.  So I

19   was focused on operating entities, I was focused on other

20   things, not the stock position or -- actually, you know what,

21   if you're referring to stocks with specific companies, then

22   maybe that's a way to look at it.  I'm sorry.  I apologize.  If

23   it was in companies that had more value, I wasn't looking at it

24   from -- okay.  So it's possible that --

25   Q.  NVIDIA?

1   A.  Yes.

2   Q.  That was a publicly traded stock; right?

3   A.  Yeah, I was looking at it as a company with value.

4   Q.  Implant Sciences?

5   A.  Yes.

6   Q.  So when I asked you the question about why PPVA couldn't

7   just sell some of its liquid stock on the stock market and get

8   $1 million if it needed to, this was what I was referring to.

9   Did you have an understanding about why PPVA was in this

10  position that it didn't have $1 million that it needed to to

11  meet some margin?

12  A.  If you look at this document, I refer to the companies just

13  by the total dollar amounts that I thought there was value in.

14  So I was looking at it not as a stock draft, I was looking at

15  it as a number of expressed equity.

16  Q.  I think you've answered the question.  Let's move to the

17  next slide.

18          Do you recall the email when you were asking about

19  expenses from the financial folks, the accounting folks at

20  Platinum?

21  A.  Expenses, I don't recall any specific email about expenses,

22  but I'm sure I asked the question.

23  Q.  Today, remember we looked at that email and you were asking

24  about employee costs?

25  A.  It was about compensation?

MC6Cpla2                        Gerszberg – Direct

1    Q.   Yeah.

2    A.   If it was about expenses, too, as relates to these

3    positions you're showing me in front, I didn't see that on the

4    email, but --

5    Q.   Do you have an understanding about what PPNE redemptions

6    are?

7    A.   What's the question?

8             THE COURT:   What did you mean by that?

9             THE WITNESS:   It's redemptions from whatever this

10   fund, PPNE, there were outstanding requests for repayment of

11   $15 million.

12   Q.   But PPVA didn't have the money to meet those redemption

13   requests, did it?

14   A.   I guess not.

15   Q.   And, in fact, due to the fact that they could not meet

16   those redemptions, there was interest being charged.

17            Do you see the next line?

18   A.   Sure.

19   Q.   And so you were factoring this into your analysis; right?

20   A.   Yes.  No, I'm sorry.  The $7 million is not the interest on

21   the $15 million.

22   Q.   What is the $7 million in interest?

23   A.   It couldn't be interest on the $15 million.  It's probably

24   interest on whatever the balance was.

25   Q.   You think it could have been a different balance?

1   A.  I believe it was a different balance.

2   Q.  Probably a larger balance?

3   A.  I would assume yes.  $7 million is a lot of interest.

4            MR. LAUER:  Objection.

5            THE COURT:  Overruled.

6            You're saying the interest rate would be much too high

7   if it was just the interest on the $15 million, so it must be

8   something larger?

9            THE WITNESS:  Correct.

10  Q.  So there may have been other redemptions that you're not

11  talking about right here on which interest was payable?

12  A.  No, it's possible that interest was simply due on this

13  fund.  This fund, I believe, was debt.  So I believe this fund

14  was paid as it was a debt fund.  It was like if you were to put

15  in money and you got a return.  So the interest was on the

16  fund, I guess.

17  Q.  PPNEs weren't -- do you know what PPNEs were?

18  A.  I'm trying to remember.  I think it's -- I think it was the

19  fund that lent money to PPVA.

20  Q.  Were you speculating that PPNE was a separate fund?

21  A.  I don't get stuck on the vernacular.  It was different than

22  PPVA.

23  Q.  Do you see where it says BAM total interest per year?  What

24  is that?

25  A.  I don't remember the acronym.

MC6Cpla2                        Gerszberg - Direct

1    Q.  Beechwood, is that familiar?

2    A.  Yes.

3    Q.  Let's assume that BAM is an acronym for Beechwood.

4    A.  Okay.  Beechwood total interest per year, $16 million.

5    Q.  Why was PPVA paying Beechwood $16 million a year in

6    interest?

7                MR. LAUER:  Objection.

8                THE COURT:  Ground.

9                MR. LAUER:  Scope.

10               THE COURT:  Overruled.

11               Do you know?

12   A.  For money that Beechwood lent to, I guess, the Platinum

13   businesses or Platinum.

14   Q.  Could it have been debts being held by Beechwood in

15   PPVA's --

16               THE COURT:  Sustained.

17   Q.  First of all, New Mountain, $30 million.  Do you have an

18   understanding of what that is?

19   A.  First time seeing these things in five-plus years, but I

20   think they owed New Mountain $30 million.

21   Q.  Do you remember why?

22   A.  You'd have to remind me.

23   Q.  It says June through September redemptions, $40 million.

24   Had there been $40 million worth of redemptions?

25   A.  I assume so.  It says $40 million and I was probably

MC6Cpla2                    Gerszberg - Direct

1   putting data together that was provided to me, I would imagine.

2   Q.  And PPVA couldn't pay this?

3   A.  No.

4   Q.  December redemptions, same question.

5   A.  Same answer.

6        MR. GLUCK:  Next slide, please, Mr. Parson.

7   Q.  Do you remember a company called Implant Sciences?

8   A.  Yes.

9   Q.  What was it?

10  A.  A company that had trace technology for checking for, I

11  guess, bomb residue on passengers for airlines and other types

12  of security-related stuff.

13  Q.  It was one of PPVA's good investments; right?

14       MR. LAUER:  Objection.

15  A.  Seemed like it.

16       THE COURT:  Sustained.

17  Q.  Was PPVA's interest in Implant Sciences valuable?

18  A.  At this stage, my -- the numbers here -- and the reason why

19  I didn't know the stocks is because I wasn't looking at the

20  stock price or the warrants or any of the components.  All I

21  took was what I thought was the delta between an investment and

22  value.  So, in this presentation, I looked to have $50 million

23  of value at this time based on what someone told me.

24  Q.  I'd like to ask you about the third bullet, and it says net

25  cash, $50 million, sale price, 80 to $100 million, less

1    $35 million for Monstant.  Do you see that?

2    A.   Uh-huh.

3    Q.   What was your understanding, the reason you had to deduct

4    $35 million in the event that Implant Sciences --

5    A.   Maybe -- I would be guessing.

6    Q.   Do you remember, just now, we talked about the Monstant

7    collateral --

8              THE COURT:  I'm sorry.  Counsel, if you're making

9    objections, you have to speak louder, because I can't hear you.

10             MR. LAUER:  I'm sorry, your Honor.  Summary judgment

11   on Monstant.

12             THE COURT:  Well, the question in the present,

13   somewhat half-baked form is objectionable.  The objection is

14   sustained.  But put another question and we'll see a more

15   substantive question being raised by defense counsel.

16   Q.   Do you understand why, if PPVA sold its interest in Implant

17   Sciences, it would have to deduct $35 million from Monstant?

18             THE COURT:  So that was asked and he said he would be

19   guessing.  So asked and answered.

20   Q.   None of these happened, PPVA is facing a $150 million

21   deficit.  Do you recall that?

22   A.   Yep.

23   Q.   What would that mean?

24   A.   That's the total amount that was owed at that time or would

25   be owed, I suppose, or it was anticipated being owed.  It's a

MC6Cpla2                        Gerszberg – Direct

1    total of those previous pages.

2    Q.  Now the last bullet --

3              THE COURT:  It was already clear to you, even from the

4    limited experience with the company, that they were facing a

5    very substantial deficit, yes?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  Go ahead.

8    Q.  Now, does the last bullet posit that if PPVA gets

9    $50 million from Monstant and a net amount from Implant

10   Sciences, there's still going to be a $50 million deficit?

11   A.  That's what it says.

12             MR. GLUCK:  Next slide, please.

13             THE COURT:  Counsel, you've reached the limit you've

14   asked for, but I'll give you five more minutes.

15             MR. GLUCK:  Mr. Parson, can you zoom in on this.

16   Q.  Do you recall this chart of significant investments,

17   Mr. Gerszberg?

18   A.  I don't recall this page.  I'm sorry.

19   Q.  Do you have any doubt that you prepared it?

20   A.  Was it in the presentation?

21   Q.  Yes.

22   A.  I don't recall.

23   Q.  Do you have an understanding, as you sit here today, what

24   encumbered and unencumbered means within the fourth and fifth

25   columns?

MC6Cpla2                          Gerszberg – Direct

1   A.   Probably if it was cross collateralized.  I don't know.

2   Q.   Do you see where it says oil and gas in the first row?

3   A.   Yup.

4   Q.   Do you see how it says the unencumbered amount is zero?

5   A.   Yes.

6   Q.   PPVA's oil and gas investments worth zero?

7            MR. LAUER:  Objection.

8   A.   No.

9            MR. GLUCK:  I didn't finish my question.

10           THE COURT:  Ground.

11           MR. LAUER:  He's testifying.

12           THE COURT:  Well, I think the question rephrased was,

13  was it your understanding that at the time that PPVA's oil and

14  gas investments were worth zero.

15           MR. GLUCK:  And I had something to add, which was

16  unencumbered.

17           THE COURT:  Unencumbered.

18           MR. LAUER:  I have no objection to unencumbered or

19  encumbered.

20           THE COURT:  Well, we're making great progress.

21           Do you understand the question?

22           THE WITNESS:  I do understand the question.  I'm just

23  taking a moment.

24  A.   I think it's what it says.  It says that it's encumbered.

25  So all of the value had been pledged for something that looks

MC6Cpla2                        Gerszberg - Direct

1   like less than its value.

2   Q.  In the interest of moving things along --

3           THE COURT:  You better move it along because I'm

4   giving you two minutes, and I mean two minutes.

5   Q.  $312.6 million, was that your calculation of the

6   unencumbered value of PPVA's assets?

7   A.  Is this page PPVA only?  Is that what you're -- it doesn't

8   have PPVA on it.  Does it say PPVA on it?

9           MR. GLUCK:  Can I answer?

10  A.  Can you ask the question again?

11          MR. GLUCK:  My understanding is it's purely PPVA.

12  A.  Can you ask the question again.

13  Q.  The $312.6 million, was that your calculation of the

14  unencumbered value of the assets listed on this page?

15  A.  Yes.

16  Q.  One question on one of the assets that I can't skip over.

17  Over Everything, that was your company; right?

18  A.  I don't know what specifically they put into Over

19  Everything or what value was attributed at that time.

20  Q.  For the avoidance of doubt, in January of 2016, had your

21  clothing business already gone bankrupt?

22  A.  The clothing business definitely went bankrupt -- no, it

23  was not operational.  What was left were a number of other --

24  were the brand names and the brand names, whatever value those

25  had, and the software development that we had in place.

MC6Cpla2                        Gerszberg - Cross

1            MR. GLUCK:  Noah, please go to what we want from David

2    and Murray's slide, since we have one minute left.

3    Q.  Do you recall going to Murray Huberfeld's house and

4    presenting this to David Bodner and Murray Huberfeld, this

5    particular presentation?

6    A.  I remember going to his house and I believe I did present

7    this.  I believe it was after I prepared this.

8            MR. GLUCK:  Thank you.  No more questions.

9            THE COURT:  Cross examination.

10           THE WITNESS:  Can I see that piece of evidence.  I

11   just want to make sure -- never mind.  It's okay.

12   CROSS-EXAMINATION

13   BY MR. LAUER:

14   Q.  Good morning, Mr. Gerszberg.

15   A.  Good morning.

16   Q.  I'm Eliot Lauer.  We have not met, have we?

17   A.  No.

18   Q.  A few moments ago when the Judge was asking you some

19   questions about who is attending the meeting working on this

20   presentation, you said that in addition to you thought Mark

21   Nordlicht was participating, you said Naftali and David.  Do

22   you remember that?

23   A.  Yes.

24   Q.  The David was David Levy; right?

25   A.  More David Steinberg.

MC6Cpla2                         Gerszberg – Cross

1    Q.   Okay.  It wasn't David Bodner?

2    A.   No.

3    Q.   Bodner wasn't part of these organizational meetings where

4    you're trying to figure out how much liquidity these assets

5    needed; right?

6    A.   Not at all.

7    Q.   You mentioned that the -- one of your focuses in bringing

8    your own business experience here was to see how you could free

9    up trapped value in these companies; right?

10   A.   Yes.

11   Q.   Could you explain what you mean by trapped value and how

12   this inflow of cash, if you could get it, would free up the

13   value?

14   A.   So if someone lends money -- so if I lent $5 million to a

15   company that was -- let's say we were worth $10 million, but I

16   secured it with all of the collateral of the $10 million, plus

17   I also secured it with let's say another company that also

18   borrowed $5 million.  So I add the value of the $5 million that

19   I lent secured by the $10 million in one company, and also

20   cross collateralized, secured by another company that also had

21   maybe another $5 million of value there.  So if you announce

22   the position that the one lender basically had $10 million of

23   value that was trapped by a $5 million loan.  And so, what I

24   was trying to find was a path to change the nature of the

25   over-collateralization from various different lenders to create

MC6Cpla2                     Gerszberg - Cross

liquidity, and that liquidity can be used to make some obvious

decisions either by getting other investors to buy into these

companies, sell these companies, or just create some value from

the positions that look very healthy.

Q.  So you were also asked a couple of questions on encumbrance

and value.  Is it fair to say that one of the technical words

for what you were just describing is you could have $20 million

worth of value encumbered with respect to just a $5 million

loan?

A.  Yes.  Or $5 million on each company.  So at least 10 free

million dollars of capital encumbered by -- $20 million of

equity value, yes, by a $5 million loan.

Q.  So you could have a company that is worth hundreds of

millions of dollars, but if it hasn't done what you want it to

do, which is free up all the available value for leverage, you

could have a company worth hundreds of millions of dollars that

has a hundred million dollars of loans, but all of it is

encumbered; right?

A.  Yes.  So I firstly had the same experience --

          THE COURT:  No, you've answered.

          THE WITNESS:  Okay.

Q.  So one of the things you were looking at and what the

presentation is addressing is the oil and gas assets were all

encumbered; right?

A.  Yes.

1    Q.  But you believed that there was a lot of trapped value

2    there and the goal was to figure out how to work with the

3    lenders and free up that trapped value?

4    A.  Across the whole portfolio.

5             MR. LAUER:  So let's take a look at 590.  Can we get

6    that back up on the screen.

7    Q.  Now the period of time that we're addressing is January of

8    2016; right?

9    A.  Yes.

10   Q.  You weren't there in this kind of help-out mode in 2013,

11   2014, 2015; right?

12   A.  Nope.

13   Q.  And you said you started to basically come to the office in

14   order to help out.  Did you tell Mark Nordlicht that you were

15   doing that?

