```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  In re:

 4  PLATINUM-BEECHWOOD LITIGATION           18 Civ. 06658 (JSR)

 5  ------------------------------x

 6  MARTIN TROTT and CHRISTOPHER            18 Civ. 10936 (JSR)
    SMITH, as Joint Official
 7  Liquidators and Foreign
    Representatives of PLATINUM
 8  PARTNERS VALUE ARBITRAGE FUND LP
    (in Official Liquidation) and
 9  PLATINUM PARTNERS VALUE ARBITRAGE
    FUND LP (in Official Liquidation)
10
                Plaintiffs,
11
             v.
12
    PLATINUM MANAGEMENT (NY) LLC,
13  et al.,

14                Defendants.

15  ------------------------------x        Trial

16

17                                         New York, N.Y.

18                                         December 7, 2022
                                           9:00 a.m.
19

20  Before:

21                  HON. JED S. RAKOFF,

22                                         District Judge
                                                 and a Jury
23

24

25
```

                              APPEARANCES

HOLLAND & KNIGHT, LLP
        Attorneys for Plaintiffs
BY:  WARREN E. GLUCK
        MARTIN L. SEIDEL
        RICHARD A. BIXTER JR.
        QIAN (SHEILA) SHEN
        NOAH W.S. PARSON
        ELLIOT A. MAGRUDER


KATTEN MUCHIN ROSENMAN, LLP
        Attorneys for Defendant Bodner
BY:  ELIOT LAUER
        GABRIEL HERTZBERG
        JULIA B. MOSSE


CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
        Attorneys for Defendant Bodner
BY:  NATHANIEL C. AMENT-STONE
        ALLESANDRA TYLER




Also Present:

Michael Robson, Paradocs Motion Support

Esterah Brown, Paralegal, Curtis Mallet

1              (In open court; jury not present)

2              THE COURT:  So, I've had a chance now to review the

3    various submissions on the Nordlicht testimony and the release

4    and also on the request to call Mr. Lauer.  So this much seems

5    to be, subject to hearing from counsel, reasonably clear.

6              First, I see no basis for calling Mr. Lauer.

7              Second, I think New York law is clear that you don't

8    have to have consideration for the release.  I think the law is

9    also reasonably clear and, in any event, I'm inclined to adopt

10   the proposition that joint tort feasors cannot release one

11   another from the legal liabilities for the tort.  Therefore, if

12   the relevant parties are all joint tort feasors, which I think

13   is a jury issue, then, as a matter of law, the release is

14   invalid.  So the jury would have to be instructed that if they

15   find that there's tort fees involved and what the release

16   purports to be applied to here, that the release is of no

17   moment and that would be, therefore, a mixed question of law of

18   fact and law for a properly instructed jury.

19             So that leaves only the questions, as far as I'm

20   concerned, because I don't think there's any real issue as to

21   the authenticity of the release of whether there's anything

22   left that Mr. Nordlicht's testimony could be relevant to and

23   the subsidiary question of whether he has the right to take the

24   Fifth on any such issue.

25             So that's what I'd like to hear oral argument on as

1     well as any disagreement with anything I've just said.  So let

2     me hear first from plaintiffs.

3          MR. GLUCK:  Taking the courts premises, the core

4     question here is whether, assuming Platinum Management had the

5     ability to bind PPVA to this release, whether either Platinum

6     Management or signatory Mark Nordlicht was a joint tort feasor

7     with David Bodner.

8          What we intend to show through evidence is that the

9     answer is yes for the following reasons.  Firstly,

10    Mr. Nordlicht was aware of the specific liabilities being

11    released, and that is a quote from a particular piece of

12    document, specific liabilities that were, in turn, discussed

13    with Mr. Katz and his counsel, but we don't know what was said.

14    The word specific liability, we need to ask Mr. Nordlicht.

15         THE COURT:  Why would you have to reach any of that if

16    the jury is instructed that they need to consider whether

17    Nordlicht, Bodner, PPVA and whomever were coconspirators or, in

18    this case, joint tort feasors with respect to the inflation of

19    the representations made to investors?  If, in fact, they are

20    joint tort feasors, then they cannot release for anyone,

21    Mr. Bodner or anyone else, their liability for fact or anything

22    related to that.  So we don't have to get into whether they

23    discussed it or not.

24         MR. GLUCK:  Fair point.  That was actually my point,

25    too, but let me begin there, then.

1          In fact, this was the argument -- perhaps I made it

2     badly.  This was the argument we attempted to make in one of

3     our motions *in limine*.  Premise A, Platinum Management was a

4     tort feasor in relation to the overvaluation.  We sued Platinum

5     Management in this case on that very basis.  They appeared and

6     they participated in the case class motions to dismiss, and

7     through their 30(b)(6) witness deposition, they declined to

8     file summary judgment oppositions and, at a certain point, they

9     stopped responding and we moved for default, which has been

10    entered.  So they will liable for the overvaluation.  A

11    judgment needs to be entered, but that's besides the point.

12          Secondly, signatory, Mr. Mark Nordlicht, he was sued

13    in this case, as well.

14          THE COURT:  Remind me, and I really should have

15    doublechecked this before this morning.  So was he indicted?

16          MR. GLUCK:  He was indicted on multiple grounds,

17    convicted on one set of grounds related to the Black Elk

18    subordination.  If I get that wrong, it's just not part of my

19    particular scope, but convicted on one set of charges related

20    to the Black Elk subordination.

21          THE COURT:  And what was his sentence?

22          MR. GLUCK:  The sentence is to be occurred.  He was

23    convicted by a jury.  The court actually undid the conviction,

24    it went up to the Second Circuit, they reinstated it, and now

25    sentence is pending having various motions in between being

1   denied.  That's actually the jeopardy in question, is he's

2   going to be sentenced, he hasn't been sentenced yet.

3          But here's the thing, there's one portion of the

4   criminal action, and then I'm going to get to his bankruptcy,

5   which is also relevant because the bankruptcy took him out of

6   this particular case by definition.  In the criminal

7   conviction, the Second Circuit issued a very long opinion,

8   80-odd pages on the bases for the conviction.

9          THE COURT:  And I guess I have to go and read it now.

10          MR. GLUCK:  It's a book.  But there's a really

11   important one, and we summarized it in one of our motions *in*

12   *limine*, it's not a matter of law, it's a matter of fact, but

13   it's irrelevant, right.  One of those passages from the Second

14   Circuit was an express and explicit finding that the

15   bondholders of Black Elk had been harmed by these acts, by the

16   subordination, there wasn't enough money to pay off the

17   bondholders.

18          What does that mean for us?  It is a necessary and

19   unavoidable conclusion that if the bondholders were harmed,

20   that three layers down below the unsecured creditors, the

21   preferred equity, and now what we're now talking about is the

22   PPVA common equity, it's a zero.  It is a zero.  For that

23   reason, the criminal conviction does go to overvaluation and is

24   almost -- it is impossible that either Nordlicht or Platinum

25   Management was not a joint tort feasor.

1           THE COURT:  So if, assuming the correctness of that

2    analysis for the moment, we'll hear, of course, from defense

3    counsel in a minute, you don't need to call Nordlicht because,

4    under your analysis, I should be instructing the jury that he

5    has already been determined to be a joint tort feasor.

6           MR. GLUCK:  Yes.  This is what we were saying, is

7    there has been a logical solution to this problem and it was

8    denied, so now it came back to the -- now let me explain the

9    bankruptcy part, because that's directly relevant.

10          THE COURT:  By the way, the fact of whatever I held in

11   a motion *in limine* doesn't ultimately control any of this

12   because, as I indicated at the time, those were preliminary

13   determinations made for the convenience of the court in

14   conducting the trial.

15          MR. GLUCK:  Okay.  So now the bankruptcy issue, and if

16   I get anything wrong, I'll ask Mr. Bixter, who is our

17   bankruptcy counsel, to help me.

18          While this case was stayed as to Mr. Nordlicht, in the

19   intervening period, other cases were not stayed, and for a

20   variety of reasons, who cares why, Mr. Nordlicht filed for

21   personal bankruptcy.  PPVA has participated in that bankruptcy

22   in all respects as the largest creditor or certainly one of

23   them.  In that bankruptcy, PPVA's allegations, particularly

24   including overvaluation, have been accepted, adjudicated, and

25   PPVA's now simply waiting on its distribution, in the next two

1    years, I hope.  There's some sort of appeal, but it has nothing

2    to do with it this, it has to do with another creditor and his

3    standing, but you can't get a distribution without knowing who

4    your distributor -- So on that basis, setting aside the logical

5    inference arising from the Second Circuit opinion,

6    Mr. Nordlicht has admitted to being a joint tort feasor on

7    overevaluation as well as other things.

8            And by the way --

9            THE COURT:  Again, if I accept that, then, again,

10   there's no need to call him.

11           MR. GLUCK:  If we accept both of those premises, then

12   the sole question that remains is whether Mr. Bodner, the

13   relessee is a joint tort feasor.

14           THE COURT:  That, of course, is a central issue.

15           MR. GLUCK:  Now, if he is, the release is invalid

16   automatically by virtue of this logical operation.  If he's

17   not, he's not liable and the release is irrelevant.

18           THE COURT:  I think the release may be more than

19   relevant, it may be definitive.

20           MR. GLUCK:  Precisely.

21           THE COURT:  So I want to hear, of course, from defense

22   counsel.  So far, I basically agree with your analysis, but it

23   seems to me to follow from that that, on the one hand, I have

24   to instruct the jury that Nordlicht has been determined to be a

25   tort feasor with respect to the overvaluation, and that on the

1    other hand, as to you, there's no need to call Mr. Nordlicht.

2         MR. GLUCK:  I would love that outcome.  That's the

3    outcome --

4         THE COURT:  Assuming that analysis is wrong, for sake

5    of argument, I want to hear from defense counsel, then I think

6    you would have a right to call Mr. Nordlicht even if he took

7    the Fifth on everything because there, the inference that the

8    jury could draw, which they can do in a civil case from the

9    invocation of the Fifth, would be clear-cut.  Mr. Nordlicht,

10   isn't it true you overvalued the assets of PPVA, yes.  Excuse

11   me, I take that back, et cetera, et cetera, et cetera.

12        MR. GLUCK:  Same question --

13        THE COURT:  Very much unlike the situation we

14   discussed with respect to the signature.

15        MR. GLUCK:  Very well, yes.

16        THE COURT:  And so I think that is the alternative if

17   the first analysis is for any reason not correct.

18        So let me hear now from defense.

19        MR. GLUCK:  I just got a very -- a note from the

20   brains of the operation.  A, it's just the Court made a ruling

21   about joint tort feasors.  Does the Court's view extend like

22   with the coconspirator exception?  Our understanding, looking

23   at the case law, it's joint tort feasors, period.  So this --

24        THE COURT:  Well, joint tort feasors is the civil

25   variation of coconspirators.

1          MR. GLUCK:  That's what we think, too.

2          THE COURT:  I think that's clear, that a conspiracy to

3    commit a tort also makes you liable for the tort.

4          MR. GLUCK:  Right.  On that basis, there is a

5    relevancy to all of these emails talking about a specific

6    liability and COBA because, also, Platinum Management engaged

7    Huberfeld.

8          And this is the other one.  There is a sub-issue,

9    which the Court can evaluate this prejudice versus prejudice

10   person analysis.  There are a number of circumstances where the

11   only person who has knowledge of Mr. Bodner's role at Platinum

12   or what Nordlicht told him is Mr. Bodner, and that becomes

13   particularly acute, and I will have a whole thing on memory

14   with Mr. Huberfeld, but it becomes particularly acute if

15   Mr. Huberfeld is not able to recall certain joint meetings or

16   conversations.  And on that issue, we got the one guy in the

17   whole world who knows what he told Mr. Bodner, and I think

18   Huberfeld was sort of in and out of that dinner, but there were

19   also a lot of other meetings we can show the Court, we have a

20   chart.  He's the only guy in the world.  And so that's --

21         THE COURT:  You're talking about Mr. Nordlicht?

22         MR. GLUCK:  Talking about Mr. Nordlicht.

23   Mr. Nordlicht is the only guy in the world for certain issues

24   who knows what he told Mr. Bodner.

25         THE COURT:  I think this is more of an issue, but I'm

1    not so clear that taking the Fifth with respect to a particular

2    conversation is a basis on which the jury could reasonably

3    infer that the conversation took place in the form put to the

4    witness by the questioner if the person asserting the Fifth is

5    taking the Fifth as to everything.

6            Now, there is another question, which we're going to

7    get to eventually I suppose, if we have to go down this road,

8    of whether he has the right to take the Fifth on any of this,

9    given that the criminal proceedings have been resolved.  I

10   think the answer to that is he can because, that's why I asked

11   the question, he can take the Fifth up to through sentencing.

12           MR. GLUCK:  I have two answers there.  The comment

13   about testimony is distinct from the comment about documents.

14   So we have real documents showing certain Nordlicht intent lack

15   thereof, fraudulent intent with regard to this release.  How do

16   I deal with that?  Separately, the answer to -- it's like a

17   foundation issue.

18           Separately, the answer to the Court's question is

19   there is a wrinkle.  While Mr. Nordlicht took the Fifth

20   Amendment in the criminal proceedings through the present, as

21   far as I know, something happened in this proceeding.  In this

22   proceeding, PPVA, the JOLs at the time on a really good-faith

23   basis believed that one family member, Mr. Ezra Beren was the

24   mirror image of somebody else named David Levy.  He was a

25   family member, extremely senior title, seemed to be sending

1   these important emails, et cetera.  We later determined that we

2   were wrong.  He was not that sort of person.  It's fine.  I'll

3   admit it.

4           Here's the issue, though.  As part of convincing us,

5   and I think this was actually a good-faith thing, as part of

6   convincing us what Mr. Beren's actual role was, Mr. Nordlicht

7   voluntarily and without any compulsion filed an affirmation

8   declaration with this court and certainly waived his Fifth as

9   to every word of that declaration.  Then he was deposed on the

10  same matters, including, by the way, the release, and he

11  answered some questions and not others.  In particular, though,

12  and the Court, I believe, should have a copy of his deposition

13  transcript as well as the affirmation.  In particular, both the

14  affirmation and the deposition transcript deal --

15          THE COURT:  I'm sorry.  The witness just came in.

16          You need to stay in the witness room just right

17  outside.  Thank you.  We'll get to you very shortly.

18          MR. GLUCK:  The declaration and the deposition

19  transcript specifically center on the nature of the roles at

20  Platinum and that Ezra Beren was not a top dog, to put it

21  simply.  So you read that New York State Bar Association

22  official report, and you don't have to get to the outer bound

23  of subject matter waiver to simply ask the converse question:

24  All right, if Mr. Ezra Beren wasn't in charge, who was.  And on

25  that point, we believe that there is at least an argument as to

```
 1    whether Mr. Nordlicht may invoke the Fifth, this Court can

 2    determine --

 3         THE COURT:  I want to put you on hold because I think

 4    we need to hear from defense counsel, who must be very relieved

 5    that he doesn't have to testify.

 6         MR. LAUER:  Your Honor, I need to define the issue

 7    because I don't represent Mr. Nordlicht, and as much as we feel

 8    that creating a mechanism for him taking the Fifth Amendment is

 9    highly prejudicial and should be avoided.  And I appreciate the

10    incredible amount of effort and scholarship that has gone into

11    this issue, both counsel and the Court.  I submit that in the

12    whirlwind of trying to read through the complexity of the

13    waiver issue and the relevance of the potential Nordlicht

14    testimony versus the prejudice, the Court has made some rulings

15    today that I need to not only take exception to, but

16    respectfully ask the Court to reconsider --

17         THE COURT:  I haven't made any rulings.  I suggested

18    this was my approach.  The only ruling I made was that you

19    didn't have to take the stand.  I take it you're not contesting

20    that?

21         MR. LAUER:  I very much on both a personal and

22    professional level, I very much appreciate that.  So I don't

23    want to spend a lot of time.  I just want to address a few

24    issues.

25              The Court denied the motion *in limine* to prevent us
```

1   from offering the release on the joint tort feasor ground, and

2   on that we think the Court was correct.  On that basis, we

3   opened, we tried our case on that basis.

4           THE COURT:  I don't think I ever said anything that,

5   with respect to, you couch, usually in shorthand, as void as a

6   matter of public policy.  And you'll have to show me if you

7   think I said something otherwise, but many of my rulings on the

8   motions *in limine* were I want to hear more about what the

9   evidence is rather than any final ruling.  In any event, it's a

10  question, in my view, of law.  If I said something, which I

11  doubt very much, that made you think otherwise, your case

12  hasn't even begun.  All we've heard from you so far is opening

13  statement, which is not evidence.

14          MR. LAUER:  I understand that, your Honor.

15          THE COURT:  My recollection is you mentioned the

16  release.

17          MR. LAUER:  We opened on the release.

18          THE COURT:  Yes.  Maybe I'm misunderstanding what

19  you're saying.  Is it your contention that whether or not a

20  release by joint tort feasors as to the subject matter of the

21  tort are encompassing the subject matter, the tort, whether the

22  question of that's its validity or invalidity on that ground is

23  a question of fact or a question of law?

24          MR. LAUER:  If it is a question of law, if, if there

25  is such a legal proposition that joint tort feasors cannot

1   under any circumstances, regardless of consideration, enter a

2   release, if that's what the Court intended, then I think the

3   Court is wrong.  If the Court --

4           THE COURT:  So you're right, that's what I intended.

5   So what is your authority that says I'm wrong?

6           MR. LAUER:  My authority is the only case that would

7   support an overriding rule, regardless of consideration -- in

8   other words, the Court's statement, which adopts what the

9   plaintiff had said, makes an absolute rule.  You could have a

10  tort, so to speak, that's worth $10,000, and you can have a

11  release that has consideration of $1 million.  And then, read

12  literally, even if there's no question about the disparity and

13  the proof, the Court's ruling is it doesn't matter how valid

14  your consideration is or how genuine or arm's length the rule

15  was.  Your Honor may recall --

16          THE COURT:  Okay.  So I understand your argument.  Now

17  my question is what's your authority?

18          MR. GLUCK:  My authority is there is no authority to

19  the contrary.  When Mr. Huberfeld's counsel at summary judgment

20  cited a case to the Court, essentially saying here's an example

21  of tort feasors being released and accepted, the Court's

22  footnote pointed out that in that case, there was no third

23  party involved.  If you look at this release and you look at

24  all the evidence, the third party was Mr. Katz and his counsel.

25  Katz was a third party beneficiary, he had the right to enforce

1   the release, Mr. Huberfeld will explain, Ms. Horowitz will

2   explain that Katz represented the PPVA interests because Katz

3   was putting money into the fund and that's what this was all

4   about.  That met exactly the Court's response to Mr. Huberfeld

5   on that case because what you have here is a highly negotiated

6   transaction involving counsel.  So the case I'm referring to is

7   New York Court of Appeals of case central.

8           But the point is, your Honor, this case has always

9   been following the Court's ruling on summary judgment is, A,

10  show me that the principal, if you will, PPVA, had someone

11  looking out for it, that it's arm's length.  Show me that there

12  was a genuine business purpose to the transaction.

13          If you will, your Honor, let's assume plaintiff is

14  entirely right that this PPVA fund has a $30 million claim for

15  incentive fees, I don't think they do, but let's assume that.

16  Let's assume at the same time there's overwhelming evidence

17  that by creating this transaction, Nordlicht is able to save

18  the fund and save hundreds of millions of dollars of locked up

19  value, because you've heard all this testimony.  Whether or not

20  there was overstatement on the valuations, they all believe

21  that they could turn this around.  Now to rule --

22          THE COURT:  A lot of that testimony about locked up

23  value came yesterday from the interesting witness who, of

24  course, had no biases whatsoever as is evident from his

25  responses.  But anyway, that's off the --

 1          MR. LAUER:  I'm not arguing the facts to the Court,

 2   I'm explaining that the absolute rule that would render the

 3   release --

 4          THE COURT:  My understanding of what you're saying is

 5   if two tort feasors get together and the tort they've committed

 6   is defrauding investors, and one guy says, you know, if you pay

 7   me $1 million, I'll have the company write you a release that

 8   says that you can never be sued for this, and you're saying

 9   that's perfectly fine.

10          MR. LAUER:  No, I'm not saying that.  What I'm saying

11   is if two years earlier, starting in the middle of 2014 they

12   stopped taking incentive fees, so if there was a problem with

13   valuations, there was no harm to PPVA and the management fees

14   were going into the business to try to make value for PPVA.  So

15   there was no harm for two years to PPVA, and that's accepting

16   their view of the case.  And they sit down and they say, look,

17   we don't -- and I'm making this up, right, I'm trying to make a

18   legal argument with the worst possible facts.  They say, look,

19   this thing is a little bit of a mess, the only way we're going

20   to straighten this out is if you guys leave and I can bring in

21   a couple of hundred million dollars, and that's going to

22   benefit the fund, it's not putting any money in my pocket, Mark

23   Nordlicht is not benefiting from this, he's doing this for the

24   benefit of PPVA.  If you use Marcos Katz and Isaac Neuberger as

25   the example, they're looking out for this because -- I'll give

1   you another example.

2          THE COURT:  Well, the --

3          MR. LAUER:  Can I say one thing, your Honor, because

4   you never heard this.  If you look at this release, you're

5   going to see there are two separate paragraphs, there is an

6   indemnity paragraph and there is a release paragraph.  The

7   negotiations over this release, we said we wanted indemnity

8   that includes the funds and, Neuberger specifically said -- and

9   this is all back and forth in emails.  Neuberger said that's

10  too much.  And when you look at the indemnity, you will see

11  indemnity to Huberfeld and Bodner for claims from PPVA or the

12  other funds only -- the indemnity is only from the old

13  partners, it does not cover Katz.

14         THE COURT:  Forgive me for interrupting.  Assuming you

15  are right on the law, then are you opposing their calling

16  Mr. Nordlicht to establish their view of the facts regarding

17  the release or for any other purpose?

18         MR. LAUER:  I think, your Honor, since I'm

19  representing Mr. Bodner and I believe so much taint has already

20  come in, and I may get overruled by my colleagues, but if the

21  question that the Court is asking is do you want a ruling that

22  says the release is irrelevant or do you want a ruling that

23  says it's fair game for them to use whatever means available to

24  them to show that the release was corrupt, but if you can

25  convince either the Court or the jury, and I think it's still a

1    matter of law as a matter of fact that there's nothing corrupt

2    here, then obviously I have to go with the release and not

3    Mr. Nordlicht.  This happens in the context of complicated

4    issues, that the tail ended up wagging the dog.  In the

5    interest of trying to preserve a criminal defendant's

6    constitutional rights, we've basically moved too quickly with

7    respect to a relatively, if you will, mundane commercial

8    lawsuit.  But this is real money to Mr. Bodner.  And if that's

9    the decision that the Court is saying in order to make an

10   equitable ruling, I have to go with the release and take what

11   the Court feels is necessary to afford them the opportunity.

12   I'm not afraid of, A, Mr. Nordlicht's testimony, I'm not afraid

13   of any argument they're going to make because the evidence will

14   be overwhelming --

15          THE COURT:  I was trying to ask a much more narrow

16   question.  Maybe I wasn't clear.

17          Assuming, for the sake of argument, that there is some

18   relevance to Mr. Nordlicht taking the stand and being asked

19   about the circumstances regarding the release and assuming that

20   he still has a Fifth Amendment right with respect to all that,

21   are you opposing their calling Mr. Nordlicht on the ground that

22   the prejudice from having him taking the Fifth outweighs the

23   probative value?

24          MR. LAUER:  I do, your Honor, but I certainly don't

25   want to do anything that encourages the Court, as a court of

1  equity and law, to I think mistakenly rule that the release is

2  not relevant.

3          THE COURT:  No, I don't think I ever said the release

4  is not relevant.

5          MR. LAUER:  That's the effect of the Court's

6  statement.

7          THE COURT:  What I suggested, and again, I was making

8  no holdings other than as to your taking the stand.  What I

9  suggested in my comments earlier was it seemed to me that if

10  the question became relevant for any reason that Mr. Nordlicht

11  was a coconspirator, that may have already been resolved as a

12  matter of law by his conviction, as well as the other items

13  mentioned.  And then if he was a coconspirator, it doesn't mean

14  that Mr. Bodner was.  That's, of course, a separate issue that

15  you have already cross examined about and I think your basic

16  position is Mr. Bodner didn't know there was inflation.

17          MR. LAUER:  Then the Court has essentially conflated,

18  in other words, without the release, the issue in this case is

19  did Mr. Bodner have knowledge that someone was committing a

20  tort, in which case he may, if he's a fiduciary, have

21  responsibility for that and therefore be deemed a joint tort

22  feasor.

23          So I think that's incorrect, the fact is, given the

24  relatively small amount of harm that was transpiring, that they

25  had frozen this for two years before the release, and I'm not

1    saying anyone was even thinking about this, but if they were

2    thinking about it, there's nothing inappropriate --

3            THE COURT:  I understand.  We need to bring in the

4    jury, you need to bring in the witness.  We will take this up

5    further at the next break.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.  Thank

 3    you, as always, for your promptness.  We had a bunch of legal

 4    issues that we were discussing, that's why we were a little

 5    late starting, but we are ready to continue.

 6              Go ahead counsel.

 7     MURRAY HUBERFELD, resumed.

 8    DIRECT EXAMINATION CONTINUED

 9    BY MR. GLUCK:

10    Q.  Mr. Huberfeld, when we took our break, we were discussing

11    the COBA transactions and COBA's investments into PPVA.

12              MR. GLUCK:  Mr. Parson, will you please call up

13    Plaintiffs' Exhibit 522.

14              We would seek to move this into evidence.

15              MR. HERTZBERG:  No objection.

16              THE COURT:  Received.

17              (Plaintiff's Exhibit 522 received in evidence)

18    Q.  Do you recall participating in a partner meeting two days

19    after COBA's money came into PPVA?

20    A.  I think I testified yesterday that I attended meetings.  I

21    don't have a recollection of any specific meeting or date.

22    Q.  Looking at the specific date here, which is two days after

23    the money was wired into PPVA, does that refresh your

24    recollection?

