MC82PLA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION          18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER          18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                    Plaintiffs,

          v.

PLATINUM MANAGEMENT (NY) LLC,
*et al.*,

                    Defendants.

------------------------------------x          Trial


                                        New York, N.Y.

                                        December 8, 2022
                                        9:20 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge
                                          and a Jury

MC82PLA1

```
 1                              APPEARANCES

 2    HOLLAND & KNIGHT, LLP
             Attorneys for Plaintiffs
 3    BY:   WARREN E. GLUCK
             MARTIN L. SEIDEL
 4           RICHARD A. BIXTER JR.
             QIAN (SHEILA) SHEN
 5           NOAH W.S. PARSON
             ELLIOT A. MAGRUDER
 6

 7    KATTEN MUCHIN ROSENMAN, LLP
             Attorneys for Defendant Bodner
 8    BY:   ELIOT LAUER
             GABRIEL HERTZBERG
 9           JULIA B. MOSSE

10

11    CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
             Attorneys for Defendant Bodner
      BY:   NATHANIEL C. AMENT-STONE
12           ALLESANDRA TYLER

13

14

15    Also Present:

16    Michael Robson, Paradocs Motion Support

17    Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25
```

MC82PLA1

1          (Trial resumes; jury not present)

2          THE COURT:  So I am very grateful for the submissions

3     from the parties on this very interesting issue regarding the

4     release.  I think, given that the plaintiffs will rest——other

5     than Mr. Quintero's continuing testimony——later this morning

6     that it is time for the Court to rule.  My ruling will be

7     stated shortly here, but it will also be elaborated in a

8     written opinion that I will issue in due course.

9          My ruling is that when joint tortfeasors negotiate and

10    enter into a release that purports to release them from claims

11    related to the tort, that the release is invalid under New York

12    law.  And although I recognize that to some extent this is not

13    a matter that has been elaborated in the case law of New York

14    State, after further research, I think it is reasonably clear

15    that this is where the highest court in New York would come

16    out.  But I will elaborate on that in my written opinion.

17         I will note that I think the hypotheticals raised by

18    defense counsel, both orally previously and now their latest

19    submission, about what they think would be the practical

20    problems presented by such a ruling are, I think, a

21    misunderstanding of the ruling.  The Court is not ruling that,

22    if there is an otherwise valid release, it can't be enforced

23    against claims unrelated to the tort perpetrated by the

24    tortfeasors.  This only comes up, as it does in this case,

25    where the suggestion is that the release entered into by the

MC82PLA1

1    joint tortfeasors bars any claim for the very tort that they

2    sought to mutually release.  It doesn't relate to anything else

3    that is being arguably released.

4           Also, the burden is on the plaintiff in any such case,

5    including this one, to show that the parties entering into the

6    release were joint tortfeasors.  So it's not that it is, as

7    some of the arguments raised by defense counsel suggest, a

8    burden placed on the defense; it's a burden placed on the

9    plaintiff.  And the jury will be so instructed when we get to

10   that stage of the case.

11          Now, an issue that I don't have to resolve right now

12   but I want to flag for the charging conference is should I

13   instruct the jury, if the plaintiff fails to show that the

14   parties to the release were joint tortfeasors, that the release

15   is a total defense to this lawsuit?  I think the answer is

16   probably yes, but I will hear argument on that in due course.

17   I am not yet persuaded by plaintiffs' arguments that there are

18   other grounds for invalidating the release in part or in whole

19   in this case, but I don't have to reach that.

20          All right.  So are we going to hear from that short

21   witness first or are we going to have the reading of the

22   deposition?

23          MR. GLUCK:  Short witness.

24          THE COURT:  I'm sorry?

25          MR. GLUCK:  Short witness, Mr. Trott.

MC82PLA1

1           THE COURT:  Very good.  Let's bring in the jury.

2           THE DEPUTY CLERK:  I'm sorry.  I misspoke.  They are

3     not all here.  I am going to go take attendance.

4           THE COURT:  Okay.  Who is the defense's first witness?

5           MR. LAUER:  Oh, no, I think they are still calling

6     Mr. Trott.

7           THE COURT:  No, no.  I'm saying, they are going to

8     rest this morning.  I will spend the necessary five minutes

9     hearing any motions, and then we will have defense call their

10    first witness.  So I am saying who is your first witness?

11          MR. HERTZBERG:  Your Honor, after Mr. Trott,

12    plaintiffs will do the routine for the deposition of Mr. Katz.

13    I understand that will take about a half hour, 40 minutes.

14    Then we are prepared to call Joe SanFilippo, the CFO of

15    Platinum Management --

16          THE COURT:  That's all I wanted to know.  I was

17    curious who the person was.  And maybe if you could tell me,

18    because we are going to go a full day, how long do you think he

19    will take on direct?

20          MR. HERTZBERG:  I think the direct will take about

21    two, two and a half.

22          THE COURT:  Minutes or hours?

23          MR. HERTZBERG:  Weeks, Judge.

24          THE COURT:  That's what I feared.  Okay.  But we still

25    may reach a second witness today.  Who after that?

MC82PLA1

1          MR. HERTZBERG:  We also have ready today in the

2     courthouse David Steinberg.  He was the portfolio manager and

3     chief risk officer of Platinum Management.

4          THE COURT:  Yes, sir.

5          MR. LAUER:  I would like a few minutes very briefly to

6     argue a motion for judgment after they close their case.  And

7     as your Honor had suggested, we will reserve anything that we

8     think relates to the numbers that Mr. Quintero will be talking

9     about in the middle of our case when he comes back.  But I

10    would like --

11         THE COURT:  Yes.  First of all, you correctly state

12    that you will have another shot, but the second shot will only

13    be as to anything raised by his testimony.

14         I am happy to give as much time as you want, but I

15    think some of that time may have to be during the first morning

16    break.  It depends how quickly we move.  But it may be that I

17    will hear you for five minutes, I will rule tentatively, you

18    will put your first witness on the stand, and then I will give

19    you further argument at the break.  And if I -- if you persuade

20    me, the worst that could happen is you had an hour of your

21    witness for the greater glory of the law.  So I don't see how

22    that will prejudice you.

23         MR. LAUER:  I am happy to use the time now, your

24    Honor.

25         THE COURT:  Okay.  Well, let me see.

MC82PLA1

<table>
<tr><td>1</td><td>THE DEPUTY CLERK:  No. 6, who comes from the Bronx,</td></tr>
<tr><td>2</td><td>just got off of a subway near here, so five minutes.</td></tr>
<tr><td>3</td><td>THE COURT:  If you want to start, that's fine.</td></tr>
<tr><td>4</td><td>MR. LAUER:  I will, because Mr. Trott is not a fact</td></tr>
<tr><td>5</td><td>witness as it relates to anything that happened during our</td></tr>
<tr><td>6</td><td>relevant period.</td></tr>
<tr><td>7</td><td>Your Honor, we think there is a failure of proof as it</td></tr>
<tr><td>8</td><td>relates to the actual claims in this case.</td></tr>
<tr><td>9</td><td>THE COURT:  Yes.  By the way, just I think the record</td></tr>
<tr><td>10</td><td>is already crystal clear on this, but you object to my ruling</td></tr>
<tr><td>11</td><td>on the release, the ruling I just gave, and you preserve that</td></tr>
<tr><td>12</td><td>ruling for appeal.  And I'm sure it is an issue that I think</td></tr>
<tr><td>13</td><td>the Court of Appeals may find of interest.  So you don't have</td></tr>
<tr><td>14</td><td>to reargue any of that.</td></tr>
<tr><td>15</td><td>MR. LAUER:  Thank you, your Honor.</td></tr>
<tr><td>16</td><td>THE COURT:  It's fully preserved.</td></tr>
<tr><td>17</td><td>MR. LAUER:  I was trained very well in this courthouse</td></tr>
<tr><td>18</td><td>by the late Peter Fleming and Judge John Sprizzo.  They will</td></tr>
<tr><td>19</td><td>always say you waived when you get upstairs, your Honor.</td></tr>
<tr><td>20</td><td>THE COURT:  Yes, and he didn't mean they would wave at</td></tr>
<tr><td>21</td><td>you.</td></tr>
<tr><td>22</td><td>MR. LAUER:  Okay.  So the claim against Mr. Bodner is</td></tr>
<tr><td>23</td><td>that he is a fiduciary or something equivalent to a fiduciary</td></tr>
<tr><td>24</td><td>and that at some point in time he came to learn that Platinum</td></tr>
<tr><td>25</td><td>Management was fraudulently overvaluing the assets and failed</td></tr>
</table>

MC82PLA1

1    to do whatever it was he had the power to do.  So let me try to

2    break that apart.  I submit, most respectfully, he is not a

3    fiduciary, and admittedly the facts of this case are somewhat

4    unique in trying to put this particular role into a box.

5         Fiduciaries typically involve someone who has specific

6    authority——a manager, an officer, an attorney, an advisor.  I

7    think, as the Court held in the summary judgment, and I think

8    as there has been no evidence, Mr. Bodner had no managerial

9    roles or supervisory roles in terms of the actual business of

10   the company.  He wasn't involved in the valuations, wasn't

11   involved in supervising portfolio managers or traders.  So it

12   would be very hard to say that a failure of supervision or

13   failure to correct a valuator could even conceivably apply.

14        THE COURT:  What about there was some evidence, I

15   think——although I am not sure how much of it actually got into

16   evidence, but there at least was a suggestion that he had the

17   ultimate authority.

18        MR. LAUER:  Yes.

19        THE COURT:  Yes.

20        MR. LAUER:  Yes.  I'm trying to break this up.

21        THE COURT:  I see.

22        MR. LAUER:  In other words, there were basically three

23   ways——two that I think are more common and one that I think the

24   Court may have semi created for this case.  There are three

25   ways that I think of:

1          One is that you have an actual job.  You are a

2    fiduciary, you know you are a fiduciary, and the people who are

3    your principals know that you are there.  So at the managerial

4    level there is no evidence that -- or certainly not sufficient

5    evidence to meet their burden that Mr. Bodner had managerial or

6    authority -- that he was a fiduciary at that level.

7          The second way that someone can be a fiduciary is

8    typically in a direct communication type of transaction, where

9    you have two siblings that are managing the estate and one

10   sibling is relying on the other; or two people are doing a

11   transaction, and one clearly -- and they each know that one is

12   relying on the other; the other understands that there is

13   reliance, and one of them has unique facts that is not

14   disclosed.  So in those advisory direct communication

15   situations, you can have a fiduciary relationship.

16         THE COURT:  So in that regard──and I'm not sure it

17   pertains to any claim made by the plaintiffs in this case, but

18   just to raise it──there is the letter and e-mails that came

19   into evidence yesterday from Moses Katz and his wife saying, in

20   effect, that they had relied totally on Mr. Bodner and

21   Mr. Huberfeld in entering or considering entering into their

22   investment.  What about that?

23         MR. LAUER:  Well, let me respond to that.  I think

24   there is a difference between I -- I am -- I like the idea that

25   this is your fund because I have a lot of respect for you, but

MC82PLA1

```
 1     I don't expect for a minute -- there is no indication for a

 2     minute that Marcos Katz was expecting David Bodner to be doing

 3     what I would call oversight work, as opposed to you are a

 4     leader of the Jewish community, I'm a leader of the Jewish

 5     community, we know each other for a long time, so if this is a

 6     fund that you are founding and you are associated with, that is

 7     what brings me in and why I am not going to Goldman Sachs.

 8             THE COURT:  You are saying that -- and I don't think

 9     we should use the example Goldman Sachs.  There is enough

10     Judaism in this case as it is.  But you are saying if my friend

11     says to me I'm invested in Platinum and you ought to do it,

12     too, that doesn't create a fiduciary duty?

13             MR. LAUER:  Correct.  And I think you need more of a

14     communication basically.  It's very unclear exactly how

15     reliable, from an evidentiary point of view, Marcos Katz's

16     letters were when he is trying to guilt Bodner and Huberfeld

17     and Nordlicht into releasing the funds when he knows they don't

18     have liquidity.

19             THE COURT:  That's fair.  But of course on a motion at

20     the close of the plaintiffs' case, I have to take every

21     reasonable inference there could be.

22             MR. LAUER:  I appreciate that, but it's interesting

23     that they have complete access to the server, so 20 million

24     documents and e-mails.  They have complete access to multiple

25     former employees of Platinum.  They have cooperation agreements
```

MC82PLA1

1    with a number of them.  And the closest they come to anyone

2    saying anything about the issue is in 2015 Marcos Katz——a

3    frustrated, angry Marcos Katz——saying, hey, you know, I am in

4    this because of you.

5           THE COURT:  Along those lines, I don't recall anything

6    in any of those communications in which he or his wife says:

7    You told us X --

8           MR. LAUER:  Correct.

9           THE COURT:  -- and we relied on that.

10          MR. LAUER:  Correct.  And your Honor is absolutely

11   correct because in that one-on-one -- in that bilateral type of

12   situation, you need not only the principal saying I am relying

13   on you, but there has to be some manifestation by the fiduciary

14   that, yes, you can rely on me and I know you are relying on me

15   and I will look after it.  There is nothing from Mr. Bodner

16   responding, as your Honor points out.

17          So let me turn to the third --

18          THE COURT:  Yes, and then I think the juror is

19   probably here.  So I will hear you briefly on the third, just

20   so --

21          MR. LAUER:  The third one is really what the case has

22   evolved into, which is this idea that even if he has no

23   managerial or supervisory responsibility, he is a partner and

24   he is a participating and active partner and has the power on

25   the partnership level to supervise and react to incorrect

MC82PLA1

1   conduct or fraudulent information.  And that's the one that

2   this case has focused on, which is --

3                THE COURT:  All right.  I now have your three.  I know

4   you need to elaborate the last one at great length and we will

5   give you all of that opportunity, but now I think the jury is

6   here.

7                THE DEPUTY CLERK:  Yes, they are.

8                MR. LAUER:  Thank you, your Honor.

9                THE COURT:  And let's bring in the witness.  Let's get

10  the plaintiff to bring in the witness, your witness.

11               THE DEPUTY CLERK:  The Judge is asking for the

12  witness.

13               MR. GLUCK:  He is right here.

14               THE COURT:  I'm sorry.  I forgot it was the liquidator

15  himself.

16               THE WITNESS:  Your Honor.

17               THE COURT:  Unfortunately, since I grew up in the

18  Soviet era, liquidation has a different meaning for me than it

19  does for this case.

20                    (Continued on next page)

