MC9Cpla1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION          18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER            18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                    Plaintiffs,

            v.

PLATINUM MANAGEMENT (NY) LLC,
*et al.*,

                    Defendants.

------------------------------------x        Trial



                                        New York, N.Y.

                                        December 9, 2022
                                        9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge
                                          and a Jury

MC9Cpla1

                              APPEARANCES

HOLLAND & KNIGHT, LLP
        Attorneys for Plaintiffs
BY:  WARREN E. GLUCK
        MARTIN L. SEIDEL
        RICHARD A. BIXTER JR.
        QIAN (SHEILA) SHEN
        NOAH W.S. PARSON
        ELLIOT A. MAGRUDER


KATTEN MUCHIN ROSENMAN, LLP
        Attorneys for Defendant Bodner
BY:  ELIOT LAUER
        GABRIEL HERTZBERG
        JULIA B. MOSSE


CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
        Attorneys for Defendant Bodner
BY:  NATHANIEL C. AMENT-STONE
        ALLESANDRA TYLER




Also Present:

Michael Robson, Paradocs Motion Support

Esterah Brown, Paralegal, Curtis Mallet

MC9Cpla1

```
 1                    (In open court; jury not present)
 2                    MR. HERTZBERG:  Your Honor, before the jury comes in,
 3        we have just a few minutes on two --
 4                    THE COURT:  No.
 5                    MR. HERTZBERG:  Thank you.
 6                    THE COURT:  I am very concerned at the rate this case
 7        is going at.  I think from now on, except in most extraordinary
 8        circumstances, there will be no sidebars.
 9                    (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (Jury present)

2          THE COURT:  Counsel, you have two questions.

3          Good morning, ladies and gentlemen.  So I like the

4   jersey juror No. 3 is wearing, but, of course, we didn't make

5   it past the -- yes.  Well, there you go.

6          Counsel has two more questions.

7          The exhibits that were started to be shown yesterday

8   have now been received on consent.

9          MR. HERTZBERG:  Mr. Robson, would you please pull up

10  Exhibit 690.

11         Mr. Robson, could you please go to the last page of

12  690.  Could you highlight, Mr. Robson, just the entries on the

13  top third.  There are three categories there, just highlight

14  the top third.

15   JOSEPH SANFILIPPO, resumed.

16  DIRECT EXAMINATION CONTINUED

17  BY MR. HERTZBERG:

18  Q.  Mr. SanFilippo, the line item, management fee payable as of

19  March 31, 2016.  I'm sorry.  As of 4/30/2016, can you explain

20  to the jury what that entry means, please.

21  A.  Sure.  Those are management fees that were charged, but

22  remain unpaid as of April 30th, 2016.

23         MR. HERTZBERG:  Mr. Robson, could you please pull up

24  687.  Again, go to the last page and highlight the substantive

25  part of the document.  Could you highlight the management fee

1    payable line.

2    Q.  Mr. SanFilippo, could you explain to the jury the

3    significance of this line and how it differs from the one that

4    they just saw.

5    A.  Sure.  The previous exhibit or the management fees that

6    remained unpaid for the onshore feeder fund, PPVA USA fund,

7    these are the unpaid fees for the Intermedia fund, which is the

8    fund in between the offshore feeder and the master fund.

9              MR. HERTZBERG:  Thank you, Mr. SanFilippo.

10             THE COURT:  Cross examination.

11   CROSS-EXAMINATION

12   BY MR. GLUCK:

13   Q.  Good morning, Mr. SanFilippo.

14   A.  Good morning.

15   Q.  Did you have preparations with defendants prior to your

16   testimony here today?

17   A.  Yes.

18   Q.  Did you fly in from Ohio?

19   A.  I didn't fly in from Ohio for the preparation.  I live in

20   New Jersey.

21   Q.  I thought you said that you worked at an Ohio daycare

22   facility as a CFO?

23   A.  Yes, I work remotely.

24   Q.  Understood.  Who owns that daycare facility?

25   A.  That group of daycare facilities is owned by a group of

MC9Cpla1                           SanFilippo - Cross

1     individuals.  The majority owner is a fellow by the name of

2     Jacob Sahd.

3              MR. GLUCK:  Mr. Parson, please call up PX 946, which

4     is a newly marked exhibit.  Please go to the leadership team.

5     Q.  Whose picture is this?

6     A.  It's a picture of Ezra Beren.

7     Q.  Is that Mr. Huberfeld's son-in-law?

8     A.  It is.

9     Q.  He runs this place?

10    A.  He is the CEO.

11    Q.  Is that a relevant fact?

12             MR. HERTZBERG:  Objection.

13             THE COURT:  Sustained.

14    Q.  Does Mr. Huberfeld's family have interest in this facility?

15    A.  They are a minority owner, yes.

16    Q.  Does the Bodner family have interest in this facility?

17    A.  No, they do not.

18    Q.  The Huberfeld family is funding your pay checks?

19    A.  The operations of the company are funding the paychecks.

20    Q.  Did you formally act as a CFO for a Puerto Rican bank?

21    A.  I did.

22             MR. GLUCK:  Mr. Parson, please call up PX 947.

23             Sorry.  We would like to move this particular exhibit

24    into evidence, presently 946.

25             MR. HERTZBERG:  401.

MC9Cpla1                        SanFilippo - Cross

1              THE COURT:  Sustained.

2              MR. GLUCK:  Go to the second page, please.

3   Q.  Mr. SanFilippo, were you the controller at International

4   Financial Enterprise Bank?

5   A.  I was.

6   Q.  Did that bank receive a wire transfer from Mark Nordlicht?

7   A.  No.

8   Q.  No?

9   A.  No.

10  Q.  Anyone in Mark Nordlicht's family?

11  A.  Excuse me?

12  Q.  Anyone in Mark Nordlicht's family?

13  A.  So there were, I believe, four or five trusts that owned

14  ownership interests in that bank related to the Nordlicht

15  family.

16             MR. GLUCK:  We would like to move this LinkedIn

17  exhibit, 947, into evidence.

18             MR. HERTZBERG:  401.

19             THE COURT:  Sustained.

20             MR. GLUCK:  Mr. Parson, please call up 949.

21  Q.  Do you see any of the wire transfers from the Nordlicht

22  family on this exhibit?

23             MR. HERTZBERG:  401.

24             MR. GLUCK:  Credibility, your Honor.

25             THE COURT:  I think the word is bias, but anyway,

MC9Cpla1                        SanFilippo - Cross

1    overruled.

2           THE WITNESS:  I'm sorry.  Can you repeat the question?

3    Q.  Do you see any wire transfers from the Nordlicht family on

4    this exhibit?

5    A.  Wire transfers to anyone in particular or --

6    Q.  Any others?

7           THE COURT:  You want to point him to some particular

8    item.

9    Q.  Gilad Kalter, is that Mr. Nordlicht's wife?

10   A.  Yes.

11   Q.  Quinn Emanuel, is that Mr. Nordlicht's counsel?

12   A.  It is, yes.

13   Q.  Goldstone Partners, is that connected with Mr. Nordlicht?

14   A.  I believe so.

15   Q.  Maria SanFilippo?

16   A.  That is my wife, yes.

17          MR. GLUCK:  I move this exhibit to be brought into

18   evidence.  Credibility.

19          MR. HERTZBERG:  401, 403.

20          THE COURT:  Well, those, I can't rule on those because

21   what hasn't yet been established is what accounts these entries

22   are from and to who.

23          Do you recognize these transfers?

24          THE WITNESS:  I recognize some of the companies on

25   this document.

1          THE COURT:  And these are transfers to who?

2          THE WITNESS:  They're transfers to a variety of

3     individuals and companies.

4          THE COURT:  So, counsel.

5          MR. GLUCK:  Could you please provide copies.

6          THE COURT:  You haven't established foundation.

7     BY MR. GLUCK:

8     Q.  Mr. SanFilippo, during your time as controller of the bank,

9     all the accounts in question that we just went over were

10    established through you; is that correct?

11    A.  Of the bank itself, yes.

12    Q.  And Mr. Stadtmauer raised some of these transfers in his

13    contention that Mr. Nordlicht was evading his bankruptcy

14    estates.  I don't know if I said that correctly, but did you

15    understand the question?

16          MR. HERTZBERG:  401, 403.

17          THE COURT:  So let me ask the witness.

18          You were comptroller of what bank at this time?

19          THE WITNESS:  I was controller of a bank.  The name of

20    the bank was International Financial Enterprise Bank.  It later

21    changed its name to NextBank International.

22          THE COURT:  And is it correct that transfers were made

23    to or from Nordlicht-related persons or entities to or from or

24    through that bank at the time that these documents that we're

25    looking at?

MC9Cpla1                      SanFilippo - Cross

1           THE WITNESS:  So the group of Nordlicht trusts along

2     with another group of individuals purchased all the outstanding

3     shares of that bank, I believe in early 2020 or late 2019.

4           THE COURT:  At this point in your career, you were

5     working for a bank that was owned by Nordlicht-related entities

6     or persons, yes?

7           THE WITNESS:  It was owned by a group of trusts that

8     had the Nordlicht family's beneficiaries.  The trustees of

9     those trusts were, I believe, family members of Mark Nordlicht.

10          THE COURT:  So the answer to my question is yes;

11    correct?

12          THE WITNESS:  Yes.

13          THE COURT:  So when did you move from that position to

14    your next position?

15          THE WITNESS:  I believe it was November of 2021.

16          THE COURT:  And how did you come to get the position

17    you now hold?

18          THE WITNESS:  So Ezra Beren, who I worked with while I

19    was at Platinum, he was a portfolio manager, he had called me

20    when I was actually away on vacation with my family.  He had

21    told me he was running a childcare center and they're looking

22    to make a change with a person they were using as their

23    CFO/controller.  He asked me if I would be interested in

24    working with him.  After some deliberation, I accepted his

25    offer.

1      THE COURT:  And that entity, it's the Brightside

2  Academy of Ohio, is that it?

3      THE WITNESS:  Yes.

4      THE COURT:  And some of the people who have been the

5  subject of this lawsuit are also involved in that, have an

6  ownership interest or something like that; is that right?

7      THE WITNESS:  Yes, that's correct.

8      THE COURT:  I think that's enough.

9      MR. GLUCK:  Agreed.

10  BY MR. GLUCK:

11  Q.  One question.  The purpose of the $10,000 transfer to your

12  wife --

13      MR. HERTZBERG:  401, 403.

14      THE COURT:  Overruled.

15  A.  So I was doing some work on a company that Mr. Nordlicht

16  was invested in.  We flew down to San Francisco and I helped

17  him with some diligence.  At that time, I didn't have my own

18  bank account, so he wired it to an account that my wife owns.

19  Q.  It was a payment to you for services rendered?

20  A.  Correct.

21  Q.  Now, you said you work from home now.  Was that also the

22  case when were you working at Platinum?

23  A.  For a short period of the time.  For a majority of the time

24  I was at Platinum, I worked in its offices in Manhattan.

25  Q.  At what times did you work from home?

MC9Cpla1                         SanFilippo - Cross

1   A.  So, I believe it was from May of 2014 through July of 2014,

2   and then I returned to the office for a couple of months, and

3   then I worked from home from, I believe it was September

4   through the end of the year, and then I returned full-time in

5   the office in January of 2015.

6             MR. GLUCK:  My apologies.  I forgot to move in

7   Exhibit 949.

8             MR. HERTZBERG:  401, 403.

9             THE COURT:  Received.

10            (Plaintiff's Exhibit 949 received in evidence)

11  Q.  Did you have any involvement in the creation of Beechwood?

12  A.  No.

13  Q.  Did you know much about Beechwood?

14  A.  No.

15  Q.  Did you have any involvement in the creation of Black Elk

16  Opportunities Fund?

17  A.  No.

18  Q.  Do you know much about the Black Elk Opportunities Fund?

19  A.  I know generally what it is, but that didn't fall under my

20  responsibilities when I worked for Platinum.  There was another

21  CFO that oversaw that fund.

22  Q.  Who is that CFO?

23  A.  Naftali Manela.

24  Q.  What was Naftali Manela's job at Platinum Management?

25  A.  So he didn't have a job at Platinum Management.  He worked

1    for a related hedge fund advisor.  He worked for Platinum

2    Partners Credit Opportunities Management Fund.  I believe I

3    said that right, I'm not quite sure.  But it was the management

4    company for a group of funds that was the Platinum Credit

5    Opportunities Fund.  I believe he worked in that management

6    company from approximately 2008 through early -- actually

7    through -- I think through early 2016.  At some point, he had

8    also taken the COO position of the entire group of investment

9    managers, including Platinum Management New York LLC.  I

10   believe that was in early 2015.

11   Q.  So you didn't take into consideration anything having to do

12   with Beechwood or BOF when you're preparing these financial

13   statements, did you?

14   A.  I did.

15   Q.  You did?

16   A.  Yes.

17   Q.  How?

18   A.  The fund had certain liabilities over its time.  I think

19   primarily in '14 and '15 or '15 through '16, and those

20   liabilities were recorded on the books of Platinum Partners

21   Value Arbitrage Fund.

22   Q.  Do you know what Beechwood was doing with that at that

23   time?

24   A.  No.

25            MR. GLUCK:  Please call up DX 170, the Black Elk

MC9Cpla1                        SanFilippo - Cross

1    session.  We move this into evidence.

2              MR. HERTZBERG:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 170 received in evidence)

5              MR. GLUCK:  Will you please go to the Black Elk page,

6    the notes, please.

7    Q.  Is this the equivalent document that we looked at yesterday

8    when the Court asked you whether there were notes about the

9    explosion, Black Elk in 2013?  This is 2012; right?

10   A.  This is the 2012 financial statement of Platinum Partners

11   Value Arbitrage Fund, correct.

12   Q.  When was this issued?

13   A.  Can you turn to the opinion page.  There should be a date

14   on it.

15   Q.  Please.

16             THE COURT:  Someone should have a hard copy of this.

17   Would you give it to the witness, please.

18   A.  The audit report was issued June 28th, 2013.

19   Q.  June 28th?

20   A.  Correct.

21   Q.  When was the Black Elk explosion?

22   A.  I'm not really sure.  It could have been either late '12 or

23   late '11.  I don't remember the exact timing.

24   Q.  Are there any notes on this $215 million Black Elk

25   position?

1   A.  Can you give me a minute to review the document?

2   Q.  Of course.  Just let us know when you're done.

3   A.  I don't see any notes, no.

4   Q.  Why not?

5   A.  I'm not sure.  We discussed it with our auditors.  The

6   auditors were fully aware.  We discussed it with our investors

7   during investor call.  Really not sure why it was not included

8   in the financial statement.

9   Q.  Nearly 30 percent of the fund?

10  A.  30 percent of the fund, correct.

11          MR. GLUCK:  Mr. Parson, please call up PX 761.

12  Q.  What was your role in preparing this monthly NAV statement?

13  A.  So this is not a NAV statement.  This is a long short

14  position summary.

15  Q.  Part of the monthly NAV packs; right?

16  A.  It's one of the supporting reports.

17  Q.  Did you know that in April of 2016, Golden Gate was

18  defunct?

19          MR. HERTZBERG:  Objection.

20          THE COURT:  Overruled.

21  A.  Can you repeat the question.

22  Q.  Did you know that in April of 2016, Golden Gate was

23  defunct?

24  A.  Defunct?

25  Q.  Defunct.

MC9Cpla1                    SanFilippo - Cross

1   A.  What do you mean by defunct?  Bankrupt?  I'm not sure what

2   you mean by defunct.

3   Q.  As a CFO, you don't know what defunct means?

4            MR. HERTZBERG:  Objection.

5            THE COURT:  Sustained.  You want to tell him what you

6   meant.

7   Q.  No longer operating.

8   A.  I don't recall that Golden Gate was no longer operating as

9   of April 2016.

10  Q.  No one told you that?

11  A.  If they did, I don't recall it at that point in time.

12  Q.  Do you know a guy named Jed Latkin?

13  A.  I do.

14  Q.  Would you work with him at Platinum?

15  A.  He was a portfolio manager at Platinum.  I didn't work

16  directly with him, but we worked together at Platinum at the

17  same time.

18  Q.  He never told you that Golden Gate was no longer operating?

19  A.  Jed Latkin?  No.

20  Q.  When you would have these meetings to provide information

21  to your auditors and your valuators, were there any

22  instructions given to Jed Latkin or any of the portfolio

23  managers, they weren't allowed to talk about anything related

24  to these assets?

25  A.  Absolutely not.

1          MR. GLUCK:  Mr. Parson, please highlight the Lafitte

2     and Northstar GOM holdings sections.

3     Q.  Mr. SanFilippo, what do you understand the assets of

4     Northstar to be as of April 2016?

5     A.  Approximately $190 million value.

6     Q.  Sorry.  That was not my question, but I think that was a

7     mistake.

8          PPVA is valuing its equity in Northstar at

9     approximately $190 million; right?

10    A.  Yes, both its preferred and common equity.

11    Q.  Yeah, preferred and common.

12    A.  Yes.

13    Q.  What did you understand the assets of Northstar to be at

14    this time?

15    A.  The assets of Northstar were reserves, oil reserves.

16    Q.  Where did they come from?

17    A.  So, a portion of Northstar's portfolio was purchased from

18    Black Elk.

19    Q.  Were you aware that Black Elk sold all or substantially all

20    of its assets in the Renaissance sale in 2014?

21    A.  They sold the majority of their assets, yes, I was aware of

22    that.

23    Q.  What do you mean by majority?

24    A.  They sold a majority of their assets to Northstar.

25    Q.  What do you mean by majority?

MC9Cpla1                     SanFilippo - Cross

 1   A.  More than half.  I don't know what the exact percentage

 2   was, but it was a large amount of their assets.

 3   Q.  CFO.  More than 75 percent?

 4   A.  Possibly.

 5   Q.  More than 90 percent?

 6   A.  This was eight years ago.

 7   Q.  More than 90 percent?

 8   A.  If you point me to a document --

 9   Q.  I'm just asking for what you knew.

10   A.  I already answered it.

11   Q.  Did you know it was more than 90 percent?

12   A.  I think I already answered it.

13   Q.  Was it a yes?

14   A.  If you want to repeat the answer that I answered before, we

15   could reread it.

16          THE COURT:  Well, this is the a worthless colloquy, so

17   let's put a fresh question.

18          Were you aware of what percentage of its assets had

19   been sold as of --

20          THE WITNESS:  I was aware at the time --

21          THE COURT:  You were aware at the time?

22          THE WITNESS:  But sitting here today, I can't remember

23   the exact percentage.

24          THE COURT:  I understood that.  So you would have been

25   aware at the time of whether it was 50 percent or 75 percent or

1  90 percent or whatever, yes?

2          THE WITNESS:  Yes.

3          THE COURT:  And if it were the 90 percent or more, how

4  would that impact, if at all, Platinum's financial statements?

5          THE WITNESS:  So Platinum owned interests in both

6  Black Elk and Northstar.  So, theoretically, at that point in

7  time or what would have happened at that point in time is there

8  would have been a reduction in investment value of Black Elk

9  and an increase in investment valuation of Northstar.

10 Q.  But Black Elk sold its assets to Renaissance for cash;

11 right?

12 A.  I believe so, yes.  I think I might be just getting

13 confused with the facts.  It's been eight years.

14         MR. GLUCK:  PX 175, please.

15 Q.  Do you recognize this as a copy of the asset purchase

16 agreement to Northstar Lafitte?

17         I made a mistake with that, but you can say what this

18 document is.

19 A.  So this is a purchase agreement of assets that later came

20 to be known as Northstar.

21         MR. GLUCK:  Thank you.  We move to have this in

22 evidence.

23         MR. HERTZBERG:  No objection.

24         THE COURT:  Received.

25         (Plaintiff's Exhibit 175 received in evidence)

1              MR. GLUCK:  PX 173, please, the one I was talking

2      about last time.

3      Q.   Do you recognize this document?

4      A.   This is a purchase and sale agreement by and between

5      Black Elk as seller and Northstar as purchaser.

6      Q.   Would you have seen something like this in your role as

7      CFO?

8      A.   Yes.

9              MR. GLUCK:  Move this into evidence, please.

