MCC2PLA1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION              18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER                18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

              Plaintiffs,

          v.

PLATINUM MANAGEMENT (NY) LLC,
et al.,

              Defendants.

------------------------------------x    Trial



                                         New York, N.Y.

                                         December 12, 2022
                                         10:25 a.m.

Before:

               HON. JED S. RAKOFF,

                                         District Judge
                                            and a Jury
```

MCC2PLA1

                              APPEARANCES

HOLLAND & KNIGHT, LLP
        Attorneys for Plaintiffs
BY:  WARREN E. GLUCK
        MARTIN L. SEIDEL
        RICHARD A. BIXTER JR.
        QIAN (SHEILA) SHEN
        NOAH W.S. PARSON
        ELLIOT A. MAGRUDER


KATTEN MUCHIN ROSENMAN, LLP
        Attorneys for Defendant Bodner
BY:  ELIOT LAUER
        GABRIEL HERTZBERG
        JULIA B. MOSSE


CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
        Attorneys for Defendant Bodner
BY:  NATHANIEL C. AMENT-STONE
        ALLESANDRA TYLER




Also Present:

Michael Robson, Paradocs Motion Support

Esterah Brown, Paralegal, Curtis Mallet

MCC2PLA1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Let's get Mr. Quintero in.

3                    MR. LAUER:  Change of plan.  We will continue with

4     Mr. Bodner because he has a grandson's *bris* tomorrow and he may

5     be delayed.

6                    THE COURT:  Very good.

7                    Thank you for your papers.  I will give you my rulings

8     at the first break.

9                    Mr. Bodner, come on up.

10                   My recollection is you have got about two hours more.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mcc2Pla1                          Bodner - Direct

1           (Jury present)

2           THE COURT:  Please be seated.

3           Good morning, ladies and gentlemen.  Thank you for

4    your promptness.  I am sorry for the delay this morning.  I had

5    a medical appointment and you will be very surprised to hear

6    that my doctor was running a half hour late.  That never

7    happens.

8           But, in any event, we are still on schedule and we are

9    going to continue with Mr. Bodner's testimony and then we will

10   come back to Mr. Quintero after that.

11          Go ahead.

12    DAVID BODNER, previously affirmed, resumed.

13   DIRECT EXAMINATION

14   BY MR. LAUER:

15   Q.  Good morning, Mr. Bodner.

16   A.  Good morning.

17   Q.  When we left off, you were about to discuss the move of

18   PPVA.

19          Did there come a time when Mr. Nordlicht and the PPVA

20   side of the Platinum Management business moved downstairs in

21   the building to the 4th floor?

22   A.  There came a time.

23   Q.  Do you recall approximately when that was?

24   A.  I think it was in approximately 2007.

25   Q.  And what was left on the 54th floor?

Mcc2Pla1                          Bodner - Direct

1   A.   What was left on the 54th floor were the employees of

2   Centurion.

3   Q.   Who headed Centurion?

4   A.   Murray Huberfeld.

5   Q.   And after Murray Huberfeld stepped down from running

6   Centurion, who were the Centurion people on the 54th floor?

7   A.   Who was on the 54th floor after Murray stepped down from

8   running Centurion?  I think it was basically the same people.

9   Q.   Okay.  Was Gilad Kalter there?

10  A.   Yes.

11  Q.   Do you remember what his role was?

12  A.   It was -- he had some sort of a role in the credit fund in

13  Centurion.

14  Q.   Brian Jedwab?

15  A.   Same.  He was a portfolio manager to my recollection.

16  Q.   And who told you that PPVA was moving to the 4th floor?

17  A.   I was told by Mark Nordlicht and by Ari Glass.

18  Q.   And what did they tell you?

19  A.   They told me that they didn't -- they wanted to

20  institutionalize PPVA and in order to institutionalize it they

21  wanted to be on their own floor because there were a lot of

22  rabbis coming up to this floor and it was more -- it didn't

23  look that professional.  And they felt that being downstairs

24  alone, without all these charities and everything coming up to

25  the office, would be more beneficial.

Mcc2Pla1                        Bodner - Direct

1    Q.   After they moved downstairs, did you have a conversation

2    with Ari Glass about the 4th floor?

3    A.   Yes.  Ari Glass came over to me and he says that he doesn't

4    want me to come down at all because, as he quoted it, wearing

5    my *yalmulke* and my white shirt, my suit, I looked too Jewish,

6    and the institutions are not going to want to put money into

7    the fund.  So before I go down to the 4th floor, I should call

8    up and make sure that there is no investors there at that time

9    if I have a reason to go down to the 4th floor.

10            THE COURT:  Are you Jewish?  I never would have

11   guessed.

12            Go ahead, counsel.

13   BY MR. LAUER:

14   Q.   Who was Ari Glass?

15   A.   Ari Glass was a partner that was brought in to Platinum

16   Management to raise money from institutions and from other high

17   net worth investors.

18   Q.   Did you speak with Mark Nordlicht about what Ari Glass had

19   told you about coming down to the 4th floor?

20   A.   I recall that it bothered me and I must have spoken to him

21   about it.

22   Q.   Now we have heard about a gentleman named Uri Landesman.

23   Who was Uri Landesman?

24   A.   Uri Landesman, there was a fallout between Mark Nordlicht

25   and Ari Glass, and at that time Mark was looking for somebody

1  to replace Ari Glass, so he brought in Uri Landesman.

2  Q.  And what did Landesman do at PPVA?

3  A.  Landesman became president of PPVA, and he was also in the

4  business of raising institutional money.

5  Q.  We have also heard the name David Levy.  Who was David

6  Levy?

7  A.  David Levy was a portfolio manager and later he became very

8  close to Mark Nordlicht.  He was doing everything together with

9  Mark.

10  Q.  How did Levy come to Platinum?

11  A.  I think he was recommended by Murray Huberfeld, who was his

12  uncle.

13  Q.  Bernie Fuchs, what was his role at PPVA?

14  A.  If I remember correctly, Bernie Fuchs was an investor.

15  Q.  Did he have a role at PPVA either as an investor or later

16  as a partner?

17  A.  Later he became a partner.

18  Q.  And what did he do for PPVA?

19  A.  He raised money.

20  Q.  Did you have any discussion with Bernie when he became a

21  partner?

22  A.  Yes, when --

23  Q.  What was that discussion?

24  A.  The discussion was when Mark Nordlicht made him a partner,

25  he came into my office very happy and he told me that he's

1    becoming a partner in the fund, and he was smiling.  He was

2    very happy.

3          So I mentioned to Bernie that I think it's only fair,

4    because that's the way I used to do it, together with

5    Huberfeld, we would wait to take out our withdrawals.  I'm not

6    talking about incentive fees.  That was for sure something that

7    came last.  But even our own withdrawals, I used to take out

8    profits at the end of every year to support my family, to give

9    charity, to pay taxes, but I was always last.  I waited for

10   investors to take out money first.  And I told Bernie I think

11   that's the right way a partner should do it.

12         It upsetted him because he felt that he is not going

13   to be able to get his redemption right away, and that was the

14   discussion.

15   Q.  Did you make Bernie Fuchs a partner?

16   A.  No.

17   Q.  Did you have a discussion with Bernie or were you told by

18   someone that he had a discussion with Bernie in terms of what

19   was expected of Bernie in making him a partner?

20   A.  If I remember correctly, I discussed with Murray Huberfeld

21   why they made Bernie a partner, himself and Mr. Nordlicht, and

22   he told me that Bernie committed that he would raise $125

23   million for the fund.

24   Q.  At any time did anyone working in Platinum Management,

25   other than perhaps your shared secretary, report to you?

Mcc2Pla1                        Bodner – Direct

1    A.  No.

2    Q.  Did you supervise anyone at Platinum Management?

3    A.  I did not supervise anybody at Platinum Management.

4    Q.  Did you participate in valuation committee meetings?

5    A.  I never participated in any meetings of evaluations.

6    Q.  Did you get draft valuation documents?

7    A.  I have never received any draft evaluation documents.

8    Q.  Did you know that Platinum had a risk committee?

9    A.  I knew that there was some sort of a committee there

10   that -- when you say Platinum, I knew that Murray Huberfeld,

11   when he ran Centurion, he had a small committee that, you know,

12   looked at the loans and saw if they were risky or not, and PPVA

13   I did not have any knowledge of any committees.

14   Q.  I take it you did not participate in PPVA risk committee

15   meetings?

16   A.  In PPVA risk committee meetings I never participated.

17   Q.  Did any PPVA trader report to you daily, weekly, or monthly

18   positions?

19   A.  No trader ever reported to me.

20   Q.  Did you review PPVA trading positions?

21   A.  Never.

22   Q.  Did you get e-mails or memos with operating data for the

23   oil and gas investments?

24   A.  I never got any e-mails on data for operating, for the

25   oils.

Mcc2Pla1                        Bodner - Direct

1   Q.   Did you get documents or e-mails with respect to the number

2   of wells that were being drilled?

3   A.   I don't recall getting any documents on anything on the oil

4   industry.

5   Q.   How about the reserves, the number of barrels in the

6   ground?

7   A.   No.

8   Q.   The oil and gas actually produced by these development

9   sites?

10  A.   I don't recall getting anything on any oil and gas.

11  Q.   Any details of production issues?

12  A.   I don't recall getting any details of any production

13  issues.

14  Q.   What about for the other operating companies that

15  Platinum -- that PPVA had an interest in?  Did you get

16  operating data, financial data for those investments?

17  A.   No, not to my recollection.

18  Q.   Did you get any data that would have enabled you at any

19  time between 2012 and 2016 to determine the accuracy of the

20  valuations that were assigned to the assets owned by PPVA?

21  A.   No, I did not get any data.

22  Q.   Now, we heard of an investment called China Horizon.

23  Briefly, tell us your recollection of the development of this

24  investment and exactly what it was.

25  A.   China Horizon was brought to the fund by a gentleman by the

Mcc2Pla1                         Bodner – Direct

