MCDCPLA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   In re:

 4   PLATINUM-BEECHWOOD LITIGATION           18 Civ. 06658 (JSR)

 5   ------------------------------------x

 6   MARTIN TROTT and CHRISTOPHER            18 Civ. 10936 (JSR)
     SMITH, as Joint Official
 7   Liquidators and Foreign
     Representatives of PLATINUM
 8   PARTNERS VALUE ARBITRAGE FUND LP
     (in Official Liquidation) and
 9   PLATINUM PARTNERS VALUE ARBITRAGE
     FUND LP (in Official Liquidation)

10
                Plaintiffs,
11
                  v.
12
     PLATINUM MANAGEMENT (NY) LLC,
13   et al.,

14                Defendants.

15   ------------------------------------x     Trial

16

17                                            New York, N.Y.

18                                            December 13, 2022
                                              9:10 a.m.
19

20   Before:

21                  HON. JED S. RAKOFF,

22                                            District Judge
                                                and a Jury
23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MCDCPLA1

1                                    APPEARANCES

2    HOLLAND & KNIGHT, LLP
          Attorneys for Plaintiffs
3    BY:  WARREN E. GLUCK
          MARTIN L. SEIDEL
4         RICHARD A. BIXTER JR.
          QIAN (SHEILA) SHEN
5         NOAH W.S. PARSON
          ELLIOT A. MAGRUDER
6

7    KATTEN MUCHIN ROSENMAN, LLP
          Attorneys for Defendant Bodner
8    BY:  ELIOT LAUER
          GABRIEL HERTZBERG
9         JULIA B. MOSSE

10

11   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Defendant Bodner
     BY:  NATHANIEL C. AMENT-STONE
12        ALLESANDRA TYLER

13

14

15   Also Present:

16   Michael Robson, Paradocs Motion Support

17   Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25

1        (Case called)

2            THE COURT:  Good morning.  Please be seated.

3        So, the first order of business is how much longer

4    plaintiffs' counsel is going to be in its cross of Mr. Bodner.

5            MR. GLUCK:  We have 15 minutes left with Mr. Bodner,

6    and then one request or set of requests for these summary

7    exhibit calendars.  If they don't come in, then we can

8    reevaluate the situation.

9            THE COURT:  So depending how we resolve the calendar

10   question, 15?

11           MR. GLUCK:  15.

12           THE COURT:  Very good.  That sounds perfect.

13       Second, I expect to get you, before lunch, a first

14   draft of my proposed jury charge in addition to having the

15   lunchtime to look it over.  When we break at 4:30, I will give

16   you a half hour to further review the proposed charge and then

17   we'll have the charging conference at 5 o'clock.

18       So, how do you proposed to introduce these charts?

19           MS. SHEN:  Your Honor, so there is testimony in the

20   record from Ms. Albanese that lays the foundation establishing

21   that she's multiple both Platinum server and Gmail email

22   addresses to both communicate on behalf of Mr. Bodner as well

23   as schedule his meetings.  The summary chart summarizes

24   primarily correspondence with Ms. Albanese, putting meetings on

25   Mr. Bodner's calendar and either through emails in which she's

MCDCPLA1

1    tracking them or through actual calendar invites.

2           We understand, we did have a discussion pretrial with

3    Mr. Bodner's counsel about this exhibit.  I understand that

4    their primary objection had to do with whether this particular

5    exhibit linked to a different demonstrative or summary chart

6    that we weren't expecting to use.  Our position is those are

7    two independent exhibits and we understand that -- we're not

8    arguing that there are any other objections to this particular

9    exhibit.

10          THE COURT:  That's fine.

11          MR. LAUER:  Your Honor, we went through this chart, we

12   got some substantial issues with it.  I just want to first say

13   that because our client is in the middle of cross examination,

14   we were limited in doing this to what we ourselves know from

15   the limited testimony that has come in so far at trial to

16   identify what I'll call obvious people who are not there to

17   deal with understanding the PPVA assets.

18          So, for example, there is something --

19          THE COURT:  You'll have a chance to talk to your

20   client because I will make an exception to the normal rule of

21   no contact during cross examination when he returns at, I think

22   he said about 11:30.  Then you are permitted, if we haven't yet

23   resolved these charts, to talk to him about the charts.

24          MR. LAUER:  I appreciate that.  I think that may be

25   mooted by what I'm about to show the Court.

MCDCPLA1

1              Based on 15 minutes on doing this at 1 o'clock in the

2    morning last night by ourselves, we identify what we think are

3    about 65 --

4              THE COURT:  I know it must be one, two, three, four,

5    five people at defense table.  Gee, it must have been really

6    tough to get this done.  Go ahead, counsel.

7              MR. LAUER:  I would say there are --

8              THE COURT:  I miscounted.  Six.

9              MR. LAUER:  There are at least 65 easy ones that

10   clearly have nothing to do with PPVA.  For example, Ben Mayer,

11   there are 22 Ben Mayer entries.  Ben Mayer was --

12             THE COURT:  Before we get to the specifics, first of

13   all, when were these charts first shown to defense counsel?

14             MS. SHEN:  These charts were first shown to defense

15   counsel, I believe, either right before or at the beginning of

16   trial.  We've gone through some revisions --

17             THE COURT:  So you've had them for over a week?

18             MS. SHEN:  Correct.

19             THE COURT:  Okay.  Second, this, just looking at the

20   first page of the first chart, Plaintiffs' Exhibit 933, the

21   first row has numbers, 1, 2, 3.  The second row has control

22   number.  Is there anything in evidence to indicate what the

23   control number is?

24             MS. SHEN:  Yes, the control numbers are the Bates

25   stamps, effectively, for all the numbers in this case.  This is

MCDCPLA1

1    really a reference for easy of cross-referencing against the

2    underlying documents.  We included it as a courtesy for defense

3    counsel.

4           THE COURT:  I don't recall anything coming into

5    evidence in this case regarding Bates numbers.  I'm talking

6    about evidence that was presented before the jury.  You want to

7    present this to the jury.

8           MS. SHEN:  I understand what you're saying, your

9    Honor.  So --

10          THE COURT:  So the answer to that is no.

11          Nevertheless, I take it that defense counsel has no

12   objection to the jury being informed that that second column is

13   the Bates stamp.

14          MR. LAUER:  I mean, if that's the only issue --

15          THE COURT:  That's not the only issue.  I'm just

16   taking it one step at a time.

17          MR. LAUER:  No.  But we've told them from day one that

18   the chart they really want to get in is a doc chart that is

19   completely wrong --

20          THE COURT:  That may be, but I would like an answer to

21   my question, which is, do you object if this chart comes in, do

22   you object to my informing the jury, which would otherwise be

23   totally ignorant of what the second column means, that it means

24   Bates stamp?

25          MR. LAUER:  I don't have an objection.

MCDCPLA1

 1          THE COURT:  Good.  Let's move along.

 2          MR. LAUER:  To that.

 3          THE COURT:  I know you have lots of others.

 4          The next column says attendees.  What is the basis for

 5   the statements that are then set forth under attendees?

 6          MS. SHEN:  Your Honor, the basis is the underlying

 7   documents.  So, in each of these emails that are summarized by

 8   the chart, there is either a listing --

 9          THE COURT:  Most of which are not in evidence?

10          MS. SHEN:  That's correct, yes.

11          THE COURT:  So how can you have a chart from -- unless

12   you were going to call a summary witness, which I took the

13   liberty of mentioning to you yesterday, but this is not

14   self-authenticating.

15          MS. SHEN:  Your Honor, we believe that the summary

16   witness was Ms. Albanese.  She's already authenticated.

17          THE COURT:  She wasn't even shown these charts, so

18   don't give me that.  And most of these exhibits are not in

19   evidence; true?

20          MS. SHEN:  Correct.

21          THE COURT:  So that does not supply the missing one.

22   So ditto the next several columns.

23          So before we can get to objections on grounds of

24   relevance or something else, I take it that this exhibit is a

25   summary of either emails or calendar entries or something else

MCDCPLA1

1    that most of which is not in evidence; true?

2              MS. SHEN:  That's true, yes.

3              THE COURT:  So the only way this could come into

4    evidence, it can't come in through Mr. Bodner.  It could have,

5    perhaps, arguably come in through Ms. Albanese, though I doubt

6    it.  The proper way to introduce this is through a summary

7    witness who, if you look at the Federal Rules of Evidence,

8    you'll see what a summary witness has to say and do, and the

9    right summary witness would typically be someone like someone

10   who prepared these charts.

11             Did one person prepare these charts?

12             MS. SHEN:  Yes.

13             THE COURT:  Who?

14             MS. SHEN:  It would be counsel.

15             THE COURT:  Well, counsel is not necessarily one

16   person.  Who are we talking about?

17             MS. SHEN:  Me.

18             THE COURT:  You.  Okay.

19             So, normally, the way to do this would be to have a

20   paralegal prepare them.  The paralegal could take the stand.

21   Counsel are very -- well, I need to consider whether I will

22   allow you to take the stand.  But assuming I would allow you to

23   take the stand, even though the jury has seen you as a lawyer

24   for plaintiffs, you could take the stand and say I examined the

25   following documents, which you could then offer in evidence,

MCDCPLA1

and here are the summaries of it and here's what these charts

mean.  Very simple, straightforward, very clear to the jury.

          Now, assuming, for the sake of argument, that I allow

that to be done, what other objections does defense counsel

have?

          MR. LAUER:  Your Honor, first, I remind the plaintiff

rested.  So they had the opportunity to try to put in through a

summary witness, but let me --

          THE COURT:  That's a fair point.  I am surprised,

frankly, that able plaintiffs' counsel was not familiar with

this fundamental principle of rules of evidence, which is set

forth expressly in the rules.  So I think that's a fair

argument, but assuming I overcome that hypothetically, I'll

think about it, but what other objections?

          MR. LAUER:  The other objections -- how many

objections does one need?  But the other objections are, first

of all, these are calendar invites in large part.  We have not,

given the fact that there are so many of these entries, these

are calendar invites, no one has testified that, in fact, these

meetings actually occurred.  They took 35 emails yesterday with

Mr. Bodner, gave it their best shot to try to identify what

takes place at these meetings.  I would say their batting

average was pretty poor in terms of what arguably could relate

to managing PPVA and what, in reality, is dealing with other

things, even though many of the PPVA people are engaged in

1    these meetings because of the social network and the

2    relationships that exist in this institution.

3           But then substantively, so many of these entries on

4    their face, even if they occurred, have nothing do with the

5    case.  I mean, personally, I'm listed on seven or eight of

6    these, along with a few for Andy Lavender.  If I remember

7    correctly, and I'm not testifying, I may be off, but this

8    related to both an investment that PPVA had made, but

9    Mr. Bodner had also made separate investments, and he was

10   involved in discussions --

11          THE COURT:  All right.  Let's assume that I keep this

12   in, then plaintiffs' counsel says okay, then he wants to

13   question Mr. Bodner about these meetings.  So, for example, I'm

14   just picking this as the -- so he would say, Mr. Bodner, didn't

15   you have a meeting on January 18th, 2010, a solo partners

16   meeting with Murray Huberfeld.  I'm not sure the chart even

17   shows that much.  I'm not sure what's meant by solo partners

18   meeting.  In any event, Mr. Bodner, who would say I'm almost

19   certain, I don't remember.  You would be objecting that it was

20   untimely in any event and it has nothing to do with the

21   timeframe of the case.

22          But assuming we got past that, then plaintiffs'

23   counsel would show him an email from Angela Albanese at her

24   Centurion address and say does this refresh your recollection,

25   and I am willing to bet that as to that one, the answer would

MCDCPLA1

1      be no, I don't remember what meeting I had on January 18th,

2      2010.  And so, we would have what sounds like an endless waste

3      of time going on potentially for hours.

4              Is that what plaintiffs' counsel contemplates?

5              MR. GLUCK:  It's not what we want to do.  And I'll

6      briefly respond on the resting of the case points, the two

7      points there.

8              The first, we had a medical issue with Ms. Albanese

9      that we agreed, we believe the foundation that she was his

10     email and she was his calendar had been established.  That's

11     why there was no cross.  Her testimony was very clear.

12             Secondly, the Court has a rule about witnesses

13     testifying only once.  Mr. Bodner was part of their case, we

14     knew he was going to be called.  They could have not called

15     him, true, but they did, and we believed they would because we

16     asked.  And we had, obviously, a number of exhibits yesterday

17     that we were intending to bring in through Mr. Bodner.

18             The issue here is an unusual one.  If the case was

19     about what Warren Gluck did over four years at work, you'd look

20     to my Holland & Knight email account, which has a calendar, and

21     there is a whole bunch of calendar invites and court

22     appointments and court calls, too.  It wouldn't matter whether

23     I remembered or not, that's my calendar.  We have in evidence

24     that she was his calendar --

25             THE COURT:  Yeah, but you don't have these exhibits

MCDCPLA1

1    in.

2              MR. GLUCK:  That's the point.  That's the point.  Even

3    if I said I don't remember on every single calendar invite that

4    I had, defense counsel on the other side would say, well, it

5    doesn't matter if you remember, that is your calendar.  I'm

6    moving this into evidence for the very same reason we have

7    emails that he's on that he say, I don't remember this email in

8    evidence.  For example, the email the day of the Black Elk

9    explosion, he doesn't remember that email.  It's in evidence

10   because it went right to him.

11             THE COURT:  Excuse me.  The emails are not in

12   evidence, the calendar entries are not in evidence, a few of

13   them are, but the great majority are not.

14             MR. GLUCK:  Right.  But this is the point.  What we

15   understand the federal rules say, the summary evidence rule is

16   that when, otherwise, one would have to go through the process

17   of showing one email after another or calendar invite after

18   another over four years and saying do you remember and the

19   answer is no, but there is good reason to admit the underlying

20   piece of evidence -- let's be clear, when Ms. Albanese accepts

21   a calendar invite on Mr. Bodner's behalf, and given the

22   testimony in this case, there was good reason to think that's

23   his calendar.  The same reason if Warren Gluck accepts an

24   invite from the Southern District of New York court to attend a

25   court conference, there is good reason to think that's my

MCDCPLA1

1    calendar invite.  The bases for admission are there.

2              THE COURT:  That, we can argue that as to particular

3    entries, but the overall point can be solved, I agree, by

4    calling a summary witness.

5              So now the question is, your adversary says you

6    shouldn't be able to call a summary witness because you rested

7    without doing so and you didn't ever indicate on your witness

8    list that you're going to call a summary witness.  Maybe you

9    did.

10             MR. GLUCK:  Bodner was on our witness list.

11             THE COURT:  Bodner is not a summary witness.

12             MR. GLUCK:  Summary witness, I'm sorry.  The notion

13   that Mr. Bodner would have remarkable recall as to the exact

14   meetings that Mr. Lauer asked him about, but no recall --

15             THE COURT:  I'm asking a different point.  My point is

16   this:  You chose not to put the summary witness on your witness

17   list and you rested without calling a summary witness, and to

18   be frank, it's only the court that has helped you out by

19   suggesting that this is solvable through a summary witness.

20             So the question then is, should the Court exercise its

21   discretion to nevertheless allow you to call a summary witness.

22             MR. GLUCK:  Under circumstances --

23             THE COURT:  And on the theory that since defense

24   counsel had these charts for over a week, they knew darn well

25   that, one way or another, you were going to try move them in.

MCDCPLA1

1    And so, they're not prejudiced by the fact that you rested and

2    now are reopening.

3          Yes.

4          MR. LAUER:  Your Honor, they had David Bodner on their

5    witness list.  Putting aside their sophistication, and I think

6    you have to attribute knowledge of the federal rules and the

7    concept of a summary witness to them, they chose not to call

8    Bodner, they chose not to continue with Albanese.  We didn't

9    ask them to cancel Albanese.  They decided not to continue with

10   Albanese and asked us if we would agree.  So Albanese could

11   have been here, could have been questioned on what exactly does

12   this calendar mean, what percentage of calendar invites does

13   Bodner not actually attend.  I mean, this is absolute insanity.

14   I apologize for that, your Honor.

15         THE COURT:  Yes, not that there isn't variations on

16   absolute insanity every day in this courthouse, but not in my

17   court.

18         All right.  Here's where I come out for the moment,

19   because if the jury is here --

20         THE DEPUTY CLERK:  They are.

21         THE COURT:  So we need to get Mr. Quintero on the

22   stand.  I will reserve until the next break on the question of

23   whether to allow a summary witness and hear further argument

24   beyond that, but these charts are not coming in

25   self-authenticating.  They'll either come in through as a

MCDCPLA1

1    summary witness.

2              And just to flag for plaintiffs' counsel to think

3    about, I think Mr. Lauer makes a good point that he would have

4    chosen, if Ms. Albanese had gotten into any of this, to examine

5    her more about it.  Although, I guess something that you have

6    and I don't is the transcript of her testimony.  So if someone

7    can give that to me, I'll take a look at it sometime this

8    morning.

9              MR. LAUER:  Your Honor, I know the witness is here,

10   but Mr. Hertzberg has been dealing with this for the week.

11   We've objected to this and he would like to address one item.

12             MR. HERTZBERG:  If it pleases the Court, your Honor.

13   We have had the exhibit for a week.  We've been objecting to it

14   every single day as they've modified it and refined it, there

15   has been various iterations of it.

16             The principal objection that we articulated from day

17   one is that there's an unfair burden shifting that occurs with

18   this chart.  The jury gets to see a chart of 400 entries

19   without actually seeing the substantive content and we have to

20   use our trial time, which has been highly restricted because of

21   the way this has played out, to then go through each of these

22   with Bodner and say, and tell me about your meeting with Ruby

23   Schroen, what was that about, me about your meeting with Eliot

24   Lauer, what was that about, and we have to go through 400.  If

25   it takes two minutes per entry, there's no trial time.

MCDCPLA1

1           THE COURT:  I don't understand this argument in the

2      abstract.  Maybe you may apply the fact -- it may be relevant,

3      the fact that they've rested, it may be relevant to the fact

4      they agreed not to bring back Ms. Albanese to complete her

5      testimony, but had they listed on their witness list a summary

6      witness, a summary witness typically presents a long, big chart

7      and then you would have had to go through with Mr. Bodner all

8      the ones that you thought were questionable.  So I'm not sure

9      quite how you're prejudiced by that.

10          MR. LAUER:  Your Honor, I'm sorry to say this, but on

11     the issue of relevance, putting aside all these other

12     deficiencies, the issue in this case is not how many separate

13     potential meetings or phone calls did Mr. Bodner have during a

14     six-year period.  At best, the issue is how many meetings did

15     he have that relate to managing the PPVA.

16          THE COURT:  That's a different objection than the one

17     you're about to get to.

18          MR. LAUER:  That's the one I was getting to.

19          THE COURT:  Yes, I intuited that's what you were

20     getting at.  And I'm sure plaintiff wants to be heard on that

21     and we're going to have further discussion on it, but not now

22     because we are getting Mr. Quintero on the stand and bringing

23     in the jury.

24          How long do you think you'll be with Mr. Quintero?

25          MR. GLUCK:  Under an hour.

MCDCPLA1

1              THE COURT:  Excellent.

2              (Continued on next page)

1      (Jury present)

2      THE COURT:  Please be seated.

3      Ladies and gentlemen, as you know, the rule at this

4  particular trial is we keep interrupting one witness to take

5  another.  So we are going to, with counsel's consent, interrupt

6  Mr. Bodner to hear the rest of Mr. Quintero, who we had

7  interrupted previously at his request.

8      So, Mr. Quintero, come back up on the stand, please.

9      THE DEPUTY CLERK:  The jury is asking if they have

10 deliberations on Friday, will it still be a half day or will it

11 be different.

12     THE COURT:  Your choice.  You want to stay late,

13 regardless of -- I only need, while you're deliberating, one

14 lawyer from each side.  I don't need the parties, I don't need

15 the defendant, I don't need anyone except one lawyer for each

16 side, you, and me.  So if you want to go late on Friday, that's

17 fine, but we'll see where we stand.

18     I remind the witness he's still under oath.

19     THE WITNESS:  Yes, your Honor.

20     THE COURT:  Go ahead, counsel.

21  RONALD GARY QUINTERO, resumed.

22 DIRECT EXAMINATION CONTINUED

23 BY MR. GLUCK:

24 Q.  Good morning, Mr. Quintero.

25 A.  Good morning.

MCDCpla1                        Quintero - Direct

1   Q.  When we took a break, you were describing the calculations

2   you had made in relation to the incentive fees paid to the

3   Platinum Partners.

4           Do you recall that?

5   A.  I do.

6   Q.  For way of a reminder, had you come to a conclusion

7   regarding how much incentive fees should have been paid to the

8   Platinum Partners between December of 2012 and 2016?

9   A.  Yes, I had.

10          MR. LAUER:  Objection.

11          THE COURT:  Ground.

12          MR. LAUER:  It's not in the report.

13          MR. GLUCK:  It's in the report, literally --

14          THE COURT:  My recollection, for what it's worth, is I

15  think it wasn't in the report, but let me ask the witness.

16          Was this in your report?

17          THE WITNESS:  It was.

18          THE COURT:  Overruled.

19  BY MR. GLUCK:

20  Q.  Did you come to a conclusion regarding the amount of

21  incentive fees that should have been payable to the Platinum

22  Partners from the years December 2012 through 2016?

23  A.  Yes, I did.

24  Q.  And what was the conclusion?

25  A.  No incentive fees should have been paid during that time

MCDCpla1                    Quintero - Direct

1    period.

2    Q.  Is it true that only incentive fees may only be paid when

3    there's an increase in the net asset value of PPVA?

4    A.  Yes.  And to be more precise, there has to be an

5    appreciation in the value of the underlying assets.  In other

6    words, it has to become more value in relationship to costs.

7    Q.  And did you form an opinion as to --

8           THE COURT:  Just for the clarity of the jury, remind

9    everyone what the incentive fees were.

10          THE WITNESS:  The incentive fees were the general

11   partner getting paid 20 percent of the appreciation in the

12   asset value during the course of the period.

13          THE COURT:  And the general partners were?

14          THE WITNESS:  Platinum New York had created specific

15   entities that were the recipients of these incentive fees.

16          THE COURT:  And were some of them owned directly or

17   indirectly by Mr. Bodner?

18          THE WITNESS:  Yes, that's my understanding.

19          THE COURT:  Go ahead.

20   BY MR. GLUCK:

21   Q.  And did you form a view as to whether the NAV of PPVA

22   appreciated, to use your word, between December 2012 and 2016?

23   A.  Yes, I did.

24   Q.  And what was that conclusion?

25   A.  It did not appreciate.

MCDCpla1                        Quintero - Direct

1    Q.  Were you asked to calculate the amount of incentive fees

2    paid, in fact, from December 2012 through 2016?

3    A.  Yes.

4          MR. GLUCK:  Mr. Parson, please call up

5    Plaintiffs' Exhibit 924, which is already in evidence.

6    Q.  Do you see this on your screen?

7    A.  I do.

8    Q.  Will you please take the jury through this chart --

9          MR. LAUER:  I'm not sure it's in evidence.

10         THE COURT:  I think he's arguing as an aid to the jury

11   in following the witness.  It's not being offered in evidence.

12         MR. GLUCK:  I think that's right.

13         No, it's in evidence.  There is another chart that I

14   think that's coming.  I misspoke.  This chart is in evidence

15   and was admitted in evidence.

16         THE COURT:  It must have been done on consent.

17         MR. GLUCK:  It was done on consent, and is one of the

18   reasons we have that other issue.

19         THE COURT:  Now that it's been brought to my

20   attention, these kinds of charts, ladies and gentlemen, are not

21   themselves evidence, they are summaries of what the witness is

22   testifying about.  They're helpful to you sort of like a Power

23   Point, in effect, but don't regard it as substantive evidence.

24   You may take them in, since it was admitted, into the jury room

25   and use it then to refresh your recollection, what the witness

MCDCpla1                         Quintero - Direct

1    said and so forth, but his testimony is the evidence and the

2    underlying documents are the evidence, not the chart.

3              Go ahead, counsel.

4    BY MR. GLUCK:

5    Q.  Mr. Quintero, you've reviewed this chart before?

6    A.  I have.

7    Q.  And you were shown this chart when you were last testifying

8    before us; is that right?

9    A.  Yes.

10   Q.  Could you please explain to the jury what this chart means

11   and how you arrived at the figures on this chart.

12   A.  Yes.  This chart shows that during the years 2013 and 2014,

13   that total incentive fees paid were $30,773,579.  Those fees

14   have two components.  First of all, there are the actual cash

15   fees that were paid, and with those cash fees, they were paid

16   in February of 2013 in the amount of $597,110, and then in

17   February of 2014 in the amount of $13,399,999.

18             The other way in which fees are paid are what as known

19   as payment in kind, where instead of directly paying cash,

20   instead, limited partnerships in the fund were provided or paid

21   out, and they were subsequently redeemed.  So these limit

22   partnership interests are similar to receiving stock.  So that,

23   those limited partnerships were converted into cash over this

24   two-year period in the amount of $16,776,470.

25             So, again, total fees paid, both directly in cash and

1    then in a two-step process in the form of limited partnerships

2    that was subsequently redeemed, totaled $30,773,579.

3    Q.  Thank you.  Now, I think the Court asked you questions that

4    I'm about to ask, but I want to be very clear.

5              Did you review the structure of Platinum Management

6    and who the partners at Platinum Management were?

7    A.  Yes.

8    Q.  Was Mr. Nordlicht a partner of Platinum Management through

9    various entities and trusts?

10   A.  Yes.

11   Q.  Was Mr. Bodner a partner of Platinum Management through

12   various entities and trusts?

13   A.  Yes.

14   Q.  Was Mr. Huberfeld a partner of Platinum Management through

15   various entities and trusts?

16   A.  Yes.

17   Q.  Was Mr. Landesman a partner of Platinum Management directly

18   or through various interests and trusts?

19   A.  Yes.

20   Q.  This $307,773,000 does not contain any redemptions made by

21   Mr. Fuchs over the relevant period, does it?

22   A.  It does not.

23   Q.  Now, is it true that this $30,773,579 figure is based on

24   adding up the $13 million and the $16 million?

25   A.  That is correct.

1    Q.  Now, for the $16 million figure, the redemptions, are these

2    only redemptions by or through their trust vehicles,

3    Mr. Nordlicht, Mr. Huberfeld, Mr. Bodner, and Mr. Landesman?

4    A.  Yes.

5    Q.  Have you also reviewed data concerning the award of the

6    stock or LP interests in PPVA to Mr. Bodner, Mr. Huberfeld,

7    Mr. Nordlicht, and Mr. Landesman?

8    A.  Yes.

9    Q.  And so, is it part of your conclusion that the incentive

10   fee awarded in the past was then redeemed by these four for the

11   total $16,776,470?

12           MR. LAUER:  Objection.  Same objection as before.  Not

13   in.

14           THE COURT:  Well, let me ask the witness.

15           Was this in your report?

16           THE WITNESS:  The information that this is based on

17   was, yes, your Honor.

18           THE COURT:  But not the conclusion?

19           THE WITNESS:  I had a larger amount that was since

20   reduced for reasons such as eliminating Mr. Fuchs.

21           THE COURT:  I see.  Overruled.

22           MR. GLUCK:  Yes.  I'll note for the original report

23   contained things that we have now --

24           THE COURT:  No.  No.  No.  No.  No.  You can't

25   testify.

1   　　　　MR. GLUCK:  Oh, sorry.  Sorry about that.  Trying to

2   be accurate.

3   BY MR. GLUCK:

4   Q.  Mr. Quintero, what sorts of documents and data did you

5   review to arrive at the conclusions and figures that we're

6   seeing on this chart?

7   A.  The third-party administrator SS&C produces reports on a

8   variety of things, including changes in the fund interest.  So

9   those reports provide me a basis to be able to see what were

10  the payments either in kind or in cash.  And then I also saw

11  bank statements over this period of roughly 40 months that

12  provided me the ability to see what the actual cash received,

13  either directly or indirectly through this two-step process

14  was.

15  Q.  If you're not one of the Platinum Partners, and under

16  normal circumstances and you're holding one LP interest, how do

17  you go about redeeming it?

18  A.  By making a request to the fund -- or, actually, to the

19  feeder funds, more specifically, to redeem my interest in the

20  feeder fund.

21  Q.  And then what happens?  Or, specifically, what happens to

22  the master fund's bank account at that point?

23  A.  Given the master fund is the only fund that actually has

24  significant assets, the master fund has to pay the applicable

25  feeder fund the amount of cash for the redemption, and then if

MCDCpla1                          Quintero - Direct

1    I were a partner or a limited partner, the feeder fund would

2    then pay me.

3    Q.  Can you tell, based on the documents, who is redeeming a

4    particular LP or stock interest, whether it's an investor or

5    whether it's a Platinum partner?

6    A.  Yes.

7    Q.  How can you tell?

8    A.  Because in these monthly SS&C reports, they indicated

9    changes in everybody's limited partnership position.  So I can

10   actually see the specific individuals, whether they are members

11   of Platinum or whether they are independent investors who whose

12   interest changed either through buying interest or redeeming

13   interest.

14   Q.  So SS&C tracks who owns what percentage of the fund at any

15   given time?

16   A.  Yes, that is their job.

17   Q.  And you can tell if somebody's position goes down that

18   they've either made a redemption or not?

19   A.  Yes.

20          MR. GLUCK:  I'd like to call up JX 40, which we'll

21   seek to admit into evidence.  It's a joint exhibit.

22          MR. LAUER:  No objection.

23          THE COURT:  Received.

24          (Joint Trial Exhibit 40 received in evidence)

25   Q.  Mr. Quintero, is this an example of the sort of SS&C

1    statements that you were just talking about?

2    A.   That is correct.

3    Q.   And Mr. Parson highlighted a portion of one row.  Can you

4    just walk us through this row.

5    A.   Yes.  What this first row indicates is for Platinum

6    Partners Arbitrage LP, that is the applicable entity.  They are

7    the general partner and it shows the changes in their position.

8    So at the beginning of the applicable period, that being the

9    month of January 2013, it had interests that were valued at

10   $6,951,859.47.  It then got a contribution equal to

11   $11,581,775.99.  So that was what it was credited.  Then it

12   redeemed $18,533,635.46.  So, as to arrive at an ending

13   balance, the next to last column of $1,144,538.03.

14           MR. GLUCK:  Thank you.  You can take that down,

15   Mr. Parson.

16   Q.   You also reviewed bank statements which showed monies in

17   these amounts corresponding to your analysis actually leaving

18   the bank account of the master fund; is that right?

19   A.   Yes.

20   Q.   Did you also review any emails showing this process taking

21   place?

22   A.   Yes.

23           MR. GLUCK:  Mr. Parson, will you please pull up

24   PX 645.

25           We seek to move this into evidence.

1           MR. HERTZBERG:  Can we see the next page, please.

2           THE COURT:  Any objection?

3           MR. LAUER:  No objection.

4           THE COURT:  Received.

5           (Plaintiffs' Exhibit 645 received in evidence)

6           MR. GLUCK:  I think it may help to walk everyone

7    through this.  Why don't you go back to the first page,

8    Mr. Parson.

9    Q.  So we heard from Mr. Joe SanFilippo.  Who do you understand

10   Mr. Joe SanFillipo to be?

11   A.  Mr. SanFilippo was the chief financial officer of Platinum

12   at that time.

13   Q.  And Mr. Michael Kimelman was also a Platinum guy; correct?

14   A.  Yes.

15   Q.  And he's attaching a document, he being SanFilippo was

16   attaching a document to this email; right?

17   A.  Yes.

18   Q.  Now we're going to look at the attachment.  Can you please

19   walk the jury through this.

20   A.  These are the payment instructions in which Mr. SanFilippo

21   is informing Mr. Kimelman who the recipients of the aggregate

22   amount of this payment should be.  And so, the applicable

23   individuals or entities of the partnership are indicated on

24   PX 645.

25   Q.  In this case, we have approximately $13.4 million going

1    out?

2    A.   Approximately.  It's in the first three rows of this

3    exhibit.

4    Q.   Let's walk through.  We have $1.4 million going to Mr. Ari

5    Glass.  Do you recall who Mr. Ari Glass was?

6    A.   He was one of the individuals who I saw named on a number

7    of documents.  I don't remember --

8    Q.   Former Platinum.

9    A.   Yeah -- what his position was at the time.

10   Q.   And then there's $1.233 million going to Mr. Mark

11   Nordlicht?

12   A.   Yes.

13   Q.   Would it refresh your recollection if Mr. Uri Landesman

14   took over for Mr. Ari Glass as president?

15   A.   I don't recall how that worked out.

16   Q.   And then $10,766,000 is going from PPVA GP to the Mark

17   Nordlicht Grantor Trust.

18            Do you see that?

19   A.   Yes.

20   Q.   Explain just very briefly the PPVA GP, is that the general

21   partner you were talking about?

22   A.   Yes.

23   Q.   That's where the monies first allocated?

24   A.   Yes.

25   Q.   And then the Mark Nordlicht Grantor Trust, that's this

1    agreement that allows for Mr. Bodner and Mr. Huberfeld and

2    Mr. Nordlicht's actual interests?

3    A.  Yes, the means by which they share distributions.

4    Q.  So $10 million is going to them?

5    A.  That is correct.

6    Q.  And $1.4 million is going to Mr. Ari Glass, whatever his

7    former position is, and then $1.233 million is going to

8    Mr. Mark Nordlicht?

9    A.  Yes.

10   Q.  Now, when you were tasked with figuring out how much

11   incentive fees were paid, what sorts of -- can you take the

12   jury through how you went about your task and what sort of

13   documents you looked at or relied upon or cited in your report?

14              MR. LAUER:  We object.  We refer the Court to

15   paragraphs 24 and 25 of his report.

16              THE COURT:  Can someone hand up a copy of his report.

17              MR. GLUCK:  Basis for the objection.

18              MR. LAUER:  We also refer the Court to --

19              THE COURT:  You're referring me to something, but

20   you're not handing it up.  I'll ask again, would someone hand

21   up -- it's the defense making this objection, so the defense

22   should hand it up.

23              MR. LAUER:  I apologize, your Honor.  I thought you

24   had it.

25              THE COURT:  I have it in my chambers, I don't have it

MCDCpla1                        Quintero - Direct

1    here.

2                MR. LAUER:  Give the Court paragraph 24, 25 in exhibit

3    one.

4                (Pause)

5                THE COURT:  Overruled.  The question was, what did you

6    look at.

7    A.  Your Honor, what I looked at were actual underlying

8    documents that showed the allocation and reallocation of

9    membership interests or partnership interests, actual cash

10   payments that were made to individuals or entities.

11               THE COURT:  And these were documents provided by the

12   liquidators?

13               THE WITNESS:  I received them from legal counsel.

14               THE COURT:  Well, in your report, it says, quote, this

15   is paragraph 24, "I did not review any documentation prepared

16   by the defendants that detail their monthly computation of

17   management fees and incentive fees.  However, the liquidators

18   and foreign representatives retained in this matter were able

19   to trace management fees and incentive fees to bank statements,

20   general ledgers, and other certain financial records."

21               So is that what you relied on?

22               THE WITNESS:  Yes, your Honor.

23               Would you like me to explain the distinction between

24   the two?

25               THE COURT:  Sure.

1    THE WITNESS:  The first one, how the fees were

2    calculated by Platinum, I haven't seen any information that

3    showed how they were calculated.  But the second group of

4    information, that being the actual SS&C statements, the bank

5    statements, I see what was paid, I just don't know how it was

6    calculated, but they paid themselves.

7    BY MR. GLUCK:

8    Q.  Just to clear up any confusion, are you personally aware

9    that the liquidators are accountants and employee accountants?

10   A.  Yes.

11   Q.  Did you work with the liquidators and their staff in

12   preparing your report and your testimony?

13   A.  Yes.

14   Q.  Are you aware there was a Platinum server that was

15   partially copied and that the liquidators have access to?

16   A.  That is my understanding.

17   Q.  On that server are some subset of all of Platinum's

18   documents; is that correct?

19   A.  That is my understanding.

20        MR. GLUCK:  I'll try to get through this next portion

21   quickly.

22        Could we please call up JX 40.

23        Excuse me.  PX 573, please, which is admitted in

24   evidence.

25   Q.  Very briefly, because I think you've testified about the

1    basis of your findings, but could you very quickly walk the

2    jury through how you understand this document.

3              MR. LAUER:  Objection.  I don't think it's in his

4    report.

5              THE COURT:  I'll allow it.

6              MR. LAUER:  Sorry, your Honor.  It's also 403, COBA.

7              MR. GLUCK:  Redemption requests.

8              THE COURT:  Overruled.

9              By the way, ladies and gentlemen, I should mention to

10   you that when you begin your deliberations, we're going to send

11   you all the exhibits in paper form together with an index so

12   you can find it and read it and you won't have to go through

13   all this rigmarole that I'm doing.

14             You may answer the question.

15   A.  What was the question?

16   Q.  Mr. Quintero, is this the sort of format by which partners

17   could redeem the LP interests or stock that they had been

18   awarded as contingent incentive fees, and can you walk the

19   jury --

20             THE COURT:  Hold on.

21   Q.  Is it first as a yes or no, is it first?

22   A.  Yes, it pertains to that format.

23   Q.  I think this was my original question.  Can you please walk

24   the jury through how one would perform this incentive fee

25   redemption and then get cash?

1    A.   The incentive fee redemption would occur by way of the

2    holder of limited partnership interest requesting that they be

3    redeemed or turned over in exchange for cash.  And so, this

4    email includes transactions where that occurred.

5    Q.   If one of the partners wanted to make a redemption request,

6    but there was no money in the master fund's bank account to

7    meet it, what would happen?

8    A.   The request would not be honored.

9    Q.   So the only time that a request would be honored is if

10   there was money in the master fund's bank account?

11   A.   Yes, because that's the only source of money to make the

12   redemption.

13   Q.   And based upon your review of bank statements, your work

14   with the JOL accounting staff, the SS&C reports and emails, is

15   it fair to say that you've concluded that during the period,

16   December 2012 through 2016, more than $30 million of incentive

17   fees were paid out in cash or the LP interests redeemed?

18            MR. LAUER:  Objection.  I've stated this ground

19   before.

20            THE COURT:  Well, that objection is overruled.  I am

21   concerned that plaintiffs' counsel seems to be intent on asking

22   nothing but leading questions, typically with multiple

23   subparts, but that was not the ground of the objection.  So you

24   can answer the question.

25   A.   Yes, the information that I've seen indicates that either

1   the cash payments or redemptions of limited partnership

2   interest to the partners of Platinum aggregated approximately

3   $31 million between 2013 and 2014.

4   Q.  Mr. Quintero, were you asked to perform an even harder

5   analysis for the JOLs?

6           MR. LAUER:  Objection.

7           THE COURT:  Sustained.

8   Q.  Mr. Quintero, were you also asked to calculate the amount

9   of management fees that were overpaid during the period January

10  2013 through 2016?

11          MR. LAUER:  Objection.  Same ground.

12          THE COURT:  Overruled.

13  A.  Yes.

14  Q.  How would you go about trying to calculate the overpaid

15  management fees, if any?

16  A.  The management fees are charged an annual rate of 2 percent

17  of assets under management.  Given that I determined that the

18  reported values that are attributed to these assets were

19  grossly overstated, I had to come up with a basis for

20  estimating the difference between what actually was paid as

21  opposed to what reasonably should have been paid had the assets

22  been properly valued or stated in what was reported by

23  Platinum.

24          And so, the difference between the two is the

25  overpayment of management fees.  So, for example, if management

fees over the period aggregated $50 million, but based on

determining what the assets seem to be worth, 2 percent on an

annual basis should have been $30 million.  The difference

between the two, the $20 million would be the excess payment or

overpayment of management fees.

