MCE2PLA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

In re:

PLATINUM-BEECHWOOD LITIGATION          18 Civ. 06658 (JSR)

------------------------------------x

MARTIN TROTT and CHRISTOPHER            18 Civ. 10936 (JSR)
SMITH, as Joint Official
Liquidators and Foreign
Representatives of PLATINUM
PARTNERS VALUE ARBITRAGE FUND LP
(in Official Liquidation) and
PLATINUM PARTNERS VALUE ARBITRAGE
FUND LP (in Official Liquidation)

                Plaintiffs,

          v.

PLATINUM MANAGEMENT (NY) LLC,
*et al.,*

                Defendants.

------------------------------------x      Trial


                                        New York, N.Y.

                                        December 14, 2022
                                        9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge
                                          and a Jury

MCE2PLA1

1                                    APPEARANCES

2    HOLLAND & KNIGHT, LLP
          Attorneys for Plaintiffs
3    BY:  WARREN E. GLUCK
          MARTIN L. SEIDEL
4         RICHARD A. BIXTER JR.
          QIAN (SHEILA) SHEN
5         NOAH W.S. PARSON
          ELLIOT A. MAGRUDER
6

7    KATTEN MUCHIN ROSENMAN, LLP
          Attorneys for Defendant Bodner
8    BY:  ELIOT LAUER
          GABRIEL HERTZBERG
9         JULIA B. MOSSE

10

11   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Defendant Bodner
     BY:  NATHANIEL C. AMENT-STONE
12        ALLESANDRA TYLER

13

14

15   Also Present:

16   Michael Robson, Paradocs Motion Support

17   Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25

MCE2PLA1

1              (Trial resumed; jury not present)

2              THE COURT:  Please be seated.  Linda is checking on

3     the jury but let's get the witness on the stand so we can start

4     right away.

5              You will recall, Mr. Gluck, that you have six more

6     minutes on nonchart stuff and a half hour on the other stuff.

7              MR. GLUCK:  That's my understanding.

8              MR. HERTZBERG:  Your Honor, may I take care of a

9     technical issue while waiting for the jury?

10             THE COURT:  Yes.

11             MR. HERTZBERG:  So on December 10 we had Mr. Fuchs on

12    the stand, and the Court may recall that we played a video from

13    his deposition.  So that the jury can see the text of what was

14    played on the video, we have marked an exhibit, it is DX 762.

15    I understand there is no objection, and we would offer it.

16             THE COURT:  Okay, received.

17             (Defendant's Exhibit 762 received in evidence)

18             THE COURT:  I am looking forward to your letters at

19    noon.  I emphasize they need to be filed by noon because there

20    are a bunch of decisions I need to make

21             THE DEPUTY CLERK:  All jurors present.

22             THE COURT:  Great.  Let's bring in the jury.

23             (Continued on next page)

24

25

Mce2Pla1                        Bodner – Cross

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Thank

3     you, as always, for your promptness.  We are in the home

4     stretch.

5              So please be seated, counsel, and let's continue.

6      DAVID BODNER, previously sworn, resumed.

7     CROSS-EXAMINATION

8     BY MR. GLUCK:

9     Q.  Mr. Parson, please bring up Plaintiffs' 440, which we seek

10    to move into evidence.

11             MR. LAUER:  We have no objection.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 440 received in evidence)

14    BY MR. GLUCK:

15    Q.  Mr. Bodner, Maggie Muller became your secretary after

16    Ms. Albanese left in 2015, is that correct?

17    A.  Yes.

18    Q.  Okay.  Thank you.

19             Mr. Parson, please call up Plaintiffs' Exhibit 956,

20    and as you are doing something -- as you are doing that, I will

21    ask the question.

22             Mr. Bodner, you testified that the liability you were

23    worried about had to do with some sort of gift tax issue?

24    A.  That's what I recall.

25             MR. GLUCK:  We would seek to move this into evidence.

Mce2Pla1                    Bodner – Cross

1    Q.  Were you negotiating --

2            MR. LAUER:  Wait.  I have to read it.

3            We are okay.  No objection.

4            MR. GLUCK:  Received.

5            (Plaintiff's Exhibit 956 received in evidence)

6    BY MR. GLUCK:

7    Q.  Do you see in the second line "any litigation paid for from

8    Platinum Management in a timely fashion"?

9    A.  Yes.

10   Q.  What liabilities were you worried about?

11           MR. LAUER:  Objection.

12           THE COURT:  This is not from Mr. Bodner.  It is from

13   Ms. Horowitz, so I don't know that he knows what is necessarily

14   being referred to.

15   BY MR. GLUCK:

16   Q.  Did you provide Platinum Management with a list of wants?

17           THE WITNESS:  I can answer that?

18           THE COURT:  There is no objection, so --

19   A.  What do you mean "wants"?

20   Q.  In connection with the release agreement.

21   A.  I don't recall.

22   Q.  Do you recall asking that litigation be paid from Platinum

23   Management in a timely fashion?

24   A.  No, I don't recall talking about litigation.

25   Q.  Bring this e-mail down.

Mce2Pla1                        Bodner - Cross

1          You testified that you had no idea about Jona Rechnitz

2    and COBA and those issues?

3               MR. LAUER:  Objection.

4               MR. GLUCK:  Sorry?

5               THE COURT:  Well, what's the objection?

6               MR. LAUER:  It is both COBA and the phrasing of "those

7    issues."

8               MR. GLUCK:  Credibility on --

9               THE COURT:  My recollection, for what its worth, is

10   similar to plaintiffs' counsel in this regard, but why don't

11   you just put the underlying question.

12              MR. GLUCK:  Sure.

13   BY MR. GLUCK:

14   Q.  My recollection, did you previously testify that

15   Mr. Huberfeld did not share the issues of COBA bribe and Jona

16   Rechnitz with you prior to his arrest?

17   A.  Yes.

18   Q.  Please call up Plaintiffs' Exhibit 577.  Excuse me, 578.

19              We seek to move this into evidence.

20              MR. LAUER:  No objection.

21              THE COURT:  Received.

22              (Plaintiff's Exhibit 578 received in evidence)

23   BY MR. GLUCK:

24   Q.  Did you call up Jona Rechnitz the day the check was cut to

25   him?

Mce2Pla1                    Bodner - Cross

1              MR. LAUER:  Objection.

2    Q.  Is that right?

3              THE COURT:  Well, the -- having looked at this

4    document, do you recall having a conversation with Jona

5    Rechnitz?

6              THE WITNESS:  Yes, I had quite a few conversations

7    with Jona Rechnitz.

8    Q.  Thank you.

9              THE COURT:  Put another question.

10   BY MR. GLUCK:

11   Q.  Mr. Bodner, you never reviewed the audit valuations that

12   were done for PPVA, did you?

13   A.  To my recollection I never reviewed any audit -- any audit

14   what?  Valuation.

15             MR. GLUCK:  I was just actually looking at the judge.

16   He is going to be shocked.  I'm done early.  Now I will move to

17   the --

18             THE COURT:  Yes.

19             MR. GLUCK:  -- 30 minutes.

20             THE COURT:  Yes.

21   BY MR. GLUCK:

22   Q.  Mr. Parson, please call up PX 440.  Excuse me.  I'm sorry.

23   PX 1283, which we seek to move into evidence.

24             MR. LAUER:  No objection.

25             THE COURT:  Received.

Mce2Pla1                    Bodner - Cross

1              (Plaintiff's Exhibit 1283 received in evidence)

2     BY MR. GLUCK:

3     Q.  This is a meeting with Beechwood, right?

4     A.  It seems like it was a meeting with Beechwood.

5     Q.  Mr. Bodner, you are a courteous person when it comes to

6     your business associates and partners, is that fair to say?

7     A.  I try to be.

8     Q.  Where is there any return e-mail saying you wouldn't be

9     able to make this meeting?  Is there one?

10    A.  I might have attended it or I might have just told them I

11    can't attend it.  I don't remember it.

12    Q.  Thank you.

13             Mr. Parson, PX 1325, please.  Seek to move it into

14    evidence.

15             MR. LAUER:  I have to read it.

16             THE COURT:  I'm sorry, is someone going to provide me

17    with a copy?

18             MR. LAUER:  No objection.

19             THE COURT:  Received.

20             (Plaintiff's Exhibit 1325 received in evidence)

21    BY MR. GLUCK:

22    Q.  This is another meeting with Beechwood and Scott Taylor,

23    right?

24             MR. LAUER:  Objection.

25             THE COURT:  Well, as phrased, sustained.

Mce2Pla1                          Bodner - Cross

 1   BY MR. GLUCK:

 2   Q.  This is another meeting with Mr. Scott Taylor?

 3             MR. LAUER:  Objection.

 4             THE COURT:  What he has objected to the is the word --

 5   Q.  Is this --

 6             THE COURT:  -- another.

 7   Q.  Is this a meeting with Scott Taylor?

 8   A.  On the e-mail it says it was a meeting.  I'm not sure if I

 9   attended this meeting or not.

10   Q.  Is there any return e-mail or follow-up saying you wouldn't

11   be able to attend this meeting?

12   A.  If I couldn't attend the meeting I would usually tell Angie

13   to call Mark or Murray and tell them that I can't be there.

14   Q.  Take this down.  Mr. Parson, PX 1327.  Move into evidence.

15             MR. LAUER:  Wait.

16             No objection.

17             THE COURT:  Received.

18             (Plaintiff's Exhibit 1327 received in evidence)

19   BY MR. GLUCK:

20   Q.  Is this another meeting with Moshe Feuer and Scott Taylor

21   of Beechwood?

22   A.  It looks like, but again I don't think I attended a lot of

23   these meetings in the office, and the way I would tell them is

24   I can't be there at 3:30 or 4:00.

25   Q.  So there is no return e-mail saying you wouldn't be able to

Mce2Pla1                        Bodner - Cross

1   make this meeting?

2   A.  I didn't e-mail.  I would call Murray or Mark or somebody

3   else and just tell them that I couldn't be there.

4   Q.  You can take this down, Mr. Parson.  PX 1359, seeking to

5   move it into evidence.

6           Is this another meeting Beechwood, Scott Taylor, Moshe

7   Feuer, and if you look at the date --

8           THE COURT:  I'm sorry.  Is this in evidence?

9           MR. LAUER:  It's not.

10          MR. GLUCK:  Oh.  Move it into evidence.

11          MR. LAUER:  No objection.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit 1359 received in evidence)

14  A.  I have the same answer.  I usually did not attend these

15  meetings to my recollection, and the way I would tell them is I

16  just can't be there.  I trusted Mark Nordlicht and Murray

17  Huberfeld, especially Murray Huberfeld on Beechwood issues.

18  Q.  This is the week after the Black Elk bond subordination?

19  A.  I have no idea.

20  Q.  Um-hmm.

21          No return e-mail saying you wouldn't be able to make

22  it?

23  A.  I don't see any.

24  Q.  Mr. Parson, PX 1365, please.  This is the acceptance.

25          THE COURT:  Are you offering it?

Mce2Pla1                          Bodner - Cross

1              MR. GLUCK:  Yes, I'm offering it.

2              MR. LAUER:  We have no objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 1365 received in evidence)

5    BY MR. GLUCK:

6    Q.  You accepted the invitation to this meeting?

7    A.  It might have been accepted for Murray Huberfeld or for me.

8    I don't know.  I really don't know.  I don't remember the

9    meeting.

10   Q.  To try to jog your memory, you don't have a recollection of

11   some meetings the week after the Black Elk --

12   A.  No.

13   Q.  -- bond subordination?

14   A.  No.  I'm sorry.  I have no recollection at all about the --

15   Q.  All right.  Mr. Parson, PX 1427.  Move into evidence.

16             MR. LAUER:  No objection.

17             THE COURT:  Received.

18             (Plaintiff's Exhibit 1427 received in evidence)

19   BY MR. GLUCK:

20   Q.  This is a direct meeting with you and Scott Feuer, February

21   8, 2016?

22             MR. LAUER:  Objection.  There is no Scott Feuer.

23   Q.  Mark Feuer.

24   A.  This might have been a meeting I attended because usually I

25   met with Mark Feuer about the charity.  This puts me at the

Mce2Pla1                          Bodner - Cross

1    time more or less when we started to raise money for the

2    Passover campaign, and I used to go around to all the partners

3    and try to solicit them that they should come to the party and

4    also give a nice check.

5    Q.  It's also a little bit after your Seth Gerszberg

6    presentation and the Nordlicht side letter, right?

7            MR. LAUER:  Objection.

8    A.  I think that.

9            THE COURT:  Hold on.

10           MR. LAUER:  Objection.

11           THE WITNESS:  Sorry, sorry.

12           THE COURT:  Sustained.  I think it's really for

13   argument, not for a question.

14   BY MR. GLUCK:

15   Q.  Mr. Parson, PX 1122, please.  Move into evidence.

16           MR. LAUER:  Wait.

17           No objection.

18           THE COURT:  Received.

19           (Plaintiff's Exhibit 1122 received in evidence)

20   BY MR. GLUCK:

21   Q.  Is Solo a restaurant?

22   A.  Yes, it is.

23   Q.  Is that one of the restaurants where you would hold your

24   partners meetings?

25   A.  Yes, it is.

Mce2Pla1                          Bodner - Cross

1   Q.  Did you attend this partner meeting?

2   A.  It looks -- from the e-mail it looks like "did David Bodner

3   want to meet for dinner tomorrow night with Murray, Uri, and I"

4   and she sent back "yes," so it looks like I wanted to meet with

5   them.

6   Q.  Did you send a follow-up e-mail saying you couldn't make

7   this?

8   A.  I don't see any follow-up e-mail.  This looks like it's a

9   meeting I wanted to go to.

10  Q.  Thank you.

11          Exhibit PX 1141, please, Mr. Parson.

12          THE COURT:  Are you offering it?

13          MR. GLUCK:  Offering.

14          MR. LAUER:  No objection.

15          THE COURT:  Received.

16          (Plaintiff's Exhibit 1141 received in evidence)

17  BY MR. GLUCK:

18  Q.  Is this an example of another partner meeting being set up

19  at Solo?

20  A.  It looks like it, it definitely looks like that.

21  Q.  Mr. Uri, where it says Uri, that's Uri Landesman, right?

22  A.  Correct.

23  Q.  PPVA?

24  A.  It could be PPVA or PPCO.

25  Q.  Could it?

Mce2Pla1                        Bodner - Cross

1    A.  I think so.

2    Q.  For Uri Landesman?

3    A.  Yes, Uri was an owner.  The way I remember, he also got

4    commissions from PPCO.

5    Q.  Mr. --

6    A.  That's my recollection.

7    Q.  Mr. Parson, PX 1167, please.

8            MR. LAUER:  No objection.

9            MR. GLUCK:  Move into evidence.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 1167 received in evidence)

12   BY MR. GLUCK:

13   Q.  Do you remember setting up this meeting?

14   A.  It looks like I set it up.  Angela wrote, "David wants to

15   have a meeting at Solo 5 p.m."

16   Q.  Did you attend this meeting?

17   A.  I would think I attended it.  I don't know for sure.  It is

18   2012.

19   Q.  No follow-up e-mails saying you weren't going to be

20   attending, is there?

21   A.  Again, if I didn't attend an e-mail [sic] I would call

22   Murray, usually Murray, and tell him, I'm sorry I can't come,

23   even if the last minute something came up.

24   Q.  Thank you.

25           Mr. Parson, PX 1187, please.  Move into evidence.

1            MR. LAUER:  Wait.

2            No objection.

3            THE COURT:  Received.

4            (Plaintiff's Exhibit 1187 received in evidence)

5    BY MR. GLUCK:

6    Q.  Did you attend this?  Is this another partner meeting?

7    A.  Again, I have the same answer.  It is a partners meeting.

8    It looks like from the e-mail.  If I attended, I don't know.

9    Q.  No return e-mail?

10   A.  I don't see any return e-mail.

11   Q.  Did you discuss the closing out of the BEOF funds at this

12   meeting?

13   A.  I do not remember discussing -- closing out of what?

14   Q.  Closing out on the BEOF funds at this meeting.

15   A.  I don't remember discussing at all the BEOF funds.  These

16   meetings were basically about what liquidity the fund needs to

17   meet over the next month.

18   Q.  Thank you.

19          Mr. Parson, PX 1205, please.

20          So every time, just so I understand your testimony,

21   every time you are asking for these meetings to be set up, you

22   think it's because you are going to be told about some

23   liquidity issues and what money the fund needs?

24   A.  When I set up these meetings these are friendly meetings

25   that the partners are getting together for dinner and we

1   discussed a lot of different things.  We also discussed private

2   businesses that I was involved with, that I needed Mark's okay

3   to go ahead with.

4              Also, when it came to the fund, I don't see anything

5   showing that I was involved in any of B-E whatever it's called

6   or thing that was more Mark with David Levy.  These things when

7   it came to Platinum was:  We need money.  We need money.  What

8   was discussed at the meeting could have been a million

9   different things.  It could have been the charity party that I

10  made twice a year, which I need help, they should help me

11  solicit people.  It could have been private businesses that I

12  needed Mark's okay to go ahead with --

13  Q.  Thank you.

14             You are setting up all these meetings, right?

15             MR. LAUER:  Objection.

16             THE COURT:  Yes, I think it's --

17  Q.  Are you setting up all these meetings?

18             MR. LAUER:  Objection.

19             THE COURT:  What do you mean by "all."

20  BY MR. GLUCK:

21  Q.  Are you scheduling all of these meetings?

22             MR. LAUER:  Objection.

23             THE COURT:  No.  You misunderstood the objection.

24             MR. GLUCK:  Oh.

25             THE COURT:  So do you mean all of the --

Mce2Pla1                         Bodner - Cross

1              MR. GLUCK:  The ones we just looked at?

2              THE COURT:  Just the last couple.

3              MR. GLUCK:  Correct.

4              THE COURT:  Not the previous four or five or six.

5              MR. GLUCK:  No, the ones that specifically say --

6              THE COURT:  All right.  So the last couple ones we

7    looked at appear to be ones that you set up, yes?

8              THE WITNESS:  Appears to be that, yes.

9              THE COURT:  Okay.  So these were fairly regular

10   meetings, yes?

11             THE WITNESS:  They were meetings that we used to have,

12   yeah, fairly regularly, if you call that.

13             THE COURT:  And Mr. Nordlicht was usually there, yes?

14             THE WITNESS:  Yes.

15             THE COURT:  And I think you told us previously he

16   would make some presentation, you would have a small note or

17   two regarding the situation at Platinum, yes.

18             THE WITNESS:  Yes.

19             THE COURT:  So is it your testimony that you never

20   discussed with him NAV?

21             THE WITNESS:  I never -- I mean, I did -- I could have

22   asked him how much money the fund has, if that's what you mean

23   by NAV, how much money the fund has.  I never discussed how we

24   came to this NAV.  I might have just asked --

25             THE COURT:  Okay, I understand your answer.  The

Mce2Pla1                          Bodner - Cross

1    question is why not?

2              THE WITNESS:  I had no reason to.

3              THE COURT:  Okay.

4              MR. GLUCK:  Move this into evidence, please.

5              MR. LAUER:  We don't have an objection.  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 1205 received in evidence)

8              MR. GLUCK:  PX 1244, please.  Move into evidence.

9              MR. LAUER:  No objection.

10             THE COURT:  Received.

11             (Plaintiff's Exhibit 1244 received in evidence)

12   BY MR. GLUCK:

13   Q.  This is another meeting you are scheduling?

14   A.  It could be me, it could be Murray.  I think, you know,

15   with Angela, it is probably me, but I can't say for sure.

16   Q.  Do you see at the bottom -- do you see at the bottom where

17   it says "Can you do a partner with Uri, Murray and Mark?

18   A.  Yes.

19   Q.  That presumes you, right?

20   A.  It says "Hi, Uri, can you do a partners meeting with Uri,

21   Murray, and Mark?"  It doesn't make sense to me.  She is asking

22   Uri if he can do a meeting with Uri?  Oh.  I'm sorry.  I see

23   sent back, "I assume you mean David instead of Uri.  Ironically

24   David is my middle name."  Yes.

25   Q.  Thank you.

1           Take this down, Mr. Parson.

2           PX 1108, please.  Move to admit.

3           MR. LAUER:  Wait.

4           No objection.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 1108 received in evidence)

7           MR. LAUER:  What number was this?

8           MR. GLUCK:  That was 1108.

9    BY MR. GLUCK:

10   Q.  And this is a calendaring by -- for PPVA meeting with Uri

11   Landesman and investor Erani, Ezra Erani?

12   A.  I don't know if Ezra Erani was an investor in the fund.  I

13   know Ezra Erani.

14   Q.  Who is he?

15   A.  Ezra Erani is a Sephardic Jew.  He is a very charitable

16   person.  I used to meet with him about giving me money for

17   charity for the parties that we used to make twice a year.  He

18   used to sometimes attend it also.  More than that, I did not

19   speak to Ezra Erani about.

20   Q.  Prior to Mr. Landesman's joining Platinum Management as

21   president, you didn't have any social or business connection to

22   him, did you?

23   A.  I did.  I just testified.

24   Q.  Mr. Landesman?

25   A.  No, Mr. Landesman, no.  I thought you mend Ezra Erani.

1    Q.  I think you misheard my question.

2             Prior to Mr. Landesman joining Platinum Management,

3    you didn't have any social or business connection to

4    Mr. Landesman, did you?

5    A.  No, I did not.

6    Q.  Mr. Landesman is Platinum Management president, right?

7    A.  Yes, he was.

8    Q.  You are saying this meeting could have been about charity?

9    A.  The part with me and Ezra Erani, I did not attend investors

10   meeting if somebody was pitching him.  It was usually Murray

11   himself, Uri himself, Bernie Fuchs or jointly Bernie Fuchs,

12   Murray.  I did not attend these meetings.  I sat in my office

13   myself.  I did attend if it was somebody that I could solicit

14   for my parties, my charity.  I would go in and ask them if they

15   could come to the party and donate.

16   Q.  And then you don't know that Mr. Erani was an investor in

17   PPAV?

18   A.  I'm sorry.  I don't know that.

19            MR. GLUCK:  PX 1441, please.  Move into evidence

20            MR. LAUER:  One second.

21            I object to this.  We are not on it.

22            MR. GLUCK:  This is a business record.

23            THE COURT:  Hold on.

24            Yeah, I think on its face it's a business record.

25   Received.

1                    (Plaintiff's Exhibit 1441 received in evidence)

2    BY MR. GLUCK:

3    Q.  Is Mr. Erani an investor in PPVA?

4    A.  From this e-mail it looks like he was sent a subscription

5    agreement.

6    Q.  Is he one of your contacts?

7    A.  Ezra Erani was not my contact.  I knew him.  It was more

8    Murray's contact, but I did know him.

9    Q.  PX 1132, it's three days after your meeting with the

10   subscription agreement?

11               MR. LAUER:  Object to that.

12               THE COURT:  I think you just need to put questions.

13               MR. GLUCK:  Okay.  We move to admit this as well.

14               MR. LAUER:  No objection.

15               THE COURT:  Received.

16                    (Plaintiff's Exhibit 1132 received in evidence)

17   BY MR. GLUCK:

18   Q.  Who is Aaron Elbogen?

19   A.  Person I did a lot of business with, investing in deals

20   that he had.

21   Q.  Former partner with yourself and Murray Huberfeld?

22   A.  We both invested with him.

23   Q.  He an investor in PPVA?

24   A.  He was an investor in PPVA.

25   Q.  Andy Katzenstein, do you remember him?

Mce2Pla1                    Bodner - Cross

1   A.   I remember Randy Katzenstein coming to the office and

2   showing me some sort of a trading platform.

3   Q.   Did he pitch to be part of Platinum?

4   A.   He didn't pitch me that.  He pitched me a strategy if I

5   would invest in it.

6   Q.   You don't remember?

7   A.   I remember that he showed me some -- I didn't understand it

8   fully, but he showed me some sort of a trading platform.

9   Q.   All right.  Did he want Platinum to invest, Katzenstein?

10  A.   If I remember correctly, he met with me about myself

11  putting money into his platform.

12  Q.   Just you, not Platinum?

13  A.   No, I don't know.

14  Q.   Not Beechwood?

15  A.   I don't know.  He met with me.  He met with me and Murray.

16          MR. GLUCK:  PX 1134, please.  Move it into evidence.

17          MR. LAUER:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 1134 received in evidence)

20  BY MR. GLUCK:

21  Q.   Who is Richard Stadtmauer?

22  A.   Richard Stadtmauer was a friend a long time.  I invested in

23  a lot of real estate with him and some other stuff.

24  Q.   Investor in PPAV?

25  A.   Yes, he was.

1  Q.  Tzvi Rosenblum?

2  A.  I mentioned before Tzvi Rosenblum was a person who was on

3  drugs.  I took him under my wings to try to bring him back as a

4  productive member of society.

