MCFCPLA1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x

 3    In re:

 4    PLATINUM-BEECHWOOD LITIGATION           18 Civ. 06658 (JSR)

 5    ------------------------------------x

 6    MARTIN TROTT and CHRISTOPHER            18 Civ. 10936 (JSR)
      SMITH, as Joint Official
 7    Liquidators and Foreign
      Representatives of PLATINUM
 8    PARTNERS VALUE ARBITRAGE FUND LP
      (in Official Liquidation) and
 9    PLATINUM PARTNERS VALUE ARBITRAGE
      FUND LP (in Official Liquidation)

10
                   Plaintiffs,
11
               v.
12
      PLATINUM MANAGEMENT (NY) LLC,
13    et al.,

14                 Defendants.

15    ------------------------------------x      Trial

16

17                                          New York, N.Y.

18                                          December 15, 2022
                                            9:00 a.m.
19

20    Before:

21                     HON. JED S. RAKOFF,

22                                          District Judge
                                              and a Jury
23

24

25
```

MCFCPLA1

1                              APPEARANCES

2    HOLLAND & KNIGHT, LLP
          Attorneys for Plaintiffs
3    BY:  WARREN E. GLUCK
          MARTIN L. SEIDEL
4         RICHARD A. BIXTER JR.
          QIAN (SHEILA) SHEN
5         NOAH W.S. PARSON
          ELLIOT A. MAGRUDER

6

7    KATTEN MUCHIN ROSENMAN, LLP
          Attorneys for Defendant Bodner
8    BY:  ELIOT LAUER
          GABRIEL HERTZBERG
9         JULIA B. MOSSE

10

11   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Defendant Bodner
     BY:  NATHANIEL C. AMENT-STONE
12        ALLESANDRA TYLER

13

14

15   Also Present:

16   Michael Robson, Paradocs Motion Support

17   Esterah Brown, Paralegal, Curtis Mallet

18

19

20

21

22

23

24

25

MCFCPLA1

