```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| In re PLATINUM BEECHWOOD LITIGATION.<br><br>MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), and PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation),<br><br>　　　　Plaintiffs,<br><br>　　-v-<br><br>PLATINUM MANAGEMENT (NY) LLC, et al.,<br><br>　　　　Defendants. | 18-cv-06658 (JSR)<br><br>18-cv-10936 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

　　Familiarity with the facts of this case is here assumed.[1] After more than two weeks of trial and jury deliberations, a jury found defendant David Bodner liable for breaching his fiduciary

---

[1] These facts are described in detail in several of the Court's orders, including its Opinion and Order on the parties' summary judgment motions, ECF No. 624, and its ruling on the Daubert motions, ECF No. 646. All capitalized terms herein refer to the definitions set forth in those orders, unless otherwise specified. All internal quotation marks, alterations, emphases, and citations have been omitted from all cited sources. Unless otherwise indicated, this opinion cites docket entries from No. 18-cv-10936.

1

duty to the investment fund he co-founded, the Platinum Partners Value Arbitrage Fund ("PPVA").[2] More specifically, the jury concluded that Bodner had breached his duty to PPVA and its investors and directed Bodner to pay PPVA, through its court-appointed liquidators, $8,150,601.80 in damages. See ECF No. 789 ("Jury Verdict"). The Court must now decide whether, and by how much, this amount is to be offset, or reduced, under New York General Obligations Law Section 15-108. In addition, this opinion reconfirms and explains a ruling the Court made at trial -- that a purported liability waiver negotiated between co-tortfeasors for their joint misconduct is invalid as a matter of New York law. In addressing these issues, this opinion puts an end to a sprawling litigation that involved dozens of defendants, tens of millions of dollars in alleged damages, and the courts of two sovereigns.

I. Discussion

A. Offset of Damages

Under New York General Obligations Law Section 15-108,[3] a jury award rendered against a defendant must be adjusted where a

---

[2] PPVA is represented in this case by two joint liquidators, Martin Trott and Christopher Smith, who were appointed by a court overseeing the fund's liquidation in the Cayman Islands. See ECF No. 285, ¶ 2.

[3] The statute provides, in relevant part: "When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, . . . it reduces the claim of the releasor against the other tortfeasors to the extent of any amount

2

"release or a covenant not to sue . . . is given to" another person or entity who is "liable or claimed to be liable in tort for the same injury."[4] In other words, where one or more defendants are alleged to have caused the same injury, a court must reduce the damages award against the non-settling defendant by the amounts the plaintiff already obtained from other defendants through settlement.[5] Requiring such an offset serves two, related purposes:

---

stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages . . . , whichever is the greatest." N.Y. Gen. Oblig. Law § 15-108(a).

[4] Bodner has not waived his right to reduce his liability according to his share of responsibility. Though Bodner did not furnish particularized evidence to support his proposed calculation of the equitable share of damages, he did provide some evidence of his fault relative to that of the earlier settling defendants. Cf. Hamilton v. Garlock, Inc., 96 F. Supp. 2d 352, 356-57 (S.D.N.Y. 2000). That is enough to defeat waiver. Indeed, there is no requirement that a defendant reduce an inherently subjective concept like "fault" or "responsibility" to an empirically particularized calculation. Of course, this does not mean that the Court agrees with Bodner's relative fault calculation. But because the Court finds that Bodner's liability would be reduced by a greater amount if it were offset by the cash consideration that the earlier settling defendants agreed to pay to release their claims, the Court has no need to determine how "responsible" for the injury Bodner was relative to his co-defendants.

[5] More specifically, the statute dictates that, in these circumstances, an award must be reduced by the greater of two figures: either (1) the cash payments that the earlier settling defendants agreed to make as consideration for being absolved of any legal liability for the alleged tort; or (2) the cash equivalent of the earlier settling defendants' share of responsibility for the alleged tort. See Gruber v. Gilbertson, -- F. Supp. 3d --, --, 2022 WL 17828609, at *5 (S.D.N.Y. Dec. 21, 2022). The Court determines that the first category -- the sum of

first, to prevent a plaintiff from recovering twice for the same injury and, second, to "protect non-settling defendants" by ensuring that a defendant who chooses not to settle but is nevertheless found liable "pay[s] only [that defendant's] commensurate share of the damages." Gruber v. Gilbertson, -- F. Supp. 3d --, --, 2022 WL 17828609, at *4 (S.D.N.Y. Dec. 21, 2022). Because such an offset is an affirmative defense under New York law, the non-settling defendant bears the burden to prove that that defendant is entitled to it and, if so, to show how much of that defendant's liability should be reduced. See Schipani v. McLeod, 541 F.3d 158, 162-65 (2d Cir. 2008).