16   A.  It says I'm coming into the office to see if I can be

17   helpful.

18   Q.  Was Mark the one that coordinated with you and explained

19   what he thought you could do to help free up value?

20   A.  Mark gave me his ideas and I listened and followed whatever

21   I thought was appropriate.

22   Q.  You wanted to try to raise $200 million for PPVA; right?

23   A.  I don't know if I wanted to raise $200 million.  I wanted

24   to identify that there was a need for a very significant amount

25   of capital.

1   Q.  Was it the view of the managers that were working with you

2   and the financial people that were working with you that if you

3   could pull this off, if you could get the kind of money that

4   you thought was needed, that these companies could do well?

5   A.  My thesis that I presented to Mark was that if the firm

6   seemed to have the legal right to convert from a hedge fund to

7   a private equity fund and if it converted to a private equity

8   fund, it wouldn't have to address the redemptions or the run of

9   the money that was being called from it.  By doing that, they

10  would have an extended period of time to stay focused entirely

11  on working on the operating positions instead of juggling

12  redemption requests from investors.  And while the investors

13  wouldn't get their cash right away, all the investors would

14  benefit from the focused effort on these investments that seem

15  to have real value if they could be particularly focused on and

16  if the management team wasn't worried about investor

17  redemptions.  So I was trying to make the argument that the

18  hedge fund should use its legal right to switch to a private

19  equity fund to be able to focus on the business and not worry

20  about the more significant amount of money which would be

21  required for the redemptions.

22  Q.  Thank you.  You also described earlier in your testimony

23  sort of these short-term needs where $1 million or $2 million

24  could, if they couldn't get it, could have a significant

25  negative impact on the trading positions; right?

MC6Cpla2                         Gerszberg - Cross

1   A.  Yes.

2   Q.  I know you've said that you weren't involved in the stocks

3   or the bonds or the options trading, but did you have a sense

4   of magnitude or the size of the book that was being traded at

5   Platinum in PPVA?

6           MR. GLUCK:  Objection.  Knowledge.

7   A.  I don't remember.

8           THE COURT:  The objection would have been sustained,

9   but given the answer, we'll let it stand.

10  Q.  You did know that while you weren't focusing on it, a

11  portion of PPVA's assets consisted of this whole trading group;

12  right?

13  A.  Yes.

14  Q.  And Mark was the trader by training?

15  A.  Yes.

16  Q.  And he had a group of traders which was separate and apart

17  from the guys that were managing these various, what we'll call

18  real businesses?

19          MR. GLUCK:  Objection.

20          THE COURT:  I think the form is a little vague.

21          MR. LAUER:  Sorry, your Honor.  I'll rephrase it.

22  Q.  They had a group of traders that were trading stocks,

23  bonds, options, and other instruments?

24  A.  It seemed to me there were things that were trading daily

25  and then there were these positions that were more -- that the

1    firm didn't trade as much.  I was focused on the things that

2    didn't trade as much.

3              MR. LAUER:  If you would turn to the page in this

4    write-up, PPVA potential inflows, 100 to $150 million.  Thank

5    you.

6    Q.  So second item, do you have it, Mr. Gerszberg, PPVA

7    potential inflows?

8    A.  Yes.

9    Q.  So you're hoping that one of the sources of liquidity would

10   be $50 million from PPCO, right, assuming you could raise the

11   money that you talked about earlier on this presentation?

12   A.  I'm sorry.  I apologize.  I'm just reading.

13   Q.  Sure.  Take your time.  Tell me when you're ready.

14   A.  Sorry.  Go ahead.

15   Q.  First line item is $50 million from PPCO; right?

16   A.  Yes.

17   Q.  And you were asked some questions earlier about hoping to

18   raise $80 million for PPCO and you would then propose that 50

19   of that be used as somehow to help PPVA's assets; right?

20   A.  Yeah.  I don't know the mechanism specifically.  I don't

21   remember.

22   Q.  Then the next line is something called management share

23   class, 50 to $100 million.  Can you tell us, to the best of

24   your recollection, what that was referring to?

25   A.  So Mark was trying to sell the management share classes

MC6Cpla2                         Gerszberg - Cross

1   that David and Murray had to somebody else.  So they were going

2   to give up their management share class and that person would

3   put in 50 to $100 million into the fund.

4   Q.  So David Bodner and Murray Huberfeld would exit and their

5   shares in Platinum Management or the company would be available

6   to new investors to come in as partners?

7   A.  Yeah.  I mean, they weren't management at the time when you

8   say exit, but that was the idea of the value.

9   Q.  Did you know any of the individuals that were in discussion

10  with Mark or were on a short list --

11  A.  I had heard about these different people for sale or from

12  other places, but I didn't interact with them.

13  Q.  Did you know that he was talking with Marcos Katz?

14  A.  Yes.  Well, I know some guy named Marcos, I don't know the

15  last name, but there was a couple names that kept coming up.

16  Q.  By the way, did you see Michael Katz in the office at that

17  time?

18  A.  It was a grandson --

19  Q.  Grandson of Marcos Katz.

20  A.  He was in, yeah.

21  Q.  Had you heard of Marcos Katz?

22  A.  I'm remembering -- was he from Brazil, was he Brazilian or

23  something.  These are names that came up.  I don't remember at

24  this point.  I wasn't involved in the specifics.

25              THE COURT:  It was your understanding that he had a

MC6Cpla2                    Gerszberg - Cross

1    lot of money?

2              THE WITNESS:  I would imagine moreover he was talking

3    to that 50 to $100 million of liquidity had money.

4              THE COURT:  By the way, in this slide that refers to

5    the management, that's referring to the entity called Platinum

6    Management?

7              THE WITNESS:  I don't know the --

8              THE COURT:  I mean, you weren't using this term as an

9    everyday noun.  Were you using it to identify a specific

10   entity, yes?  If you know.

11             THE WITNESS:  Now you're exposing my ability to

12   integrate the word "noun" with the question.

13             THE COURT:  If the answer is you don't know, you don't

14   know.

15             THE WITNESS:  I understood that there would be a big

16   investment that would go into the fund and they would take the

17   benefit of whatever historically was -- the other historical

18   owners had received.

19             THE COURT:  Go ahead.

20   BY MR. LAUER:

21   Q.  So you could have referred to this colloquially as the

22   owner class; right?

23   A.  Yeah, absolutely.  In fact, to clarify, if that was the

24   question, then I was disappointed and surprised at how little

25   anybody knew, besides Mark, as it related to the operating

1    positions.  That was the ultimate outcome of all of this, was

2    that I was incredibly frustrated at how little -- the reason I

3    went to -- the reason -- the question was -- I remember the

4    question now, you know, why would I be on an email about going

5    to Mark instead of David and Murray, it's because nobody else

6    was going because everybody else knew they weren't involved and

7    they weren't running it.  So I was going in trying to get them

8    to participate.

9            The critical thing is what it says at the end, which

10   is I couldn't get them to participate.  They weren't running --

11   ultimately, they had no say in what happened with either

12   Beechwood or Platinum because the end result here was they only

13   do the -- it says, as it relates to David and Murray, they'll

14   only help if they see the possibility of extricating themselves

15   in the long run.  They need to to see there is a plan to make

16   things work afterwards --

17           THE COURT:  I think you've answered the question.

18           THE WITNESS:  That's it.

19   Q.  So if you turn to that page, the David and Murray page,

20   help us figure out short-term liquidity.  What did you mean by

21   that?

22   A.  I was hoping they'd put in money.  It wasn't much they were

23   willing to do.

24   Q.  Did you ask David Bodner and Murray Huberfeld to help out

25   with the short-term liquidity?

1    A.  I did.

2    Q.  Would that be in the form of a loan?

3    A.  I believe that that was the form that it was going to take.

4    Q.  And what did Mr. Bodner tell you?

5    A.  I don't remember.  I mean, it was clear that he -- it

6    didn't -- this presentation was only to allow Mr. Bodner and

7    Huberfeld to understand the merit of this idea, of converting

8    the hedge fund into a private equity fund and the fact that

9    there could be value, but what I found was that they weren't --

10   they didn't know any of this stuff --

11           THE COURT:  I need to cut you off because the

12   question, I'll ask you to just respond to the question.

13           The question was, and what did Mr. Bodner tell you?

14           THE WITNESS:  I don't know.

15           THE COURT:  And the answer which you gave initially

16   was I don't remember.  That was the answer to the question.

17           THE WITNESS:  Okay.

18           THE COURT:  Go ahead, counsel.

19   BY MR. LAUER:

20   Q.  Did Mr. Bodner tell you that he was familiar with all of

21   the details of these operating companies?

22   A.  It was just the opposite.  It was clear that he wasn't.

23           MR. LAUER:  Could we have PX 588.

24   Q.  I'm not going to ask you to read the email, which you were

25   shown before, but if you could turn closer to the bottom where

MC6Cpla2                     Gerszberg - Cross

1  it says go to Izzy or Garfunkel or Schroen, and say I know you

2  don't normally invest in funds, but I need a favor.  We have

3  this fund that is healthy, so much so we are closing for a year

4  because we don't want to dilute returns.

5           Do you know who Izzy is, or Izzy Englander?

6  A.  That was a name that I'm only reminded of seeing this.  I

7  don't know.

8  Q.  Do you know Mr. Schroen?

9  A.  It was probably Ruby Schroen, maybe, I would probably guess

10  that.

11  Q.  Who's Ruby Schroen in the Jewish business community?

12  A.  It's a wealthy individual.

13  Q.  What about Izzy Englander?

14  A.  I don't know him.

15  Q.  Have you heard of Millennium Fund?

16  A.  I have, but --

17  Q.  How about Garfunkel, do you know that family?

18  A.  I guess I'm not really in the know of rich Jews.

19  Q.  Right above the "it's embarrassing," it says we have 35

20  more -- I'm sorry.  Go up three more lines.  It says Shlomo

21  Yehuda offered to help.  Why not tell him you didn't want to

22  put him in until you got comfortable?  But at this point, we

23  have PPCO, which we think we can do north of 25 percent for the

24  next few years, and if he put in 15, we have 35 more raised and

25  frum peoples' money will be salvaged.

1          What does it mean when he says frum people?

2    A.   Religious people.

3    Q.   Do you know this Shlomo Yehuda he's referring to?

4    A.   Yes.

5    Q.   Is that Mr. Rechnitz?

6    A.   I believe so.

7    Q.   He's what we would call uber wealthy in California?

8    A.   Yes.

9    Q.   And he's heavily involved in philanthropy, helping support

10   people, helping institutions?

11   A.   I'm not a follower, but --

12          MR. GLUCK:  Objection.

13          THE COURT:  Sustained.

14   Q.   I'd like to show you exhibit 592.  Take a moment to look at

15   the two paragraphs of this email.

16          MR. LAUER:  These are all in evidence.

17   Q.   Tell me when you've read it and are ready.

18   A.   Yup.

19          (Continued on next page)

20

21

22

23

24

25

Mc62Pla3                        Gerszberg – Cross

BY MR. LAUER:

Q.  Okay.  So David Steinberg writes to Mr. Manela "taken
altogether, they show that with the flows (including Apollo)
and with some success with Agera, VSTA, Echo, Desert Hawk, we
can still produce a decent return despite the interest expense
of the additional debt (after the reduction of the rate to 7
percent)."

          Do you know who Apollo is?

          MR. GLUCK:  Objection.  Personal knowledge.  No
foundation.

          THE COURT:  Sustained.

BY MR. LAUER:

Q.  Did you discuss with Mr. Steinberg that overtures had been
made to Leon Black's company, Apollo, to have them put money
in?

A.  There was definitely discussion.  I don't know about
overtures to his company or to who, but we definitely had a
meeting with Apollo and there was discussions with Apollo about
the opportunity for them to provide more funding to the fund.

Q.  All right.  And this was all to help free up the trapped
value?

A.  Um-hmm, yes.

          THE COURT:  So in the subsequent paragraph, there are
two terms there that I just want to make sure.  What is your
understanding of what is meant by BK?  Do you see that in the

Mc62Pla3                      Gerszberg - Cross

1    sentence?

2              THE WITNESS:  BK is bankruptcy.

3              THE COURT:  Bankruptcy.

4              THE WITNESS:  Uh-huh.

5              THE COURT:  And the more difficult question what is

6    *rachmanus*.

7              THE WITNESS:  Mercy.

8    BY MR. LAUER:

9    Q.  So in the second paragraph that the Court directed you to,

10   Steinberg is telling Manela they can't get the extra money, the

11   funds will need to gate.  What does, when we are talking about

12   a hedge fund or investment fund and we use the term "gate,"

13   what does "gate" mean?

14   A.  I never invested in hedge funds, but my understanding was

15   that a gate would prevent redemptions, would stop money going

16   out back to investors.  Investors have the ability to take

17   money.  Every quarter, they could ask for their money back.  So

18   if there were investors asking for redemptions, putting a gate

19   up would stop those redemptions from happening.  At that point,

20   you know, you are presumably not getting more money in.  This

21   is the reason I kept arguing for the private equity conversion,

22   because you wouldn't have to pay anything out and you could

23   realize this value.  And there was value.

24   Q.  And that's because these -- this company, this business

25   that had started out as a hedge fund relatively liquid had now

1    become pretty much a private equity fund?

2    A.   They got stuck and the nature of the collateral that they

3    had pledged showed an optimism of it being short-term because

4    they -- in order to get money, they took -- they didn't care

5    about maybe rates or the collateralization.  They were just

6    trying to answer a short-term need because they thought they

7    would clearly get out, because otherwise you wouldn't have

8    collateralized this much, and I think they didn't have a longer

9    term view.  And so they must have been caught with positions

10   that took longer to realize or something.  As a result, they

11   were stuck and they needed to focus on those positions.

12   Q.   So when we talk about gating, right, in this context, it's

13   to temporarily stop the money going out so whatever money is

14   available can be used to run the businesses, right?

15   A.   Yes.

16   Q.   All right.  So the gating doesn't mean you are going out of

17   business, it means you are stopping the outflow of investor

18   funds for the time being, right?

19   A.   Correct.

20   Q.   And there were a number of related party loans, right?

21        MR. GLUCK:  Objection.

22   Q.   I know you didn't write this e-mail, but the Court asked

23   you about the bankruptcy and --

24        THE COURT:  No, I just asked him what the -- you

25   introduced the first paragraph and asked him about it, and I

Mc62Pla3                    Gerszberg – Cross

1   allowed that because there was no objection, although there

2   could have been.  Then I thought since the jury saw this right

3   in front of them, they should know what the two words were that

4   were not part of everyday language for some of the jurors, like

5   BK and *rachmanus*, and that's all the Court asked.

6              So put another question, counsel.

7              MR. LAUER:  I was going to get there in a second.

8   BY MR. LAUER:

9   Q.  Are you familiar with a concept in bankruptcy called

10  equitable subordination?