25    A.  No.
```

1    Q.  Did you receive any money transmitted from COBA into PPVA

2    after it went to PPVA?

3    A.  Can you say that again.

4    Q.  You received money from COBA after it was transmitted to

5    PPVA from PPVA; is that right?

6    A.  I received monies in PPVA.  I don't know if there's a

7    direct money from COBA to me.

8    Q.  And Mr. Bodner received money in the same mechanism?

9    A.  I believe that we had a distribution in that time period to

10   Manor Lane and to Grosser Lane through the Martin Nordlicht

11   trust.  I don't know if it was directly from COBA's money.

12   Q.  Do you see that it says, from Ms. Albanese, could you meet

13   David at Prime Grill?

14   A.  Yes.

15   Q.  Would you or Mr. Bodner have been scheduling this meeting?

16   I know she was a secretary for both of you.

17   A.  As I said, I don't recall this meeting specifically, but

18   could have been either one of us who wanted to meet.

19        MR. GLUCK:  Mr. Parson, will you please call up

20   PX 573.

21        We will seek to move this into evidence.

22        THE COURT:  Any objection?

23        MR. HERTZBERG:  Objection, your Honor.

24        THE COURT:  Ground.

25        MR. HERTZBERG:  Mr. Huberfeld is not on this email,

 1   don't know who the sender is or what his capacity is.

 2              MR. GLUCK:  The email concerns bank statements and

 3   then Manor lane management $1.8 million, the five bullets and

 4   two sub-bullets in.  I'm establishing --

 5              THE COURT:  Hold on.

 6              MR. HERTZBERG:  I see it, your Honor.  Objection

 7   withdrawn.

 8              THE COURT:  Received.

 9              (Plaintiff's Exhibit 573 received in evidence)

10   BY MR. GLUCK:

11   Q.  Mr. Huberfeld, in front of you is a timeline of the COBA

12   money flowing into PPVA and then what happened thereafter with

13   all the relevant account numbers through the entities.  Isn't

14   it true that your entity, Manor Lane Management LLC received

15   $1.8 million of the money sent into PPVA from COBA?

16   A.  Are you asking me if this is true?

17   Q.  Yeah, did you receive $1.8 million as this chart shows?

18   A.  It's two different questions.  If this is true, I don't

19   know.  I said before, we received it, I don't know exactly the

20   amount, but we received money in that timeframe.

21   Q.  Manor Lane is your entity, though?

22   A.  Correct.

23   Q.  Any reason to believe that this chart prepared by a bank is

24   wrong?

25   A.  I don't know.

 1    Q.  That's a no?

 2    A.  I don't know if that's correct or not.

 3    Q.  Is there any reason to believe?

 4    A.  Any way to believe?

 5    Q.  Do you have a basis to believe that this is wrong?

 6    A.  No.

 7    Q.  Now, one line up, Grosser Lane Management, are you familiar

 8    with that entity?

 9    A.  Yes.

10    Q.  Whose entity is that?

11    A.  I believe that's Mr. Bodner's.

12    Q.  So Mr. Bodner also received $1.8 million of the COBA money

13    as a fee; right?

14    A.  I said that I believe that both are management companies

15    that received money during that timeframe.  I believe those

16    were monies that were owed to us.  I'm not arguing this chart,

17    I'm just saying I have no knowledges.

18    Q.  If they were owed to you, they would have been owed to you

19    as fees?

20    A.  They would have been owed to us as fees for the previous

21    year, I believe.

22    Q.  Just to clarify the record.  Grosser Lane Management LLC

23    and Manor Lane Management LLC, those are the entities that had

24    the beneficial interests in the Mark Nordlicht grantor trust?

25    A.  Correct.

1   Q.   Those are the entities that when there were fees paid,

2   that's where they'd go?

3   A.   Correct.

4   Q.   We discussed yesterday the nature of your partnership with

5   Mr. Bodner.  Do you recall that?

6   A.   I do.

7   Q.   Did you have discussions with Mr. Bodner about this subject

8   that we're looking at now, the payment of fees from the COBA

9   money that was achieved through the illicit payment?

10  A.   I don't recall that.

11  Q.   You spoke with Mr. Bodner all the time?

12  A.   I did.

13  Q.   Every day?

14  A.   Every day is a big word, but a lot.

15  Q.   So much so that your wife wouldn't be happy about it;

16  right?

17  A.   We spoke a lot.

18  Q.   Why wouldn't it be fair and reasonable to assume that when

19  you speak about every day, that you also talked about this?

20  A.   I don't want to speculate.  I just don't recall.

21  Q.   I asked you whether there were any specific items you

22  remember withholding from Mr. Bodner.  You don't specifically

23  remember withholdings, do you?

24  A.   No.

25          MR. GLUCK:  Would you mind zooming out.

 1  Q.  On this page, do you recognize the name Uri Landesman?

 2  A.  I do.

 3  Q.  He's another partner of PPVA; right?

 4  A.  He was a partner, I believe --

 5  Q.  Excuse me.  Platinum Management.

 6  A.  I believe he was a partner of Platinum Management.

 7          MR. GLUCK:  Now I'm going to bring up PX 577.

 8  Q.  I'm going to show you this for the limited purpose of

 9  asking you whether you discussed this with David Bodner.

10          MR. HERTZBERG:  Objection, your Honor.

11          THE COURT:  Ground.

12          MR. HERTZBERG:  401 and 403.  I think we've been

13  through enough on this.  It has nothing to do with valuation.

14          MR. GLUCK:  It has to do with fees and damages.

15          THE COURT:  I can't tell yet.  So lay a foundation, if

16  you can, as to relevance.

17          MR. GLUCK:  I'm hoping we have the right document.

18          Can you go to the next page, there is a sticky note on

19  this document.

20  Q.  Now, as this is being pulled up, we apologize for the

21  computer problems.  This was the sticky note that I referenced

22  and it says Centurion.  Do you see that?

23          THE COURT:  This is not in evidence, is it?

24          MR. GLUCK:  No.  We would seek to bring it in.

25          THE COURT:  Don't ask him about what it says.

 1              MR. GLUCK:  The reason is, as per Mark sent to Murray,

 2   and it's on Mr. Murray's letterhead.

 3              THE COURT:  Do you recognize this sticky or the

 4   previous page?

 5              THE WITNESS:  So --

 6              THE COURT:  I want just a yes or no answer.  Do you

 7   recognize this?

 8              THE WITNESS:  From then?  From now?  That's the --

 9              THE COURT:  We'll get to that in a minute.  Do you

10   recognize it, yes or no?

11              THE WITNESS:  I've seen these things.

12              THE COURT:  Pardon?

13              THE WITNESS:  I have seen these things in the past.

14              THE COURT:  Did you see it at the time of the

15   underlying events, which is in late 2014?

16              THE WITNESS:  I don't recall that.

17              THE COURT:  Are you familiar with something called JSR

18   Capital Manhattan?

19              THE WITNESS:  I believe that was an entity involved

20   with Jonah Rechnitz.

21              THE COURT:  With respect to the sticky, do you know

22   whose handwriting that is?

23              THE WITNESS:  I do not.

24              THE COURT:  Pardon?

25              THE WITNESS:  I don't.

 1             THE COURT:  Counsel can put some more questions, but

 2      on the current state of the record, the objection is sustained.

 3             MR. GLUCK:  Let me see if I can build a foundation.

 4      BY MR. GLUCK:

 5      Q.  Did you ask for a check to be cut and sent to you as per

 6      Mark sent to Murray?

 7             MR. HERTZBERG:  Objection.  Your Honor, I need to

 8      request a brief sidebar.

 9             THE COURT:  All right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  I take it this is the payment, the bribe,

3     if you will, he pled guilty to, aside to say pled guilty to

4     falsifying the payment.  But we already had that.  So what's

5     the relevance?

6              MR. GLUCK:  The relevance is that Mr. Bodner directly

7     received fees from this conspiracy directly, and that goes to

8     the damages in this case.  The witness just testified that the

9     money that came in were then directly paid out as fees, the

10    very fees we're seeking to recover from Mr. Bodner.

11             And then secondly, we plan, in the next six exhibits,

12    to demonstrate Mr. Bodner's knowledge of all this, not just

13    based on the fact that they were partners and spoke every day,

14    but I have a few documents.

15             MR. HERTZBERG:  Your Honor, may I be heard?

16             THE COURT:  Yes.

17             MR. HERTZBERG:  At summary judgment, at footnote 20,

18    your Honor dealt with this and rejected any claim relating to

19    it.

20             After the Court has read that, I'll have another brief

21    comment.

22             THE COURT:  So the footnote, in effect, says that this

23    allegation was not part of the amended complaint and,

24    therefore, it's really a separate, if you will, conspiracy or

25    allegation that's not part of this case.  And therefore, why

1    isn't that still the case?

2            MR. GLUCK:  Because this goes to the issue of

3    knowledge of the conspiracy, the release what was being

4    released, and damages.  These were paid as fees or, as admitted

5    in the bench memorandum that was submitted by defendants, all

6    LP interests converted --

7            THE COURT:  Excuse me.  Excuse me.  So if I allege in

8    a complaint, not to mention a second amended complaint, that

9    Mr. Bodner conspired to inflate the assets and I don't say

10   anything in that complaint about Mr. Bodner also conspired,

11   allegedly, to bribe COBA to invest in Platinum, and the Court

12   then determines that, therefore, that's out of the case for

13   purposes of summary judgment, why isn't equally out of the case

14   for these purposes?

15           MR. GLUCK:  Two reasons.  One is this the $1.4 million

16   that is the subject of this is our proof of damages.  The

17   second reason is that when we filed that second amended

18   complaint, we didn't know about the release.  I didn't know

19   about it.  That's their defense.  I'm going against their

20   release saying you're releasing joint tort feasors and a

21   coconspirator.  So I'm responding to their defense.  I'm not

22   holding Mr. Bodner liable for COBA and all of its problems,

23   you'll hear about it when I get to the settlement with

24   Mr. Huberfeld.  Mr. Huberfeld agreed that there were damages to

25   PPVA in his settlement agreement purely because of COBA,

1    nothing to do with overevaluation.  I'm not holding Bodner

2    liable for COBA, I'm saying these are my damages for

3    overevaluation, A.  And B, when we talk about the validity of

4    that release, and you will see documents, a specific liability

5    grounded that release.

6              THE COURT:  I'm a little skeptical, but in any event,

7    what I will do is allow you to put, for now, some more

8    questions.  These exhibits don't come in, in any event, because

9    he doesn't recognize them.  So there's no way the current two

10   exhibits come in.

11             MR. GLUCK:  Now we know that, but it said Murray, so

12   we thought it would.

13             MR. HERTZBERG:  Your Honor, we don't dispute that

14   Grosser Lane received the $1.8 million, that's undisputed.

15   Where the money came from is not in the case and it's a big

16   403 issue.  They are trying to show the jury that Bodner must

17   have been --

18             THE COURT:  I understand, and that's why I'm not yet

19   prepared to say they can go ahead on that theory, but I want to

20   hear some more questions before I make a final ruling.

21             MR. GLUCK:  Your Honor, I think it is important that

22   we're disputing and I don't think it's so relevant because

23   they're not acknowledging that all the cash LP interests are

24   damages, but they are disputing whether this was a fee or a --

25             MR. HERTZBERG:  We're past that.

1          THE COURT:  Okay.

2          (Continued on next page)

 1              (In open court)

 2              THE COURT:  The witness, with respect to the sticky

 3    that's before you on the screen, without saying anything about

 4    what's on that, it refers to Murray.  Was there any other

 5    Murray involved in any of this but you?

 6              THE WITNESS:  No.

 7              THE COURT:  I'm still sustaining the objections for

 8    the reasons given at the sidebar, but we'll see how it goes.

 9              MR. GLUCK:  We can take that down.

10    BY MR. GLUCK:

11    Q.  Did you discuss that particular instruction to Mark with

12    Mr. Bodner?

13    A.  I don't recall that.

14    Q.  Is there any reason why, given that you spoke to Mr. Bodner

15    the all times about all things and didn't withhold anything, in

16    your mind, is there any specific reason why you wouldn't have?

17    A.  No.

18    Q.  Earlier in this case — I'd like your opinion about whether

19    this is true — Mr. Fuchs suggested that he was an investor

20    contact for the Rechnitz family; is that true?

21    A.  The Rechnitz family is many people.  So Shlomo Yehuda

22    Rechnitz, I believe that's a cousin of Jonah Rechnitz, I

23    believe that Mr. Fuchs was at some point the contact with him.

24    Q.  Did there come a point when you were also a contact?

25    A.  I definitely met with him and -- I'm trying to recall who

1  was the first contact, if it was Mr. Fuchs or myself, I just

2  don't remember.  We vacationed together, myself and

3  Mr. Rechnitz, in the same hotel during the Jewish holidays, so

4  it's possible I met him on my own and possibly Mr. Fuchs was

5  there at the same time.  I just don't recall.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. GLUCK:

2   Q.  So Rechnitz's father, you and he may have vacationed

3   together?

4   A.  Just so I'm clear, it was his cousin, not his father.

5   Q.  But that's how you would have known him?

6   A.  He was a well-known figure.  Again, I tried to be very

7   active.  It is possible I met him somewhere else, but I believe

8   that's where -- more of a meeting, more of a starting

9   relationship with him from being in Israel for the Jewish

10  holiday.

11  Q.  Was Mr. Bodner also an investor contact for Mr. Rechnitz?

12  A.  I think he knew him.  I don't know how to describe that.  I

13  don't think that would be at the same level as Mr. Fuchs.

14          THE COURT:  Can we go back to the guilty plea that we

15  discussed yesterday.

16          So, as I understand your testimony -- correct me if

17  I'm wrong -- you pled guilty to a conspiracy to cover up

18  through a false entry that monies had been paid for the

19  ultimate purpose of getting Mr. Seabrook to invest in Platinum.

20          Do I have that right?

21          THE WITNESS:  That's a high-level understanding, yes.

22          THE COURT:  So who was the coconspirator?

23          THE WITNESS:  Again, I'm not an attorney.

24          THE COURT:  No.  But in your plea, you said, I agreed

25  with others or something like that.

1            THE WITNESS:  I think the allocution is public.

2            THE COURT:  It is, but I don't have it.  So I have to

3    ask the original source, namely, you.

4            THE WITNESS:  I think it was very carefully --

5            THE COURT:  I'll bet it was.  I just want your

6    knowledge of the facts.

7            THE WITNESS:  Yes.  There were a lot of facts, and we

8    wanted to make sure --

9            THE COURT:  Who did you agree with to carry out the

10   scheme that you're referring to?

11           THE WITNESS:  That's the $4,000 --

12           THE COURT:  It could be for 5 cents.

13           THE WITNESS:  I understand.  I never allocuted to the

14   fact that I had any sort of relationship or knowledge or deal

15   with Mr. Seabrook.

16           THE COURT:  So we'll eliminate Mr. Seabrook.

17           THE WITNESS:  I allocuted to the fact that I presented

18   a false invoice presented to me by Mr. Rechnitz for Knicks

19   tickets when I knew that money was for other things.

20           THE COURT:  So at least Mr. Resnick was your

21   coconspirator.

22           THE WITNESS:  Okay.

23           THE COURT:  Did you discuss any of this with

24   Mr. Bodner?

25           THE WITNESS:  During that relevant time period, I

 1   don't think so.

 2          THE COURT:  Meaning that ultimately you did discuss

 3   it?

 4          THE WITNESS:  Meaning as I was arrested, he came to my

 5   house.  I had discussions about various other things.  He may

 6   have asked me -- again, I don't want to speculate.  Maybe at

 7   the time I got a subpoena, he asked me.  Was it a reference, I

 8   just don't recall.

 9          THE COURT:  Go ahead, Counsel.

10   BY MR. GLUCK:

11   Q.  We just looked at the previous documents before the

12   question that occurred just now.

13          Do you know that Mr. Bodner called Mr. Resnick the

14   same day that that check was written?

15   A.  Mr. Bodner called?

16   Q.  Mr. Rechnitz.

17   A.  Jona Rechnitz?

18   Q.  Yes.

19   A.  I did not know that.

20   Q.  Did you talk about it in any way?

21   A.  I said I didn't know about it.  How could I have spoken

22   about it.

23          MR. GLUCK:  Let's get the date right.

24          Mr. Parson, Could you get the check number 577.

25          MR. HERTZBERG:  Same objection based on sidebar.

1     MR. GLUCK:  Then I would like to call up Exhibits

2  CTRL5960144 -- actually, you know what.

3  Q.  You do not know one way or another or have no recollections

4  whatsoever that Mr. Bodner called Mr. Rechnitz on December 15,

5  2014?

6  A.  I don't recall that.  Say the date again.  I'm sorry.

7  Q.  December 15, 2014.

8     MR. HERTZBERG:  Asked and answered.

9     THE WITNESS:  I don't think I knew that.

10  BY MR. GLUCK:

11  Q.  At any time did Mr. Bodner tell you that he was in touch

12  with Mr. Rechnitz?

13  A.  Mr. Rechnitz was someone who Mr. Bodner could have been in

14  touch with for many different reasons, many different reasons.

15  I just don't know.

16     MR. HERTZBERG:  Can you just be clear about the

17  Mr. Rechnitz we're talking about here.

18     THE WITNESS:  Jona Rechnitz.  It's possible Mr. Bodner

19  called him but about a myriad of other things.

20     THE COURT:  Who was he?

21     THE WITNESS:  Mr. Rechnitz was the coconspirator we

22  discussed.

23     THE COURT:  What was his relationship, as you

24  understood it, to either Mr. Seabrook or any of the people

25  we've been talking about?

1            THE WITNESS:  I think he had a relationship with

2   Norman Seabrook.

3            THE COURT:  What was his relationship?

4            THE WITNESS:  He was in the finance business, real

5   estate.  Like I said, there was a myriad of things that either

6   myself or Jona Rechnitz called Mr. Bodner about.

7            THE COURT:  What other things did you talk to him

8   about?

9            THE WITNESS:  We showed him the apartment we bought in

10  Manhattan.  That was years before this.  It was a many-year

11  relationship with Jona Rechnitz.  It was not specifically just

12  this.

13           THE COURT:  Thank you.

14  BY MR. GLUCK:

15  Q.  The same question:  Do you recall speaking with Mr. Bodner

16  in any fashion regarding a conversation that Mr. Bodner had

17  with Jona Rechnitz on December 22, 2014?

18  A.  I don't recall that.

19  Q.  Sharing everything with each other, is there any reason to

20  believe that this was one of those things that you wouldn't be

21  talking to each other about?

22  A.  No.

23  Q.  Do you recall a time when Mr. Fuchs was made a partner of

24  Platinum Management?

25  A.  Yes.

 1   Q.  Was there any paperwork at all about that?

 2   A.  That's not something that I would have been doing.  I don't

 3   know.

 4   Q.  In the criminal findings with respect to you, it was found

 5   that you continued to control Platinum unofficially, even after

 6   your formal affiliation with the fund had ceased.

 7           Is that true?

 8           MR. HERTZBERG:  Objection.

 9           THE WITNESS:  You asked me if that was a fact

10   statement.

11   BY MR. GLUCK:

12   Q.  Was it a finding, and then also was it true?

13   A.  I don't know if it was a finding or not.

14           THE COURT:  The objection to the finding is sustained.

15   I'm not sure what you answered the question about.

16           As a factual matter, you did continue to control or

17   have some control over Platinum unofficially, even after your

18   formal affiliation with the fund ceased.

19           Is that true or not?

20           THE WITNESS:  If you could expound on "control."

21           THE COURT:  Since it wasn't my words, I'll ask counsel

22   to explain.

23   BY MR. GLUCK:

24   Q.  Did you continue to solicit investors for Platinum after

25   2011?

```
 1   A.   Yes.   I think there was a public announcement where I said
 2   I was giving up management control of the fund I was running to
 3   Platinum Management and specifically said that I would help
 4   with -- still help raise money for various Platinum products.
 5   Q.   And you would still control or advise on investments after
 6   2011?
 7                MR. HERTZBERG:   Objection.
 8                THE COURT:   Why?
 9                MR. HERTZBERG:   Form, your Honor.   It's the two verbs
10   that are together.
11                THE COURT:   Sustained.
12   BY MR. GLUCK:
13   Q.   You would still advise on investments after 2011?
14   A.   I take that -- after 2011, my role of course on the credit
15   fund diminished.   And there were times that people would still
16   come and seek my advice for legacy positions that the credit
17   fund still had that were "inaugurated" during my tenure.
18                It's possible that mangers within the fund could have
19   come and seeked my advice for deals that were inaugurated --
20   maybe "started" is a better word -- during my tenure while I
21   was running the credit fund.   So my advice was seeked and
22   given, if it was asked for.
23                And that could have happened.   It was a very -- I
24   don't want to get into a whole speech.   But it could have
25   happened if someone had an investment where they were a manager
```

1    in PPVA.

2           Someone could have come over and asked me my opinion

3    and my advice.  I was in the office.  That could have happened.

4    I was in the office.  My door was opened to anyone who knocked

5    on it and asked me a question.

6    Q.  You also played a role in operations of Platinum

7    Management, for example, interviewing new chief investment

8    officers, new portfolio managers, and so forth, afterwards.

9    A.  I think that after 2011, again, if I would have been asked

10   by someone, whether it be Mark or someone else, I'm

11   interviewing this guy.  I think he's going to be great.  Would

12   you mind meeting with him and giving me your opinion.  Sure.

13   Q.  So fund managers, solicit investors, you spoke on

14   investments, running operations -- you were doing all three of

15   those things after 2011.  Right?

16   A.  You're saying that.  That's not what I said.

17   Q.  You were doing all three of those things after 2011.

18   A.  Again, I don't want to be argumentative with you.  You can

19   read what I said back and see what I said.

20   Q.  Mr. Fuchs was an actual partner in 2014, and there isn't a

21   piece of paper showing it.  Right?

22           THE COURT:  Sustained.

23   BY MR. GLUCK:

24   Q.  Mr. Fuchs was a partner post 2014, and there is no

25   paperwork regarding that fact.

1          MR. HERTZBERG:  Same objection.

2          THE COURT:  Sustained.  The answer is not justified.

3    BY MR. GLUCK:

4    Q.  Isn't it true that there is no paperwork concerning --

5    Mr. Fuchs testified to this.  I'm asking Mr. Huberfeld.

6          MR. HERTZBERG:  Objection.

7          THE COURT:  First of all, neither counsel on either

8    side can, in asking a question to a witness, refer to what's in

9    another witness' testimony.  Second, without that, the question

10   is undecipherable.  Sustained.

11   BY MR. GLUCK:

12   Q.  Mr. Huberfeld, you agreed to admit Mr. Fuchs to the

13   partnership.

14          Is that right?

15   A.  My recollection is that Mr. Fuchs told me that he's

16   becoming a partner.  Again, I don't know the timeframe.  You

17   said 2014/2015.  I don't recall exactly, something in that

18   vein.  I don't know if I was asked specifically.  You told me I

19   met with Mark and him becoming a partner.  And I probably said

20   great.  Welcome.

21   Q.  There's no dispute that he became a partner.

22   A.  No.  I believe he did.

23   Q.  Okay.  There was no paperwork about it, was there?

24   A.  You asked.  I don't know if there was or there wasn't.

25          MR. GLUCK:  Can you please call up DX363.