21

22

23

24

25

MC82PLA1

```
 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3         We have had a number of occasions in this case

 4    unusually where witnesses have had to come back later than we

 5    expected.  Mr. Quintero, who was testifying yesterday, his wife

 6    has some health issues that I think will be resolved today or

 7    tomorrow, but I have excused him until Monday.

 8         Now, we will just go ahead.  Plaintiffs will finish

 9    their case this morning other than that, and then the

10    defendants will start their case, and then we will interrupt

11    their case to have Mr. Quintero come back on Monday morning.

12         The order of witnesses doesn't matter at all.  What's

13    important for you is what you think the witness has proven or

14    failed to prove as the case may be, and it doesn't matter who

15    calls the witness or what the order of the witnesses or

16    anything like that.  What's really important is your evaluation

17    of the witness.

18         So I'm sorry that we had to interrupt Mr. Quintero's

19    testimony, but he will be back to complete his testimony on

20    Monday.

21         So please call your next witness.

22         MR. GLUCK:  Plaintiff calls Mr. Martin Trott.

23    MARTIN TROTT,

24        called as a witness by the plaintiffs

25        having been duly sworn, testified as follows:
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc82Pla1                        Trott - Direct

1    DIRECT EXAMINATION

2    BY MR. GLUCK:

3    Q.  Good morning, Mr. Trott.

4    A.  Good morning.

5    Q.  Are you one of the two joint official liquidators of

6    Platinum Partners Value Arbitrage Fund, LP?

7    A.  I am.

8    Q.  Could you please describe for the jury what a joint

9    official liquidator is?

10   A.  Yes, certainly.  So a joint official liquidator is a

11   court-appointed officer who takes over in a liquidation

12   scenario, which is akin to a U.S. bankruptcy process, in this

13   case of a fund.  And I am appointed by the Court, as I say,

14   under a Court order, with very specific duties to investigate

15   the affairs of the company, collect the books and records, look

16   at the asset position, what assets can be realized, investigate

17   whether or not there are any claims that can be brought on

18   behalf of the fund, and ultimately recover assets for the

19   benefit of creditors of the fund and, should there be enough

20   assets realized, to then distribute those assets to the

21   rightful parties.

22             THE COURT:  Just out of curiosity, where are you from?

23             THE WITNESS:  I was born in England.  I now reside in

24   the Cayman Islands.

25             THE COURT:  And the Court that appointed you was the

Mc82Pla1                          Trott – Direct

1    Cayman Island Court.

2                    THE WITNESS:  It was, your Honor.  It was the Grand

3    Court of the Cayman Islands.

4                    THE COURT:  Very good.  Go ahead.

5    BY MR. GLUCK:

6    Q.  Mr. Trott, is private equity funds and hedge funds a major

7    business in the Cayman Islands?

8    A.  Yes.

9    Q.  Do you have any idea about how many hedge funds and private

10   equity funds are registered there?

11   A.  So the statistics are approximately 60 to 70 percent of

12   hedge funds globally domiciled in the Cayman Islands, so it's a

13   very large part of the financial services business.

14   Q.  Cayman Islands has become for hedge funds and private

15   equity funds what Delaware is for U.S. corporations, is that

16   fair?

17   A.  Yes.  In this case, the investors would invest in two

18   what's called feeder funds.  One was a Delaware corporation so

19   that U.S. investors could invest into a Delaware entity, and

20   the second was a Cayman Islands company which was where

21   international investors could invest on a tax efficient basis

22   through the feeder fund that's based in the Cayman Islands, and

23   the various two entities, the money flowed into PPVA, which is

24   the entity that I am in control of.

25                    THE COURT:  I will give a little bit more background

Mc82Pla1                    Trott - Direct

1   because I think this is not relevant to any issue in the case.

2   But just to move things along, so business entities incorporate

3   or otherwise choose to arrange for their organization to be

4   either in a particular state or in a particular country.  So,

5   for example, a great many U.S. companies are incorporated in

6   Delaware, the State of Delaware, even though most of their

7   activities are not in Delaware, but they see usually some tax

8   advantage or some other advantage to being incorporated in

9   Delaware.

10          And similarly, hedge funds frequently originate or

11  choose as their home the Cayman Islands.  You may -- I don't

12  believe it is because of the beaches there, although they may

13  like that, as well, but again because there are business

14  advantages to doing so.  So this is all routine stuff.  I

15  didn't want you to think this was unusual.

16          Go ahead.

17  BY MR. GLUCK:

18  Q.  The Grand Court of the Cayman Islands oversees the

19  wind-down, official or otherwise, of many of the world's

20  private equity funds and hedge funds, is that right?

21  A.  When -- yes.

22  Q.  Are you yourself, by virtue of your appointment here, an

23  officer of the Cayman Islands court?

24  A.  Correct.

25  Q.  Are you a fiduciary?

Mc82Pla1                        Trott - Direct

1    A.  Yes.

2    Q.  Do you have a duty to --

3           THE COURT:  So how come you are not wearing a wig?

4           Go ahead, counsel.  I think now we have exhausted the

5    background.

6    BY MR. GLUCK:

7    Q.  Do you have a duty to act neutrally?

8    A.  Absolutely.

9    Q.  How is it that you came to be appointed over Platinum

10   Partners Value Arbitrage?  Are you aware of the chain of events

11   that led directly in the Cayman Islands into liquidation and

12   your appointment?

13   A.  Yes.  So as a result of a chain of events in 2016 and

14   earlier, including Murray Huberfeld's arrest, for example,

15   there was a filing first in the Cayman Islands over the feeder

16   fund in the Cayman Islands and then the Platinum Management

17   itself filed for a winding up in the Cayman Islands of PPVA.

18   That was in August of 2016.

19   Q.  Since August of 2016, have you and the team at Rawlinson &

20   Hunter been working to realize the assets, investigate the

21   causes of the insolvency, and to bring litigation?

22           MR. LAUER:  Leading.

23           THE COURT:  For sure.

24   BY MR. GLUCK:

25   Q.  What have you been doing since your appointment?

1    A.  So since our appointment, the joint official liquidators

2    have a -- we have a team -- there are two of us, but we have,

3    as you would expect, a team that assists us in the performance

4    of our duties, and we have been putting an enormous amount of

5    work in over the last six years on this case combined, just my

6    team and myself alone, it's about 27 1/2 thousand hours and

7    myself, I have spent about 3 1/2 thousand hours on this case

8    going over a vast amount of information and investigating the

9    causes of the failure.

10   Q.  Have you brought a series of litigations in courts and

11   arbitral panels around the world, Mr. Trott?

12   A.  Yes.

13   Q.  Were some of those litigations designed to reduce the

14   insolvency?

15             MR. LAUER:  Objection.  Leading.

16   BY MR. GLUCK:

17   Q.  What were the various purposes of those litigations?

18   A.  So as I mentioned, one of our powers as liquidators is we

19   have the ability to bring claims on behalf of the fund, on

20   behalf of PPVA, after our investigations and should there be

21   sufficient evidence to bring such claims.  And so in this case,

22   given the circumstances of the failure and the circumstances

23   behind the collapse, there have been multiple litigations that

24   we have had to bring against various parties.

25   Q.  After a time, did you come into possession of records of

Mc82Pla1                        Trott - Direct

1    Platinum Management?

2    A.  Yes.

3    Q.  After a time, did you ultimately gain access to a portion

4    of the Platinum server?

5    A.  Yes.

6    Q.  Speaking as an officer of the Cayman court, why have you

7    brought this case?

8             THE COURT:  Sustained.

9             MR. LAUER:  Objection.  He is not --

10            THE COURT:  Sustained.

11            MR. LAUER:  Thank you.

12            THE COURT:  He is a fact witness and you need to

13   confine your questions to specific things that he heard, saw,

14   observed, but not his conclusions because he is a party and not

15   his opinions because he is a party.

16   BY MR. GLUCK:

17   Q.  Have you and your team reviewed bank records of PPVA in

18   this matter?

19   A.  Yes.  A significant volume of information we have had to

20   review.

21            MR. GLUCK:  Mr. Parson, would you please call up

22   PX 926.  Can we go to the third chart, please.

23            Now, this is a Platinum Management-created document we

24   will move into evidence.

25            MR. LAUER:  We object.  401, among other things.

Mc82Pla1                    Trott - Direct

1              MR. GLUCK:  I have a CTRL --

2              THE COURT:  On 401, overruled.  I'm not sure what you

3    mean by other things, but 401, overruled.

4              MR. LAUER:  All right.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 926 received in evidence)

7    BY MR. GLUCK:

8    Q.  Now, have you made a determination by a review of the bank

9    records as to the amount of management fees paid after April 1,

10   2016?

11             MR. LAUER:  Objection.

12             THE COURT:  Sustained.

13   BY MR. GLUCK:

14   Q.  Mr. Trott, are you a forensic accountant?

15             MR. LAUER:  Objection.

16             THE COURT:  Counsel, come to the sidebar.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Mc82Pla1                           Trott - Direct

1              (At the sidebar)

2              THE COURT:  So he wasn't listed as an expert, was he?

3              MR. GLUCK:  No, no.  But his job is just to calculate

4    assets and liabilities.  That's the sole purpose here.

5              THE COURT:  Excuse me, excuse me.  If you want to ask

6    him, based on these records, did you ad column X, Y, and Z and

7    that's the total, that you can ask.  But that wasn't what you

8    asked.

9              MR. GLUCK:  I'm just asking him to add column X, Y and

10   Z.

11             THE COURT:  So just confine it.  I assume he is in

12   effect the functional equivalent of a summary witness on

13   certain of these records, and that's permissible if all he did

14   was add up certain columns.  And of course you can, on

15   cross-examine, ask why didn't you add this one or subtract that

16   one.  That's a matter for cross.  But that is what he can do.

17   He can't --

18             MR. GLUCK:  That's all I am asking.

19             THE COURT:  All right.

20             MR. GLUCK:  Adding certain numbers.

21             THE COURT:  All right.

22             (Continued on next page)

23

24

25

1              (In open court)

2    BY MR. GLUCK:

3    Q.  I am going to ask you to look at the document on your

4    screen.  And, first, did you prepare this document?

5    A.  No.

6    Q.  Do you know who did prepare this document?

7    A.  My understanding is this is a document prepared by Platinum

8    Management.

9    Q.  Thank you.  Could you please look to row 13.

10             What is the number that is set forth in row 13?

11   A.  Approximately $9.26 million.

12   Q.  Now please go back to the first page, Mr. Parson.

13             MR. LAUER:  Your Honor, we object and we would like to

14   approach the bench.

15             THE COURT:  All right.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Mc82Pla1                        Trott - Direct

1           (At the sidebar)

2           MR. LAUER:  I have no idea what this document is, but

3    the first page is Agera.

4           Secondly, he's got a witness on management and

5    incentive fees, as Quintero will put in a report.  I have no

6    idea what they are doing here, but he supposedly is a short

7    witness who is supposed to say, hey, I'm Trott, and I settle

8    with these cases.

9           THE COURT:  I agree with you that's what I understood

10   him to be from the representations made yesterday.

11          Why is this not just duplicative of what --

12          MR. GLUCK:  Quintero?

13          THE COURT:  Yes.

14          MR. GLUCK:  It's not.  That's the whole point.  And if

15   these two -- I have one question and one question.  We are just

16   taking a long time.  That is a document in Mr. Trott's

17   possession which he has reviewed, and he's reviewed the bank

18   statements and it shows $9 million of Platinum Management fees

19   simply being paid after April 1, 2016.  There is nothing else

20   that we are saying.  We are not saying anything about Agera.

21   We are saying as a matter of fact that was paid after April 1,

22   2016.

23          MR. LAUER:  Two things.  I have no idea who prepared

24   this or why it was prepared or what it means.

25          THE COURT:  Well, I agree.  I am having second

Mc82Pla1                         Trott - Direct

1   thoughts about the introduction of this document because I

2   thought it was represented that it was a Platinum Management

3   document, internal Platinum Management document.  But then he

4   said that he believes that is what it is.  That was his

5   testimony, and that suggests that he doesn't know.

6               MR. GLUCK:  No, I think he knows.

7               THE COURT:  Well, let's -- you better bring that out.

8               MR. GLUCK:  Sure.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc82Pla1                     Trott - Direct

1              (In open court)

2    BY MR. GLUCK:

3    Q.  Mr. Trott, I will ask you to keep your answers very clear

4    on this.  What you know, you know.

5    A.  Understood.

6    Q.  Mr. Trott, did you have access to the Platinum server?

7    A.  Yes.

8    Q.  Are Platinum server documents prefixed with the letters

9    CTRL?

10   A.  Yes.  I understand that's a reference that's applied to all

11   documents.

12   Q.  You know your firm didn't produce this document.

13   A.  Our firm -- my firm definitely did not produce this

14   document.

15   Q.  You know this document came from the Platinum Management

16   server.

17   A.  I do.

18   Q.  Do you know, is it your understanding that this is simply a

19   recitation of the distributions of a particular asset?

20              MR. LAUER:  Objection.  Leading.

21              MR. GLUCK:  Well, I was trying to abide by the Court's

22   instruction.

23              THE COURT:  I will allow that even though it is

24   leading just to move it along.

25              Is that your understanding?  Yes or no.

Mc82Pla1                      Trott - Direct

1        THE WITNESS:  Yes.

2   BY MR. GLUCK:

3   Q.  Does this document indicate, based on the page we just

4   looked at, that --

5        THE COURT:  I'm sorry.  Which page are we looking at?

6        MR. GLUCK:  The third page.  Where the highlighting

7   is.

8   Q.  It's not particularly complicated, Mr. Trott.  Do you see

9   line 13?

10   A.  Of the page that's on the screen, yes.

11   Q.  Okay.  Do you know --

12        THE COURT:  So forgive me.  This is what exhibit

13   number?

14        MR. GLUCK:  926.

15        THE COURT:  What was handed to me by counsel as 926

16   doesn't correspond to what's on the screen.  Maybe someone can

17   take a look at what was handed to me and see if you gave me the

18   wrong document.

19        MR. MAGRUDER:  Your Honor, I think we are on page 23

20   of this document.

21        THE COURT:  23.

22        That's helpful, because the pages in what you gave me

23   are not numbered.

24        MR. MAGRUDER:  It is the second to last page, your

25   Honor, if that helps.

Mc82Pla1                          Trott - Direct

1          Now we are on the same page.  Go ahead.  Go ahead.

2     Put another question.

3          MR. GLUCK:  Pursuant to the Court's instruction.

4     BY MR. GLUCK:

5     Q.  Do you know that $9,258,362 was paid from your company PPVA

6     to Platinum Management?

7          THE COURT:  Well, sustained as formulated.  But this

8     is a document prepared by Platinum internally, right?

9          THE WITNESS:  Correct.

10         THE COURT:  And does the entry that we are looking at

11    now, entry 13 on the next to last page of this exhibit, show

12    net payments to the management company of $9,258,362.00?

13         THE WITNESS:  It does, your Honor.

14         THE COURT:  Okay.

15    BY MR. GLUCK:

16    Q.  And have you confirmed that this payment was made within

17    the PPVA bank statements in your possession?

18         MR. LAUER:  Objection.  It's after the period.

19         MR. GLUCK:  There is no period.  I don't --

20         THE COURT:  Overruled.

21         MR. LAUER:  Thank you.

22    A.  Yes.

23    Q.  Thank you.

24         So it was after the release was signed.  Is that --

25    A.  Yes.

Mc82Pla1                        Trott - Direct

1   Q.   -- right?

2            Mr. Trott, you suggested that one of your roles was to

3   bring litigation.  Is that right?

4   A.   Yes.

5   Q.   This would be an example of the sort of litigation you

6   would bring?

7   A.   Yes.

8   Q.   Have there been other litigations besides this case?

9   A.   Yes, several.

10  Q.   Now, in this case, Mr. Bodner was not the only defendant

11  originally.

12  A.   No.

13  Q.   Is it fair to say that there were other defendants in this

14  particular case?

15  A.   Yes, multiple defendants in this case.

16  Q.   Was Murray Huberfeld one of the defendants in this case at

17  one time?

18  A.   He was, yes.

19  Q.   Have you arrived at a resolution with Mr. Huberfeld?

20  A.   Yes, we have.

21  Q.   And what were the settlement terms?

22  A.   So we settled with Mr. Huberfeld for $10 million in total,

23  which was $5 million in cash on signing of the agreement and a

24  deferred $1 million payments over five years for the remainder.

25  We received one of those installments, so we received 6 out of

Mc82Pla1                        Trott - Direct

1   the 10.

2   Q.  Was Mr. Huberfeld's financials provided to you?

3   A.  Yes.

4   Q.  Did you also conduct -- did you hire an asset investigator

5   to determine Mr. Huberfeld's worth?

6           MR. LAUER:  Objection.

7           THE COURT:  Sustained.

8   Q.  Did you believe that that was the highest amount

9   Mr. Huberfeld --

10          MR. LAUER:  Objection.

11          THE COURT:  Sustained.

12  Q.  Did Mr. Huberfeld admit to anything in the --

13          MR. LAUER:  Objection.

14  Q.  -- settlement agreement --

15          THE COURT:  Overruled.

16  Q.  -- regarding the reason he was settling?

17  A.  Yes.

18  Q.  And what did he admit?

19  A.  So one of the areas that we had against Mr. Huberfeld was

20  the impacts on PPVA of COBA bribery scandal you heard about

21  yesterday in Mr. Huberfeld's testimony.  So that was one of the

22  factors that we say caused PPVA's collapse.

23  Q.  At the time when you settled with Mr. Huberfeld, were there

24  a number of claims that were pending against him by you?

25  A.  Yes.

Mc82Pla1                    Trott - Direct

1    Q.  Is it your understanding that in this case the lost -- this

2    trial against Mr. Bodner is only on the issue of overvaluation?

3    A.  That's my understanding.

4    Q.  What issues or claims existed with respect to Mr. Huberfeld

5    at the time you settled?

6               MR. LAUER:  Objection.

7               THE COURT:  No.  Yeah, I think -- I have allowed a

8    certain amount of inquiry here because the jury had heard from

9    both sides that Mr. Huberfeld was on the stand about different

10   aspects of the settlement as well as his criminal difficulties

11   and so forth, but I think we have now exceeded what would be --

12   or now reached what would be relevant for this jury, and we

13   don't need to get into too further details.

14              MR. GLUCK:  Your Honor, potential sidebar.  This is

15   not to talk about other schemes.  The intention is to do a

16   set-off, and there will be other defendants that have nothing

17   to do --

18              MR. LAUER:  Excuse me.  Excuse me.  I really object to

19   this --

20              MR. GLUCK:  May we have a sidebar?

21              MR. LAUER:  -- in open court.

22              THE COURT:  All right.  I will have a sidebar.  Always

23   a fun thing.

24              (Continued on next page)

25

1      (At the sidebar)

2          MR. GLUCK:  Judge Rakoff, the entirety of the

3    remainder of Mr. Trott's testimony relates to one issue, the

4    other litigations.  I actually understood that Mr. Lauer was

5    going to cross him on these issues and he would be happy for me

6    to do it.

7          The point here is it is our understanding that at the

8    conclusion of this case the defendant is going to seek set-off

9    under GOL 108 for the settlements that have been reached in the

10   liquidation.  The point we are trying to draw out is that --

11   let's take the simplest example.

12         THE COURT:  Let me interrupt you for a second.  I am

13   glad you brought that up, because I think you had offered a

14   proposal early -- shortly before this case went to trial that

15   that somewhat complicated arithmetic should be, if defense

16   counsel agrees, performed by the Court, so we don't have to let

17   the jury worry about it.

18         Is that acceptable to both sides?

19         MR. LAUER:  I would have to confer with my team.

20         MS. MOSSE:  I think what we proposed was the jury

21   could apportion the percentages and not worry about --

22         MR. GLUCK:  No.  He is going further.

23         MR. LAUER:  What the judge is saying is he would

24   allocate percentage of fault and --

25         THE COURT:  Which I should say I have done routinely

1   in many other cases because this is usually something that

2   detracts the jury from the central issues in the case, whereas

3   I am always happy to be detract -- distracted.

4           MR. LAUER:  If the Court would permit me, I would have

5   to ask the client.  It's basically a waiver of his rights.

6           THE COURT:  All right.  Go ahead and ask him.

7           MR. GLUCK:  Because the Court will know --

8           MR. LAUER:  I'm sorry.  What?

9           MR. GLUCK:  I wanted the Court to know that we would

10  have been happy, but we received two trial subpoenas for these

11  documents for -- that's why I had to go here, just so you

12  understand.

13          (Pause)

14          MR. LAUER:  We agree.

15          THE COURT:  Great.  I will instruct the jury the very

16  broad picture so they understand we are ending this witness

17  right now.

18          MR. GLUCK:  Then I only have two minutes, right.

19          MR. LAUER:  But you have to include Blank Rome.

20          MR. GLUCK:  We are doing this later.  That's what we

21  agreed to.  I'm not going to include anything.

22          MR. LAUER:  What?

23          MR. GLUCK:  I'm not going to include anything.

24          MR. LAUER:  Okay, so I'm not waiving anything.

25          MR. GLUCK:  Nobody is -- we are dealing with GOL 108

Mc82Pla1                         Trott – Direct

1    later.  Is that what everybody understands?

2              MR. LAUER:  Fine.

3              MR. GLUCK:  Fine.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc82Pla1                         Trott - Direct

 1              (In open court)

 2    BY MR. GLUCK:

 3    Q.  All right.  Mr. Trott, this is going to be much shorter.

 4              THE COURT:  So -- and notwithstanding that it's a

 5    pleasure to hear your accent, so as you know, the defendant

 6    here claims he is not liable at all and you are going to hear

 7    plenty of arguments on both sides about that.  If he were

 8    liable and if you awarded certain damages, they would then have

 9    to be reduced, what we call set off, by amounts paid by other

10    people who were sued in related litigation.  And that is what

11    this testimony was being offered for.  But counsel for both

12    sides and their clients have graciously agreed that that

13    arithmetic will be left to me to do, so you won't have to do

14    it.  And, you know, I have got five fingers and five toes, so I

15    can certainly count, and I am sure I will be able to do it

16    without counsel.

17              So you are excused, thank you very much.

18              MR. GLUCK:  One moment.  There was a last issue.

19    BY MR. GLUCK:

20    Q.  Not on the issue of set-offs or 108, Martin, but did you

21    sue in arbitration the firm of CohnReznick, an auditor?

22    A.  Yes.

23    Q.  Did you sue in arbitration the firm of BDO, an auditor?

24    A.  Yes.

25    Q.  Did you incur legal fees in relation to those proceedings?

Mc82Pla1                         Trott - Direct

1    A.  Yes, significant legal fees.

2    Q.  And what was the amount of those legal fees?

3              MR. LAUER:  Objection.  Relevance.  Never saw them.

4              MR. GLUCK:  The relevance is that --

5              MR. LAUER:  Not produced.

6              THE COURT:  If it was not produced, that's not a

7    question of relevance.  It's a question of discovery failure.

8    If it was not produced, that's a good objection.

9              MR. GLUCK:  Produced -- these arbitrations were

10   commenced after discovery, and they have been expressly

11   notified to defendants.

12             THE COURT:  I think we need another sidebar.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Mc82Pla1                          Trott - Direct

1            (At the sidebar)

2            MR. GLUCK:  There is an exhibit.  Hold on.  This is

3    simpler than more complicated.  We presented a proposed

4    exhibit.  It just says amount of fees paid, there is fees,

5    there is support for it.

6            THE COURT:  Did you present the underlying support for

7    it?  Did you present the underlying support for that chart?

8            MR. LAUER:  No.

9            (Counsel confer)

10           MR. GLUCK:  One moment.

11           THE COURT:  Independent of that, after you saw their

12   chart, did you ask for the underlying --

13           MR. LAUER:  Yes.

14           THE COURT:  -- support?

15           MR. LAUER:  Yes.  And this is also covered by the

16   consequential damages ruling.  I have no idea what he is

17   talking about.  He sued Blank Rome -- he sued the accountants

18   and we are supposed to pay his attorney's fees?

19           THE COURT:  That's a different question.

20           MR. LAUER:  I agree.

21           MR. GLUCK:  Only if we assume --

22           MR. LAUER:  But we never, we never received, we never

23   received -- we had a line item saying he has $4 million.  We

24   said:  Give us the backup.  Where is the backup?  If you want

25   to ask for legal fees, I want to see your time records, your

Mc82Pla1                           Trott - Direct

1   time sheet.

2              MR. GLUCK:  They were --

3              THE COURT:  Wait a minute.  Hold on.  Listen.  If you

4   all want to have your private conversations, I will excuse the

5   jury for two weeks and you can do that, but otherwise when you

6   are at the sidebar, only one person talks and it is the person

7   being addressed by the Court.  Understood?

8              So the representation is that, after receiving this

9   chart, a request was made for the underlying time sheets and

10  that they were never provided.  So let me ask plaintiffs'

11  counsel what the story is on that.

12             MR. GLUCK:  I am personally not aware of any request.

13             MS. SHEN:  I'm not sure I am aware of any specific

14  request for the time sheets either.  I think we were asked

15  generally.

16             THE COURT:  Who made the request?

17             MR. LAUER:  I think we talked about it.

18             THE COURT:  Whoa, whoa.  Just answer my questions.

19             MR. LAUER:  I don't know who made the request.  I do

20  believe that when we saw their pretrial order listing $4

21  million in fees -- is that what this is?  We said:  Where is

22  the basis and the backup?

23             MR. GLUCK:  Then we gave them this and then there was

24  no further discussion.

25             THE COURT:  I need to have persons with personal

Mc82Pla1                        Trott - Direct

1    knowledge.  So the first thing I need to know is who, and you

2    may need to consult on this and we can move on and I think take

3    this up out of order later, if necessary, because it doesn't

4    relate to any of the motions you are about to make.  I want to

5    know who, if anyone, on plaintiff -- on defendant's side asked

6    for the time sheets, and I want to know -- and to whom did they

7    make that request, and then I want to know from that person to

8    whom he allegedly made the request, whether they agreed the

9    request was made, and what their response was.

10              But let's take that up, and we can always recall.

11   This gentleman is here for the duration, so --

12              MR. GLUCK:  He can always say this is his sheet and

13   they are in and out, and then we don't have to recall him, I

14   guess.

15              THE COURT:  This is not what he purportedly asked for.

16   Any lawyer would want to know, when you see a bill for that

17   amount of money, what the heck were you doing?  And the chart

18   only shows the summary.  It doesn't explain that there were

19   three paralegals dancing on the head of a pin.  That would not

20   be an appropriate charge.  Much as I love dancing.

21              So but we will take this up later.  We will excuse the

22   witness subject to being recalled out of order after we resolve

23   this issue.

24              MR. GLUCK:  I'm sorry, one comment.

25              (Counsel confer)

1             MR. GLUCK:  Our side does not remember or know

2     anything about a request.

3             THE COURT:  We will wait to hear from --

4             MR. LAUER:  I would like to say one other thing

5     because whether or not there was this request, I mean, I think

6     that there was, but whether or not there was, we would object

7     to a summary document without the underlying data.

8             THE COURT:  I think, since we are putting this off in

9     any event, that the defendant should be furnished with the

10    underlying data if it turns out that they requested and didn't

11    get it and I'm not going to permit this into evidence.  If it

12    turns out they didn't request it, then I will permit it into

13    evidence.  But I think before that occurs, they should be able

14    to see the underlying data.  All right?

15            MR. GLUCK:  No problem.  We didn't know this was an

16    issue.

17            (Continued on next page)

18

19

20

21

22

23

24

25

MC8Cpla2                        Trott - Cross

1              (In open court)

2              THE COURT:  So, the great advantage, ladies and

3    gentlemen, of sidebars is we keep cutting out testimony and

4    making your job easier.  So the witness is now excused.

5              Subject to all the possible recall, like Mr. Quintero,

6    anything else from plaintiff?

7              MR. GLUCK:  No, the plaintiffs rest.  Oh, no.  Katz.

8    Sorry.  That's my fault.

9              THE COURT:  You have a deposition you want to read?

10             MR. GLUCK:  We have the deposition.

11             THE COURT:  Let's go ahead.

12             MR. LAUER:  Your Honor, I didn't get the opportunity

13   to --

14             THE COURT:  They're still on their case.  They just

15   remembered that they --

16             MR. LAUER:  What about cross examination?

17             THE COURT:  Oh, I am so sorry.  I thought, given the

18   way we resolved it, I'm not sure -- you're right, there are

19   some limited things that you might want to cross examine him

20   about, like the nature of the beaches in the Cayman Islands.

21   Let's get the witness back on the stand.

22   CROSS-EXAMINATION

23   BY MR. LAUER:

24   Q.  Good morning, Mr. Trott.  How are you?

25   A.  Good morning.  Very well.  Thanks.

MC8Cpla2                          Trott - Cross

1          MR. LAUER:  We would offer DX 0699, which is the

2     declaration that began this proceeding.  No, it's the wrong

3     document.  Sorry.

4          Sorry.  We do offer DX 69.  699.

5          THE COURT:  This is why the arithmetic is being left

6     to me because they can't distinguish between 69 and 699.

7          Any objection?

8          MR. GLUCK:  Relevance.  This is a Chapter 15

9     declaration.

10         MR. LAUER:  I'm going to withdraw that and turn to

11    something else.

12         THE COURT:  Okay.

13    BY MR. LAUER:

14    Q.  You said that you are appointed by the Court, but in terms

15    of how you make a living, you're a private businessman;

16    correct?

17    A.  Correct.

18    Q.  And you work in an office with other people who do similar

19    work, liquidator work?

20    A.  Correct.

21    Q.  Your company, how do you get paid?

22    A.  So, I'm a partner of -- my firm is Rawlinson & Hunter, and

23    I get paid as a partner from the partnership.

24    Q.  How does your firm, in which you're a partner, get paid for

25    a case like this?

MC8Cpla2                        Trott - Cross

1    A.   So we charge fees as liquidators to the estate, to PPVA.

2    Q.   Do you have an agreement with somebody?

3    A.   Correct.

4    Q.   Does that agreement include a performance fee?

5    A.   No.

6    Q.   What rate do you charge?

7    A.   In this liquidation, off the top of my head, I believe it's

8    seven-nine-five an hour.

9    Q.   Does everyone charge close to that rate or above that rate?

10   A.   No.

11   Q.   So you charged three and a half thousand hours on this

12   case?

13   A.   Approximately, yes.

14   Q.   At $750 an hour?

15   A.   No.

16   Q.   Maybe I misheard.  What was your rate?

17   A.   It's approximately seven-nine-five now.

18   Q.   $795 an hour?

19   A.   $795 currently.

20   Q.   And it was a little bit lower over the last couple of

21   years?

22   A.   Yeah.  The rate, that's the highest the rate has been in

23   the liquidation.  When I first started on this case in 2016, it

24   was much lower.

25   Q.   So 27,000 hours, how much did that translate into revenue

1    for your company?

2    A.   Off the top of my head, I don't know.  I can't answer the

3    question.

4    Q.   What's the average rate?

5    A.   The average rate across the team or myself?

6    Q.   Do you have a blended rate for the 27,000 hours that you

7    charged for these cases?

8    A.   Not off the top of my head, no.

9    Q.   At $100, it would be $2,700,000; right?

10   A.   Correct.

11   Q.   At $400 --

12            THE COURT:  Sustained.  Argumentative.

13            MR. LAUER:  Thank you.

14   Q.   What percentage of the 27,000 hours has been devoted to

15   lawsuits and what percentage has been devoted to running

16   businesses to try to preserve their value?

17   A.   I can't answer that off the top of my head.

18   Q.   Can you identify any businesses that you took over that you

19   still owned and were operating a year after you took over the

20   business?

21   A.   Sorry.  Can you explain what you mean by took over?

22   Q.   Any other --

23            THE COURT:  No, he says your question is unclear to

24   him.

25   Q.   When you became a joint liquidator, you stepped into the

MC8Cpla2                        Trott - Cross

1   shoes of Platinum Management managing PPVA; right?

2   A.  Correct.

3   Q.  And PPVA had many hundreds of individual assets; right?

4   A.  Incorrect.

5   Q.  What did it have?

6   A.  It had, I'd say, off the top of my head, about 40 or 50

7   subsidiary companies of the fund.

8   Q.  And did it have stock positions?

9   A.  Yes.

10  Q.  Did you count those in the 40 and 50?

11  A.  No, they were encumbered in one of the subsidiary companies

12  called Monstant.

13  Q.  Let's turn to the 40 or 50 investments in various

14  companies.

15          Did you manage any of them for longer than a year?

16  A.  Yes.

17  Q.  Which ones?

18  A.  So DMLJ would be an example.  That's a Delaware limited

19  liability company, and we stepped in as the managing member,

20  which is a shareholder, and the operating manager.

21  Q.  Any others?

22  A.  There were certainly others, yes.

23  Q.  But you can't remember any of them?

24  A.  There was also Monstant, who changed the -- so the majority

25  of the directly held subsidiaries of PPVA.  The majority of

MC8Cpla2                    Trott - Cross

1    them, we changed the managing member and operating manager who

2    at the time was either Platinum Management or Mark Nordlicht.

3    That's usually, liquidations, we would take control.

4    Q.  Did any of these companies need new capital?

5    A.  Yes.

6    Q.  Did you arrange financing to leverage these companies so

7    that they could operate?

8    A.  We, at the time, the position, as you could imagine, was

9    extremely convoluted.  So the way that the Platinum Management

10   had gone about their business and the partners at Platinum

11   Management had gone about operating these funds, they had to

12   perform so many transactions and cross collateralized and came

13   up with schemes that it made it incredibly difficult to raise

14   financing directly at the subsidiary level.

15   Q.  So you basically sold them?

16   A.  We've sold certain assets and then we've realized what we

17   can from other assets.

18   Q.  You say that you're a neutral.  When it comes to all the

19   people that you sued, do you consider yourself neutral as to

20   them?

21   A.  So when I say neutral, my job is to recover assets for the

22   benefit of the creditors of the company.  I have no axe to

23   grind against any particular defendants, but my job is to bring

24   claims against individuals who I think were perpetrators of the

25   fraud.

MC8Cpla2                          Trott - Cross

1    Q.  So basically, Cayman liquidation is not -- is Cayman

2    liquidation the same thing as the United States corporate

3    reorganization under Chapter 11?

4    A.  No.

5    Q.  Very briefly, could you explain the difference, as best you

6    understand it?

7    A.  As best I understand it.  So one of the key differences is

8    in the individuals that are given the power to take over, in

9    the U.S., a Chapter 11 proceeding under the U.S. bankruptcy

10   code is a trustee is normally appointed, who is a lawyer.  I'm

11   an accountant and a forensic accountant by my background, I'm

12   not a lawyer.  The Chapter 11 is to do with reorganization and

13   rescue of an entity.  So that means trying to -- the

14   Chapter 11, we're trying to get the company back into good

15   health.  In a liquidation, we are typically realizing the

16   assets, not saving the vehicle, not saving PPVA because in this

17   instance, it was impossible.  It is to realize the assets and

18   pay those back to creditors.  Under your code, you have what's

19   called a Chapter 7, which I think is analogous to a Cayman

20   Islands liquidation.

21   Q.  And this is basically a liquidation process; right?

22   A.  This is a liquidation process and as part of that, my role,

23   as I said, is to maximize the value of those assets.  So if I

24   can, in maximizing the value of the assets, if I can sell an

25   entity, a subsidiary for full value, then I will try and do

MC8Cpla2                        Trott - Cross

1    that.  Obviously, if that's impossible, I will try to do what I

2    can to realize what I can.

3          THE COURT:  I want to interrupt because, although

4    there's no objection, most of this was asking for a description

5    of the law, and the only person who can give a description of

6    the law is the Judge.  So let me describe.

7          So, in the United States, when a company goes into

8    bankruptcy because it's not able to pay its debts or other

9    similar situations, there are two possibilities.  One is that

10   it can be reorganized, turned around, and made to run again,

11   but in many, many cases, there's no hope of that.  So then the

12   object is to recover what monies can be recovered to pay off

13   the creditors, and the creditors are ordered, according to

14   various laws as to the most senior creditors down to the most

15   junior creditors.  Typically, a trustee is appointed to do

16   that, and he or she can bring a lawsuit.

17         Cayman Islands, it's very similar to that latter

18   situation.  So a company goes into liquidation because it's

19   financially destitute, and a liquidator is appointed by the

20   court, and it can be a private lawyer, a private accountant or

21   whatever, and that person then takes whatever steps that they

22   believe are appropriate to try to maximize the amount of

23   recovery to go to the creditors.  Some of this can be brought

24   about by bringing lawsuits, some by settling lawsuits, some by

25   transferring assets, selling assets, whatever.  The person who

1    does that is paid a fee, approved in advance by the court for

2    their services, but typically they recover a much larger

3    amount, which the rest goes to the creditors.

4              So I think we need to turn to something else.

5              MR. LAUER:  Can we put up 698.

6              We would offer 698, the petition.

7              MR. GLUCK:  What's the next page?

8              THE COURT:  I'm sorry, was there an objection?

9              MR. GLUCK:  It's a pleading.  It's not evidence

10   prepared by former Platinum Management.  It's their petition.

11             THE COURT:  I'm sorry.  My question was, is there an

12   objection?

13             MR. GLUCK:  Yes.  Relevance.

14             THE COURT:  Sustained.

15   BY MR. LAUER:

16   Q.  Do you know who commenced the winding-up petition that led

17   to your sitting in that chair today?

18   A.  Yes.

19   Q.  And who was it?

20   A.  It was Platinum Management.

21   Q.  Do you know the individual at Platinum Management who made

22   the decision to file the winding-up petition?

23   A.  I believe the petition was supported by an affidavit from

24   Mark Nordlicht.

25   Q.  And by the way, after you and your colleagues took on the

MC8Cpla2                        Trott – Cross

1    role of liquidator, did you have occasion to come to New York

2    in the late spring, early summer of 2016 and set up shop at the

3    Platinum offices?

4              MR. GLUCK:  Objection.  Set up shop.

5              THE COURT:  Sustained.

6    Q.  Did you have occasion to work with Mark Nordlicht in the

7    summer and fall and early winter of 2016 in your role as the

8    liquidator?

9    A.  I think the work with Mark Nordlicht, in your words, I met

10   Mark Nordlicht in the offices in New York, yes.

11   Q.  Did he provide you with information?

12   A.  Yes.

13   Q.  Did you hire, as consultants, some of the Platinum

14   Management personnel, such as SanFilippo?

15   A.  No.

16   Q.  Steinberg?

17   A.  No.

18   Q.  Did you work with them?

19   A.  We were getting information out of -- the start of a

20   liquidation, the main role is -- we are brand new to the

21   situation.  So the main role is to gather, collect information

22   to the greatest extent possible.  And so, we were meeting

23   certain individuals, certainly those individuals that Mr. Lauer

24   just mentioned, and we were gathering documents.  So we weren't

25   working with them, they were still employed by Platinum

MC8Cpla2                     Trott - Cross

1    Management at the time, I believe.

2              THE COURT:  Was it part of your duties to investigate,

3    as best you could, all the underlying events?

4              THE WITNESS:  Yes.

5              THE COURT:  In that regard, you would want to talk to

6    anyone you could talk to, even if you did not necessarily

7    credit everything they said; is that fair?

8              THE WITNESS:  That's fair, yes.

9    BY MR. LAUER:

10   Q.  So they were still on the payroll of Platinum Management,

11   but they were available to you to answer any questions that you

12   had?

13   A.  Yes, to a certain extent.  When you say available to us,

14   there wasn't free, unrestricted access, we had some issues in

15   that regard, but on the whole, yes.

16   Q.  Do you recall who you spoke with?

17   A.  So I personally spoke to Mark Nordlicht, David Levy, David

18   Steinberg, Joe SanFilippo.

19   Q.  Did members of your team speak to other people?

20   A.  Yes.  I believe, at the time, Suzanne Horowitz was there,

21   for example.

22   Q.  She was general counsel?

23   A.  I believe so, yes.

24   Q.  And you were trying to get the lay of the land.  Did any

25   one of these individuals tell you that you should speak to

MC8Cpla2                              Trott - Cross

1   David Bodner?

2   A.  I can't recall.

3   Q.  Did you reach out to speak with David Bodner?

4   A.  No.

5          THE COURT:  Why not?

6          THE WITNESS:  At the time, we didn't know the extent

7   of Mr. Bodner's feelings with Platinum Management or PPVA.

8   That only became apparent subsequently as part of my

9   investigations.  Mr. Bodner was not in the office when we

10  arrived and it was only when we investigated all the records

11  that we eventually got, then it became clear, the extent of

12  Mr. Bodner's involvement.

13  Q.  Just so that we have an understanding of the time.  About

14  when did you arrive or team members arrive at the Platinum

15  offices to begin gathering facts?

16  A.  So I believe it was in August.  The exact date, I couldn't

17  be precise.

18         THE COURT:  August of 2016?

19         THE WITNESS:  August of 2016, yes.

20  Q.  And between August and December, your team was in the

21  office and there still was Platinum Management and their team,

22  their employees were in the office?

23  A.  No, we weren't there the whole time.  We were coming and

24  going.  We were -- when I say we, I'm talking not me

25  personally, but collectively as a team, we were in Platinum's

MC8Cpla2                          Trott - Cross

1    offices on occasion in that time period.

2    Q.  But during this four-month period, you had the opportunity

3    to talk to anyone you wanted to and to get any documents that

4    you thought were important?

5    A.  No.

6    Q.  No?  What were you doing?

7    A.  So, as I mentioned in my previous testimony, we were

8    provided access to certain individuals and certain documents,

9    but at the time, you only know what you know, and as the

10   investigation goes on, you uncover more facts and then that

11   leads into other lines of inquiry.  So we were provided with

12   certain documents by Platinum Management at the time, but we

13   weren't provided with further access to Platinum Management's

14   records.

15   Q.  You understood, though, that Mark Nordlicht was the chief

16   investment officer of Platinum Partners Value Arbitrage?

17   A.  My understanding is he was the chief investment officer of

18   Platinum Management.

19   Q.  Now, you authorized the filing of the second amended

20   complaint in this case?

21   A.  Yes.

22   Q.  And before that, there was an original complaint?

23   A.  Yes.

24   Q.  And then there was a first amended complaint?

25   A.  I believe so, yes.

MC8Cpla2                    Trott - Cross

1  Q.  And this complaint, the one that is in our case, was filed

2  March 29, 2019; right?

3  A.  I don't have the document in front of me, but around that

4  time period I understand it, yeah.

5  Q.  So basically almost three years after you were retained to

6  investigate matters at Platinum; right?

7  A.  That complaint you're referencing, yes.

8  Q.  And you made a number of allegations with respect to a

9  gentleman, Michael Katz; right?

10  A.  Again, I need the document in front of me to confirm, but

11  yes, that's my understanding.

12  Q.  Michael Katz was one of the individuals that you sued in

13  this case; right?

14  A.  Yes.

15  Q.  In this case, you allege that Michael Katz was the grandson

16  of Marcos Katz, a significant investor?

17  A.  Yes.

18  Q.  You allege that he worked on a number of PPVA asset

19  matters; right?

20  A.  I believe -- yeah.  I can't recall the words in the

21  complaint, but --

22  Q.  And you were suing him with respect to your allegation that

23  he had been involved with one or more of the assets of PPVA;

24  right?

25  A.  I believe so, yes.

1    Q.  And you alleged with respect to the Katz family that they

2    were seeking to withdraw funds at a time that Platinum and PPVA

3    experienced a liquidity problem; right?

4    A.  May I see the document?

5    Q.  Yeah.  We'll show it only to you, it's not going to come

6    into evidence.  If it will refresh your recollection, I will

7    show it to you.

8              MR. LAUER:  Can we turn to the paragraphs on Katz.

9              I'm trying to find it.  There are so many paragraphs

10   in here.  I'm sorry, your Honor.

11             Turn to paragraph 123, which is on page 31 of the

12   complaint, so probably 32 of the PDF.

13   Q.  Do you have 123?  Do you see 123?

14   A.  I do, yes.

15   Q.  Well, you've answered 124.

16             MR. LAUER:  Go to 125.

17   Q.  Take a look at that.  Does that refresh your recollection

18   that Marcos Katz was looking to redeem funds, but there was

19   insufficient funds to honor his request?

20   A.  Correct.

21   Q.  That refreshes your recollection?

22   A.  Yes, on that sentence, yeah.

23   Q.  Did you also allege that, in response to Katz wanting to

24   take his money out, Platinum offered Katz the opportunity to

25   exchange his investment in PPVA for an interest in Platinum

MC8Cpla2                    Trott - Cross

1    Management and certain other consideration?

2    A.  Yes, I see that.

3    Q.  And you also allege, as part of the proposed deal, Marcos

4    Katz was offered the opportunity to appoint a representative to

5    oversee his interests; right?

6    A.  Yes.

7    Q.  If you go on to paragraph 126, you allege that a term sheet

8    was prepared, plus final documents between and among Marcos

9    Katz and the other members of Platinum Management apparently

10   were never finalized.

11          Do you see that?

12   A.  I do.

13   Q.  And then you also went on to allege, despite this, Michael

14   Katz, Marcos Katz's grandson, began taking an active role at

15   Platinum Management beginning in or about January 2016.

16          You alleged that; right?

17   A.  Correct.

18   Q.  You also alleged, in paragraph 127, that Michael --

19          THE COURT:  So, counsel, come to sidebar.

20          (Continued on next page)

21

22

23

24

25

MC8Cpla2                          Trott - Cross

1                  (At the sidebar)

2                  THE COURT:  So, just for the purposes of the record,

3       the Court takes no -- virtually every question put by defense

4       counsel in this cross examination, except at the very

5       beginning, could have been objected to on numerous grounds.

6       For example, right now, we have, in fact, a witness being asked

7       to read from a record that's not in evidence and under the

8       guise of refreshing recollection, but that's so clearly just a

9       facade.

10                 But, more importantly, plaintiffs' counsel has chosen

11      not to object.  I assume plaintiffs' counsel has made that

12      determination either because he has no problem with his

13      testimony or because he thinks, as it well may be the case,

14      that it opens the door to questions to this witness about all

15      sorts of things found through his investigation.

16                 But, in any event, I just want to note for the record

17      that it is not that the Court doesn't recognize that the rules

18      of evidence are being blatantly disregarded.

19                 (Continued on next page)

20

21

22

23

24

25

MC8Cpla2                        Trott - Cross

1    (In open court)

2    MR. LAUER: We can take that down.

3    BY MR. LAUER:

4    Q.  Did there come a time when you authorized a lawsuit against

5    Michael Goldberg?

6    A.  Yes, on behalf of a subsidiary, yes.

7    Q.  One of the assets that is in the Quintero report is the

8    Michael Goldberg note?

9    A.  Yes.

10   Q.  In connection with the suit against Goldberg, did you come

11   to understand that the collateral that was underlying the

12   Goldberg note had been in the possession of PPVA?

13   A.  Are you referring to the -- what, collaterally, are you

14   referring to?

15   Q.  There were securities that supposedly were securing this

16   term sheet and at a certain point in time, some of those

17   securities were provided to Goldberg and you thought that was

18   inappropriate and you brought a lawsuit to recover those

19   securities; right?

20   A.  So, the whole -- I'll go into the Goldberg story if you

21   want me to, it's very complicated.

22   Q.  There's no need to.  I'm trying to focus on did the

23   securities exist and were they, at one point in time, with

24   PPVA?

25   A.  At one point in time, they were with a subsidiary of PPVA.

MC8Cpla2                     Trott - Cross

They never went into the -- this is another sham transaction

that's being referred to.  Goldberg was, as part of this deal

with Goldberg, he was going to get some of PPVA's assets.  That

actually never happened because the assets were encumbered by

somebody else that Platinum Management came up with.

          There was a second litigation that we took against

Michael Goldberg because he took an asset of the company after

the day of liquidation.

Q.  With respect to one of the assets, Desert Hawk, do you

recall that there was a situation in which Desert Hawk needed

funding and the Securities and Exchange Commission said that it

did not want to be keep operating the company, that the company

should be sold?

A.  I can't recall that, no.

Q.  Did you work at all with Guidepost or communicate with

Guidepost?

A.  Not personally, no.

Q.  In 2020, do you recall authorizing a short article,

Strategies for Managing Through Challenging Markets?

A.  That rings a bell, yes.

Q.  Do you recall that one of the things you commented on is

during the COVID crisis in March and April of 2020, a number of

stocks dropped significantly; right?

A.  If you have the article, then yes.  If that's what I said,

that's what I said.

```
 1            MR. LAUER:  Do we have a clean copy of it?

 2            THE WITNESS:  This wasn't in this case, though.

 3   Q.  Just generally, do you recall expressing your professional

 4   view that assets may have dropped 25 percent or more due to

 5   COVID; right?

 6            MR. GLUCK:  Objection.  Relevance.

 7            THE COURT:  Sustained.

 8            MR. LAUER:  I take the hint.  I am finished.

 9            THE COURT:  Redirect.

10   REDIRECT EXAMINATION

11   BY MR. GLUCK:

12   Q.  Mr. Trott, are you the most senior member of your team?

13   A.  Yes.

14   Q.  You have the highest billing rate?

15   A.  Yes.

16   Q.  Who has the lowest billing rate?

17   A.  Administrators.

18   Q.  What's that rate?

19   A.  $150.

20   Q.  You were asked a series of questions about how much time

21   and costs have been put into this liquidation; is that fair?