10             MR. HERTZBERG:  No objection.

11             THE COURT:  Received.

12             (Plaintiff's Exhibit 173 received in evidence)

13             MR. GLUCK:  Mr. Parson, please call up DX 622,

14     page 72.

15             Move into evidence.

16             These are the consolidated financial statements.

17             MR. HERTZBERG:  No objection.

18             THE COURT:  Received.

19             (Defendant's Exhibit 622 received in evidence)

20             MR. GLUCK:  Please go to page 72.

21     Q.   Are these related party transaction disclosures?

22     A.   Yes.

23     Q.   Where is the Beechwood related party transactions?

24     A.   I believe they're under financing transactions.

25     Q.   That's what that is?

MC9Cpla1                        SanFilippo - Cross

1    A.  Yes.

2            MR. GLUCK:  DX 625, please, page 55.

3    Q.  This is a disclosure about a master fund guarantee.  Do you

4    see that?

5    A.  Yes.

6            MR. GLUCK:  Mr. Parson, just highlight the second

7    sentence of the third paragraph.  Fourth.  I'm sorry.  I didn't

8    see the top.  "However."

9    Q.  Now, would you have written that?

10   A.  I would have.

11   Q.  When was this issued?

12   A.  I'm sorry.  Can we turn to the --

13           MR. GLUCK:  Of course.  Cover page, please.

14   A.  I think I have it here.  September 16th, 2015.

15   Q.  No one told you Golden Gate had stopped operating by that

16   point?

17   A.  I'm not sure what that would have to do with that

18   particular disclosure.

19   Q.  What guarantees were you talking about?

20   A.  Can we turn back to the page.

21           So what this note, not this particular paragraph

22   that's highlighted, what this note is discussing is it's

23   discussing the master fund's guarantees of certain debt owed by

24   its portfolio companies.  That debt would have been accounted

25   for in the valuation of the portfolio companies themselves.  In

1    other words, when you do a valuation and you come up with a

2    market cap, you add back any cash that the company has on the

3    balance sheet and you subtract its liabilities.

4    Q.   The holder of this debt was Beechwood?

5    A.   Right, but Platinum was guaranteeing it.

6    Q.   But the debt had already defaulted and Beechwood just

7    wasn't enforcing its rights, you knew that; right?

8              MR. HERTZBERG:  Form.

9              THE COURT:  Sustained as to form.

10   Q.   Did you know that the debt these operating companies,

11   Golden Gate, Northstar couldn't pay interest and these debts

12   were in default, but Beechwood just wasn't enforcing it?

13   A.   Well, they were paying their interest.

14   Q.   The companies were or Platinum?

15   A.   So Platinum was the funder of the companies as it's a

16   100-percent owner.  So Platinum owned all the capital of all

17   the companies.  In order to make the interest payments,

18   Platinum was advancing funds to the portfolio company, in this

19   case, Golden Gate.

20   Q.   Let's keep going with Golden Gate.  If the company wasn't

21   operating, how were they going to pay the principal back?

22   A.   I'm sure the plan was for the company to operate in the

23   future, it wasn't operating at the time, but if the debt came

24   due, then, obviously, the master fund would advance funds to

25   the company in order to pay its debt.

1   Q.   Now, how does that jive with your statement that master

2   fund had not had prior claims or losses?  Isn't every interest

3   payment a loss?  Pursuant to these contracts and expects the

4   risk of loss to be remote.

5           MR. HERTZBERG:  Form.

6           THE COURT:  Well --

7   A.   An interest expense is an interest expense of the portfolio

8   company, it's not a loss of the master fund.

9   Q.   It came out of the master fund's bank account?

10  A.   It came out of the master fund's bank account as an

11  investment in Golden Gate as an asset.

12  Q.   And if it were shut down, but you had hopes that it would

13  go up, how is that the risk of loss being remote?

14  A.   It's the risk of loss being remote considering the fact

15  that Golden Gate had oil reserves that were worth a certain

16  amount of money as determined by the third-party engineer, D&M.

17          MR. GLUCK:  Let's go to PX 538.

18  Q.   When is the first time you became aware of this valuation?

19  A.   I'm not sure by looking at this email what this is a

20  valuation of.

21  Q.   You don't know?  Nobody shared this with you?

22          MR. HERTZBERG:  Form.

23          THE COURT:  Do you recollect whether this was shared

24  with you or is it your best recollection it was not shared with

25  you?

MC9Cpla1                         SanFilippo - Cross

1    A.   So after reading the whole email, this was not shared with

2    me during my time at Platinum, but I had seen it subsequent to

3    my time at Platinum.

4    Q.   Did you ever attend a so-called partner dinner of the

5    Platinum Partners?

6    A.   No, I wasn't a partner.

7    Q.   Nobody invited you; right?

8    A.   It was only partners, I wasn't a partner.

9    Q.   So you don't know anything that was said at those dinners,

10   do you?

11   A.   I don't.

12   Q.   When you would go into the office, where was your office?

13   A.   So, my office was at different places at various different

14   times.

15   Q.   Fair point.  Before the move, was your office on the third

16   floor?

17   A.   It was the fourth floor of --

18   Q.   Excuse me --

19   A.   -- West 57th Street.

20   Q.   Your office was on the fourth floor?

21   A.   Yes.

22   Q.   Would you go up to the other floor very often?

23   A.   Not very often, no.

24   Q.   So you have no idea what's happening on that floor?

25   A.   No.

1       MR. GLUCK:  PX 417, please.

2           Seek to move this into evidence.

3       MR. HERTZBERG:  No objection.

4       THE COURT:  Received.

5           (Plaintiff's Exhibit 417 received in evidence)

6   Q.  What is your understanding of why -- well, firstly, who is

7   Joane Janczewski, who is she?

8   A.  She was the chief operating officer of Platinum Management

9   New York up until --

10  Q.  Naftali Manela?

11  A.  No.  So, she was the COO up until, I believe -- I thought

12  it was -- I thought she had left earlier than this.  I'm

13  looking at the date on here of November 2012.  I thought she --

14  she had an unfortunate accident and she could no longer work.

15  But she was the COO of Platinum Management New York until her

16  accident, which I thought was in '11, but apparently it must

17  have been in '12 at some point.

18  Q.  I don't think she's the most material part of this.  But,

19  here's my question:  What does chaya mean?

20  A.  I think she's referring to a person, but I'm not really

21  sure.

22  Q.  Is this the day after the Black Elk explosion?

23  A.  I'm not sure what the date of the Black Elk explosion was,

24  but it looks around -- from my recollection, I believe it was

25  either late '11 or late '12, so --

1   Q.   Did you speak with -- day of.  Excuse me.  Day of.  Does

2   that refresh your recollection, that's the day of?

3   A.   I don't remember the exact date, but I know it was either

4   late '11 or late '12.  So it could have been this date.

5   Q.   Did you end up speaking with Ms. Janczewski or otherwise

6   talking about this?

7   A.   Honestly, I don't remember at all.

8   Q.   Did you ask her why Mr. Bodner seemed anxious?

9   A.   I don't remember.  This is nine years ago.  I don't even

10  remember this -- I don't even remember that she was still with

11  the fund at this time.

12          MR. GLUCK:  Move into evidence.

13          THE COURT:  Excuse me.  In exhibit 417, she is

14  bringing to your attention that Mr. Bodner seemed anxious for

15  data regarding the Black Elk situation, yes?

16          THE WITNESS:  Yes.  She's saying that Mr. Bodner

17  seemed anxious for the data related to how much more we have to

18  pay the Black Elk investors.  I'm not sure which Black Elk

19  investors she's referring to, if that's the Platinum Partners

20  Black Elk Opportunities Fund.  I'm not sure why she's asking me

21  for the data.  But, yes, I agree she's asking me that question

22  and she's letting me know that David Bodner seemed anxious for

23  the information.

24          THE COURT:  Are you saying that you have no idea why

25  she would want to bring to your attention that Mr. Bodner

1   seemed anxious for this data?

2           THE WITNESS:  No, I don't know why she's asking me in

3   particular for the data because I don't know which Black Elk

4   investors she's referring to.  There was another fund that was

5   run by another CFO called the Black Elk Opportunities Fund,

6   PPVE fund, I think that's what she's referring to in this

7   email.  What I was wondering was why she was asking me that

8   question since I was not the CFO of that fund.

9           THE COURT:  Did Mr. Bodner ask you for data from time

10  to time?

11          THE WITNESS:  He asked me for data from time to time

12  regarding his capital account within the fund.  Other than

13  that, he didn't ask me for any other data.

14          THE COURT:  This doesn't relate to his capital account

15  as far as you can tell, yes?

16          THE WITNESS:  Unless he was an investor in the

17  Black Elk fund, it would relate to his capital account in the

18  Black Elk fund.  But this doesn't relate to his Platinum

19  Partners Value Arbitrage Fund capital account.

20          THE COURT:  Go ahead, counsel.

21          MR. GLUCK:  PX 225, please.  It's already in evidence.

22  BY MR. GLUCK:

23  Q.  Mr. SanFilippo, you've seen this document before, haven't

24  you?

25  A.  I'm just going to take a minute to read it, if you don't

1   mind.

2   Q.  Sure.

3   A.  Yes, after reading it now, I do recall it.

4   Q.  Would you please explain to the jury what a side letter is

5   within the context of the hedge fund.

6   A.  So a side letter generally, in the context of a hedge fund,

7   refers to any kind of special fee or arrangement with a partner

8   that is different from the other partners in that fund.

9   Q.  So let's go through this.

10          PPVA and PPCO, those are the two funds; right?

11  A.  Yes.

12  Q.  And together, they would typically be called Platinum?

13  A.  I think the group of funds is sometimes referred to as

14  Platinum Partners.

15  Q.  Platinum Partners.  Fair enough.  Who are the Platinum

16  Partners?

17  A.  Platinum Partners were a group of management companies that

18  managed multiple funds within the Platinum organization.

19  Q.  Sorry.  Who are the human beings that were the Platinum

20  Partners?

21  A.  So speaking for Platinum Management New York LLC, the

22  partners were Mark Nordlicht, the Mark Nordlicht Grantor Trust,

23  and Uri Landesman at this particular point in time.  Within the

24  trust, there were multiple beneficiaries.  Those beneficiaries

25  were the Nordlicht family, the Bodner family, and the Huberfeld

 1   family.  I'm not sure what the ownership was in the other

 2   management company structures.

 3   Q.  Do you recognize the name Implant Sciences?

 4   A.  Yes, Implant Sciences was a portfolio company that was

 5   owned by Platinum Partners.

 6   Q.  Do you have any awareness of whether Platinum -- do you

 7   know what the value of Platinum's investment in Implant

 8   Sciences was at this time?

 9   A.  Is there any document you can point me to to refresh my

10   memory.

11   Q.  I probably could.

12        MR. GLUCK:  Could you call up the April 2016 NAV

13   statement.  It will be close enough.

14   A.  This is January 2016.  So if you have --

15   Q.  It will be close.

16   A.  Okay.

17   Q.  I was wrong.  Well, I'll remind you that the value of

18   Implant Sciences was close to $70 million.  Sound about right?

19        MR. HERTZBERG:  Objection.

20   Q.  You were a witness in that Implant Sciences bankruptcy;

21   right?

22        MR. HERTZBERG:  Objection to both pieces for different

23   reasons.

24        THE COURT:  Sustained.

25   Q.  Were you a witness in the Implant Sciences bankruptcy?

MC9Cpla1                    SanFilippo - Cross

1    A.  Honestly, I don't remember, but it's certainly possible.

2           When you say witness, meaning that I testified at

3    trial?  I did not testify at trial --

4    Q.  -- the bankruptcy case, did you remember that?

5    A.  I remember being deposed in various cases, but I don't

6    remember implant specifically.

7    Q.  PPVA was trying to get its money out of the Implant

8    Sciences investment?

9           MR. HERTZBERG:  Objection.

10          MR. GLUCK:  Trying to jog the witness's recollection.

11   A.  I don't recall --

12          THE COURT:  The objection is sustained.

13   Q.  What is this document stating purporting to obligate

14   Platinum to do once there were proceeds from Implant Sciences?

15   A.  It's obligating them to forward those proceeds to Beechwood

16   or an affiliate of Beechwood to repay the debt of Golden Gate

17   Oil.

18   Q.  Now, when did you first know about this side letter?

19   A.  I'm sure I learned about it shortly after it was created, I

20   don't know exactly when, but some point in January, I would

21   say.

22   Q.  Why wasn't this liability listed -- first of all, do you

23   know how much the debt of Golden Gate Oil was with principal

24   interest around this time?

25   A.  I don't remember.  If you want to pull up that schedule

1  again, I can read it off the schedule.

2  Q.  Sure.  We'll do that.  About $40 million?

3  A.  Sounds about right.  I don't know if --

4  Q.  Sounds about right, it's close enough.

5        MR. HERTZBERG:  Objection.

6        THE COURT:  Well, he said the witness said it sounds

7  about right.  So let's proceed.

8  Q.  So why wasn't this $40 million obligation listed on the

9  April 2016 --

10  A.  So as I explained earlier, that was debt of Golden Gate

11  Oil.  So when doing the Golden Gate Oil valuation, that would

12  have been subtracted from the total valuation of Golden Gate

13  Oil.  Accounting rules don't call for it to be listed

14  separately as a liability on our books, but what happened is

15  when we paid it, it would show up as an investment in Golden

16  Gate Oil and any debt would be reduced from the value of that

17  investment.

18  Q.  Walk me through this.  You get in excess, you, Platinum,

19  get in excess of $40 million from Implant Sciences; right?

20  A.  Yes.  So at that point, we record what's called a realized

21  gain or loss on sale.  We credit the proceeds of that sale to

22  our bank account.  And then let's say, for instance, we have to

23  take that money and repay Golden Gate's debt.  What we would do

24  is we would advance money to Golden Gate and treat that as an

25  addition to the debt that Golden Gate owes us.

MC9Cpla1                     SanFilippo - Redirect

1   Q.  You mentioned some investor calls earlier in your

2   testimony.  Were you on those calls?

3   A.  I was on a few of them.

4   Q.  In 2016?

5   A.  I don't recall exactly which calls I was on, but I was on a

6   few investor calls.

7   Q.  Here's my question, do you recall anyone ever mentioning

8   this side letter on any of those investment calls?

9   A.  I honestly don't remember if I was even on any investor

10  calls in 2016.

11          MR. GLUCK:  No further questions.

12  REDIRECT EXAMINATION

13  BY MR. HERTZBERG:

14  Q.  Mr. SanFilippo, you left Platinum at the end of 2016;

15  correct?

16  A.  Yes.

17  Q.  Since that time, have you had any contact with David

18  Bodner?

19  A.  No.

20  Q.  Have you had any contact with any member of David Bodner's

21  family?

22  A.  No.

23          MR. HERTZBERG:  Can we call up DX 3, please.

24  Q.  Do you recognize this document, Mr. SanFilippo?

25  A.  Yes, this is the 10-K that was filed with the SEC for

MC9Cpla1                        SanFilippo – Redirect

1    Black Elk Energy Offshore Operations for the period ending

2    December 31st, 2012.

3              MR. HERTZBERG:  We offer it.  I'm sorry.  It's in.

4              Can you turn, please, Mr. Robson, to PDF page 6, which

5    is page 1 of the document.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. HERTZBERG:

2   Q.  Mr. SanFilippo, can you see at the top of this page when

3   this document was filed with the SEC?

4   A.  I believe it was April 3, 2013.

5   Q.  Does that mean that this document has been publicly

6   available since April 3, 2013?

7   A.  Yes.

8   Q.  And any investor or interested person could go online and

9   pull this document, right?

10  A.  Yes.  This would also be one of the documents that we

11  provided to our valuation agents and our auditors.

12  Q.  Okay.  So your valuation agents and auditors had this

13  document when they were reviewing your NAVs as of 12/31/13?

14  A.  Yes.

15  Q.  And 12/31/12, right?

16  A.  Yes.

17  Q.  And the third full paragraph on this page—you are going to

18  have to zoom out a little bit—starting with November 16, is

19  that a description of the event that occurred on November 16,

20  2012 on the West Delta platform in the Gulf of Mexico?

21  A.  Yes.

22  Q.  Mr. Robson, if you would turn, please, to page 18 -- I'm

23  sorry, PDF page 23, page 18 of the document.

24          And right at the top, under "risk factors," item 1A,

25  do you see the heading where it says "risks related to the oil

Mc92Pla2                      SanFilippo - Redirect

1   and natural gas industry and our business"?

2   A.  I do.

3   Q.  And you do you see the sentence below it that says:  We may

4   be subject to claims and liabilities as a result of our

5   ownership of the West Delta platform?  Did I read that

6   correctly?

7   A.  Yes.

8   Q.  Below that, is there another detailed disclosure of the

9   events on November 16, 2012?

10  A.  Yes.

11  Q.  And if you zoom out of there and you go to the fourth

12  paragraph, perfect, keep going down, keep going down.  Right

13  there is great.

14          Do you see there that it says that as of April 10,

15  2013, four civil lawsuits filed by investors and by or on

16  behalf of certain injured or deceased workers against the

17  company?  Did I read that correctly?

18  A.  Yes.

19  Q.  Along with entities affiliated with PPVA Black Elk Equity,

20  LLC.  Do you see that?

21  A.  Yes.

22  Q.  And PPVA Black Elk Equity, LLC, is defined as the company's

23  majority unit holder, right?

24  A.  Yes, PPVA Black Elk Equity, LLC is a subsidiary of PPVA.

25  Q.  I would like you to pull up DX 569, please.

1             Mr. Gluck was asking you some questions about

2    Golden Gate Oil.  Do you recall that?

3    A.  Yes.

4    Q.  And the disclosures in the financial statements.

5    A.  Yes.

6    Q.  And he was asking you some questions about the disclosures

7    regarding Beechwood, correct?

8    A.  Yes.

9    Q.  Could you pull up page 41 of the financial statements,

10   please, Mr. Robson.  It is 42 of the PDF and the second full

11   paragraph, and keep going down to the end of that section.

12   Thank you.

13             Right at the top there, is there a disclosure

14   regarding Beechwood as a related party of the general partner?

15   A.  Yes.

16   Q.  And a disclosure that Beechwood had purchased 28 million of

17   the Golden Gate senior secured debt.  Do you see that?

18   A.  Yes, that's correct.

19   Q.  And that was disclosed in the 2013 financial statements?

20   A.  Yes.

21   Q.  And do you see the second paragraph from the bottom there

22   is a reference to Precious Capital.  Do you see that?

23   A.  Yes.

24   Q.  What is Precious Capital?

25   A.  Precious Capital was a subsidiary of Platinum Partners

1   Value Arbitrage Fund.

2   Q.  And that was the entity that was the lender on the loan

3   agreement to Golden Gate, correct?

4   A.  Yes, I believe they were both the lender and the

5   equityholder.

6   Q.  And there is a disclosure there that Precious Capital and

7   Golden Gate amended the loan documents to extend the credit

8   limit and also extended the maturity date to October 1, 2015.

9   Do you see that?

10  A.  I do.

11  Q.  And that loan was secured by all the assets of Golden

12  Gate?

13  A.  Yes.

14  Q.  And so the value of Golden Gate as you and your team

15  determined it to be was the collateral for the loan.

16  A.  Yes.

17  Q.  And the value of Golden Gate as you determined it to be was

18  substantially in excess of the loan amount, correct?

19  A.  Yes.

20  Q.  And that value that you determined, that you and your team

21  determined at Platinum Management, that had been confirmed

22  through the valuators and the auditors, right?

23  A.  Yes, through the auditors as of December 31, 2014 and

24  through the third-party valuation agents at the end of every

25  quarter throughout the year.

Mc92Pla2                      SanFilippo - Redirect

1    Q.  If the valuation was reliable, then there was substantial

2    coverage for the loan.

3    A.  Yes, that's correct.

4    Q.  And the valuation that you assigned to Golden Gate was not