```
 1    name of Alan Clingman.  He came to me and he explained to me
 2    what he was doing.  In the rural areas in China there were
 3    billions of people living, and the only way they were able to
 4    buy basic needed stuff——toothbrushes, toothpaste,
 5    mouthwash——was by going to a gas station.  He decided that he
 6    wants to make these gas stations, turn them into 7-Elevens,
 7    that all these places should have 7-Elevens all over the place
 8    in all these rural areas and he felt that it would be
 9    profitable from the profit that he would be making on the
10    products and also by enticing American companies by sending
11    these products to his stores in China.
12    Q.  Did you personally invest in China Horizon?
13    A.  Yes.
14    Q.  Did Mr. Huberfeld personally invest?
15    A.  Yes.
16    Q.  About how much did the two of you invest?
17    A.  If I recall correctly, together about a million dollars.
18    Q.  In addition to your personal investment, did PPVA invest in
19    China Horizon?
20    A.  Yes.
21    Q.  Who from PPVA took a lead role in monitoring the China
22    Horizon investment?
23    A.  Bernie Fuchs.
24    Q.  Do you know how it came about that Bernie Fuchs was the one
25    monitoring China Horizon?
```

Mcc2Pla1                          Bodner – Direct

1    A.  Bernie Fuchs used to travel to China for his electronic

2    business, so he knew the Chinese people very well.  He knew

3    where to go, what to do, and everything.  So the fund felt

4    comfortable, Mark Nordlicht, sending him, and he should be

5    part, he should be on the board of China Horizon, and he should

6    report back what he sees over there.

7    Q.  And did Mr. Fuchs report to you and the others at PPVA?

8    A.  Mr. Fuchs, when I asked him how it was doing——I had my own

9    personal investment——he told me how he felt it was doing.

10   Q.  And how did he feel it was doing?

11   A.  It was very bullish.

12   Q.  Did you have a detailed financial information on the China

13   Horizon investment?

14   A.  I don't remember having detailed financial information.  I

15   knew that they needed money and they were soliciting people for

16   money.

17   Q.  Did the come to learn at a certain point that the Chinese

18   government reneged on its agreement?

19   A.  Yes.

20   Q.  And do you recall what happened after that?

21   A.  I recall that Alan Clingman was talking about suing the

22   government and he felt that he would be able to get the

23   business back going somehow.

24   Q.  We heard some testimony concerning a meeting that took

25   place with you and some of the others on China Horizon.

Mcc2Pla1                          Bodner - Direct

1   Mr. Katz testified to this.  Do you recall the meeting?

2   A.   No, I don't.

3   Q.   What happened actually to Mr. Clingman's lawsuit?

4   A.   If I'm not mistaken, I think he won $26 million from the

5   government, Chinese government.

6   Q.   That was for his interest?

7   A.   I don't know whose interest it was for.

8   Q.   Over the five years that we are focusing on in this

9   courtroom, in addition to China Horizon, can you think of any

10  other PPVA operating company investment where you had some more

11  direct connection.

12  A.   PPVA had an investment in company call Agera.

13  Q.   Briefly what was the business of Agera?

14  A.   Agera was selling energy.

15  Q.   And did you come to spend some time at the Agera offices?

16  A.   Yes, I did.

17  Q.   Can you tell us what caused you to spend time at the Agera

18  offices?

19  A.   I had a son who for seven and a half years had OCD,

20  obsessive-compulsive disorder, and I was trying to get him out

21  of it by putting him into business.  And it helped him a lot by

22  going out and doing deals, finding deals, having his own

23  office.  So I spoke to the person at Agera, if it was possible

24  to make him a salesman, to sell the energy, to bring customers

25  to Agera.

Mcc2Pla1                          Bodner – Direct

1   Q.  Who did you speak with?

2   A.  Kevin Cassidy.

3   Q.  Did he agree to bring your son on as a salesman?

4   A.  After I told him the situation, not only did he agree to

5   bring him on, he gave him an office there also.

6   Q.  Other than -- did you have any detailed financial

7   information about Agera?

8   A.  No, I did not.

9   Q.  Did you have a role in managing the Agera business?

10  A.  No role whatsoever.

11  Q.  Did there come a time when PPVA lent money to Agera?

12  A.  I know that PPVA owned Agera to some degree.  I don't know

13  how, if they lent money or how they got ownership in Agera.

14  Q.  Did there come a time when you participated in one or more

15  loans to Agera?

16  A.  Yes.

17  Q.  Can you tell us about that.

18  A.  David Levy formed something, I forgot the name, and it was

19  lending money to Agera, and it was paying an interest rate

20  monthly.

21  Q.  Did you ever speak to the auditors who audited the

22  financial statement of PPVA?

23  A.  Never spoke to any auditors.

24  Q.  Did you speak with any of the valuators who issued the

25  valuation reports on the PPVA assets?

1   A.   No, I did not.

2   Q.   Now, every month you received an NAV report, right?

3   A.   At the end of the month I would call a gentleman by the

4   name of Michael Kimelman, and I would ask him basically if he

5   could tell me how much the fund was up and how my different

6   entities, what they were worth at that time and how much money

7   was in the fund.

8   Q.   When you talk about individual entities, do you mean each

9   of the family accounts that you had at PPVA?

10   A.   That's what I mean.

11   Q.   And is the information that Kimelman gave you, whether the

12   fund was up or what percentage it was up, is that any different

13   than the information that all the outside investors were

14   getting?

15   A.   No, it's not.

16   Q.   Did you have any role in developing the numbers that became

17   the NAV statement?

18   A.   I'm not understanding the question.

19   Q.   Did you have any role in participating in figuring out what

20   the net asset value would be each month?

21   A.   No, I did not.

22   Q.   You mentioned that you would call Kimelman.  Did outside

23   investors also call Kimelman?

24   A.   Some outside investors called him.

25   Q.   All right.  And did outside investors have the opportunity

Mcc2Pla1                           Bodner - Direct

1    to call other members of the Platinum executive group?

2    A.  Yes, I think they did.

3    Q.  All right.  Do you know anyone who followed up more

4    directly?

5            MR. GLUCK:  Objection.

6    A.  I think --

7            THE COURT:  Sustained.

8            MR. LAUER:  All right.

9    BY MR. LAUER:

10   Q.  We have heard -- I'm going to ask you some list of names

11   and tell us briefly what they did.

12           Naftali Manela.

13   A.  Naftali Manela I think was the CFO of Centurion Partners.

14   Q.  Okay.  Joseph SanFilippo.

15   A.  Was the CFO of PPVA.

16   Q.  Did you supervise SanFilippo?

17   A.  No, I did not.

18   Q.  Did he take instruction from you?

19   A.  No, he didn't.

20   Q.  Mr. Steinberg, who was here on Friday.

21   A.  Mr. Steinberg was a portfolio manager and later he became a

22   risk manager.

23   Q.  Did you direct him?

24   A.  No, I did not direct him.

25   Q.  David Ottensoser.  Who was he?

Mcc2Pla1                         Bodner - Direct

1   A.   If I'm not mistaken, he was an in-house lawyer for

2   Platinum.

3   Q.   Did you supervise him?

4   A.   No, I did not.

5   Q.   Suzanne Horowitz.

6   A.   I think at the later date Suzanne Horowitz became an

7   in-house attorney.

8   Q.   Did you have any interaction with her?

9   A.   I don't remember offhand having any interaction with her.

10  Q.   Eli Rakower, do you know that name?

11  A.   It sounds familiar.

12  Q.   Did you have any dealings with him?

13  A.   No.

14  Q.   Mr. Jed Latkin, who was here a few days ago, do you

15  remember what he did?

16  A.   No, I don't.

17  Q.   Seth Gerszberg, did you supervise him?

18  A.   No, I didn't.

19  Q.   Kerry Propper.  Who was Kerry Propper?

20  A.   Kerry Propper was a friend of David Levy and he was brought

21  on to become a partner in the fund and maybe ultimately take

22  over the reins from Mark Nordlicht.

23  Q.   What interaction, if any, did you have with Kerry Propper?

24  A.   I was introduced to him being an owner of Platinum

25  Management.

Mcc2Pla1                          Bodner - Direct

1    Q.  Did you hire him?

2    A.  No.

3    Q.  Danny Saks, who was Danny Saks?

4    A.  Danny Saks was also a gentleman that was supposed to come

5    in and take over managing the fund.

6    Q.  Did you hire Danny Saks?

7    A.  No, I did not.

8    Q.  Now, from time to time, did the partners in Platinum

9    Management get together for meetings?

10   A.  From time to time.

11   Q.  To the best of your recollection, during the period, say,

12   2012 through 2016, how often did the partners get together?

13   A.  Not very often.

14   Q.  Do you recall -- can you put a number on it?

15   A.  I would say maybe three or four times a year we had dinner

16   together.

17   Q.  And during this period of time, '12, '13, '14, '15, the

18   beginning of '16, who typically would attend these dinner

19   meetings?

20   A.  Well, in the beginning, it was attended by Uri Landesman,

21   myself, Murray Huberfeld, and Mark Nordlicht.

22   Q.  And after the beginning?

23   A.  After Bernie Fuchs became a partner, he started to attend

24   the meetings.

25   Q.  During the period 2012 to 2016, how often did you come to

Mcc2Pla1                              Bodner - Direct

1    the office?

2    A.  I came to the office usually two or three times a week and

3    usually for about three hours.

4    Q.  And are you -- how is it that you came to the office for

5    three hours?

6    A.  First of all, I live in Monsey, New York.  Just traveling

7    to get to the office could take two, two and a half hours, so I

8    used to not leave my house before 10:30, 10, 10:30, or 11:00,

9    because there was no traffic then.

10   Q.  And when would you leave?

11   A.  I usually left anywhere between 2:30 and 4:00.

12   Q.  Okay.

13   A.  Also on the way home there was traffic, and I wanted to

14   avoid traffic.

15   Q.  We heard testimony that there was a time or for a while, a

16   long while, that you shared an office with Murray Huberfeld.

17   A.  Yes.

18   Q.  Did there come a time when you moved off of the 54th floor

19   to a different office building?

20   A.  Yes.

21   Q.  Do you recall approximately when that was?

22   A.  I think in 2014 Platinum moved out of 57th Street to 55th

23   Street.

24   Q.  And did you move to 55th Street?

25   A.  Yes.

Mcc2Pla1                    Bodner - Direct

1  Q.  Did Mr. Huberfeld move to 55th Street?

2  A.  No.

3  Q.  So during the -- I guess the last two years of this time

4  period, you did not share an office with Mr. Huberfeld.

5  A.  I did not share an office with him.

6  Q.  Did your -- did you continue to have the level of contact

7  with Mr. Huberfeld that you previously had?

8  A.  Much less.

9  Q.  Did there come a time when liquidity became a central

10  concern of PPAV?

11  A.  Yes.

12  Q.  To the best of your recollection, can you tell us how that

13  came about?

14  A.  When you say concern, what do you mean by that?

15  Q.  Was this a topic of discussion?

16  A.  Yes.

17  Q.  All right.  Tell us what the discussion was.

18  A.  The discussion was that Mark needed money -- Mark Nordlicht

19  was not a person who used to calculate that January 1 I'm going

20  to need for February 1 a certain amount of withdrawals, so I

21  have to put that money on the side.  He didn't exactly

22  calculate to the point how much he is going to need.  He was a

23  very optimistic person, and it came a time when it just hit him

24  in the face that he needs a certain amount of liquidity to give

25  back the withdrawals and money for the companies.

Mcc2Pla1                              Bodner – Direct

1           So at every dinner that we had, that was the top

2    topic.   Where are we going to get the liquidity from?   How are

3    we going to get the liquidity?   Which investors are we going to

4    for the liquidity.

5           (Continued on next page)

MCCCpla2                    Bodner - Direct

1  BY MR. LAUER:

2  Q.  Did you also have discussions with Mark Nordlicht at these

3  meetings or otherwise in terms of how much cash he had

4  available set aside that was not invested?

5  A.  I don't remember having that discussion, but he always

6  needed money.  So I understood that there was no money set

7  aside.

8  Q.  Did you have an understanding as to Mark's approach to

9  using cash in investing?

10  A.  Not really.

11  Q.  By the way, after Mr. Huberfeld was arrested, did you

12  continue to have conversations with him?

13  A.  I went to visit him.

14  Q.  At some point in time, did the partners stop taking the

15  incentive fees?

16  A.  Yes.

17  Q.  Was that your decision?

18  A.  Nothing to do with me.

19  Q.  Can you tell us how that came about?

20  A.  Mark Nordlicht decided that for the year 2014, we're not

21  going to pay out incentive fees, instead we're going to accrue

22  them.  That means we're going to still own them, it's going to

23  be ours, but we're not going to take them out in cash.

24  Q.  Did Mark explain why he was doing that?

25  A.  He had no money to give us.

MCCCpla2                          Bodner - Direct

1   Q.  Tell us the general format of these partner dinners, who

2   said what and what information was exchanged?

3   A.  It wasn't really an official meeting, it was more of a

4   dinner.  We had dinner together, we used to speak about

5   everything that's going on in the Jewish world and in the world

6   in general.  Then, for a few minutes, Mark would bring a sheet

7   of paper and on the sheet of paper, he would show the fund's

8   positions, and he would talk about how much money he needs and

9   when he needs it and how he's pressed that he must have this

10  money by this and this time to support the companies and also

11  to support the withdrawals.

12  Q.  Why was Mark telling the partners this?

13  A.  To tell the partners to go out and raise money.

14  Q.  Did you go out and raise money for the fund?

15  A.  No.

16  Q.  Did there come a time when in or about the end of 2014 or

17  the first month or two of 2015, when the partners met and

18  Mr. Fuchs now attended?

19  A.  Yes.

20  Q.  Do you have a recollection of that dinner?

21  A.  Yes, I do have a recollection of it.

22  Q.  So, to the best of your recollection, tell us what you

23  remember about the dinner.

24  A.  I remember that Mark was under a lot of pressure.  He

25  needed over $100 million very fast to meet redemptions and for

MCCCpla2                    Bodner - Direct

his companies.  He said that if we don't raise it, the fund's

going to have to shut down, put up the gate or something's

going to happen.

Q.  Did he go through the assets?

A.  I don't remember if he went through the assets.  I think it

was more withdrawals that he was concerned about.  That was

most of the money what was needed for.

Q.  Do you recall generally or approximately how much money was

going out above how much was coming in?

A.  I think he was usually short $25 million, 25 to 50 million,

that's what he was asking for.

Q.  Did you say anything at that dinner meeting?

A.  Yes.  I told Mark that I think an asset, being a trader,

and when you trade something, you buy and sell something, you

get cash right away.  If you buy a stock and you sell it, the

cash comes out right away.  If you buy an illiquid asset, I

told him that I think he should mark the asset when it's sold.

When that happens, when the asset is sold, that's the right

time to mark it because you're causing everybody to want to

take their money out.  If you have an illiquid asset that goes

up, people are going to be enticed to make withdrawals.  And I

think that was his major problem and you don't have the money

to give it because your asset is illiquid.

Q.  Did you say anything about the correctness of Mark's

valuations?

MCCCpla2                          Bodner - Direct

1    A.   Absolutely not.

2    Q.   Did you have any information to form an opinion confirming

3    or contradicting his valuations?

4    A.   No, I did not.

5    Q.   When you told this to Mark, what was Mark's reaction?

6    A.   Mark got very angry at me, he screamed at me, it was in the

7    middle of a restaurant.  And he says, you don't come into the

8    office, go back to Monsey, go back to Yeshiva, you do not how

9    to run a hedge fund.  I have two accountants and an evaluator

10   who tell me how to run the hedge fund.

11   Q.   What did you do after he said that?

12   A.   If I'm not mistaken, I was very upset.  He embarrassed me

13   in front of not only the people sitting at the table, but there

14   was a group of people sitting in the restaurant.  So I might

15   have left then or very soon after.

16   Q.   Did you continue to invest your family money in the fund?

17   A.   I don't remember if I put in new money, but I did not

18   withdraw my money.

19   Q.   Did you continue to have confidence in Mark?

20   A.   Yes.

21   Q.   Why was that?

22   A.   Because Mark was an optimistic person.  I knew Mark over

23   the years, not only from '12 to '16, that Mark would invest,

24   overinvest every penny that he had.  A good deal came his way,

25   he would put money in it even if he didn't have the money for

MCCCpla2                    Bodner - Direct

1  it.  And he showed me very nice returns.  And I believe, you

2  know, he believed in everything he did.

3  Q.  Did Mark have a previous experience with a liquidity crisis

4  with PPVA?

5  A.  Mark had an experience in 2008 when the whole world was

6  shaking and all the hedge funds were shaking.  And if I

7  remember correctly, he side-pocketed the nonliquid assets,

8  meaning that nobody could take out any of their money.  If I'm

9  not mistaken, it was 55 or 60 percent of the fund's assets that

10 nobody was allowed to take out.  It's called a side pocket.

11 And then, over the years, he worked out of it and I think by

12 2010, two years later, everybody was able to receive all their

13 money, whatever they wanted.

14 Q.  Did you say at that dinner something to the effect that no

15 one is taking money out?

16 A.  No.

17 Q.  We've heard testimony about a gentleman named Marcos Katz.

18 Who is Marcos Katz?

19 A.  Marcos Katz was an older man who lived in Mexico City, a

20 wealthy man who I knew for quite a few years.

21 Q.  Did you bring Mr. Katz into PPVA or Platinum?

22 A.  No, I did not.

23 Q.  Who at Platinum had the closest relationship with Mr. Katz?

24 A.  Murray Huberfeld.

25 Q.  Did you have occasion in or about 2015, 2016 to meet with

1    Mr. Katz on one or more occasions?

2    A.  Yes, I did.

3    Q.  And can you tell us why you were meeting with Mr. Katz?

4    A.  Mr. Katz was very upset that he put in redemptions and they

5    weren't giving him his money.

6    Q.  Why did you meet with him?

7    A.  I met with him to try and explain to him that there's no

8    money and nobody's getting redemptions.

9    Q.  Do you recall anything else that was discussed with

10   Mr. Katz?

11   A.  I think, if I'm not mistaken, there were two meetings, one

12   in Mexico and one in Acapulco.

13   Q.  Was the conversation different or basically are you

14   testifying to what you recall from the two meetings?

15   A.  I think one meeting, Marcos Katz was discussing coming into

16   the fund and being a partner in management.  He was telling us

17   that he was able to bring in investors, and his name being

18   associated with the fund would help the fund immensely.  I

19   think he introduced Murray Huberfeld and Mark Nordlicht to some

20   Saudi Arabian person that they trapped that he said he could

21   put in $200 million.  And he was going to introduce him, he

22   knew him.  And they would fly down there -- and I think they

23   did fly down there and they met with him.  That's my

24   recollection.

25   Q.  Did you know Marcos Katz's grandson, Michael Katz?

MCCCpla2                       Bodner - Direct

1   A.  Yes, I knew him.

2   Q.  Did you see him at the Platinum offices?

3   A.  When I was in the office, he was usually there.

4   Q.  Any idea what he was doing?

5   A.  Marcos Katz wanted him to have a job.  Mr. Huberfeld told

6   me that Marcos Katz wanted him to have a job at Platinum and to

7   watch over the fund for him.

8   Q.  And did you come to form an understanding as to what

9   Michael Katz was doing to monitor the investment?

10  A.  I noticed that he was very busy meeting with David Levy and

11  Mark Nordlicht a lot.

12  Q.  Did Michael Katz have any connection to the fund itself?

13  A.  Connection in which way?

14  Q.  I'll rephrase it.

15          You said that Marcos Katz expressed an interest at one

16  of these meetings in joining the management or ownership of the

17  fund.  Did that include a role for his grandson?

18  A.  Yes, he wanted his grandson to be part of the fund.

19  Q.  Did you make any misrepresentations to Marcos Katz about

20  valuations?

21  A.  No.

22          MR. GLUCK:  Objection.

23  Q.  Was the conversation even about valuations?

24  A.  No.

25  Q.  In 2016, did there come a time when Mark Nordlicht asked

MCCCpla2                        Bodner - Direct

1    you and Murray Huberfeld to give up your shares in Platinum

2    Management?

3    A.  Yes.

4    Q.  What did Mark tell you?

5    A.  Mark told me that he needs money and money is not coming

6    in, so he would like to sell our piece of the management to

7    raise money.

8    Q.  Before he asked you to give up your piece of management,

9    had he asked you for personal money?

10   A.  He constantly asked me to put in personal money.

11   Q.  And did you agree?

12   A.  I told him that I can't afford it.

13   Q.  So you did not agree?

14   A.  I did not agree to put in any more personal money.

15   Q.  Did Mark explain to you why it would make sense for you and

16   Mr. Huberfeld to give up your interest in Platinum Management?

17   A.  Yes.

18   Q.  And what did he say?

19   A.  He said that if we don't give up, if he doesn't raise

20   money, the fund is going to fall apart and everybody's going to

21   lose their money because you're not going to be able to support

22   the companies to give them the money they need to develop or go

23   further.  So it would make sense to give it up to save my

24   $80 million that I had together with Mrs. Huberfeld to get that

25   out by just giving up my ownership in Platinum.

MCCCpla2                        Bodner – Direct

1    Q.  Did you consider that your ownership in Platinum Management

2    had value?

3    A.  Definitely.

4    Q.  Did this develop into an agreement?

5    A.  Yes.

6    Q.  And in connection with the agreement, did the agreement

7    contain mutual releases?

8    A.  Yes, it did.

9    Q.  Was there also a companion agreement between Mr. Katz and

10   the Platinum Partners?

11   A.  To my recollection, there was.

12   Q.  Do you have a recollection of who actually first raised the

13   issue of releases?

14   A.  No, I don't.

15   Q.  Did you raise the issue of releases?

16   A.  No, I did not.

17   Q.  I'd like to show you JX 74.

18            MR. LAUER:  Your Honor, despite our great efforts, we

19   have not been able to clarify whether this actually was

20   technically received or not.

21            THE COURT:  My recollection is that when that question

22   was last raised, I said that if it had not previously been

23   received, it was now received.  But to put it so there is no

24   doubt whatsoever, it has been or will now be received.

25            (Joint Trial Exhibit 74 received in evidence)

MCCCpla2                         Bodner - Direct

1            MR. LAUER:  Thank you, your Honor.  Thank you.  Thank

2      you.

3      BY MR. LAUER:

4      Q.  Mr. Bodner, I'm showing you what has been marked as Joint

5      Exhibit 74.  Is this the release agreement between Platinum

6      Management and you and Mr. Huberfeld?

7            THE COURT:  Do you want to look at a hard copy?

8            THE WITNESS:  No, I'm fine.

9      A.  Can we go to the next page.

10     Q.  Please, let's go to the next page.

11     A.  Thank you.

12     Q.  You're free to read it, but you don't have to read it in

13     detail.

14     A.  Ask me the question.

15           THE COURT:  Would someone please go to the last

16     signature page.

17           On the bottom-right column, it says David Bodner and

18     then there is a signature.  Is that your signature?

19           THE WITNESS:  Yes, that's my signature.

20           THE COURT:  And you signed it because you accepted and

21     entered into this agreement, yes?

22           THE WITNESS:  Correct.

23           THE COURT:  Very good.

24           MR. LAUER:  Thank you, your Honor.

25     Q.  Was your agreement dependent on Mr. Katz actually going

1    through with his own agreement?

2    A.  That was not my understanding.

3    Q.  At the time that you entered into this agreement, did you

4    have --

5           THE COURT:  Just so I'm clear, you understood that

6    this was in conjunction with your giving up your ownership in

7    the management company, yes?

8           THE WITNESS:  Yes.

9           THE COURT:  And you said a minute ago that that had

10   value.  Would you explain why, in your view, it had that?

11          THE WITNESS:  It had value because if you go back,

12   over the years, the management company, if I'm not mistaken, I

13   could be off by the figures, was able to generate in incentive

14   fees and in management about 40 to $50 million a year.

15          THE COURT:  And that was money that was above what one

16   would get from just being an investor?

17          THE WITNESS:  Correct.

18          THE COURT:  All right.  Go ahead, counsel.

19   BY MR. LAUER:

20   Q.  By the way, in this agreement, there's an indemnity.  Did

21   you ask Mark Nordlicht to indemnify you?

22   A.  I think I did.

23   Q.  What was the particular issue for which you asked Mark to

24   provide an indemnity?

25   A.  It's called gift tax.  I was gifting my ownership back to

MCCCpla2                          Bodner - Direct

Platinum Management and my accountants told me that I might

have a liability on a gift tax due to the value of it.  Plus, I

was giving back any fees that were owed to me.  So I wanted him

to indemnify me, if I have any liability, tax liability, he

would pay it.

Q.  Now, in this agreement, you agreed to a two-year lockup?

A.  Yes.

Q.  And Mr. Huberfeld agreed to a two-year lockup?

A.  Mr. Huberfeld also agreed.

Q.  So approximately how much money were you agreeing not to

take out of PPVA and PPCO?

A.  Between myself and Mr. Huberfeld?  Around $80 million.

Q.  So why did you agree to this?

A.  Because the fund was in dire straits.  Mark Nordlicht

explained to me that by selling ownership, it had a tremendous

value.  If I remember correctly, he told me it could --

ownership could be worth $200 million and by selling my piece,

he would be able to raise $70 million either by having people

invest money in Platinum and giving them a small piece of the

ownership or by just selling the ownership straight out.

Q.  At the time that you signed this agreement, did you have

any idea that Murray Huberfeld had given funds to Jonah

Rechnitz regarding COBA?

A.  No, I did not.

Q.  Did you have any idea that Murray Huberfeld faced criminal

1  exposure for that?

2  A.  No, I did not.

3  Q.  Were you charged in the COBA case?

4  A.  No, I was not.

5  Q.  Were you a witness at the trial?

6  A.  I was not a witness.

7  Q.  Did the government interview you for assistance at the

8  trial or cooperation?

9  A.  No, the government did not interview me at all.

10  Q.  Did you have any contact with COBA?

11  A.  No contact whatsoever.

12  Q.  At the time that you signed this agreement, did you have

13  any concerns that PPVA had claims for incentive fees or

14  management fees against you?

15  A.  No.

16  Q.  At any time between 2012 and when you signed this release,

17  did you have any idea that Platinum Management would be sued

18  for fraud or that Mark Nordlicht would be indicted for fraud?

19  A.  No, I had no idea.

20        MR. GLUCK:  Objection.

21  Q.  Were you aware of any claims that PPVA had against Platinum

22  Management?

23  A.  I was not aware of any claims, no.

24  Q.  Now, a few months after you signed this agreement, Murray

25  Huberfeld was arrested; right?

MCCCpla2                        Bodner - Direct

1    A.  Correct.

2    Q.  What happened to the fund after that?

3    A.  I think the fund was in disarray.  I wasn't that often in

4    the office, but I think everything was in disarray.  I was more

5    busy -- Mark Nordlicht was my partner for 30 years, I was more

6    busy visiting him and seeing how I could help him.

7    Q.  Mark Nordlicht was indeed charged.  Do you know what he was

8    charged with?

9    A.  I think he was charged for over-valuating the fund and also

10   something with a Black Elk vote.

11   Q.  Did you have anything to do with the Black Elk vote?

12   A.  Absolutely nothing to do.

13   Q.  And what happened to the charge against Mr. Nordlicht for

14   overvaluing the fund?

15   A.  The jury found him not guilty.

16            MR. GLUCK:  Objection.

17            THE COURT:  So that objection, of course, should have

18   been made before the answer was given, and I've warned

19   plaintiffs' counsel before to be a little more alert to that,

20   but the objection is sustained.

21   Q.  I would like to show you a group of different emails that

22   have come into evidence so that you will have the opportunity

23   to help us understand the documents.  We could start with the

24   screen.

25            MR. LAUER:  These are all in evidence.

1        THE WITNESS:  For me, it would be better with the

2    screen.  It's much better for me.

3    Q.  You want paper or screen?

4    A.  Screen.

5    Q.  Screen, fine.  Let me show you Plaintiffs' Exhibit 442.

6    Take a look at it and let me know when you're ready for a

7    question.

8    A.  I'm ready for a question.

9    Q.  Who is Lee Haddad?

10   A.  We used to make a charity party twice a year at the home of

11   Ira Rennert to raise money for poor people in Israel.  I was

12   very involved.  And the one who was in charge of all the

13   logistics and doing everything was a gentleman by the name of

14   Lee Haddad.

15   Q.  And in the middle of the page, a gentleman named Eliyahu is

16   writing you, attaching a summary investment and valuation for

17   Omek.  What was this?

18   A.  Eliyahu is Lee Haddad.  His Hebrew name is Eliyahu.  Omek

19   is a company, a private company that he wanted me to invest in.

20   Q.  Did this have anything to do with PPVA?

21   A.  Nothing to do with PPVA.

22   Q.  The bottom of the page says what's the story of Jay

23   Schottenstein.  Do you know who that refers to?

24   A.  Yes, that refers to the party.  If I'm going to solicit

25   Jay, to bring money to the party and to come to the party.

1   Q.  And was Mr. Schottenstein a well known, wealthy

2   businessman?

3   A.  Yes, he was a well known, wealthy businessman.

4   Q.  Did you solicit him?

5   A.  I had Ira Rennert elicit him.

6   Q.  And that was for the charity event?

7   A.  Yes, it was.

8   Q.  By the way, is Mr. Rennert also another wealthy Jewish

9   businessman?

10  A.  Yes, he is.

11  Q.  Who is Isaac Barber?

12  A.  Isaac Barber was -- I think he was a -- a manager of a

13  portfolio at the fund.  I used to use him to help me out to

14  value companies.  He was very smart and he was able to look at

15  a company and tell me what he thought it was valued at.

16          MR. LAUER:  Turn to Plaintiffs' Exhibit 417.

17  Q.  This is dated November 16, 2012.  That's the day of the

18  explosion on one of the platforms that Black Elk had in the

19  Gulf of Mexico?

20  A.  I don't recall this email at all.  I don't know who Chaya

21  is.

22  Q.  This says someone left a message on your phone for

23  Black Elk investors.  Do you have any idea what this is about?

24  A.  No idea what's going on.

25  Q.  Did you solicit anyone to become a Black Elk investor?

1    A.  No, I did not.

2    Q.  Were you a Black Elk investor?

3    A.  No, I was not.

4         MR. LAUER:  Turn to PX 381.

5    Q.  Do you have it?

6    A.  Yes.

7    Q.  This looks like a list of terms?

8    A.  Yes.

9    Q.  Was this the precursor to the creation of the Beechwood

10   business?

11   A.  Yes.

12   Q.  Were you at this initial meeting?

13   A.  No, I was not.

14   Q.  But you were shown this?

15   A.  It was sent to me.

16   Q.  What was your understanding of the business model of the

17   Beechwood business?

18   A.  Beechwood was brought to me by my partner, Murray

19   Huberfeld.  He said that he has a friend, Mark Feuer, who has a

20   sterling reputation.  He used to work at Merrill Lynch and he

21   wants to start a reinsured business.  The way I understood a

22   reinsurer business is that insurance companies have to meet

23   every year for policies, if somebody dies or if they have to

24   pay insurance for anything that happens, in order to meet that,

25   they would pick the premiums that they have and they would give

MCCCpla2                        Bodner - Direct