Q.  And did you arrive at any conclusions regarding whether

there was an overpayment of management fees?

A.  Yes.

Q.  Were there any special circumstances that made arriving at

that conclusion more complex or difficult?

A.  Yes.

Q.  Could you please describe those circumstances.

A.  Yes.  Over the period from December 2012 through March

2016, the fund had an aggregate of more than 1200 investments.

On average, I would say that the fund had about 750 investments

in their portfolio that, each month, a representation was made

as to what the value applied or attributed to those investments

was.

          So, first of all, it was not practical to, each month,

come up with 750 different valuations, most significantly

because the information actually was either misstated and/or

did not even exist to do a proper valuation of those

investments each month over a roughly 40-month period.  So I

had to do a workaround, and I did it on a conservative basis,

giving better credit to the management company for the claimed

1   value than what I believe would be appropriate if I actually

2   had all the information to value each of these securities on a

3   monthly basis.  And so, I had to estimate or develop a basis

4   for estimating what the overpayment was over the 40-month

5   period.

6   Q.  Did the joint official liquidators provide any guidance to

7   you regarding ensuring that only what you would be sure would

8   be an overpayment would be included?

9             MR. LAUER:  Objection to form.

10            THE COURT:  Sustained.

11  A.  Legal counsel to the JOL --

12            MR. LAUER:  Sustained.

13            THE COURT:  Sustained.

14            THE WITNESS:  I'm sorry.  I was so bent on answering.

15            THE COURT:  Let me just try to move this along.

16            So your opinion, which I think you gave when you were

17  here previously, is that the assets of Platinum were

18  substantially overstated, yes?

19            THE WITNESS:  Yes, your Honor.

20            THE COURT:  And now you are describing monies that

21  should not have been paid out that were paid out directly or

22  indirectly as a result of that overstatement?

23            THE WITNESS:  Yes, your Honor.

24            THE COURT:  All right.

25            MR. GLUCK:  Precisely right.

1  BY MR. GLUCK:

2  Q.  Until now, Mr. Quintero, we've been discussing whether the

3  fund went up and whether any incentive fees should have been

4  paid out; is that right?

5  A.  Yes.

6  Q.  Now we're trying to say for the 2 percent, the management

7  fees, how much of those, if any, were overpaid; right?

8  A.  Yes.

9  Q.  The incentive fees, it only matters if it didn't go up;

10  right?

11  A.  That is correct.

12  Q.  However, could you please describe what matters for the

13  management fees, the 2 percent?

14  A.  On the management fees, what matters is the extent of which

15  assets were overvalued because if assets are overvalued, the

16  fees are being paid on inflated or excessive asset valuations.

17  Q.  Rather than go through 200 assets, did you instead

18  determine to focus on some specific large assets?

19  A.  Yes.  As I previously testified, the number was much more

20  than 200.

21  Q.  Sorry, I may have misstated.

22       What were the assets that you focused on?

23  A.  The ones that had the greatest level of value that was

24  being attributed to them by the manager.

25  Q.  Was Black Elk one of those?

1    A.  Yes, during most of that time period.

2    Q.  Was Golden Gate one of those?

3    A.  Yes.

4    Q.  Was Northstar one of those?

5    A.  Yes.

6    Q.  Was Pedevco one of those?

7    A.  Yes.

8    Q.  Was Desert Hawk Gold Corp. one of those?

9    A.  Yes.

10   Q.  Was Michael Goldberg Receivable one of those?

11   A.  Yes.

12   Q.  But for the ones I just mentioned, what value did you

13   attribute to every other asset in the PPVA portfolio?

14   A.  I gave the manager, that being Platinum New York, credit

15   for having valued them fairly.  I only focused them -- not that

16   I believe it, incidentally, but I did not do any calculations

17   assuming that any of those other assets were improperly valued.

18   I only focused on the assets that were the largest assets or

19   groups of assets because several of those entities, for

20   example, Black Elk, had several different types of securities,

21   but I went to the issuers or focused my analysis on the issuers

22   that constituted the largest portion of the portfolio and did

23   my calculations based on management fees paid to those issuers

24   and did not make any proposed adjustments for any other fees

25   paid to any other issuers.

MCDCpla1                        Quintero - Direct

1    Q.  So is it fair to say that your analysis assumes that

2    100 percent of the value reported by management of every other

3    asset, other than the ones we just went over, was right?

4    A.  With, as I recall, two exceptions.

5    Q.  Very good.  What were those two exceptions?

6    A.  There was an entity, China Horizon, that I also did

7    calculations on.  Then there was an entity called Over

8    Everything that I also did calculations on.

9    Q.  But those are not included in any way in your damages

10   analysis to be presented in court today, are they?

11   A.  They are not.

12   Q.  Did you arrive at a conclusion as to what the minimum

13   overpayment of management fees, given the 100 percent

14   attribution we just went over, was?

15   A.  Yes.

16   Q.  And what is that conclusion?

17   A.  My recollection, and there is a table --

18           MR. GLUCK:  I'm sorry.  There is a table, you're

19   right.

20           Mr. Parson, will you please call up PX 925.

21   Q.  Is PX 925 the table you were referring to?

22   A.  Yes.

23   Q.  For the avoidance of doubt, PX 925 does not include China

24   Horizon in any way, does it?

25   A.  It does not.

1    Q.  So if China Horizon --

2              THE COURT:  No.  Come on.  Let's get to the part of

3    this.

4              MR. GLUCK:  Sure.

5    Q.  Can you please take the jury through your calculations as

6    to the overstated management fees for these six particular

7    assets?

8              MR. LAUER:  Excuse me.  Is this in evidence?

9              THE COURT:  Is this in evidence?  It's the same thing.

10   It's not going to be -- if it's already been received in

11   evidence, the jury will still only be able to use it as an aid.

12   If it's not received in evidence, it's not received in

13   evidence.

14             MR. LAUER:  If it's not yet in evidence.  I would like

15   to *voir dire* if they're offering it.

16             THE COURT:  Come to the sidebar.

17             (Continued on next page)

18

19

20

21

22

23

24

25

MCDCpla1                      Quintero - Direct

1           (At the sidebar)

2           THE COURT:  First, I don't know which is more tedious,

3    watching an iceberg melt or having the testimony of this

4    witness continue in the manner that it's being undertaken.  So

5    I'm asking plaintiffs' counsel to move it along.

6           MR. GLUCK:  I will move it along.

7           THE COURT:  Second, this is not being offered in

8    evidence, and the other one probably should not have been, but

9    you consented to it, but this is just a chart so that the jury

10   can follow his testimony.  So there's nothing to *voir dire*.  So

11   the request for a *voir dire* is overruled.  And this exhibit

12   will not be received in evidence.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MCDCpla1                        Quintero - Direct

1           (In open court)

2    BY MR. GLUCK:

3    Q.  Would you please take the jury through your conclusion as

4    to the minimum amount of management fees overpaid over the

5    damages period.

6    A.  Over the assets listed in PX 925, my conclusion is that the

7    minimum amount of excess management fees paid from December

8    2012 through March 2016 for the assets of these issuers

9    aggregate at least $15,506,000.

10   Q.  In addition to crediting the other assets at 100 percent of

11   value, what steps did you take in your analysis, if any, to

12   credit or ensure only the minimum fees would be deducted?

13   A.  At the inception of the period that I analyzed, I gave the

14   manager credit for coming up with a good-faith estimate as to

15   what fair value was.  So, just to give you a quick example,

16   with Northstar, that was attributed a value of $200 million,

17   which still actually persisted as of March of 2016, but I

18   assumed that, initially, it was worth whatever the manager

19   asserted that it was worth, but I know that ultimately the case

20   of Northstar, it went bankrupt in August of 2016.  So four

21   months, five months after the last valuation and the ultimate

22   realization of proceeds by the bankrupt estate was

23   approximately $13 million and the equity or the stock of the

24   company was worthless.  So I assumed that if I give it credit

25   for initially having been worth $200 million, I know it ended

1    at zero, that that descent to zero occurred over the period in

2    which it was in the Platinum portfolio.

3            So a common practice, when you have two measurement

4    points, a starting point and an ending point and you don't have

5    good quality informational, as the company did not, as to what

6    value would have been during any of the interveining time

7    periods is just to assume that that value in this case declined

8    on a straight-line basis by an equal amount every month,

9    subject to monthly adjustments for what was in the particular

10   issuer's account.

11           So I assumed that the amount of excess fees would be

12   the difference between the 2 percent times the claimed value,

13   and the 2 percent times the gradually diminishing value over

14   the applicable time period.

15           So, in the case of Northstar, by doing that

16   calculation, I assumed that of all the fees that I could relate

17   to Northstar over the applicable holding period, that

18   $2,286,000 was the overpayment.  And I did that same analysis

19   for each of the issuers that are shown on this exhibit.

20           MR. LAUER:  We move to strike on the basis of the

21   *Daubert* decision that it was explicitly violated.

22           MR. GLUCK:  I don't know what you're talking about.

23           THE COURT:  Tell me what paragraph of the *Daubert*

24   decision you're referring to.  Tell me a page, and if there is

25   more than one paragraph on that page, tell me which paragraph.

1    I do not want argument.

2              MR. LAUER:  It's the last full paragraph on page 20 of

3    the Court's decision.

4              THE COURT:  I think that just requires a followup

5    question, it's not a reason to exclude the testimony.

6              Overruled, but there will be a followup question.

7    BY MR. GLUCK:

8    Q.  Mr. Quintero, was your methodology prepared for this case

9    something that you had to --

10             THE COURT:  Proceeded in a nontraditional way?

11             MR. GLUCK:  Yes.

12   A.  This type of approach is routinely used in situations like

13   this where you only have the beginning valuation point and

14   ending valuation point, and you have to come up with some

15   basis, if you have to have periodics, such as monthly

16   valuations for what may have changed in the intervening time

17   period.

18   Q.  To the extent --

19             MR. LAUER:  We press the objection.

20             THE COURT:  Sustained.  That will be stricken.

21             Let's continue just with Northstar as an example.

22             You concluded that its value by Platinum had been

23   overstated by the order of 192-plus million dollars, yes?

24             THE WITNESS:  Over the time period, yes, your Honor.

25             THE COURT:  And that was, I think we've already

MCDCpla1                     Quintero - Direct

1    explained, that was based on things like the company went into

2    bankruptcy, the assets can only be sold for a fraction of the

3    assumed value, et cetera; correct?

4         THE WITNESS:  Yes, your Honor.

5         THE COURT:  So then you had to figure out what, if

6    any, management fees that were paid should not have been paid

7    if the correct value had been used; right?

8         THE WITNESS:  That is correct.

9         THE COURT:  But one little problem was that the

10   management fees were paid over a period of several years, so

11   you had to figure out how to portion it year by year, yes?

12        THE WITNESS:  Actually month by month.

13        THE COURT:  Month by month.  And you did that by using

14   what you call a straight-line method, yes?

15        THE WITNESS:  Yes, your Honor.

16        THE COURT:  And if better data had been available, you

17   might not have been required to use the straight-line method,

18   but you thought it was appropriate, given the data you had; is

19   that right?

20        THE WITNESS:  Yes, it was the only way I could have

21   reasonably done it.

22        THE COURT:  All right.  I think that is sufficient.

23        Go ahead, counsel.

24   BY MR. GLUCK:

25   Q.  Taking Northstar as an example, did this methodology

1   provide a benefit to defendants because, for example, did you

2   value Northstar at the full value it was represented at at the

3   beginning of that investment.

4            MR. LAUER:  Leading.

5   Q.  Did you --

6            THE COURT:  I would say in addition to leading, it's

7   asked and answered.  Sustained.

8            So let me just try it.  You used the same method with

9   respect to management fees for the other entities listed on

10  this chart; right?

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  And you concluded that Platinum had

13  overstated the assets of Black Elk by about $20 million;

14  correct?

15           THE WITNESS:  Specifically, they overstated the

16  claimed gains by that amount and, yes, they overstated the

17  assets by even larger amounts.

18           THE COURT:  And I think you told us this when you were

19  here before, but just to remind the jury, why did you think

20  Platinum's figures were overstated by this amount?

21           THE WITNESS:  Because on an asset-by-asset basis,

22  except for the Michael Goldberg receivables, the underlying

23  data showed that these companies, except for Black Elk, never

24  generated any substantial revenues, they had huge losses, they

25  had substantial operating problems, as indicated by emails that

MCDCpla1                    Quintero - Direct

1    I talked about, in part, a few days ago.

2              THE COURT:  Now, did you take into account the fact

3    that the company's valuations were audited?

4              THE WITNESS:  Yes, I did.

5              THE COURT:  And did you also take into account the

6    fact that they used a third-party valuation company of some

7    sort?

8              THE WITNESS:  Yes, I did.

9              THE COURT:  And why did you reject those valuations?

10             THE WITNESS:  Two reasons.  First of all, the

11   management fees are calculated on a month-by-month basis based

12   on the reports given by SS&C that come from the values that are

13   claimed by Platinum Management.  The audit comes about as much

14   as 13 months after yearend.  So the audit, as well as the

15   quarterly valuation by the third-party valuators, that's

16   information for the file, but they have no direct bearing on

17   the actual fees that are being charged.

18             Secondly, both the auditors and the third-party

19   valuators have the same problems that I had, in that if they

20   don't have the appropriate information to do a valuation on,

21   then it's going to undermine the calculations that they do.

22   And if they don't have access to a lot of the emails and other

23   information that I saw proclaiming the woes, the problems of

24   these portfolio investments, they're not going to be able to do

25   a reliable valuation.

1           THE COURT:  Okay.  Go ahead, counsel.

2    BY MR. GLUCK:

3    Q.  Did you consider the issue of PPVA's interest payments and

4    Beechwood?

5    A.  Yes.

6    Q.  What were your conclusions regarding that issue?

7    A.  That --

8           MR. LAUER:  Not in.

9           MR. GLUCK:  It's in his report.

10          THE COURT:  Was that in your report?

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  Overruled.

13   Q.  What were your conclusions regarding that issue?

14   A.  That with Beechwood, they were providing -- excuse me.

15   They were holders of some of the debt instruments of these

16   entities that were being valued at par, when, in fact, these

17   entities couldn't pay the interest on their loans, and it wound

18   up that Platinum had to forward the interest for Beechwood to

19   be paid so that the loans would not be in default and they

20   would not be called so that Platinum could continue to maintain

21   the appearance that these loans are worth 100 cents on the

22   dollar.

23          MR. GLUCK:  Mr. Parson, Plaintiffs' Exhibit 398,

24   please.

25   Q.  How would it be -- quickly, how would it be that the

MCDCpla1                    Quintero - Direct

1    payment of interest by PPVA to Beechwood would impact the

2    valuations to these entities?

3    A.  Because if the interest was unpaid, the loans would be in

4    default.  If the loans would be in default, Beechwood would

5    have to call the loans.  If Beechwood calls the loans, they

6    would wind up having to be adjusted to zero or a pretty

7    de minimus amount, which would have caused a severe problem for

8    Platinum if Platinum was having to take huge write-downs

9    because of these defaults.

10   Q.  Do you see Plaintiffs' Exhibit 398 in front of you?

11   A.  Yes, I do.

12   Q.  Is this the sort of document that you would have reviewed

13   concerning this debt stability interest payment issue?

14   A.  Yes.

15           MR. GLUCK:  Move this document into evidence.

16           MR. LAUER:  Is there another page to this?

17           MR. GLUCK:  I'm sure there is.  It's a series of

18   invoices like this with the cover email.

19           MR. LAUER:  We can't find the citation.  Can you help

20   us.

21           MR. GLUCK:  The help would be the bottom of legend

22   produced in this case with the number after it.

23           MR. LAUER:  In the report.

24           MR. GLUCK:  This is an example of the type of document

25   concerning the issue.

1           MR. LAUER:  We're asking counsel where in the report

2     this is cited.

3           THE COURT:  Okay.

4           MR. LAUER:  He didn't cite it, we object.

5     BY MR. GLUCK:

6     Q.  Did you cite every single email or document that you looked

7     at in this case in your report?

8           MR. LAUER:  We're dealing with 398, your Honor, and

9     Exhibit 1 lists all the documents that he relied on or staff

10    relied on.  We've studied this.

11          THE COURT:  The objection is sustained.

12          MR. GLUCK:  Take that down.

13    Q.  Did you review documents in evidence concerning the payment

14    of interests by PPVA in respect of the assets you analyzed?

15    A.  Yes.

16    Q.  And what effect does this have on valuation?

17    A.  It contributes towards overvaluation if the actual entities

18    that owe the money can't pay the interest, because if they

19    can't pay the interest, they clearly can't pay the principal.

20    So that would be a basis for calling the loans and most likely

21    marking them down to zero.

22    Q.  What evidence did you review that some of the assets that

23    you were looking at were actually defunct or inoperable?

24          MR. LAUER:  Leading.

25    Q.  Did you consider the issue of whether any of the assets you

1   were viewing were defunct?

2   A.   Yes.

3   Q.   Such as what?

4   A.   For example, Golden Gate Oil, which was being valued at

5   about $140 million, they were reworking abandoned oil fields

6   that had been abandoned in the 1980s by Unical.  They were not

7   able to pump sellable oil, they were actually pumping water and

8   they didn't have the money to be able to remove the water.

9   They did not have the money to be able to continue with the

10  drilling.  They had numerous defaults with their various

11  vendors.  By middle of 2015, they actually were in default with

12  the lessors, the property owners that they had to pay in order

13  to maintain their lease rights and they were losing their

14  permits on these oil fields to be able to produce anything.

15           In the case of Golden Gate, the last financial

16  statements that they had were from 2012.  They were audited by

17  an unknown accounting firm.  They showed the company had

18  minimal revenues, that it was insolvent, and all the

19  information that I saw since then confirmed that.  The email

20  correspondence that I saw pertaining to Golden Gate was

21  reiterating their financial difficulties, their inability to be

22  able to produce sellable oil, the inability to be able to pay

23  its vendors.  That's an example of what I saw with other

24  investments.

25           (Continued on next page)

```
 1              MR. GLUCK:  Let's look at some examples.  PX 549.  We
 2   move this into evidence.
 3              MR. LAUER:  No objection.
 4              THE COURT:  Received.
 5              (Plaintiff's Exhibit 549 received in evidence)
 6   BY MR. GLUCK:
 7   Q.  What were your conclusions regarding the ability of
 8   Golden Gate or Northstar to produce oil and how does this
 9   document relate?
10   A.  This is indicative of the types of e-mails I was seeing.
11   Ari Hirt, the person who was overseeing the investment, says in
12   the second paragraph, "Temporary shutdown of all wells was put
13   in place last week," and so this is indicative of the types of
14   problems that they were encountering, and this series of
15   e-mails pertains to the inability of Golden Gate to be able to
16   pay its vendors and other problems that were occurring at that
17   time, and this was the prelude to their being in default of
18   their obligations to the lessor, the entity from which they --
19   entity or entities from which they leased the lands on which
20   they were doing drilling that was the basis for them eventually
21   losing their leasehold rights.
22   Q.  Thank you.
23              PX 252.  Thank you.  In your report.  And I seek to
24   move it into evidence.
25              MR. LAUER:  No objection.
```

1        THE COURT:  Received.

2        (Plaintiff's Exhibit 252 received in evidence)

3   BY MR. GLUCK:

4   Q.  Did you analyze the circumstance of the purchase in August

5   of 2014 of the remaining 50 percent interest in Golden Gate

6   Oil?

7   A.  Yes.

8   Q.  And what were your conclusions?

9   A.  That with this purchase it reflects a value that is

10  radically different than the value that was being attributed to

11  Golden Gate Oil.

12  Q.  How is it radically different?

13  A.  Round numbers, and I have seen a number of documents

14  related to this, but the purchase price for 50 percent interest

15  in August of 2014 was $2.7 million.  So if half is worth 2.7

16  million, the whole thing would be worth 5 1/2 million.

17  Q.  Thank you.

18        And have you reviewed the NAV statements of PPVA

19  through, let's say, April 2016?

20  A.  Yes.

21  Q.  What did PPVA value Golden Gate at generally through April?

22  A.  By even at the very end, 2016, March, where they no longer

23  even had the rights to drill, Golden Gate's securities were

24  being valued at $140 million.

25  Q.  What is the effect of losing leases or the rights to drill

1    on the value of the property subject to drilling?

2    A.  Well, the value of the assets, such as, any equity

3    interests, any debt interests, is going to be zero.  You have

4    no ability to realize that value.

5    Q.  And had you reviewed information that leases had been

6    actually lost by 2016?

7    A.  Yes.  I saw some correspondence pertaining to that.

8    Q.  Thank you.

9          Did you perform a similar analysis for the other six

10   assets on your table?

11   A.  Yes.

12   Q.  Including Northstar?

13   A.  Yes.

14   Q.  For each of the assets you assume that the original

15   valuation was correct and then that there was a devaluation

16   evenly spread over time?

17   A.  Yes.

18   Q.  What is your conclusion as to the minimum amount by which

19   management fees were overpaid during the damages period?

20   A.  As indicated in that chart that we previously saw, a little

21   bit more than $15 million was the minimum amount by which

22   management fees were overpaid from December 2012 through March

23   2016.

24   Q.  Mr. Quintero, were you also asked to prepare an analysis

25   about what would have happened if the true asset values had

1    been disclosed?

2              MR. LAUER:  Objection.

3              THE COURT:  Overruled.

4    A.  Yes.

5    Q.  What does the phrase "run on the bank" mean?

6    A.  It dates back to the depression, where once depositors find

7    out a bank is having problems, they rush to the bank to get

8    their money out while there is still something to withdraw.

9    Q.  Please state your conclusions reached, if any, regarding

10   what the impact of disclosure of the actual values of the

11   assets that you analyzed would have been?

12             MR. LAUER:  Objection.  This is also specifically

13   dealt with in the *Daubert*.  I'm finding the page.

14             MR. GLUCK:  41 through 42, your Honor, specifically

15   authorizes him to testify on this subject, page 41 to 42.

16             MR. LAUER:  We are mindful of that part.  What we are

17   objecting to is the numeric element on the -- any numeric

18   element.

19             MR. GLUCK:  Doesn't restrict numeric elements.

20   Restricts --

21             THE COURT:  You are talking about the sentence at the

22   very bottom of page 41 going over to the top of 42, right?

23             MR. LAUER:  Yes.

24             THE COURT:  So he can't give any quantification.

25             MR. GLUCK:  Sidebar, your Honor?

1           THE COURT:  No.

2           So I take it -- just to move things along, I take it

3    that your view is that if all these overstatements had been

4    revealed to the regular investors in Platinum, that they likely

5    would have sought to withdraw their investments or take other

6    action.

7           THE WITNESS:  Yes, your Honor.

8           THE COURT:  Go ahead, counsel.

9    BY MR. GLUCK:

10   Q.  Please describe what happens to a fund like PPVA when there

11   is wave of withdrawals.

12          MR. LAUER:  Objection.  That violates the *Daubert*,

13   your Honor.

14          THE COURT:  Overruled.  I think the next sentence on

15   page 42 allows this testimony.

16   BY MR. GLUCK:

17   Q.  I'll state the question again.  Please describe what

18   happens to a fund like PPVA when there are a wave of

19   withdrawals?

20   A.  If there is a wave of withdrawals and the fund is unable to

21   meet those withdrawals by payment in cash, what would normally

22   happen is the fund would go into a liquidation mode, most

23   likely a receiver or some other third-party would oversee the

24   wind-down and liquidation of the assets of the fund and return

25   of whatever assets are available to the limited partners.

1  Q.  How many management -- are any management fees payable once

2  the wind-down occurs?

3  A.  No.

4           MR. GLUCK:  Thank you, Mr. Quintero.

5           THE COURT:  Cross-examination.

6  CROSS-EXAMINATION

7  BY MR. LAUER:

8  Q.  Good morning, Mr. Quintero.

9  A.  Good morning.

10  Q.  You testified that the last audited statement that you saw

11  with respect to Golden Gate was for 2012?

12  A.  That is my recollection.

13  Q.  Okay.  I would like to show you DX 582.

14           Show that to the witness.  Do you have it?

15           We've got a technological issue.

16           THE COURT:  Let me give the witness my hard copy which

17  seems to be consistently more reliable than technology.

18  BY MR. LAUER:

19  Q.  Am I correct that this, what you are looking at, is an

20  audited financial statement for the year ended December 31,

21  2013, as well as 2012, right?

22  A.  Yes.

23  Q.  Am I right?

24  A.  Yes, that is correct.

25  Q.  Okay.  That was the question.

1          THE COURT:  Are you offering it?

2          MR. LAUER:  We offer it.

3          THE COURT:  Any objection?

4          A VOICE:  No objection.

5          MR. GLUCK:  We are waiting for a paper copy.

6          MR. HERTZBERG:  It's on the screen.

7          THE COURT:  Your co-counsel just said no objection,

8    but you can duke it out with him after the break.

9          Received.

10          (Defendant's Exhibit 582 received in evidence)

11   BY MR. LAUER:

12   Q.  You said if the fund has a wave of withdrawals, that could

13   lead to liquidation or a receiver.  If a fund has a liquidity

14   issue but has assets that are believed to have significant

15   values and there are withdrawals that can't be met, is it not

16   the case that the fund can put these assets in a side pocket

17   and wait for the assets to recover; they do not need to go into

18   liquidation if they like the asset?

19   A.  It would depend upon the rules pertaining to the fund and

20   the ability of the limited partners to vote that the fund be

21   moved into a liquidation mode and/or the manager be replaced.

22   Q.  So depending on the assets, depending on the fund,

23   depending on the relationship between the managers and the

24   limited partners, the fact that withdrawals can't be met does

25   not necessarily mean that the fund closes up shop; it may mean

McdPla2                     Quintero - Cross

that the fund side pockets these investments to work on them
and not worry about withdrawals, right?

A.   That is a hypothetical possibility.

Q.   All right.  And you were giving a hypothetical possibility
of what happens if there is a wave of withdrawals, right?

A.   No, I was giving a probability.

Q.   Did you examine the terms under which this fund operated
and its -- and did you conclude whether this fund had the
ability to side pocket the oil and gas assets?

A.   I don't recall at this point.

Q.   Did you examine the history of the fund that, in an earlier
period of time, when there was a liquidity problem they
side-pocketed assets?

A.   I don't recall at this point.

Q.   And did you review the fund, the history dealing with the
side pocket and the success that came after they side-pocketed
assets in 2008 and 2009?

A.   That was outside the scope of the period that I examined.

Q.   You were shown exhibit -- you were shown a chart which
showed $30,773,000 in incentive fees that you say were paid.

A.   I don't remember if that's the exact number.  I know that
that was the approximate number.

          MR. LAUER:  Can we show the witness the chart?

Q.   Now, can you show me -- you have your report, right?

A.   I do.

1    Q.  Can you show me where in your report you express the

2    opinion that $30,773,579 in incentive fees were paid?

3    A.  My report had a larger number, which has since been

4    reduced, as I previously testified.

5    Q.  Can you show me that?  Where in your report?

6    A.  You are asking for the 30.7 million?

7    Q.  I'm asking you where in your report you say that

8    $30,773,579 in incentive fees was paid, P-A-I-D, paid.

9           MR. GLUCK:  Objection.  Asked and answered.

10          THE COURT:  I'll allow it.

11          (Pause)

12   A.  Exhibit 21 shows the total amount of incentive fees for the

13   period 2013 through March of 2016, but this included both paid

14   and unpaid, as opposed to the $31 million that pertains just to

15   the cash component.  So as I previously testified, I have

16   reduced the amount to only reflect what's been paid in cash

17   either directly through cash payment or, as I previously

18   testified, in kind through the -- both distribution of LP

19   interests which were subsequently redeemed for cash.

20   Q.  Now, we understand that 33 is less than a higher number.

21   The question, Mr. Quintero, is if you are citing Exhibit 21,

22   where on Exhibit 21 do you conclude that the numbers reflected

23   were incentive fees paid?

24   A.  These are the incentive fees that I was able to trace to

25   bank statements or partners' capital accounts.  In the back of

MccdPla2                    Quintero - Cross

1  this report, there was approximately 400 pages of -- worth of

2  statements from SS&C that would have shown some of the

3  allocation of partnership interest -- limited partnership

4  interest; but, again, it is since then that I have reduced the

5  number to focus just on what was converted into cash.  So that

6  would be a subset of the amounts that are reflected in my

7  Exhibit 21.

8  Q.  What I am asking you is do you ever say on Exhibit 21 that

9  these incentive fees were paid?

10            MR. GLUCK:  Objection.  Asked and answered.  Twice.

11            MR. LAUER:  I'm not getting an answer.

12            THE COURT:  I think it's reasonably clear what's there

13  and what's not there.  Let's go on to something else.

14            MR. LAUER:  Okay.

15  Q.  Am I correct that Exhibit 21 reflects fees charged which

16  are basically allocated but does not necessarily mean paid,

17  right?

18  A.  That is correct.

19  Q.  Okay.  Now, by the way, what's the heading on Exhibit 21?

20  A.  "Fees charged to the fund based on AUM"──or assets under

21  management──"reported by Platinum."

22  Q.  What's the next line?

23  A.  "January 2012 through" -- it's not actually correctly

24  labeled.  "January 2012 through March 2016."

25  Q.  Is that a typo, January 2012?

MccdPla2                        Quintero - Cross

1   A.  It is.

2   Q.  It should say January 2013.  Right?

3   A.  That is correct.

4            MR. GLUCK:  Objection.

5   Q.  And that's because all of the --

6            MR. GLUCK:  Objection.

7            THE COURT:  Excuse me, excuse me.

8            MR. GLUCK:  Objection.

9            THE COURT:  We cannot have two people talking.

10            MR. LAUER:  I'm sorry, your Honor.  I didn't hear.

11            THE COURT:  Ground.

12            MR. GLUCK:  Relevance.

13            THE COURT:  I think it is marginally relevant.  I will

14   allow it.  Go ahead.

15   BY MR. LAUER:

16   Q.  Is that because all of the itemized incentive fees in this

17   Exhibit 21 for 2013, 2014, 2015, and the first few months of

18   2016 do not include 2012?

19   A.  No.

20   Q.  Does this include 2012?

21   A.  The fees that were paid in January 2013 would have been

22   based on the December 31, 2012 valuation.

23   Q.  Table 21 deals with fees that were charged, not paid,

24   right?

25   A.  That is correct.

1    THE COURT:  Asked and answered.

2  Q.  So, for example, the year to date 3/16, those fees were

3  never paid, right?

4    MR. GLUCK:  Objection.

5    THE COURT:  I'll allow it.

6  A.  Yes, some of them were.

7  Q.  They were never paid to partners, were they?

8  A.  They were paid to Platinum.

9  Q.  They were paid to Platinum in the form of shares or limited

10  partnership interest.

11  A.  No, there was actual cash that was paid to Platinum for

12  management fees from the proceeds of Agera.

13  Q.  Looking only at the incentive fees on this table, am I

14  correct that the incentive fees listed are the fees that were

15  allocated or charged and not necessarily paid?  Some were paid,

16  some weren't, right?

17  A.  Yes, that is correct.

18  Q.  So let's work backwards.

19    The 1,881,824 for '16, that was not paid, right?

20  A.  That is correct.

21  Q.  The 13,640,075 for 2015 fees, that was not paid in cash or

22  redeemed in cash, right?

23  A.  That is correct.

24  Q.  The $16,795,074 from 2014 also was neither paid in cash nor

25  redeemed in cash, right?

MccdPla2                         Quintero - Cross

1    A.  That is not correct.

2    Q.  Are you saying that these -- some of these fees from 2014

3    were paid in cash or redeemed in cash?

4    A.  Yes, but as you asked me and I answered, Exhibit 21 shows

5    when they were recorded on the financial statements of

6    Platinum.  What I previously testified on -- about pertains to

7    just when actual cash was paid or redemptions of securities for

8    cash occurred.

9    Q.  That's what I am asking you.  And these 16,795,074, these

10   are charged as incentive fees for performance during 2014 and

11   these fees were never paid in cash or, am I correct, redeemed

12   in cash?

13   A.  The -- correct.  I previously testified on the actual cash

14   payments, so this is comparable to, but not identical to, the

15   actual cash payments that occurred.

16   Q.  I'm not asking you to compare arithmetic numbers.  I am

17   asking you about this table.  All right?  Am I correct that

18   this table purports to show fees allocated for each of the

19   years that ended.

20              MR. GLUCK:  Objection.

21   Q.  It does not --

22              THE COURT:  Sustained.

23   BY MR. LAUER:

24   Q.  This chart --

25              THE COURT:  Sustained.

MccdPla2                        Quintero - Cross

Q.  Where in your report do you show that any of these fees
listed under the heading "2014" were either paid in cash or
redeemed in cash?

        MR. GLUCK:  Asked and answered.

        THE COURT:  No.  I will allow it.

A.  In the back 400 pages of my report, I indicate the amount
of credits associated with transfers of LP interest.  I did not
reflect the actual cash payments that I have just testified on
as an amount in my report.  As I previously testified, I have
since reduced the amount just to focus on cash.

Q.  And I'm focusing on whether any of these 2014 fees were
ever paid.  You have the entire report in front of you, right?

A.  No, I only have the text and exhibits.  I don't have the
400 pages of appendices.

        MR. LAUER:  Can I have a copy of the report?

        May I hand this to the witness, your Honor?

        THE COURT:  Sure.  And then once you have finished
this area, we need to give the jury their mid-morning break.

BY MR. LAUER:

Q.  The question is, can you show where in your report,
including the back of the report, you identified any payments
either in cash directly or redeemed in cash based on the 2014
fees?

A.  It is not directly reflected in those detailed exhibits in
the back.

MccdPla2                     Quintero - Cross

1   Q.  So is there anything in your report that connects the

2   16,795,074 in charged fees for 2014 to any payments?

3   A.  No.

4   Q.  Will you agree with me that in fact this number does not

5   reflect any fees actually paid?

6   A.  It is a basis for calculating fees, but is not the cash

7   amount.

8   Q.  Okay.  Now, turn to --

9          MR. LAUER:  Your Honor, I have a few more questions on

10  this topic and then if we could break if that's okay.

11         THE COURT:  All right.

12  BY MR. LAUER:

13  Q.  Turn to PX 924.  That's the chart, plaintiffs' damages,

14  incentive fees.  Do you have it?

15         What portion of the 30,773,579 is based on incentive

16  fees computed on the basis of performance from 2012, 2013, can

17  you break that up?

18  A.  Yes.

19  Q.  Okay.  So of the 30,773,579, how much of that was based on

20  incentive fees computed for year end 2012?

21  A.  The year end December 31, 2012 is the basis for computing

22  the fees for 2000 -- that are paid out in 2013.  So it's not

23  even subject to being calculated until 2013.  And as I

24  previously testified, this chart shows just what was paid, not

25  necessarily what year that it pertains to.

MccdPla2                     Quintero - Cross

1   Q.  Did you -- if we don't know what year it pertains to, we

2   don't know whether it comes from -- let me rephrase that.

3        Year end 2012 incentive fees are calculated at some

4   point after December 31, 2012, correct?

5   A.  Yes, they are calculated as of December 31, 2012, because

6   they can't be calculated prior to that.  And then they are

7   awarded in 2013.

8   Q.  Okay.  So when I talk about 2012 fees, I'm talking about

9   incentive fees that are calculated on the basis of December 31,

10  asset under management, December 31, 2012.  Do you understand

11  me?

12  A.  Yes.

13  Q.  What portion -- and at some point a number was calculated,

14  right?  And according to your chart, some or all of that was

15  paid in cash or redeemed in cash, right?

16  A.  Yes.

17  Q.  And then the next year, at the year end 2013, a new

18  calculation was done of incentive fees and a number was

19  determined, and that was charged for the 2013 incentive fees,

20  right?

21  A.  Yes.

22  Q.  Now sticking on those two years, incentive fees that are

23  based on 2012 and incentive fees that are based on 2013,

24  putting aside when or whether they were paid, just determining

25  which are 2012 fees and which are 2013 fees, what portion of

MccdPla2                         Quintero - Cross

1    this 30,773,579 comes from the 2012 fees and what portion comes

2    from the 2013 fees.

3    A.   This is calculated in the same way as my Exhibit 21.

4    Normally what would occur is that incentive fees would be

5    awarded, paid in either cash or in securities, and so the

6    principal dates were February 2013, February 2014, because by

7    those dates they would have had the year end data from December

8    2012, December 2013.

9    Q.   Can you tell --

10            THE COURT:   Counsel, I'm going to give you -- we can

11   break now and you can continue afterwards, but you can't

12   keep --

13            MR. LAUER:   No, let's break because . . .

14            THE COURT:   All right, fine.

15            So ladies and gentlemen, we will give you a 15-minute

16   break at this time.

17            Mr. Quintero, you can step down.  We will see you in

18   15 minutes.

19            (Continued on next page)

20

21

22

23

24

25

 1                (Jury and witness not present)

 2                THE COURT:  Please be seated.

 3                All right.  When we resume after this break, I will

 4      want defense counsel to give me a binding representation of how

 5      much longer he will be on cross-examination Mr. Quintero.

 6                Mr. Bodner has returned and we previously got a

 7      representation from plaintiffs' counsel that, but for the issue

 8      of the charts, which we will turn to in a minute, he would have

 9      only 15 minutes more of cross, so it sounds to me like we will

10      reach the other defense witnesses possibly before lunch, but

11      more likely beginning right after lunch.  So who is the first

12      defense witness?

13                MS. MOSSE:  Your Honor, we have Murray Grenville from

14      Sterling Valuation and then --

15                THE COURT:  I remember him well.  Okay.  So the

16      defense counsel was worried about ending by tomorrow.  I'm not.

17      But we need to keep witnesses available and ready to proceed.

18                Yes.

19                MR. SEIDEL:  Your Honor, we are not sure that either

20      the valuation or accounting experts -- accounting witnesses are

21      necessary.  My slip explains the reason.

22                THE COURT:  We can take that up in a minute.  I want

23      to deal with the charts first.

24                MR. SEIDEL:  Okay.  Fair enough.

25                THE COURT:  It seems to me clear that these charts,

MccdPla2                    Quintero - Cross

which are collectively Plaintiffs' Exhibit 933, could only have
been introduced through a summary witness or possibly the
testimony of Ms. Albanese.  Plaintiffs never proposed a summary
witness nor listed any such witness.  Indeed, the whole idea of
a summary witness didn't even enter into their presentation
until the Court mentioned it yesterday for the first time.

          Yet these are classic examples of what would normally
be presented as a summary witness under Federal Rule of
Evidence 106.  "The proponent may use a summary chart or
calculation to prove the content of voluminous writings,
recordings, or photographs that cannot be conveniently examined
in court.  The proponent must make the originals or duplicates
available for examination or copy or both to all of the other
parties at a reasonable time and place, and the Court may order
the proponent to produce them in court."

          Not only was no summary witness offered, but it
appears that the only person who could qualify as a summary
witness at present would be one of plaintiffs' counsel, which
would lead to the very discouraged practice of having counsel
testify even while representing a party.  I already precluded
Mr. Lauer's being called as a witness for that reason, among
others.  And I see no way to avoid similar harm if plaintiffs'
counsel were called as a summary witness.

          For example, these charts reflect judgment calls by
the preparer of the charts that undoubtedly would be the

MccdPla2                    Quintero - Cross

1    subject of cross-examination, and thus her credibility would be

2    an issue, just the sort of thing that is confusing to a jury

3    when the witness is also counsel for one of the parties.