5  Q.  George Weinberger?

6  A.  George Weinberger was probably a charity meeting.  He was

7  the chairman of an organization called Agudath Israel.

8  Q.  The 5 p.m. meeting to see the property in Westchester, is

9  that a reference to Agera?

10  A.  No, that's not.  That's a reference to a drug center.

11  Q.  Drug center.

12  A.  Yes, to open up a drug center.

13  Q.  Did Mr. Weinberger own nursing homes with Bernie Fuchs?

14  A.  I have no idea.

15  Q.  Let's do PX 1226.

16          MR. LAUER:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 1226 received in evidence)

19  BY MR. GLUCK:

20  Q.  Who is Karen Lau?

21  A.  Karen Lau was -- to my recollection was Mark Nordlicht's

22  secretary.

23  Q.  PPVA invested in China Horizon, right?

24  A.  Yes.

25  Q.  Did you attend this meeting?

Mce2Pla1                          Bodner - Cross

1    A.  It sounds like I attended it, yes.

2              MR. GLUCK:  Plaintiff Exhibit 433, please.

3              MR. LAUER:  Object on that.  No connection.  I

4    withdraw it.  No objection.

5              THE COURT:  Received.

6              MR. LAUER:  Hard to read.

7              (Plaintiff's Exhibit 433 received in evidence)

8    BY MR. GLUCK:

9    Q.  Thor Equities?

10   A.  Thor Equities was something that was owned by somebody Joey

11   Sitt.

12   Q.  And why did you want him to see this?

13   A.  If I remember correctly, Alan Clingman was looking for

14   money for China Horizon and I felt that maybe Joey Sitt could

15   be a partner and invest money in China Horizon.

16   Q.  You were trying to arrange for a bridge loan?

17   A.  I was introducing him to somebody who I felt would have an

18   interest in something like this.

19   Q.  Thank you, Mr. Bodner.

20   A.  I'm finished?

21   Q.  In my book.

22              MR. LAUER:  We have no questions.  Thank you,

23   Mr. Bodner.

24              THE WITNESS:  Thank you.  Thank you, your Honor.

25              THE COURT:  Thank you very much.  You may step down.

1          THE WITNESS:  Thank you, your Honor.

2          (Witness excused)

3          THE COURT:  Call your next witness.

4          MS. MOSSE:  We call John Czapla.

5    JOHN CZAPLA,

6         called as a witness by the defendant,

7         having been duly sworn, testified as follows:

8          THE COURT:  Counsel.

9    DIRECT EXAMINATION

10   BY MS. MOSSE:

11   Q.  Good morning, Mr. Czapla.

12   A.  Good morning.

13   Q.  Where do you currently work?

14   A.  Valuation Research Corporation.

15   Q.  What's your title?

16   A.  Senior managing director of the portfolio valuation group

17   and I'm also the chairman of the group.

18   Q.  What type of company is Valuation Research Corporation?

19   A.  It's a consulting firm on valuations, providing valuation

20   consulting services --

21   Q.  How many --

22   A.  -- to keep it concise.

23   Q.  How many employees does it have?

24   A.  About 250.

25   Q.  And does it also go by VRC?

Mce2Pla1                          Czapla - Direct

 1   A.  It does, VRC.

 2   Q.  So I may sometimes say VRC instead of saying Valuation

 3   Research Corporation.

 4   A.  That's fine.

 5   Q.  How long have you been at VRC?

 6   A.  Since 1999.

 7   Q.  Have you worked there continuously that whole time?

 8   A.  Yes.

 9   Q.  What's your highest level of education?

10   A.  Bachelor of arts in -- from the University of Pittsburgh.

11   Q.  Do you hold any professional licenses or degrees?

12   A.  I have a CFA, charter financial analyst.

13   Q.  I hear that's a very prestigious --

14   A.  It's very challenging.

15   Q.  Congratulations.

16            Are you familiar with a company called CohnReznick?

17   A.  I am.

18   Q.  And are you familiar with a company called Platinum

19   Partners Value Arbitrage Fund or PPVA?

20   A.  Yes.

21   Q.  Did there come a time that VRC was engaged by CohnReznick

22   to provide certain valuation services in connection with its

23   audit of PPVA's financial statements?

24   A.  That is correct, yes.

25   Q.  And was that in connection with the audit of PPVA's

Mce2Pla1                         Czapla - Direct

1   financial statements for the year ended December 31, 2014?

2   A.   Yes, 2014, um-hmm.

3   Q.   And what was the scope VRC's engagement?

4   A.   To provide an independent valuation opinion, it was a range

5   of values on I think it was two oil and gas companies.

6   Q.   Do you recall the names of those oil and gas companies?

7   A.   I would say one was Golden Gate and then north something,

8   Northfield, Northstar.

9   Q.   Northstar?

10  A.   Yeah.  Um-hmm.

11  Q.   You said to provide a range of values.  What does that

12  mean?

13  A.   So we provide -- as it sounds, we provide independent range

14  of values all low and higher range, a reasonable range of

15  values we call that.

16  Q.   Why is a low and high range of values something that VRC

17  provides?

18  A.   That is what was requested from the client to have a

19  reasonable range of values as opposed to a point estimate.

20  Q.   When you say a reasonable range of values, does that mean

21  that any value that falls within that low or high range is

22  considered by VRC to be reasonable?

23  A.   Yes.

24             MR. GLUCK:  Objection.

25             THE COURT:  I assume the objection is for leading and

1     the objection is sustained.  Put another question.

2     BY MS. MOSSE:

3     Q.  What do you mean by a reasonable range of values?

4     A.  Just a low-high range we think is reasonable that someone

5     would actually theoretically pay for an entity.

6     Q.  Did VRC prepare a written report setting forth the results

7     of its work?

8     A.  We did.

9     Q.  Can we please pull up, Mr. Robson, DX 763.

10            Is this the written report that VRC prepared?

11    A.  Yes.

12            MS. MOSSE:  We offer it.

13            MR. GLUCK:  No objection.

14            THE COURT:  Received.

15            (Defendant's Exhibit 673 received in evidence)

16    BY MS. MOSSE:

17    Q.  Mr. Czapla, your name is on the bottom of this report.  It

18    says, "Contact John Czapla."  Do you see that?

19    A.  Yes.

20    Q.  And it says that this report is prepared for CohnReznick.

21    Do you see that?

22    A.  I do.

23    Q.  Was VRC, just to clarify, engaged by CohnReznick or by

24    PPVA?

25    A.  By CohnReznick.

1    Q.  Can we turn, please, to page 4 of the report.  This is a

2    section entitled Engagement Overview.

3    A.  Um-hmm.

4    Q.  And if you look at the second paragraph, first line, you

5    see, "The investments subject to valuation are Golden Gate and

6    Northstar for which we provide a range of values."

7          Is that accurate that VRC provided a range of values

8    for Golden Gate and Northstar?

9    A.  Yes.

10   Q.  Can we --

11         THE COURT:  It goes on in the very same sentence to

12   say "and Golden Globe, for which we provided a negative

13   assurance opinion on Platinum's internal valuation."  What does

14   that mean?

15         THE WITNESS:  So there was -- it looks like there was

16   a third entity where we were asked to look at Platinum's

17   internal valuation work papers and simply opine if it was

18   reasonable or not, so not to provide an independent opinion.

19   It's a lighter opinion.

20         THE COURT:  So you -- a negative assurance opinion on

21   Platinum's internal valuation is your opinion that they got it

22   wrong.

23         THE WITNESS:  That it's not unreasonable.

24         THE COURT:  That their valuation was not reasonable.

25         THE WITNESS:  Not unreasonable.  So we are saying it

Mce2Pla1                          Czapla - Direct

```
 1   is okay.
 2            THE COURT:  So not unreasonable?
 3            THE WITNESS:  Yeah.  That's how it is defined.
 4            THE COURT:  So -- well, that's all and good, but since
 5   neither the jury nor I are familiar with your definitions,
 6   that's why I am trying to figure out what this means.
 7            THE WITNESS:  Sure.
 8            THE COURT:  So a negative assurance opinion is a
 9   statement that their valuation is not unreasonable.
10            THE WITNESS:  Correct.
11            THE COURT:  As opposed to a statement that their
12   valuation is reasonable.
13            THE WITNESS:  Correct.
14            THE COURT:  Why the difference?
15            THE WITNESS:  You have to ask my -- our lawyers, I
16   guess they deem that a lighter opinion -- that not unreasonable
17   is a lighter opinion than a reasonable opinion.
18            THE COURT:  When you say a lighter opinion, what do
19   you mean.
20            THE WITNESS:  As opposed to giving an actual point
21   estimate.
22            THE COURT:  Well, are you saying that the negative
23   assurance opinion says that you have less confidence in their
24   internal valuation than you did when you give a positive
25   assurance opinion.
```

1          THE WITNESS:  You could say that.

2          THE COURT:  Well, I'm asking you.

3          THE WITNESS:  It's -- I would say it is similar, but

4  the distinction for us is really the difference between

5  providing an actual point estimate or a range of values or an

6  opinion such as this that their -- what Platinum put together

7  is not unreasonable.  We are not doing the full-level diligence

8  that we would normally do.

9          THE COURT:  Go ahead.

10  BY MS. MOSSE:

11  Q.  Mr. Czapla, you used the term "point estimate" a few times.

12  What does that mean?

13  A.  It means just a single valuation opinion.

14  Q.  In case it wasn't clear, who is CohnReznick?

15  A.  They are an audit firm, an accounting firm.

16  Q.  If you look at the last paragraph on page 4, it says,

17  "Based on its review of the subject investments, and in

18  reliance thereon, VRC believes that its concluded valuations

19  represent fair value as of the valuation date."

20  A.  Um-hmm.

21  Q.  What does "fair value" mean?

22  A.  It's a definition, an accounting definition.  It's willing

23  buyer, willing seller, having all information, and arm's length

24  transaction.

25  Q.  And what does "as of the valuing" mean?  Why is a range

1    provided as of a certain valuation date?

2    A.  The valuation date here was I believe December 31, 2004, so

3    it's an opinion of value as of a particular date and time.

4              THE COURT:  Right above that it says "the fair value

5    of each investment is ultimately determined in good faith by

6    Platinum."

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Do you know whether they are exercising

9    good faith or not?

10             THE WITNESS:  I don't.  We provide the opinion to help

11   support -- in this case it was to support an audit.  It was up

12   to them in all of our engagements like this, it is ultimately

13   the managers responsible for coming up with the final

14   valuations.

15             THE COURT:  So my question was do you know whether

16   they are exercising good faith or not?

17             THE WITNESS:  I do not.

18             THE COURT:  All right.

19   BY MS. MOSSE:

20   Q.  Did VRC communicate directly with any Platinum personnel

21   during the course of its engagement?

22   A.  I believe so.

23   Q.  Do you recall who at Platinum VRC communicated with?

24   A.  I do not.

25   Q.  Did VRC communicate directly with CohnReznick during the

Mce2Pla1                          Czapla - Direct

1   course of this engagement?

2   A.  We did.

3   Q.  And did VRC receive documents from CohnReznick during the

4   course of its engagement?

5   A.  I don't remember.

6   Q.  Did VRC have documents that it reviewed in connection with

7   producing this report?

8   A.  Who is "them," CohnReznick?

9   Q.  Sorry?

10  A.  Who is "them"?

11  Q.  Did VRC have documents that it reviewed in order to produce

12  this report?

13  A.  We had documents, yes.

14  Q.  Do you know where it got those documents from?

15  A.  From Platinum.

16  Q.  Directly from Platinum?

17  A.  I don't recall.

18  Q.  Was VRC free to ask for additional documents if it wanted?

19  A.  Yes.

20  Q.  And did VRC do that during the course of its engagement?

21  A.  I don't recall.

22  Q.  Can we turn, please, to page 10.  What does this page

23  reflect?

24  A.  Excuse me?  I missed the last part.

25  Q.  What is reflected on this slide?

Mce2Pla1                         Czapla - Direct

1   A.   This is an overview or Golden Gate Oil and ultimately there

2   is a valuation opinion or conclusion in the middle.

3   Q.   Mr. Robson, can you zoom in on the valuation conclusions,

4   please.

5            So is this the range of values that VRC provided for

6   Platinum's investment in Golden Gate as of December 31, 2014?

7   A.   That is correct.

8   Q.   You talked before about providing ranges.  Why is a low,

9   mid, and high value provided?

10  A.   It is just how we show it, how clients like to see it.

11  Q.   Can we zoom out, please.  If we look at the box "Investment

12  Thesis and Risks" on the right side towards the top of the

13  page, can we zoom in on that, please.  What's an investment

14  thesis?

15  A.   It's an objective of the investor or Platinum, what they

16  are trying to get out of the investment.

17  Q.   And what's investment risk?

18  A.   The challenges that may happen or may incur that may be

19  negative on the investment.

20  Q.   And these are all risks that VRC took into account when

21  arriving at a range of values?

22  A.   Yes.

23  Q.   What's commodity price risk?

24  A.   In this case oil, the risk that oil and gas prices change.

25  Q.   And how was that a risk with respect to Platinum's

Mce2Pla1                          Czapla - Direct

1   investment in Golden Gate?

2   A.   They -- Golden Gate is an oil and gas exploration company.

3   Q.   So what impact would a change in the price of oil --

4   A.   They sell oil and gas, so it's -- if the price of oil and

5   gas moves, then the economics of the business will change.

6   Q.   What's execution risk?

7   A.   That in this case it's oil and gas, that they successfully

8   drill and extract oil and gas from the field.

9   Q.   So execution risk is the risk of not being able to

10  successfully drill or --

11  A.   It's a general term, but it's how we perceive it in this

12  case.

13  Q.   And what is integration risk?

14  A.   Here I'm not sure.  I'm not sure what that meant for these

15  guys.

16  Q.   Do you have a general understanding of that term with

17  respect to your experience in other investments?

18  A.   It can mean a lot of different things.  I don't know.

19  Q.   Fair enough.

20        Can we zoom out, please?  Can we zoom in, please, on

21  the bottom section "Valuation Considerations and Conclusion

22  Highlights."

23        I just want to briefly go over these four bullets with

24  you.

25        The first one refers to VRC's reliance on three

Mce2Pla1                    Czapla - Direct

1    industry standard market value approaches.

2    A.   Yes.

3    Q.   And the first one is a multiple to proved reserves.  What

4    does that mean?

5    A.   Okay.  I'm trying to be as eloquent as I can here.  Proved

6    reserves, it's an engineering term.  It has the highest

7    probability of success of being pulled out of the ground

8    economically.

9    Q.   The next one is a multiple to PV10.  What does that mean?

10   A.   So -- a multiple, to be clear, a multiple's value to

11   something.  In this case PV10 means present value 10.  It is

12   an -- from an engineering report, PV10 means present value 10

13   at a 10 percent discount rate, so it's taking a stream of cash

14   flows from an engine or reserves -- from reserves economic cash

15   flows and discounting those cash flows back by a rate of 10

16   percent.

17   Q.   And what about the third bullet, a multiple to FY16 EBITDA?

18   A.   That means fiscal year '16, or 2016, in this case EBITDA

19   means earnings before interest, taxes, depreciation, and

20   amortization.  It's a proxy for a cash flow term.

21   Q.   And --

22   A.   Or earnings.

23   Q.   The last sentence of that bullet reads, "We did not utilize

24   a DCF analysis in our valuation due to lack of reliable

25   individual cash flow projections for GGO."  What does that

1    mean?

2    A.  DCF means a discounted cash flow analysis.  It's a standard

3    valuation methodology which comes up with value looking at

4    projections or cash flows from a company which we are saying we

5    didn't have to do that type of analysis.

6    Q.  Why did you look to fiscal year 16 for bullet three that we

7    just reviewed?

8    A.  I'm not sure.  It's a forecast year.  I'm not sure why that

9    was chosen.

10   Q.  The next bullet, which we don't need to review in detail,

11   that describes VRC considering a change in oil prices, is that

12   correct?

13   A.  Yes.

14   Q.  And this notes that there was a material decline in the

15   price of oil beginning in October 2014?

16   A.  That's correct.

17   Q.  And the last sentence says, "The company revised down its

18   2015-2017 forecast and Platinum reestimated P1 PV10 reserve

19   values, using YE NYMEX forward strip pricing from over $600

20   million to just over $400 million," what does that mean?

21   A.  It means the company, based on lower oil prices, had their

22   model -- changed their model where the value, internal

23   valuation was lower.

24   Q.  The next bullet refers to comparable publicly traded oil

25   and gas exploration companies.

Mce2Pla1                         Czapla - Direct

1   A.  Um-hmm.

2   Q.  What are comparable companies?

3   A.  Comparable means similar companies to the subject company.

4   Q.  And that's a factor that's taken into consideration when

5   arriving at a range of value for an oil and gas asset?

6   A.  Yes, we were trying to find similar companies to use as

7   benchmarks for the valuation.

8   Q.  And finally the fourth bullet refers to the high level of

9   PUD reserves about 100 percent of proved reserves.  What are

10  PUD reserves?

11  A.  I will try my best here.  It stands for proven undeveloped,

12  so it's an engineer term.  It means they are in the ground but

13  they are not known economically to be economic, so they are

14  undeveloped.  They are not yet developed.

15  Q.  So this reflects that Golden Gate, about 100 percent of its

16  proved reserve for these not yet proved to be economic

17  undeveloped -- undeveloped reserves?

18  A.  I shouldn't say economic.  It means -- undeveloped means

19  there is not flowing or drill -- there is not wells in the

20  ground or actually flowing oil that could sell.  It's an

21  engineering term that they think they are there but they

22  haven't been drilled yet.

23  Q.  So VRC took that fact into account when arriving at its

24  range of values for Platinum's investment in Golden Gate?

25  A.  Yes.

Mce2Pla1                    Czapla - Direct

1   Q.  And this says that PUD reserves require high cap ex.  What

2   is cap ex?

3   A.  Cap ex means capital expenditures.

4   Q.  I would like to turn quickly to Northstar.  That's on page

5   17 of the report, please.  Can we turn to 18, please.

6          Is this an investment summary slide for Northstar

7   similar to the one that we just looked at for Golden Gate?

8   A.  That's correct.

9   Q.  And if you zoom in, please, Mr. Robson, on the "Security

10  Valuation Conclusions" box, this reflects VRC's range of low,

11  mid, and high values for Platinum's investment in Northstar as

12  of December 31, 2014, is that right?

13  A.  Yes.

14  Q.  And again, VRC provided a low, mid, and high range of

15  values?

16  A.  Yes.

17  Q.  Can we zoom out, please.  There is an "Investment Thesis

18  and Risks" box similar to the one that we looked at before.

19  Were the same investment theses and risks generally considered

20  by VRC with respect to its valuation of Northstar as it

21  considered for Golden Gate?

22  A.  The way it is stated it looks so, it looks to be.

23  Q.  There is a reference in the second thesis point to

24  attractive entry valuation.  Do you know what that is referring

25  to?  And maybe you can zoom out.

Mce2Pla1                          Czapla - Direct

1   A.  Yeah, I'm not sure.

2   Q.  If you look at the point "investment," the second section

3   from the top, does this help to provide some context for what

4   attractive entry valuation meant?

5   A.  Yes.  It appears it is stating that they purchased the

6   assets from a company called NGP that was nearing the end of

7   its fund life.  It says they were motivated to divest their

8   assets because of that.

9   Q.  Zoom out please.  I believe you said, Mr. Czapla, that this

10  report was used in connection with CohnReznick's audit of

11  Platinum's financial statements, is that right?

12  A.  Yes.

13  Q.  What was your understanding of how this report would be

14  used?

15  A.  I don't know.  I don't know how they were going to use it

16  specifically.

17  Q.  Is this the only valuation report that VRC was engaged to

18  provide by CohnReznick in connection with its audit of

19  Platinum.

20  A.  Well, there is two.  There is Northstar and the Golden Gate

21  if that's what you mean yet.

22  Q.  In this single document?

23  A.  Yes.

24  Q.  Is there another report like this or is this it?

25  A.  I don't believe so.

Mce2Pla1                          Czapla – Direct

1              MS. MOSSE:  Thank you, Mr. Czapla.

2              THE COURT:  Cross-examination.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. GLUCK:  Could I trouble defense counsel to call up

2     763, which was just on the screen.

3     CROSS-EXAMINATION

4     BY MR. GLUCK:

5     Q.  You were retained to do a limited scope valuation of

6     certain of PPVA's assets?

7     A.  Yes.

8     Q.  Limited scope means the analysis you conducted was limited

9     as described in your opinion?

10    A.  I believe so.

11    Q.  If you can speak into the microphone.

12          You didn't conduct any independent reviews of the

13    management of the assets, did you?

14    A.  No.

15    Q.  You didn't conduct any independent reviews of the portfolio

16    companies that you were analyzing balance sheets, i.e.,

17    Northstar, i.e., Golden Gate?

18          MS. MOSSE:  Objection.  Form.  Compound.

19          MR. GLUCK:  Withdrawn.

20    Q.  You didn't conduct any independent review of portfolio

21    company Golden Gate's balance sheet, did you?

22    A.  No.

23    Q.  You didn't conduct any independent review of portfolio

24    company Northstar's balance sheet, did you?

25    A.  No.

MCECpla2                          Czapla – Cross

1    Q.  You didn't contact any company creditors, did you?

2    A.  No.

3    Q.  Did you review its cash flows independent of the

4    information provided to you by Platinum Management?

5    A.  No.

6    Q.  Do you know why you weren't retained to do a valuation on

7    all of PPVA's assets?

8                MS. MOSSE:  Objection.

9                THE COURT:  Sustained.

10               MR. GLUCK:  Please turn to page 4.

11   Q.  Does page 4 represent the limited scope engagement that we

12   just described?

13   A.  Does it represent the engagement?

14   Q.  Is this a statement of the limited scope of the engagement?

15   A.  It's a statement of the scope, what we did.

16   Q.  Do you recall interacting with Mr. Joe SanFilippo at

17   Platinum?

18   A.  No.

19               MR. GLUCK:  Page 5, please.

20   Q.  Please read the second paragraph and tell the jury what it

21   means.

22   A.  The one that starts financial statements?

23   Q.  Yes.  Would you please read it.

24   A.  I'm sorry?

25   Q.  Could you please read it to the jury.

MCECpla2                    Czapla - Cross

A.   Financial statements and other related information provided
by our clients or their representatives in the course of this
investigation have been accepted, without verification, as
fully and correctly reflecting the business conditions and
operating results for the respective periods, except as
specifically noted herein, of each relevant entity.  All other
information presented during the investment periods represents
deal diligence performed by Platinum.

Q.   So you just accepted what they said without any
verification?

          MS. MOSSE:  Objection.

          THE COURT:  Overruled.

A.   Yes.

Q.   And all of the diligence was done by Platinum?

A.   Yes.

Q.   Could you please read the final paragraph, saying we do not
provide assurance.  Third to final, we do not provide assurance
on the achievability.

A.   You want me to read that?

Q.   Yes.

A.   We do not provide assurance on the achievability of the
results forecasted by our client or any of the subject entities
on the performance of the subject entities because events and
circumstances frequently do not occur as expected; differences
between actual and expected results may be material; and

MCECpla2                        Czapla - Cross

1    achievement of the forecasted results is dependent on actions,

2    plans, and assumptions of management.

3    Q.  You didn't do any due diligence on these companies?

4              MS. MOSSE:  Objection.  Asked and answered.

5              MR. GLUCK:  Excuse me.

6    Q.  You didn't independently verify the revenues of these

7    companies, did you?

8    A.  No.

9    Q.  Did you confirm their expenses?

10   A.  No.

11   Q.  Did you visit oil fields?

12   A.  No.

13   Q.  Did you interview any of the petroleum --

14   A.  No.

15   Q.  Did you meet with any of the management?

16   A.  Of the companies?

17   Q.  Platinum companies.

18   A.  No.

19   Q.  In particular, did you ever meet with a gentleman named Jed

20   Latkin?

21   A.  No.

22             MR. GLUCK:  Please turn to page 10.

23   Q.  On thesis, were you aware that directional and horizontal

24   drilling had already been attempted?

25   A.  It's an oil and gas well, I assume it's been attempted.

MCECpla2                          Czapla - Cross

1   Q.   In the last year.

2   A.   What's your question?  Specifically in the last year?

3   Q.   Yeah.  In the past year, did this --

4   A.   Have they -- you're asking the last year.  So, to be

5   specific, so 2014 is when we did the valuation.  So you're

6   asking --

7   Q.   I'll be very specific.  Are you aware that directional and

8   horizontal drilling did occur within 2013 and 2014?