```
 1              (In open court; jury not present)
 2              THE COURT:  Where do we stand on the exhibits and the
 3    index to the exhibits?
 4              MS. SHEN:  Your Honor, the parties, we have one set of
 5    printed copies.  Plaintiffs printed the JX exhibits and the
 6    PX exhibits, and the defendant printed the DX Exhibits.  We do
 7    have a proposed joint index that we just need to finalize and
 8    print.
 9              I do think there was at least one question about an
10    exhibit that was not objected to, but was not marked received
11    on the record, it is PX 364.  We wanted to just clarify that
12    that was, in fact, received.
13              THE COURT:  Okay.
14              MR. AMENT-STONE:  Mostly the same as what she said, we
15    expect delivery of our exhibits this morning, within the hour.
16              THE COURT:  And there's this one exhibit that was just
17    mentioned, do you have any objection to its receipt?
18              MR. AMENT-STONE:  I'm going to open up my email.  I
19    believe the one she's talking about we thought was not
20    received.
21              MS. SHEN:  But there was no objection on the record.
22    It was not marked by the Court as having been received.
23              THE COURT:  I'm sorry.  Was it offered?
24              MS. SHEN:  Yes, it was offered.  Mr. Lauer said he had
25    no objection, and then there was just no Court --
```

MCFCPLA1

1           THE COURT:  It's received.

2           (Plaintiff's Exhibit 364 received in evidence)

3           THE DEPUTY CLERK:  All jurors are present.

4           THE COURT:  We're going to start summations right now,

5    but I assure you that you will not be given any lunch unless

6    you get this exhibit list and the exhibits themselves ready to

7    go in during the lunch hour.  I warned you about this

8    yesterday.  I want that because as soon as I charge the jury,

9    we're sending in the exhibits.

10          Bring in the jury.

11          MR. GLUCK:  There is one issue.  I think we have to

12   get that screen working.

13          THE COURT:  We're bringing in the jury.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Please be seated.

3            Good morning, ladies and gentlemen.  Thank you for

4    coming in early.  We're about to hear closing arguments from

5    counsel.

6            I want to remind you, as I did before opening

7    statement, that nothing counsel says is itself evidence.  The

8    evidence came from the witnesses, the exhibits.  I don't think

9    there were any stipulations, but if there were, that would be

10   the third possible source of evidence.

11           So, why do we have closing arguments?  Well, before

12   you start your deliberations, it may be useful for you to hear

13   what counsel for both sides thinks that the evidence proves or

14   fails to prove as the case may be.  This is just their view,

15   but they may suggest some insights that you may not have

16   thought of.  So it's always helpful to hear their view of the

17   evidence.

18           The plaintiff has what we call the burden of proof.

19   So we'll start with the plaintiff.

20           MR. GLUCK:  Good morning, and thank you for your time

21   over the last two weeks.  It has been appreciated and we hope

22   that your deliberation will go smoothly.

23           Here is what we believe plaintiffs have shown over the

24   last 12 days.  First, Mr. David Bodner, a Platinum party

25   partner was a fiduciary of the hedge fund PPVA.  Second, PPVA

MCFCpla1                    Summation - Mr. Gluck

1   was overvalued.  Third, Mr. Bodner knew that PPVA was

2   overvalued, and he knew before the 2012 incentive fees were

3   paid and at multiple points after, and we're going to go

4   through that and what it means.

5          Mr. Bodner, Mr. Nordlicht, and Mr. Huberfeld, all of

6   whom you heard from, conspired together to conceal and

7   camouflage the overvaluation such that by 2016 in April, you

8   have a wildly catastrophic overvaluation.  That's what

9   happened.  If you find that they worked together, that they

10  conspired to conceal this overvaluation, real easy damages

11  calculation, goes all the way to the beginning.  And I'm going

12  to get into that when we describe the Court's instructions,

13  what he will be instructing you, but we'll go over it in some

14  of these slides, as well.

15         Mr. Bodner did not disclose the overvaluation at any

16  time through today.  He denies it happened.  That's their

17  position.  That's why they called the auditors, that's why they

18  put him on the stand.  He has never disclosed it and it's

19  undisputed, because if he disclosed it, he would admit it, so

20  it's an impossibility.

21         Secondly, he wielded some influence, and he could

22  have stopped it himself or, as you heard Mr. Quintero, our

23  expert, say, he could have alerted other investors and there

24  might have been a run in the bank.  Now, he didn't say when

25  that would have occurred, but he could have.  And we've seen

MCFCpla1                       Summation - Mr. Gluck

1   evidence about mini runs on the bank that actually

2   happened.

3        Ultimately, of course, Mr. Trott was appointed

4   pursuant to that very circumstance.  There was a redemption

5   demand, finally, finally, finally, not met, court gets

6   involved, put into bankruptcy, appoint a liquidator.  That's

7   why we're here.  What we're saying is that if this had been

8   disclosed earlier, it would have happened already, that's it.

9        Lastly, you heard a lot about this release, and the

10  Court, I believe, has made the question very simple for this

11  jury ruling on different things.  What he says is that if

12  Platinum Management or Nordlicht participated in the

13  overvaluation, this release is no good as to Bodner for the

14  overvaluations, very simple.  If Platinum Management did the

15  overvaluation, they couldn't release Bodner for it.  End of

16  story.

17       You heard a lot about whether there was adequate

18  value and consideration, who got what.  I'll get into it a

19  little, but this Court's clear instructions as of today, if

20  Platinum Management did an overvaluation, Nordlicht did it,

21  they could not release Bodner.  It's invalid as a matter of

22  law.  End of story.

23       I spent a lot of time on this first one because that's

24  what a lot of this is about.  Mr. Bodner is saying that he was

25  a passive investor in Platinum Management.  He owned his

MCFCpla1                    Summation - Mr. Gluck

1    interest in Platinum Management through this Mark Nordlicht

2    Grantor Trust and, in turn, it was a family company and he

3    ultimately controlled that.

4            We don't think he was a passive investor.  We think

5    the evidence clearly demonstrates he wasn't a passive investor.

6    Rather, he was an active member and he knowingly put himself

7    out there as one who was trusted and relied upon to oversee

8    these investments.

9            This is the first question you're going to be asked to

10   address, was Mr. Bodner a fiduciary.  If the answer is no,

11   that's effectively the end, because what we're saying is he was

12   and he breached his duty because, as a fiduciary, when he

13   learned about that overvaluation, he had an obligation to

14   disclose it, period.  Mr. Bodner was a fiduciary of PPVA and

15   Platinum Management just like Mr. Nordlicht was, just like

16   Mr. SanFilippo was, just like the other portfolio managers

17   were.  Their duty happens to be written in a contract, but

18   there is absolutely no requirement that there needs to be a

19   contract for someone to be a fiduciary.  If there was, we

20   wouldn't be here.

21           You can become a fiduciary by your conduct.  In this

22   case, it's conduct over about 12 years, 2004 to 2016.  So it

23   doesn't matter that there's this trust agreement.  It happens

24   to say he's a passive member — that is not how things worked in

25   practice.  That is why we are in trial, because he wasn't a

1   passive member.  He did not sit back and collect checks.  He

2   was there every day, overseeing the investments, soliciting new

3   investors, dealing with the investors and dealing with

4   operations.

5          We started this case with you're going to hear about a

6   hedge fund manager, this is what a hedge fund manager does.  In

7   fact, I'm going to get into some of the expert testimony.  We

8   put up an expert, a guy who spent 20 years supervising hedge

9   funds and hedge fund managers, and he says I've looked at

10  this, I've looked at the whole record, more than what the

11  jury has seen because we obviously can only introduce so many

12  exhibits in 12 days, but he says this is not consistent with a

13  passive ownership interest in a hedge fund management

14  company.  Solicited investors, participated in the investment

15  process, values, liquidity, everything, actual operations,

16  employees, where we going to move, where am I going to have an

17  office, I need a Bloomberg terminal.  The evidence clearly

18  shows it.

19         So what is a fiduciary and what is this question that

20  you will need to ask yourself?  Someone who's trusted.  And

21  let's just be clear, anyone who manages investments of an

22  investment fund owes fiduciary duty to fund its investors.

23         You can have this by conduct.  If Mr. Bodner was

24  trusted, represented himself as a principal of the fund, told

25  investors he would look after the investments, he's a

MCFCpla1                    Summation - Mr. Gluck

1    fiduciary.  You don't get to just write down on paper that

2    you're a passive member and then act contrary to that and then

3    not have any responsibility.  Again, that's why we're here.

4          We have spent a couple of weeks showing all the ways

5    Mr. Bodner exercised influence, control, authority.  We've

6    given some instances or even did an override or did a demand,

7    but that isn't even the test.  They're going to try to say oh,

8    Mr. Nordlicht was ultimately in charge.  That can be true and

9    he can still be a fiduciary.  It doesn't matter.  The test is

10   significant control, not total, he doesn't have to be a mini

11   dictator back there where his will is the word.  It's not what

12   the issue is.  In fact, he could have been a junior partner

13   with Nordlicht as the senior partner and still been a

14   fiduciary.  It happens to be that everyone who encountered them

15   believes he was the senior partner.  That's not necessary to

16   the finding.  The only thing you need to decide is whether he

17   engaged in significant of the trust, whether he represented

18   himself as a principal.  And if he did, that's a manifestation

19   of the sense.  That's him saying, come join my fund.

20         In fact, it's ironic that back when there were more

21   issues in release with respect to this release, their entire

22   argument is oh, look, Marcos Katz is going to be coming to the

23   management company, people will like that and invest.  That's

24   what David Bodner was.  He was a well known figure in the

25   Jewish community and people invested because of him, and he

MCFCpla1                    Summation – Mr. Gluck

1   solicited on that basis, document after document, email after

2   email.

3           Now, let's be clear, there are some instances that we

4   happen to have a very clear record of, of him issuing a dictate

5   that somebody else disagreed with, him issuing a demand like,

6   for example, this dinner.  There is a little conflicting

7   testimony about it, but the only conflict is between Mr. Bodner

8   and Mr. Fuchs.  Mr. Huberfeld says he doesn't remember

9   anything, he was in and out, and that's the sum total of the

10  people who were there.

11          We will talk about credibility, incentives in a

12  moment, but the question is who do you believe on that?

13  Mr. Nordlicht was on the stand.  He was the one arguing with

14  Mr. Bodner, and the Court is going to instruct you as to the

15  parameters by which you can judge Mr. Nordlicht's testimony.

16  We all know he took the Fifth Amendment after everything past

17  his name.  That's not our problem.

18          Mr. Fuchs testified very clearly about this point and

19  very consistent.  He issued a dictate, Nordlicht disagreed,

20  nevertheless, not never a penny of partner funds were taken out

21  after that dinner.  That's serious stuff.  It was a big part of

22  their income.  Law firms work the same way.  Work hard during

23  the year, you take a distribution at the end of the year,

24  that's your whole salary.  Fuchs was upset about it.  That was

25  a dictate.

1    But, again, that's not the test.  Did he exercise

2  significant control, did he represent himself as a principal?

3  Answer yes?  Then we talk about whether there was an

4  overvaluation, whether he knew about it, and what the damages

5  are.  This is an important point.

6    We saw an email, just by way of example, because

7  remember, I'm going to get to this paper trail in a second

8  where, after this Black Elk explosion, and this really was a

9  big deal, it was their biggest investment and this thing was a

10  disaster.  The president of the company, Landesman, had to

11  check with Mr. Bodner before he told the then next biggest

12  investor, Fuchs, after Katz, about the whole Black Elk

13  situation.  That is control.  That is authority and it happens

14  to be in writing.

15    We saw another disaster situation.  This is as the

16  walls are closing.  That Northstar entity, PPVA was about to

17  miss one of the interest payments.  The real insurance

18  companies who had given the money that goes to pay the

19  hospitals and the nursing homes for their patients to Beechwood

20  were about to not realize that the debt paper they were holding

21  was bad, right.  And it was bad, Northstar debt was a zero,

22  just a zero.  PPVA even, let alone Northstar, couldn't make the

23  interest payment.  So this guy, this insurance guy at

24  Beechwood, Scott Feuer says to get Murray and David on the

25  phone, it's an emergency.  That's another stakeholder,

MCFCpla1                     Summation – Mr. Gluck

1    creditor, they believed he had the authority, he acted like it,

2    and that's the point, it was different than the trust

3    agreement.  Your job is to decide what the truth is and what

4    the reality was.

5           These are two examples, I think we've provided a lot

6    through the trial, I have two hours today.

7           Over the last two weeks, you've probably gotten to

8    know us a little bit, we don't know you at all, but you've

9    watched us, I'm sure you have views about everyone here and

10   where they stand and what they do.  We have a lot of testimony

11   that, basically everyone who encountered Mr. Bodner and

12   Mr. Huberfeld and Mr. Nordlicht in the room arrived at the

13   conclusion that Huberfeld and Bodner were senior partners, and

14   this was not a passing issue.

15          In the worst of it, their family fortune, the Katz's,

16   the grandfather sent the son into the offices for a couple of

17   weeks.  You sort of heard his testimony, you heard me read it.

18   He's not within 100 miles of the courthouse, but I did my best

19   to be this grandson, Michael Katz.  He interacted with them for

20   weeks, in the office, outside the office, in Nordlicht's

21   apartment.  He watched them, he watched them talk about value,

22   he watched them argue, he watched them debate policy and what

23   should be done and how his family is going to be compensated

24   and what they should come in.  These were live impressions over

25   a real period of time.  And it is not dismissible no more than

is dismissible the impressions you formed about everyone in

this room and the Court over the last two weeks either.  It's

real.  You can tell.  Again, that's why we have a jury and

that's why we're here.

        We saw Mr. Fuchs' testimony.  Mr. Fuchs is in the fund

because Bodner and Huberfeld represented themselves as

principals of the fund and then he invested.  That's his

testimony.  And it's his further testimony that he happened to

have a lot of connections and knew people, and that every

single person that he brought into the fund, he brought to meet

Bodner and Huberfeld.  And, once again, he was in the meeting,

they represented themselves as principals of the fund, we'll

watch your money and it will be safe.  That is the testimony in

the case.

        And the only contrary evidence, and I mean only is

this one trust agreement which says he's a passive member and

Mr. Bodner's own testimony.  Huberfeld didn't deny it.

Huberfeld said, basically, I don't know to almost every

question.  Nordlicht did not deny it certainly, he took the

Fifth Amendment to almost every question.  And that's the inner

circle, that's the sum total.  Arguably, Mr. Huberfeld's

nephew, David Levy, you might have seen him in the emails, he

was closer to the inner circle.  Would have been the same

result as Mr. Nordlicht, a little bit of a waste of time.

        There is no contrary testimony to this.  There is a

1  document and then they showed Mr. Fuchs' subscription agreement

2  and said, didn't you sign this which says that Mr. Nordlicht is

3  in charge?  Yes, and they had him read it to you.  That's not

4  testimony, that's not evidence.

5          Katz, Fuchs, Latkin, Katzenstein, everyone who

6  plaintiffs called and some who we didn't, they say the same

7  thing, because it's true.  This one is not a hard one.

8          Yesterday, we went through email after email just so

9  you could get a sense of what's out there.  It wasn't just that

10  Mr. Bodner attended these partner meetings, he often called for

11  them.  He said we're all meeting now, and he did so at the most

12  crucial times.  April 18, 2013, right before BEOF, demanding

13  meetings with Nordlicht for hours right before the consensus

14  solicitation.  After the Renaissance sale.  Those are all his

15  meetings.  We're meeting, when are you free.  Uri Landesman

16  reaching out to his subordinates, listen, I need notes for this

17  meeting, forwarding the email to Bodner so he knew that Bodner

18  would know that he had gotten prepared.  It's authority.

19  That's influence, that is not passive.

20          You heard at the beginning of the case, where's all of

21  the documents?  This really happened, we should see a jillion

22  emails, but now we know the truth, don't we.  He didn't use

23  email.  It's pretty strange in and of itself in this day and

24  age.  You can draw your own inferences as to why.

25          And we have testimony from two of his secretaries.

MCFCpla1                    Summation - Mr. Gluck

1    They acted as his email.  Ms. Albanese and Ms. Mullen.  If you

2    look at your screen now, these are emails, these are in

3    evidence.  That's not his email, his email is my email.  I

4    avoided email, he gives a reason why.  I don't know.  So is

5    Mr. Huberfeld, so are a lot of people.  He testified people

6    came to see him all the time, they pick up the phone anytime.

7            We also have testimony from Ms. Albanese that in the

8    midst of this SEC investigation where they set up camp in their

9    office, she had to move his emails off the Platinum server and

10   set up that Gmail account.

11           Which leads us to circumstantial evidence.  What you

12   get to see is what actually exists, calendar invites, other

13   people referencing meetings in which he attended, other people

14   sending emails about him — all of that is called circumstantial

15   evidence, but it's exactly the same as direct evidence.

16           That's what you'll hear from the Court.  If I were to

17   walk in from the outside dripping wet and you could see that it

18   was dark outside and there's rain on the windowsill, it might

19   be a pretty good conclusion that it's raining.  That's all

20   we're talking about.  That's obviously why there aren't

21   hundreds of thousands of emails, but it also explains why and

22   how we presented the evidence we have and how we needed to

23   present it.

24           He solicited investors.  We went through a bunch.

25   Before Bernie Fuchs, there was a PPVA and Mr. Bodner and

1    Mr. Huberfeld solicited those investors.

2            You heard Mr. Latkin testify — and if you need the

3    transcript, this is at page 306, line 21, to 307, line 12 —

4    that everyone at Platinum Management understood that Bodner and

5    Huberfeld were the ultimate decision makers.  Again, you can

6    pick it up.  So much so that Ms. Albanese, I'm sure she had her

7    reasons, but in trying to negotiate her severance package sent

8    an email —— she went to PPVA, at Platinum, sent an email about

9    Beechwood to threaten him.  That's how well known this was.

10           And we're going to come back to the witnesses they

11   actually chose to call and the witnesses we called separate who

12   wouldn't be able to testify any differently than Mr. Nordlicht.

13   This was known.  There were inner circles, there were outer

14   circles, but this was well known.  And you heard from a guy who

15   worked there for six years, Jed Latkin.  They installed him as

16   CEOs of these companies.

17           If you ever wondered how this all works, the masters

18   of the universe thing, the CEO is actually at the bottom, not

19   the top.  It's the private equity funds they install a CEO

20   over.  So, for example, they installed him at Black Elk.

21   That's how he knew all that stuff.  He worked there for six

22   months, 20 hours a day.  That is one example.

23           We heard the Fuchs' testimony.  Pitched to him,

24   pitched to every one of his investors.  They tried to confuse

25   him on cross.  Mr. Fuchs, it's not that hard, I'll admit it,

MCFCpla1                    Summation - Mr. Gluck

1    but they didn't change his testimony, didn't change the core of

2    it.  In fact, guys like Mr. Fuchs are probably the reason these

3    frauds happen.  He still couldn't process everything and what

4    Mr. Nordlicht had done to him.  Sitting here today, he's been

5    prepped on all of this, he still can't really figure it out.

6    The fact that they were able to confuse him live, read to it

7    the way you like.

8           Marcos Katz, the "what the hell is going on" letter.

9    He was clearly -- it was to Bodner, to Huberfeld.  He did not

10   view the relationship as governed by that little trust

11   agreement, which is, again, the only evidence of this, that he

12   had never seen.  He had never seen the Mark Nordlicht Grantor

13   Trust, neither did Fuchs, neither did anyone else, neither did

14   the employees.  That was a little private agreement between the

15   partners, and it wasn't followed.

16           It is not passive to induce people to keep their money

17   in funds.  It is not passive to set up offices at PPVA

18   investments, like Agera.  It is not passive to go into the

19   office every day and to have a secretary and to call meetings,

20   to be part of the process, it's just not.  But you don't have

21   to take my word for it.  That's why we called an expert on the

22   subject who is a hedge fund manager, who's passive, who's not,

23   and they didn't.  Again, read what you like.  They had an

24   opportunity to.

25           Think about that, president of Platinum Management,

this guy, Landesman.  Unfortunately, he died.  Well, 2016, '17,

something like that.  He's the president of Platinum

Management.  You see him on TV, CNBC.  He's asking permission

from Bodner to tell one of his PPVA's biggest investors about

Black Elk, just process that.  We are seeing here in this case

the rung is well above what many ordinarily see it.  It's one

of the reasons I find the case fascinating.  But he was the

president of Platinum Management, asking permission from

Bodner — not passive.

        What to invest in?  Again, they tried to confuse

Mr. Fuchs a little, but he attended those process selections, a

lot of them.  He participated in China Horizon directly.

Mr. Bodner absolutely participated in the investment process,

he knew the assets, he knew the values — that is not passive.

That is not getting a statement in the mail, getting your check

in the mail, whatever your fees rip is, it's not passive, it's

incompatible.  He had put on staffing, shtupping, you can make

light of it.  That is control, that is influence.  It wasn't

one person either.  These are jobs with salaries and 401Ks,

real stuff.

        So you're going to decide soon whose truth is the

right truth.  I just want to make sure I'm wearing clothes

because I think there was something about emperors wearing no

clothes at the beginning of this case.  Whose truth is the

right truth?  You saw the witnesses, you saw the valuators and

MCFCpla1                    Summation - Mr. Gluck

1   the auditors and Joe SanFilippo, Mr. Nordlicht, Mr. Huberfeld.

2   Whose truth is the right truth?

3          What the Court will tell you is that basically this

4   case, it's not beyond a reasonable doubt, it's not like TV

5   criminal law, it's which one is more likely.  It has to be one.

6   One of these truths is more likely.  You decide which.  You

7   evaluate the credibility of the witnesses, the actual evidence

8   and documents in front of you, and the plaintiffs' experts.

9          Now this is hard stuff, but we put on not only a hedge

10  fund expert, but someone who did their very best to calculate

11  various forms of quantifiable damages in this case.  No

12  damages, no opposition, no damages expert from them, no hedge

13  fund expert from them, just nits, technicalities, attempts,

14  which, frankly, I don't think worked at all.  So you can

15  decide, but there's no opposition, there is no alternative

16  view.

17         Jed Latkin, he's a serious guy.  He testified at

18  length about Golden Gate, Black Elk, and Northstar.  He had a

19  pretty good view of all three.  He was the actual one there on

20  the ground, he was in California, he was in Texas.  He was in

21  California when Golden Gate fell on its face.  In 2010, 2011,

22  it might have had potential.  It's almost like a hand of

23  blackjack.  You don't know when the other card is going to flip

24  what's going to happen, but once it does, that's the end, you

25  know what the card is.  And you see, that's what we're saying

MCFCpla1                      Summation - Mr. Gluck

1    they did wrong.  They pretended there was still potential when

2    they knew differently, knew, and that's what you saw yesterday

3    with the valuator and the auditors in those crosses.  They knew

4    differently.

5            And by the way, just so you can follow the thread, it

6    was they put up this CR -- the first valuator who formed the

7    CohnReznick audit report, they didn't even call the second

8    auditor, they didn't.  It was BDO until 2013, they didn't even

9    call CohnReznick who did '14.  You will not get to hear from

10   him.  Whose truth is more likely?