Here, Bodner was the only defendant who did not settle with the court-appointed liquidators. Indeed, before the trial, the plaintiffs released from legal liability no fewer than ten co-defendants in return for approximately $40 million. Because, Bodner asserts, the plaintiffs "claimed" those co-defendants "to be liable" for at least one of the same "injur[ies]," his own liability should be reduced, he argues, from $8.15 million to $0 under Section 15-108. In response, plaintiffs argue that the other defendants settled to avoid liability for "other injuries that resulted from various other schemes and transactions connected to the Platinum fraud." ECF No. 826 ("Opp."), at 2 (emphasis added).

---

cash payments made by earlier settling defendants -- is the greater amount.

In other words, plaintiffs assert that the jury found Bodner, by virtue of his particular position and authority at PPVA, liable for a "unique injury" caused by him and by none of the earlier settling defendants. If true, Section 15-108, which attaches only where co-defendants are accused of causing the same injury, would not apply.

The Court must thus define the precise injury that the jury found Bodner to have caused. After the Court instructed the jurors on the elements of liability for breach of fiduciary duty, the jury unanimously concluded that Bodner did, indeed, breach his duty to PPVA and its investors. Under those instructions, the jury must have found that Bodner did so "by failing to disclose to [them] his . . . knowledge that PPVA's assets were overvalued and/or by failing to object to the payment by PPVA of incentive and management fees to which he knew he and other persons or entities were not entitled." ECF No. 787 ("Jury Instructions"), at 13-15.

The fact that Bodner harmed investors by "wield[ing]" his particular capacities and knowledge as a co-founder of PPVA does not automatically mean -- as plaintiffs argue -- that he inflicted a "unique" injury on investors. Opp. at 18. Nor is it necessarily relevant that he and the earlier settling defendants "had different positions of authority in the Platinum/Beechwood structure." Id. at 21. Indeed, a rule that credits a non-settling defendant only

where the settling defendants possessed identical means to inflict the same injury -- in other words, a rule that carries plaintiffs' argument to its logical conclusion -- would present considerable difficulties.

To begin with, accepting plaintiffs' view would require the Court to read words into the statute that are not there. So long as the co-defendants are "claimed to be liable in tort for the same injury," Section 15-108 prevents a plaintiff's double recovery for that injury. Whether the co-defendants used the same or different means to inflict that injury makes no difference, as far as the statute is concerned. See Roma v. Buffalo Gen. Hosp., 481 N.Y.S.2d 811, 813 (3d Dep't 1984) ("Nothing in section 15-108 of the General Obligations Law requires that the two defendants be liable upon the same theory. All that is required is that they be subject to liability for damages for the same injury.").

If courts required defendants seeking an offset to show that they caused harm through the same mechanism as another defendant, that would allow plaintiffs to recover twice for an alleged harm that was jointly caused by different means. Not only would this be unfair, but, because the prospect of double recovery would encourage rational plaintiffs to litigate their claims, it would serve as a disincentive to settlements -- the exact opposite of what the state legislature intended. See Matter of N.Y.C. Asbestos Litig. (Brooklyn Naval Shipyard Cases), 624 N.E.2d 979, 984 (N.Y.

1993) (describing "the general purpose of General Obligations law § 15-108(a) of encouraging settlements").

Furthermore, plaintiffs' reading presents the possibility that non-settling defendants "might be forced to pay plaintiffs for losses equally or more attributable to other defendants' actions." Gruber, 2022 WL 17828609, at *9. That would mean the New York legislature's efforts to protect non-settling defendants' contribution rights would instead diminish those rights. When a democratically elected legislature speaks in clear and unequivocal text, the Court must dutifully carry out the legislature's directive, whatever its views on the merits of the motivating policies. Here, Section 15-108's wording admits of no ambiguity: the focus of the Court's inquiry must be on the harm, and not on the means by which the defendants inflicted such harm.