11             MR. GLUCK:  Objection.

12             THE COURT:  Sustained.

13             MR. LAUER:  All right.

14             THE COURT:  That's also objectionable on grounds that

15  it's a matter of law which is strictly for the Court.

16  BY MR. LAUER:

17  Q.  Have you had an experience in a commercial bankruptcy where

18  the owners also have loans and, while third parties have their

19  loans treated as debt and higher up on the food chain, the

20  owners sometimes have their loans treated as equity so they are

21  lower down in the food chain?

22             MR. GLUCK:  Same objection.

23             THE COURT:  Yes, in addition, the objection to the

24  multiple compound components of that question needs to be

25  sustained.

Mc62Pla3                         Gerszberg - Cross

1            MR. LAUER:  I will leave it at that and I won't go

2    further.

3            THE COURT:  Seems like a prudent thing to do.

4            MR. LAUER:  Okay.

5            THE COURT:  You have more time than you asked for, but

6    I do want to remind you that we need to break at 12:25 for

7    lunch because I have a matter at 12:30.

8    BY MR. LAUER:

9    Q.  I am showing you Exhibit 393, PX 393, if we can show that

10   up.

11           This is an e-mail May 3, 2016.  Really just interested

12   in the very top line.  Do you recall basically telling Mark

13   that you needed a physical office at Platinum?

14   A.  Yup.

15   Q.  And Mark responded:  "You officially have my office.  I'll

16   send out a memo.  Or better yet, tell Bodner he can't come in

17   anymore and take the other corner."  Did you end up taking that

18   office?

19   A.  I don't recall, but it was a joke because he wasn't there

20   anyway.

21   Q.  When you discussed with Platinum obtaining financing for

22   your clothing businesses, with whom at Platinum did you discuss

23   that matter?

24   A.  Predominantly Mark.

25   Q.  And when you would have discussions with Platinum with

Mc62Pla3                         Gerszberg - Cross

1     respect to the amount of funding you were getting and the

2     timing of the funding, did you have any of those discussions

3     with David Bodner?

4     A.  Never.

5              MR. LAUER:  We offer 393, sorry, PX, but we offer it.

6              MR. GLUCK:  No objection.

7              THE COURT:  Received.

8              (Plaintiff's Exhibit 393 received in evidence)

9     BY MR. LAUER:

10    Q.  You were asked a number of questions about the company

11    called NVIDIA, that was the company that you said had something

12    to do with bombs, bombs or airplanes?  No.  I got that wrong

13    okay.  Straighten me out.  You were asked about NVIDIA, right?

14    A.  I believe so.

15    Q.  And you were asked about Implant?

16    A.  Yes.

17    Q.  I may have it confused them.  I apologize.  What was

18    Implant again?

19    A.  A company that did trace detection for bombs.

20    Q.  And did you know that some of these technological companies

21    and biopharmaceutical companies whose stock was owned by PPVA

22    were restricted stock?

23    A.  I didn't really have clarity or familiarity with the

24    components to the restrictions outside of the fact that they

25    may have been -- the entire portfolio or piece of the portfolio

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc62Pla3                          Gerszberg - Cross

1    was maybe pledged as a guarantee as relates to trading

2    restrictions.  I didn't know that.

3    Q.  Okay.  So you didn't know whether they owned more than 5

4    percent or had technical Securities and Exchange Commission

5    restrictions that would prevent immediate sale?

6    A.  I don't even know that 5 percent was immediate sale.  They

7    told me.

8    Q.  Okay.  At a certain point in time did Mr. Trott, who is the

9    businessman and the liquidator here for PPVA, did he authorize

10   a lawsuit against you?

11   A.  I don't know who authorized the lawsuit.

12   Q.  But you were sued?

13   A.  Absolutely.

14   Q.  And did there come a time when Mr. Trott authorized his

15   lawyers to file a stipulation and order of voluntary dismissal?

16   A.  I don't know the legal terms.  At some point we settled.  I

17   got a little money.

18   Q.  In connection with that, did you receive any funding from

19   PPVA?

20   A.  I received some money at the end of the settlement.

21   Q.  And just in general terms, could you tell us what the

22   settlement was?

23   A.  It sucked.

24   Q.  That's pretty general.  Was it a commercial settlement?

25   A.  Not -- it wasn't commercially reasonable in my mind.

Mc62Pla3                          Gerszberg – Cross

1              THE COURT:  This is, Counsel --

2    A.  And I --

3              THE COURT:  Excuse me.

4              I think we need to move on and I think we need to

5    conclude so I can make the matter that I have to preside over.

6    So you can ask more questions after the lunch break, but I

7    think we will break now for lunch.

8              MR. LAUER:  May I just move this document, DX 506.

9              THE COURT:  Any objection?

10             MR. GLUCK:  No objection.

11             THE COURT:  Received.

12             (Defendant's Exhibit 506 received in evidence)