```
 1   Q.  You are not on this email, but I'm going to ask you whether
 2   you were represented by Curtis in connection with this.
 3             MR. HERTZBERG:  Objection.
 4             THE COURT:  Sustained.
 5             MR. GLUCK:  And then I'll ask my question.  That's my
 6   foundation.
 7             THE COURT:  It's not in evidence.
 8             MR. GLUCK:  I'd like to move it into evidence.  I
 9   think it was moved.
10             THE COURT:  Is this in evidence?
11             MR. HERTZBERG:  It was not moved in evidence.
12             THE COURT:  Is it in evidence or not?
13             MR. HERTZBERG:  It is not in evidence, your Honor.
14             MR. GLUCK:  Not in evidence.
15             THE COURT:  So I don't see how you can ask him about
16   it if it's not in evidence.
17             MR. GLUCK:  Let me lay the foundation.
18   Q.  Do you have an understanding of whether Curtis represented
19   PPVA or Platinum Management in connection with the case?
20   A.  I'm not sure.
21   Q.  Did you provide a deposition in this matter previously?
22   A.  Yes.  With you.
23   Q.  Yes.
24             THE COURT:  Let me ask counsel.  Is the release,
25   Exhibit 74, in evidence?
```

 1          MR. HERTZBERG:  We did show it to the jury, but I

 2   think I neglected to offer it.

 3          THE COURT:  Are you offering, or are you offering it?

 4          MR. GLUCK:  I think it's a joint exhibit.

 5          THE COURT:  It was marked as a joint exhibit.

 6          MR. GLUCK:  It's been previously received.

 7          THE COURT:  It has been previously received.

 8          Let me show you a copy of it.  It's Exhibit 74.

 9          You signed this; right?

10          THE WITNESS:  I did.

11          THE COURT:  To your knowledge, how did this document

12   come about?

13          THE WITNESS:  As I said yesterday, during this time

14   period, I wasn't that often in the office.  I was told -- we

15   had spoken about it, as I said yesterday, that Mark wanted our

16   input.

17          I believe that David had the lead in taking care of

18   this paperwork, not doing the paperwork.  But he was in the

19   office, and he was taking care of it.  And I was told when the

20   lease agreement was ready.  I got it, read it, and signed it.

21          THE COURT:  So do I understand that Mr. Bodner, so far

22   as respects you and Mr. Bodner, this was primarily in his

23   hands?

24          THE WITNESS:  That's my recollection.

25          THE COURT:  It refers to a "lockup" piece.

 1             Do you recall that?

 2             THE WITNESS:  Yes.

 3             THE COURT:  What was the "lockup" piece?

 4             THE WITNESS:  Do you mind if I read it?  I just want

 5   to make sure it's the same thing.

 6             MR. HERTZBERG:  Your Honor, I just want to make sure

 7   that the jury hears him.

 8             THE WITNESS:  I believe there was a two-year lockup in

 9   which myself, Mr. Bodner -- it was to not withdraw any funds

10   from Platinum.

11             THE COURT:  There are certain things that were

12   specific just to you and Mr. Bodner in this agreement as

13   opposed to the other signatories.

14             Is that correct?

15             THE WITNESS:  Yes.

16             THE COURT:  For example, it says on page 5:

17             "During the lockup period, Platinum shall not make any

18   charitable contributions without the prior written consent of

19   Bodner and Huberfeld."

20             What was the reason for that?

21             THE WITNESS:  I did not take care of this.  So if

22   you're asking me to speculate, I can.

23             THE COURT:  No.

24             THE WITNESS:  I don't remember that.

25             THE COURT:  And then it says, a little further down:

1      "Except as agreed to herein, Huberfeld's fund's interests shall

2      be treated like all the limited partnership's fund's interests

3      with all rights and obligations attended hereto."

4             So, again, the agreement contemplated that you would

5      be, in some respects, treated differently or singled out from

6      the other --

7             THE WITNESS:  I think we were on one side of the

8      opinion and the remaining partners were on the other side of

9      the opinion.

10             THE COURT:  So, in other words, as you understood it,

11      this was -- this agreement was something that was being

12      negotiated between two sides.

13             THE WITNESS:  I think there was some negotiation.

14      Again, I wasn't part of it.  But when reading it, it doesn't

15      make sense.

16             THE COURT:  And the other side was who?

17             THE WITNESS:  The other side would have been Mark

18      Leben representing the managing company and the fund.

19             THE COURT:  So he wanted something from you, namely,

20      your interest in management.  Yes?

21             THE WITNESS:  He wanted our interest in management and

22      longterm lockup.

23             THE COURT:  And you wanted from him a release from any

24      claims that Platinum might have.

25             THE WITNESS:  Again, as I testified yesterday, I don't

 1    recall that exactly, but that would have made sense.

 2            THE COURT:  Okay.

 3    BY MR. GLUCK:

 4    Q.  Did you have any conversations with Mark Nordlicht that

 5    indicated to you that Mark Nordlicht believed that Curtis was

 6    representing Platinum in connection with this?

 7            MR. HERTZBERG:  Objection.

 8            THE WITNESS:  Did I have any conversations?

 9            THE COURT:  No.  Just a second.

10            THE WITNESS:  I apologize.

11    BY MR. GLUCK:

12    Q.  Did you have any conversations with Michael Katz?

13    A.  I don't recall.

14    Q.  I'll ask the specific question.

15            Did you have any conversations with Mr. Katz where

16    Mr. Katz believed that Curtis was representing Platinum?

17            MR. HERTZBERG:  Objection.  It's just a one-word

18    difference.  The same objection.

19            THE COURT:  Sustained.  You're not going to go there.

20    BY MR. GLUCK:

21    Q.  Who were the primary Platinum partners with the Katz and

22    family investors?

23    A.  Can you repeat that.  I didn't understand the question.

24    Q.  Who -- between yourself, Mr. Bodner, Mr. Fuchs, and

25    Mr. Nordlicht -- had the Katz family relationship?

1   A.   So Marcos Katz, who was the primary person -- David and I

2   knew him for many years.  Again, within the Jewish world, we

3   crossed paths many, many times.  We knew him probably from

4   1985.

5           THE COURT:  I think you've answered the question.

6           MR. GLUCK:  Mr. Parson, will you pull up PX59.  If you

7   will go to the second page, please.

8   Q.   Just to move this along, Mr. Katz had been asking for a

9   redemption of $10 million prior to January 5.

10          Is that correct?

11  A.   I know there were issues with Mr. Katz.  I don't

12  specifically know about $10 million or what number it was.

13  But, like I said, there was a very long relationship with

14  Mr. Katz over many years.

15          MR. GLUCK:  Now if we can go through a couple pages.

16          THE COURT:  I'm sorry.  Is this in evidence?

17          MR. GLUCK:  I'll move it into evidence.

18          MR. HERTZBERG:  No objection.

19          THE COURT:  Received.

20          (Plaintiffs' Exhibit 59 received in evidence)

21  BY MR. GLUCK:

22  Q.   Mr. Katz -- who is Malena Belafonte?

23  A.   I'm not sure.

24  Q.   Do you believe that she would have been writing on behalf

25  of Mr. Katz?

 1   A.  Possibly.

 2        THE COURT:  When she says in the subject line:  "From

 3   Marcos Katz," would that give you a hint that she was writing

 4   on behalf of Marcos Katz?

 5        THE WITNESS:  You're asking as I read this now?

 6        THE COURT:  Yes.

 7        THE WITNESS:  Of course.  Yes.

 8        THE COURT:  Go ahead.

 9        MR. GLUCK:  Thank you.

10   Q.  Mr. Katz was trying to reach you about this issue.

11   A.  Just from the email, that would tell me he was trying to

12   reach me.

13   Q.  It what was your general awareness that by 2016 a lot of

14   people were looking to redeem their interests.

15        Is that fair?

16   A.  I know there were definitely redemptions.  Again, I don't

17   want to characterize what "a lot" means.  Whatever the number

18   was.

19   Q.  By 2016, the fund had no ability?

20   A.  I believe there were issues with regard to liquidity in

21   2016.  Again, I don't know the scope.

22   Q.  And again, there had been a prior directive locking up all

23   partners from making redemptions?

24   A.  Again, I testified to this yesterday.  I don't know if it

25   was in a formal agreement or if it was just known that's what

1   was going on.

2   Q.  Do you have any personal knowledge that Mr. Katz was going

3   to invest in PPVA as opposed to Platinum Management?

4   A.  Again, I know there were discussions with Mr. Katz.  I

5   don't remember the specifics of them.

6   Q.  $10 million would not have solved PPVA's problems at this

7   particular time, would it?

8   A.  Again, the same answer that I gave before.

9           MR. GLUCK:  Mr. Parson, please pull up PX593.  Excuse

10  me.  PX372.  I'm going to move this into evidence.

11          MR. HERTZBERG:  Could we see the second page, please,

12  Mr. Parson.  The third one.  No objection.

13          THE COURT:  Received.

14          (Plaintiffs' Exhibit 372 received in evidence)

15          MR. GLUCK:  Could you go to the third page,

16  Mr. Parson.

17  Q.  To the best of your knowledge, did Mr. Katz ever make an

18  investment in Platinum Management?

19  A.  I don't know.

20  Q.  This release was so that you believe someone would later

21  make an investment in PPVA?

22  A.  I think I testified to this yesterday.  I will say it

23  again.  My impression was or my thought was that Mark was going

24  to go out and raise money for the fund using our shares as an

25  added benefit.

         THE COURT:  So let me ask you.  In the email you

received from Mr. Katz or a message you received from Mr. Katz

--

         THE WITNESS:  I received many messages.

         THE COURT:  Look at this one.  This is dated Acapulco,

April 11, 2016, because where else would anyone want to be in

April 2016.

         But in any event, it's directed -- the first name it's

directed to is you.  Right?

         THE WITNESS:  Yes, it is.

         THE COURT:  And it says:  "I am totally confused.

Michael informed me that you have Platinum and gave back your

shares.  What the hell is going on?  I left 50 million U.S.

dollars in the fund just because I trusted you."

         THE WITNESS:  In the context of my relationship with

Marcos Katz, my recollection of calling him and speaking to him

and him telling me, Mr. Katz, I just got this one -- not this

one but other communications from him.

         He said that's not from me.  It's from my wife.  It's

my from daughter.  Call me.  Mr. Katz had a very -- I don't

know if that was true either because Mr. Katz was a broker to

many negotiations.

         As a matter of fact, he wrote a book on negotiations

which he gave to me.  So I was always unsure when he said

something what exactly he meant, what his other motives were.

1          THE COURT:  He goes on to say:

2          "Unless I see a written explanation, I will go public

3     in what you have done here.  What a shame.  If I don't receive

4     a reply to this fax, I am calling a newspaper and tell them the

5     whole story.  My heart is broken."

6          Now, is it your testimony that you don't recall

7     receiving this?

8          THE WITNESS:  Like I said, I remember eight years ago.

9     I remember six years ago.  I remember receiving a number of

10    different communications.

11         THE COURT:  Is it fair to say this is a pretty irate

12    email?

13         THE WITNESS:  Absolutely.

14         THE COURT:  So you had not --

15         THE WITNESS:  During this time period, April 11, my

16    father was very ill.  But I definitely remember calling

17    Mr. Katz, as I just said.

18         THE COURT:  And when you called him, as best you

19    recall, in response to this --

20         THE WITNESS:  Or something else similar to this.

21         THE COURT:  Okay.  So he was frustrated.

22         THE WITNESS:  Definitely.

23         THE COURT:  What was he frustrated about?

24         THE WITNESS:  He was frustrated that he had made a

25    redemption.  He was frustrated that he wasn't getting responses

1   on time or people weren't responding to him.  If we told him

2   something on Tuesday, he wanted it to happen on Tuesday.

3   That's the kind of person he was.

4           THE COURT:  What did you say?

5           THE WITNESS:  I said, Mr. Katz -- I believe there were

6   two trips that people had made and I believe a third to Israel.

7   Again, Mr. Katz was the kind of person that remembered what he

8   wanted to remember in a series of things when you converse with

9   him.  So putting in things like you said to me --

10          THE COURT:  I'm just saying what did you say to him?

11          THE WITNESS:  My recollection is I said, Mr. Katz, I

12  got this irate email.  I said, you know everything.  You're

13  familiar with everything that is going on.  Your grandson is in

14  the office.  What are you talking about?  What are you getting

15  so upset about?  You know everything that's going on.  Nobody

16  is hiding anything.

17          THE COURT:  Did you have any understanding of what you

18  thought was the problem that he was going to take to the

19  newspaper?

20          THE WITNESS:  That he invested in the fund and he

21  didn't get money back.  This is he was calling saying he wasn't

22  happy.

23          THE COURT:  Did you discuss that with Mr. Bodner, this

24  particular message?

25          THE WITNESS:  I don't remember speaking to him

1   specifically about this.  I think Mr. Bodner was aware of

2   Mr. Katz's sentiments.

3         THE COURT:  When he said:  "I'm calling the newspaper,

4   and I'm telling them the whole story," did you understand that

5   to mean that he felt something improper was going on, not

6   something that he wasn't getting.

7         THE WITNESS:  So I had at many different time -- even

8   though he was told a thousand times, and he didn't want to --

9         I said, this isn't a bank account.

10        He said, send me my money.  He's didn't want to hear

11  the fact that -- so he heard it at different times.  And then

12  when you would speak to him, then he would make, like, what are

13  you talking about?

14        THE COURT:  Counsel.

15        MR. GLUCK:  This has already been moved into evidence?

16        MR. HERTZBERG:  Yes.

17  BY MR. GLUCK:

18  Q.  Do you see the c.c. at the bottom?

19  A.  Yes.

20  Q.  Who is Mr. Yaakov Neeman?

21  A.  Yaakov Neeman is someone who passed away unfortunately.  He

22  was someone that, A, had been an investor in the fund, someone

23  who David and I had known who was a common attorney in Israel.

24  And he was also a close friend of Mr. Katz's.

25  Q.  He was the minister of finance and minister of justice in

```
 1    Israel at various times; correct?

 2    A.  Correct.  He was in and out of government.  That is also

 3    correct.

 4    Q.  Why was he copied on this?

 5    A.  I think that Mr. Katz knew he was close with us.  As a

 6    matter of fact, I think -- again, not about this one but in

 7    general about our relationship with Mr. Katz.  We said we're

 8    giving him all the information.  He knows everything.  He's

 9    upset still.  Maybe you wanted to speak to him.

10    Q.  Mr. Katz trusted you and Mr. Bodner to oversee his

11    investment in PPVA, didn't he?

12    A.  He think he felt very close to David and myself and felt

13    that if we're investing our money here, this is a good place.

14    Q.  He had previously requested a $10 million redemption?

15    A.  I don't recall the exact amounts.

16    Q.  Do you even have an understanding of the amount of

17    unencumbered assets that remained in the fund by April of 2011?

18            THE COURT:  I'm sorry.  What?

19            MR. GLUCK:  I'll repeat.

20    Q.  Did you have an understanding of the amount of unencumbered

21    assets that even remained in the fund by April of 2012?

22    A.  I'm not sure.

23    Q.  Did you have an understanding whether it would matter

24    whether your LP interests were locked up for two years?

25    A.  I think I testified to this again yesterday.  If you want
```

 1   me to repeat it, I'm happy to do so.

 2           THE COURT:  Counsel, in the question first you gave

 3   was 2011, and then you gave 2012.

 4           I'm looking at this letter.  Don't you mean 2016?

 5           MR. GLUCK:  I do.  I misspoke '12.  I meant '16.

 6   Q.  After this letter, the deal with Katz was off, wasn't it?

 7   A.  Which deal are we talking about?

 8   Q.  This proposed deal where you take your and Mr. Bodner's

 9   interest.

10   A.  Again, I don't know exactly what the deal was with

11   Mr. Katz.

12   Q.  A little before this.

13           Could you please pull up PX368, Mr. Parson.  And we'd

14   this move it into evidence.

15           MR. HERTZBERG:  No objection.

16           THE COURT:  Received.

17           (Plaintiffs' Exhibit 368 received in evidence)

18   BY MR. GLUCK:

19   Q.  This is an email to you.

20           Do you see that?

21   A.  Yes.

22   Q.  From Mark Nordlicht?

23   A.  Yes.  I see that.

24   Q.  The subject line is "Maggie, please print out and send to

25   Bodner tomorrow."

1    A.  I see that.

2    Q.  I asked you whether you had an understanding or you had any

3    information that would lead you to believe that there was a

4    significant investment the Katz family.

5           This $10 million, that was going into Platinum

6    Management; right?

7    A.  Again, you're asking me questions I can't answer.

8    Q.  Why can't you answer?

9    A.  I just don't know.

10   Q.  You don't know.  Okay.

11          Have you ever seen a document suggesting that there

12   was going to be hundreds of millions of dollars invested into

13   PPVA by the Katzes?

14   A.  I don't recall that.

15   Q.  Hundreds of millions is a lot of money; right?

16   A.  Absolutely.

17   Q.  Would you remember if you had seen something like that?

18   A.  Like I said, I don't recall that document.  I can't say

19   that.  I don't want to speculate.

20   Q.  Did you receive a presentation from Mr. Seth Gerszberg

21   around --

22          THE COURT:  This is from Mr. Nordlicht.  Yes?

23          THE WITNESS:  Yes.

24          THE COURT:  He says he was expecting $10 million from

25   Katz tomorrow.  This is in March of 2016.  Yes?

```
 1                    THE WITNESS:  I see that.

 2                    THE COURT:  He says it's being held up because they

 3      have him:  "It is delayed by the partners' release agreement."

 4                    Do you see that?

 5                    THE WITNESS:  I see that.

 6                    THE COURT:  That was the agreement we were looking at

 7      earlier, as far as you understand?

 8                    THE WITNESS:  Yes.

 9                    THE COURT:  And he says:  "I don't even care what's

10      printed.  I trust you and will sign whatever is needed, but you

11      must have the $10 million by Friday now, or I'm sending a

12      vesting letter over the weekend closing up shop."

13                    Do you see that?

14                    THE WITNESS:  I do.

15                    THE COURT:  What did you understand he meant by

16      "closing up shop"?

17                    THE WITNESS:  According to this email or at all?

18                    THE COURT:  When you received it.

19                    THE WITNESS:  It has my email address on it.

20                    THE COURT:  Would you agree that you have no reason to

21      doubt you received it?

22                    THE WITNESS:  I have absolutely no reason to doubt I

23      received this email.

24                    THE COURT:  Did you not understand or do you not

25      understand now that by "closing up shop" he meant taking
```

 1    Platinum into bankruptcy or and the company would lose ongoing

 2    business.

 3         THE WITNESS:  Are you asking what I think "closing up

 4    shop" means now?

 5         THE COURT:  Yes.

 6         THE WITNESS:  I think that "closing up shop" means

 7    he's going to put the funds into liquidation, and he's going to

 8    shut off the asset.

 9         THE COURT:  And that would mean the end of the company

10    as an ongoing business.

11         THE WITNESS:  As a continuing business.

12         THE COURT:  And that would affect those people who had

13    invested in it.

14         THE WITNESS:  Possibly.  With respect, the question is

15    what you would eventually get for those assets.

16         THE COURT:  And he suggests that the only reason he's

17    not getting $10 million from Mr. Katz is because his release

18    agreement has not been finalized at your end.  Right?

19         THE WITNESS:  That's what reading it seems as right

20    now.

21         THE COURT:  Do you have any recollection of that?

22         THE WITNESS:  No.

23         THE COURT:  Okay.  Counsel.

24    BY MR. GLUCK:

25    Q.  Did Mr. Nordlicht or Platinum Management ever receive $10

 1   million from Mr. Katz?

 2   A.  I don't know.  I don't think so.

 3   Q.  They did go into bankruptcy?

 4   A.  That's what they're in now, bankruptcy?

 5   Q.  Liquidated.

 6        Mr. Parson, will you please call up PX590, which is

 7   already in evidence.  Go to the cover page, please.

 8        Mr. Huberfeld, did Seth Gerszberg deliver a PowerPoint

 9   presentation to the house in January of 2016?

10   A.  I don't recall.

11   Q.  You don't recall anything about it?

12   A.  No, I do not.

13        MR. GLUCK:  Mr. Magruder, will you please hand the

14   paper copies of this up to Mr. Huberfeld so he can flip through

15   the slides and see if he recognizes the slides.

16   Q.  As he's giving you a paper copy --

17   A.  Can I see the first page of this.

18   Q.  Sure.  You're not on the cover email.  It's a gentleman

19   named Seth Gerszberg.

20        You know who he is; right?

21   A.  It was only yesterday I met him.  I saw him a couple of

22   times.

23   Q.  Do you know what he started doing at Platinum Management?

24   A.  You're asking me a very broad question.

25   Q.  In late 2016, do you know what he was doing at Platinum

```
 1   Management?

 2              MR. GLUCK:  Mr. Parson, why don't you flip about 10

 3   seconds in.  A little faster.  Keep going.  Keep going.  All

 4   the way.

 5   Q.  Your testimony is you don't remember getting this

 6   presentation?

 7   A.  No.  I don't remember.  I don't.

 8   Q.  Do you remember Seth Gerszberg coming to your house?

 9   A.  Seth Gerszberg coming to my personal house?

10   Q.  You don't recall?

11   A.  I do not.

12   Q.  You don't recall it.

13              Do you have any reason to dispute that you received

14   this presentation from Seth Gerszberg?

15   A.  It's hard to speak about a negative.  So I don't want you

16   to bring me a Federal Express thing that said it came.  I just

17   don't recall this document.

18   Q.  That wasn't what I asked.

19              As you're sitting here today, do you have any specific

20   reason in your head why you would dispute that you received

21   this presentation?

22              MR. HERTZBERG:  Asked and answered.

23              THE COURT:  Overruled.

24              THE WITNESS:  I can't say specifically that I have

25   some recollection that I didn't receive it, but that's going to
```

1   a negative.  I don't know how to say that.

2   BY MR. GLUCK:

3   Q.  Do you recall at any time in January of 2016 or after being

4   told --

5         Do you recall at any time from January of 2016 or

6   after being told that there were only $40 million left of

7   unencumbered assets at PPVA?

8   A.  No, I do not.

9   Q.  Do you recall being told at any time that the value of

10  PPVA's oil and gas investments had substantially diminished?

11  A.  What timeframe are we talking about?

12  Q.  From 2013 through 2016, June.

13  A.  I don't recall being told that they were significantly

14  diminished, those words, something around that.  I do not.

15  Q.  Your family owned some of the interest in Beechwood.

16        Is that right?

17  A.  Correct.

18  Q.  Did you know that Beechwood at this time was a very

19  significant creditor of PPVA?

20  A.  Predator?

21  Q.  Creditor.

22  A.  I believe that Beechwood had loans -- that's what I

23  recall -- against certain assets that Platinum had interests in

24  as well.

25  Q.  Did you have detailed knowledge of those loans?

1   A.  I think -- again, I don't want to go off on a tangent.

2   From October of 2014 until sometime in early 2016, I had an

3   office at Beechwood.  And I knew that there were significant

4   amount of loans against assets, like I said, that Platinum had

5   an interest in.

6   Q.  Your business is -- certainly Centurion was in the lending

7   business.  Right?

8   A.  Correct.

9   Q.  Do you know how much collateral had been pledged to

10  Beechwood?

11  A.  A significant amount.  I don't know exactly the number.

12  Again, those specific assets.

13  Q.  You know, based on all of that, can you testify about the

14  amount of encumbrances of Beechwood on PPVA's assets?

15  A.  If you want to show me a document, I'd be happy to testify

16  to it.

17  Q.  This presentation right here which I think you received.

18  A.  Which one?

19          MR. GLUCK:  Can you please go to the asset list.  Zoom

20  in.

21  Q.  Who had encumbrances over PPVA other than Beechwood?

22  A.  I don't know.

23  Q.  You know Beechwood did; right?

24  A.  I will repeat it for the third time.  I know that Beechwood

25  had loans against specific assets that Platinum had interests

1   in.

2   Q.  You knew that if PPVA was reporting a nav of $800 million,

3   which I think you testified earlier, that that should have been

4   reduced by the amount of debt and collateral Beechwood was

5   owed.  Right?

6   A.  Are you asking me an accounting question?

7   Q.  No.  As a lender.

8   A.  As a lender, they should have been reporting what their

9   value is net of any loans.  Yes.

10  Q.  And you never were told by anyone that the unencumbered

11  value of the assets, as they were marked, was just $312

12  million?

13  A.  I don't recall that.

14  Q.  You don't recall?

15  A.  No.

16  Q.  And you don't recall being told --

17          If we can go to the $40 million slide, Noah.

18          -- that there were just $40 million of assets in the

19  fund as the positions were marked?

20  A.  I don't recall that.

21  Q.  Mr. Katz by himself was owed more than $40 million, wasn't

22  he?

23  A.  I think Mr. Katz's investment value was more than $40

24  million.

25  Q.  He asked for it to be redeemed though; right?

 1  A.   Again, he asked for some money to be redeemed.  I don't

 2  know the exact amount.

 3  Q.   Let's talk about the assets themselves.

 4           You became aware that the oil and gas assets being

 5  held by PPVA were themselves being overvalued, didn't you?

 6  A.   I don't know that.

 7  Q.   Let's start with Beechwood.

 8           Mr. Parson, please call up PX381.

 9           THE COURT:  Counsel, I was going to wait another five

10  minutes, but I wonder whether this is maybe the best time to

11  give the jury their midmorning break.

12           MR. GLUCK:  Fine.

13           THE COURT:  So we'll take a 15-minute recess.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  How much longer do you have on direct?

3          MR. GLUCK:  I'm almost done.

4          THE COURT:  Very good.  We'll see you all in

5   15 minutes.

6          (Recess)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (Jury not present)

2                  THE COURT:  I have to ask the witness to step out for

3      just five seconds.

4                  Please be seated.

5                  So, several things.  First, I've now had a chance to

6      review the conviction and acquittal of Mr. Nordlicht, and he

7      was acquitted on counts relating to the more general

8      overvaluation, which doesn't, of course, preclude its being

9      proved in this case because the standard of proof is different.

10     An acquittal just means the government just didn't establish it

11     beyond a reasonable doubt.  But I do think it means that the

12     plaintiff can call Mr. Nordlicht.

13                 Now, there was an argument that I didn't quite follow,

14     but I'll hear more about later, that he still admitted to being

15     a coconspirator on the overevaluation in connection with a

16     bankruptcy or something like that, and that I'll still consider

17     that at the next break.

18                 The reason I'm raising this now is I'm told by my law

19     clerk that he, through his counsel, had previously indicated he

20     was only available this afternoon.  So counsel for plaintiff

21     should reach out to his counsel and say we want him here at

22     2 o'clock sharp in the witness room.

23                 I went back and looked at what I had to say at the

24     time of motions *in limine* and also in the summary judgment.  I

25     don't think there's anything I said that remotely precludes the

1  position I stated earlier today.  And I am ever more leaning

2  toward instructing the jury that the release agreement is void

3  if it is made by joint tort feasors who thereby release claims

4  between themselves that otherwise could be brought.  But I

5  agree with defense counsel that there's modest authority for

6  this.

7          So I will give counsel this evening one last

8  opportunity to either argue for it or against it, and

9  particularly if there is some authority that I've missed, there

10 is an opinion by Judge Oetken of this court where he suggests

11 that it makes sense, but doesn't, in the end, firmly hold that

12 because it didn't have to in that case.  So this may be new

13 law.  Oh, my gosh, new law.  But, in any event, if there is any

14 additional authority, direct or indirect, that either side

15 wants to bring to my attention, I won't make a final ruling

16 until tomorrow on this point, but send it to me by email or

17 letter by no later than midnight tonight.

18         Also, I wanted to quickly ask defense counsel, as I

19 understood from earlier testimony, the supposed reason for this

20 release was that Mr. Nordlicht, and this seems to be strongly

21 confirmed by the email that was just entered into evidence,

22 Mr. Nordlicht thought he could get an investment from Mr. Katz,

23 and some of the testimony was to the effect this would be a

24 sweetener to the deal.  There is other evidence that he didn't

25 even know about it.  But the last email, he suggests strongly

1    that Mr. Nordlicht was looking to the partners, and

2    particularly Mr. Bodner and Mr. Huberfeld, to finalize the

3    release so that he could get the investment, and as I

4    understand, he never got any investment.  So I wonder what the

5    consideration was for the release.  So I think that's another

6    question you might want to address in your letter tonight.

7              Finally, when did the company go into liquidation?

8              MR. GLUCK:  Voluntary liquidation, June 10th; official

9    provisional liquidation, August 20-something; and then final

10   official in October.

11             THE COURT:  So I don't know whether under Cayman

12   Island law, which I'm otherwise completely conversant with,

13   there's the equivalent of the bankruptcy law in the United

14   States that transfers made some period before you go into

15   bankruptcy are void or voidable.  So there might be something

16   there, I don't know, but if there's something there, counsel

17   can bring that to my attention, as well.

18             MR. LAUER:  Your Honor, there are a couple of things

19   that are completely getting lost in the quickness, and I must

20   put them on the record because it cannot simply be put into

21   writing.

22             There were four complex agreements being negotiated

23   with Mr. Katz.  That was the first of these potential new

24   deals.  It was not simply this agreement that happened to be

25   called a release.  And this is all going to be in evidence.

```
 1              Second, on June 7, this is two months after that weird

 2   fax from Mr. Katz and several months after he did not yet sign

 3   the release.  Mr. Katz's grandson, Michael Katz, sent two of

 4   the agreements that Katz was negotiating with Platinum, signed

 5   by Marcos Katz, signed by Adela Katz, his wife, and sent to

 6   Suzanne Horowitz at Platinum.  Unfortunately, for everyone, the

 7   next day, Huberfeld was arrested and Mark Nordlicht felt

 8   obliged to put the fund into liquidation.  On July 26th,

 9   Mr. Katz died and the Katz family then asked Platinum to

10   relieve it of its obligations under the agreements that they

11   had signed, and on July 27, they said yes.  That's one point.

12              THE COURT:  So there may well have been consideration.

13              MR. LAUER:  I'm just saying this was not conditioned

14   on Katz, but the Katz was the first.

15              Second, New York law is explicit, and what the Court

16   is ruling is, I say this with great respect, is flatly

17   contradictory to New York law.

18              THE COURT:  Which you don't need consideration.

19              MR. LAUER:  New York law says that a release is not

20   the beginning of litigation.  Under this Court's ruling --

21              THE COURT:  I don't think the statute says that, but I

22   understand your point.

23              MR. LAUER:  Under this Court's ruling, a release could

24   never be used by a person sued who is alleged to have been a

25   tort feasor because you would have no affirmative defense.
```

1             THE COURT:  Look, you made this argument this morning,

2    I was listening to you.  That's why, among other things, I'm

3    giving everyone a last shot at this tonight.  If you want to

4    repeat those arguments tonight in your letter, feel free.  You

5    can put into your letter anything you want so that the record

6    will be replete.

7             Nevertheless, I wanted to alert everyone to the fact

8    of where I was leaning and to reject, which I firmly rejected

9    anything I said before precludes my making that holding, I

10   don't think that's true.  But that doesn't mean I couldn't be

11   persuaded on the merits that it's not the right ruling, and I

12   admit that since it's not supported by any clear precedent one

13   way or the other, this is something that I can use all the help

14   I can get, including anything you want to put in your papers

15   tonight.

16            Thank you for bringing the part about consideration or

17   the history that clarifies that a little bit more, the

18   subsidiary point we were talking about.

19            Now let's bring in the witness and let's bring in the

20   jury.

21            (Continued on next page)

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Counsel.

 3   BY MR. GLUCK:

 4   Q.  Mr. Huberfeld, when we broke, we were just about to start a

 5   new topic, but I have one query.  Do you have, sitting here

 6   today, any memory problems that would prevent you from

 7   testifying completely truthful?

 8   A.  I went through a lot of trauma the last six years, but I

 9   think my memory's okay.  I wouldn't say it's perfect, it's

10   okay.

11   Q.  Isn't it true that you have an unusually strong memory?

12   A.  I can't answer that.

13   Q.  Let me see if I can point you to something specific.

14              Do you recall in this litigation, in your deposition,

15   you provided a series of financials to counsel, plaintiff, in

16   connection with the Huberfeld family foundation?

17   A.  Can you -- I'm not sure I understand the question.

18              MR. HERTZBERG:  401.

19              THE COURT:  Well, it's not being offered for the

20   substance, it's being offered on this question of memory.  So I

21   will allow it.  Overruled.

22   Q.  Do you recall that you prepared a set of financials

23   spanning years, dozens of entities and loans and principal

24   amounts from memory to your assistant, and then handed it over

25   to us?
```

1   A.   Discussing the foundations?

2   Q.   Yeah.

3   A.   I remember preparing extensively for several loans that

4   were being questioned from the foundation, correct.