22   A.  Yes.

23   Q.  And the distribution of hours is between those at the

24   lowest rates and then also at yourself at the highest rates; is

25   that right?
```

MC8Cpla2                          Trott - Redirect

1    A.  Yes, like every professional advisor, we have a range of

2    different levels, we have a range of different rates.

3    Q.  Now, who oversees the fees that you charge in this case?

4    A.  Ultimately, the court has final approval authority.  So the

5    process is we have a liquidation committee, which is made up of

6    creditors from PPVA.  So we have five representatives on that

7    committee.  We consult with them very, very regularly.  At one

8    stage, it was once a week, now maybe it's once a forth.  Once a

9    quarter, over a quarter, I should say we produce a feedback,

10   summaries, and that goes to a liquidation committee.  They have

11   to approve it first, they ask questions and challenge, et

12   cetera.  Ultimately, they're the ones with the economic

13   interest.  Then it goes to the court for final approval.

14           THE COURT:  So, I understand what you were just

15   saying, but I want to be sure the jury is clear.

16           Your fees are, in the short-term, reviewed by a

17   committee of creditors?

18           THE WITNESS:  That's correct.

19           THE COURT:  And the creditors have an interest, do

20   they not, in keeping your fees reasonably low because every

21   dollar paid to you is a dollar less that's available to them

22   for recovery; correct?

23           THE WITNESS:  That's correct.

24           THE COURT:  Go ahead, counsel.

25   Q.  Do you communicate, in advance, proposed strategies to this

1  liquidation committee and what they will possibly cost?

2  A.  Yes.  The purpose of the liquidation committee is to assist

3  me and my colleague in running the liquidation of PPVA.  And so

4  we consult with them on a whole range of different matters,

5  including bringing of -- filing of lawsuits.  So before we file

6  lawsuits, we discuss with that liquidation committee the

7  reasons why, what we're trying to achieve, budgets, all those

8  type of things.  We also agree within strategies on asset

9  sales.  Another part of their duties is to review our fees.  So

10 they're a very important function and part of the liquidation

11 because they -- we're actually in their interests.  So their

12 views are important to me.

13 Q.  If you were to decide to sell an asset, would you go to

14 that committee for approval?

15 A.  Yes, we have to.

16 Q.  And would you sometimes have to go to the court depending

17 on certain very technical particulars?

18 A.  Yes.  So on occasion, we ask the court for an order which

19 allows us to sell assets with only the consent of the

20 liquidation committee.  So sometimes we don't have to go to the

21 court, as well, we can just go to the committee.

22 Q.  Those are the circumstances where the committee is

23 unanimous; is that right?

24 A.  Correct.

25 Q.  Now, let's try to flip it.  If you would want to divert

MC8Cpla2                    Trott - Redirect

1   money into a particular asset, would it be the same process,

2   for example, to invest in the asset, to maintain it?

3   A.  Yes, absolutely.

4   Q.  So you'd have to go to the committee, and if the committee

5   was unanimous, it would happen, and if it wasn't unanimous, you

6   would need court approval?

7   A.  Yes, that's correct.

8   Q.  If the liquidation committee did not believe that what you

9   were doing is in the best interest of the estate, would they

10  have the ability to object to your fees or your strategy?

11  A.  Sorry.  Can you repeat the question.

12  Q.  Sure.  The liquidation committee approves strategy, it

13  approves litigations, it approves fees; is that fair?

14  A.  Yes.

15  Q.  If they didn't approve of one of those things, could they

16  vote no?

17  A.  Yes, and they have frequently voted no.

18  Q.  The strategies you've undertaken since 2016 are the product

19  of either unanimous resolutions of the liquidation committee or

20  failing that a court order from the Cayman Islands judge; is

21  that correct?

22  A.  Yes.

23  Q.  Now, when you were appointed as JOL, I'd like to take you

24  through some of the assets that Mr. Lauer described and whether

25  they were either worthy of funding, work, or sale.  That's just

MC8Cpla2                        Trott - Redirect

1   a premise.

2           So Mr. Trott, how much cash did PPVA have when you

3   were handed this file?

4   A.   We recovered about $100 000 from a lawyer's client account.

5   Q.   When you recovered that $100 000, had there been more than

6   that already in out-of-pocket expenses that you incurred?

7   A.   Yes, significantly.  The estate was unfunded.  So in

8   practical purposes, when we arrive on the scene, there was no

9   money left.

10  Q.   Now I know you've been sitting here in the trial.  We've

11  been talking in this trial about NAV.  Do you understand that

12  word?

13  A.   I do.

14  Q.   The net asset value implies the amount of net assets that

15  are available to shareholders and limited partners; is that

16  fair?

17  A.   Yes.

18  Q.   How many creditors did PPVA have?

19  A.   So over time -- so creditor claims come in over time and

20  they come in very quickly because, as you can imagine, when a

21  business fails, creditors are instantly on the telephone or

22  writing letters.  So, the amount of liabilities that were

23  coming into us daily were significant.  Almost straight away,

24  it got into the hundreds of millions of liabilities that we

25  were receiving.

MC8Cpla2                    Trott - Redirect

1          Now, we have to go through a process to adjudicate

2     those claims, to challenge some of them, to reject some of

3     them, but ultimately the numbers were significant.  So, rather

4     than this fund having assets that we can realize and return to

5     the investors, this fund was insolvent.  It had more creditors

6     than it had assets.

7     Q.  $100 000, do you recall whether that was actually locked up

8     in a court bond?

9     A.  I don't recall the circumstances.  All I remember is there

10    wasn't much left.

11    Q.  Wasn't much left.

12         Now, that which was left, was it possible for you to

13    even access it, absent litigation?

14    A.  On the most part, yes.  There were some assets that we

15    realized in the relatively short-term, but the majority of the

16    value was -- the value that was there was locked up in various

17    different subsidiaries, and as we've heard, subject to all

18    manner of encumbrances.

19    Q.  Did you approach a variety of private equity funders,

20    extreme risk funders to try to raise money to see if there was

21    money, should there be an intent to invest in any of these

22    assets?

23         MR. LAUER:  Objection.  Directly to your question.

24         THE COURT:  Well, I think the question is defective as

25    to form.

MC8Cpla2                        Trott - Redirect

1              MR. GLUCK:  Withdrawn.

2     Q.   Did the JOLs approach investors and lenders to see if they

3     would be willing to put any money into PPVA for any purpose?

4     A.   Yes.  We approached certain existing creditors of the fund.

5     So some of the creditors, we asked whether they would be

6     prepared to fund the liquidation because in order to bring

7     claims, as you'd imagine, requires a lot of money, and because

8     we couldn't access the assets to do that, then we had to try

9     and raise some funds.  So we spoke to certain of the investors

10    and some of the creditors, none of whom were prepared to fund.

11    And we then approached third parties, so people that were not

12    involved in Platinum at all, to see if they would fund this.

13    Q.   Third parties like private equity firms; right?

14    A.   Yes.

15             THE COURT:  By the way, this may already be clear to

16    the jury, but JOL means joint official liquidator; right?

17             THE WITNESS:  Yes.

18             THE COURT:  And there were two here, you and

19    Mr. Christopher Smith; is that right?

20             THE WITNESS:  That's correct.

21             THE COURT:  Counsel, how much more do you have,

22    because I want to give the jury --

23             MR. GLUCK:  I'll try to speed through this.

24    BY MR. GLUCK:

25    Q.   You did your best to obtain funds to arrive at a place

MC8Cpla2                          Trott - Redirect

1    where you could make investments if you wanted to; right?

2    A.  We did our best, absolutely, in a very challenging

3    situation, because one of the things you have to offer to a

4    funder, a third party that's not involved is securities.  So

5    it's like going to a bank and the mortgage now, you have to put

6    up something to obtain funding.  As I've already explained,

7    there wasn't much to do that, but there was a lot of claims.

8    So it became clear in the first few months that there had been

9    a fraud on the fund and there had been individuals that were

10   responsible.  So, there were claims that we were going to bring

11   eventually, such as this claim, and it was those claims that

12   led us to get funding in the end.

13   Q.  Now, you, the JOLs, had some access to certain individuals

14   at Platinum Management; is that fair?

15   A.  Yes.

16   Q.  You had some telephone conversations?

17   A.  Yes.

18   Q.  How many days, full days were you actually permitted in

19   Platinum's offices?

20   A.  It's hard to say now because it was six years ago, but we

21   were there -- in the initial phases, we were there for, I'd

22   say, most of the week, then it became less and less.  There was

23   a criminal indictment that came down on Mr. Nordlicht and

24   others in, I think, December, and that was it.  We then had no

25   access.

MC8Cpla2                    Trott - Redirect

1   Q.  So about five days and then a handful of days through the

2   rest of the year and then there is the rest?

3   A.  Yes.  I mean, there were various parts of the SEC also

4   investigated and carrying out an investigation.  The sister

5   fund, as you've heard, PPCO, that had a receiver appointed to

6   it.  And so, there were different parties trying to get access

7   to the same information.

8   Q.  Did any of the people that you talked to tell you about any

9   of the problems that you've alleged in this second amended

10  complaint and that we've heard about in this trial?

11  A.  Certainly none of the serious allegations, no.  None of

12  the -- as you'd expect, nobody said this was -- nobody on

13  Platinum Management's side said this was a fraud.  They

14  certainly explained that there were significant issues with the

15  remaining assets in terms of their value.

16  Q.  When you say you have access to documents, you were

17  provided certain documents by former Platinum Management; is

18  that correct?

19  A.  Yes, we were provided with the documents they wanted us to

20  see.  So the easy documents for them to give, we certainly

21  received.  We didn't have full access to the database.  We

22  tried to get our IT guys to, what's called image their server,

23  and we weren't able to do that, we weren't allowed.  It was

24  only until much, much later that we got access to the full

25  suite of documents.

MC8Cpla2                        Trott - Redirect

1    Q.  When did you get access to the emails and records of PPVA?

2    A.  Finally, finally in early 2018.  We had some access during

3    2017, but because of the different competing parties, the SEC,

4    PPCO receiver, ourselves, the feeder funds liquidators, that

5    was a separate firm.  There were a number of parties trying to

6    get access to the same information and because there were --

7    because there were criminal aspects to this and there were

8    claims everywhere, it was hard for the information to be fully

9    released to us until that point.

10   Q.  Is it fair to say that you had to enter into a complicated

11   and detailed agreement simply in order to access Platinum's

12   emails, such as the ones we've seen in this case?

13   A.  Yes, we had to enter into an agreement with the SEC and

14   with the receiver of PPCO.

15   Q.  That was in, what did you say, June 2018?

16   A.  June 2018, we finally had access.

17   Q.  When was this case filed?

18   A.  In late 2018.

19   Q.  So you got the emails, saw what really had happened, and in

20   a few months, you filed this complaint?

21           MR. LAUER:  Objection.

22           THE COURT:  Sustained.

23   Q.  Had you heard the name David Bodner prior to your ability

24   to conduct an investigation with the actual documents?

25   A.  Yes, we heard the name Mr. Bodner and Mr. Huberfeld.

MC8Cpla2                         Trott - Redirect

1    Q.   What was the context of that?

2    A.   We knew they were partners in Platinum Management.

3    Q.   Have you made recoveries in this liquidation?

4    A.   Yes.

5    Q.   How much of all creditors — secured, administrative — have

6    you paid out?

7                MR. LAUER:  Objection.

8                THE COURT:  Overruled.  The door was fully opened to

9    this.  Overruled.

10   A.   So, to date, we've been able to return about $75 million to

11   creditors, and that's a combination of creditors that had

12   security or what we would call purported security.  And to

13   subsidiary-level creditors, creditors that were at some of the

14   portfolio companies.

15   Q.   To this day, is it true that you are attempting to sell the

16   remaining assets of PPVA?

17   A.   Yes, we still have some assets.  Even to this day that we

18   are fighting over with some of these encumbrances, and there is

19   still assets left to realize.  But we have close to $1.2

20   billion of creditor and investor claims.

21   Q.   The reason you haven't just sold all assets already, are

22   you waiting for the right price?

23               MR. LAUER:  Objection.

24               THE COURT:  Overruled.

25   A.   In some -- no, we're not waiting for the right price.  In

MC8Cpla2                         Trott - Redirect

1    some cases, it's just an inability to be able to fully sell the

2    asset.  We are still resolving some issues with the

3    encumbrances.  In other cases, we are waiting on certain other

4    determinations to free the asset up to be able to sell it.

5    There's not much left.  I'm painting a picture of this, there

6    is very little left to actually realize, other than the legal

7    claims in this case.

8    Q.  When you were --

9               THE COURT:  Counsel, I'm going to give you five

10   minutes more and that's it.

11   Q.  Well, there were a number of questions about Mr. David

12   Bodner and what you had learned about him.

13              THE COURT:  Then you've got five minutes to address

14   that.

15              MR. GLUCK:  So this will be my last question.

16   Q.  Upon gaining access to the actual emails at Platinum and

17   PPVA, what did you learn about Mr. David Bodner and why are we

18   here?

19              MR. LAUER:  Object.  And I would -- well --

20              THE COURT:  I think that this was, I think, fully

21   opened by the --

22              MR. LAUER:  May I approach the bench on this?

23              THE COURT:  Yes.

24              (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At the sidebar)

2          THE COURT:  Go ahead.

3          MR. LAUER:  Two things.  Number one, the only

4   questions I asked about Bodner was to establish that while he

5   was getting this thing for the first four months, nobody told

6   him that he needed to speak with him.

7          Number two, they have asserted all sorts of privilege

8   issues.  If he's going to now say here's what I learned about

9   David Bodner during these investigations, I respectfully

10  submit, A, it's hearsay, B, I did not open the door on that.

11  My questioning was very limited to basically it's so obvious

12  that Bodner was not central and nobody mentioned his name that

13  he didn't think it important enough to call him.  That's the

14  whole point.  And I think it would be -- I recognize the Court

15  thought I opened the door on other things and I'm not going

16  to --

17         THE COURT:  First of all, yes, you clearly opened the

18  door, for example, on how much he has recognized and because

19  you asked him about his fees.

20         MR. LAUER:  I accept that, but this is not that.  This

21  is really on the merits.

22         THE COURT:  I am rethinking this a little because I

23  think that the main inquiry into what he had determined related

24  to allegations against Michael Katz, not against --

25         MR. LAUER:  Right.

MC8Cpla2                          Trott - Redirect

1            THE COURT:  -- Mr. Bodner.  And the question as to

2    Mr. Bodner was simply, in effect, you didn't interview him, and

3    the argument that was made was because he was so

4    inconsequential, that no one brought that to your attention.

5            MR. GLUCK:  And that's what we want to say.

6            THE COURT:  Well, no, that's why it was fair to get

7    into the fact that he had a way to get all the documents and so

8    forth, which has been inquired into.  But now you want to say

9    further what did he then conclude.  Yeah, I think even if the

10   door was opened, it would be 403, too prejudicial.

11           In the circumstances, I will reverse myself and

12   sustain the objection.

13           MR. LAUER:  Thank you, your Honor.

14           (Continued on next page)

MC8Cpla2                        Trott - Recross

1          (In open court)

2     BY MR. GLUCK:

3     Q.  Mr. Trott, did you and your colleague, joint official

4     liquidator, initially make a determination that Mr. Michael

5     Katz had played a role in the so-called Agera transaction?

6     A.  Yes, that was why he was in the complaint.  We, through

7     receiving the documents, Michael Katz's name was on the Agera

8     documents and that was a significant asset that we say was

9     taken from the fund inappropriately.

10          MR. GLUCK:  Thank you.

11          THE COURT:  Anything else?

12          MR. LAUER:  Just one question.

13    RECROSS EXAMINATION

14    BY MR. LAUER:

15    Q.  So you had trouble raising money, but you were able to

16    raise money for the litigations; right?

17    A.  The money we raised was what's called liquidation funding,

18    and we could use that for various purposes, but the majority of

19    it is used for litigation, yes.

20    Q.  And that comes from a litigation funding company?

21    A.  In this case, it came from another fund.

22    Q.  What do they get out of this?

23    A.  So they charge an interest rate and they get a return on

24    what we recover.

25    Q.  What interest rate?

MC8Cpla2                        Trott - Recross

1    A.   8 percent, I believe, from memory.

2    Q.   Do they get a performance fee?

3    A.   No.

4    Q.   And on the waterfall, how --

5              THE COURT:  Is this one question?

6              MR. LAUER:  Withdrawn.  Thank you, your Honor.  Thank

7    you, Mr. Trott.

8              THE COURT:  You may step down.

9              Ladies and gentlemen, we'll take our midmorning break

10   and resume in 15 minutes.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MC8Cpla2                    Trott - Recross

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Mr. Lauer, let's continue with your motion.  We were

4     up to the third item of what you were --

5          MR. LAUER:  So, your Honor, I was about to turn to the

6     third category, which is the one I think is -- has garnered the

7     most attention here.

8          I do want to say with respect to what I'll call the

9     second category, the direct relationship, we're not relying on

10    it because I don't think there's anything other than the

11    one-way letter from Katz, and I don't know the Court ever has

12    to reach this, but it's an interesting question when the fund

13    is the client and not the investor group.  The fund is not

14    acting on behalf of investors, it's only suing on behalf of

15    itself, which, itself, is an interesting concept.  So

16    *vis-à-vis*, quote, the fund, I don't know that there was any

17    interaction.  I'm just raising it and I don't know that we'll

18    have to address that.

19          Let me turn to -- I'm not be being clear?

20          THE COURT:  I'm not sure I understand the argument.

21    When a company is in bankruptcy or liquidation, while the

22    lawsuits they bring are brought in the name of the company, it

23    is crystal clear, as a matter of law, that this is a trustee

24    or, in this case, a liquidator acting on behalf of the

25    creditors, and it's the creditors who are allegedly defrauded.

MC8Cpla2                        Trott - Recross

1            For example, Mr. Irving Picard has spent the last ten
2       years recovering, I think, perhaps millions of dollars in the
3       Madoff scandal, but all those cases are technically brought in
4       the name of the Madoff fund.  So I'm not sure I understand your
5       argument.  In any event, since we have limited time, why don't
6       you go on to your more important --
7            MR. LAUER:  Using Madoff as an example, the point I
8       was making is Madoff is dealing with recovering money for
9       investors who have claims as investors.  In other words, they
10      relied, they were defrauded, et cetera.
11           THE COURT:  Yes.  So why is this --
12           MR. LAUER:  This case is not on behalf of the
13      investors, in other words, we're not -- on behalf of the
14      creditors.  The investors happen to be --
15           THE COURT:  I see what you're saying.  I didn't see
16      the distinction you were making.
17           MR. LAUER:  I'm not dwelling on it now --
18      (indiscernible crosstalk) necessary at some point -- article on
19      it.
20           THE COURT:  Well, you got the whole weekend to do
21      that.
22           MR. LAUER:  Let me turn to the issue of control.  The
23      basic allegation here is that Mr. Bodner is a fiduciary, even
24      though he's not listed in any of the literature and doesn't
25      really have a managerial role because, at the top of the

MC8Cpla2                        Trott - Recross

structure, there's Platinum Management, and Platinum Management

has fiduciary responsibilities to PPVA.  And the question then

is, is Mr. Bodner, by virtue of the fact that he is not only a

passive partner, but somehow has some other capacity, he can

become a fiduciary.

          Now, I think, unquestionably, if he merely owned

25 percent and stayed home, never came to the office, never

talked to anyone, being a passive partner, he's not a

fiduciary.  So the question is, is there evidence in this case

sufficient that they can meet their very high burden to

establish that all the elements that he's a fiduciary.  And

what it really boils down to is Mark Nordlicht is a fiduciary

because he not only has the managerial role, but because he, at

the top of the chain, controls Platinum Management.  So even if

Mark decided to let Uri Landesman run the fund on a regular

basis but got reports, Mark clearly has control over Platinum

Management, control over Uri Landesman.

          (Continued on next page)

Mc82Pla3

1          MR. LAUER:  Now let's apply that to our case.  What do
2    we have?  Structurally and legally, there is no dispute that
3    Mark Nordlicht, both in terms of the written document and the
4    basic agreement, controlled Platinum Management, and that's
5    really how these businesses are set up.  There is one boss.
6    He's got the responsibility.  Same way, if it's your portfolio,
7    win or lose, it's your portfolio.

8          So Mark Nordlicht controlled Platinum Management.  He
9    had partners.  He had partners whom he respected, partners with
10   whom he discussed matters, but it is very clear, and they had
11   the opportunity of two witnesses with whom they settled——Fuchs
12   and Huberfeld——and nobody was able to say that David Bodner
13   controlled Mark Nordlicht.  Nobody controlled Mark Nordlicht.
14   And you can have opinions, you could have strong opinions, very
15   often your opinions could be respected, because these are smart
16   guys and they had a good sense of camaraderie, but ultimately
17   if Mark Nordlicht didn't want to do something, he doesn't do
18   it.  And you saw a sufficient number of e-mails making it very
19   clear that Mark ran the show and Mark was no one's patsy, and
20   no one has -- there has been no introduction of any side deal,
21   oral agreement --

22         THE COURT:  I see your point.  What about the fact
23   that your client solicited investors?  The argument, as I
24   understand it, from plaintiffs' counsel, among other arguments,
25   the argument is that at the time he solicited investors, he

Mc82Pla3

1    knew that the fund was a fraud and he knew that Mr. Nordlicht

2    was concealing that fraud and that the company was concealing

3    that fraud, but it was to his interest not to reveal that to

4    investors, so he was, in effect, a coconspirator of

5    Mr. Nordlicht, in Mr. Nordlicht's portion of the scheme.

6            MR. LAUER:  So I think that confuses Bodner with

7    Fuchs.  There has been no evidence, other than at the very

8    early beginning, back in 2003-2004, when the fund was set up,

9    Mr. Bodner may have --

10           THE COURT:  You are saying we don't know what Bodner

11   said to any investor because that was never introduced into

12   evidence.

13           MR. LAUER:  We also have no evidence that he solicited

14   investors after the early 2000s or that he, quote, solicited

15   investors as opposed to enabled, you know, some close relatives

16   to put money in.  We are talking about 2012 to give them the

17   benefit of the doubt of yesterday's ruling, but we will come

18   back to that.  '13, '14, '15 and '16, there is absolutely no

19   evidence that Bodner solicited any investor during that time

20   period.

21           And so let me turn to knowledge, then, because I think

22   it is pretty clear there is no evidence of control.  Having

23   opinions and having even strong opinions that you issue in a

24   "you have to do this" doesn't mean anything when Mark Nordlicht

25   completely runs the show.

Mc82Pla3

1        Now let's talk about knowledge.  They had multiple

2   opportunities between the people they settled with -- because

3   they settled with Steinberg and SanFilippo—Steinberg was the

4   head of risk; SanFilippo was CFO—but they didn't get any money

5   so they are not relevant to the GOL issue.  They settled with

6   Huberfeld and Fuchs, and they had every opportunity for them to

7   show them or to have them show the Court and the jury that in

8   this four- or five-year period there was a production of

9   detailed information to David Bodner at any point in time that

10  undercut any of these valuations.

11       The only evidence that has come in about Bodner having

12  any relevant, meaningful information on a potential fraud is

13  this dinner that took place somewhere between December of 2014

14  and March of 2015, and at most what Fuchs said—and we will

15  credit what he said—is this was essentially a dispute over how

16  to tamp this thing down so that you ameliorate the liquidity.

17  No one, including Fuchs, no one has said at this dinner or any

18  other dinner, there was data presented or information presented

19  that differed from the valuation.  And think of it this way.

20  There are 17 million documents or something like that on the

21  server.  They have had five years, multiple depositions,

22  multiple negotiations to try to find an agenda, they could talk

23  to secretaries, come up with something written that somebody

24  sent David Bodner over this five-year period.

25       THE COURT:  I don't think that last point was

Mc82Pla3

1    relevant.  The question is whether, regardless of whether they

2    had one page or 17 million documents, the question is whether

3    they have made out a *prima facie* case that can go to the jury.

4         MR. LAUER:  I agree.  And they have offered no

5    evidence.  So they had the opportunity to.

6         And I want to say one other thing.  Timing in this

7    case is extremely important, and that's because if the Court

8    were to say, you know, you will have another opportunity at the

9    end of your case, perhaps, but if the Court were to say, I'm

10   not going to give you a judgment because they have the right to

11   argue that dinner during the time when oil had collapsed, you

12   know, they can argue off of that that that conversation

13   reflected a comprehension that there was something wrong with

14   the numbers, not just that Mark was out of control, but there

15   is nothing before that and the amount of damages in this case

16   goes down substantially.  And I'm not trying to, you know,

17   seduce the Court into encouraging a settlement, but I just want

18   to say that in terms of the litigation issue, if I were to say

19   let's talk about is there any evidence in this case that David

20   Bodner discussed with anyone valuations——high, low, impact on

21   liquidity——in 2013, there is none.

22        THE COURT:  All right.  So since you happened to

23   mention settlement, I will tell you my view on that.  I never

24   encourage settlement.  I never get involved in settlement.

25   This is unlike many of my distinguished colleagues who feel

Mc82Pla3

1    that it is part of their job.  I don't do so for two reasons,

2    three reasons.  First, I love trials; second, I think that a

3    trial is where the truth comes out and that there is a major

4    public purpose served, and I feel that the frequency of

5    settlements has become so extreme that whole important issues

6    have been in effect kept from the public not through the

7    parties' bad intentions, but through the fact that they were

8    attracted to settlements; and, third, when I first went on the

9    bench my first week, I went to two distinguished judges——one

10   was at that point a former judge——and asked them for advice.

11   One was Judge Milton Pollack who said, Keep your cases moving,

12   and the other was Marvin Frankel, then retired, who said, Don't

13   get involved and don't even try to promote settlement because

14   settlements rarely address the merits.  They are a matter of

15   just parties making risk assessments, but it doesn't really get

16   to the truth.  So I am delighted if you don't settle.  If you

17   do settle, that's your business.

18           MR. LAUER:  Your Honor, I'm not going to comment on

19   the great Milton Pollock who I had the -- but --

20           THE COURT:  If this were before Milton Pollock the

21   case would have ended two days ago.

22           MR. LAUER:  I agree.  And most of the examination

23   would have been done by the Court.

24           THE COURT:  All right.  Let's take five minutes and at

25   the next break we are going to hear from plaintiffs' counsel in

Mc82Pla3                          "Katz –

1    response.

2              (Recess).

3              (Jury not present)

4              THE DEPUTY CLERK:  All rise.  May I bring in the jury?

5              THE COURT:  Please.

6              I take it you are going to read the deposition now, is

7    that it?

8              MR. GLUCK:  We would like to read it in, yes.

9              THE COURT:  It's the only thing you have left.

10             MR. GLUCK:  It's the only thing we have left.

11             Your Honor, from my planning purposes, will I have

12   about the same time Mr. Lauer had, about 20 minutes?

13             THE COURT:  Yes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Mc82Pla3                          "Katz –

1           (Jury present)

2           THE COURT:  If you want to take your respective

3     positions.

4           All right.  My understanding is that plaintiffs want

5     to read the final deposition, the deposition excerpts from

6     Michael Katz, is that right?

7           MR. MAGRUDER:  That is correct.

8           THE COURT:  Go ahead.

9     BY MR. MAGRUDER:

10    "Q   Can you just state your full name and spell your first and

11    last name for the purposes of the record.

12    "A   Michael Katz, M-I-C-H-A-E-L K-A-T-Z.

13    "Q   And where do you work?

14    "A   I work for myself -- I work and I work for myself.  I have

15    my own company.

16    "Q   Were you at some point employed with Platinum?

17    "A   No.

18    "Q   What about Beechwood?

19    "A   No.

20    "Q   All right.  At one point am I correct that you had a

21    Platinum e-mail address, is that right?

22    "A   That's correct.

23    "Q   And you said you were not employed at Platinum.

24    "A   That's correct.

25    "Q   Why did you have a Platinum e-mail address?

Mc82Pla3                    "Katz –

1   "A    I was given an address as just part of my oversight of my

2   grandfather's investments in the funds.

3   "Q    And your grandfather was Marcos Katz, is that right?

4   "A    That's correct.

5   "Q    And your grandmother's name was?

6   "A    Is.

7   "Q    Is, I apologize.

8   "A    Yes.  Is Adella.

9   "Q    Say it again.

10  "A    Adella, A-D-E-L-L-A.

11  "Q    And did you have -- in that capacity, did you have an

12  office at Platinum in their office space?

13  "A    I had the use of the office space.  I didn't have an

14  office.

15  "Q    So you didn't have pictures up there?

16  "A    No, I didn't have personal pictures.

17  "Q    No nameplate there?

18  "A    No, no set place, just access.

19  "Q    Can you give us an idea -- let's do it this way, at the

20  time that you had that Platinum address, I'm not expecting you

21  to remember exact days, what was your role at Platinum?  What

22  did you do on a day-to-day basis with regard to interacting

23  with Platinum?

24  "A    I didn't have any role at Platinum.  I thought I said

25  that.

Mc82Pla3                    "Katz -

1   "Q    You said you had to monitor your grandfather's

2   investments, is that right?

3   "A    Again, it wasn't given to me to monitor.  It was given to

4   me as just sort of perks that were given to investors, I think.

5   I'm sure why -- not sure why.

6   "Q    During the time that you had that e-mail address what was

7   your interaction with Platinum or any of the people that worked

8   there?  Kind of, what did you do, if anything, with them?

9   "A    Mostly, for the most part, asked questions, tried to

10  understand what was going on with the various investments, what

11  the status was.  It was part of their version of transparency,

12  of saying you have access to the office, you can come, you have

13  an e-mail address, you can talk to the PMs, you can talk to the

14  CIO, and, you know, you can talk to whomever you want, and they

15  will answer your questions.

16  "Q    When you were doing that, did you interact with David

17  Bodner?

18  "A    I did.

19  "Q    What about Murray Huberfeld?

20  "A    I did, as well.

21  "Q    And Mark Nordlicht as well?

22  "A    Yes.

23  "Q    Of those, who did you interact with the most if you can

24  answer that?

25  "A    Probably evenly between the three, maybe a little more,

Mc82Pla3                         "Katz –

1   yeah, no, I would say the three.

2   "Q   Let's take a look at what we will mark as Katz 2.  I will

3   ask you, Mr. Katz, do you recognize this first amended

4   complaint?  It's dated as received March 8 of 2019.

5   "A   Yes.

6   "Q   And do I have this right; you are the trustee of your

7   grandfather's trust, is that correct?

8   "A   The estate.

9   "Q   I said trust.  I meant estate.

10   "A   Yes.

11   "Q   And is it in that capacity that this complaint was

12   brought?

13   "A   Yes.

14   "Q   And did you review the complaint before it was filed?

15   "A   Of course.

16   "Q   Taking a look at -- well, first of all, the defendants in

17   this -- Mark Nordlicht worked at Platinum, is that right?

18   "A   Yes.

19   "Q   And Murray Huberfeld also worked at Platinum or did Murray

20   Huberfeld own or was he employed at Platinum, if you know?

21   "A   I don't know.

22   "Q   What about David Bodner?  What was his relationship with

23   Platinum, if you know?

24   "A   My understanding is that the three -- that he was a

25   founder, co-founder of the firm.

Mc82Pla3                     "Katz –

1    "Q    You said the three.  That would be with?

2    "A    Murray and Mark.

3    "Q    And who is Bernard Fuchs?

4    "A    He also presented himself as a shareholder of the firm, an

5    investor.

6    "Q    I apologize.  I cut you off.  An investor you said?

7    "A    Uh-huh.

8    "Q    Do you know who first solicited your grandfather to invest

9    in Platinum?"

10              MR. MAGRUDER:  Page 36.

11   "A  Yes.

12   "Q    Who was that?

13   "A    Murray Huberfeld.

14   "Q    Taking a look, if you would, at paragraph 15, about

15   halfway through, said 'Defendants Huberfeld and Bodner also

16   represented to the Katzes that PPVA was and would remain liquid

17   and that the Katzes could withdraw their investment at any

18   time.'

19          "Same question.  Sitting here now, is that still

20   accurate to your knowledge?

21   "A    Yes.

22   "Q    And is that something -- let's focus, if you would, at the

23   time when you were given the Platinum -- you were issued the

24   Platinum e-mail address.  Did you know this to be true at that

25   point?

Mc82Pla3                         "Katz –

1    "A    Yes.

2    "Q    Okay.  And did that turn out to be true or false?

3    "A    False.

4    "Q    And about when did you realize or did you, not your

5    grandfather, but did you learn that this was not true?

6    "A    Can you be more specific?

7    "Q    So, again, it's a poor question.  I apologize.  This says

8    that they represented, in essence, that Marcos Katz could get

9    his money out when requested, you know, a certain amount of

10   lead time, and that the fund would remain relatively liquid.

11   That was false, is that correct?

12   "A    That was true up until the time it became false.

13   "Q    And about what?

14   "A    So the redemption requests for 2016 that were partially

15   redeemed, but substantially not redeemed.  I think the last --

16   there was a liquidity crisis that was known, which is the

17   reason they couldn't fill that obligation.  As far as I know

18   starting in '16, perhaps at the -- as the end of '15, early as

19   the end of '15.

20   "Q    When did you learn about -- let me ask this question.

21   "A    So it's not true or false.  It's could they honor their

22   commitment.  That's how I see it.  I mean, they made a

23   commitment for the account to be liquid within 30 days' notice,

24   and that was true up to the time when they didn't have the

25   liquidity to fill the obligation.  The first I know, that

1    obligation they started not being able to pay -- to fulfill

2    that obligation sometime in 2016, perhaps as early as the end

3    of 2015, but there were redemptions, partial redemptions that

4    were made and honored but not under those terms.

5    "Q   So at the point in late 2015-2016, when the liquidity

6    crisis prevented them from honoring redemptions, did they --

7    Mr. Huberfeld and Mr. Bodner, were they lying to Marcos Katz

8    about the liquidity of the fund?

9    "A   No, I don't think they were saying they didn't have

10   liquidity.  They didn't say -- they didn't say they had the

11   liquidity and they weren't paying.  So it was a known fact that

12   they had a liquidity crisis.  To all investors in fact I think

13   they made several conference calls to that effect.

14   "Q   And they were open.  They said that the liquidity crisis

15   existed then at least to your grandfather?

16   "A   Yes.

17   "Q   Okay.  If you could look at page 7, paragraph 24, at the

18   beginning, and your counsel is right.  If you need to look at

19   any other part of this, please feel free to take your time, but

20   I would like to focus you.

21        "It says, 'In mid March 2015, Mr. Nordlicht and the

22   other partner officials schemed to meet a sudden wave of over

23   70 million in redemptions by pressing redeeming investors to

24   cancel those redemptions or at least defer them for one

25   quarter.'  And then it goes on from there.

Mc82Pla3                    "Katz –

1           "Let me ask this first.  To your knowledge, sitting

2    here now, is that an accurate fact?

3    "A    Yes.

4    "Q    And how did you learn of that?

5    "A    Same as the others, specific, sometimes 2017.

6    "Q    Let me focus on Mr. Bodner, if I could.

7    "A    Uh-huh.

8    "Q    Did he press your grandfather not to ask for any

9    redemptions from the fund?

10   "A    Yes.

11   "Q    Did Mr. Huberfeld do that as well?

12   "A    Yes.

13   "Q    At the time, again, let's start with Mr. Bodner.  Will you

14   give us a rough idea of when that was, in other words, the

15   earliest time that you know of when Marcos Katz, your

16   grandfather, asked for a redemption and Mr. Bodner either urged

17   or pressed him not to exercise those?

18   "A    I don't remember the exact date, but it was probably more

19   than one occasion, and multiple meetings in New York as early

20   as -- could have been early as 2015.

21   "Q    And same for Mr. Huberfeld, roughly the same time period?

22   "A    Yes, oftentimes they met together so the meetings were,

23   you know, not one then the other, but --

24   "Q    Did you attend any of those meetings, Mr. Katz?

25   "A    Yes.

Mc82Pla3                        "Katz –

1    "Q    So what we are talking about here, you observed it?

2    "A    Yes.

3    "Q    Were they conversations or were they heated?

4    "A    Both.  Sometimes they were very cordial, sometimes they

5    were heated.

6    "Q    So when you say 'heated,' were people yelling?

7    "A    Raising voices would be better, more accurate, not

8    screaming.  Nobody screamed.

9    "Q    Certainly don't want to talk bad about your grandfather,

10   but who was angry?  Who was the person who was angry in the

11   room?

12   "A    My grandfather.

13   "Q    Okay.  Can you look at page 7 again, looking at paragraph

14   25, the first sentence says, 'Platinum Management also treated

15   as fungible investor monies held in separate funds under the

16   Platinum Partners umbrella, transferring between funds as

17   needed to meet liquidity demands.'

18          "Sitting here now, do you still believe that statement

19   to be true?

20   "A    Yes.

21   "Q    Rough time period, when would you have learned that fact?

22   "A    Again, sometime 2017.

23   "Q    Okay.  And the next sentence says, 'This was contrary to

24   promises made to investors in each fund and represented in

25   obvious conflict of interest.'

Mc82Pla3                    "Katz –

1      "When the promise was made, did David Bodner make

2  those promises?

3  "A   Could you be more specific?

4  "Q   Sure.  This is talking about -- going back to the first

5  sentence, 'Platinum Management also treated as fungible

6  investor monies held in separate funds under the Platinum

7  Partners umbrella, transferring money between funds as needed

8  to meet liquidity demand.  This was contrary to promises made

9  to investors.'

10      "So in terms of the promises made --

11  "A   Promises made?

12  "Q   Was that by Mr. Bodner?

13  "A   As well, sure, yes.

14  "Q   And Mr. Huberfeld?

15  "A   Yes.

16  "Q   And did you yourself hear those promises?

17  "A   Yes.

18  "Q   Okay.  Looking at the paragraph on the same page,

19  paragraph 32, it indicates, 'Even so, and as PPVA's liquidity

20  crisis worsened through '12-'16, defendants Nordlicht,

21  Huberfeld, Bodner, and Fuchs represented to the Katzes that

22  PPVA had sufficient assets to permit the Katzes to fully

23  withdraw their investment.'

24      "Sitting here now do you still believe that to be

25  true?

Mc82Pla3                         "Katz –

1    "A    Yes.

2    "Q    Did you hear any of the representations that are discussed

3    here or --

4    "A    Yes.

5    "Q    Okay.  Did you hear those from Mr. Bodner?

6    "A    Yes.

7    "Q    And did you hear those from Mr. Huberfeld?

8    "A    Yes.

9    "Q    If you would go to page 11, paragraph 37.  This indicates,

10   'In June 2015, in reliance on the defendants' representations

11   about the Katzes' ability to redeem their investment, the

12   Katzes pledged 6 million to a nonprofit girls school in

13   Brooklyn, New York.'

14            "That is accurate, am I right?

15   "A    Yes.

16   "Q    And it says 'reliance on the defendants' representations.'

17   Did that include Mr. Bodner?

18   "A    Yes.

19   "Q    Did it include Mr. Huberfeld?

20   "A    Yes.

21   "Q    The next paragraph says, 'Thereafter, defendants

22   Nordlicht, Bodner and Huberfeld and Fuchs attended meetings

23   with the Katzes in Mexico City and Acapulco.'

24            "Those are two different meetings, is that right?

25   "A    Yes.

Mc82Pla3                    "Katz –

1    "Q   I guess that was a silly question because they are two

2    different places.

3    "A   Yes.

4    "Q   Were they close together in time, the Mexico City and the

5    Acapulco meeting?

6    "A   I don't recall what the exact spacing was.  I'm guessing a

7    few months apart.

8    "Q   Did you attend either or both?

9    "A   No.

10   "Q   Looking at the next paragraph, paragraph 48, this refers

11   to a Mexico City meeting in December of 2015.

12   "A   Uh-huh.

13   "Q   You may or may not know this.  Is that paragraph referring

14   to the Mexico City meeting that is discussed in the prior

15   paragraph, paragraph 47?

16   "A   I believe so.

17   "Q   So you weren't at that December --

18   "A   No.

19   "Q   But the people referred to in this were at that meeting.

20   "A   Yes.

21   "Q   Same questions for paragraph 49.  This is an Acapulco

22   meeting.  To your knowledge, as you understand this complaint,

23   that Acapulco meeting is the one referred to in paragraph 47?

24   "A   Yes.

25   "Q   So you did not attend that?

Mc82Pla3                    "Katz -

```
 1    "A    No.

 2    "Q    We could look at page 13 --

 3    "A    Yup.

 4    "Q    -- paragraph 45.

 5    "A    Yes.

 6    "Q    It says, 'During the week of October 18, 2015, defendant

 7    Nordlicht visited Marcos Katz and apologized for the mistakes

 8    he had made in Platinum's relationship with the Katzes.  He

 9    promised Marco that he would speak with defendants Huberfeld,

10    Bodner, and Fuchs and then propose a resolution to the Katzes'

11    redemption request?

12    "A    Uh-huh.

13    "Q    First question is, were you there for that?

14    "A    Yes.

15    "Q    And Mr. Nordlicht said that he had to check with

16    Mr. Bodner to fix this?

17    "A    Yes.

18    "Q    And he indicated that he also had to check with

19    Mr. Huberfeld to fix this?

20    "A    Yes.

21    "Q    And was that -- from what you observed when you were

22    interacting with Platinum, was that typical of their

23    relationship?

24    "A    Could you be more specific?

25    "Q    In other words, did Mr. Nordlicht have to check with
```

Mc82Pla3                    "Katz –

```
 1    Mr. Bodner and Mr. Huberfeld to do something significant like

 2    this?

 3    "A    Significant meaning like business decisions?  Is that what

 4    you mean?

 5    "Q    Yes.

 6    "A    Yes.

 7    "Q    Okay.  You spoke earlier about a meeting you attended.  I

 8    asked you a whole bunch of questions on whether people brought

 9    marketing materials.  Do you remember that meeting that we

10    talked about?

11    "A    Yeah, yes.

12    "Q    I believe you said it was in New York.  Is that right?

13    "A    That's right.

14    "Q    And Mr. Bodner was there?

15    "A    Yes.

16    "Q    Mr. Huberfeld was there?

17    "A    Yes.

18    "Q    Both of your grandparents were there?

19    "A    Yes, but I don't think my grandmother attended that

20    meeting as far as I remember.

21    "Q    What was the -- who called the meeting?  Who wanted it

22    scheduled?

23    "A    My grandfather.

24    "Q    Did you talk to him about the purpose in calling that

25    meeting?
```

Mc82Pla3                          "Katz –

```
 1    "A   I did.

 2    "Q   What was it?

 3    "A   He didn't tell me.

 4    "Q   He wouldn't tell you.

 5    "A   No.

 6    "Q   Why wouldn't he tell you?

 7    "A   That's how he was.  He just did his own thing.

 8    "Q   Do you know whether -- well, when the meeting -- what you

 9    remember.  I realize this is a while back.  Who started the

10    meeting?

11    "A   I don't remember who started the meeting.  They all walked

12    in and started talking.

13    "Q   What did they talk about, as you remember?

14    "A   Platinum, Platinum investments.

15    "Q   Do you remember any specific investments they talked

16    about?

17    "A   Very generally, yeah.

18    "Q   And China Horizon?

19    "A   Most definitely came up.

20    "Q   And what do you recall was discussed about China Horizon?