5    determined by the operations of Golden Gate, was it?

6    A.  It was not.

7    Q.  Remind the jury what your valuation model was based upon.

8    A.  The primary input in the valuation model was the reserve

9    report which was prepared by the independent third-party

10   engineer, D&M.

11   Q.  And again you didn't take D&M's appraisal, you put it

12   through your model, right?

13   A.  Yes, we applied this in multiples.

14   Q.  By the way, it says here that the maturity date of the loan

15   was extended.  What does that mean?

16   A.  That means it wasn't due on its original due date.  It was

17   extended.  The due date was extended to October 1, 2015.

18   Q.  We can pull this down.

19          PX 538, put that up.

20          Do you see the date of Mr. Garza's e-mail is April 5,

21   2013?

22   A.  Yes.

23   Q.  Mr. Garza was a -- well, where did he work?

24   A.  He worked at Black Elk.

25   Q.  Were you aware of whether Black Elk was contemplating any

Mc92Pla2                    SanFilippo - Redirect

1   kind of transaction with Golden Gate around this time?

2   A.  I was advised that Black Elk was -- I was advised by

3   Mr. Nordlicht that they were looking -- that Black Elk was

4   looking to acquire Golden Gate.

5   Q.  So Mr. Garza was an employee of a prospective buyer?

6   A.  He was part of the management team of Black Elk, which was

7   a portfolio company that we owned, but the prospective buyer in

8   this deal.

9   Q.  And the buyer of the Golden Gate assets.

10  A.  Correct.

11  Q.  And the buyer is communicating to Mr. Nordlicht what the

12  buyer believed the Golden Gate assets to be worth.

13  A.  That is correct, yes.

14  Q.  And he is representing the interests of the buyer.

15  A.  He is representing the interests of Black Elk Energy.

16  Q.  He wants to buy the assets for as cheap as he can get them,

17  right?

18  A.  Normally that's what a prospective buyer would do.

19  Q.  Okay.  And do you recall that yesterday I showed you a

20  reserve report for Golden Gate prepared by D&M and it was dated

21  four months prior to this?

22  A.  Yes.

23  Q.  And do you recall that I showed you a second one that was

24  dated about seven months after this?

25  A.  Yes.

Mc92Pla2                     SanFilippo - Redirect

1    Q.  And it is the one -- and your models relied on two of those

2    appraisal reports prepared by D&M.

3    A.  Yes, that's correct.

4    Q.  Both the one before that e-mail and the one after that

5    e-mail.

6    A.  Correct.

7    Q.  Mr. Gluck was asking you about a $40 million liability at

8    Golden Gate Oil.  Do you recall that?

9    A.  Yes.

10   Q.  If you were to have reported that liability at the

11   Golden Gate level and at the PPVA level, which was what

12   Mr. Gluck was suggesting, what would be the net effect of

13   counting it twice?

14           MR. GLUCK:  Objection.

15           THE COURT:  As it is phrased, sustained, but there is

16   a question that can be put.

17   BY MR. HERTZBERG:

18   Q.  The value of Golden Gate as carried on PPVA's books

19   incorporated its $40 million obligation.

20   A.  Yes, it was reduced from the market cap of the company.  So

21   typically when you do a valuation of the company, you subtract

22   its debt and you add back any cash that it has on the balance

23   sheet.

24   Q.  And if you were to also record that liability at the PPVA

25   level, what would be the net effect?

Mc92Pla2                      SanFilippo - Redirect

1    A.  It would be double counting the liability.

2    Q.  And would your -- would the financial records of PPVA have

3    been accurate if you had double counted the liabilities?

4    A.  No.

5    Q.  They would have been materially inaccurate if you had done

6    it that way.

7    A.  That's correct.

8    Q.  You mentioned that you had attended investor calls handled

9    by Mr. Nordlicht, correct?

10   A.  I wasn't on every investor call, but I was on a few.

11   Q.  What was the general format of that?  Who was invited?  How

12   did it work?

13   A.  So the investor calls were open to all investors.

14   Typically Mr. Nordlicht would speak on the investor calls, give

15   an update on the portfolio as a whole.

16   Q.  And did you assist Mr. Nordlicht in preparing for those

17   calls?

18   A.  I don't recall assisting him on any particular call, but it

19   is possible that he would have asked me for a portfolio report

20   prior to any call.

21   Q.  And you have specific recollections of what was discussed

22   on those calls?

23   A.  I don't really.

24   Q.  Do you have any recollection of Mr. Nordlicht discussing

25   the relationship between the general partner and Beechwood on

Mc92Pla2                        SanFilippo - Redirect

1    those calls?

2    A.  No, not that -- not on any call that I was part of.

3    Q.  Do you recall Mr. Nordlicht discussing the oil and gas

4    positions with the investors in some detail?

5    A.  Yes.

6    Q.  Were the investors permitted to ask questions of

7    Mr. Nordlicht on those calls?

8    A.  Yes.

9    Q.  Did some do so?

10   A.  Yes.

11   Q.  Did you ever come away from those calls with an impression

12   that Mr. Nordlicht had been untruthful?

13   A.  No.

14   Q.  You would have resigned if Mr. Nordlicht had been

15   untruthful on any?

16           MR. GLUCK:  Objection.

17           THE COURT:  Sustained.

18   Q.  Mr. SanFilippo is there any difference between an

19   encumbrance and a liability?

20   A.  An encumbrance is typically an off-balance-sheet obligation

21   or contingent liability.  An actual liability is recorded in

22   its dollar amount on the balance sheet.

23   Q.  Can we pull up DX 620.12, please.

24           Mr. SanFilippo, can you identify DX 620.12, please.

25           MR. GLUCK:  Object.  Outside of cross.

1           MR. HERTZBERG:  I haven't offered it.

2           (Counsel confer)

3           THE COURT:  The pending question is a yes-or-no

4    question.  Can you identify DX 620.12?  Yes or no.

5           THE WITNESS:  Yes.

6           THE COURT:  Put another question.

7    BY MR. HERTZBERG:

8    Q.  What is it?

9    A.  It's the consent of Platinum Partners Value Arbitrage Fund,

10   LP.

11          MR. GLUCK:  Delayed objection.  Outside cross.

12          THE COURT:  No, I will allow it.  You may have

13   recross.

14          However, how much longer do you have?

15          MR. HERTZBERG:  This is my last question or set of

16   questions.

17          THE COURT:  All right.  Go ahead.

18          MR. HERTZBERG:  We offer it.

19          MR. GLUCK:  Oh.  It's a CRZ document.  We object to

20   the --

21          MR. HERTZBERG:  I'm sorry, your Honor, there was a

22   question pending to Mr. SanFilippo.  The objection is

23   overruled.  The question is:  What is the document.

24          MR. GLUCK:  I was responding to the offer.  We object.

25          MR. HERTZBERG:  I'm sorry.  He answered that question.

Mc92Pla2                        SanFilippo - Redirect

1          THE COURT:  The question was "what is it" and he said

2     "it is the consent of Platinum Partners Value Arbitrage Fund."

3     I don't think you put a further question, but if you want to

4     put a further question --

5          THE WITNESS:  I don't think I got to finish my answer.

6          THE COURT:  Excuse me.  I don't think I asked you --

7          THE WITNESS:  I'm sorry.

8          THE COURT:  -- to say anything.

9          THE WITNESS:  I apologize, your Honor.

10          THE COURT:  Put another question.

11     BY MR. HERTZBERG:

12     Q.  Is that your signature on the bottom of the page,

13     Mr. SanFilippo?

14     A.  Yes.

15     Q.  And what is the purpose of this document?

16     A.  It is consent of Platinum Partners Value Arbitrage Fund,

17     LP, to grant the officers listed on this form as authorized

18     signatories of the fund.

19          MR. HERTZBERG:  We offer 620.12.

20          MR. GLUCK:  I need more than four words.

21          THE COURT:  I think what I am intuiting, I could be

22     wrong, you were asking for a *voir dire*.

23          MR. GLUCK:  Yes.

24          THE COURT:  If I am wrong --

25          MR. GLUCK:  Yes.  May I?

Mc92Pla2                          SanFilippo - Redirect

1              THE COURT:  Yes.

2   *VOIR DIRE* EXAMINATION

3   BY MR. GLUCK:

4   Q.  Mr. SanFilippo, do you note the legend at the bottom of

5   this document says PPVA RH?

6   A.  Yes.

7   Q.  That's a PPVA document subpoenaed from CohnReznick.

8              And you see the top of the document it says CRZ notes?

9   A.  Yes.

10             MR. HERTZBERG:  Objection.

11  Q.  That is --

12             THE COURT:  Excuse me.  Overruled.  Go ahead.

13             MR. GLUCK:  Put another question.

14  BY MR. GLUCK:

15  Q.  That is a CRZ notation, isn't it?

16  A.  That is a note that CRZ put on this document.

17             MR. GLUCK:  That's what we object to, your Honor, not

18  original, authentic document, and that is hearsay, whatever is

19  in that square.

20             THE COURT:  So let me ask defense counsel, do you want

21  to redact that little box?

22             MR. HERTZBERG:  Definitely, yes.

23             THE COURT:  Okay.

24             MR. HERTZBERG:  We happened to have received it --

25             THE COURT:  So when you show it to the jury, whatever

Mc92Pla2                    SanFilippo – Redirect

1    the techie person needs to redact that part.

2              MR. HERTZBERG:  We are doing that now.

3              THE COURT:  There we go.  Received.

4              (Defendant's Exhibit 620.12 received in evidence)

5    BY MR. HERTZBERG:

6    Q.  Do you see the list of officers and personnel who are

7    identified in this written consent?

8    A.  Yes.

9    Q.  Is this -- and why are these people being identified?

10             MR. GLUCK:  Objection.  Outside the scope.

11             THE COURT:  Yes.  Well, you made that point before,

12   but I indicated I would allow it and you could recross.

13   Overruled.

14   A.  Can you just repeat the question again, Mr. Hertzberg.

15             THE COURT:  What is this?

16             THE WITNESS:  It's an authorization of Platinum

17   Partners Value Arbitrage Fund to grant these individuals as

18   authorized signatories on certain accounts within the fund.

19             THE COURT:  So this is just something that gives them

20   the right to sign for certain purposes.

21             THE WITNESS:  Right.  It's something you would provide

22   to a brokerage firm or a bank when setting up an account.

23             THE COURT:  Okay.

24   BY MR. HERTZBERG:

25   Q.  And what is the significance of the eight or ten people

Mc92Pla2                        SanFilippo – Redirect

1    identified in that list?

2              THE COURT:  I don't know what that means.  Sustained.

3              MR. GLUCK:  Objection.

4    BY MR. HERTZBERG:

5    Q.  Was this document provided to the auditors?

6    A.  Yes.

7    Q.  For what purpose?

8    A.  An auditor is required to gather information during the

9    course of their audit, and that information includes a

10   disclosure or verification of who the authorized signatories

11   are on each account.

12   Q.  Are these the people entrusted with signatory authority for

13   Platinum Management?

14             MR. GLUCK:  Objection.  Objection --

15             THE COURT:  I heard you.

16             As phrased, sustained.

17   BY MR. HERTZBERG:

18   Q.  What are these people entrusted with as reflected in this

19   document?

20   A.  They are entrusted with being authorized to make

21   transactions from either a bank or a brokerage account and to

22   enter into binding contract -- binding derivative contracts,

23   including --

24             THE COURT:  On behalf of who?

25             THE WITNESS:  On behalf of Platinum Partners Value

Mc92Pla2                          Steinberg - Direct

1    Arbitrage Fund.

2    BY MR. HERTZBERG:

3    Q.  Is David Bodner on that list?

4    A.  No, he is not.

5              MR. HERTZBERG:  Pass the witness.

6              THE COURT:  Okay.  Recross.

7              MR. GLUCK:  Waive.

8              THE COURT:  Pardon?

9              MR. GLUCK:  No recross.

10             THE COURT:  Thank you very much.  You may step down.

11             THE WITNESS:  Thank you.

12             (Witness excused).

13             THE COURT:  Please call your next witness.

14             (Pause)

15             THE COURT:  Call your witness, please.

16             MR. HERTZBERG:  Your Honor, for Mr. Bodner we called

17   David Steinberg.

18    DAVID STEINBERG,

19        called as a witness by the defendant,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. HERTZBERG:

23   Q.  Good morning, Mr. Steinberg.  What do you do for a living?

24   A.  I invest in real estate projects.

25   Q.  And did you formerly work at Platinum Management?

1    A.  I'm not sure if it was Platinum Management or another

2    Platinum entity but, generally speaking, a Platinum hedge fund,

3    yes.

4    Q.  What years did you work at Platinum?

5    A.  I believe I started as a summer intern in the summer of

6    2009 and then I -- well, I guess it's -- I left -- well, the

7    fund, I guess, closed or was taken over in 2016, so I guess the

8    fall of 2016.

9         And then I was asked to stay on by the receiver that

10    took over the fund in 2016 and I think I stayed there until --

11    working for her until 2017, maybe.  And then afterwards, one of

12    the liquidators that was managing one of the feeder funds out

13    of Cayman Islands asked me to work for them to help them, as

14    well, with the plan on recovery.  I think that was until 2018.

15    I believe so.

16    Q.  Okay.  Prior to 2009, what were you doing?

17    A.  I was in school.

18    Q.  And do you have a degree?

19    A.  Yes.

20    Q.  What do you -- what did you study?

21    A.  Finance.

22    Q.  And do you have a bachelor's or a master's?

23    A.  I have a master's degree in business administration.

24    Q.  Did you come into Platinum after getting your MBA?

25    A.  As a summer intern, yes.

Mc92Pla2                        Steinberg - Direct

1   Q.  And what was your role there?

2   A.  So it evolved.  You want to give me some time frames to

3   work with?

4   Q.  Sure.  Why don't you just start at the beginning in 2009

5   and tell us how it evolved.

6   A.  Okay.  So in 2009 I came as a summer intern.  I was working

7   with a portfolio manager.  His name was -- is Jonathan

8   Friedman.  He had a small portfolio of what they call micro cap

9   stocks that he was trading a liquid strategy.  I was working

10  with him.

11            THE COURT:  Counsel, fascinating though it is to know

12  what this witness did as a summer intern, and I'm glad to know

13  it was more than pouring coffee, I think maybe we should go to

14  when he was a full-time employee.

15            MR. HERTZBERG:  Fair enough, Judge.

16  A.  I can accelerate that.

17  Q.  Please do, Mr. Steinberg.

18  A.  Okay.  So I think it was toward the fall of 2009,

19  Mr. Nordlicht hired me, asked me to stay on as a full-time

20  employee.  At that point I was working on a strategy that

21  involved credit derivatives and that lasted probably until

22  maybe the beginning of 2010.  There was an opportunity in the

23  market at that point at the end of the financial crisis that my

24  strategy was based on, and when that went away, Mr. Nordlicht

25  sort of like reallocated me to a different group of people to

1    help them with what they were working on.

2            And so the first group that I worked with was with Dan

3    Small and David Levy.  They were portfolio managers.  I also

4    had a title as a portfolio manager, but they were the ones that

5    were running their strategy, which was a secured lending

6    platform.  They were lending money to private companies.

7    Q.  Did you report to Mr. Nordlicht?

8    A.  Yes.  As well as -- I reported to Mr. Nordlicht as well as

9    to David Levy and Dan Small.

10   Q.  Did -- who was Uri Landesman?

11   A.  Uri joined, I think, later from the time frame that we are

12   talking about right now, but he was brought -- I think his

13   title was president.  My understanding was that he was brought

14   on to raise institutional capital for the fund.

15   Q.  Did you understand Mr. Nordlicht to be the senior executive

16   of the organization?

17   A.  Yes.

18   Q.  And did Mr. Landesman also have a senior position of

19   authority when he came on?

20   A.  I don't -- I guess authority depends on -- in the realm of

21   what I was working on in terms of making investments, helping

22   determine strategy with investments, Mr. Landesman was probably

23   not involved, so he had other areas that he was in charge of,

24   like marketing and the team that worked with the marketing team

25   he was in charge of.  But Mr. Nordlicht was the person that, at

1    least in terms of what I was doing on a day-to-day basis, which

2    was analyzing investment opportunities, Mr. Nordlicht was the

3    person that made final decisions on that.

4    Q.  But you understood that Mr. Landesman had senior level

5    authority within the organization.

6    A.  Correct.

7    Q.  And if Mr. Landesman told you to do something, you would do

8    it.

9    A.  Well, if it overlapped with investment stuff, then

10   Mr. Nordlicht would have to sign off on it also.  But generally

11   speaking what Mr. Landesman would say carried weight.

12   Q.  Thank you.

13          So you said you started to work with David Levy and

14   Dan Small.  Were they portfolio managers?

15   A.  Yes.

16   Q.  And what does that mean within Platinum to be a portfolio

17   manager?

18   A.  What it generally means is that you have responsibility to

19   source investment opportunities, to assess whether they --

20   there is an investment opportunity that's suitable for the

21   Platinum strategy, negotiate terms of a potential investment,

22   conduct due diligence on the potential investment, and

23   eventually present it to Mr. Nordlicht for a decision of

24   whether or not the investment should be made.

25          And then once the investment is made, then there is

1  the maintenance of the investment following the actual

2  investment itself.  And then eventually is the monetization of

3  that investment, whether it's a repayment of a loan or selling

4  equity in something.  But that's generally what a portfolio

5  manager's responsibility would be.

6  Q.  When is Mr. Nordlicht brought into the picture in that

7  process?

8  A.  Fairly early.  Portfolio managers generally don't want to

9  waste time conducting due diligence or negotiating terms of a

10 deal if Mr. Nordlicht will tell them that this is not for us or

11 I'm not going to approve this deal no matter what.  So usually

12 he is looped in fairly early into a deal.  But he wouldn't

13 generally get really heavily involved in it until it was being

14 presented by the portfolio manager as an actionable investment.

15 Q.  What does it mean to source an investment?

16 A.  So a fund could have a lot of money to invest, but it needs

17 to have investment opportunities in front of it to put that

18 money to use.  So there is always a lot of deals in the market

19 that are looking for funding, and you need a -- sort of a -- I

20 guess, like hang your shingle up to tell the world that you are

21 opening for business and people should show you the

22 opportunities.  So there's brokers, companies, conventions you

23 could go to to sort of get your name out there, that you are

24 there to provide capital for investments, and you have to find

25 your niche of what kind of investments you want to work for,

and then people who are pitching investments for companies

would know to come to you.

Q.  Is part of your value as a portfolio manager your ability

to hang a shingle, as you say?

A.  That's part of it.

Q.  When you hear about an investment, how do you evaluate it?

How do you determine whether it is something that you want to

pitch to Mr. Nordlicht?

A.  Well, I guess the number one thing that, if I could recall

correctly, was most important for Platinum was what is the

return on the capital going to be with this investment?  So,

you know, I guess there are investments that will have all

sorts of return profiles, right?  You could invest in

treasuries and earn a 2 percent return or you could take, as

you move on -- up the risk scale, your returns will increase as

well.  So the risk profile and the return profile needed to fit

what Platinum was trying to accomplish, which was earning a

high return on investments, which would be riskier than a

treasury yield, obviously, but structuring it in a way where a

lot of risk could be minimized or mitigated.

        But the return profile was very important for

Mr. Nordlicht, and so there was that, that's the negotiation

part of it, of negotiating terms with the company, about what

you could get for your investment.  And then obviously there is

the due diligence part of it, which is assuring that whatever

Mc92Pla2                          Steinberg - Direct