```
1    it to a reinsurer to invest it.  And Murray explained me that
2    according to the actuaries, the people who make charts to see
3    how much an insurance company should need each year, in order
4    to meet their commitments, anything over and above that their
5    investment makes over 4 or 5 percent, we would receive as our
6    profits, the reinsurer would receive it, Beechwood would
7    receive it.  Being that we were in the asset lending business,
8    myself and Mr. Huberfeld, over the years, something that made a
9    lot of sense to me, that there's investments out there that
10   could earn much more than 4 percent, and that profit would go
11   to us.  Also, I was explained that first losses that come from
12   these investments go to us.  So we would have to put up
13   $100 million in capital.
14   Q.  Did Mr. Nordlicht participate in this?
15   A.  Yes, he did.
16   Q.  And did the three of you put up capital?
17   A.  We did.
18   Q.  And what was Feuer's role in all this?
19   A.  Mr. Feuer and Mr. Scott Taylor were the bosses of
20   Beechwood.  They ran Beechwood and their job was to get the
21   insurance companies to invest the money.
22   Q.  And you, Nordlicht, and Huberfeld would put up the capital?
23   A.  We'd put up the risk capital, the $100 million.
24   Q.  What do you mean by risk capital?
25   A.  That means that if you invested an investment -- let's say
```

1   an insurance company puts in $50 million in the reinsurer and

2   you make an investment for the reinsurer and you lose

3   $5 million, that would come from you before you go take the

4   money from the insurance company, and it went on a ratio

5   according to how much money was put in.

6   Q.  Approximately how much capital did you personally or your

7   family members put up to capitalize the Beechwood business?

8   A.  I was explained that it was capitalized at different

9   levels.  It had to start first with $40 million at one level.

10  I didn't really understand it, but this is the way Mark Feuer

11  explained it to me, that there's different levels of capital

12  that go in.  The original capital we had to put in was

13  $40 million, after that, another amount of money, and then at

14  another level, another amount of money.  Ultimately, I had to

15  put up $25 million worth of capital.

16  Q.  And what happened to that capital?

17  A.  It was lost, except for certain shares that I didn't have

18  to put in, a certain amount of shares, which was worth, if I'm

19  not mistaken, about three or $4 million.

20  Q.  In connection with Beechwood, you, Mr. Nordlicht,

21  Mr. Huberfeld put up the majority of the capital?

22  A.  All the capital.

23  Q.  Did you have an agreement with Nordlicht and Huberfeld

24  similar to the agreement you had in Platinum in terms of who

25  would be in charge of Beechwood?

MCCCpla2                          Bodner - Direct

1   A.  No.

2   Q.  So you were each free to express your views?

3   A.  We each expressed our views in Beechwood.

4   Q.  And Mr. Nordlicht did not control Beechwood?

5   A.  As far as I understood, Mark Feuer and Scott Taylor were

6   the bosses there.

7          MR. LAUER:  Turn to Plaintiffs' Exhibit 377.

8   Q.  This seems to be a meeting at Prime KO.  Prime KO was a

9   restaurant?

10  A.  Prime KO was a restaurant, yes.

11  Q.  Do you recall this dinner?

12  A.  It was in 2013.  I do not recall it.

13  Q.  So this says please remind Mark to bring with him to

14  Prime KO two copies of positions for PPCO and PPVA.

15         What did that look like, if you can recall?

16         MR. GLUCK:  Objection.

17         MR. LAUER:  I'll rephrase it.

18         THE COURT:  Sustained.

19  Q.  In what form did these positions appear?

20         THE COURT:  I'm sorry.  Wait a minute.  I thought you

21  testified you don't recall the dinner.

22         THE WITNESS:  That's what I told him, yes.  He was

23  asking me a lot of questions.

24         THE COURT:  So do you recall receiving, at the dinner,

25  some information?

1          THE WITNESS:  I don't recall this dinner.

2          THE COURT:  So when, if ever, did you receive the two

3     copies of the positions for PPCO and PPVA?

4          THE WITNESS:  I don't recall receiving it.

5          THE COURT:  So how can you know what's in them?

6          Sustained.

7     BY MR. LAUER:

8     Q.  At any dinner, do you remember receiving a handout from

9     Mark Nordlicht?

10    A.  At most dinners with Mark Nordlicht, he would come with,

11    scribbled on a piece of paper, positions that he wrote himself.

12    And he didn't give us copies, he read them off, and he told us

13    his liquidity needs, that this position needs this much money

14    and this needs this and withdrawals.

15         MR. GLUCK:  Objection.  Move to strike as

16    nonresponsive, most of the answer.

17         THE COURT:  I'll allow it.  Overruled.

18         MR. LAUER:  Turn to PX 467.

19    Q.  This is an email from Angela with your calendar, and your

20    calendar is Mr. Huberfeld's calendar, and then on the bottom,

21    David's calendar.

22         Do you see that?

23    A.  Yes, I do.

24    Q.  So let's turn to David's calendar.  Let's go through this

25    meeting.

MCCCpla2                          Bodner - Direct

 1            The first meeting, 12:00 p.m., Mark Nordlicht and
 2   Allen Clingman.  Do you have a recollection of meeting with
 3   Mark and Allen Clingman?
 4   A.  I don't have an exact recollection, but I probably met with
 5   them about China Horizon, you know, if I would put more money
 6   into it.
 7   Q.  1:00 p.m., Nelson Heft.  Who was he?
 8   A.  He was somebody who was bringing me a private deal to look
 9   at.
10   Q.  Do you remember the deal?
11   A.  No, I don't.
12   Q.  2:00 p.m., meeting with Rob Koltun, Murray Huberfeld, David
13   Bodner --
14   A.  Rob Koltun was a hedge fund manager that I had a
15   substantial amount of money in together with Murray.
16   Q.  That was a personal investment?
17   A.  Personal investment, yes.
18   Q.  2:30, Isaac Barber, Murray Huberfeld, David Bodner.
19   A.  As I stated on all my private deals, whenever I needed
20   help, I used to call Isaac Barber to evaluate for me, if I
21   should go into the deal or not.  Also, together, we tried to
22   start a company.  So could be that was the meeting.
23   Q.  3:15, Ben Mayer?
24   A.  3:15, Ben Mayer is having problems, marriage problems with
25   his wife.  He was my nephew, so I used to meet with him and his

MCCCpla2                    Bodner – Direct

 1    wife periodically.

 2    Q.  3:30, Tzvi Rosenblum?

 3    A.  Tzvi Rosenblum was a boy that was on drugs and I would meet

 4    with him and have constant contact with him to try to get him

 5    off drugs and become a productive citizen.

 6    Q.  4:30, meeting Ruby Schron and David Bodner at Ruby's

 7    office.  Why were you meeting with Ruby Schron?

 8    A.  I was meeting with him about buying a property in Monsey,

 9    New York, where I live, to build affordable housing for people

10    who can't afford houses.

11              MR. LAUER:  Let's turn to Plaintiffs' Exhibit 470.

12              THE COURT:  Counsel, let's find a spot in the next few

13    minutes, even though we started late, I still do want to give

14    the jury their midmorning break.

15              MR. LAUER:  I could stop at any time.  I don't have

16    that much more, but I could stop.  We should take the break.

17              THE COURT:  So, ladies and gentlemen, we'll take a

18    15-minute break.

19              (Continued on next page)

20

21

22

23

24

25

MCCCpla2                         Bodner - Direct

1        (Jury not present)

2        THE COURT:  Please be seated.

3        So, I thank counsel for their very helpful letter

4   briefs submitted yesterday.

5        With respect to any aiding and abetting theory, having

6   now reviewed the underlying case law as well as the briefs of

7   counsel, I agree with defense counsel that aiding and abetting

8   cannot be a theory for retroactive be liability so that if, for

9   example, someone enters into a fraudulent scheme by aiding and

10  abetting, an aspect of the scheme in 2016, that would not

11  support liability for fraud and damages occurring before 2016.

12       Furthermore, I adhere to the preliminary ruling I made

13  in connection with the motions *in limine*, that the aiding and

14  abetting counts here are duplicative of the substantive counts

15  and so they will not be charged to the jury.

16       With respect to conspiracy, while I continue to adhere

17  to the position stated in summary judgment that New York law

18  does not recognize the separate count for conspiracy, I am no

19  longer of the view that conspiracy and aiding and abetting are,

20  on the facts of this case, duplicative.  Specifically, I think

21  that if plaintiff can show by meeting all the elements of an

22  evidentiary proof of conspiracy to support one or the other

23  substantive counts and can show that Mr. Bodner joined in that

24  conspiracy, that would support liability for earlier damages on

25  the classic conspiracy theory that one, when one enters a

MCCCpla2                        Bodner – Direct

1  conspiracy and becomes part of a conspiracy, one is then liable

2  for what has occurred in the past in furtherance of the

3  conspiracy.  So the liability for pre-2016 damages remains

4  viable, but only on a conspiracy theory.

5          I think those are the only issues that I asked the

6  parties to address in the letter briefs.  There are other

7  issues that, of course, we'll want to take up at the charging

8  conference that we should talk today about when that's going to

9  be.

10          Unless there's anything else, we'll give you all a

11  10-minute break.

12          MR. GLUCK:  Your Honor, 2014 or 2016?

13          THE COURT:  Maybe it was 2014.  I'm sorry.  The point

14  is, if you can show a conspiracy, you can go back to the

15  beginning of the conspiracy.  If you can't show a conspiracy,

16  then aiding and abetting is out of the case and that's not

17  going to help you.

18          MR. LAUER:  Your Honor, may I just take exception to

19  the conspiracy portion of this?

20          THE COURT:  Yes, of course.  Your adversary probably

21  takes exception to the aiding and abetting theory.  And I've

22  learned through long experience that if both sides disagree

23  with what I rule, I almost certainly got it right.  In any

24  event, that's for another court to say one way or the other.

25          (Recess)

1          (Jury present)

2              MR. LAUER:  May I continue?

3              THE COURT:  Please.

4              MR. LAUER:  Please bring up on the screen

5     Plaintiffs' Exhibit 470.

6     BY MR. LAUER:

7     Q.  Mr. Bodner, this is an email that was sent to you from

8     Bernie Fuchs.  Do you see that?

9     A.  Yes.

10    Q.  And the email that he sent you was from Allen Clingman and

11    it talks about the UBS offering document.  Do you recall this?

12    A.  I don't recall, but it looks to me like they were trying to

13    entice me to put more money into China Horizon by showing me

14    that there's banks that are going to put money in.

15    Q.  Did you have any connection with UBS?

16    A.  No connection whatsoever.

17             MR. LAUER:  Turn to Plaintiffs' Exhibit 384, which

18    would be next on the screen.

19    Q.  This is an email from Elliot Feit to Naftali Manela.  Who's

20    Elliot Feit?

21    A.  I don't know.

22    Q.  Regarding Puerto Rico limits, he's here now, Scott taking

23    Murray and Mr. Bodner through the CNO limits now in Feuer's

24    office.

25             So who's Scott?

MCCCpla2                        Bodner – Direct

1   A.  Scott must be Scott Taylor, who was Mark Feuer's partner.

2   Q.  Do you recall what this meeting was about?

3   A.  I think he was taking us through to show us what an

4   insurance company -- what a reinsurance, a lot of investing for

5   an insurance company.

6   Q.  And why were you at that meeting?

7   A.  I was an owner in Beechwood, and also, my son was out there

8   bringing deals to different people and to different funds.  So

9   he asked me to find out what deals Beechwood would do.

10  Q.  Next document is Plaintiffs' Exhibit 414.  This is an email

11  from David Steinberg to Angela Albanese copying Ezra Beren,

12  Murray Huberfeld.  Meeting with David B.

13          Do you recall this meeting?

14  A.  I think this meeting was about a private company that I had

15  in Israel that David Steinberg was involved with me in.

16  Q.  Do you remember the name of the company?

17  A.  It was a gambling company.  I don't remember the name

18  offhand.

19  Q.  Next document is Defendant's Exhibit 710.  You're not on

20  this email, are you?

21  A.  No, I do not see myself on there.

22          (Continued on next page)

23

24

25

Mcc2Pla3                        Bodner - Direct

1    BY MR. LAUER:

2    Q.  Take a look at this for a moment.  I will ask you some

3    questions.  Tell me when you are ready.

4    A.  I'm ready.

5    Q.  At the bottom, Mark Nordlicht writes Ezra Tuchman, "Are you

6    available 12:30 Monday to meet with my partner David Bodner to

7    talk about the merchant cash advance line."  Do you see that?

8    A.  Yes.

9    Q.  Do you remember any meetings about merchant cash advance

10   line?

11   A.  I think I do remember that they wanted us to put money in

12   this business, a merchant cash advance.

13   Q.  And then in the middle of the page, Mark writes, "Okay.

14   There's a chance I might be in London, but David will be there

15   regardless.  I would like to hear more, but I'm already sold on

16   the borrower."  Do you see that?

17   A.  Yes.

18   Q.  Were you the borrower?

19   A.  No, I was not.

20   Q.  And then later up the letter, Ezra writes, "Good morning.

21   I just received an e-mail from David that he has decided to

22   move forward with another lender."  Is that referring to you?

23   Were you the borrower?

24   A.  No, I was not the borrower here.

25   Q.  Okay.

1   A.  I didn't borrow money from Mark Nordlicht.

2   Q.  And did you ever overrule Mark Nordlicht on a loan

3   transaction?

4   A.  Never.

5   Q.  Did you ever overrule Mark Nordlicht on anything?

6   A.  No, I did not.

7   Q.  Let's do Plaintiffs' Exhibit 415.  This is "Bodner needs

8   four uninterrupted hours with Mark—two hours Tuesday, two

9   hours Wednesday."  Do you remember either the e-mail or the

10  subject matter of the e-mail?

11  A.  Yes, I do.

12  Q.  Okay.  What do you remember?

13  A.  Mark Nordlicht had a plan to open up schools in the modern

14  orthodox communities all over the United States for a cheaper

15  tuition.  Tuition was costing about $25,000 a student, and most

16  working people were not able to afford it.  So he had proposed

17  a plan how he is going to bring the tuition down to $8,000 with

18  the same type of education and he would open this up all

19  through the United States.

20          And he was haunting me every week, I have to meet with

21  him, I have to meet with him, I have to meet with him, he has

22  to show me the meeting, what this is about.  So I decided, I

23  said that I have this and this day, but I don't want any

24  interruptions.  Because Mark was used to taking phone calls in

25  the middle of a meeting.  He didn't concentrate.  He was unable

1   to concentrate on one thing.  So I told him that's the only way

2   I'm going to meet him.

3            So he told me we have to meet with a group of five

4   people and go over exactly the plan.  He wanted me because he

5   felt, through my charities, I knew a lot of very wealthy

6   individuals, like Ira Rennert, Jay Schottenstein, Izzy

7   Englander, and maybe through them I will be able to raise

8   him -- he was looking to raise millions and millions of dollars

9   to implement this plan.

10  Q.  Did --

11  A.  That's what this meeting was about.

12  Q.  Sorry.

13            Did one or more of these meetings occur?

14  A.  I remember one meeting occurred, and I met with Mark and

15  with a gentleman and with a lady.

16  Q.  And what was the topic?

17  A.  The topic was the school, the plan.  They showed me a whole

18  plan, how it's going to work, how the kids are going to get

19  educated, where they are going to open it.  They took me

20  through everything.

21  Q.  And after the meeting, did you do anything on this?

22  A.  I didn't do anything because I was very overcommitted with

23  my own charities and I couldn't bring in a new charity at that

24  point to this.

25  Q.  The next document is Plaintiffs' Exhibit 373.  Tell me when

1   you are ready.  You are not on this e-mail.

2   A.  I think I am ready.

3   Q.  Okay.  So where did Brian Jedwab work?

4   A.  Brian Jedwab I think worked upstairs on the 54th floor.

5   Q.  He was not part of the PPVA portfolio group?

6           MR. GLUCK:  Objection.

7   Q.  Was he part of PPVA?

8   A.  No.

9   Q.  This says, like the third or fourth line down, "Consumer

10  lending line is an offshoot of bellicose and was cut from 50

11  million to 10 million by DB after term sheet was completed."

12  Do you know what that references?

13  A.  No, not offhand.

14  Q.  Maybe a third of the way down to the bottom there is the

15  sentence, "This revised loan agreement against the business

16  loans is also a good one.  Paul Reddam has been a great

17  borrower.  I can't go back and modify any further to lower the

18  advance rate as Dovid asked."  Do you know what that is

19  referencing?

20  A.  I was an investor with Brian Jedwab in Cash Call which, if

21  I remember correctly, Paul Reddam ran it.  And when Brian came

22  to me to ask me to put more money in, a substantial amount of

23  money, I asked him that he should go back to the borrower and

24  try to get me a better deal.

25  Q.  Did -- was this a PPVA asset?

Mcc2Pla3                    Bodner - Direct

1   A.  I think PPVA was also an investor in Cash Call.

2   Q.  But this was Brian Jedwab's transaction?

3   A.  I think Brian Jedwab brought deals to PPVA and to PPCO.  I

4   think they invested together.

5   Q.  Turning to Plaintiffs' Exhibit 588.  This is an e-mail from

6   Mr. Nordlicht to Murray Huberfeld and he starts out, "Please

7   read this to Dovid."  Do you recall Murray reading this to you

8   or showing it to you or discussing it with you?

9   A.  I recall somebody showing it to me.

10  Q.  So the second paragraph, Mr. Nordlicht says to

11  Mr. Huberfeld for him to say to you, "The frustrating part for

12  me and Bernie is that Mr. Fuchs" --

13  A.  Yes.

14  Q.  -- "when we discussed, it's that we have gone all in with

15  our lives, and we feel it is not the same for you guys."  "You

16  guys" refers to you and Mr. Huberfeld.

17  A.  Yes.

18  Q.  And then he says, "God knows I'm not perfect, and I accept

19  blame for getting us into liquidity crisis."  And then that was

20  Mr. Nordlicht accepting blame for the liquidity crisis.

21  A.  Yes.

22  Q.  And then the next paragraph says, "There seems to be a

23  complete refusal to go out on a limb to go the extra mile to

24  close."  Then he says, "Shlomo Yehuda offered to help."  Is

25  that Mr. Shlomo Yehuda Rechnitz?

Mcc2Pla3                         Bodner - Direct

1  A.  I would think so.

2  Q.  Then he says, "We have 35 more raised and *frum* people's

3  money will be salvaged."

4         What was it that Mr. Nordlicht wanted you to do with

5  that information?

6  A.  He wanted me to solicit money from the group of people at

7  the bottom of the list.

8  Q.  What's the reference to *frum* people?

9  A.  These are religious people in the community.

10 Q.  Then he says, "The others on the list below, it's

11 embarrassing to go to people and say you need help, but at this

12 point that's where we are.  Go to Izzy."  Who is Izzy?

13 A.  Izzy Englander.

14 Q.  And Garfunkel?

15 A.  George Garfunkel.

16 Q.  Or Schroen, who is that?

17 A.  Ruby Schroen.

18 Q.  "And say I know you don't normally invest in funds, but I

19 need a favor.  We have this fund that is healthy, so much so

20 that we are closing for a year because we don't want to dilute

21 returns."  And he continues, "If you invest in that, you would

22 be doing me a big favor, and I really think you would do well."

23 And then Mr. Nordlicht continues, "Why aren't we doing this,

24 Dovid?  For all you have done for *Klal Ysroil*."

25        What is the reference to *Klal Ysroil*?

1   A.  He is saying why shouldn't I ask these people for a favor

2   since I was involved with them with all different types of

3   charities for the *Klal Yisroil*, for the Jewish people.

4   Q.  In other words, they should put money in to help the fund?

5   A.  Yes, because the liquidity crisis that he caused.

6   Q.  Then he says "you," meaning you, David Bodner, "owe it to

7   your future *tzdakkas* to swallow pride and allow/urge people to

8   help."  What is that referencing?

9   A.  Meaning if I lose money in the fund, I'm not going to be

10  able to give charity or make charity parties or doing anything

11  for charity anymore.

12  Q.  And did you understand why -- what he meant by you should

13  swallow your pride?

14  A.  I never went out to raise money.  My mother taught me that

15  when you raise money and you make money for people, they never

16  say thank you; and if you lose, all you hear is complaints.  So

17  I went with that motto, and I never looked to take money from

18  people.  He wanted me to swallow my pride and tell one of these

19  people, I'm desperate, I need the money, please help me out,

20  and everything will be okay.

21  Q.  Did you go out and solicit either these people or other

22  people to raise money at that time?

23  A.  No, I did not.

24  Q.  Let's turn to Plaintiffs' Exhibit 508.  This starts with

25  someone named Gabe Feder.  Do you see that?

Mcc2Pla3                    Bodner - Direct

A.  Yes.  I didn't read the e-mail yet.  Do you want me to read

it?

Q.  Take a minute to read it, sure.

A.  Yes.

Q.  Okay.  Who is Gabe Feder?

A.  Gabe Feder at one time was a portfolio manager for PPVA.

Q.  And what is Mr. Feder writing about?

A.  Mr. Feder went on to work for Abraham Fruchthandler, and

Abraham Fruchthandler had a sizeable investment in Platinum

PPVA.

Q.  And what is it that Mr. Feder is writing about?

A.  He is writing about that Mr. Nordlicht, the way I

understood him, Mr. Nordlicht didn't pay back the holdbacks.

When a fund gives you withdrawal on your money, they hold back

certain money.  They don't give you your full withdrawal

because they hold back certain money for to make sure that the

accounting, everything is -- comes out the way that they

figured it would come out.  So from this letter it looks like

the two charitable investors from Mr. Fruchthandler didn't get

their holdback, and they had a letter prepared to send to their

CC.

Q.  And what did you have to do with this?  Why were they

copying this letter for you?

A.  I was a friend of Mr. Fruchthandler and we respected each

other, and they wanted me to go down and talk to

Mcc2Pla3                         Bodner - Direct

Mr. Fruchthandler, to tell him the situation, that there is no

liquidity, and please there should be no letters sent out or

threats to the fund because of this.

Q.  And did you speak with Mr. Fruchthandler?

A.  Yes, I did.

Q.  And how did -- how did the situation get resolved?

A.  Mr. Fruchthandler was shocked.  He said, I never sent a

letter and this has nothing to do with me.  I would never send

a letter, and that was basically all I heard about it.

Q.  Turn to Plaintiffs' Exhibit 368.

A.  Yes.

Q.  Do you recall the e-mail?

A.  I don't think the e-mail was sent to me.

Q.  Okay.  Do you recall any particular problems in connection

with the release agreement?

A.  No.  It looks like I sent it to my lawyer to look it over,

to see that everything in the agreement was correct, and it

sounds like the lawyer couldn't give an answer until 4 p.m. and

Mark wanted to know before then

Q.  Turn to Plaintiffs' Exhibit 372.  This is an e-mail to Mark

attaching this fax from Marcos Katz.  Do you see that?

A.  I don't see the fax.

Q.  The next page.

A.  I don't have it.

Q.  You will get it.

1      How did you get -- did you see this letter around the

2    time that it was sent?

3    A.  I think I did.

4    Q.  And did you have any discussion with someone from the Katz

5    family on or about the date that this letter came?

6    A.  I was called by one of Mr. Katz's daughters, very

7    frustrated that she couldn't reach Mr. Nordlicht, and her

8    father wanted his money back.  And she tried Mr. Huberfeld and

9    she couldn't reach him.  She called me and she told me about

10   her frustration, and I told her that the only one who could

11   take care of you is Mr. Nordlicht.  I have no authority or no

12   control over the fund and I can't help you.

13   Q.  Turn to Defendant's Exhibit 312.  I should ask you, with

14   respect to Katz and the Katz letter, did you speak with

15   Nordlicht?

16   A.  I spoke to -- yeah, I definitely spoke to Nordlicht.

17   Q.  And what did he tell you?

18   A.  I went down to him and I told him -- I went down on 55th

19   Street and I told him he has to talk to Mr. Katz.  He can't

20   avoid calls.

21        MR. LAUER:  We don't want to see 312.  It is not in

22   evidence.  That was a mistake.  Sorry.

23        That completes the e-mails.

24   Q.  One of the assets that PPVA was invested in was Black Elk.

25   Did Mark Nordlicht consult with you before PPVA invested in

Mcc2Pla3                          Bodner - Direct

1   Black Elk?

2   A.  No, he did not.

3   Q.  Were you aware in or about November of 2012 that an

4   explosion had occurred on one of the offshore platforms at

5   Black Elk?

6   A.  Yes, I was aware.

7   Q.  Did you have any discussion with anyone from PPVA

8   concerning the impact the explosion might have on the value of

9   PPVA?

10  A.  I don't remember -- I remember that in the office they were

11  talking about it, and what was said was that it's very

12  unfortunate that a person died there, but they -- Black Elk has

13  a tremendous amount of oil reserves.

14          MR. GLUCK:  Objection.

15  Q.  Do you recall --

16          THE COURT:  I'm sorry.  That objection, while it would

17  have been proper had it been made in a timely fashion, was

18  clearly waived.  You can't wait until he finishes a

19  multi-sentence answer and then say "objection."  So overruled.

20          MR. GLUCK:  I have to wait second, because my hearing

21  is terrible, so I have to watch on the screen.

22  A.  I should continue?

23          THE COURT:  Well, the point is that the objection was

24  one that could have been put to the question because it called

25  for hearsay, because it was unspecific, and numerous other

Mcc2Pla3                        Bodner - Direct

1   grounds, and you chose not to object.  Overruled.

2   BY MR. LAUER:

3   Q.  Did you speak with Uri Landesman about the explosion?

4   A.  It's possible.

5   Q.  Do you have any recollection of -- are you able to recall

6   any specific conversation with anyone that you can identify

7   with respect to the Black Elk asset?

8   A.  Are you talking about the explosion.

9   Q.  The explosion or the impact the explosion was thought to

10  have.

11          MR. GLUCK:  Objection.

12          THE COURT:  So and the objection is based on?

13          MR. GLUCK:  Compound question, vague.

14          THE COURT:  Are you objecting -- oh, on compound?

15  Okay.  Compound and vague.

16          MR. GLUCK:  And hearsay.

17          THE COURT:  Hearsay I would overrule, only because it

18  will be received for his state of mind but not for the truth of

19  it.  But we don't reach that because I agree with you it is

20  compound.

21          Put another question.

22  BY MR. LAUER:

23  Q.  Did anyone send you any information at the time or

24  thereafter describing the impact, if any, that the explosion

25  had on the valuation of Black Elk?

1    A.  No.

2              MR. GLUCK:  Objection.

3              THE COURT:  The objection is overruled because it was

4    intended to elicit a negative.  Go ahead.

5    BY MR. LAUER:

6    Q.  What did you know about Black Elk at the time?

7    A.  At which time are you referring to?

8    Q.  In 2012.

9    A.  I didn't know too much about it at all.

10   Q.  After the explosion what did you know about Black Elk?

11   A.  I remember in the office they were talking about millions

12   and millions of reserves that Black Elk had.

13   Q.  Do you have any specific recollection of talking to any

14   specific individual at Black -- concerning Black Elk?

15   A.  If I spoke to somebody, it would have been Uri Landesman,

16   and he might have told me this, that there was --

17             THE COURT:  No.  Sustained.

18   Q.  Okay.  What about Golden Gate Oil?  Did Mark Nordlicht

19   consult with you before he acquired what came to be known as

20   Golden Gate Oil?

21   A.  No, he did not.

22   Q.  Did you have any idea of the number of reserves, meaning

23   how many millions of barrels of oil was in the ground at

24   Golden Gate?

25             MR. GLUCK:  Objection.

Mcc2Pla3                        Bodner – Direct

1    A.  No, I did not.

2    Q.  Did you have any --

3              THE COURT:  Whoa, whoa.

4              MR. LAUER:  Sorry.

5              THE COURT:  Again, because the -- it was intended to

6    elicit a negative, the objection is overruled.

7    BY MR. LAUER:

8    Q.  Did you have any of the details on the fair market value of

9    Golden Gate?

10   A.  No, I did not.

11   Q.  Northstar, did you ever hear of the Northstar asset?

12   A.  What years are you talking about?

13   Q.  Any time.  Did you ever hear that PPVA had an investment in

14   something called Northstar?

15   A.  Yes.