4           In addition, a decision was made by counsel jointly,

5    after Ms. Albanese was sick, not to have her come back when she

6    was well for any purpose.  And while I have still not been

7    furnished, as I asked to be furnished, with a transcript of her

8    testimony, my own recollection is that it did not -- don't give

9    me now what I asked for two hours ago.  I will take it since

10   you are on your feet.  My own recollection, and I will read

11   this over the remainder of the break and make sure it doesn't

12   detract from what I have to say, is that while there were some

13   general references to some of the kinds of documents presented

14   in these charts, there was nothing like an elaborate inquiry of

15   her as to what the various bases of these charts might mean or

16   what their limitations and exceptions would be.

17          So I think there would be considerable prejudice, for

18   all the reasons I just mentioned, to having a summary -- to

19   having plaintiffs' case reopened to allow a summary witness,

20   and I see no other bases for allowing this exhibit in evidence,

21   and therefore Plaintiffs' Exhibit 933 will be excluded.

22          Now, this does not prohibit plaintiffs' counsel from

23   asking more detailed questions about some of the entries or

24   some of these meetings of Mr. Bodner, and I will therefore

25   extend the cross-examination of Mr. Bodner to up to 45 -- the

MccdPla2                         Quintero - Cross

```
 1   remaining cross-examination of up to 45 minutes, but the

 2   difference, the additional half hour will be solely on the

 3   question of meetings as reflected in these charts.

 4           With respect to whether a particular witness that the

 5   defendants seek to call should be allowed, I will hear argument

 6   on that at the lunch break.

 7           MR. SEIDEL:  Sorry, your Honor, you said at the lunch

 8   break?

 9           THE COURT:  At the lunch break.

10           MR. SEIDEL:  Thank you, your Honor.

11           THE COURT:  All right.  I will give you five more

12   minutes.

13           (Recess)

14           THE DEPUTY CLERK:  All rise.  May I bring in the jury?

15           THE COURT:  Yes, and let's get the witness on the

16   stand.

17           Where is Mr. Lauer?

18           Hold on.

19           THE DEPUTY CLERK:  Okay.

20           THE COURT:  Mr. Lauer, how much more do you have on

21   cross?

22           MR. LAUER:  I'm sorry?

23           THE COURT:  How much more do you have on cross?

24           MR. LAUER:  I have two hours on cross, your Honor.

25   This is complex and --
```

1              THE COURT:  Two hours.

2              MR. LAUER:  If it gets a little smoother, it could be

3     less.  It really is complex, your Honor.

4              THE COURT:  Well, the -- please be seated.

5              Since you asked for two hours and this is an important

6     witness, of course you have already gone well over an hour, so

7     we are talking three hours plus, but I will allow that, but I

8     may intervene if I think time is being wasted.  For example,

9     there was significant questioning about Exhibit 21 to the

10     report.  It was never in evidence.  Virtually every question

11     could have been objected to by plaintiffs' counsel on the

12     ground that is it refers to a matter not in evidence.

13              It is one thing to -- an expert of course can always

14     be examined about document that is relied on or he produced

15     that are not in evidence, but this went far beyond that.  This

16     was like detailed description of individual entries and things

17     like that.  If the jury—and we have an extraordinarily good

18     jury in this case who have been taking careful notes and so

19     forth.  If the jury could follow what any of that was about,

20     then I think we need to put them into the prognostication

21     business because they clearly are brilliant beyond all known

22     prior juries.

23              In short, there was an excessive waste of time.  Now,

24     plaintiffs' counsel did not object and therefore I didn't cut

25     it off.  I can understand, though, strategically why

MccdPla2                        Quintero - Cross

1    plaintiffs' counsel may not want to object when its own expert

2    is on the stand.  So now if I think it is a waste of time in

3    the future I'm going to intervene.

4              With that reservation, you have your two hours.

5              MR. GLUCK:  Two small points on the subject, your

6    Honor.

7              THE COURT:  I'm sorry?

8              THE DEPUTY CLERK:  Jury entering the courtroom.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MccdPla2                         Quintero - Cross

1                       (Jury present)

2                  THE COURT:  Please be seated.  Counsel.

3     BY MR. LAUER:

4     Q.  Mr. Quintero, would you --

5                  THE COURT:  I'm sorry.  Did plaintiffs' counsel want

6     something?

7                  MR. GLUCK:  Yes.  We had an objection.  We request a

8     sidebar to the continuing line of questioning.

9                  THE COURT:  Let's hear the question.  Go ahead.

10    BY MR. LAUER:

11    Q.  I think you were shown earlier from one of the schedules in

12    your report Investor Capital Detail for Partnerships for the

13    period 1/1/2013 to 1/31/2013.  Am I correct?

14    A.  Would you direct me to where in my report you are

15    referring?

16    Q.  I am referring to the colored schedules and the one that

17    has "Investor Capital Detail for Partnerships."  I believe you

18    were shown this earlier today.

19    A.  Okay.  The SS&C schedules?

20    Q.  Yes.

21    A.  Yes.

22    Q.  Could you turn to the page for -- that you were shown

23    before which is January 1, 2013 to January 31, 2013.

24                 MR. GLUCK:  Objection.

25                 THE COURT:  Sustained.

MccdPla2                    Quintero - Cross

1   BY MR. LAUER:

2   Q.  Does this chart indicate the amount of accrued incentive

3   fees for the year ended 2012?

4              MR. GLUCK:  Objection.  Entire line.

5              THE COURT:  No.  I'm going to allow it.

6              So ladies and gentlemen, before an expert witness

7   testifies, they have to prepare a report and counsel is

8   permitted within limits to question the witness as to whether

9   his report backs up what he said in court, but I'm going to ask

10  counsel to keep this quite limited because it's very hard for

11  the jury, which doesn't have the report, to follow what you are

12  getting at.  But I will allow it within limits.

13  BY MR. LAUER:

14  Q.  Can you answer the question?

15  A.  Will you please direct me to the page from this exhibit

16  that you are referring.

17  Q.  Well, it is the page --

18             THE COURT:  What page of his report?

19             MR. LAUER:  They don't have pages.

20  Q.  It's the schedule Investor Capital.

21             THE COURT:  I'm sorry.  I have a copy of the report

22  and I won't be able to find it unless someone can tell me where

23  in the report it is.

24             MR. LAUER:  Your Honor, it is by date, and he was

25  shown this earlier.

MccdPla2                        Quintero - Cross

```
 1              THE COURT:  All right.

 2              MR. LAUER:  It is January --

 3              THE COURT:  I'm looking at the report, and there is

 4     the report.  There are then a bunch of exhibits --

 5              MR. LAUER:  It is the --

 6              THE COURT:  -- and then there is an appendix.  Now

 7     which is this?

 8              MR. LAUER:  It's now on the screen.

 9              THE COURT:  I don't care.  I want to know where in the

10     report it is.

11              MR. LAUER:  I can show you it in the hard copy.

12              THE COURT:  Well, I'm looking at the hard copy and I

13     am just asking would someone like to point me to it.  But never

14     mind.  I don't want to belabor this with the jury.  Let's go.

15     Put your question.

16     BY MR. LAUER:

17     Q.  Does this indicate --

18              THE COURT:  And I assume the screen is not being shown

19     to the jury because it is not in evidence.

20              MR. LAUER:  No.

21     BY MR. LAUER:

22     Q.  Does this indicate to you the amount of incentive fees that

23     were charged for the year ended December 2012?

24              MR. GLUCK:  Objection.

25              THE COURT:  I'll allow that.
```

MccdPla2                    Quintero - Cross

1    A.  It is not so noted on this page.

2              THE COURT:  So what is this page?

3    Q.  Is there anything --

4              THE COURT:  What is this page?

5              THE WITNESS:  The one that Mr. Lauer was just

6    referring to that's on my screen.

7              THE COURT:  Yes.  What is it.

8              THE WITNESS:  This is an excerpt from the monthly

9    report created by SS&C, which is the third-party administrator

10   of the fund.

11             THE COURT:  Okay.

12   BY MR. LAUER:

13   Q.  Is there anything in any of your reports or schedules that

14   would enable us to see what amount of fees in your opinion are

15   based on incentive fees charged to the fund for the calendar

16   year ended December 31, 2012?

17             MR. GLUCK:  Objection.

18             THE COURT:  Hang on.

19             Well, I think he really answered this before when he

20   explained how he calculated and the methodology he used, but

21   you may answer the question.

22   A.  My report in the Exhibit 21 that you were previously asking

23   me about is a summary exhibit, the sources of which are

24   reflected in the footnote.  But as I previously testified a

25   couple times, I have since refined it to solely focus on the

MccdPla2                         Quintero - Cross

1    cash payments, which is a lesser amount.

2    Q.  I'm sorry to belabor this, Mr. Quintero, but it is

3    important to know which year is associated with incentive fees,

4    so I am asking you is there anything where you identify in your

5    report or in the schedules that would show the dollar amount of

6    incentive fees that you believe were charged to the fund for

7    the year 2012?  And that's the year that had the explosion,

8    right?

9              MR. GLUCK:  Objection.  Misleading.  Report not in

10   evidence.  Sidebar requested.

11             THE COURT:  I will give you the sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

MccdPla2                    Quintero - Cross

1              (At the sidebar)

2              MR. GLUCK:  This --

3              THE COURT:  The objection not in evidence is not a

4    valid objection.  As I have already explained to the jury, in

5    fact, an expert can be cross-examined about his report and

6    about other underlying documents that he relied on so that they

7    can assess whether he is relying on good information or bad

8    information.  It is very hard for the jury to follow.  That's a

9    different issue.  That's the issue I raised with Mr. Lauer.

10   But the objection that it is not in evidence is overruled.

11             Now, what else?

12             MR. GLUCK:  The other objection was confusing and now

13   allow me to explain what's going on.  I think this entire line

14   of questioning is inappropriate for the jury to hear.

15             THE COURT:  Go ahead.

16             MR. GLUCK:  Mr. Quintero prepared a report on the

17   total amount of incentive fees paid and at the time that

18   amount was both cash and LP interests.  Only after this

19   particular report was issued did we have the *Daubert* decision

20   this Court decided in which the Court determined that only cash

21   paid would constitute damages to the master fund and what

22   Mr. Quintero will testify about.  The bank statements in the

23   SS&C reports comprising only those cash payments are appended

24   to his report.

25             It appears that the entire purpose of Mr. Lauer's

1    testimony is to highlight the fact that now, pursuant to this

2    Court's order that he may only testify as to that cash -- and I

3    object to the word "paid" because the LP interests were paid

4    just by the feeder fund, they were received, the entire purpose

5    to say where in your report does it say that there was this for

6    this year, and the answer is because the original report

7    combined and did not distinguish between the cash fees and the

8    LP interest paid, okay?  So it's not there obviously.

9            But it's so confusing to the jury because -- and this

10   is from their own bench memo submitted to this Court.  "If a

11   member" -- this is where we got to now.  "If a member of the

12   general partner redeems unearned inflated fees for a cash

13   payment, Bodner acknowledges that it is properly characterized

14   as a damage."  the answer to this question would then require

15   Mr. Quintero to go into the bank statements that are the

16   subject of his report and literally add up the totals, because

17   obviously it is not there, but he's done that in his testimony.

18           MR. LAUER:  Can I respond?

19           THE COURT:  Yes.

20           MR. LAUER:  This has nothing to do with the real

21   issue.

22           Your Honor, I believe, quite mistakenly, ruled——no,

23   this goes to the heart of the issue——that Mr. Quintero could

24   testify about 2012 damages, and what I -- and your Honor, I

25   know this thing is moving quickly, your Honor --

MccdPla2                    Quintero - Cross

 1              THE COURT:  I respectfully disagree with that.

 2              MR. LAUER:  Your Honor looked at the report and you

 3    denied my objection.  There is nothing in this entire report in

 4    which he says anything about $18 million of inflation from

 5    2012.  This entire case has been --

 6              THE COURT:  Okay, okay.

 7              MR. LAUER:  And that --

 8              THE COURT:  So, so, if that is the question, then why

 9    don't you put to him the question:  Where in this report do you

10    say anything about 2012 inflation?

11              MR. LAUER:  All right.  I would be happy to.

12              THE COURT:  That would be --

13              MR. LAUER:  I --

14              THE COURT:  But you haven't asked that question.  But

15    if you would like to put that question, I will allow that.

16              MR. LAUER:  Thank you, your Honor.

17              THE COURT:  Any time.

18              MR. HERTZBERG:  But the jury doesn't know how much of

19    the 31 is attributable to that.

20              MR. LAUER:  No.  That's what I am asking.

21              THE COURT:  You can have plenty of colloquy between

22    yourselves, but not on my time.

23              MR. HERTZBERG:  Thank you, Judge.

24              (Continued on next page)

25

MccdPla2                         Quintero – Cross

1              (In open court)

2    BY MR. LAUER:

3    Q.  Mr. Quintero, where in your report do you reflect that

4    damages include $18 million of incentive fees accrued or

5    associated with the year end 2012?

6    A.  As I previously testified and wrote in my report, since no

7    calculations were provided by Platinum, I don't have a direct

8    basis for calculating it and so, as I testified, I have refined

9    my calculation to only reflect cash.  And so that cash would

10   have been subsumed within the information that is summarized in

11   my Exhibit 21.

12             THE COURT:  I guess maybe I am misunderstanding both

13   the question and the answer.  Is there somewhere –– you say in

14   your report that the damages due to inflated management and

15   incentive fees are at least $70.9 million.  Do you remember

16   saying that in your report?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  What portion of that is

19   attributable to payments made from 2012?

20             THE WITNESS:  The payments occurred in 2013 and

21   subsequently.

22             THE COURT:  Okay.  So there were no payments made in

23   2012 that are part of that $70.9 million.

24             THE WITNESS:  Not to the best of my recollection, your

25   Honor.

MccdPla2                    Quintero - Cross

 1              THE COURT:  Okay.  That's fine.

 2              Now, with respect to the years that that does apply

 3     to, it's 2013, 2014, 2015, and 2016?

 4              THE WITNESS:  In the calculation, yes, your Honor.

 5              THE COURT:  Okay.

 6              Some of this has already been discussed, but just so

 7     the jury is clear and I am clear, some of that was in cash and

 8     some of it was in other forms of transfers, yes?

 9              THE WITNESS:  Yes, it was with respect to what I

10     previously testified in this proceeding, yes, your Honor.

11              THE COURT:  And the backup for the portion that was

12     cash is contained in your report where?

13              THE WITNESS:  It's referred to in my Exhibit 21, which

14     is a summary exhibit.  It is the underlying bank statements of

15     the fund.

16              THE COURT:  All right.  So you examined the underlying

17     bank statements and then summarized them in Exhibit 21, and the

18     underlying bank statements were, so far as you know, made

19     available to both sides here?

20              THE WITNESS:  To the best of my knowledge.

21              THE COURT:  All right.  Then in determining how much

22     of, say, the incentive fees -- the incentive fees was an

23     automatic calculation under the contract, yes?  If the assets

24     were here, then a percentage of that was paid in incentive

25     fees, is that right?

MccdPla2                    Quintero - Cross

1           THE WITNESS:  It should have been, yes, your Honor.

2           THE COURT:  Correct.  So that didn't require any

3    extended hypotheses, it was a simple question of arithmetic.

4           THE WITNESS:  That's what it should have been, your

5    Honor.

6           THE COURT:  All right.  Whether or not those were paid

7    in fact is shown how?

8           THE WITNESS:  By looking at the actual cash or in-kind

9    payments about which I have testified today --

10          THE COURT:  Okay.

11          THE WITNESS:  -- and last week.

12          THE COURT:  So now with respect to the management

13   fees, you used -- you did use a hypothesis of how to apportion

14   them for any given year, right?

15          THE WITNESS:  I did.

16          THE COURT:  And that was what you referred to as the

17   straight line approach, yes?

18          THE WITNESS:  Yes.

19          THE COURT:  All right.  And that's all stated in your

20   report, yes?

21          THE WITNESS:  It is.

22          THE COURT:  All right, counsel.  Go ahead.

23   BY MR. LAUER:

24   Q.  I understand your testimony that the 30 million reflects

25   payments made in cash or redeemed for cash during the calendar

MccdPla2                      Quintero - Cross

1    years 2013 and 2014, right?

2    A.  That is correct.

3    Q.  So we are not addressing '15 or '16 because there were no

4    redemptions or payments made in cash, right?

5    A.  For incentive fees, that is correct.

6    Q.  All right.  Only on incentive fees now.

7            With respect to the payments made in '13 and '14, is

8    there anything anywhere that allows us to identify which of

9    those fees is based on your opinion that incentive fees were

10   inflated for 2012?

11           MR. GLUCK:  Objection.  Asked and answered.

12           THE COURT:  No.  Now I am beginning to understand what

13   Mr. Lauer is getting at.

14           So is it your opinion, as stated in your report, that

15   there was an inflation of NAV during 2012?

16           THE WITNESS:  In my report I start with December of

17   2012 and, yes, that is correct.

18           THE COURT:  So -- and that's after the Black Elk

19   explosion.

20           THE WITNESS:  Yes, your Honor.

21           THE COURT:  So if I understand the question──if not, I

22   will ask counsel to rephrase──did any inflation occur, in your

23   view, in 2012 after December or in December that affected your

24   calculations for how much was paid incentive fees in 2013 and

25   2014?

1          THE WITNESS:  Because the company, Platinum, did not

2     disclose how these amounts were -- that were paid were

3     calculated, I don't know.  So I reverted to two simple

4     things—one, I know that there was gross inflation as of

5     December 31, 2012; and, two, I know the cash amounts that were

6     paid promptly after year end, but those cash amounts are not

7     supported by any document that I saw from Platinum indicating

8     how they were calculated.

9          THE COURT:  All right.  So in other words, you are

10    saying their monies flowed from the company, from the fund to

11    various entities or individuals, including some associated with

12    Mr. Bodner, beginning in early 2013.

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  And those figures you can derive from the

15    bank statements.

16         THE WITNESS:  Bank statements, that is correct, and/or

17    changes in the partnership interests that were transferred and

18    then subsequently redeemed.

19         THE COURT:  And how exactly those were calculated by

20    the company you do not know, true?

21         THE WITNESS:  That is correct.

22         THE COURT:  But if the assets had been hugely

23    overinflated, then no money should have flowed.

24         THE WITNESS:  That is correct.

25         THE COURT:  Yeah.  Go ahead, counsel.

MccdPla2                    Quintero - Cross

1   BY MR. LAUER:

2   Q.  So on the -- the incentive fees were accrued monthly,

3   right?

4   A.  I don't recall at this point if they were accrued monthly,

5   but they can't be earned for the year until after year end.

6   Q.  Did you study the SS&C charts?

7   A.  Yes.

8   Q.  And the SS&C charts have a column for incentive fee, right?

9   A.  That is my recollection.

10  Q.  And the charts go month by month and show the accrual for

11  the incentive fee, right?

12  A.  Yes, but that would only be an estimate on an interim

13  basis.

14  Q.  I understand it's an estimate.  But it accrues monthly

15  throughout the year 2012, right, month by month, what the

16  incentive fees are being accrued for that year, right?

17            MR. GLUCK:  Objection.

18  A.  We --

19            MR. GLUCK:  Not in evidence.

20            THE COURT:  No.  I'm going to allow it.

21  A.  Would you show me what you are looking at so I can confirm

22  that?

23  Q.  Do you have the SS&C charts?

24            THE COURT:  He is going to have the same problem that

25  I have, counsel, which is your incapability of pointing us to

MccdPla2                         Quintero - Cross

1    the specific page.

2              MR. LAUER:  Because there are no pages.  It is by

3    month.  We will put it on the --

4              THE COURT:  You can say like five pages from the end

5    or 13 pages from the marker.  Or you can give him your copy and

6    maybe your co-counsel has another copy.

7    BY MR. LAUER:

8    Q.  Do you see the column "incentive fee"?

9    A.  Yes.

10   Q.  And these are accrued monthly?

11   A.  That appears to be the case, that is correct.

12   Q.  And are you able to turn to December of 2012?  You know how

13   to work these charts, right?

14   A.  I know how to work the charts.  The challenge is finding

15   the one that you are referring to.

16   Q.  December 2012.  It is the month before this one, which is

17   January 2013.  You also have it on the screen now.

18   A.  Yes.

19   Q.  Do you see the top line?

20   A.  Yes.

21   Q.  Do you see the accrual of incentive fees for 2012?

22   A.  This appears to be accrual for the month.

23   Q.  And do you see the ending?  Ending net capital?

24   A.  Yes.

25   Q.  All right.  And that's the ending net capital that was

MccdPla2                      Quintero - Cross

1   accrued for this portion of the fund as of year end 2012,

2   right?

3   A.  Yes.

4   Q.  And do you see --

5   A.  That is the total interest of the fund.

6   Q.  Can you tell us the number?

7   A.  The aggregate ending capital is $6,951,859.47.

8   Q.  Now turn to the chart for January of 2013, the next month.

9   Do you see that?

10  A.  Yes.

11  Q.  And that 6 million number is there from the beginning

12  capital?

13  A.  Yes.

14  Q.  And then they added from the other fund the 11 million?

15  A.  Yes.

16  Q.  And you were shown this by Mr. Gluck earlier.  Do you

17  remember that?

18  A.  Yes.

19  Q.  And the total was 18 what?

20  A.  The withdrawal?

21  Q.  Yeah.

22  A.  $18,533,635.46.

23  Q.  So this is the allocation of incentive fees based on 2012,

24  right?

25  A.  It actually doesn't indicate how they were allocated.  All

1   it shows is a dollar value attributed to the withdrawal.

2   Q.  Well, you saw that the 6 1/2 came from 2012, right?

3   A.  That is correct.

4   Q.  And the 11 comes from the other fund?  The intermediate

5   fund?

6   A.  That's not indicated on this chart.

7   Q.  All right.  Last question on this.  Is there anywhere in

8   your report where you give the opinion that 18 million or

9   18,500,000 of incentive fees from 2012 is damages?

10            MR. GLUCK:  Objection.

11            THE COURT:  Overruled.

12  A.  That 18,553,000 -- 533,000, is that the number you are

13  referring to?

14  Q.  Either that or a rounded number.

15  A.  No, I don't have that exact number in my report.

16  Q.  Do you have any number in your report where you say:  This

17  number represents the amount of inflated incentive fees from

18  calendar year 2012?

19            MR. GLUCK:  Objection.

20  A.  In my report I calculate them for each of the main

21  investments by month and I have added them all together.  This

22  amount that you are referring to is for the entire fund, not

23  for the individual investments that I have calculated them for.

24  Q.  Okay.  But you said on your -- in your testimony that the

25  entire incentive fee for 2012 should not be collected, right?

MccdPla2                    Quintero - Cross

A.  No, I said the entire incentive fees that were paid in cash

or in kind and subsequently redeemed during 2013 and '14 were

not earned.

Q.  All right.  You testified about the schedules that you

performed?

A.  I'm sorry.  Which schedules are you referring to?

Q.  Schedules that you testified about when you explained why

you felt you could not do an appraisal or a traditional

valuation.

A.  Yes, but I don't know how you are linking that to specific

schedules.

Q.  Well, you --

A.  The question is ambiguous to me.

Q.  Okay.  You did schedules showing the decline in -- you are

showing your opinion of the decline of the value in these

individual assets, right?

A.  No, that's not correct.

Q.  So turn to -- did you do a schedule for Black Elk?

A.  Yes.

Q.  And did you do a schedule comparing the reported values for

Black Elk versus what you say should be adjusted values for

Black Elk?

A.  Well, to be precise, that was solely for purposes of

calculating inflated management incentive fees.  It was not a

valuation of Black Elk.  I believe those numbers would be much

1  lower, but I previously testified about the straight-line

2  approach that I used for the narrow and specific purposes of

3  calculating inflated management incentive fees.

4  Q.  So I'm asking you, you did these schedules, right?

5  A.  I prepared the schedules I just described, yes.

6  Q.  And in one of the schedules, you compare the reported value

7  for Black Elk, right?

8  A.  Compared it to what?

9  Q.  You compared it to an adjusted value for Black Elk.  Right?

10  A.  That is correct.

11  Q.  And the reported is what you believed came from the

12  Platinum records, right?

13          MR. GLUCK:  Objection.

14  A.  I got them from the SS&C reports which are Platinum

15  records.

16  Q.  And the --

17          MR. GLUCK:  Objection.

18          MR. LAUER:  And -- sorry, what?

19          (Continued on next page)

20

21

22

23

24

25

1      THE COURT:  No.

2  BY MR. LAUER:

3  Q.  And what does the adjusted represent?

4  A.  The adjusted represents, for purpose of calculating

5  inflated fees, the amount that results from this straight-line

6  decline from the initially reported value to the gradual

7  diminution to zero.

8  Q.  So the core of your report were these schedules where you

9  compare your straight-line approach, which reflects adjusted

10  values, to Platinum's actual values; right?

11      MR. GLUCK:  Objection.  Continuing objection to the

12  entire line for the record.

13      THE COURT:  Overruled.

14  Q.  Could you answer the question?

15  A.  So my "analysis compares" is computed based on the

16  calculation for the difference between the adjusted values and

17  the reported values attributed by Platinum to the applicable

18  securities, and using that for the narrow and specific purpose

19  of calculating inflated management and incentive fees.

20  Q.  These schedules were incorporated in your opinion on the

21  inflated -- the damages caused to PPVA from inflated fees;

22  right?

23  A.  That is correct.

24  Q.  So if you would turn to exhibit 23.1, which is in your

25  chart.

MCDCpla3                        Quintero - Cross

1              MR. LAUER:  And I would like to put it up on the

2       screen.

3              MR. GLUCK:  Objection.

4              MR. LAUER:  Not for the jury.  Just for the witness

5       and the Court.

6       Q.  Do you have 23.1?

7       A.  I do.

8       Q.  Could you read the caption so we know what we're talking

9       about?

10      A.  Exhibit 23.1, Black Elk Energy Offshore Operations LLC,

11      minimum damages from inflated management and incentive fees due

12      to Platinum's inflation of reported net asset values, December

13      2012 through March 2016, in dollars, thousands.

14      Q.  Am I correct that the first month included in your damages

15      schedule is December 2012; right?

16      A.  That is correct.

17      Q.  And am I also correct that your schedule shows for December

18      2012, which is the yearend December 2012, the total damages

19      from inflated fees is zero?

20             MR. GLUCK:  Objection.

21      A.  That is correct.

22      Q.  And that is both for incentive fees and management fees;

23      right?

24      A.  Yes.

25      Q.  Now, turn to your chart, exhibit 23.2.

MCDCpla3                     Quintero - Cross

1           Do you have that?

2  A.  I do.

3  Q.  This is your chart.  Read the caption so we know what

4  you're addressing.

5  A.  Exhibit 23.2, Black Elk Energy Offshore Operations LLC.

6  Net unrealized gains as reported and net asset value as

7  adjusted, December 2012 through March 2016, in dollars,

8  thousands.

9  Q.  And the first month that's included in this damages

10  calculation is December 2012?

11  A.  That is correct.

12  Q.  And you list here the reported value, that is the value

13  reported for the yearend 2012 by Platinum for Black Elk, do you

14  not?

15  A.  For the specific securities that are in group A and group

16  B, that is correct.

17  Q.  What was the reported value as of yearend December 2012?

18  A.  Combining the two categories of securities, the reported

19  value was $284,006,000.

20  Q.  According to your schedule, what was the adjusted value?

21  A.  To start under my straight-line method --

22  Q.  What is the adjusted value?

23  A.  $284,006,000.

24  Q.  And according to your chart, what is the amount, if any, of

25  reported over adjusted?

MCDCpla3                         Quintero - Cross

1    A.  Zero.

2    Q.  Just so that we understand this, the next month is January

3    2013; right?

4    A.  Yes.

5    Q.  And there, what was the reported value?

6    A.  $295,530,000.

7    Q.  And what was the adjusted value?

8    A.  $208 million -- pardon me?

9    Q.  I think you misspoke.

10   A.  $271,833,000.

11   Q.  So for January of 2013, did you state that there was a --

12   what was the reported over adjusted in January of 2013?

13   A.  $23,697,000.

14   Q.  And it goes down from there; right?

15   A.  Well, it changes on a monthly basis.  Sometimes it

16   increases, sometimes it decreases based on differences between

17   what Platinum was reporting as opposed to the result of my

18   straight-line calculations.

19   Q.  And in your opinion and the work that you did, the reported

20   over adjusted reflects the amount of inflation; right?

21   A.  Well, to be more precise, the excessive reported value over

22   a diminution of value based on a straight-line method.

23   Q.  If you turn back to 23.1, which is calculating the

24   inflated -- your view of damages of inflated fees for inflated

25   incentive fees for the period December 2012 through March '16,

MCDCpla3                      Quintero - Cross

1  do you have a final number after going through all the months

2  in that period of damages from inflated incentive fees?

3  A.  Yes.

4  Q.  And what's that number?

5  A.  $4,107,600.

6  Q.  And that covers all the months from March '16 up to

7  December 12th; right?

8  A.  That is correct.

9  Q.  And if you turn back to table 1, on page 17 of your report,

10  this is a table, right, damages from excessive fees during the

11  damages period?

12  A.  Yes.

13  Q.  And the damages period is December 2012 through March 2016;

14  right?

15  A.  Yes.

16  Q.  And do you list here the total incentive fees that you

17  claim were damages for this period, December 2012 through March

18  of 2016?

19  A.  Yes.

20  Q.  And it's $4,107,600; right?

21  A.  On a net basis, that is correct.

22  Q.  It's not $18 million, is it?

23  A.  No.

24  Q.  Now, you said that you did not do an appraisal or a

25  traditional valuation of these assets at any point in time;

MCDCpla3                    Quintero - Cross

1   right?

2   A.   That is correct.

3   Q.   You're an experienced financial analyst, so you clearly

4   have the skills to do that; right?

5   A.   Subject to having available information, that is correct.

6   Q.   Now, you testified at trial to an opinion that after the

7   platform explosion of Black Elk in November 2012, that

8   Black Elk had no value; right?

9   A.   The equity, that is correct.

10   Q.   And yet, in your schedules, you listed adjusted value, did

11   you not?

12   A.   For purposes of applying the straight line-method to

13   calculate inflated management incentive fees, that is correct.

14   Q.   And that same schedule was used for incentive fees;

15   correct?

16   A.   That is correct.

17   Q.   Now, you testified that Black Elk was insolvent.  Am I

18   correct that the mere fact that a company is insolvent does not

19   mean it lacks significant value?

20   A.   May or may not be the case.

21        MR. GLUCK:  Objection to that last question.

22   Q.   In fact, today, we have many startup companies, electric

23   car manufacturers, et cetera, that are in development that are

24   insolvent from a balance sheet point of view, but have billions

25   and billions of dollars of value or at least the market thinks

MCDCpla3                          Quintero - Cross

1    so?

2                MR. GLUCK:  Objection.

3                THE COURT:  Sustained.

4    Q.  A company that is financially insolvent on its balance

5    sheet can have significant fair market value; right?

6                MR. GLUCK:  Objection.

7                THE COURT:  I don't see how that's related to any

8    issue with his testimony, but I will, in an excess of moving

9    this along, allow him to answer that question.

10               So you may answer it.

11   A.  It is possible that it could have a substantial price, not

12   necessarily fair market value, but it could have a substantial

13   price, but I'm saying that's possible, not necessarily

14   probable.

15   Q.  Is there anything in your report where you express the

16   opinion that you gave on Wednesday that PPVA increased the net

17   asset value of Black Elk from December 31, 2011, to December

18   31, 2012?

19   A.  Yes, if we look at the underlying schedules that you were

20   just having me testify from, I show on each month what the

21   changes in price or value were of the applicable securities.

22   Q.  Is there anything in the report itself where you expressed

23   that opinion?

24   A.  The report refers to the exhibits, so you have to go back

25   into the exhibits in order to see what the differences are

MCDCpla3                    Quintero - Cross

1   between the claimed net asset value and my adjusted net asset

2   values are, as well as any claim changes in net asset value.

3   Q.  Turn to page 6 of your report, summary of professional

4   opinions.

5          Is there anything that indicates that you are

6   expressing an opinion that the net asset value of Black Elk

7   increased from yearend December '11 to yearend December '12?

8          MR. GLUCK:  Objection.

9          THE COURT:  Overruled.

10  A.  No, that is a summary of opinions.

11  Q.  Well, in addition to your summary, do you ever state an

12  opinion, in summary form or other form, that the Black Elk

13  asset increased from December 2011 to December 2012?

14  A.  The value increased or the reported value?

15  Q.  The reported value.

16  A.  As I previously testified, that is on a

17  security-by-security -- or security-group by security-group

18  basis in the underlying exhibits.  Those aren't my opinions,

19  those are what are reported in the SS&C reports, which come

20  from Platinum.

21  Q.  Do you ever express an opinion in your report that the

22  reported value of Black Elk increased from yearend 2011 to

23  yearend 2012?

24  A.  As I previously testified, I'm not rendering opinions on

25  changes in value, but the reported changes of value are

1   contained within the exhibits of my report.  They're not my

2   opinions, they are what has been reported by Platinum to SS&C.

3   Q.  Do you ever express an opinion in your report that the

4   reported change in values between 2011 and the end of 2012 is

5   inflated?

6   A.  Are we talking now about Black Elk or are we talking more

7   broadly?

8   Q.  We're talking about Black Elk.

9   A.  I don't have a narrow opinion just on the value of

10  Black Elk.

11  Q.  Did you express any opinion on Black Elk for the period

12  2011 to the end of 2012?

13  A.  Not specific to that period.  Again, I have underlying

14  calculations detailed in supporting exhibits.

15  Q.  Where in your report do you say that no incentive fees

16  should have been paid for 2012?

17  A.  I don't recall those exact words in my report.

18  Q.  Well, are you able to find an opinion -- where in the

19  report did you express the opinion that no incentive fees

20  should have been paid for 2012?

21  A.  I didn't express opinion about incentive fees that should

22  have been paid.  Rather, I calculated a basis for being able to

23  quantify a conservative or minimum-basis damages associated

24  with incentive fees over the applicable time period.

25  Q.  Well, your damages charts say zero inflation for December

MCDCpla3                    Quintero - Cross

1   of 2012; right?

2            MR. GLUCK:  Objection.

3   A.  Would you tell me what you're referring to?  Are you

4   talking about what we just talked about on Black Elk?

5   Q.  Let me stick on the earlier question.

6            Is there anything in your report where you express an

7   opinion that no incentive fees should have been paid for 2012?

8   A.  My report, I'm not saying what should have been paid, I'm

9   quantifying minimum amount of damages based on the

10  straight-line approach towards calculating them.

11  Q.  Is there anywhere in your report where you say the 2012

12  incentive fees were inflated?

13  A.  I didn't express that specific opinion.

14  Q.  Is that a no?

15           MR. GLUCK:  Objection.

16           THE COURT:  Overruled.

17  A.  I would say no.

18  Q.  Now, you testified on Wednesday that after the explosion at

19  the platform on November 16, 2012, in your opinion, Black Elk

20  was worthless.  Do you recall that testimony?

21  A.  Yes.

22           MR. GLUCK:  Objection.

23  Q.  Where in your report do you express the opinion that as a

24  result of that event, Black Elk was worthless?

25  A.  I did not express that specific opinion in my report.

MCDCpla3                    Quintero - Cross

1    Q.  In fact, your report only uses the term worthless, in your

2    opinion, after the Renaissance sale in June of 2014, almost two

3    years later; right?

4    A.  I don't recall that specific wording, but I believe that to

5    be true.

6    Q.  Did you prepare the portion of your report which you label

7    overview of damages?

8    A.  I prepared my entire report.

9    Q.  Am I correct, in your report, you state that after the

10   explosion, there was a steady erosion of value that was seen in

11   2013 and into 2014?

12   A.  Yes.  I don't recall those specific words, but I know that

13   to be true.

14   Q.  Right.  But you do not say in your report that within six

15   weeks after the Black Elk explosion on that one platform, the

16   Black Elk was worthless, do you?

17   A.  I did not write that in my report.

18   Q.  Now, you were shown this chart with the $30,773,579.  Did

19   that include a $1 million withdrawal by Dahlia Kalter?

20   A.  I'm sorry.  By whom?

21   Q.  Dahlia Kalter?

22   A.  She was the wife of Mr. Nordlicht?

23   Q.  Yes, she was.

24   A.  I don't recall if she was a recipient because in my

25   analysis, I broke it down based on the applicable partners

MCDCpla3                    Quintero – Cross

rather than necessarily their designees.

Q.  Now, if you were including in this $30 million, $1 million

that she withdrew, but she was not withdrawing from an

incentive fee account, would you agree with me that that

$1 million would not count?

          MR. GLUCK:  Objection.

          THE COURT:  Overruled.

A.  I would regard that to be a legal determination.  I have no

such opinion.

Q.  Now, you used this straight-line method.  Is there any

professional literature or scholarly treatise that you could

point to that endorses a straight-line method reducing values

over time as a way of identifying the value of an asset or a

company at one or more measurement dates?

A.  It is routinely used most often in venture capital.  In

fact, I have a current case where both I and the opposing

expert are using that, and then there is literature talking

about potential departures from using that, but I don't have a

specific recall, recollection of which book or books that's

contained in.  It's also contained in accounting literature and

tax literature in terms of applying that method and potential

issues in applying it.

Q.  Now, when you're valuing an oil and gas asset, and just

doing a straight line, meaning you're arithmetically reducing

it, your adjusted value month by month.  Does your

straight-line method take into account significant changes in the price of oil?

A. No, I gave the company the benefit for that because the price of oil was declining quite rapidly during this time period, but I did not harm or penalize my straight-line application to reflect that. If I did, it would have shown more rapid decline in value.

Q. What about when the price went up?

A. Same thing. I did not consider that because, in fact, the price of oil was also less directly involved in the value of these assets when you have companies that can no longer produce the oil. If you can't produce it, the value of the oil doesn't really matter.

Q. Did you consider the amount of oil that Black Elk was producing in 2013?

A. I was aware of it. I don't know what you mean by did I consider it.

Q. Were you aware of the reserves that Black Elk had?

A. Yes, I was aware it had reserves.

Q. They had many, many millions of reserves; right?

A. And they had many, many millions in debt, and ongoing costs, as well, those are all correct.

Q. How many wells did they have drilled in the Gulf?

A. I don't recall the number at this point.

Q. Was it a thousand? Does that refresh your recollection?

MCDCpla3                    Quintero - Cross

1   A.  I don't recall the number.

2   Q.  Do you recall how many actual platforms they had in the

3   Gulf?

4   A.  No.

5   Q.  Do you recall they had over 200 platforms?

6   A.  As I said, I don't recall the number.

7   Q.  And this explosion occurred on a single platform; right?

8   A.  Yes.

9   Q.  Do you know the size of the acreage that Black Elk had

10  under lease and license?

11  A.  I don't recall the number.

12  Q.  Do you recall that it was in the range of 500,000 acres?

13  A.  As I had just testified, I don't recall the number.

14  Q.  And would you agree with me that all that information is

15  contained in their SEC filings?

16  A.  I don't recall the numbers at this point or the amounts.

17  Q.  You did review the valuation reports; right?

18  A.  I did.

19  Q.  And those contained that type of information; right?

20  A.  I don't recall at this point.

21  Q.  Now, your report does not mention the -- do you know BDO?

22  A.  Yes, I do.

23  Q.  They're an accounting firm?

24  A.  Yes, they are.

25  Q.  They also do consulting?

MCDCpla3                      Quintero - Cross

1   A.  Yes, they do.

2   Q.  Did you review the BDO consulting report for Black Elk?

3   A.  I reviewed the audit reports.

4   Q.  But you didn't review the valuation report?

5   A.  Oh, the valuation report?  I don't recall a valuation

6   report at this point, although I may have seen it.