9   A.   I'm not sure.  I don't remember.

10  Q.   Were you told that they were pumping up water?

11            MS. MOSSE:  Objection.

12            THE COURT:  Overruled.

13  A.   I don't believe so.

14  Q.   Were you told that they had no sellable oil?

15  A.   I don't believe I was told that.

16  Q.   Is prolific past production in these fields, what's that a

17  reference to?

18  A.   It means historically, prolific means does well.  It's

19  saying that those fields in the past, prolific defining

20  prolific as doing well.

21  Q.   You're talking about when these same fields were drilled in

22  the '80s?

23  A.   I don't know when it was.

24  Q.   This report is a valuation date of 12/31/14, issued in

25  2015; is that right?

MCECpla2                        Czapla - Cross

1   A.  That's correct.

2   Q.  Who was the new management team?

3   A.  I'm sorry.  I missed that.

4   Q.  Who was the new management team?

5   A.  I have no idea.

6   Q.  Was there a management team?

7   A.  At Platinum or Golden Gate?

8   Q.  At Golden Gate.

9   A.  I don't know.

10  Q.  Were you aware of whether they were operating, Golden Gate?

11  A.  Meaning as a going concern?

12  Q.  Yeah.

13  A.  Our assumption was they were going concern.

14  Q.  That's your assumption?

15  A.  Uh-huh.

16          THE COURT:  Excuse me, sir.  Put page 11 on the

17  screen.

18          By the way, is this the size of the actual report?

19          THE WITNESS:  Terms of number of pages or --

20          THE COURT:  In terms of the size of the print.

21          THE WITNESS:  I don't know.

22          THE COURT:  So, on page 11 towards the bottom under

23  the heading financial performance review, do you see that?

24          THE WITNESS:  Yes.

25          THE COURT:  It says historical performance was not

MCECpla2                    Czapla - Cross

1   provided.  I'll stop there.  What does that mean?

2            THE WITNESS:  I'm presuming -- I don't recall

3   specifically, but we may not have had financials, sellable

4   financials.

5            THE COURT:  For a prior year?

6            THE WITNESS:  Yes.

7            THE COURT:  Sentence goes on, but was not deemed

8   relevant for GGO.  What's GGO?

9            THE WITNESS:  I believe that's an acronym for Golden

10  Gate Oil.  That's the subject company.

11           THE COURT:  As the management team was replaced in

12  mid-2014 after drilling a couple wells that were well over

13  budget.

14           Do you see that?

15           THE WITNESS:  Yes.

16           THE COURT:  So you didn't know how prior management

17  had done it because historical performance was not provided,

18  and the only thing you knew about the new management was that

19  they came in in the middle of this year after there was a

20  problem with two wells going well over budget, yes?

21           THE WITNESS:  Yes, that's what it looks like from

22  here.

23           THE COURT:  So why did that not cause you to cause you

24  concern?

25           THE WITNESS:  I don't know if it was concern.  Just

MCECpla2                        Czapla - Cross

1   what we base the valuation on is a more forward look.  There

2   were engineering reports that were done on the field that we

3   rely more on in terms of as we state, you know, we can't opine

4   on the execution strategy if we don't know.

5            THE COURT:  All right.

6            MR. GLUCK:  Could you please highlight credit profile

7   and liquidity.

8   BY MR. GLUCK:

9   Q.  Could you please read that out loud.

10  A.  It is our understanding that the debt is to a related

11  Platinum entity.  We presume the debt is in good standing.  We

12  note that GGO's PV-10 provides generous coverage to the debt,

13  even at 12/31/2014 strip pricing, which was $324 million.  We

14  also presume that Platinum will provide the necessary funding

15  for current working capital and future CapEx needs to meet the

16  projections.

17  Q.  Why did you presume that that is in good standing?

18  A.  Because otherwise it wouldn't be a going concern.

19  Q.  Did someone tell you that?

20  A.  I believe so, if we're stating here our assumption was that

21  the business was a going concern and it would execute on the

22  strategy for which the engineering report was based on.

23  Q.  Do you know what Beechwood is?

24  A.  No.

25  Q.  You referred to an engineering report that formed the basis

MCECpla2                        Czapla - Cross

1   of this PV-10.  Do you remember who prepared that report?

2   A.  I do not.

3   Q.  Do you recall reviewing an NSAI report on Golden Gate Oil?

4   A.  I don't recall.

5   Q.  Would it help your recollection if I were to bring an NSAI

6   report on Golden Gate Oil up?

7   A.  It's too long ago.  I wouldn't remember.

8   Q.  How many engineering reports did you have?

9   A.  I don't remember.

10          MR. GLUCK:  The last sentence of company outlook:

11  Also, given the land has already been vertically drilled.  Do

12  you mind highlighting that, Mr. Parson.

13  Q.  If you didn't investigate any expenses, why were you saying

14  that the cost per well would be lower?

15  A.  That could have been a statement from the company or

16  provider from the company to us.

17  Q.  Did you have an understanding of Platinum's financials?

18  A.  No.

19  Q.  But you presumed that Platinum would provide the necessary

20  funding for current working capital and future CapEx needs to

21  meet projections?

22  A.  That's correct.

23  Q.  Did you presume that because if a third party were to come

24  in and provide CapEx funding, PPVA's funding would be diluted?

25          MS. MOSSE:  Objection.

MCECpla2                        Czapla - Cross

1          THE COURT:  Sustained.

2          Let me ask you, how could you presume that Platinum

3    would provide adequate financing if you didn't know whether or

4    not Platinum itself was undergoing liquidity problems?

5          THE WITNESS:  Is that a question for me, your Honor?

6          THE COURT:  Yeah.

7          THE WITNESS:  When we're engaged, we're not asking --

8    we're not doing diligence on the manager.  We're asked to do --

9    we were asked to perform a valuation on Golden Gate with

10   certain information that's provided.  If we're being asked to

11   do that, we're assuming it's a going concern.

12         THE COURT:  So if I understand what you're saying, are

13   you saying we're told by Platinum that they will do X, Y, and

14   Z, and we assume that to be true in doing our analysis?

15         THE WITNESS:  That's correct.

16         THE COURT:  How much more do you have?

17         MR. GLUCK:  Northstar and that's it.

18         THE COURT:  Okay.

19   BY MR. GLUCK:

20   Q.  This capital structure table, was that provided to you by

21   Platinum, as well?

22   A.  Yes.

23   Q.  You have no independent basis of capital structure of

24   Golden Gate?

25   A.  No, we don't do any forensic accounting on this.

MCECpla2                    Czapla - Cross

1              MR. GLUCK:  If you turn to page 15, please.

2   Q.  Did Golden Gate have any revenue in 2015?

3   A.  I have no idea.  The valuation was as of 2014.

4   Q.  Earnings before interest, EBITIA, what does that mean?

5   A.  Earnings before interest, taxes, interest, and

6   amortization.

7   Q.  How did you calculate EBITIA in 2014?

8   A.  The negative 2.9, is that what you're referencing?  That

9   would have been provided.

10  Q.  Who selected these comparables?

11  A.  Our team.

12  Q.  Could you describe your affiliation to CohnReznick?

13  A.  There's no affiliation.

14  Q.  There's none?

15  A.  It's just a relationship.

16  Q.  What is that relationship?

17  A.  Just someone we know.  Business relationship.

18  Q.  And CohnReznick relied on this to audit PPVA?

19  A.  I don't know what all their procedures were as part of

20  their audit.

21  Q.  But they told you they were going to rely on this to audit?

22  A.  They didn't tell me anything.  They engaged us to provide

23  opinion of value.

24  Q.  I'm sorry.  Didn't you testify earlier this morning that

25  they engaged you for their audit, PPVA?

MCECpla2                          Czapla - Cross

1   A.  I don't know what our engagement letter says specifically.

2   Q.  You don't remember?

3   A.  No.

4           MR. GLUCK:  Turn to page 4, please.  The fair value

5   sentence, if you wouldn't mind, Mr. Parson, highlighting that.

6   Q.  They told you they were going to be using this for their

7   audit; right?

8   A.  It appears so, yes.

9   Q.  Why doesn't this valuation represent an investment

10  recommendation or investment advice in any manner whatsoever?

11  A.  That's not what the scope of this is for.  The scope was to

12  provide an opinion of fair value for the stated purpose for

13  financial reporting.

14  Q.  Can this report be relied on in any manner whatsoever?

15          MS. MOSSE:  Objection.

16          THE COURT:  Sustained.

17  Q.  You were also tasked to review an investment called

18  Northstar?

19  A.  Yes.

20  Q.  If I was to ask you all the same questions about whether

21  you contacted management, reviewed the independent financials,

22  would all of those answers be the same as you gave for Golden

23  Gate also with respect to Northstar?

24  A.  Yes, sir.

25  Q.  Were you informed that the acquisition referred to was from

MCECpla2                        Czapla - Cross

1  Black Elk?

2             MS. MOSSE:  Objection.

3             THE COURT:  Overruled.

4  A.  I'm not sure.  I don't understand your question.

5  Q.  Can you please describe your understanding of this

6  Black Elk acquisition.

7  A.  I don't recall.  You want me to read in?  I mean, it's too

8  long ago to give the details.

9  Q.  Did you have an understanding of what Black Elk sold its

10 other assets for?

11 A.  Do I have an understanding?

12 Q.  Did you.

13 A.  I don't recall.

14 Q.  Did you do any due diligence on Black Elk?

15 A.  No.

16 Q.  Did you speak with Black Elk's CEO?

17 A.  No.

18 Q.  Were you told that these assets were actually a liability?

19 A.  No.

20             MS. MOSSE:  Objection.

21             MR. GLUCK:  I'll rephrase.

22             THE COURT:  Given the answer, I'll let it stand.

23             MR. GLUCK:  Sustained?

24             THE COURT:  No.  I said I would let it stand.

25             MR. GLUCK:  Let it stand.

MCECpla2                         Czapla - Cross

1   Q.  Were you told these assets were actually a liability?

2          MS. MOSSE:  Objection.

3          THE COURT:  Overruled.

4   A.  I don't recall.

5          THE COURT:  If you had been told that, would that have

6   changed your analysis?

7          THE WITNESS:  From what I recall, the way we handled

8   Black Elk, we treated it as an asset.  It was $65 million.

9   That's how we added it into the valuation.

10  Q.  Do you know what an plugging and abandonment liability is?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's generally a term for -- mostly used in the offshore

14  drilling area.  It could be anywhere, actually.  I shouldn't

15  say just offshore.  When you finish a well, environmentally,

16  you have to clean it up, plug it up.

17  Q.  Did you evaluate whether the assets being transferred from

18  Black Elk to Northstar had plugging abandonment liabilities

19  associated with them?

20  A.  I don't recall.

21  Q.  Did you evaluate whether there was any litigation

22  concerning Black Elk?

23  A.  I don't recall that.

24  Q.  Did you receive any engineering reports concerning

25  Northstar?

MCECpla2                    Czapla - Cross

1   A.  I believe we did.

2   Q.  PV-10?

3   A.  You'd have to flip to the next pages.  One more.  Yes,

4   those -- this page is the reserve figures.

5   Q.  Who provided that report?

6   A.  I can't see.  It may be in the footnotes, but I can't read

7   them.

8   Q.  Doesn't identify the report, just says provided by PPVA; is

9   that right?

10  A.  It says PPVA provided.

11          MR. GLUCK:  Can you please highlight the last page,

12  Mr. Parson, expected hold period.  Page 18.  Expected exit/hold

13  period.

14  Q.  Can you explain what this is?

15  A.  It's saying PPVA's exact exit strategy and hold period for

16  the investment are unknown.

17  Q.  Why did they need an exit strategy?

18          MS. MOSSE:  Objection.

19  Q.  Why are you commenting about this?

20          THE COURT:  He withdrew the question, so the question

21  you can answer is why were you commenting on this.

22  A.  I don't recall specifically why we were commenting on it.

23          MR. GLUCK:  Please highlight the investment overview.

24  Q.  You got these numbers from Platinum?

25  A.  There was really no numbers there.  It's just a date and

MCECpla2                      Czapla – Cross

1    what they own.  But, yes, it's says 100 percent, we would have

2    got that from them.

3    Q.   Why does it say N/A next to PPVA investment cost?

4    A.   We didn't have it.

5    Q.   But in your investment thesis, you say in tract of entry

6    valuation.  How can you say that if you didn't know what the

7    investment cost is?

8    A.   We must not have had the specific amount.

9    Q.   There's a star.  It says information from PPVA memo.  Did

10   you get a memo?

11   A.   I don't recall.

12   Q.   What debt was associated with Northstar?

13   A.   I'm sorry.  I missed that.

14   Q.   Northstar made bonds outstanding?

15   A.   I don't remember.

16   Q.   Secured debt?

17   A.   I don't know.

18   Q.   Did you receive periodic oil and gas update emails from

19   PPVA?

20   A.   Not that I recall.  We did one valuation, so we wouldn't

21   have been asked.

22   Q.   So over the course of your work, you wouldn't receive

23   here's what's going on with Golden Gate, here's what's going on

24   with Northstar emails from PPVA, Platinum?

25   A.   Not that I recall.

MCECpla2                    Czapla - Cross

1   Q.  When did you become aware that Golden Gate and Northstar's

2   wells were shutting?

3            MS. MOSSE:  Objection.

4            THE COURT:  Did you become aware of that?

5   Q.  Did you.

6   A.  Not that I know of, no.

7   Q.  There's a third asset on this valuation.  Can you tell us

8   about it.

9   A.  I don't recall which one is it.

10  Q.  Golden Globe?

11  A.  Golden Globe, that was -- the Judge was asking where we

12  delivered an assurance opinion.  I don't recall exactly what

13  that was.

14  Q.  Never even existed; right?

15           MS. MOSSE:  Objection.

16  Q.  Do you know if there was ever a company called Golden

17  Globe?

18  A.  I don't recall.  I mean, I don't know.  I didn't do a legal

19  analysis.  We didn't do a legal analysis.

20           MR. GLUCK:  Thank you.

21           THE COURT:  Redirect.

22           MS. MOSSE:  Very briefly.

23           Can we put up, please, of the exhibit that we were

24  just looking at, page 12, DX 763.

25  REDIRECT EXAMINATION

MCECpla2                    Czapla - Redirect

1   BY MS. MOSSE:

2   Q.  Mr. Czapla, you were asked about reserve reports that you

3   reviewed for Golden Gate.  Do you recall that?

4   A.  Yes.

5   Q.  And you were asked if you recalled who the engineer was

6   that produced the reserve report?

7   A.  Yes.

8           MS. MOSSE:  Can we zoom in, please, Mr. Robson, on the

9   reserve statistics box and the source note beneath it.

10  Q.  Do you see there the source of the reserve report?

11  A.  Yes, for Golden Gate, it was DeGolyer & McNaughton.

12  Q.  Is there a reference here to an initial report as of

13  December 31, '13, and then an update to the figures?

14  A.  Yes.

15  Q.  And do you recall why the reserve report figures were

16  updated?

17  A.  There were two different periods.

18  Q.  And there's a reference to forward 12/31/14 strip pricing.

19  Do you know what that means?

20  A.  Yeah, that's saying that was the -- that means the oil and

21  price curve as of 12/31/2014 going forward, as of that date.

22  Q.  So the reserve report was updated to take that into

23  account?

24  A.  Yes.  So it was updated from -- that note reads from

25  12/31/2013, to bring it forward to 12/31/2014 using 12/31/2014

MCECpla2                    Czapla – Redirect

1   for the prices.

2   Q.  You were asked if you did any diligence on Platinum or on

3   the portfolio companies.  Do you recall that?

4   A.  Yes.

5   Q.  Was the focus of your valuation on the reserves, on the

6   value of the reserves?

7              MR. GLUCK:  Objection.

8              THE COURT:  I'll allow it.

9   A.  Yeah, it was based on this -- a lot of it was based on

10  these reserve reports, the data in these reserve reports, yes.

11  Q.  Did you just rely on -- you referred to PV10 value.  Did

12  VRC just rely on the PV-10 value in the reserve reports or did

13  it apply certain discounts to that value?

14  A.  I don't recall.  You'd have to reference the pages.

15             MS. MOSSE:  We looked before at page 10.  Can we turn

16  to that, please.

17  Q.  And under valuation considerations, the first bullet refers

18  to a multiple to prove reserves and a multiple to PV-10.  Do

19  you see that?

20  A.  Yes.

21  Q.  What's a multiple?

22  A.  It means the value, it's a -- it's taking a number and

23  applying it to that base, that denominator in this case, the

24  first one, prove the reserves, we apply a multiplier to that to

25  get a value indication.

MCECpla2                          Czapla - Redirect

1            THE COURT:  So in connection with reserves, would you

2    put on the screen page 12.  And there's something called

3    reserve overview.  Do you see that?

4            THE WITNESS:  Yes.

5            THE COURT:  It says GGO's reserves are almost

6    exclusively made up of oil and PUD — can you remind us what PUD

7    means.

8            THE WITNESS:  That means proven undeveloped.

9            THE COURT:  — reserves, meaning the CapEx requirement

10   is materially higher.  What is that?

11           THE WITNESS:  It means capital expenditures.  It means

12   that you have to spend a lot to get the reserves out of the

13   ground.

14           THE COURT:  And then it says it is our understanding

15   that Platinum will fund the necessary CapEx, or find

16   alternative sources of funding.  Do you see that?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  So if that was not true, you would have

19   put a much lower value on the reserves, yes?

20           THE WITNESS:  It may be just a different propose

21   altogether.

22           THE COURT:  Go ahead.

23   BY MS. MOSSE:

24   Q.  Did the fact that Golden Gate's reserves were made up

25   almost exclusively of PUD or proven undeveloped reserves, was

MCECpla2                         Czapla – Redirect

1     that something that VRC took into account when arriving at its

2     range of values?

3     A.   Yes.

4               MS. MOSSE:  No further questions.

5               THE COURT:  Anything else?

6               Thank you very much.  You may step down.

7               THE WITNESS:  Thank you.

8               (Witness excused)

9               THE COURT:  And we'll give the ladies and gentlemen

10    their midmorning break, 15 minutes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCECpla2                          Czapla - Redirect

1                    (Jury not present)

2                    THE COURT:  Please be seated.  While I continue to be

3     intrigued by defense counsel's decision to call these kinds of

4     witnesses and plaintiffs' opposition to these witnesses being

5     called, but, of course, strategy is not my department, it's

6     yours.

7                    Who is the next witness?

8                    MS. MOSSE:  Keith McGowan of BDO.

9                    THE COURT:  All right.  We'll see you in 15 minutes.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mce2Pla3

1          THE COURT:  Let's get the next witness on the stand.

2     Let's bring in the jury.  And I am looking forward to your

3     letters in 27 minutes.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2              THE DEPUTY CLERK:  Jury entering the courtroom.

3              THE COURT:  Please be seated.  Call your witness.

4              MS. MOSSE:  We call Keith McGowan.

5      KEITH McGOWAN,

6          called as a witness by the defendant,

7          having been duly sworn, testified as follows:

8              THE COURT:  Counsel.

9      DIRECT EXAMINATION

10     BY MS. MOSSE:

11     Q.  Good morning, Mr. McGowan.

12     A.  Good morning.

13     Q.  Where do you currently work?

14     A.  BDO U.S.A.

15     Q.  How long have you are worked at BDO?

16     A.  I actually have done two stints with the company.  I

17     started in '85 and left in '97 and returned in 2008 and still

18     reside there.

19     Q.  You were at BDO between the years 2012 and 2015?

20     A.  Yes.

21     Q.  What's your current title?

22     A.  I'm an audit partner in the assurance practice.

23     Q.  And were you an audit partner also in the years 2012 to

24     2015?

25     A.  Yes, I was.

1   Q.  What type of company is BDO?

2   A.  BDO is an accounting and consulting firm.

3   Q.  How many employees does it have?

4   A.  It's a good question.  I don't know offhand.  It's a global

5   firm.

6   Q.  Are you based out of the New York office?

7   A.  Yes, I'm based out of the New York office.

8   Q.  How many employees are in the New York office?

9   A.  Again, I wouldn't know that number.  I could tell you

10  approximately in the asset management group, which I am the

11  head of, it's approximately 60 professionals.

12  Q.  Is there a valuation group within BDO?

13  A.  Yes, there is.

14  Q.  And are they based out of New York also or are they global?

15  A.  I mean, they have -- they are professionals all around the

16  country, so they are based in New York, but they are all over.

17  Q.  And in connection with your work as an audit partner, do

18  you have occasion to work with BDO's valuation group?

19  A.  All the time.

20  Q.  What's your highest level of education?

21  A.  I graduated from Adelphi with a bachelor's degree in

22  accounting.

23  Q.  Do you have any professional licenses?

24  A.  I am a CPA.

25  Q.  Are you familiar with a company called Platinum Partners

1  Value Arbitrage, or PPVA?

2  A.  Yes, I am.

3  Q.  Did there come a time that BDO was engaged to provide

4  independent auditing services to PPVA?

5  A.  Yes, we were the auditors for a period of time.

6  Q.  Do you recall what that period of time was when BDO was

7  first engaged?

8  A.  I don't.  They were a client before I rejoined the firm in

9  2008, and then our last year we were engaged to audit for the

10 year ended December 31, 2013.

11 Q.  So at least to your knowledge from 2008 through the year

12 ended December 31, 2013, BDO was PPVA's independent auditor.

13 A.  That is correct.

14 Q.  And did you personally work on the PPAV engagement?

15 A.  I did.

16 Q.  What was your role?

17 A.  I was the engagement audit partner.

18 Q.  Focusing specifically on BDO's audit of PPVA's financial

19 statements for the year ended 2013, were you the engagement

20 partner for that audit?

21 A.  Yes, I was.

22 Q.  And you said that in your role as engagement partner you

23 have occasion to work with BDO's valuation group all the time.

24 Was that the case with respect to BDO's audit of PPVA's

25 financial statements for the year end December 31, 2013?

Mce2Pla3                      McGowan - Direct

1   A.  Yes, it was.

2   Q.  In addition to you as engagement partner, were other

3   members of BDO's audit team involved in the 2013 audit?

4   A.  Yes.

5   Q.  How many members?

6   A.  I mean, we had a couple of staff that I recall, senior --

7   we had at least -- I don't remember if he was a senior manager

8   or director at the time.  We also had a director, as well as

9   certain members of BDO Cayman office were involved as well.

10  That's all, not including the valuation team that was also part

11  of the audit process.

12  Q.  I was just going to ask you about the valuation team.  So

13  how many members of BDO valuation team were involved in the

14  2013 audit?

15  A.  Again, I don't remember offhand.  I'm sure they had some

16  people assisting with some of the valuation work.  I recall at

17  least four.

18  Q.  Can you just describe at a high level how the audit team

19  interacts with the valuation group with respect to an audit or

20  how it did in particular with respect to the audit of PPVA's

21  financial statements for 2013?

22  A.  Sure.  So we are engaged to opine on -- to opine and give

23  reasonable assurance that the financial statements are free of

24  material misstatement.  And so as part of that process, we

25  evaluate the areas of risk and decide what those procedures

1    should be.

2            When you look at an investment company, generally one

3    of the areas that we would focus on would be the fair value of

4    the investment portfolio which they hold.  In the case where

5    you have what is referred to as level 3 assets, which means

6    they are at the bottom of the chart where the inputs that drive

7    the valuation oftentimes are unobservable, in those cases, we

8    generally ask for our valuation group to assist the audit team,

9    and their primary focus is to evaluate the methodologies and

10   the assumptions and to assist us in determining a reasonable

11   range of fair value for what those level 3s might be.

12           And then our job, as part of the audit team, is, you

13   know, we are responsible for evaluating the adequacy of the

14   valuation specialist's work and then there is various things

15   that we would do to accomplish that goal.

16   Q.  You referred to level 3 assets being on the bottom of the

17   chart.  What do you mean by that?

18   A.  Well, it's based on the observability.  So there are, you

19   know, three levels that are defined in the guidance.  There are

20   level 1 assets which are the most observable, and so if you

21   have never, you know, say, taken a look to see what Yahoo! or

22   Facebook or Google are worth, you can easily determine what the

23   fair value or the price of those securities are worth.  And

24   then there is what's called level 2 assets which have still a

25   level of observability, but not the same level as level 1.  And

Mce2Pla3                        McGowan - Direct

1   then finally there are level 3 assets which the primary drivers

2   of determining the value are what's called the inputs that go

3   into driving the value are unobservable, so you can't look them

4   up on the Internet or things of that nature.

5   Q.   Did PPVA have a high concentration in level 3 assets?

6   A.   Yes, they did.

7   Q.   Can we pull up, please, DX 569.  This is already in

8   evidence.  Can we turn to page 3, please.

9        Mr. McGowan, is this BDO's audit report that it issued

10  in connection with the audit of PPVA's financial statements for

11  2013?