11           Mr. Nordlicht, complicated subject because he took the

12   Fifth Amendment to every question, including silly questions

13   posed by defense counsel, but does that mean his testimony

14   would not have been helpful to our side?  He was at that

15   dinner, he knows what he told Nordlicht -- Mr. Bodner, he knows

16   what he told Mr. Huberfeld, who was in the room.  You will

17   receive instructions as to how to interpret Mr. Nordlicht's

18   testimony.

19           Mr. Huberfeld, we called him.  You think they would

20   have, but we called him.  You know why?  Because he was

21   Mr. Bodner's partner for 25 years.  And what you heard him say

22   is that, first of all, they had a real partnership,

23   unincorporated, but an actual one, binding, sharing losses,

24   sharing profits.  They have to put up money for an investment,

25   they have to share losses.  When there's a joint project that

1   succeeds, they split the proceeds 50/50.  This is a business

2   partnership.  And what Mr. Huberfeld said is that he does not

3   have a recollection ever, over their relationship, withholding

4   anything from Mr. Bodner.  He said one thing, how you got

5   arrested and why.  These are memorable things, not one, not one

6   thing.

7           Mr. Bodner, on the other hand, suggests that he

8   doesn't recall Mr. Nordlicht sharing -- excuse me.

9   Mr. Huberfeld sharing a lot of crucial details.  Whose truth is

10  the right truth?  The auditors and valuators we've already been

11  over.  That ain't a defense here, now when you conceal, you

12  break your promises, not when you're there and they're not.

13  Think about it this way, when I asked questions yesterday about

14  show me in the report where it says that Beechwood was playing

15  the interest.  I hope, and only hope, but I hope you all know

16  exactly what I was getting at.  You've been here for 12 days,

17  this is 12 years, and Mr. Bodner is saying he has no idea what

18  these things are?  Very smart guy, made a fortune in penny

19  stock trading.  Whose truth is the right truth?

20          Joe SanFilippo, CFO.  Worked from home, you can judge

21  his credibility for yourself.  He knew things and didn't pass

22  them along.  In fact, that was the *modus operandi*.  That was

23  the very conspiracy that we are suggesting existed — Huberfeld,

24  Nordlicht, Bodner, and for the purpose of this release,

25  Platinum Management, as well, because the reason why you don't

1     include the company for the release -- doesn't matter why.

2            They intentionally did this overvaluation to get fees.

3     It isn't that complicated a story.  They knew better, and yet,

4     every month, they were pretending there were tens and then

5     later hundreds of millions of assets that weren't there, and

6     they knew it.  That is a breach of duty and Mr. Bodner is

7     liable for it.

8            They did call one guy, David Steinberg.  Let's talk

9     about David Steinberg's testimony.  He joined as an intern, not

10    in the inner circle, barely knew anything, had heard of

11    Northstar maybe, never worked at Black Elk after 2012, had

12    nothing to do with Golden Gate.  That's who they chose to call.

13    He made his first pitch to Mr. Bodner as a junior portfolio

14    manager, and he was not aware that Mr. Bodner had real

15    professional responsibilities.  But isn't even that weird?  Why

16    is the junior kid in the company making his first pitch to some

17    passive investor?  They suggest that he was the chief risk

18    officer, which probably was true by 2016, but you saw an email

19    about that.  You saw an email from Mark Nordlicht to Uri

20    Landesman saying he was scared out of his mind because Seth

21    Gerszberg, who you met, had taken over the Kerry Propper role.

22            Now, Seth Gerszberg is a failed T-shirt seller.  Kerry

23    Propper, there's evidence in the record, was a buddy of David

24    Levy, Huberfeld's nephew, same age.  In 2014, after the SEC

25    camped out in their offices, the COBA investigation began and

1    Mr. Nordlicht left with his family to Israel, not permanently,

2    but with his family and was not residing here.  And at that

3    point, those that remain were there, and that included

4    Mr. Steinberg who, as of January 2016, when he wrote that

5    rachmanus email and helped Mr. Gerszberg with that

6    presentation, he delivered to Huberfeld and Bodner, feels quite

7    strongly about it, his thesis anyway.  That is when David

8    Steinberg was chief risk officer.  He said he was looking for

9    another job because there was nothing for him to do, there was

10   no money to invest.  That's who they chose to call.

11            Very briefly, because I know -- I hope you already

12   know this.  You did not hear from David Levy, Naftali Manela,

13   or Daniel Small.  Those are figures, you saw them on the

14   emails.  Naftali Manela, CFO, David Levy, co-chief investment

15   officer with Nordlicht to the side of the -- They were not here

16   because they would have testified the same way Mr. Nordlicht

17   testified.  The reality we are in.

18            Now, Mr. Bodner did testify and you will need to judge

19   his credibility against emails and evidence referencing powers

20   that be.  He says that all this time over 12 years, all he

21   discussed was liquidity.  Just, what do you need for the

22   fund -- And even if it's possible, which is more likely, that's

23   all you're being asked to decide.  I didn't solicit investors

24   when we're showing you a meeting with an investor and then a

25   subscription agreement the next day where he's copied on both —

1    which is more likely?  Didn't Noah talk about values when you

2    got Mr. Katz's testimony saying he was always talking about

3    values to me, as the investor, pitching the fund.  At Agera, he

4    was all upset about China Horizon.  Should we bring a

5    litigation, this and that, and he's saying nothing but

6    liquidity.  He's trying to suggest that, over these 12 years,

7    that all of this talk had to do with the meetings, had to do

8    with his charities and his little side investments, but these

9    were PPVA investments, that was the primary investment.  He

10   arguably claims that he had side investments.  I'm going to

11   show you an interesting slide in a second, but he didn't

12   present any evidence, not a document, not even a document as to

13   how he capitalized the fund.  He says that when everything went

14   down, he had $40 million in it, but that was the worthless LP

15   interests.  That was $40 million of what Platinum Management

16   was valuing the stock they gave him over the years, that was a

17   zero.  In July, Mr. Trott took over.  Credibility.

18          I asked him if he knew what Beechwood was, and at

19   first he thought they might be a reinsurance company, maybe he

20   had one or two meetings.  Went through quite a few emails

21   yesterday and that was a subset of direct meetings with the two

22   chief guys at the reinsurance firm that he owned.  Whose truth

23   is more likely?  This whole PPVO PPCA move is just that.  We

24   saw that they were discussed in the same breadth, shared an

25   office, co-invested in investments, PPVO is going to do this,

MCFCpla1                         Summation - Mr. Gluck

1   PPCO is going to do this, and they're trying to say that this

2   particular thing wasn't a PPVA thing, so you shouldn't think

3   anything about it.  You can judge for yourselves whether those

4   two entities in particular were unified.  We have expert

5   evidence that Beechwood and Platinum shared officers,

6   directors, ownerships -- excuse me.  Officers, ownership,

7   control.  That's what Mr. Post testified.  Couldn't even say

8   the words, but he testified about the characteristics about

9   Beechwood and Platinum.

10          Again, who did they choose to call?  David Steinberg,

11  somebody who basically knew nothing about any of the issues,

12  certainly on valuation related to this case.  Yes, Platinum was

13  a real company, there were people there, and they made real

14  investments.  They failed, though, and that's the issue for

15  this case.  And then it was so obvious that they failed that he

16  wrote up these little email saying, read these Excel

17  spreadsheets in order, they tell a story, and those

18  spreadsheets are our story, basically, except he didn't realize

19  that the oil and gas investments were not just encumbered, but

20  actually worthless, it's worse than he thought, and that's who

21  they chose to call.

22          Mr. Bodner suggested that his lifelong friend --

23  excuse me.  Partner.  Mr. Huberfeld got arrested.  The first

24  thing he heard of any of this was the day of the arrest.  And

25  then his response to being asked why he sent an email and made

MCFCpla1                    Summation - Mr. Gluck

1  a phonecall to Jonah Rechnitz on the day of the bride payment

2  check cutting was "I don't remember."

3         He claims he has almost no knowledge about these

4  Black Elk Opportunities funds.  There, he was certainly a

5  passive member.  He got fees, he solicited the investors, he's

6  on the emails, he's in the office in the all-hands emergency.

7  They raised $95 million, it's a lot of money, doesn't remember

8  much about it.  Same thing with Black Elk, doesn't remember

9  much.

10        Here's the issue, I'm not going to go through the

11  overvaluations, but what I'm going to ask is as we do, you keep

12  this fiduciary thing in the back of your head because I'll show

13  you the emails that he's on related to these overvaluations,

14  related to his knowledge about it, but none of that, in

15  addition, I can put it all in this section, none of that is

16  consistent with being this passive investor.

17        We spent some time looking at that April 2016 NAV

18  sheet.  Real people put their pension money into this thing,

19  they get their statements in the mail — they're passive.  Their

20  shares were worth a share of $720 million, and it was a dead

21  lie, it was a dead lie and they knew it was.  It was wrong.

22  And he knew that it was untrue because he got these exact same

23  NAV sheets.  He flew out to Mexico, after he supposedly

24  disassociated himself and got this release, to tell Marcos Katz

25  that everything was going to be fine, he should keep his money

1     in the fund.

2             Naftali Manela couldn't be in this trial, but here we

3     have David Steinberg who, again, is there at this point,

4     sending this email.  We call it the rachmanus email because

5     it's a colorful word.  It's a Yiddish word that means mercy.

6     They're saying when someone like Mr. Trott gets appointed,

7     they're not going to care that Beechwood is calling these

8     loans.  He's going to say you're not getting any money, no

9     mercy on Beechwood.  That's what a guy like David Steinberg can

10    take one look at this and say, if this thing goes into

11    bankruptcy, big problem.  And he attaches three Excel

12    spreadsheets, potential winners, those which aren't potential

13    winners, which is most of the fund by value anyway, and then

14    these debts.

15            Now, Mr. Gerszberg was of the opinion that they were

16    over-collateralized.  He was a T-shirt seller who was there for

17    a week.  What we of course know is that if they were

18    collateralized by the Golden Gate assets by the Northstar

19    assets way under collateralized, and this debt was even worse

20    than David Steinberg's.

21            And then what happened?  He wrote this email and,

22    effectively, not every letter, but most of it became a Power

23    Point presentation that Mr. Gerszberg personally delivered to

24    Mr. Bodner and Mr. Huberfeld, just like I'm doing now, I

25    assume.  We had to call Mr. Gerszberg Because Mr. Bodner and

1    Mr. Huberfeld don't remember this thing happening.  We know

2    that Mr. Gerszberg felt very strongly about his

3    over-collateralization thesis, but he presented it, and in that

4    presentation, half the fund is missing.  There's $40 million

5    total that's unencumbered and it assumes a $300 million

6    valuation of just Golden Gate and Northstar.  They were zeros.

7    So it's much more than half the fund is missing.

8           And they get this presentation and they didn't pick up

9    the phone.  They get the NAV sheet the next month that was

10   completely contradictory to it, he didn't pick up the phone and

11   tell anyone.  He knew about the overvaluation, he didn't

12   disclose it, he's a fiduciary, that's the end of the case on

13   liability.  That's it.  It's a simple task.  It's why we could

14   do it in 12 days and not 120 days.

15          There's only one extra question.  If you also find

16   that at then or anytime thereafter there was an implicit

17   understanding or an explicit understanding between him and Mark

18   Nordlicht and Mr. Huberfeld, for example, when they flew out to

19   Acapulco to see Mr. Katz to cover this overvaluation up, then

20   it's all the damages back to 2012.  That will be what the Court

21   says.  And if that's the end, that's the end.  And if you don't

22   find the conspiracy, then you're going to decide exactly when

23   he knew, that's it.  That is the way this will --

24          You heard Mr. Post state that the fund was

25   catastrophically overvalued and Quintero quantified it, but the

MCFCpla1                    Summation - Mr. Gluck

1    math isn't that hard.  When, in April 2016, their top assets

2    include zeros, like Northstar, like Golden Gate, like Seth

3    Gerszberg's company, which was shut down and bankrupt and he

4    was working there, not running it — the clothing company — how

5    is it $30 million?  It's crazy.

6            And here's what's interesting, when you get to

7    Mr. Quintero's testimony, he didn't even take that into account

8    on his value estimation, he didn't.  He didn't even take the

9    undisposed debts into account.  All he said on this management

10   fee side, the 2 percent, if you just look at six assets over

11   time, it's at least 15 million bucks.  That's a lot of money to

12   take.  Now, you're going to decide for yourselves what the

13   exact, what the amount should be, when there would have been a

14   run on the bank, people actually learned the truth.

15           Let's go through what happened.

16           Beginning in 2012, management fees get paid every

17   month, right, but until then, the fund went up.  Platinum

18   Partners got a slice, 20 percent.  Here's the problem, oil

19   starts to drop in 2012, it's part of Mr. Quintero's chart if

20   you want to take a look at it, and Black Elk specifically,

21   their biggest investment, they're valuing a common equity of

22   more than $200 million.  That's a lot.  It has its own internal

23   problems, so oil down and problems.

24           Now, the bond rating companies, this isn't common

25   equity level, this is secured debt.  They drop them to jump ons

MCFCpla1                    Summation - Mr. Gluck

saying there is only a 70-percent chance of recovery.  That's a

disaster.  If that would actually happen in the economy,

terrible.  There are real implications when you're just a

shareholder and you get a piece of the upside, but you also get

a piece of the downside when there are these sorts problems at

the company.  This is before the explosion.

The explosion, though, was the nail in the coffin.  It

was the worst oil explosion in the Gulf since BP.  It was on

the news, people died, there were criminal investigations,

Black Elk itself was in parts of all sorts of litigation around

it where the lawyers might have been paid for, but not the

liabilities.  That was going to be Jed Latkin's job when he

testified about talking at that room full of people all wanting

to know what happened, exactly why what happened.  This was

serious stuff.

And because of the proportion of PPVA's portfolio that

was this Black Elk common equity, we don't need to figure out

what the NAV actually was.  It didn't go up, it didn't go up,

incentive fees are a zero.  It's that simple.  Incentive fees

weren't a zero.  He was part and in the office for those

all-hands-on-deck meetings.  They decided to take extraordinary

actions with these BOF funds and it doesn't even matter how

they resulted.  He knew.  It would as a zero and he took the

money anyway.  In fact, this money went directly into his

pocket, him and Nordlicht and Bodner and Mr. Huberfeld.  These

MCFCpla1                          Summation – Mr. Gluck

1     are incentive fees.

2                    (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GLUCK:  You look at the Black Elk Northstar story.

2     You all figured out in 12 days.  I'm not sure why the auditor

3     didn't understand it until three weeks later.  But again, you

4     can make your own judgments.

5          Black Elk, after this disaster, sold most of his

6     operations and assets for $115 million.  It was real.  Gross.

7     It wasn't 700 million.  $115 million.  They took the leftovers,

8     the remnants, and combined with a little low increase start-up,

9     you can see it from the audit papers, these other lands that

10    were undeveloped, they called it Northstar.

11         And Latkin, who did the deal, who oversaw the deal,

12    2015, he is the CEO, called it a liability.  It was a play.

13    There is still metal in the ocean.  There is abandoned

14    liabilities.  You shift it off to someone else to see if you

15    can get some of the money from the bonds back.

16         They are valuing the common equity 190 million?  When

17    there is 80 million of secured bonds that were never going to

18    get paid?  It's April of 2016.  They knew that was wrong.

19         Mr. Bodner apparently decided to call Mr. Steinberg,

20    Mr. SanFilippo, an auditor and valuator to say there was no --

21    you are wrong.  No overvaluation here and nothing to see.

22    Look.  The explosion was on TV and it was disclosed in their

23    public SEC filings.  We couldn't have been wrong as a result.

24    It's not a defense.

25         Mr. Bodner knew differently.  Same reason you know

1    differently.  You have been here six hours a day for 12 days.

2    He was at Platinum for 12 years.  Every one of those meetings,

3    working through every one of those crises, talking to every one

4    of those investors.  Which truth is the right truth?

5          These valuators, they just take the information

6    Platinum Management guy Joe SanFilippo gives them and they

7    write it down on their own letterhead.  They didn't go to any

8    of these sites.  They didn't review the financials.  They take

9    a memo, they read it, they decide if it's not unreasonable or

10   whatever that phrase was, and then say nobody should rely on

11   this and then hand it over.  That is not a defense.  Not when

12   you know better.

13         They make a big deal about these reserve reports.  But

14   at least as to Golden Gate they really had at least one

15   completely different reserve report.  They are trying to say,

16   well, because Black Elk wanted to push down the price?  They

17   control Black Elk.  They installed Black Elk's CEO.  This was

18   all done while at Platinum.  Not a word to the valuators, not a

19   word to the auditors, not a word to the investors.

20         We have testimony in the record stating Bodner talked

21   about valuations all the time.  We have testimony in the record

22   where there is a big kind of public fight in a restaurant here

23   in New York City where Bodner is saying the fund is mismarked.

24   At that same dinner there is testimony in the record that he

25   issued a directive that as a result, something internally hit

Mcf2Pla2                    Summation - Mr. Gluck

1  him, we shouldn't take incentive fees anymore.  But that's not

2  good enough.  You can't charge management fees in the meantime

3  and then let people lose their money.  It shows control and

4  knowledge, not a good deed.

5          Instead, they set up Beechwood, camouflaged this whole

6  thing.  They don't tell anyone that their operating companies

7  can't even make the most basic thing they need to make, which

8  is their interest payments.  And he knew about those interest

9  payments because we showed you e-mails where he is getting them

10  (inaudible).

11          And the response to all of this is, let's be clear, is

12  just I don't remember or it didn't happen from the guy at

13  issue.  It doesn't jive.  It doesn't jive with Latkin's

14  testimony when he is talking to the president of PPVA saying

15  I'm going to dinner with Bodner.  I need this information.  I

16  promised I'm going to tell him this about Golden Gate.  And we

17  need a better team in there etc., etc.

18          They tried the vertical drilling.  They tried the

19  horizontal drilling.  Latkin was there.  He is telling the

20  president of Platinum these things.  And the president of

21  Platinum is saying:  I'm going to go to dinner with Bodner now.

22          Latkin was on the ground.  Latkin talks to Landesman.

23  These partner dinners, just so everyone remembers, are

24  Landesman, Bodner, Huberfeld, and Nordlicht.  That's the

25  testimony in the record.

1          No suggestion in April that Platinum knew that their

2     own bonds in Black Elk were impaired.  They knew better.  It's

3     only 21.5 million, but it's a pretty good example.

4          Just think.  Think about all that that means.  They

5     knew about the Northstar thing.  They knew about the

6     subordination that has caused all these problems, that the

7     money didn't even go to the bondholders.  The bondholders were

8     left holding the bag, and they are still marking them at full

9     value.

10         You heard Jed Latkin became the CEO of Black Elk and

11    had to testify in front of all these people about what

12    happened.  That explosion fundamentally changed the business.

13    No longer was it just about oil prices.  It's more expensive,

14    more oversight, more regulation, more environmental stuff.

15    That's the testimony in the record from the person on the

16    ground.

17         This is also in the record.  Doesn't remember.

18    Surprised to see it.  But the day of the explosion, and it

19    certainly seems that an anxious David Bodner is asking for him

20    to be called right away.  He needed to know how much more we

21    have to pay the Black Elk investors.  He knew then.  You can

22    find this conspiracy went in Acapulco after 2016, but he knew

23    then and didn't say anything.  He took the fees anyway.

24         Testimony in the record from Mr. Quintero is that

25    after that explosion, the value of the stock, the common equity

1    in Black Elk was worthless.  Valuing it at 200 million.

2            The bonds they also had, they had some value probably

3    at this time.  But that's not the pecking order.  The stock,

4    the common stock, the stuff that goes up and down on their

5    success, this is called a wipe out.  You admit it, you move on.

6    You don't cover it up the next four years.

7            Instead, they take extraordinary action, they call it

8    a one-off.  They raise $95 million, which is real money, to set

9    up these BEOFs and they do inject that money into Black Elk but

10   it didn't work.  The point is not whether it worked or not.

11   The point is whether they knew.  This was an emergency.  This

12   was extreme.  If this didn't work, big problem.  They are

13   marking it no risk, no problem.

14           By the way, while these BEOFs did get paid out first

15   ahead of everyone, even if they were going to get paid the way

16   they were supposed to, the BEOFs were preferred.  Mr. Post

17   testified that.  Mr. Quintero testified that.  They are above

18   PPVA's common equity in the pecking order.  They had to be paid

19   back first.  That doesn't work.  Not with a $200 million

20   valuation.  And that's why the NAV didn't (inaudible).  That's

21   why Mr. Quintero was so certain about it.

22           Now, it's not just that he is in the office.

23   Mr. Bodner oversaw at least some of the very effort to solicit

24   investors.  He proofed Mr. Fuchs's e-mails that Fuchs would

25   send out to his investors so that they would invest in this.

1    Mr. Fuchs testified that Bodner authorized and directed him to

2    seek out investors for BEOF.  We don't have a lot of e-mails,

3    but we have some, and they clearly show what happened.  There

4    is paper and there should be more, but for the way Mr. Bodner

5    conducted his business.

6            Bodner called a dinner shortly after -- partner dinner

7    shortly after the Renaissance sale.  No question that it

8    happened.  No question what the price was, even if I jam it up

9    in talking live, no question, but 110, 115 million.  That was

10   it.  110, 115 million.  Actually there were more creditors than

11   that at Black Elk.  That's why Quintero was saying it was

12   insolvent.  That does not account for paying back BEOF

13   preferred equity and certainly does not account for the common

14   equity.

15           The reality is that in April of 2016, when that NAV

16   statement went out, it was almost inconceivable that it was

17   (inaudible).  But yet they flew to Mexico anyway.  Mr. Bodner

18   denies that the overvaluation happened, so he certainly did not

19   tell Mr. Katz about the overvaluation then.  They all flew down

20   together.  Huberfeld, Nordlicht, Fuchs, and Bodner.  Even if

21   you only found an implicit understanding about what they were

22   going to do then, all of the damages are in this case.  But, as

23   we have shown you, the day of the explosion he calls up

24   anxiously, set up BEOF, right after.  Both in here.

25           I didn't see in any reports indicating that the --

Mcf2Pla2                    Summation – Mr. Gluck

pretty much the head investment person at Platinum was cringing
at the purported Golden Gate PV10 number.  Of course they tried
the drilling.  Did not work.  Right around 2013.  By the end of
2014-2015, you could go there, there was no one home.  I made a
joke about that the valuator said there is a new management
team.  Who?  There was no one there.  They were trying to
combine it with Black Elk, and they were going to call it
Golden Gate, but it never happened, and that valuator put out a
value of that company anyway.  There was no such company.
Auditor, valuer, it's not a defense when you actual know.  It's
smoke.

        Bottom line, this same equity they are valuing 110
million sold for less than 3.  That's what they bought.  After
the failures.  They are trying to say there is all sorts of
incentives, but you can't make it work.  They knew this.
Platinum testified about it.  Inaudible) testified about it.
The auditors had no way to explain it.

        This one is interesting because this is not April
2016.  This is April 2015.  Trying to point to all this oil in
the ground.  Losing the leases.  Interest payments have to