Bearing in mind the specific harm that the jury found Bodner to have caused, the failure to disclose the overvaluation of PPVA's assets and/or the improper collection of management fees, the Court's task becomes simple. To the extent plaintiffs alleged that the earlier settling defendants were liable either for failing to disclose their knowledge that PPVA's assets were overvalued and/or for not objecting to the payment of inflated management fees, Bodner must receive credit for the amounts that those defendants paid to be released from alleged liability on those claims. After carefully considering, in the context of the entire record, each

of the settlement agreements that plaintiffs entered with the earlier settling defendants, the Court determines that Bodner's liability must be offset by the contributions of the following settling defendants: BDO LLP; CohnReznick LLP; Blank Rome LLP; Baker Botts LLP; Murray Huberfeld; Bernard Fuchs; the estate of Uri Landesman; Daniel Saks; and Mark Feuer, Scott Taylor, and Dhruv Narain (the "Beechwood Defendants").

It is immaterial that those settling defendants were also alleged to be liable for separate schemes in which Bodner played no part. Plaintiffs argue otherwise, contending that Bodner did not commit the same "injury" as his co-defendants because "the scope of injuries alleged and damages sought" against the settling defendants were "substantially greater as compared to Bodner." Opp. at 21. Thus, their argument runs, the agreements struck by PPVA and Bodner's co-defendants were intended to settle "significantly larger . . . claims" and Bodner's $8.15 million liability represents a different claim, separate and apart from those earlier resolved. Opp. at 4.

Plaintiffs' position finds scant support in the statutory text. Section 15-108 applies wherever "a release . . . is given to one of two or more persons liable or claimed to be liable in tort for the same injury." N.Y. Gen. Oblig. Law § 15-108(a). And when it does attach, the Court must "reduce[] the claim of the [plaintiffs] against the other tortfeasors" -- in this case, Bodner

8

-- "to the extent of any amount stipulated by the release or the covenant." Id. Bodner's liability, in other words, must be reduced by a settling defendant's agreed payment so long as the settling defendant was "claimed to be liable" for the same injuries as Bodner. Id. Whether the defendant was also "claimed to be liable" for another injury is irrelevant.

That makes good sense. If a particular settling defendant was alleged to have committed the same injury as Bodner as well as some separate harms, it defies logic to assume that his cash contribution went exclusively toward resolving the separate harms, and that he was released from liability on the injuries he jointly caused with Bodner by the plaintiffs' good graces. Put another way, it is fair to assume that that at least some of that co-defendant's payment was intended to settle potential liability for the overvaluation scheme for which Bodner was also deemed liable.

Such a circumstance does mean, however, that -- for much of the cash consideration paid by the above-listed co-defendants -- a "dollar-for-dollar" offset is not appropriate. Koch v. Greenberg, 14 F. Supp. 3d 247, 272 n.15 (S.D.N.Y. 2014). Put another way, "[i]t does not automatically follow . . . that a 100-percent reduction" of each co-defendant's "settlement amount is required by § 15-108." Id. at 271. Rather, where claims do not completely overlap, the Court must "make an independent determination of what the proper apportionment of settlement

9

proceeds should be, based on the monetary value of each cause of action." Andrulonis v. United States, 924 F.2d 1210, 1226 (2d Cir. 1991), vacated on other grounds sub nom. N.Y. State Dep't of Health v. Andrulonis, 502 U.S. 801 (1991).

Admittedly, Section 15-108 is somewhat ambiguous on this point. It requires that a court "reduce[] the claim of" a non-settling defendant "to the extent of any amount stipulated by the release" if the settling defendant is alleged to be liable for the same injury. N.Y. Gen. Oblig. Law § 15-108 (emphasis added). On its face, the statute appears not to distinguish between defendants whose liability only partially overlaps from those who are claimed to have caused the exact same injuries. If this reading were correct, however, a non-settling defendant's liability must -- without exception -- be reduced by the entirety of an earlier settling defendant's cash consideration wherever the two defendants shared only one (even minor) allegation against them in common. Far from inducing settlements, which is generally accepted as one of the statute's chief aims, this reading would make settlement financially impractical for plaintiffs in the vast majority of civil cases involving multiple defendants. See Matter of N.Y.C. Asbestos Litig., 624 N.E.2d at 984 ("[T]he general purpose of General Obligations Law § 15-108(a) [is] encouraging settlements and assuring that a nonsettling defendant does not pay more than its equitable share.").

Because this Court cannot "interpret . . . statutes to negate their own stated purposes," it rejects this view of the statute. N.Y. State Dep't of Soc. Servs. v. Dublino, 413 U.S. 405, 420 (1973). Instead, the statute mandates only that the Court reduce Bodner's liability by the amount that his co-defendants paid to settle claims brought against Bodner and the earlier settling defendants in common -- that is, for breach of fiduciary duty in relation to the overvaluation scheme.