13             THE COURT:  Ladies and gentlemen, we will take our

14   lunch break at this time and resume at 25 after the hour, so

15   you will have a full hour for lunch.  Have a good lunch and we

16   will see you shortly.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Mc62Pla3                    Gerszberg – Cross

```
 1                  (Jury not present)

 2                  THE COURT:  Real good.  We will see you in an hour.

 3     If there is something counsel needs to raise, it will have to

 4     be later because I have to make this other matter, so we will

 5     see you in an hour.

 6                  (Luncheon recess)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MC6VPLA4                          Gerszberg – Cross

1                    A F T E R N O O N   S E S S I O N

2                              1:30 P.M.

3           (Jury present)

4           THE COURT:  All right.  Counsel.

5    BY MR. LAUER:

6    Q.  So I'd like to show you DX --

7           MR. LAUER:  If we could pull up DX 747, if it's not in

8    evidence, don't show it to the witness -- don't show it to the

9    jury please.  Is DX 747 in?  We move DX 747.

10          MR. GLUCK:  No objection.

11          THE COURT:  Received.

12          (Defendants' Exhibit 747 received in evidence)

13   BY MR. LAUER:

14   Q.  Do you have the email, Mr. Gerszberg?

15   A.  Yes.

16   Q.  Just going to ask you a few questions about this.  So take

17   a moment, if you need to refresh your recollection or your

18   familiarity with it, and let me know when you're ready.

19   A.  Okay.

20   Q.  Thanks.  So this document has two emails, right?

21   A.  Yes.

22   Q.  The top -- let's take the top email is an email by you to

23   Mark Nordlicht on December 31, 2015, right?

24   A.  Yes.

25   Q.  So this was very early on in your trying to help Platinum,

MC6VPLA4                          Gerszberg – Cross

1    right?

2    A.   Yes.

3    Q.   And you write Mark and you say:  Attached below, my first

4    contact with Fabrice.  Can you tell us who is or who was

5    Fabrice?

6    A.   I recall him to be a significant investor in the Platinum

7    fund; and I guess he had a redemption.

8    Q.   And then a couple of lines down, you say:  The goal will be

9    to convert Fabrice, Frederick, statmour, etc., into the

10   management fund or eight percent with upside NE type debt

11   piece.

12        What does that refer to, converting these people into

13   the management fund?

14   A.   So Mark had indicated that Murray and David were trying

15   to -- that he had the right to take the management fund equity

16   and allocate it to other people that invested in the fund.

17   Q.   This was, again, the ownership issue?

18   A.   Yeah.

19   Q.   And trying to get these individuals and others to put money

20   in and replace Bodner and Huberfeld?

21   A.   Right.  The management is the -- is a name, but it's the

22   equity, I guess, or the ownership, I guess, not the operations.

23   Q.   Did there come a time when Platinum owed you money?

24   A.   They owed almost -- they owed my company money that they

25   promised to fund; they owed my family money from money we put

MC6VPLA4                        Gerszberg – Redirect

1   into -- that was put in by my family to the fund.

2   Q.  And did Mark give you a security interest in some assets to

3   help secure Platinum's obligations to you?

4   A.  The money that was put into my company was put through

5   PPNE, which we thought had more liquidity.

6   Q.  And did there come a time when you were in litigation with

7   the liquidator with respect to the collateral that was given to

8   you?

9   A.  That was given to family members that I -- that I was

10  responsible to pay back if they lost their money.

11  Q.  And in connection with that litigation, did you reach a

12  resolution with the liquidator?

13  A.  Yes.

14  Q.  And did your agreement with the liquidator contain mutual

15  releases?

16  A.  Yes.

17          MR. LAUER:  I have no further questions.

18          THE COURT:  Redirect.

19          MR. GLUCK:  Mr. Parson, will you please call up PX

20  Exhibit 590 and turn to the position slide.

21  REDIRECT EXAMINATION

22  Q.  Mr. Gerszberg, when this was prepared, you had been working

23  within Platinum's offices for a couple of weeks, is that fair?

24  A.  I wasn't getting paid, but I was there for sure.  Felt like

25  work.

 1   Q.  For a couple of weeks though?

 2   A.  Sure.

 3   Q.  See where it says oil and gas, 367.5 million?

 4   A.  Yes.

 5   Q.  You were assuming that number was true, weren't you?

 6   A.  It was provided to me.

 7   Q.  By who?

 8   A.  I don't know.  It could have been Naftali or David

 9   Steinberg.

10   Q.  Sorry.  Anyone else?

11   A.  No, just David Steinberg or Naftali probably, I would

12   imagine.

13   Q.  You see in the notes column where it says GGO?

14   A.  Yup.

15   Q.  Familiar with a company called Golden Gate Oil?

16   A.  I'm familiar with the name Golden Gate Oil, the company

17   name.  I didn't have a lot of understanding of the specifics

18   about the companies.

19   Q.  Familiar with -- do you see where it says Nstar?

20   A.  Northstar.

21   Q.  There you go.

22        Do you know how much of that 367 million that you

23   were assuming existed was Golden Gate and Northstar?

24   A.  I can't tell you.

25   Q.  Were you aware that by this point Golden Gate had become

MC6VPLA4                          Gerszberg - Redirect

1   defunct?

2              MR. LAUER:  Objection.

3              THE COURT:  Sustained.

4   Q.  Had you spoken to anyone at Platinum Management about the

5   current operational status of Northstar by this point?

6   A.  I had some discussions.

7   Q.  Had you spoken to anyone at Platinum Management regarding

8   the current operational status of Golden Gate Oil?

9   A.  I had broad conversations with position managers about

10  values, which was assembled here.  I would imagine that the

11  components that were unencumbered -- the reason things were

12  encumbered was because they had more value.  But if you -- if

13  you're trying to ask if there was value in the positions --

14  Q.  I'm asking you --

15  A.  -- I feel very comfortable with the fact that the positions

16  were mitigated to the detriment of their full value.  And I

17  only know that specifically because you probably left $40

18  million on the table by selling my investment short.  So while

19  you're smug about the fact that I said it sucked, it sucked for

20  you, too.

21             THE COURT:  I think you've answered the question.

22  Q.  I think the question has been answered.

23             At the time did you know the operational status of

24  Golden Gate Oil?

25  A.  No.  I don't know how much information I had on any

1    specific one; probably not very much on Golden Gate Oil.

2    Q.  Your thesis that there had been an overcollateralization of

3    Beechwood loans was based upon what you believed at this time

4    to be the gross value of the assets in the left-hand column?

5    A.  That's entirely a fair position.  I wasn't giving value to

6    these positions.

7    Q.  And should there have been information that those asset

8    values were wrong, it may have altered your conclusion that

9    there had been an overcollateralization?

10   A.  There were some investments that were clearly demonstrably

11   overcollateralized.  I can't speak to the oil and gas

12   positions.

13   Q.  I'm specifically asking about the oil and gas positions on

14   367.5 million.

15           THE COURT:  Put another question, please.

16   A.  I can tell you --

17           THE COURT:  No, no, no.  Put another question,

18   counsel.

19           THE WITNESS:  I'd like to answer it.  I think I can

20   answer it.

21           THE COURT:  As I tried to explain to you before, we've

22   got rules.

23           THE WITNESS:  Then I won't.

24           THE COURT:  Thank you.

25           Put another question.

MC6VPLA4                        Gerszberg – Redirect

1   Q.  If information was to come to your attention that those

2   positions were worth materially less than 367 million, how

3   would that impact your overcollateralization?

4              MR. LAUER:  Objection.

5              THE COURT:  Sustained.

6   A.  It's all --

7              THE COURT:  No, no, no.

8              THE WITNESS:  Okay.

9              THE COURT:  I sustained the objection.

10             THE WITNESS:  Thank you.  Sorry.

11  Q.  On this particular sheet, your clothing business which had

12  shut down is being valued at 22 million, isn't it?

13             MR. LAUER:  Objection.

14             THE COURT:  Ground.

15             MR. LAUER:  The lawyer is testifying, your Honor.

16             THE COURT:  No, no, no, I think he's just referring

17  him to the exhibit that is in front as a preliminary to a

18  question.  So the objection is overruled, but now let's hear

19  the question.

20  Q.  On this sheet, your clothing company over everything is

21  being valued at 22 million, isn't it?

22             MR. LAUER:  Objection.  Mischaracterization.

23             THE COURT:  The question is, is that right?

24  A.  I wasn't involved in any of the valuations.  My focus here

25  was not to argue the valuations, it was to argue the encumbered

1    positions, and that they could yield an outcome for liquidity.

2    So what Platinum valued or what the value was of my position

3    had zero to do with my preparation.

4           However, I would imagine if we could go and try to

5    piece together assets that we left on the table that were of

6    significance, but without funding, I couldn't advance.  There

7    was a number of proprietary programs and positions and brands

8    that I abandoned.

9    Q.  Now, you presented this presentation and thesis to

10   Mr. Bodner and Mr. Huberfeld; correct?

11   A.  Okay.

12   Q.  And you said it seemed like they didn't know much about

13   what you were talking about.  Is that fair?

14   A.  They did not.

15   Q.  Did you ask them or at any time later whether they had

16   information that the oil and gas investments had been

17   materially overvalued such that your overcollateralization

18   thesis would make no sense?

19   A.  No.

20   Q.  Another purpose of your presentation which Mr. Lauer asked

21   you about was this concept of a management class of equity, is

22   that fair?

23   A.  Yes.

24   Q.  We saw in an email just now that you considered yourself a

25   good friend of Mark Nordlicht?

1    A.  Might have been broad.

2    Q.  Okay.

3    A.  It was a little broad but, you know, he was letting me get

4    involved in trying to work through.

5    Q.  Did you ever have any conversations directly with Mark

6    Nordlicht about what he thought the remaining value of the

7    management company was?

8    A.  He thought it was going to bring in --

9    Q.  I'm sorry, my hearing is --

10   A.  No, your hearing is fine.  I'm not talking into the mic.

11   Q.  Okay.

12   A.  He thought -- his belief was that it was going to bring in

13   value.  He thought he was going to get people to invest in the

14   fund for the management equity.

15   Q.  He thought that just -- this presentation assumes that just

16   a slice of the management equity is going to be worth 10, 20,

17   $30 million, right?

18   A.  No, it assumes that if you invest 10, 20, or $30 million,

19   you get a slice of the management equity.  It wasn't buying the

20   management equity.

21   Q.  Fair.

22        You thought that this presentation assumes that if you

23   invested 10 or 20 or $30 million, that person would be getting

24   a slice of management equity?

25   A.  Actually this presentation presumes that the right answer

1    for this entire thing to preserve value is to -- is to turn

2    this fund into a private equity fund.  Because if you did, you

3    have the right to give pieces of each of the companies that

4    exist or the right to hold all of the redemptions which would

5    give you the opportunity to work through funding different

6    positions.

7    Q.  Did you have any direct conversations with Mark Nordlicht

8    regarding his specific understanding of the value of those oil

9    and gas assets?

10   A.  No.

11   Q.  Okay.

12          MR. GLUCK:  Mr. Parson, will you please call up

13   Plaintiffs' Exhibit 367.

14          We'll seek to move this into evidence.

15          MR. LAUER:  I object.  It's a 403 issue.

16          THE COURT:  I understand that.  And I actually think

17   there's other objections as well, but one is sufficient.

18          Sustained.

19   Q.  Did Mr. Nordlicht ever tell you that it was his personal

20   view that there was no value to the management company?

21   A.  Mr. Nordlicht would position arguments on both sides of any

22   equation to be able to make an effective case at that moment,

23   and you could argue things both ways.

24          I think that Mr. Nordlicht continued to believe that

25   the value -- that there was enough value to get an investor to

1    bring in 100 or $150 million at various different times.  And

2    that's probably why he wanted to preserve the structure and I

3    felt it would be better to focus on a conversion.  But I can't

4    speak to this document.  I don't know what --

5    Q.  The document is not --

6              (Indiscernible crosstalk)

7              MR. LAUER:  Can we ask that it be taken down?

8              Thank you.

9              THE COURT:  Yes, I agree.

10   Q.  If the NAV --

11   A.  But to clarify, he thought the sky was falling one day and

12   he thought the opportunities were abound the next.  I can't --

13   Q.  If the NAV of PPVA was zero or close to zero, there would

14   be no value to the management company; is that correct?

15             MR. LAUER:  Objection.

16             THE COURT:  I'll allow it.  You may answer.

17             Do you want to repeat the question?

18             THE WITNESS:  No, I want to answer.

19             THE COURT:  All right.

20   A.  It's a funny thing to ask a question like that.  Because

21   the entire portfolio ultimately, as opposed to fallacy, which

22   is you're stuck with your outcome that you produced because of

23   the way you approached managing the outcome.  So positions like

24   mine that were mitigated by not having focus or investment or a

25   good transition don't get addressed.

1          So you're saying that the company was worth nothing

2     because you liquidated for nothing; but that doesn't mean it

3     was worth nothing.  You're just proving what your outcome was

4     was right.  I don't want to speak to --

5               MR. GLUCK:  Move to strike as nonresponsive.

6               THE COURT:  Yes, that's granted.

7          Did you have any knowledge of what, if anything,

8     Mr. Nordlicht said to investors?

9               THE WITNESS:  No, I wasn't involved in investor

10    relations outside of trying to get people to hold off on

11    redemptions and convert them.

12              THE COURT:  So you don't know whether he said to them,

13    This is a great company or the sky is falling?

14              THE WITNESS:  I was not involved at all in the

15    management share class sale, that idea.  That was his idea.

16              THE COURT:  The answer is you don't know.

17              THE WITNESS:  Not at all.

18              THE COURT:  Very good.

19              MR. GLUCK:  On that, unfortunately, I am going to have

20    to impeach in a second.

21         Now, can you please call up PX 364, Mr. Parson.

22              THE COURT:  I didn't hear.  It hasn't been offered.

23              MR. GLUCK:  It's being offered.

24              THE COURT:  Any objection?

25              MR. LAUER:  Yes, your Honor.

1          THE COURT:  Sustained.

2          MR. LAUER:  Thank you.

3   BY MR. GLUCK:

4   Q.  You were asked some questions regarding the stock traders

5   at Platinum by Mr. Lauer, do you recall that?

6   A.  You asked me?

7   Q.  Stock traders with short positions as opposed to like the

8   long-term one, do you recall that?

9   A.  Yes.

10  Q.  Do you have personal knowledge as to whether the liquid

11  stock positions of PPVA were stuck in a third-party collateral

12  account that PPVA couldn't access?

13  A.  I don't recall.

14  Q.  No?

15  A.  I don't recall.

16  Q.  Don't recall.

17          Another position you took with respect to this

18  presentation was the concept that the one way to solve this was

19  that -- would be by sort of converting this to a private equity

20  structure so that no more redemptions could occur?

21  A.  Correct.

22  Q.  At the time, we went over the backlog of redemptions that

23  were then pending, right?

24  A.  Right.

25  Q.  People couldn't get their money out at that time?

1   A.  Right.  So what's the question?

2   Q.  My question is if someone had agreed to not redeem their

3   interests, it wouldn't be worth it very much because nobody

4   could redeem their interests?

5            MR. LAUER:  Objection.

6            THE COURT:  Hold on.

7   A.  I don't think you asked a question --

8            THE COURT:  No, wait.  When there is an objection, you

9   have to wait for me to rule.

10           THE WITNESS:  Sorry.

11           THE COURT:  I think all these kinds of questions are

12  not proper for this witness.  This is a percipient witness;

13  he's being asked to testify to what he saw, heard, observed, or

14  himself said, prepared, or the like.  He's not here to give his

15  opinion about if X were true, would Y follow.

16           So sustained.

17           MR. GLUCK:  That's fair.

18           May I build some foundation?  Because the settlement

19  agreements -- litigations brought up by Mr. Lauer directly

20  impact what Mr. Gerszberg saw, heard, and did.

21           THE COURT:  All right.

22           You can lay a foundation.  That's fine.

23  BY MR. GLUCK:

24  Q.  Mr. Gerszberg, you were not personally --

25           THE WITNESS:  Judge, he's referencing the settlement.

1  I don't have an attorney here and I don't know what he's

2  referencing within the settlement.

3          THE COURT:  You may recall that it's already in

4  evidence by consent of both sides here, so you can answer

5  anything about it.  If it touches on attorney-client privilege,

6  I'll interrupt and protect you.

7          THE WITNESS:  Thank you.

8  BY MR. GLUCK:

9  Q.  Mr. Gerszberg, you were not personally or through an entity

10 you control in a litigation with PPVA over the security granted

11 in Implant Sciences, were you?

12 A.  Repeat the question.

13 Q.  Contrary to your answer to Mr. Lauer, you were not

14 personally or through a company you controlled --

15 A.  You're incorrect.

16 Q.  Do you control West Loop?

17 A.  No, but I personally guaranteed to repay many monies lost.

18 So you asked me if I'm personally responsible, I was personally