5   Q.   In your business -- it's a lending business; correct?

6   A.   Not only lending, but definitely part of my business.

7   Q.   For the lending part of your business, you didn't keep

8   records, but when you needed to produce records, you were able

9   to cite entity names and borrowers and amounts and principal

10  amounts and connect them to all the bank statements; right?

11  A.   I think I worked on it extensively to prepare that.

12  Q.   So I just want to be clear, you have absolutely no memory

13  of Mr. Seth Gerszberg going to your house and delivering a

14  fairly lengthy and detailed presentation on PPVA to you?

15  A.   So --

16              MR. HERTZBERG:  Objection.

17              THE COURT:  I'll allow it.  You may answer.

18  A.   So I did, thinking about it as I went outside, because I

19  didn't recall it, but I looked and thought about the date.  So

20  I believe that I was in Florida in early and mid January 2016.

21              And if you would like to go through some events that

22  happened that month that may contribute to me not remembering,

23  I'd be happy to do that with you.

24              MR. GLUCK:  Mr. Parson, will you please call up

25  PX 381, which I don't believe is in evidence, so we'll move it

 1   in.

 2           MR. HERTZBERG:  No objection.

 3           THE COURT:  Received.

 4           (Plaintiff's Exhibit 381 received in evidence)

 5   Q.  Look at it for a minute and let me know when you're ready.

 6   A.  Yes, I see it.

 7   Q.  Do you recall engaging with Mr. Feuer to form what would be

 8   Beechwood in, let's call it middle 2013?

 9   A.  Do I remember being engaged with Mr. Feuer, yes.

10   Q.  And did Mr. Feuer have a partner, a junior partner?

11   A.  I think he worked together with someone named Scott Taylor.

12   Q.  Scott Taylor.  Would Mr. Feuer and Scott Taylor work out of

13   Platinum's offices?

14   A.  I think they were there for some period of time.

15   Q.  This document, is it an outline of terms of how the

16   agreement around Beechwood would work?

17   A.  It was an outline of a potential deal.

18   Q.  The phrase, Nordlicht Group, what does that mean?

19   A.  Nordlicht Group would have included myself and Mr. Bodner.

20   Q.  From where would the capital necessary to secure funds,

21   where would that come from?

22   A.  From us.

23   Q.  The Nordlicht group?

24   A.  Nordlicht, myself, and Mr. Bodner.

25   Q.  I know it was a complicated transaction.  Isn't it true

 1    that the members of the Nordlicht group put up LP interests

 2    that they had been awarded as incentive fees from Platinum

 3    Management as capital to secure the Beechwood?

 4    A.   I believe that the group family members — group being

 5    expansive — put up some shares that they had in a different

 6    unrelated company and put up some of their interest that they

 7    had in Platinum, as well.

 8    Q.   On point 5, do you see where it says Feuer Group?

 9    A.   Yes.

10    Q.   What's Feuer Group?

11    A.   I believe that was Mark Feuer and Scott Taylor.

12    Q.   Was there anyone else in that group?

13    A.   At the time?

14    Q.   Yes, at the time.

15    A.   I think that's who I thought that was.

16    Q.   How did you know Mr. Feuer?

17    A.   So Mr. Feuer was a neighbor of mine.  I did not know him

18    that well.  I got to know him, he came to see me about some

19    unrelated issue and told me about his background and it just

20    was deposited in my, as you say, good memory.

21    Q.   Did Feuer and Taylor, did they work for an insurance

22    company called Marsh McLennan?

23    A.   Mark Feuer did.  I don't know if Scott Taylor did.  I just

24    remember that name being told to me.

25    Q.   They were insurance side guys?

1    A.  I believe.

2    Q.  They didn't have investment experience, did they?

3    A.  I don't think so.

4    Q.  The investing side, that was going to be done by the

5    Nordlicht group?

6    A.  I think that was something that was contemplated at the

7    beginning based on this term sheet.  I think things manifested

8    itself as they became into a business arrangement, may have

9    changed at some point.

10   Q.  There were a bunch of documents that ended up formalizing

11   Beechwood; right?

12   A.  I believe there were many documents.

13   Q.  And the Nordlicht group that would be running these

14   investments was yourself, David Bodner, and Mark Nordlicht?

15   A.  I believe at the beginning when this was formed, I believe

16   that we thought that the money would be invested in Platinum

17   and were run by Platinum.

18   Q.  And, in fact, even after Beechwood was formally

19   incorporated, it operated from Platinum's offices; correct?

20   A.  I don't know that.

21   Q.  Do you know that the first meeting Beechwood took with its

22   big client, CNO, was in Platinum's office?

23   A.  Again, I don't know if I knew that now or knew that then,

24   I'm not sure.

25   Q.  The Nordlicht Group, did that also include David Levy?

 1   A.  I don't know when, since I wrote this, if David Levy was in

 2   my mind at the time, possibly.  I don't know 100 percent.

 3          MR. GLUCK:  Let's pull up PX 419.

 4          I think this is in evidence already.

 5   Q.  Bottom email is from Mark Nordlicht to you.  Do you see

 6   that?

 7   A.  I do.

 8   Q.  And Angela Albanese, that's David Bodner?

 9   A.  Angela Albanese was an assistant.

10   Q.  No.  When one would send an email to Angela Albanese,

11   that's how you would send an email to David Bodner; right?

12   A.  I'm not understanding.  Please ask me more clear.  I'm not

13   understanding.

14   Q.  I mean, you worked with David Bodner at Platinum for what,

15   2005 to 2016?

16   A.  1985 to 2016.

17   Q.  I mean at Platinum, you worked with David Bodner at

18   Platinum from 2005 to 2016?

19   A.  I think 2003.

20   Q.  Same question.

21          THE WITNESS:  I don't know if I'm waiting for --

22          MR. HERTZBERG:  There was an objection to the form,

23   Judge.

24          THE COURT:  I'm sorry.  I didn't hear that.

25   Overruled.

 1  A.  Do you mind repeating it.

 2          THE COURT:  You worked with David Bodner at Platinum;

 3  correct?

 4          THE WITNESS:  Yes.

 5          THE COURT:  Closely, yes?

 6          THE WITNESS:  Yes.

 7          THE COURT:  For a period of years; correct?

 8          THE WITNESS:  Correct.

 9  BY MR. GLUCK:

10  Q.  Over that period of years, the way you would send an email

11  to David Bodner was by sending it to Ms. Angela Albanese or his

12  secretary at the time; right?

13  A.  I don't recall about sending emails to Mr. Bodner, but if I

14  did and I wanted him to see something, I would possibly send it

15  to her.  I just don't know if that email address -- whatever,

16  whoever the assistant was at the time.

17          THE COURT:  But you understood that if you sent an

18  email to her, it was really just to be conveyed to Mr. Bodner,

19  yes?

20          THE WITNESS:  Are you asking me if every email I

21  sent --

22          THE COURT:  I'm not asking about everyone, but in the

23  normal course.

24          THE WITNESS:  It's possible I wanted to print it out

25  for myself, it is possible.  I just want to be 100 percent.

```
 1            THE COURT:  There may be other ways you communicated

 2   with Mr. Bodner.  I'm just saying you weren't regularly

 3   communicating with Ms. Albanese except in relation to things

 4   that were to involve Mr. Bodner; correct?

 5            THE WITNESS:  That's not correct.  I think it was also

 6   possible that she was my assistant, as well.  And I was out of

 7   the office and I wanted something and I would say send it to

 8   her.

 9            THE COURT:  Okay.

10   Q.  In fact, the subject line of the email is:  Angela, please

11   print out for David.  Right?

12   A.  That is.  That's not me writing it.  I just want to point

13   that out.

14   Q.  Right.  But that is the subject line in the email?

15   A.  That's what it says.

16   Q.  Now, let's assume 590 is the right number, it might be 600,

17   but you got about $590 million initially into Beechwood right?

18   A.  Some number, approximately.

19   Q.  That's a significant investment within the framework of

20   your companies?

21   A.  100 percent.

22   Q.  This is a form where you are trying to allocate those

23   investments; right?

24   A.  That I'm trying to allocate the investments?

25   Q.  You, the Nordlicht Group.
```

1  A.  Again, it's written from someone who's putting allocations

2  down.  I don't know if it's me allocating that.  Again, I want

3  to be accurate.

4  Q.  If you speak into the microphone.

5  A.  I'm sorry.  I said if it's someone writing about

6  allocations, I don't know if that's me writing it.  I want to

7  be --

8  Q.  Okay.  But this is the Nordlicht Group, which you just

9  defined in your last question, yourself, Mark Nordlicht, and

10  David Bodner allocating the $590 million?

11  A.  I don't think it says the Nordlicht Group is allocating.  I

12  don't want to be argumentative either.  The Nordlicht Group is

13  described here in a separate email, which --

14  Q.  I realize it's a separate email, but I asked you who the

15  Nordlicht Group was, you said yourself, David Bodner --

16  A.  Again, in this email, it's referring to myself, David, and

17  Mark.

18  Q.  Now, how much money was going to be allocated to Platinum?

19  A.  I believe it says PPCO 59, I imagine that's $59 million,

20  and PPVA 29.5.

21  Q.  Was this a proposal, did you have a meeting about this, how

22  did this come to fruition?

23  A.  I don't recall this.

24       MR. GLUCK:  Mr. Parson, will you please pull up

25  exhibit 384.  It's already in evidence.

1  Q.  You had meetings with Mr. Bodner regarding allocations that

2  were permissible with the investment money that Beechwood

3  received; right?

4  A.  It's possible.  I don't recall them specifically.

5  Q.  It says that -- that's what it says in this email right

6  now, Scott taking Mr. Murray and Bodner to CNO limits now?

7  A.  I see that.

8  Q.  CNO is Beechwood's client; right?

9  A.  Correct.

10  Q.  They were the first client?

11  A.  They were.

12  Q.  And this time, 2000 --

13  A.  '14.

14  Q.  When did you obtain an office at Beechwood?

15  A.  I believe after the Jewish holidays in 2014.  So it would

16  be sometime in October of '14.

17  Q.  Originally, was your nephew, David Levy was the titular

18  seat and chief investment officer at Beechwood; right?

19  A.  I don't know his exact title.  I believe that Mark had some

20  involvement and David -- I don't know the titles.

21  Q.  But David Levy's role at Beechwood was terminated; right?

22  A.  Again, I don't know how exactly it happened.  I remember

23  that in October of '14, I was in Israel, Mark Feuer was in

24  Israel at the same time, and we had a discussion about me

25  taking an office there.  That's what happened.  I don't know if

1  at the same time Levy went, quote-unquote, back to Platinum.  I

2  don't know if it was exactly that same timeframe.  Certainly

3  was not trading me for Levy.

4  Q.  You don't think so?

5  A.  Absolutely not.

6  Q.  Was Mr. Levy in the office once you got your office?

7  A.  I don't recall him being there.  Not never, but I don't

8  recall him being there as having his office there.

9           MR. GLUCK:  Now we'll move this document into

10  evidence, PX 384.

11           MR. HERTZBERG:  No objection.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 384 received in evidence)

14  Q.  I asked you whether you had come into information that

15  Platinum's oil and gas investments had been overvalued prior to

16  that release being signed.  Do you remember that?

17  A.  Yes.

18  Q.  Did you come into information that Platinum's oil and gas

19  investments were overvalued prior to that release being signed?

20  A.  I think I answered that I don't recall that.

21  Q.  You don't recall?

22  A.  No.

23  Q.  Do you have any grounds to dispute it, any thinking in your

24  head like no, quite the opposite?

25  A.  I just don't recall someone telling me or someone with

1   knowledge telling me Platinum's oil assets are overvalued.  I

2   just don't recall that.

3   Q.  How often would you go into the Beechwood office once you

4   started going?

5   A.  Probably, maybe three days a week.  The average, I was

6   traveling, as well, so average three days a week.

7   Q.  Holidays?

8   A.  Holidays, vacations.

9   Q.  What would you do on those three days?

10  A.  So, when I got there, I just used it as my office for

11  myself.  At some point in conversations with Mr. Feuer, he

12  asked me that I had an expertise, or at least he thought so, in

13  lending, and if any deals come my way, I should possibly

14  introduce them to Beechwood for an investment.  At the same

15  time, also help him from time to time with analyzing deals that

16  he may be looking at.

17  Q.  When did you find out that -- you know about Black Elk;

18  right?

19  A.  Of course.

20  Q.  When did you find out that Black Elk was going to sell

21  substantially all of its assets to Renaissance?

22  A.  I don't recall.

23          MR. GLUCK:  Mr. Parson, PX 530, please.

24          THE COURT:  Counsel, bear in mind you have five

25  minutes.

```
 1                MR. GLUCK:  Move into evidence very quickly and I'll
 2    simply ask --
 3    Q.  You were told, at least by July of 2014, that was the case;
 4    right?
 5    A.  I'm not sure what this means.  I see that there is an email
 6    regarding sale of properties.
 7    Q.  That's a yes or a no?
 8    A.  Can you repeat the question.  I'll try to answer it.
 9    Q.  You knew that Black Elk was selling substantially all of
10    its assets to Renaissance by July of 2014; right?
11    A.  I don't know.
12                MR. GLUCK:  Mr. Parson, quickly, PX 918.
13    Q.  While he's bringing that up, any reason why you wouldn't
14    have discussed this with Mr. Bodner, given your constant
15    discussions?
16    A.  You're asking me if I would have discussed it had I known
17    that?  It's possible.
18    Q.  Any reason why you wouldn't?
19    A.  No.
20    Q.  Do you remember while you were at the Beechwood offices
21    after the Renaissance sale, Beechwood was still holding the
22    Black Elk bonds?
23    A.  What I recall about Beechwood bonds was at some point in
24    time, I found out that Beechwood was holding some bonds and I
25    subsequently found out that Beechwood sold those bonds.
```

 1  Q.  You were the one with authority, final authority to make

 2  that sale transaction back to PPVA happen, weren't you?

 3  A.  Absolutely not.

 4          MR. GLUCK:  Move this into evidence.

 5          THE COURT:  Was there any objection?

 6          MR. HERTZBERG:  No objection.

 7          THE COURT:  Received.

 8          (Plaintiff's Exhibit 918 received in evidence)

 9  Q.  Top line?

10  A.  Yes, I see that.

11  Q.  You were the one with final authority?

12  A.  Does not change my answer.

13  Q.  Does not?

14  A.  Absolutely not.

15  Q.  What does this mean?

16  A.  Someone is writing that nothing is to happen with this

17  until you hear from Feuer or Murray.  You can't comment what

18  someone else is writing.

19  Q.  At this point, Black Elk had sold all its assets, hadn't

20  they?

21  A.  I didn't know that.

22  Q.  You know about a company called Golden Gate; right?

23  A.  I know the name.

24  Q.  When did you find out that Golden Gate was defunct?

25  A.  Now.

 1   Q.  Now?

 2   A.  Yes.

 3   Q.  When did you find out it was pumping water?

 4   A.  I don't even know what that means.

 5           MR. GLUCK:  Quickly, Mr. Parson, PX 542.

 6   Q.  Did Mr. Nordlicht tell you that Golden Gate was overvalued?

 7   A.  Reading this thing, I'm not sure what it means, something

 8   about $1.2 billion evaluation based on --

 9           THE COURT:  Hold on.  It's not in evidence yet.

10           THE WITNESS:  I'm sorry.

11   Q.  Did you know that PPVA was making interest payments on

12   behalf of companies where Beechwood was holding the debt?

13   A.  I know that Beechwood would receive interest payments, some

14   of them from Platinum.  I'm not sure which one was for which.

15   Q.  Those companies couldn't service their own debt, could

16   they?

17   A.  I don't know if they could or they couldn't.

18           MR. GLUCK:  Very quickly, PX 401.

19           THE COURT:  This is the last one.

20           MR. GLUCK:  Next page, please.

21           We move this into evidence.

22           MR. HERTZBERG:  Can we see the cover page?

23           MR. GLUCK:  Mr. Parson, please go to the cover page.

24           THE COURT:  I take it there was no objection?

25           MR. HERTZBERG:  No objection.

 1                THE COURT:  Received.

 2                (Plaintiff's Exhibit 401 received in evidence)

 3                MR. GLUCK:  Now go to the schedule.

 4   Q.  You were told that PPVA was making interest payments to

 5   Monstant Partners and Golden Gate; right?

 6   A.  I see this.  I don't remember this.

 7   Q.  What about Northstar, you told, you know --

 8   A.  Just don't remember it.  It's possible.  I said before,

 9   it's possible some interest payments were being made, but which

10   one they were for, I just don't recall it.

11   Q.  Did you receive an urgent phonecall from Mr. Nordlicht at

12   the direction of Mark Feuer in an emergency because the

13   Northstar interest payments weren't being made?

14   A.  I don't remember that.

15                MR. GLUCK:  This is the last one.  Thank you very

16   much.

17                THE COURT:  Cross examination.

18   CROSS-EXAMINATION

19   BY MR. HERTZBERG:

20   Q.  Good afternoon, Mr. Huberfeld.

21   A.  Hi.

22   Q.  Prior to 2011, you were a hedge fund manager?

23   A.  From October 2005 to '11, I managed Centurion Credit.

24   Q.  After January 1, 2011, you were no longer a hedge fund

25   manager?

1  A.  After 2011, January, I was no longer running Centurion,

2  correct.

3  Q.  During the time when you were the manager of Centurion, you

4  shared an office with David Bodner?

5  A.  Yes, I did.

6  Q.  And you were sitting in that office and running a hedge

7  fund?

8  A.  Yes, I was.

9  Q.  What was David doing?

10  A.  Good question.  Again, it's a very long period of time.  We

11  had many other investments outside of the hedge fund, and David

12  was very involved with those things.  That's what I could say.

13  Q.  Could you give the jury a flavor of what kinds of

14  investments those were?

15  A.  So, there's a general rule, anything that I heard about,

16  any kind of investment that I heard about that I thought was

17  appropriate for the credit fund would go there.  Then there

18  were things that were sent to me, myself, David that were

19  outside of the fund and we would consider investing in them.

20  Those could have been real estate deals, those could have been

21  loans that were inappropriate for the credit fund, those could

22  have been investments in public companies or shares or private

23  companies, a myriad of different things.

24  Q.  So David was doing business, he just wasn't doing business

25  on the fund; is that right?

1  A.   It's a little bit too broad of a question.  If you ask me

2  specifically, I'm happy to answer.

3  Q.   David was giving his attention to other investments that

4  you and he had together?

5  A.   He did.

6  Q.   And he was evaluating pros and cons of prospective deals

7  that you and he were shown?

8  A.   Correct.

9  Q.   Did David also have charitable obligations that he attended

10  to?

11  A.   He did.

12  Q.   Did he spend a lot of time on that?

13  A.   Some time.

14  Q.   Did he take meetings with charitable or religious

15  institutions that wanted his attention?

16  A.   Yes.

17  Q.   Did he spend quite a bit of time on that?

18  A.   I think so.

19  Q.   And those charitable or religious institutions would come

20  visit him at the office that was occupied by Centurion?

21  A.   Sometimes.

22  Q.   After your resignation from Centurion -- by the way, was

23  your resignation from Centurion covered in the financial press?

24  A.   I believe so.

25  Q.   Did The Wall Street Journal cover it?

1   A.  I don't remember exactly who covered it.  I don't know if

2   it was The Wall Street Journal or some other publication.  I

3   think one publication related to hedge funds did cover it.  I

4   don't know if The Wall Street Journal did or not.

5   Q.  Do you recall that the news story at the time was that you

6   were stepping down, that Mark Nordlicht was taking over?

7   A.  I believe the press release said that Mark or -- Mark or

8   Platinum Management was taking over the management of the

9   credit fund.

10  Q.  After your resignation, from time to time, did Mark

11  Nordlicht ask your opinion about a potential investment?

12  A.  Yes.

13  Q.  Did he ever ask you to meet someone who was pitching him an

14  idea?

15  A.  From time to time, yes.

16  Q.  After hearing such a pitch, would you share your views with

17  Mr. Nordlicht?

18  A.  I think so.

19  Q.  Would you tell him what you thought the strengths of such a

20  proposition were?

21  A.  I think so.

22  Q.  Maybe the weaknesses?

23  A.  I think so.

24  Q.  Did Mark Nordlicht listen to your opinions?

25  A.  Sometimes yes, sometimes no.

1  Q.  Did he heed your views?

2  A.  Same answer.

3  Q.  If he refused your views, what could you do?

4  A.  Try to reemphasize my view, but at the end of the day, it

5  was just a view.

6  Q.  What if you and David had the same view, could the two of

7  you together overrule Mark?

8  A.  No.

9  Q.  It wasn't a democracy?

10  A.  There is no democracy in Mark Nordlicht world.

11  Q.  But the two of you could make arguments to try to persuade

12  him, couldn't you?

13  A.  Yes.

14  Q.  And if you failed to persuade him, then what?

15  A.  Ultimately, he was the manager, he made the decisions.

16  Q.  Is that because that was the deal that you and Mr. Bodner

17  made with Mr. Nordlicht?

18  A.  He was the manager.  That was the understanding.

19  Q.  Those were the rights that you bargained for when you went

20  into business with Mr. Nordlicht; isn't that right?

21  A.  Yes.

22  Q.  That's the control that he wanted when you went into

23  business together?

24  A.  I can't remember that specifically.  I think that's what it

25  was.

 1              MR. HERTZBERG:  Can we pull up DX 159, please.

 2  Q.  Mr. Huberfeld, can you tell me what's on your screen?

 3  A.  Mark Nordlicht, grantor trust.

 4  Q.  Is that a document you've seen before?

 5  A.  I have.

 6              MR. HERTZBERG:  We move it into evidence.

 7              MR. GLUCK:  No objection.

 8              THE COURT:  Received.

 9              (Defendant's Exhibit 159 received in evidence)

10  Q.  Is this what you might call a trust instrument,

11  Mr. Huberfeld?

12  A.  Again, I don't want to get into technicals, I don't know

13  what that means.  This was the, I believe, agreement that we

14  had with Mark laying out the trust.

15  Q.  Do you see that it's dated the first day of November 2008?

16  A.  I see that.

17  Q.  And at the top, Nordlicht Management LLC is defined as the

18  settler.  Do you see that?

19  A.  I do.

20  Q.  And is Nordlicht Management LLC an entity that is

21  controlled by Mark Nordlicht, as far as you know?

22  A.  I don't know that name specifically, so I don't want to

23  testify to that.

24  Q.  Do you see that Mark Nordlicht is defined as the trustee?

25  A.  I do.

1    Q.  In the first recital, it says that the settler wishes to

2    provide certain limited liability companies with the economic

3    equivalent of a passive membership interest in Platinum

4    Management NY LLC, and that's defined as the company?

5    A.  I see that.

6    Q.  If we go down to the next paragraph, do you see that it

7    says that the trustee, which is Mr. Mark Nordlicht, wishes to

8    grant each of Manor Lane Management LLC and Grosser Lane

9    Management LLC the economic equivalent of a 24.999 percent

10   passive membership interest in the company?

11          Do you see that?

12   A.  I do.

13   Q.  Is Manor Lane Management a company that you know?

14   A.  I do.

15   Q.  What is it?

16   A.  That's my management company that held the interest in the

17   trust.

18   Q.  Is it owned 50/50 by you and your wife?

19   A.  No.

20   Q.  Who owns Manor Lane Management?

21   A.  Myself.

22   Q.  Do you know what Grosser Lane Management is?

23   A.  I believe it was a management company connected to

24   Mr. Bodner.

25   Q.  Do you see that under this trust instrument, that Nordlicht

1   Management III LLC is to receive the economic equivalent of a

2   15 percent passive membership interest in Platinum Management?

3   A.  I see that.

4           MR. HERTZBERG:  And the last sentence in that

5   paragraph, which carries over to the next page, I'll have

6   Mr. Robson zoom out.  Starting with notwithstanding, anything

7   to the contrary.

8   Q.  Do you see that it says that notwithstanding anything

9   herein to the contrary, other than the economic interests

10  granted to them herein, the beneficiaries shall have no control

11  over the underlying assets of the trust and shall have no

12  interest in or control over company.

13          Did I read that correctly?

14  A.  I see that.

15  Q.  And the beneficiaries are Manor Lane Management and Grosser

16  Lane Management?

17  A.  Yes.

18  Q.  Did you understand this to mean that your company and

19  Mr. Bodner's company would have no interest in or control over

20  Platinum Management?

21  A.  I mean, that was what was understood.  I don't remember

22  specifically if this meant that, but I understood.

23  Q.  That was the deal that you made with Mr. Nordlicht?

24  A.  We had a passive interest in limited partners in the fund,

25  and Mark was running the fund.

 1  Q.  Let me call your attention to paragraph 1.3.  Again, we see

 2  here notwithstanding anything herein to the contrary, the

 3  trustee -- that's Mark Nordlicht; right?

 4  A.  Yes.

 5  Q.  -- shall vote the trust's membership interest and give or

 6  withhold the trust's consent to actions of the company,

 7  Platinum Management, as he determines in his sole and absolute

 8  discretion.

 9          Did I read that correctly?

10  A.  Yes.

11  Q.  After your resignation from Centurion, you still held

12  ownership interest in the Centurion management company;

13  correct?

14  A.  Yes.

15  Q.  So PPVA had an investment manager and that was Platinum

16  Management?

17  A.  These names are garble to me.  There was a management

18  company running PPVA and there was a management company running

19  Centurion.  A lot of these names are very similar, so it's hard

20  to be -- I want to be accurate.

21  Q.  Fair enough.  The management company that was running

22  Centurion earned fees from Centurion; correct?

23  A.  Yes.

24  Q.  And the management company that was running PPVA earned

25  fees for running PPVA?

 1    A.  Yes.

 2    Q.  And after resigning from management of Centurion, Manor

 3    Lane still held its economic interest in the management

 4    company?

 5    A.  Which one?

 6    Q.  Excuse me.  In the management company of Centurion.

 7    A.  I believe that after I resigned, the structure became

 8    similar to the structure in that whereas Mark became the

 9    manager and I went down into the trust.  That's what I believe.

10    It's my recollection.

11              MR. HERTZBERG:  Let's take a look at DX 744, please.

12    Q.  Do you recognize this document?

13    A.  I don't remember it specifically, but it looks familiar.

14    Q.  Is it another Mark Nordlicht grantor trust instrument?

15    A.  Yes.

16              MR. HERTZBERG:  We offer it.

17              MR. GLUCK:  No objection.

18              THE COURT:  Received.

19              (Defendant's Exhibit 744 received in evidence)

20    Q.  Looking at the top line, do you see that it says Mark

21    Nordlicht Grantor Trust II?

22    A.  I do.

23    Q.  And that Roman II is the only difference in the title from

24    the last one we looked at; right?

25    A.  Yes.

1    Q.  This one is dated January 2, 2011.  Do you see that in the

2    top line?

3    A.  I do.

4    Q.  And that was the first business day after your resignation

5    from running Centurion?

6    A.  I think so.

7    Q.  And if you look at the first recital, here it says that the

8    settler transfers to the trustee and trustee acknowledges

9    receipt of 75 percent membership interest in Centurion Credit

10   Holdings LLC, and a 75 percent interest in Centurion Credit

11   Management LP.

12          Do you see those two?

13   A.  I do.

14   Q.  And again, the trustee here is Mark Nordlicht; right?

15   A.  I believe so.

16          MR. HERTZBERG:  If you zoom out.

17   Q.  Look at the top line there, do you see it defines Mark

18   Nordlicht as trustee?

19   A.  Yes.

20   Q.  If we go down to the last full paragraph on that page, it

21   says the trustee wishes to grant each of Manor Lane and Grosser

22   Lane the economic equivalent of a 26.33 percent interest in the

23   company and a 26.33 percent interest in the partnership.