21    "A   It's a great investment, it's was gonna do great, great

22    evaluation, it was gonna be sold for a lot of money, around the

23    corner, that kind of conversation.  I don't remember the

24    specifics of the numbers, but it was very bullish on that

25    investment.
```

Mc82Pla3                    "Katz –

1    "Q   And who, Mr. Katz, said that, was talking about China

2    Horizon?

3    A.   I think everybody said that.  I don't exactly know who

4    spoke the most, but everybody had a word.  Bernie Fuchs had the

5    most say about China Horizon.

6    "Q   Did Mr. Bodner discuss China Horizon?

7    "A   Sure.

8    "Q   Did Mr. Huberfeld as well?

9    "A   Yes.

10   "Q   You may have answered this.  I can't see it on here.  Can

11   you give me a rough time period of when that meeting was?

12   "A   Towards the end of 2015.

13   "Q   And do you recall how did it end?  What was the conclusion

14   of the meeting?

15   "A   We're going to get through.  I mean, the headline was

16   we're going to get through this crisis and everything's going

17   to be fine and everyone is going to get their money back and

18   make a lot of money with Platinum.  That was the headline.

19   That was the message.

20   "Q   During the meeting, had either you or your grandfather

21   asked for any redemptions?

22   "A   Yes.

23   "Q   What was the response to that?

24   "A   Well, we're working on it and we'll get back to you with a

25   proposal.  That's I think how the proposal came on about the

Mc82Pla3                          "Katz –

1   redeeming.

2   "Q    Do you recall like a specific date when a redemption --

3   "A    No, not in that meeting.

4   "Q    Is that because it didn't happen or you don't recall?

5   "A    It's because I don't recall.

6   "Q    All right.  Who was the one, if it was one person, who

7   said we will get back to you with the schedule?

8   "A    Probably that would have been Mark.

9   "Q    Mark Nordlicht.

10  "A    Mark Nordlicht, yeah.

11  "Q    Did Mr. Bodner -- do you have an impression that he was

12  familiar with the investments that PPVA had made?

13  "A    Of course, yeah, sure.

14  "Q    What about Mr. Huberfeld?

15  "A    Also.

16  "Q    Just for the record, Mr. Katz, I'm going to show you, I

17  promise, some shorter documents at this point --

18  "A    Sure.

19  "Q    -- and ask you a couple of questions about them.  Please

20  feel free to look at these.  As you look at these, I may focus

21  for time reasons on certain parts, but you should feel free to

22  look at any part of it that you would like.

23  "A    Okay.

24  "Q    And this is control number CTRL6585427.  I believe we are

25  marking it at Katz 3.

Mc82Pla3                    "Katz –

1          If you take a look at the bottom part of this, this is

2     from your -- well, let me ask you this.  Do you recognize that

3     as one of your grandfather's e-mail addresses?

4     "A   Yes.

5     "Q   This is March 24 of 2015?

6     "A   Uh-huh.

7     "Q   All right.  It indicates at the bottom, 'For further

8     notice, I would like to receive a monthly report to be sent to

9     me in the same way we used to receive in the time that Joan

10    Janczewski worked for Platinum.'

11         "Do you recognize that name, first of all?

12    "A   Yes.

13    "Q   Who is that

14    "A   She used to work for Platinum.  I never met her.

15    "Q   Do you recall looking at the BodnerAnge@PlatinumLP e-mail

16    address from the bottom, the CC line there?  Is that an e-mail

17    address that you recall David Bodner using?

18    "A   Yes.

19    "Q   Okay.  All right.  Let's take a look at CTRL563311.

20    Again, if you start at the bottom, I guess as the back page,

21    which is the last one is dated, it's from David Levy, it says',

22    We have a meeting tomorrow with David Bodner at 1 p.m.  He

23    asked me to ask you to reserve us the conference room.'

24    "A   Uh-huh.

25    "Q   'It will be me, Isaac Barber, Michael Katz, and David

Mc82Pla3                    "Katz –

1    Bodner.  I think we have an hour.'

2           "Look at that and obviously feel free to look above.

3    Do you recall whether this meeting happened?

4    "A   No, I don't remember.

5    "Q   This is mid June of '14?

6    "A   Yeah, yes.

7    "Q   Would it have been during that time period were you

8    meeting with David Bodner with any regularity?

9    "A   I met with him from time to time.  It depends what you

10   mean by regular.

11   "Q   Do you recall, again, focusing on 2014?

12   "A   This is 2016.  Oh, sorry, you are right, 2014.  Okay.

13   "Q   I get these things wrong all the time.

14   "A   Sorry about that.

15   "Q   But at this time, 2014, am I right this is before you

16   understood some of the things we talked about, about this

17   representation of liquidity, is that right?

18   "A   Uh-huh.

19   "Q   At this time why would you have been meeting with

20   Mr. Bodner?  Let me make this clear.  I don't remember this --

21   I understand you don't remember the specific meeting, but you

22   said that you would meet with him on occasion.  What would that

23   be about?

24   "A   I'm not sure.  I mean, different meetings were for

25   different things.  I met with him about all kinds of things.

Mc82Pla3                    "Katz –

1    "Q   About your investments, about your grandfather's

2    investments?

3    "A   Yes, that too, yeah.  Yes.

4    "Q   These 2014 meetings, focusing on Mr. Bodner first, you

5    recall talking about things other than investments?

6    "A   No.

7    "Q   All right.  Same thing with Mr. Huberfeld.  Talking about

8    things other than investment?

9    "A   No.  I mean small talk.

10   "Q   Understood.

11   "A   Yeah, limited amount of that.

12   "Q   All right.  Let's take a look at BW SHIP 01007103.  All

13   right.  This is, again, with your time here, this is December

14   2014 and this is, again, it's with the B asset manager account,

15   Mr. Nordlicht's and Mr. Bodner, both on their Platinum account.

16   "A   Uh-huh.

17   "Q   It says, 'Mark, sending this follow-up message per David's

18   instructions.  Thanks.'  And the subject is 'Agera and Lumens.'

19   "A   Uh-huh.

20   "Q   And we have discussed those.  Do you recall at all what

21   this relates to looking at this now?

22   "A   No.

23   "Q   All right.  With regard to investments at Platinum, would

24   it be normal for you to write to Mr. Nordlicht and Mr. Bodner?

25   "A   Yes.

Mc82Pla3                     "Katz –

1    "Q   Do you recall having conversations with Mr. Bodner about
2    Agera?
3    "A   Yes.
4    "Q   Getting close here.  You could look at CTRL RL8329053.
5    This will be Katz 12.
6          "Do you know whether or not Platinum had other
7    valuable assets?  Let me back up.
8          "At this time, when this exchange is happening, do you
9    know whether or not Platinum had other valuable assets?
10   "A   I was --
11   "Q   Other than Agera?
12   "A   I mean, I was told there were plenty of valuable assets.
13   All of the assets were represented as being value or having
14   value.
15   "Q   Represented by the people who are --
16   "A   Yeah, by Platinum.
17   "Q   Including Mr. Bodner?
18   "A   Yes.
19   "Q   And Mr. Huberfeld?
20   "A   Yes.
21   "Q   All right.  Let's take a look at CTRL7942765, which will
22   be 15.
23         "If you take a look at this, if I'm reading it
24   correctly, it's in essence two documents—one to you with
25   something drafted by Mark Nordlicht and then a response.

Mc82Pla3                    "Katz –

1          "Mr. Katz, if you look at this, this is, I believe,

2     '16 or '15 -- '15, I'm sorry.

3     "A   Yes.

4     "Q   First of all, do you -- I think what I was saying was that

5     it appears to me to be kind of a draft of a note to your

6     grandfather from Mr. Nordlicht that you look at and edit, is

7     that fair?

8     "A   I'm not sure.  Yes.  It looks to me like some kind of a

9     draft letter.  I'm not sure how much of this if I edit it.

10    "Q   This is kind of my question.  Do you recall this?  Do you

11    recall doing this?

12    "A   Not this specifically, no.

13    "Q   I take it, then, you don't recall what your intent was in

14    doing it?

15    "A   I do recall the intent, yeah.  The intent was to convey

16    the representations of management as to what was the state of

17    affairs as to various investments.  That was my mandate was to

18    communicate as best as I could on various positions to my

19    grandfather.

20    "Q   The information that you got to do that, where did you get

21    it?

22    "A   From various people at Platinum.

23    "Q   Including Mr. Bodner?

24    "A   Yes.  So from everyone.

25    "Q   Including Mr. Nordlicht?

Mc82Pla3                    "Katz –

1  "A    Right.  So I talked to everyone at length.  When I say

2  everyone, I mean Mark Nordlicht, Murray Huberfeld, David

3  Bodner, Bernard Fuchs, and probably some other people at

4  Platinum.

5  "Q   Is that true, the investments that are listed here, like

6  Agera, the oil and gas investment, China Horizon?

7  "A    Yes.

8  "Q   I should have asked this earlier.  When was the first time

9  you learned about the existence of Beechwood?

10  "A    I don't remember the exact date, but on these dates that

11  we are discussing, sometime in '14 I suppose would be my best

12  guess.  I'm not sure.

13  "Q   Can you clarify for me what your understanding was of the

14  relationship between Beechwood and Platinum?

15  "A    It was never clear.  I saw the same people, but I never

16  really understood what it meant.

17  "Q   When you say you saw the same people, you saw the people

18  at the Platinum offices at Beechwood's offices?

19  "A    I saw people taking jobs from one entity to the other, but

20  it was described to me as independent entity, but I don't know

21  what the relationship was from one to the other.

22  "Q   Who described it to you as an independent entity?

23  "A    Mark and Murray and David Bodner.  Probably asked the same

24  question to everybody.  David Levy.

25  "Q   Did anyone -- what was your understanding of who owned

Mc82Pla3                    "Katz –

Beechwood?

"A    It wasn't clear as to who owned it.  I know that the
gentlemen I just described obviously some stake in the venture.
That's all I know.

"Q    When you say the gentlemen you described, that's
Mr. Nordlicht, Mr. Bodner, Mr. Huberfeld, Mr. Levy?

"A    Correct.

"Q    Mr. Katz, did there come a time when you helped facilitate
a lease agreement between or at least on behalf of your
grandfather, his interest, and Platinum and related persons?

"A    The negotiation of the deal as it relates to his
investment.  I was just following instructions from my
grandfather as to what to do.

"Q    What were those instructions?

"A    Again, I don't remember every specific, but you know he
couldn't get his money out, and so he was trying to get
whatever he could out of -- out of the -- he was convinced, as
I was, you know, that the company would turn around and that
the value, you know, that all these things we thought at the
time were correct as a company in distress, but it could turn
around.  But it had no liquidity, it couldn't get the
redemption.  So based on that, within that context, he was
trying to negotiate something.

"Q    And was anyone else involved in this negotiation?

"A    All the parties involved.

Mc82Pla3                        "Katz –

1  "Q   I'm sorry.  That was a poor question.  On behalf of your

2  grandfather's interest.

3  "A   On behalf of my grandfather?  Who was involved on behalf

4  of my grandfather?

5  "Q   Um-hmm.

6  "A   Only he was involved and I.  I just do -- doing what he

7  told me to do.

8  "Q   What is your understanding of the end result?

9  "A   There was no end result.  There was no deal.

10  "Q   There was never any release agreement signed or agreed

11  upon?

12  "A   No, never executed.

13  "Q   Would it surprise you to find out that there was a set of

14  executed documents?

15  "A   Yes.  I mean fully executed documents?  It would surprise

16  me a great deal.

17  "Q   When did the deal fall through?

18  "A   I don't remember the specifics.

19  "Q   But do you recall --

20  "A   No deal.  I believe in part it was due to the matter -- to

21  the arrest of Murray Huberfeld on an unrelated matter.  I

22  believe that was part of it.

23  "Q   Were you represented by lawyers in negotiating these

24  deals?

25  "A   Yes.

Mc82Pla3                    "Katz –

1    "Q    Who was your lawyer?

2    "A    For this it was what's his name.  I forgot his name.  It

3    should be here somewhere.  Isaac Neuberger was the attorney.

4    "Q    And it's your understanding that there exists

5    communications after this June 7 e-mail?

6    "A    Oh, yes, absolutely.

7    "Q    Just to clarify for the record, it's your understanding

8    that there are e-mails after this June 7 e-mail, which I want

9    to phrase it correctly, which confirm that no agreement was

10   ever made to the parties between the parties as to the content

11   of these release agreements?

12   "A    Correct.  That's correct.

13   "Q    You said that you started visiting Platinum in an informal

14   capacity in around 2012, and then you started visiting in a

15   more formal capacity later in 2015, correct?

16   "A    At the end of '15 -- 2015.

17   "Q    The end of 2015?

18   "A    Yeah, specifically probably either late November or

19   December 2015.  That's when I received a mandate to do so.

20   "Q    Mandate from who?

21   "A    From my grandfather.

22   "Q    Personally?

23   "A    Personally.

24   "Q    How old was he at that time?

25   "A    He was 88.

Mc82Pla3                    "Katz –

1    "Q    What year did he pass?

2    "A    2016, 89.

3    "Q    November-December 2015, was he of sound mind in your

4    opinion?

5    "A    Yes.

6    "Q    In between January 1, 2014 and September 2014, do you

7    think you visited the office more than twice?

8    "A    Yes.

9    "Q    Do you think you visited the office more than four times?

10   "A    I'm not sure.

11   "Q    Could it have been about that?

12   "A    Could have been.  I'm not sure.

13   "Q    At some point the office, Platinum's offices, moved to

14   55th Street.  Are you aware of that?

15   "A    Yes.

16   "Q    And you visited that office?

17   "A    Yes.

18   "Q    And you visited that office in 2014?

19   "A    Not sure.

20   "Q    I will represent to you that the office move was in

21   October of 2014.

22   "A    Okay.  I don't have any recollection of going in 2014 or

23   even early 2015.

24   "Q    Were you present for the move?

25   "A    No.

Mc82Pla3                    "Katz –

1  "Q   In the period when you received the mandate from your

2  grandfather -- well, tell me about the mandate.  What did your

3  grandfather ask you to do?

4  "A   Please try to get as much -- well, first, it was get as

5  much information as possible and report back.  That was the

6  first part of the mandate.  And then do as much as I can

7  diligence on the underlying assets and report back my opinions

8  and then receive his instructions as to what to do and when.

9  "Q   So when you got to Platinum in December 2015 with some

10 experience under your belt, did you feel like you knew what

11 documents to ask for in order to satisfy your grandfather's

12 mandate?

13 "A   Yes, I believe I -- yes.

14 "Q   Did you -- were you ever denied a document or information

15 that you had asked for?

16 "A   No.

17 "Q   When you wanted a document from Platinum Management in

18 that period, who did you go to?

19 "A   Depending on the document, but most requests went through

20 Mark Nordlicht.

21 "Q   Do I have it right that you would ask Mark for the

22 document and then Mark would deal with it internally and then

23 come back to you with the document or Mark would just point you

24 to deal directly with someone within the fund?

25 "A   Both.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mc82Pla3                    "Katz –

1  "Q   Okay.  In December of 2015, you knew that PPVA had

2  liquidity issues, right?

3  "A   Correct.

4  "Q   Is it fair to say that Mark was bullish about liquidity

5  events on the horizontal?

6  "A   Yes.

7  "Q   Is that what made you feel that liquidity event was always

8  around the corner?

9  "A   What's the question?

10  "Q   Was it Mark's bullishness that made you feel there was a

11  liquidity event around the corner, shifting target, as you

12  described it?

13  "A   Yeah, yes, to a large degree.  I mean, not only, but in

14  part.

15  "Q   In August 2015 your grandfather submitted a full

16  redemption request, right?

17  "A   Yes, he did.

18  "Q   And that account -- and that was for a redemption for his

19  entire capital account with PPVA?

20  "A   Correct.

21  "Q   What was the value of the capital account at the time he

22  submitted his full redemption?

23  "A   I don't remember, but it was around 47, 48 million.

24  "Q   Okay.  Over time, from the time your grandfather started

25  investing in PPVA, did he withdraw -- make periodic

Mc82Pla3                    "Katz –

1    redemptions?

2    "A    Yes.

3    "Q    When did he initially invest with PPVA?

4    "A    I don't recall the initial date, but there is a schedule

5    with the dates in the complaint.

6    "Q    And the complaint you are referring to is the complaint

7    that you filed as managing trustee of the MDK Hijos Trust,

8    correct?

9    "A    Correct.

10   "Q    And in that complaint you sued Mr. Nordlicht,

11   Mr. Huberfeld, Mr. Bodner, Bernard Fuchs, and Gilad Kalter,

12   correct?

13   "A    Correct.

14   "Q    So when did your grandfather start investing in PPVA?

15   "A    2006.

16   "Q    He continued making investments almost annually through

17   February of 2015, correct?

18   "A    Correct.

19   "Q    You testified that in March of 2016 you were aware that

20   PPVA was distressed.  That's your term.  Correct?

21   "A    Correct.

22   "Q    And that PPVA lacked liquidity, correct?

23   "A    Correct.

24   "Q    Tell me in your own words what the business arrangement

25   was that is reflected in the agreement attached to Exhibit 23.

Mc82Pla3                      "Katz –

1    "A    There was –– I think there are three parts.  There is a

2    main agreement, which included shares in the management company

3    and an opportunity to by into, further buy into the management

4    company; and there were releases associated with that

5    transaction.  I think that kind of sums it up.

6    "Q    As part of this transaction, was somebody going to make an

7    investment that would give that investor an economic interest

8    in the management company?

9    "A    There was an option, not an obligation.

10   "Q    What you are saying is that as part of this transaction

11   somebody was going to make an investment that would give that

12   investor an option to take an economic interest in the

13   management company?

14   "A    Correct.

15   "Q    Who was that investor?

16   "A    My grandfather.

17   "Q    Do you recall that Mr. Huberfeld and Mr. Bodner were

18   giving up their interest in the management company to free

19   those interests up so they could be offered to your

20   grandfather?

21   "A    Yes.  There was some discussion related to that.  I don't

22   recall that's where we ended.  I know that it was discussed.

23   "Q    Okay.  Let me call your attention to CTRL –– part of

24   Exhibit 23.  It's 8022087-3.

25   "A    Okay.  Yup.

Mc82Pla3                    "Katz –

1    "Q   Is that your grandfather's signature over his name on the

2    bottom of the page?

3    "A   Yes.

4    "Q   What is Atlanta Global Holdings, LLC?

5    "A   It was an entity that was created specifically for this

6    transaction but never used.

7    "Q   Was the entity formed?

8    "A   Yes.

9    "Q   In connection with this transaction, was Atlanta Global

10   Holdings represented by Isaac Neuberger?

11   "A   Yes, I believe so, yes.

12   "Q   Mr. Neuberger was its counsel?

13   "A   Yes.

14   "Q   And was your grandfather represented by Mr. Neuberger?

15   "A   Yes.

16   "Q   Who signed for Atlanta Global Holdings on the page we are

17   looking at?

18   "A   I think that's my grandmother.

19   "Q   Do you recognize her signature?

20   "A   Vaguely.  I'm not sure.  It looks like an A.  It's my

21   guess.  I'm not so sure.

22   "Q   When did your grandfather and your grandfather sign this

23   page?

24   "A   I don't remember the exact date, but it was in

25   anticipation of the deal closing.  They were leaving the

Mc82Pla3                    "Katz –

1    country, so they left a signature page.

2    "Q    Were you physically present when your grandmother and your

3    grandfather signed the page than ends in 87-3?

4    "A    Yes.

5    "Q    Where were you?

6    "A    I was with them in their apartment.

7    "Q    It says in section 6, 'The parties will enter into the

8    swap agreement attached hereto and incorporated herein by

9    reference.'  Do you see that?

10   "A    Yes.

11   "Q    Do you know what this swap agreement was?

12   "A    Yes.

13   "Q    What was it?

14   "A    It was a rebalancing the position from 100 percent of PPVA

15   and the side pocket and having exposure to PPCO.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

MC8Cpla4                         "Katz –

1    "Q.  And as a result of the swap agreement, your grandfather's

2    capital account would be partially moved to PPCO; is that fair?

3    "A.  Not physically, but in the form of a swap agreement.  So

4    the shares weren't physically moved, there would just be

5    consideration, like a true up, true down.

6    "Q.  So exhibit 24 is a document that doesn't have a Bates

7    number, and I'm going to -- it's one email with attachments.

8    That was all one copy.  I made the copy here.  So I apologize

9    to counsel, I don't have extras.

10            It's an email that's dated March 21st, 2016.  It's

11   from Harvey Wreblowsky to myself, and forwarded from

12   Mr. Wreblowsky is an email from David Levy, dated March 20,

13   2016, at 11:42 p.m.  And the document's on the Platinum server.

14            Mr. Katz, David Levy sends the March 20th email to

15   you, correct, along with some others?

16   "A.  Yes.

17   "Q.  And your attorney -- or your grandfather's attorney,

18   Mr. Neuberger is on there?

19   "A.  Yes.

20   "Q.  Mr. Levy said he has attached some kind copies of all the

21   agreements, waiting on the Katz the's signatures?

22   "A.  Correct.

23   "Q.  And attached to Mr. Levy's emails were a series of

24   agreements, and one of those is the balancing agreement that

25   you mentioned earlier?

MC8Cpla4                    "Katz –

1    "A.   Uh-huh.

2    "Q.   Is that what we referred to as the swap agreement?

3    "A.   Yeah.  Yes.

4    "Q.   And one of the agreements that was attached to Mr. Levy's

5    email of March 20th was a release agreement between Mr. Bodner

6    and Mr. Huberfeld and your grandfather.

7             Do you see that?

8    "A.   Yup.

9    "Q.   I'm going to show you exhibit 25 where, if you turn to the

10   second-to-last page of that packet, there is a signature over

11   the line Marcos Katz.

12            Do you see that?

13   "A.   Uh-huh.

14   "Q.   Is that your grandfather's signature?

15   "A.   Looks like it.

16   "Q.   Between March 20, 2016 and June 7, 2016, when you sent the

17   exhibit 23 email to Suzanne Horowitz, can you tell me what was

18   going on between you and your grandfather with regard to this

19   set of agreements?

20   "A.   There were constant changes.  There were several attempts

21   to get signatures and the signature packets together on all the

22   agreements.  Even though they're separate agreements, they're

23   all related, they're all part of the single transaction and

24   there were, you know, differences that kept on -- changes made

25   several times.

MC8Cpla4                    "Katz –

1    "Q.  Do you recall what some of the issues were that you recall

2    being changed?

3    "A.  I don't remember specifically, you know.  I know there

4    were -- every time there was something new that was asked for,

5    something else, so --

6    "Q.  Meaning something new that was asked for by your

7    grandfather or by --

8    "A.  By any of the parties.  It was very difficult to

9    communicate with all these people because everybody had an

10   opinion, everybody had a say, multiple parties, very

11   complicated to move.  Changing a comma was complicated, as you

12   would recall.

13   "Q.  As you recall it, were the changes being circulated by

14   email between March 20th and early June by counsel for the

15   parties?

16   "A.  Sometimes they were.  Sometimes there were phone calls.

17   Sometimes there were physical copies, communications in all

18   kinds of ways.

19   "Q.  Mr. Katz, were any of the issues with these agreements

20   that were raised after March 20th, were they issues that were

21   raised by you?

22   "A.  Possibly.  I don't remember.

23   "Q.  Do you recall any that you raised?

24   "A.  No.

25   "Q.  Do you recall -- can you recall the most significant of

MC8Cpla4                          "Katz –

1   the changes that you believe were made or proposed between June

2   20th -- March 20th and June 7th?

3   "A.  The most significant, I can't qualify what is most

4   significant because I don't remember it all, you know, I

5   remember a significant back-and-forth.  As I said, very

6   difficult to get any small change done.  So there are seven or

7   eight parties involved.  It's very complicated.  Multiple

8   locations, multiple time zones.

9   "Q.  But as a result of this transaction, your grandfather was

10  prepared to release Mr. Bodner and Mr. Huberfeld from any

11  claims that he may have had against them at the time?

12  "A.  He had proceeded with consummating all the agreements.

13  That was part of the deal.

14  "Q.  Were you encouraging your grandfather to execute the

15  agreements we looked at in exhibit 24?

16  "A.  I was encouraging him for a resolution because he was

17  frail and sick and it was really affecting his health.  So I

18  wanted closure of some kind, whatever it was.

19  "Q.  The basic deal, again, is that he would put in $10 million

20  of new cash to the funds and then, in exchange, he would have

21  an option to acquire a piece of the management company?

22  "A.  No.  Part -- part of the -- there are many parts of the

23  agreement.  There was a rebalancing, there were the releases,

24  there was a piece of the management company, plus an option to

25  purchase additional or get additional consideration in the

MC8Cpla4                    "Katz –

1    management company associated with an option of investing an

2    additional chunk of equity or investment into the funds in the

3    amount of $10 million.

4    "Q.   It's your recollection that as a result of that set of

5    agreements, your grandfather was not obligated to put in

6    $10 million?

7    "A.   No.   No, he was not under -- under no obligation.   In

8    fact, I think that's how it was written, yeah.   There was

9    something also that went back and forth, but that's correct.

10   His understanding, you know, was that it was one point, it was

11   always kind of mulled over, and there was a disagreement on it,

12   whether it was an option or an obligation.   In his mind, it was

13   always an option and I don't think any final version he saw

14   there was obligation, as far as I recall.

15   "Q.   And if he exercised the option to put in $10 million, di

16   he then have a right to a piece of the management company?

17   "A.   Yes.

18   "Q.   Let me call your attention to Katz 2, which is the

19   complaint.   Just want to go over a couple of things that you

20   said to Mr. Gould when he examined you this morning about this.

21          You said to -- in response to questions from Mr. Gould

22   with respect to paragraph 13 where it says that "Bodner and

23   Huberfeld were coequal partners and Nordlicht was treated as

24   the more junior partner."

25          Do you see that?

MC8Cpla4                    "Katz –

1    "A.  Yes.

2    "Q.  I think you said that Mr. Gould, that that was based on

3    their interactions?

4    "A.  Uh-huh.

5    "Q.  What interactions specifically gave you that impression?

6    "A.  I was present at multiple meetings with the three of them.

7    So multiple interactions.

8    "Q.  What was the subject matter of those meetings?

9    "A.  All kinds of things, but, typically, mostly related to the

10   investments and other related matters applied.

11   "Q.  What investments specifically?

12   "A.  All of them.  I mean, you know, whatever investments were

13   discussed, they were discussed at various locations and the

14   dynamic gave me that impression.

15   "Q.  When were those meetings?

16   "A.  Through the time period that we're talking about?  Mostly,

17   you know, some point in late 2015 through 2016.

18   "Q.  The period where you had the "Mandate"?

19   "A.  Yeah, that's right.

20   "Q.  Can you recall a single transaction that was discussed

21   where Nordlicht took direction from Bodner and Huberfeld?

22   "A.  Yes.  It was a matter relating to what to do about China

23   Horizons and there were differences of opinion as to whether to

24   pursue a certain lawsuit or not, and their opinion prevailed,

25   so --

MC8Cpla4                     "Katz –

1    "Q.  Meaning they convinced Nordlicht of their views?

2    "A.  Yes.

3    "Q.  Who else was present at that meeting?

4    "A.  Specific one that I can think –– it was just us.  There

5    were three of them and me.  I just happened to be there.

6    "Q.  Was it common that Mr. Nordlicht, Mr. Huberfeld, and

7    Mr. Bodner would have a meeting and you would attend?

8    "A.  No, it wasn't that they called the meeting.  They just

9    happened to be in the room, probably for something else, and

10   they would walk in and start talking.  So it wasn't a kind of

11   formal meeting set.  They met, presumably, I think, took them

12   to the place in Mark's apartment in his kitchen.

13   "Q.  What were you doing in Mark's apartment at the time?

14   "A.  Discussing the investments.

15   "Q.  Did Mark call a meeting for you to come to his apartment

16   to discuss the investments?

17   "A.  Yes.  In fact, I think on that occasion it was Murray who

18   asked me to come because he lived in the same building.  So

19   Murray –– and then we went to Mark's apartment.

20   "Q.  And Mr. Bodner was there?

21   "A.  Yeah.  Yes.

22   "Q.  Do you recall when that was, roughly?

23   "A.  No, I don't.

24   "Q.  And the subject matter of the meeting was China Horizons?

25   "A.  Well, for that part of the meeting, yes.  I mean, lots of

MC8Cpla4                    "Katz –

1   things were discussed, but that was one of them.  It got pretty

2   heated.

3   "Q.  I'm sorry?

4   "A.  It was, you know, emotions were on high on that.

5   "Q.  Did you come away from that meeting as to why emotions

6   were high?

7   "A.  Yes, they were concerned about the position.

8   "Q.  Your grandfather's LP account at that time was

9   approximately $39 million?

10  "A.  Right.

11  "Q.  What was it about Mr. Bodner and Mr. Huberfeld's

12  interactions with Mr. Nordlicht that left you with the

13  impression that he was the more junior partner?

14  "A.  I think we just went over that.  In their interactions,

15  they always -- they seemed to act like the senior partners.

16  They would speak to him in a certain way that I don't think

17  equal partners would talk to one another like that.  I mean, I

18  wouldn't.

19  "Q.  Is that statement in paragraph 13 of the complaint based

20  on that interaction?

21  "A.  In part, but not only.

22  "Q.  What else is it based on?

23  "A.  Other interactions, similar interactions.

24  "Q.  Can you think of any other, other than that instance in

25  Mr. Nordlicht's kitchen?

MC8Cpla4                    "Katz –

"A.  Not specifically as in kind of a heated in that

discussion, but in general, whatever they, you know, either

Mr. Bodner or Mr. Huberfeld would walk into Mark's office, have

a discussion with them, he was treated like a junior partner.

I mean, the tone, the manner is the way you would treat someone

who is subordinate to you.  I mean, it's pretty clear.  I can't

give you a specific dialogue, but I think you know it when you

see it.

"Q.  Is Mr. Nordlicht substantially younger than Mr. Bodner and

Mr. Huberfeld?

"A.  Yes.  I don't know if it was 10, 15 years or something

like that.  And the story of the firm sort of, I think, sort of

supports that, you know, they brought him into their

partnership predates -- meaning Mr. Huberfeld's and

Mr. Bodner's partnership predates their association with

Mr. Nordlicht.

"Q.  The complaint says in paragraph 14, and Mr. Gould asked

you about this, the Katz's considered Bodner the leader of the

Platinum Management organization.

          Do you see that?

"A.  Uh-huh.

"Q.  In your time in the Platinum Management organization, did

you consider Bodner the leader of that organization?

"A.  Yes.

"Q.  What was that based on?

MC8Cpla4                    "Katz –

1   "A.  Just my observations.

2   "Q.  Can you give me an example of one such observation?

3   "A.  Sure.  He had an office, last office that Platinum had

4   where he summoned different people from management.  And on

5   occasion, I've witnessed some of those meetings and it led me

6   to believe that he was, you know, if there was any disagreement

7   as to what had to be done, he was consulted and he had the last

8   word.  That was my impression.

9   "Q.  Can you think of an example of the situation where you had

10  the last one?

11  "A.  Well, I can give you -- I just gave you one, the China

12  Horizons.

13  "Q.  No, what you said with China Horizons, that Mr. Bodner and

14  Mr. Huberfeld disagreed with Mr. Nordlicht and convinced him of

15  their view.

16  "A.  I mean, that's one way of putting it, but I mean, they

17  had -- it was their view that prevailed.  Convincing, not

18  convincing, I don't know what was going on in Mr. Nordlicht's

19  head.  He acquiesced to the position of Mr. Huberfeld and

20  Mr. Bodner.  So whether he did willingly or not, especially in

21  my presence, which must have been very uncomfortable.

22  "Q.  Other than that situation, can you think of one where

23  Mr. Bodner, I think as you put it, had the last word?

24  "A.  I can't recall another one at this time.

25  "Q.  In your time in the Platinum Management organization, did

1  you ever see or hear Mr. Bodner give attention to a valuation

2  issue?

3  "A.  Did he give attention to a valuation issue?

4  "Q.  Correct.

5  "A.  Yeah, I mean, he discussed valuations all the time.

6  "Q.  Okay.  Tell me about that.

7  "A.  I can recall him talking about Agera, for example, and

8  saying it had to be, you know, it had to be a billion dollars,

9  it had to be valued at a billion dollars and it had to get

10  there.  He had strong opinions about values all the time.

11  "Q.  Who did he share that opinion with?

12  "A.  Whoever was in the room.  Mr. Nordlicht, I think David

13  Levy might have been in the room, Bernie Fuchs may have been in

14  the room, I don't remember, but everyone who's in the room, but

15  this was common, you know, for him to express his sentiments on

16  a specific position if it was discussed.

17  "Q.  And at your time at Platinum Management, were you involved

18  in the valuation process?

19  "A.  No.

20  "Q.  So this wasn't like a valuation meeting, this was a

21  comment that you observed?

22  "A.  Correct, comments on the value of the assets as opposed to

23  a valuation process.  So I never observed Mr. Bodner or anyone

24  else for that matter in whatever process was to peg the

25  valuations to assets.

MC8Cpla4                    "Katz –

1    "Q.   In paragraph 49 with respect to that tentative agreement,

2    the reference there, it says with the defendants Bodner and

3    Huberfeld's blessing.

4              Do you see that?

5    "A.   Uh-huh.

6    "Q.   What do you mean by "blessing"?

7    "A.   They're agreeing.

8    "Q.   And is that an agreement that they expressed or you

9    believe it to be implied?

10   "A.   I think it was the witnesses to their agreement.   There

11   are multiple witnesses to both of their agreements.

12   "Q.   You're saying that when Mr. Nordlicht wrote the agreement

13   that's referenced in paragraph 49, Mr. Bodner and Mr. Huberfeld

14   were physically present?

15   "A.   Yes.

16   "Q.   And how do you know that to be true?

17   "A.   There were four witnesses that were there.

18   "Q.   Who are they?

19   "A.   My grandmother, my aunt, my mother, yeah.   I mean, those

20   are the ones I know of.

21   "Q.   You never specifically asked, though, for full PM reports

22   and were denied?

23   "A.   No, I didn't.

24   "Q.   Were there ever any specific item that you asked for that

25   you were denied?

MC8Cpla4                    "Katz –

1    "A.  No.  I already said that.

2    "Q.  Is your grandfather a sophisticated investor?

3    "A.  Yes."

4              MR. MAGRUDER:  Okay.  That's all.

5              THE COURT:  So, you want to take your seat.

6              So, do I understand that except for the completion of

7    Mr. Quintero's testimony and possibly one small item relating

8    to Mr. Trott, that the plaintiffs rest at this time?

9              MR. GLUCK:  We do.

10             THE COURT:  So, ladies and gentlemen, I need to take

11   up some legal matters with counsel at this point, so we're

12   going to give you an hour and ten minutes for lunch and we will

13   resume at 2 o'clock.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.  We'll start the

3     argument by plaintiffs' counsel in response to the motion that

4     was made, we may have to continue it at the next break.

5          MR. HERTZBERG:  Your Honor, before plaintiffs' counsel

6     begins, may I raise a scheduling matter with the Court?

7          THE COURT:  Yes.

8          MR. HERTZBERG:  So we have the CFO in the hallway and

9     he's ready to go, and we had as a backup, although sort of

10    doubting we'd get to him, but we did have him ready to drive

11    down to Manhattan, he's about 90 minutes away.  In the event

12    that we finish with Mr. SanFilippo, we would call

13    Mr. Steinberg.  Given that the witness is about 90 minutes away

14    and, in all likelihood, we're not going to get to him today,

15    plus his wife is extremely pregnant and due on Monday, he

16    doesn't want to be away unnecessarily.  With the --

17         THE COURT:  That of, course may, not be her view,

18    but --

19         MR. HERTZBERG:  So with the Court's indulgence, I

20    would tell Mr. Steinberg that he doesn't have to be here this

21    afternoon and he can just come tomorrow morning.  That may

22    mean, although I think it's very unlikely, that may mean if we

23    finish with Mr. SanFilippo and they finish cross and it's

24    4:20 --

25         THE COURT:  If his wife is very pregnant, she may

MC8Cpla4

1    deliver tomorrow.  Who's your backup?

2              MR. HERTZBERG:  Our backup would be either one of the

3    auditors or one of the third-party valuators.

4              THE COURT:  We only have a half day tomorrow, as you

5    know, so I do not want to be in the position of missing large

6    portions of that day.

7              Let me ask plaintiffs' counsel, do you have a rough

8    idea how much cross, you haven't heard the direct yet, but how

9    much cross you would have with the witness who is available?

10             MR. GLUCK:  SanFilippo?

11             THE COURT:  Yes.

12             MR. GLUCK:  How long is the direct?

13             MR. HERTZBERG:  I estimate about two hours.  I think I

14   said two, two and a half.

15             MR. GLUCK:  Probably an hour forty to two.

16             THE COURT:  It sounds like we're safe.  So you can

17   tell him that he doesn't have to appear today, assuming he's

18   still available based on his wife's situation, and we'll take

19   him first thing tomorrow.

20             MR. HERTZBERG:  Thank you, Judge.

21             THE COURT:  Go ahead.

22             MR. GLUCK:  So we are somewhat surprised the motion

23   was made, we're not surprised, but we're also a little

24   surprised.

25             THE COURT:  It's only made in 99.9 percent of all --

MC8Cpla4

1          MR. GLUCK:  Right.  That's why we're not surprised.

2          I'm going to go through the evidence that was

3     presented, and with the greatest respect to Mr. Lauer, I

4     believe the evidence presented in his submission was omitting a

5     lot of the evidence actually presented, that's one big issue.

6          The other big issue that I have with Mr. Lauer's

7     presentation was, A, that he seems to be equating a

8     determination that Mr. Bodner was a fiduciary with a

9     determination that Mr. Bodner was the most senior leader in the

10    organization.  Frankly, it is irrelevant whether Mr. Bodner

11    could give an order to Mr. Nordlicht, to Mr. Huberfeld, or

12    vise-versa.  We are going to hear, at least from Mr. Steinberg,

13    who joined as an intern, and Mr. SanFilippo, who is a CFO,

14    neither of whom are the most senior people, accountant and so

15    forth, they were both fiduciaries.  Now, they were contractual

16    fiduciaries, but they were both fiduciaries.  The issue in this

17    case is whether, by his conduct, Mr. Bodner assumed the role of

18    a fiduciary.  And it does not matter whether he was the leader

19    of the organization or more of a mid-person for that to be the

20    case.  That's misconception one.

21         The second part, B, is that there was no mention of

22    the secondary basis upon which this Court ordered that

23    liability may be had, and that basis is irrespective of whether

24    the aggregate set of conduct rises to the level of fiduciary.

25    I'm going to go through what that actually means.  This Court

1    ruled that when a particular person acquires sufficient

2    knowledge and has a close relationship, which is different than

3    fiduciary, for a very good reason.  At that point, there can be

4    a duty to disclose, and if you don't, it's fraud by omission.

5    That is why there is two claims, one's for breach of duty of

6    fiduciary, and the other is fraud by omission.  You don't have

7    to be a fiduciary to do fraud by omission, and that portion was

8    entirely absent from Mr. Lauer's testimony.  And I'm going to

9    take it that Mr. Lauer, just because he didn't mention it, is

10   not contesting that we have not met the burden to show

11   overvaluation or damages, I'm focusing on Bodner, and that's

12   how I took his submission.  If I'm wrong, Mr. Lauer will tell

13   me and I'll get back on that.

14           MR. LAUER:  Well, it's reserved.

15           MR. GLUCK:  First, what is a fiduciary?  A fiduciary

16   is someone who is entrusted to with the assets or obligations

17   and roles of another.  It is not about power, because there can

18   be extremely low-level persons who are absolutely fiduciaries —

19   bank tellers.  There can be extremely high-level persons who

20   are, of course, fiduciaries — chairmans of boards.  But there

21   is a spectrum.

22           The question is whether -- and I think he raised a

23   very interesting issue -- whether PPVA as a constituency, the

24   limited partners, which in this case are feeder funds, the

25   investors and creditors as a whole considered Mr. Bodner a

MC8Cpla4

1   fiduciary, and also not just whether they considered it,

2   whether he took acts in their presence or made known to them

3   that resulted in that trust.  I completely agree that if

4   Mr. Bodner had never entered the Platinum office in his life,

5   had never held himself out as principals and brought in

6   investors and solicited investors and made decisions and did

7   all the things that he had done and he had only had a

8   25-percent beneficial interest pursuant to the documents that

9   we've seen in this case, the trust documents and the other

10  documents, no fiduciary.  There may still be, by the way,

11  special knowledge, but then there would be no fiduciary.

12          But here's the thing.  First, our case is based, in

13  part, on the fact that those documents were not followed, they

14  are just documents.  On paper, you can say whatever you want.

15  Who would have taken redress if Mr. Bodner exercised authority

16  that he wasn't permitted to under a trust agreement?  Perhaps

17  Mark Nordlicht could have sued him, perhaps.  Who knows.  Our

18  point is that those documents are irrelevant.  We, just like

19  when the SEC sues Platinum Management when they have, on paper,

20  unlimited discretion as to how to value, we're talking about

21  reality.  That's why we have a jury here.  The reality is that

22  Mr. Bodner was both perceived by and held himself out as a

23  principal and a fiduciary.  There is no contention in our side

24  that principal means the highest principal and everyone had to

25  do what he said all the time.

MC8Cpla4