```
1    you think you are going to get, whatever the portfolio manager
2    thinks they will get from the investment is actually feasible.
3    Q.  And in making your presentation to Mr. Nordlicht, does that
4    put you in a position where you are having some back and forth
5    with him?
6    A.  Certainly, yes.
7    Q.  He is asking questions and you are responding to them?
8    A.  Yes.
9    Q.  And would he sometimes ask you to go back and do more
10   research and come back to him?
11   A.  Very frequently, yes.
12   Q.  And ultimately was it Mr. Nordlicht's call as to whether an
13   investment went forward or not?
14   A.  Certainly seemed that way to me, yes.
15   Q.  Did you ever get the impression that Mr. Nordlicht lacked
16   the authority to make those calls?
17   A.  Never.
18   Q.  Did you see Mr. Nordlicht make those calls in realtime?
19   A.  Yes.
20   Q.  He never said he had to go check with anybody?
21   A.  Not that I could recall, no.  He was very decisive, very
22   decisive leader.
23   Q.  Did you have occasion in your years at Platinum to meet
24   Mr. Bodner?
25   A.  Yes.
```

Mc92Pla2                    Steinberg - Direct

1    Q.  And in what capacity did you meet him?

2    A.  So the way the -- at least when I first joined Platinum,

3    Platinum was in a building at 57th Street.  They had two

4    floors.  One was the fourth floor, where I worked, which was

5    also where Mr. Nordlicht sat and David Levy and Dan Small sat.

6    On the 54th floor was another floor where other employees sat,

7    and there was a daily afternoon prayer that took place on that

8    floor.  And that's where I believe I met Mr. Bodner the first

9    time, but our conversation wasn't -- was more we had a similar

10   background, yeshiva education, and so we had a little bit of a

11   connection with each other, but it wasn't like an employee

12   capacity if that's what your question was.

13   Q.  So did employees from the fourth floor sometimes go to the

14   54th floor for afternoon prayer?

15   A.  Yes.

16   Q.  Was that a fairly common thing?

17   A.  The people on the fourth floor if they wanted to do

18   afternoon prayers would come to the 54th floor for afternoon

19   prayers.

20   Q.  Did they also serve lunch on the 54th floor?

21   A.  I don't know, but there was lunch on the fourth floor.

22   Q.  Did you ever have occasion to seek Mr. Bodner's authority

23   for anything you were doing at Platinum?

24   A.  Seek his authority?  No.

25   Q.  Did he ever tell you how to do your job?

Mc92Pla2                        Steinberg - Direct

1    A.  No.  There were occasions where I may have asked advice

2    from him, but not -- he didn't -- I never took any direction

3    from him.

4    Q.  Well, tell me about that.  Why --

5                THE COURT:  Well, counsel, I will allow that, but how

6    much longer do you have with this witness?  I'm asking because

7    we want to give the jury their mid-morning break.

8                MR. HERTZBERG:  We can take a break now Judge.

9                THE COURT:  Well answer my question.  How much longer

10   do you have on your direct?

11               MR. HERTZBERG:  35, 40 minutes.

12               THE COURT:  All right.  We will give the jury their

13   mid-morning break.

14               See you in 15 minutes.

15               You can step down.  We will see you in 15 minutes.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

Mc92Pla2                          Steinberg - Direct

1           (Jury and witness not present)

2           THE COURT:  Please be seated.

3           So what is it that you intend to ask this witness

4    that's going to take 30 to 35 minutes?

5           MR. HERTZBERG:  Your Honor, the witness was portfolio

6    manager for the years we touched on Black Elk, Desert Hawk,

7    implant, Pedevco, Golden Gate.  I think your Honor is right

8    that I did just get to the punch line before the break, but

9    there is some additional material to cover.  He attended meets

10   of the valuation committee.  He had his knowledge of the

11   release.  He has --

12          THE COURT:  So let me just make sure I understand the

13   relevance.  If the relevance is that the ultimate loss as far

14   as he is concerned was Mr. Nordlicht and Mr. Bodner played no

15   role that he observed, you have already pretty much brought

16   that up.  If the relevance is to the accounting for any of

17   those entities, I don't see how he can speak to that.  That's

18   why you had your previous witness.

19          So what is it that he is going to be adding?

20          MR. HERTZBERG:  He worked on these positions, Judge.

21   He can -- the assertion by the plaintiffs, I mean, from where I

22   am sitting, it sounds like this is all a hoax, and this is a

23   guy who worked on these positions.  He is a solid professional,

24   and he believed in what Platinum was doing.

25          THE COURT:  So maybe I misunderstand plaintiffs'

1    position, but I understood their position to be that the

2    accounting for these various entities was -- did not accurately

3    reflect their real value through various what plaintiffs would

4    view as accounting tricks and defense counsel would say, no,

5    they are perfectly legitimate accounting.  But I don't see

6    how -- I don't recall them saying anything about there wasn't

7    oil in the ground or something like that.

8              MR. HERTZBERG:  I think that very much is the

9    implication every time Mr. Gluck stands up and says that these

10   wells are pumping water, just by way of --

11             THE COURT:  By the way, how would he know?

12             MR. GLUCK:  I was about to say --

13             THE COURT:  Excuse me.  Did he go to visit these

14   wells?

15             MR. HERTZBERG:  He did not visit and go to California,

16   but he was working with portfolio team, he rose to be the chief

17   risk officer and was working across the whole portfolio.

18             THE COURT:  All right.  I'm going to give you a

19   maximum of 15 minutes with him, and so see what you can do, and

20   you might want to talk to him and make sure that he doesn't

21   feel he will has to describe the history of the universe in

22   answer to every question.

23             MR. HERTZBERG:  I will heed that direction.  I do want

24   to flag for the Court that we don't have another witness after

25   Mr. Steinberg today and I don't know that we will get to that.

1           THE COURT:  Oh, no.  You sure do.  You have

2    Mr. Bodner, and he is going to be called if you don't have

3    another witness.

4           MR. GLUCK:  May I --

5           THE COURT:  We will see you in five minutes.  No.

6           THE DEPUTY CLERK:  Judge, the jurors have asked me to

7    ask you that whichever plaintiffs' counsel was doing the

8    examining in the last session should please be directed to

9    speak directly into a microphone.  They couldn't hear a thing

10   he was saying.

11          THE COURT:  That's been an ongoing problem.

12          MR. GLUCK:  Sorry.  I will pull it closer to me.

13          (Recess)

14          THE DEPUTY CLERK:  All rise.  May I bring in the jury?

15          THE COURT:  Hold on one minute.

16          So I want to elaborate on two points.

17          First—please be seated—this is something that I

18   would have thought that at least Mr. Lauer would have

19   recognized, because it is trial lawyering 101, which is

20   "shorter is better."  And the reason I am concerned about

21   length is because elaborate length can only lead to a confused

22   jury.  My client is the jury.

23          Now, as I understand this witness's testimony, it

24   could be about five questions:

25          Who was your boss, ultimate boss?  Mr. Nordlicht.  We

1   have already had that, but that took 15 minutes, not one

2   question.

3          Did you ever have any substantive -- did Mr. Bodner in

4   any way ever direct you substantively?  No.  Again, we

5   basically got that out already.

6          Did you work on these various projects, like

7   Black Elk?  Yes.

8          And were you one of the primary people working on it?

9   Yes.

10          And did you have confidence that they were good

11   investments and you recommended them?  Yes.

12          And eventually some problems arose with respect to X

13   and Y or Z?  Yes.

14          And how to treat them financially in an accounting

15   wise was none of your responsibility, correct?  Correct.

16          Isn't that what you want to bring out from this

17   witness?

18          MR. HERTZBERG:  Certainly in part, your Honor, but

19   there are other areas.

20          THE COURT:  Like?

21          MR. HERTZBERG:  Like his presentations to the

22   valuation committee and his impression as a percipient witness

23   of what those meetings were like, like the -- his knowledge of

24   what was going on in the early part of 2016 with the efforts to

25   exit Huberfeld and Bodner and his knowledge of what was

Mc92Pla2                        Steinberg - Direct

1    anticipated next.

2              THE COURT:  Well, it sounds a lot of this may be

3    either hearsay or beyond the scope of lay witness impression,

4    which is quite limited under the federal rules, but we will

5    see.

6              All right.  Let's bring in the witness, let's bring in

7    the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc92Pla2                        Steinberg - Direct

1           (Jury present)

2           THE DEPUTY CLERK:  Jury entering the courtroom.

3           THE COURT:  The witness should come back up to the

4      stand, please.

5           Please be seated.

6           Counsel.

7           MR. HERTZBERG:  Thank you, your Honor.

8      BY MR. HERTZBERG:

9      Q.  Mr. Steinberg, right before the break, you were saying that

10     there was an occasion where you may have taken advice or sought

11     the vice of Mr. Bodner.  Can you explain that to the jury, what

12     you meant by that?

13     A.  Sure.

14          So I can only recall one instance of this occurring,

15     but it was the first time that I was making a pitch for an

16     investment that I would be responsible for separate from Dan

17     Small and David Levy, and it was the first time that I was

18     looking at an investment opportunity on my own without the help

19     of the senior portfolio managers with David Levy and Dan Small,

20     and so I just felt like I needed some general guidance,

21     business advice, somebody else to just take a look at what I

22     was seeing and see if there was any gaping holes in the

23     opportunity that I was looking at.

24          And so I probably spoke to more than one person, but I

25     asked David if he could -- Mr. Bodner if he could just listen

Mc92Pla2                        Steinberg – Direct

1  to what I had to say and hear me out, and if there was anything

2  that he would advise me on, just as from a practical

3  perspective, my presentation.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HERTZBERG:

2               THE COURT:  Do I understand it that at no time during

3    your employment did you take direction from Mr. Bodner?

4               THE WITNESS:  That's correct.

5               THE COURT:  And do I understand that, as far as you

6    observed, it was Mr. Nordlicht who was the ultimate boss?

7               THE WITNESS:  Absolutely, yes.

8               THE COURT:  Counsel.

9    BY MR. HERTZBERG:

10   Q.  What was the transaction in which you sought Mr. Bodner's

11   input?

12   A.  It was a company called -- it was a potential investment

13   into a called Pedevco.

14   Q.  When you asked Mr. Bodner if he would provide you some

15   advice, did you sit with him in his office?

16   A.  I don't recall if it was in his office or in a conference

17   room or on the phone, maybe just on the phone.  I don't recall.

18   Q.  What was Pedevco, just so the jury understands what we're

19   talking about.

20   A.  Pedevco was an oil and gas company.  It still is, I think.

21   It may have changed its name, but it's an oil and gas company

22   that was doing oil and gas exploration, which means that they

23   would buy land, which -- I don't know how to describe it

24   properly.  Basically, there is a way of determining if there's

25   actual oil in the ground underneath the ground that you're

1    purchasing using engineering or different kind of testing or

2    and seismic and things like that.  And it's like a prospect.

3    And there were developed wells in the area already that showed

4    a high level of confidence that additional drilling would

5    produce more wells.  And that's what oil and gas exploration

6    company is.

7    Q.  Was there an appraisal report associated with the Pedevco?

8    A.  I don't think it was an appraisal.  I think it was

9    something called the reserve report.

10   Q.  Was the reserve report prepared by engineers?

11   A.  I believe so, yes.

12   Q.  Did you review it?

13   A.  Yes.

14   Q.  Did you have the expertise personally to understand the

15   reserve report?

16   A.  Not at a deep level.

17   Q.  Did you ask anybody to help you with that?

18   A.  Yes, we hired another engineering company to audit that

19   reserve report.

20   Q.  Did you ultimately present this to Mark Nordlicht as

21   something you thought that PPVA should invest in?

22   A.  Yes.

23   Q.  And when you presented it, was the reserve report factored

24   in as one of the important points as to why you thought it was

25   a good idea?

1   A.  Yes.  For oil and gas companies, the reserve report is a

2   key component of the investment analysis.

3   Q.  And that third-party consultant, they reviewed the reserve

4   report?

5   A.  Correct, yes.

6   Q.  Did you talk with them about it?

7   A.  Yes.

8   Q.  You got comfortable, I take it, that what they told you

9   about the reserve report, it supported the bona fides of

10  Pedevco?

11  A.  Correct, yes.

12  Q.  And you shared all of that with Mr. Nordlicht?

13  A.  Yes.

14  Q.  And what ultimately was the nature of the PPVA investment

15  with Pedevco?

16  A.  So the investment was a loan made to the company.  I don't

17  recall the exact terms of the loan, how soon it needed to be

18  repaid, or what the interest rate was, I don't recall that

19  right now.  Besides the loan, there was also a significant

20  amount of stock in the company that Platinum received.  I don't

21  remember the exact structure of how they received the stock, if

22  it was shares in the company or if it was a convertible

23  preferred share, but it was an equivalent of the stock in the

24  company, a large portion of the company stock.

25  Q.  Were you the portfolio manager on that position?

MC9Cpla3                        Steinberg - Direct

1    A.  It was myself and Ezra baron.

2    Q.  Did you understand that Platinum had to place a value on

3    the note and the equity?

4    A.  I always understood that, but it wasn't something I was

5    involved in.

6    Q.  But you understood that it had to be done?

7    A.  Yes.

8    Q.  Did you understand why it had to be done?

9    A.  I think so, yes.

10   Q.  Can you explain that very briefly.

11   A.  I can tell you how I understand it.  Whether it's true or

12   not, I can't tell you.  But the way I understood it was that --

13            THE COURT:  Well, let me ask you, you're not an

14   accountant?

15            THE WITNESS:  No, I am not.

16            THE COURT:  And you're not an expert on accounting

17   rules and accounting procedures, are you?

18            THE WITNESS:  No, I am not.

19   Q.  Did you have occasion to make a presentation to the

20   Platinum Management valuation committee?

21   A.  I don't know if it was a presentation, but there were

22   occasions where the -- the term "valuation committee" that

23   we're talking about, I don't recall specifically, like a

24   valuation committee or members of a valuation committee at

25   Platinum or who those were, but there were frequent calls with

1    Platinum's third-party valuers.

2            In the beginning, it was a company called Sterling, I

3    don't remember what the rest of the name was.  Sterling then

4    eventually changed to Phelps, if that's correct.  I don't

5    remember.  There was a third-party valuation company that

6    Platinum hired to review the valuation that Platinum was

7    putting on different assets, and once a quarter or once a

8    month, I don't remember the frequency of it, sometimes they

9    would ask portfolio managers to join a call with the

10   third-party valuers to provide an update or answer any

11   questions they may have.  So maybe once or twice I was asked to

12   join such a call.  They would tell you dial in at 11 o'clock in

13   the morning and it's going to be your turn to talk about what

14   your -- the investments that you're seeing.

15           MR. GLUCK:  Move to strike.  The question was about

16   valuation committee meetings, not auditor valuator.  Whole

17   answer.

18           THE COURT:  I'm going to allow it, but I'll remind, of

19   course, counsel of the time limit.

20   Q.  Were you ever instructed not to be truthful with the

21   third-party valuators?

22   A.  Never.

23   Q.  And if somebody had instructed you to be untruthful, what

24   would your reaction have been?