16   Q.  Did you know what it was?

17   A.  Not exactly.

18   Q.  Did you know that it involved oil and gas?

19   A.  Yes.

20   Q.  Did you know the reserves?

21   A.  No, I did not.

22   Q.  Did Mr. Nordlicht consult with you before he created

23   Northstar?

24   A.  No, he didn't.

25   Q.  What about something called Pedevco?  Did you know what

1   that investment was?

2   A.  I wasn't sure what it was, but I think that might have been

3   the investment that David Steinberg and Ezra Beren came to talk

4   to me how to negotiate.

5   Q.  Do you remember that was also an oil and gas development?

6   A.  I remember it had something to do with oil and gas.

7   Q.  Did anyone consult with you before Pedevco was acquired?

8   A.  No.

9   Q.  Did you have any of the details on operations or anything

10  of that sort?

11  A.  No details whatsoever.

12  Q.  Another asset that's in this case we haven't heard too much

13  about is something called the Michael Goldberg note.  Did you

14  know Dr. Michael Goldberg?

15  A.  Yes, I did.

16  Q.  And what was your understanding of his role within the

17  fund?

18  A.  My understanding was he was managing an asset called

19  Navidea, a public company called Navidea.

20  Q.  And what is Navidea?

21  A.  I don't know.

22  Q.  Do you know anything about a term sheet or a potential note

23  that was supposed to be exchanged between Dr. Goldberg and

24  PPVA?

25  A.  No, I don't.

Mcc2Pla3                          Bodner - Direct

1   Q.   Did you have anything to do with negotiating it?

2   A.   I don't recall having anything to do with any note.

3   Q.   Then another asset is Desert Hawk.  Do you remember what

4   Desert Hawk was?

5   A.   I have no idea what Desert Hawk is.

6   Q.   I take it Mr. Nordlicht did not consult with you --

7   A.   No.

8   Q.   -- before acquiring it?

9   A.   No, he didn't consult with me.

10  Q.   So just a few wrap-up questions.

11           From the time that Platinum was started until you

12  exited, did you have a responsibility to any aspect of PPVA's

13  business?

14           MR. GLUCK:  Objection.

15  A.   I had no responsibility whatsoever.

16  Q.   To your knowledge, was anyone at Platinum Management

17  relying on you for anything?

18           MR. GLUCK:  Objection.

19           THE COURT:  No, I think he can answer that to his

20  knowledge, given the fiduciary claim.  Overruled.

21  A.   No.  Nobody was relying on me.

22  Q.   Did you accept responsibility for any aspect of PPVA's

23  business?

24  A.   No, I never accepted any responsibility.

25  Q.   Did you affirmatively tell Mark Nordlicht or Murray

Mcc2Pla3                        Bodner - Direct

1   Huberfeld that you did not want to have responsibility or be

2   involved in managing a fund?

3   A.  Yes.

4        MR. GLUCK:  Objection.

5        THE COURT:  Well, did you tell that to both? each?

6   separately? what?  The question was compound.  The question was

7   did you affirmatively tell Mark Nordlicht or Murray Huberfeld

8   that you did not want to have responsibility or to be involved

9   in managing the fund?  You may want to, counsel, rephrase the

10  question.

11       MR. LAUER:  Okay.

12  BY MR. LAUER:

13  Q.  Did you affirmatively tell Mark Nordlicht that you did not

14  want to have any responsibility at the fund?

15  A.  I did.

16  Q.  Did you tell Murray Huberfeld affirmatively that you did

17  not want to have any responsibility at the fund?

18  A.  Yes, I did.

19  Q.  Did they accept that?

20  A.  Yes, they did.

21  Q.  Did you have any control over the fund?

22  A.  I had no control whatsoever over the fund.

23  Q.  Did you have any control over Platinum Management?

24  A.  No, I did not.

25  Q.  Did you have any control over Mark Nordlicht?

Mcc2Pla3                           Bodner - Cross

1    A.  No, I did not control Mark Nordlicht.

2    Q.  Did you ever come to know that the PPVA valuations were

3    fraudulently overvalued?

4    A.  No, I did not.

5    Q.  Did you ever see data that contradicted Mark Nordlicht's

6    numbers for these assets?

7    A.  No, I never saw any data whatsoever.

8    Q.  Turning back to the December 2014, January '15 dinner,

9    when -- after Mark Nordlicht told you to go home and stay at

10   yeshiva, did you take your money out of the fund?

11   A.  No, I did not.

12   Q.  Did you continue to have confidence in Mark Nordlicht?

13   A.  Yes, I did.

14   Q.  Now, you had family money of $40 million in the fund.  Did

15   you end up writing that off?

16   A.  Yes, I did.

17             MR. LAUER:  Thank you.

18             Pass the witness.

19             THE COURT:  Cross-examination.

20   CROSS-EXAMINATION

21   BY MR. GLUCK:

22   Q.  Good afternoon, Mr. Bodner.

23   A.  Good afternoon.

24   Q.  You knew that in 2016 the fund was in dire straits, is that

25   right?

Mcc2Pla3                         Bodner - Cross

1   A.  I knew in 2016 that the fund had liquidity problems.

2   Q.  Did you visit -- you visited Mr. Marcos Katz in Mexico

3   twice then, didn't you?

4   A.  I visited him once in Mexico and once in Acapulco.

5           THE COURT:  By "Mexico," you mean Mexico City?

6   Because last I checked Acapulco is in Mexico.

7           THE WITNESS:  I meant Mexico City.

8   Q.  How did you fly to Mexico?

9   A.  I think we flew on a private plane.

10  Q.  Who paid for the private plane?

11  A.  I don't know.

12  Q.  Mr. Parson, please call up PX 954.

13          Did you have access to a private plane?

14          MR. LAUER:  We object.  403, your Honor.

15          THE COURT:  I can't see this.  If someone wants to

16  blow it up or give me a copy, that would be helpful.

17          MR. GLUCK:  I can build a foundation.

18          THE COURT:  No, I don't even think it passes the test

19  of relevance.  Sustained.

20  BY MR. GLUCK:

21  Q.  You signed a release giving up your management agreement

22  prior to going to Mexico City and Acapulco, is that correct?

23  A.  I'm not sure.

24  Q.  Why would you go to Mexico City and Acapulco if you had

25  already released your interest in Platinum Management?

Mcc2Pla3                    Bodner - Cross

1  A.  You -- could you show me the dates when I signed the

2  release and when I traveled to Mexico City?

3           MR. GLUCK:  Sure.  Bring up the release, Mr. Parson,

4  JX 76.

5  A.  That was March.

6  Q.  What was your role -- so does this refresh your

7  recollection?

8  A.  It shows me release.  When did I fly to Mexico City and

9  Acapulco?

10  Q.  Let's call up PX 514.  We will seek to admit it in

11  evidence.

12           MR. LAUER:  No objection.

13           THE COURT:  Received.

14           (Plaintiff's Exhibit 514 received in evidence)

15  BY MR. GLUCK:

16  Q.  Does this refresh your recollection?

17  A.  I flew on 5/11 are you telling me?  Can you give me the two

18  dates?  When did I fly?  I'm a little confused here.

19  Q.  Yeah, sure.

20           Why don't we bring up PX 516 which -- wait.  Hold on.

21  We will move this into evidence.

22           MS. SHEN:  It's in.

23           MR. GLUCK:  Why don't we bring up 516.

24  A.  This says --

25           MR. GLUCK:  We move this into evidence.

Mcc2Pla3                    Bodner – Cross

1    A.  This says I flew on May 16.

2              MR. GLUCK:  This door's been wide open.

3              MR. LAUER:  Same objection.

4    A.  What?

5              THE COURT:  Well, no, since the witness insisted on

6    volunteering questions to counsel about when he flew, counsel

7    for plaintiff was simply responding to the questions put by the

8    witness, which waived any objection that might otherwise have

9    been put, so the objection is overruled and 516 is received.

10             (Plaintiff's Exhibit 516 received in evidence)

11   BY MR. GLUCK:

12   Q.  You flew to Mexico on May 16, didn't you?

13   A.  Right.  And when was the release given?

14   Q.  March.

15   A.  March.  So you --

16             THE COURT:  Excuse me.  Can someone put up the

17   release, first page of the release, which is Joint Exhibit 74?

18             MR. GLUCK:  It's up on the screen.

19   A.  So what was the question.

20             THE COURT:  Excuse me.  I'm about to put a question.

21   It states, does it not, "This release agreement is made

22   effective as of this 20th day of March 2016."  Do you see that?

23             THE WITNESS:  Yes.

24             THE COURT:  That doesn't mean, does it, that that was

25   the actual date it was signed, does it?  It could have been

1    signed earlier or later or whatever, right?

2              THE WITNESS:  Could have been.  I don't know.

3              THE COURT:  So if either counsel wants to present the

4    witness with any evidence of the date of actual signing, I will

5    admit it, but I don't think it shows when the agreement was

6    signed.

7              MR. GLUCK:  Sure.  I think we can go to the last page

8    and then we will call up the defendant's exhibit, last page,

9    please, or second to last page.

10             THE COURT:  What does it show?

11             MR. GLUCK:  Delivered and executed the agreement.

12             (Pause)

13             THE COURT:  Near as I can tell——correct me if I am

14   wrong——the dates of the signatures are not shown anywhere.  But

15   there was an e-mail earlier when Mr. Nordlicht is pressing

16   Mr. Huberfeld for his signature.  Why don't we put that back up

17   on the screen for a minute.

18             MR. GLUCK:  Mr. Parson, if you will, in a moment,

19   please call up the Nordlicht exhibit.

20             THE COURT:  So all we know from this -- that wasn't

21   what I had in mind, but at least we know that the document was

22   being exchanged on March 2.

23             All right.  Anyway, I think, counsel, you should

24   continue with your examination.  I don't want to get lost on

25   this.

1                Having looked at these documents, is it your best

2       recollection that you had signed the release before you went to

3       Mexico?

4                THE WITNESS:  Looking at the documents, it seems like

5       that.

6                THE COURT:  Okay.

7       BY MR. GLUCK:

8       Q.  You went to Mexico on behalf of Platinum Management, didn't

9       you?

10      A.  I went on behalf of, if I'm not mistaken, it was a call

11      that I have got from Yaacov Neeman who told me that Marcos Katz

12      would like to talk to you.

13      Q.  You made representations concerning stability of Platinum

14      Management in Mexico, didn't you?

15      A.  As stated before, it was two meetings.  There was a meeting

16      in Mexico and there was a meeting in Acapulco.  In Acapulco, I

17      made statements.  Marcos Katz was looking to redeem his money.

18      There was no liquidity whatsoever in the fund.  There was not

19      even $5 in the checking account to my recollection.  And Marcos

20      Katz was looking to take out his $15 million so Yaacov Neeman

21      called me up and said I should please go to this meeting.  He

22      is going to meet me there.  He came in from Israel, and he was

23      going to meet me there.  Because he understood when a fund has

24      no money, you just can't get money when there is no money

25      there, and also you can't take money ahead of other investors.

Mcc2Pla3                          Bodner - Cross

1    So we met all together at Acapulco, and I tried to explain it

2    to Mr. Katz.  All I head heard from Mr. Katz was:  I want my

3    money.  And I tried to explain to him, not once, twice.

4    Q.  The fund didn't have $5, but it could fly everyone down to

5    Acapulco?

6    A.  I don't know who paid for that.  It might have been paid

7    personally by one of the people in Platinum Management.  I

8    don't recall.  It could be we all paid for it.

9            MR. GLUCK:  Now we would like to move Plaintiff 954

10   into evidence.  Please call it up.

11           MR. LAUER:  We object.  Same objection as before.

12           MR. GLUCK:  For the proposition Platinum Management --

13           THE COURT:  Yeah, I understand.  Received.

14           (Plaintiff's Exhibit 954 received in evidence)

15   BY MR. GLUCK:

16   Q.  You consulted Mr. Levy about positions at the fund in

17   advance of the meeting, didn't you?

18   A.  No, I did not.

19   Q.  Please call up Plaintiffs' Exhibit 423.

20   A.  Do you have a question on this e-mail?

21   Q.  You consulted Mr. Levy concerning the positions of the

22   fund, didn't you?

23   A.  That's not what I am reading here.

24           THE COURT:  No, no, just the -- I think he's already

25   answered that question.  The question before was:  "You

Mcc2Pla3                     Bodner - Cross

1   consulted Mr. Levy about positions at the fund in advance of

2   the meeting, didn't you?

3            "Answer: No, I did not."

4            MR. GLUCK:  We would like to move Plaintiffs' Exhibit

5   423 into evidence.

6            MR. LAUER:  No objection.

7            THE COURT:  Received.

8            (Plaintiff's Exhibit 423 received in evidence)

9   BY MR. GLUCK:

10  Q.  Mr. Katz trusted you to oversee his investment, didn't he?

11  A.  No.

12  Q.  Plaintiffs' Exhibit 372.

13           THE COURT:  What is the question.

14  Q.  Isn't Mr. Katz saying he trusted you here?

15  A.  I don't think Mr. Katz is pointing towards me.  Mr. Katz

16  had looked at me as a talmudical scholar, and he used to call

17  me a *batlen*.  A *batlen* in Hebrew means somebody who doesn't do

18  anything and doesn't understand.  He trusted Murray Huberfeld,

19  who was in constant contact with him on a monthly basis.

20  Whenever he came to New York he would meet with Murray.  I had

21  very, very infrequent meetings with him.

22           MR. GLUCK:  Move to strike.

23           THE COURT:  No, I think that was --

24  A.  It's correct.

25           THE COURT:  -- responsive.  Overruled.

Mcc2Pla3                     Bodner - Cross

 1  BY MR. GLUCK:

 2  Q.  All right.  You testified for Mr. Lauer that the specific

 3  liability in question when the release was being negotiated and

 4  you asked for an indemnity was that you might have a tax issue?

 5  A.  A gift tax issue.

 6  Q.  A gift tax issue.

 7  A.  Yes.

 8  Q.  Please call up PX 370.  It is already in evidence.

 9          Mark Nordlicht was saying that he couldn't personally

10  be responsible for your and Mr. Huberfeld's misconduct, because

11  he thought there was a gift tax issue.

12  A.  I have no idea what Mark Nordlicht was thinking.

13  Q.  That's your lawyer, Mr. Gabriel Hertzberg, isn't it?

14  A.  He is sitting right there.  You could talk to him.

15  Q.  It says Katz, Bodner, and Huberfeld release?

16  A.  Yes, it does.

17  Q.  Gift tax issue.

18  A.  That's what I went to him for, for my accountant told me

19  that my gifting, the management, you are going to get charged

20  tax.  And I told Mark, I'm happy to do it, but I'm not

21  interested in having a tax on a $50 million gift or whatever it

22  was worth plus the crude that I didn't take.  What Mark was

23  thinking about misconduct, I have no idea.  This was not

24  discussed with me.

25          You have another question?

Mcc2Pla3                    Bodner - Cross

1   Q.  Do you have anything further for your answer?

2   A.  No, I don't have anything further --

3              THE COURT:  Whoa, whoa, whoa.

4   BY MR. GLUCK:

5   Q.  Plaintiff Exhibit 368.  Excuse me 366.

6              You discussed this purported gift tax liability with

7   Mr. Katz as well or was there something else?

8   A.  Let me read the document a minute.

9              THE COURT:  I'm sorry.  I'm failing to see the

10  relevance of the last two exhibits that were -- they are in

11  evidence, but they are not addressed to this witness nor are

12  they from this witness, so I'm not quite sure why they are

13  being shown to the jury.  So take it down.  Thank you.

14  BY MR. GLUCK:

15  Q.  You testified that you had about 40 million in the fund at

16  the time it went down?

17  A.  That's my recollection.  I said between 37 million and

18  above.

19  Q.  PPVA and PPCO, is that right?

20  A.  Correct.

21  Q.  Other than the 10 million you seeded, do you have any

22  recollection of specific additional investments that weren't

23  incentive fee LP interests or incentive fees that you kept in

24  the fund?

25  A.  Yes.

Mcc2Pla3                          Bodner - Cross

1    Q.  What are those?

2    A.  I had $17 million of my foundation in the fund to my

3    recollection.  I had, if I'm not mistaken, either a million 250

4    or two and a half million for my children in the fund.  Then I

5    had also -- what was it, 17, 27, 30, oh, and then I had for an

6    endowment fund that I was responsible for was over $3 million.

7    And then I had -- it takes me to 33.  And then I think I had

8    some other monies between me and my wife in the fund.

9    Q.  PPVA or PPCO?

10   A.  Oh, PPLO, there was another fund called PPLO, where I think

11   I had another $3 million.  Altogether in all the three funds, I

12   had between 37 and $40 million.

13   Q.  Did you take out roughly 100 million in fees?

14   A.  Not that I recall.

15   Q.  Did you have any conversations with Mr. Nordlicht to the

16   effect that you took out 100 million in fees?

17   A.  Not that I can recall.

18   Q.  Can I show you a document to refresh your recollection?

19   A.  Yes, you could.

20   Q.  Plaintiffs' Exhibit 424.

21        My question is, did you have any conversations with

22   Mr. Nordlicht that.

23        (Court reporter confers)

24   Q.  Did you have any conversations with Mr. Nordlicht to the

25   effect that you had taken out 100 million from the fund

Mcc2Pla3                         Bodner – Cross

1    yourself?

2              THE COURT:  Counsel, come to the sidebar.

3              (Continued on next page)

1      (At the sidebar)

2      THE COURT:  So this again appears to be a document

3  from one person to another person, neither of whom is

4  Mr. Bodner, correct?

5      MR. GLUCK:  That is correct.

6      THE COURT:  I don't see how you get to show a witness

7  something -- at the moment, and I think it's really stretching

8  it.  This might give rise to an inference upon an inference

9  upon an inference that he had such a conversation, but on its

10  face it doesn't remotely show that.  And in any event, it is at

11  best something for summation, not for cross-examination.

12      Now, I understand that defense counsel is in his

13  potted plant mode of not objecting, but the Court has a

14  responsibility to make sure that the jury is not misled.  So I

15  don't want anymore documents shown to the jury, whether they

16  are in evidence or not, that are not documents that either (a)

17  are from Mr. Bodner, (b) are sent to Mr. Bodner, or (c) on

18  their face specifically refer to a conversation with

19  Mr. Bodner.  Okay?

20      MR. GLUCK:  If the secretaries are in?

21      THE COURT:  Pardon me.

22      MR. GLUCK:  Albanese and --

23      THE COURT:  I understand your point but, anyway, I

24  think maybe we should take a lunch break at this point and we

25  will continue thereafter.

Mcc2Pla3                          Bodner - Cross

1            MR. GLUCK:  Sure.

2            MR. LAUER:  Thank you, your Honor.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mcc2Pla3                              Bodner – Cross

 1              (In open court)

 2              THE COURT:  So ladies and gentlemen, counsel have

 3      forced me to give you your lunch break five minutes early.  I

 4      protested vehemently, but they just overruled me with the force

 5      of their argument.  So we will take an hour and five minutes

 6      and resume at 2:00.

 7              THE WITNESS:  Thank you very much, your Honor.

 8              THE COURT:  Mr. Bodner, you can step down.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mcc2Pla3                         Bodner – Cross

1            (Jury not present)

2            THE COURT:  I'm going to give plaintiffs' counsel

3    pretty much whatever time he wants on cross-examination.  This

4    is the most critical witness.  But if you could give me a

5    reasonably good estimate after lunch of how much it will be,

6    just so we can plan the rest of the schedule.

7            Very good.  We will see you in an hour and five

8    minutes.

9            (Luncheon recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCCCpla4                              Bodner – Cross

                              AFTERNOON SESSION

                                  2:08 p.m.

 1

 2

 3             (Jury not present)

 4             THE COURT:  Plaintiffs' counsel was going to give me a

 5        ballpark around about how much.

 6             MR. GLUCK:  Ballpark is around 100 minutes, except for

 7        one issue.  Towards the end of the examination, I'll ask for a

 8        sidebar regarding certain summary exhibits of certain meetings

 9        that I understand is contested, and if we don't get those in, I

10        do have quite a lot of documents.

11             THE COURT:  What intimidation.  Anyway, let's bring in

12        the jury.

13             I will get everyone a draft charge either tonight or

14        early tomorrow, and assuming I get it to you tonight, we'll

15        have a charging conference at the end of the day tomorrow.  If

16        I don't get it to you tomorrow, we'll figure out whether we

17        want to do it tomorrow or Wednesday.

18             (Continued on next page)

19

20

21

22

23

24

25

MCCCpla4                          Bodner - Cross

 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              Counsel.

 4     BY MR. GLUCK:

 5     Q.  Mr. Bodner, Mr. Nordlicht was routinely asking you to raise

 6     money, was he not?

 7     A.  It wasn't routinely.  He asked me once in a while when he

 8     was in an investment situation.

 9     Q.  You stated earlier that he was always in need of you to

10     raise investors for him, didn't you?

11     A.  Yes, but I think he knew that I wasn't raising money.

12     Q.  Murray Huberfeld was your partner for about 25 years?

13     A.  More like 30 years, 30-something years.

14     Q.  You talk to him every day or almost every day?

15     A.  I talked to him often.

16     Q.  Almost all the time; right?

17     A.  Till around 2013.

18     Q.  You continued to correspond with him and talk to him after

19     2013, didn't you?

20     A.  But not often.

21     Q.  Not often?

22     A.  No.

23     Q.  You solicited a number of investors for PPVA?

24     A.  No, I did not.

25              MR. GLUCK:  Mr. Parson, PX 426.

MCCCpla4                          Bodner - Cross

1         I seek to move this in evidence.

2    Q.   Angela Albanese was your secretary; is that correct?

3    A.   Yes, she was, and she was Murray's secretary.

4    Q.   She would print and send emails on your behalf?

5    A.   Yes, she would.

6    Q.   Richard Geyser and Jenna Boyle, they're investors in PPVA,

7    aren't they?

8    A.   To my recollection, Richard Geyser worked at PPVA to raise

9    money for them.  I'm not sure he was an investor.

10   Q.   You pitched them on behalf of PPVA, which is issue in this

11   case, and then also PPLO which I believe is the other fund you

12   mentioned; is that right?

13   A.   I have no recollection.  I don't know who Jenna Boyle and I

14   have no recollection of pitching any of them.

15        MR. GLUCK:  Please go to the first page, Mr. Parson.

16   Q.   You would provide these investors with monthly letters;

17   right?

18   A.   Which investors are you talking about?

19   Q.   Investors that you pitched.

20   A.   I did not pitch investors for the fund.

21   Q.   Mr. Geyser was a PPVA portfolio manager; right?

22   A.   To my recollection, Mr. Geyser was -- worked for PPVA to

23   bring money in.  I don't remember him being a portfolio

24   manager.

25   Q.   You were well aware that PPVA had invested in Black Elk as

1    far back as 2010; right?

2    A.  No.

3            MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 476.

4            I'm sorry.  426, I move into evidence.

5            MR. LAUER:  401.

6            THE COURT:  Well, I think 401 is very liberally

7    construed.  Overruled.  Received.

8            (Plaintiff's Exhibit 426 received in evidence)

9            MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 476,

10   please.

11           Seek to admit this into evidence.

12           MR. LAUER:  No connection.

13           MR. GLUCK:  It's from Mr. Huberfeld to Ms. Albanese to

14   Mr. Bodner.

15           THE COURT:  Well, right now, no foundation has been

16   laid whatsoever.  If you want to lay a foundation, then I'll

17   consider it.

18   BY MR. GLUCK:

19   Q.  MA2500, that's Mr. Huberfeld's email address, isn't it,

20   Mr. Bodner?

21   A.  I remember the email address Murray Huberfeld, not MA2500.

22   Q.  This is one of Huberfeld's email addresses, isn't it,

23   Mr. Bodner?

24   A.  It's possible.  I don't recall.

25   Q.  He's sending you summaries of the Black Elk and China

1    Horizon investments in 2010; right?

2    A.   Could be sending it to Angela to print it out for somebody.

3    I don't know.  I don't have any recollection of seeing this

4    document.

5    Q.   He's sending it to both Ms. Albanese's email addresses,

6    both at Centurion and at Platinum?

7    A.   Yes.  I have no clue what he was doing.

8              MR. GLUCK:  We seek to move this into evidence.

9              MR. LAUER:  Same objection.

10             THE COURT:  Do you know who Greg Safiro was?

11             THE WITNESS:  No, I don't.

12             THE COURT:  Do I understand you don't know who the

13   address, MA2500, who that belongs to?

14             THE WITNESS:  No, I do not.

15             THE COURT:  The objection is sustained.

16             MR. GLUCK:  PX 478, please.

17   BY MR. GLUCK:

18   Q.   Do you know who Mr. Martin Stern is?

19   A.   Yes.

20   Q.   Who is he?

21   A.   Martin Stern is my brother-in-law.

22   Q.   Mr. Martin Stern, an investor in Black Elk equity?

23   A.   This, I don't know if he invested in Black Elk equity.

24   Q.   BEE refers to Black Elk equity, doesn't it?

25   A.   Yeah.

1           THE COURT:  Are you offering this?

2           MR. GLUCK:  I'm about to build a foundation.

3           THE COURT:  Very good.

4  Q.  BEE, you were asked a question earlier about the email

5  regarding your anxiousness over the Black Elk investors.

6           Do you recall BEE as Black Elk equity?

7  A.  Yes.

8  Q.  So Martin Stern is your brother-in-law and he invested in

9  Black Elk equity; right?

10 A.  It seems like that from the email.

11 Q.  And you brought him in?

12 A.  No.

13 Q.  Who brought in your brother-in-law, other than you?

14 A.  Could have been Murray Huberfeld.  It could have been

15 somebody else.  Richard Geyser knew a lot of the people that I

16 knew.  I have no idea.

17          MR. GLUCK:  And now if you go, Mr. Parson, to the top,

18 top email.

19 Q.  And you were consulted on the rollover or repo of

20 Mr. Stern's investment in Black Elk equity, weren't you?

21 A.  I don't recall this at all.

22          MR. GLUCK:  This email I seek to move into evidence.

23          MR. LAUER:  Objection.

24          THE COURT:  Sustained.

25 Q.  Now, as building a little more foundation, it says to

MCCCpla4                         Bodner - Cross

 1   Murray Huberfeld AOL.

 2            Do you see that on the second email?

 3   A.  Yes.

 4   Q.  And at the top, it just says MA2500@aol.  That was Murray

 5   Huberfeld's AOL address, wasn't it?

 6   A.  I mean, it looks like that.

 7            MR. GLUCK:  Now, could you please return to the prior

 8   exhibit, Mr. Parson, exhibit 476.

 9   Q.  With the foundation that MA2500 is Mr. Huberfeld, he is

10   sending you this Black Elk investment summary investment

11   thesis, isn't he?

12            MR. LAUER:  Objection.

13            THE COURT:  Well, let me ask you this:  In this email,

14   there are two addresses for Ms. Albanese.

15            Do you see that at the top?

16            THE WITNESS:  Yes.

17            THE COURT:  Now, one of them refers to Centurion.  She

18   also worked for Mr. Huberfeld, yes?

19            THE WITNESS:  Correct.

20            THE COURT:  So something sent to the Centurion address

21   presumably had something even who was sent from Mr. Huberfeld

22   was simply an exchange related to the two of them and Huberfeld

23   as far as one can ascertain; is that fair?

24            THE WITNESS:  That's fair to ascertain.

25            Also, my email that she used for me was BodnerAng.  In

MCCCpla4                        Bodner - Cross

1   2010, I don't recall her using these emails.  If something was

2   sent to me, it was sent to BodnerAng.

3          THE COURT:  I'm still sustaining the objection.

4          MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 430,

5   please.

6   BY MR. GLUCK:

7   Q.  What was Mr. Small's role at PPVA?

8   A.  I think he was a portfolio manager.

9   Q.  Was he in charge of the Black Elk investment?

10  A.  I think he worked together with David Levy.  I'm not sure

11  exactly on what he worked.

12  Q.  Was he convicted of fraud in connection with the Black Elk

13  subordination?

14  A.  That's what I read in the newspapers.

15         MR. GLUCK:  Now go to the front page, please.

16  Q.  See how it says on the subject matter, conference room, on

17  the "Re:" line, "conference."

18  A.  Could you light it up.

19         MR. GLUCK:  Could you please, Mr. Parson, line up one

20  of the subject lines.

21  Q.  Do you see on the "Re:" line, "confirm."

22  A.  Yes.

23  Q.  You testified earlier that there was a fourth floor and

24  then there was a floor --

25  A.  54th.

MCCCpla4                          Bodner - Cross