7   Q.  Do you know a company called Valuation Research Corp.?

8   A.  Yes.

9   Q.  Did you review their report?

10  A.  I don't recall offhand.  Although, I or one of the members

11  of my team may have.

12  Q.  What about the audit reports of CohnReznick?

13  A.  As I recall, wasn't there just one audit report for one

14  year?

15  Q.  For 2014; right?

16  A.  Yes.

17  Q.  You reviewed their report?

18  A.  Yes.

19  Q.  But you didn't review their work papers?

20  A.  I have no recollection of having done so.

21  Q.  So you don't know what they had or what they didn't have?

22  A.  I don't.

23  Q.  On the same form, BDO's 2013 audit, you didn't review their

24  work papers?

25  A.  I have no recollection of having done so.

1    Q.  Did you review the valuation reports of Sterling and

2    Alvarez & Marsal?

3    A.  For the years specified in my report, I did.

4    Q.  And would you agree that Alvarez & Marsal, BDO, and

5    CohnReznick are reputable companies that you're familiar with?

6    A.  Generally, that is correct.

7    Q.  I take it you weren't familiar with Sterling?

8    A.  No.

9    Q.  Now, you had a team at Charted Capital that helped you

10   prepare your reports?

11   A.  Yes.

12   Q.  One of them was Mr. Striker?

13   A.  That is correct.

14   Q.  He was an oil and gas expert?

15   A.  He did a lot of oil and gas work, that is correct.

16   Q.  He worked at BDO on earlier PPVA audits; right?

17           MR. GLUCK:  Objection.

18   A.  No, he didn't.

19   Q.  He didn't?

20   A.  No.

21           THE COURT:  Given the answer, I'll let it stand.

22   Q.  What about Mr. Bezner, he worked at CohnReznick?

23   A.  Yes, he did.

24   Q.  Actually worked there until 2015; right?

25   A.  That's my recollection.

MCDCpla3                        Quintero – Cross

1   Q.  And Mr. Ronnie, another member of your team?

2   A.  Yes.

3   Q.  He worked at BDO; right?

4   A.  That is correct.

5            THE COURT:  Why don't you find a good place to stop

6   and we'll give the jury their lunch break.

7            MR. LAUER:  I think now is as good as any time.

8            THE COURT:  Ladies and gentlemen, we'll give you a

9   lunch break and reconvene at 2 o'clock.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          So the reason I gave the jury their lunch break a few

4     minutes early is because they gave every sign of being bored,

5     and this has been an extraordinarily attentive jury.  I just

6     raise that for consideration.

7          Defense counsel still has an hour and six minutes of

8     his allotted two hours.

9          I now have had a chance to review the testimony of

10    Ms. Albanese, and it only confirms my previous ruling to not

11    admit the charts.  Actually, she says quite little about

12    calendaring or anything like that.  She describes some of the

13    email addresses, but not in ways that are particularly helpful

14    to the admission of a chart.  For example, at page 571, she was

15    shown an email from exhibit 390.

16    "Q.  Ms. Albanese, this email is from Bodner and Huberfeld.

17    That's the sort of shorthand, and the email itself is

18    BodnerAng@gmail.com.  Do you see where I'm at?

19    "A.  Yes.

20    "Q.  That was your email address; correct?

21    "A.  Yes.

22    "Q.  That was an email that you used specifically for

23    Platinum-related correspondence; correct?

24    "A.  I think specifically for Bodner or Huberfeld, not

25    Platinum."

1          THE COURT:  In addition, there was received, I think

2    it was yesterday, Plaintiffs' Exhibit 425, which bears no

3    names, but it says it's from 516-458-6739.  I thought

4    plaintiffs' counsel had told me at the time that that had

5    already been identified by Ms. Albanese as Mr. Bodner's number.

6    Maybe I'm misremembering the representation, but there's

7    nothing in her testimony to that effect.

8          Let me have my law clerk hand each side a copy of my

9    draft charge.  We'll have the charging conference at 5 o'clock

10   as previously mentioned.

11         With respect to plaintiffs' objection to some of

12   defense witnesses, I think that at the rate we're going, we'll

13   take that up at the midafternoon break rather than now.

14         Finally, I want to remind both sides that we need to

15   give to the jury, immediately after I have finished charging

16   them on Thursday afternoon, a hard copy of each and every

17   exhibit received in evidence, plus an index to all the exhibits

18   of both sides.  So don't leave that to the last minute.  You

19   should probably get going on that tonight or tomorrow at the

20   latest.  There may be some additions you'll have to add at the

21   end of the evidence tomorrow, but I won't be able to give it --

22   I assume it will be the form of one or more heavily-loaded

23   carts, which should be ready to be wheeled out, and both sides,

24   after they've prepared the index, should show it to each other

25   to make sure they both agree the index is correct.  It should

MCDCpla3                          Quintero – Cross

1    be one index, but jointly prepared.

2              See you at 2 o'clock.

3              (Continued on next page)

Mcd2Pla4                    Quintero - Cross

```
 1                  A F T E R N O O N   S E S S I O N

 2                          2:00 p.m.

 3              (Jury not present)

 4              THE DEPUTY CLERK:  Shall I bring in the jury?

 5              THE COURT:  Please, and let's get the witness on the

 6      stand.

 7              (Jury present)

 8              THE COURT:  Please be seated.

 9              MR. LAUER:  May I proceed?

10      BY MR. LAUER:

11      Q.  Mr. Quintero, I believe you testified that either you or

12      your staff looked at the various valuation reports?

13      A.  That is correct --

14      Q.  And --

15      A.  -- during the applicable time period.

16      Q.  Yeah.

17              I would like to introduce DX 558, which is the

18      Sterling report for the first quarter of 2013.

19              MR. GLUCK:  Objection.

20              THE COURT:  Well, let me see the exhibit.

21              Well, there is nothing to object to yet.  It hasn't

22      been offered and a question hasn't been put, so put a question.

23      BY MR. LAUER:

24      Q.  Well, we did offer it, but I am happy --

25              THE COURT:  I'm sorry.  Did you offer it?  I didn't
```

```
 1    hear you.  It must it be catching.
 2                MR. GLUCK:  Hearsay.
 3                THE COURT:  Sustained.
 4    BY MR. LAUER:
 5    Q.  Maybe I misunderstood.  Do you review these reports as part
 6    of your report -- your work?
 7    A.  As I testified, during the applicable time period I did.
 8    Q.  Meaning when you were doing your work, you looked at the
 9    2013 Sterling report.
10    A.  That is correct.
11                MR. LAUER:  May I approach the bench?  I don't
12    understand --
13                THE COURT:  The fact that he looked at it does not
14    make it admissible for its truth.  That's why there was a
15    hearsay objection.
16                Now, you have several choices.  You can either seek to
17    have it admitted for some other purpose, but you first have to
18    lay the foundation, or you can see if you could lay a
19    foundation for its admittance as a business record.  There are
20    many possibilities.  But until that is satisfied, the objection
21    is sustained.
22                MR. LAUER:  Okay.
23    BY MR. LAUER:
24    Q.  You testified that you did not believe the valuator had all
25    the appropriate information to do a valuation report.
```

Mcd2Pla4                    Quintero - Cross

A.   During the applicable time periods, that is correct.

Q.   Okay.  So with respect to, let's take this valuation
report, which is May 16, 2013, for the first quarter of 2013,
am I correct that the valuator had information on the financial
performance of Black Elk?

          MR. GLUCK:  Objection to form.

          THE COURT:  So you examined this report in reaching
your conclusions?

          THE WITNESS:  Yes, your Honor.

          THE COURT:  And you accepted its conclusions, rejected
its conclusions, disregarded its conclusions, or what?

          THE WITNESS:  I reviewed them but I did not believe
that Sterling had sufficient information to be able to come to
appropriate conclusions.  And in fact, in the last paragraph of
this first page, they indicate that they are constrained by
information provided by management.

          THE COURT:  So you understood that this was an
ordinary business record, but one you thought, even on its
face, did not fairly and accurately reflect the matters to
which it was referring?

          THE WITNESS:  That is correct, because of the
constraints that Sterling was subjected to, as well as other
issues.

          THE COURT:  All right.  Does defense counsel want to
offer it as an ordinary business record of Platinum?

Mcd2Pla4                    Quintero - Cross

1            MR. LAUER:  Among other bases, yes, your Honor.

2            THE COURT:  Well, I don't want to deprive you of your

3    alternative bases, but if you want to move its admission on

4    that basis, that would be a first step.

5            Any objection?

6            MR. GLUCK:  Yes, objection.  This is not a business

7    record of Platinum.  This is a business record of, at best,

8    Sterling.  And Platinum --

9            THE COURT:  Hmm.

10           MR. GLUCK:  -- did not --

11           THE COURT:  I think it probably is a business record

12   of Platinum, but I must admit we don't really have a witness

13   here to set the full foundation for that.  I was just hoping to

14   move things along.  Silly me.

15           Do you want to offer it not for its truth, but for the

16   fact that it was received by Platinum?

17           MR. LAUER:  I think it should be offered for its truth

18   and he can comment on --

19           THE COURT:  What's the basis for that if it's not --

20   if the foundation of the ordinary business record has not been

21   laid by a witness with knowledge?

22           MR. LAUER:  I think the witness's report and the

23   witness would indicate it was the regular relationship between

24   Platinum and the valuators, as stated in all of their

25   literature to investors, that they have these valuators every

Mcd2Pla4                    Quintero - Cross

1    quarter.  The witness will acknowledge that he looked at every
2    one of these that were from the business records of Platinum.
3    SanFilippo testified --
4                THE COURT:  Whoa, whoa.
5                MR. LAUER:  Sorry.
6                THE COURT:  So I don't think this witness can say any
7    of that except on a hearsay basis, but I think you are right
8    that some of at least one of your previous witnesses or one of
9    the parties' previous witnesses said essentially that, so I
10   will receive the document.  This is 558.
11               MR. LAUER:  Thank you.
12               (Defendant's Exhibit 558 received in evidence)
13   BY MR. LAUER:
14   Q.  Mr. Quintero, I direct you to the first page of 558.
15   That's the cover page from Sterling.  Do you have it?
16   A.  I do.  It's in front of me in electronic format.
17   Q.  And am I correct that this is for the period ended March
18   31, 2013?
19   A.  That is correct.
20   Q.  And that's about four and a half months after the platform
21   in the gulf exploded, is that right?
22   A.  That is correct.  Actually it's a little bit more than
23   that, but yes.
24   Q.  Well, November '16 was the explosion?
25   A.  Yes.

Mcd2Pla4                          Quintero - Cross

1   Q.  That's four and a half months.

2   A.  Well, it's four and a half months to May 16, and then

3   another month and a half from November 16 to December 31, so

4   it's approximately six months later.

5   Q.  The report is dated May 15, but it's for the period ended

6   March 31, 2013, correct?

7   A.  Yes, I agree with that.

8   Q.  Okay.  So go to page 5 of the report, which is 68 of the

9   document or 69 of the PDF.

10          Do you have that?

11  A.  No.  I'm constrained by what's on the screen.

12          (Pause)

13  Q.  Can we highlight the paragraph that begins "as of December

14  31, 2012"?

15          Do you see that as of December 31, Black Elk held an

16  interest in approximately 542,000 gross acres?

17  A.  Yes.

18  Q.  Is that basically consistent with your understanding of the

19  size of their lease.

20  A.  I have no reason to dispute this.

21  Q.  And they had 1,109 wells?

22  A.  Again, I have no reason to dispute this.

23  Q.  And 233 production platforms, right?

24  A.  They had those under lease, that is correct, not ownership.

25  Q.  All right.  And now turn to the next page, page 6 of the

Mcd2Pla4                         Quintero - Cross

```
 1   document, and 69 of the -- yup.  At the very bottom, the very
 2   last -- the last two lines, last three lines, where it says
 3   S & P.  You had testified about S & P lowering the rating
 4   shortly -- in September of 2012.  Do you remember that?
 5   A.  Yes.
 6   Q.  And if you look at the bottom, it says that "S & P would
 7   consider a further negative rating," and then the last four
 8   words, "it would consider a."  Now let's turn to the next page.
 9   "It would consider a positive rating if the company is able to
10   improve liquidity to approximately 40 million while maintaining
11   production."  Do you see that?
12   A.  Yes.
13   Q.  So they weren't -- they were not concluding -- S & P was
14   not concluding the company was worthless, right?
15   A.  First of all, S & P was referring to the company's debt,
16   not the company's equity.
17   Q.  Okay.
18   A.  And there is a lot more underlying this that's negative
19   than just what appears in this little excerpt we are going
20   through.
21   Q.  Then the next paragraph --
22        THE COURT:  Wait.  So the paragraph begins, "On
23   September 17, 2012, Standard & Poor's rating services lowered
24   its long-term corporate credit ratings on BEEOP to CCC+ from B-
25   with negative outlook, reflecting the vulnerable business risk
```

1   and highly leverage financial risk."

2          Explain to the jury, because they may not be familiar

3   with this, what's a rating of CCC+?

4          THE WITNESS:  CCC+ means that there is extremely high

5   risk of potential default, and so that is the least level we

6   would refer to as junk bonds.  It means there is an extreme

7   risk that the company may wind up going into default and that

8   creditors would have to look to proceeds from the sale of

9   assets to be paid.

10          As I said, there is much more negative to this report

11   than what's been excerpted here.

12          THE COURT:  Go ahead, counsel.

13   BY MR. LAUER:

14   Q.  Turning to the paragraph on the next page, "in formulating

15   our opinion."

16          So they relied on the NSA reserve report?

17   A.  Yes.

18   Q.  And do you have any basis to dispute the facts that were in

19   the NSA reserve report?

20   A.  No.

21   Q.  21 million barrels?

22   A.  I have no reason to dispute that.

23   Q.  Okay.  And then the next paragraph talks about various

24   investment banks considered an initial public offering for

25   Black Elk?  Do you see that?

1   A.  Yes.

2   Q.  And this was in 2011, they list various valuations that the

3   investment banks gave for Black Elk, right?

4   A.  Yes.

5   Q.  And these included Deutsche Bank and UBS and Stevens and

6   other investment banks?

7   A.  Yes.

8   Q.  And these were in the hundreds and hundreds of millions of

9   dollars?

10  A.  Well, very specifically, an enterprise value, which is the

11  company's debt and equity and, again, these are stale

12  valuations at a time when the company was in less bad condition

13  than it was in 2012.

14  Q.  All right.  But when -- they are mentioned in the valuation

15  report as things that the valuator considered, right?

16  A.  Yes.

17  Q.  And by the way, this report mentions the explosion that

18  occurred four months before the March 31 date, right?

19  A.  The preceding paragraph following an explosion.

20  Q.  Do you see that?

21  A.  Yes.

22  Q.  And it indicates that the platform which had the explosion

23  had already been shut down for repairs since August of 2012.

24  A.  Yes.

25  Q.  So the revenues and the oil that was being produced by

1   Black Elk was not immediately or directly affected by the

2   explosion, was it?

3   A.  Yes, because of the fact that they could not use this

4   particular platform.

5   Q.  Okay.  But it had been shut down for -- since August,

6   right?

7   A.  For repairs, but the presumption normally is that once

8   repaired it would come back online.

9   Q.  And if you would turn to page 9 of the document, which is

10  72 of the PDF, do you see that the valuators gave their opinion

11  of the value of the equity interest that's not counting the

12  debt of Black Elk at $215 million?

13  A.  Yes.

14  Q.  Okay.  You -- let's switch gears from 2012-2013 to the

15  summer of 2014, after the Renaissance sale.  Do you have me?

16  A.  Yes.

17  Q.  Am I correct that the Black Elk bonds were still trading

18  publicly at between 87 and 90 percent of par?

19  A.  I don't remember the numbers, but it was certainly an

20  inexplicable price for -- over very illiquid bonds, in other

21  words, very few trades occurring.

22  Q.  Did you study the volatility or the volume of the bonds?

23  A.  Yes.

24  Q.  Is that in your report?

25  A.  I -- I don't recall if I reflected that, but I had

1   information on that at the time that I prepared my report from

2   two different sources.

3   Q.   Is there anything in your report that discusses the volume

4   or the trading prices of the Black Elk bonds in the summer of

5   2014?

6   A.   Yes, I believe that I have a reference to pricing in my

7   report, but at this point I don't recall.  I just know that I

8   looked at the underlying information from the two sources that

9   were available.

10  Q.   You looked at the year-end statement and report by BDO for

11  the period ended 2013?

12  A.   Yes, I did.

13  Q.   And did you see in the report -- and I believe this is in

14  evidence, 569?  So I would show you Exhibit 569, and in

15  particular page 5, which might be page 6 of the PDF.  Do you

16  see that BDO confirms a valuation of $148 million for Black Elk

17  Energy Offshore Operations LLC?

18  A.   Investments in that company, that is correct.

19  Q.   And this is a year and one month after the Black Elk

20  platform had its explosion, right?

21  A.   Yes, and it is both debt and equity investments.

22  Q.   Let's talk about Golden Gate.  Of the specific assets that

23  were in your report, am I correct that only Black Elk and

24  Golden Gate were assets held by PPVA during calendar year 2012?

25  A.   I don't know what you mean by "only assets held by PPVA."

Mcd2Pla4                    Quintero - Cross

1    Would you explain that?

2    Q.  You did schedules for Black Elk, right?

3    A.  Yes.

4    Q.  Golden Gate?

5    A.  Yes.

6    Q.  Northstar?

7    A.  Yes.

8    Q.  Pedevco?

9    A.  Yes.

10   Q.  Desert Hawk?

11   A.  Yes.

12   Q.  And Michael Goldberg's note.  Right?

13   A.  Yes.

14   Q.  Of those six, only Black Elk and Golden Gate generated

15   management fees or incentive fees during the full calendar year

16   2012?

17   A.  I would have to look back if you would want me to confirm

18   that possibly.

19   Q.  Let's look at your schedule for Golden Gate, this is

20   schedule 24 of your report.  Perhaps that will help refresh.

21   If you would turn to schedule 24.1.  Got it?

22   A.  I do.

23   Q.  This is identical format to the one from Black Elk?

24   A.  Yes.

25   Q.  And am I correct that for the first month, December '12,

Mcd2Pla4                    Quintero - Cross

1    with respect to management fees and incentive fees, you show no

2    damage from inflated fees?

3    A.   That is correct.

4    Q.   And similarly, if you go to 24.2, this is the chart that

5    compares the reported values for going with the adjusted

6    values, which are the ones you use in your straight-line method

7    for the first month, December '12, you say the reported

8    overadjusted is zero, right?

9    A.   That is correct.

10   Q.   And in fact you give -- you say the reported value is

11   49,440,000, right?

12   A.   Yes.

13   Q.   And the adjusted value is the same, 49,440,000, right?

14   A.   For purposes of calculating damages, that is correct.

15   Q.   The first month within the damages period that you find,

16   there was inflation in the Golden Gate which resulted in

17   reported overadjusted is January '13, right?

18   A.   That is correct.

19   Q.   You have a chart 17 in your report which lists oil prices.

20   I would like to show that to you.  Do you have it?

21   A.   Yes.

22   Q.   All right.  Are you able to tell from the chart what was

23   the price of a barrel of oil in the United States in January of

24   2013?

25   A.   Yes.

Mcd2Pla4                       Quintero - Cross

1    Q.   And what is it?

2    A.   From looking at the graph, it looks like it was

3    approximately a little bit over $90 a barrel.

4    Q.   Okay.  And at year end December 31, 2013?

5    A.   It appears to have dropped slightly.

6    Q.   Isn't it closer to a hundred, December 31?

7    A.   From looking at this, that would have been a couple of

8    months earlier.

9    Q.   Approximately what was the price of oil February '15?

10   A.   Looks like it's a little bit over $40 a barrel, February

11   possibly a little over $50 a barrel.

12   Q.   And how about February -- January/February of 2016?

13   A.   Looks like it is about $30 a barrel, plus or minus, maybe

14   slightly less.

15   Q.   In doing your work, did you come to have an understanding

16   of the approximate cost of production per barrel for oil that

17   was produced in California?

18   A.   Are we talking now with respect to Golden Gate as opposed

19   to California in general?  Because there are two different

20   factors.

21   Q.   Well, let's start with California.

22   A.   No, I was focused on Golden Gate.

23   Q.   Okay.  Golden Gate, what was their -- what -- if they had

24   an anticipated rate of production, what would their cost of

25   production be per barrel?

Mcd2Pla4                    Quintero - Cross

1   A.  By January 2016?

2   Q.  No, I'm talking about December -- well, any way you want to

3   do it.  We will break it up.

4   A.  By 2016, I believe they had already lost their leasehold

5   rights.  During the previous months they had never been able to

6   successfully pump oil that could be sold from the ground, and

7   they didn't have the money to be able to pump it, so it was a

8   moot point what the price was because they had no ability to be

9   able to commercially both extract and then sell any oil during

10  this entire time period.

11  Q.  All right.  My fault.  What was the average cost of

12  producing a barrel of oil in California in 2013?

13          MR. GLUCK:  Just note my continuing objection right

14  before the break to this level of detail going through the

15  expert reports, but it was overruled.

16          THE COURT:  Duly noted.  Overruled.

17  A.  I don't have a specific recollection about California,

18  although costs always have to be related to a specific

19  producer, not the entire state.

20  Q.  Can you give me any cost of production for U.S. producers

21  of petroleum?

22  A.  It is quite variable depending on who the producer is and

23  where they are extracting the oil from.

24  Q.  Am I going to get a number?  Any number?

25  A.  I don't have a specific number.

Mcd2Pla4                        Quintero - Cross

1    Q.  Okay.  Does the price of oil have an effect on whether oil

2    development companies can make a profit producing the oil that

3    they have?

4    A.  Yes, it does.

5    Q.  And is it -- at $100 a barrel, I take it, Golden Gate could

6    have been more profitable if it produced oil than at $30 a

7    barrel, right?

8    A.  Assuming they could find it.

9    Q.  Okay.  Did you have any basis to challenge the reserve

10   reports for Golden Gate?

11   A.  No.

12   Q.  And am I correct that those reports indicated there was

13   approximately 18 million barrels of oil in the ground?

14   A.  I don't remember the numbers at this point.

15   Q.  So did you look at the valuation reports from Sterling for

16   the period ended September 30, 2014, which would include the

17   Golden Gate asset?

18   A.  Yes.

19             MR. LAUER:  We would offer 632.

20             MR. GLUCK:  Same objection.  Hearsay.

21             THE COURT:  Same ruling.  Received.

22             (Defendant's Exhibit 632 received in evidence)

23   BY MR. LAUER:

24   Q.  Can we turn to page 3 of the report or 100 of the PDF.  Do

25   you have that?  Not yet.

1                   Can we highlight the top two paragraphs?

2                   So do you see that the valuator is discussing the

3      transaction that occurred?

4      A.  Yes.

5      Q.  And this is the one that you had testified about where half

6      of the Golden Gate interest was acquired by PPVA?

7      A.  Yes.

8      Q.  And could you also turn to the very last page of the

9      appendix in this report.  It is PDF page 188.  I'm sorry.  I

10     got that wrong.  Turn to page 103 of the PDF.  It is page 6 of

11     the document.  And the last paragraph "based on the foregoing."

12     Do you see that?

13     A.  Yes.

14     Q.  So am I correct that the valuator, taking everything into

15     account, concluded that the range of value for Golden Gate, as

16     of September 30, 2014, was between 172 million and 181 million,

17     right?

18     A.  Yes.

19     Q.  Now, this report also did a valuation of Northstar.  That's

20     one of your six assets, right?

21     A.  Yes.

22     Q.  And if you would turn to the last page, 188 of the PDF.  Do

23     you have that?

24     A.  Yes.

25     Q.  And by the way, am I correct that this -- well, let's do

Mcd2Pla4                         Quintero - Cross

1    the valuation.  The valuator valuated Northstar, as of December

2    30, 2014, between 89,600,000 and 97 million, right?

3    A.  Yes.

4    Q.  And this is before Northstar acquired the remaining assets

5    from Black Elk, right?

6    A.  Yes.

7    Q.  So this valuation does not include the Black Elk assets.

8    A.  It does not.

9    Q.  And the valuator gave it this valuation.  Okay.

10            Am I also correct that the transaction that we just

11   talked about, buying the half of the facility, is also

12   reflected in the financial statements as of the year end 2013

13   as a subsequent -- it's not a subsequent event, but it's listed

14   there.

15   A.  You are talking about Northstar now?

16   Q.  No, I'm talking about Golden Gate.  Sorry.

17   A.  Which transaction are you talking about now with respect to

18   Golden Gate?

19   Q.  The purchase of the 50 percent interest.  Am I correct that

20   it is reflected in the 2013 financial statement?

21            MR. GLUCK:  Objection.  Financial.

22   Q.  Do you remember that?

23   A.  If you want to point it out to me, I would be happy to

24   comment on it.

25            THE COURT:  Whoa, whoa.  I think it's partly because

Mcd2Pla4                        Quintero - Cross

1    plaintiffs' counsel keeps his voice so low, but he interposed

2    an objection.  So let me talk a look.

3              Overruled.  Go ahead.

4    BY MR. LAUER:

5    Q.  Turn to page 41 of Exhibit 569.  And that may be 42 of the

6    PDF.

7              I misspoke.  Do you see that the paragraph February

8    26, 2014, there is disclosure of a Beechwood loan?

9    A.  Yes.

10   Q.  $28 million loan?

11   A.  Yes.

12   Q.  So that's disclosed here?

13   A.  Yes.

14   Q.  If you go a little bit lower in the page, "as a result of

15   certain production," do you have that paragraph?

16   A.  Yes.

17   Q.  All right.  And that basically says as a result of certain

18   production milestones not being met, PPAV was able to acquire

19   the other 50 percent, right?

20   A.  Yes.

21   Q.  So that's disclosed here, too.

22   A.  Yes.

23   Q.  Okay.

24             Do you understand the concept fair market value?

25   A.  Yes.

Mcd2Pla4                    Quintero - Cross

1    Q.   What is fair market value?

2    A.   Fair market value is the price at which property would

3    change hands between a willing buyer and a willing seller,

4    assuming both parties had access to relevant information, and

5    normally it pertains to a cash value, rather than a theoretical

6    value.

7    Q.   Okay.  Am I correct that at your deposition you

8    acknowledged that --

9              MR. GLUCK:  Objection.

10             MR. LAUER:  I'm sorry.  Rephrase.

11   BY MR. LAUER:

12   Q.   Am I correct that whether a seller, in determining fair

13   market value, whether the seller has sufficient capital or not

14   is not typically reflected in a fair market value analysis?

15   A.   It depends on what you are referring to.  So it's quite

16   variable.  It depends on a situation-specific basis.

17   Q.   Am I correct that, in your opinion, fair market value

18   assumes a seller that does not have to sell, a buyer that does

19   not have to buy, and assumes that someone would have the funds,

20   right?

21   A.   And also, as I said, both parties had reasonable access to

22   all relevant information.  So those are all key criteria.

23   Q.   How much do you charge per hour?

24   A.   At the time that I was preparing this report, I believe it

25   was $575 an hour.

Mcd2Pla4                         Quintero - Cross

1   Q.  And what was the total revenue that you and your company

2   received for the work in this case?

3   A.  For this project, I believe I received $119,000 or there

4   about, and since then I have accrued probably a similar amount.

5   Q.  And what about for other Trott-related PPVA projects?

6   A.  What I just described was the sum total of everything.

7   Q.  Okay.  Sum total of all your PPVA-related work.

8   A.  That is correct.

9   Q.  Okay.  Do you work for Mr. Trott on other matters?

10  A.  No.

11  Q.  What information did the valuators and the auditors not

12  have that you believe you do have concerning Black Elk or

13  Golden Gate or Northstar?

14  A.  Starting with Golden Gate, the financial statements that I

15  referred to, and I improperly thought it was for the two years

16  ended December 2012.  As was pointed out to me, it was actually

17  two years ended December 2013, they showed that Golden Gate was

18  insolvent, did not have the ability to be able to drill the

19  oil.  There is no reference to that information whatsoever

20  in -- that I recall in the Sterling report, and I don't know

21  for sure what BDO had.  As a CPA firm that also I have done

22  work for in the past, I would believe if they saw that that

23  would be enormously problematic because, again, you have got an

24  insolvent company where the ability to be able to realize the

25  value of the oil depends on the ability to be able to actually

1   do the work necessary to bring it out of the ground, that was

2   not present.  That alone would have been an enormously

3   difficult problem.

4           Also, there was an abundance of correspondence

5   indicating that Golden Gate was having difficulty on an

6   operating basis.  They had vendors clamoring from payments.

7   They eventually had to stop drilling.  They eventually lost

8   their leasehold rights.  All of that would have been enormously

9   problematic for a valuator or for a CPA to get behind.

10          With respect to -- oh, and also --

11          MR. LAUER:  I would move to strike this.  I asked a

12  very specific question:  What information did they not have?

13          THE COURT:  I think he is giving you a response.  It

14  was a fairly open-ended question.  Overruled.  You may complete

15  your answer.

16  A.  With respect to -- another issue, at least they didn't

17  reference in their report, and so I don't know if they did or

18  did not have this --

19  Q.  Can we limit it to what information, in your opinion, they

20  did not have?

21  A.  Well, if they don't reference things in the report, then it

22  says to me they didn't have it.

23  Q.  Just list the information that you say they did not have.

24  A.  First of all, in all of them --

25  Q.  Could you just list --

Mcd2Pla4                          Quintero - Cross

A.  I'm giving you across the board, so that way I don't have

to go one at a time, although I'm happy to go one at a time if

you prefer.

         But in all of them, they -- the three entities you

described, the recurring electronic correspondence talking

about financial difficulties, vendors clamoring for payments,

operational problems, that is a common theme in all of them.

In Northstar, I saw no evidence that they ever looked at

financial statements.  The financial statements of Northstar

were -- they only go into the first quarter of 2014, which

makes it very hard -- excuse me, the first quarter 2015, which

makes it hard to do a valuation from the subsequent period if

you don't even have the financial statements.  But the

financial statements indicate, again, Northstar insolvent,

inability to be able to finance the extraction of oil.  So

again, that makes any other valuations theoretical if you don't

even have the ability to be able to extract the oil.

         With respect to Black Elk, you know, aside from the

abundance of correspondence, information underlying, for

example, the S & P rating, where they indicate not only, as we

talked about, that the rating was reduced to CCC+ and indicate

that, in the event of default, the company would be unable to

be able to pay their lenders in full the recovery 70, 90

percent of face value.  If creditors are not going to be paid

in full, equity, which was the lion's share of Black Elk, would

1    be worthless.

2            In 2013, setting aside internal correspondence --

3    2014, 2014 there was internal corresponding -- correspondence,

4    very devastating, but 2013 there was a company called Asiasons

5    that was hired by a company considering making an investment in

6    Black Elk.  They reported to their client 2013 the equity was

7    worthless.

8    Q.  Is any of this not reported?  That was the question.  What

9    information was not available?

10   A.  I didn't see --

11           THE COURT:  No, I think he is answering your question

12   by saying, as I understand it --

13   A.  I didn't --

14           THE COURT:  Excuse me.  That if they didn't reference

15   it in their report, he can assume that they didn't have it.

16           Do I have that right?

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  All right.

19   A.  I didn't see any evidence that they had that information.

20   Q.  Did you look at the SEC filings for Black Elk?

21   A.  Yes, I did.

22   Q.  And it's your testimony that the information you have just

23   described about the financial performance of Black Elk is not

24   reported in the SEC filings.

25           MR. GLUCK:  Objection.

1           THE COURT:  Sustained.  That wasn't his testimony.

2           MR. LAUER:  Okay.

3   BY MR. LAUER:

4   Q.  Is it your testimony that the Asiasons Capital is not

5   reflected in the valuation reports?

6   A.  I don't recall seeing any reference to their having that

7   information.

8   Q.  Am I correct that, with respect to CohnReznick, you did not

9   form an opinion one way or the other with respect to the

10  quality of their work?

11  A.  I previously testified I didn't see the underlying work

12  papers.  I only saw the annual audit that was issued several

13  months after year end.

14  Q.  So you did not form an opinion as to whether -- as to

15  whether their work was good or not, right?

16  A.  I was not hired to critique CohnReznick, and I have not

17  offered any opinion in my expert report.

18  Q.  And the same for BDO, right?

19  A.  That is correct.

20  Q.  You did a valuation -- with respect to Desert Hawk, I would

21  like to turn to the schedule in your report that deals with

22  Desert Hawk, and that is 28.1.  Do you see that?

23  A.  Yes.

24  Q.  Same format as for Black Elk and Golden Gate, right?

25  A.  That is correct.

1    Q.   Now, for December '13, that is December 31, 2013, what is

2    the amount of damages from inflated incentive fees according to

3    your chart?

4    A.   For that particular month?

5    Q.   Yes, that's the year ended December '13.

6    A.   I'm calculating these on a monthly basis.

7    Q.   Okay, for that month.

8    A.   Okay.  So for the month, I actually caused it as an offset.

9    Let me just take a look, because it is related to another

10   schedule in there that you have not asked me about, so I have

11   to take a look at both of them together.

12   Q.   Do you have it?

13   A.   Yes.  I have to look at Exhibit 28.2 because that feeds

14   Exhibit 28.1.

15           So as I previously testified, I reflect that as an

16   offset because of changes in that one specific month.

17   Q.   And the cumulative -- for December '13, cumulative, meaning

18   from the period that your chart begins, March of 2013 to the

19   end of December 2013, those ten months, cumulatively you have

20   an offset of $3,587,000 -- I'm sorry, cumulative $2,663,000 as

21   an offset, right?

22   A.   That is correct, specifically for incentive fees.

23   Q.   Incentive fees.

24           So if life stopped on December 31, 2013, and we were

25   looking at what is the amount of inflated fees that you say was

Mcd2Pla4                     Quintero - Cross

1    attributed to the 10-month of Desert Hawk, it would have been

2    an offset, a credit, not a negative number -- not a positive,

3    inflated number, right?

4    A.  Yes, an offset against other damages, that's correct.

5    Q.  Okay, that's good.

6              THE COURT:  Let me ask you this, because perhaps it

7    might be helpful to the jury.

8              So supposing a company owns a bunch of oil wells, but

9    it's in such bad shape that it can't access the oil wells.  It

10   is about to go under.  What would be the value, the asset value

11   of that company?

12             THE WITNESS:  It depends upon the quality of the oil

13   and its extractability, and so, your Honor, it can be quite

14   variable.

15             THE COURT:  All right.

16             THE WITNESS:  In this particular case there were some

17   problems that I have referred to.

18             THE COURT:  I understand that.  I just wanted to get

19   the overall picture.

20             All right.  Go ahead.

21   BY MR. LAUER:

22   Q.  Let's turn to the Northstar schedules.

23             THE COURT:  Counsel, just so you are aware, you have

24   ten minutes.

25             MR. LAUER:  I thought I had 15, but whatever -- the

Mcd2Pla4                        Quintero - Cross

1   Court's clock is the right one.

2   Q.  Let's turn to the Northstar schedules.  That is Exhibit

3   25.1.  Do you have that?

4   A.  I do.

5   Q.  This is the same format except it starts with September

6   '14.

7   A.  Yes.

8   Q.  And for the first month the amount of inflated damages from

9   incentive fees is zero?

10  A.  Yes.

11  Q.  And the same for management fees, it's zero?

12  A.  That is correct.

13  Q.  Let's go to Pedevco.  That is the other oil and gas asset.

14  The schedule is 27.1?  Do you have that?

15  A.  Yes, I do.

16  Q.  And the first month is May '15, May of 2015?

17  A.  Yes.

18  Q.  And here you actually start with a total damages from

19  inflated fees of $2,548,000, right?

20  A.  Yes.

21  Q.  And for management fees, $21,000, right?

22  A.  Yes.

23  Q.  Let's go on.

24          Now let's talk a little bit about the Michael Goldberg

25  note.

Mcd2Pla4                    Quintero - Cross

1            You calculated your opinion from your schedule that

2    $726,000 in management fees was inflated, right?

3    A.   Yes.

4            (Continued on next page)

MCDCpla5                    Quintero - Cross

1   BY MR. LAUER:

2   Q.  And that's because you viewed the note as having no value;

3   right?

4   A.  Yes.

5   Q.  And did you come to learn that there was a term sheet which

6   listed the collateral for the Michael Goldberg note?

7               MR. GLUCK:  Objection.

8               THE COURT:  Ground.

9               MR. GLUCK:  Facts not in evidence.

10              THE COURT:  Well, what about that?

11              MR. LAUER:  It's in his report, Exhibit 30.

12              THE COURT:  On that representation, overruled.

13  Q.  Now, let me ask you this, if the note was not signed and

14  has no value and the securities were never delivered to

15  Mr. Goldberg but remained in the possession of the company,

16  could the company include the securities in its balance sheet

17  if it were not including the note?

18  A.  I have no specific knowledge of what you're suggesting.

19  Q.  Well, you understood that they could not double count, they

20  could not count the $16 million note and they could not also

21  count the $16 million of securities; right?

22  A.  Yes, that would be improper.

23  Q.  And you did not offer an opinion that the securities that

24  underlay the note were in any way inflated; right?

25  A.  I don't know what the securities were underlying the note.

1    I only know the note was reflected in the SS&C report.

2    Q.  Did you know that the securities were all level 1

3    pharmaceutical securities?

4    A.  As I just testified, I don't know what those securities

5    were.

6    Q.  Were you aware that in the financial statements, the

7    auditors discussed this and said in order to avoid double

8    counting the note and the securities, they were only counting

9    the $16 million once?

10   A.  I don't recall that.

11   Q.  I'd like to show you the term sheet.

12           MR. LAUER:  I'd like to offer DX 620.37, which is the

13   term sheet with the collateral.

14           THE COURT:  Was there an objection?

15           MR. GLUCK:  No objection.

16           THE COURT:  Received.

17           (Defendant's Exhibit 620.37 received in evidence)

18   Q.  Did you look at the trial balances for the offshore and

19   domestic fund to determine to what extent, if any, accrued

20   management fees were not all paid as of March 31, 2016?

21   A.  I don't have a specific recollection at this point.

22   Q.  You said earlier this morning that, in your opinion,

23   $15,500,000 of management fees were paid.  Is there anything in

24   your report or anything you can point to to show that all of

25   the management fees that were accrued, as of March 31, were, in

MCDCpla5                     Quintero - Cross

1    fact, paid?

2              MR. GLUCK:  Objection.  Outside the scope.

3              THE COURT:  Overruled.

4              MR. LAUER:  You can answer it.

5    A.  You said $15 million in management fees were paid.  Would

6    you tell me what that specifically refers to.

7    Q.  You were shown a chart this morning, which you testified

8    to, reflected your opinion that $15,500,000 in management fees

9    were paid.  I'm asking you, is there anything in your report

10   which indicates that all of the management fees that were

11   accrued, as of March 31, 2016, were, in fact, paid?

12   A.  Well, my opinion this morning was with reference to table 1

13   of my report, which indicates that approximately $15 million in

14   inflated management fees pertain to the specific assets that I

15   described.  That's not total management fees that were

16   incurred.  This portion of my report doesn't pertain to what

17   specifically was paid.

18   Q.  Yes, but let's try to isolate this.

19             MR. LAUER:  And this will be my last questions, your

20   Honor.

21             THE COURT:  Just so I understand, you're a damages

22   expert, yes?