12  A.   Yes, it is.

13  Q.   If you look at the line above "opinion" at the bottom, can

14  you highlight that, please, or blow it up, the -- not the

15  signature, the line above "opinion," please.  Thank you.

16       BDO writes, "We believe that the audit evidence we

17  have obtained is sufficient and appropriate to provide a basis

18  for our audit opinion."  What is audit evidence?

19  A.   Audit evidence is all the information that we collect as

20  part of the audit process that we utilize when we are

21  determining whether or not either the accounting is right or in

22  this particular case we are focused on investments, whether or

23  not the fair values are within a range of reasonableness, you

24  know, whether or not the investments themselves actually exist.

25  It's really a culmination of audit evidence that we process and

1   include in our files before we issue the audit opinion.

2   Q.  What are audit work papers?

3   A.  Audit work papers is exactly that; it's the culmination of

4   all the work that we have done, which is then contained in our

5   file.

6   Q.  Can we look at the opinion paragraph, please?  And does

7   this reflect BDO's opinion on Platinum's financial statements

8   for the year ended 2013?

9   A.  Yes, it does.

10  Q.  And what was BDO's opinion?

11  A.  Well, you can see here that we issued what's referred to as

12  an unqualified opinion.  And so we had determined that we

13  thought that the financial statements presented fairly in all

14  material respects their financial position and the consolidated

15  statements of operations, changes in partners' capitals and

16  cash flows in accordance with generally accepted accounting

17  principles of the United States.

18  Q.  When reference is made to the consolidated financial

19  statements, does that include the financial statements and any

20  footnotes or disclosures that accompany the financial

21  statements?

22  A.  Yes, it does.

23  Q.  Can we pull up, please, DX 576.  Is this an example of an

24  audit work paper?

25  A.  Yes.

Mce2Pla3                    McGowan - Direct

1          MS. MOSSE:  We offer this.

2          MR. GLUCK:  No objection.

3          THE COURT:  Received.

4          (Defendant's Exhibit 576 received in evidence)

5    BY MS. MOSSE:

6    Q.  This document is entitled "Engagement Team Discussion."  Do

7    you see that?

8    A.  Yes.

9    Q.  What does this reflect?

10   A.  The engagement team discussion is a document where we

11   document the engagement team's overall discussion around or

12   related to the audit, our areas of focus, our areas defined as

13   areas of risk.

14   Q.  What's the purpose of that discussion?

15   A.  It's really to bring together the entire engagement team to

16   ensure that the engagement team as a whole understands how we

17   are going to go about the audit, the steps that we are going to

18   take to mitigate the potential for a material misstatement.

19   Q.  Can we turn, please, to page 6.  Can you pull out the text

20   in blue, please.

21          This reflects that the BDO audit team will assess the

22   fair value of level 3 investments and this area of the master

23   fund audit is considered a primary risk area.  What does that

24   mean?

25   A.  Well, we identify risk of between what we refer to as risk

1   of material misstatement and those of normal risk.  We had

2   assessed this as an area of a risk of material misstatement.

3   Q.   And --

4   A.   So in other words it is a higher level of risk.

5   Q.   And once BDO accesses something as a higher level of risk,

6   does it focus on that as part of its audit?

7   A.   Yes, it does.

8   Q.   What's professional skepticism?

9   A.   Well, throughout the audit process, we are required to keep

10  a level of professional skepticism, so that entails, you know,

11  evaluating information for management's bias to determine

12  whether or not the information has anything that might lend an

13  answer that we think is questionable.

14  Q.   Was the fair value of PPVA's level 3 investments a focus of

15  BDO in connection with its 2013 audit?

16  A.   Yes, it was.

17  Q.   Continuing in this paragraph, there is a reference to you.

18  Do you see that it says "Keith McGowan" -- well, "in addition

19  to Bob Simon's general review, engagement partner Keith McGowan

20  will review the valuation work papers."

21  A.   Yes.

22  Q.   What are valuation work papers?

23  A.   That's all the support around our valuation of the fair

24  value assessments related to the investment portfolio.

25  Q.   And did you in fact review valuation work papers in

Mce2Pla3                        McGowan - Direct

1    connection with the 2013 audit?

2    A.  Yes, I did.

3    Q.  Can we pull up DX 602, please.  Is this another example of

4    a BDO work paper?

5    A.  Yes.  It was in our files.

6           MS. MOSSE:  We offer this.

7           MR. GLUCK:  It is already in evidence.

8           THE COURT:  All right.  If it is already in evidence,

9    it is already in evidence.

10          MS. MOSSE:  I don't believe this -- we had an

11   agreement yesterday with respect to certain --

12          THE COURT:  All right.  It is received.

13          MS. MOSSE:  Thank you.

14          (Defendant's Exhibit 602 received in evidence)

15   BY MS. MOSSE:

16   Q.  There is a note at the top.  Was this note added by BDO?

17   A.  Yes.

18   Q.  And it reads, "These Sterling Valuation memos are for

19   information purpose only."  What does that mean?

20   A.  That means we didn't rely on the information included

21   within the report.

22   Q.  BDO did its own valuation analysis independent of the work

23   that Sterling did?

24   A.  Yes, as well as doing work on the management valuations as

25   well.

Mce2Pla3                    McGowan - Direct

1   Q.  Can we pull up DX 577, please.

2              Is this another one of BDO's work papers?

3   A.  Yes.

4              MS. MOSSE:  We offer it.

5              MR. GLUCK:  No objection.

6              THE COURT:  Received.

7              (Defendant's Exhibit 577 received in evidence)

8   BY MS. MOSSE:

9   Q.  You see the red box at the bottom, Mr. McGowan?

10  A.  Yes.

11  Q.  Does that indicate your electronic signature?

12  A.  Yes, it does.

13  Q.  What is this?  This document is entitled "FASB ASC 820

14  (SFAS 157) Review Report."

15  A.  So this was the report that we receive from the valuation

16  specialist within BDO when they have completed their valuation

17  assessments along the lines of what we have asked them to do.

18  So this report encompasses their discussion around the

19  investments and their conclusions.

20  Q.  And does your signature on this report -- and we can pull

21  out the under "conclusions of the audit engagement team."  Does

22  your signature on this report reflect your conclusions, as this

23  says, that the valuations assessed in this review report by

24  BDOC appear reasonable?

25  A.  Yes.

1    Q.  And BDOC, BDO Consulting, is that the valuation group that

2    we have been talking about?

3    A.  That is correct.

4    Q.  Can we turn to page 4, please.  If you look at the last

5    sentence of the first paragraph in the large box, there is a

6    reference to BDO Consulting performing sensitivity analysis,

7    which I think is a term you referred to before.  What's a

8    sensitivity analysis?

9    A.  The sensitivity analysis is where they determine an

10   appropriate fair value range of what they believe is a

11   reasonable range of fair value for each of the level 3

12   investments.  So it has certain computations in there that

13   create a low end of the range and certain computations that

14   create a high end of the range.

15   Q.  Why is a range of values provided?

16   A.  Because when you look at level 3 assets, you know, due to

17   the level of unobservability, then there is a lot of

18   subjectivity that goes into those valuations, so where we

19   believe that a range is more appropriate than a specific mark

20   as we evaluate them from the audit perspective.

21   Q.  If you look at the second paragraph that's called out here,

22   there is a reference to Black Elk Energy.  Do you see that?

23   A.  Yes.

24   Q.  Is that one of PPVA's level 3 assets that the BDO valuation

25   team provided a sensitivity range for?

1   A.   Yes.

2   Q.   And the sensitivity value range provided was 172 million to

3   184 million?

4   A.   Yes.

5   Q.   And is that as of December 31, 2013?

6   A.   Yes.

7   Q.   Can we go to page 28, please.  Does this section of the

8   report provide the backup or detail for the work that the

9   valuation group did?

10  A.   Yes.

11  Q.   There is an overview section with a footnote 17 that refers

12  to excerpts from 10-K and 10-Q forms.  Do you know what that is

13  referring to?

14  A.   Sure.  You know, 10-K and 10-Q forms are reporting forms

15  with the SEC that Black Elk was required to file.  Those

16  reports are available to the public.

17  Q.   And information in those reports formed the basis at least

18  for this overview section of BDO Consulting's report?

19  A.   I mean, I wouldn't say it formed the basis, but it is

20  information that they were aware of and considered as they

21  thought appropriate.

22  Q.   What were BDO Consulting's other sources of information?

23  A.   It would have been information related to documents that we

24  received from the company.  It would also -- they would also

25  evaluate certain inputs based on market data that's available

Mce2Pla3                        McGowan - Direct

1    to them.

2    Q.  Was BDO free to go back and forth with the company to

3    request whatever information it felt that it needed?

4    A.  Yes.

5    Q.  And did BDO do that?

6    A.  Yes.

7    Q.  If you look at the third paragraph on this page, there is a

8    reference to reserves and a reserve report.  Do you see that?

9    A.  Yes.

10   Q.  Was BDO's valuation of Platinum's investment in Black Elk

11   as of 2013 based on this reserve report?

12   A.  The reserve report was a major input into the valuation

13   estimate of assessment.

14   Q.  Why was it a major input?

15   A.  Because that's -- it's very common that -- for these types

16   of companies to utilize the reserve reports in estimating the

17   fair value of the underlying entity.

18   Q.  If we zoom out, please, and zoom in on the next two

19   paragraphs.

20        These paragraphs refer to several headwinds related to

21   the November 2012 West Delta 32 incident.  Do you see that?

22   A.  Yes.

23   Q.  Do you recall what the West Delta 32 incident was?

24   A.  Offhand, I remember there was fires that they had with some

25   of their facilities.  I don't recall specifically.

Mce2Pla3                    McGowan - Direct

1    Q.  If you continue in this paragraph, the top paragraph it

2    says, "The incident negatively impacted the performance for the

3    first nine months of 2013."  It refers to inspections.

4            And then the second paragraph refers to a decline in

5    production.  It says, "Total oil, natural gas, and plant

6    production of 3,155 Mboe decreased by 18 percent during the

7    nine months ended September 30, 2013, compared to the same

8    period in 2012 as a result of down time in the field requiring

9    hot work, which was delayed in part" -- I think this should say

10   "due to BSEE requirement force approval after the West Delta 32

11   incident."

12           Do you see that?

13   A.  Yes.

14   Q.  So is that something that -- the decrease in production

15   that BDO's valuation group took into consideration when

16   arriving at its range of values for Platinum's investment in

17   Black Elk?

18   A.  So the valuation experts consider a lot of information.  To

19   the degree that they consider this, I don't recall.

20   Q.  Can we zoom out, please.  The last paragraph on this page

21   refers to an August 15, 2014 sale to Renaissance Offshore.  Why

22   is an August 15, 2014 event included in work papers related to

23   a 2013 audit?

24   A.  Well, it's a material subsequent event that they documented

25   in their report.  It was information that we also looked at as

1    part of evaluating the reasonableness of the market December

2    31.

3    Q.  What's is a subsequent -- you referred to material

4    subsequent event.  What does that mean?

5    A.  Well, it's an event that happens post the balance sheet

6    date, so after the balance sheet date.  So there are two types

7    of subsequent events in most audits, where we focus on a

8    subsequent event that should be considered within the financial

9    statements at that time period and then there are subsequent

10   event that is are generally just disclosed if significant to

11   the entity on a going-forward basis.

12   Q.  Can we turn to page 29, please.  The bottom section of this

13   is covered up a little bit by a box, but it refers to it looks

14   like management analysis.  Do you see that?

15   A.  Yes, I'm sorry, yes.

16   Q.  Does this reflect Platinum's own analysis that it used to

17   value its interest in Black Elk as of the end of 2013?

18   A.  Yes.

19   Q.  Can we turn to the next page, please, page 30.  Does this

20   section reflect BDO's own sensitivity analysis?

21   A.  Yes.

22   Q.  And is that analysis dependent on Platinum's analysis or

23   was it separate?

24   A.  No, it was separate.  You know, obviously, like I said, the

25   reserve report played into there, but that's obviously an

1    observable piece of information from an outside third-party.

2    But they then ran their own model.

3    Q.  When you say they then ran their own model, are you

4    referring to BDO valuation group?

5    A.  The valuation specialists within BDO.

6    Q.  If you look at the first paragraph under BDO Consulting

7    sensitivity analysis, the second sentence reads "as an SEC PV10

8    reserve report is not considered fair value, we applied the

9    following adjustments to the NSAI reserve report in our

10   sensitivity analysis."  Do you see that?

11   A.  Yes.

12   Q.  And then there is a list of five bullets beneath that.  Can

13   we zoom out?  Thank you.

14        What does it mean to apply adjustments to a reserve

15   report?

16   A.  So the PV10 report is an SEC reporting mechanism, so in

17   order for a lot of these companies to sort of give apples to

18   apples information in their financial statements, but it's not

19   considered fair value.  And so when the valuation specialist

20   here was running what's referred to as his income method, they

21   make adjustments that are referred to as risk-adjusted

22   adjustments, which is very common and those are based on their

23   expertise.

24   Q.  And if you look at number 3 in this list, there is a

25   reference to "risk adjustment factors."

Mce2Pla3                    McGowan - Direct

1   A.  Yes.

2   Q.  Is that what you were just --

3   A.  Yes.

4   Q.  -- talking about?

5   A.  Yes.

6   Q.  So this reads that "risk adjustment factors were applied at

7   the reserve level to volume, operating expenses, and capital

8   expenditures that are in line with typical RAFs applied for oil

9   and gas properties with similar characteristics," and then

10  there is a chart beneath that.

11          Do you have an understanding of what this chart

12  reflects?

13  A.  Well, it's the risk adjustment factors that they applied to

14  the different types of reserves that are identified in the

15  report.

16  Q.  How does it work in terms of the percentages?  Are they --

17  are certain categories of reserves risk higher than other once?

18          MR. GLUCK:  Objection.

19  A.  Uhm --

20          THE COURT:  Hold on.  There is an objection.

21          MR. GLUCK:  Form.

22          THE COURT:  No, I will allow it.  You may answer.

23  A.  The reserves are categorized in a manner which you have

24  referred to at the very top, producing wells, which means that

25  those wells have been bored and they are actually producing

1    oil.  Then they go down to reserves that in this particular

2    case go all the way down to "possible," which means they may or

3    may not be there.  So they risk adjust the cash flows related

4    to those different sets of reserves according to their

5    expertise.

6    Q.  Does risk adjust, is that -- is discounting another term

7    for it?

8    A.  It is in effect a discounting methodology.

9    Q.  And if you look at number 5, there is a reference to a

10   discount rate of 11 percent to 13.5 percent based on offshore

11   guideline companies.  Do you see that?

12   A.  Yes.

13   Q.  What's a guideline company?

14   A.  A guideline company is a set of companies that the

15   valuation specialist would utilize as comparable companies to

16   the one in question.

17   Q.  And continuing in this paragraph, if we go two sentences

18   more in into the paragraph it reads "given the accidents in

19   2012 and heightened regulatory scrutiny in 2013 described

20   above, we believe a company-specific risk premium is

21   warranted."  What is a company-specific risk premium?

22   A.  Well, that means that they apply an additional discount

23   related to, you know, specifically to where Platinum's

24   investment in Black Elk stood.

25   Q.  You had said before you weren't sure what impact, if any,

1    the incident in 2012 that was referenced had on the valuation.

2    Does this reflect that the incident in 2012 was factored

3    into --

4    A.  The --

5              MR. GLUCK:  Objection.

6              THE COURT:  Well, sustained as to form.

7    BY MS. MOSSE:

8    Q.  Did BDO factor into its valuation of Platinum's investment

9    in Black Elk the impact of the West Delta incident in the end

10   of 2012?

11   A.  The valuation specialist appears to have applied a risk

12   factor related to this given their documentation here.

13   Q.  Can we turn to page 32, please.  We may need to zoom in,

14   and I'm sure this is tiny for anyone with a hard copy, as well.

15   Can we zoom in on the top section, please, through the

16   paragraph right beneath it.  Thank you.

17             Does this reflect the results of BDO Consulting

18   sensitivity analysis?

19   A.  Yes.

20   Q.  And if you look at the line that is in bold "indicated

21   common equity value rounded," do you see that in the middle of

22   the chart?

23   A.  Yes.

24   Q.  Can we highlight the numbers, please, 136 to 148.

25             What does that reflect?  What is indicated common

1  equity value?

2  A.  That's the fair value range that they concluded on related

3  to the common stock value for Black Elk.  Black Elk had more

4  than one class of stock.

5  Q.  So beneath this 136 to 148, are there certain additions

6  that are made by BDO to arrive at the indicated Platinum's

7  holding value at the bottom?

8  A.  Yes.

9  Q.  And what are those?

10  A.  Well, one is to include the fair value range for the

11  preferred stock for Black Elk and then one was also to then

12  ultimately include the debt value for Black Elk.

13  Q.  And the paragraph underneath this chart, it reflects the

14  range of 172 to 184 million and then it reads:  Management's

15  fair value conclusion did not fall within BDO Consulting's

16  sensitivity range.  Management's fair value conclusion of $185

17  million is approximately $1 million higher than BDO's range.

18  Do you see that?

19  A.  Yes.

20  Q.  Can we zoom out, please.  And can you zoom in to include

21  that paragraph in the red box with the arrows pointing to that

22  paragraph.  Not the top one, the one beneath it, please.

23         What's reflected in this red box with the arrows

24  pointing to the red box with the 172 to 184 range?

25  A.  It is indicating that management adjusted their fair value

1    on their financial statements to fall within BDO's range.

2    Q.  Can we turn to page 43, please.  Did BDO's valuation group

3    also provide a sensitivity range of values for Platinum's

4    investment in Golden Gate as of year end 2013?

5    A.  Yes.

6    Q.  And is that reflected, at least the beginning portion of it

7    here, in the bottom of page 43?

8    A.  Yes.

9    Q.  Can we turn to page 44, please.  Four paragraphs down,

10   there is a reference to a reserve report by D&M.  Do you see

11   that?

12   A.  Yes.

13   Q.  Did Golden Gate's reserves factor in to BDO valuation

14   group's sensitivity range of values for Golden Gate?

15   A.  Yes.

16   Q.  Was it a primary input for BDO's valuation?

17   A.  Yes.

18   Q.  Can we turn to page 44, please, this bottom section.  Does

19   that reflect, as we saw with Black Elk, this shows Platinum's

20   own analysis of its valuation of its investment in Golden Gate

21   as of 2013?

22   A.  Are you referring to the management analysis paragraph?

23   Q.  Yes.

24   A.  Yes.

25   Q.  And did BDO rely on Platinum's valuation or did it perform

Mce2Pla3                        McGowan – Direct

1    its own valuation?

2    A.   No, they did their own valuation assessment.

3    Q.   And can we turn to page 45, please.  The section that

4    begins "BDO Consulting sensitivity analysis," does that reflect

5    BDO's conclusions as to the sensitivity range for Platinum's

6    investment in Golden Gate as of year end 2013?

7    A.   Yes.

8    Q.   Was the methodology used by BDO to value Platinum's

9    investment in Golden Gate generally the same as the one that it

10   followed for Black Elk?

11   A.   It was very similar.

12   Q.   Why is that?

13   A.   It's a very similar type of investment.

14   Q.   Can we turn to page 46, please.  Does this page reflect the

15   results of BDO valuation sensitivity analysis?

16   A.   Yes.

17   Q.   Can we zoom in on this, please.

18          The bottom paragraph reads, "BDO Consulting estimated

19   a sensitivity value range of the common equity between 146.4

20   million and 177.4 million.  The fund's concluded equity value

21   of 173.1 million falls within BDO Consulting's sensitivity

22   range."

23          Does this reflect that BDO valuation's own range

24   agreed with Platinum's valuation for its investment in

25   Golden Gate as of year end 2013?

Mce2Pla3                        McGowan - Direct

1   A.  Yes, it concluded that management's mark was within our

2   range.

3   Q.  If you look in this chart, there is a line -- there is the

4   heading and then two lines beneath it and one line is cash as

5   of December 31, 2013.  Does this reflect the amount of cash

6   that Golden Gate had as of December 31, 2013?

7   A.  Yes.

8   Q.  What is that amount?

9   A.  Well, that should be the amount that was recorded on their

10  financial statements at year end.

11  Q.  And that's 202,623 --

12  A.  Oh, I'm sorry.  Yes.  $202,623.

13  Q.  Can we pull up DX 570, please.

14          Is this another of BDO's work papers?

15  A.  Yes.  This is our final communications that we give to

16  management at the end of -- at the conclusion of our audit.

17  Q.  And do you provide this before or after you provide your

18  final opinion on Platinum's financial statements?

19  A.  I don't recall if we provided it before, but it was pretty

20  close thereafter, probably.

21          MS. MOSSE:  We offer this.

22          MR. GLUCK:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit 570 received in evidence)

25  BY MS. MOSSE:

Mce2Pla3                        McGowan - Direct

```
 1    Q.  Can you turn to page 3, please.  Page 3, please.

 2              So looking at the third bullet, it reads, "We expect

 3    to issue an unmodified opinion on the financial statements and

 4    release our report on or close to February 11, 2015."  Do you

 5    see that?

 6    A.  Yes.

 7    Q.  What's an unmodified opinion?

 8    A.  That's a typo.  It should have said unqualified.  An

 9    unqualified opinion is where we don't make any modifications

10    into our standard audit report.

11    Q.  Can we turn to page 6, please.  Page 6 of the PDF, sorry,

12    page 5 of the document.  And can we zoom in on the first

13    paragraph.

14              The second sentence reads, "We have concluded that a

15    material weakness exists in the master fund's investment

16    valuation process related to its level 3 investments."  What

17    does that mean?

18    A.  So as part of the audit process, we consider their

19    framework of internal controls.  Their framework of internal

20    controls is the preparation and review framework to ensure that

21    a material misstatement could not be recorded within their

22    financial statements.  So in an audit like this, which is

23    considered a substantive audit, which means that we are

24    applying audit procedures to the various balances within the

25    audit -- audited financial statements, we also, if we come
```

1    across areas where we believe that there might be a deficiency

2    in their internal control framework, we are required to report

3    that to those that are charged with governance.

4           So when you look at the control deficiencies, they

5    range from exactly that, a control deficiency, to one that

6    could be a significant deficiency, and then ultimately a

7    material weakness.  So when something arises to a material

8    weakness, that is because we have concluded that either

9    something did or could have been recorded within the audited

10   financial statements that is material and that is in error so

11   to speak.

12   Q.  And with this material weakness finding, BDO still issued

13   an unqualified opinion on PPVA's financial statements for the

14   year end 2013, correct?

15   A.  Yes.

16   Q.  And how does that work?  How does -- why are you able to

17   issue an unqualified opinion even if you find a material

18   weakness?

19   A.  First we did not rely on any internal controls in our work.

20   And so, you know, the fact that we ultimately concluded on a

21   material control weakness really didn't, you know, stop us from

22   issuing our clean opinion as we had concluded that the audit

23   procedures as a whole were sufficient in order to do so.

24           MS. MOSSE:  I pass the witness.

25           THE COURT:  Cross-examination.

Mce2Pla3                          McGowan - Cross

1    CROSS-EXAMINATION

2    BY MR. GLUCK:

3    Q.   Good afternoon.

4    A.   Hi.

5    Q.   Mr. McGowan, you are a CPA?

6    A.   Yes.

7    Q.   You are a certified by the American Institute of CPAs?

8    A.   Yes, I am.

9    Q.   That's the organization that the SEC charges with writing

10   the rules for how to audit private companies and investment

11   funds?

12   A.   Yes.

13   Q.   Are those rules called the generally accepted audit

14   standards?

15   A.   Yes.

16   Q.   GAAS?

17   A.   Yes.

18   Q.   You are familiar with the statement of audit standards,

19   including the AICPA audit standards?

20   A.   Yes.

21   Q.   The financial statements that we just looked at, auditors

22   don't prepare them, management does, right?

23   A.   That is correct.

24   Q.   You just review them.

25   A.   We examine them and gain support for the various

1    disclosures and obviously evaluate the numbers as they are

2    presented.

3    Q.  You don't validate or guarantee that the financial

4    statements are correct, do you?

5    A.  No.  The audit opinion indicates that we give reasonable

6    assurance, not absolute assurance.

7    Q.  What is reasonable assurance?

8    A.  Well, reasonable assurance is that we have concluded that

9    our audit procedures under the circumstances were sufficient in

10   order to ensure that the financial statements are free of

11   material misstatement.  But it's not absolute assurance, which

12   is a much higher standard.

13   Q.  Your audit work is based on the audit evidence provided to

14   you by Platinum?

15   A.  Yes.

16   Q.  Who would you speak with at Platinum?  Who was your primary

17   contact?