people come in and foreclose or you don't if you are Beechwood
and you are actually owned by Platinum and you sit on the deck.
That's the debt stability scheme.  (Inaudible).  They didn't
have the oil in the ground.  They couldn't have put money in to
drill, and they knew it.  Lots.  And they are denying the

1    valuation to this day.  Overvaluation.

2            I think we have gone over Northstar, but you have got

3    the guy who sold Northstar its assets as CEO of Black Elk

4    saying Northstar was a liability on asset.  There is no

5    contrary testimony, not even a word, not one word from the

6    auditors.  David Steinberg had heard of Northstar.  There is

7    nothing in the record to contradict this other than these

8    valuation reports, and you can judge them for yourself.  They

9    are pieces of paper, just like that Mark Nordlicht Trust is a

10   piece of paper, and this is the real world.  Because the piece

11   of paper says something, it doesn't make it true.  It doesn't

12   make it true that Mr. Bodner was a passive investor and it

13   doesn't make it true that Northstar was worth $200 million.

14           In the record.  Not going well.  Where's the

15   disclosure?  This is only more likely than not.  He should have

16   disclosed it.  Whose truth is more likely here?

17           Here it is.  December 28, 2015.  About two weeks from

18   those e-mails where he says Beechwood and Platinum are going

19   down.  This is judgment week.  He signs that Nordlicht side

20   letter.  You heard testimony about what a side letter is.  It's

21   a 40 million, nearly 40 million undisclosed liability.  This is

22   why.  Because remember that emergency with Northstar where they

23   were going to miss an interest payment get him on the phone,

24   everyone is going to figure this out.  This is a lot worse than

25   an interest payment.  They said that when Beechwood bought the

1   debt, and it's it absolutely true, that the Golden Gate

2   maturity, the actual principal, you know, the 30 million, not

3   the interest, that was coming due in November of 2015.  It had

4   been extended for two years.  By this time it had defaulted.

5   And suddenly the game was up.  Beechwood, which had been

6   sitting on this bad paper, and it's a good thing for a case,

7   bad paper, Nordlicht Grantor Trust included, suddenly they

8   couldn't anymore.  They were supposed to get not a check for

9   400,000, but a check for 38 million or whatever the principal

10  was and there was no money.  There was no money at Golden Gate.

11  There was no operations at Golden Gate.

12         PPVA didn't have it either.  Directs that they shut in

13  all the profit -- unprofitable fields and signs an agreement,

14  this Nordlicht side letter, saying he will take money from some

15  of the other assets when it comes in and either buy back that

16  Golden Gate debt, which is worthless, or repay.  Mr. Quintero

17  did not testify about the damage from that, 15 million straight

18  line analysis for the incentive fees.  It's a reason why NAV

19  sheets are wrong.

20         China Horizon.  Mr. Quintero didn't testify about

21  either.  Bernie Fuchs did.  Mr. Post did.  There was a problem.

22  These things happened.  Okay.  Chinese government breached

23  their deal.  You don't put out -- card had been flipped over.

24  You lost the hand or you might have lost the hand.  Very

25  material either way.  Valuator just going up though.  Not

1    included in Quintero's 15 million of management fees or

2    incentive fees.

3         Another one, this is the Gerszberg clothing company.

4    Remember they made the presentation that he was in the office.

5    He wasn't offering any companies.  He was in bankruptcy.

6         November 2015, they are valuing $22 million.  These

7    are lies.  Mr. Bodner met with him in Mr. Huberfeld's home.

8    Gerszberg gave Mr. Bodner that presentation.  Not in

9    Mr. Quintero's damages chart.  In the April 2016 NAV statement.

10        You can take your pick.  What we tried to do, and you

11   may recall this timeline from the beginning, it hasn't changed

12   an iota, these are all points in which there are clear

13   evidentiary bases to find that Mr. Bodner knew that there had

14   been an overvaluation, beginning with Black Elk, the 200

15   million common equity.

16        And they raise BEOF.  BEOF formed the funds and they

17   subordinated.

18        And they formed Beechwood.  They discussed the

19   Beechwood terms, and they are going to get the money from the

20   Beechwood insurance companies and allocate it to PPVA and buy

21   that debt.

22        And we have e-mails where they are saying:  I am in

23   the insurance guy's office.  I am taking Bodner and Huberfeld

24   through the allocations.  This was very conscious.  There are

25   e-mails showing the interest payments (inaudible).  Any one of

1    these qualify for knowledge that transferred to Beechwood.

2              SEC rolls into the office five months or whatever it

3    was.  Period of time.  Many days.

4              The dinner.  The fighting about the NAV, fighting

5    about the marks, no incentive fees.  There is demands from

6    Beechwood that PPVA buyback the Black Elk bonds which happened.

7    That's Scott Taylor saying I know how to get what I want and

8    what Bodner wants at the same time.  These are all (inaudible).

9              And you get to that Gerszberg presentation, which is

10   plain as day, just nothing else to say, but the NAV sheets keep

11   rolling out.  He took the trip to assure Mr. Katz anyway.  They

12   knew.

13             This is a Nordlicht e-mail to Bodner and others in

14   evidence.  Judgment week.  This is just after that Golden Gate

15   principal was due and eventually (inaudible).  This is a

16   printout from the presentation.  This is the salient page, the

17   PowerPoint.  It's incompatible with the NAV sheets.

18             But what's crazy about it is it's valuing the

19   Northstar and the Golden Gate investment at full value.  These

20   are saying the debt alone is a problem.  The presentation was

21   given to Murray Huberfeld, David Bodner in Murray Huberfeld's

22   house.  Those debts, Seth Gerszberg, the e-mails leading up to

23   this, the e-mail saying I am getting this ready for Huberfeld

24   and Bodner even says what we need from Huberfeld and Bodner in

25   the slide neither Mr. Huberfeld or Mr. Bodner remember.

1    Mr. Gerszberg sure does.

2           Talked about the dinner regarding the NAV.  This is

3    both knowledge now, and remember I asked you to think about

4    fiduciary.  It's hard to reconcile.  This is not what a passive

5    person does.  It's not.  Post says, common sense also tells you

6    that.  Passive person gets their checks in the mail.  Maybe

7    after a long period of time they might send their grandson in

8    to the office to see what's going on.  Not this.  Not over 12

9    years.

10          David Steinberg sent Mr. Bodner's secretary, both of

11   them, Huberfeld, a report from this Renaissance group, which

12   significantly undermines any contention continuing valuing.  He

13   knew.  Take a point.  We ask that it be November of 2012, or if

14   you find at any one of these points BEOF setting up Beechwood,

15   the interest payments, to getting the presentation, to jumping

16   on the plane to Marcos Katz, it is implicit and our express

17   understanding, and then, frankly, the points don't even matter.

18          This is what Mr. Bodner was an owner of.  This was

19   sent to Mr. Huberfeld.  This was forwarded to Bodner, I

20   believe.  They talk about everything together.  This a part of

21   their partnership.  They have this big partnership, right, they

22   have all of these projects.  This was one of them.  There is

23   direct testimony about that.  This was planned.  Nordlicht

24   group.  It's Nordlicht, Bodner, and Huberfeld.  They are going

25   to run the investment allocation.  We then see Mr. Bodner in

Mcf2Pla2                    Summation - Mr. Gluck

1  their office going through those very same allocations.  These

2  same, in contrast, to be fair, it was about allocating to

3  different things, not about this.  Which is more likely?

4          The reason you see NManela@Beechwood.com is there was

5  sort of rotation of employees.  There was a period when

6  actually Naftalis Manela had a Beechwood address.  There was

7  Beechwood offices.  Just a contextual thing.  But whose truth

8  is more likely.

9          Mr. Bodner states that he did not solicit investors

10 for Black Elk opportunities.  This seems to suggest

11 differently.  Attended partner dinners, information for those

12 partner dinners, there was a fight at the partner dinner.  That

13 was where the raw information——that's a term used by

14 Mr. Latkin——was discussed.  What really happened at

15 Golden Gate?

16         So now we get little bit of law on EBITA very quick.

17 This is what I am talking about when I am saying you can find

18 the date of the breach or any time during this period you can

19 find that there is an implicit or an express understanding and

20 agreement between Bodner, Huberfeld, and Nordlicht in which

21 case damages go back to 2012.  The judge is going to instruct

22 you on this and it's literally -- the top part is a copy-paste,

23 and tried to simplify even further, and I hope I did a good job

24 on the second bullet.  Give you the implication from the book.

25         It will all point to the agreement.  Every time they

do a partner agreement and they don't change the NAV when they

know things are wrong.  Raising an emergency BEOF fund.  Know

things are wrong, that that money is going to come in ahead.

By the way, PPVA also guaranteed it.  Another problem.  Doesn't

even matter.

Capitalizing Beechwood, allocating the Beechwood

investment, paying the interest, not disclosing problems after

that dinner, flying to Mexico in May and June 2016 when

everything was not right and not saying a word.  They couldn't

have said a word because that would mean that the overvaluation

happened.  Numbers are huge.  On that April NAV sheet all you

do, and I will explain where this is Quintero opinions, and

then where is a fact opinion.  Northstar Quintero zero, post

zero.  Likely Latkin zero.  Black Elk bonds Quintero

substantially impaired.  Golden Gate multiple witnesses.  Both

post Quintero.  Latkin zero.  China Horizon big problem.

Chinese government broke the deal.  Desert Hawk.  Quintero.

Impaired.  Problems.  Not valued what it says.  Over everything

14 million.  That's Seth Gerszberg (inaudible).  Wasn't in

operation.  Not part of (inaudible).

This whole Nordlicht side letter, they are saying that

this liability was baked into Golden Gate's financials.  But

you can't subtract 40 million from nothing, and it was a

nothing.  We saw the e-mail where Nordlicht would be shutting

the fields.  We heard testimony.  There was no one there.  They

1    lost the leases.  You can't subtract 40 million from nothing.

2    PPVA suddenly had that obligation to pay an issue, among many,

3    which Mr. Trott had to deal with and their colleagues when they

4    started to unwind this.  It is an undisclosed liability.

5         My rough NAV, that little squiggly line means

6    approximate, approximately 25, 457 million.  Wait.  There is

7    only 700 million, and then there were a whole bunch of

8    disclosed liabilities, right?  All the redemptions.  100

9    million.  Katz asked for his 50 million back.  There was the

10   collateral account.  It's almost nothing.  Not a small thing.

11   There was nothing there.  And that is ultimately of course like

12   Mr. Trott's appointment into bankruptcy, the equivalent in

13   Cayman of bankruptcy, official liquidation.  Mr. Trott, the

14   joint official liquidator.  He has a joint person.  He is

15   sitting Cayman now.  The fiduciary of the Cayman court,

16   appointed by the Cayman court to do exactly this, by the way,

17   to investigate what happened, to realize the assets, dispute

18   any improper debts, for example, in the Nordlicht side letter,

19   and then bring litigation against those who are responsible.

20        If you find that there is liability, then there is

21   also the question of damages.  That is also your job

22   unfortunately.

23        Incentive fees.  These are that 20 percent cut where

24   we presented the evidence.  There was no rise beginning in

25   2012, so the math is super easy.  It's a zero.  Incentive fee

Mcf2Pla2                    Summation - Mr. Gluck

1    was paid, shouldn't have been paid.  5 million goes directly

2    into Mr. Bodner's pocket.  1.8 million of that, what is that?

3    COBA money?  Union pension fund?  And Mr. Quintero testified

4    based on bank statements——this isn't hard stuff——you can see

5    total cash for redemptions going out to PPVA, this bank

6    account, our bank account, $30,773,579.  Not a penny should

7    have.  That simple.

8         On your verdict form there is going to be a special

9    place for your overall amount of damages and then a very

10   special place for 2012 incentive fee damages.  They are going

11   to ask you how much of the total damages are purely due to 2012

12   incentive fees.  Shouldn't be paid again the conspiracy will

13   probably moot that issue or not, but that will be your job,

14   too.

15        Mr. Quintero relying on bank statements, working with

16   the accountants employed by Mr. Trott, found 30,773,579.  The

17   math is not and was not that hard.

18        Management fee is more complicated.  This is that two

19   percent.  If you are taking 2 percent and 100 percent is

20   write-off you are taking too much.  That's all it means.  Now,

21   that's a more difficult task Mr. Quintero had.  He was trying

22   to figure out exactly how quickly, how fast, what rate the

23   value of the assets went down, the NAV went down.  Very

24   difficult task.  He simplified it.  There is only looking at

25   six assets, not including China Horizon, not including Over

Mcf2Pla2                         Summation - Mr. Gluck

1   Everything, Chinese company, not including Chinese company, not
2   including the clothing company, not including any of this
3   undisclosed debt.  He just looked at six assets and said, by
4   those alone, if I give every inference, if I give every
5   inference to Platinum Management, including that the
6   valuation's right to begin with, and they didn't suddenly go
7   down like due to an explosion, but just basically draw a
8   straight line from March 2016, there is $15 million of
9   overpayment under this method.  And he looked -- hundreds of
10  hours looking at each individual -- just these six.  He assumed
11  that all of the other hundred or so were 100 percent valued and
12  didn't incorporate the debt issue at all, didn't incorporate
13  the clothing, the Gerszberg company, didn't incorporate the
14  China Horizon.  That number that he found with his straight
15  line was 15 million.  During the whole period, 46,434,428.  He
16  says 15 million at least was (inaudible).  You can decide what
17  the damages are.  He did testify, Mr. Quintero testified, that
18  in the event of the disclosure there likely would have been a
19  run on the bank.  No numbers, no when.  You get the pleasure of
20  doing that.

21          But that is how damages are to be calculated.  You
22  will be asked for two numbers.  One is an overall damages
23  number and then the second, if there is an overall damages
24  number, how much of that is just due to incentive fees in 2012.
25  The sub issue.  We have tried to make this as easy as possible.

1          Last issue.  This release.  You heard a lot of

2    testimony about it; that as of now today the issue had been

3    simplified for you.

4          This agreement, the only reason it could possibly bind

5    the fund is because Mark Nordlicht signed it on behalf of

6    Platinum Management.  Undisputed.  You have a binary choice.

7    If you find that Platinum Management or Mark Nordlicht

8    overvalued PPVA, this release is invalid because Mr. Bodner's

9    charge is breaching his duty and failing to disclose the

10   overvaluation of PPVA.

11         So if you find the overvaluation, release out.  It is

12   as simple as that.

13         Platinum Management was a defendant in this case.

14   They litigated the matter for 15, 18 months and then just

15   stopped.  And a default has been entered against them.  Now

16   it's not a hundred percent binding, but you can consider that.

17   There is a default against them.  They can't contest it.  They

18   stopped litigating.  They defunct.  Platinum Management is

19   clearly defunct.

20         You heard Mr. Nordlicht's testimony.  You can review

21   public record, take notice of this default.  The release is

22   invalid.  It's obvious.  Can't release someone for the thing

23   you did, otherwise it would be no good.  It's against public

24   policy.  That is the concept.

25         At minor points that have lost their dispositive

Mcf2Pla2                    Summation - Mr. Gluck

1   relevance but were presented to you, it was sought by Bodner

2   and Huberfeld, post SEC investigation, both COBA and subpoena

3   investigation, they are requesting covers for specific

4   liabilities which Mr. Bodner contends was a gift tax charity

5   issue, but then in the same breath talks about -- or his

6   lawyers are asking about litigation and that Platinum

7   Management should cover all the same.  There is a request that

8   Mark Nordlicht personally indemnify everyone, and he responds

9   that he can't be personally responsible for their misconduct.

10              And then to top it all off, the terms of the deal were

11  I get a -- they get a release for all of this, free pass, and

12  Mr. Bodner won't take out his money, the 40 million of the LP

13  interests that were mismarked, and he doesn't have his shares

14  in the management company.  Mr. Nordlicht is sending e-mails

15  saying management company is worthless, worth zero.  And nobody

16  could take out any money.  They had already decided that it was

17  also impossible.  There was a hundred million dollars of

18  redeemers ahead of them and you know that includes Marcos Katz

19  or it doesn't.  (inaudible) nothing.  But the important thing,

20  the dispositive thing, it ends the conversation, is that if

21  Platinum Management engaged in overvaluation or Mark Nordlicht,

22  engaged in overvaluation, this release is out.

23              The box. . .

24              One more thing.  I will come back to that.

25              They are trying to contend that the last four, five,

1    six million of management fees were never paid.  They were.

2    It's in the record.  It's in the bank records.  Trott testified

3    to it.  Mr. Bodner's report ended at March 31, 2016 purposely

4    with a straight line.  That's why Mr. Trott got up there, you

5    recall, very short testimony.  Just not true.

6              This is what the form you are going to get looks like:

7              Is he a fiduciary?  If the answer is no, not liable.

8    If the answer is yes, not passive, liable.

9              If he knew about the overvaluation at any point and

10   didn't disclose it, that's liability.

11             The second thing is about the release.  Platinum

12   Management or Nordlicht overvalued this fund, does not bar

13   liability.

14             And then an overall amount of damages in number three.

15             And then of that amount, if any, you decide how much

16   were incentive fees for 2012.

17             A special instruction you are going to get is that if

18   you find that any one of these points, any one of these points,

19   including the trip to Mexico to Mr. Katz in 2016, there was an

20   implicit or express understanding between Nordlicht, Bodner,

21   Huberfeld to overvalue (inaudible) valuation, then you begin

22   2012 damages.  Simple.  You don't have to decide when he knew

23   and when he didn't disclose.  If you don't, if you don't find a

24   conspiracy, then the question of when is relevant.

25             So 30 million incentive fees paid in cash.  5 million

1    paid to Bodner personally.  Mr. Quintero on the basis of just

2    six assets and no debt issues is at least 15 million, point

3    five, unearned management fees paid.  Total amount 46 million

4    after January 1 of 2013.

5            Those are all possibilities.  And in addition, one

6    small issue.  If it seems like Mr. Trott was aware of BDO,

7    auditor, he was.  Part of his job was to investigate all this.

8    And you are not allowed to award attorney's fees for this case,

9    but Mr. Trott testified about certain attorney's fees that

10   PPVA -- not me, I don't do that stuff, but a different lawyer

11   incurred suing BDO auditors, about $4 million.

12           In summary, thank you for 12 days.  It is appreciated

13   and required in this sort of circumstance.

14           Secondly, we ask that you find Mr. Bodner was not a

15   passive investor but, rather, a fiduciary, one who manifested,

16   one who presented himself as a principal, somebody who could be

17   trusted and relied on, the reason for the investment,

18   oversight.  We ask that you find that he is aware there was an

19   overvaluation, undisputed he didn't disclose it because he is

20   denying (inaudible).  We ask that you find that he entered into

21   a conspiracy at any point with Mr. Nordlicht, Mr. Huberfeld on

22   this overvaluation, concealed it, and we ask that you find

23   Mr. Nordlicht or Platinum Management engaged in an

24   overvaluation in which case this release is invalid.

25           We ask that you calculate, based on every piece of

Mcf2Pla2

1  evidence that you have heard, the overall damages here to the

2  very best of your ability that were proximately caused by the

3  overvaluation by Mr. Bodner, or if he entered into a conspiracy

4  even before, back to 2012, not forever, back to 2012, and then

5  we ask that if any portion of those damages are for 2012

6  incentive fees, you write that down and how much.

7          Thank you very much.

8          THE COURT:  Thank you very much.  Ladies and

9  gentlemen, we will give you a 15-minute break at this time.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mcf2Pla2

1           (Jury not present)

2           THE COURT:  Please be seated.

3           All right.  Several housekeeping items.

4           First, let my law clerk hand to counsel the final

5    instructions to the jury and the final verdict form.  This is

6    essentially what was signed off yesterday.  I caught one or two

7    typos, which amazingly had not been caught by Ms. Shen, but I

8    corrected those typos, and the only thing that was even not a

9    typo change was on page 15 in connection with the third element

10   of the breach of fiduciary duty.  And the second line of that,

11   between the words "he" and "breached" I inserted the word

12   "knowingly."  that was consistent with the rulings I had made

13   yesterday, but I think it had been inserted.

14          Second, let me return to Mr. Lauer his copy of the

15   *Daubert* opinion that he kindly handed up, or maybe it was

16   plaintiffs' copy.  Okay, whoever's copy it was.  I don't want

17   to be accused of theft.

18          Third, just out of curiosity, because I do in my

19   instructions refer to the three types of evidence as testimony,

20   exhibits, and any stipulations, were there any stipulations?

21          MS. SHEN:  Your Honor, there were a handful of --

22          THE COURT:  All right, then I don't need to change

23   that if it's right.  Okay.

24          And finally, plaintiffs' counsel in his summation

25   twice said that I would be giving the jury instructions with

Mcf2Pla2

1    respect to inferences that could or could not be drawn from

2    Mr. Nordlicht's invocation of the Fifth.

3            Now, in none of the charging conferences——and we had

4    about three——did anyone ask for that.  I gave them an

5    instruction at the time.  So maybe what I should just say to

6    them when they come back is you will recall I gave you the

7    instruction on that at the time and if you have any further

8    question about, that you can always send us a note.

9            MR. GLUCK:  That's my mistake.  I should have used the

10   past tense.

11           THE COURT:  Okay.  Anything else, counsel wants to

12   raise?

13           MS. SHEN:  Yes, your Honor the parties have one

14   question about two of the exhibits, PX 924 and PX 925, the two

15   summary exhibits laying out the incentive fees and the

16   management fees.  We understand that they were not received in

17   evidence and the parties are all in agreement on that, but your

18   Honor had indicated that they might be helpful visual aids for

19   the jury to consider.

20           THE COURT:  Yes.  So my normal practice, unless there

21   is any objection, is to send any visual aids to the jury but

22   marking them separately in the index, and I will tell the jury

23   that those are being submitted for whatever help they may have

24   as an aid to your memory, but they are not intended to be

25   themselves evidence.  So I am happy to do that.

Mcf2Pla2

1                Any objection to that?

2                MR. HERTZBERG:  Well, no objection to the visual aid,

3    but we would ask that the PX stamp be removed so the jury

4    doesn't confuse the visual aid as evidence.  In the closing it

5    was shown with the PX 924 and PX 925 stamp on it.  I think

6    that's --

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MCFCpla3

| 1 | THE COURT:  That's the way the jury first saw it.  I

2    think it's actually helpful to you because that shows that this

3    is the plaintiffs' assertion, not the defendant's.  So, what

4    you should do is add them to the index, I want to see the index

5    before I instruct the jury after lunch, but it should have

6    these as a final separate thing and I'll just explain to them

7    this is not being submitted as evidence, et cetera.

8          MR. LAUER:  Your Honor, I apologize.  We didn't

9    communicate on this because your Honor raised it for the first

10   time.  I would object to the jury getting any chart that was

11   not a traditional summary and put in evidence.  That's

12   basically the evidentiary rule.  We did not have the

13   opportunity to examine these charts in that context.  I

14   always --

15         THE COURT:  That's a good argument, and I may agree

16   with it, but I will note for the record, my recollection is

17   that the first summary chart was offered by plaintiffs as an

18   exhibit in evidence, was not objected to on any ground at that

19   time by defense counsel.

20         So if we were really being hyper technical, what we

21   would do is allow that first chart in as evidence and not the

22   others.  But I don't think that's a sensible way to proceed

23   because the sensible thing is to tell the jury this is not

24   evidence, it's just there for a helpful summary.

25         Yes, go ahead.

MCFCpla3