The Court must thus determine how much to adjust Bodner's amount of liability, determined by the jury to be $8,150,601.80. Jury Verdict. To do so, the Court must articulate a formula that captures the "amount of consideration" specified in the release for each of the co-defendants for "the same injury" as the claim that went to trial. Koch, 14 F. Supp. 3d at 271-72 & n.15.

Of course, no equation can, in every case, supply a perfectly accurate estimate of the figure contemplated by the statute. But the Court finds that the following equation yields the best possible measure of this "amount." Id. First, the Court will take the damages exposure that Bodner faced at trial (and that each of his co-defendants would have faced had they gone to trial on the same breach of fiduciary duty claim) -- $50.2 million -- as a percentage of the total damages sought by the plaintiffs against each of the co-defendants. This figure represents the perceived value of the breach of fiduciary claim vis-à-vis the broader

11

universe of allegations brought against the settling co-defendants. Second, it will apply this percentage to the settlement amount paid by each of the co-defendants, adjusted to account for prejudgment interest on each payment. The resulting figure measures how much of the settling defendants' payments went toward resolving the breach of fiduciary duty claims. See Koch, 14 F. Supp. 3d at 272 (applying a similar proportional reduction of a co-defendant's settlement amount); Barkley v. United Homes, LLC, 848 F. Supp. 2d 248, 267 (E.D.N.Y. 2012) (same).

The $50.2 million in damages that the plaintiffs alleged Bodner to have caused represented 10.15% of Bodner and the settling defendants' total damages exposure of $494 million. The total amount "stipulated by the release[s]" of the settling defendants is $40,096,325.13.[6] In turn, 10.15% of that figure is $4,069,777.

Before subtracting the settlement amount from Bodner's liability, both the settlement amount and the jury's assessment of Bodner's liability must be adjusted for prejudgment interest. See Huang v. Sy, 878 N.Y.S.3d 398, 400 (2d Dep't 2009) (affirming an

---

[6] Plaintiffs dispute that total because the settlement amount for the Beechwood Defendants includes an assignment of a promissory note that plaintiffs contend is "valueless and uncollectable." Opp. at 15. But the text of Section 15-108 requires an offset of "any amount stipulated by the release." N.Y. Gen. Oblig. Law § 15-108(a). The statute contains no exception for settlement funds that have not been fully paid or secured, and plaintiffs have provided no authority for such an exception. The Court thus will not look beyond the terms of the settlement agreements in calculating the total settlement amount.

award of prejudgment interest under N.Y. C.P.L.R. 5001(a) for a breach of fiduciary duty claim); In re Joint E. Dist. & S. Dist. Asbestos Litig., 18 F.3d 126, 131-33 (2d Cir. 1994) (case cited by both plaintiffs and Bodner that applied prejudgment interest to settlement amounts and to non-settling defendant's liability amount in calculating offset under N.Y. Gen. Oblig. Law § 15-108). Adding prejudgment interest accruing until September 20, 2023, the settlement amounts that must be offset total $4,757,121.83.[7]

---

[7] Because each of the nine settling co-defendants entered their respective releases on different dates, the Court must separately calculate prejudgment interest for each of those individual settlement amounts (each multiplied by 10.15%, as calculated above, to reflect the portion of the settlement attributed to releasing claims for breach of fiduciary duty), before summing them. The statutory interest rate is 9% per annum. N.Y. C.P.L.R. 5001(a). That calculation is as follows:

BDO LLP (settlement on 10/31/22): ($2,350,000 x 10.15%) (9% per annum) (324 days) = $19,055.86
CohnReznick LLP (settlement on 10/22/20): ($8,500,000 x 10.15%) (9% per annum) (1063 days) = $226,135.05
Blank Rome LLP (settlement on 10/26/22): ($10,500,000 x 10.15%) (9% per annum) (329 days) = $86,457.14
Baker Botts LLP (settlement on 12/23/19): ($1,750,000 x 10.15%) (9% per annum) (1367 days) = $59,871.79
Murray Huberfeld (settlement on 4/29/22): ($10,000,000 x 10.15%) (9% per annum) (509 days) = $127,389.45
Bernard Fuchs (settlement on 11/16/22): ($2,000,000 x 10.15%) (9% per annum) (308 days) = $15,416.88
Estate of Uri Landesman (settlement on 2/6/20): ($337,500 x 10.15%) (9% per annum) (1322 days) = $11,166.60
Daniel Saks (settlement on 3/2/2020): ($199,000 x 10.15%) (9% per annum) (1297 days) = $6,459.65
Beechwood Defendants (settlement on 5/25/20): ($4,459,825.13 x 10.15%) (9% per annum) (1213 days) = $135,392.41

The above amounts sum to $687,344.83.