19 responsible.

20 Q.  I asked you whether you --

21         THE COURT:  All right.

22         MR. GLUCK:  It's a very important distinction here.

23 Q.  Were you or was any company in your control in a litigation

24 with the JOLs in --

25 A.  No.

1    Q.  -- respect of the Implant Sciences --

2           THE COURT:  So I think his answer, correct me if it's

3    wrong, is he was indirectly involved through a guarantee.  Do I

4    have that right?

5           THE WITNESS:  Yes.

6           THE COURT:  I think he's answered the question.

7    Q.  Did you arrange via Mark Nordlicht to grant West Loop,

8    which is owned by your family, a subsidiary level encumbrance

9    over the Implant Sciences investment?

10   A.  It was part of a larger negotiation with consideration.

11   Q.  Okay.  Did you?

12   A.  As part of a larger settlement, yes.  As part of a larger

13   business transaction, yes.

14   Q.  And the liquidators sued West Loop, that company, to

15   invalidate that security agreement in New York state court; is

16   that right?

17   A.  That is right.

18   Q.  Okay.  Now, you arranged for this after Mr. Murray

19   Huberfeld had been arrested and the fund had actually imploded,

20   is that right?

21           MR. LAUER:  Do we need this?

22   A.  Time out.

23           MR. GLUCK:  We do.  Because --

24           THE COURT:  Excuse me.  Excuse me.

25           Although Mr. Lauer couched his objection a little

MC6VPLA4                          Gerszberg – Redirect

1   unusually, I think he was raising an objection.

2              That objection is sustained.

3              MR. LAUER:  Thank you.

4   Q.  Had you formed a view by the summer of 2016 that PPVA would

5   not be able to pay back not merely its investors, but its

6   unsecured creditors and secured creditors too, such that a

7   subsidiary-level encumbrance would benefit your family?

8              MR. LAUER:  Relevance.  It's long outside the period.

9              MR. GLUCK:  It goes directly to --

10             THE COURT:  No, no, I think --

11             THE WITNESS:  It would actually benefit --

12             THE COURT:  Whoa, whoa.

13             I think it goes to bias.  It is permitted.

14             You may now answer.  Go ahead.

15  A.  It went to support a transaction that was worth about $40

16  million to Platinum that you ultimately mitigated.  I mean, you

17  walked away from -- at some point in the near future -- here's

18  the same, Sapatta.  Look it up.  And when you see the value of

19  the company at well over a couple $100 million, remember that

20  you're the one that mitigated it for $2 million.

21             And now you're asking me whether or not the

22  transaction was good that you personally mitigated, that you

23  went and sacrificed opportunity.  So I don't understand.  You

24  can laugh all you want.  When I said it sucked, it didn't just

25  suck for me, it sucked for all the people that were going to

1    benefit from the liquidation of the Platinum positions.

2              You mitigated value without asking or understanding.

3    You went and dropped tons of opportunities that I could -- I'd

4    be happy to point out.  Because you said we have to quickly get

5    rid of things or who knows, but you're suing for six years, but

6    positions -- you could laugh all you want, but positions that

7    were fully secured you traded out for cents on the dollar so

8    you could pay back a legal defense fund.  It's ridiculous.

9              You're creating your own version of the outcomes by

10   mitigating them, making sure they suck, and then asking me.

11   But you would have never said anything to me if it was worth

12   $40 million; you would have just shut up.  But so you forced

13   the outcome, and then you're asking me about value.

14             THE COURT:  Excuse me.  Excuse me.

15   Q.  The question is --

16             THE COURT:  Excuse me.

17   A.  Smile --

18             THE COURT:  Hey.

19             THE WITNESS:  Sorry.

20             THE COURT:  My question to counsel is whether you want

21   that last answer stricken as nonresponsive or whether you

22   prefer to leave it.

23             MR. GLUCK:  I would prefer the answer be stricken and

24   to --

25   A.  Figured.

1          MR. GLUCK:  -- repose the question on the very

2    specific basis of a simple query.

3    Q.   Ignore your jetpack.

4    A.   Ignore the reality.  Play your game.

5    Q.   Let me ask my question.

6          Ignore your jetpack --

7          THE COURT:  You know, excuse me.  Excuse me.

8          In approximately 30 seconds I will have to consider

9    the very difficult question that I haven't had to reach in my

10   26 years on the bench, which is whether to hold counsel and the

11   witness in contempt, and have the marshals come here and take

12   them to jail, or whether it's time for both of you to grow up

13   and behave and play according to the rules.

14         Would you care to play before the rules?

15         MR. GLUCK:  I would love to.

16         THE COURT:  Would you care to play before the rules?

17         THE WITNESS:  I don't know the rules.

18         THE COURT:  You don't know the rules?  Well, the

19   rules --

20         THE WITNESS:  Trying to understand.

21         THE COURT:  The rules are that you only answer the

22   questions put and that you don't give emotional, long-winded

23   answers that aren't called for by the questions.

24         THE WITNESS:  Judge, I lost $40 million.

25         THE COURT:  Yes, I understand that.  You've already

MC6VPLA4                     Gerszberg - Redirect

1    told that to me and the jury 14 times.

2         THE WITNESS:  Right.

3         More money that was ever lost because of -- Platinum

4    Management was lost because of this gentleman.

5         THE COURT:  Okay.  So my question to you is do you

6    want to continue, continue saying that, which you've already

7    said many times to the jury, do you want to continue saying it,

8    which is in violation of the rules of evidence, because it

9    wasn't the question asked, or would you prefer me to call the

10   marshals and take you off to jail tonight, which will be a

11   comfortable place to spend the evening?

12        May I humbly suggest to you that you've already made

13   your point to the jury many times.

14        THE WITNESS:  Thank you.

15        THE COURT:  Why don't we just continue according to

16   the rules, okay?

17        THE WITNESS:  Sure.

18        THE COURT:  Very good.

19        MR. GLUCK:  I'm going to try to ask a very simple set

20   of yes-or-no questions.

21   BY MR. GLUCK:

22   Q.  I'm going to try to ask a very simple set of yes-or-no

23   questions.  Was West Loop, a company owned by your cousins, a

24   secured creditor of PPVA?

25        THE COURT:  We're having trouble hearing.  Put the

MC6VPLA4                        Gerszberg - Redirect

1    question again.

2    Q.  Was West Loop, the company owned by your cousins, a secured

3    creditor of PPVA?

4    A.  That was secured by PPNE.

5    Q.  Was there a security agreement with PPNE?

6    A.  I don't know.

7    Q.  Did you determine --

8    A.  I don't recall.

9    Q.  Did you determine to have a document executed which would

10   give West Loop a right to recoveries even above PPNE-secured

11   creditors?

12   A.  Can you repeat the question?

13   Q.  Did you ask Mark Nordlicht to execute a document that would

14   give West Loop a right of recovery even above the secured

15   creditors of PPVA at what's called a subsidiary?

16   A.  As part of a larger agreement.

17   Q.  Fine.  Did that subsidiary --

18   A.  The consideration was for the agreement, not because --

19          THE COURT:  No, you've answered the question.

20   Q.  I'll try to do yes or no's.

21          Did that subsidiary of PPVA, operated by Mr. Trott,

22   sue in New York State Supreme Court to try and invalidate that

23   agreement?

24   A.  And yet it was paid, because it was right to pay it.

25   Because you --

MC6VPLA4                     Gerszberg - Redirect

1    Q.  Did -- I'll try to ask it as a yes or no.

2              Did Mr. Trott sue in New York State Supreme Court from

3    DMRJ to invalidate that agreement?

4    A.  I don't recall the specifics of the process of the lawsuit.

5    Q.  Do you recall being deposed in that lawsuit?

6    A.  Oh, yeah.

7              MR. LAUER:  I don't know, it just seems to me we're

8    getting a little far afield.

9              THE COURT:  Wait a minute.  Wait a minute.

10             You think we're getting a little far afield?

11             I'm going to confine plaintiffs' counsel to five more

12   minutes.

13   BY MR. GLUCK:

14   Q.  Why would it be helpful for West Loop to have a

15   subsidiary-level lien on PPVA's assets?

16   A.  I'm sorry.  Can you explain the question better so I can

17   understand.  Because you don't want to ask a real question,

18   you're trying to ask an out-of-context question.

19             THE WITNESS:  I don't understand what he's saying.

20   Doesn't even make sense the way he's asking it.

21             Sorry, Judge, I'm trying.  But he won't ask a robust

22   question because he knows it won't serve him; so he asks a

23   marginalized question and I can't figure out what he's saying.

24             MR. GLUCK:  I move to strike.

25             THE COURT:  It will be stricken.

1          Last I understood, this has only been the law for the

2   last 500 years in both England and the United States, and

3   what's 500 years between friends?  But the role of one counsel

4   is to put questions, and the role of the other counsel is to

5   object if the question is improper, and then the role of the

6   judge is to make that determination.  But never in the last 500

7   years has it ever been held that the role of the witness is to

8   determine what is a proper question.

9          THE WITNESS:  Fair.  Sorry.

10          THE COURT:  Put another question.

11   BY MR. GLUCK:

12   Q.  The question is whether you had formed a view as to whether

13   PPVA would be unable to pay back its creditors?

14          MR. LAUER:  Objection.  Relevance.

15   Q.  Valuation.

16          MR. LAUER:  Objection.

17          THE COURT:  Well, I don't think it's irrelevant, but I

18   think it has effectively been asked and answered by prior

19   questions.  So on that silently conveyed ground of asked and

20   answered, the objection is sustained.

21          MR. LAUER:  Thank you.

22   Q.  Due to the work of Mr. Trott, West Loop was repaid in full

23   outside of that agreement, is that true?

24          MR. LAUER:  Objection.

25   A.  It was supposed to be paid in full.

1              MR. LAUER:  Objection.

2              THE COURT:  Well, I will allow that.  Well, actually,

3    I won't allow that because it's a compound question.  But you

4    may rephrase it if you wish.

5    Q.  West Loop became a secured creditor in the PPVA estates,

6    didn't they?

7    A.  You asked me whether or not I owned West Loop; now you're

8    asking me --

9              THE COURT:  He's asking do you know whether or not --

10   Q.  Do you know?

11   A.  I didn't read the charges against West Loop.

12             THE COURT:  So the answer is you don't know.

13   Q.  And do you know one way or another whether West Loop as a

14   creditor in the PPVA estates, not through this other agreement,

15   but as a creditor in the PPVA estates, has been repaid?

16             MR. LAUER:  Objection.  Relevance.

17             MR. GLUCK:  Your cross-examination testimony regarding

18   these lawsuits and settlements.

19             THE COURT:  Well, I think given his answer to the

20   previous question, it doesn't sound like it's within the scope

21   of his knowledge.  Sustained.

22             I'm sorry, you didn't hear me.

23             MR. GLUCK:  No, I have a hearing issue.

24             THE COURT:  I'm sorry.

25             THE WITNESS:  Within the scope of my knowledge --

MC6VPLA4

1              THE COURT:  Whoa.  You really are pressing your luck.

2              I sustained the objection on the grounds that it's

3    outside the scope of his knowledge.

4    Q.  Final question:  Are you aware that PPVA entered into

5    liquidation, not officially, but liquidation shortly after the

6    arrest of Murray Huberfeld?

7              MR. LAUER:  I'm objecting.

8              THE COURT:  Sustained.

9              All right.  That concludes the examination.

10             You are excused.  Thank you very much.

11             THE WITNESS:  Thank you.

12             (Witness excused)

13             THE COURT:  Well, I know you hated to have that

14   examination come to an end; nevertheless, we're only going to 4

15   o'clock today.  We'll take our 15-minute mid-afternoon break

16   now, and then we'll reconvene at 2:30 and go straight till 4.

17             See you then.

18             (Jury not present)

19             THE COURT:  All right.  Please be seated.

20             I'm tempted to ask plaintiffs' counsel whether he

21   called Mr. Gerszberg because of the close and friendly

22   relations that they enjoy; but, in any event, I think the jury

23   has a sense of the situation.  Okay.

24             I know that someone said to my courtroom deputy, but I

25   don't think I've seen yet, there was a submission, someone said

MC6VPLA4

this morning, about the release, something additional to what
I've seen before.  And it was a two-page letter or something
like that.

          MR. GLUCK:  I don't know about the pages --

          THE COURT:  Do you happen to have a hard copy?

          MR. GLUCK:  I'm sure I could show it to you on the
laptop.

          THE COURT:  I'll tell you what, why don't you send
it -- well, as soon as we break, send it to my law clerk and
I'll read it over the break and we can discuss that further.

          Anything else we need to take up now?

          MS. MOSSE:  Your Honor, we sent a response as well.

          THE COURT:  Okay.  So send that as well.

          I was wondering whether I would have trouble sleeping
tonight, but now I have both of your responses, there will be
no problem.

          All right.  See you in a few minutes.

          (Recess)

          (Continued on next page)

MC6Cpla5

1            (Jury not present)

2            THE COURT:  What's the issue?

3            MR. GLUCK:  Issue one may be simple.  With respect to

4    Mr. Huberfeld, we believe that the entire argument is that the

5    giving up of the Platinum Management interest form the

6    consideration for the release, there were two exhibits in the

7    previous unusual examination that did not come into evidence,

8    but that are directly on the value of those shares being given

9    up.  Our inquiry was whether they were not brought in for

10   knowledge, it wasn't clear from the record for personal

11   knowledge or for some other reason.

12           THE COURT:  Well, what is your application?

13           MR. GLUCK:  We believe we need to show Mr. Huberfeld

14   the exhibit and ask whether he had conversations with

15   Mr. Nordlicht just to value the --

16           THE COURT:  This is for the next witness?

17           MR. GLUCK:  This is the lessor, so this is direct.

18           THE COURT:  Does someone have a hard copy?

19           MR. GLUCK:  These are exhibits 364 and 367.

20           MS. SHEN:  They were passed up for identification for

21   Mr. Gerszberg's examination.

22           THE COURT:  So these are two exhibits for

23   Mr. Nordlicht, but they did not copy the previous witness,

24   which is why, among other reasons, they were not received

25   through the previous witness.  The witness you're about to call

MC6Cpla5

1      is Mr. Huberfeld.

2              MR. GLUCK:  Huberfeld, who is a lessee.

3              THE COURT:  He is not copied on this, is he?

4              MR. GLUCK:  He's not, but our issue in this case is

5      whether there was consideration to PPVA for this release.  The

6      suggestion is that the relinquishment of the shares was

7      valuable.

8              THE COURT:  My question is not about relevance, my

9      question is how can you ask a witness to say anything about an

10     email that was neither sent by him nor received by him?

11             MR. GLUCK:  I think my answer is we are -- there is

12     some uncertainty whether Mr. Nordlicht can be called.  This is

13     a fundamental issue in the case, and my question would be

14     whether there was a conversation between Mr. Nordlicht and

15     counsel for Mr. Huberfeld or Bodner, or Huberfeld and Bodner

16     himself regarding this subject matter, whether there was value

17     in the management company.  Otherwise, this was the point about

18     why, among other reasons, Mr. Nordlicht --

19             THE COURT:  I now have, I think, both sides, I now

20     have all your emails and I will look at them tonight, alertly.

21     And I was going to mention later but will mention now, I think

22     we'll get together at 9:00 a.m. tomorrow just to get a final

23     decision on the Nordlicht calling and the questions related to

24     the release.

25             So I will consider these with respect to that

MC6Cpla5

1    question, but with respect to the witness who's coming up, I

2    just don't see how he has any personal knowledge of either of

3    these.

4            MR. GLUCK:  I think that's fair --

5            THE COURT:  You can put to him questions about did you

6    discuss with X, Y, or Z such and such, but that would not

7    enable the admission of the exhibits.

8            MR. GLUCK:  That's understood.  I think this should be

9    considered one of our attempts to limit Mr. Nordlicht's

10   testimony.

11           THE COURT:  I will certainly consider that tonight.

12           MR. HERTZBERG:  Your Honor, if I may be heard briefly

13   on that issue.  Mr. Gluck say that this arises in the context

14   of whether consideration was given to PPVA in exchange for the

15   release, consideration is not an issue.  Under New York State

16   GOL, there is no consideration needed for a written release.

17   That issue has never been the case.

18           MR. GLUCK:  I have a number of treatise articles which

19   state that an examining of the validity of the release, the

20   form of conversation, the type of consideration, and what is

21   being released is exactly and expressly at issue.  I can

22   probably forward or Ms. Shen has the set of treatise articles.

23           THE COURT:  That will give me something else to think

24   about tonight or really for my law clerk to think about, and

25   you should give him at the end of the day the citations on that

MC6Cpla5

1    issue.  Of course New York law may be controlling.  It seems

2    really odd you can have a contract without consideration.  I

3    thought they decided that in 1492.  But anyway, I hear what

4    you're saying.