24          So those numbers are different, but the structure is

25   the same?

1    A.  Yes.

2    Q.  And if you look at the second to last paragraph at recitals

3    on page 2 of the PDF, starting with the sentence that begins

4    notwithstanding anything herein to the contrary, other than the

5    economic interest granted to them herein, the beneficiaries --

6    and that's Manor and Grosser, right?

7    A.  Yes.

8    Q.  -- shall have no control over the underlying assets of the

9    trust and shall have no interest in or control over the company

10   or the partnership.

11          Do you see that?

12   A.  Yes.

13   Q.  So again, it's the same thing.  When you resigned from

14   Centurion, you gave up control of Centurion and the management

15   company of Centurion that held your economic interests.  That

16   was the deal that you had with Platinum Management, that you

17   had the economic interests in Platinum Management, but you had

18   forfeited any control over the company to Mark Nordlicht?

19   A.  Yes.

20   Q.  And you had vested sole and exclusive control to Mark

21   Nordlicht?

22   A.  Yes.

23          MR. HERTZBERG:  Can you pull up DX 164, please.

24   Q.  Do you recognize this document, Mr. Huberfeld?

25   A.  Can we turn a few pages so we can look at it.  I'm looking

1    at one page.

2            MR. HERTZBERG:  We offer DX 164.

3            MR. GLUCK:  No objection.

4            THE COURT:  Received.

5            (Defendant's Exhibit 164 received in evidence)

6    Q.  Mr. Huberfeld, do you see on the cover page that DX 164 is

7    the second amended and restated operating agreement of Platinum

8    Management NY, LLC?

9    A.  Yes.

10   Q.  Is this the operating agreement of Platinum Management?

11   A.  Again, looking at one piece of paper --

12           MR. HERTZBERG:  Fair enough.  Can we go to page 4 of

13   the PDF.

14   Q.  Are you familiar with what an operating agreement is to an

15   LLC?

16   A.  Yes.

17   Q.  Does it govern the rights of the members to the LLC?

18   A.  I think so.

19   Q.  Is it effectively a contract between and among the members

20   of the LLC?

21   A.  I'm not an attorney, but I've seen operating agreements

22   before.

23   Q.  And you've been a member of an LLC?

24   A.  Yes.

25   Q.  And do you know that your rights as a member of an LLC are

1  determined by an operating agreement?

2  A.  I think so.

3  Q.  And this is dated effective as of January 1, 2011.  Do you

4  see that?

5  A.  I do.

6  Q.  And it's between and among Uri Landesman, who is defined as

7  manager, and Mark Nordlicht, and the Mark Nordlicht Grantor

8  Trust, who are each defined as passive members and collectively

9  with Mr. Landesman, the members.

10         Do you see that?

11  A.  I do.

12  Q.  Who was Uri Landesman?

13  A.  Uri Landesman --

14  Q.  Other than being the manager that we see here on this

15  document.

16         MR. GLUCK:  Objection.

17  A.  I don't understand the question.

18  Q.  Excuse me.  Tell the jury who Mr. Landesman was.

19  A.  Uri Landesman was someone that Mark brought into the fund.

20  I believe he came in to replace -- it was another manager who

21  was working with Ari Glass, and Mark recruited him to be one of

22  the managers of the company.

23  Q.  What was his background?

24  A.  He had some financial background.  I remember him -- I

25  remember him being on TV a lot.  I don't know if that was

1   before or during the time, but I remember him being on TV a

2   lot.  So he was some analyst.  Again, I don't know exactly what

3   his position was.  I know he was in the financial world.

4   Q.  Do you know that he came, prior to joining Platinum, that

5   he had come from an institutional firm?

6   A.  Possibly.  I'm not --

7   Q.  What I mean is like a big Wall Street firm.

8   A.  If you ask me the name, I couldn't tell you.  I know he

9   came from a Wall Street firm.

10  Q.  And he was like a talking head on financial news?

11  A.  Again, reference of time, yes, he was on CNBC sometimes.

12  Q.  Do you have an understanding as to why he was brought into

13  Platinum Management?

14  A.  I think that Mark wanted another manager to work together

15  with him and I think Ari Glass, at the time, was leaving.  So I

16  believe that's what his role was supposed to be.

17  Q.  Did you have an understanding of what Mark hoped to

18  accomplish by bringing in someone of Mr. Landesman's stature?

19  A.  I think Mark -- my understanding was in 2011, and one of

20  the reasons that he asked me to give up Centurion Management to

21  him because he was, quote-unquote, trying to make the place

22  more institutionalized.  That's what my recall is.

23          MR. HERTZBERG:  If we go to the last page of this

24  document, schedule 1.

25  Q.  Do you see that Mark Nordlicht had a 10-percent voting

1    company percentage of Platinum Management?

2    A.  I see that.

3    Q.  Mr. Landesman had a 25-percent voting company percentage?

4    A.  I see that.

5    Q.  And that the Mark Nordlicht grantor trust had a 65-percent

6    voting company percentage?

7    A.  I see that.

8    Q.  And do you recall, in the last document we looked at, that

9    Mark Nordlicht, as trustee of that trust, had sole and

10   exclusive rights to vote for the trust?

11   A.  Okay.

12   Q.  Do you recall that?

13   A.  I saw that.

14   Q.  So if you add together the 10 percent that he held in his

15   own name and the 65 percent that he controlled as a trustee,

16   what is the total amount of voting interest controlled by

17   Mr. Nordlicht?

18   A.  You want me to do the math?

19   Q.  You were a fund manager.

20   A.  Hold on one second.  75.

21   Q.  Thank you, Mr. Huberfeld.

22              MR. HERTZBERG:  If you go to paragraph 4.1, PDF page

23   12.  I'm sorry.  4.3 on PDF page 13, section 4.3.1.

24   Q.  Do you see in 4.3.1 that 75 percent of the voting company

25   percentages permits control over the removal and appointment of

1   managers?

2   A.   I see that.

3   Q.   So Mark Nordlicht, with his 10, plus his 65, had control

4   over who could and couldn't be a manager of Platinum

5   Management?

6   A.   That's what it says here.

7   Q.   By the way, when Mr. Nordlicht hired Mr. Landesman, did he

8   ask for your opinion?

9   A.   I have some recollection of going to dinner with Uri

10  Landesman.  I don't know if that's when he started already or

11  was supposed to come.  I remember meeting him -- again, I don't

12  have a reference of the timeframe, if it was before or

13  afterwards, and I believe we met in -- I'm not sure if David

14  was there or not.  I remember meeting him myself.

15  Q.   Did Mark ask you what you thought?

16  A.   I'm sure he did.

17  Q.   Did you ever hear him ask Mr. Bodner for permission to hire

18  Uri Landesman?

19  A.   I don't recall that.

20           (Continued on next page)

21

22

23

24

25

1          MR. HERTZBERG:  Could we pull up DX742.

2  Q.  DX742 is schematic that was prepared by us to help the

3  jury, Mr. Huberfeld.

4          Counsel, we offer it.

5          Any objection?

6          MR. GLUCK:  Objection.  Inaccurate, at least one

7  respect insofar as Murray Huberfeld.

8          THE COURT:  Come to sidebar.

9          (Continued on next page)

1                    (At the sidebar)

2          MR. HERTZBERG:  Counsel is right that we made a

3     mistake in splitting Manor Lane between him and his wife.  I

4     just heard from him that he and his wife don't own it 50/50,

5     and I'll make that clarification on the record.  Otherwise, we

6     think this is unobjectionable.

7          MR. GLUCK:  This was shared.

8          THE COURT:  As my courtroom deputy mentioned a few

9     minutes ago, you need to identify yourself by name.

10         MR. HERTZBERG:  I apologize.  Let me start over.  This

11    is Gabriel Hertzberg for Mr. Bodner.

12         Counsel for the plaintiffs pointed out that the

13    schematic that was prepared to help the jury is inaccurate in

14    one respect in that it shows a 50/50 ownership of Manor Lane

15    Management, the witness' company.  The witness has said that he

16    owns the company outright.  We will make that clarification on

17    the record.  Nonetheless, I do believe that the jury would

18    benefit from seeing a structural chart.

19         MS. SHEN:  We think the percentage without any context

20    is misleading for the jury.  Given -- especially that there is

21    incorrect information about the ownership interest in the Manor

22    Lane Management, I think the rest of it is subject to review as

23    well.

24         MR. HERTZBERG:  Other than what we talked about with

25    Manor Lane management, I'm not sure.

 1              THE COURT:  Was this listed on the pretrial consent

 2    order?

 3              MR. HERTZBERG:  It was, Judge.

 4              THE COURT:  Was there an objection made?

 5              MS. SHEN:  There was -- we had reserved objection

 6    until we saw -- had an opportunity to review it.  We did

 7    exchange --

 8              THE COURT:  That's not my question.

 9              What was on the pretrial consent order?

10              MR. HERTZBERG:  I think it said something like a

11    summary exhibit or organizational chart or something like that.

12              THE COURT:  What was the objection noted there?

13              MS. SHEN:  The objection noted was accuracy.  At the

14    time the pretrial consent order was submitted, the parties had

15    not exchanged summary exhibits yet.

16              MR. GLUCK:  We hadn't seen this at the time.

17              MR. HERTZBERG:  We have shared a slightly different

18    version, only in terms of color and sort of graphics.  But

19    substantively I don't think this is disputed.  We just waked

20    through -- grantor Trust, 65 percent; Madison 25; Nordlicht 10.

21    The jury needs to see something like this.

22              THE COURT:  Well, I'm disappointed that this wasn't

23    addressed much earlier, but I will receive it with the

24    correction that you're going to make.

25              Now, how much longer do you have?

1          MR. HERTZBERG:  I've got to go like -- I really wanted

2     to let him go at lunch.  But if we're going to take lunch at

3     1:00, I think unfortunately I'm going to have to go a little

4     longer than that.

5          THE COURT:  So I am extremely disappointed that both

6     sides have been going at what I consider a dawdling pace.

7     Instead of getting right to the issues that are at the heart of

8     this case, we have endless background.  We have incredibly

9     useful things like asking the witness to add 10 and 65 and

10    other things.

11         I think you ought to try to finish by lunch.

12         MR. HERTZBERG:  Thank you, Judge.

```
 1              (In open court; jury present)

 2              MR. HERTZBERG:  Your Honor, may I represent that 742

 3    was received subject to a correction?

 4              THE COURT:  Yes.  Why don't you tell the jury -- it's

 5    on the screen.  Put it on the screen for the jury and tell them

 6    what the correction is.

 7    BY MR. HERTZBERG:

 8    Q.  Mr. Huberfeld, does this org chart look correct to you in

 9    every respect, other than the ownership of Manor Lane

10    Management?

11    A.  Based on the trust agreement that I saw, yes.  But, again,

12    the timeframe, there were some modifications at different

13    times.

14    Q.  Fair enough.

15              Because Mr. Fuchs became a partner -- right? -- in

16    2014.  So the percentages shifted when Mr. Fuchs became a

17    partner?

18    A.  I think Mr. Glass had some sort of retained.  Again, I'm

19    trying to be accurate.  Again, I'm time framing.

20    Q.  Setting aside the dilution that would result from taking on

21    a new partner, structurally, does this look accurate to you?

22    A.  Structurally, yes.

23    Q.  So that gray box that says "Platinum Management NY LLC,"

24    that's the entity that controls Platinum Partner's value

25    arbitrage fund; right?
```

1   A.  I believe so.

2   Q.  And the control of Platinum Management is vested 65 percent

3   in the Mark Nordlicht grantor trust, 25 percent in Landesman,

4   and 10 percent with Nordlicht; right?

5   A.  We said that already.

6   Q.  And the control of the trust, of that 65 percent piece, was

7   set forth, as we went through earlier, that Manor and Grosser

8   had no ability to control that trust.

9   A.  Yes.

10  Q.  And had forfeited control of that trust to Mr. Nordlicht

11  many years ago.

12  A.  I don't know if I would characterize it as "forfeited."

13  But he granted the trust.

14  Q.  Vested authority.  Right.

15          Now, there were occasional meetings of the owners of

16  Platinum Management, yourself, Mr. Nordlicht, Mr. Landesman,

17  later Mr. Fuchs.

18          Correct?

19  A.  There were meetings.

20  Q.  There were meetings.  And some of those meetings occurred

21  offsite at restaurants.

22  A.  I believe most of them.

23  Q.  And was it Mr. Nordlicht's habit at those meetings to make

24  some kind of informational presentation about what was going on

25  with PPVA?

1   A.   I think the characterization of these meetings were, as

2   I've heard of them for a number of years, were uncharacterized

3   properly.   These were dinners that myself and Mr. Bodner and

4   Mr. Nordlicht attended.

5          From time to time, other people attended.   Uri

6   Landesman, Bernie Fuchs.   I can't say that Uri Landesman,

7   for example, was at every meeting.   I don't recall that.

8          So a lot of things were discussed at these meetings.

9   It was not a meeting where Mr. Nordlicht presented and David

10  and I sat there and listened.   That was not the format, that

11  you described.

12  Q.   Was it more social than that?

13         Is that what you're saying?

14  A.   I think our relationship spanned the globe of a business

15  relationship, outside investment relationship, and a social

16  relationship.

17  Q.   And did you and Mr. Bodner have business deals where you co

18  invested with Mr. Nordlicht totally outside of the funds?

19  A.   Yes.

20  Q.   So would those occasionally be a topic at some of these

21  meetings?

22  A.   I think so.

23  Q.   Now, when you did talk about PPVA, what was the level of

24  detail that Mr. Nordlicht gave you and Mr. Bodner about PPVA?

25  A.   Again, we had many meetings.   So it's hard for me to answer

1    specifically about -- there were many meetings where there was

2    a general conversation about things.  Once in a while, there

3    was a conversation with some more detail.

4    Q.  Did he give you details on how the wells were performing at

5    the Casamalia field in central California?

6              MR. GLUCK:  Objection.

7              THE COURT:  Overruled.

8              You may answer.

9              THE WITNESS:  I don't recall that.

10   BY MR. HERTZBERG:

11   Q.  Did he tell you how the rig was recovering in the Gulf that

12   was being operated by Black Elk?

13   A.  I don't recall that.

14   Q.  Do you recall that the level of information that you

15   received was not granular in that way?

16             THE COURT:  Sustained.

17   BY MR. HERTZBERG:

18   Q.  Did Mr. Nordlicht ever tell you what the water cut was of a

19   well that was being pumped by Golden Gate Oil?

20   A.  No.

21   Q.  And you don't recall Mr. Bodner at one of those meetings

22   ever receiving any kind of information like that?

23             THE COURT:  I'm sorry.

24             If I say "sustained," you don't answer.  You didn't

25   answer that question.  You were right not to answer.

1          Go ahead.

2          The witness wanted to know what the meaning was of my

3    sustaining an objection.  We had a detailed legal discussion

4    that must have lasted at least five seconds.

5    BY MR. HERTZBERG:

6    Q.  Out of you and Mr. Nordlicht and Mr. Bodner, who's the

7    oldest?

8    A.  Mr. Bodner.

9    Q.  So he's the most senior?  Is that another way to put it?

10   A.  That's your characterization.

11   Q.  If somebody had a meeting with you and Mr. Bodner and

12   Mr. Nordlicht and came away with the impression that Mr. Bodner

13   was leading the meeting or something to that effect, do you

14   have any sense for why a person could have that impression?

15          MR. GLUCK:  Objection.

16          THE COURT:  Sustained.

17   BY MR. HERTZBERG:

18   Q.  At a meeting with you and Mr. Bodner and Mr. Nordlicht, did

19   Mr. Bodner ever take the head of the table?

20   A.  Yes.

21   Q.  Why would you and Mr. Nordlicht let Mr. Bodner have the

22   head of the table?

23          MR. GLUCK:  Objection.

24          THE WITNESS:  I can only speak for myself.

25          THE COURT:  The objection is overruled.  You can

 1  answer.

 2          THE WITNESS:  I can only speak for myself.  It was a

 3  matter of age respect in my head.

 4  BY MR. HERTZBERG:

 5  Q.  By sitting at the head of the table, did that give David

 6  Bodner the power to dominate Mark Nordlicht?

 7  A.  I don't think so.

 8  Q.  Did it give Mr. Bodner the power to control Mark Nordlicht?

 9  A.  I don't think so.

10  Q.  Did David Bodner dominate Mark Nordlicht?

11  A.  I don't think so.

12  Q.  Did David Bodner control Mark Nordlicht?

13  A.  I don't think so.

14  Q.  Did David Bodner control Platinum Management?

15  A.  I don't think so.

16  Q.  When was the last time you and Mr. Bodner spoke?

17  A.  Several years ago.

18  Q.  Mr. Gluck asked you about some Beechwood loans that had

19  been made to PPVA.

20          Do you recall that?

21  A.  Yes.

22  Q.  I think the testimony was that you acknowledged that PPVA

23  had pledged some assets or collateral to back those loans.

24  A.  I testified that I believe that Beechwood made loans to

25  assets that had involvement with PPVA and PPCO for that matter.

 1    Q.  Those loans resulted in cash going to either PPVA or to a

 2    PPVA portfolio company as the case may be.

 3              MR. GLUCK:  Objection.

 4              THE COURT:  Overruled.

 5              You may answer.

 6              THE WITNESS:  I don't have specific memory of where it

 7    went to.  As I said again, there were loans given.  Where

 8    specifically the money went to -- to the portfolio company, to

 9    Platinum -- I just don't recall.

10    BY MR. HERTZBERG:

11    Q.  Right.  But the collateral wasn't given to Beechwood for

12    free.  It was because a loan had been given to either PPVA or

13    to the borrower, whether it was PPVA or to the portfolio

14    company.

15    A.  I think that's accurate.

16    Q.  Cash flowed in one direction, and a pledge of security went

17    in the direction.

18    A.  I think that's accurate.

19    Q.  That's how collateralized loans work; right?

20    A.  I think so.

21    Q.  Let me ask you about the Marcos Katz situation.

22              If Marcos Katz were to make an investment in PPVA, was

23    there nonmonetary value to having Marcos Katz associated with

24    PPVA?

25              MR. GLUCK:  Objection.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I'm not sure I understand the question.

 3  BY MR. HERTZBERG:

 4  Q.  Well, if Mr. Katz were to become an owner of PPVA, an owner

 5  of Platinum Management, would that have helped in marketing or

 6  in some other intangible way, beyond the cash investment that

 7  he put in?

 8  A.  I'm sure it's possible.

 9              MR. GLUCK:  Objection.

10              THE COURT:  Overruled.

11              You may answer.

12              THE WITNESS:  It's possible.

13  BY MR. HERTZBERG:

14  Q.  Given Mr. Katz's stature, isn't it in fact likely?

15              MR. GLUCK:  Asked and answered.

16              THE COURT:  I think yes, implicitly yes.  Sustained.

17  BY MR. HERTZBERG:

18  Q.  Was the late Marcos Katz a big deal in the religious

19  business community that you operate in?

20              MR. GLUCK:  Objection.

21              THE COURT:  Sustained.

22  BY MR. HERTZBERG:

23  Q.  In March of 2016, how much money did you and your family

24  have in the fund?

25  A.  A significant amount of money.
```

1  Q.  Did Mr. Bodner's family also have a significant amount of

2  money?

3  A.  I think so.

4  Q.  Was there value to the --

5       We heard earlier that you and Mr. Bodner agreed to a

6  lockup of two years as part of that March 2016 agreement.

7  Right?

8  A.  Correct.

9  Q.  Is there value to the fund when two significant investors

10 agree to keep their money in place, to keep their investment in

11 place, for two years?

12       THE COURT:  I'll allow it.

13       THE WITNESS:  I think so.

14 BY MR. HERTZBERG:

15 Q.  Can you explain to the jury why that is.

16 A.  In the fund business, long-term capital, locked up capital,

17 has a value to a manager.  And what it means to the manager it

18 means to the fund which means he is able to do certain types of

19 investments; that he knows he has this capital committed for a

20 significant period of time.

21 Q.  It creates stability for the manager?

22 A.  I think it creates what it creates.  It's two years.  He

23 knows this money is going to be there.

24       MR. HERTZBERG:  Can we pull up, please, 739.

25 Q.  Mr. Huberfeld, do you recognize the document that's on the

1   screen?

2   A.  I know what this is.  I've seen variations.  I don't know

3   if it's specifically this document.  I've seen variations of

4   this document.

5            MR. HERTZBERG:  Your Honor, we offer it.

6            Just to be clear, the exhibit that we're offering is

7   multipage.  So if you want to click through, Mr. Robson, to

8   show plaintiffs' counsel.

9            THE COURT:  Received.

10           (Plaintiffs' Exhibit 739 received in evidence)

11   BY MR. HERTZBERG:

12   Q.  Mr. Huberfeld, is this sometimes called a "tear sheet" or a

13   "one-pager"?

14   A.  I think a "one-pager" is more accurate.

15   Q.  And is it a marketing document?

16   A.  It's both an initial marketing document and something that

17   also may be sent to an investor on a monthly basis.

18   Q.  So investors in the fund would receive -- the one that

19   we're looking at is January 2014.  Correct?

20   A.  I see that.

21   Q.  And it's for Platinum Partners Value Arbitrage Fund.

22           Do you see that?

23   A.  Yes.

24   Q.  So an investor in January 2014 would have received this

25   document in the mail or by email?

1            How does that work?

2   A.  A current investor in the fund?  Is that what you're

3   asking?

4   Q.  Yes.

5   A.  Yes.  My recollection is they would receive it I think by

6   email.  Is it possible someone asked for it by mail?  Yes.  But

7   I think by email would be the general mode of communication.

8   Q.  And I recognize that somehow, the way this got saved in the

9   plaintiffs' system, some of the characters aren't legible.

10           If you look at the third heading down, if you ignore

11  the hieroglyphics, it looks like it says "Manager Biography."

12           Do you see that?

13  A.  Yes.

14  Q.  It has the buying fees -- it has biographies of

15  Mr. Nordlicht and Mr. Landesman.

16  A.  Yes.

17  Q.  Because they are the two most senior people at PPVA.

18           That's what this is communicating?

19  A.  I think so.

20           MR. HERTZBERG:  You can zoom out, Mr. Robson.

21           Just to complete the exhibit, we compiled several

22  months of this.  So if you can go to page 2.  This is the

23  second page of the January one.  If you go to page 3, this is

24  the first page of February.  Let's go one more page.  This is

25  the second page of February.  So I think everybody gets the

 1   point.

 2           Could you go back one page, Mr. Robson.

 3   Q.  The information that's being communicated in that chart on

 4   the bottom -- is that communicating the current and historical

 5   monthly returns?

 6   A.  Yes.  I believe so.

 7   Q.  And column second to the last on the right-hand side, YTD,

 8   that's year to date?

 9   A.  Yes.

10   Q.  So that's telling the investors, here's how you're doing

11   this year effectively.  Right?

12   A.  Yes.

13   Q.  And cumulative -- sorry.  "CUM," is that cumulative?

14   A.  I think so.

15   Q.  And that's telling the investors what your return would be

16   had you been in the fund since 2003, since its inception?

17   A.  Yes.

18   Q.  So an investor, let's say in this month of February 2014

19   who had been in PPVA from 2003, would have returned his or her

20   money about 5 1/2 times by this point in 2014.

21   A.  I don't know how it's being calculated.  Again, I can just

22   go by the math.

23   Q.  What does the math tell you?

24   A.  The math would be approximately 560 percent rounding up.  I

25   don't know if that comes up to 5 1/2 times their money.  I

1  don't know how that's exactly calculated.

2  Q.  So let's look at the present month reflected on the page

3  that we're looking at, that plus/minus 1.35 percent.

4       Do you see that?

5  A.  I do.  What month are we looking at?

6  Q.  So February of 2014.

7  A.  I think though it's 1.37.

8  Q.  And just below that plus/minus, do you see that just below

9  that, it says that that symbol means it's an estimate and

10  subject to change?

11  A.  I see that.

12  Q.  Do you see that that little asterisk next to 2014 says that

13  that's an unaudited member?

14  A.  I see that.

15  Q.  Did you have the ability at Platinum Management to go to

16  somebody, go to the CFO, and say, can I get a preview of what's

17  going to be sent to the investors this month?

18  A.  I think I recall from my own accounts speaking -- I don't

19  know if it was the CFO or someone -- saying you have Mark's

20  estimate.  Can you send me my approximate numbers.  That's my

21  recollection.

22  Q.  And getting a couple of days' or a couple weeks' preview on

23  what that unaudited estimate is, does that give you some kind

24  of benefit or position relative to an investor who can't just

25  walk over to somebody's desk and ask that same question?

1    A.  I don't believe that it was weeks.  We're talking about

2    days or hours prior to this.  I may have called someone and

3    said, has Mark given you an estimate yet?  Could you send me my

4    approximate estimate.  This is based on Mark's estimate.

5              MR. HERTZBERG:  Can we pull up 711, please.

6              THE COURT:  Counsel, this will be the last item before

7    the lunch break.

8              MR. HERTZBERG:  Thank you, Judge.  My last question.

9              This is in evidence.  So we can publish it to the

10   jury.

11   Q.  Mr. Huberfeld, is 711 an email from Dan Mandelbaum to you?

12   A.  I see that it is.

13   Q.  Was Mr. Mandelbaum working at that time as the CFO of PPVA?

14   A.  It says that he is.

15   Q.  Where it says "VA," do you know that to be PPVA?

16   A.  I think so.

17   Q.  And where it says "CO," do you understand that to be PPCO?

18   A.  I think so.

19   Q.  And the subject line you see, albeit misspelled, is initial

20   estimates.

21             Do you see that?

22   A.  I do.

23   Q.  Is this an instance where -- let me note this is July 2 of

24   2015.  Right?

25   A.  I see that.

1   Q.  So right at the beginning of the month.

2   A.  Yes.

3   Q.  And so are you, in this email, getting the initial

4   estimates for June 2015 from Mr. Mandelbaum?

5   A.  I think so.

6   Q.  And the investor statements would have gone out what?

7   Hours or days after this?

8   A.  They should be.

9   Q.  Is this evidence that you control PPVA?

10  A.  That I control PPVA?  I did not.

11  Q.  Is this evidence that you control PPVA?

12  A.  I don't think so.

13          MR. HERTZBERG:  No further questions.

14          Thank you, your Honor.

15          THE COURT:  Any redirect?

16          MR. GLUCK:  I will, but I'll be more than 15 minutes.

17          THE COURT:  Come to the sidebar.

18          (Continued on next page)

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  So I put defense counsel on a fairly

3    strict time limit which he adhered to, and plaintiffs' counsel

4    already had a very substantial direct examination beginning

5    yesterday.  And my suggestion is that plaintiffs' counsel

6    forego any redirect.

7              But if plaintiffs' counsel wants redirect, then of

8    course I will feel compelled to first give defense counsel more

9    cross-examination time before we turn to redirect.

10             MR. GLUCK:  There is one topic I would like to hit.

11             THE COURT:  You don't have to tell me what it is.

12             MR. GLUCK:  It's agreed.

13             THE COURT:  Very good.

14             MR. GLUCK:  As he can have more time.  Agreed that

15   way.