```
 1              THE COURT:  Just one question for clarification, and
 2    then, unfortunately, we're going to have to break and you're
 3    going to have all the time you need before the end of the day,
 4    we'll go as late as we need to, but I have a luncheon
 5    appointment at 1:00, so we're going to have to break now.
 6              You are, of course, quite right that someone can
 7    assume a fiduciary responsibility, regardless of the level
 8    they're at if they take the acts that cause someone else to
 9    have complete trust in them in reliance upon them, et cetera.
10    And you are also right that if you have special access to
11    knowledge, you may be guilty of fraud, even if you don't have a
12    fiduciary duty.
13              What I'm a little unclear is who you say Mr. Bodner
14    owed his fiduciary duty to.  For example, you gave an example
15    of a bank teller.  A bank teller has a fiduciary duty to the
16    bank, doesn't have a fiduciary duty to the deposit.  So who do
17    you say Mr. Bodner had the fiduciary duty to?
18              MR. GLUCK:  That is a deep and metaphysical question
19    and we have thought a lot about it, too.  The best answer I
20    have for you now is that you can have fiduciary duties to more
21    than one person or entity.  For example, a CEO has fiduciary
22    duties to his shareholders, under certain circumstances,
23    creditors, and under certain circumstances, employees.  That's
24    my set level hypothetical.
25              In this case, I submit that David Bodner had fiduciary
```

MC8Cpla4

1    duties to the following:  Platinum Management entity.  There's

2    a good amount of law about the role of a member or managing

3    member of an entity, like Platinum Management, and that he had

4    a duty to Platinum Management in the first instance.

5            Secondly, by virtue of Platinum Management's role as

6    manager and general partner and, of course, the very thing the

7    fund did, David Bodner had a duty to PPVA.  It's all a little

8    ephemeral, the notion that Platinum Management tells PPVA

9    something, but that is the structure.

10           THE COURT:  That is very helpful and I apologize for

11   having to cut you off because I know you have more you have to

12   say on this subject, but my luncheon guests await.

13           MR. GLUCK:  The last two, you'll have to wait and see.

14           THE COURT:  So we will resume at 2:00.  We will start

15   the defense case without prejudice to these motions being fully

16   argued, which they will be before we end for today.

17

18

19

20

21

22

23

24

25

MC8Cpla4

AFTERNOON SESSION

2:11 p.m.

  (In open court; jury not present)

  THE COURT:  So I think defense counsel said they
wanted two and a half hours for the direct of this witness?

  MR. HERTZBERG:  Try to get it done in two --

  (Continued on next page)

```
 1              (Jury present)
 2              THE COURT:  Please be seated.  Defense will call their
 3      first witness.
 4              MR. HERTZBERG:  We call Joseph SanFilippo, your Honor.
 5       JOSEPH SANFILIPPO,
 6          called as a witness by the Defendant,
 7          having been duly sworn, testified as follows:
 8              THE DEPUTY CLERK:  Please be seated and please state
 9      your name and spell it slowly for the record.
10              THE WITNESS:  Joseph SanFilippo, J-o-s-e-p-h, last
11      name S-a-n-F-i-l-i-p-p-o.
12      DIRECT EXAMINATION
13      BY MR. HERTZBERG:
14      Q.  Good afternoon, Mr. SanFilippo.
15      A.  Good afternoon.
16      Q.  Can you tell the jury what you do for a living?
17      A.  What I do now or what I did in my past life?
18              THE COURT:  What you do now.
19      A.  I'm a chief financial officer of a group of daycare
20      facilities located in the State of Ohio.
21      Q.  From 2005 to 2016, what did you do?
22      A.  For the greater part of that time, from February 2005
23      through December of 2016, I was chief financial officer of
24      Platinum Management New York LLC.
25      Q.  Do you have a university degree?
```

MC8Cpla4                        SanFilippo - Direct

1    A.  Yes.

2    Q.  In what field?

3    A.  I have a bachelor's of science and accounting.

4    Q.  Do you have any licenses in that area?

5    A.  Yes.  I'm a certified public accountant in the State of New

6    York.

7    Q.  How did you come to be employed by Platinum Management?

8    A.  So, previous to my employ at Platinum Management, I worked

9    at a public accounting firm, BDO Seidman, and BDO Seidman was

10   the auditor of the Platinum Partners Value Arbitrage Fund.  I

11   was the in-charge auditor for the 2013 Platinum Partners Value

12   Arbitrage Fund audit.  Subsequent to that engagement ending, I

13   was approached by the chief investment officer of Platinum and

14   he had offered me a position in the fund.

15   Q.  You said the 2013 audit, did you mean the 2003 audit?

16   A.  Yes.  My apologies.  I meant 2003.

17   Q.  So you got hired by your client, is that how it worked?

18   A.  That's correct.

19   Q.  And were you chief financial officer right off the bat or

20   did you grow into that role?

21   A.  So my initial title was senior controller.  There was

22   nobody above me at the time in the finance department.

23   Approximately, about a year and a half after that, I was made

24   chief financial officer.

25   Q.  And who at Platinum Management hired you?

1    A.   Mark Nordlicht.

2    Q.   How big was the fund when you started?

3    A.   I believe when I started back in 2005, we had about

4    $90 million of assets under management.

5    Q.   And in hedge fund terms, is that a smaller fund, a

6    middle-size fund, how would you put it?

7    A.   It's a smaller fund.

8    Q.   And over your time there, did the fund grow in size?

9    A.   It did.

10   Q.   What is the role of a chief financial officer at -- well,

11   describe, please, the role of a chief financial officer at

12   Platinum Management.

13   A.   Sure.  So it was my responsibility to report to investors,

14   and that includes overseeing the monthly net asset value

15   calculation of the funds.  We had hired a third-party

16   administrator to prepare the net asset value.  They were

17   responsible for preparing the books and records.  It was my

18   responsibility to get them all the information they needed to

19   prepare the books and records.  So that includes information

20   regarding the fund's bank accounts, the fund's investments

21   accounts, the fund's investments, the fund's liabilities, and

22   anything else related to calculating the NAV.  It also includes

23   allocating capital to the partners.  So every partner puts in a

24   certain amount of money and the profits or losses are allocated

25   to the partner based on their capital balance at the start of

MC8Cpla4                    SanFilippo - Direct

1    every month.

2              In addition to overseeing the monthly net asset value

3    calculation process, at some point, I was also responsible for

4    overseeing the flow of information to third-party valuation

5    agents.  We had hired a few expert firms or one or two expert

6    firms to review our valuations at the end of every quarter and

7    provide a report to us on whether or not those asset valuations

8    were reasonable.

9              In addition to that, at the end of every year, the

10   fund had the responsibility to get our financial statements

11   audited by a third-party accounting firm.  And I also oversaw

12   the process of information to that third-party audit firm.

13   Q.  What does an audit firm do for a hedge fund?

14   A.  So it's the audit's firm responsibility to gather

15   information about our assets and liabilities and our profits

16   and losses and our disclosures in the financial statement and

17   express an opinion on whether or not those financial statements

18   are fairly stated.

19   Q.  Who were the auditors hired by Platinum Management to audit

20   the financials of PPVA?

21   A.  So for the period from when I was there -- from actually

22   before when I was there, from 2003 to the yearend 2013, the

23   auditor was BDO.  Subsequent to BDO, the auditor was

24   CohnReznick for 2014.  And I don't believe we issued our audit

25   report for 2015, but they were the auditor for 2014.

MC8Cpla4                      SanFilippo – Direct

1   Q.   BDO is the firm that you came from?

2   A.   Yes.

3   Q.   Does BDO have a certain reputation in the hedge fund

4   community?

5              MR. GLUCK:   Objection.

6              THE COURT:   Sustained.

7   Q.   And you also mentioned independent third-party valuators.

8   What third-party valuators did Platinum Management hire with

9   respect to PPVA?

10  A.   So for a certain point of time, we had engaged Sterling

11  Valuation Group and Alvarez & Marsal succeeded Sterling

12  Valuation Group.

13  Q.   Did you use Sterling Valuation Group from approximately

14  2008 to 2014?

15  A.   It sounds about right.  I think we switched over mid-2014.

16  Q.   And then Alvarez in '15 and the first part of '16?

17  A.   Yes.

18  Q.   And the valuators, are they doing their work daily,

19  monthly, quarterly, how does that work?

20  A.   So they issue a report quarterly.  We participate in

21  conversations with them and share information with them

22  throughout the course of the entire year.

23  Q.   And what about with the auditors, what's the schedule like

24  with them?

25  A.   So they typically come in a little bit before the end of

MC8Cpla4                      SanFilippo - Direct

the year to do some preliminary testing and gathering some

documents.  Then, subsequent to the end of the year, it usually

takes us about a month to a month and a half to finalize our

report for the yearend.  They would come in and start gathering

information post-yearend.

Q.  With respect to the auditors, is it one professional or a

team of professionals that are doing that work?

A.  So this is probably a group of usually five or six

individuals that work on our account all together as a team.

Q.  Are they all accountants like yourself?

A.  They are.

          MR. GLUCK:  Objection to form.  Just leading.  It's

been a little while.

          THE COURT:  No.  I'll allow it.  Overruled.

Q.  Why did Platinum Management hire third-party valuators?

A.  Sure.  It was important to us to make sure that our

valuations were accurate because we had investors entering the

firm at a certain price every month and we had investors

exiting the fund quarterly, so it was important for us to be

able to measure the valuation of our assets so when they either

subscribed or redeemed, it was based on an accurate amount or

an accurate value.

Q.  And why was it important for Platinum Management to have an

independent auditor?

A.  So it is important because, number one, it's required by

1    our bylaws, it is required by the SEC, and it's also an

2    additional way for us to make sure that our books and records

3    are accurate.

4    Q.  So let me see if I have this straight.

5        Investors can come into the fund on a monthly basis;

6    correct?

7    A.  That's correct.

8    Q.  And are those also called subscribers?

9    A.  Yes.

10   Q.  And when a subscriber comes into the fund, does the

11   subscriber come in at a certain price?

12   A.  They come in based on the value of -- based on the cash

13   that they contribute.  Why it's important to know the valuation

14   at that point is because that investor is going to be given an

15   ownership percentage of the fund in order to allocate profits.

16   Q.  So is it like shares that a subscriber is coming in and

17   buying shares of the fund at a specific price?

18   A.  So technically, they are purchasing shares for the offshore

19   fund.  The offshore fund is where our tax exempt investors and

20   our offshore investors subscribe.  They are purchasing

21   partnership interests in the domestic feeder fund.

22   Q.  And an investor that's going out, is that also called a

23   redeeming investor?

24   A.  It's either referred to as withdrawing or redeeming.

25   Q.  Is an investor going out at a certain price?

1   A.  Yes.

2   Q.  And that price is determined by Platinum Management and

3   with your input; correct?

4           MR. GLUCK:  Objection.  That's leading.

5           THE COURT:  I do think there's been a little too much

6   leading.  Sustained.  I think you could have asked how is that

7   price determined and that would have been perfectly allowable.

8           MR. HERTZBERG:  Let's try it that way.

9   Q.  How is that price determined, Mr. SanFilippo?

10  A.  So it's determined based on the month-end net asset value,

11  which I explained earlier is calculated by our fund

12  administrator using information that we provide to them,

13  information about transactions, information about accounts and

14  account values, and it's also prepared in conjunction with

15  them.  They are responsible for valuing a portion of our

16  portfolio.  So the answer is redeeming investors, their

17  redemption is calculated based on the month-end net asset value

18  that's calculated by our fund administrator with my oversight.

19  Q.  Did you work alone or did you have a team?

20  A.  I had a team of accountants.

21  Q.  And they reported to you?

22  A.  Yes.

23  Q.  And did you report to someone?

24  A.  Yes.

25  Q.  Who did you report to?

MC8Cpla4                           SanFilippo - Direct

1    A.  Can you clarify what time period you're referring to.

2    Q.  That's fair.  When you started in 2005, who did you report

3    to?

4    A.  So I reported to Mark Nordlicht in 2005.

5    Q.  Did you always report to Mark Nordlicht or did there come a

6    time when you started reporting to somebody else?

7    A.  I always reported to Mark Nordlicht, but there came a time

8    when I also reported to other people in addition to Mark

9    Nordlicht.

10   Q.  Who are they?

11   A.  In approximately 2007, it was Ari Glass, who was admitted

12   as a partner to the management companies.  He had subsequently

13   separated with the firm.  In 2011, Uri Landesman was admitted

14   as the managing member of Platinum Management New York.  I also

15   reported to him in addition to Mark Nordlicht.

16   Q.  So from 2011 through 2016, you reported to both Mark

17   Nordlicht and Uri Landesman?

18   A.  That's correct.

19   Q.  And did Uri Landesman have a title within Platinum

20   Management?

21   A.  I believe his title was president.

22   Q.  Was he also the managing member of the company?

23   A.  He was the managing member of Platinum Management New York

24   LLC.

25   Q.  Is there a contract between Platinum Management and PPVA

MC8Cpla4                          SanFilippo - Direct

1    that governs the responsibilities of Platinum Management to

2    PPVA?

3    A.   Yes, that's the investment management agreement.

4          MR. HERTZBERG:  Can we pull up DX 154, please.

5    Q.   What's on your screen now, is this the investment

6    management agreement you're referring to?

7    A.   Yes.

8          MR. HERTZBERG:  We offer it.

9          MR. GLUCK:  No objection.

10         THE COURT:  Received.

11         (Defendant's Exhibit 154 received in evidence)

12         MR. HERTZBERG:  If we can zoom in on the first

13   paragraph.

14   Q.   In the last sentence, do you see that Platinum Management

15   NY LLC is defined as the investment manager?

16   A.   Yes.

17   Q.   Is Platinum Partners Value Arbitrage Fund LP defined as the

18   master fund in that paragraph?

19   A.   Yes.

20   Q.   And you mentioned an onshore and an offshore feeder fund.

21   Can you just briefly explain what that means?

22   A.   Sure.  A typical hedge fund structure, when you have both

23   domestic USA investors and offshore and tax exempt investors is

24   called what's called a master feeder structure.  The investors

25   invest in the feeder funds, the feeder funds would be Platinum

MC8Cpla4                    SanFilippo – Direct

Partners Value Arbitrage USA LLP, that would be the domestic

feeder fund.  That would be the entity that the U.S. nontax

exemptors invest in.  The Platinum Partners Value Arbitrage

International LTD would be the offshore feeder fund that's

domiciled in the Cayman Islands.  In that fund, which I

mentioned before, is a corporation and the investors subscribe

into shares.  That is where your offshore investors and your

U.S. tax exempt investors invest, and the reason why the

structure is set up that way is for tax purposes.

          So what happens is the investors invest into the

feeder funds and then the feeder funds invest –- well, the

offshore feeder funds first invest through an intermediate fund

and then the intermediate fund invest into the master fund, and

then the USA investors invest through the USA fund or the

domestic feeder, and that domestic feeder invests directly into

the master fund.

          All the investment activity is done at the master-fund

level, and it's allocated at the end of each month.  Any

profits and losses from that master fund is allocated back down

to the feeder funds, and at the feeder-fund level is where you

calculate the investors' capital balance or how much their

account is worth at the end of each month.

          (Continued on next page)

Mc82Pla5                    SanFilippo - Direct

1    BY MR. HERTZBERG:

2    Q.  You mentioned investors.  Generally speaking, what kinds of

3    investors are we talking about?

4    A.  So we are talking about accredited investors and qualified

5    purchasers.  An accredited investor is an investor that has --

6    I'm not sure what the amount is now, but back then it was a

7    million dollars in net worth, and a qualified purchaser I

8    believe is 5 million and above in net worth.  The majority of

9    our funds' investors were qualified purchasers.

10   Q.  Mr. Robson, if we can zoom out here and go to the next page

11   and look at paragraph 2 and highlight "the authority" or zoom

12   in on all of paragraph 2.

13           Mr. SanFilippo, what is the authority of the

14   investment manager pursuant to this agreement?

15           MR. GLUCK:  Objection.  Document speaks for itself.

16   Lacks foundation.

17           THE COURT:  No, I think -- the document does speak for

18   itself, but I think it would be helpful for the jury to have a

19   brief overview, so I am going to allow it.

20   A.  So the authority of the investment manager is -- without

21   going into all the details here, the basic authority of the

22   investment manager is to manage the day-to-day of the fund, and

23   the fund includes all of those companies I just described, the

24   master fund and the feeder funds.  It manages -- it makes

25   decisions on all the trading activity.  It just -- it has the

Mc82Pla5                          SanFilippo - Direct

1    power to act on behalf of the master fund and make any

2    decisions, make any transactions.

3    Q.  And if you look at, for example, 2(e), and we zoom in

4    there, does that empower the investment manager to engage

5    personnel and, halfway down, in its reasonable discretion

6    engage professionals, delegate authority, that sort of thing?

7    A.  Yes.

8    Q.  And you were personnel that was hired by the investment

9    manager, and authority was delegated to you, for example?

10   A.  Yes.

11   Q.  Okay.

12   A.  So I was an employee of the investment manager.

13   Q.  You were an officer, right?

14   A.  Yes.

15   Q.  And you accepted the role of an officer of Platinum

16   Management.

17   A.  That's correct.

18   Q.  And if we look at the signature pages to this IMA, we

19   should be looking at pages 14 and 15.  Okay.  Thank you,

20   Mr. Robson.

21          It's a little hard to see on my screen, but can you

22   make out that signature?

23   A.  I can.

24   Q.  Is that the signature of Mark Nordlicht?

25   A.  Yes, it's the signature of Mark Nordlicht in various

Mc82Pla5                        SanFilippo - Direct

1    different capacities within the organization.

2    Q.  So he is signing on behalf of the investment manager,

3    Platinum Management, right?

4    A.  Yes.

5    Q.  And he is signing as a director of the intermediate fund?

6    A.  That is correct.

7    Q.  And he is signing as a director of the international fund?

8    A.  Correct.

9    Q.  And he is signing as chairman of Platinum Management.

10           Let's take a look at the next page.  Okay.  I think we

11   got it.

12           Was Mark Nordlicht, in your 11 years at Platinum

13   Management, in control of Platinum Management?

14   A.  Yes.

15   Q.  Was he in sole control of Platinum Management in your view?

16           MR. GLUCK:  Objection.

17           THE COURT:  Well, as phrased, sustained.  Sustained in

18   part because you haven't given sufficient foundation yet.

19   BY MR. HERTZBERG:

20   Q.  Did you have daily interaction with Mark Nordlicht during

21   your 11 years at Platinum Management?

22   A.  I did.

23   Q.  And what was the nature of that interaction?  Was it

24   casual, was it substantive?  Could you give the jury a flavor

25   for what your day-to-day interaction was with Mark Nordlicht.

Mc82Pla5                    SanFilippo - Direct

A.   So Mark was in charge of basically running the fund.   He
was the chief investment officer.   I would interact with him
every day on any decisions that needed to be made.   You know,
he would -- just if I had any questions regarding any
transactions or anything else, he was the primary person that I
would ask or go to for information.   If I needed an important
decision made, I would go to him.

        THE COURT:   If you know, who owned Platinum
Management?

        THE WITNESS:   So Platinum Management was owned -- a
portion -- and, again, it changed over the time period, so I
would just need clarity on what time period.

        THE COURT:   All right.   So we will say from 2013 to
2016.

        THE WITNESS:   So in 2013, Platinum Management was
owned -- a portion of Platinum Management was owned by Uri
Landesman.   I believe that portion was approximately 25
percent.   10 percent was owned by Mark Nordlicht directly and
65 percent was owned by the Mark Nordlicht Grantor Trust.

        THE COURT:   Who was that.

        THE WITNESS:   And the trustee of the Mark Nordlicht
Grantor Trust was Mark Nordlicht.   And the beneficiaries of the
grantor trust were a combination of either Mark Nordlicht
directly or Nordlicht family and the Bodner and Huberfeld
family.

Mc82Pla5                    SanFilippo - Direct

1    BY MR. HERTZBERG:

2    Q.  Did you work with Mark on valuation issues?

3    A.  So Mark was primarily in charge of valuation.  He was

4    chairman of the valuation committee.

5    Q.  And how did you take input from Mark Nordlicht on valuation

6    issues?

7    A.  A variety of ways——e-mail, telephone, in person, at a

8    valuation committee meeting, however he needed to communicate

9    with me we communicated.

10   Q.  Well, tell me about the valuation committee.  How many

11   members sat on that committee?

12   A.  I don't remember exactly, but I am going to estimate that

13   between six and nine or six and ten, somewhere around that

14   range.

15   Q.  What was the process of that committee?  How did it work?

16   A.  So at certain points the committee met monthly and at other

17   points the committee met quarterly.  It was a gathering of all

18   the members, where we would discuss all of the material

19   investments in the firm, but primarily the investments that

20   were hard to value, not the easy-to-value investments like,

21   let's say, Apple or anything that you can get an easy quote on

22   and determine valuation.

23          Also, I should mention that our third-party valuation

24   agent also participated and that they weren't members of the

25   valuation committee but they participated in our committee

1  meetings.

2          And at those meetings, we would discuss the valuations

3  of those assets and we would have portfolio managers who worked

4  for Mark Nordlicht and who were responsible for certain

5  investments, they would present information and detail to the

6  group.  And if there was any kind of sort of questions or any

7  concerns with valuation, the valuation committee members would

8  bring that up at the meeting.

9  Q.  Did Mark Nordlicht attend valuation committee meetings?

10 A.  He did.

11 Q.  Did Uri Landesman attend valuation committee meetings?

12 A.  He did.

13 Q.  Can you think of an instance where either Mark or Uri did

14 not attend either in person or by phone?

15 A.  I cannot.  But I should just backtrack for one second.

16 It's possible that later on in 2015 or 2016 that Uri didn't

17 participate in the valuation committee meetings.

18 Q.  Is that because he had health issues?

19 A.  Yes.

20 Q.  But Mark Nordlicht you recall being at every meeting of the

21 valuation committee?

22 A.  Yes.

23 Q.  Did you ever tell anyone what they could or could not say

24 at a meeting of the valuation committee?

25 A.  No.

Mc82Pla5                          SanFilippo - Direct

1   Q.  Are you certain of that?

2   A.  100 percent positive.

3   Q.  Did you witness Mark Nordlicht make executive decisions on

4   a daily basis?

5   A.  Yes.

6   Q.  Significant decisions in the context of a fund?

7   A.  Every decision, significant or not significant.

8   Q.  Well, what to order out for lunch is less significant than

9   what to value Golden Gate at, for example?

10  A.  Yes, I agree.

11  Q.  And you witnessed yourself Mark Nordlicht make those

12  decisions in realtime.

13  A.  Yes.

14  Q.  Did Mark ever say to you:  Joe, hold on, I have got to go

15  check with David Bodner before I make this decision?

16  A.  No.

17  Q.  Did Mark ever say to you:  I have to go check with Murray

18  Huberfeld before I make this decision?

19  A.  No.

20  Q.  Did David Bodner, in your 11 years at Platinum Management,

21  have any role in the valuation process?

22  A.  None whatsoever.

23  Q.  Did he have any role in Platinum Management at all in your

24  11 years at Platinum Management?

25  A.  Except --

Mc82Pla5                          SanFilippo - Direct

1              MR. GLUCK:  Objection.

2              THE COURT:  I'll allow it.

3   A.  Except the fact that, through the trust, he was a

4   beneficiary and he also was an investor in the fund, he had no

5   role in managing or making any decisions of Platinum

6   Management.

7   Q.  Did you ever witness David Bodner make a decision on any

8   issue regarding the affairs of PPVA?

9   A.  No.

10  Q.  Did anyone ever tell you that David Bodner had made a

11  decision regarding the affairs of PPVA?

12  A.  No.

13  Q.  Did anyone ever tell you that the reason they were doing

14  something or weren't doing something was because of what David

15  Bodner told them?

16             MR. GLUCK:  Objection.

17             THE COURT:  Overruled.

18  A.  No.

19  Q.  And if I asked those same questions with respect to Murray

20  Huberfeld, would you have the same answer?

21  A.  I would have the same answers.

22  Q.  So coming back to the valuation process for a moment, is

23  there a term you use in your business or in the hedge fund

24  business for determining the net asset value of the fund on any

25  given time?

Mc82Pla5                    SanFilippo - Direct

1   A.  I believe it's called striking an N-A-V, but I'm not sure

2   if that's exactly what you were referring to.

3   Q.  That's what I had in mind.  Thank you.

4           So I will say strike NAV.

5   A.  Yes.  N-A-V is also referred to as NAV.

6   Q.  Internally Platinum Management without any outside

7   professional——correct me if I am wrong——is striking NAV on a

8   monthly basis?

9   A.  Yes, that's correct, except for the -- take that back,

10  except for the fund administrator --

11  Q.  Okay.

12  A.  -- who is also a group of professionals and they also have

13  input into the NAV process.

14  Q.  So is that SS&C?

15  A.  SS&C Technologies, Inc.

16  Q.  Are they a third-party, not owned or affiliated by Platinum

17  Management or PPVA?

18  A.  Yes, they are completely independent.

19  Q.  It's a big company?

20  A.  Yes.

21  Q.  They are called a fund administrator?

22  A.  Yes, they are the largest fund administrator, I believe.

23  Q.  What is their role in striking NAV on a monthly basis?

24  A.  So, again, their role is to gather information from myself

25  and my team, to reconcile accounts, to reconcile bank balances,

1  brokerage balances, to reconcile investment balances, to come

2  up with basically P & L first at the master fund level, and

3  then it is also their responsibility to allocate it down, as I

4  explained before, to the feeder funds.  And once it's allocated

5  to the feeder funds, we can determine each partner's or each

6  shareholder's capital balance.

7  Q.  Does SS&C also have some responsibility in investor

8  communications?

9  A.  Well, they do communicate directly with investors

10 specifically when investors are entering and exiting the funds.

11 When an investor subscribes to a fund or contributes capital to

12 a fund, they have to submit their paperwork to our fund

13 administrator, SS&C.  And similar to a bank, when a bank opens

14 up a bank account, SS&C is responsible for KYC, which is "know

15 your client," so they are responsible to make sure that that

16 client is a real person, is who he says he is, and they are

17 also responsible to make sure that that investor has certified

18 that they are either an accredited investor, again, who has one

19 million in net worth or they are a qualified purchaser who has

20 5 million in net worth.

21 Q.  And are they sending monthly statements out to the

22 investors?

23 A.  After we finalize and strike our NAV and calculate all of

24 the partners' capital balances, each partner or shareholder

25 will get a statement that reflects their beginning capital

1  account balance, any subscriptions or contributions, any

2  redemptions, and income made for that month, which is used to

3  determine the -- their final ending balance for that particular

4  month.

5  Q.  I think you said earlier that SS&C was also determining the

6  value of -- easy to value assets in the PPVA portfolio, right?

7  A.  Yes.

8  Q.  So if PPVA owns Apple stock, you, Joe SanFilippo, you are

9  not determining the value of the Apple stock.  SS&C goes and

10 pulls a quote.  Is that basically how it works?

11 A.  So SS&C uses -- they used—I don't know if they still

12 do—but they used two third-party pricing companies.  They used

13 IDC and they used Bloomberg.

14 Q.  And the stock that's harder to value, that's being done

15 internally with you and your team in consultation with Mark

16 Nordlicht and others within Platinum Management.

17 A.  Yes, and those valuations are getting reviewed quarterly by

18 a third-party valuation agent who then they draft a report and

19 they send the results of that report to myself and that report

20 is also shared with the valuation committee.

21 Q.  Are those reports also shared with the auditors?

22 A.  They are.

23 Q.  So you are striking NAV on a monthly basis with the help of

24 independent SS&C, right?

25 A.  Yes.

1    Q.  And then on a quarterly basis, you have the independent

2    third-party valuators who are looking backward over the quarter

3    just ended, is that right?

4    A.  That's correct.

5    Q.  And they are providing Platinum Management with an opinion

6    of their views of value for the PPVA assets.

7    A.  That's correct.

8    Q.  Right.

9           And then at year end you have the auditors who are

10   auditing financial statements for the year just ended.

11          MR. GLUCK:  Objection.  Leading, last five questions.

12          THE COURT:  Well, that's true, but you didn't object

13   until this one, but you objected to this one, so this one your

14   objection is sustained.

15   BY MR. HERTZBERG:

16   Q.  Are the auditors coming in after 12/31 each year?

17   A.  As I explained before, they come in a couple of months

18   before just to do planning and gather some information, and

19   then they do come in again after year end, once the numbers are

20   finalized, to do this real substantive part of their testing.

21   Q.  Can we pull up just for the witness, please, 514.

22          Mr. SanFilippo, this is an org chart that was -- it's

23   not a Platinum document.  It's prepared by counsel.  Can you

24   take a look at it and tell me if it looks generally correct to

25   you?

Mc82Pla5                        SanFilippo – Direct

1           MR. GLUCK:  Objection.

2           THE COURT:  Yes, I think that is a little vague to say

3    the least, or I should put it, it sounds generally vague.

4    BY MR. HERTZBERG:

5    Q.  Mr. SanFilippo, is there anything inaccurate in this org

6    chart as you see it on your screen?

7           MR. GLUCK:  Objection.

8           THE COURT:  Does this chart reflect organization that

9    you were personally familiar with?

10          THE WITNESS:  It does.

11          THE COURT:  And having reviewed the chart, is there

12   anything inaccurate in the chart?

13          THE WITNESS:  There is nothing inaccurate.  I would

14   just say it's a combination of people that worked there

15   throughout that period of time.  It's not at any one point in

16   time.  So all these people together didn't work together at the

17   same time, if that makes sense, but they all were in the

18   correct positions when they worked for the organization.

19          THE COURT:  All right.  So this includes people for

20   various times who occupied positions, but the positions are

21   accurately stated on the chart.

22          THE WITNESS:  That's correct.

23          THE COURT:  All right.

24          MR. HERTZBERG:  We offer it.

25          MR. GLUCK:  Sidebar, your Honor.

Mc82Pla5                        SanFilippo - Direct

1          (At the sidebar)

2          MR. GLUCK:  Aside from our obvious view that he is

3   omitting certain relevant persons, but that is a fact question,

4   we have concerns about the heights and levels.  The problem is

5   you have got a bunch of people and they are all being

6   represented at the same level when that's neither the role

7   within the organization nor the relative power.

8          THE COURT:  So as I understand your objection, what

9   you are asking for is to *voir dire* the witness on this chart.

10          MR. GLUCK:  I could probably do that during cross.

11          THE COURT:  That's what you are permitted to do under

12   the law of the United States.  I would suggest you invoke the

13   law of the United States at this point and put some questions

14   to the witness.

15          MR. HERTZBERG:  Thank you, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1     (In open court)

2          THE COURT:  Ladies and gentlemen, when an exhibit of

3     this sort is offered, counsel who has possible objections is

4     allowed to put some questions to see whether there is a basis

5     for those objections or not.  This is known in what's called

6     law French as "*voir dire*" or if you are a lawyer in Texas it is

7     *voir dire*.  That's why we interrupt for some questions from

8     plaintiffs' counsel here.

9     *VOIR DIRE* EXAMINATION

10    BY MR. GLUCK:

11    Q.  Let's start on the first row of the chart.  Why do you have

12    the chief investment officer listed above the president?

13    A.  It looks like he is listed to the side, not necessarily

14    above.

15    Q.  The side example would be David Levy and Daniel Saks.  Is

16    there a particular reason why Mark Nordlicht is elevated above

17    the president?

18    A.  I'm not sure.  I didn't put this chart together, but it

19    looks to me like he is on the side.  I will take it for your

20    word that he is above, but it looks to me that he is on the

21    side.

22         THE COURT:  Are we looking at the same thing?

23         THE WITNESS:  Yes.

24         THE COURT:  So at the very top there is a box that

25    says "Mark Nordlicht, Chief Investment Officer."  Do you see

Mc82Pla5                          SanFilippo - Direct