25           MR. GLUCK:  Objection.

1    THE COURT:  It never happened, so it's a hypothetical.

2    Sustained.

3    Q.  Were you, in fact, truthful with these valuators?

4    A.  I believe so.

5    Q.  You believe so or you're certain that you were?

6    A.  I'm certain that I was, yes.

7    Q.  Because you wouldn't have been untruthful; right?

8    A.  Correct.

9    MR. GLUCK:  Objection.

10   Q.  You had occasion as a junior portfolio manager, I guess, to

11   work with Dan Small and David Levy on some of the positions

12   that they were managing; right?

13   A.  Correct.

14   Q.  Was one of those Black Elk?

15   A.  Yes.

16   Q.  And in your time working with Dan Small and David Levy,

17   what was your function?

18   A.  It was mostly dealing with ministerial kind of tasks.  At

19   that time, Black Elk was trying to raise money from the capital

20   market, so there was a lot of forms that needed to be filled

21   out and spreadsheets that to be shown and presentations.

22   Mostly ministerial stuff.  I wasn't involved in negotiation

23   between the different parties related to that capital raise,

24   but I had some superficial knowledge of the investment.

25   Q.  Is there anything that you saw in your time working with

MC9Cpla3                    Steinberg - Direct

1   Mr. Small or Mr. Levy that undermined your confidence in the

2   position?

3   A.  No, at that point, Black Elk was one of the more exciting

4   prospects that were spoken about at the fund.

5   Q.  And you also performed a similar function with respect to

6   Desert Hawk; is that right?

7   A.  Desert Hawk was less involvement.  There wasn't much taking

8   place.  The company was -- if I recall correctly, the company

9   was waiting for a mining permit at that point, so there wasn't

10  really much going on until they got those mining permits.  It

11  was a gold mine company.  So I don't recall there being much

12  activity, but it was one of the investments that Dan and David

13  were in charge of.

14  Q.  Did you see anything with any of the positions that you

15  were working with Levy and Small on, did you see anything that

16  undermined your confidence in what they were doing?

17  A.  No.

18  Q.  You never saw any kind of wrongdoing of any kind?

19  A.  No.

20             MR. GLUCK:  Objection.

21             THE COURT:  Overruled.

22  Q.  Let me bring you to early 2016.  So on the latter part of

23  your tenure at Platinum, did you come to learn that Platinum

24  was having liquidity concerns?

25  A.  I believe so, yes.

MC9Cpla3                         Steinberg - Direct

1        MR. GLUCK:  Objection.  Foundation.

2        THE COURT:  Overruled.

3  Q.  Did you have occasion to work with someone named Seth

4  Gerszberg on something related to that?

5  A.  Said to the liquidity issues?

6  Q.  Yeah.

7  A.  Briefly, probably, yes.

8  Q.  Can you help us understand what it is that you and

9  Mr. Gerszberg were trying to accomplish?

10        THE COURT:  I'm unclear from the witness's previous

11  answers.  You said that you briefly, probably had occasion to

12  work with him on something related to liquidity issues, et

13  cetera?

14        THE WITNESS:  Yes.

15        THE COURT:  So do you have a memory of it?

16        THE WITNESS:  Yes.

17        THE COURT:  Okay.

18        THE WITNESS:  Sorry for not being clear.

19  Q.  So what do you recall about what you were hoping to

20  accomplish when working with Mr. Gerszberg in the latter part

21  of '15 or the early part of '16?

22  A.  I believe it was early 2016, maybe it was February, that

23  timeframe, February, March, maybe January even.  But the fund

24  was going through an issue where I guess monetization events

25  that were anticipated to occur were being delayed and there was

1     an issue with liquidity in terms of being able to fund the

2     portfolio in a manner that would help it to continue to allow

3     it to thrive.  So we were looking for ways to try to structure

4     an investment that could be attractive to an investor to invest

5     a significant amount of capital into Platinum.

6               What Mr. Gerszberg, who wasn't an employee of

7     Platinum, his company was a borrower of Platinum and he had a

8     creative, sort of out-of-the-box way of looking at things.  He

9     was trying to help Mr. Nordlicht figure out how to present what

10    the fund has in a way that could be easy and simple for an

11    investor to understand and perhaps entice an investor to bring

12    capital into the fund to help it gap this liquidity issue that

13    the fund had.

14    Q.  Did you come to learn at that time that Mr. Nordlicht

15    wanted Mr. Bodner and Mr. Huberfeld to exit the management

16    company?

17    A.  I think it was a little bit later than that, maybe more

18    towards the springtime, but I did eventually learn about that,

19    yes.

20    Q.  What did you come to learn?

21    A.  That Mr. Nordlicht was trying to raise capital, but he

22    called the management share class, and that in order for those

23    investors to join the management company, he would need

24    existing partners to leave the management company so that there

25    could be space for this new investor.

MC9Cpla3                        Steinberg - Direct

1    Q.  And you mean a new investor in the fund?

2    A.  In the fund, yes.

3    Q.  In PPVA?

4    A.  I believe that's what it was.

5            MR. GLUCK:  Objection.  Leading.

6            THE COURT:  I'll allow that.  I'm a little unclear

7    what you're saying here.

8            You understood, did you not, that the fund was in

9    serious financial difficulty, yes?

10           THE WITNESS:  The question he asked was about

11   liquidity.

12           THE COURT:  Excuse me?

13           THE WITNESS:  The question that he asked was about

14   liquidity.

15           THE COURT:  All right.

16           THE WITNESS:  There was --

17           THE COURT:  So you understood that there was a serious

18   liquidity problems?

19           THE WITNESS:  Correct.

20           THE COURT:  By liquidity, what do you mean?

21           THE WITNESS:  That there was not enough cash to

22   support -- to continue supporting the investments that were in

23   the portfolio.

24           THE COURT:  So the fund might have to go out of

25   business unless steps were taken to rectify this?

1          THE WITNESS:  Correct.

2          THE COURT:  So this fellow Gerszberg comes up with a

3     proposal and presents it, but as I think you said that, later

4     on, Mr. Nordlicht came up with the idea of asking the people

5     who were the effective owners of the management company to give

6     up their role so that he could attract some other investors by

7     sweening the pond.  Do I have that right?

8          THE WITNESS:  Yeah.  I think the episode Mr. Gerszberg

9     is separate from this management share class that the Judge was

10    talking about.

11         THE COURT:  Okay.  So just focusing on Mr. Nordlicht,

12    as you understood it, Mr. Nordlicht's proposal, how did you

13    know about all that?

14         THE WITNESS:  I definitely learned about it from

15    Suzanne Horowitz, who, at that point, was -- I don't know

16    exactly what her title was, but she was like an in-house lawyer

17    at Platinum who was working on documentation for this

18    investment because there seemed to be some --

19         THE COURT:  You were not personally involved in

20    formulating this proposal?

21         THE WITNESS:  Correct.  The management shareholders.

22         THE COURT:  Sounds to me like hearsay, counsel.

23    BY MR. HERTZBERG:

24    Q.  Did you have specific discussions, Mr. Steinberg, with

25    Susan Horowitz about this --

 1              THE COURT:  Still hearsay.

 2   Q.  Did you have discussions with Mr. Gerszberg about the

 3   proposal to use the management share class to attract --

 4              THE COURT:  Still hearsay.

 5              MR. HERTZBERG:  Could we pull up Exhibit PX 592,

 6   please.

 7   Q.  Is this an email that was sent by you, Mr. Steinberg?

 8   A.  It stays that it was.

 9   Q.  Who's Naftali Manela, who this email is --

10              MR. HERTZBERG:  I'm sorry.  This is in evidence.  The

11   jury can see it.

12   Q.  Who is Naftali Manela?

13   A.  I believe his title was the CFO of Platinum.

14   Q.  Did he have a different job than Joe SanFilippo?

15   A.  Yes.  Now maybe his title was chief operating officer at

16   the time.

17   Q.  What were you communicating to Mr. Manela in this email?

18   A.  I'm just going to read it for a second.

19              THE COURT:  So, you say in the second paragraph,

20   without the extra money from Apollo or BAM.  Who was BAM?

21              THE WITNESS:  BAM is Beechwood Asset Management.

22              THE COURT:  The fund will need to gate.  What did you

23   mean by gate?

24              THE WITNESS:  Gate is the general term in the hedge

25   fund industry referring to telling investors that redemptions

MC9Cpla3                      Steinberg - Direct

1      will not be paid.

2                  THE COURT:  Then you say Ari Glass and NM, who is NM?

3                  THE WITNESS:  I'm probably referring to an investment

4      firm called New Milton.  My recollection of this email, I think

5      it's primarily based on the fact that I was asked these

6      questions at my deposition.  I don't remember --

7                  THE COURT:  No, I don't care about your deposition and

8      I just want you to listen to my questions and answer just my

9      questions.

10                 THE WITNESS:  I apologize, sir.

11                 THE COURT:  Do you recollect what you meant when you

12     said NM?

13                 THE WITNESS:  Yeah, New Milton.

14                 THE COURT:  It goes on, we lose probably lose to

15     $400 million of value due to unfunded position.  I'm sorry.  I

16     skipped over.  After eventually, BAM will have to join, put the

17     fund into BK.  That was bankruptcy; right?

18                 THE WITNESS:  Yes.

19                 THE COURT:  We lose probably lose to 400 million of

20     value due to unfunded positions and a trustee is appointed to

21     run the wind-down with no rachmanus on BAM.

22                 In other words, this was a very serious crisis, yes?

23                 THE WITNESS:  Yes.

24                 THE COURT:  So when you say this is the narrative for

25     Murray, who is Murray?

1              THE WITNESS:  I presume I was referring to Murray

2    Huberfeld.

3              THE COURT:  I'm sorry?

4              THE WITNESS:  Murray Huberfeld.

5              THE COURT:  And Beechwood.

6         So why were you singling out Mr. Huberfeld in that

7    last sentence?

8              THE WITNESS:  If I could recall correctly, Naftali was

9    going to be speaking with Murray and also Beechwood about

10   potentially making an investment into Platinum in this

11   timeframe of January to help relieve this liquidity issue.

12             THE COURT:  All right.  Counsel.

13   BY MR. HERTZBERG:

14   Q.  You write here, without the extra money from Apollo or BAM.

15   What did you mean by that when you referred to Apollo?

16   A.  There was -- Apollo is an investment firm and there was

17   discussions or negotiations that are taking place.  I wasn't

18   involved in them, but one of the other employees, Haim Salfati,

19   was leading an effort to have Apollo -- I don't recall the

20   structure, if it was going to be an equity or an investment or

21   a loan to Platinum to shore up this liquidity gap that Platinum

22   had.

23             MR. GLUCK:  Objection.  Move to strike.  He said he

24   had no involvement of it.  It's all hearsay.

25             THE COURT:  I think part of the answer is responsive.

1    I'm going to let it stand.  I would, again, ask the witness be

2    sure to confine yourself just to the question.

3         So the question that was put to you was, what did you

4    mean by Apollo.  Apollo is a great big fund that you thought or

5    people thought maybe would be interested in helping bail out

6    Platinum, yes?

7         THE WITNESS:  Correct.  But I had --

8         THE COURT:  I think that was a yes or no question.

9         Go ahead, counsel.

10   BY MR. HERTZBERG:

11   Q.  You wrote Apollo or BAM.  What were you saying with respect

12   to BAM there?

13   A.  I think that that was -- what I was referring to in that

14   last line of that email when Naftali was speaking to Beechwood,

15   Beechwood and BAM are interchangeable, at least my

16   understanding, and Naftali was going to try to get Beechwood or

17   BAM to also participate in this investment.

18   Q.  And there are some schedules attached to this.

19        MR. HERTZBERG:  If Mr. Robson would turn to the one

20   headed PPVA position breakout.

21   Q.  Is this the schedule that you prepared, Mr. Steinberg?

22   A.  Standing here today, I don't have a recollection of

23   actually preparing this schedule, but I'm pretty sure at my

24   deposition, at that point, I testified that this is the

25   schedule and I did put it together.

MC9Cpla3                       Steinberg - Direct

1     Q.  It was a schedule attached to your email to Mr. Manela;

2     right?

3                THE COURT:  Just so you understand, your deposition is

4     not part of this case, so you don't have to worry about what

5     you said at your deposition.  If it becomes relevant, someone

6     will --

7                THE WITNESS:  Okay.

8                THE COURT:  All we want to know is what you know

9     today.

10               So do I understand it, that although you don't have a

11    specific recollection of preparing this, you think it's likely

12    that you did?

13               THE WITNESS:  Yes.

14               THE COURT:  Okay.

15    Q.  Do you have a recollection of where you got the data from

16    for this spreadsheet?

17    A.  No.

18               MR. HERTZBERG:  Mr. Robson, if you could zoom out a

19    little bit.

20               THE WITNESS:  I don't have a specific recollection,

21    no.

22    Q.  When you have those two columns encumbered and

23    unencumbered, do you see that?

24    A.  Yes.

25    Q.  Were you equating encumbered with liability?

MC9Cpla3                       Steinberg - Direct

1   A.  I don't believe so.  Given the numbers here, I don't

2   believe so.

3   Q.  Do you have an understanding of whether encumbered and

4   liability are not the same thing?

5   A.  They're not the same thing.

6   Q.  Why not?

7   A.  Encumbered means that there's just a lien or an encumbrance

8   on an asset, it doesn't necessarily mean the amount of the

9   encumbrance.  So liability would be a specific amount that

10  encumbers the lien, encumbers the asset.  But encumbered just

11  means that there's a party that has a claim for their

12  investment or their loan on that asset.

13  Q.  And on the bottom line where it says total assets, 1048.

14  Is that $1,000,480,000?

15  A.  I believe so, yes.

16          MR. HERTZBERG:  You can take that away, Mr. Robson.

17  Q.  And where it says unencumbered, 333.2, is that

18  $333.2 million?

19  A.  Yes.

20  Q.  You were not suggesting in this document that the NAV of

21  PPVA was $333.2 million?

22          MR. GLUCK:  Objection.

23          THE COURT:  Sustained.  Leading, in the extreme.

24  Q.  What were you attempting to indicate with the

25  $333.2 million?

MC9Cpla3                      Steinberg - Direct

1   A.   That there was $333 million worth of investments which did

2   not have anybody else having a lien on them.

3   Q.   So a potential investor or lender would see $333.2 million,

4   that lender or investor could have first position with respect

5   to that $333.2 million?

6            MR. GLUCK:  Objection.

7            THE COURT:  Sustained.

8   Q.   How would a prospective lender or investor view the --

9            MR. GLUCK:  Objection.

10           THE COURT:  Sustained.

11  Q.   Why does a lender or investor care whether an asset is

12  encumbered or unencumbered?

13           MR. GLUCK:  Objection.  He's not an expert.

14           THE COURT:  Are you a lender?

15           THE WITNESS:  At Platinum, we were making loans, yes.

16           THE COURT:  And are you an investor?

17           THE WITNESS:  That was both, we were making

18  investments --

19           THE COURT:  Were you a lender or investor with respect

20  to any of the Platinum companies?

21           THE WITNESS:  As in me loaning money to Platinum?

22           THE COURT:  Were you lending money to Platinum?

23           THE WITNESS:  I was not lending money to Platinum.

24           THE COURT:  Were you investing in Platinum?

25           THE WITNESS:  No.

MC9Cpla3                        Steinberg – Direct

 1              THE COURT:  Sustained.

 2    BY MR. HERTZBERG:

 3    Q.  Did you have occasion to communicate with lenders and

 4    investors with respect to Platinum assets?

 5              MR. GLUCK:  Objection.

 6              THE COURT:  You're going to hit hearsay all over

 7    again.

 8    Q.  Changing gears, who was Bernard Fuchs?

 9              MR. HERTZBERG:  You can take this down.

10    A.  I believe he was an investor and also a partner in the

11    management company at Platinum.

12    Q.  Did you see Mr. Fuchs in the office?