```
 1    Q.  54th floor.  The conference rooms for Platinum they were on
 2    the 54th floor; right?
 3    A.  The conference room, Platinum on the 4th had its own
 4    conference room also.  As a matter of fact, I think they had
 5    two conference rooms.
 6    Q.  If you were to take a meeting, which conference room would
 7    you go to?
 8    A.  Usually, I would use the 54th floor.
 9    Q.  That's where you sat.
10            Do you have a recollection of who Shlomo Kalish is?
11    A.  It could have been a charity that David Levy wanted me to
12    meet with this gentleman.  Either it could have been a charity
13    or a deal that he wanted me to see.
14    Q.  That is something that you would have been doing with
15    Daniel small?
16    A.  I have no idea if Daniel Small was that at this meeting.
17    Q.  Well, who was Karen Lau?
18    A.  Karen Lau was Mark Nordlicht's secretary.
19    Q.  Who is Rene Trotter?
20    A.  Her, I don't know.
21    Q.  Excuse me?
22    A.  I don't know.
23    Q.  This is an investor meeting; right?
24    A.  This is an investor meeting?
25    Q.  Correct.
```

MCCCpla4                         Bodner - Cross

1  A.  Not that I know of.

2            MR. GLUCK:  Plaintiffs' Exhibit 479, please.

3            Sorry.  We would like to admit this into evidence,

4  your Honor.

5            It's in evidence.

6            MR. LAUER:  Objection.  No connection.

7            MR. GLUCK:  It's in evidence.

8            Plaintiffs' Exhibit 479, please.

9            THE COURT:  I'm sorry.  Wait a minute.  So is 479 in

10 evidence or not?

11           MR. GLUCK:  430, which is presently on the screen, is

12 in evidence.

13           THE COURT:  Well, is that in evidence or not?

14           MR. GLUCK:  It is.

15           THE COURT:  Okay.  I thought you just --

16           MR. GLUCK:  I made a mistake as to whether it was in

17 evidence.

18           THE COURT:  Okay.  Go ahead.

19           MR. GLUCK:  Now please call up 479, Mr. Parson,

20 Plaintiffs' Exhibit 479.

21 BY MR. GLUCK:

22 Q.  Let me ask you, to lay some foundation, this is already in

23 evidence.

24           Mr. Bernie Fuchs, he was an investor in PPVA?

25 A.  Yes, he was.

MCCCpla4                          Bodner – Cross

1    Q.  Who brought him in?

2    A.  Abe Biderman.

3    Q.  How much did he invest in PPVA?

4    A.  I don't know.

5    Q.  You told him that PPVA was your fund; right?

6    A.  Never told him such a thing.

7    Q.  You told him that you were the principal of the fund;

8    right?

9    A.  Never told him such a thing.

10   Q.  You told him that you would look after his investment;

11   right?

12   A.  I never told him such a thing.

13          MR. LAUER:  We object to the document on the screen.

14   No connection.

15          MR. GLUCK:  I'm just about to build a foundation.

16          THE COURT:  All right.

17   Q.  Dovid, that's you; right?

18   A.  It's possible it's me.

19   Q.  And Mr. Landesman, he's a Platinum Management employee;

20   right?

21   A.  Mr. Landesman was the president of Platinum Management.

22   Q.  And he was in charge of investor relations?

23   A.  And he was in charge, he did investor relations.

24   Q.  And he had to suggest to you to give Bernie Fuchs, a major

25   investor, about a Black Elk update?

1    MR. LAUER:  Objection.  It's not what it says.

2    MR. GLUCK:  I'll read what it says.

3    THE COURT:  I'm sorry.  He was just asking him a

4    question.  I don't know that he was tying to the exhibit or

5    not, it was an independent question.  But put another --

6    MR. GLUCK:  I'll put another question.

7    Q.  Mr. Landesman suggested to you that Platinum give Bernie

8    Fuchs, a Platinum investor, a Black Elk update; right?

9    A.  I do not remember that, having a discussion with Bernie

10   Fuchs a Black Elk update.

11   Q.  And you knew that Black Elk had just exploded; right?

12   A.  It says that this was sent December 11th.  I don't remember

13   exactly the date for the explosion.

14   Q.  You knew that Black Elk had just exploded on November 15th;

15   right?

16   A.  I knew it exploded, yes.

17   Q.  And --

18   A.  I would think Bernie also found out about it then because

19   it was in all the newspapers.

20   Q.  And Mr. Landesman needed to get your comfort with him

21   providing a Black Elk update to major investor Bernie Fuchs?

22   A.  I don't remember such, having a discussion like this with

23   Bernie Landesman at all.

24   THE COURT:  Are you denying that it occurred or are

25   you simply saying you don't have a memory one way or the other?

MCCCpla4                        Bodner - Cross

1          THE WITNESS:  I don't have a memory of Bernie

2     Landesman having to ask me to give Bernie Fuchs an update of

3     Black Elk.

4          THE COURT:  So that the jury can evaluate that, what

5     I'm unclear is, are you saying I don't have the memory one way

6     or the other, it could have happened, but I don't know or are

7     you saying my best memory is it did not happen?

8          THE WITNESS:  My best memory that something like this

9     didn't happen because --

10          THE COURT:  Okay.  You answered.

11     BY MR. GLUCK:

12     Q.  And the reason Mr. Landesman would have needed to check

13     with you before giving major investor Bernie Fuchs a Black Elk

14     update was because PPVA had so much exposure to Black Elk, and

15     you knew that, too; right?

16     A.  No, I didn't think that PPVA had any exposure with

17     Black Elk.  I was told after the blowup that there's a

18     tremendous amount of reserves and it was unfortunate somebody

19     died, and nothing changed in the company itself, except one

20     platform that blew up.  800, that's what I was told.

21     Q.  You didn't think that PPVA had any exposure to Black Elk?

22     A.  I think they had a legal exposure maybe from the family

23     suing for the person that was killed.  More than that, I didn't

24     know that they had any exposure in the company itself.

25          MR. GLUCK:  Plaintiffs' Exhibit 417.

MCCCpla4                        Bodner - Cross

1    Q.  You knew that a number of investors, including your

2    brother-in-law, had invested in Black Elk; right?

3               MR. LAUER:  Objection.

4               THE COURT:  Well, the question is you knew that a

5    number of investors, including your brother-in-law, had

6    invested in Black Elk; right?

7               What's the ground of the objection?

8               MR. LAUER:  There's no foundation.  It hasn't been

9    established that he knew.

10              THE COURT:  He's asking him a question.

11              MR. LAUER:  All right.

12              THE COURT:  This question stands alone regardless of

13   anything on the screen.

14              So, did you know that a number of investors, including

15   your brother-in-law, had invested in Black Elk?

16              THE WITNESS:  We knew a number of investors invested

17   in Black Elk.  I was very surprised when I seen the email that

18   spoke about my brother-in-law.  Him, I did not know that he

19   invested in Black Elk.

20   BY MR. GLUCK:

21   Q.  Your brother-in-law, where does he live?

22   A.  Today, he lives in Lakewood, New Jersey.

23   Q.  Then?

24   A.  I think then, he lived in Monsey, New York.

25   Q.  Not in Chicago?

MCCCpla4                           Bodner - Cross

1    A.  No, he did not live in Chicago.  Maybe that's a Martin

2    Stern from Chicago, not my brother-in-law.

3                MR. GLUCK:  Let's call up Plaintiffs' Exhibit 429.

4    Q.  You attended investor pitch meetings with Mr. Landesman  in

5    Chicago as a blitz; right?

6    A.  I attended meetings for what?

7    Q.  You attended investor pitch meetings in Chicago with

8    Mr. Landesman; right?

9    A.  I have no recall about that.

10   Q.  Who's Bob Collins?

11   A.  Bob Collins owned seats on the exchange.  As I said earlier

12   in my testimony, I was a trader on the exchange of the

13   Chicago -- the name of his companies was Collins, and I used to

14   have an account there and trade there, and I was friendly with

15   Bob Collins.  I do not remember meeting him in a blitz meeting

16   in Chicago about Platinum.  I used to speak to him on the phone

17   and when he came to New York, once in a while -- I think maybe

18   once or twice, we got together to talk about trading, not about

19   Platinum.

20   Q.  You don't remember?

21   A.  No, I do not remember at all meeting him at a meeting for

22   Platinum.

23               MR. GLUCK:  Move to admit this into evidence.

24               MR. LAUER:  Objection.  Lack of connection.

25               THE COURT:  Sustained.

MCCCpla4                        Bodner - Cross

1              MR. GLUCK:  PX 477, Mr. Parson.

2     Q.   Who is Mr. Aaron Wolfson?

3     A.   Mr. Aaron Wolfson is -- how should I describe him?  He's a

4     wealthy individual, very charitable.  He comes from a family

5     where I knew his father and his brother.

6     Q.   What is your connection to Mr. Aaron Wolfson?

7     A.   We did a lot of charity together.  Also, when Centurion was

8     started, we met with his father, myself and Mr. Huberfeld, and

9     his father wanted to seat the fund.

10    Q.   Banyan, that's one of those one-off projects; right?

11             MR. GLUCK:  Mr. Parson, could you highlight Banyan.

12    Q.   Banyan was one of the one-off projects?

13    A.   I think -- I don't remember.  Maybe you could -- I don't

14    remember exactly what Banyan was.  Could you tell me a little

15    bit about it?

16    Q.   Did Uri Landesman make you call Aaron Wolfson on Banyan and

17    Black Elk in 2012?

18    A.   It's possible that Uri Landesman asked me to call Aaron

19    Wolfson, since I was very friendly with him, to set up a

20    meeting for himself with Aaron Wolfson.  Aaron Wolfson was a

21    very, very busy person.  He was managing over --

22             THE COURT:  You've finished your answer.

23    Q.   After the Black Elk explosion, it was an all-hands-on-deck

24    situation at Platinum, wasn't it?

25    A.   What do you mean by hands on deck?

MCCCpla4                          Bodner - Cross

1    Q.  Do you understand what all hands on deck means?

2    A.  No, I don't.

3    Q.  After the Black Elk explosion, it was a time of urgency and

4    crisis at Platinum, wasn't it?

5    A.  Yes.

6    Q.  And you and the other Platinum Partners formulated a plan

7    to create the Black Elk Opportunities Fund; is that right?

8    A.  That's not true.

9              MR. LAUER:  Objection.

10   A.  That's not true.

11             MR. LAUER:  Objection.

12             THE COURT:  I'll overrule the objection.  The answer

13   has been given.

14   Q.  After the Black Elk explosion, the Platinum Partners

15   created Black Elk Opportunities Fund?

16   A.  I don't know who created Black Elk Opportunities Fund.  I

17   wasn't -- they had a meeting, I wasn't spoken to about creation

18   of a fund like this.  Afterwards, I found out that they were

19   raising money for Black Elk.  How, where, and when, I wasn't

20   aware of it.

21   Q.  You weren't aware ahead of time?

22   A.  No, I didn't.  Ahead of time meaning when?  When it was

23   created?  No.

24             MR. GLUCK:  Move 477 into evidence, please.

25             MR. LAUER:  No connection.

MCCCpla4                          Bodner - Cross

 1          THE COURT:  So not only is there no meaningful

 2   connection to the witness, and that would be sufficient to

 3   sustain the objection, but also it includes a great deal of

 4   hearsay, and that's a further ground for the objection.  And

 5   also it is filled with earlier messages that seem to have no

 6   connection, even on their face, let alone remotely, with any

 7   issue relating to this witness or this case.

 8          So, on all those grounds and about a dozen others, the

 9   objection is sustained.

10   Q.  You, Mr. Bodner, received fees from the Black Elk

11   Opportunities Fund, didn't you?

12   A.  I don't recall.  I received fees in any -- that was the

13   deal when we structured Platinum, I was going to get fees from

14   any fund that has to do with Platinum.

15   Q.  So you don't recall receiving fees from the Black Elk

16   Opportunities Fund, but you do recall there being a general

17   deal in relation to you receiving fees of anything that has to

18   do with Platinum?

19   A.  I remember when we structured the deal with Mark Nordlicht

20   and Murray Huberfeld way back, we were partners in any hedge

21   fund fees that would come in.

22          MR. GLUCK:  On this one, I think it's fair ground to

23   refresh your recollection.  So could you call PX 497,

24   Mr. Parson.

25   Q.  My only question is, did you receive $25,147.42 from

1    Black Elk Opportunities Fund?

2              MR. LAUER:  Objection.  There's no connection.

3              THE COURT:  He's not offering the exhibit.  The

4    question was, having looked at this exhibit, which is not in

5    evidence, does that refresh your recollection that you

6    received, we'll start with monies in connection with Black Elk

7    Opportunities Fund?

8              THE WITNESS:  Definitely looks like that from the

9    document.

10             THE COURT:  And if I understand, while you don't have

11   a specific memory with respect to that particular fund, you did

12   have an understanding that, in connection with the Black Elk

13   investment, you would receive monies from related entities,

14   yes?

15             THE WITNESS:  My understanding was when we made the

16   deal that any fund, hedge fund that's formed by Mark Nordlicht,

17   either Platinum Credit Fund, Platinum Value Fund, Platinum

18   Liquid Fund, those three funds, I remember.  PPLO, PPCA.  My

19   understanding was at the end of the year, Joe SanFilippo came

20   up to my office and he would show me how much fees I made on

21   each fund.  This, I don't remember in particular, but the

22   document says --

23             THE COURT:  The document is not in evidence.

24             But there is nothing inconsistent with your overall

25   arrangement and such a distribution being made?

MCCCpla4                        Bodner - Cross

1             THE WITNESS:  Correct.

2             MR. GLUCK:  You can take that down now, Mr. Parson.

3  BY MR. GLUCK:

4  Q.  You told Mr. Fuchs to go out and solicit investors for the

5  Black Elk Opportunities Fund, didn't you?

6  A.  Totally false.

7  Q.  You, yourself, solicited investors for the Black Elk

8  Opportunities Fund, didn't you?

9  A.  No, I didn't.

10            MR. GLUCK:  Mr. Parson, please call up

11  Plaintiffs' Exhibit 482.

12  Q.  Who are Bob and Allen Cohen?

13  A.  Bob and Allen Cohen are two people that I know.  They own

14  an optical chain.  It looks like here, like the other emails

15  you showed me, there's a list of names that I should be going

16  to to raise money for Black Elk.

17  Q.  Sol Werdiger?

18  A.  A friend of mine.

19  Q.  Ezra Erani?

20  A.  Another acquaintance.

21  Q.  Adam Sokol?

22  A.  Do not know who he is.

23  Q.  Tom Deutch?

24  A.  Do not know him.

25  Q.  Harari?

MCCCpla4                        Bodner - Cross

1   A.  I know who he is, but he was a friend of Murray Huberfeld.

2   Q.  Martin Stern?

3   A.  I don't know if it's my brother-in-law.  It doesn't make

4   sense because my brother-in-law was not a rich man.  I don't

5   know why they would of solicit him.

6   Q.  Steven Steinheimer?

7   A.  I have no idea.

8   Q.  Jonathan Mayer?

9   A.  Jonathan Mayer is a brother-in-law of mine.

10  Q.  You were asked to contact the persons highlighted in

11  yellow, weren't you?

12  A.  Not Adam Sokol.

13  Q.  Not Adam Sokol.  You did contact the persons highlighted in

14  yellow to pitch them on the Black Elk Opportunities Fund?

15  A.  No, I did not.

16  Q.  You deny it?

17  A.  I deny it 100 percent.  I did not contact anybody to put

18  money into Black Elk.

19          MR. GLUCK:  All this we'll move into evidence.

20          MR. LAUER:  We object.

21          THE COURT:  Well, I think this one comes in under the

22  coconspirator exception.  So it will be received.

23          (Plaintiff's Exhibit 482 received in evidence)

24          MR. GLUCK:  You can take that down, Mr. Parson.

25  Q.  Now, after the Black Elk Opportunities Fund had been

MCCCpla4                          Bodner - Cross

1   raised, you received data and information suggesting that

2   PPVA's common equity in Black Elk was near or actually

3   worthless, didn't you?

4   A.  No, I did not.

5          MR. GLUCK:  Mr. Parson, please call up PX 554.

6          This we seek to admit into evidence or it may already

7   be?

8          MS. SHEN:  It's already in.

9   Q.  So who is Seaport?

10  A.  I have no idea.

11  Q.  You don't know their investment advisor?

12  A.  No, I don't.

13  Q.  You received their report for Black Elk from Mr. David

14  Steinberg, didn't you?

15  A.  No.

16  Q.  Sent to Ms. Albanese?

17  A.  As I said before, Ms. Albanese was Murray's and my

18  secretary.  And my email was BodnerAng.com.  It was not

19  Angela@Platinum.  So this could have been received to Murray.

20  Uri Landesman was in the office next to me.  It's possible she

21  received it to give to Uri Landesman.  I have no idea.  I do

22  not know who this person is.  I know David Steinberg.

23  Q.  I'm glad you brought up that BodnerAng@gmail.com email

24  address.  When was that in use?

25  A.  I think that was in use when we started.

MCCCpla4                         Bodner - Cross

1    Q.  You think that was in use when you started?

2    A.  Or later on.  I don't remember.  That was the email I

3    remember her using with me a lot.

4    Q.  Ms. Albanese set up that email address so that you could

5    engage in correspondence off the Platinum server once the SEC

6    started spending a few months in the office, didn't she?

7               MR. LAUER:  Objection.

8    A.  Not to my knowledge.

9               MR. LAUER:  Wait.

10              THE COURT:  There's an objection.  I have to rule.

11              Sustained.

12   Q.  You don't know that Ms. Albanese set up the BodnerAng

13   gmail.com --

14              THE COURT:  The problem with the question is counsel

15   is, in effect, testifying.  If you want to inquire as to the

16   date, that's fine, but not what you're --

17   Q.  The BodnerAng@gmail.com was set up after 2014, wasn't it?

18   A.  I don't know.

19   Q.  You don't know why it was set up?

20   A.  No.  I remember that was the email that I used to tell

21   people if they wanted to send me an email, they should send it

22   to.

23   Q.  You didn't instruct Ms. Albanese to set up an email off the

24   Platinum server so your Platinum-related correspondence

25   couldn't be seen?

MCCCpla4                          Bodner - Cross

1    A.  No, absolutely not.

2    Q.  So you deny receiving this Seaport report?

3    A.  I don't remember receiving it.

4    Q.  I think you testified that you would have partner meetings

5    for Platinum about four times a year, once a quarter?

6    A.  Usually three, four times a year.

7    Q.  At those partner meetings, you were provided with detailed

8    information on all of Platinum's positions; right?

9    A.  No.

10   Q.  And you, in fact, instructed Mr. Nordlicht and others to

11   prepare detailed summaries of Platinum's positions so that you

12   could hear them at the meeting; right?

13   A.  I did not instruct Mr. Nordlicht to prepare --

14   Mr. Nordlicht used to come with a small piece of paper with the

15   positions.  He never showed us.  To my recollection, I never

16   saw any backups on any of these positions.  The meetings were

17   focused on liquidity and liquidity only, how much money he

18   needs and what pressure he's under if he doesn't get the money.

19          MR. GLUCK:  Mr. Parson, please bring up PX 377, which

20   is already in evidence.

21   Q.  Is it your testimony that two copies of positions for PPCO

22   and PPVA, quote-unquote, was a handwritten piece of paper that

23   you were asking Mr. Nordlicht to draft?

24   A.  It's possible.  I don't remember or I don't see anything

25   else showing that I asked him to bring positions or copies of

1   positions.  There must have been a special reason -- if I did

2   tell him to do this, there must have been a special reason in

3   2013, which I can't remember why I would ask him to bring

4   copies of positions.  That's not how the meetings worked.  The

5   meetings worked, they were a dinner, he brought a small little

6   scrap paper together, on it he wrote this position, this

7   position, this position, we have 10 positions here, this is how

8   much money we need and he's under tremendous pressure to meet

9   withdrawals and we must bring money in.  That was the crux of

10  every meeting we had.

11  Q.  Did you find those pieces of paper to be useful?

12  A.  He didn't give me the pieces of paper.  He held it by him

13  and read off it.

14  Q.  Why would you be reminding him to bring those position

15  statements --

16  A.  It says two copies, there must have been a reason.  I don't

17  remember in 2013 why I would ask him to bring two copies of

18  positions.  I never asked him anytime else if this is correct,

19  I don't remember why I would ask him in 2013 to bring them.

20  Maybe Uri needed it for marketing, maybe somebody needed it.  I

21  have no idea.

22          MR. GLUCK:  Mr. Parson, PX 523, please.

23          We seek to move this into evidence.

24  Q.  And that's not a BodnerAng Gmail address at the top, is it?

25  A.  No, that's another email that she had for me.  Rendob is

1    Bodner is backwards.  18@ -- I think that was the email -- if

2    she had to send me an email, I think that's where she sent it

3    to.

4    Q.  Mr. Landesman is asking for Fuchs' feedback on fairly

5    detailed positions so that he, in turn, can be prepared to

6    present the partners dinner next week, isn't it?

7    A.  I think he was asking Mr. Fuchs about China Horizon.

8    Q.  But Mr. Landesman was trying to set up for a partners

9    dinner the next week, wasn't he?

10   A.  I think Shaw listened to the 1 o'clock call today is asking

11   about an investors call.  I'm just telling you the way I'm

12   reading it.  And if you are able, would like your feedback —

13   meaning Bernie Fuchs' feedback about the call.  And then he --

14   the second thing he wrote was he's trying to set up a partners

15   dinner for next week asking Mr. Fuchs if he'll be available.

16   Q.  And Mr. Landesman was so interested in making sure that you

17   knew that he had asked Mr. Fuchs to gather this information

18   that he actually sent it to Ms. Albanese, who then sent it to

19   your -- well, that's your personal email address, isn't it?

20          MR. LAUER:  Objection.

21          THE COURT:  Sustained.

22   Q.  Mr. Landesman then forwarded the conversation he had with

23   Mr. Fuchs to Ms. Albanese for your attention, didn't he?

24   A.  If we could read the email a little slow, I think it says

25   over here --

1          THE COURT:  Well, wait a minute.

2          Are you offering this?

3          MR. GLUCK:  We are offering this into evidence.

4          THE COURT:  Any objection?

5          MR. LAUER:  No objection to the document.

6          THE COURT:  Received.

7          (Plaintiff's Exhibit 523 received in evidence)

8    A.   The way I'm reading it is Uri Landesman sent an email to

9    Angela.  Then it says Bernie Fuchs sent an email to Uri, and he

10   wrote that he's available Monday or Thursday.  At 10:57 a.m.,

11   Uri Landesman wrote to Bernie Fuchs, sure.  Listen to the

12   1 o'clock call today, which I would think would mean the

13   investor call that Platinum had with their investors.  He's

14   asking Mr. Fuchs if you are able, would like your feedback.

15   Please tell me what you thought about the investors call.  And

16   then he told him, also, he's trying to set up a partners dinner

17   for next week, meaning are you going to be back next week from

18   where you're going.  And then the next thing he wrote was, have

19   China Horizon board tomorrow, Bernie is saying, we'll try to

20   meet before 12:00.  If I can't, let's talk China marketing on

21   Monday.  He's telling Uri Landesman we'll talk about marketing

22   China Horizon on Monday and see you tomorrow.

23          THE COURT:  Well, as is often common with emails,

24   isn't this actually in reverse chronological sequence?  So if

25   you look at the bottom, it says on August 6th, 2014, at 10:40

1   a.m., Uri Landesman wrote.  And then if you look right above

2   that, there's a message from Mr. Fuchs on August 6th at 10:53

3   a.m.  And then if you look right above that, there is a message

4   from Mr. Landesman at 10:57 a.m.  And if you look right above,

5   there's a message for Mr. Fuchs at 11:06 a.m., et cetera, et

6   cetera.  Right?  So the chronology is starting at the bottom,

7   yes?

8             THE WITNESS:  It sounds to me like that.  But I think

9   I read the email correct --

10            THE COURT:  I'm not raising that one way or the other.

11  I'm just saying, so the jury is clear, that the order of this

12  is starting at the bottom going to the top.

13  BY MR. GLUCK:

14  Q.  So the bottom email from Bernard Fuchs is August 6th, 2014

15  at 10:53 a.m.  Do you see that?

16  A.  Yes.

17  Q.  And Mr. Fuchs responds same day, 10:57 a.m.

18  A.  Yes.

19  Q.  And then he responds again at 11:06 a.m.  Do you see that?

20            MR. LAUER:  Objection.  It's just not the way it

21  reads.

22            THE COURT:  I agree.  Sustained.

23            THE WITNESS:  Excuse me, your Honor.

24            MR. GLUCK:  Excuse me.  Uri Landesman wrote at 10:57.

25            THE COURT:  The witness needs to take a break.

MCCCpla4                         Bodner - Cross

1          THE WITNESS:  Just for two minutes.

2          THE COURT:  The jury can stay here because we can talk

3     about the schedule while the witness is taking a break.

4          So, ladies and gentlemen, I was going to mention this

5     at the end of the day.  I am still hopeful that the testimony

6     will be completed tomorrow, but because of a few delays we've

7     had, it may go into Wednesday.  Counsel and I totally agree

8     that's the worst case, it will be over by Wednesday, and we'll

9     try to do better than that, but I can't guarantee it.  Then,

10    worst case, Thursday morning, you'll have closing arguments

11    from counsel and my instructions of law.  So the case will be

12    yours starting, worst case, after lunch on Thursday.  I'm

13    hoping that we can do better than that, but I wanted to give

14    you the worst case scenario.

15         Then, of course, once the jurors -- it's up to you,

16    you can take five minutes, you can take five days, I wouldn't

17    recommend taking 50 days, but that's up to you.

18         So, I just wanted to give you that schedule.

19         Tomorrow, we will sit a full day from 9:30 to 4:30,

20    and we are going today until 4:30.  So, hopefully, the witness

21    will be here.

22         I will mention one other thing, just so you're aware

23    of it, I think it's already obvious that this case centers on

24    whether or not the Platinum assets were overvalued and whether

25    Mr. Bodner knew that and whether he participated in concealing

MCCCpla4                          Bodner - Cross

1   that or whatever.  It has nothing to do, in terms of any claim,

2   with the liquidity problem.  The liquidity problem was — I

3   assume you understand by now — they didn't have enough money to

4   pay the immediate demands for money that they were getting, and

5   that was a serious problem, but there's no claim in this case

6   that that is part of any fraud or any allegation of misconduct.

7   The misconduct, if there was any, centers totally on the

8   question of overvaluation.

9              I'm running out of things to talk about.

10             MR. LAUER:  Your Honor, while we're waiting for the

11  witness, may we approach the bench for a moment?

12             THE COURT:  Sure.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MCCCpla4                         Bodner - Cross

1                    (At the sidebar)

2                    MR. LAUER:  Your Honor, until this morning's ruling on

3          coconspirator, the evidentiary issue of coconspirator exception

4          didn't impart any substantive issue.  Now that you've made this

5          ruling, which we accept, that coconspirator is, in effect, a

6          merits-related claim.  I would respectfully ask the Court,

7          obviously the Court is free to sustain objections or overrule

8          objections, but to say coconspirator exception, now that we're

9          on the frontier of this new phenomenon is somewhat prejudicial.

10                   THE COURT:  Okay.  So I'll use another term.

11                   MR. LAUER:  Thank you.

12                   THE COURT:  Maybe we'll call it the controversial

13         exception.  We'll figure out something.  That's fair enough.

14                   MR. LAUER:  I appreciate it, Judge.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
1              (In open court)
2      BY MR. GLUCK:
3      Q.  Returning to this e-mail, Mr. Bodner, Uri Landesman then
4      sends an e-mail at 10:57 a.m. back to Mr. Bernard Fuchs
5      stating, "Listen to 1:00 call today if you are able.  Would
6      like your feedback, trying to set up a partners dinner for next
7      week."
8              Do you see that?
9      A.  Yes.
10     Q.  And then above that, at 11:06 a.m., Mr. Fuchs responds to
11     Mr. Landesman stating that he is only available on Monday or
12     Thursday.  Do you see that?
13     A.  Yes.
14     Q.  And then Mr. Landesman, at 12:57 p.m., one hour later,
15     sends this e-mail for your attention.  Right?
16     A.  Yes.
17     Q.  And you would be the one who would be attending the
18     partners dinner that would be set up the next week, right?
19     A.  I would think so, yes.
20     Q.  And numbers were something that was discussed at the
21     partners dinner, wasn't it?
22     A.  Numbers, meaning liquidity numbers, what they needed, how
23     much money they needed, that's what I would think.
24     Q.  There is nothing about liquidity in this e-mail chain, is
25     there?
```