23             THE WITNESS:  Yes, your Honor.

24             THE COURT:  So what you are opining on is what you

25   think the defendant, if he is found liable, should be paying by

MCDCpla5                    Quintero - Cross

1    way of cash, yes?

2              THE WITNESS:  I'm not asserting myself -- I'm

3    quantifying damages at a minimum pertaining to excessive

4    management fees --

5              THE COURT:  No.  If the management fees that were

6    reported were never paid, then damages would be zero; right?

7              THE WITNESS:  If they were never paid, that would be

8    correct, but a lot more than this was paid.

9              THE COURT:  So that's why I was confused by your last

10   answer, because I thought what you had said before was that an

11   amount in excess of this was, in fact, shown by the bank

12   statements paid, but the portion that you're claiming should be

13   returned, if you will, paid by way of damages is only a portion

14   of that, it's the portion you believe resulted from the

15   overstatement.  Do I have that right?

16             THE WITNESS:  Yes, your Honor.

17             MR. LAUER:  Let me clarify this so that we have the

18   actual --

19   BY MR. LAUER:

20   Q.  You testified this morning that other than these six assets

21   and the other one that is not specifically mentioned for

22   damages by China Horizon, you testified that other than these

23   six assets for which you're testifying they were inflated, for

24   practical or other reasons, you took the position that all the

25   other assets, the hundreds and hundreds of assets were not

1    inflated; am I correct?  Did I get that right?

2    A.  No, I just chose not to include them in my calculation of

3    damages.

4    Q.  And you express no opinion that they were inflated, the

5    other assets?

6    A.  I'm not giving any specific opinion on the other assets.

7    Q.  So with respect to the assets that you did give an opinion,

8    you said there's $15,500,000 of inflated fees, right,

9    management fees; right?

10   A.  That is correct.

11   Q.  And if the other assets are not in play because you've

12   expressed no opinion on those other assets, I'm asking you with

13   respect to the unpaid management fees, am I correct that,

14   therefore, a portion of this $15 million is not paid?

15   A.  That's a legal determination to determine how that should

16   be apportioned, if at all.

17   Q.  One last question, DX 764, which is a chart.  Did you help

18   counsel prepare this chart?

19   A.  I may have provided information, but I didn't write any

20   correspondence to --

21           MR. GLUCK:  Objection.

22   A.  -- your Honor.  So this may be based on information that I

23   provided to legal counsel.

24   Q.  When is the last incentive fee that was paid in cash?

25   A.  June of 2014.

MCDCpla5                     Quintero - Redirect

1   Q.  With respect to the $1 million, September 2013, have you

2   been able to identify a partner or a partner account for which

3   that $1 million is attributed?

4   A.  I --

5               MR. GLUCK:  Objection.  This is our letter.

6               THE COURT:  Is this in evidence?

7               MR. GLUCK:  We would object to it coming into

8   evidence.

9               THE COURT:  I'm just asking a question.  Is this in

10  evidence or not?

11              MR. LAUER:  No, it's not, but I'd offer it.  It's a

12  chart prepared by our colleagues.  It's a chart prepared by

13  plaintiffs.

14              THE COURT:  Any objection?

15              MR. GLUCK:  Yes.  This is the memo delivered to the

16  courthouse over the weekend.

17              THE COURT:  Sustained.

18              MR. LAUER:  We pass the witness, your Honor.

19              THE COURT:  We can go a few minutes before the break.

20  REDIRECT EXAMINATION

21  BY MR. GLUCK:

22  Q.  Good afternoon, Mr. Quintero.

23  A.  Good afternoon.

24  Q.  Do you have your report in front of you?

25  A.  I do.

MCDCpla5                         Quintero - Redirect

1    Q.  Can you please read the second sentence of your report on

2    page 1, beginning "I was asked."

3    A.  I was asked to render my expert opinions about damages

4    sustained by the plaintiffs as a consequence of actions by the

5    defendants during the period beginning December 2012 through

6    March 31st, 2016 (the damages period), including but not

7    limited to -- and I described four categories of damages.

8    Q.  The damages period is a defined term that governs your

9    whole report?

10   A.  Yes.

11   Q.  Now will you please turn to page 17 of your report.  I

12   would like you to read the sentence beginning "However..." and

13   going on to the next page, ending with the word "fund."

14   A.  However, losses are absolute reductions in incentive fees

15   if measured as of the end of the damages period since they can

16   only be offset by subsequent realized and unrealized gains,

17   which is not likely for a fund that is in liquidation.  Since

18   the calculated losses are more than justified, and I am sure

19   that additional losses can be identified if I broaden my scope,

20   the above analysis reveals that aggregate incentive fees during

21   the damages period were unearned and constitute damages

22   sustained by the fund.

23   Q.  Thank you.  Is it to your opinion that all of the incentive

24   fees from 2012 December through 2016 were unearned and

25   constitute damages sustained by the fund?

1            MR. LAUER:  Multiple objections.  Paid, scope.

2            THE COURT:  Scope is overruled.  What else?

3            MR. LAUER:  He used the word "paid."  He said that

4    that's not his testimony.

5            THE COURT:  I don't see that in the question.  The

6    question was, is it your opinion that all of the incentive fees

7    from 2012 December through 2016 were unearned and constitute

8    damages sustained by the fund.  That's the question asked.

9    Your second objection is overruled.

10   Q.  Can you read the sentence — this is in response to the

11   cross examination.

12           THE COURT:  Wait a minute.  I overruled the objection.

13   You don't want an answer?

14   Q.  Can you read sentence beginning "Accordingly," just down

15   the paragraph.

16   A.  Yes.  Accordingly, all of the incentive fees charged to

17   Platinum during the damages period constitute damages sustained

18   by Platinum.

19   Q.  Did you mean all?

20   A.  Yes.

21   Q.  You were asked by Mr. Lauer a series of questions as to

22   whether you had incorporated the fees paid in 2013 on account

23   of the 2012 overvaluation into your analysis.  Do you recall

24   that?

25   A.  Yes.

MCDCpla5                        Quintero – Redirect

1   Q.  Did you incorporate those fees, the ones paid in 2013, on

2   account of an overvaluation in 2012 into your analysis?

3   A.  As I testified, the defendants did not indicate how they

4   calculated fees.  So, instead, I focused on what actually was

5   paid in cash or in kind.

6            THE COURT:  Counsel, let me ask you, do you have five

7   minutes, ten minutes, half hour, whatever?

8            MR. GLUCK:  Based on that, I think we have 45 minutes.

9            THE COURT:  Whatever it is, I think we'll give the

10  jury their midafternoon break.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You can step down.  We'll see you in

3    15 minutes.

4           Please be seated.

5           I'll ask plaintiffs' counsel to think more carefully

6    about whether he really needs 45 minutes and let me know at the

7    end of this break how much you really need.

8           But, meantime, we were going to hear about objections

9    to some of the defense witnesses.

10          MR. SEIDEL:  Thank you, your Honor.  Martin Seidel for

11   plaintiffs.

12          So we would object to principally the two -- I keep

13   saying experts, which kind of raises the issue I'm going to be

14   talking about.  They decided they would like to call the two

15   lead engagement partners from the audit firms, BDO and

16   CohnReznick.  And those witnesses create a real risk under 401,

17   403, and 701 in the following:  There is no question the audit

18   reports are in evidence, but Mr. Bodner has testified he never

19   met with the auditors, he never met with the valuators, in his

20   depositions he said he never read or relied on the audit

21   reports.

22          So what ends up happening is they bring in the

23   auditors and the goal is to try and convince the jury the

24   auditors fly spec the numbers and bless the accounting and

25   bless the numbers, and that's going to create confusion for the

jury.  It's going to create a waste of time because none of

that's necessary to this case.  And ultimately -- and I know

403 says confusion, waste of time, and other reasons, that and

the likely cross where we have to walk through what an audit is

and isn't, and how under AU110 it's all about reasonable

assurance and it's not a guarantee of anything — it's going to

bore the jury to tears.

          We have offered to the defendants a stipulation that

we would stipulate that the audits were, in fact, conducted,

they were conducted in accordance with gas.  The opinions are

the opinions and they're already in the case.  If they were to

agree to stipulate to the following, that in February of 2013,

BDO submitted on — and I believe it's Defendant's Exhibit 570 —

an end-of-audit wrap-up letter in which they declared a

material weakness with respect to the internal controls

surrounding valuation and were almost immediately fired by the

company, that both BDO and -- and that material weakness was

never disclosed in any of the financials, that BDO and

CohnReznick have both been sued in litigation and arbitration

by a number of parties related to their audit and that they

have asserted as a defense *in pari delicto*, which, as we all

know, basically is we're not at fault because to the extent

there was a fraud here, it was concealed from us by management.

We also have Mr. SanFilippo's testimony already in the record

as the person who wrote the financial statements.

1          THE COURT:  Well, first, the Court has no power to

2     order a stipulation or order a party to agree to a stipulation.

3     So if they don't agree, they don't agree, that's that.  Much of

4     what you've referenced sounds like cross examination material

5     for -- they're calling someone from BDO?

6          MR. SEIDEL:  Yes.  Forgive me, your Honor, I didn't

7     mean to cut you off.

8          THE COURT:  Pardon?

9          MR. SEIDEL:  I started to speak and realized you were

10    still talking.

11         THE COURT:  That's all right.  It's never stopped

12    anyone else.

13         MR. SEIDEL:  Because I have a bad habit of doing it

14    and I'm trying very hard to satisfy my wife by listening to

15    people.

16         THE COURT:  But I'm not here for marriage counseling.

17         So what I am concerned with, and this I am determined,

18    is that the evidence in this case will end tomorrow.

19    Therefore, if there is, for example, repetitive evidence, I

20    will stop it.  I am skeptical -- let me ask defense counsel,

21    who are your witnesses?

22         MS. MOSSE:  So our next witnesses, your Honor, were to

23    be the Sterling valuation Group.

24         THE COURT:  What happened to Mr. Grenville?

25         MS. MOSSE:  That's Mr. Grenville from Sterling.

1        THE COURT:  That's right, he is Sterling.

2        MR. SEIDEL:  We do have objections.

3        THE COURT:  The fortunately avoided trip of the U.S.

4    Marshals to Sterling's office, right.

5        MS. MOSSE:  So we have Mr. Grenville from Sterling

6    Valuation Group.  We have Mr. Czapla from Valuation Research

7    Corporation, which is a third party that was a valuation

8    company that was engaged --

9        THE COURT:  Let's take them one at a time.

10        MR. SEIDEL:  I'm sorry.  Czapla was not on their

11    witness list, your Honor.

12        MS. MOSSE:  He has since the beginning.

13        THE COURT:  How long is Mr. Grenville going to take on

14    direct?

15        MS. MOSSE:  With respect to Mr. Grenville, in light of

16    the Court's rulings today with Mr. Quintero and Mr. Quintero's

17    testimony that he reviewed Sterling's reports and the Court's

18    admission of two of the Sterling reports, we would be willing

19    to stipulate to the admission of remaining Sterling reports in

20    lieu of Mr. Grenville's testimony.  So we could eliminate that

21    live testimony.

22        MR. SEIDEL:  We'll stipulate to that, your Honor.

23        THE COURT:  Great.  So Grenville is down to one

24    minute, in effect.  But think of the fun he had coming back

25    from Hong Kong.

 1          What's next?

 2          MS. MOSSE:  Mr. Czapla is a very limited examination.

 3   His company was engaged by CohnReznick --

 4          THE COURT:  What about a time?

 5          MS. MOSSE:  20 minutes on direct.

 6          THE COURT:  All right.  Who else?

 7          MS. MOSSE:  We have Keith McGowan, who is the lead

 8   engagement partner from BDO.  I would say that's 30 to 40

 9   minutes on direct.  We have Jennifer Lange, who is from

10   CohnReznick, and I would say the same, 30 to 40 minutes on

11   direct.

12          THE COURT:  Anyone else, not just from you, from

13   anyone on the defense side?  Have we now covered --

14          MS. MOSSE:  We have one more non-audit valuation

15   witness, Mr. Isaac Neuberger.

16          THE COURT:  What's he testifying about?

17          MS. MOSSE:  He was the attorney for Mr. Katz in

18   connection with the March 2016 agreement.

19          THE COURT:  What's he going to testify?

20          MR. LAUER:  He's going to testify to meetings that he

21   had with Marcos Katz, he's going to testify to the bona

22   fides --

23          THE COURT:  Meaning the attorney had with Marcos Katz?

24   Why aren't they covered by attorney-client privilege?

25          MR. LAUER:  I think he's going.  He's going to

MCDCpla5                         Quintero - Redirect

1    basically explain the process --

2              THE COURT:  Excuse me.  That's not answering my

3    question, I don't think.  The only person who can waive the

4    attorney-client privilege is Mr. Katz, who I understand is

5    deceased, so we're probably not going to receive a waiver from

6    him.  So sounds to me like this would trench on attorney-client

7    privilege.

8              MR. LAUER:  He's going to discuss non-privileged

9    communications because there were multiple people at some of

10   these meetings, I don't know how many there were, but they all

11   had relationships with people like Yaakov Neeman, the former

12   Justice Minister of Israel who came in to deal with this.  I

13   don't know exactly what he's going to testify to, but we

14   believe his testimony, even within the context of the rulings,

15   demonstrates a business-like approach to what was going on.

16   Everyone was acting in complete good faith.  There was really

17   no suggestion --

18             THE COURT:  No one I know has accused Mr. Marcos Katz

19   of bad faith.  So the only relevant conversations are what

20   conversations he had with Mr. Bodner.

21             MR. LAUER:  I don't think he had any with Mr. Bodner,

22   but he had with counsel for Platinum, multiple.  He negotiated

23   the transactions.  There were four transactions.

24             THE COURT:  So what?  So last I recall, the defendant

25   in this case is Mr. Bodner.

1          MR. LAUER:  I agree.  To the extent -- if no one will

2     argue that there was any type of bad faith associated with the

3     relationship with Mr. Katz, then --

4          THE COURT:  I always thought, and maybe I

5     misunderstood, I thought the argument was that Mr. Bodner,

6     allegedly knowing that the assets of Platinum were overstated,

7     solicited or participated in the solicitation of the investors

8     without revealing the fact that the assets were overstated.

9     That has nothing to do with Mr. Katz, other than any

10    conversations, if any, he had with Mr. Bodner.  All the rest is

11    neither here nor there.

12         So if I, in good faith, using all sorts of wonderful

13    assistance from no less than the former Minister of Justice of

14    Israel, not to mention other high-ranking people, choose to

15    invest in Joe Schmo company, but what none of them know and

16    what I don't know is that Mr. Bodner, who, under this

17    hypothetical, was serving as a solicitation agent of Platinum

18    and, under this hypothetical, knew that Platinum's assets were

19    overstated, failed to reveal that to me, which would

20    presumptively have been material under almost any analysis,

21    then Mr. Bodner has a problem, but I don't see how this witness

22    bears on any of that.

23         MR. LAUER:  I think there are two separate issues.

24    First, until quite recently, the issue in this case, as

25    indicated quite specifically in the Court's summary judgment

1      decision, was did Mr. Bodner come to learn that the assets were

2      inflated.

3              THE COURT:  Your other witnesses are all speaking to

4      that.  I understand that.

5              MR. LAUER:  There had not been an issue in this case

6      that Mr. Bodner was accused in any pleading of misrepresenting

7      to investors, including Mr. Katz.

8              THE COURT:  You're missing my point totally.  The

9      theory of the fraud claim, for example, has always been a

10     failure to disclose what he allegedly knew and a claim that he

11     had a duty to do so because he had special knowledge.  So it's

12     not a question of what he said, it's a question of, under their

13     theory, what he failed to say.

14             MR. LAUER:  I understand that.  The failure to

15     disclose had always been to, if you will, investors in general

16     or to the fund.  There was never a specific allegation that

17     Mr. Bodner failed to disclose when he had a duty to disclose in

18     a conversation with someone who is being solicited.

19             So, one of the things -- to the extent that --

20             THE COURT:  No, there was always Mr. Bodner himself

21     saying he wasn't soliciting.  So they certainly were entitled

22     to put in proof of what they consider proof of his soliciting.

23             MR. LAUER:  But to the extent they would rely on Katz

24     as someone with who Mr. Bodner failed to disclose in 2015 or

25     2016, I would offer the following:  Number 1, he settled with

1    Katz; number 2, prior to the settlement when Mr. Neuberger was

2    representing the Katz family, Marcos Katz had sufficient

3    knowledge about everything that he negotiated and signed two of

4    these very complicated business deals where he was going to

5    take an interest in the fund, and this is after all those

6    heated meetings in Mexico City and Acapulco.

7         So to the extent that we're now sort of zeroing in on

8    the hearsay conversation from Michael Katz as to what took

9    place in meetings in Mexico City and Acapulco, and to the

10   extent the Court continues to be influenced by the April 11

11   facts, which the Court, I think, featured somewhat prominently

12   in the Court's summary judgment decision, Mr. Neuberger can

13   explain he had conversations with Katz, he met with him in

14   Israel to talk about -- and Mr. Katz had full knowledge of

15   what's in that weird fact.

16        So, for a number of reasons, it's extremely important

17   to hear Mr. Neuberger because he's going to explain, number 1,

18   notwithstanding whatever Michael Katz, hearsay, said about a

19   meeting in Mexico City in Acapulco, which was almost

20   exclusively dealing with liquidity and withdrawal and not

21   valuation, that the Katz family was sufficiently comfortable

22   and eager to get Michael into the management, that they went

23   forward with these transactions.

24        THE COURT:  I am currently very skeptical that

25   Mr. Neuberger has anything to offer, but I don't need to make

MCDCpla5                        Quintero - Redirect

1   the decision now because we're all getting together at

2   5 o'clock today to first do the charging conference and then my

3   time is your time, or at least that's the way this trial has

4   gone.  So we'll go as late as necessary to resolve any

5   outstanding issues.  And I know the court reporter is thrilled

6   to hear that.

7              Anyway, we'll take five minutes and we'll return.

8              (Recess)

9              THE COURT:  So what is plaintiffs' counsel's latest

10  estimate of how long he will be?

11             MR. GLUCK:  We were just finalizing a way to shave 20

12  minutes off.

13             THE COURT:  Well, that may be, but without

14  finalization, you're going to have to give me an answer.

15             MR. GLUCK:  Right now, 45.

16             THE COURT:  No.  I'll give you a half hour.

17             Let's bring in the jury.  Let's bring in the witness.

18             (Continued on next page)

19

20

21

22

23

24

25

MCDCpla5                    Quintero - Redirect

1          (Jury present)

2          THE COURT:  Let's get the witness back on the witness

3    stand.

4          Please be seated.

5          Go ahead, counsel.

6          MR. GLUCK:  Mr. Parson, will you please bring up

7    exhibit 23 to the Quintero report, and don't show the jury yet,

8    but let's lay the foundation.

9    BY MR. GLUCK:

10   Q.  Mr. Quintero --

11         THE COURT:  Are you offering 23?

12         MR. GLUCK:  Yes.

13         THE COURT:  Any objection?

14         MR. LAUER:  Yes, we weren't allowed to do this.  He

15   objected.

16         THE COURT:  You questioned him at great length about

17   the specifics of this, if I recall correctly.

18         The exhibit is received.

19         (Plaintiff's Exhibit 999 received in evidence)

20   BY MR. GLUCK:

21   Q.  Mr. Quintero, do you recall a set of questions earlier --

22         THE COURT:  What are you calling this,

23   Plaintiffs' Exhibit what?

24         MR. GLUCK:  This will be now Plaintiffs' Exhibit --

25         MR. PARSON:  PX 999, your Honor.

Q.  Do you recall a set of questions asking you to point to a

place in your voluminous report as to where you stated that the

common equity of Black Elk was worthless this afternoon?

A.  Yes.

Q.  Can you please read the second bullet of the fair value

opinion.

A.  Series A, B, and E units were unequivocally worthless after

the Renaissance sale, 8/14 — or August of 2014 — and the series

A and B were likely worthless in its entirety.  See group B,

exhibits 23.1, page 2.  Nevertheless, Platinum attributed value

to the remaining Black Elk equity held by PPVA until 11/15 — or

November 2015.  N.B., an involuntary bankruptcy case, was filed

against Black Elk in 8/15 — or August 2015 — exhibit 23.2,

page 1.

          MR. GLUCK:  Thank you.  This can be taken down.

          Mr. Parson, can you please bring up the Sterling

valuation report, page 69, which described the standard porous

ratings, which was shown to the witness earlier.

          THE COURT:  Which of the Sterling report?

          MR. GLUCK:  This is the 2014 Sterling report.

Q.  As that's being brought up, the common equity of Black Elk

was not publicly traded, was it?

A.  It was not.

Q.  Standard and porous reports on publicly traded debt; is

that right?

1    A.   That's correct.

2    Q.   The only thing they could have been talking about was the

3    publicly traded bonds of Black Elk?

4    A.   They were referring, as I recall, to the corporate family

5    of Black Elk.  In other words, I believe it was referring to

6    all of the debt of Black Elk because I believe it was a

7    corporate family debt rating.

8    Q.   Did you also form views as to whether PPVA's setting that

9    those views were about the Black Elk bonds, did you form views

10   as to whether Platinum had material nonpublic information that

11   those publicly traded bonds were misvalued?

12   A.   Yes.

13   Q.   And what was that?

14   A.   At which point in time?

15   Q.   Well, let me refer you.  Do you have your report in front

16   of you?

17   A.   Yes.

18   Q.   Please turn to paragraph 61.  And please read it.

19   A.   Aloud or to myself?

20   Q.   No, out loud.

21   A.   In addition, given the Black Elk's 10-Q — that is a

22   quarterly financial statement — for the period September 30th,

23   2014, as well as internal nonpublic financial information to

24   which Platinum was privy, given its control over Black Elk, and

25   its knowledge concerning Platinum's orchestration of a

1    Black Elk scheme, Platinum was aware that the actual value of

2    BE notes likely was substantially less than as indicated by

3    market price on the date of sale.  In fact, I am not aware that

4    PPVA has received any payment in respect of its BE notes since

5    its January 30th, 2015 transaction.  As such, I estimate that

6    the actual damages relating to this purchase were the full

7    amount of the purchase price or $34,610,895.

8    Q.  So you did form a view on the value of those Black Elk

9    bonds, didn't you?

10   A.  Yes.

11   Q.  Next, do you recall a set of questions regarding the

12   Michael Goldberg note receivable and the level 1 securities

13   associated with it?

14   A.  Yes.

15   Q.  Did you form a view on how and why those level 1 securities

16   were entirely encumbered in a third-party collateral account to

17   which PPVA did not have access?

18            MR. LAUER:  Objection.  Not in the report.

19            THE COURT:  In any event, it's leading.

20            MR. GLUCK:  Let me rephrase then.

21   Q.  Do you recall the line of questioning regarding the Michael

22   Goldberg note, the level 1 securities, and those securities

23   being on PPVA's balance sheet?

24   A.  Yes.

25   Q.  Do you recall him asking you, Mr. Lauer asking you whether

1   it would be proper to calculate those assets as being on PPVA's

2   balance sheet?

3   A.   Yes.

4   Q.   In connection with this litigation, were you asked to

5   provide an opinion regarding the third-party collateral account

6   into which all of those level 1 securities were deposited?

7   A.   No.

8   Q.   I will refresh your recollection.  Look to paragraph 62.  I

9   would just ask that you read paragraph 62, A and B, into the

10  record.

11          MR. LAUER:  We object.  This is unrelated and I think

12  it's excluded.

13          MR. GLUCK:  This is precisely related and concerns the

14  exact line of questioning which counsel --

15          THE COURT:  We'll see.  You can show him anything to

16  refresh his recollection.

17  Q.   Sure.  Can you read paragraph 62.

18          THE COURT:  To himself.

19          MR. GLUCK:  Last sentence of A, all of B.

20  A.   Okay.

21          THE COURT:  Having read that, does that in any way

22  change your prior testimony that you did not opine on the

23  subject?

24          THE WITNESS:  I don't recall having made any opinion

25  relating these securities to what was collateral from

MCDCpla5                    Quintero - Redirect

 1  Goldberg's note.

 2              THE COURT:  Very well.

 3  BY MR. GLUCK:

 4  Q.  Regarding Golden Gate, did you review Sterling's valuation

 5  reports?

 6  A.  Yes.

 7  Q.  Did you form your own views regarding the values of Golden

 8  Gate?

 9  A.  Yes.

10  Q.  What documents of Golden Gate or its financials did you

11  review?

12  A.  The only financial statements that Golden Gate had were

13  financial statements for the two years ended December 31st,

14  2013 that were audited by a small accounting firm that I never

15  heard of, and they indicated the company had minimal revenues,

16  large losses, was insolvent, deficit net worth, didn't have

17  financial capability to be able to develop those oil wells.

18  There were no subsequent financial informations that I saw in

19  the files nor did I see any such references in the Sterling

20  reports or subsequently the Alvarez & Marsal reports.  It is

21  inconceivable that an asset deemed to be worth as much as 140

22  or $150 million would not have current financial statements

23  audited by a major CPA firm.  I saw considerable correspondence

24  indicating all the problems that were being encountered,

25  talking about all of the nonroutine ways they tried to drill

1    the oil.  They tried a horizontal method, they tried a J method

2    because these were wells that had been abandoned by Unical in

3    the 1980s, and Unical --

4              THE COURT:  I think you've answered the question.

5    Q.  You reviewed correspondence that they tried to drill to

6    extract this oil that the PV10 suggested exists?

7    A.  Yes.

8    Q.  But failed; correct?

9              MR. LAUER:  Objection.

10             THE COURT:  Well, really asked and answered, but I'll

11   leave it.  Put another question.

12   Q.  What is the effect of losing a lease on land that is

13   suggested to have oil?

14   A.  There's no longer an ability to be able to drill the oil on

15   that land.

16   Q.  Why is that?

17   A.  Because the leasehold rights have been lost.

18             MR. GLUCK:  Mr. Parson, can you please call up PX 986.

19             We seek to move this into evidence.

20             MR. LAUER:  Hold on.  Looks like hearsay, your Honor.

21             THE COURT:  Well, at this point, it's the visual

22   equivalent of hearsay since no one's made a comment.

23             MR. GLUCK:  Move it in.

24             THE COURT:  Well, let me see.  Is it this one page on

25   the screen or is it several pages?

MCDCpla5                        Quintero - Redirect

1            MR. GLUCK:  Three pages total.  It's one of the

2      documents that's referenced in Mr. Quintero's report.

3            THE COURT:  Is this a document you reviewed?

4            THE WITNESS:  Yes, your Honor.

5            THE COURT:  So without describing anything they said,

6      who are the people who sent it and who received it?

7            THE WITNESS:  Ari Hirt from Platinum who was

8      responsible for overseeing the investment, and the

9      correspondence in email form is to other members of Platinum.

10            THE COURT:  Received.

11            (Plaintiff's Exhibit 986 received in evidence)

12      BY MR. GLUCK:

13      Q.  If you go to the first page of the report, is there a

14      discussion regarding what the loss of just a single lease would

15      mean?

16      A.  Yes.

17      Q.  And what is that?

18      A.  Would you like me to read the sentence?  It's pretty clear.

19      Q.  Sure.

20      A.  The real dollar impact is disclosing in the audit that

21      $227 million in PV10 percent reserves are no longer owned by

22      GGO — or Golden Gate Oil.

23      Q.  You were asked some questions by Mr. Lauer as to why you

24      didn't think that auditors were being told everything.  Do you

25      recall that?

1   A.  Yes.

2   Q.  Is this one of the many examples that you were thinking of?

3           MR. LAUER:  Objection.

4           THE COURT:  Sustained as to form.

5   Q.  Is this one of the examples that you were thinking of?

6   A.  Yes.

7   Q.  Any others that come to mind?

8   A.  Many like this.

9           MR. LAUER:  We move to strike as nonresponsive.

10          THE COURT:  No, I think it is.  You may have recross

11  on that if you wish.

12  Q.  With respect to the incentive fees, your damages

13  methodology was different than the management fees; is that

14  right?

15          MR. LAUER:  Objection.  It's not what the charts say.

16          MR. GLUCK:  I'm asking as a matter of fact.

17          MR. LAUER:  That's a fact.

18          THE COURT:  Overruled.

19  A.  If you would repeat the question.

20  Q.  With respect to the incentive fees, the 20 percent payable

21  when the NAV increased, your calculation methodology was

22  different than for the management fees, wasn't it?

23  A.  Yes.

24  Q.  We just heard you testify regarding your conclusion that

25  all the incentive fees were unearned.  My question, did you

MCDCpla5                    Quintero - Redirect

1    intend, by any of those charts on your straight-line analysis,

2    to exclude the payments made on account of incentive fees?

3             MR. LAUER:  Objection.  Charts speak for themselves.

4    Q.  My question is for your testimony.

5    A.  Are we talking about management --

6             THE COURT:  There's an objection.

7             So, as formulated, the objection is sustained because

8    counsel began by testifying, saying, quote, we just heard you

9    testifying regarding your conclusion that all the incentive

10   fees were unearned.  My question --

11            I'm glad you finally got to your question, but I'm not

12   going to allow you to testify like that.  Put another question.

13   Q.  Did you intend, by the charts showed to you by counsel this

14   afternoon, to exclude incentive fees from your analysis?

15            MR. LAUER:  Objection.  I don't understand it.

16            THE COURT:  Well, his intent is not an issue, but the

17   question is, did your analysis, in fact, exclude incentive fees

18   or not?

19            THE WITNESS:  I'm unsure which charts you're referring

20   to.

21            THE COURT:  Show him the charts.

22            MR. GLUCK:  That's fine.

23   Q.  Let's take, as an example, the Black Elk chart, Northstar

24   GOM Holdings, 25.2.

25            THE COURT:  What exhibit are you referring to?

1           MR. GLUCK:  25.2 of the Quintero report, which was

2     showed today.

3     Q.  Was it your intent --

4           THE COURT:  Intent is not an issue.  Is this a chart

5     that you prepared?

6           THE WITNESS:  Yes.

7           THE COURT:  Does it or does it not show the exclusion

8     of any --

9           THE WITNESS:  This exhibit shows damages both from

10    management fees and incentive fees.

11          THE COURT:  And does any of the former exclude,

12    according to this chart, any of the latter?

13          THE WITNESS:  I'm sorry.  Any of?

14          THE COURT:  The latter.

15          I think that's the question you were trying to ask,

16    counsel.  Correct me if I'm wrong.

17          MR. GLUCK:  Yes.

18    Q.  By these charts, which utilized this straight line, was it

19    your intent as a matter of fact --

20          THE COURT:  It's not a question of intent.

21          MR. GLUCK:  Did you --

22          THE COURT:  -- what the charts show.  This is why

23    counsel said the document speaks for itself, but I don't think

24    it's so clear it speaks for itself.  So he can say what he

25    believes the chart shows.

Mcd2Pla6                    Quintero - Redirect

1            MR. GLUCK:  I'm actually asking a different question.

2            THE COURT:  Okay.  Go ahead.

3    BY MR. GLUCK:

4    Q.  Do charts and the ones like this bear upon your conclusion

5    as to the amount of overpaid incentive fees in your testimony

6    today?

7            THE COURT:  No, I will allow that.  That I think is a

8    good question.

9    A.  They do not.

10   Q.  And why is that?

11   A.  Because I narrowed my opinion to just the cash payments

12   received directly and indirectly, and so those are what I

13   testified about last Wednesday and today, just the cash

14   portions.

15   Q.  Now -- thank you.

16           Mr. Parson, please bring up PX 924.

17           Is it -- please describe for the jury, as clearly as

18   you can and as quickly as you can, the amount of incentive fees

19   that were directly and indirectly paid but were unearned

20   pursuant to your analysis.

21   A.  $30,773,579.

22   Q.  And of those, is it in your report that the 16 million --

23   excuse me.

24           Please identify for the jury how that is broken down.

25           MR. LAUER:  Asked and answered.

1          THE COURT:  And you only have five minutes left.  You

2    really want to go over what he went over before?  If that's

3    what you want to do, I will let you do it, but it is still only

4    going to be five minutes more.

5          MR. GLUCK:  I understand.

6          THE COURT:  All right.

7    BY MR. GLUCK:

8    Q.  Please identify for the jury how that is broken down.

9    A.  13,997,109 in cash and 16,776,470 in securities or limited

10   partnership interests that were redeemed between 2013 and 2014.

11         MR. GLUCK:  I understand there is a stipulation that

12   we have agreed regarding the 16,776,470 being in the report.

13   Is that correct, Mr. Hertzberg?

14         MR. HERTZBERG:  I don't think you want to do this in

15   front of the jury.

16         MR. GLUCK:  Well, if I call up -- if you don't want to

17   do this, I'm going to call it up, JX 42, please.  Would you

18   please hand the witness a copy.

19         Your Honor, I'm sorry if I need more than five minutes

20   here.  About an hour and a half -- the reason being about an

21   hour and a half of the direct today was a suggestion that the

22   calculations and underlying SS&C --

23         MR. LAUER:  Can we just have a question?

24         MR. GLUCK:  -- statements were not here.  And now I

25   need to go through --

1    THE COURT:  Counsel, if necessary, we will have a

2    sidebar, but just at the moment you have got three more

3    minutes.

4    BY MR. GLUCK:

5    Q.  Mr. Quintero, do you have JX 42 in front of you?

6    A.  I do.

7    Q.  Can you identify where on JX 42 the payment to Mr. Uri

8    Landesman comprising a portion of this amount is?

9    A.  Unfortunately, these are small numbers and --

10   MR. GLUCK:  We seek to admit this into evidence,

11   JX 42.

12   MR. LAUER:  We don't have any objection.

13   THE COURT:  All right.  Received.

14   (Joint Exhibit 42 received in evidence)

15   MR. LAUER:  We have no objection, but I think we need

16   the first page so we would have the dates.

17   THE COURT:  I think the date on the copy I have says

18   for the period 3/1/2013 to 3/31/2013.

19   MR. LAUER:  What I meant is the caption so you know

20   what it is.

21   THE COURT:  It is the Investor Capital Detail for

22   Partnerships via EU Platinum Value Arbitrage Funds.

23   MR. LAUER:  My apologies, your Honor.  It's not

24   showing up on the screen.

25   THE COURT:  I see.

Mcd2Pla6                    Quintero - Redirect

1    BY MR. GLUCK:

2    Q.  Can you see the document on your screen, Mr. Quintero?

3    A.  Yes.

4              THE COURT:  Here.  Take the hard copy.  And since your

5    counsel has all of two minutes left, put a question.

6    A.  Yes, I can see it in the highlighted portion here.

7    Q.  Yes, it is on page 3.

8    A.  Yes.

9              MR. GLUCK:  Okay.  Now, Mr. Parson, please call up

10   JX 45.  We seek to move that into evidence.

11   Q.  Appended to your report, right?

12             MR. LAUER:  We object.  I'm sorry, we do not object.

13             THE COURT:  Received.

14             (Joint Exhibit 45 received in evidence)

15   BY MR. GLUCK:

16   Q.  Mr. Parson, can you please go to page 4, PDF page 3,

17   highlight 1.

18             Do you see the payments to the Mark Nordlicht Grantor

19   Trust there?

20   A.  I do.

21   Q.  It's appended to your report, right?

22   A.  Yes.

23   Q.  Form the basis of your calculation?

24   A.  Yes.

25             THE COURT:  All right, counsel.  Thank you very much.

1    That concludes your redirect.

2              I will give defense counsel five minutes or less --

3              MR. LAUER:  Thank you.

4              THE COURT:  -- for recross.

5              MR. GLUCK:  I did have one more important question.

6              THE COURT:  All right, one more.

7              MR. GLUCK:  Thank you.

8    BY MR. GLUCK:

9    Q.  Please bring up 924 again.

10             Mr. Quintero, the 13,997,000 of incentive fees paid to

11   the GP account on your screen, did you trace those within your

12   report and form a conclusion they were unpaid incentive fees?

13   A.  I traced these cash amounts to bank statements.

14             MR. GLUCK:  Thank you.

15             MR. LAUER:  I will try to do this quickly.

16             THE COURT:  I don't think you have a choice.

17   RECROSS EXAMINATION

18   BY MR. LAUER:

19   Q.  You were shown a document, your overview, Exhibit 23, that

20   was put in evidence.

21             We would offer 23.1, 23.2, which is the backup

22   schedules, and 24.1 and 24.2, all included in DX Exhibit 765.

23             THE COURT:  All right.  Any objection?

24             MR. GLUCK:  We do have an objection.

25             THE COURT:  I'm sorry?

Mcd2Pla6                    Quintero - Recross

1              MR. GLUCK:  We do have an objection.

2              THE COURT:  Ground?

3              MR. GLUCK:  Matters not in evidence.

4              THE COURT:  I think the door was opened, so they are

5     received.

6              (Defendant's Exhibit 765 received in evidence)

7     BY MR. LAUER:

8     Q.  You mentioned that Golden Gate lost its leases.  This was

9     in April of 2015, right?

10    A.  It was beginning to lose them at that point, that is

11    correct.

12    Q.  Okay.  So it had its leases in 2014, 2013, and 2012?

13    A.  Yes, it did have leases during that time period.

14    Q.  Okay.  And is there anything in your report that comments

15    on leases or not having leases with respect to Golden Gate in

16    2012?

17    A.  I don't recall having written anything about that.

18    Q.  Is there anything in your report dealing with production

19    problems during calendar year 2012?

20    A.  No.  Because I wasn't -- that is correct.

21    Q.  You -- I would offer DX 679.1, which are the investor

22    capital detail partnerships for the period 1/1/2016 backwards

23    to 2013.

24              THE COURT:  Any objection?

25              MR. GLUCK:  No objection.

Mcd2Pla6                    Quintero - Recross

1              THE COURT:  Received.

2              (Defendant's Exhibit 679 received in evidence)

3    BY MR. LAUER:

4    Q.  If you turn to the investor capital detail for partnerships

5    1/1/2013 to 1/31/2013, tell me when you have it.

6    A.  This is 2016.

7    Q.  If you go all the way -- I would ask, it is in evidence, so

8    let's . . .

9              DX 679, put it up.

10             THE COURT:  Are you offering it?

11             MR. LAUER:  Yes, we are offering it.

12             THE COURT:  Any objection?

13             MR. GLUCK:  It's not on our screen yet.

14             THE COURT:  Pardon?

15             MR. GLUCK:  It's not on our screen yet.

16             THE COURT:  Here.  Take a look at my hard copy.

17   BY MR. LAUER:

18   Q.  Can you turn to the --

19             THE COURT:  Wait a minute.  We don't know whether it

20   is objected to.

21             MR. LAUER:  Sorry.

22             MR. GLUCK:  No objection.

23             THE COURT:  Received.

24             (Defendant's Exhibit 679 received in evidence)

25   BY MR. LAUER:

1  Q.  Can you turn to the Uri Landesman entry for January of

2  2013.  Tell me when you have it.  It is on the bottom of the

3  page in yellow.  There we go.  It is right underneath that.

4          Now it is on the top of the screen.  Do you have that,

5  Mr. Quintero?

6  A.  Yes.

7  Q.  Okay.  And you see that prior to January 1, 2013, Landesman

8  had in his capital account for previously issued incentive fees

9  not redeemed, 4,733,390?  Do you see that?

10 A.  Yes.

11 Q.  And what was added in January of 2013 is 3,858,993.64?

12 A.  Yes.

13 Q.  And immediately above that you see that the Mark Nordlicht

14 Trust III, prior to January 1, 2013, had in its account

15 2,038,749?

16 A.  Yes.

17 Q.  And added to it in January incentive fees 2,501,043.34.

18 Right?

19 A.  Yes.

20 Q.  Did you do any analysis of FIFO or LIFO?

21 A.  No.

22 Q.  Can you explain very briefly to the jury the accounting

23 concept known as FIFO?