18   A.  Generally it was the CFO.

19   Q.  Joe SanFilippo?

20   A.  Joe SanFilippo.

21   Q.  He gave you the information that formed the basis of your

22   audit opinion?

23   A.  Not in all cases, no.

24   Q.  Who else?

25   A.  You know, offhand, I don't remember everybody's name.

Mce2Pla3                         McGowan - Cross

1  There was a gentleman by the name of Naftali that was heavily

2  involved, especially in Joseph's absence.

3  Q.  Has Mr. Manela pled guilty to fraud?

4          MS. MOSSE:  Objection.

5  A.  I don't know.

6          THE COURT:  Hold on when there is an objection.

7          No, the objection is overruled.  The answer was "I

8  don't know."

9  Q.  Has he?

10 A.  I don't know.

11 Q.  Can you please pull up Plaintiffs' Exhibit 985.  And we

12 seek to admit this.

13         MS. MOSSE:  No objection.

14 Q.  After you have reviewed it --

15         THE COURT:  Received.

16         (Plaintiff's Exhibit 985 received in evidence)

17 BY MR. GLUCK:

18 Q.  After you have reviewed it, just let me know.  Ready?

19 A.  Yes, sir.

20 Q.  Is this a rep letter?

21 A.  Yes this is the management rep letter received in

22 connection with the audit.

23 Q.  Could you please explain to the jury what the rep letter

24 is?

25 A.  A rep letter is where we ask for management to represent to

1  us certain items that are contained within the letter.

2  Q.  And what are those items?

3  A.  Well, that they fulfilled their responsibilities in

4  connection with the audit, that they in theory have turned over

5  all available documents that were essential for the audit

6  procedures that were performed, that they are aware of the

7  adjustments that we concluded on as part of the audit process,

8  and things of that nature.

9  Q.  They promise to give you everything that was material in

10  connection with your audit, right?

11  A.  One of the representations indicates that they -- anything

12  that was related to the investments.  I don't remember the

13  exact wording, but there should be a representation in there.

14  Q.  If they didn't give you something that was material, it

15  would be considered a mis-- an omission or misstatement,

16  correct?  Under this agreement?

17  A.  If they didn't give something that could potentially impact

18  the financial statements in a material manner, then they would

19  not have lived up to the representation.

20  Q.  Let's go through the representations Platinum made.

21        As of February 11, 2015.  Please read number one.

22  A.  "We have fulfilled our responsibilities, as set out in the

23  terms of the audit engagement letter dated September 17, 2013,

24  for the preparation and fair presentation of the consolidated

25  financial statements in accordance with the accounting

1    principles generally accepted in the United States."

2    Q.  And their responsibility was to give you all material

3    information related to your audit and not to omit anything,

4    right?  Material.

5    A.  Yes.

6    Q.  Please read number two?

7    A.  "We have fulfilled our responsibilities as set out in the

8    terms of the aforementioned audit engagement letter, for the

9    design, implementation, and maintenance of internal control

10   relevant to the preparation and fair presentation of

11   consolidated financial statements that are free from material

12   misstatement, whether due to fraud or error."

13   Q.  So they are promising you that they have looked at the

14   financials and they are free from misstatement, fraud, or

15   error, right?

16   A.  Yeah, they are -- that they are representing they fulfilled

17   their responsibility in related to making sure that the

18   preparation and presentation of the consolidated financial

19   statements are free from material misstatement, yes.

20          MR. GLUCK:  I forgot, could we please move this into

21   evidence?

22          MS. SHEN:  You did.

23          MR. GLUCK:  Oh it is.

24   BY MR. GLUCK:

25   Q.  When did you learn that the SEC had been investigating an

Mce2Pla3                      McGowan - Cross

1    investigation into Platinum's offices from -- for about six

2    months?

3              MS. MOSSE:  Objection.

4    Q.  Did you learn?  That the SEC had commenced an investigation

5    where it was in Platinum's office almost every day from 2014 to

6    2015?

7              MS. MOSSE:  Objection.

8    Q.  Did you learn that?

9              THE COURT:  Well, all right.  I think to break it

10   down, did you learn at some point that the SEC had commenced an

11   investigation?

12             THE WITNESS:  We were aware of an SEC examination.

13             THE COURT:  All right.  And when did you learn that?

14             THE WITNESS:  I believe we learned it in either

15   November or December of 2014.

16             THE COURT:  All right.  Go ahead, counsel.

17   BY MR. GLUCK:

18   Q.  Is there a place in your report where you talk about this

19   examination?

20   A.  No.

21   Q.  Why is that?

22   A.  Well, the audit reports standards of our -- you know, this

23   would not be a consideration in that audit report.  We were

24   under -- I mean, as far as I can remember and recall, this was

25   a routine SEC custody exam.

1    Q.  Are you aware that the SEC then sued Platinum Management

2    for fraud and undervaluation?

3              MS. MOSSE:  Objection.

4              THE COURT:  Overruled.

5              MR. GLUCK:  In evidence.  Sorry.

6              THE COURT:  Did you become aware at some point that

7    the SEC sued Platinum Management for fraud and under valuation.

8              THE WITNESS:  I'm not aware of the details.  I am

9    aware that there was a Department of Justice action.

10             THE COURT:  All right.

11   BY MR. GLUCK:

12   Q.  Just to clarify for the record, I didn't say DOJ which may

13   be something different.  SEC.

14             Did the SEC, which was in their office for six months,

15   then sue Platinum Management for fraud and overvaluation?

16             MS. MOSSE:  Objection.

17             THE COURT:  Sustained.

18   BY MR. GLUCK:

19   Q.  Did -- as opposed to the Department of Justice, did you

20   become aware of a Securities and Exchange Commission litigation

21   filed against Platinum Management?

22   A.  I don't recall that.

23   Q.  Are you aware of whether that litigation pertained to

24   overvaluation?

25             MS. MOSSE:  Objection.

1    THE COURT:  If he wasn't aware of it, how can he

2    answer that?  Sustained.

3    BY MR. GLUCK:

4    Q.  Would you please turn to PDF page 7, paragraph 7.  Excuse

5    me, paragraph 11.  Just go through the additional advice that

6    you received from Platinum Management in connection with this

7    audit.

8    A.  Did you want me to read these?

9    Q.  Yeah, I do.

10   A.  "We also advise you to the best of our knowledge and

11   belief:  Portfolio securities are stated at fair value as

12   determined in accordance with the valuation methods set forth

13   in the LPA."

14   Q.  Let me stop you there.  What is the LPA?

15   A.  That's the limited partnership agreement.

16   Q.  So they are promising you that their values are in

17   accordance with the PPVA partnership agreement?

18   A.  The limited partnership agreement.

19   Q.  Limited partnership agreement?

20   A.  Yeah.

21   Q.  Go to the next one.

22   A.  "All of the master fund's investments during the year were

23   made in accordance with the LPA."

24   Q.  They are representing that the form of investment was in

25   compliance with the limited partnership agreement?

Mce2Pla3                         McGowan - Cross

1            MS. MOSSE:  Objection.

2            THE COURT:  Well, is that your understanding?

3   BY MR. GLUCK:

4   Q.  What are they representing in --

5            THE WITNESS:  Well, my understanding is that they were

6   making investments in accordance to whatever terms and

7   conditions exist in the LPA.

8   BY MR. GLUCK:

9   Q.  Are you familiar with the LPA?

10  A.  Yes.

11  Q.  Did the LPA provide -- have any provisions regarding

12  concentration in level 3 assets?

13  A.  I don't recall.  I haven't seen the LPA in quite some time.

14  Q.  Do you know whether PPVA's investments and concentrations

15  in level 3 assets were in accordance with the LPA in this year?

16  A.  I don't recall what the LPA indicated.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. GLUCK:

2    Q.  But they were promising you that they were?

3    A.  The representation indicates that they were making the

4    investments in accordance with whatever terms that are in the

5    LPA.

6    Q.  Subsection C, please.

7    A.  All material related party transactions are disclosed in

8    the notes of consolidated financial statements from January

9    1st, 2013, to the date of this representation letter.

10   Q.  What are they saying there?

11   A.  Well, they're indicating that they made proper disclosures

12   related to related party transactions, which are transactions

13   with people that are -- entities that are affiliated with the

14   fund.

15   Q.  They told you about the Black Elk Opportunities Fund?

16   A.  I don't recall.

17   Q.  They tell you about Beechwood?

18   A.  Offhand, I don't recall.

19   Q.  Were you aware that Platinum and Beechwood were affiliated

20   companies?

21   A.  Again, I'd have to look at the work papers and, you know, I

22   don't recall what the, you know, they are indicated in the

23   charts and other information we received.

24   Q.  Why don't you go through letter D.

25   A.  Interests in the master fund have been offered for sale in

1      accordance with its offering document and by no other means.

2      No offer or solicitation of the master fund's interest has been

3      made in any jurisdiction in which such offer or solicitation

4      would be unlawful.

5      Q.  What's your understanding of how Beechwood acquired the

6      debt issued by PPVA's portfolio companies?

7                MS. MOSSE:  Objection.

8                THE COURT:  Overruled.

9      A.  I'm sorry.  Again, I don't recall the specifics around that

10     at all.

11     Q.  It might have been material or not, you don't know?

12     A.  I don't.  Without looking at the work papers, I don't know.

13               MR. GLUCK:  Go to page 10, paragraph 22, please.

14     Could you highlight it.

15     Q.  I'll ask you to read this, explain what it means.

16     A.  The methods and significant assumptions used to determine

17     fair values of financial instruments are as disclosed in the

18     consolidated financial statements.  The valuation methods and

19     significant assumptions used to determine the fair values are

20     in accordance with FASB ASC 820 fair value measurement and take

21     into account all the considerations.  For securities whose fair

22     values have been estimated by management, the valuation

23     principles and significant assumptions used result in a measure

24     of fair value appropriate for the financial statement

25     measurement and disclosure purposes in accordance with FASB ASC

MCECpla4                      McGowan - Cross

820 fair value measurements, and take into account all the

considerations therein.  The methods and significant

assumptions used to determine fair values of investments are

properly disclosed in the consolidated financial statements.

Any events subsequent to December 31st, '13 related to the

master fund's investment portfolio were evaluated to determine

whether such events require adjustments to the estimated fair

value measurements as of that date and/or disclosures in the

financial statements and, as a result of such evaluation, all

appropriate adjustments and disclosures are reflected.

Q.  Fair to say that Platinum is promising you that they're

preparing their financials in a lawful manner and that they're

going to tell you if there's any material events after December

31, 2013, that materially impact the fair value?

          MS. MOSSE:  Objection.

          THE COURT:  Even though it's compound, I think that

for this witness, it's clear enough.  Overruled.

A.  So the representation is indicating that in terms of their

investment valuation process, that they have considered all of

the guidance, as well as any material subsequent events that

may have been considered known or knowable as of that date and

should have been considered in the fair value assessment.

          MR. GLUCK:  Let's go to the last paragraph.

Q.  What's that say?

A.  To the best of our knowledge, no events have occurred

MCECpla4                         McGowan - Cross

subsequent to the consolidated statement of financial condition

date and through the date of this representation letter, as

entered on the first page, that would require adjustment or

disclosure in the aforementioned consolidated financial

statements.

Q.  They promised you what?

A.  They are representing to us, to the best of their

knowledge, that they considered the factors in this letter, in

this paragraph.

Q.  They tell you that Black Elk was in bankruptcy?

A.  I don't recall whether we knew that or not.

Q.  They tell you whether Golden Gate was defunct?

         MS. MOSSE:  Objection.

Q.  No longer operating?

A.  I don't recall what was disclosed to us.  It would be in

the work papers.

Q.  Golden Gate was not producing any revenue, right, did they

tell you that?

A.  I do not recall, no.

         MR. GLUCK:  Let's go to the signatures.

Q.  Do you recognize these signatures?

A.  Yes.  They're members of Platinum Management and, it

appears, their counsel.

Q.  Joe SanFilippo, that was your principle contact?

A.  Yes, he was the chief financial officer at the time.

1   Q.  Was he the person you most directly corresponded with?

2   A.  Again, for a period of time, Joe was out.  I do remember

3   Naftali, I don't remember his last name, being involved.  There

4   was also their controller, George Duke, that we conferred with,

5   but not necessarily with the valuations.

6   Q.  Mark Nordlicht, do you remember him?

7   A.  Yes.

8   Q.  Who was he?

9   A.  I mean, he was the primary general partner at Platinum.

10  Q.  Do you know that he's been convicted of fraud?

11            MS. MOSSE:  Objection.

12            THE COURT:  Overruled.

13  A.  Yes, I was, on another matter, but I don't know the details

14  behind that.

15  Q.  It was on a Platinum matter; right?

16  A.  I thought it was related to something with Black Elk, but I

17  don't recall.

18  Q.  Platinum subordination of the Black Elk bonds?

19  A.  Again, I don't recall the details.

20  Q.  David Levy, who was he?

21  A.  He was one of their investment officers.

22  Q.  Did you know him?

23  A.  I know that we had conversations or email traffic, I think,

24  but I don't, offhand, recall how much I personally dealt with

25  him.

MCECpla4                          McGowan – Cross

1   Q.  Were you aware that he was convicted of fraud?

2   A.  No.

3   Q.  You were not?

4   A.  I don't think so, no.

5   Q.  If Platinum Management had violated this agreement, what

6   would BDO do?

7           MS. MOSSE:  Objection.

8           THE COURT:  Overruled.

9   A.  If they hadn't lived up to their representations, I think

10  it potentially could be facts and circumstances, but generally,

11  I think we would consider resigning.

12  Q.  If they had told you that Golden Gate was defunct, not

13  pumping oil and revenue, would it have affected your audit?

14          MS. MOSSE:  Objection.

15          THE COURT:  Overruled.

16  A.  I mean, that's really facts and circumstances.  We would

17  have to understand the whole body of the information and

18  evaluate that, and that's a process.

19  Q.  If they told you Black Elk was in bankruptcy and had never

20  paid off its secured creditors after selling substantially all

21  of its assets, would that have affected your audit?

22  A.  Again, it would depend on the totality of the information

23  that we were not aware of and we would have to go through a

24  process to evaluate it.

25  Q.  It could, though; right?

MCECpla4                    McGowan - Cross

1   A.   Potentially, yes.

2   Q.   You were shown --

3        THE COURT:  If you learned after you had done your

4   audit and signed off that some or all of the representations

5   made to you were inaccurate, materially inaccurate, what would

6   you do?

7        THE WITNESS:  Well, the first thing I would do would

8   be to confer with my national office, but I would think that we

9   would probably issue some letter indicating that our opinion is

10  not to be relied on.

11       THE COURT:  And would that be true regardless of

12  whether it was -- you learned this two months later or two

13  years later or whatever?

14       THE WITNESS:  It would really require me to confer

15  with my national office.  To some degree, you know, generally,

16  the audit report is really only considered to be relied on

17  within 12 months after the balance sheet date, and we actually

18  didn't issue this until February of 2015.  But, again, it would

19  require a conference with my national office to conclude on

20  that matter.

21  BY MR. GLUCK:

22  Q.   Why did it take so long for to you issue this audit

23  opinion?

24  A.   There were a lot of reasons for it, but there was certainly

25  delays and receiving information from management, which, in

MCECpla4                    McGowan - Cross

1  turn, created delays from us in evaluating the information.

2  There was back and forth related to certain of the investments.

3  We had proposed a material adjustment on one of them, which

4  they disagreed with, so there was back and forth related to

5  that.   Then we found out about the SEC examination, which we

6  were contacted by the examiners.   They asked us certain

7  questions that we decided we needed some time to evaluate.

8  Q.   That asset that you wanted an adjustment on, which was it?

9  A.   It was an entity by the name of Glacial.

10 Q.   Platinum had to reissue its assets under management for

11 2013.   Do you recall that?

12 A.   I don't understand that question.

13 Q.   Did Platinum have to restate its AUM in 2013?

14 A.   Well, a restatement generally refers to an audit report

15 that's already been issued and then adjusted subsequent to that

16 date.   So I am not aware of that situation.

17 Q.   In connection with your confirmation that Platinum's

18 management valuation of Golden Gate was reasonable, you relied

19 on a PV-10 report; is that right?

20 A.   Yes.

21 Q.   Now, for Black Elk, you relied on an NSAI PV-10 report;

22 right?

23 A.   Yes.

24 Q.   You know who NSAI are?

25 A.   Yes, Netherland is a specialist in the field.

1           MR. GLUCK:  Let's call up Plaintiffs' Exhibit 538.

2    Q.  Why didn't you rely on the NSAI report for Golden Gate when

3    you did for Black Elk?

4    A.  I don't know if we -- I don't recall being aware of this.

5    Q.  Wouldn't be this a material item for Golden Gate that they

6    promised to provide you?

7           MS. MOSSE:  Objection.

8           THE COURT:  Overruled.

9    A.  If they received additional reporting, we would have asked

10   for it, we would have wanted to see it.

11   Q.  When you say wanted to see it, they promised to provide you

12   items like this?

13   A.  Correct.

14   Q.  Did they?

15   A.  As far as I am aware, I do not believe so.

16   Q.  If you were made aware of this, would this have affected

17   your audit opinion?

18   A.  I think it would have affected the procedures that we

19   applied.  Again, without all the facts and circumstances, it's

20   hard for me to answer that question.

21          MR. GLUCK:  Would you call up DX 577, please, page 28.

22   Q.  This is your work paper on Black Elk?

23   A.  It's the valuation of specialist report, yes.

24   Q.  Where does it talk about the Black Elk Opportunities Fund?

25   A.  I don't see it.  I don't recall it.

MCECpla4                         McGowan - Cross

1    Q.  Where does it talk about Beechwood's acquisition of the

2    Black Elk fund?

3    A.  Again, I don't see it here.

4    Q.  You stated that you recalled that there was a fire in 2012?

5    A.  Yes, I thought the incident related to a fire.  Again,

6    without seeing the details of the work papers, I don't recall

7    exactly those details.

8    Q.  It was an explosion; right?

9    A.  Explosion, yes.

10   Q.  People died?

11   A.  Yes.

12   Q.  The worst disaster in the Gulf since BP?

13   A.  Well, that I can't comment on.

14   Q.  Are you familiar with the disasters in the Gulf?

15   A.  I am aware of the BP one, yes.

16   Q.  What about this one, how does it compare?

17   A.  Offhand, I don't know.

18            MR. GLUCK:  Mr. Parson, will you please highlight the

19   third paragraph.

20   Q.  Here, you're using NSAI; right?

21   A.  Yes.

22   Q.  Was BDO also Black Elk's auditor?

23   A.  I believe there was an audit by the firm of UHY that was

24   their auditors that was then acquired by BDO.

25   Q.  But a unique set of knowledge with respect to Black Elk;

MCECpla4                     McGowan – Cross

1   right?

2              MS. MOSSE:  Objection.

3              THE COURT:  Sustained.

4   Q.  As a result of your firm's acquisition of the company which

5   was auditing Black Elk, you had special knowledge –– or

6   detailed knowledge, excuse me, instead of special, regarding

7   Black Elk; right?

8              MS. MOSSE:  Objection.

9              THE COURT:  Sustained.  I think there are some

10  questions that could be put in this area.

11             How much longer are you going go on cross?

12             MR. GLUCK:  40 minutes.

13             THE COURT:  So what I'm going to do is give the jury

14  an early lunch break so we can discuss these matters outside

15  their presence rather than sit through a long sidebar.

16             So, ladies and gentlemen, we'll give you an hour lunch

17  and we'll reconvene at 10 minutes to 2:00.

18             (Continued on next page)

19

20

21

22

23

24

25

MCECpla4                          McGowan - Cross

1              (Jury not present)

2              THE COURT:  Please be seated.

3         So, several things.  First, I thought there was a

4    representation made to me last night by plaintiffs' counsel,

5    who's absent today, that there was some sort of followup letter

6    or report or something from BDO modifying their earlier audit.

7              MR. GLUCK:  Yes, I think it's called -- it was

8    actually brought out by defense counsel at the end of her --

9              MS. MOSSE:  The audit wrap-up.

10             THE COURT:  Was that what --

11             MR. GLUCK:  No.

12             THE COURT:  I thought --

13             MR. GLUCK:  It's material weakness.

14             MS. MOSSE:  Which was included in the audit wrap-up

15   presentation.  It's not subsequent to the issuance of the

16   opinion, did not modify the opinion in any way.

17             THE COURT:  I misunderstood.

18        Secondly, I'm not quite sure what you mean by special

19   knowledge or something like that, that your question was just

20   objected to.

21             MR. GLUCK:  So if you're auditing a company, you have

22   more insight into the financials of the company than a stranger

23   audit firm.  That's it.

24             THE COURT:  What follows it?

25             MR. GLUCK:  That they did, in fact, have

1    particularized knowledge about Black Elk, which, some of which,

2    we will see was not incorporated in their audit or erroneously

3    incorporated.

4            THE COURT:  I think the term is a little vague, but I

5    will allow a question along that line.

6            I do think 40 minutes is probably considerably more

7    than you should take, given that there are still some defense

8    witnesses to be heard.

9            After this witness, who do we have?

10           MS. MOSSE:  Just one more, your Honor.

11           THE COURT:  Okay.  Now, I thank counsel for their

12   letters, which I received and we will docket, if not docketed

13   already, and they address most of the questions I had and I

14   will make my rulings certainly no later than the midafternoon

15   break.

16           There are a couple things that were not covered, some

17   of which are minor, but defense counsel, with respect to the

18   charge on breach of fiduciary duty where I gave, towards the

19   end of that charge, I said for example, plaintiffs argue that

20   if the investors had been aware of the fund's overvaluation of

21   assets, they would have withdrawn their investments while

22   Mr. Bodner argues that their the loss was occasioned not by any

23   alleged overvaluation, but by the fund's liquidity problems.

24           And defense counsel said there were other examples

25   that they might give and I said great, put it, if wanted an

MCECpla4                          McGowan - Cross

1    alternative or second example, put it in your letter, which you

2    did not.

3              MR. HERTZBERG:  We did, actually, Judge.

4              THE COURT:  Where?

5              MR. HERTZBERG:  It is right above the paragraph that

6    starts number 4, statute of limitations.

7              THE COURT:  What page of your letter?

8              MR. HERTZBERG:  Page 4, middle of the page.

9              THE COURT:  Oh, that.  So you want to replace the

10   example altogether?

11             MR. HERTZBERG:  Correct.

12             THE COURT:  That's different from what I gave you the

13   opportunity, which is if you wanted to give a second example, I

14   would consider it, but I instead now will consider language

15   you've raised.

16             MR. HERTZBERG:  Thank you.

17             THE COURT:  Secondly, I'd ask defense counsel to

18   supply me, if I agreed with their position on the $18 million,

19   that whole ball of knocks, any language they wanted me to

20   include in the damages section.  Now maybe you think that this

21   language that you've proposed in the earlier instruction is

22   sufficient, and that's fine, but if you had any language that

23   you wanted to include in the damages section, I need to see it.

24             MR. HERTZBERG:  I'm not entirely sure I follow.  The

25   issue with the $18 million was the Rule 50 issue to keep the

MCECpla4                        McGowan - Cross

```
 1    18 --
 2            THE COURT:  -- you're saying if I rule in your favor
 3    on that, that it doesn't come in, but what I thought what you
 4    might want was to make that crystal clear to the jury since the
 5    Rule 50 would have been outside their presence.  Of course, it
 6    would preclude plaintiffs' counsel for arguing for the
 7    $18 million or something like that, but if that's sufficient
 8    for your purposes and you don't want further instruction,
 9    that's fine, but that was the -- so --
10            MR. HERTZBERG:  So in the event that the Rule 50
11    motion with respect to the $18 million is denied, then we would
12    ask the Court to instruct the jury that the $18 million is --
13    of the 30 that's at issue for incentive fees, that 18 of it
14    relates to the 2012 fees.
15            MR. GLUCK:  '13.
16            THE COURT:  Whatever proposed language you want in
17    that regard, if any, you need to give me in writing by the end
18    of lunch.
19            MR. HERTZBERG:  Thank you, Judge.  We will.
20            THE COURT:  So on the plaintiff side, I don't know
21    whether you wanted to say anything further on the FIFO issue,
22    which is addressed in defense letter, but not in your letter,
23    although you had addressed it earlier at some earlier briefing.
24    You don't have to, but if you want to put anything in writing
25    on that issue, you need to do it by the end of lunch.  Other
```

MCECpla4                         McGowan - Cross

than that, I think I have enough to resolve all the issues.

        The one thing I have already resolved, I thought a lot about this, is that the fraud claim is out.  In the form that I had proposed an instruction, it was really never put and I went back and looked at the complaint, although I can't say I looked at every single word, it really -- so that's determined.

        And along those lines, I'll ask my law clerk to hand to both sides a proposed verdict form along the lines I already suggested yesterday.  If there are any problems with the verdict form, we can deal with that later today.