```
 1              MR. AMENT-STONE:  Your Honor, I hate to take the
 2      Court's time.  Just for a clear record, on page the 66 of the
 3      transcript is where this exhibit, Plaintiffs' Exhibit 924, was
 4      first raised.  It was not actually offered, but Mr. Lauer
 5      objected, the objection was overruled, but it was not offered
 6      or received.  Later, the Court had an exchange with plaintiffs'
 7      counsel where plaintiffs' counsel represented --
 8              THE COURT:  That's as to one, but I thought there was
 9      an earlier one.
10              MR. AMENT-STONE:  Not that I've seen, your Honor.
11      Based on what I saw in the transcript, it was not received or
12      even offered, and it was not consented to.
13              THE COURT:  If what I just thought I remembered, and I
14      always tell my wife that my memory is perfect and then my nose
15      grows a little, if my memory was wrong, we will not submit it,
16      but if my memory is right, we will submit it with the
17      instruction that I just indicated.
18              So that will give you something else to look for for
19      both sides, but I, for what it's worth at the moment, it seems
20      to me that one of these exhibits, they didn't come in
21      necessarily in numerical order, but one of these exhibits I
22      think was received and then, later on, there were objections
23      and so forth, and that were not received, but let's find out
24      what the record is.
25              I'm sure defense counsel wants a few minutes before he
```

MCFCpla3                    Summation - Mr. Lauer

1    starts, so let's talk a five-minute break.

2              (Recess)

3              THE COURT:  Please be seated.  My law clerk is

4    checking, as well, but his initial take is that my memory was

5    correct.  Although, of course his testimony is biased in my

6    favor, but we'll see what he has to say.

7              Let's bring in the jury.

8              (Jury Present)

9              We'll now hear from defense counsel.

10             MR. LAUER:  Good morning.  You've been a great jury,

11   attentive, quite patient when addressed so many documents, so

12   many conversations, so many emails, so many technical materials

13   on oil and gas development, oil and gas valuations, the PPVA

14   assets, the PPVA fees, and all the multiple interactions

15   between and among the very interesting managers from Platinum

16   Management.

17             I have to take my time this morning.  This case is a

18   serious one.  It has the ability to affect the very life not

19   only of David Bodner, but his wife, his children, his

20   grandchildren, and I know you take this seriously, and bear

21   with me when we go through the evidence in the case and what is

22   not evidence.

23             You may find that much of the evidence that came in

24   from the plaintiffs' side was actually plaintiffs' counsel

25   speaking, and then ask yourself when you evaluate the issues in

1    the case, did the testimony come from a credible witness or was

2    it argument of counsel.

3         When you consider the evidence in the case, the key

4    issue or the preliminary key issue is whether David Bodner, who

5    the Court will instruct you, whether David Bodner exercised

6    significant control over PPVA's management and its investments

7    or agreed with Platinum Management or others at PPVA to carry

8    out and be responsible for a particular role in the business or

9    undertake a particular duty on behalf of PPVA.  And there is no

10   evidence in this case that David Bodner agreed at any time to

11   take responsibility for a particular job at PPVA.

12        Now, a passive investor is simply a legal term.

13   Mr. Bodner was a limited partner investor, but fundamentally,

14   Mr. Bodner was an owner.  He had founded this fund with Murray

15   Huberfeld, with Mark Nordlicht.  He had his family wallet in

16   this fund.  You may find that an owner has every right and

17   every expectation to spend time in the business talking with

18   the people who are working there, meeting with them, doing all

19   these things.  So the dichotomy, so to speak, is not is he a

20   passive investor, no, he's an owner, but he made it very clear

21   to Mark Nordlicht, to Murray Huberfeld and to everyone, I'm

22   moving on with my life, I'm putting the money in, I'll help

23   seed this fund, but I want no responsibility, I want no

24   particular duties.

25        There's also no evidence in this case that David

MCFCpla3                    Summation – Mr. Lauer

1   Bodner exercised significant control with respect to Platinum

2   Management, with respect to PPVA, or controlling Mark Nordlicht

3   or anyone else.  That's the primary issue that you must first

4   address, is he a fiduciary, did he undertake a particular job

5   that was his responsibility or was he an owner, what's going

6   on, tell me, give me a briefing.  Did he have control or was he

7   simply an owner of gathering information, expressing views,

8   meeting with people.

9        Second issue, and I hope you never have to get there

10  because on the first issue, your deliberations can end.  David

11  Bodner was an owner, a founder, a guy who had moved on and said

12  I'm not taking any managerial role in this business.  But the

13  second issue is knowledge.  I submit to you, most respectfully,

14  there is no evidence that David Bodner at any point in time

15  came to have actual knowledge that the assets of PPVA, in

16  particular these six assets, these larger ones were these

17  complex oil and gas development companies, no actual knowledge.

18  In fact, you will find he had no suspicion that Mark Nordlicht

19  or anyone at Platinum Management was intentionally inflating

20  these assets.

21       You may find that not much has changed since I

22  addressed you on November 30 in my opening.  I told you then

23  that the claim that David Bodner controlled Platinum Management

24  was empty clothes, it was just spin.  And plaintiffs claim that

25  David had actual knowledge that PPVA assets were intentionally

1   inflated was more spin.  I said this is a case of emperor's

2   clothes because David did not control Platinum, Mark Nordlicht

3   controlled Platinum.  He was the sole manager of Platinum and

4   PPVA, and responsible for everything that happened at the fund.

5        David, through his family company, was a beneficiary

6   of the trust.  He received fees profounding it with basically

7   the wealth that he had acquired prior to the fund being

8   started, but when the fund was created in 2003, David Bodner

9   made it very clear to Mark Nordlicht and Murray Huberfeld, you

10  guys can run the fund, I don't want any part of it.  I am not

11  going to manage a hedge fund.  You may find, therefore, that

12  David Bodner was not a fiduciary, and that will end the case.

13       The evidence clearly shows David had no detailed

14  information on these complex assets.  He relied on Nordlicht,

15  Ari Glass, Uri Landesman, SanFilippo, the other executives at

16  Platinum to manage the fund.  He lacked the information to be

17  able to confirm or contradict the high-level remarks at partner

18  meetings discussing these assets.  You've seen some of these

19  valuation reports, a PV-10, these are complex documents and

20  understanding exactly how you value an oil and gas development

21  company does not come naturally.

22       There were dozens of people working at Platinum during

23  the relevant time.  Many of them were subject to potential

24  subpoena to come into this court.  Several of them testified,

25  dozens of emails were introduced, and I submit to you, you will

1    not find in any of the evidence that David Bodner, one,

2    exercised managerial control with respect to PPVA's investments

3    or that anyone testified that David Bodner agreed to take

4    specific responsibility over a particular job at PPVA.

5         I will try to summarize the evidence on each of the

6    key points.  David Bodner had no legal control of Platinum

7    Management or PPVA, he had no practical control over Platinum

8    Management, no managerial control, and did not accept any

9    particular duty or role within or on behalf of PPVA.  He

10   clearly had no role in creating or reviewing the net asset

11   value statements and never had actual knowledge that any of

12   these valuations or statements were intentionally overvalued.

13   I think you will find that, at all times, David Bodner acted in

14   good faith, took no steps, had no omissions, and did nothing to

15   harm PPVA.

16        Now, by early 2014, David and the others accepted Mark

17   Nordlicht's advice that the partners should not take out

18   incentive fees while the fund was experiencing liquidity

19   problems.  So for the last two years of the fund, while

20   supposedly David Bodner knows that the assets are inflated and

21   supposedly knows that the rest of the world does not know that

22   they're inflated, does he talk his money out, does he take some

23   of his money out?  No.  They basically pass a rule, none of the

24   partner families can take their money out until all the outside

25   investors get their money out, and since there was no liquidity

1    for that, they basically were agreeing to keep their money in

2    the fund, and they agreed, beginning in the middle of 2014,

3    that the partners would not take any of the incentive fees out.

4    And that's why, while the incentive fees that were calculated

5    on the basis of the net asset value was 55 or $60 million, the

6    actual amount of incentive fees that were paid over this period

7    was $30 million, because starting in 2014, in fact the very

8    last incentive fee payment was to Mark Nordlicht in June of

9    2014.  David Bodner's last withdrawal of incentive fees was

10   February of 2014, more than two years before the fund went into

11   liquidation.  Ask yourself if that is the conduct of a man that

12   supposedly knows that the money is not there.

13           Let me now turn to the instructions that you will

14   receive from the Court shortly after lunch.

15           The first question the Court will ask you is to

16   address whether David Bodner is a fiduciary.  You will have the

17   instructions, but I'm going to read from them right now.

18           First, David could be a fiduciary if one party — that

19   is someone at PPVA — with David's knowledge and consent

20   reasonably put its trust and confidence in David to carry out a

21   particular role or undertake a particular duty on behalf of

22   PPVA.

23           Now, my colleague talked about people trusting David.

24   You may find there's a fundamental difference between being

25   recognized as a scholar, a charitable individual, an individual

1   who helps people and has the general trust of other people on

2   the one hand and trust within the meaning of the fiduciary

3   charge that PPVA is relying specifically on David to do

4   something, relying on him to supervise a particular area of the

5   fund.  Therefore, people had trust in David, investors who knew

6   David, but were solicited by Huberfeld or Fuchs from the same

7   community.  They liked David and they thought he was a good

8   guy, but he didn't solicit them, he didn't bring them in, and

9   no one has testified that they relied on David Bodner to

10  monitor or to do anything for them within the fund.

11          I believe you will find there is absolutely no

12  evidence that anyone associated with PPVA or Platinum

13  reasonably assumed that David Bodner was assuming

14  responsibility to carry out a role or to undertake a particular

15  duty on behalf of PPVA.

16          The second way David could be a fiduciary is if he

17  exercised significant control, and there's no evidence of that.

18          Now let's go through the evidence that plaintiff

19  offers on these points.  Their whole case seemingly rests on

20  the fact that David Bodner came to this office, that he

21  attended meetings, he talked to people, that a number of these

22  meetings involved the portfolio managers at PPVA are included

23  investors of PPVA.  Obviously, many of these meetings, as you

24  saw when Mr. Bodner was shown 40 or so emails, many of these

25  emails had nothing to do with the business of PPVA.  They

involved personal meetings, personal investments, charity work,

working with kids at risk, but there clearly were meetings

involving PPVA, but none of that evidence is control and none

of that evidence is taking responsibility for a particular job.

You've heard both from Mr. Bodner himself and from

Mr. Huberfeld that when they started the fund.  David Bodner

affirmatively said, so there was no mistaking it, I'm putting

my money in, I don't want to manage a hedge fund.  This is what

Mr. Bodner testified to under oath.  Did you affirmatively tell

Mr. Nordlicht that you did not want to have responsibility of

the fund?  I did.  Did you tell Huberfeld affirmatively that

you did not want to have any responsibility at the fund?  I

did.  Did they accept that?  Yes, they did.  Did you have any

control over the fund?  I had no control whatsoever.  Did you

have any control over Platinum Management?  No, I did not.

You heard evidence about the physical office structure

over, and over, and over again, 54th floor, 4th floor.  At the

end of the day, as Mr. Bodner testified, that office suite on

the 54th floor was the original offices that, in 1996, Bodner

and Huberfeld had taken.  When Mark came in because the lease

payments were well below market, they said Mark, you can run

Platinum from this floor, we'll keep our office and we'll have

access to the adjacent conference room.  Mark came in, put up a

glass wall to separate Platinum Management from the office that

Bodner and Huberfeld shared.

1          During the trial, plaintiff showed David dozens and

2     dozens of emails, and you were shown a number of emails where

3     Mark Nordlicht asks David at various points in time, please go

4     out and talk to these wealthy businessmen that you're socially

5     friendly with, please go out, ask Englander, ask Schroen, ask

6     them to help, ask them to put money into the fund, ask them to

7     invest.  There is no evidence in this record that David ever

8     went out and solicited any of those people.

9          You have seen emails, particularly with respect to the

10    Black Elk fund and other items, here's a list that David should

11    call, and there is no evidence that David called any of those

12    people, and those people all live in the New York area.  If it

13    was important to plaintiff to show that David Bodner actually

14    solicited any of these investors to make that point, they could

15    have subpoenaed any one of the number of people, a number of

16    whom were deposed in this litigation.  They didn't do that

17    because not a single person has testified that David Bodner

18    solicited them.

19         Now, David Bodner knew a lot of these investors, and

20    that's because, as I said earlier, it's one community.  Murray

21    Huberfeld solicited them, Bernie Fuchs said I will raise

22    $125 million, make me a partner, he solicited them, but David

23    Bodner did not solicit investors.

24         You may find attending a partners meeting every three

25    months or that, on occasion, David Bodner, through his

secretary, would ask Mark Nordlicht's secretary or Uri
Landesman, can we set up a partners meeting.  You may find that
the plaintiffs have turned this on its head.  David Bodner is
saying "hey, I'd like to have a meeting so I can get briefed on
what's going on" is not a sign of someone who's running the
place, it's the sign of a guy who's got $40 million invested,
is a participant in the management company to receive the fees
and he wants to get briefed.  Mark Nordlicht doesn't need to
have partner meetings other than to raise money, to deal with
his liquidity problem.  David Bodner attends partners meetings
when he can to find out what's going on.  Nothing about these
partner meetings demonstrates either going into the meeting or
coming out of the meeting that David Bodner undertook a
specific role, I'm going to do this job, I'm going to supervise
that portfolio manager, I will work with these consultants.  I
mean, you all have jobs, you all live in the real world.  If
you're running a business, you have people asking you for
approval on this, approval on that.  The only thing they could
come up with is when they wanted to brief Bernie Fuchs on the
Black Elk situation, Uri Landesman says to David, who do you
think would be the best one to brief Bernie who wasn't then a
partner.  That doesn't represent, oh, Mr. Bodner, please let me
know that I can brief Bernie Fuchs.  He's asking for his
advice.  They're colleagues.

          So, in short, I've probably taken more time on this

MCFCpla3                    Summation - Mr. Lauer

1    issue than necessary.  The meetings prove nothing, the calendar

2    invites prove nothing.  They simply show a man who's an owner

3    of a business, a person who's involved in charity, a person

4    who's involved in all sorts of endeavors living a life, but no

5    one showed you any emails, any documents, any testimony that

6    reflected either control or, yes, I now assume responsibility

7    for this.

8         My colleague made a point of saying they called

9    Mr. Huberfeld, we didn't.  You may find that the Court has a

10   rule that a witness can only be called once in this case.  They

11   go first, they put Mr. Huberfeld on the list, and the deal was

12   we had to examine on their case.  So I'm not sure why that

13   point was made, but you should understand that nothing about

14   the order of witnesses reflects anything other than the

15   plaintiffs go first.

16        Control is so important here because if you find no

17   control and no specific undertaking of duty, your deliberations

18   end, you're done.  So I'm going to spend a little time on

19   control.

20        First, what we'll call legal or contractual controls.

21   Did David Bodner, in fact, have significant control, real

22   authority within Platinum Management or did he not.

23        So let's look at DX 159.

24        Notwithstanding anything herein to the contrary, the

25   trustees, this is the Mark Nordlicht trust, shall both the

1    trust's membership interest and give or withhold the trust's

2    consent to actions of the company as he determines in his sole

3    and absolute discretion.

4            Let's go to section 3.2.  Passive members.

5            No passive member shall have the right, authority, or

6    power to act for or on behalf of the company.

7            Let's go to the Platinum Management operating

8    agreement, DX 164.

9            The investment manager of the fund, the controlling

10   principal of the investment manager is Mark Nordlicht as may be

11   determined by the general partner in its sole discretion

12   collectively.

13           The next one is DX 729, the private offering

14   memorandum, which is what is given to every investor who

15   subscribes to the fund.  I don't know if you can see it, but

16   this document is in evidence.  The investment manager,

17   Nordlicht, has sole discretion over investment decisions as

18   controlling principal of the investment manager.

19           Finally on this point, DX 620.12.  This is a Platinum

20   document that was given to the auditors so the auditors can see

21   who actually has authority to write checks in a business.  Mark

22   Nordlicht, Uri Landesman, Gilad Kalter, Naftali Manela, Daniel

23   Mandelbaum, Joseph SanFilippo, Will Slota, Joshua Kramer,

24   Michael Kimelman, Joseph Ritterman — no David Bodner.  He's an

25   owner of Platinum Management because he has no job or

MCFCpla3                    Summation - Mr. Lauer

1     responsibility within PPVA, he doesn't even have check-writing

2     authority within the fund.

3            In sum, you may find, and I hope you do, David Bodner

4     is not a fiduciary.  In order to find him liable, in order to

5     go on to discuss valuations and damages and all the other

6     things, you first have to find that David Bodner was a

7     fiduciary, and there's no escaping it.  In order to find David

8     Bodner liable, you have to find he had significant control over

9     the management of PPVA's investments or that he agreed to carry

10    out a particular role or undertook a particular duty on behalf

11    of PPVA and its business.  There's nothing here.  It's really

12    exactly like I said when I opened, emperor's new clothes, there

13    is no evidence.

14           Let's talk about knowledge.  If you find he was a

15    fiduciary, you will then be asked to determine whether David

16    had knowledge that the fund's assets were overvalued, and he

17    breached his duty by failing to disclose that knowledge.  And

18    you have to find actual knowledge, not a suspicion, not a hint,

19    you have to find that he actually knew that these assets were

20    inflated intentionally.

21           I would submit to you there's no evidence.  What

22    evidence have they offered?  They say on November 16, 2012,

23    there was an explosion on the platform that Black Elk had on

24    the Gulf, three people were killed, and there's testimony that

25    that was quite an event, front page of the New York Times, it

MCFCpla3                    Summation - Mr. Lauer

1    was all hands on deck at Platinum.  And then plaintiff offered

2    PX 417, which reflects that somebody must have asked David to

3    find out if the interest payments on the Black Elk fund were

4    going to be paid.  We know from the evidence that if, in fact,

5    an investor friend called David up, he didn't solicit that

6    person, but someone who knew David must have called him to ask,

7    are the funds getting paid.  While David didn't remember this

8    particular email, nothing in this document evidences knowledge

9    that PPVA's valuations for Black Elk were inflated.  All it

10   says is that an investor was concerned, and reasonably so, that

11   there could be a significant impact on the company by virtue of

12   the explosion and they called David.  But there's no indication

13   as to at what level did Black Elk -- at what valuation level

14   had Platinum valued Black Elk, and there's no indication that

15   David Bodner ever knew and there was no evidence of to what

16   extent Platinum lowered its valuation for Black Elk after the

17   explosion.

18           So, knowing that there's an explosion, knowing that it

19   probably had some meaningful impact on the company really

20   doesn't tell you anything about, A, what dollar amount was

21   Platinum using to value it, to what extent did Platinum, in the

22   six weeks between November 16 and December 31, fully absorb the

23   financial impact, and to what extent were the revised

24   December 31 valuations overinflated, and then, finally, the

25   real point, there's no evidence in any way connecting David

1    Bodner to knowing what that dollar amount was.

2            And you will see in the valuation reports, Black Elk

3    had 233 platforms.  This was one platform out of 233.  It's one

4    platform, and the cause of the explosion was that the welders

5    were working on the platform which had been shut down since

6    August.  No one wants to minimize the fact that three people

7    were killed, but in evaluating the financial impact, while

8    obviously meaningful and significant, there's no evidence that

9    this one well out of -- this one platform out of 233, a company

10   with 500,000 acres under lease, 500,000 acres, that's almost

11   the size of Rhode Island, and 1100 wells in the Gulf of New

12   Mexico, that somehow this company was now worthless.  There's

13   no evidence of that and the evidence is to the contrary.

14           While clearly in 2013, 2014, the prospects for this

15   company significantly declined, but the erosion was gradual.

16   And you will find in exhibit 23, Mr. Quintero's own, quote,

17   overview, it shows that he, himself, said in his report, not

18   what he said at trial, that the financial prospects for the

19   company gradually declined.  It was only after the Renaissance

20   sale two years later in 2014 that Mr. Quintero, in his report,

21   says he believes it became worthless in 2014.

22           But the issue in this case on the 18 and a half

23   million dollars of incentive fees from 2012 was based on an

24   unsupported statement that Black Elk lost significant value so

25   that the incentive fees paid in December were inflated.

1            The next thing that plaintiff points to about

2    Black Elk trying to show that David Bodner knew the assets were

3    inflated is a year later in January of 2014, David Steinberg

4    sent Angela Albanese a stock broker's report on Black Elk

5    traded bonds.  While David doesn't remember whether he got that

6    or not, if you look at that document, and it's Exhibit PX 554,

7    you will see that the broker says -- and this is in January of

8    2014.  The broker says the Black Elk bonds are trading in the

9    80s, say 85, 86, 87, and in his view, the bonds are overvalued

10   and he's recommending that the bonds be sold by those reading

11   his report.  He doesn't say this company is worthless, and he

12   says nothing about a year and a half earlier, gee, this company

13   became worthless.  To the contrary, he's evaluating it, he's

14   saying in the 80s, the bonds could be priced by the market

15   above where they should be, and if you're holding these bonds,

16   you ought to sell them.  No panic.  Nothing about significant

17   loss of value.

18           The other thing that's interesting is he talks about

19   the engineering report.  One of the things that seems to be

20   undisputed in this case is that no one has challenged the

21   competency of these engineering reports, DeGolyer or the other

22   one.  And each of these engineering reports for Black Elk, for

23   Golden Gate, for Northstar shows millions and millions and

24   millions of oil in the ground or billions of cubic feet of

25   natural gas that is in the ground.  No one has -- they have not

MCFCpla3                    Summation - Mr. Lauer

1    disputed that, they ignore it.  But no one has disputed that

2    these companies had enormous wealth in the ground waiting to be

3    extracted.

4              Another document that supposedly shows knowledge is

5    PX 459.  Let's pull up 459, please.

6              Pretty boring document, but this document is an email

7    from Levy to Huberfeld, listing a company apparently with

8    interest payments, and this was forwarded to Albanese by

9    Huberfeld.  Whether this went to David Bodner or not, who

10   knows, but nothing in this document indicates knowledge of

11   valuations, knowledge that the valuations were off.

12             Next document, PX 592.  This one is from David

13   Steinberg, and he says, if we don't have the extra money, we

14   probably lose close to $400 million of value due to unfunded

15   positions.

16             Now, this document supposedly says that the author

17   believes there's no value.  You may find the exact opposite.

18   He's saying if we don't get the funding, we're going to lose

19   $400 million of value in these illiquid companies that is

20   trapped and needs to get free with liquidity.  So this

21   document, far from showing David Bodner has knowledge that the

22   assets are inflated, shows that the assets are not inflated,

23   but the value is trapped and needs liquidity.

24             Also, the email mentions gate.  You may find, as David

25   Bodner testified, gating is not going out of business.  Gating

MCFCpla3                    Summation - Mr. Lauer

1     is dealing with liquidity issues.  And in the fund documents,

2     when there are too many people seeking withdrawal of funds and

3     the funds don't have the money, you put up a gate, and you have

4     a right to do that.  And what you do is you put up the gate to

5     manage the assets, everybody understands there are no

6     withdrawals.  The accrual of management fees is suspended and

7     that's what happened in 2008, 2009.  They put up a gate, there

8     were no withdrawals, Nordlicht managed the assets in that

9     manner and realized tremendous profit for the fund.  This email

10    is not saying we're going out of business, this email is saying

11    we would have to put up a gate, side-pocket the illiquid

12    investments and deal with it that way.  Nobody wants to do that

13    because you're basically -- you annoy your investors and there

14    are a lot of other hedge funds people can invest in.

15         That brings me to the famous Bernie Fuchs dinner,

16    because you may find until this dinner, there's absolutely

17    nothing in the case in which David Bodner is affirmatively

18    addressing valuations.  There are no emails, no documents,

19    nothing.  So Mr. Fuchs thought the dinner occurred sometime

20    between December of 2014 and March of 2015.  Mr. Bodner also

21    couldn't definitively place it, but basically we'll assume it's

22    around that time.

23         So at that meeting, Mark made his typical

24    presentation, the 10 largest assets, here's where we stand,

25    here's the money that we need, we're having these tremendous

1    liquidity issues, people want their money out.  David Bodner

2    says one way to stop encouraging people to take their money off

3    the table or to take the profits off the table is not to

4    realize in your valuations the profits you believe you have,

5    but you haven't turned into cash.  And Mark says, you don't

6    know what you're talking about, I've got auditors, I've got

7    valuators, I'm required, when I run a hedge fund, to value the

8    fund every month and include in the valuation the anticipated

9    profits.  Obviously that involves a tremendous amount of

10   judgment, but I've got to do that.  And then he tells David,

11   dismissively, this person who is supposedly his partner in

12   crime, this person who supposedly has authority over him

13   basically says you don't know what you're talking about, go

14   back to Yeshiva, go back to Monsey, you do not know how to run

15   a hedge fund.

16        No one at that dinner meeting says that this

17   conversation involved or suggested that anyone at the dinner

18   thought that Mark was intentionally overinflating the fund

19   values.  This was a discussion about how do you tamp it down a

20   little bit so people don't take their money off the table.  You

21   may find that this dinner is significant in a number of

22   respects.  A, it shows that David was not in control, it shows

23   that he was not in agreement with Mark to do anything because

24   that clearly is not a way to talk to someone who's supposedly

25   in agreement with you on inflating the assets to defraud the

1    PPVA fund.  Nothing before that dinner, nothing after the

2    dinner in any way suggests that David Bodner, Bernie Fuchs, or

3    Mark Nordlicht, or Murray Huberfeld thought that Mark Nordlicht

4    was intentionally overvaluing the assets.  Consider that Bernie

5    Fuchs attended the dinner, testified he believed Mark knew what

6    he was talking about, and for a year and a half, he continued

7    to solicit investors, his close friends to put money into the

8    fund, never considered that the assets were inflated.

9              This is significant because over the next year and a

10   half, there were multiple partner meetings, multiple meetings,

11   and this issue never comes up again.  And plaintiffs, despite

12   having 17 million documents in their Platinum server, have not

13   shown us a single document before or after this dinner which

14   suggests that David Bodner knew or anyone knew that these

15   assets were intentionally inflated.

16             Now, also at the time of this dinner, and I think this

17   is clearly an important element to all of this, because you're

18   being asked to decide that David Bodner intentionally

19   participated in a scheme or a conspiracy, if you will, to

20   defraud the fund.

21             Now, as of December 2014 or early 2015, the partners

22   had already agreed and Mark had made the decision, no family is

23   taking money out, no incentive fees are being paid, and that's

24   why the focus on incentive fees is the performance in '12 and

25   '13.  '14, '15, and '16 have no bearing on the incentive fee

1  payments.

2        I think no matter what you may think of Mark

3  Nordlicht's approach to running a hedge fund, there simply is

4  no evidence in this case that David Bodner had actual knowledge

5  that Mark Nordlicht or anyone working for him at Platinum was

6  intentionally inflating the asset values.  And unless you find

7  actual knowledge, actual knowledge that you know this, that you

8  could swear to it, unless you find actual knowledge, you have

9  to find for David Bodner because his liability, he can only be

10  liable if he's a fiduciary and you find that he came to have

11  actual knowledge that Mark Nordlicht was inflating the assets.

12        I want to talk a little bit about the release.  This

13  is complicated, a lot of legal points that the lawyers and the

14  Court deal with that don't always make it into evidence.  But

15  the next instruction that the Court will give you is on the

16  release agreement, and pursuant to the Court's instructions,

17  you must find that the release is enforceable, it's written,

18  it's signed, it has consideration, and it bars plaintiffs'

19  claims.  And then there is the exception, unless you find that

20  David and Mark Nordlicht both engaged in misconduct and they

21  both engaged in the same misconduct.  You've seen the release

22  at this trial, it's JX 74.

23        I think we should show JX 74.

24        And the background to the release is not in dispute.

25  There were significant liquidity issues.  Platinum was

1   experiencing a critical liquidity problem.  And at first, Mark

2   Nordlicht asks David and Murray Huberfeld to put in their own

3   personal money, David refused.  He asked them to go out and

4   solicit investors to put in money, David refused.  Finally,

5   Mark Nordlicht said, well, if you're not going to work with me,

6   give me your shares so I can go to Katz and Hannah and other

7   wealthy people and bring them in and save the fund.  And David

8   and Murray Huberfeld effectively said, we each have about

9   $40 million, the majority of our family money in this fund.  If

10  we don't give up the shares, he won't be able to entice people

11  like Katz or Hannah or others to invest.  So I'll give up my

12  shares, hopefully he can get the money, hopefully he can save