To calculate the amount of prejudgment interest that must be added to the jury's assessment of Bodner's liability, the Court must first determine the appropriate start date for the interest. "Where damages are incurred at various times after the cause of action accrues, [New York law] grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest." Conway v. Icahn & Co., Inc., 16 F.3d 504, 512 (2d Cir. 1994). Naturally, the parties differ in their proposals of such "a reasonable date." Id. Plaintiffs propose January 1, 2014, because "it would fall after an entire year of monthly . . . statements through 2013 that the [plaintiffs] alleged were misstated (and the jury did not dispute), and immediately prior to the payment of incentive fees to Bodner and other Platinum Management owners at the beginning of 2014." Opp. at 24-25. Although Bodner advances a date of October 15, 2014, he agrees that "the earliest payment of inflated fees . . . was plainly sometime between February 2013 (when the first management fees for calendar year 2013 were paid) and June 2016 (when the last management fees were allegedly paid)." ECF No. 832 ("Reply"), at 12. Given that plaintiffs' proposed date also falls within Bodner's timeline, the Court accepts plaintiffs' date of February 1, 2014 as "a reasonable date" on which prejudgment interest began to accrue. Conway, 16 F.3d at 512.

Adding prejudgment interest at the statutory rate of 9% per annum, from February 1, 2014 to September 20, 2023, to the jury's

determination of Bodner's liability produces a figure of $8,614,851.10. As the Court calculated above, Bodner's liability must be offset by $4,757,121.83. Subtracting that figure from $8,614,851.10 yields a result of $3,857,729.27. As a result -- after accounting for the statutory offset and prejudgment interest, both provided by New York law -- Bodner is liable to plaintiffs in the amount of $3,857,729.27.

### B. Invalidity of Bodner's Purported Liability Waiver

Crucial to Bodner's defense was his argument that he was released from any liability by a March 20, 2016 agreement (the "Release Agreement") that he and Murray Huberfeld, among others, entered into with Mark Nordlicht, who was acting on behalf of Platinum Management. Under the Release Agreement, Bodner and Huberfeld "gave up their economic rights in Platinum and provided Platinum entities with a general release from liability, in exchange for those Platinum entities, including PPVA, providing a similar unconditional general release of Bodner and Huberfeld." ECF No. 624, at 14; see ECF No. 585, Ex. 9.

At trial, however, after considering letter briefing and argument, the Court ruled that "when joint tortfeasors negotiate and enter into a release that purports to release them from claims related to the tort" that they jointly committed, "the release is invalid under New York law." ECF No. 802 ("Trial Transcript"), at 978. As a result, the Court instructed the jury as follows:

> If, but only if, you find that plaintiffs have proved the essential elements of their claim that Mr. Bodner breached a fiduciary duty to PPVA and its investors, you must then determine whether Mr. Bodner must still be found not-liable on that claim because he was released from liability by the Release Agreement dated March 20, 2016, which was signed by Mr. Bodner in his personal capacity and by Mr. Mark Nordlicht on behalf of Platinum Management.
>
> Specifically, the Release Agreement, if it is valid, absolves Mr. Bodner from any liability for plaintiffs' fiduciary breach claim. However, there is an important exception. If you find by a preponderance of the evidence that Mr. Nordlicht or Platinum Management also engaged in the same fiduciary breach that you have found Mr. Liable for, then the release is unenforceable as to that claim. This is because two persons or entities liable for the same misconduct cannot lawfully agree to release each other from liability for that misconduct.

Jury Instructions at 16. In addition to finding Bodner liable for breach of fiduciary duty, the jury made a specific finding that the Release Agreement does not bar liability. Jury Verdict, Question No. 2. Given the instructions, the jury must have found "by a preponderance of the evidence that Mr. Nordlicht or Platinum Management also engaged in the same fiduciary breach" as Bodner. Jury Instructions at 16.