5         MR. HERTZBERG:  The value of the shares wouldn't be

6    the only consideration anyway.  It was a mutual release.  There

7    was a release in both directions.  There was also an agreement

8    by Mr. Bodner and Mr. Huberfeld to lock up their interests in

9    the funds for two years.  That's consideration, too.

10        THE COURT:  I must say, and we really need to get to

11   the next witness, but of course counsel for both sides are

12   totally in control what they want to argue and what they want

13   to put before the jury in terms of the issues in this case,

14   subject to the rulings previously made on summary judgment.

15        But, if I were a juror in this case, I would have

16   thought that on one hand, there is not a serious question that

17   there was a material overstatement, and that, therefore, the

18   real issue on that is whether Mr. Bodner knew of it, and if so,

19   whether he had any obligation to do anything about it.

20        On the other hand, I would think a reasonable juror

21   would not spend much time on things like the authenticity of

22   the release that has been referred to numerous times already,

23   but rather the issue of whether the release is valid and

24   binding under more general principles of law that both sides

25   are able to argue to the jury after we set forth the relevant

1    provisions in my instructions.

2            So I'm not making any rulings about anything.  You're

3    free to argue whatever you are.  What I'm suggesting is that if

4    defendants are still contesting that there was, in fact, a

5    material overstatement, my suspicion is they've got a very hard

6    road to a hoe, and if plaintiff is still arguing mostly to me

7    that there's some reason why this release should not be

8    evaluated as a release because the signature was questionable

9    or something like that, I think they got a very hard road to

10   hoe.  So I just throw that out there for what it's worth.

11            Let's get the witness on the stand.

12            MR. GLUCK:  There was a second issue.  The second

13   issue does go to the very heart of the release.  So our

14   contention is that the release is not valid, not because of the

15   signature, because of its content.

16            THE COURT:  That, of course, is the real issue, yes.

17            MR. GLUCK:  And our contentions are that there was no

18   value to the management company, there was no value with the

19   share lock upend, as Ms. Shen has a document, that one of the

20   items released specifically concerned Mr. Huberfeld and the

21   issues surrounding -- there is a memorandum that was prepared

22   prior to the release being signed, and it is a memorandum that

23   was prepared within the Curtis firm and then transmitted to

24   PPVA's lawyers, Dechert --

25            THE COURT:  Does someone have a hard copy of that?

MC6Cpla5

1          MR. GLUCK:  Yes.  And it has the cover email.  It's

2     just sort of how it was transmitted and then the content.

3          THE COURT:  Let me take a quick look.  So this appears

4     to be a memo from Mr. Hertzberg to Mr. Lauer, dated March 10th,

5     2016, that looks like should normally be covered by

6     attorney-client privilege.  Moreover, it appears that it was in

7     the context of discussions with an assistant U.S. attorney and

8     providing him with information, and that would have been part

9     of a settlement discussion, albeit the criminal segment.

10          Then there is another memo from Mr. Levander -- by the

11     way, on the cover memo, it says privileged and so forth, but

12     the cover memo is from Mr. Levander at Dechert to Ms. Halk at

13     Dechert, and then there is a, earlier, I'm reading it in

14     reverse order.  So that last one was dated June 13th, but

15     before that, there was a letter, an email from Mr. Brown at

16     Dechert to Mr. Eriksberg at Curtis forwarding the internal

17     memo.  Then there is a further -- then it goes from Mr. Brown

18     to Mr. Levander, et cetera.  So that, seemingly, is part of the

19     joint defense or something like that.

20          So let me ask defense counsel.  Are the documents that

21     have just been shown, is your assertion they are covered by

22     privilege or not?

23          MR. HERTZBERG:  Your Honor, if I could provide some

24     context, if I may?

25          THE COURT:  Yes, and you can even tell me I'm asking a

MC6Cpla5

1    bad question because you've now got some precedent, but perhaps

2    you would like to answer my question yes or no, and then you

3    can give your explanation.

4         MR. HERTZBERG:  Mr. Bodner is not and has no capacity

5    to assert privilege with respect to this document.

6         THE COURT:  Now what is it you wanted to say?

7         MR. HERTZBERG:  I wanted to provide the Court some

8    context what's happening in these emails of five, six years

9    ago, because it may not jump off the page.

10        The memo that you saw was a memo from myself to

11   Mr. Lauer --

12        THE COURT:  He delegates all the important matters.

13        MR. HERTZBERG:  Types with two fingers, Judge.

14        We were, at that time -- the memo was March of 2016,

15   we were representing Platinum Management who had received a

16   subpoena in 2015 for matters relating to our witness,

17   Mr. Huberfeld, who's in the hallway, what was being

18   investigated in the context of what ended up being the

19   commercial bribe charge, to which there was ultimately a guilty

20   plea to honest services fraud.

21        Mr. Lauer and I at that time were representing both

22   Platinum Management and Mr. Huberfeld, who had both received

23   subpoenas in that case.  It had gone on for, I don't know, six

24   months or so.  And the memo that you saw was when the AUSA who

25   we had been interfacing with, Russ Capone, had called us and

MC6Cpla5

asked us to describe some transactions between Platinum and

Beechwood.  We went to Platinum Management, we dealt with the

in-house lawyer, we got the information.  We told AUSA Capone

what we had learned, and that was the end of it.

Then on June 8th, without notice to us, Mr. Huberfeld

was arrested at home that morning and charged with the bribe to

Mr. Seabrook.

On June 9th, Mark Nordlicht hired -- June 8th or June

9th, the same day or the next day, Mark Nordlicht hired Andy

Levander, and Eliot and I were interfacing with Mr. Levander

and his partner, Jeff Brown.  So we were forwarding them our

internal work product so that they can get up to speed.

MR. LAUER:  Counsels of defense.

MR. HERTZBERG:  Correct, on a joint-defense basis.

The joint defense, not Mr. Bodner, who is not our client and

had nothing do with this, but the joint defense between

Platinum Management -- Platinum Management's two lawyers,

actually.  It was Platinum Management being represented by

Curtis and Platinum Management being represented by Dechert.

Fast forward to the liquidation and Dechert produced this memo

to them.

THE COURT:  So any privilege was waived.  Is that the

point?

MR. HERTZBERG:  We entered a stipulation with the JOLs

that it was a joint -- that we jointly held the privilege and

1   left it there.

2          THE COURT:  So this was -- it's plaintiffs' position

3   this was shown to Mr. Huberfeld?

4          MR. HERTZBERG:  No, I don't believe that's their

5   position.  I don't believe we have any facts on this.

6          THE COURT:  How do you plan to introduce it?

7          MR. GLUCK:  Plaintiffs' position is that Mr. Huberfeld

8   was aware of this work being done by Curtis, in particular in

9   relation to him, that Mr. Huberfeld and Mr. Bodner hired Curtis

10  to negotiate this release, and that this particular liability

11  was the subject of the release, and that is an impermissible

12  one.  That's it.

13         MR. LAUER:  Your Honor, I know Mr. Grossberg --

14  Mr. Hertzberg has addressed this, but I don't want my silence

15  to imply that I have some --

16         THE COURT:  You just got yourself in deep trouble by

17  mispronouncing his name, but --

18         MR. LAUER:  It's sleep deprivation or otherwise known

19  as trial.  My best recollection is this was not communicated

20  with Mr. Huberfeld or Mr. Bodner.  We were basically dealing

21  with Harvey Wroblowski and Platinum Management, and this really

22  had nothing to do with -- had absolutely nothing to do with

23  Mr. Bodner.

24         THE COURT:  Let me go back to plaintiffs' counsel just

25  so I understand what you think.

1          Your claim that the release is invalid with respect to

2     the issues that you are now discussing is exactly what?

3          MR. GLUCK:  Our claim that the release is invalid is

4     that it -- threefold, each of which is important.  First, it

5     violated public policy on the ground that joint --

6          THE COURT:  I think that's an issue for the Court, as

7     I indicated previously.

8          MR. GLUCK:  It may be, but this is our argument.

9     Somebody's got to listen to this evidence.

10         THE COURT:  No, but I could take evidence outside the

11    hearing of the jury.

12         MR. GLUCK:  Firstly, it violated public policy on the

13    ground that it was an impermissible release between joint tort

14    feasors, coconspirator, Mark Nordlicht, Platinum Management,

15    David Bodner, and Murray Huberfeld.  And with respect to those

16    joint torts, we have overvaluation.  We have this COBA issue,

17    we have the Black Elk issue --

18         THE COURT:  I'm sorry.  The joint tort feasors, again,

19    are who?

20         MR. GLUCK:  The joint tort feasors are Platinum

21    Management, who had an alleged ability to buy into PPVA, Mark

22    Nordlicht, Murray Huberfeld, and David Bodner.

23         THE COURT:  Okay.  So now let me get back to defense

24    counsel.

25         So the claim is that the release was just a phoney

MC6Cpla5

1      arranged by joint tort feasors to try to let various people off

2      the hook.  That is certainly an arguable defense.

3      Mr. Huberfeld can certainly be questioned about that.

4              I think we had to take it question by question, and in

5      response, I may have to interrupt the jury while we hear some

6      testimony outside the presence of the jury.

7              I take it you're not arguing they can't adduce

8      evidence that -- let me give it a hypothetical.  If

9      Mr. Huberfeld sat down with Mr. Bodner is and said, you know,

10     we're going to let you off the hook, you know too much, but

11     we'll cover for you, here's a release.  That would clearly be

12     admissible, yes, because you're relying on the release.  That

13     would be a response to the release.  So why isn't this a more

14     circumstantial variation on that theme, in effect?

15             MR. LAUER:  I'm not sure of the question, your Honor.

16     I thought that the reason we're talking about this is Mark

17     Nordlicht.  If we're addressing the merits of the release, just

18     to build on what Mr. Hertzberg said, the merits of the release,

19     absent the so-called public policy issue that largely -- that

20     enabled them to survive summary judgment because of Marcos

21     Katz's facts that caught the Court's attention and is

22     referenced in the summary judgment, but if we're arguing the

23     merits of the release, there will be overwhelming evidence that

24     the relatively minor potential exposure, to the extent God was

25     thinking about it because God knows no one else was with

1    respect to management fees that went into the business and

2    incentive fees that, two years before, had been stopped because

3    they are ethical people, that this was overwhelmingly, as you

4    heard from one witness after the other, was designed to free

5    this up so Mark, who felt he was stuck with Murray and David

6    clipping coupons without putting in effort, money, or doing

7    anything, now was going to guilt them into, guys, this is thing

8    is going to collapse if you don't let me take your shares.

9              So we're more than comfortable arguing this to the

10   jury.  We believe when all the evidence is in that the Court

11   will be asked --

12             THE COURT:  I may decide as a matter of law, I

13   understand that, but I don't think --

14             MR. LAUER:  So I don't know what the question is.

15             THE COURT:  So you were listening to the last witness

16   because you're giving the same response.

17             Actually, I'm going to withdraw the question because I

18   think I've heard enough now to rule as to particular questions

19   that are put.  So I see the issues now, we'll take it one

20   question at a time.  So we need to get this witness on the

21   stand, so let's get the witness on the stand and the jury.  I

22   want to mention to plaintiffs' counsel, and I do not in any way

23   suggest you haven't been moving with reasonable speed, but I do

24   think the jury is anxious to move this case along.  So I'm

25   hopeful we can conclude the plaintiffs' case tomorrow if at all

MC6Cpla5

1      possible.

2                  MR. GLUCK:  Subject to any inordinate issues.

3                  THE COURT:  Has anyone heard anything with

4      Ms. Albanese?

5                  MS. SHEN:  We emailed her and I don't believe we've

6      heard back, but I'll check with my colleague.

7                  (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2                   THE COURT:  The witness should come up here.

3                   THE DEPUTY CLERK:  Please take the witness stand.

4     MURRAY HUBERFELD,

5          called as a witness by the Plaintiffs,

6          having been duly sworn, testified as follows:

7                   THE DEPUTY CLERK:  Please be seated.  State your name

8     and spell it slowly for the record.

9                   THE WITNESS:  Murray Huberfeld, M-u-r-r-a-y,

10    Huberfeld, H-u-b-e-r-f-e-l-d.

11    DIRECT EXAMINATION

12    BY MR. GLUCK:

13    Q.  Good afternoon, Mr. Huberfeld.  I would like to ask you a

14    few questions today regarding the following topics to put your

15    mind in the right place:  Your relationship with Mr. Bodner,

16    your relationship with Platinum, and the circumstances by which

17    a release was executed by Platinum Management in favor of

18    yourself and Mr. Bodner.

19                   MR. HERTZBERG:  Objection.  Move to strike.

20                   THE COURT:  No.  Go ahead, place your question.

21    Q.  First, could you please tell us when did you begin working

22    with Mr. Bodner?

23    A.  I believe in 1985.

24    Q.  And in what capacity was that?

25    A.  At the time, I was in the restaurant business, I met

1    Mr. Bodner and another associate of his.  They, at the time, I

2    believe, owned a brokerage firm and I joined them as a partner.

3    Q.  Did you, yourself, become a financial services person?

4    A.  Could you expand on that.

5    Q.  What did you do with the brokerage firm?

6    A.  So I worked on the trading desk together with Mr. Bodner

7    and together with the other partner, leading the companies that

8    possibly we were going to invest in.

9    Q.  What was Mr. Bodner's role at this trading company?

10   A.  He was mostly on the trading desk.

11   Q.  And how long did that continue?

12   A.  That continued till the crash of 1987, October of '87.

13   Q.  And then what happened?

14   A.  Then the two of them decided not to continue working

15   together and I had to choose one or the other, and I decided to

16   stay and become partner with David Bodner.  At the time, we

17   didn't have any business, but we started to work together as

18   partners.

19   Q.  Did you have a formal partnership agreement?

20   A.  No.

21   Q.  Did you have an informal partnership agreement?

22   A.  Can you expand on that.

23   Q.  Have you heard the term "unincorporated partnership" before

24   today?

25   A.  I think you asked me that in a deposition.  That was the

MC6Cpla5                          Huberfeld - Direct

1    first time I had heard that.  We were partners, we had been

2    doing things together, 50/50, investing in things together and

3    working together.

4    Q.  Let me try to break that down.

5         What was the business of your partnership?

6    A.  So that business lasted a very long time.  So it changed

7    from year to year or every few years, but it was a -- we traded

8    together.  We bought -- we traded stocks for ourselves through

9    our accounts for a while, we traded options for a while, we

10   invested in companies.  We did various different things within

11   the financial world for ourselves.

12   Q.  Until how long did that partnership continue or does it

13   still continue?

14   A.  No, I believe the partnership ended approximately at the

15   time that Platinum had its issues in 2016.

16   Q.  During the period from when your partnership formed until

17   2016, would you do all or almost all of your business together

18   with Mr. Bodner?

19   A.  I think besides the restaurant business, which I had with

20   my family, yes.

21   Q.  Could you please elaborate on the 50/50 role.  So was

22   responsibility divided 50/50?

23   A.  I don't think that there had been a discussion about

24   responsibility in the business.  Everyone's doing what they

25   can.  So it's not about I'm going to work six hours, he's going

1   to work four hours.  It was better business, if something had

2   to be done, whoever was doing it was doing their utmost.  So I

3   don't know if it was a 50/50 partnership on minutes.  It was a

4   50/50 partnership that we're both doing both our efforts to

5   help our business.

6   Q.  Understood.  Now, if there was profits from the partnership

7   business, how would those be distributed?

8   A.  A partnership was a 50/50 partnership with profits.

9   Q.  So you would share the partnership -- the profits on a

10  roughly 50/50 basis?

11  A.  I don't think roughly.  I think 50/50.

12  Q.  If there were losses, how would those be shared?

13  A.  The same.

14  Q.  If there was a requirement, not profits or losses, but a

15  requirement to invest capital in a particular project, who

16  would have responsibility and how would it be shared?

17  A.  I can't say 100 percent on everything, but it could have

18  happened that one of us would have more liquidity for

19  something, a partner of many, many years.  So I'm trying to be

20  accurate, but we both put in the same as necessary, but it

21  could have been in some circumstance one of us would have laid

22  out money for the other.  That could have happened.

23  Q.  There would be some sort of netting later, perhaps?

24  A.  Yeah, somebody laid out money for the other and later on

25  money was -- it came in, that money would get squared up.

1  Q.  Was Platinum one of the businesses of your partnership?