```
 1                    (In open court; jury present)

 2             THE COURT:  My understanding is that plaintiffs'

 3   counsel is going to forego any recross.

 4             MR. GLUCK:  No.

 5             THE COURT:  Ladies and gentlemen, I'm going to have to

 6   give defense counsel then an additional hour of

 7   cross-examination, after which we will hear the redirect from

 8   plaintiffs' counsel.

 9             Are you certain that's the election you'd like to

10   make?

11             MR. GLUCK:  We're debating it.

12             (Discussion off the record)

13             MR. GLUCK:  We'll waive.

14             THE COURT:  All right.  Very good.  So, ladies and

15   gentlemen, we'll give you your lunch break, and we will

16   reconvene at five minutes after 2:00.

17             (Continued on next page)

18

19

20

21

22

23

24

25
```

```
 1                  (In open court; jury not present)

 2             THE COURT:  Please be seated.

 3             Just very quickly, first, I want to note for the

 4    record that, although I properly sustained the objection to the

 5    question put by defense counsel whether Mr. Katz was a "big

 6    deal" in the religious business community that Mr. Huberfeld is

 7    part of, I would also have sustained that objection, even if it

 8    had properly been worded, namely, was Mr. Katz a macher.

 9             We have Mr. Nordlicht after lunch.

10             Has that already been arranged now?

11             MS. SHEN:  It has.

12             THE COURT:  With respect to Ms. Albanese, I wanted to

13    bring everybody up to date.  She remains sick.  She was

14    supposed to go to a doctor at 2:00.  She said she didn't want

15    to testify tomorrow.

16             I'm not sure I'm going to excuse her.  But what I

17    arranged was that we will call her jointly from the courtroom

18    at 4:30 today and see where things stand.

19             MS. SHEN:  Your Honor, may I be heard on that.  So I

20    spoke with Ms. Albanese for about ten minutes.  Our

21    understanding is that her illness is quite severe.  I think,

22    depending on how the next few days play out, we may be done.

23    We may be able to go forward without any further testimony from

24    Ms. Albanese.

25             THE COURT:  That would be great.  I think that's the
```

1    right decision.

2              MS. SHEN:  We've been conferring.

3              THE COURT:  That would be greatly appreciated.  If you

4    can let me know by 4:30 so we can relay that to Ms. Albanese.

5    All right.  Very good.  We'll see you in an hour.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| 1 | AFTERNOON SESSION |
| 2 | 2:05 p.m. |

3          MR. ENGEL:  Steven Engel, Dechert LLP.  I represent

4   Mr. Nordlicht.

5          Mr. Nordlicht is outside, and he's prepared to testify

6   as the Court is directed.  The only thing I just wanted to make

7   sure that I understand -- I have not seen a transcript.  I'm

8   not aware of the Court's ruling.

9          It was described to me that your Honor believed that,

10  because Mr. Nordlicht was acquitted of charges related to

11  valuation, he may no longer have a Fifth Amendment privilege

12  with respect to that issue.

13         THE COURT:  No.  I never said that at all.  No.  I

14  said, on the contrary, that because he's still facing sentence,

15  he has the Fifth Amendment privilege across the board.

16         MR. ENGEL:  Thank you, your Honor.  That has been

17  clarified.  Mr. Nordlicht is here, whenever the parties wish to

18  call him.  He does intend to take the Fifth to the fullest

19  extent of the law.

20         THE COURT:  Yes.  I understand.

21         Let's bring in the witness and bring in the jury, and

22  I'll give the jury some instructions.

23         MR. ENGEL:  Thank you.

24         (Continued on next page)

25

1              (In open court; jury present)

2              THE DEPUTY CLERK:  Please take the witness stand.

3              Just take a seat.

4              Would someone from counsel table come up and grab the

5    exhibits from the last witness.

6              Ladies and gentlemen, please be seated.

7              Ladies and gentlemen, one of the issues you're going

8    to have to decide in this case is whether or not the defendant,

9    Mr. Bodner, was a so-called "coconspirator" with other persons

10   who allegedly committed the fraud.

11             And I will give you detailed instructions as part of

12   my final instructions of how you determine whether somebody is

13   or is not a coconspirator.  But the allegation by the plaintiff

14   is that he was a coconspirator with Mr. Nordlicht who is the

15   witness we're about to hear from.

16             Now, I am told by Mr. Nordlicht's counsel that he is

17   going to invoke his Fifth Amendment right to silence with

18   respect to the questions put, and that is his right under the

19   Constitution of the United States.

20             However, in a civil case, you can, if you wish, infer

21   from the invocation of the Fifth Amendment that the answer, if

22   he had to substantively answer, would have been adverse to his

23   interests.

24             You can consider that in determining if he is or is

25   not a coconspirator.  That is not enough, by itself, to show

1    that he is or is not a coconspirator, but it's one of the

2    things that you can consider, if you wish.  You don't have to

3    draw any inference, but you are permitted to draw an inference.

4         Let me give you an example.  Supposing the question is

5    put to some hypothetical witness, Mr. Jones, isn't it true that

6    you and Mr. Smith planned a fraud?  And Mr. Jones says, I

7    respectfully decline to answer on the basis of my Fifth

8    Amendment right to silence, you could, if you wish, infer from

9    that that in fact he had committed fraud.  Or you could infer

10   that he didn't.  You have to consider all the circumstances,

11   all the evidence in the case, and see what is relevant.

12        So just to repeat, first, one of the issues you're

13   going to have to decide is whether or not the defendant here

14   was or was not a coconspirator with Mr. Nordlicht.  And

15   secondly, in considering that, you may, if you wish, draw

16   negative inferences from the invocation of the Fifth Amendment,

17   but you're not required.  You may say, well, we have other

18   evidence.  It's totally up to you.

19        I will spell this all out in great detail in my final

20   instructions, but I want to give you a heads-up because my

21   understanding is that the witness is going to invoke the Fifth

22   Amendment.  So we'll swear him in.

23    MARK NORDLICHT,

24        called as a witness by the Plaintiffs,

25        having been duly sworn, testified as follows:

1          THE DEPUTY CLERK:  Please be seated.

2          State your name and spell it for the record.

3          THE WITNESS:  Mark Nordlicht, M-a-r-k

4    N-o-r-d-l-i-c-h-t.

5          THE COURT:  Thank you.

6    DIRECT EXAMINATION

7    BY MR. GLUCK:

8    Q.  Mr. Nordlicht, were you the chief investment officer of

9    Platinum Management?

10   A.  On the advice of counsel, I have to invoke the Fifth

11   Amendment according under the Constitution.

12          MR. GLUCK:  Mr. Parson, will you bring up JX74, which

13   is already in evidence.

14          Mr. Magruder, please hand the witness a copy of the

15   document.

16   Q.  While he's getting that, Mr. Nordlicht, in front of you is

17   a release agreement.

18          Did you release Murray Huberfeld and David Bodner on

19   behalf of the fund PPVA?

20   A.  On advice of counsel, I invoke the Fifth Amendment on this

21   issue.

22          MR. GLUCK:  Please turn to the second page of this

23   document, Mr. Parson.

24   Q.  Mr. Nordlicht, clause 3B contains a release that I just

25   described.

1          My question is:  For what matters were you releasing

2    Mr. Bodner and Mr. Huberfeld?

3    A.  On advice of counsel, I have to invoke the Fifth Amendment.

4          MR. GLUCK:  Please go to the next page, Mr. Parson.

5    Go to the next page.

6    Q.  Clause D on the page that's being highlighted provides for

7    a lockup.

8          My question is:  At the time this agreement was

9    executed, was PPVA capable of meeting redemptions as they came

10   in?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12   Q.  Since roughly January of 2015, was there a directive in

13   place preventing partners of Platinum Management from

14   withdrawing from the fund?

15   A.  On the advice of counsel, I invoke the Fifth Amendment.

16   Q.  Is it your understanding, Mr. Nordlicht, that by this

17   document, Mr. Huberfeld and Mr. Bodner gave up their interests

18   in Platinum Management?

19         MR. LAUER:  Your Honor, I didn't mean to interrupt the

20   questioning, but to preserve our record, we object to this

21   line.

22         THE COURT:  Okay.  Now of course you have a right to

23   object to any given question on other grounds like hearsay or

24   foundation or whatever, your overall objections.

25         THE WITNESS:  Is there a question?

```
 1              MR. GLUCK:  Yes, there is.

 2              THE WITNESS:  On the advice of counsel, I invoke the

 3  Fifth Amendment.

 4              MR. GLUCK:  Mr. Parson, please call up PX364.  Please

 5  highlight the sentence regarding "no value to management."

 6              We move for 364 to be received into evidence.

 7              THE COURT:  Any objection?

 8              MR. LAUER:  No, your Honor.

 9              MR. GLUCK:  Mr. Parson, can you please highlight that

10  section.

11  Q.  Mr. Nordlicht, isn't it true that there was no value to

12  Platinum Management as of March 10, 2016?

13  A.  On the advice of counsel, I invoke the Fifth Amendment.

14              MR. GLUCK:  We can bring that down.

15              Please bring up PX595.  Please flip to the next page.

16  This is already in evidence.

17              MR. LAUER:  It's not in evidence.

18              MR. GLUCK:  It's not.  Excuse me.  I move it in

19  evidence.

20              THE COURT:  Any objection?

21              MR. LAUER:  We don't object, your Honor.

22              THE COURT:  Received.

23              (Plaintiffs' Exhibit 595 received in evidence)

24              MR. GLUCK:  Mr. Parson, will you please go to the

25  cover email.
```

1   Q.  Mr. Nordlicht, isn't it true that as of January 2016,

2   Mr. Marcos Katz had requested a full redemption of his Platinum

3   interests at any price?

4   A.  On the advice of counsel, I invoke the Fifth Amendment.

5           MR. GLUCK:  Mr. Parson, will you please call up

6   Plaintiffs' Exhibit 367.  We seek it to be moved into evidence.

7           THE COURT:  Is there an objection?

8           MR. LAUER:  No objection.

9           THE COURT:  Received.

10          (Plaintiffs' Exhibit 367 received in evidence)

11  BY MR. GLUCK:

12  Q.  Mr. Nordlicht, isn't it true that within the context of

13  negotiations surrounding the relinquishment of Mr. Huberfeld

14  and Mr. Bodner's interests, the question arose as to whether

15  such relinquishment would be considered to be a gift for tax

16  purposes and that you responded:  "It's the most moronic thing

17  I've ever heard, even for them.  There is no value right now to

18  management"?

19  A.  On the advice of counsel, I invoke the Fifth Amendment.

20  Q.  And did you evidence this statement, at least in part, by

21  noting that the fact that the shares are being given away for

22  just investment, no consideration, is a reason?

23  A.  On the advice of counsel, I invoke the Fifth Amendment.

24          MR. GLUCK:  Mr. Parson, will you please pull up

25  Plaintiffs' Exhibit 365.  Just a moment.  We have a technical

 1   error.  Why don't we do 366 instead.

 2           Mr. Parson, in the meantime, will you please pull up

 3   Plaintiffs' Exhibit 366.

 4           We seek to move this document into evidence.

 5           MR. LAUER:  No objection.

 6           THE COURT:  Received.

 7           (Plaintiffs' Exhibits 366 received in evidence)

 8   Q.  Isn't it true that it was Mr. Bodner and Mr. Huberfeld that

 9   were demanding a release from the fund PPVA?

10   A.  On the advice of counsel, I invoke the Fifth Amendment.

11   Q.  What was the specific liability that you wished to talk

12   about with Mr. Katz?

13   A.  On the advice of counsel, I invoke the Fifth Amendment.

14   Q.  That was a liability being faced by Mr. Huberfeld and

15   Mr. Bodner, wasn't it?

16   A.  On the advice of counsel, I invoke the Fifth Amendment.

17   Q.  Why didn't it make sense to address the liability in the

18   document?

19   A.  On the advice of counsel, I invoke the Fifth Amendment.

20   Q.  What was the purpose of the requested indemnification to

21   Mr. Bodner and Mr. Huberfeld?

22   A.  On the advice of counsel, I invoke the Fifth Amendment.

23   Q.  Isn't it true that Mr. Katz never intended to invest money

24   in PPVA but, rather, only place money into Platinum Management,

25   specifically, $10 million?

1    A.  On the advice of counsel, I invoke the Fifth Amendment.

2              MR. GLUCK:  Mr. Parson, please call up Plaintiffs'

3    Exhibit 367.  Sorry.  370.  I misspoke.  We seek to move this

4    document into evidence.

5              MR. LAUER:  No objection.

6              THE COURT:  Received.

7              (Plaintiffs' Exhibit 367 received in evidence)

8    BY MR. GLUCK:

9    Q.  Mr. Nordlicht, why wouldn't you personally guarantee the

10   indemnity being requested by Mr. Bodner and Mr. Huberfeld?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12   Q.  Mr. Nordlicht, what misconduct by Mr. Bodner and

13   Mr. Huberfeld did you state you obviously can't be responsible

14   for?

15   A.  On the advice of counsel, I invoke the Fifth Amendment.

16   Q.  Mr. Nordlicht, was it ever stated to you by Mr. Katz that

17   Mr. Hertzberg and the Curtis firm were representing PPVA in

18   connection with this release?

19   A.  On the advice of counsel, I invoke the Fifth Amendment.

20   Q.  Mr. Nordlicht, isn't it true that Mr. Huberfeld and

21   Mr. Bodner had knowledge that PPVA's assets were materially

22   overvalued?

23   A.  On the advice of counsel, I invoke the Fifth Amendment.

24   Q.  Mr. Nordlicht, isn't it true that Mr. Bodner and

25   Mr. Huberfeld knew that PPVA had material liabilities that had

 1   not been disclosed?

 2        MR. LAUER:  Objection.  He can ask what he told them,

 3   not what they knew.  This is getting --

 4        MR. GLUCK:  I'll ask what he told them.

 5        THE COURT:  I'm actually surprised you didn't object

 6   sooner.  But anyway, the objection is sustained.

 7   BY MR. GLUCK:

 8   Q.  Mr. Nordlicht, had you told information to Mr. Bodner and

 9   Mr. Huberfeld that PPVA's assets were materially overvalued?

10        MR. LAUER:  Assumes facts.

11        THE COURT:  No.  That's a permissible question.

12   Overruled.

13        THE WITNESS:  I invoke the Fifth Amendment afforded

14   under the Constitution.

15   BY MR. GLUCK:

16   Q.  Mr. Nordlicht, isn't it true that you told Mr. Huberfeld

17   and Mr. Bodner that PPVA had significant liabilities that were

18   undisclosed and specifically Beechwood liabilities?

19        MR. LAUER:  Again, same objection.

20        THE COURT:  Well, that objection is overruled.  But

21   it's a compound question.  So I'll ask you to rephrase it.

22        MR. GLUCK:  I'll separate it.  Withdrawn.

23   Q.  Mr. Nordlicht, isn't it true that you told Mr. Huberfeld

24   and Mr. Bodner that PPVA had material liabilities that were

25   undisclosed?

1          MR. LAUER:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  On advice of counsel, I invoke the Fifth

4   Amendment.

5   BY MR. GLUCK:

6   Q.  Mr. Nordlicht, isn't it true that you told Mr. Huberfeld

7   and Mr. Bodner that PPVA had material liabilities to Beechwood

8   that had not been disclosed?

9   A.  On the advice of counsel, I invoke the Fifth Amendment.

10  Q.  Mr. Nordlicht, isn't it true that you told Mr. Huberfeld

11  and Mr. Bodner that PPVA had material liabilities to the

12  Correction Officers' Benevolent Association pension fund that

13  had not been exposed?

14         MR. LAUER:  Objection.  Assumes facts.

15         THE COURT:  Yes.  I'm going to overrule.  If you want

16  to, for future reference, have a sidebar, I'll tell you why I'm

17  overruling it.  It is overruled.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  So there is already evidence that he told

3    the defendant and Mr. Huberfeld about numerous liabilities.

4    While there is no evidence in the record so far that he said to

5    them that these are undisclosed, I think a reasonable -- if

6    Mr. Nordlicht had been a regular witness, that still would have

7    been a regular question to put to him because it's a reasonable

8    inference of the nature of their dealings.

9              So if he had asked something that has no basis in the

10   record, I would have sustained the objection.  But here I think

11   it's a reasonable inference from what is in the record.  So the

12   objection is overruled.

13             MR. LAUER:  Thank you, your Honor.

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          MR. GLUCK:  Mr. Parson, please call up Plaintiffs'

3    Exhibit 411.  That's not the 411 that I was hoping for.

4    Plaintiffs' Exhibit 372, please.  This is 411.  Thank you.

5    Please go to the next page.  This is already in evidence.

6    Q.  Mr. Nordlicht, isn't it true that subsequent to this

7    letter, Mr. Katz and the Katz family had no intention of

8    investing further or Platinum Management?

9    A.  On the advice of counsel, I invoke the Fifth Amendment.

10          MR. GLUCK:  Mr. Parson, please call up Defendants'

11    Exhibit 419.  We seek to move this into evidence.

12          MR. LAUER:  No objection.

13          THE COURT:  Received.

14          (Defendants' Exhibit 419 received in evidence)

15    BY MR. GLUCK:

16    Q.  Mr. Nordlicht, isn't it true that PPVA never deposited the

17    $3 million into Mr. Katz's bank account in 2016?

18    A.  On the advice of counsel, I invoke the Fifth Amendment.

19          MR. GLUCK:  Plaintiffs' Exhibit 379, please.  We seek

20    to admit this into evidence.

21          MR. LAUER:  No objection.

22          THE COURT:  Received.

23          (Plaintiffs' Exhibit 379 received in evidence)

24    BY MR. GLUCK:

25    Q.  Mr. Nordlicht, isn't it true that in 2014 and onward, PPVA

1    began to have significant problems meeting the deadlines?

2    A.  On the advice of counsel, I invoke the Fifth Amendment.

3    Q.  Mr. Nordlicht, isn't it true that you told Murray Huberfeld

4    and David Bodner that if those redemptions did continue, you

5    would be shut down?

6    A.  On the advice of counsel, I invoke the Fifth Amendment.

7    Q.  Mr. Nordlicht, isn't it true that if the actual value of

8    PPVA's assets were disclosed and that value was materially

9    lower than on PPVA's nav statements, there would have been a

10   wave of investor redemptions?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12   Q.  Upon a wave of investor redemptions, the fund would have

13   been forced into liquidation.  Isn't that true?

14            MR. LAUER:  Speculation.

15            MR. GLUCK:  It's in the email.

16            THE COURT:  Sustained.

17   BY MR. GLUCK:

18   Q.  Mr. Nordlicht, in 2014 onward, were you concerned about a

19   wave of investor redemptions that would lead to the liquidation

20   of the fund?

21   A.  On the advice of counsel, I invoke the Fifth Amendment.

22   Q.  Mr. Nordlicht, isn't it true that in November of 2012,

23   there was an explosion on the Black Elk rig?

24   A.  On the advice of counsel, I invoke the Fifth Amendment.

25   Q.  Mr. Nordlicht, isn't it true that in the summer of 2014,

1    Black Elk sold all our substantially all of its assets?

2    A.  On the advice of counsel, I invoke the Fifth Amendment.

3            MR. GLUCK:  Mr. Parson, please bring up PX527.  I

4    believe this is already in evidence.

5    Q.  Mr. Nordlicht, isn't it true that subsequent to the Black

6    Elk explosion, you worked with Mr. Bodner and Mr. Huberfeld to

7    form and create the BEOF fund?

8    A.  On the advice of counsel, I invoke the Fifth Amendment.

9    Q.  Mr. Nordlicht, isn't it true that the proceeds of the

10   renaissance sale were paid out, not to the creditors of Black

11   Elk, but rather to the investors?

12           MR. LAUER:  Scope.  Irrelevant.

13           MR. GLUCK:  The valuation of the Black Elk fund.

14           THE COURT:  I think it's marginally relevant.

15   Overruled.

16           THE WITNESS:  On advice of counsel, I invoke the Fifth

17   Amendment.

18   BY MR. GLUCK:

19   Q.  Mr. Nordlicht, isn't it true that after the renaissance

20   sale, PPVA's common equity in Black Elk became worthless?

21           MR. LAUER:  Same objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  On the advice of counsel, I invoke the

24   Fifth Amendment.

25   BY MR. GLUCK:

1    Q.  Mr. Nordlicht, isn't it true that after the renaissance

2    sale, PPVA's holdings in Black Elk bonds became impaired?

3    A.  On the advice of counsel, I invoke the Fifth Amendment.

4    Q.  Mr. Nordlicht, isn't it true that David Bodner solicited

5    investors for the BEOF funds?

6    A.  On the advice of counsel, I invoke the Fifth Amendment.

7    Q.  Mr. Nordlicht, isn't it true that on the authority of David

8    Bodner, Mr. Fuchs solicited investors for the BEOF funds?

9    A.  On the advice of counsel, I invoke the Fifth Amendment.

10   Q.  Mr. Nordlicht, isn't it true that in December and January

11   of 2015, PPVA purchased roughly $30 million of Black Elk bonds

12   from Beechwood?

13           MR. LAUER:  Objection.  Relevance.

14           THE COURT:  Also, Counsel, the question put was:

15   Isn't it true that in December and January of 2015 --

16           MR. GLUCK:  Excuse me.  December 2014/January 2015.

17           THE COURT:  -- PPVA purchased roughly $30 million in

18   Black Elk bonds.  Overruled.

19           THE WITNESS:  On the advice of counsel, I invoke the

20   Fifth Amendment.

21   BY MR. GLUCK:

22   Q.  Isn't it true that the Black Elk bonds purchased in

23   December of 2014 or January of 2015 had a value that was

24   substantially impaired?

25   A.  On the advice of counsel, I invoke the Fifth Amendment.

1    Q.  Isn't it true that PPVA did not have sufficient liquidity

2    to purchase those Black Elk bonds and, as a result, it had to

3    take a loan from Beechwood in order to accomplish the same?

4              MR. LAUER:  Objection.  Not in evidence.

5              MR. GLUCK:  It's in evidence.

6              THE COURT:  Overruled.  I think there is a

7    possibility.  Overruled.

8              THE WITNESS:  On the advice of counsel, I invoke the

9    Fifth Amendment.

10   BY MR. GLUCK:

11   Q.  Mr. Nordlicht, isn't it true that in connection with that

12   transaction whereby these impaired bonds were purchased, PPVA

13   then was required to place the substantial majority of its

14   liquid tradeable assets into a third-party collateral account?

15   A.  On the advice of counsel, I invoke the Fifth Amendment.

16   Q.  Mr. Nordlicht, isn't it true that in 2013, yourself,

17   Mr. Bodner, Mr. Huberfeld formed the Beechwood company?

18   A.  On the advice of counsel, I invoke the Fifth Amendment.

19             MR. GLUCK:  Mr. Parson, please bring up Plaintiffs'

20   Exhibit 388, which I believe is in evidence.

21             (Continued on next page)

22

23

24

25

 1   BY MR. GLUCK:

 2   Q.  Mr. Nordlicht, isn't it true that the management of

 3   Beechwood and the management of Platinum were the same?

 4   A.  On the advice of counsel, I invoke the Fifth Amendment.

 5   Q.  Mr. Nordlicht, isn't it true that this email says, and that

 6   it's true, that the portfolio managers at Beechwood and

 7   Platinum are the same?

 8   A.  On the advice of counsel, I invoke the Fifth Amendment.

 9   Q.  Mr. Nordlicht, isn't it true that Beechwood and Platinum

10   were being treated as affiliates from a regulatory perspective?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12          MR. GLUCK:  Mr. Parson, please bring up

13   Plaintiffs' Exhibit 588.  558.  It's been a long day.

14          Move to admit this into evidence.

15          MR. LAUER:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 558 received in evidence)

18   Q.  Mr. Nordlicht, isn't it true that Mr. David Bodner was the

19   senior partner of Platinum Management?

20   A.  On the advice of counsel, I invoke the Fifth Amendment.

21   Q.  Mr. Nordlicht, isn't it true that Mr. Bodner had the power

22   to issue vetoes or override decisions he didn't agree with at

23   Platinum Management?

24   A.  On the advice of counsel, I invoke the Fifth Amendment.

25   Q.  Mr. Nordlicht, isn't it true that the insurance business

1   referenced in this email is Beechwood?

2   A.  On the advice of counsel, I invoke the Fifth Amendment.

3   Q.  Mr. Nordlicht, isn't it true that Mr. Bodner had the power

4   to control and dictate investment policies at Beechwood?

5            MR. LAUER:  Objection.

6            THE COURT:  I think it's very close to the margin, but

7   I will allow it.

8   A.  On the advice of counsel, I invoke the Fifth Amendment.

9            MR. GLUCK:  Mr. Parson, please bring in

10  Plaintiffs' Exhibit 421.

11           We would move Plaintiffs' Exhibit 421 into evidence.

12  Q.  Mr. Nordlicht, isn't it true that --

13           THE COURT:  Was there any objection?

14           MR. LAUER:  I'm reading it.

15           MR. GLUCK:  Sorry.  I didn't realize.

16           MR. LAUER:  We don't object with this witness.

17           THE COURT:  Well, I'm not quite sure what that means,

18  but it's received.

19           (Plaintiff's Exhibit 421 received in evidence)

20  Q.  Mr. Nordlicht, isn't it true that David Bodner had control

21  over employees at Platinum Management?

22  A.  On the advice of counsel, I invoke the Fifth Amendment.

23  Q.  Mr. Nordlicht, isn't it true and doesn't it say in this

24  email Mr. Bodner would shtup in people you don't want?

25  A.  On the advice of counsel, I invoke the Fifth Amendment.

1    Q.  Mr. Nordlicht, what does shtup mean?

2    A.  On the advice of counsel, I invoke the Fifth Amendment.

3            MR. GLUCK:  Mr. Parson, you can unzoom that.

4            Mr. Parson, please call up Plaintiffs' Exhibit 373.

5    Q.  Mr. Nordlicht, isn't it true that Mr. Huberfeld and

6    Mr. Bodner were your senior partners?

7    A.  On the advice of counsel, I invoke the Fifth Amendment.

8    Q.  Mr. Nordlicht, isn't it true that Mr. Bodner and

9    Mr. Huberfeld were the senior partners in relation to Platinum

10   Management?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12   Q.  Mr. Nordlicht, isn't it true that decisions were being made

13   by committee at both Platinum Management and Beechwood?

14   A.  On the advice of counsel, I invoke the Fifth Amendment.

15   Q.  Mr. Nordlicht, isn't it true that that committee was

16   composed of yourself, Mr. Bodner, and Mr. Huberfeld?

17   A.  On the advice of counsel, I invoke the Fifth Amendment.

18   Q.  Mr. Nordlicht, isn't it true that matters ranging from

19   legal advertising to investment decisions, to the traction of

20   investors were negotiated and executed based on input from

21   David Bodner and Murray Huberfeld?

22           MR. LAUER:  Objection.

23           THE COURT:  Sustained.  Counsel, how much more do you

24   have?

25           MR. GLUCK:  Six minutes.

1          Mr. Parson, please bring up Plaintiffs' Exhibit 377.

2          We seek to admit this into evidence.

3          It's already in.  Excuse me.

4   Q.  Mr. Nordlicht, isn't it true that there would be regular

5   partner dinners at which you would bring positions of PPCO and

6   PPVA so that you could discuss those positions with Mr. David

7   Bodner and Mr. Murray Huberfeld?

8   A.  On the advice of counsel, I invoke the Fifth Amendment.

9   Q.  Mr. Nordlicht, isn't it true that only partners were

10  permitted to attend these dinners?

11  A.  On the advice of counsel, I invoke the Fifth Amendment.

12  Q.  That was a terrible question.

13          Mr. Nordlicht, isn't it true that only partners of

14  management were allowed to attend these dinners?

15  A.  On the advice of counsel, I invoke the Fifth Amendment.

16          MR. GLUCK:  Please bring up Plaintiffs' Exhibit 508.

17          Seek to admit this into evidence.

18          MR. LAUER:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 508 received in evidence)

21  Q.  Mr. Nordlicht, isn't it true that Mr. Bodner was kept fully

22  apprized of the SEC's investigations into Platinum Management

23  and PPVA?

24  A.  On the advice of counsel, I invoke the Fifth Amendment.

25  Q.  Mr. Nordlicht, isn't it true that the SEC was investigating

```
 1    the valuation of PPVA's assets?