```
 1   that.
 2            THE WITNESS:  Correct.  And then there is two arrows
 3   pointing down to the --
 4            THE COURT:  Excuse me.
 5            THE WITNESS:  Sorry.
 6            THE COURT:  Then there are two downward pointing
 7   arrows, right?  One entitled "risk committee" and one entitled
 8   "valuation committee."  Do you see that?
 9            THE WITNESS:  Yes.
10            THE COURT:  And then there is -- parallel to valuation
11   committee, there is a box tied to that by arrows saying "Uri
12   Landesman, President."  Do you see that?
13            THE WITNESS:  I do see that.
14            THE COURT:  So this chart appears to be putting
15   Mr. Nordlicht above Mr. Landesman in the organization, yes?
16            THE WITNESS:  I'm not sure if I see it that way
17   because --
18            THE COURT:  You don't think that this -- that a
19   downward arrow means below?
20            THE WITNESS:  I guess if the downward arrow were
21   pointing to Landesman like it points to the risk committee and
22   the valuation committee, I would agree.
23            THE COURT:  Excuse me.  Excuse me.  The -- on the
24   right-hand side, under Mr. Nordlicht, there is a downward arrow
25   to the valuation committee.  Do you see that?
```

Mc82Pla5                         SanFilippo - Direct

1          THE WITNESS:  I do see that.

2          THE COURT:  And then parallel with that there is Uri

3     Landesman, correct?

4          THE WITNESS:  I see that, yes, correct.

5          THE COURT:  So the chart says that Mr. Landesman, the

6     president, is tied to the valuation committee, yes?

7          THE WITNESS:  Correct.

8          THE COURT:  And then above that is Mr. Nordlicht,

9     right?

10         THE WITNESS:  Correct.  Mr. Nordlicht was the chairman

11    of the valuation committee.  So he is above the valuation

12    committee.  And he was also the chairman of the risk committee,

13    so he is above the risk committee.

14         THE COURT:  So you are saying this does reflect the

15    actual hierarchy as between Mr. Nordlicht and Mr. Landesman in

16    your view.

17         THE WITNESS:  With specific to the risk committee and

18    the valuation committee, I would say yes.  At this point in

19    time or at a certain point of this time, Uri Landesman was the

20    president and the managing member of Platinum Management

21    New York LLC.  So --

22         THE COURT:  So maybe now I am not fully understanding.

23    So you are saying this chart does not fully reflect the

24    hierarchy between Mr. Nordlicht and Mr. Landesman.

25         THE WITNESS:  If it's truly below at this point, I

1    would say it doesn't, but I'm not seeing it as being below.

2    I'm seeing it as being --

3              THE COURT:  I hear what you are saying, but the

4    objection to the chart is sustained.

5              MR. GLUCK:  Only had nine more.

6              MR. HERTZBERG:  You can take it down, Mr. Robson.

7    Thank you.

8    BY MR. HERTZBERG:

9    Q.  Mr. SanFilippo, what was your role in the preparation of

10   the financial statements for PPVA?

11   A.  When you say financial statements, do you mean the annual

12   financial statements or the monthly financial statements or --

13   Q.  I do mean the annual.

14   A.  So it was my responsibility to prepare the financial

15   statements and all of the note disclosures to those financial

16   statements.

17   Q.  Okay.  And then are you -- do you have a role in

18   interacting with the auditors with respect to the financial

19   statements?

20   A.  Yes, it was -- that was my primary role in the audit,

21   interact with the auditors.

22   Q.  So let's pull up DX 569.

23              Mr. SanFilippo, do you recognize DX 569?

24   A.  Yes.

25   Q.  What is it?

Mc82Pla5                    SanFilippo - Direct

A.   It's the annual audited financial statement of Platinum

Partners Value Arbitrage Fund, LP, and its subsidiaries, also

referred to as the master fund, and it's for the year ended

December 31, 2013.

          MR. HERTZBERG:  We offer it.

          MS. SHEN:  It's in.

          MR. HERTZBERG:  Oh, it's in?

          THE COURT:  Sorry?  Was there any objection?

          MR. GLUCK:  It's already in.

          THE COURT:  Oh, it's already into evidence.

BY MR. HERTZBERG:

Q.   And if we turn to page four of the financial statement,

which I think is five of the PDF, what is this page of the

financial statements commonly known as?

A.   So this is the consolidated statement of financial

condition, which also can be referred to as a balance sheet.

Q.   And are the assets on top and the liabilities below?

A.   Yes.  The assets are on top and then there is a subtotal,

and then directly below that there are the liabilities and

partners' capital.

Q.   Is the total partners' capital, which is on the bottom of

the page——Mr. Robson could zoom in there——that 757.9 million,

is that the net asset value of the fund?

A.   Yes, assets minus liabilities equals the partners' capital

in this case which can also be referred to as the net asset

1    value.

2    Q.  So on this page what we see is a billion dollars in assets

3    and 242.3 in liabilities and, with some adjustments, that's how

4    you get to the NAV of roughly 758 million, correct?

5    A.  Correct.

6    Q.  Now, there is a line under assets, six lines down, that

7    says "cash."  Do you see that?

8    A.  Yes.

9    Q.  And if Mr. Robson would highlight across that line, is that

10   a representation that PPVA as of December 31, 2013 had cash on

11   hand of $135,000?

12   A.  We had cash at our bank accounts in hand of $135,210.

13   Q.  Is that the liquidity of PPVA at that point in time?

14           MR. GLUCK:  Objection, liquidity.

15           THE COURT:  Well, are you familiar with the term

16   "liquidity"?

17           THE WITNESS:  I am.

18           THE COURT:  What does it mean?

19           THE WITNESS:  Basically it means any asset that you

20   can turn into cash within basically 30 days or a short-term

21   period is a liquid asset, and that reflects liquidity.

22           THE COURT:  So with that definition, is that the same

23   as the figure given here for cash?

24           THE WITNESS:  I would say you have to review your

25   assets and your liabilities and distinguish each asset and each

Mc82Pla5                    SanFilippo - Direct

1   liability either as liquid or nonliquid and then you can make a

2   determination from there.

3           THE COURT:  All right.  Put another question.

4   BY MR. HERTZBERG:

5   Q.  If we turn to page 6 of the PDF and if we could just zoom

6   in on sort of the top half of that page up to "total limited

7   liability company," that's right.  Right there.

8           Under the heading "Investments in Securities," there

9   are two positions right at the top, Golden Gate Oil and

10  Black Elk Energy.  Do you see that Mr. SanFilippo?

11  A.  I do.

12  Q.  If we zoom out of that, then we see there are some other

13  assets, but they are listed underneath the double line.  So my

14  question to you is why are Golden Gate and Black Elk listed

15  right at the top of that?

16          THE COURT:  Just for clarification, I think you said

17  page 6, but I believe this is numbered as page 5.

18          MR. HERTZBERG:  It's page 6 of the PDF and that's how

19  I have to communicate to my friend who is controlling the

20  computer, but you are right, your Honor, it is page 5 of the

21  document.

22          THE COURT:  All right.  Go ahead.

23  A.  Can you ask that question again?  I'm sorry.

24  Q.  Yes.  Why are Golden Gate and Black Elk singled out on top

25  when everything else is down below underneath the double lines?

Mc82Pla5                          SanFilippo - Direct

1    A.   So for one, this section is talking about a specific

2    security type, limited liability company interests.  And in

3    general, actually it is required by generally accepted

4    accounting principles that any investment in the aggregate

5    that's over 5 percent of partners' capital, or also referred to

6    as NAV, must be disclosed individually in the condensed

7    schedule of investments.  Any asset that is -- or any portfolio

8    company, which is also referred to as an investment, that in

9    the aggregate is below 5 percent of the partners' capital does

10   not need to be disclosed separately in the condensed schedule

11   of investments.

12   Q.   So Golden Gate Oil has its own line item at 173.1 million.

13   Am I reading that being correctly?

14   A.   Yes.

15   Q.   And Black Elk Energy Offshore has its own line item at 148

16   million, correct?

17   A.   Correct.

18   Q.   And then there is another line that's "other," and the

19   "other" is 517,000, right?

20   A.   Correct.

21   Q.   And these are the -- that's the total limited liability

22   company interest.  Those aren't the only positions that the

23   fund owns.  Those are the limited liability company interests,

24   right?

25   A.   Along with -- so there are three different industries

Mc82Pla5                    SanFilippo - Direct

listed here under limited liability company interests.  There
is the energy industry, which Black Elk, Golden Gate, and other
portfolio companies are listed, and then there is the financial
and consumer cyclical industries.  Those three
together——energy, financial, consumer cyclical——add up to your
total limited liability company interests.

Q.  I see.

So and these -- there are three columns here——level 1,
level 2, level 3——and all of these positions are in level 3.
So can you just explain what level 3 means and why they are in
that column.

A.  So a level 3 asset is an asset that has no ready, available
market.

Q.  And does that require the judgment of the fund manager to
determine the value of the asset?

A.  Yes.

Q.  If we look at page 28 of the PDF or 27 of the document, is
this explained here under level 3, if Mr. Robson can zoom in
under level 3 there, where it says, "Valuations based on inputs
that are unobservable, supported by little or no market
activity," etc.  Is that describing the level 3 assets?

A.  Yes.

MR. GLUCK:  Objection.  Objection to the words on the
page or is he asking him to testify?

THE COURT:  I'll allow it.

Mc82Pla5                    SanFilippo - Direct

1          The value placed here on Black Elk Energy Offshore
2    Operations is 148 million plus, yes?
3          THE WITNESS:  Yes.
4          THE COURT:  Had there been an explosion in connection
5    with Black Elk at an earlier point in time?
6          THE WITNESS:  Yes, I believe that was in either '12 or
7    '11.  I can't recall the exact year.
8          THE COURT:  And you reviewed these financial
9    statements and approved them?
10         THE WITNESS:  I prepared the financial statements.
11         THE COURT:  And where in this document does it refer
12   to that explosion?
13         THE WITNESS:  I'm not sure that it does.  I would have
14   to read the document again.
15         THE COURT:  So here it says, underneath "Black Elk
16   Energy Offshore Operations (notes 3 and 4)."  Do you see that?
17         THE WITNESS:  I'm stuck on the page here that has the
18   level, the description, the definition of a level 3 asset.
19         THE COURT:  I'm sorry.  Would someone please go back
20   to the page I was referring to, which was what the document
21   listed as page 5 and counsel referred to as page 6.
22         All right.  So here we have Black Elk Energy Offshore
23   Operations as a level 3 asset worth -- or the portion owned by
24   Platinum Partners is 173 million plus, right?
25         THE WITNESS:  That's correct.

1          THE COURT:  Then there is a reference to notes 3 and

2     4.

3          THE WITNESS:  That is correct.

4          THE COURT:  And if one wanted to look at notes 3 and

5     4, one would go towards the very back of this document, yes?

6          THE WITNESS:  Sure.  The notes to the financial

7     statements are immediately following the cash flow statement.

8     So somewhere in the middle of the document I would guess.

9          THE COURT:  And, for example, on page what the

10    document lists as page 37 it says, under "Black Elk Energy

11    Offshore Operations and its wholly owned subsidiary

12    (collectively BEEOO) is a Houston-based oil and natural gas

13    company engaged in the exploration, development, production,

14    and exploration of oil and natural gas properties."  Do you see

15    that?

16         THE WITNESS:  I do.

17         THE COURT:  Now, we go down further, to the top of

18    page 38, it says "for the years ended December 31, 2013 and

19    2012, BEEOO has been unprofitable and has been subject to

20    litigation."  Do you see that?

21         THE WITNESS:  I do see that.

22         THE COURT:  And indeed, that was litigation growing

23    out of the explosion, yes?

24         THE WITNESS:  Yes.

25         THE COURT:  So how could it have the value of 148

Mc82Pla5                          SanFilippo - Direct

million plus dollars?

        THE WITNESS:  So, Judge, is it okay if I take a step

back and just discuss the inputs that were used to value the --

        THE COURT:  Sure.

        THE WITNESS:  -- company?

        So I believe Black Elk engaged an engineer,

third-party engineer firm, called NSAI to test basically their

wells and their oilfields and to estimate how much oil they

would be able to extract and sell over the course of I believe

it's -- I don't know the exact amount of years, but I believe

it is five to ten years.  And they also factor in the cost of

extracting the oil and they factor in the cost of plugging and

abandoning the wells.  An oil and gas exploration company is

required to plug the wells and close the wells up when they are

finished their drilling.

        So what the third-party experts, the engineering

firms, do is they calculate how much oil that they believe the

company can generate and sell over the next years, and they use

that to determine future cash flows.  They apply a present

value discount to that, and that basically -- that basically

determines the current value of future cash flows, and that's a

perfectly acceptable model to value an oil and gas investment,

and this valuation was reviewed by our third-party valuation

expert, Sterling Valuation Group, which also had knowledge of

the explosion in either 2011 or 2012.  Our valuation was

Mc82Pla5                        SanFilippo - Direct

1    reviewed by -- BDO engaged their own third-party valuation

2    expert to review our valuation methodology, and they determined

3    that the valuation was reasonable.

4              THE COURT:  Let me ask you one last question --

5              THE WITNESS:  Sure.

6              THE COURT:  -- which is, and of course this is the

7    59-page, single-spaced document, which I am sure the jury will

8    want to read word for word during their deliberations, but on a

9    quick review, it does not appear that there is actual

10   description of the explosion and its impact anywhere.  Am I

11   right about that or did I miss something?

12             THE WITNESS:  Judge, I apologize, I haven't read this

13   document in a very, very long time.  I would have to read the

14   entire document.

15             THE COURT:  You did read it at the time.

16             THE WITNESS:  I wrote it at the time.

17             THE COURT:  You wrote it.

18             THE WITNESS:  Yes.

19             THE COURT:  So you don't remember whether you included

20   the description of the explosion or not?

21             THE WITNESS:  I don't remember as I sit here today

22   whether or not I --

23             THE COURT:  So your best recollection,

24   remembering—and you will have a chance at a break to review

25   it—it's your best recollection that you did not include it.

1    THE WITNESS:  I see here in this note that we did

2    disclose all the litigation that was going on with the company.

3    We disclosed the fact that the company was operating at a loss.

4    We disclosed the debt of the company.  But I don't see here any

5    particular mention of the explosion.  I'm not sure as I sit

6    here today whether that is included elsewhere in the document

7    or not.

8            THE COURT:  All right.  Counsel, go ahead.

9    BY MR. HERTZBERG:

10   Q.  Mr. SanFilippo, what is the purpose of a footnote

11   disclosure in a financial statement?

12   A.  It's to provide further information to the reader of the

13   financial statement.

14   Q.  And the --

15           THE COURT:  I thought it was to test your eyesight.

16   BY MR. HERTZBERG:

17   Q.  And the explosion that occurred -- well, do you recall

18   whether that event was publicly disclosed by Black Elk?

19   A.  I'm pretty sure it was, yes.

20   Q.  In a 10-Q or a 10-K, right?

21   A.  Yes, Black Elk was a public filer so they would have had

22   their note disclosures listed in a Q or a K.

23   Q.  And do you recall whether -- I think you said Sterling was

24   well aware of the event?

25   A.  Yes.

1    Q.  And the auditors were well aware of the event?

2    A.  Yes.

3    Q.  And did you work with the auditors to determine what was

4    and was not something that's appropriate for a financial

5    statement disclosure?

6    A.  Absolutely.  If they felt that the financial statements

7    weren't fairly represented or presented, they would have made

8    that known and they would have expressed that in their opinion.

9    Q.  And the --

10              MR. GLUCK:  Objection.  Move to strike.

11              THE COURT:  No.  I will allow it.

12   BY MR. HERTZBERG:

13   Q.  If you recall, the explosion was on one of the wells that

14   was owned by Black Elk.  Do you recall that?

15   A.  Yes.

16   Q.  Black Elk owned more than just one well, right?

17   A.  They owned a great deal of wells.

18              THE COURT:  Counsel, find a spot in the next few

19   minutes to give the jury their mid-afternoon break.

20              MR. HERTZBERG:  This is fine, Judge.  Thank you.

21              THE COURT:  Very good.  We will give you a 15-minute

22   break.

23              You may step down.  We will see you in a few minutes.

24              (Continued on next page)

25

Mc82Pla5                         SanFilippo - Direct

 1              (Jury and witness not present)

 2              THE COURT:  Please be seated.  So I think defense

 3     counsel is doing an excellent job of moving this along.  It

 4     would certainly be my hope that you could complete your direct

 5     before we end today.  I think that would be helpful to the

 6     jury.

 7              MR. HERTZBERG:  Absolutely, Judge.

 8              THE COURT:  In terms of the continuing argument on the

 9     motion, I will give plaintiffs' counsel the choice.  Do you

10     want to continue it right now for about ten minutes and then we

11     will only have a five-minute break or I have nothing after 4:30

12     today so we could have very full argument including response

13     from defense counsel at 4:30, and of course our wonderful court

14     reporters prepared to stay until midnight.  But anyway,

15     whichever you prefer, we can continue now or we will continue

16     later.

17              MR. GLUCK:  No point in breaking it up.  4:30 is fine.

18              THE COURT:  All right.  Very good.

19              (Recess)

20              (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Jury present)

2          THE COURT:  Please be seated.

3          Counsel.

4   BY MR. HERTZBERG:

5   Q.  Mr. SanFilippo, when performing an evaluation on a level 3

6   asset that is an oil and gas property, I think you explained to

7   the judge that you start with a reserve report.  Do I have that

8   right?

9   A.  Yes, that was our primary methodology, it was our primary

10  input.

11  Q.  Explain to the jury what a reserve report is, please.

12          MR. GLUCK:  Objection.

13          THE COURT:  Overruled.

14  A.  So I can explain it as to my best understanding of it, I'm

15  not an oil and gas expert, but I think, as I testified earlier,

16  the expert, the oil and gas expert, in this case it was a

17  company called NSAI.

18  Q.  That was for Black Elk; correct?

19  A.  Yes, correct.  They go out to the wells, to the fields and

20  they do certain amount of testing.

21          MR. GLUCK:  Objection.  Move to strike.

22          THE COURT:  The only question before you was what is a

23  reserve report, not what they do.

24          So what is a reserve report?

25  A.  Basically, it's --

MC8Cpla6                        SanFilippo - Direct

```
 1              THE COURT:  Let me maybe move this along.

 2              Is it their evaluation of what the remaining reserves

 3   in oil and gas are worth?

 4              THE WITNESS:  Correct.  Exactly.

 5              THE COURT:  Go ahead.

 6   Q.  And for Golden Gate, there was also a reserve report that

 7   was a foundation of your valuation methodology; correct?

 8              MR. GLUCK:  Objection.

 9   A.  Yes.

10   Q.  Who prepared that reserve report?

11              MR. GLUCK:  Vagueness, timeframe.  Which report?

12              THE COURT:  You want to make it a little more precise.

13   Q.  Is there a reserve report for Golden Gate?

14              THE COURT:  I think the question is relating to this

15   particular financial statement or are you asking in general?

16              MR. HERTZBERG:  Let me back up.

17   Q.  In 2013, PPVA held a position in a company called Golden

18   Gate Oil; correct?

19   A.  Yes.

20   Q.  And Platinum Management did valuations of that position to

21   strike NAV on a monthly basis?