13    A.  Yes, frequently.

14    Q.  I'm sorry.  At the time that you drafted the document that

15    we were just looking at, what was your title at that time?

16    A.  I think it was co-chief risk officer.

17    Q.  You were no longer a portfolio manager; correct?

18    A.  Correct.

19    Q.  You were the chief risk officer; right?

20    A.  Co-chief risk officer.

21    Q.  Back to Mr. Fuchs.

22              Did you have occasion to see Mr. Fuchs sitting with

23    Mark Nordlicht?

24    A.  Yes.

25    Q.  Did you have occasion to talk with Mr. Fuchs about the

MC9Cpla3                    Steinberg – Direct

1    positions of the funds?

2    A.  Yes.

3    Q.  Did you, as a result of those interactions, have an

4    impression that Mr. Fuchs was knowledgeable about the positions

5    of the funds?

6    A.  Yes.

7    Q.  Did Mr. Fuchs have a role in marketing?

8         MR. GLUCK:  Objection.  Witness said he had no role in

9    marketing.

10        THE COURT:  I'm not sure that's what he said.  So

11   let's ask it again.

12        To your observation, did Mr. Fuchs have a role in

13   marketing?

14        THE WITNESS:  Yes.

15        THE COURT:  What was his role?

16        THE WITNESS:  He had a group of people at the fund who

17   were tasked with raising money from the Asian markets.

18   BY MR. HERTZBERG:

19   Q.  Did you have occasion to witness him working with any of

20   the people in that group?

21   A.  Yes.

22   Q.  Did he have a leadership role in that group?

23   A.  They seemed to answer to him.

24   Q.  Did you see or hear him interacting with that group in a

25   way that led you to believe that he understood the value of the

MC9Cpla3                          Steinberg - Direct

1    positions of PPVA?

2    A.  In order to present investments to an investor, it's

3    inherent they're understanding what you're presenting, which

4    would mean understanding the investments.

5            MR. GLUCK:  Objection.  I think it was a yes or no

6    question.

7            THE COURT:  Sustained.  The jury will disregard.

8    Q.  You mentioned Suzanne Horowitz.  Who's she?

9    A.  She was an in-house attorney at Platinum.

10   Q.  Did you have occasion to work with her directly?

11   A.  Yes.

12   Q.  In what kinds of matters?

13   A.  There would be matters that related to investments at the

14   fund and also matters that would relate to transactions between

15   the fund and other parties.

16   Q.  Did you have an impression that she was a good attorney?

17   A.  Yes.

18           MR. GLUCK:  Objection.

19           THE COURT:  Sustained.

20   Q.  Did you have the impression that she did her work in good

21   faith?

22           MR. GLUCK:  Objection.

23           THE COURT:  Sustained.

24   Q.  What was your impression of Mrs. Horowitz?

25           THE COURT:  Sustained.  Any question beginning "Did

MC9Cpla3                          Steinberg – Direct

1    you have the impression," that will be ruled objection.

2    Q.  Who was Harvey Wreblowsky?

3    A.  He was an attorney and also a portfolio manager at

4    Platinum.

5    Q.  Did you have occasion to work with Mr. Wreblowsky?

6    A.  Yes.

7    Q.  On what kinds of matters?

8    A.  Specifically, there was a workout in 2011, I believe, that

9    I worked closely with Mr. Wreblowsky in recovery of that

10   investment.

11   Q.  Over how long a period of time?

12   A.  Probably two years, like 2010 to 2012, maybe.

13   Q.  Mr. Wreblowsky was working in his capacity as an in-house

14   lawyer with you when were you working on matter?

15   A.  Yes.

16            MR. GLUCK:  Relevance.

17            THE COURT:  Sustained.  Counsel, come to the sidebar.

18            (Continued on next page)

19

20

21

22

23

24

25

MC9Cpla3                    Steinberg – Direct

1             (At the sidebar)

2             THE COURT:  So, I had asked counsel to limit himself

3    to 15 minutes, but since I have the greatest respect for all

4    counsel in this case, I decided not to interrupt.  It has now

5    been almost 35 minutes.  You began your examination after the

6    break at 11:33 and it's now 12:07.  So, I think at this point

7    I'm going to give you one more question.

8             MR. HERTZBERG:  Judge, may I explain the relevance of

9    Mr. Wreblowsky.  I think the objection was just sustained.

10            THE COURT:  You can explain that, but I hope in the

11   future, I'm really very, very disappointed that greater

12   adherence was not given to my direction.  But, yes, what's the

13   relevance?

14            MR. HERTZBERG:  I do appreciate the extra minutes,

15   Judge.

16            Mr. Wreblowsky and Mr. Horowitz were the two lawyers

17   who worked on the release, and there is documentation to that

18   effect, and I wanted the jury to have that understanding that

19   they're going to hear about those people and I wanted them to

20   know that these are, in fact, human beings who worked at the

21   fund and were solid lawyers.

22            THE COURT:  I'm not sure what the relevance is.  This

23   is not a case in which you've raised an advice of counsel

24   defense.  So what's the relevance?

25            MR. HERTZBERG:  They were acting for Platinum

MC9Cpla3                        Steinberg – Direct

1    Management on one side of the table from Mr. Bodner and

2    Mr. Huberfeld and the transaction where Mr. Bodner and

3    Mr. Huberfeld were exiting.  There have even been questions --

4              THE COURT:  I don't believe that's in evidence yet and

5    I don't think this witness has personal knowledge of that, does

6    he?

7              MR. HERTZBERG:  I just wanted the witness to

8    articulate for jury who Ms. Horowitz and Mr. Wreblowsky were.

9              THE COURT:  I thought he's already answered, but I'll

10   let you put one more question about Mr. Wreblowsky.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MC9Cpla3                          Steinberg - Cross

1           (In open court)

2    BY MR. HERTZBERG:

3    Q.  Mr. Steinberg, in your work with Mr. Wreblowsky, when

4    Mr. Wreblowsky was working in his capacity as an in-house

5    lawyer, did the two of you work together on complex and

6    involved matters?

7    A.  Yes.

8           MR. HERTZBERG:  We pass the witness.

9           THE COURT:  Cross examination.

10   CROSS-EXAMINATION

11   BY MR. GLUCK:

12   Q.  Mr. Steinberg, good afternoon.

13          You joined Platinum as an intern right after you got

14   your MBA?

15   A.  It was a few months after I graduated, yes.

16   Q.  And since that time, you haven't worked anywhere else,

17   except for what you've mentioned, the SEC receiver and the

18   other feeder fund liquidator?

19   A.  I currently invest in real estate.

20   Q.  And you currently invest in real estate.  So you have no

21   experience at any other hedge funds?

22   A.  Correct.

23   Q.  You never worked on Black Elk after 2012, did you?

24   A.  I don't believe so.

25   Q.  You have no familiarity with Northstar, did you?

MC9Cpla3                          Steinberg - Cross

1    A.  I knew that it existed.  I think I was at the office one

2    time, but I was not involved day-to-day in the investment.

3    Q.  You worked for Dan Small and David Levy?

4    A.  For a period of time, yes.

5    Q.  Were they both convicted of fraud?

6    A.  I'm not familiar what they're convicted of.

7    Q.  You don't know?

8    A.  I know they're convicted of, but I don't know what their

9    counts were.

10   Q.  You relayed your understanding of what happened at Platinum

11   to the SEC receiver?

12              MR. HERTZBERG:  401.

13              THE COURT:  Well, that's a yes or no question, so I

14   will allow the answer to that question and we'll see where we

15   go.

16   A.  Can you repeat the question.

17   Q.  You relayed your understanding of what happened at Platinum

18   to the SEC receiver?

19              MR. HERTZBERG:  What happened at Platinum over seven

20   years?

21              THE COURT:  Did you have communication with the SEC

22   receiver?

23              THE WITNESS:  Sure.

24              THE COURT:  And was that oral or written or both?

25              THE WITNESS:  Both.

MC9Cpla3                              Steinberg - Cross

1           THE COURT:  Did the receiver put questions to you that

2   you responded to?

3           THE WITNESS:  Sure.

4           THE COURT:  Go ahead, counsel.

5   BY MR. GLUCK:

6   Q.  Did you assist in the SEC receiver's fraud case against

7   Beechwood?

8   A.  The answer is I don't know.  The information that she or --

9   first was Mr. Schwartz then Mrs. Janczewski as the receivers.

10  The information that they requested from me, I wouldn't know if

11  they were using that information or not, ultimately, in their

12  litigation.

13  Q.  But you do know that former Judge Janczewski sued Beechwood

14  for fraud after listening to what you had to say?

15  A.  No.

16          MR. HERTZBERG:  403.

17          THE COURT:  Sustained.

18  Q.  Do you know whether the feeder fund liquidators obtained a

19  judgment against various Platinum Partners for fraud based on

20  your work there?

21  A.  No.

22          MR. HERTZBERG:  401, 403.

23          THE COURT:  It's also probably hearsay, but I'm

24  sustaining on all three grounds.

25  Q.  You state that your principal interactions with Mr. Bodner

MC9Cpla3                    Steinberg - Cross

1    were in connection with afternoon prayer?

2    A.  I'm sure there are other conversations that we've had,

3    socially, beyond just afternoon prayer.

4    Q.  What about concerning Platinum Investments?

5    A.  Certainly wasn't our primary social interaction.

6    Q.  So we're going to introduce Platinum Exhibit 950.

7           THE COURT:  It's always helpful to have an exhibit

8    that's in 6-point font or smaller.

9           MR. GLUCK:  I think we were thinking about the screen

10   as opposed to paper, but my apologies.

11   Q.  Are all of these meetings social?

12   A.  I don't know what this is.

13          MR. HERTZBERG:  Objection.

14   Q.  Did you have a meeting with David Steinberg -- would you

15   have a meeting with David Bodner on June 6th, 2012?

16   A.  I have no recollection.

17   Q.  Any reason to doubt that you did?

18   A.  It says here -- I guess this is what you're saying this

19   paper says, then --

20          MR. HERTZBERG:  That's exactly the problem, Judge.

21   A.  I don't know what this paper is.

22          THE COURT:  Sustained.

23   Q.  Did you use Microsoft Outlook at Platinum?

24   A.  Sure.  Yes.

25   Q.  Would it be the practice to send calendar invites if you

MC9Cpla3                        Steinberg - Cross

1    needed to do a meeting?

2    A.  Yes.

3    Q.  And any reason why these calendar invites would be

4    incorrect?

5              MR. HERTZBERG:  Objection.  There are no calendar

6    invites in front of the witness right now.

7              MR. GLUCK:  There are calendar --

8              THE COURT:  Sustained.  This is not a

9    self-authenticating document and I doubt very much that it can

10   be authenticated through this witness.  So if you want to get

11   this in, you're going to have to call someone else.

12             MR. GLUCK:  That's fine.

13   Q.  When you wrote that rachmanus email, were you looking for

14   other work at the time?

15   A.  I believe so, yes.

16   Q.  Why was that?

17   A.  Because Platinum was struggling with liquidity and there

18   was certainly possibility that they wouldn't be able to raise

19   the money that they needed and that they couldn't make

20   additional investments into new opportunities, which is what

21   portfolio managers get paid for.

22   Q.  Do you use the word "inmates running the asylum," or the

23   phrase, when you previously described your job?

24   A.  I don't recall.

25   Q.  You don't recall.

MC9Cpla3                        Bodner - Direct

1           MR. GLUCK:  No more questions.

2           THE COURT:  Anything else?

3           MR. HERTZBERG:  No redirect.

4           THE COURT:  Thank you very much.  You may step down.

5           (Witness excused)

6           Please call your next witness.

7           MR. LAUER:  We'll call David Bodner.

8    DAVID BODNER,

9        called as a witness by the Defendant,

10       having been duly sworn, testified as follows:

11          THE DEPUTY CLERK:  Please be seated, draw close to the

12   microphone, state your name and spell it slowly for the record.

13          THE WITNESS:  My name is David Bodner, D-a-v-i-d

14   B-o-d-n-e-r.

15   DIRECT EXAMINATION

16   BY MR. LAUER:

17   Q.  Good morning, Mr. Bodner.  How are you?

18   A.  I'm well.  Thank you very much.

19   Q.  Tell us about yourself.  Where did you grow up?

20   A.  I grew up in Brooklyn, New York until I got married --

21   Q.  Let's take it one step at a time.  How old are you?

22   A.  I am 66 years old.

23   Q.  Would you describe your education.

24   A.  My education was mostly Yeshiva education.  I went to

25   elementary school.  After that, I was followed by high school.

MC9Cpla3                        Bodner - Direct

1    I graduated high school and I went to Brooklyn College for a

2    very short period of time.  I received 22 credits.  After that,

3    I concluded with my Talmudic studies.

4    Q.  So when you say you went to Yeshiva, does that also have

5    secular programs, as well?

6    A.  Yes.

7    Q.  And you left.  About what year did you leave Brooklyn

8    College to return to Yeshiva?

9    A.  I left Brooklyn College when I was around -- I graduated

10   early high school at about 16 years old, and then I went for a

11   very short period of time to Brooklyn College, that would take

12   me to about 17 years old.  Even when I was in Brooklyn College,

13   it was a night program, I wasn't there by day.  By day, I

14   studied.  It was just at night, I used to go to Brooklyn

15   College.

16   Q.  You mean during the day, you were studying Talmud in

17   Yeshiva?

18   A.  Yes.

19   Q.  And you went to Brooklyn College at night?

20   A.  Yes.

21   Q.  For everyone's benefit, can you try to fix a year or two

22   about when --

23            THE COURT:  When is your birthday?

24            THE WITNESS:  My birthday is 10/11/56.

25            THE COURT:  So you would have been 16 in 1972 or

MC9Cpla3                         Bodner – Direct

1   thereabouts; right?

2              THE WITNESS:  Correct.

3              THE COURT:  I didn't even take the law school course

4   in arithmetic.  So go ahead.

5   Q.  When you stopped attending Brooklyn College and went to

6   full-time at Yeshiva, for how many years did you study Talmud

7   full-time in the Yeshiva?

8   A.  Well, I studied full-time till my wedding, which was when I

9   was 21 years old, which would give me four years of full-time

10  studying.  Then, after I got married, I went and studied for

11  years after my wedding.  People who are married go to this

12  place to study to become rabbis, so I did that for five years.

13  Q.  And during the time that you were studying, were you

14  working?

15  A.  No, at that time, I was not working.

16  Q.  And you were married and you were not working, how did you

17  support yourself?

18  A.  My wife was working.

19  Q.  What did she do?

20  A.  She was a teacher at a school in Brooklyn.

21  Q.  Do you and your wife have any children?

22  A.  Yes.  Thank God, we have eight children.

23  Q.  Are they married?

24  A.  All of them are married.

25  Q.  Do you have grandchildren?

MC9Cpla3                          Bodner - Direct

1   A.  Yes, thank God.

2   Q.  Did there come a time that you entered out in the world of

3   business?

4   A.  Yes.

5   Q.  Around what calendar year would you say that you left

6   full-time study and started to make a living for yourself and

7   your family?

8   A.  I would say I was around 27 years old.  So it should be

9   around 1983.

10  Q.  And what did you do?

11  A.  I was a trader.  I used to sell premium on options.  At

12  that time, there was an index called the OEX, which monitored

13  the stock market going up and down.  It was a basket of stocks

14  that were put into this OEX, and if the market would move up,

15  usually this basket would move up with it.  So when the OEX

16  would move up, the index would move up.  If this market would

17  go down, the index would go down.  It was usually with the Dow

18  Jones.  On this index, you were able to sell options.  I was a

19  premium seller.  If I saw that the index had a very heavy

20  premium, the index would expire every month, once a month.  In

21  those times -- today, if I'm not mistaken, it's every day they

22  have options.  In those times, it was once a month was

23  expiration.  So I would sell premiums, and at the beginning of

24  the month, I would sell the premium that I was able to take in

25  for that month and I would hold it as the premium -- premium is

1    based on twofold.  If the index moves up, the call moves up, if

2    the index moves down, la put.  La put is something that's put

3    to you if something goes against you.  So that would move up.

4    So at this period of time the month, the four weeks they gave

5    you for the index, I would put in a call, take in a fat premium

6    — that they used to call, that was the language they used — and