Mcc2Pla5                          Bodner - Cross

```
 1    A.   I don't know what numbers -- what he means by numbers.  I
 2    know what we discussed at the meetings.
 3    Q.   Numbers, including PPVA's values of its assets, were
 4    routinely discussed at the partner meetings, weren't they?
 5    A.   No, they were not.
 6               MR. LAUER:  Objection.
 7    A.   The positions --
 8               THE COURT:  Whoa, whoa.
 9               THE WITNESS:  I'm sorry.
10               THE COURT:  So the objection is overruled, but the
11    answer was, "No, they were not," period.  Go on to something
12    else.
13    BY MR. GLUCK:
14    Q.   Mr. Bodner, in addition to soliciting investors at
15    Platinum, you also had input into Platinum hiring decisions,
16    didn't you?
17               MR. LAUER:  Objection.
18               THE COURT:  Yeah.  The trouble with that question is
19    the premise which he has already denied.  But if you want to
20    ask him whether he had any input into Platinum Management
21    hiring decisions, I will allow it.
22               MR. GLUCK:  Rephrase.
23    BY MR. GLUCK:
24    Q.   Mr. Bodner, you had input into Platinum hiring decisions,
25    didn't you?
```

1    A.  No, I didn't.  I did ask Mark as a favor to hire a person

2    who was in need of a job, but I had no authority whatsoever to

3    hire anybody in Platinum, to fire anybody in Platinum, or to

4    just -- there was a lawyer, an ex-lawyer, who was a friend of

5    mine who was out of a job, and I asked Mark if it is possible

6    to fit him here in the organization, and I asked him also for a

7    job for a nephew of mine if he had.

8    Q.  You interviewed Mr. Saks, right?

9    A.  I did not interview Mr. Saks.  Mr. Saks was somebody that

10   Mr. Nordlicht grew up together.  They were childhood friends.

11   And Mr. Saks is someone that Mark Nordlicht wanted to take over

12   the fund.  He introduced me to him.

13   Q.  You interviewed Mr. Landesman.

14   A.  I did not interview Mr. Landesman.  Mark Nordlicht

15   introduced him to me being an owner of Platinum Management.  He

16   showed me Mr. Landesman and he asked my opinion what I think

17   about him.  I did not hire Mr. Landesman.

18   Q.  Mr. Parson, PX 421, please.  Excuse me.  One more question.

19          Mr. Kimelman, you didn't want him to be fired, did

20   you?

21   A.  I had no say in Mr. Kimelman being hired or fired.

22   Q.  Mr. Parson, Plaintiffs' Exhibit 421, please.

23          This is already in evidence, so I will just ask you,

24   when Mr. Nordlicht is referring to *shtupping* in people he

25   didn't want from you, who are you referring to there?

Mcc2Pla5                    Bodner - Cross

A.  He was referring to somebody who my son trained with.  His

name is Bobby Orbach, and in his eyes these were the *rachmones*

cases, pity cases that I pushed in, that he should plea hire.

These people needed jobs, and I asked Mr. Nordlicht if he could

put him somewhere in the organization and assist him, to help

him to do something.  And that's Bobby, Itchy's partner.  Itchy

is my son.  Rafi has --

Q.  Sir, Itchy's partner, you are saying they didn't hire

Itchy, they hired your son's partner?

A.  My son's partner was a gentleman who was about -- today

about 70 years old.  He was training my son.  Again, I spoke

about my son having a condition, an OCD condition.  Bobby

Orbach was helping him out with this condition.

        Bobby Orbach was unemployed, and he wanted to have a

position somewhere.  So I asked Mark as a favor if it's

possible to hire him, maybe he can be useful somewhere in the

organization.  That's what it means, "*shtupping* in people I

don't want."  Mark Nordlicht had no need for him, but he felt

that I was pushing him on him because I asked him a favor.

Q.  And Rafi?

A.  Rafi has nothing to do with me.  Rafi is Murray Huberfeld's

nephew.

Q.  And Ari Hirt?

A.  Ari Hirt is like a stepson -- son to Bernard Fuchs.

Q.  Um-hmm.

Mcc2Pla5                          Bodner - Cross

1                   Well, you also had --

2                   THE COURT:  So just so I'm clear, although this is in

3       evidence, Mr. Bodner, this was an e-mail from Mr. Nordlicht,

4       not to you, but to Gilad Kalter who was?

5                   THE WITNESS:  Mr. Nordlicht's brother-in-law.

6                   THE COURT:  Okay.  Did you see this at the time?

7                   THE WITNESS:  No.

8                   THE COURT:  So you didn't have a chance to respond to

9       it, correct?

10                  THE WITNESS:  No, I did not.

11                  THE COURT:  And so he is saying, I can't hire a guy

12      sight unseen, meaning that the hiring decision is his, yes?

13                  THE WITNESS:  Yes.

14                  THE COURT:  And then he says "this is the consequence

15      of David Bodner and others *shtupping* in people I don't want."

16      Do you see that?

17                  THE WITNESS:  Yes.

18                  THE COURT:  *Shtupping* means pushing.

19                  THE WITNESS:  It means pushing.  I worked on his

20      feelings, that this guy is a *rachmones*, he is a pity, he --

21                  THE COURT:  So meaning recommending perhaps strongly,

22      yes?

23                  THE WITNESS:  Recommending that if he could do me a

24      favor and please hire this person.

25                  THE COURT:  All right.  Thank you.

1           Go ahead, counsel.

2           MR. GLUCK:  Mr. Parson, you can bring that down but

3     please bring up PX 555.

4     Q.  Do you recall I asked you about Mr. Danny Saks?

5     A.  Yes.

6     Q.  What was his role at Platinum?

7     A.  His role at Platinum was -- I think Mark Nordlicht was

8     trying to train him in to take over part or all of Mark

9     Nordlicht's position as the managing partner, one who managed

10    Platinum PPVA.  I think that's what his -- he was supposed to

11    be.  I'm not sure.  I think he did work for Platinum for a few

12    months, and then I think it didn't work out.

13    Q.  So senior at Platinum?

14    A.  I think he was a senior person, yes.

15    Q.  And now he is asking you to meet with him so Danny Saks can

16    join Beechwood instead.  Right?

17    A.  I'm not understanding.  Danny Saks sent an e-mail to Bodner

18    and Huberfeld.  That was a joint e-mail for myself and

19    Mr. Huberfeld.

20    Q.  She set up yet another -- the e-mail address is

21    BodnerAng@gmail.com?

22    A.  Ange Huberfeld.  I don't know.  Is it one e-mail, two

23    e-mails?  I don't know what this is.

24    Q.  The e-mail address is BodnerAng@gmail.com.

25          People sometimes save e-mail addresses in their phone

Mcc2Pla5                          Bodner - Cross

1    in different ways, don't they?

2    A.  It could be, yes.

3    Q.  And you are David, right?

4    A.  I am David, yes.

5    Q.  And that's your phone number, right?

6    A.  Which is my telephone number?

7    Q.  Is that your telephone number, 212?

8    A.  That was the number in the office.

9    Q.  And David Bodner's e-mail responds at the top, right?

10   A.  It looks like Angie was sending me an e-mail.

11   Q.  Regarding meeting Danny Saks for Beechwood, right?

12   A.  It could be.

13   Q.  You know that Ari Hirt was the -- one of the portfolio

14   managers on Golden Gate Oil, right?