24 A.  FIFO was used for inventory analysis and it assumes that

25 the first inventory in is the first inventory out.  LIFO——last

1    in first out——assumes that the last in is the last out, but

2    those don't particularly pertain to investments.

3    Q.  Did you issue any opinion on whether incentive fees coming

4    in in a following year are allocated to the immediate year or

5    the previous years?

6    A.  It's reflected in the calculations that I expressed an

7    opinion on with respect to the payments in cash and payment in

8    kind of incentive fees during 2013 and 2014.

9              THE COURT:  All right.  That concludes the

10   examination.

11             Thank you very much.  You may step down.

12             (Witness excused)

13             THE COURT:  Let's get Mr. Bodner back on the stand.

14    DAVID BODNER, previously affirmed.

15             THE COURT:  We are on cross-examination.

16             Mr. Gluck.

17             MR. GLUCK:  Just a moment, your Honor.  I just need to

18   figure out where we left off.

19             THE COURT:  That's fine.

20             (Counsel confer)

21   CROSS-EXAMINATION (continued)

22   BY MR. GLUCK:

23   Q.  Mr. Parson, please call up PX 523.

24             I believe we were on this e-mail last time when we

25   broke.

1          Mr. Bodner, isn't it true that the positions and

2     valuations of PPVA were discussed in detail in partner meetings

3     that you attended?

4     A.   Absolutely not.  I testified yesterday about that.  They

5     were not discussed in detail.  All discussed in detail was the

6     liquidity that Mr. Mark Nordlicht needed going forward for the

7     next month.

8     Q.   Mr. Landesman here is forwarding you this exchange so that

9     you would know that he was properly prepared to discuss this

10    investment with you at the partner meeting, isn't that true?

11    A.   Which part of the e-mail are you referring to, please?

12    Q.   The partner meeting that Uri Landesman is talking about

13    scheduling.

14    A.   But which part of the e-mail, I asked you, are you talking

15    about?

16    Q.   Sure.  Middle of the page, "Sure.  Listen to the 1:00 call

17    today.  If you are able, would like your feedback.  Trying to

18    set up a partner dinner for next week."

19          That is what I am referring to.

20    A.   I think that e-mail is written to Bernie Fuchs and it is

21    telling him that he should listen to the investor call, which I

22    never listened to in all my years at Platinum, and he is

23    telling him, if you are able, he would like Bernie's feedback

24    on it, and he is telling Bernie Fuchs, he is trying to set up a

25    partners dinner for next week, and my understanding is because

Mcd2Pla6                       Bodner - Cross

1   Bernie had information on China Horizon.

2              MR. GLUCK:  PX 521, please.  I move this into

3   evidence.

4              MR. LAUER:  Is this in evidence?  No.  No connection

5   to this witness.

6              THE COURT:  Wait, wait.  Are you offering it?

7              MR. GLUCK:  We are.

8              THE COURT:  Objection?

9              MR. LAUER:  That was the objection.

10             MR. GLUCK:  I am told it is actually --

11             THE COURT:  Hold on.

12             Sustained.

13  BY MR. GLUCK:

14  Q.  Mr. Bodner, you also had detailed knowledge about what

15  Beechwood was doing with its acquisitions of PPVA investments'

16  debt, right?

17  A.  I testified yesterday that the only thing I knew about

18  Beechwood was what type of business it was when it started.  I

19  can't give you an exact date, but I think it was two years or a

20  year and a half after Beechwood was formed that I found out

21  that Beechwood had positions in Platinum's debt.  Until then, I

22  understood that Beechwood had an investment in Platinum PPCO

23  that they put in five percent, five or six percent they were

24  allowed to put in according to the rules from the insurance

25  money.  More than that, I don't recall having any other than

Mcd2Pla6                          Bodner - Cross

1    that.

2    Q.  Mr. Parson, PX 459.

3           In fact, you knew --

4           THE COURT:  I'm sorry.  Is this in evidence or not?

5           MR. GLUCK:  This is in evidence.

6           THE COURT:  Go ahead.

7    BY MR. GLUCK:

8    Q.  In fact, you knew that Beechwood had not only acquired

9    PPVA's debt, but that PPVA was making the interest payments on

10   it, right?

11   A.  If I'm not mistaken, this question was asked to me

12   yesterday and I stated I did not know.  I don't know why Murray

13   Huberfeld send it to Angie.  It didn't say to print out and

14   show David Bodner.  It says that he sent it to Angie.  It could

15   be for a lot of different reasons.  I was not told that

16   Platinum was paying Beechwood's debt or these companies' debts.

17   Q.  You weren't told.

18   A.  No, I was not told.

19   Q.  Not by Murray Huberfeld?

20   A.  Not by Murray Huberfeld.

21   Q.  Not by Scott Taylor?

22   A.  Not by Scott Taylor.

23   Q.  Not by Mark Feuer?

24   A.  I think, if I remember correctly, I met Scott Taylor twice.

25   Q.  Um-hmm.

Mcd2Pla6                         Bodner - Cross

1   A.  And I was not told by Mark Feuer either.

2              THE COURT:  Do I understand that you did not yourself

3   use e-mail?

4              THE WITNESS:  I avoided e-mail.  Should I talk into

5   the -- I avoided e-mail, because I was very well-known in the

6   Jewish community --

7              THE COURT:  Just answer my questions yes or no.  You

8   avoided e-mail?  Yes or no.

9              THE WITNESS:  The answer is I had an e-mail.  My

10  secretary used to show me any e-mails that she felt was

11  important for me to see.

12             THE COURT:  Okay.  And --

13             THE WITNESS:  And there was a time --

14             THE COURT:  Excuse me.

15             So what reason do you have to believe that she didn't

16  show you this one.

17             THE WITNESS:  Because it wasn't instructed to her that

18  she should show it to David.  It was sent from Murray to her

19  and it could have been for a million reasons.  Murray was --

20             THE COURT:  Excuse me.  Excuse me.  You told me a

21  minute ago, "My secretary used to show me any e-mails that she

22  felt was important for me to see."  That was your testimony

23  about five seconds ago, right?

24             THE WITNESS:  Right.  I meant to say that anything

25  that was addressed to David Bodner.  Like Bernie Fuchs use

Mcd2Pla6                          Bodner - Cross

today say "show it to David" or Murray would say "show it to

David."  If it was not written on it "show it to David," I

don't think she would analyze something and show it to David.

          THE COURT:  So is it your testimony that when she

received an e-mail from someone at Platinum, for example, that

if it didn't say on its face "show it to David" or the

equivalent, that she would not show it to you.

          THE WITNESS:  I would think she would not show it to

me if it didn't say specifically "show it to David."

          THE COURT:  Why would someone like, let's say,

Mr. Nordlicht, who knew that you didn't personally operate

e-mails but that your secretary did, send her something

relating to Platinum just for her secretarial knowledge.

          THE WITNESS:  No, he would send for Murray, like if

you saw in the other e-mails Mr. Nordlicht wrote "please print

it out and show it to David."  If the other e-mail, when he

went to Israel and he was in a panic, Bernie Fuchs wrote

"please print it out, show it to David."

          If it doesn't say "show it to David," Angela Albanese

was being used by Murray Huberfeld, Uri Landesman, and very

little by myself.  She answered phone calls for me.  As an

e-mail, she was not somebody who constantly showed me e-mails.

I have no idea why the other people send her e-mails unless,

like you see on a lot of e-mails that were sent that were

important, setting up a meeting, "show it to David."  Mark

1   Nordlicht is in a panic, he needs liquidity, "please print it

2   out, show it to David."  "Make sure David reads it."  Bernie

3   Fuchs, "make sure David sees this."  That were the messages

4   that the e-mails got that I would understand she would show me.

5           Something like this, I have no idea who sent it to

6   her.  Well, it was sent by Murray Huberfeld, and David Levy, it

7   looks like, sent it to him.  And I don't know why he sent it.

8   Maybe he wanted to copy it, show it to Mark, I have no idea

9   what this was.

10          THE COURT:  Anything else, counsel?

11          MR. GLUCK:  Yeah, I think I have about six minutes

12  left.  I just want to -- before we get to the 30 minutes.

13          THE COURT:  Yes, I understand.  Although, we are going

14  to let the jury go at 4:30 of course.

15          MR. GLUCK:  Of course.

16  BY MR. GLUCK:

17  Q.  You are saying that Murray Huberfeld never told you

18  anything about COBA or Jonah Rechnitz either?

19  A.  I'm testifying I found out about COBA the day Murray was

20  arrested.  His wife called me up in a panic and she asked me

21  where I am.  I did not answer the phone until 9:00.  I was sick

22  in bed.  And she told me Murray was arrested.

23  Q.  What --

24  A.  I had no knowledge -- could you let me finish, please?

25          I had no knowledge about this COBA situation.  Nobody

Mcd2Pla6                          Bodner - Cross

1    told me about it.  Murray used to do these things.  Murray used

2    to have things that he did in the business which I have no idea

3    about.

4              THE COURT:  I think we are going to give the jury

5    their evening recess at this time.

6              So ladies and gentlemen, I am determined that we will

7    finish the evidence tomorrow, and I will take all necessary

8    steps.  But to make sure that we do that, we need to start

9    promptly at 9:30, so we will see you tomorrow.

10             (Continued on next page)

Mcd2Pla6                    Bodner - Cross

1           (Jury not present)

2           THE COURT:  Please be seated.

3           Mr. Bodner, you were present in the courtroom, were

4   you not, last week when there was a witness who, instead of

5   giving responsive answers, went on at great length?  Do you

6   remember that?  What was his name counsel?

7           THE WITNESS:  Pleading the fifth?

8           MR. GLUCK:  Gerszberg.

9           THE COURT:  Gerszberg.

10          And you remember that I eventually had to say to him

11  that if he didn't just end his testimony when he had answered

12  the question put, I might have to send him to jail.  Do you

13  remember that?

14          THE WITNESS:  Yes, I do remember.

15          THE COURT:  Keep that in mind, because I think the

16  last few answers went well beyond what the question is.  Okay.

17          THE WITNESS:  I was upset.  I was emotional.

18          THE COURT:  I understand you were upset.  He was

19  upset.  I'm upset when anyone doesn't play by the rules.

20          THE WITNESS:  Okay.  I'm sorry.  I apologize.

21          THE COURT:  Okay.  We will see you tomorrow.

22          Okay.  We will see you all at 5.

23          MR. LAUER:  Your Honor, I'm sorry to hold you, but at

24  some point we would like to recapture our reserved opportunity

25  to move on the basis of what has come out.

Mcd2Pla6                    Bodner - Cross

1          THE COURT:  Yes.  We will do that at the 5:00 session.

2          MR. LAUER:  As long as --

3          THE COURT:  Absolutely.  Okay.

4          (Recess)

5          (Jury not present)

6          THE COURT:  Please be seated.

7          I want to cover the following three things: first, any

8     motions, any renewed motions from defense counsel based on the

9     testimony of Quintero; second, the charge; and, third, the

10    question of excluding any witnesses from the remainder of the

11    defense.

12         So let's hear first, Mr. Lauer, from you on the

13    motion.

14         And I take it, just for the record, that the plaintiff

15    has again rested, yes?

16         MR. GLUCK:  Based on what Mr. Lauer is about to say, I

17    don't know if we have.

18         THE COURT:  No, no.  But you are not planning to

19    call -- I've already said you are not going to call a summary

20    witness, but you are not planning to call any other witness.

21         MR. GLUCK:  No.  We may have to introduce two

22    documents.

23         THE COURT:  Okay.  We will talk about that in a

24    minute.

25         Go ahead.

Mcd2Pla6                    Bodner - Cross

1            MR. LAUER:  Okay, your Honor.

2            First, now that the Court has essentially separated

3    aiding and abetting from conspiracy, I just wanted to clarify

4    the motions, and I will spend the most time dealing with the

5    Quintero numbers, but they all relate to that issue.

6            So with respect to aiding and abetting, to the extent

7    there is no conspiracy --

8            THE COURT:  There is no aiding and abetting claim

9    left.  Did you look at the charge?

10           MR. LAUER:  Well, what I mean is, to the extent there

11   is no conspiracy retroactive picking up of damages --

12           THE COURT:  So I will repeat what I think I already

13   have elaborated on the record.  There are no aiding and

14   abetting charges left.  The conspiracy is relevant only to

15   picking up earlier years of damages if the jury accepts your

16   view that the defendant didn't know anything, at worst case,

17   until a later year.  So that's all been decided, and you noted

18   your objection on the conspiracy part of that repeatedly.

19           MR. LAUER:  I'm sorry.  I understand the Court's

20   ruling on conspiracy, that it picks up retroactive.  If the

21   jury finds there is no conspiracy, is there then --

22           THE COURT:  Then all that's left is the substantive

23   charges.

24           We will get into this when we get to the charging

25   conference --

Mcd2Pla6                         Bodner - Cross

1          MR. LAUER:  So --

2          THE COURT:  -- but at least what I have ruled so far,

3    and it is repeated in my proposed charge, is there is a

4    substantive count for breach of fiduciary duty, there is a

5    substantive count for fraud, there is a defense of the release

6    if liability is found on either of those two claims.  And

7    finally, if they get to damages, then and only then does the

8    conspiracy issue arise.  And if a conspiracy is found, then

9    that picks up earlier retroactive damages.

10         MR. LAUER:  And what I am addressing is the

11   nonretroactive part.  In other words, I still understand --

12         THE COURT:  Okay, so go ahead.

13         MR. LAUER:  And this was simply with respect to the

14   nonretroactive counts.

15         THE COURT:  Okay, that's fine.

16         MR. LAUER:  I reemphasize that there is no evidence on

17   which the jury can find that Mr. Bodner knew that the

18   valuations were fraudulently overstated before the earliest of

19   December 14.

20         So to that extent, we would ask that any damage

21   associated with nonretroactive claims be eliminated from the

22   case.

23         THE COURT:  Okay.  I understand that argument.  We

24   will take it up when we get to the charge, but I fully

25   understand that argument.

Mcd2Pla6                        Bodner - Cross

1            MR. LAUER:  Okay.

2            Next, with respect to conspiracy itself, and obviously

3       we have made our record on that, there is no actual evidence

4       that there were at least two human beings who fraudulently

5       engaged in an overvaluation at least——let's just take an easy

6       one——with respect to Black Elk year-end valuation 2012.  In

7       other words, there is evidence --

8            THE COURT:  The conspiracy, because each conspirator

9       doesn't need to know everything that is involved.  The alleged

10      conspiracy, so far as damages are concerned, is that there was

11      a conspiracy between at least Mr. Nordlicht and Mr. Bodner to

12      overvalue Platinum in order to both deceive investors and line

13      their own pockets.  And the fact that aspects of that alleged

14      conspiracy involved one little entry there or one little entry

15      here would not preclude the jury from finding a conspiracy

16      under established conspiracy law.

17           MR. LAUER:  No, I understand that.  The point I was

18      making is that there is no evidence that the conspiracy began

19      before, say, January -- before, say --

20           THE COURT:  I see, okay.  That is an interesting

21      argument.  I will hear your adversary on that in a minute.

22           MR. LAUER:  And the reason I am emphasizing it is

23      because it all revolves around the testimony of Mr. Quintero,

24      which is not in his damages report, that there is roughly $18

25      million of incentive fees that he claims should never have been

1    charged originating from the explosion at Black Elk on November

2    12.

3            So put another way, the Quintero valuation evidence is

4    that six weeks later, when they did the Black Elk valuation as

5    of year end 2012 and calculated the incentive fees as of year

6    end 2012, there is no evidence in the case that Mr. Nordlicht

7    or anyone else conspired with respect to how to do that

8    valuation six weeks after the explosion.  And it's a failure of

9    proof.  There is no evidence that Nordlicht acted with

10   fraudulent intent.  I'm not addressing whether he --

11           THE COURT:  I hear you --

12           MR. LAUER:  Okay.

13           THE COURT:  -- but—and I will hear from plaintiffs'

14   counsel in a minute—I thought what Quintero said was that it

15   wasn't just the explosion, it was that the company was already

16   in bad shape and this sort of like was the straw that broke the

17   camel's back, and it became essentially incapable of operating

18   in any meaningful way.  Therefore, to value it in the way that

19   Platinum did was inherently fraudulent.  It is hard to see how

20   Mr. Nordlicht, notwithstanding, I gather, his acquittal in the

21   criminal case on this charge, couldn't be found by a jury by a

22   preponderance of the evidence to have known that Black Elk was

23   just not an operative company anymore.

24           MR. LAUER:  Well, I --

25           THE COURT:  And then the question of whether

1    Mr. Bodner knew that and joined in a plan, etc., is a little

2    more dicey.

3              But go ahead.

4              MR. LAUER:  I think there is tremendous conflation

5    here in the way that plaintiffs put in their proof.  In other

6    words, I am not arguing that with respect to Black Elk's

7    valuation in 2014.  I'm not even arguing with respect to

8    Black Elk's valuation in 2013.  I am focusing on a new $18

9    million in incentive fee damages --

10             THE COURT:  Maybe I am misremembering.  The documents

11   relating to Black Elk that are claimed to be fraudulent begin

12   with a valuation that was actually produced in 2013 for the

13   previous year, and the argument that Mr. Quintero makes is that

14   they knew beginning in December 2012 that this company was now

15   on the skids and could never realize anything like the value of

16   its reserve oil and gas.  That's their argument.

17             MR. LAUER:  Okay.  I hear your Honor.  I'm not going

18   to argue back and forth on that.  I will save that part for the

19   summation.

20             But on the issue of the beginning of a conspiracy,

21   there is no evidence that anyone acted with fraudulent intent,

22   including Mr. Nordlicht, but certainly no second person to form

23   a conspiracy in early 2013.  That's the --

24             THE COURT:  All right.  Let me hear from plaintiffs'

25   counsel on that, and then we will come back to you in a minute.

Mcd2Pla6                          Bodner - Cross

1           MR. GLUCK:  May I take the podium?

2           THE COURT:  Yes.

3           MR. GLUCK:  Okay.  First I would like to address the

4      evidence of conspiracy before the most relevant date of March

5      2014, which is the date that the 14 million——not 18——14 million

6      was paid.

7           In this regard, the plaintiffs submitted the following

8      evidence:

9           Firstly, the expert testimony of both Mr. Post and

10     Mr. Quintero concerning the financial health of Black Elk, but

11     not the enterprise, specifically, the impact of that explosion,

12     given Black Elk's illiquidity and the $200 million-plus common

13     equity position of PPVA.

14          What is relevant ultimately——and this would be my

15     closing——is not whether Black Elk was destined to go bankrupt

16     or not at this particular point; what's relevant is whether

17     PPVA's common equity was impaired.  And on those points we have

18     introduced not merely expert testimony, but contemporaneous

19     documents and information.  So that is -- you know, have we

20     presented a scenario where PPVA's net asset value, 30 percent

21     of which comprised this common equity position, was impaired,

22     (a).

23          (B) is have we presented evidence that, as of that

24     time and then forward through to March of 2014, a conspiracy

25     existed.  And I would submit to the Court the following pieces

1    of evidence, among others, but you just heard this argument,

2    are highly relevant:

3            One, the testimony and evidence regarding Mr. Bodner's

4    anxiousness the day of the Black Elk explosion concerning

5    Black Elk investors, and there is an e-mail to that effect;

6            (b) the e-mail and related testimony, including that

7    of Mr. Nordlicht, concerning Mr. Landesman having to obtain

8    permission for him to tell Mr. Fuchs, then investor, about the

9    whole Black Elk situation;

10           (c) the testimony from Mr. Latkin and Mr. Fuchs, among

11   others, that the event of the Black Elk explosion -- explosion

12   and the period immediately thereafter was a, quote, all hands

13   on deck circumstance at Platinum.

14           Continuing, the e-mails concerning the raise of the

15   BEOF fund.  What we see prior to March of 2014, and there is

16   one payment in January -- I'm going to come back to that one,

17   we need to get into evidence or the Court could deem that we

18   proved it via Mr. Quintero.  The circumstance was that there

19   was a hope that investing a very large amount of money in

20   Black Elk could somehow turn it around.

21           Now both of our experts have testified that it didn't

22   work; that people invest all sorts of things lots of time,

23   Facebook, VR.  You can spend all sorts of money, but you don't

24   necessarily get something.

25           But the fact there was this sort of crisis, that a

Mcd2Pla6                          Bodner - Cross

1    one-off had to be done -- in fact, I think there is or was

2    testimony it was the biggest one ever, 95 million.  It's a lot

3    of money.  The fact that that was done and needed to be done

4    and there are a half dozen e-mails in evidence saying:  Did you

5    make this investor call?  Did you make this investor call?  Did

6    you get this person in?  That is all knowledge of the extreme

7    circumstance that was PPVA's position in Black Elk.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCDCpla7

1           MR. GLUCK:  We don't need to show that Black Elk was a

2    forever foregone conclusion writeoff.  The query, especially in

3    light of the damaged financial stake, even prior to the

4    explosion, is whether that bottom tier, common equity, was

5    impaired.

6           Moreover, when the money did finally come in to

7    Black Elk through this BOF fund, it went in above the common

8    equity in what's called a preferred equity share class.  We

9    have heard testimony that in a payout order, preferred equity

10   of course comes above common equity in the result of dilution.

11          This leads to a broader point.  PPVA did not invest in

12   Black Elk.  When someone else comes into any asset and adds

13   money via debt or shares, they are diluting the investment that

14   came before it.  It's not just additive, it could be in the

15   long-term, sure, but it wasn't, and that's the testimony.

16          We will or have — it's on my outline, I just can't

17   remember where — introduced a particular email regarding a

18   December 31, 2012 partners meeting.  This is the close of the

19   year and when an initial view concerning the incentive fees was

20   made.  This is our evidence in advance of the January 2013

21   Landesman payment that comprises $597,000 of that $14 million.

22   Another exhibit I was trying to introduce through Mr. Quintero

23   at the end.

24          In a related point, it was not until today that we,

25   PPVA, plaintiffs, understood that the underlying data for these

1    damages was subject to challenge.  In fact, I have not only the

2    proposed bench memo from defendants stating that if a member of

3    the general partner redeems unearned/inflated incentive fees

4    for cash payment, Bodner acknowledges, as properly

5    characterized as damages to PPVA -- we had a whole sidebar

6    about this, and I have a specific recollection of this, which

7    is how I found it.

8            It was during the Huberfeld testimony.  The question

9    was whether we could introduce the COBA-related redemptions.  I

10   said it's because, as far as we knew at that time, they were

11   still trying to dispute or maybe were going to dispute that

12   these had come out of PPVA's bank accounts, these particular

13   damages.  What Mr. Hertzberg said is it's over.  He said it's

14   over, it's over.

15           I can promise this Court, we only delayed

16   Mr. Quintero's testimony for scheduling purposes.  If anything

17   like the cross examination that occurred today had occurred in

18   its normal order, we would have ensured to introduce the bank

19   statements or whatever else Mr. Lauer spent more than an hour

20   today contesting whether it was in the report.  The answer, it

21   was appended to the report or referenced in the report, et

22   cetera, et cetera.

23           THE COURT:  I'm going to take the liberty of

24   interrupting.  I'll hear anything -- because I'm leaning your

25   way, but let me hear anything Mr. Lauer still has to say.

MCDCpla7

1          MR. LAUER:  Let me try to make the point.  My next

2     point, your Honor, is that to the extent the fiduciary breach

3     claim is in the case, we submit that $10,423,580 of the

4     incentive fees, and this is basically all of the 60 percent of

5     the $18 million that Quintero talked about in his testimony

6     that is not in his report, is barred by the statute of

7     limitations.

8          So, three-year statute of limitation, and under most

9     cases that address a relatively interesting phenomenon of when

10    a fraud claim is inextricably also coterminous with the

11    fiduciary breach claim that gives rise to it, there is also a

12    three-year statute of limitations that you cannot -- and I

13    don't have the cases here, but I can submit them later.  There

14    is a three-year statute of limitations on a fiduciary breach

15    claim.  So to the extent we're dealing with anything other than

16    clear and convincing as a fraud, that's barred by the

17    three-year statute of limitations.

18         We've calculated, taking into account the tolling that

19    existed because of the filings, and there is ample case law

20    that when there really is no difference between the fiduciary

21    breach and the fraud that's based on the fiduciary breach

22    because, as the Court recognized extensively in the summary

23    judgment decision, the issue with respect to Bodner is did he

24    have a duty to do something other than remain silent.  That

25    silence is a fiduciary breach and is also the equivalent of an

MCDCpla7

1    actionable omission.

2        So we believe that to the extent that we're dealing

3    with a non-fraud claim that doesn't require clear and

4    convincing, for sure it's a three-year statute of limitations.

5        THE COURT: So I have a couple of questions.  Before I

6    get to that, just with respect to the prior argument that the

7    jury could not, for damages purpose, conclude that there was a

8    conspiracy dating back to end of 2012, beginning of 2013

9    between Mr. Nordlicht and Mr. Bodner, I think I'm satisfied by

10   plaintiffs' counsel that there is enough.  Of course, the final

11   motions for a directed verdict will come at the close of all

12   the evidence.  I typically, at that point, say I'll wait until

13   I hear summations until I make that ruling, so these arguments

14   will have a chance to be repeated.

15       For now, the motion is denied.

16       I would also note, though it's not yet in my proposed

17   charge, but if the conspiracy, as of 2013, is only a conspiracy

18   between Mr. Nordlicht and, say, Mr. Huberfeld, but Mr. Bodner

19   joins that conspiracy in 2014, he is still responsible for the

20   earlier damages.  That's where conspiracy law differs from

21   aiding and abetting as we discussed.

22       Now, turning to the statute of limitations, I am very

23   curious to see, and you can provide them to me tonight or early

24   tomorrow, any case that says that when there's both a fraud

25   claim and a breach of fiduciary claim arising from the same

MCDCpla7

facts, that the shorter statute of limitations applies.  I am
very skeptical of that because here, at least, the fraud claim
is not based on a breach of fiduciary duty.  The fraud claim is
based on having special knowledge that cannot be acquired by an
outside investor and that, therefore, generates a duty to
disclose.  These are the classic exceptions to the common law
doctrine that silence cannot be fraud.  The silence can be a
fraud when there is a duty to disclose, and that duty can arise
under New York law either from having a fiduciary duty towards
the relevant person or from having special knowledge that the
other person cannot reasonably be thought to acquire.  So I'm
very skeptical, but I defer to whatever New York law says.  So,
if you want to provide me with those cases.

        Assuming for the moment that the fraud claim is not
barred as to damages by the statute of limitations, then the
question is, is there, nevertheless, a statute of limitations
problem with respect to the fraud calculation on the breach of
fiduciary duty claim where the statute is a three-year statute.
And this is on the assumption that conspiracy is not shown
that's retroactive, et cetera.

        Let me hear from plaintiffs' counsel.

        MR. GLUCK:  Court's points being taken as largely what
I would have said, we refer the Court to Kaufman v. Cohen, 760
NYS 2d 157, which I believe has been briefed to this Court
already.

MCDCpla7

 1          THE COURT:  Yes, it strikes a bell.

 2          MR. GLUCK:  And that's why I know it, because what it

 3     says is that the breach of fiduciary duty statute of

 4     limitations is six years when the underlying conduct is akin to

 5     some sort of fraud.

 6          So, the breach of duty claim in its most severe form

 7     stays no matter what.  Now, I want to hit the actual dates here

 8     because the second part is going to matter.  What Mr. Lauer

 9     referred to in this Chapter 15 tolling is the effect of filing

10     or getting a chapter 15 order on all statutes of limitations in

11     the United States.  In this case, that occurred in November of

12     2016.  So six years back from that is way before.  So the fraud

13     is in and the higher, more strict form of fiduciary duty

14     breach, i.e., those that sound and look and walk like fraud are

15     in.

16          One of our comments to the Court's proposed charge was

17     that the lesser form of duty breach, which is the duty of care

18     was not included, but if he is a fiduciary, he had both the

19     duty of loyalty and the duty of care, and I would say that the

20     duty of loyalty sounds more like fraud, lining your own

21     pockets.  The duty of care actually means regardless of whether

22     Mr. Bodner had actual knowledge, he had a duty to inquire.

23     That's the concept --

24          THE COURT:  That's the point, but we'll take that up

25     with the charge.  I need to move because we'll be here until

MCDCpla7

1      midnight otherwise.

2            For now, I am denying Mr. Lauer's motions with the

3      caveat that I will look at any relevant case law that anyone

4      wants to supply me, provided they supply it to me by no later

5      than noon tomorrow, and that, of course, most of these issues

6      will come up again at the close of all the evidence and, of

7      course, I may reconsider then.

8            MR. GLUCK:  If I can do three words.

9            THE COURT:  Yes.

10           MR. GLUCK:  Discovery rule, continuing act.

11           MR. LAUER:  Your Honor, I'm going to address

12     Mr. Quintero's testimony, and we believe that -- I'm focusing

13     on the $18 million.  He testified based on what I'll call the

14     yearend 2012, which includes December 2012 incentive fees.  And

15     I have to refer your Honor to the Court's opinion and order on

16     the *Daubert* where, for example, in footnote 27 on page 34, the

17     Court said the heading of exhibit 21 states, quote, fees

18     charged to PPVA based on AUM reported by the Platinum, January

19     2012 through March 2016, Quintero report, exhibit 21.  Because

20     the damages period, because the damages period starts from

21     December 2012, Bodner contends that exhibit 21 purports to

22     impermissibly include into damages incentive fees from January

23     2012 through December 2012.  However --

24           THE COURT:  Where are you quoting from?

25           MR. LAUER:  I'm quoting from the Court's --

MCDCpla7

1          THE COURT:  *Daubert*, but what page?

2          MR. LAUER:  Page 34, footnote 27.

3          THE COURT:  So this is an interesting footnote.  Never

4    know what I'm going to say.  Quote, the heading of exhibit 21,

5    and that I believe is a reference to exhibit 21 in the expert

6    report.

7          MR. LAUER:  Correct.

8          THE COURT:  States, quote, fees charged to PPVA based

9    on AUM reported by the Platinum January 2012 through March

10   2016.  Because the damages period starts from December of 2012,

11   Bodner contends that exhibit 21 purports to impermissibly

12   include — and then there's the word into, which was a typo on

13   my part.  To include damages -- oh, no, that's right.  To

14   include into damages incentive fees from January 2012 through

15   December 2012.  So there was no typo on my part.  However,

16   contextually, it is obvious that 2012 in the heading of exhibit

17   21 is a typo where Quintero meant to say 2013.

18         So I'm missing the relevance to --

19         MR. LAUER:  I'm just getting started.

20         THE COURT:  Go ahead.

21         MR. LAUER:  Just getting started.

22         What I've been trying to show the Court for the last

23   three days is that Mr. Quintero's testimony, that $18 million

24   based on a December 31 inflated valuation for Black Elk is not

25   only not in his report, but is contradicted directly by his

MCDCpla7

1   schedules in his report, which was the entirety of his opinion

2   and the subject of the entire *Daubert* exercise.  And I would

3   refer the Court first to the Court's discussion earlier on

4   page 28 of the Court's report, and you can see that what we

5   were talking about, in the middle of the page, with respect to

6   equity interest and Black Elk generally, Quintero --

7            THE COURT:  Just to go back a second.  Exhibit 21, for

8   the record, is entitled fees charged to the fund based on AUM

9   reported by the Platinum, January 2012 through March 2016.  But

10  there then follows headings for 2013, 2014, 2015, and up

11  through March of 2016.

12           So you agree, do you not, that the heading should have

13  said January 2013?

14           MR. LAUER:  Of course.

15           THE COURT:  Okay.  My understanding is that the 2013

16  fees, which are here listed as $32 million and some odd

17  dollars, including they were charged in 2013, but they were

18  based, in part, on events in 2012.

19           MR. LAUER:  No, that's absolutely not true.  I can

20  tell you that, as an officer of this court --

21           THE COURT:  You don't have to say that.  I take

22  everything that you and every other counsel in this case says

23  as an accurate representation of what you are representing when

24  it comes to factually.

25           So even as not an officer of the court, you're

MCDCpla7

```
 1    representing what?

 2              MR. LAUER:  What I'm saying, Judge, is we marked in

 3    evidence his schedules, his exhibits to the Black Elk, the

 4    so-called straight-line method, 23.1 and 23.2 of his report.

 5    Those two charts are now in evidence.

 6              THE COURT:  Yes.  I'm still missing your point.

 7    Apparently I missed it for three days, but I'm still missing

 8    it.

 9              MR. LAUER:  I'm sorry if you're missing the point.  I

10    will try better.

11              THE COURT:  Okay.

12              MR. LAUER:  The damages period that they defined

13    included December of 2012.  When you calculate, even though you

14    accrue incentive fees each month, the month that counts is the

15    last month of the year because you're comparing the number as

16    of December 31, 2012 to the prior year, December 31, '11.  For

17    whatever reason, they included -- Quintero included in his

18    damages period the key December 2012 month.

19              Now, in his report, his schedules that we argued so

20    much about at the *Daubert*, his report says for the month of

21    December, my opinion, because of the way I'm doing my schedules

22    and I'm being nice to you, but that's his -- he decided that.

23    He says, and you could see it right there, the inflation is

24    zero.  And it's not a mistake because when you look at 23.2, he

25    shows the basis for this where he is starting with -- he said
```

MCDCpla7

in order to be conservative, in order to do these schedules my way and not having to do appraisals, I started with, for damages purposes, Platinum's number.

Now, I'm not saying Quintero, in his heart of hearts, believes that, but the way he structured his opinion and the way you allowed him to testify, even though this was really not the way you do appraisals, is he can get his schedules in.  His first month, December, both values of $284 million are equal. They show no inflation.

So when you go back to exhibit 21 in the report, the reason -- exhibit 21 is the actual numeric calculation of inflated fees that are reflected in these six schedules.  They don't include the zero from December 2012 because zero is zero, but this report, whether it's table 21 or the other tables, it is 100 percent clear from his report and from everything that was argued at the *Daubert* — I can cite you additional testimony — that his report, his opinion on inflated incentive fee damages was starting with zero in December.  And what that means is he can't come into court on Wednesday and say, even though it's not in my report and even though it's flatly contradicted by my schedules, I decided that as a result of the explosion on November 12th, that there was sufficient elimination of the value in Black Elk that therefore at least $90 million or $200 million, or whatever the number is, resulted in $18 million of incentive fees inflated.

MCDCpla7

1           So his testimony in court is flatly contradicted to

2   his report.  We took discovery on his report, we argued the

3   *Daubert* on his report, and there's nothing in his report that

4   supports any inflation of December 2012.  The $18 million

5   should be out of the case either because of Rule 37, because of

6   the rule on reports, because of the representations.  It's just

7   not in the report.

8           THE COURT:  All right.  Hang on a minute.

9           Well, now, I do understand your point and I'm

10  beginning to see that it is arguably colorable because, for

11  example, I'm looking at table 1 on page 17 of his report, this

12  is before we even get to any spectrum, where he says for

13  Black Elk, the damages from excessive fees during the damages

14  period due to inflated values reported by Platinum were for

15  Black Elk, management fees of $4,363,000 and incentive fees of

16  $4,176,000 for $4-million plus for each.  So that's only

17  $8 million plus, not the figure that he was giving earlier

18  today as your point, yes?

19          MR. LAUER:  Your Honor, we're talking about two

20  separate numbers.  The $18 million is just the incentive fees

21  and his report, the table that you're looking at --

22          THE COURT:  So either way, the point is he doesn't say

23  $18 million in incentive fees, he says $4 million in incentive

24  fees for Black Elk.

25          MR. LAUER:  Exactly, he says $4 million, not

MCDCpla7

$18 million.

THE COURT:  That's the point I think that you were getting across.

So let me hear from plaintiffs' counsel.

MR. GLUCK:  Point one concerns the footnote read to the Court.  It confuses --

THE COURT:  Forget about the footnote.  I'm looking at table 1 of his report on page 17.

MR. GLUCK:  I understand what he is saying, too.  I always have.  We've argued this now five times.  The answer is always the same.  While that is a misleading and potentially contradictory point, his opening and his primary conclusions are that all incentive fees shouldn't have been paid.

Now let me take the Court through it and that why, at most, this is an argument for closing on an expert witness's credibility that, A, was rejected when this Court issued its motions *in limine* ruling on the record by opposing counsel.  We didn't think this was an issue anymore and so forth.  But let me go through it because I tried to take Mr. Quintero through it today.

Firstly, at page 1 of the report, an important page, damages period is a defined term in the second sentence, and it begins December 2012, which is that relevant date, we're in agreement there, through March 31, 2016.  Damages period.  You see that?  That's a defined term.

1          Now, on the incentive fees section of the report,

2    which is page 17, is where we begin.  In that report, beginning

3    at paragraph 32, which does not end until page 18, he states

4    the above analysis reveals that aggregate incentive fees during

5    the damages period, which includes December, were unearned and

6    constitute damages sustained by the fund.  And then two

7    sentences later after providing an example, he says all of the

8    incentive fees charged to Platinum during the damages period

9    constitute damages sustained by Platinum, referring to the

10   fund.  Then at 33b, he states that damages sustained by the

11   fund pertaining to inflated incentive fees were at least the

12   full amount of incentive fees charged by the fund during the

13   damages period.

14          What he was trying to say was that, on the one hand,

15   all incentive fees were unearned.  That was his primary thesis.

16   And he wasn't trying to be nice on this one.  He was trying to

17   say that proximate to the Black Elk explosion, which is in his

18   report and he states at a later time.  And I'll refer the Court

19   to exhibit 23 and others, that after that Black Elk explosion,

20   there was such a deleterious effect on PPVA's Black Elk common

21   equity — and this is also, by the way, repeated by Mr. Post —

22   that there is no way that the value of the fund could go up.

23   This is what Post says, this is what Quintero says.

24          THE COURT:  Let me make sure I follow what you're

25   saying.  Page 18, paragraph 33, he says based on the foregoing,

MCDCpla7

1    it is my opinion as stated to a reasonable degree of

2    certainty -- which is a phrase, by the way, that, in my view,

3    should never be used because it's misleading.  Under New York

4    law, it just means more likely than not.

5            But, in any event, it is my opinion, as stated to a

6    reasonable degree of certainty that damages sustained by the

7    fund pertaining to inflated management fees were at least

8    $15.844 million, and he cites to table 1 where there is the

9    corresponding figure.  B, damages sustained by the fund

10   pertaining to inflated incentive fees were at least — which is

11   boldfaced — the full amount of incentive fees charged to the

12   fund during the damages period, which has currently been

13   calculated in the amount of $55 million.  Citing exhibit 21,

14   subject to further refinement.

15           Now, how do you square that with the fact that, in

16   table 1, the incentive fees are calculated as $88 million

17   rather than $55 million?

18           MR. GLUCK:  I'm sorry.  I'm not following.

19           THE COURT:  Table 1 purports to be damages from

20   excessive fees and is then broken down to management fees and

21   incentive fees; right?

22           MR. GLUCK:  Mhm.

23           THE COURT:  And the management fees are

24   $15.844 million, that's the same figure that he used in

25   paragraph 33.

MCDCpla7

1            MR. GLUCK:  Mhm.

2            THE COURT:  The incentive fees on table 1 are

3      $88,929,000, although he says here, on paragraph 33, that is

4      currently being calculated in the amount of $55 million.  So I

5      don't understand how those two correspond.

6            MR. GLUCK:  Sure.  The $88 million refers to a summary

7      calculation of the six assets and the allocated incentive fees

8      over the period of time, not including 2012, the $55 million,

9      which references exhibit 21, also, there's a typo there, but it

10     should say December 13 through March of 2016.