        All right.  We'll see you at 10 minutes to 2:00.

        (Luncheon recess)

        (Continued on next page)

MCECpla4                           McGowan – Cross

1                          AFTERNOON SESSION

2                              2:03 p.m.

3          (Jury not present)

4          THE COURT:  And as I indicated, thank you for your

5    further submissions.  I'll give you all my rulings at the

6    midafternoon.

7          I assume plaintiff's counsel is now down to

8    10 minutes.

9          MR. GLUCK:  I'll do my best.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated.

3           MR. GLUCK:  I think we had DX 577 on the screen,

4    page 28.  I think there was also a question pending that the

5    Court ruled on.

6           THE COURT:  Remind me of the question again.

7    BY MR. GLUCK:

8    Q.  As a result of BDO's acquisition of the firm that was

9    conducting the Black Elk audit, was BDO in possession of

10   information concerning Black Elk that was superior to that of a

11   standard review relationship?

12          MS. MOSSE:  Objection.

13          THE COURT:  Overruled.

14   A.  The only information that we were aware of was when we

15   asked specifically if the UHY team could give us some

16   information about more test work they did on the reserve

17   report.  I'm not aware nor do I recollect any other information

18   provided by the UHY audit team.

19   Q.  Could you run us through UHY, what that acronym is?

20   A.  Offhand, I don't remember the name of the firm but, you

21   know, when they were acquired by BDO.

22          MR. GLUCK:  Could you go to page 29.  Would you mind

23   highlighting the last sentence of the bottom paragraph.

24   Q.  Did BDO consider the Renaissance sale in relation to the

25   preparation of this opinion?

MCECpla4                        McGowan - Cross

1    A.  We did have some work performed related to some of the

2    information related to the sale that was included in our work

3    papers.

4    Q.  Are you aware of the proportion of Black Elk's assets and

5    operations that were sold in that transaction?

6    A.  Offhand, I don't recall the exact numbers.

7    Q.  Do you know what the actual sale proceeds were?

8    A.  Offhand, I'd have to look at the work papers for what we

9    document.

10   Q.  It says here $149.2 million in net proceeds.  Do you

11   believe that's an accurate number?

12   A.  Again, I'm assuming that if they documented this, but I

13   would have to look at the work papers.

14   Q.  Do you have any knowledge if it was $115 million?

15   A.  I'm aware of the Renaissance transaction.  The specific

16   details, I don't recall exact details in the work papers.  I do

17   recall that we did look at the information in evaluating what

18   we did around the mark set 12/31/13.

19   Q.  So you're not in a position to say whether that number is

20   overstated by $35 million?

21            MS. MOSSE:  Objection.

22            THE COURT:  I'll allow it.

23   A.  Again, I would have to look at the work papers to comment

24   on that.

25   Q.  Most of the proceeds of the sale were used to pay the

MCECpla4                         McGowan - Cross

1    company's outstanding $150 million 3.75 senior secured notes.

2    That's not true, is it?

3              MS. MOSSE:  Objection.

4              THE COURT:  Overruled.

5    A.  Again, I would have to look at the details of the work

6    papers.  I don't recall.

7    Q.  In fact, you stated that you were aware that Mr. Nordlicht

8    was convicted of fraud?

9              MS. MOSSE:  Objection.

10             THE COURT:  Overruled.

11   Q.  Right?

12   A.  I think I said that, that he was committed related to

13   another action.

14   Q.  Involving Black Elk?

15   A.  Again, I don't know the specifics.

16   Q.  Are you unaware that the bonds referenced in this final

17   sentence were subordinated and that the proceeds for this sale

18   were paid to the BEOF preferred equity holders?

19   A.  Again, I would have to look at the work papers to see what

20   we documented.  Those are very specific questions.

21   Q.  If, after this sale of substantially all the assets, the

22   bonds, these senior secured notes were still outstanding, how

23   would that affect your analysis of the value of Black Elk?

24   A.  Again, everything is facts and circumstances.  We would

25   have to consider all the information that is available.

MCECpla4                         McGowan - Cross

<span>1</span>          MR. GLUCK:  Let's go to page 29, please.

<span>2</span>  Q.  You were asked about a company-specific discount premium in

<span>3</span>  your direct.  Do you recall that?

<span>4</span>  A.  Yes.

<span>5</span>  Q.  Why did BDO choose to apply a minimal risk company premium?

<span>6</span>  A.  When we engage our valuation specialist, it's their area of

<span>7</span>  expertise around the methods and the assumptions that they

<span>8</span>  ultimately conclude on.  I don't recall the basis of where they

<span>9</span>  landed on their risk adjustment.

<span>10</span>  Q.  Are you aware of who the CEO of Black Elk was, this company

<span>11</span>  you were evaluating in 2015 when this report was issued?

<span>12</span>  A.  I don't recall.

<span>13</span>  Q.  Does the name Jed Latkin ring a bell?

<span>14</span>  A.  I don't recall.

<span>15</span>  Q.  Did you discuss the risks Black Elk was facing with anyone

<span>16</span>  at Black Elk management?

<span>17</span>  A.  I don't recall.

<span>18</span>  Q.  Were you aware that there were criminal manslaughter

<span>19</span>  charges against Black Elk at the time?

<span>20</span>          MS. MOSSE:  Objection.

<span>21</span>          THE COURT:  Sustained.

<span>22</span>  Q.  Were you aware that there was litigation that impacted the

<span>23</span>  profitability of Black Elk?

<span>24</span>  A.  Again, I don't recall.

<span>25</span>          MR. GLUCK:  Let's go to page 43, please.

MCECpla4                     McGowan - Cross

1   Q.  You were asked a number of questions about your audit of

2   Platinum Management's valuation of Golden Gate on direct.  Do

3   you recall that?

4   A.  Yes.

5   Q.  Did someone at Platinum Management tell you that Golden

6   Gate was operating in 2015?

7   A.  I don't recall.

8   Q.  Did they not tell you that it had been shut down?

9   A.  Again, I don't recall.  I don't know what we have

10  documented in our work papers.

11  Q.  Where in this report would I find those details concerning

12  the related party transaction with Beechwood concerning the

13  Golden Gate debt?

14  A.  I don't know.

15  Q.  Did somebody tell you that that debt was in good standing?

16  A.  Again, I don't recall the specifics.

17  Q.  How would it have affected your analysis if that debt had

18  been in default?

19  A.  We would have to understand the total facts around that and

20  evaluate it as part of the other work that we did.

21  Q.  Were you informed that PPVA was making interest payments on

22  this Golden Gate debt to Beechwood?

23  A.  I don't recall.

24  Q.  Were you aware that there was a merger discussion between

25  Black Elk and Golden Gate?

1    A.  Again, I don't recall.

2            MR. GLUCK:  Let's call up PX 537, please, and move it

3    into evidence.

4            MS. MOSSE:  No objection.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 537 received in evidence)

7    Q.  Did anyone at Platinum Management tell you what the implied

8    valuations were of Golden Gate based upon these Black Elk

9    offers?

10   A.  I'm not party to this, so I don't recall if we ever had any

11   conversations around this.

12   Q.  Did Platinum Management withhold this email from you?

13           MS. MOSSE:  Objection.

14   A.  Again, I don't recall --

15           THE COURT:  Hold on.  Overruled.  You can answer.

16   A.  I don't recall all the emails that we traded back and

17   forth.  I'm not aware of or have any recollection of this.

18   Q.  Can you point me to anywhere in your report that discusses

19   mergers between Golden Gate and Black Elk?

20   A.  If we had it, it probably would have been disclosed in the

21   investments footnote.

22   Q.  Would this have been the sort of material item that you

23   would want to receive pursuant to the agreement that Platinum

24   Management signed?

25   A.  It would be information that we would like to consider,

MCECpla4                    McGowan - Cross

1    yes.

2    Q.  You testified about the material weakness conclusion that

3    BDO issued in your direct.  Do you recall that?

4    A.  Yes.

5    Q.  Why, what were the material weaknesses?

6    A.  Well, it's a combination of the length, the process that we

7    had to go through relating to gathering all the information for

8    us to complete the audit, which was not in a timely manner.

9    Also, a big piece of that was that we actually had them book a

10   significant adjustment to one of their valuations, which, up

11   until they agreed to it, had been in disagreement with our

12   analysis.

13   Q.  Why didn't you, if you were a qualified or a restricted

14   audit?

15   A.  I don't know what a restricted opinion is.

16   Q.  Well, why didn't you -- qualify --

17   A.  We had determined that we believed we had all the evidence

18   that we needed to opine on the financial statements as a whole

19   and give reasonable assurance that they were free from a

20   material mistake.

21   Q.  As you sit here today, does that remain true?

22   A.  Again, I am not aware of any facts that would have changed

23   our view, and if there are, we would need time to evaluate them

24   in connection with the audit that we had completed.

25             MR. GLUCK:  Mr. Parson, just bring up

1    Plaintiffs' Exhibit 970, please.

2              Move into evidence.

3              MS. MOSSE:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 970 received in evidence)

6    Q.  Does this refresh your recollection as to whether BDO was

7    informed about the sale of the Golden Gate debt to Beechwood?

8    A.  It certainly -- I'm an addressee on this email, but I don't

9    recall the specifics.  I don't remember.

10   Q.  That debt was going to come due in full in November of

11   2015; right?

12   A.  I don't remember.

13   Q.  $40 million, approximately?

14   A.  I don't remember.

15   Q.  And you don't know one way or another whether Golden Gate

16   was able to make its interest payments under this note?

17   A.  Again, I'd have to look at the work papers.  I don't recall

18   the specifics.

19   Q.  It would have $200,000 in the bank, though; right?

20   A.  You mean as of 2013?

21   Q.  Yeah.

22   A.  Yeah.

23              MR. GLUCK:  Could you call up Plaintiffs' Exhibit 960,

24   please.

25   Q.  Now, in just in this email, only Nordlicht is disclosed as

MCECpla4                          McGowan - Cross

1   a Beechwood owner, and not Mr. Bodner and Mr. Huberfeld; right?

2   A.   Yes.

3   Q.   Were you aware that Mr. Bodner and Mr. Huberfeld were

4   owners of Beechwood?

5   A.   Again, I don't recall the specifics.

6             MR. GLUCK:   All right.  Now, 960, please, which we'll

7   move into evidence.

8             MS. MOSSE:   No objection.

9             THE COURT:   Received.

10            (Plaintiff's Exhibit 960 received in evidence)

11            MR. GLUCK:   Item No. 1, page 2.

12  Q.   Is this a set of regulations governing how accountants are

13  supposed to treat deficiencies of the sorts that we were

14  discussing?

15  A.   Yes, it looks like it's part of the standard.

16  Q.   Was the disclosure of this deficiency to Platinum

17  Management mandatory or voluntary?

18  A.   We are required under the standards to communicate to those

19  charged with governance and material weakness.

20  Q.   So can you just walk us through the difference between

21  deficiency, significant deficiency, and material weakness?

22  A.   Well, I mean, the standards are sort of laid out right

23  here.

24            But, again, as we look at the three levels of

25  deficiencies, a deficiency is essentially a deficiency in

1   internal control where there might be misstatements that go

2   either undetected or non-corrected.  However, those are

3   generally considered not material.

4         A significant deficiency is a deficiency or a

5   combination of deficiencies where it, again, it's been

6   concluded that it's not material, but we, you know, as

7   auditors, it's our judgment that we want to give it more

8   emphasis.

9         And then a material weakness is where there's a

10  deficiency or a combination of deficiencies where it is either

11  a material misstatement was not corrected or the possibility of

12  a material misstatement could go undetected.

13  Q.  What you said is the third one, right, material weakness?

14  A.  Yes.

15  Q.  A combination?

16  A.  Yes.

17  Q.  What was the reaction of Platinum Management when you sent

18  that notification?

19  A.  I don't recall much reaction.

20  Q.  Did they fire you?

21  A.  We were -- we did not renew the engagement for 2014.

22          MR. GLUCK:  Call up Plaintiffs' Exhibit 984.

23          Move into evidence.

24          MS. MOSSE:  No objection.

25          THE COURT:  Received.

MCECpla4                        McGowan - Cross

1             (Plaintiff's Exhibit 984 received in evidence)

2    Q.   Whose decision was it not to renew the engagement?

3    A.   Management.

4    Q.   Platinum Management's?

5    A.   Platinum Management's.

6    Q.   How were you informed of that decision?

7    A.   I received a phonecall from Joe SanFilippo.

8    Q.   This letter came later, didn't it?

9    A.   I believe so, yes.

10   Q.   There has been litigation and arbitrations against BDO USA

11   and BDO Cayman from PPVA and other investors in which BDO has

12   taken the position of *in pari delicto*; is that right?

13             MS. MOSSE:   Objection.

14             THE COURT:   Ground.

15             MS. MOSSE:   401 and 403.

16             THE COURT:   No, I think this goes to bias.   Overruled.

17   A.   I'm not aware of the specifics around the cases that are

18   being dealt with by BDO's counsel.   I'm only aware that I've

19   been asked to be a party for depositions as required.

20   Q.   Do you have an understanding of what the phrase *in pari*

21   *delicto* means?

22   A.   No, I don't.

23   Q.   If I was to tell you it was a Latin phrase that means in

24   equal fault --

25             MS. MOSSE:   Objection.

MCECpla4                        McGowan - Redirect

1           THE COURT:  Sustained.

2    Q.  Has BDO contended that BDO is in equal fault?

3           THE COURT:  Sustained.  Sustained.  He doesn't have

4    any knowledge.

5           MR. GLUCK:  That concludes.  Thank you.

6           THE COURT:  It's not being received.  It's as to his

7    state of mind.

8           MR. GLUCK:  Yes, I think we moved this in.

9           THE COURT:  Redirect.

10          MS. MOSSE:  Can we pull up DX 569, please.  Can we go

11   to page 41, please, 42 of the PDF.  Can you highlight the

12   second full paragraph, please.

13   REDIRECT EXAMINATION

14   BY MS. MOSSE:

15   Q.  Mr. McGowan, you were asked some questions about Beechwood

16   and whether you knew it was a related party of Platinum; is

17   that right?

18   A.  Yes.

19   Q.  And in the email that we just looked at, I think it was

20   PX 970, you saw that it was communicated to you that Beechwood

21   was a related party of Platinum; is that correct?

22   A.  Yes.

23   Q.  And that is also reflected in this note to Platinum's

24   financial statements for the yearend December 31, 2013?

25   A.  Yes.

MCECpla4                    McGowan – Redirect

1    Q.  And that note was audited by BDO?

2    A.  I don't recall the extent of procedures we did around that

3    disclosure, but we likely got some support.

4    Q.  Was it BDO's common practice to audit footnote disclosures

5    in its clients' financial statements?

6    A.  Yes.

7    Q.  And this footnote refers to Beechwood being a related party

8    of Platinum and also refers to it purchasing debt of Golden

9    Gate; is that correct?

10   A.  Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And so that's something that was audited by BDO, is that

2    right?

3    A.  It was included in our procedures related to the audit of

4    the financial statement.  To what extent, I don't recall.

5    Q.  Do you have any reason to believe that BDO did not audit

6    this particular portion of Platinum's footnote disclosures?

7    A.  No.

8    Q.  You were asked questions about Glacial and adjustment to

9    Platinum's valuation of Glacial.  Do you remember that?

10   A.  I did respond to information related to Glacial, yes.

11   Q.  And I believe you testified that Platinum did ultimately

12   agree with BDO's proposed adjustment?

13   A.  They ultimately booked the adjust, yes.

14   Q.  So Platinum adjusted the valuation of Glacial to go in line

15   with what BDO recommended.

16   A.  Yes.

17   Q.  You were asked questions about the reserve report for

18   Golden Gate and whether you had reviewed a report by NSAI, and

19   I think you were shown an e-mail that referred to the NSAI

20   report.  Do you remember that?

21   A.  Yes.

22   Q.  The reserve report that you -- that BDO did review for

23   Golden Gate was issued by D&M, DeGolyer McNaughton is that

24   correct?

25   A.  Yes.

Mce2Pla5                          McGowan - Redirect

1   Q.  Do you have any basis to question the reliability of the

2   D&M report?

3   A.  No we had done procedures around who D&M was.

4   Q.  And did BDO conclude that D&M was a reliable expert?

5          MR. GLUCK:  Objection.

6   BY MS. MOSSE:

7   Q.  Can we pull up DX 696, please.

8          Is this one of BDO's work papers?

9   A.  Yes.

10         MS. MOSSE:  I offer it.

11         MR. GLUCK:  No objection.

12         THE COURT:  Received.

13         (Defendant's Exhibit 696 received in evidence)

14  BY MS. MOSSE:

15  Q.  This form is entitled "Use of Management's Experts."

16  What's the purpose of this form?

17  A.  This is a document with certain information around

18  management's experts to evaluate them from a professional

19  perspective.

20  Q.  And what does this particular form reflect?

21  A.  It is discussing D&M.

22  Q.  Can we turn to page 2, please.

23         The blue box on the bottom, what does that reflect?

24  A.  It reflects a conclusion to the question that is being

25  asked.  It is:  Is management's expert sufficiently competent,

Mce2Pla5                          McGowan - Redirect

1    capable, and objective for our purposes?  Yes.

2    Q.  That was BDO's conclusion with respect to D&M?

3    A.  Yes.

4    Q.  And D&M was the company that issued the reserve report for

5    Golden Gate as of December 31, 2013?

6    A.  Yes.

7    Q.  I think we talked about this before when we were reviewing

8    the valuation report, but Black Elk made public filings with

9    the SEC, is that right?

10   A.  Yes.

11   Q.  And as part of BDO's work, would it review those public

12   filings?

13   A.  Yes, it would.

14   Q.  And so if BDO was auditing PPVA's financial statements for

15   the year end 2013, would it review filings that Black Elk made

16   for the year 2013?

17   A.  Yes, we included those in our work papers.

18   Q.  Can we pull up DX 008, please.  This is already in

19   evidence.  Can you turn, please, to page 11.  I am looking for

20   the page that actually is numbered 11.  Can you highlight,

21   please, the second paragraph under "senior secured revolving

22   credit facility."  And then highlight point 10, please.

23        You were asked questions about Black Elk Opportunity

24   Fund.  Do you remember that?

25   A.  Yes.

1    Q.  Is this a reference to Black Elk Opportunity Fund in

2    Black Elk's publicly filed financial statement for September --

3    sorry, publicly filed form 10-Q for the quarter ended September

4    30, 2013?

5    A.  Yes, it's a reference to the fund that's identified here,

6    yes.

7    Q.  Can you turn, please, three pages ahead in the PDF to page

8    13 on the bottom.  And can you call out the first two

9    paragraphs, please -- sorry, the first two paragraphs under

10   note 8, the first two paragraphs.

11          Looking at the first sentence, do you see again

12   reference to Platinum Partners Black Elk Opportunity Fund?

13   A.  Yes.

14   Q.  Can you turn, please, to page 17 of this document.  Call

15   out the first paragraph, please.

16          You were asked questions about whether Black Elk was

17   ever considering purchasing Golden Gate Oil.  Do you remember

18   that?

19   A.  Yes.

20   Q.  And do you see that that is disclosed in Black Elk's

21   publicly filed form 10-Q?

22   A.  Yes.

23   Q.  Can we please turn back in this document five pages,

24   please, there is not a page number, but two pages after 13.

25          This is a section of this publicly filed document on

1    the West Delta incident.  Do you see that?

2    A.  Yes.

3    Q.  And if you look at the paragraph that begins "as of

4    November 2013," can we zoom out, please?

5         "As of November 12, 2013" you were asked if you had

6    knowledge of any lawsuits that were filed in relation to the

7    West Delta incident.  Do you remember that?

8    A.  Yes.

9    Q.  And does this paragraph of Black Elk's publicly filed form

10   10-Q reference lawsuits that were filed as a result of the West

11   Delta incident?

12   A.  Yes.

13   Q.  You can take this down, please.

14        You were asked about a sale of Black Elk's -- certain

15   of Black Elk's assets in August of 2014.  Do you recall that?

16   A.  Yes.

17   Q.  If BDO was valuing PPVA's interest in Black Elk as of year

18   end 2013, what relevance, if any, would a sale of certain of

19   Black Elk's assets in August 2014 have -- not as of 2014 have

20   to BDO review as of the prior year end?

21   A.  You know, while you consider the facts that are known and

22   knowable as of the balance sheet date, you also evaluate

23   subsequent events for whether or not any of that information

24   could have been known or knowable or if they are applicable in

25   any way.  Particularly look to that, you know, we had done some

work to just do a reasonableness on the sale prices that we

believed were related to the reserve sold in looking at where

our VBA -- our valuation specialists were coming up with their

ultimate multiples as of December 31.

Q.  And with all of that knowledge that you had as to the

subsequent event, BDO's opinion remains that Platinum's

financial statements presented fairly as of year end 2013, is

that right?

A.  Yeah, we issued an unqualified opinion, yeah.

          MS. MOSSE:  No further questions.

          THE COURT:  Anything else?

          MR. GLUCK:  Just one.

          THE COURT:  Okay.

RECROSS EXAMINATION

BY MR. GLUCK:

Q.  Black Elk had a purchase option for Golden Gate for $60

million.  Golden Gate had $40 million worth of debt.  What's

the maximum that its equity could have been worth?

A.  You know, again, I would have to understand that in terms

of what that full transaction meant, and, you know, the

valuation methodology applied related to the reserves, so

that's a specific related-party transaction.  I can't really

answer that question without evaluating all the facts.

Q.  Couldn't have been more than $20 million, which would have

been a sixth of what's in the audit, right?

Mce2Pla5

1            MS. MOSSE:  Objection.

2            THE COURT:  Overruled.

3    A.   Again, I would have to consider that with all the facts

4    around the transaction and the other work that we did.  I can't

5    answer that question.

6            MR. GLUCK:  Thank you very much, sir.

7            THE COURT:  Thank you very much.  You can step down.

8            THE WITNESS:  Thank you.

9            (Witness excused)

10           THE COURT:  All right.  Anything else from the

11   defense?

12           MS. MOSSE:  Your Honor, at this time we have certain

13   exhibits that we would like to admit pursuant to a stipulation.

14           THE COURT:  Go ahead.

15           MS. MOSSE:  DX 552, DX 561, DX 566, DX 601, DX 605,

16   DX 614, DX 641, DX 637, and DX 647.

17           THE COURT:  Any objection?

18           MS. SHEN:  No objection.

19           THE COURT:  Received.

20           (Defendant's Exhibits 552, 561, 566, 601, 605, 614,

21   641, 637, and 647 received in evidence)

22           THE COURT:  Anything else?

23           MR. LAUER:  At this time the defense rests.

24           THE COURT:  Very good.

25           Ladies and gentlemen, that concludes the evidence in

Mce2Pla5

this case.  So I have a proposition to put to you.  I could ask

you to just sit here for 4:30 because you expected to go to

4:30.  You could look up at the ceiling.  You could contemplate

all the mysteries of life.

          But to get serious for a minute, we are going to

excuse you now, but I wonder—tell me by raising your hands if

this is a problem—whether tomorrow we could begin at 9:00

rather than 9:30.  And the reason for that is I have given each

side two hours for their closing arguments.  So if we start at

9:00, we can have the plaintiffs' argument concluded by 11:00,

take a short break, and then we could have the defense finish

by a few minutes after 1:00, and then you would have, of

course, your lunch break.  So there wouldn't be any split

between before and after lunch in their closing arguments.  I

think that would make a lot of sense, but it means you are

coming in at 9:00.

          Now, is that a problem?  Terrific.  You are such a

great jury.

          All right.  So we will see you at 9:00 tomorrow.

          (Continued on next page)

Mce2Pla5

1          (Jury not present)

2          THE COURT:  All right.  So I thank counsel again for

3     their latest submissions.  And all four submissions, ones that

4     came in at noon and ones that just came in, if they haven't

5     been docketed already will be.  I will hand them right now to

6     my law clerk to docket if they haven't already been.

7          I have already indicated that I am dismissing the

8     fraud count as not pled in any way separate from the fiduciary

9     breach count.  I am finding that the -- I am concluding that

10    the breach count does have to be an intentional breach, but

11    therefore that the statute of limitations is six years.

12          I don't think I am persuaded that FIFO should apply.

13          The hardest question, closest question is the one

14    regarding the 18 million, and after a lot of thought and study,

15    I have concluded that I will allow plaintiffs' counsel to argue

16    for that, and therefore there is no need to put in any

17    additional documents.  I do think that the binding statement of

18    damages is that set forth in Mr. Quintero's report.  But on

19    rereading, I think there is enough there——it's not totally

20    consistent, but I think there is enough there to allow the

21    argument for the 18 million.  And I am somewhat solidified in

22    that conclusion by going back to my *Daubert* decision where I

23    reached the same conclusion.