13  the fund.

14          So they have a release agreement.  Now, this agreement

15  is not simply a release, it's an agreement by which David

16  Bodner, Murray Huberfeld give up their shares.  They agree to a

17  lockup of two years, in other words for at least two years to

18  help with the liquidity at the fund, $80 million will not be

19  taken out.  They agree that because Uri Landesman was retiring

20  and also leaving the fund, that the first $6 million that comes

21  out goes to Uri.  And basically, when you look at JX 74,

22  there's nothing funny about it, it's a straightforward release

23  agreement.  The only thing that's a little bit interesting is

24  Marcos Katz, who's not a party to this agreement, but was going

25  to be an investor and put new money in and basically would

MCFCpla3                        Summation – Mr. Lauer

1    become one of the owners of Platinum Management and would be

2    responsible for the success of PPVA.  He is listed as what we

3    call a third-party beneficiary.  There's not a party to the

4    agreement because it was a release between Platinum and

5    Huberfeld and Bodner, but he negotiated through his counsel to

6    have the right to enforce the agreement, to enforce the lockup

7    agreement.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. LAUER:  So what you see is this was an agreement

2     involving Platinum, involving Huberfeld and Bodner and

3     Landesman and Fuchs, but also the third-party beneficiary, the

4     Katz family.

5          The Court will instruct you that the agreement is a

6     valid agreement and Mr. Bodner would have no liability under

7     this agreement unless you find this exception.  And that

8     exception is that you find (a) Bodner was a fiduciary, came to

9     have actual knowledge and breached his fiduciary duties and (b)

10    Nordlicht is also a -- or Platinum Management also breached

11    their duties, also knew that the valuations were intentionally

12    inflated, and committed the same misconduct as Bodner.  If you

13    don't find that, then you have to find that the release is

14    valid.

15         Now, you may find——and you are free to try to find

16    it——you may find that there is no evidence in this case, and

17    you will get all the exhibits and you could ask for testimony

18    if you want it, but there is no evidence in this case that

19    Bodner had any agreement with Mark Nordlicht or anyone else to

20    do anything improper, certainly no agreement to engage in a

21    scheme or a plan or a conspiracy to inflate the assets of PPVA

22    to injure the fund and its investors.  There is no evidence

23    that David Bodner conspired with anyone.

24         Let me talk a little bit about valuation.

25         Mr. Quintero was their valuation guy.  Mr. Quintero

Mcf2Pla4                        Summation - Mr. Lauer

1   came in and he had done this elaborate report, it was 500

2   pages, and basically you may find that he came into court and

3   he completely contradicted everything in his report.  He just

4   made it up on the witness stand.

5          Before I take you through the damages, I would like to

6   take some time to walk you through some of these valuation

7   reports by Sterling, by Alvarez, the audit reports by

8   CohnReznick, by Bodner, the valuation evidence within those

9   reports.  Because while Quintero did not do a valuation, he is

10  supposedly an expert, he knows how to do valuations, but he

11  chose never to do a valuation of any of these assets.  He could

12  have valued Black Elk as of December 31, 2012, he could have

13  valued Golden Gate as of December 31, 2013, he did do

14  valuation.

15         He came in and he said I'm going to pick two numbers,

16  a starting number, a bottom number, I'm going to draw a line

17  and then I'm going to compare my line with Platinum's numbers.

18  It's completely arbitrary.  It's completely made up.  And you

19  may find you can ignore everything he said because what he

20  should have done was come in with a valuation report to explain

21  here are the reserves, here is what I see, here all the bad

22  evidence that's in this case about this company, and let me

23  show you how it interacts with 18 million barrels of oil in

24  California.  But he didn't do that.  But it's incumbent on us

25  to show you the people who did do valuations.  These were

professionals.  Every three months either Sterling or Alvarez
did a valuation report and it's complex, but they are
professionals and they did it, and let's start.

Start with 2012.  The only two assets that were owned
by Platinum were Black Elk and Golden Gate.  I'm sorry.  I
misspoke.  We are going to start with Quintero's report because
you are going to see what's in his report which is completely
contradicted by his trial testimony.  So I'm sorry.

Let's start with Quintero report, Exhibit 23.2.  What
Quintero did is he took a number which was the value that
Platinum used for Black Elk December 31, 2012, put up there, he
took another dot which is after the Renaissance sale in 2014,
and he drew that line.

So he starts with Black Elk's fair value, I want to
show this, as of December 31, 2012, and this is Exhibit 23.2
and it is in evidence as Defendant's Exhibit 765.  This is an
important exhibit because it shows what Quintero put in his
report that was subject to cross-examination before trial.

So he says as reported this is worth 284,006,000 as
adjusted.  This is Platinum.  This is his number.  He is saying
based on the way I am doing my valuation, my straight line
valuation, the adjusted is the same, 284,006,000.

And then he says reported over adjusted?  Zero.
Meaning he submitted this report, testified under oath that in
year ended December 31, 2012, the amount of inflation was zero.

1    And this is an arithmetic error because the next month shows

2    January 2013.  December was zero and then he shows that in

3    January, Platinum has it valued at 271 million.  And Quintero

4    says I believe the number on my sliding scale is 257 million,

5    and therefore there is a 36 million inflation.

6            So for 2013, Quintero is saying in January there is

7    inflation.  For 2012 -- and the reason we are emphasizing this

8    and the reason the Court asks to you identify '12 versus '13 is

9    18 1/2 million of the 30 million in incentive fees that they

10   are claiming are based on 2012 and, according to Quintero, in

11   his report, you see there was no inflation in 2012.

12           Let's go to 23.1.  So you see this is not a mistake.

13   23.1, which you will have, it's part of 765, again shows zero

14   total damages for inflated fees as of December 2012.  That is

15   the top line here.  That's December 2012, zero across the

16   board.

17           As long as we are doing this, let's take a look at

18   Golden Gate, which was the other 2012 asset.  This is 24.1.

19   It's part of Exhibit DX 765.  Here again, doing it backwards,

20   here again, December 12, excessive reported overadjusted zero.

21   Damages from inflated management fees, zero.  Damages from

22   inflated incentive fees December 2012, zero.  Total damages

23   from inflated fees, zero.

24           Let's go to 24.2.  This is the companion document in

25   Quintero's report, and it shows that in December of 2012 the

Mcf2Pla4                    Summation - Mr. Lauer

1    reported valuation is 49,440,000.  The adjusted, that's his

2    straight line number, 49,440,000, the amount of inflation or

3    reported overadjusted, zero.

4           Now, what does he do?  He comes into trial and he

5    says:  Well, forget my report.  I express my, quote,

6    professional opinion that once that explosion occurred on that

7    platform, this multimillion dollar company was worthless.  Now,

8    if that were his true belief or if he were being responsible

9    here, if that's what you believe, then do a valuation as of

10   December 31, 2012 that can be cross-examined and we can

11   evaluate whether in fact that opinion makes any sense.  But all

12   he did is testified on the stand, boom.

13          Now, you may find when you look at another exhibit

14   from his schedule, and that is Exhibit 23, which is called an

15   overview, and the plaintiffs put this in, and I thank them for

16   that, the only time in his report that he says in this overview

17   that Black Elk became worthless is after the Renaissance sale

18   when 150 million of assets were sold, there was very little

19   left to Black Elk, and that is in June, July, and August of

20   2014.  And you may find when you look at his overview, you will

21   see that he basically stood -- he sat in the witness chair and

22   used the phrasing from 2014 and said, ah-ha, that's my opinion

23   that as of the explosion this company was worthless.  And you

24   will see in that overview that he gives, he has different facts

25   that occurred in November and December of 2012.  You will see

here "unequivocally worthless after Renaissance sale August
14."

         And when you go back up front to the 2012 section, you
will see a completely different phrase.  "Black Elk
demonstrated signs of financial" -- "Black Elk" -- what
happened to it?

         (Pause).

         MR. LAUER:  This is what we were looking for.  This is
in chart 23, overview.  "Black Elk demonstrated signs of
financial deterioration during 2013 that accelerated during the
first three quarters of 2014."

         And when you look at that overview, what you are going
to see is a complete contradiction of what he testified to at
trial.

         So there are two contradictions with Quintero.  (A) he
puts in this elaborate report, does his schedules for each of
the six assets and for the two in 2012 he says what's the
amount of inflation?  Zero.  Right?  Doesn't do a valuation
report.  Then he comes in to trial and he says the moment the
explosion occurred, the company was worthless.  Then when you
look at the overview, that's not what he said.  He said there
was gradual deterioration and it only became worthless on the
next page in his overview after the Renaissance sale.  You may
find the Court is going to instruct you on special witnesses,
and two experts are special witnesses, and I will address this

1    more in a few moments, but you may find, if you conclude that

2    Mr. Quintero was not straight with you, not a mistake, but he

3    knowingly, he knowingly was not straight, that he had in his

4    report 2012 was zero, comes to trial and they need to get

5    another 18 1/2 million to really zing Mr. Bodner, so he says on

6    the witness stand, oh, right after -- I don't have it in my

7    report, but 18 1/2 million in incentive fee damages because

8    this was worthless.  And even that is not in his report.  You

9    can disregard his entire testimony if you find that he was not

10   straight with you.

11           Now I am going to show you Exhibit DX 558.  Bear with

12   me.  Some of this is repetitive.  But we want to show you a

13   number of the valuation reports so you can see the reserves,

14   you can see, some of you may even enjoy looking at the PV10

15   analysis.

16           So let's go to DX 558, page 4.  This is going to be,

17   when it shows up, the first quarter of 2013, which is just a

18   few months after the November explosion.

19           Okay.  This is the summary of Sterling's conclusion.

20   Black Elk, Sterling low value 222 million.  This is as of March

21   31, 2013, four and a half months after the explosion.  Sterling

22   high value 290 million.

23           They also did Desert Hawk, 5.9 million to 26 million.

24   This was a gold mine that was in development.

25           Golden Gate, low value 49 million, high value 55

Mcf2Pla4                    Summation - Mr. Lauer

1    million.

2              Let's go to the next document.  DX 5621.  This is the

3    second quarter of 2013.  So they did it three months, March 31,

4    now it is six months.  You realize a lot of this is dependent

5    on the price of oil.  What you are going to find, and this is

6    in Mr. Quintero's report, oil hit $100 at the end of 2013, so

7    during '13, it is going up, company values are going up.

8    Sterling low value 230 million for Black Elk, Sterling high

9    value 260,500,000.  Desert Hawk, 27 million, 27 million.  So

10   they basically find it around at the same number.  Golden Gate,

11   low value 61 million, high value 65 million.

12             The next document is DX 566.  That's the third

13   quarter.  Black Elk 252 million is the low valve, 283 million

14   is the high value.  Desert Hawk 26 million and 26 million.

15   Golden Gate low value 66 million, high value 71 million.

16             And finally for 2013, DX 601.  And here you have 186

17   million for Black Elk with the high value 195 million.  Desert

18   Hawk low value 22, high value is 26.  Golden Gate 175, high

19   value 197.

20             Now let's turn to DX 569, which is the audit opinion.

21   And I am rushing through this because I have to finish in an

22   allotted time, but please you will receive these reports and

23   some of it is technical jargon that most of us wouldn't

24   understand, but there is enough there in basic English, you

25   will see what their reasoning was and why they are applying

Mcf2Pla4                    Summation - Mr. Lauer

these values to the oil in the ground.

Here is BDO.  This is the audited report for the
financial statements year ended December 31, 2013.  And in
their summary, you will see that they value Golden Gate and
Black Elk together at 173 million total, fair value 173
million.

Let's go to the BDO valuation report.  This is year
ended December 2013.  The two years connected to incentive
fees, 18 1/2 million 2012, and a little bit less, around 12
million for 2013.  You may find that there is no inflation and
certainly no credible expert testimony of inflation for 2013.
As of December 31, 2013, the company had estimated total proved
oil, natural gas, and NGL reserves of 26, whatever that is, 45
percent oil with a PV10 value of $636 million based on the
reserve report as of December 31, 2013, of Netherlands Sewell &
Associates, Inc. ("NSAI Reserve Report").  For 2013, the
company's net daily production average approximately 11,388
Boepd.  That is for Black Elk.

Let's go to DX 577.  This is the valuation report.
According to the third-party reserve report dated December 31,
2013, it goes on, you have got 628,402,000 of probable
undeveloped reserves, proved reserves, proved developed
producing reserves, proved developed nonproducing reserves and
619 million in proved undeveloped reserves, and the PV10 of net
probable undeveloped reserves to be 151,908,000.

Mcf2Pla4                    Summation - Mr. Lauer

1          Because of time constraints, I would ask you, although

2     not nearly as important because it only relates to this much

3     smaller number of the management fees, look at the 2014

4     Sterling quarterly reports and you will see the work that they

5     did in 2014.  Look at the VRC report and you will see how VRC,

6     these expert valuators relied on reserves and came up with a

7     range of values.  And finally the CohnReznick report on 2014,

8     DX 625, shows an unqualified audit opinion.

9          So when you look at all of that, you should consider

10    that the only expert valuation evidence in this case——I'm going

11    to repeat that——the only expert valuation evidence in the case

12    is in the valuation reports that we introduced and in the audit

13    reports that we introduced.  You have all of that evidence.

14    You can see the analysis.  You can see that they are not --

15    they are doing this professionally and they are doing it every

16    three months.  You have all of that, and then you have

17    Quintero.  You ask yourself, what's reality and what's an

18    expert on the stand?

19         Now, the plaintiff and Quintero have no answer to the

20    contemporaneous valuations.  Instead, they call into question

21    the valuations.  And you may have been confused during the

22    trial by a lot of sort of hit-and-run questions dealing with

23    the Beechwood loan and is it disclosed, is it not disclosed.

24    And frankly, you may find that no one ever connected any of

25    those modest Beechwood loans with the actual valuation issue

Mcf2Pla4                        Summation - Mr. Lauer

1    for any of these assets.

2         But be that as it may, plaintiff and Quintero baldly

3    suggested, well, you can't rely on these valuators.  You can't

4    rely on these two audit firms because they didn't have certain

5    data.  Certain data wasn't disclosed.

6         Now, ask yourselves, what actual evidence did

7    plaintiffs show you that existed with respect to Black Elk in

8    2012?  What evidence was not publicly available that, according

9    to them, had a material effect on the audit work or the

10   valuation work?  And all they can point to is, well, they

11   didn't get e-mails.  But they didn't show you anything about

12   Black Elk in 2012, which is the key year on the incentive fees.

13   They didn't show you a single document that you or anyone else

14   could fairly conclude if they had that evidence the auditors

15   and evaluators could not have issued the opinion.

16        Instead, let's see what they did say.  Okay?

17        They said this Black Elk explosion, they almost said,

18   I can't say that they said it explicitly, but the implication

19   was this explosion was hidden from the auditors, hidden from

20   the valuators.  And yet, as Bernie Fuchs testified, it was in

21   the *New York Times*.  It was also in the Securities and Exchange

22   Commission filings.  You have the opportunity, they are in

23   evidence, to flip through the SEC filings and you are going to

24   see all the good and the bad that Black Elk filed about itself,

25   including all of the reserve, the 1100 wells and the 232

Mcf2Pla4                    Summation - Mr. Lauer

1     platforms that were not affected by the explosion.  That's

2     DX 008.

3          Let's take a look at Black Elk's 10-Q for the third

4     quarter 2013.  And right up here, you will see the beginning of

5     the Black Elk story.  You are also going to see in Sterling,

6     Sterling report discusses, West Delta, DX 552.  I am just going

7     to read it to you while they are showing it.  This is DX 552.

8     It is the fourth quarter of 2012, page 70.  "following an

9     explosion and fire on one of the company's oil pumping

10    platforms in the Gulf of Mexico, shut in and not in production

11    since August 2012, on November 21, 2012, S & P placed BEEOP on

12    watch negative reflecting that the potential for further

13    weakening of the company's credit profile and liquidity."

14    Nothing said about being worthless.

15         And then BDO's valuation report for year ended 2013

16    discusses the impact of West Delta.  That's Exhibit 577 on page

17    28.  "Following an explosion and fire on one of the company's

18    oil pumping platforms in the Gulf of Mexico since August 2012,

19    it's on negative watch."  This is the December 31, 2013 BDO

20    valuation.  As of December 31, 2013, this is a year after year

21    ended 2012, the company had estimated total proved oil, natural

22    gas and NGO reserves of 26 whatever that Mboe means with a PV10

23    value of 636 million.  "The company faced severe headwinds

24    related to the November 2012 West Delta 32 incident.  The

25    incident negatively impacted the performance for the first nine

1   months of 2013."

2          You also heard about Beechwood as if that was a big

3   secret.  So let's go to DX 569.  This is Beechwood is disclosed

4   and PPVA's audited financials as a related party and disclosed

5   that Beechwood bought Golden Gate's debt.  On February 26,

6   Beechwood, a related party of the general partner, purchased

7   approximately 28 million of Golden Gate senior secured debt.

8   And then on March 26, 2014, Golden Gate and Precious Capital

9   amended the loan documents to waive any payment defaults

10  through December 2014.

11         So far from being hidden, this is disclosed in the

12  audit report.

13         What about the Black Elk Opportunity Fund?  A fund

14  that Mr. Bodner was asked to solicit investors for and did not.

15  This is DX 008.

16         You will find that this is the Black Elk Opportunity

17  Fund.  It is expressly disclosed in Black Elk's public filings

18  with the SEC.  And you probably know this.  When somebody is

19  doing an audit, when somebody is doing a valuation about a

20  company that has public filings, they are going to look at the

21  public filings and you can reasonably assume that all of the

22  significant information in the SEC filings was looked at and

23  absorbed by valuators and auditors.

24         Finally, the Precious Capital transaction in which 50

25  percent of Golden Gate was acquired by PPVA, let's look at

1      DX 569.  So here is full disclosure of this transaction.  "In

2      October 2014, Precious Capital and Golden Gate amended the loan

3      documents" and then this is disclosure of the Beechwood loan.

4              Do we have the Black Elk Opportunity Fund, DX 008?

5      Anyway, this is disclosure of the famous Beechwood loan again.

6      Okay.  I am told to move on.  But if you -- if you are

7      interested, looking for the Precious Capital transaction, it is

8      in DX 569 and page 41.  It is disclosed in the audited

9      financials.

10             I want to turn to damages.  Obviously you don't have

11     to deal with damages if you find David is not a fiduciary, if

12     you find that David had no actual knowledge that the assets

13     were being inflated.  But the judge will instruct you on

14     proximate cause and it's important to first identify, well,

15     when, if you find that David somehow came to learn that the

16     assets were inflated, you have to find, you know, when did that

17     occur, and the exception to the general rule of proximate

18     causation, the general rule of proximate causation is if I am

19     doing something wrong and you have a right to claim from me, I

20     can only be sued for what comes after.  So if on January 1,

21     2015, I did something -- failed to do something and I have

22     liability, I can only be responsible for damages in this case,

23     fees that are paid after January of 2015.  I can't be

24     responsible for something that occurred in '14 or '13 because I

25     didn't cause it.  But there is this exception.  If you find

1    that somehow David and Murray Huberfeld or David and Mark

2    Nordlicht concocted a scheme in which David agreed to

3    participate and David Bodner basically sat with Murray

4    Huberfeld or sat with Mark Nordlicht and said this great idea,

5    let's bump up the inflated assets and that way we can steal

6    money from the fund.  If you find that, then it may not matter

7    exactly when you find that David had actual knowledge.

8         But I think you will find it matters because there is

9    really no evidence in this case whatsoever that David Bodner

10   conspired with anyone to violate the law, conspired with anyone

11   to defraud PPVA.  You have seen David.  You have seen the kind

12   of person he is.  Yes, there were times when he was a little

13   bit emotional, as I think any one of us would be if we were

14   facing the kind of devastating liability that they want to reap

15   on him.  But I believe you will find from this evidence or the

16   absence of evidence there is no agreement to inflate assets.

17        And therefore, the only thing that you might be

18   considering, if at all, would be, well, gee, is there a time

19   when he did get actual knowledge?  And the only thing that they

20   can point to is this Fuchs dinner.  And I submit to you, and we

21   have gone through this, there is nothing in that Fuchs dinner

22   that says these assets are fraudulently inflated.  Okay.

23        It is their burden to prove damages, and the damages

24   numbers that are on this chart, this is not gospel.  It is not

25   coming from the Bible.  It is these made-up numbers from

Mcf2Pla4                    Summation - Mr. Lauer

1    Quintero who did this line.  So if you are actually addressing

2    damages, it is completely up to you to look at the valuation

3    reports, to look at the numbers, and say, gee, I was not

4    impressed with Quintero's integrity, I was not impressed with

5    his -- with the way he answered questions, and I don't think

6    there was any inflation and therefore no management fees and no

7    incentive fees.  Or you know what, maybe there was some

8    inflation here, but it's completely up to you to say whether

9    the management fees are 15 million, 9 million, 5 million, 2

10   million.  You don't have to accept numbers that Quintero drew

11   on the dotted line.  He could have done a valuation.  He didn't

12   do a valuation.  If he had done a valuation, I would have had

13   the opportunity to take him through it.

14            You also heard a lot of evidence about all the bad

15   things that happened in 2015, 2016.  You know, as I said

16   earlier, at the end of December 2013, oil was at $100.  In

17   January of 2016, when they are trying to raise money to save

18   the fund, oil was $30.  It's a big difference.  If your cost of

19   production is over $30, you are not going to make it up on

20   volume.

21            So they quantified two areas of damage, incentive fees

22   and management fees.  Incentive fees are 18 1/2 million for

23   2012 and roughly 12 million for 2013.

24            Now, for management fees, Quintero came in and said if

25   you take my numbers, then the inflation is 15 1/2 million.  But

1   Quintero also said I only -- I only did these charts for the

2   specific asset.  And I asked him, well, what about the rest of

3   the fund?  You have all these hundreds and hundreds of assets.

4   So he said, I gave no opinion on that.  In other words, you

5   should assume the rest of the fund is completely in

6   equilibrium.

7          In a way it is completely irrelevant to where do we

8   find payment for the 15 million that Quintero says was

9   inflated?  And you will find, as we introduce in this case and

10  as SanFilippo testified, Exhibit 687 and 690, these show, as of

11  March 31, 2016, the end of the damages period—and there are

12  two of these because one is for the domestic fund, one is for

13  the international fund—this one shows management fees payable

14  2,760,209 as of the end of February, 670,000 of the management

15  fees was not paid, and as of March 31, 3,430,452.40 was not

16  paid.  Let's go to the other one.  And for the other fund the

17  number was 2,106,000.

18         So roughly 5,700,000, even if you accept Quintero's

19  number, 5,700,000 of management fees that would have been paid

20  if they had the money, was not paid.  And as the Court will

21  instruct you, damages in this case only relate to what was

22  actually paid.  So if you look at 687 and 690 and you agree

23  that that shows in total 5.7 million of management fees

24  payable, which means not paid, then even if you were to accept

25  Quintero's numbers, the total maximum damage is 9.9 million.

1    And of course you are free to disregard those numbers and find

2    no damage or some damage in management fees between zero and 9

3    million 9.

4            Now, there is no dispute in this case that the 12.2

5    million from 2013 and the 18 1/2 million from 2012 were paid.

6    That's different for the management fees.  This 5.7 million

7    were not paid.

8            What you have seen when I took you through his chart,

9    the 23.1 and the 24.1 for Black Elk and Golden Gate,

10   Mr. Quintero, who was their damages expert, said for 2012 there

11   was no inflation.  He said that for Golden Gate and that he

12   said for Black Elk, which means if you accept his reported

13   number and not his winged-it number from the stand, there is no

14   damage for 2012.  And at most, they could recover for 2013, if

15   you find that Golden Gate and Desert Hawk and Black Elk were

16   inflated by his number or you could say, you know, I think

17   maybe PPVA's numbers were a little high, but I don't agree with

18   Quintero that it was so high, so the incentive fees are not 12

19   million for 2013, they are 3 million or 4 million.  That's

20   completely up to you.

21           And you should compare the limited evidence that

22   Quintero gave on how he came to his numbers because you are

23   going to find -- you are going to look for a Quintero

24   memorandum, you are going to look for something where Quintero

25   explains why you should conclude that there is 12 1/2 million

of damages based on inflated valuations in 20 -- for 2013, and
you are going to find that he has no valuation report, he has
no valuation memorandum.  But what you have are the valuation
reports by Sterling and you have the audit report by BDO to
show that there was no inflation, that these were solid
numbers, and there are no damages.

Because this issue of did David enter into some kind
of dark conspiracy with Mark Nordlicht or Murray Huberfeld to
defraud his friends and co-religioners, because that's such an
important and scandalous claim, I want to take you through you
a number of documents that you may find show the exact opposite
of any kind of agreement with Mark Nordlicht to defraud the
people in the fund.

And I'm not going to have time to put everything up on
the screen because it takes a long time to put these up, but I
will refer you to the famous busybody e-mail that is Exhibit
Plaintiff 488.  You may remember Mark Nordlicht writes an
e-mail to David Levy:  Why are you talk to go Bodner?  He is a
busybody.  Just stop talking to him.  That's no way to talk
about your coconspirator.

Nordlicht and Fuchs, Fuchs writes to Nordlicht:  You
destroyed my simcha.  That's Hebrew for celebration.  You
destroyed my celebration in some family event.  And Nordlicht
writes back:  If anybody destroyed your celebration, it was
those two guys.  Another great comment by conspirators.

1          Nordlicht writes PX 588:  Bernie and I are going all

2     in with our lives, and David, you have got to go call these

3     people.

4          I would like to show 588.  And here, this is where he

5     sends an e-mail to Huberfeld to read this to Bodner.  The

6     frustrating part to me and Bernie when we discussed it is that

7     we have gone all in with our lives, and we feel it is not the

8     same for you guys.  They are not conspirators.  And then he

9     says:  I know it is embarrassing to go to people and say you

10    need help, but at this point, that's where we are.  Go to Izzy

11    or Garfunkel or Schroen.  If you invest in that, you would be

12    doing me a big favor and I really think you would do well.  Why

13    aren't we doing this, Dovid?  For all you have done for *Klal*

14    *Yisroel*——that's the Jewish people——they would want to help you.

15    You owe it to your future *tzdakkas*——those are your

16    charities——to swallow your pride and allow, urge people to

17    help.

18         What kind of a conspiracy is this?  It is not

19    following the plan.

20         Then you have 390 -- PX 590, which is Gerszberg coming

21    to Murray and David and asking for money, and what you see is

22    they are on the outside, the people working at Platinum for

23    Mark are on the inside, and they are coming to them for money

24    and they don't get the money.  Again, what kind of a

25    conspiracy?

1          Then of course the famous dinner.  If they have this

2     conspiracy, why is David Bodner in front of Bernie Fuchs

3     challenging Mark Nordlicht?  They supposedly have this secret

4     plan, this nefarious plan that they are going to engage in the

5     scheme to defraud the PPVA investors, they are going to inflate

6     the assets.  And you have to ask yourself, since David Bodner

7     has nothing to do with the valuations and he has nothing to do

8     with running the business, if Mark Nordlicht wants to overvalue

9     the assets, what does he need David Bodner for?  Tell me one

10    thing David Bodner contributed to the supposed conspiracy?

11    It's an absolute lie.  It's disgraceful.

12         You may find that every time Mark Nordlicht asks David

13    to put in money or to find an investor he says no, no, no.  So

14    you may find there is no conspiracy just as there is no control

15    and no knowledge.

16         And I'm not going to spend time on the questions to

17    Mark Nordlicht.  That was -- you may find that was a complete

18    charade.  Put a guy who is awaiting sentence, who facing

19    criminal exposure, whose got a motion for a new trial, and ask

20    all these questions.  And my colleague, Mr. Hertzberg was

21    right, the only question I should have asked Mr. Nordlicht is:

22    Is the moon made out of green cheese?

23         So I mentioned, talked about Mr. Quintero, and the

24    fact that as an expert if you find that he wasn't straight with

25    you, you completely disregard his testimony, just disregard it,

Mcf2Pla4                        Summation - Mr. Lauer

as you would someone else who, in a setting about whom you

concluded that person is not being straight with me.  If you

find, when you think about it, when you think about what's in

his report and what he said at trial, if you find that he

wasn't straight with you, you are free to basically ignore

everything he said.

        I want to talk about the great Bill Post.  All right?

Bill Post came in here and he couldn't answer a direct

question.  Here is a guy who supposedly had prophetic vision

comes in and says:  I didn't talk to anybody who worked at

Platinum, but I can tell you, looking at a couple of these

e-mails, that David Bodner controlled Platinum.  And then you

show him some of these e-mails and it was ludicrous, right?

You have that transaction where some guys in Israel had a

borrower, and Mark says, I'm sold on the borrower.  He is

obviously not talking about David Bodner.  And then two or

three lines up, Tuchman, who is the guy in Israel who is going

to work with Mark on this loan, says, oh, David, obviously

referring to the borrower, says he found another lender.  And

Bill Post says, I believe that that is talking about David

Bodner.  And I say could it possibly be David Bodner if you

think he is borrowing money from Mark Nordlicht?  That was Bill

Post.  Bill Post was the guy who came in and told you that

Bodner came to the office for 15 years five days a week.  And I

said what's that based on?  The record.  I said what record?

Mcf2Pla4                        Summation - Mr. Lauer

Testimony, deposition, testimony, records, e-mails.  Tell me
one person's deposition who said that for 15 years, for 15