A New York court has not directly laid out the rule that joint tortfeasors cannot release each other from liability for their joint tort to an entity to which the tortfeasors each owe a fiduciary duty. "To the extent that New York law is uncertain or ambiguous on [an] issue," the Court's "task is carefully to predict how [New York's] highest court . . . would resolve the uncertainty or ambiguity." <u>Lelchook v. Société Générale de Banque au Liban</u>

16

SAL, 67 F.4th 69, 76 (2d Cir. 2023). "In doing so," the Court assigns "fullest weight to the decisions of a state's highest court and proper regard to the decisions of a state's lower courts, and . . . also consider[s] the decisions of federal courts construing state law." Id.

The Court predicts that New York's highest court would approve of such a rule because it follows naturally from other well-established principles of New York law. At a bedrock level, "where a fiduciary relationship exists between parties to a contract, there must be clear proof of the integrity and fairness of a transaction between them, or any instrument thus obtained will be set aside or held as invalid, even in the face of a release of claims." Aviles v. S & P Global, Inc., 380 F. Supp. 3d 221, 301 (S.D.N.Y. 2019) (citing Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc., 385 N.E.2d 285 (1978)). That principle is not limited to "contract[s] between a fiduciary . . . and a beneficiary." Id. Indeed, "New York courts will sometimes set aside a third-party transaction executed by a fiduciary in breach of its obligations." Id. (citing cases).

On that basis, Judge Oetken has held that a settlement agreement's release of claims did not bar derivative claims against a third party "to the extent that the release arose from a fiduciary breach that the [third party] knowingly abetted." Id. at 302. Indeed, "considerations of equity militate against allowing

17

an unscrupulous fiduciary to double down on a breach by taking the additional step of validly insulating its third-party co-conspirator from any liability for the breach." Id. at 301-02. As Judge Oetken explained, the available authority gives no indication "that New York law permits such a gambit." Id. at 302.

The case against enforceability is even stronger here, where no third party is involved.[8] If "an unscrupulous fiduciary" may not "double down on a breach" by "insulating its third-party co-conspirator from any liability from the breach," id. 301-02, it follows with even greater force that co-tortfeasors may not insulate themselves from such liability. Indeed, the jury found by a preponderance of the evidence that the Release Agreement is a contract, between fiduciaries of an entity, that purports to relieve those fiduciaries of liability for torts they jointly committed against that very entity. See Jury Instructions at 16; Jury Verdict, Question No. 2. Such a release is inherently permeated by self-dealing because "the releasing party was . . .

---

[8] Plaintiffs also made unrelated arguments against the Release Agreement's enforceability, including that the agreement was not supported by proper consideration. While the Court need not reach those arguments, the Court notes that the agreement was supported by consideration because it included, among other things, mutual releases of claims by the Platinum funds and others, on the one hand, and by Bodner and Huberfeld, on the other.

controlled by the same set of individuals that were being released from liability." ECF No. 624, at 21 n.11.[9]

Bodner argues that the rule the Court has adopted "would represent a sea change in the law." ECF No. 781, at 4. His arguments -- and related hypotheticals -- are based on a mischaracterization that broadens the scope of the Court's holding. The Court's ruling applies only where a release negotiated and entered into by joint tortfeasors "bars any claim for the very tort that they sought to mutually release." Trial Transcript at 978-79. It has no bearing on separate claims released by an otherwise valid agreement.

Finally, the Court's ruling places no burden of proof on the defense. Rather, as the Court instructed the jury, plaintiffs bore the burden to prove "by a preponderance of the evidence that Mr. Nordlicht or Platinum Management also engaged in <u>the same fiduciary breach</u>" as Bodner. Jury Instructions at 16 (emphasis added).

## II. Conclusion

After accounting for the offset required under New York law, Bodner is liable to plaintiffs in the amount of $3,857,729.27. As the Court ruled at trial, the Release Agreement is not a defense to liability if the jury found -- as it did -- that the Release Agreement was entered into by co-tortfeasors purporting to release

---

[9] That fact distinguishes this case from <u>Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.</u>, 952 N.E.2d 995 (N.Y. 2011), which Bodner argues is the "leading New York case," ECF No. 781, at 3.

themselves from liability for their joint misconduct. The Clerk is respectfully directed to close the docket entry at 820 for No. 18-cv-10936 and the docket entry at 1075 for No. 18-cv-6658, and to enter final judgment in both cases in accordance with this Opinion and Order.

    SO ORDERED.

Dated:    New York, NY
           September 20, 2023        _____
                                                                JED S. RAKOFF, U.S.D.J.