2  A.  It was the business that myself and David helped found, I

3  believe, in 2003, and we both invested capital when Platinum

4  started.

5  Q.  I understand there were two funds, PPVA and PPCO, but was

6  your interest, yours and Mr. Bodner's interest in those funds

7  also split 50/50 within your partnership?

8  A.  I believe that David and I had the same interest in both

9  funds.  I think at the beginning it wasn't called PPCO, it was

10  called Centurion, but our interest was basically the same.

11  Q.  Same question, but for -- do you remember a company called

12  Beechwood?

13  A.  Yes, I do.

14  Q.  Was Beechwood one of the businesses within your

15  unincorporated partnership?

16  A.  Beechwood was a business that was started that myself, my

17  family, and David's family both held an interest in.  I believe

18  they were similar interests.

19  Q.  If I was to ask the same questions just for the sake of

20  time about sharing profits, who took losses, would they be

21  substantially the same as your prior answers?

22  A.  I think so.

23  Q.  How often would you communicate with Mr. Bodner from the

24  beginning of your partnership through 2016?

25  A.  I don't remember.  It's -- I couldn't quantify it, but a

MC6Cpla5                           Huberfeld - Direct

1    lot.

2    Q.  All the time?

3    A.  All the time.

4    Q.  Would you talk about your various projects?

5    A.  Of course.

6    Q.  Among those projects, would you talk about Platinum?

7    A.  Of course.

8    Q.  Among those projects, would you talk about Beechwood?

9    A.  Yes.

10   Q.  Would it be a regular practice for one of you to conceal a

11   portion of something you learned within one of the businesses

12   of your partnership from the other or would you mostly tell

13   each other everything, is really what I'm asking.

14   A.  It's hard to answer that question.

15   Q.  Let me see if I can do a better job.

16   A.  Okay.

17   Q.  Is your regular practice that if you get a piece of

18   information in relation to your partnership, one of your

19   businesses, let's say Platinum, would you communicate that to

20   Mr. Bodner?

21   A.  If I thought it was relevant, yes.

22   Q.  Same question based on your experience.  If Mr. Bodner

23   received a piece of information in connection with your

24   partnership, whatever, Platinum, Beechwood, would he

25   communicate that to you?

1   A.  Are you asking me what someone else would do?  Would I have

2   an expectation that he would do it?  Probably.  If he did it, I

3   would think so.

4   Q.  Can you think, off the top of your head, any particular

5   examples of something that either you didn't tell him or he

6   didn't tell you as it relates to your partnership?

7   A.  It's too broad of a question.  You want to ask me something

8   specific, I'm happy to answer.

9   Q.  That's what I'm thinking.  Are there any immediately

10  specific examples that come into your head?

11  A.  No.

12          MR. GLUCK:  Mr. Parson, will you please pull up

13  exhibit 72, which should be the release.

14  Q.  As Mr. Magruder is getting the paper copy and we're working

15  through computer problems, do you recall an agreement by which

16  you and Mr. Bodner divested yourselves of your interests in the

17  Platinum Management hedge fund management entities and, in

18  turn, were provided with what purports to be a release?

19          MR. HERTZBERG:  Objection.

20          THE COURT:  It's a compound question, so break it

21  down.

22          MR. HERTZBERG:  Your Honor, the objection is the

23  document on the screen appears to be a draft.  If that's what

24  Mr. Gluck wants to show the witness, that's fine, but --

25          MR. GLUCK:  No, it is certainly not.

1              MR. HERTZBERG:  73 is on the screen --

2              MR. GLUCK:  I understand that.  74 is the correct

3     document.  74, Mr. Parson.

4     Q.  But same question, do you recall that there was an

5     agreement by which you and Mr. Bodner gave up your interests in

6     Platinum Management?

7     A.  Yes.

8     Q.  Do you recall that pursuant to the same agreement, yourself

9     and Mr. Bodner were granted a release by Platinum?

10    A.  Yes.

11    Q.  Did you have counsel in connection with this transaction?

12    A.  I think so.

13    Q.  Do you know who that counsel was?

14    A.  I think it was Eliot Lauer and Dave Eriksberg.

15    Q.  Do you know whether PPVA or Platinum Management had counsel

16    in connection with this transaction?

17    A.  Do I know now?  Did I know then?  I'm not understanding the

18    question.

19    Q.  Let's say now.

20    A.  Now, I think I seen things that was some back and forth

21    with their legal counsel in house.  I don't know if they had

22    outside counsel.  I don't know if I knew that then.

23    Q.  Did you have an understanding at the time that this release

24    was signed that it wasn't merely Platinum Management giving you

25    a release, but the actual hedge fund, PPVA?

MC6Cpla5                         Huberfeld - Direct

1  A.  Same answer.  Do I know that now?  Did I understand that

2  then?

3  Q.  Then.

4  A.  I can't recall if I knew that then.

5  Q.  Why would you seek a release -- excuse me.  Why did you

6  want a release from Platinum Management or --

7  A.  Would you repeat the question.

8         THE COURT:  I'm going to ask you a different question

9  to try to move this along.

10         To your personal knowledge, how did this release come

11  about?  I don't want to hear about what you were told years

12  later by someone, but from your personal knowledge.

13         THE WITNESS:  So what I recall is that Mark Nordlicht

14  had communicated to myself -- again, I don't know if he

15  communicated to Mr. Bodner.  I was, at the time, not in the

16  office that often.  He communicated that he wanted to raise

17  additional funds for the fund.  And he asked if we would be

18  willing — or at least he asked me, I imagine it would be the

19  both of us — to give up our interests, he could use those

20  interests to raise additional funds for the fund.

21         THE COURT:  Your interest in --

22         THE WITNESS:  In the management company.

23         THE COURT:  In the management company.  Okay.

24         THE WITNESS:  So I believe that most of the

25  discussions happened with Mr. Bodner.  He was more in the

1    office at the time.  I may have had some input into it, I don't

2    recall that, but I was told you're going to agree to leaving

3    monies in the fund for a considerable amount of time

4    relinquishing some possible fees that will be possibly owed to

5    us and we would give up our interest in the fund.

6          I think the release came about as a general business

7    practice that when you finish something and you're giving

8    something up, you're having a release.  I don't know if the

9    release was the main subject.  And the release came about as

10   part of an agreement.

11         THE COURT:  Well, you were giving up something, namely

12   your interest in the management company; right?

13         THE WITNESS:  Yes.

14         THE COURT:  So what were you getting in return?

15         THE WITNESS:  For myself, my main motivation was that

16   Mark had expressed to me that by raising this money, the funds

17   would be healthy, and that was my personal main interest, that

18   the fund would be healthy.  The investors --

19         THE COURT:  So he would sell your interests to someone

20   else?

21         THE WITNESS:  I think it was more he was going to use

22   my interest as a bonus or -- that's what was explained to me,

23   some large investor to come into the fund.

24         THE COURT:  So he would be able to say to some other

25   investor, if you invest, it will get you a further benefit of

1    this interest in the management company?

2              THE WITNESS:  Correct.

3              THE COURT:  Whose idea, if you know, from your

4    personal knowledge, was the release?

5              THE WITNESS:  That was not my concentration issue at

6    the time.

7              THE COURT:  What you just described didn't have

8    anything to do with the release per se; right?

9              THE WITNESS:  I don't remember focusing on the release

10   at the time.  As I said before, my concern was the fund.  The

11   release came back as part of a document that I saw.

12             THE COURT:  Explain to me, though, again what you were

13   getting from giving up your interest in the management.

14             THE WITNESS:  I don't think that my general thought

15   was my own personal concern at the time, that was not my

16   thought.  My thought, as I said before, was my family, myself,

17   my friends had a large amount of money in the fund and my

18   concern was that the fund would be healthy and do well.

19             THE COURT:  So you thought this would help increase

20   the value of your remaining holdings in the fund?

21             THE WITNESS:  I thought so.

22             THE COURT:  Did you discuss the release with

23   Mr. Bodner?

24             THE WITNESS:  I don't recall.

25             THE COURT:  Did you discuss the release with anyone

1   other than a lawyer?

2              THE WITNESS:  I don't think so.

3              THE COURT:  Don't tell me what was said, but did you

4   discuss the release with a lawyer?

5              THE WITNESS:  It's eight years ago, seven, six years

6   ago --

7              THE COURT:  So you don't recall?

8              THE WITNESS:  Not right now.

9              THE COURT:  It's possible, but you're not sure?

10             THE WITNESS:  It's possible that when someone briefed

11  me on the case, they told me these are the points and mentioned

12  the release as part of it.

13             THE COURT:  What was your understanding, if you had

14  one, as to what you were being released from?

15             THE WITNESS:  Again, I'm not an attorney, but to me,

16  if I was told it was a release, then I can't be sued by anyone,

17  whether it's an investor, whether it's the fund, whether it's

18  tomorrow morning.  Mark Nordlicht decides that I got too good

19  of a deal.  It's over with, whatever that is.

20             THE COURT:  So as you understood it, you were being

21  released from any possibility that Platinum could sue you for

22  any claims they might have?

23             THE WITNESS:  Correct.

24             THE COURT:  All right.  Go ahead.

25  Q.  Did you receive any money at all for the relinquishment of

1    your Platinum interests?

2    A.  Directly or –– again, I want to be clear.

3    Q.  In this document, in this particular agreement.

4    A.  I don't recall.

5    Q.  If it's not in this agreement, did you receive any –– does

6    this agreement provide for payment of any money to you for

7    selling or relinquishing your Platinum Management interests?

8    A.  I don't think so.

9    Q.  Had you had any discussions with Mr. Nordlicht regarding

10   the value of your Platinum Management interests prior to giving

11   them up?

12   A.  I don't recall.

13   Q.  Judge Rakoff asked you a question about whether the

14   understanding you had was that your shares in the management

15   company could be an inducement to some large investor

16   investing.  Do you recall that?

17   A.  Yes.

18   Q.  Did you have any understanding at all as to whether

19   Mr. Nordlicht had represented to a potential investor that

20   these management shares were valuable?

21   A.  I mean, it's self-evident that they were valuable.  So they

22   could be used to ask someone to put in money to the fund.  So

23   of course they were valuable.  There's no question about that.

24   Q.  You suggested it's self-evident that your interests in

25   Platinum Management were valuable, and here's what I'll ask

MC6Cpla5                         Huberfeld - Direct

1    you.  Is it fair to say that you held your interests indirectly

2    through the Mark Nordlicht grantor trust and then through a

3    couple of vehicles owned by your family?

4    A.  I believe that I owned it through Manor Lane Management,

5    which was a beneficiary of the Mark Nordlicht trust.

6    Q.  Did you have an understanding of how the management company

7    would be paid either management fees, I'll say 2 percent, or

8    incentive fees, the 20 percent?

9    A.  Well, I ran the Centurion fund, so of course I understood

10   that.  I ran it myself from I believe 2005 to 2011.  So of

11   course I understood the percentage, the management fees, how

12   those things work.

13             THE COURT:  Just so the jury, because they may not

14   remember this, this was covered earlier, but what exactly was

15   the Centurion fund?

16             THE WITNESS:  So in October of 2005, we started a

17   second fund, which was --

18             THE COURT:  The first being Platinum?

19             THE WITNESS:  First being PPVA, Platinum.  The second

20   fund, I proposed that I was going to run it myself.  Myself and

21   David founded that fund, put in money into that fund, and he

22   was going to do, quote-unquote, different strategies than PPVA

23   was doing.  And we decided to go into that fund and basically

24   keep the -- other than a few percentages that were given to one

25   partner that was only a partner in that fund, the percentages

1    of the management -- I'm sorry.  The percentages of the

2    management company would be basically the same as in PPVA,

3    minus some small adjustments.

4            THE COURT:  So PPVA already was paying a management

5    fee to Platinum Management for its services, yes?

6            THE WITNESS:  I think so, yes.

7            THE COURT:  And what was your understanding of what

8    that fee was?

9            THE WITNESS:  I think that was 2 and 20.

10           THE COURT:  And 2 being?

11           THE WITNESS:  2 being an expense fee, a number based

12   upon the total assets of the fund.  Just make it easy, the fund

13   had $100 million, it would be $2 million that would be charged

14   that could be used for rents, expenses, whatever they would be.

15           THE COURT:  Even I can understand that.  And what

16   about 20?

17           THE WITNESS:  And the 20 percent was what's called, I

18   think, an allocation fee, which is that if the fund made or

19   invested, let's say made 10 percent, then 2 percent, 20 percent

20   would be taken off of that, so they would make effectively

21   8 percent and 2 would go to the manager for the same thing.

22           THE COURT:  Go ahead, counsel.

23   BY MR. GLUCK:

24   Q.  Now, my question is, you suggested that it would be

25   self-evident that your shares indirectly had value.  My

1    question is, did you personally have an understanding of what

2    the NAV, net asset value of PPVA was in March 2016 when you

3    signed this release?

4    A.   I believe that a general number, $800 million was something

5    that was bandied about.  It could be up or down something.

6    That was the number that was in my head if you would have asked

7    me.

8    Q.   Did you personally have an understanding of whether

9    Platinum Management would be entitled to any incentive fees on

10   a go-forward base, the 20 percent?

11   A.   Platinum Management would be entitled to fees under normal

12   circumstances.  I don't think that -- from what I understand, I

13   didn't think that changed.

14   Q.   Did you personally — and what I mean by that is the entity

15   structure which you held the Platinum Management interest —

16   actually get any of those management 2 percent fees or was that

17   used on operations?

18   A.   Again, I don't have the exact accounting.  In general, most

19   of the money, at least the experience that I had, most of the

20   money was used for expenses.  There may have been some conduit,

21   some residual money left over, but it was not a major profits.

22   The major profits center was the 20 percent.

23   Q.   Did there come a time when you learned that somebody named

24   Marcos Katz was interested in assuming your Platinum Management

25   shares?

1    A.   I believe I knew there was some discussions with Marcos

2    Katz.  I didn't know what percentage exactly was going to go to

3    him.  I knew there was some discussions with him about a

4    possible investment and a possible incentive.

5    Q.   Do you have any personal knowledge, not what you may have

6    heard later, but did you have any personal knowledge at the

7    time that the Katz family intended to invest in PPVA, the fund,

8    as opposed to merely acquiring shares of --

9    A.   Again, I know there were discussions, I wasn't part of

10   those discussions on a regular basis to tell you exactly who --

11   Q.   So you don't have personal knowledge?

12   A.   Not that I recall.

13   Q.   If Marcos Katz or his family was to pay money to Platinum

14   Management for your shares, how does that help the fund, PPVA?

15   A.   Are you asking me a hypothetical question?

16   Q.   No, in this case.

17   A.   I'm not sure what you're saying.

18   Q.   Upon relinquishing your shares, you said you wanted to help

19   the fund, right.  How would relinquishing a beneficial interest

20   in incentive fees and allowing someone else to get those fees

21   help the fund?

22   A.   Without investing more money, is that what you're saying?

23   Q.   Yeah, just --

24   A.   In an abstract, no, but maybe there were other

25   beneficiaries or other benefits that came along with that.  If

1    they got no other benefits, of course not, but maybe it was --

2    again, I don't want to speculate.  Maybe he was tying his money

3    along.  I don't know what the discussions were, but saying

4    giving him shares for no reason, of course not.

5    Q.  Here, this release was executed and there wasn't even an

6    agreement at the time for the Katz family to take shares of the

7    management, was there?

8           MR. HERTZBERG:  Counsel's testifying.

9           MR. GLUCK:  It's a leading question, but he's also a

10   defendant witness on the Platinum side.  So I would ask

11   permission to ask leading questions.

12          THE COURT:  You may ask the questions, but I think

13   your question was poorly phrased.

14          At the time -- well you signed the release, yes?

15          THE WITNESS:  I did.

16          THE COURT:  At the time you signed your release, did

17   you know what the status was of any of the proposed investment

18   by Mr. Katz?

19          THE WITNESS:  Mr. Katz specifically?

20          THE COURT:  Or his family.

21          THE WITNESS:  With Mr. Katz specifically, I don't

22   know.  I know there were discussions, I don't know where they

23   were at that time.

24          THE COURT:  Okay.  Go ahead.

25   Q.  Under these circumstances, why is it that you believed and,

1    in fact, testified that giving up your interests in Platinum