 2              MR. LAUER:  Objection.

 3              THE COURT:  Overruled.

 4    A.  On the advice of counsel, I invoke the Fifth Amendment.

 5              MR. GLUCK:  Plaintiffs' Exhibit 931, please.

 6              Seek to admit into evidence.

 7              THE COURT:  Hold on a minute.  Going back to the

 8    previous question and answer, I was considering that under 401,

 9    but are you making that objection under 403?

10              MR. LAUER:  Yes, your Honor.

11              THE COURT:  I thought you might say that after my

12    general hint.  And so I'm going to change my ruling on that.

13    So the jury will disregard the last question and answer.

14    Q.  Mr. Nordlicht, isn't it true that the SEC spent a

15    considerable amount of time in Platinum's offices in 2014 to

16    2015?

17    A.  On the advice of counsel, I invoke the Fifth Amendment.

18    Q.  Isn't it true that as part of that investigation, the SEC

19    was evaluating and investigating the value of PPVA's assets?

20    A.  On the advice of counsel, I invoke the Fifth Amendment.

21              MR. GLUCK:  Mr. Parson, please bring up

22    Plaintiffs' Exhibit 905.

23              We would move 931 into evidence.

24              MR. LAUER:  No objection.

25              THE COURT:  No objection to 931.
```

1            MR. LAUER:  No objection.

2            THE COURT:  Received.

3            (Plaintiff's Exhibit 931 received in evidence)

4            MR. GLUCK:  Final exhibit.

5   Q.  Mr. Parson, Plaintiffs' Exhibit 905.  This is already in

6   evidence.

7            MR. LAUER:  Objection.

8            THE COURT:  I thought this was already in evidence.

9            MR. GLUCK:  This was already in evidence.

10           MR. LAUER:  Sorry.

11  Q.  Mr. Nordlicht, isn't it true that the Securities and

12  Exchange Commission ultimately determined to sue Platinum

13  Management and others for overvaluation, among other things?

14  A.  On the advice of counsel, I invoke the Fifth Amendment.

15  Q.  Mr. Nordlicht, isn't it true that Platinum Management was

16  sued by the joint official liquidators of Platinum Partners

17  Value Arbitrage Fund in this action?

18  A.  On the advice of counsel, I invoke the Fifth Amendment.

19  Q.  Mr. Nordlicht, isn't it true that Platinum Management

20  defaulted?

21           MR. LAUER:  Objection.  401, 403.

22           THE COURT:  Well, in addition, I think this is

23  ultimately a matter of public record and that would be the best

24  evidence, so sustained.

25           MR. GLUCK:  I'll rephrase.

1   Q.  Mr. Nordlicht, isn't it true that Platinum Management

2   declined to defend, after a period of time, this action filed

3   by Mr. Trott --

4            MR. LAUER:  Objection.  Objection.

5            THE COURT:  I think we need a sidebar on this one.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  The suit that you're referring to, was a

3   default judgment entered?

4          MR. GLUCK:  Yes, in this case, but I'm saying they

5   declined to defend.  It is on the issue --

6          THE COURT:  No.

7          MR. GLUCK:  Sorry.

8          THE COURT:  You brought an action against him and

9   others.  Where did you bring it?

10          MR. GLUCK:  This court.

11          THE COURT:  You were that desperate, huh?  And has

12   default judgment been entered against any of the parties there?

13          MR. GLUCK:  Platinum Management default.  I don't know

14   if it's a default..

15          MS. SHEN:  There's no judgment.

16          MR. HERTZBERG:  It's a clerk's default, not a judgment

17   of default.

18          THE COURT:  A clerk's certificate.

19          MR. HERTZBERG:  Yes.

20          THE COURT:  So that you can introduce into evidence as

21   public record if you want to, but it's a matter on which he --

22   he's not a lawyer, he doesn't know the effect of that.  And it

23   was clear to rephrase --

24          MR. GLUCK:  I was attempting to rephrase it.  I'll

25   withdraw it.  I'll do a better question.

1            (In open court)

2            MR. GLUCK:  Question is withdrawn for a better

3  question.

4  Q.  Mr. Nordlicht, isn't it true that the joint official

5  liquidators PPVA and PPVA sued Platinum Management for, among

6  other things, overvaluation?

7  A.  On advice of counsel, I invoke the Fifth Amendment.

8  Q.  Isn't it true that the joint official liquidators and

9  PPVA's contentions as to overvaluation were accurate?

10 A.  On advice of counsel, I invoke the Fifth Amendment.

11 Q.  Mr. Nordlicht, isn't it true that Mr. Bodner and

12 Mr. Huberfeld also participated in and knew about the

13 overvaluation?

14           MR. LAUER:  State of mind.

15           THE COURT:  I think it might have been phrased that

16 based on your conversations with them, did you understand or

17 something like that, but I will allow it.

18           MR. GLUCK:  I will interject those.

19 Q.  Based on your conversations and interactions with

20 Mr. Huberfeld and Mr. Bodner, isn't it true that Mr. Huberfeld

21 and Mr. Bodner participated in and were aware of the

22 overvaluation of PPVA?

23           MR. LAUER:  Can we fix specific dates and

24 conversations.

25           THE COURT:  You can do that on your examination, but

1   I'm going to let the question stand.  Overruled.

2   A.  On the advice of counsel, I invoke the Fifth Amendment.

3           MR. GLUCK:  Thank you very much, Mr. Nordlicht.  And I

4   apologize for the interruption.

5           THE COURT:  Cross examination.

6   CROSS-EXAMINATION

7   BY MR. LAUER:

8   Q.  Good afternoon, Mr. Nordlicht.  You were asked a number of

9   isn't it true questions, and isn't it true that the moon is

10  made of green cheese?

11  A.  On the advice of counsel, I invoke the Fifth Amendment.

12  Q.  You'll forgive me, I have to ask you comparable questions

13  so we even this out.

14          Let's start with Marcos Katz.

15          Was Marcos Katz a well known billionaire investor

16  worldwide and viewed with awe?

17          MR. GLUCK:  Objection.  Same basis as before, similar

18  question.

19          THE COURT:  As phrased, sustained.

20  Q.  Is it true that having Marcos Katz associated with the

21  ownership and management of the fund would significantly

22  enhance Platinum Management and the funds it managed,

23  particularly in the international Jewish world?

24          MR. GLUCK:  Objection.  Same objection.

25          THE COURT:  I'll allow it.

1   A.  On the advice of counsel, I invoke the Fifth Amendment.

2   Q.  Was Victor Hannah an individual with whom you were

3   negotiating a $50 million investment in the funds, a wealthy

4   individual, easily capable of making that investment?

5   A.  On the advice of counsel, I invoke the Fifth Amendment.

6           MR. GLUCK:  Objection.

7           THE COURT:  I think the objection came too late or I

8   would have sustained it.  So the answer will stand.

9           MR. LAUER:  Thank you, your Honor.

10  Q.  Did you negotiate with Victor Hannah, and in connection

11  with that negotiation, did he do diligence of the funds --

12          MR. GLUCK:  Objection.

13          THE COURT:  Sustained.

14  Q.  Did you propose to Victor Hannah that he make an investment

15  in the funds?

16  A.  On the advice of counsel, I invoke the Fifth Amendment.

17  Q.  Did you discuss with him the amount of his investment would

18  be $50 million?

19  A.  On the advice of counsel, I invoke the Fifth Amendment.

20  Q.  Did you discuss with him that if he put $50 million in, he

21  would become a shareholder or an owner or one of the owners of

22  Platinum, the management company?

23          MR. GLUCK:  Objection.  Facts not in evidence.

24          THE COURT:  Well, some of this I think is a prelude to

25  something that defense counsel has previously indicated he

1    intends to attempt to introduce.  So overruled.

2    A.  On the advice of counsel, I invoke the Fifth Amendment.

3    Q.  Did Marcos Katz introduce you or Mr. Huberfeld to some

4    Saudis for purposes of investing significant funds in the

5    Platinum funds?

6          MR. GLUCK:  Objection.  Compound, vague, prejudicial.

7          THE COURT:  Sustained.

8    Q.  Would the infusion of 50 or $100 million of fresh cash in

9    2016 have benefited PPVA at that time?

10          MR. GLUCK:  Objection.  Facts not in evidence.

11          THE COURT:  Overruled.

12    A.  On the advice of counsel, I invoke the Fifth Amendment.

13    Q.  Was there substantial trapped value in the assets that were

14    owned by Platinum Management and PPVA, put by PPVA in 2016?

15    A.  On the advice of counsel, I invoke the Fifth Amendment.

16    Q.  Was a program designed, led by Seth Gerszberg, to untrap or

17    free the trapped value in any of those assets that were

18    over-encumbered?

19          MS. SHEN:  Objection.

20          THE COURT:  Well, I don't want objections from two

21    different lawyers, but the objection is overruled.

22    A.  On the advice of counsel, I invoke the Fifth Amendment.

23    Q.  Is it correct that you ran the fund and had the final say

24    on everything?

25    A.  On the advice of counsel, I invoke the Fifth Amendment.

1   Q.  Is it true that in the early part of 2014, this is more

2   than two years before the negotiation of the exit of Bodner and

3   Huberfeld, that you had stopped charging the fund incentive

4   fees?

5   A.  On the advice of counsel, I invoke the Fifth Amendment.

6   Q.  Isn't it true that the decision to stop taking incentive

7   fees from the fund was not made by David Bodner or directed by

8   David Bodner?

9   A.  On the advice of counsel, I invoke the Fifth Amendment.

10  Q.  Isn't it true that the decision not to take incentive fees,

11  meaning the partners shouldn't take money from the fund so long

12  as there were liquidity problems preventing all of the outside

13  investors to get all of their funds?

14  A.  On the advice of counsel, I invoke the Fifth Amendment.

15  Q.  And isn't it true that the initial impetus for that

16  decision came from Naftali Manela, who said that he thought it

17  was not right --

18          MR. GLUCK:  Objection.  Facts not in evidence.

19          THE COURT:  Sustained.

20  Q.  Is it true that you agreed that it was not right to take

21  any money for the partners if the outside investors could not

22  get their money out?

23          MR. GLUCK:  Objection.  Facts not in evidence.

24          THE COURT:  It's a permissible question.  Overruled.

25  A.  On the advice of counsel, I invoke the Fifth Amendment.

1    Q.  So that we understand the timing of everything, for two

2    years, the partners were not taking any money in the form of

3    incentive fees because of the liquidity issue?

4    A.  On the advice of counsel, I invoke the Fifth Amendment.

5    Q.  During that period of time, as reflected on the financial

6    statements of PPVA, more than $100 million was scraped together

7    to make withdrawals for the outside investors; right?

8             MR. GLUCK:  Objection.  Facts not in evidence.

9             THE COURT:  Sustained.

10            MR. LAUER:  It's in the financial statements, which

11   are in evidence.  The financial statements reflect money going

12   in and money going out.

13            THE COURT:  All right.  I will allow a question along

14   the lines.  I do think you do need to be careful not to use

15   vague terms like scraped together, but I will allow the

16   question.

17            MR. LAUER:  Thank you, your Honor.

18   Q.  Do you recall that the imbalance between the money going in

19   and the money going out was close to $100 million, that is more

20   than $100 million went out to investors who wanted their funds?

21   A.  On the advice of counsel, I invoke the Fifth Amendment.

22   Q.  And during all that time, the partners took no money out

23   from the fund?

24   A.  On the advice of counsel, I invoke the Fifth Amendment.

25   Q.  Now, management fees, the management fees did not go to the

1   partners; right?

2   A.   On the advice of counsel, I invoke the Fifth Amendment.

3   Q.   Management fees were used to run the business, rent,

4   salary, Bloomberg machines; right?

5   A.   On the advice of counsel, I invoke the Fifth Amendment.

6   Q.   And by 2016, the time period that release discussions were

7   taking place, Platinum Management had stopped charging PPVA the

8   entirety of the management fee because of a lack of liquidity;

9   right?

10  A.   On the advice of counsel, I invoke the Fifth Amendment.

11  Q.   In fact, by March 30, 2016, which is the end of the

12  so-called damages period --

13          MR. GLUCK:   Objection.

14          THE COURT:   Just put a question.

15  Q.   In fact, by the end of March 2016, there was accrued, but

16  unpaid, approximately $5.7 million in management fees from PPVA

17  to Platinum Management?

18  A.   On the advice of counsel, I invoke the Fifth Amendment.

19          THE COURT:   Counsel, how much more do you have?

20          MR. LAUER:   I would say, could be 25 minutes.

21          THE COURT:   Well, then we will give the jury their

22  midafternoon break at this point and resume in 15 minutes.

23          (Continued on next page)

24

25

```
 1                (Jury not present)

 2           THE COURT:  Mr. Nordlicht, I would ask you whether you

 3      wanted to step down for a minute, but I don't think you can

 4      give me an answer without consulting the advice of counsel.

 5      But you may step down.  We'll see you in 15 minutes.

 6           What, if anything, other than the possibility of

 7      Ms. Albanese, does plaintiff have after this witness?

 8           MS. SHEN:  Our expert, Mr. Quintero, is up next.  And

 9      then we potentially have testimony from Mr. Trott that I think

10      might be limited.  Then we have one designation that still

11      needs to be read into the record.

12           THE COURT:  I thought you indicated to me yesterday

13      you thought you would end today?

14           MR. GLUCK:  I think we said subject to Mr. Nordlicht,

15      we probably would have made it, but --

16           THE COURT:  Well, all right.  So that would take us

17      through tomorrow morning.  But if you're going to be reading

18      that long deposition, that's going to take quite some time, I

19      think.  Maybe I forgot, you did narrow it down.  That's right.