22   A.  That's correct.

23   Q.  Did Platinum Management have a methodology for valuing the

24   Golden Gate position?

25   A.  Yes.
```

MC8Cpla6                         SanFilippo - Direct

1   Q.  Did that methodology involve at least, in part, reliance on

2   a reserve report?

3   A.  Yes.

4   Q.  Was that reserve report prepared by a reserve report

5   preparing firm?

6   A.  It was prepared by independent --

7          THE COURT:  I don't see how that question could be

8   answered any other way but "yes."

9   A.  It was prepared by an engineering firm that's an expert in

10  preparing these types of reports.  The name of that company

11  was -- I forget their exact name, but their initials were D&M.

12  Q.  Everybody here wants to hear you pronounce the first word

13  of D&M.  DeGolyer & McNaughton?

14  A.  That sounds right.

15         MR. HERTZBERG:  Can we pull up 608, please.

16  Q.  Mr. SanFilippo, would you, in the course of your duties as

17  CFO at Platinum Management, have had occasion to review the D&M

18  report?

19  A.  Yes.

20  Q.  Is that what you see on your screen now?

21  A.  Yes.

22         MR. HERTZBERG:  We offer it.

23         MR. GLUCK:  No objection.

24         THE COURT:  Received.

25         (Defendant's Exhibit 608 received in evidence)

MC8Cpla6                       SanFilippo - Direct

1   Q.  If we go to the second pageful this report, is this an

2   appraisal report dated as of 12/31/13?

3   A.  Yes, it's an appraisal report of certain properties owned

4   by Golden Gate Oil LLC as of December 31st, 2013.

5            MR. HERTZBERG:  The jury doesn't have a copy to go

6   through, but if you can click through with some pace to give

7   the jury a feel of what the document looks like.

8            THE COURT:  If you want my hard copy, you can have my

9   hard copy.  It's very good for weight lifting.

10           MR. HERTZBERG:  If you go to page 100 of the PDF.

11  Perfect.

12  Q.  Mr. SanFilippo, this is a fairly technical document;

13  correct?

14  A.  Very technical.

15  Q.  It's a couple hundred pages long.

16           Is D&M a renowned engineering firm that provides these

17  kinds of analyses?

18           MR. GLUCK:  Objection.

19           THE COURT:  Sustained.

20  Q.  Did Platinum Management rely on this appraisal report in

21  its valuations of Golden Gate Oil?

22  A.  Yes.

23  Q.  Did Platinum Management or did Golden Gate commission a

24  second D&M report for 2014?

25  A.  I believe so, yes.

1         MR. HERTZBERG:  Can we pull up DX 645 and go to the

2    second page.

3    Q.  Is this an appraisal report dated one year later, also by

4    D&M also for Golden Gate Oil?

5    A.  Yes.

6    Q.  Did Platinum Management receive this report at some time

7    after December 31, 2014?

8    A.  Yes.

9    Q.  And did it rely on this report in part in its valuation of

10   the GGO properties?

11   A.  Yes, it relied on these reports and they also distributed

12   this report to our third-party valuation agents and our

13   independent auditors.

14        MR. GLUCK:  Move to strike.

15        THE COURT:  Just answer the question put.

16        THE WITNESS:  Sorry.

17        MR. HERTZBERG:  The objection was not sustained,

18   correct?

19        THE COURT:  The objection is just to the latter part.

20        MR. HERTZBERG:  We offer 645.

21        MR. GLUCK:  No objection.

22        THE COURT:  Received.

23        (Defendant's Exhibit 645 received in evidence)

24   Q.  Now, how does an appraisal report, like this one, the last

25   one we looked at, how do those fit into what you were doing and

1   your team was doing to place a fair value on PPVA's GGO

2   holdings?

3   A.   It was the primary input used to value GGO holdings.  You

4   take your value of the reserves, which is your PV10 by -- which

5   is the present value of future cash flows.  So you add up your

6   total future cash flows and you apply discount and that

7   basically calculates your current value.  Then, from that

8   point, there is, based on the discretion of the investment

9   manager and based on what's going on in the company, there are

10  certain discounts or multiples applied to that PV10 report.

11  So, ultimately, you end up with your final valuation.

12  Q.   And included within D&M's analysis, is there any

13  consideration for the cost of extraction of the product from

14  the ground?

15          MR. GLUCK:  Objection.

16          THE COURT:  Overruled.

17  A.   So, yes, all of the costs of extraction are included in

18  those as a reduction of those cash flows.  In addition, the

19  cost of plugging and abandoning the wells -- when a well is

20  done producing, it's the operator's responsibility to plug and

21  close those wells.  So the cost of plugging and abandoning

22  those wells are also included in the report.

23  Q.   So was Platinum Management just taking the appraisal number

24  from D&M and reporting that as the asset value on its own

25  books?

1    A.   No.  As I explained earlier, there are certain discounts

2    and multiples then applied to come up with the ultimate

3    valuation.

4    Q.   Who determines what is an appropriate discount or a

5    multiple?

6    A.   So, the ultimate -- you're asking who determines?

7    Q.   Yeah.

8    A.   The ultimate person that made the final decision on

9    valuation and those multiples was Mark Nordlicht, our chief

10   investment officer.  He was also chairman of the valuation

11   committee.

12   Q.   Did Mark take counsel from you or others on the committee

13   as to what those multiples or discounts ought to be?

14   A.   He took counsel from his portfolio managers and the

15   third-party valuation agents.  And also, at other times, we

16   had, you know, I think this is 2014.  In 2014, we had hired an

17   in-house valuation person that came from Price Water House in

18   their valuation group, and he would take counsel from them, as

19   well, in terms of what discounts or multiples to apply.

20   Q.   And D&M prepared the reports for Golden Gate, but had a

21   different appraisal firm, NSAI, doing an appraisal report for

22   Black Elk; correct?

23   A.   Yes, that's correct.

24   Q.   Did the NSAI appraisal report factor into your valuation

25   methodology in a similar way as you just described for D&M?

MC8Cpla6                        SanFilippo - Direct

1    A.  Yes.

2    Q.  And is the multiple that you apply for Black Elk

3    necessarily the multiple or the discount that you apply for

4    GGO?

5    A.  No, not necessarily.

6    Q.  Can you explain for the jury what is a multiple?

7    A.  Sure.  So let me take a step back.  A multiple is a

8    percentage of whatever your input is versus the market

9    capitalization of the company.  When I say market

10   capitalization, it is the total value of the company, less

11   without liabilities and any back cash.

12           So, in this case, let's just say a hypothetical

13   situation, the reserve report was valued at $500,000, and our

14   investment had a market capitalization of 250.  The multiple in

15   that case would be .5.  When we're looking at valuations, we're

16   taking public companies that are similar to these types of

17   companies, Black Elk and Golden Gate, and we're looking at how

18   their market capitalization compares to the value of their PV10

19   in their reserve report.

20   Q.  Is there professional judgment involved in identifying what

21   that appropriate multiple or discount rate should be?

22   A.  Yes.

23   Q.  What about in the selection of comparable companies, is

24   there judgment involved in determining what is a comparable

25   company or is not a comparable company?

MC8Cpla6                          SanFilippo - Direct

1    A.   Yes.

2    Q.   And could two valuation professionals, acting in good

3    faith, come to different conclusions as to what is an

4    appropriate multiple or discount?

5    A.   Yes.

6    Q.   Could two valuation professionals, both acting in good

7    faith, have disagreements about what is a comparable company?

8    A.   Yes.

9    Q.   And with those disagreements, is it that you could produce

10   different valuations; correct?

11   A.   That is correct.

12   Q.   And they could be materially different?

13   A.   Yes.

14   Q.   Both determined by two individuals acting in good faith?

15   A.   Correct.

16   Q.   I think you said that the appraisal reports were passed

17   along to the independent valuators; correct?

18   A.   Both the D&M reports and the NSA reports were provided to

19   the third-party valuation agents and the auditors.

20   Q.   And did they take your model and replicate it?

21   A.   No, they came up with their own independent model using the

22   methodology they felt was appropriate.

23   Q.   How do you know that?

24   A.   Because they share their work papers with me in the course

25   of their work.

Q.   Did you determine for them what a comparable company was?

A.   No, they determined that independently.

Q.   Did you determine for them what an appropriate discount rate or multiple was?

A.   No, we did not.

        MR. HERTZBERG:  Can we pull up, please, DX 566.

Q.   Mr. SanFilippo, what is 566?

A.   So this is the Sterling Valuation Group Inc. third-party independent valuation report for the period of September 30th, 2013.

        MR. GLUCK:  We object to this.

        MR. HERTZBERG:  Your Honor, the parties have conferred and I think we may need a sidebar on 566.

        THE COURT:  All right.

        (Continued on next page)

MC8Cpla6                        SanFilippo - Direct

1              (At the sidebar)

2              MR. COHEN:  You have a copy.

3              THE COURT:  Yes, all 149 pages.

4              MR. HERTZBERG:  Your Honor, the objection is one of

5    hearsay.  We are not offering the document for its truth, we're

6    offering the document to show, first, what the state of mind

7    was of the CFO and the people who worked with the CFO in

8    striking NAV and determining valuations.  I think the document

9    is also admissible because their expert has opined and will

10   opine when he comes back on Monday that these reports are not

11   credible or not trustworthy and don't support the Platinum

12   Management numbers.

13             MR. GLUCK:  As to the latter, I can assure you that is

14   not my direct outline.  So on the former, the problem is that

15   not in for its truth is --

16             THE COURT:  If it were just the former, I would

17   sustain the objection because he can just testify I received

18   this report.

19             MR. GLUCK:  Exactly.

20             THE COURT:  And to put in the entire lengthy report

21   with all its findings and then tell the jury, but don't take

22   any of this for the truth seems, to me, to be asking them more

23   than can reasonably be expected to do.  But, if it's coming in

24   with respect to your expert, if he's going to be offering an

25   opinion about it, you're saying he's not?

MC8Cpla6                          SanFilippo - Direct

1          MR. GLUCK:  He's not.

2          THE COURT:  So then the objection is sustained.

3          Now, while we're at the sidebar, the defendant has not

4    been here all afternoon, and that's his prerogative, but I'm

5    surprised that no one mentioned it to me.  So do you know why

6    that is?

7          MR. HERTZBERG:  We had a brief conversation before the

8    jury came back in and that's when it was, right when the jury

9    was coming in, your Honor.

10         THE COURT:  Excuse me?

11         MR. HERTZBERG:  Maybe I misunderstood.

12         THE COURT:  Mr. Bodner has not been here.

13         MR. HERTZBERG:  I'm so sorry.

14         THE COURT:  The entire afternoon, as near as I can

15   tell.

16         MR. HERTZBERG:  He did have a family obligation.  I

17   don't know the details.  But we should have raised it.

18         THE COURT:  If he is willing to absent himself for

19   that long a time and allow the jury to continue, maybe tomorrow

20   we should go beyond 1 o'clock.

21         MR. HERTZBERG:  The Sabbath issue is both Mr. Bodner

22   and Mr. Lauer.

23         THE COURT:  I see.

24         MR. HERTZBERG:  I will make sure --

25         THE COURT:  If it's an issue for both of them, that's

1    a different story.  The original reason I allowed Mr. Bodner's

2    absence and instructed the jury we wouldn't sit past 1 o'clock

3    on Friday was because he, of course, has the right to be here

4    throughout, and it seemed that his intention was to be here

5    throughout and, therefore, he would have been missing whatever

6    would have occurred on Friday afternoon.  But now it appears

7    that he feels that he can absent himself for other reasons,

8    which I'm sure are legitimate, they weren't brought to the

9    attention of the Court, for hours on end.  And since we are

10   already running a little behind schedule, I'm just wondering

11   whether we should sit tomorrow now.  If Mr. Lauer has an issue,

12   where is he?  There he is.  Why don't you ask him to come to

13   the sidebar.

14          MR. HERTZBERG:  While we're waiting for Mr. Lauer,

15   with respect to 566, we are calling Sterling, the authors of

16   566.

17          THE COURT:  Then it's going to come in then, or at

18   least arguably will come in.

19          Mr. Lauer.

20          MR. LAUER:  I apologize, Judge.  I don't know exactly

21   what his family obligation was, but he said he had to go and it

22   will not happen again.  But I'm Sabbath observant, I live in

23   Lawrence, Long Island.  I've been staying in the city because

24   the traffic is impossible.

25          THE COURT:  So given it's obviously critical that you

MC8Cpla6                        SanFilippo – Direct

1    be here, not that there isn't other competent counsel on your

2    side, and I do hear that Lawrence, Long Island is –– you can't

3    even see it from here.  So I will stick with the 1 o'clock

4    cutoff.

5              MR. LAUER:  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Counsel, you do have 25 more minutes.

3              MR. HERTZBERG:  Thank you.

4    BY MR. HERTZBERG:

5    Q.  Mr. SanFilippo, before the sidebar, I think you

6    identified -- do you recall that you received quarterly

7    valuation reports from Sterling Valuation Group for the period

8    that Sterling was engaged?

9    A.  Yes.

10   Q.  Do you recall whether, without referring to the document,

11   I'm asking from your memory, do you recall whether Sterling

12   expressed an opinion as to the level 3 assets held by PPVA?

13   A.  They expressed an opinion as to the range of values.

14   Q.  And did they do that on a quarterly basis?

15   A.  Yes.

16   Q.  And did they express an opinion as to the range of values

17   for GGO?

18              MR. GLUCK:  Objection.

19              THE COURT:  Overruled.

20   A.  Yes.

21   Q.  Did they express an opinion for the range of values of

22   certain of the securities issued by Black Elk?

23   A.  Yes.

24   Q.  Are there securities issued by Black Elk that were held by

25   PPVA that Sterling did not express in the opinion?

 1    A.   Yes.

 2    Q.   And why is that?

 3    A.   Because they were publicly traded bonds.

 4    Q.   So with respect to the bonds, who determined the value on a

 5    monthly basis when you were striking NAV?

 6    A.   So that was determined by SS&C using their pricing service.

 7    Q.   So no judgment involved with respect to the bonds; correct?

 8    A.   That's correct.

 9    Q.   Platinum Management did not determine the value of the

10    bonds on a monthly basis when striking NAV?

11              MR. GLUCK:  Objection.  Leading.

12              THE COURT:  Well, I think it was also asked and

13    answered.  Sustained.

14    Q.   Do you recall whether Sterling, in its discussion of the

15    Black Elk level 3 positions, excluding the bonds, discussed in

16    its report the fact of the explosion and the potential

17    financial impact of the explosion?

18              MR. GLUCK:  Objection.

19              THE COURT:  Sustained.

20    Q.   Do you recall whether Sterling, in its discussion of the

21    Black Elk level 3 positions, excluding the bonds, discussed in

22    its report the fact of the explosion?

23              MR. GLUCK:  Same objection.

24              THE COURT:  Same ruling.

25    Q.   Did you have conversations with Sterling Valuation Group

MC8Cpla6                        SanFilippo – Direct

1   about the explosion at Black Elk?

2           MR. GLUCK:  Objection.

3           THE COURT:  You can answer that yes or no.

4   A.  Yes.

5   Q.  When did those conversations take place?

6   A.  Probably after the valuation period for the next quarter

7   subsequent to the explosion or leading up to that quarter.

8   Q.  If the explosion was in November of 2012, when would you

9   have had those discussions with Sterling?

10  A.  It's possible that we had those discussions both prior and

11  after December 31st, 2012.

12  Q.  Do you recall seeing an opinion in writing from Sterling

13  discussing that explosion?

14          THE COURT:  Sustained.

15  Q.  When you would receive an opinion --

16          MR. HERTZBERG:  You can take that down, Mr. Robson.

17  Thank you.

18  Q.  When you would receive the valuation opinion from Sterling,

19  would you note whether your valuation at the time you were

20  striking NAV was within the range determined by Sterling at the

21  end of the quarter?

22  A.  Yes.

23  Q.  And were there occasions when your valuation was within the

24  range of Sterling?

25  A.  From the best of my recollection, our valuations were

1    always within the range of Sterling, except for maybe one or

2    two immaterial differences over the course of the years.

3    Q.  And in those instances where your valuation was outside the

4    range, was it outside high or outside low?

5    A.  I believe in some cases, it could be either or.  There were

6    some cases where our valuation were slightly too high and I

7    think others, our valuations were slightly too low.

8    Q.  Would you study that and try to understand why it is that

9    they came out different from you?

10   A.  Sure.  And we would also discuss it within the valuation

11   committee and potentially adjust our valuations the next

12   quarter.

13   Q.  Did you always take it their way or did you, on other

14   occasions, stick to your guns and do it the way that you were

15   doing it?

16   A.  I honestly don't recall.  I think there were very few

17   instances and the differences weren't material.

18   Q.  And is the same true, if I asked you those questions about

19   Alvarez & Marsal, who was the doing the valuation work after

20   they replaced Sterling?

21   A.  Yes.

22   Q.  So there were occasions when your value was within their

23   range and there were occasions when your values were outside of

24   the range?

25   A.  I can't recall a specific instance on where our valuations

MC8Cpla6                          SanFilippo – Direct

were materially different from either Alvarez & Marsal or

Sterling Valuation Group.

Q.  Why do you receive valuation reports from Sterling?

          MR. GLUCK:  Asked and answered.

          THE COURT:  Yes.  Sustained.

Q.  Did Platinum Management use the valuation reports from

Sterling to confirm or modify Platinum Management's own values?

          MR. GLUCK:  Asked and answered.  Three times.

          THE COURT:  Sustained.

Q.  Did you ever, in your eleven years at Platinum Management,

ever intentionally withhold any information from either the

third-party valuator or from an auditor?

A.  Never.

Q.  Was there ever, in your eleven years at Platinum

Management, a situation where a valuator or an auditor asked

you for information or a document that you or someone on your

team didn't provide?

A.  If the document was available, we would always provide it

to our auditors or private valuation agents.

Q.  Did you ever have an valuator or auditor resign because the

auditor or valuator was denied something they asked for?

A.  No, never.

          MR. GLUCK:  Objection.  Calls for hearsay.  Move to

strike.

          THE COURT:  Overruled.  The answer will stand.

MC8Cpla6                          SanFilippo - Direct

1    Q.  Was there a risk committee at Platinum Management?

2    A.  Yes.

3    Q.  Did you attend the meetings of that committee?

4    A.  Yes.

5    Q.  Were you on that committee?

6    A.  I believe I was a member, yes.

7    Q.  And what was the work of that committee?

8    A.  So, the work of that committee, we prepared -- the reports

9    that were provided to that committee were prepared by whoever

10   our chief risk officer was at the time.  They would basically

11   identify the portfolio, identify concentrations in the

12   portfolio, and they would calculate our daily, monthly, and

13   periodic VAR, which is value at risk.  So how much the fund

14   could potentially lose in a day or a month or a quarter or a

15   year.

16   Q.  Did Uri Landesman attend the meetings of that committee?

17   A.  He did.

18   Q.  Did he chair it?

19   A.  I don't believe so.

20   Q.  And Mr. Landesman, do you recall where he came from before

21   he joined Platinum Management?

22   A.  So I believe he was a portfolio manager at ING. Capital.

23   Q.  And did he have any information about the size of the

24   portfolio that he managed before coming to Platinum?

25            MR. GLUCK:  Objection.

1    THE COURT:  Sustained.

2    Q.  What was his, Mr. Landesman, I think you said was on the

3    valuation committee; correct?

4    A.  Yes.

5    MR. GLUCK:  Asked and answered.

6    Q.  And other than that period where he was ill, he attended

7    the meetings; right?

8    MR. GLUCK:  Asked and answered.

9    THE COURT:  Well, I think there was a slight

10   modification here, so I'll allow it.

11   Was there a period when he did not attend the meeting

12   because he was ill?

13   A.  Yeah, I don't think he attended all the meetings in 2015.

14   Q.  Do you have personal knowledge of whether Mr. Landesman was

15   informed as to the valuation of the PPVA positions on a going

16   basis?

17   THE COURT:  So my question would be is that single

18   hearsay or double hearsay, possibly triple hearsay, but we

19   don't need to press the point.  Sustained.

20   Q.  Did you have any discussions with Mr. Landesman about

21   valuation at any time?

22   A.  Yes, at least during the valuation committee meetings,

23   there was discussion regarding the valuations.

24   Q.  Did you hear Mr. Landesman say things to you or at those

25   meetings that caused you to believe that he was informed on

1   valuation matters?

2   A.  So, prior to every valuation committee meeting, we provided

3   a -- or my team provided a list of all of our level 3 or harder

4   to value investments.

5           MR. GLUCK:  Move to strike.  Not responsive.

6           THE COURT:  Well, it's not directly responsive, but I

7   think it is in the ballpark.  So I will allow it and overrule

8   the objection, but put another question.

9   Q.  Was Mr. Landesman involved in marketing the fund?

10  A.  Yes.

11  Q.  And in his role in marketing the fund, was it important for

12  him to be knowledgeable about the positions of the fund?

13  A.  Yes.

14  Q.  And the values of the positions of the fund; right?

15  A.  Yes.

16  Q.  And did you ever talk with him about the values of the

17  positions of the fund in the context of preparing him for

18  marketing meetings?

19          MR. GLUCK:  Objection.  Foundation.  Preparation.

20          THE COURT:  Sustained as leading.

21  Q.  When you were having discussions with Mr. Landesman about

22  valuations, did you have an understanding as to why you were

23  having that conversation?

24  A.  So, yes.  Mr. Landesman was a member of the valuation

25  committee meeting.  He was also the president of Platinum

1    Management.  So he was provided with all of the investments

2    that were hard to value and their ultimate valuations.

3    Q.  And, in fact, you had to directly report to Mr. Landesman;

4    correct?

5    A.  Yes.

6    Q.  I'm going to switch topics.

7            Do you have a recollection as to in March of 2016, did

8    the ownership or the beneficial ownership of Platinum

9    Management change?

10   A.  Yes.

11   Q.  What do you recall about that?

12   A.  Well, actually, take a step back.  So I think the ownership

13   in the Mark Nordlicht Grantor Trust changed.  The Mark

14   Nordlicht Grantor Trust was a member of Platinum Management.

15   They owned 65 percent of Platinum Management.  So I think the

16   beneficiaries within that trust changed in March of 2016.

17           THE COURT:  And how?

18           THE WITNESS:  The trust was amended to remove the

19   Bodner and Huberfeld family interests from the trust.

20   Q.  Do you know why that occurred?

21   A.  From the best of my recollection, the fund was having

22   liquidity issues at the time and the partners -- the members of

23   the management company were looking for capital from their

24   members, including Mr. Bodner and Mr. Huberfeld.  At that

25   point, they weren't willing to contribute any more capital.  So

1   they'd agreed to give up their partnership interests or their

2   beneficiary interests in the Mark Nordlicht Grantor Trust so

3   that the grantor trust can market that ownership to a third

4   party, a group that was willing to put in the capital.

5   Q.   Did you maintain the books and records for Platinum

6   Management in addition to your responsibilities for PPVA?

7   A.   Yes.

8   Q.   And that was part of your responsibility of CFO of Platinum

9   Management; right?

10  A.   Correct.

11  Q.   Did you alter the books and records of Platinum Management

12  to reflect the fact that the beneficial ownership of the Mark

13  Nordlicht Grantor Trust had changed?

14  A.   I think I created a document while I was employed at

15  Platinum Management New York in 2016 that showed the amended

16  ownership percentages of Platinum Management LLC after the

17  change was made to the Mark Nordlicht Grantor Trust.

18  Q.   So from your perspective as CFO of Platinum Management,

19  Grosser and Manor, the Bodner and Huberfeld family entities

20  were no longer entitled to any distributions from Platinum

21  Management?

22          MR. GLUCK:   Objection.   Leading.

23          THE COURT:   I'll allow it, but I'm a little unclear.

24          Why would their giving up their ownership of the Mark

25  Nordlicht Grantor Trust improve the chances of bringing in a

1    new investor?

2           THE WITNESS:  Because then the management company

3    could potentially sell that ownership interest in the

4    management company to a third party that would be willing to

5    contribute capital in addition to his ownership interest in the

6    management company.

7           THE COURT:  What would be the benefit having that

8    ownership interest as opposed to simply an ordinary investment

9    in the fund?

10          THE WITNESS:  So the fund had -- at that point, in

11   2016, the fund had a 10-year track record of solid returns.

12   And the managers of that fund are entitled to fees as part of

13   their management of the fund.  So a third party who was coming

14   in to take a percentage of the management company would be

15   entitled to whatever percent of fees, future fees.

16          THE COURT:  So the owners of the management fund get

17   additional returns, if you will, beyond what they would get as

18   ordinary investors in the fund?

19          THE WITNESS:  That's correct.

20          THE COURT:  And is that because they had --

21          THE WITNESS:  The investment manager itself has a role

22   in managing the funds.  The beneficiaries of the grantor trust,

23   through the grantor's trust interest in Platinum Management

24   would be entitled to distributions from those fees, but they

25   would not necessarily be in a position to make decisions for

MC8Cpla6                          SanFilippo - Direct

1    the funds.  It's the grantor trust as a trustee, who is Mark

2    Nordlicht, who makes all the decisions.

3              THE COURT:  Counsel.

4              MR. HERTZBERG:  Could we pull up, in the last few

5    minutes, DX 690.

6    Q.  Mr. SanFilippo, do you recognize DX 690?

7    A.  Yes.

8    Q.  And in the generalist terms, what is it?

9    A.  So this is the comparative trial balance of Platinum

10   Partners Value Arbitrage Fund U.S. LP for the periods of

11   January 31st, 2013, and December 31st, 2012.

12             MR. HERTZBERG:  And I'll represent to counsel and the

13   Court that this is a composite --

14             MR. GLUCK:  We object to this exhibit.  It's not --

15             MR. HERTZBERG:  That contains the comparative trial

16   balance through April 30, 2016.  So this is a --

17             MR. GLUCK:  This is not a PPVA document.

18             MR. HERTZBERG:  We offer it.

19             Let me ask a question to the witness, your Honor, if I

20   may.

21   Q.  In your role as CFO of Platinum Management, is this a

22   document that you would have relied upon in the course of your

23   day-to-day duties?

24   A.  So this document is part of the -- is prepared as part of

25   the monthly net asset value calculation of the fund.  SS&C Fund

1    Services is our fund administrator.  They are the official

2    books and records of Platinum Partners and its feeder funds.

3            So this is a document -- as I explained before, we

4    provide all of the information to the fund administrator and

5    they use that information to, number one -- first step is to

6    finalize a trial balance.  From that trial balance, financial

7    statements are prepared.  A trial balance is a list of all

8    accounts of the entity — in this case, Platinum Value Arbitrage

9    Fund USA.  And those are asset accounts, viability accounts,

10   and profit and loss accounts, and equity accounts.

11   Q.  Is this part of the books and records of the PPVA feeder

12   funds?

13   A.  These are the official books and records of the PPVA feeder

14   fund.

15   Q.  If one wanted to determine what management fee had been

16   paid by the fund to the fund manager, this document is one that

17   would tell you what that management fee is?

18   A.  This document tells you, number one, if you look in the

19   section of the trial balance that's labeled balance sheet,

20   there's an account called management fee payable that tells you

21   how much the feeder fund owes the management company at that

22   point in time.

23           There's another account on this trial balance in the

24   profit and loss section that is just management fee.  So that

25   number represents the total management fee charged for the year

MC8Cpla6                    SanFilippo - Direct

1    at that point in time.

2                MR. HERTZBERG:  We offer it again.

3                THE COURT:  It's hearsay.  It's not a party record.

4                MR. HERTZBERG:  It's a business record, Judge.

5                MR. GLUCK:  Some other, not a party.

6                THE COURT:  Were you planning to put any further

7    questions to this witness, other than about this document?

8                MR. HERTZBERG:  I have the same document for the other

9    feeder fund, it's one question on each, and then I can --

10               THE COURT:  So we will let the jury go for the day, we

11   will take up argument, and I will allow you to, if they are

12   admitted, put those two questions tomorrow.

13               So, ladies and gentlemen, now please remember that on

14   Fridays we only sit until 1 o'clock.  That's because we don't

15   want to interfere with your Friday afternoon poker game.  So it

16   is important, of course, to start promptly at 9:30.  You've

17   been very good about that.  So we'll see you tomorrow at 9:30

18   a.m.

19               (Continued on next page)

20

21

22

23

24

25

MC8Cpla6                          SanFilippo - Direct

1              (Jury not present)

2              MR. HERTZBERG:  Your Honor, I want to note there is no

3    objection to this document on the exhibit list.

4              THE COURT:  So you withdraw your objection?

5              MR. GLUCK:  Because it's not on the exhibit list?

6              THE COURT:  I'm sorry?

7              MR. GLUCK:  We'll withdraw it.

8              THE COURT:  Okay.  So 690 and then what's the other

9    one?

10             MR. HERTZBERG:  687.

11             THE COURT:  So 687, 690 are received.

12             (Plaintiff's Exhibits 687, 690 received in evidence)

13             So the witness now can step down.  We'll see you at

14   9:30 tomorrow.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Mc82Pla7

1    THE COURT:  Please be seated.

2         So we are back to plaintiffs' counsel's argument on

3    the motion.  We left off at to whom would Mr. Bodner owe

4    fiduciary duties.

5         MR. GLUCK:  Right.  I submit the answer is PPVA, PPNY,

6    their investors, and approaching the zone of insolvency,

7    creditors.  In fact, the groups to whom Mr. Bodner would owe

8    fiduciary duties if he is found to be a fiduciary is exactly

9    the same as those to whom Mr. Nordlicht would owe fiduciary

10   duties.

11        THE COURT:  Okay.  So, however, of course, the

12   difference is Mr. Nordlicht held all sorts of positions that,

13   as a matter of law, impose a fiduciary duty upon him to those

14   very sentiments, whereas your argument has been that Mr. Bodner

15   achieved that same fiduciary responsibility not by assuming any

16   official position, but by other things that the evidence shows.

17   So why don't you go into that.

18        MR. GLUCK:  Correct.

19        And in particular, all that I am saying is that the

20   distinction between them is that Mr. Bodner's role was not

21   papered.  That is the difference.  We can't --

22        THE COURT:  I understand that argument, and that's

23   fine.  The question is, what is the evidence that he exercised

24   in fact a role that made him a fiduciary?  That could either be

25   because he made himself representations to X, Y, or Z on which

Mc82Pla7

1    they relied and which he knew they were relying because of his

2    position within Platinum or it could be because he

3    intentionally aided and abetted Mr. Nordlicht in the exercise

4    of Mr. Nordlicht's fiduciary responsibilities, including the

5    ones that include the alleged breach of fiduciary duty.  Which

6    of those, if you are saying both, and I thought you were saying

7    both, so what's your evidence of that on this record before

8    this jury?

9         MR. GLUCK:  Very simple answer:  Mr. Bodner exercised

10   all of the duties that a hedge fund manager would normally

11   exercise.  It's very simple.  A hedge fund manager brings in

12   investors.  A hedge fund manager directs the resultant

13   investments.  A hedge fund manager engages in logistics

14   associated with that hedge fund's operations.  Some hedge fund

15   managers who have fiduciary duties engage in only one of those

16   three areas.  It just so happens to be that Mr. Bodner engaged

17   in all three.  When anyone properly manages --

18        THE COURT:  Let's start with the first one, bringing

19   in investors.  So your adversary said, to the extent that was

20   true, it was in the early days, before any of the alleged

21   breaches occurred here, so it is irrelevant.  What about that?

22        MR. GLUCK:  Mr. Bodner's fiduciary status began at the

23   founding of the fund and did not end until it ended, if it ever

24   did.  The damages period dictated by a statute of limitations

25   has nothing to do --

Mc82Pla7

1          THE COURT:  No, I'm not talking about statute of

2     limitations.

3          MR. GLUCK:  Oh.

4          THE COURT:  I'm saying if one evidence of -- let me

5     give you a hypothetical.  So Mr. Jones has -- assumes the duty

6     of bringing in investors on years one, two, and three.  And

7     then he says or is told it is no longer your job, so he doesn't

8     do it in four, five, and six.  At that point he is no longer a

9     fiduciary with respect to the investors.

10         MR. GLUCK:  I would agree that if one wants to and the

11    party to whom the duty is owed agrees, of course it is possible

12    to relinquish by conduct fiduciary status the same way it is

13    possible to establish it by conduct.  But it is irrelevant

14    because that's not what occurred here.

15         THE COURT:  Just so I'm clear on the facts, is there

16    any evidence currently on the record in this case of Mr. Bodner

17    bringing in investors subsequent to December 2012?

18         MR. GLUCK:  Yes.

19         THE COURT:  Okay.  What's that evidence?

20         MR. GLUCK:  That evidence concerns all activities

21    related to the post lack of explosion investment raise through

22    the BEOF funds.

23         THE COURT:  Remind me what was the evidence.

24         MR. GLUCK:  The evidence is Bernie Fuchs stating that

25    he was -- Bodner directed him to get investors, but then there

Mc82Pla7

1   is also a document outlining what each of the three partners --

2   who they are going to contact.  And this, by the way, continues

3   all the way up until that Seth Gerszberg presentation which

4   highlights the Bodner-Huberfeld --

5        THE COURT:  It proposed they bring in another 20

6   million.

7        MR. GLUCK:  Precisely.

8        Rechnitz, another example, Bodner connection.  Katz,

9   another example, Bodner connection

10       THE COURT:  Okay.  You have satisfied -- I will hear

11   from defense counsel in a minute.

12       So go on to you were about to say that even though you

13   think any one of the three elements is sufficient, that you had

14   evidence of all three in this case, what's the evidence on the

15   other two?

16       MR. GLUCK:  The other two.  So the next -- once you

17   get past solicitation, then you get to—sorry, I've got to find

18   it—the investments themselves.  Now, the standard here is

19   could a reasonable juror rationally infer from the evidence

20   presented that Mr. Bodner was involved in these investments?

21   We have pointed through the testimony of Mr. Fuchs to a very

22   particular set of investments around China Horizon.  Mr. Bodner

23   was both managing, had oversight of, made decisions in respect

24   to, and followed very closely.

25       Secondly, and perhaps most importantly, I will refer

Mc82Pla7

1    the Court to Beechwood.  When Mr. Bodner is allocating, sitting

2    in that office, and I'm referring to that particular e-mail,

3    allocating what is going to come into PPVA, that is inherently

4    an investment-related decision.  Same in relation to the

5    progress of those BEOF funds.  We have testimony from

6    Mr. Latkin, who -- which this was admitted on the coconspirator

7    exception -- who was expressly told that his views and packages

8    especially regarding Golden Gate were being transmitted to

9    Bodner in connection with those partner dinners.

10         We have meetings that are hours long with

11   Mr. Nordlicht, four hours, and Mr. Steinberg, where perhaps a

12   reasonable juror might think they were talking about the

13   New York Giants, but in the context of the e-mails, especially

14   when added to a reasonable juror's availability to invoke an

15   adverse inference from Mr. Nordlicht's testimony on the Fifth

16   Amendment, is easily satisfied.

17         I just want to get to a few more.

18         Mr. Huberfeld testified that both he and Mr. Bodner

19   would routinely provide advice or consulting when asked to do

20   so.

21         Mr. Fuchs testified that the -- Mr. Bodner was in

22   these process meetings and, frankly, has rejected that each and

23   every one of these process meetings was PPCO, because what we

24   see from the record plenary is that PPVA and PPCO are mentioned

25   in the same breath, same concept.

Mc82Pla7

1          An important thing that I think is also relevant here

2     to the working of all three is this presence in the office.

3     That was the place he reported every day when he left the

4     house.  If there wasn't a holiday or somewhere to go or

5     something to do, Mr. Bodner was in the office eight hours a

6     day.  And here's how I think we can look at this.  You will --

7          THE COURT:  If I understand this part of the argument,

8     aside from everything else you have mentioned, even standing

9     alone, if someone was in the office where all the critical

10    decisions as to which a fiduciary duty would lie were being

11    made, for example, nominally by Mr. Nordlicht and he had a very

12    substantial ownership interest, a reasonable jury might, on a

13    preponderance standard, conclude even from that alone that he

14    was exercising control over those decisions or at least had

15    material input into them.  Is that the argument you are making?

16         MR. GLUCK:  That is the argument, and I have two

17    subpoints to it.

18         The first subpoint is that we have lists of meetings

19    where the meetings are not social, they are all PPVA personnel

20    investment decisions.

21         Secondly, he had his own office.  When you look at

22    three comparison cases I think, two of the three who are

23    witnesses and the other one will be cut for time, Mr. Fuchs

24    shared an office, was in the office a few days a week,

25    eventually got a partnership interest, had some oversight

Mc82Pla7

1    especially over those Chinese assets.  I think a reasonable

2    juror could, just on the Fuchs side, conclude that he was a

3    fiduciary, especially combined with Mr. Fuchs' role, admitted

4    role bringing in investors.

5         You take somebody like Kerry Propper, who is

6    completely undocumented, but I will represent to the Court

7    there's a couple of e-mails involving Kerry Propper, I'm scared

8    out of our mind.  Seth Gerszberg had basically replaced Kerry

9    Propper.  The background to that is that in 2015, very shortly

10   after the first COBA subpoena, Mr. Nordlicht took his family to

11   Israel, which is his right to do, but in the meantime there was

12   this large vacancy.  No one was at home.  You will hear from

13   Mr. Steinberg, when he is called to testify, inmates running

14   the asylum.  Mr. Propper was brought in without any paperwork,

15   no CIO, no new prospectuses.

16        THE COURT:  I need to interrupt you.  None of this is

17   presently before me in evidence.

18        MR. GLUCK:  The e-mail I am referring to is saying

19   replace Kerry Propper.  I am just providing the --

20        THE COURT:  I know, but the context is not something

21   the jury has.

22        MR. GLUCK:  I would -- my point, though, is it is

23   possible that Mr. Propper, based on his coming into the office

24   every day, managing various policies, became a fiduciary as

25   well.  Seth Gerszberg, we heard a lot from him.  He started

Mc82Pla7

1    coming into the office.  He started making presentations to
2    founders.  He started dictating policy, issuing promissory
3    notes, all sorts of stuff.  And he may well have been a
4    fiduciary as well.  I think a reasonable jury could easily find
5    those, too.
6          What we have over a period of eight years with
7    Mr. Bodner is far more than that.  And when I go through the
8    evidence now, what Mr. Lauer repeatedly is saying, you know
9    there is 5 million e-mails.  Why don't you have more?  That's
10   basically the argument.  Where are your witnesses?
11         THE COURT:  I do want to move this along.  I already
12   said to him, so you don't need to waste any time, the question
13   is not what some other e-mails that are not before the jury may
14   have shown or failed to show.  The question is what the
15   evidence before the jury reasonably can be inferred to show.
16         MR. GLUCK:  And the evidence in front of the jury will
17   show that there are e-mails to Ms. Albanese and the other
18   secretaries that are in fact business e-mails, PPVA e-mails,
19   Platinum Management e-mails that concern really important
20   issues that are going to Mr. Bodner or coming from Mr. Bodner.
21   That is what the jury will see and has seen.
22         The jury will also see that there are a dearth of
23   relevant witnesses in this case.  We called one Mr. Nordlicht,
24   but the persons who actually know, others, Mr. Levy, Mr. Small,
25   they can't -- we would be wasting time, but they are also not

Mc82Pla7

1    here to testify.

2               There is a relevance to the fact that Mr. Nordlicht

3    took the Fifth amendment on these crucial issues and that there

4    is no one else to say differently.

5               The partner meetings, the very fact that there are

6    partner meetings shows operational control, investment control,

7    and in some cases bringing in new investors.  If Mr. Bodner was

8    a mere passive investor, he would never have to go to an

9    investor meeting.  He would just collect his checks.  There

10   were a set of investor meetings that only partners were allowed

11   to attain -- attend, and at those meetings there is absolutely

12   evidence in the record that PPVA business, including core

13   positions and valuations were discussed, not merely from

14   Mr. Latkin, but from other e-mails stating, "Print out these

15   values for Dovid for the meeting today."  These things were

16   discussed at the meeting and, again, a reasonable juror could

17   infer that and, moreover, a reasonable juror could infer

18   Mr. Nordlicht's invocation of the Fifth Amendment to those

19   points to buttress what is already in evidence.

20              But these are all examples.  Within the record these

21   are examples.  What has been shown to the jury is as follows:

22              Mr. Post.  Mr. Post has represented himself as an

23   expert in the oversights and operation of hedge funds.  He

24   provided testimony that he had reviewed the complete record.

25   And that testimony was that the indications are that Mr. Bodner

Mc82Pla7

1   was not a passive member but, rather, his activity is much more

2   consistent with an active member, *i.e.*, someone who is

3   exercising the very duties of a hedge fund manager.

4           We then heard from Mr. Jed Latkin who went into the

5   office every day and saw, other than when he was traveling, and

6   saw Mr. Bodner working in his office.  He reported to

7   Mr. Landesman whose testimony was brought in through conspiracy

8   basis and he had testified that Mr. Bodner was informed of the

9   problems at Golden Gate and was interested and had views and

10  input all through these partner meetings.

11          We then heard from Mr. Fuchs and Mr. Fuchs testified

12  that not only did Mr. Bodner recommend himself as the principal

13  of the fund and the person who is overseeing Mark Nordlicht to

14  Bernie Fuchs at all times through 2016, but that with respect

15  to the many people that Mr. Fuchs brought to Platinum for a

16  potential investor, Mr. Bodner said the same thing.  It was

17  represented.

18          We heard from him what was said during group trips to

19  Mr. Marcos Katz.  And with respect to Mr. Marcos Katz:  You can

20  trust me.  We have oversight.  The fund is fine.  We heard

21  that.

22          We also saw Mr. Katz's apparent belief and

23  confirmation that that was the case via his letters.  Those

24  letters didn't come from nowhere.  We have evidence and

25  testimony in the record that showed that the overture and the

Mc82Pla7

1    trust promises were made in the first instance.

2         We have testimony from two other witnesses through the

3    deposition——Mr. Katz and Mr. Katzenstein.  Mr. Katzenstein was

4    a broker -- trader, I guess, for PPVA and he testified

5    Mr. Bodner, Mr. Huberfeld were in charge, that's why he wrote

6    to them, that's why he dealt with them.

7         The exhibits to that deposition, which I understand

8    are being uploaded, indicates that the decision tree as to

9    whether he would be retained as a broker was cut short with no

10   coupon/no pass from Mr. Huberfeld with Mr. Bodner copied.

11        We heard from Mr. Katz, Jr., and Mr. Katz, who is one

12   of these very investors to whom this duty is owed, and he

13   testified that he was personally told by Mr. Bodner that he was

14   a principal, that he was in charge, that he was overseeing the

15   funds, that Mr. Bodner was -- had detailed knowledge regarding

16   the assets and positions and they were fighting about some

17   issue about whether to start litigation on China Horizon.

18        These are all pieces of evidence that go to the

19   fiduciary point.  They are also all, by the way, all pieces of

20   evidence that go to the knowledge points.  I'm not sure that's

21   even debatable.  But obviously the presence in the office on an

22   extremely routine basis, the discussions with portfolio

23   managers on a routine basis, the advance knowledge, the e-mails

24   that we have brought into evidence regarding the status of the

25   investments, Northstar, don't talk to Bodner, he is a busybody,

Mc82Pla7

1    well, somebody talked to him and he knew the truth, which is

2    that Northstar was just the remnants of Black Elk.

3              THE COURT:   Okay.  I want to interrupt you.  I know

4    there is other evidence you want to mention.

5              Just remind me, where in the Katz deposition or

6    otherwise are the statements that you just referred to that

7    Mr. Bodner said he was in charge or words to that effect?

8              MR. GLUCK:  I will find it.  I read it this morning.

9              (Pause)

10             MR. GLUCK:  So I would refer the Court to, firstly,

11   page 20, which begins -- 20.

12             THE COURT:   I had a copy which is now in this pile,

13   but okay, thank you.  Just hand it to my law clerk.

14             (Pause)

15             MR. GLUCK:  So the guidelines at 22/20 describe your

16   interactions with David Bodner and Mr. Huberfeld.

17   BY THE COURT:

18   "Q   When you were doing that," which was a reference back to

19   interaction with Platinum or people there.

20   "Q   When you were doing that, did you interact with David

21   Bodner?

22   "A   I did.

23   "Q   What about Murray Huberfeld?

24   "A   I did as well.

25   "Q   And Mark Nordlicht as well?

Mc82Pla7

```
 1    "A    Yes.

 2    "Q    Of those, who did you interact with the most?"

 3          Of course, grammatically it should be whom did you

 4    interact with the most, but I will overlook that the

 5    grammatical error.

 6    "Q    Of those, who did you interact with the most if you can

 7    answer that?

 8    "A    Probably evenly between the three, maybe a little more,

 9    you know, I would say the three."

10          So that's not what I am asking about.

11          MR. GLUCK:  It's one of many.  The next one I will

12    refer the Court to is page 33/line 10 through 16, specific

13    statements regarding statement by Bodner to induce -- to

14    invest, maintain, and increase investment in PPVA.

15          THE COURT:  This is a reference -- if it's page 33/10,

16    it's not a reference to any statement by him.  It's a reference

17    to what was contained in the pleadings.  Line 10:

18    "Q    Looking at paragraph 3 'each of the defendants made false

19    representations to the Katzes to induce them to invest and

20    maintain and increase their investment in PPVA,' does this

21    include David Bodner?

22    "A    Yes."

23          All he is saying there is that what they were

24    alleging.