7    as days -- premium was also based on time.  If you have 28 days

8    and it is at the same price, three or four days later, your

9    premium is going to be less.  So you're going to make profit on

10   it.  So that's what I used to do, trading, I used to trade.

11   Q.  I think we're going to need more time to understand how to

12   do that.

13              MR. GLUCK:  Move to strike.  Relevance.

14              THE COURT:  It's not irrelevant, but I agree with you,

15   with defense counsel, we probably should move on.

16   Q.  So for how long did you do this?

17   A.  If I'm not mistaken, I did it for either three or four

18   years.

19   Q.  Did you then go into some other type of business?

20   A.  You see, I think --

21   Q.  Or did you trade in a different context?

22   A.  I was doing it at a time after I was doing it for myself, I

23   started doing it for a wealthy individual who we did it

24   together with.  He would pay my salary.

25   Q.  How long did you do that?

1    A.   I think that lasted about three, four years.

2    Q.   Did there come a time when you met Murray Huberfeld?

3    A.   Yes.

4    Q.   How did you come to meet Murray Huberfeld?

5    A.   Murray Huberfeld had a string of restaurants called Kosher

6    Delight.  It's like a fast food McDonald's and he wanted to

7    take them public.  And he came to ask advice of somebody I was

8    a partner with then.  Together, we all met and we told him

9    that, you know, he usually -- when it comes to taking something

10   public, you get a much better valuation when you take it public

11   and you build it.  Usually, Wall Street gives you a very good

12   evaluation so you can make much more money by opening up a

13   string of restaurants, plus you're able to raise money on Wall

14   Street.  If you own two, three restaurants, all you get is the

15   earnings that restaurants give you.  If you take it public,

16   since you're raising money, you can raise millions of dollars

17   with plans to open up 50 or 60.  This was the kosher

18   McDonald's, so there was a need for this Kosher Delight in

19   every Jewish community.  People like the food very much.

20   Q.   So what then next did you end up doing a public offering

21   for Mr. Huberfeld's company?

22   A.   No, it never work out.

23   Q.   Did you come to form some type of arrangement or

24   relationship with Mr. Huberfeld?

25   A.   Yes, I did.

MC9Cpla3                          Bodner – Direct

Q.  And what was the nature of that relationship?

A.  We were going to be partners, 50/50 on anything that we do.

He even gave me a partnership in one of his three restaurants.

Q.  So about what time did you and Mr. Huberfeld form a

business partnership?

A.  I'm thinking around 1990.

Q.  Between let's say the beginning of your partnership in 1990

and the early 2000s when you started the Platinum fund

organization, so for that 10 or 12 years, could you describe

what types of business you and Mr. Huberfeld were engaged in?

A.  At first, maybe it was two or three years, Mr. Huberfeld

used to come out to Upstate New York where I live, in Monsey,

New York.  And I was a trader and he used to sit with me, watch

me trade, and also we spoke about different ideas.

        And I remember then, somebody gave us an idea about a

company called Geotech.  It was a private company, it was not

far from Monsey.  I think it was in Ramsey, New Jersey.  And we

decided together to become an investor in this company.  And

with God's help, it worked out very, very nicely for us.  We

owned a very nice percent of the company and it was some sort

of a technology company, not that any of us knew what was going

on there, but we invested in it, we owned the ownership, and it

came to make us a sizeable amount of money.

Q.  And in addition to Geotech, without too much elaboration, I

can follow up, could you basically give us a survey of the

MC9Cpla3                        Bodner - Direct

1    kinds of business deals and investments that you and

2    Mr. Huberfeld did over the '90s and into the early 2000s?

3                THE COURT:  Can someone bring the witness a bottle of

4    water.

5                MR. GLUCK:  Objection.  Is there a relevance?

6                THE WITNESS:  To the water?  No.

7                MR. GLUCK:  What is the relevance?

8                THE WITNESS:  I apologize.

9    Q.  Are you okay?

10   A.  Yeah, I was just getting dry.

11   Q.  So my question was for you to describe, without too much

12   detail, the kinds of trading and investing that you and

13   Mr. Huberfeld did between when you started your partnership in

14   1990 and around 2003 when Platinum was formed.

15               MR. GLUCK:  Objection.

16               THE COURT:  The objection is overruled.  You may

17   answer.

18   A.  We invested in all different types of private companies and

19   public companies the same way we started with Geotech.  Geotech

20   gave us the capital to do that.  After that, we invested in

21   some different real estate investments.  We did some charity

22   work together and all different types of charity work.  We

23   spent our time a lot.  If I remember correctly, we moved from

24   Monsey.  We used to come to my house and it might have been in

25   '96, we took offices at Carnegie Hall Towers.  So we were able

MC9Cpla3                    Bodner – Direct

1    to have, you know, more professional meetings.  We were on the

2    54th floor and we took offices and we met with all different

3    types of investments.  And, also, we met with all different

4    types of charities.  That's where we spent our time usually.

5                 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mc92Pla4                        Bodner – Direct

1    BY MR. LAUER:

2    Q.  So like what types of people would come to your office on

3    the 54th floor?

4    A.  All different types of peoples.  We would get offers for

5    different businesses.  People who were doing real estate

6    projects who needed capital would come to us.  Private

7    companies that, you know, were starting out, Israeli companies

8    that they came over to make a presentation to us.  We had a lot

9    of meetings with different charities.  I myself personally was

10   busy a lot with kids at risk.

11   Q.  So you were here when Mr. Steinberg talked about putting a

12   shingle up.  Is it fair to say that you and Mr. Huberfeld had a

13   shingle up and people came to visit?

14   A.  I'm not sure what you mean by a shingle.

15   Q.  Knowing that you were a potential source of -- potential

16   source of funding for people starting out in business, looking

17   for capital.

18   A.  Our community is a very close-knit community, and word gets

19   around.  When people are successful and they have money, word

20   gets around twofold.  There is somebody you should call up for

21   charity, and also if you need a business investment, come to

22   them, maybe they could invest in your business.

23   Q.  What were some of the principal charities that you were

24   working on whose representatives came to your office?

25   A.  We were working on an organization called *Ezer Mizion*.

Mc92Pla4                         Bodner - Direct

1   Q.   And what does that charity do?

2   A.   That charity is basically a volunteer charity that brings

3   food to needy people.  It has an arm of bone marrow.  It

4   transfers bone marrow to patients.  It finds bone marrow.  It

5   does bone marrow drives and it does bone marrow for people who

6   need bone marrow transplants.  It's basically a cancer

7   organization, filled with all cancer.  When a person has it in

8   his family, somebody who has cancer, God forbid, the family is

9   basically disabled.  They are busy the whole day taking care of

10  this patient.  So *Ezer Mizion* has volunteers that come, take

11  the family, take the kid out to make a camp in the summer for

12  these kids that the parents could have a rest.  This was one of

13  many organizations that we were busy with.

14  Q.   Okay.  Then you mentioned that you had people coming up in

15  connection with your work with kids at risk.  Could you briefly

16  describe what that work was and some of the people who came up.

17  A.   Unfortunately today in our community kids are unhappy.

18  Maybe it's too high pressure in the schools, maybe not, but

19  kids are unhappy and they stop going to school and they stop

20  adhering to the religion.  They become irreligious and they

21  start taking drugs.

22          So I started with this, if I'm not mistaken, over 20

23  years ago, maybe it was -- it's 2022, maybe it was more than

24  that.  And a parent called me up and he told me a friend of

25  mine, he says he has so many problems with his child.  It's his

1    oldest child.  And on the sabbath he sits in the room all day

2    and he listens to the radio, watches television, and he is not

3    adhering to the rules.  So I told him I will call him up.  Let

4    me meet with him.  The fact that he came up to a beautiful

5    office in Carnegie Towers overlooking Central Park West enticed

6    him.

7            Then I used to look into what type of problems he has,

8    if he was -- you know, if he had mood disorders, if he had OCD,

9    obsessive/compulsive disorders, any type of disorders that he

10   had, learning disabilities, I would look into it and I would

11   get the right professional help for him.  After that, I would

12   keep a constant contact with the child and get him -- I would

13   leave religion for the last.  I wouldn't talk to him about

14   becoming back religious day one.  First I would try to make him

15   happy.  I would get him a job.  I would make him a productive

16   human being.  I had friends in all different types of work, and

17   I would ask them, together with myself, if we could higher

18   them.  I would *shtup* them into a job, which means push.  I

19   would push them into somebody who could get a job by somebody.

20   Q.  Thank you.

21           THE COURT:  Can I have the original question be read

22   by the court reporter, please?

23           (Record read)

24           THE COURT:  So the operative word in that question was

25   "briefly."

1           THE WITNESS:  I'm sorry.

2           THE COURT:  Please keep that in mind.

3           THE WITNESS:  I will.  I'm sorry, I'm sorry.

4    BY MR. LAUER:

5    Q.  So over the course of -- because I don't want to come back

6    to this topic, so when the Platinum was formed and you would

7    come to your office on the 54th floor, did you continue to have

8    young people come up as part of this program that you

9    personally worked on?

10   A.  Yes.

11   Q.  On -- did there come a time when you and Mr. Huberfeld

12   decided to look into forming a hedge fund?

13   A.  There came a time.

14   Q.  And can you fix that time for us approximately?

15   A.  Approximately in 2002 or '3.

16   Q.  And why did you -- you seemed to have been doing pretty

17   well.  Why did you decide to form a hedge fund?

18   A.  There was a crash in the Internet stocks on the stock

19   market.  I think that was in 1998.  So all these companies

20   had -- went from very high flying prices and they went all the

21   way down.  And it wasn't a time to be able to make money to

22   invest capital in these type of companies.  So base -- and

23   trading, I stopped trading once we started to become investors.

24   So basically we were looking for something to do.  And Murray

25   had a friend, Izzy Englander, who at that time had a hedge fund

1  for Millennium Partners, and he suggested to Murray you should

2  try to open a hedge fund.

3  Q.  And did you -- so did there come a time when you brought in

4  someone to run the fund?

5  A.  There came a time.  Basically we were in this office from

6  1996, if I remember correctly, and we were paying $55 a foot,

7  which was very cheap rent.  In 2002 and -- if I'm not mistaken

8  we had a 15-year lease, a 10- or 15-year lease.  When we were

9  going to open a hedge fund, we decided -- I had a cousin.  His

10  name was Mark Nordlicht.  And I had heard of him that he was a

11  very good trader.  He used to trade on the Exchange.  He had

12  seats on the Exchange.  And we offered him to become a full

13  partner with us, meaning if he will run the hedge fund solely

14  himself, we will give him one third of whatever we make in any

15  investments we make.

16  Q.  Okay.

17  A.  And if I could just finish, and we decided to keep the

18  hedge fund at the 54th floor in Carnegie Hall Towers because

19  the rent was very cheap.  It was half price.  So Mark was okay

20  with that.

21       But Mark did not want us as part of the hedge fund.

22  He wanted us to have one office.  We took the office -- the

23  nice office overlooking Central Park and he gave us access that

24  we could use the conference room, which was next to that

25  office.  He himself and his group, they were behind a glass

Mc92Pla4                         Bodner - Direct

1    door, if I'm not mistaken, on both sides.  That's where the

2    Platinum staff set -- sat, and he had a big office at the end

3    on the 54th floor.

4    Q.  What was the arrangement in terms of finance?  Did

5    Mr. Nordlicht put in seed money to start the fund?

6    A.  If I remember correctly, he did not.  Myself and

7    Mr. Huberfeld put in money.

8    Q.  All right.  And do you remember approximately how much

9    money you and Mr. Huberfeld each put in to start the fund?

10   A.  I don't remember exactly.  It could be anywhere from 10

11   million to 20 million each.

12   Q.  And why does a hedge fund need that kind of money to start?

13   Why can't you start at zero?

14   A.  You cannot start a hedge fund at zero because a hedge

15   fund's profits come from investments that it makes.  So if a

16   hedge fund has zero money, you could sit and twiddle your

17   thumbs, you are not going to be able to make any money.  If a

18   hedge fund has -- that's why hedge funds are looking to

19   constantly grow.  The bigger they are, the more investments

20   they could make.

21          And a hedge fund manager is paid by the amount of

22   money in the fund and also how much the fund makes.  It's

23   called a formula of 2 and 20.  Two percent you get of the

24   capital.  That means if a hedge fund has a million dollars,

25   they take off the top $20,000 to pay for their expenses.  And

Mc92Pla4                          Bodner - Direct

1    then at the end of the year, if they make money, if they make,

2    let's say, $100,000 on that million dollars, they get another

3    $20,000 as a fee.  That's called a 20.  They get 20 percent of

4    all the profits.

5              So if a hedge fund has a million dollars, it's limited

6    to the amount of money you could make.  Here we were talking

7    about three partners trying to make money out of a business.

8    It wouldn't make sense to make $20,000.  the car fare coming in

9    from Monsey the few times a week I came in would be more than

10   that.

11   Q.  So can you describe to the best of your recollection the

12   legal structure or the contractual structure that you,

13   Mr. Huberfeld, and Mr. Nordlicht agreed to in terms of who

14   would own the fund and who would -- how the fund would be owned

15   and who would actually run the fund.

16   A.  The way we structured it was, I would continue, together

17   with Murray, on all our endeavors, all our deals, and that

18   enticed him to become a partner with us.  At that time we were

19   negotiating to start a security company.  It was after 2001,

20   September 11, and we had potential to start a very big security

21   company.  We even had a meeting, some of my partners, with Rudy

22   Guiliani, who was a very big name then, to start a security

23   company together with him.  And that's what enticed Mark

24   Nordlicht to join our partnership.

25   Q.  But turning to the business and legal arrangement, did you,

Mc92Pla4                    Bodner - Direct

1   Mr. Huberfeld, and Mr. Nordlicht agree on the structure for who

2   would own the fund and who would run the fund?

3   A.  We agreed on who would own it and who would run it.

4              THE COURT:  What did you agree?

5              THE WITNESS:  We agreed that the owner of the fund at

6   this present time would be myself, Mr. Huberfeld, and

7   Mr. Nordlicht.  And running the fund, Mr. Nordlicht wanted

8   sole -- he wanted to have sole discretion, making all

9   decisions.  He didn't want us to mix into any decisions he made

10  or anything.  He was the sole decision-maker in the fund.

11  Q.  Did you and Mr. Huberfeld agree to that?

12  A.  100 percent.

13  Q.  I would like to show you on the screen DX 159, the Mark

14  Nordlicht Grantor Trust.  It is in evidence.

15             Now, Mr. Bodner --

16  A.  Excuse me.  Could I just read it a second?

17  Q.  Of course, of course.

18             (Pause)

19  Q.  Let me ask you a question and then you will see if you

20  actually need to read it further.  We want to move it along.

21  We are breaking soon.

22             Do you see in the second paragraph it says, "The

23  trustee wishes to grant each of Manor Lane Management and

24  Grosser Lane Management the economic equivalent of a 24.999

25  percent passive interest"?

Mc92Pla4                          Bodner - Direct