15   A.  No, at the time I did not know that.

16   Q.  All right.  Let's call up PX 987 under the special

17   exception.  Oh.  Sorry.  Move this into evidence.  This is

18   PX 555.

19              MR. LAUER:  We object.  No connection to this witness.

20              THE COURT:  Yes.  Well, on this one I'm going to need

21   to hear some more from counsel, but fortunately we are ready to

22   take -- or to give the jury their mid-afternoon break, so we

23   will give you a 15-minute break at this time while I take this

24   matter up with counsel.

25              (Continued on next page)

1          (Jury not present)

2          THE COURT:  Please be seated.

3          So this is unlike any other e-mail I think we have

4     seen in this case, and I'm not quite sure what to make of it.

5     It starts at the bottom, again, the chronology starts at the

6     bottom, on November 21, 2014, at 1:23 p.m., Danny Saks to

7     "BodnerAngHuberfeld," an e-mail address following that that's

8     been associated previously with Mr. Bodner, but I'm not quite

9     sure what to make of BodnerAngHuberfeld.

10          That e-mail says, "I spoke to David about meeting some

11     potential people for Beechwood.  How is his schedule on

12     Tuesday?"  and then there is a response from BodnerAngHuberfeld

13     to it says David Bodner's e-mail, again, without any e-mail

14     address, at 7:07 p.m., on November 21, and it says, "Not sure

15     what your planning."  I note for the record that "you're" is

16     spelled here "your" where it should be "you're," but I will

17     overlook that.

18          But continuing, it says, "But I told him so far you

19     are available and if can send me the time.  Kind regards,

20     Platinum Partners."

21          So one way, I suppose, of looking at this is there was

22     an e-mail from Mr. Saks to Mr. Bodner's secretary or assistant,

23     but I'm just guessing at that, and I'm not sure how the jury

24     can make head or tails of this.  But let me hear from counsel

25     if he wants to say anything further about this.

1       MR. GLUCK:  Sure.  I think this is explainable in a

2    very simple way.  Danny Saks saved as a shorthand name on his

3    BlackBerry or iPhone BodnerAngHuberfeld as a reference for

4    BodnerAng@gmail.com.  That's something people do.  There is a

5    lot of shorthand.  You see how it says --

6        THE COURT:  So what does the "Ang" in that mean?

7        MR. GLUCK:  That's just how he saved it in his phone.

8    E-mails typically have the saved name in the beginning,

9    followed by the actual name at the end.  For example, at the

10   top it says David Bodner's e-mail.  I will submit to you that

11   that's RODB, his other e-mail address, and this foundation was

12   actually laid by Ms. Albanese.

13       THE COURT:  So why is -- if it's Mr. Bodner who is

14   BodnerAngHuberfeld, then he wouldn't be sending an e-mail to

15   himself.

16       MR. GLUCK:  No.  That would be Ms. Albanese sending on

17   his behalf, which she testified about.

18       THE COURT:  Okay.  So your interpretation is, which I

19   think is plausible, that Mr. Saks sends an e-mail to

20   Mr. Bodner's secretary, and she then sends an e-mail to

21   Mr. Bodner, and the e-mail from her begins with:  Not sure what

22   you are planning.

23       So what's the relevance?

24       MR. GLUCK:  That Mr. Bodner is going to be e-mailing

25   Danny Saks -- interviewing Danny Saks for a Beechwood position.

Mcc2Pla5                          Bodner - Cross

1            THE COURT:  No, no.  So you are saying that Saks

2    e-mail is, "I spoke to David about meeting some potential

3    people for Beechwood."  That would be inadmissible hearsay

4    unless it is in furtherance of the alleged conspiracy, and it's

5    hard to see how it is in furtherance of the conspiracy.  And

6    then the response, not from Mr. Bodner, but from his secretary,

7    is "not sure what you are planning."

8            So it is very hard for me to see how, even assuming,

9    which is not self-evident but I think may be plausible, that

10   this is an interchange between Mr. Saks and Mr. Bodner's

11   secretary, I'm not sure why his statement is in furtherance of

12   the conspiracy and I'm not sure why her statement shows, even

13   if it wasn't in furtherance of the conspiracy, why there is any

14   confirmation about what Mr. Bodner allegedly knew or heard or

15   saw or whatever.  It is not that it's impossible, but I think

16   it requires a great deal of speculation on the part of the

17   jury, given their total unfamiliarity.  What you just told me,

18   by the way, which makes perfect sense, that some people

19   sometimes shorthand how they record an e-mail address is not

20   before the jury.  They have never heard that before.

21           MR. GLUCK:  The e-mail address point, I believe that

22   Ms. Albanese testified exactly that that's what --

23           THE COURT:  She testified to BodnerAngHuberfeld?

24           MR. GLUCK:  Yes.

25           THE COURT:  I'm sorry.  I forgot that.

1          MR. GLUCK:  That is the foundation.

2          THE COURT:  What did she say about it?

3          MR. GLUCK:  She said that she established this e-mail

4   address *inter alia* to keep Mr. Bodner's e-mail off the Platinum

5   server.

6          MR. LAUER:  There is nothing about keeping things off

7   the server.

8          MR. GLUCK:  Ms. Shen, who is nodding her head, is the

9   one who took the examination, and I also have the recollection.

10  I'm sure we can look it up in the transcript.

11         THE COURT:  I had forgotten that.  Given that, I will

12  receive this.

13         Yes.  I'm sorry, Mr. Lauer.  Did you want to say

14  something?

15         MR. LAUER:  Not on that.

16         THE COURT:  Okay.

17         MR. LAUER:  Before the jury comes in.

18         THE COURT:  Go ahead.  Something else?

19         MR. LAUER:  Does your Honor have a view as to how long

20  you will permit closing arguments?

21         THE COURT:  Yes, I do have a view, but let me start

22  out by asking—and my practice is plaintiff first, defense

23  second—so how long does plaintiff want?

24         MR. GLUCK:  I am signaling to my co-counsel, and we

25  think we can get this done in about two hours.

1   THE COURT:  Okay.  And how about defense counsel?

2   MR. LAUER:  I think if he is going to take two hours,

3   I will need two hours.

4   THE COURT:  Okay.  So coincidentally that's the

5   maximum I would allow.

6   MR. LAUER:  I'm glad I asked.

7   THE COURT:  It's a total meeting of the minds.  That

8   will never happen again.

9   So what that means is that the entirety -- assuming it

10  is Thursday morning, the entirety of Thursday morning will be

11  the summations, and then I will give my instructions very early

12  on Thursday afternoon, right after lunch, and then the jury

13  will have the -- will start their deliberations.  Okay.  Let's

14  take five more minutes.

15  THE WITNESS:  Excuse me.  Was I asked a question on

16  this e-mail?

17  THE COURT:  I don't know whether you were or not, but

18  is there something you wanted to say about this e-mail?

19  THE WITNESS:  Definitely.

20  THE COURT:  So when we come back, when the jury can

21  hear what you have to say, if no one else puts the question to

22  you, I will put a question, a very deep and profound question

23  like:  Is there something you wanted to say about this e-mail?

24  THE WITNESS:  Thank you.

25  (Recess)

Mcc2Pla5                    Bodner - Cross

1            THE DEPUTY CLERK:  All rise.

2            May I get the jury?

3            THE COURT:  Please.

4            (Jury present)

5            THE DEPUTY CLERK:  Jury entering the courtroom.

6            THE COURT:  Please be seated.

7            Ladies and gentlemen, after hearing from counsel, I do

8     receive Exhibit 555, so that can now be shown to the jury.

9            (Plaintiff's Exhibit 555 received in evidence)

10           THE COURT:  Mr. Bodner, was there something you wanted

11    to say about this exhibit.

12           THE WITNESS:  Yes.  I think when there was a

13    fallout -- not fallout, when Danny Saks and Mark Nordlicht

14    didn't make an agreement that Danny should stay at Platinum

15    after a few months, I spoke to Danny Saks that maybe I would

16    speak to Mark for you, who was the boss of Beechwood, that

17    maybe I could speak to him about maybe he would want a job

18    there, and could be that's why Danny Saks is writing to me that

19    if I have time to meet with him to discuss calling Mark Feuer

20    to interview him for a job.

21           THE COURT:  All right.

22           Counsel.

23           MR. GLUCK:  Thank you.

24    BY MR. GLUCK:

25    Q.  Mr. Landesman was brought in to help generate institutional

Mcc2Pla5                      Bodner - Cross

1    investors for Platinum, right?

2    A.   That and other jobs.

3    Q.   And did he have discretion in terms of how he went about

4    his job?

5    A.   I can't tell you.  I don't know.

6    Q.   Well, would he take any instructions from you?

7    A.   From me, definitely not.

8    Q.   Definitely not?

9    A.   Definitely.

10   Q.   Well --

11   A.   He might take advice from me if he asked me something, but

12   instructions, I was not his boss.

13   Q.   Mr. Parson, could you please pull up PX 436, which will be

14   one of those special exception e-mails.

15            (Pause)

16            THE COURT:  Go ahead, counsel.

17            MR. GLUCK:  We would seek to move it in evidence.

18            MR. LAUER:  We would object.  We don't think the

19   exception applies to these people.

20            MR. GLUCK:  Concerns the very undisclosed control at

21   issue.

22            MR. LAUER:  We object to that.

23            THE COURT:  That's not the issue.  The issue is

24   hearsay.  And the defense counsel is saying that it doesn't

25   fall within the exception to hearsay that you are asserting,

Mcc2Pla5                    Bodner – Cross

1    and I think that's correct.  So at the end of the day if you

2    want to make further argument about it, we can discuss it then,

3    but for now it is not received.

4    BY MR. GLUCK:

5    Q.  So you never had the ability to instruct Mr. Landesman to

6    make investments?

7    A.  To make what?

8    Q.  To make investor calls.

9    A.  I never had the ability to instruct him.

10           MR. GLUCK:  So, your Honor, my response to the hearsay

11   exception is the special exception which we are calling the

12   special exception, and therefore this is directly in

13   furtherance of the secret of control that's directly the

14   subject of the special item.

15           THE COURT:  All right.  I will tell you what.  I hate

16   to do it, but let's have a sidebar and get this done.

17           (Continued on next page)

18

19

20

21

22

23

24

25

Mcc2Pla5                          Bodner - Cross

1           (At the sidebar)

2           THE COURT:  So the initial message is from Gilad

3     Kalter who has not been, I think, identified as a coconspirator

4     at any time, to Mr. Landesman saying are you -- I'm sorry.

5     Forgive me.  There is an earlier message.  The first message at

6     the very bottom, on October 29, 2014, at 1:55, it is from

7     Mr. Landesman and he writes, "For educational purposes, I have

8     made all of the pre-new class calls I'm likely to make, unless

9     the powers that be decide otherwise."  Okay.

10           Then the response is from -- is Gilad Kalter a Mr. or

11    Ms.?

12           MR. HERTZBERG:  Mr.

13           THE COURT:  From Gilad Kalter saying, "Are you making

14    more calls?"  And Mr. Landesman responds, as I just indicated,

15    "No, unless Duvid asked me to, which I don't think he is going

16    to do.  As far as I know, which is not very far, we are going

17    forward with a new PPVA class and will broadly disclose it on

18    next week's conference call.  We can discuss that in pre-call

19    meeting."

20           So I don't see how this is in furtherance of the

21    conspiracy.  Because Mr. Landesman is saying that he is not

22    going to make any more calls unless Duvid asked me to, which I

23    don't think he is going to do.  So what's being advanced?  I

24    don't see how the conspiracy is being advanced.  It sounds like

25    it's an e-mail about why Mr. Landesman is not going to do

1    anything more in the way of making calls.

2           MR. GLUCK:  So the response --

3           THE COURT:  Please.

4           MR. GLUCK:  The response would be the making of calls

5    themselves is in furtherance of the conspiracy, it's 2014,

6    post-Black Elk.  He is making calls about the Black Elk and

7    state of mind.  Mr. Landesman believes that his job is done.

8    So unless Mr. Bodner, who is literally the subject of the

9    secret conspiracy, tells him to, he is done.  Now it's his

10   state of mind that if Bodner was to tell him to, he would have

11   to continue.  That's what we are saying.

12          THE COURT:  Well, I think -- well, let me hear from --

13   so the claim is Mr. Landesman, who is an alleged member of the

14   conspiracy, shows by the language he uses that he believes that

15   Bodner has the power to ask him to make more of these investor

16   calls.

17          MR. LAUER:  I think there is a very dangerous

18   conflation between asking someone to do something and having

19   power to instruct.  So there is an ambiguity right there.

20          Second of all, with all respect for the law of

21   conspiracy, not everything that innocent people like Gilad

22   Kalter are engaged in is in furtherance of a conspiracy.  The

23   conspiracy, as I understood it, was to conceal fraudulent

24   overinflation of valuations.  The conspiracy is not all the

25   innocent people trying to run a business.  And I think with

Mcc2Pla5                    Bodner - Cross

1    respect to this particular document, it really falls short

2    and --

3              THE COURT:  So what you are saying is that while

4    arguably if this were otherwise admissible for its truth, it

5    might be impeachment of Mr. Bodner because it shows that

6    Mr. Landesman believed that Mr. Bodner had this power.  It's

7    not -- nothing about this is in furtherance of the conspiracy

8    to overvalue the assets, etc., and so the probative value of

9    this at best is extremely modest compared to the potential for

10   misinterpretation.  I think that's right, so I will exclude it.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MR. GLUCK:

3    Q.  Mr. Bodner, did Mr. Landesman refer to you and

4    Mr. Huberfeld as the powers that be?

5    A.  No.

6    Q.  Did anyone at Beechwood refer to you and Mr. Huberfeld as

7    the powers that be?

8    A.  Absolutely not.

9    Q.  Um-hmm.

10          Mr. Nordlicht discussed with you and you with

11   Mr. Nordlicht buying back the excess Black Elk debts with the

12   excess proceeds of the Renaissance sale in selling it?

13          MR. LAUER:  Objection.  Testifying.

14          THE COURT:  Well, a little bit, but I think you could

15   rephrase it and ask a proper question along those lines.

16   BY MR. GLUCK:

17   Q.  Mr. Nordlicht discussed the details of the bond buyback

18   plan with you and you with him, correct?

19   A.  Never happened.

20   Q.  And he specifically discussed with you and you with him

21   using the excess to buy back the Black Elk bonds.

22          MR. LAUER:  Objection.

23          THE COURT:  Overruled.

24   A.  Never happened.

25   Q.  On November 24 or thereabouts you had a conversation with

1   Mr. Scott Taylor of Beechwood regarding the Black Elk bond

2   buyback after the consent solicitation, and he had an idea that

3   would get what you want and what he wanted at the same time.

4              MR. LAUER:  Objection.  This is more testifying.

5              THE COURT:  Well, he has a right to confront the

6   witness with some specific allegations, but what I think it

7   needs to be broken into two phases.  So the first question

8   should be, "On November 24 or thereabouts, did you have a

9   conversation with Mr. Scott Taylor of Beechwood regarding the

10  Black Elk bond buyback?"

11             THE WITNESS:  I do not remember having any discussion

12  whatsoever with Scott Taylor about Black Elk bonds.

13             THE COURT:  And then you can, just so we know where we

14  are going, at that point if you want to confront him with the

15  specific allegation, then you can.

16  BY MR. GLUCK:

17  Q.  Would you like your memory refreshed or would you like to

18  see the specific statement?

19  A.  100 percent.

20  Q.  Okay.  Well, let's -- four exhibits here, let's start with

21  PX 484.

22  A.  Is there anything --

23             THE COURT:  Let me caution the witness, don't refer to

24  anything in this exhibit, which is not in evidence.  The only

25  question before you is, having looked at this, does that

Mcc2Pla5                          Bodner - Cross

1   refresh your recollection as to anything about a discussion

2   that you had, if you did, with Mr. Nordlicht regarding a

3   buyback of some Black Elk debt?  So, in other words, if your

4   memory is still the same that you did not have that

5   conversation.

6           THE WITNESS:  I don't remember having any

7   conversation.

8           THE COURT:  All right.

9           THE WITNESS:  And Dovid could be Dovid Steinberg.

10          THE COURT:  So that's the answer.  Yeah, that's the

11  answer.

12          THE WITNESS:  I don't remember having any conversation

13  with Mark Nordlicht about Black Elk bond.

14          THE COURT:  The court reporter cannot pick up two

15  people.

16          THE WITNESS:  I do not remember having any discussion

17  with Mark Nordlicht about Black Elk bonds.  Dovid --

18          THE COURT:  Okay.  You have answered the question.

19          THE WITNESS:  Yes.

20  BY MR. GLUCK:

21  Q.  Now we will do the same thing with Exhibit 396, and I will

22  ask you if this exhibit refreshes your recollection that

23  Mr. Scott Taylor presented an idea that would get what you want

24  and what he wanted simultaneously regarding the buyback.

25          THE COURT:  Is that in evidence?

1           MR. GLUCK:  It is not.  But this was --

2           THE COURT:  So I want to caution the jury, nothing

3   that any counsel says in a question is ever in evidence.  So if

4   counsel says, "Take a look at this document in which it says

5   that you murdered your mother in cold blood," it doesn't mean

6   that the document says that he murdered his mother in cold

7   blood.  In fact, it is not evidence in any way, shape, or form

8   because it is not in evidence.  So just so do not assume that

9   when counsel says to a witness does this document here refresh

10  your recollection that X, Y, Z, that X, Y, Z is what the

11  document says or let alone that it's true.  It may be true.  It

12  may be what the document says.  It may not be true.  It may not

13  be what the document says.  But you won't know because it is

14  not in evidence, and you can only deal with what's in evidence.

15          Is this on the screen to the jury?

16          MR. GLUCK:  Because this was is in evidence.

17          THE COURT:  I thought you just said --

18          MR. GLUCK:  A great instruction for the next exhibit.

19  This particular exhibit, which was called up 396, is in

20  evidence.

21          THE COURT:  All right.

22          MR. GLUCK:  The next one shows --

23          THE COURT:  Silly me relying on counsel.

24          Okay.  Was there some question you wanted to put to

25  this witness about this document?

Mcc2Pla5                    Bodner - Cross

BY MR. GLUCK:

Q.  Mr. Bodner, you knew that PPVA was going to buyback the
Black Elk bonds.

A.  No, I did not.

Q.  You knew that those bonds were rendered impaired after the
Renaissance sale.

A.  No, I did not.

Q.  Scott Taylor came up with an idea that would get both what
you wanted and what he wanted at the same time, didn't he?

A.  I do not know what was in Scott Taylor's mind when he wrote
this e-mail, and I do not have any recollection whatsoever of a
Renaissance sale or Black Elk bonds.  I was not involved in any
of that and I do not know what this is talking about.

Q.  You communicated your wants concerning the Black Elk bond
buyback to Mr. Taylor, didn't you?

        MR. LAUER:  Objection.

        THE COURT:  Sustained.

BY MR. GLUCK:

Q.  The next one, PX 486, I will ask you if this refreshes your
recollection as to whether there are those at Beechwood who
also called you and Mr. Huberfeld the powers that be.

A.  Where am I the powers --

        THE COURT:  You are not.

        The only question is, having looked at this, does that
refresh your recollection regarding anything you were just

Mcc2Pla5                          Bodner - Cross

1    asked about?  Yes or no.

2                THE WITNESS:  No, absolutely not.

3                THE COURT:  Okay.  That's the answer.

4    BY MR. GLUCK:

5    Q.  Mr. Bodner, you participated in the formation and the

6    capitalization of Beechwood, correct?

7    A.  Yes, I did.

8    Q.  Did you capitalize Beechwood with Platinum Limited

9    Partnership interests?

10   A.  Part of the capital that went into Beechwood was White

11   Star, which was a partnership between my wife and Murray

12   Huberfeld's wife of $20 million was put up as collateral.  That

13   was part of the collateral that was put up.

14               Besides that, my children owned shares in a public

15   company that had a value of about, if I'm not mistaken, around

16   $10, 12 million, and that was also put up as collateral.

17   Q.  So the capitalization put up by yourself and Mr. Huberfeld

18   were the Platinum Limited Partnership you were awarded and your

19   children's interest named Crius?

20   A.  Crius is my children's interest in -- that was the public

21   company; mine and Mr. Huberfeld's shares, which I think had a

22   market value of between 20 and $25 million if I'm not mistaken.

23   Q.  So the capitalization consisted of your and Mr. Huberfeld's

24   Platinum LP interest awarded as incentive fees and the Crius

25   interests, right?

1   A.  No, Platinum that we put up was not incentive fees.  It was

2   our investment when we started Platinum, White Star invested.

3   That was part of the seed money that we put up, and that was

4   put up.  It was not incentive fees that was given to us.

5   Q.  You are suggesting that the White Star interests were

6   something other than Platinum Partners Value Arbitrage Fund LP

7   interests?

8   A.  You just said incentive fees if I'm not mistaken.  Maybe I

9   heard wrong.  I'm sorry.

10  Q.  You were paid incentive fees in the form of PPVA LP

11  interest over the years in addition to cash, correct?

12  A.  I'm sorry.  I'm not following what you are saying.

13  Q.  You were paid incentive fees in the form of LP interests,

14  right?

15  A.  I was paid incentive fees as being an owner of Platinum

16  Management.

17  Q.  And some of those incentive fees came in cash and some of

18  them came in the form of LP interests in PPVA, right?

19  A.  I don't think so.  I think at the end when there is no cash

20  to pay it, when Mark stopped the withdrawals in 2014, that's --

21  I could just tell you what I remember, that's when I think it

22  became not cash, it became, you know, accrued interest, then it

23  became an LP in the fund.  But before that it was something

24  that we were able to take out every year.

25  Q.  That's the best of your recollection?

Mcc2Pla5                         Bodner - Cross

1    A.  That's the best of my recollection, yes.

2    Q.  Mr. Propper was also a founding member of Beechwood,

3    correct?