11           What happened here is that in an attempt to be

12     helpful, while going through his straight-line management fee

13     analysis, he also listed the corresponding incentive fees

14     beginning only in 2013.  There is no doubt about it.  The

15     report, which was filed as best as he could, I am sure, was

16     unhelpful in this regard.

17           THE COURT:  So I'm still not following.

18           By the way, he says at various places in the report,

19     including at the end of paragraph 33 and subparagraph D, quote,

20     I am confident that if I expanded my analysis to include a

21     larger number of securities, my calculation of damages would

22     increase substantially.

23           That's neither here nor there, nor are other

24     references in his report that he reserves the right to amend it

25     and so forth.  This is the only report he ever produced.

MCDCpla7

1          MR. GLUCK:  This is the only report he ever produced.

2          THE COURT:  So he's bound by this report.

3          MR. GLUCK:  He's bound by the report, but not an

4     unintentional contradiction.

5          So this is the real point, and, at most, it's an

6     unintentional contradiction, but there's also a way to read it

7     that it's entirely coextensive.

8          On the one hand -- I'm sorry.  Entirely symbiotic.  On

9     the one hand, all incentive fees, period, were unearned

10    beginning in 2012.  It is a very simple statement.  It is a

11    statement that is backed by his clear analysis regarding the

12    impacts of the Black Elk explosion.  That is his primary

13    conclusion on incentive fees.

14         Unhelpfully, for the purposes of this argument, but I

15    see what he was trying to do, in his straight-line analysis,

16    beginning at exhibit 21 and then continuing through exhibit 23,

17    he lists the correlating incentive fees charged from January

18    2013 onwards without intending to exclude the original December

19    2012 number.  I can see what he was doing.  He tried to place a

20    corresponding reported incentive fee alongside his

21    straight-line analysis and nothing more.

22         Defense counsel says it contradicts.  I disagree.  I

23    think it correlates, I think he could have put an extra

24    footnote saying I did not intend to exclude the December 2012,

25    but it doesn't contradict, it just captures the incentive fees

MCDCpla7

associated with each month beginning after January of 2013.

That is all.  He always intended to opine that post Black Elk

explosion, no incentive fees were earned because the fund

didn't go up.  It's a very simple proposition.  The rate at

which the fund went down is only and solely relevant to the

straight-line management fees analysis.  That is what is

happening here.  They are suggesting that by including an

incentive fee column on these later tables, he is somehow

disclaiming or contradicting his prior assertions regarding no

incentive fees chargeable.  He just didn't begin the table for

the management fee straight-line analysis at the right month.

If he had begun one month earlier, it would have looked

different.

THE COURT:  Where in the report does he discuss

Black Elk?

MR. GLUCK:  I believe it's exhibit 23.

THE COURT:  Well, before we get to exhibit 23, and

that certainly needs to be looked at, but I'm looking at --

these were all exhibits to his overall report, which occupies

pages 1 through 38, and then is backed up by various schedules.

So he discusses, starting on page 19, various schemes

that the defendants engineered.  First there's the Agera sale,

then there is the Black Elk scheme on page 25.  Let me just

read that for a second.

(Pause)

MCDCpla7

1          So that description, which occupies paragraphs 43

2     through 52, all relates to events occurring in 2014.  It

3     doesn't say one word about the earlier period.  So I don't see

4     how that supports your claim.  You're relying primarily on his

5     conclusory statement that we just read to the effect that --

6     now I'm missing where we were.  There it is, page 18, paragraph

7     33, sub paragraph B, damages sustained by the fund pertaining

8     to inflative incentive fees where at least the full amount of

9     incentive fees charged to the fund during the damages period.

10    And then he says which is currently being calculated in the

11    amount of $55 million.

12          That is largely conclusory statement, doesn't

13    correspond to anything in his description of Black Elk in those

14    paragraphs we just looked at.  It doesn't correspond an amount

15    to table 1 of his report showing the Black Elk incentive fees

16    at $4 million.  And so, I think there is some real question

17    here of whether his opinion exceeded the scope of what his

18    report would convey to a reasonable reader taking account of

19    the full report, in which case we would have to reduce the

20    amount of claimed damages related to Black Elk as in the

21    fashion indicated by Mr. Lauer.  So what about it?

22          MR. GLUCK:  His report concerned about five schemes

23    involving dozens of defendants.  Now, on his valuation of

24    Black Elk, which is exhibit 23, if the Court would allow me,

25    I'll take you through the detailed --

MCDCpla7

1          THE COURT:  Go ahead.

2          MR. GLUCK:  -- pieces, which I concur with what the

3    Court just read, standing by itself, that would be one thing,

4    but that is not all he said and that is certainly not what he

5    testified to in his deposition.

6          To exhibit 23, page 1 is the beginning of his

7    Black Elk damages section.  I believe this is in evidence.

8          THE COURT:  I'm looking at it.

9          MR. GLUCK:  If the Court would flip to page 2,

10   valuation considerations, this is where it comes in, because

11   there was a lot -- there were dozens of assets here.

12         Firstly, he describes the PPVA investment in the first

13   bullet, nothing remarkable about that.  But then, beginning on

14   September 17, 2012, he specifically notes how S&P lowered its

15   credit rating to triple C, which is the jump-on testimony from

16   today.  Negative outlook for reasons including vulnerable

17   business risk, highly leveraged financial risk, small reserve

18   and production base, high operating costs, weak sources of

19   liquidity, and insufficient cash flow covered anticipated

20   capital expenditures, which he testified about today and could

21   probably spend a lot of time on.

22         Then, the very next bullet is 11/16/12, oil platform

23   on Gulf of Mexico explodes resulting in two deaths and several

24   injuries, West Delta 32 explosion, which is the defined term.

25   Black Elk demonstrated signs of financial deterioration during

MCDCpla7

1        2013 that accelerated during the first three quarters of 2014.

2                   THE COURT:  That's all about 2013, 2014.

3                   MR. GLUCK:  Right.

4              So the first two bullets and, with respect, the

5        explosion was a big one, formed the basis of his conclusion --

6        by the way, which is replicated in its entire -- not

7        replicated, but separately stated in Mr. Post's report, which

8        is why I would disagree there needs to be any reduction.

9              Separately, both of our experts in this case have

10       clearly stated that with the $200 million common equity

11       valuation, the NAV going up after this explosion was

12       impossible.  That's what he testified to at his deposition and

13       that's what he testified to today, and that's what he wrote in

14       his report, and that's what Mr. Post, whose report is intended

15       to be a companion report, Mr. Post hired Mr. Quintero to run

16       the numbers, all testified to.

17             Then fast forward to how we get right here.  This

18       trial opens with six motions *in limine* in which these precise

19       arguments were made by both sides and rejected defendant's

20       position, the Court rejected the defendant's position.  We

21       didn't plan for a trial on that basis.  We bring in Mr. Post's

22       testimony on the concept and then Mr. Quintero's testimony.

23       And then on top of it, we have a bench memo from defendant's

24       counsel acknowledging that all redeemed incentive fees or

25       incentive fees are damages to the master fund, and a sidebar

MCDCpla7

```
 1   with this Court, which I remember very clearly, where it was
 2   stated, and it's on the record, that this was no longer an
 3   issue.  If it had been in any way, the only two pieces of
 4   conclusion that PPVA requires is that from Post and Quintero,
 5   there was no up, there was no increase in the NAV beginning in
 6   December of 2012, and they both very clearly testified to that.
 7   I acknowledge the numbers --
 8             THE COURT:  We cannot --
 9             MR. GLUCK:  And then it's just a matter of arithmetic.
10             THE COURT:  I think this is a real issue that I want
11   to think about overnight, but let me ask, because we have to
12   move to other things.  Let me ask Mr. Lauer, there has been
13   several references and a quotation from a bench memo --
14             MR. LAUER:  I don't know what he's talking about, your
15   Honor.  I need five more minutes on this.
16             THE COURT:  No, not until you answer my question.  I
17   seem to have a real problem with all counsel in this case that
18   when I ask a question, they prefer to give me the answer to a
19   question they would have preferred me to ask, and this has been
20   a problem from day one.  And I have nothing but respect for
21   counsel in this case, but I wish you would assist the Court on
22   both sides by just answering my questions.
23             Now, my question was, and this is addressed to anyone
24   on the defense side, what was this bench memo?  It was clearly
25   quoted earlier, so there was some document in some context.
```

MCDCpla7

1          MR. LAUER:  Yes, your Honor.  It's a bench memorandum

2     regarding calculation of damages based upon inflated management

3     and incentive fees.

4          THE COURT:  Bench memo sent from defense counsel to

5     the Court?

6          MR. HERTZBERG:  Correct, Judge.  It was filed at ECF

7     1018-4.  Although that ECF refers to the in Re:

8     Platinum-Beechwood docket.  I see.  It's 760-4 on the

9     Platinum --

10         THE COURT:  Why isn't that statement binding on

11    defense counsel?

12         MR. HERTZBERG:  Your Honor, what we said in this bench

13    memo was that the damages issues were going to be very

14    complicated for the jury because you have three, three and a

15    quarter year period of time, six different assets that we knew

16    would be in the case.  And we thought it would be basically

17    impossible for the jury to say, well, we think Bodner came to

18    learn of the overvaluation, let's say at the January 2015

19    dinner, worst case scenario.  And the jury would then have to

20    determine to locate the damages.  What's the inflation as of

21    that period.

22         So we proposed in a bench memo to the Court, let's

23    take that away from the jury.  All the jury has to do is

24    determine when Bodner -- if and then when Bodner came to learn

25    that there was overvaluation, and then the Court and the

MCDCpla7

1   parties could figure out the damages from that point forward.

2   And that was the point of the bench memo.

3          THE COURT:  So my recollection is that plaintiffs

4   declined that suggestion, which was a shame, because I think it

5   is a complicated issue for the jury.  Later on, the suggestion

6   was adopted in a more narrow respect, which was that the Court

7   would calculate any setoffs, and both sides agreed with that.

8          MR. HERTZBERG:  That's true.

9          THE COURT:  Let me ask plaintiffs' counsel, would you

10  still accept the proposal?

11         MR. GLUCK:  As written because of other components of

12  it, the answer is no.  However, it's a big however, I'd like to

13  explain to the Court the reason I'm referencing.

14         THE COURT:  I'm sorry?

15         MR. GLUCK:  The reason I'm referencing it.

16         The only reason that this particular bench memo and

17  that sidebar are relevant is because if we had believed that

18  there was a genuine dispute on numbers, the Court remembers, we

19  tried to move in all the bank statements and SSD statements,

20  and the Court reserved our right to, if there was a dispute, to

21  move in those documents.  That dispute emerged today.

22         THE COURT:  So if I understand, the bench memo, it was

23  just explained to me and I'll need to take a look at it

24  obviously, but it was a proposal.  So all that defense counsel

25  is saying, according to their interpretation, is to speed

MCDCpla7

things along, we will accept X or Y or Z for purposes of

damages calculation if damages calculation is left to Court.

So when you turned down that proposal, they were no longer

bound by the concessions that they had made in order to induce

you to get to agree to their proposal.

MR. GLUCK:  Except for this particular point, which

was addressed at a sidebar during the testimony of Murray

Huberfeld, and this particular point of the amount, because all

I need, all PPVA needs is the conclusion the NAV didn't go up

after 2012.  Mr. Trott, any of the other handful of witnesses

that we've called, Platinum Management folks, Joe SanFilippo,

all they need to do is have admitted into evidence two

documents which show the amounts paid and when.  One in January

for $597,000 and then one in March for, $13,400,000.  That's

it.

The amount of a zero, if no incentive fees are paid,

which is what both experts are saying, the amount of incentive

fees actually paid can be introduced by anyone.  There was a

thought the Court was making that point earlier today in

Mr. Quintero's testimony.  There is no special trick to it.

You don't need an expert to state an amount that is simply two

numbers added together, one from January, one from March.

THE COURT:  That's a different point.

MR. GLUCK:  That's all we're saying.  I don't need

Mr. Quintero to state on incentive fees, for this particular

MCDCpla7

year, the amounts.  I don't need Mr. Post to do it either.  If

there is any dispute to those amounts and what was paid, I

would introduce these two exhibits either during Mr. Quintero's

testimony when I had the folders or through a variety of other

witnesses.

THE COURT:  So wait a minute, do I understand what

you're now proposing is that instead of the $18 million, it's

$13 million?

MR. GLUCK:  I have the exact numbers.  Number 1 is

$597,624.66, and number 2 is $13,400,027.

THE COURT:  And you're saying that that, not those

specific numbers, but the concept of including those earlier

fees is supported by testimony of other witnesses beyond

Mr. Quintero, is that what you're saying?

(Continued on next page)

Mcd2Pla8

1          MR. GLUCK:  Yeah, two witnesses.  One is Quintero

2     testifying that --

3          THE COURT:  Well, put him aside for the moment.

4          MR. GLUCK:  Oh, Mr. Post, his -- a very significant

5     portion of his testimony was impossible.  The numbers couldn't

6     have gone up.  A lot of them he was saying --

7          THE COURT:  Let me go back to --

8          MR. GLUCK:  Then, sorry, the last witness was a fact

9     witness was -- was actually the CEO of Black Elk, also

10    impossible.

11         MR. LAUER:  I'm just going to give you some basic

12    information, because there is so much confusion and

13    distraction.  You were quoted page 18, 33(b), which talks about

14    the incentive fees as 55 million.  That 55 million is on

15    Exhibit 21, which is the one that has the typo, because when

16    you look—and there is not going to be any dispute on this—you

17    look at incentive fee and deferred incentive fee, the '13, '14,

18    '15, and the first three quarters of '16, the 45,609,036 and

19    the 9,474,086 adds up to 55,083,000.  And what that means is

20    Mr. Quintero, his damages expert, in the chart says fees

21    charged to the fund based on AUM reported by the Platinum

22    January 13—I am making the change—through March 2016.  Then

23    if you go to --

24         THE COURT:  And I would like to get my questions

25    answered.

Mcd2Pla8

1          MR. LAUER:  Sorry.

2          THE COURT:  I think the question that has now been

3     raised by plaintiffs' counsel, which is an interesting

4     question, is if a party's damages expert says the damages are X

5     but also adds the words "at least" and also indicates in

6     conclusory fashion that all the incentive fees should be

7     included, but nevertheless does not support that so far as the

8     Black Elk 18 million is concerned through his report, but

9     plaintiff offers through other witnesses evidence that all the

10    incentive fees going back through the damages period are bogus

11    and then can introduce two other records showing that they

12    amount to 13 million, my question is——and it's a legal

13    question——is plaintiff nonetheless bound by the figures the

14    expert presented or can it be added to by the testimony of

15    other witnesses who would add in this case 13 million?  So

16    that's a legal question that I don't know the answer to.  But

17    if someone would like to get me some case law on that, you guys

18    have nothing better to do, so I will look forward to hearing on

19    that by either side by submissions by noon tomorrow.

20          Now, that's all we are going to say tonight on this

21    issue.  We are going to turn to the charging conference, and I

22    am reserving on this issue until I get your submissions

23    tomorrow.

24          MR. LAUER:  I'm not going to argue my other points

25    because I know you want to get to the charging, but I never got

Mcd2Pla8

1    to at least list the other motions.

2            THE COURT:  Oh, I'm sorry.  I didn't know you had

3    other motions.

4            MR. LAUER:  I'm sorry.  There has been no evidence --

5    Mr. Quintero, their damages expert, testified that other than

6    the listed assets, he did not -- he did not express an opinion

7    on the remainder of the fund being out of balance.  And what

8    that means is if you assume everything else is okay, then the

9    only moving part is to what extent were the management fees

10   that were charged, the 15.5 million, actually paid.  Because it

11   no longer matters the rest of the fund.  We are only talking

12   about as if this is the universe.  And as we pointed out in

13   Exhibit 687 and 690, there is no dispute as of March 30 --

14   March 16, 5.7 million was accrued and unpaid.  And since the

15   rest of the assets under management are in balance, according

16   to Quintero, what that means, as a matter of logic and I think

17   as a matter of law, the maximum amount of management fees that

18   they can recover is the 15.5 million minus the 5.7 million

19   because --

20           THE COURT:  All right.  So you now preserve that

21   argument.  We will argue some more tomorrow or later tonight.

22           Any other motion you wanted to make?

23           MR. LAUER:  We think you should apply the FIFO to the

24   extent any of those earlier payments come in.

25           THE COURT:  What's your basis?  The witness says it

Mcd2Pla8

1   doesn't apply.  What's your basis for saying that I must as a

2   matter of law apply FIFO?

3           MR. LAUER:  I think we can brief that.  I think FIFO

4   would be the applicable way to deal with --

5           THE COURT:  I remember there was briefing on this, but

6   the -- well, all right, so that's your other motion.  We will

7   consider that.

8           Okay.  Now let's turn to the draft jury instructions.

9           So you have my proposed instructions.  Starting with

10  the general instructions 1 through 8, which are pretty much my

11  standard instructions on general matters, what I want to know

12  from each counsel is (a) whether you have any objection to any

13  of the charges, (b) whether you want to add something to the

14  general instructions, and -- I guess it's just (a) and (b).

15          So with respect to instructions 1 through 8, any

16  objections or additions from plaintiff?

17          MR. GLUCK:  1 through 8?

18          THE COURT:  Pardon?

19          MR. GLUCK:  Sorry?  I couldn't hear.  1 through 8?

20          THE COURT:  Yes.

21          MR. GLUCK:  Yes, beginning at 4.

22          THE COURT:  Go ahead.

23          MR. GLUCK:  For the burden of proof regarding the

24  release and it being Platinum Management releasing Mr. Bodner

25  for the overvaluation is not here.

Mcd2Pla8

1          THE COURT:  I'm sorry.  I'm having trouble hearing

2     you.

3          MR. GLUCK:  For the release, (a) the -- whose burden

4     of proof it is.

5          THE COURT:  It is initially theirs, but since there

6     was no disagreement in the end so far as what was presented to

7     the jury that this was a valid document and the real objection

8     is to its being between joint tortfeasors, and as to that the

9     burden is still on the plaintiff.  That's why I didn't get into

10    a more subtle discussion on that.

11         MR. GLUCK:  Which?  Is it preponderance or clear and

12    convincing?

13         THE COURT:  What?

14         MR. GLUCK:  Preponderance or clear and convincing?

15         THE COURT:  For what?

16         MR. GLUCK:  As to our burden to show that it was joint

17    tortfeasors --

18         THE COURT:  Yes.

19         MR. GLUCK:  -- is it preponderance of the evidence?

20         THE COURT:  Oh, I'm sorry.

21         I think when we get to the release, I think the

22    instruction already makes this plain, but here is what it

23    should say:  If the claim is that they were joint tortfeasors

24    on breach of fiduciary duty, then the burden is preponderance.

25    If the claim is they were joint tortfeasors on fraud, then the

Mcd2Pla8

1    burden is clear and convincing.  And if the jury has found

2    both, then they don't even really have to worry about it

3    because either one will do.

4           So that's what I think the law is on that.

5           MR. GLUCK:  Nothing further.

6           THE COURT:  All right.  We come to the release if we

7    need further language on that and that's structural.  We will

8    add that.

9           MR. HERTZBERG:  Your Honor, we do have another issue

10   with 4, and --

11          THE COURT:  Let me finish.  Anything else on from

12   plaintiffs on 1 through 8?

13          MR. GLUCK:  On 4, nothing else.  I have something on

14   8.

15          MR. LAUER:  With respect to 4, it provides the jury

16   instruction on both preponderance standard and clear and

17   convincing, and I have heard what the court just had to say and

18   when we get to the release I will take exception to it because

19   we respectfully disagree with the Court on the instruction on

20   the release, but --

21          THE COURT:  You have already preserved.  You don't

22   believe in my joint tortfeasors defense, but --

23          MR. HERTZBERG:  But even living within the context of

24   it, we have some issues with 12.  But we are not on 12 yet, we

25   are on 4.

Mcd2Pla8

1          THE COURT:  Okay.

2          MR. HERTZBERG:  So on 4, the breach of fiduciary duty

3    claim that survives summary judgment and that we have been

4    trying is coterminous with the fraud claim, at least that's the

5    way that we have understood it.  And that's the way it was

6    analyzed in the summary judgment opinion.  At page 26, the

7    Court said, "The Court finds that there is a genuine dispute of

8    whether Bodner breached his fiduciary duty by failing to

9    disclose the overvaluations of PPVA's NAV."  And then when

10   addressing the fraud claim, "pure omission made here would be

11   actionable because Bodner might have had the obligation as a

12   fiduciary to disclose."

13         THE COURT:  Whatever I may have said then, it has

14   evolved clearly and well before the drafting of this charge

15   that the two claims that remain are breach of fiduciary duty

16   based on Mr. Bodner's allegedly exercising some control and a

17   fraud based on his having special access to information that he

18   should have disclosed to purchasers.  I think those are two

19   separate claims.

20         MR. HERTZBERG:  So and that is what we read in the

21   Court's instruction, and we respectfully don't think that is a

22   fair articulation of the fraud claim.  It's not alleged that

23   way.  There has been no daylight for the years of this case

24   between the breach of fiduciary duty claim and the fraud claim.

25         THE COURT:  Let me ask you this:  This really goes

Mcd2Pla8

1    back to the pleadings, which I haven't had a chance to look at

2    in recent days, but the evening is young.  Did the fraud claim

3    in the second amended complaint allege fraud on the basis of

4    special access or not?

5            MR. HERTZBERG:  No.  No.  It was a fraud based on --

6    the way it was alleged was that Bodner was a participant in the

7    creation of the NAV statements and was responsible for the

8    fraudulent misstatements in the NAV statements, basically that

9    Bodner participated in the inflation.  This idea that Bodner --

10           THE COURT:  All right.  Let me see if I can find the

11   second amended complaint.  It is here somewhere.

12           Here it is.  I have it.  So --

13           MR. HERTZBERG:  Your Honor, I would take you to

14   paragraph 792 on page 141.  That's the fraud against the

15   Platinum defendants.

16           MR. GLUCK:  763, page 143, first count, breach of

17   fiduciary duty.

18           THE COURT:  Just I think the federal rules of evidence

19   say that a complaint should be a short and concise statement of

20   the claims, and this one is a measly 188 pages.  But tell me

21   the page again.

22           MR. LAUER:  If the Court wishes to go to the fraud

23   claim, that starts at paragraph 792 on page 141.

24           MR. GLUCK:  And if the Court wishes to go to the

25   breach of fiduciary duty claim, that starts at page 143

Mcd2Pla8

1  paragraph 763.

2       THE COURT:  All right.  So the first paragraph, 792,

3  reads, "The plaintiffs repeat and reallege paragraphs 1 through

4  791 as is fully set forth herein," so we are going to have to

5  see whether the theory was set forth there.

6       793 says, "As detailed herein, the Platinum defendants

7  intentionally engaged in the first and second schemes by

8  communicating material misrepresentations to PPVA in various

9  forms and by omitting to state material facts."  So the

10  omission part of it is clearly here, but let's go on.

11       794, "These material representations occurred by way

12  of the Platinum defendants making and causing to be made

13  written and oral representations concerning the financial

14  condition of PPVA and the acts in furtherance of the Platinum

15  defendants' administration and management of PPVA's assets and

16  investments."

17       795 says, "These included" and they mention the

18  various statements.

19       796 says that they knew that such representations were

20  material, though actual materiality is not a question of

21  knowledge, it's a question of what a reasonable investor would

22  understand.

23       797, "At all relevant times, the Platinum defendants

24  knew that their omissions and their representations they

25  individually or collectively made, caused to be made, or knew

Mcd2Pla8

1    were being made with their consent were false when made.  I am

2    not even sure what that means as applied to an omission.

3           Well, certainly there is nothing here -- actually

4    there is very little about omissions, period, and they are not

5    particularly specified.

6           Paragraph 806 does say, "The Platinum defendants

7    knowingly and intentionally made numerous false representations

8    of material fact and omitted to state material facts to PPVA

9    concerning the Platinum defendants' intent to manage and

10   administer PPVA, its subsidiaries, and its assets in compliance

11   with the terms of PPVA's governing documents, including, but

12   not limited to, the PPVA partnership agreement."  I'm not sure

13   how that states anything about an omission and certainly,

14   anyway, not the omission that is referenced in my proposed

15   charge.

16           Now, in the next count --

17           MR. GLUCK:  Your Honor --

18           THE COURT:  -- the constructive fraud count, that

19   count is clearly premised on the fiduciary duty claim.  So, for

20   example, paragraph 834 says, "Because of the nature of the

21   fiduciary relationship, PPVA justifiably relied upon the

22   Platinum defendants' misrepresentations and omissions or

23   concealments to its detriment," etc.

24           So I don't see -- I haven't gone through all of the

25   aiding and abetting claims, but I don't see anywhere the

Mcd2Pla8

1    allegation that the fraud consisted of someone having a duty to

2    disclose not based on fiduciary duty but based on special

3    knowledge.  So maybe the fraud claim dies.

4             But let me ask plaintiffs' counsel.

5             MR. GLUCK:  Sure.  Well, first I would refer the Court

6    to Count One.

7             THE COURT:  I'm sorry?

8             MR. GLUCK:  Count One.

9             THE COURT:  All right.  Let me go back to Count One.

10   What paragraph are we talking about?

11            MR. GLUCK:  763.

12            THE COURT:  763.

13            MR. GLUCK:  That is breach of duty.

14            THE COURT:  "The plaintiffs repeat and reallege

15   paragraphs 1 through 762."  I agree.  Where in paragraphs 1

16   through 762 do you allege special knowledge arising independent

17   of fiduciary duty?

18            MR. GLUCK:  Arising independent of fiduciary duty?

19   Well, 767 --

20            THE COURT:  There are two possible theories for an

21   omission claim in this case.  One is that there was a duty to

22   disclose arising from a fiduciary duty and if that is the only

23   claim for fraud, it merges with the breach of fiduciary duty

24   claim.  Indeed, you are better off with the breach of fiduciary

25   duty claim because the burden is less and the damages would be

Mcd2Pla8

1      the same.

2              So the question is, where——and you may be surprised to

3      learn that I don't remember each word of this 180-plus page

4      complaint, but if there is somewhere in those earlier

5      paragraphs a description of special knowledge that might

6      support your fraud claim on the alternative theory, I'm not

7      sure about that, but point me to where it says that.

8              MR. GLUCK:  Sure.  I understand now that the Court is

9      reviewing the fraud and special knowledge as opposed to breach

10     of fiduciary duty.

11             THE COURT:  That is going to make the jury's job even

12     easier.  They only have to decide the breach of fiduciary duty

13     claim.

14             MR. GLUCK:  While true, it would also increase the

15     plaintiffs' burden on the trial's premise --

16             THE COURT:  Well, if the alternative theory -- I think

17     the alternative theory is easier for you to prove factually if

18     it is alleged, but if it isn't alleged that's the end of the

19     subject.

20             MR. GLUCK:  Sure.

21             THE COURT:  All right.  I will tell you what.  I am

22     going to tentatively knock out the fraud claim and I will

23     adjust the charge accordingly, but I will once again give

24     counsel, particularly plaintiffs' counsel, until tomorrow noon

25     to supply me in writing with any paragraphs in the pleadings

Mcd2Pla8

1    that supports the alternative theory.  All right.  So we don't

2    have to go through all the -- you know, that will obviously

3    change the wording of instruction 4 and the instructions about

4    fraud and so forth.  I will take care of all of that and give

5    you guys a new version after I see what is supplied by noon

6    tomorrow.

7              Is there anything else on the general instructions

8    that defense counsel wanted to raise?

9              MR. HERTZBERG:  Just on this point of preponderance

10   versus clear and convincing.

11             THE COURT:  You think it is clear and convincing for

12   breach of fiduciary duty.

13             MR. HERTZBERG:  What I was going to say is that there

14   is support for the principle that where the breach of fiduciary

15   duty is coterminous with fraud, basically where there is

16   willful misconduct, then its standard is clear and convincing.

17   If they are proceeding with something less than that, if they

18   are proceeding with some special facts doctrine that's not

19   based on willful misconduct then, subject to Mr. Lauer hitting

20   me over the head, I think what flows from that --

21             THE COURT:  But he does that so regularly, why should

22   you complain?  You assume the risk.

23             So I think this one really we have looked at before,

24   and I am inclined to still think it is preponderance, but I

25   will take one last look at the cases tonight.

Mcd2Pla8

1          MR. HERTZBERG:  We will supply those cases, your

2     Honor.

3          THE COURT:  Very good.

4          MR. HERTZBERG:  As Mr. Lauer raised the statute of

5     limitations, I think that also --

6          THE COURT:  That goes to damages when we get to the

7     damages.  The damages clearly is very much in flux as a result

8     of the two hours of debate that we have already spent on that,

9     but I am just now asking about instructions 1 through 8.

10          MR. HERTZBERG:  I am finished with 1 through 8.  Thank

11     you.

12          THE COURT:  Now, turning to 9.

13          MR. GLUCK:  Sorry, 8.  We have one instruction on 8.

14          THE COURT:  You do?  Something on 8?

15          MR. GLUCK:  Yes.  We wanted to request that it may

16     turn on the next motion about the auditor and valuator

17     witnesses, but that --

18          THE COURT:  You are going to have to go to -- your mic

19     for some reason isn't picking up that well.  Sorry.

20          MR. GLUCK:  A note that auditors and valuators are not

21     specialized witnesses.

22          THE COURT:  Well, I said the only two specialized

23     people are William Post and Ronald Quintero.  Doesn't that

24     limit the field?

25          I mean, if you want me to say --

Mcd2Pla8

1          MR. GLUCK:  No.  I understand.  Only those would -- we

2     were moving to exclude the other two on the very basis of the

3     concern that they could be construed as experts.

4          THE COURT:  You are raising really a question that I

5     think may relate to the third item we are going to get to this

6     evening, bringing joy to our court reporter, which is whether

7     any of the witnesses from the defense should be excluded.  So

8     to what extent are the accounting witnesses you are planning to

9     call tomorrow going to say that they have specialized knowledge

10    or expertise?  I guess that's the question.

11         MS. MOSSE:  Your Honor, we would not be offering them

12    as experts.  I would certainly ask them about their basic

13    background information——I mean, one is a CFA, the other are

14    CPAs——just so the jury has some context, because there have

15    obviously been accusations throughout the case about the

16    quality of the work.  But we are not offering them as experts.

17    They did contemporaneous audit and valuation work at the assets

18    at issue.

19         THE COURT:  Maybe we should say on instruction 8 "in

20    this case"——this is in the second sentence——"the only such

21    witnesses who testified were William Post and Ronald Quintero,

22    both of whom were called by the plaintiffs."

23         Let me ask plaintiffs' counsel, does that satisfy

24    your --

25         MR. GLUCK:  Subject to the prejudice motion, I think

Mcd2Pla8

1    it does.

2                THE COURT:  Okay.  All right.  I will make that

3    change.

4                I think where this really will come up is with respect

5    to what the accounting witnesses can or cannot testify to, but

6    we will get to that later.

7                On instruction 9, that clearly will be changed if I

8    adhere to knocking out the fraud count.  And then I think the

9    rest is likely to remain the same, with those adjustments.  But

10   anything else that, first, plaintiffs' counsel, wants to raise

11   as to number 9?

12               MR. GLUCK:  On instruction 9, on the fourth line,

13   which is "and/or by accepting payments," we would propose it

14   say "permitting payment" so you can get all the payments.

15               THE COURT:  I'm sorry.  What is it you want to change?

16               MR. GLUCK:  So it says "David Bodner breached the duty

17   to PPVA" --

18               THE COURT:  We are going to take out "and/or committed

19   fraud" if I adhere to knocking that out, but still the rest

20   would still be the same, yes.

21               MR. GLUCK:  Except for so our proposed change is

22   "breached his fiduciary duty to PPVA and/or committed fraud

23   by" -- excuse me, "his alleged knowledge that PPVA's assets

24   were overvalued and/or by permitting" instead of "accepting" --

25               THE COURT:  I see.  It's accepting.

Mcd2Pla8

```
 1              MR. GLUCK:  It is implied --

 2              THE COURT:  Yes, right, "or by permitting."  All

 3    right.  I will hear from defense counsel on that in a minute.

 4    Anything else on 9 from plaintiffs?

 5              MR. GLUCK:  And then "he allegedly knew he and others

 6    including Platinum Management were not entitled" because not

 7    all humans, it's an entity.

 8              THE COURT:  I'm sorry.  So --

 9              MR. GLUCK:  So the last sentence, after "permitting

10    payment of incentive and management fees to which he allegedly

11    knew he and others" --

12              THE COURT:  I'm sorry.  Other persons or entities,

13    right.

14              MR. GLUCK:  Persons or entities or Platinum

15    Management.

16              THE COURT:  I think we get into more detail later

17    where I do say persons and entities, so I think this will be

18    parallel to that.  Okay.

19              Anything else on 9 from plaintiffs' counsel?  Okay.

20              Turning to defense counsel, if I continue to agree

21    with dropping fraud, of course that language will come out.  I

22    think "permitting" is closer to their theory.  It's not just

23    the fees he received, but also the fees that were paid to

24    others and persons or entities I think is also correct.  But

25    any other problem -- any problems with that or any problems
```

Mcd2Pla8

1    with anything else on 9?

2            MR. HERTZBERG:  I respectfully think permitting is too

3    passive a term.  What we are talking about here is causing.

4            THE COURT:  I'm sorry?

5            MR. HERTZBERG:  What we are talking about here is not

6    permitting, but causing.  The allegation is that by remaining

7    silent he caused the payment of incentive and management fees

8    to which he allegedly knew he and others were not entitled.

9    When we get to the substantive charge on liability, it's

10   causation.

11           MR. GLUCK:  Allowing for.  It has to do with

12   causation.

13           MR. HERTZBERG:  Allowing for is just as passive as

14   permitting.

15           MR. GLUCK:  He didn't push a button.

16           THE COURT:  It's not a question of the -- his

17   fiduciary duty so far as the fees were concerned, assuming he

18   had a fiduciary duty because he had some control, was to say

19   you can't do that because it is based on inflated values.  And

20   that is, I think, all that he was required to do under his

21   fiduciary duty.  If he then got overruled by Nordlicht, that's

22   Nordlicht's problem.  But I don't think causation is -- he

23   doesn't have to cause the payment of the fees.  His fiduciary

24   duty is to object to the payment of the fees.

25           MR. GLUCK:  Or disclose.

Mcd2Pla8

1          THE COURT:  Pardon?

2          MR. GLUCK:  Or disclose.  Because the thesis is if he

3    discloses to PPVA and its investors or creditors, they would

4    have taken some action.  So it is stop or disclose.

5          THE COURT:  Well, the failure to disclose is in the

6    previous part of the sentence, so I think that's already

7    covered.

8          MR. HERTZBERG:  Does failing to suspend --

9          THE COURT:  I think it is failing to object, the more

10   I think about it, so it would read "they assert" -- this is

11   plaintiffs.  "They assert that the defendant David Bodner

12   breached his fiduciary duty to PPVA by failing to disclose to

13   PPVA shareholders his alleged knowledge that PPVA's assets were

14   overvalued and/or by failing to object to payment of incentive

15   and management fees to which he allegedly knew he and other

16   persons and entities were not entitled."  So I think that

17   really captures the second prong.  The failure to disclose is

18   really in the first prong.

19         So any problem with that wording from plaintiffs'

20   counsel?

21         MR. GLUCK:  By plaintiffs, I have just one nit.  Could

22   we make it, instead of PPVA shareholders, which I think is

23   inaccurate --

24         THE COURT:  I'm sorry, what?

25         MR. GLUCK:  Where it says "to disclose to PPVA's

Mcd2Pla8

1    shareholders" --

2              THE COURT:  You prefer investors?

3              MR. GLUCK:  Stakeholders.  First of all, they are

4    limited partners, but also creditors.

5              THE COURT:  I don't want to use a term that the jury

6    is not familiar with.  Shareholders is an everyday language.

7    Investors is everyday language.

8              MR. GLUCK:  Could it be investors and creditors?

9              THE COURT:  Pardon?

10             MR. GLUCK:  Could it be investors and creditors?

11             MR. HERTZBERG:  We would oppose that.  What the

12   complaint says --

13             THE COURT:  I am going to -- remember, this whole

14   sentence is just sort of -- well, I am going to say -- I will

15   give you the choice.  Do you prefer investors or shareholders,

16   but I'm not going to include creditors.

17             MR. GLUCK:  Investors.

18             THE COURT:  Okay.  Investors it is.

19             Then again, the next paragraph will be adjusted if the

20   fraud claim dies, then anything else from plaintiffs on

21   instruction 9?

22             MR. GLUCK:  No, your Honor.

23             THE COURT:  Anything from defendants on instruction 9?

24             MR. HERTZBERG:  On 9, at the end, it says:  You will

25   have to determine what are called damages, and if the Court or

Mcd2Pla8

1    plaintiffs would take us up on our proposal to take the damages

2    issue away from the jury that would eliminate that sentence,

3    but I'm not sure that we have --

4            THE COURT:  All right.  Instruction No. 10.  Again, we

5    will make the same corresponding set of "and/or by accepting"

6    it will be "and/or by failing to object to" in the first

7    sentence and others will become "other persons and entities."

8            Now, from plaintiffs' counsel other problems with

9    instruction 10?

10           MR. GLUCK:  So the -- for the breach of duty count,

11   it's failing to disclose to investors and PPVA because as we

12   went through with the prior --

13           THE COURT:  Yes, all right.

14           MR. GLUCK:  -- to disclose --

15           THE COURT:  So, I'm sorry, I agree with that in the

16   first sentence, so it would be by failing to disclose to PPVA

17   and its investors.

18           MR. GLUCK:  Yes.

19           Second paragraph, sentence beginning "although

20   Mr. Bodner."

21           THE COURT:  Where are you now?

22           MR. GLUCK:  Second paragraph, the sentence --

23           THE COURT:  I see towards the end.

24           MR. GLUCK:  Yeah.  "Although Mr. Bodner was not an

25   officer of Platinum Management," not PPVA.

Mcd2Pla8

1          THE COURT:  I thought your theory was that although

2     the victim is PPVA and its investors, the way he exercised his

3     control was at least in part through Platinum Management.  So

4     isn't the relevant point the fiduciary duty that he owes is to

5     PPVA and its investors because of his indirect control of PPVA

6     and its investors, right, or PPVA and its management?

7          MR. GLUCK:  That's it.  I'm getting to the point it

8     doesn't even make sense to talk about officers --

9          THE COURT:  I see.  I see.  But I think -- well,

10    "Although Mr. Bodner was not an officer of PPAV or Platinum

11    Management, plaintiffs argue that he exercised significant

12    control over PPVA's management of" -- "argue that through

13    Platinum Management and otherwise he exercised significant

14    control over PPVA."  Right?

15         MR. GLUCK:  That is correct.

16         THE COURT:  All right.  We will hear from defense

17    counsel in a minute, but anything else from plaintiffs on No.

18    10.

19         MR. GLUCK:  So second paragraph, again we have breach

20    of fiduciary duty by failing to disclose to PPVA and its

21    investors.  PPVA, same correction --

22         THE COURT:  But I -- it's a fiduciary duty that he

23    owes is to PPVA.  It comes about indirectly through his

24    participation in Platinum Management, right?

25         MR. GLUCK:  This is a different point.  It was also

Mcd2Pla8

1   addressed in the first paragraph.  The disclosure of the NAV

2   was the duty was to disclose to PPVA because PPVA --

3           THE COURT:  Oh, oh, oh.  I agree with that.  By

4   failing to disclose to PPVA and its investors.