24          I do think, because this is a close call, that we

25    should add to the verdict form a fourth question.  You saw my

Mce2Pla5

verdict form with three questions.  The fourth question will

read:  Please indicate how much of this amount, if any, is for

incentive fees based on the 2012 NAV.

So if the Court of Appeals disagrees with me on this

point, we don't have to retry the whole case and we can just

subtract whatever that amount is.

I have incorporated my rulings, including not only the

ones I just mentioned but some other ones that are referred to

in your letters, in what I consider a final draft or maybe

penultimate draft of the Court's instructions of law, which I

will ask my law clerk to now hand out in its latest form to

both counsel.

I have included -- I have taken out the "for example"

language in the instruction, I think it was ten or whatever,

and I have included some language suggested by defense counsel

on incentive fees and management fees, but I put it into the

damages section, not the earlier section.  So you will see

that.

Since we ended, and I thank all counsel very much for

the alacrity with which we proceeded today, but since it is

3:00 and I don't have another court matter until 4:30, what I

suggest is you look over the final penultimate instructions

that I just gave you, and I will get you the revised verdict

form and my law clerk bring it to you in about five minutes,

and then I will hear one final argument on anything after you

Mce2Pla5

have read the new language in both the instructions and in the

verdict form you want to make at 3:30.  I don't want to rehear

any of the stuff that we argued until 8:30 last night.  This is

just any -- you will see where the language has been changed

and if there is any problems with any of that, this would be

your opportunity to object to it.

I should note that on summation I always allow counsel

to quote from my instructions since you have them in advance.

Some judges don't allow that.  I do.  So feel free to make

reference to the instructions.

I assume at this point defense counsel wants to renew

his Rule 50 motion.

MR. LAUER:  Yes, your Honor, without elaboration

unless the Court --

THE COURT:  No, but I know the Court of Appeals says

if you don't do that, as you said before, waiver reigns, so the

motion is made.  I assume it is made on each and all of the

points raised previously.

Is there anything new that you wanted to raise?

MR. LAUER:  Well, in light of what the Court has just

ruled, which did I not expect, I want to renew the 50 motion

but also make the specific comment for the Court that the

*Daubert*, when the Court ruled that they would be restricted to

55 million, if that's what the Court is referring to,

demonstrably the 55 million does not include a single dollar of

Mce2Pla5

1    2012 fees.  That is a fact.  No one can honestly dispute it.  I

2    can demonstrably prove it.  So if the Court was thinking

3    that --

4              THE COURT:  No, that wasn't -- there were two things.

5    I don't think it will ultimately change my mind, but I will

6    hear what you have to say because while the primary reason for

7    my ruling was that while there are, I think it's fair to say,

8    inconsistent statements or at least vague statements in the

9    Quintero report, some of which support your position, which is

10   why I say it is a close call, I think there was enough there to

11   allow him to say what he said.

12             But having said that, yes, I was reinforced by the

13   reference in plaintiffs' letter to what I had said at *Daubert*,

14   which I thought did include the 18 million, but if I am -- I

15   didn't go back and look at the *Daubert* opinion itself, I just

16   took their letter.  So if that's wrong, now is the time to let

17   me know and I will rethink it once again.

18             MR. LAUER:  It is demonstrably wrong and that is why,

19   with all due respect for your Honor, you are completely being

20   misled.  And let me explain one example of why the 55 million

21   does not include a dollar of 2012 fees.

22             There is no dispute in this case that the last

23   incentive fee paid is in June of 2014.  So what that means is

24   fees that were based on 2014 accrued incentive fees were not

25   paid.  Fees that were accrued for the three months of March 16

Mce2Pla5

1    were not paid.

2              Now, when you go to those charts or the table which

3    lists 2013, 2014, 2015, and 2016, and they add up to 55

4    million, and you start working backwards, you realize that this

5    is not a chart of payments, it's a chart by year.

6              In other words, the first three months of 2016, which

7    no one disputes was never paid, is based on accrual within '16.

8              The number for 2015, again, no one disputes that not a

9    dollar of the number in the '15 column was ever paid.

10             Then you go back '14, not a dollar of the '14 fees was

11   ever paid.

12             Now you go to '13.  A portion of that may have been

13   paid -- was paid, and that's the end of the table.

14             That table, which adds up to 55, does not contain a

15   dollar of 2012.

16             THE COURT:  I gave to my law clerk this morning, but

17   I'm not sure he can find it, but it's in one of those manila

18   folders, which is the *Daubert* opinion, or if someone has it,

19   maybe they can pass it up to me, then I will want to hear from

20   plaintiffs' counsel.

21             (Pause)

22             THE COURT:  So let me go back while we are searching

23   for the *Daubert* opinion.  Hand me back the letters that I just

24   handed you.

25             MR. GLUCK:  A copy for the Court.

Mce2Pla5

1           THE COURT:  I will take it.

2           So the letter of defense counsel that I partly relied

3    on says——this is on page 3 of the letter submitted around noon

4    on December 14, today——"Accordingly, Mr. Quintero specifically

5    opined that zero incentive fees should have been paid on

6    account of PPVA performance in 2012 or any time thereafter.

7    *See also Daubert* opinion, docket entry 646, at 40, confirming

8    Quintero opinion that no incentive fee should have been paid

9    during the damages period and further ruling that Quintero may

10   testify as to 55.03 million incentive fees that were

11   illegitimately claimed."

12           And page 40 of the *Daubert* opinion says, starting at

13   the top of the page, "Nevertheless, Quintero may testify that

14   damages attributable to excessive incentive fees amount to

15   55.083 million.  Bodner here argues that such damages figures

16   must be lower than 55.083 million because some portion of that

17   must have been based on legitimate gains.  However, Quintero's

18   assumption here is indeed that all of the 55.083 million was

19   illegitimately gained, given that Quintero's estimated true

20   value for each and every asset at issue decreased over time

21   during the damages period, therefore, according to Quintero, no

22   incentive fees should have been paid cumulatively during the

23   damages period at all.  *See* Quintero report, Exhibits 23.1,

24   24.1, 25.1, 26.1, 27.1, 28.1, 29.1 and 30.1.  In sum, Quintero

25   may testify that the amount of damages attributable to

Mce2Pla5

1  excessive management fees is 55.083 million but not that such

2  amount is at least 55.083 million or 88.9 million."

3       So I think in one way that captures the same

4  ambiguities that we have been dealing with in his report, which

5  is that on the one hand he gives a figure and on the other hand

6  he says that there should be no incentive fees paid during the

7  damages period which goes back to December 2012.  However, I

8  was under the impression——and defense counsel now says it was a

9  misimpression——that the figure he was now seeking as of the

10  time of the *Daubert* report he testified to was 55 million then

11  he also made the argument for more based on other factors and

12  those were just considered.

13       So let me ask plaintiffs' counsel is the 55 million

14  exclusive of the 18 million?

15       MR. GLUCK:  So I did my best to accurately set forth

16  the chain of events in my letter of last night, which I

17  finished around 3 in the morning.  Here is the deal.

18       Effectively, until yesterday afternoon, defense

19  counsel had been making a series of arguments that I found

20  incorrect on their face, which is that Mr. Quintero had never

21  suggested that 2012 incentive fees were overpaid or that he did

22  not analyze the assets in 2012.  Okay?  Most specifically he

23  analyzed the Black Elk problems leading up to the explosion and

24  then the explosion.

25       Yesterday afternoon, it became apparent for the first

Mce2Pla5

1    time what the basis, which I am trying to verify, of

2    defendant's counsel's argument just made was.  What they appear

3    to be saying, and this is set forth in my letter and in I think

4    the exact same words, is that if Mr. Quintero intended for the

5    2013 fees to be part of the, quote, 55 million -- the $13

6    million number and not an $18 million number, the number should

7    have been 68 million.  There is an arithmetic error.  And that

8    is why I suggested that to the extent there is an arithmetic

9    error, it could be very easily corrected by the documents

10   referenced in his report to particular bank statements.

11          I got it now for basically the first time what they

12   are saying is that if you add the 2016 LP interests—tell me if

13   I'm wrong—and then add the 2015 LP interests, none of which

14   were ever redeemed for cash, and then you add the 2014 LP

15   interests, none of which were redeemed for cash, and then you

16   add the combination of 2013 cash and noncash interests, and

17   then you add the 2012 cash and noncash interests, the number

18   should come out to about 68 million approximately, 13 million

19   more than the 55.

20          And what it appears to me, having poured over this for

21   hours last night, is that Mr. Quintero, in that section on the

22   88 million, was referencing payments, some of which were

23   withdrawn, for example, payments to Bernie Fuchs's family

24   members.  And in a nutshell, while we are trying to work

25   through this with Mr. Quintero, and Mr. Bixter is not here

Mce2Pla5

today, I am going to go ahead and assume that my rendition just
now of defendant's thesis is correct.  And by the way, that is
the exact same thesis that was placed into my letter of this
morning.

Now, what the letter suggests is that there is no
reasonable argument that Mr. Quintero evaluated the assets up
to 2012, particularly Black Elk.  And he clearly——and it's
quoted in a very long footnote——testified that his opinion was
that the drop in the value of PPVA Black Elk common equity
proximate to the problems of 2012 and the explosion, about 200
million worth, could not have been made up by any of the
purported gains in the other assets.  And so the NAV didn't go
up and incentive fees were zero.  Those are the core opinions
of his report.  Period, full stop.

Now, in his --

MR. LAUER:  Are you done?

MR. GLUCK:  No.  Because I fundamentally disagree with
98 percent of what Mr. Lauer has said, and I believe that this
circumstance has been brought about by a fundamentally
incorrect argument repeated over about six months now which
obfuscated this narrow accounting issue.  There is an
arithmetic error they say.  They say that if you add up the
noncash fees and the cash fees, going back to 2012, what we
will find is that Quintero's $55 million number should have
been 68 million.

Mce2Pla5

1          And this is the solution we presented in the letter.

2   The 13 million -- it is not 18 million.  The 13 million of cash

3   incentive fees paid in 2012 are clearly and unambiguously

4   referenced on a PPVA bank statement where basically they were

5   the only transactions for the whole month——one $500,000

6   transaction, one $13 million transaction approximating it is

7   approximately about $13.7 million.

8          Now, Quintero referenced it, and I think, I think that

9   he was including that within his $80 million number.  The

10  question we believe the Court put to us yesterday was whether,

11  under these circumstances, Mr. Quintero can utilize a number

12  other than 55 million.

13         And under that ground, here is what the letter says

14  and here is what I say:  When this Court issued the *Daubert*

15  opinion, it is not clear to me, because the argument came

16  later, that the Court was aware that for the '12-'13 fees, a

17  portion of them, it is admitted, were never redeemed for cash.

18  They were just LP interests and they just sat there.  And

19  therefore, when the -- when they argue that neither management

20  fees nor incentive fees were damages of the master fund it was

21  one of the core arguments in the *Daubert* hearing and papers,

22  the outcome the Court settled on was that if the money came out

23  of the master fund bank account, it was damages to the master

24  fund.

25         The instant that ruling was made, the 55 million

number was no longer the number.  In fact, it was 30.3,

whatever the number is on that chart.  What they are -- so it

was automatic.  We could no longer in good faith -- we PPVA,

could no longer say that there were 55 million of incentive

fees damages because the Court ruled that the only damages that

we could claim were the ones that came out of the bank account.

So then we looked and we said, okay, which ones came out of the

bank accounts, and the answer was 30.2 million.

What they are saying now, as I understand it, is that

if one looks back, the number shouldn't have been 55 million,

it should have been 68 million and that within the $55 million

number, Quintero made some sort of arithmetic error that I am

now attributing because I am looking at it.

THE COURT:  I'm going to cut you off because I want to

ask a question of defense counsel in a minute, but before I do,

you can both be seated for a minute.  I have now gone back and

looked at the *Daubert* report and I think it is consistent with

what plaintiffs' counsel just said, subject to hearing from

defense counsel.

The real problem here in part is that Mr. Quintero's

expert report is less than careful.  I decided not to confront

him when he was on the stand with the innumerable grammatical

and punctuation errors in his report because it wasn't really

relevant to the jury and because to go through all of them

would have required at least an hour.  But the man is incapable

Mce2Pla5

1    of writing a coherent -- a fully coherent, grammatically and

2    punctuationally correct report.

3            But what I think emerges from his report and was more

4    than the *Daubert* reason for my determination, although the

5    *Daubert* played a role, was his statement on page 18 of his

6    report that "the damages from inflated incentive fees are

7    limited to what was charged to Platinum during the Damages

8    Period," which is a defined term that's been repeatedly pointed

9    out, and is here shown to be a defined term because of its

10   initial caps.

11           Continuing with the sentence "which has been

12   calculated as of the date of this report as 66.083 million

13   subject to further refinement."

14           And then in the next paragraph, he says, "The damages

15   sustained by the fund pertaining to inflated incentive fees

16   were at least the full amount of incentive fees charged to the

17   fund during the damages period," which has apparently been

18   calculated in an amount of 55 million.  And then he references

19   Exhibit 21 which is filled with typos and other

20   inconsistencies.

21           But in my *Daubert* ruling, what I was confronting was

22   the claim that he could somehow increase still further the

23   amount of damages based on those words "at least" which I

24   rejected because of internal inconsistencies and because it

25   went beyond anything that was fairly set forth in his report.

Mce2Pla5

1    So what I was addressing there was the attempt to get

2    a still higher figure and not really the issue that was raised

3    last night and earlier by defense counsel.

4    But what I want to know from defense counsel is where

5    in his report, in Quintero's report does he say that we are not

6    claiming any incentive fees paid for the year end December 2012

7    NAV?

8    MR. LAUER:  Okay.

9    THE COURT:  Go ahead.

10   MR. LAUER:  Let me start with the quote in the *Daubert*

11   where the Court said -- and I'm not relying on the *Daubert*.  I

12   want to explain to the Court that there is no inconsistency

13   between the *Daubert* and the tables.  The Court said, "See

14   Quintero report Exhibits 23.1, 24.1, 25.1, 26.1, 27.1, 28.1,

15   29.1, 30.1."  Each of those is the schedules which is the only

16   valuation level work which in any typical situation would be

17   viewed as the only acceptable manifestation of his valuation

18   opinion.  These are the individual schedules for the straight

19   line method.  And the Court will note at the top of each one

20   the -- the two that are relevant to December 2012——Black Elk

21   which is 23.1 and Golden Gate Oil, 24.1——the amount of inflated

22   incentive fees for December 31, 2012 is zero.  So let's just

23   start there.  The Court's own reference to the 55 million and

24   the chart was Quintero is saying in his report I have 55

25   million dollars of incentive fees that were charged, not paid,

Mce2Pla5

1    charged.  And they are backed up by my schedules and those

2    schedules as it relates to December 2012 were zero.  That's the

3    first point.

4              THE COURT:  Let me just -- so I am looking at the

5    *Daubert* decision, page 40, which was the page that you are

6    citing and also the page that plaintiffs' letter cited, and it

7    is addressed to a different issue.  The argument that was being

8    made by plaintiffs here was that they could go beyond the

9    actual cash payments.  And I rejected that.  And then you made

10   the argument, I will quote from the *Daubert* opinion, "Bodner

11   here argues that such damages figures must be lower than 55.83

12   million because some portion of that must have been based on

13   legitimate gains."  That is a totally different argument.

14             MR. LAUER:  I agree, and that has nothing to do with

15   our motion.

16             THE COURT:  I agree with that.  But therefore I don't

17   think you can say that the *Daubert* opinion wasn't supportive of

18   the ruling that I made a few minutes ago that you are now

19   challenging, because what I said in the *Daubert* was:  He says

20   it's the whole kit and kaboodle for all the damages period.

21   You say it should be -- no, it should only be some portion of

22   it because there were some legitimate gains.  I don't think

23   that precludes him from his argument that it's the whole thing,

24   and I just used the figure he had given for the whole thing, 55

25   million, but -- and said he couldn't therefore go beyond it

1    because his new theory went beyond cash to other stuff.  So

2    that seemed to me to be a clear message that he was allowed to

3    challenge all incentive fees but only up to what was actually

4    paid in cash.  And that's why plaintiffs' counsel I think quite

5    correctly said that after he read that he realized the 55

6    million figure was more than just cash and he would reduce it,

7    which he did.  I don't see how any of that supports your notion

8    that I was saying you can't include 2012.

9            MR. LAUER:  Your Honor, my reference to the *Daubert*

10   earlier, which unleashed this, frankly completely irrelevant,

11   and I will deal with each of those issues, because your Honor

12   asked -- your Honor asked a very simple question to plaintiffs'

13   counsel which never got answered, but which I will get back to.

14   My reference to the *Daubert* was not to rely on the *Daubert*.  We

15   are not relying on --

16           THE COURT:  No, but you were saying the 55 million --

17           MR. LAUER:  Exactly.

18           THE COURT:  -- included the 18 million, but --

19           MR. LAUER:  It did not include the 55 million --

20           THE COURT:  -- did not include the 18 million --

21           MR. LAUER:  -- and --

22           THE COURT:  -- but I think that --

23           MR. LAUER:  -- I'm going to get to --

24           THE COURT:  -- that is an irrelevancy as far as the

25   *Daubert* opinion.

Mce2Pla5

1           MR. LAUER:  I agree.

2           THE COURT:  Okay.

3           MR. LAUER:  But to the extent the Court thought that

4     the *Daubert* 55 included --

5           THE COURT:  No, no, no, what I said earlier, maybe I

6     wasn't as clear, I said I was -- I thought that plaintiffs

7     could claim the 18 million as part of their damages and my

8     primary reason for saying that was language in Mr. Quintero's

9     report, notwithstanding some inconsistent language that was

10    discussed at length, and I mentioned I was further supported in

11    that conclusion by what I said in the *Daubert* decision.  And I

12    think I still have further support in that because what the

13    *Daubert* decision said was he can testify notwithstanding a

14    different objection you had raised to all the incentive fees

15    during the damages period, but he just can't go beyond the

16    cash.  But anyway let me hear final argument on this.

17          MR. LAUER:  So I don't understand what is happening

18    here.  The question that was posed to plaintiffs' counsel, and

19    I am paraphrasing, is:  Do you agree that with respect to

20    schedule 21, which has the 55 million in incentive fees, do you

21    agree -- and which has the chart where the Court observed and

22    Quintero agreed it's a typo, it should say damages for

23    incentive fees during the period January 2013, the question to

24    plaintiffs' counsel was:  Do you agree that those columns——'16,

25    '15, '14, '13——purport to represent fees that were charged on

1    the basis of the year of the AUMs in the years identified, and

2    this is not purporting to be a chart of when payments were

3    made, that indeed this chart, schedule 21, is not addressing

4    2012.  That was the question.  You didn't get an answer to

5    that.

6              So that I don't turn this back over to another

7    filibuster, I'm going to answer the question for counsel

8    because I applaud his alacrity at this in not directly

9    answering the question.  So that's point one.

10             Number two, coming back to the *Daubert* and this issue

11   that, you know, for fours years we have been pushing to say

12   there are no incentive fees, we made our original motion *in*

13   *limine* on this issue more than a year ago.  So there is no

14   misunderstanding here.  What was happening at the *Daubert* to

15   the benefit of everyone had nothing to do at the end of the day

16   from their perspective the 88 million or 89 million that

17   Quintero had in his report and the Court said it seems a little

18   bit illogical that you can claim inflation of 89 million if

19   only 55 million went out.

20             (Continued on next page)

21

22

23

24

25

MCECpla6.

1              MR. LAUER:  Putting aside whether he really could or

2       not construct this up-and-down thing, that's what that was

3       about, that had --

4              THE COURT:  I agree.

5              MR. LAUER:  It had nothing to do with what year's fees

6       are included.  So the only thing --

7              THE COURT:  No, it was assumed and not challenged at

8       the *Daubert* hearing, it doesn't mean you waive your right to

9       challenge it here, that what plaintiffs were claiming was all

10      the incentive fees for the damages period.

11             MR. LAUER:  Which is --

12             THE COURT:  And, therefore, I assume that, as well, I

13      just disagreed that that could include things other than cash.

14             MR. LAUER:  No, because if you look at paragraph 32,

15      which has this 88.929, he says during the damages period that

16      aggregated more than $55 million, again citing schedule 21.

17             THE COURT:  Yeah, you're back to his report, and I

18      agree that, in the end, the plaintiffs are bound by his report.

19      I don't accept that they can add this back in through the

20      testimony that they were asserting of other people and

21      documents they haven't yet offered.  On that, I totally agreed

22      with defense counsel.

23             MR. LAUER:  I just want to make one other point.

24             THE COURT:  But when I went back and looked at the

25      report, with all its seeming inconsistencies and other errs, it

MCECpla6.

1    seems to me that it was consistent in its fundamental theory,

2    which was that none of the incentive fees for the damages

3    period should ever have been paid because if they were the

4    product of a gross overinflation, and if you subtracted that

5    inflation, you had loss, not gain.  That theory, I think,

6    permeates the report and that's why I changed my mind last

7    night.  I was leaning in your direction, I know you're

8    disappointed I changed my mind, but it is Felix Frankfurter

9    famously said, the fact the wisdom comes late does not mean it

10   should be ignored.

11         MR. LAUER:  Of course with disappointment, but I think

12   the Court should perhaps look at this from defense counsel's

13   perspective.  I'm not talking about now.  In 2019, we get this

14   report.  Any rational person reading this report and

15   understanding that he's doing these schedules would conclude

16   that to the extent the expert is expressing an opinion -- and

17   in this court and in every court, an expert's report is not

18   deemed to -- a one-liner in a expert's report that is not

19   connected to the scientific work is not deemed an opinion.

20         THE COURT:  I agree with that, and that's why I was

21   leaning your way last night, but when I went back and read the

22   report, it's not just a one-liner, it's a whole theory that's

23   developed at some considerable length throughout the report,

24   and that is that, simply put, but put this way, in various

25   places in the report, that because of overinflation, there

MCECpla6.

really were no gains, therefore, there should have been no

incentive fees paid, and this was true for the entire damages

period.

MR. LAUER:  Then he didn't need to do these schedules.

Our *Daubert* motion originally was this man did not do

appraisals, he came in with this arbitrary set of numbers on

the schedules starting with zero.  No one, no one could

reasonably assume, looking at those schedules, which are the

body of the work, no one could assume that for Black Elk and

Golden Gate for December, when he says zero, that he really

means $18 million.  That's what this is about because you can't

put in those schedules, have us do discovery and decide, well,

we don't need -- if we're not dealing with 2012, this is what

we're dealing with.  So this is truly remarkable.  When you

look at that report, almost all the work in terms of numeric

work is in the schedules, that was his report.  I didn't do a

valuation.

Then you have these miscellaneous statements that are

not connected.  If he meant to include 2012 beyond the 55, he

should have had five years there, '12, '13, '14, '15 '16.  This

is really total, total attempt to survive -- to have something

survive that, when looked at, never said I am expressing an

opinion that when it says zero, it really means $18 million.

And when you look, it's not just the chart with the

numbers.  You look at the point 2 section, he's expressing the

MCECpla6.

1   adjusted value of $284 million.  So if he's expressing the

2   adjusted value of $284 million, for purposes of how he did his

3   model -- I didn't tell him to do it this way.  For purposes of

4   how he did his model -- how can they come into court and say we

5   fooled you, you guys are idiots.  It said we slipped in

6   something, $66 million, which doesn't add up to 18 and 55, it

7   would be 73.  I have no idea what the 66 is.

8           THE COURT:  He does also say 73.

9           Let me ask you this, did you question him on this at

10  his deposition?

11          MR. LAUER:  We questioned him on his methodology.  We

12  saw no reason to talk to him about '12 because this said zero.

13  We were happy to have zero.

14          THE COURT:  I hear what you're saying about reliance,

15  but another way to look at it is even though you thought his

16  methodology -- even though you thought his approach did not

17  include 2012, you never asked him about that at his deposition,

18  you didn't raise it with the Court at the *Daubert* hearing.  If

19  it was something you were so clearly, in your mind, relying on,

20  you would have thought you would have at least asked him at his

21  deposition, isn't it true that you're claiming zero for the

22  period related to 2012.

23          MR. LAUER:  I was happy with his schedule.  I was

24  happy to say this guy says zero, he's got a schedule, which, in

25  my view, is indefensible, and we'll take it on.  And my

MCECpla6.

experience -- I didn't do Quintero, but my experience with

experts, you don't want to play your game in the locker room.

You are much better off just playing around the issues, don't

do your examination because you can always supplement his

report.

I would like to just say a few other things on related

matters.