years, Mr. Bodner came to the office five days a week for 15
years.  And he said, actually, I believe that's what you said
in your opening statement.  The Court had to remind Bill Post
that what counsel says is not evidence.

          Post is also the guy who came in and said if I borrow
a hundred dollars from the bank and the bank says put up 200
dollar asset as collateral and I said to him what's the amount
of my liability?  Well, I would say it would be $300.  Really?
You have a $200 asset, you borrowing $100, and I think all of
you can agree if you are borrowing $100 your liability is $100.
But Bill Post, the man who couldn't answer a question, well, I
would say it would be $300 possibly because if you were unable
to service your debt and they foreclosed, they would get the
collateral plus you would still owe the $100.  That's the way
collateral works.
"Q  If I borrow 100 from the bank and I put up a $200 asset, on
that day that I borrow the 100, is it not a fact that the
amount of my -- that the amount of my liability is only $100?
"A  No."

          Really?

          And then finally Mr. Post said if -- talked about the
Black Elk Opportunity Fund, plaintiff trying to find some kind
of scheme in the fact that some of the managers──not

1    Mr. Bodner—raised a hundred million dollars from Fresh Capital

2    to help Black Elk.

3         So I asked him:

4    "Q  From the strict perspective of PPVA's value and PPVA's

5    holdings, what happens when another company invests?  So it's

6    your testimony that you can put $100 million of fresh money

7    into a company and it doesn't add to the value of the company?

8    I just want to understand your testimony.

9         "That's exactly my testimony."

10        I think you could find, like Mr. Quintero, Bill Post

11   came here, he was programmed like a robot, and nothing he said

12   has any significance on the questions in this case.  Did Bodner

13   control Platinum?  Did he have a specific job or responsibility

14   at PPVA?  Did he have knowledge of fraud?  You can disregard

15   Bill Post.

16        You may find that from David Bodner's perspective the

17   partner meetings and the meetings from time to time with

18   Platinum portfolio managers is to get high level updates as to

19   how the business was going, not evidence of control or

20   responsibility.

21        There is simply nothing about a part owner of a

22   business meeting with the managers in the business or even with

23   investors that other people have brought in that reflects any

24   undertaking by David Bodner to perform a duty or to take

25   responsibility for anything at PPVA.

1          Not one of the e-mails that they showed David indicate

2     that is he accepted responsibility for a specific role or a

3     specific duty.  We ask you to study the evidence and recognize

4     the spin for what it is.  You heard so much about the Beechwood

5     loan, and I mentioned this.  They never connected Beechwood and

6     the Beechwood loan with the claim in this case.  How does that

7     show that David Bodner knew that the PPVA assets were inflated

8     intentionally?

9          We heard testimony from Latkin, Gerszberg, Steinberg,

10    SanFilippo, Fuchs, and Huberfeld.  Not one of them said David

11    Bodner exercised control.  Not one of them could point to a job

12    that David had accepted.  In fact, it seems that Gerszberg and

13    David had very little understanding of the details in the

14    fund's investments.

15         What is this case about?  The plaintiff seeks tens of

16    millions of dollars from David Bodner which you may find would

17    be truly devastating to a man, his wife, his children, and his

18    grandchildren who depend on him.  Truly catastrophic to a man

19    who has given his adult life to helping people both financially

20    and with his own personal time.  You have met David.  You have

21    seen him for two weeks, and at times Mr. Bodner did get

22    emotional.  You may find this case is extremely significant to

23    him.  The amount of money that plaintiff seeks in this case is

24    extraordinary.  When you review the evidence and you review

25    every aspect of the Court's instruction, you may find that in

Mcf2Pla4                    Summation - Mr. Lauer

2003, David Bodner made a lifestyle decision.  He would put

money into the fund, but he would not be involved in

management.  He would devote as much time as possible to

personal investments and to communal activities.  There is no

evidence in this case that David Bodner knew that Mark

Nordlicht or anyone else was intentionally inflating the assets

to defraud PPVA.

There is no evidence that anyone, including the

valuators, the auditors, or anyone working at Platinum ever

expressed the view to David that Mark Nordlicht was defrauding

the fund or that they considered these assets to be inflated.

It shows -- in fact we have shown multiple reports of valuators

and auditors who interacted with multiple portfolio managers at

PPVA and not one of them ever said that they thought the assets

were inflated and no one ever spoke with David Bodner to tell

him, do you know, as an owner of this fund, that your assets

are inflated?

So on the primary issue, the first issue that can

knock this whole case out and basically end your deliberations,

on the issue of significant control or a defined role or job at

Platinum, I am going to end where I began two weeks ago:

There is absolutely no evidence that David Bodner

controlled Platinum Management, had significant control of

Platinum Management, or significant control at PPVA.  And you

know what I am going to say about control.  On the issue of did

Mcf2Pla4

1    David Bodner control Platinum or Mark Nordlicht?  The emperor

2    clearly has no clothes.

3            On behalf of David Bodner, thank you for your time,

4    thank you for your attentiveness, and the seriousness by which

5    I know you will deliberate.

6            I want to end on the following:

7            We have no burden.  They have the burden.  If you are

8    in doubt, they lose.  They have produced no evidence on the key

9    issues in the case, they have not met their burden, and I urge

10   you to do your sacred duty in this case and enter a verdict in

11   favor of David of no liability.

12           Thank you.

13           THE COURT:  Thank you very much.

14           Ladies and gentlemen, I want to mention one quick

15   minor thing, and I stress it is minor.

16           In plaintiffs' counsel closing remarks he said a

17   couple of times that I would instruct you about Mr. Nordlicht's

18   taking the Fifth Amendment.  Actually, it is not going to be

19   part of my written instructions because I gave you an

20   instruction at the time and it is only a collateral issue.  But

21   just to remind you, on the one hand, when someone takes the

22   Fifth Amendment, you can, if you wish, infer that they are

23   taking the Fifth because a true answer would be to admit

24   whatever they are being asked about, such as overinflation.  On

25   the other hand, you can infer when someone takes the Fifth

Mcf2Pla4

Amendment as to every question that they are simply following

the advice of their counsel to assert the Fifth as to

everything.

So those are inferences you both can -- either one of

those you can draw.  It is totally up to you.  However, under

no set of circumstances could you decide any element of this

case solely on the inference you draw from the taking of the

Fifth.  It is at most a secondary issue.  It is not a primary

issue.  It is not sufficient in itself to decide any issue in

this case.

So now that you have heard that repeat instruction, I

think it is time for you to forget about all of this again for

just a short time, go to lunch, remember not to discuss the

case even now among yourselves, because there is one other

thing that is still going to come, and that's my instructions

of law, and I'm going to give them to you──it will take about a

half hour──right after lunch, and then the case will be yours

to discuss and deliberate.

So have a good lunch and we will resume at 2:00.

(Continued on next page)

Mcf2Pla4

1          (Jury not present)

2          THE COURT:  Please be seated.  Okay.  We have now had

3     a chance, thanks to my super law clerk to look at all the

4     references in the transcript to those two charts, 924 and 925.

5     And here is what the record shows:

6          924 was first called up on December 7.  This is at

7     page 966 of the transcript, beginning at line 3:

8          "Mr. Gluck:  Mr. Parson, will you please call up

9     Plaintiffs' Exhibit 924.

10          "Mr. Lauer:  We object for the record, your Honor.

11          "The Court:  Duly noted.  Overruled."

12          This was to say the least ambiguous.  Plaintiffs'

13     counsel did not actually offer the exhibit.  On the other hand,

14     Mr. Landesman inferred that he was about to offer the exhibit

15     and said we object, quote, for the record, which was perhaps

16     not the strongest objection ever made.  I denied the objection,

17     but there is nothing there that expressly admitted 924.

18          The next time it comes up is, several days later, at

19     1539, beginning at line 4.

20          "Mr. Gluck:  Mr. Parson, please call up Plaintiffs'

21     Exhibit 924 which is already in evidence."

22          Not, frankly technically accurate.  And then this is

23     all of course, all of this is Quintero testimony and the reason

24     for the delay was, as everyone remembers, we separated out his

25     testimony into two different days.

Mcf2Pla4

1          So at that point Mr. Gluck says:

2     "Q  Will you please take the jury through this chart.

3          "Mr. Lauer:  I'm not sure it's in evidence.

4          "The Court:  I think he is arguing as an aid to the

5     jury in following the witness.  It is not being offered into

6     evidence."

7          Mr. Gluck initially says, "I think that's right."  But

8     then he says, "No, it's in evidence.  There is another chart

9     that I think that's coming.  I misspoke.  This chart is in

10    evidence.  It was admitted in evidence."

11         The Court says:  "It must have been done on consent"

12         Mr. Gluck says:  "It was done on consent.  And it is

13    one of the reasons we have that other issue."

14         The Court then says:  "Now that it's been brought to

15    my attention, these kinds of charts, ladies and gentlemen, are

16    not themselves evidence.  They are summaries of what the

17    witness is testifying about.  They are helpful to you sort of

18    like a Power Point, in effect, but don't regard it as

19    substantive evidence.  You may take them in, since it was

20    admitted, into the jury room and use it then to refresh your

21    recollection what the witness said and so forth, but his

22    testimony is the evidence and the underlying documents are the

23    evidence, not the chart."

24         Now, first, in saying that, I relied on plaintiffs'

25    counsel's erroneous statement that it was in evidence, not only

Mcf2Pla4

1    that it was in evidence, but it was in evidence on consent.

2    There is nothing in the record remotely to support that.  But

3    on the other hand, I indicated that it would be -- could be

4    used as 925 were later used as an *aide memoire* to the jury.

5    But my reference to its being taken into the jury room to be

6    looked at, notwithstanding that it was only an *aide memoire* was

7    premised on the representation, that I now see was erroneous,

8    by plaintiffs' counsel that it had been received in evidence.

9           The last thing that happened was with respect to 925

10   at page 1559, and that was shown to Mr. Quintero by Mr. Gluck.

11   "Q  Can you please take the jury through your calculations as

12   to the overstated management fees for these six particular

13   assets?

14           "Mr. Lauer:  Excuse me.  Is this in evidence?

15           "The Court:  Is this in evidence?  It's the same

16   thing.  It's not going to be -- if it's already been received

17   in evidence, the jury will still only be able to use it as an

18   aid.  If it's not received in evidence, it's not received in

19   evidence.

20           "Mr. Landesman:  If it's not yet in evidence, I would

21   like to *voir dire* if they are offering it."

22           I then took a sidebar, and at the sidebar I said, this

23   is at page 1560, "Second, this is not being offered in evidence

24   and the other one probably should not have been, but you

25   consented to it."  Again that's a misstatement based upon the

Mcf2Pla4

1    representation by plaintiffs' counsel.  And then I continue,

2    "But this is just a chart that the jury can follow his

3    testimony, so there is nothing to *voir dire*, so the request of

4    *voir dire* is overruled."

5        So it is now clear to me that neither exhibit was ever

6    received in evidence and therefore the only question is

7    whether, nevertheless, they should be submitted to the jury

8    with a notation that they are not in evidence but are being

9    shown because they may be an aid.

10        I think on the record that I have just recited, they

11    should not be sent to the jury initially.  Based on long

12    experience, I have a feeling we may well get a note from the

13    jury asking for them and we will deal with how we deal with

14    that then.  Maybe there won't be a note.  But that is just a

15    hypothetical.

16        The immediate ruling is they are not to be submitted,

17    and therefore nothing in the index should refer to them nor

18    should hard copies of them be submitted.

19        Now, do we have the index in all other respects

20    finished?

21        MS. SHEN:  We do, your Honor.

22        THE COURT:  And how about on the defense side?

23        MR. AMENT-STONE:  Yeah, your Honor, I think we are

24    using one --

25        THE COURT:  Yes, it should be one, that's what I

Mcf2Pla4

1    requested.

2              MR. AMENT-STONE:  Yes.

3              THE COURT:  Let me see the index.

4              Also you have all the exhibits ready to go?  Okay, is

5    it just that?  My question is do we need a cart or not?

6              MR. AMENT-STONE:  I think not, your Honor.

7              THE COURT:  Okay, terrific.  Excellent.  So let me

8    look at the index.

9              Okay.  So I think we are ready to go.  And unless

10   anyone has anything else, you are all free to go to lunch.  See

11   you at 2:00.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

Mcf2Pla4

1                        AFTERNOON SESSION

2                            2:05 p.m.

3          THE COURT:  Please be seated.

4          Ladies and gentlemen, we're going to -- we all set?

5   What's the problem?  Okay.

6          We're going to read the instructions of law together

7   now and then you'll have them to take with you into the jury

8   room.

9          So, if you look at the second page of the table of

10  contents, you'll see there are first a bunch of general

11  instructions.  These are instructions that are the same, not

12  just for this case, but for all civil cases.  Then there are

13  the instructions relating to the charge of this case.  You may

14  remember from the preliminary instruction that there were

15  initially two charges, breach of fiduciary duty and fraud.  The

16  fraud charge is no longer part of the case and don't speculate

17  about that.  It's all down to a single claim of breach of

18  fiduciary duty.  Then, if you find there is liability, then

19  there is the instruction of how you calculate damages.  That's

20  the legal word for money.  We don't use simple words in the

21  law, we always use complicated and obscure words.  So instead

22  of using the word money, we use the word damages, but just to

23  let you in on the secret, it means money.  Finally, there are

24  some concluding instructions about how you fill out your

25  verdict form.

Mcf2Pla4

1          So let's turn to the first general instruction on

2   page 3.

3          We are now approaching the most important part of this

4   case, your deliberations.  You have heard all the evidence in

5   the case, as well as the final arguments of the lawyers for the

6   parties.  Before you retire to deliberate, it is my duty to

7   instruct you as to the law that will govern your deliberations.

8   These are the final and binding instructions, which entirely

9   replace the preliminary instruction I gave you at the start of

10  the case, which you should now discard.

11         Regardless of any opinion that you may have as to what

12  the law may be or ought to be, it is your sworn duty to follow

13  the law as I give it to you.  Also, if any attorney or other

14  person has stated a legal principle different from any that I

15  state to you in my instructions, it is my instructions that you

16  must follow.

17         Because my instructions cover many points, I have

18  provided each of you with a copy of them, not only so that you

19  can follow them as I read them to you now, but also so that you

20  can have them with you for reference throughout your

21  deliberations.  In listening to them now and reviewing them

22  later, you should not single out any particular instruction as

23  alone stating the law, but you should instead consider my

24  instructions as a whole.

25         Your duty is to decide the fact issues in the case and

Mcf2Pla4

arrive, if you can, at a verdict.  You, the members of the

jury, are the sole and exclusive judges of the facts.  You pass

upon the weight of the evidence; you determine the credibility

of the witnesses; you resolve such conflicts as there may be in

the testimony; and you draw whatever reasonable inferences you

decide to draw from the facts as you determine them.

          In determining the facts, you must rely upon your own

recollection of the evidence.  To aid your recollection, we

will send you all the exhibits at the start of your

deliberations, together with an index to help you find what you

want.  If you need to review particular items of testimony, we

can also arrange to provide them to you in transcript or

read-back form.

          Please remember that none of what the lawyers have

said in their opening statements, in their closing arguments,

in their objections, or in their questions, is evidence.  Nor

is anything I may have said evidence.  The evidence before you

consists of just three things: the testimony given by witnesses

that was received in evidence, the exhibits that were received

in evidence, and any stipulations of the parties as to matters

in evidence.

          Testimony consists of the answers that were given by

the witnesses to the questions that were permitted to be asked

here in court.  Please remember that questions, although they

may provide the context for answers, are not themselves

Mcf2Pla4

evidence; only answers are evidence, and you should therefore
disregard any question to which I sustained an objection.
Also, you may not consider any answer that I directed you to
disregard or that I directed be stricken from the record.
Likewise, you may not consider anything you heard about the
contents of any exhibit that was not received in evidence.

More generally, you should be careful not to speculate
about matters not in evidence.  Your focus should be solely on
the evidence that was presented here in court.

It is the duty of the attorney for each side of a case
to object when the other side offers testimony or other
evidence that the attorney believes is not properly admissible.
Counsel also have the right and the duty to ask the Court to
make rulings of law and to request conferences out of the
hearing of the jury.  All such questions of law must be decided
by me.  You should not show any prejudice against any attorney
or party because the attorney objected to the admissibility of
evidence, asked for a conference out of the hearing of the
jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or
from the fact that on occasion I asked questions of certain
witnesses.  My rulings were no more than applications of the
law and my questions were only intended for clarification or to
expedite matters.  You should understand that I have no opinion
as to the verdict you should render in this case.

Mcf2Pla4

1          You are to form your duty of finding the facts without

2     bias or prejudice or sympathy or hostility as to any party, for

3     all parties are equal under the law.  You are to perform your

4     final duty in an attitude of complete fairness and

5     impartiality.  You are not to be swayed by rhetoric or

6     emotional appeals.  It must be clear to you that if you were to

7     let extraneous considerations interfere with your thinking,

8     there would be a risk that you would not arrive at a true and

9     just verdict.  So do not be guided by anything except clear

10    thinking and calm analysis of the evidence.

11         As you know, this is a civil case.  In a civil case, a

12    party who is making a claim against another party has what we

13    call the burden of proof, which is the burden of establishing

14    each of the essential elements of that claim.  Here, it is the

15    plaintiffs who have the burden of proof.

16         As it turns out, there is now only one claim against

17    Mr. Bodner that you are called upon to consider: a claim for

18    breach of fiduciary duty.  I will describe the essential

19    elements of this claim shortly, but for now, keep in mind that

20    plaintiffs must prove each of the essential elements of that

21    claim by a preponderance of the credible evidence.  The

22    credible means that such evidence that you find worthy of

23    belief.  To establish an element by a claim of preponderance of

24    the credible evidence means to prove that that element is more

25    likely true than not true.

Mcf2Pla4

          When assessing whether the party bringing a claim has

met its burden of proof as to that claim, the question is not

which party called the greater number of witnesses as to that

claim or how much time one party or another spent on it during

the trial.  The focus must always be on the quality of the

evidence: its persuasiveness in convincing you of its truth.

          In deciding whether a party meets its burden of proof,

you may consider both direct evidence and circumstantial

evidence.

          Direct evidence is evidence that proves a fact

directly.  For example, where a witness testifies to what he or

she saw, heard, or observed, that is called direct evidence.

          Circumstantial evidence is evidence that tends to

prove a fact by proof of other facts.  To give a simple

example, suppose that when you came into the courthouse today

the sun was shining and it was a nice day, but the courtroom

blinds were drawn and you could not look outside.  Later, as

you were sitting here, someone walked in with a dripping wet

umbrella, and, soon after, somebody else walked in with a

dripping wet raincoat.  Now, on our assumed facts, you cannot

look outside the courtroom and you cannot see whether it is

raining.  So you have no direct evidence of that fact.  But on

the combination of the facts about the umbrella and the

raincoat, it would be reasonable for you to infer that it had

begun raining.

Mcf2Pla4

1          That is all there is to circumstantial evidence.

2     Using your reason and experience, you infer from established

3     facts the existence or the nonexistence of some other fact.

4     Please note, however, it is not a matter of speculation or

5     guess; it is a matter of logical inference.

6          The law makes no distinction between direct and

7     circumstantial evidence.  Circumstantial evidence is of no less

8     value than direct evidence, and you may consider either or

9     both, and may give them such weight as you conclude is

10    warranted.

11         It must be clear to you by now that counsel for the

12    opposing parties are asking you to draw very different

13    conclusions about various factual issues in the case.  An

14    important part of that decision will involve making judgments

15    about the testimony of the witnesses you have listened to and

16    observed.  In making these judgments, you should carefully

17    scrutinize all of the testimony of each witness, the

18    circumstances under which each witness testified, and any other

19    matter in evidence that may help you to decide the truth and

20    importance of each witness's testimony.

21         Your decision to believe or not believe a witness hay

22    depend on how that witness impressed you.  How did the witness

23    appear to you? Was the witness candid, frank, and forthright,

24    or did the witness seem to be evasive or suspect in some way.

25    How did the way the witness testified on direct examination

Mcf2Pla4

compare with how the witness testified on cross examination?
Was the witness consistent or contradictory.  Did the witness
appear to know what he or she was talking about?  Did the
witness strike you as someone who was trying to report his or
her knowledge accurately.  These are examples of the kinds of
common sense questions you should ask yourself in deciding
whether a witness is or is not truthful.

          How much you choose to believe a witness may also be
influenced by the witness's bias.  Does the witness have a
relationship with any of the parties that may affect how he or
she testified.  Does the witness have some interest, incentive,
loyalty, or motive that might cause him or her to shade the
truth.  Does the witness have some bias, prejudice, or
hostility that may cause the witness to give you something
other than a completely accurate account of the facts he or she
testified to?

          You should also consider whether the witness had an
opportunity to observe the facts he or she testified about, and
whether the witness's recollection of the facts stands up in
light of the other evidence in the case.

          In other words, what you must try to do in deciding
credibility is to size up a person just as you would in any
important matter where you are trying to decide if a person is
truthful, straightforward, and accurate in his or her
recollection.

Mcf2Pla4

1          Some of the testimony before you was in the form of

2      excerpts from depositions that were received in evidence and

3      read during the trial.  A deposition is simply a procedure

4      whereby, prior to trial, the attorneys may question a witness

5      or a party under oath before a court stenographer.  You should

6      consider the deposition testimony received at trial according

7      to the same standards you would use to evaluate the testimony

8      of a witness given in live court.

9          The law permits parties to offer testimony from

10      witnesses who were not involved in the underlying events of the

11      case, but who, by education or experience, profess to expertise

12      in a specialized area of knowledge.  In this case, the only

13      such witnesses who testified were William Post and Ronald

14      Quintero, both of whom were called by the plaintiffs.

15      Specialized testimony is presented to you on the theory that

16      someone who is learned in the field may be able to assist you

17      in understanding specialized aspects of the evidence.

18          However, your role in judging credibility and

19      assessing weight applies just as much to these witnesses as to

20      other witnesses.  When you consider the specialized opinions

21      that were received in evidence in this case, you may give them

22      as much or as little weight as you think they deserve.  For

23      example, a specialized witness necessarily bases his or her

24      opinions, in part or in whole, on what that witness learned

25      from others, and you may conclude that the weight given the

Mcf2Pla4

witness's opinions may be affected by how accurate or

inaccurate that underlying information is.  More generally, if

you find that the opinions of a specialized witness were not

based on sufficient data, education, or experience, or if you

should conclude that the trustworthiness or credibility of such

a witness is questionable, or if the opinion of the witness is

outweighed, in your judgment, by other evidence in the case,

then you may, if you wish, disregard the opinions of that

witness, entirely or in part.  On the other hand, if you find

that a specialized witness is credible, and that the witness's

opinion are based on sufficient data, education, and

experience, and that the other evidence does not give you

reason to doubt the witness's conclusions, you may, if you

wish, rely on that witness's opinions and give them whatever

weight you deem appropriate.

        With these general instructions in mind, let me now

turn to the claim in this case, a claim for fiduciary breach.

Plaintiffs Martin Trott and Christopher Smith are

court-appointed liquidators suing on behalf of Platinum

Partners Value Arbitrage Fund, L.P., they assert that the

defendant, David Bodner, breached a fiduciary duty he had to

PPVA and its investors by failing to disclose to PPVA and its

investors his alleged knowledge that PPVA's assets were

overvalued and/or by failing to object to the payment by PPVA

of incentive and management fees to which he allegedly knew he

Mcf2Pla4

and other persons or entities were not entitled.

In assessing this claim, you must first determine, according to my instructions, whether the plaintiffs have proved each essential element of this claim.  This is known as establishing liability.  If you determine that the defendant is liable on plaintiffs' claim, you must then decide whether the release agreement nevertheless relieves Mr. Bodner of liability.  Finally, if you find that the defendant is liable on plaintiffs' claim and that the release agreement does not bar the claim, you will have to determine what are called damages, that is, the amount of money to be paid by Mr. Bodner on the claim.

Against this background, let us now discuss the essential elements of the plaintiffs' claim of breach of fiduciary duty.

Specifically, plaintiffs' claim is that Mr. Bodner breached a fiduciary duty to PPVA and its investors by failing to disclose to PPVA and its investors his knowledge of the alleged overvaluation of PPVA's assets and/or by failing to object to payment of incentive and management fees to which he allegedly knew he and other persons or entities were not entitled.

To prove their breach of fiduciary duty claim, plaintiffs must prove by a preponderance of the evidence each of the three essential elements.  The first is that Mr. Bodner

Mcf2Pla4

owed a fiduciary duty to PPVA and its investors.  What is a

fiduciary duty?  It is a special duty of care that is created

when one party, with the other party's knowledge and consent,

reasonably puts its trust and confidence in the other party to

carry out a particular role or undertake a particular duty on

behalf of the first party.  In particular, those who manage the

investments of an investment fund owe a fiduciary duty to the

fund and its investors.  Although Mr. Bodner was not an officer

of PPVA, plaintiffs argue that, through Platinum Management and

otherwise, Mr. Bodner exercised significant control over PPVA's

management of its investments and thereby assumed a fiduciary

duty to PPVA and its investors.  Mr. Bodner denies that he

exercised any such control.  So, this is the first issue you

will need to resolve.

        Second, if you find that Mr. Bodner owed a fiduciary

duty to PPVA and its investors, you must then determine whether

Mr. Bodner breached that fiduciary duty by failing to disclose

to PPVA and its investors the alleged overvaluation to the

fund's assets that he allegedly knew about and/or by failing to

object to payment of incentive and management fees to which he

allegedly knew he and other persons or entities were not

entitled.  One who owes a fiduciary duty to a fund and its

investors is required to act in good faith to advance the

interests of the persons and entities to whom he owes the duty.

This includes a continuing duty to truthfully and fully

Mcf2Pla4

disclose to the persons and entities to whom he owes the duty
all material facts, meaning any facts that would be material to
these persons and entities in making an investment or financial
decision.  He also owes these persons and entities his
undivided loyalty and may not obtain an improper advantage for
himself or otherwise act in any manner contrary to their
interests.  In short, if Mr. Bodner had a fiduciary duty to
PPVA and its investors, which he denies, and if the fund's
assets were overvalued and he knew about this, which he also
denies, then he would have had a duty to disclose this
knowledge to the investors, as well as a duty to object to the
payment of incentive and management fees to which he knew and
other persons or entities were not entitled.

            Third, and finally, if you find that Mr. Bodner owed a
fiduciary duty to PPVA and its investors and that he knowingly
breached that fiduciary duty by failing to disclose his alleged
knowledge of the alleged overvaluation of the fund's assets
and/or by failing to object to payment of incentive and
management fees to which he knew he was not entitled, you must
then determine whether the fund and its investors were
financially damaged as a result of Mr. Bodner's failure to
disclose this knowledge.  Here, again, the parties are in
dispute.  For example, they differ considerably as to the
amounts of incentive and management fees that were allegedly
wrongfully paid as a result of Mr. Bodner's alleged fiduciary

Mcf2Pla4

1   breach.  Again, this is a dispute you must resolve, remembering

2   at all times that it is the plaintiffs' burden to prove each of

3   the essential elements of their fiduciary breach claim by a

4   preponderance of the evidence.

5          If, but only if, you find that plaintiffs have proved

6   the essential elements of their claim that Mr. Bodner breached

7   a fiduciary duty to PPVA and its investors, you must then

8   determine whether Mr. Bodner must still be found not-liable on

9   that claim because he was released from liability by the

10  release agreement dated March 20, 2016, which was signed by

11  Mr. Bodner in his personal capacity and by Mark Nordlicht on

12  behalf of Platinum Management.

13         Specifically, the release agreement, if it is valid,

14  absolves Mr. Bodner from any liability for plaintiffs'

15  fiduciary breach claim.  However, there is an important

16  exception.  If you find by a preponderance of the evidence that

17  Mr. Nordlicht or Platinum Management also engaged in the same

18  fiduciary breach that you have found Mr. Bodner liable for,

19  then the release is unenforceable as to that claim.  This is

20  because two persons or entities liable for the same misconduct

21  cannot lawfully agree to release each other from liability for

22  that misconduct.