2    Management would help the fund PPVA?
3    A.  As I said, I believe that Mark told me that he was planning
4    or negotiating to raise money.  I don't know if it's just
5    limited to Mr. Katz for many different people to use these
6    shares to raise money.  You're limiting it to Mr. Katz, I
7    didn't testify to that.
8    Q.  No, I didn't say that.  I just asked you why would giving
9    up your shares, period, to anyone, help fund.
10   A.  As I think I said, my expectation was that Mark was going
11   to take those shares to help raise money for the fund.
12   Q.  And that expectation, you were asked some questions about
13   how did you have that expectation, had you talked to the Katz,
14   et cetera.
15        So can you explain why you had this expectation?
16   A.  That is what my conversation, I believe, with Mark
17   Nordlicht at the time.
18   Q.  During your conversations with Mark Nordlicht, did he relay
19   to you that it was his view that the shares of the management
20   company had no value?
21   A.  I don't recall that.
22   Q.  Do you recall having your counsel communicate with Platinum
23   Management as to whether the shares being relinquished for no
24   money would be considered a gift for tax purposes?
25   A.  I don't recall.

MC6Cpla5                        Huberfeld - Direct

1   Q.   In addition to relinquishing your interest in Platinum

2   Management, is it also true that you agreed to not take money

3   out of the fund for a period of time?

4   A.   Yes, I believe so.

5   Q.   You did not relinquish your LP interests with stock in the

6   fund itself by this agreement?

7   A.   Correct.

8   Q.   In March of 2016, was it already the case that partners of

9   Platinum Management were prohibited from taking money --

10  A.   What I recall was that there was a period of time in which

11  partners were not taking out any money.  I don't know --

12  remember exactly when that started.  I believe that during

13  2016, it was in effect, as well.

14  Q.   I may have questions about that later.

15       So in March of 2016, it was already the case that you

16  couldn't take money out of the fund, was it?

17  A.   I believe so.

18  Q.   Separately, in the course of your work in connection with

19  Platinum Management, did it come to your attention that there

20  was a backlog of redemption costs?

21  A.   I believe that I knew there were redemptions that had not

22  been paid, and that was a moving target over, you know, a

23  period of time.

24  Q.   The inability to pay redemptions was one of the problems

25  facing PPVA at this particular time; correct?

1    A.  I think so.

2               THE COURT:  Just again, so the jury is clear, because

3    they don't have the years of involvement that counsel does.

4    What is meant by redemption?

5               THE WITNESS:  A redemption is that an investor had the

6    right to take out their money under certain circumstances and

7    certain times.  There could have been a time where the investor

8    put in a redemption, which, for example, January 1st, and at

9    the time the fund didn't have any available funds, the fund

10   had, I believe, different remedies on what to do.  One of them

11   was paying time, one of them was to borrow money to pay those

12   things, one of them was going to delay.  Again, I wasn't

13   running the fund, but when I was -- had that experience when I

14   was running the fund, those different options were available as

15   the management.

16              THE COURT:  Okay.  Go ahead.

17   BY MR. GLUCK:

18   Q.  So in this agreement where you were agreeing to not

19   withdraw your money from the fund, isn't it true that it was

20   already the case that you couldn't withdraw your money from the

21   fund and that even if you wanted to, others had tried who were

22   not prohibited and also couldn't?

23   A.  Well, I think the thinking at the time, at least in my

24   mind, was it may not be the case at this moment, but if Mark

25   goes out and raises a significant amount of money, that exit

MC6Cpla5                          Huberfeld - Direct

vehicle would be available and we had agreed to not exit, I

think — I'm not reading it here, but just off the top of my

head — something like two years.  So that was something of

value I think that Mark felt that there's a significant amount

of money that would be, quote-unquote, locked up for a period

of time.

Q.  Did you have an understanding of the quantum, the amount of

redemptions that were outstanding around March of 2016?

A.  I don't know.  I'm not sure.

Q.  If I was to ask you to -- would more than a hundred million

sound right?

A.  I don't know if it's a hundred million.  It sounds like a

big number.  It's possible.

Q.  I'll ask you about a particular dinner in a moment, but is

it true that Mr. Bodner directed that no partners take money

out of the fund on a go-forward basis from late 2014 to early

2015?

A.  I don't recall.

Q.  I'm sorry.  Could you speak up.

A.  I don't recall that.

Q.  You don't recall that?

A.  No.

Q.  I asked you earlier whether it was already the case that

partners could not take money out of the fund.  Do you remember

that?

1    A.  I do.

2    Q.  If you don't recall that, how is it that partners could not

3    take money out of the fund?

4    A.  My recollection is that I was told -- again, I don't recall

5    by whom, that I think Naftali Manela — who was, I believe, the

6    CFO or some other position — felt and communicated that -- I

7    think maybe Mark told this to me, that when there was any

8    pending redemption from an investor that could not be paid on

9    time, that no one from the, quote-unquote, from the family,

10   including myself, Mr. Bodner, Mr. Nordlicht would be able to

11   withdraw any money.

12   Q.  To your knowledge, was that directive ever rescinded?

13   A.  Again, I don't know if it was directed.  This was a

14   conversation that I had with, I think, Mr. Nordlicht at the

15   time, and it was communicated to me and I never -- I didn't

16   follow up on that to see if it was rescinded or not.

17   Q.  So in connection with this agreement, you gave up your

18   interests in Platinum Management and you agreed not to make

19   redemptions for a period of time; is that fair?

20   A.  Yes, I believe.  Again, I didn't read this over carefully

21   today.  I believe there may have been also some waiving of some

22   crude management fees, as well.

23   Q.  By March 30, 2016, had any facts been drawn to your

24   attention that the NAV of PPVA was inaccurate?

25   A.  I'm going to try to answer accurately.  I don't know.

1    Q.  By that same date, had you become aware of any claims,

2    litigation, regulatory, criminal, that were being investigated

3    or asserted against PPVA, Platinum Management, or the family of

4    the partners?

5    A.  I think the only thing in this timeframe that we were aware

6    of, that there was an investigation to COBA's investment into

7    Platinum.

8    Q.  Would you please describe for the jury the broad

9    circumstances of that investigation.

10   A.  So I believe that the fund received a subpoena sometime in

11   mid 2015 requesting information having to do with COBA's

12   investment and our relationship with Jonah Rechnitz, and I

13   believe that continued for a period of time.

14   Q.  Was that investigation particularly targeted at any members

15   of Platinum Management?

16   A.  I'm not sure of how I can answer that.

17   Q.  What was the outcome of that investigation?

18   A.  The outcome of the investigation was that I was arrested on

19   June 8th, 2016, and charged with -- I don't know the exact

20   charges, but having to do with Jonah Rechnitz and COBA.

21   Q.  Would it refresh your recollection if you saw the SDNY

22   statement regarding your conviction?

23   A.  Yes.  I know that I was convicted and served a sentence in

24   prison and am currently on probation for another few months.

25   Q.  Was anyone else charged in the same investigation?

1    A.  I think Jonah Rechnitz and Norman Seabrook.

2    Q.  Do you know what Jonah Rechnitz was charged with?

3    A.  The exact charge, I don't know.

4    Q.  Do you know what Mr. Seabrook was charged with?

5    A.  What his exact charge was, I don't know.

6           THE COURT:  The conviction and what the defendant was

7    convicted of is a matter of public record.  So if you have the

8    judgment of conviction, you can state that on the record.

9           MR. GLUCK:  We can do that.  If you can please pull up

10   the justice.gov exhibit.

11   Q.  As he's doing that, my query is, were you specifically

12   aware of the COBA investigation --

13          MR. HERTZBERG:  The Court invited counsel to put up

14   the judgment of conviction.  It's not what we have on the

15   screen and I see the witness is looking at his screen.  So I

16   don't want there being any confusion.

17          THE COURT:  I agree.  It's not.

18          MR. GLUCK:  What's on the screen --

19          THE COURT:  No, don't describe what's on the screen.

20   If you don't have the judgment of conviction --

21          MR. GLUCK:  We'll bring it up, the correct document.

22          THE COURT:  Okay.

23          MR. GLUCK:  I'm sure that was a mistake.

24   Q.  At the time you signed this release, were you aware that

25   the COBA investigation was going on?

1    A.  Yes.

2    Q.  COBA, is that the Corrections Officers Benevolent

3    Association Pension Fund or something to that effect?

4    A.  Yes.

5    Q.  Is this the judgment in the criminal case that we were

6    referring to, Plaintiffs' Exhibit 899?

7    A.  Yes.

8            THE COURT:  So the jury can take notice, and

9    Mr. Huberfeld pled guilty to conspiracy to commit wire fraud,

10   meaning he agreed with at least one other person to make

11   fraudulent representations and that the interstate wire

12   communication was used in the course of a conspiracy.

13           When you pled guilty, who did you plead guilty was

14   your coconspirator?

15           THE WITNESS:  He did not plead guilty.  Mr. Seabrook

16   did not plead guilty, he went to trial.

17           THE COURT:  Excuse me.  That's not my question.

18           When you pled guilty, were you asked who was your

19   coconspirator?

20           THE WITNESS:  I don't think so.

21           THE COURT:  Okay.  And what was it that you pled

22   guilty to in your own words?

23           THE WITNESS:  I pled guilty to presenting a $60,000

24   false invoice to my own management company.

25           THE COURT:  And that was a bribe?

1              THE WITNESS:  No.

2              THE COURT:  What was it?

3              THE WITNESS:  It was a false invoice that I presented

4     to my management company.

5              THE COURT:  And you knew it was false?

6              THE WITNESS:  I knew that they -- that the invoice was

7     not for Nick tickets.

8              THE COURT:  Why did you do that?

9              THE WITNESS:  I did that because I was asked by

10    Mr. Rechnitz to pay him $60,000 and I came up with how to pay

11    him $60,000.

12             THE COURT:  So this was a bribe to him or -- my

13    apologies.  Withdraw the word "bribe."

14             This was a payment to him that he was demanding from

15    you?

16             THE WITNESS:  Correct.

17             THE COURT:  And you made the payment, but then it was

18    covered up through this false invoice, is that --

19             THE WITNESS:  Correct.

20             THE COURT:  Go ahead, counsel.

21    BY MR. GLUCK:

22    Q.  What is the relationship between the false invoice that you

23    submitted for the payment to Jonah Rechnitz and the Corrections

24    Officer Benevolent Association Pension?

25    A.  The payment was to reimburse Jonah Rechnitz for Norman

MC6Cpla5                        Huberfeld - Direct

1   Seabrook's efforts to steer money into Platinum fund.

2   Q.  Did that pension, the union pension fund, make an

3   investment in PPVA?

4   A.  Yes.

5           MR. GLUCK:  Mr. Parson, will you please call up

6   CTRL6159792, which we'll mark as Plaintiffs' Exhibit, next in

7   order, which Ms. Shen will provide.

8           MS. SHEN:  PX 934.

9           MR. GLUCK:  We seek to admit this as PX 934.

10          MR. HERTZBERG:  Objection, your Honor.  401.  I think

11  we've gone as far as we need to go on this issue as pertaining

12  to this case.

13          THE COURT:  No, I think it's -- well, I'd agree with

14  you that there will come a point where it will be not a 401

15  problem, but possibly a 403 problem.  I don't think we're there

16  yet.  So this exhibit is received.

17          (Plaintiff's Exhibit 934 received in evidence)

18  BY MR. GLUCK:

19  Q.  How much money did COBA invest into PPVA?

20  A.  I believe $20 million.

21  Q.  In approximately 2014?

22  A.  I think during that time period, in that year.

23  Q.  I asked you earlier whether you typically shared

24  information concerning your -- the businesses that fell within

25  the scope of your unincorporated partnership with Mr. Bodner.

1    Did you share the fact that COBA had invested in PPVA with

2    Mr. Bodner?

3    A.  I don't recall.

4    Q.  Did you share the circumstances by which COBA was induced

5    to invest in PPVA with Mr. Bodner?

6    A.  I can't answer that question.  The way you're asking, I

7    can't answer it.

8    Q.  Do you not understand the question?

9    A.  I understand the question, I just can't answer it the way

10   you're asking me.

11           THE COURT:  Well, did you have any discussions with

12   Mr. Bodner relating to any aspect of what has just been

13   described?

14           THE WITNESS:  I need a timeline to be able to answer

15   that.

16           THE COURT:  When was the money paid?

17           THE WITNESS:  They invested in 2014.

18           THE COURT:  Okay.  At any time in 2014 or '15.

19           THE WITNESS:  Is it possible that I said to Mr. Bodner

20   COBA invested, it's possible, I just don't recall that.  You're

21   asking me -- I don't want to say things I wasn't asked to.

22           THE COURT:  You made this payment with the

23   understanding that it would lead the person who was arranging

24   for the investments of this pension fund to invest in Platinum,

25   yes?

1    THE WITNESS:  Those payments were made well after they

2    invested.  It was not before --

3           THE COURT:  But it was still in your mind, a payment

4    for improper services rendered, yes?

5           THE WITNESS:  At the time, no.  Subsequently, I found

6    that out later.

7           THE COURT:  What did you think you were paying for?

8           THE WITNESS:  If you take out my allocution, it was

9    not -- we had this -- I believe I was put in a situation where

10   this was a criminal story and I was represented by counsel, but

11   I was trying to be very accurate.  And yes, when I allocuted to

12   the fact that I gave or arranged to get the $60,000, it was not

13   for Nick tickets.  What the ultimate -- what it was for, I was

14   found out later on.

15          THE COURT:  And what you found out was that it was for

16   investing in Platinum?

17          THE WITNESS:  No, it was found out that it was used to

18   reimburse Norman Seabrook -- or Rechnitz, the money he laid out

19   to Seabrook.

20          THE COURT:  And what was your understanding of why he

21   laid it out to Mr. Seabrook?

22          THE WITNESS:  Because he invested in the fund.

23          THE COURT:  Because Mr. Seabrook had the power to

24   invest the monies in Platinum?

25          THE WITNESS:  Yes, we found that out at some point.

MC6Cpla5                          Huberfeld – Direct

1           THE COURT:  Very good.  So the question then is, this

2   is what I think counsel is trying to ask, I'll take the liberty

3   of asking it because we're going to end for the day in about

4   three minutes, did you discuss any of what you've just

5   described to me with Mr. Bodner at any time prior 2016?

6           THE WITNESS:  I don't believe so, other than the fact

7   that COBA may have invested.

8           THE COURT:  You mentioned that before.

9           I think, ladies and gentlemen, we need to stop for the

10  day because I have another matter.

11          Tomorrow, we will start promptly at 9:30 and we'll

12  probably go straight to 4:30 tomorrow, so you have a full day

13  tomorrow.  And have a very good evening.  We'll see you in the

14  morning.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (Jury not present)

 2              THE COURT:  So how much longer does plaintiffs'

 3     counsel anticipate his examination of this witness?

 4              MR. GLUCK:  Let me just check my outline.

 5              THE COURT:  Take your time.  Take your time within the

 6     next minute.

 7              MR. SEIDEL:  Take your time, you have 30 seconds.

 8              MR. GLUCK:  If we continue at this rate, I would

 9     estimate no more than maybe an hour and 10 minutes.

10              THE COURT:  And how long on cross?  This is not

11     absolutely binding because you haven't heard the direct yet,

12     but given Mr. Huberfeld just asked me how long he was going to

13     be on the stand, I feel we should give him at least an idea.

14              MR. HERTZBERG:  An hour to 90 minutes, not more than

15     that.

16              THE COURT:  It sounds to me you have a full morning.

17     We're going to be 9:30 to 1:00, maybe less than that.

18              You're excused.

19              Now, there were some things that counsel was going to

20     get to my law clerk, so we'll take a five-minute break, but

21     after that, you'll promptly leave the courtroom because we have

22     some distinguished lawyers ready to present argument in another

23     matter.  We'll see you in five minutes.  We will be starting at

24     9 o'clock tomorrow.

25              (Adjourned to December 7, 2022 at 9:00 a.m.)

```
                       INDEX OF EXAMINATION

Examination of:                                Page

 SETH GERSZBERG

Direct By Mr. Gluck . . . . . . . . . . . . . 644

Cross By Mr. Lauer . . . . . . . . . . . . . 684

Redirect Q. . . . . . . . . . . . . . . . . 708

 MURRAY HUBERFELD

Direct By Mr. Gluck . . . . . . . . . . . . 745

                       PLAINTIFF EXHIBITS

Exhibit No.                                  Received

 927    . . . . . . . . . . . . . . . . . . 611

 907    . . . . . . . . . . . . . . . . . . 651

 908    . . . . . . . . . . . . . . . . . . 658

 909    . . . . . . . . . . . . . . . . . . 658

 393    . . . . . . . . . . . . . . . . . . 702

 934    . . . . . . . . . . . . . . . . . . 772

                       DEFENDANT EXHIBITS

Exhibit No.                                  Received

 144    . . . . . . . . . . . . . . . . . . 654

 506    . . . . . . . . . . . . . . . . . . 704

 747    . . . . . . . . . . . . . . . . . . 706
```