20      That should be okay.

21           What is it that Mr. Trott's going to be testifying?

22           MR. GLUCK:  Down to its absolute essence, Mr. Trott is

23      testifying solely on the issue of having incurred legal fees,

24      as previously mentioned to the Court.  I understand defendants

25      believe that the Court's ruling on consequentials covered it.
```

1   Legal fees, though, were outside the discovery period and it

2   will take two minutes.

3           Then the second topic is it is our understanding the

4   jury is going to be asked to decide for purposes of GOL108, the

5   impact of about five or six settlements that have occurred, and

6   Mr. Trott would be explaining the basis for those settlements

7   and whether or not they had any relationship to overvaluation

8   damages.  So by way of example, if there was a settlement with

9   Mr. Kevin Cassidy about Agera, it wouldn't be overvaluation

10  damages.

11          THE COURT:  Well, I'm not going to rule on any of that

12  right now.

13          How long will your expert take on direct?

14          MR. GLUCK:  My practicing has us in at about under an

15  hour.

16          THE COURT:  I'm sorry.  Someone is raising their hand.

17          MR. GLUCK:  He just wanted to confirm my timeframe.

18          THE COURT:  I thought you were waving hello and I was

19  so disappointed when I learned to the opposite.

20          So I would urge defense counsel -- I understand you

21  have to do some of what you're doing right now, but I think it

22  could be, since your basic argument is going to be, I think, to

23  the jury, maybe I don't have a basis for drawing an inference

24  given the consistent invocation of the Fifth to both sides'

25  positions, so to speak, I wonder if you can make it a little

1    bit shorter than you had contemplated.  But I'm not ordering

2    that, I'm just suggesting it.

3              MR. LAUER:  Your Honor, I will endeavor to do that.

4              I want to raise one other issue as long as we have

5    this time.

6              THE COURT:  Yes.

7              MR. LAUER:  When we made a *Daubert* against

8    Mr. Quintero, and your Honor may remember the argument and the

9    Court's decision, we had two points.  One was he did not do an

10   official appraisal.  He had this unique methodology where he

11   just calculated a divisible number and subtracted it.  And two,

12   there was a lot of back and forth and a lack of clarity on the

13   dollar amounts of the incentive fee damages.  One of the

14   results of the *Daubert* argument was the Court ruling in the

15   *Daubert* decision that Mr. Quintero would be limited to his

16   $55 million number.

17             Now, his $55 million number comes from a chart in his

18   report and, as the Court well knows, under Rule 37, in this

19   district in particular, you cannot go outside of your report or

20   the Court's ruling on *Daubert*.

21             The numbers in the chart, the $55 million, represent

22   accrued, but not paid, some could be paid, but accrued for '13,

23   '14, '15, and '16, and they add up to $55 million.

24             We're now told, and I'm not going to try to untangle

25   all of the rulings until now on the motions *in limine*, but this

1   is the reality and this is the truth of Quintero's report.  He

2   has nothing in his report in which, as an expert, he states

3   that the 2012 fees were inflated.  They are not included in the

4   $55 million, which was the Court's explicit ruling, he's

5   limited to the 55.

6          Separate and apart from the Court's *Daubert* ruling --

7   and this goes to how much time I would need with him.  Separate

8   and apart from the *Daubert* ruling, when you look at his report,

9   he has detailed schedules starting with the month of December

10  2012.  And in the month of December 2012, on all of his

11  schedules, the two that are most relevant, Black Elk and Golden

12  Gate, he finds no inflation.  That's his methodology, he could

13  have done an appraisal, he could have done an appraisal saying,

14  gee -- so what we're asking --

15         THE COURT:  What are you asking?  Specifically, what

16  are you asking?

17         MR. LAUER:  What I'm asking for is for the Court to

18  rule that he is restricted to the 55, he's restricted to his

19  report, and he cannot offer evidence or an opinion on 2012 fees

20  because they are not in the $55 million and they are not in the

21  opinion that he gave on his straight line method.

22         THE COURT:  Let me hear from plaintiffs' counsel, but

23  one thing I know I agree with you on is no expert can go beyond

24  their report in any way, shape, or form.  But let me hear from

25  plaintiffs' counsel.

1           MR. GLUCK:  We have Mr. Bixter on this and we

2    completely agree with the Court.

3           MR. BIXTER:  Your Honor, the first page of

4    Mr. Quintero's report says that the damages period is from

5    December 2012, not 2013.  And the report in one table talks

6    about the accrued fees of $55 million, but we're not seeking

7    55.  In good faith, all we're seeking for in incentive fees is

8    the $31 million paid in cash because, as the Court ruled, there

9    was some stock that was paid in lieu of cash and that will be

10   calculated as $31 million.

11          Mr. Quintero's report has 400 pages in the back with

12   detailed schedules and every single SS&C statement talking

13   about these redemptions.  Some of them included Mr. Bernard

14   Fuchs after discovery, and the evidence, we realized that

15   redemptions he received in 2015 probably were incentive fees

16   after his deposition.  So we're not looking for those.  We're

17   looking for the $31 million that was paid to entities related

18   to Landesman, Bodner, Huberfeld and Nordlicht.

19          THE COURT:  I get the point.

20          What about, Mr. Lauer, that sounds like they are

21   confining themselves to what's in the report.

22          MR. LAUER:  No, they're not.  First of all, the

23   $55 million.

24          THE COURT:  They're only asking for 31.

25          MR. LAUER:  That's not the point.  The point is the

1    $55 million that the Court ruled on in the *Daubert* and how we

2    prepared for this trial does not include the 2012 fees.  That's

3    the first point.

4         THE COURT:  So on that he says that the first page or

5    something like that references that period.

6         MR. LAUER:  The first page does not say anything

7    specific about 2012.  It says I was asked to render my

8    expert -- I was asked to render my expert opinions about

9    damages sustained by plaintiffs as a consequence of actions by

10   defendants during the period beginning December 2012 through

11   March 31, 2016.

12        Then he says on page 14, was able to trace management

13   fees and incentive fees to bank statements, generally ledgers

14   and other certain financial records.  Fees charged to the fund

15   during the damages period, excluding December 2012, amounted to

16   approximately $102 million.  I don't understand that.

17        But then he has the table in which he --

18        THE COURT:  Excuse me.  Let me interrupt you for a

19   second.

20        First of all, what portion of the $31 million you're

21   claiming is attributable to 2012?

22        MR. BIXTER:  Approximately something like $16 million

23   with the redemption.

24        MR. LAUER:  $18 million.  $18 million.

25        THE COURT:  Is there anything other than what you just

1  told me about the general period, is there any discussion of

2  those $18 million anywhere in the expert report?

3          MR. BIXTER:  Yes, your Honor.  In the back,

4  appendix A, there is hundreds of pages that talk about

5  reconciliation, the cash payments during that period.

6          THE COURT:  Well, the appendix is not his opinion.  I

7  now see the issue.  I will have to go back — lucky me — and

8  take a look at his report and then I'll hear any further

9  argument I need to hear.  But if you want me to call the jury

10 right now, we can and have Mr. Lauer do his thing, but maybe

11 you would like a five-minute break.

12         MR. LAUER:  Your Honor, I appreciate the Court's

13 comment and I will take that into consideration in one moment.

14         THE COURT:  Very good.

15         MR. GLUCK:  Your Honor, this was briefed --

16         THE COURT:  I'm not hearing anything more until I come

17 back.

18         (Recess)

19         THE COURT:  I examined the report.  I totally disagree

20 with defense counsel and I agree with plaintiffs' counsel.

21 That's a final ruling.  I will hear no further argument on it.

22         Bring in the jury and bring in the witness.

23         (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, I know you're all in

3    suspense what the witness will say, but go ahead, Mr. Lauer.

4    BY MR. LAUER:

5    Q.  Mr. Nordlicht, is it true that no one at Platinum

6    Management reported to David Bodner, except perhaps his

7    secretary?

8    A.  I had a long talk with counsel and I still intend to invoke

9    the Fifth Amendment.

10   Q.  Did Mr. Bodner make clear when you started the fund then

11   throughout that he did not want any responsibility?

12   A.  On the advice of counsel, I intend to -- I invoke the Fifth

13   Amendment.

14   Q.  And was it always very clear that he had no responsibility,

15   he was available as a resource only?

16   A.  On the advice of counsel, I invoke the Fifth Amendment.

17   Q.  Am I correct that David Bodner did not have any of the

18   underlying facts or details with respect to any of these

19   valuations at any time?

20          MR. GLUCK:  Objection.  Speculation.

21          THE COURT:  Sustained.

22   Q.  Am I correct that Mr. Bodner had no power to direct you to

23   do anything?

24   A.  On the advice of counsel, I invoke the Fifth Amendment.

25   Q.  Am I correct that the SEC did not sue Mr. Bodner or

1    interview Mr. Bodner?

2            MR. GLUCK:  Objection.  Speculation.

3    A.  On the advice of counsel, I invoke the Fifth Amendment.

4    Q.  Am I correct that the assistant U.S. attorneys prosecuting

5    the case in which you were involved did not prosecute

6    Mr. Bodner and did not interview Mr. Bodner?

7            MR. GLUCK:  Objection.  Speculation.

8            THE COURT:  Sustained.

9    Q.  Am I correct that you were accused by the U.S. attorney of

10   engaging in a scheme to overvalue Platinum's assets?

11   A.  On the advice of counsel, I invoke the Fifth Amendment.

12   Q.  They also charge you with another scheme that did not

13   involve the valuation of Platinum's assets; right?

14   A.  On the advice of counsel, I invoke the Fifth Amendment.

15   Q.  And is it true and correct that on the valuation charge,

16   you were acquitted?

17           MR. GLUCK:  Objection.  Best evidence.

18           THE COURT:  Well, if you want to ask that and we need

19   to put in, which is a public record, the entirety of what

20   happened in his criminal case, but if you don't want to ask

21   that, then it's not yet ripe.

22   Q.  Were you acquitted of the valuation case?

23           MR. GLUCK:  Same objection.

24           THE COURT:  So someone will produce the judgment in

25   his case, but I will tell the jury that, as you will see when

1    we have that judgment, he was acquitted of certain charges and

2    convicted of at least one other charge, and his sentence is

3    still pending.  But we really need to have the judgment based

4    on the door now having been opened.

5            MR. LAUER:  I think it's DX 17.  Can we bring that up.

6    That's not it.  We'll find it.

7            THE COURT:  When it is located, we'll automatically

8    put it in.  It's a self-authenticating record, so we don't need

9    the witness.

10           MR. LAUER:  Thank you, your Honor.

11   BY MR. LAUER:

12   Q.  You were found guilty on another matter that did not

13   involve valuation; correct?

14   A.  On the advice of counsel, I invoke the Fifth Amendment.

15   Q.  And with respect to that matter, you have not yet been

16   sentenced; right?

17   A.  On the advice of counsel, I invoke the Fifth Amendment.

18   Q.  And you filed a motion for a new trial to challenge that

19   finding; right?

20           MR. GLUCK:  Objection.

21           THE COURT:  I think it's getting beyond anything

22   that's relevant.  Sustained.

23   Q.  You have not been sentenced, so you still face, as we say,

24   criminal exposure in the context of a sentencing; right?

25           MR. GLUCK:  Objection.  Calls for legal.

1          THE COURT:  I'll explain to the ladies and gentlemen

2     of the jury that regardless of whether you've been convicted or

3     acquitted, under the Constitution, you still have the full

4     Fifth Amendment rights until sentence is imposed because some

5     of it may come up before the judge who — not me, another

6     judge — is determining the sentence, so that's why he has a

7     basis for invoking his Fifth Amendment, which he seems to have

8     accomplished successfully.

9          MR. LAUER:  One final question.

10    Q.  And your failure to answer questions here on the advice of

11    counsel has nothing to do with David Bodner or any of the

12    issues in this case, does it?

13         MR. GLUCK:  Objection.

14         THE COURT:  Sustained.

15         MR. LAUER:  No further questions, your Honor.

16         THE COURT:  Thank you very much.  You may step down.

17         Call your next witness.

18         MR. GLUCK:  Plaintiff calls Mr. Ron Quintero.

19         THE COURT:  By the way, ladies and gentlemen,

20    Ms. Albanese, who you may recall, gave some testimony and she

21    got sick.  Counsel for both sides, in light of her not being in

22    the best of health, have agreed that they will not recall her.

23    So the testimony she already gave still is testimony before

24    you, but she won't be called for any further testimony in this

25    case.

1            All right.  We need the witness.  While we're waiting

2     for the witness, I'll mention another thing, which is that I

3     had hoped in fulfillment of the schedule that I had given to

4     you, that we would complete the plaintiffs' case by the end of

5     today.  It looks like it will go over till tomorrow morning,

6     but we're still pretty close to on schedule.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE DEPUTY CLERK:  Please take the witness stand.

 2   Remain standing.  Right hand.

 3    RONALD GARY QUINTERO,

 4        called as a witness by the Plaintiffs,

 5        having been duly sworn, testified as follows:

 6          THE DEPUTY CLERK:  Please be seated.  State your name

 7   and spell it slowly for the record.

 8          THE WITNESS:  Ronald Gary Quintero, R-o-n-a-l-d

 9   G-a-r-y Q-u-i-n-t-e-r-o.

10          THE COURT:  Counsel.

11   DIRECT EXAMINATION

12   BY MR. GLUCK:

13   Q.  Good afternoon, Mr. Quintero.

14   A.  Good afternoon.

15   Q.  Have you been retained by the plaintiffs in this matter,

16   PPVA and the joint official liquidators PPVA, to calculate

17   damages related to the claims of liability in this case?

18   A.  I have.

19   Q.  Would you please go through your education, your

20   experience, and your experience acting as a damages expert in

21   cases in the United States.

22   A.  Certainly.  I have a Bachelor of Arts degree with

23   concentrations in economics and Spanish literature from

24   Lafayette College; a Master of Science in accountancy from the

25   New York University Stern School of Business; an advanced

1    professional certificate, which is an intermediate degree

2    between an MBA and a Ph.D.  My field of concentration was

3    investment management.

4           Also in connection with the ten professional licenses

5    that I have earned, they have minimum continuing education

6    requirements of up to 40 hours per year.  I've always vastly

7    exceeded that amount since I earned my first professional

8    license in 1977.

9           With respect to my professional licenses, as I

10   indicated, I've earned ten.  The ones that are most germane to

11   this matter are I'm a certified public accountant.  I am a

12   chartered financial analyst which is a principal designation in

13   the investment field.

14          I have an accreditation from the American Institute of

15   Certified Public Accountants in business valuation.  I have a

16   certification in distressed business valuation.  I'm also a

17   certified fraud examiner.

18          In terms of my professional experience, it extends

19   over 47 1/2 years, initially at Peat Marwick Mitchell & Company

20   which was, at the time, the largest of the Big 8 accounting

21   firms.  It's now known as KPMG.

22          I started in the audit staff, moved into the mergers

23   and acquisitions department, and wound up starting and running

24   our valuation practice, which, to the best of our knowledge, it

25   was the first valuation practice at a Big 8 accounting firm.

1          Subsequently I went to Zolfo Cooper, now part of Alex
2     Partners, a major consulting firm.  Then I was an investment
3     banker in the financial restructuring group which deals with
4     financially troubled companies of Bear Stearns, one of the
5     large investment banks, now part of JPMorgan Chase.

6          And finally in 1988, I started two firms.  One is R.
7     G. Quintero & Co,., which is a specialty CPA firm which is most
8     frequently involved in matters involving companies that are in
9     financial difficulty.  Also it is a financial training firm.

10         Another aspect of my professional activities is I have
11    given lectures and seminars.  I've given more than 20,000 hours
12    during the course of my professional career.  It's what I
13    characterize as my hobbies and weekend activities.

14         The most frequent ones I've given are for candidates
15    seeking to become chartered financial analysts, which I've
16    said, is the most sought-after designation in the investment
17    profession.

18         Then our parallel firm -- I've been continuously
19    employed by both R. G. Quintero and Chartered Capital Advisers
20    since 1988.  So our affiliated firm is Chartered Capital
21    Advisers.  The most frequent work products that we provide are
22    in the area of business valuations.

23         My fields of expertise are mergers and acquisitions,
24    valuations, bankruptcy and insolvency, financial forecasting,
25    calculating financial damages, as well as financial training.

1        I've worked on well over 1,000 projects during the

2   course of my professional career.  I've valued more than 10,000

3   businesses, financial instruments, and other assets during the

4   course of my professional career.

5        Also I have been retained on many occasions to serve

6   as an expert witness, more than 100 times, in courts and

7   arbitrations throughout the United States, the matters

8   pertaining to my fields of expertise.

9        And I also serve as a court-pointed neutral in various

10   matters, as well as a bankruptcy trustee, bankruptcy examiner.

11   And I'm hired through the bankruptcy court as an accountant,

12   financial advisor, or in other capacities in connection with

13   companies that are in bankruptcy and to represent various

14   parties in interest in bankruptcies.

15        THE COURT:  Thank you.

16   BY MR. GLUCK:

17   Q.  What was your limit -- by that I mean what tasks were you

18   assigned -- to evaluate in this matter?

19   A.  I was asked to calculate the excessive management and

20   incentive fees incurred by the funds collectively as a result

21   of the overstatement of the assets of the fund.

22   Q.  Did you prepare a report in this matter?

23   A.  I did.

24   Q.  How long is that report?

25   A.  Approximately 550 pages.

1   Q.  Do you have that report with you?

2   A.  Yes.  That is what I brought to the witness stand.

3   Q.  If you feel the need to refresh your recollection on any of

4   those topics in those pages, please let me know.

5        Were you asked to provide any sort of opinion on the

6   role of Mr. David Bodner at Platinum?

7   A.  I was not.

8   Q.  I'm going to use the phrase "damages period" as you used it

9   in the report.

10        Can you please tell the jury what the damages period

11  is.

12  A.  The timeframe was December of 2012 through March 2016.

13  Q.  Is "damages period" a defined term within your report?

14  A.  Yes.

15        THE COURT:  Just so the jury knows, "damages" is a

16  legal word, namely, the amount of money that the plaintiffs

17  claims they are owed by defendants.  But lawyers would never

18  use such a crude word such as "money" when they can use a more

19  skilled word such as "damages."

20  BY MR. GLUCK:

21  Q.  You were asked to calculate how much money PPVA lost as a

22  result of overvaluation.

23        Is that right?

24  A.  Specific to the areas you just asked me about to the

25  amounts pertaining to excessive incentive fees incurred by the

fund and excessive management fees incurred by the fund.

Q.  Tell me about how you went about making these calculations.

A.  I and my team reviewed a number of documents that are cited in Exhibit 1 of my report.  They included the monthly reports of the composition of the portfolio, and that composition was typically in excess of 700 securities per month.  It included information on the cost, the number of securities, the claimed net asset value of each of the investments.

And these were produced on a monthly basis for the entire damages period.  I reviewed information that was prepared by the fund's independent CPA firm, the independent valuation firms that they hired, as well as a number of supporting pieces of information pertaining to the portfolio investments, specifically, to the extent that they were available, financial statements, email correspondence describing some of the issues that were faced by the various portfolio investments.

I sought out independent, publicly available information to help me in the undertaking.  I reviewed bank statements, as well as a number of other documents.  In aggregate, it was in excess of a thousand documents representing literally tens of thousands of pages.

Q.  Big job.  I know you mentioned a team.

How many team members did you have helping you out?

A.  There were five members to my team.  I was the

1   next-to-the-youngest member of the team.  These are people who

2   I've worked with for many years.  On average, we have more than

3   40 years of professional experience.  I think I'm actually the

4   next-to-the-youngest on my team.

5   Q.  How many hours did you spend reviewing the asset's

6   valuation of Platinum Management, both before the submission of

7   your report and then through your subsequent deposition and

8   today?

9   A.  I spent, I believe, over 200 hours in connection with the

10  work that I did.  And the four team members that assisted me

11  spent a multiple of what I did in preparing the report.  And

12  then subsequent to preparation of the report up until the date

13  of my deposition, it was probably another couple of dozen

14  hours.

15  Q.  Thank you.

16          And the other team members, are they also certified

17  accountants or CFAs or fraud experts?

18  A.  Three of the four are valuation experts.  The other is a

19  forensic accountant who has been working with me for, at that

20  time, about 25 years.

21  Q.  Now, were you asked to formulate a view as to whether

22  PPVA's nav increased from December 2012 on?

23  A.  I was.

24  Q.  And what was your conclusion?

25  A.  It did not increase.

1   Q.  Do you have an understanding of the mechanism by which

2   incentive fees were payable to Platinum Management and Platinum

3   Partners?

4   A.  Yes.

5   Q.  What was that understanding?

6   A.  The incentive fees were based on 20 percent of the

7   appreciation of the assets during the course of the relevant

8   time period.

9   Q.  So how much incentive fee should have been paid within

10   December 2012 to the defendants' fund?

11           MR. LAUER:  Objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  None.

14   BY MR. GLUCK:

15   Q.  Zero?

16   A.  That is correct.

17   Q.  Can you take us through why you believe, beginning in 2012,

18   the net asset value of PPVA did not increase.

19           MR. LAUER:  Objection.

20           THE COURT:  Overruled.

21           THE WITNESS:  Yes.  In undertaking my review, I looked

22   at the most significant assets within the portfolio, the

23   largest of which, as of December 2012, was a company called

24   Black Elk.

25           And that represented more than a third of the

1    portfolio of the fund.  The claimed value was approximately

2    $257 million at the end of 2012.  And, as I said, that was more

3    than a third of the claimed value of the complete portfolio.

4          With Black Elk, they had a major disaster on

5    November 16, 2012, that being they had a major platform in the

6    Gulf of Mexico that exploded.  It was characterized in the

7    media as the "worst disaster in the Gulf since the British

8    Petroleum explosion in 2010."

9          People lost their lives.  Black Elk was sued as a

10   consequence of this.  It came out the following month in the

11   Wall Street Journal that Black Elk had more than 300 serious

12   violations of procedures.

13         From my own analysis -- first of all, based on the

14   publicly available financial statements, Black Elk was, at the

15   time, even before the explosion, insolvent; that is, their

16   assets were less than their liabilities.

17         Their current assets, those that would turn into cash

18   within the next 12 months, were less than the current

19   liabilities, those that were owing within the next 12 months.

20         Two months prior to the explosion, Standard & Poor's,

21   a client of mine, one of the major rating agencies, had

22   downgraded Black Elk's corporate family of debt to CCC+ which

23   is a grading for a company that is at severe risk of being

24   unable to pay its obligations as they come due.

25         And Standard & Poor's reported that the availability

 1    of cash from the sale of Black Elk would result in only a 70 to

 2    90 percent realization on debt.  If debt can't be due, can't be

 3    paid, then equity cannot be worth anything.

 4            And in fact, there is a variety of information I

 5    looked at starting in 2013 that also reinforced the fact that

 6    the Black Elk equity was worthless.  So it was evident from

 7    contemporaneous information that by the end of 2012, there was

 8    no value to Black Elk equity.

 9            If you were to mark that down to zero, which the

10    company did not, it would have taken away any ability to

11    recognize any appreciation for 2012.  And things only got worse

12    afterwards.

13    Q.  Now, you looked at the -- strike that.

14            Were you asked to look at the other assets of PPVA and

15    make sure that they didn't increase in a proportion more than

16    the 200 plus million of Black Elk equity?

17    A.  Yes.

18    Q.  What was your conclusion?

19    A.  They did not.

20    Q.  Were you asked to make a determination as to whether it was

21    possible for PPVA's nav to increase at the end of the calendar

22    year of 2012?

23    A.  Yes.  In the sense that the loss from Black Elk was so

24    monumental, there was nothing about the other assets in the

25    portfolio -- and I reviewed all of the major assets in the

 1  portfolio -- that could have offset such a catastrophic loss.

 2  Q.  Did you review the set of circumstances by which a separate

 3  group of funds called BEOF-injected capital into Black Elk?

 4  A.  Are we talking about the Beechwood-related entities.

 5  Q.  The Black Elk Opportunity Fund.

 6  A.  The Black Elk Opportunity Fund.  I do recall seeing some

 7  information.

 8  Q.  There's been some testimony in this case -- and we would

 9  ask that, if it's in your report, you comment on the following:

10       How can it be that money is put into an entity --

11       MR. LAUER:  Objection.

12       THE COURT:  Let me hear the whole question.

13  BY MR. GLUCK:

14  Q.  How could it be that money is put into an entity but that

15  the value of that entity either does not rise in the amount of

16  that money or perhaps doesn't realize at all?

17       MR. LAUER:  Outside the scope.

18       THE COURT:  I think the door was opened to this by the

19  defense cross-examination of the previous witnesses.

20  Overruled.

21       You may answer.

22       THE WITNESS:  It depends what happens to that money

23  once it is injected into the organization.

24  BY MR. GLUCK:

25  Q.  Could it be wasted?

 1    A.   Yes.

 2    Q.   Could it be invested in a project that doesn't work out?

 3    A.   Yes.

 4    Q.   You described "common equity."  And I just want to lay

 5    things out for this jury.  PPVA held a number of forms of

 6    investment in Black Elk.

 7         Is that right?

 8    A.   It did.

 9    Q.   It held bonds in Black Elk.

10    A.   Yes.

11    Q.   That's senior secured debt; right?

12    A.   In the case of those bonds, yes.

13    Q.   But it also held shares, common equity, in the company.

14    Correct?

15    A.   Yes.

16    Q.   Can you please explain to the jury the impact of dilution

17    when new shares are issued by a company.

18              MR. LAUER:  Outside the scope.

19              THE COURT:  I don't recall whether this is something

20    contained in your report.

21              Was this in your report?

22              THE WITNESS:  I don't have a specific recollection,

23    although it may have been.

24              MR. GLUCK:  I'll rephrase because there's a key here.

25    Q.   The new money that was put into Black Elk, was that in the

1    form of preferred shares?

2    A.   In the case of Black Elk, they continued to create

3    additional forms of preferred stock after December 2012.

4    Q.   Credit debt is at the top, and common equity is at the

5    bottom.

6            Is that correct?

7    A.   Yes.

8    Q.   Are preferred shares superior to common equity?

9    A.   No.

10   Q.   Explain why.

11   A.   Because preferred shares are a form of equity ownership of

12   the company.  Essentially, there's the secured creditors that

13   not only are creditors of the company, but they have collateral

14   that supports that.

15           Also there are the unsecured creditors such as the

16   trade creditors, such as the parties that were suing Black Elk

17   because of the explosion.  They are senior to the preferred

18   shareholders.  And there are a few other forms of claims that

19   would be senior to preferred.

20           Then if you go below that, Black Elk, as I have

21   mentioned, had created several different categories of

22   preferred shares that had a seniority relationship to each

23   other, but they were all junior to creditors.  And then below

24   that, at the end of the totem pole, is the Black Elk common

25   stock.

1    Q.  Thank you.

2          If Black Elk could not pay its creditors or preferred

3    shareholders, what was the value necessarily of the common

4    stock?

5    A.  Zero.

6    Q.  Thank you.

7          Before we get to some of the specific numbers, could

8    you please provide the jury -- you did it for Black Elk.

9          But what documents of the company's, of Platinum, of

10   public records did you look at or your team look at for the

11   various assets you analyzed here?

12   A.  The documents I looked at included both information that I

13   received through discovery, those being the monthly statements

14   that came from the third-party administrator of the fund; the

15   quarterly valuation reports that were prepared by the

16   independent evaluators that were hired by the fund; the annual

17   audited financial statements, as well as all of the information

18   that I could get through discovery, those being a combination

19   of emails, other correspondence, in some cases reports

20   pertaining to the portfolio companies or appraisals pertaining

21   to the portfolio companies.

22          I also obtained all the publicly available information

23   that I could find about the major portfolio companies that I

24   looked at, which were principally the largest investments of

25   the fund.

1    Q.  Thank you.

2         Prior to your admission to the Court, did you have

3    access to the SEC complaint against Platinum Management in

4    respect of overvaluation?

5    A.  Yes.

6    Q.  Did you have access to the United States government's

7    indictment and supporting charges related to the charges at

8    issue?

9    A.  Yes.  Related to the criminal charges brought.  Yes.

10   Q.  You had access to the audit reports; correct?

11   A.  That is correct.

12   Q.  You had access to the correspondence between Platinum

13   Management and the auditors?

14   A.  I saw some correspondence.  That's correct.

15   Q.  Did you review the auditors' so-called "work papers"?

16   Please explain what "work papers" are.

17        MR. LAUER:  I object to the characterization.

18        MR. GLUCK:  I will withdraw my quotes in air.

19        THE WITNESS:  I don't recall having seen the audit

20   work papers.

21   Q.  Did you feel it was necessary to review the audit work

22   papers in this case?

23   A.  No.

24   Q.  Why is that?

25   A.  Because there was a lack of information to be able to

1   properly value these companies.  I looked at the information

2   that the evaluators used, and they did not have certain key

3   information.  In fact, I was able to obtain information that

4   they didn't have.

5           So if the auditors don't have good-quality information

6   to use to review the portfolio investments, they're not going

7   to be able to conduct a proper audit.  And in fact, the audit

8   opinion clearly states that the financial statements are the

9   responsibility of the company.

10          And an essential element of auditing financial

11  statements is that the company information has been prepared in

12  good faith and properly done, to the best of its ability, and

13  that there is an absence of collusion among the management of

14  the company that would be another issue that could undermine an

15  audit.

16  Q.  Now we're going to get to the meat.

17          You were given two tasks in this case.  One was to

18  calculate the amount of overpaid incentive fees.  Correct?

19  A.  Yes.

20  Q.  And the second was to calculate the amount of overpaid

21  management fees.

22  A.  Yes.

23  Q.  The first task was a lot easier, wasn't it?

24  A.  Yes.

25  Q.  Because the amount of incentive fees that should have been

1    paid was zero.

2    A.  That is correct.

3          MR. GLUCK:  Mr. Parson, will you please call up

4    Plaintiffs' Exhibit 924.

5          MR. LAUER:  We object for the record, your Honor.

6          THE COURT:  Duly noted.  Overruled.

7    BY MR. GLUCK:

8    Q.  Mr. Quintero, can you walk the jury through the two ways in

9    which money would be taken from the bank account of PPVA and

10   end up in the pocket of Platinum Partners for these incentive

11   fees?

12   A.  Yes.  The master fund has the assets as the cash, and they

13   would provide money to the two feeder funds that would, in

14   turn, have the ability to pay money to the general partner for

15   any incentive fees.

16   Q.  The "general partner," would you mind explaining.

17          That's Platinum Management?

18   A.  Yes.  The general partner that is involved in the

19   management company in managing the funds.  So cash fees are

20   pretty straightforward.  With cash, there were two payments of

21   fees, one in February of 2013 for $597,110 in cash fees were

22   paid.  Then the second payment was in February of 2014 where an

23   aggregate of $13,399,999 was paid.  So the aggregate of those

24   two payments in cash for incentive fees was $13,997,109.

25          Then the other way of paying fees is what's known as

1   payment in kind where.  Rather than paying cash, additional

2   limited partnership interests were paid.  And so with those

3   limited partnership interests, those were directly credited to

4   the accounts of their relevant members of the general

5   partnership.  And with the amount of membership interest that

6   they had or limited partnership that they had, they were

7   subsequently redeemed for cash.

8           So that's a two-step process.  First, the recipient

9   gets the partnership interest.  And then the recipient, for the

10  most part, redeemed those limited partnership or LP interests

11  to receive the cash that came, indirectly, from the fund.

12  Q.  Thank you.

13          Just to clarify, the general partner is Platinum

14  Management?

15  A.  Yes.

16  Q.  Who are the human beings who are the partners of Platinum

17  Management are Mark Nordlicht?

18  A.  Yes.

19  Q.  David Bodner?

20  A.  Yes.

21  Q.  Murray Huberfeld?

22  A.  Yes.

23  Q.  Uri Landesman?

24  A.  Yes.

25  Q.  David Leff?

1    A.   Yes.

2    Q.   Anyone else that I forgot?

3    A.   Not that I can recall offhand.

4    Q.   If I forgot, I'll correct it later?

5    A.   Incidentally, just to complete that, the aggregate of the

6    redemption of LP interest or limited partner interest that were

7    disbursed was $16,776 470.  So the sum of the two amounts,

8    payment in cash and provision of limited partnership interest

9    that were in turn turned into cash through redemption, was

10   $30,773,579 between 2013 and 2014.

11   Q.   Incentive fees were paid based on a calculation at the end

12   of every year at the beginning of the next one.

13   A.   That is correct.

14   Q.   And that's why you said '13 and '14 there?

15   A.   Yes.

16   Q.   So $30 million, $30,773,579, went into the bank accounts of

17   the human beings that were these Platinum Partners.

18            Is that correct?

19   A.   Either directly or indirectly.

20   Q.   Via the cashing of their stock awards or their LP awards.

21   A.   That is correct.

22   Q.   Did you review -- by "you" I'm going to refer to you and

23   your team.

24            Did you review PPVA bank statements?

25   A.   Yes.

1    Q.  Did you review what are called SS&C account administrator

2    statements?

3    A.  Yes.

4    Q.  Did you review all of the ones for the relevant time

5    period?

6    A.  Yes.

7              MR. GLUCK:  We would seek to move those SS&C

8    statements and bank account statements into evidence.

9              MR. LAUER:  To the extent they're shown to the

10   witness, we have no objection.

11   BY MR. GLUCK:

12   Q.  How many such pages of statements are there?

13   A.  In the case of the SS&C statements, I appended those to my

14   report for the ones that show the changes in membership

15   positions.  And those aggregate approximately 400 pages.  And

16   in terms of the bank statements, there are multiple accounts

17   that aggregate well in excess of 1,000 pages.

18   Q.  And is it fair to say that the SS&C statements are actually

19   separate documents broken down by both month and asset?

20   A.  Yes.

21   Q.  How many documents would we be talking about here if I were

22   to show you each one individually?

23   A.  Each SS&C statement as issued on a monthly basis, it

24   provides information on roughly an average of 750 investment

25   positions.  Then there is information on the various limited

1    partnership interests.  So in aggregate, it's thousands of

2    pages of documents.

3    Q.  Now, I'm told by Ms. Shen that we have an agreement that

4    these documents could be admitted upon relevant testimony by

5    Mr. Quintero.

6          MR. LAUER:  We have no problem with the summaries.  To

7    the extent there is a particular schedule that they think is

8    important, we would have no objection if it's shown to the

9    witness.  We do object to this idea that a thousand documents

10   that no human being can read should be in evidence and then

11   parsed out later.

12         THE COURT:  I think, once again, counsel have raised a

13   difficult legal issue that I'll probably have to spend hours

14   deciding, maybe two minutes.  But it's probably a good

15   opportunity, ladies and gentlemen.  So we will excuse the jury.

16   And we will resume.

17         MR. GLUCK:  We also now have a scheduling matter to

18   raise.

19         THE COURT:  Please be seated.

20         I have a 4:30 telephone conference in my chambers.

21   I've got about a minute.  I assume you don't want to put in

22   thousands of pages.

23         So what is it you'd like to put in?

24         MR. GLUCK:  We would like the official business record

25   bank statements of PPVA and the official SS&C nav reports of

 1    PPVA which consist of hundreds and hundreds of documents

 2    admitted -- that Mr. Quintero reviewed -- admitted into

 3    evidence because it's the --

 4            THE COURT:  Why do you want to admit them?  He can

 5    testify about them.

 6            MR. GLUCK:  Why would I want them into evidence?

 7            THE COURT:  Yes.

 8            MR. GLUCK:  Because they would form the factual

 9    evidentiary basis for what is ultimately a conclusion by

10    Mr. Quintero.

11            THE COURT:  Every expert consults all sorts of stuff.

12    And the rule is that in order to testify about it, it has to be

13    admissible.  It doesn't have to be admis, admitted.  So as it

14    is, the jury can get to get a ton of exhibits here.

15            Unless there is some -- if, in cross-examination, some

16    dispute comes up about a particular issue, then you can put in

17    the documents related to that issue.

18            MR. GLUCK:  Fine.  We may, and that's what we're

19    worried about it, is some factual context.

20            THE COURT:  For now, they won't be admitted.  But

21    that's subject to their being admitted if an issue is raised on

22    cross.

23            MR. GLUCK:  Now as to the scheduling issue.  So

24    Mr. Quintero was supposed to go about four hours ago, before

25    the Nordlicht testimony and decision.  He has a surgery for his

1 │ wife.  I'm sure he can tell you about it himself.

2 │        But, Mr. Quintero, when is the absolute next time you

3 │ could appear before this Court?

4 │        THE WITNESS:  Monday.

5 │        MR. GLUCK:  We could put on Mr. Trott tomorrow.

6 │        THE COURT:  I'm sorry we started this witness because

7 │ I think we could have probably found out if Mr. Quintero could

8 │ be put off.

9 │        MR. GLUCK:  We just figured it out.  Sorry.

10 │        THE COURT:  You understand though you're going to have

11 │ to rest tomorrow, subject to only being able to bring in his

12 │ additional testimony on Monday.

13 │        MR. GLUCK:  Yes.

14 │        THE COURT:  To the extent that there are any motions

15 │ to be made and the plaintiff rests, defense counsel can make

16 │ those motions, both tomorrow but also reserve the right to make

17 │ further motions based on the additional testimony after he

18 │ finishes his testimony.

19 │        MR. GLUCK:  I'm looking to my team.  Settled.  Okay.

20 │        THE COURT:  So we'll see you Monday.  Good luck to

21 │ your wife.

22 │        THE WITNESS:  Thank you.

23 │        THE COURT:  We'll see you all tomorrow at 9:30.

24 │        Is there anything else that we have for today?  So

25 │ probably in the excess of caution, I would say 9:20 tomorrow.

1              MR. GLUCK:  Thank you, your Honor.

2              MR. LAUER:  Thank you, your Honor.

3              (Adjourned to December 7, 2022, at 9:20 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3       MURRAY HUBERFELD

4      Direct By Mr. Gluck  . . . . . . . . . . . . 801
       Cross By Mr. Hertzberg . . . . . . . . . . . 868
5       MARK NORDLICHT

6      Direct By Mr. Gluck  . . . . . . . . . . . . 911
       Cross By Mr. Lauer . . . . . . . . . . . . . 934
7       RONALD GARY QUINTERO

8      Direct By Mr. Gluck  . . . . . . . . . . . . 952

9                        PLAINTIFF EXHIBITS

10     Exhibit No.                              Received

11      522  . . . . . . . . . . . . . . . . . . . 801

12      573  . . . . . . . . . . . . . . . . . . . 803

13      59   . . . . . . . . . . . . . . . . . . . 829

14      372  . . . . . . . . . . . . . . . . . . . 831

15      368  . . . . . . . . . . . . . . . . . . . 837

16      381  . . . . . . . . . . . . . . . . . . . 855

17      384  . . . . . . . . . . . . . . . . . . . 863

18      918  . . . . . . . . . . . . . . . . . . . 866

19      401  . . . . . . . . . . . . . . . . . . . 868

20      739  . . . . . . . . . . . . . . . . . . . 898

21      [Exhibits]*[received]  . . . . . . . . . . 913

22      595  . . . . . . . . . . . . . . . . . . . 913

23      367  . . . . . . . . . . . . . . . . . . . 914

24      366  . . . . . . . . . . . . . . . . . . . 915

25      367  . . . . . . . . . . . . . . . . . . . 916

1   379   . . . . . . . . . . . . . . . . . . . . 920

2   558   . . . . . . . . . . . . . . . . . . . . 925

3   421   . . . . . . . . . . . . . . . . . . . . 926

4   508   . . . . . . . . . . . . . . . . . . . . 928

5   931   . . . . . . . . . . . . . . . . . . . . 930

6                    DEFENDANT EXHIBITS

7   Exhibit No.                          Received

8   159   . . . . . . . . . . . . . . . . . . . . 873

9   744   . . . . . . . . . . . . . . . . . . . . 877

10  164   . . . . . . . . . . . . . . . . . . . . 880

11  419   . . . . . . . . . . . . . . . . . . . . 920

12

13

14

15

16

17

18

19

20

21

22

23

24

25