25          MR. GLUCK:  Um-hmm.  On the next couple of pages
```

Mc82Pla7

1    later, there is a confirmation that it is still true, it is

2    page 35 and of course --

3              THE COURT:  Page 35, what lines?

4              MR. GLUCK:  Okay, page 35/line 9.  35/line 9.

5              THE COURT:  Let me just read that into the record:

6    "Q   And when did you learn, when did you become aware of that,

7    that Bodner and Huberfeld were coequal partners and

8    Mr. Nordlicht was more of a junior partner?

9    "A   From just their interactions with one another.

10   "Q   From what you observed?

11   "A   From what I observed."

12             So that is at least partly responsive to the point you

13   were raising.

14             Anything else?

15             MR. GLUCK:  Sure.  There are quite a few.

16             Then line 17 through line 24.

17             THE COURT:  Well, then --

18             MR. GLUCK:  Same page.

19             THE COURT:  Now we are back to -- oh.  Well, again,

20   it's really back to the pleadings.

21             MR. GLUCK:  Back to the pleadings.  "Do you still

22   understand this to be true?  Yes."

23             THE COURT:  That's not -- that's pretty -- well, there

24   is at the very bottom of page 35, after what you have just

25   referred to, line 25:

1   "Q   That is also from your personal observations?

2   "A   Yes."

3          Okay, that's at least in the ballpark.  What else?

4          MR. GLUCK:  Sure.  I am getting some notes, but there

5   is quite a lot of testimony.  I think we could do this for

6   quite some time, but 108/line 3 through 19.

7          THE COURT:  I think while this is clearly relevant to

8   the issue at hand, it's a little bit different from what you

9   were telling me a minute ago, which was that Mr. Katz said that

10  Mr. Bodner had told him X, Y, or Z.  Now what you are

11  presenting is that this is a conclusion that Mr. Katz drew from

12  his observations.  That is definitely relevant, but I don't

13  think it's quite the same as an admission, which was what --

14         MR. GLUCK:  A little different.  He is representing

15  that all of the assets had value.

16         THE COURT:  I'm sorry.  Where are you talking to?

17         MR. GLUCK:  This is page 108.

18         THE COURT:  108.  Hold on.

19         MR. GLUCK:  There is quite a lot in this transcript.

20         THE COURT:  And I'm trying to take a look at it.  108,

21  starting at line 3:

22  "Q   Do you know whether or not Platinum had other valuable

23  assets?  Let me back up.  At this time when this exchange is

24  happening, do you know whether or not Platinum had other

25  valuable assets --

Mc82Pla7

 1   "A    I was --

 2   "Q    -- other than Agera?

 3   "A    I was told there were plenty of valuable assets.  All the

 4   assets were represented as being of value or having value.

 5   "Q    Represented by the people who are --

 6   "A    By Platinum, yeah.

 7   "Q    Including Mr. Bodner?

 8   "A    Yes."

 9           Now, that's a good example of something that may

10   support your fraud claim because the argument would be that

11   Mr. Bodner was making a representation to an investor of what

12   the Platinum assets were when he knew from his special

13   knowledge that those assets were nothing like what was being

14   represented, but on the fiduciary claim, I'm not sure it

15   supports that.

16           MR. GLUCK:  I concur with the Court's analysis.  On

17   the fiduciary level, I point to the following items, firstly,

18   the urging of Mr. Katz to stay in the fund.  That is different.

19   That's not saying everything is okay.  That's saying do not

20   redeem.

21           Secondly, obviously we have this dinner where a

22   mandate that partners not withdraw anything further is given.

23   That's fiduciary side not merely knowledge and fraud side.

24           Now, on the quote that I will give you on the

25   fiduciary side, I will only include those from this point

Mc82Pla7

1    forward.  I think we have established the knowledge.  Page 43.

2              THE COURT:  Hang on.

3              MR. GLUCK:  And that begins at line 5.

4    BY THE COURT:

5    "Q    Let me focus on Mr. Bodner if I could?

6    "A    Uh-huh.

7    "Q    Did he press your grandfather not to pass for any

8    redemptions from the fund?

9    "A    Yes.

10   "Q    Did Mr. Huberfeld do that as well?

11   "A    Yes.

12   "Q    At the time, again, let's start with Mr. Bodner, can you

13   give us a rough idea of when that was?  In other words, the

14   earliest time that you know of when Marcos Katz, your

15   grandfather, asked for redemption and Mr. Bodner either urged

16   or pressed him not to exercise those?

17   "A    I don't remember exactly.  It was probably more than one

18   occasion, in multiple meetings in New York as early as -- could

19   have been as early as 2015."

20             And then he goes on to say that he was at some of

21   those meetings.

22             So why do you say that that shows a fiduciary

23   relationship?  He is saying, you know, I know as an owner and

24   investor that this would be a bad time, so I am urging you not

25   to seek a redemption.

Mc82Pla7

1          MR. GLUCK:  But that is something that -- that is not

2     just saying, oh, everything's okay.  That is something that

3     a -- keeping money in a fund is something a hedge fund manager

4     does.  It's not something a passive investor does with special

5     knowledge.  He is saying:  Don't redeem.

6          THE COURT:  All right.

7          MR. GLUCK:  But I have more.  There is about --

8          THE COURT:  Go ahead.

9          MR. GLUCK:  -- making promises regarding the ability

10     to take out money.

11          THE COURT:  I will tell you what.  I know you have

12     more and I want to hear more, if necessary, but let me turn to

13     defense counsel at this point and then we will come back to

14     you.

15          MR. GLUCK:  If I may just one last one.  It is an

16     important one.

17          THE COURT:  Last one.

18          MR. GLUCK:  Pages 266 to 277, there is a heated

19     argument between --

20          THE COURT:  Hold on.  Hold on.

21          MR. GLUCK:  -- between --

22          THE COURT:  Hold on.

23          MR. GLUCK:  Okay.

24          THE COURT:  266/line 10:

25     "Q   From your time in the Platinum Management organization,

Mc82Pla7

1    did you consider Bodner the leader of the organization?

2    "A    Yes.

3    "Q    And what was that based on?

4    "A    Just my observations.

5    "Q    Can you give me an example of one such observation?

6    "A    Sure.  He had an office, glass office that Platinum had

7    where he summoned different people from management, and on

8    occasion I witnessed some of those meetings and led me to

9    believe that he was -- you know, if there was any disagreement

10   as to what had to be done, he was consulted and he had the last

11   word.  That was my impression.

12   "Q    And can you think of an example of a situation where he

13   had the last one?"

14         I think he meant──it's a typo──last word, but anyway.

15   "A    Well, I gave you one, the China Horizons.

16   "Q    No, what you said with China Horizons, that Mr. Bodner and

17   Mr. Huberfeld disagreed with Mr. Nordlicht and convinced him of

18   their view?

19   "A    That's one way of putting it, but I mean they had -- it

20   was their view that prevailed convincing, not convincing, I

21   don't know what was going on in Mr. Nordlicht's head.  He

22   acquiesced to the position of Mr. Huberfeld and Mr. Bodner.  So

23   whether he did it willingly or not and especially in my

24   presence, which must have been very uncomfortable.

25   "Q    And other than that situation, can you think of one where

Mc82Pla7

1    Mr. Bodner I think, as you put it, had the last word?

2    "A   I can't recall another one at this time.

3    "Q   In your time in the Platinum Management organization, did

4    you ever see or hear Mr. Bodner give attention to a valuation

5    issue?"

6         Then there was some colloquy, then the answer was:

7    "A   Did he ever give attention to a valuation issue?

8    "Q   Correct.

9    "A   Yeah, I mean, he discussed valuations all the time.

10   "Q   Okay.  Tell me about that."

11        And then there is a discussion about his giving his

12   views of valuations.

13        "He had strong opinions about values all the time."

14        Okay.  I want to hear from defense counsel.

15        MR. LAUER:  This is a little bit like a bad metaphor,

16   wrestling with a greased pig because, no offense to my

17   colleague, it's just a machine gun, rapid fire of supposed

18   facts which actually are not really supported in the record.

19        But I want to start --

20        THE COURT:  It's hard for me to picture you wrestling

21   with a greased pig holding a machine gun, but perhaps you want

22   to not mix your metaphors.

23        MR. LAUER:  Okay.  I apologize for that.

24        Let's first deal with some technical matters.  I think

25   we should phrase our motion both in terms of a motion for

Mc82Pla7

1    judgment -- motion for a judgment in our favor, but I also want

2    the Court, as I said earlier, to focus each of the years, and I

3    will get to knowledge in a minute, but I know we are focusing

4    on fiduciary, but I don't want to forget this.

5            There is no evidence that Bodner had knowledge of

6    fraudulent valuations, let's say, before February 1, 2013.

7    That would eliminate the 2012 issue.

8            There is no evidence that Bodner had actual knowledge

9    of fraudulent valuations before the middle of 2014, and that

10   would dispose of the 2013 incentive fees.

11           Let me turn to the issue.

12           THE COURT:  Let me just ask you, going to the

13   fiduciary issue, there was testimony, some of which we just

14   read, where someone who was present on the scene who observed

15   the interactions between Nordlicht and Bodner and Huberfeld

16   said that it was his observation that it was Mr. Bodner who was

17   in charge.  Let's assume for the sake of argument that that was

18   the only evidence.  Why isn't that enough to survive a motion

19   of this sort on a fiduciary duty basis?

20           MR. LAUER:  All right.  Mr. Katz, aside from the fact

21   that his deposition was simply a regurgitation of a lawsuit

22   that he brought --

23           THE COURT:  I distinguished that when I was reading

24   it, but there were questions in which he simply was asked:  It

25   says so-and-so and he affirmed that so-and-so.  That's entitled

Mc82Pla7

1    to no weight on this issue.  But then he went on to say in at

2    least some instances that he had personally observed this.

3              MR. LAUER:  Okay.  So Mr. Katz was not qualified as an

4    expert with a degree in observation.  He had no specifics.  It

5    was all this generalized, vague notion because he was

6    supporting his then pending lawsuit, and he has --

7              THE COURT:  Those are good arguments, but it was

8    admitted into evidence.  In fact, there was no objection to

9    this particular part of the deposition, and so why isn't what

10   you are saying right now perfectly sound arguments that you can

11   make to the jury, but why is it enough to say that they have

12   not given the jury enough to infer that he was the man in

13   charge?

14             MR. LAUER:  Because the fact that evidence was

15   admitted doesn't mean that the evidence is competent or the

16   evidence stands for anything.

17             THE COURT:  Well, that is -- I'm not so sure about

18   competence, but of course this was buttressed also by the

19   testimony of their expert.

20             MR. LAUER:  Your Honor, Mr. Katz does not know and did

21   not testify, and could not contradict the undisputed evidence

22   that Mr. Nordlicht had legal, contractual control of Platinum

23   Management.

24             THE COURT:  Let's deal with that because you made that

25   point before, and it is certainly a relevant point, but that's

Mc82Pla7

1      not their theory.  Their theory is, yeah, he was the front man,

2      but the guy really calling the shots at least in important

3      ways, including some decisions where there was disagreement,

4      was Mr. Bodner.

5              MR. LAUER:  Yeah, but I think, your Honor, even if we

6      were going to anoint Mr. Katz, at a minimum, in order to

7      establish that in fact Mr. Bodner had control over

8      Mr. Nordlicht as opposed to having the capacity in the two

9      occasions that Katz made these observations, there would have

10     to be a context that Mr. Nordlicht strongly disagreed and

11     Mr. Bodner said, I don't care if you disagree, you have to do

12     it.

13             To the contrary, when Katz was examined and said,

14     well, did he basically accept their view and he said, I can't

15     say -- I can't tell you what's in Nordlicht's mind.  What that

16     does is contradict the rationale for saying Katz is providing

17     meaningful information on who is in charge.  He is providing

18     some meaningful information, if I credit him, in the dynamic of

19     that particular meeting.

20             But what you would need -- what you need from

21     Mr. Katz, which you don't have, is Katz saying, look, I was in

22     this meeting, I could tell you exactly what was going on, Mark

23     Nordlicht wanted to do this, he was pleading to do this, and

24     David Bodner -- and I don't know how it is that Bodner has this

25     ability, but David Bodner said to Mark, I don't care, you have

Mc82Pla7

1    to do what I tell you.

2              In contrast, the only other meeting that we have had

3    some testimony about, Mr. Fuchs talking about his dinner

4    meeting, when David Bodner expressed the view that the

5    valuations were creating -- were exaggerating the liquidity

6    problem, Mark Nordlicht told David Bodner to go back to Monsey

7    and go back to Yeshiva.

8              So I think to respond, without dwelling on Katz,

9    because I think at the end of the day, Katz is making an

10   observation, but he doesn't know why Mark is accepting the

11   view, is accepting the view because he has to, that somehow

12   there is this unwritten -- unwritten side deal that no one has

13   ever heard of or suggested, or Mark basically says, you know

14   what, you guys are right.  You know, I'm impetuous, you know

15   I'm impetuous.  Everybody says, you know, I see things a

16   certain way, and you guys are saying keep your feet on the

17   ground.

18             So enough with Michael Katz.  Let me talk a little bit

19   about this whole Marcos Katz thing, because it's the only

20   substantive matter.

21             My colleague likes to keep talking about this is

22   manager activity, this is not passive activity.  Mr. Bodner was

23   an owner.  He is an owner of a business.  He's got $40 million

24   invested in the assets that are being managed by this business,

25   and he has almost a 25 percent interest in the profits of this

Mc82Pla7

1    business that was throwing off millions of dollars a year in

2    the good years.

3          Now, to say that you become a fiduciary because a man

4    in this particular fund has an office -- which originally was

5    their office before they invited Mark in in 2003 to start the

6    fund in the first place.  But to say that having an office when

7    you are one of the owners and now you are a fiduciary is just

8    not substantive.

9          THE COURT:  Well, fair enough as far as that goes, but

10   why shouldn't -- why couldn't a reasonable juror say that once

11   you add the fact is that, number one, ownership provides a

12   certain amount of inherent power on its own, then you add to

13   that the fact that he was there all the time, and then you add

14   to that the fact that he wasn't just sitting at his desk, he

15   was going to meetings and bringing other people into his office

16   to discuss a bunch of things, including valuation, that maybe

17   he wasn't the ultimate authority, but he was exercising full

18   control?

19         There are arguments the other way.  I think your

20   argument about the -- what I will call the Monsey/yeshiva

21   incident, just because it is so colorful, I don't know how many

22   yeshivas there really are in Monsey.

23         MR. LAUER:  Many.

24         THE COURT:  But I know we are talking about Yeshiva

25   University in part and yeshiva, a school.  Anyway.

Mc82Pla7

1          That cuts the other way.  That's an argument to the

2     jury that I am sure you would make.  But why, taking everything

3     most favorably to the plaintiff, as I must do, why isn't that

4     combination of circumstances suggestive sufficiently for the

5     jury to conclude that he is really exercising at least some

6     control?

7          MR. LAUER:  Because -- I'm going to answer in two

8     parts.

9          THE COURT:  Okay.

10         MR. LAUER:  First I'm going to draw an analogy to

11    Marcos Katz.  Marcos Katz is another owner.  He doesn't own

12    Platinum Management, but he owns a $45 million interest in the

13    fund.  And the testimony was this is not an institutionalized

14    fund; it's a friends and family fund.  Marcos Katz, right, gets

15    periodic reports, and he's got a grandson who is sitting in

16    Platinum when he wants to and he was involved enough to

17    actually get involved in some matters.  So Marcos Katz is not a

18    fiduciary; he is a very interested owner who gets reports on

19    what's going on.

20         When they talk to Marcos Katz and they say, Marcos,

21    it's not a good idea for you to pull your money out, we don't

22    have the money, we are all owners, I've got $40 million in,

23    Murray's got $40 million in, Mark's got $40 million in, you

24    have $40 million in, he --

25         THE COURT:  That's a good point, too, but Michael Katz

Mc82Pla7

1   is not saying -- I accept that Michael Katz is there to be the

2   eyes and ears for his grandfather on this substantial

3   investment, but Michael Katz is not saying, Come into my

4   office, Mr. Nordlicht, Mr. Huberfeld, things like that because

5   he knows he doesn't have that power.

6           MR. LAUER:  Well, let me address that.

7           There were lots of e-mails, lots of offices, lots of

8   office meetings, and almost no real testimony that these

9   meetings involved the specific details of managing, supervising

10  what was going on.  To the contrary, and that's the shame of

11  this, to the contrary, they had hundreds of e-mails with

12  respect to calendar events, but they didn't call any witnesses

13  to discuss who was at that.  And when you look at some of those

14  names, you will see, without any testimony, that those are

15  orthodox Jewish business men engaged in charity work, because

16  that's what these wealthy orthodox Jewish men spend a lot of

17  time on, and they play this calendar pure innuendo.

18          Let's talk about Rechnitz, right, or this idea that

19  Mr. Bodner solicited investors.  What we saw in e-mails is that

20  Murray Huberfeld had a relationship with Rechnitz.  Fuchs,

21  Huberfeld went out and met with Rechnitz.  And then there was

22  this e-mail, and the only connection with Bodner is his

23  secretary says Bodner will call Mark.

24          Then they talk about soliciting investors to

25  Black Elk, and there is an e-mail that says David should call

Mc82Pla7

1    these people.  But they didn't follow up.  They didn't offer

2    any evidence on whether he did call any of these people because

3    they know from deposition testimony from Elbogen that, Bodner

4    didn't call me.  There is no evidence that Bodner acted on it.

5    So with respect to -- so that's the first answer.

6          The second answer, to be a fiduciary, it's a two-way

7    street.  If you are going to put -- if you are going to be

8    accused of failing to meet your duty, failing to meet the

9    responsibility, you have to manifest in some way to the

10   relevant period that you are accepting your duty.  Now, in the

11   case of Bodner and Platinum Management, who is the relevant

12   people?  The relevant people are Mark Nordlicht to start and

13   any of the other partners in Platinum Management who are the

14   senior executives.  And if anything, the record in this case is

15   abundantly clear that not only did Mr. Bodner not implicitly

16   assume responsibility, but he explicitly disclaimed

17   responsibility.  Basically, I am putting my money in and I'm an

18   owner and I'm happy with the structure.  I'm a passive owner.

19   I have no power.

20          So from Platinum Management's perspective, Mark

21   Nordlicht, who runs Platinum Management, Uri Landesman, who was

22   president, they have no expectation that David Bodner is going

23   to be doing anything.  He is a resource.  He is an interested

24   owner.  He is someone who can put money in if you ask him.  He

25   is someone who can help out and go to visit Marcos Katz to try

Mc82Pla7

1     to calm down Marcos Katz.  But he accepted no responsibility.

2     And if you think about it, how could it be that someone who

3     specifically says I don't want any responsibility, I don't have

4     any responsibility, I don't want to be known to have any

5     responsibility --

6             THE COURT:  Whoa, whoa.  Let's take Marcos Katz.

7     Where is it that you see Mr. Bodner saying to Mr. Katz:  I

8     don't want any responsibility?

9             MR. LAUER:  No, I'm not addressing Katz.  I'm

10    addressing PPVA and Platinum Management.

11            THE COURT:  Well, but --

12            MR. LAUER:  I think that this --

13            THE COURT:  But with respect to Mr. Katz, clearly the

14    evidence shows, both from him and from his wife, as well as his

15    son, but just some of the letters that came in, that they

16    regarded him as having accepted responsibility.

17            MR. LAUER:  So let's assume, let's assume that there

18    was enough evidence that Marcos Katz had some level of trust in

19    David Bodner, right?  Marcos Katz has a right under that

20    scenario to say to David Bodner, I relied on you.  You let me

21    down, I'm suing you, right?  This case is not on behalf of

22    Marcos Katz.  It's on behalf of PPVA.  There are investor

23    suits.  Thankfully there were only one or two involving my

24    client.  But this case is not Marcos Katz.  This case is PPVA

25    suing for incentive fees and management fees, claiming that

Mc82Pla7

1    Platinum Management breached its fiduciary obligation and that

2    Mr. Bodner somehow was responsible for aiding and abetting or

3    allowing Platinum Management to continue to do this.

4            So the focus is on Platinum Management and PPVA, and

5    in the context of Mr. Bodner's role in Platinum Management and

6    Mr. Bodner's indirect role, if any, with PPVA—that's what I

7    was addressing—the evidence was established from Huberfeld and

8    I think others that he disclaimed responsibility.  He didn't

9    want to have a role.  So you can't make someone a fiduciary by

10   being an interested owner.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  You've made many good points.

2     So let me hear again from plaintiffs' counsel.  But I think

3     there are two points in particular, I'll everything you want to

4     say, but two points in particular that you ought to address,

5     and that is much of the evidence that suggests that Mr. Bodner

6     was exercising control or partial control or whatever, is

7     fairly conclusory in nature.  It was not objected to, so it's

8     in evidence, but it's not supported, defense counsel argues, by

9     specific instances where that alleged control was exercised,

10     and he even gives an example where Mr. Bodner was very upset

11     about the valuations and Mr. Nordlicht told him, to use a bad

12     analogy, go fly a kite.

13          The second question I think you need to address is one

14     that we've already discussed, but defense counsel brought it up

15     again, is to whom is the fiduciary duty owed.

16          MR. GLUCK:  The first thing that I would like to

17     address on these issues of specific instances is a categorical

18     rejection that the standard is absolute control.

19          THE COURT:  I accept it.  It has to be material.

20          MR. GLUCK:  It has to be material.  So I would like to

21     flip, with respect, Mr. Lauer's description of that dinner on

22     its absolute head.  The question is not whether Mr. Bodner was

23     some sort of dictator --

24          THE COURT:  Flipping that dinner on its head is

25     another metaphor that is difficult to swallow.

MC8Cpla8

1              MR. GLUCK:  Sweet, but very good.  My point, though,

2    it is irrelevant whether a portion of the decree was followed,

3    no management fees further, or that one portion, which says go

4    mark the books differently wasn't followed.  The question was

5    not absolute control, it is some control.  Our argument is not

6    that Nordlicht was a frontman, but really there was a

7    totalitarian behind him doing everything and controlling

8    absolutely everything.  There was just control.  It doesn't

9    have to be absolute.  That's the big point.

10             Now let's talk about the specific instances of

11   control, and if the Court accepts it, rejecting this notion

12   that simply to be a fiduciary, one must be effectively a shadow

13   dictator.

14             Firstly, the dinner.  Both the raising of the issue of

15   fees and who's going to get them, as Mr. Lauer just said, this

16   thing is throwing off millions a year, and all of a sudden one

17   person, which affects the whole group, is saying no more

18   millions a year wouldn't go over so well at a law firm, right.

19   That was serious stuff.

20             Secondly, the notion that someone would feel

21   comfortable raising the sorts of valuation issues in their

22   implications at a dinner like this itself means control.  What

23   we don't know, I agree it's not in evidence either way, we

24   don't know whether Nordlicht declined to remark the fund

25   because Nordlicht continued to assist upon it or whether they

MC8Cpla8

reached an agreement and accommodation, but they haven't proved
that either.  What we know is that a demand was made.  We have
no idea that it was not withdrawn or accommodated so far.  So
that's the dinner.

         Secondly, with respect, Mr. Lauer has made a series of
arguments stating that what Mr. Bodner did is just consistent
with a high net worth envisual overseeing his investment.  That
completely discounts the admitted expert testimony of this case
from Mr. Post.  What he is saying is that is actually not true.
I don't know, I'm not the expert.  We have an expert for
exactly this purpose, and that contention was explicitly
rejected.

         Next, we have hard evidence, like get Murray and David
on the phone.  Context, which three witnesses testified about
this, context, an interest payment for Northstar is late and
needs to be made from Platinum to Beechwood.  The insurance guy
at Beechwood is freaking out.  What he says is, Mark, if you
personally can't figure this out, we need to get Murray and
David on the phone.  That is evidence of control, not
dictatorial control, but control.  And that's a creditor, by
the way.  Creditor, former creditor in our case who views
Mr. Bodner as the fiduciary.  I'm going to come to that whole
issue of who the duties are owed to in a moment because it was
insolvent going back to 2013.

         Next, with respect, once again, just like ignoring

MC8Cpla8

Post's testimony, we have an ignoring of Mr. Fuchs' substantive
testimony.  Mr. Fuchs' substantive testimony was that in all of
Mr. Fuchs' dealing, whether they be with joint context
investors or his own personal, Mr. Bodner did explicitly make
the representations that this was his fund, which he oversaw
and controlled, and your money's safe with me.  Those were
explicit, that was half his testimony.

        Next, for example, Plaintiffs' Exhibit 479.  Now this
is within the damages period and also express knowledge of the
overvaluation because it happened just after the Black Elk
explosion.  Question, November, big explosion, how do we tell
this to Fuchs, one of our biggest investors, he wasn't a
partner yet.  Landesman has to get permission to tell Fuchs the
truth about Black Elk.  Dictator?  No.  Material?  Yes.

        Next, Mr. Lauer's rendition ignores the testimony of
Jed Latkin, and I will refer the Court to 306, line 21, to 307,
line 12.  And in those lines, Mr. Latkin states that Mark
Nordlicht and Uri stated that Bodner and Huberfeld had ultimate
authority, and my colleague, just so I can do the quote
properly, is picking it up.

        What he states is, what is your understanding as to
the roles of David Bodner and Murray Huberfeld at Platinum?
Answer, my understanding was that they were two of the founding
three partners at the organization.  Question, what hours did
they have as they were absolutely, they were the final decision

MC8Cpla8

1    makers.  Now I'm not saying I need final, he's saying it.  Who

2    told you that?  Both Mark and Uri.

3            Now, this leads me --

4            THE COURT:  Stop there and let me ask defense counsel,

5    why isn't that, by itself, sufficient evidence of material

6    control, because it's an admission?

7            MR. LAUER:  It's not an admission by my client.  It's

8    a statement --

9            THE COURT:  He says -- I'm sorry.  Who are the people

10   that said that?

11           MR. GLUCK:  Mark Nordlicht and Uri Landesman.

12           THE COURT:  I see.  Okay.  You're right.  It's not an

13   admission by your client, but it's an admission by the person

14   you say was the real person in control.

15           MR. LAUER:  It's not an admission.  We have no --

16           THE COURT:  I misunderstood who said it.  So admission

17   is the wrong word.

18           If Mr. Nordlicht, the legal fiduciary, says to someone

19   who becomes a witness, the person who has ultimate control is

20   Mr. Bodner.  Why isn't that enough for the jury to conclude

21   that's the case?

22           MR. LAUER:  Because in that context -- first of all,

23   we're dealing with a dead man and a man who's going to take the

24   Fifth.  In that context, that is comparable to your negotiating

25   on behalf of a client and the other side says can you go up,

MC8Cpla8

1   and you already have full authority and you say, I don't, I've

2   got to talk to the client because that's part of your process.

3   Mr. Nordlicht -- obviously, this is all hearsay, but if

4   Mr. Nordlicht is, according to Latkin, cooperating Latkin is

5   said to have said to him, I can't make this decision, I got to

6   talk to Murray and David — that just means that that's what he

7   told Mr. Latkin, that doesn't establish anything about the

8   reality of what Mr. Nordlicht said.  I will accept the

9   statement, but everyday business, everyday management all the

10  time, someone says I don't have the authority, I'm not the one

11  that's firing you.  If it were up to me, I'd give you a bigger

12  raise.

13          So I have to say, if they're going to pin -- if you

14  can pin a $50 million or whatever dollar case on an individual

15  on the theory that he has control over someone who has

16  contractual and legal control on the basis of a BS-type of

17  statement, forgive the colloquialism, then there are no

18  standards.  They need evidence.

19          THE COURT:  That, again, is a perfectly fair argument

20  to make to the jury on summation, but if a lawyer comes up to

21  the sidebar and says before I can give you an answer to that

22  question, Judge, I need to consult with my client,

23  theoretically, it might have been something that the law says

24  is within the lawyer's control, but another inference is that

25  the lawyer thought the client had the ultimate say and felt he

MC8Cpla8

1  had to check in with his client.  So these are competing

2  inferences, but under this motion, I have to take the inference

3  most favorable to the plaintiff.

4           MR. LAUER:  In effect, let me ask the Court a

5  question.  In the context of a jury trial where we have

6  abundant exhibits and testimony, on the issue of whether a

7  rational jury, whether there is enough evidence for a rational

8  jury to conclude beyond a reasonable doubt -- on clear and

9  convincing evidence that Mr. Bodner had control, don't we have

10 to evaluate, doesn't the Court have to evaluate this Latkin

11 statement in the context of the overwhelming, uncontroverted

12 evidence that Mark Nordlicht, A, ran the place, didn't take --

13          THE COURT:  So the answer with one qualification to

14 your question is, yes, the Court has to either evaluate what a

15 rational juror taking things most favorably to the plaintiff

16 could conclude, the Court has to look at the entirety of the

17 evidence and not just any given item.  Although, I think when

18 you said clear and convincing, I think that applies to the

19 fraud count, but not to the fiduciary count, but --

20          MR. LAUER:  I think it applies to the fiduciary count

21 because we're not dealing with negligence, we're dealing with

22 willful conduct.

23          THE COURT:  That's not the question.  In everyday

24 civil lawsuits involving an intentional tort, in most cases,

25 the standard is preponderance, in a few areas the standard is

1    clear and convincing.  We don't have to worry about that

2    tonight, but we will have to worry at the charging conference.

3            Anyway, let me go back, because I interrupted

4    plaintiffs' counsel.  There were some other things you wanted

5    to --

6            MR. GLUCK:  Yes.  So A, it is not one statement, I've

7    been machine-gunning quite a bit of evidence here, and that is

8    simply one that Court took notice of.

9            The next item that I would like to address is that,

10   first of all, Latkin repeats it, it came up into context.  We

11   don't need to get into it now, but it's not just once.

12           Secondly, with respect, this notion that there is

13   overwhelming evidence to the contrary is rejected by our side.

14   Huberfeld said I don't know to almost every question.  The only

15   evidence countering the substantial evidence we have seen are

16   these documents, and as the Court has noted, our theory is,

17   yes, there was a frontman, not a dictatorial frontman, but a

18   frontman.  These documents didn't actually govern the

19   relationship.  They were not adhered to to a T, Mr. Fuchs never

20   made it into the documents.  Somehow Mr. Kerry Propper, who was

21   managing the fund forever, and there is an email about this,

22   never makes it into the documents.  Somehow Seth Gerszberg,

23   who's taking over, never makes it into the documents.  These

24   documents are just paper and our case is about reality.  What I

25   have not heard from anyone other than Joe SanFilippo, and there

1      wasn't much about it today other than he wasn't witness to

2      particular meetings involving Mr. Bodner, was Bodner's power.

3              And this leads to the next point, which is not only

4      has there been a complete absence of evidence to the contrary,

5      not surprising, they haven't put their case on, but in complete

6      absence to evidence to the contrary.  We've called witness, all

7      of whom say that Bodner had real power.  We showed documents,

8      all of which show Bodner had real power, not dispositive power

9      necessarily, but real and material power.

10             Then we get to the issue of this contention that

11     somehow everyone else at Platinum Management knew differently.

12     A, no one was in the room ten minutes after the code red was

13     told not to be given.  There was an inner circle here and, in

14     fact, my cross of SanFilippo will focus on the fact that he

15     wasn't in it, and neither was David Steinberg, their next

16     witness, who I deposed and didn't even know about COBA until

17     date of the arrest.  None of the people they're calling were at

18     the partner dinners.  Mr. Fuchs was at one.

19             THE COURT:  I don't have to worry about that tonight.

20     If I agree with you and let the case go forward, they, of

21     course, can reraise their motion at the end of all the evidence

22     and then it would be relevant, but it's not relevant tonight.

23             MR. GLUCK:  I'm just saying there is a contention here

24     that somehow we are presenting specs of evidence against a face

25     of overwhelming — that is wrong.  There's barely anything in

MC8Cpla8

1    this record?

2              THE COURT:  Okay.

3          MR. GLUCK:  But then we get to the answer of why.  You

4    see, it is a good point that Mr. Nordlicht, who would be the

5    star witness here, isn't testifying.  It is a good point that

6    Mr. Uri Landesman died.  It is a good point that David Levy,

7    who is probably next on the inner circle list can't testify

8    either.  And we don't want to go through this rigmarole again,

9    it would probably be the same out.  It is a good point that

10   Daniel Smalls, a serious portfolio manager, can't testify.  So

11   the thing is, that's not plaintiffs' fault, can't be.

12   Mr. Bodner was part of an organization where the relevant

13   persons can't testify for one reason or another, and so we're

14   relegated to those who can and the emails that are available.

15             Same point, we have testimony --

16             THE COURT:  I don't find any of that relevant either

17   because it's still your burden of proof, whether it's

18   preponderance or clear and convincing, it's still your burden

19   of proof.

20             MR. GLUCK:  True.  But my point is, there's no

21   overwhelming evidence to the contrary.  The only point I was

22   making there is we presented evidence.  We just went over the

23   Latkin stuff --

24             THE COURT:  This is addressed to defense argument that

25   if I look at the whole picture, there's not material support

MC8Cpla8

1      for the plaintiffs' position.

2                 MR. GLUCK:  Yes.

3                 THE COURT:  That context I understand.

4                 MR. GLUCK:  That is all and I'll move on.

5            So now, once that issue is dealt with that got Fuchs,

6      Latkin, Nordlicht, Post, all presenting evidence from which a

7      reasonable juror could infer material control, material trust,

8      Katz, et cetera.

9                 Then I'll answer the Court's question about who is

10     this duty owed to.  On that point, the critical thing is that

11     it's to PPVA.  Now, it's true.  It's an ephemeral fund with no

12     employees.  But think about that management agreement, the one

13     between PPVA and Platinum Management.  Platinum Management --

14                 THE COURT:  I thought that was an interesting

15     contract.  I don't think I've ever seen a contract where all

16     the parties sign the same name.

17                 MR. GLUCK:  This is exactly where I was going.  We

18     have a circumstance, but we can't alter where we're suing

19     Platinum Management and those we believe similarly owed a duty,

20     and it was Platinum Management's responsibility to report the

21     NAV to PPVA.  That is the duty.

22                 Now, PPVA has investors and creditors and

23     constituencies, all of whom are impacted by this, but the

24     breach of duty here on overvaluation for incentive fees and

25     management fees, and to a lesser extent, these arbitration --

MC8Cpla8

on the incentive fee and the management fee, there is a
fiduciary obligation.  You are presenting correct numbers to
PPVA so that money can be taken out of PPVA's bank account and
paid to new management.  What we are saying is just like Mark
Nordlicht, David Bodner had the duty to be loyal, not be
careless, and that he breached duty every single time he
allowed a report.  That's why we're focusing on those monthly
NAV sheets from which money was then immediately taken.  Every
time a report was issued, he knew was wrong, he breached his
duty.  That is our case.

THE COURT:  All right.  I'm going to hear from -- this
will be the final --

MR. GLUCK:  If the Court is interested in these
meetings, the names thing doesn't make sense.

THE COURT:  I think both sides have had ample
opportunity, but I want to have defense counsel have the last
word.

MR. LAUER:  I want to focus on knowledge.

With respect to the period, January 15, 2013, which
is, I believe -- or let's say January 31, 2013, which I believe
is a period after the distribution of the 2012 incentive fees.
I want to talk about knowledge because the Court has heard
enough on fiduciary and --

There is no evidence with respect to the alleged
fraudulent valuation, in particular, Black Elk, attributed to

MC8Cpla8

1    Mr. Bodner.  The only evidence in the case is the public event

2    that there was the Black Elk explosion on one of their wells.

3    Mr. Quintero was able to give his view on valuation, which I'll

4    deal with when he comes, but on the issue of knowledge on

5    Mr. Bodner's part, there is no evidence that Mr. Bodner had any

6    knowledge that the amount of reduction that Mr. Nordlicht or

7    Platinum made between October 31 or November 31 and December 31

8    was insufficient.

9          In other words, to put it more directly, there was an

10   event, it obviously had some meaningful impact on the company,

11   but it was never put in context that there was a meeting or

12   someone communicated to Bodner that here's what Platinum

13   lowered it to, but it only lowered it this amount, and given

14   the fact that this well had this amount of impact, it should

15   have lowered it much more and therefore there's a fraud.

16         That's not what we have.  What we have is Black Elk,

17   it's got lots of reserves, it's got lots of wells, and it has

18   the explosion, and in order to find Mr. Nordlicht liable, even

19   assuming he is a fiduciary, he's got to know prior to the

20   distribution of those fees, that, in fact, there's been fraud

21   with that valuation, and there is a complete failure of proof.

22         The same is true the next year, because all of the

23   evidence on knowledge is surrounding that dinner.  But by June

24   of 2014, long after the 2013 fees were distributed, there's no

25   evidence that Mr. Bodner had any details that in any way

MC8Cpla8

1   compared what honest people would have valued Golden Gate.

2          THE COURT:  So, once again, you're making many good

3   points, but why isn't that dinner quite telling?

4          MR. LAUER:  Because the dinner occurred after.  In

5   other words, Mr. Bodner can only be responsible for what he

6   failed to stop.  So the dinner occurs in the beginning of 2015.

7   If something was paid, if other people, unbeknownst to

8   Mr. Bodner, caused an incentive fee to be paid that should not

9   have been paid two years earlier or a year earlier, he has no

10  liability for that.  This is a civil case, it's not a criminal

11  conspiracy where you can tack on something from the past.

12  That's why we moved to dismiss each of these years because even

13  if the Court finds that there's a jury question over exactly

14  what was meant at that famous --

15         THE COURT:  Now your argument on knowledge is --

16         MR. LAUER:  Yes.

17         THE COURT:  Hold on.  You want a partial dismissal on

18  that ground on certain years.

19         MR. LAUER:  Yes, each year, and they're significant.

20         And one last point.  And, please, I think you

21  understand, for the purpose of the record, and I think your

22  Honor has heard enough on the issue of the release, but for the

23  purpose of the record, we disagree with the Court's thinking on

24  this.  We believe the issue, frankly, is crystal clear on our

25  way, and there has been -- I've got to do this, right?

MC8Cpla8

1          THE COURT:  I already told you, I thought it was fully

2     preserved.  But what you're saying now, which I have frequently

3     heard, but mostly from my in-laws, is you don't know what

4     you're talking about.

5          MR. LAUER:  Thank you, your Honor.

6          MR. GLUCK:  Your Honor, I'll limit my remarks to just

7     these last few points.

8          What we're now dealing with is, basically as I

9     understand it, a request to limit the period.

10         THE COURT:  Yes.

11         MR. GLUCK:  Firstly, I understand.

12         Secondly, the contention that the analysis is the same

13    for breach of duty and fraud is rejected for the following

14    reasons.

15         On the breach of duty side, there's the duty of care.

16    If, counter-factually, because I'm going to read to the Court a

17    bunch of evidence, if, counter-factually, there wasn't evidence

18    that Mr. Bodner was actually aware that proximate to the

19    Black Elk explosion, there's no way the NAV could have gone up,

20    and there's no way incentive fees could have been paid, forget

21    management.  Even then, a reasonable jury could find that duty

22    of care breached.  That's on duty of care.

23         On coconspirator.  Excuse me.  On fraud, I

24    respectfully take issue with the way that Mr. Lauer

25    characterized the timing analysis, and here's why.  This Court

MC8Cpla8

1    dismissed the conspiracy count on the basis that it was wholly

2    duplicative of conspiracy and cited a number of cases --

3        THE COURT:  Wholly, I think you misspoke, but anyway.

4    One was duplicative of the other, but --

5        MR. GLUCK:  Right.  It was interesting to me for

6    whatever reason, so I decided to read all those cases.  They

7    all concern administrative dismissals of duplicative claims.

8        Now, if, in fact, they are duplicative --

9        THE COURT:  I want to make sure I know the point

10   you're making.  If someone joins a conspiracy and they are

11   liable for what the conspirators have done before, if one aids

12   and abets a fraudulent scheme, one becomes liable for what they

13   did before, as well, I think.

14       MR. GLUCK:  Well, I believe that was a distinction

15   Mr. Lauer was trying to make and I will suggest that's

16   something I pored over.  And the conclusion is that, A, I

17   believe the Court's right, and one who decides to aid and abet

18   should be liable for what's come before.  And I think if we

19   looked at the collection of precedent throughout the United

20   States, we would find good support for that contention.

21   However, the law is crystal clear in New York, appellate, as to

22   the point of conspiracy.  So my point is that if it was

23   duplicative, I prefer the crystal clear one.

24       Secondly, on the issue of evidence, the explosion at

25   Black Elk occurred mid-November 2012.  I will refer the Court

MC8Cpla8

1    to PX 554, which is in evidence, and that is an email

2    containing an attachment from seaport, which is an investment

3    research group.  That report, which was sent from David

4    Steinberg to David Bodner, strongly indicates that the

5    remaining common equity in Black Elk, zero.  And one, you

6    cannot tell me that Mr. Bodner did not know about the magnitude

7    of the investment in Black Elk, and when you lose $200 million,

8    there's no way to make it up.

9           Secondly, I would refer the Court to PX 434, which is

10   a pre-fees distribution email in 2013 on the Black Elk

11   Opportunities Fund.  Now, our thesis is as follows.  As

12   Mr. Fuchs testified, at page 270 to 272 of his trial testimony,

13   the Black Elk explosion was a, quote, all hands on deck,

14   unquote, situation at Platinum, at the office where Mr. Bodner

15   was every day.  And the decision was made to -- almost every

16   day.  I know that's been an issue.  Most days when he went to

17   work.  And the decision was made to scramble and try to get

18   this BEOF fund together and Bodner is copied, or at least

19   Angela is.  So the notion that there's no evidence that

20   Mr. Bodner -- no evidence that Mr. Bodner knew that there was a

21   serious problem, specious.  At the time, before the

22   distribution is made, both based on the Seaport and based on

23   the all hands on deck testimony in this case.

24          The issue here is one of magnitude.  When a fund like

25   this, and we know that David Bodner was getting both the

MC8Cpla8

1    monthly NAV sheets, he was getting the special information,

2    going to the office every day, when you lose $200 million,

3    there's no way to make it up.  But you see, here's the thing,

4    we don't need to prove that David Bodner knew what the new true

5    NAV was.  I believe that was the implication of Mr. Lauer's

6    testimony to say, well, how do we know that David Bodner didn't

7    know the exact calculation?  Forget management fees, I'll

8    concede the management fees for that month.  What I'm saying,

9    what plaintiff is saying is that he knew there wasn't an

10   increase — that was impossible.  And certainly not an increase

11   of the magnitude that was the result in $14 million of

12   incentive fees being paid out.  Impossible.  That is what our

13   expert, whose testimony is in evidence, stated as his official

14   conclusion.  What is your view on the value, the increase in

15   NAV, not the actual NAV, but the increase in NAV from 2012 to

16   2013?  Impossible.  So there is not only evidence –– no

17   reasonable person, we'll submit to the jury, no reasonable

18   person could think otherwise.

19          And then on top of it, on top of it going back to

20   first principals, fiduciaries have a duty of care.  So if you

21   didn't know, you should have investigated as to why

22   $14 million –– I think it's 14 or 18, but whatever.  If he

23   didn't know, he should have investigated as to why this very

24   large distribution was being made in this calamitous year.

25          And then, secondly, we've talked about what the

MC8Cpla8

1    analysis is on conspiracy, aiding and abetting.

2          THE COURT:  I want to hear from defense counsel in a

3    minute, but just, my recollection is that my primary reason for

4    dismissing the civil conspiracy count, though I may have had

5    additional reasons regarding duplicativeness, was that under

6    New York law, there's not a separate civil tort for conspiracy.

7    That doesn't mean, of course, that you can't prove a conspiracy

8    to the extent it's relevant, for example, to the admission of

9    statements of coconspirators, that's right there in the Federal

10   Rules of Evidence.

11         So I'm not sure that the bait of what follows from my

12   dismissal of the federal conspiracy count really is so much a

13   question of duplicativeness or nonduplicativeness, I may have

14   said things about that, but I'm sure from this and many, many,

15   many other summary judgment cases who are in civil conspiracy,

16   there is simply no separate civil conspiracy tort under New

17   York law, but that doesn't mean you can't prove a conspiracy in

18   proving liability on what you do allege.

19         So, the analogy here would be that even if the charge

20   is aiding and abetting, if you can show that the aiding and

21   abetting was pursuant to a conspiracy, then it brings in

22   earlier stuff.

23         But now let me hear from defense counsel.

24         MR. GLUCK:  That's exactly what --

25         MR. LAUER:  Duty of care has no application in this

MC8Cpla8

1  case.  Going back to the summary judgment, the Court ruled that

2  what was left in the case is showing that he's a fiduciary and

3  that he came to have knowledge that the assets were inflated.

4  There's no -- the management agreement between Platinum

5  Management and PPVA expressly eliminates negligence for this

6  kind of duty.  Basically, in order to --

7       THE COURT:  But I want you to address two things, you

8  tell me which of these two arguments you're making.  If I had

9  no knowledge that NAVs had been inflated previously, but I

10  become aware of that knowledge on day X, but it is part of a

11  scheme to defraud investors or whomever, once I then join the

12  scheme, why am I not liable subject to aiding and abetting or

13  whatever for every wrong committed pursuant to the scheme?

14       MR. LAUER:  Your Honor, a scheme is not charged,

15  that's my first answer.

16       My second answer, I believe, generally, in civil --

17       THE COURT:  I believe the definition of fraud is a

18  scheme to obtain money or property by means of false or

19  fraudulent representations or promises.

20       MR. LAUER:  Second answer is I believe in — and we can

21  brief this — civil law, for what is essentially an aiding and

22  abetting, you're liable for what you cause, not for what

23  happened before you.

24       THE COURT:  All right.  I think here, because even

25  though it's only 10 minutes after 6:00 and I know you're both

MC8Cpla8

1  anxious to stay here and offer arguments for several more

2  hours, here's where I come down.

3          I think the motion for judgment in defendant's favor

4  on both the remaining claims on the basis that a fiduciary

5  relationship or, in the case of fraud, a failure to meet the

6  requirements that you have special knowledge that needs to be

7  disclosed, that part of the motion is denied.  I think there is

8  enough for the jury to find.  They're very important arguments

9  to the contrary as a factual matter, and that, of course, that

10  is why this is an interesting case to say the least.

11          With respect to the other motion, which is to

12  eliminate liability or certain of the years involved, that, I

13  think, might turn on the law of aiding and abetting.  So I will

14  reserve judgment on that and allow both sides to brief it.  If

15  you want me to decide it tomorrow, you have to give me the

16  briefs by later tonight.  If you'd rather have the weekend to

17  do it, I'll reserve judgment until Monday.  I see some of the

18  real parties at interest favoring the latter possibility.  You

19  must have had at least three hours of sleep in the last week, I

20  mean, come on.

21          MR. LAUER:  You want to do it tonight?

22          MR. GLUCK:  No, I'd like the weekend.

23          MR. LAUER:  You'd like the weekend?

24          MR. GLUCK:  I'm actually a little tired myself.

25          MR. LAUER:  I have to pretend to consult.

MC8Cpla8

1              THE COURT:  I think the answer is clear.  Any briefing

2    on that subject needs to be sent to the Court by 5 o'clock

3    Sunday, and I will decide that part of the motion on Monday.

4              Very good.  Thank you, all, for your very helpful

5    arguments and we'll see you tomorrow at 9:00 a.m.

6              (Adjourned to December 9, 2022 at 9:00 a.m.)

7                              * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     MARTIN TROTT

 4    Direct By Mr. Gluck  . . . . . . . . . . . . 989

 5    Cross By Mr. Lauer . . . . . . . . . . . . .1015

 6    Redirect By Mr. Gluck  . . . . . . . . . . .1034

 7    Recross By Mr. Lauer . . . . . . . . . . . .1048

 8     JOSEPH SANFILIPPO

 9    Direct By Mr. Hertzberg  . . . . . . . . . .1113

10                        PLAINTIFF EXHIBITS

11    Exhibit No.                              Received

12     926  . . . . . . . . . . . . . . . . . . 995

13     687, 690 . . . . . . . . . . . . . . . .1182

14                        DEFENDANT EXHIBITS

15    Exhibit No.                              Received

16     154  . . . . . . . . . . . . . . . . . .1122

17     608  . . . . . . . . . . . . . . . . . .1156

18     645  . . . . . . . . . . . . . . . . . .1158

19

20

21

22

23

24

25
```