```
 1    A.  Yes, I see that.

 2    Q.  And can you tell us what is Grosser Lane?

 3    A.  Grosser Lane is a company that myself and my wife control

 4    and we pay our bills from it and also we make investments

 5    through it.

 6              MR. LAUER:  We offer DX 429.

 7              THE COURT:  I think it is already in evidence.  If

 8    it's not, it is received.

 9              (Defendant's Exhibit 429 received in evidence)

10              MR. LAUER:  Put up 429.  Sorry.  Trying to move it

11    along.

12              THE COURT:  I'm sorry, what's the problem?  429 is in

13    evidence.

14              MR. HERTZBERG:  No.

15              THE COURT:  It's either previously been received or

16    it's received right now, so put another question.

17              MR. LAUER:  If it's in evidence, then I will go to

18    another question.  The document that the witness had -- was

19    asked about was 159.

20              THE COURT:  I see.

21              MR. LAUER:  That's fine.

22              THE COURT:  So 429 is a new document.  Are you

23    offering it?

24              MR. LAUER:  Yes.

25              THE COURT:  Any objection.
```

Mc92Pla4                          Bodner - Direct

1              MR. GLUCK:  (Shakes head).

2              THE COURT:  Received.

3              (Defendant's Exhibit 429 received in evidence)

4    BY MR. LAUER:

5    Q.  Grosser Lane, which was yours and your wife's company, you

6    were a beneficiary of this Mark Nordlicht Trust which had the

7    interest in the Platinum Management business, right?

8    A.  Correct.

9    Q.  And the earlier document that I showed you said that you

10   had a passive interest.  Do you understand what a passive

11   interest means?

12   A.  A passive interest means that I have no say.

13   Q.  While you had no say, is it fair to say that you and

14   Mr. Huberfeld could freely express your opinions to

15   Mr. Nordlicht?

16   A.  In the rule of Mr. Nordlicht, there is not too much

17   expressing your opinion if you know Mr. Nordlicht.

18   Q.  But you can -- from time to time you would express your

19   opinions --

20   A.  From time to time I would tell him something, yes.

21   Q.  And from time to time he would accept your opinions, right?

22   A.  That time to time I don't remember.  I'm sorry.

23   Q.  Okay.  Did there come a time when Mr. Huberfeld headed up

24   the asset lending fund?

25   A.  It was basically an idea that myself and Mr. Huberfeld came

Mc92Pla4                          Bodner - Direct

1  with, being that we were completely shut out of PPVA, meaning

2  we didn't have, you know, any say in any investments there, and

3  ourselves, this was our business.  We were lending money,

4  again, assets and we knew this business, you know.  We used to

5  negotiate -- I was called a good negotiator.  We used to

6  negotiate with people if they needed a loan, they would put up

7  a certain asset, we would make terms with them; or if it was a

8  private company that needed a loan, we would try to get an

9  interest rate plus some equity in the company, which worked out

10 a lot of times for us.  So we became --

11 Q.  So did you and Mr. Huberfeld -- did Mr. Huberfeld head up a

12 new fund?

13 A.  Yes.  Together we decided that this would be a great

14 business.  We were limited with the amount of monies that we

15 had, but it would be a great business.  Since it's a hedge

16 fund, it could do the same strategies, lending money,

17 asset-based loans, all the type of business that we were doing

18 for ten years, and make returns.  So you would make returns and

19 you would get much more if you were investing, if you build it

20 up to be a 50 or a $100 million fund.

21 Q.  Did this fund come to be known as Centurion?

22 A.  It was known as Centurion.

23 Q.  And did Mr. Huberfeld run it?

24 A.  Mr. Huberfeld ran it.

25 Q.  And was it owned the same way as Platinum Management?

Mc92Pla4                          Bodner - Direct

1   A.  To my recollection, it was owned like that, but I think

2   there was another small partner by the name of Gilad Kalter.

3   Q.  Who was Mr. Kalter?

4   A.  Mr. Kalter was a person -- when Murray started this fund,

5   Centurion, Mr. Kalter was a person who helped out a lot—I'm

6   not sure what his position was—and I think he wanted to have a

7   piece of the fund.  So at that point instead of being

8   one-third, one-third, one-third, myself, Mr. Huberfeld, and

9   Mr. Nordlicht, we joined Gilad Kalter for a small percentage,

10  which I don't remember how much.

11  Q.  And in terms of running the Centurion fund, who ran the

12  Centurion fund?

13  A.  Murray Huberfeld.

14  Q.  Did you run it?

15  A.  No, I did not.

16  Q.  Okay. now, in addition to putting in the seed money to

17  start the Platinum fund, did you and Mr. Huberfeld invest in

18  PPAV?

19  A.  Yes, we did.

20  Q.  And --

21  A.  Excuse me.  I'm not understanding.  The seed money was an

22  investment.

23  Q.  Oh, okay.  And was that investment exclusively in your

24  individual name or in the name of family members?

25  A.  I don't remember what our original investment was, but

Mc92Pla4                      Bodner - Direct

1  ultimately I had money in the PPVA fund from my foundation, my

2  children, it's possible for my grandchildren, and for myself

3  and my wife.

4  Q.  And approximately how much money did you have in the funds

5  that were managed by Mr. Nordlicht?

6  A.  That's -- there was a time that Centurion turned into PPCO.

7  Q.  Okay.  So --

8  A.  At that time Mr. Nordlicht ran both funds.  I seeded

9  Centurion together with Mr. Huberfeld when he started the

10 credit fund.  All of a sudden that changed over at a certain

11 time period to become another fund that Mr. Nordlicht ran.  So

12 when you are asking me how much money I had, it depends on the

13 time.

14 Q.  Okay.

15 A.  In 2003 -- okay.

16 Q.  So let me clarify it.  There came a time when Mr. Huberfeld

17 stopped running Centurion and it was absorbed under the

18 umbrella of Mr. Nordlicht and was renamed the Platinum PPCO.

19 A.  Correct.

20 Q.  And so you had family money in both funds, right?

21 A.  Correct.

22 Q.  And both funds were managed by Platinum Management.

23 A.  Correct.

24 Q.  And Mr. Nordlicht was the manager and controlling person of

25 Platinum Management.

Mc92Pla4                        Bodner - Direct

1    A.  Correct.

2    Q.  And --

3            THE COURT:  I think you were asking——maybe correct me

4    if I am wrong——at that point in time how much money had he put

5    in.

6            MR. LAUER:  Yes.  Thank you, your Honor.

7    A.  So at that point in time means when Nordlicht took over

8    both funds?

9    Q.  What was the total of Bodner family money invested in the

10   funds that were being run under Mr. Nordlicht's control?

11   A.  I'm giving you an approximate.  It could be anywhere from

12   37 million to $45 million.

13   Q.  And did Mr. Huberfeld have a similar amount in various

14   foundations and family accounts?

15   A.  We were similar.

16   Q.  When Platinum went into liquidation in 2016, what happened

17   to the funds that you, your foundation, and your family had?

18   A.  So far I haven't received a penny from the liquidator.

19   Q.  Now, while Mr. Nordlicht was running the funds and you were

20   not, did you add value in various ways to the Platinum fund?

21   A.  As the judge put it, I was a *macher*.  A *macher* means

22   somebody who people respected in the Jewish community.  The

23   Platinum funds was not an institutional fund. It was more

24   family and friends, religious people, Jewish people, in our

25   community.  Our community means Brooklyn, the five towns,

Mc92Pla4                        Bodner - Direct

1     over -- Los Angeles, Chicago, and I was a person people

2     respected.  I always tried to stay under the radar and do all

3     my charities without any fanfare.  I stayed away from honors

4     and everything.  But my name got out there because I was very,

5     very active, especially with kids at risk and other type of

6     stuff.  So people respected me.  So could be if people saw that

7     I was an investor in a fund, they would also want to.

8     Q.  Now, you mentioned --

9          THE COURT:  I'm sorry, counsel.  I just want to alert

10    you that we have about three more minutes before we break.

11         MR. LAUER:  Okay.

12    BY MR. LAUER:

13    Q.  In addition to now having the Platinum fund, did you and

14    Mr. Huberfeld continue to invest privately?

15    A.  What years are you talking about?

16    Q.  Let's say between 2000 -- let's focus on what we will call

17    the relevant period, 2013, '14, '15, '16.

18    A.  2013, '14, '15, and '16, myself and Mr. Huberfeld did

19    invest still privately.

20    Q.  Okay.  And --

21    A.  Also we had old investments that we had to take care of.

22    Q.  Was Mr. Nordlicht in some of these private investments?

23    A.  I think Mr. Nordlicht -- we gave Mr. Nordlicht an

24    opportunity.  That was the deal when we started, that we would

25    be each an equal partner in the funds that he was doing all the

1   work for, and he would be an equal partner in any investment.

2   So I would have to show him any investment that myself and

3   Mr. Huberfeld invested in.  If he invested in every investment?

4   No.  Mr. Nordlicht was always very tight with liquidity.  So

5   but certain investments he did invest with.  So I don't

6   remember clearly which ones he was or not.  But myself and

7   Mr. Huberfeld were always equal investors in investments.

8   Q.  And from time to time did potential borrowers or people

9   looking for capital come to the Platinum offices or to your

10  office on the 54th floor?

11  A.  That period of time the office was not on the 54th floor

12  anymore.

13  Q.  Did there come a time when Mr. Nordlicht moved his group

14  down to the fourth floor?

15  A.  Yes, but that's a discussion I would rather have on Monday

16  morning because it's going to take more than a minute.  The

17  answer is yes.

18          THE COURT:  That's fair.  I know that you have to

19  leave.  So the -- and maybe by breaking now you will be able to

20  reduce it to a minute.

21          So in any event, ladies and gentlemen, we have had a

22  very full but productive week.

23          On Monday, we will start kind of later, at 10:00

24  rather than 9:30 because of another matter that I have, but we

25  will go until 4:30.

Mcp2Pla4

1           Do not even think about this case over the weekend.

2    Have fun, and have a very good weekend, and we will see you on

3    Monday morning.

4           (Continued on next page)

 1               (Recess)

 2               THE COURT:  Mr. Bodner, you are free to leave.  I have

 3     some matters I need to discuss with counsel.

 4               THE WITNESS:  Thank you very much.

 5               (Witness not present)

 6               THE COURT:  Everyone else be seated.

 7               First, there was an outstanding item relating to

 8     possible recall of Mr. Scott on the question of 4 million paid

 9     to Rohm & Haas, something like that.  The question, if I recall

10     correctly, was I needed to hear from any person on the

11     plaintiffs' side who had actually asked someone on the defense

12     side for the backup to the chart that shows those figures.  Who

13     was that person?

14               MR. LAUER:  So I think, as we have told them, we can't

15     confirm that the request was made, so I --

16               THE COURT:  That's what I am -- so is plaintiffs'

17     counsel saying that the request was made?

18               MR. GLUCK:  Not made.

19               THE COURT:  Was not made.

20               MR. GLUCK:  Not made.

21               THE COURT:  I see.  Okay.  Then what needs to be done,

22     if it hasn't been done already, if -- and I can't even remember

23     at this time who was seeking it to introduce that $4 million or

24     for what purpose, but if someone is still seeking to introduce

25     it, then you have to give backup to plaintiffs' counsel over

Mcp2Pla4

1    the weekend so that if we have to recall the witness, we will

2    have it for that.

3              MR. LAUER:  Fair enough, your Honor.

4              MR. GLUCK:  Defendants.

5              THE COURT:  Then there is, of course, the testimony of

6    Mr. Quintero.  So the question is whether to interrupt

7    Mr. Bodner and hear the rest of Mr. Quintero or whether to

8    complete Mr. Bodner and then hear from Mr. Quintero.  I am open

9    to either motion.

10             MR. LAUER:  Well, I would respectfully request that we

11   start with Mr. Quintero.  I have done most of the background,

12   but I think, in fairness to us, to the extent that there are

13   substantive questions to address Mr. Bodner with respect to the

14   matters --

15             THE COURT:  Okay.  That's a good point.

16             So I had told Mr. Quintero 9:30.  Make sure counsel,

17   plaintiffs' counsel should tell him it is 10:00 rather than

18   9:30.  So we will have him, and then we will complete

19   Mr. Bodner.

20             MR. LAUER:  Your Honor, we have scheduling issues with

21   some of these other third-party witnesses.  Is it okay if we

22   just defer Bodner for later?

23             THE COURT:  No.  I say that from the standpoint of the

24   jury although, frankly, I'm amazed you even want to do that,

25   because it seems to me——and this is as in all similar

Mcp2Pla4

1    cases—the jury has been very anxious to hear from Mr. Bodner.

2                MR. LAUER:  I know that.

3                THE COURT:  So I think we should finish Mr. Bodner.

4                MR. LAUER:  But we will do Quintero.

5                THE COURT:  Quintero and then Bodner.

6                And I also think, along the same lines, that defense

7    counsel ought to really think about who else they want to call

8    and for how long.  I mean, for example, we spent, what, well

9    over an hour in the end on Mr. Steinberg, which I think his

10   testimony was not irrelevant, but a pretty good argument could

11   be made that it was immaterial.

12               And in that regard, when lawyers have been involved in

13   a case, as all the fine lawyers have been for years, every

14   little nit seems important.  But it's been my privilege to talk

15   to jurors, either directly or through my law clerk, after every

16   jury trial I have had for the last almost 27 years on the

17   bench, and that's over 300 trials.  And those 300 juries, 300

18   times, so thousands of jurors, to my pleasure always zoom in

19   and tell me that in their deliberations they zoomed in on the

20   real issues, the important issues, and they spent very, very

21   little time, usually zero, on some of these nuances that seem

22   so important to counsel.  I know there is -- particularly on

23   the defense side there is always a worry, gee, will plaintiffs'

24   counsel get up and say we never responded to X?  And so we have

25   got to put in something.  Okay.  But I think you can make it

Mcp2Pla4

1    very short.

2              MR. LAUER:  Your Honor, I still have a suggestion.

3    With respect to some of the witnesses, if there could at least

4    be a suggestion for enhanced cooperativeness on agreeing to

5    documents, we can move the process with valuators and the

6    auditors.  Quintero and -- one of the themes of the plaintiffs'

7    case is that the valuations were affected or artificially

8    propped up through basically concealment and lying to the

9    auditors, etc.  That's sort of a subtext here.  And it's

10   important for us to be able to show the jury that that's

11   precisely not true.

12             THE COURT:  I encourage -- plaintiffs' counsel had

13   made a similar proposal at an earlier stage of the case, so I

14   encourage the parties who know this stage with all the

15   depositions, no one has any secrets, so why don't you get

16   together over the weekend and see what you can work out?

17             MR. LAUER:  Thank you.

18             THE COURT:  All right.

19             MR. GLUCK:  One thing, your Honor.

20             THE COURT:  Yes.

21             MR. GLUCK:  None of the auditors or valuators have

22   been deposed.  We cannot give valuation opinions for that

23   reason.  He never chose to depose them.

24             THE COURT:  Okay, but I thought it was just a question

25   of documents.  But if you can't agree, you can't agree.  I'm

1    not about to force that.

2         I do think that we need to complete the evidence in

3    this case, worst case, by close of business Wednesday, and that

4    is what both sides have sort of flagged for me earlier.  And so

5    I just flag that for you, because, for example, if I indicate

6    that a witness is limited to 15 minutes, counsel should

7    understand that, notwithstanding his creative arithmetic, that

8    doesn't mean 30 minutes.  But you get the idea.

9         Okay.  Is there anything else we need in this case?

10        MS. SHEN:  Your Honor, can I just mark something on

11   the record as a matter of housekeeping?  We had a couple of

12   transcription errors that we wanted to have the transcripts

13   corrected as we were getting the realtime.  So on December 7

14   PX 367 should have been marked as PX 370.  PX 739 should have

15   been marked as DX 39, PX 59 should have been marked as PX 593;

16   and then on December 8, what was marked as PX 687 should have

17   been DX 687 and PX 690 should have been DX 690.

18        THE COURT:  So I take it there is no objection to

19   those corrections.

20        MR. LAUER:  No.

21        MR. HERTZBERG:  No objection.

22        THE COURT:  Very good.

23        I am in awe of our court reporters because counsel for

24   both sides have at various times engaged in a campaign of

25   whispering, and they have had to deal with that.  But I'm glad

Mcp2Pla4

1     to have those corrections.

2               (Plaintiff's Exhibits 370, 593 received in evidence)

3               (Defendant's Exhibits 739, 687, 690 received in

4     evidence)

5               THE COURT:  So I am not totally sure why Mr. Bodner

6     had to leave since we clearly have a *minyan* here.  But, in any

7     event, anything else we need to discuss?

8               MR. LAUER:  No, your Honor.

9               THE COURT:  Anything from plaintiffs?

10              MR. GLUCK:  No.

11              THE COURT:  Very good.  Thanks a lot.  We will see

12    you -- why don't you guys come in five minutes before 10:00

13    just in case something develops over the weekend.

14              (Adjourned to Monday, December 12, 2022, at 9:55 a.m.)

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JOSEPH SANFILIPPO

Direct By Mr. Hertzberg . . . . . . . . . .1239

Cross By Mr. Gluck . . . . . . . . . . . . .1240

Redirect By Mr. Hertzberg . . . . . . . . .1267


DAVID STEINBERG

Direct By Mr. Hertzberg . . . . . . . . . .1283

Cross By Mr. Gluck . . . . . . . . . . . . .1324


DAVID BODNER

Direct By Mr. Lauer . . . . . . . . . . . .1329

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

949   . . . . . . . . . . . . . . . . . . .1247

175   . . . . . . . . . . . . . . . . . . .1254

173   . . . . . . . . . . . . . . . . . . .1255

417   . . . . . . . . . . . . . . . . . . .1260

370, 593 . . . . . . . . . . . . . . . . . .1360

```
 1                         DEFENDANT EXHIBITS

 2    Exhibit No.                                  Received

 3     170    . . . . . . . . . . . . . . . . . .1249

 4     622    . . . . . . . . . . . . . . . . . .1255

 5     620.12    . . . . . . . . . . . . . . . .1281

 6     429    . . . . . . . . . . . . . . . . . .1347

 7     739, 687, 690    . . . . . . . . . . . . . .1360

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```