4    A.  I don't know.

5    Q.  Do you recall meeting with Mr. Propper, Mr. Huberfeld, and

6    Mr. Levy regarding the formation of Beechwood?

7    A.  No, I recall meeting Mr. Propper, as I testified, about

8    becoming, the takeover management of Platinum from Mark

9    Nordlicht.

10   Q.  In 2013?

11   A.  I don't remember the date, but that's what I meant.

12   Q.  Let's call up PX 444.  And this is definitely under that

13   special exception.

14           MR. LAUER:  Is this in evidence?

15           MR. GLUCK:  Not yet.

16           THE WITNESS:  I did not go to this meeting.

17           (Continued on next page)

18

19

20

21

22

23

24

25

MCCCpla6                    Bodner - Cross

1   BY MR. GLUCK:

2   Q.  I'm not sure if that's relevant.

3            MR. GLUCK:  We move this into evidence.

4            THE COURT:  Yes, I was waiting for you --

5            MR. GLUCK:  We move this into evidence.

6            MR. LAUER:  We object.  401.  It's also 801.

7            THE COURT:  Overruled.  Received.

8            (Plaintiff's Exhibit 444 received in evidence)

9   Q.  Did you attend a meeting with Mr. Kerry Propper and

10  Mr. Huberfeld regarding what became Beechwood in August of --

11           MR. LAUER:  Objection to the testifying.

12           THE COURT:  So, Mr. Nordlicht, at 8:48 a.m. on

13  October 8th, 2013, writes to Mr. Levy, can you schedule meeting

14  between Kerry and his guy and M and D.

15           Did you have an understanding of what he meant by

16  M and D?

17           THE WITNESS:  Is that the question to me?

18           THE COURT:  Yes.

19           THE WITNESS:  Yes.

20           THE COURT:  What?

21           THE WITNESS:  That would be Murray and David.

22           THE COURT:  In other words, Murray and you?

23           THE WITNESS:  Yes.

24           THE COURT:  To hear this deal.  $200 million line.  I

25  don't want anyone to have taynas.  What does that mean?

MCCCpla6                        Bodner - Cross

1           THE WITNESS:  It's a Jewish word that nobody should

2      have come back later and say -- Eliot, how you say?

3           MR. LAUER:  Complaints.

4           THE WITNESS:  Nobody should have complaints about it.

5           THE COURT:  Got it.

6           THE WITNESS:  I never attended this meeting.  It looks

7      like I was invited to it.  As I testified earlier, the only

8      thing I knew about Beechwood was what Murray Huberfeld told me

9      about the business.  I had no idea about Kerry Propper.  I have

10     no idea if he was a partner or what this meeting was about.

11     Murray Huberfeld sold me on Beechwood, it was a reinsurer, and

12     anything the reinsurer makes above 5 percent is our profit and

13     it's a great business, and Mark Feuer and Scott Taylor are

14     running it, and they have sterling reputations.  That was my --

15          THE COURT:  Okay.  That's fine.

16          Go ahead.  Put another question, counsel.

17     BY MR. GLUCK:

18     Q.  Yes or no, was Mr. Proper granted an interest in Beechwood?

19     A.  I don't know.

20     Q.  You don't know?

21     A.  No, I don't.

22     Q.  You stated that Mr. Feuer was the boss of Beechwood; is

23     that fair?

24     A.  Yes, and Mr. Scott Taylor, that was my knowledge.

25     Q.  You would routinely meet with Mr. Feuer?

MCCCpla6                      Bodner - Cross

1    A.  No, I met with Mr. Feuer very unoften.  I went to Beechwood

2    very unoften.

3            MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 418,

4    please.

5            Move this into evidence.

6            MR. LAUER:  Can we see what it is.

7            MR. GLUCK:  It is a calendar invite.

8            MR. LAUER:  Is this the entire document?

9            MR. GLUCK:  This is what all calendar invites look

10   like.

11           MR. LAUER:  We object.  No idea what it is.

12           MR. GLUCK:  May I lay some foundation?

13           THE COURT:  Yes.

14   BY MR. GLUCK:

15   Q.  You agreed to meet Mr. Feuer on a weekly basis, which

16   meetings commenced with this calendar invite, which was

17   accepted; right?

18   A.  Totally false.  I never went to Beechwood on a weekly

19   basis.  I never went to Beechwood on a monthly basis.  I was

20   very, very unoften at Beechwood headquarters.  I did not meet

21   with Mr. Feuer often.  Once in a while, I met him.  He once in

22   a while came up to Platinum, but I never had weekly meetings

23   with Mr. Feuer.  I don't know.  Maybe this is --

24           THE COURT:  You've answered the question.

25   Q.  I'd like to be very clear in your testimony.  You never had

MCCCpla6                        Bodner - Cross

1    meetings with Mr. Feuer?

2    A.  I did not say that.

3           MR. LAUER:  Objection.

4    Q.  How many meetings with Mr. Feuer did you have?

5    A.  Very few.  Definitely not weekly and not monthly.

6    Q.  You never met with Mr. Kerry Propper about Beechwood?

7    A.  No, I never met Kerry Propper about Platinum, as I

8    testified.

9           MR. GLUCK:  Take that in reverse order.  Could you

10   bring up 259, please.

11          Let's bring up PX 384.  This is in evidence.

12   Q.  Now, your testimony is that at this time, Mr. Taylor was

13   explaining what reinsurance was to you as opposed to taking you

14   through the limits of what can be invested in Platinum debt in

15   his office?

16          MR. LAUER:  Objection to the form.

17   Q.  Do you recall --

18          THE COURT:  Rephrase.

19   Q.  Do you recall testifying earlier that your understanding of

20   this meeting was that Mr. Taylor was explaining what

21   reinsurance was to you?

22          MR. LAUER:  Objection.

23   A.  No, I did not testify to that.  I testified that my son was

24   out there doing deals and he was looking for investors, and he

25   asked me to find out what the limits are on Beechwood, what

MCCCpla6                      Bodner - Cross

1   Beechwood could invest in.  So Scott Taylor took me through

2   CNO's limits, what they're allowed to invest in and what

3   they're not allowed to invest in.  As I testified earlier,

4   Murray Huberfeld is the one who explained me what a reinsurer

5   is and how we make money, not Scott Taylor.  Scott Taylor took

6   me through the limits of what you're allowed to invest in and

7   what you're not.

8   Q.  Before we come off this, you knew that Beechwood was going

9   to be acquiring bad paper from Platinum, didn't you?

10  A.  No, I did not know that.

11          MR. GLUCK:  PX 1235, please.

12          Seek to admit this into evidence.

13          MR. LAUER:  We object.  There's a top and there's a

14  bottom.

15          MR. GLUCK:  It's on both.

16          THE COURT:  Sustained.

17          MR. GLUCK:  Take it down, please.

18  Q.  You knew that the PPVA operating assets were incapable of

19  making their own interest payments to Beechwood, and therefore

20  PPVA had to pay them; right?

21          MR. LAUER:  Form.

22          THE COURT:  Overruled.

23  A.  Excuse me, what's the question?

24  Q.  You knew that the PPVA operating companies were not capable

25  of making their own interest payments to Beechwood, so PPVA had

MCCCpla6                      Bodner - Cross

1   to pay them instead; right?

2   A.  I don't recall.  I don't recall knowing that, no.

3   Q.  You don't recall?

4   A.  I don't -- I wasn't involved to know who paid the interest

5   payments.

6   Q.  You and Murray Huberfeld used to speak all the time; right?

7   A.  Murray Huberfeld and me spoke all the time, but he didn't

8   speak about the payments.  He didn't even speak to me about

9   COBA or his notes with Jonah Rechnitz.  He didn't speak to me

10  about a lot of things.  We were friends.  We spoke about a lot

11  of things besides business and anything that he felt was

12  important in business, in our private deals, we spoke together.

13  When he moved to Beechwood, we rarely spoke about Beechwood's

14  business.

15          MR. GLUCK:  Mr. Parson, please call PX 459.

16          We seek to move into evidence.

17          MR. LAUER:  Objection.

18          MR. GLUCK:  It's in already.

19          MR. LAUER:  Could be in.  It is in.

20          THE COURT:  All right.  So go ahead.

21  Q.  This is an email of Mr. Huberfeld forwarding you the very

22  interest payments we were just talking about, isn't it?

23  A.  To me, this looks like interest payments that were paid

24  from these companies to Beechwood.  And if it was forwarded to

25  me, I'm not sure.  Could be many reasons why they send it to

MCCCpla6                         Bodner - Cross

1    Angie.

2    Q.  Why you would send this to Angela?

3    A.  Yes, Angela was his secretary.  I have no idea -- it

4    doesn't say that he told Angie to print it out and read it to

5    me or give it to me.  I don't know.  I can't answer for

6    Mr. Huberfeld why he sent it.

7    Q.  You knew that PPVA was making these payments to Beechwood;

8    right?

9    A.  I testified that I did not know that PPVA was making

10   payments to Beechwood.

11   Q.  And you knew that these entities, Golden Gate Oil, others,

12   they couldn't make their own interest payments; right?

13              MR. LAUER:  Objection.

14   A.  No.

15              THE COURT:  Sustained.

16   Q.  Did you have a phone number at Beechwood?

17   A.  No.

18   Q.  Because you went there so rarely?

19   A.  I never had a phone number at my office at Beechwood.  I

20   have nothing at Beechwood.

21              MR. GLUCK:  PX 501, please, Mr. Parson.

22              We seek to move it into evidence.

23              MR. LAUER:  We have no objection.

24              THE COURT:  Received.

25              (Plaintiff's Exhibit 501 received in evidence)

1   Q.  You did have a telephone number at Beechwood, didn't you?

2   A.  Not that I know of.  I don't know if David B. direct is me

3   and this is the first time I'm seeing this phone number.  I did

4   have a phone number at Platinum.

5   Q.  And there was a direction that unless it was a trusted

6   caller, calls for you and Mr. Huberfeld would need to be

7   transferred to Alexis Northwood?

8   A.  Alexis Northwood was Murray's secretary at Beechwood.  I

9   don't remember anything about me having a number there, I

10  didn't have an office at Beechwood.  I very, very rarely went

11  up to Beechwood.  You could count on your hand how many times I

12  went to Beechwood.  My office was at Platinum.  I had a

13  secretary called Angela Albanese.  She took my calls.  I have

14  no idea what this is about, if the David B. is me.  I know

15  Alexis Northwood was Murray's secretary.

16  Q.  And Ms. Albanese forwarded this to you to your personal

17  email so that you would know that this directive had been

18  implemented?

19  A.  I don't know anything about this directive.

20  Q.  You got the email; right?

21  A.  It looks like she sent me this email, but I have no idea

22  what this is about.  Why would somebody call me at Beechwood if

23  I was sitting at Platinum?

24  Q.  Because you didn't want anybody to know that you were

25  working at Beechwood.

MCCCpla6                              Bodner - Cross

1            MR. LAUER:  Objection.

2            THE COURT:  Sustained.  That was not a question.

3            MR. GLUCK:  One more and then I think we'll try a

4    chart, I'll ask for a sidebar.

5            PX 380, please, which is already in evidence.

6    Q.  Ms. Albanese, did she have an office at Beechwood?

7    A.  No.

8    Q.  She only had an office in Platinum?

9    A.  Yes.

10   Q.  She testified that she sent this email to you in order to

11   scare you; right?

12           MR. GLUCK:  Excuse me.  Withdrawn.

13   Q.  Are you aware that she sent you this email in order to

14   scare you?

15   A.  I'll tell you the truth, I saw this email the first time

16   when my lawyers showed it to me and they asked me what this is

17   about.  I couldn't figure it out, but then I remember that

18   Angie was threatening because we didn't give her enough of a

19   severance pay.  So she threatened that she's going to do

20   something.  And, for some reason, this email, I couldn't figure

21   out what this is all about.  David Bodner, to David Bodner,

22   from -- I didn't understand the whole email until I told them I

23   think this is what Angie sent when she wanted a bigger raise

24   and a salary.  What it's about, I have no clue what she wanted

25   here.

MCCCpla6                    Bodner - Cross

1   Q.  This was part of her attempt to get a better severance;

2   right?

3   A.  This was part of her attempt.  She spoke to me, that the

4   severance is not enough.  I don't know why she sent this email

5   to Harvey Wreblowsky, it says.  I think I tried to send it to

6   Harvey Wreblowsky at the end.  I'm not sure.  I'm just not sure

7   about this.  I definitely did not write this email and I had

8   nothing to do with this email.

9   Q.  She wrote this email; right?

10  A.  She wrote the email without any permission from me.  I did

11  not ask her to write this email.  And I can't answer for Angie

12  Albanese what her intentions were exactly.

13  Q.  But DavidBodner18@gmail.com, that's one of her email

14  addresses?

15  A.  Yes.

16          She got into it and used it without my permission.  I

17  did not write this email and I have no idea what was running

18  through her mind when she wrote the email.  And I don't know

19  what the email's about.  I don't know who Ed Bonach is.  I

20  don't know who she's sending this to.  It says from me to me.

21  I'm not sure what she wanted here.

22  Q.  You saw it, though; right?

23  A.  I saw it when the case started, my lawyers showed it to me.

24  Q.  And you might have tried to forward this to Harvey

25  Wreblowsky and messed it up and then you typed in

MCCCpla6                    Bodner - Cross

1   H. Wreblowsky; right?

2   A.   I don't remember.  I might have.  I don't remember.

3        Why would it mess up if I did type it in?  Why

4   wouldn't it go to Harvey Wreblowsky?

5   Q.   And then you did send it to Mr. Wreblowsky's in-house

6   counsel; right?

7   A.   I don't know.  I can't figure out this whole email from the

8   beginning to the end because everything is David Bodner.

9   Q.   Without getting into all the details, why would

10  Ms. Albanese be threatening you with this Beechwood revelation

11  to try to get greater severance at Platinum?

12  A.   I don't think she was threatening me.  We had a discussion

13  and I had to speak to Mark Nordlicht, because he was the boss,

14  and I spoke to Mark Nordlicht that she wants more money.  Mark

15  Nordlicht didn't want to give her more money.  And then, all of

16  you a sudden, I never saw this email till the case started and

17  my lawyers showed it to me.  And I told my lawyer, I have

18  nothing to do with this email, I have no idea what this is

19  about.

20  Q.   No idea?

21  A.   I had no idea at the time what this email was about.

22  Q.   She was threatening you to get higher severance; right?

23  A.   That's what -- are you telling me that?

24        MR. GLUCK:  Okay.  So let's go to PX 425.

25  Q.   It's your phone number, right, the top of the page?

MCCCpla6                    Bodner - Cross

1    A.  No, that's not my phone number.

2    Q.  Sorry.  That's her phone number; right?

3    A.  I have no idea.  My phone number is a 646 number.

4    Q.  She send you this text message?

5    A.  I don't remember getting it.  It sounds like --

6         THE COURT:  You've answered the question.

7    Q.  You produced this to PPVA as part of discovery; right?

8    A.  I produced it to PPVA?

9    Q.  Right.  So this was sent to you; right?

10   A.  I don't know.  I have no idea if this was sent to me.

11   Where does it say it was sent to me?

12        THE COURT:  Okay.  The chances that this will be

13   received in evidence is approximately zero.  So you might want

14   to move on.

15        MR. GLUCK:  So why don't we try then, if I may

16   approach sidebar regarding particular summaries.

17        THE COURT:  So you know what, this really hurts,

18   because I'm going to give you your time to leave eight minutes

19   early, oh, my god.  I could see juror No. 3 in particular is

20   devastated.  But, we do have a full day tomorrow.  So we'll see

21   you at 9:30 tomorrow.  Have a good evening.

22             (Continued on next page)

23

24

25

1          (Jury not present)

2          THE COURT:  First, with respect to exhibit 425, all I

3     see is a -- it says from 516-458-6739.  I don't remember any

4     testimony linking that to Mr. Bodner.

5          MR. GLUCK:  It was a text message produced by

6     Mr. Bodner from his cellphone.

7          THE COURT:  I'm sorry?

8          MR. GLUCK:  This was a text message produced by

9     Mr. Bodner from his cellphone.

10         THE COURT:  So I will repeat my question.  I don't

11    remember any evidence in the record about that.  If there is,

12    please remind me when it came up.

13         MR. GLUCK:  This is the evidence and it's the Bates

14    stamp at the bottom of the email, Bodner00039 --

15         THE COURT:  No.  The fact that it was produced by

16    Mr. Bodner doesn't mean it's admissible against Mr. Bodner.

17    People can produce in discovery all sorts of stuff because,

18    typically, discovery requests are quite broad and they have a

19    choice, they can either run up legal fees by fighting about it

20    or they can produce it.  I'm talking about the evidence before

21    the jury in this case right now shows no basis for the

22    assertion you just made.  If you want to find something in the

23    record that I've forgotten about, I'm happy to reconsider.

24         MR. GLUCK:  Except the Court's position, we would need

25    to lay foundation for this particular email, but given the

MCCCpla6                    Bodner - Cross

1    Court's statement that even if there were such foundation that

2    the email would not be admitted, which is principally to

3    impeach the witness's credibility that he didn't know anything

4    about the threatening email that we had just looked at --

5            THE COURT:  This exhibit may well be admissible if it

6    comes from Mr. Bodner.

7            MR. GLUCK:  What I would need to do, I can show the

8    Court two sets of depositions, one from Mr. Bodner and one from

9    Ms. Albanese.  Ms. Albanese was questioned about this

10   particular text message at length.

11           THE COURT:  If there's a deposition from Mr. Bodner in

12   which he says this is my email, then, of course, you can

13   confront him in front of the jury with that.

14           MR. GLUCK:  There's a deposition from his --

15           THE COURT:  And I might very well admit it.  So that's

16   fine.  I just can't admit it on the current state of the

17   record.

18           MR. GLUCK:  I think the accurate thing to say --

19           THE COURT:  So you have your guidance for tomorrow.

20           Second, Mr. Bodner reminded me that he has to be out

21   tomorrow morning.  From when to when?

22           THE WITNESS:  From 8 o'clock in the morning -- I would

23   get here between probably 11:00, 11:30, depending on traffic.

24           THE COURT:  So we have Mr. Quintero.  So just have him

25   ready to go at 9:30 and we'll take him and then we'll go back

MCCCpla6                    Bodner - Cross

1   to Mr. Bodner when he arrives.

2            You're going for a bris?

3            THE WITNESS:  Yeah, grandchild.

4            THE COURT:  I will not burden the record with the

5   50 million jokes that can be made about bris.  Very good.

6            Anything else we need to take up today?

7            MR. GLUCK:  There is one, your Honor.  While this

8   testimony is fresh in the head, we have about four summary

9   exhibits concerning, one, Bodner meetings with only Platinum

10  employees between 2010 and 2016, 100 such meetings.  We have a

11  second summary exhibit, 68 meetings with Platinum PPVA

12  investors between 2010 and 2016.  Then we have 106 meetings

13  regarding Platinum asset companies, potential companies, 2010

14  to 2016.

15           THE COURT:  These are based on what?

16           MR. GLUCK:  These are based on a combination of

17  calendar invites accepted, just like we saw, emails from

18  Ms. Albanese showing the schedule and the sort.  So we have

19  CTRL numbers next to each and every meeting --

20           THE COURT:  So, normally, I think you would be calling

21  a witness to put these in, but if you're not, I somehow suspect

22  that Mr. Bodner is not in the position to affirm --

23           MR. GLUCK:  We suspect the same thing.  Now, this

24  arose actually during the Albanese testimony, which was

25  unfortunately cut off due to her illness.  She testified that

MCCCpla6                          Bodner - Cross

1       she made Mr. Bodner's calendar, set Mr. Bodner's calendar,

2       accepted his outlook --

3                   THE COURT:  Here's what I would say, I think we need

4       to have a discussion about those exhibits, their bases and

5       their admissibility, and the good time to do it would be early

6       tomorrow because Mr. Bodner won't be here, so his testimony

7       won't be affected by it.  So congratulations.  Let's get

8       together at 9:10 tomorrow morning and we'll go over those.

9                   Mr. Lauer.

10                  MR. LAUER:  I'm just getting a little concerned about

11      the timing.  We tried to be as efficient as possible with

12      Mr. Bodner.  We all accept the Court's advice that, come

13      Wednesday afternoon, evidence ends.  We have a number of

14      substantive witnesses and --

15                  THE COURT:  I'm going to ask plaintiffs' counsel to

16      give me, first thing tomorrow at 9:10 before we get into our

17      discussion of exhibits, what will now be a binding

18      representation of how much more he'll be on cross.

19                  MR. GLUCK:  Very good.

20                  THE COURT:  Anything else we need to discuss?  Okay.

21                  You're excused.  We'll see you tomorrow.

22                  THE WITNESS:  These meetings that I had, we went over

23      them, he showed the whole list today and I explained that a lot

24      was charity meetings and met with employees of Platinum, a few

25      of them about different deals.  One was a lawyer who helped me

MCCCpla6                        Bodner - Cross

1    out with the deals that I was doing --

2              THE COURT:  So that is for your -- I don't know

3    whether I'll admit these exhibits or not, but what you're

4    telling me is that the meetings took place, but they had to do

5    with other things.  That's something that your counsel can

6    bring out on redirect, but it's not by itself a reason not to

7    admit these exhibits.

8              THE WITNESS:  I just wanted to --

9              THE COURT:  Thank you for clearing that with me.

10             Very good.  We'll see you all tomorrow.

11             (Adjourned to December 13, 2022 at 9:10 a.m.)

12                                * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3      DAVID BODNER

4     Direct By Mr. Lauer   . . . . . . . . . . . .1366

5     Cross By Mr. Gluck . . . . . . . . . . . . . .1428

6                          PLAINTIFF EXHIBITS

7     Exhibit No.                              Received

8      514   . . . . . . . . . . . . . . . . . . . .1430

9      516   . . . . . . . . . . . . . . . . . . . .1431

10     954   . . . . . . . . . . . . . . . . . . . .1434

11     423   . . . . . . . . . . . . . . . . . . . .1435

12     426   . . . . . . . . . . . . . . . . . . . .1447

13     482   . . . . . . . . . . . . . . . . . . . .1464

14     523   . . . . . . . . . . . . . . . . . . . .1470

15     555   . . . . . . . . . . . . . . . . . . . .1487

16     444   . . . . . . . . . . . . . . . . . . . .1501

17     501   . . . . . . . . . . . . . . . . . . . .1507

18                           JOINT EXHIBITS

19    Exhibit No.                              Received

20     74                                       1392

21

22

23

24

25