5           MR. GLUCK:  That's it.

6           THE COURT:  Okay.

7           MR. GLUCK:  Then end of the sentence is what we just

8   talked about, knew about or should have known about.  That's

9   duty of care.

10          THE COURT:  This is your duty of care you are saying.

11  That's where "should have" comes in.

12          MR. GLUCK:  That's where "should have" comes in.

13          THE COURT:  I want to hear from defense counsel on

14  that in a minute.  And then, again, instead of accepting

15  payment, it's failing to object to it, so I won't repeat each

16  time we have to make the same changes.  All right.

17          I wanted to hear about the duty of care in a minute,

18  but maybe we should get to it because it is also in the

19  remainder of that paragraph.  So let me hear from defense

20  counsel.  Should we add something about duty of care?

21          MR. HERTZBERG:  So the Court will be very surprised to

22  hear me say absolutely not.

23          THE COURT:  Well, I was expecting not, but if you want

24  to add "absolutely," following in the footsteps of your

25  partner, that's okay, too.  Go ahead.

Mcd2Pla8

1          MR. HERTZBERG:  Whatever was alleged in the first

2     cause of action in the second amended complaint, it was

3     litigated, it was decided at summary judgment that what

4     survived was a claim for breach of fiduciary duty based on

5     actual knowledge of fraudulent overvaluation and a failure to

6     disclose.  The idea that there has been a --

7          THE COURT:  I agree.

8          MR. HERTZBERG:  Okay.

9          THE COURT:  And I'm going to leave it the way it is.

10          MR. HERTZBERG:  And then the only other point I would

11     make on 10 is that the paragraph that begins "second" and then

12     it goes on "if you find Mr. Bodner owed a fiduciary duty to

13     PPVA and its investors," so, again, it's not alleged in the

14     complaint that the fiduciary duty is owed to the investors.

15     But more importantly I think there is a real issue of confusion

16     here for the jury.

17          THE COURT:  Well, all right, this is a point I think

18     we started to discuss a little bit in passing before.  So if

19     you owe a duty, fiduciary duty to PPVA, is it not classic law

20     that you therefore owe a duty to its investors?  I thought that

21     was black-letter law.

22          MR. HERTZBERG:  Let me address the issue of confusion

23     first if I could.

24          THE COURT:  Okay.

25          MR. HERTZBERG:  So it is entirely possible that on a

Mcd2Pla8

1    common law basis you could have one investor in PPVA who

2    actually is not an investor in PPVA but is an investor in one

3    of the two feeder funds.  But setting that nicety aside, you

4    could have one investor who, by virtue of his or her

5    relationship with Mr. Bodner could say, you know, I trusted you

6    and I repose my trust and confidence in you and you accepted

7    that trust and confidence when you told me that you would look

8    out for me.  That might create, under New York law, a fiduciary

9    relationship between Mr. Bodner and that one investor, but that

10   does not create a fiduciary obligation from Mr. Bodner to the

11   partnership that is PPVA.

12        THE COURT:  No, but this is different because these

13   are, for example, take the incentive fees.  These are monies

14   that are being depleted from PPVA, but they are, by the token

15   of that, also limiting the amount of money that's available to

16   general investors.

17        Now, I think on the facts of this case, it is a duty

18   owed to both if the proof is there at all.  So I'm going to

19   leave that as is.

20        MR. HERTZBERG:  If I could, if you take the Marcos

21   Katz facts, for example, the jury could be confused and think,

22   wow, Marcos Katz wrote to Bodner and Huberfeld and Nordlicht

23   that I left my money in the fund because of you, and the jury

24   could say, wow, that's a fiduciary duty owed to -- that sounds

25   like it could be a fiduciary duty owed to a PPVA investor.

Mcd2Pla8

1              THE COURT:  No, I don't think that is possible in this

2      charge because the fiduciary duty part of this charge is

3      premised on his control over the investment decisions of PPVA.

4              MR. HERTZBERG:  Okay.

5              THE COURT:  So I don't think that's possible.

6              All right.  Turning to instruction 11, if I throw out

7      fraud we will be gone.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCDCpla9

1            MR. GLUCK:  Just want to make sure that I had some --

2            THE COURT:  That's right, because we segued on that

3       one issue, you're right.

4            MR. GLUCK:  There was a second page.  I think there

5       are following changes from the ones we've already made.

6            THE COURT:  All those will be made.  You don't have to

7       repeat them.  So accepting payment again is failing to object

8       to, et cetera.

9            MR. GLUCK:  Well, I had actually addressed this issue

10      separately of disclosing or stopping.

11           THE COURT:  But I haven't accepted that, but what I

12      have accepted, which actually I think is better for you --

13           MR. GLUCK:  We have a different wording.

14           THE COURT:  Okay.  Anything else from defense counsel

15      on instruction 10?

16           MR. HERTZBERG:  On the paragraph that begins third, we

17      think the for example sentence or the two sentences that follow

18      for example creates some confusion where maybe they were trying

19      to create some clarity.

20           MR. GLUCK:  It's a disjunctive which is the point we

21      were just making.  So he either could have prevented it somehow

22      through his own action or disclosed it, which would have caused

23      investors to take out.  So I guess it should say "Or" instead

24      of for example.

25           MR. HERTZBERG:  If we were going to add a for example,

MCDCpla9

1   it should be addressed to the payment of fees, of management

2   and incentive fees.

3        THE COURT:  Well, I'm willing to -- I thought both

4   those examples, there was testimony today from Mr. Quintero

5   about the run on the bank analogy and all like that.  But, if

6   you want to propose another example, I'm willing to contemplate

7   that.  So what's the language you want there?

8        MR. HERTZBERG:  Perhaps this is one that we could

9   submit to the Court.

10       THE COURT:  Okay.  I'm going to have such fun at noon

11  tomorrow, but yes, you can submit something.

12       Now we come to instruction No. 12, because 11 is the

13  fraud claim.  This will be adjusted, again, to a single claim.

14  Therefore, if I adhere, as I expect I will, to my view that the

15  breach of fiduciary duty has to be proved only by a

16  preponderance of the evidence, then we don't have to get into

17  anything further on this.  We might say by a -- I think if you

18  find by a preponderance of the evidence that Mr. Nordlicht also

19  reached the same misconduct that you have found Mr. Bodner

20  liable for, then the release is unenforceable.

21       So any, with those adjustments, any problems from

22  plaintiffs' counsel.

23       MR. GLUCK:  It should say, we believe, it should say

24  permanently management or Mark Nordlicht.

25       THE COURT:  Where are you?

MCDCpla9

1          MR. GLUCK:  Both instances where Mark Nordlicht is

2     referenced, which was signed by Mr. Bodner in his personal

3     capacity and by Mark Nordlicht on behalf of Platinum

4     Management.  That's probably --

5          THE COURT:  Oh, yes.  Okay.  I have that in the first

6     paragraph.

7          MR. GLUCK:  Right.  And then in the second one, if you

8     find that Mark Nordlicht or Platinum Management, right, because

9     in principle --

10          THE COURT:  Well, I'm trying to remember, but I think

11     we cannot have a conspiracy of a -- for example, I know it's

12     the law.  You cannot have a conspiracy between an officer and

13     employee of the company and the company.  That's not permitted

14     under federal law.

15          So, I don't think you can have a conspiracy between

16     Mr. Bodner and Platinum Management.  You can only have a

17     conspiracy between Mr. Bodner and Mr. Nordlicht, albeit the

18     latter operating in his capacity or the former operating in his

19     capacity.

20          MR. GLUCK:  For conspiracy, without having those cases

21     at disposal, let's assume here, though, it's tort fees.

22     Platinum Management was sued --

23          THE COURT:  That's a good point.  Yes, you've

24     persuaded me on that.  If you find that Mr. Nordlicht or

25     Platinum Management also -- okay.  I accept that.

MCDCpla9

1          Anything on 12 from defense counsel?

2          MR. HERTZBERG:  Yes, Judge.  So the Court knows our

3     view that we think the jury should be asked to determine

4     whether the release is invalid because of a fraudulent purpose

5     and not because on the joint tort feasor exception.

6          THE COURT:  You've argued that before.  It's

7     preserved.

8          MR. HERTZBERG:  What we want to do here, though, is

9     have the jury determine both on a special verdict form, because

10    if the jury comes back and says that the release is invalid

11    because of a fraudulent purpose, but not under the joint tort

12    feasor exception, then this issue that we've raised really

13    doesn't matter.  But, on the other hand, if the jury finds that

14    there is no fraudulent purpose to the release, in other words

15    that there's a genuine business purpose to the release and --

16         THE COURT:  I have -- I think you've argued that

17    before and it's an interesting argument that you will

18    undoubtedly want to preserve for appeal, but I don't think

19    that's the case.  I think when two tort feasors, whatever other

20    purposes they may have, agree to a release that, among other

21    things, that where it may be perfectly valid, is an agreement

22    to release them from their liability for that tort that they

23    jointly engaged in.  The release is invalid to that extent.

24         I have already made clear that I will write a whole

25    little opinion explaining this in more detail, but the gist of

MCDCpla9

1    it is that although there's not case law as directly on point

2    as I would have hoped, I think it follows from basic principles

3    of New York law and would be the position of the New York Court

4    of Appeals, which is what I call upon to predict in such a

5    situation.  So I'm going to leave as it is.

6         MR. HERTZBERG:  Thank you.

7         MR. GLUCK:  Your Honor, that is, unfortunately, it

8    raised a point, and I'll raise it and the Court can treat it

9    however it likes.

10        It's either in evidence or something that we have

11   mentioned in this trial.  Platinum was sued for overvaluation

12   and defaulted.  It's not a default judgment, but it's a

13   default.  How do we treat that?

14        THE COURT:  Yeah, I don't -- I don't think a default

15   in that context is -- constitutes collateral estoppel in this

16   context.  So I think you're free to argue on summation

17   something along the lines of, while not definitive, you can

18   take account of the fact and then mention it.  That I will --

19        Instruction 13, compensatory damages.  Again, we'll

20   change it to reflect that it's only a single claim and so

21   forth.

22        So I thought in the third paragraph that I would not

23   use the term coconspirators because Mr. Lauer convinced me

24   earlier in the day carries a sort of freight that is

25   unnecessary and may be unfortunate, may be prejudicial.  So I

MCDCpla9

1    changed it here to unless plaintiffs also prove -- I'll give

2    the whole sentence.  Please note that Mr. Bodner is liable only

3    for the damages proximately caused by his own acts that caused

4    the breach of fiduciary duty -- let me strike and/or fraud.

5    Unless plaintiffs also prove by a preponderance of the evidence

6    that the intentionally entered into a plan with Mr. Nordlicht

7    to defraud the investors by hiding the fact that the fund's

8    assets were overvalued, in which case he was also liable for

9    the damages Mr. Nordlicht caused.  And I think that's a

10   succinct statement of conspiracy without using the loaded term.

11   Instead of plan, if you prefer agreement, I'm happy to

12   substitute since that's the class conspiracy term.  If it's

13   agreement, it's going to have to be agreement explicit or

14   implicit is the classic term.  We should do that, entered into

15   an agreement explicit -- an agreement with Mr. Nordlicht,

16   explicit or implicit, et cetera.

17          So, with that change, any problems from plaintiffs on

18   instruction No. 13?

19          MR. GLUCK:  The Mr. Nordlicht thing again.  So we'll

20   take the Court's --

21          THE COURT:  I'll read the whole paragraph as it now

22   would read.

23          Please note that Mr. Bodner is liable only for the

24   damages proximately caused by his own acts that caused the

25   breach of fiduciary duty, unless plaintiffs also prove by

MCDCpla9

preponderance of the evidence that he intentionally entered

into an agreement with Mr. Nordlicht, explicit or implicit to

defraud the investors by hiding the fact that the fund's assets

were overvalued, in which case he is also liable for the

damages Mr. Nordlicht caused.

MR. GLUCK:  Mr. Nordlicht or others at Platinum

Management.

THE COURT:  I think -- we talked about that earlier.

MR. GLUCK:  Huberfeld.

THE COURT:  I think the only person that think there's

evidence from which the jury could infer that there was an

agreement would be Mr. Huberfeld.  Defense counsel doesn't

think there is any evidence of an agreement, period.  I can't

think of anyone else aside -- I'm willing to add Mr. Huberfeld,

subject to hearing from defense counsel.  I don't know who else

he had an agreement with.  He barely talked to the rest of the

other people.  Even on the plaintiffs' side.  Plaintiff has him

talking with Nordlicht, has all those calls with Nordlicht and

so forth, meetings with Nordlicht.  Plaintiffs have always

argued this is the three --

MR. GLUCK:  Bodner, Huberfeld -- if it's anyone else,

it's SanFilippo who was the CFO.

THE COURT:  I hear you, but --

I would add, subject to hearing from defense counsel,

so that he intentionally entered into an agreement with

MCDCpla9

Mr. Nordlicht and/or Mr. Huberfeld to defraud the investors by

hiding the fact that the fund's assets were overvalued.  He was

also liable for the damage Mr. Nordlicht and/or Mr. Huberfeld

caused.

          But now let me hear from defense counsel.

          MR. GLUCK:  We had one minor one.

          MR. HERTZBERG:  We take exception to the addition of

Mr. Huberfeld there.

          THE COURT:  My understanding is, first of all, you

totally preserved your argument that the coconspirator

exception should not operate here to allow retroactive damages,

both because there was no conspiracy or insufficient proof of

any conspiracy.  And second, because even so, it shouldn't

apply in this context to retro active damage.  That's fully

preserved for appeal, but that has been argued and rejected.

          Anything else you wanted to raise.

          MR. HERTZBERG:  I'm not addressing that issue.  I'm

addressing the evidentiary issue that, Nordlicht I understand,

there has been plenty of evidence in this case that Nordlicht

is in charge of, responsible for the overvaluation scheme that

Mr. Bodner is accused of keeping quiet, but there's no evidence

that Mr. Huberfeld is responsible, factually or legally, for

the overvaluation scheme, and yet the jury heard so much

evidence --

          THE COURT:  Maybe this is not sufficient as to

MCDCpla9

1    Huberfeld.  Wasn't there evidence from at least some witnesses

2    that they were ultimately in control, those three, or something

3    to that effect?

4              MR. HERTZBERG:  I mean, that was -- that came in

5    through the deposition testimony that was read aloud from

6    Michael Katz, but he didn't do anything, meaning we weren't in

7    this trial defending Mr. Huberfeld's --

8              THE COURT:  So you should be limited to Mr. Nordlicht?

9              MR. HERTZBERG:  I do.  I think once you include

10   Mr. Huberfeld, and maybe I'm arguing against myself, but why

11   stop there?  It could be Landesman --

12             THE COURT:  I don't think you're arguing against

13   yourself.

14             So let me ask plaintiffs' counsel, what's the evidence

15   that Mr. Bodner conspired with Mr. Huberfeld to defraud

16   investors?

17             MR. GLUCK:  I hope I'm not arguing against myself, but

18   there's quite a bit.  The email where Bodner and Huberfeld are

19   in Feuer's office going through the limits and the allocations,

20   we of course say that's the exact debt stability scheme that's

21   been testified about, that Huberfeld was forwarding the

22   interest payments.  It's disputed as to whether it got to

23   Mr. Bodner, it's certainly Mr. Huberfeld who did it.  Huberfeld

24   was at Beechwood in a Beechwood office when Mr. Levy was fired.

25   There was testimony at that from Mr. Huberfeld, I don't know if

MCDCpla9

he said the word fired, that's my word.  There is quite a lot

in the record regarding the partnership.  It's actually one of

the instructions we intended to raise.  There was an

unincorporated partnership between Mr. Bodner and

Mr. Huberfeld.  One of the thesis in the case is that one knew

something, the other knew something.  In fact, Huberfeld

testified that was almost always the case.  He wasn't

specifically aware of anything that he withheld with Mr. Bodner

saying, well, I don't remember him saying X, Y, or Z to me.

THE COURT:  And I think, assuming that there was

evidence, which I think there well may be, that they both knew

of the overvaluation, they are lumped together by Nordlicht,

but he says you two have to go -- and it's not just Nordlicht,

even in the projection from that guy who planned to save the

company or whatever.  We're going to have the two of them go

out and raise X million, $50 million I think it was.

So if at that point they both had knowledge of the

overvaluation, the inference was they were being jointly asked

to carry out that conspiratorial agreement, we won't call it

conspiracy in this charge, to defraud investors on behalf of

Platinum and PPVA.

Yes.

MR. LAUER:  Your Honor, most respectfully, this entire

case focuses on -- focused on fraudulent net asset value and

knowledge that the net asset values were fraudulent.

MCDCpla9

```
 1            Putting aside whether Bodner talks to Huberfeld or

 2      not, there was insufficient evidence inform this case, because

 3      this clearly wasn't the focus and wasn't opened on, that

 4      Mr. Huberfeld, who testified that he was in and out of the

 5      famous Fuchs dinner, there was no evidence that Huberfeld had

 6      actual knowledge that the NAVs were fraudulently valued.  Does

 7      he know about interest payments, et cetera, there's no

 8      connection to Mr. Huberfeld and yet, if you were to connect

 9      Mr. Huberfeld, you could basically jet in Mr. Nordlicht, forgot

10      him, then there is the question of did Bodner -- it's grossly

11      unfair.

12            THE COURT:  You've all made very good arguments.  I'll

13      think about this one since -- after I see your submissions at

14      noon, I'm going to have to give you a revised charge anyway.

15      I'll reserve on this one until then because I think it's a

16      close call.

17            MR. LAUER:  On the issue of mechanics of damages, I

18      know that hopefully we might get some agreement on lessening

19      the jury's burden --

20            THE COURT:  Yeah, well, I'm all for that, but

21      plaintiffs' counsel doesn't seem to agree, but if you want to

22      talk to each other tonight, that's fine.

23            But, assuming there is no agreement, I am leaning

24      towards the lessening of damages in the way that we debated at

25      such great length earlier.  So, in the submissions at noon,
```

MCDCpla9

 1   give me your proposed instruction on that to the jury on the

 2   damages claim.

 3           MR. LAUER:  I appreciate that, your Honor.  But it

 4   just seems to me that absent -- whether the conspiracy count is

 5   in or not, right, regardless, doesn't matter --

 6           THE COURT:  There is no conspiracy count, it's out.

 7           MR. LAUER:  There are two issues.  One is at what

 8   point in time did Bodner or anyone else come to have knowledge

 9   that --

10           THE COURT:  That's what you're all going to argue that

11   to the jury.

12           MR. LAUER:  Okay.  The second issue, the second issue

13   is how much were these assets inflated.  In other words --

14           THE COURT:  So here's what I'm saying, you have

15   tentatively persuaded me that the calculations, the monetary

16   calculations given by the expert are binding on him and on the

17   plaintiffs and don't include the $18 million or whatever it

18   was.  So that, the jury should be told that in the damages

19   instruction.

20           What I'm saying is, give me your proposed language,

21   give it to me by noon tomorrow, and if I'm still on the same

22   wavelength, of course plaintiffs' counsel have a chance to

23   object to it and so forth, but if I'm still on the wavelength,

24   then I'll add that language, but I want you to give me the

25   language.

MCDCpla9

1          MR. LAUER:  I'm going beyond that.  In other words,

2     let's take Michael Goldberg's note.  Is there ever -- without

3     specificity, we're not going to know whether the jury believed

4     that issue.  In other words, there is 770 --

5          THE COURT:  Of course, that's true of all general

6     verdicts.  The verdict form, which I will try to get you at

7     some point tomorrow, the proposed verdict form will be a simple

8     verdict form.  It will say on the -- if, assuming fraud's out,

9     on the count of breach of fiduciary duty, do you find the

10    defendant, Mr. Bodner -- and then there are two boxes, liable,

11    not liable.

12         Then it will say if you find not liable, don't answer

13    anything else, go and sign the verdict form.

14         The second question will be, assuming if you do find

15    liable, is liability still barred by the general release.  Yes,

16    no, check the box.  If you check yes, it is barred, then just

17    go sign the verdict form.

18         Third question will be assuming you have found him

19    liable and assuming you have answered question No. 1 liable and

20    you've answered question No. 2 no, it was not barred by the

21    release, please indicate the amount of damages that Mr. Bodner

22    must pay for his alleged breach of fiduciary duty, you know

23    where there will be a dollar sign and an amount.  And, of

24    course, we will never know all the nuances of how the jury

25    broke that down.  That is called the beaut of the jury system.

MCDCpla9

1           MR. LAUER:  Okay.  So I take it you're going to -- it

2      will be a general verdict and it's up to us to slice and dice

3      for them?

4           THE COURT:  Yes.

5           MR. LAUER:  Okay.

6           THE COURT:  Which doesn't -- I still am sort of

7      attracted to your idea of having the Court calculate damages

8      because I've done so little work on this case that anything

9      more would be much appreciated.

10          Finally, instruction No. 14, which is my standard

11     instruction to -- I'm sorry, 14 and 15.  Any problems with 14

12     and 15 from plaintiffs' counsel?

13          MR. GLUCK:  Just on 13, we had two items we never got

14     a chance to address.

15          So the first is we had submitted to the Court a

16     different version of the damages instruction that included

17     prejudgment interest, and it's not here.  And I was curious if

18     that was intentional or --

19          THE COURT:  Sometimes you get a question from the

20     jury, but prejudgment interest is not, I think, a jury question

21     at all.  It's a question of law.

22          MR. GLUCK:  So long as it's not omitted.

23          THE COURT:  I will decide whether to include it or

24     not, but I don't think it's for the jury.

25          MR. GLUCK:  And then the second item, also on damages,

MCDCpla9

1    is not here is any instruction either for or against punitive

2    damages.

3          THE COURT:  Yes.  So that is intentional.  That is to

4    say its omission is intentional.  I do not see -- New York law

5    requires quite a lot on punitive damages.  It has to be

6    something that is sufficiently wanton that you need to deter

7    not just the defendant, but others who might contemplate

8    similar activity, et cetera, et cetera, et cetera.  Even taking

9    the evidence most favorably to the plaintiff, I don't see

10   anything rising to that level in this case.  So you have that

11   as an appeal issue, but I am excluding punitive damages.

12         MR. GLUCK:  And then there was one final issue, and

13   this is nothing more than an attempt to save eyeballs and a

14   5:00 a.m. night.  So I've seen the Court be persuaded before by

15   very simple things, and this is in that vein on damages.

16         First, it was plaintiffs' express understanding and as

17   pled in the complaint, which is now just been reviewed, that it

18   would have the opportunity to prove its damages at trial.  By

19   way of example, the attorney's fees and the consequential

20   damages Mr. Trott would have testified to but for the

21   submission.

22         If, at the outset of this trial, this Court had not

23   ruled on the motion *in limine* on this $14 million in the way it

24   had, this is my turn to say very unfair and prejudicial,

25   plaintiffs would have just elicited the two statements on no

MCDCpla9

1    incentive fees should have been paid.

2           THE COURT:  That's a question you're going to be

3    addressing -- that's no lie.  That's a question you're -- now

4    there's some other questions, but that's a question you're

5    going to be addressing tomorrow in the -- and the question is,

6    are you bound, notwithstanding anything else, by your expert's

7    report as far as damages are concerned or can you prove

8    additional damages in the way you propose.  If you persuade me

9    that you can do that, you've already put in the testimony, and

10   it's only a question of putting in these two exhibits, and I

11   might allow you to put those in.  But I need, first, your

12   competing views on what the law allows.

13          MR. GLUCK:  Understood.  And I have a very specific

14   point here.  I believe the Court already ruled that it could go

15   downward.  So when the Court declined to allow Mr. Quintero to

16   testify about two or three assets in its *Daubert* opinion, all

17   the numbers changed.  We went into this trial expecting the

18   numbers to change from the export downward.

19          THE COURT:  Now, but only in the respects that he

20   already testified at length, that he excluded, after the

21   *Daubert* decision, certain items.  That's a different question

22   than this $14 million.

23          MR. GLUCK:  Different question, but in the same

24   *Daubert* opinion for the very first time, this distinction

25   between fees, LP interest incentive fees, and cash incentive

MCDCpla9

1     fees arose for the very first time.  It's the same -- I just

2     thought if there was --

3          THE COURT:  All fair, but I don't think that controls

4     this narrow issue I'm raising.

5          MR. GLUCK:  We have one more.  This also -- this may

6     have been intentional, but I just want to clarify.  We had

7     submitted a proposed jury instruction on unincorporated

8     partnerships under New York law.

9          THE COURT:  Does anyone raise that as a problem?  I

10     didn't hear defense counsel saying or anyone saying, what?

11          MR. GLUCK:  We submitted -- it was just on knowledge

12     that if we proved an unincorporated partnership between

13     Mr. Huberfeld and Mr. Bodner, which I believe we did, there was

14     a whole line of questions on it, then the knowledge of

15     Mr. Huberfeld could be imputed to Mr. Bodner and vise-versa,

16     and we cited treatises in the jury instruction.

17          THE COURT:  I think that goes to admissibility, and I

18     allowed you on the coconspirator exception to put in, in

19     effect, everything you would have put in under that alternative

20     theory.  So I don't see -- it's already there.  I don't think

21     the jury needs to be instructed.  Your argument is, in effect,

22     when Mr. Bodner's partner, Mr. Huberfeld, said X, he was saying

23     it for the two of them.  And the argument the other way, as I

24     understand, will be, well, they cease to be partners in any

25     sense relevant to this when Huberfeld moved out.  So I think it

MCDCpla9

1    really comes down to a factual question, it's not legal theory.

2              MR. GLUCK:  I don't know if it will change the Court's

3    view.  It's no, we're not saying that when Huberfeld said X or

4    Bodner said Y, it's really for the two of them, we're just

5    talking about knowledge.  So if Huberfeld knew X, Bodner knew

6    X.

7              THE COURT:  Thank you.  Now I see your point.  So that

8    the knowledge of one partner is automatically imputed by law to

9    another party.

10             MR. GLUCK:  We have cited in our proposed jury

11   instructions some treatises --

12             THE COURT:  Well, I'm duly intimidated.  Let me hear

13   from defense counsel on this.

14             MR. LAUER:  Going back to the very beginning when we

15   had the group pleading that alleged that Mr. Bodner had

16   actually prepared the NAVs, this case has always been about

17   fraud on Mr. Bodner.  They survived the dismissal by claiming

18   that he participated in creating the NAVs and it turned out

19   that was an absolute misrepresentation.

20             Then they survived the motion to dismiss under rule 9,

21   which required particularity by using the Debohak email that

22   had nothing to do with Platinum.

23             Now, they survived summary judgment, but the Court

24   limited the case to actual knowledge of fraud that Mr. Bodner

25   failed to disclose because he potentially was a fiduciary.  It

MCDCpla9

1    has never been alleged in this case that somehow, on a

2    constructive basis or a vicarious basis whether there is the

3    so-called unincorporated partnership or not, that Mr. Bodner

4    could be held liable for all these things because Murray

5    Huberfeld may have had knowledge.

6          THE COURT:  Well, I think it may have been alleged in

7    two respects.  First, there was a claim going back to the

8    second amended complaint for constructive fraud.  Now, it's

9    broader than just the two of them because, at that point, the

10   complaint was being brought against umpteen persons and

11   entities, but there certainly was the suggestion in that claim

12   that fraud could be a product of a legal construction arising

13   from legal relations.  Also, they presented before the start of

14   this trial their proposed jury instruction along these lines.

15         But, having said that, I -- my gut reaction is that

16   it's unfair, not so much for the reason Mr. Lauer mentioned,

17   although I agree that it has not been argued previously in

18   anything that's been presented to the jury, but because I

19   really wonder whether it makes sense in the context of this

20   case.  So I will think about, I'm not ruling it out yet, I'll

21   think about it overnight and look at some of the cases, but at

22   least, right now, I'm leaning against not including it.

23         So, can we get to instructions 14 and 15?

24         MR. GLUCK:  I imagine, but Mr. Lauer just raised what

25   I believe is an extremely important point about the group

MCDCpla9

1    pleading.

2              THE COURT:  I'm always glad to hear an extremely

3    important point.  It goes well with the absolute wrong or

4    whatever the phrase was we heard from the defense counsel, and

5    as all lawyers are, you are masters of understatement.  But

6    what's the extremely important point?

7              MR. GLUCK:  The extremely important point actually

8    directly relates to how this was pled using group pleading.

9    Mr. Bodner was one of the Platinum defendants, and that was a

10   defined term within the pleading.  He was also one of the

11   Beechwood defendants, and that was a defined term within the

12   pleading.

13             THE COURT:  That's true.

14             MR. GLUCK:  So two premises.  I submit that whether it

15   be on this partnership knowledge issue -- and it's only a

16   knowledge issue, it's not a liability issue -- or on whether

17   omission was pled, because I'm reading it, it happened to be on

18   my screen, the entire way this was pled was as detailed herein

19   the Platinum defendants intentionally engaged in the first and

20   second schemes by communicating material misrepresentations to

21   PPVA in various forms and by omitting to state material facts.

22   And that applied to different persons in different ways.

23             THE COURT:  There's no doubt that your complaint has

24   omission mentioned.  The question was, did you, in any place,

25   say that there was an independent fraud based not on omission

MCDCpla9

because a fiduciary has a duty to disclose, but rather based on
omission because even in the absence of a fiduciary duty, you
have special access.  I didn't see that yet anywhere in the
complaint, but, of course, if I have any trouble sleeping
tonight, I'll just read the complaint.  But if you find that,
of course, then that would reopen the subject.

MR. GLUCK:  I think I'm staring at it, but we'll have
to put it in the papers.

THE COURT:  Last instructions, ladies and gentlemen,
instructions 14 and 15, which are my very standard instruction
that I've used about what the jury should do, and I don't want
to discourage you from any objections, but this has been the
wording I've used for the last 26-plus years.

Now, any objections from plaintiffs' counsel.

MR. GLUCK:  No, your Honor.

THE COURT:  From defense counsel.

MR. LAUER:  None at all.

THE COURT:  Very good.

Now, the last thing we were going to talk about, but
I'm going to give you an option is the exclusion of witnesses.
Where I was leaning was allowing all the witnesses, except for
the lawyer and excluding the lawyer, but we had not, by any
means, finished our argument.

It's 8:10 p.m., so the night is young, but my
suggestion is that we continue that argument at 9 o'clock

MCDCpla9

1    tomorrow, that will give us a half hour to continue that

2    argument -- to conclude that argument before I rule.  Yes, that

3    theoretically might mean that some gentleman or persons might

4    come to court and then be told they have to go home, I'm sure

5    they'll still be delighted under those circumstances.  But I

6    think it would be better to do it then while we're all fresher

7    than we are now.

8             MR. SEIDEL:  As you're raising off the bench, your

9    Honor, I hate to say this, but I actually not going to be here

10   tomorrow, so --

11            MR. GLUCK:  He was supposed to make this motion.

12            MR. SEIDEL:  Unfortunately, your Honor, I took deeply

13   to heart your statements about 10 days.

14            THE COURT:  We're going to hear it now.  We're going

15   to hear it now.

16            So, is there anything else any defense counsel wanted

17   to say about the lawyer?

18            MR. LAUER:  Your Honor, we think it's important,

19   certainly for this jury, given the fact that we opened on the

20   agreement that has been called a release, to have Mr. Neuberger

21   go through it, it's not going to take a lot of time.  I think

22   it takes away some of the mystery, but it's competent, he's a

23   serious lawyer, he will explain it, and I think it's part of

24   the story and I think --

25            THE COURT:  Well, the trouble with that is you've

MCDCpla9

1    already won on the release in all but the joint tort feasors.

2    I'm instructing, as a matter of law, that except if there is a

3    joint tort feasor problem, the release bars liability.  So you

4    can't do any better than that.

5         Furthermore, I'm not quite sure of your whole point,

6    which came up in argument about there were other reasons for

7    this release and it wasn't -- is neither here nor there because

8    if the release is not barred by joint tort feasors, it's

9    absolutely good.  If it's barred by joint tort feasors, that, I

10   concluded, as a matter of law, you have your exceptions, but

11   it's not a question for the jury, it's a question -- all they

12   have to determine is whether there were joint tort feasors.

13   But, the fact that joint tort feasors cannot release that claim

14   related to the one I made as a matter of law.  So I'm going to

15   exclude the lawyer.

16        Now, turning to the other witnesses, let me hear from

17   plaintiffs' counsel.

18        MR. SEIDEL:  Yes, your Honor.  Just now, just this

19   evening, three times, Mr. Lauer has said that the focus of this

20   case is on Mr. Bodner's knowledge of fraudulent -- whether or

21   not the NAVs were fraudulent.  Mr. Bodner has testified that he

22   didn't read the financial statements, he didn't meet the

23   auditors, and then I think we can infer from that, he doesn't

24   know what work they did.

25        THE COURT:  But this is being offered -- they have

MCDCpla9

```
 1    always taken the position that, as a factual matter, the NAVs

 2    were not overstated.  So their defense, and I think they've

 3    been quite consistent on this, despite my efforts to get them

 4    to drop it from time to time, is that, as a factual matter, the

 5    NAVs were fine, the expert is wrong, their auditors are right,

 6    there's lots of reserves and they had the value subscribed to

 7    them, et cetera.  If that's true, then, of course, we don't

 8    even reach the question of what Mr. Bodner knew or didn't know

 9    because there was no overstatement.  So they're maintaining,

10    one, there was no overstatement; two, assuming there was an

11    overstatement, Bodner didn't know about it; and three, even if

12    he knew about it, he didn't have a duty to say anything.

13    That's always been their three defenses from day one of this

14    trial.

15             MR. SEIDEL:  So let's focus on number one only, then.

16    The auditors do not draft nor do they certify beyond gap

17    reasonableness anything in the financial statements, including

18    the NAV.  The issue of whether the NAVs are inflated or not

19    turns on what did Mr. SanFilippo, whose testified at length, do

20    in preparing those financial statements, and what information

21    didn't he include when calculating the financial statements.

22    Take, for instance, Golden Gate Oil.  Golden Gate Oil, he uses

23    a PV10 analysis that talks about proven reserves.  Did he

24    include the fact that none of these wells were pumping anything

25    but salt water.
```

MCDCpla9

1           THE COURT:  Certainly that's cross examination

2      material.

3           MR. SEIDEL:  It could be cross examination, but here,

4      the problem with the auditors is confusion and cumulative

5      evidence.  It doesn't advance --

6           THE COURT:  And there was also the valuators.

7           MR. SEIDEL:  I'm not talking about the valuators.

8           THE COURT:  All right.  Let's talk about the auditors.

9      The auditors are required to give an opinion that the financial

10     statements of the entity they're auditing are a fair

11     representation of what would be required by general accepted

12     accounting principles.  If, therefore, they have failed to make

13     adequate inquiry, that's a perfect reason to cross examine him

14     about, hey, you said it was fair, how could you comply with

15     gap, how could you possibly say that because you never

16     considered X, Y, or Z.

17          MR. SEIDEL:  Except what you're going to hear from the

18     auditors, because it's what they've said in other litigations,

19     as well, is that they received representations from management,

20     they looked at the modeling, the files, you name it, all of

21     these things, but whatever led to the inflated NAV, all of the

22     evidence we've brought in was information that they were not

23     made aware of.  It isn't that their audit lacked professional

24     skepticism, it's not that their audit failed to follow

25     generally accepted audit standards.  Their position has been

MCDCpla9

1   consistently in other matters --

2          THE COURT:  But this is -- actually, I think this is

3   classic cross examination.  Mr. Jones, would you have signed

4   off on this if you had known X, if you had known Y, if you had

5   known Z.  Did you know that they were pumping water because

6   they couldn't pump oil and whatever.

7          MR. SEIDEL:  And if this were an accounting fraud

8   case, I would say you would have to put the jury through the

9   pain of that, but you're talking about if you're having trouble

10  falling asleep at night, read or listen to the testimony

11  surrounding reasonable assurance, gap, and gas when we don't

12  need to.  That's the gravamen of our argument.

13         THE COURT:  And those are the only witnesses you're

14  seeking to exclude?

15         MR. SEIDEL:  Correct.

16         THE COURT:  And what, two auditors?

17         MR. SEIDEL:  Yes.

18         MS. MOSSE:  Your Honor, I think you've --

19         THE COURT:  I must say, forgive me for a second.  This

20  is plaintiffs' call not to make this motion, not the Court's,

21  but I think it's very strange.  You don't want the opportunity

22  to show the 50 million things that they were not told, you

23  don't want the opportunity in the case of -- what was it?  One

24  of them that they later on, in effect, backed off when they

25  were told some of this?  Okay.  That's your choice.

MCDCpla9

1          MR. SEIDEL:  We're just trying to streamline the

2     presentation.

3          THE COURT:  That's okay.  Go ahead.

4          MS. MOSSE:  There is no issue of streamlining.  We

5     understand the Court's instruction of when the evidence needs

6     to be in, we have committed to meeting that deadline and we

7     will do so.  It is a short examination.

8          When we disclosed these witnesses on our witness list

9     to plaintiffs, at this point over a month ago, we actually had

10    seven audit and valuation witnesses on the list.  We have cut

11    that down now to three.  There's no question as to the

12    relevance of these witnesses.  Today is the first we're hearing

13    about any motion to exclude them.

14         THE COURT:  I'm glad we had this argument, because now

15    I can rule, and I'm going to allow those witnesses.  I am going

16    to ask defense counsel to do what she already said she was

17    planning to do, which was streamline their direct.  So I Done

18    think you need 45 minutes for what you're telling me now.

19    You're calling for maybe, you know 10 might be a little too

20    short, but maybe a half hour would be reasonable, but I'm not

21    ordering it, I'm just suggesting it.

22         And all the cross that has been mentioned seems to be

23    perfectly appropriate.

24         Anything else anyone wanted to raise?

25         Hearing nothing -- so we don't have to come in at 9:00

MCDCpla9

1    tomorrow.  So you can get tons of extra sleep.  Someone bound

2    to come up with something overnight.  Why don't we come

3    together at 9:20 in case someone has something.  Goodnight.

4              (Adjourned to December 14, 2022 at 9:20 a.m.)

5                               *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    RONALD GARY QUINTERO

 4   Direct By Mr. Gluck  . . . . . . . . . . . .1536

 5   Cross By Mr. Lauer . . . . . . . . . . . . .1576

 6   Redirect By Mr. Gluck  . . . . . . . . . . .1667

 7   Recross By Mr. Lauer . . . . . . . . . . . .1696

 8    DAVID BODNER

 9   Cross By Mr. Gluck . . . . . . . . . . . . .1700

10                    PLAINTIFF EXHIBITS

11   Exhibit No.                           Received

12    645   . . . . . . . . . . . . . . . . . .1546

13    549   . . . . . . . . . . . . . . . . . .1571

14    252   . . . . . . . . . . . . . . . . . .1572

15    999   . . . . . . . . . . . . . . . . . .1681

16    986   . . . . . . . . . . . . . . . . . .1688

17                    DEFENDANT EXHIBITS

18   Exhibit No.                           Received

19    582   . . . . . . . . . . . . . . . . . .1577

20    558   . . . . . . . . . . . . . . . . . .1637

21    632   . . . . . . . . . . . . . . . . . .1648

22    620.37   . . . . . . . . . . . . . . . . .1663

23    765   . . . . . . . . . . . . . . . . . .1697

24    679   . . . . . . . . . . . . . . . . . .1698

25    679   . . . . . . . . . . . . . . . . . .1698
```

```
1                              JOINT EXHIBITS
2    Exhibit No.                                       Received
3     40                                                1544
4     42                                                1694
5     45                                                1695
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```