I think his testimony should be stricken.  I think the

Court has to consider the fact that there is no evidence by the

plaintiffs that at least $13.4 million of the $30 million on

their chart was ever paid.  That's a separate issue that

Mr. Hertzberg raised in the letter.  But I have to say, if the

Court allows them to completely renege and contradict their

schedules, I have to ask for a mistrial.

Your Honor, we relied on that.  We relied on that in

how we prepared for this case.  They have made -- in response

to our original motion *in limine*, they said, well, you know

what, even if 2012 is not in the case — I don't remember their

exact words — we want to move -- we want disgorgement because

we can get disgorgement from Bodner in 2013 when he's a

faithless servant even if the 2012 is not in the case.

From day one, we have operated on the assumption, on

the basis of Quintero's zeros and his valuation at $284 million

for Black Elk, that 2012 was not in the case.  And to put it in

the case because the Court sees 66.083 or because Quintero came

MCECpla6.

1      up with this interesting idea that during the damages period,

2      meaning the part of this chart, he can do more than 55 because

3      if, if it wasn't only not appropriately increased, it should

4      have been decreased.  That's what he meant by the 89.  We were

5      happy with the 55 ruling, but whether we were at 55 or 89,

6      there's still nothing in his report that says to counsel, my

7      zero should not be taken seriously, I'm fooling you.

8              So I have to ask the Court to reconsider this --

9              THE COURT:  In the report itself — I'm not asking

10     inferences you derived from his schedules, whatever — where do

11     you say it says it's zero for 2012?

12             MR. LAUER:  The top of schedule 23.1 and the top of

13     24.1.

14             THE COURT:  Let me look at those again.  My question

15     was about where it is in the main part of his report, but let's

16     see.  So 23.1, where are you?

17             MR. LAUER:  The top lines, excess of reported over

18     adjusted NAV, and then at the very right, total damages from

19     inflated fees, zero, zero, zero, zero, zero, zero.

20             THE COURT:  You pointed this out to me last night, but

21     I had forgotten about this.

22             So let me hear now from plaintiffs' counsel.

23             MR. LAUER:  It's also in 24.1 for Golden Gate.

24             MR. GLUCK:  It's for all of it.

25             MR. LAUER:  Only two of them are for 2012.

MCECpla6.

MR. GLUCK:  It is for all of them because some didn't
exist in 2012.  It's a very simple answer to everything that
Mr. Lauer said.  And, frankly, we've entered the silly zone,
which is why we're here today.

What Mr. Quintero decided to do, in the context of his
straight-line analysis, which was unnecessary, not necessary,
was to put in incentive fees column next to his straight-line
analysis as an FYI.  It was not his incentive fees analysis.
That is what the Court is talking about when it says it
permeates his report.  This notion that there was reliance on
these charts is the fiction that has brought us here today.

Point one, I think, and Mr. Hertzberg can correct me,
that this was expressly raised over about 50 pages in his
deposition.  Not a little bit, but a lot.  If I'm wrong on
that, let me know with my fairly distinct memory, maybe I'm
wrong, I'm tired.

But, let's be clear and let's get real.  What happened
here is that defendant believed in its own argument that
management fees and incentive fees were not damages of the
master fund.  That is what happened.  And then, when in the
*Daubert* the decision the Court ruled that actually, that which
came out of the master fund's bank account were damages to the
master fund, that is when the motions *in limine* started.  And
they stemmed from the false premise, this demonstratively false
premise, not in the sense that there is no arguable

MCECpla6.

inconsistency, but demonstratively false premise that

Mr. Quintero never or disclaimed that incentive fees

attributable to 2012 were damages, he just didn't, and that's

what's obvious and that's what improperly colored any argument

that he has had until yesterday.

And now yesterday, for the very first time, we hear an

argument that at least I understand.  What he's saying is that

within the $55 million, when you did your reduction, if you had

done it properly, it's not 18.  This is one of the problems

here, he keeps saying 18 and it's a misfact and it colors the

rest of the argument as being wrong.  That is one of the things

that's happening.  What Mr. Lauer is suggesting is that he

relied on these schedules, planned his whole case around it

when the exact opposite is true, we did all of discovery with

no distinction whatsoever between LP interests and fees and

cash payments.  It was for the very first time in the whole

case, including, by the way, at a deposition, including in a

deposition that, at *Daubert*, the thesis that the master fund

was damaged by payment of fees was challenged for the very

first time, and they didn't just challenge it for incentive

fees, they challenged it for management fees.

So we arrived at a place after *Daubert* where the Court

says fees out of the fund's bank account are challenged, and

all that happened thereafter --

THE COURT:  I'm going to cut you off because I'm going

MCECpla6.

1    to adhere to my ruling.

2            I would note one other thing, in exhibit 23, before we

3    get to the schedule, he is recounting what led to inflation,

4    and his second entry is September 17, 2012.  That's even before

5    the explosion, "S&P lowered its corporate credit rating on

6    Black Elk to CCC plus with a negative outlook for reasons

7    including, one, vulnerable business risk; two, highly leveraged

8    financial risk; three, small reserve and production base; four,

9    high operating costs; five, week sources of liquidity; and six,

10   insufficient cash flow to cover anticipated capital

11   expenditure."  That's all before the explosion.  So, I think

12   the only fair way to read that entry from his report is you got

13   to be kidding, you're saying the value of this entity is going

14   up when there are six good reasons why it should be viewed as

15   down.  And then, of course, on 11/16/12 is the explosion.

16           However, I recognize that there are good arguments on

17   both sides, and that's why I have added to the verdict form the

18   additional proposed question so that if I'm wrong, we can just

19   subtract out whatever portion of the damages they ascribe to

20   the 2012 NAV.

21           So, it's now quarter of 4:00 and I still wanted to

22   give you all a chance to look over the final jury instructions

23   and also the final verdict form, which we'll get to in a couple

24   minutes.  I have another matter at 4:30, so why don't we

25   reconvene at 10 minutes after 4:00.

MCECpla6.

1          MR. LAUER:  Your Honor, I would just ask you to

2     consider the other two issues, which is that there is no

3     evidence of payment of management fees, the last $5.7 million;

4     and second, the point that Mr. Hertzberg raised in his letter

5     that there is no evidence with respect to at least

6     $13.4 million of the $30 million that was on their chart, that

7     any of it was ever paid in cash or redeemed in cash.  I'm not

8     going to argue it --

9          THE COURT:  So I guess the question on the latter

10    part, because I noticed that the representation was it was in

11    the bank records that were presented, and so, one of you is

12    saying it is in his records, one of you is saying it isn't in

13    his records.  If you, maybe between now and ten after 4:00,

14    plaintiffs counsel can pull --

15         MR. GLUCK:  With respect, I don't think that's what

16    Mr. Lauer is saying.  He's trying to say there's no evidence in

17    this case to that effect.

18         MR. LAUER:  Right.

19         MR. GLUCK:  He's not disputing they're in the bank

20    records, and this is why I can answer his problems in two

21    seconds.  There is evidence in this case, Mr. Quintero's

22    testimony, who reviewed the bank records.  The bank records

23    clearly and unambiguously show that $5 million payment

24    occurring in June or May 2016, that's the management fee side,

25    and they clearly and unambiguously show the $13 million being

MCECpla6.

1    paid in January --

2              THE COURT:  When Mr. Quintero was testifying, did you

3    ask him -- you asked him whether he reviewed the bank records.

4    Did you ask him specifically about those two calculations?

5              MR. GLUCK:  Yeah, remember when I was doing the five

6    minutes right at the end and I had the manila envelopes, that's

7    exactly what I was doing and that was exactly what I did in the

8    management fees section.  That, I did realize where he is

9    going, because there is no question about it --

10             THE COURT:  Since he's an expert, he can rely upon

11   records that are actually not in evidence as long as they are

12   admissible, and, of course, bank records are classically

13   admitted as business records.  So what about them?

14             MR. HERTZBERG:  Your Honor, what we were addressing in

15   the letter was the request last night of Mr. Gluck that they

16   recall Mr. Trott to get in evidence --

17             THE COURT:  I've ruled that out.

18             MR. HERTZBERG:  And we're all past that.  So we oppose

19   that effort to get in additional evidence that these --

20             THE COURT:  And you win on that.

21             MR. HERTZBERG:  So the record is what it is then.

22             THE COURT:  If your assertion is that there is no

23   evidence in the record to support that figure, and the

24   representation of plaintiffs' counsel is he specifically asked

25   Mr. Quintero is that part of your figure, yes, and where did

MCECpla6.

1    you get it, that it was paid, and the answer was bank records,

2    why can't the jury then -- why isn't that more than sufficient

3    to take the issue to the jury?

4            MR. HERTZBERG:  It very well may be.  We were

5    responding to the application, after they had rested, to put in

6    somebody --

7            THE COURT:  So I come back, Mr. Lauer, doesn't sound

8    like it's an issue.

9            MR. LAUER:  I will have to check.  If, in fact,

10   Quintero said that, then I agree.  I don't recall him saying

11   it, but we'll check that.

12           THE COURT:  You've got 20 minutes.

13           MR. GLUCK:  This is where I want to be heard for two

14   minutes.  That five minutes when I had those envelopes, that's

15   exactly what I was trying to elicit.

16           THE COURT:  It's not a question of what you were

17   trying to do, it's a question of --

18           MR. GLUCK:  That's my point, that I specifically was

19   asking, and if it had taken another two minutes -- the record

20   says what it says, but if there is any actual dispute, these

21   are not in the bank statements, let me know.  And if all we

22   need --

23           THE COURT:  No, that's not the question.  Listen,

24   we're going to take this break so you can find what he said or

25   didn't say and then we can continue then.

MCECpla6.

```
 1            (Recess)
 2            THE COURT:  Please be seated.
 3            So, first, any further objections to any of the new
 4    language added to the Court's instructions of law?  All
 5    previously argued objections are reserved, obviously.  I just
 6    want if there's anything new.
 7            MS. SHEN:  Your Honor, we have no objections, but we
 8    do have two suggestions to just clarify some of the
 9    instructions.
10            THE COURT:  Page and line.
11            MS. SHEN:  On page 14, instructions No. 10.
12            THE COURT:  I'm sorry, page --
13            MS. SHEN:  14, instruction No. 10.
14            THE COURT:  Go ahead.
15            MS. SHEN:  We ask that the words "claim one" be
16    removed --
17            THE COURT:  I'm sorry.  Where are you looking at?
18            MS. SHEN:  I'm looking at the subheading under
19    instruction No. 10.
20            THE COURT:  That should have been taken out.  Thank
21    you very much.  It should just read breach of fiduciary duty.
22    So the question, which I'm sure you'll be able to answer is,
23    should I impose criminal contempt on my law clerk and send him
24    to jail tonight or just forgive him?  We'll just forgive him.
25            And there was something else?
```

MCECpla6.

1          MS. SHEN:  Yes.  On the same page --

2          THE COURT:  I'm sorry?

3          MS. SHEN:  On the first line of the substantive

4   instruction 10, we would just ask that plaintiffs' first

5   claim --

6          THE COURT:  Yes, take out the word "first."  So it

7   just says specifically then, plaintiffs' claim is, et cetera.

8   Thank you very much.

9          MS. SHEN:  And one more, your Honor, on page 16.

10          THE COURT:  You're two for two so far.  Go ahead.

11          MS. SHEN:  In the third line of the instruction, we

12   would ask that the phrase "or claims" be removed.  So it will

13   just read "Mr. Bodner must still be found not liable on that

14   claim."

15          THE COURT:  Yes.  Okay.  You're three for three.

16   Thank you very much.

17          Anything from defense counsel?

18          MR. LAUER:  I hope I do as well.

19          THE COURT:  Go ahead.

20          MR. LAUER:  Your Honor, I know you thought about this.

21   We would ask you to reconsider and remove the basis for

22   liability of Mr. Huberfeld for the following reason.

23          THE COURT:  There was another close call, I agree.

24          MR. LAUER:  I think if the issue is extreme prejudice,

25   this is extreme prejudice for the following reason:  It was

MCECpla6.

```
1    only a day or two ago that the Court had us address and then
2    the Court decided that the Court was going to apply a
3    retroactive conspiracy approach in the case, and that
4    Mr. Bodner could be liable for past damages based on a
5    conspiracy.  Prior to that, conspiracy was not in this case.
6    So we prepared --
7         THE COURT:  Well, it's always in the case in the
8    sense, which is not different from what you're saying.  It was
9    a basis of the admission of certain testimony.
10        MR. LAUER:  I understand that, it was an admission.
11   But the case, put simply, was originally that David Bodner --
12        THE COURT:  Let me hear from plaintiffs' counsel
13   because I went back and forth on this with myself last night.
14   What is the evidence that Mr. Bodner had an agreement, even if
15   it's implicit, with Mr. Huberfeld to defraud investors by not
16   revealing the overvaluation?
17        MR. GLUCK:  The record is replete from the trip to
18   Acapulco after the release, going all the way back to 2012.
19   Mr. Huberfeld is in virtually all of the meetings that we went
20   through today during the summary exhibits session.
21        THE COURT:  If that was something where Mr. Nordlicht
22   was, in effect, running the show, Mr. Bodner, you argue, may
23   have joined him, Mr. Huberfeld may have joined him, but I don't
24   recall anything suggesting that Mr. Huberfeld said, directly or
25   indirectly to Mr. Bodner, let's go along with this
```

MCECpla6.

overinflation.

MR. GLUCK:  Beechwood, when he's sitting in the

offices, allocating the Beechwood money for the debt stability

scheme, Beechwood, Bodner, and Huberfeld -- but I actually have

a suggestion that may solve some of this, because I've been

thinking --

THE COURT:  Let me go back to defense counsel.  What

about Beechwood?

MR. LAUER:  There's nothing in the joint pretrial

order that was the basis for preparation for the actual trial

that in any way purports to attribute liability in any way on

the basis of Bodner's relationship with Huberfeld.  So going

into this trial, we're preparing to defend, in a sense, is

Bodner in some way helping Nordlicht or, quote, Platinum

Management do whatever is alleged.

THE COURT:  Although I knocked out the conspiracy

count, the conspiracy count was not knocked out on the basis

that it didn't allege a conspiracy between, among others,

Bodner and Huberfeld.

MR. LAUER:  I understand that, but there's nothing in

the pretrial order that identifies Huberfeld and Bodner that

their bilateral relationship is a meaningful issue at this

trial.

THE COURT:  So let me go back.  That's a fair point.

MR. GLUCK:  I have an aside, which is Latkin's

MCECpla6.

1    testimony.  They were always being reported to together.  There

2    is quite a bit of evidence, I went through it yesterday.  I'm

3    trying to think a way through this.

4         THE COURT:  His point is different.  His point is that

5    if you wanted to claim, even for evidentiary purposes, a

6    conspiracy between Bodner and Huberfeld, you needed to set it

7    forth in the pretrial order.  I'm not 100 percent sure he's

8    right about whether that's required, but that's the assertion.

9         MR. GLUCK:  We had a whole jury instruction about the

10   unincorporated partnership.  Mr. Huberfeld's primary purpose

11   for being called was to testify about their relationship over

12   the years.  When --

13        THE COURT:  I'm going to leave it as is.

14        MR. GLUCK:  And then also --

15        THE COURT:  You don't have to say anything more.  When

16   you win, you should shut up.

17        MR. LAUER:  We take very strong exception.

18        THE COURT:  I know.  I know.  And to quote, and the

19   record should reflect that for not just now in this trial, but

20   for literally decades, it has been my privilege to be aware of

21   what an exceptional lawyer Mr. Lauer is.  So everything you say

22   I take very seriously.

23        MR. LAUER:  Thank you, your Honor.

24        THE COURT:  But, nevertheless, I've ruled.

25        Was there anything else from the defense, other than

MCECpla6.

1    we're going to get to, in a minute, the question we left

2    hanging about what was in the transcript.  But anything about

3    the charge that anyone has?

4              MR. HERTZBERG:  Nothing else from the defense.

5              THE COURT:  So we'll make the Shen changes.

6              And anything about the verdict form that anyone has a

7    problem with?

8              MS. SHEN:  Plaintiffs have no objections to the

9    verdict form as is.

10             MR. HERTZBERG:  None from us either.

11             THE COURT:  Very good.

12             Now, the only other open question is what was said to

13   Mr. Quintero about, and did you calculate the figures for this

14   or that or whatever based on the bank records.  So what's in

15   the transcript?

16             MS. SHEN:  So, your Honor, there's testimony in

17   multiple pieces from Mr. Quintero's time on the stand.  The

18   first is he testified extensively about PX 924, which is the

19   summary exhibit noting specifically that there were $30,773,579

20   incentive fees paid out.  Then, at transcript page 1543, lines

21   4 through 14, he was asked:

22   "Q.  Mr. Quintero, what sorts of documents and data did you

23   review to arrive at the conclusions and figures that we're

24   seeing on this chart?

25   "A.  The third-party administrator SS&C produces reports on a

MCECpla6.

1    variety of things, including changes in the fund interest.  So

2    those reports provide me a basis to be able to see what were

3    the payments either in kind or in cash.  And then I also saw

4    bank statements over this period of roughly 40 months that

5    provided me the ability to see what the actual cash received,

6    either directly or indirectly through this two-step process

7    was."

8         THE COURT:  Okay.  Now, was he asked about whether he

9    was basing this on the bank records?

10        MS. SHEN:  Yes.  So in that specific portion, he said

11   that he reviewed bank statements over this period of roughly

12   40 months.  And then, also, in addition to that, he said at

13   page 152, starting at line 13 -- sorry.  I'm sorry.  I misread.

14   It was page 1549, lines 15 through 22.  The Court asked

15   Mr. Quintero:

16        "Well, in your report, it says, quote, this is

17   paragraph 24, I did not review any documentation prepared by

18   the defendants that detail their monthly computation of

19   management fees and incentive fees.  However, the liquidators

20   and foreign representatives retained in this matter were able

21   to trace management fees and incentive fees to bank statements,

22   general ledgers, and other certain financial records."

23        "So is that what you relied on?"  And Mr. Quintero

24   answered the Court:  "Yes, your Honor."

25        THE COURT:  Always good to have a short answer.

MCECpla6.

1        I think that is sufficient, but let me hear if defense

2    counsel wants to say anything in response.

3        MR. HERTZBERG:  With respect to PX 924, which breaks

4    up the $30.7 million into the cash incentive fees to the GP

5    account, which is $13 million, I'm going to call it $14 million

6    because it's just a few dollars short.  That number, that

7    breakdown of the February 13 payment and the February 14

8    payment, not in Mr. Quintero's report.  He did say what

9    Ms. Shen says he said from the stand, it was conclusory, but I

10   don't think there's any dispute that those two numbers are not

11   in his report.  They're not in the schedules.

12       THE COURT:  That's a different point than the one you

13   were making before.  Did you object at the time on that basis

14   to this particular exhibit?  Your colleague was not shy about

15   saying making an objection not in the report, this, that, or

16   the other.

17       MR. HERTZBERG:  I'm going to rely on the fact that I

18   think he was bouncing up and down for the entirety of

19   Mr. Quintero's time on the stand.

20       THE COURT:  I thought that was just, you know, we old

21   men need our exercise.

22       MR. HERTZBERG:  My colleagues are telling me he did,

23   in fact, object, page 966, line 5.  We object for the record.

24   I think he said it a few times.

25       THE COURT:  I'm sorry?

MCECpla6.

1              MR. HERTZBERG:  Yes, it's page 966, line 5 where that

2      objection was made.

3              THE COURT:  That's a different point now.  But,

4      nevertheless, I'm not going to go through all the arguments.

5      I'm going to allow counsel to still present those as potential

6      damages.  I think there is enough there, it was in the record.

7      Whether it was in the report or not, certainly it's implicitly

8      in the report and I think maybe it might be explicitly, but we

9      don't need to worry about that.

10             MR. GLUCK:  Formal instances, objection's overruled.

11             THE COURT:  Yeah.  I think I already overall denied

12     the Rule 50 motion, but just in case, it is hereby denied.

13             Now, as you can see, people are already coming in

14     court for the 4:30 matter that I have.  We will begin promptly

15     at 9:00.  Plaintiffs' counsel has until 11:00.  We will then

16     take probably a 10-minute break and defense counsel will have

17     the two full hours, so we'll go slightly past 1 o'clock, then

18     we'll excuse the jury for lunch.  Then we'll have my

19     instructions of law right after lunch, and then the case will

20     be theirs to deliberate.

21             During deliberations, there must always be on this

22     floor, it can be in the corridor right outside, at least one

23     attorney from each side who can respond to any notes we get

24     from the jury.  I don't want to have to go searching for you.

25     The defendant is welcome to remain, but if he prefers not to,

MCECpla6.

1     that's his choice, but I always need an attorney from both

2     sides.

3                Okay.  When the verdict comes in, there are three

4     possibilities.  One is that one side will be ecstatic and the

5     other devastated.  The second is that both sides will be

6     disappointed.  The third is that all counsel say, well, at

7     least we can go home now.  But I want to say all counsel in

8     this case I thought were terrific, and not just counsel, the

9     paralegals, as well.  Not only did you do an excellent,

10    excellent job, but you even put up with the judge.  So my great

11    thanks to all of you.  And I say this now because who knows

12    when the verdict will be.  I don't want to be seen as

13    commenting on the verdict.  I never comment on the verdict.

14                So if you can vacate the premises so I can start the

15    4:30 matter, that would be much --

16                MR. HERTZBERG:  Your Honor, is the jury going to

17    deliberate from 9:00 to 5:

18                THE COURT:  I'll let them deliberate whenever they

19    want.  I'll initially suggest tomorrow 4:30, but if they say

20    they rather go to 5:00, I will allow it.  Okay.

21                (Adjourned to December 15, 2022 at 9:00 a.m.)

22                               * * *

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    DAVID BODNER

 4   Cross By Mr. Gluck . . . . . . . . . . . . . .1803

 5    JOHN CZAPLA

 6   Direct By Ms. Mosse  . . . . . . . . . . . . .1824

 7   Cross By Mr. Gluck . . . . . . . . . . . . . .1841

 8   Redirect By Ms. Mosse  . . . . . . . . . . . .1858

 9    KEITH McGOWAN

10   Direct By Ms. Mosse  . . . . . . . . . . . . .1864

11   Cross By Mr. Gluck . . . . . . . . . . . . . .1890

12   Redirect By Ms. Mosse  . . . . . . . . . . . .1927

13   Recross By Mr. Gluck . . . . . . . . . . . . .1934

14                     PLAINTIFF EXHIBITS

15   Exhibit No.                              Received

16    440   . . . . . . . . . . . . . . . . . . . .1803

17    956   . . . . . . . . . . . . . . . . . . . .1804

18    578   . . . . . . . . . . . . . . . . . . . .1805

19    1283  . . . . . . . . . . . . . . . . . . . .1807

20    1325  . . . . . . . . . . . . . . . . . . . .1807

21    1327  . . . . . . . . . . . . . . . . . . . .1808

22    1359  . . . . . . . . . . . . . . . . . . . .1809

23    1365  . . . . . . . . . . . . . . . . . . . .1810

24    1427  . . . . . . . . . . . . . . . . . . . .1810

25    1122  . . . . . . . . . . . . . . . . . . . .1811
```

```
 1    1141  . . . . . . . . . . . . . . . . . .1812

 2    1167  . . . . . . . . . . . . . . . . . .1813

 3    1187  . . . . . . . . . . . . . . . . . .1814

 4    1205  . . . . . . . . . . . . . . . . . .1817

 5    1244  . . . . . . . . . . . . . . . . . .1817

 6    1108  . . . . . . . . . . . . . . . . . .1818

 7    1441  . . . . . . . . . . . . . . . . . .1820

 8    1132  . . . . . . . . . . . . . . . . . .1820

 9    1134  . . . . . . . . . . . . . . . . . .1821

10    1226  . . . . . . . . . . . . . . . . . .1822

11    433  . . . . . . . . . . . . . . . . . . .1823

12    985  . . . . . . . . . . . . . . . . . . .1892

13    537  . . . . . . . . . . . . . . . . . . .1921

14    970  . . . . . . . . . . . . . . . . . . .1923

15    960  . . . . . . . . . . . . . . . . . . .1924

16    984  . . . . . . . . . . . . . . . . . . .1926

17                         DEFENDANT EXHIBITS

18    Exhibit No.                              Received

19    762  . . . . . . . . . . . . . . . . . . .1802

20    673  . . . . . . . . . . . . . . . . . . .1827

21    576  . . . . . . . . . . . . . . . . . . .1871

22    602  . . . . . . . . . . . . . . . . . . .1873

23    577  . . . . . . . . . . . . . . . . . . .1874

24    570  . . . . . . . . . . . . . . . . . . .1887

25    696  . . . . . . . . . . . . . . . . . . .1930
```

1    552, 561, 566, 601, 605, 614, 641, 637, . . .1935

2              and 647