23         If you have found Mr. Bodner liable on plaintiffs'

24  fiduciary breach claim and have also found that the release is

25  unenforceable as to that claim, then you mutt determine the sum

Mcf2Pla4

of money that must be paid by Mr. Bodner to the plaintiffs as a result of his fiduciary breach.  These sums of money are called damages, and the plaintiffs bear the burden of proving the amount of these damages by a preponderance of the credible evidence.

Generally speaking, an injured party is entitled to recover from a liable party the sum of money that will justly and fairly compensate the injured party for the injuries that were proximately caused by the misconduct of the liable party. An injury is proximately caused by the misconduct of the liable party if that misconduct was a substantial factor in causing the injury.  With respect to the breach of fiduciary duty, then, the measure of damages is how much money the fund and its investors lost as a proximate result of Mr. Bodner's fiduciary breach.

Please note that Mr. Bodner is liable only for the damages proximately caused by his own acts that constituted the breach of fiduciary duty unless plaintiffs also prove by a preponderance of the credible evidence that he intentionally entered into an agreement, explicitly or implicitly, with Mr. Nordlicht and/or Mr. Huberfeld, to defraud the investors by hiding the fact that the fund's assets were overvalued, in which case he is also liable for the damages caused by Mr. Nordlicht and/or Mr. Huberfeld.  This might include, for example, the allegedly inflated amount of any management fees

Mcf2Pla4

1    paid in cash during the relevant period, as well as the

2    allegedly inflated amount of any incentive fees paid in cash or

3    redeemed as cash during the relevant period.

4           In calculating damages, do not concern yourself with

5    the possibility that other persons may have already paid or

6    been ordered to pay some of the damages.  Such set-offs will be

7    determined by the Court and duly deducted from any sum of

8    damages that you calculate.

9           You will shortly retire to the jury room to begin your

10   deliberations.  As soon as you get to the jury room, please

11   select one of your number as the foreperson, to preside over

12   your deliberations and to serve as your spokesperson if you

13   need to communicate with the Court.

14          You will be bringing with you into the jury room a

15   copy of my instructions of law and a verdict form on which to

16   record your verdict.

17          Let me pause there for one second, ladies and

18   gentlemen.  I think you already saw this up on the screen

19   during one of the closing arguments, but this is the verdict

20   form.  It's a simple form that asks you four questions.  First

21   question is whether on the fiduciary breach claim you find

22   Mr. Bodner liable or not liable, you'll check the relevant box.

23   If you find not liable, that's the end, you just sign the form

24   and don't bother with the other questions.  If you find liable,

25   then you go to the second question which is whether the release

Mcf2Pla4

1    bars liability or does not bar liability.  And again, you'll

2    check the relevant box.  If you find the release does not bar

3    liability, then you would go and the third question of the

4    calculation of damages, and finally, there's a fourth and

5    special question because of certain legal issues that I wont

6    bore you with, and that is for you to indicate how much of the

7    damages, if any, is for incentive fees based on the 2012 net

8    asset value.  Southern District.

9              So after you have completed your verdict form, your

10   foreperson will sign it, date it, and seal it in this envelope

11   very clearly marked verdict, and that will then be brought to

12   me and I will not open it until all nine of you are back here

13   in the courtroom.  Then we will read it and ask each of you

14   individually whether that is your verdict.  And we do that just

15   to be absolutely sure that we have your verdict as you have

16   decided.

17             Back to the instructions.

18             In addition, we will send into the jury room all the

19   exhibits that were admitted into evidence, along with an index

20   so you can locate what you want.  If you want any of the

21   testimony, that can also be provided, in either transcript or

22   read-back form.  But please remember that it is not always easy

23   to locate what you might want, so be as specific as you

24   possibly can be in requesting portions of testimony.

25             Any of your requests, in fact any communication with

Mcf2Pla4

1    the Court, should be made to me in writing, signed by your

2    foreperson, and given to the marshal, who will be available

3    outside the jury room throughout your deliberations.  After

4    consulting with counsel, I will respond to any question or

5    request you have as promptly as possible, either in writing or

6    by having you return to the courtroom so that I can speak with

7    you in person.

8          You should not, however, tell me or anyone else how

9    the jury stands on any issue until you have reached your

10   verdict and recorded it on your verdict form.

11         Each of you must decide the case for yourself, after

12   consideration, with your fellow jurors, of the evidence in the

13   case, and your verdict must be unanimous.  In deliberating,

14   bear in mind that while each juror is entitled to his or her

15   opinion, you should exchange views with your fellow jurors.

16   That is the very purpose of jury deliberation — to discuss and

17   consider the evidence; to listen to the arguments of fellow

18   jurors; to present your individual views; to consult with one

19   another; and to reach a verdict based solely and wholly on the

20   evidence.

21         If, after carefully considering all the evidence and

22   the arguments of your fellow jurors, you entertain a

23   conscientious view that differs from the others', you are not

24   to yield your view simply because you are outnumbered.  On the

25   other hand, you should not hesitate to change or modify an

Mcf2Pla4

1    earlier view that, after discussion with your fellow jurors,

2    now appears to you erroneous.

3            In short, your verdict must reflect your individual

4    views and it must also be unanimous.

5            This completes my instructions of law.

6            Now, before we swear in the marshal, first, all

7    previously argued objections to any portion of the charge are

8    hereby deemed renewed and denied.

9            Is there anything else any counsel needs to approach

10   the Court about?

11           MR. GLUCK:  No, your Honor.  Thank you.

12           MR. LAUER:  No, your Honor.

13           THE COURT:  Very good.  You can deliberate as long as

14   you need.  It's totally up to you.  If you want to deliberate

15   past 4:30, you need to, either today or tomorrow, you need to

16   let us know by 4 o'clock so we can make the appropriate

17   arrangements.  But whatever time you decide to deliberate

18   until, you haven't reached a verdict by that time, then you

19   should all just go home, still not discussing the case with

20   anyone, and come back tomorrow morning at 9:30 and resume your

21   deliberations.  And whoever you choose as your foreperson must

22   make sure that the deliberations do not recommence until all

23   nine of you are back.

24           All right.  I think we're ready to swear in the

25   marshal.

Mcf2Pla4

1            (Marshal sworn)

2            THE DEPUTY CLERK:  Jurors, please follow the marshal.

3            (Jury not present)

4            THE COURT:  All right.  Just a couple of final

5    housekeeping items.  I have marked one copy of my chart as

6    Court Exhibit 1, and it will be docketed.

7            Second, let me remind you what I mentioned yesterday.

8    At all times, you must be on this floor, one lawyer from each

9    side can respond to any notes, questions the jury has.  Don't

10   need more than one.  Mr. Bodner, you are welcome to stay or not

11   as you please.  We always need at least that one lawyer until

12   the jury ends for the day or whatever.  If we go into tomorrow,

13   I'll tell the jury the lawyers will be excused from 1:00 to

14   2:00 for lunch, so they shouldn't send out any notes during

15   that period.

16           Anything else that we need to talk about today?

17           I have a feeling some of you may need a little sleep,

18   but stick around, at least one lawyer from each side, and we'll

19   see you today or tomorrow.

20           As soon as my courtroom deputy returns from the jury

21   room, please hand her the exhibits and the index and she'll

22   take them right into the jury room.

23           (Continued on next page)

24

25

Mcf2Pla6

1                    (In open court; jury not present)

2              THE COURT:  We have several notes.  The first note,

3    which we have marked as jury note 1, says, "What is the

4    definition of significant control?"  And this is obviously a

5    reference to instruction 10.  And the second paragraph, this is

6    the instruction now, "Although Mr. Bodner was not an officer of

7    PPVA, plaintiffs argue that through Platinum Management and

8    otherwise Mr. Bodner exercised significant control over PPVA's

9    management of its investment."

10             So let me hear from first plaintiffs' counsel and then

11   from defense counsel as to what you think we should say in

12   response to that first note.

13             MR. MAGRUDER:  Thank you, your Honor.  I just want to

14   note before I start, and I'm happy to speak to the note of the

15   jury.  I already spoke with your clerk.  The lead counsel for

16   plaintiffs, Mr. Gluck, was having a little bit of a health

17   issue and needed to go eat.  He intended to come back all

18   along, and he is in a cab right now.

19             THE COURT:  He didn't advise me in advance that he was

20   leaving and he knew that I had stated, not once, but twice,

21   that there had to be attorneys who could respond to notes.  So

22   is your question whether I should hold him in contempt?

23             MR. MAGRUDER:  That's not my question, your Honor.  It

24   is just to -- if it's at all possible.  Of course I am happy to

25   answer, and I can answer if ordered right now.

Mcf2Pla6

1          THE COURT:  I'm sorry he is not feeling well, but

2     throughout this trial you were here and in fact there was an

3     endless cast of lawyers at your table as well as your

4     adversary's table, so that request is denied.

5          MR. MAGRUDER:  Thank you.  Understood.

6          So, your Honor, in response to the question what is

7     the definition of "significant control," plaintiffs submit that

8     significant control in this context would be a nonpassive role

9     within the investment manager as exemplified by involvement in

10    investor relation, involvement in personnel and employment

11    decisions, involvement in transactions, bringing in deals, kind

12    of -- that's kind of what I can say for now.

13         THE COURT:  Okay.  Thank you very much.  Let me hear

14    from defense counsel.

15         MR. LAUER:  The Second Circuit uses the description

16    "idea facto control" and "dominance" but that is not -- I doubt

17    that is in the context that was clear here that we weren't

18    saying he had the final say.  No one -- I think the -- it is --

19    and this is not the wording, but just the idea we can talk

20    about the wording, I think what the Court and, frankly, what I

21    think the parties intended to convey by that language, which

22    they approved, was that he had the ability to exercise

23    meaningful determination over investments.  It would not be

24    enough that he just expressed his views on investments.  That

25    wouldn't be control.  But it wasn't as much as he had the final

Mcf2Pla6

say.  We wouldn't have used the word "significant" if we wanted

to convey "final say," we would have said "final say."  So it

is something in between, and the question is finding the right

language to express it.

        If I remember Mr. Gluck in his closing argument talked

about practical control or words to that effect, and I think

maybe the answer is something along the lines of as a practical

matter he could either veto or require certain investments,

something like that.  But it is more than just having a say,

that is clear.

        Your Honor, would your Honor consider "singularly have

the ability"?  I think the issue -- the issue in the case, it

is a little murky, right, and I think the way this case was

tried from the beginning to the end is that Bodner has real

authority on his own --

        THE COURT:  I think the analogy that was being used by

plaintiffs' counsel, and I think it is a reasonable analogy, is

in plaintiffs' view, obviously contested by the defense, there

were really three people who were still in meaningful control.

If we analogize to partnership law, for example, each member of

the partnership would have meaningful control over how a

partnership invested its monies even though, if it was a true

partnership, two might be able to outvote the third.

        So but I think it has to be something along the lines

that he had the ability, because I don't want to hang them up

Mcf2Pla6

1    with questions of legal power.  He had the practical act to

2    determine that a particular investment could be vetoed or that

3    a particular investment would be made, something along those

4    lines.  Let me just right that down.  Hold on.

5              MR. LAUER:  Thank you, your Honor.

6              THE COURT:  We will hold on that for a minute.  Let's

7    take a look at the next.  We just got a fourth note from the

8    jury.  We have a third one, as well.  You have only received

9    copies so far of the first two.  I will get you copies of the

10   third and fourth in a minute.

11             The fourth one is jury would like to stay until 5 p.m.

12   today.  Any objection for that?

13             MR. MAGRUDER:  No objection, your Honor.

14             MR. LAUER:  None.

15             THE COURT:  Okay.  So I will have my courtroom deputy

16   just go in now and tell them that they can stay until 5:00 and

17   that we are working on a response to their other three notes.

18             The second note, which we marked as jury note 2, is,

19   "What is the definition of specific role or duty?"  This is in

20   the first paragraph of instruction 10, "What is a fiduciary

21   duty?  It is a special duty of care that is created when one

22   party, with the other party's knowledge and consent, reasonably

23   puts its trust and confidence in the other party to carry out a

24   particular role or undertake a particular duty on behalf of the

25   first party."

Mcf2Pla6

1          But then I add in my instruction "in particular those

2     who manage the investments of an investment fund owe a

3     fiduciary duty to the fund and its investors."

4          So I am inclined to answer the second note by saying

5     as relevant in this case we are talking with the -- we are

6     talking about whether he had meaningful control over the

7     investments.  I really think it dovetails with the other.

8          Any response from plaintiffs' counsel?

9          MR. MAGRUDER:  Your Honor, just briefly.  We would

10    just.

11         THE COURT:  You can be seated, but just speak into the

12    microphone.

13         MR. MAGRUDER:  Oh.  We would just submit that the

14    specific role or duty does not require -- did not require

15    Mr. Bodner to have any sort of formal title.

16         THE COURT:  Yes.  I think I said that.

17         MR. MAGRUDER:  Just wanted to reiterate that.

18         THE COURT:  But I think you are right, we should put

19    in something along those lines to make clear.

20         MR. MAGRUDER:  Thank you, your Honor.

21         THE COURT:  All right.

22         The third note is a request for testimony and that

23    reads, this is jury note 3, "Can we get testimony from

24    Mr. Bodner?  Specifically last five minutes of the

25    cross-examination before recross?"  I don't know quite how we

1  are going to figure out five minutes, but I think we can make a

2  good try.  And the note continues, "And also when he testified

3  about coming back and forth to the city."

4        So here is what I suggest we do.  I will get you a

5  copy of that note as well as note 4 in the next couple of

6  minutes.  You should work together to prepare the transcript to

7  go in with a response to note 3.  If you have disagreements, I

8  will come up and resolve them.  If you don't have

9  disagreements, you can just let my courtroom deputy know and we

10 will take it in.  We will let them know that -- we will give

11 them one copy initially and then if they want multiple copies

12 we will tell them that we can make nine copies for them.

13       In preparing the transcript, as I know you have daily

14 copy, but you can also work with our court reporter to get a

15 fresh copy if necessary.  You do not have to eliminate stuff

16 that is objected to even if the objection was sustained.  They

17 have been told to disregard it.  That's good enough.  But you

18 do have to redact any side bar.

19       So why don't you work on that.  I will work on putting

20 a note together responsive to number one and two, I will come

21 back and give you that proposal, and then we can proceed from

22 there.

23       (Recess pending verdict)

24       THE COURT:  I see you can back, Mr. Gluck.  I hope you

25 are feeling better.

Mcf2Pla6

1              MR. GLUCK:  Thank you.

2              THE COURT:  So here is my proposed response to the

3    notes so far received.  After I read it, I will ask for any

4    comments, objection, changes, or additions from each side:

5              To the jury:

6              Thank you for your four notes.

7              In your first note, you ask "what is the definition of

8    significant control?"──a reference to the term used in the

9    second paragraph of instruction 10.  In the context of this

10   case, "significant control" means the power to determine that a

11   particular investment should be made or that a particular

12   investment should not be made, or how a particular investment

13   that has been made should be reported to investors.  It does

14   not mean exclusive control over investment and/or reporting

15   decisions, which may be shared with or delegated to others, but

16   it means more than just commenting on an investment decision or

17   on its reporting.  In other words, it means practical power

18   over investment decisions and reporting, but not exclusive

19   power.

20             In your second note, you ask, "What is the definition

21   of specific role or duty?"──again, a reference to terms used in

22   the second paragraph of instruction 10.  In this case, the

23   relevant role and duty is the practical power over Platinum

24   investments or reporting of those investments, as described

25   above.  Again, however, it need not be exclusive power and the

Mcf2Pla6

1    defendant need not be an officer or director of Platinum if he

2    can exercise such power as a practical matter.

3           With respect to your third note asking for certain

4    testimony, counsel and I are working on it and will get it to

5    you shortly.  And we are delighted that you will be staying

6    until 5 p.m. today, as requested in your fourth note.

7           Please let us know if we can be of help in any other

8    way.

9           Judge Rakoff.

10          Any objections, additions, comments, or whatever from

11   plaintiffs' counsel?

12          MR. GLUCK:  Yes.  As to both notes what, appears to be

13   missing, and I'm not sure if it was intentional, is the

14   practical power of soliciting the investors.  So there is two

15   issues.  There is what investments and then it is solicit

16   investors.

17          THE COURT:  Well, that was not intentional, but --

18          MR. LAUER:  Your Honor --

19          THE COURT:  I'm sorry.  I will hear from you.

20          MR. LAUER:  Soliciting investors, an 18-year-old could

21   solicit investors.

22          THE COURT:  The --

23          MR. LAUER:  That has nothing --

24          THE COURT:  I agree with that.  That's why I am

25   thinking about wording.  I think the point that's being

Mcf2Pla6

1    suggested is the power to control what investors should or

2    should not be solicited.  That would be a power to control.

3         MR. LAUER:  I really don't think that's how that case

4    is tried and --

5         THE COURT:  You are saying there is no evidence on

6    that issue.

7         So let me go back to plaintiffs' counsel what evidence

8    is there—direct or circumstantial—that Mr. Bodner had the

9    nonexclusive but practical power to determine which investor

10   should be solicited and which should not?

11        MR. GLUCK:  I said investors.  I didn't just mean

12   which, I meant how.  And the evidence at trial, the testimony

13   of Bernie Fuchs was that he was directed and authorized by

14   Mr. Bodner to solicit investors for the BEOF, for example.  And

15   also the Seth Gerszberg presentation where he was urged that

16   they take their 20 million in investors as well as the

17   admission by Bodner at trial that he did initially solicit

18   investors, and that's one of the reasons --

19        THE COURT:  I agree with you that how investors should

20   be approached is closer to what the evidence was in this case,

21   but what is the evidence that he had control of it?

22        MR. GLUCK:  The evidence that he had control over it

23   is that Mr. Fuchs testified, when I asked Mr. Fuchs who

24   authorized you to solicit the investors, answer was Mr. Bodner

25   and Mr. Huberfeld.  When I asked him the manner in which the

Mcf2Pla6

1    investors were solicited, how was that done, that was approved

2    by Mr. Bodner and Mr. Huberfeld.

3            THE COURT:  All right.

4            MR. GLUCK:  When Mr. Fuchs was writing an e-mail, he

5    sent it to Mr. Bodner for approval and he said he would think

6    about it and come back to him.

7            Another example would be Mr. Landesman stating in an

8    e-mail which was put into evidence that he would wouldn't

9    contact for investors further unless Bodner directed him to.

10           So it's about the direction.  It's not -- I agree it's

11   not being an agent, but it's about directing how investors

12   would be brought to the fund, managing investments bringing

13   investors in.

14           MR. LAUER:  Your Honor, we went to the jury, our

15   summation, using this instruction where instruction 10 focused

16   on what this case is about, the investment, the valuation of

17   the investment, and the instruction was, "In particular, those

18   who manage the investment of an investment fund."  Talking --

19   these one or two isolated statements which are completely

20   ambiguous and was never a need to focus on, Bernie Fuchs

21   saying, oh, David Bodner said I could solicit an investor,

22   there was no focus in this trial on that.  And the idea that

23   you can take a comment that I think it's a good idea, a good

24   idea, if you will, to solicit someone that now David Bodner is

25   a fiduciary and liable for a $40 million valuation --

Mcf2Pla6

1          THE COURT:  I don't think it is necessarily a side

2     comment, but I think the test of that, in part at least, is

3     what did, which I don't remember offhand, but I'm sure

4     Mr. Gluck will, what did you say about this, Mr. Gluck, in your

5     summation?

6          MR. GLUCK:  In my opening and my summation I said

7     precisely the same words, that the question of whether

8     Mr. Bodner is a fiduciary turns on whether he performed the

9     active functions of a hedge fund manager.  There are three

10    active functions——the bringing in of investors in soliciting

11    investments; the direction of how that money is then directed

12    into investments and assets; and I also mentioned the

13    logistical aspects, employee, running the fund, the operational

14    things.  I said that in the opening and the closing and

15    throughout the case.  In fact, the testimony of Mr. Post for

16    nearly a day and --

17         THE COURT:  Okay.  Hold on.  Let me just work on my

18    wording for just a minute.

19         MR. GLUCK:  Same comment.  PX 479 is both in my

20    closing -- I spent quite a bit of time on it.  Landesman

21    checking with Bodner before updating Fuchs right after the

22    Black Elk.  This is one the biggest investors in the fund.

23    Landesman had to check with Bodner first.  Now Mr. Lauer

24    commented in his closing on this e-mail, too.  So this was

25    directly at issue and we have different takes on it.

Mcf2Pla6

1            MR. LAUER:  I am going to say, your Honor --

2            THE COURT:  You know, about three seconds ago I said

3    hold on, I want to work on my wording, and that just led both

4    plaintiffs' counsel and defense counsel to continue talking.

5    Now if you want to continue that, I will just bring in the jury

6    and have them hear you bickering and then I will give them my

7    instructions of law.  But if you prefer otherwise, just please

8    shut up for a minute.

9            (Pause)

10           THE COURT:  All right, so I have reworded it to -- I

11   will read the whole thing again.

12           To the jury:

13           Thank you for your four notes.

14           In your first note, you ask, "What is the definition

15   of significant control?"——a reference to the term used in the

16   second paragraph of instruction 10.  In the context of this

17   case, "significant control" means the power to determine

18   whether a particular investment by Platinum should or should

19   not be made, or the power to determine what potential investors

20   in Platinum should or should not be told, or how a particular

21   Platinum investment that has been made should be reported to

22   investors.  It does not mean exclusive control over investment,

23   solicitation, and/or reporting decisions, which may be shared

24   with or delegated to others, but it means more than just

25   commenting on an investment decision or on its reporting or on

Mcf2Pla6

what potential investors should or should not be told.  In
other words, it means practical power over investment
decisions, solicitation, and/or reporting, but not exclusive
power.

In your second note, you ask, "What is the definition
of specific role or duty?"—again a reference to terms used in
the second paragraph of instruction 10.  In this case, the
relevant role and duty is the practical power over Platinum
investments, solicitation of investors, and/or reporting of
those investments, as described above.  Again, however, it need
not be exclusive power and the defendant need not be an officer
or director of Platinum if he can exercise such power as a
practical matter.

With respect to your third note asking for certain
testimony, counsel and I are working on it and will provide it
to you at 9:30 a.m. tomorrow.  And we are delighted that you
will be staying until 5 p.m. today, as requested in your fourth
note.

Please let us know if we can be of help in any other
way.

All right.  Any objections?  I'm going to get to
defense counsel.

Any other objections from plaintiffs' counsel?  From
plaintiffs' counsel.

MR. GLUCK:  I sense that they are asking about

Mcf2Pla6

1    specific, so I think in the context that led up to the jury

2    instruction that they referenced and that this Court has

3    referenced --

4              THE COURT:  I'm really not hearing you.

5              MR. GLUCK:  I'm sorry, and I didn't hear the Court

6    when it said -- give me a minute.

7              I think they are asking about "reasonably puts its

8    trust and confidence in the other parties carried out a

9    particular role or undertake a particular duty."  In this case

10   that is the operation of a hedge fund.

11             THE COURT:  I think what I have just said is more than

12   enough to respond to your earlier objection and I don't think

13   we need to add anything more.

14             Any objections from defense counsel?

15             MR. LAUER:  Your Honor, I want to make a distinction.

16   You added two things as it relates to investors.  The first one

17   which dealt with reporting I can accept because the instruction

18   to the jury that we used for summation dealt with managing

19   investments, and therefore what's reported to investors is

20   connected to managing investors.

21             THE COURT:  And also failing to object to payment of

22   incentive fees and so forth.

23             MR. LAUER:  The other -- on the second addition seems

24   close to similar, but it's fundamentally different, and that is

25   deciding whom can be solicited.  And the reason for that is

Mcf2Pla6

1    that could just as well be a human resources person who --

2              THE COURT:  Whoa, whoa.  I changed the wording after

3    you raised that, so it doesn't say to whom the solicitations.

4    It is what they will be told.

5              MR. LAUER:  That's fine.  I may have missed what they

6    would be told.

7              THE COURT:  I accepted that distinction and changed

8    it.

9              MR. HERTZBERG:  Your Honor, I just wanted to note that

10   we were able to pull the pages and so we can provide it to the

11   jury now and get rid of the third part.

12             THE COURT:  Okay.  So why don't you provide -- I take

13   it there is no disagreement on those pages?

14             MR. HERTZBERG:  Well, we are on the same page and we

15   are not entirely sure what pages they are looking for what we

16   think we know.

17             THE COURT:  Okay.  But you are in agreement as to what

18   should go in there.

19             MR. HERTZBERG:  Exactly.

20             THE COURT:  Okay.  So if there is something more, we

21   can worry about that tomorrow, but so why don't you give that

22   to my courtroom deputy, who will take it in, tell them that if

23   they need multiple copies let us know, and we will give them

24   that tomorrow morning because it is already 4:50.

25             Let me go downstairs.  I'm not going to take any

Mcf2Pla6

1   further argument on this note.  It's the language I just gave,

2   but I will give it to the my courtroom deputy who can give it

3   to the jury.

4            (Pages 1380-1381 and 1803-1806 provided to jury)

5            (Recess pending verdict)

6            THE COURT:  So here is the note we are going to send

7   to the jury and --

8            THE LAW CLERK:  They headed out for the night.

9            THE COURT:  I will reword the wording very slightly to

10   reflect that it's going to go to them first thing in the

11   morning, and then I will ask my courtroom deputy to prepare.

12            THE DEPUTY CLERK:  I didn't see you sneak past me.  We

13   have another note.  They say the testimony they were asking

14   for, they understand they can't get it until tomorrow because

15   they are gone.

16            THE COURT:  So the jury has left for the day.  It's a

17   few minutes after 5:00.  So I had just finished putting the

18   changes into the jury note.  I will reword it just so it now

19   makes clear that they are getting it tomorrow morning.

20            I will ask my courtroom deputy to go into the jury

21   room now and retrieve the testimony and make eight more copies,

22   and also I will give her in the next five minutes the response

23   to the jury's other notes and she can make nine total copies of

24   that, and we will then leave on the seats of the jurors in the

25   jury room, each of those two items so that when they first come

Mcf2Pla6

1    in they will have it right then and there.

2            All right.  So -- you said there was a fifth note?

3            THE DEPUTY CLERK:  Yes.

4            THE COURT:  The fifth note says, "Can we get

5    Mr. Bodner's testimony where Plaintiff Exhibit 1226 and

6    Plaintiff Exhibit 433 was introduced right before John Czapla's

7    testimony?  Since we're breaking soon, understand this won't be

8    available till tomorrow."

9            So while I am working on the final touches of the note

10   so it will read that they are getting it tomorrow morning, why

11   doesn't counsel work on that when pages are responsive and we

12   will try to get that on each juror's chair tonight before we

13   leave.  And I am also going to mark the note or have my

14   courtroom deputy mark the note after I revise it, my response

15   to the notes as Court Exhibit 2.  We have marked the charge as

16   Court Exhibit 3.

17           THE DEPUTY CLERK:  You want me to get the pages of the

18   transcript that are in there now and just make eight copies?

19           THE COURT:  Yes.

20           (Recess)

21           THE COURT:  So I will hand to my courtroom deputy the

22   responsive note.  She should make a total of nine copies and

23   should leave on the chairs of each of the jurors on top the

24   note, then the transcripts responsive to the earlier transcript

25   note, and finally the transcript that we will talk about in a

Mcf2Pla6

1    minute responsive to the final note.

2              I will have my law clerk give each counsel a copy of

3    the note and also give him a copy which we are marking as Court

4    Exhibit 2 to be docketed.

5              Where do we stand on the final request?

6              MR. GLUCK:  I believe we have agreement on what they

7    asked for.

8              THE COURT:  Agreement on?

9              MR. GLUCK:  And printed.  We have agreement on what

10   they asked for and it's printed.

11             THE COURT:  Okay.  So hand it to my law clerk and I

12   will read off the pages to save a little time.  The court

13   reporter already has the pages for the pages responsive to the

14   first note, the first note that asks for testimony.

15             Now in response to what is actually the second note

16   asking for testimony, though it's actually the fifth note of

17   this note-happy jury, it is pages 1821, 1822, and 1823.  So

18   that will be delivered to -- will be part of the package left

19   on the jurors' seats so when they come in the morning they will

20   have everything.

21             So if I were you guys, I'd want to go home.  Now, it's

22   a public court.  If you want to stick around of course that's

23   your prerogative.

24             But so we will resume at 9:30 tomorrow, and again I

25   always need at least one counsel for each side.  All right.

Mcf2Pla6

1    Very good.  Thanks a lot.

2              COUNSEL:  Good night, your Honor.

3              (Adjourned to Friday, December 16, 2022, 9:30 a.m.)